# EXHIBIT 1

*G*

*WW* *George W. Woods, Jr. MD*

1-866-646-0509

E-mail:gwoods@georgewoodsmd.com

Oakland Seattle Atlanta San Antonio

October 5, 2009

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 701 McGill Park Avenue NE, Atlanta, Georgia, 30312; 1511 M Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

Sycamore Avenue # 258, Hercules, California, 94547; and 139 Harmon Drive, San Antonio, Texas, 78209.

## I.     Curriculum Vitae

I am a Fellow of the American Psychiatric Association, a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am

1

also a member of the American Association of Individuals with Intellectual and Developmental Disabilities (AAIID)

I am the current Secretary General of the International Academy of Law and Mental Health, based at the University of Montreal. I am also on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

I teach Clinical Aspects of Forensic Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry. I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento.

I was on the faculty of the University of Washington, Bothell campus, where I taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California, Medical Center.

I received by Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm.

The neuropsychiatric assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline. @ (American Neuropsychiatric Association (ANPA) Web Page)

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical

2

training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders, mental retardation, developmental disability, and dysmorphology (the study of structural abnormalities often related to developmental disorders).

The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and synergistic with both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status in undertaken. (ANPA web page)

The training encouraged by the American Neuropsychiatric Association is explicit:

Develop clinical expertise regarding the psychiatric care of persons with disorders of brain function to include diagnostic skills, neurologic and mental status examinations, cognitive testing, electrophysiological testing, neuroimaging, differential diagnosis, crisis intervention, application of time-limited psychotherapy, and referral for rehabilitative therapies.

Gain broad knowledge in the field of neuropsychiatry though extensive exposure to the core literature in neuropsychiatry, neuropsychology, and behavioral neurology. Neuroanatomy and neurochemistry of behavior should be emphasized.

Gain an advanced understanding of psychopharmacology, including neuropsychopharmacology, with special emphasis on anticonvulsants, psychostimulants, and the interactions of psychotropic medications with other medications on the central nervous system. (ANPA web Page)

My early medical training focused on primary care medicine as well as psychiatry. My internship at Alameda county Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, general surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital, in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

3

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United States Farmworkers. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had developmental disabilities, neurological impairments, and significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

The focus of my American Psychiatric Association/National Institute of Mental Health Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges. First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated.

Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly with mentally retarded clients in my clinical practice, as well as forensic populations. Both populations experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long term psychiatric facility, dedicated to treating severely ill patients, often with mental retardation and accompanying mental disorders. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common

4

among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many mentally retarded clients manifest a "Cloak of Competence," which must be recognized as an attempt to mask deficits that define mental retardation. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations.

During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital was one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many neuropsychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these drugs are not utilized for their primary psychiatric indication. For example, anti-psychotics, anti-depressants, and anti-seizure medications may be effective in diabetic limb and phantom pain.

Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention. During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California.

Sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all neuropsychiatric disorders. Substance abuse is also often related to impairment of

5

normal sleep patterns. From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic.

We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance.

From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, developmentally disabled, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients who presented with what are called co-occurring disorders. Persons with co-occurring disorders are persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, cardiologists, neurologists, and hospital pharmacologists on all patients in the Intensive care unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological tests, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not

6

limited to, the Minnesota Multiphasic Personality Inventory (MMPI_1 and 2), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

Doctors Hospital had a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry. I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia. I teach third and fourth year residents Clinical Aspects of Forensic Psychiatry.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

Prior to being installed as Secretary General, I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November, 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that,

even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in geriatric psychiatry, neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

## II.    Referral Questions

At the request of counsel, I performed a neuropsychiatric evaluation of Ms. Angela Johnson, a 45 year old divorced white female.  The specific referral questions I was asked to address are:

- Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

- Could the defendant have reasonably foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.

- Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

- Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?

- Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Did the defendant's impairments and medications inform her demeanor at trial?

- Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?

8

### III. Materials Reviewed/Bases for Analysis

In order to answer these referral questions, I interviewed Ms. Johnson over the course of two days, August 5th and 6th, 2009. I performed a neurological examination of Ms. Johnson, limited to some degree by the lack of visual privacy in the room.

I also reviewed multiple materials, including, but not limited to the records and testimony of Mark Cunningham, PhD, Marilyn Hutchison, PhD, and William Logan, M.D. I reviewed the IQ and neuropsychological battery of Michael Gelbort, PhD. I reviewed the medical records from the various county jails in which Ms. Johnson was housed, including the Woodbury County Jail. I reviewed declarations from a number of family members, persons who lived with Ms. Johnson and her family while she was growing up. I reviewed testimony from the trial, and discovery from the investigation. These are the types of materials relied upon in coming to an expert opinion.

### IV. Clinical Formulation

The following is a preliminary formulation, to be supplemented after further testing and analysis.

#### A. Angela Johnson's Childhood

Angela Johnson was born into a cognitively impaired family, a family in which the abnormalities of their brains manifested in paranoid, delusional, and, in the long run, violent behavior.

Ms. Johnson's early life was fertile ground for the development of complex trauma. Complex trauma must be differentiated between simple trauma as described in the Diagnostic and Statistical Manual-IVTR (DSM-IVTR). The DSM-IVTR describes Type I trauma, typically a single incident or event. Complex trauma is caused by ongoing, chronic, often pervasive stressors.

The role of parents in the modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her. Parents model for children appropriate responses to various stressors in life, so the child will be able to respond directly and in a manner that fits the degree of stress presented.

> ...Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological

9

dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones ... Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal ... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage ... (Bessel Van Der Kolk, Traumatic Stress: The effects of Overwhelming Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185)

These buffering qualities, such as playing and comforting, were absent in Ms. Johnson's home, replaced by ongoing terror, masked as religious fervor. The terror was a manifestation of the neurological abnormalities shared by generations of Ms. Johnson's family.

The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome (Perry and Pollard 1998; Teicher 2000, 2002). Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences (Teicher 2000; Heim and Nemeroff 2001; Repetti 2002; Gutman and Nemeroff 2002; Gorman 2002; De Bellis and Thomas 2003a; Bremner and Vermetten 2001). Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems (Sanchez 2001; Bremner 2003a). (Anda et al, *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, European Archives of Psychiatry and Clinical Neuroscience (2006) 256 : 174)

Ms. Johnson underwent a ritualized terror in her childhood that even her mother, one of the perpetrators, cannot speak of. Under the neurologically-derived hyper religiosity of her mother and grandmother, Mr. Johnson was consistently abused and, ironically, Ms. Johnson was often "exorcised," as her personal terror was described, due to the very neurological abnormalities that created her mother's and grandmother's religious terrorism.

Ms. Johnson, who was a small and slender child, was regularly "exorcised," which typically consisted of being held down against her will by several grownups, being hit, shaken,

10

thrown and beaten, in the hopes of curing the "deaf and dumb demon." Her inability to respond, the behavior that was translated into the "deaf dumb demon," was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements, the violent shaking commonly associated with seizures. Ms. Johnson's deaf and dumb demon, a visible sign of the inherited aberrant electrical activity in Ms. Johnson's brain, was the catalyst for her mother, herself suffering from the same inherited aberrant electrical activity, to repeatedly abuse Angela Johnson.

**B.     Ms. Johnson Suffers From Profound, Complex Trauma**

These rituals, performed over critical developmental childhood years, coupled with multiple moves, sexual abuse by a caregiver, perceived abandonment by her father, and cognitive deficits, were the foundation for the profound, complex trauma from which Ms. Johnson suffered, documented abuse from the hands of those that were supposed to love her, abuse that, itself, was the product of multigenerational cognitive impairment.

Complex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than Type I trauma described in DSMIV-TR. The irrational behaviors that often result from complex trauma shape neurological, academic, social, emotional, and contextual landscapes with well-documented symptoms.

> We define *complex psychological trauma* as resulting from exposure to severe stressors that (1) are repetitive and prolonged, (2) involve harm or abandonment by caregivers or other ostensibly responsible adults, and (3) occur at a developmentally vulnerable times in the victim's life, such as early childhood or adolescence (when critical periods of brain development are rapidly occurring or being consolidated, see Ford, Chapter 2, this volume). (Treating Complex Traumatic Stress Disorders: an evidence-based guide; Guilford Press, 2009 Ford et al, page 13)

> *Complex posttraumatic sequelae* are the changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotion dysregulation, somatic distress, or relational or spiritual alienation, hereafter referred to as complex traumatic stress disorders. (Ford et al, page 13)

It was the ritualized trauma that allowed Ms. Johnson to stick pins in her arm, with no show of emotion. It was also the ritualized trauma that allowed Ms. Johnson to fall apart at the smallest sign of true stress, as her daughter and sisters describe. It was the ritualized trauma that allowed Ms. Johnson to "go to her special space," as described by her sisters and Ms. Johnson, and dissociate from life threatening reality. Ms. Johnson describes dissociative experiences, developing out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state, a

11

clinically significant period following a seizure. Her sister reported that Ms. Johnson returned from her dissociative episodes at times and announced, "I'm back."

### C. Ms. Johnson Suffers From Electrical Abnormalities: Temporal Lobe Dysfunction/Seizures

Ms. Johnson's profound emotional impairments, secondary to the complex trauma, were augmented by the electrical abnormalities Ms. Johnson experienced. This aberrant electrical activity was inherited from her mother, Jean, who inherited it from her mother.

### i. Description of Temporal Lobe Dysfunction

We describe a new syndrome of familial temporal lobe epilepsy in 38 individuals from 13 unrelated white families. The disorder was first identified in 5 concordant monozygotic twin pairs as part of a large-scale twin study of epilepsy. When idiopathic partial epilepsy syndromes were excluded, the 5 pairs accounted for 23% of monozygotic pairs with partial epilepsies, and 38% of monozygotic pairs with partial epilepsy and no known etiology. Seizure onset for twin and nontwin subjects usually occurred during adolescence or early adult life. Seizure types were simple partial seizures with psychic or autonomic symptoms, infrequent complex partial seizures, and rare secondarily generalized seizures. Electroencephalograms revealed sparse focal temporal interictal epileptiform discharges in 22% of subjects. Magnetic resonance images appeared normal. Nine affected family members (24%) had not been diagnosed prior to the study. Pedigree analysis suggested autosomal dominant inheritance with age-dependent penetrance. The estimated segregation ratio was 0.3, indicating an overall penetrance of 60% assuming autosomal dominant inheritance. The mild and often subtle nature of the symptoms in some family members may account for lack of prior recognition of this common familial partial epilepsy. This disorder has similarities to the El mouse, a genetic model of temporal lobe epilepsy with a major gene on mouse chromosome 9, which is homologous with a region on human chromosome 3. (Berkovic et al, *Familial temporal lobe epilepsy: a common disorder identified in twins*; Annals of Neurology, 1996,

Temporal lobe dysfunction, a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, appears to run in the maternal side of Ms. Johnson's family. The table below describes the kinds of behavior associated with temporal lobe dysfunction; many of these behaviors describe Ms. Johnson's grandmother, mother, and her own behavior.

12



**TABLE 1. Characteristics Historically Attributed to Temporal Lobe Epilepsy**[a]

| Inventory Trait | Reported Clinical Observations |
|---|---|
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Aggression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

[a] Adapted from Bear and Fedio,[30] with permission.

In addition to these behavioral manifestations, brief **psychotic episodes** can also develop when seizures are infrequent or fully controlled. These psychoses last from days to weeks, they are usually self-limiting, and their separation from postictal psychoses may be difficult. The favored description is of an alternating psychosis, i.e., a brief psychosis alternating with periods of increased seizure activity such that the seizures and psychosis appear antagonistic. The phenomenology is characterized by paranoid delusions and auditory hallucinations, but multiple other features, including affective symptoms, may

13

occur. (Sachdev et al, *Schizophrenia-Like Psychosis and Epilepsy: The Status of the Association*, American Journal of Psychiatry*155:3, March 1998*, page 327.)

### ii.      Family History of Temporal Lobe Dysfunction

Jean Johnson, Ms. Johnson's mother, continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity. She has a life long history of behaviors recognized as temporal lobe based: heightened emotionality, guilt, obsessionalism, circumstantiality, sense of personal destiny, hypergraphia, dependence, paranoia, and humorlessness. Angela's mother's mother was also a woman with apparent religious delusions, auditory hallucinations, intense emotionality, and dependence. Yet there is not the significant social deterioration typically seen in shizophreniform disorders such as schizophrenia, particularly when not treated. Rather, a labile, heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances are neurocognitive traits Ms. Johnson shares with her mother.

### iii.      Angela Johnson's Temporal Lobe Dysfunction

Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister. She was placed in special education throughout her school years. She could not learn how to make change, and although she worked as a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks. Many of these academic functions require intact temporal lobes.

Ms. Johnson's IQ testing, administered prior to her trial, also reflect left hemisphere vulnerability, in the face of overall adequate intellectual functioning. Ms. Johnson's Verbal IQ, more sensitive to left temporal functioning, was 18 points lower than her performance IQ, which is more sensitive to right hemisphere functioning. There are specific motor tasks that, due to right hand dominance, will also be focused in the left temporal lobe. For example, Ms. Johnson and her sister appear to have a tremor of the right leg, consistent with left motor strip involvement.

Ms. Johnson's intellectual testing captured her extremely limited fund of knowledge. She did not know how many weeks there were in a year, guessing 48. Vocabulary, Similarities, Mathematics, and Information were her lowest subtests on her intelligence testing.

Ms. Johnson also has a remarkable history of migraine disease, which is a soft sign of neurological dysfunction. Her migraines are accompanied by a gastrointestinal aura, severe, and debilitating.

14

Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

### D. Methamphetamine Abuse

Ms. Johnson suffers from methamphetamine abuse, severe, chronic, currently in institutional remission. Methamphetamine can have lasting effects on the brain, so observing the testing after she had been off the drug for a significant period of time is important. This is especially true since the behavioral effects of methamphetamine can last long after the drug has been metabolized.

Methamphetamine's primary neuroanatomic focus is the frontal lobes, although there are other parts of the brain impacted by amphetamine compounds. Two tests of frontal lobe function, The Wisconsin Card Sorting Test and the Booklet Category Test, were within normal limits. Yet Ms. Johnson's symptoms of mood lability, altered spirituality, impaired strategic thinking, losses of consciousness, heightened emotionality, and headaches continue, requiring looking past methamphetamine use as the primary disorder.

Ms. Johnson's methamphetamine use further eroded her ability to effectively judge and respond accordingly. We are now seeing the interaction, for example, between the paranoid scanning associated with trauma, the paranoid ideation of her temporal lobe impairment, and the added paranoia of the methamphetamine. These are the symptom interactions that, much like drug interactions, lead to atypical and severe presentations and behaviors.

### E. Dissociation

Ms. Johnson has a maternal history of a religiously delusional mother and grandmother who experience auditory, visual, and tactile hallucinations, among other perceptual disorders. She has cognitive testing suggestive of left hemisphere dysfunction, and she has, all her life,

15

manifested symptoms of deepened emotionality, irritability, impaired judgment, and altered spirituality.

Ms. Johnson's familial neurological inheritance led to the profound destruction of her will. Ms. Johnson describes dissociative experiences, out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state. Her childhood trauma's most important clinical symptoms, in terms of her trauma, are Ms. Johnson's dissociation and her affective dysregulation. These symptoms are synergistic with her temporal lobe dysfunction, particularly in times of stress, to overwhelm her functioning.

Dissociation, as defined by Spiegel et al is:

"The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings, and attitudes." Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

Ms. Johnson, in her childhood, dissociated multiple times over years of ritualistic abuse, Many of her rebukings may have been in response to absence seizures, rendering her the deaf and dumb demon. Dr. Dvoskin acknowledges Ms. Johnson's abuse history, now well-documented, met the criteria for traumatic disease.

Ms. Johnson's symptoms are synergistic, in the same way cholesterol impacts heart disease. Her symptoms of cognitive dysfunction, deepened emotionality, mood lability, impaired judgment, and poor decision making are augmented by her trauma symptoms, her dissociation, loss of self, hyperreactivity, and inability to modulate her emotional state.


## V.   Mental Status Examination of Angela Johnson

Angela Johnson is a white female who looks younger than her chronological age of 45. She was dressed appropriately. She flung her hands up, initially using broad gestures, in an attempt to control her extreme anxiety. As each interview progressed, she became less anxious, although not less symptomatic in other ways.

Ms. Johnson's level of consciousness was variable. Throughout my two interview periods, Ms. Johnson had moments when she did not spontaneously answer my question. She would blink, look away, and then say, "What?" She describes periods when a person's voice sounds muffled, or she loses time. She stated, "Sometimes I go deaf" and don't hear what people say. She notes that she often will have to reread pages of a book she has just read. What

16

she describes is not a retrieval of memory problem. Rather, it appears as brief losses of consciousness, consistent with absence seizures, among other possible cognitive impairments.

Ms. Johnson regularly shook her right leg, consistent with a tremor. The right leg is, of course, controlled by the left motor strip, imbedded in the left hemisphere of her brain.

She attended to the environment appropriately, although she tended to be easily distractible.

Her language comprehension was within normal limits. Her understanding of complex sentences was good, although she would often ask to hear the question again. Her voice was normal in tone, although occasionally rapid. She was able to follow simple commands, and was hesitant with more complex (3 step) commands. She typically, with reassurance, could complete a 3 step command. Speech was fluid, both spontaneous and impulsive, often requiring redirection. There were no signs of perseveration. Her language usage was not complex. She was able to name common objects like a fork, a comb, and a coin. She was able to name simple colors and shapes.

Ms. Johnson was able to name body parts appropriately. She could determine coin denomination in both hands. She experienced writing on her left palm to be reversed, reflecting sensorimotor abnormalities.

> The authors show convincingly that a left inferior temporo-occipital area is differentially engaged in normal control subjects as early as 180 msec after onset of the visual word. It is important that both the electrophysiological and the anatomical data are consistent with results obtained by other methods (eg, depth electrodes and positron emission tomographic results [7, 81]). Salmelin and colleagues [3] suggest that the primary reason for adult dyslexia is probably the left inferior temporoparietal area dysfunction implicated by their study. (Poeppel et al, *Magnetic Source Imaging and the Neural Basis of Dyslexia*, Annals of Neurology, Volume 40, Issue 2, page 137)

Ms. Johnson's thought processes reflected tangentiality and, at times, flight of ideas. Her thought content displayed some referential thinking and oddities of thought, including hyperreligiosity, beliefs in spiritual concepts like ghosts, aliens, and witches. She acknowledged childhood auditory, visual, and tactile hallucinations. She also describes an "engine" in her head, a constant noise that has been in her head her entire life. Seroquel initially quieted this noise, but it has returned.

Affective range was extremely broad. Ms. Johnson was often literally laughing and crying at the same time. This was accompanied by a deepened emotionality on both poles. As noted before, she strode into the room with her arms outstretched. At other times, she was sitting in her chair, almost in a fetal position.

17

Mood was labile, with little impediment on either end. Her sense of humor, while ready, was often inappropriate to the content of the interview. She denied suicidality. She was future oriented, in terms of recognizing the potential options for her future.

Insight was impaired by her heightened emotionality and mood lability. She acknowledged that her emotionality prevented her from being able to work through a problem, even if she had the technical ability to do so. She understands her current circumstances. Her ability to describe her personal psychological state is impaired by significant negativity.

Judgment is grossly impaired by her disinhibition and affective dysregulation. Ms. Johnson acknowledged poor decision making skills. She is unable to develop strategies to solve certain problems.

Ms. Johnson could not describe how to divide 54 by 3. She did describe a strategy of multiplying 5 x 3, which would give you 15, then adding three 15s, which would give you 45. She was unable to solve this problem in her head.

Her constructional ability was impaired. She was asked to draw a clock and make the hands say 6:25. She initially drew 3 hands, erased one hand, and the other hands were placed backward on the clock to read 5:35.

Abstract thought was impaired. Consistent with limited IQ testing at the time of her trial, her impaired similarities and vocabulary, plus a poor fund of information, limit abstracting ability.

## VI.    Prior Observations by Government Experts

Ms. Johnson's cognitive deficits, and the impairment in mood stability resulting from her cognitive dysfunction, were recognized by other experts in earlier evaluations. Dr. Martell listed symptoms consistent with temporal lobe dysfunction in his report.

> Her observable affect impressed as broad, bright, and comfortable. She was affable, easy-going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children. (Dvoskin/Martell, page 31)

> She did endorse a number of behavioral symptoms in childhood, including:

> o Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother

> o Behavioral problems at school: including difficulty paying attention

18

o Bedwetting 2x per week until the 4th grade

o Nail biting and picking at her fingers

o Difficulty paying attention

o Depression: "I'm sure I was depressed my whole life."

o Aggression: Fights with her sister, and at school

o Shyness: "Came as I got older."

o Nightmares: "Bad dreams about my mother; pig and rabbit things."

o Poor self-esteem: "Mom beating devils out of me; made me feel stupid

and ugly."

o Unpredictable: "I've always been impulsive."

o Frustrates easily: "If I couldn't do or accomplish something."

o Daydreaming

o Easily distracted: "Couldn't concentrate; now it's OK."

o Fidgety / Trouble sitting still: "foot rocking" (Dvoskin/Martell, page 31)

Dr. Martell noted distractibility, a "foot rocking," daydreaming, depression, difficulty paying attention, and difficulty paying attention at school. Dr. Dvoskin noted the shaking of Ms. Johnson's right leg as well.

Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety. She made good eye contact. (Dvoskin/Martell report, page 29)

VII.  **Present Diagnoses** (based on the DSM-IV-TR Multiaxial system)

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

19

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

IV. LEGAL PROBLEMS

V. 60

## VIII.  Ms. Johnson's Diagnoses at the Time of Trial

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

D. ZOLOFT INTOXICATION, ACUTE

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

C. METHAMPHETAMINE ABUSE, CHRONIC, SEVERE

20

## IV. LEGAL PROBLEMS

### V. 40

Ms. Johnson's mental state was impaired at the time of trial. Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe, as noted in the Persinger article above. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft, identified by Astra Zeneca as having double the incidence of seizure activity than placebo, was the medication regimen Ms. Johnson was taking during the time leading up to her trial. These medications were increased precipitously just days into Ms. Johnson's trial. Zoloft, already at 200mg. per day more than 4 times the recommended dosage, was increased to 300mg per day, 100mg. above the 50mg-200mg dosage Goodman and Gilman's The Pharmacological Basis of Therapeutics, 11th edition describes as an "extreme dose.' (Goodman and Gilman's, page 435, table 17-1).

Ms. Johnson reported to medical staff at the jail that she was unable to tolerate the stress of the trial. Her family noted that her behavior changed noticeably after trial started. She appeared child like and in a daze, according to her daughter and sisters, who also reported Ms. Johnson was "different" from the way she was before trial. She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide. She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." She felt "hopeless" and "was unable to do anything that mattered." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For instance, after I testified, she gave me a big smile and waved at me, like we were in school."

The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Ms. Johnson experienced each of these, consistent with both her circumstances and her faulty medication regimen.

**Forensic Formulation**

- **Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?**

21

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction and methamphetamine abuse at the time of the offenses. Her capacity to conform her conduct to the requirements of law was significantly impaired by these disorders, which manifested themselves under ordinary circumstances in grossly impaired judgment and insight, inability to develop strategies, problem solve, and understand consequences. Extreme stress would have also exacerbated her underlying paranoia, hyperractivity, and dissociative reactions. Her pregnancy would have significantly heightened her mood lability. The lingering affects of methamphetamine use would also have increased her already abnormal paranoid feelings.

- **Could the defendant have reasonably have foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was incapable as a result of impairments in judgment and insight, and in ability to plan and predict consequences, of understanding and predicting outcomes of situations in a normal way.

- **Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction at the time of the crimes. These conditions result in severe mental and emotional disturbances. Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally. Her moods are extremely labile, cycling inappropriately from grandiosity to depression. She dissociates and functionally disappears from consciousness periodically as result of her disorders. All of these conditions are exacerbated by incidents of extreme stress, methampehamine use and withdrawal, and pregnancy.

- **Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was under unusual and substantial duress at the time of the offenses. Dustin Honken has been described as a calculating and manipulative person. As a result of Ms. Johnson's brain impairment, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living. Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through. Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken.

22

- **Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?**

Ms. Johnson was at the upper limit of her antidepressant medication, Zoloft, at the start of her trial. The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose. She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. She had also complained of headaches, another symptom of Zoloft intoxication. However, Ms. Johnson has experienced headaches her entire life.

Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg. Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction. Dr. Martell described Ms. Johnson's mood as "labile."

When her antidepressant was increased to 300mg daily a couple of days into her trial, Ms. Johnson was no longer a part of the process. She was unable to focus, drawing most of the day. She waved to family members, and her affect was often inappropriate. Her serotonin toxicity, with extreme levels of her antidepressant Zoloft, impaired her ability to rationally assist her attorneys during trial.

- **Did the defendant's impairments and medications inform her demeanor at trial?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's mood impairments, dissociative tendencies, sleep disorders, trauma history, and medications caused and explained her disengaged appearance, largely flat and absent affect, and inability to show emotion at trial.

- **Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty that Ms. Johnson's use of profanity and verbal threats are consistent with a history of hyperreactivity, hypervigilance, and affective dysregulation.

Thank you for allowing me to examine Ms. Johnson,



23

George Woods, MD