# EXHIBIT 5

3590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3047

       Plaintiff,                            Sioux City, Iowa
                                             October 19, 2004
   vs.                                       8:46 a.m.

DUSTIN LEE HONKEN,

       Defendant.                            VOLUME 20
                              /

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

Case 3:09-cv-03064-MWB-LTS    Document 1-6    Filed 10/05/09    Page 2 of 8

not say she did not see any emotion. I think that is not -- when I got permission to interview her, that is not what she said.

MR. WILLIAMS: Just so we're clear because to some degree there's an allegation I misrepresented something here, I wasn't privy to any conversation between Mr. Parrish and Sali Van Weelden, so nothing I said -- I've not talked to her. I don't know what she saw. She's not told me what she saw, and she certainly didn't tell me what she told Mr. Parrish today, so I don't know about that.

THE COURT: Any other record anybody would like to make?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Anything else we need to talk about? Oh, this rebuttal issue?

MR. WILLIAMS: Rebuttal issue, and I think it's probably best handled if I give you a quick preview of where we're going with our rebuttal evidence, and then the defense can make whatever objection they deem appropriate.

The rebuttal evidence that I understand they're objecting to has to do with a bank robbery that occurred back in 1986. There's a couple things that have come up during this trial not the least of which is the mitigating factors identified by the defendant that he's not had a history of

violent behavior, he's not had a history of -- now significant history of criminal convictions, previously a significant history of criminal conduct.

Beyond that, during the evidence, most certainly the image, the impression, that the defense has attempted to paint for the jury is that other than these murders Mr. Honken was a good little boy who always did everything right. In the words of Carol Honken, never, ever got into trouble and that he grew up, went to school, was a good student, average student, went to college, just a law-abiding citizen who, lo and behold, in 1992 apparently starts down the road of criminal conduct.

In particular today during the testimony of Alyssa Nelson, she testified that she found out about the Britt bank robbery, Dustin confided in her about the robbery, that Carol had kicked Dad out, Dad was living in a shack without heat, Dustin was called by him, he was drunk, he told Dustin where he was staying, Dustin took food to him, and that Dustin told Alyssa that his dad told him, I've got a plan; if you don't help me, I'm going to kill myself, and had Dustin make a copy of his mom's pass key to the bank, and Dustin claimed he had no other choice than to do this because his dad was going to kill himself.

The evidence the government intends to put on tomorrow is from six witnesses to rebut that specific allegation. The first witness is Kenny Hansen. Kenny Hansen was a person who

was a couple years ahead of Honken in the school. Kenny Hansen was approached a couple months before the robbery in June of 1986. Honken approached him about committing the robbery, had a plan, a detailed plan in mind --

THE COURT: When you say Honken, you're meaning Dustin Honken or Jim Honken?

MR. WILLIAMS: Yes, I'm sorry. I'll make it clear. The defendant approached Kenny Hansen about robbing the bank; had a very detailed plan about how it was to be done, what door was to be entered; once they went inside, there was going to be an old lady working there; that once they got inside, the old lady should be shoved into the bathroom; that the door should be secured; whoever robs the bank should be wearing a mask that fully covers the face; they should have surgical gloves on their hands, a very detailed plan.

Kenny Hansen is expected to testify that he probably would have gone through with it. He didn't go through with it. He knows that at some point he was told by one of our other witnesses, Mark Johnson, that the plan was for Honken to kill him, for the defendant to kill him, but he doesn't recall if that was the specific reason why he did not go through with the bank robbery.

The next witness is Alan Johnson. Alan Johnson will testify that he was a year ahead of the defendant in school, that he graduated from high school in May of 1985, and prior to

graduating from high school in May of 1985 had had detailed discussions with the defendant about robbing the Britt bank, the same type of details, the same type of scenario, the same type of plan.

Alan Johnson then went to the Army, was discharged from the Army in February of 1986. And sometime between February of 1986 and the bank robbery in June of 1986, Alan Johnson's expected to testify that he was approached by the defendant and asked to kill Kenny Hansen who was going to be robbing the bank and that they would split the money.

Mark Johnson, Alan Johnson's brother, will also testify to being approached by the defendant in the spring of 1986; that the defendant had a plan for the bank robbery; again detailed the plan to Mark Johnson which coincides in detail with Ken Hansen and Alan Johnson; that the defendant also asked him to help kill Kenny Hansen after he committed the bank robbery; that they were going to dispose of the body by throwing the body into a manure lagoon; that the defendant told him that the chemicals in that lagoon would eat away all of the remains including the bones and the body would never be found and that they would split the money.

Mark Johnson will testify that he then went to Kenny Hansen and told Kenny Hansen of the plan at which point Kenny Hansen responded that he was not going to go through with the plan.

3680

Within about a month of the approach of Kenny Hansen to rob this bank, the bank was robbed. The bank was robbed using a key, we heard from the defendant's own testimony here today, obtained by the defendant. The bank robbery occurred in a manner identical to that described by the defendant.

Bill Basler would testify that he interviewed the defendant in connection with this bank robbery back in 1986. The defendant denied ever talking to anybody else about any plan to rob a bank. The defendant also told Mr. Basler, admitted that he was with his father the night before the bank robbery on June 1 of 1986.

Beverly Meyland, M-e-y-l-a-n-d, will testify that she was the teller of the branch bank for the First State Bank in Britt, Iowa, and that she was the teller who was robbed on the morning of June 2 of 1986; that she was, in fact, approached by a man wearing a mask around his face; that he had -- and I don't recall if she saw gloves on his hands or not. That part I don't remember right now but that she was, in fact, put into the bathroom, the door was tied shut, and that she was told to stay there for ten minutes.

And then finally Police Officer Charles Stubbe will testify that he arrested the defendant's father, James Honken, on June 6 I believe or June 8 of 1986, arrested him in response to a citizen complaint about a man slumped over a steering wheel in a car. When he approached the man, he was inebriated. The

man identified himself as James Honken; that the officer saw cash in the backseat on the floor. He arrested Mr. Honken, Mr. James Honken, and when he searched the vehicle found approximately $12,000 in U.S. currency, a ski mask, gloves, and a loaded handgun in the backseat. And I forgot to say the handgun was part of the scheme as outlined by the defendant and was actually used -- the teller will say the gun was actually used during the robbery.

The government believes this is in direct rebuttal to the picture painted by the defendant today that his father is this evil man who led him into a life of crime by bragging about his criminal exploits and that he was talked into getting a pass key for his father to rob the bank, and our evidence is that's simply not true, and it goes to the mitigating factor the defense has alleged that the defendant's not been involved in significant criminal conduct and not been involved in violent behavior before.

THE COURT: Doesn't it also rebut the testimony of Mr. Honken's motivation for getting the key from his mother, Dustin Honken's motivation?

MR. WILLIAMS: Yes. And I guess I meant to be saying that, but it rebuts the allegation that his only involvement in this was to go --

THE COURT: Was under duress.

MR. WILLIAMS: Right. It most certainly was not