IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ANGELA JOHNSON, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | No. C 09-3064-MWB |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S RESISTANCE TO PLAINTIFF'S MOTION UNDER 28 U.S.C. § 2255**

TABLE OF CONTENTS

I.   PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Indictments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   LEGAL STANDARD FOR 28 U.S.C. § 2255 RELIEF. . . . . . . . . . . . . . . . . . 18

IV.   DEFENDANT'S TRIAL COUNSEL WERE NOT INEFFECTIVE. . . . . . . . . . . 23

    A.   Plea Negotiations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.   Defendant's Mental State at the Time of the Offense. . . . . . . . . . . . . . 27

        1.   Defendant's Criticism of Her Mitigation Evidence. . . . . . . . . . . 27

        2.   Defendant's New Claim of Psychological Impairment. . . . . . . . 29

        3.   Defendant Cannot Show Her Trial Counsel's. . . . . . . . . . . . . . 32
            Performance Was Defective

Case 3:09-cv-03064-MWB-LTS    Document 15    Filed 11/30/09    Page 1 of 93

          4.       Defendant Cannot Show She Suffered Prejudice. . . . . . . . . . . 37

    C.     Defendant's Alleged Susceptibility to Honken.. . . . . . . . . . . . . . . . 40

    D.     Defendant's Demeanor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    E.     Experts' Confrontation of Aggravating Evidence.. . . . . . . . . . . . . . . 46

    F.     Mitigation Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

          1.       Holly Dirksen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

          2.       Doug Book. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

          3.       Susan Marsolek. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

          4.       Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    G.     Defendant's Offer to Plead Guilty as Mitigation Evidence.. . . . . . . . . 54

    H.     Government's Argument That Killing Children Cannot be Mitigated.. . . 55

    I.     Timing of Trial and Death Notice.. . . . . . . . . . . . . . . . . . . . . . . . . . 57

    J.     Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    K.     Investigation of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    L.     Residual Doubt Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    M.     Appealing Alleged Juror Misconduct.. . . . . . . . . . . . . . . . . . . . . . . 65

    N.     Cumulative Effect of Alleged Errors by Trial Counsel. . . . . . . . . . . . . 68

V.     THE GOVERNMENT DID NOT PRESENT EVIDENCE IT KNEW
    WAS FALSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

VI.     THE GOVERNMENT DID NOT FAIL TO DISCLOSE REMUNERATION
    PROVIDED TO WITNESSES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    A.     Christi Gaubatz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    B.     Peggy Hoover. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    C.     Steve Vest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Case 3:09-cv-03064-MWB-LTS    Document 15    Filed 11/30/09    Page 2 of 93

D. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

VII. MOVANT CANNOT DEMONSTRATE DEFENDANT WAS INCOMPETENT AT THE TIME OF TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . 76

VIII. A JUROR DID NOT ENGAGE IN MISCONDUCT BY ALLEGEDLY FAILING TO DISCLOSE ALLEGED CHILDHOOD ABUSE OR FAMILIARITY WITH THE JUDGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

A. Defendant's Claims are Procedurally Barred. . . . . . . . . . . . . . . . . . 80

B. Defendant's Claims of Juror Misconduct Fail on Their Merits. . . . . . . . 82

1. Juror #55 Answered Questions Honestly. . . . . . . . . . . . . . . . . 83

i. Alleged Physical Abuse. . . . . . . . . . . . . . . . . . . . . . . 83

ii. Knowledge of Presiding Judge. . . . . . . . . . . . . . . . . 85

2. Juror #55 Was Not Motivated By Bias. . . . . . . . . . . . . . . . . . 86

3. Even if Facts Were Known, Juror #55 Would Not Have Been Struck for Cause. . . . . . . . . . . . . . . . . . 88

4. Defendant's Other Allegations Regarding Juror #55. . . . . . . . . . 88

5. An Evidentiary Hearing on Alleged Juror Misconduct Would be Inappropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

IX. THE COMBINED EFFECT OF ALLEGED CONSTITUTIONAL ISSUES DO NOT RENDER HER CONVICTIONS AND SENTENCES INFIRM. . . . . . . 90

X. EIGHTH AMENDMENT ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XI. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

3

Respondent United States of America, provides the following resistance to petitioner Angela Johnson's Section 2255 motion.

## I.  PROCEDURAL BACKGROUND

### A.  Indictments

On July 26, 2000, a grand jury indicted defendant, charging her with aiding and abetting the murders of five witnesses, in violation of 18 U.S.C. § 1512.  On August 30, 2001, a grand jury returned a second indictment against defendant.  (Docket #1).[1] Counts 1 through 5 charged defendant with aiding and abetting murders while engaged in a drug trafficking conspiracy, in violation of 21 U.S.C. § 848(e).  Counts 6 through 10 charged defendant with committing murders in furtherance of a Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848(e).

### B.  Trial

Defendant's trial was "trifurcated."   There was a "merits phase" during which the jury determined defendant's guilt.  An "eligibility phase" followed, during which the jury determined if defendant was eligible for the death penalty.  In the "penalty" or "selection" phase, the jury determined whether to impose the death penalty.

On May 24, 2005, the jury returned a guilty verdict on all 10 counts.  (Verdict, Docket # 527).  On May 31, 2005, the jury found defendant eligible for the death penalty.  (Verdict, Docket # 545).  On June 21, 2005, the jury found the death penalty appropriate for the murders of all but an informant, for whose murder the jury imposed a

---

[1]  "Docket" refers to the clerk's docket sheet in criminal case CR 01-3046 MWB; "Tr." refers to the trial transcript; "H.Tr." refers to the Honken Trial Transcript; "Motion" refers to petitioner's Motion, Document # 1, in civil case C 09-3064 MWB.

4

life sentence.  (Verdict, Docket # 593).

On December 20, 2005, the Court imposed death sentences for Counts 2 through 5 and 7 through 10 and life imprisonment for Counts 1 and 6.  (Judgment, Docket # 686).  On December 29, 2005, defendant filed a timely appeal notice.  (Docket # 689).

C.     Appeal

On appeal to the Eighth Circuit Court of Appeals, defendant raised 28 separate claims of error.  Defendant did not, however, claim on appeal that: 1) the government allowed testimony it knew to be false to go uncorrected in violation of her Fifth and Eighth Amendments; 2) that the government violated *Brady v. Maryland* when it failed to disclose remuneration provided to witnesses; 3) that she was incompetent; 4) juror #55 engaged in misconduct; 5) the Eighth Amendment Requires a Heightened Standard of Proof for Imposition of the Death Penalty; 6) the Eighth Amendment precludes the execution of the mentally ill; 7) the manner in which the government would carry out the death penalty violates the Eighth Amendment; or 8) the death penalty violates the Eighth Amendment.  These are all issues defendant raises for the first time in her Section 2255 motion.

With regard to the issues defendant did raise on appeal, the Eighth Circuit Court of Appeals rejected them, affirming her convictions and sentences.  *United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007).

## II.   STATEMENT OF THE  FACTS

Introduction[2]

Defendant Angela Johnson was a drug dealer, and became the girlfriend and partner of drug kingpin Dustin Honken in early 1993.  After police arrested him on drug charges, defendant assisted Honken in murdering witnesses to enable the drug enterprise to continue.  Defendant purchased the murder weapon, helped track down the government's informant and used a ruse to gain entry in the home where the informant was staying with an innocent woman and her two little girls.  Defendant helped Honken bind and gag the informant and the woman.  Defendant and Honken took them and the children to some remote woods where Honken shot them all.  Three months later defendant lured Honken's only other dealer to an abandoned farm so Honken could murder him before he turned informant.  The authorities discovered the bodies seven years later after defendant drew a map to their location in a failed effort to have another inmate claim responsibility for the murders.

Drug Enterprise 1992-93

Beginning about 1992, Dustin Honken and his best friend, Tim Cutkomp, began manufacturing methamphetamine in Arizona.  (Tr. 349-51, 838-39).  Honken's brother, Jeff, financed their operation.  (Tr. 333, 344-45).  Honken transported or had others

---

[2]  In defendant's "introduction," which purports to set forth pertinent facts surrounding defendant's life history, events leading up to Nicholson's cooperation, and defendant's subsequent prosecution, she conspicuously omits recitation of the facts surrounding the murders and her role in the murders.  Notably, she does not claim she is innocent of the crimes.  Similarly, defendant's 26-page untitled document marked as Appendix C, which appears to recite defendant's life history from birth until her arrest, fails to include any description of her involvement and participation in the murders.

6

transport the methamphetamine to Mason City, Iowa. (Tr. 847-49). Honken distributed methamphetamine to only two customers, Greg Nicholson and Terry DeGeus. (Tr. 99-100, 847). Nicholson and DeGeus had their own drug customers. (Tr. 66, 277, 851). Among DeGeus's customers was his girlfriend, defendant Angela Johnson. (Tr. 271-282, 570, 857).

In early 1993, during one of Honken's trips to Mason City, Iowa, DeGeus sent defendant to Honken to deliver drug proceeds or obtain methamphetamine. (Tr. 279, 570). Defendant told Honken that DeGeus was using too much methamphetamine, she knew more customers, and Honken should begin delivering methamphetamine directly to her. (Tr. 857-58). That night, Honken and defendant began a romantic relationship, and within six months defendant was pregnant with Honken's child. (Tr. 589-90).

In March 1993, police officers in Minnesota made a controlled buy of methamphetamine from a drug dealer, who immediately cooperated and gave up his source, David Patrick, a Mason City resident. (Tr. 52). Police officers arrested Patrick, who gave up his source – Greg Nicholson – and made a controlled buy from Nicholson. (Tr. 52-54). A search of Nicholson's house uncovered a large amount of methamphetamine and cash. (Tr. 55-63).

Nicholson, too, decided to cooperate. (Tr. 64). Nicholson said Honken supplied him with pounds of methamphetamine the previous year, for which Nicholson owed Honken approximately $100,000. (Tr. 64-65). On March 21, 1993, officers arranged a recorded meeting between Nicholson and Honken, during which Nicholson delivered drug proceeds to Honken and discussed past and future deliveries of methamphetamine. (Tr. 67-79). When Honken left Nicholson's house, officers arrested

7

Honken and Cutkomp, who was waiting in a car. (Tr. 79-81).

Nicholson's wife left him, following the search of their home, and Nicholson thereafter lived various places. (Tr. 202-204). In mid-July 1993, a mutual friend introduced Nicholson to Lori Duncan, a single, working mother. (Tr. 439-41). Nicholson began staying with Duncan shortly thereafter. (Tr. 607). Duncan was raising her two girls, Kandi (age 10) and Amber (age 6). (Tr. 452-54).

Honken Prosecution

The state charged Honken and Cutkomp with drug offenses, though it later dropped Cutkomp's charges. (Tr. 101, 864). In April 1993, a federal grand jury indicted Honken for conspiracy to distribute methamphetamine, and the state dismissed its charges. (Tr. 172). The indictment was based on Nicholson's cooperation and grand jury testimony. (Tr. 93-102, 222, 232). Honken was released on bond pending trial. (Tr. 168-69). On June 8, 1993, Honken notified the court he intended to plead guilty. (Tr. 175, 223). A plea hearing was scheduled for July 30, 1993. (Tr. 175, 224).

Hunt for Nicholson

During June and July, Honken and defendant repeatedly asked defendant's best friend, Christi Gaubatz, to babysit defendant's daughter and borrowed Gaubatz's car, telling Gaubatz they were looking for Nicholson. (Tr. 563, 580-83, 871). When defendant and Honken searched for Nicholson, they usually came home before midnight. (Tr. 584).

On June 30, 1993, defendant obtained a permit to purchase a handgun. (Tr. 402-405). On July 7, 1993, defendant purchased a semiautomatic 9mm assault pistol at a pawn shop in Waterloo, an hour's drive from her home. (Tr. 407-409).

8

On the night of July 24, 1993, defendant again asked Gaubatz to watch her daughter and borrowed Gaubatz's car so defendant and Honken could hunt for Nicholson. (Tr. 585-86). This was the last time they did so. (Tr. 585, 588).

This night, defendant and Honken did not come home until near dawn. (Tr. 586). Gaubatz heard them come in defendant's house, whisper a moment, and then go into the bathroom. (Tr. 586-87). When Gaubatz heard the shower running, she left and went home. (Tr. 588).

On July 25, 1993, Nicholson, Lori Duncan, and Duncan's two children suddenly disappeared. (Tr. 458).

Five days later, on July 30, 1993, Honken appeared for his plea hearing but suddenly refused to plead guilty. (Tr. 175, 224). He told the prosecutor the case against him was not as strong as the government believed. (Tr. 225). Honken gave his attorney a videotape showing Nicholson exonerating Honken. (Tr. 224-232). Honken's attorney never showed the tape to the government, and years later returned it to Honken; it was never seen again. (Tr. 233-34).

Continuing Investigation

Not until August 1993 did the government learn Nicholson disappeared. (Tr. 179). While warrants were issued for his arrest, no sign of him was found. (Tr. 177-78). The Duncan family was also discovered missing. (Tr. 458-59). The government continued its drug investigation, now focusing on Honken's only other customer, Terry DeGeus, defendant's former boyfriend. (Tr. 180-84).

On October 27, 1993, several witnesses were subpoenaed to the federal grand jury, including defendant and DeGeus's drug associate, Aaron Ryerson. (Tr. 180, 285).

9

The grand jury questioned both witnesses about whether there was a drug association between Honken and DeGeus. (Tr. 180-84). Ryerson invoked his right to remain silent. (Tr. 287). Defendant denied any drug association or conduct by Honken. (Tr. 180-84). After he appeared before the grand jury, Ryerson told DeGeus he was questioned about Honken and DeGeus. (Tr. 287-88). DeGeus called defendant and reported it to her. (Id.)

Disappearance of DeGeus

Nine days later, on November 5, 1993, DeGeus disappeared. (Tr. 499). DeGeus dropped his daughter off at his mother's house that night, telling them he was going to meet defendant. (Tr. 500-501, 508-509). DeGeus said he would return to pick up his daughter later that evening, but he never returned. (Tr. 501, 510-512). When DeGeus's family and police officers later questioned defendant about DeGeus, she gave conflicting statements, telling some she never saw DeGeus that night, while admitting to others she saw him but he left on his own after they talked. (Tr. 501-502, 513, 522-23, 541-45).

Continuation of Drug Enterprise

In March 1995, the court dismissed the 1993 federal drug case against Honken for lack of prosecution. (Tr. 185-86). Meanwhile, Honken had moved to Mason City, and defendant gave birth to his child in February 1994. (Tr. 1105, 1112). Cutkomp also returned to Iowa. (Tr. 858). While the charges were pending against him, Honken, Cutkomp and defendant continued experimenting in manufacturing methamphetamine and other drugs at various locations, including defendant's house, until they ultimately moved operations in late 1995 to a house Honken rented in Mason City. (Tr. 885-88,

10

894).

In the fall of 1995, Honken recruited Dan Cobeen to assist with the methamphetamine manufacturing.  (Tr. 664-65).  Before Cobeen was permitted to assist, Honken took him to see defendant for her approval.  (Tr. 684-88).  Unknown to defendant and Honken, Cobeen had gone to the police and was cooperating.  (Tr. 680, 743).  There followed an undercover investigation during which Cobeen recorded conversations with Honken and Cutkomp and provided up-to-date information to officers about their drug operation.  (Tr. 682-87, 745).

Second Honken Prosecution

On February 7, 1996, officers executed a search warrant at Honken's house. (Tr. 746, 774-75).  Officers seized a methamphetamine laboratory, chemicals, and equipment.  (Tr. 747-62, 776-92).  In April 1996, the federal government brought drug charges against Honken and Cutkomp.  (Tr. 799).  While the court released Cutkomp pending trial, it restricted Honken to home confinement, with work release, and subjected him to electronic monitoring.  (Tr. 800-802).

Honken, goaded by defendant, immediately began to plot the murder of Cobeen and police officers and the destruction of evidence.  (Tr. 908-910, 914-15, 929). Cutkomp, disturbed by these plans, decided to cooperate with the government.  (Tr. 803).  Cutkomp confessed to his involvement with the drug operation beginning in 1992. He also reported that, in the winter of 1993 - 1994, Honken came to him with a large black pistol, requesting Cutkomp's assistance in destroying the weapon.  (Tr. 804). They used a torch and cut the weapon into several small, unrecognizable pieces and discarded them in ditches along county roads.  (Tr. 878-84).  Cutkomp also told officers

11

of Honken's and defendant's plans for killing Cobeen and officers.  (Tr. 908-910).

Cutkomp subsequently wore a wire and recorded hours of conversations with Honken,

during which Honken discussed the 1993 drug charges, made vague references to

eliminating witnesses in 1993, and recounted his plans for evading the current charges

by killing witnesses and officers.  (Tr. 915-938).

Based on these recordings, the court revoked Honken's pretrial release and

detained him pending trial.  (Tr. 805-806, 938).  Before his release was revoked,

Honken had persuaded a co-worker, Rick Held, to buy him a handgun, allegedly for his

girlfriend living in Des Moines.  (Tr. 1044-47).  Shortly after Honken's release was

revoked, Held received a call from a woman identifying herself as Honken's girlfriend.

(Tr. 1047-48).  The caller told Held "Honken didn't need the pup any longer."  (Tr.

1048).  Held believed this referenced the handgun.  (Tr. 1049).

Honken's First Conviction and Sentencing

Honken pleaded guilty to the drug charges in 1997.  (Tr. 806-807).  During a

multi-day sentencing hearing in 1997 and 1998, the government presented evidence

tying Honken to the disappearances of witnesses in 1993 and to the ongoing attempts

to obstruct justice during the current charges.  (Tr. 808).  Defendant was present during

at least the final day of the sentencing hearing.  (Tr. 2680).  During the sentencing

hearing, Honken's sister heard defendant make comments about getting the officers

responsible for Honken's plight.  (Tr. 2682).  She heard defendant make threats toward

the officers and prosecutors.  (Tr. 2682).

Murder Investigation

In 1993, officers began an investigation into the disappearances of Nicholson,

12

the Duncan family, and DeGeus, but it was disjointed.  (Tr. 1077-78).  In 1999, officers renewed the investigation.  (Tr. 1077).  In 2000, Gaubatz decided to cooperate.  (Tr. 617).

Gaubatz told officers that, in the fall of 1993, she found a large black handgun in a closet.  (Tr. 599-600).  She confronted defendant about the gun, believing defendant likely stored it there.  (Tr. 601).  Defendant retrieved the gun and told Gaubatz not to worry about it as Honken would take care of it.  (Id.).

Gaubatz also told officers that, at some point in 1994, defendant confessed to her.  (Tr. 606).  Defendant told Gaubatz she and Honken had tracked down Nicholson in the summer of 1993 and found him staying with the Duncan family.  (Tr.607).  Defendant told Gaubatz she gained entry into the Duncan home by posing as a lost saleslady.  (Id.).  Once defendant got inside the home, Honken followed.  (Id.).  Honken made Nicholson give a videotaped statement exonerating Honken.  (Tr. 608).  Defendant and Honken then took Nicholson and the Duncan family to some woods where Honken shot them all.  (Tr. 608-610).  Defendant told Gaubatz they were all buried in some woods, but gave no further description of the location.  (Tr. 610).

Defendant also admitted to Gaubatz she lured DeGeus to a remote location where Honken gunned him down and beat him with a bat.  (Tr. 611-14).  Again, defendant did not provide Gaubatz with the location of the body.  (Tr. 614).

Defendant Johnson's Indictment and Arrest

A federal grand jury indicted defendant on July 26, 2000, charging her in relation to the murders of witnesses.  On July 30, 2000, officers arrested defendant and took her to the Benton County Jail.  (Tr. 1113-15).

13

Robert McNeese was a federal prisoner serving a life sentence for a drug offense. (Tr. 1174). McNeese was one of several targets of an unrelated investigation into drug and money laundering crimes. (Tr. 1182-83). Having chosen to cooperate, the government transported him to Iowa to testify and work out pleas to federal charges. (Id.). McNeese had been housed in the Benton County Jail since March 2000. (Tr. 1157).

Defendant's Contact With McNeese

McNeese made contact with defendant and her cell-mate, Sarah Bramow, about a week after defendant arrived at the Benton County Jail. (Tr. 1191-97). During August, defendant and McNeese developed a friendship, communicating with each other by yelling through the walls, passing notes surreptitiously, and by talking through a window facing the exercise yard. (Tr. 1197-1201, 1215-18). During these conversations, defendant confided in McNeese about her involvement in the murders. McNeese convinced defendant he was connected to the Mob, he could find a prisoner serving a life-term who would confess to the crime, and all he needed was evidence the other inmate could provide to the police to convince them the inmate had committed the murders. (Tr. 1218-20). Defendant ultimately agreed to the plan, providing McNeese with maps to the location of the bodies, along with descriptions of how the victims were murdered and buried. (Tr. 1221-22). McNeese provided this information to the government. (Tr. 1222).

Defendant's Cell Mate, Sarah Bramow

Bramow and defendant became close to each other while in jail together. (Tr. 1299). Defendant shared a lot of information with Bramow about the murders.

14

Defendant told Bramow that Honken and she were looking for Nicholson because he had testified against Honken, and they found Nicholson at his girlfriend's home. (Tr. 1304-1305). Defendant said she and Honken intended to get a videotape from Nicholson. (Tr. 1303, 1309). Defendant told Bramow that Honken had a weapon when they went to the home and the girlfriend's two girls were there. (Tr. 1307). Bramow reported defendant told her defendant "took her out," a reference to Lori Duncan that Bramow interpreted as meaning defendant killed her. (Tr. 1306). Defendant told Bramow the bodies were buried. (Tr. 1312).

Discovery of the Bodies

Using the maps defendant drew, officers located the bodies of all the victims. (Tr. 1578-80). Nicholson and the Duncan family were found in a single grave, located in a wooded area outside Mason City. (Id.). Nicholson and Lori Duncan were found bound and gagged, each shot multiple times including once in the head. (Id.). Officers found the two little girls in the bottom of the grave; each girl had a single bullet hole in the back of her head. (Id.).

Officers found DeGeus's body a few miles away, in a farm field behind an abandoned house. (Tr. 1546-77, 1710-30). He was face-down in a shallow grave. (Id.). He had multiple gunshot wounds, and his skull was fractured into scores of pieces such that the forensic anthropologist was unable to reconstruct his skull. (Tr. 2056-59).

Merit's Phase of Trial

During the trial's "merits" phase, the government produced 45 witnesses, introduced 212 exhibits, and presented 10 days of trial testimony. The evidence came from officers, experts, defendant's former associates, co-conspirators, and inmates.

15

Key evidence consisted of testimony of Jeff Honken and Cutkomp, which implicated defendant in the drug conspiracy from 1993 through 1996, Gaubatz's testimony about defendant's confession, and the maps defendant drew leading authorities to the murder victims defendant help bury.

The jury found defendant guilty of each of the 10 counts.  The jury found the maximum alleged drug quantity, and 12 of the 13 alleged CCE predicate offenses.  Finally, when asked during the penalty phase whether any juror had residual or lingering doubt of defendant's guilt, not a single juror responded affirmatively.  (Verdict, Docket # 527).

Penalty Phases

The penalty portion of the trial was bifurcated into "eligibility" and "penalty" phases.  The eligibility phase consisted only of argument by counsel based on the evidence admitted during the merit's phase.  The government argued defendant was eligible for the death penalty because she had the requisite intent and because it proved at least one statutory aggravating factor.  (Tr. 2458-2504).  The government alleged the murders showed substantial planning and premeditation, the adult victims suffered substantial abuse, and the child victims were vulnerable.  (Id.).  The eligibility phase took place on May 31, 2005, and the jury returned its verdict that day, finding defendant eligible for the death penalty.  (Tr. 2531-32).  The jury found substantial planning and premeditation with respect to DeGeus's murder, the adults suffered substantial physical abuse, and the girls were vulnerable victims.  (Verdict, Docket # 545).

The penalty phase began on May 31, 2005, and lasted until June 21, 2005.  The

16

government proved defendant continued to distribute methamphetamine after Honken went to prison in 1998.  (Tr. 2701-72).  The government also presented testimony from the victims' family members.  (Tr. 2873-2965).  The government argued the evidence proved additional aggravating factors calling for imposition of the death penalty.

During the penalty phase, the government presented substantial evidence of defendant's violent and volatile history.  When Honken was arrested, defendant threatened his brother.  (Tr. 369).  Defendant threatened Honken's other girlfriend on several occasions.  (Tr. 2368-40).  After defendant learned Dan Cobeen cooperated with law enforcement authorities, she threatened him.  (Tr. 708-710).  After police searched defendant's ex-husband's house, defendant left threatening messages on the police chief's answering machine.  (Tr. 3613-14).  While defendant relates testimony by Honken's sister who testified about defendant's violent rages, she left out the threats defendant made to harm law enforcement officers at Honken's sentencing hearing.  (Tr. 2682-83).  Finally, the government introduced undercover tapes, taken after Honken was in prison, where defendant attempted to hire an undercover agent and a confidential informant to kidnap a drug dealer so that she could collect a drug debt.  (Tr. 2726).

The government also presented evidence of defendant's domineering personality.  For example, Honken had to have defendant approve of Cobeen's involvement in the conspiracy.  (Tr. 684-88).  Defendant goaded Honken to kill Cobeen after they learned he had cooperated with law enforcement officers.  (Tr. 908-910, 914-15, 929).  Cutkomp testified that, when asked by agents whether he was afraid of cooperating, he responded that he was most afraid of defendant because she was

17

pushing Honken to act.  (Tr. 826).

Defendant also presented evidence during this phase of trial, including testimony from three experts, family members, and friends.  (Tr. 2966-3927).  Defendant asserted the existence of many mitigating factors.

Death Verdict

On June 21, 2005, the jury returned a death penalty verdict for counts 2 through 5 and 7 through 10, for the murders of the Duncan family and DeGeus, and life imprisonment verdict for counts 1 and 6, regarding Nicholson's murder.  (Docket # 593).

## III.    LEGAL STANDARD FOR 28 U.S.C. § 2255 RELIEF

Defendant seeks relief pursuant to Title 28, United States Code, Section 2255. That section provides that a prisoner in custody under sentence of a federal court may seek to have a sentence of incarceration vacated, set aside or corrected upon the ground that the sentence

> was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or as otherwise subject to collateral attack . . ..

To obtain relief under Section 2255, a defendant must establish: 1) the sentence was imposed in violation of the Constitution or the laws of the United States; 2) the court was without jurisdiction to impose such sentence; 3) the sentence was in excess of the maximum allowed by law; or 4) her sentence is otherwise subject to collateral attack. See _Hill v. United States_, 368 U.S. 424 (1962).  Section 2255 was enacted to create a jurisdictional basis in the sentencing court for certain types of post-conviction claims, in general those dealing with the imposition of the sentence for which the court would

18

have access to the necessary files. *Lee v. United States*, 501 F.2d 494, 499-500 (8th Cir. 1974).

Section 2255, however, did not grant subject matter jurisdiction over all types of post-conviction claims. *Lee*, 501 F.2d at 500. It established subject matter jurisdiction for the enumerated claims in the statute, which relate to the legality of the sentence. *Lee*, 501 F.2d at 500. To allow jurisdiction under section 2255 in all cases would defeat its purpose in creating limited subject matter jurisdiction over those claims concerning the imposition of the sentence. *Lee*, 501 F.2d at 500. Congress only intended to shift jurisdiction over specific types of claims in order to distribute post-conviction cases more efficiently. *Lee*, 501 F.2d at 500. Section 2255 is not intended as a substitute for direct appeal, and matters which could have been raised on appeal will not be considered. *United States v. Sappington*, 527 F.2d 508 (8th Cir. 1975).

Particularly where a defendant had a fair opportunity to previously present her federal claims to a federal court, the court is entitled to presume that the defendant stands fairly and finally convicted and will give respect to the prior judgment. *United States v. Frady*, 456 U.S. 152, 164-65 (1982). For this reason, in a section 2255 collateral challenge, a defendant, in order to gain relief under any claim, is obliged to show "a good deal more" than would be sufficient on a direct appeal from a sentence. *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (citing *United States v. Frady*, 456 U.S. at 165 ("error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment")). Accordingly, the court is authorized to grant relief only if it determines that the challenged judgment resulted

19

from "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." *Pollard*, 959 F.2d at 1020 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

A claim is procedurally defaulted and barred from consideration on collateral review where a petitioner failed to raise a claim that could have been raised on direct appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998). A court cannot review a defendant's claims on the merits, when procedurally defaulted, unless the movant "is able to demonstrate either [1] cause for his default and actual prejudice, or [2] that the failure to consider the claims would result in a fundamental miscarriage of justice." *McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997). The "fundamental miscarriage of justice" exception to procedural default is "only available to a [movant] who demonstrates 'that a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *McCall*, 114 F.3d at 758. "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal citations and quotations omitted).

One common cause for default alleged by defendants is ineffective assistance of counsel. The Sixth Amendment to the United States Constitution provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defen[s]e." U.S. Const., amend. VI. The Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S. Ct. 838 (1993). Counsel is

20

constitutionally ineffective under *Fretwell* when, (1) counsel's representation falls below

an objective standard of reasonableness; and (2) the errors are so prejudicial that the

adversarial balance between defense and prosecution is upset, and the verdict is

rendered suspect. *Fretwell*, 506 U.S. at 368-69.

As stated by the Supreme Court in *Strickland v. Washington*:

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

The benchmark for judging any claim of ineffectiveness is whether an attorney's

conduct so undermined the proper functioning of the process that it "cannot be relied

upon as having produced a just result." *Strickland*, 466 U.S. at 686. In other words the

defendant must show that "counsel's errors were so serious as to deprive the defendant

of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690. In scrutinizing counsel's performance a court is to be

highly deferential. *Strickland*, 466 U.S. at 689. When examining a counsels'

21

performance, the Court should exercise a strong presumption that the representation was within a wide range of reasonable assistance. <u>See, e.g.</u>, *Strickland*, 466 U.S. at 687; *Johnson v. United States*, 278 F.3d 839, 842 (8th Cir. 2002); *Collins v. Dormire*, 240 F.3d 724, 727 (8th Cir. 2001). "Strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengable." *Knowles v. Mirzayance*, --- U.S. ----, 129 S.Ct. 1411, 1420 (2009) (internal quotation omitted); *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (same). A defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Lawrence v. Lockhart*, 767 F.2d 449, 450 (8th Cir. 1985). The presumption exists to "eliminate the distorting effects of hindsight" and recognizes that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

A defendant must show not only that counsel's conduct fell below an objective standard of reasonableness, but show:

> that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. The same deferential review applies to the "prejudice" portion of the test. *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989). The failure to establish "prejudice" is dispositive of the case without consideration of the *Strickland* "performance" factor. *Sanders*, 875 F.2d at 211 n.8. Accordingly, the Court need not determine whether counsel's performance was deficient before examining the prejudice

22

suffered by the defendant as a result of the alleged deficiency.  *Strickland*, 466 U.S. at 697.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, the Court should do so.  *Strickland*, 466 U.S. at 697.  In order to show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Pfau v. Ault*, 409 F.3d 93, 939 (8th Cir. 2005) (internal quotation and citation omitted).

If a petitioner fails to demonstrate ineffective assistance of counsel as cause for the procedural default, her collateral claim cannot survive.  *Wainright v. Sykes*, 433 U.S. 72 (1977).  In the context of an ineffective assistance of counsel assertion of cause to excuse procedural default, a defendant must ordinarily demonstrate that some objective factor external to the defense impeded counsel's efforts to comply with the standard of conduct.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

## IV.    DEFENDANT'S TRIAL COUNSEL WERE NOT INEFFECTIVE

Defendant claims defense counsel was ineffective with respect to 14 areas where she now claims her trial counsel acted in an unreasonable manner and that she was prejudiced as a result.  The government will address each of these claims in turn.

### A.    Plea Negotiations

Defendant claims her trial counsel were ineffective for failing to "take the necessary steps to resolve this case in a plea for a sentence less than death."  (Motion at 12-25).  Defendant claims her attorneys did not spend sufficient time with her, did not enlist a psychiatrist, family or others to persuade her to plead guilty.  Defendant faults her attorneys for failing to secure a plea offer from the government that would have

23

resulted in something less than death, but fails to carry her burden of showing that their conduct fell below that required of competent counsel. Moreover, defendant cannot carry her burden of showing that, even if counsel had done what she now claims they should have done, it would have resulted in a different outcome. In other words, it is pure conjecture that the Attorney General would have ever agreed to a plea agreement in this case.

While defendant finds fault in her trial counsel, she has not established that they failed to act in an objectively reasonable manner. Defendant does not claim her attorneys failed to advise her of all of the plea options, or that they failed to adequately investigate possible plea options. This stands in stark contrast to conduct by counsel in *United States v. Hernandez*, 450 F. Supp.2d 950, 976 (N.D. Iowa 2006), where this Court found trial counsel failed to explore with defendant all of the possible options and sentencing ramifications. Defendant's attorneys met with her repeatedly, and discussed plea options with her. Even from the little information defendant provides in her motion, it is clear defendant was generally not interested in a guilty plea, instead claiming the witnesses were lying. Defendant's attorneys did explore plea possibilities with the government repeatedly. Though those discussions did not result in a plea agreement, that does not mean the attorneys acted ineffectively. Indeed, defendant's attorneys endeavored to protect her interests by attempting to ensure that any plea agreement would not require her to debrief as a condition-precedent. Accordingly, while defendant can, in hindsight, suggest other things her attorneys might have done or steps they could have taken, she has failed to establish what they did do fell below the standard of objective reasonableness. See *Cheek v. United States*, 858 F.2d 1330,

24

1336 (8th Cir. 1988) (failure to establish counsel gave unreasonable advice is fatal to an ineffective assistance claim).

Even assuming her trial counsel's conduct fell below an objective standard of reasonableness, defendant cannot show she was prejudiced.  Defendant has proffered no evidence that had trial counsel done what she now claims they should have done, that it would have made a difference.  To establish prejudice, defendant "must show that she would have accepted the plea but for counsel's advice . . .." *Engleen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995).  See also *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (no ineffective assistance of counsel unless defendant can show that, but for counsel's advice, he would have accepted an offer and not have proceeded to trial).  There is, indeed, almost no indication defendant was ever willing to plead guilty.  Defendant has produced a note she wrote to attorney Pat Berrigan in May 2003, indicating a willingness to plead guilty.  (Defendant's Exhibit 7).  There is no indication, however, that defendant was willing to act on that statement.  Indeed, this note appears to be a passing expression of frustration, not reflective of a true expression of her desire to plead guilty.  Defendant has provided no other evidence, before or after this note, showing any willingness to plead guilty.  Given the complete absence of any other such correspondence or evidence reflecting an intent to plead guilty, defendant's single note does not constitute sufficient evidence to demonstrate that defendant would have pled guilty.  Defendant's self-serving, conclusory assertion that she would have accepted the plea offer carries no weight when made only after conviction and a sentence of death.  There is no credible evidence defendant would have admitted her guilt prior to trial.  Defendant refused to proffer with the United

25

States, did not admit guilt during her penalty phase of trial, and made no admissions of guilt during her allocution. Indeed, defendant does not even admit guilt in her Motion, leading to the conclusion that she still asserts her innocence. Accordingly, defendant cannot establish she would have pled guilty.

Regardless of what defendant would have done, there is no showing that the government would ever have agreed to a sentence less than death. The reported cases in this area all involve instances where the government had made a plea offer and the defendant alleges he failed to accept the plea because of faulty advice of counsel. Here, the government never made a plea offer to the defendant. Though there were preliminary discussions about possible ways to resolve the case, the discussions never progressed to the stage where the government gave defendant a plea offer. Regardless, no one in the United States Attorney's Office had the authority to make a binding plea offer to the defendant. Only the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case. There is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea. Indeed, the only evidence extant is to the contrary; when defendant offered to plead guilty in exchange for a life sentence, the Attorney General rejected the offer.

To demonstrate prejudice, defendant must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Defendant has failed to provide this Court with any proof to support her self-serving, conclusory

26

assertion that she would have accepted an offer to plead guilty to a life sentence, and the record of her conduct contradicts this assertion.  More important, the defendant offers nothing but conjecture that, had her attorneys done as she now claims they should have done, that the government would have made her a plea offer.  Accordingly, the Court should deny defendant's motion on this ground without a hearing.

### B.  Defendant's Mental State at the Time of the Offense

Defendant claims her trial attorneys were ineffective with respect to investigating and proving her mental state at the time of the offense.  (Motion at 25-50).  Defendant concedes her trial counsel presented "extensive evidence" about her background and childhood (Motion at 26), through "no shortage of testimony and expert opinion" (Motion at 25).  She now claims, however, her attorneys "arbitrarily" failed to present evidence about her "brain," which she now claims was affected by "her genes, her biology, and her pregnancy" (Motion at 26).  Defendant has hired a new expert, Dr. George Woods, who she claims will present evidence showing defendant's mental state was impaired at the time of the offense.  (Motion at 38-39).

### 1.  Defendant's Criticism of Her Mitigation Evidence

Defendant devotes about 13 pages of her Motion to recapping the mental health mitigation evidence presented by her trial counsel.  (Motion at 27 to 41).  In this recitation, defendant makes a lot of assumptions for which she has presented no factual support.  For example, defendant says "counsel made the critical decision not to investigate the fertile areas of mitigation" counsel had asked Dr. William Logan to investigate, which defendant claims "[w]e know [ ], in part, because Dr. Logan did not talk to Angela about the offenses, nor does it appear that he discussed Angela's

27

relationship with McNeese or Dustin Honken." (Motion at 28). Other than citing this presumption, defendant gives no factual support for the assertion defense counsel made a decision not to investigate any matter. Defendant further claims "[b]oth Dr. Logan and Dr. Cunningham knew the fact that Angela's brain was not normal," but cite no basis for this assertion. (Motion at 30).

A prime example of defendant's far-reaching but factually unsupported assertions is her claim Dr. Cunningham "said that a PET scan would show 'little bitty pockets of dead brain.'" (Motion at 31). Dr. Cunningham had no factual basis for making this claim, as no PET scan was ever performed. (Motion at 31 n. 23). Indeed, defendant has not provided the government with any PET scan results, even in support of her present Motion.

Defendant takes her trial counsel to task for instructing her experts not to evaluate her regarding her state of mind at the time of the offense. (Motion at 32-38; 41-42). Again, defendant claims this decision was "arbitrary." (Motion at 41). Yet, defendant admits her counsel had reasons for choosing not to present such evidence. (Motion at 42-43). Defendant therefore shifts her claim, asserting there was no reasonable strategy basis for instructing her experts not to evaluate her state of mind at the time of the offense. (Motion at 42-46). Defendant claims trial counsel should have instructed her experts to investigate her state of mind at the time of the offense and then, if they did not like the answers, not offer it and therefore "the Government would not evaluate that issue." (Motion at 43-44). This argument is flawed for the reasons explained in Section V(B)(4) below.

Defendant claims that once her attorneys decided on a "mere presence" defense

28

during the merits phase of the trial, "they left themselves with no choice in mitigation but to offer an explanation as to what could have possibly going [sic] on in Angela's head at that time." (Motion at 45). Defendant fails to explain why this is so. To the contrary, if a person was "merely present" at the time of an offense, her state of mind does not bear importance. For trial counsel to present a coherent defense, they needed to maintain a consistent position that defendant was merely present when Honken committed the offenses, and therefore not guilty. The mental impairment defense trial counsel presented during the penalty phase was consistent with defendant's merit phase defense, as it maintained that defendant had no state of mind to commit any offense, but sought to mitigate the punishment that should be imposed not because of her state of mind at the time of the offense, but rather, because her mental impairments made the death penalty inappropriate for her. Defendant now claims trial counsel should have presented an inconsistent defense, first claiming her innocence at the time of the offense because she was merely present, but during the penalty phase excuse her intentional conduct as the product of mental impairment.

### 2.    Defendant's New Claim of Psychological Impairment

As mentioned above, defendant has paid a new expert to examine her, and he has, not surprisingly,[3] concluded her mental functioning was impaired at the time of the offense. (Motion at 38-39). Apparently Dr. George Woods will claim defendant suffers from "complex trauma, as a result of the significant abuse she suffered in her

---

[3] Dr. Woods has testified in scores of death penalty habeas cases, always on behalf of the defense, where he has consistently found the defendant suffered from some type of mental impairment.

29

childhood."[4] (Motion at 39). Dr. Woods will also claim defendant suffers from "temporal lobe dysfunction" resulting from "genetically inherited 'aberrant electrical activity'" in the brains of both defendant and her mother. (Motion at 39). Dr. Woods bases his diagnosis on an interview and a neurological examination of defendant, and the review of medical records, testimony of other defense experts, and declarations from family members and others. (Exhibit 1, at 9). The diagnosis is not based on EEGs, PET scans, CAT scans, or any other type of objective, measurable medical testing.

In other words, Dr. Woods claims defendant had a temporal lobe dysfunction, and had it at the time of the offense, based largely on anecdotal information related by defendant and her family. Defendant has not provided any medical records to support this diagnosis. No other doctor or expert has ever diagnosed defendant with temporal lobe dysfunction. Moreover, Dr. Woods purports to diagnose not just defendant, but also defendant's mother and grandmother as having the same mental impairments, though he has never met or examined them. (Exhibit 1, at 12).

Defendant's new diagnosis is highly questionable. To begin with, Dr. Woods purports to diagnose defendant's condition at the time of the offenses, now more than 16 years ago. Further, Dr. Woods claims defendant suffered from "absence seizures" and "complex partial seizures" due to "inherited aberrant electrical activity in Ms. Johnson's brain." (Exhibit 1, at 11). Dr. Woods makes this diagnosis without reference to any medical records showing a history of seizures or the electrical activity in

---

[4] It appears that "complex trauma" is the same as "complex Post Traumatic Stress Disorder." (See Exhibit 1, at 19-20, setting forth formal diagnosis, and Exhibit 1, at 22, summarizing defendant's condition as "suffering from Complex PTSD and Temporal Lobe dysfunction").

30

defendant's brain.[5]  He takes his diagnosis one step further by purporting to diagnose defendant's mother, whom he has never met, let alone medically examined or tested, as "suffering from the same inherited aberrant electrical activity." (Id.).  Dr. Woods claims "Jean Johnson, Ms. Johnson's mother, continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity." (Exhibit 1, at 14).  It appears that Dr. Woods based his conclusion defendant suffers seizures, at least in part, on her claim that she sometimes doesn't hear what people say and sometimes has to reread pages in a book.  (Exhibit 1, at 16-17).  Dr. Wood apparently believes this evinces "brief losses of consciousness, consistent with absence seizures . . .."  (Exhibit 1, at 17).  If that is the test for diagnosing seizures, a great many people, including the undersigned, could be so diagnosed.

The conclusions Dr. Woods' draws from his diagnosis are even more suspect. Having diagnosed defendant with temporal lobe dysfunction and complex trauma, Dr. Woods claims it "led to the profound destruction of her will." (Exhibit 1, at 16).  Dr. Woods claims, therefore, defendant's capacity to conform her conduct to the law was impaired at the time of the offense.  (Exhibit 1, at 22).  Further, based in large part on second-hand reports of defendant's behavior at trial, Dr. Woods also concludes defendant was mentally impaired at the time of trial.  (Exhibit 1, at 21).  See Vogt, 88 F.3d at 591 (not every manifestation of mental illness, low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior demonstrates incompetence to

---

[5]  Dr. Woods concedes defendant had adequate intellectual functioning based on an IQ test administered prior to trial.  (Exhibit 1, at 14).  Though defendant abused methamphetamine, Dr. Woods concedes the two tests of frontal lobe function "were within normal limits."  (Exhibit 1, at 15).

31

stand trial).

### 3. Defendant Cannot Show Her Trial Counsel's Performance Was Defective

Defendant claims her trial counsel were ineffective for failing to have her examined regarding her mental condition at the time of the offense. Trial counsel's performance, however, did not fall below an objective standard of reasonableness. Attorney Pat Berrigan, a very experienced death penalty attorney, stated that he made a strategy decision not to pursue a defense regarding defendant's state of mind at the time of the offense. Berrigan believed it was counterproductive during the penalty phase to focus on defendant's state of mind at the time of the offense because it takes the jury's focus back to the offense. (Hearing Transcript of March 7, 2005). A conscious decision not to pursue or introduce psychological evidence as a matter of trial strategy is "virtually unchallengable" in a collateral attack. *Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006). By limiting the scope of mental health evidence during the penalty phase, Berrigan effectively injected defendant's mental condition into the penalty proceedings while barring the government from rebutting that condition with crucial evidence of her thinking and behavior at the time of the offense. Thus, this was not an arbitrary, irrational decision, as defendant alleges, but was a clever, informed, and calculated strategy decision which was not unreasonable.

Defendant's trial counsel had defendant examined and investigated possible mental impairment defenses. They presented substantial evidence regarding defendant's purported Post Traumatic Stress Disorder, and evidence of her childhood and its reported traumas. The only thing Dr. Woods adds to what her attorneys already

32

developed is his questionable diagnosis of temporal lobe dysfunction and his claim to know her state of mind at the time of the offense.  Assuming trial counsel had developed this same evidence of defendant's state of mind, trial counsel made a strategic decision not to focus on defendant's mental functioning at the time of the offense so as to shift focus away from the crime to the appropriate punishment.  While her current counsel apparently would choose a different approach, it cannot be said that trial counsel's decision was so objectively unreasonable as to constitute ineffective assistance of counsel.

Trial counsel's strategic decision was reasonable, particularly in light of the evidence.  At trial, the government presented evidence demonstrating defendant was a high-functioning individual, owning her own business at one time, consistently employed otherwise, all the time while raising children as a single mother.  The evidence showed she was also capable of detailed planning, both in the execution of the charged offenses as well as her later planning to kidnap a drug dealer who owed her money.  Moreover, defendant's conduct after her arrest, when she attempted to evade conviction by blaming the crime on another, showed further complex planning and full understanding of her conduct.   Under these circumstances, it was reasonable for trial counsel to conclude that a claim defendant's will was destroyed and her mental state so impaired that she could not comply with the law at the time of the offense would have fallen on deaf ears or, worse, would have offended the jury.  See *Jones v. Delo*, 258 F.3d 893, 903-904 (8th Cir. 2001) (trial counsel was not ineffective for making strategy decision not to investigate or have defendant mentally evaluated regarding his state of mind at the time of the offense, even with evidence he suffered a head injury,

33

when evidence showed at the time of offense defendant "functioned in society at a substantial level of competence[,] . . . held a job, had relationships with men and women, and, has we have seen, was capable of detailed planning.").

Contrary to defendant's current argument, a mere presence defense was consistent with the mitigation case presented. Defendant maintained that she was not a willing participant, but was only present when Honken committed the offense. Accordingly, it was consistent to maintain that her state of mind at the time of the offense was not in play. Therefore, the only relevant mental health issues concerned her past and current mental states as they related to the appropriate punishment. In contrast, asserting a defense that she was merely present, but then shifting gears during the penalty phase to explain that she had impaired mental capacity at the time of the offense would have been inconsistent. The difficulty with presenting such an inconsistent position is obvious from defendant's current pleadings. She fails to explain in her motion her role in the offense, let alone explain her state of mind at the time of the offense. In other words, defendant has not identified any act she took which she claims was the result of impaired thinking. Defendant appears to maintain she was only present, faulting her trial counsel for not doing more to push residual doubt, yet also faults her attorneys for failing to present evidence that she was mentally impaired at the time of the offense. It is hard to see how she can fault her trial counsel for maintaining a consistent defense: she was merely present at the time of the offenses, and therefore her state of mind at that time was not relevant. To have maintained her innocence during the guilt phase, but then present evidence of an impaired state during the penalty phase, would have appeared duplicitous in the extreme.

34

In addition, trial counsel was concerned about the ramifications of having defense experts examine defendant about her state of mind at the time of the offense because of what defendant might say to government experts. (Motion at 43).[6] Defendant's criticism that this strategy decision is of recent origin[7] and premised on a misunderstanding of Rule 12.2 is misguided. First, there is nothing recent about trial counsel's concerns about defendant making incriminating statements about her involvement in the offense if expert inquiry was allowed as to her state of mind at the time of the offense. Indeed, this was the subject of protracted litigation between trial counsel and a government taint team appointed by the Court, and resulted in a published opinion which reflected that concern. See *United States v. Johnson*, 383 F. Supp.2d 1145 (N.D. Iowa 2005). Second, it is amply clear from this Court's opinion that trial counsel suffered no misunderstanding of Rule 12.2, as this Court's opinion sets out in plain terms the scope and limits of disclosure of expert information under these circumstances. *Johnson*, 383 F. Supp.2d at 1151-1152, 1161-1164. Finally, this was a legitimate concern. Unlike with Honken, the government here did not have recordings

---

[6] We have limited insight into what defendant would have said if questioned about her role in the offense through defendant's attorney proffer made in pursuance of a plea offer. According to the proffer, she admitted entering the Duncan house through a rouse, holding the family hostage at gunpoint until Honken arrived, assisting in binding and gagging the adult victims, and driving the victims to the woods where they were all shot. She further admitted luring DeGeus to his death. This is very inconsistent with her mere presence defense at trial. (Defendant's Exhibit 9).

[7] Defendant implies trial counsel's concerns about defendant making incriminating statements about the offense is a post-hoc justification. (Motion, at 43 – "Second, there is Berrigan's now stated strategy that he was afraid that what Angela might say to her experts or the Government's experts would be damaging.") (emphasis added).

35

where defendant made incriminating statements about her involvement in the murders or her state of mind at the time of the murders.

Rule 12.2, and the consequences of decisions relating to mental examinations, is more nuanced than defendant's current counsel suggests. Defendant's current attorneys suggest trial counsel should have allowed a full examination to take place and, if they did not like the answers, "offered the expert to testify only to certain portions of results" or start over with new experts "to perform a more limited evaluation." (Motion at 43-44). Had her experts fully inquired into defendant's state of mind at the time of the murders, they would not have been allowed to offer "limited" testimony for the government would have a right to disclosure of the full extent and basis for the experts' opinion in order to effectively cross examine them. See *Johnson*, 383 F. Supp.2d at 1162-63 (discussing circumstances where a defendant would "open the door" to offense specific questions, then try to control what the government can use to rebut the evidence, and concluding that "in fairness and justice the [prosecution] should be permitted to cover the subject also.") (internal quotation and citation omitted). Had she fired her experts because she did not like the answers, the government would have deduced the same and may have subpoenaed them to testify. See *Williams v. Calderon*, 41 F. Supp.2d 1043, 1051 (C.D. California 1998) (if defendant consulted with one expert, but then called a different one at trial, "the prosecution would have known that [the first expert] had been appointed and would have known inferentially why the defense did not call him" and "[t]he prosecution could then have subpoenaed [the first expert] to rebut" the defense's second expert).

Further, defendant's attorneys assert that Rule 12.2(c)(2) requires the

36

government to turn over the reports of its experts before the defense is required to turn over its reports. (Motion at 44). First, this is not what this Court ordered. This Court ordered defendant to produce to the government the "raw testing data" and held that defendant would be entitled to the government's data "only if she is convicted and confirms her intent to offer during sentencing proceedings expert evidence on mental condition." *Johnson*, 383 F. Supp.2d at 1167. Second, this does not address trial counsel's concerns about defendant incriminating herself. If trial counsel had failed to protect defendant's Fifth Amendment rights by barring inquiry into defendant's state of mind and behavior at the time of the murders, however, she would have waived that right. Once waived, defendant could not "unwaive" her rights by limiting the scope of her experts' testimony or by firing her experts, hiring new ones, and then attempting to limit the inquiry.

### 4. Defendant Cannot Show She Suffered Prejudice

Assuming for the sake of argument defendant could demonstrate her trial counsel's strategic decision to pursue a mere presence defense, bar the government from examining defendant as to her role in and state of mind at the time of the murders, and yet present mental health mitigation evidence during the penalty phase somehow fell below an objective standard of reasonableness, defendant cannot show she was prejudiced by the strategy decision. Defendant only speculates that, had the jury been presented with Dr. Woods' testimony, one or more jurors would have voted against the death penalty.[8] Defendant's argument is without merit because Dr. Woods' analysis is

---

[8] To the extent defendant attempts to rely on post-trial statements by jurors as to what they were thinking during deliberations (see Motion at 49), that evidence is barred

37

incomplete.  It fails to fully account for all the evidence that would have been admitted during the penalty phase, had defendant's state of mind been at issue.  It also fails to account for the overwhelming aggravating factors found by the jury that suggests a different outcome would not have occurred, even with Dr. Woods' testimony.

Defendant fails to fully account for all the evidence that would have been presented if, as she now suggests, her state of mind at the time of the murders would have been put into play.  First, defendant fails to articulate what her defense during the merits phase would have been; had she still presented a mere presence defense like she did during trial, it would have been completely inconsistent with the evidence of what her real role was during the murders.  It would also be inconsistent with her continued claim she was entitled to a residual doubt mitigation instruction.  Second, defendant presents a one-sided view of the evidence, for the government has had no opportunity to examine defendant to rebut her claims of diminished capacity.  The government will be filing a motion for a full examination of defendant, now that she has made her state of mind at the time of the murders an issue.  Had she done so before, as she now argues her attorneys should have, the government would have had a similar opportunity to examine defendant about her role and state of mind at the time of the murders and would have presented a rebuttal case.  Defendant cannot now make only a one-sided argument and claim the outcome would have been different.  Finally, defendant fails to factor into her analysis the jury's reaction to hearing her admissions about her role in the murders.  Gone would be any possibility of relying on residual

---

by Federal Rule of Evidence 606(b).

38

doubt, or suggestions she was merely present.  Rather, the jury would have been fully confident that she was intimately involved in the murders from the beginning.[9]

Defendant's assertion the outcome would have been different, if only her attorneys had presented Dr. Woods' testimony, also fails to take into account the overwhelming evidence and many aggravating factors proven during the case.  The jury unanimously found the following aggravating factors applied: 1) crime was committed after substantial planning and premeditation (as to DeGeus only); 2) victims were tortured (as to adult victims); 3) serious physical abuse (of the adult victims); 4) vulnerable victims because of age (child victims); 5) obstruction of justice; 6) aiding and abetting the killing of more than one person in a single criminal episode; 7) effect on the victims' families was injurious.  (See 5/31/05 Verdict - Docket # 545; 6/21/05 Verdict - Docket # 593).  Given the weight of the evidence presented, defendant cannot show the jury's decision would have been different.  See, e.g., *Strickland*, 466 U.S. at 700 ("given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances"); *Jones*, 258 F.3d at 903 (there was no prejudice from trial counsel's failure to present mitigating evidence regarding defendant's abuse as a child and brain injury during penalty phase); *Link*, 469

---

[9]  The import of this knowledge would outweigh any expert testimony about her alleged diminished capacity as she held two little girls and their mother hostage at gunpoint.  This is shown by the jury's verdict.  The jury did not find defendant's involvement in the murders of Nicholson and the Duncan family were the result of substantial planning and premeditation, apparently buying the defense argument that defendant simply found herself present at something Honken had planned.  Had they fully known defendant's role in the murders, they would have found this additional aggravating factor as well.

39

F.3d at 1205 (finding no prejudice where trial counsel failed to present psychological evidence in mitigation of the death penalty where defendant killed a child); *Schlup v. Armontrout*, 941 F.2d 631, 639 (8th Cir. 1991) (finding "trial counsel's failure to offer expert psychiatric or psychological testimony as mitigating evidence" did not prejudice defendant's case "[i]n light of the numerous aggravating circumstances . . ..").

Accordingly, the Court should deny defendant's motion on this issue. Because of the nature of the issue raised, however, the government believes an evidentiary hearing would be appropriate on this issue.

C. Defendant's Alleged Susceptibility to Honken

Defendant claims her attorneys were ineffective for failing to call witnesses to show Honken was not "bookish" and "easily led" by defendant, but was manipulative and violent. (Motion at 50-59). Defendant claims that "[t]hough they knew it not to be true," the government offered evidence through Ms. Nelson that, until he met Ms. Johnson, Honken had never engaged in any violence." (Motion at 51). Defendant then recites statements from a number of witnesses about various "plans" and "goals" Honken had for violent acts, most of which planning took place after Honken met the defendant.[10] From this recitation of statements, defendant concludes her counsel were ineffective for failing to show that Honken was violent, and claims that had they done so, the outcome would have been different. Defendant's argument is without merit.

---

[10] The only alleged act of violence defendant cites, prior to meeting her, is a reference by Alan Johnson who claims that when they were children, Honken once hit him with a bullwhip and stripped skin off his nose. In his affidavit, Johnson does not explain when or how this occurred, whether it was an accident resulting from horsing around, or an intentional act of violence against him.

40

The government did not misrepresent Honken's history of violence, or defendant's violent, volatile, nature. As is explained in more detail below in Section V, there is no evidence Honken ever personally engaged in an act of violence until after he met defendant. While he planned a bank robbery when he was in high school, and allegedly talked about going to Minneapolis to assault people, there is no evidence he personally ever engaged in an act of violence. After he and defendant were separated by prison walls, Honken still did not engage in acts of violence. Sure, he planned violent acts. He plotted them out in great detail and recruited others to participate in his plans, but he still did not engage in an act of violence. Honken's dangerousness comes from his evil cunning, and the potential of hooking up with someone who will goad him to act, like defendant did.

Therefore, had trial counsel presented all the evidence defendant now claims they should have presented, it would have only fed into the government's theory of the case. All of the evidence recited by defendant shows Honken to be a planner of evil deeds, but not an actor of evil deeds until teamed up with defendant. On the other hand, there was significant evidence defendant was volatile and violent.[11] Accordingly, defendant cannot show that trial counsels' performance fell below an objective standard

---

[11] See, e.g., (Tr. 369 – when Honken was arrested, defendant threatened his brother ); (Tr. 2368-40 – Defendant threatened Honken's other girlfriend on several occasions); (Tr. 708-710 – after defendant learned Dan Cobeen cooperated with law enforcement authorities, she threatened him); (Tr. 3613-14 – after police searched defendant's ex-husband's house, defendant left threatening messages on the police chief's answering machine); (Tr. 2678-79, 2682-83 – defendant had a horrible temper, flew into rages, pointed a gun at Honken, and made threats about "getting" prosecutors and agents); (Tr. 2726 – defendant attempted to hire an undercover agent and a confidential informant to kidnap a drug dealer so that she could collect a drug debt); (T. Tr. 3210 – defendant needed calmed down).

41

of reasonable conduct under these circumstances.

Further, defendant cannot demonstrate that the outcome would have been different had this evidence been presented. It is pure conjecture to suggest that more evidence showing Honken liked to plan violent acts and was manipulative himself would overcome the fact that, until he met defendant, he never engaged in an act of violence himself, and that defendant was a woman to be feared in her own right. If there was any doubt about this, the evidence presented during the penalty phase of the undercover tapes recording defendant planning the kidnapping of a drug dealer who owed her money should put to rest the idea that she was the passive victim she now makes herself out to be.

### D. Defendant's Demeanor

Defendant claims her trial counsel were ineffective because they failed to control her demeanor at trial, or to have explained her demeanor to the jury. (Motion at 59-65). Defendant claims her demeanor negatively impacted the jury, relying on post-trial juror interviews. (Motion at 63-64). Defendant cannot offer nor the Court rely on evidence, however, of what jurors thought about defendant's demeanor. Such evidence is barred by Rule 606(b) of the Federal Rules of Evidence. See *Carter v. Gibson*, 27 Fed.Appx. 934, 2001 WL 1612065, *8 - 9 (10th Cir., Dec. 18, 2001) (unpublished, copy attached) (court may not consider testimony of juror as to the juror's impression of the capital defendant's demeanor). Without relying in inadmissible evidence, defendant has nothing but conjecture to suggest that there was anything negative about her demeanor that required change or addressing.

Defendant assumes her demeanor was inappropriate because of medications or

42

instructions from counsel.  Defendant fails to show that her demeanor was changed at all by either the medication or instructions.  There is no evidence of defendant's "normal" demeanor.  There is no evidence her normal demeanor changed as a result of either medications or instructions.  Moreover, defendant cannot show her demeanor was "inappropriate."  While defendant points out that her demeanor was passive and unemotional, is it subjective to suggest this was an inappropriate demeanor.  Defendant points out that she was unemotional in response to victim testimony.  Defendant fails to establish that an emotional response would have been more appropriate.  Moreover, defendant fails to demonstrate that her lack of emotion to victim testimony resulted from either medication or her attorneys' instructions.  Indeed, defendant was capable of showing emotion – she did so when her family members testified.  That she was unemotional during the victim testimony may have only meant that she had no remorse for the murders, and nothing more.  That lack of remorse cannot be laid at the feet of her doctors or attorneys.

Assuming, for the sake of argument, defendant's demeanor was inappropriate in some way, defendant has failed to carry her burden of demonstrating that trial counsel's performance fell below the objective standard of reasonableness.  Defendant claims her attorneys should have monitored her medications in consultation with the defense psychiatrist, including discussing possible modifications of the medications.  (Motion at 61).  Defendant has not proffered evidence, however, that trial counsel failed to do so, or had they done so, that the psychiatrist could have modified the medications or, had they modified the medications that it would have made any difference on defendant's alleged demeanor.  Defendant claims her dose of Zoloft was increased 30% during the

43

course of the trial (Motion at 62), but fails to demonstrate this change in medication had any impact on her demeanor, or if it had an impact, the impact was negative, or if it was, that there was an alternative to the medication, or that defense counsel should have been involved in having defendant's medication modified. Defendant claims counsel should have had Dr. Logan testify about "demeanor affecting side effects" the medication might have had. (Motion at 62). Defendant fails to proffer, however, what that testimony would have been. Moreover, defendant fails to address the negative impact drawing attention to defendant's demeanor might have had.

Defendant claims "counsel should have considered how any instructions they gave Angela regarding her behavior would play out in front of the jury." (Motion at 62). Defendant claims she was instructed "not to show any emotion, but instead to draw pictures and eat candy while the jury decided whether she regretted assisting in the murders of five people including two children." (Motion at 63). Defendant provides no factual basis for the assertion that defense counsel gave her such instructions. Assuming these instructions were given, however, defendant fails to demonstrate that counsel failed to consider how her behavior would "play out in front of the jury." Nor has defendant established that her attorneys' instructions had any impact on her demeanor during trial; again, her demeanor may have been the same regardless of instructions from her attorneys. Moreover, there is nothing objectively unreasonable about the instructions. Defendant has a history of being volatile. Defendant concedes the instructions were intended to keep her calm during trial (Motion at 65). Keeping the defendant calm during trial would seem to be an objectively reasonable goal.

Defendant further faults her attorneys for failing to explain her demeanor to the

44

jury through witnesses. Again, assuming for the sake of argument there was something inappropriate about defendant's demeanor, defendant has failed to demonstrate that counsel's failure to elicit testimony about defendant's demeanor was objectively unreasonable. Generally, it is inappropriate to comment on the demeanor of a defendant who does not testify. *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (because defendant did not testify, "[h]is courtroom demeanor was not in any sense legally relevant . . ..").  Moreover, defendant argues that her attorneys "could have simply told the jury that in helping to assist Angela to endure this incredibly stressful trial, they instructed her to sit quietly and draw, which she did to calm herself down, so that her constellation of impairments did not get the best of her." (Motion at 65). This would have been an entirely objectionable comment by counsel. First, their advice to their client was protected by the attorney/client privilege. Defendant has made no showing that she would have waived the attorney client privilege. Nor has she indicated she fully contemplated the ramifications of waiving the privilege and how that may have led to exploitation of that waiver by the government. Second, defense counsel were not testifying as witnesses and were not placed under oath, and therefore could not make statements about their instructions to defendant. Finally, defense counsel's prior statements to defendant would have constituted inadmissible hearsay.[12]

Defendant confidently claims "there is a reasonable probability" that had her

---

[12] The government recognizes the rules of evidence are relaxed during penalty phases of capital trials. The Court retains a gate-keeping obligation, however, and surely unsworn statements by counsel about advice they allegedly gave their client falls outside the realm of admissible evidence even under the most relaxed standards of evidence.

45

attorneys done as she claims they should have done, "one juror would have voted to spare her life." (Motion at 65). This is pure conjecture and speculation. Given the weight of the evidence and the presence of significant aggravating factors, defendant "cannot show that the outcome of either stage of trial probably would have been different." *Carter*, 2001 WL 1612065, at * 8. Defendant was convicted and sentenced to death due to the substantial evidence supporting guilt and the aggravating factors and not because defendant "did not maintain a proper demeanor." Id., at *10.

Accordingly, the Court should deny defendant's motion in this regard. Further, the Court should not hold an evidentiary hearing on this issue. What jurors thought about defendant's demeanor is inadmissible evidence under Rule 606(b). Because defendant is left with nothing but conjecture that her demeanor was inappropriate or thought so by the jury, further evidence concerning her medications and what effect they had on her demeanor is irrelevant.

E.     Experts' Confrontation of Aggravating Evidence

Defendant claims her counsel were ineffective for failing to have her experts explain her threatening, violent behavior. (Motion at 65-68). Defendant mentions some of the aggravating evidence the government presented, claiming it showed she behaved in a "bizarre" manner. (Motion at 65). There was nothing bizarre about her behavior. Rather, the government presented several witnesses who related a series of events spanning a number of years showing defendant was prone to violent behavior and threats. When Honken was arrested, defendant threatened his brother. (Tr. 369). Defendant threatened Honken's other girlfriend on several occasions. (Tr. 2368-40). After defendant learned Dan Cobeen cooperated with law enforcement authorities, she

46

threatened him.  (Tr. 708-710).  After police searched defendant's ex-husband's house, defendant left threatening messages on the police chief's answering machine.  (Tr. 3613-14).  While defendant relates testimony by Honken's sister testified about defendant's violent rages, she left out the threats defendant made to harm law enforcement officers at Honken's sentencing hearing.  (Tr. 2678-79, 2682-83).[13] Finally, the government introduced undercover tapes, taken after Honken was in prison, where defendant attempted to hire an undercover agent and a confidential informant to kidnap a drug dealer so that she could collect a drug debt.  (Tr. 2726).

This was not bizarre behavior.  This was behavior that revealed the true nature of defendant's personality.  She was a violent, threatening person.  She did attempt to hire an agent to kidnap a drug dealer and, given her involvement in prior abductions and murders, that plan could hardly be claimed to be outside the scope of her behavior.

Defendant suggests all this could have been explained away by an expert, "by contextualizing the behavior as the result of mental impairments that are beyond the defendant's control."  (Motion at 67).  Defendant further suggests counsel should have anticipated the government's argument that defendant lived a normal life and to have rebutted this with expert testimony that leading a seemingly normal life is not

---

[13] (Motion at 66).  In relating a portion of Alyssa Nelson's testimony, defendant criticizes the government, suggesting "the Government apparently thought [crude comments by defendant about a female law enforcement officer] relevant to the weighty choice regarding whether the Government should take or spare Angela's life."  (Motion at 66). This is a cheap shot which is unjustified.  Nelson's comment about the female agent was not elicited and was unresponsive to the question asked.  Rather, the government was attempting to elicit testimony about defendant's threat toward the female agent and other law enforcement officers, threats which defendant chose to leave out of her recitation of Nelson's testimony.

47

inconsistent with mental impairments. (Motion at 67-68).

Defendant cannot carry her burden of demonstrating trial counsel acted outside an objective standard of reasonableness. As was explained in more detail above, trial counsel did secure expert testimony and did present evidence of mental impairment. Trial counsel did present a mental illness defense in this case. While defendant now claims trial counsel should have hired Dr. Woods, she cannot establish that trial counsel's conduct was objectively unreasonable.

Moreover, defendant cannot establish that had trial counsel presented more or different psychological evidence that it would have resulted in a different outcome. Trial counsel did present psychological evidence and it carried little or no weight with the jury, and for good reason. The evidence demonstrated that defendant was a fully-functioning, but mean-spirited and violent person. No amount of psychological testimony would have been able to overcome the overwhelming weight of evidence showing her guilt or the aggravating factors supporting imposition of the death penalty.

Therefore, the Court should deny defendant's motion on this ground and no evidentiary hearing is necessary on this issue.

F.      Mitigation Evidence

With remarkably clear hindsight, defendant now faults her trial counsel for calling certain witnesses in an attempt to support mitigating factors. (Motion at 68-74). It is precisely because of this type of Monday-morning quarter-backing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Defendant faults her trial counsel specifically for calling three witnesses: Holly

48

Dirksen, Douglas Book, and Susan Marsolek. The government will address each in turn. Before that, however, it should be noted that defendant does not dispute that each of these witnesses presented mitigating evidence; rather, she now concludes that it was not worth it. Defense counsel cannot be expected to be able to predict either how a witness will perform, nor how the government may cross-examine a witness. Further, defendant claims that "[h]ad these witnesses not been called, this damaging information [elicited by the United States] would not have been put before the jury, as none of these witnesses were called by the prosecution." (Motion at 69). This is not fully accurate, as the government could have called these witnesses in rebuttal to defendant's mitigation case, and at least with respect to Doug Book, had planned to do so.

        1.     <u>Holly Dirksen</u>

Defendant called her sister, Holly Dirksen, to testify about their childhood which defendant then, and now, claims was relevant to explain her violent conduct. Dirksen testified about "unusual religious practices" and "exorcisms" performed by defendant's mother. (Tr. 3247-53). Dirksen testified about how supportive defendant was of her, and helped provide for her. (Tr. 3257-59). Dirksen testified about DeGeus beating defendant. (Tr. 3265-67). Dirksen also testified about the close relationship defendant had with her children. (Tr. 3269-70). Defendant now claims her testimony was of little value. Defendant claims, however, the government was able to obtain valuable testimony from her about defendant supplying her with methamphetamine and that Dirksen encouraged another person not to talk to authorities about the disappearance of Terry DeGeus. (Tr. 3255-75).

49

Defendant's criticism of her trial counsel for calling Dirksen is unwarranted and that decision certainly does not rise to the level of being objectively unreasonable. Dirksen provided mitigating evidence in support of multiple mitigating factors.[14] Moreover, defendant overemphasizes the effectiveness of the government's cross examination. That defendant distributed methamphetamine was already established by other witnesses, and whether she distributed drugs was of little or no import on whether the jury should impose the death penalty. The import of the drug use is that it went to Dirksen's character, not the defendant's. The same can be said of Dirksen's attempt to persuade another person not to cooperate with law enforcement officers. That testimony had nothing to do with defendant and whether the death penalty was appropriate, but rather, addressed the witness's credibility as a way of mitigating the impact of her testimony.

### 2. Doug Book

Central to defendant's mitigation, then and now, is that she was manipulated and abused by other men. Defendant's trial counsel called Chief Doug Book to testify about DeGeus's violent nature, his strength, and that DeGeus beat Johnson severely. (Tr. 3597 - 3601). While defendant now claims this testimony was only "peripherally" connected to her, it was important to establish what defendant continues to claim is

---

[14] Mitigating Factors: 3 (strong bond between defendant and her children); 6 (defendant was abused as a child through unusual religious practices); 8 (defendant would not be a danger to others if incarcerated for life); 9 (defendant raised by unstable mother, resulting in defendant being susceptible to drug abuse, unhealthy relationships, etc.); 10 (defendant was physically and emotionally abused by DeGeus); 11 (defendant has loving relationship with family); 13 (defendant is loved by her daughters); 15 (defendant is loved by her family); 18 (defendant has supported her daughters); 20 (defendant has been a good mother).

50

mitigating evidence – her mistreatment by men and in particular by DeGeus.

On cross-examination, the government elicited testimony from Chief Book about defendant's threats toward him in relation to Chief Book's investigation of defendant's ex-husband. (Tr. 3609, 3612-3615).

Defendant again faults her trial counsel for failing to be prescient, and failing to predict the nature of the government's cross-examination. That is hardly a showing that trial counsel failed to live up to an objective standard of reasonableness. Defendant also faults her trial counsel for failing to recognize the relaxed rules of evidence permitted the government to elicit testimony beyond the scope of direct examination. (Motion at 72). This criticism is unfounded. It is absurd to declare "[h]ad defense counsel not called Chief Book, this evidence would never have been heard by the jury." (Motion at 72). Even if the Court had sustained an objection for questions outside the scope of direct examination, the government had a right to present a rebuttal case. The undersigned prosecutor knew Chief Book well, knew what he had to say, and planned on calling him in rebuttal if defendant did not call him. There is nothing about the fact that he testified on cross examination versus direct examination that makes a material difference in the impact of his testimony.

### 3. Susan Marsolek

Defendant faults her trial counsel for calling Susan Marsolek as a witness. (Motion 73-75). Marsolek had worked with defendant in Clear Lake in the late 1990s. (Tr. 3731-32). Marsolek described defendant as "very compassionate," a "loyal friend," and "trustworthy." (Tr. 3732). Marsolek testified that she and defendant were later housed in the Linn County Jail together and that defendant did not get in fights at the

51

jail.  (Tr. 3734-3736).  Marsolek testified during direct examination that defendant was involved in Bible study.  (Tr. 3737).  She described defendant as trying to help other inmates, taking them "under her wing" to care for them."  (Tr. 3739).  Marsolek also testified defendant was a "very good mother" and cared about her daughters.  (Tr. 3740).  This testimony supported multiple mitigating factors in support of defendant's theory of defense during the penalty phase.[15]

On cross examination the government questioned Marsolek about her own truthfulness, reminding her of false statements she made in her own case and about Marsolek's prior statement about defendant's involvement in a fight.  (Tr. 3742-45).  Marsolek denied memory of the fight.  (Id.).  On redirect, Marsolek said she would not be a snitch (Tr. 3749).  On recross, the government rebutted this with evidence Marsolek received a reduction in her sentence for testifying against another person.  (Tr. 3750).

Defendant now claims Marsolek's testimony was "only marginally helpful testimony" (Motion at 73) or "added nothing to the defense's mitigation case" (Motion at 74), but was somehow "particularly damaging to the defense's mitigation case" (Motion at 73).  Defendant claims by calling Marsolek it permitted the government to "probe a fight in the Linn County Jail" and showed that a "good friend of Ms. Johnson . . . [was] a criminal and a liar."  (Motion at 74).  Defendant labels the decision to call Marsolek as a

---

[15] Mitigating Factors: 3 (strong bond between defendant and her children); 8 (defendant would not be a danger to others if incarcerated for life); 11 (defendant has loving relationship with family); 13 (defendant is loved by her daughters); 15 (defendant is loved by her family); 17 (defendant can lead a productive life while incarcerated); 18 (defendant has supported her daughters); 20 (defendant has been a good mother).

52

witness as "irresponsible and inexcusable." (Motion at 74).

Defendant's hindsight view of Marsolek's testimony has been blurred because her new counsel did not see this testimony and overemphasizes the impact cross examination had on the case. First, the questioning of Marsolek about the fight had little or no impact as she consistently denied defendant's involvement in the fight. The government attorney's questions were not evidence, and therefore no evidence of any value was obtained through the cross examination of Marsolek. Further, to the extent defendant claims calling Marsolek showed that a good friend of defendant was "a criminal," the point of the testimony was to show that defendant behaved well in jail, evidence which only another criminal would be best placed to provide. Finally, to the extent the cross examination showed Marsolek to be untruthful, it only hurt Marsolek's credibility and did not directly affect defendant. At worst for defendant, cross examination neutralized the impact of Marsolek's testimony.

4.     Summary

In summary, defendant's allegation that her attorneys were ineffective for calling these witnesses is unsupportable. While with hindsight another attorney may determine that their testimony was not helpful, that is not the test for ineffective assistance of counsel. Each of these witnesses provided testimony that furthered the defendant's mitigation case. The decision to call them as witnesses cannot be said to have fallen outside an objective standard of reasonableness. Moreover, defendant has completely failed to demonstrate the outcome of the case would have been different had trial counsel not called these witnesses. It is pure conjecture to suggest these witnesses made any difference in the case whatsoever. Regardless, there is nothing to

53

support a conclusion that their conduct was so prejudicial that the adversarial balance between defense and prosecution is upset, and the verdict is rendered suspect. *Fretwell*, 506 U.S. at 368-69.

### G. Defendant's Offer to Plead Guilty as Mitigation Evidence

Defendant claims her attorneys were ineffective for failing to submit as a mitigating factor her willingness to plead guilty in exchange for a life sentence. (Motion at 75-76). Defendant claims that, had this been done, there is a reasonable probability at least one juror would have voted for life. (Motion at 76). This argument is speculative, at best, fails to fully account for the record, and ignores the practical ramifications that would have followed introduction of such evidence.

First, assuming defendant could have found a way to submit admissible evidence she was willing to plead guilty in exchange for a life sentence, it would have opened the door to the fact that the offer came during jury selection, hardly a compelling case of remorse. Second, defendant did not plead guilty, but rather, required the government to spend weeks of the jurors' time proving she was guilty of the offense. Had she then presented evidence indicating that she was willing to plead guilty in exchange for a life sentence, it is reasonable to conclude that the jurors would be none too happy to learn that they just wasted weeks of their time. Third, defendant fails to take into account that submission of this evidence would have negated her ability to pursue the "residual doubt" mitigating factor. If she asserted she was willing to plead guilty, then it means she was guilty and there is no place for residual doubt. Therefore, in assessing whether trial counsel's conduct fell below an objective reasonableness standard, the Court should take into account these practical

ramifications. It was not unreasonable for defense counsel to view such evidence as an empty gesture suggesting remorse, fear the potential backlash from taking a position inconsistent with denying her guilt, and recognize that submission of that evidence would eliminate the availability of pursuing another mitigating factor. That is why "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

In any event, defendant cannot demonstrate prejudice. Defendant's bold assertion that this would have resulted in at least one juror voting for life is pure conjecture and speculation. There is no factual basis upon which to conclude such evidence would have resonated with any juror, or that it wouldn't have had an adverse impact for the reasons set forth above.

Therefore, the Court should deny defendant's motion on this ground and no evidentiary hearing is necessary on this issue.

### H.  Government's Argument That Killing Children Cannot be Mitigated

Defendant claims her trial counsel were ineffective for failing to object to what she claims was an improper government argument that killing children is an evil that cannot be mitigated by any evidence (referencing the trial transcript at 4018, 4033). (Motion at 76). Defendant's argument is without merit.

It is shocking defendant claims this was an improper argument when the Eighth Circuit Court of Appeals rejected that precise contention. Defendant made an identical argument in her direct appeal, and the Eighth Circuit Court of Appeals said "[w]e disagree." *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007). The Court

55

found "[t]he prosecutor was not arguing that the jurors could choose to ignore the mitigators or exclude them from consideration, but rather that they were insufficient to outweigh the gravity of the offense." Id.

Given that the Court of Appeals did not find the remark to be improper, defendant's trial counsel cannot be found to have acted in an objectively unreasonable manner for failing to object to the unobjectionable remark. See *Garrett v. United States*, 78 F.3d 1296, 1302 (8th Cir. 1998) (counsel is not ineffective for failing to object to something that is not objectionable). Moreover, defendant cannot establish that defendant's failure to object fell below an objective standard of reasonable conduct by counsel in any event. See, e.g., *Seehan v. State of Iowa*, 72 F.3d 607, 611 (8th Cir. 1995) (a decision not to object to alleged improper argument presumed to be a strategic decision by counsel); *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994) ("decision to object during prosecutor's summation must take into account the possibility that the court will overrule it and the objection will either antagonize the jury or underscore the prosecutor's words in their minds."). Finally, defendant cannot demonstrate that, had her counsel objected the outcome would have been different. The Eighth Circuit Court of Appeals found that the remark was not objectionable. In other words, the Court's rejection of defendant's argument did not turn on whether defendant's attorneys objected; the standard of review on appeal was not the deciding factor. Rather, the Court rejected the merits of defendant's claim. Therefore, whether trial counsel objected or not made no difference in the outcome.

Accordingly, the Court should deny defendant's motion on this ground and no evidentiary hearing is necessary on this issue.

56

I.    Timing of Trial and Death Notice

Defendant claims her trial counsel were ineffective for failing "to proceed with a trial date that would have prevented the government from issuing a timely notice of intention to seek the death penalty." (Motion at 77-80). Defendant argues that trial counsel's decision to move in January 2002 for a continuance of the May 6, 2002, trial date precluded the possibility from moving to dismiss the government's April 25, 2002, Death Notice. To reach this argument, defendant ignores any legitimate reasons trial counsel had for seeking a continuance. She further assumes that the government would not have filed its Death Notice sooner had the trial not been continued. Defendant's argument is the result of blurred hindsight further impaired by blinders.

When weighing whether trial counsel acted in an objectively unreasonable manner, the Court must take into account all of the circumstances and the trial attorneys' tactical decisions. Defendant makes no accommodation for these. Although acknowledging the government had "thousands of pages of discovery" (Motion at 78), defendant faults her attorneys for seeking a continuance of the trial so that they could adequately prepare for trial. Moreover, defendant faults her attorneys in this same motion for failing to conduct an adequate investigation. Had defendant's trial counsel not moved for a continuance, it stands to reason she would now be claiming ineffective assistance of counsel for failing to continue the trial.

Further, defendant presumes that, had the Court not continued the May 6, 2002, trial date, the government still would not have filed its Death Notice until April 25, 2002. There is no basis for making this assumption. Once the trial date was moved, there was no need to rapidly file the Death Notice. The government held off filing the Notice

57

because once it filed the Notice, it would become very difficult to ever withdraw it.  Had the trial date not been moved, the government would have quickly filed the Death Notice.

Defendant argues that the Death Notice was already too late and even if the government had filed its Death Notice in January 2002, four months prior to trial, trial counsel "could have immediately moved to dismiss it on the basis of its late filing." (Motion at 78).  While counsel could have filed such a motion, it would have been without merit.

A Death Notice must be filed "at a reasonable time before the trial."  18 U.S.C. § 3593(a).  Section 3593 does not define "a reasonable time."  Moreover, there is "no legislative history addressing those issues."  *United States v. Robinson*, 473 F.3d 487, 491 (2nd Cir. 2007) (internal quotation and citation omitted).  Whether notice is timely depends on the totality of the circumstances, "including, but not limited to: (1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known."  *United States v. Wilk*, 452 F.3d 1208, 1221 (11th Cir. 2006).

Without analyzing all of the factors here, a review of just a couple is sufficient to demonstrate that the four-month notice would have been reasonable.  First, in looking at what transpired in the case before the Death Notice was filed, it is clear defendant was on notice that the government was likely to seek the death penalty.  In *Wilk*, "from

58

the start, all parties knew this was a likely death penalty case." *Wilk*, 452 F.3d at 1222. While here it was not clear "from the start" this would be a death penalty case, it became clear shortly after the government found the bodies of the murder victims in the summer of 2000. Whether the Court appointed death qualified counsel on December 12, 2000, it referenced this was a "capital case." Thus, while formal Death Notice was not filed until April 25, 2002, defendant knew for more than a year she was likely facing the death penalty. Second, other courts have held notice provided four months or less before trial as adequate. See, e.g., *United State v. Ponder*, 347 F. Supp.2d 256, 270 (E.D.Va. 2004) (notice filed four months before trial reasonable); *United States v. Le*, 311 F. Supp.2d 527, 534-35 (E.D.Va. 2004) (113 days' notice is reasonable). Thus, disregarding the fact defendant was on notice more than a year before the government filed its Death Notice, the notice would have been timely filed in January 2002.

Regardless, defendant is simply wrong when she asserts that the remedy for a late-filed notice is striking the death penalty. Section 3593 is silent as to the remedy for an allegedly late death notice. An obvious and available remedy for the filing of a late notice is to continue the trial to allow defendant adequate time to prepare for a death penalty trial. *Wilk*, 452 F.3d at 1223 ("Continuing a trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the government's intent to seek the death penalty."); *United States v. Pepin*, 367 F. Supp.2d 315, 319 (E.D.N.Y. 2005) (denying defendant's motion to strike death penalty, finding continuance of trial sufficient remedy for any potential notice issue). But see *United States v. Ferebe*, 332 F.3d 722, 738 (4th

59

Cir. 2003) (suggesting a court may not address the timeliness of a death notice by continuing the trial date).

Accordingly, defendant's assertion that her trial counsel was ineffective for moving for a continuance of the trial date is without merit. She cannot demonstrate her attorneys acted unreasonably in moving to continue the trial so they could fully prepare to defend her. Nor can defendant demonstrate prejudice, as the notice was not untimely and the remedy for filing a late notice would have been a continuation of the trial, which in this case was continued any way for other legitimate and reasonable purposes.

J.      Voir Dire

Defendant claims her trial attorneys were ineffective for failing to "inquire of jurors whether they considered [bizarre religious rituals involving speaking in tongues and exorcisms] to be normal or abnormal expressions of religious belief or even whether they practice such rituals themselves or knew people who did." (Motion at 80). Defendant hypothesizes that "presenting such practices as abusive to people who engaged in them would not only not be mitigating, but would likely anger the juror." (Id.). Defendant also claims her attorneys were ineffective for failing to "probe jurors' attitudes toward women in general and women accursed of crime in particular." (Motion at 81). Defendant declares "[t]here is little doubt that many women and men judge women that do not adhere to widely held female stereotypes very harshly" and that trial counsel should have used voir dire to "identify these jurors as well as plant the seed with unbiased jurors that the picture of Angela that the Government planned to paint was not necessarily accurate." (Motion at 81). Having declared what she believes her

60

trial counsel should have done, defendant confidently asserts that "there is a reasonable probability that Angela was tried by biased jurors . . .." (Motion at 81). Defendant's argument is wholly without factual support, is premised on pure conjecture, and fails to establish that her attorneys' conduct fell below the objectively reasonable standard or that she suffered any prejudice as a result.

Defendant's suggestion that her trial attorneys should have questioned jurors about "bizarre" religious practices and adverse views of "women who do not adhere to stereotypes" is premised on assumptions that are not supported by any factual basis. First, defendant presumes that there were members of the jury who engaged in "bizarre" religious practices, but there is no evidence of this. Second, defendant presumes that if they did, the juror would view the evidence defendant presented about her childhood negatively and would be angered by it, but there is nothing but speculation as to how such a hypothetical juror would react to the evidence.[16] Third, defendant assumes that trial counsel could have discovered these beliefs and views had they conducted voir dire on this issue, but there is nothing to support that conclusion. Absent evidence to show that any of the jurors engaged in "bizarre" religious practices, and if they did that they were offended by the defense presentation, defendant cannot show her trial counsel failed to act in a reasonable manner. Nor can she demonstrate actual prejudice. There is most certainly no support for defendant's declaration that she was tried by a biased jury.

---

[16] Indeed, Rule 606(b) would prohibit defendant from developing evidence of how the jurors reacted to this issue or whether they held adverse views of defendant because she did not adhere to a stereotypical female role.

61

Similarly, defendant has nothing but conjecture to support her assertion that there must have been jurors who had negative views of "women that do not adhere to widely held female stereotypes." First, there's no evidence to support the conclusion that any of the jurors held these views about women generally. Second, there is no evidence to support the conclusion that jurors held these views about defendant in particular; after all, she fit many of the female stereotypes (mother, waitress, cook, etc.). Thus, defendant cannot support her claim that she was "tried by biased jurors." Third, there's no factual support for defendant's conclusion that questioning on this topic would have uncovered jurors with these views, or that it could have "planted seeds" that the government's representation of defendant was inaccurate. Finally, there's no support for defendant's assertion that the government's representation of defendant was inaccurate.

Defendant has failed to demonstrate her trial attorneys' conduct fell below an objective standard of reasonableness. Trial counsel conducted a thorough voir dire, focused on the jurors ability fairly to consider both the death penalty and life in prison. The Court appropriately limited the time period for both sides, limiting the number of questions attorneys could ask. While in hindsight, defendant can theorize other questions that could have been asked, that is different from showing that the questions counsel chose to ask with their limited time available demonstrated an unreasonable performance.

Accordingly, the Court should deny defendant's motion on this ground and there is no need for an evidentiary hearing on this issue.

62

### K.    Investigation of the Case

Defendant claims her trial attorneys were ineffective for failing to investigate the case.  (Motion at 81-82).  Defendant provides little explanation, however, regarding how she believes her attorneys failed to effectively represent her in this regard, what it is she believes they would have found, or how it would have made a difference.  Defendant makes a vague reference to Martin Cole and Cheryl Conroy Bachman Poole, "other witnesses," "court records," "and counsel's own discovery file that would have cast doubt on the credibility of Christi Gaubatz and a number of other witnesses the Government presented at trial."  (Motion at 82).  Defendant does not, however, explain how her attorneys acted below an objectively reasonable standard in conducting the investigation on these matters.  Defendant does not identify all of the alleged witnesses, none of the records or files, and fails to explain what any of this would show.  Thus, the government is entirely at a loss to respond to this portion of defendant's motion.

Defendant claims Phyllis Prosovic should have been interviewed and her testimony preserved because, according to defendant, it "is completely inconsistent with the Government's theory." (Motion at 82).  Again, defendant fails to explain how her attorneys should have predicted that Prosovic would die before trial and why their conduct failed to meet an objectively reasonable standard.  Nor does defendant explain how the testimony was inconsistent with the government's theory; the government is familiar with the interview of Prosovic conducted by law enforcement officers and does not believe her testimony would have been inconsistent with the government's theory.

Defendant claims counsel failed to consider and explore possible theories about how defendant could have obtained the information contained in the maps and

63

statements provided by witnesses against her.  Again, however, defendant utterly fails to explain what counsel should have done that they did not do, what explanation they would or should have discovered, and what that explanation would have been, other than that she was guilty as charged.

Despite defendant's complete lack of detail or explanation, she boldly asserts that "[h]ad her counsel done these things, there is a reasonable probability" of establishing reasonable doubt.  (Motion at 82).  This assertion is absurd when defendant has completely failed to explain what "things" her counsel should have done and what, if anything, they would have discovered had they done these things.

Accordingly, because defendant has failed to make even a prima facie showing of ineffective assistance of counsel in this regard, the Court should deny defendant's motion on this ground and no evidentiary hearing is necessary on this issue.

L.      Residual Doubt Evidence

Defendant claims trial counsel were ineffective for failing to present during the sentencing phase the government's interview of Prosovic, claiming again that it "undercuts the Government's theory of the case."  (Motion at 83).[17]  While defendant recites a portion of the information Prosovic provided to law enforcement officers, she wholly fails to explain how any information Prosovic provided undercut the government's theory of the case.  Mere conclusory assertions are insufficient to raise a

_____

[17]  It must be noted that this position conflicts with defendant's assertion that her attorneys were ineffective for failing to introduce as a mitigating factor her willingness to plead guilty in exchange for a life sentence.  She cannot claim her attorneys failed because they did not admit her guilt while simultaneously claim her attorneys failed because they did not present better evidence of her innocence.

64

viable issue.  Without making a showing of how this information was inconsistent with the government's theory of the case, defendant cannot make a prima facie showing that her counsel were ineffective for failing to present this information during the sentencing phase.  Nor has defendant shown that the decision not to present this information was the result of negligence instead of a strategic decision by trial counsel.  Moreover, defendant certainly has not established a showing that this information, had it been provided to the jury, so undercut the government's theory of the case that the result would have been different.

Accordingly, because defendant has failed to make even a prima facie showing of ineffective assistance of counsel in this regard, the Court should deny defendant's motion on this ground and no evidentiary hearing is necessary on this issue.

M.     Appealing Alleged Juror Misconduct

Defendant claims her trial counsel were ineffective for failing to raise on appeal the juror misconduct issues regarding Juror #55 (alleged extrinsic evidence and his belief he was not the final decision-maker).  (Motion at 83-85).  Defendant's argument is without merit because there was no error and, therefore, trial counsel's decision not to appeal the alleged error did not fall below an objective standard of reasonableness. See Ferdinand v. Dormire, 212 F.3d 473, 475 (8th Cir. 2000) (if underlying substantive claim lacks merit, counsel was not ineffective for failing to raise the issue on appeal). Defendant concedes her attorneys appealed the district court's denial of an evidentiary hearing into alleged jury misconduct.  (Motion at 84).  This necessarily involved an assessment of the merits of the underlying claim.

Before requiring a hearing, the moving party must "show[ ] that outside contact

65

with the jury presents a reasonable possibility of prejudice to the verdict." *Tunstall v. Hopkins*, 306 F.3d 601, 611 (8th Cir. 2002) (quoting *United States v. Tucker*, 137 F.3d 1016, 1030 (8th Cir. 1998). Thus, "[n]ot every allegation of outside influence requires an evidentiary hearing." *United States v. Moses*, 15 F.3d 774, 778 (8th Cir. 1994). Moreover, to impeach a verdict, a defendant must produce evidence that is: (1) not barred by the rule of juror incompetency, Rule 606(b) of the Federal Rules of Evidence, and; 2) is sufficient to prove grounds recognized as adequate to overturn the verdict. *United States v. Francis*, 367 F.3d 805, 828 (8th Cir. 2004), reversed and remanded on other grounds (*Booker* issue), 543 U.S. 1180 (2005). Federal Rule of Evidence 606(b) generally prohibits testimony of any juror regarding intrajury communications. *Caldwell*, 83 F.3d at 956. The Supreme Court explained the reason for this prohibition thus:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (internal citations omitted).

Defendant's first allegation of juror misconduct involved statements Juror 55 allegedly made to other jurors that defendant would go through three automatic appeals and, therefore, the jury was not the final decision-makers, but just set the stage she will have to act upon. While defendant claims "the record contained enough information to show that at least one juror who ultimately cast a vote for Ms. Johnson's death

66

sentence believed that he did not bear the final responsibility for his death penalty vote"

without further investigation (Motion at 84), this "record" consists of inadmissible

evidence. The juror's statements are clearly inadmissible under Rule 606(b) because

they involves intrajury statements made during jury deliberations. Thus, this Court

properly exercised "its broad discretion in refusing to conduct further inquiry into these

alleged statements [and] in refusing to grant a new trial on the basis of this alleged

misconduct." *Caldwell*, 83 F.3d at 956.

Defendant's second allegation of misconduct involves Juror 55's alleged inquiry

of a state prison guard of the conditions of confinement for one facing the death penalty

and for one serving a life sentence. Further investigation was unwarranted here

because it failed to establish a reasonable possibility of prejudice to the verdict, given

the nature of the information allegedly obtained, the Court's instructions, and the weight

of the evidence. This Court found defendant failed to show "there is any reason to

doubt that the jury based its ultimate decision on anything other than the evidence

formally presented at trial." *United States v. Johnson*, 403 F. Supp.2d 721, 887 (N.D.

Iowa 2005). The Court concluded defendant failed to show a reasonable possibility of

prejudice to the verdict because the information allegedly imparted by Juror #55 "about

the conditions of confinement for prisoners on death row versus the conditions for

prisoners serving life sentences, was not demonstrably different from evidence

presented in Johnson's trial by Johnson about the conditions of confinement for such

prisoners . . .." Id.

In affirming this Court's denial of defendant's motion for an evidentiary hearing

regarding this alleged misconduct, the Eighth Circuit Court of Appeals said "we are not

persuaded that there was a reasonable possibility that information pertaining to prison conditions for death row or life-in-prison inmates would have affected the jurors' deliberations or prejudiced Johnson's case." *Johnson*, 495 F.3d at 981. Further, the Court agreed that "inquiry into the remarks concerning Johnson's 'automatic' appeals is precluded by Rule 606(b) because, contrary to Johnson's suggestion, the juror's comments were not extraneous information, but merely reflected the juror's understanding of the appellate process, a topic within the range of jurors' common knowledge." Id. Thus, even if appellate counsel had raised the merits of the alleged misconduct, and not just the order denying an evidentiary hearing, her appeal would have had no merit.

Accordingly, the Court should deny defendant's motion on this ground and there is no need for an evidentiary hearing on this issue.

N.     Cumulative Effect of Alleged Errors by Trial Counsel

Defendant argues that, even if each of the alleged deficiencies of trial counsel were insufficient to find she was denied the effective assistance of counsel, "[c]onsidered together, counsel's [sic] deficiencies undermine confidence in the outcome of her trial and sentencing." (Motion at 85). Defendant appropriately acknowledges this type of aggregation claim is not cognizable in the Eighth Circuit. (Id., citing, inter alia, *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006)). Defendant claims the Eighth Circuit is in the minority, citing cases from the First, Second, Third, Seventh, Nine, and Tenth Circuit Courts of Appeal adopting an aggregation theory. (Motion at 85-86). Defendant also cites decisions from the Fourth, Fifth, Sixth, and Eleventh Circuits Courts of Appeal, however, that hold with the Eighth Circuit Court of

68

Appeals that errors cannot be cumulated to show prejudice where each claim alone does not.  (Motion at 86).  Regardless of the apparent split in the circuit courts of appeal, this Court is bound by the Eighth Circuit's ruling.

In any event, because each of defendant's claims of ineffective assistance of counsel fail on their merits, the cumulative effect of the allegations does not give rise to a meritorious claim of ineffective assistance of counsel.

## V.      THE GOVERNMENT DID NOT PRESENT EVIDENCE IT KNEW TO BE FALSE

Defendant alleges the government "pursued a theory that Dustin Honken was manipulated and led into committing these crimes by Angela Johnson, and that he had simply been a nice, bookish, Iowa boy until he came under her evil sway."  (Motion at 87).  (See also Motion at 6, where defendant claims the government elicited "testimony of what a nice, nonviolent young man Honken was (which the Government knew was false).").  Defendant hastens to say she is "not arguing that the Government improperly argued inconsistent theories of their case during the two trials."  (Motion at 87 n. 29).  Nevertheless, defendant mischaracterizes the government's argument.  The government did not describe Honken as "a nice, bookish, Iowa boy."  The government consistently described Honken as someone who planned evil things – a schemer, a planner, a thinker – but not someone who acted upon his plans until he teamed up with Angela Johnson.

Defendant alleges the government elicited testimony it knew was false.  (Motion at 87-90).  Defendant references testimony from Jeff Honken and Rick Held "that Honken was not aggressive, nonthreatening, nonviolent and not physical with people" and from Tim Cutkomp that "he did not know Honken to be violent prior to 1992, and

69

that he was never violent prior to meeting Angela." (Motion at 87). Defendant also references testimony from Alyssa Nelson where she testified she did not know Honken to engage in violence or use force prior to 1993. (Motion at 87-88). While defendant claims this was false testimony, she fails to provide any evidence showing that these witnesses testified falsely. Specifically, defendant has proffered no evidence to demonstrate the Jeff Honken and Held did, at the time they testified, know Honken to be aggressive, threatening, violent and physical with others, or that Cutkomp knew Honken was violent prior to meeting defendant, or that Nelson knew Honken engaged in violence or used force prior to 1993. More important, defendant has proffered no evidence whatsoever that, even assuming these witnesses provided false testimony, that the government knew it was false at the time they testified.

Defendant purports to suggest the government knew this testimony was false because the government knew defendant had planned violent acts in the past. ; (See also Motion at 51: "Though they knew it not to be true . . . the Government offered evidence in sentencing through Ms. Nelson that, until he met Ms. Johnson, Honken had never before engaged in any violence."). Defendant here references Honken's "plan for robbing a bank." (Motion at 87). Earlier in her motion, defendant references the "plan" Honken shared with Fred Tokars to kill others, the "plan" to kill Steve Vest, the "plan" to escape and kill others that Honken shared with William LeBaron, the "plan" to kill Tim Cutkomp, and the "plan" to kill defendant. (Motion at 52-54). Defendant also claims Honken "participated in a robbery of an elderly bank teller." (Motion at 3).

There are two primary defects in defendant's argument. First, much of what defendant relies on to show how allegedly violent Honken was derives from conduct

70

that occurred after 1992. The government's argument was that, prior to 1992, defendant was not personally violent. None of the post 1992 conduct, therefore, is relevant to the inquiry whether the government submitted false testimony when it questioned witnesses about Honken's violent conduct prior to 1992. Second, and more fundamental, however, is the fact that none of the instances cited by defendant demonstrate that Honken personally engaged in violent acts. Honken certainly planned a lot of violent acts, but he did not personally engage in acts of violence except when he was with defendant. To the extent defendant claims Honken "participated in a robbery of an elderly bank teller" when he was in high school (Motion at 3), that its misleading. Honken planned the bank robbery, but did not himself participate in the robbery. Rather, his father committed the violent act, carrying out the plans devised by Honken.

Accordingly, defendant's assertion that the government presented evidence it knew was false is baseless. The government consistently maintained the position in both trials that Honken planned many evil acts, but that he did not personally engage in violent acts except when with defendant. Defendant has proffered no evidence to prove the testimony at trial was false, and more important, no evidence to demonstrate the government knew it was false at the time it was presented. Accordingly, the Court should deny defendant's motion on this ground as baseless.

## VI. THE GOVERNMENT DID NOT FAIL TO DISCLOSE REMUNERATION PROVIDED TO WITNESSES

Defendant claims the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose remuneration provided to witnesses. (Motion at 90-92). In particular, defendant claims the government "had an understanding with Christi

71

Gaubatz, that she would not be prosecuted (*inter alia*, for perjury and obstruction of justice) if she testified against Johnson." (Motion at 91). Defendant further claims the government "never disclosed to the defense that the testimony of prosecution witness Peggy Hoover 'was as a result of a promise to help her in her own case.'" (Motion at 91). Finally, defendant surmises that Steve Vest was transferred out of the Bureau of Prison's facility in Colorado and presumes that this was the result of some sort of benefit given to Vest in exchange for his testimony. (Motion at 91-92). Defendant's claims are without merit.

A.    <u>Christi Gaubatz</u>

Defendant claims the government made a promise to Gaubatz that she would not be prosecuted, and this promise was made during a meeting with five government agents. (Motion at 91). This assertion is baseless. Defendant premises this allegation on a recent interview her investigator had with Ms. Gaubatz.[18] The government interviewed Ms. Gaubatz after receipt of defendant's motion in this case and she denies making any statement to the investigator indicating the government made her promises. Ms. Gaubatz maintains that she was never promised anything, that she testified voluntarily in order to get what she knew off her chest, and that defendant's investigator attempted during the interview to get Ms. Gaubatz to claim the government made promise to her. The reference to the meeting with five agents, Ms. Gaubatz explained, arose from the question of how many agents were in the room when she told her story.

---

[18]  Defendant has not provided the government with a copy of this interview report, nor attached it as an exhibit to her motion. The government learned of the interview when it contacted Ms. Gaubatz.

Her response was that she remembered Bill Basler, but indicated there may have been a total of five agents. (See Exhibit A – Report of Interview of Christi Gaubatz).

The fact is no one promised Ms. Gaubatz she would not be prosecuted. Ms. Gaubatz testified out of a motivation to relieve herself of the burden of knowing her friend had murdered children. There is no factual basis to suggest the government made her any promises.

### B. Peggy Hoover

Defendant claims "the testimony of prosecution witness Peggy Hoover 'was as a result of a promise to help her in her own case'" and that "Hoover received consideration from the government for her testimony against Ms. Johnson." (Motion at 91). Defendant does not give attribution to the quoted language in her argument, nor does she explain what "consideration" Hoover allegedly received. Based on her failure to articulate any basis at all to support her assertion, this alone should be sufficient for the Court to deny defendant's motion in this regard.

Nevertheless, defendant's claim is without merit. At trial, Peggy Hoover testified that she pled guilty to federal charges pursuant to a cooperation plea agreement (Tr. 1413), that she previously received a reduction in her sentence for cooperating in another unrelated case (Tr. 1414-15), and she was testifying in defendant's case with the hope of receiving a further reduction in her sentence (Tr. 1416-17). Thus, not only did the government disclose to defendant that Hoover was cooperating with a hope of reducing her sentence, she testified as much during the trial. Indeed, defense counsel cross-examined Hoover about the consideration she was hoping to receive in exchange for her testimony. (Tr. 1424-25). It is unclear to the United States what more defendant

73

now claims could or should have been done to make it plain that Hoover was testifying against her in a hope of getting a reduced sentence.[19]

C.   Steve Vest

Defendant alleges, without attribution to transcript pages, that in the Honken trial Steve Vest testified "he desired a transfer from Colorado to a facility closer to his family." (Motion at 91). She further alleges, without citation to the record, that "[a]t Ms. Johnson's trial, however, he denied being motivated by that desire." (Motion at 91-92). Because Vest does not appear on the Bureau of Prison's inmate locator, defendant speculates that Vest was moved from the Colorado prison to a facility closer to his family, and further presumes this was done as a favor by the government in exchange for his testimony. (Motion at 92). This allegation is baseless.

First, Vest was moved from the Colorado facility on February 9, 2001, long before he testified in either trial. Second, Vest was moved farther from his family, not closer, as a result of his placement in the Witness Security Program. The government is not at liberty to publicly disclose where Vest was located at the time of defendant's trial, nor is it able to state publicly where Vest is currently housed. As an officer of the Court, however, and as one who traveled to meet with Vest prior to his testimony, the undersigned Assistant U.S. Attorney assures the Court that Vest was not moved closer to his family prior to the trial. He was transferred to a facility much farther from his family. Should the Court request it, the government can provide for in camera review

---

[19] Indeed, defendant's allegations concerning Hoover are baffling, given the explicit discussion of her cooperation in the transcript. Either defendant simply failed to read the transcript, or she is referring to some other sort of "consideration" which she has failed to describe in her motion.

74

Vest's file showing where he has been housed by the Bureau of Prisons. Further, it should be noted that Vest was sentenced to a life sentence for his participation of murders in Kansas City, and he has received no reduction in that sentence as a result of testifying in the Honken and Johnson trials.

Third, defendant misstates the record. During Vest's testimony in the Honken case, Vest indicated that he had made efforts to transfer from Colorado and had wanted to be housed in Leavenworth to be closer to his family. (Honken Transcript ("H.Tr.") 1832-34, 1837). He further testified he left Florence in February 2001. (H.Tr. 1869). He was transferred out of Florence because of his assistance against Honken. (H.Tr. 1907). He further testified that, as a result of his cooperation, he was transferred to a location farther away from where his family lives in Kansas City. (H.Tr. 1903). Thus, Vest did not say he was testifying in the Honken trial with a hope of being moved out of the Florence facility to one closer to his family – he had already been moved. Nor did he say he was motivated to testify in the Honken trial out of a motivation to be moved from the undisclosed facility where he was then housed to be closer to his family. He simply testified that he wished he were housed closer to his family.

In contrast, Vest's testimony in defendant's trial was not focused at all about where Vest was housed. Nor was Vest asked about his motivation to be imprisoned near his family. Rather, he was asked whether his cooperation was motivated by his desire to have "a chance to get back with your wife and kids." (Tr. 2580-81). Vest said it was not, and explained how his cooperation started when he alerted authorities that an inmate was going to be attacked. (Tr. 2581). Vest testified that while he was hopeful the government will bring back parole in the federal system (Tr. 2625), he

75

recognized that he is not going to receive a sentencing reduction for cooperating (Tr. 2553-54),[20] and the reason he began cooperating against Honken in the first place was that Honken "killed an innocent woman and two innocent kids." (Tr. 2625).

Thus, Vest's testimony in the two trials was not inconsistent. There is no evidence Vest received any benefit for his testimony. He received no reduction in his sentence, was not moved closer to his family, and in fact, was moved farther from his family as a result of his cooperation. Other than defendant's speculation, suppositions, and conjecture, therefore, her allegation of government misconduct is without basis.

D.      Summary

Defendant's allegations the government failed to disclose "remuneration" provided to witnesses has no factual support at all. It is a spurious allegation, made without sufficient investigation into the facts, and with a disregard to the truth. Defendant's motion on this ground should be denied on this record and without further evidentiary proceedings.

## VII.      MOVANT CANNOT DEMONSTRATE DEFENDANT WAS INCOMPETENT AT THE TIME OF TRIAL

Defendant claims she should be granted a new trial (Motion at 97) because she claims she was mentally incompetent at the time of trial and sentencing as "a result of [ ] faulty and excessive medication." (Motion at 92-97). Defendant relies on the opinion of Dr. Woods, who interviewed defendant almost four years after trial. (Motion at 93-94). In addition, defendant bootstraps an ineffective assistance of counsel claim on the

---

[20] Vest has not received any reduction in his sentence as a result of testifying in either the Honken or Johnson trials.

76

end, faulting her attorneys for failing to see she was incompetent and failing to seek a competency hearing.  (Motion at 95-97).  Defendant's claim is without merit and should be denied.

Due process prohibits the trial and conviction of a defendant who is mentally incompetent.  *Drope v. Missouri*, 420 U.S. 162, 172 (1975).  "A defendant is competent is she possesses a 'sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceedings.'" *United States v. Martinez*, 446 F.3d 878, 881 (8th Cir. 2006) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curium)).  Defendant bears the burden to prove by a preponderance of the evidence she was incompetent.  *Vogt v. United States*, 88 F.3d 587, 591 (8th Cir. 1996).  To carry this burden, defendant must overcome the presumption that, absent some contrary indication, federal judges may presume she was competent.  *Branscomb v. Norris*, 47 F.3d 258, 261 (8th Cir. 1995).  In determining whether a defendant was incompetent, "attention should be paid to any evidence of [the defendant's] irrational behavior, [the defendant's] demeanor before the trial court, available medical evaluations, and whether trial counsel questioned the defendant's competency before the court." *United States v. Day*, 949 F.2d 973, 982 (8th Cir. 1991).  The Eighth Circuit Court of Appeals has made it clear, however, that

> Retrospective determinations of whether a defendant is competent to stand trial or to plead guilty are strongly disfavored.  Such determinations have 'inherent difficulties' even 'under the most favorable circumstances.'

*Weisberg v. Minnesota*, 29 F.3d 1271, 1278 (8th Cir. 1994) (quoting *Drope*, 420 U.S. at

77

183). Indeed, the Eighth Circuit Court of Appeals has described a retrospective determination of competency as "an exercise in futility." *Day*, 949 F.2d at 982 n.9.

The futility of defendant's attempt, four years after the trial, to show she was incompetent is borne out by the poor showing she makes in her motion. Measuring defendant's argument against the factors set forth in *Day*, defendant cannot begin to show incompetence. First, she cites no instance of irrational behavior by her during the trial or sentencing. Defendant cites no objective observations by her attorneys, prosecutors, court personnel, the Marshals Service, or anyone else to buttress her claim of incompetency. Second, as to her demeanor, she claims it was inappropriate, but that is a self-serving, post-trial conclusion. This was not a case where defendant was unable to show emotion – she did so when her family members testified. Her apparent lack of emotion when the victims' family members testified may reflect nothing more than a lack of remorse. Third, defendant has proffered no claim that any of her three attorneys questioned her competency or has since expressed they were unable to communicate with defendant, or that she was unable to understand what was happening to her.

As to defendant's purported medical evidence, it is insufficient to overcome the presumption she was competent and lack of any indication defendant was incompetent. First, defendant concedes both her experts and the government experts conducted competency screenings and found her competent. (Motion at 92). Defendant claims these findings are worthless, however, because her medication was increased during the trial. (Motion at 92-93). "'Treatment with anti-psychotic drugs[, however,] does not per se render a defendant incompetent to stand trial.'" *Vogt*, 88 F.3d at 591 (quoting

*Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992)). Defendant's newest expert, Dr. Woods, purports to opine, based on hearsay statements of family members, and defendant's self-serving, post-trial claims, that defendant was incompetent because of her medication. (Motion at 93-94). This conclusion is premised in part on Dr. Woods already questionable conclusion defendant suffered from temporal lobe dysfunction. (See government's argument, Section IV(B) *supra*). Dr. Woods' conclusions should not be credited. They are made four years after trial, without having observed defendant's behavior at trial himself. Moreover, Dr. Woods has provided no evidence the increase in medication was medically unwarranted or that the medication caused her demeanor. Indeed, there is no factual showing there was a change in defendant's demeanor from before the increase in medication to after the increase in medication.

Further, this portion of defendant's argument is procedurally barred. Defendant could have made a claim of incompetency at the time of trial or on appeal, but failed to do so. In an effort to evade her procedural default, defendant now claims her attorneys were ineffective for failing to move for a competency hearing. Only if defendant can show her attorneys were ineffective, therefore, can defendant proceed with her claim she was incompetent at trial.

Defendant's attorneys were not, however, ineffective for failing to seek a competency hearing. The trial attorneys made a reasonable investigation of defendant's mental condition, including her competency. They saw defendant every day of trial and had the opportunity to observe her demeanor and behavior during trial. There was nothing out of the ordinary about either. Accordingly, defendant's trial attorneys' performance did not fall below the objective standard of reasonableness.

79

See _Vogt_, 88 F.3d at 591-92 (rejecting a claim of ineffective assistance of counsel for failing to seek a competency hearing).

Therefore, the Court should deny defendant's motion on this ground without an evidentiary hearing.

## VIII. A JUROR DID NOT ENGAGE IN MISCONDUCT BY ALLEGEDLY FAILING TO DISCLOSE ALLEGED CHILDHOOD ABUSE OR FAMILIARITY WITH THE JUDGE

Defendant claims Juror # 55 committed misconduct when he failed to reveal that he had allegedly been subject to childhood abuse and that his son was a convicted methamphetamine dealer that had been sentenced by this Court.  (Motion at 98). Defendant further asserts her counsel were ineffective for failing to ask questions on voir dire to reveal bias and for failing to move to strike the juror.  (Id.).  Defendant's argument is without merit.  Portions of it are procedurally barred.  It further fails on the merits as there was no misconduct.  Finally, defendant's counsel were not ineffective in questioning juror #55 or for failing to strike him.

### A.     Defendant's Claims are Procedurally Barred

Defendant's assertion of juror misconduct is procedurally barred because she did not raise this issue on appeal.  A claim is procedurally defaulted and barred from consideration on collateral review where a petitioner fails to raise a claim that could have been raised on direct appeal.  _Bousley v. United States_, 523 U.S. 614, 622 (1998).  A court cannot review a defendant's claims on the merits, when procedurally defaulted, unless the movant "is able to demonstrate either [1] cause for his default and actual prejudice, or [2] that the failure to consider the claims would result in a

80

fundamental miscarriage of justice." *McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997). The "fundamental miscarriage of justice" exception to procedural default is "only available to a [movant] who demonstrates 'that a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *McCall*, 114 F.3d at 758. In this case, defendant does not claim actual innocence.

Defendant appears to rely on the first exception to excuse her procedural default – that is an assertion of cause in the form of ineffective assistance of counsel. If a petitioner fails to demonstrate ineffective assistance of counsel as cause for the procedural default, her collateral claim cannot survive. *Wainright v. Sykes*, 433 U.S. 72 (1977). In the context of an ineffective assistance of counsel assertion of cause to excuse procedural default, a defendant must ordinarily demonstrate that some objective factor external to the defense impeded counsel's efforts to comply with the standard of conduct. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Defendant's reliance on the ineffective assistance of counsel exception to procedural default is, at best, partial and off-base. Defendant asserts juror misconduct. The alleged misconduct of which defendant accuses Juror # 55 is failing to disclose alleged childhood abuse and his alleged familiarity with Judge Mark W. Bennett. Defendant does not fault her counsel for the alleged misconduct of the juror. Nor does defendant claim her counsel were ineffective in discovering the juror misconduct. Indeed, the alleged information was discovered during a post-trial, pre-appeal, interview of Juror #55, and therefore easily could have been raised on appeal.[21] Rather,

---

[21] Incidently, the interview reveals that trial counsel clearly violated the Court's order permitting the interviews. On June 23, 2005, the Court granted defendant's

81

defendant faults her counsel for failing to inquire about the nature of the drug the juror's

son was involved with, and for failing to strike the juror based on the information that

was disclosed.

Accordingly, to the extent defendant claims juror misconduct as it relates to

alleged childhood abuse and the juror's alleged familiarity with the presiding judge,

those claims are procedurally barred.

### B. Defendant's Claims of Juror Misconduct Fail on Their Merits

Regardless of procedural default for raising allegations of juror misconduct at this

late date, defendant's claims fail on their merits. A party seeking a new trial on the

basis of alleged concealed juror bias must prove three things: 1) the juror answered

dishonestly, not just inaccurately; 2) the juror was motivated by partiality against the

motion for permission to interview jurors. The Order provided that such interviews were to be "subject to the limits of Rule 606(b) of the Federal Rules of Evidence" and "that neither counsel nor counsel's representative may interview jurors for the purpose of investigating those jurors, but only for the purpose of understanding the process and gathering information for edification of counsel." (June 23, 2005, Order, page 2-3).

The government resisted defendant's motion, indicating that, prior to filing her motion, Dean Stowers told the government the purpose of contacting jurors was to investigate juror misconduct. On June 23, 2005, after receiving the government's resistance, the Court conducted a telephonic hearing on defendant's motion. During the hearing defense counsel denied an intent to interview jurors to uncover juror misconduct, but rather, told the Court the purpose was to interview jurors for the limited purpose of learning how to try a better case. Based upon Mr. Stowers' oral representation as to the limited purpose of the juror interviews, the Court agreed to allow the contact subject to its previous order.

Nevertheless, on July 7, 2005, an investigator working for defense counsel interviewed Juror 55, asking him questions about deliberations in direct violation of the Court's order. (See Defendant's Exhibit 13). It appears defendant's investigators questioned several jurors in addition to Juror #55 about their mental impressions, thought processes, deliberations, votes, and reasons for their verdicts, all of which is inadmissible under Rule 606(b) and therefore in violation of this Court's order. (See Defendant's Exhibits: 11 (juror #797); 12 (juror #504); 14 (juror #600); 15 (juror #513).

82

moving party; and 3) the true facts, if known, would have supported striking the juror for cause. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). "A district court has broad discretion in handling allegations of juror misconduct and its decision will be affirmed absent an abuse of discretion." *United States v. Williams*, 77 F.3d 1098, 1100 (8ᵗʰ Cir. 1996). Defendant's claims fail under each of the three prongs of the *McDonough* test.

### 1. Juror #55 Answered Questions Honestly

Defendant alleges Juror #55 was dishonest in two regards. First, defendant claims Juror #55 was dishonest when he denied being "mentally, physically, or emotionally abused as an adult or child." (Motion at 103). Second, defendant claims Juror #55 was dishonest when he denied familiarity with Judge Bennett. (Motion at 104). Defendant is wrong and has failed to carry her burden of demonstrating intentional falsehood on either issue.

### i. Alleged Physical Abuse

In support of her allegation Juror #55 lied to the Court about having suffered physical abuse as a child, defendant relies on a tortured interpretation of vague comment made by Juror#55. Juror #55 allegedly said:

> There were a couple of us that have been through a hell of a lot worse than she had. She never was beaten so bad she couldn't sit down for a month. A couple of us, we had it rough, and we didn't turn out to do drugs and kill people.

(Exhibit 13, page 4). From this, defendant presumes that Juror #55 is saying that he was beaten so bad he could not sit down for a month and, therefore, lied when he said he had never been physically abused as a child. There are two fundamental problems

83

with defendant's interpretation and conclusion, one has to do with the question and the other with the juror's answer.

First, the question asks if a juror believed he or she was physically abused. Abuse is a subjective word. One person may view spanking as child abuse, while another may view it as an appropriate means of child discipline. Accordingly, even assuming Juror #55 was paddled as a form of discipline as a child, that does not mean he believed it constituted abuse. He may have seen it as appropriate discipline.

Second, there is nothing but conjecture to support defendant's interpretation of Juror #55's answer as suggesting that he was actually "beaten so bad" that "he couldn't sit down for a month." Defendant claims it is a fact "Juror #55 was physically abused as a child" (Motion at 103), but bases this assertion of fact on her interpretation of Juror #55's comment. Her interpretation is subjective supposition. Juror #55 could have been speaking of one of the other jurors (he said there were a "couple of us that have been through a hell of a lot worse"). Juror #55 could have been speaking rhetorically. Indeed, the remainder of Juror #55's answer, omitted from defendant's motion, suggests that "rough" times Juror #55 referred to involved hard work at a young age, not physical abuse. Juror #55 went on to say: "Yeah, a rough life. I have been working since I was eight years old . . . [b]ailing hay, roofing, working in the fields . . .." Exhibit 13, page 4.

Defendant has failed to establish that Juror #55 was actually physically abused as a child, or that he believed he was physically abused. Therefore, defendant has failed to demonstrate that Juror #55 was dishonest.

84

Defendant claims Juror #55 lied when he failed to acknowledge he was familiar with the presiding judge, the Honorable Mark W. Bennett.  (Motion at 104).  Defendant bases this allegation on her research that showed Judge Bennett presided over Juror #55's son's criminal case.  (Motion at 102).  Defendant therefore concludes Juror #55 "knew the Court" and that "[i]t borders on the incredible that Juror #55 did not recognize the Court's name, or Your Honor himself."  (Motion at 104).  Again, there are two problems with defendant's claim, one of which is the question itself and the other is the lack of evidence to support the assertion Juror #55 actually knew the Court.

First, the question asked whether Juror #55 was "familiar with" several people, including the Court.  (Exhibit 23, at 16).  Assuming Juror #55 was aware the Court sentenced his son, it does not follow that Juror #55 believed he was "familiar with" Your Honor.  The undersigned has shaken the hand of the President of the United States, yet I would never claim I was "familiar with" the President.  Familiarity is defined as "a close friend"[22] or "one who is well acquainted with something."[23]  The question was not whether jurors had ever heard of, dealt with, met, seen or had any dealings involving the people mentioned.  Accordingly, defendant cannot claim Juror #55 was intentionally dishonest, as opposed to inaccurate, in his answer to this question.  See *Williams*, 77 F.3d at 1100 (finding juror was not dishonest when she answered "no" to a question whether the names of "these two" defendants meant anything to her, even though she

---

[22] See http://dictionary.cambridge.org/define.asp?key=27900&dict=CALD, searched 11/11/09.

[23] See http://www.merriam-webster.com/dictionary/familiar, searched 11/11/09.

had a grandson with the same name as one of the defendants and mistaken identity was an issue at trial).

Second, there is no evidence to support defendant's conclusion Juror #55 actually did know Your Honor, or knew Your Honor sentenced his son to prison. There is no evidence Juror #55 attended his son's sentencing hearing. There is no evidence Juror #55 saw a copy of any pleading containing Your Honor's name. There is no evidence Juror #55's son told Juror #55 Your Honor sentenced him. There is no evidence Juror #55 conducted research (like defendant) to determine who sentenced his son. Defendant presumes Juror #55 knew Your Honor, or knew Your Honor sentenced his son, but there is not a shred of evidence to support this contention.

Accordingly, defendant has failed to demonstrate Juror #55 was "familiar with" Your Honor, or that he considered himself to be "familiar with" Your Honor. Therefore, defendant has failed to establish Juror #55 was dishonest in his answer to the questionnaire.

The Court should reject, as it has done before, defendant's "broad, post-verdict interpretations of voir dire questions." See *Lopez v. Aramark Uniform & Career Apparel, Inc.*, 417 F. Supp.2d 1062, 1069 (N.D. Iowa 2006) (collecting cases). Here, Juror #55 did not deliberately conceal any bias or answer questions incorrectly. Rather, he answered the questions put to him honestly and accurately.

### 2. Juror #55 Was Not Motivated By Bias

Even assuming for the sake of argument defendant proved Juror #55 was dishonest in his answers, defendant still cannot show Juror #55 was motived by bias against defendant. The Supreme Court recognized that motives for concealing

86

information may vary, but only reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. *McDonough*, 464 U.S. at 556. Defendant has provided no evidence to support an assertion Juror #55 was biased against defendant.

Regarding the allegation Juror #55 was the victim of child abuse, a person may wish not to reveal he or she was the victim of child abuse for any number of reasons having nothing to do with bias against the defendant. The failure to mention childhood physical abuse could arise from embarrassment, shame, or privacy concerns. See *Lopez*, 417 F. Supp.2d at 1071 (lack of responsiveness by jurors regarding questions of sexual abuse more than likely was influenced by impartial factors, such as embarrassment, shame or privacy concerns).

Regarding the allegation Juror #55 failed to disclose his knowledge of Your Honor or that Your Honor sentenced his son to prison, the reason for failing to disclose such information cannot be said to have arisen out of a bias against defendant. Indeed, one would presume that Juror #55 would by sympathetic to defendant, having a son who was in prison. If anything, the potential for bias would be against the Department of Justice, the same federal agency that prosecuted his son and sent him to prison, and against Your Honor for sentencing his son to prison. To suggest Juror #55 intentionally lied about knowing Your Honor out of bias against defendant is illogical.

Defendant must support her claims with "substantiated, nonspeculative allegations of material, pre-existing bias." *Lopez*, 417 F. Supp.2d at 1070. She has failed here to carry this burden. Indeed, Juror #55 exhibited a sincere effort to be fair, bringing up on his own his son's incarceration. Voir Dire Transcript 768-70.

87

### 3. Even if Facts Were Known, Juror #55 Would Not Have Been Struck for Cause

Defendant asserts Juror #55 would have been struck for cause had these alleged facts been known. Again, assuming for the sake of argument defendant actually demonstrated Juror #55 was dishonest, and was motivated by partiality, it does not follow he would have been struck for cause. "Only if the juror professed an inability to set aside the experience, or the court did not find the juror's testimony that he or she could put aside the comments to be credible . . . would any reasonable judge or party have even contemplated striking the juror[ ]." *Lopez*, 417 F. Supp.2d at 1071.

Here, there is nothing in the record to support defendant's presumption that Juror #55 would have been struck for cause. There is no reason to believe Juror #55 could not have set aside allegedly being physically abused as a child or knowing Your Honor sentenced his son to prison. Indeed, the record revealed Juror #55 was able to set aside his son's incarceration. Voir Dire Transcript at 768-70. There is nothing to suggest he would not have been likewise able to set aside his alleged childhood abuse or his alleged familiarity with the Court.

### 4. Defendant's Other Allegations Regarding Juror #55

Defendant seizes the opportunity in this section of her motion to raise other issues regarding Juror #55 and her counsel's performance. She faults her attorneys for failing to ask more questions of Juror #55 about his son. (Motion at 99). She faults her attorneys for failing to challenge Juror #55 for cause, or to use a peremptory strike on Juror #55. (Motion at 101). See also Motion at 107 n. 36. Defendant cannot demonstrate her attorney's conduct fell below an objective standard of reasonableness.

88

While defendant's new counsel claim there were many "red flags" and they would have conducted a more thorough examination, that is not the test. The issue is whether the questioning performed by trial counsel and whether the decision not to strike Juror #55 were objectively unreasonable. Defendant has not shown them to be unreasonable. Nor has defendant carried her burden of demonstrating bias. Defendant cannot use information gained in the post-trial interview to support her allegations here, as that evidence is inadmissible under Rule 606(b) of the Federal Rules of Evidence. Accordingly, to the extent defendant is attempting to bootstrap an ineffective assistance of counsel claim in her allegation of alleged juror misconduct, the Court should reject it.

  5.  <u>An Evidentiary Hearing on Alleged Juror Misconduct Would be Inappropriate</u>

The Court should not hold an evidentiary hearing on the issue of alleged juror misconduct. Rule 606(b) bars inquiry into the validity of a verdict. Thus, while "a juror may testify as to extra-record facts introduced into the jury room or the presence of an improper influence on the deliberations of the jury such as in the case of communications or contacts between jurors and litigants, the court, or other third parties . . . juror testimony regarding the subjective prejudices or improper motives of individual jurors has been held to be encompassed by the rule . . .." *Lopez*, 417 F. Supp.2d at 1072. Thus, "[a]lthough the jury is obligated to decide the case solely on the evidence, its verdict may not be disturbed if it is later learned that personal prejudices were not put aside during deliberations." *United States v. Duzac*, 622 F.2d 911, 913 (6th Cir. 1980) (cited with approval in *Lopez*, 417 F. Supp.2d at 1072).

In her motion, defendant devotes many pages to Juror #55's alleged subjective

89

prejudices, his communication with other jurors, and the alleged impact this all had on the guilt and penalty verdicts. All this is barred by Rule 606(b). As this Court said, "'[w]hen such information becomes part of the deliberative process, it becomes sacrosanct under Rule 606(b).'" *Lopez*, 417 F. Supp.2d at 1073 (quoting *Wilson v. Vt. Castings*, 977 F. Supp. 691, 695 (M.D.Pa. 1997)).

Accordingly, the Court should deny defendant's Motion in this regard and no hearing is necessary on this issue.

## IX. THE COMBINED EFFECTS OF ALLEGED CONSTITUTIONAL ISSUES DID NOT RENDER HER CONVICTION AND SENTENCE INFIRM

Defendant asserts the combined constitutional errors render her conviction and sentence Constitutionally infirm. (Motion at 108-109). Defendant concedes, as she must, that "[t]he proposition that errors that on their own do not prejudice a defendant, but may do so when aggregated is not a cognizable claim within the Eighth Judicial Circuit." (Motion at 109, citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). Accordingly, this claim has no merits and should be denied by the Court without further hearing.

## X. EIGHTH AMENDMENT ARGUMENTS

Defendant raises for the first time in her Section 2255 motion several challenges to her conviction and sentence under the Eighth Amendment to the United States Constitution. Specifically, defendant claims: 1) the Eighth Amendment requires a heightened standard of proof for imposition of the death penalty because proof beyond a reasonable doubt can be based on testimony by "fallible humans and circumstantial evidence" (Motion at 109-110); 2) the Eighth Amendment precludes the execution of

90

the mentally ill and defendant is allegedly mentally ill (Motion at 110-115); 3) the manner in which the government would carry out defendant's execution would violate the Eighth Amendment (Motion at 115-116); and the death penalty violates the Eighth Amendment (Motion at 116). None of these claims have merit. None are supported by the case law, and indeed, the last two have been rejected by the Supreme Court. <u>See</u> *Gregg v. Georgia*, 428 U.S. 153, 177 (1976) (finding death penalty does not violate the Eighth Amendment); *Baze v. Rees*, 128 S. Ct. 1520, 1538 (2008) (finding three-drug protocol for executions did not violate the Eighth Amendment). <u>See also</u> *Clemons v. Crawford*, 2009 WL 3735849, * 5-8 (finding three-drug protocol for executions did not violate the Eighth Amendment, citing *Baze*).

Regardless, all of these claims are barred as a result of procedural default. *Palmer v. Clarke*, 408 F.3d 423, 437 (8th Cir. 2005) (Eighth Amendment argument procedurally defaulted when not raised on direct appeal). Defendant did not make these Eighth Amendment challenges on appeal. A Section 2255 proceeding is not a substitute for a direct appeal. *United States v. Addonizio*, 442 U.S. 178, 184 (1979). Thus, claims not raised on direct appeal generally may not be raised on collateral review. *Massaro v. United States*, 538 U.S. 500, 503 (2003); *Anderson v. United States*, 25 F.3d 704, 706 (8th Cir. 1994) (grounds that could have been raised at trial or on appeal are procedurally defaulted). As discussed above, defendant may overcome such a procedural default only by demonstrating both "cause" for the default and actual "prejudice," or that she is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998). This "hurdle" is "intentionally high . . ., for respect for the finality of

91

judgments demands that collateral attack generally not be allowed to do service for an appeal." *Peveler v. United States*, 269 F.3d 693, 699-700 (6th Cir. 2001).

Here, defendant has offered no cause for failing to raise these challenges on direct appeal. She does not claim her attorneys were ineffective in this regard. Nor does she clear the high hurdle of showing prejudice. Moreover, no where in the record, either at trial, on appeal, or in her Section 2255 petition, does defendant ever claim actual innocence. Such a claim would be inconsistent with her offer to plead guilty and the proffer made to the government through her trial counsel when she pursued such a plea. Indeed, such a claim is inconsistent with the overwhelming weight of the evidence which demonstrated, beyond any reasonable doubt, that defendant is guilty of the heinous crimes in this case.

Accordingly, the Court should deny defendant's Section 2255 motion with regard to all of her Eighth Amendment claims as they are procedurally defaulted. No hearing is necessary on these Eighth Amendment issues.

## XI.   CONCLUSION

WHEREFORE, for the reasons set forth above, the United States respectfully requests that the Court deny defendant's motion.  While defendant's mental health claims may merit an evidentiary hearing, the Court should deny defendant's motion without an evidentiary hearing as to all other claims.

Respectfully submitted,

STEPHANIE M. ROSE
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
401 First Street SE, Suite 400
Cedar Rapids, Iowa 52401
319-363-6333
(Fax 319-363-0091)
cj.williams@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on November 30, 2009.

UNITED STATES ATTORNEY

BY:   s/ S. Van Weelden

COPIES TO: Counsel of Record

93