Prisoner's Name: Angela Johnson
Prisoner's Number: 08337-029
Place of Confinement: FMC Carswell, Federal Medical Center, PO Box 21137, Fort Worth, TX 76127

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 01-cr-3046** |
| | ) | **CAPITAL CASE** |
| | ) | |
| **ANGELA JOHNSON,** | ) | |
| | ) | |
| **Movant** | ) | |

## MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

Michael E. Lawlor
Lawlor and Englert, LLC
6305 Ivy Lane

Suite 608
Greenbelt, MD 20770

Marta K. Kahn
The Law Office of Marta K. Kahn, LLC
PO Box 65071
Baltimore, MD 21209

Ilann M. Maazel
Kennisha A. Austin
Emery, Celli
Brinkerhoff &
Abady, LLP
75 Rockefeller Plaza
20th Floor
New York, NY 10019

**Counsel for Movant**

October 5, 2009
Sioux City, IA

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       1. Counsel Failed to Take the Necessary Steps to Resolve This Case
         in a Plea for a Sentence Less than Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            a. *What diligent counsel does to resolve a death case with a plea* . . . . . . . 13

            b. *How counsel in this case scuttled any hope of a plea* . . . . . . . . . . . . . . . 16

       2. Counsel Was Ineffective For Failing to Investigate and Present
         Evidence Regarding Angela Johnson's Mental State at the
         Time of the Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            a. *What diligent counsel does to prepare for the sentencing phase of a capital*
               *case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            b. *A lengthy but hollow and vulnerable presentation of mitigation* . . . . . . 27

            c. *Counsel's failure to follow-up on red flags and fully investigate Angela's*
               *mental state at the time of the offense was deficient performance* . . . . . 41

               (1) *No reasonable strategy supports counsel's decision* . . . . . . . . . . 42

            d. *If counsel had explained to the jury how Angela's brain impairments that*
               *were beyond her control contributed to her behavior at the crime scenes,*
               *there is a reasonable probability that at least one juror would have voted to*
               *spare her life* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

       3. Counsel Failed To Present Readily Available Evidence About Who
         the Real Dustin Honken Was and How Angela Would Have Been
         Particularly Susceptible To Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

            a. *Had counsel not failed to present copious, readily available*
               *evidence about Dustin Honken, the jury would have seen*
               *him for the manipulative, callous, criminal instigator*
               *that he was* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

i

4.       Counsel Failed to Recognize That Angela's Impairments and Medications at Trial Would Have an Effect on Her Demeanor that the Jury Perceived as Aggravating ............................... 59

         a.    *Capital jurors want to see remorse* ............................. 60

         b.    *What Angela's jury wanted to see, what they saw, and what they concluded* ................................................. 61

         c.    *What diligent counsel would have done regarding Angela's demeanor* ................................................. 62

         d.    *How counsel allowed Angela to become Government's Exhibit A in Aggravation* ................................................. 64

         e.    *How counsel could have rendered Angela Defense Exhibit A in Mitigation* ................................................. 65

         f.    *How counsel could have rendered Angela Defense Exhibit A in Mitigation* ................................................. 68

         g.    *The Medications Unconstitutionally Impaired Ms. Johnson's Ability to Cooperate with Counsel and Participate in Her Defense* ................................................. 69

5.       Counsel Failed to Have Their Experts Confront Aggravating Evidence Offered at Merits and Penalty Phases of Trial .................... 69

6.       Defense Counsel Was Professionally Unreasonable in Calling Certain Witnesses in Mitigation at the Penalty Phase; for Failing to Adequately Investigate the Potential Testimony of Those Mitigation Witnesses; for Failing to Adequately Prepare Those Mitigation Witnesses for Testifying at the Penalty Phase and for Failing to Understand the Implications of a Relaxed Evidentiary Standard at the Penalty Phase ................................................. 72

         a.    *The Testimony of Holly Dirksen* ............................... 73

         b.    *The Testimony of Douglas Book* ............................... 75

         c.    *The Testimony of Susan Marsolek* ............................. 77

         7.    Counsel Unreasonably Failed to Introduce Angela's Offer to Plead Guilty in Mitigation ..................................... 79

ii

8.      Counsel Unreasonably Failed to Object to the Government's Improper Argument that the Killing of Children Cannot be Mitigated . . . . . . . . . . 81

9.      Trial Counsel Failed To Proceed With a Trial Date that Would Have Prevented the Government from Issuing a Timely Notice of Intention to Seek the Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

10.     Counsel Failed to Structure Voir Dire to Identify Jurors With Prejudicial Views on Women and Pentacostal Religion . . . . . . . . . . . . . . . . . . . . . . . 85

11.     Trial Counsel was Ineffective for Failing to Investigate the Facts of the Case and to Present Helpful Evidence at Both the Merits and Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

12.     Counsel Unreasonably Failed to Introduce Evidence in Support of Residual Doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

13.     Counsel Provided Ineffective Assistance of Counsel When They Failed to Appeal Juror Misconduct Involving One Juror Telling Others They Were Not the Final Decisionmakers in Ms. Johnson's Case . . . . . . . . . . . . . . . . . . 89

14.     Counsel's Errors When Considered Cumulatively Operated to Deny Angela Johnson a Fair Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

B.      The Government Allowed Testimony It Knew to Be False to Go Uncorrected in Violation of the Fifth and Eight Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

C.      The Government Violated *Brady v. Maryland*, 373 U.S. 83 (1963), When It Failed to Disclose Remuneration Provided to Witnesses . . . . . . . . . . . . . . . . . . . . . . . . 96

D.      Ms. Johnson was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . 97

1.      Due to Counsel's Unreasonable Failure to Seek a Competency Hearing, Ms. Johnson Was Tried While Incompetent . . . . . . . . . . . . . . 101

E.      Juror #55 Committed Misconduct When He Failed To Reveal that He Had Been Subject to Childhood Abuse and that His Son Was a Convicted Methamphetamine Dealer that Had Been Sentenced by this Court and Counsel was Ineffective for Failing to Ask Questions on Voir Dire to Reveal Bias and for Failing to Move to Strike the Juror . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

iii

i.     The Jury Questionnaire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

ii.    Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

iii.   Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

iv.   Habeas Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

v.    Defense Counsel's Post-Trial Motion . . . . . . . . . . . . . . . . . . . . 109

2.    The Conviction and Sentence Were a Produce of Juror Misconduct
In Violation of the Fifth, Sixth, and Eighth Amendments . . . . . . . . . . . 110

3.    Defense Counsel's Failure to Investigate, to Conduct an Effective
Voir Dire, or to Dismiss Juror #55 From the Jury Pol Deprived
Ms. Johnson of the Effective Assistance of Counsel Guaranteed
Under the Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

F.    Combined Consitutional Errors Rendered Ms. Johnson's Conviction and Sentence
Constitutionally Infirm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

G.    The Eighth Amendment Requires A Heightened Standard of Proof for Imposition of
the Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

H.    The Eighth Amendment Precludes the Execution of the Mentally Ill . . . . . . . . 120

1.    Temporal Lobe Dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

2.    Complex PTSD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

I.    The Manner in Which the Government Would Carry Out Movant's Execution
Would Violate the Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

J.    The Death Penalty Violates the Eighth Amendment . . . . . . . . . . . . . . . . . . . . 126

IV.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

APPENDIX C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

## TABLE OF AUTHORITIES

__CASES__

*Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Atkins v. Virginia*, 563 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 123, 124

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Boucillon v. Collins*, 907 F.2d 589 (5th Cir. 1990 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 102

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 119

*Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Burger v. Kemp*, 483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90

*Cannon v. Lockhart*, 850 F.2d 438 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Conklin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Corocan v. State*, 774 N.E.2d 495 (Ind. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 124

*Crisp v. Duckworth*, 743 F.2d 580 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Drope v. Missouri*, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101, 102

*Duncan v. Louisiana*, 391 U.S. 145 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Dusky v. United States*, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Eismann v. Herbert*, 401 F.3d 102 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Evitts v. Lucey*, 469 U.S. 397 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Fero v. Kirby*, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Forrest v. Florida Dept. of Corrections,* 08-14418, slip op. (11th Cir. 2005) . . . . . . . . . . . . . . 91

*Geders v. United States*, 425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Case 3:09-cv-03064-MWB-LTS    Document 20-2    Filed 01/08/10    Page 6 of 165

*Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Gonzales v. McKune*, 279 F.3d 922 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Gravely v. Mills*, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Hall v. Luebbers*, 296 F.3d 685 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Hill v. McDonough*, 547 U.S. 573 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Hull v. Kuyler*, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 96

*Link v. Luebbers*, 469 F.3d 1197 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) . . . . . . . . . . . . 113, 114

*McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Medina v. California*, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 102

*Middleton v. Roper*, 455 F.3d 838 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Millender v. Adams*, 376 F.3d 520 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Morgan v. Illinois*, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 114

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 95, 96

*Pate v. Robinson*, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

*People v. Danks*, 82 P.3d 1249 (Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 123

*Remmer v. United States*, 350 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Riggins v. Nevada*, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 62, 64, 69

*Ristaino v. Ross*, 424 U.S. 589 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Case 3:09-cv-03064-MWB-LTS   Document 20-2   Filed 01/08/10   Page 7 of 165

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 41

*Rodriguez v. Hoke*, 928 F.2d 534 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Saranchak v. Beard*, 538 F.Supp.2d 84 (M. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Scott v. Jones*, 915 F.2d 1188 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 48

*Smith v. Robbins*, 528 U.S. 259 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*State v. Nelson*, 803 A.2d 1 (N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 123

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Bigeleisen*, 625 F.2d 203 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Brown*, 528 F.3d 1030 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Cheyenne*, 855 F.2d 566 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Cronic*, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 92

*United States v. DeWolf*, 696 F.2d 1(1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Fell*, 372 F.Supp.2d 773 (D. Ver. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Forester*, 874 F.2d 491 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Hatten*, 276 F.Supp.2d 574 (S.D. W.Va. 2003) . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Hayworth*, 942 F.Supp. 1406 (D.N.M. 1996) . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Hernandez*, 450 F.Supp. 950 (N.D. Iowa 2006) . . . . . . . . . . . . . . . . . . . . . . 25

Case 3:09-cv-03064-MWB-LTS     Document 20-2     Filed 01/08/10     Page 8 of 165

*United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8, 90

*United States v. Johnson*, 352 F.3d 339 (8th Cir. 2003 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Johnson*, 338 F.3d 918 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Johnson*, 196 F.Supp.2d 795 (N.D. Iowa 2002) . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Lecco*, 2009 WL 1249287 (S.D. W.Va. May 4, 2009) . . . . . . . . . . . . . . . . . 114

*United States v. McGriff*, 427 F.Supp.2d 253 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Robinson*, 301 F.3d 923 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Rodriguez*, ___F.3d___, (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Ruiz*, 44 F.3d 762 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. St. Clair*, 855 F.2d 518 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States ex rel. Sullivan v. Cuyler,* 631 F.2d 14 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . 91

*United States v. Tucker*, 137 F.3d 1016 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 114

*Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 118

*Washington v. Hofbrauer*, 228 F.3d 689 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*White v. Roper*, 416 F.3d 728 (8th Cir. 2005 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Wiggins v. Smith*, 539 U.S. 510 (2003 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*Wilson v. Simmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 81

**CONSTITUTIONAL AMENDMENTS**:

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**STATUTES**:

18 U.S.C. § 1512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 3593(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 83

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 126

21 U.S.C. § 848(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 U.S.C. § 848(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

21 U.S.C.A. § 848(m)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C.A. § 848(m)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C.A. § 848(m)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

21 U.S.C.A. § 848(m)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C.A. § 848(m)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Md. Code Ann., Crim. Law § 2-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**RULES**:

Fed. R. of Civ. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 12.2.(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Case 3:09-cv-03064-MWB-LTS    Document 20-2    Filed 01/08/10    Page 10 of 165

Fed. R. Crim. P. 12.2(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Crim. P. 12.2(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## **MISCELLANEOUS**

ABA Guideline 1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15

ABA Guideline 10.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 67

ABA Guideline 10.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ABA Guideline 10.9.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ABA Guideline 10.10.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 85

ABA Guideline 10.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

John H. Blume, et. al., *Competent Capital Reorientation: The Necessity of Knowing and Heeding
What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035 . . . . . . . . . . . . . . . . . . . . . . . . 65

Eric M. Freedman, *American Bar Association: Guidelines for the Appointment and Performance
of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) . . . . . . . . . . . . . . . 10

Stephen P. Garvey, *The Capital Jury and Absolution: The Intersecting of Trial Strategy,
Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1539
(1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 62

Kevin McNally, *Death Is Different: Your Approach to a Capital case Must be Different Too*,
THE CHAMPION, March 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Carolyn B. Ramsay, "Public Responses to Intimate Violence: A Glance at the Past," Public
Health Rep. 2006 Jul–Aug; 121(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Scott E. Sundby, *Remorse and the Death Penalty*, 83 Cornell L. Rev. 1557 1997-1998 . . . . . . 61

Case 3:09-cv-03064-MWB-LTS    Document 20-2    Filed 01/08/10    Page 11 of 165

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | Case No. 01-cr-3046 |
| | ) | CAPITAL CASE |
| | ) | |
| ANGELA JOHNSON, | ) | |
| | ) | |
| Movant | ) | |

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF

COMES NOW Movant Angela Jane Johnson, by and through her undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, respectfully requests that this Court grant her a new trial, vacate the judgment entered against her, and/or vacate, set aside or correct the sentence. In support of this Motion, counsel states:

## I.     INTRODUCTION

From the very beginning of her life, Angela's mother told her she was possessed by evil demons. Tr. 3322.[1] Her mother, blinded by her psychotic delusions about her young daughter, was able to see that Angela was actually suffering from temporal lobe brain damage and a particular seizure disorder which were the actual explanation for the behavior that her mother attributed to the

---

[1] Counsel's version of the transcript is consecutively paginated, one for the voir dire (pages 1 - 3723) and one for the merits and penalty phases (1-4100). References to the transcript of the voir dire will be VD _____, and to the merits/penalty phases Tr. _____.

1

"deaf and dumb" demon.    Exhibit 1 at p. 11.[2]  Left to fend for herself, Angela, beset by learning disabilities was sent off to school, where she sat in the back of the classroom and, once again, appeared not to be engaged.  Written off as a poor student, Angela was forced to abandon school (probably her last hope for some beneficial adult intervention in her life), after the eighth grade, when she went to work for her mother at her restaurant.  Fraught by the damaged brain she had inherited, and reeling from the abuse and neglect she had endured, Angela's internal life became a swirling tempest of a profound mood disorder, complex post traumatic stress disorder, and absence seizures.  *See* Exhibit 1.  In adolescence, she did what brain impaired and psychologically damaged children do, she used alcohol and marijuana and got married too young.  Twice.  Tr. 3557-3558, 3646-3649, 3321-3322.

Against all odds, Angela struggled to make her life work, but her mind had been assembled in such a way that she was not able to negotiate challenges, make decisions, and see consequences in the same way as others.  *See* Exhibit 1.  She was able to hold down basic jobs, but as a result of her mood disorder and the feelings of vulnerability foisted upon her by the trauma she had endured, she developed a defensive bluster, and an attitude that appeared to portray power and confidence. With one layer peeled back, however, Angela's bluster was clearly mental illness and fear, rather than power and confidence.

Angela began using methamphetamine to self-medicate her underlying conditions.  Tr. at 3649-3650.  She later became involved with Terry DeGeus, who brutally beat her, *id.*, in a way that must have felt almost familiar to Angela, who, one some level, still carried her mother's message

---

[2]  Given that the Court has scheduled an evidentiary hearing in the case, in the interest of efficiency counsel has appended only the most salient of the scores of documents that support the allegations in this petition.  Further evidentiary support for the factual allegations herein, which counsel attests are true on information and belief, will be offered at the hearing.

2

that she was possessed. She became involved in dealing meth, talking tough, and was still taking her beatings from DeGeus when DeGeus sent Angela to meet Dustin Honken about a meth transaction. Tr. 87-88.

Honken was a criminal minded planner and schemer from the very beginning. Honken had developed from scratch a meth production lab in Arizona from which he was transporting meth back to Iowa. Tr. at 848. Apparently, utterly in keeping with his "m.o.," see Exhibits 2, 3 and 4, Honken saw something in Angela he could use: maybe her addiction, her vulnerability, her bravado, or her palpable need for protection. He got Angela pregnant within weeks of knowing her, and put her on his meth operation payroll. Tr. 604-605. What Angela did not know, and was incapable of seeing in anyone, was that Dustin Honken was not the bookish respite from violent DeGeus that Angela thought he was. While DeGeus wore his garden variety violence on his sleeve, Honken's evil streak ran much deeper. Even in high school, he had participated in a robbery of an elderly bank teller in his home town of Britt, Iowa. *See* Exhibits 2, 3, and 4; Exhibit 5 at p. 3676-81. Unsatisfied with mere bank robbery, he plotted with one of his bank robbing cohorts to kill another one of his bank robbing cohorts. Naturally, for Honken, it was not enough simply to kill his cohort to increase his take of the robbery, he also plotted to throw the victim's body into a manure lagoon where the acid would eat away his remains. Exhibit 5 at p. 3679. All so that Honken could have a bigger share of the robbery proceeds.[3]

Angela's moods continued to swing, and her seizures took her in and out of active consciousness, as the father of her child became the focus of federal investigators. In 1993, Honken

---

[3] Honken's plan to murder his accomplices, a trend in his criminal career, stands in stark contrast to the Government's theory that Honken only became violent upon his introduction to Ms. Johnson. Prior to meeting Ms. Johnson, according to the Government, Honken was a non-violent, bookish, meth manufacturer.

3

was arrested after one of his meth lieutenants, Greg Nicholson, informed on him.   Tr. 706-707. Honken  decided it was time for another plot.  He was not going to spend any time in prison for his wrongdoing, just like he was not going to settle for less than his share of the robbery proceeds.  And just like his plot in Britt, Iowa, Honken decided to involve someone else in his scheme.

Angela Johnson was arrested mid-2000.  Never having been in jail before, and suffering from a storm of untreated mental illness and trauma, Angela was placed in the Benton County Jail where the Government had also placed serial informant Robert McNeese.  In what now seemed like almost a sadly predictable scenario, McNeese convinced Angela he could protect her if she just provided him with critical details of the offense.  Utterly unable to make choices in her own best interest, Angela obliged.  And shortly after that, for at least the second time in her life, Angela attempted to commit suicide.  Tr. 1404-1406; 3322.

Until that time, Angela had been represented by Alfred Willett of Cedar Rapids, Iowa.  After McNeese popped with up with maps to the bodies and a confession that he obtained from Angela, the Government indicated that it might seek the death penalty against Angela.  The Court appointed Patrick Berrigan of Kansas City, Missouri as learned counsel with expertise in death penalty proceedings.  He and Willett had never met or worked together before.  Berrigan set about retaining the services of Mary Goody, a mitigation specialist, and Dr. William Logan, a psychiatrist. Although Berrigan had told Logan in a letter that he basically did not think anything was wrong with Angela, Logan's initial evaluation of Angela in January and June of 2001 yielded some excellent initial inroads into Angela's mental illness.  He would not, however, see Angela or hear from counsel again for almost four years. Mitigiation specialist Mary Goody began working in September 2001, apparently using Dr. Logan's interview as a blueprint.  She interviewed fourteen people through November 2002 and was making progress into the pathology in Angela's social history.

4

Then, she too inexplicably, also stopped work for almost two years. Al Willet had retained the services of Ray Cornell as a merits phase investigator. It appears that Cornell's firm interviewed three people: two relatives of Angela's and an inmate related to litigation over the McNeese statements, before he was let go when counsel discovered he was working without a valid investigator's license. No investigation of the case would take place until years later when counsel retained a second investigator, Gordon Gratias.

Until the last few months prior to her trial, little was accomplished to move Angela's case forward. The Government seemed eager to settle the case, but counsel bungled each and every opportunity. Berrigan yelled at Angela and tried to force her take a plea, but in the absence of any understanding of how her mind worked, and without completing the investigation that Angela believed might help her defense, efforts to convince Angela to do what she had never done: make a decision that would result in her self-preservation, failed. By the time Angela was ready, counsel refused to allow her to proffer to the Government, without which they would not make a deal.

Real preparations for the trial did not begin in earnest until the final few months before trial, at which point Pat Berrigan made the critical decision that he would not offer any testimony concerning Angela's mental state at the time of the offense.[4] This decision had a cascade of consequences that doomed any hope Angela would have had of being spared a death sentence. It further hamstrung experts who were already rushed in their evaluations of Angela. It prevented experts from testifying as to the full spectrum of disorders that they were able to discover even given their limitations. It cut off counsel's access to almost half of the available statutory mitigating

---

[4] Mr. Berrigan was the only one of Ms. Johnson's three attorneys who had tried a capital case. In discussions with trial counsel, each made clear that the course of the investigation, consultation with experts, and purported strategic decisions regarding the penalty phase were made exclusively by Berrigan.

5

factors. And most importantly, it left counsel with absolutely no means to answer what would be the jury's most pressing concerns: "Why did she do it?" Or, "why didn't she stop it?"

Counsel decided on a strategy of "mere presence" for the merits phase, and attempted to argue that while Angela was present at the scene, Honken was the instigator of the criminal episodes and the shooter of all of the victims. The Government offered evidence in which Angela was talking tough, spewing profanity, and verbally threatening people, while simultaneously eliciting testimony of what a nice, non-violent young man Honken was (which the Government knew was false). The defense addressed none of it, despite having contradictory evidence in the form of grand jury testimony, trial testimony, and the Government's own proffer during Honken's trial.

Meanwhile, as a result of Angela's damaged and malfunctioning brain, her trauma, and the medications she was taking, critical aspects of which counsel was unaware – as well as counsel's instructions to her not to show emotions at trial, Angela sat stone-faced at counsel table, drawing pictures, and eating candy. Even after the jury expressly said they were watching her and judging her reactions, nobody explained to the jury what was going on in Angela's head. Counsel just left her there, fiddling while Rome burned.

At sentencing, counsel presented what appeared to be Angela's life story. They missed or intentionally avoided, however, presentation of evidence about Angela's brain and why it did not work like other people's brains. Most importantly, they failed to explain how her brain, when combined with her life history, and then subjected to the malevolent manipulation of Dustin Honken, created the perfect storm of impairments beyond Angela's control that led her to those crime scenes on those fateful nights. Rather than offer available evidence and testimony of the host of major mental disorders that Angela suffered from, then and at the time of the offense, counsel did everything to avoid reference to the one thing the jury would most like to have known: What was

6

Ms. Johnson's mental state at the time of the offense?

## II.  STATEMENT OF THE CASE[5]

On July 26, 2000, a federal grand jury returned a multi-count Indictment against Ms. Johnson charging with her five counts of aiding and abetting the murder of a witness (18 U.S.C. §1512), and related offenses.  On August 30, 2001, the grand jury returned a subsequent indictment against Ms. Johnson charging her with five counts of aiding and abetting murder in aid of a drug trafficking offense (21 U.S.C. §848(e)) and five counts of murder in aid of a continuing criminal enterprise (21 U.S.C. §848(e)).[6]

On April 25, 2002, the Government filed notice of its intent to seek the death penalty with respect to  each of the five victims.

The case proceeded to a jury trial. On May 24, 2005, the jury found Ms. Johnson guilty of all ten counts.

On June 21, 2005, at the conclusion of the penalty phase,[7] the jury found that Ms. Johnson should be sentenced to death for Counts 2 through 5 and 7 through 10 and found life sentences appropriate for Counts 1 and 6.[8]

On December 20, 2005, the Court conducted a sentencing proceeding during which it

---

[5]  Regarding form, the information contained in this Section is intended to encompass that requested in the Model Form appended to the Rules Governing Section 2255 Proceedings, albeit not in the same precise order.  Since this Motion is designed to follow the Model 2255 format, it is not in conformity with Local Rule 7d.

[6]  The two indictments were originally consolidated, but the Government ultimately dismissed the original indictment (Case No. 01-cr -3034) prior to trial.

[7]  Ms. Johnson's penalty phase was bifurcated.  On May 31, 2005, the jury determined that Ms. Johnson was eligible for the death penalty.

[8]  Ms. Johnson testified at neither the merits or penalty phase of the trial.

imposed the sentences recommended by the jury. Judgment was entered in the case that same day.[9]

Prior to trial, at trial and at sentencing, Ms. Johnson was represented by Patrick Berrigan, Esquire, Dean Stowers, Esquire, and Alfred Willett, Esquire.[10] The Government was represented by C.J. Williams, Esquire, Assistant United States Attorney, and Thomas Miller, Esquire, Assistant Attorney General.

A timely Notice of Appeal was filed to the United States Court of Appeals for the Eighth Circuit (Case No. 06-1001).

On July 30, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed Ms. Johnson's convictions and sentences.[11] The decision is published at *United States v. Johnson*, 495 F.3d 951 (8th Cir 2007).[12]

A timely Petition for Certiorari was filed on February 19, 2008. The Petition for Certiorari was denied on October 6, 2008.

On appeal, Movant was represented by Dean Stowers, Esquire, and Patrick Berrigan, Esquire. The Government was represented by C.J. Williams, Esquire.

This is Movant's first collateral attack on her conviction.

---

[9] In light of the decision of the Court of Appeals that Counts 1-5 and Counts 6-10 were multiplicitous, and the order that the sentences for Counts 1-5 be vacated, a corrected Judgment was issued on June 12, 2009.

[10] Two other counsel, Thomas Frerichs, Esquire, and Robert Riggs, Esquire, were briefly involved in Ms. Johnson's defense. Mr. Frerichs was forced to withdraw early in the case due to a conflict of interest and Mr. Riggs was asked to provide counsel on another conflict issue.

[11] The issues raised on appeal are listed in Appendix A.

[12] The case was the subject of another appeal, this one interlocutory, to the Eighth Circuit. The Government appealed the suppression of evidence relating to statements made and maps drawn by Ms. Johnson to Mr. McNeese at the Benton County Jail. *See United States v. Johnson*, 196 F. Supp. 2d 795 (N.D. Iowa 2002); *United States v. Johnson*, 338 F.3d 918 (8th Cir. 2003); *United States v. Johnson*, 352 F.3d 339 (8th Cir. 2003).

### III.   CLAIMS FOR RELIEF[13]

A.   Angela Johnson was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

As the Supreme Court of the United States made clear since the moment that the death penalty was reinstated in American jurisprudence from its own constitutional grave, death is different. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Death penalty cases require a level of preparation and expertise unique in the landscape of criminal law. The Supreme Court has recognized this truth consistently in cases from *Strickland v. Washington*, 466 U.S. 668 (1984), to *Williams v. Taylor*, 529 U.S. 362 (2000), to *Wiggins v. Smith*, 539 U.S. 510 (2003). Congress has followed suit by requiring the appointment of learned counsel, experienced in the particular challenges of death cases, to represent capitally charged defendants. The American Bar Association has recognized this by promulgating clear guidelines defining what the Constitution expects of counsel in capital cases. See GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (hereinafter "Guidelines").[14] These guidelines have been relied upon by the Supreme Court and numerous lower courts in the post-conviction context in determining whether

---

[13]   In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Petition sets forth only the facts and legal authority necessary to "specify all the grounds for relief available to the moving party." In conformity with the Rule, this Petition does not contain all the legal arguments Ms. Johnson could present to support her entitlement to relief, including those arguments, points, and authorities that would respond to any opposition to this Petition. Given the Court's Scheduling Order, Ms. Johnson will provide additional legal argument in support of these claims in her pre- and post-hearing Briefs.

[14]   The Guidelines in their entirety are published. *See* Eric M. Freedman, *American Bar Association: Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L Rev. 913 (2003).

9

counsel's conduct in their representation of a capital defendant met constitutional standards. *See Wiggins* 539 U.S. at 524; *Williams,*529 U.S. at 396. These Guidelines note that:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution. The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law.

Commentary to Guideline 1.1 at 4 (citation omitted). As will be shown throughout this petition, counsel cracked under that pressure and fatally failed in numerous critical ways to provide Angela Johnson with the representation that the Constitution required of them in the most important mission a lawyer is ever called upon to undertake – the effort to save his client's life. Their failure is not a unitary one. Rather, counsel's failures complemented each other in a way that ensured that Ms. Johnson would be sentenced to death.

"The right to the effective assistance of counsel is ... the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). Counsel's constitutional adequacy is assessed according to the familiar two-part test of *Strickland v. Washington*. The first prong asks whether counsel's performance "fell below an objective standard of reasonableness," the second, whether counsel's inadequate representation was prejudicial. *Strickland*, 466 U.S. at 687-88. Counsel's performance is deficient if it is unreasonable under "prevailing professional norms." *Wiggins v. Smith*, 539 U.S. at 521; *Strickland*, 466 U.S. at 688. The Supreme Court has been clear that,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Wiggins,* 539 U.S. at 521. Counsel's performance is prejudicial if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

10

different."[15] *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 695.  In the context of sentencing, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial.  *Wiggins*, 539 U.S. at 537.

Counsel's acts and omissions taken separately and together constituted deficient performance but for which there is a reasonable probability Angela Johnson would not have proceeded to trial in this case and would not have been sentenced to death.  As such, Angela Johnson was denied her rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

> **1.      Counsel Failed to Take the Necessary Steps to Resolve This Case in a Plea for a Sentence Less than Death**

**"[A]voiding execution is, in many capital cases, the best and only realistic result possible"[16]**

Fewer than one percent of federal death penalty cases that have proceeded to trial have resulted in acquittals.  The odds of winning are low, the stakes are high, and as a result, diligent counsel must think about pleading their case from the beginning.  This involves a prompt and thorough review of the evidence the Government provides and investigation of the evidence they do not.  It involves a comprehensive evaluation of the potential case in mitigation such that it can be marshaled to persuade the Government that a death penalty sentencing proceeding will not be fruitful for them or that the client is simply not death worthy.  It involves developing a close and trusting relationship with the client and her family.  And it requires an understanding of any barriers

---

[15] The Court has made clear that the adjective "reasonable" is important; in fact, a reasonable probability is a lower standard than even the preponderance of the evidence standard. *Williams*, 529 U.S. at  406.

[16] Commentary to Guideline 10.9.1 (quoting Kevin McNally, *Death Is Different: Your Approach to a Capital case Must be Different Too*, THE CHAMPION, March 1985 at 8, 15).

in the client's mental health profile or background that might impede this relationship or bear upon her ability to make decisions in her own best interest.  See ABA Guideline 10.9.1 at 91 ("Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.").

Capital defendants, however, are normally not eager to sign their lives away, and abandon hope of ever being free or seeing their families again.  Occasionally, a client will readily admit her involvement in the offense and a plea can move forward.  In a case where the plea will likely lead to a lengthy incarceration, or life, however, it is more likely that the client will, at least initially, balk.  This is especially true where a client has no criminal record and has never spent any meaningful time, much less a lifetime, in jail.  Counsel often become frustrated that their clients cannot simply see how bad the situation is and make the seemingly obvious decision to save their own lives.  There are, however, a host of reasons, mostly surmountable, that clients resist resolving cases prior to trial.      One of the biggest problems in getting a capital defendant to plead guilty is the most basic one: that the client refuses to admit her involvement.  There are many reasons clients are reluctant to admit their involvement to counsel even when the evidence overwhelmingly proves their guilt.  They may be afraid that their families will reject them if they admit their involvement.  They may be afraid God will be unable to forgive them and that their eternal life will be affected.  They may be unable emotionally to admit to themselves they have committed a horrible crime.  They may fear living in jail after having testified against another person - if that is part of the agreement.  They may believe that their lawyers will have to withdraw from representing them if they admit their involvement, or they may have formed positive attachments with their attorneys which will be cut short if they enter a guilty plea.  They may not have a realistic understanding of

what day-to-day life will be like in prison as opposed to death row, or they may have a misunderstanding of the strength of the evidence against them. Finally, they may have emotional or psychiatric impairments that actually affect their ability to remember or process their involvement in the charged offenses or to make decisions in their own best interests. In a capital case in which counsel believes that there is no chance of winning, it is thus incumbent upon them to do everything in their power to work with their client and the prosecution to ensure that the client's life is not put in jeopardy at a capital trial.

*a. What diligent counsel does to resolve a death case with a plea*

First and foremost, "counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress." Commentary to 1.1 at 6. A meaningful rapport with a client can simply not be established any other way than by spending time with her.

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense... and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.

Commentary to 10.5 at 70. If there are obstacles in a particular team member's relationship with a client, it is important to examine the source of those obstacles, repair them, or perhaps designate another team member to build a bridge to the client. Regardless of who is the primary person with client contact, it is critical that the entire defense team is unified with regard to moving a client toward a plea. A client who is reluctant to face reality will latch on to any glimmer of hope that appears to be offered by any member of the defense team who is not agreed to resolve the case with a plea. Navigating the relationship with the client will likely also require close consultation with a mental health professional, who can explain any difficulties the client may have in forming

13

trusting relationships, assessing risks and consequences, avoiding self-destructive choices, or possible barriers to remembering the offense. This expert and the team should work closely with the mitigation specialist to incorporate incoming information into the strategy for working with the client. See Commentary to Guideline 10.7 at 82 ("The mitigation investigation should begin as quickly as possible, because it may affect . . . plea negotiations.").

Second, counsel must marshal resources outside the defense team to help the client make the decision to plead. This should include identifying the people in the client's life whose opinions are important to her and who have the most influence on her, and bringing them into the fold. *See* commentary to Guideline 10.5 at 70. Counsel must share with these friends and family members that the evidence against their loved one is overwhelming and that they need to encourage and support her in a decision that will save her life.

> [I]t will often require the combined and sustained efforts of the entire defense team to dissuade the client from making a self-destructive decision. As noted there, the defense team may also need to call on family, friends, clergy, and others to provide information that assists the client in reaching an appropriate conclusion.

Commentary to Guideline 10.9.2 at 98. Depending on the particular profile of the client, counsel can bring in a religious leader to help the client navigate a plea vis-a-vis her faith. Counsel may even be able to put the defendant in contact with a person who has made the decision to plead guilty to discuss how to approach her family with that decision, or with a person who has had to endure life with a family member on death row to help the client evaluate the ramifications of her decision.

Counsel should also offer the client information about what prison life would be like after a plea as opposed to life on death row – particularly regarding things that are important to clients, like the availability and frequency of contact visits with their families or ability to get a job within the prison.

14

Third, and most important, counsel must provide the client with information and well-informed legal advice. The Guidelines are clear that "comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lower sentence [or] to persuade the prosecution to forgo seeking a death sentence at trial..[.]" Commentary to 1.1 at 6. Counsel cannot simply confront the client with the case as the Government sees it and expect the client to give in. Counsel must thoroughly investigate the case in order to demonstrate to the defendant that there is no realistic possibility of winning the case at trial. As the Commentary to Guideline 10.5 describes, a client will, quite reasonably, not accept counsel's advice about the case if the attorney has failed to conduct a meaningful investigation. This is critical to help the client understand the strength of the Government's case, the strength of the defense, and the pure statistical unlikelihood of prevailing at trial without a slam-dunk merits phase defense. Counsel must explain in detail the Government's case, including why some highly damaging evidence will be admissible, or credited by a jury, contrary to the beliefs often held by criminal defendants about how the system should work. Counsel must also explain the strength of the aggravating evidence the Government will offer at sentencing.

Finally, counsel must carefully assess what the Government's interests are in plea negotiations, whether it is a significant term of years, cooperation in another case, making a public example of the defendant, appearing tough on crime, addressing the sentencing desires of the victims or any other factors.

### b. *How counsel in this case scuttled any hope of a plea*

This was a case that was begging to plead. There is every indication throughout counsel's file that the Government was interested in resolving Angela's case from the beginning, although what they wanted at their end of the bargain changed as time went on. At first, prior to Angela's

statements to Robert McNeese, the Government was willing to exchange a plea to fifteen years, apparently for information leading to the whereabouts of the victims. Trial counsel, however, let the offer pass. Willett requested the assistance of his legal assistant, Nancy Lanoue, in meeting with the client, reviewing discovery with her, and providing whatever assistance Angela needed during her years of pre-trial detention. According to Ms. Lanoue, it is she that spent 99.9 percent of the time with the client. Nancy provided a warm, nurturing presence in Angela's life. After a history of living with a psychotic mother, and almost equally troubled sisters, and after having the person she believed to have been her best friend turn her into authorities, Nancy's caring attention became indispensable to Angela in this terrifying and uncertain time in her life. Nancy, however, unlike the rest of the defense team, supported Angela's protestations of innocence. Not only did she support the protestations, she egged them on. In reviewing the discovery, contrary to the views of counsel, Ms. Lanoue saw the seeds of reasonable doubt, thought the defense should not be mere presence, and openly disagreed with the attorneys when they informed Angela of the defense theory of the case. Counsel, however, did nothing to ensure that Nancy, who would spend more time with Angela than her three lawyers combined, was not carrying a message contrary to what counsel knew to be the best way to resolve the case.

When Pat Berrigan was appointed and took one look at the evidence, he knew immediately which way this case should go. The Government was already hinting that it was considering seeking the death penalty. Berrigan visited Angela at the jail and all but commanded Angela to plead guilty. He did not have any relationship whatsoever with Angela at that time. Angela had been spending all of her time with Lanoue, who believed she was innocent. In addition to caring for and comforting Angela, Ms. Lanoue was charged with bringing to her the discovery for review. Meanwhile, Pat Berrigan offered no indication that he had conducted any investigation that would

16

contradict that story. He appeared simply to believe the Government's story. The defense had hired investigator Ray Cornell, but in 2000, his firm interviewed only two people: one of Angela's sisters and her brother. In 2001, they interviewed only Sara Bramow, regarding the McNeese incident. Shortly thereafter, counsel realized that Cornell was operating without a valid investigator's license and dismissed him. No further investigation of the case took place until 2004. Even then, on the verge of trial, past the point where a plea was likely to be accepted by the Government, little investigation was done that was designed to counter any of the Government's proof at trial.

Throughout 2001 and 2002, the Government continued to voice interest in resolving the case, and counsel continued to fumble the ball. Assistant United States Attorney Pat Reinert made it clear to counsel that the Government would be unlikely to consider a plea once it had sought authorization to seek the death penalty from the Department of Justice, and sought to resolve the case by April 15, 2001. At this point, and not until June 7, 2001, would the local office need authorization from the Department of Justice to plead the case.[17]

Angela, not surprisingly, was not ready to plead. Berrigan had spent a scant four hours with his client. Lanoue, who was carrying the message that Angela was going to beat the case, had spent dozens and dozens of hours with Angela.[18] Nothing had been done to investigate the case.[19] Counsel had not consulted with Dr. Logan or any mental health professional for assistance regarding communication with Angela or regarding whether Angela's history of trauma, biopolar

---

[17] DOJ policy changed as of June 7, 2001. Thereafter, local U.S. Attorney's Offices would need permission of the Attorney General to plead death eligible cases.

[18] For example, in the latter two-thirds of 2002, Ms. Lanoue spent more than seventy-five hours with Ms. Johnson at the jail.

[19] Undersigned met with all counsel about this case. When asked, separately, about the merits phase investigation, both Mr. Berrigan and Mr. Stowers responded, "What investigation?"

17

disorder, PTSD or medication regimen were affecting her ability to have a rational understanding of her chances at trial and how to make a decision to save her own life. Counsel had not contacted any family members to explain to them how dire the situation might become if the Government sought a death sentence. Counsel did not explain to Angela practicalities like the enormous statistical odds against her that she would be acquitted of the charges or, if not acquitted, the very best outcome for her would be mandatory life incarceration without the possibility of release.

So Berrigan told the Government that the defense wanted to defer plea negotiations until after a ruling on the McNeese issue and until counsel had even more time to review discovery. (At that point, in March 2001, eight months into the case, Berrigan had spent only slightly over five hours doing so). Berrigan also explained to Reinert that "as in most cases that we handle for our respective clients, it often takes the parties a good deal of time to realize the benefits of negotiated plea as opposed to costly and time-consuming litigation." Berrigan would spend nine hours with his client over the course of the next full year.

That August, Berrigan underwent triple bypass-surgery. Obviously, he had to leave any efforts to resolve or prepare the case to Al Willett and Dean Stowers. Berrigan wrote in a letter to his co-counsel following the surgery, "I presume that Angela was not interested in beginning plea discussions."

The divisions on the team continued to be played out in front of Angela. Berrigan's notes from an October 2001 meeting show that Willett "launched into a discussion about choices/changes of venue. This got AJ thinking trial, not plea - counterproductive."

Then, based on what were obviously misunderstood signals, counsel believed the Government would be amenable to a twenty year offer. The Government rejected that, but in a letter dated October 10, 2001, stated that "in the right circumstance, our office may not be opposed to

18

negotiating a settlement to this case, which could include a sentence other than the death penalty or life imprisonment." But now that over a year had passed, the bodies of the victims had been found, and the Government began thinking about Angela's and Dustin Honken's trials. The Government now indicated that prior to the acceptance of a plea the Government would need to interview Angela "pursuant to a proffer agreement, [and] assess her credibility and value to the government." Exhibit 6. At this time, the Government still had not issued a Notice of Intention to Seek the Death Penalty.

Then the issue of the plea, as had the investigation of the facts of the case, fell dormant for months. In February 2002, the Government approached Berrigan. According to Berrigan, the Government,

> was not wed to their requirement that you plead guilty to a life sentence, but would instead consider a sentence of 40 years as sufficient, with pre-agreed downward departures if certain conditions were met. I informed Reinert that 40 years was indeed a life sentence and that this would also be unacceptable. That was the extent of our conversation.

At the time of that letter, again, Berrigan had spent a sum total of nine hours with Angela. Mary Goody, the mitigation specialist, had not seen her, and Dr. Logan had not seen her or reviewed her condition in eight months. Berrigan's notes indicate how the few meetings they did have were fairing:

> Angela started off friendly, but got very testy and argumentative when confronted with g.j.. and other testimony. Plea possibility discussed: this goes nowhere. AJ wants M charged dismissed. Outright rejects 20 years. "I'm not worried about Tim Cutkompt." He's lying! Goes on about the lying W's against her – not to (sic) realistic today. Wants to deal w/evid. by denying it + credibility +/or existence b/c can't really explain it. Teary eyed at end. Complains of being in jail – "it's horrible." Taking meds: paxil, tradazone at night.

In April 2002, the Government issued notice of its intent to seek the death penalty against Angela Johnson.

In all of 2002 through March of 2003, Berrigan spent seven hours with Angela Johnson. In

May 2003, Angela wrote to Berrigan:

> I am going to be as clear as I can.  I want to plead guilty.  I do not want to wait for any more rulings, not even the 8th crt.  I am asking you to get me the best deal you can and I <u>will</u> cooperate. At this point, I will confess to killing the Pope.  I have not touched my kids in THREE YEARS now and I've had it.  Please get me out of here and into a prison as close to my kids as possible.  That is all I ask.

Exhibit 7.  Berrigan's notes of his and Willett's follow-up meeting with Angela  underscore her concerns.  Berrigan approached AUSA Reinert again offering twenty years.  At this point, Reinert said that he did not believe the Department of Justice would authorize anything less than life imprisonment.  Reinert continued to express interest in resolving the case, provided that Angela provide some idea of how helpful she could be to the Government in Honken's case.

> Suddenly, in June 2003, Dean Stowers weighed in and essentially put an end to negotiations:

> Our position is that there will be no proffer without a written proposal on the table. [...] I really do not think the proposed course of action outlined in your June 10 letter will further discussions.  If it represents the government's position, then we are likely at an end of discussions.

By August of 2003, Berrigan's notes indicate that Angela was still interested in a plea.  Counsel appeared to remain intent on twenty years.

> In March of 2004, after another six months of silence on the issue, the team had a meeting with Skip Gant, federal death penalty resource counsel.  Berrigan notes reflect that the team must:

> confront Angela w/her prior statements - we need to get her off of the "I didn't do anything" posture.  It keeps her from testifying in either phase and will make plea negotiations impossible.  *** On plea, can we get high-low agreement with 15 years on bottom and 40 years on top?  Sentence needs to be left strictly w/Judge, not US Atty's office. *** Ask DOJ for reconsideration - by letter, then follow-up w/request for personal appearance b/4 the Board.

> Eventually Dustin Honken's trial was nearing, and the Government said that after June 30, 2004, Angela's cooperation would be of no use to them.   This time, Al Willet responded and reiterated that Angela would not submit to a proffer without a firm offer from the Government.

20

Thus, in July, AUSA Williams sent a joint Honken/Johnson plea proposal to the Department of Justice, that did not include cooperation by Angela. Even the AUSA that sent the offer to the Department did not support it without the proffer. The Department rejected the offer.

Assistant United States Attorney Miller, however, told Honken's counsel that he would be happy to see to a joint plea with life for Honken and thirty years for Angela. Berrigan continued to note that he could not move his client to thirty years. Berrigan had spent zero hours with his client in the first six months of 2004. In a subsequent conference call, AUSA Rich Murphy told counsel for Honken and Johnson that "DOJ wants life + life." Berrigan apparently questioned Murphy's knowledge of what DOJ wanted and called the meeting "a fishing expedition for the Honken defense team." Dean Stowers told everyone the meeting was pointless.

Yet on August 12, 2004, AUSA Murphy forwarded to counsel the most binding sort of offer he could make, as all offers required the approval of the Justice Department before they could become binding.

> In light .. of the impending trial of Dustin Honken, I thought it prudent to try to determine one last time whether there are any terms to which we can agree to have your client plead guilty and cooperate. As you know, if Honken is found guilty and the death penalty is imposed, it will be too late for your client to request the Department to forego pursuit of the death penalty against her.

Mr. Murphy continued that if Angela proffered and,

> [i]f we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval, a proposed plea agreement for your client's consideration. The basic terms of the plea agreement would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence. Your client would be required to cooperate and testify in the prosecution of Dustin Honken. In exchange, we would seek authorization not to pursue imposition of the death penalty against your client. A successful proffer and agreement to testify could be critical to a possible finding of changed circumstances such as might warrant withdrawal of the death penalty notice, however, there is no guarantee. We would also be willing to consider whether it would be possible to arrange for your client's sentence to be served in Iowa or nearby to Iowa.

21

Exhibit 8. Berrigan responded that the Government's proposal was "senseless" and that Angela would not proffer in the absence of a firm offer.[20]

Another six months went by. In February 2005, Berrigan offered a forty-year *Alford* plea that was rejected by the Government. Then, finally, in March 2005, just weeks before trial was to commence, and after Honken was already convicted and sentenced to death, counsel informed the Government that Angela would admit her involvement in the offenses as part of a plea agreement. Exhibit 9. The Assistant United States Attorney took the offer to main Justice. Counsel was too late. By that point, Washington had absolutely no incentive to accept the offer and it was rejected.

Counsel bungled the best chance to avoid a death sentence in this case before it even saw a courtroom. They failed to develop a trusting relationship with Angela and failed to carry a consistent message regarding resolving this case, or to help Angela understand she would not lose the companionship of Nancy if she admitted her role. They failed to enlist the help of Dr. Logan or another mental health professional to assist them in understanding how Angela's history, psychiatric conditions, and medications might have been erecting barriers to a plea. Counsel did not bring Angela's family on board in an effort to save her life, nor did they offer her the opportunity to talk with anybody with personal experience with life in prison or on death row. They did not tell her the simple fact that if she pled guilty she would spend her life in a federal prison facility where she

---

[20] Present in Berrigan's file was a proffer agreement from the Government to Honken's counsel which included a provision that

> The proffer will be provided to the government attorneys and agents not now involved in the prosecution of defendant. No information provided by defendant in the course of a proffer given pursuant to this agreement, may be disclosed to the agents or attorneys involved in the prosecution of defendant unless a later written agreement is executed by defendant which authorizes such a disclosure. Similarly, no information provided by defendant in the course of a proffer given pursuant to this agreement, may be used against defendant, directly or indirectly, unless a later written agreement is executed by defendant which authorizes such disclosure.

could have contact visits with her children. They failed to back up their position that she should plead guilty with a showing that they had investigated the case to reassure her with facts and the odds that she was highly unlikely to prevail at trial. When Angela did express interest in pleading, counsel remained two steps behind what the Government was seeking, made utterly unrealistic offers to the Government, and refused to have Angela proffer. The proffer would have been no risk to her, and it was the Government's main incentive to resolve the case.

There were numerous occasions among many others when the record should have reflected a flurry of activity and the entry of a plea agreement. One was in February 2002 when AUSA Reinert indicated that he would accept a plea to forty years. Another occurred when the Government expressed interest to counsel about pleading in August 2004. This is not a case in which the Government was not motivated to resolve the case. *See Eismann v. Herbert*, 401 F.3d 102, 109 (2d Cir. 2005) (*citing Burger v. Kemp*, 483 U.S. 776, 785-86 (1987)) (failure to plead a case is not ineffective assistance where record does not contain evidence that Government was open to plea or would have made an offer). Had counsel performed competently by laying the groundwork for a plea from the beginning and responding rigorously to real overtures from the Government, there is a reasonable probability that this case would have resolved with a sentence less than death and Angela never would have proceeded to trial. *See Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (requiring defendant alleging ineffectiveness to show that but for counsel's advice he would have accepted an offer and not proceeded to trial). The deficiencies in all of these important areas are numerous and compounding – trial counsel failed to develop a relationship with the client, failed to provide her with a unified message, failed to investigate the case, failed to utilize resources other than counsel and failed to permit her to proffer. The prejudice is apparent. Rather than a self-serving, after-the-fact pronouncement that Ms. Johnson would have pled guilty in this case, it is

23

clear from Ms. Johnson's letter to counsel and her offer to plead to a life sentence that had counsel not performed deficiently, there is a reasonable probability that an agreement would have been reached in this case.

Angela Johnson should be resentenced to serve the sentence she would have received had counsel handled these obligations with appropriate diligence to an agreed upon disposition. This Court's opinion in *United States v. Hernandez*, 450 F.Supp.2d 950, 980 (N.D. Iowa 2006), is instructive. There, the Court addressed all of the salient components of a claim relating to ineffective assistance in plea negotiations: deficient performance, prejudice, the ability of the defendant to satisfy the requisites of the plea and the appropriate remedy. Like the defendant there, Ms. Johnson's counsel failed to take adequate steps to settle this case short of a capital trial. The opportunity was there and it was missed. Ms. Johnson should now be afforded that opportunity.

>          **2.      Counsel Was Ineffective For Failing to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses**
>
>                   **"All of the Notes, None of the Music"**

A critical teacher heard her student perform what should have been a lyrical, beautiful piece in a technical, mechanical way. "All of the notes, none of the music," she said. The same harsh criticism must now be leveled against counsel's penalty phase presentation in Angela Johnson's case. Although counsel offered what was, on paper, no shortage of testimony and expert opinion, counsel fatally failed to put it together in any compelling or meaningful way to address what was quite clearly the elephant in the room, "what was Angela doing at those crime scenes?"

Counsel bungled the investigation, development, and presentation of mitigation evidence from the beginning in this case by: failing to follow up on red flags offered by their expert's initial evaluation four and half years prior to trial; waiting until months and weeks before trial and even during the beginning of trial itself to have their experts assess Angela and develop a theory of

24

mitigation; and most importantly, deciding not even to allow their experts to evaluate Angela's mental state at the time of these offenses. As a result, although counsel did offer the jury extensive testimony about her horrific background and childhood, they arbitrarily denied the jury powerful evidence about Angela's brain, which was profoundly affected by her genes, her biology, and her pregnancy that would have supported four statutory mitigating factors and allowed the jury to understand what (and who) led Angela to behave the way she did on those fateful nights in 1993.

> a. *What diligent counsel does to prepare for the sentencing phase of a capital case.*

Angela Johnson had a constitutionally protected right to have her trial counsel investigate, develop and present, and have the jury give effect to mitigation evidence related to her background and character and the circumstances of the offense. *Williams*, 529 U.S. at 393. Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins*, 539 U.S. at 524; *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

The Guidelines instruct counsel to focus on their penalty phase theory before they even pick a juror. They must assume that they will lose at trial, and have a comprehensive plan for explaining to the jury why the defendant, whom the jury has just found guilty of committing horrible crimes, should not be sentenced to the full extent of the law. This requires more than offering the jury a checklist of reasons that they should feel sorry for the defendant. It requires offering the jury a full explanation of how the client went from being an innocent, harmless infant to being present at one of the most aggravated murder scenes these jurors will ever have had to think about. The story counsel will tell about how the client ended up at those crime scenes must underscore counsel's

litigation of the case from investigation to motions to jury selection and through the merits phase.

As the Guidelines state, the mitigation presentation will not "be persuasive unless it is (a) consistent with that made by the defense at the merits phase and (b) links the client's behavior to the evidence offered in mitigation." Guidelines at 7. The Guidelines further state,

> If counsel cannot establish a direct cause and effect relationship between any one mitigating factor and the commission of a capital offense, counsel should endeavor to show the combination of factors that led the client to commit the crime. In any event, it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors.

Guidelines at 108. In other words, the notes have to make music.

> b. *A lengthy but hollow and vulnerable presentation of mitigation*

Pat Berrigan was appointed to Angela's case as learned counsel in death penalty cases in October 2000. He moved quickly to enlist the help of mitigation specialist Mary Goody. Then, without having ever met Angela, Berrigan began drafting a letter to Dr. William Logan, a psychiatrist, in anticipation of retaining him to assist in her defense. Approximately a month after his appointment, Berrigan made the trip to Cedar Rapids to meet his client. He spent two hours with her, and upon the conclusion of that interview, sent Dr. Logan a letter which said, in part,

> Having met with Ms. Johnson for two hours on Monday, November 20th, and having spoken to Al Willett about Ms. Johnson on several occasions, I can tell you that she is not presently psychotic and appears to have no immediate mental health concerns. She did attempt suicide by hanging shortly after receiving the news that the jail inmate she had confided in about her case had turned all of that incriminating information over the government. This was almost two months ago now, and Angela seems to have recovered fully.
>
> ***
>
> We will need a competency determination, although, frankly, that does not to seem to be an issue presently. More importantly, we need to evaluate Angela's mental state at the time of the commission of the alleged murders (July and November of 1993), and at the time she purportedly made incriminating statements to the government's snitch, Robert McNeese...] It will be important to have at least a preliminary indication by that time as to whether Angela's mental state made her unusually susceptible to coercion and/or enticement by McNeese in obtaining these

26

alleged statements.

***

> Even if Angela does not have significant mental issues that impact upon her first phase defense (which is "I didn't kill anyone"), I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Angela's boyfriend and co-defendant, Dustin Honken.

Exhibit 10.

Six months later, on January 21, 2001, after an additional three hour consultation with Al Willett, Dr. Logan visited Angela for a three hour evaluation. Dr. Logan was able to put to rest counsel's inaccurate assessment that Angela had "no immediate mental health concerns." But sometime between Berrigan's letter and Dr. Logan's visit, counsel made the critical decision not to investigate the fertile areas of mitigation that he had initially asked Dr. Logan to assess. We know this, in part, because Dr. Logan did not talk to Angela about the offenses, nor does it appear that he discussed Angela's relationship with McNeese or Dustin Honken.

Dr. Logan's report revealed a number of red flags of brain impairments in Angela and her family. The report noted Angela's mother's "religious disorder" and that Angela's grandmother "believed she was a prophetess." Logan noted that Angela attempted to "block out" her childhood, and indicated severe and continuing abuse. He reported that Angela failed in school, had trouble getting along with peers, and beginning in adolescence used alcohol, marijuana, speed, and acid. She had repeated failed relationships and moves. Dr. Logan further described Angela's feelings of worthlessness. Dr. Logan noted that Angela had been treated with a variety of psychotropic medications including Prozac, Zoloft, Paxil, Serzone, Elavil, Tradazone, and Celexa. He also reviewed investigator Rose Nevins' interviews of Angela's sister, Wendy Jacobson, in which she described her mother and grandparents holding Angela down to cast out the "deaf and dumb demon."

27

Dr. Logan expressed interest in coordinating with investigator Ray Cornell and/or Mary Goody in the development of a report for sentencing. Logan made clear to counsel he did "not want to try to obtain collateral interviews and records at the last minute." However, Dr. Logan would not work on the case or see Angela Johnson again for almost four years.

In the meantime, counsel bumbled their way through the requirements of Fed. R. Crim. P. 12.2. Deadlines were repeatedly set and extended. In October 2004, the defense still had not provided the Government any notice regarding its intent to use mental health testimony. Two months later, approximately four and a half years after Angela's arrest, counsel provided a *handwritten* notice to the Government that it intended to offer mental health testimony from Drs. Logan, Hutchinson, and Gelbort, although the notice indicated that no testing had yet been done.

It was also not until the very beginning of 2005 that any mental health professionals visited Angela Johnson again for any purpose. Michael Gelbort administered neuropsychological testing on January 25, 2005,[21] and two days later, Dr. Logan visited. Counsel requested that Dr. Logan not interview Angela about or draw any conclusions regarding her mental state at the time of the offenses, and he did not. Dr. Marilyn Hutchinson evaluated Angela on February 23 and 24, 2005. Counsel also instructed her not to evaluate Angela's mental state at the time of the offense. By April 3, just two weeks before trial was to begin, Dr. Logan was still complaining to Mary Goody that he not been sent all the records that he had requested.

Dr. Mark Cunningham did not interview Angela Johnson until May 8, 2005, after the trial had already commenced. His area of inquiry was limited. He was also told not to question Angela about the time of the offense. He was to evaluate her to determine the presence or absence of risk

---

[21] Counsel had written to Gelbort regarding obtaining his services in June 7, 2002. He supplied Gelbort with a social history prepared by Mary Goody.

factors in the now seminal study by the Department of Justice on predictors of youth violence[22] and to assess her ability to adjust to life in the Bureau of Prisons. In fact, Dr. Cunningham could not have offered testimony regarding Angela's mental state, because he had not been included in the 12.2 notice provided to the Government.

Both Dr. Logan and Dr. Cunningham knew the fact that Angela's brain was not normal, but they were restricted by the limitations that counsel had placed on them and frenzied time constraints. Dr. Logan tried to tell counsel about Angela's brain. He told Mary Goody, "as a result of PTSD, *she has a damaged nervous system*." He knew that Angela exhibited symptoms of bipolar disorder, a functional impairment of the brain, and he suspected that Angela's problems were at least to some extent inherited. Dr. Logan recognized that Angela's mother was "psychotic" at times. These conversations, however, took place with Mary Goody while counsel was in the course of picking a jury.[23]

Dr. Cunningham also recognized symptoms of brain impairment which manifested themselves as a presentation of bipolar disorder, and said that a PET Scan would show "little bitty pockets of dead brain." But it was for naught. It was too late to look at pictures of her brain. Trial had already begun. Counsel had already decided that no matter how many holes were in Angela's head, they were not going to tell the jury that they had any role in Angela's actions in 1993.

So, at the last the minute, counsel took the information that they had about the horrific trauma Angela had suffered as a child and an adult, the treatment she had received for mental health

---

[22]Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

[23] Around this same time, Dr. Gelbort had told counsel that a PET scan would reveal brain abnormalities. Trial counsel never requested the PET scan.

29

problems in the past, and trotted their half-muzzled experts onto the stand to try to thread the needle between saying Angela was impaired, and how these impairments affected her life in general, but not saying how these impairments affected her ability to participate in what would be the two most earth-shattering days of her life.

In his testimony, Dr. Logan was required by counsel to admit up front that he had not been asked to look at Angela's mental state as it related to the offenses, but simply "generally what her life experiences had been and how that affected her emotional composure, stability, and life adjustment." Tr. 3307. Dr. Logan concluded that Angela's life experience rendered her "predisposed to depression," as opposed to making the normal conclusion that a psychiatrist would make, that at least in part, her disorders emanated from her brain. Logan reiterated the bizarre, religious rituals resulting in the abuse of Angela and many other elements of the dysfunction in her life history such as her abuse by Terry DeGeus. Tr. 3308-3325, 3326-3328. He discussed her jail suicide attempt. Tr. 3298-99. He was able to make reference to the depression, anxiety, and posttraumatic symptoms in Angela's past. Tr. 3300. He also discussed the fact that methamphetamine withdrawal can cause a strong rebound depression. Tr. 3340. Dr. Logan mentioned that in "children exposed to that kind of pryotic trauma, there have known to be shrinkage [sic] in certain areas of the brain where it's possible for memory integration." Tr. 3321. He went on to explain that trauma can cause problems with maturation, concentration, and early drug use. As a result of counsel's limitations, however, Dr. Logan could not say why the brain changes caused by the trauma she had endured, why the suicidal tendencies of depression, and why her mood impairments would have created the trajectory that landed Angela Johnson with Dustin Honken at the crime scenes.

Unsurprisingly, the Government capitalized on this:

30

Q. You are not providing any opinion whatsoever that her depression affected her thinking or her behavior at the time of the offenses involved in this case are you?

A. No, I'm not.

Q. In fact, you were specifically instructed not to question her about what her thinking and behavior and mind-set was at the time she committed the offense.

A. That's right.

Q. So it's fair to say you're not offering any opinion about whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law was significantly impaired or not impaired at the time that she committed the offense, are you?

A. No, I'm offering no opinion about that area at all.

Q. You're not offering any opinion about whether she was under any form of duress or pressure or anything else at the time she committed these offenses.

A. That's right.

Tr. 3355. Even trial counsel joined in,

Q. And, in fact, you weren't you told that the defense wasn't claiming that, you know, she was nuts at the time of the offense or that that was some kind of a defense?

***

A. Right. There was no claim in that area.

Tr. 3357.

Dr. Hutchinson's testimony revealed how hard it is for a mental health professional to avoid talking in a forensic context about the connection between a defendant's mental health and the offenses. Despite having been told by counsel not to delve into this, Hutchinson testified that,

What I was looking for was from my point of view an understanding of how this tragedy could have occurred.... I'm investigating her mind and her point of view, her way of looking at the world to say how could this have happened and how does it make sense because I think the world makes sense, because I think the world makes sense if we know all the pieces.

31

Tr. 3628-29.  Counsel of course quickly had to remind her that she was making no "claim that your testimony today has to do with the mental state of Angela Johnson at the time of the homicides for which she has been convicted."  *Id.*

Hutchinson went on to discuss some interesting things  – to strike some of the notes.   For example, Dr. Hutchinson explained how the kind of abuse and neglect in Angela's childhood can lead to impulsivity,  attachment problems, ruthlessness or inhibition,  poor self-esteem and poor social skills.   Tr. 3637; Tr. 3640; Tr. 3644.   She said that Angela's abuse led to Post-Traumatic Stress Disorder.  Dr. Hutchinson also noted that Angela was "looking for boyfriends to rescue her." Tr. 3642, and developed an attraction to "bad boys."  Tr. 3646.   As an adolescent, Angela had an "anxiety disorder," was promiscuous, Tr. 3650, and never wanted to be alone.   Describing the results of PTSD, Hutchinson said that "it can be physiological distress, so your body reacts if you see or think of something that's similar to it."  Tr. 3653.  PTSD sufferers try to numb or otherwise escape from the recurring traumas, which can include a foreshortened sense of the future, Tr. 3655, and they can demonstrate paranoid hypervigilance, irritability, and sleep disturbances.  Tr. 3654. Dr. Hutchinson even noted that people that suffer from childhood violence "end up with a brain chemistry that is significantly different than children who don't grow up with that."  Tr. 3669.  She also referenced Angela's 1996 diagnosis of major depression which causes, among other things, irritability, affect vulnerability, and thoughts of suicide.

All of  these factors: impulsivity, disassociating from stressors, not envisioning a future for herself as a result of traumas and psychiatric conditions that were not Angela's fault, would have been critical for the jury to consider when contemplating Angela's moral culpability for these crimes.  But predictably, the Government put the stop to any likelihood the jury could consider the impact of these problems on Angela's choices or lack thereof at the crime scenes:

32

Q. And you were specifically not to ask any questions of Angela Johnson concerning her state of mind at the time that she committed these five murders.

A. That's correct.

Q. There wasn't anything stopping you from doing that other than the fact that you were instructed not to do that; is that correct?

A. I guess not, yeah.

Q. And so you are not here offering any opinion whatsoever concerning whether this mental condition of posttraumatic stress disorder that you've diagnosed her with had any effect on her thinking or behavior at the time that she committed these offenses, are you, ma'am?

A. I've been very clear that I'm not saying that that contributed to it.

Q. You are not suggesting in any way that she was acting under any form of duress at the time that she committed these murders?

A. I have not asserted that.

Q. You are not asserting that she acted under any form of mental defect that affected her ability to recognize that what she was doing was wrong when she participated in the murders of five people.

A. I wouldn't be -- I would have been in the other phase of the trial had I been doing that, yes.

Q. So the answer to my question is you are not giving that opinion.

A. That's correct.

Q. You are not asserting that she was unable to understand what she was doing when she went out and purchased an assault weapon for Dustin Honken.

A. I'm not asserting that.

Q. You're not asserting that she did not understand what she was doing when she helped him gain entry into a house and tie up and gag victims.

MR. BERRIGAN: I'm going to object to this whole line of inquiry. It's been repeated now with the earlier witness, and this witness has made it clear, Your Honor. This is repetitious, and these questions have already been asked and answered several times.

THE COURT: It's getting real close, so you can wrap this part of your cross up.

MR. WILLIAMS:  I will wrap it up.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.  I do want to make perfectly clear, though, ma'am, you are not in any way indicating that she did not know exactly what she was doing and acted with free will at the time that she participated in the murders of five people.

A.  I don't know what she did in relation to those.  I haven't discussed them.

Q.  And, ma'am, free will has a place in this society, doesn't it?

A.  Of course.

Q.  Despite all the problems that any one of us grew up with and have as experiences in our life, bottom line is we all have the ability to make choices, don't we, ma'am?

A.  We all have the ability to make choices within our biological, psychosocial histories.

Q.  Okay.  I'm just trying to make sure.  Are you suggesting that somehow she did not have the ability to make choices?

A.  I think that she had the ability to make choices.  I think some choices are different for different people.  And I'm just making sure that I'm not saying that everybody can choose everything at every time.

Q.  Just so we're clear, you're not asking this jury to conclude that Angela Johnson somehow suffered mental defects that affected her ability to make choices.

MR. BERRIGAN:  Asked and answered again.  I'll object, sir, repetitious.

THE COURT:  Overruled.

A.  Yes, I've said that.

Tr. 3679-3682.

Finally Dr. Cunningham testified.   He spoke about how the trauma and other setbacks in Angela's life combined to weigh against the likelihood she would be successful in her life, about "what formed her, not about her mental state at the time of the offense." Tr. 3796.  Although, like Dr. Hutchinson, he seemed to struggle with not being able to draw the most powerful mitigating

34

conclusions from the evidence he had reviewed. He referred several times to "moral culpability," which is most directly affected by factors pertaining to what was actually in the heart and mind of the defendant at the time of the crime. He said that:

> an issue that developmental psychology and forensic psychology are critically concerned with that is also relevant to these evaluations of moral culpability in a capital cases is how does this person get over here [criminal act] and how does that happen?

Tr. 3808. The whole focus of his presentation was whether Angela was on an even playing field with others in her ability to make a "choice," but her ability to make what were in the jury's mind, the only choices that really mattered to them, was not on the table.

Dr. Cunningham was able to tell the jury based on interviews that he had done with family and others that Angela had "genetic predisposition to psychological disorder," "attention and learning difficulties," "child onset psychological disorder," and other indications that Angela's brain did not work right at the time she was a child, at the time of the offenses, or at any other time. For example, like the other experts had wanted to explore:

> The research at this point identifies that traumatic experiences in childhood don't just create bad memories, but rather the brain of a child is what we call plastic. In other words, it's in a state of formation. And chronic trauma exposures in early childhood particularly, childhood in general, early childhood particularly, change the chemistry and architecture of the brain. The chemical processes, the hormonal processes of the brain as well as the laying down of tracks and pathways end up being modified or impacted by those trauma experiences.

Tr. 3853-54. He reiterated the family abuse, dysfunction, substance abuse, and other social history data that the other experts discussed, but he plotted it to follow the factors that the Department of Justice has indicated lead to delinquency.

In closing, the Government reminded the jury that the defense had not even attempted to explain what was impacting Angela's thoughts, decisions, and reactions at the time of the crimes. In fact, they appeared to be making a big secret of it. The prosecutor reminded the jury over, and

35

over, and over.

> Now, they had experts. They had a multitude of experts come in and talk about her mental state. Not one of them testified that her mental state was such at the time of these murders that because she was pregnant somehow she didn't have the ability to control her actions or that her judgment was impaired or somehow she couldn't turn him in or walk away or save those children, not one of them. There's no evidence of that, not a shred.

Tr. 4028

> There wasn't – the second thing is there wasn't any evidence – because their experts were specifically instructed not to talk to her about these crimes, there's no linking of any of this abuse to have anything to do with what her mental state was at the time of the murders, no evidence to suggest she wasn't fully capable of making that choice, no evidence to suggest she was under duress, no evidence to suggest she was somehow mentally impaired when she decided to pull that gun out in the Duncan household and condemn Lori Duncan and those girls to death.

Tr. 4031

> But you know what the defense did not do and they had the opportunity to do with all these experts? They never once put an expert up there to explain how any of this affected her state of mind whatsoever at the time that she engaged in these murders.

Tr. 4080.

Just in case any extra astute juror had been able to glean from the testimony of these experts the well kept secret that Angela had a host of problems with her brain that would have perforce affected her at the time of the crimes, the jury was instructed:

> You have heard testimony concerning Angela Johnson's mental condition. This evidence has not been offered for explaining Angela Johnson's mental state at the time of the charged killings, and you cannot consider it for that purpose.

Final Penalty Phase Instructions (Doc. No. 589 at p. 15).

In fact, however, and contrary to the Government's argument, Angela did "suffer mental defects that affected her ability to make choices." George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Ms. Johnson in August 2009, and has concluded to a reasonable degree of medical

36

certainty that Ms. Johnson's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage. According to Dr. Woods, Angela suffers from complex trauma, as a result of the significant abuse she suffered in her childhood. Complex trauma results from "ongoing, chronic, often pervasive stressors," and has dire consequences for the developing brain. Exhibit 1 at p. 11. "Complex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than the Type I trauma described in DSM IV-TR. The irrational behaviors that often result from complex trauma shape neurological, academic, social, emotional, and contextual landscapes with well-documented symptoms," to" wit: changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotion dysregulation, somatic distress, or relational or spiritual alienation." Exhibit 1 at p. 11.

Angela's mother's role as the primary abuser had the compounding effect of leaving Angela without precisely the kind of caregiver that helps children avoid long-term effects of trauma. Dr. Woods explains that:

> the role of parents in modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her. Parents model for children appropriate responses to various stressors in life, so the child will be able to respond directly and in a manner that fits the degree of stress presented.

Exhibit 1 at p. 9. "In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage." *Id*.

Ineffectively, counsel failed to investigate, discover or present evidence that Angela suffered from temporal lobe dysfunction. Dr. Woods makes clear that the abuse visited upon her by her mother also resulted from genetically inherited "aberrant electrical activity" in both of their brains. Behavior that results from complex partial seizures can manifest itself as the kind of psychotic

37

hyper-religiosity demonstrated by Angela's mother and grandmother as well as in dissociative, "absence" seizures. It was likely the occurrence of these seizures that tragically caused Angela's impaired mother to see her not as brain damaged, but as possessed by the 'deaf and dumb' demon, and as requiring abusive "exorcism." Exhibit 1 at p. 11. "Temporal lobe dysfunction, a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, appears to run in the maternal side of Ms. Johnson's family." *Id.* at 12. Manifestations also include symptoms seen in both Angela and her mother including "a labile and heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances." *Id.* Angela's failures in school, difficulties in employment, and a consistent tremor in her leg, also seen in her sister, are further indications of her temporal lobe impairment. *Id.* Ms. Johnson's inherited disorders also contributed to her "deepened emotionality, irritability, impaired judgment, and altered spirituality." *Id.*

Perhaps the most profound and tragic part of Angela's makeup is in the manner in which her complex trauma and the aberrant electrical signals in her brain interact.

> Ms. Johnson's familial neurological inheritance led to the profound destruction of her will. Ms. Johnson describes dissociative experiences, out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state. Her childhood trauma's most important clinical symptoms, in terms of her trauma, are Ms. Johnson's dissociation and her affective dysregulation. These symptoms are synergistic with her temporal lobe dysfunction, particularly in times of stress, to overwhelm her functioning.

Exhibit 1 at p. 16 . In short, "Ms. Johnson's symptoms are synergistic, in the same way cholesterol impacts heart disease. Her symptoms of cognitive dysfunction, deepened emotionality, mood lability, impaired judgment, and poor decision making are augmented by her trauma symptoms, her dissociation, loss of self, hyperactivity, and inability to modulate her emotional state." *Id*.

38

> c. Counsel's failure to follow-up on red flags and fully investigate Angela's mental state at the time of the offense was deficient performance

The Supreme Court is crystal clear: counsel is required to conduct a meaningful investigation in preparation for the sentencing phase of a capital case. *See Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 519-527. Counsel simply did not do that here. They did retain an expert early in the case. That expert identified numerous red flags regarding brain-changing levels of childhood trauma, obvious mood impairment, genetically significant apparently psychotic behavior in their client's family, indicators of dissociative behavior and serious mental health problems that afflicted Ms. Johnson. Counsel had a female client, one who had never been arrested before, who was pregnant at the time of these crimes, who was not the principal in the first degree to these offenses, who appeared to be acting at the behest of a man who had every motive to commit these crimes and still, against this backdrop, they did not launch an exploration into what was going on in her mind at the time of the crimes. Instead, in the face of these powerful clues, counsel arbitrarily decided to prevent investigation into Angela's mental state at the time of the crimes. *See Saranchak v. Banks,* 538 F.Supp.2d 84 (M.D. Pa. 2008) (counsel ineffective where preliminary examination indicated a strong probability that defendant was schizophrenic and suffered from paranoia, but counsel did not follow up on these important leads by seeking a comprehensive evaluation by more qualified and experienced practitioners). *See also Wiggins*, 539 U.S. at 527-28 (diligent counsel does not "abandon their investigation at an unreasonable juncture").

Counsel did not conduct any follow up mental health evaluations until four months prior to the start of jury selection in the case. At that point, two *additional* experts identified the same red flags: that Angela's ability to think, plan, and make choices were substantially impaired at the time of the crimes. But of course, they were prevented by counsel from completing their investigation

39

including by conducting the, recommended testing, taking the final step of applying what they believed was wrong with Angela to the dynamics of her relationship with Honken, and the other stressors that were occurring on the nights of the crimes to determine exactly what capacity she had to make "choices" on those nights. Even if they had decided to allow their experts to investigate fully, at that point, it would have been too late. *See Daniels v. Woodford*, 428 F.3d 1181, 1204 (9th Cir. 2005) (counsel's "decision to delay his investigation and preparation for the penalty phase until it was essentially too late to permit the development and therefore introduction of meaningful mitigation is without explanation or justification.").[24]

                 (1)      *No reasonable strategy supports counsel's decision*

There are a couple of possible reasons that counsel opted to avoid this critical focus of mitigation testimony, neither of which passes constitutional muster. First, there is the reason that Berrigan stated on the record. Counsel told the Court just prior to this last minute flurry of activity that:

> I think it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders. It only brings the jury's attention back to the commission of the murders when in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating circumstances that might exist regarding the defendant and her background character.

Hearing Transcript of March 7, 2005. Second, there is Berrigan's now stated strategy that he was afraid that what Angela might say to her experts or the Government's experts would be damaging.

It is now practically axiomatic that:

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

---

[24] As noted, Dr. Mark Cunningham was not afforded the ability to interview Ms. Johnson until after the trial had already begun. It is difficult to discern how counsel could have integrated this information into a merits phase that had already begun.

> investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Wiggins,* 539 U.S. at 521. No reasonable professional judgment supported Berrigan's decision to abandon this critical area of inquiry. As to the first stated strategy, counsel cannot determine whether or not the presentation of certain evidence at trial will be "counterproductive" without determining what that evidence was. Counsel had over four years since Dr. Logan first saw Angela to determine what her mental state at the time of the offense was and whether what she would tell experts was damaging or not. After and only after that determination could he make an informed strategic decision about whether or not to present it to a jury.

It appears that a misunderstanding of Rule 12.2 may have been at the root of this problem: counsel feared that if they had their experts discuss the time of the offense with Angela, then the Government would have a per se right to question her about the same thing. The Government's access to the client, however, comes only at the end of a long decisional tree; it cannot be used to justify the abandonment of investigation on the front end. For example, counsel could have had their experts make whatever evaluation was necessary to determine Ms. Johnson's mental state at the time of the offense. If at that time counsel believed the evidence that was generated was damaging, he could have done one of two things: 1) he could have offered the expert to testify only to certain portions of results, for example, that Angela suffered from depression and anxiety, as the experts ultimately did testify, or, 2) he could have dismissed the experts and retained new ones to perform a more limited evaluation. Up until that time, no obligations under 12.2 would even have been triggered. The rule is triggered if and only if counsel provides notice that he intends to provide expert testimony regarding mental health. Fed. R. Crim. P. 12.2(b). If the expert will testify based on a mental evaluation of the defendant, the Government may be provided reciprocal access to the defendant to evaluate the same areas that the defense experts covered. Fed. R. Crim. Pro.

41

12.2(c)(1)(B). *See United States v. Hayworth*, 942 F. Supp. 1406, 1407-08 (D.N.M. 1996) ("The Government's expert cannot meaningfully address the defense expert's conclusion unless the Government's expert is given similar access to the 'basic tool' of his or her area of expertise: an independent review with an examination of the defendant."). Thus, if the defense experts had come away with only damaging information regarding mental state at the time of the offense, counsel would not give notice that they would offer it and the Government would not evaluate that issue. If the defense experts were going to opine on that issue at trial, then the Government experts could evaluate the defendant on that issue. But another safety valve remained. The Government is required to turn over the report of its experts to counsel before the defense is required to turn over its reports. Fed. R. Crim. P. 12.2 (c)(2). If counsel determined that the Government evaluation was too damaging, it could decide not to offer its evidence regarding mental state at the time of the offense, but at that point the decision would be made with a full picture of what evidence was being sacrificed and at what cost. Here, counsel threw in the towel before they started to play, which is deficient performance by any standard. As the Eighth Circuit has noted, "the presumption of sound trial strategy founders on the rocks of ignorance." *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005).

The deficiency in this case is compounded when considered in light of counsel's merits-phase theory of the case. Capital cases present unique strategic problems as a result of bifurcation. Counsel must carefully consider that if they proceed to a sentencing phase it will be because the jury to whom they presented their case convicted their client. They must then stand before the same jury to plead for their client's life. Counsel must, therefore, be mindful of retaining some credibility with the jury and not putting themselves in the position of directly contradicting what they just said days before. To this end, as the Guidelines have recognized, counsel "should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any

42

inconsistencies." Guideline 10.10.01. Ideally,

> the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation. Consistency is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. First phase defenses that seek to reduce the client's culpability for the crime (e.g. by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma.

Commentary to Guideline 10.11 p. 106 (internal citation omitted).

In this case, counsel decided to pursue a "mere presence" defense. Assuming for the sake of argument that such a strategy was reasonable, once counsel had conceded her presence at the crime scene, they left themselves with no choice in mitigation but to offer an explanation as to what could have possibly going on in Angela's head at that time.

Apparently, counsel did not even find their own strategy to be reasonable, because as their experts had, they felt pulled to mitigate Angela's role in the offenses even as they cut themselves off from it. They had attempted to submit this mitigator:

> on the date of the murders of Gregory Nicholson, Lori, Duncan, Kandi Duncan, and Amber Duncan, Angela Johnson was under the substantial influence of Dustin Honken, which caused in her unusual stress, anxiety, and impairment of her normal judgment.

But they were forced to withdraw this before the case went to the jury because they failed to develop evidence to support it.

In their closing, counsel compounded their complete failure to explore or explain the impact of Ms. Johnson's mental state on her conduct. Counsel argued (again, without any investigation as to Ms. Johnson's mental state) that she "could have saved" the children but did not because "she was weak." Tr. 4040; *see id.* ("Could she have saved these little girls? Yes."). Counsel argued that Ms. Johnson remained by the road while "four people are being executed" because "she can't stand to

43

be there," Tr. 4041, rather than, *inter alia*, because she was paralyzed by mental illness, under extreme duress, and frozen by her mind's disconnection from reality.

> *d.* *If counsel had explained to the jury how Angela's brain impairments that were beyond her control contributed to her behavior at the crime scenes, there is a reasonable probability that at least one juror would have voted to spare her life*

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for her conduct.

As explained above, Dr. Woods has now done what counsel failed to do. He has followed through on the red flags identified by the experts at Angela's trial. After further investigation prompted by his evaluation, unfettered by arbitrary restrictions into his ability to inquire into Angela's mental state at the time of the offense, Dr. Woods has developed a comprehensive picture of how her brain functions. As Dr. Woods has now concluded based on an unfettered evaluation of Angela, this information would have supported four of the nine mitigating factors that Congress has expressly deemed mitigating – the only mitigating factors that directly address what Angela Johnson's mental state would have been at the time of the offense. As Dr. Woods will opine in greater detail at the evidentiary hearing:

> 1) Angela's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired by her "disorders which manifested themselves under ordinary circumstances in grossly impaired judgment and insight, inability to develop strategies, problem solve, and understand consequences. Extreme stress would have also exacerbated her

44

underlying paranoia, hyperactivity, and dissociative reactions.  Her pregnancy would have significantly heightened her mood lability.   The lingering affects of methamphetamine use would also have increased her already abnormal paranoid feelings." *Id.  See* 21 U.S.C.A. § 848(m)(1)

Exhibit 1 at pp. 21-22.

> 2)      Angela was under unusual and substantial duress at the time of the crimes.   "As a result of Ms. Johnson's brain impairment, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living.   Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through.  Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken." *Id.   See* 21 U.S.C.A. § 848(m)(2).

*Id.* at 22.

> 3)      Angela could not reasonably have foreseen that her conduct would cause, or would create a grave risk of causing, death to any person because she suffers from disorders that affect her judgment and insight, ability to plan and predict consequences, and ability to understand and predict outcomes of situations in a normal way. *Id.   See* 21 U.S.C.A. § 848(m)(4).

*Id*.

> 4)      Finally, Angela committed the offense under severe mental or emotional disturbance. Angela suffers from the results of complex trauma and temporal lobe disorder, "conditions result in severe mental and emotional disturbances.  Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally.  Her moods are extremely labile, cycling inappropriately from grandiosity to depression.   She dissociates and functionally disappears from consciousness periodically as result of her disorders.  All of these conditions are exacerbated by incidents of extreme stress, methamphetamine use and withdrawal, and pregnancy." *Id.  See*  21 U.S.C.A. § 848(m)(7).

*Id*.

Perhaps most importantly, counsel's failure also precluded them from answering, in lay terms, what had to be the foremost question in the juror's minds: "Why didn't she stop this horrific crime?  What was wrong with her?"  It is not enough to ask the jury to have mercy on the defendant when it is possible to explain the "why" of the case in a mitigating way. *See Anderson v. Sirmons*,

476 F.3d 1131, 1144 (10th Cir. 2007) (" rather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy."); *Smith*, 379 F.3d at 943 ( "[t]he jury already had evidence of [the defendant's] impulsiveness and lack of emotional control. What the jury wholly lacked was an explanation of how [the defendant's] organic brain damage caused these outbursts of violence and caused this kind hearted person to commit such a shocking crime.") (internal footnotes and quotation marks omitted). Moreover, in *Simmons v. Luebbers*, 299 F.3d 929, 936 (8th Cir. 2002), the Court explained that though the jury was aware of the defendant's anger, further available evidence could have explained that the defendant's "inability to control his violent behavior" was attributable to abuse and trauma he suffered. The Court suggested that without the link between the defendant's history and actions, the jury had been allowed "to conclude that [the defendant's] violent behavior was simply the result of his wicked and aggressive nature." *Id.*

Not only have the courts recognized the importance of explaining to jurors "why" and "how" a defendant's mental illness or traumatic background contributed to the crime, empirical evidence indicates the answer to the "how could you" is in fact, what jurors want most to know:

> On the side of mitigation, jurors tend to focus most on factors that diminish the defendant's individual responsibility for his actions. They attach significant mitigating potential to facts and circumstances that show diminished mental capacity, such as mental retardation or extreme emotional or mental disturbance at the time of the offense, but they have little patience for defendants who attribute their wrongdoing to drugs or alcohol.

Stephen P. Garvey, *The Capital Jury and Absolution: The Intersecting of Trial Strategy, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1539 (1998).

Post-trial interviews of the jurors bear out that jurors likely sentenced Angela to death as a result of not having an accurate explanation of her neurological, psychiatric, psychological make-up

46

at the time of the crimes explained to them. Thus, they were able to conclude, improperly, that "At any time when she was in the car she could have taken off with them, or told those kids to run." Exhibit 11 at p. 3; "But the kids, and their mom, they just happened to be there, and it appeared to me they, Dustin and Angela, could have decided to do something else." Exhibit 12. "What would it have taken for you to decide life was the right punishment? If she had tried in any way to help them get away, tried at all." Exhibit 13 at p. 5. "... what was it that helped you decide that the death penalty was the right punishment in this case? I think it was the situation with the kids. There looked to be like several opportunities where she could have got the kids out of there, and prevented them from losing their lives." Exhibit 14 at p. 1.

Counsel had powerful evidence to support the omitted statutory mitigators, and important non-statutory mitigators, and to disabuse the jurors of their belief that Angela had complete and unfettered free will at those crime scenes. It involved not only seeing the significance of the social history and limited psychological profile they did uncover, but linking it to Angela's behavior at the time of the crime, turning it into powerful mitigating evidence, rather than the worn out "abuse excuse." To that end, the story, the full story, the notes and the music are attached. The findings of Dr. Woods, Exhibit A, and the full social history, Appendix C, read together, paint a compelling and full picture of the nature and tragic circumstances of Ms. Johnson's life and her mental health problems. Rather than a hodge podge of unconnected parts that trial counsel presented, all without any explanation of why Ms. Johnson would be present at the these horrible crimes, Exhibit A and Appendix C, read together, offer some explanation. They are not an excuse. They mitigate Ms. Johnson's role in the offense. They are the full story, the missing story, and if presented, there is little doubt that one, or more, or all of the jurors would have elected to spare her life. Surely, had counsel presented the comprehensive case in mitigation that could have been marshaled, but which

the jury never heard, at least one juror would have opted not to impose the death penalty.

### 3. Counsel Failed To Present Readily Available Evidence About Who the Real Dustin Honken Was and How Angela Would Have Been Particularly Susceptible To Him

**"To me he seemed almost like Opie Taylor"**

At the merits phase of trial, counsel conceded that their client was present at the scene of five murders on two occasions. Their apparent strategy was to argue then, and at sentencing, that while Angela may have been present, the driving force behind these murders was Dustin Honken. The Government's theory, of course, was that Honken was under Angela's powerful sway. *See* Tr. 4011, 4026-4027, 4049, 4079-80. During the penalty phase, the Government put on Kathy Rick who said Honken was a good person, was not manipulative, and did not dominate Angela. Tr. 2361. She said that according to him, "he was not strong enough to leave Angela, that he knew what she was capable of." Tr. 2642. Honken's sister Alyssa Nelson echoed that sentiment and alleged that Honken did not follow through with plans, yet he was not impulsive. Tr. 2673, 2690. Though they knew it not to be true, *see* Claim III.B., *infra*, the Government offered evidence in sentencing through Ms. Nelson that, until he met Ms. Johnson, Honken had never before engaged in any violence. Inexplicably, the defense went out of its way to help the Government's effort by eliciting the following testimony from its own witnesses:

from Pearl Jean Johnson: Honken was "polite, clean cut, very neat, but aloof." Tr. 3080

from Wendy Jacobson: Honken was "a preppy nerd, highly intelligent, totally out of character for Angela to date." Tr. 3184

from Arlyn Johnson: "I felt he seemed like a great individual." Tr. 3203; Honken was always nice to Angela and calmed her down. Tr. 3210

from Holly Dirksen: "He was very nice. He was a gentleman, totally unlike someone my sister would ever date. He was very smart, very intelligent." Tr. 3255

from LouAnn Hare: "To me he seemed almost like Opie Taylor, kind of a nerd, kind of

48

geeky." Tr. 3701

The prosecution then argued that Angela was the driving force behind these murders, that she was "manipulating" Honken, (Tr. 4011, 4026, 4079), and "pushing and cajoling" him to commit these murders. (Tr. 4026, 4027, 4049, 4080). The prosecution admonished the jury:

> "... don't accept their premise that the person who pulls the trigger is more morally culpable than the person who's egging on and pushing and cajoling and putting the person in the position of pulling that trigger."

Tr. 4027.

Meanwhile, back at the office, sitting in counsel's files, was copious evidence that could have powerfully contradicted this notion of poor, bookish, easily-led Honken who was under Angela Johnson's thumb. A sampling of the reams of evidence of Honken's true nature is as follows:

Fred Tokars was an inmate with Honken at the United States Penitentiary in Florence. Tokars, a former prosecutor and judge, who was convicted of arranging the murder of his wife, painted a picture of how Honken worked the prison: At first, Honken tried to befriend him and told him that if anyone found out about his former career he would be dead, but that Honken was involved with a powerful prison gang called the Odinists and could help him out. Exhibit 16 at p. 11.

> At any rate, he hangs with these guys, and he's very smart and charming, and he manipulated them. There are 30 or 40 of these guys, and they stab people and kill people and steal and do these things. They sort of run the prisons. And at first he was just, you know befriending them, but after a while he became very influential, and because of his skills at manipulating people and because of his brains, he was able to influence these people.

*Id.* at 11-12.

> As soon as he could see that he needed to push me in order to get me to help, he pushed, and he picked the right buttons, and it scared the hell out of me, but – it scared me to death, and so, yeah, I said, 'Sure, I'll do what I can do.' *Id.* at 14. [...] His battle plan was 'if you can help me get out of prison then I'll get out and get a new trial, and then I'm going to go back, and I'm going to kill some witnesses in my

49

case and have a new trial.' *Id.* at 17. [...] 'When I get out of prison, you know, I am going to go, and I'm going to kill this guy Daniel Cobeen and maybe Dean Donaldson,' who was another potential informant on him. And he felt like his best friend Timothy Cutcomp, who testified against him in his first drug sentencing hearing and had cooperated against him, he felt was though he could intimidate Timothy Cutkomp so that he wouldn't testify if there was a second trial...[.] *Id.* at 18-19. And that was the plan that if I would work on his 2255, which is a habeas corpus, for him. Then he would essentially get out on bond, you know, and have a trial, and then he was going to go and kill several people who were the key witnesses.

*Id.* at 19.

Steve Ferguson, an inmate with Honken at the United States Penitentiary in Florence, Colorado told the grand jury that Honken had a "certain level of rage" against Government informants and a "high anger." Exhibit 17 at p. 10. Ferguson said that Honken offered him ten thousand dollars to go to Iowa and kill cooperators Stephen Vest, Ronald McIntosh or Fred Tokars. *Id.* at 11. The plan would be to inject Vest with enough heroin to kill him, or find a mentally unstable inmate and goad him into attacking someone. *Id.* at 12. The goal wase to show that even if Honken was locked up in Colorado, the informants "weren't safe." *Id.* at 13.

He was trying to figure out ways to get out because he wanted to kill some more people that were involved in testifying against him or providing evidence against him, and he talked about that on numerous occasions and did some marshal (sic) arts training to further that.

*Id.* at 14-15.

[H]e never showed any sign of remorse or regret for having done it and that he blamed all the blame on the parents – the father because he had informed on him, and basically that was his fault that the kids were dead, along with the threats to get out and do the same thing to more children, because apparently, like I said, there was some other people that he wanted to retaliate against that had provided information again him earlier, and that he said he was going to kill them and shoot their children in the face.

*Id.* at 17.

William LeBaron, another inmate at USP Florence told the grand jury that Honken had risen

50

to the top echelons of a white supremicist prison gang called the Odinists. Exhibit 18 at p. 25. Honken was involved in an complex escape plan. The plan was to tell the Government that Fred Tokars was planning to cooperate with the Government and lie about Honken. *Id*. at 14. That way, the plan went, the people involved would be subpoenaed to court in Sioux City where they would then break out of the Woodbury County Jail. *Id*. Honken, along with inmates Dave LaParo, Jesse Mack, and Frank Plunk were planning bank and armored truck robberies to finance the escape. LeBaron said that Honken was also planning to kill law enforcement officials and their families. Honken specifically mentioned wanting to kill Tim Cutkomp and the police chief who was pressuring Angela and almost costing her her job. *Id.* at 15-16.

> Well I was pretty shocked by some of the things he was saying he was going to do to them, and I said, look, Dustin, they know what kind of revenge you're capable of, you killed these two FBI informants – or two federal informants, you killed this lady and you killed her kids. I said, Dustin, they know what kind of revenge your capable of. He said, "well, I didn't kill those people for revenge. He said, I killed those people just so I wouldn't have to go to prison."

A grand juror asked LeBaron, "Do you think he has anybody outside that he could take revenge on anybody, or do you think it's all talk?" *Id*. at 31. To which the witness responded,

> If Dustin was on the streets, you know, when he talked about going into these – the houses of law enforcement officials and killing them and their families, he talked about that he could do it by himself, and one of the reasons is that Dustin Honken is constantly training in martial arts, and he's being trained by several individuals who are extremely, extremely deadly with their hands that are in prison.

*Id.* at 31-32. Honken told LeBaron that Angela would never tell where the bodies were buried, because she could never face her child knowing she helped put her father away. *Id*. at 18. LeBaron was afraid that if Honken found that he was keeping notes of these conversations that Honken would kill him. *Id*. at 20-21. LeBaron's whereabouts in the federal prison system are now hidden by the Bureau of Prisons (along with Robert McNeese, Steven Vest, Fred Tokars and others).

Perhaps more importantly, several grand jury witnesses testified regarding Honken's plans

51

to kill Angela.  Inmate Mike Llorente said that Honken said "maybe [Angela] shouldn't be here anymore, ... maybe he should have dealt with her back whenever he had a chance before she could testify on him, like now."  Exhibit 19 at p. 6.  "He was trying to decide whether or not to have [Angela] taken out before she had gotten locked up." *Id*. at 13-14.  John Fitzgerald Swanson told the grand jury, "He basically just plotted to do away with Angela Johnson as soon as he got enough money from his meth operation that he had going in his garage."  Exhibit 20 at p. 27.[25]

In addition, counsel could have called witnesses to describe how Honken would manipulate people, exploit their weaknesses, and take advantage of women.   Melissa Freisenborg, who was never interviewed by counsel, dated Honken as a young woman.  She is now a social worker in Arizona.  She said that she did not think "Dustin had a friend he didn't use or hook up with in a romantic way[.]"  Exhibit 2 at p. 1.  She  admits that she was naive at the time, but Honken had a way of "making you feel taken care of," so when he tried to involve her in his criminal activity, she did not ask questions. *Id*. at p. 3.  When Freisenborg found some photos of Angela among Honken's possessions and she asked him about it, Honken replied that, "Angela was a convenience. He needed her."  He would not say why.  *Id.* at p. 5.

Alan Johnson (no relation to Angela), who was never interviewed by counsel, could have told the jury that Honken was a manipulative and violent person long before he met Angela Johnson.  Alan Johnson was one of the people Honken tried to recruit into his bank robbery plot.  He could have testified that "Dustin was a master at manipulating other people to get them to do what he

---

[25]  Many of these witnesses testified at Honken's trial.  So, in addition to having the information about Honken's proclivity to murder provided to them in discovery, trial counsel presumably had available to them Honken's trial transcript where Honken's numerous plots to murder Ms. Johnson, witnesses, law enforcement officials and their families were laid out in great detail.  Nonetheless, counsel investigated none of this information and failed to present any of the information all while the Government presented Honken as merely a nerdy, bookish meth dealer until he met Ms. Johnson.

wanted. He enjoyed causing others pain even if there was no benefit to him.  He once hit me with

a bullwhip and stripped the skin right off my nose."   Exhibit 3 at p. 2.

> He and Tim told me that they would often go to Minneapolis to roll homosexuals. They chose homosexuals because they figured they would have more money than straight guys who spend all their money on girls. They took karate lessons together and after the lessons they punched the windows out of cars. Tim would never even think about doing those things on his own. Tim is just a big dumb guy who would step in front of a bus if Dustin told him to. And it wasn't just Tim. Dustin had that effect on everyone, even his teachers when Dustin didn't do his homework would be under his spell.

*Id.* at p. 3, 4.  Not only could Johnson have given lie to the Government's tale that Angela goaded

Honken into becoming a criminal, he could have explained it was much  more likely to have been

the other way around:

> The only time I ever planned a crime was the time I spent with Dustin. That's the effect Dustin could have on you. He had the gift of gab, a golden tongue. He could make people do stupid and nasty things, things they would never otherwise do. He was goofy looking. It's not nice to say, but he looked like a mole. Still, the girls all liked him because he could talk his way into and out of any situation.

*Id.* at p. 2   Alan Johnson could have testified that he knew Honken to treat both his friend, Tim

Cutkomp, and girlfriend Sherry Slausen, like "slaves," expecting them to "do his bidding."  "I don't

think he ever beat Sherry up," Alan Johnson says, "but there are things worse than being hit. There's

mental abuse that can be much worse. Dustin messed with people's minds."  *Id.* at 3.  Johnson

summed up his statement about Honken by saying:"I think Dustin liked hurting people even back

then when I knew him. He enjoyed dominating other people, always being in control. He always got

more than even if he thought you slighted him."  *Id.*  at p. 6.

Scott Gahn says quite plainly that Dustin Honken was "evil" and gave him "chills" down his

spine.  He echoes what others who knew Honken said, that he would find a person's weaknesses and

exploit them.

His sole desire was to be completely in control of people's lives.  In my opinion, he

53

derived no pleasure from the money, drugs, or obtaining material things. He wanted to be the controlling king, untouchable and dominant in his own little crime ring. I knew from personal contact he was capable of anything to get what he wanted. When he told me in front of my house that people had 'better start taking me seriously or I'm going to start whacking people,' I took him for his word. He meant it. He is nobody to mess with and I bailed out of the scene.

\*\*\*\*

Dustin Honken was evil and was capable of doing anything. He had threatened to kill children before and I took that to mean he would kill my children if I messed him over - and look what happened. It eventually happened. I was right about my instincts, history with Dustin Honken and my family.

Exhibit 4 at p. 1. Gahn also recounted how Honken involves others in his criminal activities ("His attitude was that he was too smart, that he had others do his dirty work and he was untouchable") and how he treated women, "I believe any girlfriend in Dustin Honken's life would just be a disposable pawn."

> a.  *Had counsel not failed to present copious, readily available evidence about Dustin Honken, the jury would have seen him for the manipulative, callous, criminal instigator that he was.*

Counsel never interviewed or called any of these witnesses. Counsel now say, they just never thought of it. Failure to investigate and present this critical and readily available evidence is textbook ineffectiveness.

Counsel's failure to discover and present this evidence deprived them of critical opportunities to refute the Government's case and make their own case in mitigation. First, had the jury known that Honken was a master manipulator and fear monger, deft at exploiting weaker people, counsel could have demonstrated how those traits would have wreaked havoc on someone like Angela, whose history of trauma and need to latch herself on to someone more adept than she rendered her vulnerable to a person like Honken.

Counsel could have further demonstrated how Honken had a habit of picking up women,

54

making them feel great, using them for what he needed, and tossing them away when he was finished with them. They could have told the jury that Honken was cold and frightening, and routinely talked about killing, often in brutal ways, people that crossed him. All of these things would have had tremendous value alone and in combination with other evidence, to explain how and why Angela became involved with Honken, how he would have been quite likely to exploit her weaknesses to nvolve her with crimes she had no predisposition to be involved with, and why she (and she in particular) would have been paralyzed with fear at the thought of resisting him or turning him in.

Had counsel been armed with all this information, the Government would not have been able to convince the jury, as it did, that "she had a lot to do with this, a lot to do with the planning, it wasn't all Dustin, she may have even been the mastermind, just her personality was that way." Exhibit 11 at p. 3.

Admittedly, the Government put forth a smattering of this evidence in its case in chief during Ms. Johnson's trial. *See, e.g.*, testimony of Dan Cobeen, Tr. 657, testimony of Timothy Cutkomp, Tr. 826. However, counsel failed to rebuff the Government's absurd theory that Ms. Johnson was the driving force behind these murders, and that she pushed Honken into committing these horrendous crimes. This theory is startling in the context of the evidence of this case: Honken had the motive, Honken did the shooting, Honken had planned a murder before, Honken would continue to plot murders for years to come, including Angela's murder. Notwithstanding, counsel offered nothing, even though it was all there for the offering. The testimony of the Johnson brothers, Tokars, Gahn, Fitzgerald, Friesenborg and others would have supported their theory of defense at trial that:

- Honken planned and executed these murders without Johnson's knowledge.

55

- Angela was manipulated by Honken and was under his sway.

- Honken was not simply a fair haired meth dealer until he met Ms. Johnson.

- Johnson's role was minor compared to that of Honken.

Had counsel fully developed and presented the available evidence about Honken, the evidence would have both refuted the Government's story and provided valuable support for two mitigators that they offered:

> although she is guilty of these murders, Angela Johnson was pregnant by Dustin Honken at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him into authorities, which she offers as an explanation of her conduct, not an excuse.

> even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders.

(Tracking language of 21 U.S.C.A. § 848(m)(3)); *see* Penalty Phase Verdict Form Doc. # 593. As it was, zero jurors found either of these two mitigators.

There is a reasonable probability that had counsel painted the true picture of the manipulative, diabolical, threatening, cold, and evil Honken that existed long before he met Angela, and placed it alongside evidence of Angela's neurological, psychiatric, and traumatic impairments, explaining how her deficits caused her to look to others to negotiate situations for her, and prevented her from making plans and foreseeing outcomes, one juror would have voted to spare her life.

### 4. Counsel's Failure to Reduce Ms. Johnson's Medication or To Do Anything to Address the Effects of the Medication on her Demeanor at Trial or her Ability to Participate in her own Defense Was Ineffective and Deprived Ms. Johnson of Due Process and a Fair Trial

**"She just ate coffee Nibs and drew the entire time."**

Capital jurors are called upon to make a decision about whether another human being should live or die. As such, they want to know as much as they can about that person. If the defendant does not testify, the only direct access they will have to her heart and soul is their observations of her at

trial. As a result, counsel should be keenly aware of any factors that may affect the defendant's appearance or demeanor in a way that could be negatively misinterpreted by the jury. Counsel failed to do that here, and as a result, the jury – which counsel knew was carefully observing their client – believed that she lacked remorse. As Justice Kennedy has pointedly noted, "[i]n a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins*, 504 U.S. at 143-44 (Kennedy, J., concurring).

### a. The medications

After her arrest, Ms. Johnson was medicated with antidepressants, anti psychotics, and mood stabilizers. For three years in county jail, the staff psychiatrist treated her with 200 mg Zoloft and 200 mg Seroquel. Defense counsel did not know that Ms. Johnson's mental illness required her medications to be increased significantly in response to the intolerable stress of trial. Counsel was unaware that Ms. Johnson increased her medication at trial. Counsel's failure to reduce or in any way address the effects of the medication deprived Ms. Johnson of her right to a fair trial and to effective assistance of counsel.

Defense counsel was oblivious that the increase in medication compromised Ms. Johnson's capacity to understand, keep pace with, process information about, respond to, and appreciate courtroom proceedings. The drugs dramatically altered Ms. Johnson's demeanor and presented a false picture of her to the jury and judge. As set forth below, the drugs caused Ms. Johnson to have a flat affect, to appear uninvolved, disinterested, and unconcerned, and to be unable to show her remorse, pain, and intense suffering.

This is significant. Medication at trial "can prejudice the accused in two principal ways: (1) by altering h[er] demeanor in a manner that will prejudice his reactions and

presentation in the courtroom, and (2) by rendering h[er] unable or unwilling to assist counsel."
*Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). "It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. . . . At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Id.*

For example, medication can "creat[e] a prejudicial negative demeanor in the defendant-making h[er] look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive. . . . That such effects may be subtle does not make them any less real or potentially influential." *Id.* at 143 (citing an Amicus Brief of the American Psychiatric Association).

### b. Capital jurors want to see remorse

Little is of more importance to capital jurors than expressions of remorse from the defendant. In one study, "sixty-nine percent of the death jurors who participated in the study (fifty-four of seventy-eight jurors) pointed to lack of remorse as a reason for their vote in favor of the death penalty. Many of those jurors cited it as the most compelling reason for their decision." Scott E. Sundby, *Remorse and the Death Penalty*, 83 Cornell L. Rev. 1557, 1560 1997-1998. *See also*, Stephen P.Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rv.1538, 1560 (1998) (almost forty percent of death-qualified jurors more likely to impose death if the defendant made "no expression of remorse.")

58

Indications of remorse come not only from the defendant's words, but from her appearance: "At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). In particular, "As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge h[er] character, h[er] contrition or its absence, and h[er] future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins*, 504 U.S. at 143-44 (Kennedy, J., concurring).

> c. *What Angela's jury wanted to see, what they saw, and what they concluded*

In this case, it is clear not only from empirical research and plain common sense that the jury was assessing Angela's demeanor. At least two of the jurors who convicted Angela noted in their questionnaires that they would be seeking signs of remorse: Juror 513 reported that "[t]he personal accord they take for the crime, whether they feel sorry for it should all be taken into consideration." Exhibit 21 at p. 10. Similarly, Juror 600 said that his "opinion would be greatly affected by the attitude of the convicted. Did she show remorse when found guilty or not have any emotion." Exhibit 22 at p. 12. Juror 600 reiterated this position in voir dire. Tr. 2498.

Juror 600 was hardly the only juror yearning to see remorse from Ms. Johnson at trial. The theme of remorse was pervasive in voir dire. *See*, *e.g.*, Voir Dire Tr. 1008/23-1010/8 ("A: I guess if they don't show remorse, once again, they just don't care. Q: Okay. Would you expect a

59

person to show remorse in order to have consideration for a life sentence? A: Yes."); Voir Dire Tr. 1590/24-1591/8 ("A: I think a big factor in my mind is if the defendant has shown any remorse or not. Q: All right. A: I sound kind of wishy washy this way, but if – you know, if there's no remorse, I don't care what I did, I don't care if anybody knows and what they feel and everything, you know, I'd be like, well, you know, maybe they do deserve that. But if they – if they show remorse, you know, maybe sitting in prison for the rest of their life having to think about it every single day is a harsher punishment than being put to death."); Voir Dire Tr. 361/13-362/6 ("Q: Okay. And you were asked, Why do you feel this way, or what are some of the reasons for your beliefs? I think those who show no remorse whatsoever should be punished to the full extent. Does that sound accurate? A: That does. Q: And when you say the full extent, does that mean the death penalty? A: Yes.); Voir Dire Tr. 600/23-601/17 ("A. If somebody were admitting and pleading guilty with no care about it, had shown no remorse, I think in that way I would think the death penalty would be the right thing to do."); Voir Dire Tr. 961/8-16 ("Q: Let me talk about one of the answers you had in there. It asked about your thoughts on the death penalty, and you said, If there's absolutely no doubt and this was a horrendous crime with no sense of remorse from the criminal, then I would believe in the death penalty. It would depend on the reasons behind the crime. If it came from the results of much continued abuse to the criminal from the victim, I wouldn't necessarily agree with the death penalty. Do you remember writing something like that? A: Yes, I do."); Voir Dire. Tr. 1546/25-1547/10 ("A: My mind is set pretty solid how I explained before. If the murderers that did the killing, there's no remorse and no remorse killing the people and – my mind is pretty well set for that direction… Q: So if it was an intentional murder without any remorse, you'd be leaning pretty heavily toward the death penalty? A: Yes, I would.").

Then, at trial, the jury sent a note to the Court, saying they could not see Ms. Johnson from the jury box and wanted to "see her reactions." Tr. 719-20. Once again the jury put defense counsel on notice (as if they needed further notice) that they were looking for Ms. Johnson's emotional reactions to the testimony, yet counsel still did nothing to address the effect of Angela's medication with the jury.[1] What the jury saw was a woman sitting at the defense table, drawing pictures, munching on candies, essentially expressionless. According to counsel, Angela appeared to be "somewhere else" for much of the trial.

Though defense counsel, notwithstanding voir dire, notwithstanding the jury's request at trial, and notwithstanding the Supreme Court decision in *Riggins*, was apparently unable to understand the importance of showing remorse in a murder case, the government certainly understood. The government made sure to argue lack of remorse to the jury in the penalty phase: "And remorse, there's no evidence, not a shred of evidence of remorse in this case." Tr. 4032.

> d.    *What diligent counsel would have done regarding Angela's demeanor*

Counsel were on constructive and actual notice that the jury was examining Angela's demeanor. As a result, they should have been aware of any factors that would impact her demeanor, and either change those factors or make sure those factors were explained to the jury so that the jury could not draw aggravating inferences from them. Counsel should have been monitoring Angela's medication regimens, regularly collecting her jail records, and providing those records to the defense psychiatrist and discussing the effects of those medications with him, including discussing any possible modifications of the medications prior to trial. Counsel

---

[1] Juror #55 later stated that, during trial, he was "mainly paying attention to what she [Ms. Johnson] was doing, and to what was on the witness stand, in the box." **Ex. __**, at 5.

should also have discussed with their experts how any of Angela's underlying mental health problems might affect her demeanor at trial.   Finally, counsel should have considered how any instructions they gave Angela regarding her behavior would play out in front of the jury.  They should have done these things because

> [t]he demeanor of mentally ill defendants, whether medicated or unmedicated, is particularly likely to convey a false impression of the defendant's feelings about his crime, and with such defendants, coaching may be impossible.  In such cases, expert testimony as to the causes (whether the mental illness itself or the prescribed medications) of the defendant's appearance and its misleading nature are likely to be helpful.

John H. Blume, et. al., Competent Capital Reorientation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation, 36 Hofstra L. Rev. 1035, 1050.  Counsel should have considered all of these things both to have a handle on the best and most mitigating way to handle Angela's demeanor and so that the jury could be given a complete understanding of the roots and causes of Angela's demeanor at trial.

> e.      How Counsel Allowed Angela to Become Government's Exhibit A in Aggravation

Although counsel knew that Angela was on a variety of medications during the lead up to trial, apparently they did not think this sufficiently important to ask her jail doctor what medications she was on, to request her records regularly from that facility, or to ask the doctor to inform them regarding any changes in her mediation.  As a result, they did not know the side effects of her  medications, nor that her dose of Zoloft was increased by over thirty percent during the course of the trial.  Counsel therefore could not provide this information to Dr. Logan so that he could advise them on the effects these medications might have on Angela.  Moreover, counsel failed to ask Dr. Logan while he was on the stand to opine on any demeanor-affecting side effects these medications might have.  Counsel did not ask any of their experts to address

why Angela was behaving the way she was in light of the physical and psychiatric impairments they knew she had: depression, dissociative tendencies, sleep disorders, numbing reactions to stressors and others. Finally, counsel told Angela not to show any emotion, but instead to draw pictures and eat candy while the jury decided whether she regretted assisting in the murders of five people including two children. Based on Angela's appearance and her silence during the penalty phase, the Government was able to argue, "And remorse, there's no evidence, not a shred of evidence of remorse in this case." Tr. 4032. Post- trial interviews of the jurors demonstrate that the jurors concurred.

> Q. What else helped you make decisions?
>
> A. [...] Also, the fact that the only we time we saw any emotion [from Angela] was when her own family was up there. How could she listen to those grandmothers and not show any emotion? The men on the jury were grabbing for their handkerchiefs, but she could just sit through it.

Exhibit 11 at p. 2.

*****

> A. I think she probably lacked remorse to some extent, I mean, I don't know, that might just be her personality, she doesn't seem like a real emotional kind of person.
>
> Q. What led you to conclude she had no remorse?
>
> A. That's a tough question. It was, I guess, her expressions during the trial, somewhat non-responsive - I sat very close to her during the 2nd and 3rd phase of the trial - it looked like she was kind of distant from anything that happened.

Exhibit 14 at p. 1.

*****

> Q. What else figured into your decisions?
>
> A. They needed to talk to Angela about her attitude. She winked at us the first, day, when we came in. She kind of snickered, like ha, ha, ha. She should have been more sober. She was facing the death penalty right there on the very first day of

63

trial. I wouldn't be smiling or smirking at jurors if I was in that position. Her attitude was the biggest thing. After the trial, one of my friends said, "I see you wiped the smirk off her face" because he had seen pictures of her on the news. I saw them too after the trial.

Q. When you say her attitude was the biggest thing, do you mean that if she had been more sober you might have changed your mind about the right sentence?

A. Well it might have added a little compassion.

Q. Enough to change your mind, even if she had still done all these things?

A. Maybe not, but it would have, I don't know...

Q. Made her more human?

A. Exactly.[1]

Exhibit 13 at p. 4.

> f. *How counsel could have rendered Angela Defense Exhibit A in Mitigation*

Had counsel performed reasonably, they could have explained to the jury through their experts that Angela suffers from complicated impairments in her moods that cause her to react inappropriately and disable her from regulating her intense and rapidly cycling emotions, particularly in reaction to stress. These problems require stabilization with medications that can sometimes swing the defendant's emotionality too far the other way, causing the patient to appear flat where normal people would react. Counsel could have reminded the jury that their experts had explained that Angela's trauma history resulted in her dissociating and numbing herself to stressful events. Their experts could have told the jury that Angela was having extreme difficulty sleeping, which could also have explained her disengaged appearance. Finally, they could have simply told the jury that in helping to assist Angela to endure this

---

[1]"To communicate effectively on the client's behalf in ... addressing a jury..., counsel must be able to humanize the defendant." Commentary to Guideline 10.5 at 71.

64

incredibly stressful trial, they instructed her to sit quietly and draw, which she did to calm herself down, so that her constellation of impairments did not get the best of her. Had counsel done this, there is a reasonable probability that when the jury looked at Angela, they would have seen a profoundly disturbed person whose body and brain were so unable to control her moods and emotions that she required extremely high doses of medication, a person racked with insomnia that was gorging on caffeinated candies to stay awake, a person likely re-experiencing the traumas of her childhood and trying to protect herself from them, and a grown woman in whose hand counsel had to put a crayon to keep her from breaking down. But the jury never had a chance to see the real Angela Johnson. Because of counsel's failures, they mistook a drugged woman for a cold, uninterested, compassionless, remorseless killer. This is no way to convict and sentence a criminal defendant. There is a reasonable probability that had counsel acted reasonably, one juror would have voted to spare her life. Ms. Johnson is entitled under the Sixth Amendment and the Due Process Clause to a new trial.

> g. *The Medications Unconstitutionally Impaired Ms. Johnson's Ability to Cooperate with Counsel and Participate in Her Defense*

The medications, and counsel's utter failure to address them, caused a separate and equally significant harm. "A defendant's right to the effective assistance of counsel is impaired when [s]he cannot cooperate in an active manner with h[er] lawyer." *Riggins*, 504 U.S. at 44; *Massiah v. United States,* 377 U.S. 201 (1964); *Geders v. United States,* 425 U.S. 80 (1976). "The defendant must be able to provide needed information to h[er] lawyer and to participate in the making of decisions on h[er] own behalf. The side effects of antipsychotic drugs can hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in h[er] defense." *Riggins*, 504 U.S. at 44.

Here, Ms. Johnson was unable to provide information to her lawyer or participate in decision-making. Instead, Ms. Johnson spent her time during trial making drawings, as if she were in nursery school. The medications rendered her unable to participate in her own defense or to enjoy the effective assistance of counsel, in violation of the Sixth Amendment and Due Process.

### 5. Counsel Failed to Have Their Experts Confront Aggravating Evidence Offered at Merits and Penalty Phases of Trial

In the merits and penalty phases of Angela's trial, the Government offered testimony that Angela behaved in a bizarre and threatening manner toward several people before and after the time of the offenses. The Government introduced tapes on which Angela was issuing grandiose and profanity-laden plans to recover a drug debt. Tr. 2726. Jeff Honken testified that Angela Johnson called, "yelling" that if Honken was not going get to see his kids then Jeff would not either. Tr. 369. Dan Cobeen testified that Angela made a shooting at the head type gesture at him while passing by in a car, Tr. 708-710. Kathy Rick testified that Angela confronted Rick in her car and was "screaming and yelling." Tr. 2368. Although Rick did not "know specifically" what Angela was screaming about, she took it to be threatening. Tr. 2637. Rick described another occasion when Angela was at her house screaming and banging on the door because Angela thought Honken was in the house. Tr. 2638-9. Rick also testified that Angela scratched her car. Tr. 2639-40.

Doug Book testified that after he executed a search warrant on Rick Summers house in 1998, Tr. 3613, Angela left him two voice messages saying things like "you're in over your head," and "you'd better back down or you'll get hurt." Book described her as "screaming, irate, and out of control." Tr. 3613-3614. Alyssa Nelson, Honken's sister, said that Honken told her the following about Angela:

66

she flies into rages, Alyssa, he goes, you know.  And I go, What do you mean by rages, you know?  And he goes, She gets so angry sometimes, you know, he goes, She scares me sometimes.  She just -- she goes crazy.  She just flies into rages.  And that's all he said.

Tr. 2678.  She also reported that Honken had told a story in which

He had a gun pressed to his head by Angie and that she was just screaming at him and that he had to talk her down, that kind of stuff, and that usually that was -- you know, Dustin, you know, would talk her down out of these getting angry or something like that.

Tr. 2679.

Nelson then went on to describe Angela's strange behavior at Honken's originial

sentencing hearing.  Nelson offered this vignette, which the Government apparently thought

relevant to the weighty choice regarding whether the Government should take or spare Angela's

life:

Yeah, everybody got up and walked out.  I was standing up, and she stood up with me, and I believe it was a bunch of people that worked in the courthouse that were standing up against the back of the wall, and it was a bunch of males except for one female, and we turned around, and Angie turned around and looked, you know, at one of them, and she looked at the female, and she says, you know, What are you looking at?  The woman said, Well, nothing.  And she says, Well, you're just a chick with a dick anyway, and I was incredibly embarrassed.

Tr. 2682-2683.

Although counsel got this last witness to agree on cross-examination that some of this

behavior might be consistent with methamphetamine use, diligent counsel would have offered

the much more mitigating explanation that this behavior was the result of involuntary

impairments in Angela's life and mind.

There can be no strategy for failing to take the sting out of the Government's aggravating

evidence by contextualizing the behavior as the result of mental impairments that are beyond the

defendant's control.   Even Berrigan  says he thought the tapes were among the most prejudicial

67

evidence the Government had.  This evidence would have countered one of the juror's beliefs that Angela was the mastermind because they were consistent with the picture of her "personality" that the Government had painted.   Exhibit 11 at p. 3.  Mental illness and brain impairment are more mitigating explanations for behavior than a bad "personality."  Dr. Logan's notes indicate he could have addressed just this kind of issue: he says "flirtatious behavior is really manic behavior."   Dr. Logan of course was not provided with discovery regarding these other incidents, but they are symptomatic of the same kind of disorder he had identified.   Dr. Woods will explain at the evidentiary hearing in this case that this kind of behavior: profanity, extreme mood lability, grandiosity, and hyperactivity are manifestations of Angela's malfunctioning body and mind, not simply personality defects.  There is a reasonable probability that but for counsel's omissions in this regard, the balance of aggravating and mitigating factors would have tipped in Angela's favor and she would have been sentenced to life.

The Government also attempted to make aggravating hay out of the fact that Angela seemingly lived a "normal" life despite her many impairments.  They argued that Angela

> grew up.  She left home.  She got married twice.  She had jobs.  She continuously worked during this period.  She had children.  She took care of those children.  This is a woman living a normal life in Mason City, Iowa.  This is a woman living a normal life.  Despite her abusive history, this is a woman living a normal life in Mason City, IA. . . .This is a woman, while she may have had an abusive childhood, was a woman who was out on her own living a normal life.

Tr. 4030-31.  Counsel unreasonably failed to have their experts explain, as Dr. Woods now can, that having a basic job, paying rent and getting married are not contraindications of impairment, nor are they signposts, in and of themselves, of a successful or normal life.   Counsel should have known that this is the standard way the Government attempts to avoid the implications of mental health evidence and been prepared to rebut it.

68

**6. Defense Counsel Was Professionally Unreasonable for Calling Certain Witnesses in Mitigation at the Penalty Phase, for Failing to Adequately Investigate the Potential Testimony of Those Mitigation Witnesses, for Failing to Adequately Prepare Those Mitigation Witnesses for Testifying at the Penalty Phase and for Failing to Understand the Implications of a Relaxed Evidentiary Standard at the Penalty Phase**

Defense counsel called several witnesses at the penalty phase that should never have been called. As developed below, the testimony of these witnesses was by no means mitigating; rather, the testimony fits squarely into what one would expect to hear from witnesses called by the prosecution at the penalty phase. Had defense counsel, or anyone from the defense team, adequately investigated these witnesses, they would have found that these witnesses had knowledge of circumstances that the defense would not want to put before any jury, much less a capital jury. Moreover, the mitigating testimony of these witnesses was, at best, cumulative offering nothing that could not have been elicited from other defense witnesses. Had the defense discovered this harmful information during investigation, they could have realized that the mitigating evidence these witnesses offered was outweighed by the potential harm to the defense case. The defense would not have called these witnesses at all had they performed an adequate investigation. Counsel was further professionally unreasonable in failing to prepare them for their testimony - once they had decided to call witnesses - or to prevent them from giving harmful testimony.

Finally, underlying the above issues, defense counsel was unprepared for a more relaxed evidentiary standard applied at the penalty phase. Defense counsel failed to take into account that the prosecution would not be limited to the scope of direct when conducting cross-examination of mitigation witnesses. As a result, the prosecution was permitted, through defense mitigation witnesses, to put evidence before the jury that was harmful to Ms. Johnson. Had

these witnesses not been called, this damaging information would not have been put before the jury, as none of these witnesses were called by the prosecution.

### a. The Testimony of Holly Dirksen

The defense called Ms. Johnson's younger sister, Holly Dirksen, to testify as a mitigation witness. Ms. Dirksen was one of three siblings to testify at the penalty phase; James Johnson, Jr., Tr. 3434-3458, and Wendy Jacobson, Tr. 3143-3186, also testified. The line of defense counsel's questioning of Ms. Dirksen suggests that she was called to testify regarding Angela's childhood as well as her own. However, Ms. Dirksen was six years younger than her closest sibling, Tr. 3246, and unable to recall most of the "incidents" that defense counsel questioned her about. Defense counsel asked Ms. Dirksen if she had ever been hit by her mother, Ms. Dirksen could not recall. Tr. 3253. Further, Ms, Dirksen did not know anything of her maternal grandparents, as they were both deceased by the time she was born, Tr. 3249; Ms. Dirksen could not recall any of her toys ever being burned, Tr. 3250, or a night where her mother forced the children from their beds to drive around insisting the world was ending. Tr. 3251. In fact, Ms. Dirksen could not confirm anything had happened to her older siblings. Tr. 3250.

Instead, Ms. Dirksen ended up testifying that her mother prayed for her health at church, Tr. 3251; disciplined her by sending her to a corner and by "grounding" her, Tr. 3253; attended her school conferences, Tr. 3254, and that she remains supportive of her mother. Tr. 3261. Overall, Ms. Dirksen's direct testimony depicted a rather normal childhood upbringing. As mentioned, her age prevented Ms. Dirksen from corroborating anything that happened to her older siblings, including Angela. What she could confirm, however, chiefly the "exorcisms" that her mother performed, Tr. 3247, had already been testified to by Ms. Johnson's mother Pearl, Tr. 3040-3061, and her sister Wendy. Tr. 3143-3173. Additionally, Ms. Johnson's brother testified

about the chaotic and violent upbringing in the Johnson children's home.  Tr. 3434.  As such, Ms. Dirksen's direct testimony added little to the defense's mitigation case.

Even worse, the prosecution used Ms. Dirksen to damage the defense.  First, the prosecution probed into the drug addiction that Ms. Dirksen testified to during direct-examination.  Ms. Dirksen testified that she lost a boyfriend in a motorcycle accident, and as a result, had become depressed and began to use drugs. Tr. 3255-3256.  The prosecution elicited that Ms. Dirksen was supplied methamphetamine by her sister, Ms. Johnson.  Tr. 3272-3272.  Further, Ms. Dirksen testified that she had encouraged Leslie Nedved not to talk to authorities about what she knew about Terry DeGeus' disappearance, knowledge that the prosecution asserted Ms. Nedved learned from Ms. Dirksen.  Tr. 3275.

In sum, Ms. Dirksen's testimony offered little mitigating evidence to the jury.  She portrayed her childhood as fairly normal and could not confirm the testimony of her older siblings due to the age difference between them.  It is understandable that defense counsel wanted to call all of Ms. Johnson's siblings to testify at the penalty phase.  However, had counsel adequately investigated what Ms. Dirksen's testimony would be, they would have realized that her direct testimony would be, at best, cumulative, and at worst, damaging.  Given that Ms. Dirksen's direct testimony would not have been helpful, the defense should have realized that calling her as a witness would have exposed her to a damning cross-examination.   For these reasons, defense counsel was professionally unreasonable in failing to investigate Ms. Dirksen's potential testimony, and for calling her as a witness at all.

### b.     The Testimony of Douglas Book

Chief Douglas Book was called to testify by the defense, although his testimony offered only harmful evidence of Ms. Johnson's behavior.  Defense counsel's only questions of Chief

71

Book concerned interactions that Chief Book had with Terry DeGeus. Tr. 3597-3608. During the course of Chief Book's direct testimony, Ms. Johnson was only mentioned peripherally in connection to Book's testimony about DeGeus. Tr. 3600-3601. There was nothing in Chief Book's direct testimony that even marginally helped the defense's case in mitigation. Had there been no cross-examination, Book's testimony would have been utterly forgettable.

But of course, there was cross-examination. The prosecution began by eliciting from Chief Book that he had been involved in an investigation into the drug-related activity of Ms. Johnson and Rick Summers. Tr. 3609. The prosecution began to lay the foundation for introducing evidence of phone messages left by Ms. Johnson on the home answering machine of Chief Book in 1998. Tr. 3610. Defense counsel objected that this information was outside the scope of direct, Tr. 3610, but the Court explained that there is a relaxed standard at the penalty phase, and that the questioning would be allowed. Tr. 3611-12.

As the cross-examination of Chief Book continued, he testified that a search of Rick Summers' home was executed in 1998, pursuant to a warrant, as a result of the aforementioned investigation. Tr. 3613. After the search was completed, Chief Book testified that Ms. Johnson left a message on his home answering machine indicating that he should "back-off" or he could get hurt. *Id.* Moreover, Chief Book testified that after having served a grand jury subpoena on Ms. Johnson's sister, Ms. Johnson again left a threatening message on his home answering machine. Tr. 3614. Although Chief Book never completed any reports of these messages, he described Ms. Johnson as, "screaming, irate, [and] out of control." *Id.*

By calling Chief Book to testify, the defense made it possible for the prosecution to once again bring forth evidence of Ms. Johnson's continued involvement in the distribution of drugs and, worse still, provided the prosecution with the only witness that could testify to these phone

72

messages.  It was professionally unreasonable for defense counsel to be unaware that the prosecution would be able to exceed the scope of direct in its cross-examination of Chief Book, or any mitigation witness, for that matter.  This critical misunderstanding led to the similarly unreasonable decision to call Chief Book as a defense witness.  As noted, Chief Book added nothing even remotely mitigating about Ms. Johnson.  In fact the only positive testimony about Ms. Johnson the defense managed to elicit from Chief Book was that she was a  "good-looking young lady." Tr. 3603.  Instead, the defense made it possible for the prosecution to put before the jury the aggravating evidence of these phone messages.  Had defense counsel not called Chief Book, this evidence would never have been heard by the jury.

### c.      The Testimony of Susan Marsolek

Defense counsel also called Ms. Susan Marsolek to testify.  Although Ms. Marsolek was living at a halfway house at the time, she testified in leg-irons and a prison uniform, a fact defense counsel pointed out to the jury.  Tr. 3728.  During the direct-examination of the witness, defense counsel elicited that Ms. Marsolek and Ms. Johnson were housed in the same dorm together at the Linn County Jail.   Tr. 3734.  Ms. Marsolek also testified that Ms. Johnson had never been in a fight at the jail.  Tr. 3736.  In between questions, defense counsel allowed Ms. Marsolek to ramble on about tangential topics unrelated to Ms. Johnson.  For instance Ms. Marsolek testified that "meth" is one of the worst drugs.  Tr. 3739.  After a direct-examination that produced again, only marginally helpful testimony that Ms. Johnson was a good mother,  Tr. 3740, Ms. Marsolek was cross-examined.  It is on cross-examination that Ms. Marsolek's testimony proved particularly damaging to the defense's mitigation case.

73

First, it should be noted that Ms. Marsolek was prosecuted by the same prosecutor that cross-examined her in Ms. Johnson's case. Tr. 3741. The prosecutor confronted Ms. Marsolek about several lies she had told to law enforcement in connection to her own arrest, Tr. 3742-3743, and about a supposed drug debt Ms. Marsolek owed to Ms. Johnson, evidenced by notes seized from Ms. Marsolek. Tr. 3743. Finally, the prosecution questioned Ms. Marsolek about her testimony that Ms. Johnson had never been in a fight at the Linn County Jail. Tr. 3745. During this course of questioning, the prosecutor brought forth a statement given by Ms. Marsolek about an incident at the jail that Ms. Johnson was involved in, alleging that there was a videotape of the fight. *Id.* Ms. Marsolek continually denied the fight and insisted she did not even remember the statement she was shown. *Id.*

Finally, defense counsel himself, on redirect of Ms. Marsolek, characterized this fight as a "big fight." Tr. 3747. Later, defense counsel elicited that Ms. Marsolek was not a "snitch," and was not the type of person who would ever be a "snitch." Tr. 3749. However, on re-cross of Ms. Marsolek, the prosecution elicited that in fact, Ms. Marsolek had testified against Michael Vieth in exchange for a reduction in her own sentence. Tr. 3750.

Defense counsel should never have called Ms. Marsolek to the stand, and would never had done so had they adequately investigated her background and what her testimony would be. Ms. Marsolek added nothing to the defense's mitigation case. Instead, by calling her, defense counsel opened the door for the prosecution to probe a fight in the Linn County Jail that Ms. Johnson was allegedly involved in. This testimony expressly contradicted the defense's mitigation opening statement that promised to prove Ms. Johnson would not be a threat if incarcerated. Tr. 2538. As if this were not damaging enough, the defense put on a witness, supposedly a good friend of Ms. Johnson, who ended up being portrayed to the jury as a criminal

74

and a liar.  Failing to investigate the possible testimony of Ms. Marsolek and calling Ms. Marsolek to the stand was irresponsible and inexcusable.

Defense counsel was, at a minimum, unreasonable for calling these three witnesses. These witnesses were called to support Angela's case for life, but instead their testimony was actually more appropriate for the prosecution's case.  None of the testimony of these witnesses was remotely helpful to the defense's case.  In sum, defense counsel was unreasonable for: failing to investigate the possible testimony of these witnesses; failing to understand the implications of a relaxed evidentiary standard; and calling witnesses to the stand that in no way helped the defense case, but actually damaged it.

**7.      Counsel Unreasonably Failed to Introduce Angela's Offer to Plead Guilty in Mitigation**

On numerous occasions prior to trial, Angela offered to plead guilty, culminating in an offer to plead guilty and serve life in prison without the possibility of parole.  *See* Claim III.A., *supra*.

Trial counsel was ineffective for failing to present Ms. Johnson's willingness to plead guilty to the jury as a non-statutory mitigating factor.   This was not a tactical choice, but rather the result of oversight by trial counsel.   Certainly, her willingness to plea would have been relevant to the issue of acceptance of responsibility, in the same way it is under the federal sentencing guidelines, and/or remorse.[1]

Offers to plead guilty are relevant to the mitigating factor of acceptance of responsibility. *United States v. Rodriguez*, __ F.3d __, 2009 WL 2998103, *19 (8th Cir. 2009) (September 22, 2009), *United States v. Fell*, 372 F.Supp.2d 773, 785 (D.Vt. 2005).  In *Fell*, the District Court for

---

[1]  Remorse was submitted to the jury as a mitigator, but only three, four, or five jurors found the mitigator to apply - a different number found the mitigator for each victim.

the District of Vermont held that the willingness to enter into a plea of guilty was evidence of

Fell's state of mind and should be presented to the jury. *Fell*, 372 F.Supp.2d at 785 (citing

*United States v. Biaggi*, 909 F.2d 662, 690-92 (2d Cir. 1990)).[1] A review of the voir dire shows

the importance of this mitigator. During voir dire, Juror 600 – who was ultimately selected for

the jury – stated that he would place importance on seeing remorse on the part of Ms. Johnson.

VD 2498. While remorse and acceptance of responsibility can be distinguished in some

respects, they are two sides of the same coin. Juror 600's statement during voir dire certainly

suggests that he would have been receptive to hearing evidence of Angela's interest in taking

responsibility for her actions, as would any logical juror. Ms. Johnson was prepared to admit her

role in the offense, take responsibility for it, accept a sentence of life without the possibility of

release, and spare all interested parties the anguish of a trial.

Had counsel told the jury that she had offered to take responsibility for her actions and

serve a life sentence without the possibility of parole, "there is a reasonable probability that at

least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539

U.S. at 537.

### 8. Counsel Unreasonably Failed to Object to the Government's Improper Argument that the Killing of Children Cannot be Mitigated

In its penalty phase closing, the Government argued repeatedly that "[t]here is no way to

mitigate the murder of children." Tr. 4018; *see* Tr. 4033 ("The intentional murder of children is

an unspeakable evil. It's an evil that cannot be mitigated by any evidence."). The

Government's attempt to have the jury nullify or diminish the court's instructions and impose a

mandatory death penalty was improper. *See, e.g., Woodson v. North Carolina,* 428 U.S. 280

(1976). The defense unreasonably failed to object or request a curative instruction. *See, e.g.,*

---

[1] All twelve jurors in *Fell* found for this mitigating factor.

*Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996) (finding counsel ineffective for failing to object to misconduct in closing arguments). Given the extreme aggravating weight juries apply to the murder of children, it was even more incumbent upon counsel in this case to ensure that the jury properly understood its obligation to consider and weigh mitigating evidence. But for counsel's failure to correct the prosecution's misleading assertions, there is a reasonable probability that Angela would have been sentenced to life.

**9.    Trial Counsel Failed To Proceed With a Trial Date that Would Have Prevented the Government from Issuing a Timely Notice of Intention to Seek the Death Penalty**

Trial counsel performed deficiently in continuing the trial date in this case, permitting the Government adequate time it otherwise lacked to file the death notice.

Two indictments were returned against Angela Johnson in this case, the first in July 2000 and the second in August 2001. Though charging different offenses and assigned different case numbers, each was the product of Ms. Johnson's role in the same conduct. A series of scheduling orders, requests for continuance, and trial dates followed:

- On August 8, 2000, a trial date of April 9, 2001 was scheduled.

- On October 25, 2000, a request for a continuance was filed by the defense.

- On November 7, 2000, the court continued the trial until January 14, 2002.

- Pat Berrigan and Dean Stowers entered their appearances in the case in January and April 2001, respectively.

In September 2001, this Court held a hearing, the result of which was the consolidation of the two indictments, as well as a rescheduling of trial for May 6, 2002.

77

In January 2002, just four months prior to the start of the trial in the case, and eighteen months after Angela Johnson was first arrested and charged in federal court for the murders, the defense again moved for a continuance of the trial date, which was granted by the Court, moving the trial to November 2002. Ultimately, of course, for other reasons, the trial in this case would not take place until May 2005. However, in January 2002, four months from the start of a federal capital trial, trial counsel blinked and moved to continue the trial instead of allowing the May 2002 trial date to stand and filing a Motion to Dismiss the Death Notice as Untimely, if the Government did ultimately file the notice. As it turned out, the Government filed the death notice in this case on April 25, 2002, eleven days prior to the start of the scheduled trial date.

Federal law provides that the Government must give the defendant reasonable notice of its intention to seek death. 21 U.S.C. §848 (h) (since rescinded) and 18 U.S.C. §3593(a). In this case, likely through no fault of the local United States Attorney's Office, the Government appears to have intended to deny Ms. Johnson sufficient notice of its intent to seek death. Already only four months from the start of a trial involving five homicides that occurred nine years before the scheduled trial date, with thousands of pages of discovery subject to ongoing complaints of access by defense counsel, the Government had not yet filed its death notice. Even had they filed the notice at that point, the defense could have immediately moved to dismiss it on the basis of its late filing. As it turned out, the notice would not be filed until less than two weeks prior to the scheduled trial date.

One of the unique safeguards in place in a federal death penalty case is 18 U.S.C. §3593(a), which requires that the attorney for the Government, "if he or she believes that the circumstances of the offense are such that a sentence of death is justified" . . . to serve on the defendant notice of intent to seek the death penalty. This notice must be filed "at a reasonable

78

time before the trial ...[.]" Violation of this reasonableness requirement precludes the case from going forward as a capital prosecution, regardless of a showing of prejudice. *See United States v. Ferebe*, 332 F. 3d 722, 727, 730 (4th Cir. 2003); *United States v. Hatten*, 276 F. Supp. 2d 574, 576-577 (S.D. W.Va. 2003).

The obvious goal of this provision is to allow defense counsel adequate time to meet the complex demands of preparing a death penalty case. *See Ferebe*, 332 F. 3d at 727. This purpose is served as long as there is a reasonable period of time between the notice and the current trial date.

The court in *Ferebe* considered the issue regarding the timeliness of a Death Notice. Ferebe challenged the district court's decision not to strike the Death Notice on the basis that he did not receive the Notice within a reasonable time before trial, as required by 18 U.S.C. § 3593(a). The Fourth Circuit first determined that § 3593(a) is a prophylactic statute which protects an accused from being tried for a capital offense without reasonable notice. *Id*. at 727. The Court stated that the "indisputable purpose is to ensure that the accused will not be required to stand trial for his life without having received adequate notice before that trial that he is to stand trial for capital offense ..[.]" *Id*. In other words, the Court said that a defendant's "rights are denied at the point when he proceeds toward trial, or actually to trial, in the absence of a reasonable time between his receipt of the Death Notice and his capital trial." *Id*. at 732. And *"this is so, regardless of whether he will or will not be, or was or was not, prejudiced by an unreasonably delayed Death Notice. Id*. (emphasis in original). According to the Fourth Circuit, "the question of whether the statute has been violated by a prejudice inquiry is, pure and simple, to confuse the question of harmlessness with the question of violation." *Id*. at 736; *see also United States v. McGriff,* 427 F.Supp. 2d 253, 267 (E.D.N.Y. 2006).

79

As noted, it is apparent that trial counsel were confident of the outcome of the merits phase. They did little or no investigation and conceded Ms. Johnson's presence at the crime scenes; the only possible outcomes then were life or death. The only way to preclude death would be to run the gauntlet of a federal capital trial involving five homicides, including the murder of two children – an unwise and unwanted risk in any circumstance. Two more positive methods of precluding that risk were present: pleading the case or moving to preclude death in light of the Government's late filing of the death notice. Counsel did neither. They failed to secure a plea in this case notwithstanding repeated overtures by the Government. When they finally did make an offer, the Government rejected it. Then, while the Justice Department dragged their heels on a decision whether to seek death, counsel for Ms. Johnson afforded them more time to file the Notice by moving to continue the trial. So moving was deficient performance. As a result of counsel's error, Ms. Johnson missed an opportunity to take advantage of the Government's delay in issuing the death notice and to preclude them from issuing it in the first place or have it dismissed as untimely if they tried to do it anyway. Angela proceeded to a capital trial as a result of counsel's failure simply to use the Rulebook to his client's advantage.

### 10. Counsel Failed to Structure Voir Dire to Identify Jurors with Prejudicial Views on Women and Pentecostal Religion

Voir dire is a critical stage of a criminal proceeding. This is particularly true in a capital case in which a jury will be called to judge the very life of the defendant. Selecting jurors who can fairly judge the defendant and fairly consider mitigation is vital. Voir dire also presents the first opportunity for counsel to alert the jurors to their themes in mitigation. *See* Commentary to Guideline 10.10.1 at p. 99 ("Counsel should then advance that theory during all phases of the trial, including jury selection...[.])

In this case, counsel failed to explore two critical areas with potential jurors. First, counsel knew that they were going to be offering evidence of what they would deem bizarre religious rituals involving speaking in tongues and exorcisms. Counsel failed to inquire of jurors whether they considered these kinds of rituals to be normal or abnormal expressions of religious belief or even whether they practiced such rituals themselves or knew people who did. Clearly, presenting such practices as abusive to people who engage in them would not only not be mitigating, but would likely anger the juror. In addition to identifying jurors who could not consider this critical area of mitigation, counsel could also have used the questions to begin to paint a picture of Angela's horrific childhood for the jurors.

Second, counsel did not probe the jurors' attitudes toward women in general and women accused of crime in particular. Counsel knew that the Government would offer evidence that made Angela look decidedly unfeminine, crude, and rough. This evidence would show Angela as brash, profane, and seemingly strong. *See. e.g.,* Carolyn B. Ramsay, "Public Responses to Intimate Violence: A Glance at the Past," Public Health Rep. 2006 Jul–Aug; 121(4): 460–463. ("Female defendants who defied gender norms by drinking or engaging in illicit sex could expect harsher verdicts than those who played more traditional roles."). There is little doubt that many women and men judge women that do not adhere to widely held female stereotypes very harshly. Counsel missed an opportunity to identify these jurors as well as to plant the seed with unbiased jurors that the picture of Angela that the Government planned to paint was not necessarily accurate. There is a reasonable probability that counsel would have been permitted to ask these questions. See *Ristaino v. Ross*, 424 U.S. 589, 596, 598 (1986) (counsel must be permitted to probe areas of disqualifying bias); Fed. R. Crim. P. 24 (granting wide-ranging authority to District Court judges regarding the proper conduct of voir dire). As a result of

counsel's failure to ask these critical questions, there is a reasonable probability that Angela was tried by biased jurors, *see Duncan v. Louisiana*, 391 U.S. 145 (1968) (right to trial by unbiased jury), or by jurors who were unable to consider mitigation. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

### 11. Trial Counsel was Ineffective for Failing to Investigate the Facts of the Case, to Present a Defense, or to Present Helpful Evidence at Both the Merits and Penalty Phase

Counsel is required to perform a rigorous investigation of the evidence against the defendant to unearth any evidence that may undercut the Government's theory, undermine its evidence, or advance the defense case. Counsel utterly failed in its obligations, presenting no defense case, performing almost no investigation, interviewing only a handful of witnesses and overlooking critical impeachment evidence. Evidence was available from Martin Cole and Cheryl Conroy Bachman Poole, as well as a number of other witnesses and court records, and counsel's own discovery file, that would have cast doubt on the credibility of Christi Gaubatz and a number of other witnesses the Government presented at trial. Had Phyllis Prosovic been interviewed in a timely manner, her testimony, which is completely inconsistent with the Government's theory, could have been preserved prior to her death and presented at trial. Counsel also failed to consider and explore possible theories about how Angela could have obtained the information contained in the maps and statements she provided to the witnesses against her. Had counsel done any investigation or presented a defense at trial, there is a reasonable probability that they could have demonstrated reasonable doubt about Angela's guilt to at least one least one member of the jury, and the jury would not have convicted Ms. Johnson of any of these murders.

The facts supporting this claim include those stated, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### 12. Counsel Unreasonably Failed to Introduce Evidence in Support of Residual Doubt

The complete failure to investigate Ms. Johnson's innocence or present any defense during the guilt phase at trial extended to the penalty phase. The defense again made no effort to investigate or present evidence to support a finding of residual doubt, a critical statutory mitigator.

Case in point: after the disappearances of the Duncan family, police interviewed Lori Duncan's neighbor, Phyllis Prosovic. Ms. Prosovic reported that on the night of the disappearances, Lori Duncan had come over to her house around 8pm for cake and coffee. Duncan said that Nicholson was out doing "some business" with friends. Exhibit 25. Prosovic said that Duncan called her again after Prosovic had gone to bed and after the news, and that Lori came over and was crying because Nicholson did not want her anymore. At that time, Prosovic saw Nicholson's car parked behind Duncan's house. It was gone the next day. Counsel presented no other evidence to support residual doubt about Angela's guilt.

Diligent counsel would have introduced this evidence at sentencing. Ms. Johnson was entitled at the penalty phase to present evidence to support a finding by the jury of "any residual or lingering doubts . . . as to Angela Johnson's guilt or innocence or her role in the offenses . . . even though those doubts did not rise to the level of 'reasonable doubts.'" (Court's Final Penalty Phase Instructions to the Jury, doc. no. 589 at p. 9). But defense counsel did not investigate or present any evidence to support a finding of residual doubt either as to Ms. Johnson's guilt or her

role in the offenses.  Residual doubt is the most powerful mitigator in the minds of capital juries.

*See* Garvey, *supra,* at 1563.   In fact, counsel says now that they simply "forgot."

The Prosovic interview and the other evidence *supra* undercuts the Government's theory

of the case and thus raises unanswerable questions about what really happened on the night of

the Duncans' disappearances. There is a reasonable probability that but for counsel's failure to

introduce evidence from this unbiased witness – the last person to see Lori Duncan alive – as

well as other evidence casting doubt on Angela's guilt, one juror would have had a reservation

about sentencing Angela to death and the outcome would have been different.   *Wiggins*, 539

U.S. at 537.

> **13.    Counsel Provided Ineffective Assistance of Counsel When They Failed to Appeal Juror Misconduct Involving One Juror Telling Others They Were Not the Final Decisionmakers in Ms. Johnson's Case**

The right to effective representation of counsel extends beyond the trying of a case;

defendants have the right to be represented by effective counsel on appeal as well.  *Evitts v.*

*Lucey*, 469 U.S. 397, 398 (1985).  As with claims of ineffective assistance of trial counsel,

Petitioner must satisfy both the performance and prejudice prongs of the *Strickland* analysis.

*United States v. Brown*, 528 F.3d 1030, 1032-33 (8th Cir. 2008).  In order to prevail, Petitioner

must show that an ignored claim was stronger than a claim that was actually raised in the appeal.

*Link v. Luebbers*, 469 F.3d 1197 (8th Cir. 2006) (citing *Smith v. Robbins*, 528 U.S. 259, 288

(2000) (in turn quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986)).

Amongst the issues litigated after Ms. Johnson's trial were allegations of juror

misconduct.  Trial counsel raised two separate claims of juror misconduct: (1) that Juror #55

obtained extrinsic evidence as to conditions of confinement and (2) that Juror # 55 believed that

the jurors were not the final decision makers as to Petitioner's penalty.  Brief in Support of

84

Request for Investigation and Evidentiary Hearing Based Upon Juror Misconduct, Doc. 655. Trial counsel cited *Caldwell v. Mississippi*, 472 U.S. 320 (1985), to support the argument that the death penalty cannot be imposed where a juror believed that his or her responsibility for imposing a death sentence rested other than with the jury. *Id.* at 328-29.

Although appellate counsel did raise the District Court's denial of Petitioner's motion to investigate claims of juror misconduct on appeal, *Johnson*, 495 F.3d at 981 (8th Cir. 2007), appellate counsel failed to raise the *Caldwell* problem as a substantive claim on appeal. Even without the investigation sought by trial counsel, the record contained enough information to show that at least one juror who ultimately cast a vote for Ms. Johnson's death sentence believed that he did not bear the final responsibility for his death penalty vote. On the record alone, appellate counsel could have prevailed on the *Caldwell* claim. When a jury received extrinsic factual evidence, as opposed to extrinsic explanations or clarification of the law, there has been misconduct and there is presumed prejudice as to validity of the jury's verdict. *See United States v. Cheyenne*, 855 F.2d 566, 567 (8th Cir. 1988).

> **14.     Counsel's Errors When Considered Cumulatively Operated to Deny Angela Johnson a Fair Trial**

Each of the deficiencies Ms. Johnson has alleged constitute conduct but for which the outcome of her trial and/or sentencing would have been different. Considered together, counsel's deficiencies undermine confidence in the outcome of her trial and sentencing. This proposition that deficiencies of trial counsel that on their own do not prejudice a defendant, but may do so when aggregated, is currently not cognizable in the Eighth Circuit. *See Middleton v. Roper*, 455 F.3d 838, 851 (2006) (citing *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir.2002)), *United States v. Robinson*, 301 F.3d 923, 925 n. 3 (8th Cir.2002), *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir.1996); *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir.1990) (internal

citations and quotations omitted)). This circuit is the minority of Federal Circuit Courts in not recognizing cumulative prejudice. *See Gonzales v. McKune,* 247 F.3d 1066, 1077-78, n.4 (10th Cir. 2001) (holding that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong) (citing *Strickland v. Washington*, 466 U.S. 668, 695-96 (1984)) (vacated in part on rehearing *en banc* on procedural grounds by *Gonzales v. McKune*, 279 F.3d 922 (10th Cir. 2002)); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (holding that in the post-*Strickland* era, the cumulative impact of multiple deficiencies could result in prejudice such that the absent deficiencies, there was a reasonable probability of a different outcome *and* that where cumulative error exists, there is no need to analyze each component claim of the cumulative error claim separately) (citations omitted); *Rodriguez v. Hoke*, 928 F.2d 534 (2d Cir. 1991) (holding that claims of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions) (citing *Strickland v. Washington*, 466 U.S. 668, 695-96 (1984)); *Crisp v. Duckworth*, 743 F.2d 580 (7th Cir. 1984) (holding that individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the Strickland test) (citations omitted); *United States v. DeWolf*, 696 F.2d 1, 4 (1982) (overruled on other grounds) (holding that the cumulative effect of counsel's failure to object to a number of clearly erroneous rulings could demonstrate ineffective assistance even though there was no plain error in the rulings to preserve them for appellate review); *United States ex rel. Sullivan v. Cuyler,* 631 F.2d 14, 17 (3d Cir. 1980) (holding that the cumulative effect of the alleged errors committed by trial counsel may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless.). *But see Forrest v. Florida Dept. of Corrections,* 08-14418, slip op., 2009 WL 2568185, *5 (11th Cir. 2005) (holding that, each claim of deficient

86

performance requires a showing of prejudice therefore barring the application of the cumulative prejudice doctrine to claims of ineffective assistance of counsel) (citing *United States v. Cronic*, 466 U.S. 648 (1984)); *Millender v. Adams*, 376 F.3d 520, 529 (6th Cir. 2004) (holding that cumulative error analysis does not apply in the habeas corpus setting), *Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998) (holding that as in direct appeals, errors cannot be cumulated to show prejudice in a habeas corpus proceeding), *Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996) (holding that cumulative error analysis does not apply in the habeas corpus setting).

> B. The Government Allowed Testimony It Knew to Be False to Go Uncorrected in Violation of the Fifth and Eight Amendments to the United States Constitution

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

At the merits phase of Angela's trial, the Government (the same Government that had recently convicted Dustin Honken of actually pulling the trigger in the very murders for which they were seeking the execution of Angela Johnson) pursued a theory that Dustin Honken was manipulated and led into committing these crimes by Angela Johnson, and that he had simply been a nice, bookish, Iowa boy until he came under her evil sway.[1]  The Government elicited testimony from several witnesses to this end.  For instance,  Jeff Honken and Rick Held said that Honken was not aggressive, non-threatening, non-violent and not physical with people Tr. 323; Tr. 1038.  Tim Cutkomp also testified that he did not know Honken to be violent prior to 1992, and that he was never violent prior to meeting Angela. Tr. 944.

The Government, however, knew about a different Honken.  At Honken's trial, the Government sought to introduce evidence from Kenny Hansen that he had been approached by

---

[1]  Petitioner is not arguing that the Government improperly argued inconsistent theories of their case during the two trials.

Dustin Honken, with a very detailed plan for robbing a bank. Exhibit 5 at p. 3678. Specifically, the Government proffered that Mr. Hanson would testify that Dustin Honken told him,

> [W]hat door was to be entered; once they went inside, there was going to be an old lady working there; that once they got inside, the old lady should be shoved into the bathroom; that the door should be secured; whoever robs the bank should be wearing a mask that fully covers the face; [and] they should have surgical gloves on their hands....

*Id.* Further, the Government intended to call Alan Johnson to testify that Honken approached him with the same detailed bank robbery plan. Ex. 5 at 3679. The Government also expected that Alan Johnson would testify that he was again approached by Honken and that Honken asked him to kill Hansen after the robbery. *Id.* Next, Mark Johnson (Alan Johnson's brother) was going to testify that Honken,

> also asked him to help kill Kenny Hansen after he committed the bank robbery; that they were going to dispose of him in a manure lagoon; that the defendant told him that the chemicals in that lagoon would eat away all of the remains including the bones and the body would never be found and they would split the money.

*Id.*[1] This testimony was aimed to refute, said the Government, the defense's incorrect picture that Honken, "went to school, was a good student, average student, went to college, just a law-abiding citizen who, lo and behold, in 1992, starts down a road of criminal conduct." During the penalty phase of Mr. Honken's trial, the Government sought to introduce the above testimony because, "the defense has attempted to paint for the jury [an impression of Mr. Honken] as a good little boy who always did everything right." Ex. 5 at 3677.

Oddly, during the penalty phase of Ms. Johnson's trial, the Government continually painted the opposite picture of Honken and allowed the jury to believe that previous to meeting

---

[1] The government did call Kenny Hansen, Alan Johnson and Mark Johnson to the stand, although their testimony was limited.

Ms. Johnson, Honken was a non-violent, all around good guy. The Government called Alyssa

Nelson, Honken's sister, to testify about her brother. The following colloquy ensued:

> Q.     And to that point, up until 1993, did you ever know Dustin Honken to
>        engage in violence with anybody?
>
> A.     No, never.
>
> Q.     Did you ever see him use force up until 1993 against anybody?
>
> A.     Never.

Tr. 2672.

In sum, at Ms. Johnson's trial, the Government attempted to paint Mr. Honken in the

harmless light they had vigorously opposed during the Honken trial, despite the contrary facts

that they proffered to the Court during the Honken trial.

The Government commits misconduct and violates the Constitution when it deliberately

allows testimony that it knows to be false to go uncorrected. *See Napue v. Illinois,* 360 U.S. 264

(1959). The Government has an affirmative duty to "correct false testimony." *United States v.*

*Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980) (citing *Napue,* 360 U.S. at 269; *United States v.*

*Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977)). The duty to correct the testimony arises when the

false testimony is given. *Id.*

In *Bigeleisen,* the Government's key witness testified that he had not received any

consideration for his testimony against Bigeleisen. *Id.* at 206. This testimony went uncorrected

despite the prosecutor's knowledge that the witness had been told that the Government would

make his cooperation known to the witness's sentencing judge and the parole commission. *Id.*

at 205. In reversing Bigeleisen's conviction and remanding the case for a new trial, the Court of

Appeals held that the false testimony along with a misleading closing argument during which the

Government failed to correct the witness's false testimony "could have affected the judgment of

89

jury." *Id.* at 208.     It is immaterial to evaluating a *Napue* claim whether the Government intentionally sought to solicit the false testimony or whether a witness offers the testimony without the involvement of the Government. *United States v. Forester*, 874 F.2d 491, 494 (8th Cir. 1988) (quoting *Napue*, 360 U.S. at 264)). Likewise, whether the false testimony addressed the credibility of the witness or the guilt of the defendant, is immaterial. *Napue*, 360 U.S. at 269.

In this case, the Government put on witnesses to say that, in their experience, Honken was not violent. The Government knew this testimony not only created a false impression for the jury, it was belied by evidence known to the Government which the Government had proffered to the Court in a previous trial.

A failure on the part of the Government to correct false testimony requires a new trial or a new sentencing hearing, if disclosure of the evidence creates a reasonable probability of a different result. As the Court explained in *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), "the adjective is important," and "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Here, the Government plainly attempted to underscore its theory that Angela was the mastermind of these crimes by painting a picture of Honken that it plainly knew to be false. The prejudice is compounded when viewed in combination with the fact that counsel unreasonably painted an inaccurately benign picture of Honken and failed to present copious evidence of his violent and scheming nature. (*See* Claim III. C, *infra*).

      C.     The Government Violated *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 264 (1959) When It Failed to Disclose Remuneration Provided to Witnesses and Knowingly Put on Testimony That They Did Not Receive Remuneration

90

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference

The Government violates *Brady* where it fails to produce and disclose material evidence favorable to the defendant either as to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963). The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994) (*citing United States v. Bagley,* 473 U.S. 667, 682 (1985)). Ms. Johnson need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

The prosecution in Ms. Johnson's case suppressed before, during, and after trial exculpatory evidence relevant to several key witnesses. Upon information and belief, deals, leniency or other benefits were given to witnesses in exchange for their testimony in Ms. Johnson's case and were not disclosed. Even worse, in violation of *Napue*, the prosecution put on testimony that they did not have deals with the Government, when in fact they did.

The Government, for example, had an understanding with Christi Gaubatz, that she would not be prosecuted (*inter alia*, for perjury and obstruction of justice) if she testified against Johnson. This was never disclosed to the defense. The government never even disclosed the meeting between Gaubatz and five government agents where the understanding was apparently reached.

91

The Government also never disclosed to the defense that the testimony of prosecution witness Peggy Hoover "was as of a result of a promise to help her in her own case." But Hoover received consideration from the government for her testimony against Ms. Johnson. Even worse, Hoover, a crucial witness for the government, testified falsely that she was given no promises about a further reduction in her sentence in exchange for her testimony. Tr. 1416/16-21.

Steven Vest, who testified in both Honken and in Ms. Johnson's trial, claimed to have, nor wanted, any remuneration for his testimony. He indicated at Honken's trial that he desired a transfer from Colorado to a facility closer to his family. At Ms. Johnson's trial, however, he denied being motivated by that desire. Nonetheless, he now appears nowhere on BOP's inmate locator, appearing to have been transferred out of the BOP facility in Colorado.

The facts supporting this claim include those stated, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

The testimony of these witnesses was critical to the government's case, in both guilt and in penalty. It would have been highly material to the jury to know of these undisclosed deals and understandings.

> D.   Ms. Johnson was Tried While Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

As has been noted, Ms. Johnson is a person suffering from many debilitating and serious mental health problems. She is genetically predisposed to mental health issues, made worse by the nearly constant infliction of trauma upon her, beginning from almost the time she was born.

92

She suffers from brain damage (temporal lobe dysfunction), bipolar disorder, complex PTSD, and methamphetamine addiction. Shortly after her incarceration in this case, in October 2000 Ms. Johnson attempted suicide. It was not her first attempt.

During her incarceration, Angela was regularly prescribed medications in an effort to manage the spectrum of her mental health issues. Her attorneys, and Dr. Logan, were aware of this effort. While Government and defense experts conducted competency screenings as part of their assessments in the run up to trial, none were aware the physicians at the Woodbury County Detention Center dramatically increased Ms. Johnson's medication at the beginning of the trial. Exhibit 26. The increase in Ms. Johnson's medication to 200 mg of Seroquel and 300 mg of Zoloft occurred on the second day of the merits phase of the trial. Thereafter, as opposed to being an active participant in the trial for her life, Ms. Johnson struggled to stay awake, ate candy,[1] and drew pictures. At this stage, overly and incorrectly medicated, Ms. Johnson was no longer a participant in her own trial. She was present, she was aware of the role of the respective parties, but she was not capable of assisting in her own defense.

In reference to the dramatic increase in Ms. Johnson's medication at the commencement of the trial, Dr. Woods made the following assessment:

> Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe, as noted in the Persinger article above. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft, identified by Astra Zeneca as having double the incidence of seizure activity than placebo, was the medication regimen Ms. Johnson was taking during the time leading up to her trial. These medications were increased precipitously 15 days into Ms. Johnson's trial. Zoloft, already at 200mg per day, more than 4 times the recommended dosage was increased to 300mg per day, 100mg above the 50mg-200mg dosage Goodman and Gilman's The Pharmacological Basis of Therapeutics, 11th edition describes as 'extreme dose.' ( Goodman and Gilman's, page 435, table 17-1)

---

[1] The candy contained caffeine.

Case 3:09-cv-03064-MWB-LTS   Document 20-2   Filed 01/08/10   Page 104 of 165

Ms. Johnson's mental state was impaired at the time of trial. She reported to medical staff at the jail that she was unable to tolerate the stress of the trial. Her family noted that her behavior changed noticeably after trial started. She appeared child like and in a daze, according to her daughter and sisters who also reported Ms. Johnson was "different" from the way she was before trial. She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide. She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." She felt "hopeless" and "was unable to do anything that mattered." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For instance, after I testified, she gave me a big smile and waved at me, like we were in school."

The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Ms. Johnson experienced each of these, consistent with both her circumstances and her faulty medication regimen.

As a result of this faulty and excessive medication, Ms. Johnson was no longer a participant in her own trial. Though physically present, she could not keep up with the proceedings or assist in the defense of her life. As a result, Dr. Woods finds:

Ms. Johnson was at the upper limit of her antidepressant medication, Zoloft, at the start of her trial. The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose. She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. She had also complained of headaches, another symptom of Zoloft intoxication. However, Ms. Johnson has experienced headaches her entire life.

Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg. Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction. Dr. Martell described Ms. Johnson's mood as "labile."

When her antidepressant was increased to 300mg daily 15 days into her trial, Ms. Johnson was no longer a part of the process. She was unable to focus, drawing most of the day. She waved to family members, and her affect was often inappropriate. Her serotonin toxicity, with Zoloft, her antidepressant at extreme levels impaired her ability to rationally assist with her attorneys.

94

The judgment of conviction and sentence of death was rendered in violation of Ms. Johnson's constitutional rights to: due process; a fair and reliable determination of guilt and penalty; to be physically and mentally present at trial; to present a defense; the effective assistance of counsel; the assistance of qualified mental health experts; and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Ms. Johnson was tried, convicted and sentenced to death when she was mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Medina*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Drope*, 420 U.S. at 172; *see also* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or punished. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The trial and sentencing of Ms. Johnson while she was mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate*, 383 U.S. at 386-87; *Dusky v. United States*, 362 U.S. 402 (1960).

The error deprived Ms. Johnson of a fair and reliable determination of guilt and penalty. *Pate*, 383 U.S. at 386.

### 1. Due to Counsel's Unreasonable Failure to Seek a Competency Hearing, Ms. Johnson Was Tried While Incompetent

Trial counsel were completely unaware of the increase in Ms. Johnson's medication during the trial, as were all of Ms. Johnson's psychiatric and psychological experts. As a result of their lack of awareness, in conjunction with their instruction to Angela to refrain from showing emotion, trial counsel sat idly by, unaware of Angela's condition, while Johnson sat idly by, unaware and unable to assist in the defense of her life

Trial counsel failed to investigate Ms. Johnson's mental health as it related to competency. Counsel unreasonably failed to consult with qualified mental health experts, despite the existence of readily available evidence of which counsel were or should have been aware, including but not limited to Ms. Johnson's history of psychiatric diagnoses and treatments, her family history of mental illness, and her anti-psychotic medications at trial.

The judgment of conviction and sentence of death was rendered in violation of Angela's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure to investigate Ms. Johnson's mental state and functioning before and during trial. Given what counsel did know about Angela's acute mental health problems, suicide attempts and her regular regimen of antispsychotic and other medications, trial counsel should have ensured that they closely

96

monitored changes in Angela and in her medication regimen, determined her lack of competency to stand trial, and sought a competency hearing.

As a corollary to a defendant's due process right not to be tried or sentenced while she is mentally incompetent, *see*, *e.g.*, *Medina*, 505 U.S. at 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. at 386; *Drope*, 420 U.S. at 176-77 ( noting "judges must depend to some extent on counsel to bring [competence] issues into focus." ). Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation. *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997). Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. *Id.*; *Bouchillon*, 907 F.2d at 595.

If counsel had conducted a professionally adequate investigation and closely monitored the medication given to Angela by prison doctors, they would have learned that, given the excess medication provided to her, she could not track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise her legal rights. Rather, she tried to stay awake, she ate candy, and she drew pictures.
Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Ms. Johnson's competency.

To establish the prejudice of counsel's failure to seek a timely competency hearing, Ms. Johnson must show only a reasonable probability that she was incompetent at the time of her

trial.  *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999).  Trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process."  *Williamson,* 110 F.3d, at 1519.  Therefore, Ms. Johnson should be granted a new trial.

> E.      Juror #55 Committed Misconduct When He Failed To Reveal that He Had Been Subject to Childhood Abuse and that His Son Was a Convicted ethamphetamine Dealer that Had Been Sentenced by this Court and Counsel was Ineffective for Failing to Ask Questions on Voir Dire to Reveal Bias, Failing to Investigate the Juror, and Failing to Move to Strike the Juror

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

### 1.      Background

### i.      The Jury Questionnaire

On his juror questionnaire, see Exhibit 23, Juror #55[1] was asked to list the people who live in his home (question #11).  He did so.  He was then asked to list the "age, gender and occupation and/or grade level for *any other of your children* or stepchildren" (question #12; emphasis added).  He wrote: "none."  This was false.  Juror #55 did have another child: CAM.  Apparently in an attempt to hide CAM from the Court and the parties, Juror #55 never revealed his name on the questionnaire.  Later, and in response to direct questions on the questionnaire, Juror #55 revealed that he had a son in prison because of drugs (question #43(a), 48), that he adopted his son's children because of the use of drugs (#43(b), 44), and that he visits his son in prison on occasion (#52).  At the end of the questionnaire, Juror #55 was asked whether he was

---

[1]  To protect the identity of the juror and his family member, Movant is listing the juror and his son by initials only.  The exhibits which identify the juror and his son will be filed under seal.

98

"familiar with" a number of people, including the lawyers, Your Honor, and the victims. Given

three boxes—"yes," "no," and "unsure"—Juror #55 checked "no." Ex. 23 at 16.

Juror #55 was also asked whether he (or anyone close to him) had "ever been mentally,

physically, or emotionally abused as an adult or child." He checked "No." Ex. 23 at 6 (question

#45). At the end of the questionnaire, Juror #55 "declare[d] under penalty of law that I have

answered truthfully and completely all questions in this questionnaire." *Id.* at 18.

### ii. Voir Dire

Defense counsel did no investigation of Juror #55 prior to voir dire. Counsel, for

example, did not do any criminal records search concerning his son's drug charge, conviction, or

criminal history. It would have been easy enough to find this information through a Pacer search

(as habeas counsel later did).

In voir dire, defense counsel first had the opportunity to question Juror #55 individually.

However, counsel did not ask any questions, not even one, concerning the nature of the juror's

son's drug charge, who sentenced his son, the impact of his son's drug use and imprisonment on

himself and his wife, his personal feelings about drugs and drug crimes, or whether these

devastating experiences would impact his ability to be fair and impartial in this drug related case.

VD 545-57. Defense counsel did not challenge Juror #55 for cause after the individual voir dire.

Voir Dire Tr. at 561.

In the group voir dire that followed, defense counsel posed only a few questions to Juror

#55, none of which touched upon Juror #55's personal experiences dealing with drugs and crime

and none of which even followed up on answers Juror #55 gave that signaled strongly that the

central role that methamphetamine and its trade played in the offenses with which Ms. Johnson

was charged would influence his attitude about the facts of this case. VD 741. ("Mr. Willett: So

99

Mr. 55, when I say the word methamphetamine to you, what do you think?  Prospective Juror 55: It's a nasty drug. . . . .  Mr. Willett: Can you give my client a fair trial because of that nasty drug in this case?  Prospective Juror 55: I don't see why not.").  Despite this open invitation to question Juror #55 further about why he thought methamphetamine is a "nasty drug" and to question him further about whether it was the drug that led to his own son's demise, the above-quoted two questions and a couple of stock questions about the presumption of innocence and the Fifth Amendment right against self-incrimination, VD 740, 746-47, constituted the sum total of defense counsel's questioning of Juror 55 in the group session.  Defense counsel did not ask a single question concerning Juror #55's questionnaire or ask for private voir dire of Juror #55 outside the presence of other potential jurors.

After Juror #55's panel left, Juror #55 contacted the Court through a court officer, and asked to appear again.  VD 766.  He then said:

> I have something that's never been brought up. I have a son that's 31 years old. He's sitting in prison right now in a federal penitentiary for drugs; okay? He had a little boy with his girlfriend. He is missing half his brain because he was a drug baby, and I -- drugs I hate. You gotta understand. That ain't saying I'm not – I understand what it goes through. I understand what the people go through for drugs and everything. But I just wanted that brought out so that if it's brought out later on and you're going to say, hey, how come this wasn't brought out?
>
> THE COURT: Sure. Anything else you want to tell us?
>
> PROSPECTIVE JUROR 55: No, that's it. I adopted my grandkids. He is my son now, but I wanted to make sure that was brought out so you guys didn't have nothing that --
>
> THE COURT: Thank you so much for bringing that up.

VD 766-67.  Defense counsel asked Juror #55 a few follow-up questions:

> MR. BERRIGAN: So tell me then, how does that affect your --

100

PROSPECTIVE JUROR 55: Well, it affected the little boy more than anything. We've – he's in special ed. His left side of his brain is mostly gone which is your thinking side, so we had to teach him how to use the right side of his brain. Actually what like the doctor said, we have to reconnect his wires. Okay. We've gone through where a normal kid would learn how to crawl. Well, I had to get on the floor and move his hands and his legs at two years of age to teach him to crawl, and after that he got up and walked. But this is just an example. I mean, you know, that's . . .

. . . .

MR. BERRIGAN: Is that what happened to your grandson as a result of drugs might bleed into this case in the way that you might look at the case. Is that a concern that you have?

PROSPECTIVE JUROR 55: A little bit. Because this is a murder trial, the drugs has an effect to the murder trial, of course, as you know. And I wanted -- the reason why I wanted to bring it up is that somebody could point, well, it's not going to be a fair trial because this wasn't brought up, his past, and it comes up later on that it was in my past.

. . . .

THE COURT: Could I jump in here? Let me just jump in for a minute. You can finish up. Juror 55, here's what I want to know. How, if at all, do you think this situation that you've just described to us might affect your ability as a juror in this case or might influence your ability?

PROSPECTIVE JUROR 55: Well, I hope none honestly. But if drugs were administered to the kids or something which I don't know, it might affect me then because I have kind of a hatred for that kind of thing.

THE COURT: Of course. Of course you would. Okay. Mr. Berrigan, I'm sorry. Any more questions? I didn't mean to chase you off, Mr. Berrigan.

MR. BERRIGAN: No, no, no, no. All we can ask you to do, sir, is to not certainly forget about your grandson's situation.

PROSPECTIVE JUROR 55: Right.

MR. BERRIGAN: But to try to separate that.

101

PROSPECTIVE JUROR 55: Right.

MR. BERRIGAN: As the judge has suggested, we really need somebody that can listen to the evidence here and not --

PROSPECTIVE JUROR 55: Right, I understand. I understand that.

MR. BERRIGAN: Okay. Can you promise us you'll do that?

PROSPECTIVE JUROR 55: I'll do the best I can.

VD 768-70. Juror #55 was then excused. Defense counsel did not challenge him for cause. VD 771. Counsel also did not use one of their available peremptory challenges to dismiss Juror #55. VD 773.

### iii. Trial

Juror #55 was a leader for the death penalty. He voted to convict and give the death penalty to Ms. Johnson, but he was also apparently the only juror who would have sentenced Ms. Johnson to death for the killing of Greg Nicholson. Exhibit 13 at p. 1. During the week off during the trial, Juror #55 visited his son in prison, and took it upon himself to "ask[] a guard about what the differences are between being on death row and doing a life sentence. He said how on death row you are alone, like in solitary confinement, and with a life sentence you are in the general population, like everyone else." *Id.* at 3.

In his post-trial interview, Juror #55 was asked "did any of you think life would have been the right punishment for the others?" Juror #55 confirmed that his personal experiences with the effects of drugs had influenced his vote in Angela's case. Specifically, he responded, *inter alia*: "I have a boy that is 10, he died in my arms twice in his life, due to his mother doing drugs – he is adopted – he was born addicted. I have lots of feelings about kids." Ex. 13 at 2.

In that interview, Juror #55 also revealed, for the first time, that he was subjected to serious physical abuse as a child—abuse he concealed on his juror questionnaire:

> Because [Ms. Johnson's] mother, there were things said by her that really pissed some of us off. All this about she [Ms. Johnson] was such a battered person. There were a couple of us that have been through a hell of a lot worse than she had. *She never was beaten so bad she couldn't sit down for a month.* A couple of us, we had it rough, and we didn't turn out to do drugs and kill people.

*Id.* at 3.

Finally, the entire jury knew about Juror #55's son's prison sentence, and probably knew the nature of the charges and the conviction. As Juror #504 revealed post-trial, "Everyone knew [Juror #55] had a son in prison, that he was going to visit him." Exhibit 12 at p. 2.

### iv.   Habeas Investigation

Defense counsel never did a records search concerning Juror #55's son, but habeas counsel did. With a simple Pacer search, we learned that (1) CAM's drug charges and conviction arose not just from any drug, but from methamphetamine, the drug at the heart of the Angela Johnson case. This was never revealed on the juror questionnaire or in voir dire and defense counsel never questioned him about what drug his son was convicted of using and selling. *See* Exhibit 24. (2) CAM was a methamphetamine *dealer*, just like Ms. Johnson was alleged to be. Most importantly, (3) the sentencing judge for Juror #55's son was the Court, another fact Juror #55 did not reveal on his questionnaire. On April 2, 2002, the Court sentenced the juror's son to forty months for conspiracy to distribute methamphetamine and sixty months for conspiracy to commit a violent crime, to be served consecutively. *Id.*, Docket #56-57. Juror #55's son was still in prison under the Court's sentence at the time Juror #55 convicted and sentenced Ms. Johnson to death, and in fact this was the son he visited during a break in Ms. Johnson's trial. Despite the fact that the juror questionnaire specifically asked whether venire members were familiar with, *inter alia*, the Court, Juror #55 checked the box marked "no."

### v.   Defense Counsel's Post-Trial Motion

103

Defense counsel brought a post-trial motion alleging juror misconduct, solely based on Juror #55's improper conversation with the prison guard about what "differences are between being on death row and doing a life sentence." Defense counsel did not allege any other misconduct or jury-related claim, and the motion was denied without a hearing.

**2.      The Conviction and Sentence Were a Product of Juror Misconduct in Violation of the Fifth, Sixth, and Eighth Amendments**

Juror #55 committed misconduct. Juror #55's first falsehood was his response to question #45 on the questionnaire: "Have you . . . ever been mentally, physically, or emotionally abused as an adult or child." He checked "No." This was an important question. At the sentencing phase, Ms. Johnson was planning to (and did) introduce evidence concerning her abuse as a child, an important mitigator. The jury's personal experiences with abuse, their feelings about whether such abuse can explain or mitigate criminal conduct—these were important areas of inquiry to determine whether the jury would be able to consider Ms. Johnson's troubled childhood as a mitigator in the penalty phase.

Though he concealed it in his questionnaire, Juror #55 was physically abused as a child, in his view much *worse* than Ms. Johnson:

> There were a couple of us that have been through a hell of a lot worse than she had. She never was beaten so bad she couldn't sit down for a month.

Exhibit 13 at p. 3. Juror #55 never revealed that he was beaten, much less "so bad" that he "couldn't sit down for a month." Instead, Juror #55 concealed the abuse.Question #45 also asked, if the juror or someone close to the juror had been abused, "please describe the person by relationship to you, explain the situation to the best of your ability, and the impact you felt the abuse had on the person as they grew up in their current life, and on their family." Again, Juror #55 did not answer the question. But he most certainly did have an answer, an answer he

deliberately hid from the Court and from the parties: "A couple of us, we had it rough, and we didn't turn out to do drugs and kill people." Exhibit 13 at p. 3. This is precisely what defendant was entitled to know *before* voir dire, not in a post-trial interview. This juror had very definite ideas about abuse and the "abuse excuse," based on his own personal experience. But he deprived Ms. Johnson from knowing about that experience, and he deprived counsel from questioning about it. He was not truthful, and as a result, he got on to this jury, and convicted and gave death to Angela Johnson. There is no question, had this juror given an honest answer on his questionnaire, had he said what he later admitted in his post-trial interview, that he would have been removed for cause.

Juror #55's second (known) falsehood was his attempt to hide his son CAM altogether on the questionnaire, through his false response to question #12, which asked him the "age, gender and occupation and/or grade level for *any* other of your children or stepchildren." CAM was Juror #55's son, but that name somehow never appears on the eighteen-page jury questionnaire. Juror #55's second act of misconduct occurred on his jury questionnaire when he was asked if he was familiar with this Court. He did not check "Yes." He did not even check "Unsure." He checked "No": not familiar with Judge Bennett.[1]

Then Juror #55 came to Court. He was questioned in voir dire in front of Your Honor, not once, not twice, but three times. He still did not come forward and say that he knew the

---

[1] We wish to emphasize in the strongest terms that we are not asserting any judicial misconduct claim here. It would have been extraordinary, notwithstanding (1) the nominate nature of this jury pool; (2) the fact that Juror #55 never revealed his son's name, either on the questionnaire or in voir dire; (3) the relatively common nature of Juror #55's last name; and (4) the sheer number of persons the Court sentences, if the Court had managed to divine that it had sentenced Juror #55's son. We also have no doubt that, had the Court recognized that it had sentenced Juror #55's son, the Court would have informed counsel and stricken Juror #55 immediately from the jury pool.

Court. He did not reveal it to the Court; he did not reveal it to the defense. Yet, at that very moment, his son was in prison as a result of the sentencing before the Court.

It borders on the incredible that Juror #55 did not recognize the Court's name, or Your Honor himself. His was not a long-lost son sentenced in a far-away place. This was a son, sentenced in Juror #55's own district, whose children Juror #55 adopted. This was also not a distant event. Juror #55's son was sentenced just three years before, and was *still in prison* at the time of the Johnson trial as a result of the Court's sentence. Juror #55 even visited his imprisoned son during the trial.

Had Juror #55 disclosed that the Court sentenced his own son, he would have been dismissed for cause, almost certainly on the Court's own motion (and in any event, on the defendant's motion). A juror whose son was sent to prison by the trial court cannot possibly be counted upon to follow the Court's directions, the Court's admonitions, or the Court's jury instructions. The Court may instruct the juror to presume the defendant innocent, but the juror has every motivation to flout each and every direction of the Court that broke apart his family. This is especially true given the impact Juror #55's son's sentencing for methamphetamine sale, the very enterprise at issue in this capital case, had on his own life. Juror #55's son had two young children, one of which, according to Juror #55, lost half of his brain due to his mother's drug use. As a result of the sentence, Juror #55 himself had to take those children in and adopt them. His son's conviction and sentence was a major event in his life, and Your Honor was at the center of this event.

In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548 (1984), the Supreme Court observed:

> One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence

> before it.' Voir dire examination [and jury questionnaires] serve[] to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*Id.* at 554. In a plurality opinion, Justice Rehnquist stated:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556. The majority of Justices, however, did *not* require that dishonesty by the juror be an element of the claim. *Id.* at 556-57 (Blackmun, J., concurring); *United States v. Tucker*, 137 F.3d 1016, 1026 & n.7 (8th Cir. 1998) (same).[1] In any event, as the facts here demonstrate, Juror #55 did act dishonestly.

Here, Juror #55 concealed substantial physical abuse to himself (question #45), in a case where the physical abuse of the defendant was a key mitigator. Had his abuse been revealed, and had the parties heard his extraordinary views about how childhood abuse cannot mitigate

---

[1] "We have counted the votes in *McDonough* and concluded: 'It would thus appear that a juror's dishonesty is not a predicate to obtaining a new trial. The focus is on bias.'" *United States v. Tucker*, 137 F.3d 1016, 1026 n.7 (8th Cir. 1998) (citing *Cannon v. Lockhart,* 850 F.2d 437, 440 (8th Cir.1988)). A later Eighth Circuit case, *United States v. Ruiz*, 446 F.3d 762, 770 (8th Cir. 2006), inexplicably mis-cited *Tucker* for the proposition that a defendant must prove dishonesty by the juror as one of the elements of the *McDonough* test. That is not what a *majority* of the Supreme Court held in *McDonough*, and it is not what *Tucker* held, *see* 137 F.3d at 1026 n.7. Dishonesty is *not* required to prove this claim. *Id.* In any event, though we need not prove it, *see id.*, as pled, *supra*, it is abundantly clear that Juror #55 was dishonest on his questionnaire and in voir dire.

criminal conduct, his inability to weigh Ms. Johnson's mitigators impartially would have been revealed, and he would have been stricken for cause.

Juror #55's concealment that this Court sentenced his son in a methamphetamine dealing case also meets the *McDonough* test. This was no inadvertent omission: the concealment took place in the questionnaire and throughout three rounds of voir dire. Had the true facts been known, Juror #55 would have been stricken for cause, most likely *sua sponte* by the Court. A juror whose son was sentenced for a drug crime by the Court could not possibly be impartial or be expected to follow the Court's instructions in any case, much less a drug case involving the very same drug, while that very son was still in prison as a result of the Court's sentence. *See McDonough*; *Tucker*; *United States v. St. Clair*, 855 F.2d 518, 522-23 (8th Cir. 1988) (defendant discovered after trial that a juror had not responded to a voir dire question about whether anyone had experience with explosives, although the juror had seven years' such experience; new trial granted); *United States. v. Lecco*, 2009 WL 1249287, at \*24-27 (S.D.W.Va. May 4, 2009) (juror concealed potential criminal investigation of himself; habeas petition granted). Indeed, the implied bias doctrine applies here, the doctrine that requires a new trial even without a hearing, because the facts "presented an intolerable risk, one that denied [defendant] h[er] constitutionally entitled impartial jury, and . . . no reasonable jurist could disagree with [this] legal conclusion." *Brooks v. Dretke,* 418 F.3d 430, 432 (5th Cir.2005) (juror who was subject to criminal exposure by the prosecution); *Remmer v. United States,* 350 U.S. 377, 381-82 (1956) (failed bribe attempt on a juror; retrial ordered).

If "even one" partial juror "is empaneled and the death sentence is imposed, the [government] is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729 (1992). Juror #55's own statements as well as his overt influence over his fellow jurors have made it

108

abundantly clear that he was not impartial, and that his presence on the jury sealed Ms. Johnson's death sentence.  As a result, Ms. Johnson is entitled to a new trial.

> **3.      Defense Counsel's Failure to Investigate, to Conduct an Effective Voir Dire, or to Dismiss Juror #55 From the Jury Pool Deprived Ms. Johnson of the Effective Assistance of Counsel Guaranteed Under the Sixth Amendment**

Even with the information they did have, defense counsel's failure to dismiss Juror #55 from the jury pool is startling.  From the questionnaire, to Juror #55's impromptu request to speak with the Court, it was absolutely clear that this juror was not qualified to serve in this case.

The questionnaire alone raised many red flags.  Juror #55 tried to hide CAM (questions #11-12).  Why?  Juror #55 never revealed CAM's name in the entire questionnaire.  Again, why?  Juror #55 stated that he had a son in prison because of drugs (#43(a), 48), and that he was forced to adopt his son's children because of the use of drugs (#43(b), 44).  Juror #55's own family was broken apart as a result of drug crimes, and he was forced to take the dramatic move of taking care of and adopting his own grandchildren.  Juror #55 was a victim of drug use, a big red flag in a case involving victims of drug use.

There were also reasons to believe that he might be more sympathetic to law enforcement and the prosecution.  Juror #55 was a veteran of the United States Navy, the United States Air Force, and a former member of the Woodbury County Sheriff Posse who assisted in police investigations, including at least one murder investigation (#17, 50, 57).

This was just the beginning.  Though defense counsel did nothing, *nothing*, to probe even a single aspect of Juror #55's questionnaire, Juror #55 brought himself to the Court's attention, because he knew he could not be fair in this case.  Juror #55 told the Court about his grandson, "missing half his brain because he was a drug baby, and I -- drugs I hate. You gotta understand. That ain't saying I'm not – I understand what it goes through. I understand what the people go

109

through for drugs and everything." Voir Dire Tr. 766. Mr. Berrigan asked whether Juror #55's

personal experiences would affect his ability to be fair, and he said *yes*, it would affect his ability

to be fair in the Johnson case:

> MR. BERRIGAN: Is that what happened to your grandson as a result of drugs might bleed into this case in the way that you might look at the case. Is that a concern that you have?
>
> PROSPECTIVE JUROR 55: A little bit." Voir Dire Tr. 769. Even when the Court asked further questions, Juror #55's responses were hardly reassuring:
>
> THE COURT: How, if at all, do you think this situation that you've just described to us might affect your ability as a juror in this case or might influence your ability?
>
> PROSPECTIVE JUROR 55: Well, I *hope* none honestly. But if drugs were administered to the kids or something which I don't know, it might affect me then because I have kind of a hatred for that kind of thing." Voir Dire. Tr. 769-70 (emphasis added).

Given what defense counsel knew, it is inexplicable that they did not challenge for cause.

The juror outright admitted his concern that his personal experiences would bleed into the case.

Even absent that admission, his personal situation and his own experience with drugs and drug

crimes cried out for a cause challenge. And even if the cause challenge were not granted,

counsel plainly should have used a peremptory challenge.

As ineffective as counsel's performance was for failing to dismiss a juror based on the

information they *knew*, their failure even to investigate was much worse. Had counsel done the

most cursory investigation, they would have learned that Your Honor sentenced Juror #55's son,

itself an unquestionable reason and basis for a for cause dismissal. Counsel would have learned

that Juror #55's son was still in prison during the Johnson trial, as a result of Your Honor's

sentence. Counsel would have learned that methamphetamine, the drug at the heart of the

110

Johnson case, was the drug that destroyed Juror #55's family. But counsel did not learn any of these things, because counsel did not investigate. As a result of this failure, counsel deprived themselves of knowledge that made even clearer that Juror #55 was plainly not competent to serve on this jury.

This was ineffective assistance, and it caused enormous prejudice. First, counsel allowed on to the jury a juror who (because of personal experiences) (1) could not be fair, and (2) could not be trusted to follow the Court's instructions. This alone requires a new trial. Second, this Juror tainted the entire jury; he was a leader for death, the only person who would have given death for the Nicholson murder. Third, the opinion of this juror no doubt carried special weight in this case, given not only his law enforcement background, but his personal experiences with drugs and drug crimes. "Everyone knew [Juror #55] had a son in prison," Ex. 12 at p. 2; no doubt everyone also knew that his son was a convicted drug dealer. Given his personal experiences, Juror #55's opinions would carry special moral weight in the jury room. Finally, Juror #55 was the juror who (while visiting his son) improperly spoke with a prison guard about prison conditions on death row and for inmates with a life sentence.

Defense counsel made a series of terrible errors here: failing to investigate, to question, to understand or appreciate any number of red flags, or to strike this partial juror from the pool. This was ineffective assistance and it deprived Ms. Johnson of a fair trial.

> F. Combined Constitutional Errors Rendered Ms. Johnson's Conviction and Sentence Constitutionally Infirm

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

111

All of the constitutional infirmities in Angela's trial combine to equal a trial about which there can be no confidence that there was a constitutional outcome.

The proposition that errors that on their own do not prejudice a defendant, but may do so when aggregated is not a cognizable claim within the Eighth Judicial Circuit. *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996). This position, however, is not unanimous amongst the various Courts of Appeal. *See Wilson v. Simmons*, 536 F.3d 1064, 1122 (10th Cir. 2008) (holding that under the heightened degree of reliability required in capital cases, cumulative error exists where two or more otherwise harmless errors are aggregated, the result is prejudice that would warrant the same relief as on non-harmless error) (citations omitted); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (holding that otherwise harmless errors can result in prejudice when their cumulative effect results in a substantial and injurious effect or influence in determining the jury's verdict); *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004) (holding that a reviewing court must examine a trial as a whole and determine whether a habeas petitioner received a fair trial) (citations omitted).

In Ms. Johnson's case, even if this Court does not believe that any of the Constitutional claims raised merit relief, taken as a whole, the cumulative affect of the errors alleged by Movant – a *Napue* violation, the various *Brady* violations, that Ms. Johnson was tried while incompetent to stand trial, and juror misconduct – call into question whether Ms. Johnson received a fair trial.

G.     <u>The Eighth Amendment Requires A Heightened Standard of Proof for Imposition of the Death Penalty</u>

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

112

The execution of a person who is actually innocent, while not an actual constitutional violation, according to the Supreme Court, would certainly stretch the definitions of civilized Government to the breaking point. Our system requires that the Government prove guilt beyond a reasonable doubt in order to convict a person of a crime. This proof can be made entirely, however, on the basis of fallible human perception, testimony affected in its veracity by various human motivations, scientific hypotheses, and circumstance. The risk that these forms of evidence will cumulate to "proof beyond a reasonable doubt" but not "truth" is small but extant. See Gran, David, "Trial By Fire: Did Texas Execute an Innocent Man," New Yorker, September 7, 2009. At least one state has recognized the unacceptable possibility that an innocent person could be executed in our current system by requiring that a defendant be linked to a crime by DNA or other forensic evidence, by actually committing the crime on videotape, or by a videotaped confession. (*See* Md. Code Ann., Crim. Law § 2-202 (2003). [1]

In Ms. Johnson's case, the evidence is supplied exclusively by the testimony of fallible humans and circumstantial evidence. As a result, the quantum of what we do not know for sure about what happened on the nights of July 25 and November 5, 1993. This uncertainty is far too great for the constitution of a civilized nation to tolerate her execution. The risk of mistake is simply too high in a case like this.

H.    The Eighth Amendment Precludes the Execution of the Mentally Ill:  Ms. Johnson Suffers From Severe Mental Illness; the Eighth Amendment Precludes the Death Penalty in this Case

Execution of the mentally retarded is prohibited by the Eighth Amendment and the Federal Death Penalty Act. *See Atkins v. Virginia*, 563 U.S. 304, 321 (2002). Execution of

---

[1] Changes have been made to the Maryland death penalty statute as recently as May, 2009. As such, the most recent changes can easily be accessed at http://mlis.state.md.us/2009rs/bills/sb/sb0279t.pdf.

persons with certain severe mental illness is also prohibited by the Eighth Amendment. Ms. Johnson has a long history of mental illness and diagnosed brain impairments, the effects of which have been apparent her entire life. Under the rationale of *Atkins*, the Eighth Amendment prevents the State from executing Ms. Johnson as a result of her mental illness. *See*, *e.g.*, *id.*; *People v. Danks,* 82 P.3d 1249, 1285 (Cal. 2004) ("If defendant's doctors are right, defendant's mental deficiencies are comparable in severity to mental retardation."); *State v. Nelson*, 803 A.2d 1, 41 (N.J. 2002) (the "lesser culpability" rationale for prohibiting imposition on the mentally retarded defendant is equally applicable to the seriously mentally ill defendant) (Zazzali, J., concurring); *Corocan v. State*, 774 N.E.2d 495, 502 (Ind. 2002) ("I respectfully dissent because I do not believe a sentence of death is appropriate for a person suffering a severe mental illness. . . . [T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency.").

### 1. Temporal Lobe Dysfunction

As Dr. Woods explains, temporal lobe dysfunction is "a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones" that "appears to run in the maternal side of Ms. Johnson's family." *Id.* at 12. Ms. Johnson's temporal lobe dysfunction manifests in a variety of ways:

> Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister. She was placed in special education throughout her school years. She could not learn how to make change, and although she worked as a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks. Many of these academic functions require intact temporal lobes.

Ms. Johnson's IQ testing, administered prior to her trial, also reflect left hemisphere vulnerability, in the face of overall adequate intellectual functioning. Ms. Johnson's Verbal IQ, more sensitive to left temporal functioning, was 18 points lower than her performance IQ, which is more sensitive to right hemisphere functioning. There are specific motor tasks that, due to right hand dominance, will also be focused in the left temporal lobe. For example, Ms. Johnson and her sister appear to have a tremor of the right leg, consistent with left motor strip involvement.

Ms. Johnson's intellectual testing captured her extremely limited fund of knowledge. She did not know how many weeks there were in a year, guessing 48. Vocabulary, Similarities, Mathematics, and Information were her lowest subtests on her intelligence testing.

*Id.* at 14-15.

### 2. Complex PTSD

Ms. Johnson was also "born into a cognitively impaired family, a family in which the abnormalities of their brains manifested in paranoid, delusional, and, in the long run, violent behavior." *See id.* at 9. Her "early life was fertile ground for the development of complex trauma. Complex trauma must be differentiated between simple trauma as described in the Diagnostic and Statistical Manual-IVTR (DSM-IVTR). The DSM-IVTR describes Type I trauma, typically a single incident or event. Complex trauma is caused by ongoing, chronic, often pervasive stressors." *Id.*

Instead of protecting her, the adults in Angela Johnson's life terrorized her throughout her childhood. "The role of parents in the modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her." *Id.* Specifically,

115

> Ms. Johnson underwent a ritualized terror in her childhood that even her mother, one of the perpetrators, cannot speak of. Under the neurologically-derived hyper religiosity of her mother and grandmother, Mr. Johnson was consistently abused and, ironically, Ms. Johnson was often "exorcised," as her personal terror was described, due to the very neurological abnormalities that created her mother's and grandmother's religious terrorism.
>
> Ms. Johnson, who was a small and slender child, was regularly "exorcised," which typically consisted of being held down against her will by several grownups, being hit, shaken, thrown and beaten, in the hopes of curing the "deaf and dumb demon." Her inability to respond, the behavior that was translated into the "deaf dumb demon," was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements, when the seizure is more obvious. Ms. Johnson's deaf and dumb demon, a visible sign of the inherited aberrant electrical activity in Ms. Johnson's brain, was the catalyst for her mother, herself suffering from the same inherited aberrant electrical activity, to repeatedly abuse Angela Johnson.

*Id.* at 10-11.

The complex trauma suffered by Ms. Johnson profoundly impacted her daily life and functioning; "[c]omplex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than Type I trauma described in DSMIV-TR. The irrational behaviors that often result from complex trauma shape neurological, academic, social, emotional, and contextual landscapes with well-documented symptoms." *Id.* at 11.

Ms. Johnson's brain impairment and other neuropsychological deficits are severe and have been apparent throughout her life. Her mental illness combined with her neuropsychological and brain impairments constitute subaverage intellectual functioning. *See Danks,* 82 P.3d at 1285 ("If defendant's doctors are right, defendant's mental deficiencies are comparable in severity to mental retardation."). Further,

> In *Atkins v. Virginia*, the United States Supreme Court held that to execute the mentally retarded is cruel and unusual punishment, reasoning that retarded persons 'have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engaged in logical reasoning, to control impulses, and to understand the reactions of others.' .

116

> . . The same mental capacities are impaired in a person suffering from paranoid schizophrenia, and the impairment may be equally grave.

*Danks,* 82 P.3d at 1285 (citing *Atkins*, 563 U.S. at 318) (Kennard, J., concurring in part and dissenting in part). *See also Nelson*, 803 A.2d at 41 (N.J. 2002) (stating that the "lesser culpability" rationale for prohibiting imposition on the mentally retarded defendant is equally applicable to the seriously mentally ill defendant, "I agree with defendant that her execution for crimes that are inextricably bound to her mental illness violates our State Constitution. The State's legitimate penological interests that purportedly are served by the death penalty are unconstitutionally diminished if the State executes such a mentally ill and psychologically disturbed person. In defendant's case, it is constitutionally inadequate for a jury to consider her severe mental illness as merely a mitigating factor to be weighed among other aggravating and mitigating factors.") (Zazzali, J., concurring); *Corocan v. State*, 774 N.E.2d 495, 502 (Ind. 2002) ("I respectfully dissent because I do not believe a sentence of death is appropriate for a person suffering a severe mental illness. . . . [T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency.").

Although *Atkins* did not explicitly address a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins*' bar on the death penalty for the mentally retarded was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Ms. Johnson, share the characteristics that make the execution of mentally retarded inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to

117

engage in meaningful cost-benefit analysis.  ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment.  That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise."  *Atkins*, 536 U.S. at 312, 316 n.21.

All of the above reflects Ms. Johnson's severe mental illness.  Her "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engaged in logical reasoning, to control impulses, and to understand the reactions of others," *Atkins*, 563 U.S. at 318, compels the same result: the Eighth Amendment prohibits her execution.

I.      The Manner in Which the Government Would Carry Out Movant's Execution
        Would Violate the Eighth Amendment

All facts, allegations and arguments elsewhere in this Motion and attachments are incorporated into this claim by specific reference.

The manner of carrying out Ms. Johnson's execution would violate the Eighth Amendment to the United States Constitution.  This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, all of which would result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

Ms. Johnson's execution under the current Bureau of Prison protocols would violate the Eighth Amendment, this challenge is not appropriate at this time, in this pleading, for two reasons.  First, since Movant's execution is far from imminent, the question is not yet ripe. Second, a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573 (2006) (holding that challenge to lethal injection as cruel and unusual punishment in violation of the Eighth Amendment was cognizable under 42 U.S.C. § 1983, and was not barred as a second or successive habeas petition).

Ms. Johnson will be prepared to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate.  However, litigation of this claim at this time  would appear to be an inefficient use of resources, inasmuch as Ms. Johnson believes she is entitled to relief and will not be executed.  Ms. Johnson nonetheless raises this claim to avoid a later claim of waiver, and will amend it should the Court believe it should be litigated now.

J.      The Death Penalty Violates the Eighth Amendment

The death penalty is cruel and unusual punishment in all cases. Although counsel appreciates that this is not an accurate statement of current jurisprudence, evolving standards of decency, which will continue to evolve during the pendency of this case, preclude any execution by the government, including the execution of Ms. Johnson.  Ms. Johnson preserves this claim as part of her Petition.

IV.    PRAYER FOR RELIEF

WHEREFORE, Movant Angela Jane Johnson respectfully requests that this Court provide the following relief:

1.      That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

119

2.  Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.  Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.  Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

5.  Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to her or her counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.  Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle her to relief, she is also entitled to a full evidentiary hearing to establish the facts she alleges;

7.  Permit oral argument as appropriate and required;

8.  Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

120

9.     Grant such further and additional relief as may be just.

DATED:   October 5, 2009

Respectfully submitted,

/s_____
Michael E. Lawlor
Lawlor and Englert, LLC
6305 Ivy Lane
Suite 608
Greenbelt, MD
301.474.3404
301.474.3406 (fax)
mlawlor@verizon.net

/s_____
Marta K. Kahn
The Law Office of Marta K. Kahn, LLC
PO Box 65071
Baltimore, MD 21209
410.299.6966
410.927.7216 (fax)
mkkahn@yahoo.com

/s_____
Ilann Maazel
Kennisha Austin
Emery, Celli Brinkerhoff &
        Abady, LLP
75 Rockefeller Plaza
20th Floor
New York, NY 10019
212.763.5000
212.763.5001 (fax)
imaazel@ecbalaw.com
kaustin@ecbalaw.com

Copy to:     C.J. Williams, Asst. U.S. Attorney

121

401 First Street, SE
Suite 400
Cedar Rapids, IA52401
Phone: (319) 363-0091
Fax: (319) 363-1990

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on October 5, 2009.

By: CM/ECF, email and regular mail to C.J. Williams, Esquire


/s_____
Michael Lawlor

## <u>VERIFICATION UNDER PENALTY OF PERJURY</u>

I am authorized by Angela Jane Johnson to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.

I declare that the contents of the foregoing motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence are made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I declare, under penalty of perjury, that the foregoing is true and correct.

/s_____
Michael E. Lawlor
Counsel for Angela Johnson

123

# APPENDIX A

## ISSUES RAISED ON DIRECT APPEAL

1.  Counts One Through Ten of the Indictment Are Fatally Defective in That They Fail to Allege the Essential Element of a "Substantive Connection" Between the Drug Conspiracy or CCE and the Killings

2.  The Indictment as Amended During Jury Selection to Allege Only That Johnson Aided and Abetted the Intentional Killings Failed to Charge an Offense Cognizable under Title 21, United States Code, Section 848 (E)

3.  The Trial Court Erred in Failing to Strike Legally Insufficient Allegations from Counts 6 Through 10 and Further Erred in Submitting These Allegations to the Jury

4.  The Trial Court Erred in Failing to Strike the Death Penalty after the Government Amended the Indictment During Jury Selection to Allege Only That Johnson Aided and Abetted the Killings

5.  The Trial Court Erred by Not Granting Johnson a Change of Venue Due to Overwhelming and Prejudicial Pretrial Publicity, Thereby Denying Johnson Her Right to a Fair and Impartial Trial under the Sixth and Fourteenth Amendments

6.  The Trial Court Erred by Failing to Grant Johnson Additional Peremptory Challenges in Order to Cure the Effects of Pretrial Publicity, Thereby Denying Johnson Her Right to a Fair and Impartial Jury

7.  Rule 24(b) Violates Equal Protection, in That It Provides the Parties in a Capital Case with Equal Numbers of Peremptory Challenges, but Provides Defendants in Non-capital Cases with More Challenges than the Prosecution

8.  The Trial Court Erred by Failing to Strike for Cause Jurors 52, 64, 228, 301, 379, 403, 495, 528, 548, 576, 600, 617, and 788 Thereby Depriving Johnson of Her Right to an Impartial Jury

9.  The Trial Court Erroneously Struck for Cause Jurors 458, and 769, Thereby Denying Johnson Her Right to a Fair Trial Before an Impartial Jury Comprised of a Fair Cross-section of the Community in Violation of the Sixth, Eighth, and Fifth Amendments

10. The Trial Court Erred in Allowing the Prosecution to Argue That a Juror May Give Mitigating Factors "No Weight" in That Such Instruction Allows Jurors to Preclude Entirely from Consideration Established Mitigating Factors, in Direct Contravention to Supreme Court Mandate, the Eighth Amendment and the Fifth Amendment of the United States Constitution

11. The Evidence, When Viewed in the Light Most Favorable to the "Guilt Phase" Verdicts, Was Not Sufficient to Establish the Elements of the Offenses Charged Beyond a Reasonable Doubt as Required by Due Process

12. The Trial Court Erred by Allowing into Evidence Honken's Guilty Plea, His 1997 Conviction, and Details of the Offense, and by Allowing the Government to Argue under Res Judicata That Such Evidence Established Essential Elements of the Offenses Charged Against Johnson in Violation of Her Due Process Rights, Including Her Right to Confront and Cross-examine Witnesses

13. The Trial Court Erred in Allowing into Evidence Without a Limiting Instruction Alleged Criminal Activity and Other Bad Acts of Johnson and Other Persons Occurring after the Date of the Killings

14. The Trial Court Erred in Receiving Various Hearsay Statements in Violation of the Confrontation Clause

15. The Trial Court Erred in Failing to Exclude All Evidence Suggesting That Johnson Was the Principal Because it Allowed the Government to Present Factually Inconsistent Theories Relating to the Same Crime

16. Admission of Statements Attributed to Johnson by Robert McNeese and the Fruits Thereof Violated Johnson's Fifth and Sixth Amendment Rights to Counsel

17. The Prosecution Violated Johnson's Fifth Amendment Privilege Against Self Incrimination During Closing Argument When it Argued That Johnson Had Made No "Claim of Innocence" to Various People Who Spoke to Her Following Her Arrest and Incarceration

18. The Jury Instructions Were Erroneous Both Because the Court Did Not Adequately Instruct the Jury That the Underlying Drug Offenses Had to Be Actively Continuing at the Time of the Killings and the Instructions on the CCE Murder Failed to Protect Johnson's Right to a Unanimous Verdict with Respect to the Underlying Drug Offenses

19. The Evidence, When Viewed in the Light Most Favorable to the "Eligibility Phase" Verdicts Was Not Sufficient to Establish the Aggravating Factor, "Heinous or Depraved Killing"

20. The Evidence Was Not Sufficient to Establish the Aggravators Found by the Jury Beyond a Reasonable Doubt

21. The Trial Court Erred in Admitting the Testimony of Mr. Vest as to Alleged Jailhouse Statements of Dustin Honken Because Such Testimony Violated the Confrontation Clause, Was Not Constitutionally Reliable and its Probative Value Was Substantially Outweighed by Unfair Prejudice

125

22. The Court Erred in Allowing into Evidence a Reading of the Memorial Poem of Brittany Asbe During the Penalty Phase of Johnson's Trial in That Such Evidence Had No Probative Value and Was Offered for its Emotional and Prejudicial Impact, Denying Johnson Her Fifth and Eighth Amendment Due Process Rights to a Fair Sentencing Hearing

23. The Trial Court's Conduct in Interrupting and Chastising Sua Sponte and in the Presence of the Jury Defense Experts, Dr. Logan and Dr. Hutchinson, Denied Johnson Her Due Process Right to a Fair and Impartial Penalty Proceeding

24. The Trial Court Erred in Denying Johnson's Motion Filed on June 3, 2005 to Allocute Before the Trial Jury

25. The Verdict Forms Which Were Plainly Erroneous and in Conflict with the Narrative Instructions, Denied Johnson Due Process and Her Statutory Rights

26. The Prosecutor Made Improper Statements During Penalty-phase Closing Argument That Denigrated Mitigating Factors and Thereby Deprived Johnson of Her Right to Due Process under the Fifth Amendment

27. Counts 1 Through 5 and 6 Through 10 of the Indictment Were Multiplicitous and Cumulatively Punishing Johnson for the Same Murders Violated the Double Jeopardy Clause of the United States Constitution

28. Johnson Is Entitled to an Evidentiary Hearing after One Juror Engaged in Prejudicial Misconduct When He Sought and Received Information During the Week Preceding Penalty Phase Arguments Concerning Prison Conditions for an Inmate Serving a Sentence of Life Without Parole and One on Death Row and Told Jurors They Were Not the Final Decisionmakers

126

# APPENDIX B

## INDEX TO EXHIBITS

Exhibit 1:      Expert Report of George Woods, M.D.

Exhibit 2:      Declaration. Of Melissa Freisenborg

Exhibit 3:      Declaration of Alan Johnson

Exhibit 4:      Declaration of Scott Gahn

Exhibit 5:      Government's Proffer, *United States v. Dustin Honken*, October 19, 2004

Exhibit 6:      Letter Dated October 10, 2001 from Patrick Reinert to Alfred Willett

Exhibit 7:      Letter Dated March 10, 2003 from Angela Johnson to Patrick Berrigan

Exhibit 8:      Letter Dated August 12, 2004 from Richard Murphy to Alfred Willett

Exhibit 9:      Angela Johnson Proffer (Under Seal)

Exhibit 10:     Letter November 22, 2000 from Patrick Berrigan to Dr. William Logan

Exhibit 11:     Post Trial Interview Juror #797 (Under Seal)

Exhibit 12:     Post Trial Interview Juror #504 (Under Seal)

Exhibit 13:     Post Trial Interview Juror #55 (Under Seal)

Exhibit 14:     Post Trial Interview Juror #600 (Under Seal)

Exhibit 15:     Post Trial Interview Juror #513 (Under Seal)

Exhibit 16:     Grand Jury Testimony of  Frederick Tokars (Under Seal)

Exhibit 17:     Grand Jury Testimony of Steve Ferguson (Under Seal)

Exhibit 18:     Grand Jury Testimony of William Lebaron (Under Seal)

Exhibit 19:     Grand Jury Testimony of Mike Llorente (Under Seal)

Exhibit 20:     Grand Jury Testimony of John Fitzgerald Swanson (Under Seal)
Exhibit 21:     Questionnaire of Juror #513 (Under Seal)

Exhibit 22:  Questionnaire of Juror #600 (Under Seal)

Exhibit 23:  Questionnaire of Juror # 55 (Under Seal)

Exhibit 24:  Docket Entries, *United States v. CAM* (Under Seal)

Exhibit 25:  Police Interview of Phyllis Prosovic

Exhibit 26:  Woodbury County Jail Records

Exhibit 27:  Declaration of Pearl Jean Johnson

Exhibit 28:  Declaration of Wendy Jacobson

Exhibit 29:  Declaration of Holly Dirksen

Exhibit 30:  Declaration of Alyssa Johnson

**I.     INTRODUCTION**

Angela Johnson has a life-long seizure disorder, neurological and cognitive impairments, and major psychiatric illness that affect every aspect of her life, from her development as a child to her behavior as an adult, including her behavior at the time of the offense.[1]  Her mother and grandmother, both of whom were also mentally ill, interpreted Angela's disabilities as signs of demonic possession that God demanded they drive out of Angela's mind and body through cruel, life-threatening, and painful rituals.  These rituals constituted torture and exacerbated Angela's disabilities, creating lifelong complications that explain much of Angela's behavior.

Angela's impairments have genetic, neurological, and traumatic etiologies and overlap in manifestations.  Their combined impact caused Angela to be exquisitely gullible and to rely on others to help her make sense out of her world and to achieve her goals.  She had frequent petit mal seizures that may have been congenital and present since birth but certainly prominent by early childhood.  During her seizures, she moved in and out of altered states of consciousness, uncertain about what happened to her or around her during the seizures.  Her cognitive impairments interfered with her capacity to learn, keep pace with peers academically, and problem solve.  Her neurological and psychiatric disorders, stemming from trauma, created loss of contact with reality, inexplicable mood shifts, overwhelmingly intense emotions, and irrational, illogical thoughts and beliefs.

Over the course of her life, and specifically at the time of the offense, these impairments compromised Angela's ability to think and act independently, to develop and execute realistic plans to solve problems, to rely on her insight and judgment to anticipate and develop strategies to

---

[1] Exhibit 1, Expert Report of George W. Woods, Jr., M.D., dated October 5, 2009, at 9, 21-22.

129

negotiate daily life successfully, to control the intensity of her emotions, and to recognize, understand and predict the long-term consequences of her actions.

Although Angela did not know or understand the causes and effects of her disabilities, she knew early in life that she was different from others, and she learned to depend on and follow those she believed smarter and more capable than she to negotiate her life.

## II.     MATRILINEAL ETIOLOGY OF ANGELA'S BRAIN IMPAIRMENTS

Angela's disabilities have a strong genetic etiology and were likely inherited matrilineally. Her mother and maternal grandmother experienced auditory and visual hallucinations, had bizarre and irrational religious beliefs, and demonstrated severe lability, impulsiveness, and aggression.[1] All of these conditions are associated with dysfunction in the temporal lobe region of the brain.[2] Her mother also had episodes of falling to the ground and "shaking and trembling[.]"[3] As Dr. Woods noted during his examination of Angela, "Ms. Johnson shook her right leg, consistent with a tremor. The right leg is, of course, controlled by the left motor strip, imbedded in the left hemisphere of her brain."[4] One of Angela's sisters also suffers constant right leg shaking.[5] Another sister, Jamie, suffers a nervous jerking of her head to the right all of the time.

Brain impairment, like other genetic traits such as skin complexion, bone structure, and eye color, can be genetic.[6] In Angela's family, it appears that behaviors commonly associated with temporal lobe dysfunction have been passed matrilineally from generation to generation. Angela's mother, along with Angela and Angela's first daughter – who like her mother attempted suicide by

---

[1] Exhibit 27, Declaration of Pearl Jean Johnson, dated September 27, 2009, at 1-2.
[2] Exhibit 1, Expert Report of George W. Woods, Jr., M.D., at 9, 12-14.
[3] Exhibit 27, Declaration of Pearl Jean Johnson, at 2.
[4] Exhibit 1, Expert Report of George W. Woods, Jr., M.D., at 16.
[5] Exhibit 28, Declaration of Wendy Jacobson, dated September 27, 2009, at 6.
[6] Exhibit 1, Expert Report of George W. Woods, Jr., M.D., at 9, 12, 14.

130

ingesting aspirin – have significant histories of depression and suicide attempts.[1] Angela's

grandmother's psychosis, manifested as hyper religiosity and a bizarre belief system, was wholly

shared by Angela's mother and used as the basis for extreme abuse of Angela and her siblings.[2] As

Dr. Woods found:

> Jean Johnson, Ms. Johnson's mother, continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity. She has a life long history of behaviors recognized as temporal lobe based: heightened emotionality, guilt, obsessionalism, circumstantiality, sense of personal destiny, hypergraphia, dependence, paranoia, and humorlessness. Angela's mother's mother was also a woman with apparent religious delusions, auditory hallucinations, intense emotionality, and dependence. . . . [A] labile, heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances are neurocognitive traits Ms. Johnson shares with her mother.[3]

Angela's matrilineal family's temporal lobe dysfunction is "a well-documented source of

psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones,

---

[1] Exhibit 27, Declaration of Pearl Jean Johnson, at 1-2 ("I have terrible depression, depression so bad it paralyzes me at times. It feels like if I start crying, I won't ever be able to stop crying. My girls also suffered through depression, but it fell really hard on Angela, Wendy, and Jamie. . . . I have unusual experiences in my body and mind especially when I am under stress. Anything can put stress on me and make me want to walk into the road and get hit by a car."); Exhibit 28, Declaration of Wendy Jacobson, at 6 ("Angie was always very emotional. Her moods switched from high to low, happy to depressed, and okay to terrible in a minute. Sometimes she cries and laughs at the same time, but both are intense. . . . When she got depressed, she cried and cried and felt like things would never be better."); Exhibit 29, Declaration of Holly Dirksen, dated September 27, 2009, at 6 ("Angela attempted suicide once as a kid; she took a whole bottle of Excedrin[.]"); Exhibit 30, Declaration of Alyssa Johnson, dated September 26, 2009, at 2 ("My mother had terrible episodes of depression in between her times of activity. When she was depressed, she could barely move or do anything.")

[2] Exhibit 28, Declaration of Wendy Jacobson, at 2-4 ("Mother and my grandmother made up their own weird religion that they brainwashed us children with[.] . . . Mother and . . . our grandmother were always on the lookout for signs of the devil or demons and they watched every little thing we did to see if we had the devil in us. . . . [Pearl Jean] and my grandparents did terrible things to Angela to get rid of the Deaf and Dumb Demons.")

[3] Exhibit 1, Expert Report of George W. Woods, Jr., M.D., at 14.

131

appear[ing] to run in the maternal side of Ms. Johnson's family."[1] Indicators of Angela's temporal lobe dysfunction manifested early in her life:

> Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister. She was placed in special education throughout her school years. She could not learn how to make change, and although she worked as a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks. Many of these academic functions require intact temporal lobes.[2]

Other visible signs of Angela's temporal lobe dysfunction included her seizure disorder, "[h]er inability to respond, the behavior that was translated into the 'deaf dumb demon,' was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements," and her "remarkable history of migraine disease, which is a soft sign of neurological dysfunction." [3]

Although the paternal side of Angela's family could have been a more positive influence on the quality of her life and protected her, she was isolated from them by her mother and grandmother's deliberate efforts to prevent outside support and scrutiny.

## III.    ANGELA'S FAMILY OF ORIGIN

Angela was born to two horribly damaged parents both of whom were ill-equipped to recognize and provide for a child with developmental disabilities. Neither parent graduated high school and both came from turbulent and chaotic home environments.

Like Angela, Pearl Jean, her mother, grew up in a home marked by strife, extreme physical battering, sexual abuse, and the struggle of being reared by a severely mentally ill mother. Pearl

---

[1] *Id.* at 12.
[2] *Id.* at 14.
[3] *Id.* at 10, 14.

Jean's father, Albert Gomez, was a violent alcoholic who enjoyed debasing his children.[1] He beat his wife, Florence – Angela's maternal grandmother – and their children. Pearl Jean, the oldest, was born in 1939, soon followed by her brother Skip; both children were exposed to terrible hardships at the hands of their parents.[2] After World War II began, Albert joined the U.S. Army. He returned home at the end of the war to announce that he was divorcing Florence, abandoning his children, and marrying another woman. Florence was unable to live independently, had terrible bouts of depression, and treated her children and grandchildren cruelly.[3]

Florence was unable to care for both her children, sending Skip to live with a series of relatives and sending Pearl Jean to live with Florence's mother. Florence married a second time, to a man who sexually abused Pearl Jean and Skip, physically abused Skip, and kept both children locked in a basement for days at a time. Pearl Jean had auditory hallucinations of a lion growling when she was locked in the basement.[4] Pearl Jean has a half sister, Darlene, from Florence's second marriage and a half sister, Rita, from her father's second marriage. Florence was barely able to provide for her family and made only $25 a week at a five and dime store. Florence put little emphasis on education, and Pearl Jean withdrew from school before completing the ninth grade and began to work.

Pearl Jean was 21 years-old when she met and married Angela's father, James Sr., in 1961, after a short courtship. Physical assaults, drinking, shouting matches, and charges of infidelity erupted quickly in James Sr. and Pearl Jean's marriage. Pearl Jean became pregnant and gave birth to their first child, Wendy – Angela's older sister – nine months after their marriage. James Sr.

---

[1] Declaration of Pearl Jean Johnson, at 1.
[2] *Id.*
[3] *Id.*
[4] *Id.* at 2.

measured his life by his ability to financially support his small family, causing him to work night and day. Meanwhile, he had no insight into his wife's mental illness, which had its adulthood onset with Angela's birth.

## IV. ANGELA'S BIRTH AND CHILDHOOD

### A. Adulthood Onset of Pearl Jean's Psychosis at Angela's Birth

Pearl Jean had a complicated pregnancy with Angela. She experienced difficulty gaining weight, severe morning sickness, and severe depression throughout the pregnancy. Her labor with Angela was protracted, lasting three days and culminating in Angela's breech delivery. Protracted labor could, in part, explain Angela's seizure disorder. Angela was born almost two years to the day after Wendy, who became her little sister's protector as Angela's disabilities became more apparent.[1]

Shortly after Angela was born, Pearl Jean began again experiencing auditory hallucinations, this time of voices.[2] Pearl Jean was alarmed by the voices, was deeply depressed, and extremely irritable. She did not work outside the home and became fearful of leaving the house. She was very anxious and stressed. She became pregnant again seven months after Angela's birth, but later miscarried. Pearl Jean's depression continued unabated, and she became preoccupied with keeping everything in the home in its place, forbidding Angela and Wendy from engaging in typical child's play, and punishing them harshly without provocation. James Sr. tried to intervene and convince Pearl Jean not to be so physically harsh with the toddlers, but Pearl Jean ignored his pleas. Pearl Jean and James Sr. had two more children together, Jamie in 1965, following another difficult pregnancy, and James Jr. in 1967. Pearl Jean did not want to have so many children, but she was afraid that birth control pills would cause her to have deformed babies.

---

[1] Exhibit 28, Declaration of Wendy Jacobson, at 1.
[2] *Id.* at 2.

134

In the spring of 1967, James Sr. and Pearl Jean's marriage disintegrated. By this time, Pearl Jean had been pregnant five times in six years, had five children under the age of six, had auditory hallucinations of God speaking to her, had raging mood swings, and continually beat her small children, without provocation, until she dropped from exhaustion. Repeating the cycle she had suffered, Pearl Jean abused her children and treated them in the same manner she had been treated as a child. James Sr. could not understand what was driving his wife insane and resigned himself to doing the best he could by working as hard as he could. They argued frequently, and their disagreements escalated to physical confrontations and accusations of infidelity.

James was bewildered by his wife's unpredictable mood swings. He became use to arriving home and finding his belongings piled on the front lawn. The marriage ended abruptly when their youngest child, James Jr., was only three months old and Angela was four years old. Pearl Jean found a job, moved the children to another home, held an auction to sell everything in the house, and moved to Pueblo, Colorado, in 1968, to live with her mother, Florence, and Florence's third husband.

Angela's parents' separation and divorce were acrimonious, with Angela paying the price for her parent's divisiveness and bitterness towards each other. James Sr., who opposed the divorce initially and wanted reunification, refused to pay alimony or child support, although he visited the children, babysat them, and brought them gifts in the first years after the divorce. Pearl Jean did not work and depended on public assistance to support her and her four children. She told the children their poverty was the result of their father's refusal to meet his financial responsibilities.

**B.** **Pearl Jean and Florence's Psychosis Disrupts and Terrorizes Angela and her Siblings**

135

The divorce removed the last protective barrier between Angela and her mentally ill, sadistic mother and grandparents. Before the divorce and move to Colorado, James Sr. buffered the children from unprovoked assaults by their mother. Without him, Pearl Jean was free to assault the children at will. She hit them on their heads, shook them, and beat them with a belt for either minor infractions or no reason at all. Florence, who was as mentally ill and uncontrollable as Pearl Jean, offered no refuge to the children.

Pearl Jean became wholly attached to her mother, following Florence from location to location without regard for her children's welfare or schooling. Florence moved from Pueblo, Colorado, to Mason City in 1970, and initially Pearl Jean and the children remained in Colorado, living for a period in motel rooms with no cooking facilities. Pearl Jean left the children unattended and disappeared for days. During this time, James Sr. tried to locate the children, but Pearl Jean did not want him to find them and told her family not to tell him where they were. The children, of course, simply believed their father had abandoned them.[1] A year later, Pearl Jean gathered the children and again followed her mother back to Mason City.

Back in Mason City, Pearl Jean's mental state deteriorated further as her delusions and hallucinations manifested in idiosyncratic religious practices and beliefs, many of which were shared by her mother, Florence.[2] Florence frightened the children who often heard her in the basement pounding on an old tire with a baseball bat while chanting incoherently in order to rid herself of demonic spirits that she believed seized her from time to time. Pearl Jean received special messages

---

[1] *Id.* at 2 ("We did not know we could go to our father for help because we believed he abandoned us and did not want us.")

[2] Exhibit 1, Report of George W. Woods, Jr., M.D., at 12 ("Temporal lobe dysfunction, a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, appears to run in the maternal side of Ms. Johnson's family. The table below describes the kinds of behavior associated with temporal lobe dysfunction; many of these behaviors describe Ms. Johnson's grandmother, mother, and her own behavior.")

from God that came in the form of otherwise regular objects such as her checkbook or ordinary encounters and conversations with passersby. Everything had special meaning to Pearl Jean, and she lived from one moment to the next in response to those special messages. Pearl Jean did not understand that those messages placed her and her children in harm's way, were irrational and illogical, or that were not part of any religious dogma or teaching. Quite simply, the messages were the expression of Pearl Jean's profoundly ill mind.

Pearl Jean believed she had been selected for a pitched battle against 12 demonic forces to which she gave American Indian names, with the exception of the special demons she created just for Angela, the "Deaf and Dumb Demons."[1] She forced the children to be on the look out for the demonic forces and created a special bible study program to indoctrinate the children to demonic forces. Pearl Jean also believed that she had the power to predict the future, heal people of mortal sins and illnesses, and exorcize demonic spirits that lurked in the real world. Describing how she hears voices commanding her to do things that she unquestioningly follows, Pearl Jean explains:

> I started hearing things that others couldn't hear and seeing things that others couldn't see when I was a child. . . .I have special powers that others do not have. I can see the future. I can hear and see things that others can not hear and see. Sometimes these things are scarey and bring me to my knees. Sometimes these things make me full of joy. Sometimes I only hear one word and it takes me a long time to figure out what the word means.[2]

### C. Angela Becomes Focus of her Mother and Grandmother's Ritualistic Torture

Pearl Jean's twisted and paranoid view of the world landed with full force on Angela, her most vulnerable child who "got the worst of it" of all Pearl Jean's children."[3] Angela has petit mal (or absence) seizures, resulting from an electrical disturbance in her brain. Petit mal seizures

---

[1] Exhibit 28, Declaration of Wendy Jacobson, at 3-4.
[2] Exhibit 27, Declaration of Pearl Jean Johnson, at 2-3.
[3] Exhibit 28, Declaration of Wendy Jacobson, at 3.

respond to medical treatment, but untreated they pose a serious threat to the physical and emotional well-being to those with the disorder. Petit mal seizures cause a brief, sudden lapse of conscious activity, during which a person is unresponsive to environmental stimuli and becomes disoriented. The person with the seizures is not aware that the seizures have occurred and regains consciousness confused. Time periods before and after seizures are referred to as pre-ictal and post-ictal states and may be accompanied by mental confusion. A neurological condition, petit mal seizures are treated with anti-convulsant medication and supportive therapy, which Angela has never received. Pearl Jean also described experiences where "[s]ometimes I don't know what just happened, like I've been in a daze or have gone someplace else in my mind. It makes me scatter brained."[1]

Angela was unaware that she had a medical condition that required treatment; she only knew that she depended on her older sister Wendy to help navigate her environment and to protect her. Angela lived in Wendy's shadow. As Angela grew from a toddler to a small child, Wendy saw that Angela would "check out of what was going on for a few seconds and then come back as if she hadn't left.[2] Six year old Wendy did not know what petit mal seizures were or that they were causing her sister to go "in and out of contact with reality," she just knew that she had to protect Angela.[3] Wendy tried to keep Angela away from her mother and grandmother to avoid their ire and suspicions, but Pearl Jean and Florence were vigilant, always on watch for signs that demonic forces were invading and controlling Angela.[4] Whenever Angela had a petit mal seizure and was unresponsive to commands by adults, Pearl Jean and Florence were certain demonic forces had possessed her.

---

[1] Exhibit 27, Declaration of Pearl Jean Johnson, at 2.
[2] Exhibit 28, Declaration of Wendy Jacobson, at 4.
[3] *Id.* at 1, 6.
[4] *Id.* at 1, 3-4.

138

Florence and Pearl Jean – assisted by Pearl Jean's third husband – singled out Angela and initiated a campaign of torture and sadistic treatment against her designed to exorcize the Deaf and Dumb demons. From her early childhood until Angela left home in her early teens, Pearl Jean routinely and regularly subjected the child to gut wrenching rituals.[1] Angela also had other impairments that caused her to lag behind her siblings, and Pearl Jean was quick to note them and attribute them to demonic forces. She humiliated Angela by calling her retard and stupid, and Angela came to believe that in fact she was retarded.

The ritualized torture of Angela always followed the same pattern.[2] Angela's mother or another adult would observe Angela's unresponsiveness – most likely the result of a seizure or dissociation – pronounced it to be the work of demons, most often the work of the "deaf and dumb demon," and the terror would ensue. Angela ran, resisted, begged, and pleaded not to be subjected to the ritual, but to no avail. Her mother, grandmother, and her step grandfather restrained Angela's hands, feet and head, holding her down on the floor or on a table while they chanted, prayed, clapped, danced and "fell out" in the spirit over her. They beat, punched, and slapped her. They grabbed her by her hair, shook her and threw her against walls. They starved her. They locked her in the closet. They forced her to stand and sit in stress positions without moving for hours. They strangled her. They stopped only when Angela collapsed, became unconscious, or showed some other sign that the demon had departed her body. Angela fought and resisted their assaults to no avail; she was not strong enough to defend herself against adults. They held her captive and terrorized her into silence about the abuse.

---

[1] *Id.* at 3-4.
[2] *Id.* at 4.

Although Angela was singled out for the most pervasive and cruel treatment, her siblings were also subjected to varying degrees of ritualized torture and abuse. All the children were forced to sit and stand in stress positions in the closet and at the table. Each of them was subjected to at least one ritual exorcism. In one psychotic episode, the children's step-grandfather and grandmother took all their toys, including the television, and smashed them to pieces and burned them because they represented idolatry. The other children, however, were not as impaired as Angela and were able to adopt strategies to placate the adults. Angela's siblings learned not to resist as resistance was interpreted as the demons fighting back. They learned to avoid behaviors that might be interpreted as possession, evading the rituals altogether or when subjected to the rituals they learned how to quickly give verbal or visual signs, such as belching or sighing loudly to indicate that the demonic forces had left them.[1] Angela's siblings did not have seizures so they were able to respond quickly and comply with adult commands. Angela, however, was unable to learn behaviors that would circumvent ritualistic torture or control her seizures, instead, she lived in terror of the rituals and struggled mightily against them; she screamed, begged and pleaded for release.[2]

Angela lived a life of utter terror and helplessness. She developed characteristic responses to extreme stress. She experienced auditory and visual hallucinations. She heard her and her sisters' names being called over and over as in an echo. She heard voices under her bed. She saw and talked with a form that appeared to be an eagle in her window but later decided that it was an unidentified flying object. She saw images and shadows of evil forms that intended to harm her and her siblings on the walls of her home. She rocked back and forth, paced, and her "right leg shook her all the time[.]"[3]

---

[1] *Id.* at 3.
[2] *Id.* at 3-4.
[3] *Id.* at 6

140

Angela also dissociated at times of extreme stress and went to her "special place" in her mind, distancing herself from the events around her.[1] Dissociation, an altered state of consciousness, is different from petit mal seizures, and Angela experienced both conditions. Dissociation is a "disruption in the usually integrated functions of consciousness, memory, identity, or perception of the environment."[2] Dissociation is not a conscious effort but occurs in response to chronic exposure to the threat of annihilation, terror, and helplessness. Angela lived in sickening anticipation of the assaults by her caregivers, was preoccupied with impending punishments, and was unable to attend to normal childhood activities that would prepare her for adulthood.

## V. ANGELA'S EDUCATIONAL BACKGROUND

Angela lagged far behind her peers and siblings at school. She was unable to read or tell time by the third grade, despite her best efforts to learn.[3] She had no strategy for the letters that tumbled before her on page after page. Meanwhile, she watched the other children around her read and advance, leading her to believe that she was, as her mother explained, possessed by devils. Wendy tried year after year until finally in the third grade, Angela learned how to read and to tell time.[4] School officials designated Angela as a special needs student and assigned her a resource teacher to assist her in class.[5] Angela continued to struggle to keep pace as her lessons increased in complexity.

Angela's education suffered further setbacks due to her mother's unpredictable and frequent moves. Pearl Jean was unemployed and depended entirely on aid to families with dependent

---

[1] *Id.* at 12.

[2] American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 20002), at 822.

[3] Exhibit 28, Declaration of Wendy Jacobson, at 3.

[4] *Id.*

[5] *Id.*

children for income from 1969 until 1976.  Pearl Jean continually moved from one location to the next in response to her own delusions and hallucinations or those of her mother, taking the children in tow.  Consequently, Angela moved from school to school, sometimes in the middle of the school year, missing one third to one half of her classes.  From elementary school through the eighth grade, when Pearl Jean withdrew Angela from school altogether, Angela attended at least six different schools – Mason City, Thornton, Chanute, Klemme, Thompson, and Forest City.  Pearl Jean did not attend her children's parent teacher conferences or participate in school activities.  She was, and continues to be, a recluse, afraid to leave home.[1]

The children's education was not a concern for Angela's mother and grandparents.  Instead they were preoccupied with their own delusional and psychotic thoughts.  Two examples demonstrate how their bizarre beliefs interrupted Angela and her siblings' education and created an unstable environment.  When Angela was in kindergarten or first grade in Mason City, her grandmother began hallucinating in the middle of the night that a wolf was talking to her.  Angela's grandmother, Florence, awakened the family and demanded that everyone immediately depart the house on a journey that followed a scar on Pearl Jean's leg.  The family piled into the step grandfather's car and for days they drove from one road to the next, following the direction of a scar on Peal Jean's leg, until they landed at a mission, out of money, hungry, and cold.  On another occasion, in 1972, when Angela was in the third grade, Pearl Jean withdrew the children from their local school in Thornton, Iowa, had a friend drive the family to Kansas, and placed the children in an orphanage for six months while she participated in ill-defined missions.  The founder of the orphanage sexually abused Angela and her sister, made the entire family live in a shack, forced

---

[1] *Id.* at 5.

142

Angela and her sibling to perform meaningless labor, and made Angela and her sister watch him abuse other children in the home.

## VI.  ANGELA'S ADOLESCENT YEARS

By the time Angela entered seventh and eighth grade, her peers and neighbors ostracized her and her family.[1]  She had no friends outside her home.  Angela and her siblings were forced to dress differently from the other children, were taught to proselytize their idiosyncratic belief system, and were extremely impoverished since their mother did not work.  A local child attempted to visit Angela's home, but when she entered the house, she saw Angela spread out on the dining room table with Angela's mother standing and chanting above her.  The child fled.

Angela's grandmother left the family and moved to California and then Arizona, leaving Pearl Jean alone with the children and very limited income.  Pearl Jean was in a desperate financial situation and did not know how to live independently.  She convinced a friend, Maxine Abbott, to leave her husband, sell her home, and invest the funds in a joint restaurant venture.  This friend – who has since been diagnosed with and treated for bipolar mood disorder – moved in with Pearl Jean and the children, bringing her own two daughters along with her.  The combined families lived hand to mouth, barely making ends meet.

The restaurant did not make enough money to pay its workers, so Pearl Jean decided to withdraw Angela and Wendy from school to work full-time in the restaurant for no wages.  Pearl Jean withdrew Angela from school at the end of eighth grade when Angela was only 14 years old. Angela and a 16 year old Wendy worked hard, long hours like adults.

At Angela's home, chaos filled the house with the combined families run by two women who both had serious mental health problems.  Pearl Jean rented rooms to strangers, without any notice

---

[1] *Id.* at 2.

to her children.  Angela and the other children slept on the porch, shared beds, or slept on the floors in the house when strangers rented their rooms.  When Angela and her sister did not have to work, they were unsupervised and free to roam the town.

Throughout her adolescence, Angela lived in a state of numbness.  She took inch long straight pins and stuck them straight into her arm and walked around with them as if she had no feeling.  She dissociated frequently and at 11 or 12 years old, Angela learned to use drugs to quell her intense emotions.  Angela became so depressed that she stopped eating and could not sleep.  At 14 years old, she attempted suicide by taking an entire bottle of aspirin and had to be rushed to the hospital.[1]  Angela and her siblings "lived one life inside the house and kept it secret from the outside world.[2]  They never told anyone about what happened inside the house on J Street.[3]

## VII.   ANGELA'S YOUNG ADULTHOOD

When she was 16, Angela met a 19 year old physically handicapped teenager who was blind in one eye and had a tumor behind the other.  On July 5, 1980, Pearl Jean helped the two teens get married, but the union lasted a very short while.  They separated amicably on February 18, 1981, and their divorce became final on August 31, 1981.  Less than two years later, Angela married Arlyn Johnson on February 2, 1983, after learning she was pregnant with his child.  Their daughter, Alyssa, was born on August 7, 1983.  After a rocky union, the couple separated on January 1, 1986, and then divorced on October 28, 1986.  Arlyn and Angela shared custody of their daughter and maintained a close and supportive relationship.  Arlyn, who suffered from bipolar mood disorder and was under

---

[1] Exhibit 29, Declaration of Holly Dirksen, at 6.

[2] Exhibit 28, Declaration of Wendy Jacobson, at 2.

[3] *Id.* ("We never asked teachers to help us because we were taught at home to keep secrets and not tell people what we did at home.  We believed it would be terrible if we told others what happened at home.")

144

psychiatric care, did not pay court-ordered child support for the first three years after their divorce, but resumed payment in 1989.

In 1986, symptoms of Angela's bipolar mood disorder became prominent. She had dramatic mood swings and struggled with profound depression that left her exhausted, unmotivated, and hopeless. She would leave Arlyn one day and ask to be reunited the next. She was irritable, paced anxiously, and rocked back and forth when stressed. She suffered extreme migraine attacks that lasted for days, causing her severe pain, sensitivity to light and sound, gastrointestinal distress, and mental confusion. She made plans, abandoned plans, and came up with new plans all in the same day. Her sister Holly witnessed her mood swings:

> Angela got ideas and then obsessed on them. Once she got an idea, she couldn't let go of it. She did meaningless stuff, anything to be active. She was up for days and then slept for days. She was always like that. Her bottom half was always moving and shaking. She couldn't keep her legs still.

> Angela did lots of things that made no sense. She'd stay up for days – even when she wasn't on drugs like when she was pregnant – and make things, things that you could make during regular day time hours. Then she'd crash and stay in bed for days.

> Angela never announced or decided in advance what she was doing. She showed up without announcement; she blew in like the wind, expected everybody to be happy, and then she'd blow out. She'd get an idea and go at it. One time, she came in my house, looked at my kitchen, and announced that the wall trim had to go. She immediately started ripping it down, while I stood there telling her she'd gone crazy. Then she left. I had bible study that night and everyone saw my kitchen with holes in the wall. That was Angela – crazy.[1]

Angela lacked trade or vocational skills and attempted to support herself and her daughter by being a waitress. "The only job my mother ever had was as a waitress; that's all she knew how to do."[2] She tried go to night school, but withdrew. She enrolled briefly in a modeling course, and

---

[1] Exhibit 29, Declaration of Holly Dirksen, at 5.
[2] Exhibit 30, Declaration of Alyssa Johnson, at 3.

145

also found a job as a stripper in a local nightclub.  Angela always worked hard, sometimes working two jobs to support herself and her daughter, but she still struggled financially.  Angela saved her money, bought a bar, and lost everything when she was unable to keep it open and operating in 1987.  Much like when she was a child, Angela simply was unable to successfully control her life.[1]  Throughout her life, Angela continued to need others to help her navigate her daily environment, "Angela was never able to live independently and on her own; she always depended on friends, her family, or men to help her."[2]

Over time, Angela's symptoms of depression, episodes of dissociation, and continued petit mal seizures wore her down.  Through it all, however, she remained determined to somehow push through.  She was a physically attractive, animated, and outspoken young woman.  She knew she was different and never spoke of her harrowing childhood experiences.  She kept danger at bay by appearing tough, determined, and capable.  In response to the trauma she had survived, she never allowed herself to get close to anyone.  Meeting the daily of demands single motherhood was a substantial challenge.  To cope, she began using copious amounts of methamphetamine when she owned her bar.  Methamphetamine gave her the energy, focus, and confidence that depression took from her.

---

[1] *Id.* at 1 ("When I was a teenager, I had to look out for her because she just didn't have any common or practical sense.  She worked as hard as she could, sometimes working two shifts in the same day.  It was all she could do to support us, but from time to time we had to live with one of her sisters or friends when my mother wasn't able to keep up with the day to day demands of working, paying all the bills, balancing a budget, and being a single mom.")

[2] Exhibit 29, Declaration of Holly Dirksen, at 4.  *See also* Exhibit 28, Declaration of Wendy Jacobson at 5-6 ("In many ways, Angela is like our mother.  Neither one of them can really function on their own. . . . Angela depended on other people to help her manage day to day life.  She got her own places to live but lost them and had to move in with me or my sister or a friend.  She worked hard but never had enough money to make ends meet. I used to send her boxes of food to be sure she and the girls had something to eat.")

146

In 1987, Angela began an intimate relationship with one of her bar's patrons, Terry DeGeus, a heavy methamphetamine user, who was also married. Within a few months, Terry erupted into a physically abusive, jealous, obsessive boyfriend, who beat, stalked, threatened, and raped Angela. She moved from various locations to avoid him, and called the police when he assaulted and stalked her. Angela repeatedly tried unsuccessfully to end the relationship, but having no insight into the pattern and dynamics of abusive domestic relationships, she believed his promises to reform and cease the abuse, so she would take him back.

Angela's response to Terry's physical abuse and coercive control was shaped within the cortex of complex trauma. Her childhood trauma was complicated because it was interpersonal, represented betrayal by the very people charged with protecting her, occurred during entrapment, and was repeated. Child abuse imposed limitations on her capacity to manage and regulate her emotions. As such, the impact of Terry's abuse on Angela was very different from the impact it would have had on an intact adult with a healthy childhood. Angela's internal resources were depleted, giving her a distorted sense of self that was helpless and powerless. She became malleable and dependent on the abuser whose control was absolute. Her responses to Terry's abuse mirrored the lessons of harm and fear she learned as a child, when she was first taught that she was worthless.

Angela was certain that Terry would kill her. She repeatedly sought help and protection from the local police in the small communities of north Iowa. Police responded to Angela's crisis calls, more than once found Terry beating or stalking her, but were ineffective in deterring or stopping him from another attack weeks and months later.

By the early 1990s, Angela was paralyzed by depression, incompetence, anxiety, and fear. Angela's daughter knew her mother's crippling mood swings were abnormal:

147

My mother had terrible episodes of depression in between her times of activity. When she was depressed, she could barely move or do anything. She stayed in bed, in her room, or on the couch, as if she were so sick she had no energy. I worried about these moods when they came over her, but just did my best to be there for her. After my little sister was born, I had to take care of her when mother was so depressed she couldn't do anything. I spent a lot of time at my dad's but always worried when I was there about how my mother was doing alone, without me. She really couldn't take care of herself when depression came on. It was the exact opposite when her mood changed and she started projects or new jobs. She went from one extreme to the other. At the other end of depression was her thinking everything was perfect, wonderful, and marvelous, even when I knew we were headed for disaster. Nothing could change her mind, though. She had absolutely no judgment; it was like she was in another world.[1]

Angela depended on methamphetamine to function in any capacity. Angela was unable to exist a day without the powerful drug, and it became her first priority, blinding her to its destructive impact on her life. She believed the drug allowed her to get up in the mornings, go to work, earn enough money to provide a home and care for her daughter, keep a clean home, and function on a daily basis. She believed it made her competent to meet the challenges she faced that otherwise overwhelmed her. It kept her life-long mental health symptoms at bay, masking the severity of her disabilities. Of course, her drug addiction obliterated her already compromised judgment, becoming its own corrupting rather than healing force. Angela could not afford methamphetamine on her salary as a waitress. But drug dealers explained to her that she could sell small amounts of the drug to fund her own addiction. Angela, who had no criminal history, took the bait and agreed to buy and sell small amounts of methamphetamine.

## VIII.    1993: THE YEAR ANGELA'S WORLD CRASHES IN AROUND HER

One drug dealer, Dustin Honken, was especially seductive in convincing Angela that he could manufacture, produce, and sell enough drugs for both her use and to sell to others she knew in the community. Angela perceived Honken as everything she was not. Angela "never believed

---

[1] Exhibit 30, Declaration of Alyssa Johnson, at 2.

148

she was very smart, and she thought Dustin was really intelligent and well educated.  She acted like he was going to solve all her problems[.]"[1]  He was college-educated, smart, confident, the golden child in his family, and a self-promoter.  He dressed well, had plans to make a substantial amount of money, said he had studied chemistry, and assured her he had a cadre of friends and family who would assist him in this venture.  He manipulated Angela, always gullible and dependent, into advancing him money from her hard-earned savings, loaning him her credit cards, and into getting pregnant with his child.[2]  Dustin came in and out of Angela's home at will, spending his time between her house and the homes of two other women, whom he also convinced he loved.  Dustin convinced Angela, as he convinced others over the course of his life, that she could trust, follow, and love him, and that he in turn would protect her and their unborn child, while sharing the proceeds of his drug manufacturing business.

Dustin offered Angela a life raft when she was exhausted from trying to keep her head above water for all those years, surviving her childhood, fearing Terry DeGeus, struggling to raise Alyssa, and living hand-to mouth while trying to navigate her mental illnesses and brain impairments.  She viewed him as a relief from her overwhelming state of economic peril and inability to make good decisions.  She was ecstatic when she met him.[3]

Angela's innate gullibility, mental impairments, and drug addiction, combined with the stress of being pregnant and the fear of Terry DeGeus who continued to stalk and threaten her, made her the perfect dupe for Dustin.  Pregnancy is stressful for any woman, but for women with mood disorders, pregnancy and its concomitant change in hormone levels can trigger a psychotic episode.  When Dustin learned federal drug authorities were investigating him and his brother for drug

---

[1] *Id.* at 3.

[2] Exhibit 29, Declaration of Holly Dirksen, at 3-4.

[3] *Id.* at 3; *see also* Exhibit 28, Declaration of Wendy Jacobson, at 7.

149

manufacturing and distribution, he convinced Angela to allow him to store the manufacturing equipment in her home. When Dustin needed gasoline money to drive to Tucson to pick up drug equipment from his brother, Angela gave him the money. When Dustin told Angela that he had trusted friends she could buy and sell methamphetamine to and from, she believed him.

When federal law enforcement targeted Dustin and his confederates, Dustin convinced Angela that he was invincible, that he was too clever for the government to convict, and that the charges against him would amount to naught. He was as omnipotent to Angela as her mother and grandmother had been during her childhood when they wholly controlled her and her world.

As 1993 unfolded, Angela fell apart.[1] As her sister Jamie explained, she was out of her mind and everything about Angela was unstable. She could not keep up with Dustin and his plans. She was pregnant with his child, in daily battles with his other pregnant girlfriend, and certain that Terry DeGeus would kill her and her unborn child when he learned she was pregnant.[2] Angela stopped using methamphetamine because she knew it would harm the baby, but methamphetamine has a half-life that continued to affect her even after she stopped use. Mood swings, irritability, mental confusion, terror, incompetence, and dissociative episodes made her erratic, irrational, and unpredictable. As a pregnant woman with bipolar mood disorder and other brain impairments, she experienced recurrent episodes of loss of contact with reality.[3] She was unable to figure her way out of the crises surrounding her and she became totally dependent on Dustin to tell her what to do. Angela's sister, Holly, frequently visited her and described Angela's decline:

---

[1] Exhibit 29, Declaration of Holly Dirksen, at 3 ("[S]he really fell apart in 1993 and everything fell apart in her life.")

[2] *Id.* at 2.

[3] According to the National Association for the Mentally Ill, rates of relapse into mania and psychosis are estimated at 50% to 75%, respectively, for women who have been mentally ill in the past.

It got worse 1993.  Living with Angie was like living in a rant all the time.  She could not control her emotions.  She stayed in bed for days and then worked nonstop.  She was always moving, shaking, talking, working, and doing something for the sake of moving.  Angie was unpredictable.

. . .

Angela grew crazier by the minute for every minute she spent with Dustin Honken.  She and I were very close and spent a lot of time together.  Her mood swings got worse.  She was always paranoid and had to sleep with the lights on, but she also believed that others were out to get her.  Her pregnancy made everything worse.  Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it.  She was just as worried, if not more, about Dustin.  She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently.  Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him.  She was pregnant and her hormones seemed to push her over the edge.  She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times.  The slightest thing irritated and overwhelmed her.[1]

## IX.    1994 AND BEYOND: ANGELA'S MENTAL ILLNESSES AND TOTAL DOMINATION BY HONKEN CONTINUE

On February 14, 1994, Angela gave birth to her second child, Marvea Jane Johnson, who was named after Dustin Honken's mother.  After the pregnancy, her depression deepened, according to Alyssa, who helped her mother care for the newborn.[2]  Dustin continued to move in between Angela's home, his mother's home, and his other girlfriend's home.

Angela believed she was helpless to do anything to resist Dustin.  She was trapped and powerless, the exact same way she had been as a child.  When he was arrested and confined in 1996, Dustin knew he could control Angela from his jail cell, and she did not want him to think otherwise.  She was trapped, had lost her home, and a friend she had worked with in Mason City offered her a

---

[1] Exhibit 29, Declaration of Holly Dirksen, at 2-3.
[2] Exhibit 30, Declaration of Alyssa Johnson, at 2.

151

possible way out.  The friend, Verleen Vanderpool, had taken a job in Des Moines and encouraged Angela to move there and start over.

Angela, assured by Verleen that she could find work, decided to move, but her daughter Alyssa was terrified of moving with her erratic mother away from friends.  Alyssa attempted suicide by ingesting aspirin and was taken to the local hospital for treatment.  Alyssa was referred to the Mental Health Center of North Iowa for treatment, and Angela sought treatment at the Center as well.  On March 25, 1996, Angela was seen at the Center's ambulatory (outpatient) clinic where staff found her very distraught and started her on Prozac 20 mg.q.d.  The antidepressant gave her some relief from her mood lability and panic attacks.  Angela reported that she had not hyperventilated since she started the medication.  On her mental status examination, the mental health center found that Angela was tearful with moderate lability, her rate of speech was mildly decreased, and her flow of thought was circumstantial and content dependent.  They also noted that her mood was low and insight poor.

Ultimately, Angela moved to a suburb of Des Moines, Urbandale, and Alyssa moved to her father's house in Forest City, a few miles from Mason City.  Angela tried to continue therapy by driving to the mental health center in Mason City for her appointments.  On April 8, 1996, she missed her appointment, but her psychologist received a telephone call from Verleen, who had become Angela's supervisor in Urbandale.  Verleen expressed concern that Angela had seemed out of it for the prior several days.

The psychologist suggested that Verleen discuss finding counseling closer to the Urbandale area with Angela.  Angela met with the psychologist a final time on April 29, 1996, and brought Alyssa with her.  During the session, Angela was tearful, crying, obsessing, and ruminating.  According to the psychologist, she appeared depressed with depressive symptoms.  Angela had no

154

idea why Alyssa had chosen to live with the father. Angela briefly described her life growing up as being bad, relating that she was mentally and physically abused by the mother. Angela admitted that there were traumatic events in her life that she did not want to talk about. But she did convey that she had a really bad childhood, and as a result she tried to be a good parent to her own children. The psychologist increased Angela's Zoloft prescription to 100 milligrams, and Angela returned to Urbandale. Afterward, she contacted the Mason City mental health center twice more in May, once asking that her Zoloft prescription be modified because it caused acne, and the other time cancelling her appointment.

Angela worked another year and a half in Urbandale but fared very poorly. She was not the independent person she wanted to be; instead, she "depended on Verleen for survival." Angela always worked hard and thought she was in control of everything but in reality she depended on everyone else to get from one day to the next and to take care of the kids.[1] Angela's family became increasingly concerned about her. Angela was trapped and wanted to commit suicide. Her sister Holly "worried so much about Angela" that she drove to Des Moines and "went to the court to try and get Angela committed. Angela was spinning out of control and manic."[2]

Angela left Des Moines and returned to Clear Lake in 1998, where she found work as a waitress and focused on making sure she had enough methamphetamine to keep going despite her depression. She depended on her sisters, friends, and Alyssa to help her take care of Marvea. Dustin still controlled her, but she tried to keep it in the back of her mind. She visited him in jail to appease him and simply hoped she and Marvea could be safe from him.

---

[1] Exhibit 29, Declaration of Holly Dirksen, at 6.
[2] *Id.*

After her arrest, law enforcement suggested she cooperate with them in exchange for a lesser sentence, but she had no confidence that she or her daughters would ever be safe from Dustin. Law enforcement had been unable to protect her once, and Terry DeGeus was certainly no match for Dustin Honken, the ultimate manipulator and agent of control over Angela's life.