# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| ANGELA JOHNSON, | * | |
| | * | |
| Petitioner, | * | |
| | * | No. C 09-3064-MWB |
| v. | * | CAPITAL CASE |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent | * | |

## PETITIONER'S REPLY TO GOVERNMENT'S AMENDED RESISTANCE TO MOTION UNDER 28 U.S.C. §2255

Angela Johnson, by undersigned counsel, submits the following Reply to the Government's Amended Resistance to Ms. Johnson's Motion Under 28 U.S.C. §2255.[1]

## I. Failure to Secure a Life Saving Plea

Trial counsel provided ineffective assistance in this case by failing to take all necessary steps to prepare Ms. Johnson to accept a life-saving plea, a disposition in which the Government was demonstrably interested at several points in this case.

### A. Deficient Performance

The Government contends that Ms. Johnson cannot demonstrate that counsel performed deficiently in their efforts to work with Ms. Johnson and the Government toward resolving this case, because

---

[1] Given the scheduled evidentiary hearing, as well as planned pre and post-hearing briefing, this Reply is not an effort by Petitioner to address all issues raised in her §2255 Motion, or in the Government's Resistance. Further, as the Court knows, and as noted previously by Ms. Johnson, given the scheduled hearing, many of the facts in support of Petitioner's claims will be presented there, as envisioned by the rules governing habeas cases.

- counsel "met with her repeatedly and discussed plea options with her"

- "Ms. Johnson was generally not interested in a guilty plea"

- counsel "did explore plea possibilities with the government repeatedly," and

- counsel "endeavored to protect her interests by attempting to ensure that any plea agreement would not require her to debrief as a condition precedent."

Resistance at 24. None of these bare assertions save the constitutionality of counsel's performance.

### 1.    Failure to Work with Client Effectively

First, as Ms. Johnson laid out in her initial petition and as the ABA Guidelines make clear, simply meeting repeatedly with a defendant (and Ms. Johnson does not concede her counsel did so) and attempting to strong-arm her into pleading guilty is not sufficient in a capital case. A rigorous understanding of the defendant's mental state, any roadblocks in her history or family, and any outside resources that may be useful in persuading her to save her own life are required. Moreover, no number of meetings will be sufficient to convince a client of the merits of a plea if the entire defense team is not in agreement as to the strategy for pursuing and resolving the case. Evidence regarding the actual content of these meetings with the client, evidence regarding the resources that could have and should have been marshaled, and evidence regarding the confused and splintered message being sent to the client regarding the advisability of a plea will be developed at the evidentiary hearing and will clearly demonstrate counsel's deficient performance regarding their conduct in paving

2

the way for their client to enter a guilty plea.

### 2. Failure to Negotiate Effectively

Merely exploring plea possibilities with the Government does not discharge counsel's obligations. Effective negotiations realistically account for the strength of the Government's evidence, their interests in a significant sentence, their diminishing interest in pleading the case as it gets closer to trial, and sentences handed down in similar cases. Unreasonable, pie-in-the-sky offers do not constitute effective representation simply by virtue of having been made. Evidence regarding the settlement options that were suggested by the Government and rejected by counsel will be offered at the evidentiary hearing.

### 3. Failure to structure proffer to protect Ms. Johnson

As evidence of effective assistance, the Government points to counsel's rejection of plea negotiations because the Government sought a proffer from their client as a precondition. Failure to make their client available for a proffer that could have led to a plea is, however, evidence of their *in*effectiveness. Defense counsel routinely present their clients to proffer to the Government in the presence of protections precluding almost any future use of the statements made by the defendant in any future prosecution. In fact, just such language was included in the proposed proffer ultimately offered by counsel in this case. There is no indication why a similar arrangement could not have been made to protect Ms. Johnson during a proffer earlier in the case, at a time when a successful plea was much more likely. What is clear is that counsel failed to request such protections, which was

3

plainly ineffective.

**B.      Prejudice**

The Government contends that Ms. Johnson cannot demonstrate prejudice arising from counsel's deficient performance for two primary reasons: first, that she cannot show that Ms. Johnson would have plead guilty and second, that the Department of Justice would have accepted a plea.

1.      Ms. Johnson has alleged facts which demonstrate that had she received effective counsel, she would have been persuaded to accept a life saving plea.

By focusing on what it perceives to be insufficient evidence of Ms. Johnson's willingness to plea guilty, the Government gets her claim backwards.  Ms. Johnson's claim is that counsel failed to work with her in such a way that she *could* see the advisability of a plea, and could find a motivation to save her own life.  The correspondence appended to the petition simply demonstrates that at certain times, there was an opening, a willingness in Ms. Johnson to save her own life.[2]  Unfortunately, counsel failed to follow through and give Ms. Johnson the support she needed to make the decision to plead.

2.      The Government was Demonstrably Willing to Resolve this Case for a Sentence Less than Death

The Government's assertion, that "there is no showing that government would ever

_____

[2]  Of course, contrary to the Government's assertion, the fact that Ms. Johnson did not admit guilt at trial, during allocution, or in a proffer when to so  promised no benefit whatsoever to her, is irrelevant to whether she would have entered a guilty plea for a sentence less than death.

4

have agreed to a sentence less than death," because the "government never made a plea offer to the defendant," lies in stark contrast to copious correspondence between the Government and counsel, some of which was appended to the petition, the balance of which will be offered at the evidentiary hearing, that repeatedly reflects a willingness on the part of the Government to resolve the case. While Ms. Johnson concedes that after June 7, 2001, the Department of Justice was required to approve any pretrial disposition of death cases, the Government cannot simply hide behind Washington to shield it from this claim. Prejudice - a reasonable probability that the outcome of the case would have been different – is by definition a conclusion that must be drawn from the surrounding circumstances in the absence of the ability to travel back in time to see what actually would have happened. There was much in this case that could have persuaded the Department of Justice to authorize a plea in this case. All indications are that the local attorneys were in favor of a resolution, and while not required to defer to their recommendation, such a deferral was likely given that the local attorneys knew best the facts of the case, the need for cooperation, and the local interest in seeing a death conviction, which was likely reduced in this non-death jurisdiction. Ms. Johnson is a female client, a mother of two, one of whom was young at the time, had no criminal record, and was significantly less culpable than her codefendant, the admitted principal to these crimes. Certainly, Petitioner can and will point to cases with similar aggravation and less mitigation that resulted in a life plea. The fact that counsel's last minute offer to plead to life was rejected proves nothing more than counsel should have rigorously

5

and realistically worked this case out far sooner.

Thus, even given the absence of a formal offer from the Department of Justice - which is not made in any case as a matter of DOJ policy– there is ample evidence that there was a "reasonable probability" that had counsel performed adequately, the case would have resolved for a sentence less than death. Ms. Johnson does not need to prove definitively that there would have been a deal, nor does she have to show what that deal would have been. She needs only to demonstrate a reasonable probability of a different outcome. She has proffered enough evidence thereof to state a claim and proceed to a hearing on the issue.

> 3. <u>Ms. Johnson does not simply claim that faulty advice caused her to reject a plea offer</u>

The Government seems fixated on the notion that "the reported cases in this area all involve instances where the government had made a plea offer and the defendant alleges he failed to accept the plea because of faulty advice of counsel." Resistance at 26. It is irrelevant how claims other than the one Ms. Johnson is making have been resolved. This is not a simple claim about incorrect legal advice, but a much broader claim about an impaired client, a fractured defense team, and a botched negotiation process in a capital case, with a fatal outcome. The fact the perhaps square peg of this claim does not fit into the round hole of previous IAC/plea cases does divest Ms. Johnson did of a Sixth Amendment right to counsel that would do what was necessary to save her life.

6

**II.	Failure to Investigate, Develop, and Present Evidence of Mental State at the Time of the Offense**

Ms. Johnson claims that her counsel prematurely terminated and fatally stunted the evaluation of Ms. Johnson's mental health.   They opted not to present evidence of Ms. Johnson's mental health at the time of the offenses before they knew what they were giving up.   In fact, there was copious, valuable evidence that could have been but was not developed, that could have supported, at a minimum, the submission of four statutory mitigating factors to the jury, and more importantly could have allowed the presentation of cohesive and mitigating explanation to the jury of Ms. Johnson's involvement in these crimes.

**A.	Deficient Performance**

1.	Failure to Investigate

In order to place in bold relief what Ms. Johnson contends her counsel did wrong and to refute the Government's defense of it, counsel will refer to the following basic outline of how a competent mental health investigation takes place.

1.	Upon receiving a death eligible case, counsel immediately begins collecting records and interviewing friends, family, employers, teachers, and others relevant to the full understanding of the clients life.

2.	Counsel immediately and ex parte retains a consulting expert who will be a member of the trial team and subject to all privileges.   This expert will interview the client and review records and interview memoranda as they are

7

provided. This expert will help counsel spot potential mental health issues, focus investigation, and recommend the proper experts to evaluate the client.

3. Specifically relevant experts are selected, appointed ex parte[3], and evaluate and/or test the client. Counsel structures appointment and use of experts such that if results of one are not valuable or are damaging, other experts may still be used. For example, counsel does not have the same expert test for mental retardation, childhood trauma, and brain damage. Thus if no brain damage is found, experts on retardation and childhood abuse can still testify without even the possibility of being cross-examined on the unfavorable results.

4. When the results of testing and evaluation are complete, counsel determines the value of the evidence to the sentencing phase presentation. Considerations include,

    a) are the experts' conclusions well supported, will they survive cross-examination?

    b) are the experts conclusions something the jury will find mitigating? For example sometimes substance abuse alone is not mitigating, but a brain injury affecting behavior is.

---

[3]The Government claims that counsel cannot have an expert investigate a particular avenue of mitigation and then abandon that avenue if the results are unfavorable, because the prosecution could then simply subpoena that expert and have him testify. Experts are appointed ex parte precisely because the prosecution is not entitled to know what avenues of mitigation counsel are considering and perhaps abandoning. The case cited by the Government involves an expert that was appointed by the court to do a competency evaluation for the court.

8

c) are the conclusions likely to be strong enough to outweigh any aggravating findings from a rebuttal evaluation? For example, given that Government experts generally find that defendants suffer from antisocial personality disorder, will the expert be able to explain why that does not apply? or

will the mitigating value of the expert's testimony likely outweigh any aggravating value of any statements or conduct by the defendant in rebuttal evaluation.

If the answers to these questions are yes or maybe, then go to 5. If the answers to these questions are no, then return to step 3 and select experts and testing that will be stronger or will not result in harmful rebuttal evaluation.

5. Give notice of intention to use expert evidence under 12.2. The Court will grant rebuttal evaluation limited to that which is necessary to rebut the particular mental health claims the defense is making.

6. Following finding of guilt, confirm intent to offer evidence of mental disease or defect. Government's report is released to prosecutors and defense. If Government's report is so damaging as to outweigh conclusions of some or all experts, do not present expert testimony on those issues. If aggravating value of Government's report does not outweigh experts' conclusions, provide reports of experts to prosecutors and offer expert evidence at sentencing phase.

9

Ms. Johnson contends that counsel's performance was deficient in several respects. First, counsel performed deficiently at step 1. As is laid out in more detail in the petition and as will be presented in greater detail at the hearing, counsel waited too long to begin a mitigation investigation and then only continued in fits and starts, such that a comprehensive sentencing strategy was not developed, mental health evaluation was not performed in a timely fashion, and experts were being rushed to evaluate Ms. Johnson in the weeks before trial. At step 2, counsel failed to retain a consulting expert, which had two negative effects: first, they were left to their own devices in identifying possible mental health themes in their investigation, and second, they were unable to have any expert give a complete, unfettered assessment of Ms. Johnson, without regard to what might happen on the witness stand. Such an evaluation might have eased their unfounded fears of delving into Ms. Johnson's mental state at the time of the offense. Step 3 was incomplete, because the necessary evaluations were truncated, because they avoided investigation of Ms. Johnson's mental state at the time of these offense, and critical brain imaging experts, recommended by the experts counsel did have, were not requested and the testing was not done. As a result of all of these failures, counsel could not adequately perform step 4. They could not calculate the mitigating value of evidence they had chosen not to look for. In other words, counsel cannot skip to step 4, and weigh the aggravating value of what Ms. Johnson might say to Government experts (which they could not fully have known, because they not explored it with their own consulting expert) against the mitigating value of their mental health evidence (because they

10

arbitrarily limited their investigation of it).

Trial counsel stated on the record that they were opting not to present evidence regarding any mental issues that might have affected Ms. Johnson's thinking and behavior at the time of the crime, because they thought it would put the jury's focus back on the crime. The Government says this strategy was reasonable because – well, just because. Leaving aside that this justification is preposterous on its face - the jury will have just endured weeks of testimony about the crime, and would sit through several more to determine what sentence to levy as punishment for the crime – the Government must be reminded that no strategy is reasonable unless it is based on complete investigation or a reasonable decision that makes investigation unnecessary. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984). In order for counsel to know whether it was reasonable not to tell the jury about what affected Ms. Johnson's thinking and behavior at the time of the crime, they had to know what affected Ms. Johnson's thinking and behavior at the time of the crime. They did not.

The Government also suggests that counsel's decision to exclude Ms. Johnson's thinking and behavior at the time of the crime from his investigation plan was reasonable, because it precluded the Government from making the same assessment. Resistance at 32, 35. Here again, however, the Government, like counsel, is putting the cart before the horse. As explained above, the cost-benefit evaluation regarding a Government evaluation takes place at Step 4, not prior to Step 1. If counsel's decision to truncate his investigation was made so as to preclude a Government evaluation, it was unreasonable because it was made

11

without knowing what that Government evaluation would likely yield and how strong it would be in relation to mitigating evidence uncovered. This is the antithesis of the "informed" decision the Government says it was. Resistance at 32.

Rather than being a "clever, informed, and calculated strategy," it appears, instead, that counsel found themselves just weeks prior to trial, trying to rush through Steps 1-3, and realized they did not have time to follow up on the testing that was recommended by their experts, or to regroup their sentencing phase presentation if a full evaluation by one or all of his experts was unfavorable. They did not have time to assess with a consulting expert what the positive and negative affects of a Government evaluation might be, so they punted, and did their best to minimize the fallout from the rushed, botched, and incomplete investigation they found themselves with on the virtual eve of trial. That is not a reasonable strategy. That is a white flag.

The Government again tries to save the reasonableness of counsel's actions by claiming that in the Government's view, the evidence showed that Ms. Johnson lived a "normal life" and the crimes demonstrated "complex planning" ability. Resistance at 33. "Under these circumstances," the Government says, "it was reasonable for trial counsel to conclude that a claim defendant's will was destroyed and her mental state so impaired that she could not comply with the law at the time of the offense would have fallen on deaf ears or, worse, would have offended the jury." Id. On the contrary, it is not reasonable for counsel to conclude anything in absence of investigation. The Government's perception of

12

the evidence is not an excuse for a failure to investigate Ms. Johnson's mental status – it is an invitation. If, as the Government contends, its aggravating view of the evidence was clear to counsel prior to trial, then it is precisely that characterization of the evidence that counsel should have sought to undermine. Again, if counsel had investigated and found unpersuasive evidence rebutting these claims, they could have made a reasonable choice not to offer the evidence. It is not reasonable to consider the Government's characterizations of a defendant as true and not even look for another explanation.

The effect of Rule 12.2 on this issue has been overblown. Decisions regarding whether to subject a defendant to a Government rebuttal evaluation do not happen until the end of Step 4. Counsel's unreasonable performance had largely taken place before that. The fact that counsel got themselves in a position, so close to trial, that they needed to adjust their *investigation* in order to guarantee limitation on a rebuttal evaluation was itself deficient performance. The fact that their decision may have been the most reasonable among the unacceptable, uninformed choices they had left themselves at that point does not save their performance overall. It is Ms. Johnson's position that had counsel done the proper, complete investigation, in a timely fashion, counsel would have found themselves with a wealth of mitigating evidence, that supported at least four statutory mitigating circumstances, if not more nonstatutory mitgating circumstances, and that they would have had nothing to fear from a Government evaluation of their client. There is simply nothing in Rule 12.2 that justifies the abandonment or curtailment of potentially fruitful investigation conducted in a

13

timely and professional manner from the beginning. How Rule 12.2 operates to manipulate the decisions of an unprepared attorney at the last minute need not concern us here, as by that point, the fly is already in the ointment.

### 2. Failure to Offer a Consistent Theory of Defense: Explaining to the Jury Why Ms. Johnson Did Not Try and Stop Dustin Honken when Counsel Conceded She was Present At the Crime Scenes was Critical

Ms. Johnson argued in her petition that counsel's failure to explain her mental state on the night of the offenses was deficient particularly in light of the defense they chose. Trial counsel's entire thrust was that Angela was part of the plan to make a videotape of Greg Nicholson exonerating Dustin Honken, and perhaps part of a plan to arrange a meeting with Dustin Honken and Terry DeGues, but that she was utterly unaware, until it happened, that Dustin Honken planned to kill these people. Portions of counsel's opening and closing arguments demonstrate this:

Dustin Honken's stated plan was to seize Greg Nicholson and obstruct the investigation against him by compelling Greg Nicholson to make a videotape exonerating Dustin Honken of any criminal conduct regarding methamphetamine. That's the plan that he convinces Angela Johnson to help him with. What Angela Johnson does not know is that Dustin Honken was not willing to take a change on Greg Nicholson being a snitch later. Angela Johnson would learn this too late to be of help, too late to change the plan, and too late to get out.

14

Tr. 46.

> She may have even participated in schemes hatched by Dustin Honken which later turned out differently than he ever led her to believe they would.

Tr. 48.

> Ladies and gentlemen of the jury, Angela Johnson has done some regrettable things in reference to this case. She failed to stop, if she could have, Dustin Honken from putting four people, including two little girls, to death on July 25, 1993.

Tr. 2292.

> We know little more than the fact that Johnson was with Dustin Honken on the night of July 25, 1993. We know that she was helping Dustin Honken find Greg Nicholson so that Honken would get a videotaped statement from Nicholson exonerating Honken for methamphetamine and distribution. We know from Angela's sobbing, anguished disclosures to her close friend that Christi Gaubatz that things got out of hand at some point that night.

Tr. 2325.

The Government pounced on this theory in rebuttal:

> Angela Johnson failed to stop the killings on July 25 if she could have done so. It's conceded that she didn't stop them if she could have, but it is clearly implied, suggested to you that she could not stopped those killings. (sic).

15

Tr. 2326, and went on at length as to why it believed its evidence showed that Ms. Johnson did know what was going happen on the nights of those crimes.

It is Ms. Johnson's contention that if trial counsel was going to place her at the scenes of the crimes, where, while they claimed she did not pull the triggers, she did not take any action to stop the murders, they would, perforce, have to explain the jury why she behaved as she did if they were going to convince the jury to save her life.

The undersigned, perhaps inartfully, referred to trial counsel's argument as a "mere presence" defense. Regardless of what counsel called it, however, the defense was what it was. It was not a suggestion that Ms. Johnson was on her way home from the movies when she stumbled across these crimes scenes, it was that although she was in for a penny, she never intended to be in for a pound. The Government's attempt to recast the defense into some sort of broader, chance, innocent presence defense should be rejected. See, e.g., ("To the contrary, if a person was "merely present" at the time of the offense, her state of mind does not bear importance. For trial counsel to present a coherent defense, they needed to maintain a consistent position that the defendant was merely present when Honken committed the offenses, and therefore not guilty.").

Indeed in this case, Ms. Johnson's mental state at the time of the offense was of critical importance to complete the defense's story, because while they had conceded she was there, they did not explain why she was unable to see what was about to happen or why she failed to take action to stop Honken. Explaining this to the jury was critical and would not

16

have been, as the Government contends, "completely inconsistent" or "duplicitous in the extreme." It may have been inconsistent if trial counsel had contended Ms. Johnson was simply not there, but that was not their defense, as the Government well knows.

Counsel did not, however, offer any answer to the looming question of, if Ms. Johnson was surprised by Honken's action, why she did not take evasive action. This question needed to be answered at the penalty phase once the jury had clearly found that it did believe Ms. Johnson was present at the scenes.

**B.      Prejudice**

### 1.      Evidence of temporal lobe dysfunction

In order to demonstrate prejudice, counsel must prove a reasonable likelihood that had counsel performed effectively, one juror would have voted to sentence Ms. Johnson to life without the possibility of parole. The evidence of prejudice offered by Ms. Johnson in the initial petition is a mere sketch of the vast array of mitigation that counsel turned their backs on. That picture will be pained in full at the evidentiary hearing in this case.

The Government contends that Ms. Johnson cannot demonstrate prejudice because Dr. Woods' diagnosis of temporal lobe dysfunction is "not based on EEG's, PET scans, CAT scans, or any other type of objective measurable testing. The Government is wrong. First, there are numerous kinds of tests that can be administered that are "objective and measurable" that do not involve neuroimaging. Dr. Woods administered a battery of neurological tests during his evaluation of Ms. Johnson, about which he will testify at the

17

hearing.  Second, Dr. Myla Young, a neuropsychologist, administered another battery of non-imaging tests, which confirmed Dr. Woods' diagnosis.  She will testify about these at the hearing.   Third, Ms. Johnson requested, but was denied, authorization to conduct neuroimaging tests, thus she cannot provide this proof, as a result of her indigency.  Fourth, as every psychologist that has ever practiced can attest, speaking to the client is the primary way to diagnose an array mental impairments.[4]  Finally, temporal lobe dysfunction in particular is frequently diagnosed without positive imaging results:

> EEG studies between seizures in patients with temporal lobe seizures may be normal unless a seizure occurs during the EEG test. People with TLE often have normal results on physical examinations. Neurologists rely on listening to the way seizures look and feel, in combination with EEG findings, to make the diagnosis.

Edwin Trevathan, MD MPH, "The diagnosis of epilepsy and the art of listening," NEUROLOGY 2003;61:E13-E14 (2003).   In fact, temporal lobe epilepsy is almost always diagnosed by the description of symptoms to a physician trained to spot it.

> These neurologists identified 96% of the patients with TLE by talking with their patients. Then they confirmed the diagnosis using other, more costly, tests. These tests included recording the patients' spells on videotape and using

---

[4]Apparently, the Government was, at least at one time, well aware of this.  See United States v. Johnson,  362 F.Supp. at 1081 "The government also complains that some mental defects and disorders may not be appropriate for testing, but are instead evaluated through interviews or examinations."

EEG (brain wave test). This study proved what all physicians know—the art

of listening to patients, or obtaining a "history," is a powerful diagnostic tool.

Id.  The fact that a person must be specifically trained in neurology to identify the symptoms

of temporal lobe dysfunction and differentiate them from the normal lapses in attention we

all experience[5] answers the Government's complaint that there are no records or previous

diagnoses of temporal lobe dysfunction in Ms. Johnson's history..  The only time Ms.

Johnson sought mental health care was for depression at an outpatient clinic located in a

mall.  It is unlikely that anyone there was trained to identify the condition.  None of the

experts retained by counsel at trial were specifically trained to do so, either.

Dr.  Woods identified a number of the relevant symptoms of temporal lobe

dysfunction in his declaration, found a number of these to be present in Ms. Johnson, and

found many of them to be present in her maternal ancestors.  He does not seek to, as the

Government scoffs, "diagnose" Ms. Johnson's mother and grandmother, but simply to

identify an apparent genetic pattern that reinforces his diagnosis of Ms. Johnson herself.

---

[5]The Government flippantly dismisses to the powerful impact of temporal lobe
dysfunction in people's lives based on the apparent benignity of some of its outward symptoms.
"It appears that Dr. Woods based his conclusion defendant suffers seziures, at least in part, on her
claim that she sometimes doesn't hear what people say and sometimes has to reread pages in a
book.  Dr. Wood (sic) apparently believes this evinces 'brief losses of consciousness, consistent
with absence seizures..."  If that is the test for diagnosing seizures, a great many people,
including the undersigned, could be so diagnosed."  Resistance at 31.   The fact that the
symptoms do not appear serious to the Government does not affect the seriousness of the
diagnosis.  The Government should be reminded that flu symptoms can signal the presence of
flu, or the presence of leukemia.  The difference is the eye of trained physician.

19

## 2. The Story that Could Have Been Told

The Government attempts to limit what trial counsel missed to arguments that Ms. Johnson "could not comply with the law at the time of the offense," Resistance at 33, or that her "capacity to conform her conduct to the law was impaired at the time of the offense. Resistance at 31. These statements refer only to one clause of one of the four statutory mitigating factors abandoned by counsel as a result of their deficient performance. The Government's overly narrow scope also attempts to avoid the bigger picture: Ms. Johnson's brain was not normal when she was born. It was not normal as it grew and developed. It was damaged by her upbringing when her malleable mind was subjected to an disruptive, unpredictable, violent, and bizarre environment created by her caregivers. Her brain's abnormalities left her with impaired mood that she treated to the best of her ability with what was available to her. Her brain stripped her of the ability to make choices her own best interest, and to avoid abusive, controlling relationships as an adult. This was the brain that Angela Johnson had in her head, this was the captain at the helm of her ship on the nights Dustin Honken committed these murders, but trial counsel did not tell the jury about that. Without that, the jury was left with the impression that while Angela had lived through a sad childhood, (as likely many on the jury did), there was nothing but bad character at the helm of the ship that night. And if that is all a jury is told – that a bad person with a sad childhood helped Dustin Honken kill five people – a death sentence was all but assured.

Of course nobody can reconstruct exactly what happened in Ms. Johnson's mind the

night the crimes occurred as the Government suggests. Not even Ms. Johnson can do that: the situation was too stressful, her mind too impaired to have an accurate memory of something like that. It was for the jury to determine from the full picture of her history and how her brain functioned to conclude what probably happened. This is how the Government proves what happened in criminal defendant's brains in trials every day. The Government proves intent at the moment of the crime without hearing from the defendant at all - but by clearly explaining all the facts and the circumstances that they contend prove what was happening in the defendant's mind. Counsel deprived the jury of critical information necessary to do so.

**3. The Government's Aggravating Evidence Pales In Comparison to what Counsel Could Have Offered**

The Government claims that a comprehensive picture about how Angela's brain was formed, damaged, and operated, and how her brain combined with her experience (all factors beyond her control) to explain her personality and behavior, led to her involvement with methamphetamine, her relationship with Dustin Honken, and her inability to stop him from killing five people, would not have persuaded one juror to spare her life because the Government had evidence that showed she had the ability for "complex planning" and she was a "high-functioning individual." The Government is wrong for several reasons.

First, the jury apparently did not believe that Angela was capable of "complex planning" with regard to the murder of Nicholson and the Duncans. They did not find the Government had shown substantial planning and premeditation regarding those crimes.

21

Second, the evidence does not bear out the Government's claim that she demonstrated the ability for "detailed planning... in her later planning to kidnap a drug dealer who owed her money." The "planning" evinced on those videotapes is little more than grandiose, manic rambling as Dr. Woods will explain at the hearing, and as trial counsel's experts could have explained to the jury if given the opportunity. There is no evidence that Angela Johnson ever actually *did* anything that resulted from her supposedly complex planning, although she did a lot of talking.

Third, it is belied by all of the evidence in this case to assert that Ms. Johnson was a "high-functioning individual." To be sure, all parties agree that we would hope our own daughter would grow up to be "high-functioning individuals." By this we do not mean that we hope she drops out of school after tenth grade, embarks on serial marriages and divorces, has two children with two different men, ends up in relationship in which her partner beats her half to death and stalks her, becomes a daily meth addict, a stripper, and an on again off again waitress, and never stays in one home for more than several months at a time. That our child would manage to keep it together enough so as not to become homeless or abandon her children, would likely not qualify in any of our books as "high functioning." This argument by the Government could have and should have been shattered easily by trial counsel and provides no obstacle to Ms. Johnson's proof of prejudice on this claim.

Fourth, the Government claims that Ms. Johnson's "admissions" about the crime would have been aggravating and outweighed the mitigating value of evidence about her

22

damaged brain.  Again, the Government is wrong.   All available evidence indicates that Ms. Johnson either would have denied being at the crime scenes altogether, or she would have said something along the lines of what counsel submitted in her offer to proffer prior to trial. If the former, experts could have explained that Ms. Johnson's denials stem from a variety of possible sources that did not negate in any way what they were saying about her brain.  For example, temporal lobe damage as well as complex trauma and even depression can lead to both long and short term memory impairment.   Highly traumatic events are often erased from even normal human memory completely.  Moreover, Ms. Johnson has a history of dissociation.  This is often both a psychologically and neurologically learned response to trauma that Ms. Johnson apparently developed as a child, enduring the "exorcisms" performed on her by her family.   Thus, an expert could have explained that even if Ms. Johnson was at the crime scenes, her mind was actually "somewhere else," impairing her ability to recall the event later.   The latter explanation is entirely consistent with Ms. Johnson's theory of defense and a mitigation presentation that encompassed the offense itself: that Ms. Johnson helped Mr. Honken with his ruse to get a tape from Mr. Nicholson and to lure Mr. DeGues to meet with Honken, and that he independently chose to escalate those situations to murder.   Explanation of Ms. Johnson's complete psychological, psychiatric, and neurological profile would have complemented and explained those "admissions."  Thus, just as fear of what Ms. Johnson might say to Government experts does not justify counsel's failure to investigate and present powerful mitigating evidence, they

23

similarly do not undermine Ms. Johnson's ability to prove prejudice.

Finally, the Government claims that Ms. Johnson cannot prove prejudice because there were a lot of aggravating circumstances. The Government is wrong. While the jury did find the aggravating factors the Government mentions, some combination of jurors also found *sixteen* mitigating factors indicating that the scale was close to balanced, and prime for tipping. There is a reasonable likelihood that if counsel had expanded its investigation and presentation of mitigating evidence in a way that would have afforded the jury an explanation for why Ms. Johnson thought and behaved the way she did, including on the night of the crimes, while simultaneously being able to offer four additional statutory mitigating factors, one juror would have been convinced to sentence Ms. Johnson to life.

## III. Failure to Introduce Evidence of Dustin Honken's Manipulative, Plotting, Violent Background

In her initial petition, Angela Johnson points to a wealth of information, available from a variety of sources, that Dustin Honken was a devious, criminal-minded, manipulative, violent natured person long before he barreled into Angela Johnson's life. This information would have dovetailed with other evidence, some presented, much not, regarding Ms. Johnson's susceptibility to the influence of such a person, and her limited role in the planning and carrying out of these crimes. It also would have rebutted the Government's misleading attempt to portray Mr. Honken as some quiet, bookish meth dealer, who was somehow induced into violence by Angela Johnson.

The Government alleges that it did not misrepresent Mr. Honken's violent past

24

because conspiracies to murder people are not crimes of violence. That assertion hardly merits a response, except to say that federal law apparently holds otherwise in a variety of contexts. Moreover, the Government misses the fact that Ms. Johnson's claim is broader: that Dustin Honken was criminal-minded, prone to planning complicated, cold-blooded, and vengeful schemes. Honken also prayed on the vulnerabilities of those around him to benefit himself. The Government does not contest counsel's ineffectiveness for failing to assert evidence of those qualities.

The Government next alleges that counsel was not ineffective for failing to offer this evidence because it "would have only fed into the Government's theory of the case" that Honken did not actually hurt anybody until after he met Angela Johnson. The Government misses the point, however, that its own theory is just that, a theory, and a meagerly supported one at that. It was counsel's job to rebut that theory by demonstrating that Honken was the one with violent tendencies, and it was Angela Johnson that did not even approach doing anything violent until she met Honken.

Had counsel properly investigated and presented the available evidence there is a reasonable likelihood one juror would have voted for life. As explained elsewhere in her pleadings, and as will be demonstrated in greater detail at the evidentiary hearing in this case, Angela Johnson was the victim of violence from an early age, when she was subjected to bizarre and terrifying religious exorcisms through her adulthood when she was routinely beaten bloody and stalked by Terry DeGues. Nobody in her family, her former husbands, or

25

any witness offered by the Government said that Angela ever did, said, planned anything violent, prayed on weaker people, or exploited their vulnerabilities. People who know Angela will say that she blustered to cover her insecurities and allied herself with people that she believed to be strong to cover her weaknesses. This kind of evidence would have extremely effective in explaining to the jury how this pregnant mother with no criminal record agreed to help Dustin Honken extort a videotaped statement from a witness Honken believed was a threat to him, and (along with evidence that could have been presented by defense experts at trial and will be augmented by Dr. Woods at the hearing) why she was impaired in her ability to resist or change course when Honken's plan morphed into murder.

For the reasons argued in Ms. Johnson's §2255 Motion, in this Reply, and to be presented at the upcoming evidentiary hearing, Ms. Johnson prays that this Court grant her a new trial and a new sentencing hearing.

Respectfully submitted,

/s_____
Michael E. Lawlor
Lawlor and Englert, LLC
6305 Ivy Lane
Suite 608
Greenbelt, MD
301.474.3404
301.474.3406 (fax)
mlawlor@verizon.net

26

/s_____
Ilann Maazel
Emery, Celli Brinkerhoff &
      Abady, LLP
75 Rockefeller Plaza
20th Floor
New York, NY 10019
212.763.5000
212.763.5001 (fax)
imaazel@ecbalaw.com

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 22, 2010.

      By: CM/ECF, email and regular mail to C.J. Williams, Esquire

/s_____
Michael Lawlor

27