# EXHIBIT B

1. I am an attorney licensed to practice law in Missouri and admitted to practice before the 8th and 10th Circuit Courts of Appeals and the United States Supreme Court. I have been admitted *pro hac vice* in capital cases in Federal courts in Arizona, Arkansas, Wyoming, Arkansas and Kansas, and in the State courts of Kansas and Arizona. I teach Criminal Law, Criminal Procedure, Postconviction Remedies, and Problems and Issues in the Death Penalty at UMKC School of Law, and I am Regional Resource Counsel for Capital 2254 cases within the 8th Circuit.

2. In June, 2010, I was asked by Michael Lawlor, counsel for Angela Johnson, to help him prepare for an evidentiary hearing on Ms. Johnson's petition for writ of habeas corpus. His specific questions had to do with preparing and presenting the mental health case, and he was focused primarily on the presentation of expert testimony by neuropsychiatrist George Woods. I asked for case materials, which included the 2255 petition, witness declarations developed in the postconviction investigation, and for related materials. I also contacted Dr. Woods, 2255 Project Director Ruth Friedman and mitigation specialist Scharlette Holdman.

3. Ms. Holdman and Mr. Lawlor had a falling out over the importance of the investigation, and Mr. Lawlor terminated the investigation long before its completion. Dr. Woods was concerned because his evaluation was not complete in that he needed to conduct further testing, and he had questions about Ms. Johnson's educational, medical and social history that could not be resolved without the benefit of further background investigation. Both Ms. Holdman and Dr. Woods indicated to me that they had been unsuccessful in educating Mr. Lawlor about the need for such additional testing and investigation, and that he responded in a hostile and resentful fashion to their counsel. At the point of my discussion with each of these individuals, communication with Mr. Lawlor had broken down.

4. Based on my review of documents and my discussions with prior resource counsel, the mental health expert and the mitigation specialist, I explained to Mr. Lawlor the importance of the social history investigation. I was working on a capital habeas at the time, and had just obtained a memo from my mitigation specialist about an interview with a particularly insightful life history witness, a former employer, who was knowledgeable about mental health symptoms because he had a brother diagnosed with schizophrenia. I shared that information with him, and he could see how important that was to the mental health issues in that case. I explained to Mr. Lawlor that based on the investigation done to date in Ms. Johnson's case, it is likely that finding a similarly insightful person in her background would be very meaningful to the expert assessment of her mental health and to the fact-finder's assessment of her culpability. I also recruited the assistance of capital trial attorney David Bruck to help explain this concept to Mr. Lawlor. In a conversation with Mr. Lawlor on June 15, 2010, he seemed finally to understand that his decision to prematurely pull the plug on the investigation was incorrect. It was also at this point that it seemed that Mr. Lawlor understood the necessity and manner of proving Strickland's prejudice prong. Although the petition alleges that

1

trial counsel's investigation was deficient, and that trial counsel neglected to interview many significant people in Ms. Johnson's life, the postconviction investigation remains similarly deficient.

5. I urged Mr. Lawlor to request additional time and to resume the life history investigation with all possible speed. I spoke with Scharlette Holdman and Lesa Watson, and Ms. Watson agreed to resume the investigation as soon as funding arrangements were made that would enable her to do so. Mr. Lawlor agreed that he would move forward in the manner described. Believing things were under control, I then moved on to my own cases. I conducted a week-long hearing on a state habeas corpus petition in a first degree murder case in Northwest Missouri in July, and I had an August 13, 2010, statute of limitations deadline to file a capital habeas corpus petition in a death penalty case in which I am counsel of record. My post-hearing proposed findings of fact and conclusions of law in the state habeas case were due and filed on August 26, 2010. Both of these matters took me away from Kansas City for extended periods of time since last fall, and that intensified in the summer. I was surprised to learn that while I was away from my office and otherwise occupied, virtually none of the investigation that I had discussed with Mr. Lawlor had been initiated, and Dr. Woods had decided to back out of the case because of his inability to obtain materials which in his medical judgment were essential to arriving at an accurate, reliable and defensible assessment.

6. In June and July, 2010, I obtained from Mr. Lawlor, Ms. Watson and Ms. Holdman select materials about the case so that I could give responsible advice and information. The notes and memos of the trial team reflect that they identified by name a number of witnesses who possess potentially relevant knowledge of the crime and/or Ms. Johnson's background and character, yet they were never interviewed. The un-interviewed witnesses consist of at least 45 friends, neighbors, employers, co-workers, fellow jail inmates and significant others. This includes a friend of Ms. Johnson's mother for more than 20 years and who lived in the home with the family, a couple who ran a church camp attended by Ms. Johnson and her siblings, neighbors in Leland, IA, ten friends who observed signs of both mania and depression, a former paramour, a life-long friend of Ms. Johnson's mother, five former employers who observed her inability to calculate math and her dependency on others for day-to-day living responsibilities, four former inmates at Linn County, and four persons who know the motivations of a key prosecution witness to give false testimony. In addition to these individuals, at least eight close relatives who have been identified as having relevant information. In my experience, aunts, uncles, cousins and in-laws are some of the best sources of biographical information, particularly given the barriers to disclosure by immediate family members of information regarding maltreatment, neglect and mental illness. Finally, trial counsel's notes of his interviews with Ms. Johnson contain a number of the above persons, and eleven additional people about whom trial counsel noted "obviously need to talk with." (The names of the witnesses can be provided *in camera* to the Court). After these interviews are conducted, but before the hearing, it will be necessary to interview the original trial team, investigator, mental health expert and mitigation specialist to address the implications of the more complete investigation on the issues of counsel's performance and resulting prejudice.

2

7. The postconviction investigation to date has barely scratched the surface. While Ms. Watson obtained sixteen witness declarations before her work was prematurely terminated, only five of those came from witnesses who had never previously been interviewed by trial counsel. The postconviction investigation has barely scratched the surface of the information that is potentially available. Further, the above-referenced witnesses do not include witnesses who were spoken to by trial counsel, but who will need to be re-interviewed if the investigation turns up additional areas of inquiry not previously explored. Some of the witness declarations obtained by Ms. Watson from witnesses who were interviewed by trial counsel reflect that trial counsel failed to inquire into areas that the limited investigation had failed to uncover. Although Ms. Holdman reviewed a number of records, interviewed the client, met with counsel and and started a life history investigation, she interviewed only six witnesses with relevant medical and psychiatric records before counsel stopped communicating with her. These interviews yielded cursory information that required follow up in order to be relevant to habeas claims, but Ms. Holdman received no guidance or direction from counsel in drafting declarations that the six witnesses signed.

8. The following investigative tasks should be undertaken immediately:

   a) Interview school peers, neighbors, mom's ex boyfriends re Angela's seizures, dissociation, behavior during critical life stages

   b) Locate and interview first grade and other elementary school teachers (Ms. Johnson withdrew from school in 8th grade to work for her mother).

   c) Locate and interview restaurant customers and co workers when Angela was 13 - 20. Ms. Goody only interviewed recent employers, although Ms. Johnson had good relationships with employers for whom she had worked in the more distant past.

   d) Locate and interview maternal cousins and step siblings who observed Angela in childhood.

   e) Interview and prepare trial defense experts: Hutchinson PhD, Cunningham, Logan MD, Gelbort PhD, and provide them with new materials developed by the postconviction investigation.

   f) Interview Mary Goody, the trial mitigation specialist.

   g) Continue Brady investigation regarding the Governments informants

   h) Locate and interview the health care provider who administered increased doses of psychotropic medication prior to and during Ms. Johnson's trial, and inquire into whether trial experts knew the dose was increased.

   i) Locate and interview ten named witnesses who observed Angela prior to trial who could describe her response and changed behavior due to change in meds. Incompetent to stand trial claim

j) Interview and prepare all trial counsel regarding their pretrial investigation and trial presentation, ineffective assistance of counsel claims, and effects of medication on Ms. Johnson's ability to understand and participate in her defense.

9. The witnesses whom have never been contacted by any lawyer acting on Ms. Johnson's behalf are likely to possess significant probative information critical to a life history investigation, including a former spouse, several ex-lovers, neighbors, close friends, employers and co-workers, cell mates, attorneys, physicians, aunts, uncles, cousins, former in-laws, jail guards and law enforcement officers. In my experience, many of these witnesses are likely to possess significant mitigating evidence, and likely witnessed conditions and events that would be quite relevant to assessing her mental and emotional functioning. It is quite likely that some of these individuals were sufficiently close to Ms. Johnson to have seen or experienced her positive qualities, which is an important aspect of presenting a thorough, probative and humanizing picture of Ms. Johnson's mental health.

10. Further, I have not had the opportunity to explore the completeness of life history records for Ms. Johnson. Ms. Holdman advised me that Ms. Johnson's family lived in Pueblo Colorado during her kindergarten or first grade years, and my own mitigation specialist, Ms. Lindsay Runnels, was on her way to Pueblo to obtain records from the Colorado State Hospital for a client of mine, so I had her stop and pick up the records. They revealed that Ms. Johnson was required to repeat the first grade, and was lagging in some developmental milestones. The first grade teacher is obviously someone who should be interviewed.

11. I have spent considerable time and effort trying to explain to Mr. Lawlor the importance of undertaking this investigation, and I spoke directly with Ms. Watson to assist in guiding her investigation. I have no firm understanding from Mr. Lawlor of whether court approval is necessary for Ms. Watson's fees and expenses, or whether she can plan, schedule and book investigative travel out of funds already approved by the Court for that purpose. For whatever reason, Ms. Watson has not resumed her investigation in spite of her availability to do so. Consequently, with the exception of the investigation undertaken *gratis* by my investigator, Ms. Runnels, to my knowledge, nothing has been accomplished since the Court granted Mr. Lawlor's request for a continuance.

12. In my discussions with Mr. Lawlor, he is quick to admit that he is "in over his head" in this case, but his problem goes deeper than that. He seems to be falling apart because he is not able to take even simple, fairly routine steps to reinitiate the investigation. It is difficult to imagine that with his mother's health problems he will become more rather than less functional. Even with people such as myself, Scharlette Holdman, Lesa Watson and Ms. Friedman's project offering concrete help and advice in how to investigate and present the issues in Ms. Johnson's case, he has difficulty taking even the most basic steps forward on the investigation and preparation of this case. Everything that remained undone in June, 2010, remains undone at the present time, notwithstanding the

4

availability of help and resources enabling Mr. Lawlor to perform. Although he has represented to the Court that his co-counsel, Ilann Maazel, has not contributed to Ms. Johnson's representation since the filing of the petition, I get a somewhat different picture from Mr. Maazel having to do with communication issues with Mr. Lawlor. He has alienated the 2255 project, his co-counsel, his mitigation investigator, his expert witnesses, and he has developed an antagonistic relationship with the Court as well. I have grave concerns that he will rise to the occasion at the present time, especially with the recent added distraction of his mother's health problems. Because of these concerns, I sought assistance from experienced death penalty defense lawyers for Mr. Lawlor, and Michael Burt responded to my call. Issues of expertise and experience aside, Ms. Johnson requires an attorney who will be able to prove to this Court, and ultimately to the Eighth Circuit, why trial counsel's omissions deprived the jury of information critical to their decision such that the death penalty imposed upon her is unreliable. She also needs a lead attorney, such as Mr. Burt, who will approach her case with the utmost diligence and integrity.

13. Mr. Lawlor and Mr. Maazel have done a lot of work on this case, but investigation relevant to the most important issues in the case, culpability and mental health, and other penalty phase issues, took a back seat to exploration of traditional guilt-innocence phase issues. This is not uncommon with lawyers who have little or no previous capital experience. They tend to focus on issues that are within their traditional experience and comfort zone, often to the exclusion of the equally critical life-or-death decision. That certainly appears to have happened in this case; both Mr. Maazel and Mr. Lawlor have indicated that they spent substantial time investigating and arguing about issues regarding guilt or innocence. The decision was made to terminate prematurely the investigation of Ms. Johnson's background, character and mental health runs counter to all the advice that counsel received from the 2255 Project, resource counsel, and their own experts and mitigation specialists.

14. Preparation for Ms. Johnson's hearing at this stage is more than a matter of reviewing documents and planning the direct and cross-examination of witnesses. As I explained to Mr. Lawlor, we don't know what we don't know. Witness interviews are critical to the development and proof of Ms. Johnson's claims for relief, particularly those claims that involve issues of background, character and mental health.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 2nd day of September, 2010.

Sean D. O'Brien