# EXHIBIT C

**DECLARATION OF ILANN M. MAAZEL IN SUPPORT OF MOTION TO SUBSTITUTE COUNSEL AND FOR A CONTINUANCE OF HEARING**

I, ILANN M. MAAZEL, declare under penalty of perjury:

1. I am a partner at Emery Celli Brinckerhoff & Abady LLP ("ECBA"), and co-counsel for Angela Johnson. I make this declaration in support of Ms. Johnson's motion to substitute Michael Burt for Michael Lawlor as lead counsel in this action, and for a continuance of the hearing presently scheduled to begin October 4, 2010.

2. At the request of the Federal Capital Habeas Project (the "Project"), I and my firm agreed to represent Ms. Johnson, an individual convicted of capital murder, in her 28 U.S.C. § 2255 capital habeas motion. I had never been involved in a capital case before, either at the trial level, on direct appeal, or in a habeas action, in state or federal court. The Project, however, recruited me and my small law firm to support a lead counsel with substantial experience in this field, in part because of our experience handling a range of constitutional issues in the context of a civil rights litigation practice.

3. The Project recruited Michael Lawlor to serve as lead counsel for Ms. Johnson. I had never met or heard of Mr. Lawlor prior to this case. Although it is my usual practice to co-counsel cases (if at all) only with lawyers whom I know, my firm relied on the Project—a leader in this field—to recruit lead counsel with substantial death penalty experience who could handle this complex and difficult case.

4. As eventually became apparent, however, Mr. Lawlor was incapable of leading Ms. Johnson's 2255 team. Over the course of the case, I have seen Mr. Lawlor cut off contact with original resource counsel (the Project), cut off contact with our mitigation specialist

1

(Scharlette Holdman), and for a substantial period cut off contact with our fact investigator (Lesa Watson). Within our team, Mr. Lawlor has almost exclusively handled the mental health aspect of the case. Although I attempted to serve as a conduit between Ms. Holdman and Mr. Lawlor, this was ultimately a futile effort, given my lack of expertise in this area, the fact that Mr. Lawlor was responsible for this subject area in the case, and the depth of the rift between Mr. Lawlor and Ms. Holdman . At a later point, Mr. Lawlor also had difficulties communicating with Dr. George Woods, Ms. Johnson's lead expert, and again I tried to be of help in facilitating communication. Ultimately, however, Dr. Woods and Mr. Lawlor have had to communicate directly concerning the mental health claims in this case, an area within Mr. Lawlor's responsibility and about which I have no expertise. As described further below, Dr. Woods has since concluded that he is unable to participate in this case if Mr. Lawlor remains lead counsel, a development which would make it nearly impossible to present Ms. Johnson's claims accurately and fully.

5. In addition to the above, I have had my own difficulties co-counseling with Mr. Lawlor, in part because (in my view) the work product of our firm has largely been ignored or discarded, our views have not been heard or at least reflected in the case, and there has not been effective communication among counsel throughout this case. Though I considered moving to withdraw as counsel, I ultimately felt Ms. Johnson's interests were best served by having at least someone on the litigation team with knowledge of the relevant facts who could offer some continuity to the case and who would communicate and consult with outside experts and resource counsel. I was also concerned that any discussion with the court, *ex parte* or otherwise, considering my reasons for withdrawing, could cast our lead counsel in a negative light before the ultimate decision-maker in this case: Your Honor.

2

6.     Mr. Lawlor's email correspondence with the Court on August 25 reflects the lack of effective communication among counsel.  In those emails, Mr. Lawlor told the Court that it was "cruel" and "unprofessional," and he threatened to move to withdraw from the case entirely.  Those emails were known to the Court, and to the government, *but not to me*.  I did not know that my lead counsel had threatened to move to withdraw from the case until the Court later served all counsel (including me) with a copy of the email correspondence filed under seal.

7.     After the parties' hearing with the Court on August 25, Mr. Lawlor, Mr. O'Brien, Mr. Burt, Dr. Woods, and myself had a conversation concerning Dr. Woods' ability to attend a December 13, 2010 hearing in person or by teleconference, or to make himself available for a deposition prior to the hearing.  Dr. Woods stated, however, that—consistent with his own ethical obligations—he would not participate further in this case if Mr. Lawlor remained lead counsel.  As described elsewhere, Dr. Woods is Ms. Johnson's main expert in this action, and a critical part of Ms. Johnson's ability to prove her mental health-related claims.

8.     Earlier this year, Mr. Lawlor reached out to Sean O'Brien, as an alternative resource counsel.  This is a welcome development.  Mr. O'Brien has offered a steady hand to attempt to right this ship, but Mr. O'Brien's declaration in support of this motion gives me great concern as to whether the investigation that has been performed is in any way adequate for this case.  Because of my lack of capital case experience and inexperience challenging the constitutionality of death sentences, I did not recognize before reading Mr. O'Brien's declaration how much still needs to be done.  Even despite my communications with Ms. Holdman, I simply failed to grasp the range of investigative tasks that still remain incomplete.  Even if I had recognized what investigation still needs to be completed, I lack the expertise to effectively take

3

the lead in presenting relevant evidence in support of legal claims with which I am only beginning to be familiar.

9. In light of my experience working with Mr. Lawlor over the past two years, I believe he should be substituted as lead counsel for a number of reasons. For whatever reasons, he has demonstrated himself to be plainly not up to the task of effectively representing Ms. Johnson in this habeas case. If he continues, we will lose our principal mental health expert: Dr. Woods. Mr. Lawlor has been unable to communicate with any team member or with 2255 Resource Counsel, gaps which I alone have not been able to bridge to good effect and with any consistency. There is apparently a universal view among Ruth Friedman at the Project, Mr. O'Brien, Dr. Woods, and Ms. Holdman—all people with substantially more experience than I in death penalty work – that Mr. Lawlor cannot effectively or competently represent Ms. Johnson. And in addition to all else, Mr. Lawlor is now preoccupied with an immediate, life-threatening illness of his mother.

10. I have an additional concern, raised by recent events concerning the Court and Mr. Lawlor. The heated correspondence between Mr. Lawlor and the Court – of a kind I have never seen in my law practice – raises at a minimum a major concern about Mr. Lawlor's judgment as of late and his ability to maintain the appropriate demeanor and consistency of focus that is clearly necessary to prepare for and act as lead counsel in an evidentiary hearing in a capital postconviction case.

11. With a hearing date of October 4, and a preoccupied and (by all accounts in this case) incapable lead counsel, I will not be able to effectively or competently represent Ms. Johnson as quasi-lead counsel. I do not have the experience in this field to act as lead counsel, or to prepare this case adequately for a hearing. I believe that a trait of a good lawyer is to know

4

what (s)he cannot do, and I cannot act as quasi-lead counsel in a death penalty case. In fact, I cannot ethically represent Ms. Johnson as lead counsel (whether officially or de facto because of the present circumstances) because of my lack of capital case or habeas corpus experience. *See* NY Rule of Professional Conduct 1.1 (2009) ("RULE 1.1: Competence (a) A lawyer should provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

(b) A lawyer shall not handle a legal matter that the lawyer knows or should know that the lawyer is not competent to handle, without associating with a lawyer who is competent to handle it."); *see* Commentary to NY Rule of Professional Conduct 1.1, Para. 1 Legal Knowledge and Skill ("In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to associate with a lawyer of established competence in the field in question."). I agreed to represent Ms. Johnson in this matter with the understanding that I would be working alongside, and under the leadership of, experienced capital habeas counsel. Now that it is plain that Mr. Lawlor is not in a position to provide that leadership, I cannot ethically move forward without a new lead counsel.

12. Finally, it is my understanding that, in the larger context of death penalty habeas cases, this case has been on a relatively fast track. This October will be but one year since the petition was filed. I appreciate and respect the Court's desire not to delay the case unnecessarily, and share that sentiment, but my overriding concern is that Ms. Johnson be represented properly, even if that requires some additional delay.

5

13.	I therefore respectfully request that the Court substitute Mr. Lawlor out of this case, permit Michael Burt to become lead counsel, and provide a continuance to allow a proper investigation to be completed, and Mr. Burt to be able represent Ms. Johnson competently and effectively.

Dated:	September 3, 2010
	New York, New York

_____/s/___Ilann M. Maazel_____
ILANN M. MAAZEL