# EXHIBIT D

Case 3:09-cv-03064-MWB-LTS    Document 64-4    Filed 09/03/10    Page 1 of 3

# G

## WW GEORGE W. WOODS, JR., M.D.

A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Seattle Atlanta San Antonio

September 3, 2010

Michael Burt, Esq.
600 Townsend, Suite 329e
San Francisco, California 94103

Re: Angela Johnson

Mr. Burt,

I am writing this letter in order to detail the deterioration of my ability to effectively present my findings in the case of United States v. Angela Johnson. Although my neuropsychiatric findings support the diagnosis and conclusions I came to in my report, due to the gravity of this case, it is necessary to buttress those findings with all available supportive documentation . It is equally important to determine material that may be contradictory to my findings, so that I may render the most creditable determination possible after consideration of all available evidence.

I was first contracted to evaluate Mr. Johnson in 2009. I was given a preliminary social history, psychiatric and psychological findings from previous experts, both state and defense, who had evaluated Ms. Johnson pretrial. I was also given selected trial transcripts, medical records from the pretrial jails Ms. Johnson was held in, and some declarations of her mother and other family members.

In my evaluation of Ms. Johnson, it became apparent that she suffered from significant cognitive impairments, and the bases of these impairments could be found in family, academic, and environmental history. I was aware Ms. Scharlette Holdman had been the mitigation expert, and discussed the status of the supporting data that could further solidify my clinical opinions.

Ms. Holdman reported that there were 150 boxes of materials, and no one had gone through the complete set of materials. She had been able to get through 70 boxes before communication between her and Mr. Lawlor broke down completely, and she was relieved of her duties on the case.

Mr. Lawlor would be unresponsive for months at a time and, after filing my report, I had no contact with Mr. Lawlor for several months, in spite of multiple emails. I explained in those emails and calls to Mr. Lawlor that there was a tremendous amount of work that needed to be completed in order to further support the clinical opinions I had rendered and reinforce my forensic conclusions.

After no response, I called Mr. Lawlor and explained to him that I could not continue on the case with such limited contact and his refusal to cooperate with my requests for additional materials.

Mr. Lawlor finally agreed to meet me in Atlanta, Georgia, along with Marta Kahn, Esq. We met on May 7, 2010. Over the course of the next 1.5 hours, Ms. Kahn and I began to realize that no one had completed a review of the available material. When Mr. Lawlor asked me what materials I needed, Ms. Kahn asked him how could I possibly know, since no one had ever completed a material review.

It was agreed on that day, in a very, very short meeting, given the weight of the issues to be discussed, that a thorough material review would be completed. I would be apprised of what materials were there, and sent those materials necessary for me to conduct a thorough review of Ms. Johnson's social history. Additionally, it was agreed that interviews with past experts and family members would be set up.

None of the agreed upon items were completed. I never received the list of materials that I requested. Interviews with past experts were not set up. Family visits/interviews by me were not set up. Mr. Lawlor, again, become incommunicado.

During the next several months, Sean O'Brien, Esq. became aware of the circumstances, and we discussed the lack of communication, poor planning, and impaired follow through that were the only consistencies in the case so far. Also during this period, a continuance was granted.,

Mr. O'Brien was aware of the needs of the case. When the continuance was granted, it was my belief that work would move ahead on the case, and we could complete the infrastructure needed to present a compelling case of cognitive impairment. I asked and received another opportunity to continue my examination of Ms. Johnson.

 We also agreed to set up interviews with experts that had examined Ms. Johnson previously. We agreed to contact neuroimaging experts to perform neuroimaging examinations. We discussed further neuropsychological testing to more clearly delineate Ms. Johnson's cognitive impairments from other confounding factors, like her profound trauma history. I asked Mr. Lawlor what his plans were for developing the social history so crucial to solidifying medical findings. He minimized the need for a complete social history repeatedly.

Over the course of the next week, I made arrangements to travel and see Ms. Johnson. Again, I did not hear from Mr. Lawlor again until I told him how concerned I was because I had made travel arrangements, and had been told repeatedly by the prison that no arrangements to allow me to see Ms. Johnson had been made. Two days prior to my trip, Mr. Lawlor called me and said arrangements would be made, and that I should go. I believe arrangements for me to examine Ms. Johnson were completed the day I arrived.

Mr. Lawlor, again, became incommunicado. Emails were not returned. Calls were not answered. He did call and ask me how the visit went. There were no further conversations with me about completing the social history, providing interviews with trial experts, completing the neurological examinations, or deriving a better understanding of what materials were available. It was at this point that I determined, ethically, I could no longer continue in my expert capacity, and informed Mr. Lawlor, by email, that I had withdrawn from Ms. Johnson's case.

Sincerely,

George W. Woods, Jr., M.D.