ANGELA JOHNSON,    &ast;
         &ast;
   Petitioner,   &ast;
         &ast;   **No. C 09-3064-MWB**
v.        &ast;   **CAPITAL CASE**
         &ast;
UNITED STATES OF AMERICA, &ast;
         &ast;
   Respondent  &ast;

**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY OR *IN CAMERA* INSPECTION OF GOVERNMENTAL COMMUNICATIONS RELEVANT TO CLAIM III A. 1 OF THE CORRECTED, AMENDED MOTION UNDER 28 U.S.C. § 2255**

### I. BACKGROUND

Up to this point, there has been very little need for the Court to resolve discovery disputes in this 2255 case. When disputes have arisen, the Court has made it clear that liberal and voluntary discovery should be the rule and not the exception.

Early on, the government moved to compel a neuropsychological examination of Ms. Johnson, claiming that she "has placed her mental condition into controversy by the nature of the claims she made in her Motion" and that " [g]ood cause therefore exists for the government to be permitted to examine defendant for purposes of responding to her allegations." [Doc. 29, p. 1]. The Court had "no hesitation finding that Johnson's mental condition is 'in controversy' in these § 2255 proceedings" and thus it granted the government's motion , concluding that under Rule 6 of the Rules Governing Section 2255

1

Proceedings For The United States District Courts (Habeas Rule 6), a party seeking discovery in a 2255 proceeding was only required to show that "if the facts are fully developed, there is more than a 'slight chance' that the [party] may be able to demonstrate that the [party] is ...entitled to relief." [Doc. 41, p. 13].

The Court also resolved a discovery dispute in the government's favor concerning the reports of Drs. Gelbort and Young. The Court ruled that petitioner must make the evaluations of these experts available to the government, and that "[i]f the parties are unable to accomplish that, the court may order a deposition or strike...testimony." [Doc. 40]. The Court also "advise[d] the parties to move toward full, voluntary, reciprocal discovery of experts' files, guided by Rule 35(b)" and indicated that it "will intervene if the parties are unable to work out disclosures." (Id.)

Shortly after the Court entered this order, the government moved to compel a wide range of material, including:

1) A report by Dr. Myla Young regarding her examinations of and findings regarding defendant Angela Johnson;

2) A copy of any and all results of tests or examinations conducted by both Dr. George Woods and Dr. Myla Young of defendant Angela Johnson;

3) A copy of any and all work papers, including notes of interviews, created by Dr. George Woods and Dr. Myla Young in connection with their examination and testing of defendant Angela Johnson;

2

4) A copy of any report, notes, or recording of or reflecting an interview of Christy Gaubatz;

5) A copy of all correspondence between defendant's trial counsel regarding their representation of defendant;

6) A copy of all correspondence of all correspondence between defendant and her trial counsel, and;

7) A copy of all notes of defendant's trial counsel pertaining to their representation of defendant.

[Doc. 44].

In support of its request for items 5-7, the government asserted that "defendant has waived any attorney-client privilege she had regarding such materials by asserting an ineffective assistance of counsel claim and by specifically referencing such materials in her petition. For the government to be in a position to effectively respond to defendant's allegations that her attorneys were ineffective, the government should be permitted access to the same materials upon which defendant is relying to make her argument." [Doc. 44, p. 4, citing *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) (defendant cannot use the attorney-client privilege as both a shield and a sword).]

Wisely heeding the Court's admonition that discovery in this case should be "full, voluntary, [and] reciprocal", predecessor habeas counsel did not contest the government's motion, but only indicated that since the government had just recently asked for the

requested materisl, "it will take Petitioner some time to locate, copy and deliver these materials." [Doc. 45]. The Court subsequently dismissed the discovery motion as moot. [Doc. 47]. Predecessor habeas counsel thereafter produced 3,526 pages of attorney client and work product material in response to the government's requests for items 5-7, and additional material in response to the other requests.

On December 3, 2010, present counsel wrote to the government that "I have received from Mr. Lawlor approximately 140 boxes of material which consist of trial counsel files, government discovery, investigative files, and post-conviction files. There are several boxes of Mary Goody material in this collection. In theory, given the broad scope of the petition, we have no problem in giving you access to everything in these files, as well as our own investigative reports of witnesses we intend to use, as long as there is an understanding that any disclosures cannot be used in any subsequent retrial. See, *Bittaker v. Woodford*, 331 F. 3d 715 (9th Cir. 2003)." Counsel for the government responded that "I'm agreeable to the idea that anything disclosed as part of this litigation would not be directly admissible if there were a retrial (there are some potential exceptions for impeachment, I believe, should someone testify inconsistent with the information in a retrial, but we can cross that bridge when if we get there)." In reliance on this representation, present counsel released to the government 7340 additional pages of material from the trial team's files and made it clear that it would continue to comply with all discovery requests on a voluntary basis.

4

In the spirit of "full, voluntary, [and] reciprocal" discovery, the defense has made some requests of its own. On December 7, 2010, present counsel requested that the government provide: (1) the audio and video taped interview of Petitioner conducted by Dr. Martell in March 2010, as well as his raw testing data; and (2) the results of an Office of Professional Responsibility investigation pending against Martell in Washington, DC. at the time of Ms. Johnson's trial. The raw data was provided to petitioner's expert on December 14, 2010 and the interview tapes were provided to counsel on January 7, 2011. On February 3, 2011, the government indicated in response to the second request that it had "made progress" and was " awaiting permission from PRAO to turn it over", but as of the date of this memorandum the requested discovery has not been produced. The government has also not produced a witness list or witness statements, although Ms. Johnson did so on February 21, 2011 in compliance with the agreement of the parties.

On February 3, 2011, petitioner made the request which is at issue in this motion. Petitioner requested in an email that the government produce: "(1) any correspondence or memoranda by members of United States Attorney's Office for the Northern District of Iowa directed to defense counsel for Johnson or Honken relevant to plea negotiations in this case; (2) any correspondence or memoranda by members of the same Office directed to Main Justice relevant to plea negotiations in this case; (3) any correspondence or memoranda by Main Justice directed to members of the United States Attorney's Office for the Northern District of Iowa relevant to plea negotiations in this

5

case; (4) any correspondence or memoranda between members of the United States Attorney's Office for the Northern District of Iowa relevant to plea negotiations in this case; and (5) any correspondence or memoranda by Main Justice directed to members of the United States Attorney's Office for the Northern District of Iowa relevant to the date of when there was any change in policy regarding acceptance of pleas in death eligible cases. The word 'correspondence' includes emails."

In support of this request, petitioner pointed out to the government that in claim III A. 1 of the Corrected Amended Motion Under 28 U.S.C. § 2255 petitioner was contending that Ms. Johnson was denied the effective assistance of counsel at trial because her counsel failed to take necessary steps to resolve this case in a plea for a sentence less than death. [Doc. 26, pp. 9-24]. Petitioner also pointed out that in its Amended Resistance to this claim the government had asserted that

> Regardless of what defendant would have done, there is no showing that the government would ever have agreed to a sentence less than death. The reported cases in this area all involve instances where the government had made a plea offer and the defendant alleges he failed to accept the plea because of faulty advice of counsel. Here, the government never made a plea offer to the defendant. Though there were preliminary discussions about possible ways to resolve the case, the discussions never progressed to the stage where the government gave defendant a plea offer. Regardless, no one in the United States Attorney's Office had the authority to make a binding plea offer to the defendant. Only the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case. There is nothing but conjecture to suggest the Attorney General of the United

6

States would have agreed to take the death penalty off the table in exchange for a guilty plea.

[Doc. 27, p. 26]

Petitioner further pointed out that although items 2-4 might normally be considered privileged, "it is our position that any privilege has been waived by your assertions in the Resistance, much like the attorney-client privilege is waived because of the assertions in the 2255 motion. At the very least, the requested items should be produced for *in camera* inspection by Judge Bennett. See, *United States v. Kee*, 2000 WL 863119, p. 4 (S.D.N.Y. 2000)('Kee does raise one concern that merits further inquiry. He alleges that the submissions to the Attorney General did not include evidence that he did not personally commit the murder for which the Government seeks the death penalty. Accordingly, the Court will review *in camera* documents sufficient to show whether evidence of this sort was in the Government's possession but not included in the Government's submission to the Attorney General.')."

The government responded that

As to plea negotiations, I am willing to give you all communication between the government and defense counsel (indeed, since you have the defense files, you should already have this). Nothing in my response implicated communication with Main Justice that is protected by the attorney work product and deliberative process privileges. I did not indicate we communicated with main justice about the plea, or that they communicated with us about the plea. I asserted the USAO had no authority to agree to any plea agreement and you have nothing but conjecture that Main Justice would have agreed to a plea. What we do know is that

7

> when Barrigan made the 11th hour plea offer, the AG rejected it. My response was tailored to the assertions that statements made by Pat Reinert or Tom Miller about what plea might be acceptable was in any way binding on the AG, or was proof of what the AG would accept.
>
> In any event, I'm not sure I see that you have any viable claim here. In the interview with Martell, Johnson claims she's totally innocent and did not commit the crime.

In a subsequent email, present counsel argued that "[i]n terms of the merits of the claim, I do not think that Angela's comments in 2010 to a government agent who is actively seeking her execution is necessarily determinative of what she would have done before and at the time of trial had trial counsel performed the steps we say they should have performed to perfect a plea." The government responded that "I will not provide the items you request in (2) through (5) because it constitutes ordinary attorney work product, opinion attorney work product, and is further protected by the deliberative process privilege."

As of the date of this memorandum, the government has not provided any of the five requested items.

**II. Argument**

Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that the judge "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of the law." Rule 6(b) provides that the party requesting discovery must

8

provide reasons for the request. As this Court has previously ruled in this very case, a party seeking discovery in a 2255 proceeding is only required to show that "if the facts are fully developed, there is more than a 'slight chance' that the [party] may be able to demonstrate that the [party] is ...entitled to relief." [Doc. 41, p. 13].

In this case, the threshold showing of "good cause" is clearly met. Based on the allegations set forth at pages 9-24 of the Corrected, Amended Motion and as more fully developed below, there is "more than a slight chance" that Ms. Johnson may be able to demonstrate that she is entitled to relief on her plea claim under the standards announced by this Court in *Wanatee v. Ault*, 39 F. Supp. 2d 1164 (N.D. Iowa 1999)(*Wanatee I*), *Wanatee v. Ault*, 101 F. Supp. 2d 1189 (N. D. Iowa 2000)(*Wanatee II*), aff'd 259 F. 3d 700 (8th. Cir. 2001), *United States v. Hernandez*, 450 F. Supp. 2d 950, 974-983 (N.D. Iowa 2006) . Petitioner needs the requested material in order to bolster her plea claim and in order to rebut the specific counter-arguments advanced by the government in its Amended Resistance.

The government claims in its Amended Resistance that aside from Ms. Johnson's own explicit direction to her trial attorneys on May 10, 2003 in 2255 Motion Exhibit 7 ("I am going to be as clear as I can[;] I want to plead guilty"), "[d]efendant has provided no other evidence, before or after this note, showing any willingness to plead guilty." (Amended Resistance, Doc. 27, p. 25). However, in *Wanatee* I, where no such contemporaneous evidence of the client's desire to plead was produced and in fact there

9

were indications that "Wantee did not *want* to plead guilty" , this Court held that the fact that the defendant did not want to plead guilty "is irrelevant to whether counsel was ineffective for failing to inform Wanatee of the facts and law applicable to his case in order to allow him to make an informed choice about accepting or rejecting the plea agreement." 39 F. Supp. 2d at 1171. See also, *United States v. Hernandez*, 450 F. Supp. 2d at 975 (""[T]he fact that a defendant did not appear to want to plead guilty, rather than go to trial, was no impediment to an 'ineffective assistance' claim that he was improperly advised about whether or not to go to trial or to plead guilty."). Ms. Johnson has alleged, and is prepared to prove at the evidentiary hearing, that she was "improperly advised about whether or not to go to trial or to plead guilty." Given her allegations and the facts she has alleged in support thereof, there is "more than a slight chance" that she may be able to prevail on the deficient performance aspect of her plea claim.

*Wanatee* I also holds that in addition to deficient performance, a defendant must also establish prejudice by showing that the plea bargain would have resulted in a lesser sentence than what was received at trial, and that "but for counsel's advice, he would have accepted the plea." 39 F. Supp. 2d at 1171. Again, there is "more than a slight chance" that Ms. Johnson will be able to satisfy both prongs of the prejudice test.

Regarding the first prong, a letter written to the defense by Assistant United States Attorney Reinert on an October 10, 2001 (2255 Motion Exhibit 6)  stated the defense lawyers totally unreasonable position that Ms. Johnson may be willing to plead guilty if

10

she could be assured of a sentence of twenty years. Mr. Reinhart reasonably replied that "[i]n the right circumstances (cooperation) , our office may not be opposed to negotiating a settlement to this case, which would include a sentence other than the death penalty or life imprisonment", but that in his opinion "a 20 year-term, which equates to only four years per murder, is unconscionable." A sentence of "other than the death penalty or life imprisonment" is certainly less than the death sentence which Ms. Johnson received after trial and thus the first prong of the prejudice inquiry is satisfied.

Similarly, a note contained in Mr. Stower's file dated August 3, 2002, attached hereto as Exhibit A, indicates that Assistant United States Attorney Reinert advised Mr. Stowers that "he wants to resolve case by plea" and he "seemed to agree with concept of Rule 11(e)(1)(c) plea to term of years arrived at by reduction for substantial assistance being factored in." A note in Mr. Stower's file dated August 21, 2002, indicates that Assistant United States Attorneys Reinert and Murphy advised Mr. Stowers on August 21, 2002, that "they would have offered 10-15 years prior to recovery of bodies." (Exhibit A, p. 2) A note contained in Mr. Berrigan's file dated August 21, 2002 indicates that Assistant United States Attorney Murphy "reflected that he & Pat R. had talked early on about offering A.J. 10-15 years for information leading to discovery of bodies" and that Reinhart "claim[ed] to want death for Honken & A.J. cooperating but he can also do double/joint plea w/ Dustin getting LWOP." (Exhibit A, p. 3). Importantly, Mr. Berrigan unreasonably deduced from this discussion that since the government was

11

willing to offer 10-15 years *before the bodies were discovered*, that "our high teens, low 20's offer was not out of whack." (Id.). In any event, an offer of 10-15 years before the bodies were discovered, and an offer of a "term of years" after the bodies were discovered are both below the death sentence that Ms. Johnson received after her lawyers stubbornly insisted on a twenty year offer with no proffer.

Again, a note contained in Mr. Berrigan's file dated June 30, 2004 indicates that Charlie Rogers reported that "Miller wd. be happy to see a double plea with life imprisonment for Dustin Honken and 30 yrs. for Angela." (Exhibit A, p. 4). Instead of offering such a plea, which again was below the death sentence received after trial, Mr. Johnson's lawyers authorized Mr. Rogers to write a July 17, 2004 letter to the United States Attorney on behalf of both defendants in which he stated that both defendants "would enter pleas of guilty if Mr. Honken receives a life sentence (or group of life sentences) and Ms. Johnson's sentence totaled twenty years" (Exhibit A, p. 7). This offer, which again contained the "unconsionable" twenty year offer earlier rejected by the government was doomed to failure and indeed on July 26, 2004 Mr. Williams let slip that his office was not even recommending that D.O.J. accept the plea. (Exhibit A, p. 9).

Finally, a note contained in Mr. Berrigan's file dated August 12, 2004 indicates that Mr. Miller told all defense counsel that D.O. J. was considering "life plus 20 for A.J." but that "D.O.J. wants life + life." (Exhibit A, pp. 10-12). An August 12, 2004 letter written to the defense by Assistant United States Attorney Murphy states that "[i]f we

were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval, a proposed plea agreement...[t] basic terms of [which] would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence." ( 2255 Motion Exhibit 8) Thus, even at this point, defense counsel could have settled the case for a life sentence, which was less than the death penalty she received. Prong one of the prejudice inquiry is clearly established.

Regarding the second prong of the prejudice inquiry, this Court concluded in *Wanatee I* that the prejudice inquiry does *not* focus on the defendant's bare unwillingness to enter into a cooperation agreement with the government, but rather "the question is whether the petitioner would have agreed to the plea bargain 'if properly advised.'" 39 F. Supp. 2d at 1171. On this point, the evidence to be adduced at the evidentiary hearing will show that Ms. Johnson was never advised of her significant plea options prior to the discovery of the bodies, and that following the discovery of the bodies she was improperly advised to hold out for an "unconsionable" sentence of twenty years with no proffer, and her trial team realized too late, following the conviction and death sentence of Honken, that a sentence up to and including a life sentence and a proffer should have been offered when the government desperately needed her to get a guilty verdict and death sentence against Mr. Honken. That Ms. Johnson ultimately agreed to plead to a life sentence and provide the government with a proffer is strong evidence that had she been properly advised she would have agreed to and could have complied with

13

the plea offers which were repeatedly held out to her counsel at a time when she had considerable leverage in the case. See, *Wanatee I* , 39 F. Supp. 2d at 1175 (trial counsel's efforts to reopen a plea offer, ultimately rejected by the government, was evidence which indicated a reasonable probability that the petitioner would have accepted an earlier plea); *Wanatee II*, 101 F. Supp. 2d at 1200 (requiring that the court consider whether the petitioner has shown that he "could have performed" the plea agreement.)

Wanatee II* discusses one additional requirement to a successful plea claim: " 'Logic dictates...that to establish...prejudice, the petitioner must begin by proving that a plea agreement was formally offered by the government.' " 101 F. Supp. 2d at 1200, quoting *Kingsberry v. United States*, 202 F. 3d 1030, 1032 (8th Cir. 2000). However, In *Wantee II*, this Court found this condition satisfied even though it was "undisputed that there was no written offer of a plea agreement and...no written plea agreement was ever prepared or executed." 101 F. Supp. 2d at 1202. The Court reasoned that the question of whether an offer was made "depends upon evidence about the prosecutor's conduct, i.e., evidence that the prosecutor made (or did not make) a written or oral plea offer." (Id. 1201-1202). An oral offer was found to exist in *Wanatee II* even though the government's oral offer was contingent: "The respondent has never previously denied that Wanatee was offered the opportunity to plead guilty to second-degree murder, if he agreed to 'cooperate' with the prosecution before the trial information was filed. To the extent the respondent now attempts to raise such an objection, that objection is overruled." (Id. p,

14

1202). The Court concluded that "contrary to the respondent's assertions, the adequacy of Wanatee's proffer is not relevant to the question of whether the prosecutor made a plea offer, because the plea offer preceded any proffer of information by Wanatee.

Here, at the very least, Mr. Reinhert's letter of October 10, 2001 (2255 Motion Exhibit 6) and Mr. Murphy's letter of August 12, 2004 (2255 Motion Exhibit 8) constitute contingent plea offers within the meaning of *Wanatee II*. The government claims in its Amended Resistance that "although Defendant's attorneys did explore plea possibilities with the government repeatedly", "those discussions did not result in a plea agreement" , and that "it is pure conjecture that the Attorney General would have ever agreed to a plea agreement in this case." [Doc. 27, pp. 23-24]. It also claims on this issue of prejudice that "[r]egardless of what defendant would have done, there is no showing that the government would ever have agreed to a sentence less than death", that " the discussions never progressed to the stage where the government gave defendant a plea offer", that "[r]egardless, no one in the United States Attorney's Office had the authority to make a binding plea offer to the defendant", that "[o]nly the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case", and that "[t]here is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea." [Doc. 44, pp. 25-26].

15

The five items requested by the defense are directly relevant to rebutting the government's factual assertions that (1) there is no showing that the government would ever have agreed to a sentence less than death; (2) there is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea; and (3) "[o]nly the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case".

If for instance, there is case specific documentation showing that the local United States Attorney was recommending acceptance of a plea involving a sentence of less than death or that Main Justice would have accepted such a plea, this would bolster petitioner's plea claim and directly refute the government's counter-arguments.[1]

---

[1] Over the 12-year period covered by the Department of Justice's study of the federal death penalty between 1988 and 2000, 49 % (24 of 49) of white defendants for whom Attorney General Reno authorized the death penalty were subsequently allowed to plead guilty, thus avoiding the death penalty. See "Survey of the Federal Death Penalty System (1998 - 2000)", United States Department of Justice, Sec. B (1), Plea Agreements, 33-35 (September 12, 2000), http://www.justice.gov/dag/pubdoc/dpsurvey.html. By contrast, only 27% (28 out of 105) of African-American defendants and 27% (10 out of 37) of Hispanic defendants authorized for the death penalty were allowed to plead guilty. Thus, white capital defendants like Ms. Johnson were almost 75 percent more likely than Hispanic, African-American and other defendants to avoid the federal death penalty by a plea agreement during the Reno administration.

On June 6, 2001, Attorney General Ashcroft issued a Supplementary Report admitting that "white defendants ... fared better" in reaching "a plea agreement" subsequent to "a decision by the Attorney General to seek the death penalty." See "The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review," United States Department of Justice, p. 17 (June 6, 2001), http://www.justice.gov/dag/pubdoc/deathpenaltystudy.htm [hereinafter "Supplementary Data"].

16

Similarly, if there is official documentation, which Petitioner believes there is, showing that it was not always the policy of the Department of Justice to require the approval of the Attorney General for the acceptance of a plea in a death eligible case, then the existence and effective dates of that policy become highly relevant to the resolution of Petitioner's plea claim.[2] And the validity of that claim, as the Court has previously ruled, must be resolved *after* an evidentiary hearing, not before it on the basis of some comment that Ms. Johnson may have made to a government adversary like Dr. Martell.

---

[2] A former member of the Attorney General's Capital Case Review Committee, in a comprehensive review of the Justice Department's death penalty protocol, has written:

> Plea bargains that avoid the federal death penalty are treated differently from other decisions to withdraw death penalty notices once filed.  By virtue of tradition, not law, U.S. Attorneys (who are appointed by the President and confirmed by the Senate) have always been granted almost complete autonomy in disposing of cases within their districts by plea negotiation.  Thus, U.S. Attorney autonomy in plea bargaining controls in capital cases. Under the  protocols, United States Attorneys in the field may dispose of federal capital cases, once charged, without advance approval or review by the Attorney General or Main Justice.

Rory Little, *The Federal Death Penalty: History and Some Thoughts About The Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 417-418 (1999). See also, Supplementary Data, supra ("Under the current protocol, a United States Attorney can effectively negate a decision by the Attorney General to seek a capital sentence by subsequently reaching a plea agreement with the defendant to a noncapital offense. As in other areas, however, if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances. The revised protocol will require this approach.")

17

The government's assertion of privilege claims is also specious. The government appears to be arguing that since it did not specifically mention any inter-office or inter-Departmental discussions of the plea in its Amended Resistance, it has not put into controversy any statements that may have been made between lawyers working on the case or made by Main Justice. However, the factual assertions the government does make have clearly put into controversy whether "the government would ever have agreed to a sentence less than death" and whether "the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea".

The government is arguing for a narrow waiver rule under which a waiver of any privileged communication occurs only if the party specifically discloses that specific communication. The government apparently forgets that during the trial of this case it argued that such a narrow waiver rule was inconsistent with Eighth Circuit precedent. In Doc. 352-2, the government argued that it was entitled to all of Ms. Johnson's prior mental health records because she had put her mental health at issue, even though she had not specifically put into issue statements that she had made during the course of her prior treatment. The government noted that some courts had favored such a narrow waiver rule, but that the Eighth Circuit had specifically rejected such an approach in *Schoffstall v. Henderson*, 223 F. 3d 818 (8th Cir. 2000). (See, Doc. 352-2, p. 4). The government's expansive view of waiver was accepted by this Court [Doc. 384].

18

As noted above, the government has again successfully relied upon this expansive view of waiver in urging that it is entitled to all attorney-client and attorney team communications and all expert reports and to an examination of Ms. Johnson because Ms. Johnson has placed in issue the effectiveness of her trial attorneys and her mental state [Docs. 29, 44, Case No. C 09-3064-MWB].

In light of the government's long and successful advocacy of an expansive view of the waiver doctrine it should not now be permitted to repudiate that view in favor of a narrower approach that better services its interests in the present dispute. See, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.")

Moreover, even if one were to accept the government's new narrow appproach to waiver, there would be a waiver of the privileges asserted by the government in this case. As noted above, on July 26, 2004 Mr. Williams explicitly told Mr. Berrigan that the United States Attorney's Office was not recommending that D.O.J. accept the plea then under consideration. (Exhibit A, p. 9). Further, a note contained in Mr. Berrigan's file dated August 12, 2004 indicates that Mr. Miller told defense counsel for both Ms. Johnson and Mr. Honken that D.O. J. was considering "life plus 20 for A.J."

19

but that "D.O.J. wants life + life." (Exhibit A, pp. 10-12). Since these communications disclosed both the local recommendation and what D.O.J. wanted, there has been a waiver even under the narrow waiver approach now suggested by the government. See *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir.1998)("Voluntary disclosure of ...communications expressly waives the privilege" and the waiver extends to "any information directly related to that which was actually disclosed.")

Lastly, even if the Court were to uphold the government's privilege claims, it does not follow that Ms. Johnson should be totally deprived of the information she seeks, as the Court can review the material *in camera* to see if it supports or refutes the government's position. See, *United States v. Kee*, 2000 WL 863119, p. 4 (S.D.N.Y. 2000)('Kee does raise one concern that merits further inquiry. He alleges that the submissions to the Attorney General did not include evidence that he did not personally commit the murder for which the Government seeks the death penalty. Accordingly, the Court will review *in camera* documents sufficient to show whether evidence of this sort was in the Government's possession but not included in the Government's submission to the Attorney General.')." At the very least, the Court should order that the requested material be produced and sealed for purposes of any further review of this discovery motion in the Eighth Circuit.

For all of the foregoing reasons, Ms. Johnson respectfully requests that the Court order Respondent to provide items (1) through (5) directly to Petitioner's counsel, or, in

20

the alternative, to the Court for *in camera* inspection. At the very least, the Court should order that the requested material be produced and sealed for purposes of any further review of this discovery motion in the Eighth Circuit.

DATED this 1st day of March, 2011.

Respectfully submitted,

By: s/Michael Burt

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California 94103
Telephone: 415- 522-1508
Facsimile: 415- 522-1506
michael.burt@prodigy.net


Ilann M. Maazel
Emery, Celli Brinkerhoff & Abady, LLC
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone: 212-763-5000
Facsimile: 212-763-5001
imaazel@ecbalaw.com

Marcia Morrissey
Law Office of Marcia Morrissey
2115 Main Street
Santa Monica, California 90405-2215
Telephone: 310-399-3259
Facsimile: 310-399-1173
MorrisseyMA@aol.com

## <u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA       )

                              )       ss.

COUNTY OF SAN FRANCISCO)

I am over the age of 18 and not a party to the within action; my business address is 600 Townsend Street, Suite 329-E San Francisco, California 94103.

I hereby certify that on March 1, 2011, I electronically filed the foregoing motion with the Clerk of the Court for the United States District Court for the Northern District of Iowat by using the court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.

Executed on March 1, 2011 at San Francisco, California.

s/Michael Burt

MICHAEL BURT
*Attorney for Petitioner*

22