

**U.S. Department of Justice**

United States Attorney
Northern District of Iowa

*Mailing Address:*
*P. O. Box 74950*
*Cedar Rapids, Iowa 52407-4950*
*(319) 363-6333*

*Shipping Address:*
*401 First Street S.E.*
*Suite 400*
*FAX (319) 363-1990*
*TTY (319) 286-9258*

March 2, 2005

Hand Delivery

Re:    United States v. Angela Jane Johnson

Dear Mr. Willett:

Enclosed are copies of the proffer materials in compliance with the court order of February 28. Given the sensitivity of the materials, I am sure that you and your co-counsel will be careful in limiting the number of people with access to these documents as well as complying with the court's restrictions and your agreement.

I have marked each document with a sticker which reads: "Government Exhibit", a number and then written below "Taint Team". Exhibit 1 is a copy of the preliminary jury instructions which Mr. Honken read and initialed or modified. This is explained in the Fiedler report. Exhibit 2 is a copy of the Fiedler report from the first proffer session with Mr. Honken. Exhibit 3 are handwritten notes by Steve Badger taken via telephone conference during a second proffer session. Exhibit 4 are handwritten comments received from Leon Spies and represented to be prepared by Mr. Honken subsequent to the second proffer session. Exhibit 5 is the polygraph report. Exhibit 6 is a draft report dictated on August 21, 2004 by FBI Agent Robitaille who participated in the second proffer session.

Sincerely,

Judith A. Whetstine
Assistant United States Attorney

GOVERNMENT
EXHIBIT
KK
09-CV-3064 MWB



# PRELIMINARY INSTRUCTION NO. 6 - REQUIREMENTS FOR PROOF: COUNTS 1 THROUGH 5: WITNESS TAMPERING

**Counts 1 through 5** of the Indictment charge ~~defendant~~Mr. Honken with "witness tampering." These charges are based on the alleged murders, in 1993, of Gregory Nicholson, Lori Duncan (Nicholson's girlfriend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10), and Terry DeGeus.

**Count 1** alleges that, on or about July 25, 1993, Honken murdered Gregory Nicholson (1) with intent to prevent Nicholson from attending or providing testimony at a federal criminal case against Honken; (2) with intent to prevent Nicholson from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of federal drug-trafficking offenses; and (3) with intent to retaliate against Nicholson for providing information to law enforcement officers relating to the commission or possible commission of federal drug-trafficking offenses.

**Counts 2, 3, and 4** allege that, on or about July 25, 1993, Honken murdered Lori Duncan, Kandi Duncan, and Amber Duncan with intent to prevent them from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of federal offenses, including witness tampering and violation of conditions of pretrial release on federal charges pending against Honken.

**Count 5** alleges that, on or about November 5, 1993, Honken murdered Terry DeGeus with intent to prevent DeGeus from communicating to a law enforcement

11

GOVERNMENT EXHIBIT

l

TAINT TEAM

KK-P02

officer information relating to the commission or possible commission by Honken of federal drug-trafficking offenses.

For you to find the defendant guilty of a particular Count of "witness tampering," the prosecution must prove *both* of the following essential elements beyond a reasonable doubt as to that Count:

*One*, the defendant murdered the person identified in the pertinent Count of the Indictment; and

*Two*, the defendant murdered that person with the prohibited intent alleged in the pertinent Count of the Indictment.

If the prosecution fails to prove either of these elements beyond a reasonable doubt as to a particular Count of "witness tampering," then you must find the defendant not guilty of that Count.

12

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 3 of 41

KK-P03

## PRELIMINARY INSTRUCTION NO. 7 - REQUIREMENTS FOR PROOF: COUNT 6: SOLICITING THE MURDER OF WITNESSES

**Count 6** of the Indictment charges ~~defendant~~Mr. Honken with "soliciting the murder of witnesses." This Count charges that, between about June 10, 1996, and February 24, 1998, Honken solicited, commanded, induced, and endeavored to persuade Dean Donaldson and Anthony Altimus to commit ~~a violent felony~~felonies in violation of federal law, specifically, the murder_s_ of Timothy Cutkomp and Daniel Cobeen with the intent to prevent Cutkomp and Cobeen from attending or testifying at a federal drug trial against Honken.

For you to find the defendant guilty of "soliciting the murder of witnesses," the prosecution must prove *all* of the following essential elements beyond a reasonable doubt:

*One*, the defendant intended that Dean Donaldson or Anthony Altimus murder Timothy Cutkomp or Daniel Cobeen.

*Two*, the circumstances are strongly corroborative of that intent.

> To determine whether the circumstances "strongly corroborate" the alleged intent, you may consider the following factors:
>
> (1) whether the defendant offered or promised payment or some other benefit to the person solicited if he would commit the offense;
>
> (2) whether the defendant threatened harm or other detriment to the person solicited if he would not commit the offense;

13

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 4 of 41

KK-P04

(3) whether the defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the offense, or made express statements of seriousness in soliciting the commission of the offense;

(4) whether the defendant believed or was aware that the person solicited had previously committed similar offenses; and

(5) whether the defendant acquired weapons, tools, or information requested by or suited to the person solicited in the commission of the offense or made other apparent preparations for the commission of the offense by the person solicited.

*Three*, the defendant actually solicited, commanded, induced, or otherwise endeavored to persuade Dean Donaldson or Anthony Altimus to murder Timothy Cutkomp or Daniel Cobeen.

If the prosecution fails to prove these elements beyond a reasonable doubt, then you must find the defendant not guilty of "soliciting the murder of witnesses," as charged in **Count 6** of the Indictment. However, the prosecution does not have to prove that the murder of Timothy Cutkomp or Daniel Cobeen was actually committed or attempted by anyone.

14

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 5 of 41

KK-P05

# PRELIMINARY INSTRUCTION NO. 8 - REQUIREMENTS FOR PROOF: "CONSPIRACY" DEFINED

**Count 7** ("conspiracy to tamper with witnesses and to solicit the murder of witnesses") and **Counts 8 through 12** ("conspiracy murder") require proof of a "conspiracy." To prove the existence of a "conspiracy," the prosecution must prove *all* of the following requirements beyond a reasonable doubt:

*One*, between the dates alleged in the Count in question, two or more persons reached an agreement or came to an understanding to commit one or more of the offenses alleged to be "objectives" of the conspiracy.

> The prosecution must prove that the defendant reached an agreement or understanding with at least one other person. ~~It makes no difference whether that~~ The other person ~~is the~~ or persons do not have to be defendants, or named in the indictment, or otherwise charged with a crime. There is no requirement that any other conspirators be named as long as you find beyond a reasonable doubt that there was at least one other co-conspirator besides the defendant.
>
> The "agreement or understanding" need not be an express or formal agreement or be in writing or cover all the details of how it is to be carried out. Nor is it necessary that the members have directly stated between themselves the details or purpose of the scheme. In determining whether the alleged agreement existed, you may consider the actions and statements of all of the alleged participants, whether they are charged as defendants or not. The agreement may be inferred from

15

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 6 of 41

KK-P06

all of the circumstances and the conduct of the alleged participants.

The Indictment alleges that the conspirators agreed to commit specific offenses. I will instruct you further on these "objectives" of the conspiracies in particular Counts of the Indictment. For now, I must explain that it is not necessary for the prosecution to prove that the conspirators agreed to commit all of the offenses identified as "objectives" of a particular conspiracy. Rather, it would be sufficient if the prosecution proves, beyond a reasonable doubt, an agreement to commit *one or more* of those offenses. However, in order for you to find that the conspiracy in question existed, you must unanimously agree upon *which* offense or offenses were objectives of that conspiracy. If you cannot agree in that manner, then you cannot find that the prosecution has proved the existence of that conspiracy.

To assist you in determining whether there was an agreement to commit the offenses alleged to be objectives of the conspiracies, you should consider the elements of those offenses. I will explain the elements of the objectives in subsequent Instructions.

Keep in mind that a conspiracy requires proof of an agreement to commit certain offenses, not that those offenses were actually committed by the defendant or anyone else.

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time that it was first reached or at some later time while it was still in effect.

You should understand that merely being present at the scene of an event, or merely acting in the same way as others, or merely associating with others does not prove

16

that a person has joined in an agreement or understanding. A person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of one, does not thereby become a member. Similarly, mere knowledge of the existence of a conspiracy is not enough to prove that the defendant joined in the conspiracy; rather, the prosecution must establish some degree of knowing involvement and cooperation.

On the other hand, a person may join in an agreement or understanding, as required by this element, without knowing all the details of the agreement or understanding, and without knowing who all the other members are. Further, it is not necessary that a person agree to play any particular part in carrying out the agreement or understanding. A person may become a member of a conspiracy even if that person agrees to play only a minor part in the conspiracy, as long as that person has an understanding of the unlawful nature of the plan and voluntarily and intentionally joins in it.

In deciding whether the defendant voluntarily and intentionally joined in the agreement, you must consider only evidence of his own actions and statements. You may not consider actions and pretrial statements of others, except to the extent that pretrial statements of others describe something that the defendant said or did.

*Three*, at the time that the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

The defendant must know of the existence and purpose of the conspiracy. Without such knowledge, the defendant cannot be guilty of conspiracy, even if his acts furthered the conspiracy.

17

KK-P08

Whenever an element of an offense requires the prosecution to prove the existence of a "conspiracy," the prosecution must prove *all* of the these requirements beyond a reasonable doubt for you to find that the "conspiracy" existed.

18

KK-P09

## PRELIMINARY INSTRUCTION NO. 9 - REQUIREMENTS FOR PROOF: COUNT 7: CONSPIRACY TO TAMPER WITH WITNESSES AND TO SOLICIT THE MURDER OF WITNESSES

**Count 7** of the Indictment charges defendant~~Mr.~~ Honken with "conspiracy to tamper with witnesses and to solicit the murder of witnesses." This Count charges that, between about July 1, 1993, and continuing thereafter, until about 2000, Honken conspired with other persons, known and unknown to the Grand Jury, to commit several separate offenses of witness tampering and solicitation of the murder of witnesses.

The requirements for proof of a "conspiracy" were defined generally for you in Preliminary Jury Instruction No. 8. More specifically, for you to find the defendant guilty of "conspiracy to tamper with witnesses and to solicit the murder of witnesses," as charged in **Count 7**, the prosecution must prove *all* of the following essential elements beyond a reasonable doubt:

*One*, between about July 1, 1993, and continuing thereafter, until about 2000, two or more persons reached an agreement or came to an understanding to commit one or more of the offenses alleged to be "objectives" of the conspiracy.

> The Indictment charges that this conspiracy had the following "objectives": (1) to kill or attempt to kill another person with the intent to prevent the attendance or testimony of that person at an official proceeding; (2) to kill or attempt to kill another person with the intent to prevent communication by that person to a law enforcement officer of information relating to the commission or possible commission of a federal offense;

19

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 10 of 41

KK-P10

(3) to knowingly use intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding; (4) to knowingly use intimidation, physical force, threats, or otherwise corruptly persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense; and (5) to solicit a person to engage in a violent felony in violation of federal law.

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time that it was first reached or at some later time while it was still in effect.

*Three*, at the time that the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the "overt acts" for the purpose of carrying out or carrying forward the agreement or understanding.

It is not necessary that the "overt act" done in furtherance of the conspiracy be in itself unlawful. It may be perfectly innocent in itself. Nor is it necessary that the defendant have personally committed the act, known about it, or witnessed it. It makes no difference which of the conspirators did the act. This is because a conspiracy is a kind of "partnership," so that under the law, each member is an agent or partner of every other member, and each member is bound by or responsible for the acts of every other member done to further their scheme.

20

KK-P11

The prosecution does not have to prove that more than one act was done in furtherance of the conspiracy. It is sufficient if the prosecution proves beyond a reasonable doubt *one* act was done in furtherance of the conspiracy. However, you must unanimously agree upon which "overt act" or "overt acts" were committed in furtherance of the conspiracy.

The Indictment alleges that the following "overt acts" were committed in furtherance of this conspiracy:

(1) On or about July 3, 1993, Angela Johnson filed an application and obtained a permit to acquire a handgun.

(2) On or about July 7, 1993, Angela Johnson purchased a Tech-9, 9 mm semi-automatic handgun, Serial No. 127849, at Duey's Pawnshop in Waterloo, Iowa.

(3) During about July 1993, defendant Honken attempted to locate Gregory Nicholson by various means, including talking to Scott Gahn.

(4) On or about July 25, 1993, Angela Johnson and defendant Honken secured a babysitter to stay at Angela Johnson's residence.

(5) On or about July 25, 1993, Angela Johnson and defendant Honken traveled to 619 North Van Buren, Mason City, Iowa, the residence of Lori Duncan, Kandi Duncan, Amber Duncan, and Gregory Nicholson.

(6) On or about July 25, 1993, Angela Johnson used a ruse to gain entry into the Duncan residence for herself and defendant Honken.

(76) On or about July 25, 1993, Angela Johnson and defendant Honken coerced Greg Nicholson to make statements recorded on a videotape, purporting to exonerate defendant Honken.

(87) On or about July 25, 1993, Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan were killed by Angela Johnson and defendant Honken.

21

~~(9) On or about July 26, 1993, Nicholson failed to appear for arraignment on a state drug charge.~~

~~(10~~Honken.

(8) Between about July 1993 and March 1995, ~~defendant~~ Honken provided a videotape of Gregory Nicholson to ~~defendant~~ Honken's attorney, David Thinnes. This videotape showed Gregory Nicholson making statements exonerating ~~defendant~~ Honken. This tape was subsequently returned by Thinnes to ~~defendant~~ Honken.

~~(11) On or about October 27, 1993, Angela Johnson testified before the federal grand jury and was questioned about the drug-trafficking relationship between Terry DeGeus and defendant Honken.~~

(~~12~~9) On or about November 5, 1993, Angela Johnson contacted JoAnn DeGeus, the mother of Terry DeGeus, and requested Terry DeGeus contact Angela Johnson. Terry DeGeus dropped off his daughter, Ashley, at JoAnn DeGeus' residence, stating that he had to meet Angela Johnson and would return soon.

(13~~0~~) On or about November 5, 1993, Angela Johnson and ~~defendant~~ Honken met with Terry DeGeus and killed Terry DeGeus.

(14~~1~~) Shortly after November 5, 1993, JoAnn DeGeus contacted Angela Johnson and Angela Johnson told JoAnn DeGeus that Terry DeGeus never showed up on the evening of November 5, 1993.

~~(15) On or about November 22, 1993, Deputy Sheriff Robert Gerdes interviewed Angela Johnson. Angela Johnson stated that she saw Terry DeGeus on the evening of November 5, 1993, at the Mason City Country Club, as Angela Johnson was getting off work, but that she had not seen DeGeus since that date.~~

22

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 13 of 41

KK-P13

(16) On subsequent various occasions, Angela Johnson made a number of statements regarding the meeting with DeGeus on November 5, 1993. On some occasions she admitted meeting DeGeus, on others she denied meeting DeGeus.

(17) On or about December 8, 1993, Terry DeGeus's car was discovered at the Schoolhouse Apartments in Mason City, Iowa, unlocked and with the keys in it.

(18) Beginning about the fall of 1995, defendant Honken, along with Timothy Cutkomp, continued in another attempt to manufacture methamphetamine.

(19) In about the fall of 1995, defendant Honken recruited Daniel Cobeen to assist defendant Honken and Timothy Cutkomp in the manufacture of methamphetamine.

(20) In about the fall of 1995, defendant Honken stated to Timothy Cutkomp that Angela Johnson had provided some money to start a methamphetamine lab in Mason City.

(21) On February 7, 1996, a methamphetamine-producing laboratory was seized at defendant Honken's house in Mason City.

(~~22~~12) Between February 7, 1996, and June 11, 1996, ~~defendant~~ Honken sought information about the residence of Special Agent John Graham, including obtaining a page from a telephone directory which would have contained SA Graham's address and telephone number, if it had been listed.

(~~23~~13) On or about June 16, 1996, Angela Johnson contacted Rick Held and indicated that they would not "need that pup anymore," or words to that effect, canceling an order of a firearm that ~~defendant~~ Honken was

23

KK-P14

attempting to obtain from Held while defendant Honken was on pretrial release in Case No. 96-3004.

(24) On or about June 11, 1996, glassware, equipment and chemicals used to manufacture methamphetamine, MDMA, and listed chemicals, were seized from a storage shed at Angela Johnson's house.

(2514) Between about June 10, 1996, and February 24, 1998, defendant Honken, while incarcerated in the Woodbury County Jail, met with Dean Donaldson and provided instructions to Donaldson for Donaldson to murder Timothy Cutkomp. Donaldson was subsequently released on bail.

(2615) After Donaldson returned to jail on or about November 20, 1996, without killing Cutkomp, defendant Honken approached Anthony Altimus for the purpose of Altimus killing Timothy Cutkomp and Daniel Cobeen.

(2716) Between December 1996 and January 1997, defendant Honken met with a fellow Woodbury County Jail inmate, Anthony Johnson, and agreed to have Angela Johnson meet with Anthony Johnson's ex-wife, Colleen Birkey, to obtain cash in trade for a methamphetamine recipe. The cash was to be used to provide bail for Anthony Altimus.

(2817) Between December 1996 and January 1997, Angela Johnson met with Colleen Birkey in the Fort Dodge area and obtained $1,000 from Colleen Birkey.

(2918) During about January 1997, Angela Johnson went to a bail bonding company in the Sioux City, Iowa, area and attempted to post bail for Anthony Altimus. Angela Johnson presented herself to the bail bonding company as a relative of Altimus.

(3019) While incarcerated in the United States Penitentiary in Florence, Colorado (USP Florence), from 1998 until his transfer to another penitentiary, defendant

24

# INTERVIEW

### CASE: 9605382

**NAME:** DUSTIN HONKEN
**DATE:** 8/16/04
**TIME:** 5:35 PM
**PLACE:** U.S. MARSHALL'S OFFICE
SOUIX CITY, IA

**INTERVIEWED BY:** AUSA JUDY WHETSTINE, STEVE BADGER AND
DCI S/A RAY FIEDLER

**TYPED BY:** S/A RAY FIEDLER

Also present during this interview is Alfredo Parrish, Charles Rogers and Leon Spies.

This interview started out with Rich Murphy of the U.S. Attorney's Office explaining to HONKEN that he needs to tell the whole truth to the taint team. If he isn't going to do that there is no reason to be here.

Murphy also discussed under whose authority this plea agreement will fall and that this is the start of the process. Murphy also explained that HONKEN'S statements must be truthful and complete.

Murphy then explained the last decision on the plea agreement cannot be made by this team. Murphy then went through the rules for the taint team and that if all of the arrangements work out then the last thing that will happen is the agents involved in this case will sit down with HONKEN and ask detailed questions.

Murphy then reviewed who was in contact with the U.S Attorney and the role of Judy Whetstine. Murphy also questioned HONKEN to ensure that HONKEN is aware of what is going on with this deal. HONKEN stated that if he was going to feed us bullshit he wouldn't be here. Murphy complimented HONKEN on his attitude.

Murphy then left the cell at approximately 5:45 PM.

Whetstine then reviewed some preliminary questions with HONKEN. Whetstine asked HONKEN if he was on any medication. HONKEN replied no. Whetstine then asked HONKEN if he had any problems communicating with people. HONKEN replied no. Whetstine then asked HONKEN if he had any questions or concerns about his legal representation. HONKEN replied no. Whetstine asked if HONKEN had any problems with his relationship with Judge Bennet. HONKEN replied no. Whetstine asked HONKEN if he had been coerced in any way. HONKEN replied no. Whetstine asked HONKEN if he had been made any promises. HONKEN replied no. Whetstine then

1



GOVERNMENT
EXHIBIT
2
TAINT TEAM

asked if HONKEN's statements he was about to make would be voluntary. HONKEN replied yes.

Whetstine then gave HONKEN a list of jury instructions and asked HONKEN to read through those instructions and initial off on each numbered section as a way of acknowledging those instructions. At approximately 5:53 PM HONKEN started with instruction number 6 on page 11.

Badger then told HONKEN to read the document in its entirety and only initial off on the parts that HONKEN agreed with in case there would be any problems.

HONKEN then had a question to number 1 on page 21. Whetstine told HONKEN to write on the sheet what he does know. HONKEN replied he had seen the permit.

HONKEN then stated he thought the date that ANGIE JOHNSON called TERRY DEGUES was November 2nd not November 5th. He then stated that JOHNSON called on the 3rd. HONKEN was told to make a note of that on the sheet.

HONKEN then had a question on number 15. HONKEN did not recall talking to ANTHONY ALTIMUS about killing COBEEN. HONKEN stated that he talked to ALTIMUS about killing CUTKOMP, but on COBEEN he was not sure. Parrish then discussed HONKEN's interpretation of that conversation.

HONKEN stated on number 16, the $1000.00 (one thousand dollars) was to bail out ALTIMUS, not for the meth recipe. HONKEN stated ALTIMUS wanted HONKEN to write out how to make the meth recipe, but HONKEN was not sure if ALTIMUS could make it. HONKEN stated he did not give the $1000.00 to ALTIMUS for the meth recipe.

HONKEN stated ALTIMUS originally offered to pat HONKEN for the recipe, but then a conversation came up about needing $1000.00 for a law's (sp?) rocket for outside the jail. HONKEN stated he had JOHNSON pick up the $1000.00. That cash was used to bail out ALTIMUS.

HONKEN stated JOHNSON had gotten involved with JIMMY RODRIQUEZ (phonetic). HONKEN said that he only wanted JOHNSON to pick up user amounts of meth from RODRIQUEZ, not enough to sell. She ended up picking up more than user amounts and used the extra to sell.

HONKEN stated after 1996, all he did was solicit people to try and kill people. HONKEN stated he wasn't doing anything on instructions to sell dope. HONKEN stated he later found out that JOHNSON was running around with DWAYNE WHITE (phonetic) and some undercover agents.

HONKEN then asked us to look at number 31. HONKEN stated he didn't have knowledge of JOHNSON selling meth after 1996. HONKEN wasn't telling her to do it,

2

KK-P17

she was doing it and HONKEN was hearing about it. HONKEN stated he was not directing her to sell meth after 1996. HONKEN stated he hooked her up with RODRIQUEZ to get user amounts of meth and not enough to sell.

HONKEN then made a comment that he distributed meth from 1992 -- 1996. He stated that numbers 1-4 on page 32 should be 1996 instead of 2000.

HONKEN stated there was a guy named DICK WALSTRUM (phonetic) who came in with all these names of people who owed him money and he wanted to collect. TONY JOHNSON was going to collect the money. COLLEEN BIRKEY was trying to collect the money to make money. The money she was collecting wasn't her outstanding drug debts. TONY wanted BIRKEY to collect the money, but BIRKEY couldn't do it. BIRKEY then went to ANGIE JOHNSON to get help and ANGIE tried to help. TONY was on the phone with BIRKEY every day about the outstanding debts. HONKEN stated he didn't recall how ANGIE found out or whether or not BIRKEY talked to her.

Badger told HONKEN to skip to number 5 and we will review numbers 1-4 later.

HONKEN stated on number 7 on page 33 that there was a company already named PRINTED CIRCUITS TECHNOLOGY (PCT). HONKEN stated they used that name to buy chemicals. HONKEN stated his brother used that name to get stuff. HONKEN said the company eventually went out of business, but they continued using that name to but stuff. HONKEN said not all of the stuff that was bought was purchased in that name, but some lab stuff was bought using the name PCT.

Whetstine then went back to page 32 for numbers 1-4 and asked HONKEN if he was a participant at that time. HONKEN stated he gave all kinds of suggestions, but didn't really have a handle on the day-to-day stuff. HONKEN stated he did say a lot of stuff and did give a lot of suggestions.

Whetstine then asked him to write down the stuff he did, not in gory detail, just the stuff he did as far as suggestions. Parrish asked how much should HONKEN summarize and Whetstine stated just write down what HONKEN did.

HONKEN stated he wouldn't ever do anything over the phone because you didn't know who was listening. That's why he couldn't know what was going on daily. HONKEN stated he did talk to inmates.

Whetstine told HONKEN to write down 2, 3 or 4 sentences at the most to the extent on how it relates to people on the outside and that we would get into the other stuff later. HONKEN stated he would write down that he just communicated with other inmates about general stuff. HONKEN said they all did that. HONKEN stated as far as specific stuff that there were only a couple of people that he talked to. Badger told HONKEN that was fine and to include those names.

3

KK-P18

HONKEN then stated that in reference to number 14 on page 34, he never released a tank of chlorine gas. The gas produced in his recipe is such a small amount that it did not create a substantial risk to human life. HONKEN stated the gas is part of the by-product and a minimal amount is released each time during manufacture.

At approximately 6:26 PM HONKEN was finished reviewing the instructions. He then handed them over to Steve Badger for his review. At approximately the same time Whetstine left the holding area. She returned at approximately 6:30 PM.

Whetstine then looked at HONKEN's sheet and asked him if where he had initialed that he is agreeing to the facts. HONKEN stated yes.

Badger then asked HONKEN to describe his relationship with ANGIE JOHNSON. HONKEN stated the first time they met was around 1989. HONKEN stated that he had his brother send him 3 ounces of cocaine in the mail. HONKEN then went to a friend's house to sell the cocaine. He sold 2 ounces to the friend and kept one for himself. HONKEN stated that was where he met JOHNSON that she was at the friend's house. HONKEN stated that it wasn't until 1992 that they met again. HONKEN thought it was around February or somewhere near there that JOHNSON called him at CATHY RICKS house. JOHNSON had called about TERRY DEGUES. She basically wanted to cut DEGUES out and deal directly with HONKEN. HONKEN stated JOHNSON was warning him he wasn't going to get his money. HONKEN stated that she didn't actually farm it out. (Note: Judy Whetstine left the room at approximately 6:35 PM and returned at approximately 6:38 PM.)

Badger then asked HONKEN when he started seeing JOHNSON more regularly, beyond just conversing. HONKEN stated he was living in Arizona at the time. JOHNSON was concerned that DEGUES was stalking her. HONKEN stated that he had only met JOHNSON two or three times when he was arrested in 1993. There was some talk of moving her to Arizona to get away from DEGUES. HONKEN stated prior to that all they did was talk.

HONKEN stated the night before he got arrested was when they became intimate. HONKEN said JOHNSON and he met in a hotel room to talk about money and moving her to Arizona. HONKEN stated there was nothing serious about their relationship and that it was just a fling. JOHNSON left the hotel room the next morning and later that day HONKEN was arrested. HONKEN stated she then came to visit him in jail.

HONKEN then restated he met her only once in 1989. After that he didn't recall exactly how many times they had met, but he figured it was only a couple of times.

HONKEN stated JOHNSON came to visit him in the Linn County jail. She got in using KRISTY COLE's (phonetic) name. HONKEN stated he was shocked to see her. HONKEN said JOHNSON wanted to know if he had told on DEGUES because DEGUES's house had been raided. HONKEN stated he had talked to DEGUES before he met with NICHOLSON, when HONKEN was arrested. HONKEN stated DEGUES

4

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 19 of 41

KK-P19

thought HONKEN had told them about DEGUES and JOHNSON wanted to know if HONKEN had talked. HONKEN told JOHNSON he had not talked. HONKEN stated this was not a very lengthy conversation and that he didn't know much about JOHNSON.

HONKEN stated he thought he only spent about 5 days in jail and was released around the 25th of March.

Badger then asked the nature of HONKEN and JOHNSON's relationship from March 25th through July 25th. HONKEN stated the first night they were in the hotel room in March was pretty much just a fling. HONKEN said he couldn't get near DEGUES or NICHOLSON because of a no-contact order, so JOHNSON was the go-between. But, that was supposed to be secret because CATHY RICKS was pregnant. HONKEN stated he'd talk to JOHNSON about DEGUES. HONKEN stated usually when he went to see RICKS he would stop by JOHNSON's and talk to her. Badger asked if their relationship was sexual at that time and HONKEN replied yes.

Badger then asked when and by whom was it decided to eliminate NICHOLSON. HONKEN stated originally he had planned to plead guilty to the drug charges. HONKEN figured that he was only looking at 3 to 4 years after some good behavior and boot camp.

HONKEN stated he eventually found out that JOHNSON was also pregnant. HONKEN said he found out in late June or early July about JOHNSON being pregnant with his kid. HONKEN stated between that and his son that was soon to be born with RICKS, it was his decision to hunt down NICHOLSON.

HONKEN told JOHNSON that he was looking for NICHOLSON. HONKEN said he didn't tell JOHNSON that he was going to hunt NICHOLSON down. HONKEN stated the whole thing was more wishful thinking than purposeful planning. HONKEN stated he told SCOTT GAHN and JOHNSON that he was looking for NICHOLSON.

HONKEN stated he found NICHOLSON through GAHN. HONKEN had gone to Osage with JOHNSON to find NICHOLSON. HONKEN had found out that NICHOLSON wasn't living at his house. That was discovered sometime in July. HONKEN had only lived with LORI DUNCAN for a couple of weeks. HONKEN said he found out NICHOLSON was living with DUNCAN after he found out about JOHNSON being pregnant.

HONKEN stated he followed NICHOLSON from Narcotics Anonymous on HONKENS's motorcycle. HONKEN said he lost NICHOLSON, but knew that his parent's lived in Osage. HONKEN said he went to Osage twice looking for NICHOLSON, but couldn't find him. HONKEN stated JOHNSON went along one time. HONKEN said JOHNSON knew he was going to Osage to look for NICHOLSON.

Badger then asked HONKEN what other steps were taken to find NICHOLSON. HONKEN stated after he couldn't find NICHOLSON in Osage, he went back to GAHN.

5

Case 3:09-cv-03064-MWB-LTS   Document 245-41   Filed 05/05/11   Page 20 of 41

KK-P20

GAHN verified that NICHOLSON had moved out. HONKEN stated GAHN's wife had kicked GAHN out and HONKEN went to find GAHN at GAHN's mom's house. They set up a meeting at Club Excess (phonetic). HONKEN stated GAHN worked at Tractor Supply and HONKEN would also talk to him there. HONKEN stated he talked to GAHN about NICHOLSON. After meeting at Club Excess, GAHN then went to look at some band equipment for GAHN. That's when GAHN found out where NICHOLSON lived.

Badger then asked about the weapon HONKEN had gotten. HONKEN stated already had the Tech-9 to eliminate NICHOLSON. HONKEN stated he told JOHNSON he needed a gun. HONKEN said if he didn't explain exactly why, then it was implied. HONKEN said JOHNSON had been around the drug trade long enough to know what was going on. HONKEN said he doesn't come right out and say things. HONKEN stated he told JOHNSON the only way he could stay out of jail was if NICHOLSON didn't testify.

HONKEN stated he told JOHNSON to get a gun. HONKEN stated he went to Waterloo with JOHNSON. HONKEN said he even went into the pawn shop with JOHNSON when she bought it.

Badger then asked when he discussed the plan to murder NICHOLSON with anyone. HONKEN stated his plan was that there was never any intention to use the gun. HONKEN said JOHNSON and he never knew that DUNCAN lived in that house. HONKEN said that they were going to make a video of NICHOLSON and then HONKEN was going to choke NICHOLSON out. HONKEN said there really was no plan back when JOHNSON and he were looking for NICHOLSON.

HONKEN stated he told JOHNSON to get him in the house. HONKEN said he was ambiguous about the lethal end. HONKEN said he knew JOHNSON, just not that well. HONKEN said there was no exact plan. HONKEN said he didn't move in with JOHNSON until December, sometime after DEGUES was killed.

Badger asked when it was decided to kill NICHOLSON. HONKEN stated almost immediately. HONKEN said a day or two after they found NICHOLSON's truck, he hatched the plan. HONKEN said JOHNSON was to hold NICHOLSON hostage with the gun.

Badger then asked what the ruse was. HONKEN stated JOHNSON was going to ask to use the phone. HONKEN said she carried the gun in a small case, not like a briefcase, but bigger than a purse, almost like something for cosmetics.

HONKEN stated they discussed this a day or two before the killings. HONKEN stated JOHNSON was a willing participant. HONKEN stated he doesn't remember if he said he was going to kill NICHOLSON. HONKEN said he probably told JOHNSON to go in and he would take care of the rest.

6

KK-P21

Whetstine then stated that since HONKEN told JOHNSON to go in and hold NICHOLSON hostage with the gun and HONKEN was going to choke him out, JOHNSON had to know what would happen.

HONKEN stated he really didn't say exactly what would happen, but that it was implied, if he couldn't testify. HONKEN said he might have said that he would choke him out. HONKEN said he probably said that. HONKEN stated he couldn't say for sure if it was that specific.

Badger asked if there were any other weapons involved. HONKEN stated he had mace or pepper spray.

Badger then asked what was done in regards to purchase of the tape, rope or the possibility of the woman being there. HONKEN stated they he had the tape and rope because of NICHOLSON. HONKEN wasn't sure if he would have to remove him. HONKEN stated he didn't know anything about the women in the house. HONKEN didn't get a chance to do the necessary reconnaissance.

Badger asked if he planned on the video and brought it with him. HONKEN stated that was right. HONKEN stated they brought tape, rope, gun, video camera and mace.

HONKEN stated it was just him and JOHNSON that were involved. HONKEN said any discussions of what the plan were took place in person at JOHNSON's house in Clear Lake.

Badger then asked what time things started on July 25th. HONKEN stated they met around 6 – 7 PM at JOHNSON's house. They drove CHRISTI GAUBATZ/COLE's Toyota to DUNCAN's house. GAUBATZ was babysitting at JOHNSON's house. HONKEN said they drove to within 2 blocks of DUNCAN's house. JOHNSON went in by herself. HONKEN said he saw JOHNSON knock at the door and walk in. He then walked around the block and went up to a back window. HONKEN stated he saw that JOHNSON had control of the situation through the window. She was squatted down in the corner with the gun.

HONKEN stated it had been about 5 – 10 minutes when he walked in. HONKEN said he walked in through the front door. HONKEN could see JOHNSON sitting in the corner with the gun looking towards the left hand corner of the room. She had the gun in her hand.

HONKEN stated he walked in and saw NICHOLSON and DUNCAN and her two kids (AMBER and KANDI) on their laps. HONKEN thought there was one kid on each of their laps.

HONKEN stated he then talked to JOHNSON in another room, but so they could still cover NICHOLSON and DUNCAN. HONKEN thought JOHNSON would see the kids and just walk out, but she didn't. HONKEN said they then thought about just dropping

7

Case 3:09-cv-03064-MWB-LTS   Document 245-41   Filed 05/05/11   Page 22 of 41

KK-P22

the kids off somewhere, but HONKEN told JOHNSON that one of them was 10 and that they all have to go. HONKEN said this conversation took place in another room, but they couldn't hear what was said. HONKEN also figured now he had a kidnapping charge.

HONKEN stated NICHOLSON knew right away what was going on. HONKEN said NICHOLSON told him that NICHOLSON expected something.

HONKEN stated he decided it would be all four that were killed. JOHNSON didn't like that, but HONKEN told her there was no choice.

HONKEN stated he never threatened JOHNSON during this conversation.

Badger asked where the tape and rope were at this time. HONKEN stated he never carried anything in so they had to be in the little bag.

Badger then asked about the camera. HONKEN stated he took NICHOLSON in the other room to make the video. HONKEN stated he borrowed it from KATHY RICKS. It was small and in the bag.

HONKEN said he told NICHOLSON to make the video and then HONKEN would hide out all four until the trial was over. NICHOLSON didn't argue. HONKEN stated he had no weapons at this time, but JOHNSON still had the gun on DUNCAN and her kids.

HONKEN stated they then made the video expunging him. HONKEN then told DUNCAN what was going to happen and she said she needed to get some things for the kids. JOHNSON went upstairs with DUNCAN. HONKEN then stated DUNCAN wrote a note to the babysitter and HONKEN stated he had JOHNSON sit with the kids. HONKEN then told DUNCAN to come into a different room and he taped her up. HONKEN stated he didn't want the kids to see that and they weren't making a fuss.

HONKEN stated he was not sure of a timeline, but he thought they were in the house about an hour. HONKEN said he knew it was dark when they left.

HONKEN stated he put a sock in DUNCAN's mouth then put gray duct tape on her mouth. He then tied her hands with a cloths line type rope. HONKEN said they had brought the tape and rope along. HONKEN could not recall if they were tied in the front or the back. HONKEN also said they did this after the video was done.

HONKEN stated he went into like a second living room to make the video. NICHOLSON sat on the couch when he made the video. During the video NICHOLSON said he was sorry for getting HONKEN into this mess and that it was MIKE BILLICK and TERRY DEGUES that were selling the dope.

8

KK-P23

HONKEN stated he narrated to NICHOLSON what HONKEN wanted said and NICHOLSON took notes on a paper plate. HONKEN thought the video only lasted a few minutes.

HONKEN stated he took NICHOLSON and put the sock in his mouth and taped his mouth then tied his hands. HONKEN said he then did the same to DUNCAN. HONKEN said they didn't do anything to the children.

Whetstine then asked what JOHNSON was saying to the kids. HONKEN stated she was just talking to the kids, but he couldn't tell what was said. HONKEN said he didn't want the kids involved and took NICHOLSON and DUNCAN to the kitchen to tape them up.

HONKEN said he then put NICHOLSON and DUNCAN in the back of NICHOLSON's pick-up truck. The truck had a topper. HONKEN said he had the gun in the back. JOHNSON sat in the front with the kids.

HONKEN stated JOHNSON drove the truck. HONKEN said he had picked out the spot ahead of time on where to take them. HONKEN said JOHNSON must have known where to go. HONKEN said he must have told JOHNSON that he was going to kill NICHOLSON because we had a spot picked out.

HONKEN stated he did not dig the graves before hand. HONKEN said the shovel was in GAUBATZ's car.

HONKEN stated JOHNSON drove straight to where the graves were dug.

HONKEN stated it was dark by then. They just drove down the lane and in a little bit more. HONKEN said he gave no instructions on how to get there to JOHNSON. HONKEN said she knew where to go. HONKEN said JOHNSON stayed with the kids.

HONKEN said he told NICHOLSON there was another car about 100 yards or so away to take them to away. HONKEN said he took NICHOLSON and DUNCAN 100 – 150 yards out. HONKEN said it was dark, but there was moonlight. HONKEN also said they had no flashlight.

HONKEN said NICHOLSON and DUNCAN were in front of him in a 2x2 formation. HONKEN stated he shot NICHOLSON first in the back and he dropped right down. HONKEN then turned to shoot DUNCAN, but she turned a little.

HONKEN stated he had NICHOLSON on the left and DUNCAN on the right in front of him at about arms length. HONKEN stated he was close behind.

HONKEN stated he shot NICHOLSON and NICHOLSON dropped. HONKEN then shot DUNCAN after she had turned a bit. HONKEN hit her in the side and then DUNCAN then backed up maybe 15 feet. HONKEN said he then walked over to her. HONKEN said she was looking straight at him when he shot her with one round.

9

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 24 of 41

KK-P24

HONKEN stated he was aiming at her chest, but it must have hit her in the head. HONKEN said she dropped to the ground and he knew she was dead.

HONKEN stated he then walked back to NICHOLSON and heard him moaning. HONKEN walked up to NICHOLSON and put the gun at the back of his head. HONKEN said he then shot NICHOLSON. NICHOLSON didn't move.

HONKEN then went back to the truck and talked to JOHNSON. HONKEN said he went to the door and told her he had to kill the kids and there was no choice.

HONKEN said he took the older daughter first and she didn't know what was going on. HONKEN said they walked down about 50 yards. HONKEN said she couldn't see her parents. HONKEN said he shot her in the back of the head and she went down.

HONKEN said he then went and got the second kid. HONKEN said JOHNSON then took off crying. HONKEN said he walked her out there and shot her one time in the back of the head.

HONKEN said JOHNSON was just walking around a bit. HONKEN said after a bit she got in the truck and drove it back to DUNCAN's where it was parked in the driveway. HONKEN said he thought they both had gloves on. HONKEN said he had gloves on and was pretty sure she did as well. HONKEN said he knew fingerprints were an issue.

HONKEN said he thought JOHNSON would have wiped down the steering wheel, but he didn't know for sure if she did. HONKEN said he didn't know for sure if she had on gloves.

HONKEN said they didn't go back into the house. HONKEN said he had already taken the paper plate with him. He didn't recall destroying it, but was sure he didn't leave it behind.

HONKEN stated the video tape was originally in GAUBATZ's car. HONKEN said when they got back to DUNCAN's house that HONKEN was dropped off at GAUBATZ's car and JOHNSON drove the truck to the driveway and walked back to the car.

HONKEN said he drove GAUBATZ's car back to the scene. The shovel was in the car. HONKEN said they found a suitable spot and he started digging. HONKEN thought it took about 3-4 hours. JOHNSON didn't do any digging and she was upset. HONKEN said he dug awhile.

HONKEN said he thought he drug the children first. HONKEN said he know NICHOLSON was last. HONKEN said the grave was smaller on the bottom because of the roots of trees. HONKEN said the kids went in first, then DUNCAN then NICHOLSON.

10

Case 3:09-cv-03064-MWB-LTS   Document 245-41   Filed 05/05/11   Page 25 of 41

KK-P25

Badger asked if they kept any of their personal possessions. HONKEN stated no. HONKEN said JOHNSON brought the suitcase with them and HONKEN pitched the clothes and bag in the ditch on the way back to Clear Lake.

Badger asked what was done with DUNCAN's purse. HONKEN said they had that in the truck. HONKEN said they took it up to Fertile and dumped it in the river. HONKEN didn't know which river.

Badger asked how he got the keys to the truck. HONKEN said they were in it. HONKEN said they told NICHOLSON they were going to take his truck.

HONKEN was then asked if he bound the legs. HONKEN stated he didn't think so because they wouldn't be able to walk.

HONKEN was asked if he got rid of the shoes. HONKEN said yes. He said they didn't keep any personal stuff and their clothes were dumped in a ditch on the road back to Clear Lake.

HONKEN said the shell casings were left at the scene. HONKEN said there were only six rounds fired.

HONKEN was then asked what happened after the burial. HONKEN said they went back to Clear Lake to JOHNSON's house at about 4-5 AM. GAUBATZ was sleeping on the couch. She got up and left. HONKEN said there was no blood on either him or JOHNSON.

HONKEN said JOHNSON was crying about the kids. He said she showed no remorse for the adults.

HONKEN then stated JOHNSON knew why they were going out there.

HONKEN was asked if he had been to that spot before. HONKEN stated only when he was scoping out locations, but never prior to that time. HONKEN said he figured that spot out with JOHNSON. HONKEN stated he specifically went there with her.

In response to questioning, HONKEN stated he threw the shovel into a bunch of trees out there.

HONKEN said the spot was right off a road that hadn't been used in a long time. The road was right off of Highway 18.

HONKEN stated after he put the dirt back on them, he threw a couple of old tires on top.

HONKEN said when they got back to Clear Lake, they took a shower.

11

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 26 of 41

KK-P26

HONKEN was asked what he did with the video tape. HONKEN replied that he set it off to the side. He made one copy from the small tape that was the original. The copy was a VHS size. HONKEN said he gave the camera back.

HONKEN stated he hung on to the VHS tape until he gave it to David Thinness. HONKEN said he hung on to the original until he was arrested in 1996 and then he had JOHNSON destroy it. HONKEN said the original was at his mom's house in Britt in a dresser. She didn't know anything about it. HONKEN stated the copy was at his father's house in Steamboat Rock. It was in a craft's box on the floor. HONKEN said his dad knew the tape was in there, but didn't know what was on it. HONKEN said he told JOHNSON to destroy the tapes. HONKEN said he thought she did, but he didn't know how she did it.

HONKEN was then asked be Whetstine about binding the ankles. HONKEN stated he saw the rope around NICHOLSON's and DUNCAN's ankles from photos, but didn't recall doing that. HONKEN said if they bound the ankles he didn't know how he would have gotten them in the truck.

HONKEN said he had NICHOLSON and DUNCAN walk in front of him for 100 or so yards and there would be no reason to bind them after they were dead. HONKEN said he supposes he could have tied them loosely, but he didn't think so.

HONKEN stated he drug the bodies by their arms to the grave site. He thought it was about 25 – 30 yards from the killing site to the burial site.

HONKEN was asked after he killed the two adults, what was said to the kids. HONKEN said JOHNSON was talking to them so he didn't know what was said. HONKEN said he took them individually and they weren't crying and there was no stress.

Badger then asked HONKEN to describe the TERRY DEGUES killing. HONKEN stated that JOHNSON wanted DEGUES gone or dead for a long time for the stuff he'd done to her. HONKEN said they had a very volatile relationship. HONKEN stated JOHNSON wanted DEGUES dead. They discussed that before and after the other killings.

HONKEN stated JOHNSON was scared DEGUES would see her with HONKEN, especially after she was showing. HONKEN said DEGUES knew JOHNSON was pregnant because he said so near the end.

HONKEN stated he and JOHNSON were involved together in the death of DEGUES.

HONKEN stated he couldn't say for sure a plan was actually formulated. HONKEN recalled having to hide in different rooms at JOHNSON's house when DUGUES would come over. HONKEN said the more he saw JOHNSON the more of a problem DEGUES became. HONKEN stated it was really bad when DEGUES knew he was going to get a

12

Case 3:09-cv-03064-MWB-LTS    Document 245-41    Filed 05/05/11    Page 27 of 41

KK-P27

subpoena and he started freaking out. HONKEN stated JOHNSON also got a subpoena and DEGUES would call her. DEGUES knew they were zeroing in on him.

HONKEN said after JOHNSON testified on 10/27 that DEGUES met with JOHNSON. HONKEN said JOHNSON was with GAUBATZ in GAUBATZ's car. HONKEN thought the meeting was at a McDonalds. HONKEN said he knew they met and that DEGUES had concerns.

HONKEN said DEGUES was one of the people HONKEN sold meth to and then he would sell the stuff.

HONKEN was asked about the events of November 5th. HONKEN said there was a plan to kill DEGUES by HONKEN. HONKEN stated he and JOHNSON drove around trying to find spots to do it.

HONKEN stated they were afraid DEGUES would take him and JOHNSON down over their relationship and that she was pregnant. HONKEN said he made the plans. HONKEN said JOHNSON is not a planner and she doesn't see long range. HONKEN said she wanted DEGUES dead, but didn't want to get into the minutia.

Badger asked if JOHNSON was an accomplice. HONKEN replied yes.

HONKEN said they went around together scouting places or he found the spot and took her there. HONKEN said JOHNSON knew where to take DEGUES before hand.

HONKEN stated JOHNSON called DEGUES and told him that HONKEN wanted to meet or something like that. HONKEN said he left it up to JOHNSON on how to persuade him to come over. HONKEN told JOHNSON to call DEGUES and arrange a meeting.

HONKEN said JOHNSON met DEGUES at the country club, where she worked, on November 5th around 8-9 PM. HONKEN said DEGUES knew he was coming to meet HONKEN. HONKEN stated DEGUES drove his big, blue car and picked up JOHNSON.

HONKEN said he had the shovel and the Tech-9 with him. HONKEN said he had bought the shovel at Sears for this purpose. HONKEN said it was a spade and he bought it a few days or a week ahead of time.

HONKEN said when they got there they both got out of the car. DEGUES got out of the driver's side. JOHNSON got out and just stood by the car.

HONKEN said DEGUES came up to him. HONKEN said he was sitting on his car facing away from DEGUES and HONKEN had the gun in his hands. HONKEN said it was the same gun they used before – the Tech-9.

13

KK-P28

HONKEN stated DEGUES was nervous. HONKEN said they started out by talking about the subpoena and stuff. HONKEN said he couldn't bring himself to do the shooting. HONKEN said they sat for a long time. JOHNSON finally got into HONKEN's car. HONKEN recalled it was cold and his hands were getting very cold.

HONKEN stated after awhile he just reached up and shot DEGUES. HONKEN stated DEGUES went backwards and said something like he wouldn't tell. HONKEN said the second time he shot DEGUES, DEGUES went to the ground and started rolling around. HONKEN said he just shot and shot. HONKEN stated he didn't know how many time he hit DEGUES, but that he thought he shot between 6 – 10 rounds.

HONKEN said he then went to his car to get an aluminum baseball bat. DEGUES wasn't dead and he just kept rolling towards his car. HONKEN said he grabbed the bat and hit him and kept hitting him until HONKEN thought DEGUES was dead. HONKEN then drug DEGUES to the first bin closest to the field. HONKEN said it was dark. HONKEN said he then made a noise and that made JOHNSON jump. HONKEN stated he then took the flat end of the shovel and bashed him in the head a bunch more times.

In response to questioning, HONKEN replied that the gun ended up at GAUBATZ's house after the NICHOLSON/DUNCAN killings. The gun was never at the house in Clear Lake. HONKEN thought he took it to GAUBATZ's and JOHNSON told GAUBATZ it was there. HONKEN didn't remember who got the gun to kill DEGUES, but thought it was probably him.

HONKEN said after he shot DEGUES, JOHNSON got out of the car. HONKEN thought she didn't get out until after the shooting was done. HONKEN stated after she knew HONKEN had the situation in control was when she got out.

HONKEN was asked if there were any other weapons besides the shovel, bat and gun. HONKEN replied no.

HONKEN stated he dug the grave. He said it was deeper than the first one because the ground was softer. HONKEN stated it still took about 3-4 hours.

HONKEN said JOHNSON then got into DEGUES's car and took it. HONKEN said there was blood all over him and the car. HONKEN said they left together in separate cars and JOHNSON drove DEGUES's car. They drove to a car wash in Mason City, washed the car and dropped it off at the Schoolhouse Apts. HONKEN said no one was wearing gloves because they figured JOHNSON's fingerprints could be in the car because they were meeting.

HONKEN said after they dropped off DEGUES's car, JOHNSON got in with him and they went back to Clear Lake to her house.

Badger asked if they had worked up any alibis. HONKEN stated he thought Bob Gerdes with Hancock County called and asked JOHNSON if she had met DEGUES. HONKEN

14

KK-P29

said he had told JOHNSON to say yes. HONKEN said after that she started telling people that she hadn't met DEGUES.

In response to questioning, HONKEN replied he threw the bat into a field full of water about a mile away from the burial site. HONKEN said he kept the shovel in a shed at JOHNSON's. HONKEN stated the gun was taken back to GAUBATZ's. HONKEN said it's gone now. HONKEN stated he took the gun out to TIM CUTKOMP's parent's farm and melted it down with a cutting torch. The gun ended up just all fragments of metal. There were several pieces, probably 10 or more.

HONKEN stated he discarded the pieces along a blacktop between Garner and Britt. The road is just about a mile south of Britt. HONKEN said JOHNSON wasn't along for that.

Whetstine then asked what JOHNSON's demeanor was after the shooting. HONKEN stated there weren't any comments made. HONKEN said there wasn't any dancing or JOHNSON wasn't glad it was done.

Whetstine asked if it was more businesslike. HONKED replied yes. HONKEN said for him it was all businesslike. HONKEN stated JOHNSON didn't break down or anything for DEGUES. HONKEN thought there was some relief on her part that it was over and was gone. HONKEN stated that when DEGUES was alive, JOHNSON had concern for her life. HONKEN said his concern was that DEGUES was gone for his testimony.

HONKEN was asked if he ever threatened or injured JOHNSON regarding the killings. HONKEN replied no.

HONKEN was asked what the kids were wearing. HONKEN said he thought they were wearing little gowns. The adults were in jeans and shirts. HONKEN stated DEGUES was wearing jeans and a jacket because it was cold.

HONKEN was asked why the 2 left shoes were missing. HONKEN replied he threw NICHOLSON's in the ditch on the way to Clear Lake. HONKEN thought he pulled the shoe off when he was dragging him. HONKEN stated he didn't know what he did with DUNCAN's shoe.

Whetstine then asked if there was a window between the topper and the cab of NICHOLSON's truck. HONKEN said he couldn't remember if there was a window, but there was no communication between JOHNSON and him on the way to the gravesite. HONKEN recalled no one looked back at him because he would have noticed as he was sitting facing the cab.

Badger then asked if after the second arrest there were any plans to kill other witnesses or destroy evidence and what were JOHNSON's roles in those plans. HONKEN stated the only semi-role she had was that she dropped off CUTKOMP and HONKEN at the Bondurant site for a potential break-in.

15

KK-P30

Badger then asked about the $1000.00 for bonding out ALTIMUS. HONKEN stated that all ended up being more of a scam. HONKEN said at first there was money involved about an law's (phonetic) rocket, and then it was about bonding ALTIMUS out. HONKEN said at the end it was just about money.

HONKEN stated JOHNSON knew he was going to Bondurant to break in and try and destroy evidence.

Badger then asked about the SKS. HONKEN replied he bought that from BOB RYPEMA in early 1994 or late 1995. HONKEN said it was right after pretrial release. HONKEN said RYPEMA gave it to him in the parking lot at Kraft. HONKEN said he paid $150 for it. HONKEN said he paid in cash and no one else was around.

HONKEN was then asked if there were any other participants in the killings. HONKEN said no, no one else knew.

HONKEN was then asked if he told anyone at prison about the killings. HONKEN stated the only one he told anything to in any detail was STEVE VEST.

Badger then asked if he told anyone he strangled anyone. HONKEN said he never told anyone he strangled any of the victims. HONKEN said he told the guys in prison that if you wanted to take people out then that's how he'd do it. HONKEN said he never told anyone that's how he killed them.

Everyone then took a break at approximately 8:25 PM. The taint team reentered the holding cell at approximately 8:28 PM.

Badger then asked if HONKEN omitted anything or lied about anything. HONKEN replied no.

HONKEN was asked if he had told the whole truth. HONKEN replied yes.

HONKEN was asked if he thought he'd pass a polygraph with no problems. HONKEN replied yes.

The interview ended at approximately 8:31 PM.

16

KK-P31

8-18-011
5:15p -
6:00p

Phone conference w/ Hartson from SC Marshals holding cell.
Holding area - Jade, FBI agent - Parrish, Spies & Rogers
C.R. - SMP

Both Lori & Greg were tied up on the bedroom.

Highly likely he tied them "shackle like" He's not to sure Anya did'nt tie anything.

He does'nt specifically remember doing it? But after reviewing pictures he sure? of does it so they would'nt take off running.

Graves of Nicholson & Duncan

Anya helped drag Lori Duncan into the grave possibly Greg Nicholson

Generally, what Steve Vest reported is correct but he did throw some things off his own in there.

Anya also helped dig Nicholson & Duncan grave but not Dague's grave. She dug enough to give me a break. It took 3 hours to dig the graves.

Dede mentions that Anya did'nt help in that Dague's with the help or shovel. Dustin did those things solely by himself.

GOVERNMENT
EXHIBIT
3
TAINT TEAM
PENGAD-Bayonne, N.J.

Purposely try to remember as I do not like to think about
this stuff but it is now popping into my mind because of
these recent discussions.

1. Two shovels at first site. Not because of
two people, but more for the fact one was more
of a "chiseling" type. I am unsure if two were
at the second site but I think because of the
time of year that it was highly possible. I
believe that the "chiseling" type shovel from the
first site I did take back to Angie's house. I
know I threw the other one though as I stated.
It would have remained in Angie's outside shed
as I never got rid of it.

2. Angie told me either in 1998 or 2000 during
a visit with me that she went to site 1
during the time I was in prison and added
more dirt because it was very low. We had
talked about doing this, more specifically I talked
about doing it because of the settling concerns over
time. I never did it before I got arrested
and told her in not so many words that it needed
to be done. She didn't do it when I discussed
it with her but did at some point much later.

3. As far as Angie being dangerous — yes ; would
she kill someone — yes ; has she offered to kill
someone before — yes ; with that, I mainly took
her talk of wanting to kill someone (Ben Cohen's wife, (Anthony)
as "anger" talk but do believe if in correct circumstance she would.

(over)

GOVERNMENT
EXHIBIT
4

KK-P33

cont. "3" Anjie despises informants as much as I do. She was very much in agreement with killing them, to the point of wanting to kill informants that were unrelated to our legal concerns. Specifically, in 1983-84, more so 1983, she thought we should kill Aaron Ryerson because she knew he was an informant, which is true, even though he was not informing on her at the time, to our knowledge back then. She pushed me quite hard in 1996 to kill Jon (Green), and I state it in the monitored conversations with Tim Cattana. Her stance was to hurry up and quit "fucking around" and get it done.

4. Law Enforcement: She talked about her desire to kill Doug Beck, and Lori Lewis acts, the Forest City, IA Chief of Police on many occasions. She knew where he lived and talked that we should do it but I was uninterested as he was not a problem to us. Anjie wants to kill you because she doesn't like you, I only want to kill you if you try to get me in some way (i.e. sending to prison, hurt me or my family, etc.) If I would have agreed she would have done it, no question in my mind about that. I am unsure if she would kill someone without me because of the planning issue. If you put her in the right spot without her having to plan her way to get there, she would do it. She also wanted to kill Herb Garlock, Clear Lake, IA Police chief.

TOTAL P.02

Case 3:09-cv-03064-MWB-LTS     Document 245-41     Filed 05/05/11     Page 34 of 41

KK-P34

D-498 (Rev. 1-28-99)

# POLYGRAPH REPORT

| | | | FOR FBIHQ USE ONLY |
|---|---|---|---|
| REVIEWED BY: _MK_ | DATE: _9/1/04_ | | |
| RESULTS: | | | |
| SERIES I _DI_ SERIES II _INC_ SERIES III _____ SERIES IV _____ SERIES V _____ | | | |

| Date of Report | Date of Examination | Case ID # |
|---|---|---|
| 8/18/04 | 8/17/04 | 267-OM-42676 |

Field Office/Agency Requesting Examination

Omaha Division

| Authorizing Official | Date Authorized |
|---|---|
| SAC Omaha | 8/16/2004 (verbally) |

Examinee's Name (Last, First, Middle)

Honken, Dustin Lee

Case Title:
Dustin Lee Honken,
Angela Johnson;
Drug Related Homicide

**Administrative:** This polygraph conducted pursuant to a proffer agreement subject to a "prosecutive wall" and cannot be disclosed without prior permission from the USA Office, Northern District of Iowa.

Case Synopsis/Examiner's Conclusion:

During 1993, Dustin Lee Honken was the subject of a methamphetamine investigation. Charges were not brought because of the disappearance of certain witnesses, namely Greg Nicholson and Terry Scott Degeus. Subsequently, Honken was charged and convicted with the distribution of methamphetamine and sentenced to 293 months in Federal Prison. Information was later developed indicating that Honken was involved in the shooting deaths of five (5) people, including Nicholson and Degeus, during 1993. Investigation and interviews of witnesses located the body's of Nicholson and Degeus', as well as the bodies of Lori Duncan and her two daughters, age's 10 and 8. Honken was indicted in connection with the five murders and the Federal Government is seeking the death penalty. Jury selection process started August 17, 2004, in Sioux City, IA. and has received extensive media attention, partially because the State of Iowa has no death penalty, and the fact this is the first death penalty case sought by federal authorities in Iowa.

The following information is protected and must not be disclosed without prior permission from the USA Office, Northern District of Iowa:

Attorney's for Honken approached federal prosecutors and inquired about a proffer interview. A "prosecutive wall" was established for the express purpose of obtaining information from Honken without adversely affecting his trial. Access to information provided by Honken during this proffer interview has been severely limited, both within the USA's Office, FBI and other investigating agency's. During this proffer interview, Honken admitted to his involvement in the shooting of Nicholson, et al, including Angela Johnson's role in the killings. Honken provided significant detail, corroborated in the shootings by forensic evidence. During the proffer, Honken detailed his and Johnson's role in the killings, including how the children were killed. Honken agreed to a polygraph examination regarding the veracity of his proffer information.

Examiner's Name _SA Mark L. Heavrin_

2-Burran

GOVERNMENT EXHIBIT 5 TAINT TEAM

On 8/17/04, Dustin Lee Honken voluntarily participated in a polygraph examination conducted in one of the U.S. Marshal's holding cell's located in the Federal Building, Sioux City, Iowa. This test was conducted in the holding cell for security purposes and to better assure confidentiality. Prior to the polygraph, Honken read and completed a FD-328 and FD-395. Honken refused to sign the FD-395 because his attorney was not present. During the pre-test interview, Honken generally provided the same information he had previously provided investigators during the proffer interview. Specifically, Honken's version of what Angela Johnson allegedly did during the killings was reviewed with him. The following relevant questions were asked during the polygraph:

SERIES I:

A.  Did you make up any part of your story about Angela's involvement in the shooting of those people?  (Response: No)

B.  Were you completely truthful about Angela's involvement in the shooting of those people?  (Response: Yes)

It is the opinion of the examiner that Honken's responses to these relevant questions were **deceptive.** A second polygraph series was run regarding Honken's past attempts at recruiting people to harm witnesses and/or investigators working against him. The following relevant questions were asked during the polygraph:

SERIES II:

A.  Are you making any plans with anyone else to hurt anyone involved in that shooting investigation?  (Response: No)

B.  Are you participating with anyone else in any preparations to hurt anyone investigating those shootings?  (Response: No)

It is the opinion of the examiner that Honken's responses to these relevant questions were **inconclusive.** Honken was not interviewed about his responses, in either series, because of the proffer agreement.

2

KK-P36

- 1 -

FEDERAL BUREAU OF INVESTIGATION



Date of transcription    03/01/2005

DUSTIN HONKEN, white male, was interviewed while in custody at the U. S. Marshal's Office in Sioux City, Iowa.  Also present for the interview were HONKEN's three defense attorneys, Assistant United States Attorney (AUSA) JUDITH WHETSTINE, and participating via telephone was STEVE BADGER.  All parties present participated in the interviewing process.  HONKEN provided the following information:

Eleven years ago, HONKEN shot four people to death with the assistance of ANGIE.  HONKEN and ANGIE came up with a plan where ANGIE would go to GREG's house with a gun and detain GREG in the house until HONKEN could come in and take control of the situation.  ANGIE went into GREG's house, but, when she went in, GREG was not alone.  GREG's girlfriend LORI and her ten-year-old and six-year-old daughters were present in the house.  ANGIE pulled a gun on all of them and detained them until HONKEN entered the house.

HONKEN was not happy with ANGIE's decision-making process to detain all four people.  HONKEN thought that ANGIE should have left the house without pulling her gun when she realized that GREG had other people with him in the house.  However, ANGIE made the mistake and HONKEN could not do anything about it except kill all four people.  HONKEN wanted to kill GREG because GREG was going to testify against HONKEN regarding HONKEN's drug activities.

HONKEN tied GREG and LORI's hands in a shackle-like fashion so they could not free them.  HONKEN also believes that he probably tied their legs in a shackle-like manner to keep them from running.  HONKEN probably told the two that he was tying them up for safety reasons and that LORI, GREG, and LORI's daughters should be driven to another vehicle away from the residence and that they would not be harmed.

HONKEN put LORI and GREG in the back of a pickup which had a shell on it, and ANGIE took the two little girls in the cab of the pickup.  The little girls did not see LORI and GREG shackled.  LORI drove the pickup truck to a pre-designated spot that HONKEN and ANGIE came up with to shoot GREG.  ANGIE drove to the spot and stopped.  It was night time and very dark.  HONKEN got LORI and GREG out of the back of the pickup and walked behind the

Investigation on    08/18/2004    at  SIOUX CITY, IOWA

File # _____    Date dictated    08/21/2004

by    SA JONATHAN B. ROBITAILLE:kls

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;

two and made them walk away from the pickup. When LORI, GREG, and HONKEN walked approximately 50 to 100 yards, HONKEN shot GREG from behind and LORI was startled. HONKEN then shot LORI.

HONKEN then walked back to the truck where ANGIE and the two little girls were waiting in the cab. HONKEN took the ten-year-old girl first and walked her toward where he had shot LORI and GREG. Before they reached the point where LORI and GREG had been shot, HONKEN, who was walking behind the little girl, shot the little girl in the back of the head. HONKEN then walked back to the truck and got the six-year-old girl and walked her out to the point close to where he had shot the little girl's sister. HONKEN, who was walking behind the six-year-old little girl, shot the little girl in the back of the head as she was walking.

HONKEN then started to dig a grave to bury the bodies. HONKEN dug one large grave which took approximately three hours to dig. At one point during the digging, HONKEN became tired and handed the shovel to ANGIE, and ANGIE helped dig the grave. The bodies were a fair distance from where the grave was dug and HONKEN and LORI drug the two deceased adults to the grave. ANGIE had helped HONKEN drag LORI's body approximately 25 yards when LORI let out a gurgle. This startled ANGIE and ANGIE thought that LORI's spirit had left her body. ANGIE also helped drag GREG's body to the grave, but would not touch the corpses of the children.

While HONKEN took the two adults out into the darkness to shoot them, ANGIE waited in the truck with the girls and the keys were in the ignition of the truck. ANGIE could have driven away while HONKEN was out shooting GREG and LORI.

HONKEN is sorry for what he did to the two children and LORI. HONKEN stated that it was a tragic mistake and it was unnecessary. If HONKEN could change what had happened to them, he would.

Sometime after shooting these four, ANGIE and HONKEN decided that DE GEUS had to die. ANGIE used to date DE GEUS and he used to physically assault her. ANGIE did not like DE GEUS and feared him. The plan that ANGIE and HONKEN came up with was for ANGIE to lure DE GEUS out to a remote location where HONKEN would be waiting and then HONKEN would shoot DE GEUS. ANGIE made contact with DE GEUS and DE GEUS met her at the country club. From the country club, ANGIE lured DE GEUS out to the remote location that

KK-P38

she and HONKEN had planned to kill DE GEUS. ANGIE definitely knew that DE GEUS would be killed by HONKEN at that location.

ANGIE arrived to the remote location where HONKEN was waiting with DE GEUS. DE GEUS approached HONKEN and the two started to talk. DE GEUS immediately noticed that HONKEN had a handgun with him and became alarmed. DE GEUS told HONKEN that he would pay the debt that DE GEUS owed HONKEN. HONKEN told DE GEUS that that was not what it was about and they just wanted to talk. The three stood and talked for quite awhile until ANGIE got cold and tired and went and sat in HONKEN's vehicle. HONKEN was having a hard time bringing himself to shoot DE GEUS and talked to DE GEUS for several more minutes. HONKEN decided to shoot DE GEUS and took out his handgun and shot DE GEUS until the gun was empty. HONKEN then went and got a baseball bat and started beating DE GEUS with the baseball bat and then got a shovel and started beating DE GEUS with the shovel. ANGIE was close by when all this happened but did not participate in this assault that killed DE GEUS personally. ANGIE was relieved that DE GEUS was dead because of what he had done to her when they had been dating.

HONKEN dug a grave for DE GEUS by himself. ANGIE did not help dig the grave or place the body in the grave because she was five and a half months pregnant with HONKEN's baby.

ANGIE definitely knew ahead of time that HONKEN was going to kill the people he killed beforehand and assisted HONKEN in carrying out these plans. ANGIE was not worried about the details of these plans and was just anxious to go and kill these people now. HONKEN wanted things planned out more. ANGIE was definitely afraid of DE GEUS, but she was not afraid of GREG NICHOLS.

ANGIE would not personally kill people, but she would go along with plans she and HONKEN came up with to bail other inmates out of jail and pass messages to people outside of jail to further HONKEN's plans in eliminating witnesses. ANGIE attempted to bail out a DUANE WHITE and a JIMMY RODRIGUEZ for HONKEN. ANGIE did these things for HONKEN because she wanted HONKEN around because HONKEN was the father of her unborn child, and she wanted HONKEN to be present when the child was born and not out of fear that people were going to testify against her. Part of the reason why ANGIE participated in the plan to kill DE GEUS was, in part, retaliation for what he had done to her.

When HONKEN first got into drug activity, he did fear GREG NICHOLSON. Back in 1989 or 1990, HONKEN had a $1,600 debt to NICHOLSON and NICHOLSON kept saying threatening things to HONKEN regarding the payment of that debt such as he would send people into HONKEN's parent's house and take all their furniture. At some point in the relationship through the years, HONKEN quit fearing NICHOLSON and became upset that NICHOLSON turned informant when NICHOLSON always threatened HONKEN that people should never turn snitches.

KK-P40

## VanWeelden, Sali (USAIAN)

| | |
|---|---|
| **From:** | VanWeelden, Sali (USAIAN) |
| **Sent:** | Monday, March 28, 2011 11:38 AM |
| **To:** | John Jacobsen |
| **Subject:** | US v. Sorenson |

John, I've added a significant amount of discovery to this file today, namely 193 photos from Sorenson's arrest, plus additional documents. I've burned a new CD of all the discovery, to date, for you. It will be available at the front desk for pick up.

Thank you.

1

KK-P41