# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA

ANGELA JOHNSON,      *
    *
      Petitioner,     *
    *      **No. C 09-3064-MWB**
v.     *      **CAPITAL CASE**
    *
UNITED STATES OF AMERICA,     *
    *
      Respondent     *

## MEMORANDUM IN SUPPORT OF RENEWED MOTION TO COMPEL DISCOVERY OR *IN CAMERA* INSPECTION OF GOVERNMENTAL COMMUNICATIONS RELEVANT TO CLAIM III A. 1 OF THE CORRECTED, AMENDED MOTION UNDER 28 U.S.C. § 2255

### I. BACKGROUND

Up to this point, there has been very little need for the Court to resolve discovery disputes in this 2255 case. When disputes have arisen, the Court has made it clear that liberal and voluntary discovery should be the rule and not the exception.

Early on, the government moved to compel a neuropsychological examination of Ms. Johnson, claiming that she "has placed her mental condition into controversy by the nature of the claims she made in her Motion" and that " [g]ood cause therefore exists for the government to be permitted to examine defendant for purposes of responding to her allegations." [Doc. 29, p. 1]. The Court had "no hesitation finding that Johnson's mental condition is 'in controversy' in these § 2255 proceedings" and thus it granted the

1

government's motion , concluding that under Rule 6 of the Rules Governing Section 2255 Proceedings For The United States District Courts (Habeas Rule 6), a party seeking discovery in a 2255 proceeding was only required to show that "if the facts are fully developed, there is more than a 'slight chance' that the [party] may be able to demonstrate that the [party] is ...entitled to relief." [Doc. 41, p. 13].

The Court also resolved a discovery dispute in the government's favor concerning the reports of Drs. Gelbort and Young. The Court ruled that petitioner must make the evaluations of these experts available to the government, and that "[i]f the parties are unable to accomplish that, the court may order a deposition or strike...testimony." [Doc. 40]. The Court also "advise[d] the parties to move toward full, voluntary, reciprocal discovery of experts' files, guided by Rule 35(b)" and indicated that it "will intervene if the parties are unable to work out disclosures." (Id.)

Shortly after the Court entered this order, the government moved to compel a wide range of material, including:

1) A report by Dr. Myla Young regarding her examinations of and findings regarding defendant Angela Johnson;

2) A copy of any and all results of tests or examinations conducted by both Dr. George Woods and Dr. Myla Young of defendant Angela Johnson;

3) A copy of any and all work papers, including notes of interviews, created by Dr. George Woods and Dr. Myla Young in connection with their

2

examination and testing of defendant Angela Johnson;

4) A copy of any report, notes, or recording of or reflecting an interview of Christy Gaubatz;

5) A copy of all correspondence between defendant's trial counsel regarding their representation of defendant;

6) A copy of all correspondence of all correspondence between defendant and her trial counsel, and;

7) A copy of all notes of defendant's trial counsel pertaining to their representation of defendant.

[Doc. 44].

In support of its request for items 5-7, the government asserted that "defendant has waived any attorney-client privilege she had regarding such materials by asserting an ineffective assistance of counsel claim and by specifically referencing such materials in her petition. For the government to be in a position to effectively respond to defendant's allegations that her attorneys were ineffective, the government should be permitted access to the same materials upon which defendant is relying to make her argument." [Doc. 44, p. 4, citing *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) (defendant cannot use the attorney-client privilege as both a shield and a sword).]

Wisely heeding the Court's admonition that discovery in this case should be "full, voluntary, [and] reciprocal", predecessor habeas counsel did not contest the government's

3

motion, but only indicated that since the government had just recently asked for the requested materisl, "it will take Petitioner some time to locate, copy and deliver these materials." [Doc. 45]. The Court subsequently dismissed the discovery motion as moot. [Doc. 47]. Predecessor habeas counsel thereafter produced 3,526 pages of attorney client and work product material in response to the government's requests for items 5-7, and additional material in response to the other requests.

On December 3, 2010, present counsel wrote to the government that "I have received from Mr. Lawlor approximately 140 boxes of material which consist of trial counsel files, government discovery, investigative files, and post-conviction files. There are several boxes of Mary Goody material in this collection. In theory, given the broad scope of the petition, we have no problem in giving you access to everything in these files, as well as our own investigative reports of witnesses we intend to use, as long as there is an understanding that any disclosures cannot be used in any subsequent retrial. See, *Bittaker v. Woodford*, 331 F. 3d 715 (9th Cir. 2003)." Counsel for the government responded that "I'm agreeable to the idea that anything disclosed as part of this litigation would not be directly admissible if there were a retrial (there are some potential exceptions for impeachment, I believe, should someone testify inconsistent with the information in a retrial, but we can cross that bridge when if we get there)." In reliance on this representation, present counsel released to the government 7340 additional pages of

material from the trial team's files and made it clear that it would continue to comply with all discovery requests on a voluntary basis.

In the spirit of "full, voluntary, [and] reciprocal" discovery, the defense has made some requests of its own. On December 7, 2010, present counsel requested that the government provide: (1) the audio and video taped interview of Petitioner conducted by Dr. Martell in March 2010, as well as his raw testing data; and (2) the results of an Office of Professional Responsibility investigation pending against Dr. Martell in Washington, DC. at the time of Ms. Johnson's trial. The raw data was provided to petitioner's expert on December 14, 2010 and the interview tapes were provided to counsel on January 7, 2011. On February 3, 2011, the government indicated in response to the second request that "[a]s to Martell, I've made progress and am just awaiting permission from PRAO to turn it over to you.  It will be granted, but the guy in charge is out of office right now." Despite this assurance, the government ultimately filed with a Court a <u>Request For In Camera Inspection of Potential Giglio Material And Motion In Limine</u> in which it argued that although the requested material did in fact indicate that Martell had lied in an affidavit filed in another capital case, "[t]he Government does not believe the DOJ-OPR redacted report constitutes *Giglio* material and does not need to be produced to Petitioner", but that " out of an abundance of caution, the Government is submitting this redacted report to the Court for *in camera* review to determine whether it should be produced." [Doc. 201, p. 4]. After reviewing the material *in camera*, this Court

5

determined that it "did not provide exculpatory or impeaching information concerning Dr. Martell's credibility." (Doc. 219, p. 2). To date, the government has not produced a report from Dr. Martell or its other expert witness Dr. Kempke statements, although Ms. Johnson produced witness statements and expert reports in compliance with the agreement of the parties, and has continued to produce discovery as it is received.

On February 3, 2011, petitioner made the request which is at issue in this motion. Petitioner requested in an email that the government produce: "(1) any correspondence or memoranda by members of United States Attorney's Office for the Northern District of Iowa  directed to defense counsel for Johnson or Honken relevant to plea negotiations in this case; (2) any correspondence or memoranda by members of the same Office  directed to Main Justice relevant to plea negotiations in this case; (3)  any correspondence or memoranda by Main Justice directed to members of the United States Attorney's Office for the Northern District of Iowa  relevant to plea negotiations in this case; (4) any correspondence or  memoranda between members of the United States Attorney's Office for the Northern District of Iowa relevant to plea negotiations in this case; and (5)  any correspondence or memoranda by Main Justice directed to members of the United States Attorney's Office for the Northern District of Iowa relevant to the date of when there was any change in policy regarding acceptance of pleas in death eligible cases. The word 'correspondence' includes emails."

6

In support of this request, petitioner pointed out to the government that in claim III A. 1 of the Corrected Amended Motion Under 28 U.S.C. § 2255 petitioner was contending that Ms. Johnson was denied the effective assistance of counsel at trial because her counsel failed to take necessary steps to resolve this case in a plea for a sentence less than death. [Doc. 26, pp. 9-24]. Petitioner also pointed out that in its Amended Resistance to this claim the government had asserted that

> Regardless of what defendant would have done, there is no showing that the government would ever have agreed to a sentence less than death. The reported cases in this area all involve instances where the government had made a plea offer and the defendant alleges he failed to accept the plea because of faulty advice of counsel. Here, the government never made a plea offer to the defendant. Though there were preliminary discussions about possible ways to resolve the case, the discussions never progressed to the stage where the government gave defendant a plea offer. Regardless, no one in the United States Attorney's Office had the authority to make a binding plea offer to the defendant. Only the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case. There is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea.

[Doc. 27, p. 26]

Petitioner further pointed out that although items 2-4 might normally be considered privileged, "it is our position that any privilege has been waived by your assertions in the Resistance, much like the attorney-client privilege is waived because of the assertions in the 2255 motion. At the very least, the requested items should be

7

produced for *in camera* inspection by Judge Bennett. See, *United States v. Kee*, 2000 WL 863119, p. 4 (S.D.N.Y. 2000)('Kee does raise one concern that merits further inquiry. He alleges that the submissions to the Attorney General did not include evidence that he did not personally commit the murder for which the Government seeks the death penalty. Accordingly, the Court will review *in camera* documents sufficient to show whether evidence of this sort was in the Government's possession but not included in the Government's submission to the Attorney General.')."

The government responded that

> As to plea negotiations, I am willing to give you all communication between the government and defense counsel (indeed, since you have the defense files, you should already have this). Nothing in my response implicated communication with Main Justice that is protected by the attorney work product and deliberative process privileges. I did not indicate we communicated with main justice about the plea, or that they communicated with us about the plea. I asserted the USAO had no authority to agree to any plea agreement and you have nothing but conjecture that Main Justice would have agreed to a plea. What we do know is that when Barrigan made the 11th hour plea offer, the AG rejected it. My response was tailored to the assertions that statements made by Pat Reinert or Tom Miller about what plea might be acceptable was in any way binding on the AG, or was proof of what the AG would accept.
>
> In any event, I'm not sure I see that you have any viable claim here. In the interview with Martell, Johnson claims she's totally innocent and did not commit the crime.

In a subsequent email, present counsel argued that "[i]n terms of the merits of the claim, I do not think that Angela's comments in 2010 to a government agent who is actively seeking her execution is necessarily determinative of what she would have done before and at the time of trial had trial counsel performed the steps we say they should have performed to perfect a plea." The government responded that "I will not provide the items you request in (2) through (5) because it constitutes ordinary attorney work product, opinion attorney work product, and is further protected by the deliberative process privilege."

On March 1, 2011, petitioner filed a <u>Motion To Compel Discovery Or In Camera Inspection Of Governmental Communications Relevant To Claim III A.1 Of The Corrected Amended Motion Under 28 U.S.C. § 2255</u> [Doc. 160]. In that motion, petitioner argued that the government had waived any privileges, both because of the arguments it had made in its Amended Resistance, *and because at the time of trial government counsel had disclosed to defense counsel internal plea discussions between members of the United States Attorney's Office and between that Office and Main Justice.* [Doc. 160-1, pp. 18-20](emphasis added). In support of the second waiver argument, petitioner presented copies of notes and correspondence from trial counsels' files which indicated that a waiver had taken place. [Doc. 160-2].

On March 2, 2011, prior to the filing of any Resistance by the government, this Court entered an order which granted the motion "to the extent that the respondent

9

must produce the documents in (1), which it has agreed to produce, as soon as possible." [Doc. 162, p. 2]. However, "the court reserve[d] ruling on whether respondent must produce the documents in (2) through (5), either to the petitioner or to the court for *in camera* review, until the court has heard evidence about whether the petitioner was ever amenable to a guilty plea, what steps, if any, trial counsel took to attempt to encourage the petitioner to consider a guilty plea or to obtain from the government a plea agreement to a sentence other than death, and whether the government ever made any plea offers." [Doc. 162, p. 2]. The Court acknowledged, but did not resolve, the first waiver argument raised by petitioner, noting that "[t]he petitioner argues that the respondent waived any privilege by advancing [its] response [in the Amended Resistance]." (Id. at 2). The Court did not acknowledge or resolve the second waiver argument.

Following this order, on March 2, 2011, the government filed a Resistance To Petitioner's Motion to Compel Discovery [doc. 163]. The government claimed that the defendant had not made a showing of need for the documents, that the documents were protected by the deliberative process and attorney work product privileges, and that there had been no waiver of these privileges.

Despite these arguments, on March 2, 2011, the government disclosed fifty one pages of discovery relevant to the motion, bates numbered 000001-000050 and 000079. On March 5, 2011, the government disclosed an additional unnumbered eighty seven pages of discovery in an electronic file entitled "Honken Only Communication

10

With Opposing". On March 9, 2011, following the testimony of Special Assistant United States Attorney Thomas Miller, the government disclosed two additional items of discovery. The first, a letter dated March 20, 2002 from Attorney General John Ashcroft to United States Attorney Charles Larson states that "You are authorized to seek the death penalty against Angela Johnson. As described in the United States Attorneys' Manual 9-10.100, you may not enter into a plea agreement that requires withdrawal of the notice of intention to seek the death penalty without the prior approval of the Attorney General." The second, a letter dated April 11, 2005 from Attorney General Gonzales to United States Attorney Charles Larson states that "You are authorized to continue to seek the death penalty against Angela Johnson. You are nor authorized to accept a guilty plea from Angela Johnson under the term delineated in your February 18, 2005 memorandum to Charlie Kinsey. As described in the United States Attorneys' Manual § 9-10.100, you may not enter into a plea agreement that requires withdrawal of the notice of intention to seek the death penalty without the prior approval of the Attorney General."

All of the foregoing discovery was rearranged chronologically and renumbered and introduced into evidence as petitioner's Exhibit No. 48 following the testimony of Mr. Miller.[1] (Hearing Transcript, p. 2463-2464)(hereinafter "HT").

---

[1] By stipulation, the two letters from the Attorney Generals are included in the hard copy of the Exhibit 48 but were not included in the electronic version of the exhibit because they were received after the electronic version was created.

11

During the testimony of Mr. Miller, this Court ruled that there had been a waiver of any privileges that could have been asserted with respect to the content of Exhibit 48. (HT, p. 1013, lines 17-25.). One of the issues raised by this renewed motion is whether any waiver caused by the disclosure of Exhibit 48 or by the disclosure of internal communications to trial counsel extends to any undisclosed communications on the same subject matter under Federal Rules of Evidence Rule 502 (a).[2]

Several witnesses provided testimony relevant to this issue and to the general issue of plea discussions during the first phase of the evidentiary hearing. Mr. Miller testified without objection that in a plea discussion with Mr. Berrigan and Mr. Stowers that took place on August 21, 2002 he "well may have made" the comment to the defense lawyers that "he and Pat R[einhert] had talked early on about offering A.J. 10 to 15 years for information leading to discovery of the bodies." (HT, pp. 1005-1006). Both

---

[2] Rule 502(a) provides that a waiver resulting from a disclosure of protected information in a federal proceeding extends to undisclosed protected materials "only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." Fed.R.Evid. 502(a). "The idea is to limit subject matter waiver to situations in which the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials." 8 Charles Alan Wright, et al., Federal Practice and Procedure § 2016.2 (3d ed., 2010 update). Thus, subject-matter waiver "is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed.R.Evid. 502 advisory committee notes.

Mr. Berrigan's and Mr. Stowers' notes reflect this disclosure. (Exhibit 46; Exhibit 51, p. 43).  Both Mr. Stowers and Mr. Berigan confirmed that this disclosure had taken place. (HT, p. 1122, 1154, 1191, 2144).

Mr. Stowers testified that, as reflected in his notes for August 3, 2001, he had a conversation on that date with Mr. Reinert in which Reinert said that "he wants to resolve case by plea", and "he seemed to agree with concept of Rule 11(e)(1)(C) plea to term of years arrived at by reduction for substantial assistance being factored in." (HT, 1181-1184; Exhibit 51, p. 42)

Mr. Berrigan testified that on August 21, 2001, Mr. Reinhert told him that he "want[ed] death for Honken and A.J. cooperating, but he could also do double joint plea with Dustin getting LWOP." (HT, p. 2144; Exhibit 46).

Mr. Berrigan also testified that on about May 10, 2003, he received a letter from Angela Johnson in which she stated:

> I want to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the 8th Cir. I am asking you to get me the best deal you can and I _will_ cooperate. At this point I will confess to killing the Pope. I have not touched me kids in THREE years now and I've had it. Please get me out of here and into a prison as close to my kids as possible. That is all I ask.

(HT 2206-2207; Exhibit 67, pp. MCN 03-002969-MCN 03-002970)(emphasis in original)

13

Mr. Berrigan also testified that in the context of plea discussions, Ms. Johnson eventually "came around and got off this I wasn't there." (HT 2205). More specifically, Mr. Berrigan testified that after he got the "I want to plead guilty" letter, he went to see Ms. Johnson on May 22, 2003 and she explicitly told him, and he quoted her in his notes as saying, "I want to plead guilty now–let's go !". He also wrote: "Angela's first and primary concern is having to stay in the Linn County jail. Willing to testify against Dustin Honken ! Including cooperation !" (HT 2207; Exhibit 72A, p. 352). According to Mr. Berrigan, at this point Ms. Johnson is "sick and tired of the situation and wants to plead guilty, cooperate. She's going to do whatever she can." (HT p. 2208-2209) "She's clearly on board." (HT p. 2210)

From this point forward, establishing a factual basis for a plea was not going to be a problem because "[i]t's not unusual ...for clients to...take inconsistent position as the litigation goes on." (HT, p. 2211) Mr. Berrigan testified:

> I can get that done. I've done it for years. I've had well over 50 capital cases, and the vast majority of those resulted in guilty pleas, and it's not an easy process frequently, but I was confident I could get it done with Miss Johnson.

(HT, p. 2212)

Mr. Berrigan also testified that following this meeting he called Mr. Reinhert on June 7, 2003 and told him that Ms. Johnson was "very upset, willing to cooperate", and that "[t]hey would like 20-year sentence." (HT, p. 2217; Exhibit 48, p. 41.) A letter of Mr. Berrigan to Ms. Johnson reflects that on June 7, 2003, Mr. Reinhert told him that "the

14

Department of Justice would not authorize a sentence below life imprisonment for [Ms. Johnson], even if [she] were cooperating against Dustin." (Hearing Transcript. P. 2230; Exhibit 67A, p. MCN 03-003025). Mr. Berrigan testified that in response to this statement he told Mr. Reinhert that there could not be an agreement unless it was substantially below life imprisonment. (HT 2231.) He made this statement even though Ms. Johnson never said that she would only agree to substantially less than life, and in fact had told him to just get the best deal possible. (Id.)

Mr. Berrigan testified that joint plea discussions were then pursued and that during those discussions he still insisted on 20 years even though he learned from government counsel that "what DOJ wanted was life and life." (HT, p. 2237-2238).

He testified that on or about August 12, 2004, he read a letter from Mr. Murphy in which Murphy said that "I anticipate the life and 20 proposal will be formally rejected by DOJ later today or tomorrow", but also stated that

> if we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval. a proposed plea agreement for your client's consideration. The basic terms of the plea agreement would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence. Your client would be required to cooperate and testify in the prosecution of Dustin Honken. In exchange, we would seek authorization to not pursue imposition of the death penalty against your client.

(HT 2238-2240; Exhibit 52, p. RS 13-906)

15

Mr. Berrigan testified that he rejected this offer by the government even though "[t]here wasn't any downside" to what the government was proposing, other than "life is the sentence", and Angela was "going to have to go through that process without knowing what's going to happen." (HT, p. 2241).

He testified that after Honken was convicted and sentenced to death and "the whole motive for the government wanting to cooperate with Angela dissipated significantly" he finally "gave up on the idea that we could get it done without a proffer." (HT, p. 2241, 2244) He testified that in March 2005, as a result of discussing Mr. Honken's proffer with Ms. Johnson, he was able to come up with a factual basis for a plea that Ms. Johnson was agreeable to. (HT 2079-2083). He wrote up the proffer and sent it to the government, but at this point he learned from government counsel that the local United States Attorney was not recommending to Main Justice any settlement. HT, p. 2242-2243; Exhibit 38, pp. 128-129)

Investigator Gordon Gratias testified that around this time he intercepted a letter that Ms. Johnson had written to her brother. The letter states in part:

> Dustin tried to plead guilty. He did a proffer and also took a polygraph. Of course, he wasn't honest, and they rejected his plea for life. They want to give him the death penalty. I have no problem with that. I'd like nothing more than to testify against him, but my attorneys won't allow it unless I get an iron-clad deal first. I said I don't care about a deal; I just want to tell the truth. I guess we'll see.

(HT, p. 2381; Exhibit 84, p. 50)

16

On April 13, 2011, following the first phase of the evidentiary hearing, and before the Court had heard further evidence from other trial participants on the contents of Exhibit 48 or on plea discussions between the parties, the Court denied the motion for discovery in a four page ruling. [Doc. 218]. After summarizing the government's position, and after specifically characterizing the government's position on waiver as being that "[t]he respondent denies that there has been any waiver of any applicable privilege *as a result of the respondent's response to Johnson's § 2255 motion*" (emphasis added), the Court concluded:

> I agree with the respondent. Much of the information in the remaining categories is simply irrelevant, where there is no showing that anyone other than the Attorney General had ultimate authority with regard to any plea offer in a capital case. See Fed. R. Evid. 402. Moreover, if somehow relevant, the information in these categories is subject to work product and/or deliberative process privileges....I find no waiver of any applicable privilege.

[Doc. 218, pp. 3-4]

Again, the Court did not acknowledge or resolve the second waiver argument raised in petitioner's motion.

Beginning on May 2, 2011, the Court heard additional testimony relevant to this waiver issue and to the plea discussions in this case. Assistant United States Attorney Reinert identified documents within Exhibit 48 that he had authored, including: (1) a March 8, 2001 internal memorandum to District Security Manager Steve Badger in which

17

he outlined evidence of renewed death threats by Dustin Honken against Assistant United States Attorneys and case agents, and indicated that because of these threats and the fact that Honken was one of the leaders in the Odinists white supremacist group at USP Florence, he was " a serious threat, not only if he escapes, but also while he is incarcerated " (Exhibit 48, pp. 5-6); (2) a April 9, 2001 internal memorandum to District Security Manager Steve Badger in which he indicated that at the time of the last threat by Honken, the Department put a new alarm system in his house, paid for monitoring for a period of time, and put a remote starting device on his vehicle, and that "since [his] last threat from Dustin Honken, [Reinert had] moved and changed vehicles" (Exhibit 48, p. 18), and (3) a July 27, 2001 internal memorandum to Scott Jennings of the FBI requesting that the FBI open an investigation into Honken's involvement in a conspiracy to escape and murder various officials (Exhibit 48, p. 31).[3] These internal and otherwise privileged documents, disclosed in response to petitioner's request for discovery relevant to plea discussions, explain the government's strong motivation to convict and secure a death sentence against Dustin Honken and to secure Angela Johnson's cooperation in order to do so.

Mr. Reinhert also identified a March 8, 2001 letter to Mr. Willett and Mr. Berrigan in which he made what he described as a "tentative offer" to "resolve this case

---

[3] The transcript of the evidentiary hearing testimony of Mr. Reinhert and Mr. Murphy is not yet available so it is not possible to provide transcript citations for the testimony of these witnesses.

Case 3:09-cv-03064-MWB-LTS     Document 262-1     Filed 06/01/11     Page 18 of 42

by guilty plea in exchange for the United States not seeking the death penalty." (Exhibit

48, pp. 7-8) [4]

_____

[4] The March 8, 2001 date of this letter is significant. In its ruling, the Court indicated that "there is no showing that anyone other than the Attorney General had ultimate authority with regard to any plea offer in a capital case." [Doc. 218, p. 3]. However, at page 17, n. 2 of his motion petitioner demonstrated quite conclusively that under the death penalty protocol as it existed prior to June 6, 2001, United States Attorneys in the field could dispose of federal capital cases, once charged, without advance approval or review by the Attorney General or Main Justice. [Doc. 160-1, p. 17 n. 2]. Assistant United States Attorney Richard Murphy so testified in this case on May 2, 2011.

Moreover, the Court's analysis seems to assume that the local United States' Attorney's recommendation has no relevance to the Attorney General's decision to seek or not to seek the death penalty. Historically, this has not been the case. See, Stephen Klein, Richard Berk, and Laura Hickman, Race and the Decision to Seek Death in Federal Cases (Rand Corp. 2006), p. 21, available at http://www.rand.org/pubs/ technical_reports/TR389.html.("[T]he USAO's and the AG came to the same conclusion for 544 (91 percent) of the 598 defendants they considered in common.").

As a former member of the Capital Case Review Committee has written,

U.S. Attorneys are required to provide a recommendation whether to seek the death penalty or not, and reasons for that recommendation. They may not remain agnostic on this ultimate question.

The U.S. Attorney's recommendation carries great, although not dispositive, weight with the Committee. This is particularly so when the recommendation is against seeking death in a death-eligible case. Such "no death" recommendations are almost always accepted, not just because of the traditional autonomy of the U.S. Attorneys, but also because U.S. Attorneys generally exercise great care in submitting their recommendations and are presumed to know their local communities, jury pools, judges, and the overall strengths and weaknesses of their particular case far better than Main Justice personnel.

Rory Little, *The Federal Death Penalty: History and Some Thoughts About The Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 422 (1999)

Mr. Reinhert identified a October 10, 2001 letter to Mr. Willett in which he referenced a October 1, 2001 meeting during which Mr. Willett and Mr. Berrigan " discussed the fact that [Ms. Johnson] would be willing to cooperate in order to receive a 20-year sentence." (Exhibit 48, p. 35). Mr. Reinhert's response to this offer is contained in his letter:

> In the right circumstance, our office may not be opposed to negotiating a settlement to this case, which could include a sentence other than the death penalty or life imprisonment. However, in my opinion, a 20-year term, which equates to only four years per murder, is unconscionable. In the event your client desires to attempt to resolve this matter short of trial and cooperation is part of her proposal, we need to interview your client pursuant to a proffer agreement, assess her credibility and value to the government, and then negotiate terms of any plea·agreement.

(Id. at p. 35)

Mr. Reinhert identified a handwritten note dated June 7, 2003 in which he documented a conversation with Mr. Berrigan during which Mr. Berrigan indicated that Ms. Johnson was "willing to cooperate", but that "they would like 20 year sentence." Mr. Reinhert wrote in his note: "we need proffer first."  (Exhibit 48, p. 41).

Mr. Reinhert identified a letter he wrote to Mr. Berrigan on June 9, 2003 in which he reiterated that Ms. Johnson's cooperation against Honken "could result in a lesser sentence than the death penalty", but that he would first need a proffer from Ms. Johnson. He agreed "to consider all of [Ms. Johnson's] information, the totality of the

20

circumstances, and her role in the criminal conduct compared to the role of others, and keep an open mind regarding a disposition this office would recommend to the Attorney General." (Exhibit 48, p. 42).

Mr. Reinhert identified a letter he wrote to the Johnson defense lawyers on June 10, 2003 in which he stated:

> I am open to engaging in discussions to work toward an amicable resolution of this case. The first step we must take is to interview your client to determine the nature and extent of her information and her ability and willingness to cooperate. Once that step is completed we will then be able to place her information in context with the information we otherwise have available against Mr. Honken and attempt to perform an evaluation and determination appropriate resolution for this case which would be acceptable to the Department of Justice. Once we have narrowed the options and determined the nature and extent of her cooperation, we would then seek guidance and approval from the Department of Justice. If the agreement and principle were approved by the Department of Justice, we would then execute a formal written agreement to resolve this case.

(Exhibit 48, pp. 45-46)

As indicated above, Assistant United States Attorney Richard Murphy testified that prior to June 6, 2001, the local United States Attorney had authority to negotiate capital cases without Attorney General or Main Justice approval under the Department of Justice's death penalty protocol.

He also identified a note he wrote on August 11, 2004 in which he acknowledged that he told Mr. Spies in a telephone conversation that the Department of

21

Justice had not yet responded to a joint plea offer of like for Mr. Honken and 20 years for Ms. Johnson "because we asked them to hold off at their (the Honken defense team's) request." He also acknowledged telling Mr. Spies, as reflected in his note, that "if [another plea offer] is less than life/life it may not be time well spent but that is only my gut feeling from participating in meetings, hearing CLU people talk, etc. Bottom line is that DOJ must make the call." (Exhibit 48, p. 75) He further acknowledged that in the same note he wrote that he "talked to CJ [who] agrees w/me & wants me to handle plea negotiations. Life/life-nothing less-even then, should be some proffer." (Exhibit 48, p. 75).

He also identified a note he wrote on August 12, 2004 in which he acknowledged that he told Mr. Rogers that "we are ope[n] to negotiating with Honken alone", that he told Willett that "we highly doubt 20 years is or could be agreeable", and that in a separate conversation with Willett on the same day he again told him that "I highly doubt DOJ would accept 20 years for Angie-probably life." (Exhibit 48, pp. 76-79).

Mr. Murphy identified a note that Steven Badger wrote that documents a conversation that Murphy and Badger had with Mr. Spies and Mr. Parrish on August 12, 2004. In the note , Badger wrote that during this conversation Murphy told the defense lawyers that "Department has indicated an uphill battle to change death penalty decision. Concerns about DH long term dangerousness." (Exhibit 48, p. 81). More specifically, he

22

told them that "there is a serious concern about DH's future bad acts....It is a long term serious issue. That's a big hurdle." (Exhibit 48, pp. 82-83) He also told them that "If death penalty comes off the table for DH, it would probably come off the table for A.J., but that's not a certainty." (Exhibit 48, p. 82). According to the note, when Mr. Parrish asked if all bets were off once trial started, Mr. Murphy replied, "[a]fter discussion with Mr. Larson this morning, no, but the longer it goes it probably hurts." (Exhibit 48, p. 83).

Mr. Murphy identified a note that he wrote that documents a conversation that Murphy had with Mr. Spies on August 13, 2004. In the note , he wrote: "Told him pending offer (life + 20 for Angie) will be rejected by DOJ. Told him of what we would be agreeable to propose to DOJ: plea, proffer, polygraph, ADmax, reinstitute charges if problems at BOP." (Exhibit 48, p. 99).

Mr. Murphy identified a note that he wrote that documents a conversation that Murphy had with Mr. Spies and Mr. Parrish on August 15, 2004. In the note , he wrote: "Talked to Leon & Al for half an hour about Dustin being willing to testify...I told them I tought it was a must to get Dept. To agree to this–even then, no guarantees." (Exhibit 48, p. 101).

Mr. Murphy also identified an internal email communication he sent to Mr. Larson on August 15, 2004. The email states:

> Honken has come very close to agreeing to the terms we suggested would be part of a plea proposal we would be willing to send to the Department for their approval. The

23

details would still be negotiated and drafted, but it seems we are closer than anyone ever thought we could get.

As we discussed, the key features of an agreement would be: 1) full admission and proffer of facts; 2) polygraph; 3) testimony if needed against Angie; 4) withdrawal of death notice; 5) special conditions of confinement; 6) no contact with victims families, others, etc; 7) no new threats or crimes while in prison ---if so, we reinstate dismissed charges and seek death penalty and use admissions against him.

Leon and AI have invested a great deal of energy into getting this close --- they are somewhat skeptical of our commitment and the willingness of the AG to get this resolved short of trial. I have told them we have discussed these terms because they are terms which we agree we would be willing to recommend to the Dept --- however, it remains the Department's decision.

They want to know that you remain in agreement with this. I told them we have discussed it and I would not have begun the process of pursuing this deal if you did not authorize and agree to it.

If they stay on track, we will try to take the proffer on Monday afternoon. Jury selection will start on Tues and polygraph Tues. evening.[5]

(Exhibit 48, p.114)

Mr. Murphy identified a note that he wrote that documents a conversation that Murphy had with Mr. Spies on August 15, 2004. In the note, he indicates that he told Mr. Spies that he had sent to DOJ an "original memo and & follow up on residual doubt...." (Exhibit 48, p.115)

---

[5] During the second phase the evidentiary hearing, the government argued that even though this email had been given to the defense an introduced into evidence, it was still privileged under Federal Rules of Evidence Rule 502(b). The Court rejected this argument.

24

Mr. Berrigan again testified and told the Court that at the point in time when the joint 20 plus life plea proposal was pending in Washington, Mr. Williams told Mr. Berrigan on July 26, 2004 that "Mr. Williams was waiting on word from the Justice Department", and that "[t]hey had submitted a proposal but not one that his office was recommending", as reflected in Mr. Berrigan's contemporaneous notes, (HT, p. 2899; Exhibit 67, p. MCN 04-003558).

**II. Argument**

Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that the judge "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of the law." Rule 6(b) provides that the party requesting discovery must provide reasons for the request. As this Court has previously ruled in this very case, a party seeking discovery in a 2255 proceeding is only required to show that "if the facts are fully developed, there is more than a 'slight chance' that the [party] may be able to demonstrate that the [party] is ...entitled to relief." [Doc. 41, p. 13].

In this case, the threshold showing of "good cause" is clearly met. Based on the allegations set forth at pages 9-24 of the Corrected, Amended Motion and as more fully developed herein, there is "more than a slight chance" that Ms. Johnson may be able to demonstrate that she is entitled to relief on her plea claim under the standards announced by this Court in *Wanatee v. Ault*, 39 F. Supp. 2d 1164 (N.D. Iowa

25

1999)(*Wanatee I*), *Wanatee v. Ault*, 101 F. Supp. 2d 1189 (N. D. Iowa 2000)(*Wanatee II*), aff'd 259 F. 3d 700 (8th. Cir. 2001), *United States v. Hernandez*, 450 F. Supp. 2d 950, 974-983 (N.D. Iowa 2006) . Petitioner needs the requested material in order to bolster her plea claim and in order to rebut the specific counter-arguments advanced by the government in its Amended Resistance.

The government claims in its Amended Resistance that aside from Ms. Johnson's own explicit direction to her trial attorneys on May 10, 2003 (Exhibit 67, pp. MCN 03-002969-MCN 03-002970) ("I am going to be as clear as I can[;] I want to plead guilty"), "[d]efendant has provided no other evidence, before or after this note, showing any willingness to plead guilty." (Amended Resistance, Doc. 27, p. 25). In its Resistance to Pettioner's Motion to Compel Discovery, the government goes even further, claiming that petitioner "never has offered to plead guilty..." [Doc. 163, p. 6] As demonstrated above and in the May 10, 2003 letter, this is not in fact the case. In any event, in *Wanatee* I, where no such contemporaneous evidence of the client's desire to plead was produced and in fact there were indications that "Wantee did not *want* to plead guilty" , this Court held that the fact that the defendant did not want to plead guilty "is irrelevant to whether counsel was ineffective for failing to inform Wanatee of the facts and law applicable to his case in order to allow him to make an informed choice about accepting or rejecting the plea agreement." 39 F. Supp. 2d at 1171. See also, *United States v. Hernandez*, 450 F. Supp. 2d at 975 (""[T]he fact that a defendant did not appear to want to plead guilty,

26

rather than go to trial, was no impediment to an 'ineffective assistance' claim that he was improperly advised about whether or not to go to trial or to plead guilty."). Ms. Johnson has alleged, and has demonstrated at the evidentiary hearing, that she was "improperly advised about whether or not to go to trial or to plead guilty." Given her allegations and the facts she has proven in support thereof, there is "more than a slight chance" that she may be able to prevail on the deficient performance aspect of her plea claim.

*Wanatee* I also holds that in addition to deficient performance, a defendant must also establish prejudice by showing that the plea bargain would have resulted in a lesser sentence than what was received at trial, and that "but for counsel's advice, [s]he would have accepted the plea." 39 F. Supp. 2d at 1171. Again, there is "more than a slight chance" that Ms. Johnson will be able to satisfy both prongs of the prejudice test.

Regarding the first prong, a letter written to the defense by Assistant United States Attorney Reinert on October 10, 2001 (Exhibit 67, p. MCN 01- 001205) documented the defense lawyers totally unreasonable position that Ms. Johnson may be willing to plead guilty if she could be assured of a sentence of twenty years. Mr. Reinert reasonably replied that "[i]n the right circumstances (cooperation) , our office may not be opposed to negotiating a settlement to this case, which would include a sentence other than the death penalty or life imprisonment", but that in his opinion "a 20 year-term, which equates to

27

only four years per murder, is unconscionable." [6] A sentence of "other than the death penalty or life imprisonment" is certainly less than the death sentence which Ms. Johnson received after trial and thus the first prong of the prejudice inquiry is satisfied.

Similarly, a note contained in Mr. Stower's file dated August 3, 2002, (Exhibit 51, p. 42), indicates that Assistant United States Attorney Reinert advised Mr. Stowers that "he wants to resolve case by plea" and he "seemed to agree with concept of Rule 11(e)(1)(c) plea to term of years arrived at by reduction for substantial assistance being factored in." A note in Mr. Stower's file dated August 21, 2002, indicates that Assistant United States Attorneys Reinert and Murphy advised Mr. Stowers on August 21, 2002, that "they would have offered 10-15 years prior to recovery of bodies." (Exhibit 51, p. 43) A note contained in Mr. Berrigan's file dated August 21, 2002 indicates that Assistant United States Attorney Miller "reflected that he & Pat R. had talked early on about offering A.J. 10-15 years for information leading to discovery of bodies" and that Reinert "claim[ed] to want death for Honken & A.J. cooperating but he can also do double/joint plea w/ Dustin getting LWOP." (Exhibit 46). Importantly, Mr. Berrigan

---

[6] This Court has agreed with Mr. Reinert's assessment, stating that

THE COURT: Well, you know, it's not that often I agree with the government, but their characterization of 20 years as -- I don't remember the word, something like ludicrous -- is pretty accurate at the point you got in the case at least. You couldn't have expected a 20-year plea. I mean, Reinert's right. You know, three Thanksgivings ago I think I gave out three life sentences in that week on drug cases. I mean, that's pretty standard fare in the Northern District, so to expect 20 years on a case like this is . . .

(HT, pp. 1239-1240)

28

unreasonably deduced from this disclosure of an inter-Departmental communication that since the government was willing to offer 10-15 years *before the bodies were discovered*, that "our high teens, low 20's offer was not out of whack." (Id.). In any event, an offer of 10-15 years before the bodies were discovered, and an offer of a "term of years" after the bodies were discovered are both below the death sentence that Ms. Johnson received after her lawyers stubbornly insisted on a twenty year offer with no proffer.

Again, a note contained in Mr. Berrigan's file dated June 30, 2004 indicates that Charlie Rogers reported that "Miller wd. be happy to see a double plea with life imprisonment for Dustin Honken and 30 yrs. for Angela." (Exhibit 67, p. MCN 04-003496). Instead of offering such a plea, which again was below the death sentence received after trial, Mr. Johnson's lawyers authorized Mr. Rogers to write a July 17, 2004 letter to the United States Attorney on behalf of both defendants in which he stated that both defendants "would enter pleas of guilty if Mr. Honken receives a life sentence (or group of life sentences) and Ms. Johnson's sentence totaled twenty years" (Exhibit 48, p. 69-71). This offer, which again contained the "unconsionable" twenty year offer earlier rejected by the government was doomed to failure and indeed on July 26, 2004 Mr. Williams let slip that his office was not even recommending that D.O.J. accept the plea. (HT, p. 2899; Exhibit 67, p. MCN 04-003558).[7]

---

[7] Mr. Williams' Resistance to the discovery motion does not contain any declaration from counsel denying that this disclosure of the local recommendation was made. [Doc. 163]. Instead, it is claimed that "this statement was with regard to a plea

29

Finally, a note contained in Mr. Berrigan's file dated August 12, 2004 indicates that Mr. Murphy told all defense counsel that D.O. J. was considering "life plus 20 for A.J." but that "D.O.J. wants life + life." (Exhibit 67, pp. MCN 04-003577-3579). An August 12, 2004 letter written to the defense by Assistant United States Attorney Murphy states that "[i]f we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval, a proposed plea agreement...[t] basic terms of [which] would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence." (HT 2238-2240; Exhibit 52, p. RS 13-906) Thus, even at this point, defense counsel could have settled the case for a life sentence, which was less than the death penalty she received. Prong one of the prejudice inquiry is clearly established.

Regarding the second prong of the prejudice inquiry, this Court concluded in *Wanatee I* that the prejudice inquiry does *not* focus on the defendant's bare unwillingness to enter into a cooperation agreement with the government, but rather "the question is whether the petitioner would have agreed to the plea bargain 'if properly advised.'" 39 F. Supp. 2d at 1171. On this point, the evidence at the evidentiary hearing has demonstrated that Ms. Johnson was never advised of her significant plea options prior

___

offer proposal made by Honken, not Petitioner." [doc. 163, p. 7]. This assertion is refuted by the plea letter and by a sentence on the very same page of the Resistance: "The 'plea' to which Petitioner refers was an offer Honken's counsel floated about a proposed *joint plea by Honken and Johnson* in which Honken would plead to a life sentence and Johnson would serve 20 years." (Id.)(emphasis added)

to the discovery of the bodies, and that following the discovery of the bodies she was improperly advised to hold out for an "unconsionable" sentence of twenty years with no proffer, and her trial team realized too late, following the conviction and death sentence of Honken, that a sentence up to and including a life sentence and a proffer should have been offered when the government desperately needed her to get a guilty verdict and death sentence against Mr. Honken. That Ms. Johnson ultimately agreed to plead to a life sentence and provide the government with a proffer is strong evidence that had she been properly advised she would have agreed to and could have complied with the plea offers which were repeatedly held out to her counsel at a time when she had considerable leverage in the case. See, *Wanatee I* , 39 F. Supp. 2d at 1175 (trial counsel's efforts to reopen a plea offer, ultimately rejected by the government, was evidence which indicated a reasonable probability that the petitioner would have accepted an earlier plea); *Wanatee II*, 101 F. Supp. 2d at 1200 (requiring that the court consider whether the petitioner has shown that he "could have performed" the plea agreement.)

*Wanatee II* discusses one additional requirement to a successful plea claim: " 'Logic dictates...that to establish...prejudice, the petitioner must begin by proving that a plea agreement was formally offered by the government.' " 101 F. Supp. 2d at 1200, quoting *Kingsberry v. United States*, 202 F. 3d 1030, 1032 (8th Cir. 2000). However, In *Wantee II*, this Court found this condition satisfied even though it was "undisputed that there was no written offer of a plea agreement and...no written plea agreement was ever

31

prepared or executed." 101 F. Supp. 2d at 1202. The Court reasoned that the question of whether an offer was made "depends upon evidence about the prosecutor's conduct, i.e., evidence that the prosecutor made (or did not make) a written or oral plea offer." (Id. 1201-1202). An oral offer was found to exist in *Wanatee II* even though the government's oral offer was contingent: "The respondent has never previously denied that Wanatee was offered the opportunity to plead guilty to second-degree murder, if he agreed to 'cooperate' with the prosecution before the trial information was filed. To the extent the respondent now attempts to raise such an objection, that objection is overruled." (Id. p, 1202). The Court concluded that "contrary to the respondent's assertions, the adequacy of Wanatee's proffer is not relevant to the question of whether the prosecutor made a plea offer, because the plea offer preceded any proffer of information by Wanatee.

Here, at the very least, Mr. Reinert's letter of October 10, 2001 and Mr. Murphy's letter of August 12, 2004 constitute contingent plea offers within the meaning of *Wanatee II.* The government claims in its Amended Resistance that "although Defendant's attorneys did explore plea possibilities with the government repeatedly", "those discussions did not result in a plea agreement", and that "it is pure conjecture that the Attorney General would have ever agreed to a plea agreement in this case." [Doc. 27, pp. 23-24]. It also claims on this issue of prejudice that "[r]egardless of what defendant would have done, there is no showing that the government would ever have agreed to a sentence less than death", that " the discussions never progressed to the stage where the

32

government gave defendant a plea offer", that "[r]egardless, no one in the United States Attorney's Office had the authority to make a binding plea offer to the defendant", that "[o]nly the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case", and that "[t]here is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea." [Doc. 44, pp. 25-26].

The five items requested by the defense are directly relevant to rebutting the government's factual assertions that (1) there is no showing that the government would ever have agreed to a sentence less than death; (2) there is nothing but conjecture to suggest the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea; and (3) "[o]nly the Attorney General of the United States has the authority to authorize a plea offer in a death-eligible case".

If for instance, there is case specific documentation showing that the local United States Attorney was recommending acceptance of a plea involving a sentence of less than death or that Main Justice would have accepted such a plea, this would bolster petitioner's plea claim and directly refute the government's counter-arguments.[8]

---

[8] Over the 12-year period covered by the Department of Justice's study of the federal death penalty between 1988 and 2000, 49 % (24 of 49) of white defendants for whom Attorney General Reno authorized the death penalty were subsequently allowed to plead guilty, thus avoiding the death penalty. See "Survey of the Federal Death Penalty System (1998 - 2000)", United States Department of Justice, Sec. B (1), Plea Agreements, 33-35 (September 12, 2000), http://www.justice.gov/dag/pubdoc/dpsurvey.html.  By contrast, only 27% (28 out of 105) of African-American defendants and 27% (10 out of

33

Similarly, if there is official documentation, which Petitioner believes there is, showing

that it was not always the policy of the Department of Justice to require the approval of

the Attorney General for the acceptance of a plea in a death eligible case, then the

existence and effective dates of that policy become highly relevant to the resolution of

Petitioner's plea claim.[9] And the validity of that claim, as the Court has previously ruled,

37) of Hispanic defendants authorized for the death penalty were allowed to plead guilty. Thus, white capital defendants like Ms. Johnson were almost 75 percent more likely than Hispanic, African-American and other defendants to avoid the federal death penalty by a plea agreement during the Reno administration.

On June 6, 2001, Attorney General Ashcroft issued a Supplementary Report admitting that "white defendants ... fared better" in reaching "a plea agreement" subsequent to "a decision by the Attorney General to seek the death penalty."  See "The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review," United States Department of Justice, p. 17 (June 6, 2001), http://www.justice.gov/dag/pubdoc/deathpenaltystudy.htm [hereinafter "Supplementary Data"].

[9] A former member of the Attorney General's Capital Case Review Committee, in a comprehensive review of the Justice Department's death penalty protocol, has written:
> Plea bargains that avoid the federal death penalty are treated differently from other decisions to withdraw death penalty notices once filed.  By virtue of tradition, not law, U.S. Attorneys (who are appointed by the President and confirmed by the Senate) have always been granted almost complete autonomy in disposing of cases within their districts by plea negotiation.  Thus, U.S. Attorney autonomy in plea bargaining controls in capital cases. Under the  protocols, United States Attorneys in the field may dispose of federal capital cases, once charged, without advance approval or review by the Attorney General or Main Justice.

Rory Little, *The Federal Death Penalty: History and Some Thoughts About The Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 417-418 (1999). See also, Supplementary Data, supra ("Under the current protocol, a United States Attorney can effectively negate a decision by the Attorney General to seek a capital sentence by

34

must be resolved *after* an evidentiary hearing, not before it on the basis of some comment that Ms. Johnson may have made to a government adversary like Dr. Martell.

The government's assertion of privilege claims is also specious. The government appears to be arguing that since it did not specifically mention any inter-office or inter-Departmental discussions of the plea in its Amended Resistance, it has not put into controversy any statements that may have been made between lawyers working on the case or made by Main Justice. However, the factual assertions the government does make have clearly put into controversy whether "the government would ever have agreed to a sentence less than death" and whether "the Attorney General of the United States would have agreed to take the death penalty off the table in exchange for a guilty plea".

The government is arguing for a narrow waiver rule under which a waiver of any privileged communication occurs only if the party specifically discloses that specific communication. The government apparently forgets that during the trial of this case it argued that such a narrow waiver rule was inconsistent with Eighth Circuit precedent. In Doc. 352-2, the government argued that it was entitled to all of Ms.

---

subsequently reaching a plea agreement with the defendant to a noncapital offense. As in other areas, however, if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances. The revised protocol will require this approach.")

35

Johnson's prior mental health records because she had put her mental health at issue, even though she had not specifically put into issue statements that she had made during the course of her prior treatment. The government noted that some courts had favored such a narrow waiver rule, but that the Eighth Circuit had specifically rejected such an approach in *Schoffstall v. Henderson*, 223 F. 3d 818 (8th Cir. 2000). (See, Doc. 352-2, p. 4). The government's expansive view of waiver was accepted by this Court [Doc. 384].

As noted above, the government has again successfully relied upon this expansive view of waiver in urging that it is entitled to all attorney-client and attorney team communications and all expert reports and to an examination of Ms. Johnson because Ms. Johnson has placed in issue the effectiveness of her trial attorneys and her mental state [Docs. 29, 44, Case No. C 09-3064-MWB].

In light of the government's long and successful advocacy of an expansive view of the waiver doctrine it should not now be permitted to repudiate that view in favor of a narrower approach that better services its interests in the present dispute. See, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.")

Moreover, even if one were to accept the government's new narrow appproach to waiver, there would be a waiver of the privileges asserted by the government in this case. As noted above, a note contained in Mr. Berrigan's file dated August 21, 2002 indicates that Assistant United States Attorney Miller "reflected that he & Pat R. had talked early on about offering A.J. 10-15 years for information leading to discovery of bodies." (Exhibit 46). On July 26, 2004, Mr. Williams explicitly told Mr. Berrigan that the United States Attorney's Office was not recommending that D.O.J. accept the plea then under consideration. (HT, p. 2899; Exhibit 67, p. MCN 04-003558) Further, a note contained in Mr. Berrigan's file dated August 12, 2004 indicates that Mr. Murphy told all defense counsel that D.O. J. was considering "life plus 20 for A.J." but that "D.O.J. wants life + life." (Exhibit 67, pp. MCN 04-003577-3579).Since these communications disclosed both the local recommendation and what D.O.J. wanted, there has been a waiver even under the narrow waiver approach now suggested by the government. See, Federal Rule of Evidence Rule 502 (a). See also, *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir.1998)("Voluntary disclosure of ...communications expressly waives the privilege" and the waiver extends to "any information directly related to that which was actually disclosed.")

Moreover, the government has continued to voluntarily disclose internal communications relevant to plea negotiations in the post-trial phase of this case. Contained with Exhibit 48 are a number of otherwise privileged communications. For

instance, an as noted above, the government divulged Mr. Reinert's internal communication memorandums with Security Manager Badger and FBI agent Jennings. (Exhibit 48, pp. 5-6, 18, 31). They divulged a note from Mr. Murphy indicating that he "talked to C.J. [who] agrees w/me & wants...Life/life nothing less-even then, should be some proffer." (Exhibit 48, p. 75). They divulged another note indicating that Mr. Murphy told Mr. Rogers that "I highly doubt DOJ would accept 20 years for Angie- probably life." (Exhibit 48, pp. 76-79) The divulged another note which documented that Mr. Murphy told defense counsel that the "Department has indicated an uphill battle to change death penalty decision [concerning Honken]." (Exhibit 48, p. 81). They divulged a conversation that Mr. Murphy had with Mr. Larson about whether "all bets were off", and they disclosed an email about plea negotiations and plea strategy that Mr. Murphy had sent to Mr. Larson. (Exhibit 48, pp. 83, 114). They divulged "what we would be agreeable to propose to DOJ" and that they had sent DOJ an "original memo & follow up on residual doubt..." (Exhibit 48, p. 99, 115).

This Court has explained waiver and protection of attorney-client privilege generally, as follows:

> The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter. See *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir.1998). Thus, a party wishing to invoke the privilege in responding to document discovery must assert it as to all  documents to which it may apply.

38

*Engineered Products Co. v. Donaldson Co., Inc.*, 313 F.Supp.2d 951, 992 (N.D.Iowa 2004), quoting *PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 991-92 (8th Cir.1999), cert. denied, 529 U.S. 1020, 120 S.Ct. 1421, 146 L.Ed.2d 313 (2000). " 'Voluntary disclosure of attorney client communications expressly waives the privilege [and][t]he waiver covers any information directly related to that which was actually disclosed.'.....Therefore, a party 'cannot selectively assert privilege to block the introduction of information harmful to his case after introducing other aspects of his conversation with [counsel] to his own benefit.' Id. In other words, '[t]he attorney client privilege cannot be used as both a shield and a sword,'" Id. at 952, quoting *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir.1998).

Here, allowing the government to selectively assert work product and attorney-client privileges would be unfair because it would allow the government to disclose the aspects of its internal plea discussions which favor the government's position while hiding the unfavorable aspects which favor Ms. Johnson's position. For this reason, the Court should find a waiver under Rule 502 (a) as to any internal communications concerning the same subject matter (internal plea discussions) as the disclosed comunications.

Lastly, even if the Court were to uphold the government's privilege claims, it does not follow that Ms. Johnson should be totally deprived of the information she

<div align="center">39</div>

seeks, as the Court can review the material *in camera* to see if it supports or refutes the government's position. This is the very approach that the government adopted "out of an abundance of caution" with respect to the secret documents which show that Dr. Martell lied in another federal capital case. [Doc. 201]. It is an approach which has been followed by other Court's in regard to internal Department of Justice death penalty documents. See, *United States v. Kee*, 2000 WL 863119, p. 4 (S.D.N.Y. 2000)("Kee does raise one concern that merits further inquiry. He alleges that the submissions to the Attorney General did not include evidence that he did not personally commit the murder for which the Government seeks the death penalty. Accordingly, the Court will review *in camera* documents sufficient to show whether evidence of this sort was in the Government's possession but not included in the Government's submission to the Attorney General.').'" At the very least, the Court should order that the requested material be produced and sealed for purposes of any further review of this discovery motion in the Eighth Circuit.

For all of the foregoing reasons, Ms. Johnson respectfully requests that the Court order Respondent to provide items (1) through (5) directly to Petitioner's counsel, or, in the alternative, to the Court for *in camera* inspection. At the very least, the Court should order that the requested material be produced and sealed for purposes of any further review of this discovery motion in the Eighth Circuit.

40

DATED this 1st day of June, 2011.

Respectfully submitted,

By: s/Michael Burt

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California 94103
Telephone: 415- 522-1508
Facsimile: 415- 522-1506
michael.burt@prodigy.net


Marcia Morrissey
Law Office of Marcia Morrissey
2115 Main Street
Santa Monica, California 90405-2215
Telephone: 310-399-3259
Facsimile: 310-399-1173
MorrisseyMA@aol.com

41

<center>**PROOF OF SERVICE**</center>

STATE OF CALIFORNIA       )

                     )      ss.

COUNTY OF SAN FRANCISCO)

I am over the age of 18 and not a party to the within action; my business address is 600 Townsend Street, Suite 329-E San Francisco, California 94103.

I hereby certify that on June 1, 2011, I electronically filed the foregoing motion with the Clerk of the Court for the United States District Court for the Northern District of Iowat by using the court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States that the above is true and correct.

Executed on June 1 , 2011 at San Francisco, California.

<div align="center" style="margin-left:50%">

s/Michael Burt

MICHAEL BURT
*Attorney for Petitioner*

</div>

<center>42</center>