# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

ANGELA JOHNSON,

        Petitioner,

vs.

UNITED STATES OF AMERICA,

        Respondent.

No. C 09-3064-MWB
(No. CR 01-3046-MWB)

_____

# SECOND AMENDED MOTION UNDER
## 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California   94103
415-522-1508 (tel.)
415-522-1506 (fax)
Michael.Burt@prodigy.net

Marcia A. Morrissey
Attorney at Law
2115 Main Street
Santa Monica, California  90405
310-399-3259 (tel.)
310-399-1173 (fax)
MorrisseyMA@aol.com

June 1, 2011
Santa Monica, California

**<u>TABLE OF CONTENTS</u>**

**<u>Page No.</u>**

I.      Relevant Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Statement Regarding Briefing and Legal Argument. . . . . . . . . . . . . . . . . . . . . . . 2

III.    Grounds for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     Jurisdiction and Authority to Grant Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.      Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim One

Denial of Angela Johnson's Right to Effective Assistance of Counsel. . . . . . . . . . . . . . . 3

        A.      Trial Counsel Ineffectively Failed to Pursue a Disposition
                for a Sentence of Less than Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Trial Counsel Were Ineffective in Not Proceeding to Trial at
                a Time That Would Have Precluded the Government From
                Filing a Timely Notice of Intent to Seek the Death Penalty. . . . . . . . . 17

        C.      Trial Counsels' Voir Dire Was Ineffective. . . . . . . . . . . . . . . . . . . . . . 18

                1.      Juror No. 55. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                2.      Failure to Structure Voir Dire to Identify Jurors With
                        Prejudicial Views on Pentecostal Religion and Women. . . . . . . 23

        D.      Trial Counsel Ineffectively Failed to Reduce Petitioner's
                Medication and Did Nothing to Address the Effects of the
                Medication on Her Demeanor at Trial and Her Ability to
                Participate in Her Own Defense, in Violation of her Right to
                Due Process and a Fair Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        E.      Trial Counsel Ineffectively Failed to Seek a Competence
                Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        F.      Trial Counsel Were Ineffective in Failing to Investigate and
                Present a Guilt Phase Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        G.      Trial Counsel Was Ineffective By Presenting a "Mere Presence"
                Defense Without Investigation and Despite Petitioner's Repeated
                Assertions that She Was Not
                Present at the Nicholson/Duncan Killings. . . . . . . . . . . . . . . . . . . . . 33

        H.      Trial Counsel Were Ineffective in Failing to Create a Reasonable
                Doubt Through Impeachment of Prosecution Witnesses at the
                Merits Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

i

1.  Trial Counsel Were Ineffective in Failing to Impeach
    Robert McNeese by the Court's Findings Regarding His
    Credibility at the *Massiah* Hearing. . . . . . . . . . . . . . . . . . . . . . . . 37

2.  Trial Counsel's Ineffective Examination of Christie
    Gaubatz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.  Trial Counsel's Ineffective Failure to Present Evidence of Terry
    DeGeus's Involvement in the Killing of Gregory Nicholson and
    the Duncans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

J.  Trial Counsel Were Ineffective in Failing to Present  Evidence
    of Battered Woman's Syndrome to Explain  the Relationship
    Between Petitioner and Terry DeGeus. . . . . . . . . . . . . . . . . . . . . . . . . 43

K.  Trial Counsel Were Ineffective in Failing to Investigate
    and Present Evidence Regarding Angela Johnson's Mental State
    at the Time of the Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

L.  Trial Counsel Ineffectively Failed to Introduce Evidence In
    Support of Residual Doubt at Penalty Phase. . . . . . . . . . . . . . . . . . . . 56

    1.  Trial Counsel Unreasonably Failed to Introduce The
        Statements of Phyllis Proscovec in Mitigation. . . . . . . . . . . . . . 58

    2.  Trial Counsel Were Ineffective in Failing to Offer Dustin
        Honken's Letters to Impeach The Penalty Phase Testimony
        of Steven Vest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    3.  Trial Counsel Ineffectively Failed to Impeach Steven Vest
        By Presenting Evidence that Honken Lied about Petitioner's
        Role in the Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

M.  Trial Counsel Failed to Present Readily Available Evidence
    About Dustin Honken to Refute the Prosecution's Argument That
    Angela Johnson Was  "Worse" than Honken.  . . . . . . . . . . . . . . . . . . 63

N.  Trial Counsel Were Ineffective in Failing to Use the Prosecution's
    Arguments at Dustin Honken's Trial as Party Admissions to
    Rebut the Government's Evidence That Petitioner Was "Worse"
    Than Honken. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

O.  Trial Counsel Ineffectively Failed to Offer Expert and Lay
    Testimony That Angela Johnson Was Under the Substantial
    Influence of Dustin Honken. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

P.  Trial Counsel Ineffectively Failed to Discover and Present
    Information Regarding Dustin Honken's  Plans to Kill Prosecutor
    Reinert and His Family and  Honken's Membership in a White
    Supremacist Prison Organization. . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

ii

Q.      Trial Counsel Did Not Effectively Address Aggravating
        Evidence at the Merits and Penalty Phases Of the Trial. . . . . . . . . . . . 85

R.      Trial Counsel Ineffectively Failed to Limit Future
        Dangerousness Evidence to Future Danger In Prison. . . . . . . . . . . . . . 86

S.      Trial Counsel Ineffectively Failed to Object to Kathy Rick's
        Triple Hearsay Testimony About Petitioner's
        Alleged Possession of a Gun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

T.      Trial Counsel Failed to Effectively Cross-Examine
        Wendy Jensen.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

U.      Trial Counsel Were Ineffective in Failing to Object to
        Kyla Davis's Testimony That Petitioner Tried to Find Out
        Where She Lived and What Car She Drove.. . . . . . . . . . . . . . . . . . . . . 92

V.      Trial Counsel Failed to Introduce Petitioner's Offer to Plead
        Guilty as Evidence in Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

W.      Trial Counsel Ineffectively Failed to Present Evidence of
        Remorse Through Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . 94

X.      Trial Counsel Ineffectively Failed to Elicit Evidence of the
        Effect of Petitioner's Execution on Her Family
        Members.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Y.      Trial Counsel Ineffectively Delayed Hiring Dr. Gelbort, Failed
        to Follow-Up on His Recommendations, Failed to Instruct Him to
        Conduct a More Thorough Battery of Neuropsychological Tests,
        Failed to Retain Another Neuropsychologist When Gelbort
        Inexplicably Refused to Testify, Failed to Incorporate His Helpful
        Findings and Diagnosis Into the Testimony of the Experts Who
        Did Testify and Failed to Conduct Additional Neuropsychological
        and Neuroimaging Testing of  Petitioner.. . . . . . . . . . . . . . . . . . . . . . . 98

Z.      Trial Counsel Were Ineffective in Failing to Introduce Evidence
        of, and Give The Trial Experts Records Concerning, the 1996
        Diagnosis of Petitioner With Depression and Dependent
        Personality Features.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

AA.     Trial Counsel Ineffectively Presented Mitigation
        Evidence through the Lay Witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . . 105

BB.     Trial Counsel's Presentation of Penalty Phase Witnesses Was
        Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

        1.      The Testimony of Holly Dirksen. . . . . . . . . . . . . . . . . . . . . . . 109

        2.      Douglas Book. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

        3.      Susan Marsolek.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

<p style="text-align:center">iii</p>

CC.     Trial Counsel Were Ineffective for Failing to Provide
Psychiatric Pharmacologist Roswell Lee Evans With Data
Regarding Petitioner's Drug History, Rendering His
        Expert Testimony Virtually Irrelevant. . . . . . . . . . . . . . . . . . . 115

DD.     Trial and Appellate Counsel Rendered Prejudicially
Ineffective Assistance of Counsel by Failing to Timely and
Effectively Make a Number of Meritorious Motions, Objections,
and Arguments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

EE.     Trial Counsel Were Ineffective in Offering Multi-faceted,
Overly-Complicated Yet Incomplete Mitigating Factors for the
Jury to Weigh Rather than Simple, Straight-Forward Facts that
Encompassed All of the Mitigation.. . . . . . . . . . . . . . . . . . . . . . . 123

FF.     Trial Counsel Were Ineffective in Failing to Raise Juror No.
55's Failure to Honestly Answer Questions on Voir Dire.. . . . . . . . . . 128

GG.     Appellate Counsel Provided Ineffective Assistance in Failing
to Raise All Components of the Misconduct by Juror No. 55.. . . . . . . 129

HH.     Trial and Appellate Counsel Were Ineffective in Litigating the
Prosecution's Inconsistent Theories As to Dustin Honken and
Angela Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

II.     Appellate Counsel Ineffectively Failed to Raise the
Unconstitutional Skewing Effect of Multiplicitious Counts.. . . . . . . . 131

JJ.     The Cumulative Errors of Petitioner's Trial and Appellate
Counsel Warrant the Relief Requested. . . . . . . . . . . . . . . . . . . . . . 132

Claim Two

The Government's Failure to Correct False Testimony at Angela Johnson's Trial
Violated the Fifth and Eighth Amendments to the United States Constitution.. . . . . . . . 133

Claim Three

The Government Violated Its Obligations Under *Brady v. Maryland* by Failing to
Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His
Association with a White Supremacist Prison Organization.. . . . . . . . . . . . . . . . . . . . . 135

Claim Four

The Government Violated Petitioner's Rights Under the Sixth and Eighth
Amendments and the Due Process Clause by Presenting Inconsistent Arguments
at Her Trial and That of Her Co-Defendant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Claim Five

Ms. Johnson was Tried While Incompetent, in Violation  of the Fifth, Sixth and Eighth
Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

iv

Claim Six

Misconduct By Juror No. 55. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Claim Seve

Cumulative Constitutional Errors Rendered by Ms. Johnson's Convictions
and Sentences Constitutionally Inform. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

Claim Eight

The Eighth Amendment Requires a Heightened Standard of Proof for
Imposition of the Death Penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

Claim Nine

Petitioner Suffers From Severe Mental Illness and the Eighth Amendment Precludes
Her Execution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Claim Ten

The Bureau of Prisons' Method of Carrying out the Petitioner's Execution by Lethal
Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure
Act, and the Controlled Substances Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

       A.      Under *Baze*, the BOP's Failure to Employ Competent Execution
              Personnel, Their Haphazard Drug Administration Procedures and
              The Absence of  Sufficient Safeguards Create a Substantial
              Likelihood of Maladministration and Inhumane Executions.. . . . . . . 150

              1.      Executioner Incompetence. . . . . . . . . . . . . . . . . . . . . . . . . . . 151

              2.      Drug Administration Deficiencies. . . . . . . . . . . . . . . . . . . . . . 154

              3.      Lack of Safeguards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

       B.      There Are Readily Available Alternatives That Would
              Substantially Reduce the Risks of Maladministration and
              Inhumane Executions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

       C.      Whether the BOP's New Protocol Is Constitutional Even Under *Baze*
              Cannot Be Answered Without Further Discovery. . . . . . . . . . . . . . . 160

       D.      The *Baze* Decision Does Not Have Any Impact on Petitioner's
              Administrative Procedures Act and Controlled Substances
              Act Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Claim Eleven

The Death Penalty Violates the Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . 163

VI.      Prayer for Relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

v

# TABLE OF AUTHORITIES

**Page No.**

*Atkins v. Virginia*,
563 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Baze v. Rees, __U.S.___*,
128 S. Ct. 1520 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 150, 151, 156, 158, 160

*Brady v. Maryland*,
373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 137

*Caldwell v. Mississippi*,
472 U.S. 320, 105 S. Ct. 2366, 86 L. Ed. 2d 231 (1985). . . . . . . . . . . 24, 130, 131

*Farmer v. Brennan*,
511 U.S. 825 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Fero v. Kerby*,
39 F.3d 1462 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Flammer v. Delaware*,
68 F.3d. 736 (3rd Cir. 1995) (*en banc*). . . . . . . . . . . . . . . . . . . . . . . . . 133

*Harbison v. Little*,
511 F. Supp. 2d 872 (M.D. Tenn. 2007). . . . . . . . . . . . . . . . 151, 154, 155, 161

*Heckler v. Chaney*,
470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). . . . . . . . . . . . . . . . 149

*Herrera v. Collins*,
506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

*Hill v. McDonough*,
547 U.S. 573 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Johnson v. United States*,
129 S. Ct. 32, 172 L. Ed. 2d 46 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Johnson v. United States*,
129 S. Ct. 756, 172 L. Ed. 2d 747 (2008). . . . . . . . . . . . . . . . . . . . . . . . . 1

*Jones v. Barnes*,
463 U.S. 745 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kyles v. Whitley*,
514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*McDonough Power Equipment, Inc. v. Greenwood*,
464  U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2 (1984). . . . . . . . . . . . . . . . . 129, 146

*Morales v. Tilton*,
465 F. Supp. 2d 972 (N.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . 152, 154, 156

vi

*Morgan v. Illinois*,
     504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). . . . . . . . . . . . . . . 24, 25

*Napue v. Illinois*,
     360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

*People v. Taveras*,
     424 F. Supp. 2d 446 (E.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Riggins v. Nevada*,
     504 U.S. 127 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 144

*Roane v. Holder*,
     607 F. Supp. 2d 216 (D.D.C. 2009). . . . . . . . . . 149, 150, 152, 158, 159, 160, 161

*Smith v. Groose*,
     205 F.3d 1045 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Strickland v. Washington*,
     466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1987). . . . . . . . . . . . . . . 34, 36

*Stringer v. Black*,
     502 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992). . . . . . . . . . . . . . . . 133

*Taylor v. Crawford*,
     487 F.3d 1072 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Angela Johnson*,
     495 F.3d 951 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 1, 123, 124, 130, 132

*United States v. Barrett*,
     8 F.3d 1296 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Bigeleisen*,
     625 F.2d 203 (8th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*United States v. Cooper*,
     91 F. Supp. 2d 90 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Fell*,
     372 F. Supp. 2d 773 (D. Vt. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Ferebe*,
     322 F.3d 722 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Flores*,
     63 F.3d 1342 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Gilbert*,
     120 F. Supp. 2d 147 (D. Mass. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Johnson*,

196 F. Supp. 2d 795 (N.D. Iowa 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 94

*United States v. Johnson*,
377 F. Supp. 2d 686 (N. D. Iowa 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*United States v. Johnson*,
378 F. Supp. 2d 1051 (N.D. Iowa 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 39, 60

*United States v. Johnson*,
403 F. Supp. 2d 721 (N.D. Iowa 2005). . . . . . . . . . . . . . . . . . . . . . 121, 122, 123

*United States v. Jones*,
132 F. 3d 323 (5th Cir. 1998), *aff'd on other grounds,*
*Jones v. United States*, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 133

*United States v. Llera Plaza*,
179 F. Supp. 2d 464 (E.D. Pa. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. McCullah*,
76 F. 3d 1087, 1111 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*United States v. O'Reilly*,
545 F. Supp. 2d 630 (E.D. Mich. 2008).. . . . . . . . . . . . . . . . . . . . . . . 89, 92, 93

*United States v. Peoples*,
74 F. Supp. 2d 930 (W.D. Mo. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Rodriguez*,
581 F.3d 775 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Rodriguez*,
2006 WL. 487117 (D.N.D. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Sanfilippo*,
564 F.2d 176 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Webster v. Doe*,
486 U.S. 592, 597 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Wiggins v. Smith*,
539 U.S. 510 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**STATE CASES**

*Nixon v. Singletary*,
758 So. 2d 618 (Fla. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**DOCKETED CASES**

*Nooner v. Norris*,
Case No. 5:06-cv-00110-SWW (ED AR, August 5, 2008). . . . . . . . . . . . . 154, 155

*United States v. Williams Sablan*,
  No. 00-CR-531.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Xavier Lightfoot*,
  No. 00-CR-395.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Carl Haskell*,
  No. 00-CR-395.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## FEDERAL STATUTES

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 122

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## I.      Relevant Procedural History

In 2005, a jury convicted Angela Johnson of aiding and abetting the murder of five persons in furtherance of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, and five counts of aiding and abetting the killing of these individuals while engaging in a drug conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.  The jury voted to impose the death penalty for four of the murders and to impose a sentence of life in prison for the fifth murder.

On December 20, 2005, this Court formally imposed eight death sentences and two life sentences.

The United States Court of Appeals for the Eighth Circuit affirmed five of the ten convictions as well as the death sentences, but remanded the case so that this Court could vacate her multiplicitous convictions and sentence.  *United States v. Angela Johnson*, 495 F. 3d 951, 982 (8th Cir. 2007).  The United States Supreme Court denied certiorari, *Johnson v. United States*, 129 S. Ct. 32, 172 L. Ed. 2d 46 (October 6, 2008), and denied rehearing, *Johnson v. United States*, 129 S. Ct. 756, 172 L. Ed. 2d 747 (December 8, 2008).

On August 11, 2008, upon motion by direct appeal counsel Dean Stowers, the Court appointed Michael E. Lawlor and Ilann M. Maazel to represent the petitioner in 28 U.S.C. § 2255 proceedings.  (01-CR-03046-MWB, Doc. 749).

On September 7, 2010, the Court granted Michael Lawlor's September 3, 2010, Motion to Withdraw as Counsel and appointed Michael Burt as lead counsel for petitioner in these proceedings.  (09-CV-03064-MWB, Doc. 67).  On September 10, 2010, the Court appointed Marcia Morrissey as additional counsel for petitioner.  (09-CV-03064-MWB, Doc. 69).

At trial, Ms. Johnson was represented by assigned counsel Patrick J. Berrigan (learned counsel), Dean Stowers and Alfred E. Willett.  The government was represented by C.J. Williams and Thomas Henry Miller.

<div align="center">1</div>

Petitioner was represented on direct appeal by Patrick J. Berrigan and Dean Stowers.  The government was represented by Mr. Williams.

Ms. Johnson is incarcerated at Leavenworth Detention Center, Leavenworth, Kansas, Register No. 08337-029.

In this second amended motion under 28 U.S.C. § 2255, Ms. Johnson moves to set aside her convictions and sentences as having been obtained in violation of the United States Constitution and federal law in multiple respects.[1]

## II.     Statement Regarding Briefing and Legal Argument

In accordance with Rule 2 of the Rules on Motions Attacking Sentence Under Section 2255, this motion sets forth the facts and grounds entitling Ms. Johnson to relief.

## III.     Grounds for Relief

Petitioner alleges that her convictions and death sentences were obtained in violation of her rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution, and the statutory laws of the United States.  These violations include deprivation of petitioner's rights to effective assistance of counsel, due process of law, and to be free of cruel and unusual punishment.

Petitioner moves for relief pursuant to 28 U.S.C. § 2255.  However, should it be determined that any of petitioner's claims are not cognizable under § 2255, she alternatively moves for relief under 28 U.S.C. § 2241, which is an instrument for relief as to any claim for which § 2255 is not an effective or adequate mechanism to test the legality of her detention and sentence.

---

[1]     References to sequentially numbered pages of the transcript of the trial proceedings before this Court are cited as "Tr." followed by a page citation.  Transcripts of jury selection are cited as "V.D.", followed by a page citation.  Transcripts of other district court proceedings are cited as "Tr." followed by the date of the proceeding and a page number, or as "Honken Tr." followed by a page citation to the trial transcripts of co-defendant Dustin Honken.   The evidentiary hearing transcripts are cited as H.Tr., followed by a page number.   References to Exhibits are to Hearing Exhibits unless otherwise noted.

**IV.     Jurisdiction and Authority to Grant Relief**

This Court has jurisdiction to entertain this motion and to provide the relief requested herein pursuant to 28 U.S.C. § 2255, 28 U.S.C. § 2241, and the Rules on Motions Attacking Sentence Under Section 2255.

**V.     Claims for Relief[2]**

<div align="center">

**Claim One**

**Denial of Angela Johnson's Right to Effective Assistance of Counsel**

</div>

**A.     Trial Counsel Ineffectively Failed to Pursue a Disposition
for a Sentence of Less than Death**

Trial counsel were ineffective in failing to pursue a disposition for a sentence of less than death.  Guideline 10.9.1 of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases imposes upon counsel "at every stage" of a capital case the "obligation to take all steps that may be appropriate in the exercise of professional judgment . . . to achieve an agreed-upon disposition."  In this case, Ms. Johnson's attorneys utterly failed to comply with the Guideline 10.9.1.  They failed to appreciate the seriousness of petitioner's case and the likelihood of a death verdict at the outset, despite the advice of mitigation specialist Mary Goody. The government repeatedly reached out to defense counsel, seeking to enter into a negotiated settlement of this case.   Trial counsel, however, persisted in proposing to the government an unrealistic 20-year sentence, despite having been clearly informed that such a term was "unconscionable" and would not be accepted by the prosecution. Despite two letters from Ms. Johnson stating that she wanted to plead guilty and cooperate, they failed to take immediate action towards a settlement of the case because of a unrealistic view that the Eighth Circuit would affirm the Court's *Massiah* ruling. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (the accused has the ultimate authority to

---

[2] The facts and argument of each Claim and Subclaim are incorporated by reference into each other Claim and Subclaim.

<div align="center">3</div>

decide whether to plead guilty). They unreasonably believed, contrary to all indications from the government, that if the Eighth Circuit ruled in petitioner's favor, there would not be a capital prosecution. They took a rigid position that petitioner would not proffer unless there was a plea agreement in place, despite the fact that their client was not insisting on this procedure, despite the local practice in the Northern District of Iowa, and despite the inability of the local prosecutors to offer a plea without approval from Washington, D.C. They rejected offers that they proffer to a taint team. It did not occur to counsel that they could obtain a proffer agreement that included a promise that petitioner's statements could not be used against her without her consent, even though Dustin Honken secured such a clause in his proffer agreement. They unreasonably waited to proffer until the eve of trial, after Dustin Honken had been convicted and at a time when the prosecution had no incentive to settle Ms. Johnson's case.

Petitioner was prejudiced by the errors and omissions of her attorneys – she has been sentenced to death. But for her counsel's ineffectiveness, there is a reasonable probability that her case would have been settled without a trial for a sentence of less than death.

The following facts, among others to be developed after the conclusion of the evidentiary hearing, are alleged in support of this claim:

When Mary Goody first became involved in Ms. Johnson's case, she received a one and one half to two inch package of discovery. (H.Tr. 70, 72). After reading this discovery, her assessment was that "this was a case that should plead and needed to plead and that . . . it was an LWOP case." (*Id.*, 72). *See also id.* at 74 ("this is not a case that needs to be tried"). Her assessment was based on the existence of evidence of substantial planning, an ongoing methamphetamine operation, details in the McNeese materials that only a participant could have known, a motive for both petitioner and Honken to kill DeGeus, the number of victims, and the length of time between the deaths of Nicholson and the Duncans and the death of DeGeus. (*Id.*, 73).

<center>4</center>

Ms. Goody told the defense team that her recommendation was that "they plead this case and they plead her to LWOP and that I felt that was a good and doable resolution." (*Id*., 99; *see also id*. at 270). There was no discussion among the defense team about how to implement this recommendation. (*Id.*). In fact, there was some disagreement about her assessment of the case. (*Id*., 99). Ms. Goody explained: "I know they were talking numbers and I was saying no, you – this – you don't need to be looking at numbers here. Numbers aren't going to get you anywhere. This case should be – is a life case, and it needs to be pled to that." (*Id*., 99-100). The lawyers 'were clinging to this idea that they could get her a term of years somewhere around 20 years." (*Id*., 116). Ms. Goody did not think that they would ever get anything less than life for petitioner. (*Id*.). She understood that a 20-year sentence was "the deal that was initially discussed . . . [b]efore the bodies were discovered." (*Id.*, 118). Ms. Goody did not believe it was rational to think that the pre-bodies offer of 15 to 20 years could be obtained in December of 2001, because "[a]ll bets are off" once the bodies had been discovered. (*Id*., 119). *See also Id*., 270 (defense counsel's theory that they could settle the case for a term of years was irrational, given the facts of the case and the number of victims).

The pending *Massiah* litigation did not affect Ms. Goody's recommendation that this was an LWOP case. (*Id*., 120). Even if the McNeese evidence was suppressed, the defense would still have to deal with Christie Gaubatz and the fact that petitioner bought the gun. (*Id*.. 120, 283). However, Mr. Willett and Mr. Berrigan believed that the McNeese evidence was likely to be suppressed, that the suppression of this evidence would change the nature of the case, and that the government would not seek the death penalty for petitioner. (*Id*., 121-22). Because the lawyers had been working on this case for some time and Ms. Goody had just become involved, she felt that she had to take their word for how they were feeling about it. (*Id*., 121).

There was, according to Ms. Goody, no coherent team plan about a plea

strategy.[3]  (*Id*., 122).   In fact, before Ms. Goody's first meeting with petitioner, Mr. Berrigan instructed her not to discuss a plea.  (*Id.,* 69).  Mr. Berrigan gave her the impression that they had the plea situation under control, that the lawyers were doing what they needed to do to get a plea, and that her job was to start working on mitigation.[4] (*Id*.).  Thereafter, Ms. Goody never discussed a plea with petitioner.  (*Id*., 117).  She explained that:

> No one asked me to engage with her in a conversation about a plea. Ordinarily that would be something that we would do as a – in teams or individually or we would have a game plan set up with that.  But my idea of what the plea should be did not agree with their idea.  [¶]  And so I thought that they – I really got the impression that they were just wanting to wait on that and that that was a kind of tack that was taken on a lot of issues surrounding conversations about pleas and that sort of think.  Let's just wait and see.  They were waiting and seeing what was going to happen with particular things.

(*Id*., 117-118).

Mr. Berrigan also instructed Ms. Goody not to discuss the facts of the crime with petitioner.  (*Id.,* 69).   She described this instruction as unusual and problematic: "There's a problem because the facts of the crime and the mitigation exist in a continuum, if you will.  And, therefore to separate them out or to not address one or the other is not – means that the mitigation investigation will be substandard."  (*Id*., 74).

The "wait and see" thinking because of the pending *Massiah* litigation[5] "fueled

---

[3]       Ms. Goody also wanted to get the team engaged in trying to do something about petitioner's conditions of confinement, because she felt that it would help move them along towards resolving the case by a plea.  (*Id*., 131).

[4]       This approach did not conform to the ABA Guidelines, which state that the team should act together to work towards a negotiated disposition.  (*Id*., 69-70).

Mr. Berrigan disavowed involvement by Ms. Goody's involvement.  He stated: "I don't rely on the mitigation investigator to negotiate a plea with the client.  That's not their job."  (*Id*., 2060).

[5]       A "wait and see" approach is not consistent with the Guidelines.  (*Id*., 118).

6

[an] idea that [Ms. Goody] would stop working on the case for awhile."[6] (*Id.*, 121). Around May 2002, Mr. Berrigan instructed Ms. Goody that she was to stop working on petitioner's case. (*Id.*, 131). Ms. Johnson's defense counsel had no team meetings to speak of, and most, if not all of Ms. Goody's communication was with Pat Berrigan. She testified that: "I allowed myself to be lulled into this feeling that waiting was okay." (*Id.*, at 158).

Patrick Berrigan believed that there was less than a one percent chance that petitioner would be found not guilty. (H. Tr. 2935, 2939). Mr. Willett, in his initial telephone conversation with Mr. Berrigan, told him that a plea for life without parole may be offered. (*Id.*, 581). Mr. Berrigan knew, from reading the detention hearing transcript, that there was a lot of evidence against petitioner even before the McNeese maps came into the possession of the prosecution (H. Tr. 2013-20). When he first came into the case, he wanted to get a plea,[7] but he could not do that without having the discovery; he needed to know the government's case and to sit down with petitioner. (*Id.*, 2039). Mr. Berrigan testified that it is best to resolve a potentially capital case early on and that it gets harder to do so once the Department of Justice in Washington, D.C., is

---

[6] There were other reasons why work on the case did not begin until late in 2001. Mr. Berrigan had another capital murder trial in April 2001, the same month as the *Massiah* hearing. (*Id.*, 121). In August of 2001, Mr. Berrigan had open heart surgery. As a result, Ms. Goody didn't see petitioner for the first time until October 2001. (*Id.*, 121).

[7] Mr. Willett testified that the first time Mr. Berrigan met Ms. Johnson, he told her that she needed to plead guilty, to strike a plea bargain, and to do it now. (*Id.*, 588). Petitioner asked him if he wanted to discuss the facts of the case, and Berrigan responded that we can talk about the facts all day long but it will not change the outcome. (*Id.*). This first meeting "went poorly." (*Id.*, 588). Thereafter, Ms. Johnson and Mr. Berrigan became entrenched in their relative positions. (*Id.*).

7

involved.[8] (*Id.,* 2129).  Negotiating an early plea in this case was difficult because of the initial problems with obtaining discovery (*id.,* 2129), which impeded his ability to investigate and negotiate a plea (*id.,* 2040).

Mr. Willett was not of the same mind as Mr. Berrigan regarding a plea. According to Dean Stowers, "Al wanted to go to trial on the case . . . . he told the government to pound sand . . . early on in the case, you got no bodies, no evidence . . . this kind of thing, this kind of bravado if you will. [¶] And then the client was responding to that." (*Id.,* 1115).  *See also id.,* 204, 1119-20 (Willett wrote to petitioner that he looks forward to getting her home and to her wearing something other than jail clothes); *id.,* 1118, 1122 (early on Willett told Reinert there wasn't going to be a plea in this case, we're going to trial, there's no point in having any discussions).  When Mr. Berrigan was confrontational with petitioner about her denials of guilt, Willett "sort of launched to her defense somewhat which . . .Angie responded to favorably."  (*Id.,* 1115). Mr. Willett's idea about going to trial persisted through the duration of the case preparation; they were at cross purposes, not presenting a consistent and unified front because they disagreed on whether to plead or go to trial.  (*Id.,* 1116, 2044).  Mr. Stowers states that "it was apparent throughout the case . . . that there was different views as to what message the client should be receiving about where she needed to be in terms of her thinking about her situation and her case."  (*Id.,* 1116).

Mr. Berrigan testified that Ms. Johnson was not unequivocally opposed to a plea agreement and there were times when she told him she wanted to plead guilty.  (*Id.,* 2133).

On March 8, 2001, Mr. Reinert wrote to defense counsel that the government

---

[8]     Mr. Berrigan was not aware that before June 7, 2001, the local United States Attorney could plea and authorize capital cases without Department of Justice approval.  (*Id.,* 2129).  Mr. Stowers was aware of the change in the protocol.  (*Id.,* 1157-58).

needs to "expeditiously determine if your client will resolve this by guilty plea in exchange for us not seeking death.  If we are authorized to seek death, there will be no further negotiations to resolve this case, and it will proceed to trial as a capital case."  A deadline of April 15, 2001 for resolution of the case was set.  Mr. Berrigan responded on March 16, 2001, indicating that mid-April was not realistic and asking for a deadline of mid-May.  He also stated that "negotiations cannot be productive until the uncertainty of the strength of the government's case is decided in the pending *Massiah* litigation."  Mr. Reinert responded on March 30, 2001, stating that the case can by appropriately tried as capital with or without the evidence that is the subject of the *Massiah* hearing.  (*Id*., 1143).  Mr. Stowers met with Ms. Johnson on April 3, 2001, and he testified there was no discussion of the government's settlement deadline, the effect of the case going to Washington, D.C., and the need to discuss settlement.  (*Id*., 1144-45).

On August 3, 2001, Mr. Stowers met with petitioner.  His notes include the words "life," "subst" and "25 yrs."  (*Id*., 1153).  They reflect the concept that there would be a plea entered, the starting sentence would be life, and she would substantially assist the government and end up with a final sentence of 25 years.  (*Id*.)

On October 1, 2001, while the *Massiah* litigation was still pending (*id*., 600), petitioner authorized plea negotiations.  (*Id*., 599).   That same day, Berrigan and Willett met with Messrs. Reinert, Williams and Murphy; Berrigan's notes indicate that he offered a plea of 20 years and that Reinert seemed interested, but Murphy and Williams less so.  (*Id.*).  However, in a letter to defense counsel written after the meeting, Mr. Reinert stated that that government may not be opposed to a settlement for a sentence other than death or life imprisonment; that a 20-year sentence is "unconscionable;" and that settlement would require an interview of petitioner under a proffer agreement followed by negotiation of the terms of the case settlement.  (H.Tr. 1185-86, 2143, 2145; Exh. 48, PLSP 35).   Despite this pronouncement by Mr. Reinert, Mr. Stowers testified that at this point he thought there was a reasonable chance of getting a 20-year term.  (*Id*., 1186-87).

<div align="center">9</div>

On February 27, 2002, Mr. Berrigan wrote to petitioner after Mr. Reinert approached him regarding their plea discussions last year. He told her that Reinert indicated the government was not wed to a life sentence, but would consider 40 years with pre-agreed downward departures if certain conditions were met. Berrigan's response was that 40 years was a life sentence and that the defense would need closer to 20 years with a guaranteed scenario that would not subject petitioner to additional time.

On August 3, 2002, Mr. Reinert told Dean Stowers that he wanted to resolve this case by plea and agreed with the concept of a Rule 11(e)(1)(C) plea to a term of years arrived at by reduction for substantial assistance being factored in. (*Id*., 618, 1182-84). Mr. Reinert also agreed to travel to Des Moines in order to meet with the defense team to discuss this disposition. (*Id*., 1189-90). Mr. Stowers was told by the prosecution that they wanted a plea. (*Id*., 1190). There was a meeting in Des Moines on August 21, 2002. The prosecution spoke of petitioner cooperating against Dustin Honken and about a joint plea with Honken getting life. The prosecutors were not specific on a term for petitioner, but Berrigan's impression that their offer of high teens, low 20's was "not out of wack." They indicated that a settlement for petitioner would involved a proffer and possibly a polygraph. (*Id*., 621-22, 1190-96).

Mr. Berrigan received a letter from petitioner dated October 24, 2002, asking "[c]an you just get me a deal and get me out of here please? I have not touched my girls in almost 2 ½ years . . . . All that I ask is that you push to get a deal made and get me on my way." (*Id*., 2138-40). Mr. Berrigan testified he understood from this letter that Ms. Johnson was ready to plead guilty, did not care about the proffer process, and just wanted to get a deal. (*Id*., 2140-42). He explained:

> . . . this comes in the context of our – you know, the hang-up at this point, part of it, is this whole proffer situation. And the other thing she's telling me here is I don't care. You guys are arguing about this proffer stuff and should we make a proffer first, and I don't care. That's your – let's just go; let's get going. So that's what I read when I read this letter.

10

(*Id*., 2142).

Mr. Berrigan testified that, in addition to his position on not proffering until there was a plea proposal from the government, there was the issue of a term of years. (*Id*., 2142). Although in October 2001 Mr. Reinert had described his offer of 20 years as "unconscionable" (*id*., 2143, 2145), Mr. Berrigan stated:

> Later 20 was unconscionable, but that wasn't their initial position. And 20 is – 20 is a light sentence. I wasn't expecting we'd get 20, but from a negotiating perspective, I wanted us to be talking about numbers not a life sentence.

(*Id*., 2143). *See also id*., at 1188 (20 years was a negotiation position, not a drop-dead number given to he government; it was to start discussions again and try to get the case worked out). Mr. Berrigan and Mr. Stowers acknowledged that 20 years was their number, not Ms. Johnson's; she did not tell them there would not be a deal unless she got 20 years.[9] (*Id*., 1189, 2143). She was very much a rookie in the system and dependent on her attorneys to tell her what the case was worth from a bargaining standpoint. (*Id*., 2144).

In letters dated May 10, 2003, written to Mr. Berrigan and Mr. Stowers, Ms. Johnson stated:

> I want to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the 8th crt. I am asking you to get me the best deal you can and I <u>will</u> cooperate. At this point I will confess to killing the Pope. I have not touched my kids in THREE YEARS now, and I've had. Please get me out of here and into a prison as close to my kids as possible. That is all I ask. Thank you.

(*Id*., 630; Exh. 67, MCN 03-002969-MCN 03-002970). Mr. Stowers sent his letter to Mr. Berrigan (*Id*., 2207), and shortly thereafter Berrigan and Willett visited Ms. Johnson at the jail. (*Id*., 633, 2207). Mr. Berrigan's notes of that interview include the

---

[9] Mr. Berrigan testified that as far as he knows, the first mention of a 20 year sentence to Ms. Johnson was in a letter he wrote on October 9, 2001, in which he says "we told the government that we might be interested in a deal for 20 years. Much to my surprise, they did not reject our number as being completely out of the question." (*Id*., 2143; Exh. 72A, BP-1, page 232).

11

following:

> Talked a lot about the Eight Circuit still sitting on Angie's case, possible effects on plea negotiations. This all for naught as Angela's first and primary concern is having to stay in the Linn County Jail. Willing to testify against Dustin Honken including cooperation!

(*Id*., 2207). At this meeting, Mr. Berrigan "push[ed] the plea proposition" while Mr. Willett painted "a more optimistic view of the evidence and prospects." (*Id*., 634-35, 2208). Mr. Berrigan testified that Ms. Johnson made it clear that she was willing to testify against Dustin Honken and provide whatever cooperation the government wanted. (*Id*., 2209, 2219). Petitioner wanted to cooperate against Dustin Honken because of his attempt to take custody of Marvea away from petitioner's family, Honken's wanting to kill her, and Honken's own statements implicating her. (*Id.,* 2218-19).

When asked why he was not talking to the government the next day about Ms. Johnson's clearly expressed desire to plead guilty and cooperate, Mr. Berrigan replied:

> I'm not sure. I'm not sure. I think we were waiting. We were waiting for the Eighth Circuit. In hindsight that doesn't seem to make a lot of sense, but I think that's what was going on.

(*Id*., 2209-10). Despite the fact that Ms. Johnson was willing to plead and did not want to wait for the Eighth Circuit, Mr. Berrigan believed that his negotiating position would be strengthened if Judge Bennett's ruling was affirmed and he was hopeful that that would happen. (*Id.,* 2210-11). Mr. Stowers was less hopeful about the Eighth Circuit; he suspected that it would "find an illegitimate way to reverse [this Court's ruling]." (*Id*., 1138)

On June 7, 2003, Mr. Berrigan called Patrick Reinert regarding petitioner's desire to plead guilty and cooperate and told him that they would like a 20 year sentence. (*Id.,* 2217-18). Mr. Berrigan testified that 20 years was his idea, not petitioner's; she did not mention 20 years at the jail meeting on May 22, 2003, and she left it to him to get her the best deal possible. (*Id.,* 2218, 2222). Mr. Berrigan put 20 years on the table because the last time he had discussions with petitioner it was about 20 years. (*Id.,* 2218, 2222).

12

He is not sure why he mentioned the 20 years, because Mr. Reinert had already rejected that number as unconscionable. (*Id.*). He testified that:

> I wanted the government to start talking about numbers. By that I mean terms of years, not life. They eventually came up with 40 years which was the substantial equivalent of life. I didn't necessarily think they'd accept 20, but I thought we'd at least engage in a dialogue about what an acceptable number would be.

(*Id.*, 2223).

On June 7, 2003, Mr. Berrigan wrote a letter to petitioner that accurately reflects his discussion with Patrick Reinert about a plea. (*Id.*, 2229-30). He told her that Reinert was of the opinion that the Department of Justice would not authorize a sentence below life imprisonment for petitioner, even if she cooperated against Honken; that he told Reinert he would discuss this with her, but he was pessimistic about an agreement unless the sentence was "substantially below life imprisonment;" and that "[h]opefully if we win in the Eighth Circuit the government's position will change in our favor. (*Id.*, 2230).

Mr. Berrigan admitted that Ms. Johnson did not say that she would plead only if the sentence was substantially below life. (*Id.*, 2231). As for his suggestion that a victory in the Eighth Circuit would change the prosecution's position, Mr. Berrigan acknowledged that he did not advise petitioner that if they lost in the Eighth Circuit they would lose the opportunity to plead to life (*Id.*, 2231); that he did not discuss their chances in the Eighth Circuit with Mr. Stowers before telling petitioner that their position would be stronger once that court ruled (*Id.*, 2232); and that he never conveyed to petitioner the reality of Eighth Circuit practice in death penalty cases (*Id.*, 2234).

On June 10, 2003, Mr. Reinert wrote to Mr. Berrigan, stating that a plea would require full cooperation from Ms. Johnson (*Id.*, 2227); that 20 years was not realistic sentence (*Id.*, 2228); that he was open to engaging in discussions to work towards amiable resolution of this case (*Id.*, 2234-35); and that the first step in the process would have to be an interview of petitioner (*Id.*, 2234-35).

Mr. Berrigan rejected this proposal because it required a proffer before a plea

13

agreement.[10]  (*Id.,* 2235).  He did not talk to petitioner before he rejected it; he explained that "Miss Johnson's trusting me to get her the best deal possible, and I thought this idea of proffer first was ridiculous." (*Id.,* 2235).  Subsequently, there were attempts by the government to meet Mr. Berrigan's concerns about proffering without a plea proposal, such as a suggestion by Mr. Murphy that Ms. Johnson proffer to taint team.  (*Id.,*1227-28,  2235). This was not acceptable to Mr. Berrigan; his concern was not what the government would learn as a result of a proffer but their insistence on the proffer before they were willing to negotiate an agreement. (*Id.,* 2235-36, 2239).  He testified that he wanted the local prosecutors to go to the Department of Justice and tell them petitioner was going to testify and they wanted a life sentence for her.  (*Id.,* 2240).

When the Court's suppression of the McNeese evidence was reversed by the Eighth Circuit, the nature of the case changed.  (H. Tr. 2024).  Mr. Berrigan had never heard a good explanation of how petitioner could draw a map to the bodies without implicating herself in the murder and this alone made the case one that needed to plead. (*Id.,* 2043).

Mr. Willett had told Berrigan that the practice in Iowa is to proffer before the government tenders a plea agreement (*Id.*, 2048, 2227),[11] but Mr. Berrigan thought this practice to be unreasonable, similar to the discovery practice in the district.  (*Id.*, 2047, 2227).  He did not inquire of resource counsel Kevin McNally or Richard Burr to determine whether his plea before proffer position was reasonable.  (*Id.,* 2227).

In 2004, there was a global proposal submitted by Dustin Honken's counsel that Honken would plead guilty for a life sentence and petitioner would plead guilty for a 20

---

[10]      At this time, Mr. Willett also took the position that a pretrial proffer would not occur before there was a plea agreement proposed by the government, as did Mr. Stowers.  (*Id.*, 649, 1208-11).

[11]      Mr. Stowers "never felt there was a hard and fast rule about how [plea negotiations] were done" in the Northern District of Iowa.  (H.Tr. 1075-76).

14

year sentence. (*Id.,* 2237). Ms. Johnson authorized this proposal, which was not an *Alford* plea. (*Id.,* 2899). No one seemed to believe that the Department of Justice would accept this proposal. (*Id.,* 1226, 2237-38).

If both Honken and Ms. Johnson pled guilty for life sentences the case would have ended. (*Id.,* 2243). However, Mr. Berrigan did not think that a life sentence petitioner was fair: "I don't think to this day that Angela Johnson shares equal culpability with Dustin Honken for these murders, and I'll never believe it, but the government treats them exactly the same." (*Id.,* 2244).

During the joint plea negotiation with the Honken team, time was of the essence for Honken because his trial was about to start. Mr. Parrish was trying to push the Johnson team along so that he could get Honken's case pled. (*Id.,* 2904-05). Mr. Berrigan did not believe that time was of the essence for petitioner, because she could always testify against Honken if he went to trial. (*Id.,* 2905). Consequently, at a meeting on August 12, 2004, Mr. Berrigan told the prosecutors and the Honken team that petitioner was not going to take life and that there was no point to the meeting. (*Id.,* 2906).

On August 12, 2004, Mr. Murphy sent a letter giving Mr. Berrigan an August 14th deadline to get back to him on a proposal that petitioner proffer, and if the government is satisfied they would submit a plea proposal to the Department of Justice for a mandatory life sentence and consider whether it is possible for petitioner to serve that sentence in Iowa or nearby to Iowa. (*Id.,* 2914). Berrigan sent a letter to Mr. Murphy rejecting his offer and let the deadline pass. (*Id.,* 2914-16). He testified that it was his decision to reject the offer, based on the requirement that a proffer precede a plea agreement, and this was mot a matter left to petitioner's discretion: "Angela's not a lawyer. She doesn't know kinda how these things work or how it's supposed to work particularly regarding proffers." (*Id.,* 2917). Mr. Berrigan did not tell Mr. Murphy that he needed to talk to Ms. Johnson about what her options were at that point; he thought he

15

had an ethical obligation to tell her about any plea proposal on the table[12] but his personal feeling was that the proposal was "ridiculous." (*Id.,* 2918).

On October 19, 2004, petitioner wrote to her brother and sister-in-law, Jim and Shelley Johnson, that "I'd like nothing more than to testify against [Honken], but my attorneys won't allow it unless I get an iron-clad deal first." (*Id.,* 2927-28; Exhibit 84, 50). When Mr. Berrigan read this letter, he remarked that "[a]pparently she's gotten at least my perspective which is we need to have a deal." (*Id.,* 2928).

On October 14, 2004, Dustin Honken was convicted and on October 27th, the jury recommended death. At this point, the government's need for petitioner's cooperation significantly dissipated and her leverage for a plea bargain was essentially lost. (*Id.,* 2244, 2931). The only motive for the government to settle at that point was to avoid a three-month trial. (*Id.,* 2244). Mr. Berrigan said that after Dustin Honken got the death penalty, Ms. Johnson's attorneys should have dramatically stepped up their efforts to plead the case; at that juncture, their expectation of a term of years drastically diminished and the prospect of a death sentence became much more real. (*Id.,* 2937-38).

Ultimately, Mr. Berrigan proffered to the trial prosecutors, not the taint team, without having a plea in place. (*Id.,* 2241). He explained that he "gave up on the idea that we could get it done without a proffer." (*Id.,* 2241). However, by that time Dustin Honken had been convicted and the prosecutors were not willing to say they would support a plea for a life sentence. (*Id.,* 2242-43). Mr. Berrigan wrote the proffer that was submitted to the trial prosecutors. (*Id.,* 2080). He discussed the proffer with petitioner in advance, told her what was required to get life and she was agreeable to it. (*Id.,* 2080-81). He based petitioner's proffer on Dustin Honken's proffer. (*Id.,* 2081).

Mr. Berrigan testified that Ms. Johnson's providing a factual basis for a plea was not a problem. (*Id.,* 2921-22). It is not unusual for clients to take inconsistent positions,

---

[12]     Mr. Stowers and Mr. Willett went to see petitioner on August 13th to talk about the August 12th letter. (*Id.,* 2916).

16

and he was confident he could get a factual basis for the plea. (*Id.,* 2211-12). The difficult part for clients such as Ms. Johnson is not telling what happened, but the acceptance of a sentence of life without the possibility of release. (*Id.,* 2924). Mr. Berrigan's previous refusals to let Ms. Johnson proffer before there was a plea agreement were not because she would not provide a factual basis for the plea; it was the absence of a plea agreement that caused Mr. Berrigan to reject this procedure. (*Id.,* 2918-19). *See also id*., at 2920 (obtaining a factual basis from petitioner was not a stumbling block to a plea; the main obstacle was the government's position that the proffer would be required before they would tender an agreement).

On March 22, 2005, petitioner wrote to Nancy Lanoue that she was going to have to plead guilty and take life without parole to get this case resolved, that she didn't even care, and that she just wanted it to be over. (*Id.,* 2929). Mr. Berrigan described he and petitioner as being on the same page at this point in their relationship. (*Id*., 2929). He added testified that petitioner may not have cared about getting a deal first, but he did. (*Id.,* 2930).

Mr. Berrigan did not consider proposing to proffer to a taint team with an agreement that the proffer could not be used against the petitioner if there was no plea agreement. (*Id.,* 2933). It simply did not cross his mind, but he would have considered it. (*Id.,* 2933-34). He acknowledges that Dustin Honken proffered under an agreement that statements made could not be used against him without his consent, which is not a standard stipulation in a proffer agreement. (*Id.,* 2945-47).

### B. Trial Counsel Were Ineffective in Not Proceeding to Trial at a Time That Would Have Precluded the Government From Filing a Timely Notice of Intent to Seek the Death Penalty

Trial counsel's performance was constitutionally deficient, in that if they had not sought and obtained a continuance of the May 6, 2002 trial date, the government would not have filed a timely Notice of Intent to Seek the Death Penalty and the case would have proceed to trial as a non-capital prosecution.

17

In September 2001, the Court consolidated the two indictments filed against petitioner and scheduled a trial to begin May 6, 2002. (3:01-CR 03406 - MWB, Doc. 3). In January 2002, four months before the trial was scheduled to begin, and 18 months after petitioner was arrested and charged in federal court with the murders, the defense again moved to continue the trial, this time until November 2002. (3:00-CR-03034-MWB, Doc. 224). Had trial counsel not moved for a continuance but proceeded with the May 2002 trial date, the Notice of Intent filed on April 25, 2002, eleven days before the May 6, 2002, trial date, would have been untimely. *See United States v. Ferebe*, 322 F. 3d 722, 727, 730 (4th Cir. 2003) (18 U.S.C. § 3593(a) requires the prosecution to file a Notice of Intent to Seek the Death Penalty "at a reasonable time before trial;" an untimely filing precludes a case from proceeding as a capital prosecution whether or not there is a showing of prejudice.) Trial counsel, who conducted no guilt phase investigation (Section f), had no reasonable tactical or strategic reason for not proceeding to trial on May 6, 2002, and thereby precluding a capital prosecution.

### C. Trial Counsels' Voir Dire Was Ineffective

#### 1. Juror No. 55

Juror No. 55 was asked whether he had "ever been mentally, physically or emotionally abused as a child." He checked "no." (Doc. 26, Exh. 23, p. 6). He was also asked whether he was "familiar with" various participants in the trial, including Judge Bennett; he checked "no" in response to this question. (*Id*., at p. 16). Juror No. 55's questionnaire revealed that he had a son in prison because of drugs, that he adopted his son's children because of his son's drug abuse, and that he visits his son in a prison on occasion. (Doc. 26, Exh. 23, at pp. 5-8).

Trial counsel did not investigate the information in Juror No. 55's questionnaire before voir dire. Counsel did not do a criminal record search on his son, to identify the drug involved in his case, the offense of which he was convicted, the sentence imposed or the sentencing judge. In voir dire, trial counsel did not ask any questions about the

18

nature of the juror's son's drug charge, whether it was federal or state, whether the juror's attitude toward the criminal justice system as a result of his son's case, the impact of his son's drug use and imprisonment on him and his family, his personal feelings about drugs and drug crimes, and whether his personal experiences as a result of his son's drug use would affect his ability to be fair and impartial in this drug-related case. (V.D. 545-57). There were other red flags in Juror No. 55's answers on the questionnaire that competent counsel would have inquired about. Juror No. 55 was a veteran of the United States Navy, the United States Air Force, and a former member of the Woodbury County Sheriff's Posse who assisted police investigation, including at least one murder investigation. (Doc. 26, Exh. 23, pp. 2, 7, 9). Yet these areas were not explored by petitioner's counsel. Not surprisingly, given their perfunctory voir dire, trial counsel did not challenge Juror No. 55 for cause after his individual voir dire. (V.D. 561).

In group voir dire, defense counsel posed only a few questions to Juror No. 55, none of which concerned his personal experiences with drugs and crimes or to follow up on the answers in his questionnaire that signaled he might be a problematic juror in this case. *See* V.D. 741 ("Mr. Willett: So Mr. 55, when I say the word methamphetamine to you, what do you think? [¶] Prospective Juror 55: It's a nasty drug . . . . [¶] Mr. Willett: Can you give my client a fair trial because of that nasty drug in this case? Prospective Juror 55: I don't see why not."). Trial counsel failed to explore the basis for the juror's characterization of methamphetamine as a "nasty drug," failed to ask him whether this "nasty drug" led to his son's imprisonment, and failed to inquire as to how his own life had been impacted by the "nasty drug." Instead, trial counsel asked stock questions about the presumption of innocence and the Fifth Amendment right against self-incrimination.[13] (V.D. 740, 746-47).

---

[13] The voir dire of Juror No. 55 illustrates the deficiencies in Mr. Willett's voir described by Mr. Berrigan (H.Tr. 2175), Ms. Dahl (H.Tr. 359-360) and Mr. Stowers (H.Tr. 1407-08).

After the questioning of his panel was completed, Juror No. 55 contacted the

Court through a court officer in order to provide some information. (V.D. 766).

| | |
|---|---|
| Prospective Juror 5: | I have something that's never been brought up. I have a son that's 31 years old. He's sitting in prison right now in a federal penitentiary for drugs; okay? He had a little boy with his girlfriend. He is missing half his brain because he was a drug baby, and I – drugs I hate. You gotta understand. That ain't saying I'm not – I understand what it goes through. I understand what the people go through for drugs and everything. But I just wanted that brought out so if it's brought out later on and you're going to say, hey, how come this wasn't brought out? |
| The Court: | Sure. Anything else you want to tell us? |
| Prospective Juror 55: | No, that's it. I adopted my grandkids. He is my son now, but I wanted to make sure that was brought out so you guys didn't have nothing that– |
| The Court: | Thank you so much for bringing that up. |

(V.D. 766-67). Defense counsel asked Juror No. 55 some follow up questions:

| | |
|---|---|
| Mr. Berrigan: | So tell me, how does that affect your – |
| Prospective Juror 55: | Well it affected the little boy more than anything. We've – he's in special ed. His left side of his brain is mostly gone which is your thinking side, so we had to teach him how to use the right side of his brain. Actually what like the doctor said, we have to reconnect his wires. Okay. We've gone through where a normal kid would learn how to crawl. Well I had to get on the floor and move his hands and his legs at two years of age to teach him to crawl, and after that he got up and walked. But this is just an example. I mean, you know, that's . . . . |

<div style="text-align:center">* * *</div>

| | |
|---|---|
| Mr. Berrigan: | Is that what happened to your grandson as a result of drugs might bleed into this case in the way that you might look at the case. Is that a concern that you have? |
| Prospective Juror 55: | A little bit. Because this is a murder trial, the drugs has an effect to the murder trial, of course, as you know. And I wanted – the reason why I wanted to bring it up is that somebody could point, |

<div style="text-align:center">20</div>

Case 3:09-cv-03064-MWB-LTS   Document 263   Filed 06/01/11   Page 30 of 176

well, it's not going to be a fair trial because this wasn't brought up, his past, and it comes up later on that it was in my past.

<div align="center">*　　*　　*</div>

The Court: Could I jump in here? Let me just jump in for a minute. You can finish up. Juror 55, here's what I want to know. How, if at all, do you think this situation that you've just described to us might affect your ability as a juror in this case or might influence your ability?

Prospective Juror 55: Well, I hope none honestly. But if drugs were administered to the kids or something which I don't know, it might affect me then because I have kind of a hatred for that kind of thing.

The Court: Of course. Of course you would. Okay. Mr. Berrigan, I am sorry. Any more questions? I didn't mean to chase you off, Mr. Berrigan.

Mr. Berrigan: No, no, no, no. All we can ask you to do, sir, is to not certainly forget about your grandson's situation.

Prospective Juror 55: Right.

Mr. Berrigan: But to try to separate that.

Prospective Juror 55: Right.

Mr. Berrigan: As the judge has suggested, we really need somebody that can listen to the evidence here and not –

Prospective Juror 55: Right, I understand. I understand that.

Mr. Berrigan: Okay. Can you promise us you'll do that?

Prospective Juror 55: I'll do the best I can.

(V.D. 768-70). Defense counsel did not challenge Juror No. 55 for cause (V.D. 771) or challenge him peremptorily (V.D. 773).

Juror No. 55 was a self-described leader for the death penalty, who tried to get a death verdict on the Nicholson counts, but decided he would let it go because it was eleven to one. (Doc. 26, Exh. 13, p. 1). During deliberations, when other jurors would

<div align="center">21</div>

say voting for the death penalty would make them murderers as well, Juror No. 55 answered this argument:

> I explained how that is not true. She'll go through automatic appeals. I think three automatic appeals. We are not the final decision. We just set the stage she will have to act upon. I used to be in law enforcement, so I know a few things."

(*Id*., p. 2). During the recess between penalty phase evidence and closing arguments, Juror No. 55 went to Wisconsin to see his son in prison. He asked the guard about the differences between being on death row and doing a life sentence. The guard told him that "on death row you are alone, like in solitary confinement, and with a life sentence you are in general population, like everyone else . . . ." (*Id*., p.3). Juror No. 55's personal experience with the effects of drugs was also discussed in the post-trial interview. He explained that: I have a boy that is ten, he died in my arms twice in his life, due to his mother doing drugs – he is adopted – he was born addicted. I have lots of feelings about kids." (*Id.*, p. 2). Finally, Juror No. 55 revealed that he was subjected to serious abuse as a child:

> Because of the mother [petitioner's mother], there were things said by her that really pissed some of us off. All this about she [petitioner] was such a battered person. There were a couple of us that have been through a hell of a lot worse than she had. She never was beaten so bad that she couldn't sit down for a month. A couple of us, we had it rough, and we didn't turn out to do drugs and kill people.

(*Id.,* at 3).

Trial counsel's voir dire failed to follow-up on information disclosed in Juror No. 55's questionnaire and failed to probe the personal experiences with drugs that the juror volunteered on his own, after the voir dire had concluded. This juror would have been excused for cause had trial counsel conducted an effective voir dire. If a cause challenge to Juror No. 55 was not granted, counsel should have used a peremptory challenge.

Trial counsel's ineffective voir dire of Juror No. 55 caused severe prejudice to Ms. Johnson. Juror No. 55 could not be fair and could not follow the Court's

22

instructions; he was incapable of considering petitioner's personal abuse as a child as mitigation because of his own experience as an abused child. *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). Moreover, Juror No. 55 influenced the entire jury: he led the votes for death, he offered extraneous – and incorrect – information about the appellate process that led jurors to believe that the responsibility for the determining the appropriateness of petitioner's sentence rests elsewhere (*Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2366, 86 L. Ed. 2d 231(1985)), and sought out and obtained information about the conditions of confinement for a life sentence and a death sentence. Trial counsel's failure to investigate Juror No. 55, to follow up on "red flags" in his questionnaire and courtroom statements, and to seek and obtain the removal of this juror, for cause or peremptorily, was constitutionally ineffective and denied petitioner her rights under the Fifth, Sixth and Eighth Amendments. It is reasonably probable that, had trial counsel performed adequately, Juror No. 55 would have been subject to a cause challenge or a peremptory challenge and that as a result petitioner's trial would have been different.

### 2. Failure to Structure Voir Dire to Identify Jurors With Prejudicial Views on Pentecostal Religion and Women

Voir dire is defense counsel's first opportunity to introduce prospective jurors to their evidence in mitigation. *See* Commentary to Guideline 10.10.1, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, at 1047-48 (counsel should formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages [and should] then advance that theory during all phases of the trial, including jury selection . . . ."). In this case, trial counsel ineffectively failed to voir dire about jurors' attitude towards Pentecostal religion, women in general and women accused of crime in particular. Counsel knew that the evidence in mitigation they would present was going to consist of what they deemed bizarre religious rituals involving speaking in tongues and exorcisms. However, counsel failed to

appreciate that what they believed to be bizarre might not be "bizarre" to the trial jurors. Counsel failed to ask jurors whether they considered rituals such as exorcisms and speaking in tongues to be normal or abnormal expressions of religious belief, whether they practiced such rituals themselves, whether they knew people that practiced such rituals, and about their attitudes toward such activities. This was a serious failure on the part of counsel; prospective jurors who were themselves involved, or had friends or family involved, in Pentecostal religion would not believe that the practices of that religion as would constitute abuse and, therefore, would not view this evidence as mitigating. On the contrary, characterization of Pentecostal religious activity as abuse would likely anger jurors who practiced that religion. Trial counsel failed to conduct a voir dire that would identify prospective jurors who would not consider this evidence in mitigation. *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

Lisa Dahl, the jury consultant employed by trial counsel, testified that if she had known that there was going to be mitigating evidence of hyper-religiosity, such as speaking in tongues, rebuking and exorcisms, she would have wanted to address that evidence in either jury selection or in the jury questionnaire. She stated her reasons as follows:

> I would want to know the jurors' experiences with religion and with religiosity, and I would also want to know their attitudes and beliefs about certain religions or certain religious practices and how those experiences line up – how their experiences line up with the client's experiences and if those items that you listed would be meaningful to them or to what extent they would be meaningful in mitigation.

(H. Tr. 339-40). However, trial counsel failed to inform Ms. Dahl about the specific mitigation that would be presented. (H.Tr. 355-56). Consequently, she did not know to put questions about religious experiences and beliefs in the questionnaire or to recommend to counsel that they broach this subject in voir dire. (*Id*., 357).

Trial counsel was also ineffective in failing to probe jurors' attitudes towards women in general and women accused of crime in particular. Counsel knew that the

24

prosecution would offer evidence that petitioner was a single mother of two children who used and sold methamphetamine, who had affairs with married men, who bore a child out of wedlock, whose language could be brash and profane, and whose outward appearance was strong and not feminine.  Trial counsel knew, or should have known, that many prospective jurors have negative attitudes towards women who do not adhere to widely held stereotypes of female behavior.  *See, e.g.,* Carolyn B. Ramsay, "Public Responses to Intimate Violent:  A Glance at the Past," Public Health Rep. 2006 July - August:  121(4): 460-63 ("Female defendants who defied gender norms by drinking or engaging in illicit sex could expect harsher verdicts than those who played more traditional roles."); Joan Howarth, *Deciding to Kill: Revealing the Gender in the Task Handed to Capital Jurors*, 1994 WIS. L. REV. 1345.   In voir dire, counsel had the opportunity to identify jurors who would react negatively to their client's decidedly non-traditional life style and challenge them for cause or peremptorily.  Yet counsel did not conduct a voir dire to identify such jurors.  This was ineffective assistance.  There is a reasonable probability that, as a result of trial counsel's failings, the verdicts in this case were harsher because petitioner's non-traditional lifestyle, and a reasonable probability that, but for trial counsel's failure to adequately voir dire jurors, the result of petitioner's trial would have been different.

> **D.     Trial Counsel Ineffectively Failed to Reduce Petitioner's Medication and Did Nothing to Address the Effects of the Medication on Her Demeanor at Trial and Her Ability to Participate in Her Own Defense, in Violation of her Right to Due Process and a Fair Trial**

On May 6, 2005, two days after the opening statements at the guilt phase of her trial, Angela Johnson's medication was increased by Dawn Nolan, a Physician's Assistant at the Woodbury County Jail.  (Doc. 26, Exh. 26).  Thereafter, Ms. Johnson received 300

25

milligrams of Zoloft and 200 milligrams of Seroquel daily during her trial.[14]  The increase in Zoloft to 300 milligrams daily had a marked effect on Ms. Johnson's demeanor and ability to understand and participate in her capital trial.

The description by Lisa Dahl of Ms. Johnson's courtroom demeanor before her medication was increased is instructive.   Ms. Dahl described petitioner's demeanor during jury selection as at times "girly or giddish" and at times "harsh" or "judgmental." (H.Tr. 338)   Ms. Dahl described petitioner as engaged in the jury selection process, drawing pictures of jurors, taking notes, and sharing her reactions to jurors.  (*Id*., at 339). Ms. Dahl's concerns about petitioner's demeanor caused her to advise trial counsel that they needed to work on calming her and that she needed to maintain her composure so that she did not appear judgmental.  (*Id.,* at 350-51).

After the increase in Zoloft, there was a dramatic change in petitioner's demeanor, which is described by a number of different persons who attended the trial. Nancy Lanoue was at petitioner's trial every day except during jury selection.  She testified petitioner seemed out of it, almost like she was drugged.  (H.Tr. 430-41). Melissa Launspach was present in the courtroom during the penalty phase, and was able to observe petitioner during breaks and lunch as well as going to and from the courtroom. Ms. Johnson doodled a lot, with her head down on her paper.  (H.Tr. 509).  Although she would raise her head at times, for the most part she looked down at the table.  Ms. Launspach described petitioner's demeanor as "disinterested."  She did not notice her responding to friends and family members with consistent emotion, but only when she first saw them.  (H. Tr. 510).

Dean Stowers testified that petitioner, particularly during the guilt phase, "most

---

[14]     Before her medication was increased, petitioner was at the upper limit of the antidepressant medication Zoloft.  Prior to the increase in the medication, petitioner had complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. (Doc. 26, Exh. 1, p. 23).  Petitioner presented as hypomanic even while taking 200 milligrams of Zoloft.  (*Id*.)

often was looking down and doodling and drawing pictures and this sort of thing in a note pad and appeared to be very detached from the proceedings themselves . . . ." (H.Tr. 1558). He attributed her behavior to "her need to keep some kind of psychological separation . . . or mental separation from the evidence of the crimes." (*Id*.). Alyssa Johnson attended the trial as often as she could and sat behind her mother, at an angle so that she could see some of her face. She testified that her mother "would just sit there with a very blank expression on her face." It did not seem to Alyssa that petitioner was hearing everything, understanding and taking in the actual proceeding. Petitioner's demeanor was different from the mother Alyssa knew, who had always been happy-go-lucky and upbeat. (H.Tr. at 1657). When Alyssa visited her mother at the United States Marshal's Office during breaks in the trial proceedings, she found her "different," explaining that it did not seem as though she had just walked out of a courtroom, and she found it odd that her mother spoke of the proceedings "very minimal[ly]." (*Id*., at 1658).

Wendy Jacobson was able to observe petitioner while she testified, after she testified and at the Marshal's Office during breaks. (H.Tr. 1949). During the trial, petitioner seemed to be scribbling circles on paper, like a kindergartner, and did not seem to be aware of the intensity, magnitude and seriousness of the trial. (*Id*., at 1949-50). During Ms. Jacobson's visits with petitioner at the Marshal's Office, she did not seem to comprehend what was going on; she seemed to be confused, in a childlike state. Ms. Jacobson did not think her sister behaved in a manner appropriate for someone who was on trial for her life in a death penalty case. (*Id*., at 1950-51).

Patrick Berrigan testified that during trial, petitioner "mostly scribbled and drew pictures." He did not remember a lot of substantive writing. Although petitioner had some lucid moments, she was kind of in and out. (H.Tr. at 3136-37). According to Mr. Berrigan, petitioner was "spacing out during the trial." He did not know if this was a defense mechanism, because petitioner did not want to hear the testimony or she was afraid of how she might react. Mr. Berrigan vividly remembers buying little boxes of

27

candy, Nibs, for petitioner during trial.  In Mr. Berrigan's view, it was better for petitioner to be "zoned out" than reacting to evidence.  (H.Tr. at 3137-38).  Although he cannot say whether petitioner was zoning out "voluntarily or involuntarily," he states unequivocally that when she zoned out she was not paying attention to the proceedings.  (*Id*., at 3138-

28

39).  Petitioner incorporates, as if fully set forth herein, Claim One, Subclaim E. and Claim Five.

There was a dramatic difference in petitioner's behavior after, and as a direct result of, the decision to increase her medication.  Yet trial counsel did nothing.  They did not monitor her medication, they did not question her flat affect, her scribbling with her head down, her "zoning out" or any of the behavior that troubled many observers at her trial.  Rather, they seemed relieved that their client was not reacting to the evidence, and were content to have petitioner sitting in court in a zombie-like state because they viewed this as an improvement of her pre-medicated behavior.

Petitioner was prejudiced by trial counsel's failure to monitor and adjust the medication that she was taking during her trial.  This medication altered her demeanor and presentation in the courtroom (*Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J. concurring)), made her so calm and sedated as to appear cold, unfeeling and lacking in remorse, and rendered her incompetent to stand trial.

### E.    Trial Counsel Ineffectively Failed to Seek a Competence Hearing

Trial counsel were unaware of the increase in the medication administered to petitioner during the trial.  They  instructed petitioner not to show emotion and when, as a result of over-medication, she became detached from the proceedings, they apparently breathed a sigh of relief that their client was following their instructions.  Trial counsel's failure to understand that dramatic change in petitioner's behavior was a result of over-medication, failure to investigate petitioner's competence, and failure to consult with qualified mental health experts regarding the change in her behavior was ineffective, and deprived petitioner of her right not to be tried while incompetent.  Petitioner incorporates, as if fully set forth herein, Claim One, Subclaim D, and Claim Five.  As stated by George W. Woods, Jr., M.D.:

> Angela's cognitive abilities, impaired as they already were, became increasingly disordered, secondary to the elevated Zoloft dosages.  As

Ousterhoudt noted, long term elevated dosages may accumulate, creating increasingly toxic impairment, actually causing a deterioration of the brain the medications are trying to fix. This toxicity is part of the predicament of trying to treat brain-impaired persons with psychiatric medications that are designed to treat mental illness, not necessarily cognitive deficits. While attempting to fix the depression, the side effects of the same medication may impair other areas of cognitive functioning, like sedation, motor functioning, attention, and focus.

Ms. Johnson's disinhibition was evident during the trial. She was not able to effectively participate in her defense, and is often described as "detached." Her ability to draw pictures of the witnesses seems intact, but it is not clear to me how this translated into useful information for her defense team. In short, her Zoloft toxicity, combined with her multiple impairments, disengaged her from the legal proceedings and rendered her incompetent to stand trial.

(Report by George W. Woods, Jr., M.D., May 26, 2011, p. 73).

### F.     Trial Counsel Were Ineffective in Failing to Investigate and Present a Guilt Phase Defense

Trial counsel conducted no guilt phase investigation. (H.Tr. 35, 37, 173, 300, 321, 385, 405, 412, 463, 531, 560, 561, 563-65, 589, 868-69, 1515, 1526, 1536, 1595, 1939, 2116, 2189, 2352-53, 2368, 2379, 2389, 2405, 2413, 2965).[15] The first investigator retained by trial counsel, Raymond Cornell, did not conduct any guilt phase investigation. (H.Tr. 868-69). Rose Nevins, who worked for investigator Raymond Cornell, did not do any guilt phase investigation during the time she worked on the case. (H.Tr. 1939). Gordon Gratias, the second investigator hired by Mr. Willett, did not do any guilt phase investigation. (H.Tr. 2328-35, 2340-42).

---

[15]     The guilt phase investigation in this case was primarily directed by Mr. Willett (H. Tr. 2112), whose role in the defense team was the investigation and presentation of the guilt phase at trial. (H.Tr. 589, 1994, 1998 - 99). There were portions of the guilt phase investigation that Mr. Berrigan and Mr. Stowers participated in, such as viewing the crime scenes, but their participation in guilt investigation was very limited. (H.Tr. 2112).

30

There was no investigation of the jailhouse informants who testified against petitioner. (H.Tr. 67, 383, 493, 593-95, 625, 628, 877, 905, 920, 1163, 2141, 2949, 3018). There was no investigation to locate inmates housed in the jail at the same time Ms. Johnson allegedly made admissions to the jailhouse informants to determine whether they could testify regarding Ms. Johnson's habit and custom of not talking about her case to other inmates, whether they had ever seen her in private conversations with the informants, and whether, given the conditions of confinement, that the conversations reported by the informants could have taken place. (H.Tr. 475-485, 628, 879-801, 920-23, 927, 1888-91, 2139-41, 2177). There was there was no tactical reason why trial counsel would not present evidence impeaching the testimony of jailhouse informants, including inconsistent statements these informants made at grand jury proceedings or other court proceedings, if they had such evidence. (H.Tr. May 4, 2011, at 68). This type of evidence would have advanced both counsel's guilt phase strategy of creating a reasonable doubt and penalty phase strategy of creating a lingering doubt. (H.Tr. May 4, 2011, at 69).

There was no investigation of Christie Gaubatz, whose testimony was a key part of the prosecution's case. (H.Tr. 2123). As a consequence, trial counsel was not in the position to advise Ms. Johnson that "there was not a lot of room to move on her." (H.Tr. 2123). Trial counsel deemed petitioner's statement that Gaubatz was involved in the murders "preposterous" and "illogical" without any investigation at all. (H.Tr. 2202).

Trial counsel did not present evidence to refute the prosecution theme that petitioner was more culpable than Honken, who killed the victims, because it was she, not Honken, who orchestrated the deaths. If such evidence had existed, either in grand jury testimony or trial testimony or investigative reports, here was no tactical reason why such evidence would not have been presented and it would have been consistent with the theme of the defense, including the penalty phase strategy of creating lingering doubt. (H.Tr. May 4, 2011, at 68-69; 2321-22).

31

There was no investigation of Robert McNeese, and no effort to impeach him by the Court's findings regarding his credibility at the *Massiah* hearing. There was no investigation, independent analysis, or *Daubert* motion as to the expert testimony that the handwriting on the materials Robert McNeese claimed were written by petitioner was in fact her handwriting, despite the fact that Mr. Berrigan never asked Ms. Johnson if she wrote the maps and, even if she had admitted this it does not relieve counsel of his obligation to challenge the government's evidence. (H.Tr. 2189-91). Mr. Berrigan further testified that if a handwriting expert said petitioner did not write the materials provided by McNeese, there was no tactical reason for not calling this expert to testify. (*Id.*, 2190).

There was no attempt to retain or present any other forensic expert to challenge the government's forensic evidence.

There was no presentation of evidence that it was Terry DeGeus who was involved in the killing of Nicholson and the Duncans.

There was no timely investigation of Phyllis Proscovec, whose account of the events on July 25, 1993 was inconsistent with the government's theory. (H.Tr. 2112-16, 2309-10, 2314).

There was no investigation of the owner of the gun shop where Ms. Johnson purchased the gun used in the killings (H.Tr. 2119), to determine whether he remembered selling the gun, whether Dustin Honken was present that day, and whether Honken chose the gun that Ms. Johnson purchased. There was no investigation of Dean Donaldson, who claimed that Dustin Honken had solicited him to murder witnesses. (H.Tr. 2120).

Trial counsel rejected an after-acquired knowledge theory of defense without having done any investigation to determine whether there was any credibility to that theory. (H.Tr. 2198).

There was no investigation of petitioner's whereabouts on July 25, 1993. Ms. Johnson told Mr. Berrigan that she was either at home or at work at the time of the Nicholson/Duncan homicides, but trial counsel did no investigation to determine if there

32

was a viable alibi defense to be presented. (H.Tr. 2199-2200)   He did no investigation even though he admitted that one way a lawyer gets a client off fantasy defenses is by investigating them and telling the client there is no factual basis for the alibi defense (H.Tr. 2200); that it would be relatively easy to subpoena petitioner's work records for July 25, 1993 (H.Tr. 2200); and that there was nothing physically tieing [sic] [petitioner] to this situation . . . [s]o that may have warranted investigation (H.Tr. 2201).   According to trial counsel, he did not want investigate because he did not want to "convey the impression that I'm even close to believing [petitioner's alibi]."  (H.Tr. 2200-01).[16]   In sum, the strength of Mr. Berrigan's disbelief of Ms. Johnson's alibi was not based on any independent investigation by the defense team.  (H.Tr. 2201).

Guideline 10.7 of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases states:

> A.     Counsel at every stage have an obligation to conduct thorough and independent investigations relating to issues of both guilt and penalty.
>
> 1.     The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

Ms. Johnson's counsel failed in their obligation to their client to conduct a "thorough and independent" investigation of guilt.   They had an obligation to do such investigation, irrespective of their view that there was "overwhelming evidence of guilt." There were adequate funds available to conduct guilt phase investigation (H.Tr. 2316). Trial counsel had no strategic or tactical reason for not investigating guilt, given the

---

[16]     Mr. Berrigan explained that "clients can run you all over the earth with these theories sometimes, and it's important sometimes, not all the time – it's very much a case-by-case basis and day to day.  But sometimes I want to convey the impression that's nonsense, I don't believe it, and I'm not going to waste one iota of time investigating this ridiculous proposition.  It dies now."  (H.Tr. 2200).

33

mandate of Guideline 10.7.  Ms. Johnson was severely prejudiced by her lawyers' failure to investigate guilt.   An investigation of guilt would have effectuated an early plea agreement.  As explained by Richard Burr, "[o]ne of the things a defense lawyer has to do to effectuate a plea is go through the discovery to determine the strength of the government's case."  (H.Tr. 753).  Without guilt phase investigation there could be no reasonable decision to abandon the "after-acquired knowledge" defense, to present a "mere presence" defense, or to rest at guilt phase without calling a single defense witness. *See* H.Tr. 803 (every judgment call by a defense attorney has to be informed by investigation).  As a result of trial counsel's failure to investigate guilt, there was no evidence supporting the non-statutory mitigator of residual doubt, as shown by the fact that no trial juror found this mitigator to exist.  (Doc. 593, at 8). But for trial counsel's failure to investigate guilt, there is a reasonable probability that at least one juror would not have voted to convict petitioner and that, if she had been convicted, the jury would not have returned any death verdict.

### G.   Trial Counsel Was Ineffective By Presenting a "Mere Presence" Defense Without Investigation and Despite Petitioner's Repeated Assertions that She Was Not Present at the Nicholson/Duncan Killings

As discussed in Section F, *supra*, and incorporated by reference here, counsel has a duty, under Guideline 10.7 of the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Exh. 1, p. 213), to conduct thorough and independent investigations relating to issues of guilt.  That duty arises not only from the Guidelines but from a defendant's Sixth Amendment right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

Counsel's function is as "assistant to the defendant."  *Id.* at 688.  From that function "derive[s] the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the

34

defendant informed of the important developments in the course of the prosecution." *Id*. Included in those "particular duties" is the duty to investigate. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and *on information supplied by the defendant*." *Id.* at 691 (emphasis added).

Guideline 10.5C. of the ABA Guidelines (Exh. 1, p. 205) provides that:

C. Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

    1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

    2. current or potential legal issues;

    3. the development of a defense theory;

    4. presentation of the defense case;

Guideline 10.5C (Exh. 1, p. 205).

Here, trial counsel failed to provide effective assistance of counsel, as provided by the Sixth Amendment and delineated in the ABA Guidelines. They failed to "counsel" Ms. Johnson, to engage in an interactive dialogue about the case, including the presentation of the defense case.

Ms. Johnson repeatedly told trial counsel that she was not present at the Nicholson killings, that the information she learned about the killings was after-acquired knowledge. (H.Tr. 1167-68; 2197; 2204.) She told trial counsel that the night of the killings, she was either at work or at home. (H.Tr. 2199.) Trial counsel acknowledged conducting no investigation at all into a possible alibi, including failing to even subpoena work records for the night in question. (H.Tr. 2199-2200.) Similarly, trial counsel took no steps to investigate Ms. Johnson's report that Dustin Honken gave her a map while he was in Florence, Colorado (H.Tr. 2197-2198) despite Honken having repeatedly and

35

insistently invited trial counsel to visit him and discuss the case.  (H.Tr. 841-967.)  Trial counsel undertook no investigation of Ms. Johnson's claim that Christi Gaubatz assisted Dustin Honken in the Nicholson killings, not Ms. Johnson.  (H.Tr. 2202.)

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel' failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland v. Washington*, 466 U.S. at 691.

Counsel unreasonably decided, without conducting a shred of investigation, that Ms. Johnson's version of events was not credible.  (H.Tr. 2197-2198; 2200-2101.)  This is not a case where counsel made "strategic choices [] after thorough investigation of law and facts relevant to plausible options." *Strickland v. Washington*, 466 U.S. at 690.  The decision to put on a "mere presence" defense was not strategic; it was an uninformed choice made because counsel unreasonably chose not to investigate Ms. Johnson's stated defense.

According to Dean Stowers, the decision to put on the "mere presence" defense "evolved into this theory of – loosely stated you can call it mere presence where her role would be, number one, the government was in agreement she wasn't the shooter.  Her role would be present but not involved, present but no intent to kill, present maybe

36

knowing that he was going to do this but unable to stop it from occurring because there was one gun and he had it and he was a mad man, present but the situation kind of spun out of control in some manner during the – during the videotaping situation with Nicholson. And that was actually kind of plausible to dovetail into a – into the mitigation case because it kind of – part of the mitigation case was that she's very susceptible person in certain respects to a guy like Honken and that sort of thing." (H.Tr. 1266.) That theory, however, "evolved" without the participation or consent of Ms. Johnson. *See, Nixon v. Singletary*, 758 So.2d 618 (Fla. 2000), *cert denied* 531 U.S. 980 (2000) (ineffective assistance for counsel to fail to obtain the client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing).

Had counsel effectively represented Ms. Johnson by engaging her in a dialogue about the facts, listening to the information she supplied, investigating the leads she suggested, and presenting the defense she offered, there is a reasonable possibility that at least one juror would not have voted for guilt.

Moreover, had trial counsel presented the merit phase defense Ms. Johnson offered after thorough investigation, there is a reasonable possibility that at least one juror would have been left with residual doubt about her guilt and voted against a death verdict.

### H. Trial Counsel Were Ineffective in Failing to Create a Reasonable Doubt Through Impeachment of Prosecution Witnesses at the Merits Phase

Trial counsel were ineffective in failing to utilize readily available discovery (Exh. 95), Grand Jury Testimony (Exh. 96) and testimony from Dustin Honken's trial to impeach the witnesses who were called by the government at the merits phase of Ms. Johnson's trial. Trial counsel's errors and omissions in this respect prejudiced their client, because it deprived her of evidence that undermined the government's case and created a reasonable doubt. It is reasonably probable that, but for counsel's ineffective performance, at least one juror would not have voted to convict petitioner.

37

Trial counsel's errors and omissions in this respect include, but are not limited to, the following:

### 1. Trial Counsel Were Ineffective in Failing to Impeach Robert McNeese by the Court's Findings Regarding His Credibility at the *Massiah* Hearing

Robert McNeese was a critical witness against Ms. Johnson at the guilt phase of her trial. At a pretrial hearing to determine whether self-incriminating statements obtained from Ms. Johnson were admissible in the prosecution's case-in-chief, McNeese testified. After hearing all of the evidence presented by both sides on that issue, the Court made findings regarding McNeese's credibility. Specifically, the Court found as follows:

> The court simply cannot accept McNeese's characterization of having been "talked into writing a letter to [Johnson]," when it is clear from both Sara Bramow's testimony and McNeese's later statements to Agent Basler, which the court finds more credible, that McNeese initiated and pushed for continued contacts with Johnson. Moreover, in light of his record as an informant for government agents, McNeese was shrewd enough to know that he shouldn't suggest in a note that he was pumping Johnson for information.

*United States v. Johnson*, 196 F. Supp. 2d 795, 817 (2002). The Court further found:

> The court does not find McNeese's assertions that no government agent facilitated his contact with Johnson to be credible, in light of contrary and credible evidence that Office Rich frequently passed notes between McNeese and Johnson with at least constructive knowledge that he was doing so, and the improbability that jailers were unaware of McNeese's frequent contacts with Johnson through the cell window onto the exercise yard. Moreover, Agent Basler's interview notes reflect that McNeese himself told Basler that a jailer at the Benson County Jail had allowed him to meet face-to-face with Johnson on one occasion "so that they could talk." . . . Also, as noted above, Sara Bramow testified that, on two occasions, Officer Rich permitted Johnson and McNeese to have direct contact in the jail corridor.

*Id.*, at 820 (citations omitted). Finally, the Court found as follows:

> McNeese maintains that he never intentionally questioned Johnson about her case. The court does not find this contention at all credible in light of evidence including McNeese's own characterization of the manner in which he obtained information from Johnson in his interview with Agent Basler.

Trial counsel were aware that the Court had made negative findings regarding McNeese's credibility in the course of the *Massiah* hearing; each of Ms. Johnson's

38

counsel were present at that hearing, represented her at the time the Court issued its opinion on April 23, 2002, and continued to represent her until she was sentenced. Yet counsel did not seek to introduce evidence of the Court's adverse findings as to McNeese's credibility at petitioner's trial, by asking the Court to take judicial notice of its findings regarding McNeese's credibility (Rule 201 of the Federal Rules of Evidence). If trial counsel had asked the Court to take judicial notice of its findings about McNeese's credibility, the jury would have been instructed that it may, but is not required to, accept as conclusive any fact judicially noticed. Fed. R. Evid. 201( g). Judicial notice, and the jury instruction about the weight to be given such notice, would have been powerful impeaching evidence, certainly more compelling and persuasive than the cross-examination of McNeese heard by the trial jury. However, counsel did not take advantage of this opportunity to impeach McNeese at guilt phase and then ignored a second opportunity for its introduction at the penalty phase, where there is a relaxed evidentiary standard applicable (*United States v. Johnson*, 378 F. Supp. 2d 1051, 1508-59 (N.D. Iowa 2005)). Had counsel performed effectively in impeaching McNeese, it is reasonably probable that at least one juror would have voted to spare petitioner's life.

### 2. Trial Counsel's Ineffective Examination of Christie Gaubatz

Christie Gaubatz, petitioner's former friend, testified that Ms. Johnson confessed her involvement in five murders in the winter, in 1993 or early 1994. However, until 2000, Gaubatz repeatedly denied knowing anything about these crimes during interviews by law enforcement and twice in testimony before the grand jury. Counsel failed to adequately cross-examine Gaubatz and failed to object to improper re-direct examination that elicited extremely harmful evidence.

Counsel did not question Gaubatz to establish that the relationship between Martin Cole, Gaubatz's ex-husband, and Angela Johnson caused a substantial conflict between her and petitioner. (Honken Tr. 416). Evidence that Gaubatz and petitioner were involved in a fist fight over Martin Cole in June 1996 was not adduced. (R000578).

39

Gaubatz was not questioned about her belief that Dustin Honken is evil (R000577) and that she and Honken stayed away from each other due to a mutual dislike. (R000757). Gaubatz could have, but did not, testify that Honken was jealous over the influence Gaubatz had over petitioner, and that he wanted all of petitioner's attention. (R000579). Gaubatz was not cross-examined about Honken's having maced her German Shepherd (R000579) or threatening to mace Gaubatz if petitioner did not keep Gaubatz under control. (000345). Gaubatz was not questioned about petitioner's intervening when Honken threatened Gaubatz with pepper spray. (R000569).

Trial counsel failed to impeach Gaubatz with her testimony before the grand jury that she had no firsthand knowledge of petitioner getting any drugs from Dustin Honken. (Exh. 96, C0000336-38). Gaubatz could have been, but was not, questioned about Honken's complete domination of Timothy Cutkomp. (R000588).

Gaubatz was not questioned about having stored quite a few boxes for Dustin Honken at her house in the Summer and Fall of 1993, after the trip to Arizona with Timothy Cutkomp; that the boxes were there for five or six months; and that Honken and Cutkomp removed the boxes from her house. (Exh. 95, R000588). Gaubatz could have testified that she never saw anything at petitioner's house that made her think there was a meth lab operating there (000344); that petitioner denied any involvement in a meth lab (Exh. 96, C000336-337); and that she first learned about the lab from Honken. (Exh. 96, C000337).

Gaubatz could have, but did not, testify that petitioner would leave Honken and come over to Gaubatz's house when they fought (Ex. 95, A1013); that petitioner would be upset when Honken brought Kathy Rick's baby to her house, but she would not say anything to Honken (Exh. 95, 1013); and that the relationship between petitioner and Honken was an emotional roller coaster (Exh. 95, A1013).

June 1, 2011    Gaubatz has given widely varying accounts of the end of her relationship with Angela Johnson, yet trial counsel never cross-examined her about the numerous

40

inconsistent statements.  Specifically, Gaubatz has stated that her relationship with petitioner ended in 1995 (Honken Tr. 447); that she last saw petitioner at her house in October of 1995 (Exh. 96, C000342); that petitioner called her crying six months after October 1995 (Exh. 95, A1024); that there was no contact between Gaubatz and petitioner after October 1995 (Exh. 96, C000342); that two and one half weeks before May, 1997, petitioner called Gaubatz at work, crying and upset (Exh. 95, R000591-92); that Gaubatz ceased contact after petitioner called her after she talked to some agents, about a year before April of 2000 (Exh. 95, A1741); that she had not talked to petitioner since 1997 (Exh. 95, A1741); and that she last saw petitioner in 1996 (Exh. 95, A1741).

Gaubatz was not cross-examined about her explanations for why she did not go to the police immediately after petitioner made the alleged admissions to her. Specifically, she stated that she was not sure where the bodies were buried and could not do anything to give them a proper burial; that she thought her information would not be of any value to law enforcement; and that she did not consider providing this information by making an anonymous call or telephoning in a "Crime Stoppers" tip.  (R000573, R000576).

Gaubatz was not questioned about her prior statements that Terry DeGeus was in a self-destructive mode in 1993 (Exh. 95, A1025) and that, when he showed her the scrap of paper with Nicholson's name on it in the summer of 1993, DeGeus was not making sense to her.  (000338).

Gaubatz was not effectively cross-examined due to trial counsel's failure to do any guilt phase investigation.  Trial counsel did not know, and could not ask about, Brooke Jacobson's staying with petitioner during the summer of 1993, the preference of Alyssa Johnson and Brooke for sleeping on the couch in the living room, where Gaubatz said she was sleeping on July 25, 1993, and the fact that neither Brooke nor Alyssa remember having a babysitter that summer. (H.Tr.1635, 1659). Trial counsel did not know, and could not ask, Gaubatz about her continuing her relationship with petitioner,

<div align="center">41</div>

and her telephone calls to petitioner's home until she was arrested. (H.Tr. 545-46). Trial counsel did not question Gaubatz about whether she was led to believe that she would not be prosecuted for lying to the police and for twice perjuring herself before the grand jury. (H.Tr. 919), Gaubatz was not questioned about whether Scott Gaubatz, her husband whose disapproval of petitioner caused Gaubatz to cut off contact, is himself a user and trafficker in methamphetamine. (H.Tr. 548). Gaubatz was not questioned about her false accusation of battery against her ex-husband, Martin Cole. (H.Tr. 920).

Finally, trial counsel was ineffective in not objecting to improper re-direct examination that elicited extremely damaging evidence. Specifically, on re-direct, the prosecution elicited for the first time that petitioner reported to Gaubatz that she heard gunshots when she was sitting in the car with the Duncan children, after Honken had taken Nicholson into the woods, and again after Lori Duncan was taken from the car. (Tr. 656-657).

### I. Trial Counsel's Ineffective Failure to Present Evidence of Terry DeGeus's Involvement in the Killing of Gregory Nicholson and the Duncans

There was abundant evidence available to counsel to suggest that Terry DeGeus was responsible for the deaths of Greg Nicholson and the Duncans, and then was later killed by Dustin Honken due to his involvement in their deaths. Effective counsel would have investigated and introduced this evidence, which was present in the discovery provided by the government, as well as DeGeus' suspicious actions and demeanor around this time, which were described by numerous witnesses.

Law enforcement determined that DeGeus was employed in July of 1993 by his father, who had an excavation business. (Exhibit 95, A001321). It was also determined that DeGeus had been involved in an excavation on the specific date of the disappearance of Nicholson and the Duncans (*Id.*). Law enforcement's suspicions of DeGeus was so strong that they thought it prudent to examine this excavation site as a possible location for the bodies. (*Id.*). Over the course of two days in 1997, law enforcement examined the

42

site with the aid of cadaver dogs. Although no bodies were recovered at the site, law enforcement remained suspicious of DeGeus. In 1999, investigators decided to re-excavate the same site, again with the aid of cadaver dogs, in an attempt to find the bodies. (Exh. 95, A001323)

Law enforcement had good reason to suspect DeGeus. Counsel could have presented evidence that DeGeus had at least two independent reasons for wanting to harm Nicholson: first, because Nicholson was a competitor in the Mason City area meth dealing world, and second, because Nicholson's decision to cooperate with authorities would have the potential to send DeGeus to prison for a long time. DeGeus was acutely aware of this fact, as he was constantly asking whether or not a grand jury subpoena had arrived at his home. (Exh. 95, R000487)

According to nearly every witness interviewed by law enforcement, DeGeus was particularly violent and aggressive. (Exh. 95, A000380) Counsel could have presented evidence of multiple instances of serious physical and verbal abuse directed towards Angela Johnson, including many threats to kill her, as well as evidence that DeGeus stalked her and broke into her home.

Angela Johnson was not the only target of harassment by Terry DeGeus. Numerous other witnesses could have described DeGeus' violent, paranoid and harassing behavior. For example, DeGeus' ex-wife, Wendy Jensen, could have testified that DeGeus once threatened to kill her and himself with a shotgun on Christmas. (Exh. A95, A00352). She could have testified that DeGeus had, at one point, taken on five police officers at one time and won. In fact, Ms. Jensen was so afraid of DeGeus that after her marriage ended because of his involvement with petitioner, she sent petitioner a card to thank her, telling her that the divorce from DeGeus was the best thing that ever happened to her. (*Id.*). Finally, Jensen would have testified that after she divorced DeGeus, she got as far away from DeGeus as she could. (*Id.*).

43

There was evidence, not presented by the defense, that DeGeus may have been suspected in other murders and also threatened to kill Rich Gerdes, whom he suspected of stealing his daughter's piggy bank. DeGeus' reaction to this supposed theft was to take Gerdes out on a country road and threaten to kill him. Another person on the list of people DeGeus threatened to kill was Christie Gaubatz's ex-husband.

DeGeus was a heavy user of methamphetamine, alcohol and other drugs, which only increased his violence, aggression and paranoia. DeGeus presented, especially around the time the Nicholson/Duncans disappearances, as manic, paranoid and disheveled.

Had counsel introduced the facts that led law enforcement agencies to suspect DeGeus, there is a reasonable probability that the jury would have had a reasonable doubt as to petitioner's guilt. Trial counsel's failure to introduce this evidence prejudiced petitioner. The government's case relied heavily on the testimony of jailhouse informants and other individuals who were seeking to curry favor with the government to escape their own criminal liability.

Trial counsel's failures detrimentally affected petitioner's sentence. Had trial counsel presented the evidence outlined above, there is at least a reasonable probability that one juror would have found residual doubt at the penalty phase and thus spared Ms. Johnson's life. At a minimum, her sentence should be overturned.

**J. Trial Counsel Were Ineffective in Failing to Present Evidence of Battered Woman's Syndrome to Explain the Relationship Between Petitioner and Terry DeGeus**

The government argued that Terry DeGeus' abuse of Angela Johnson motivated her to kill him. *See, e.g.,* Tr. 3611, 3930, 4017, 4029-30. Trial counsel was ineffective in failing to present evidence that Ms. Johnson was a battered woman, which would have refuted the prosecution's theory that revenge for DeGeus' beatings was the motive for his killing.

44

In the course of a tape recorded interview by prosecution psychologists Joseph Dvoskin, Ph.D., and Daniel Martell, Ph.D., on April 23, 2005, petitioner was asked about her feelings for DeGeus and her feelings for Dustin Honken. Ms. Johnson responded with an idealized, loving description of her feelings for DeGeus:

> He just took my breath away. I thought he was the sexiest man in the world. I was crazy for him. . . . The minute he walked into my bar, I was like "Oh, my god." . . . . I loved him. I didn't want to be with anybody else. With him I was perfectly happy with him but he was just real jealous about any male friend I had. Most of my friends were guys and he knew that when we first started seeing each other and all of a sudden, he got real possessive and started getting physically abusive, which was a real bummer.

(Exh. 1, MG004347). In contrast, Ms. Johnson described Dustin Honken as follows: "He was all right. I mean I wasn't crazy about him or anything. I thought he was going to be my dope connection though. I wasn't going to do anything to fuck that up." (*Id*., Exh. 1, MG004350).

Dr. Logan describes the relationship between petitioner and Terry DeGeus as follows:

> In the late 1980's, Angie began a relationship with Terry DeGeus. Terry had a daughter, Ashley, who is only two weeks apart from Angie's daughter, Alyssa. Another bond was that they both had difficult relationships with their mothers. Consequently, Angie tended to excuse his behavior. Terry soon became possessive, jealous, and physically abusive. Angie began to have nightmares of these beatings which would continue to the present. She stated she never slept in the dark out of fear. When she tried to end the relationship with Terry, he would stalk her. They separated and reconciled several times. Angie would vacillate between thinking Terry was wonderful and that he was bad. Terry continued to stalk her on a regular basis. He once ran her off the road, and hit her in the face so hard she believed her jaw was broken. Terry would break into her house and once head butted her. Angie tried various ways to protect herself, including contacting the police, having her bosses escort her home from work at her job at the Country Kitchen, and even buying a dog, to no avail. At one point following a severe beating, she fled to Wisconsin where she remained for three months.
>
> Independent sources confirm the abusive relationship. There is a record of a restraining order Angie obtained, as well as several reports from the Clear Lake Police Department. Alyssa was so frightened of Mr. DeGeus that she began to receive counseling at school. Angie's sister, Holly, reports that she had seen Terry beat up Angie quite a few times, and once called the police herself. Holly moved to Wisconsin with Angie, and confirmed

<div align="center">45</div>

Angie was black and blue following Terry's beating. They stayed with Wendy in Wisconsin to get away from Terry. Then, inexplicably to Holly, Angie called Terry and they were in love again. Terry had called that night and threatened suicide. Angie was on the phone with him for two hours. Holly believed Angie really loved Terry, but didn't know what she wanted. Holly did not believe the attraction was solely due to the meth Terry provided. Still, Holly observed Angie would become depressed when she tried to come down from meth, and would sob for hours. According to Holly, Angie was good looking and liked attention from men, but also saw herself as a victim of men.

Dave Nieman . . . also knew Terry who was described as a woman beater. He recalled an incident where Terry pushed Angie out of a car. At times Angie was afraid to be alone with Terry. Mr. Nieman observed that Terry would beat Angie when he was drunk or angry. When they were not fighting, Terry would treat Angie like a queen, which Angie liked. . . .

. . . . Alyssa [Johnson] believed her mother wanted to end the relationship with Terry who stalked Angie and threatened her for two years. Alyssa recalled at least two severe beatings where Angie had black eyes, a fat lip, and bruises. Terry tended not to hit Angie in front of Alyssa. She also recalled that Terry once pushed Angie out of a car. When she would come home from school, she would find her mother hiding.

Arlyn Johnson . . . . knew of Terry from school and described Terry had always been a bully. He once noted Angie had a black eye which she said she received from Terry. Terry once wrote to Wendy that he hated what he did to Angie. Alyssa reported that Terry once raped her mother while she was in an adjacent room sleeping. Alyssa feared Terry, who she described as intimidating. Alyssa continued that Terry would yell at her and make up things to get her in trouble with her mother.

Trial counsel retained Marilyn Hutchinson, "late in the game," because she specializes in psychological issues surrounding women, particularly women who have been abused. (H.Tr. 2103). Yet, despite having chosen a specialist in Battered Women's Syndrome, Mr. Berrigan has no recollection of specific discussions with Dr. Hutchinson about the theme that, like other abused women, the fact that DeGeus abused Ms. Johnson does not necessarily mean that she hated him and would not resume her relationship with him. (H.Tr. 2106).

Patrick Berrigan recognized that petitioner had a "peculiarly romanticized view of Mr. DeGeus that I cannot now explain nor could I then and almost the opposite position regarding Mr. Honken. It was like nothing there [with Honken] other than they had a daughter together . . . ." (H.Tr. 2107). Mr. Berrigan admits that petitioner's

46

"romanticized view" of Terry DeGeus is consistent with the battered woman syndrome, where women who are abused return "time and time and time again to their abusers." (*Id*.). His belief was that her attachment to DeGeus was "wholly irrational." (*Id*., 2988). "[DeGeus] had treated her horrible, and yet she maintained this attraction to him that I thought was very difficult to explain." (*Id*., 2988-89). This syndrome explains petitioner's love for DeGeuss, despite repeated beatings, and her continuing to express her love for him after his death. (*Id*.) When asked whether he had any tactical reason why he did not present evidence of battered woman's syndrome, Mr. Berrigan stated that there was no downside to the presentation of such evidence and explained: "The argument would be, well, she wouldn't have killed him because she loved this guy despite the fact that he abused her and abused her and abused her and abused her because the government's position obviously was the opposite of that. (*Id.*, at 2107). *See also* H.Tr. 2106 (no strategic reason not to present battered woman's syndrome at guilt to show petitioner did not kill DeGeus or in penalty phase as mitigation); 2990 (petitioner's love for DeGeus and her attachment to him could have undercut the government's argument he was killed because petitioner hated him, as revenge for his abusing her).

Trial counsel ineffectively failed to present evidence of the battered women's syndrome to explain the relationship between petitioner and Terry DeGeus, to rebut the prosecution's theory that DeGeus was killed because petitioner sought revenge for the beatings she suffered at his hands, and to establish residual doubt. There was no tactical or strategic reason for trial counsel's failure to present such evidence. Had trial counsel presented this evidence to the jury, it is reasonably probably that the prosecution's theory that she killed DeGeus for revenge would have been rejected and that the jury would not have returned death verdicts at the penalty phase of the trial.

//

//

//

47

**K. Trial Counsel Were Ineffective in Failing to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses**

Trial counsel were ineffective in failing to investigate and present evidence about Angela Johnson's mental state at the time of the offenses. Having chosen to present a "mere presence" defense at the guilt phase (Tr. 304, 904, 984, 1266, 2204), there was no tactical or strategic reason not to introduce evidence of Ms. Johnson's mental state at the time she was "merely present" at five homicides

On November 20, 2000, Patrick Berrigan met Angela Johnson for the first time and spent two hours with her. (Exh. 8-CF-000666). Two days later, Mr. Berrigan wrote to William Logan, M.D., a psychiatrist who would testify at the penalty phase. The letter stated, in part:

> Most importantly, we need to evaluate Angela's mental state at the time of the commission of the alleged murders (July and November of 1993), and at the time she purportedly made incriminating statements to the government's snitch, Robert McNeese . . . . It will be important to have at least a preliminary indication by [the time of the *Massiah* hearings] as to whether Angela's mental state made her unusually susceptible to coercion and/or enticement by McNeese in obtaining these alleged statements.

> \* \* \*

> Even if Angela does not have significant mental issues that impact upon her first phase defense (which is "I didn't kill anyone"), I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Angela's boyfriend and co-defendant, Dustin Honken.

(Exh. 67, MCN 00-000267). Mr. Berrigan has testified that his plan, at the time he wrote to Dr. Logan, was to have Dr. Logan evaluate Ms. Johnson's mental state at the time of the offense. (H.Tr. 2074).

On January 21, 2001, Dr. Logan visited with Ms. Johnson for three hours. Afterward, he expressed an interest in coordinating with investigator Raymond Cornell and mitigation specialist Mary Goody in developing a report for sentencing. Dr. Logan made it clear to Mr. Berrigan that he did "not want to try to obtain collateral interviews

48

and records at the last minute."[17]  (Exhibit 1, MG-004131).  However, Dr. Logan would not work on the case or see Angela Johnson again until January 26, 2005, almost four years after his first visit.   (Exh. 8, CF-000876).

After his letter to Dr. Logan, trial counsel changed his mind about exploring petitioner's state of mind at the time of the offense.  (H.Tr. 2075).  Before Dr. Logan's second interview with Ms. Johnson, he was instructed to not interview petitioner about, or address in any way, her mental state at the time of the offenses.  (Exh. 1, MG-004292).

Marilyn Hutchinson, Ph.D., evaluated Ms. Johnson on February 23 and 24, 2005. (Exh. 8, CF-00915).  Trial counsel also instructed Dr. Hutchinson that she was not to interview petitioner about the offenses or her mental state at the time of the murders. (Exh. 67, MCN05-005437).

Mark Cunningham first interviewed petitioner on May 8, 2005, after her trial had started. (Exh. 8, CF-00915).  Like Drs. Logan and Hutchinson, his area of inquiry was limited; he was told not to question petitioner about the offense,  to evaluate her to determine the presence or absence of risk factors in the Department of Justice study on predictors of youth violence[18] and to assess her ability to adjust to life in the Bureau of Prisons.  (Exhibit 1, MG-004472-4478).

At penalty phase, Dr. Logan testified that he had not been asked to look at Ms. Johnson's mental state at the time of the offenses, but simply to examine "generally what her life experiences had been and how that affected her emotional composure, stability,

---

[17]      Yet this is precisely what happened in this case.  On April 13, 2005, one day after jury selection started, Dr. Logan complained that he had not received all of the records about petitioner that he had requested. (Exhibit 1, MG-004205)

[18]      Hawkins, J.D., Herrenkohl T. I., Farrington, D.P., Brewer, D., Catalano, R. F., Harachi, T. W. & Cothern, L. (April 2000) Predictors of Youth Violence.  Juvenile Justice Bulletin, United States Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

and life adjustment." (Tr. 3307). He concluded that petitioner's life experiences rendered her "predisposed to depression," but did not address whether there was an organic component to this disorder. Dr. Logan described the bizarre religious rituals to which petitioner was subjected and many other elements of the dysfunction in her life history, such as her abuse by Terry DeGeus. (Tr. 3308-25, 3326-28). He described her jail suicide attempt (Tr. 3298-99), her history of depression, anxiety and post-traumatic symptoms (Tr. 3300), and the fact that methamphetamine withdrawal could cause a severe rebound depression (Tr. 3340). He testified that in "children exposed to that kind of pyrotic trauma, there have been known to be shrinkage in certain areas of the brain where it's possible for memory integration." (Tr. 3321). He explained that trauma can cause problems with maturation, concentration and early drug use. However, as a result of the limitations placed on Dr. Logan by trial counsel, he could not say how the brain changes caused by trauma and the depression and mood impairments would have created the trajectory that landed petitioner with Dustin Honken at the crime scenes.

The prosecution exploited the limitations of Dr. Logan's evaluation of petitioner:

Q: You are not providing any opinion whatsoever that her depression affected her thinking or her behavior at the time of the offenses involved in this case are you?

A: No, I'm not.

Q: In fact, you were specifically instructed not to question her about what her thinking and behavior and mind set was at the time she committed the offense.

A: That's right.

Q: So it's fair to say you're not offering any opinion about whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of law was significantly impaired or not impaired at the time she committed the offense, are you?

A: No, I'm offering no opinion about that area at all.

Q: You're not offering any opinion about whether she was under any form of duress or pressure or anything else at the time she committed these offenses?

50

A:     That's right.

(Tr. 3354-55).[19]   Trial counsel's redirect examination reinforced the point made by the government:

Q:     And, in fact, weren't you told that the defense wasn't claiming that, you know, she was nuts at the time of the offense or that that was some kind of defense?

\*     \*     \*

A:     Right, there was no claim in that area.

Q:     Okay.  And so you didn't make any inquiry in that area.

A:     No.  It just wasn't my issue.  That wasn't the task I was charged with.

(Tr. 3357).

Dr. Hutchinson testified that she was not told that the defense was claiming that Ms. Johnson was suffering from a mental disease or defect that might exclude responsibility for the crimes for which she was charged, that she was given explicit instructions that she was to address only mitigation, that she was not told the defense was claiming insanity or that mental illness prevented Ms. Johnson from understanding the nature and quality of her conduct, and that she did not ask her about the homicides charged against her.  (Tr. 3627-28).   She described what she believed her task to be as follows:

What I was looking for was from my point of view an understanding of how this tragedy could have occurred . . . I'm investigating her mind and her point of view, her way of looking at the world to say how this could have happened and how does it make sense because I think the world makes sense if we know all the pieces.

---

[19]     Mr. Berrigan chose to elicit the limitation on Dr. Logan's evaluation of Ms. Johnson on direct examination, because "[i]t was going to come out in cross-examination . . . and there was no reason to wait for cross-examination for that fact to come out." (H.Tr. 2098).  He acknowledges that the fact that his experts did not address mental state at the time of the offense in combination with the absence of an instruction on mental state mitigating factors diminished the mental health evidence he presented, and that it is "not helpful" and "not a good thing" to elicit the limitation imposed on his experts on direct examination.  (H.Tr. 2098-99).

51

(Tr. 3628-29). Trial counsel quickly reminded Dr. Hutchinson that she was making no "claim that your testimony today has to do with the mental state of Angela Johnson at the time of the homicides for which she has been convicted." (*Id.*).

Dr. Hutchinson testified about how the kind of abuse and neglect in Angela's childhood could lead to impulsivity, attachment problems, rootlessness or inhibition, poor self esteem and poor social skills. (Tr. 3637, 3640, 3644). She explained that Angela's abuse lead to post-traumatic stress disorder, that petitioner was "looking for boyfriends to rescue her" (Tr. 3642) and developed an attraction to "bad boys" (Tr. 3646). As an adolescent, petitioner had an anxiety disorder, was promiscuous and never wanted to be alone. (Tr. 3650). Dr. Hutchinson described the resultant post-traumatic stress disorder, stating that : "It can be physiological distress, so your body reacts if you see or think something that's similar to it." (Tr. 3653). PTSD sufferers try to numb or otherwise escape from recurring traumas, which can include a foreshortened sense of the future and they can demonstrate paranoid hypervigilance, irritability and sleep disturbances. (Tr. 3654-55). Those who, like petitioner, suffer from childhood violence "end up with a brain chemistry that is significantly different than children who don't grow up with that." (Tr. 3669).

Ms. Johnson's impulsivity, disassociation from stressors and inability to envision a future for herself were critical for the jury to consider when contemplating her moral culpability for these crimes. However, the prosecution was quick to remind the jury that they could not do so:

> Q: And you were specifically not to ask any questions of Angela Johnson concerning her state of mind at the time she committed these five murders?
>
> A: That's correct.
>
> Q: There wasn't anything stopping you from doing that other than the fact that you were instructed not to do that; is that correct?
>
> A: I guess not, yeah.

<center>52</center>

Q: And so you are not here offering any opinion whatsoever concerning whether this mental condition of post-traumatic stress disorder that you've diagnosed her with had any effect on her thinking or behavior at the time she committed these offenses, are you, ma'am?

A: I've been very clear that I'm not saying that that contributed to it.

Q: You are not suggesting in any way that she was acting under any form of duress at the time she committed these murders?

A: I have not asserted that.

Q: You are not asserting that she acted from any form of mental defect that affected her ability to recognize that what she was doing was wrong when she participated in the murders of five people?

A: I wouldn't be – I would have been in the other phase of the trial had I been doing that, yes.

Q: So the answer to my question is you are not giving that opinion.

A: That's correct.

Q: You are not asserting that she was unable to understand what she was doing when she went out and purchased an assault weapon for Dustin Honken.

A: I'm not asserting that.

Q: You're not asserting that she did not understand what she was doing when she helped him gain entry into a house and tie up and gag victims.

                                    *     *     *

Q: I do want to make it perfectly clear, though, ma'am, you are not in any way indicating that she did not know exactly what she was doing and acted with free will at the time she participated in the murders of five people.

A: I don't know what she did in relation to those. I haven't discussed them.

Q: And, ma'am free will has a place in this society doesn't it?

A: Of course.

Q: Despite all the problems that any of us grew up with and have as experiences in our life, bottom line is we all have the ability to make choices, don't we, ma'am?

<div align="center">53</div>

A: We all have the ability to make choices within our biological, psychosocial histories.

Q: Okay. I'm just trying to make sure. Are you suggesting that somehow she did not have the ability to make choices?

A: I think she had the ability to make choices. I think some choices are different for different people. And I'm just making sure that I'm not saying that everybody can choose everything at every time.

Q: Just so we're clear, you're not asking this jury to conclude that Angela Johnson somehow suffered mental defects that affected her ability to make choices.

* * *

A: Yes, I've said that.

(Tr. 3679-82).

Dr. Cunningham was the last mental health expert to testify. The focus of his presentation was whether petitioner was on as even a playing field as others and her ability to make "choices," but he was unable to address her ability to choose at the time of the crimes. He explained that the trauma and other setbacks in petitioner's life combined to weigh against the likelihood that she would be successful in her life, about "what formed her, not about her mental state at the time of the offense." (Tr. 3796). He addressed petitioner's "genetic predisposition to psychological disorder," attention and learning difficulties and childhood onset psychological disorder. (Tr. 3853-54). He repeated the history of family abuse, dysfunction, substance abuse and other social history data discussed by the other experts and linked those factors to the Department of Justice study. (Tr. 3815-79).

The government, in closing, emphasized the failure of the defense to explain what was impacting petitioner's thoughts, decisions and reactions at the time of the crimes. The prosecutor argued:

Now, they had experts. They had a multitude of experts come in and talk about her mental state. Not one of them testified that her mental state was such at the time of these murders that because she was pregnant somehow she didn't have the ability to control her actions or that her judgment was

54

impaired or that somehow she could turn him in or walk away or save those children, not one of them.  There is not evidence of that, not a shred.

(Tr. 4028).

> There wasn't – the second thing is there wasn't any evidence – because their experts were specifically instructed not to talk to her about these crimes, there's no linking of any of this abuse to have anything to do with what her mental state was at the time of the murders, no evidence to suggest she wasn't fully capable of making that choice, no evidence to suggest she was under duress, no evidence to suggest she was somehow mentally impaired when she decided to pull that gun out in the Duncan household and condemn Lori Duncan and those girls to death.

(Tr. 4031).

> But you know what the defense did not do and they had the opportunity to do it with all those experts?  They never once put an expert up there to explain how any of this affected her state of mind whatsoever at the time she engaged in these murders.  They gave you a bunch of statistics.

(Tr. 4080).

The penalty phase instructions emphasized the limitations of the presentation by the defense.   The jury was told:

> You have heard testimony concerning Angela Johnson's mental condition. This evidence has not been offered for explaining Angela Johnson's mental state at the time of the charged killings, and you cannot consider it for that purpose.

(Doc. 589 at p. 15).

Mr. Berrigan made a decision, at some unknown point in his representation of Ms. Johnson, that he did not want Dr. Logan to have a discussion with her about her mental state at the time of the murders.  (H.Tr. 2075).  He testified that this was "consistent with our trial position and the government's efforts to get a psychiatric evaluation of Miss Johnson.  (*Id*.).  This decision was made before, and independent of, the Court's rulings on issues of disclosure and mental health experts and before the government announced it was going to seek an examination by its own expert. (*Id*., 2075-77).  This decision was based on Mr. Berrigan's experience in another case and was his knowledge that, under Rule 12.2, the government was going to have the ability to conduct an evaluation of Ms. Johnson.  (*Id*.). This decision was not based on a concern about what

55

petitioner would say about the events at the time of the crime; Mr. Berrigan testified that:

> I wasn't sure what she was going to say, to be perfectly honest. So I think that was part of the problem. We never made sufficient progress to sort of address that issue. An then we had the Honken trial. We had our plea negotiations. [¶] I guess at the end of the day I could have changed the decision and flipped back. I'm sure the Court would have allowed the government to go ahead and question her about the events at the time of the crime right up until the time of trial and present that evidence, but I never did, never did change my mind.

(*Id*., 2077-78).

Mr. Berrigan's decision was not driven by the thought that he might be able to avoid any government mental health evaluation of Ms. Johnson: he was "confident" that if he presented any mental health evidence the government would be able to present some rebuttal testimony. (*Id*., 2086).

Mr. Berrigan did not think that this decision would preclude the submission of a mitigating factor instruction regarding impaired mental state at the time of the crime, because "mental state is on a continuum" and if a mental disorder that existed before the murders and after the murders "you could draw a conclusion that she was suffering from [a mental disorder] at the time of the murders. (*Id*., 2087-88). When the Court ruled that "any mitigator that said at the time of the offense would be precluded," Mr. Berrigan did not re-weigh his decision not to present evidence of mental state at the time of the offense. (*Id*., 2088-89).

In this case, counsel decided to pursue a "mere presence" defense. Assuming for the sake of argument that such strategy was reasonable, once counsel conceded petitioner's presence at the crime scene, they left themselves no choice but to offer an explanation as to what was going on in her mind at that time. It was ineffective to limit the evaluation of petitioner in the manner chosen by trial counsel.

The prejudice to Ms. Johnson from trial counsel's decision to limit the evaluations of his experts was severe. The limitation Mr. Berrigan imposed on his experts undermined and diminished their credibility and the persuasiveness of their

56

testimony. Any mitigator based on mental state at the time of the offenses was precluded, as was a proposed mitigator based on petitioner's being under the "substantial influence" of Dustin Honken at the time of the crimes because counsel failed to develop evidence to support it. Despite trial counsel's consistent position that no evidence of what was going on in petitioner's mind at the time of the offenses was to be presented, counsel, at the last minute, violated his own rule by arguing that she "could have saved" the children but did not because "she was weak." (Tr. 4040).

### L. Trial Counsel Ineffectively Failed to Introduce Evidence in Support of Residual Doubt at Penalty Phase

The Court instructed the jury that they could consider as evidence in mitigation "any residual or lingering doubts . . . as to Angela Johnson's guilt or innocence or her role in the offenses . . . even though those doubts did not rise to the level of 'reasonable doubts.'" (Doc. 589, at 9). Defense counsel failed in their duty to investigate, discover and present evidence in support of residual doubt. If counsel had performed adequately, and presented evidence in support of residual doubt to the trial jury, there is a reasonable probability that the jury would not have returned death verdicts.

It is undisputed that trial counsel conducted no guilt phase investigation. (H.Tr. 35, 37, 173, 300, 321, 385, 405, 412, 463, 531, 560, 561, 563-65, 589, 868-69, 1515, 1526, 1536, 1595, 1939, 2116, 2189, 2352-53, 2368, 2379, 2389, 2405, 2413, 2965). There was no investigation of the jailhouse informants who testified against petitioner. (H.Tr. 35, 37, 173, 300, 321, 385, 405, 412, 463, 531, 560, 561, 563-65, 589, 868-69, 1515, 1526, 1536, 1595, 1939, 2116, 2189, 2352-53, 2368, 2379, 2389, 2405, 2413, 2965). There was no investigation to locate inmates housed in the jail at the same time Ms. Johnson allegedly made admissions to the jailhouse informants to determine whether they could testify regarding Ms. Johnson's habit and custom of not talking about her case to other inmates, whether they had ever seen her in private conversations with the informants, and whether, given the conditions of confinement, that the conversations

57

reported by the informants could have taken place. (H.Tr. 475-485, 628, 879-801, 920-23, 927, 1888-91, 2139-41, 2177).  There was no tactical reason why trial counsel would not present evidence impeaching the testimony of jailhouse informants, including inconsistent statements these informants made at grand jury proceedings or other court proceedings,  if they had such evidence.  (H.Tr. at 2949).  This type of evidence would have advanced both counsel's guilt phase strategy of creating a reasonable doubt and penalty phase strategy of creating a lingering doubt. (H.Tr. at 2950).  There was no investigation into the credibility of Christie Gaubatz, whose testimony was a key part of the prosecution's case.  Trial counsel did not present evidence to refute the prosecution theme that petitioner was more culpable than Honken, who killed the victims, because it was she, not Honken, who orchestrated the deaths.  If such evidence had existed, either in grand jury testimony or trial testimony or investigative reports, there was no tactical reason why such evidence would not have been presented and it would have been consistent with the theme of the defense, including the penalty phase strategy of creating lingering doubt. (H.Tr. at 2949-2950).  There was no effort to impeach Robert McNeese by the Court's findings regarding his credibility at the *Massiah* hearing.   There was no presentation of evidence that it was Terry DeGeus who was involved in the killing of Nicholson and the Duncans. Trial counsel had no tactical reason for not presenting evidence tending to show petitioner was innocent of the crimes.  (H.Tr. 2950).

As a result of trial counsel's ineffective preparation and presentation at both the guilt and penalty phases in this case, no juror found residual or lingering doubt as a factor in mitigation.  (Doc. 593, at 8).   Trial counsel was ineffective in failing to present the jury with evidence that could support the lingering doubt non-statutory mitigator. Minimally competent counsel would have realized that residual doubt is the most powerful mitigator in the minds of capital jurors.  It is reasonably probable that, but for trial counsel's ineffective failure to present evidence in support of lingering doubt, at least

58

one juror would have had a reservation about sentencing petitioner to death and the outcome of her penalty phase would have been different.

### 1. Trial Counsel Unreasonably Failed to Introduce the Statements of Phyllis Proscovec in Mitigation

After the disappearances of Greg Nicholson and the Duncan family, law enforcement interviewed Phyllis Proscovec, who lived in a house directly north of the Lori Duncan.  Proscovec remembered the day the Ducans disappeared quite clearly, because it was a Monday morning and she had gone over to Lori's house at approximately 7:50 a.m. to get her children up for school, her normal routine.  On that Monday morning, she knocked on Duncan's front door and got no response, even though she saw Lori's car parked out in front.  Proscovec pushed the front door open, went in and found no one home.  When she returned to her own home, Proscovec found a note between her front door and her storm window that said "Phyllis, had to leave on short notice, will be in touch shortly.  Love, Lori."  (Exh. 75; H.Tr. 2113-2115).

Ms. Proscovec told the police that she last saw Lori the Sunday evening before her disappearance.  She went to Lori's between 7:30 and 8:00 p.m. that evening and stayed for approximately one hour.  During this time, Lori commented that Greg Nicholson was not home because he had to do some business with his friends.  Ms. Proscovec returned home and, after watching the news, prepared for bed.  Before she retired, she noticed that Greg Nicholson's car had not yet returned to the Duncan home.  Shortly thereafter, Lori telephoned Proscovec, asking if she could come to her (Lori's) house.  Ms. Proscovec went to the Duncan residence, where she found Lori was crying because Greg did not want her any more.  Ms. Proscovec stayed with Lori for awhile, and then went home.  After she returned home, she noticed that Greg Nicholson's car was parked behind Lori's house.  (*Id*.)

Phyllis Proscovec died on August 24, 2002, without having been interviewed by counsel for Ms. Johnson.  (H.Tr. 2113, 2308).

59

Ms. Proscovec's account of what happened on the evening of July 25, 1993, is inconsistent with the government's theory of the case. If Ms. Proscovec's statement is believed, Ms. Johnson did not go to the door of the Duncan home in the evening hours and use an "Avon lady" ruse to so that she and Honken could enter the residence.

Under the relaxed evidentiary standard applicable to federal capital sentencing proceedings, information relevant to "mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials except that the information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Johnson*, 378 F. Supp. 2d 1051, 1058-59 (N. D. Iowa 2005) (statements by Honken to Steven Vest that implicate Ms. Johnson admissible at penalty phase under the relaxed standard of admissibility). There was no impediment to the admission of the interview of Ms. Proscovec at penalty phase to establish the non-statutory mitigator of residual doubt. The interview has indicia of reliability, in that Proscovec was an apparently unbiased witness who was interviewed soon after the events at issue and whose account of the events at issue is corroborated by physical evidence, the note left by Lori Duncan on Proscovec's front door that had been booked as evidence. (H.Tr. 2117). Yet trial counsel failed to offer – or even consider – the Proscovec interview as penalty phase evidence in mitigation. Indeed, Mr. Berrigan testified that "[b]y the time the penalty phase came around [the Proscovec interview] was probably the furthest thing from my mind." (H.Tr. 2116). There was no tactical reason for not introducing the Proscovec interview at penalty phase; Mr. Berrigan himself acknowledges that "it helps towards residual doubt." (H.Tr. 2116).

There is a reasonable probability that, but for counsel's failure to introduce evidence of Phyllis Proscovec's account of what happened on July 25, 1993, at least one

60

juror would have had a reservation about sentencing petitioner to death and the outcome of the penalty phase would have been different.

### 2. Trial Counsel Were Ineffective in Failing to Offer Dustin Honken's Letters to Impeach The Penalty Phase Testimony of Steven Vest

The prosecution was permitted to call Steven Vest at petitioner's penalty phase. Vest was housed with Dustin Honken from 1996 to 2000 in United States Penitentiary, Florence, Colorado. Honken, during the course of his relationship with Vest, made statements implicating both himself and petitioner in the crimes charged. (Tr. 2551-2625).

When hearsay statements, such as those made by Dustin Honken to Steven Vest, are admitted into evidence, the credibility of the declarant may be attacked "by any evidence which would be admissible for those purposes if declarant had testified as a witness." Federal Rule of Evidence 806. Refusal to permit impeachment of a hearsay declarant under Rule 806 may be reversible error. *See, e.g., United States v. Barrett*, 8 F. 3d 1296, 1298 (8th Cir. 1993) (error to bar defense from introducing three-year-old declarant's prior statement).

Defense counsel possessed letters written by Dustin Honken to Alfred E. Willett in which Honken declared petitioner's innocence. These letters could have been, but were not, admitted to impeach Honken's inculpatory statements about Ms. Johnson to Steven Vest.

On August 13, 2000, Honken wrote to Mr. Willett that "it is my utmost priority to ensure Ms. Johnson is safe, well represented, and going to walk away from this case. Whatever must be done to bring out the truth of her innoncense [sic], I am prepared to do so." (Exh. 10, p. 1). He continued:

> I have a potential "Silver Bullet" for Ms. Johnson's defense. It is an issue that I have personal knowledge of but I have never discussed it with anyone nor brought it out before. The government has no knowledge of it and I intend to keep it that way until trial, should Ms. Johnson's case go so far. Ms. Johnson has no knowledge of it either, but I am quite sure that the

<div align="center">61</div>

"tables will turn" on the government's case against her should this information be brought out in court properly." (*Id.*).

> I am fully prepared to cooperate as a defense witness and I will debrief any and all information on government witnesses, evidence and also myself. I am quite sure that my assistance and knowledge in this matter will be invaluable to Ms. Johnson's defense. I can inform you who is saying what, what problems they have with their credibility, and who else has some strong motives (and modus operandi for making people vanish) in this case. Hopefully my information will save you many hours of working on useless information in the "Discovery File."

This letter ended as follows: "[Angela Johnson] has done **nothing** but be a good supportive girlfriend to me and a wonderful mother to our daughter. I will await your response." (*Id.*, p. 2; emphasis in original).

On August 29, 2000, Dustin Honken again wrote to Mr. Willett, provided names of witnesses who he believed could help her, and stated as follows:

> I feel it is my responsibility to do as much as I can for [petitioner] to insure that she goes home. As I stated in my last letter to you, my only concern is that she is safe, well represented, and going to go home soon. Absolutely anything that I can do for her I will.

(Exh. 12, p. 2). On September 12, 2000, Mr. Honken again wrote to Mr. Willett. In this letter, he provided names of additional witnesses to help Ms. Johnson. (Exh. 14, p. 2). He closed his letter with the following statement:

> "The only thing that does matter to me is to help Ms. Johnson out of this and whatever I have to do, I will do. If I can be of any further assistance please contact me."

(Exh. 14, p. 2; emphasis in original).

On August 6, 2001, Mr. Honken wrote to Mr. Willett. In this letter, he complains that Willett is telling petitioner that Honken is "throwing her to the wolves" and protests that this is not true. He states:

> Nothing could be further from the truth. If you are so inclined to find out the truth then I implore you to contact Alfredo Parrish and ask him what I have tried to do for her – much to the demise of myself! I have never nor will never do anything to harm Miss Johnson in any way. And, to the contrary, I have through my attorney tried to get her out of this mess and I will continue to do so. If you would work with me instead of against me

62

> it might be possible to help Ms. Johnson. . . . In reality, I am the <u>only</u> hope
> Ms. Johnson has of going home. I know this, you know this and I assume
> she knows it also. I will do everything I can to help her but if you will not
> assist, then I doubt I can do any good. Unfortunately, I'm afraid, it is up
> to you at this point. Will you continue to try and convince her that I am the
> enemy and in the long run get her sent to prison or will you work with me
> in trying to get her home? You make the choice – I am at your service if
> you wish it so.

(Exh. 67, MCN01-001063 - 62; emphasis in original).

Dustin Honken's statements to Willett exculpated petitioner and they were known to trial counsel. Yet trial counsel did not utilize these letters to impeach Honken's alleged statements to Steven Vest. There was no valid tactical reason not to impeach the credibility of Honken, the hearsay declarant whose statements were related by Steven Vest. Trial counsel's failure to do so prejudiced petitioner. It is reasonably likely that if Honken's statements declaring petitioner's innocence would have been put before the jury, at least one juror would have voted for life.

### 3. Trial Counsel Ineffectively Failed to Impeach Steven Vest By Presenting Evidence that Honken Lied about Petitioner's Role in the Offenses

As discussed above, Steven Vest testified to statements by Dustin Honken that incriminated petitioner. Trial counsel could have attacked the credibility of Honken's statements to Vest "by any evidence which would be admissible for those purposes if declarant had testified as a witness." Federal Rule of Evidence 806. Trial counsel knew, or should have known, that Honken took a polygraph and was found to be deceptive on two questions: (1) his negative response to a question asking if he made up any part of his story about Angela's involvement in the shooting of these people and (2) his affirmative response to a question asking if he was completely truthful about Angela's involvement in the shooting of those people.

Trial counsel was ineffective in not introducing the results of the government's polygraph examination of Honken to impeach the testimony of Steven Vest. There was no tactical or strategic decision for counsel's failure to impeach, and trial counsel's

63

omission in this respect prejudiced Ms. Johnson. If trial counsel had impeached Honken by his failed polygraph examination, it is reasonably probable that at least one juror would not have voted to impose a death sentence on any count.

### M. Trial Counsel Failed to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument That Angela Johnson Was "Worse" than Honken

At the penalty phase of petitioner's trial, the prosecution elicited testimony that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson. From this evidence, the government argued that Angela Johnson was "egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling that trigger." (Tr. 4027). *See also* Tr. 4011, 4019, 4026-27 and 4079-80. Specifically, Jeffrey Honken testified that Dustin was "not at all short tempered; that he was not violent, that he had never seen his brother engage in violence "whatsoever" toward anyone; that he was not physical with people and never roughed anyone up or slapped anyone. (Tr. 323). Timothy Cutkomp testified that from the time he met Dustin Honken in the early 1990's he did not know Honken to use violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that Honken never hurt anyone until he became involved with Angela Johnson. (Tr. 830-31). Rick Held testified that, in his experience, Dustin Honken was not an aggressive or violent person. (Tr. 1038). Kathy Rick testified that Honken told her that he was not strong enough to leave petitioner because he knew what she was capable of, and offered her opinion that Honken was afraid of Ms. Johnson. (Tr. 2641-42). Rick also told the jury that she never saw Honken use violence or force toward anyone from 1989 until 1993. (Tr. 2669). Alyssa Nelson, Honken's sister, testified that she never knew her brother to engage in violence or use force before 1993. (Tr. 2672). The prosecution also elicited testimony from Alyssa Nelson about Honken's report to her that he had woken up with Angela Johnson pressing a gun to his head and that it scared him. (Tr. 2679).

64

There was readily available evidence to refute the government's portrayal of Honken as a non-violent, peaceable "bookworm" until the time he became involved with Angela Johnson. At Honken's penalty phase, the government made a proffer of evidence to rebut testimony of Alyssa Nelson that Honken had been coerced into committing a bank robbery by his father. It was proffered that Kenneth Hansen would testify that Honken approached him with a very detailed plan to rob a bank, which included shoving an old lady into a bathroom, securing the door and wearing surgical gloves and masks. (Honken Tr. 3678). The prosecutor proffered testimony by Alan Johnson that Honken had shared his bank robbery plans with him. (Honken Tr. 3678). The government also proffered Alan Johnson's testimony that Honken asked him to kill Kenneth Hansen, who was to participate in the planned bank robbery, so that they could split the money between them. (*Id.*, 3678-79). The prosecution's proffer of evidence it sought to present from Mark Johnson, Alan Johnson's, brother about the plan to kill Hansen was even more graphic. Not only did it seek to present evidence that Mark Johnson was also approached by Honken with the bank robbery plan, it sought to introduce testimony that Dustin Honken planned to kill Kenneth Hansen after the bank robbery; that Honken proposed disposing of Hansen's body by throwing it into a manure lagoon, where the chemicals would eat away the remains; and that he wanted to kill Hansen so that they would not have to split the proceeds of the bank robbery with him. (Honken Tr. 3679).

Information about Dustin Honken's penchant for planning violent criminal activity is not confined to the transcript of his trial; the discovery in this case is replete with such evidence. For example, Fred Tokars was an inmate with Honken at the United States Penitentiary in Florence, Colorado. Honken tried to befriend Tokars, a former prosecutor and judge, by telling him that if anyone found out about his former careers he would be dead and reassuring Tokars that because of membership in a powerful prison gang called the Odinists he could protect him. (Doc. 26, Exh. 16, at p. 11). Tokars described how Honken, who was "very smart and charming," was able to "manipulate[ ]"

65

this violent prison gang of 30-40 guys who "stab people and kill people and . . . sort of run the prisons." He reported that "after awhile [Honken] became very influential, and because of his skills at manipulating people and because of his brains, he was able to influence these people." (*Id.* at p. 11-12). Tokars could also testify about Honken's plan to escape from prison and kill Daniel Cobeen and Dean Donaldson, potential informants against him. (*Id.* at 19). Honken planned to intimidate Timothy Cutkomp, so he would not testify at a second trial, and had plans to kill "key witnesses" against him. (*Id.*).

Steve Ferguson, who was also housed with Honken in Florence, described Honken's "rage" and "high anger" against anyone who informed on him. (Doc. 26, Exh. 17 at p. 10). Honken offered Ferguson $10,000 to go to Iowa and kill Steven Vest, Ronald McIntosh or Fred Vickers. *(Id.*, at 11). Honken's plan was that Vest would be injected with enough heroin to kill him or a mentally unstable inmate could be goaded into attacking Vest. (*Id.*, at 12). Honken's goal was to show the informants that even if he was locked up in Colorado, they "weren't safe." *(Id.*, at 13). Ferguson describes Honken's attempts to "figure out ways to get out because he wanted to kill some more people that were involved in testifying against him or providing evidence against him, and he talked about that on numerous occasions and did some marshal [sic] arts training to further that." *(Id.*, at 14-15). Significantly, Ferguson testified that Honken "never showed any sign of remorse or regret" for the murders in Iowa and "blamed it all on the parents." Honken said that he would retaliate against others who provided information against him, by killing them and shooting their children in the face. (*Id.*, at 17).

William LeBaron, another inmate at USP Florence, told the grand jury that Honken had risen to the upper echelons of a white supremacist prison gang called the Odinists. (Doc. 26, Exh. 18 at p. 25). He also described Honken's involvement in a complex escape plan involving multiple federal inmates and an escape from the Woodbury County Jail. (*Id.*, at 14). Honken planned involvement in bank and armored truck robberies to finance his escape, which was for the purpose of killing law

66

enforcement officials and their families, Tim Cutkomp, and a police chief. (*Id.*, at 15-16). Regarding the killings in this case, Honken told LeBaron that the five individuals were not killed for revenge, but were killed so that Honken would not have to go to prison. *(Id.*, at 31).

Trial counsel also had access the grand jury testimony regarding Honken's plans to kill Angela Johnson. Honken told Mike Llorente that "maybe [Angela] shouldn't be here anymore . . . maybe he should have dealt with her back whenever he had a chance before she could testify on him, like now" and said that he was trying to decide whether or not to have Ms. Johnson "taken out" before she was arrested. (Doc. 26, Exh. 19 at p. 6). Another inmate, John Fitzgerald Swanson, told the grand jury that Honken "basically just plotted to do away with Angela Johnson as soon as he got enough money from his meth operation that he had going in his garage." (Doc. 26, Exh. 20 at p. 27).

Trial counsel had access to discovery about Michael Kluver, who told of Honken's plans to kill all the prosecutors in his case as well as Judge Bennett (H.Tr. 2159) as well as discovery indicating that Terry Bregar could testify to planned violence by Honken (*Id.*, 2967-67).

Trial counsel has admitted that he knew of the witnesses discussed above from reading the discovery. (H.Tr. 2119-20, 2159-61). Trial counsel sat through Dustin Honken's trial in part and was familiar with the government's themes at that trial. (H.Tr. 2096). Trial counsel's failure to call any of the above witnesses to refute the prosecution's argument that it was Angela Johnson, not Honken, who was the driving force behind the crimes was ineffective.[20] There was no tactical or strategic reason for

_____

[20] Not only did trial counsel fail to rebut the prosecution's portrayal of Dustin Honken, defense witnesses supported this false presentation. *See, e.g.*, Pearl Jean Johnson's testimony that Honken was polite, clean cut, very neat but aloof (Tr. 3080); Wendy Jacobson's testimony that Honken was a preppy nerd, highly intelligent, someone totally out of character for petitioner to date (Tr. 3184); Alyssa Johnson's testimony that Honken "seemed like a great individual" (Tr. 3203); Holly Dirksen's testimony that he

67

this omission; as stated by Mr. Berrigan, "[t]o the extent it didn't happen is we just missed it." (H.Tr. 2094; *see also* H. Tr. 2097-98 ("We just missed it. There was a lot going on in the penalty phase of the trial, and that's an issue that should have received substantially more time and attention pretrial than it did."); H.Tr. 2120 ("I guess you could argue that the testimony of some of these folks might have been helpful"); H.Tr. 2161 ("we were not prepared to put on evidence about Dustin's background").)

If trial counsel had effectively represented Ms. Johnson by presenting the evidence set forth above, there is a reasonable probability that the jury's penalty verdict would have been different

### N. Trial Counsel Were Ineffective in Failing to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence That Petitioner Was "Worse" Than Honken

Trial counsel were ineffective in failing to offer the prosecution's arguments at Dustin Honken's trial as party admissions (Federal Rule of Evidence 801(d)(2)) to refute the argument advanced at petitioner's trial that she solicited and encouraged the crimes by Dustin Honken and was more culpable than Honken, who was as a mere pawn under her evil sway. The arguments that would have been admissible as party admissions are as follows:

> Dustin Honken was the chemist. He was the one with the knowledge that was necessary to building a meth lab and not just some county bumpkin meth lab but a meth lab such as DEA Agent Mizell described, a super lab that produces methamphetamine of a high quality, better than 90% meth.

(Honken Tr. 3220).

> I would submit to you that among [Dustin Honken, Tim Cutkomp and Jeff Honken], clearly Dustin Honken was the organizer of this criminal activity. It is he was the chemist. It is he who had the know-how. It is he who actually put together the method of manufacturing methamphetamine. It

---

was "a gentleman, totally unlike someone my sister would ever date . . . very smart and very intelligent" (Tr. 3255); and Lou Ann Hare's testimony that Honken seemed "almost like Opie Taylor, kind of a nerd, kind of geeky" (Tr. 3701).

68

is he who invited Tim Cutkomp to Arizona. It is he who distributed drugs through Terry DeGeus and through Greg Nicholson.

(Honken Tr. 3292).

Suggested to you [by the defense] that Dustin Honken is merely a chemistry nerd. He's a smart guy. He understands chemistry. He understands organic chemistry. Not a lot of people do. But that doesn't mean he isn't also a criminal schemer and manipulator.

(Honken Tr. 3392).

However, no one in that partnership did more to organize that operation than Dustin Honken. He was the man with the know-how. He was the chemist. He was the one who recruited the other participants. He was the one who told Greg Nicholson about the plans for the future growth of the drug business.

(Honken Tr. 3404).

What kind of man after doing that [killing Greg Nicholson and the Duncan family] and having his own son born three months later can lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and a month later – you saw the video – have a happy Christmas with his family?

(Honken Tr. 3903).

This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case. We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christie Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.

We know that he purchased a handgun through his girlfriend Angela Johnson. Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there? Do you think Angela Johnson picked it out? Defendant picked it out.

(Honken Tr. 3905-06).

We also know that he thought this out long and hard. You remember the Poor Man's James Bond Book, at 1991, that was seized from the defendant's house in 1996? Remember this page from it? Remember the language on this suggesting that if you really want to do a good job in making sure that you have a more effective gag you stuff a piece of cloth in their mouth and use duct tape across it? You don't think this defendant was thinking this out far in advance on exactly how he was going to do

69

this?

> We know that he buried Greg Nicholson and the Duncan family in a remote site. This is somebody who thinks these things out in advance. Do you think after abducting these people that he started driving around looking for a possible spot, or do you think this defendant knew exactly where he was going to bury these people, had it cased out, had found a place that he knew was secluded, some woods that nobody would go to?

(Honken Tr. 3906-07).

> The defendant plans, schemes, thinks out these things long in advance.

(Honken Tr. 3908).

> Now, think back about the way this defendant thinks, they way he plans, the way he schemes. [Lori Duncan's] name was in that ring. Do you think it was accidental, do you think it was accidental that her ring was found downstairs from a dam miles away from the burial site, or do you think this defendant's thinking this out, thinking, I've got to divert the police from any chance of finding this body, so I'm going to throw her ring so that the police can find with her name in it, and I'm going to throw it in this river?

> And when did he take that ring off her finger? We know there was spiral fracture of the finger, her ring finger on her hand as testified to by Dr. Steadman. Did he rip it off her hand while she was still alive? Did he rip it off her hand when she was dead?

> Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and was still plotting to kill. He's not deterred by law enforcement. He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families. And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

> The defendant will plan an escape. You know how this defendant thinks now, don't you? You know what he's capable of. You know how intelligent he is. You know how he schemes and plans and thinks.

(Honken Tr. 3912).

> Defendant thinks more of his dog . . . than he does of people, and he has no conscience.

(Honken Tr. 3917).

There was no strategic or tactical reason for trial counsel's failure to present this

evidence. Mr. Berrigan sat through Dustin Honken's trial in part and knew the

70

government's themes at his trial.[21]  (H.Tr.  2096).  Mr. Berrigan, when asked whether he considered trying to present evidence of the admissions of the government in the Honken trial regarding Honken's dominant role in the crimes, responded as follows:

> No.  The only consideration I think that ever crossed my mind is that I remember Mr. Williams' closing argument – I'm trying to think if it was – it had to be in the penalty phase of the Honken trial where he portrayed I thought quite vividly quite a different portrait of Honken than he had presented in our case.  But I hadn't given it more than a passing thought.

(H.Tr. 2163).   Petitioner was prejudiced by trial counsel's error and omission in not introducing evidence of the prosecution's arguments at Honken's trial to refute their entirely inconsistent argument at petitioner's trial it was she – not Honken – that was the catalyst for these crimes.  There is a reasonable likelihood that the penalty phase  would not have resulted in death verdicts but for the ineffective failure to trial counsel to present the evidence set forth above.

### O.      Trial Counsel Ineffectively Failed to Offer Expert and Lay Testimony That Angela Johnson Was Under the Substantial Influence of Dustin Honken

Early in his involvement in this case, Mr. Berrigan sent a letter to Dr. Logan stating ". . . I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Angela's boyfriend and co-defendant, Dustin Honken." (Doc. 26, Exh. 10, p. 2).   Yet in testifying at the evidentiary hearing, trial counsel could not recall discussing the issue of Honken's domination of petitioner with Dr. Logan or asking him to comment on dominance and control issues in their relationship.  (H.Tr. 2111).   Trial counsel discussed the theme of domination with the prosecutors prior to trial, and identified it as an important mitigation theme.  (H. Tr. 2157-58).  The defense proposed a non-statutory mitigator based on petitioner's having been under the

---

[21]      Mr. Berrigan did not, however, read the transcript of Mr. Honken's trial. (H.Tr. 2096).

71

"substantial influence" of Dustin Honken at the time of the offenses; however, at the conclusion of the penalty phase testimony, the Court refused to submit this mitigator to the jury because the defense failed to present any evidence of Honken's substantial influence over Ms. Johnson. (Tr. 3978-80).

There was ample evidence regarding Dustin Honken's calculating nature, and his influence over, and ability to manipulate, Ms. Johnson in the discovery from the government and in trial counsel's own file. There was no tactical or strategic reason for trial counsel's failure to present evidence of this mitigating factor. (May 14, 2011 H.Tr., at 84). Petitioner's attorneys were ineffective in failing to present this evidence to the jury that convicted her and sentenced her to death.

Fred Tokars, a fellow inmate at USP Florence and a former attorney and judge, described Mr. Honken "an evil person" and said that he had "never met anyone who can be so charming and evil like that." (May 17, 2000 Grand Jury Testimony at 53).

Petitioner told Joseph Dvoskin, Ph.D., and Daniel Martell, Ph.D., that Honken portrayed himself as a big drug dealer and promised to relocate her to Arizona and free her from the abuse of Terry DeGeus. (2005 Dvoskin/Martell Interview, at 87). She was not "crazy" about Dustin Honken, but thought he was going to be her methamphetamine connection. (*Id*., at 88). She stated that Dustin Honken "was never any good for me, never any good in my life. He was such a fucking liar and I believed – I don't know why I believe anyone else. I'm trying not to be that way any more. I think because I say I'm going to do something, I do it – I have – I'm not a liar. I don't bullshit people, and I don't think that anybody is going to do that to me, but they do all the time, and then I think, "You're so fucking stupid. When will you learn? I'm stupid that way. I am better now, but I do say that all the time." (*Id*., at 89). Petitioner stated that "[Honken] was just a fucking liar (inaudible) and he was getting me in debt, and it was just fucking ridiculous. It was the worse relationship I ever had . . . Dustin mind fucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from

72

and knew the results.  With Dustin, everything that came out of his mouth was a lie."
(*Id*., at 91).  Petitioner tried to get away from Dustin Honken by moving to Des Moines
(*Id*., at 94).   She never had a real good relationship with Honken; in fact, the whole
relationship "was solely to benefit Dustin."  (*Id*.)

Petitioner told Marilyn Hutchinson, Ph.D., that their relationship "was short and
full of lies.  All he did was lie to me.  And he is such a fucking ass manipulator."
(Hutchinson Notes, at 10-11; spelling corrected).  She reported that Honken took her
credit cards and ran them up; he promised to pay them off, but never did.  She had perfect
credit until she met Honken, but he ruined it.  (*Id*., at 13).  Honken never apologized for
taking her money; he was a liar, and he never told the truth.  She did not love him; she did
not even like him.  (*Id*.).  Honken did not love her and she felt that he did not know how
to love.  (*Id*., 14-15). The more petitioner pulled away from Honken, the more he tried to
be with her.  (*Id*., at 14).  He used fear to control her, fear for her safety and for that of her
children and fear of going to jail.  (*Id*., 14-15).  Initially, petitioner thought Honken would
be a success, and she believed him when he said that he was writing a book about making
methamphetamine that would be published; she explained "He talked so much shit.  I
really believed he could succeed in these things.  Until I realized all fuckin' talk."  (*Id*.).
At the end, she was "sick of not trusting and being lied to."  (*Id*., at 16).

Petitioner's family members also described her manipulation by Dustin Honken.
In a December 2004 interview by Mary Goody, Alyssa Johnson described Honken as
trying "to overstep his boundaries" with her to play the "dad" role.  (Exh. Exh. 1,
MG005451, MG005451).  She told Ms. Goody that Honken put her mother in debt with
various credit card purchases, which caused petitioner to get more stressed out and lose
her temper more easily.  (Exh. 1, MG005452).  Alyssa said that Honken "sees Mom as
someone to manipulate.  I hate the fact that Mom and Marvea went to see him [in
Colorado]."  She said that Honken is a "bad influence" and that his contact with Marvea
should be monitored.  (Exh. 1, MG005453).  Alyssa cited Honken's efforts to take

73

custody of Marvea from petitioner's family as evidence of his using his daughter as a "pawn." She described him as "very, very smart criminally" but "not smart enough to quit ahead of time." (Exh.1, MG005453).

According to Holly Dirksen, Honken was living off petitioner, not paying bills, but at the same time helping to support Kathy Rick. (Hutchinson Notes of Interview with Holly Dirksen, at 7). She described Dustin as trying to make petitioner "feel crazy." (*Id*)

Daniel Cobeen and Timothy Cutkomp confirm that Honken ran up petitioner's credit card debt. Cobeen testified before the grand jury that petitioner had financed the cost of equipment for a methamphetamine lab. (Exh. 96, C000163). Timothy Cutkomp testified that Honken told him that petitioner got a "$5,000 cash advance" on her credit card to buy chemicals and glassware for Honken. (Exh. 96, C000197).

Petitioner was not the only one Honken used to finance his illegal activities. Honken got his brother, Jeffrey to finance the methamphetamine lab operations in Arizona (Exh. 96, C000188) and again in Mason City in 1995. (*Id.,* C000198). Honken financed his 1995 methamphetamine operations by funds obtained from his step-brother. (*Id*.). In the summer of 1995, Honken borrowed his father's credit card, ran it up to the limit of $1,400, and repaid only $200. (Exh. 95, A969-70). In 1992, when Honken was setting up the Arizona meth lab, he obtained $1,000 from a friend, Russell Miller, ostensibly to invest in Jeffrey Honken's business, and never repaid the funds. (Exh. 95, A50-52). Honken convinced his sister, Alyssa Nelson, to put money on the jail accounts of fellow inmates in 1996. (Exh. 96, C000894). He convinced his mother, who worked in a bank, to open an account for inmate Artie Dufur and to deposit checks sent to her from USP Florence into that account. (Exh. 96, C001132-33.)

A persistent theme in Honken's life was his use of women for his own benefit. During the period that Honken was involved with petitioner, he was involved with two other women, Melissa Friesenborg and Kathy Rick, with whom he had a child. Honken told Ms. Friesenborg that petitioner was "a convenience," someone he "needed." (Doc.

74

26, Exh. 2, at 5). Both Ms. Friesenborg and Ms. Rick agreed to assist Honken with his criminal activities, despite knowing about his involvement with other women. Friesenborg destroyed evidence at the behest of Honken and Cutkomp after their arrest in March 1993. (Honken Tr. 366-67). In 1996, Ms. Rick posted bond on behalf of an inmate, Dean Donaldson, because Honken told her that she would get money from Donaldson if she did; she never received this money. (Exh. 96, C001056.) Ms. Rick is also reported to have transferred $30,000 to an inmate housed with Mr. Honken. (Exh. 96, C000224-25).

Honken's manipulation of others was not limited to women. According to an offer of proof made by the prosecutor during Mr. Honken's trial, in 1985 he tried to enlist the support of three high school friends to rob the bank where his mother worked. This effort failed when he suggested that two of the friends kill the third after the robbery so they would not have to share the money. (Honken Tr. 3677-79). In 1992, Honken convinced a reluctant Timothy Cutkomp to become involved in manufacturing methamphetamine. He convinced Mr. Cutkomp to move to Arizona and used him to rent apartments, purchase equipment and make methamphetamine under his direction. (Exh. 96, C000186-88). Although Mr. Cutkomp tried to disengage from these illegal activities, Honken was able to lure him back into his scheme despite Mr. Cutkomp's receiving very little compensation for his efforts. (*Id.*, C000188-190). Honken later got Mr. Cutkomp to destroy evidence for him and to assist him in "casing" a building where he believed the government was storing chemicals seized from his house. (*Id.*, C000195, C000202). Mr. Cutkomp told the grand jury that "[Honken] kind of had a way of manipulating me to do the things he wanted," and agreed with a grand juror that Honken had a way of mesmerizing people, and was "smooth talker." (*Id.*, C000205).

Daniel Cobeen also described Honken's ability to get others involved in his schemes as follows: "He had me doing all the dirty work, so if anything came his way, it would fall on me." (Exh. 96, C000161).

While his 1996 drug case was pending, Dustin Honken solicited several people to assist him in killing witnesses, both while on release and in custody. (Exh. 95, CC00001-5). He also enlisted inmates at the Woodbury County Jail in a scheme to escape. (Exh. 95, CC00001-6).

After he was sent USP Florence, Honken again involved other inmates in his schemes. Mr. Tokars was enlisted to aid Honken's legal work by veiled threats to expose his prior history as a prosecutor and a judge to other inmates. (Exh. 96, C001220). Honken enlisted the assistance of inmate Mike Llorente and John Swanson in a complicated scheme to dupe the government into believing Honken's exculpatory statements; the plan was to have Llorente write the prosecution, saying that he knew an individual who had information on Honken. When the government responded, Llorente would lead them to Swanson. Swanson would agree to record Honken's admissions, but when Swanson was wired, Honken would instead place the blame on Timothy Cutkomp. (Exh. 96, C000133-34). Mr. Tokars was impressed with Honken's ability to manipulate a group of inmates, Aryan Brotherhood-types known as the "Dirty White Boys" and the "Odinists." Mr. Tokars described these inmates as "30 or 40 of these guys, they stab people and kill people and steal and do these things. At first [Mr. Honken] was just, you know, the befriending them, but after awhile he became very influential, and because of his skills at manipulating people and because of his brains, he was able to influence these people." (Exh. 96, C001220).

Ms. Friesenborg's assessment of Honken's impact on her is similar to Ms. Johnson's assessment of Honken. Ms. Friesenborg said that "Dustin took from me my ability to trust in relationships. Dustin was such a good liar, and at the same time he made me feel so special and so good – I can't let that happen to me again." (Doc. 26, Exh. 2, at 8). Honken's ability to make women feel "so special" is evident from his letters to Ms. Johnson in 1996. On July 1, 1996, he wrote to her,

There is no better woman than you!! When there's trouble I need not look because you are always there. I sit here and look at your picture and you're beautiful indeed. The picture can't do you justice for what comes from inside your heart. I feel unjustly rewarded for getting these feelings radiated towards me. One man could only wish to have a woman who stands by them as you do. I hope some day I can make you feel this special . . . . I will protect you to the end of my life, never fear . . . . You gave me the two greatest things a woman could ever give her man. Those things are your heart and Marvea . . . .

(Exh. 95, G1182-1184).

On December 3, 1996, Honken wrote petitioner,

I probably shouldn't be writing this letter right now because I am kinda in the dumps for a mood . . . . I hope things are going better for you and the kids . . . . One thing for sure is that my friend will definitely help you out! It's bad enough that I'm in jail in the first place but now I can't talk or see you at all! . . . . Oh I have things to make me upset enough to cry over, but I dare not think of them. You know I'm not much good at being alone. Well, this is definitely changing certain things about me. I always thought the most dangerous emotion was envy, but now I know it is self-pity. For now I must find happiness in that my friend can at least help you. I can take care of myself. A time will come when the table will turn against those who lie and try to keep me from my woman and children. I'll do my best to take care of you and build friends until them. I must go. I love you. Love, Dustin.

(Exh. 95, G1179-G1181).

During the time that Honken wrote these letters to petitioner, he was also telling a fellow inmate, Terry Bregar, that he was concerned petitioner would disclose information about him to law enforcement. (Exh. 96, C000112). Honken's letters to Ms. Johnson represent efforts to keep her under control, rather than expressions of Honken's true feelings.

A further example of Honken's efforts to control petitioner while he was in custody can be found in the taped conversations of calls he placed to petitioner from MCC Chicago in the fall of 1997. During these calls, Honken is concerned that petitioner is falling outside his sphere of influence. Ms. Johnson is having financial problems and tells Honken that she is not thinking about their life together when he gets out, but rather trying to get through each day. (Tape 9A-7746, at 6-7). She had begun seeing another man, whom said she needed, but Honken still asks her for assurance that she does not like

this man and that she is not ending her relationship with him. *(Id.*, at 5-6). There is also a call that Mr. Honken made to Alyssa Johnson, in which he tells her that his parents have been trying to reach petitioner and that he's "kind of wondering if you're mom's all right you know cause they had that grand jury stuff Monday, she's fine though huh?" (Tape 10A-7746J at 1). During the same call, he asks Alyssa for reassurance that petitioner is "not mad at me for anything is she?" *(Id.*, at 2). In a call to petitioner, just after the call to Alyssa, Honken tells her "I just love you very much and I think about you every fucking day woman, more than I ever have. More than ever. . . . you'd be sick of me if I get out cause I'd fucking be attached at the hip to you the whole fucking time." (Tape 10B-7746J at 7). Later in the same call, Honken expresses concern about petitioner's involvement with the law: Okay if you ever hear anything, if anything bad happens, if you ever – if you were to ever get arrested or anything, I hope you'd call mom immediately." He went on to request that petitioner call his mother or dad twice a week and to assure petitioner that his mother would take care of Alyssa if she were arrested. (Tape 10B-7746J at 9-10). Honken was even able to fool the staff at MCC Chicago: he was referred for treatment of anxiety, due to his legal difficulties and the "emotional disruption" he experienced when he learned that his girlfriend was involved with another man. (Exh. 95, CC00001-00006).

Additional evidence of Honken's efforts to control petitioner can be found in his correspondence after her arrest on July 29, 1993. Even as he tells others about his anger and a desire for revenge against petitioner (Exh. 96, C000134), Honken writes a letter to Ms. Johnson and her attorney, Al Willett, offering his assistance in her case. (Exhs. 10, 12 and 13). On September 23, 2000, Honken wrote to petitioner about reports that she was convinced that he intended to kill her. (Exh. 95, A001284-89). He repeatedly assured her that he still loved her, that the government was attempting to divide and conquer and that he knew she loved him. *(Id.)* He berated petitioner for not believing in him, and cast aspersions for not responding to his letters. *(Id.)* He suggests "mantras"

78

that petitioner should chant: "Dustin is not trying to put me in prison, the government is. Dustin is trying to help me out of prison, the government is not. Dustin wants me home with our daughter and Alyssa, the government wants me to rot in prison until I die, and then bury me standing up to do the rest of my time. Dustin is my lover, the government is my enemy. Etc." (Exh. 95, AA001288).

While Honken was professing his love to Ms. Johnson, he was expressing much different feelings about her to Wayne Byerly. Just after petitioner attempted suicide, Honken told Byerly "Why couldn't the bitch have just died?" (Exh. 96, C000147).

Petitioner was particularly susceptible to Dustin Honken's manipulation due to her brain impairment and her history of trauma. Trial counsel, however, failed to present any evidence to support the "substantial influence" non-statutory mitigator proposed to the Court. Trial counsel's errors and omissions in this regard were constitutionally ineffective. It is reasonably probable that, had trial counsel introduced readily available evidence of Honken's manipulation of petitioner, the jury would not have returned a death verdict.

**P.     Trial Counsel Ineffectively Failed to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and His Family and Honken's Membership in a White Supremacist Prison Organization**

As discussed at Claim One, Section M, at the penalty phase of petitioner's trial, the prosecution elicited testimony that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson. From this evidence, the

79

government argued that Angela Johnson had manipulated and encouraged Honken to commit the charged crimes.  *See* Tr. 4011, 4026-27, 4049 and 4079-80.

At Honken's trial, however, the prosecution argued that Mr. Honken in custody:

> Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and was still plotting to kill.  He's not deterred by law enforcement.  He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families.  And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

(Honken Tr. 3912).

The prosecution had good reason to believe Honken was dangerous while in custody.  On March 8, 2001 Assistant United States Attorney Patrick Reinert wrote an internal memorandum to District Security Manager Steve Badger, entitled, "Renewed Threat on AUSA and Agents."  (Exh. 48, PLSP-000005-6.)  In that memorandum, Reinert summarized previous threats made by Honken against law enforcement, specifically his plans in 1996 to kill the DEA chemist, Reinert himself, drug agents and other cooperating individuals, and noted that the Justice Department took steps at that time to ensure the safety of the AUSAs involved in the case. ( *Id.*, PLSP-000005.)   Reinert also detailed a report from a federal inmate at USP Florence who was housed with Dustin Honken.

Reinert described Honken's then-current plans as follows:

> Once Honken became convinced that he would be charged for his involvement in the murders, he approached other inmates at USP Florence and developed a plan to have those inmates travel back with him as potential witnesses at his trial.  Honken's plan was for those prisoners to escape from the county facility where Honken anticipated that they would be housed, by killing the guards.  Honken developed an elaborate plan, which included robbing a bank to obtain money and fleeing to Canada where he would obtain false identification to allow him to re-enter the country at will.  Honken told inmates that when he re-entered the country after his escape, or if he is ever released from prison, one of the first things he plans to do is murder this AUSA, along with others, including former AUSA Steve Colloton, a state narcotics agent, and a state homicide agent. . . . However, Honken has taken steps from prison to locate addresses for agents and others using the Internet.  Honken indicated he intends, upon entering this AUSA's home, to kill the children immediately and then tie up this AUSA so the AUSA could be forced to watch while Honken

80

> tortures and murders this AUSA's wife. After torturing and killing this AUSA's wife, Honken plans to kill and decapitate this AUSA and take the head with him back to Canada. Honken states his reason for removing the head from the body was to ensure that the AUSA's family never had closure and would be forever emotionally distraught due to the murder. Honken told inmates that he plans on making a bowl out of the skull of this AUSA.

(*Id.*, PLSP-000005-6.)

AUSA Reinert's memorandum also informed the District Security Manager that "[w]hile incarcerated, Honken has become involved in the Odinists movement, a network of white supremacists with ties in and out of prison. Honken is one of the leaders in the Odinists group at USP Florence." (*Id*., PLSP-000005). *See also*, *id*., PLSP-000031.

The AUSA and Justice Department took these threats seriously. AUSA Reinert wrote, "I believe he is a serious threat, not only if he escapes, but also while he is incarcerated." (*Id.*) Steps were taken after both the 1996 threat and the 2001 threat to install multiple sophisticated security measures at AUSA Reinert's home and on his car. (*Id.*, PLSP-000018.)

Through discovery, the defense was aware of Honken's threats against AUSA Reinert in 1996. Timothy Cutkomp reported Honken's expressed wish that Reinert had not returned from Korea. (Exh. 95, A803). In conversations recorded by Cutkomp, Honken expressed his frustration with AUSA Reinert. *See, e.g.*, Exh. 95, G000127 and G000178. In 1997, informant Dean Donaldson told law enforcement agents that "Patrick Reinert is definitely the prosecuting attorney that Honken said he was going to kill. (Exh. 95, A859.) Also in 1997, informant Terry Bregar reported to law enforcement that Honken wished to get out of jail for a week in order to kill Reinert and his family, and that Honken knew where Reinert lived. (Exh. 95, A1331.)

The defense was also aware, through discovery, that Honken had threatened to kill AUSAs Reinert and Colloton, and their families. Steven Vest told Agents Basler and Graham that Honken initially intended to kill the AUSAs as they walked to court but subsequently changed his plan to murder them in their homes along with their families.

<div align="center">81</div>

(Exh. 95, A1426-27.)

Honken's participation in the Odinists was also made known through discovery. *See, e.g.,* Exh. 95, R000936, detailing information from informant Ron McIntosh about a packet that Honken had made on witnesses, informants, and others who are targeted, and his use of white supremacist groups, including Odinist Church, Aryan Brotherhood, and Dirty White Boys, to disseminate the packet and carry out the mission. The government also provided in discovery a roster from the Federal Bureau of Prisons of known Odinists. (Exh. 95, A-003433-35.) Honken's mother was asked about the Odinists in her Grand Jury testimony, and she testified that she believed it to be a religious group. (Exh. 96, CC001932.) Prison informant Wayne Byerly testified that the Odinists were a religious group that met regularly in prison, that Honken was a member, and that Honken invited Byerly to attend Odinists meetings. (Exh. 96, CC000132.) Other prison informants testified that the Odinists either were a religious group made up of white supremacists, or posed as a religious group but were actually a prison gang of white supremacists. *See, e.g.*, Patrick Gibson's Grand Jury testimony (Exh. 96, CC000387); William LeBaron's Grand Jury testimony (Exh. 96, CC000713); Ron McIntosh (Exh. 96, CC000779).

The information provided in discovery came almost exclusively from jailhouse informants, with the exception of the roster of Odinists. Despite having this discovery, defense counsel never requested discovery informally or formally about whether the government actually believed the jailhouse informants, and the basis for the government's belief. Moreover, the defense never asked for discovery regarding what steps the government took to protect its personnel against such threats. Such information would have been exculpatory as to Ms. Johnson, because it would have directly contradicted the prosecutor's assertion at her penalty phase that it was Ms. Johnson, not Mr. Honken, who was the instigator of violence. The information would have demonstrated that Mr. Honken had the skill and intelligence to plan violent acts, and the means, including contacts within and without the prison, to carry them out, without the encouragement or

support from petitioner.  As such, the information was subject to disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

Defense counsel had no reason not to seek this information, and their failure to do so rendered their assistance ineffective, as can be seen by the weak use made of the information at trial.     The only use defense counsel made of this information was during the cross-examination of Steve Vest at petitioner's penalty phase.  Defense counsel asked Vest only a few questions about the Odinists:

Q. Tell the jury what is the odinists.

A. It's a religious group.

Q. Religious group.

A. Uh-huh.

Q. What kind of religion to (sic) the odinists practice?

A. It's an old-style religion like a pagan religion.

Q. Isn't it a white supremacy group posing as a religious group?

A. Well, that's what they say.

Q. Well, there aren't any African Americans in there, are there?

A.  No.

Q. And they have some really strong views about African Americans, don't they?

A. Yes.

Q. Would it be unfair to characterize the odinists as a white supremacy group?  Would that be unfair of me?

A. No.

Q. But they claim they're a religious group?

A. Yes.

Q. And they practice some – what did you say?  It was old-time religion?

A. Yeah, something like the pagans.

83

Q. Do they have odinist priests or spiritual leader?

A. Somebody does the ceremony, but he's just a regular –

Q. Just a regular old white supremacist?

A. He's a regular inmate, whatever, nobody off the street.

(Tr. 2583-2584).

A little later in his cross-examination of Vest, defense counsel asked a few more questions about the Odinists and Honken's plans of escaping, taking a woman hostage, robbing a bank, killing the hostage, and then going to Canada to train. Although trial counsel attempted to tie the Odinists to Honken's plan, he was unsuccessful.

Q. And you were going to hide out. This group of people were going to hide out for a year and train.

A. Yeah.

Q. What does that mean.

A. Artie and Dustin were going to train.

Q. Train. This kind of the white supremacist odinists group in Canada?

A. I wouldn't say that, but it's just a – I don't know. Just they were into that stuff.

Q. Yeah. Did the odinists have a branch in Canada that you know?

A. No. Not that I'm aware. I don't know.

(Tr. 2616-2617). Then, trial counsel asked Vest about the threats against law enforcement:

Q. So after the training, then the group is coming back to wreak more havoc on the criminal justice system; isn't that right?

A. I wouldn't say the group. It was just Dustin as far as I know.

Q. Okay, Dustin, what was he supposed to be doing after –

A. He was going to come back and kill everybody that testified against him.

Q. Didn't he – it was more than that. He was going to come back and torture people and torture their families; right?

84

Q. He was going to cut people's heads off and keep them in bags.

A. That's what he said.

Q. Didn't he talk about taking the skulls and making bowls out of these people?

A. Uh-huh.

Q. And the people we're talking about were prosecutors?

A. Prosecutors and FBI agents.

Q. FBI agents?

A. Yeah.

Q. He went on at some length about this too, didn't he?

A. Yes.

Q. And think this was very credible story, Mr. Vest? Pretty wild stuff, isn't it?

A. Yeah, but I do not know.

Q. Who knows?

A. Yeah.

(Tr. 2617-2618).

Imagine the impact had the defense called AUSA Reinert to testify about the actions the government took in light of Honken's threats – a federal prosecutor testifying that he found Honken's threats so credible, he and the Department of Justice instituted sophisticated security measures to thwart any potential attack by Honken; a federal prosecutor testifying that, in his opinion and the opinion of the Security Division of the Department of Justice, the Odinists were not the benign religious group Vest portrayed but a white supremacist gang with contacts in and outside the prison that were capable of helping to carry out Honken's threats. Such testimony would have completely undercut the prosecution's testimonial evidence of Honken's bookwormish nature and the

85

prosecutor's argument that but for petitioner, Honken would not have been spurred to actual violence.

Defense counsel's failure to seek discovery of the government's response to Honken's threats and the government's actual characterization of the Odinists constituted ineffective representation.   If trial counsel had effectively represented Ms. Johnson by discovering the memoranda identified above (Exh. 48, PLSP-000005-6, 000018, 000031) and by presenting the testimony of Patrick Reinert, there is a reasonable probability that at least one juror would have voted against death, particularly since petitioner's jury was told that Honken's jury did not return death verdicts for the killings of the adult victims. (Tr. 3093.)

### Q.   Trial Counsel Did Not Effectively Address Aggravating Evidence at the Merits and Penalty Phases of the Trial

At both the merits and penalty phases of her trial, the prosecution elicited testimony that petitioner behaved in a bizarre and threatening manner before and after the time of the offenses.[22]   During the testimony of Agent Michael Mittan, the prosecution introduced audio tapes and transcripts of petitioner issuing grandiose, profanity-laden plans to recover a drug debt.  (Tr. 2726).  Jeffrey Honken testified that he received a telephone call from petitioner in which she threatened that if Dustin Honken was not going to see his kids then Jeffrey Honken would not see his children either.  (Tr. 369). Daniel Cobeen testified that petitioner made a shooting type gesture at him while passing by in a car.  (Tr. 708-10).  Kathy Rick testified that petitioner confronted her when she was driving with her children, "screaming and yelling," and that she took this behavior to be a threat.  (Tr. 2637-38).  Rick also testified that petitioner once came to her house early in the morning, and screamed and banged on her door, looking for Dustin Honken, and about another occasion when her car was vandalized and the letter "A" scratched in its

_____

[22]     Petitioner contends that this evidence was not admissible in the first instance. *See* Claim One, subsection R.

86

surface. (Tr. 2638-40). Doug Book testified about "screaming, irate and out of control" voice messages left by Angela Johnson after he executed a search on Rick Summers' house and served a subpoena on Holly Dirksen. (Tr. 3613-14). Alyssa Nelson, Honken's sister, reported that Honken told her that petitioner was "angry" and "flies into rages." (Tr. 2678). She also testified that Honken told her that once he woke up with petitioner pressing a gun to his head and that this scared him. (Tr. 2679). Nelson described bizarre behavior by petitioner at Honken's sentencing hearing in 1998 when she called a female law enforcement officer a "chick with a dick." (Tr. 2682-83).

Trial counsel ineffectively failed to have their three mental health experts – Dr. Logan, Marilyn Hutchinson, Ph.D., and Mark Cunningham, Ph.D. – address the evidence described above. There is an explanation for this behavior other than that urged by the government, that petitioner was a violent woman who inspired and encouraged violence by Dustin Honken. Dr. Woods will explain at the evidentiary hearing that the behavior set forth above – profanity, extreme mood lability, grandiosity and hyperactivity – is a manifestation of petitioner's malfunctioning brain and not a matter of a personality deficit. There is a reasonable probability that, but for trial counsel's failure to address this evidence in aggravation, the balance of aggravating and mitigating factors would have tipped in petitioner's favor and she would have been sentenced to life.

### R. Trial Counsel Ineffectively Failed to Limit Future Dangerousness Evidence to Future Danger In Prison

Trial counsel ineffectively failed to limit the scope of evidence of future dangerousness in this case, to their client's severe prejudice. There was no tactical or strategic reason for not limiting future dangerousness evidence to future dangerousness while serving a sentence of life in prison without possibility of release. It is reasonably probable that, had trial counsel performed effectively and limited future dangerousness evidence to the future danger posed by petitioner while serving a sentence of life in prison without possibility of release, the jury would not have returned any death verdicts.

87

The overwhelming weight of authority is that where the only sentencing options are death or life in prison without possibility of release, evidence of future dangerousness must be limited to evidence of the danger posed by the defendant while serving a sentence of life in prison with no possibility of release. *See, e.g., United States v. Gilbert*, 120 F. Supp. 2d 147, 154-55 (D. Mass. 2000) (striking non-statutory aggravating factor of future dangerousness in its entirety because all evidence proffered by the government, including information about defendant's prior history of poisoning others and breaking and entering into the home of a former lover, "lack[ed] any substantial relevance to defendant's dangerousness in a prison setting;" *United States v. Peoples*, 74 F. Supp. 2d 930, 933 (W.D. Mo. 1999) (finding evidence of burglaries and possession of a weapon during an auto theft irrelevant to defendant's dangerousness in a federal prison); *People v. Taveras*, 424 F. Supp. 2d 446, 454 (E.D.N.Y. 2006) (excluding evidence of an out-of-custody assault on a minor to prove the non-statutory aggravating factor of future dangerousness); *United States v. Llera Plaza*, 179 F. Supp. 2d 464, 487 (E.D. Pa. 2001) ("if there is a sentencing phase, the jury will be instructed that it is to evaluate the defendants' 'future dangerousness' in the context of life imprisonment, and the government will be required to limit its sentencing phase evidence to that which is relevant to a context of life imprisonment"); *United States v. Cooper*, 91 F. Supp. 2d 90, 111-12 (D.D.C. 2000) ("The government will be permitted to introduce evidence of future dangerousness only as it pertains to any threat Cooper may present if he is sentenced to life imprisonment without the possibility of release."); *United States v. Rodriguez*, 2006 WL 487117, *5 (D.N.D. 2006) ("the government will be limited to presenting evidence relating to the Defendant's future dangerousness in the context of life imprisonment"); *United States v. Flores,* 63 F. 3d 1342, 1368-69 (5th Cir. 1999), *reh'g denied sub nom United States v. Garza*, 77 F. 3d 481, *cert. denied*, 519 U.S. 825 (1996) (rejecting claim of improper evidence of future dangerousness because the government focused its arguments on the danger the defendant would pose while in prison; in dicta, stating that the government's future dangerousness

88

evidence should be restricted to defendant's danger while in prison in any case where there is little likelihood that a defendant would ever be released); *United States v. O'Reilly*, 545 F. Supp. 2d 630, 638-39 (E.D. Mich. 2008) ("The Notice of Intent does not include any evidence related to O'Reilly's alleged dangerousness in prison . . . the Government may not introduce 'future dangerousness' evidence if O'Reilly is convicted on count two and not count three; 'future dangerousness' evidence would be irrelevant on a count two conviction because the jury could only sentence O'Reilly to life in prison or the death penalty.").

If trial counsel had performed effectively, the government would not have been permitted to introduce a substantial amount of inadmissible, prejudicial evidence at petitioner's trial. This evidence is set forth below:

• Jeff Honken's testimony that during his brother's sentencing in 1998, petitioner called him and "yelled over the phone very loudly that if Dustin wasn't going to be able to see his kids she was going to make sure we weren't going to be able to see ours." Tr. 369.[23]

• Kathy Rick's testimony about Ms. Johnson following her in her car, banging on the car window, and yelling and screaming at her and her three children. (Tr. 2636-37). Rick's testimony that after this confrontation, she drove to Dustin Honken's mother's house, and that his mother told her that Dustin called and said that Angie may be on her way to the house, that Angie may have a gun, and that they needed to leave. (Tr. 2636-37). Rick's testimony that Angela Johnson came to her house at five or six in the morning, banged on the door, screaming to get in; and that Dustin Honken advised her to call the police. (Tr. 2638-39). Rick's testimony that her car was vandalized in early or

---

[23] This evidence was admitted as a result of trial counsel's failure to file a motion in limine to exclude the testimony. Tr. 258-59.

89

mid-1999, with four slashed tires, damage to the inside and outside of the car, and scratching on the hood that "could resemble an A." (Tr. 2639-40).

- Doug Book's testimony that Angela left a screaming, threatening message on his home answering machine after the execution of a search warrant at Rick Summers' house in 1998 (Tr. 3613) and his testimony about a screaming, irate and out of control message on his home answering machine that petitioner left after he served a subpoena on Holly Johnson (Tr. 3614-14).

- The testimony by Alyssa Nelson that petitioner was "making implications towards the prosecutor at [the] time [of Dustin Honken's sentencing], something [like] Angie's coming for you". (Tr. 2682). Ms. Nelson's testimony that at Dustin Honken's sentencing, petitioner told a female law enforcement officer "Well, you're just a chick with a dick anyway." (Tr. 2682-83). The testimony of Alyssa Nelson that petitioner started taking pictures of people sitting on the courthouse steps during her brother's sentencing. (Tr. 2680). Ms. Nelson's testimony about Honken's statements to her about petitioner's "horrible temper" and "rages," and petitioner's having woken him by pointing a gun to his head. (Tr. 2678-79).

- Jennifer Rinden's testimony that during Dustin Honken's sentencing hearing, petitioner uttered profanities and said something to the effect of 'you'll be sorry." (Tr. 2697-98).

- The testimony of Michael Mittan, and related tape recordings and transcripts, regarding petitioner wanting to "put a world of hurt" on someone (Tr. 2721); using duct tape to tie people up (Tr. 2728); instructing the undercover operatives to "do whatever it takes" to get money from Jimmy Rodriguez and, if he can't produce the money to bring him to her (Tr. 2736); petitioner's having smuggled or attempting to smuggle methamphetamine into the federal correctional facility in which Honken was housed in Colorado (Tr. 2739); and her desire to be a "hit woman" for the Mafia (2740).

90

Trial counsel's failure to properly limit the scope of future dangerousness evidence was devastating to petitioner. It allowed the prosecution to argue as follows:

> Let's talk about future dangerousness. At Honken's sentencing, you remember you heard testimony from Honken's sister and then also from this clerk about her threatening law enforcement officers in this very courtroom at Honken's sentencing. This is a woman who, after Honken is sentenced hires what she believes to be a couple of thugs to collect drug debts in whatever manner was necessary.
>
> Now, that was a unique opportunity for you to see what this woman was like. Remember that videotape? Remember her in that hotel room? This is a woman, number one, who was in control. She was in control. She was hiring these people to go out and use violence.
>
> Number two, she was violent. She had no problem, no qualms with talking about violence. Remember her talking about that young girl that was less than 18 years old that she had to put sin her place? Remember her talking about that, saying something to the effect that that's pleasure and pleasure isn't profit? And ths is a woman who was willing to haves these two guys go out and kidnap Jimmy Rodriguez and bring him to her.
>
> Now, ask yourself when you watch that woman on that videotape knowing what you do about her, knowing what you know about what she's done in the past and what she was capable of doing, do you have any doubt in your mind if they would have brought Jimmy Rodriguez to her what would have happened to him? Any doubt in your mind what she would have done with that duct tape she had?

(Tr. 4018-19). In its final closing argument, the prosecution continued this theme:

> Defense has talked to you about lack of future danger in this case, and, you know, the best predictor of future behavior is past behavior. So just look at this case and think about the past behavior this defendant has engaged in. [¶] She has a history of violence.

(Tr. 4082).

### S. Trial Counsel Ineffectively Failed to Object to Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun

At penalty phase, Kathy Rick testified about Angela Johnson following her in a car from Dustin Honken's residence. Rick pulled over and Ms. Johnson got out of the car and banged on the windows of Rick's car. When Rick rolled a window down, Ms. Johnson yelled and screamed at her. (H.Tr. 2636-37). Rick left the scene of this confrontation and drove to Dustin Honken's mother's house. She testified, without

91

objection, that when she arrived, his mother told her that Dustin had called and said that Angie may be on her way to the house, that Angie may have a gun, and that they needed to leave. (*Id.*, at 2637).

Even under the relaxed evidentiary standard applicable to federal capital sentencing proceedings, hearsay upon hearsay is not admissible. Trial counsel unreasonably failed to object to testimony by Rick that Dustin's mother said that Dustin had called her and indicated Angie may be on the way there and may have a gun and that they needed to leave as a result.

### T. Trial Counsel Failed to Effectively Cross-Examine Wendy Jensen

Wendy Jensen, Terry DeGeus' ex-wife, testified that they met in 1978, were married for seven years, and had one child, Ashley. (Tr. 518). DeGeus supported his family by working for his father, driving a semi and working at Holland Construction. (*Id*., at 519). When they divorced in 1990, it was because DeGeus had begun a relationship with Angela Johnson and she wanted them to get a divorce. (*Id.*). Their child had a good relationship with her father and spent every weekend with him. (*Id*., 520). Ashley was very upset that DeGeus did not come home on Friday, November 5, 1993 and she told her mother that her father had taken her to her grandparents house, gone to see Angie and never came back. (*Id*., at 522).

On cross-examination, Ms. Jensen denied knowing that Terry DeGeus was involved with Dustin Honken (*Id*., 523), and denied telling law enforcement that DeGeus and Honken were involved in drug deals together (*Id*., at 524). She was asked whether, after her divorce, she sent petitioner a card, thanking her for involvement with DeGeus and responded as follows: "I don't believe I ever sent it. I think I told people I thought about it." (*Id*., at 525). She was asked whether she told people that, after her divorce, she got as far away from DeGeus as she could and responded that "[a]fter divorce people are usually a little bitter at first, so I may have said that, yes." (*Id*.)

<div align="center">92</div>

Trial counsel's perfunctory cross-examination of Wendy Jensen was ineffective. Discovery provided by the prosecution contains information that a competent attorney would have utilized in questioning Ms. Jensen. Specifically, on April 8, 1997, Jensen told Special Agent VanDyke and Deputy Dan Smith of the Hancock County Sheriff's Office that DeGeus was "no wimp" and had "taken on five cops at one time and had won." (Exh. 95, Bates No. R000655-56). She admitted that one time DeGeus threatened to kill her and that this happened the second Christmas they were married, when DeGeus got drunk and threatened to kill her with a shotgun and then kill himself. (*Id.*, at 656-57). Ms. Jensen also admitted that she sent petitioner a card after she and DeGeus divorced, thanking her for her involvement with her husband and telling her that it was the best thing that had ever happened to her. (*Id.,* at 657). She told law enforcement, a full seven years after she divorced DeGeus, when DeGeus left her, she tried to get as far away from him as she could. (*Id.*). Despite the readily available evidence impeaching Ms. Jensen's testimony and showing DeGeus' violent nature, this information was not utilized by trial counsel and Jensen's misleading, inaccurate testimony went unchallenged.

### U. Trial Counsel Were Ineffective in Failing to Object to Kyla Davis's Testimony That Petitioner Tried to Find Out Where She Lived and What Car She Drove

At penalty phase, Kyla Davis, a dispatcher with the Benson County Sheriff's Office, testified that she reprimanded Angela Johnson for not correctly wearing her jail clothes. (H.Tr. 2776-77). Ms. Johnson's response was to tell her that "I'll find out who you are; you're dead." (*Id.,* at 2777). Ms. Davis was shocked and took this as a serious threat. (*Id.,* at 2778). The prosecutor asked Ms. Davis whether she was aware that "after that occurrence any steps were made by anybody to find out who you were or where you went?" (*Id.*). Ms. Davis' response was: "I later found out that they were. I didn't know at the time, but I found out later that she did try to find out who I was and what I drove and where I lived." (*Id.*).

93

Trial counsel was ineffective in failing to object to Kyla Davis' testimony about the alleged steps that were taken by Ms. Johnson to find out who she was, what she drove and where she lived. There was no foundation for this testimony; even under the relaxed evidentiary standard at penalty phase, hearsay upon hearsay upon hearsay is not admissible.[24]

### V.    Trial Counsel Failed to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation

Angela Johnson clearly and unequivocally informed her lawyers that she wanted to plead guilty. *See, e.g.,* Exh. 67 (Bates MCN02–002750-53); Exh. 67 (Bates MCN03-002970). Her desire to plead guilty was conveyed to the prosecution in this case (Exh. 48 (PLSP 118-121); Exh. 48 (PLSP 118-121)) and culminated in an offer to plead guilty and be sentenced to life in prison without possibility of release (Exh. 67 (MCN05-005546)). Trial counsel was aware that this evidence was of value at penalty phase. *See* H.Tr. 1648-49; Exh. 53 (RS-12-00822) (Dean Stowers' notes of "Issues to Work Up" includes "evidence of plea offer or negotiations – gov't offer of life, deft offer of life, gov't willingness to do life for Honken").[25] In fact, the prosecutor himself suggested that "any guilty plea if somehow the deal fell through would be a factor in mitigation. (H. Tr.

---

[24]    It appears that the source of this information was Robert McNeese, who told Detective Wright that petitioner was trying to learn the dispatcher's name and what kind of car she drove – but not where she lived. *United States v. Johnson,* 196 F. Supp. 2d 795, 816 (N.D. Iowa 2002). It is unclear whether Detective Wright gave this information to Ms. Davis or whether she learned about it in some other fashion. What is clear is that, in the context of the *Massiah* litigation, this Court made findings that McNeese's testimony was not credible. *See* Section H, Subsection 1..

[25]    There is ample authority for the proposition that offers to plead guilty are appropriate evidence in mitigating. *See, e.g., United States v. Rodriguez*, 581 F. 3d 775, 800 (8th Cir. 2009) (district court admitted Rodriguez' offer to plead guilty, in return for a life sentence, as a proposed mitigating factor showing acceptance of responsibility); *United States v. Fell*, 372 F. Supp. 2d 773, 785 (D. Vt. 2005) (willingness to enter into a plea of guilty admitted as mitigating evidence of Fell's state of mind that should be presented to the penalty jury).

94

2227).  Yet trial counsel failed to offer, as evidence in mitigation, Ms. Johnson's willingness to plead guilty.

Ms. Johnson was prepared to admit her role in the offenses, take responsibility for her actions, accept a sentence of life without the possibility of release, and spare all parties the anguish of a trial.  Yet her attorneys failed to present this mitigation to the jury.  Had trial counsel presented evidence that Ms. Johnson had offered to plead guilty, to take responsibility for her actions and to accept a sentence of life in prison without the possibility of release, "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of the trial.  *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

### W.      Trial Counsel Ineffectively Failed to Present Evidence of Remorse Through Expert Testimony

Trial counsel knew that remorse is a very significant mitigating factor, and lack of remorse is an equally significant aggravating factor.  (May 14, 2011 H. Tr., at 72).  He has testified that there would have been no tactical reason for not presenting available evidence that Ms. Johnson was remorseful for the crimes charged against her. (*Id*.)   There was evidence of petitioner's remorse in the discovery provided by the government, but trial counsel ineffectively failed to present this evidence to the jury.

During an April 23, 2005, audio taped interview of Angela Johnson by Joseph Dvoskin, Ph.D., and Daniel Martell, Ph.D., petitioner was asked the following questions and gave the following answers:

> JD:    I have to think about this question for a second.  I'm going to ask Dr. Martell to tell me if you think it's (inaudible).  I don't want to violate the judge's order.  You've been talking quite a bit about your strong feelings about children.
>
> A:     Uh-huh.
>
> JD:    Now, I don't want to ask – I don't want you to tell me what happened or what you did or what anybody else did over the course of the events that you're charged with.
>
> A:     Uh-huh.

JD: I want to ask you how you feel about the fact that children were killed?

A: I feel terrible about it.

DM I wouldn't pursue much deeper than that.

JD: Go ahead and tell me about that.

A: I think children shouldn't ever be a victim of any kind of violence or harm – I never spanked either of my kids – I just don't like to see abuse – children on the street abused by their caretaker. I mean, I will verbally confront someone –

JD: Okay.

A: - if I think it's necessary, and then – I worry that (inaudible) – I don't know.

JD: So you believe – you believe that it's wrong to hurt kids?

A: Absolutely.

JD: Have you ever not believed that?

A: No.

JD: During the time that you had your kids?

A: Uh-huh.

JD: Do you think you could have become, for example, angry about that – you would have hurt them or was that just not in you?

A: No. I would never hurt a child.

JD: So if – do you lose your temper sometimes?

A: Yeah.

JD: If you ever lost your temper with your kids –

A: I've never hit either of my two kids.

JD: Okay, you seem pretty certain about that?

A: Oh, I know I haven't.

JD: No, not that you haven't but that you wouldn't have.

A: Huh-uh.

JD: And that's cause you know it's wrong?

96

A:      Yeah, kids are innocent.  Just because you're bigger and stronger than them and can inflict pain on them, that is not what I think of as a way to get them to listen or obey you, you know, I mean you look at little kids, and they think "Okay, that person can spank me or cause me pain, so I better do what they say."  No, I wouldn't want a child to obey me like that.  I want them to do good because they're good kids and do good things.  I would never inflict pain on a child to get them to obey me or spank them because they did something wrong.  I just don't think that's a good way to teach a child.  I'm bigger than you and I can hurt you and don't do that again.

JD:     Okay.

A:      I can't stand that.  I don't like it.

(Exhibit 1-MG004343).

Trial counsel reviewed the Dvoskin/Martell interview of his client and provided that interview to his experts, yet he did not consider presenting evidence from experts as to Ms. Johnson's feelings about the fact that children were killed in this case.  (H.Tr. at 2955).  Nor did trial counsel, after reviewing the Martell/Dvoskin interview, consider requesting that his experts ask petitioner how she felt about the fact that children were killed in that case; he admitted that he did not think about this and that there would have been no tactical reason not to have his experts ask such a question, given petitioner's answers to the prosecution experts.  (*Id*., at 2956).  He explained his failure to do so as follows:

> I think by the time that we took up the issue of remorse in the instructions I'd completely forgotten about that whole interview. . . .  That was long gone in my mind. . . . But looking at it now, that would have been evidence of remorse that could have been and should have been presented."

(*Id*., at 2957).   Trial counsel acknowledged that such evidence might have backfired, but stated that "I don't want to pretend I weighed [the possibility of the evidence backfiring]."  (*Id*., at 2959).  He explained:

> Maybe if I had weighed it,  I don't know what decision – you know, I do think it's fair to say that if the Court's questioning what the evidence of remorse is maybe I should be thinking a little harder about, boy, I wish I had remembered that; maybe I could have considered putting it in.  That wasn't something that entered my mind.  But I understand your point.

(*Id.*).

97

## X. Trial Counsel Ineffectively Failed to Elicit Evidence of the Effect of Petitioner's Execution on Her Family Members

Trial counsel called ten family members at the penalty phase of this case: Pearl Jean Johnson (Tr. 2966-3089); James Jeffrey Johnson (Tr. 3095-3143); Wendy Jacobson (Tr. 3144-86); Arlyn Johnson (Tr. 3187-3213); Holly Dirksen (Tr. 3244-79); Jamie Hayes (Tr. 3363-97); Marvea Johnson Honken (Tr. 3398-3421); Shelley Johnson (Tr. 3422-33); James Jeffrey Johnson, Jr. (Tr. 3434-68); and Alyssa Johnson (Tr. 3904-27). Not one of these ten witnesses were asked to describe to the jury how they would be affected if Angel Johnson were executed.

Federal capital juries have received evidence and listened to testimony about the impact the defendant's execution would have on them and other family and friends in numerous cases.[26] Mr. Berrigan recognized that the execution of a parent is devastating to a child. (H.Tr. 2213-14). Yet, trial counsel failed to elicit this very powerful evidence from any of petitioner's family members during their penalty phase testimony.

Trial counsel provided deficient performance by failing to present evidence of the effect of petitioner's execution upon her family members. There was no strategic or tactical reason for failing to present such evidence. If trial counsel had presented such

---

[26]     *See, e.g., United States v. Ramon Molina and John McCullah*, (CR 1:92-032-S E.D. Oka); *United States v. Anthony Walker and Walter Diaz*, (CR No. 94-328 N.D.N.Y); *United States v. Dennis Moore* (CR No. 94-00194-01-12-CR-W-9 WD. Mo.); *United States v. Phouk Nguyen* (CR No. 94-10128-01 D. Ks.); *United States v. Dean Anthony Beckford*, (CR No. 3:96-66 E.D. Pa.); *United States v. Rashi Jones* (97 CR 129 E.D. Va.); *United States v. Plutarco Tello* (CR No. 98-00311-01/05-CR-W-2 W.D. Mo.); *United States v. Xavier Lightfoot* (No. 00-CR-395 W.D. Mo.); *United States v. Carl Haskell* (No. 00-CR-395 W.D. Mo.); *United States v. Williams Sablan* (No. 00-CR-531 D. Co.); *United States v. Robert and Michael Ostrander* (CR No. 01-M-639 W.D. Mich.); *United States v. Luis Gonzales-Lauzan* (CR No. 02-20572 S.D. Fl.); *United States v. Heraldo Medina Villegas and Lorenzo Catalan Ramon* (CR No. 3:02-117 D. Pr.); *United States v. Shawn Arnette Breeden*, (CR No. 03-13 W.D. Va.); *United States v. Brent Simmons* (CR No. 5-04-00014 W.D. Va.); *United States v. Ishmael Cisneros and Oscar Antonio Grande* (CR No. 04-283 E.D. Va.); and *United States v. Kenneth McGriff* (CR No. 04-966 E.D.N.Y.).

98

evidence, there is a reasonable probability that the jury would not have sentenced petitioner to death on any counts.

**Y.      Trial Counsel Ineffectively Delayed Hiring Dr. Gelbort, Failed to Follow-Up on His Recommendations, Failed to Instruct Him to Conduct a More Thorough Battery of Neuropsychological Tests, Failed to Retain Another Neuropsychologist When Gelbort Inexplicably Refused to Testify, Failed to Incorporate His Helpful Findings and Diagnosis Into the Testimony of the Experts Who Did Testify and Failed to Conduct Additional Neuropsychological and Neuroimaging Testing of Petitioner**

Mr. Berrigan testified that the first step in a capital case is neuropsychological testing for brain impairment, followed by an MRI or PET scan or other diagnostic tests. (H.Tr., at 2980-2981).  Dr. Logan recommended neuroimaging and neuropsychological testing as early as February 5, 2001, when he wrote to Mr. Berrigan that "[a] psychiatric evaluation of Ms. Johnson would involve the following procedures . . . .IV.  Coordination with psychologist to obtain approval for appropriate tests including neuropsychological tests if indicated.  V.  Coordination with other medical specialties to obtain indicated physical, laboratory and x-ray examinations such as EEG, MRI, CT scan, PET scan." (Exhibit 1, MG004228-4233).  On December 7, 2001, mitigation specialist Mary Goody alerted  to the need for neuropsychological testing of Ms. Johnson.  (H.Tr. 104).  Mr. Berrigan noted, on May 29, 2002, that he needed an "ex parte motion on [neuropsychologist] Dr. Gelbort – ASAP!  Al to send him a letter!!" (Exh. 67, MCN02-002025).  Yet later in 2002, Mr. Berrigan responded to Goody's offer to contact Dr. Gelbort by instructing her not to "sign [him] up yet."  (H.Tr., 151).

On October 23, 2002, Mr. Berrigan contacted Dr. Gelbort and obtained a promise that he would evaluate petitioner when funds were acquired for this purpose.  (H.Tr. 151-52).[27]  On September 1, 2004, Berrigan's notes include "[t]alk to Michael Gelbort about evaluation, w/o talking to AJ about." (Exh. 67).   After the jury in Dustin Honken's case

---

[27]      Mr. Berrigan did not obtain funding for Dr. Gelbort until February 4, 2005. (Exh. 8,  CF-0006400).

returned death verdicts, Mr. Berrigan wrote Mary Goody that "I've been holding off on getting Michael Gelbort involved, hoping that if Dustin got life, we'd have a good chance to plead Angela's case.  That strategy seems pretty naive now."  (Exh. 67, MCN-04-004224).

Despite trial counsel's early recognition of the need for a neuropsychological examination of Ms. Johnson, Dr. Gelbort did not see petitioner until January 24, 2005.  (Exh. 8, CF-000865).  Mr. Berrigan admitted that this was "pretty late" into the case.  (H.Tr. 2183).

Mitigation specialist Mary Goody spoke to Dr. Gelbort on February 3, 2005, shortly after he concluded his testing.  According to her notes, Dr. Gelbort told her that Ms. Johnson "had some memory disturbance;" that she had an 18-point differential spread between her verbal and performance IQ, which is statistically significant and indicates that one hemisphere of the brain had damage and the other does not;[28] that she has "difficulty seeing consequences for her actions;" that "her intuitive reasoning is mildly impaired;" "that her brain has holes in it, . . . like cheese, Swiss cheese, has holes in it, so there are areas of her brain that are not working properly and just, you know, they could be dead areas of her brain;" that "[i]n . . . the categories test, her problem solving was more impaired on intuitive but better on rote;" that "[s]he has bad judgment and not terribly well thought . . . in intuitive communication and in personal communication and in relations with other people, her dealings with other people;"  that "she's bad on nuances and cannot apply long-term logical thinking;" that "[h]er insight is not great;" that "she really tried hard on the tests," but "would rush through things sometimes which would cause her to become . . . unravelled;" that "the diagnosis he would give would be cognitive disorder NOS;" that "with meth all her symptoms get worse;" that "she had

_____

[28]     Mr. Berrigan also understood that the difference between petitioner's verbal and performance IQ scores was significant because it supported a diagnosis of mild neurological impairment.  (H.Tr. 2983).

100

Swiss cheese before the meth and the meth made it worse;" that [a] pharmacology consultation would be useful to touch on how it affects her brain, the meth;" and that "she's one that shows a positive finding on a PET scan if there's no downside to it."and translates into petitioner being really impaired. (H.Tr. 188-92).

Dr. Gelbort found petitioner to be mildly impaired. (H.Tr. 186-87). In the context of neuropsychological testing, mild impairment does not mean insignificant impairment. (H.Tr. 186-88; 2982-2983). Mild impairment is not insignificant. (H.Tr. 188).[29]

Although Dr. Gelbort subsequently told Ms. Goody that he did not want to testify because "there's nothing huge or useful, nothing useful, too much crap," clearly Dr. Gelbort's own preliminary test results called for a fuller neuropsychological and neuroimaging work-up of the case as Ms. Goody herself acknowledged. (H.Tr. 194-97).

Ms. Goody testified that Dr. Gelbort's findings indicated the need to call in other experts. (H.Tr., 189). She talked to Mr. Berrigan about neuroimaging, but she did not recommend that neuroimaging or other testing be done. (*Id*., 193). After her discussions with Mr. Berrigan about Dr. Gelbort's testing, Ms. Goody e-mailed Dr. Gelbort asking him to write a brief report of his findings. (HT 194). If Dr. Gelbort prepared a report, Ms. Goody has never seen it. (*Id*.).

Ms. Goody testified that she did not know the specific tests that Dr. Gelbort had administered to petitioner. As far as she knew, he may have only performed a preliminary battery of tests; if this was the case, additional neuropsychological testing was necessary. (H.Tr. 193-94). Mr. Berrigan also understood that Dr. Gelbort did a preliminary

---

[29]    At the time Dr. Gelbort tested Ms. Johnson and talked to Ms. Goody about the test results, he had not seen any materials about petitioner or this case.    Ms. Goody testified that it was not until April of 2005 that she learned trial counsel had not provided any case materials to Dr. Gelbort. (H.Tr. 138). Mr. Berrigan testified that he delegated the task of sending materials to Dr. Gelbort, setting up his interview of petitioner, and finding the results of his testing to Ms. Goody, because she had previous experience with Dr. Gelbort and he did not. (*Id*., at 2981-2982). Ms. Goody had worked with Dr. Gelbort once before petitioner's case. (H. Tr. 285).

101

screening battery of tests; he spent a couple of hours with Ms. Johnson and left. (H.Tr. 2984-2085). He cannot recall why he did not ask for a more thorough neuropsychological testing given Dr. Gelbort's preliminary testing results; he does not believe that Dr. Gelbort was unwilling to follow-up, but they never asked him to follow-up. (*Id.*, 2985).

From February 3, 2005 until May 12, 2005 Ms. Goody had no contact with Dr. Gelbort. When she spoke to him on May 12th, Ms. Johnson's trial had already started. (*Id.*, at 195). Dr. Gelbort told her that he did not want to testify; that there was nothing "huge" or useful in his findings; and that he did not think it was a good decision to call him. (H.Tr. 194, 284). Ms. Goody did not understand what was going on with Dr. Gelbort; his demeanor was curt, he did not want to talk to her and had avoided her for some time before they spoke. (H.Tr. 196).

Ms. Goody told Mr. Berrigan about her conversation with Dr. Gelbort, and her best recollection is that Mr. Berrigan told her to "just forget it." (H.Tr. 196, 286-87). Mr. Berrigan does not recall either Ms. Goody telling him that Dr. Gelbort did not want to testify or that Dr. Gelbort was unavailable.[30] (H.Tr., 2981-2984, 3033).

Ms. Goody never made a strategic decision, based on what Dr. Gelbort reported, that there was "no issue here." (H.Tr. 196). On the contrary, she believed that his work indicated petitioner had cognitive problems. (*Id.*). One strategy at that point would have been to hire a new expert, but she believes that Mr. Berrigan felt they could not get another expert at that late date, even though they did not have a neuropsychologist to testify. (H.Tr. 196-97). Ms. Goody believes that she and Berrigan also talked about providing Dr. Gelbort's data to another expert for evaluation, but because he had never written a report there were difficulties with that. (*Id.*, at 197). According to Ms. Goody,

---

[30]      Mr. Berrigan testified that there would have been no reason not to subpoena Dr. Gelbort ; the fact that he did not want to testify would not, in and of itself, be determinative of whether he did testify. (*Id.*, at 2984).

"this issue just got lost" given "the huge crush of things that were trying to be addressed and done at this time" (H.Tr. 197).

Mr. Berrigan testified that he decided not to call Dr. Gelbort because "in light of the lack of supporting evidence I didn't think that finding was sufficient to warrant introducing him as a witness." (H.Tr., at 2977-2978). He did not specifically recall Ms. Goody telling him that Dr. Gelbort described petitioner's brain like Swiss cheese before meth and that the meth made it worse, but acknowledged she may have said this. (H.Tr., at 2983). This testimony would have been very helpful and there would have been no tactical reason not to put on such evidence. (*Id.*). He also testified that, from the standpoint of mitigation, brain impairment is a more favorable diagnosis than non-brain based disorder such as depression or post-traumatic stress disorder because it is more objective. (*Id.*, at 2980).

Mr. Berrigan does not know whether Dr. Gelbort's test results were given to Dr. Hutchinson, Dr. Cunningham and Dr. Logan. (*Id.*, at 2981). He does not know "why we wouldn't have at least given [Dr. Gelbort's results] to them. They could have determined themselves whether it might have been helpful." (*Id.*). There would have been no tactical reason for not providing Dr. Gelbort's findings to the experts who testified. (*Id.*, at 2985). If the findings were not provided, it was a timing issue, because Dr. Gelbort's evaluation came late in the process. (*Id.*, at 2981).

Mr. Berrigan testified that there was no tactical reason for not administering a full battery of neuropsychological tests in this case, nor was there a tactical reason for not presenting the testimony of a neuropsychologist at Ms. Johnson's trial. (*Id.*, 2984-85). He believes that the mental health issues in this case were not developed to the degree that they could have or should have been. (*Id.*, at 2997-2998). He explained:

> The thing with Gelbort haunts me a little bit even though at the time I – I knew, you know, what his diagnosis was. I just didn't put it in the picture of a mitigation case. And there may have been problems with him coming to trial. I don't frankly remember. Mary probably does. But whatever they were, it's nothing we couldn't have gotten around. The judge would have approved

103

additional funds I think if we needed somebody else or needed more money for Gelbort. I think we could have gotten the money. We didn't – we didn't do it and that was solely my responsibility. That's not Al or Dean.

(*Id.*, at 2998).

Trial counsel's failure to present the findings of Dr. Gelbort to the jury that convicted Ms. Johnson and sentenced her to death, to provide the results of his testing to Drs. Logan, Hutchinson and Cunningham, and to conduct additional neuropsychological testing was ineffective. Counsel had no strategic reason for failing to obtain and introduce this evidence. Counsel's omissions prejudiced petitioner. Myla Young, Ph.D. who administered a complete battery of neuropsychological tests, reports as follows:

> Although her abilities on several tests of neuropsychological functioning were in the average range, [petitioner] demonstrates some level of impairment across all brain functions. . . . sensory motor, attention, memory, psychomotor and executive functioning are all significantly impaired. Diffuse brain impairment which affects all brain regions is indicated, but with the greatest impairment in the pre-frontal cortex, temporal cortex, and limbic cortex structures, as well as significant impairments in all connecting systes among these brain structures. Although both right and left brain hemisphere dysfunction is indicated, the most severe impairment for Angela Johnson is for the left brain hemisphere. Neurological disorder is indicated and temporal lobe seizure activity is a distinct possibility.

The significance of the Dr. Young's testing and the MRI, PT and EE tests administered to Ms. Johnson is explained by Dr. Woods:

> Current neuroimaging reinforces Dr. Young's finding of Ms. Johnson's multiple cognitive impairments. Ms. Johnson underwent Magnetic Resonance Imaging (MRI) and an electroencephalographic (EEG) study at the Tarrant County Hospital on February 8, 2011. She also underwent Positron Emission Tomography (PET), coupled with Cathode Tomography (CT) testing at Radiology Associates of Fort Worth on February 7, 2011. Cutting edge EEG investigation could not be completed since this was a forensic assessment, rather than preparation for neurosurgery or for treatment. Nevertheless, MRI, PET, and EEG studies were all consistent with cognitive impairment.

There is a reasonable possibility that absent trial counsel's errors and omissions with respect to Dr. Gelbort and the neuropsychological and neuroimaging testing of his client, at least one juror would have voted for a life sentence for Ms. Johnson on all five murders.

<div align="center">104</div>

**Z.    Trial Counsel Were Ineffective in Failing to Introduce
Evidence of, and Give The Trial Experts Records
Concerning, the 1996 Diagnosis of Petitioner With
Depression and Dependent Personality Features**

On March 25, 1996, Ms. Johnson was seen at the Northern Iowa Mental Health
Center by Dr. Lassie, who concluded that she had an Axis I diagnosis of depression and
an Axis II diagnosis of dependent personality features. (Exh.1, MG001494).    This
diagnosis is consistent with Ms. Johnson's personal history of involvement with strong-
willed men, and refers to the need to be dependent on a stronger person. (H.Tr. 87-88).
The  diagnosis was relevant to the prosecution's theory that petitioner was the person
pushing Honken to eliminate Nicholson and and DeGeus.  (*Id.*, 87).  The physician who
saw Ms. Johnson in 1996 could have testified about this earlier diagnosis, expanded upon
the diagnosis, and explained how it applied to Ms. Johnson. (*Id.*, 88).

Although Ms. Goody came into possession of these records in January 2002
(H.Tr. 86), she did not interview the clinician who arrived at the diagnosis and he was not
called to testify at petitioner's trial.   (*Id.*, 85).  Ms. Goody explained that she did not work
on petitioner's case from May 2002 until late November 2004, and that, due to time
pressures once she resumed work in late 2004 she did not interview Dr. Lassie.  (*Id.*, 85).

Ms. Goody was present when Dr. Logan testified at the penalty phase of Ms.
Johnson's trial.  (*Id.*, 88).  Dr. Logan did not discuss the dependent personality features
referred to in the 1996 medical records, and talked about petitioner only as a person who
suffered from depression as a result of her abusive background.  (*Id.*, 88-89).
This was, in Ms. Goody's opinion, a defect in the presentation of mental health
mitigation.  (*Id.*, 89).   Ms. Johnson's dependent personality features should have been a
prominent part of the case in mitigation.  (*Id.*, 89). And,  Dr. Logan did not testify about
major depression or Post Traumatic Stress disorder, so that it appeared that the depression
petitioner suffered was a lot like the depression experienced by many persons.  (*Id.*).   Ms.
Goody testified that Dr. Logan's presentation was hastily put together towards the very

105

end of the trial preparation time, and that she did not think that he had the opportunity to review the records or talk with the clinician who arrived at the 1996 dependent personality features diagnosis. (*Id*., 87).

Mr. Berrigan testified that he does not "recall [the 1996 records] at all." (H.Tr., 2979). He acknowledged, however, that evidence from a pre-offense mental health expert who could have established that Ms. Johnson suffered from depression and a dependent personality disorder would have furthered his case in mitigation. (*Id*.). First, the existence of these diagnoses before the crimes rebutted any notion that petitioner's mental disorders were constructed after the fact, to mitigate capital crimes. (*Id*., 2980). Second, these two particular diagnoses are consistent with petitioner's behavior before she was arrested, while she was in jail, and most of her life. (*Id*.). Third, "the depression, personality disorder certainly fits with our theme that she was dominated by Dustin Honken."[31] (*Id*.).

### AA. Trial Counsel Ineffectively Presented Mitigation Evidence through the Lay Witnesses

The American Bar Association 1989 Death Penalty Guidelines state that "Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." (Exh. 1, 1989 A.B. A. Guidelines 11.8.6.) The A.B.A. 2003 Guidelines expanded on the 1989 guidelines with respect to the use of lay witnesses during the penalty phase. (Exh. 1, 2003 ABA Guidelines, Guideline 10.11F.) Guideline 10.11 directs counsel to consider including the following:

---

[31] Mr. Berrigan was aware of Dustin Honken's domination of Ms. Johnson very early in the case. In his first conversations with mitigation specialist Mary Goody, he told her that "Dustin had some power over [Ms. Johnson] and that she keeps in contact with him . . . [and] that was ridiculous because he had been plotting to have her killed and that was something everybody knew." (H.Tr. 50).

106

1.  Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentence, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence of less than death;

2.  Expert and lay witnesses along with supporting documentation . . . to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotinal state and life history . . .

3.  Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones;

. . . .

Unfortunately, rather than a careful consideration of the evidence and preparation of the witnesses, the defense team hurriedly threw together a mitigation presentation in disjointed fashion. Mitigation specialist Mary Goody testified to the chaos at the evidentiary hearing, stating that prior to the sentencing hearing she was, "[g]etting [witnesses] -- talking to them, getting all of their information put together in groups of exhibits, gathering photos, trying to update the lawyers on a constant basis, Dean and Pat, about what -- where we were at with all of these people and this impending penalty phase." (H.Tr., 245. ) Ms. Goody testified that they used a cattle call approach to meet with all the witnesses in Mason City and that this did not meet minimum standards of practice. (H.Tr., 173.)  This led to a failure to develop relationships with family members. (H.Tr., 178-179.)

To combat the chaos, Ms. Goody prepared extensive examination scripts for Pat Berrigan to use Johnson's family members.  (H.Tr., 245-46. *See, also*, Exh. 1, MG003818-24; MG003465-69; and Index of Goody files following Exh. 1, MG007340.) Mr. Berrigan did not use the scripts, and he had no strategic reason not to do so. (H.Tr. 246.)

Mr. Berrigan's examination of Angela Johnson's sister, Wendy Jacobson, is an example of Mr. Berrigan's ineffective presentation of mitigation evidence through the lay witnesses despite having readily available material with which to work.

107

Ms. Jacobson was an important figure at sentencing, yet trial counsel failed to prepare for her testimony, not even interviewing her prior to her testimony at sentencing. (H.Tr., 1948.) Mr. Berrigan acknowledged that this failure, among others, was a result of the team, "waiting two or two and a half years or whatever that took for this Massiah issue to get settled, we're sitting on our hands. I don't proffer any excuse for that, but that happened." (H.Tr., 3025.)

Mary Goody prepared 73 questions for Wendy Jacobson's testimony. (Exh. 1, MG003818-3824) The questions were drafted in a manner that showed not only what happened during Angela Johnson's childhood but, most importantly, why things happened to Ms. Johnson and what effect they had throughout her life. Ms. Jacobson would have been able to testify about the following: that Angela Johnson was dependent on Ms. Jacobson emotionally, that Angela Johnson followed Ms. Jacobson like a lamb, that Angela Johnson was physically beaten at a very young age resulting in bruises and red marks, that Angela Johnson changed homes in her formative years several times, that Angela Johnson faced terrible consequences if she reached to out for help to her community, that the police came to Angela Johnson's house where her parents fought, that Angela Johnson shares similar mental and psychological limitations as her mother Pearl Jean, that Angela Johnson was shunned as a child, that Angela Johnson was bullied as a child, that Angela Johnson was not protected as a child, that Angela Johnson did not have a positive male role model in her life, that Angela Johnson's learning disabilities made it even more difficult for Angela Johnson to cope with her childhood home, that Angela Johnson suffered from petit mal or absence seizures, that Angela Johnson had difficulty adjusting professionally and financially after she moved out of her home, that Angela Johnson had trouble controlling her emotions, that Angela Johnson's right leg shook all the time similar to Ms. Jacobson, that Angela Johnson did not have consistent with reality, that Angela Johnson's emotional condition worsened the older she got and worsened even more when she was arrested, that Angela Johnson was calling Ms.

<div align="center">108</div>

Jacobson after her arrest crying, sobbing, and pleading for help, and that Angela Johnson attempted suicide, that Angela Johnson cut her ankles, and that Angela Johnson and the family had significant trust issues. (Doc. 26, Exh. 28; Exh. 1, MG007288-7290 and MG007273-7287.)

Rather than follow Ms. Goody's script, trial counsel asked questions of Ms. Jacobson that resulted in responses primarily focused on Ms. Jacobson. Moreover, the answers glossed over Ms. Johnson's experience in a general sense and failed to tie the testimony back to Ms. Johnson individually as the script intended. For example, Mr. Berrigan elicited answers that Ms. Jacobson remembers her parents generally arguing, that Ms. Johnson's father left when they were little, that Ms. Johnson's grandparents were over religious, that the family believed in demons, that the family participated in exorcisms, that the family forced Ms. Johnson to partake in exorcisms, that Ms. Johnson was restrained during exorcisms, that Ms. Johnson was not consciously present during the exorcisms because she suffered from ADD, that Ms. Johnson burped, coughed, or sneezed during the exorcisms, that Ms. Johnson was passive, that the children generally lived in fear, that Pearl Jean Johnson forced the children to fast for three days which caused the children to puke, that the children were taught to preach the Bible at school, that the children were hit with a belt that only caused red welts, that Ms. Jacobson had to wear makeup to cover up her bruises, that Pearl Jean Johnson was an angry woman, that Pearl Jean Johnson beat a tire with a baseball bat, that Pearl Jean Johnson did not want Wendy Jacobson as a child, that life on the Dillow farm was difficult, that Ted Dillow molested Ms. Jacobson, that Ted Dillow molested Ms. Johnson, that Ms. Johnson and Ms. Jacobson married young, that Ms. Johnson and Ms. Jacobson married multiple times, that Terry DeGeus abused Angela Johnson, that Angela Johnson's involvement with Dustin Honken was a good thing, and that Ms. Jacobson has not committed any felonies despite the fact that Ms. Jacobson had a troubled upbringing, that Johnson's family would support her if Ms. Johnson spent the rest of her life in prison, and that Ms. Johnson has a

109

closer relationship with her daughters ever since she has been in prison. (Tr., 3143-3187.)

These statements do not speak to the substance of Ms. Johnson's experience, as presented Ms. Jacobson's declaration of September 27, 2009. (Doc. 26, Exh. 28.)

Trial counsel's questioning showed Ms. Jacobson had a terrible upbringing, not Ms. Johnson, that Ms. Jacobson was not a criminal despite the upbringing, and that Dustin Honken was a good part of Johnson's life. Trial counsel's examination of Ms. Jacobson was ineffective. His examination of the other lay witnesses during the penalty phase was just as ineffective.

Had trial counsel properly prepared for his examination of the lay witnesses, it is reasonably probable that at least one juror would have voted to spare Ms. Johnson's life.

**BB. Trial Counsel's Presentation of Penalty Phase Witnesses Was Ineffective**

The witnesses called by trial counsel at penalty phase included Holly Dirksen, Douglas Brook and Susan Marsolek. The prosecution was able to elicit evidence in aggravation from each of these individuals, as a direct result of trial counsel's inadequate preparation. Trial counsel knew, or should have known, that these witnesses would provide information harmful to their client. Had defense counsel performed competently, and adequately prepared before calling these witnesses, they would have known that the mitigating evidence that each of them could provide was far outweighed by the harm they would do to their client's defense. Trial counsel acted unreasonably in failing to prepare for these witnesses, failing to identify the damaging information that they would provide, and by calling the witnesses.

**1. The Testimony of Holly Dirksen**

Holly Dirksen is Ms. Johnson's younger sister. She, along with siblings James Johnson, Jr. (Tr. 3434-3458) and Wendy Jacobson (Tr. 3143-3186) testified at penalty phase. Ms. Dirksen, who is six years younger than James Jr. (Tr. 3246), was unable to recall most of the events about which she was questioned. For example, Ms. Dirksen

110

testified that she could not recall being hit by her mother (Tr. 3253); that she did not know anything about her maternal grandparents, who died before she was born (Tr. 3249); that she did not recall any of her toys being burnt (Tr. 3250); and did not recall a night where her mother forced the children from their beds to drive around because the world was ending (Tr. 3251). Ms. Dirksen could not confirm most of the testimony of her older siblings. (Tr. 3250). The events that Mr. Dirksen did remember – the exorcisms performed by her mother (Tr. 3247) – had already been described by Pearl Johnson and Wendy Jacobson (Tr. 3040-46, 3143-73).

In contrast to the horrific upbringing described by James Johnson, Jr., and Wendy Jacobson, Holly Dirksen's testimony on direct examination depicted a rather normal childhood. Holly Dirksen testified that her mother prayed for her at church (Tr. 3251); disciplined her by sending her to a corner and "grounding" her (Tr. 3253); and attended her school conferences (Tr. 3254). In sum, Ms. Dirksen's direct testimony added little to the mitigation case presented by the defense.

On cross-examination, the prosecution was able to elicit extremely damaging testimony from Ms. Dirksen. Specifically, Ms. Dirksen was a drug addict and petitioner supplied her with methamphetamine. (Tr. 3255-56, 3272-73). The prosecution elicited a description of the relationship between petitioner and Dustin Honken as "normal." (Tr. 3271). Ms. Dirksen lived in Fertile, Iowa for a period of time in 1993, the town where property belonging to Lori Duncan was found in 1995. (Tr. 3272). Ms. Dirksen testified that petitioner told her that Terry DeGeus was missing before the bodies were ever found. (Tr. 3272-73). Dirksen admitted that she was friends with Leslie Nedved, and was questioned about whether she told Nedved that DeGeus was buried, in a pit, right under the nose of the police (Tr. 3273-74) and that "they" "took care" DeGeus (Tr. 3274). Dirksen was asked about her behavior after Nedved was contacted by law enforcement officers and subpoenaed before a grand jury, and testified that she told Nedved that she did not know petitioner, was not involved in the investigation into the disappearance of

111

DeGeus, and there was no reason for her to make herself involved. (Tr. 3274). Dirksen also testified that she advised Nedved she had a right not to talk to law enforcement. (Tr. 3275). Dirksen was asked if she told an acquaintance, Amy Wonsmos, that Aaron Ryerson, a guilt phase witness for the prosecution, would end up like Terry DeGeus if he didn't watch his mouth. (Tr. 3276). Dirksen also admitted that when she learned that her sister Wendy testified before the grand jury about petitioner's statement that she "lured" Terry DeGeus to his death she became very upset with her, because she did not understand why she said that and did not believe what she said to be true. (Tr. 3277). Finally, Dirksen was asked – and denied – that she threatened to kill her sister Wendy. (*Id*).

Had trial counsel been familiar with the discovery, they would have known about the facts elicited by the prosecution on cross-examination. *See* Exh. 95, Bates No. R000869-871; R000677-680; 706-709; A1115-1122; C000846-857; C000840-843. They would have realized that Ms. Dirksen's testimony would be cumulative and, upon cross-examination, would have turned into evidence in aggravation, and that this witness should not be called.

### 2. Douglas Book

Douglas Book was the Chief of Police at Forrest City, Iowa, since 1974. Trial counsel called Chief Book to testify that he found Angela Johnson laying on the side of the road, injured and bloody, as a result of a beating administered by Terry DeGeus. He also testified that petitioner did not want law enforcement involved, did not want to go into an ambulance, did not want to talk about the incident, and did not want to file charges. (Tr. 3600-01). Later that night, he encountered Terry DeGeus, who had abrasions on his knuckle but was defiant and would not admit anything about the altercation with petitioner. (Tr. 3602). Chief Book testified about another incident, involving his arrest of Terry DeGeus for a traffic violation, in which DeGeus hit him and broke his wrist (Tr. 3607) and that DeGeus wore a t-shirt that said "Fuck Doug Book"

(Tr. 3608). Finally, he testified that in 1985 petitioner was a nice looking young lady with a good figure.  (Tr. 3603).

On cross-examination, the prosecution questioned Chief Book about an investigation he conducted into drug activity by petitioner and Rick Summers. (Tr. 3609). After a search warrant was executed at Rick Summers' home in 1998, petitioner left a message on Book's home answering machine telling him to "back-off" or he "could get hurt," that he was in over his head, and that this was bigger than he could handle.  (Tr. 3613).  Chief Book also described a threatening message that petitioner left on his home answering machine after he served a subpoena on Holly Dirksen, which told him to leave her family alone, he did not know what he was getting into, and he could get hurt.  (Tr. 3614).  He described Ms. Johnson's message as "screaming, irate, [and] out of control." (*Id*.)[32]

By calling Chief Book, the defense made it possible for the prosecution to elicit evidence of petitioner's continued involvement in distributing drugs and her threatening behavior towards law enforcement. There was ample evidence in the discovery that Chief Book would likely be a hostile witness.  *See, e.g.,* Exh. 95, A000041-44 (Book was investigating this case as early as March 23, 1993); Exh. 95, A000474 and A1115 (Book investigated petitioner's involvement in Terry DeGeus' disappearance); Exh. 95, A000675 (Book involved in controlled meetings with Agent Mittan); Exh. 95, H000168 and H000174-75 (Book assisting North Central Iowa Narcotics Task Force in surveilling petitioner).

---

[32]     Defense counsel objected to the introduction of the threatening phone messages left by Ms. Johnson on Chief Book's answering machine as outside the scope of direct examination (Tr. 3610), but the Court overruled this objection based on the relaxed standard of evidence at penalty phase.  (Tr. 3611-12).

113

The responsibility for this considerable misstep falls with Mary Goody and Patrick Berrigan, who interviewed Douglas Book. (Exh. 1, MG005615-17). In her zeal to call a police officer as a mitigation witness, Goody failed ask Book whether he had any negative information about Johnson. (H.Tr. 179-185). This mistake was exploited by the prosecution, to petitioner's severe prejudice. The defense had other means of showing that DeGeus was a violent individual and had been abusive to Ms. Johnson. However, because of the haste with which this penalty phase was put together and for perceived funding reasons, alternative witnesses were not sought and Book was called without having been asked the critical question about whether he had any negative information. (*Id.*)

### 3. Susan Marsolek

Susan Marsolek, a halfway house resident who appeared in leg irons and a prison uniform, testified for the defense at penalty phase. (Tr. 3728). During direct examination, defense counsel elicited evidence that Marsolek did not cooperate in her own case (Tr. 3731); that she worked with Ms. Johnson at the Waterfront Restaurant and Lounge and became good friends with her (Tr. 3731-32); that petitioner was compassionate, trustworthy and loyal (Tr. 3732); that she was housed with petitioner in M Block at Linn County Jail, where petitioner took her under her wing (Tr. 3734-35); that petitioner had never been in a fight while they were housed together in Linn County Jail (Tr. 3736); that methamphetamine is one of the worst drugs (Tr. 3739); and that Ms. Johnson was a good mother (Tr. 3740).

On cross-examination, Marsolek was throughly discredited and turned into an aggravation witness, based on discovery that was readily available to defense counsel. *See* Exh. 95, A000754 (Marsolek, aka Sue Paulson, was a known drug user and dealer); Bates A3674-3697; E001098. Marsolek had been prosecuted by C.J. Williams, who elicited testimony that she told numerous lies to law enforcement after her own arrest (Tr. 3741-43). Marsolek denied having obtained methamphetamine from petitioner, denied telling

114

Special Agent Graham that notes found after her arrest, which included petitioner's name, reflected drug debts, and insisted that she owed petitioner for items bought at a rummage sale. (Tr. 3743-44). In fact, trial counsel had these "pay and owe" notes in their discovery files. (Exh. 95, A003671). Then the prosecution attacked Marsolek's testimony that petitioner had never been in a fight at the Linn County Jail by introducing a statement made by Marsolek during the investigation of that incident and suggesting that a videotape of the fight existed. (Tr. 3745). On redirect, defense counsel characterized the fight that Marsolek insisted never occurred as a "big fight" (Tr. 3743) and elicited testimony that Marsolek was not a "snitch" and was not the type of person who would ever be a "snitch." (Tr. 3749). On re-cross examination, the prosecution was able to elicit evidence that Marsolek had in fact been a snitch, and testified against Michael Vieth in exchange for a reduction of her sentence. (Tr. 3750).

Marsolek was called by the defense to provide tepid mitigation evidence, despite its possession of a discovery file that contained abundant information that Marsolek should not be a witness. First, the defense knew, or should have known, that Marsolek gave a statement about the "big fight" in the jail that was the centerpiece of the prosecution's future dangerousness argument, because it occurred in custody. Marsolek's testimony that the fight never occurred did not advance petitioner's cause; rather, it proved Marsolek to be the liar she admitted to be on cross-examination. Had defense counsel read the discovery, he would have known that Marsolek was arrested with drug "pay and owe" notes that featured petitioner's name. Finally, Marsolek's testimony that she was not a snitch was yet another lie; if trial counsel had bothered to read her case file, they would have discovered that she testified against her co-defendant, the very sort of behavior she adamantly denied.

It was objectively unreasonable for trial counsel to call these three witnesses. None of the witnesses provided compelling mitigation testimony and the evidence

115

adduced by the prosecution on cross-examination was devastating to their client at a proceeding in which her life hung in the balance.

**CC.  Trial Counsel Were Ineffective for Failing to Provide Psychiatric Pharmacologist Roswell Lee Evans With Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant**

Trial counsel called Dr. Roswell Lee Evans, the Dean of Pharmacy at the Auburn School of Pharmacy, to testify at petitioner's penalty phase "about methamphetamines, their actions, what do they do, and pretty much from an informational perspective."  (Tr. 3580).  At the outset of his testimony, Dr. Evans acknowledged that he did not know Ms. Johnson and had never seen her before; that he had not been provided any material concerning her case; that he was not going to testify about her state of mind at the time of the commission of the offenses; and that he was "just asked to talk about methamphetamine." (*Id.*).

The prosecutor was able to exploit Dr. Evans' lack of knowledge about Ms. Johnson.  He began his cross-examination by getting Dr. Evans to agree that some people are involved in the drug trade not because they are using methamphetamine, but for profit.  (*Id.* at 3592).  Dr. Evans also agreed that methamphetamine can have different effects on different people, and that while some people are highly addicted, others use it recreationally and can start and stop using it.  (*Id.* at 3592-3593).   Dr. Evans admitted that, although there is a psychiatric diagnosis for drug dependency, he did not know whether Ms. Johnson had been given such a diagnosis.  (*Id.* at 3593).  The prosecutor pointed out that Dr. Evans "really do[es]n't know anything about this particular case," wasn't "asked to present any testimony about this case," and that "there's nothing stopping [Dr. Evans] from evaluating the defendant. [He] just [wasn't] asked to do it." (*Id.*).

Most notably, Dr. Evans had to admit that he knew absolutely nothing about Angela Johnson's drug usage during any time period:

116

Q. You don't know how often she used methamphetamine.

A. No.

Q. You don't know what quantity of methamphetamine she used.

A. I do not.

Q. You don't know during what time period she used methamphetamine.

A. No, I don't.

Q. You would have no reason to dispute the report that she quit using methamphetamine during her pregnancies.

A. No.

Q. So you'd have no reason to dispute that during the time period of July of 1993 and November of 1993 when she was involved with murdering five people she wasn't using methamphetamine during that time period.

A. I have no idea.

Q. You'd have no idea whether the methamphetamine use she was involved with had any impact on her ability to function in day-to-day society.

A. No, I don't.

Q. And in substance you're here to educate this jury on the effects that methamphetamine could have, but you have no basis to suggest to this jury that any of these effects you've talked about, any of these possible long-term damage to the brain, any of these physiological effects has any application whatsoever to Angela Johnson?

A. That's true.

(Tr. 3594-3595).

The only redirect examination after the devastating cross-examination of Dr. Evans

consisted of two questions:

Q. Doctor, what do we know from the experience and research of methamphetamine regarding its rate of addiction versus other illicit drugs as well?

A. Right. (Sic.)

Q. What do we know about that?

A. We know that the exposure to methamphetamine has a very high

117

likelihood leading to addiction, especially with its repeated use. (*Id.* at 3595.)

At the evidentiary hearing, Patrick Berrigan was asked, "Was there some reason why you did not at least provide the drug history that you provided to the other experts so that Dr. Evans could be in a position to say that I know what this person's drug history is and here's what I can say about what effect drug use would have on her given history?" His answer was, "I just didn't think to do it." (H.Tr. 2103).

In the absence of any connection between Dr. Evans' generalized information about the effects of methamphetamine and Ms. Johnson, the jurors were left scratching their heads as to why Dr. Evans was even called to testify. Dr. Evans could have been, but was not, given the same information that Drs. Logan and Hutchinson were given: that Angela Johnson had a significant history of methamphetamine use. Ms. Johnson told the government's experts in April 2003 that, ". . . I just wanted to do it everyday for the rest of my life, I just liked the way I felt on it." (Exh. 1, MG004342.) She reported that Dr. Logan had told her she was self-medicating, and that "maybe if I would have been on an antidepressant or something like that, I wouldn't have had such a need for crank and since I've been on antidepressants, I do feel better. (Exh. 1, MG004343.) She also described to the government's experts how much and how often she used:

A.  When I had my bar I really got into the drugs. It was just continuous. I had it for – I only had the bar for a year . . . . yeah, it got to be a party fest and I knew after a year I couldn't do that again. So I closed up shop and got another job.

Q:  So when you say you really got into the drugs you told me that you were pretty much high all the time before that so it got worse. Were you – did you stop sleeping?

A.  I didn't sleep every night.

(Exh. 1, MG004346.) She also reported that she did drugs both before and after her pregnancy with Marvea, and that she got pregnant with Marvea in June 1993. (Exh. 1,

118

MG004347, MG004352-53.) She started up again because "[c]rank was a part of my life." (Exh. 1, MG004353.)

Had Dr. Evans been provided with Ms. Johnson's history of drug abuse, he could have tied his testimony about the long-term effects of methamphetamine on an individual's ability to "control outbursts, control anger issues, control perhaps even some memory issues would be there" even after the individual stops taking the drug. (Tr. 3588-89) He also could have tied drug use to Angela Johnson's behavior in 1993. Ms. Johnson's sister, Holly Dirksen has reported:

> I visited Angela often in 1992 and 1993, and moved in with her in 1994, when my daughter was a little more than a year old. It was the worst year of Angela's life. Angela was shattered and stepped out of herself in 1993; she was literally insane that year. . . .
>
> It got worse in 1993. Living with Angie was like living in a rant all the time. She could not control her emotions. She stayed in bed for days and then worked nonstop. She was always moving, shaking, talking, working, and doing something just for the sake of moving. Angie was unpredictable. I moved out in the spring of 1995 because it was too insane trying to live with her. Anything could set her off, and she stayed irritated and upset, angry with everyone and everything for little or no reason.
>
> Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together. Her mood swings got worse. She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her. Her pregnancy made everything worse. Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin. She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently. Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him. She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times. The slightest thing irritated and overwhelmed her.

(Doc. 26, Exh. 29, pp. 1-2).

Dr. Evans could have diagnosed Ms. Johnson with an Axis I disorder of drug dependency – which the prosecutor suggested did not exist – if he had been given Ms. Johnson's drug history, of which every other expert, both defense and prosecution, was

<div align="center">119</div>

aware.  That diagnosis, coupled with Dr. Evans' explanation of the long term residual effects of methamphetamine, would have aided the jury in understanding Ms. Johnson's behavior in 1993, and mitigated the crimes for which she was convicted.

As Mr. Berrigan acknowledged, there was no strategic reason whatsoever for not providing Dr. Evans with petitioner's drug history.   Had counsel effectively prepared Dr. Evans to testify, it is reasonably probable that at least one juror would have voted to spare petitioner's life.

**DD.    Trial and Appellate Counsel Rendered Prejudicially Ineffective Assistance of Counsel by Failing to Timely and Effectively Make a Number of Meritorious Motions, Objections, and Arguments**

Guideline 10.8 of the 2003 ABA Death Penalty Guidelines is entitled "The Duty to Assert Legal Claims" and provides in part that "[c]ounsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should... consider all legal claims potentially available" and should "evaluate each potential claim in light of...the unique characteristics of death penalty law and practice; and...the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited". (Exhibit 1, p. 223)

As explained in the Commentary to this Guideline,

> Counsel must therefore know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection, or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings.

(Exhibit 1, p. 225)

Counsel in the present case did not fulfill this basic duty to assert legal claims in a timely and effective manner, as is evident by the many claims, motions, and objections which this Court and the Eighth Circuit deemed waived, forfeited, or not effectively presented, including, but not limited to the following:

120

a.　　　Letter from this Court to Dean Stowers, August 1, 2002, Hearing Transcript, p. 1767; Exhibit 67, p. MCN 02-002449 ("If you would spend as much time on the mediocre briefs that you have filed in this case as you have pestering our office about payment, your client's interest would be well served.")

b.　　　Transcript of Change of Venue Hearing, November 17, 2004, p. 1 (" I have a number of issues I wanted to  raise.  First would be motion for change of venue. Once again, I think the defense totally missed the mark on your motion. Your motion was just this kind of general brief about the  general law of change of venue which I found totally not helpful in this case.  It seems to me you missed the issue.")

c.　　　*United States v. Johnson,* 377 F. Supp. 2d 686, 687 (N. D. Iowa 2005) ("First, the defendant has known that "substantive connection" is an element of the § 848 offenses charged here at least since this court's ruling in August of 2002, she has asserted other challenges to the § 848 offenses without raising this issue, and she now attempts to raise the issue well after the deadline for pretrial motions set by the undersigned in this case. Furthermore, the defendant has not asserted any good cause for her failure to raise this argument, and the court finds that there is none. Thus, the issue of this supposed deficiency of the indictment has been waived.").

d.　　　*United States v. Johnson*, 403 F. Supp. 2d 721, 764-795 (N. D. Iowa, 2005) ("In this case, despite extensions of time to file post-trial motions, and assurances from the court that the defense could take all the time reasonably necessary to prepare post-trial motions, Johnson initially filed her motion for judgment of acquittal or new trial without any accompanying brief, in violation of local rules.... Instead, along with her motion for judgment of acquittal or new trial, Johnson filed a request for additional time to file her brief in support of her motion for judgment of acquittal or new trial. The court granted Johnson the ten additional days that she requested within which to file her supporting brief. Even then, Johnson had to request, and was granted, another additional day to file her supporting brief. Despite the various extensions, when the supporting brief

121

was ultimately filed, it shockingly did no more than recite from the motion eight of Johnsons allegations of error (Grounds Nos. 11, 21, 22, 23, 24, 26, 28, and 29) with absolutely no additional supporting argument, and for six further allegations of error (Grounds Nos. 2, 5, 6, 7, 31, and 34), the brief offered little or nothing more than token argument, providing little or no additional specificity, citation to pertinent parts of the record, or citation of supporting authority. In light of the applicable local rules and authority cited above, such as Sweet, 125 F.3d at 1159, the court finds that Johnson has waived fourteen of her allegations of error, Grounds Nos. 11, *765 21, 22, 23, 24, 26, 28, and 29 for failure to provide any briefing at all in support of the allegations of error, and Grounds Nos. 2, 5, 6, 7, 31, and 34 for failure to provide adequate briefing.")

e.      *United States v. Johnson*, 403 F. Supp. 2d at 796 ("[T]he court finds that Johnson waived the issue [of change of venue] by failing to renew or re-urge her motion for a change of venue at the conclusion of jury selection on the ground that the voir dire of potential jurors demonstrated that the pool was so tainted with prejudice that she could not obtain a fair trial in this district.")

f.      *United States v. Johnson*, 403 F. Supp. 2d at 771 ("[T]he court also reiterates its conclusion that striking the allegations [in Counts 6 through 10] was not an appropriate remedy, because Johnson had waived the issue by failing to object to the November 26, 2002, order of Magistrate Judge Paul A. Zoss.")

g.      *United States v. Johnson*, 403 F. Supp. 2d at 778 ("Johnson has waived any objection to the manner in which the available peremptory challenges were allocated.")

h.      *United States v. Johnson*, 403 F. Supp. 2d at 886 (" Finally, to the extent that Johnson asserts that the jury should simply have been required to reject the death sentence, and leave to the court the question of the sentence less than death to be imposed in this case, if jury's verdict for death was non-unanimous, such a course might have been appropriate under the death-penalty provisions of 21 U.S.C. § 848....However, Johnson

122

waived this argument by specifically requesting that the alternatives submitted to the jury be either a 'death sentence,' upon an unanimous verdict, or 'life imprisonment without possibility of parole,' if any one or more jurors so found.")

       i.      *United States v. Johnson*, 403 F. Supp. 2d at 890 ("Johnson has not pointed to any 'penalty phase' instructions that engendered the confusion that she asserts is evident from the jury's findings on various 'mitigating factors.' Indeed, the court generally accepted Johnson's formulation of her 'mitigating factors,' so that she is responsible for any ambiguity as to their meaning.")

       j.      *United States v. Johnson*, 495 F. 3d 951, 961 (8th Cir. 2007) ("Johnson provides little support for her contention that a district court may strike the death penalty from the indictment despite the government's compliance with the statutory prerequisites for seeking the death penalty.")

       k.      *United States v. Johnson*, 495 F. 3d at 961 (rejecting Eighth Amendment proportionality claim, in part because "Johnson has not apprised us of the mitigation evidence Honken presented in his trial.")

       l.      *United States v. Johnson*, 495 F. 3d at 965 ("If Johnson had felt that the voir dire testimony of the jurors belied that conclusion, she could have elected to renew her motion for a change of venue during, or at the conclusion of, jury selection, but she did not. Id. In light of the foregoing, we cannot say that the district court erred in declining to provide Johnson with a greater number of peremptory challenges than the 20 provided by Rule 24(b).")

       m.      *United States v. Johnson*, 495 F. 3d at 970 n. 15 ("Johnson also contends, without supporting argument, that the district court erred in failing to give Johnson's proposed jury instructions on subsequent acts. We disagree.")

       n.      *United States v. Johnson*, 495 F. 3d at 975 ("Johnson does not challenge on appeal the [torture] instructions the district court gave on the statutory aggravating

123

factors, and she provides no authority for her suggestion that this aggravating factor required her to personally commit the murders.")

o.    *United States v. Johnson*, 495 F. 3d at 980 (court fails to consider whether erroneous multiplicitous counts creates penalty phase error because no such argument was raised on appeal).

Petitioner was prejudiced by trial counsel's multiple acts of ineffectiveness in failing to assert legal claims in a timely and effective manner because counsel's ineffectiveness resulted in the forfeiture or waiver of meritorious motions and objections at trial and prevented counsel from raising such meritorious issues on appeal, or restricted her to raising them only under an almost impossible to meet " plain error" standard. See, *United States v. Johnson*, 495 F. 3d at 977 (rejecting challenge to penalty jury forms under plain error standard because "Johnson did not object to the forms."); Id. at 978 ("Because Johnson raised a contemporaneous objection to only one of the [prosecutor's penalty phase closing] comments, we will review the majority of the assertedly improper remarks for plain error and 'we will only reverse under exceptional circumstances.'")

**EE.    Trial Counsel Were Ineffective in Offering Multi-Faceted, Overly-Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather than Simple, Straight-Forward Facts that Encompassed All of the Mitigation**

A.B.A. Guideline 10.11 K. provides,

Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument.

Trial counsel had in their possession a list of 44 simple, declarative statements prepared by mitigation specialist Mary Goody that could have, and should have, offered as the mitigating factors for the verdict form. (Exh. 1, MG002245-2247.) Ms. Goody's list encompassed facts from Ms. Johnson's entire life, and the lives of her parents and grandparents, facts that supported "an understanding of the client's extended,

124

multigenerational history [] necessary for an understanding of [her] functioning." Commentary to A.B.A. Guideline 10.11.

For example, Ms. Goody's list included the following facts, each as a separate mitigating factor:

> "James Johnson and Pearl Johnson's marriage was unstable and there was verbal and physical abuse between them;"
>
> "Angela Johnson did not know her father as a child or an (sic) teenager;"
>
> "Pearl Johnson was emotionally unavailable to her children;"
>
> "Pearl Jean Johnson suffered from a 'religious disease' and abused her children by causing them to fast – going with (sic) food for whole days at a time;"
>
> "Angela Johnson was singled out by her grandparents, Florence and Andrew Limesand, and Pearl Johnson to undergo 'exorcisms' or casting out of deaf and dumb demons because she had a learning disability as a child;"

(Exh. 1, MG002245)

> "Angela John's (sic) childhood family was highly unstable, moving a great deal and her adult life was patterned on the same movement;"
>
> "Angela Johnson became addicted to methamphetamine at a young age and used the drug nearly on a daily basis until the time of her arrest in 200s. She had an inherited proclivity to become addicted to drugs;"
>
> "Angela Johnson's addiction to methamphetamine was severe;"
>
> "Angela Johnson suffered from depression and low self-esteem."
>
> "Angela Johnson's childhood caused her to have problems with Post Traumatic Stress Disorder, attachment disorder, and set her up for abuse triangle difficulties as an adult. Her relationships with men were unhealthy;"
>
> "Terry DeGeus mentally, physically, and sexually abused Angela throughout their relationship;"
>
> "Dustin Honken abused Angela throughout their relationship, taking advantage of her psychological problems, and poor coping skills and used her to further his own personal ends."

(Exh. 1, MG002246.)

Each of those individual facts was proven by the defense, and each would have been found true by every juror. Even if some jurors did not find all of these factors proven, all the jurors would have found at least some of these factors true, and those findings would have allowed the factors to be weighed as mitigators.

By contrast, trial counsel submitted the following single mitigating factor:

"Angela Johnson was raised in a single parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, to long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem."

(Exh 1, MG002248.)

That factor was included in the verdict form as Mitigating Factor (9), unchanged from counsel's First Amended List of Mitigating Circumstances." (Exh. 1, MG002248-49.) Only five jurors agreed that this mitigating factor had been proved.

Counsel's single mitigating factor included too many facts and required jurors to reach a specific conclusion about the impact of those facts. The consequence was that none of those facts – (1) that Angela Johnson was raised in a single parent household; (2) that Angela Johnson's mother was emotionally unstable; (3) that Angela Johnson's mother subjected her to unusual fasting practices; (4) that Angela Johnson suffered long periods of abandonment and physical detachment; (5) that Angela Johnson suffered occasional physical abuse; (6) that Angela Johnson was susceptible to escape through illicit drug use; that Angela Johnson had a series of unhealthy relationships with men; (7) that Angela Johnson had chronic feelings of abandonment and low self-esteem – were considered or weighed by seven of the jurors.

Moreover, the factor as written by trial counsel required the jurors to agree that Ms. Johnson's feelings of abandonment and low self-esteem were the result of the previous six factors. If a juror found any part of this multifaceted, overly-complicated

126

factor to be untrue, the juror necessarily had to reject the entire factor, and each of its subparts, as mitigation.

Mitigating Factor (9) was not the only factor that suffered from encompassing too many facts and drawing overly-specific conclusions. Another example is, "(10) Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, causing her great fear and traumatic stress." That factor was found by only four jurors, despite the fact that Mr. DeGeus' physical abuse of Ms. Johnson was not in dispute and, indeed, was proven by the prosecution in the merits phase. Because trial counsel insisted on coupling the abuse by Mr. DeGeus with the consequences of "great fear" and "traumatic stress," eight jurors did not consider or weigh Mr. DeGeus' abuse as a mitigator at all.

It was not the Government that insisted on limiting the number of factors or combining multiple facts into a single factor. The Government told the Court, " In my view I think the defense is – let me put it this way. I don't think I want to be in a position of impacting what they claim to be mitigators." Tr. 2154. Nor was it the Court that insisted on limiting the number of factors or combining multiple facts into a single factor. Although the Court noted that it "could get them [the mitigating factors] down to about 7," Tr. 3986, the Court also told counsel, "I think you're for the most part entitled to your language unless I have a serious objection to it." Tr. 2152. The Court only excluded factors it felt the defense had not proved or should be precluded because of the defense's position that its experts were not opining on mental state at the time of the offense.

Indeed, the Court sought to simplify some of the defense's proposed mitigating factors. On May 18, 2005, after trial counsel had submitted the defense's first list of mitigating circumstances, the Court suggested removing statutory language from three factors. Trial counsel had suggested the following language: "1. Angela Johnson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge. 2. Angela Johnson is punishable as a

127

principal in the offense, which was committed by another, but her participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge. . . . 23. Angela Johnson's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge." It was the Court, not counsel, who suggested deleting, in each of these factors, the phrase beginning with the word "regardless." Tr. 2149-2150. The Court thought "it'd just be confusing." Tr. 2151.

Trial counsel also failed to submit any mitigating circumstances that dealt with the evidence of Angela Johnson's parents' upbringing. Evidence of Ms. Johnson's multi-generational history had been introduced and should have been included in the mitigating circumstances pursuant to A.B.A. Guideline 10.11 and the Commentary to the Guideline. Mary Goody had included those circumstances on the list she emailed to trial counsel. (Exh. 1, MG002245.) Trial counsel had no strategic reason to exclude such circumstances, and neither the Government's arguments nor the Court's rulings prevented trial counsel from doing so.

Trial counsel's proposed mitigating circumstances did not "ensure that jurors will be able to consider and give effect to all relevant mitigating evidence" as required by A.B.A. Guideline 10.11. Instead, trial counsel offered "inaccurate" and "confusing" mitigators that resulted in a death sentence. *Id*.

The mitigating circumstances proposed by trial counsel fell below the minimum standards of effective assistance of counsel. Had counsel proposed simple, declarative mitigating circumstances that were in his file, that gave effect to all the relevant mitigating evidence, and could have been found true by the majority if not all the jurors, it is reasonably probable that at least one juror would have voted to spare petitioner's life.

128

**FF.    Trial Counsel Were Ineffective in Failing to Raise Juror
           No. 55's Failure to Honestly Answer Questions on Voir Dire**

Juror No. 55 was asked whether he had "ever been mentally, physically or

emotionally abused as a child." He checked "no." (Doc. 26, Exh. 23, p. 6). Juror No. 55

was also asked whether he was "familiar with" various participants in the trial, including

Judge Bennett; he checked "no" in response to this question. (*Id.*, p. 16). At the end of

the questionnaire, Juror No. 55 "declare[d] under penalty of law that I have answered

truthfully and completely all questions in this questionnaire." (*Id.*, p. 18).

In a post-trial interview, Juror No. 55 revealed that he had been subjected

serious physical abuse as a child. He stated:

> Because [Ms. Johnson's] mother, there were things said by her that really
> pissed some of us off. All this about she [Ms. Johnson] was such a
> battered person. ***There were a couple of us that have been through a hell
> of a lot worse than she had. She was never beaten so bad she couldn't
> sit down for a month.*** A couple of us, we had it rough, and we didn't turn
> out to do drugs and kill people.

(Doc. 26, Exhibit 13, p. 3 (emphasis supplied)).

On April 2, 2002, Judge Bennett sentenced the son of Juror No. 55 to

consecutive sentences of 40 months for conspiracy to distribute methamphetamine and 60

months for conspiracy to commit a violent crime. (Doc. 26, Exh. 24). At the time Juror

No. 55 sat on the jury that convicted petitioner and sentenced her to death, the son of

Juror No. 55 was serving the sentences imposed by Judge Bennett; in fact, Juror No. 55

visited his son in prison during the break between penalty phase evidence and argument.

(Doc. 26, Exh. 13).

Trial counsel was ineffective in failing to raise Juror No. 55's misconduct in

failing to disclose that he had suffered abuse as a child and that his son was a convicted

methamphetamine dealer who had been sentenced by Judge Bennett. Juror No. 55's

failure to honestly answer the questions at issue violated Ms. Johnson's Sixth Amendment

right to an impartial jury. *See McDonough Power Equipment, Inc. v. Greenwood*, 464

129

U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2 663 (1984). There was no strategic or tactical reason for not raising a claim of concealed juror bias as to Juror No. 55, and trial counsels' failure to do so prejudiced petitioner. But for counsel's failure to raise this misconduct by Juror No. 55, her conviction would have been set aside based on the violation of her right to an impartial jury.

### GG. Appellate Counsel Provided Ineffective Assistance in Failing to Raise All Components of the Misconduct by Juror No. 55

Petitioner's attorneys raised two aspects of juror misconduct in the district court. The first assignment of error was Juror No. 55's misconduct in obtaining information concerning prison conditions for an inmate serving a sentence of life without parole and an inmate on death row and sharing that information with the other jurors. (Doc. 655, at 1-2). The second error raised was Juror No. 55's having told the jurors that petitioner would go through "three automatic appeals," that the jury's verdict was "not the final decision . . . we just set the stage she will have to act upon," and that the juror "used to be in law enforcement, so I know a few things." This was a violation of the rule of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

Appellate counsel raised only the first instance of misconduct by Juror No. 55. *United States v. Johnson*, 495 F. 3d 951, 981 (8th Cir. 2007). The failure to raise the full spectrum of juror misconduct in this case was ineffective; each component of the misconduct by Juror No. 55 should have been raised on appeal. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases litigate all potentially meritorious issues, and this standard was enunciated in case law extant at the time of the appeal. There was not, and could not be, any tactical or strategic reason for

130

counsel not to raise the meritorious claim of juror misconduct under *Caldwell v. Mississippi*. Appellate counsel's failure to raise these issues prejudiced petitioner. But for counsel's failure to raise all aspects of juror misconduct, the appeals court would have, at a minimum, vacated her death sentences.

### HH. Trial and Appellate Counsel Were Ineffective in Litigating the Prosecution's Inconsistent Theories As to Dustin Honken and Angela Johnson

Trial counsel filed a prophylactic boilerplate motion seeking to preclude, as a violation of due process, the prosecution from presenting factually inconsistent theories relating to the same crime. (Doc. 454). This motion was based on the Eighth Circuit's decision in *Smith v. Groose*, 205 F. 3d 1045, 1049 (8th Cir. 2000), which held that the state violated the defendant's due process rights when it used one version of events surrounding murders to convict the defendant, then relied on a different version at a later trial to convict a co-defendant, because "[t]he State's use of factually contradictory theories in this case constituted 'foul blows,' error that fatally infected Smith's conviction." The motion failed to cite any facts in support of the due process claim and made no mention at all of Sixth or Eighth Amendment claims.

Trial counsel's post-verdict Motion for Judgment of Acquittal or for New Trial summarily referenced district court error in denying the motion in limine raising the violation of due process by a prosecutor presenting factually inconsistent theories relating to the same crim. (Doc. 634, at 5, ¶ 22). Again no facts or legal argument were offered in support of the due process claim, and the Sixth and Eighth Amendment claims were ignored.

On appeal, appellate counsel simply incorporated his sparse and boilerplate trial court arguments into his appellate brief, again failing to support the argument with facts or law on the due process claim and failing to raise the Sixth and Eighth Amendment claims at all.

131

At the time of the trial and the direct appeal it was standard practice that counsel in capital cases should seek to litigate all issues, whether or not previously presented, that are arguably meritorious, especially Eighth Amendment issues. (*See* ABA Guideline 10.8 and Commentary, "The Duty to Assert Legal Claims," Exh. 1, p. 223-227.) "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial." Stephen B. Bright, *Preserving Error at Capital Trials*, The Champion, Apr. 1997, at 42-43, cited in Commentary.

Reversal of petitioner's conviction and sentence would have resulted from an effectively presented Due Process, Sixth Amendment and Eighth Amendment challenges to the prosecution's inconsistent, irreconcilable theories at petitioner's trial and Honken's trial. There was not, and could not be, any tactical or strategic reason for counsel not to raise these meritorious claim. There is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the trial and appeal would have been different.

## II. Appellate Counsel Ineffectively Failed to Raise the Unconstitutional Skewing Effect of Multiplicitous Counts

On appeal, counsel argued that petitioner's convictions for murder while engaging in a conspiracy and her convictions for murder while working in furtherance of a Continuing Criminal Enterprise were multiplicitious. The government did not contest the multiplicitious nature of the charges. The Eighth Circuit Court of Appeals ruled that the charges were multiplicitous, and remanded with instructions to vacate the conspiracy murder convictions. *United States v. Angela Johnson*, 495 F. 3d 951, 980-82 (8th Cir. 2007).

Appellate counsel rendered ineffective assistance by not raising and litigating the constitutionally impermissible skewing effect of multiplicitous counts on the jury's determination of penalty. The penalty for a Title 21 capital offense is determined by a

132

weighing process, and the multiplicitious counts submitted to the jury unfairly tipped the scales in favor of death. In *Stringer v. Black* 502 U.S. 222, 231, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992), the Court observed that the difference between a "weighing state and non-weighing state is not one of 'semantics,' . . . but of critical importance. Where an invalid aggravating factor is weighed, it may result in the placement of a "thumb [on] death's side of the scale." *Id*., at 243; *see also Flammer v. Delaware*, 736, 745-79 (3rd Cir. 1995) (en banc); *United States v. Jones*, 132 F. 3d 323 (5th Cir. 1998), *aff'd on other grounds, Jones v. United States*, 527 U.S. 373 (1999). Like invalid aggravating factors, duplicative aggravating factors tend to "skew the weighing process and create the risk that the death sentence will be imposed arbitrarily and thus unconstitutionally." *United States v. McCullah*, 76 F. 3d 1087, 1111 (10th Cir. 1996) (reversing death sentence imposed pursuant to 21 U.S.C. § 848(e)). The jury's consideration of multiplicitious counts has the same constitutionally impermissible effect as invalid aggravating factors and duplicative aggravating factors – the scales are unfairly tipped in favor of death, in violation of the Fifth and Eighth Amendments.

At the penalty phase of Ms. Johnson's trial, the jury was directed to twice consider a death sentence for each murder and, in effect, to double-count as aggravating factors the multiplicitious counts. This violated petitioner's rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to the jury. Also, by permitting the jury to double-count, the death sentences were arbitrary and capricious in violation of the Eighth Amendment. If trial and appellate counsel had raised the unconstitutionality of the submission of multiplicitious counts, there is a reasonable probability that the jury would not have sentenced petitioner to death on any counts.

### JJ. The Cumulative Errors of Petitioner's Trial and Appellate Counsel Warrant the Relief Requested

Each of the above-described claims of constitutional error based on ineffective

133

assistance of counsel stand on their own and independently require relief.  However, should this Court find error but believe that individually the claims do not merit relief, the Court should consider the cumulative impact of the constitutional violations.  Petitioner alleges that the cumulative impact of the errors and omissions by trial counsel requires a new trial and sentencing hearing.

<center>**Claim Two**</center>

<center>**The Government's Failure to Correct False Testimony
at Angela Johnson's Trial Violated the Fifth and
Eighth Amendments to the United States Constitution**</center>

At Angela Johnson's trial, the government elicited testimony that Dustin Honken was a studious young man who had never committed a violent act until he met Angela Johnson in support its theory that Honken was manipulated and encouraged to commit these crimes by Angela Johnson.[33]  Jeffrey Honken testified that his brother Dustin was "not at all" short tempered; that he was not violent; that he had never seen his brother engage in violence "whatsoever" toward anyone; that he was not physical with people, and never roughed anyone up or slapped anyone.  Tr. 323.  Timothy Cutkomp testified that from the time he met Dustin Honken until the early 1990's, he was not aware of Honken using violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that he was not aware of Honken hurting anyone up to the point when he became involved with Angela Johnson.  Tr. 830-831.  Rick Held testified that in his experience, Dustin Honken was not an aggressive or violent person.  Tr. 1038.  Kathy Rick testified that Honken told her that he was not strong enough to leave Johnson because he knew what she was capable of, and offered her opinion that Honken was afraid of Ms. Johnson.  Tr. 2641-42.  On redirect examination, without objection, the prosecution elicited testimony from Ms. Rick that she

---

[33]  The prosecution's arguments in support of its theory that it was Angela Johnson, not Honken, who was the driving force behind the crimes are at Tr. 4011, 4026-27, 4049 and 4079-80.

<center>134</center>

never saw Dustin Honken use violence or force toward anyone from 1989 until 1993. Tr. 2669. Alyssa Nelson, Dustin Honken's sister, testified that she never knew her brother to engage in violence or use force before 1993. Tr. 2672. The government also elicited from Ms. Nelson testimony about Honken's report that he had woken up with Angela Johnson pressing a gun to his head and that it scared him. Tr. 2679.

The testimony repeatedly elicited by the government regarding Dustin Honken's non-violent nature prior to his acquaintance with Angela Johnson was false, and the government knew this testimony was false. This is apparent from the government's proffered penalty phase evidence at Dustin Honken's trial. There, the government sought to rebut the testimony of Alyssa Nelson that Dustin was coerced into committing a bank robbery by his father with a proffer of testimony by Kenneth Hansen, which included: Honken's approaching Hansen with a very detailed plan about robbing a bank, which included shoving an old lady into a bathroom, securing the door and wearing surgical gloves and masks. Honken Tr. 3678. On the same issue, the prosecutor proffered testimony by Alan Johnson that he had detailed discussions with Honken about the same bank robbery. Honken Tr. 3678. The government proffered Alan Johnson's testimony that Honken asked him to kill Kenneth Hansen, who was to participate in the bank robbery, so that they could split the money between them. *Id*., 3678-79. The prosecution proffered even more graphic testimony on the killing of Hansen by Mark Johnson, Alan Johnson's brother. Not only did it seek to present evidence that Mark Johnson was approached by Honken with the plan for a bank robbery, the prosecution sought to introduce testimony by Mark Johnson that Dustin Honken asked him to help kill Kenneth Hansen after the bank robbery; that Honken proposed disposing of Hansen's body by throwing it into a manure lagoon, where chemicals would eat away the remains; and that he wanted to kill Hansen so they would not have to split the proceeds of the bank robbery with him. Honken Tr. 3679.

The government's elicitation of testimony that it knew to be false runs afoul of

135

the long-established principle that the government has an affirmative duty to correct false testimony.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Bigeleisen*, 625 F. 2d 203, 208 (8th Cir. 1980); *United States v. Sanfilippo*, 564 F. 2d 176, 178 (1977).[34]

<div align="center">

**Claim Three**

**The Government Violated Its Obligations Under *Brady v. Maryland*
by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial
Prosecutor and His Association with a White Supremacist Prison Organization**

</div>

As outlined in Claim One, Section P,  AUSA Reinert wrote three memoranda to various law enforcement agents regarding the threats Dustin Honken made against AUSA Reinert and his family.  (Exh. 48, PLSP-000005-6, 000018, 000031).  The first two were to the District Security Manager; the third memorandum was to FBI Agent Scott Jennings.   In the first memorandum, AUSA Reinert summarized previous threats made by Honken against law enforcement, specifically his plans in 1996 to kill the DEA chemist, Reinert himself, drug agents and other cooperating individuals, and noted that the Justice Department took steps at that time to ensure the safety of the AUSAs involved in the case. (Exh. 48, PLSP-000005.)   Reinert also detailed a report from a federal inmate at USP Florence who was housed with Dustin Honken in which the inmate said that Honken knew where AUSA Reinert and his family lived, and outlined Honken's thorough plan to kill the AUSA's children, torture and murder his wife, then kill and decapitate AUSA Reinert, and making a bowl out of his skull.  (Exh. 48, PLSP-000005-6).

The second memorandum reported an upcoming meeting with the U.S. Marshal's Service to discuss security of AUSA Reinert's home and family.  The memo described

---

[34]     The prejudice to petitioner from the government's failure to correct testimony it knew to be false is compounded by counsel's unreasonable failure to correct the fundamentally inaccurate picture of Dustin Honken by the presentation of readily available evidence of his violent and aggressive nature that predated his acquaintance with petitioner.  *See* Claim One, section N.

<div align="center">136</div>

the security that had been installed after Honken's first threats against AUSA Reinert and his family, and reported what steps he had taken to increase the security in light of the more recent threats. (Exh. 48, PLSP-000018).

The third memorandum to FBI Agent Scott Jennings outlines what investigation into Honken's threats has been conducted, and suggests that a broader investigation into a conspiracy to murder witnesses and other individuals be undertaken in light of Honken's anticipated indictment and return to the Northern District of Iowa. (Exh. 48, PLSP-000031).

None of these memoranda were discovered to petitioner's trial counsel. Yet, Honken's propensity for violence was a major theme at petitioner's penalty phase. The government took the position, and introduced evidence, at penalty that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson. From the adduced evidence, the government argued that Angela Johnson had manipulated and encouraged Honken to commit the charged crimes. *See* Tr. 4011, 4026-27, 4049 and 4079-80.

Dustin Honken's plans to kill AUSA Reinert, and AUSA Reinert's response to the plans, contravened and undermined the prosecution theory presented at petitioner's penalty trial. AUSA Reinert and others in the Department of Justice took Honken's threats extremely seriously. They took steps to protect AUSA Reinert and his family. They investigated the reports of Honken's plans, and they sought the assistance of the FBI to expand that investigation. The memoranda outlining AUSA Reinert's response to the threats and the steps taken were clearly both material and favorable to the defense. They spoke volumes about the government's view of Honken's propensity for violence. As such, the government was obligated to produce them in discovery. *Brady v. Maryland*, 373 U.S. 83 (1963).

Without the memoranda, defense counsel were hamstrung in their ability to contradict the prosecution's theory. Defense counsel were left with the tepid cross-

137

examination of jailhouse informant Steve Vest as described in Claim One, Section L, Subsection 3,[35] rather than a vigorous examination of AUSA Reinert, a federal prosecutor who would have told the jury just how serious he took Honken's threats, what steps he took to protect his family and his home, and what further investigation he asked the FBI to conduct because he believed reports of Honken's threats to be so credible.

The prosecution's failure to disclose these memoranda violated petitioner's right to Due Process. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994 (*citing United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [s]he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles\ v. Whitley*, 514 U.S. 419, 434 (1995).

Here, the prosecution's theory was that petitioner was the driving force behind the homicides, and painted a picture of Honken as a bookworm with no proclivity for violence until he met petitioner. Disclosure of the memoranda would have led defense counsel to presenting the true Dustin Honken – a man with a violent and scheming nature. Disclosure "to competent counsel would have made a different result reasonably probable." *Kyles*, 514 U.S. at 441.

<div align="center">

**Claim Four**
**The Government Violated Petitioner's Rights Under the Sixth And Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and that of Her Co-Defendant.**

</div>

The Government initially charged Angela Johnson as a principal but then moved, before trial, to reflect its election to proceed to trial on the theory that Ms. Johnson was an aider and abettor." [Doc. 449.] Having made that election, the Government then repeatedly argued during Petitioner's trial that she was the more culpable of the two

---

[35]     *See* Tr. 2583-2584, 2616-2618.

<div align="center">138</div>

defendants for purposes of punishment. The Government elicited substantial testimony at Petitioner's trial that Dustin Honken had no history of violence prior to his meeting Johnson. Indeed, the Government went so far as to suggest that Honken was not even capable of murder absent the manipulation and negative influences of Petitioner. The Government argued that Angela Johnson was "egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling that trigger." (Tr. 4027). *See also* Tr. 4011, 4019, 4026-27 and 4079-80.

Yet, at Honken's trial, the Government followed a much different course. There, the Government described Honken as the master manipulator, the organizer, and Angela Johnson as the compliant dupe. The Government argued at Honken's trial:

> What kind of man after doing that [killing Greg Nicholson and the Duncan family] and having his own son born three months later can lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and a month later – you saw the video – have a happy Christmas with his family?

(Honken Tr. 3903).

> This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case. We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christie Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.

> We know that he purchased a handgun through his girlfriend Angela Johnson. Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there? Do you think Angela Johnson picked it out? Defendant picked it out.

(Honken Tr. 3905-06).

> The government also argued at Honken's trial:

> The defendant will plan an escape. You know how this defendant thinks now, don't you? You know what he's capable of. You know how intelligent he is. You know how he schemes and plans and thinks.

(Honken Tr. 3912).

139

Defendant thinks more of his dog . . . than he does of people, and he has no conscience.

(Honken Tr. 3917).

Those arguments were completely at odds with the presentation at Petitioner's trial. The position taken at Petitioner's trial were directly relevant to her culpability and numerous issues at Petitioner's penalty phase, including but not limited to her claims of substantial domination by Honken and lesser culpability than Honken.

The inconsistency in the Government's theories violated Petitioner's rights under the Due Process Clause, the Sixth Amendment, and the Eighth Amendment.


**Claim Five**
**Ms. Johnson was Tried While Incompetent, in Violation of the**
**Fifth, Sixth and Eighth Amendments to the United States Constitution**

Even before trial, Ms. Johnson's counsel were on notice that suffered from mental illness. Counsel knew that their client was taking psychotropic medication (H.Tr. 2025-26, 2066, 2195) and they observed symptoms of mental disorder. For example, Mr. Berrigan testified that Ms. Johnson had an "unrealistic perception of [her] situation." (H. Tr. 2045). When asked if he felt Ms. Johnson's unrealistic view was driven in part by mental illness, Mr. Berrigan responded:

> I think yes, to give the short answer. There are many notes where when I visit her in jail we're having discussions and she's behaving erratically, either overly emotional. Sometimes she engaged in this rocking back and forth behavior that was a little disconcerting. Sometimes she had difficulty focusing on the issues that I really wanted to discuss. And throughout her stay I think in most of these jails, maybe not all of them, she's on some type of anti-anxiety medication. So she was anxious about her situation. All clients are anxious in this situation, but she was extremely anxious.

(H.Tr. 2045). Mr. Berrigan testified about a meeting with Angela Johnson on August 21, 2003, at which they discussed the current posture of the case. Mr. Berrigan arrived before his co-counsel, Mr. Willett, and described Ms. Johnson as:

> . . . doing this (demonstrating) back and forth, is shaking back and forth.
> . . . Rocking – right, rocking, and she sometimes hugs herself like this.

140

> Sometimes she has her hands down like this, but it's obvious she's in some distress. And so the first ten minutes that we're talking this keeps up. And it wasn't uncommon. I didn't always note it, but this would happen, particularly when we're – she and I are talking about the government's evidence. When I'm confronting her with the government's evidence, she's doing this rocking. And then Al [Willett] arrived, and then she was fine. She seemed markedly more relaxed. I didn't make a note that the discussion changed or that the subject discussion changed, but I suspect it did. And then I wrote down I pretty much tried to shut up as a result. And I think probably I was talking about this plea. She was getting upset. So I stopped.

(H.Tr. 2052).

Mr. Berrigan, however, acknowledged that he has no mental health training, unlike a mitigation specialist, and that:

> Yeah, well I may be misperceiving this all together. I mean, my view of the situation here is Angie with her daughters is just stressing out. You know, this is just stressful, very, very painful. I don't know that I looked at it as a mental health issue, that this rocking back and forth means there's something mentally going on there that's a bad. She's a mother. I don't – we don't typically have a lot of female capital defendants, frankly. I think I've had maybe two or three. And then when they have children on top of it, that relationship is just – it's inviolate. They don't think of anything else. So I'm sort of looking at it as she's worried about leaving her children. Maybe that's not how Miss Goody would look at it or somebody who has mental health training.

(H.Tr. 2061-2062). At another meeting, during a discussion of the defense of after-acquired knowledge, Mr. Berrigan, who believed that Christie Gaubatz' involvement in the crimes was "preposterous" and the "Sophia Jensen" letter sent to Dustin Honken was "hocus pocus," thought Angela Johnson's mental problems were affecting her ability to rationally perceive what was going on and questioned whether she was appropriately medicated. (H.Tr. 2195). He made a note to discuss petitioner's medications with Dr. Logan, but never did so. (H. Tr. 2195 - 96).

Mr. Stowers has described Ms. Johnson's behavior in similar terms. While testifying about one of his first meetings with Ms. Johnson, he was referred to his notes which stated: "Met Angela Johnson at jail, emotional, attempted suicide, no plea bargaining desired, asked questions – asked various questions, showed photos – show photos of girls and first boyfriend." Mr. Stowers testified:

141

I remember meeting her that first time, and I had a recollection that Pat [Berrigan] was there, so I'm not remembering that meeting all that well. But I remember she was very emotional, and if this was the one meeting that I had described to you on the phone where she was in her chair sort of rocking like this – [Mr. Burt notes for the record, "You're sort of rocking back and forth with your hands on your lap?]. Yeah, and she was looking down and rocking back and forth in the chair as Pat was confronting her with – with the facts of life. But I'm not certain that was on April 3 as I sit here at this moment right now. It was one of the early meetings.

(H.Tr. 1114).

On May 6, 2005, two days after the opening state at the guilt phase of her trial, Angela Johnson's medication was increased by Dawn Nolan, a Physician's Assistant at the Woodbury County Jail. (Doc. 26, Exh. 26). Thereafter, Ms. Johnson received 300 milligrams of Zoloft and 200 milligrams of Seroquel daily during her trial.[36] The increase in Zoloft to 300 milligrams daily had a marked effect on Ms. Johnson's demeanor and ability to understand and participate in her capital trial.

The description by Lisa Dahl of Ms. Johnson's courtroom demeanor before her medication was increased is instructive. Ms. Dahl described petitioner's demeanor during jury selection as at times "girly or giddish" and at times "harsh" or "judgmental." (H.Tr. 338) Ms. Dahl described petitioner as engaged in the jury selection process, drawing pictures of jurors, taking notes, and sharing her reactions to jurors. (*Id*., at 339). Ms. Dahl's concerns about petitioner's demeanor caused her to advise trial counsel, advising them that they needed to work on calming her and that she needed to maintain her composure so that she did not appear judgmental. (*Id.,* at 350-51).

After the increase in Zoloft, there was a dramatic change in petitioner's demeanor, which is described by a number of different persons who attended the trial. Nancy Lanoue was at petitioner's trial every day except during jury selection. She testified that petitioner seemed out of it, almost like she was drugged. (H.Tr. 430-41).

---

[36] Prior to August 6, 2005, Ms. Johnson had been taking 200 milligrams per day of Zoloft, 50mg more than the upper limit of the usual daily dose. Goodman & Gilman's The Pharmacological Basis of Therapeutics, 12th Ed., Table 15-1.

142

Melissa Launspach was present in the courtroom during the penalty phase, and was able to observe petitioner during breaks and lunch as well as going to and from the courtroom. Ms. Johnson doodled a lot, with her head down on her paper. (H.Tr. 509). Although she would raise her head at times, for the most part she looked down at the table. Ms. Launspach described petitioner's demeanor as "disinterested." She did not notice her responding to friends and family members with consistent emotion, but only when she first saw them. (H.Tr. 510).

Dean Stowers testified that petitioner, particularly during the guilt phase, "most often was looking down and doodling and drawing pictures and this sort of thing in a note pad and appeared to be very detached from the proceedings themselves . . . ." (H.Tr. 1558). He attributed her behavior to "her need to keep some kind of psychological separation . . . or mental separation from the evidence of the crimes." (*Id*.). Alyssa Johnson attended the trial as often as she could and sat behind her mother, at an angle so that she could see some of her face. She testified that her mother "would just sit there with a very blank expression on her face." It did not seem to Alyssa that petitioner was hearing everything, understanding and taking in the actual proceeding. Petitioner's demeanor was different from the mother Alyssa knew, who had always been happy go lucky and upbeat. (H.Tr. at 1657). When Alyssa visited her mother at the United States Marshal's Office during breaks in the trial proceedings, she found her "different," explaining that it did not seem as though she had just walked out of a courtroom, and she found it odd that her mother spoke of the proceeding "very minimal[ly]." (*Id*., at 1658).

Wendy Jacobson was able to observe her sister, the petitioner, while she testified, after she testified and at the Marshal's Office during breaks. (H.Tr. 1949). During the trial, petitioner seemed to be scribbling circles on paper, like a kindergartner, and did not seem to be aware of the intensity, magnitude and seriousness of the trial. (*Id*., at 1949-50). During Ms. Jacobson's visits with petitioner at the Marshal's Office, she did not seem to comprehend what was going on; she seemed to be confused, in a

<div align="center">143</div>

childlike state.  Ms. Jacobson did not think her sister behaved in a manner appropriate for someone who was on trial for her life in a death penalty case.  (*Id.*, at 1950-51).

Patrick Berrigan testified that during trial, petitioner "mostly scribbled and drew pictures."  He did not remember a lot of substantive writing.  Although petitioner had some lucid moments, she was kind of in and out.  (H.Tr. at 3136-37).   According to Mr. Berrigan, petitioner was "spacing out during the trial."  He did not know if this was a defense mechanism, because petitioner did not want to hear the testimony or she was afraid of how she might react.  Mr. Berrigan vividly remembers buying little boxes of candy, Nibs, for petitioner during trial.  In Mr. Berrigan's view, it was better for petitioner to be "zoned out" than reacting to evidence.  (H.Tr. at 3137-38).  Although he cannot say whether petitioner was zoning out "voluntarily or involuntarily," he states unequivocally that when she zoned out she was not paying attention to the proceedings.  (*Id*., at 3138-39).   Petitioner incorporates, as if fully set forth herein, Claim One, Subclaims D and E.

There was a dramatic difference in petitioner's behavior after, and as a direct result of, the decision to increase her medication.  Yet trial counsel did nothing.  They did not monitor her medication, they did not question her flat affect, her scribbling with her head down, her "zoning out" or any of the behavior that troubled many observers at her trial.  Rather, they seemed relieved that their client was not reacting to the evidence, and were content to have petitioner sitting in court in a zombie-like state because they viewed this as an improvement over her pre-medicated behavior.

Petitioner was tried while incompetent.  She was not "able to provide needed information to h[er] lawyer and to participate in the making of decisions on h[er] behalf." *Riggins v. Nevada,* 504 U.S. 127, 44 (1992).  The side effects of the medications she was administered hampered the attorney-client relationship, by "preventing effective communication and rendering [Ms. Johnson] less able or willing to take part in h[er] defense." *Ibid.*   Ms. Johnson's over-medication rendered her incompetent, and her trial while incompetent violated her rights under the Fifth, Sixth and Eighth Amendments.

144

## Claim Six

### Misconduct By Juror No. 55

Juror No. 55 was asked whether he had "ever been mentally, physically or emotionally abused as a child." He checked "no." (Doc. 26, Exh. 23, p. 6). He was also asked whether he was "familiar with" various participants in the trial, including Judge Bennett; he checked "no" in response to this question. (*Id.*, at p. 16). At the end of the questionnaire, Juror No. 55 "declare[d] under penalty of law that I have answered truthfully and completely all questions in this questionnaire." (*Id.*, p. 18).

A post-trial interview of Juror No. 55 revealed serious misconduct by this juror. During deliberations, when other jurors would say voting for the death penalty would make them murderers as well, Juror No. 55 answered this argument:

> I explained how that is not true. She'll go through automatic appeals. I think three automatic appeals. We are not the final decision. We just set the stage she will have to act upon. I used to be in law enforcement, so I know a few things."

(*Id.*, p. 2).

In the recess between penalty phase evidence and closing arguments, Juror No. 55 went to Wisconsin to see his son in prison. He asked the guard about the differences between being on death row and doing a life sentence. The guard told him that "on death row you are alone, like in solitary confinement, and with a life sentence you are in general population, like everyone else . . . ." (*Id.*, p.3).

> Juror No. 55 also revealed that he was subjected to serious abuse as a child: Because of the mother [petitioner's mother], there were things said by her that really pissed some of us off. All this about she [petitioner] was such a battered person. There were a couple of us that have been through a hell of a lot worse than she had. She never was beaten so bad that she couldn't sit down for a month. A couple of us, we had it rough, and we didn't turn out to do drugs and kill people.

(*Id.,* at 3).

On March 4, 2011, Juror No. 55 was interviewed by SAC John Graham of the Division of Narcotics Enforcement. Juror No. 55 acknowledged having made

145

statements set forth in the previous paragraph, but denied he made those statements to an investigator; he stated that he "did not recall speaking to an investigator after the trial." Juror No. 55 said that he made the statement at issue "to other jurors [in this case], not to an investigator," and further explained that the statement was made "during deliberations." In addition, Juror No. 55 described one incident of abuse that he experienced when he was a child. While working for his father at a construction site, Juror No. 55 fell asleep on a stack of sheet rock; while he slept, his father stapled his clothing to the sheet rock, hung the sheet rock on the ceiling, and went to lunch. Upon returning, he let his son, Juror No. 55, down from the ceiling. Juror No. 55 explained that "he didn't think his father's form of discipline was abuse;" that "it was not until he started therapy that he figured out his father was abusive;" and that "he began group therapy sessions after the completion of the Johnson trial."

Investigation by post-conviction counsel revealed that on April 2, 2002, Judge Bennett sentenced the son of Juror No. 55 to consecutive sentences of 40 months for conspiracy to distribute methamphetamine and 60 months for conspiracy to commit a violent crime. (Doc. 26, pp. 106-107). At the time Juror No. 55 sat on the jury that convicted petitioner and sentenced her to death, the son of Juror No. 55 was serving the sentences imposed by Judge Bennett; in fact, Juror No. 55 visited his son in prison during the break between penalty phase evidence and argument. (*Id*.)

Petitioner's Sixth Amendment right to an impartial jury was violated because Juror No. 55 concealed his history of physical abuse as a child and his familiarity with Judge Bennett, who had sentenced his own son in a criminal case. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2 663 (1984).

### Claim Seven

### Cumulative Constitutional Errors Rendered Ms. Johnson's Convictions and Sentences Constitutionally Infirm

As the result of the errors described in this motion, considered individually and

146

considered cumulatively, Angela Johnson was denied a trial that comports with her rights under the Fifth, Sixth and Eighth Amendments.

## Claim Eight

### The Eighth Amendment Requires a Heightened Standard
### of Proof for Imposition of the Death Penalty

The execution of a person who is actually innocent, while not an actual constitutional violation according to the Supreme Court,[37] would certainly stretch the definition of civilized conduct to the breaking point. Proof beyond a reasonable doubt can be founded entirely on the basis of fallible human perception, testimony affected in its veracity by a myriad of human motivations, scientific hypothesis and circumstance. The risk that such evidence will cumulate to "proof beyond a reasonable doubt" but not "truth" is small but extant. See Gran, David, "Trial by Fire: Did Texas Execute an Innocent Man," *New Yorker*, September 7, 2009.[38]

In Ms. Johnson's case, the evidence adduced by the prosecution consists of the testimony of fallible humans and circumstantial evidence. We do not know with the certainty required for the government to take a life what Angela Johnson did on the nights of July 25 and November 5, 1993. This uncertainty about her role is far too great for the constitution of a civilized nation to tolerate her execution.

---

[37]     *Herrera v. Collins*, 506 U.S. 113 S. Ct. 853, 122 L. Ed.2d 203 (1993).

[38]     At least one state has recognized the unacceptable possibility that an innocent person could be executed in our current system by requiring that a defendant be linked to a crime by DNA or other forensic evidence, by actually committing the crime on videotape, or by videotape confession. See, Md. Code Ann., Crim. Law § 2-202 (2003).

147

**Claim Nine**

**Petitioner Suffers From Severe Mental Illness and
the Eighth Amendment Precludes Her Execution**

Execution of the mentally retarded is prohibited by the Eighth Amendment. *Atkins v. Virginia*, 563 U.S. 304, 321 (2002). Petitioner contends that under the rationale of *Atkins*, the Eighth Amendment precludes the execution of persons suffering from severe mental illness.

Although *Atkins* did not explicitly address a categorical exception for persons who are severely mentally ill, its reasoning makes necessary an expansion of Eighth Amendment protection to such individuals. *Atkins'* bar on the death penalty for the mentally retarded was levied to remedy the very wrongs inherent in the execution of the mentally ill. People with mental illness, like petitioner, share the characteristics that make execution of a mentally retarded individual inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, poor impulse control and poor ability to engage in meaningful cost-benefit analysis. American Bar Association, *Special Feature: Recommendation and Report on the Death Penalty and Persons With Mental Disabilities*, 30 Mental & Physical Disability Law Reporter 668, 670 (2006).

In addition, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. *See Atkins*, 536 U.S. at 312, 316 n. 21 (the Eighth Amendment analysis is "informed by objective factors," such as the use of professional "organizations with germane expertise").

Ms. Johnson's "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," *Atkins*, 563 U.S. at 318, compels that the same result reached in *Atkins* be applied to Ms. Johnson.

148

**Claim Ten**

**The Bureau of Prisons' Method of Carrying out the Petitioner's
Execution by Lethal Injection Violates the Fifth and Eighth Amendments,
the Administrative Procedure Act, and the Controlled Substances Act**

The Bureau of Prisons method of carrying out the petitioner's execution by lethal injection violates the Eighth Amendment's prohibition against cruel and unusual punishment. Further, petitioner has been denied due process under the Fifth Amendment because the Bureau of Prisons has refused to disclose the procedures that will be utilized in carrying out petitioner's execution. The BOP has also failed to follow the Administrative Procedure Act's rule making procedures when promulgating their lethal injection protocol.[39] Finally, the BOP has arbitrarily and capriciously failed to exercise their authority to enforce the Controlled Substances Act against persons dispensing one of the lethal injection drugs, sodium thiopental, without a valid registration, and the protocol's failure to require registration precludes enforcement of the registration requirement.".[40]

---

[39] The APA "provides judicial review to any 'person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Webster v. Doe*, 486 U.S. 592, 597 (1988) (quoting 5 U.S.C. § 702). However, under 5 U.S.C. § 701(a), judicial review under the APA is not available if the relevant statute precludes review or if the "agency action is committed to agency action by law." 5 U.S.C. § 701(a). See, *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). But see, *Roane v. Holder*, 607 F.Supp.2d 216, 228 (D.D.C. 2009)("Because Count V alleges an APA challenge to an alleged general nonenforcement policy and the defendants' lethal injection protocol itself, the defendants' motion to dismiss Count V and the DEA Administrator as unreviewable under Heckler will be denied.")

[40] The CSA requires "[e]very person who dispenses, or proposes to dispense, any controlled substance" to "obtain from the Attorney General a registration" unless the registration requirement is waived by the Attorney General. 21 U.S.C. §§ 822, 829, 841(a)(1). "The Attorney General may, by regulation, waive the requirements for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety." 21 U.S.C. § 822(d). There is generally a "presumption

149

In support of these claims, petitioner alleges the following facts:

In late July, 2008 the Bureau of Prisons, responding to a 1983 action in the federal district court in Washington D.C. which challenged federal lethal injection procedures, appended to their Reply Brief a new Bureau of Prisons ("BOP") execution protocol, not previously seen by Plaintiffs or their experts. [41] The BOP claimed that the new protocol laid to rest all Eighth Amendment challenges under *Baze v. Rees,* __U.S.___, 128 S. Ct. 1520 (2008).

*Baze* in fact holds that a substantial risk of the maladministration of the protocol in a manner that creates a substantial danger of inadequate anesthesia renders the procedure unconstitutional. See, e.g., *Baze*, 128 S. Ct. at 1526, 1530-31, 1533. Whether the BOP's procedures create a substantial risk of maladministration depends not only on their written protocol but also on the personnel's ability to implement the protocol as intended. Defendants seek to avoid judicial scrutiny of their ability to constitutionally implement execution procedures by altering their written protocol. But not only does BOP's newly-revised protocol differ from the protocol approved in *Baze*, BOP's personnel are incompetent and unfit and therefore are no more likely to properly implement the new protocol than they were the previous one. Cosmetic changes to the

---

against reviewability for 'an agency's decision not to take enforcement action' " established in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). However, "[t]o the extent the plaintiffs are claiming that the defendants have made a general statement about their policy of enforcement of the CSA with respect to federal lethal injections divorced from any fact-specific enforcement decision, the plaintiffs have stated a claim outside the scope of the Heckler presumption against judicial review. Similarly, the plaintiffs also challenge 'the lethal injection protocol itself,' arguing that the protocol's 'failure to require registration ... preclud[es] enforcement of the registration requirement.'... To the extent the plaintiffs are arguing that the lethal injection protocol itself is unlawful, such a claim is not foreclosed by *Heckler*." *Roane v. Holder*, 607 F.Supp.2d 216, 227 (D.D.C. 2009).

[41]     The case is *Roane v. Holder*, 607 F.Supp.2d 216, 227 (D.D.C. 2009). The BOP's original and amended protocols are attached hereto as an Exhibit to Claim Nine.

150

written protocol cannot mitigate the substantial risk created by BOP's pervasive incompetence and lack of fitness. There is a substantial risk of maladministration of the execution protocol such that the resulting risk to petitioner states a claim under the Eighth Amendment and *Baze*.

**A.**        **Under *Baze*, the BOP's Failure to Employ Competent Execution Personnel, Their Haphazard Drug Administration Procedures and The Absence of Sufficient Safeguards Create a Substantial Likelihood of Maladministration and Inhumane Executions**

*Baze* did not, and could not, hold that as long as the government employs facially qualified personnel and a protocol similar to Kentucky's, it does not matter how systemically flawed and dangerous the government's actual practices and personnel are. Evidence of this sort was not before the *Baze* Court, but it is at the core of petitioner's allegations here. Petitioner's allegations regarding the dangers posed by unqualified personnel, faulty procedures and inadequate safeguards clearly constitute allegations of the requisite risk of serious harm. See *Baze*, 127 S.Ct. at 1562 (Thomas, J., concurring in the judgment) (stating that under the Plurality's opinion, the lower courts are now tasked with the obligation to determine what evidence is sufficient to demonstrate substantial risk).

Errors and deviations from the protocol, resulting in inadequate anesthesia are a foreseeable inevitability so long as the BOP employs personnel who are unable or unwilling to perform their execution responsibilities properly, and, relies upon a non-specific protocol, that tolerates and exacerbates the shortcomings of such personnel. See *Harbison v. Little*, 511 F. Supp. 2d 872, 891 (M.D. Tenn. 2007) (employing the substantial risk standard used in *Farmer v. Brennan*, 511 U.S. 825 (1993), and subsequently in *Baze*, in finding that the "failure to utilize adequately trained executioners" contributed to substantial risk of excruciating pain); see also *Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006) (finding that pervasive incompetence and lack of training created "undue" and "intolerable" risk).

151

Contrary to the BOP's assertions in the *Roane* case, *Baze* contemplates that lower courts will consider a number of areas critical to the execution process. The BOP prove lacking in each of them.

### 1. Executioner Incompetence

The *Baze* plurality was careful to note that Kentucky's execution personnel, with EMT level training, were "trained and experienced," and that it had found no evidence that they were not competent to perform their execution responsibilities. 128 S. Ct. at 1533-34, 1537; *Baze v. Rees*, Oral Arg. Tr. 27:22-24 (Jan. 7, 2008) ("literally the best qualified human being in the Commonwealth of Kentucky ... place[s] the IV line"). In fact, as Justice Ginsburg noted, Kentucky uses a phlebotomist with 8 years ' experience and an EMT with 20 years' experience. Jd. at 1569 (Ginsburg, J., dissenting).

BOP's New Protocol, on the other hand, offers no such assurances. It provides that lethal substances shall be administered by "qualified personnel," par. A, which is partially defined to "*include*[] currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, [and] other medically trained personnel, including those trained in the United States Military having at least one year professional experience." para. D (emphasis added). However, the New Protocol further defines "qualified personnel" to include "other personnel with *necessary* training and experience in a specific execution related function" and "[n]on medically licensed or certified" persons who have participated in "a minimum of ten (10) execution rehearsals a year and ... at least two (2) execution rehearsals prior to participating in an actual execution." Id. (emphasis added). In other words, under BOP's New Protocol, execution personnel need not have any medical training or certification, so long as they (1) have what the BOP views -- but does not define --as "necessary training and experience;" and (2) have participated in as few as two execution rehearsals, the content of which is undefined and unknown. Therefore, on its face, the New Protocol does not require the same level of qualification as the Kentucky protocol approved in *Baze*. Contrary to BOP's argument in *Roane*, then, even if the only

<p style="text-align:center">152</p>

relevant analysis under *Baze* was whether the New Protocol was "substantially similar" to Kentucky's protocol, the New Protocol is materially inferior to Kentucky's with regard to what the *Baze* Court found to be the "most important" safeguard against unconstitutional executions.

And in any event, petitioner hereby alleges, and the evidence substantiates, that BOP employs incompetent execution personnel who -- whatever their on-paper qualifications -- are unprepared to implement the procedures properly. In this case, far more is known about the execution team's actual qualifications (or lack thereof) and performance than was known in *Baze*. Petitioner alleges and is prepared to show that BOP has a history of hiring unqualified and incompetent medical personnel and, by their own admission, place total faith in, and rely implicitly on, the advice their medical personnel provide them in the execution context. The selection of, and reliance on, incompetent and unfit execution team members causes great concern that the lethal injection procedures will be implemented in an unconstitutional manner. See *Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006) (finding California's execution protocol constitutionally defective based upon a record replete with evidence that in actual practice, California's execution protocol does not function as intended; one "critical deficienc[y]" the court identified was "inconsistent and unreliable screening of execution team members.").

More generally, the Kentucky protocol approved in *Baze* requires that IV personnel participate in 10 execution rehearsals -- which "encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers"-- per year. 127 S. Ct. at 1534. While BOP's New Protocol makes reference to similar qualifications, it does not require that federal execution personnel take part in similar training in order to be qualified for the team. Further, there is no requirement in the New Protocol that the medically trained executioners undertake any training with the

153

BOP executioners, which apparently continues BOP's prior practice. [42]

The deficiencies in the qualifications and practices of BOP's execution personnel, which are exacerbated by the New Protocol's failure to require adequate training, create a substantial and remediable risk that federal executions will be improperly performed. [43] See, e.g., *Harbison*, 511 F. Supp. 2d at 891 ("failure to utilize adequately trained executioners" contributed to substantial risk of excruciating pain). There is ample evidence that BOP's executioners, whatever their on-paper qualifications, have performed incompetently in previous executions. Their incompetence demonstrates that BOP's practices, regardless of the language in the New Protocol, have created a substantial risk that petitioner will be inadequately anesthetized and will suffer serious harm.

Further, there is no guarantee that BOP will not recruit similarly incompetent and/or unfit personnel to complete its execution team. There is also no guarantee that BOP will not, as they have in the past, fail to adequately train and support these personnel in their performance of the New Protocol. These failures are particularly likely to lead to maladministration of the execution procedure because the New Protocol leaves to the discretion of the execution team the manner in which many of the crucial steps, such as whether to use peripheral or femoral IV access, will be accomplished. Where BOP employs personnel who are unable or unwilling to perform their execution responsibilities

---

[42] Neither of the two physician executioners ever practiced with the BOP executioners prior to the first three federal executions. The nurse executioner attended only one training, just prior to the McVeigh execution.

[43] While the plurality in *Baze* affirmed the trial court's findings that there was no evidence that Kentucky's personnel were not "trained and experienced," it did not hold that evidence that personnel are untrained, incompetent or unfit would be irrelevant to a lethal injection challenge. Indeed, because all that was known about Kentucky's personnel was their on-paper qualifications, the Court did not have before it any evidence that individual execution personnel, while perhaps facially qualified, were in fact unable or unwilling to perform executions properly.

154

properly, errors and deviations that result in inadequate anesthesia are foreseeable inevitabilities. Other courts have recognized the close connection between incompetence, official disregard, and a substantial risk of inhumane executions. For instance, in applying the "substantial risk" standard to Tennessee's protocol, the court in *Harbison v. Little* concluded that evidence that the execution personnel did not understand and were unable to perform their responsibilities under the protocol created a substantial risk of maladministration and inadequate anesthesia. 511 F. Supp. 2d, 872, 891 (M.D. Tenn. 2007); see also *Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006) (finding that pervasive incompetence and lack of training created "undue" and "intolerable" risk).

### 2. Drug Administration Deficiencies

The lack of competence on the part of execution personnel described above makes drug delivery failures, and therefore inadequate anesthesia, more likely. The execution team's ability to insert and maintain reliable IVs is crucial to ensuring successful administration of the lethal injection drugs.[44] In Baze, the plurality noted that there was no evidence of any IV problem in Kentucky's single execution, 128 S. Ct. at 1528, and therefore there was no showing of a substantial risk that such problems would occur in the future, id. at 1537-38. In contrast, several foreseeable drug delivery problems have occurred in previous federal executions, and they are not likely to be corrected by the New Protocol.

For instance, an obvious and substantial risk of harm unique to BOP's procedures is the practice of administering the pancuronium and the potassium within a minute of the thiopental. Thiopental takes more than a minute to bring the inmate to a sufficiently deep level of unconsciousness -- a state known as "burst suppression" --where he will be unable to feel the pain caused by the second two chemicals. It is highly unlikely

---

[44] Infiltration, catheter migration, and other IV problems can result in the delivery of insufficient thiopental to fully anesthetize, but sufficient pancuronium and potassium to paralyze and cause pain and death.

<div align="center">155</div>

that a prisoner will achieve burst suppression within 15 to 20 seconds after receiving a dose of thiopental. *Baze* considered only the inmates' claim of risk that the chemicals would not be administered in their intended doses, and thus had no occasion to confront the risks that are created by injecting the intended doses in too quick a sequence. But what little evidence there is in *Baze* on this point suggests that Kentucky pauses after administering the thiopental to allow for a consciousness check. 128 S. Ct. at 1534. [45]

BOP's New Protocol retains procedures that differ in other critical respects from the Kentucky protocol approved in *Baze*. For example, the *Baze* Court relied heavily on the fact that the Kentucky protocol required execution personnel "to establish both primary and backup lines and to prepare two sets of the lethal injection drugs before the execution commences. 128 S. Ct. at 1534. As the *Baze* Court held, "(t]hese redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected." Id.

BOP's New Protocol requires a backup line if the lethal drugs are delivered peripherally, but provides that the BOP Director or his designee may choose the means of IV access (femoral or peripheral) on-site. Although the New Protocol deletes the prior version's statement that femoral access is "preferred," it does not restrict in any way the ability of the Director or designee to opt for this method, in which case there will be no backup line. [46]

---

[45] It is ostensibly for this reason that Arkansas and Missouri have amended their protocols to require a three minute pause after administering the thiopental. *Taylor v. Crawford*, 487 F.3d 1072, 1083 (8th Cir. 2007); *Nooner v. Norris*, Case No. 5:06-cv-00110-SWW (ED AR, August 5, 2008). BOP's New Protocol does not have this safeguard.

[46] Moreover, femoral access-i.e., the insertion of a catheter into the femoral vein (located in the groin and buried anywhere from about half an inch to several inches below the skin)-is an invasive procedure that can be expected to cause significant pain

156

Without further discovery into the question of when, under the New Protocol, femoral access will be used, there is no basis on which to determine whether BOP's execution procedures will continue to use femoral catheterization, a procedure that creates needless and substantial risk of pain and suffering, as its default.

In addition to lacking the safeguards upon which the *Baze* Court expressly relied, BOP's protocol also raises a number of issues not even considered in *Baze*. For example, the New Protocol calls for the preparation of 40 syringes of four different substances, and although it specifies the order in which those syringes are to be administered (because, were they administered out of order, the execution would be unconstitutional), it provides no labeling or handling instructions meant to ensure that they are administered in proper order.

### 3.    Lack of Safeguards

The *Baze* Court based its approval of the Kentucky system on the "safeguards" Kentucky had put in place "to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner." Id. BOP's New Protocol lacks the critical safeguards upon which the *Baze* Court relied in finding that the Kentucky protocol does not violate the Eighth Amendment.

First, unlike in Kentucky, BOP's execution personnel have little to no ability to observe the prisoner during the execution.[47] The New Protocol does not require any

---

even with the use of local anesthesia, and physicians generally use femoral lines only where peripheral access is impossible, and then, only after providing intravenous sedation through a peripheral line. And in addition to the pain it can be expected to cause, femoral access can result in numerous excruciating complications, including hematomas. The BOP's execution facility does not contain the equipment and supplies necessary to address these complications. The use of femoral IV access, particularly when such an invasive procedure is not medically indicated, was not considered by the *Baze* Court.

[47]    Although one Senior BOP official is designated to be on site, the Protocol does not require that he or she be in the execution chamber with the prisoner. This BOP

157

executioner or BOP official to remain in the execution chamber during the entire execution process. The lighting in the execution facility, as verified by Plaintiffs' lighting expert in *Roane*, is poor. The line of vision from the chemical room to the execution gurney and the prisoner is obstructed. It is impossible to observe the entire length of the IV lines from inside the chemical room. And, even if the New Protocol required an executioner to be present in the execution chamber through the course of the execution, which it does not, that person's ability to observe the last portion of the IV lines as well as the IV site(s) would be obstructed by a sheet that covers the prisoner's body. As the *Baze* plurality recognized, effective observation is crucial in detecting IV failures and signs of consciousness. 128 S. Ct. at 1534.

The *Baze* Court also relied heavily on the presence of the warden and deputy warden in the execution room "to watch for signs of IV problems, including infiltration." *Baze*, 128 S. Ct. at 1534. The New Protocol does not require anyone to remain in the execution room for any specified period. And although it does provide for inspection of the IV site, it states merely that "the IV site will be physically examined, *to the extent practicable*," following the injection of sodium thiopental. para. I (emphasis added). Without further discovery, it is impossible to know how execution personnel will interpret "to the extent practicable" (or how or if they have been told to interpret it in rehearsals). Moreover, the New Protocol does not alter the BOP's practice of covering the inmate from head to toe with a sheet, so it is unclear to what extent inspection of the IV site will be "practicable" in view of this covering.

Additionally, BOP's New Protocol gives the BOP Director or "his/her designee" authority to modify *any* part of the procedure "as necessary to ( 1) comply with specific

---

official is not tasked with the responsibility for observing the inmate or any part of the drug administration process. Nor does the New Protocol require that any executioner, with medical training and experience, be present in the execution room with the prisoner through the course of the execution.

158

judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) *as may be required by other circumstances*" (emphasis added). The New Protocol does not specify any criteria to be used in evaluating the need for any such  modifications.[48]  Thus, it is clear that the procedures described in the New Protocol are not necessarily the procedures that will be used to execute the petitioner. Given this all-purpose "escape hatch," the Court cannot conclude from the face of the New Protocol what procedures BOP will use to execute petitioner and certainly not whether they would pass muster under *Baze.*[49]  At a minimum, further discovery and expert opinion are needed with regard to the many facets of unlimited discretion provided for in the protocol.

In short, BOP's claim in *Roane* that their lethal injection procedures are "substantially similar" to the procedures approved in *Baze* is both wrong and irrelevant.[50]

In reality, BOP's system is unique in its deficiencies, and the assurances on which the *Baze* plurality relied are entirely absent here. Furthermore, even if this Court

---

[48]      The New Protocol also provides that when any "member of the execution team becomes aware of a situation not contemplated in this procedure" that person should notify the supervisory BOP team member who is required to "advise" the Director's on-site designee who, in turn, must consult with the United States Marshal about how to proceed. The New Protocol does not specify any criteria for identifying situations "not contemplated."

[49]      A BOP witness in Roane, who has participated in each of the three executions BOP has carried out to date testified that he has never seen a written procedure during his performance of past executions .

[50] In addition, the New Protocol lacks any assurance that qualified personnel, adequate equipment, or appropriate medications are on hand in the event of a need for resuscitation, an eventuality that the New Protocol contemplates. See para. L. As seen in the Kentucky protocol under review in *Baze*, see Baze v. Rees, No. 07-5439, Joint Appendix Vol. IV at 985, medical personnel and medical equipment can be made available for such purpose. This issue is relevant, in light of the heightened risk of maladministration of anesthesia under the New Protocol.

159

were to accept the government's anticipated argument that the New Protocol is facially substantially similar to Kentucky's, the crucial question is whether the New Protocol can be implemented properly, an inquiry contemplated under *Baze*. Petitioner is entitled to explore BOP's assumption/assertion of proper implementation. Petitioner's allegations - as well as the evidence amassed to date in *Roane* - require judicial scrutiny and therefore cannot be resolved by a Judgment on the Pleadings. Additionally, now that BOP has suddenly changed the protocol in material respects in mid-stream, further discovery is needed to determine whether personnel can implement this protocol.

**B.      There Are Readily Available Alternatives That Would Substantially Reduce the Risks of Maladministration and Inhumane Executions[51]**

There are "feasible [and] readily implemented" alternative procedures available to BOP that will "significantly reduce the risk[s]" described above. *Baze*, 127 S.Ct. at 1532. The available alternatives are not just feasible, they are obvious. At a minimum, BOP should not inject the pancuronium and potassium until at least three minutes have elapsed since the injection of the thiopental. And BOP should not give supplemental doses of pancuronium and potassium without first giving a supplemental dose of thiopental. Execution personnel should be present in the execution chamber to be able to closely monitor the execution procedure. The record in *Roane* reveals no impediment to these reforms -- not only has the federal government never articulated a justification for either aspect of its current practice, but other States have implemented precisely these changes -- and they would represent a substantial improvement in BOP's practices.

---

[51]      In *Baze*, the Court found that a prisoner challenging a lethal injection procedure must show that the challenged protocol gives rise to a "substantial risk of serious harm," and that the governmental entity involved has refused, "without a legitimate penological justification" to implement an alternative that is "feasible, readily implemented, and [which] in fact significantly reduce[s] a substantial risk of severe pain." 128 S. Ct. at 1532. Prior to *Baze*, no controlling authority required a petitioner to prove that such an alternative existed. Based on evidence developed in Roane, petitioner is prepared to do so with leave of this Court and adequate expert funding.

160

But while such overdue reforms would be welcome, they are not sufficient to remedy entirely the substantial risks in BOP's practices. The feasibility of an "anesthetic-only" protocol was not definitively addressed in *Baze* because that "alternative was not proposed to the state courts below." *Baze*, 128 S. Ct. at 1534. Having no findings to review on the efficacy of that reform, the Supreme Court could not have concluded in the first instance whether it was feasible or readily implementable. This Court, however, has the opportunity to hear and consider evidence concerning the efficacy of such a protocol. There is no dispute that a sufficiently large dose of a barbiturate would be lethal and painless; the only remaining question is whether some legitimate, countervailing consideration makes the use of a single drug infeasible. Defendants' expert in *Roane*, Dr. Mark Dershwitz, advised Tennessee in April 2007 to switch from its three-drug protocol to "a one-drug protocol which provided for the administration of 5 grams of sodium thiopental, ... and a waiting period of five minutes before the physician came in and confirmed death." *Harbison*, 511 F. Supp. 2d at 876. In any case, given the factual nature of the question, additional discovery is certainly warranted.[52]

C.      **Whether the BOP's New Protocol Is Constitutional Even under *Baze* Cannot Be Answered Without Further Discovery**

The New Protocol has not previously been disclosed to plaintiffs in the Roane litigation and has never been the subject of discovery or consideration by Plaintiffs' experts in Roane. Before this Court can determine whether the New Protocol protects against a substantial risk of serious harm and can be constitutionally implemented without

---

[52]      Further factual development is particularly appropriate here because *Baze* changed the legal rule regarding the presentation of alternative methods. In *Hill v. McDonough*, 547 U.S. 573, 582 (2006), the Supreme Court held that a method of execution challenge need not allege specific alternatives to the challenged practice. In *Baze*, the Plurality changed course and held that a plaintiff must show that a feasible alternative is available. It is appropriate then to allow both parties to present evidence regarding the feasibility of an anesthetic-only alternative.

161

substantial risk of maladministration, the New Protocol must be subject to testing by petitioner through discovery and expert opinions. BOP cannot unilaterally change the facts, and then seek to dispose of this claim in their favor based on their own interpretation of those new facts, without affording petitioner any opportunity for discovery with respect to those new facts. Accordingly, petitioner is entitled to take discovery in order to determine whether BOP is capable of carrying out their new lethal injection protocol in a manner that does not create a substantial risk of serious harm to petitioner. Discovery is necessary to allow petitioner to learn of any plans BOP has to change or recruit new personnel prior to resuming executions. Discovery would also allow petitioner to learn when and through what means BOP intends to be ready to perform the New Protocol, whether personnel know anything about or have even read the New Protocol, and, if they have read the New Protocol, whether they have concerns about the new procedures. Also relevant would be BOP's plans to train personnel on the New Protocol, including the number of trainings the BOP plans to undertake before BOP determines their executioners will be ready to perform executions under the new procedures.

Discovery would also allow petitioner to uncover the manner in which BOP developed the current protocol, the number of drafts considered, the identities of those involved in the drafting, and whether doctors were consulted in the drafting process.[53] Such discovery will provide petitioner with necessary information regarding BOP's interpretation of the protocol – which is written to give BOP personnel broad discretion in how they actually perform executions --as well as BOP's intentions regarding implementation of the protocol.

_____

[53]    Information about what information BOP considered and whether other alternatives were considered and rejected are clearly relevant to determining whether there exists a substantial likelihood that petitioner will suffer severe pain in the context of her execution.

162

Discovery is also necessary to determine the manner in which BOP and their executioners will exercise their broad discretion under the New Protocol to decide, for instance, who will decide whether femoral IV access is appropriate and what the criteria will be for that determination, which executioner will conduct the IV patency checks required by the protocol and in what manner those IV checks will be undertaken.

To give but one example of how the BOP's discretionary implementation decisions can result in very different procedures, the consciousness check performed by a doctor with some anesthesia training would have a different probability of effectiveness from one performed by an EMT with no such training or experience -- or a person who has no medical training and has participated in two training sessions. These implementation questions will largely determine the reliability of the procedures, but BOP's plans regarding implementation are still largely undisclosed. Discovery regarding the development of the protocol is likely to lead to admissible evidence regarding BOP's intentions with respect to implementation.

**D.      The *Baze* Decision Does Not Have Any Impact on Petitioner's Administrative Procedures Act and Controlled Substances Act Claims**

Petitioner has stated a claim under the Eighth Amendment and *Baze* that there is a substantial risk of maladministration of BOP's execution protocol that will result in a substantial risk of inadequate anesthesia, i.e. serious harm, and thus an unconstitutional execution. Petitioner, after being afforded the opportunity to conduct discovery about the New Protocol, with the assistance of qualified experts, will be prepared to prove substantial risk and less dangerous alternatives.

Moreover, *Baze* does not address (or have any impact on)  separate claims that petitioner hereby brings under the Administrative Procedures Act (APA) and the Controlled Substances Act (CSA). Specifically, the APA claim is that the BOP did not provide adequate notice and a full and fair opportunity to comment on their Lethal Injection Protocol and the various amendments, including the administration of chemical substances by unqualified personnel, prior to their promulgation. The CSA claim is that the BOP has arbitrarily and capriciously failed to exercise their authority to enforce the

163

Controlled Substances Act against persons dispensing one of the lethal injection drugs, sodium thiopental, without a valid registration. Whatever actions this Court may take on petitioner's Eighth Amendment claim, her APA and CSA claims survive.

<center>**Claim Eleven**</center>

<center>**The Death Penalty Violates the Eighth Amendment**</center>

In all cases, the death penalty is cruel and unusual punishment, and thus proscribed by the Eighth Amendment. Although counsel appreciate that this is not an accurate statement of the current law, it is nonetheless alleged that evolving standards of decency, which will continue to change during the pendency of this case, preclude any execution by the government, including the execution of Ms. Johnson.

**VI.      Prayer for Relief**

Based upon all of the above allegations and entire record in this case, petitioner respectfully requests that the Court provide the following interim and final relief:

1.   That the Court require the government to respond to the allegations made herein;

2.   That the Court permit petitioner to amend this petition in accordance with law;

3.   That the Court permit petitioner discovery to the extent necessary to fully develop and identify the facts supporting this motion and any defenses thereto raised by respondent;

4.   That the Court permit petitioner the opportunity to file appropriate memoranda in support of the relief requested herein;

5.   That the Court conduct an evidentiary hearing on all disputed issues of material facts;

6.   That the Court award final relief by vacating petitioner's convictions and/or sentences, including her sentences of death.

DATED this 1st day of June, 2011.

<div align="right">Michael Burt</div>

<center>164</center>

Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California   94103
415-522-1508 (tel.)
415-522-1506 (fax)
Michael.Burt@prodigy.net

Marcia A. Morrissey
Attorney at Law
2115 Main Street
Santa Monica, California 90405
310-399-3259 (tel.)
310-399-1173 (fax)
MorrisseyMA@aol.com

By:   /s/ Marcia A. Morrissey___
      _____
      Marcia A. Morrissey

**<u>PROOF OF SERVICE</u>**

       I, Cathy Mackerl, hereby certify that on this 1st day of June, 2011, I served the forgoing on the following person by ECF filing and by placing two copies in the United States Mail, postage prepaid, to the following:

C.J. Williams
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, Iowa   52401-1825


By:   /s/ Cathy L. Mackerl
      _____