Angie described after their family's return from Kansas, they were quite poor and lived on assistance. Her mother would not let them celebrate holidays, like Halloween or Thanksgiving. Although they had Christmas, there was no Santa Claus. She did not care about school and viewed herself as an outcast. Her situation improved once her mother opened a restaurant. She continued to be disturbed about the exorcisms, and the focus on being possessed. For many years, she didn't' believe her father loved her and thought that her stepmother hated her. Recently these relationships have improved. Angie and her other siblings believed her mother had a nervous breakdown after Bob's death. After their return from Kansas, Angie forgot to shut the cupboards and drawers. Jean grabbed her by the hair, beat her with a belt, and then wrapped the belt around her neck and strangled her until she was nearly unconscious. Wendy had to stop her mother. Now, Angie believes her mother had a religious disorder. She now is thankful for her mother's recent support.

Angie recalls being depressed as an adolescent. She went to Forest City Hospital after she took an overdose of aspirin in a suicide attempt. By this point, Wendy was living with their father. A record from Forest City Medical Center dated 12/19/77 reflects Ms. Johnson was admitted with abdominal pain after doing setups. She would have been age 13 at the time.

Despite the turmoil when home, Angie had concern for others. She gave her babysitting money to see that Cambodia orphans would be adopted. She wanted to bring a busload of Cambodian orphans home. Her mother made her stop sending them her money.

By as early as 5th grade, Angie began using alcohol. By 7th and 8th grade, she was using marijuana, and had experimented with LSD and white crosses (speed).

**SUMMARY**:

Ms. Johnson suffered numerous traumatic experiences during her childhood, including emotional and physical abuse. She likely was sexually abused at the Dillows as well. There was no reliable source of support from her father, mother, or

LOG000401

grandparents. She additionally felt isolated from her peers, had poor self-esteem, and was chronically anxious and depressed. She did show concern for her younger siblings and others such as Cambodian orphans. She likely identified with their vulnerability. Her family's unusual religious practices isolated her, and resulted in difficulties with trusting others and in her own self-worth. She sought escape through various channels, including premature heterosexual relationships and drugs. Although there was one suicide attempt, treatment for her emotional problems went undetected and untreated.

If anything, Ms. Johnson minimized some aspects of her abuse as compared to the accounts of her parents and siblings. Her younger brother, Jim, was athletically talented and distanced himself from his family. In early interviews with Ms. Goody, Wendy recalled their mother administered "frenzied beatings" with a wide belt or plastic paddle. Angie was the subject of the most severe beatings because she refused to cry. James Jr. recalled Angie was the fighter in the family, and was always one to take their mother's discipline to protect her younger siblings. He and his younger sister, Holly, were so hungry they had to steal food and were beaten at least twice a week. They moved frequently due to their mother's constant fear. James Jr. believed he and his siblings were programmed as children through religious fear, as well as physical and psychological abuse to be thoughtlessly obedient. He described their childhood as a "state of siege." He broke down and wept while describing it on several occasions. This was also noted in the interviews with Wendy and Jamie. Holly (DOB; 2/5/73) described that while her mother kept to herself and had strange religious beliefs, that Angie was her best friend when her mother wasn't around. Holly also has suffered from depression. She has experimented with drugs and noted sisters Wendy and Angie also have had problems with alcohol and drugs.

**ADULT ADJUSTMENT**:
As a adult, Angie has struggled with substance abuse, depression, and series of broken relationships, yet has formed attachments to others who have remained supportive of her. Her emotional difficulties are common in abused children, who have increased vulnerability to stress and poor adjustments as adults.

Case 3:09-cv-03064-MWB-LTS   Document 284-7   Filed 06/23/11   Page 2 of 83
LOG000402

Angie became sexually active in the 8th grade with Steve Hugo. The next year in 9th grade, she withdrew from school. She and Mr. Hugo applied for a marriage license on 6/23/80 and married on 7/5/80. Angie was attending 10th grade in night school. The marriage was brief and produced no children. She was 17 when they separated. The divorce was filed on 4/21/81. They were only together for nine months. She married to get away from home.

Angie began dating Arlyn Johnson at age 18. She drove her mother to Colorado, as her mother decided to move there. They applied for a marriage license on 1/26/83 when Angie had just turned 19. Angie and Arlyn's daughter, Alyssa, was born on 8/7/83. Koenen Chiropractic Clinic records from 3/23/84 indicated Angie had been experiencing frequent headaches for a year, as well as low-back pain. In May 1984, Angie obtained a job at Winnebago Industries. Angie became tearful when she talked about her marriage to Aryln Johnson. They divorced after three years when she had an affair. She wondered if Arlyn truly loved her as she was pregnant when they married. Arlyn Johnson was a good provider, but as a "workaholic" who mainly did his own thing. Angie felt abandoned and depressed.

Angie's affair was with Kirby Thompson a man who introduced her to cocaine. She worked at Perkins Restaurant, and also occasionally as an exotic dancer. She began using "crank" (methamphetamine) to stay awake. She still believed she was functional. Her daughter, Alyssa, was doing well in school, and Angie tried to show Alyssa a lot of love. She realized however, that her drinking and methamphetamine use was getting out of control.

In the late 1980s, Angie began a relationship with Terry DeGeus. Terry had a daughter, Ashley, who was only two weeks apart from Angie's daughter, Alyssa. Another bond was that they both had difficult relationships with their mothers. Consequently, Angie tended to excuse his behavior. Terry soon became possessive, jealous, and physically abusive. Angie began to have nightmares of these beatings which continue to the present. She stated she never slept in the dark out of fear. When she tried to end the relationship with Terry, he would stalk her. They separated and reconciled several times. Angie would vacillate between thinking Terry was

LCG000403

wonderful and that he was bad. Terry continued to stalk her on a regular basis. He once ran her off the road, and hit her in the face so hard she believed her jaw was broken. Terry would break into her house and once head butted her. Angie tried various ways to protect herself, including contacting the police, having her bosses escort her home from work at her job at the Country Kitchen, and even buying a dog, to no avail. At one point following a severe beating, she fled to Wisconsin where she remained for three months.

Independent sources confirm the abusive relationship. There is a record of a restraining order Angie obtained, as well as several reports from the Clear Lake Police Department. Alyssa was so frightened of Mr. DeGeus that she began to receive counseling at school. Angie's sister, Holly, reports she had seen Terry beat up Angie quite a few times, and once called the police herself. Holly moved to Wisconsin with Angie, and confirmed Angie was black and blue following Terry's beating. They stayed with Wendy in Wisconsin to get away from Terry. Then, inexplicably to Holly, Angie called Terry and they were in love again. Terry had called one night and threatened suicide. Angie was on the phone with him for two hours. Holly believed Angie really loved Terry, but didn't know what she wanted. Holly did not believe the attraction was solely due to the meth Terry provided. Still, Holly observed Angie would become depressed when she tried to come down from meth, and would sob for hours. According to Holly, Angie was good looking and liked attention from men, but also saw herself as a victim of men.

Dave Nieman who has known Angie since age 10, described Arlyn Johnson was bipolar. Angie's mom, Jean, believed A.J. was possessed. He also knew Terry who he described as a woman beater. He called an incident when Terry pushed Angie out of a car. At times Angie was afraid to be alone with Terry. Mr. Nieman observed that Terry would beat Angie when he was drunk or angry. When they were not fighting, Terry would treat Angie like a queen, which Angie liked. David Nieman recalled that Angie also had mood swings, even when her drug usage wasn't too bad. Despite this, he noted Angie would work a lot of hours and was good with her kids.

LOGO000404

Alyssa confirms Angie was a good mom who spent a lot of time with her, took her to activities, and went to parent-teacher conferences. Alyssa believed her mother wanted to end the relationship with Terry who stalked Angie and threatened her for two years. Alyssa recalled at least two severe beatings where Angie had black eyes, a fat lip, and bruises. Terry tended not to hit Angie in front of Alyssa. She also recalled that Terry once pushed Angie out of a car. When she would come home from school, she would find her mother hiding.

Arlyn Johnson did not believe that Angie used cocaine or meth until she met Kirby Thompson. Arlyn Johnson knew of Terry from school and described Terry had always been a bully. He once noted Angie had a black eye which she said she received from Terry. Terry once wrote to Wendy that he hated what he did to Angie. Alyssa reported that Terry once raped her mother while she was in an adjacent room sleeping. Alyssa feared Terry, who she described as intimidating. Alyssa continued that Terry would yell at her and make up things to get her in trouble with her mother.

Angie began secretly dating Dustin Honkin while Terry was seeing someone else. Angie was usually crack, but denied receiving this from Mr. Honkin. Terry owed money to Mr. Honkin. Angie stated she didn't know Dustin was in a relationship with a women named Kathy, who was pregnant by Dustin. She believed Kathy was stalking Dustin. Soon, in the spring of 1993, Angie herself became pregnant and quit using methamphetamines. During her pregnancy she worked as a waitress at the county club. Her daughter, Marvea, was born in February 1994. Angie believes Dustin is the father.

Alyssa noted a change in her mother after Marvea was born. She descried that her mother was touchy with a quick temper, and did not seem happy. Ms. Johnson stated she had stopped using methamphetamines and was depressed.

Holly moved with Angie and Alyssa and observed that there was a lot of fighting between Dustin and Angie. By early 1995, Angie ended the relationship with Dustin and moved to Des Moines to work at the Urbandale County Club. Alyssa for a time

LOG000405

lived with her father, but returned to live with Angie when A.J. had a relapse of his Bipolar Disorder.

In 1996, Ms. Johnson received treatment at the Mercy Medical Center in Mason City. She was having suicidal thoughts of cutting her wrists. She additionally complained of an upset stomach, agitation, fatigue, and decreased concentration. Angie also complained of anxiety attacks. Dr. Lassisse initially prescribed Prozac, and then Zoloft which Angie tolerated better. There was improvement in her mood lability, panic attacks, and energy according to Dr. Lassisse. Dr. Lassisse's note reflects Angie's reality testing was not impaired, but her thoughts were curricumstantial, that she was dependent, her mood was low, and her insight poor. Angie ended treatment a short time later due to the expense of the medication. Angie described panic attacks during which she would hyperventilate and couldn't breathe. Her heart rate was rapid. She became dizzy and sweaty, and for a time thought she would die. The attacks occurred almost hourly, but resolved with the change of antidepressant from Prozac to Zoloft.

In 1998, Ms. Johnson was working at North Beach and was living with Rick Summers. Her sister, Holly, described this was a low point in Angie's life as Rick's sons treated her poorly. Angie was fixing up Rick's house. Rick was arrested, and Angie then moved to an apartment above the North Beach Restaurant, where her boss was George Barlas. She became more involved with her daughter's school, which was two block away.

In 2000, Angie was arrested for her current offense. She was placed in the Benton County Jail. She became depressed, had crying episodes and difficulty sleeping. She was placed on an antidepressant, Serzone. She remained despondent and desperate. In October 2000, Angie transferred to the Black Hawk County Jail. A short time later, she had a serious suicide attempt by hanging, and was unconscious before being discovered and revived. She was transferred to the Linn County Jail in Cedar Rapids where a psychiatrist, Dr. Ali Saftar treated her for depression. The precipitating event for her suicide was being told she would be permanently separated from her daughters. Angie remained on suicide precautions for months. She

LOG000406

remained in the Linn County Jail for nearly four years before being transferred to Hardin County Correctional Center in Eldora, Iowa.

Ms. Johnson received a number of different antidepressants since her incarceration, including Elavil (Amitriptyline), Prozac (fluoxetine), Trazodone (desyrel), Celexa (Citalopram), and Paxil (paroxetine). Currently her medications are Seroquel (quetiapine) 200 mg/day and Zoloft (sertraline) 200 mg/day. She reports benefits from her current medication regimen which helps her not become overcome by depression, and reduces her irritability in terms of making her less reactive to the stresses of incarceration. Zoloft is an antidepressant, while Seroquel is an antipsychotic with mood stabilizing properties. Since her arrest, Angie has become closer to her family including her father and stepmother. She remains actively involved in the lives of both her daughters, Alyssa and Marvea, both of whom continue to value their mother's emotional support. This is particularly true of her younger daughter, Marvea, who now lives out of state with Angie's sister, but maintains ongoing contact with her mother.

## SUMMARY:

Ms. Johnson has had a difficult and sometimes chaotic adult adjustment marked by multiple transitions in her romantic attachments. For a several year period, she was physically battered and stalked by one partner. She has experienced posttraumatic anxiety, panic attacks, and depression, with suicidal thoughts and at least one serious suicide attempt. She has constantly worked despite these stressors. She has abused methamphetamine, which does have a strong antidepressant effect and decreased her feelings of vulnerability. Methamphetamine produces a strong rebound depression when discontinued, however. On her current medication regimen, Ms. Johnson has experienced less depression and mood volatility, which has allowed her to re-establish family ties and be a more consistent source of emotional support for her daughters.

LOG000407

_____

William S. Logan, MD
Diplomate, American Board of Psychiatry and Neurology 1982
Diplomate, American Board of Forensic Psychiatry 1987
Subspecialty in Forensic Psychiatry by the
American Board of Psychiatry and Neurology 1994 and 2003

Date Signed: _____

WSL/ns

LOG000408

William S. Logan, MD
Diplomate, American Board of Psychiatry and Neurology 1982
Diplomate, American Board of Forensic Psychiatry 1987
Subspecialty in Forensic Psychiatry by the
American Board of Psychiatry and Neurology 1994 and 2003

Date Signed: 5/31/05

WSL/ns

LOG000409

Holiday Inn
Sioux City, Iowa

6/6/05

Dr. Logan —
 has BOP statistics but they're
old. She d/n qualify for high risk
facility.

 Biggest worry is her falling under
the influence of someone.

 Suicide letters - denials

 We can't talk about mental state
@ the time of the offense —
 She had quite a bit of physical illness
in the fall after having Marvea.

 Jim said ~~also~~ they were taught to
be blindly obedient.

 Dustin operated on a need to know
basis. Guy gets him a gun on a lark.

 Linn Co. records —

MG006040

LDG000416

<u>Serious</u> suicide attempt.

Oct. 13 - ① digging up bodies
② bond hrg appeal had been
denied.

delirious — d/n/t She was aware
enough - Combative in semi concious
state.

— how he got involved in Case
— Benton — Serzone
Blackhawk - cut dose of
Serzone in ½ + then cut on
low dose of Elavil

Seroquel — put her on this.

<u>Marilyn</u> — She took a huge gamble + lost.
(Maps.) She's looking for a hero - such a
Sucker for him.

needs
marilyn's
report

① depression
② physical abuse
③ sexual abuse
④ religious - terribly frightened —
isolated them from peers.
⑤ Billows
abandonment by mom

MG006041
LOG000447

Deth, animals —

emotional abandonment
*Allen Co. records* — early leaving of the father
Mother + of phy + sex abuse
emotionally distant
religion made her less available

lack of nurturing
ignored
burden

Jim + Cookie rescued some of the kids.

Prevented this in Angie bec she felt protective of her mother

*Cambodian orphans abuse triangle* — Stimulants used in kids + elderly.
But have rebound depression + hypersomnia —

MG006042

3285

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

        Plaintiff,                         Sioux City, Iowa
                                 June 7, 2005
    vs.                                      8:30 a.m.

ANGELA JANE JOHNSON,                         VOLUME 19 of 24

        Defendant.
                       /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3286

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 28-37   Filed 06/23/11   Page 13 of 83
LOG000413

2005-6-7 Logan Trial testimony VOLUME 19, 6-7-05
Court Reporter:            Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

3287

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Who's up?  But who?

MR. BERRIGAN:  Oh.  Dr. Logan.  I'm sorry.

THE COURT:  Okay.  I didn't think you were testifying.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.  I noticed Juror 55 switched from Pepsi to Mountain Dew this morning so --

JUROR 55:  Need the caffeine.

THE COURT:  Something new every day.  That's what they say about trials, something new every day.

Mr. Berrigan, are you ready to call your next witness?

MR. BERRIGAN:  Yes, Your Honor.  The defense calls Dr. William Logan to the stand.

WILLIAM LOGAN, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in our witness box.  You can adjust the chair and the microphones so you can speak directly into the microphones.  And we'll let you get settled in there.  Should be a fresh glass of water for you, and you're free to move that.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  William Searle is the middle name,

3288

Case 3:09-cv-03064-MWB-LTS    Document 28447    Filed 06/23/11    Page 14 of 83

LOG000414

S-e-a-r-l-e, and the last name is Logan, L-o-g-a-n.

THE COURT:   Thank you.

Mr. Berrigan?

MR. BERRIGAN:   Thank you.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Dr. Logan, where do you live, sir?

A.   Currently I'm in the process of moving from Topeka, Kansas, to Lawrence, Kansas.

Q.   And what do you do for a living?

A.   I'm a physician that specializes in psychiatry.

Q.   I want to start your examination by talking a little bit about your background and qualifications if we might.  Could you tell us a little about your educational experience?

A.   When I went to college, I had wound up with two majors. One of them was in biology with a specialization in microbiology, and the second was a major in psychology that I kind of picked up on the side.  At that point it was a secondary interest.  My undergraduate university was out in New Mexico at New Mexico State University.  That's in southern New Mexico, fairly close to El Paso where I grew up.

I then attended medical school in Dallas which is about 600 miles away from El Paso but still in Texas at the University of Texas Southwestern Medical School which is located there.

3289

Q.   When did you graduate from medical school, sir?

A.   1977.  And during that time I had received a scholarship from the Public Health Service through medical school, the

Page 3

LOG000415

requirements of which were that I work in an underserved area eventually.

After I finished my medical school training, I decided to specialize in psychiatry. I remained in Dallas and did four years of what they call a psychiatric residency. That's what they call subspecialty training. And that was at Baylor Hospital located in Dallas and also at a private psychiatric hospital called Timberlawn Psychiatric Hospital, and that also included, as psychiatric residencies now do, about six months worth of internal medicine and two months of neurology. So that lasted from 1977 to 1981.

And then it came time for me to do the Public Health Service commitment which was three years, and that was actually done in a federal prison facility called the Medical Center For Federal Prisoners, and that's located in Springfield, Missouri.

Q.   What kind of facility is that?

A.   It's a fairly complex facility. It has one section that's to address the medical and surgical needs of inmates, federal inmates, from around the country. There's also another section that serves as a camp section or technical support, painting, you know, nursing facilities, things of that nature. And then a third part of that facility is for psychiatric patients also

3290

from around the federal prisons around the nation.

In my case, however, I actually did a fairly substantial amount of work on one particular section in the psychiatric unit that worked with people who had not yet been convicted, and they were separated from the other inmates. But they were actually sent there from the federal courts for determinations of whether they were competent to stand trial,

Page 4

LOG000416

sometimes their mental state at the time of an offense, on other occasions for recommendations about treatment provisions in conjunction with their sentencing.

Q.   And are these federal courts from around the country that were seeking these services?

A.   Yes.  You know, during the three years itself there, I did well over 500 evaluations and testified actually all the way from San Juan, Puerto Rico, to Sacramento, California.

Q.   Is -- that Federal Medical Center in Springfield, Missouri, is that the major medical and psychiatric unit for federal prisoners nationwide?

A.   It's one of the major ones.  They've got other facilities in Rochester, Minnesota, and Butner, North Carolina, for the psychiatric patients.  But at the time I was there, Springfield was handling the bulk of the load.

Q.   When you finished that internship, we're going to talk a little bit about your work experience, but is that when you began to work in private practice?

3291

A.   No.  Actually several other things came before that.

Q.   Okay.

A.   While I was at the medical center, I had initially intended to go back to the hospital where I trained in Dallas, but I talked to the director there, and he wanted me to get a fellowship in the area of forensic psychiatry because at that point I decided to make that a subspecialty.  And a consultant at the medical center was Walt Menninger from the Menninger Clinic which was in Topeka, and he invited me to do the fellowship there, so for an additional there I did training in law and psychiatry at the Menninger Clinic.

Page 5

Q. Could you tell the jurors a little bit about the Menninger Clinic for those of us that might not be familiar with?

A. Sure. The Menninger Clinic was formed by a family of doctors, not unlike the Mayo Clinic, only it specialized in the area of psychiatry. And it had a number of departments. One of the things that it did was specialize in the treatment of severely ill psychiatric patients who were referred from around the country who had not done well in shorter-term hospitalizations or in outpatient treatment.

They also had a number of community outreach components of the Menninger Clinic that worked with things like business leaders. It worked with the police department. It worked with county social service agencies. They had a children's hospital, and they worked with a number of group

3292

homes, and so they had a wide variety of services.

Q. Where is it located?

A. At the time it was located in Topeka, Kansas. It's since relocated to Houston, Texas, and is now part of Baylor Medical Center there.

Q. While we're talking about your specialty in forensic psychiatry, could you tell us whether or not you're licensed as a medical doctor anywhere in the country?

A. Yes, in four states: Texas, Missouri, Kansas, and Nebraska.

Q. Do you -- go ahead. I'm sorry.

A. Those are primarily states where I've lived with the exception of Nebraska where we had considered moving when my father-in-law was ill.

Q. Are you board certified in any particular areas?

Page 6

A.   Yes.  I'm board certified in psychiatry, and I have certifications from two different boards in forensic psychiatry.

Q.   What are those boards?

A.   One of them is the American Board of Forensic Psychiatry. The other one is a subspecialization in forensic psychiatry by the American Board of Psychiatry and Neurology.

Q.   What does it mean to be board certified?

A.   Board certification means that you have gone through an approved training program which is approved by another organization called the American Council of Graduate Medical

3293

Education and that you have had several years of experience and that you have passed a written examination and, in the case of a couple of those boards, an oral examination.

Q.   If we could go back now to your work experience, after you completed your fellowship in forensic psychiatry, what was the next line of work that you engaged in?

A.   I got asked to stay on at the Menninger Clinic as director of their department of law and psychiatry, and in that regard I had a number of clinical responsibilities including working with the police department and doing private psychiatric evaluations of all types that involved forensic issues, and those could vary anywhere from assessing the emotional damages of, say, someone who was in a motor vehicle accident to determining which parent might be the better parent in a custody battle to determining whether someone was competent to make a will to looking at someone's treatment who was suffering from, say, a work-related injury.  So a wide variety of issues and not just things in the criminal sphere.

And also there was a teaching component of that with

Page 7

LOG000419

2005-6-7 Logan Trial testimony VOLUME 19, 6-7-05

working with the trainees in psychiatry about issues that might come up in their practice that involved court procedures, things like civil commitments, and also child psychiatrists who were in training there as well.

Q. How long were you the director of the department of law and psychiatry at Menninger's?

3294

A. From 1985 through 1993.

Q. What did you do thereafter?

A. Menninger's was downsizing at that point in anticipation of this move to Houston, and our department was doing fairly well on our own, so we broke away as a department and formed a private practice in Kansas City.

Q. Is that practice still ongoing?

A. Yes.

Q. What's the name of the practice?

A. Logan and Peterson.

Q. And what's your position there?

A. Well, I'm technically president as far as the corporate structure of it goes, but it's basically a small practice with a couple of physicians in it.

Q. What does that practice encompass? That is, what kind of work do you do?

A. I do just regular psychiatry quite a bit in terms of, you know, treating patients, medicating them, doing individual psychotherapy with a wide variety of different constellations actually, a wide variety of age ranges and also become involved with a fair variety of different cases that involve some area that requires an expert opinion about some legal issue usually involving somebody's mental state to do some particular task.

Page 8

Q. And could you tell us -- give us maybe an example of the variety of legal issues you might be asked to address and who it

3295

is that asks you to address those?

A. Well, in different areas, different people ask. The variety of issues can range from, as I said, somebody who's involved in some type of accident assessing their emotional damages, determining the standard of care of some physician who has been named in a malpractice suit.

I've also been asked to look at impaired physicians by the medical boards in Kansas and Missouri. It can involve some training. We did a suicide prevention workshop with the large county jail in Kansas City. It can involve such things as looking at various prison systems.

At one point I was asked by a federal court to design an entire prison mental health system for the state of Nevada and then was asked by the judge in that case to act as his agent in implementing that project that took six years or more. It can involve looking at whether someone is competent to enter a contract or to make a will. It can involve many areas in the criminal justice system all the way from whether someone's competent to stand trial, the reliability of statements they may have made, say, to police during an interrogation. It can involve their ability to stand trial, work with their attorneys, understand courtroom procedures. It can involve their mental state at the time of a crime, whether they had intent or whether they were mentally ill.

So it can involve most commonly actually issues

3296

Page 9

Case 3:09-cv-03064-MWB-LTS   Document 28-17   Filed 06/23/11   Page 21 of 83
LOG000421

regarding -- when they're being sentenced, if you testify in capital cases, it can involve things such as we're here today for about whether somebody has aggravating or mitigating circumstances. Many times I become involved in cases even after a conviction in something called postconviction relief where they take a backwards look and see if things should have been done but weren't.

Q.   Does this work involve you testifying in court frequently?

A.   Yes, fairly frequently, although many times, for example, in Iowa when I do cases up here, unlike Missouri and Kansas and Nebraska, they actually have depositions during a criminal part of court proceeding that is fairly unusual, and they've been pretty gracious in doing that by phone, so many times it doesn't involve a lot of time, just testifying from my office. But on the average I would say that I testify anywhere from 25 to 40 times a year on average.

Q.   If we could talk about the instances where you're involved in criminal-type proceedings, who is it that calls you to testify or to work in a particular criminal case?

A.   That also varies somewhat by state, who you -- what area you come known for and the circle of attorneys in that area. In Iowa I think it's almost been exclusively for defense attorneys. In Kansas where I have a longer history, it often is the attorney general's office or also defense attorneys. In Missouri, many times in Kansas City federal courts I'm often

3297

called in by judges particularly to look at the issue of whether somebody's competent to stand trial.

Q.   So there are occasions when you're working in Kansas City, it's neither of the parties but the court's asking you to do an

Page 10

LOG000422

evaluation?

A.    Right, because of the way the law is designed, the -- anybody can bring up an issue if they have reason to believe somebody may not be competent to stand trial because that's such an important principle, and that includes the judge.  If he sees, for example, that an inmate has done something that would cause concern about that individual's competency, he's perfectly free to contact me himself.  He'll usually do that through court services and request an evaluation.

Q.    Have you been involved in cases in which judges have asked you to do evaluations in capital murder cases?

A.    Yes.

Q.    Do you have any memberships in any professional organizations?

A.    Pretty much the standard ones which are the American Medical Association, the American Psychiatric Association, and two that are kind of more related to my area which one is the American Academy of Psychiatry and the Law, and the other one is the American Academy of Forensic Sciences.

Q.    I want to turn our attention to this particular matter if I might.  And I'll ask you to tell the jury when you first became

3298

involved with Miss Angela Jane Johnson.

A.    I first became involved I think when I was contacted by an attorney named Al Willett in -- I believe it's Cedar Rapids, Iowa, and I had done a few evaluations for him before, and he wanted me to come see Miss Johnson because she had had a rather serious suicide attempt while she was in the -- I believe Black Hawk County Jail that she was in and the Linn County Jail.  So I initially saw her in January of -- I believe the year was 2001.

Page 11

LOG000425

Q. And where was she when you actually saw her?

A. In the Linn County Jail.

Q. In custody in Linn County.

A. Right.

Q. The suicide attempt that you saw her for and that had taken place in the Black Hawk County Jail, do you recall roughly when that occurred?

A. Ironically I do only because of the coincidence of the date. It was on a Friday, the 13th of October.

Q. October.

A. Yes.

Q. So you saw her roughly about three months thereafter.

A. Almost four months later I think.

Q. Almost four months.

A. Yeah.

Q. And what was the purpose of your seeing Miss Johnson at that point?

3299

A. To make any recommendations about treatment that might be applicable. I think there was some concern at that point. Four months later she was still on a daily suicide watch, and I think her attorney had questions about whether that was still necessary, so he wanted me to give an opinion about that and also to give him kind of an overview if there were any mental health issues that might be relevant to her charges.

Q. And did you make a determination first I guess about the necessity for continued suicide watch at that point, the early part of 2001?

A. Well, as I told Mr. Willett, you know, the jail has the primary responsibility for making that decision, so any comments

Page 12

I made would be advisory only. But I did make some recommendations about medication which I think the jail psychiatrist eventually did try. And also I thought by that time she had stabilized enough that the suicide precautions weren't necessary. Actually I think the administration at the jail which is responsible for security played some role in that, and she actually was continued on suicide precautions for almost a year after her initial suicide attempt. I don't believe she got off until the following September.

Q. What medication was Miss Johnson on if you recall at the time that you visited her at the Linn County Jail in January of 2001?

A. I believe she was taking an older antidepressant that had

3300

some sedative side effects. The trade name of it is Elavil. The generic name is amitriptyline. She also -- that was supplemented by a second antidepressant called Trazodone which is also an older antidepressant with some sedative side effects. Part of the reason for that was she continued to have difficulty sleeping.

Q. Did you recommend that that course of treatment be continued, the Elavil and the Trazodone?

A. I didn't recommend continuing Elavil because ironically that's a particularly lethal drug in overdose. And I've actually seen a couple of cases where inmates have killed themselves by hoarding the medication and overdosing on it. I recommended something that was a little more targeted for people with depression and anxiety and some posttraumatic symptoms which was one of the newer antidepressants. I think I recommended Paxil. The psychiatrist I think prescribed

Page 13

Prozac -- and that didn't work very well -- and several others before he -- including Paxil before eventually she settled on the two medications she's on now which one is an antidepressant called Zoloft and the other one is a -- basically started as an antipsychotic drug. It's named Seroquel, but they have found it has mood-stabilizing properties. And she's been on that now for probably nearly a year and a half and seems to be doing fairly well on it.

Q. After you saw her in the Linn County Jail in January 2001

3301

and you made these recommendations in terms of a change in medication and that perhaps she didn't need to be on suicide watch, did you follow up with Mr. Willett, that is, kind of report back to him about your findings and observations?

A. At his request he had me write a brief letter to the jail. I also did follow up with him and let him know my interview findings with her, and he asked that I actually see her again to kind of assess her progress, and I believe that was in June of 2001. And I think I combined those two interviews and kind of gave him an overview of what I had seen. And after that, I really did not hear about the case again for years.

Q. How was Miss Johnson doing when you saw her again in June 2001, five months after your initial visit?

A. I thought she was doing somewhat better. She had been on -- she had had a medication change. I thought that she was responding fairly well in terms of that medication change. She was certainly not as depressed. She wasn't suicidal.

Q. After that visit with her in June 2001, you reported back to Mr. Willett you said?

A. Right.

Page 14

Q.    And then for a period of time you really didn't have much contact with her or her case.

A.    Yes.   The next time I heard from anyone about her case, I think Mary Goody sent me some records in June of 2002 with really not very much explanation, just some jail mental health

3302

records.   And then the next contact -- that was a year later. And then the next contact I had was actually about three and a half years later when you contacted me in November of 2004.

Q.    And at that time what were you asked to do in reference to Miss Johnson and her case?

A.    At that time I was asked to basically reassess her situation, particularly with the possibility that if she was convicted there might be psychiatric testimony at the penalty phase of her capital sentencing.

Q.    And is that something you've done in the past in other capital murder cases?

A.    Yes.

Q.    All right.   So in response to that request, what did you do?

A.    I reinterviewed her in January of this year, prepared a list of things that I had not seen which is really pretty extensive, and then after I did that, beginning in about April of this year, I really received pretty much a barrage of materials that wound up being about two banker's boxes full of things to review.

Q.    So you got a bunch of stuff closer to the trial date.

A.    Always happens that way.

Q.    Yeah.   That probably does.   Did you have occasion to interview anybody in connection with Miss Johnson's case other

Case 3:09-cv-03064-MWB-LTS    Document 28-7    Filed 06/23/11    Page 27 of 83
LOG000427

than she herself?

3303

A.    Yes, I did.

Q.    Who did you interview?

A.    Basically this got organized by I believe Mary Goody who had done some mitigation work and had done quite a bit of work over the interim talking to a number of friends and associates of Miss Johnson.

Q.    Just to interrupt you for a second, Doctor, but I'm sure the jurors haven't heard of Miss Goody's name.  Do you know what she does for a living?

A.    Yes, I do.

Q.    What is that?

A.    She generally works with attorneys in developing mitigation evidence not only for federal capital cases but for other cases as well.

Q.    Have you had occasion to work with Miss Goody in the past?

A.    Yes.  She now lives in Wyoming, but I had known her for many years since probably I began doing work in Missouri in the mid-1980s.

Q.    And I interrupted you.  You were starting to tell us about the interviews of other individuals that were arranged by Miss Goody.

A.    Basically it was arranged that we would interview a number of people one after another over a two-day period which occurred in early May of this year.  And the interviews were with Pearl Jean Johnson who is her mother.  We interviewed all of her

3304

Page 16

LOG000428

siblings, Holly, her youngest sister; James, her brother; her older sister Wendy; her younger sister Jamie.

We also interviewed -- in addition to her mother, we interviewed her father and her stepmother. We interviewed Carol Mann who is a friend of her mother. We also interviewed several of her friends, Mikell Olson and Dave Nieman, and we also interviewed Kim Swalve who is a woman who had become a friend of her mother who actually lived in the home with them as she was growing up. Talked to both of her daughters Marvea and Alyssa; her former husband Arlyn Johnson; and another friend, Todd Graham.

Q. And approximately over how much time did these interviews take place?

A. Well, it was 2 days, a little over 16 hours.

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Dr. Logan, I've just handed you Defendant's Exhibit 2167. Do you recognize that document?

A. Yes, this is a copy of my curriculum vita.

Q. And what is a curriculum vita?

A. It's a resume where you list your educational background and training and different professional activities that you've done over the years.

MR. BERRIGAN: Defendant would offer Defendant's 2167,

3305

Your Honor.

* * * *

(Defendant Exhibit 2167 was offered.)

* * * *

Page 17

LOG000429

MR. WILLIAMS:  No objection, Your Honor.

THE COURT:  2167 is received.

*  *  *  *

(Defendant Exhibit 2167 was admitted.)

*  *  *  *

BY MR. BERRIGAN:

Q.   So in addition to interviewing these people that you interviewed over the course of the 16 hours or so and your discussions with Miss Johnson, roughly what other materials were provided you to aid you in coming to your determinations and findings regarding her mental conditions?

A.   Kind of a time line had been prepared by Miss Goody that I reviewed.  She labels it a chronology.  But it is based on a collection of a number of records, everything from county records to Social Security Administration records to family medical records to the person's prior records from various mental health facility and even police records and employment records.  And so I reviewed her chronology, and then I got the background documents and reviewed those as well which included kind of wide spectrum of records I talked about.

I also had looked at all of her correctional records

3306

since her arrest back in July of 2000, and that included the Benton County Jail, the Black Hawk County Jail, the Linn County Jail, and more recently the Hardin County Jail.

Q.   In connection with the work that you did in this case, Dr. Logan, are you being compensated?

A.   Yes, I am.

Q.   What is the rate of compensation that you charge?

A.   My standard price is $225 an hour.

Page 18

LOG000430

Q. And how does that compare to a person of your expertise and experience of 25 years or so of psychiatry?

A. Pretty standard.

Q. Okay. Based on the interviews and all the materials you reviewed and your discussions with Miss Johnson, were you able to make findings regarding some mental health conditions that existed in her case?

A. Yes.

Q. What in a summary fashion -- before I do that, let me interrupt you for one moment. Are there occasions in which you are sometimes asked to assess defendant's mental health at the time of the actual incident, that is, what their mental state is at the time of the murders for which they're charged or for which they've already been convicted? Does that occur in your practice?

A. Yes, it does.

Q. And does it happen both pretrial and posttrial?

3307

A. Well, the only time it would occur posttrial, of course, I suppose would be in a sentencing issue, but sometimes in postconviction relief if they determine that perhaps an attorney should have raised a defense based on the person's mental state and did not, it may come up later in appeals.

Q. Were you asked to do that in this particular case?

A. No.

Q. And as a result, in fact, did you question Miss Johnson about her mental state at the time of the murders for which she was charged?

A. I was specifically asked not to, as a matter of fact, and so --

Page 19

LOG000431

Q.   And was there an explanation given to you for that?

A.   Yes.  Basically that there was no intent on the part of the defense to raise mental health issues in relation to the acts that form the basis for her charges themselves.

Q.   And so when you proceeded to kind of incorporate all this information that you had received, all these documents and records and these interviews and your discussions with Miss Johnson, what were you looking at specifically in terms of mental health issues?

A.   Generally what her life experiences had been and how that affected her emotional composure, stability, and life adjustment.

Q.   And in doing that, in a summary fashion first before we

3308

discuss it in detail, what conclusions did you come to?

A.   The conclusion I came to is that she had had a very stressful childhood marked by a number of things that often predisposed a depression when a person reaches adulthood, and those included things like physical abuse, divorce, some emotional abandonment on the part of her mother, potentially some sexual abuse, and then also some fairly unusual and traumatic religious experiences that had created an atmosphere of fear.

Q.   What was the significance again in sort of a summary fashion of these findings?

A.   The significance of them is that any of these things alone normally will predispose somebody, make them more fragile as they go through adulthood in terms of how they respond to various life changes and crises in their life.  Certainly people who've had this type of background just don't have the

Page 20

foundation that somebody would have emotionally that has come from a more stable environment, and you find that they're often more likely to become depressed, to have anxiety attacks, to have a poor life adjustment, to have higher rates of things such as drug use.

Q.   In regard to depression, did you find the presence of existing depression with Miss Johnson?

A.   Yes, I did.

Q.   And were there particular areas in her history that you

3309

thought were significant for that particular finding?

A.   Yes.

Q.   And what were those?

A.   Basically in her history as a child, her parents divorced at a fairly early age.  She witnessed conflict between her parents before the age of four when they divorced.  Her mother had her own mental health issues and had been a victim of physical abuse and sexual abuse herself as a child. Consequently, her mother often would blow up, and not only Ms. Johnson but her siblings would describe frenzied beatings with a belt and later a paddle.

Later she -- her mother and her grandparents became involved heavily in religion.  There were episodes not just with Miss Johnson but with her siblings as well when her mother or the parents would suddenly believe if they were demon possessed for some reason, this would result in exorcisms.  Several -- her older sister Wendy particularly gave a fairly graphic description of one that was done on Angela where she was held down by three people screaming and kicking that lasted for several hours, described it as a terrifying experience.  Wendy

Page 21

LOG000455

tried to intervene and kind of was rebuked by the grandfather who said, Get thee behind me, Satan.

Other siblings and Miss Johnson told incidences where her parents would suddenly just decide that their toys were satanically influenced. The toys were then taken and thrown

3310

into a trash barrel and burned. Her grandfather decided the TV was Satanic, and it was smashed with a hammer. They had a pet dove. They decided that that had a demon in it, and they did a three-day exorcism and eventually let the dove go because they thought that was demonic.

There was a time when her grandmother Florence thought she saw a wolf at her window. She went over in the middle of the night to their home and said the end of the world was coming. Her mother loaded and her grandparents got in the car with all four of the kids at that point, and they drove around with nothing but -- no food at all for approximately three days. For direction they were following a scar on their the mother's leg during the day and a star in the sky at night. Her sister Wendy talked about how the kids were beginning to hallucinate from lack of food. They eventually stopped at a church and were fed, but they hadn't eaten in so long that they just vomited the food back up.

There was a whole series of these kind of religious experiences. The grandmother later in life became involved with various spiritual exercises. She would go down their basement and beat on a tire with a hammer or a baseball bat and would make loud groans. The kids were afraid to go in the basement because they were -- thought demons were there. They frequently had to check each other's head for the mark of the beast, see if

Page 22

number 666 were on their heads.

3311

At various times their mother would decide that they had a demon inside, and they would have to go through exorcisms not just with Angela but also with the kids. The exorcisms would sometimes be two or three times a week.

Q. Did they describe -- the information that you got, first of all, when you were talking about Wendy had described this or the kids had described that, did they talk to you about these matters during the interviews that you conducted with them?

A. Yes, face to face I heard it from not only -- well, I actually heard from her mother too. Her mother admitted that she would slap and beat the kids and was at times overwhelmed and really wasn't able to be there for them emotionally. Every -- not only Angie but every single one of her siblings told exactly the same story about the three days roaming around thinking the end of the world was going to come, the multiple exorcisms, the physical abuse, the being scared about demons, having the toys destroyed. All of these things all of the siblings remembered, not just her.

Q. What about the exorcisms? How did they describe them?

A. Basically they described the exorcism that the person would be made to lie down. They would be held down actually, and the grandfather would be at their head with a Bible kind of rebuking Satan while the other two, the mother and grandmother, would be on each side holding the person down, and they would be yelling and screaming and praying and that Angie was somewhat more

3312

resistant than the other siblings and it would last longer with
Page 23

Case 3:09-cv-03064-MWB-LTS    Document 284-7    Filed 06/23/11    Page 35 of 83
LOG000435

her. Eventually the siblings caught on that -- and Angie did too that if they gave some sign that the demon had left, if they could belch or make some kind of a grown or utterance or do something, then that exorcism would stop. And so they eventually learned ways to truncate it at the time.

Q. They would pretend that some demon had passed from their body.

A. Right, and that would end that session. But it was very capricious. They really didn't know when it was coming or when their mother would make some decision that this needed to be done.

Q. What -- well, before we talk about the results of these experiences, besides the physical abuse that you heard about and the religious experiences that the children went through, was there any other abuse noted in Miss Johnson's childhood history?

A. Yes, there was, but there was more I might want to say about the religious abuse.

Q. Oh, I'm sorry. I didn't mean to interrupt you. What other things were you told?

A. In terms of the religion, it had a couple of effects. The immediate effect, of course, was in terrifying the kids and making them panic and fearful.

But the other thing that it really did is it isolated them because the other kids in the community learned about this.

3313

They attempted to talk about some of their experiences at school. The other kids thought they were weird, they couldn't come over to -- you know, have kids over to their house because they didn't know when this was going to happen. Really saw themselves as kind of the town freaks and were kind of looked

Page 24

LOG000456

down upon they thought by other people because of these religious beliefs.

Another factor was because of fear perhaps their mother moved repeatedly during their childhood, and so they never really had a chance to put down roots and get to know people very well. And this had probably a little bit more severe impact on the older kids than it did the younger ones because eventually the mother did get a restaurant and they settled down somewhat. But particularly in the early years, this really had the effect of not only traumatizing them directly because these experiences were very frightening but also isolating them from other people.

And then a third thing was that because their mother was so obsessed by religious ideas, they really didn't feel like she was available for them in any other way. It was not a very nurturing environment. There were very few normal times they spent with her.

Q. Did you talk to Pearl Jean Johnson about that aspect of her mothering skills? Did she give any explanation as to what she attributed her problems to?

3314

A. Well, one of her problems was her own background in that she had been physically and sexually abused by a stepfather herself, that when her mother and stepfather divorced, then her mother went to work, and she had been raised by a grandmother who spoke primarily Norwegian and kind of had the opinion the kids should be seen and not heard. So the grandmother was pretty distant. Her mother was working, and she'd been abused by her stepfather. Her own father had died very early. She just didn't have an emotional background to give the warmth and

Page 25

LOG000437

empathy that a kid might need growing up.

In addition to that, there was a lot of conflict when she married Angie's father. And they had fought, divorced when the kids were pretty young, and all of a sudden, she was a single mother with four kids on welfare.

Q. Would you do me a favor, Doctor? Do you think you could slide your chair up maybe six inches? Yeah. Okay. Thank you. Appreciate that. It's sometimes hard to hear here.

A. All right. Is this better?

Q. Yes, much better. Thank you.

A. Okay. Great.

Q. Okay. So you've discussed -- was there anything else about sort of the unusual religious practices that was discussed with you during these interviews and your review of the material we haven't talked about?

A. No.

3315

Q. Do you remember anything about fasting being discussed?

A. Yes, excuse me. I didn't mention that. But yeah, that was a pretty standard practice for them not to be able to eat food during the daylight hours, and a couple of them did mention that one of their memories of childhood was being not only poor but continuously hungry.

Q. And then we were starting to talk about other aspects of abuse. Other than the physical abuse and then this sort of unusual religious ideology, was there anything else in Miss Johnson's background that suggested abuse to you?

A. Yes, there was. One additional thing about the religion -- and this played a significant part in a couple of the siblings -- is that their mother would read them stories from

Page 26

LOG000438

the Bible. And one of them was about Abraham sacrificing his son Isaac. And they had asked if she would ever do that with them. And she said, you know, If I'm led to, yes, I would kill you. And so they never knew whether they were in immediate threat from their mother in terms of where her religious beliefs might lead her.

There also was another area that was traumatic in that there were several father figures that came along through relationships with their mother that were disruptive. At one point they had moved out to Colorado, and there was a repairman who had taken an interest in Jean, Angie's mother, and had done some family activities with them, and this was really one of her

3316

first experiences of having more of a normal family existence. This was before her mother became preoccupied with religion.

But then inexplicably, her mother had moved back to Iowa, and primarily that was to resume a relationship with a man who was married at the time and eventually became Holly's father. Actually the man died in a motor vehicle accident during the time that her mother was pregnant with her youngest sister Holly, so there was a loss of that individual as well.

Her mother was depressed enough about the unexpected pregnancy with her youngest sister that she loaded all the kids in a car and she and the kids drove to a place called the Teardrop Orphanage near Chanute, Kansas, and this was run by two individuals named Ted and Bobbi Dillo who were known to a friend of hers named Carol Mann.

Q. Do you know where Chanute, Kansas, is?

A. Yes. I'm from Kansas. I've lived in Kansas a lot. I know where Chanute is.

Page 27

LOG000439

2005-6-7 Logan Trial testimony VOLUME 19, 6-7-05

Q.   Could you tell the jurors roughly where Chanute, Kansas, is located?

A.   Sure.  Well, as you know, like a lot of midwest states, Kansas is kind of square.  And if -- it's kind of -- if you divided it into quadrants, Chanute is probably in the middle of the southeast quadrant of Kansas.  It would be, oh, probably 150 miles or so south, southwest from Kansas City.

Q.   And I interrupted you.  You were talking about this

3317

orphanage run by Ted and Bobbi Dillo.  What did you learn about that?

A.   Well, that the Dillos had been involved with Carol Mann through some of their shared religious beliefs and were in the process of trying to build a church with an outreach ministry which included an orphanage, and they had taken in several small Indian boys, American Indian boys, and also had three of their own daughters who I believe were teenage years, and Jean went down there with her children which at the time included Wendy, Andy -- Angie, Jamie, and the youngest, Jim.  And basically they all described that the experience was absolutely terrifying. The Dillos had some rather sadistic practices, would purposely try to scare them.

Jim recalled that they would have him touch a fence to see if it was electrocuted or wired with electricity, and he would get shocked.  They would have him go slop the hogs standing very close to the -- some fairly large hogs that he had seen eat live cats and kittens that would go in to get the food. They would cut the heads off of chickens and have the chickens chase the kids around the barnyard.  They had the kids witness animal butcherings including butchering a rabbit where they

Page 28

LOG000440

would hold the rabbit's head down and then drive the rabbit's head into a nail causing its eyes to pop out and see the rabbit's stomach eviscerated.

This is the kind of things that they would have

3318

nightmares about. Angie's younger brother Jim described that he continued to have nightmares about his experience there clear up through the time he was in college.

There was also a suggestion that Ted Dillo was sexually molesting his older daughters who would have to go in in the afternoon and take naps with him. Eventually this happened to Wendy as well, and she basically described how Ted Dillo masturbated while lying next to her in bed.

Ms. Johnson's memory of that has varied somewhat. When I first interviewed her back in 2001, she recalled that Mr. Dillo had approached her sexually one time and tried to fondle her, and she basically had told him if he did that that she would come back later and get him, and he had backed off.

Wendy recalls, though, later, some years later, they both got to talking about their sexual experiences, and Angie had told her that she too had been abused by Ted Dillo but didn't go into specifics. More recently when I interviewed her, she didn't recall that, and sometimes people do repress memories of experiences like that.

Q.   Can I ask you about that briefly?

A.   Sure.

Q.   In your practice over the last almost three decades, have you treated patients that have suffered from sexual abuse as a child?

A.   Numerous times.

Page 29

Q.   And is that an area that is sometimes difficult in terms of getting the client to reveal the underlying abuse?

A.   Well, absolutely.  I mean, it's things that people like to -- it's embarrassing.  It's traumatic.  They like to bury it, not talk about it.  It's kind of a taboo subject, and it's something that's pretty hard for somebody in a forensic interview who hasn't had the opportunity to establish an ongoing relationship to have somebody come in and talk to them about it freely.

Q.   Was there anything else at the Dillos that was reported to you that you thought was significant?

A.   Yeah, the living conditions.  Apparently they were in some kind of a shed.  The shed was mice infested, the kids being -- talked about being force fed food.  I think at one point the Dillos threatened to wash Jim's mouth out with a hog brush. Wendy and Angie I think both intervened to try and stop that from happening.  Jim recalls being made to eat a bar of soap.

One of the more significant things about this is even though Jean had gone down there with the kids, she was so involved with doing things with the church that several of the kids actually didn't even remember she was there.  They thought that she had just left them there.  All of them thought that they were basically going to be abandoned at that point.

Eventually I think Wendy did contact her mother and told her about some of the sexual things that Ted Dillo was

doing, and she got ahold of her mother and had -- and Carol Mann

Page 30

recalls driving basically down to Chanute to pick them up in the middle of a snowstorm, not an opportune time for Jean to leave because she was very far along in her pregnancy with Wendy (sic) who was delivered about a month later after they left.

Q. Were there other aspects of Angela's childhood that were reported to you that you thought were significant in your findings?

A. Just in terms of some of the emotional impact of this kind of childhood --

Q. We haven't discussed sort of the impact of these episodes, and, of course, we want to know what that is. You've sort of mentioned that -- this kind of a constant siege of terror in this household as a result of lots of these incidents. Is that one of things you thought was significant?

A. Well, actually I think you're borrowing some words from what her brother actually called their childhood.

Q. What did he tell you?

A. Under siege I think is a word he used primarily in an interview with Miss Goody, certainly was something they wanted to escape, and eventually all of them did escape in various ways and something that all of them have struggled to deal with in various ways throughout their life.

Q. What's the significance of that childhood experience, this constant living in siege or living in terror for people as they

3321

get older?

A. Well, for one, they have very poor self-image. Certainly to believe and being told by your mother that you are demon possessed and evil isn't something that isn't a positive self-concept for a child. Also the fact that you're constantly

Page 31

LOG000445

under threat from invasion by unseen forces such as demons creates an atmosphere of fear. To be suddenly exorcised or to be beaten certainly creates an atmosphere of intimidation.

Certainly children exposed to that kind of pyrotic trauma, there have known to be shrinkage in certain areas of the brain where it's possible for memory integration. Additional impact of that is the kids become impulsive in terms of trying to escape. There can be fairly early drug abuse, early sexual experiences that are premature. Their normal maturation process is stunted. Often they don't go through a normal school development in terms of graduating from school. They drop out early, can't concentrate well in school.

Q. Did you find that some of these predictors, if you will, were actual experiences of the children involved, that is, the Johnson children?

A. Yes. Particularly the two oldest girls, Wendy and Angie, both married fairly early to get away from home. There was fairly early substance abuse. I think Miss Johnson said that she was drinking alcohol by fifth grade. By seventh and eighth grade, there was experimentation with stronger drugs including

3322

LSD, an hallucinogen, and also marijuana use which kind of can have a tranquilizing impact, also some stimulants in the form of white crosses. At age 13 she was depressed enough that she tried an overdose and was taken to a local hospital to have her stomach pumped.

So there was early evidence of wear-and-tear depression, drug use, the efforts to escape the home situation. Others of her siblings escaped in various ways. Her younger sister became more withdrawn. Her older brother -- her younger

Page 32

brother had athletic talent and eventually began spending more and more time at home -- away from home as he grew older at the homes of girlfriends and friends. Experience was more normal.

Another thing that Ms. Johnson did was -- by the time she entered junior high school, her mother with another friend had formed a restaurant in a small town, and she basically quit school fairly early, I think the fall of her ninth-grade year, and spent most of her time working in the restaurant, and that was a more stable existence for her. But even there there was some impairment about the religion as the mother would try to evangelize various ones of the customers.

Q.   I know we're going to have another psychologist talk about the sexual abuse in more detail and what implications that has, but does -- the report of sexual abuse, does that have any long-term implications for somebody who suffered that type of experience as a child?

3323

A.   Well, sexual abuse, of course, varies from individual to individual. I mean, you know, under that collective heading you have people who've been in incestual relationships for years or been abused by pedophiles for years or have had terrifying one-time experience, so the stressor varies.

In terms of Miss Johnson's background, the sexual abuse could be a factor, but certainly it would be hard to choose between the various stressors. Certainly you don't have to isolate one alone. It would be hard to tease out one alone.

Simply I think the thing is -- that I noted was this was a childhood that really predisposed somebody to being mentally ill, to really struggling during life, to having a lot of anger, resentment, depression, bad feelings about themselves,

Page 33

no sense of real security, perhaps a search for that because, you know, she was basically also estranged somewhat from her father, had conflict with the stepmother. Her mother and grandparents were involved in this religious situation. Various men would come through, but for various reasons they were never there long enough to form any kind of real stabilizing influence.

So these kids basically -- and Miss Johnson wasn't the only one. They had the sense of a group of survivors who banded together themselves, and they took various roles.

Wendy was the -- somewhat of a parental figure. Angie was somewhat more forceful, and she was kind of seen as a

3324

protector of some of the younger siblings. And particularly her youngest sibling Wendy really talked about her in more like a surrogate mother for her.

Q. You mean Holly?

A. Or Holly rather, excuse me, yes. Holly talked about her more as being kind of a surrogate mother. There was a story told by Jean -- and I think Angie told me this as well -- about her using her babysitting money to try and send it to Cambodian orphans, and eventually she was sending all of her babysitting money, and her mother made her stop. But there was a strong need on her part to try and rescue people that she saw as being bullied or disadvantaged in some way.

Q. What did you -- did you attach any significance to the fact that Pearl Jean Johnson knowing of this abuse didn't make any effort to report it to authorities or take any action respecting what she claims she knew?

A. It didn't really surprise me. I mean, basically there's

Page 34

still a lot of stigma associated with psychiatric care. Particularly that stigma's pretty prevalent in small towns, not unknown in large towns either. And it's really not unusual at all for people to kind of struggle on for years with some major problems without really seeking out help.

Certainly there were times when her mother herself could have used some help and she didn't seek it for herself. I just don't think the idea of doing that was something that she

3325

was attuned to. She was a survivor. She did the best she could. She did raise the four kids. You know, some of the religious preoccupation she had she got from her mother and was a way of coping herself with some of the uncertainties in her own life in feeling overwhelmed.

And so in this way you can often see problems that began in one generation passing on down to another generation, and one of the things that I picked up through my interviews that was really important to Ms. Johnson was that as much as possible she wanted to be a better influence on her own daughters than what she had experienced.

Q. And you're talking about Angela respecting her daughters as opposed to her mother and her experience.

A. Right, in terms of her relationship with Alyssa and Marvea and a real concerted effort on her part to be nurturing to them, to be loving to them, to become involved with them in their school, and uniformly everyone who knew her did talk about her being a really good mother to her kids.

Q. In addition to your investigation regarding her childhood, did you also look at her adolescent years and her years as a young adult?

Page 35

A.    Yes.

Q.    Were there areas of significance in that period of her life that you thought might be important to your findings regarding her mental health situation?

3326

A.    Yes, there were.

Q.    And what areas did you find were significant?

A.    A fairly early marriage, early I believe when she was 16, to a man named Steve Hugo, primarily as a way to get away from home.  That marriage lasted only a very brief time.  She moved back home again, and then there was a marriage to Arlyn Johnson.  There was a -- soon that marriage for a short time and the production of a daughter Alyssa ended, and she moved on to other relationships.  And there was a real sense that she never really felt protected or secure or satisfied in a relationship, so there was a constant searching for something, a need that she really couldn't fill.

Q.    Did you learn anything regarding a relationship she had with a fella by the name of Terry DeGeus?

A.    Yes, I did.

Q.    And what were your sources in terms of that information?

A.    Angela Johnson herself, her sister Wendy talked about that.  Her younger sister Holly talked about that.  She had a friend Dave Nieman who talked about that.  Other family members were aware secondhand of what the relationship had been, although they didn't meet Mr. DeGeus on any kind of regular basis, but they certainly saw the impact of that relationship on her.

Q.    That relationship with Mr. DeGeus, was that in any way relevant to your findings regarding her depression and anxiety?

A.    Yes, it was.  I also forgot to mention another source of

Page 36

information.  There are actual police records of times when she reported some abusive activities on his part including a lot of stalking that went on.

I've also forgot to mention her daughter Alyssa was witness to a lot of this and made some pretty revealing statements about the relationship with Mr. DeGeus.  Particularly to summarize, when she tried to separate from him, he became very possessive and abusive.  It developed into a battering relationship and then a stalking relationship.

There was one I believe, Dave Nieman, who talked about picking her up on the roadside and giving her a ride after she'd been thrown out of a car with her face being bloody.  There were times when she had gone to motels to escape when he had threatened her.  For a time they went to Wisconsin, she and her younger sister Holly, to live with her sister.  Alyssa talked at one point of remembering him raping her mother when she was in the next room and hearing that going on.  There was also a kind of ambivalence or kind of aspect of the relationship that Ms. Johnson couldn't resolve.

Q.    What would that be?

A.    Her sister talked about -- I believe this was Holly -- talked about this, that when they were in Wisconsin Mr. DeGeus called her and told Angie that he was suicidal and that she talked to him for several hours on the phone to convince him not to kill himself and eventually they reconciled much to the

3328

amazement of other people.

And so there was an aspect that she really loved him
Page 37

and hoped he would change. And this is not unusual in this type of relationship where there's chronic physical conflict in that there's emotional explosions and beatings, and then there's remorse and sorrow and then a hope that things will be better and reconciliations only to have the pattern repeat.

Q. This is kind of a cycle of abuse that occurs.

A. Yes, not unknown.

THE COURT: Mr. Berrigan, could I just give the jury a stretch break?

MR. BERRIGAN: Sure. Absolutely, sir.

THE COURT: Okay. Why don't we just take a short stretch break. Thank you.

Pardon the interruption. Thank you.

MR. BERRIGAN: No. That's fine.

BY MR. BERRIGAN:

Q. Dr. Logan, I think I forgot to ask you one area that we covered earlier about the childhood experience in terms of its relevance later in life, and that was the emotional abandonment issue respecting her mother not being there. Did you find that that had any relevance to your findings regarding her depressive condition?

A. Yes. I think I probably did touch on that issue somewhat, but certainly the kids felt abandoned by their mother when they

3329

were taken to the orphanage down in Kansas. They often felt that she was not there for them emotionally because of her preoccupation with the religion. The mother admitted that often she thought she wasn't there emotionally for her kids. She would blow up and strike them.

At other times the kids heard her say things like they

Page 38

LOG000450

were a burden or an imposition to her. She did have particularly the first four kids in fairly rapid succession. Then she was left with really no income. She was divorced. The father lived in a different state. There were some visits, but particularly for Angie those visits did not go well and didn't continue. So there was a real issue that the kids had where there is just no stability there, no one here who will always be here for us or who can support us. And so there was really no stable foundation.

Q. Were there particular records -- let me withdraw that question first.

In her history did you find documented instances where Miss Johnson had been diagnosed as being depressed or that she had taken action such as suicide attempts to substantiate your findings of depression?

A. In terms of documents, there was a time in 1996 when she went to a local mental health center on referral from I guess a hospital emergency room. And the issue at the time was that she was once again moving. She had gotten an opportunity to take a

3330

job with a country club down in Urbandale, a suburb of Des Moines. Her daughter Alyssa was at an age where some of her primary attachments were to friends, really was not enthusiastic about this move, and both Alyssa and Ms. Johnson herself were depressed.

Q. I'm sorry to interrupt you, but do you recall specifically the agency from which those documents came?

A. I think there was North Iowa Community Hospital, and then there was the Mental Health Center of -- North Iowa Mental Health Center. They were both located I believe in Mason City.

Page 39

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Dr. Logan, I've just handed you Defendant's Exhibits 2020 and 2016. Do you recognize those records, sir?

A. Yes, I do.

Q. Could you tell the jury what they are?

A. One of them is the North Iowa Mercy Health Center where she went in March of 1996 and first discussed some of her own suicidal thoughts, and she got referred then for additional care to the Mental Health Center of North Iowa. Both of these as I recall were in Mason City and was seen at the Mental Health Center for the next several months both by an individual therapist and a psychiatrist.

Q. And was her daughter Alyssa also experiencing some mental

3331

health problems at the same time?

A. Yes.

MR. BERRIGAN: Defense would move to admit, Your Honor, Defendant's Exhibits 2016 and 2020.

* * * *

(Defendant Exhibits 2016 and 2020 were offered.)

* * * *

MR. WILLIAMS: No objection.

THE COURT: 2016 and 2020 are admitted.

* * * *

(Defendant Exhibits 2016 and 2020 were admitted.)

* * * *

BY MR. BERRIGAN:

Q. Were there other records provided to you that aided you in

Page 40

coming to a determination about her mental health findings particularly in the area of depression?

A.    Well, in terms of depression, really the most consistent records that I had were those after she was incarcerated in July of 2000 through about April of this year.

Q.    And that would include the jail records from the Benton County Jail?

A.    Yes.

Q.    Those were records from 2000, were they not?

A.    Yes.

Q.    And she was also in the Black Hawk County Jail in 2000?

3332

A.    Very briefly, for about two weeks in October of 2000.

        MR. BERRIGAN:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. BERRIGAN:

Q.    Dr. Logan, I've handed you records that have been marked Defendant's Exhibits 2027 and 2126.  Do you recognize those documents?

A.    Yes.  These are records from the Benton and the Black Hawk County Jail.

        MR. BERRIGAN:  Defendant would move to admit 2027 and 2126, Your Honor.

                        *   *   *   *

        (Defendant Exhibits 2027 and 2126 were offered.)

                        *   *   *   *

        MR. WILLIAMS:  No objection, Your Honor.

        THE COURT:  Those exhibits are received.

                        *   *   *   *

        (Defendant Exhibits 2027 and 2126 were admitted.)
                        Page 41

* * * *

BY MR. BERRIGAN:

Q.    You've told us a little bit already about the Black Hawk County Jail incident in terms of that prompting your involvement in the case when you were called by Mr. Willett.  What do you understand -- from your review of the records and your interviews and assessment of the materials provided you, what do

3333

you understand the situation to have been, this suicide attempt in October of 2000?

A.    Well, to start with, she was evaluated at the Benton County Jail and found to be depressed there and was placed on an antidepressant medication called Serzone.

Q.    I'm sorry?  What type?

A.    Called Serzone, S-e-r-z-o-n-e.  It's an antidepressant.

Q.    And was that a medication that she was prescribed daily?

A.    Yes.

Q.    And do you know whether that was continued throughout the period of time she was at the Benton County Jail?

A.    It was continued until early on, first day or so, in the Black Hawk County Jail, and then they changed that and put her on a different antidepressant for sleep called Elavil.

Q.    Do you know what prompted the Black Hawk County Jail to change her medication?

A.    Depression -- oh, the change.  Boy, that I don't know.  Frankly, it's usually the situation that if somebody's on a certain medication they'll remain on it.  Serzone, however, is a newer antidepressant that doesn't have a generic equivalent yet because it's still under patent.  Many jails from my own experience choose to go with older antidepressants because of

Case 3:09-cv-03064-MWB-LTS    Document 28447    Filed 06/23/11    Page 54 of 83
LOG000454

cost. I don't know if that was a factor. I'm speculating.

Q. As between those two medications, the Serzone and the Elavil, is one of those a preferable medication for the

3334

treatment of antidepression as to the other?

A. Both of them can be equally effective. The Elavil is often given for sleep because it carries a side effect of sedation. It can also cause blurred vision, dry mouth, and constipation, and it's particularly lethal if somebody hoards the medication for an overdose, so I don't like to use it with patients that I'm concerned about their stability. The Serzone is a newer antidepressant and more effective in people who have both depression and anxiety.

Q. Was Miss Johnson then kept on Elavil during the time she was at Black Hawk County?

A. Yes, she was.

Q. And then we were starting to discuss the actual suicide attempt. Were you able to, from your review of the records and interviews, make some determination as to what had occurred there?

A. Yes, I talked to her directly about it and also reviewed the records from the jail and from Allen Hospital where she was taken after the attempt.

Q. We've heard some testimony about that, Doctor, but I wonder if you could just summarize for the jury what you determined the suicide attempt at the Black Hawk County Jail to consist of.

A. Basically she was upset about two -- well, one issue in particular. She was really upset about the potential long-term separation from her daughters, and she had appealed I think the

3335

fact that the judge had not granted bail and learned in a letter that day that she had lost that appeal and would have to be incarcerated through the time of trial and wouldn't be able to have any physical contact at least with her daughters.

I believe she also got news that day that the bodies of Mr. Nicholson and the Duncans were found.

Q.   Not to interrupt you, but were you aware that the Black Hawk County Jail did not allow visitation for Miss Johnson's children because of their age?

A.   No, I wasn't actually.

Q.   Okay.

A.   That became -- the type of note -- the no-contact visits had been an issue for her in terms of not being able to touch her children in various jail settings, but I wasn't aware that Black Hawk had not even visible contact.

Q.   All right.

A.   But that certainly could have influenced her I think.  At any rate, she had already been depressed.  She had mentioned to another female inmate who had a history of suicide about what would be the best way to kill yourself, and the inmate had mentioned with a sheet.  She had gone to an area of the jail where there was poor visibility from the cameras.  There was an unmonitored area.  And she had tied a sheet around her neck and had jumped off the second rail, upper balcony I guess of the jail.  And another inmate had just received an intercom to come

3336

out for her medication and, in the process of doing so, happened to see her and started screaming for help.

Page 44

LOG000456

There was some other behavior they discovered afterwards. There were several letters in her jail that contained references to her death including one to her daughter and one to a boyfriend at the time. She had turned down a visit from her attorney that morning and also a professional visit from a mental health person. They had called in to assess her. So she refused both of those.

When they found her, she was -- her feet were dangling, didn't touch the floor. They had to hold her up. The noose was tight enough around her neck that they couldn't untie it. One of the officers had to run upstairs and untie the other end from the rail. She was blue in the face. She was foaming at the mouth. She was initially not breathing but then began gasping for area and began spitting and flailing. They restrained her and called an ambulance, and she was taken to the hospital, assessed in the emergency room, placed in the ICU.

Later she had no memory of this which is not atypical when somebody suffers a period of anoxia. So this was a very serious suicide attempt that very nearly worked.

Q. In your career as a psychiatrist, have you had occasion over the last two and a half decades or so to treat people who have attempted suicide?

A. Yes, I've been involved in legal suits where inmates have

3337

successfully hung themselves in jail. Hanging is the most common method of suicide in jails. I've also been involved in jail prevention suicide programs, training for actual officers what kind of signs to look for and have dealt with that issue also in state forensic units I've visited and consulted in.

Q. Is there a term that's used to describe people who sort of

Page 45

LOG000457

pretend suicide, they make some overt -- take some overt action but not seriously engage in a real suicide attempt, more of a cry for help type of a situation?

A.   There are some people who make suicide gestures.  Some of those same individuals are sometimes accidentally successful in killing themselves, and some of them are more attention seeking.

I remember particularly back when I was in training I had a moonlighting job at a county hospital, and every weekend they would bring in the same lady who was found laying across a bridge, and she would get a free room for the weekend and was probably not a serious suicide attempt.

Q.   Was this a suicidal gesture in your view?

A.   Not at all.  This was a serious suicide attempt that very nearly worked.

Q.   I wanted to ask you about one aspect of it that's come up, and that is there's been some testimony that as Miss Johnson was being restored or revived, if you will, and was able to start breathing that she was combative with the individuals who were trying to treat her actually.  As a medical doctor, is that an

3338

unusual occurrence for people who have been deprived of oxygen for some period of time?

A.   No.  I mean, from people I've treated in the emergency room and also even from surgical experiences I've had, when somebody's in a delirious state and they're not completely aware of their surroundings, it's not unusual at all for them to be combative.  So usually that's something at least medical personnel are prepared for and move in fairly quickly and administer restraints if they need to if the person's highly agitated like that.

Page 46

LOG000458

Q.   I wanted to ask you just a few questions about illicit drug usage by Miss Johnson.  When you were kind of assessing her mental condition and reviewing all this information, did you receive information that she had used drugs, illicit drugs, for a period of time during her life?

A.   Yes.

Q.   And I think you've described some of that already in terms of her alcohol usage going back to fifth grade and then starting smoking marijuana in seventh grade and so on.  What other types of information were you provided regarding her illicit drug use?

A.   Some by herself, some by, you know, friends, former husband, other people that knew her, siblings.

Q.   Is there any correlation or relationship between that type of drug usage and people that suffer from depression on a chronic basis?

3339

A.   Yes, enough so that many psychiatric units have what they call dual diagnosis units where they both treat substance abuse but underlying usually mood disorders that tend to trigger and fuel the substance abuse.  They found that simply an abstinence program alone without addressing the underlying emotional instability that often is a part of it is just not successful.

Q.   So these are conditions they frequently do simultaneously?

A.   Right, they often coexist.

Q.   Let me ask you -- and we're going to have some testimony about methamphetamine in some detail, but as a medical doctor, are you familiar with the drug methamphetamine?

A.   Unfortunately quite a bit lately.  Really epidemic proportions across the midwest.

Q.   Could you generally describe for the jurors what that drug

Page 47

is and what it does in a summary fashion if you could?

A.    Sure.  Methamphetamine is a really strong stimulant.  It really kind of produces a manic-like feeling of euphoria, and it does this by releasing a brain neural transmitter called dopamine.  It has very strong antidepressant effects in milder form, not -- not nearly as strong as methamphetamine, but in a milder form it actually was used by psychiatrists in the 1930s and 1940s to treat depression.  It was perhaps the earliest antidepressant.

Drugs called Ritalin was an example.  And that was fairly helpful for depression, but it had some downsides that

3340

are even more characteristic of methamphetamine.  It causes sleeplessness.  If someone continues to use it, they can become emotionally agitated.  They can become hostile; aggressive is fairly typical.  Many of them become paranoid.

There's also a problem that caused discontinuation of its use pretty much for standard depression in psychiatry in that if you try and withdraw from this medication there's a very strong rebound depression.  The depression comes back very quickly once the medicine's withdrawn.  It causes long periods of sleeping; hypersomnia they call it.

The medicine is still used in -- not methamphetamine but similar type drugs that are stimulants in lower dosage with hyperactive kids who seem to have what we call a paradoxical or just opposite reaction to these drugs.  They, in fact, slow them down.

And the other place that it's still used is in the elderly who sometimes have depression in very low dosages because it has a low incidence of side effects on things like

Page 48

LOG000460

the heart function which might be important for elderly people.

But for -- in terms of street drug use, the methamphetamine produces an air of confidence, energy, well being. You may see truck drivers use it that need to drive long hours or people that work two jobs. And often Ms. Johnson did work two jobs and was pretty productive. But eventually it catches up with them in terms of lack of sleep and other things.

3341

Q. That rebound effect that you talked about, does that have some implications for long-term methamphetamine abuse?

A. Certainly makes it difficult to quit. I mean, there's two reasons to get addicted to it. Number one is being on it is very pleasurable. It's certainly a feeling of confidence and not having any -- being invincible and being self-sufficient is certainly something that the individual finds, you know, comforting and basically likes a lot.

But also if they try and stop, the effects of stopping are not good. You know, there can be sobbing episodes, crying, really strong rebound depression. So if they stop, there's really a period they will have to go through where it's really difficult and they probably would need some treatment to help.

Q. You've, I know, reviewed a lot of records. Have you looked at Miss Johnson's progress in terms of her treatment for depression now since she's been incarcerated over the last five years?

A. Yes, I have.

Q. And what do the records reveal in terms of her progress there?

A. Initially they had some difficulty finding a good antidepressant for her. She had a lot of side effects to a

Page 49

number of the different antidepressants, and sometimes they just didn't work all that well. But she went through the Serzone, the Elavil, Trazodone, Celexa, Prozac, and Paxil and didn't

3342

really do very well on any of those. And then they came up with a combination of what she's currently been on for the last couple of years, and that's an antidepressant called Zoloft, and she takes a fairly heavy dosage of that.

And then the second medication she's on is a mood stabilizer called Serzone that has just been found in the last couple of years to have this mood-stabilizing effect. It was originally used for another purpose. But on those medications she appears to be very stable, to be doing fairly well, has really been able to focus a lot more of her attention particularly on her younger daughter and on maintaining family contacts. And she has made a real effort to continue relationship with her mother, to repair relationships with her father. She's maintained contact with her sisters and to some extent her brother, and particularly she's been able to establish a line of support with her two daughters, particularly the youngest daughter Marvea.

Q. Is it safe to say she's not currently suicidal?

A. Yes.

Q. And hasn't been for some period of time?

A. Right. I don't see any evidence really since the fall of 2000 that that has been an issue.

Q. Way back when you first assessed her back in January of 2001, did you discuss suicide with her?

A. Yes, I did.

3343

Page 50

LOG000462

Q.   And in terms of any concern that she might commit suicide in the future, did you talk to her about that?

A.   Sure.  And, you know, I certainly did not think that she was suicidal when I talked to her even back in January of 2001, but you never know, of course, you know, how somebody is going to react to the impact of future events.

But certainly the fact that she's on medication right now, that she has sources of support that she didn't have before, that she has not been suicidal in some time, that she has this real attachment to her daughters gives me a lot more confidence that she'll be able to weather other things in her future.

Q.   In fact, even back then didn't she reference her daughters in discussing with you why she wouldn't consider further suicide attempts?

A.   Yes, she did.  And, I mean, the daughters played a role, frankly, in the suicide attempt itself in terms of the separation issue.  I think what's happened is that she has a better hope now of being able to be a meaningful part of their life, of being able to establish some contact with them.  She's got a project with Marvea that I'm sure Marvea will testify about, a memory book, that's been really important to her.

MR. BERRIGAN:  That's all I have.  Thank you, Doctor.

THE COURT:  Mr. Williams, would you have any objection to deferring your cross-examination till after our morning

3344

recess?

MR. WILLIAMS:  No, Your Honor.  That'd be fine.

THE COURT:  Okay.  Members of the jury, it's ten
Page 51

LOG000465

o'clock. We'll take our usual 25-minute recess. Please keep an open mind until you've heard all of the evidence in the penalty phase. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 9:59 a.m.)

THE COURT: Ready?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Doctor.

A. Good morning.

Q. I want to go back over some of the points you made during your testimony here this morning. One of the first things is

3345

you indicated you interviewed a number of people in addition to the defendant in this case in order to arrive at your opinions. Do you remember giving that testimony, sir?

A. Yes, I do.

Q. Those people were chosen by Mary Goody who was employed specifically to find mitigation evidence in this case; isn't that right?

Page 52

A.   Yes, it is.

Q.   And the people that were chosen were friends and family of the defendant; isn't that right?

A.   Well, certainly people that knew her.  Those would have been some of the same people I would have talked to if I'd been selecting people that certainly had contact with her.

Q.   Sure.  You didn't go out and find anybody who were enemies of the defendant --

THE COURT:  You know, Doctor, that wasn't responsive to his question, so you need to answer the question he asks you and not volunteer information.  Do you understand, Doctor?

THE WITNESS:  Yes.

THE COURT:  Okay.  It wasn't responsive at all.  He didn't ask you about who you would pick if you were picking witnesses, did he?

THE WITNESS:  No, sir.

THE COURT:  Okay.  So then why did you answer it that way?

3346

THE WITNESS:  Primarily to convey that the picks were logical.

THE COURT:  But it wasn't --

THE WITNESS:  But I didn't make them.

THE COURT:  That's right.  And so you need to answer his questions, not some question you hoped he had asked you; okay?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.   So the fact is, Doctor, you didn't interview anybody who

Page 53

LOG000465

was an enemy of the defendant; right?

A.    No.

Q.    Didn't interview any law enforcement officers about their dealings with the defendant, did you?

A.    No.

Q.    So you took as your guide who to interview the people that were told to you to be interviewed by an expert hired by the defense to find mitigation evidence.  That's fair to say, isn't it?

A.    Yes.  They were selected by Mary Goody.

Q.    Now, all of these people I think your testimony was indicated that Angela Johnson was a good mother; is that correct?

A.    Yes.

3347

Q.    And you agree with that assessment based on your analysis in this case.

A.    From talking to her daughters I would say yes.

Q.    Okay.  And so you would apparently think that it's a good mother to -- while you have young daughters at home to be out dealing large quantities of methamphetamine while your daughters are sitting at home?

        MR. BERRIGAN:  I'm going to have to object to that, Judge.  There's no evidence that the defendant was dealing large quantities of methamphetamine.

        MR. WILLIAMS:  I'll rephrase.

        MR. BERRIGAN:  One ounce is the highest we've ever heard.

        THE COURT:  You can rephrase.

        MR. WILLIAMS:  I'll rephrase, Your Honor.
                    Page 54

LOG000466

2005-6-7 Logan Trial testimony VOLUME 19, 6-7-05

BY MR. WILLIAMS:

Q.   Are you suggesting that it's a good mother who is out dealing methamphetamine while her young daughters are at home?

A.   No.

Q.   Are you suggesting it's a good mother who goes out and buys an Intratec Tec-9 semi-automatic firearm while her daughters are at home?  Is that a good mother, sir?

A.   No.

Q.   Is it a good mother who gets herself so involved in criminal activity that she causes, she causes, herself

3348

ultimately to be incarcerated and separated from her children?  Is that being a good mother, sir?

A.   No, not at all.

Q.   These Kansas events I want to talk to you about.  First of all, they lasted less than nine months, didn't they, sir?

A.   I didn't hear all of your question.  I'm sorry.

Q.   Yes.  The Kansas events that you testified about, this event where they were in Kansas at this orphanage down there --

A.   Yes.

Q.   -- the entire time period they were down there was significantly less than nine months, wasn't it?

A.   Yes, it was.

Q.   And you called the activities down there sadistic.  Do you remember giving that testimony, sir?

A.   Yes, I remember using that word.

Q.   Sadistic is a pretty strong word, isn't it, sir?

A.   Yes, it is.

Q.   This was a farm, wasn't it?

A.   Part, yes, it was a farm.

Page 55

LOG000467

Q. And the practices you're talking about is practices -- in part about the animals is the slaughtering practices that occur on farms even here in Iowa, isn't it, sir?

A. Yes.

Q. You indicated that they had the chickens after they cut off their heads chase the children around. Are you suggesting that

3349

the Dillos cut off the heads of the chickens and then instructed the headless chickens to chase the children around?

A. What I was suggesting was that they purposely placed the children where the chickens would chase them around and frighten them.

Q. They had the children help them in chores on this farm during that brief period they were in Kansas. Isn't that what really happened here, sir?

A. That was not the way it was conveyed to me.

Q. The sexual abuse I want to talk to you about. First of all, I think your testimony was that Angela Johnson told you that she didn't recall any sexual abuse.

A. At least on one occasion, that's correct.

Q. Okay. Wendy Jacobson indicated that Angela Johnson told her at some point later in their lives that she had been sexually abused down there. I think you indicated that during your testimony as well.

A. Yes.

Q. Okay. But, in fact, during the evaluation process conducted as part of your analysis, Angela Johnson told you that she had been told by somebody else that she'd been sexually abused but she didn't recall it.

A. Go over that again if you would. I'm sorry.

Page 56

LOG000468

Q.    Yeah.    As part of your evaluation of Angela Johnson, didn't she tell you that she was told by Wendy, in fact, that she had

3350

been sexually abused but didn't recall it?

A.    She said that on the last time I interviewed her.    That was not her response the first time.

Q.    All right.    And so ultimately we have the records from 1996 in which Angela Johnson's questioned about whether she was sexually abused or molested, and she indicated to the doctor in 1996 that that never happened.

A.    Yes, that's correct.

Q.    You can't tell this jury that you know in any way that Angela Johnson was sexually molested ever in her life, can you, sir?

A.    No, I can't.

Q.    I want to talk to you about her pregnancies.    You indicated in this case you evaluated and talked with Angela Johnson about her personal history, is that correct, as part of your efforts to arrive at an opinion in this case; correct?

A.    Yes.

Q.    And part of that you took down her personal history, when she was pregnant, what her drug use was, and what boyfriends she had and all that kind of stuff; is that right?

A.    Yes.

Q.    And you have to rely upon those statements in order to formulate your opinion; is that correct?

A.    In part, yes.

Q.    In fact, she told you that she did not use any controlled

3351

Page 57

LOG000469

substances during her pregnancies, didn't she?

A.    Yes, she did.

Q.    Your ultimate conclusion in this case is that the defendant in this case has suffered from depression.  Is that fair to say?

A.    Yes.

Q.    And you were asked is there evidence in her past that you looked to to confirm, in fact, she suffered from depression, and you were pointing out the 1996 medical records as some indication to verify your conclusion that she suffered from depression.  Have I got that right?

A.    Mostly.  My answer was in specific response to what documents from her past would show that she is depressed.

Q.    Fair enough.  So you came to the conclusion she was depressed, and then we went through some discussion about what documents would back up that depression; is that correct?

A.    Yes.

Q.    Now, the first time that there's documentation of any depression was in March of 1996 when she went to Mercy Medical Center.

A.    Yes.

Q.    All right.  What happened immediately before March of 1996 in relation to any criminal activity that the defendant was involved in, sir?

A.    I don't know if I have a time line that would tell me that.

Q.    In fact, what happened immediately before that is on

3352

February 7 of 1996, federal law enforcement officers executed search warrants of Dustin Honken's house in which they found a meth lab in which Dustin Honken, Tim Cutkomp, and Angela Johnson

Page 58

LOG000470

and others were involved in manufacturing methamphetamine, and that had just been seized by law enforcement officers prior to the first time she goes to a medical facility and announces that she has depression.

MR. BERRIGAN: Just for the record, Your Honor, I'll object that also misstates the evidence. There's no evidence Miss Johnson was involved in the meth manufacturing process whatsoever.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Isn't that the timing, sir?

A. I didn't make a time line of some of the criminal investigation of the case. I'll have to take your word for it.

Q. The next time there's documentation of depression that you identified was when she was taken to the Benton County Jail; isn't that correct?

A. Yes.

Q. In the Benton County Jail she's incarcerated; right?

A. Yes.

Q. And that's an event that would be depressing to anybody; isn't that fair to say?

A. Sure.

3353

Q. The next documentation that you identified was the suicide attempt in the Black Hawk County Jail on October the 13th of 2000; isn't that correct?

A. Yes.

Q. Okay. And what happened immediately before that suicide attempt was that the bodies of five -- I'm sorry, of four murder victims were discovered by law enforcement officers; correct?

Page 59

LOG000471

A.    Yes, that's correct.

Q.    And you know from your investigation in this case that the way they were discovered is because the defendant in this case drew a map that led authorities directly to the bodies.  You know that, don't you, sir?

A.    Yes, I do.

Q.    And as a result of that, the defendant would be in a position of having to face her family knowing now for the first time they would know that she was, in fact, involved in the murder of children; isn't that fair to say?

A.    Yes, it is.

Q.    And that would, to any normal person, be a depressing thought that you now have to face your family and know that they know that you were involved in murdering kids; right?

A.    Sure.

Q.    Despite your diagnosis the defendant suffered from depression, the fact is that that depression did not cause her to be unable to hold a job; right?

3354

A.    No.  She worked consistently.

Q.    In fact, I think your testimony was that she was quite productive; right?

A.    Yes.

Q.    Those are your terms.

A.    Yes, I . . .

Q.    So this depression didn't keep her from having a house and making house payments.

A.    Not to my knowledge, no.

Q.    The depression didn't keep her from being able to clothe and feed herself and her children.

Page 60

LOG000472

A.   No.

Q.   The depression really didn't impact her ability to function on a daily basis in society, did it?

A.   That's correct.

Q.   And you covered this with defense counsel, but I just want to make sure that we understand.  You are not providing any opinion whatsoever that her depression affected her thinking or her behavior at the time of the offenses involved in this case, are you?

A.   No, I'm not.

Q.   In fact, you were specifically instructed not to question her about what her thinking and behavior and mind-set was at the time she committed the offense.

A.   That's right.

3355

Q.   So it's fair to say you're not offering any opinion about whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired or not impaired at the time that she committed the offense, are you?

A.   No, I'm offering no opinion about that area at all.

Q.   You're not offering any opinion about whether she was under any form of duress or pressure or anything else at the time she committed these offenses.

A.   That's right.

          MR. WILLIAMS:  I have nothing further, Your Honor.

          THE COURT:  Mr. Berrigan?

          MR. BERRIGAN:  Thank you, sir.

                    REDIRECT EXAMINATION

BY MR. BERRIGAN:

Page 61

LOG000473

Q. You are sometimes asked by lawyers for those types of findings, aren't you, Doctor?

A. Yes.

Q. Because certainly somebody who suffers from a mental disease or defect, the terms we lawyers use, that is so profound that they can't even appreciate the wrongfulness of their conduct or what they're doing or are psychotic, that can be a defense to even the most severe criminal activity, can it not?

A. Yes. I mean, it involves not only the act but the mental state in which it occurs.

3356

Q. So we have people like John Hinckley hearing voices from Jodie Foster and shooting the president. He's an example of such a type of an individual; is that right?

A. In the distant past, yes.

Q. And then there are sometimes cases where, depending on where you are, what state you are, that the mental elements for murder in the first degree might vary from murder in the second degree. That might be a significant determination as to whether a crime was committed deliberately versus intentionally or something of that nature; is that right?

A. Yes.

Q. And you weren't asked -- specifically you were not only not asked but you were told that nobody was making those kind of allegations in this case. Weren't you told that?

A. Yes.

MR. WILLIAMS: Objection, Your Honor, to leading the witness.

MR. BERRIGAN: I'll rephrase.

BY MR. BERRIGAN:

Page 62

Q. What were you told when you were asked to look at Angela Johnson's mental condition in this particular case? What were you told regarding her mental state at the time of the commission of the offense?

A. Basically that that was an area that I was not to question her about, that that had been kind of an agreed-on area, and

3357

that I was to focus on other aspects of her life but not those events.

Q. And, in fact, weren't you told that the defense wasn't claiming that, you know, she was nuts at the time of the offense or that that was some kind of a defense?

MR. WILLIAMS: Objection, Your Honor. Leading the witness again.

THE COURT: Overruled. You may answer.

A. Right. There was no claim in that area.

Q. Okay. And so you didn't make any inquiry in that area.

A. No. It just wasn't my issue. That wasn't the task that I was charged with.

Q. The Black Hawk County Jail suicide attempt, you were asked some questions about these bodies being uncovered at about that same time. That's certainly true, isn't it?

A. Yes.

Q. But were there other explanations given to you by Miss Johnson that you were able to verify in terms of why she was particularly distressed at that time?

A. I think the most consistent one I heard from her was that she was looking at -- realizing that she was facing a long time of separation from her children, and she's always been very attached to her own two daughters and was highly distressed by

Page 63

that.

Q. The discussion that was had about this North Iowa Mental

3358

Health report where Miss Johnson in 1996 was depressed, what was going on in her life at that time other than Dustin Honken's house being searched? Do you know from the records?

A. She was in the process of a move down to Urbandale. I think a lady named Vanderpool who was her boss at the Mason City Country Club had recommended her for a job. Her daughter who had experienced numerous moves and transitions in her life was highly upset about the prospect of leaving the area and had herself begun acting out and was very depressed.

Q. Where is Urbandale?

A. It's a suburb of Des Moines.

Q. Okay.

A. I think to the west, northwest of Des Moines and a considerable distance from Mason City. I'm guessing 125 miles or so. And she was distressed not only about herself. She also was distressed about how her daughter was doing.

Q. Was there some concern that, in fact, her daughter wasn't going to go with her?

A. Yes. In fact, for the first time Alyssa had said that she wanted to remain with her father, A.J., Arlyn Johnson.

Q. Rather than be with her mother.

A. Right.

Q. And Mr. Johnson at that time, do you know where he was living?

A. Actually no, I don't.

3359

Page 64

Case 3:09-cv-03064-MWB-LTS    Document 284-7    Filed 06/23/11    Page 76 of 83

LOG000476

Q. Forest City, does that ring any bells with you at all?

A. I thought you meant in the type of place.

Q. I'm sorry.

A. Yeah, he was living in Forest City which is up in that same area as Mason City. It's not near Des Moines at all.

Q. When you were talking about your observations about Angela Johnson being a good mother, I take it you weren't discussing Tec-9s and selling drugs and getting herself incarcerated.

A. What I was referring to specifically was her emotional involvement with them in terms of trying to be loving and supporting of them and particularly in terms of her recent contact with them since her incarceration, particularly the last couple of years being able to be involved in a much more supportive and consistent way.

I didn't want to convey that she was always a responsible parent, although she did provide for their material needs. But certainly there are other areas in terms of her choice of romantic attachments and frequent moves and use of drugs and other things that certainly wouldn't put her in the category of an ideal mother.

Q. You've also testified in your experience you've done a lot of work in prisons and the federal mental health hospital in Springfield in particular. Have you evaluated and had contact with people who are incarcerated that are parents?

A. Yes.

3360

Q. And do you know from your experiences whether these people have at least the capability of being good parents even in an incarcerated setting?

A. They can be. Certainly women have a greater desire to do

Page 65

LOG000477

that. Unfortunately, many of the men I've seen have not really maintained very good family contacts. But certainly in facilities that I've seen that have been -- where women are housed, there's a much -- for example, Mitchellville here in Iowa, there's certainly a much greater focus on these women maintaining contacts with their family, and the family ties are much stronger generally.

Q. I wanted to ask you just a couple of questions about the people you did interview, the ones that Miss Goody selected. If you had to categorize those folks and their relationship with Miss Johnson, how would you categorize them?

A. The primary group were people in her immediate family growing up and people who lived with her and then her own daughters and to some extent a couple of people who had known her over the years, long-time friends, people who have had a lot of contact with her over the years.

Q. Were you made aware of any police officers that had known Angela Johnson for four decades or any enemies that had grown up with her in the household run by Pearl Jean Johnson?

A. No.

Q. Were there any people brought to your attention that might

3361

have known what happened in Chanute, Kansas, during the time they were with the Dillos that you weren't able to talk to other than the Dillos themselves and the people that were at the orphanage?

A. Right. I didn't talk to the Dillos themselves. But in terms of Angie and the three siblings that were there, I talked to them. I talked to Jean. I also talked to Carol Mann who transported them there and actually recommended they go there.

Page 66

LOG000478

Q.   I don't know what your experience is with farms or farming practices or animals being slaughtered on farms, although I did think you said you were raised in Texas and spent a good deal of time in Kansas.

A.   Not a great deal of time on farms.

Q.   In your experiences doing this type of work, this practice of having five-year-olds watch squirrels' eyes pop out as the hammer's plucked into the squirrel's head, is that a common experience in your career when you've talked to people?

A.   Well, I've talked to a lot of people that have grown up on farms in Kansas.  That's not something I frequently hear.

Q.   What about little boys being asked to touch electrical fences to see if they're working and there's electricity going through them?

A.   No.

Q.   How about children between five and ten watching live kittens being eaten by hogs?  Is that something that comes up

3362

frequently?

A.   No.

Q.   You did have a chance to talk to all the Johnson children about these experiences.

A.   Yes.

Q.   Did any of them consider these experiences to be pretty routine farm work that children would typically be involved in?

A.   No.

        MR. BERRIGAN:  That's all.  Thank you.

        THE COURT:  Mr. Williams?

        MR. WILLIAMS:  Nothing, Your Honor.

        THE COURT:  You may step down.
                Page 67

LOG000479

6/7

Dr. Logan
psychiatrist, education, licensure
medication – Linn – antidepressant.
Amitrip – trazedone. d/n/r elavie. overdos
dep. & anxiety Paxil. But prescribed Prozac
& then Zoloft + Seroquel. Wrote letter to
jail. Period of time not much contact.
2167 adm.
Conclu. very stressful childhood & ua.
predisposed to depression. Sexual abuse.
dramatic religious experiences that created
an atmosphere of fear.
depression, anxiety, drug use – poor
coping skills
Childhood history – mother volatile,
episodes when they were believed to be
demon possessed. Toys. TV. bird. Wolf @
window. end of world. Tire in basement.
fear of basement – mark of beast. Exorcisms
Describes exorcisms.
fearful & isolated. Looked down upon.
Married repeatedly. Never had chance to
put down roots – More severe w/ older
kids.
Mother's own background. physical &
sexual abuse.
Conflict w/ dad – single mother w/ 4
kids.
fast-paced – self-involved practice

MG006043

Mother read bible story - kill them if necessary. Traumatic - several father figures that were disruptive. CO, IA (Klaus). Went to KS located. Middle of SE quad. 150 mi. so. of KC.

Dillows. Terrified. Sadistic practices. Hogs. Cut heads off chicken. Animal butchering. Kids had nightmares. Til college for Jim. SA by Dillow. Living conditions - shed - mice infested - force fed food. Ate soap. Jean so involved w/ church - kids thought she had left them there. Emotional impact. "Under siege." They have all struggled to deal w/ this all life."

Poor self image - no positive self concept - fearful - beaten intimidation. Shrinkage of certain areas of brain. Impulsive. Early drug & sexual experiences. Stunted maturation, normal school develop. C/N concentrate in school. Johnson - Wendy & Angie show this. Δ's early drug use. Quit school early.

Long term implications of SA - hard to choose between various stressors. This was a childhood that predispose someone to mental illness. Estranged from father. the survivors banded together. Δ seen as protector. Holly - more of a surrogate mother. Jean said Δ used her babysitting $ to Cambodia. Strong need to rescue people.

Not surprised Jean d/n report SA. Not unusual for people to struggle on for yrs w/o help. Survivor - did the best she could - way of coping w/ being overwhelmed. Generation → generation. As much as possible she wanted to be a better influence to her daughters. Uniformly - good mother to her kids.

S/g. early marriage. then AJ. then other relationship. Constant searching for someone she c/n fill.

MG006044

Tdg - lots of people gave info on this. relative to depres-
sion. Police records. Alyssa witness to this. Battering
+ stalking rela. Ambivalence - aspects, c/n resolve. Kept
reconciling. She loved him + hoped he wd change.
Cycle of abuse.
Abandonment by mother. No stability. No foundation.
√2016, √2020 - adm̄.    √2021, √2126  adm
Depression - best records are in carceration. Benton Co. Serzone
then Blackhawk Co. Chged meds. c/n /k why. Bodies found + no
contact w/ daughters. describes suicide. Serious. Nearly worked.
Combative is usual.
Drug use - some by herself other people who knew her. Can
treat as dual dx. Meth - epidemic proportions across the
midwest. Manic like feeling of euphoria. Dopamine.
Strong anti dep effects. Ritalin - earliest drug. Sleeplessness.
Emotionally agitated, aggressive, rebound dep. if w/d.
Confidence, energy, wellbeing. Diff. to quit. Stopping are
not good. Period of W/D.
Incarceration records - depression - treated thru out 5 yr.
Zoloft - heavy dose; Serzone & stable + doing well. Able +
focus attention on daughters + family. life support. Not
suicidal + h/n been for some time. has better hope now
Ⱦ
        /nt. people in add to △. Mg. Enemy. law enforcement
(judge yells) Selected by me. Good mother. large guardian. Meth. 9m
KS - √ 9 mos. Sadistic testimonies. sa. d/n/r. Preg. you c/n say
she was ever sa. No drugs during preg. Concln: depression
is there evidence in her past? March 1996 - ? Meth labs
found. Benton Co. incarcerated. Bodies disc. Instructed not to
ques. her.

to not go into area. No claim she was mentally ill. She was highly stressed by not seeing kids. Good mother. Kept her emotional involvement w/ them. During incarceration.

Jamie Jo Hayes

Faribault, Mn. Children. (3). 1) older sister. 3rd born. 39 y. diff ↓ 2 yrs. 1985 lived in Iowa + moved away. PJ + James. Recalls Pueblo, CO. Waiting w/ Jim for Angie + Wendy to come home from school. Recalls Mason City, I. Grandparents were around a lot. Florence + Andrew. Subjected to exorcism. Overheard everything they believed. Programming all the time. Fear in what they believed. We were intimidated by it. Satan + the end of world. Afraid we wgn go to heaven. Grandmother had the records. Exorcism of demons. Screaming + praying. Stupid d/n bother that much. All of us subjected. laying on hands + praying. to release. If a serious need then we were all taken in a room. Angie subjected to this. Strong personality. Tried to be subdued — her personality. heard it. Petrified. loud prayer. Angie scared. Holding her down. little kid. Powerless to do anything about it. Roaring lion seeking whom he could devour. got used to it. They were afraid. Demons were always lurking around the corner somewhere. Got used to it. As we got older less afraid. lifestyle. I d/n/n the fear of Wendy + Angie. Satan very real to Wendy. terrified of basement. Then. had to go thru extraction. No choice. Fasting. Sat + watch Billy Graham. Boring + tired. d/n understand. No food from morning to sundown. Every week. Thornton. Physical discipline. Belt. afraid of it. All got it. Kind of trying to protect each other. not very intimate. She d/n/k how to. Work? father figures - grandfather. father? gn/r for a long time. Some visits. 1x a yr. wonderful. the highlight of life - year. Felt safe + loved.

MG000046