2005-6-8-Hutchinson Trial Testimony VOLUME 20, 6-8-05

that is?

A.    Yes.   This is a -- sort of a summary encapsulated version of Erik Erickson's developmental tasks.

Q.    These categories on the side seem to be self-explanatory, but could you just tell us briefly what those are that run up and down the page on the left?

A.    They are sort of broad guidelines of the ages through which students usually or children usually move through these stages. They're somewhat fluid.   They don't -- you know, when you turn two, you don't automatically jump into a new place.   It's sort of a slow evolution, but these are markers to kind of indicate when things happen.

3633

Q.    And what about the top column that runs across the top of the page?   What are those categories?

A.    Those are the ways that it's been sort of boiled down into this chart.   What is the crisis that the person has to resolve? Who are the significant people that contribute to that?   What are the behaviors that are associated with it, which is labelled the modalities?   If someone successfully negotiates that stage, what virtue will they have?   And if they don't successfully negotiate that stage, what maladaptation or malignancies would they have?   And a maladaptation is where they have an overextenuation of the positive, or a malignancy is where they have too much of the negative side.   The object is to have some of both.

Q.    The virtues of the maladaptations and the malignancies, do they necessarily grow out of these psychosocial modalities, the behavior, or is there some correlation, a recognizable percentage of people that if they suffer this psychosocial

Page 89

Case 3:09-cv-03064-MWB-LTS     Document 284-12     Filed 06/23/11     Page 1 of 64
HUT000401

behavior that they're going to have either this virtue or this malignancy?

A. Well, no one does it perfectly, and no one does it not at all. So, I mean, every -- it's sort of a question of how well you successfully navigate it. It's not a black and white, all or nothing. But what you look at is the adult behavior and whether there is more or less of one side or the other, and then you can look back at what experiences took place during that

3634

time of their life to make some inferences and some hypotheses about what actually might have interfered with the successful navigation of that stage.

Q. Well, let's take for an example the first column which would be the infant stage, zero to one. When you employed this model, the Erikson model, respecting Miss Johnson, were there any findings that were relevant to Miss Johnson at this age in her life?

A. Yes. I believe that there was some lack of successful moving through this stage that left her sometimes overtrusting and sometimes not trusting enough, that she was overly trusting of men that she thought would rescue her and ones that she thought could protect her even in the face of great evidence that they wouldn't, couldn't, aren't doing that. That seemed to be some kind of defense in order to maintain what might be popularly called a Pollyanna stance.

Q. What is a Pollyanna stance?

A. Sort of like everything's fine, everything's going to be okay. So instead of having the virtue of hope and faith, she had a somewhat naive idea of, you know, not taking seriously, not dealing with some reality of some pretty serious things that

Page 90

HUT000402

were going on.  And she sort of blithely or naively went forward with this hope and faith.  So she had some of the maladaptation of too much trust and, on the other hand, a mistrust which is that the world is an okay place, the world is safe.

3635

And one of the most basic ideas that forms our personality because it takes place at such a young age is is the world a safe place or is the world not a safe place.  And I think in general she thought that the world wasn't a safe place but that she could pick out particular men who would rescue her and she put overtrust in them.

Q.    Well, in making that analysis, do you have any information about kind of her childhood at that stage in her life?

A.    There isn't a lot of information about her first year of life.  What I do know is that her mother was likely pretty overwhelmed.  She had a sister who was two years older and a brother who was two years younger.  So her mother didn't evidence strong parenting skills.  And I think that there probably was some instances or substantial number of instances where she wasn't giving -- wasn't given the holding, trusting atmosphere.

This doesn't mean that you run every time a baby cries.  It doesn't mean that they get everything that they need because that leads them to not understand how the world works either.  But to be normally responsive and reliable is what's expectable and what's needed.

What I do understand is that there was a great deal of marital tension at this time, domestic violence between her father and mother, and that couldn't not have impacted her mother's ability to be a reliable nurturing caretaker.

Page 91

HUT000405

Q.   Well, those factors you just mentioned regarding the violence in the home, those things, did they continue into the next two stages of her life, the toddler and preschool?

A.   Yes, they did.

Q.   And what is it that at this age of the literature and research indicates children should be learning?

A.   The age of two to three?

Q.   Two, three.

A.   Okay.  This is the age where you're learning autonomy versus shame and doubt.  This is the I can do it stage when you have a two- and a three-year-old who wants to do things by themselves.  And the good parent, even though it takes longer, you let them do it because that will build for them the sense of will and determination.  It gives them the idea of holding on and letting go to things.  This is the age of toilet training, so there's holding on and letting go sort of quite explicitly in that.

But it also is the age at which issues about dependency, impulsivity, compulsivity, and attachment are beginning to be learned.  This was, as you mentioned, the time when there was I think increased physical violence between the parents.  Her father left a year later than that.  Her mother told me that she had the philosophy that she felt like she was so bad that she was going to make her children perfect as compensation for her own badness.  She herself was a sexual

3637

abuse survivor and I think left her with a great deal of shame and sense of inadequacy.  The way that she tried to make her

Case 3:09-cv-03064-MWB-LTS   Document 284-12   Filed 06/23/11   Page 4 of 64

HUT000404

children perfect which in her mind meant they would get to go to heaven was that she was very strict and used a great deal of physical punishment.

What consequences that had for her was that she ended up with a lot of impulsivity throughout her life, issues around holding on and letting go in terms of her attachment and her adult relationships.

Q. Were there changes in Miss Johnson's childhood, what was going on in her life then as she entered into stage 3 as a preschooler?

A. Well, her father left at that time. My descriptions from hearing a variety of family members talk about it was that it was a pretty chaotic time. Her father broke into the house, and Angie found her (sic) under her mother's bed one time when there was a baby-sitter in the middle of the night. She often reported that she cried when she wanted to leave with her dad. She was still wetting the bed. Her mother would be gone for weekends. The report is that her mother was pretty nervous and upset during this time.

They moved into her grandparents' home. The physical abuse was pretty substantial as reported by a number of the children. This is the time period in which perhaps you've heard about the incident where her mother believed the world was going

3638

to be coming to an end and they drove for three days with the children without food in the backseat. They began to hallucinate from hunger. Mother was following some religious symbols that she believed would direct them. The children were neglected in terms of food and clothing.

So at an age when the family is supposed to be able to

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 5 of 64
HUT000405

help a child learn to have purpose in life and have courage in life and make decisions, her life was chaotic.

Q. And what's the -- in terms of the literature and research in this area, what's the consequence of the experiences such as Miss Johnson's?

A. Impulsivity and attachment problems, unable to attach and stay attached, unable to let go sometimes when you are attached. So it's that holding on and letting go phenomena that's crucial to this learning.

Q. Was there evidence of that actually later in life then?

A. Yes, there was.

Q. What was that?

A. That she couldn't let go of Terry DeGeus, and other times in relationships that we might have thought could have been more stable for her, she wasn't able to hold on. I think part of that also comes from this stage in confusing love and abuse, that if the people who are supposed to love you and that you love and seem like the ones who should love you also abuse you, then it gets very confusing about, well, people who love me

3639

abuse me. And that idea learned at that very young age is difficult to break into adulthood. And we find evidence that she, like many other battered women, believed if he's really jealous, if he's really possessive, he loves me so much that he hits me. And that kind of belief plays into the holding on and letting go phenomena.

Q. What about the next stage there? Is it 4? I'm sorry. Did I skip the preschooler?

A. Yeah, we're on three to six.

Q. Right, three to six, initiative versus guilt. What's the

Page 94

HUT000406

psychosocial crisis? What does that mean there?

A. Well, this is where the family is more influential, and it's -- this is the age of great fantasy for children. And they learn through play that they can plan things, and they learn that they can fantasize the future. This is where little boys and girls have all kinds of ideas of what they're going to be when they grow up because they're fantasizing their future. This is where they begin to have a sense of personal adequacy because they are now being successful at things, going to school, and they are much more accomplished in the world.

And so they learn I can do things, I can be competent, and they learn to trust their own feelings if parents give them the decision making to make choices which are, of course, age appropriate. If they don't get that kind of -- those kinds of choices, that kind of autonomy, then they end up with less

3640

initiative or an overinitiative versus guilt.

Q. What -- I'm sorry to interrupt you, but what was the evidence based on your investigation of Miss Johnson's childhood at that age as to whether she was getting this type of autonomy and being able to make these kinds of choices?

A. This is a time when -- I think we may be blending a bit here because I talked about this a little bit. This is when they did the three-day drive. She became estranged from her father. There seems to be some disagreement these many years later about whether Mom was keeping Dad away or Dad was staying away. But it was clear that the children were not having the kind of regular contact that they needed to have with their father. There was neglect of the children in terms of clothing. Mom would be gone for weekends it's reported. So I think it was

Page 95

HUT000407

a very chaotic time.

The children didn't have enough food. They began doing fasting and -- which for children just means you're hungry.

Q.   And the maladaptations and malignancies from behaviors such as this at the age of three to six the literature suggests is what?

A.   Well, the maladaptations can either be ruthlessness or inhibition so -- or some of both, is that you hold yourself back from things that might be good for you or you might have this impulsive ruthlessness to go out and act.

3641

Q.   What about this next stage, 7 to 12? Based on your review of the reports and your discussions with not only Angela Johnson and her sister but her mother, did you find this to be a particularly traumatic period of time for the Johnson children?

A.   I think this was the worst of the worst. This -- according to Wendy, she said that at about age 10 she became the mom with Angela, age 8, as chief sidekick. I think Jim described this time of their life as a siege. This is where the exorcisms, the rebuking, spitting the devil out, beating the tire became much more commonplace.

On one occasion their grandparents made them throw away all of their toys because if they loved God they wouldn't want toys. There was group punishment of all of them. They didn't have enough to eat. They were beaten with a belt a couple times a week. They began looking for the sign of the beast on each other, that their mother believed that if they were possessed by the devil then the sign of the beast, the number 6, would be on their bodies, and they took to looking

Page 96

HUT000408

over each other's heads on a regular basis to see if it had appeared which says that these are little kids who thought they were really bad because they were looking to see whether the beast had appeared on them.

They were sure they were never going to go to heaven. Angie reported that at this time she had a strong belief that her father did not love her. She held out this sort of fantasy

3642

rescuer idea that he was going to come and rescue her, but, of course, he never did. This was a pattern that she subsequently repeated with boyfriends, was looking for boyfriends who would rescue her.

She had the sense that she never fit in. She was living with her grandparents' craziness, her mother's -- what the children have called Mother's religious disorder. She said when they did occasionally visit her father, her father and his stepchildren had all the toys, all the everything, and they were living in pretty extreme poverty.

It was at this time that they made the trip to Kansas, and I'm pretty sure you've probably heard about the trip to the, quote, orphanage in Kansas. The children knew that the intention to go there was to leave Holly because the mother, Pearl Jean, was afraid of her own mother, if her mother discovered that she had had a child out of wedlock. So she was going to take -- she moved there at the beginning of her pregnancy so to hide that pregnancy and intended to leave this new baby at this orphanage. The children report that they thought they'd all get left too at what seems like absolutely a horrific place.

The children regularly witnessed sadistic treatment of
Page 97

HUT000409

animals, beating the heads of rabbits and squirrels with sledgehammers, butchering a cow on the kitchen table, throwing kittens in to the hungry pigs to eat, being threatened that they

3643

would get thrown in to the pigs.

Wendy reports that she was sexually abused at this place, says that she remembers that her sister also had to take naps with this man. Although she wasn't in the room, she assumed that what happened to her at that time is what happened to her when she had to take naps with that man.

She said that her mom -- there's some discrepancy between the children's memories which was that Mom was almost never there or that she was there some. Mother reports that she was out trying to raise money to support the orphanage. So we know at least that she was gone for significant periods of time. They lived in a converted garage that had rats and mice in it.

It sounds -- they watched the abuse, the sadistic treatment of two young Indian boys. It sounds like it was probably a torturous situation beyond what any child could incorporate into a sense of the world is not a safe place.

Q. So I want to ask you about what should be going on in terms of the psychosocial modalities at this point in a child's life if it's a normal childhood.

A. Well, the ages of 7 to 12, we have what's called industry versus inferiority. They begin more involvement with their neighborhood and their school. This is when teachers start giving them a lot of projects to do, science projects, home projects, where they learn to be able to complete things and get a sense of planning and follow-through. And out of that they

3644

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 10 of 64

HUT000410

get a sense of competence in the school.

Q.    And to contrast that sort of normal childhood with the Johnsons' experience and the malignancies and maladaptations that resulted from their experiences, what would those typically be?

A.    I believe that out of this, Angie left this stage with extremely poor self-esteem on top of the religious abuse that she had to have another set of adults treat her as if she didn't matter, certainly left her with the feeling that she didn't matter which is poor self-esteem, very poor social skills.  When you feel like you don't fit in, when your clothes don't look right when you go to school, your social skills don't -- kids learn how to talk and have friends through moms and dads having kids over and saying, you know, you really shouldn't -- you should learn to share your toys.  And, you know, that sort of just gentle guiding through social relationships didn't happen in this family.

Angie developed posttraumatic stress disorder out of the kinds of trauma and abuse that occurred at that time in her life.  She began having nightmares.  And also what I've listed as sadistic and masochistic repetitions, that it's clear to me that the Dillos were sadistic.  They seemed to have no end of ways to be mean and traumatic to these young children.  When someone is treated in a sadistic manner, then they develop a sense of masochism for themself which is that they will treat

3645

themselves in that same sadistic manner.  We treat ourselves in the way we were treated.  So she directed that same kind of

Page 99

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 11 of 64

HUT000411

self-hatred, self-sabotaging, self-nonaffirming to herself which is a -- masochistic. So she repeated it internally just in her own psyche, and she also repeated it in terms of tolerating abuse and unhealthy situations subsequently in her life.

Q. The stage from 12 to 18, this would be typically children who are about to enter early high school through high school age or so?

A. Yes.

Q. What is the psychosocial crisis that's going on at that time typically in children's lives?

A. This is where they learn to be themselves. This is where they're battling between am I going to be just like everybody else, and almost every adolescent goes through the "but everybody else is doing it," "but everybody else has these kind of shoes." And then out of that you hope that they begin to identify the ways that they are unique, the ways that they are special, the ways that they are not like everybody else. Usually they have to go through the "I am" before they can begin to differentiate that "I'm not."

It's how you learn to be one's self, and that happens by having your individual differences supported. So one kid in the family might be an athlete. Somebody might be a musician. Somebody else might like to cook. Somebody else might be good

3646

with children. So it's like all of those things are good. Those are you. That's the way you are unique.

Out of this kind of support and validation, the child experiences others being -- particularly parents, being loyal to them, validating them individually. And when others are loyal to them, they learn to be loyal to others.

Page 100

HUT000412

This didn't happen for Angie and for most of her siblings. They said that Mom disappeared for days at a time. There was one time when they were living in a very minimal housing while Mother was living in a motel with a boyfriend, that there were rats there.

It was at this time that Angie said that she began to have an attraction to the bad boys in school. I think that there were a number of reasons for that, one of which was she said that she decided it was better to be feared than loved. Now, if we look back, we can see why it was better to be feared than loved. People who were bigger and stronger than her had hurt her over and over and over and so this initial identification with "I can hook up with some boy, and if he's the bad boy, then he's going to protect me. I don't want one of these nice boys who might not be able to protect me."

Along with being with the bad boys, she began using drugs. She said she was introduced to marijuana by her sister Wendy who was two years older. She liked the feeling of being high.

3647

One of the things that happens for these kinds of children is that when they begin using things like marijuana or other street drugs is they find a group that they fit in. For the first time in their life they fit somewhere, and this had been an ongoing issue for Angela that she never fit anywhere. So all of a sudden she's got a club she belongs to. It's the bad kids who smoke dope.

Smoking dope also served a number of other sort of helps for her. She had an anxiety disorder it appears at this time. She said that she began compulsive hand washing and there

Page 101

HUT000413

were other family members who recalled that and she developed an

obsessive, ruminative habit of spelling words in her head.

These kinds of compulsive or repetitive habits are used as ways

to get control, ways to control anxiety.

I think that, you know, the rebukings were still

continuing, the physical punishment was still continuing, the

craziness in the family was still continuing.  She was looking

for some kind of way to get an escape from that, and smoking

marijuana gave her that.

The other escape that she looked for was she said, I

was always looking for a man to rescue me, and they just never

do.  I always wanted a guy who would take care of me and take

care of my problems and I could just relax and not have to

worry, but men have always been a major pain for me.

I think what we see there is the repetition of the dad

3648

that she wanted to rescue her who never came to rescue her.

Whether he could or he couldn't have, I don't know.  But her

sense was as a little girl he just didn't.  And so that kind of

childhood history sets up women to go looking for somebody else

who will rescue them, the unavailable father.

She recalled also that it was very difficult for her

to be alone.  She never wanted to be alone.  And when I asked

her what the theme of her life was, she said, I was looking for

love in all the wrong places.  And I think that's really true,

is that she didn't feel love.  She was trying to find a way to

do that.  She had an early pregnancy which is often the result

of a teenager going, I'm going to have somebody who will love

me.  She was using drugs to hide, trying to find a place to be,

trying to stop her feelings.  And that's a train wreck.

Page 102

HUT000414

Q. So instead of learning what should have been learned at this stage, psychosocial virtues of fidelity and loyalty, what are the maladaptive and malignant behaviors that can result from these types of experiences she had at the age of 12 to 18?

A. She could have either gone to a fanaticism or a repudiation of society. And it seemed as if she went more to the repudiation of society in saying, I'll smoke dope; I'm going to sort of live on the edge. And society hasn't worked for me. I don't know why I should try and follow all the rules because nobody's followed the rules in relation to me.

This is the age where we look for people to sort of

3649

find their place in society, not where they're going to be forever, but by the time they're 18, we have a good sense of what kind of an adult are they moving towards, what kind of place are they going to have? Are they going to be one who's going to be seeking achievement? Are they more oriented towards a family? And she didn't have that kind of sense of direction. She was into a group that was a drug group, and she decided that being bad was better than being a nobody. Just like a small child who will act out to get attention, being a nobody is the worst thing. So being bad is better than being a nobody.

Q. Let's talk about this last category I'd like to discuss with you before lunch if we could, Dr. Hutchinson, and that is the early 20s, young adult years, this category 6 in the left column.

A. Uh-huh.

Q. The Erikson model would suggest that this is a time where the psychosocial crisis they're in is intimacy versus isolation. What does that mean exactly?

Page 103

Case 3:09-cv-03064-MWB-LTS     Document 284-12     Filed 06/23/11     Page 15 of 64

HUT000415

A.    Well, it's learning to connect to a partner.  This is the age when we begin seriously thinking about who do we want to connect with?  Do we want to connect with somebody?  How involved are we going to be in the world?  How am I going to interface with friends and intimates?

At this time when she was 24, she began to use meth on a daily basis.  She began her involvement with Terry DeGeus

3650

where she was regularly physically abused.  She tried for police help.  That didn't work.  She called police lots of times, sometimes right in the middle of things.  They'd tell him, you know, Go on, Terry, you know, leave her alone.  And I think that she just didn't have a sense that society worked for her.

And so she had to find some other way to have something for herself, and I think that part of that was to say, I'm not going to fit in society; I'm going to be promiscuous; I'm going to use drugs.  And one of the things that she said was, I felt like my whole life I'd been fighting, struggling, and defending, and I never got a break.  But when I did crank, I got a break from that.

Q.    You knew what she was talking about when she said crank.

A.    Yes.

Q.    What was that?

A.    It's methamphetamine.

Q.    And did your discussions with Miss Johnson and the other materials that you received substantiate that claim?

A.    Yes.  From everything I understand, she was a prolific drug user.  What she indicated was that it gave her the energy to be with her daughter in the daytime, work long double shifts at night, come home, sometimes stay up all night and get the

Page 104

HUT000416

housework done.  It most likely was a way to fight her depression that she'd had coming out of her childhood abuse, a way to block the memories of her posttraumatic stress disorder.

3651

So, I mean, it worked.  It gave her the ability to have the energy to try and make it in the world, to try and block out her history so that she could keep functioning and to have the energy and capability to care for her daughter in the way that she wanted to.

Q.   This period of time -- and you've already touched upon this to some extent, but this is a period of time where young adults should be learning which virtues based on their life experiences?

A.   Love.

Q.   Love.  And the maladaptive consequences and the malignancies, promiscuity and exclusivity.  We know what promiscuity is, but could you tell us what do you mean by exclusivity?

A.   Well, it can be a real narrowing of your life into some very small facet.  It can be the jealousness or possessiveness of a partner that you try and make everything.  It's saying I'm going to make all of my life just one little narrow piece and leave out the broad spectrum of religious, social development that makes for a healthy life.

Q.   There's a couple of areas that we could at least touch on.

A.   Okay.

Q.   And you've mentioned them already.  One is this posttraumatic stress syndrome as a consequence of some of the violence and trauma that occurred in Miss Johnson's childhood.

3652

Page 105

HUT000417

A.   Yes.

Q.   In your discussions with her and your review of the materials and the discussions with her sister, did that symptom resurface later in adult life?  That is, did she have other experiences that would contribute to posttraumatic stress syndrome?

A.   Yes.

Q.   And what were those experiences?

A.   I think she experienced the abuse and the subsequent stalking by Terry DeGeus as traumatizing, and perhaps it might make sense to explain what traumatizing means to a psychologist.

Q.   Yes, please.

A.   Traumatizing isn't just that you feel bad like if -- I mean, I might watch -- I watch some mother in K-Mart be mean to her children, and that's distressing to me, but it isn't traumatizing.  Traumatizing is when my ego or my self is overwhelmed such that I can't process it, sort of ingest it, work through it by talking to people, sometimes by having a few dreams about it, working through it so that it isn't left hanging in my psyche if you will.

If I'm not capable either because of the trauma was so intense or I don't have the psychic resources to make that resolution, then I will end up with posttrauma stress disorder.  So that trauma can be car wrecks.  It can be childhood abuse.  It can be domestic violence.  It can be witnessing a murder.  It

3653

can be held up at the Kwik Trip.

Anything that happens to a person that overwhelms them and so it's -- one person can be traumatized by an event, and
Page 106

HUT000418

another person can have the same event and it not be traumatizing in the way that I'm speaking that it overwhelmed their ego.

If your ego or your self is overwhelmed, then you develop a whole range or a syndrome of compensatory behaviors.

Q.    And this is a psychologically recognized disorder or syndrome, is it not?

A.    Oh, certainly, yes.

Q.    What are the elements of posttraumatic stress syndrome?

A.    All of these -- there are different sections, and you have to have some of each of them in order to have that diagnosis.

Posttraumatic stress disorder has that you have to reexperience the trauma repetitively after the trauma's over. So you might have nightmares.  We heard a lot about Vietnam flashbacks:  Car backfires; they drop to the ground.  That's a reexperiencing.

It can be intrusive recollections.  You're driving down the street and just out of nowhere pops up an image of what it was that was traumatic.  It can be physiological distress, so your body reacts if you see or think of something that's similar to it.  Women that have been raped or women that have been abused will report that if they see a television show that's

3654

similar to that, they might break out in a sweat.  So all of those are ways in which someone can reexperience it.  You have to have that first.

The second criteria is that you have some kind of way that you try and numb that experience.  So you may avoid things that are like it.  You may never watch the television shows that would trigger you.  You don't go back to the location where it

Page 107

HUT000419

happened. You withdraw from people. You try and numb yourself out in any kind of way to say, I'm not going to feel those things.

The other component then is that that anxiety that's from that breaks through anyway and it breaks through kind of sideways. It can break through in hypervigilance. This is the looking over your shoulder kind of thing. It can be in sleep disturbance. It can be in irritability. I just blanked on the other two. I forgot them.

Q.   That's all right.

A.   But it's that your body still has this trauma inside of it. You're going, Don't think about it, don't think about it, avoid it, avoid it, but your body has it, and so it's popping out in these anxious responses, and it's popping out in these reoccurring responses.

Q.   So in terms of Miss Johnson's experience, the evidence in terms of her reexperiencing the trauma that she suffered both in childhood and then at the hands of Mr. DeGeus was what?

3655

A.   She talked about having nightmares. One of the other somatizations that she had by responses to it as a child, she had headaches. She had a lot of stomach aches. Those lasted into her adulthood. She had a lot of terror and intrusive recollections, particularly of the stalking kinds of things.

The hyperarousal, not feeling safe were present, trying to distance herself, trying to numb out her feelings with drugs and avoidance of people sometimes, distance from other people.

Another one of the numbing ones is belief that you will have a foreshortened future thinking that you're just not

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 20 of 64

HUT000420

going to live a life. She believed that Terry would kill her. Whether Terry really was going to kill her or whether that was a manifestation of the posttraumatic stress disorder we can't say, but she believed that she was going to die at a young age at his hands.

So she had the reexperiencing. She had the numbing. And she had the break-through anxiety.

MR. BERRIGAN: I think this is probably a good place to break, Your Honor, just a suggestion.

THE COURT: Sure. That's fine. Thank you, Mr. Berrigan.

Members of the jury, it's noon. We'll take our standard hour recess. Please keep an open mind until you've heard all of the evidence in the penalty phase, and we'll see

3656

you back here at one o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Please be seated.

MR. WILLIAMS: Your Honor, this witness has been reading from some materials at the witness stand, reading from materials that I don't have. She's been reading statements from -- by Angela Johnson about nightmares. There's nothing in her report about Angela Johnson suffering from nightmares. And in order for me to be in a position to adequately cross-examine her, I think I need to be able to look at what materials she's using and quoting to the jury so that I'm in a position to adequately cross-examine this witness.

THE COURT: Mr. Berrigan?

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 21 of 64

HUT000421

MR. BERRIGAN: Yeah. I -- frankly, I'm not sure what those materials are either, Your Honor. But we're -- I think Mr. Williams is arguably entitled to any materials the witness is relying on, so we'll be happy to get those and provide them.

THE COURT: Okay. Can you just try and work that out among yourselves because there doesn't appear to be a dispute about it?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

MR. BERRIGAN: I have one other matter.

3657

THE COURT: And if you want a brief period of time in addition to the noon recess before you begin cross, we can probably do that. How much longer, just so we're scheduling --

MR. BERRIGAN: I bet not more than 15, 20 minutes.

THE COURT: Okay. You know what we'd probably do? If you need some additional time, we'll just -- you know, at 10 to 1 or something, we'll just have the CSO tell the jury it will be till 1:15 or 1:30.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Why don't you just let Carey know, and assuming there's no objection from Mr. Berrigan --

MR. BERRIGAN: No, that's fine, Judge.

THE COURT: -- we'll just take a little longer if you need it.

MR. WILLIAMS: Sure. I'll let her know.

THE COURT: Okay. Now then you had a matter.

MR. BERRIGAN: Yes, sir.

THE COURT: Yes.

MR. BERRIGAN: I raise this reluctantly, but I raise

Page 110

HUT000422

it because I'm concerned about it. Today when Dr. Hutchinson turned around and looked at the screen --

THE COURT: Yeah.

MR. BERRIGAN: -- the Court in my view addressed her -- maybe curtly might be the nicest way I could describe it in terms of "that's not your job." Yesterday a similar incident

3658

took place with Dr. Logan. I didn't raise an objection at that time, and the record will reflect what was said with Dr. Logan.

But my concern is -- and I'm sure the Court does not intend this, but the jurors have spent a good deal of time with the Court. I suspect based on the treatment the Court has provided them, which has been gracious to say the least, they have a very high view of the Court presently. They don't know these experts from Adam until they come in and testify. And when the Court addresses them in what I would have to describe at least as a hostile manner right at the beginning of their testimony for what I perceive in my humble opinion to be very minor infractions, it sets a tone with the expert that's very difficult for me to overcome.

Again, I'm going to presume, do presume, that the Court -- that this is just a matter of perhaps some annoyance with these individuals, but I very much fear the effect that it has on the jurors, and we still have at least one more expert to go.

So I'm just going to note it for the record because I fear later on appeal if I don't somebody's going to ask me about it. But -- and they probably will based on my silence regarding Dr. Logan, but I do have a concern about it, and I'd ask the Court to at least consider it. If our experts are acting

Page 111

HUT000423

inappropriately, I'd be happy to address it at the bench or in some fashion where the jurors are not left with the impression

3659

that the Court right away is unhappy with them for some perceived reason.  And I just wanted to state that before our break.

THE COURT:  Anything else you'd like to say?

MR. BERRIGAN:  Nothing else, Your Honor.

THE COURT:  Okay.  Thank you.  We'll be in recess.

(Lunch recess at 12:05 p.m.)

THE COURT:  Mr. Williams, you didn't need any additional time.  Everybody can be seated.

MR. WILLIAMS:  No, Your Honor.  They got the information to me right away, and I had enough time to digest it, so I appreciate it.

THE COURT:  Okay.  Where is the witness?

MR. BERRIGAN:  Oh, sorry, Judge.

MR. WILLETT:  They went to get her, Judge, and I'll follow up on that.

MR. BERRIGAN:  Your Honor, I frankly don't know where Dr. Hutchinson is.  It's two minutes of one, so obviously she should be here.  She might be in the ladies' room.  We're trying to check on that right now.  We do have other witnesses ready to go if you don't want to delay at all.  If I could have just maybe another 120 seconds.

THE COURT:  Actually I had her CJA voucher here, and I had some questions about it, and I wanted to clear that up, and obviously I'm not going to do that in the presence of the jury.

3660

Page 112

HUT000424

(The witness entered the courtroom.)

THE COURT:  You're late.

MR. WILLETT:  Judge Bennett, may I say something on Dr. Hutchinson's behalf?

THE COURT:  Not really.

You're late.  Let's get in the witness box.  I have some questions for her.  I don't keep the jury waiting.

THE WITNESS:  I was sitting upstairs by a guard and was told I couldn't stay here, sir, or I wouldn't have left.

THE COURT:  Well, whatever.  You knew we were starting at one.  It's after one.

I'm confused by your hourly rates, and you seemed a little bit confused by it too when you were testifying, and I was just reviewing one of your CJA vouchers, and let me ask you this.  If a person comes in that's private pay, what do you charge that patient?

THE WITNESS:  For forensic or therapy client?

THE COURT:  Therapy.  For an hour's worth of your time, what do you charge?

THE WITNESS:  For therapy --

THE COURT:  Private pay.

THE WITNESS:  Private pay clinical work is $110.

THE COURT:  Okay.  And what do you charge if it's -- what's the usual and customary rate if you're being reimbursed by insurance?

3661

THE WITNESS:  It varies from $90 to $110.

THE COURT:  And what's your rationale for charging 170 for forensic work?

Page 113

HUT000425

THE WITNESS: I only charge that for trial testimony because it's a very different kind of work. It involves a lot more stress. It involves travel away from home. It seems a reasonable rate to me.

THE COURT: Well, when you submit your additional bills, one thing in your billing that you don't do that I've never seen an expert do is you just block bill. You put $400 for X service. You don't indicate what the hourly rate is. And you don't indicate the time you spent on it. And it's impossible to extrapolate either one of those things from your bill because you don't indicate how much time you spent on each activity.

THE WITNESS: There is a notation. I can show you how to read it. I have a copy of it with me if you'd like some explanation because it does say how much everything is.

THE COURT: Not in the bill I have.

THE WITNESS: Well, it says units, and that indicates percent -- a unit is an hour unless it's a test, so there are things like 3.75 units, so that's 3.75 hours.

THE COURT: It doesn't say that on the bill.

THE WITNESS: I'm sorry that that's confusing to you.

THE COURT: Well, it's more than confusing. It

3662

doesn't indicate on the bill. But anyway, you're going to have to indicate the time you spend on each unit and what you do.

And while we're at it, review of records is not sufficient for me because I can't determine whether that's reasonable. I have to know what records you reviewed.

THE WITNESS: Okay.

THE COURT: Because it's not reasonable to just say

Page 114

HUT000426

review of records.  I would have no idea what you're doing.

THE WITNESS:  Okay.

THE COURT:  That's not a sufficient specificity to make a judgment about whether it's reasonable or not, and ultimately I'm the one that has to make that determination.

THE WITNESS:  Yes, sir.

THE COURT:  So I passed on your first bill, but I'm going to be a lot more careful this time.

MR. BERRIGAN:  I should apologize to the Court as well, Your Honor, because based on our earlier conversations regarding Dr. Gelbort's bill as you recall --

THE COURT:  His was worthless too.

MR. BERRIGAN:  -- his was worse.

THE COURT:  His was terrible.  His didn't indicate anything.

MR. BERRIGAN:  These bills come through my office, and I have an obligation --

THE COURT:  But I'm sending Gelbort's back too.

3663

MR. BERRIGAN:  We sent it back, sir.

THE COURT:  No, the one I just got.  I'm sending it back because it hasn't met any of my criteria.  I don't want to keep the jury waiting.

MR. BERRIGAN:  No, I should have given Dr. Hutchinson a heads-up.

THE COURT:  Yeah, but I was just confused by the hourly rate.

MR. BERRIGAN:  I understand.

THE COURT:  Because it's so layered.  There are so many different rates.

Page 115

HUT000427

MR. BERRIGAN: Right. That's unusual, yes.

THE COURT: Okay. Let's bring the jury in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Berrigan, you may continue.

MR. BERRIGAN: May it please the Court.

BY MR. BERRIGAN:

Q. Dr. Hutchinson, I'd like to turn our attention to one of the principal subject areas in Angela Johnson's life, her choice in men --

A. Yes.

Q. -- and ask you how her childhood and adolescent experiences relate to that particular subject matter. Can we discuss that for a moment?

3664

A. Of course.

Q. Okay. You've made some reference to it as we've gone on.

A. Yes.

Q. But specifically how does Miss Johnson's experience growing up as she did and her experiences as an adolescent, how did they later affect the decisions she made respecting the significant men in her life?

A. There's kind of a common statement that people say, you know, we marry our parents or you marry your mom, and that has some wisdom to it which is that psychology has substantiated that we do, in fact, repeat the patterns that were established for us early in life.

The particular patterns that Miss Johnson had were that she had an unavailable father and she had an abusive mother. So those two patterns are ones that she is going to be

Page 116

unconsciously seeking to replicate in adolescence and adulthood.

One theory is that we're trying to, quote, get it right this time or we're trying to overcome what didn't work the first time. So sort of basically she was repeating finding men who were abusive and who were abandoning like her two parents.

Q. And are there examples, concrete examples, of that behavior that she exhibited in her adult life?

A. Yes. Certainly with Terry DeGeus he was physically abusive. A number of the men that she chose were in varying ways unavailable. They were married. They lived out of town.

3665

Dustin Honken had another woman that he was simultaneously involved with. So unavailability can be -- take different forms, but they were ones that couldn't provide the kind of day-to-day nurturance and the day-to-day relationship that we would think of as a healthy relationship.

Q. Well, Mr. DeGeus seems to fall into a different category, would that be right, than being unavailable?

A. Yes.

Q. And certainly he was available to her in terms of being with her for a significant period of time.

A. Yes, he was.

Q. Before we talk about Mr. DeGeus, though, why would a woman choose to consciously make decisions about men choosing people that would be unavailable to be a realistic significant life partner?

A. Well, first I don't think they consciously choose them. I think that we are unconsciously drawn to those things in our life that we are trying to resolve psychologically. So I think she was unconsciously drawn to the unavailable and the abusive.

Page 117

HUT000429

Q.    Let's talk about the abusive then.

A.    Okay.

Q.    And specifically Mr. DeGeus.  You were provided and also in your interviews received information about her relationship with Mr. DeGeus?

A.    Yes.

3666

Q.    What did you understand the relationship between Angela Johnson and Terry DeGeus to have been?

A.    I think it's the -- when it was good, it was very, very good and when it was bad, it was really bad fits for her, that she found him to be strong and a rescuer like her dad.  He was a man who could do many things, and she looked to him to be that kind of strong person that she had wanted her father to be for her as a child.  And there was some period of time when, in fact, initially that I think he was that kind of a man for her.

But his drug usage prompted extreme jealousy and paranoia, and out of that grew a violent relationship.  He was physically abusive to her numerous occasions.  And when she tried to break that off, he obviously had failed some of his own developmental stages, and he was very possessive, and he wouldn't let her go.

Q.    Well, why didn't Miss Johnson leave Mr. DeGeus given the nature of their relationship and all of the violence that she experienced at a much earlier stage than she finally did?

A.    Well, it was that "when it's good" part.  The research on battered women is that battered women are hooked, if you will, by the cycle of violence where there will be a tension-building phase and then an instance of violence and then a honeymoon phase.  And the honeymoon is the "I'm sorry; I didn't mean to do

Page 118

HUT000430

it; I'll never do it again; I'm going to bring you presents."

And this was a typical kind of behavior that Mr. DeGeus engaged

3667

in.

And what most battered women do is that they deny to themself that the violence is really violence.  It's because he loves me or it's because I didn't have the house clean or it's because I didn't make pork chops or it's because he had a bad day.  And they excuse the violence and pretend, if you will, that the relationship is really the honeymoon part.  As time progresses, the honeymoons get shorter and the violence gets longer and the violence gets harder and more extreme.

Q.   I want to ask you if there was any evidence from the materials and the interviews that you were provided that during the course of the relationship between Terry DeGeus and Angela Johnson -- and just to be very specific, I'm talking about certainly well before November of 1993; okay?  Were there any instances in which Miss Johnson responded to this violence perpetrated upon her by Mr. DeGeus in a violent fashion herself acting out of any sense of vengeance against Mr. DeGeus?

A.   None that I recall.

Q.   You didn't see anything.

A.   None that I recall.

Q.   I want to ask you a few questions about some of the things that you said a little earlier this morning regarding choices that people make, even people that have had the experiences Miss Johnson's had.  One of the things that you said was she had made a choice to be feared rather than loved, and I wanted to ask you

3668

Case 3:09-cv-03064-MWB-LTS   Document 284-12   Filed 06/23/11   Page 31 of 64

HUT000431

exactly what that means.

A. Well, it wasn't a choice like do I want to go to this movie or that movie where you're thinking which do I want or do I want to go to this college or that college. Retrospectively she labelled it a choice, but psychologically, it would have been in the moment an experience of I'm going to do the best I know how to do.

When she was ten, she recalled to me that she decided that she wasn't going to be a victim anymore. And she kind of got a puffed-up bravado image defending her younger siblings, protecting herself. And, you know, it's -- in a family where the biggest and the strongest get to beat up on the ones who aren't, then being bigger and stronger seems like the only way to survive.

Now, she didn't beat up people, but she wanted to get bigger and stronger, and she had this bravado about her. We might say that she didn't act like a lady. She liked to ride motorcycles and she ran a bar, so she had a strongness about her that is sometimes atypical for women. And that was her way to try and be big enough in the world that nobody was going to hurt her anymore.

Q. I want to ask you about the choice to use drugs from a psychological standpoint. Is the choice to use illicit substances such as methamphetamine, is that the same choice for a person who has had Angela Johnson's life experiences as a

3669

child and an adolescent as it is for a person who's had a, quote, unquote, normal childhood and experience growing up?

A. It's not the same at all. Children who have childhood violence end up with a brain chemistry that is significantly

Page 120

different than children who don't grow up with that. The hypothalamus, pituitary and the adrenal glands function together to produce what's known as the fight-or-flight response, and we all have that, and it's available for us when we need it.

And a child who has been subjected to lots of danger, lots of instances where fight-or-flight mechanisms are triggered, they end up with an excessive chemical called cortisol. They have an excess of that in their brain, and it's also retriggered faster than it is in people who have not had childhood violence. That means that in situations where it wouldn't trigger such a big response in somebody else it's going to more quickly and to a greater extent trigger in them.

This leads to a need to in some way self-medicate that triggering, that hyperactivity, that startle kind of response that's there. It leads to promiscuity, drug abuse, passive and active suicide, promiscu -- I said that one -- in both teenagers and adults. That brain chemistry is looking for some kind of way to mitigate those responses, and she found that initially in the marijuana which calmed things down, and then as life progressed, she changed it to meth in order to get the things done that she needed to get done.

3670

Q. These childhood and adolescent experiences that caused some of the problems you've discussed with Miss Johnson such as her developmental disorders and the posttraumatic stress syndrome, are those treatable conditions?

A. They all can receive some kind of treatment. I believe that what she has received so far during the last few years has actually in part treated her posttraumatic stress disorder. One of the two main things that are treatment for posttraumatic

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 33 of 64

HUT000453

stress disorder are the same drugs that you use for the treatment of depression which she has been using for four or five years since her incarceration. Those serotonin drugs help alleviate the reactivity that's common in posttraumatic stress disorder.

The other way that posttraumatic stress disorder is treated is through talking through those experiences. The whole investigation for this instance here has led her to talk to people about her childhood that she never had done before. And I believe that she has made significant progress. She indicated that she had forgiven her mother, she'd forgiven her father, and that's really pretty far along in the treatment of PTSD.

Q.    What about the other -- you know, the other maladies, if you will, from the Erikson model that we've talked about and some of her feelings of self-worth and depression and some of the other matters you've discussed? Are those treatable conditions?

3671

A.    They are. They're a little more difficult to treat. One of the things that is crucial is that the person stops doing chemicals. At the point that somebody starts doing chemicals, they stop developing. So if you start doing drugs at 14, you stop growing up at 14 because you just can't move through those cycles if you're in an impaired consciousness.

So having been drug free and emotionally stable on her regular medications has allowed her a lot of experiences of growing up.

Again, there are redemptive kinds of experiences that can help people. I usually say that there are three things that can help people who have bad childhoods. One is long-term

Page 122

HUT000434

psychotherapy which is expensive, time consuming, and pretty tough for most people to accomplish.

The other is religious experiences, religious conversion kinds of experiences and being involved in a spiritual community of some kind.

And the third one is having a loving, long-term relationship is also a way to mature and heal some of the things from childhood.

Q.   Of those three methods I suppose that you'd recommend, does Miss Johnson have any of those available to her?

A.   I think that she's in some ways working on all three, that she's not involved in psychotherapy per se, but she's been doing a lot of soul searching and a lot of talking and trying to come

3672

to terms with the things that have happened to her in her life.

Given the time that she's had, she's pursued her religious expression, sort of undoing what she got as religion and finding her own way of spirituality.

I think that children who believe they're bad believe that they'll never be anything, that there's nothing to them can heal a lot of that when they realize that God loves them and God cares for them and that that's really bigger than Mom and Dad had lots of troubles and they didn't know how to treat me.

And thirdly is because of her new stability, she has reestablished very substantial, loving relationships with many members of her family and through that I think is also getting additional healing.

MR. BERRIGAN:  Thank you.  That's all I had.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

Page 123

Case 3:09-cv-03064-MWB-LTS   Document 284-12   Filed 06/23/11   Page 35 of 64

HUT000435

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Doctor, I want to go back over some of the things you spoke about with counsel here.  In arriving at your opinion, you looked at the defendant's past history.

A.    Yes.

Q.    And there were certain events in that past history that were significant to you in helping you arrive at your diagnosis in this case; is that fair to say?

3673

A.    Sure.

Q.    One of those events was this conduct that occurred down at the Dillo orphanage in Kansas.  Is that fair to say?

A.    That's fair.

Q.    Okay.  And your understanding that you used in part to arrive at your analysis is that down there these Dillos engaged in sadistic practices with animals.  I think those were your words.

A.    It was sadistic for the children how they treated the animals, yes.

Q.    Okay.  And your understanding is they beat rabbits and squirrels in the head with sledgehammers?

A.    Yes.

Q.    And threw kittens into the pen with pigs.

A.    In part, yes.

Q.    You also based in part your analysis on the fact that she had a young pregnancy and this to you was an outgrowth, if you will, a result of some of her trauma or problems growing up in her adolescence.

A.    Yes.

Page 124

Case 3:09-cv-03064-MWB-LTS   Document 284-12   Filed 06/23/11   Page 36 of 64

HUT000456

Q.   I think in your own notes you indicated when we're talking about the various stages you put this at the stage of 12 to 18, married and had a child.

A.   Yes.

Q.   Okay.  And that was a young pregnancy.

3674

A.   Beg pardon?

Q.   That was a young pregnancy.

A.   Yes.

Q.   And young pregnancies can have an effect on people if you have a child too young; right?

A.   They certainly can.

Q.   So when is it that you believe she had a child the first time, ma'am?

A.   I think it was when she was 18.

Q.   Okay.  How about 19 1/2?

A.   Okay.

Q.   Okay?  And that wouldn't actually fit within that time period of 12 to 18; right?

A.   I made a mistake on that year.  I thought it was 18.

Q.   And she got married when she was 16, but she didn't get pregnant with that first marriage, did she?

A.   No.

Q.   So she was able to make a decision whether to have or not have a child when she was pretty young.

A.   I don't know whether that was a decision or an accident.

Q.   You indicate in part that your decisions or at least one of the conclusions I guess you've reached is that she was attracted to, I think in your term, bad boys.

A.   Yes.

Page 125

HUT000437

Q.    Abusive and abandoning men; right?

3675

A.    Yes.

Q.    Okay.  Steve Hugo, her first husband, was a guy that was blind in one eye, and she left that marriage because she was bored; right?

A.    Exactly.

Q.    He was not a bad boy in the definition, was he?

A.    Right, which is why she left.

Q.    Her next husband was Arlyn Johnson.

A.    Yes.

Q.    And she thought he was boring and acted like a married man.

A.    Yes.

Q.    So, in fact, she was also attracted and married -- the only two marriages in her life were to men who were not bad boys; fair?

A.    Yeah, those were very short relationships.

Q.    You indicate that she has a poor self-worth.  But, in fact, ma'am, hasn't she described herself as a good person?

A.    Those aren't incompatible.

Q.    She's described herself as a good worker.

A.    Yes.

Q.    She's described herself as a good mother.

A.    Yes.

Q.    And she described herself as a good person.

A.    Yes.

Q.    The posttraumatic stress disorder diagnosis you arrived at,

3676

Page 126

HUT000438

ma'am, in order to arrive at that diagnosis, you need to rely on her self-reporting of having nightmares or flashbacks. That's one of the requirements for you to be able to diagnose as a clinician somebody with posttraumatic stress disorder.

A. Neither nightmares nor flashbacks are requirements. They're one of the possibilities.

Q. And one of the possibilities you relied upon in this case to reach your diagnosis, her self-reporting that she had nightmares.

A. That's true.

Q. And that was necessary for you to be able to arrive at your diagnosis in this case.

A. It wasn't necessary. It was part of it.

Q. Without that, would you be able to have arriven -- arrived at your diagnosis, ma'am?

A. I would have to go back and look at the exact criteria that I used on that diagnosis now. I don't believe that that was a make it or break it.

Q. It's what you relied on in this case, though, to reach your diagnosis is that she had nightmares reported to you by her.

A. That's one of the things she reported, yes.

Q. And she told you this after she had been charged with a capital offense.

A. Yes.

Q. She told you this after you had been specifically hired for

3677

the purpose of analyzing this case for mitigating evidence.

A. Yes.

Q. She was actually treated or seen by a psychiatrist back in 1996, wasn't she?

Page 127

HUT000439

2005-6-8-Hutchinson Trial Testimony VOLUME 20, 6-8-05

A.    Briefly.

Q.    And she was not diagnosed with posttraumatic stress disorder in 1996, was she, ma'am?

A.    No.

Q.    And this woman upon whom you're relying to tell you that she had these events that occurred to her and had these nightmares and so forth, are you aware this is the same woman who repeatedly appeared before the federal grand jury and lied to the federal grand jury?

A.    I don't know that testimony.

Q.    Despite these problems that you've identified with Angela Johnson in her adolescence, the fact is she was not a juvenile delinquent, was she?

A.    Well, there are many definitions of juvenile delinquent.

Q.    All right. Let me just do it this way. She was not involved in the criminal justice system as a child.

A.    That's correct.

Q.    She was not arrested for committing crimes as a child.

A.    That's correct.

Q.    Even after she got married when she was 16, she wasn't arrested for being involved in any criminal activity, was she?

3678

A.    No.

Q.    Despite these problems, she apparently was able to confine her conduct to the dictates of society after she was in her early 20s and was not arrested for any criminal activity in that time period either.

A.    She was not arrested.

Q.    She was able, despite all these problems, to have jobs; right?

Page 128

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 40 of 64

HUT000440

A.    Yes.

Q.    She was able to have a house that she maintained; correct?

A.    For a short period, yes.

Q.    She was able to have some children that she raised.

A.    Yes.

Q.    In fact, she did not become involved in criminal activity based on your knowledge until she was in her late 20s; isn't that fair to say, ma'am?

A.    Well, she was involved in drug usage prior to that.  She wasn't ever arrested for any of that, but it was still criminal activity.

Q.    And, in fact, her drug usage wasn't so bad that she ended up getting arrested.  There are people out there that have such bad drug habits that it actually impacts their day-to-day life, doesn't it?

A.    Sure.

Q.    They repeatedly get arrested for drug possession; right?

3679

A.    Yeah.

Q.    They can't show up to work because they're so off on drugs; right?

A.    Yes.

Q.    Their attendance falls off; right?

A.    Sure.

Q.    Can't keep -- can't take care of their children; right?

A.    Sometimes.

Q.    That doesn't describe Angela Johnson, does it, ma'am?

A.    There are pieces of that that occurred occasionally.

Q.    The beginning of your testimony in part was a discussion of what you were hired to do in this case.  Do you remember that

Page 129

HUT000441

discussion with defense counsel?

A.   Of course.

Q.   And you were specifically not to ask any questions of Angela Johnson concerning her state of mind at the time that she committed these five murders.

A.   That's correct.

Q.   There wasn't anything stopping you from doing that other than the fact that you were instructed not to do that; is that correct?

A.   I guess not, yeah.

Q.   And so you are not here offering any opinion whatsoever concerning whether this mental condition of posttraumatic stress disorder that you've diagnosed her with had any effect on her

3680

thinking or behavior at the time that she committed these offenses, are you, ma'am?

A.   I've been very clear that I'm not saying that that contributed to it.

Q.   You are not suggesting in any way that she was acting under any form of duress at the time that she committed these murders?

A.   I have not asserted that.

Q.   You are not asserting that she acted under any form of mental defect that affected her ability to recognize that what she was doing was wrong when she participated in the murders of five people.

A.   I wouldn't be -- I would have been in the other phase of the trial had I been doing that, yes.

Q.   So the answer to my question is you are not giving that opinion.

A.   That's correct.

Page 130

HUT000442

Q.   You are not asserting that she was unable to understand what she was doing when she went out and purchased an assault weapon for Dustin Honken.

A.   I'm not asserting that.

Q.   You're not asserting that she did not understand what she was doing when she helped him gain entry into a house and tie up and gag victims.

MR. BERRIGAN:  I'm going to object to this whole line of inquiry.  It's been repeated now with the earlier witness,

3681

and this witness has made it clear, Your Honor.  This is repetitious, and these questions have already been asked and answered several times.

THE COURT:  It's getting real close, so you can wrap this part of your cross up.

MR. WILLIAMS:  I will wrap it up.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.   I do want to make perfectly clear, though, ma'am, you are not in any way indicating that she did not know exactly what she was doing and acted with free will at the time that she participated in the murders of five people.

A.   I don't know what she did in relation to those.  I haven't discussed them.

Q.   And, ma'am, free will has a place in this society, doesn't it?

A.   Of course.

Q.   Despite all the problems that any one of us grew up with and have as experiences in our life, bottom line is we all have the ability to make choices, don't we, ma'am?

Page 131

HUT000443

A.   We all have the ability to make choices within our biological, psychosocial histories.

Q.   Okay.  I'm just trying to make sure.  Are you suggesting that somehow she did not have the ability to make choices?

A.   I think that she had the ability to make choices.  I think

3682

some choices are different for different people.  And I'm just making sure that I'm not saying that everybody can choose everything at every time.

Q.   Just so we're clear, you're not asking this jury to conclude that Angela Johnson somehow suffered mental defects that affected her ability to make choices.

MR. BERRIGAN:  Asked and answered again.  I'll object, sir, repetitious.

THE COURT:  Overruled.

A.   Yes, I've said that.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  I'll be brief.

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Why don't I explore this idea of choices first.  Are the choices for a person who's had Angela Johnson's life in your view as a psychologist these many years and your experience with patients, are those the same choices that I get to make having grown up in a normal if not advantaged childhood and adolescence?

A.   No.

Q.   And why are they different?

A.   The biology is different.  If you have an alcoholic parent,

Page 132

you have a 50 percent chance of inheriting a gene or the biology

3683

that if you drink you'll become alcoholic. You don't have that list of virtues that we talked about in terms of trust and initiative and ways of being positive in the world. You're not going to have those as a backdrop, as an undergirding. You're not likely to have a family upon whom you can rely when things get tough the way I've done, the way many of you have probably done, whether it's you call home and just cry on somebody's shoulder or you ask for a loan for a hundred dollars. Some people don't have those choices, and it makes a difference in what life choices are available to them.

Q. The prosecutor asked you several questions about Miss Johnson having the ability to, I guess, pay the mortgage on a house, have a job, sort of go through the everyday experiences of life. Are those things, the ability to kind of survive day to day, does that mean she's not mentally or psychologically impaired?

A. No.

Q. Do you have patients that are even severely mentally ill that are able to do those types of things?

A. Oh, sure. And some of them do them with psychotropic drugs to help them. Some of them do them with coming to therapy twice a week. Angela did it by taking meth. You know, I think we -- if you have deficiencies, if you have a broken leg, you use crutches. If you have psychological weaknesses, you either try and find somebody to lean on or you use drugs or you find a way

3684

to cope and that all of us do that with what things are
Page 133

HUT000445

available in our environment and within our psyches.

Q.    You were asked, Dr. Hutchinson, about some mental health treatment that Miss Johnson received back in 1996.  Do you remember seeing that in the records?

A.    Yes, I do.

Q.    And there was a diagnosis at that time, was there not?

A.    Yes.  I believe it was major depression.

Q.    And that was an axis 1 diagnosis.

A.    That's correct.

Q.    And tell the jury what that means to be an axis 1 diagnosis of major depressive disorder.

A.    There are different kinds of diagnoses.  An axis 1 diagnosis is what are the clinical symptoms that the person is most profoundly presenting at this time.  Major depression includes sleep disturbance; eating disturbance; mood disturbance; often irritability; concentration; affect variability, kind of up and down; thoughts of suicide; feeling blue and depressed and hopeless.  That was what she was manifesting most at that time, and so, of course, that was the most appropriate diagnosis, and she received medication for that.

Q.    Well, not only that, but the examiner at that time, do you -- is there anything in the records to reflect that the psychologist -- I think it was a psychiatrist that examined her

3685

at that time made any inquiry about what happened to her in Chanute, Kansas, or what the religious practices of her mother Pearl Jean Johnson were 25 years before or whether there was any discussion about Terry DeGeus repeatedly beating her and throwing her out of moving cars and leaving her on the side of

Case 3:09-cv-03064-MWB-LTS    Document 284-12    Filed 06/23/11    Page 46 of 64

HUT000446

the road?  Do any of those things appear in those records?

A.  I think there were a couple brief sentences or references to that she had a pretty tough childhood, she didn't want to talk about it, and the person didn't push her on that.

Q.  Finally, this discussion that was had about Miss Johnson's poor self-image and you were asked questions about whether she had reported or described herself as a good person, a good worker, and a good mother, do you recollect those questions?

A.  Yes.

Q.  Do those responses indicate to you at all that she had some high self-esteem or high self-worth?

A.  No.  I think what they do is reflect some of the growth that she's made in the last few years, that she is beginning to improve her self-esteem and beginning to say, I'm going to do these things better, and I can be a better person; I can be a good mom, and those things are really important to me where I live now.  I have no doubt that there is still an underlying "I'm a bad girl" that came from her childhood that is still there that in the darkness of the night still eats at her in some ways and that that will take some time to resolve through

3686

her religious faith and the love of her family.  The "I'm a good person" is in some ways a new awareness for her.

Q.  This is the real finally.  That was only the false finally. When you were retained in this case, when I contacted you, was it made clear to you that the investigation that you were going to conduct and the evaluation of Miss Johnson was strictly for purposes of presenting evidence in the penalty phase of a capital murder trial if we got there?

A.  Yes.

Page 135

HUT000447

Q.   Now, in your practice in working for lawyers and judges, do you think you'd have much of a forensic practice if a judge told you to do an evaluation for a specific purpose and received instructions and you violated those instructions?

A.   I can't even fathom doing that.  One, it'd be unethical.  Two, it'd be stupid.

        MR. BERRIGAN:  That's all.  Thank you.

        THE COURT:  Mr. Williams, anything further?

        MR. WILLIAMS:  No, Your Honor.

        THE COURT:  You may step down.

        Members of the jury, you can take a stretch break.

        Are you ready to call your next witness?

        MR. BERRIGAN:  We are, sir.

        LOU ANN HARE, DEFENDANT'S WITNESS, SWORN

        THE COURT:  Okay.  Please be seated in the witness box.  And you can adjust the chair and the microphones so you

                                                3687

can speak directly into the microphones.  And you have to scoot up that chair and get nice and close to the microphones.  You can adjust those microphones and pull them towards you.  And then when you're ready, would you state your full name, please, and spell your last name.

        THE WITNESS:  My name is Lou Ann Hare; spelling of my last name, H-a-r-e.

        THE COURT:  Mr. Berrigan?

                DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Is Lou Ann one or two words?

A.   Two words.

Q.   Two words.

                Page 136

HUT000448

Call came in. Recorded over it. Probably talked w/ Graham or Lewis. Was w/ them when served warant or subpoena. No documents.

Marilyn Hutchinson
　　　　2170 —
　⟶　"that's not your job." — denigration
　　　　jury really d/n like her.
　　　　7-18 the worst of the worst.
　　　　PTSD — (ok?)
　　　　Anxiety disorder — compulsive hand washing — spelling words in her head.
　　　　"I don't know why I should follow

<span>dangerous</span><br>
<span>re: choices</span>　the rules —" Needs to find her place in society. Being bad better to be a nobody. society d/n work for her. I'm going to be promiscuous, I d/n use drugs. I never got a break. So used crank.
　　　　Trying to find mother & father abusive & unavailable
　　　　looks for this in men. C/n provide day to day vour terrance in a healthy relationship. Tdg available. Uncon— sciously drawn to unavailable and abusive. When good very very good & when bad it was really bad. His drug usage prompted jealousy & paranoia. He had failed some of his own developmental

MG006058

Stages. Why d/n she leave him — it's the when it's good part. Hooked by cycle of violence. Violence is excused & pretend that the honeymoon is the rela. But violence gets more extreme & honeymoon phase gets shorter. Δ violence towards Tdg. No. defend herself & siblings — Bravado — She d/n act like a lady. Strongness that is sometimes atypical for women. So people w/n hurt her. drugs — Choice — Childhood of violence — Brain chges lots of danger — excess cortisol. quick trigger. Self-medicate the Startle response thru. Leads to promiscuity, drug abuse & passive & active suicide. Mj. calmed things done. Chgd to meth — this has been treated. Same drugs used for depression. talking thru experiences. Talk to people about her Childhood experiences. Something she had never done. Forgiven parents, pretty fa along for treatment of PTSD. @ point you start doing chemicals you stop grow-ing up. Redemptive that can help people — long term psychotherapy. Religious exp. spiritual community. loving long term rela. Helps heal.

X — in writing opinion — past history. helped arrive @ diagnosis. Dillos as

MG006059

hammered animals; pigs; young pregnancy
19.5- d/n get pregnant- made decision not
to have child w/ Steve. Bad boys- abusive
+ abandoning men. Not bad boy. e.g. boring,
not bad boys. Poor self worth - good worker,
good mother, good person. (not incompatible)
PTSD - nightmares - (this was necessary) -
not a make it or break it. One of things she
reported. Not diagnosed in 1996 w/ PTSD.
She lied to grand jury. Not a juvenile
delinquent. Not involved w/crim justice
as a child. Confined conduct. She had
jobs. Maintained hse. Raised children.
She d/n become involved in criminal
activity. d/n impact day to day life.
d/n describe Angela Johnson. ~~Instructed~~
not to talk about crime. So did diagnosis
affected by diagnosis. No form of mental
defect. no opinion on guilt phase. free
will. Problems - but bottom line have
ability to make choices. Axis I diagnosis
of major depressive disorder. Where I live
now I can be a good person, a good mom.
Time to resolve — the bad person. new
awareness for her. Strictly prepared for
the penalty phase.

*margin notes:* getting attached in self report- suggest

MG006060
HUT000451

<u>LouAnn Hare</u>

Mason City - Nurses aid. 4 yrs. Good Shepard. Nursing. divorced. 1 daughter 14 - born + raised in fertile, Iowa. fc. clear lake area. Knows Angela. friends. Since we were in 7th grade. fc. ms completed ms. graduated. Got some College. AA degree. She was in same grade. She dfn. dropped out. 7th grade. We lost contact until 1987 - She was waitress @ Perkins + I was working @ Unisys. got to be friends. She was divorced. Well did normal girl things. lay out, Go shopping, ~~do~~ do nails. She had dated several guys. She got flowers. Started seeing Tdg. thought he was a nice looking, muscular - nice guy. She liked him. They had a rather up + down relationship - kind of rocky. He was abusive to her - verbally + physically. One night She came to my hse - nose busted up - 2 big black eyes. She was going to leave town to heal face. Saw off + on. She was using drugs. we did them together. In 1988-89. Meth. Usually once or twice a month. 8ball. do it from Thurs. nite to Sunday am. we dfn sleep. did a bunch of nothing. Nails, clean hse. Wasted energy. $350.- we'd split the cost.

MG006061

HUT00452

# CONSEQUENCES OF CHILD HOOD ABUSE

## Emotional Consequences:

Anxiety
Depression
Self-Esteem
Anger
Shame

## Cognitive Consequences

Attention/ Concentration Difficulties
Dissociative Traits
Perceptual Distortions

## Biological

Hyperarousal
Somatization

## Behavioral

Aggression
Passive & Active Suicide
Impaired Social Functioning
Developmental arrests
Repetition of abuse cycles

## Interpersonal

Sexual problems
Revictimization
Problems in intimacy:
Attachment, empathy, dependence and trust

HUT000453

# CORRELATES OF CHILDHOOD ABUSE

Frequent family moves

Ambiguity or confused family roles

Alcohol or drug usage by parents

Family isolation in particular niche

Lack of support for education

Lack of support for appropriate social behavior

Inherited proclivity to substance use

Inherited proclivity to mental health problems

HUT000454

# ERIK ERIKSON DEVELOPMENTAL TASKS

| Stage (age) | Psychosocial crisis | Significant relations | Psychosocial modalities | Psychosocial virtues | Maladaptations & malignancies |
|---|---|---|---|---|---|
| I (0-1) -- infant | trust vs mistrust | mother | to get, to give in return | hope, faith | sensory distortion -- withdrawal |
| II (2-3) -- toddler | autonomy vs shame and doubt | parents | to hold on, to let go | will, determination | impulsivity -- compulsion |
| III (3-6) -- preschooler | initiative vs guilt | family | to go after, to play | purpose, courage | ruthlessness -- inhibition |
| IV (7-12 or so) -- school-age child | industry vs inferiority | neighborhood and school | to complete, to make things together | competence | narrow virtuosity -- inertia |
| V (12-18 or so) -- adolescence | ego-identity vs role-confusion | peer groups, role models | to be oneself, to share oneself | fidelity, loyalty | fanaticism -- repudiation |
| VI (the 20's) -- young adult | intimacy vs isolation | partners, friends | to lose and find oneself in a another | love | promiscuity -- exclusivity |
| VII (late 20's to 50's) -- middle adult | generativity vs self-absorption | household, workmates | to make be, to take care of | care | overextension -- rejectivity |
| VIII (50's and beyond) -- old adult | integrity vs despair | mankind or "my kind" | to be, through having been, to face not being | wisdom | presumption -- despair |

HUT000455

WHY ANGIE CHOSE BAD MEN
GENERAL EDUCATION
**I. Consequences of Childhood abuse**---Schema by McCann, Sakhiem, Trauma and Victimization: a model of psychological adaptation.   Published in counseling psychologist

A. Emotional problems:
Fear/anxiety
Depression
Self-esteem
      Slow to develop confidence
      Unhappy and nonconforming
Anger
Guilt and shame

B. Cognitive

Perceptual and or dissociation????
Add symptoms—attention, concentration'

C. Biological
Hyper arousal
Somatic???

Abuse survivors have smaller brains—this appears to be related to brain development during stress; the hypothalamic-pituitary-adrenal axis is to produce cortisol from adrenal glands into blood.  In subsequent stress and hypothalamus sends CRH to pituitary gland. The pituitary gland release ACTH and Beta endorphin (natural opiate).  ACTH stimulates the adrenal glands and they produce cortisol as well as fight or flight norepinephrine.  When stress is resolved, the cortisol and opiates have an inhibitory regulatory influence by turning off the cells which produce CRH in grain. And HPA returns to normal.

Heightened cortisol levels produced difficulties in regular brain functions—e.g. memory and attention.
Maltreated children have higher cortisol levels.
Chronic PTSD causes over compensation and then has attenuated cortisol response land increased vulnerability to subsequent stressors.

These biological changes lead to higher than usual incidence of cigarette smoking, obesity,  alcohol and drug use, depression, suicide attempts,  and sexual promiscuity.

Teenagers are more likely ot drink smoke, do drugs, have eating disorders, behave illegally, report suicide thoughts, be in poor health

HUT000456

The HPA axis is more susceptible to stress induced dysregulation and increases vulnerability to depression


D. Behavioral
Aggression
Anti social behavior
Impulse control problems
Repetition of abuse cycle—perpetrator, rescuer and victim
Passive or active suicide
Substance
Impaired social functioning
Abuse triangle
Social deficits
Developmental arrests/personality disorder

E. Interpersonal
Sexual problems???
Revictimization
Problems in intimate relationships
Attachment disorder
Empathy problems
Dependent
Distrustful

II; Correlates of Abuse

Family instability—moving; roles in family; multiple parenting styles
Alcohol and drug usage while a child---DAD??
Family isolated into some particular niche (religious)
Lack of support for education and social behavior
Inherited proclivity to substance use
Inherited proclivity to mental health problems

HUT000457

III. PROBLEMS ANGIE HAS/HAD

PTSD
Repetition of sadism/masochism
Low self esteem
Attachment disorder
Abuse triangle—victim, rescuer, abuser
Unhappy, non conformation
Exaggerated independence/dependence
ADD—impulse control, hyperactivity,
Aggressiveness
Lack of interpersonal skills—deception, trust, problem solving;
Difficulties with authority

Drug use—related to mental health and/or genetic and her way to cope;
Coping skills deficit—modeled and taught in family; not there if abuse is model

HUT000458

IV.    INTERFACE OF MODEL AND ANGIE

Childhood physical abuse by mom---PTSD, attachment problems, abuse triangle, anger and aggressiveness; difficulties with authority; lack of interpersonal problem solving skills—learned to be deceptive; lack of  trust; non-conforming;   hyper arousal;

Religious abuse by mother and grandparents---really bad person; afraid of everything; abuse triangle

Divorce by mom and dad:  mom trashed by cookie—put her in defensive position and prevented making use of haven from home.
Arguments with cookie---kept her from support of father; felt like not chosen; cant trust
Orphanage—sadism and horror—Ptsd; abandonment by mother; sexual abuse?  Further interruption of attachment (mom was going to leave us too); additional school problems

Idea of men—abandon; have to try and please; can't trust them; unavailable "good"


WHEN READY TO DATE boys and men:

Looking to get away—more important than choice of who
Looking for excitement—antidote to religiosity; defiance of authority; asserting
          independence from extreme level of control; led her to "bad boys"
Introduction to drugs and alcohol—initially cigs and marijuana
          Marijuana to have fun and act out defiance
          Cigs to self medicate depression

          Introduced to crank—high; energy to work; kept away from feelings; provided
          Self confidence; became only way to live successfully

Men became the conduit for that—connected to them to get dope
          Getting dope more important than the relationship
          Evidence of attachment problem—
          Evidence of developmental arrest—like teenager in relationships
          Lack of interpersonal skills
          Impulsive decisions with relationships


Try really hard to get love from men be cause of father's unavail
"savior complex for men"  --trying to help them???

Development of masochistic traits—bad , deserve bad

HUT000459

Abuse honeymoon cycle---such a relief when feel loved, delue self that is is real. Split good and bad

Men who were abusive
  Took it—deserved it?  Not do any better. Abuse triangle
  Lack of trust in help from others
  Fear—knew about power of abuse and threats from childhood
  Repetition of sadism/masochism
  Exacerbation of PTSD

Excitement of drug world
  Consequence of hyper arousal—continued excitement
  Takes more to get excitement due to above noted dysregulation

Summary:
Living out idea of being really bad; way to get drugs for self medication; acts of defiance against over control of childhood; repetition of abuse cycle;  repetition of unavailable father, mean mother;  (we marry our parents)

*Erickson*

*McNeese*

*Hdy no one pressure up * fast d card to ... to ma*

WHY ANGIE CHOSE BAD MEN
GENERAL EDUCATION
**I. Consequences of Childhood abuse**---Schema by McCann, Sakhiem, Trauma and
Victimization: a model of psychological adaptation.   Published in counseling
psychologist

  A. Emotional problems:
    Fear/anxiety
    Depression
    Self-esteem
        Slow to develop confidence
        Unhappy and nonconforming
    Anger
    Guilt and shame

*Where in Erickson — more culpability*

  B. Cognitive

    Perceptual and or dissociation????
    Add symptoms—attention, concentration'

  C. Biological
    Hyper arousal
    Somatic???

*hypothalamic – pituitary – adrenal – regulates cortisol.*

Abuse survivors have smaller brains—this appears to be related to brain development
during stress; the hypothalamic-pituitary-adrenal axis is to produce cortisol from
adrenal glands into blood.  In subsequent stress and hypothalamus sends CRH to
pituitary gland. The pituitary gland release ACTH and Beta endorphin (natural
opiate).  ACTH stimulates the adrenal glands and they produce cortisol as well as
fight or flight norepinephrine.  When stress is resolved, the cortisol and opiates have
an inhibitory regulatory influence by turning off the cells which produce CRH in
grain. And HPA returns to normal.

Heightened cortisol levels produced difficulties in regular brain functions—e.g.
memory and attention.
Maltreated children have higher cortisol levels.
Chronic PTSD causes over compensation and then has attenuated cortisol response
land increased vulnerability to subsequent stressors.

These biological changes lead to higher than usual incidence of cigarette smoking,
obesity,  alcohol and drug use, depression, suicide attempts,  and sexual promiscuity.

Teenagers are more likely ot drink smoke, do drugs, have eating disorders, behave
illegally, report suicide thoughts, be in poor health

The HPA axis is more susceptible to stress induced dysregulation and increases vulnerability to depression

D. Behavioral
Aggression
      Anti social behavior
      Impulse control problems
      Repetition of abuse cycle—perpetrator, rescuer and victim
Passive or active suicide
Substance
Impaired social functioning
      Abuse triangle
      Social deficits
Developmental arrests/personality disorder

E. Interpersonal
Sexual problems???
Revictimization
Problems in intimate relationships
      Attachment disorder
      Empathy problems
      Dependent
      Distrustful

II; Correlates of Abuse

      Family instability—moving; roles in family; multiple parenting styles
      Alcohol and drug usage while a child---DAD??
      Family isolated into some particular niche (religious)
      Lack of support for education and social behavior
      Inherited proclivity to substance use
      Inherited proclivity to mental health problems

HUT0004662

*Erickson*

*McNeese*

*Holy
no more
pressure up

* fast d cards
to ma*

WHY ANGIE CHOSE BAD MEN
GENERAL EDUCATION
**I. Consequences of Childhood abuse**---Schema by McCann, Sakhiem, Trauma and
Victimization: a model of psychological adaptation.   Published in counseling
psychologist

A. Emotional problems:
   Fear/anxiety
   Depression
   Self-esteem
         Slow to develop confidence
         Unhappy and nonconforming
   Anger
   Guilt and shame

B. Cognitive

   Perceptual and or dissociation????
   Add symptoms—attention, concentration'

C. Biological
   Hyper arousal
   Somatic???

*Where in
Erickson
moral culpability*

*hypothalamic -
pituitary -
adrenal -
regulates cortisol.*

Abuse survivors have smaller brains—this appears to be related to brain development
during stress; the hypothalamic-pituitary-adrenal axis is to produce cortisol from
adrenal glands into blood.  In subsequent stress and hypothalamus sends CRH to
pituitary gland. The pituitary gland release ACTH and Beta endorphin (natural
opiate).  ACTH stimulates the adrenal glands and they produce cortisol as well as
fight or flight norepinephrine.  When stress is resolved, the cortisol and opiates have
an inhibitory regulatory influence by turning off the cells which produce CRH in
grain. And HPA returns to normal.

Heightened cortisol levels produced difficulties in regular brain functions—e.g.
memory and attention.
Maltreated children have higher cortisol levels.
Chronic PTSD causes over compensation and then has attenuated cortisol response
land increased vulnerability to subsequent stressors.

These biological changes lead to higher than usual incidence of cigarette smoking,
obesity,  alcohol and drug use, depression, suicide attempts,  and sexual promiscuity.

Teenagers are more likely ot drink smoke, do drugs, have eating disorders, behave
illegally, report suicide thoughts, be in poor health

The HPA axis is more susceptible to stress induced dysregulation and increases vulnerability to depression

D. Behavioral
Aggression
Anti social behavior
Impulse control problems
Repetition of abuse cycle—perpetrator, rescuer and victim
Passive or active suicide
Substance
Impaired social functioning
Abuse triangle
Social deficits
Developmental arrests/personality disorder

E. Interpersonal
Sexual problems???
Revictimization
Problems in intimate relationships
Attachment disorder
Empathy problems
Dependent
Distrustful

II; Correlates of Abuse

Family instability—moving; roles in family; multiple parenting styles
Alcohol and drug usage while a child---DAD??
Family isolated into some particular niche (religious)
Lack of support for education and social behavior
Inherited proclivity to substance use
Inherited proclivity to mental health problems

HUT000464