**LISA GREENMAN**
3925 Morrison Street NW
Washington, DC 20015
(202) 686-0978

## EMPLOYMENT

### Federal Public Defender Organization, District of Maryland
2002 to present

Assist and train defense counsel in the investigation and litigation of sentencing issues in death penalty cases, primarily in the areas of mental health and developmental disabilities; identify and recruit mental health experts who can evaluate capital defendants and provide testimony in support of the defense; consult with counsel on how most effectively to represent individuals with mental health/developmental disability issues; lecture on psychological assessment, mental health procedures in criminal cases, intellectual disability, and other topics in criminal law and mental health.

### Public Defender Service for the District of Columbia, Mental Health Division
1998 – 2001

Defended individuals in involuntary civil commitment proceedings; provided ongoing representation for persons civilly and criminally (not guilty by reason of insanity) committed to Saint Elizabeths Hospital; consulted on complex mental health issues arising in criminal and death penalty litigation, including competence, insanity, voluntariness, ethical obligations of mental health experts, risk assessment and future dangerousness.

### Administrative Office of the U.S. Courts, Defender Services Division
1995 – 1998

Participated in the management of administrative, policy and training matters relating to death penalty representation in the federal courts. Responded to judicial, congressional and other inquiries regarding death penalty issues. Served as counsel to Judicial Conference committee that studied and issued report on cost and quality of defense representation in federal death penalty cases ("Spencer Report").

### Public Defender Service for the District of Columbia
1987 - 1995

Provided direct representation to persons charged with serious criminal offenses in all facets of trial, appellate and post-conviction proceedings.

## EDUCATION

### New York University School of Law
J.D. 1987, cum laude
Order of the Coif; Criminal Law Clinic

### Yale University
B.A. 1981 (Literature)

GRN000001

PERSONAL

**Take 2 Camp: An Innovative Program for Social Learning**, Washington, DC
  Cofounder and member of the Board of Directors of therapeutic summer camp for children with Asperger Syndrome and related disorders (www.take2camp.org).

**Ivymount School**, Rockville, Maryland
  Board of Directors
  Parent of child enrolled in Model Asperger Program (www.ivymount.org/asperger.html)

**Children's National Medical Center**, Washington, DC
  Leadership Education In Neurodevelopmental Disabilities (LEND) Program: adjunct faculty
  Center for Autism Spectrum Disorders: Parent Advisory Committee

**National Institute of Mental Health**, Bethesda, Maryland
  Interventions Committee for Disorders Involving Children and Their Families
  Scientific Review Committee – Public Reviewer

GRN000002

## Timeline Related to Investigation of Mental Status
## at Time of the Offense

10/13/00    Angela's attempted suicide in Blackhawk County Jail

11/22/00    Berrigan –> Logan

asking that evaluate AJ's "mental state both at the time of the commission of the alleged murders and the at the time she purportedly made incriminating statements to the government's snitch." Also asks him to address substantial domination by Honken and competency. Berrigan states in letter that in his opinion she is competent and not psychotic.

1/19/01     Logan's first interview with Angela (2.25 hrs)

1/22/01     Logan –> Blackhawk jail. Her depression has improved. Says suicide precautions are no longer necessary.

6/21/01     Logan's second interview with Angela (3.0 hrs)

10/7/02     Defense motion to extend 12.2 deadline to 11/4/02 granted.

11/9/02     (per billing) drafted defense notice of expert witnesses of mental health evidence at penalty phase

11/10/02    same as above

11/11/02    draft modification of Not/Expt Wit's

11/12/02    (from billing) tele w/Willett re: Not/Expt Wit's; finish Mot/File Not/Expt Wit's OutOfTime

11/12/02    Filed Motion for Leave to File Notice of Expert Witnesses Out of Time (granted) "Notice of Expert Witnesses and Intent to Possibly Offer Mental Health Evidence at the Penalty Phase" (Gelbort and Logan)

11/14/02    Government files a notice of intent to seek the death penalty

1/16/03     (from PB notes 40) t/c w Gov "scratch deadline to challenge D's experts"

5/10/03     AJ letter to Stowers and Berrigan: "I am going to be as clear as I can.  I want to plead guilty.  I do not want to wait for any more rulings, not even the 8th crt.  I am asking you to get me the best deal you can and I will cooperate.  At this point, I will confess to killing the Pope.  I have not touched my kids in THREE YEARS now and I've had it.  Please get me out of here and into a prison as close to my kids as possible.  That is all I ask."

GRN000003

| | |
|---|---|
| 6/11/03 | Government's Motion for Notice of Intent to Introduce Expert Testimony of Capital Defendant's Mental Condition and for Court Ordered Mental Examination on Receipt of Such Notice |
| 7/2/03 | Motion for Extension of Time to File Response to Gov's Motion indicating that Berrigan is "familiar with the issue raised by the government motion, namely whether the government can force the accused to submit to an evaluation by a hired government psychiatric expert or force the prospect of her being denied her Sixth and Eight Amendment rights to present mitigating mental health testimony in her defense." |
| 7/17/03 | Second Motion for Extension of Tim to File Resistance to Government's Motion for Notice of Intent to Introduce Expert Testimony of Capital Defendant's Mental Condition and for Court Ordered Mental Examination on Receipt of Such Notice |
| 7/17/03 | Resistance to Government's Motion for Notice of Intent to Introduce Expert Testimony of Capital Defendant's Mental Condition and for a Court Ordered Mental Evaluation of Receipt of Such Notice (364) |
| 8/4/03 | ORDER setting 12.2 deadline 12 weeks prior to trial (365) |
| 8/7/03 | Government's Motion for Notice of Intent to Introduce Expert Testimony of Capital Defendant's Mental Condition and for Court Ordered Mental Examination on Receipt of Such Notice |
| 8/12/03 | ORDER regarding Plaintiff's Motion for Notice of Intent to Introduce Expert Testimony of Capital Defendant's Mental Condition and for Court Ordered Mental Examination on Receipt of Such Notice (second case) |
| 9/1/04 | "talk to Michael Gelbort about evaluation, but without talking to Angela about" |
| 10/4/04 | Travel to Sioux City <br> "CJ called - he wanted to know if we'll have mental health evidence - expert stuff. December sometime. Told him we were working on it, but that I couldn't say at this point one way or the other." |
| 11/5/04 | PB attends training at which 12.2 discussed <br> in his notes he says "If we keep Bill Logan from interviewing on the murders, will that prevent the gov't from" |
| 12/20/04 | Defense provides handwritten notice to Gov of Hutchinson, Logan, and Gelbort notes that no testing had yet been done. |

GRN000004

| | |
|---|---|
| 1/3/05 | Johnson filed a Defense Designation Of Expert Witnesses (docket no. 265) providing notice that four mental health experts (Hutchinson, Gelbort, Logan, and Cunningham) are expected to testify on her behalf in the "penalty phase" of her trial on issues regarding her mental health. |
| 1/6/05 | Government filed a Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270). |
| 1/18/05 | Defense Resistance to Motion for Court Ordered Examination of Defendant |
| 1/24/05 | Dr. Gelbort makes first and last visit to Angela. Charges $ 7400 for performing "the Wechsler Memory Scale-Third Edition (Logical Memory I, Faces I, Verbal Paired Associates I, Family Pictures I, Logical Memory II, Faces II, Verbal Paired Associates II, and Family Pictures II), Halstead Category Test, Wide Range Achievement Test-Revision 3, Trails, and the Wechsler.Adult Intelligence Scale-Third Edition. Also administered was Mental Status Testing, some items from the Luria Nebraska, and diagnostic interview." No report |
| 1/26/05 | Logan's third and final examination of Angela (3.5 hrs) |
| 1/27/05 | Court hearing touches on this issue (do we have transcript of this??)* |
| 2/18/05 | Court granted the government's motion by ordering and directing Johnson to submit to mental examinations, evaluations, or interviews by government mental health experts pursuant to Rule 12.2(c)(1)(B), subject to certain conditions and procedures. See *United States v. Johnson*, 362 F.Supp.2d 1043 (N.D.Iowa 2005). |
| 2/18/05 | Court appoints Matt Whitworth and Roseann Ketchmark, both Assistant United States Attorneys for the Western District of Missouri, as "outside taint attorneys" to manage the government's mental health experts in this case. (docket no. 328) |
| 2/23/05 | Dr. Hutchinsonmakes first of two visits with Angela (4.00 hrs). Administers Tower of London and Mental Status Checklist |
| 2/24/05 | Dr. Hutchinson makes second and last visit with Angela (5.25 hrs) No further testing. |
| 3/2/05 | Gelbort —> PB re: tests administered |
| 3/3/05 | PB –> Ketchmark and Witworth (firewalled attorneys) forwarding tests administered |
| 3/4/05 | Matt Whitworth sends an e-mail to the court stating that defense attorney Pat Berrigan told Mr. Whitworth that Angela Johnson "would plead the 5th |

3

Case 3:09-cv-03064-MWB-LTS    Document 284-13    Filed 06/23/11    Page 5 of 100

GRN000005

Amendment if the government experts attempted to ask questions of her concerning her involvement in the murders of these five individuals." Mr. Whitworth, Ms. Ketchmark, and Mr. Berrigan requested a conference with the court concerning this matter.

3/7/05    March 7, 2005- Conference held re issue. At the conference, Johnson argued that there is a tremendous difference between reliance on mental condition evidence during the "merits phase" of the trial versus reliance on such evidence during the "penalty phase," such that a defendant has a viable Fifth Amendment right against self-incrimination during examinations by government experts concerning a mental condition that would be asserted only as a mitigating factor in the "penalty phase." She explained that, in her view, if she never puts her mental condition at the time of the offense at issue during the "merits phase," she has not waived her right against self-incrimination for purposes of a mental condition mitigating factor during the "penalty phase," at least where that mitigating factor is not "offense specific." Johnson represented that she has instructed her mental health experts not to question her regarding her alleged commission of the murders or her mental state at the time of the murders. Instead, she represented that her mental health evidence, during the "penalty phase," would relate to her past and more particularly her present mental condition as a mitigating factor for punishment purposes. She also represented that she would not argue for mitigation on the basis of any offense-specific mental condition. Johnson argued that, if her experts will not get into questions related to her involvement in the charged offenses, then the government should not be able to, either. she acknowledged that it might be permissible for the government to impeach her experts with why they did not ask her about her mental health at the time of the offense. After the taint attorneys were excused from the conference, Johnson's counsel did make a brief and general ex parte statement to the court concerning Johnson's mental health mitigating factors. Johnson again suggested that nothing about those mitigating factors will require offense-specific questions from mental health experts.
"My experts have not, will not be questioning Miss Johnson regarding the actual commission of the murders or what her mental state was at that time."

"I think it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders.  It only brings the jury's attention back to the commission of the murders when in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating cirucmstances that might exist regarding the defendant and her background character."
Court attempts to draw the distinction between saying "AJ had a continuing illness, which existed at the time of the offense but experts didn't ask about how that played in at the time offense" and AJ has X mental condition and it just mitigating on its face.

4

Case 3:09-cv-03064-MWB-LTS    Document 284-13    Filed 06/23/11    Page 6 of 100
GRN000006

Much discussion about the extent of 5th amendment waiver implied by 12.2
PB says he hasn't looked into it much.

"For some period of time my mental health experts have been under very strict instructions not to inquire into this area of her mental status at the time of the murders. Its' counterproductive, frankly, in my opinion for the defense to inquire into that in this particular case. And I intend to offer no evidence on that."

"But I realize that we're – the defense is really on very perilous ground by taking this position if we were to seek to introduce evidence at trial that Miss Johnson was suffering from duress at the time of the murders..... I've gone out of my way to avoid that very issue."

"Your Honor, here's my dilemma. It's my belief that Miss Johnson has suffered from certain mental conditions or defects, if you will, for quite a long period of time, and much of that arises out of some events in her childhood... and so these are sort of longstanding mental health issues. And those – the dtermination by a mental health expert that she's been suffering from that type of – let's say depression as an example for a long period of time from childhood into her adult life in my view does not require the expert to then delve into what her mental state was at the time of the murders. Now having said that, I suppose the Government could say, well, if yo're contending she's suffering from depression over the court of her adult life, then she's got major depressive disorder, doesn't that impact her mental statuts at the time of the events? *And frankly I don't know what the answer to that is.*"

"I can tell you for sure that I am not arguing, for example, that she was under duress because of this relationship with Mr. Hoken at the time of the murders."

"I'm arguing that Miss Johnson has less moral culpability because of these mental defects that she's had, but they're not related to the murders. That is, it's not something that arose during the course of the murder."

Court says at the end he has a "fairly clear, somewhat murky" understanding of what Berrigan is talking about

| | |
|---|---|
| 3/9/05 | 3/9/05 Berrigan jail visit with AJ, 1030 - 1250 |
| | <u>Plea negotiations</u> Advised AJ we had not heard anything on our proposal, but that Matt Whitforth told me DOJ hates Alford pleas. Need to be prepared to counter-offer w/ factual basis plea, and that Dustin proffer was largely the factual basis we'd have to go with. [*And the Dustin proffer was in fact the template for Berrigan's written proffer*] ¶ No real response on this from Angie other than she hoped to God that Alford plea would go down. Surprisingly, she didn't tell me to go fly a kite or anything similar, but more colorful. So I went over verbally what DH said in his proffer, then had her read it herself. . . . AJ quibbled about DH claim that he didn't bring anything into the hourse. AJ points out there's no way she could have carried rope, tape, gun & video camers. "That camera wasn't small – it was huge." Camera belonged to Kathy Rick (how would AJ know how lg it was?!)" PB2-286-87. |

5

Case 3:09-cv-03064-MWB-LTS    Document 284-13    Filed 06/23/11    Page 7 of 100

GRN000007

3/14/05      Ketchmark and Whitworth — > Bennett
Taint team submits letter brief. The taint attorneys suggested that a stipulation concerning Johnson's use of mental condition evidence might go a long way toward dissipating their concerns, but that even with a stipulation, it might be necessary for the court to give an instruction to the jury explaining that Johnson's mental condition is not being used to show impaired capacity, substantial duress, severe mental or emotional disturbance, or any other enumerated mitigating\*1151 factors under 21 U.S.C. § 848(m), but only for purposes of the "catchall" mitigating factor in § 848(m)(10).

3/14/05      "Johnson's defense team apparently decided to forego the opportunity to file a letter brief to articulate further her position on the issues now before the court, because the court received no timely letter brief on these issues from the defense team." *United States v. Johnson*, 383 F.Supp.2d 1145 (N.D.Iowa 2005).

3/17/05      March 17, 2005- Court rules that " Rule 12.2 likely strike the appropriate balance when, for example, a defendant charged under 21 U.S.C. § 848 relies on an enumerated statutory mental condition mitigating factor, such as 21 U.S.C. § 848(m)(1) (lack of capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law), (2) (duress), or (7) (commission of the offense under severe mental or emotional disturbance). When the defendant relies on these enumerated mitigating factors, it appears that no meaningful evaluation of the defendant's mental condition can be made except in relation to the defendant's thinking or conduct at the time of the offense. The "lack of capacity" and "severe mental or emotional disturbance" mitigating factors under § 848(m) expressly tie the defendant's mental condition to her actions at the time of the offense. See 21 U.S.C. § 848(m)(1) (the mitigating factor is defined in terms of "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law") & (7) ("The defendant committed the offense under severe mental or emotional disturbance.") (emphasis added). The implication from statutory language that the defendant's conduct at the time of the offense was the result of the "unusual and substantial duress" is also very strong for the "duress" mitigating factor in § 848(m)(2), so that the tie between the defendant's mental condition and her actions at the time of the offense is just as apparent for this enumerated mitigating factor. Where the defendant relies on one of these enumerated mitigating factors, this court does not see how a meaningful rebuttal can be achieved without the opportunity for the government's experts to ask offense-specific questions; hence, the defendant's waiver of the Fifth Amendment right against self-incrimination necessarily includes a waiver of the right to refuse to answer offense-specific questions." *United States v. Johnson*, 383 F.Supp.2d 1145 (N.D.Iowa 2005)
 "Rule 12.2 procedures fit well with an enumerated, offense-specific mental condition mitigating factor, but the fit is less good where, as here, the defendant

6

GRN000008

relies on a mental condition mitigating factor that only falls within the scope of a § 848(m)(10) "catchall" mitigating factor. *1162 See 21 U.S.C. § 848(m)(10) (the defendant may also assert "[t]hat other factors in the defendant's background or character mitigate against imposition of the death sentence"). Such a mental condition mitigating factor may not be offense-specific in any sense. For example, such a mitigating factor may involve a post-offense mental condition, which plainly has no connection to the defendant's thinking or conduct at the time of the offense, or a long-standing mental condition, which may have no specific impact on the thinking or conduct of the defendant at the time of the offense." *United States v. Johnson*, 383 F.Supp.2d 1145 (N.D.Iowa 2005)

Given Johnson's representations, "the court finds that there is, at least initially, no need for either the defense's or the  government's mental health experts to inquire into offense-specific details during mental health examinations of Johnson, and no need for the court to compel Johnson to answer such questions, because Johnson has made an initial showing that neither "need" nor "fairness" requires such inquiries by either party. Cf. Obstein, 247 A.2d at 11-13. Indeed, based on her representations, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the "penalty phase," if any, of these proceedings. Nevertheless, the government is not foreclosed from asserting-for example, after the Rule 12.2(c)(2) and (3) disclosures are made or if, contrary to her present representations, Johnson presents or one of her experts inadvertently refers to mental condition evidence specifically related to her involvement in the crimes at issue here-that its experts need to ask and obtain answers to offense-specific questions, or that Johnson's experts should have asked such questions, to formulate opinions regarding any mental health mitigating factor that Johnson actually asserts." *United States v. Johnson*, 383 F.Supp.2d 1145 (N.D.Iowa 2005)

"Johnson's counsel expressly conceded during the March 7, 2005, conference that the government might be entitled to impeach her experts with why they did not ask her about her mental state at the time of the offenses, if the government makes some showing that such questions are relevant to a proper evaluation of her mental condition mitigating factor." *United States v. Johnson*, 383 F.Supp.2d 1145, 1165 (N.D.Iowa 2005)

"The parties may also contemplate entering into a stipulation as to the reasons that no offense-specific questioning is required and why no evidence of such questioning will be presented during the "penalty phase," if any. Such a stipulation would likely dissipate the government's concerns about the need for offense-specific questions and obviate the need for further management of expert examinations by the court. Such a stipulation could be read by either party at pertinent points in the proceedings, incorporated into the "penalty phase" jury instructions, or both. Such a stipulation would not, of course, prevent the court from determining that the government's experts are entitled to ask offense-specific questions in order to rebut the mental condition mitigating factor evidence actually

7

GRN000009

presented by Johnson at the "penalty phase," if any. *United States v. Johnson*, 383 F.Supp.2d 1145, 1165 (N.D.Iowa 2005)

3/19/05   AJ proffer by Berrigan

3/21/05   PB –> Gelbort send raw data to Martell
       PB – > Hutchinson send raw data to Martell

3/30/05   Whitworth/ Ketchmark—> PB
       Dan Martell has not recieved raw data from Gelbort's office

4/11/05   MG submits Hutchingson interview notes to Berrigan for review. It is clear from the notes that Angela wanted to and did talk about the offenses, claiming her innocence.

4/15/05   Jury selection starts

4/23/05   Martell and Dvoskin interview Angela on tape for 5.5 hours

5/1/05    PB sends marked up notes back to MG, suggesting that the offending parts be deleted.

5/8/05    Mark Cunningham's first and last interview with Angela (5 hrs 35 min.)

5/19/05   MD sends PG a sanitized version of Hutchingson's notes

5/20/05   Martell –> Whitworth: asking for life history records, contact information for witnesses with important relationships with AJ

5/23/05   Dvoskin –> Withworth re: more information re: witnesses relied on by experts

5/24/05   Ketchmark –> PB re: requests from Martell and Dvoskin for additional information

5/26/05   Government Motion for Disclosure of Defense Expert Reports

5/26/05   Telphonic hearing - Bennett, Berrigan, Ketchmark and Whitworh
       *PB attempts to argue that his experts don't have to prepare reports; court orders that they prepare reports or he will order depositions
       *Court orders Gov to turn over their reports, they will get any other contact info relied upon by defense experts when they turn over their reports
       *Discussion re: what jury should be instructed me MOS. PB says "We've not suggested at all that her mental condition affected her ability to in any way participate in the homicides. She does have a couple chronic conditions meaning

8

GRN0000010

going back almost her entire life – one is depression, and one is posttraumatic stress disorder – which certainly existed at the time of the homicide, but they don't go away, but we're not claiming that these homicides had anything to do with her conditions or vice versa."

| | |
|---|---|
| 5/26/05 | Formal entry of Orders issued on phone |
| 5/26/05 | Letter (draft?) PB –> Hutchinson, Logan, Cunningham asking them to generate reports |
| 5/28/05 | PB – > Bennet withdrawing mitigating factor "Angela Johnson committed the offenses under severe mental and emotional disturbance." |
| 5/30/05 | Logan drafts long and short reports |
| 5/30/05 | Hutchinson drafts report |
| 5/30/05 | Whitworth –> PB: Gov thought defense was not contending her anxiety and depression affected her mental state at the time of the offense, has there been a change in position? |

PB –> Bennett

replacing mitigator 21 b/c "it may suggest the presence of a mental incapacity which the defense is not relying on in the penalty phase of trial" with this language:

"At the time of the murders of [the first four victims], Angela Johnson was under the substantial domination of Dustin Honken, causing her unusual stress, anxiety, and an impairment of her normal judgment."

| | |
|---|---|
| 5/31/05 | Cunningham submits report |
| 6/7/05 | Logan testifies. Berrigan prefaces exam with the fact that Logan was not asked to look at mental state at the time of the crime. |
| 6/8/05 | Hutchinson testifies that she did not discuss the crime with Angela. Berrigan prefaces exam with the fact that she was not asked to look at mental state at the time of the crime. |
| 6/8/05 | Dr. Roswell Evans testified re drugs. Was not asked to interview Angela or even review any records. Cross highlights the worthlessness of his testimony. |

9

GRN0000611

6/9/05        Mark Cunningham testifies. Stowers prefaces exam with the fact that he was not asked to look at mental state at the time of the crime.

6/10/05        DS –> PB Thinks they should "revisit the limiting instruction issue because it may be too broad in that it addressed her behaviors at the time of the offense and not just he mental condition at the time of the offense." Noting distinction in MC's testimony between MSO and "make up as a person."

6/17/05        PB — > Bennett re: instructions issues
Includes paragraph:
"None of the defense experts proffered testimony on Ms. Johnson's "mental state" at the time of the murders. This is consistent with the defendant's position that a person can suffer longstanding mental health conditions dating back to childhood and adolescence, post-traumatic stress disorder, for example, which may have nothing to do with the defendant's mental state at the time of the murders but which, nonetheless, are relevant mitigation evidence. Focusing the instruction on Ms. Johnson's mental state at the time of the killings most accurately reflects the limits and exclusions of the penalty phase mental health testimony which was heard."

6/21/05        Death verdict returned

10

GRN0000012

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES of AMERICA, )
)
Plaintiff, )
)
v. ) Case No. CR00-3034-MWB
)
ANGELA JOHNSON, )
)
)
Defendant. )

## NOTICE OF EXPERT WITNESSES AND INTENT TO POSSIBLY OFFER MENTAL HEALTH EVIDENCE AT THE PENALTY PHASE

COMES NOW the defendant, Angela Johnson, by and through counsel, in response to the Court's Orders of 7-24-02, 10-7-02 and 11-7-02, and hereby notifies the government that the defense may call the following expert witnesses at the trial of this case, if a penalty phase takes place:

Dr. William S. Logan, M.D.      Dr. Michael Gelbort, Ph.D.
Logan and Peterson, P.C.        1051 Essington
428 W. 42nd Street              Suite 270
Kansas City, MO 64111         Joliet, IL 60435

The endorsement of these experts is contingent on the Court approving defendant's budgetary request for their services, an event as yet undetermined as of the filing of this pleading.

Defendant will not be relying on a defense of mental disease or defect excluding responsibility. See Rule 12.2 F.R.Cr.P.. The defendant may, however, present mental health testimony in the penalty phase of the trial, should that occur.

As to alibi, the defendant maintains her previous position as set forth in "Defendant Johnson's Response to Government's Request for Notice of Alibi," filed on 10-31-01.

Further defendant sayeth not.

Respectfully submitted,

Patrick J. Berrigan, MO #34321
WATSON & DAMERON, LLP
2500 Holmes Drive
Kansas City, Missouri 64108
(816) 474-3350
(816) 221-1636 (FAX)

Mr. Dean Stowers
ROSENBERG & STOWERS
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, Iowa 50309
(515) 243-7600
Fax: (515) 243-0583

and

Mr. Al Willett
TERPSTRA & EPPING
118 3rd Ave SE, Ste. 500
Cedar Rapids, IA 52401-1424
(319) 364-2467
Fax: (319) 364-2460

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing document were hand delivered/mailed U.S. mail, postage pre-paid, on this 27th day of November, 2002, to the office of: Mr. Patrick J. Reinert, Assistant U.S. Attorney, P.O. Box 74950, Cedar Rapids, IA 52407-4950, (319) 363-0091, Fax: (319) 363-1990.

Attorney for Defendant

GRN000014

GOVERNMENT
EXHIBIT
J J
09-CV-3064 MWB

PREPARED BY    P.L.
DATE

FED. D.P. CONF., SALT LAKE CITY, UTAH
NOV. 5-6, 2004                           Little America Hotel

8:45 am

EXPANDING THE HORIZONS OF MITIGATION              by Dick Bur

Pillar #1 → Looking Back Thru Client's Life
              Searching for What Went Wrong
              — how did this person get to this point
              — why did this happen

         Archeology of our client's life — sifting through
the dust of our client's life.


Pillar #2 → Looking at What Went Right —
              how, at times, our Clients have done Right
Poem → "To Create an Enemy" by Sam Keane(?)

Client is not just a disabled, abused, hurt person.
              — this is part of mitigation that
provides jury w/ who our client's are,
              what kind of person she is NOW


Pillar #3 → PRESENT MITIGATION. What is the
good that client is doing NOW. Maybe

JJ-P01



client is doing _well_ in prison, getting along w/ people, stuff, etc....

Can be more than client not being a problem — maybe client can become an asset (teacher A.F.D. to other inmates).

Pillar #4 → The Future. Notion is that this person, who has had problems in the past, has some insight now, and will make better decisions in the future.

This person in the future will have redemptive qualities. It's much the same as if we are representing a juvenile — here are the qualities, Judge, that will be valuable to us all in this client's future.

Pillar #5 → Outreach to V's. How do we mitigate the crime?

We face up to it, acknowledge it.

Lives taken without reason, w/ holes in V's lives, with emptiness that nothing will heal them.

Approaching V's w/ idea that we don't want anything from them, other than to acknowledge

Case 3:09-cv-03064-MWB-LTS   Document 284-13   Filed 06/23/11   Page 16 of 100

GRN000016

JJ-P02

the incredible loss & pain the V's families have suffered. To explain that we don't want to do our job in a way that causes them more pain.

9:15 am  END  Dick Barr.

THE FED. D.P. IN 2003-2004    by Kevin McNally

89 Va. L. R. 1497 — article by Judge Gleason

8th Cir. rejecting Hayner (TN) Instruction —
"you never have to give death"

John Williams — Jeff City atty.

11-5-01
10:30 am

## LITIGATING NEW RULE 12.2 MENTAL HEALTH ISSUES

by ① David Bruck, ② Julie Brain + Lisa Greenman
└ Fed. Defender's Off.
in Balt., Md.

Mental Health requirements:
(a) thorough social history
(b) experts to interpret, explain the findings,
the symptoms, + how this illness
makes client different from the rest of us

(Julie does case study — one of her cases — lecture.)

Scale for Assessment of Thought, language +
_____ Disorders

❋ Bruck makes excellent pt. → Rule 12.2 is not a discovery
tool for gov't, or a way to drum up additional
aggravators └ It is a rebuttal evaluation,
done only to keep Δ's evaluation honest.
It allows the gov't the opportunity to Rebut what
Δ affirmatively puts on —— that's it!

Lisa Greenman

There should be nothing going on in gov't rebuttal eval.
that def. atty doesn't know: what measures will gov't take, what instruments
are to be used, topics will be covered,

GRN000018

JJ-P04

Her advice — be aggressive in protecting the client, + the information you have.

✱ Angela Johnson → If we keep Bill Logan from interviewing AJ on the murders, will that prevent the gov't from

✱ File a motion to seal the Notice of D under Rule 12.2! No reason that this shd. be public — encourages speculations by public as to D's mental health, what evidence might be presented. Bad idea.

✱ Request to designate "firewalled" prosecutors — the prosecutors handling the case shd. No absolutely nothing! Order shd. have names of everyone authorized to see info.

✱ See sample orders in Kenyones, + Sampson cases.

These are VERY GOOD ORDERS! Get Them!

See __Beckford__ case on what disclosure is absolutely required.

　—No diagnosis necessary

　—No need to give basis of defendant's experts.

__Faulks__ case Notice read.

　Dr. X, a neurologist from U. of _____, who will testify that ☐ has cognitive deficits and other neurological impairments.

__Presence of Counsel__　　　　Faulks order

Get Notice of What Testing Gov't will do, + Chance to object to those tests.

　✱ ==Don't do personality testing, + gov't won't be able to either.==

　✱ ==The whole idea is to limit what gov't can do to== pure rebuttal.

Get info. on what gov't expert can talk to your client about.!

GRN000020

JJ-P06

✷ Move that Gov't <u>not</u> get to see the gov't evaluation until:

① you're in penalty phase

and ② defense has seen gov't report,

and ③ defense has, after ① + ②, to still go forward + ~~present~~ present mental Health evidence anyway.

<u>Location of Gov't Evaluation</u>

Unless it's at same place as where your expert saw client, then gov't should not get a superior opportunity to observe the client.

McClure Order also very good.

(This gal not a <u>great</u> speaker, but she sure has <u>great</u> info... Check the

✷✷✷ → project's website for all these orders, David Friedman's mental health mitigation guide, + other good stuff.



✳ Do we want actual mental health testimony? That is, could a social worker give outline of Δ's social history without offering testimony on mental health diagnosis? In other words, if you keep Logan off the stand + put up Mary Goody to discuss the prior childhood + history of Angie Johnson, does that avoid Rule 12.2?

Brock says "yes" — Rule says "mental health" testimony.

12:10pm  END

GRN000022

JJ-P08

FRIDAY
11-5-04
1:15 pm

THE NEIGHBORHOOD AS MITIGATION    by
DAVID FREEDMAN

Social Institutions
Neighborhood
Family
Client

Ecological System (Model)

NEIGHBORHOOD EFFECTS

Specifically density of poverty (if 40% below gov't poverty level,
that's concentrated poverty)

— clustering of poor neighborhoods
— % of vacant houses
— residential segregation
— poverty rates
— unemployment rates
— access to services (medical, employmt, etc)
          + transportation

Collective Efficacy — see CD. by Sampson, Morenoff +
                                    Gannon-Rowley (2002)

belief of mutual trust, interaction, and feelings of
      being a community of friends

(cont.)

GRN000023

JJ-P09



**(CLOSING)** ✱ Gov't says D made a choice to commit crime, choice to murder. It's an individual choice (not destined to happen from background).

— We know ~~poor~~ people commit more ~~thefts~~ — b/c of <u>their environment</u>, their background, they're need. ~~It's Less~~ of an individual choice ~~to steal~~ a bike or a car if you're poor + not able to afford either.

<u>Social Efficacy</u> measurements:

— social participation (voting, PTA)
— vacancy / turnover in housing
— public assistance rates
— exposure to violence
— health records
— emergency response times

✱ **(JAMAL SHAKIR)** Great chart comparing birth rates, deaths, arrests + several more social factors for Greenmount Avenue vs. City of Baltimore as a whole
Very effective chart.
We could use something like this for Jamal's case.

Case 3:09-cv-03064-MWB-LTS    Document 284-13    Filed 06/23/11    Page 24 of 100

GRN000024

JJ-P10

**JAMAL SHAKIR**

Find the person who got _OUT_ of the neighborhood. This is the guy who can tell the jury about the break he got that enabled him to get out — and how your client didn't get that break.

**JAMAL HAKIR**

I bet this guy knows a lot about South Central LA. Talk to him about JAMAL's case!!

Advantage of the Neighborhood as Mitigation

- It differentiates your client from others.
- " helps humanize your client.
- " can be quantified (w/statistics), & is therefore true + credible.
- Allows defense to talk about race + class in a new + different way. It's more than racial discrimination

CAPITAL CASE COSTS — Q'S BY JUDGES

Small Group Session → PLEA DISCUSSIONS UNDER ASHCROFT

Skip Gant & Jay T. McCamic

5 Stages of Grief:       by Kubler-Ross
              Denial
              Anger
              Bargaining
              Depression
              Acceptance

(* Angela made it to depression, her attempted suicide,
    but not to acceptance).

WHAT TO DO FOR ANGELA:
        ① Contact Visit w/ Mellissa + Marvea

GRN000026

JJ-P12

PREPARED BY
DATE
p. 13.

LEGAL DEVELOPMENTS in 2003-2004

Joining Aggravators to Statutory Requirements of Death Eligible Offense is a HUGE PROBLEM!

Bifurcation of Penalty Phase

recent case in Charlottsville

✳ Ask Dean to talk to DAVID BRUCK about this!

✳ Good Cases → See U.S. v. Gonzalez (D. of Conn.)

U.S. v. Green (J. Nancy Geurtner) → Severance Cas

U.S. v. Perez → another good severance case.
(J. Atherton)

U.S. v. Ramon case in Puerto Rico → has to do w/ gov't ability to throw somebody in SHU (Special Housing Unit). Couldn't do it just because D was death-eligible D. Throwing people in SHU for No reason deprives D of 8th A. right to provide Skipper evidence (good jail/prison conduct).

Deck v. Missouri → U.S. Sup. Ct. grants cert. to determine whether trial ct. can shackle D

at penalty phase for absolutely no reason other than it was a retrial after D had gotten death at first trial.

U.S. v. Peoples (8th Cir.) → 8th Cir. says D can be <u>death</u> retried after successful appeal where in first case D was charged capitally, but gov't waived death in the first trial.

U.S. v. Ferraby (4th Cir. 2003) → death notice must be filed a reasonable time b/4 trial & this <u>right</u> is independently appealable if not provided. If circuit decides notice was insufficient time wise, remedy is dismissal of death notice, <u>not</u> a delay in the trial to get ready.

COPY

U.S. v. Sampson (J. Wolf) → 250 pg. memorandum in F. Supp. 3d 166 (66 pages body opinion). 335 F. Supp 2d 166

testimonial hearsay is inadmissible unless
① witness is unavailable, <u>and</u>
② D had a prior opportunity to cross-examine the witness.

Good habeas case

Banks v. Dreadkey (Texas decision) 5th Cir. or Sup. Ct. ?

Ct. discusses availability of prosecutor's prep. notes, In this case a transcript, to the defense in discovery.

Angela Johnson

File a motion for the prosecution's notes of witness preperations, and information about how, where when + how long

See Tennard case from U.S. Supreme Ct. — Upholding Penry and Lackett.

9:05 am END.                    (V. gd. session)

P. Berrigan
11/2/04

1-6-04
9:05 am

| UNDERSTANDING POVERTY |

Dr. Elizabeth Beck + Tim Sullivan

What jurors think of the poor:
- poor are lazy, unwilling to work
- " " unwilling to delay gratification
- " engage in irresponsible sexual behavior
- " are unwilling to play by the rules

- poor lack initiative + have a sense of
                                    entitlement

Book → When Work Disappears, Jason dePano
        Wilson's book

As lawyer, we have to deconstruct all these
mistaken beliefs. How to do that is the challenge.
  = if client worked, stress the difficulty of
      that, how hard just to get there every day
  given her environment

9 of 10 poor African Americans live in neighborhoods
   that are 90% poor (below poverty level).

Case 3:09-cv-03064-MWB-LTS     Document 284-13     Filed 06/23/11     Page 30 of 100
GRN000030

JJ-P16



How to tell our client's story of Poverty:

— don't use the word "poverty". It's a loaded term that will cause the jurors to compare + contrast their life to your client's, or somebody else's life to your client's life.

— need to describe your client's daily existence in graphic, real + truthful narratives

— emphasize universal themes of empathy — such as food

— avoid loaded terms "section 8 housing", "welfare", "single mom"

— NEVER even SUGGEST that being poor is an excuse for committing a crime, particularly murder.

Think about having questions on JUROR QUESTIONNAIRE concerning the juror's views on the poor + poverty.

Think of a ranking Q: "IN describing the attributes of poor people, rank the terms below from one to five on what you believe best describes the poor people you know of (1 being most accurate)

GRN000031

JJ-P17

lazy ——
sense of entitlement ——
—— unwilling to work
engages in irresponsible sexual behavior ——
unwilling to delay gratification ——

⚘ Ask questions of the investigating cops about
the poor, the poverty of the neighborhood,
facts you'll want to advance later in
penalty phase.

11/4/04

~~C. Belling~~ _(signature)_

END. 10 AM

GRN000032

JJ-P18

 
11/6/04
10:45am

## JURY SELECTION IN D.P. CASES

by DAVID BRUCK &
JOHN HOLDRIDGE

Website → Capdefnet.org

### Capital Jury Project

① guilt issues predominate in penalty phase
② jurors tend to assume aggravating C's require the death penalty.
③ misunderstand & fail to apply mitigation

<u>Witt</u> → automatically no death or juror is substantially impaired in ability to give death.

<u>Morgan</u> ⇒ automatic No life

↳ fails to consider issue if whether jurors are substantially impaired in honestly considering a life sentence

### State v. Miller (Louisiana)

### LAW DOUBLE STANDARDS

(1) <u>Witt</u> → gov't can challenge based on facts of case.
(2) Morgan → Δ cannot challenge based on facts of case or even Q about facts of case. but see State v. Ross

Case 3:09-cv-03064-MWB-LTS   Document 28-13   Filed 06/23/11   Page 33 of 100

GRN000033

JJ-P19

 

Excellent discussion in <u>Simpson</u> case on jurors obligation

<u>Tennard</u>, 124 S. Ct. 2562 (2004) → Supreme Ct. found impaired intelligence to be a mitigating circumstance & — <u>must</u> be considered as mitigating — not optional.

\* Think about a <u>chart</u> for use in Angela's voir dire —— a ROAD ~~To~~ LIFE chart.

Mitigating factors
are factors tending to support a life sentence

Q→ Wd. you ~~~~ have a difficult time voting for a life sentence if government proved a statutory aggravating factor. ?
If yes, need to follow up with:

— no matter what mitigating evidence was presented ?



If D intentionally kills
do you think his life story is irrelevant to whether
he should get the death penalty
— even if D not insane,
not self-defense, or

Some people think adults are responsible
for their actions and that mitigating
factors are just an excuse.
Do you feel that weigh?

If we prove D had mental impairments, even
if she is not mentally retarded, would you consider
that evidence in assessing punishment,
even in a case of intentional, deliberate murder?
— consider it if gov't proved an agg. factor(s),

Even if members of the V's family testify that
they will never be able to recover from
the V's death?

Case 3:09-cv-03064-MWB-LTS   Document 284-13   Filed 06/23/11   Page 35 of 100
GRN000035

JJ-P21

11/6/04  D.P. VOIR DIRE (cont.)

Bruck makes a good argument that since
D in non-capital murder case gets
10 challenges + gov't gets only 6, where
in capital cases each side gets 20.

Should be same advantage in capital
trials!

If gov't gets 20, then D should have 33 1/3
Keep the same RATIO!

Argument is that gov't benefits, not suffers,
as a result of the decision to seek
death!

$$\frac{6}{10} \quad \frac{20}{\phantom{0}}$$

$$6\overline{)200} \quad 33\frac{1}{3}$$
$$\underline{18}$$
$$\phantom{0}20$$
$$\phantom{0}\underline{18}$$
$$\phantom{00}2$$

Judge in _Kesner_ did this!

                majority
_Summerlin_ ~~dissent~~ by Breyer (or Souter)

A.J. ✳ Project has cases — list of them — where judges
have _granted_ additional peremptory challenges.
This could be persuasive w/ J. Bennett!

11:05 End.

SAT.
11-6-04
11 AM

WORKING WITH SURVIVORS

Ms. Kelly _____,

Atty. Dick _____,

~~Michell Branham,~~
~~Judy Clarke,~~ +
+ Tammy Krause

<u>See</u> Dick Burr's law review article

their journey in life has to do w/ their
support system, their process of
getting ~~through~~ this
— it comes from within the
person,

— Not from without, not from what
happens to this D, my client.
(the jury)
It's not anything <u>we</u> can do for
the victim by ~~the~~ sentencing verdict.

<u>Experts</u>: Why not use a grief counselor, psychologist,
or someone who deals w/ people who are
victims — even a priest, theologian — to
come in and testify about the grief process
+ how it is internal, not external —
not result of punishment to D.

Angela
Johnson

Case 3:09-cv-03064-MWB-LTS     Document 284-13     Filed 06/23/11     Page 37 of 100
GRN000037

JJ-P23



Sat. 11/6/04

1:10pm

STORY TELLING IN MITIGATION

Nancy Pemberton, Scharlette Holdman
& Kevin McNally

2:15pm

INTEGRATING THEORIES BETWEEN THE 2 PHASES

3:30p — KEEPING CLIENT FROM PREVENTING MIT. EVID.

David Ruhnke, Neal Walker, + ~~David~~ Jim
Wyda

T⊤D Angela Johnson

① Send letter to family members re: upcoming interviews
+ mitigation

② Get ex parte motions + orders to J. Bennett on:
(a) MARY GOODY
(b) Steve Peterson (Logan's partner).

- TAMAR SHAKIR  —  4:15 – 5:10pm Meet w/ Tom Bloom, Rick Kammen
+ Richard _____ (Eaton's atty)
+ discuss discovery J3.

CRN000038

JJ-P24

```
┌─────────────────────────────────────────────────────────┐
│            A NEWSLETTER FOR DEFENSE COUNSEL               │
│              IN FEDERAL CAPITAL CASES                     │
│    Prepared by the Federal Defender Capital Resource Counsel │
│    and the Federal Death Penalty Resource Counsel Project │
│                                          March 2005       │
└─────────────────────────────────────────────────────────┘
```

## Table of Contents

**Federal Capital Defense Training** . . . . . **1**
**DOJ Committee** . . . . . . . . . . . . . . . . . . . . **1**
**Website** . . . . . . . . . . . . . . . . . . . . . . . . . **1**
**Resources Available** . . . . . . . . . . . . . . . . **2**
**Using Booker** . . . . . . . . . . . . . . . . . . . . . **2**
**Recent Developments: Rule 12.2** . . . . . . **5**
**Exposure to Metal** . . . . . . . . . . . . . . . . . **9**
**Supreme Court Activity** . . . . . . . . . . . . **13**
**Resource Counsel Contact Info** . . . . . . **16**
*************************************

### Federal Capital Defense Training

The second national seminar on **Making the Most of *Wiggins*: The Development and Integration of Mitigation Evidence in Capital Cases** is scheduled for April 21-24, 2005 at the Prime Hotel, 215 West South Temple in Salt Lake City, Utah. To obtain an application form, or if you have any questions or require additional information, please contact LaVarr McBride at lavarr_mcbride@ao.uscourts.gov or 202-502-1693.

The annual **Clarence Darrow Death Penalty College** is May 21- 26, 2005, at the University of Michigan Law School in Ann Arbor, Michigan. A limited number of scholarships are available for CJA attorneys; FDO staff should pay from their FD office budgets. The deadline for applying for scholarships is 4/15. For information about scholarships, contact Margaret O'Donnell at mod@dcr.net. For more information about the college, contact Andrea Lyon at (312) 362-

8402 or alyon1@depaul.edu.

The annual **Santa Clara Death Penalty College** will be July 30 - August 4, 2005. There will also be a limited number of scholarships available to CJA attorneys. For information about this program, contact Ellen Kreitzburg at (408)544-4724 or ekreitzberg@scu.edu; or regarding scholarships, contact Margaret O'Donnell at mod@dcr.net.

### 2005 Strategy Session Dates

The 2005 Federal Death Penalty Strategy Session will be November 4-5, 2005 in Pittsburgh, Pennsylvania. More information regarding location, program content, faculty and scholarships will be available closer to the time of the program.

### DOJ Committee

As of early March, Peggy Griffey, the chief of the DOJ Capital Case Unit, advises that the Department of Justice has not implemented any changes in procedure or the protocol under Attorney General Gonzales.

### Website

Remember to check the www.capdefnet.org website for updated materials and information on the federal death penalty. Contact Robert Lominack at robert@blumelaw.com with questions or for access to the private side.

1

**Resources Available to Defense Counsel in Federal Capital Cases**

Through the Federal Death Penalty Resource Counsel (DPRC) and Capital Resource Counsel (CRC) Projects, a number of resources are available *free of charge* to federal capital case teams:

- case consultation at all stages of your case, including meeting with capital case teams without cost to FDO offices or CJA counsel;
- assistance in selecting experts, including traversing the minefield of mental health defenses;
- motions and various litigation guides are available on www.capdefnet.org;
- the database maintained by Kevin McNally's office contains substantial information on various procedures, including data on the average length of time from indictment to the authorization decision and to trial, data on experts, severance, race of defendant and race of victim, information on voir dire and jury questionnaire practices;
- defense based victim outreach FDO staff are available to consult on the variety of very sensitive victim related issues that confront capital defense counsel.

The DPRC are lawyers in private practice who have contracted with the Administrative Office of the U.S. Courts to assist in the appointment of counsel, and to provide support and advice regarding federal capital defense, including budgetary as well as substantive issues. The CRC are fulltime employees of federal defender offices and have a role similar to the DPRC, but with the priority being support for federal defender capital teams providing direct representation.

The two Projects work closely together, and share information on a daily basis. One of the resource counsel is assigned as a contact for each pending case, regardless of whether the representation is by an FDO or a CJA lawyer, so that capital teams will have someone to discuss the multitude of issues that counsel confront in defending those accused of federal capital offenses. If you are not aware of who is assigned to be your resource counsel contact, please check with Margaret O'Donnell at mod@dcr.net. Current Resource Counsel Projects contact information is attached to this newsletter.

**Using *Booker* to Challenge the Constitutionality of the FDPA[1]**

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that statutory aggravating factors, which raise the lawful maximum penalty from life imprisonment to death, must be proven to a jury beyond a reasonable doubt. While the Federal Death Penalty Act (FDPA), does not implicate the core holding of *Ring* because it requires that the government prove all aggravating factors to a jury beyond a reasonable doubt, *Ring* has nonetheless generated a number of issues in federal death penalty cases. One obvious issue, which virtually all courts have agreed upon, is that statutory aggravating factors, at a minimum, must now be pled in the indictment.

---

[1] Similar challenges may be made to 21 U.S.C. § 848.

2

GRN000040

*Ring* raises other issues as well: 1) is the FDPA unconstitutional because it treats statutory aggravating factors, mental state requirements, and age as sentencing factors rather than elements of the offense; 2) is the FDPA unconstitutional because it does not provide a role for the grand jury in passing on the elements of a capital offense; 3) does the relaxed evidentiary standard under the FDPA comport with due process protections that generally exist in trials; 4) must jury deliberations in a capital case now be divided into three stages (guilt/innocence, eligibility, and selection) so that information relevant to one issue does not taint deliberations on the other?

Since *Ring*, defense counsel have raised a number of these challenges with little success. *See United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) (agreeing that *Ring* requires government to allege at least one statutory aggravating factor in indictment, but finding no constitutional flaw in FDPA because "no language" in the statute "restricts the government from submitting aggravating factors to the jury"); *United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004) (*Ring* did not create common law crime by adding elements to statutory offense; relaxed evidentiary standard for penalty phase is not unconstitutional in light of *Ring*'s definition of capital offense), *cert. filed*, No. 04-8773 (Feb. 18, 2005); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir.) (FDPA not facially unconstitutional because nothing in statute prohibits prosecutor from charging aggravating factors in indictment), *cert. denied*, 125 S.Ct. 623 (2004); *United States v. Fell*, 360 F.3d 135, 142 (2d Cir.) (relaxed evidentiary standard in FDPA not unconstitutional), *cert. denied*, 125 S.Ct 369 (2004). Other challenges have not yet reached the circuit courts. *See, e.g., United States v. Johnson*, No. CR-01-3046-MWB (N.D. Iowa Feb. 18, 2005) (FDPA not unconstitutional because it does not provide for trifurcated proceeding; *Ring* does not constitutionally require such a procedure).

All is not lost, however. The Supreme Court's recent decision in *United States v. Booker*, 125 S.Ct. 738 (2005), provides a basis for courts to revisit these decisions or decline to follow them. In *Booker*, the Supreme Court, like in *Apprendi* v. *New Jersey*, 530 U.S. 2466 (2000), found that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S.Ct. at 759. Faced with the question of whether the Court could add this constitutional jury trial requirement "onto the Sentencing Reform Act as currently written," the Court declined. *Id*.

The first reason the Court provided for refusing to engraft a jury trial requirement onto the Sentencing Reform Act was the statute's text. That text states in relevant part: "**the court** when sentencing will consider the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The Court found that the dissent's proposal of simply having the jury pass upon the sentencing factors would require a "reinterpretation" of the statute. As the Court put it, the dissent's approach would require "reading the words 'the court' as if they meant 'the judge working together with the jury.'" 125 S.Ct. at 759. Such a reinterpretation would be "plainly contrary to the intent of Congress." *Id*.

3

GRN000041

*Booker's* analysis applies to the FDPA. Were a constitutional grand jury trial requirement added onto the FDPA, like the government has done since *Ring* and some courts of appeal have permitted, the requirement would fundamentally transform the death penalty scheme that Congress intended. The FDPA quite plainly states:

> If, in a case involving an offense described in section 3591, the **attorney** for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, **the attorney** shall . . . sign and file with the court, and serve on the defendant, a notice–
>
> > (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
> >
> > (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

In the context of the statute, the words "the attorney" mean the "attorney without the grand jury," not the "attorney working with the grand jury." Nothing in section 3593(a) or other parts of the FDPA contemplate any role for the grand jury in passing upon required mental states or aggravating factors. Moreover, the timing provisions within the statute (the government must file the notice "a reasonable time" before trial or plea of guilty), especially when read in conjunction with the Speedy Trial Act and Fed. R. Crim. P. 7 contemplate that the grand jury will return the indictment before the government identifies aggravating factors. Thus, *Booker* lends support to the argument that courts should not reinterpret the FDPA to permit the government to work with the grand jury in identifying the mental state factors and statutory aggravating factors.

*Booker's* mode of analysis also supports other defense challenges to the FDPA. For example, *Booker* refused to read the Sentencing Reform Act to include a jury trial requirement because it "would create a system far more complex than Congress could have intended." *Id.* at 761. In this context, *Booker* raised concerns about what the indictment would allege and whether a defendant could mount a defense against some or all claims, but maintain that the evidence did not place him at the scene. As an example of how *Apprendi* raised questions about the content of indictments, the *Booker* majority queried whether an indictment in a mail fraud case would "have to allege the number of victims, their vulnerability, and the amount taken from each." *Id.* at 762. Because Congress did not anticipate such issues when it enacted the SRA, the Court declined to reinterpret the statute to meet the demands of *Apprendi*.

As previously discussed, similar questions have emerged in sorting out *Ring's* ramifications for practice under the FDPA. Does the indictment have to allege the mental state factors, the statutory aggravating factors, the non-statutory aggravating factors, and a preliminary weighing

4

GRN000042

determination before an offense may be deemed death-eligible?  If the additional elements of the capital offense involve the mental state and statutory aggravating factors, as several courts have held, is a defendant entitled to the full panoply of Fifth and Sixth Amendment protections at the trial of those elements, *i.e.*, the eligibility phase?  Does that mean the proceedings should be trifurcated so that the jury is not infected with evidence regarding non-statutory aggravating factors, mitigating factors, and the government's rebuttal to defense mitigation, which is not relevant to its deliberations on whether the government has proven a required mental state and a statutory aggravating factor beyond a reasonable doubt?  Does it also mean that the right to confrontation applies in the guilt/innocence and eligibility phases, but not the selection phase?  If so, is the relaxed evidentiary standard at 18 U.S.C. § 3593 constitutional?  These and other questions, not contemplated under the FDPA, show that engrafting *Ring's* requirements onto the FDPA creates "a system far more complex than Congress could have intended."  *Booker*, 125 S.Ct. at 761.  Thus, the same considerations that caused the Supreme Court to reject the notion of engrafting onto the guidelines a Sixth Amendment jury trial requirement counsel against engrafting onto the FDPA a grand jury requirement or other constitutional requirements, which flow from *Ring*.

If a court follows the *Booker* analysis, and refuses to engraft additional requirements onto the FDPA, that does not mean it must adopt *Booker's* remedial analysis.  While the Court in *Booker* fixed the Sentencing Reform Act's constitutional flaw by severing portions of the statute, severance is not a workable solution under the FDPA.  For example, the key provision governing the death notice and the identification of the factors that the government claims justify imposition of the death penalty cannot be severed from the remainder of the statute.  The notice of intent to seek the death penalty triggers all other provisions of the statute.  *See* 18 U.S.C. § 3593.  Similarly, the relaxed evidentiary standard and provisions governing the penalty phase deliberations cannot be severed because they form the center piece of the special hearing provisions of section 3593.[2]  In short, unlike a noncapital sentencing hearing, which can go forward without the statutory provisions that *Booker* severed, a capital sentencing hearing cannot.  Hence, while *Booker's* analysis on why the constitutional jury trial requirement could not be added to the Sentencing Reform Act shows why *Ring's* requirements cannot be added to the FDPA, *Booker's* remedial analysis cannot apply.  Under these circumstances, the only remedy is to declare the statute unconstitutional and make Congress decide whether and how it should be fixed.

*[Denise Barrett is an assistant federal public defender in Baltimore, Maryland, actively involved in litigating federal capital case issues.  She can be reached at [denise_barrett@fd.org](mailto:denise_barrett@fd.org)]*

### Recent Developments - Rule 12.2
### Protecting the Defense Mental Health Case

There are now three reported decisions interpreting the capital provisions of Rule 12.2 that were adopted in 2002.  These cases find that the new Rule and the Fifth and Sixth Amendments

---

[2]  Arguments addressing severability have been developed.  These arguments are available through resource counsel.

5

GRN000043

protect the defense mental health investigation from pretrial discovery except to a very limited extent, and they narrowly circumscribe the scope of the government's rebuttal mental health examination so that it does not exceed that of the expert testimony the defense intends to introduce.

In order to make the most of the new provisions, and of the new caselaw that is generally far more favorable to the defense than the decisions that preceded adoption of the Rule, counsel will want to think about their impact long before Rule 12.2 disclosure is required. Consideration of these issues will bear not only on what the defense chooses to disclose and how the government's evaluation is regulated, but also on what type of defense experts are chosen, what testing they are asked to undertake, and what areas of they are asked to explore and refrain from exploring with the client.

> *United States v. Johnson,* 2005 WL 588872 (N.D. Iowa 2005)
> *United States v. Sampson,* 335 F. Supp. 2d 166 (D. Mass. 2004)
> *United States v. Taylor,* 320 F. Supp. 2d 790 (N.D. Ind. 2004)

**Practice Pointers:**

**Watch for Untimely and Overbroad Government "Rule 12.2 Demand"**

Rule 12.2(b) requires the defense to file notice of its intention to introduce expert mental health evidence bearing on punishment "within the time provided for filing a pretrial motion or at any later time the court sets." Typically, this means notice is filed quite late in the development of the case, as trial approaches, with the referenced motions deadline being the date for death penalty-related motions following the government's filing of its death notice.

The government, however, is in many cases filing a boilerplate motion seeking early notice and demanding discovery that exceeds the requirements of the Rule and violates the Fifth and Sixth Amendments. The government's request is unnecessary, in that no "demand" is necessary to trigger the defense obligations under Rule 12.2, and the expectation of notice is premature until it has fully complied with its own discovery obligations and the defense mental health investigation is completed. This requires, among other things, that the government have provided complete discovery regarding the defendant's alleged criminal conduct, including discovery about allegations relating to uncharged misconduct, and that the government have complied with any mental health-related Brady demands. Without being able to provide such information for its experts' consideration, the defense cannot decide whether or not to use mental health evidence, or determine what mental health evidence to introduce.

**Notice Need Not Identify the Nature of the Mental Condition**

*Sampson* and *Johnson*, the only decisions addressing this issue since amendment of the Rule, find that the Fifth and Sixth Amendments, as well as the Advisory Committee notes, support very limited notice. Both cases resoundingly reject the government's request for, among other things, the identity and qualifications of the defense experts, and a summary of the topics they would address.

6

GRN000044

Instead, what is required is "meaningful notice," serving the purpose of permitting the government to hire the right type of rebuttal experts and conduct the proper tests.

"Under the new Rule, … requiring the defendant to provide such information is no longer permissible because 'the nature of the proffered mental condition(s)' is essentially the same as the 'results and reports' for which early disclosure is barred. See Fed. R. Crim. P. 12.2(c)(2)." *Sampson*, 335 F.Supp. 2d at 243.

"The court finds that the government's assertions of the difficulty of selecting appropriate rebuttal experts, without knowing the nature of the mental condition for which the defendant was or will be tested, interviewed, or evaluated are overblown. First, as the defendant suggests, the government's scheme would 'put the cart before the horse,' by reversing the scheme contemplated by Rule 12.2. That scheme requires the defendant's notice of intent to rely on mental condition evidence, followed by court-ordered examinations, followed by the government's disclosures of its expert's reports. Only after the government's disclosures is the defendant required to make her disclosures." *Johnson*, 2005 WL 588872 at 29-32.

Meaningful notice, according to Sampson and Johnson, informs the government of the type of experts the defense intends to rely on, and the nature of the testing those experts performed.

**The Defense Need Not Turn Over the Basis of Its Expert's Opinion at This Stage**

Quite simply, it would violate the Sixth Amendment to require the defense to turn over the fruits of its mental health investigation before the time identified in Rule 12.2(c)(3). (See 12.2 timeline, below.) This includes the defendant's medical records, which are routinely requested by the government and have been ordered turned over by some courts. Even in *Beckford*, the case that provided much of the foundation for New Rule 12.2, such a request was specifically denied as unconstitutional.

"The Government's Motion is DENIED with respect to its request that the defense be ordered 'to provide the government with any and all materials supplied to the defense expert that form the basis of his or her opinion.' An order of that scope would violate the defendants' Sixth Amendment right to effective assistance of counsel in that defense planning and strategy would necessarily be revealed through the production of 'any and all materials supplied to the defense expert.'" *United States v. Beckford*, 962 F. Supp. 748, 764 n. 16 (E.D. Va. 1997).

Likewise, the court held in *Sampson* that "…the defendant's Sixth Amendment right to the effective assistance of counsel could be compromised if defense counsel was required to reveal his strategy or to disclose materials he provided to his experts." *Sampson* 335 F. Supp. 2d at 243.

The government has also requested in its boilerplate 12.2 motion that the parties be required to agree on "joint testing" by their respective experts. These requests are routinely denied.

7

GRN000045

**The Time Line for Disclosure Contained in the Rule Protects the Defense**

Rule 12.2 provides a clear timeline that is consistent with protecting the defense mental health case from discovery by the government until the last possible moment. This includes filing the government's report under seal, and prohibiting the government attorneys themselves from learning any of the information obtained by their mental health expert until there has been a capital conviction and the defense has reaffirmed its intention to introduce expert testimony, for use or derivative use of such information would eviscerate the defendant's Fifth Amendment rights (see discussion, infra, concerning appointment of "firewalled" prosecutor). The six stages of disclosure provided under the Rule are listed below.

Counsel should note that the rule does not require simultaneous disclosure of defense and government reports. Rather, it requires that the government's report be disclosed first, after which the defense has the opportunity to again revisit the question of whether it wishes to introduce expert testimony about a mental condition. Should the defense withdraw its notice, the government would not be entitled to the defense report.

Furthermore, although it is not explicit in the Rule, there is a compelling argument that the government should not receive its own expert's report until after the defense has reviewed the government's and reaffirmed its intent.

1. Defense files notice  (Rule 12.2(b)(2))
2. Government requests examination (Rule 12.2(c)(1)(B))
3. Rebuttal exam "*may*" be ordered **"*under procedures ordered by the court*"**  (Rule 12.2(c)(1)(B))
4. Results of Rebuttal Exam are Sealed and Filed With the Court (Rule 12.2(c)(2))

**After defendant convicted of capital offense and re-affirms intent:**

5. Government evaluation disclosed (Rule 12.2(c)(3))
   a. to the defense
   b. to the government
6. Defense evaluation disclosed to government (Rule 12.2(c)(3))

**Appointment of "Taint Team" or "Firewalled" AUSA**

To protect against disclosure, many courts, including the courts in *Sampson* and *Johnson*, have elected to appoint prosecutors – sometimes from another district or division of the district – who are "firewalled" from the Assistant U.S. Attorneys prosecuting the case to manage the process of the government's mental health evaluation. (Regarding what needs to be managed, see following discussion of procedures for the government expert's examination.) Both cases forbid the firewalled AUSA from ever joining the prosecuting team – a practice that was permitted in some earlier cases before amendment of the Rule.

8

GRN000046

In *Johnson*, the court goes a step further, and rigidly limits the communication the firewalled AUSA may have with the prosecuting attorneys, and requires that even this limited communication is to be transcribed and placed under seal, to be turned over the defense together with the government's report. In *Sampson*, as in several other unreported cases, a protective order is entered and must be signed by anyone who will be involved in the process of obtaining the government evaluation.

**The Court Must Establish Procedures to Appropriately Limit the Government Rebuttal Evaluation**

Rule 12.2(c)(1)(b) specifies that the government's rebuttal evaluation is to be conducted "under procedures ordered by the court." Typically, the defense and government negotiate to reach agreement on whatever they can, and return to the court to resolve areas of disagreement. The defense should ensure that it weighs in on absolutely every aspect of the government's evaluation, including:

- the type of expert the government utilizes;
- the specific tests the expert administers;
- the scope of the interview the expert conducts;
- the topics that will be within bounds and off limits;
- the location of the examination;
- the presence of counsel or other defense representative;
- whether or not the examination is recorded, whether by audio or video.

It is particularly vital that the defense demand notice of and an opportunity to object to the specific tests the government expert would like to administer. Courts are routinely granting anywhere from three to ten days' advance notice to the defense. See, e.g., *Taylor*, 320 F. Supp. 2d at 791.

In the next issue of this newsletter, there will be an article focusing on the specific procedural safeguards courts are endorsing to appropriately limit the government's rebuttal evaluation to the areas that are put in issue by the defense.

*[Lisa Greenman is available to discuss a multitude of mitigation related issues, and has assisted several capital teams in challenging government mental health evaluations. She is a lawyer with the FPD in Baltimore, Maryland and can be reached at lgreenman@starpower.net]*.

**Exposure to Metal**

Mercury, lead, cadmium, arsenic, selenium, manganese, and aluminum, all metals, are widely used in common products. Exposure to each of them causes serious cognitive and behavioral problems which persist throughout life after exposure. As a result of their widespread use, people come into contact with these metals quite frequently, usually at very low doses. For some, a low level dose-exposure appears to have no measurable, lasting effect. However, for all metals at high levels of exposure, and for lead and mercury at any exposure level, significant cognitive and

9

GRN000047

behavioral effects will be observed. Significant exposure to lead or mercury *in utero* or in early childhood can cause mental retardation as well.

Symptoms Associated with Metal Exposure

| Acute Exposure Symptoms | Chronic Exposure Symptoms |
|---|---|
| abdominal colic<br>constipation<br>vomiting<br>headache<br>lightheadedness<br>dizziness<br>forgetfulness<br>anxiety<br>depression<br>irritability<br>muscle and joint pain<br>seizure<br>coma<br>increased intra-cranial pressure<br>parathesia<br>nightmares<br>confusion<br>emotional lability<br>mood swings | Persistent cognitive deficit<br>Decline in IQ score<br>Impaired Attention<br>Decline in visuo-spatial functioning<br>Impaired Memory<br>Reduced Reaction time<br>Impaired Executive Functioning<br>Mood Alterations |

1) *Lead*: Recent research indicates that there is no safe level of lead exposure, with even the smallest amounts, at 1 microgram per deciliter of blood, ingestion in childhood results in lifelong decreases in IQ and increases in behavior problems.

Lead has been recognized as causing neurological damage for at least 150 years, yet industry was slow to remove lead from places which exposed people to lead's dangers. Lead water pipes were used until the 1920s, lead paint was used in household indoor paint until the 1960s, it was used in cans for food and drinks until the 1970s, and in gasoline well into the 1970s. Lead persists in the soil of many urban neighborhoods in significant amounts. Lead is still found in solder, batteries, paint, pipes, ceramic glazes, and roofing materials. Lead is still used in many folk remedies in some Asian and Latino communities. Lead exposure disproportionately affects poor and urban people.[3]

---

[3] Brody, D.J. et al (1994). Blood lead levels in the US population: Phase 1 of the Third National Health and Nutrition Examination Survey (NHANES III, 1988 to 1991) Journal of the American Medical Association 272(4) 277-83.

10

GRN000048

Although its use is now limited in many products, lead is still extensively used in industrial production.

Lead crosses the placental barrier and poses a threat to normal development *in utero*. As with other neurotoxic agents, children are more susceptible to exposure and symptoms because of a combination of behaviors and the developmental stages of the brain. Children often put things in their mouths and chew on things that adults may not (e.g., lead paint chips which have a sweet taste). Once exposed, lead is stored in skeletal bones.

Even at exceptionally low levels of exposure, lead causes:

- decreased IQ and cognitive functioning
- heightened distractibility and shortened attention span
- impulsivity
- inability to inhibit inappropriate responses to stimuli
- poor vigilance
- inability to follow simple and complex sequences of directions
- deficits in changing response strategy

These impairments, which often begin in childhood from lead exposure, persist across the lifespan of the exposed person. Lead has a diffuse effect on the central nervous system, reducing synaptic counts, neuron density, mitochondrial membrane development, and neurotransmitter and enzyme function. As a result, low level lead exposure, even without overt symptoms can result in cognitive, developmental, and behavioral deficits and delays.

Almost all jurisdictions (county or local) have lead abatement programs. These programs are usually an excellent source of community exposure information. Some of these programs have created zip-code based exposure risk maps that are very helpful exhibits.

2) *Mercury*: Mercury is commonly used in batteries, paint, radios, thermometers, calculators, cosmetics, jewelry, dental care (although, rarely in the US currently), and various manufacturing processes. Mercury was also used widely in the US as a fungicide for many years to treat seeds (in some countries it is still in use). Exposure to mercury is also common for people whose diets are high in fish as a result of the bio-accumulation of mercury in fish which passes onto humans on ingestion. Methyl mercury, one of two types of mercury (the other being inorganic mercury), is extremely damaging to the brain because a large amount of ingested, inhaled or absorbed mercury crosses the blood-brain barrier and builds up in the brain, with approximately 10% of methyl mercury body burden being found in the brain. As with lead, there is really no safe level of exposure although EPA currently uses an exposure limit of .1 microgram per kilogram of weight per day.

Mercury appears to be the only metal that biomagnifies, meaning higher in the food chain shows higher amounts of mercury per body weight and heightened effects. Mercury is also quite mobile, carried in water, air and soil. Epidemiological evidence of the effects on humans come from two large scale poisoning incidents (Minamata, Japan 1953 to 1959; and Iraq 1971).

11

GRN000049

Methyl mercury also crosses the placental barrier and children are at heightened risk for symptoms and exposure. Children who are exposed (unlike adults) show language and memory deficits. Acutely exposed adults also have certain hallmark symptoms that involve peripheral neuropathy, muscle tremoring, gait disturbance and ataxia, visual field constriction and hearing loss.

Like lead, mercury causes a variety of long-term problems:
- decreased IQ and cognitive functioning
- gait and balance problems
- impulsivity and agitation
- inability to inhibit inappropriate responses to stimuli
- poor vigilance
- inability to follow simple and complex sequences of directions
- deficits in changing response strategy
- mood swings

Childhood and *in utero* exposure effects persist across life-span. *In utero* exposure in humans has been shown to cause severe developmental abnormalities, including neurological abnormalities, delays in developmental milestones, sensory and behavioral maladjustment that persists. An extensive literature on human methyl mercury exposure and outcomes exists for both acute and chronic exposures.

*Testing for Metals*: First, you must have developed facts from independent sources that effectively prove the quality and quantity of the exposure before you consider medical testing for metals. Second, you must have neuropsychological testing performed before considering medical testing. Neuropsychological batteries have been developed to specifically test for neurotoxic exposures. These batteries utilize existing neuropsychological tests, but the examiner should have specialized training to interpret the tests for neurotoxicity. Since the evidence you are seeking for mitigation is both the facts of exposure and how your client was exposed, as well as evidence of the behavioral and cognitive symptoms of exposure, it is not enough nor often useful to use medical tests to quantify exposure. However, in some cases, when carefully considered with your experts and based on overwhelmingly strong neuropsychological and corroborative factual evidence, quantifying exposure may incrementally add to your case.

For lead, it is possible to use long-bone x-ray techniques to assess quantity of lead exposure that occurred earlier in life. If the exposure is very close in time to when you test, blood-lead levels can be helpful.

12

GRN000050

For mercury and lead, a pattern of deficits has been identified that can be observed with MRI imaging. For lead, diffuse neuronal damage is expected which suggests functional as well as structural imaging (see Section 9 below). For mercury, the key areas of the brain damaged by methyl mercury appear to be the visual cortex, cerebellar vermis and hemispheres, and the postcentral cortex.

*[David Freedman is a capital investigator working with the Death Penalty Resource Counsel Project and the Capital Resource Counsel. He is the author of a new Guide to Mental Health Mitigation, available on the private side of the capdefnet.org website. David can be reached at freedman99@earthlink.net.]*

**Supreme Court Activity**

We include in this section U.S. Supreme Court cases addressing death penalty trial issues, as well as issues commonly seen in capital cases. We do not include all Supreme Court decisions or grants of certiorari.

**Opinions**

Review of prison segregation policy

*Johnson v. California*, 125 S.Ct. 1141 (Feb. 23, 2005). In a case challenging the California Department of Corrections' unwritten policy of racially segregating prisoners in double cells for up to 60 days each time they enter a new correctional facility, the Court determined that strict scrutiny was the proper standard of review for an equal protection challenge to the policy. The Court rejected the Ninth Circuit's determination that a deferential standard of review that the CDC policy supported its conclusion was "reasonably related" to "legitimate peneological interests."

Double Jeopardy

*Smith v. Massachusetts*, 125 S.Ct. 1129 (Feb. 22, 2005). The Court held that the double jeopardy clause precluded the defendant's firearm conviction, after the trial judge had granted the prosecution's motion to dismiss for insufficient evidence and then later reversed her previous ruling and allowed the firearm count to go to the jury.

No Death Penalty for Juveniles

*Roper v. Simmons,* 125 S.Ct. 1183 (Mar. 1, 2005). The Court overruled *Stanford v. Kentucky,* 492 U.S. 361 (1989) and determined that the executions of juveniles under the age of 18 at the time of their offenses constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. The opinion authored by Justice Kennedy relied upon national consensus against the death penalty for juveniles as well as established international law.

13

GRN000051

<u>Sentencing Guidelines Not Mandatory</u>

*United States v. Booker*, 125 S.Ct. 738 (2005). The Court held that 18 U.S.C. §3553(b)(1) which makes the Federal Sentencing Guidelines mandatory, is incompatible with the Sixth Amendment right to a jury trial and must therefore be severed and excised from the Sentencing Reform Act of 1984. So modified, the Act makes the Guidelines effectively advisory, requiring a sentencing court to consider Guideline ranges, but permitting it to tailor the sentence in light of other statutory concerns.

<u>Limitations on Proof of Priors</u>

*Shepard v. United States*, 2005 WL 516494 (March 7, 2005). For purposes of determining the existence of prior convictions in Armed Career Criminal Act cases, the Court has limited federal judges' review of evidence to the prior case charging documents, the terms of plea agreements or admissions by the defendant in an exchange with the trial judge. The Court rejected the government's argument that judges should also be able to review police reports or the evidence cited by police in applying for a criminal complaint about the earlier cases. In a separately authored portion of the opinion, Justice Souter raised the prospect that the Court may be on the verge of extending the holding in *Apprendi v. New Jersey* ("any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. ") to proof of prior convictions.

**Cert Granted:**

<u>Mexican National/Vienna Convention</u>

*Medellin v. Dretke,* 04-5928 (cert. granted December 10, 2004)(oral argument March 28, 2005) (case below: 371 F.3d 270 (5th Cir.)): (1) In a case brought by a Mexican national whose rights were adjudicated in the [World Court's] *Avena* Judgment, must a court in the U.S. apply as the rule of decision, notwithstanding any inconsistent U.S. precedent, the *Avena* holding that the U.S. courts must review and reconsider the national's conviction and sentence, without resort to procedural default doctrines? (2) In a case brought by a foreign national of a State party to the Vienna Convention, should a court in the U.S. give effect to the [World Court's] *LaGrand* and *Avena* Judgments as a matter of international judicial comity and in the interest of uniform treaty interpretation?

[NOTE: Related to the *Medellin* case, on February 28, 2005, President George W. Bush ordered state courts to consider the complaints of 51 Mexican foreign nationals on death row in the United States. This Executive Order is an abrupt international policy shift for the Bush administration and comes just weeks before the United States Supreme Court is scheduled to consider in *Medellin* what effect U.S. courts should give the ICJ ruling in favor of the 51 Mexican nationals. The text of the President's memo is as follows:

14

"MEMORANDUM FOR THE ATTORNEY GENERAL

SUBJECT: Compliance With the International Court of Justice in Avena

The United States is a party to the Vienna Convention on Consular Relations (the "Convention") and the Convention's Optional Protocol Concerning the Compulsory Settlement of Disputes (Optional Protocol), which gives the International Court of Justice (ICJ) jurisdiction to decide disputes concerning the "interpretation and application" of the Convention.

I have determined, pursuant to the authority vested in me as President by the Constitution and laws of the United States, that the United States will discharge its international obligations under the decision of the International Court of Justice in the Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of American (Avena), 2004 I.C.J. 128 (Mar. 31), by having state courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision. "]

[FURTHER NOTE:  However, according to the Washington Post, "[i]n a two-paragraph letter dated March 7, Secretary of State Condoleezza Rice informed U.N. Secretary General Kofi Annan that the United States "hereby withdraws" from the Optional Protocol to the Vienna Convention on Consular Relations. The United States proposed the protocol in 1963 and ratified it -- along with the rest of the Vienna Convention -- in 1969. The administration's decision does not affect the rest of the Vienna Convention, which requires its 166 signatories to inform foreigners of their right to see a home-country diplomat when detained overseas. But it shows that Washington's desire to counteract international pressure on the death penalty now weighs against a long-standing policy of ensuring the United States a forum in which to enforce its citizens' allegations of abuse. "The International Court of Justice has interpreted the Vienna Consular Convention in ways that we had not anticipated that involved state criminal prosecutions and the death penalty, effectively asking the court to supervise our domestic criminal system," State Department spokeswoman Darla Jordan said yesterday. Withdrawal from the protocol is a way of "protecting against future International Court of Justice judgments that might similarly interpret the consular convention or disrupt our domestic criminal system in ways we did not anticipate when we joined the convention," Jordan added. The administration's action comes after its Feb. 28 decision to grant 51 Mexicans on death row in Texas and elsewhere new state court hearings, as the ICJ had ordered. But withdrawal from the protocol means that the United States will not have to bow to the ICJ again, legal analysts said."]

Batson

*Johnson v. California,* 04-6964 [case below: 30 Cal. 4th 1302], *cert. granted* __ U.S. __ (Jan. 7, 2004):(oral argument April 18, 2005): In order to establish a prima facie case under *Batson v. Kentucky*, 476 U.S. 79 (1986), must the objector show that it is more likely than not that the other party's peremptory challenges, if unexplained, were based on permissible group bias?

*[Margaret O'Donnell summarizes death penalty trial related United States Supreme Court decisions and cert grants for the newsletter.  She can be contacted at mod@dcr.net].*

15

GRN000053

**Contact Information for Resource Counsel Projects**

Kelly Branham ( CRC victim outreach)
c/o Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
Work:615-736-5047
Fax: 615-736-5265
email: mickell_branham@fd.org (ccmail)

David Bruck (DPRC)
Washington & Lee University School of Law
Lexington, Virginia 24450
Work: 540-463-8539
Cell: 803-413-1112
Fax: 540-463-8588
email: bruckd@wlu.edu

Richard (Dick) Burr (DPRC)
906 E. Jackson
Hugo, Oklahoma 74743
Work: 580-326-4042
Cell:713-628-3391
eFax: 713-893-2500
email: dick@burrandwelch.com

Michael Burt (DPRC)
600 Townsend Street, Suite 329
San Francisco, CA 94103
Work: 415-522-1508
Cell:  415-250-4541
Fax: 415-522-1506
email: michael.burt@prodigy.net

Judy Clarke (CRC)
c/o Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
Work: 619-234-8467
Cell: 619-279-3804
eFax: 619-374-2908
email: judyclarke@jcsrlaw.net

David Freedman (CRC capital investigator)
c/o Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
Cell: 501-412-2784
eFax: 415-358-5540
email: freedman99@earthlink.net

Isaiah "Skip" Gant (CRC)
c/o Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
Work: 615-736-5047
Fax: 615-736-5265
email: skipgant@hotmail.com
and skip_gant@fd.org (ccmail)

Tammy Krause (victim outreach)
c/o Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007
Work: 602-382-2700
Fax: 602-382-2800
email: tammy_krause@fd.org (ccmail)
or krauset@emu.edu

Robert Lominack (DPRC website contact)
1247 Sumter St, Ste 201
P.O. Box 11744
Columbia, South Carolina 29211
(803) 765-1044
robert@blumelaw.com

Kevin McNally (DPRC)
Margaret O'Donnell (DPRC training contact)
McNally & O'Donnell
513 Capitol Avenue
P.O. Box 1243
Frankfort, Kentucky  40602
Work: 502-227-2142
Fax: 502-227-4669
email Kevin: kmcnally@dcr.net
email Margaret: mod@dcr.net

16

GRN0000054

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.

ANGELA JANE JOHNSON,

      Defendant.

_____/

COPY

No. CR01-3046

TRANSCRIPT OF
PHONE HEARING

**TO BE FILED UNDER SEAL**

     The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 7, 2005, commencing at 2:30 p.m.

APPEARANCES

For the Plaintiff:       ROSEANN KETCHMARK, ESQ.
                  MATT WHITWORTH, ESQ.
                  Assistant United States Attorneys
                  Charles Evans Whittaker Courthouse
                  Room 5510
                  400 East Ninth Street
                  Kansas City, MO  64106

For the Defendant:     PATRICK J. BERRIGAN, ESQ.
                  Watson & Dameron
                  2500 Holmes
                  Kansas City, MO  64108

Reported by:          Shelly Semmler, RMR, CRR
                  320 Sixth Street
                  Sioux City, IA  51101
                  (712) 233-3846

THE COURT: Good afternoon. This is United States versus Angela Johnson, 2001-3046. We're here in a sealed conference with the taint team members, Assistant U.S. Attorneys Matt Whitlock (sic) and Roseann Ketchmark from the Western District of Missouri, and Pat Berrigan, death penalty counsel for Angela Johnson. Well, Mr. Berrigan?

MR. BERRIGAN: How are you, sir?

THE COURT: Good.

MR. BERRIGAN: Good.

THE COURT: I spent all weekend reading state Supreme Court and Court of Appeals decisions on this issue because there's not much under federal law. So what's the deal? You're instructing Miss Johnson to take the Fifth Amendment with regard to questions propounded by any government experts about her involvement in the criminal activity that gives rise to the indictment?

MR. BERRIGAN: Without I guess disclosing attorney-client privileges, Your Honor, I wanted to raise this as an issue as I think I did during the hearing, although I haven't reviewed a transcript.

THE COURT: I don't believe you did.

MR. BERRIGAN: I'm sorry?

THE COURT: I don't believe you raised this issue.

MR. BERRIGAN: Well, I -- I may stand corrected, but I certainly brought it to the attention of Mr. Whitworth the other

day when we spoke because I didn't want it to suddenly arise during the course of the evaluation by the government experts so that we could deal with it if need be ahead of time. The case law -- and first of all, I guess I certainly agree there's very little on this particular issue in the federal courts. And I just think there's a substantial difference between Miss Johnson putting her mental health in evidence as a defense in the first phase and thereby waiving her Fifth Amendment privilege all together in the second phase if she does not put into evidence mental health at the time of the offense, for example, specifically dealing with mitigating circumstances that would pertain to mental health issues, for example, that she was under unusual and substantial duress or at the time of the offense she suffered from incapacity to appreciate the harmfulness of her conduct.

And I told Mr. Whitworth that I instructed our experts not to discuss these issues with her so as to avoid the possibility that the government's argument would be, well, this is only rebuttal to what your experts have already done. My experts have not, will not be questioning Miss Johnson regarding the actual commission of the murders or what her mental state was at that time.

THE COURT: Are they going to give an opinion about what her mental state was at that time?

MR. BERRIGAN: No, no, they are not.

THE COURT: They're not going to give an opinion about her mental state at the time of the --

MR. BERRIGAN: Commission of the murders.

THE COURT: Yes.

MR. BERRIGAN: That's right, Your Honor.

THE COURT: So is it -- and I'm not trying to get you to disclose more than you need to.

MR. BERRIGAN: Right.

THE COURT: But is it basically her current mental --

MR. BERRIGAN: Current and past, I mean, particularly her past.

THE COURT: And would the past precede or come before the murders?

MR. BERRIGAN: Oh, definitely came before the murders. Just by way of an analogy -- and I don't want to give you the wrong idea. I'm not arguing Miss Johnson's mentally retarded, but let's just say that for the sake of argument that she was and I wanted to present evidence that she was mentally retarded in the penalty phase of the trial. My belief is that that would not, first of all, be a first phase defense unless her mental retardation provided a complete defense, she was unable to appreciate the nature and quality of the harmfulness of her conduct, but it certainly would be a relevant mitigating case -- certainly we've had many cases, Atkins versus Virginia among them -- to indicate that is a significant mitigating

factor and in some circumstances can be a bar to the death penalty.

I believe the defense can put on that evidence of the mental health professionals without one iota of discussion of the actual murders and what happened next and who killed who and what step was taken and preceding the murders and how did you dispose of the bodies because that evidence doesn't directly relate to the mental health diagnosis there. Mental retardation is not offense specific.

And this kind of comes in under the catch-all mitigator that other individuals -- I think the scope of mitigating evidence is certainly broad enough to incorporate and encompass mental health evidence without it necessarily directed to the mental state at the time of the commission of the murders, and I don't -- I'm not trying to hide the ball. I think it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders. It only brings the jury's attention back to the commission of the murders when in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating circumstances that might exist regarding the defendant and her background and character.

So that's our position. If the defense isn't going to get into this area, the government's not entitled to either.

THE COURT: Well, it's not quite that simple because let me use the last phrase you used. If the defense isn't going to get into this area, what exactly does that mean? I mean, if you're arguing, for example, that she's suffering from some kind of mental illness or condition related to child abuse or maybe she had an incident that gave rise to posttraumatic stress disorder, whatever it is, and she had that and your psychologist or psychiatrist or both could put whatever label they want on her mental illness, condition, disease, et cetera, and she had that before the commission of the murders and she had it after the commission of the murders, then you might then want to then argue that -- I mean, it depends on how you're going to argue it. You could argue that while your experts didn't question her about the specifics of the killing, she had this condition and somehow that renders her less culpable in the commission of the murders.

And if that's how you're going to argue it, then I think there's a strong argument that even though your experts didn't ask it the government experts ought to be able to ask.

If instead you're going to argue that she simply suffers from A, B, C, and D and that's a mitigating factor that the jury should use in making the decision not to impose the death penalty, then there's less of a compelling need for the government to get into it. Do you see what I'm saying?

MR. BERRIGAN: Yes, Your Honor.

THE COURT: So it's not quite as simple.

MR. BERRIGAN: Of course, I'm very aware of this issue, and so I'm going to be very careful I think not to tread on ground that I can't support with the direct evidence of the mental health experts.

THE COURT: Well, let me ask you this fundamental question.

MR. BERRIGAN: Yes, sir.

THE COURT: Why do you think the current 12.2 doesn't act as a complete waiver should you decide to put on mental health evidence in the penalty phase? I mean, the rule could be read that way.

MR. BERRIGAN: I don't think it can be read that way consistent with the Fifth Amendment, Your Honor. I mean, I -- there's certainly no dispute -- and I'm not proffering any -- that when a defendant offers mental health evidence to try to avoid responsibility for a crime, they waive their Fifth Amendment right completely.

But there are a number of different circumstances in which a defendant could offer mental health testimony in the penalty phase of the trial without implicating the mental state at the time of the murders themselves, and I agree. You know, I suppose the government could say, well, you know, your mental health experts did evaluate her in terms of her mental state at the time of the murders, so what difference does it make if she

GRN000061

had PTSD or suffered from child abuse.  But, frankly, that's a jury determination, and my experts are subject to cross-examination on their failure to inquire about her mental state at the time of the murders.  I think arguably the government probably could do that.  I haven't really looked into it very much.  But I don't agree I suppose that --

THE COURT:  Well, do you have 12.2 --

MR. BERRIGAN:  I could get it --

THE COURT:  -- in front of you?

MR. BERRIGAN:  -- right here.

THE COURT:  Okay.  Why don't you take a look at 12.2(c)(4) that talks about inadmissibility of a defendant's statements.  And read that and then read the subsection (B) underneath it which is kind of the exception.  And it seems to me that the only reading of the rule is that it's a waiver of the Fifth Amendment.

Now, the scope of the waiver may be subject to some nuance dispute, but there's no question that that is a waiver because it talks about the trigger that makes a defendant's statements inadmissible if she puts it in -- if she calls expert testimony in a capital sentencing phase, then her statements become admissible.  That has to be a waiver of her Fifth Amendment right.  Otherwise her statements wouldn't be admissible.

MR. BERRIGAN:  Yeah, I don't disagree with that, Your

Honor. But, for example, I mean, she can't refuse -- in our situation if she were to give evidence to our experts about her background and there was some evidence of abuse that was going to be testified to, she can't claim the Fifth Amendment privilege respecting that area when the government tries to evaluate her. I don't disagree with that at all. Otherwise they'd have no evaluation whatsoever.

But it seems like a very special circumstance all together when the defendant's being questioned about the crime itself when she's not waived her Fifth Amendment privilege respecting her defense, she never contended that she had a mental disease that constituted a defense in the first phase of the trial, and all she's trying to do is put in mental health testimony regarding certain diagnosis that might be relevant to the jury's assessment of her character or background.

THE COURT: Well, let me ask you this. Precisely because it's used only in the penalty phase and not in the merits phase, doesn't she have -- assuming that 12.2(c)(4) is not a complete waiver, doesn't she have less of an interest in her Fifth Amendment right with regard to the commission of the crime after she's been found guilty? I mean, I understand the Fifth Amendment still applies through sentencing. I understand that.

MR. BERRIGAN: Well, I guess my argument would be no. I mean, there's always the possibility that that verdict may not

GRN000063

withstand appellate review, that those statements could be used certainly if not directly against her for impeachment purposes perhaps. I frankly don't know what the law is on that, but we know there's a great deal of difference in the law between the admission of statements directly and those that are used for impeachment purposes, even those that are begotten by ill means.

THE COURT: But I'm assuming they couldn't be used in a retrial either because they couldn't be used on the merits.

MR. BERRIGAN: No, not on the merits. No, I agree. I suspect they couldn't be used on the merits. It'd be an interesting issue if she came back in the second part of a trial and testified inconsistently in the first phase respecting some testimony she gave to a mental health expert that was conducted during the penalty phase of her first trial. I frankly don't know how that would go. I wouldn't bet my house on it.

THE COURT: Yeah. Well, why don't we hear from the government. Mr. Whitlock?

MR. WHITWORTH: Yes, Your Honor. It's our position that -- and Pat was kind enough to give me a heads-up to this last week, but it's our position that Rule 12.2, if a defendant wants to put on mental health evidence in either the guilt or sentencing phase, they essentially are giving up their right not to talk about the case with the expert witnesses for the government because my question, of course, Your Honor, would be -- and we're kind of operating in a vacuum here -- would be

why -- if the -- the jury, of course, is free to consider any evidence as mitigating evidence. And if a defendant puts on evidence, for instance, that -- I don't think mental retardation's going to be the issue here, but let's say -- and I'm -- that the defendant here wants to put on evidence to show that she was battered and that she was under duress when she committed this offense with her boyfriend, then I would think that that clearly goes to her state of mind at the time of the offense. And so the jury's going to think of it in that way. And so if it's going to be offered for some purpose other than this defendant's state of mind at the time of the offense, then why are we even needed as taint counsel?

THE COURT: Well, you're needed for a whole lot of reasons unrelated to this issue, basically the kind of timing of 12.2. I mean, that's the primary reason. We didn't appoint a taint team because I thought they were going to raise a Fifth Amendment issue with regard to the government experts questioning her about the offense. That wasn't the reason.

MR. WHITWORTH: Okay.

THE COURT: So it's really unrelated to why we have a taint team. It just so happens that the taint team now has to handle this issue. But your argument why do we need a taint team, there's lots of reasons why we need a taint team. If you don't see it, I don't have the time to educate you on it, but it's not for this issue.

GRN000065

MR. WHITWORTH: Okay. Well, the other que -- I guess -- I was looking at -- basically I think the purpose of 12.2, the reason they put it in is because of the Fifth Amendment concerns a defendant had, legitimate Fifth Amendment concerns. And we believe that the section you identified, Your Honor -- you obviously studied this already -- constitutes a waiver. And we don't know how the defendant's going to offer this evidence in this case. It seems to me that if our experts are precluded from inquiring into the defendant's state of mind or the events surrounding the murder, then if later at trial when the evidence is offered it turns out that it does relate to that issue in some fashion, then, you know, we're going to have to stop the trial, go back and have our experts talk to the defendant again.

THE COURT: But isn't the thrust of 12.2 as it relates to the context of this case is to provide the government with adequate rebuttal, not perfect rebuttal but adequate rebuttal? If it was perfect rebuttal, they wouldn't have the timing issues. You'd just be able to go ahead and examine them across the board. And so it seems to me that Rule 12.2 sets up a kind of symmetry all aimed at giving the government a fair opportunity of rebuttal. And if the defense psychiatrist and psychologist didn't question in this area, why should you be able to? Why are you handicapped by rebutting the defendant's case by not being able to?

I mean, it'd be a whole different story if they were going to do it, if they were going to question her about the crimes and give opinions based on that. Then basic notions of reciprocity and fairness would trigger your right to do that, it seems.

But when Mr. Berrigan is making a representation that they're not going there, why should you be able to go there? And do you have a single case that would suggest -- because I'll tell you something. There's very few state cases -- and I picked states because I knew what the federal law was, and there's not much, if any, out there on this issue. There are very, very few, if any, state cases that support your view, and the clear majority view is that there's an actual exception for questioning about the crime. And I'm going to give the parties an opportunity to brief it if they want to. I suspect I know a great deal more about it than the lawyers do at this point only because I spent the weekend reading over a dozen state Supreme Court and Court of Appeal decisions and three law review articles on the subject.

MR. WHITWORTH: Judge, I'm sorry if I ruined your weekend.

THE COURT: Well, that's what I get paid these big bucks for. It's neither the first time nor the last time, and actually I rather enjoy it. So I'm not upset by it. It was an interesting learning experience for me, and I realize it came up

quickly on Friday, but my job is to figure it out. Sometimes the parties help me do that. Sometimes they don't. And I don't really plan on it, to be honest with you, after 11 years of this.

MR. WHITWORTH: What I did do is I called Matt Hellman who's with our capital case unit on Friday afternoon, and I asked him if this issue had come up before in any of the capital cases around the country because the rule as you noted isn't -- and Matt advised that this same issue came up in a case out of Massachusetts, and he told me that apparently the def -- they were -- they had taken it to the judge.

THE COURT: And they worked out a compromise. You're talking about United States versus Sampson.

MR. WHITWORTH: Is that the one?

THE COURT: Judge Wolf, Mark Wolf. If that's the case -- there have been only been two capital cases I'm aware of in Massachusetts, that one Sampson and then another one where they actually pled guilty and just went to trial on the penalty phase. But is there -- there are numerous reported decisions in Sampson. There's about a dozen reported decisions, and I don't think Judge Wolf ever expressly -- matter of fact, I'm sure didn't address this in any of his reported decisions, and he wrote publishable decisions on virtually every ruling.

MR. WHITWORTH: Well, if I recall right, I think Matt Hellman told me that the defense had withdrawn the mental health

issue and they didn't have to resolve it.

THE COURT: Oh, I see.

MR. WHITWORTH: So I'm not aware of any cases. It just struck me that it seemed to me that we would -- you know, any information that we would gain as taint counsel would never be given to the trial team so if there were any Fifth Amendment or any damaging statements made by the defendant, if it turns out that the evidence is offered for a purpose totally unrelated to the defendant's state of mind at the time of the offense, then we -- the trial team will never get that information unless it turns out later that it is relevant to the state of mind or a jury could consider it as evidence related to the defendant's state of mind. Then in that event we would be prepared to rebut that at the sentencing phase, and that was the reason I just felt like we ought to bring this to your attention.

THE COURT: No, I appreciate -- I appreciate it being brought to my attention. I appreciate it being brought quickly too. Of course, we have a record made here today, but, you know, part of how I would tentatively rule would depend upon the purpose for which the defendant is offering -- I don't know -- you know, I'm in the dark as to what you're doing, Mr. Berrigan, in terms of your mental health experts.

MR. WHITWORTH: Judge, may I offer a suggestion?

THE COURT: Yeah.

MR. WHITWORTH: We would not object if you would have

GRN000069

an ex parte conversation with Mr. Berrigan about the reason the evidence is being offered so you could reach that -- or make that determination without us being involved. You know, certainly we would trust your judgment. But, you know, for instance, if it's -- let's say it's a duress-type related defense, mental health evidence related to battered spouse or something of that nature. I think that that clearly is evidence which would go directly -- be offered directly for the purpose or indirect purpose of how the defendant was thinking, what her thought process was at the time these murders were committed.

And so in that event I would say there's a strong argument the government should be able to inquire into her state of mind or her -- the murders when our experts are examining her. If it's mental retardation, that's different. I think that's a different issue, and I think that Mr. Berrigan would have a stronger point there.

THE COURT: Well, Mr. Berrigan, maybe I could ask it this way. Are you putting at issue in the penalty phase Miss Johnson's state of mind at the time of the murders?

MR. BERRIGAN: No, Your Honor. I mean, that -- I didn't want to sandbag anybody with this. It seems completely counterproductive as Mr. Whitworth suggested that we would have to stop the trial or reevaluate Miss Johnson. So for some period of time my mental health experts have been under very strict instructions not to inquire into this area of her mental

status at the time of the murders. It's counterproductive, frankly, in my opinion for the defense to inquire into that in this particular case. And I intend to offer no evidence on that.

And I just wanted to bring that to Mr. Whitworth and Miss Ketchmark's attention so that they kind of have a heads-up when they were talking to their mental health people regarding the evaluation of Miss Johnson and if they had a problem with it as they obviously do, they could bring it to your attention which we've done.

But I realize that we're -- the defense is really on very perilous ground by taking this position if we were to seek to introduce evidence at trial that Miss Johnson was suffering from duress at the time of the murders. Well, I don't know how that works without the defense people evaluating that much less the prosecution having a chance to do it. So that's not our intention whatsoever. I've gone out of my way to avoid that very issue.

THE COURT: Well, let me ask you this. Are you willing to kind of enter into a written stipulation that you are not putting the defendant's state of mind at the time of the murders in issue in the penalty phase?

MR. BERRIGAN: If you'll let me consider that, the implications of that, Your Honor, I'll be happy to do so, not do it on the phone.

THE COURT: Yeah, I'm not asking you to do it now. I'm sorry if you would have thought that.

MR. BERRIGAN: Certainly. I think I've made that oral representation.

THE COURT: Yeah, I think you've made something very close to that.

MR. BERRIGAN: I think so as well, and I probably wouldn't have a problem with it if you at least give me 24 hours to think about this issue.

THE COURT: And this way you can talk to taint team counsel and try and work something out, but then we'd have something in a nice neat little package.

MR. BERRIGAN: Right.

THE COURT: Mr. Whitlock, are you opposed to that? Does that -- it might resolve some of your concerns but not all of your concerns.

MR. WHITWORTH: That's fine, Your Honor, with me, either that or we remain -- I want to make it clear that we have no objection, Your Honor, if Mr. Berrigan wants to reveal to you without us being involved the nature of the evidence so that you can kind of do a pretrial ruling in your mind at least about this issue and you can come back and say, hey, no questions about -- from your experts about the defendant's involvement in these murders can be asked of your experts. We will certainly respect that, Your Honor.

GRN000072

THE COURT: Let me ask you this: Does either side want to take a look at the case law? And you could do something real informal like just send what I call a letter brief where you just cite the cases and what you think they hold rather than writing a more formal brief? I mean, I feel very well grounded, and I've looked at a lot of law, but I certainly don't want to foreclose the parties from trying to take a look at this issue.

MR. WHITWORTH: Your Honor, I'll look into it from the government's standpoint. I apologize for not having done that over the weekend like you.

THE COURT: You don't have to apologize for it. Your jobs are much more stressful than mine, so I don't need the weekends to relax like the lawyers do. So I wouldn't have expected anybody to have done that on such short notice. But, you know, I felt I should do it. I'm not being critical in any way of the lawyers not doing it. I didn't expect that you would. But you want me to leave this open for a little while, maybe till the end of the week, and I'd be prepared to probably rule on Friday or perhaps next Monday?

MR. WHITWORTH: That's fine with us.

THE COURT: Why don't we do this.

MR. BERRIGAN: If you can give me till Monday, I've got a Tenth Circuit oral argument on Friday morning I need to spend a little bit of time preparing for.

THE COURT: I would hope so.

GRN000073

MR. BERRIGAN: But if I could just have till Monday, I'd have more than enough time. And as a corollary to this, Your Honor, I want to bring to your attention that I frankly misread the Court's order respecting the issue of who was picking the mental health experts for the government, although I think in hindsight when I re-read the order it's quite clear that Mr. Williams and Mr. Miller have that responsibility, not Mr. Whitworth and Miss Ketchmark.

So I have provided pursuant to the Court's order the mental health testing that's been done on Miss Johnson and sort of the specialties I guess of the four mental health experts. I've provided that to Mr. Williams but only today after a telephone conversation with him because I frankly thought that was the purview of Miss Ketchmark and Mr. Whitworth, and he has kindly corrected me; that is, Mr. Williams has.

So I don't know that he's going to be ready by March 11 to name experts or not, and I've certainly told him that I'd have no objection to whatever extension he needed, although I strongly suspect he has some people already in mind irrespective of the information I provided him. I don't frankly know right now -- he wasn't able to get back to me before this hearing -- whether he needs any more time than March 11 which is Friday, but I suspect he might, and I wanted to let you know that the fault there lies solely with me. Mr. Williams has been expecting me to give him the information, and I gave it to Miss

Ketchmark and Mr. Whitworth if that makes any sense at all.

THE COURT: It does. I totally understand.

MR. BERRIGAN: So he might be just a few more days. I doubt it will take him very much longer, and I don't know that this particular issue impacts that at all. I expect not.

THE COURT: I don't think it does. So why don't I give the parties till a week from today. Could you just e-mail me a letter brief?

MR. BERRIGAN: Yes, sir.

THE COURT: With any citations to authority and any argument you want to make. Don't feel compelled to send me anything. But I'll hold off ruling. But I'm going to rule pretty shortly thereafter.

MR. WHITWORTH: Okay.

THE COURT: And I don't think I need -- I'd feel un -- I don't know if Mr. Berrigan would be willing to tell me, but I'd feel even uncomfortable getting into what his defense is.

MR. BERRIGAN: I'm a little uncomfortable myself, Your Honor.

THE COURT: Well, so am I.

MR. BERRIGAN: But Mr. Whitworth's suggestion makes some sense to me, that if it were done ex parte maybe that really isn't much of a problem, and I think I could do it in a very simple, straightforward fashion. So if you could -- I'll submit that as well perhaps under cover -- under seal --

GRN000075

THE COURT: Or would you rather just do it at the end of this conversation?

MR. BERRIGAN: I'm sorry, sir?

THE COURT: Would you rather just do it at the end of this conversation?

MR. BERRIGAN: Oh, that would be fine.

THE COURT: Would you be prepared to do that?

MR. BERRIGAN: I think so, yes.

THE COURT: I think it'd be easier rather than writing because then I can ask some questions if I have any.

MR. BERRIGAN: Sure. You bet. Okay.

THE COURT: Miss Ketchmark, Mr. Whitworth, do we need anything further?

MR. WHITWORTH: No, I don't think so, Your Honor.

MS. KETCHMARK: No, sir. I think our big concern is that the jury, if they were to draw an inference that the mental issue was somehow a defense to the commission of the crime, how could we be -- how could C.J. be prepared to rebut that inference even if they don't claim that, even if Pat doesn't claim that, and I don't know that C.J. could rebut that with cross-examination of the expert because the expert may just say, I simply didn't look into that area. And then they're really at a loss. I was thinking, you know, maybe some agreed-upon instruction, but your idea of a stipulation may be a really nice idea.

GRN000076

THE COURT: Why don't you try and work it out.

I'm sorry, Mr. Whitworth. I was calling you Mr. Whitlock. I apologize for that.

MR. WHITWORTH: That's all right, Judge. I'm used to that.

THE COURT: Well, I imagine you get called worse, at least by defendants. So, Mr. Whitworth, I'm very sorry.

MR. WHITWORTH: That's all right.

THE COURT: I just made a note to myself who the counsel of record were, and I wrote down Whitlock instead of Whitworth, and I knew better, and I just realized I was doing it, so I'm a little punch crazy today, and I apologize for that. But if we don't need Mr. Whitworth and Miss Ketchmark anymore, then I'll just proceed ex parte with Mr. Berrigan, and I think that will help me flesh out the defense, and that's important to how I would rule in this case.

MR. WHITWORTH: Okay. I appreciate that. And, Your Honor -- or, Pat, if you could -- if you think of a way we can resolve this informally, please give me a call.

MR. BERRIGAN: Certainly.

MR. WHITWORTH: Okay. Thank you, Your Honor.

THE COURT: Oh, and just one other thing. I don't think the stipulation necessarily resolves the legal question, but I think it could have a huge impact on how I might rule.

MR. WHITWORTH: Okay.

GRN000077

THE COURT: So I think I still will need to rule. Of course, if the parties totally agree -- but I wasn't trying to force some agreement to avoid the need for ruling on it. I just thought a stipulation would assist in how ever I ruled so that there wouldn't be a violation of it down the road.

MR. WHITWORTH: I like the idea, Your Honor. I had thought of that myself, and I think that's a good suggestion.

THE COURT: Well, sometimes I have good ones. And sometimes I have pretty poor ones, but I usually have options available. So appreciate it very much. And we'll have the government lawyers hang up now, and then I'll proceed with Mr. Berrigan.

MR. WHITWORTH: Okay. Thank you for your time. We're hanging up.

(Ms. Ketchmark and Mr. Whitworth hung up the telephone.)

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Your Honor, here's my dilemma.

THE COURT: Yeah.

MR. BERRIGAN: It's my belief that Miss Johnson has suffered from certain mental conditions or defects, if you will, for quite a long period of time, and much of that arises out of some events in her childhood that were very traumatic in nature to say the least, and so these are sort of longstanding mental health issues.

GRN000078

And those -- the determination by a mental health expert that she's been suffering from that type of -- let's say depression as an example for a long period of time from childhood into her adult life in my view does not require the expert to then delve into what her mental status was at the time of the murders.

Now, having said that, I suppose the government could say, well, if you're contending she's suffering from depression over the course of her adult life, that she's got major depressive disorder, doesn't that impact her mental status at the time of the events? And frankly I don't know what the answer to that is.

It seems to me if you have a permanent mental condition -- retardation is another example -- that doesn't go away for a 24-hour period when some murder's being committed or some other unlawful activity. And we're not relying on that diagnosis to say that she's relieved of responsibility in any fashion because at the time of the murders she was suffering from major depressive disorder.

THE COURT: You're just going to argue it as a general mitigator.

MR. BERRIGAN: Right. Exactly, Your Honor.

THE COURT: That these -- whatever these psychiatric or psychological conditions are --

MR. BERRIGAN: Right.

GRN000079

THE COURT: -- that that's a mitigation and that they ought not to put her to death if they found her guilty.

MR. BERRIGAN: Right. But I am not going to argue specifically -- I can tell you for sure that I'm not arguing, for example, that she was under duress because of this relationship with Mr. Honken at the time of the murders, you know, that this is some kind of quasi-duress defense or something of that nature which I can understand frankly Mr. Whitworth's concern about that. I just don't know how much I can tell them or the Court I suppose.

THE COURT: Right, right.

MR. BERRIGAN: Without divulging --

THE COURT: But I think it would be important for how I would rule to indicate in your stipulation that you're not going to be arguing her culpability for the crime as a result of any mental disease, defect, or condition. You're going to be arguing it as a mitigation.

MR. BERRIGAN: Yes. I understand what you're saying, Your Honor, but I guess mitigation -- I guess my concern is mitigation does affect one's culpability -- at least her moral culpability for the crime.

THE COURT: Moral culpability for punishment.

MR. BERRIGAN: For punishment.

THE COURT: Right.

MR. BERRIGAN: I represented Christopher Simmons whose

GRN000080

decision came down last week. For many years I've been representing him, and the court held that his age, you know, reduces his moral culpability. This is sort of an analogous situation.

For punishment purposes, yes, I'm arguing that Miss Johnson has less moral culpability because of these mental defects that she's had, but they're not related to the murders. That is, it's not something that arose during the course of the murder. They're longstanding mental health defects that she's experienced at least since adolescence.

So I don't know if that's a distinction without a difference or if that has any meaning for the Court where the defense is coming from regarding this type of evidence.

THE COURT: No, it does have meaning because, you know, you could -- you could have the psychologist and psychiatrist testify that even though she was found guilty that she's not as responsible for the crime as someone who didn't have these conditions even though they never questioned her about her involvement in the crime.

MR. BERRIGAN: Right.

THE COURT: But you're not going to do that.

MR. BERRIGAN: I'm not going to have -- I'm not going to do what? I'm sorry?

THE COURT: You're not going to have your experts testify she's less culpable about the commission of the crime.

GRN000081

MR. BERRIGAN: I don't think they could because they haven't examined her about that, and I don't know that that evidence, given the scope of their evaluation, really would be appropriate.

THE COURT: Yeah.

MR. BERRIGAN: So no, I don't intend to do that. I think the -- from my vantage point, the evidence that's going to have most impact is mitigation evidence of these longstanding problems, not -- it's counterproductive for me to get into --

THE COURT: The crime.

MR. BERRIGAN: -- the crime, right, for obvious reasons. It's a horrible crime.

THE COURT: Right. Why would you want to get into it? Yeah.

MR. BERRIGAN: And I don't want that to be the main focus of the penalty phase of the trial, at least if I can prevent it. Obviously the government may have some say about that. So I'm making every effort to at least try to avoid that through mental health testimony not only by the government witnesses but my own witnesses as well.

THE COURT: Okay. I have a fairly clear, somewhat murky understanding.

Can I ask you one other question? It is slightly ex parte, but I asked the other side in an ex parte hearing I had with Williams and Whitlock earlier today which I guess I

wasn't supposed to tell you I had it.

MR. BERRIGAN: Whitworth.

THE COURT: Yeah, Whitworth. But anyway, where are you on selection of jurors that are going to be eliminated by agreement, because our clerk's office is really on me? They've got to send notices out. They want to do it by the 21st --

MR. BERRIGAN: Okay.

THE COURT: -- of this month, and supposedly you guys were going to try and agree on knocking out, you know, X numbers of jurors.

MR. BERRIGAN: Mr. Miller called me last week, and he has at least identified people that have definite scruples that he'd like to talk about. So far as I know, that's the only category. I'm working with Miss Dahl, Lisa Dahl, in an effort to identify -- really I think we'd like to get the hardship people identified quickly.

THE COURT: I'd like to get as many as you can agree on for whatever reason -- as long as you agree they're gone, but the bottom line is come the 21st, we're going to start putting them in panels.

MR. BERRIGAN: All right, sir.

THE COURT: So we're going to have to know before the 21st who you agree on. I don't care what the reason is.

MR. BERRIGAN: I understand.

THE COURT: Yeah, I just want to eliminate as many

people as we can so that we're not spending our valuable time on people who are ultimately going to go out.

MR. BERRIGAN: Of course, Your Honor.

THE COURT: Right?

MR. BERRIGAN: Of course we are working on that and Miss Dahl's working on it with me.

THE COURT: And now you know. I don't think I ever gave you a deadline. Really probably be the 18th is the drop-dead deadline for that, and all I need to know is some e-mail confirmed by both sides that this is the list of jurors who we don't need to bring in for jury selection.

MR. BERRIGAN: I understand, Your Honor.

THE COURT: Anything else?

MR. BERRIGAN: I don't think so, sir.

THE COURT: Thank you. Bye now.

(The foregoing hearing was

concluded at 3:09 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          6-1-05
Shelly Semmler, RMR, CRR                    Date

DS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. CR 01-3046MWB |
| vs. | ) | |
| | ) | |
| ANGELA JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S MOTION TO COMPEL DISCLOSURE OF PSYCHOTHERAPIST PRIVILEGE DOCUMENTS

The United States moves this Court for an order compelling defendant to produce to the United States copies of medical records pertaining to defendant's evaluation and treatment by mental health professionals. Defendant has made it clear that she intends to make her mental health an issue in the penalty phase of this case. By placing her mental health into issue, she has waived any psychotherapist privilege she had regarding her treatment by mental health professionals. To be clear, the government is seeking only records of past mental health treatment, not discovery of reports or evaluations conducted by defense experts in anticipation of litigation.

WHEREFORE, for the reasons more fully set forth in the Memorandum filed in support of this motion, the United States respectfully requests that the Court enter an order compelling defendant to produce to the United States copies of medical records pertaining to defendant's evaluation and treatment by mental health professionals.

1

Case 3:09-cv-03064-MWB-LTS    Document 28-13    Filed 06/23/11    Page 85 of 100
GRN000085

Respectfully submitted,

CHARLES W. LARSON, SR.
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
P. O. Box 74950
Cedar Rapids, IA 52407-4950
(319) 363-6333
(319) 363-1990 - fax
cj.williams2@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the
foregoing document to which this certificate is
attached to the parties or attorneys of record,
shown below, on March 8, 2005.

UNITED STATES ATTORNEY

BY: s/ S. Van Weelden
COPIES TO:
Attorneys of Record

2

GRN000086

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | No. CR 01-3046MWB |
| vs. | ) ) | |
| ANGELA JOHNSON, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL
DISCLOSURE OF PSYCHOTHERAPIST PRIVILEGE DOCUMENTS**

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    The Psychotherapist Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.    Waiver of the Psychotherapist Privilege . . . . . . . . . . . . . . . . . . . . . 4

       C.    Defendant Has Waived Her Psychotherapist Privilege . . . . . . . . . . . . . 6

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1

# I.    INTRODUCTION

The United States moves the Court for an order compelling defendant to produce to the United States copies of medical records pertaining to defendant's evaluation and treatment by mental health professionals. Defendant has made it clear that she intends to make her mental health an issue in the penalty phase of this case. By placing her mental health into issue, she has waived any psychotherapist privilege she had regarding her treatment by mental health professionals. To be clear, the government is seeking only records of past mental health treatment, not discovery of reports or evaluations conducted by defense experts in anticipation of litigation.

# II.    BACKGROUND

In October 2000, after the press reported the discovery of the murder victims' bodies, defendant attempted to commit suicide while in the Black Hawk County Jail. As a result of this suicide attempt, defendant received psychological treatment and evaluations by mental health professionals. On December 20, 2004, defendant provided the government with notice that she intended to claim that she suffers from some undisclosed type of mental defect or disease, and to present that evidence during the penalty phase of this trial. Defendant has refused to produce medical records pertaining to defendant's past treatment and evaluation for mental defects or diseases, or to sign a waiver of her psychotherapist privilege.

2

GRN000088

III. ARGUMENT

A. The Psychotherapist Privilege

In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the United States Supreme Court recognized for the first time the existence of a psychotherapist privilege. The Court found that communication between patients and mental health professionals, including psychiatrists, psychologists, and the like are privileged to the same extent that communications between clients and lawyers are privileged. *Jaffee*, 518 U.S. at 1928. The Court asserted that the need for a psychotherapist-patient privilege is like the need for an attorney-client privilege in that it is "rooted in the imperative need for confidence and trust." *Id.* citing *Trammel v. United States*, 445 U.S. 40, 51 (1980). The Court specifically found that "effective psychotherapy, [ ], depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears." *Id.* The Court then found the psychotherapist privilege to "serv[e] public ends." as required by *Upjohn Co. V. United States*, 449 U.S. 383, 389 (1981). *Jaffee*, 518 U.S. at 1929. The Court stated: "The psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.*

The Court recognized that, just as clients can waive the attorney/client privilege, patients may be found to have waived the psychotherapist/patient privilege. *Jaffee*, 518

3

GRN000089

U.S. at 1931 n. 14. The Court further stated, "we do not doubt that there are situations in which the privilege must give way,". *Jaffee*, 518 U.S. at 1932 n. 19. The Court, however, declined to delineate all of the contours of the psychotherapist privilege in *Jaffee* but instead left them to be defined on a "case-by-case basis." *Id.*

**B. Waiver of the Psychotherapist Privilege**

There are two schools of thought as to what establishes waiver of the psychotherapist/patient privilege. Some courts recognize that patients impliedly waive the privilege when the patient makes her mental condition an issue in the litigation. *Vann v. Lone Star Steakhouse & Saloon of Springfield, Inc.*, 967 F. Supp. 346, 349-50 (C.D. Ill. 1997). Other courts have taken a more narrow view of waiver, finding that an implied waiver occurs when the privileged communication itself is made an issue, that is, when it is actually used as evidence by the patient. *Vanderbilt v. Town of Chilmark* 174 F.R.D. 225, 1997 WL 440732 (D. Mass.1997).

The Eighth Circuit Court of Appeals has already spoken as to which theory it subscribes. In *Schoffstall v. Henderson*, 223 F. 3d 818 (8th Cir. 2000) the court held "we agree that by placing her medical condition at issue, Schoffstall waived the psychotherapist-patient privilege." In support of this holding, the Eighth Circuit relied on decisions by other courts finding that patients waive the privilege when they placed their mental health at issue in the litigation. See, e.g., *Sarko v. Penn-Del Directory Co.*, 170 F.R.D. 127, 130 (E.D.Pa. 1997) (psychotherapist/patient privilege waived when plaintiff put mental condition at issue); *Vann v. Lone Star Steakhouse & Saloon, Inc.*, 967 F.

4

Supp. 346, 349-50 (C.D.Ill.1997) (psychotherapist/patient privilege waived because plaintiff placed her mental condition in issue and disclosed psychiatrist as an expert witness for trial); *EEOC v. Danka Indus., Inc.,* 990 F. Supp 1138, 1142 (E.D.Mo.1997) (psychotherapist/patient privilege because plaintiff sought damages for emotional distress resulting from sexual harassment, making plaintiff's mental condition directly related to issue of damages, just as advice given by an attorney is directly made an issue in an attorney malpractice claim); *Jackson v. Chubb Corp.,* 193 F.R.D. 216, 225 (D.N.J. 2000) (plaintiff waived psychotherapist privilege because she intended to use psychotherapist/patient communications as evidence, in furtherance of her claims of emotional distress).

There are two primary reasons a party should be found to have impliedly waived the psychotherapist privilege by placing her mental condition at issue. First, the Supreme Court specifically analogized the policy considerations supporting recognition of the privilege in *Jaffee* to those underlying the attorney-client privilege which is waived when the advice of counsel is place at issue in litigation. Second, allowing the patient "to hide . . . behind a claim of privilege when that condition is placed directly at issue in a case would simply be contrary to the most basic sense of fairness and justice." *Sarko,* 170 F.R.D. at 130.

Moreover, fundamental fairness dictates this outcome. In *Allen v. Cook County Sheriff's Dep't, No. 97 C 3625,* 1999 WL 168466 at *2 (N.D.Ill. March 17, 1999), the court recognizing that fundamental fairness demands that the defendants were entitled

5

to an ample opportunity to scrutinize the basis for the opinions of the plaintiff's

therapists if she attempts to elicit therapist testimony or evidence to prove her damages

caused by her alleged emotional distress.  Likewise, in *Santelli v. Electro-Motive,* 188

F.R.D. 306 (N.D.Ill.1999), the court held:

> The problem with the narrow waiver rule is that it would enable a party
> who had undergone psychotherapy to offer at trial only the testimony of a
> retained, non-treating expert and thereby prevent discovery of what she
> had told her treating psychotherapist.  Among other things, this would
> allow the party to provide the expert with a selective "history," while
> preventing the veracity of that history from being tested by comparing it to
> what the party had reported to her treating psychotherapist.  We find this
> result unacceptable, as it would allow the privilege holder to thwart the
> truth seeking process by using the privilege as both a shield and a sword.

*Santelli*, 188 F.R.D. at 308.  In short, the *Santelli* Court said, "[a] party cannot inject

his/her psychological treatment, conditions, or symptoms into a case and expect to be

able to prevent discovery of information relevant to those issues."  188 F.R.D. at 309.

**C.     Defendant Has Waived Her Psychotherapist Privilege**

A patient places her mental state into issue whenever the mental condition is an

element of the offense or defense.  Thus, defendant Johnson has clearly placed her

mental health into issue by giving notice of her intent to claim a mental disease or

defect as a mitigating factor during the penalty phase of this case.  She cannot at once

use her alleged mental problems as a sword to benefit her case, then invoke the

psychotherapist privilege as a shield to prevent the government from obtaining records

about her past treatment and evaluations for alleged mental problems.  Therefore, the

Court should order defendant to produce to the United States copies of any and all

6

GRN0000092

medical records pertaining to defendant's past mental health evaluations, testing and treatment. In the alternative, the Court should issue an order compelling defendant to sign a written waiver of her psychotherapist privilege so that the United States may subpoena such records directly from defendant's mental health providers.

## IV. CONCLUSION

For the above reasons, the United States respectfully requests that the Court enter an order compelling defendant to produce to the United States copies of medical records pertaining to defendant's evaluation and treatment by mental health professionals.

Respectfully submitted,

CHARLES W. LARSON, SR.
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
P. O. Box 74950
Cedar Rapids, IA 52407-4950
(319) 363-6333
(319) 363-1990 - fax
cj.williams2@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on March 8, 2005.

UNITED STATES ATTORNEY

BY: s/ S. Van Weelden
COPIES TO:
Attorneys of Record

7

GRN000093

**Amy Nauman**

| | |
|---|---|
| **From:** | ndia.ecf.notification@iand.uscourts.gov |
| **Sent:** | Tuesday, March 08, 2005 3:05 PM |
| **To:** | ndia.ecf.notification@iand.uscourts.gov |
| **Subject:** | Activity in Case 3:01-cr-03046-MWB USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER "Motion to Compel" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**Northern District of Iowa**

Notice of Electronic Filing

The following transaction was received from Williams, Charles J entered on 3/8/2005 at 3:04 PM CST and filed on 3/8/2005

| | |
|---|---|
| **Case Name:** | USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER |
| **Case Number:** | 3:01-cr-3046 |
| **Filer:** | United States of America |
| **Document Number:** | 352 |

**Docket Text:**
MOTION to Compel *Disclosure of Psychotherapist Privilege Documents* by United States of America as to Defendant Angela Jane Johnson. (Attachments: # (1) Brief in Support of Government's Motion to Compel Disclosure of Psychotherapist Privilege Documents)(Williams, Charles)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=3/8/2005] [FileNumber=202054-0]
[bd7c8f0048433a684a3d57e8da1f28d6f4bb595dddf48a0e2e35af99d72260b446608
b5a64df2ddbb50d6115c0549ed8e9ca37df8eee315945ff2acfb1674982]]
**Document description:**Brief in Support of Government's Motion to Compel Disclosure of Psychotherapist Privilege Documents
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=3/8/2005] [FileNumber=202054-1]
[9c5a11066849046c86d7afd5d6d0ea89ec9fd5bdf1b71fbe199a12276648bbda593aa
e578024f8cb08d444c07037f4dc66c928b8f2e98b92ee72f360255d718a]]

**3:01-cr-3046-1 Notice will be electronically mailed to:**

GRN0000094

Patrick J Berrigan    pberrigan@kctriallawyers.com, rwalker@kctriallawyers.com

Thomas Henry Miller    tmiller@ag.state.ia.us,

Robert R Rigg    robert.rigg@drake.edu,

Dean A Stowers    amy@rosenbergstowersmorse.com

Alfred E Willett    aewillett@tewlaw.net, nlanoue@tewlaw.net

Charles J Williams    cj.williams2@usdoj.gov, usao.ian-crim-cr@usdoj.gov

**3:01-cr-3046-1 Notice will be delivered by other means to:**

GRN000095
3/8/2005



**U. S. Department of Justice**

*Todd P. Graves*
*United States Attorney*
*Western District of Missouri*

*Office of the United States Attorney        (816) 426-3122*
*Charles Evans Whittaker Courthouse  FAX (816) 426-4210*
*400 East 9th Street, Fifth Floor*
*Kansas City, Missouri 64106*

March 14, 2005

Honorable Mark W. Bennett
Chief Judge
United States District Court
Northern District of Iowa
United States Courthouse
320 6th Street
Sioux City, Iowa 51101

    Re:  <u>United States v. Angela Johnson</u>
        No. DR 01-3046-MWB

Dear Judge Bennett:

Thank you for extending the parties the opportunity to submit a letter brief regarding the issue of whether the Government's expert witness will be able to question Ms. Johnson about her mental state at the time of the charged offenses during her forthcoming examination. We hope the Court will find the following discussion of some assistance when ruling on this issue.

<u>Issue</u>

Whether a defendant who intends to introduce penalty-phase mitigation evidence relating to her mental state has a Fifth Amendment right to prevent the Government's expert from examining her regarding her mental state at the time of the charged offenses, if she eschews any intent to claim that her mental state prevented her from forming the requisite intent to commit the offenses, prevented her from distinguishing right from wrong, or kept her from conforming her conduct to the requirements of the law.

<u>Discussion</u>

By order of February 18, 2005, this Court ordered the defendant, Angela Johnson, to submit to mental examinations, evaluations, or interviews by Government mental health experts

Chief Judge Bennett
March 14, 2005
Page 2

pursuant to Rule 12.2(c)(1)(B) of the Federal Rules of Criminal Procedure, subject to various conditions and procedures. (Order at 121-22.) Mr. Berrigan, counsel for Ms. Johnson, subsequently has requested this Court to impose an additional condition on such examinations, that is, he seeks a directive from this Court prohibiting the Government's experts from questioning Ms. Johnson regarding the charged offenses and her mental state at the time of the offenses.

Mr. Berrigan has indicated that he intends to present evidence of his client's mental condition as a mitigating factor at the penalty stage of her trial. The Government, of course, is proceeding in this discussion with no idea of the type of mental condition the defense expert will claim Ms. Johnson allegedly suffers. This lack of information makes this discussion somewhat difficult. However, under 21 U.S.C. § 848, evidence of an accused's mental state is arguably admissible under at least four subsections of this statute: impaired capacity ((m)(1)); duress ((m)(2)); severe mental or emotional disturbance ((m)(7)); and "other factors" ((m)(10)). It is the Government's understanding that Ms. Johnson intends to submit evidence of her abnormal mental state under the "other factors" subsection.

That is to say, Ms. Johnson will not attempt to show that she suffered from "impaired capacity" at the time her crimes were committed, i.e., that her "capacity to appreciate the wrongfulness of [her] conduct or to conform [her] conduct to the requirements of the law was significantly impaired." 21 U.S.C. § 848(m)(1). Nor, apparently, will she attempt to show that she was "under unusual and substantial duress" at the time her crimes were committed. 21 U.S.C. § 848(m)(2). Likewise, it is the Government's understanding that Ms. Johnson's evidence will not attempt to demonstrate that she committed the charged offenses under "severe mental or emotional disturbance." 21 U.S.C. § 848(m)(7).

Instead, Ms. Johnson apparently intends to present evidence of her mental condition under the "other factors" catchall subsection, (m)(10), which allows evidence of "other factors in the defendant's background or character [which] mitigate against imposition of the death sentence." Ms. Johnson suggests that since she does not intend to argue that she lacked the capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law, or that she committed the offenses under duress, or that she committed the offenses under severe mental or emotional disturbance, it would violate her

Chief Judge Bennett
March 14, 2005
Page 3


Fifth Amendment rights to allow the Government's expert to
question her about her mental state at the time the crimes were
committed.

The Government disagrees. Rule 12.2(c)(4)(B) clearly
implies that a defendant in a capital sentencing proceeding
waives his Fifth Amendment privilege if he provides notice of
intent to offer mental health evidence. There is no exception in
Rule 12.2(c) for the "other factors" catchall as described in 21
U.S.C. § 848(m)(10). To be sure, as this Court's order
recognizes, the defendant's Fifth Amendment privilege against
self-incrimination is implicated where the Government uses as
evidence against the defendant the substance of his or her
disclosures during a pretrial psychiatric examination. Estelle
v. Smith, 451 U.S. 454, 464-65 (1981). But where, as here, the
defendant puts her mental condition in issue, the defendant
waives his or her Fifth Amendment right against
self-incrimination. See Powell v. Texas, 492 U.S. 680, 684
(1989); Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987).

Of course, "that waiver is not 'limitless'; it only allows
the prosecution to use the interview to provide rebuttal to the
psychiatric defense." Gibbs v. Frank, 387 F.3d 268, 274 (3d Cir.
2004). See also Commonwealth v. Sartin, 561 Pa. 522, 751 A.2d
1140, 528 (2000) (defendant does not "categorically waive[ ] his
Fifth Amendment privilege merely by announcing his intention to
submit expert psychiatric testimony at the sentencing hearing;
rather, the prosecution "may only utilize the results of its
psychological examination in a rebuttal capacity, and only as to
those issues which have been implicated by the expert testimony
of the defendant's psychiatrist").

In addition, under Fed. R. Crim. P. 12.2(c)(4)(B), "No
statement made by the defendant in the course of any examination
conducted under this rule . . . , no testimony by the expert
based on the statement, and no other fruits of the statement may
be admitted into evidence against the defendant in any criminal
proceeding except on an issue regarding mental condition on which
the defendant . . . has introduced expert evidence in a capital
sentencing proceeding requiring notice under Rule 12.2(b)(2)."

In this case, Mr. Berrigan has expressed fear that if the
Government's expert is allowed to question Ms. Johnson regarding
her mental state at the time of the charged offenses, her
responses might be used to incriminate her in this or some future

GRN000098

Chief Judge Bennett
March 14, 2005
Page 4

criminal case. However, Rule 12.2(c)(4)(B) clearly and unequivocally precludes the use of such statements in the present or any future criminal proceeding except to rebut Ms. Johnson's evidence that her mental condition constitutes evidence in mitigation. United States v. Taylor, 320 F.Supp.2d 790, 793 (N.D. Ind. 2004). Therefore, Ms. Johnson's supposed fears in this regard are completely unfounded.

Not surprisingly, the Government has been unable to find any support for Ms. Johnson's contention that the waiver of her Fifth Amendment rights is only a partial waiver since she does not intend to claim that her mental condition prevented her from forming the necessary intent to commit her crimes or constituted "impaired capacity." In fact, most of the courts that have discussed this issue have used absolute terms in describing the scope and extent of the waiver. See, e.g., United States v. Curtis, 328 F.3d 141, 145 (4th Cir. 2003) ("defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal"); United States v. Beckford, 962 F.Supp. 748, 763 (E.D. Va. 1997) ("[I]f a defendant elects, with the advice of counsel, to put his mental status into issue in the penalty phase, then he has waived the right to refrain from self-incrimination arising from a mental health examination, and there is no Fifth or Sixth Amendment concern"); United States v. Vest, 905 F.Supp. 651, 653 (W.D. Mo. 1995) ("If a defendant elects, with advice from counsel, to put his mental status into issue in the penalty phase, then he has waived his right to refrain from self-incrimination arising from mental health examination, and there is no Fifth Amendment implication"); United States v. Sampson, 335 F.Supp.2d 166, 247 (D. Mass. 2004) (defendant cannot "present expert testimony on his mental condition and yet refuse, on Fifth Amendment grounds, to answer questions put to him by the government's experts"); Savino v. Commonwealth, 239 Va. 534, 391 S.E.2d 276, 281 (1990) ("[W]hen a defendant gives . . . notice [that he intends to present evidence of his mental condition] 'he waives his [F]ifth [A]mendment privilege against the introduction of psychiatric testimony by the prosecution'").

The Government has located several cases from California where the rule is qualified as follows: "By tendering his mental condition as an issue in the penalty phase, defendant waived his Fifth and Sixth Amendment rights to the extent necessary to permit a proper examination of that condition." (Emphasis added.) People v. Carpenter, 15 Cal.4th 312, 63 Cal.Rptr.2d 1, 61 (1997),

Chief Judge Bennett
March 14, 2005
Page 5


quoting <u>People v. McPeters</u>, 2 Cal.4th 1148, 9 Cal.Rptr.2d 834,
832 P.2d 146, 168 (1992).

In <u>Centeno v. Superior Court</u>, 117 Cal.App.4th 30, 11
Cal.Rptr.3d 533, 544 (2004), the court utilized this provision to
restrict the scope of the prosecution's mental evaluation of the
defendant. There, the defendant claimed that he was mentally
retarded to such an extent that his execution was foreclosed by
the holding of <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002). Citing
<u>Carpenter</u>, the court in <u>Centeno</u> ruled that any examinations by
the prosecution's experts must "bear some reasonable relation to
measuring mental retardation . . . " Id., 11 Cal.Rptr. at
544-45. "Otherwise," the court added, "there is a danger that
defendants will be improperly subjected to mental examinations
beyond the scope of the precise issue they have tendered and
their resulting waiver of constitutional rights." Id., 11
Cal.Rptr. at 545.

Centeno, however, presents no authority for Ms. Johnson's
claim that her Fifth Amendment rights would be violated if the
Government's expert questioned her regarding her mental condition
at the time of the commission of the crimes. In <u>Centeno</u>, the
issue raised by the defendant was extremely narrow, i.e., whether
he was mentally retarded to such a degree that he could not
constitutionally be executed. Centeno's mental state at the time
of the offense was simply irrelevant to any issue in the case.
In the present case, by contrast, if Ms. Johnson's mental state
at the time she committed the crimes with which she is charged
becomes an issue which even one juror may decide is a result of a
mental condition the defense claims she suffers from and is thus
a mitigating factor, then it is crucial for the Government expert
to be able to question her concerning her mental condition at the
time of the offenses. It is only then that the Government expert
will be able to make a rational determination as to whether he
believes her alleged mental condition constitutes a factor
mitigating against the death penalty. Obviously, if the
Government's expert is able to testify in rebuttal that Ms.
Johnson's mental condition did not prevent her from forming an
intent to kill or prevent her from conforming her conduct to the
law, Ms. Johnson's mitigation evidence will be seriously
weakened.

Conversely, if the Government is precluded from presenting
such evidence, the sentencing jury might conclude that Ms.
Johnson's mental condition did have an adverse impact on her
ability to formulate the necessary mental state, or that her