condition did preclude her from knowing right from wrong or conforming her conduct to the law. In that event, the Government will have been deprived of the most effective means it has of controverting Ms. Johnson's proof on an issue that she injected into the case.

## Conclusion

Mr. Berrigan advances the notion that Ms. Johnson's mental condition and the charged offenses can be compartmentalized and remain completely separated. Keeping the mental condition and the offenses compartmentalized would be an unreasonable request of the jury if, for example, Ms. Johnson's co-perpetrator, Dustin Honken, contributed to or affected Ms. Johnson's proposed mitigating mental condition, such as Battered Spouse Syndrome.

Although it is difficult to argue without knowing the nature of the mental health condition Ms. Johnson seeks to introduce, the Government does not believe she should be able to inject her mental condition into the penalty phase of the trial as a mitigating factor, yet preclude the Government from using the most powerful and persuasive evidence it could muster to rebut that mitigating evidence, that is, testimony from a qualified expert that Ms. Johnson's mental condition did not affect her thinking or behavior at the time of the charged crimes. The Government believes Rule 12.2(c)(4)(B) requires Ms. Johnson to submit to questions concerning her mental state at the time of the alleged offenses if she intends to offer evidence concerning mental health during the sentencing hearing. The Government respectfully requests the Court to enter an order requiring Ms. Johnson to respond to questions from the Government's expert during his examination relating to her mental state at the time of the offenses.

However, if the Court is not inclined to enter such an order then the Government does believe the Court's earlier suggestion that the parties enter into a stipulation is a good step toward resolution of this issue. If Ms. Johnson would commit to a position that she is not claiming that her mental condition affected her thinking or behavior at the time of the charged offenses nor is she challenging her ability to form the necessary mental state, nor claiming that she was mentally impaired at the time of the offenses, then many of the Government's concerns would dissipate.

GRN000101
MON000005516

The Government would also urge the Court to also consider giving an instruction to the jury informing each juror that he/she may not consider Ms. Johnson's mental health evidence as a mitigating factor for purposes of impaired capacity, substantial duress, or severe mental or emotional disturbance. See 21 U.S.C. § 848(m)(1)(2) and (7).

## Additional Issue

There is one other somewhat minor issue that has arisen regarding a request of Mr. Berrigan to have his experts turn over their raw testing data to the Government expert(s) for analysis and review. As the Court is certainly aware, one of the issues to be determined by the Government expert(s) will be whether the tests administered by defense experts were conducted in accordance with established standards. We believe a pretrial review of the testing data does not have any Fifth Amendment implications and is discovery which the Government's experts are entitled to examine. Mr. Berrigan has indicated to me that he believes we are entitled to the data but not until the jury has reached a decision on guilt. We believe that delaying the disclosure of this data could very well cause a delay in the trial. Consequently, with the Court's permission we would like to discuss this issue in our next teleconference.

Again, we appreciate the opportunity to present our position above to the Court. If you need any additional information please let us know.

Sincerely,

Todd P. Graves
United States Attorney

By *Matt J. Whitworth*

Matt J. Whitworth
Deputy United States Attorney
Western District of Missouri

By *Roseann Ketchmark*

Roseann Ketchmark
First Assistant U.S. Attorney
Western District of Missouri

MJW/dr
cc: Mr. Patrick Berrigan
Counsel for Ms. Johnson

GRN000102
MON0005517

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case Nos. CR 01-3046-MWB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S RESISTANCE |
| | ) | TO GOVERNMENT'S MOTION |
| ANGELA JOHNSON, | ) | TO COMPEL DISCLOSURE OF |
| | ) | PSYCHOTHERAPIST PRIVILEGE |
| Defendant. | ) | DOCUMENTS |
| | ) | |

COMES NOW Defendant, Ms. Angela Johnson, by and through counsel, and resists the government's motion to compel disclosure of psychotherapist privilege documents for the following reasons:

1.  Rule 12.2 does not require the defense to provide privileged psychotherapist documents to the government at any stage of a capital murder trial, but certainly would not compel such production, if at all, until "[a]fter disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination...," which is *after* the defendant has been found "guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition." Rules 12.2(2) and (3). The government's effort to procure such documents pretrial is a renewed attempt[1] at improper discovery of the defendant's second stage mental health evidence, in violation of Rule 12.2 and the spirit, if not the letter, of this Court's Order Nunc Pro Tunc of 2-18-05 at pp. 62-64, and 121.

---

[1] The government sought detailed information about the "nature" of defendant's mental condition when it first requested a Rule 12.2 rebuttal mental health evaluation of Angela Johnson. The Court rejected that effort in its order of 2-18-05 as outside the requirements of Rule 12.2.

GRN000103

2. There is no authority for the government's request for disclosure of the defendant's psychotherapist records in a capital murder prosecution, particularly when there is no showing defendant's own experts were provided or had access to any such records in forming their opinions regarding Angela Johnson. The government's evaluation is a *rebuttal* mental evaluation, not more. None of the cases which the government cites are capital murder cases[2], much less discuss the limitations of Rule 12.2 upon the government's request. This is a fishing expedition.

3. The government's motion is indeed out of time, and should be barred. Although the government contends, that "[t]he defendant did not provide notice to the United States of its intent to present a defense at the penalty phase of the trial concerning psychological disease or defect until December 2004," see Government's Motion for Extension of Time to File Motion to Compel Disclosure of Psychotherapist Privilege Documents filed on 3-8-05, defendant actually filed her Notice of Expert Witnesses and Intent to Possibly Offer Mental Health Evidence at the Penalty Phase on *November 12, 2002.*

WHEREFORE, for the foregoing reasons, defendant respectfully prays that this honorable court deny the Government's Motion to Compel Disclosure of Psychotherapist Privilege Documents forthwith. In the alternative, oral argument is respectfully requested.

---

[2] Only one case cited by the government is even a criminal case, Trammel v. United States, 445 U.S. 40 (1980), a case dealing with *marital privilege.*

Respectfully submitted,

/Patrick J. Berrigan/

PATRICK J. BERRIGAN, MO #34321
WATSON & DAMERON, LLP
2500 Holmes
Kansas City, MO 64108
(816) 474-3350
Fax (816) 221-1636

/Alfred E. Willett/

ALFRED E. WILLETT LI0008215
TERPSTRA, EPPING & WILLETT
Higley Building
118 – 3rd Avenue SE, Suite 500
Cedar Rapids, IA 52401-1424
(319) 364-2467
Fax (319) 364-2460

/Dean Stowers/

DEAN STOWERS
ROSENBERG, STOWERS & MORSE
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA 50309
(515) 243-7600
Fax (515) 243-0583

ATTORNEYS FOR DEFENDANT,
ANGELA JOHNSON

Original filed.

Copy to: C.J. Williams, Asst. U.S. Attorneys, P.O. Box 74950, Cedar Rapids, IA 52407-4950; Phone: (319) 363-0091

GRN000105

# PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 16, 2005.

By:       CM/ECF

Signature   /Melissa Launspach/

GRN000106

## Responses & Replies
3:01-cr-03046-MWB USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER

### U.S. District Court

### Northern District of Iowa

Notice of Electronic Filing

The following transaction was received from Stowers, Dean entered on 3/16/2005 at 5:34 PM CST and filed on 3/16/2005

| | |
|---|---|
| **Case Name:** | USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER |
| **Case Number:** | 3:01-cr-3046 |
| **Filer:** | Dft No. 1 - Angela Jane Johnson |
| **Document Number:** | 365 |

**Docket Text:**
RESISTANCE by Defendant Angela Jane Johnson re [352] MOTION to Compel *Disclosure of Psychotherapist Privilege Documents* (Stowers, Dean)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=3/16/2005] [FileNumber=205075-0]
[a9a70ee6485a09df5f8928cccf3a6ab6e73848e5fdc9842aafd51984b26b66e28172
f84d5cb31be3580cd396fa4d98e84736f9eeb44d1854c015d3479826b51d]]

**3:01-cr-3046-1 Notice will be electronically mailed to:**

Patrick J Berrigan     pberrigan@kctriallawyers.com, rwalker@kctriallawyers.com

Thomas Henry Miller     tmiller@ag.state.ia.us,

Robert R Rigg     robert.rigg@drake.edu,

Dean A Stowers     amy@rosenbergstowersmorse.com

Alfred E Willett     aewillett@tewlaw.net, nlanoue@tewlaw.net

Charles J Williams     cj.williams2@usdoj.gov, usao.ian-crim-cr@usdoj.gov

**3:01-cr-3046-1 Notice will be delivered by other means to:**

https://ecf.iand.uscourts.gov/cgi-bin/Dispatch.pl?741009379194331                3/16/2005

| | |
|---|---|
| **From:** | Mary Goody [mitigate@silverstar.com] |
| **Sent:** | Friday, May 13, 2005 2:19 PM |
| **To:** | Pat Berrigan; DEANSTOWERS@aol.com |
| **Subject:** | List of Mitigating Circumstances |

Here's my contribution:

1.   Pearl Jean Johnson, Angela Johnson's mother, was born into a broken family, in which she was left alone much of the time and had no bonding experience with her parents;

2.   Pearl Jean Johnson had a 9th grade education;

3.   Pearl Jean Johnson was sexually abused by her step-father;

4.   Pearl Jean Johnson and her brother, Skip Gomez, were terrorized by their step-father, causing her to have to be removed from her mother's home on numerous occasions and sent to live with relatives;

5.   Pearl Jean Johnson slept with James Johnson on the night they met;

6.   Pearl Jean Johnson became pregnant by James Johnson, a man 3 years her junior and married him within 4 months of meeting;

7.   James J. Johnson, Angela's father, had difficulties in school, and suffered from a learning disability;

8.   At 14 years of age, James Johnson was sent to the state reform school, the youngest male child ever housed there;

9.   James Johnson's father died under possible suicidal circumstances;

10. James Johnson and Pearl Johnson's marriage was unstable and there was verbal and physical abuse between them;

11. James Johnson and Pearl Johnson had 4 children within the four years they were married and divorced when Angela was 4 years old because of allegations that Pearl was caught naked with another man;

12. Pearl Johnson later had a child out of wedlock by a married man, Robert Klauss;

13. Pearl Johnson suffered from a "religious disease" and abused her children by causing them to fast - going with food for whole days at a time;

14. Pearl Johnson was emotionally unavailable to her children;

15.   James Johnson became estranged from his children after his divorce from Pearl and did not see his children or have contact with them very often. He often could not find out where they were living and had no telephone contact with them as a result of Pearl's "hiding" of the family;

16.   Angela Johnson did not know her father as a child or an teenager;

17.   Angela Johnson was singled out by her grandparents, Florence and Andrew Limesand, and Pearl Johnson to undergo "exorcisms" or casting out of deaf and dumb demons because she had a learning disability as a child;

18.   Angela Johnson had difficulties in school and her sister Wendy had to teach her to tie her shoes and to tell time because her mother, Pearl Johnson, was disinterested in her education;

19. Angela Johnson worked as a teenager continuously for many years, even when her mother, Pearl Johnson, was unemployed;

20. Pearl Johnson collected welfare benefits in a number of states;

21. When Pearl Johnson was pregnant with her daughter Holly by Robert Klauss, she and Carol Mann too her children to live in Chanute, Kansas at the home of Ted Dillow whose business was an orphanage;

22. Ted and Bobbie Dillow physically and sexually abused the Johnson children while they lived there for a period of 6 months;

23. Pearl Johnson was not present in a way to protect her children at the Dillow home - who lived in a garage type shed without a bathroom and slept in a room where there were rodents, bugs and generally unclean living arrangements. The Johnson children do not recall their mother being there with them;

24. Florence Limesand and Andrew Jensen suffered from the religious disease and lived by the texts, tapes and records of exorcisms of Bishop Whitlock. The Johnson children were made to listen to these records often;

25. Florence, Andy and Pearl once put the children in the car because they believed the world was ending and traveled in the car for three days without food or water, traveling by the direction of the "arrow shaped" birthmark on Pearl's leg;

26. Angela Johnson quit school to help her mother work at the truck stop café because her mother didn't have money to hire other workers;

27. Angela Johnson married early to get out of Pearl's home;

28. Angela Johnson married Arlyn Johnson because she was pregnant with their daughter, Alyssa, at the age of 18;

29. Angela Johnson was a good mother to Alyssa Johnson;

30. Angela Johnson became addicted to methamphetamine at a young age and used the drug nearly on a daily basis until the time of her arrest in 2001. She had an inherited proclivity to become addicted to drugs;

31. Angela Johnson's addiction to methamphetamine was severe;

32. Angela Johnson suffered from depression and low self esteem;

33. Angela Johnson suffered from fear and anxiety as a child and later as an adult;

34. Angela Johnson had impulse control problems and used drugs to self medicate;

35. Angela's John's childhood family was highly unstable, moving a great deal and her adult life was patterned on the same movement;

36. Angela Johnson's childhood caused her to have problems with Post Traumatic Stress Disorder, attachment disorder, and set her up for abuse triangle difficulties as an adult. Her relationships with men were unhealthy;

37. Terry DeGeus mentally, physically, and sexually abused Angela throughout their relationship their relationship;

38. Dustin Honken abused Angela throughout their relationship, taking advantage of her psychological problems, and poor coping skills and used her to further his own personal ends;

39. Angela Johnson had a child by Dustin Honken, Marvea Honken Johnson to

GRN000109

whom she was a good mother;

40. Angela Johnson has stayed in touch with her children Alyssa and Marvea, to the best of her ability in jail and will continue this relationship even after she has gone to prison;

41. Dustin Honken has admitted that Angela Johnson played a peripheral role in the killings of the victims in this case;

42. Angela Johnson is not a future danger while in the custody of the Bureau of Prisons;

43. Angela Johnson has not been a future danger while in the custody of the Linn County, Harding County or Blackhawk County Jails;

44. Dustin Honken's next intended victim was Angela Johnson.

GRN0060110

# List of Mitigating Circumstances

1. Pearl Jean Johnson, Angela Johnson's mother, was born into a broken family, in which she was left alone much of the time and had no bonding experience with her parents;

2. Pearl Jean Johnson had a 9th grade education;

3. Pearl Jean Johnson was sexually abused by her step-father;

4. Pearl Jean Johnson and her brother, Skip Gomez, were terrorized by their step-father, causing her to have to be removed from her mother's home on numerous occasions and sent to live with relatives;

5. Pearl Jean Johnson slept with James Johnson on the night they met;

6. Pearl Jean Johnson became pregnant by James Johnson, a man 3 years her Junior and married him within 4 months of meeting;

7. James J. Johnson, Angela's father, had difficulties in school, and suffered from a learning disability;

8. At 14 years of age, James Johnson was sent to the state reform school, the youngest male child ever housed there;

9. James Johnson's father died under possible suicidal circumstances;

10. James Johnson and Pearl Johnson's marriage was unstable and there was verbal and physical abuse between them;

11. James Johnson and Pearl Johnson had 4 children within the four years they were married and divorced when Angela was 4 years old because of allegations that Pearl was caught naked with another man;

12. Pearl Johnson later had a child out of wedlock by a married man, Robert Klauss;

13. Pearl Johnson suffered from a "religious disease" and abused her children by causing them to fast - going with food for whole days at a time;

14. Pearl Johnson was emotionally unavailable to her children;

GRN000111

15. James Johnson became estranged from his children after his divorce from Pearl and did not see his children or have contact with them very often. He often could not find out where they were living and had no telephone contact with them as a result of Pearl's "hiding" of the family;

16. Angela Johnson did not know her father as a child or an teenager;

17. Angela Johnson was singled out by her grandparents, Florence and Andrew Limesand, and Pearl Johnson to undergo "exorcisms" or casting out of deaf and dumb demons because she had a learning disability as a child;

18. Angela Johnson had difficulties in school and her sister Wendy had to teach her to tie her shoes and to tell time because her mother, Pearl Johnson, was disinterested in her education;

19. Angela Johnson worked as a teenager continuously for many years, even when her mother, Pearl Johnson, was unemployed;

20. Pearl Johnson collected welfare benefits in a number of states;

21. When Pearl Johnson was pregnant with her daughter Holly by Robert Klauss, she and Carol Mann too her children to live in Chanute, Kansas at the home of Ted Dillow whose business was an orphanage;

22. Ted and Bobbie Dillow physically and sexually abused the Johnson children while they lived there for a period of 6 months;

23. Pearl Johnson was not present in a way to protect her children at the Dillow home - who lived in a garage type shed without a bathroom and slept in a room where there were rodents, bugs and generally unclean living arrangements. The Johnson children do not recall their mother being there with them;

24. Florence Limesand and Andrew Jensen suffered from the religious disease and lived by the texts, tapes and records of exorcisms of Bishop Whitlock. The Johnson children were made to listen to these records often;

25. Florence, Andy and Pearl once put the children in the car because they believed the world was ending and traveled in the car for three days without food or water, traveling by the direction of the "arrow shaped" birthmark on Pearl's leg;

GRN000112

26. Angela Johnson quit school to help her mother work at the truck stop café because her mother didn't have money to hire other workers;

27. Angela Johnson married early to get out of Pearl's home;

28. Angela Johnson married Arlyn Johnson because she was pregnant with their daughter, Alyssa, at the age of 18;

29. Angela Johnson was a good mother to Alyssa Johnson;

30. Angela Johnson became addicted to methamphetamine at a young age and used the drug nearly on a daily basis until the time of her arrest in 2001. She had an inherited proclivity to become addicted to drugs;

31. Angela Johnson's addiction to methamphetamine was severe;

32. Angela Johnson suffered from depression and low self esteem;

33. Angela Johnson suffered from fear and anxiety as a child and later as an adult;

34. Angela Johnson had impulse control problems and used drugs to self medicate;

35. Angela's John's childhood family was highly unstable, moving a great deal and her adult life was patterned on the same movement; 36. Angela Johnson's childhood caused her to have problems with Post Traumatic Stress Disorder, attachment disorder, and set her up for abuse triangle difficulties as an adult. Her relationships with men were unhealthy;

37. Terry DeGeus mentally, physically, and sexually abused Angela throughout their relationship their relationship; 38. Dustin Honken abused Angela throughout their relationship, taking advantage of her psychological problems, and poor coping skills and used her to further his own personal ends;

39. Angela Johnson had a child by Dustin Honken, Marvea Honken Johnson to whom she was a good mother; 40. Angela Johnson has stayed in touch with her children Alyssa and Marvea, to the best of her ability in jail and will continue this relationship even after she has gone to prison;

GRN000113

41.     Dustin Honken has admitted that Angela Johnson played a peripheral role in the killings of the victims in this case;

42.     Angela Johnson is not a future danger while in the custody of the Bureau of Prisons;

43.     Angela Johnson has not been a future danger while in the custody of the Linn County, Harding County or Blackhawk County Jails;

44.     Dustin Honken's next intended victim was Angela Johnson.

GRN000114

$(unusual\ and)$

1. Defendant was under substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

2. Defendant is punishable as a principal in the offense, which was committed by another, but her participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

3. Defendant could not reasonably have forseen that the defendant's conduct in the course of the commission of the murders, for which defendant was convicted, would cause, or would create a grave risk of causing death to any person.

4. Defendant was youthful, although not under the age of 18.

5. Defendant does not have a significant prior history of other criminal conduct.

6. Defendant committed the offense under severe mental or emotional disturbance.

7. Another defendant, equally culpable in the crime, at least as to the deaths of Greg

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 15 of 100
GRN0001115

Nicholson, Lori Duncan and Terry DeGeus, will not be punishable by death as to those murders.

8. Two victims, Greg Nicholson and Terry DeGeus, consented to the conduct, methamphetamine distribution and trafficking, the resulted in their deaths.

9. Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices.

10. Angela Johnson was sexually abused and inappropriately fondled by Ted Dillo during the time the Johnson family spent with the Dillo's in Chanute Kansas when Angela was approximately nine years old.

11. Angela Johnson, if incarcerated in a federal penitentiary for life, would not be a future danger to herself or others

12. There is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela is sentenced to life imprisonment without possibility of parole.

13. Angela Johnson was raised in a single parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, ~~emotionally in~~ long periods of abondonment and physical detachment, and occasional physical abuse, resulting in Angela being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem.

14. Angela Johnson was physically abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her, in part, into a fateful relationship with Dustin Honken from which the underlying murders sprung.

GRN000117

15. Angela Johnson has a loving and lasting relationship with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobsen, Jamie Jo Hays, Jimmy Johnson and Holly Dirksen, which will continue into old age if Angela is sentenced to life imprisonment with out possibility of parole.

16. Angela Johnson suffers from chronic post traumatic stress disorder and border line personality disorder as a result of experiences endured in childhood and these mental conditions have ~~the~~ greatly hampered her ability to make intelligent, thoughtful and wise ~~decisions~~ choices in ~~so~~ many of the important decisions in her life.

17. Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and Angela's death would have a profoundly disturbing effect on their young lives, now and for years to come.

18. Angela Johnson has felt genuine remorse for the role she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and especially Kandi and Amber Duncan, which remorse will continue to every day of her life. (plague her conscience)

Case 3:09-cv-03064-MWB-LTS    Document 294-34    Filed 06/23/11    Page 18 of 100
GRN0000118

19. Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer ~~and~~ grievously her ~~death~~ execution should ~~she~~ be sentenced to death.

20. Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly effected her ability to make wise choices, to see clearly the men she has taken into her life, and to deal with difficult self-esteem and psychological issues which have plagued her since childhood.

21. Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her past kindness and helpfulness to other inmates, her interest in Bible study and religion, her artistic work, and the furtherance of her education, obtaining a GED while incarcerated after having dropped out of school years earlier in the 9th grade.

22. Angela Johnson, in spite of all of her problems with drugs, men, and her own depression, has always held a steady job, and has religiously worked to provide for the care and comfort of her daughters, Alyssa and Marvea.

GRN000119

by Dustin Honken

23. Angela Johnson was pregnant with her daughter, Marvea, at the time of these murders and as a result was in a ~~(the)~~ disadvantaged position to refute Mr. Honken, leave him, or turn him in to authorities; this is offered as an explanation for her conduct, not an excuse.

24. Despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson was always a good mother to her daughters, that she communicated with them regularly, stays as active as posible in their lives, and attempts to pass on the values and beliefs which will help her daughters avoid her ~~own fate~~ own fate.

25. That there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without parole, and against the death penalty.

That's it Nancy.

Thanks.

Pat.
Thx.

GRN000420.

B. Delete the

May 17, 2005

The Honorable Mark W. Bennett
Chief Judge, U.S. District Court
Northern District of Iowa
U.S. Courthouse
320 6th St.
Sioux City, IA 51101

Re: **U.S. v. Angela Johnson**, Case No. 01-3046 MWB

Dear Judge Bennett:

Attached are the defendant's expected mitigating factors.

Respectfully submitted,

Patrick Berrigan
Co-counsel for Angela Johnson

PB:ndl

Enclosure

GRN000121

# List of Mitigating Circumstances

1.  Angela Johnson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

2.  Angela Johnson is punishable as a principal in the offense, which was committed by another, but her participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

3.  Angela Johnson could not reasonably have foreseen that her conduct in the course of commission of the murders, for which she was convicted, would cause, or would create a grave risk of causing death to any person.

4.  Angela Johnson was youthful, although not under the age of 18.

5.  Angela Johnson does not have a significant prior history of other criminal conduct.

6.  Angela Johnson committed the offense under severe mental or emotional disturbance.

7.  Another defendant, equally or more culpable in the crime, as to the deaths of Greg Nicholson, Lori Duncan and Terry DeGeus, will not be punishable by death as to those murders.

8.  Two victims, Greg Nicholson, and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that resulted in their deaths.

9.  Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices upon her.

10. Angela Johnson was inappropriately touched, fondled and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillo's in Chanute, Kansas, when Angela was approximately nine years old.

11. Angela Johnson, if incarcerated in a federal penitentiary for life, would not be a danger to herself or others.

GRN000122

12. There is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela is sentenced to life imprisonment without possibility of parole.

13. Angela Johnson was raised in a single parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, to long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem.

14. Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her, in part, into a fateful relationship with Dustin Honken from which the underlying murders sprung.

15. Angela Johnson has loving, lasting relationships with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson and Holly Dirksen, which will continue into old age if Angela is sentenced to life imprisonment without possibility of parole.

16. Angela Johnson suffers from chronic posttraumatic stress disorder and borderline personality disorder as a result of experiences endured in childhood and these mental conditions have greatly hampered her ability to make intelligent, thoughtful and wise choices in many of the important decisions in her life.

17. Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and Angela's death would have a profoundly disturbing effect on their young lives, now and for years to come.

18. Angela Johnson has felt genuine remorse for the role she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and particularly Kandi and Amber Duncan, which remorse will continue to plague her conscience every day of her life.

19. Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously her execution should she be sentenced to death.

2

GRN000123

20. Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly effected her judgment, her personality, her relationships, and her ability to deal with difficult self-esteem and psychological issues which have plagued her since childhood.

21. Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her past kindness and helpfulness to other inmates, her interest in bible study and religion, her artistic endeavors, and the furtherance of her education, obtaining a G.E.D. while incarcerated after having dropped out of school years earlier in the 9th grade.

22. Angela Johnson, in spite of all of her problems with drugs, men, and her own depression, has always held a steady job, and has religiously worked to provide for the care and comfort of her daughters, Alyssa and Marvea.

23. Angela Johnson's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge.

24. Although guilty of participating in these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to refute Mr. Honken, leave him, or turn him in to authorities; this is offered as an explanation for her conduct, not as excuse.

25. Angela Johnson committed the offense under severe mental and emotional disturbance.

26. Despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson has always been a good mother to her daughters; she communicates with them regularly, stays as active as possible in their lives, and attempts to pass on the values and beliefs which will help her daughters avoid her own fate.

27. That there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without parole, and against the death penalty.

3

GRN000124

to compile those in notebooks, one for each juror in alphabetical order. They're all going to be printed the same size on 8 1/2-by-11 sheets of paper and to have those in a notebook simply by alphabetical order based on the last name.

THE COURT: Can you have a mock-up for it so that defense counsel can see it and I can see it and we can make any further record on it by tomorrow? We just really need one I guess. It doesn't even have to have all the photographs in it if you can just, you know, show us a mock-up of what it's going to look like.

MR. WILLIAMS: Sure.

THE COURT: Because we had some discussions about the size -- I'm not so sure the size of the photographs but what information. I think it will just be the witness's name. I'd just like to see what it is that you're proposing. I'm sure defense counsel wants to too. They've already objected to it but . . .

MR. WILLIAMS: May not be able to do it by first thing in the morning because I'm not sure where we're at in that process but certainly before we get done tomorrow.

THE COURT: That's fine, at the end of the day. Okay.

1950

We'll take a look at that tomorrow.

MR. WILLIAMS: That's all I had.

THE COURT: Okay. Anything from the defense?

MR. BERRIGAN: No, sir.

THE COURT: Okay. I really need your list of mitigators. It's way overdue. It was technically due before the trial started pursuant to my pretrial order. So, I mean, it's way, way overdue. It's beyond every deadline I've set.

Page 231

It's beyond the deadline you committed to, so I'm going to press you. When am I going to have it.

MR. BERRIGAN: Tomorrow?

THE COURT: When tomorrow?

MR. BERRIGAN: I suppose I can have it by tomorrow morning.

THE COURT: Okay. I would appreciate that because I'm going to give you a proposed set of both preliminary and final penalty phase instructions in a couple of minutes.

MR. BERRIGAN: Okay.

THE COURT: But obviously they do not have the list of mitigating factors in there.

MR. BERRIGAN: Yes.

THE COURT: And, you know, it's a matter of just adding that to it. So I will get that proposed set of final penalty phase instructions and preliminary penalty phase instructions should we have a penalty phase to you in a few

1951

minutes.

What I would like to do is tomorrow morning at 7:30 have a preliminary conference. The number-one priority would be in the sequence that we would need the instructions. So I would first like to take up -- just have a preliminary discussion about the eligibility and gateway phase 2 instructions of which there's only one set. There's not a preliminary set and a final set. There's only one set for obvious reasons.

And then I'd like to make the full record on that tomorrow afternoon at the end of the day. I'd also like to have a preliminary discussion about the preliminary and final penalty phase instructions tomorrow morning before we get started and at

Page 232

least have an additional conference tomorrow afternoon at the end of the day if we have time about the penalty phase instructions, but we obviously have some more time to work on that.

And then tomorrow I'd like to hear argument on an issue that's going to affect the substance of the penalty phase instructions, and that is the effect of Booker on the -- what we told the jury in jury selection and what we're going to tell them in the penalty phase. I've deferred having to discuss it until the penalty phase. It was actually in some preliminary eligibility instructions, but I redid those to defer that until the penalty phase, and I feel comfortable doing that.

But I'd like to have argument on it tomorrow if we

1952

could, or, if everybody's going to be here, we could do that -- Thursday morning would be fine. I have actually gone ahead -- and I have not decided what I'm going to do on that issue. I have a leaning, but I haven't decided, but I've gone ahead and revised the instructions if I follow the government's position on it because that took a lot of work to do that. And I just wanted to have a set -- you know, I'm basically using the Honken set, so that would be the defense view.

But if I actually, in light of Booker, make a substantial change in what we tell the jury, I felt I should have that language, and I've got that language ready to go. I really have gone both ways on what to do on it, and I want further argument from counsel on it.

So that's the plan. Anything else we need to take up? Okay. Why don't I go get you the set of preliminary and final penalty phase instructions. And then we'll be done for the day.

Page 233

Thanks.

MR. WILLIAMS:  Thank you.

(The foregoing trial was adjourned at 4:43 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

9-17-05
Date

1953

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| J.D. SMITH | | |
| | MR. MILLER | 1711 |
| | MR. STOWERS | 1727 |
| | MR. MILLER | 1729 |
| MARY BUCKLEY | | |
| | MR. MILLER | 1731 |
| | MR. BERRIGAN | 1739 |
| JOHN FRASCO | | |
| | MR. MILLER | 1741 |
| | MR. STOWERS | 1758 |
| JOHN KRAEMER | | |
| | MR. MILLER | 1760 |
| | MR. STOWERS | 1777 |
| | MR. MILLER | 1786 |
| DENNIS KLEIN | | |
| | MR. MILLER | 1788 |
| | MR. BERRIGAN | 1853 |
| | MR. MILLER | 1870 |
| | MR. BERRIGAN | 1873 |
| | MR. MILLER | 1874 |
| JULIA GOODIN | | |
| | MR. MILLER | 1875 |
| | MR. STOWERS | 1890 |
| | MR. MILLER | 1893 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 1903 |
| | MR. STOWERS | 1909 |
| FRANK TARASI | | |

Page 234

GRN000128

VOLUME 9, 5-18-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA   51101
                         (712) 233-3846

                                              1957

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  The record should reflect that Angela Johnson is present with her three defense lawyers and Mr. Williams is present on behalf of the United States.  We have a number of matters to take up this morning before the jury comes in at 8:30.

I'd first like to take up the proposed eligibility phase instructions.  We'll just go in order.  What's the government's position?  This is just a preliminary discussion.  It's not our final discussion.

MR. WILLIAMS:  Certainly.  Your Honor, my first thought would be to instruction number 2, page 3, the second full paragraph, at the bottom -- and this is just a wording process.  The last two sentences starts, You must make your determination of whether or not the pertinent aggravating factors have been proved and whether the defendant is, therefore, eligible for the death sentence in three steps.  That would suggest that there's three steps to the death sentence as if, you know, she will be killed in three different steps.

I think if you take away the "in the three steps" at the end of that sentence and then start the next one saying, I will explain the three-step process for making this determination in the following instructions, it might read better.

                                              1958

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 29 of 100
GRN0000129

THE COURT: Sure. Thank you.

MR. WILLIAMS: Going to instruction number 3, page 8 --

THE COURT: I assume you may not be pursuing some of these.

MR. WILLIAMS: Exactly. We are not pursuing the first two. The only one we're pursuing is the third one.

THE COURT: Number 3.

MR. WILLIAMS: Right.

THE COURT: Which would now become number 1.

MR. WILLIAMS: Correct.

THE COURT: I assumed that but --

MR. WILLIAMS: Wanted to hear from me first obviously.

THE COURT: Right.

MR. WILLIAMS: And obviously that's going to create a number of wording changes throughout that.

THE COURT: Yes, right.

MR. WILLIAMS: Okay. Instruction number 5, page 15, just a note in that first paragraph there, because we're only seeking one gateway aggravating factor, there's a change in the middle of that, if you found one and only one.

THE COURT: Yes.

MR. WILLIAMS: We'll have to just change that to the gateway aggravating factor and then just the changes on the verdict form --

1959

THE COURT: Right.

MR. WILLIAMS: -- at page 2 to reflect that issue. Other than that, we have no objections to it.

Page 3

GRN000130

THE COURT: Okay. Mr. Stowers?

MR. STOWERS: I think Mr. Berrigan's . . .

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: I don't think we have any additional recommendations at this point, Your Honor. We were concerned mostly about page 8 and the language therein so . . .

THE COURT: Okay. When you say at this time, does that mean you have some concerns and you're not disclosing them now?

MR. BERRIGAN: No.

THE COURT: Or you have no concerns at this time?

MR. BERRIGAN: No, we haven't really recognized any concerns. We did go through these last night, and that kind of jumped out at us because it was such an obvious difference with the government's position. But nothing else has, so that's my honest assessment at this point.

THE COURT: Okay. Thank you.

Now, how about the penalty phase instructions? Why don't we start with the government.

MR. WILLIAMS: Page 6, Your Honor, just wording. The first full paragraph where it says -- at step 3, it says, For each count you must consider whether the gateway aggravating

1960

factor and the one or more statutory aggravating factor that you found for that count during the eligibility phase, comma, and any nonstatutory, I would just suggest a wording change saying, Together with any nonstatutory. It's not a big deal, but it just sounds -- reads better to me.

THE COURT: Okay.

MR. WILLIAMS: I'm thumbing through quickly here,

Page 4

Judge, but I don't think I have anything else. No, I have no other changes.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: I had a number in this instruction, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: Starting on page 3, the first line which reads, You must give separate consideration to whether or not the death penalty should be imposed on each count on which you have found the defendant eligible for a death sentence. And I think many of these suggestions are going to depend on ultimately the Court's position regarding how the verdict director instructions are going to read in terms of what the options are for the jury.

But just to bring them to your attention now, we would prefer that this language to whether or not the death penalty should be imposed be removed all together and that the jury just be advised you must give separate consideration to the

1961

appropriate sentence on each count, period.

Our position is -- and I'll -- this will be clear as we go on -- that the instructions overly emphasize the death penalty as the option for punishment rather than giving equal consideration to the available punishments, and this is just one example of that.

THE COURT: Okay.

MR. BERRIGAN: The third sentence down, Your determination of whether or not to impose the death penalty, we'd like the language "whether or not to impose the death penalty" be replaced with "your determination of the sentence on

Page 5

Case 3:09-cv-03064-MWB-LTS   Document 24-14   Filed 06/23/11   Page 32 of 100
GRN000132

a particular count."

THE COURT: Okay.

MR. BERRIGAN: The next paragraph, the very last line, that the defendant should not be sentenced to death, we'd ask the Court to replace -- I'm sorry. I can't read my own note here. Oh, yes. This is -- I should read that whole sentence in context. I think it will be helpful. A mitigating factor, on the other hand, is any aspect of a defendant's character or background, any circumstance of the offense in question, or any other relevant fact or circumstance that might indicate that the defendant should -- the current language says, Not be sentenced to death. And we'd ask that be replaced by "be sentenced to life in prison without possibility of parole." The discussion is about mitigating factors, and we think that mitigating

1962

factors are essentially reasons to vote for life in prison without parole rather than not the death penalty.

THE COURT: Okay. Well, we just have a -- yeah, I doubt if I'm going to go with you on any of these.

MR. BERRIGAN: Right, it's a language thing. I understand you may not agree. I'm just proffering these suggestions.

THE COURT: Yep.

MR. BERRIGAN: The very next sentence, The three steps you must go through to make your final determination of whether or not the death penalty should, we'd like that language omitted, "whether or not the death penalty should be," and be replaced by "the sentence to be imposed." So that would read, The three steps you must go through to make your final determination of the sentence to be imposed on each count would

Page 6

be our preference.

THE COURT: You -- okay. I don't know where you are now.

MR. BERRIGAN: I'm sorry, sir.

THE COURT: But you want your mitigating factors listed in the preliminary instructions or not?

MR. BERRIGAN: We'd really prefer neither the preliminary -- the aggravating or the mitigating circumstances be listed.

THE COURT: Why would that be?

1963

MR. BERRIGAN: Well, I guess this is consistent with our earlier position about the preliminary instructions all together -- and I don't want to beat a dead horse -- our position merely being that we'd rather not have the jurors with preliminary instructions to evaluate the evidence as it's coming in in terms of whether certain mitigating or aggravating factors have been met during the course of the testimony. So to be consistent with that position, we would not want them listed.

THE COURT: But if I'm going to list aggravating factors, you want mitigating factors.

MR. BERRIGAN: If you are, yes, sir, right.

THE COURT: Right.

MR. BERRIGAN: Then my next suggestion would be on page 6, sir.

THE COURT: Okay.

MR. BERRIGAN: In the middle of the first paragraph right after step 2, we'd ask the Court to put a period after step 2, period, and omit the language "so that the count in question calls for a sentence of death," that that language be

Page 7

omitted. And then two lines down where it says, Themselves sufficient to call for, and the Court uses this language throughout the instructions, call for. We'd ask that that be replaced with "justify" which is consistent with the statute and at least the little case law that I've looked at.

THE COURT: I just want to -- okay. Where it says,

1964

Calls for a sentence of death?

MR. BERRIGAN: Yes, sir.

THE COURT: Change that to "justify"?

MR. BERRIGAN: To justify, yes.

THE COURT: Okay. That's consistent with the statutory language.

MR. BERRIGAN: Yes, sir.

THE COURT: Yeah.

MR. BERRIGAN: Then the very next sentence, Based on your weighing of all the factors, you will decide whether to impose a sentence of death, we'd like the Court to then put "or life in prison without possibility of parole," period, and omit the language that's presently there, Rather than a sentence other than death authorized by law for the count in question. And this is one of those issues where it will depend on what you decide.

THE COURT: Right, right. I'm tracking you there.

MR. BERRIGAN: Okay. And then in that same paragraph, Your Honor, the very last sentence where it says, If you unanimously -- and this again is a language issue I know. But our concern is unanimously sounds very much like the instructions that the jurors get in terms of the merits phase. We'd ask the Court to consider replacing "unanimously" with the

Page 8

GRN000135

language "each independently," so that would read, If you each independently find that a death sentence should be imposed. And

1965

that would be -- we'd ask the same change on the very next page, the third line down where it says, Unanimously find.

THE COURT: Okay.

MR. BERRIGAN: And then on page 11, Your Honor, very top of the page, The task of determining whether or not to impose a death sentence, and we'd ask that the language "whether or not to impose a death" be omitted and that that be replaced with merely "the," so that would read, The task of determining the sentence for any count in this case is an extremely important one. Then halfway through that paragraph, sir, the sentence that begins with, Remember whether or not the circumstances in this case -- language presently reads, Call for a death sentence.

THE COURT: Justify?

MR. BERRIGAN: Yes, sir, justify, and we'd ask the Court to include "or life without parole," so it would read, Justify the death penalty or life without possibility of parole on any of the counts in question is entirely yours.

THE COURT: Okay.

MR. BERRIGAN: Page 13, the very first line says, You must give separate consideration to whether or not the defendant should be sentenced to death. We'd ask that the language "whether or not the defendant should be sentenced to death" be replaced by "the appropriate sentence," so that would read, You must give separate consideration to the appropriate sentence on

1966

Page 9

Case 3:09-cv-03064-MWB-LTS   Document 29434   Filed 06/23/11   Page 36 of 100
GRN000136

each count. And then we'd ask the Court to omit the language after count that says, For which the death penalty and just leave that "on each count at issue." At this point the death penalty is obviously at issue in every count.

THE COURT: What else?

MR. BERRIGAN: The fourth -- I guess it's the end of the third line, the sentence that's in italics, Your determination to impose a death sentence on a particular count must be unanimous, we'd ask that the Court add a sentence immediately following that regarding life without parole. That sentence would be, You are not required to be unanimous in order to return a verdict sentencing Angela Johnson to life without possibility of parole.

THE COURT: Okay.

MR. BERRIGAN: Immediately after that, Your Honor, the sentence that starts, If you find that a death sentence should be imposed, we'd ask the Court to change the initial language, "if you find that a death sentence," and replace that with "whichever sentence you find should be imposed."

THE COURT: Well, except that's not a true statement of the law. Well, that gets us back into --

MR. BERRIGAN: I'm sorry? Whichever sentence you find should be imposed on a particular count, then I'm required to impose that sentence. Yes, I understand this is --

THE COURT: Well, you know, I think, you know -- I

1967

mean, we're getting into this other area now.

MR. BERRIGAN: Right, I know.

THE COURT: But if you really insist on this, then you're going to be estopped if the jury comes back with a life

Page 10

GRN000137

sentence.

MR. BERRIGAN: Yeah, we recognize that, and we'll argue this later, but that's exactly our position. We didn't go into this blind. We knew that if we took this position that it's death or life then we're held to that and we're willing to be held to it, and I don't want -- I know you're going to take this up at some point, but we've not made any bones about that.

THE COURT: Okay, fine.

MR. BERRIGAN: I'm not going to argue otherwise.

THE COURT: Okay.

MR. BERRIGAN: And then halfway through that same paragraph, Your Honor, there's a sentence that begins, On the other hand, comma, if any one of you finds that a sentence of death is not called for, and we just ask that language be replaced with "justified."

Two lines down, "unanimously" appears again in the sentence "you unanimously find that a sentence of death." We'd ask that that "unanimously" be replaced with "each independently" consistent with our earlier position.

THE COURT: I don't actually understand that argument, but you expressed it in jury selection. I don't really

1968

understand it because in any unanimous verdict, the jurors make an independent judgment.

MR. BERRIGAN: Well, I think the process is different, Your Honor.

THE COURT: Well, the process is different, but the independence isn't any different. The effect of the independence might be different.

MR. BERRIGAN: Right.

Page 11

GRN000138

THE COURT: But the fact -- they always operate independently. Every juror makes an independent judgment, and then you determine whether that judgment is unanimous or not. That's no different in the penalty phase than it is in the merits phase.

MR. BERRIGAN: Well, I guess I'd respectfully disagree that the process in the merits phase encourages deliberation in a joint decision regarding the verdict.

THE COURT: Well, we don't tell them they can't discuss it. We don't tell them --

MR. BERRIGAN: No, I know that.

THE COURT: I just totally disagree with your characterization. There's nothing in the law that supports your characterization in my view.

MR. BERRIGAN: I do think there are very different processes, and the fact that we use the same term to describe them I think's misleading.

1969

THE COURT: I don't think they are misleading. The effect is different. We don't put them in 12 different rooms and say deliberate independently and then collect the verdict separately. Do we?

MR. BERRIGAN: No.

THE COURT: And that's kind of what you suggest.

MR. BERRIGAN: Not at all.

THE COURT: Well, when you suggest they do it independently, that's exactly what you suggest. It's not independent.

MR. BERRIGAN: I don't suggest --

THE COURT: It's the same independence that they do in

Page 12

GRN000139

every jury verdict in a civil case or a criminal case that requires a unanimous verdict.

MR. BERRIGAN: Well, with all due respect, I completely disagree.

THE COURT: Well, I disagree with you, so move on to another area.

MR. BERRIGAN: Then the next area I'd like to move on to is the last sentence in that paragraph which begins, I will then determine the sentence. We ask the Court omit that all together consistent with our position that the jury's determining sentence in this case.

THE COURT: You can keep going.

MR. BERRIGAN: The next suggestion we have is on page

1970

14, Your Honor, the sentence that is in the middle of the first paragraph, These aggravating factors are sometimes called nonstatutory aggravating factors because they are not identified by the statute authorizing the death penalty for conspiracy murder and CCE murder, we'd ask that the language "authorizing the death penalty for conspiracy murder and CCE murder" be omitted all together. The sentence suggests that the aggravating circumstances authorize the death penalty which they do not. Then in the --

THE COURT: Well, it says the statute authorizing the death penalty, not that the factors authorize the death penalty. How could you read it that way?

MR. BERRIGAN: Well, because they're mixed together. "The aggravating factors are sometimes called nonstatutory aggravating factors because they're not identified by statute" is plenty sufficient. It's the language authorizing the death

Page 13

penalty for conspiracy murder and CCE murder that we object to. Our position is that even the proof of aggravating factors doesn't authorize the death penalty and that we think this sentence suggests that it does.

THE COURT: It talks about the statute authorizing the death penalty.

MR. BERRIGAN: It's unnecessary verbiage that suggests that the factors authorize the death penalty in our view.

The next suggestion we would have, sir, is under

1971

subparagraph 1, and we'd ask that the language beginning with "evidence," that whole paragraph, be omitted. There are particular factors that the defense believes are, in fact, not evidence of future dangerousness at all, particularly low rehabilitative potential which is C, lack of remorse, high custody classification. Those things in our view have nothing to do with future dangerousness. And we don't frankly know what the authority is to define that particular language in any case.

On page 15, we have the same position regarding the Court's definition of the effect of the crime upon the victims' family was injurious. We believe this language -- first of all, we think that language is self-explanatory but that the language that follows beginning with "the prosecution must prove", that explanation makes the finding of that aggravator a certainty, and we'd ask that that subparagraph be omitted.

THE COURT: You think it just doesn't need definition?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. What else?

MR. BERRIGAN: Our next recommendation, sir, would be on page 17. We'd ask that the Court omit the language in

Page 14

fairness that appears on line 5 -- or 4, I'm sorry.  That's --
it says, Would suggest, comma, in fairness that a sentence of
death is not the most appropriate punishment.

THE COURT:  Okay.

MR. BERRIGAN:  We'd also ask the Court change the

1972

language "death is not the most appropriate punishment."
Because this is a discussion about mitigating factors, we'd ask
the Court replace that with life without parole is the most or
more appropriate punishment, whatever you think is more
appropriate.

THE COURT:  What else?

MR. BERRIGAN:  On page 18, sir, in the first
paragraph, third line down, that line begins, Or her role in the
offenses in determining whether or not to impose a sentence of
death, we'd just ask that "whether or not to impose a sentence
of death" be replaced with her sentence, so that would read, Or
her role in the offenses in determining her sentence, comma,
even though those doubts did not rise.

THE COURT:  What else?

MR. BERRIGAN:  The next to last sentence on that same
page where it says, Defendant's background or character that
would mitigate against imposition of the death penalty, and we
would ask that the Court insert the language "for life without
parole" and between "mitigate" and "against" so that that would
actually read, Defendant's background or character that would
mitigate for life without parole and against imposition of the
death penalty.

THE COURT:  Okay.

MR. BERRIGAN:  Then page 19, that first paragraph is I

Page 15

think essentially identical to the preliminary instruction

1973

paragraph that describes step 3, and we'd have the same recommendations in terms of changes. That is, after step 2, there should be a period on the fourth line omitting the language "so that the count in question calls for a sentence of death." And then two lines down, the language "call for a sentence of death" we'd ask the Court to replace with "justify."

And then the last sentence in that paragraph, Based on your weighing all of the factors, you will decide -- it says, whether or not to impose a sentence of death. And we'd ask the Court to take out "or not" so that language would read, You will decide whether to impose a sentence of -- we like "of life without parole or death for the count in question," that those two options be inserted.

In the next paragraph, the very last sentence of the paragraph -- this would be the second paragraph on page 19 -- reads, Your deliberation should be based on the evidence that you have seen and heard and the law on which I've instructed you. We'd ask the Court to omit that sentence all together. At this point in the discussion the Court's talking about the weighing process. And our view is that that sentence is -- although it's accurate -- I'm not complaining about the language -- it's just not in the proper place. Perhaps if it was moved later in the paragraph -- later in the instruction it would be fine.

And another one -- a minor suggestion at the very last

1974

Page 16

GRN000143

line, Your Honor, on that page 19, it says, In order to determine whether or not the death penalty should -- and we'd just ask the Court to insert "the appropriate punishment," so that would read, In order to determine the appropriate punishment instead of the language about the death penalty.

In the middle of the very next page on page 20, there's a sentence that reads, I will then determine the sentence other than death to which the defendant should be sentenced for that count. And obviously our position is life without parole. That's the only other option, so we'd just like you to say that. I will then determine the sentence to be life in prison without possibility of parole.

Two sentences down there's another "call for," and again, "justify" we think should be more appropriate.

And then the very next paragraph that begins, Your determination to impose a sentence must be unanimous, here I don't think we could change that language given the structure of the sentence, so I was going to ask the Court if you would consider inserting an explanation immediately after "unanimous" as to what that means.

(Mr. Miller entered the courtroom.)

MR. BERRIGAN: And the explanation I was going to proffer is that after "unanimous" instead of a period there be a comma followed by "that is, all 12 jurors in their own weighing process independently found that aggravating factors outweigh

1975

mitigating factors," comma, and --

THE COURT: Well, what does that mean, independently? They can't talk to the other jurors about it?

MR. BERRIGAN: No.

Page 17

Case 3:09-cv-03064-MWB-LTS    Document 29-14    Filed 06/23/11    Page 44 of 100
GRN000144

THE COURT: I mean, I don't know what the word means.

MR. BERRIGAN: It means they have to make a decision, each juror, independently respecting this momentous decision about life or death.

THE COURT: But they make that in every case.

MR. BERRIGAN: Well, they don't in my view make it in every case.

THE COURT: They don't make an independent judgment in every case?

MR. BERRIGAN: No, I think it's a group dynamic, Your Honor. They're told that the --

THE COURT: But it's a group dynamic here because they're allowed to discuss it.

MR. BERRIGAN: Except they're told here that the failure to come back with a unanimous verdict is a verdict.

THE COURT: That's the effect of their deliberations. It doesn't -- well, we just disagree.

Okay. What else? Did you submit your own penalty phase instructions with all these suggestions?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Why not? It's not your obligation?

1976

MR. BERRIGAN: Well, we -- well, I don't know. I mean, my -- I had not dealt with these preliminary instructions before in my career, so I'm very unused to that.

THE COURT: Well, you have a pretty limited career then.

MR. BERRIGAN: We usually take them up after the evidence, and we do submit proposed instruction after the evidence but obviously the process is different here. Just for

Page 18

the record, I don't know that I finished that sentence. If you want me to, we can do it later.

THE COURT: No. Go ahead.

MR. BERRIGAN: I don't want to waste time. What I had suggested is the language we'd like to have inserted after "unanimous" in the paragraph that starts, Your determination to impose a death sentence must be unanimous, we'd like the Court to include after that a comma and the following language: That is, all 12 jurors in their own weighing process independently found that aggravating factors outweigh mitigating factors, comma, and that you are also -- that you also independently found death to be the appropriate punishment consistent with, we believe, the position of the Eighth Circuit in Allen.

Our next suggestion is the very next page on page 22. This is the defendant's right not to testify instruction. The second sentence begins, However, there is no burden upon a defendant to prove that he or she should not be sentenced to

1977

death. We'd ask the Court before that sentence to insert a sentence that says, She has a constitutional right to remain silent. I know we've told the jurors that repeatedly in the voir dire, but it's not in the instruction. And then that "however" would be changed to "furthermore" given the addition of that sentence. Otherwise that's fine.

And then the very last line in that -- or the last sentence in that same paragraph, consistent with our position regarding the death sentence language, we'd ask the Court to change the current language which says, In arriving at your decision on whether or not to impose the death sentence, to change that to "in arriving at your decision -- at your

Page 19

punishment decision, in arriving at your punishment decision, for any count in this case."

Then the very last suggestion we have, Your Honor, is the next instruction number 6 on page 23. The very first line, it says, In your consideration of whether the death sentence is called for, we'd ask that the Court insert after "sentence" "or life in prison without parole." So that would read, In your consideration of whether the death sentence or life imprisonment without parole is called for. And that's it.

THE COURT: Well, let me ask you a question. Going to -- I'm shifting gears now to the final merits instructions.

MR. BERRIGAN: Yes, sir.

THE COURT: Final merit instruction number 11,

1978

defendant's decision not to testify, you didn't complain about the fact that it doesn't discuss her constitutional right in that instruction.

MR. BERRIGAN: Yeah, and we should have, and I apologize for that. And as you know by now I'm sure, we have sometimes split responsibilities, and not all of the lawyers are doing the same things, but that language we believe should be included, and the Court's been very, I think, forceful in telling all the jurors that it's a constitutional right that she has.

THE COURT: No, I don't have any --

MR. BERRIGAN: We're not complaining about that.

THE COURT: I don't have any problem putting it in. I was just pointing out the inconsistency.

MR. BERRIGAN: It was an omission. That's plain and simple.

Page 20

THE COURT: Why don't we take the first shot at emphasizing in final instruction number 11 entitled defendant's decision not to testify that it's her constitutional right.

MR. BERRIGAN: Yes, sir. Thank you.

THE COURT: And then you can critique it after we've done that. How's that?

MR. BERRIGAN: Thank you, Your Honor.

THE COURT: Now, you want to take up now or defer till after the close of the evidence today the issue of what to tell

1979

the jury about punishment?

MR. BERRIGAN: We'd like to put it off if that's not a problem. We're going to have a short day anyway, and we want to have as much time as we need.

THE COURT: That's fine.

MR. BERRIGAN: Thank you.

THE COURT: Did you want to respond generally to the critique of the defense about the penalty phase instructions, Mr. Williams?

MR. WILLIAMS: Yes. Thank you, Your Honor. Generally I guess I don't have a problem with the change of the words "call for" to "justify" where it's been suggested in here.

As far as the unanimous aspect of it, I have the same concerns the Court do -- does. And that is it clearly suggests that this jury should not talk, that somehow they should go back and break off into individual decision making, come back, and then poll their decision and whatever that decision is done that's the end of it. I think this is a deliberative process, and I do not like the suggestion of independently.

Mr. Berrigan is very articulate. He can explain that

Page 21

to the jury. He can explain all he wants to I think to the jury the effect of them not agreeing unanimously.

THE COURT: Is he going to assign them the 12 different rooms, though, because we don't have that many in the courthouse?

1980

MR. WILLIAMS: I'm sure he'd like to. But other than that, I guess I don't have a strong opposition to the rest of the suggested changes in here. I think they're largely semantic, but that's my only real concern.

With regard to the future dangerousness and the Court's explanation in the subparagraph, I do contest the deleting of that paragraph. I think that's an appropriate paragraph, and I'll --

THE COURT: We'll try and find the authority. It obviously comes from somewhere. And we'd have that in our Honken set where we found it so . . .

MR. BERRIGAN: And we'd like to, belated as it is, take advantage of your invitation to -- we're willing to rewrite the complaints that we have about the instructions and get those to the Court by Monday if that's helpful to you rather than this oral presentation.

THE COURT: No. I think the oral presentation's fine.

MR. BERRIGAN: All right, sir.

THE COURT: Yeah. I'm sorry, Mr. Williams. Anything else you want to add?

MR. WILLIAMS: No, Your Honor. I would just for -- to alert the Court ahead of time in preparation for our argument this afternoon, given the defendant's position here that they're willing to be bound by a life-in-prison sentence, as much as I'd

Page 22

GRN000149

be fine with that, I don't think that can work. And there's

1981

a -- I think it's Greatbear or -- I can't remember the name of the case. Now it's an Eighth Circuit case that came down about two years ago in which a court I believe from South Dakota imposed a sentence that the parties agreed to but it wasn't the law, and the Eighth Circuit overturned it and said doesn't matter if the parties agree to it. The law is the law, and you have to properly follow the law.

And so I just alert the Court to that decision because I think that may impact on whether I'd like to agree to that or not, I don't know that it can be done.

THE COURT: Well, I don't think I could agree to it because I have to exercise my own independent judgment post-Booker if I'm given the authority to do so.

MR. WILLIAMS: And I don't know how you would effectuate legally the defendant's willingness to be sentenced to life without parole other than having the jury impose it. And, I mean, there's a possibility I suppose we could put into the --

THE COURT: Well, put it this way. It's a 2255 motion either way.

MR. BERRIGAN: You know, the government -- again, I think we're jumping the gun. I know we're going to discuss this this afternoon. But two years ago, two years ago, their proposed penalty phase instructions included three options, life, death, and a sentence other than life. That was their

1982

position two years ago, and there's nothing that's changed in my
Page 23

GRN000150

view legally, Your Honor, that should make things any different. I understand Booker and Fanfan don't require now the Court to follow the guidelines. But I don't know that that makes much of a difference. The jury could at least have those options at the very least, and we'll discuss it further this afternoon.

THE COURT: Yeah, why don't we take it up at the end of the day.

MR. WILLIAMS: Very good.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Anything else about the trial this morning? Any heads-up?

MR. WILLIAMS: Yeah, just have the two witnesses, Your Honor. And, you know, before noon or maybe slightly after noon.

THE COURT: Okay.

MR. BERRIGAN: Nothing by the defendant, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 8:11 a.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Is the government ready to call its next witness?

1983

MR. MILLER: Yes, Your Honor. The government calls Dawnie Wolfe Steadman. Dr. Steadman, if you'll please step forward and be sworn.

DAWNIE STEADMAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Please adjust the chair

Page 24

and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Dawnie Wolfe Steadman, S-t-e-a-d-m-a-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q.  Good morning, Dr. Steadman.

A.  Good morning.

Q.  Your occupation, ma'am?

A.  I'm an assistant professor at the State University of New York at Binghamton.

Q.  Where is Binghamton, New York?

A.  It's in the southern tier of New York just north of the Pennsylvania border in the middle of the state.

Q.  And that's part of the State University of New York system?

A.  Yes, it is.

1984

Q.  As an assistant professor there, what are your duties, ma'am?

A.  I teach both graduate and undergraduate courses in forensic anthropology, skeletal biology, general biological anthropology, diseases and evolution, and I also do research in bioarchaeology and forensic anthropology.

Q.  Please briefly describe for us your educational background that brings you to this position.

A.  I received my bachelor's degree at University of Arizona in

Page 25

GRN000152

THE COURT: Okay. Thank you very much. Have you had

2148

a chance to look at the revisions to the eligibility phase instructions, or would you like some more time?

MR. BERRIGAN: We honestly have not, Your Honor, although I remember our complaints about those were rather limited. I apologize. We just haven't had a chance to look at it. If we could do that tomorrow at some point before or after the conference call with Mr. Honken, I'm sure we'd be ready.

THE COURT: Would you be ready to do that by telephone maybe after the conference call with the Honken defense team?

MR. WILLIAMS: Certainly, Your Honor. On behalf of the United States, I'm ready to do it now. We've reviewed it. I have no objections to it. But I'll be on the phone tomorrow to have any input that the defense might have on any objections they might have.

THE COURT: Okay. Let's talk a little bit just about the list of mitigating circumstances that the defense has submitted. I have a couple of observations. You know, I can submit them in any order you want. It strikes me that there is a logical basis to group them, but this isn't it. But if there's -- and one, maybe you don't want them in a logical order. There's no requirement that they be in a logical order.

MR. BERRIGAN: I specifically did not want to group them that way, Your Honor, because I think it has a tendency that the jurors might jumble them sort of in the package that we're anticipating and that if they're sort of mixed up then

2149

Case 3:09-cv-03064-MWB-LTS    Document 94-14    Filed 06/23/11    Page 53 of 100
GRN000153

they really get more individual consideration. Now, that could be -- who knows, I mean? But that's the theory.

THE COURT: Yeah, I'm willing to defer to your view on that. I actually -- I have a little bit different view, but I understand it, and if that's -- you know, I kind of view mitigating as it's the defense thing.

MR. BERRIGAN: Yeah, and I could be completely wrong. That's the theory under which I've kind of cobbled these together.

THE COURT: No, it's less likely they would skip over or mush them together if you have them kind of spread out.

MR. BERRIGAN: Right.

THE COURT: Would you agree with me, though, for example, that 6 and 25 are identical and that you're not entitled to have two identical mitigators submitted?

MR. BERRIGAN: Yes, I would totally agree with that. Yes, sir. That was an oversight. I apologize.

THE COURT: This is just an observation. I don't really know why I have kind of a negative view of it. But it would be with regard to mitigators 1, 2, and 23. And it's the second clause of the sentence, Regardless of whether duress was of such a degree as to constitute a defense --

MR. BERRIGAN: Those are -- you probably know this, but I just took those from the statute. I think that is the language that's used.

2150

THE COURT: That "regardless of" is the language of the statute?

MR. BERRIGAN: I believe so. I don't like it either.

Page 2

GRN000154

I don't.

THE COURT: I just thought because we never instructed -- I could understand that if you instructed on it.

MR. BERRIGAN: Right. No, I don't like it either, Your Honor, and perhaps I'll propose an amendment to that, but that's how it reads in the instruction.

THE COURT: Okay. I'll tell you what. We'll leave it in then, and if you decide you want it out and you just want to end it with "Angela Johnson was under unusual and substantial duress," period --

MR. BERRIGAN: Okay. Yeah, I almost prefer that. I just -- those were statutory mitigators, so I followed the exact language. I'm not crazy about it at all.

THE COURT: I would suspect you don't need to have it.

MR. BERRIGAN: Right.

THE COURT: But that it's important to make that clear for purposes of it can be a mitigator.

MR. BERRIGAN: Yes, sir.

THE COURT: But that the jury doesn't need -- I think it'd just be confusing.

MR. BERRIGAN: I agree. I have no disagreement about that.

2151

THE COURT: Okay.

MR. BERRIGAN: I'll amend those.

THE COURT: Do you have a problem then if I just take that language out?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Now, can you work with me on the language of number 8?

Page 3

GRN000155

MR. BERRIGAN: Yes, sir.

THE COURT: I mean, I have some exception with the way it's phrased.

MR. BERRIGAN: That again is -- I guess it's a combination of my language and the statutory mitigator. There is a statutory mitigator concerning the victims consenting to the actions that caused their death. Obviously these men didn't consent to their death. But they were willing participants, we believe the evidence is, in a drug conspiracy and/or a continuing criminal enterprise that eventually led to their deaths.

THE COURT: Well, that's where I have a problem with it where it says, The methamphetamine manufacturing and distribution that resulted in their deaths.

MR. BERRIGAN: Right.

THE COURT: What resulted in their deaths was an intervening act.

MR. BERRIGAN: No, that's right.

2152

THE COURT: And so I don't have a problem with kind of the substance of it.

MR. BERRIGAN: All right. I'll be happy to work on rephrasing that, Your Honor. I think we're on the same page. It's not artfully worded.

THE COURT: To me you could just lop off that "resulted in their deaths." Everybody knows they died, every juror in this trial, and you could just -- but, you know, I'm not insisting on my language. I think you're for the most part entitled to your language unless I have a serious objection to it.

Page 4

GRN000156

05-18-05 FURTHER JURY INSTRUCTION ARGUMENT IN COURT

MR. BERRIGAN: I'll try to rework that by tomorrow; is that all right?

THE COURT: That's fine. That's fine. And then in 14.

MR. BERRIGAN: Yes, sir.

THE COURT: For some reason I just kind of have a red flag reaction to the word "fateful."

MR. BERRIGAN: Fateful, all right.

THE COURT: I mean, in many senses, of course, that's true.

MR. BERRIGAN: You're not the only one that's brought that to my attention. The members of my defense team didn't think that was a great word either.

THE COURT: Would you just take a look at that?

2153

MR. BERRIGAN: Yes, sir, absolutely.

THE COURT: And then I think in 19 "would suffer grievously," I think you want to add the word "by her execution."

MR. BERRIGAN: Yes, sir.

THE COURT: And, you know, some of that's a little bit redundant, should she be -- by her execution should she be sentenced to death.

MR. BERRIGAN: That is redundant. You're right.

THE COURT: So you might just want to say, By her execution, but why don't you look at that and we can talk about that tomorrow.

MR. BERRIGAN: I could either take out the -- either "by her execution" should be omitted.

THE COURT: Or the other.

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 29454-14    Filed 06/23/11    Page 57 of 100
GRN000157

MR. BERRIGAN:  One or the other, right.

THE COURT:  In 22, religiously doesn't really work for me.

MR. BERRIGAN:  Okay.

THE COURT:  Is there another word that you could find?

MR. BERRIGAN:  Yes, sir.

THE COURT:  Okay.

MR. BERRIGAN:  It wasn't meant to convey a religious concept.  I understand your concern.

THE COURT:  Right.  But I think it's ambiguous.  And

2154

those are the only comments I have.

Now, does the government have any comments on the list of mitigators?

MR. WILLIAMS:  No, Your Honor.  In my view I think the defense is -- let me put it this way.  I don't think I want to be in a position of impacting what they claim to be mitigators.

THE COURT:  Now, there has to be evidence ultimately to support them I think.

MR. WILLIAMS:  Right.  If there's nothing that supports some of these things obviously before the final instructions, I'll take issue with them.  But assuming they have evidence to back this up, then that's something I think they're entitled to claim whatever they want to in the realm of mitigation.

THE COURT:  Now, Mr. Berrigan, did you -- I asked Roger to make copies of the Eighth Circuit model 12.08 on the nonstatutory aggravating factors.

MR. BERRIGAN:  Yes, sir.

THE COURT:  So I don't know that there will be any

Case 3:09-cv-03064-MWB-LTS    Document 294-34    Filed 06/23/11    Page 58 of 100
GRN000158

evidence -- there has to be evidence to support it.

MR. BERRIGAN: I understand.

THE COURT: But at least I wanted to let you know where it came from.

MR. BERRIGAN: I appreciate that, and I have been enlightened as a result. I find it hard to believe, but it's

2155

obviously there in print. I mean, things like custody classification, frankly, largely depend on what crime you're charged with. It has nothing to do, in my humble opinion, with future dangerousness, but obviously the Eighth Circuit thinks otherwise, and they're going to I'm sure influence the Court more in this decision.

There is an issue about whether or not we still need to define that aggravator in the way that it's being done. That is, I understand that there's some support for the elements that have been included. I'm not sure that we need to actually insert those elements.

THE COURT: Right.

MR. BERRIGAN: So I'd still like to reserve my objection at least in that regard, but obviously there's a basis for some -- all of the subparagraphs that the Court had previously inserted.

THE COURT: Do you really think we have to define it?

MR. WILLIAMS: I think it helps, Your Honor, because, you know, for the jury simply to get the word, you know, danger to the future lives and safety of other persons, in my view I think it is helpful to the jury to have some idea of what the Court means by that or what has been taken or understood to create that. So in my view I think it helps, and if the purpose

Page 7

GRN000159

of the instructions are to aid the jury in their deliberations, I think it's helpful. Is it absolutely necessary? No. But I

2156

think it's helpful.

MR. BERRIGAN: Even the Eighth Circuit notes that some of these factors are very much debatable, Your Honor. I see the note number 5 in this handout, United States versus Davis, held that threatening words and warped bravado without affirmative acts were not admissible to prove future dangerousness which seems to contradict subparagraph A, specific threats of violence. And I suspect if we look we might be able to find other cases, but we haven't done that yet.

So our strong preference -- and I don't know that we're deciding this finally today. Perhaps we're not.

THE COURT: No, we're not.

MR. BERRIGAN: But our strong preference is we not have these kind of a checklist that we think is very much in debate as to whether these are specific acts of future dangerousness.

THE COURT: To me, you know, this is one of those situations where it seems to me the parties are flip-flopped in what they're arguing, that they would want specifics, that you're better off without them, but the parties don't see it that way, and that's why you're advocates and I'm just sitting in the middle. So I don't know. I think if the defense was insisting on specifics I would instruct on specifics. But with the defense taking just the opposite posture --

MR. WILLIAMS: I can live without them. I mean, I'm

2157

Page 8

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 60 of 100
GRN000160

fine without them.

THE COURT: I think I'm probably inclined not to go the specific route because it's clear that I'm doing that at the request of the defense in the case.

MR. BERRIGAN: Well, there's no doubt about that, sir. No, we really don't think -- I know the Eighth Circuit disagrees, and who am I to say? But this list --

THE COURT: Is that the first time they disagreed with you, Mr. Berrigan? I know it's not with me.

MR. BERRIGAN: I think it's the second time, sir. But some of these things like, as I mentioned, custody classification and low rehabilitative potential, how that could possibly equate to future dangerousness is beyond me, frankly. I suppose a gentleman who's mentally retarded sitting in prison has low potential for future rehabilitation. That doesn't mean he's a danger to anybody. It baffles me that that would be included, frankly. And if it's in the instruction, our fear is that it suggests to the jurors it's a valid consideration, and I think it's really up to them to determine these things, not the Eighth Circuit, with all due respect to them. So we'd very much like them not to be included.

THE COURT: Okay. I'm inclined not to include it. Mr. Williams?

MR. WILLIAMS: Just for fun, I was going to note that I believe if I recall Mr. Cunningham's testimony -- that'd be

2158

their expert -- I think he's talked about low custody classification being an indicative factor in determining low --

THE COURT: But you're free to argue that.

MR. WILLIAMS: Right. Oh, yeah. I just think it's

Page 9

GRN000161

ironic that their expert has actually argued that very fact, but that's fine. I can argue all that.

THE COURT: And I'm off track a little bit here, but, Mr. Berrigan, you said something this morning that caught my attention.

MR. BERRIGAN: Yes, sir.

THE COURT: And when you were going through your numerous objections to the penalty phase instructions, you did make a reference to United States versus Allen.

MR. BERRIGAN: Yes, sir.

THE COURT: And without going back to the realtime, could you refresh my recollection? And do you know which United States versus Allen opinion it would be?

MR. BERRIGAN: I actually have copies of that section. It's very brief if I could provide that, and I should have this morning.

THE COURT: Yeah, that'd be very helpful.

MR. BERRIGAN: I didn't think we were going to take it up. I have it right here if I can have just a second to give Mr. Williams a copy.

THE COURT: Sure.

2159

MR. BERRIGAN: May I approach?

THE COURT: You may.

MR. BERRIGAN: The specific language, not that you don't want to read the whole thing I'm sure, Your Honor, but on the third page, page 781, the court discusses the differences between the death penalty statutes under Title 18 and Title 21. And we think that's the language that we'd like the Court to take a look at.

Page 10

GRN000162

THE COURT: And in your view our instructions don't do that or they don't do it often enough or in the place you want it?

MR. BERRIGAN: No. I can't remember the context in which I brought this up, quite honestly, but I don't think that anywhere in the Court's instructions there's a sentence -- and I may be absolutely wrong -- that says that if the jury determines that the aggravating circumstances outweigh the mitigating circumstances they're still not required to vote for life, and that's the difference between the Title 18 and Title 21 statutes.

THE COURT: Yes, I am aware of that, and we'll go back and take a look at that.

MR. BERRIGAN: All right, sir.

THE COURT: And seems to me that if that's what the circuit said in Allen --

MR. BERRIGAN: That's what we think it says, sir.

2160

THE COURT: -- we better have it in the instructions.

Now, are we ready to talk about the issue of what to tell the jury with regard to punishment that both sides have now briefed?

MR. WILLIAMS: Certainly, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, I did pull that case that I was thinking about called Greatwalker. I've had a chance to review that decision. And again, just for the record, it's 285 Fed. 3d 727. It's a 2002 decision from the Eighth Circuit. But my recollection was a little off on it from what happened there

Page 11

versus what's happening here.

In that case the defendant was facing a death penalty or life in prison as a mandatory minimum sentence. The parties agreed to a 30-year sentence, and that was declared to be an illegal sentence the parties could not agree to.

In dicta the court does say, however, that there's an exception to the general rule that the parties can't agree to something that is not statutory if the defense agrees to a sentence that exceeds the sentence authorized by law and the government accepts a sentence reduced to the legal term. The last part of that, I'm not quite sure what that means, but at least in dicta on page 730 of the decision it appears to me that it wouldn't necessarily be an illegal sentence if the defendant

2161

agreed to be sentenced to a life term which exceeds what is the statutory mandatory minimum in the case.

And I just wanted to clarify for the record that my recollection of the holding of that case was slightly off. The holding's the same. I forgot about that dicta in there.

That said, I don't know if I have a whole lot more to add to what I briefed on this in my written submission. Mr. Berrigan's right. Three years ago when -- or two, two and a half years ago when we submitted our first set of proposed jury instructions to the Court, we had all three options in there. I would just note that the case was under control of somebody else at that point.

After that point I learned that the department's position was that the government should not be advocating that given that the guidelines were binding; if the Court rejected a requested instruction from the jury -- or from the defense that

Page 12

GRN000164

there was only two options, that we could intervene at that point and agree with the Court that that's not required, but we were not to propose that.

And so that's why we backed off of it in Honken. That's why we backed off of making that renewed suggestion in this case until Booker came out. And then once I realized the ramifications of Booker, that changes the advice that we were provided from Washington and the position we're supposed to take on this case. I think Booker does change the landscape here.

2162

So that said, I don't really have anything more to add to this argument other than what I've already provided in the brief. I think the jury's entitled to know what the law is, and I think the Court's obligated to instruct the jury as to the law.

THE COURT: And, Mr. Berrigan, before you respond, I just want to clarify one thing because I don't know if this was in a telephone conference that we had that wasn't on the record, and I suspect it was. Well, I'll talk to you back in chambers about it.

MR. BERRIGAN: And I'm aware of what you're referring to, Your Honor. I think Mr. Miller participated, not Mr. Williams.

THE COURT: Yes, and let me just try and describe. The difference was there's a difference between me rejecting an 11(c)(1)(C) agreement that restricts my discretion --

MR. BERRIGAN: Right.

THE COURT: -- and having the full discretion post-Booker to deviate or vary from the guidelines using the 3553(a) factors. And I just want -- I think you're catching the

Page 13

GRN000165

drift of what I'm saying.

MR. BERRIGAN: Yes, sir. I understand that.

THE COURT: And I wouldn't want those comments to influence your decision here.

MR. BERRIGAN: No. I can't say that they had no

2163

effect in our determination about our position all together. It was certainly a factor, but I wouldn't want to mislead you to think that I relied upon that in making this decision.

Our very strong feeling was that after we got -- well, first of all, my understanding of the proceedings of Mr. Honken -- and I'm the last one that can speak authoritatively about that here -- is that there were just two options presented, and I understand he had a mixed count Title 21 and Title 18 situation. I don't know that that would make a difference, frankly, under the law. Doesn't seem to me it would, but I wasn't privy to the discussions had by the Court and counsel.

And then we got our order from the Court respecting the voir dire, the scope of voir dire, and it was very clear to me from that order -- I don't know how it couldn't be more clear -- that there were going to be two options discussed, the death penalty and life imprisonment. We had no problem with that, frankly.

THE COURT: Yeah, but here's where -- but you had -- you knew about -- I think you told me the other day that you recognized the impact of Booker.

MR. BERRIGAN: well, actually Mr. Stowers and I saw a Fourth Circuit decision that precedes Booker, precedes Booker, that said that even if -- and I wish I had it before you. I

Page 14

GRN000166

apologize.  But even if the guidelines did require a life

2164

sentence, that doesn't mean the court was required in the Fourth Circuit to submit a verdict that said death or life.

So in my mind if that was out of the Fourth Circuit, Booker wouldn't change anything.  But that's not what we had been led to believe would apply to this case.  We've never thought for a moment that there would be sentences other than life or death, life imprisonment without parole or death.  And the parties have conducted themselves in such a manner as to I think enforce that proposition up until whenever Mr. Williams stood up a week ago and said, I looked at the law over the weekend and think maybe there should be a change.

THE COURT:  Well, here's where I'm confused.  I thought you said when we had that discussion that you were well aware of the change, you had thought it through, and you knew that before we started jury selection.  That's how I understood your comment.

MR. BERRIGAN:  I think we could have taken the position, Your Honor -- and maybe to some lawyers it would make sense.  We could have come in and said, Your Honor, what are you talking about?  Life or death?  The statute says she can get as little as 20 years, and we want to voir dire on that because there might be jurors sitting there who would not be able to consider a sentence if the Court's going to impose it --

THE COURT:  But here's my point.  I was operating under a misapprehension of the law that you knew about.

2165

Page 15

Case 3:09-cv-03064-MWB-LTS   Document 294-14   Filed 06/23/11   Page 67 of 100

GRN000167

MR. BERRIGAN: No, I don't think --

THE COURT: And you had an obligation in my view -- you had an ethical obligation to correct that.

MR. BERRIGAN: Well, I didn't know you were operating under a misapprehension of the law. I find it hard to believe that this hadn't come up -- in fact, I talked to Mr. Rogers about it, Charlie Rogers, about this very issue in the discussions about how the voir dire was conducted because he had informed me -- I didn't sit through the voir dire -- that the only two options discussed were life or death. So I was never under a misapprehension that you were uninformed as to what Title 18 provided in terms of punishments given that we had already had this experience, extended experience, with Mr. Honken.

And then just from my own experience with the Court and its research and writing, that never even remotely entered my mind that this hadn't been considered by the Court. And certainly it was not, in our view, inappropriate to have these two options. We believe that those should be the two options that are before the jury. This hasn't been an issue with the defense at all at any point, and I'm not sure why the government decided all of a sudden in the middle of the trial that it was an issue.

But it seems to me if they wanted to change the rules that should have been something that was done before the trial.

2166

This Booker decision I think came out in January. It wasn't like -- I think that was on the -- at least there was some -- I can't remember the appellate decision, circuit court appellate decision, that preceded that, but it's been an issue I think for

Case 3:09-cv-03064-MWB-LTS    Document 294-34    Filed 06/23/11    Page 68 of 100
GRN000168

some time as to whether the federal sentencing guidelines might not be mandatory, that people have known about the possibility of Booker since before the decision came down.

THE COURT: Oh, sure, because you had Blakely.

MR. BERRIGAN: Right. But, you know, in my mind, Your Honor, I don't see how Booker changes the equation. The statute hasn't changed. The statute was always as little as 20 years. And so I don't understand the government's position, frankly, that all of a sudden now because the statute's -- the guidelines aren't mandatory --

THE COURT: Because the guideline put it at a base offense level that was mandatory life, so that's why you could -- because you were bound by the guidelines, you could tell the jury that it was either death or life because the guideline range was I think a 43.

MR. BERRIGAN: Well, I don't know of any case law that supports that, and the Fourth Circuit expressly rejected that position. They said, No, that doesn't matter; we don't care what the guidelines say in terms of being bound. That decision preceded Booker. And I'll get the decision for you.

THE COURT: Yeah, I wasn't aware of that decision

2167

either.

MR. WILLIAMS: It's the Stitt decision, Your Honor, 250 Fed. 3d 878, 2001. But in Stitt basically the Fourth Circuit said it was not an error for the court to reject the defense request that the jury be instructed there was only two options. And there's a difference between that and the government ever coming forward saying that they affirmatively wanted the jury instructed that there was more than two options.

Page 17

And that's the difference, because the department in a nutshell basically to some degree found it to be disingenuous for the government to stand up and request the jury be instructed that there's more than two options when in all practical purposes there were really only two options.

Booker has changed that, and that's why before we were never supposed to ask the jury be instructed that there is more than two options because in reality there wasn't. The Fourth Circuit said it's not error for the court to reject an instruction like that but the government wasn't supposed to be asking for those kind of instructions, and that's where it's changed.

And it's my fault. You know, I did not think about the ramifications of Booker until we were into this trial or else I would have raised it long before this. And I don't have a strong opinion one way or the other about how the Court should resolve this issue, but I felt duty bound to alert the Court

2168

that this is an issue because you're going to be instructing the jury as to what the law is, and I didn't want it to be inaccurate. But how ever you resolve it is fine with me, but I wanted to raise the issue.

THE COURT: Well, I guess I'm trying to understand -- and I'm sure you have it clear in your mind -- why you wouldn't have pointed that out.

MR. BERRIGAN: Why we didn't point out what, sir? You mean that the statute provides for a sentence of as little as 20 years?

THE COURT: That, or the effect of Booker.

MR. BERRIGAN: We don't think Booker has any effect.

Page 18

GRN000170

I mean, we just disagree. And as a practical matter, there's just a virtual certainty that if our client gets convicted of aiding and abetting in five murders and all of the drug evidence that's been in this case and the conspiracy and the CCE, there's no chance that she's going to get a sentence of less than life. And to suggest to the jury --

THE COURT: Why do you say that? I have an independent obligation after Booker to evaluate the Title 18 3553(a) factors, and I have done that on my own when defense lawyers haven't even argued them and varied from the guidelines in case after case sua sponte where the defense wasn't even asking for it. And that's how I view my role.

MR. BERRIGAN: And I'm not being disparaging of the

2169

Court that it couldn't be a possibility. But, you know, we have to look at this realistically. Our client -- these are decisions literally involving life and death. We did not think there was a realistic possibility of Miss Johnson getting a sentence of less than life if she was convicted.

THE COURT: Well, whether you thought that or not, don't you think you had an obligation to point out that my preliminary instructions were in error?

MR. BERRIGAN: Well, we don't think that that's supported by the Fourth Circuit. They said, Fine, you want to have death or life, go with it. I mean, that's our option. We're the ones that are giving up a chance to get a sentence as little as 20 years. Who's prejudiced by this? Not the government. It's us. We're coming before you and saying, Hey, there are two options, life or death, and we're willing to live with that. We'll make a record with our client if we need to.

Page 19

GRN000171

We've discussed this.

We don't want to play some game where -- with the jury, particularly given this possibility that, you know, if they're told now that what we told them in voir dire really isn't true and furthermore we're going to talk to them about, you know, there's a possibility that she could get as little as 20 years and be released, we have grave concerns that there are people that could be sitting there, Your Honor -- we don't know -- that would never have been able to sit on the jury if

2170

they had known that. They were willing to give punishments that involved her never getting out of jail. Either one, life or death, they'd give those consideration, but they may not have considered a punishment that might involve her being out of jail in as little as 20 years, and now we're talking about the possibility I guess of changing that equation. And that would be very much to the detriment of the defense. We're not --

THE COURT: And it would be to the detriment of the defense because in your view it affected your voir dire strategy.

MR. BERRIGAN: Absolutely, and it will affect the decision -- the grave fear I have is it will affect the decision of the jurors if they learn, wait a second; do you mean to tell me that this woman, we find her guilty of five murders, and she might get out of jail? I'm not going to abide by that. If it means that she has to be incarcerated, then death is the only option that a juror might be willing to consider. And we have no way of finding that out at this point which is our really big concern about this whole issue is to how to deal with that.

And we don't think it's an illegal sentence.

Page 20

GRN000172

Mr. Williams has pretty much conceded that, that if the defense is saying life sentence is an option to death and that's within the range of punishment that's available to the Court, I don't know why you couldn't consider us bound by that if we're asking to be bound by it.

2171

THE COURT: Because it --

MR. BERRIGAN: That doesn't --

THE COURT: For the same reason that I vary when defense lawyers don't raise it: Because I have an independent obligation to determine the appropriate sentence.

MR. BERRIGAN: Right.

MR. WILLIAMS: Your Honor, I think that a practical solution to this issue is if the defendant is, in fact, willing to be bound by two options -- and I think we would have to have a record made by the defendant herself that she agrees to that -- then I think the Court could honestly instruct the jury that there's only two options available to them, life or death, and it would not be an incorrect statement of the law and it would be binding on the defendant.

I do feel -- I think Mr. Berrigan's right. I do feel after my review of the law, I don't think there's anything that would prohibit the defendant from agreeing to a sentence higher than what is the statutory mandatory minimum. So I wouldn't have an objection to doing that.

THE COURT: Well, it's not anything I have to decide today. Would it -- would you -- do you have in front of you my proposed preliminary and final penalty phase instructions that we talked about this morning?

MR. BERRIGAN: Yes, sir. If you could give me just a

Page 21

GRN000173

minute, I'm sure I could.

2172

THE COURT: Yeah.

MR. BERRIGAN: I have them here, sir.

THE COURT: Okay. Now, page 2 was the first draft of the alleged cure for the problem if I went with the government's initial view. You with me?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Would it make any difference to you if we came up with different language -- and I'm now in that bracketed first paragraph on page 2 -- so it would read something like this? Rather, if you determine that a death sentence should be imposed on a particular count -- death sentence should not be imposed on a particular count, then I will determine whether the defendant should be sentenced to life imprisonment without the possibility of release or some lesser punishment and not get into the 20 years to life that the statute refers to?

MR. BERRIGAN: And I appreciate that, Your Honor, but the lesser punishment obviously is something less than life without parole.

THE COURT: Yes, it is, yes, yes.

MR. BERRIGAN: And the jurors would be informed of that.

THE COURT: Yes.

MR. BERRIGAN: I think it would be better result that they not be informed of any options other than the death penalty

2173

if we're bound by this course, that you just not say anything to
Page 22

GRN000174

them at all and they're making a decision about death penalty or no death penalty. I'm not advocating this, believe me. But as opposed to talking about lesser sentences, they're not -- I don't know why they would be even advised about the lesser sentences given that they're not making a decision about whether a lesser sentence is to be given. Seems like the statute's going to say that if they don't give death then you provide the sentence.

THE COURT: How about this? Rather, if you determine that a death sentence should not be imposed on a particular count, then I will determine the appropriate sentence for the defendant.

MR. BERRIGAN: That's certainly preferable to what's here, yes, sir, not to abandon my position because I do feel strongly about it.

THE COURT: I'm trying to come up with all kinds of other options.

MR. BERRIGAN: Right. I think that's a better option certainly than what's presently in the instruction, yes, sir.

THE COURT: But it wouldn't be -- there isn't really any option I could propose that would sway your opinion.

MR. BERRIGAN: It really wouldn't, Your Honor. I think I'd feel compelled to object at some point, to be perfectly honest, only because of what we've done up to this

2174

point with the voir dire, and I don't think any of us wants a mistrial, but I don't know how I'd have -- how I could avoid at least moving for one if we're in a posture where we're doing something other than death or life.

THE COURT: No, I understand your position.

Page 23

GRN000175

MR. BERRIGAN: Yeah, and Mr. Williams apparently doesn't have at least the strenuous objections he might have had earlier. So I guess we'll just ask the Court perhaps to reconsider. I know you haven't made a decision yet.

THE COURT: No, I haven't made a decision actually.

MR. BERRIGAN: And we're happy to propose, particularly in this area -- I know I haven't given you anything -- but propose a specific instruction other than what the Court has.

THE COURT: No. I think I can figure it out.

MR. BERRIGAN: I have no doubt about that. That's a preferable alternative, sir, but it wouldn't be our choice.

THE COURT: Okay. Well, I've exhausted my imagination. I'll take it under advisement and let you know. I mean, I'm inclined -- I've sensed a shift in position a little bit, Mr. Williams. There's nothing wrong with that.

MR. WILLIAMS: No. There has been. My biggest concern was that the Court was going to be put in a position of incorrectly stating the law to the jury, and that was my biggest concern. If, in fact, the defendant's willing to be bound by

2175

those two options, then I don't think there's a problem with the Court instructing the jury that they only have two options to consider because reality is they would.

And my other concern was whether the defendant could, in fact, do that. My research has suggested she can limit herself to those two options even though that's greater than what the statute requires if that's her choice.

THE COURT: But I'm not sure that limits me.

MR. WILLIAMS: Yeah, it may not.

Page 24

GRN000176

THE COURT: I mean, I'm not sure I'm bound by any record that they make.

MR. WILLIAMS: It probably would be basically the same thing as a plea agreement the Court can accept or reject as the Court wants to do.

THE COURT: What, Mr. Stowers?

MR. STOWERS: I'm just frustrated with the whole situation. That's all.

THE COURT: Well, I'm feeling that you all kind of sandbagged me on this one, but maybe I'm missing the boat.

MR. BERRIGAN: Your Honor --

THE COURT: I think you gave me more credit than I was due is the problem.

MR. BERRIGAN: Well --

THE COURT: I should have figured it out. I understand that. Believe me, I understand that.

2176

MR. BERRIGAN: No. It isn't just you. I mean, Mr. Williams -- and he's a sharp guy. I mean, I've learned that over the years. We get these instructions from the Court, and we're talking about life or death. Nobody's saying anything. And I'm like puzzled. I was puzzled initially, but then I talked to Mr. Rogers, and I thought you had mixed counts there and there must have been some decision that we weren't going to talk about 20 years.

THE COURT: They never raised it.

MR. BERRIGAN: That's amazing to me knowing the people involved. And I looked at this case in the Fourth Circuit that said, well, okay, if you want to do that and it's in our interest, to be quite honest, not to be talking about 20 years

Page 25

GRN000177

when realistically we don't think that's a possibility, this voir dire could have drug on for ages if we're going to have to get jurors that could say, Well, I would be okay with a sentence as little as 20 years if the judge decided to impose that when realistically -- and I understand the statute says it's possible and the Court would be willing to consider it. But we don't think that that's a possible punishment that's very likely.

THE COURT: Well, before I decide, I'm going to have to hear the record that's made on the issue.

MR. BERRIGAN: Yes, sir.

THE COURT: You want to take some time out and do that later today or --

2177

MR. BERRIGAN: Can we do it tomorrow?

THE COURT: Well, there's not going to be anybody here from the government.

MR. BERRIGAN: Oh, I see.

THE COURT: I mean, we'll have time to do that.

MR. BERRIGAN: We've discussed it with Miss Johnson on a number of occasions, but I'd like to talk about it one more time before we make a record just so we're crystal clear about what's happening. But I don't anticipate any problem, frankly.

THE COURT: Well, why don't we go ahead and make that record Monday when the jury goes out to deliberate. Would that be okay?

MR. BERRIGAN: That'd be fine, sir.

THE COURT: Give you time to, you know, think it through again. You're obviously a very thoughtful lawyer, very conscientious. I'm sure you've thought a lot about this.

MR. BERRIGAN: I could make the record myself quite

Page 26

GRN000178

easily. But obviously that's Miss Johnson's decision. We'll talk about it again.

THE COURT: Yeah, it is her decision.

MR. BERRIGAN: Right. I understand that. Yeah.

THE COURT: Okay. Anything else we need to talk about?

MR. BERRIGAN: Just for scheduling purposes, Your Honor, I know there's been some discussion that there might be a

2178

break of perhaps a day between the jury's verdict, and I'm not sure in which phase, to be quite honest, a break between the merits phase verdict and the beginning of the eligibility phase or maybe it's after the eligibility phase but before the penalty phase. But I know we all have witnesses to schedule.

THE COURT: Yeah. I think it depends a little bit on when there's a verdict and the timing of it in relationship to our trial week and those type of things. But I'm not going to rush into the penalty phase. I might rush into the eligibility phase.

MR. BERRIGAN: Sure.

THE COURT: I'm not going to rush into the penalty phase. I think you know what I mean by that.

MR. BERRIGAN: Yes, sir. We'll be ready to go on the eligibility phase as soon as -- and obviously there's not a lot of preparation on that. So we'll be ready to go on that. But we would really appreciate a break between the eligibility phase and penalty phase even if it's a day just to kind of get our act together on that.

THE COURT: And I'm sure the government probably would too because you go first; right?

Page 27

MR. WILLIAMS: That's right, that's right. That'd be fine.

THE COURT: And do you actually think we're going to have about two weeks worth of test -- oh, that was with

2179

deliberation and argument, instructions?

MR. WILLIAMS: Yeah, that's with the gateway phase and deliberation, argument, and everything combined I figure we'd eat two weeks. I think the government's front-end case -- and I'm assuming that they're going to be calling -- presenting some type of psychological defense, so I'm going to have some rebuttal to that, but my front-end case I think would take a day and a half, maybe two days but probably just a day and a half to present.

THE COURT: Are there any 12.2 issues bubbling that I need to know about in terms of reports? I mean, I did extensive rulings on it.

MR. BERRIGAN: Not that we're aware of, Your Honor. We don't have any reports, and I presume we will not until we're at the posture of being in the penalty phase.

THE COURT: So I imagine all the problems will develop then, not now.

MR. BERRIGAN: Right, all of a sudden, that's right. I think -- I don't know if Mr. Williams agrees, but, you know, it's inconceivable to me that we wouldn't be finished before the break, the June 10 break, because we have 3 full weeks left. There's a possibility I think we could go into the week of June the 6th, but I'd be very surprised if it went past the 8th to be honest.

Page 28

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 80 of 100
GRN000180

May 19, 2005

The Honorable Mark W. Bennett
Chief Judge, U.S. District Court
Northern District of Iowa
U.S. Courthouse
320 6th St.
Sioux City, IA  51101

Re:  U.S. v. Angela Johnson, Case No.  01-3046 MWB

Dear Judge Bennett:

Pursuant to the Court's kind suggestions of May 18th, please find attached the first amended list of mitigating factors.  I have also reordered the mitigating factors based, in part, on our discussion yesterday.

Respectfully submitted,

Patrick Berrigan
Co-counsel for Angela Johnson

PB:ndl

Enclosure

CC:  C.J. Williams
     Tom Miller

GRN000181

# First Amended List of Mitigating Circumstances

1. Angela Johnson was under unusual and substantial duress at the time of the murders, and participated reluctantly and with extreme anxiety.

2. Angela Johnson is punishable as a principal in the offense as an aider and abettor, but her participation was relatively minor as compared to Dustin Honken's role in these murders.

3. Angela Johnson does not have a prior criminal record.

4. There is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela is sentenced to life imprisonment without possibility of parole.

5. Another defendant, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan and Terry DeGeus, will not be punishable by death as to those murders.

6. Two victims, Greg Nicholson, and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that significantly contributed to the circumstances of their deaths.

7. Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices upon her.

8. Angela Johnson was inappropriately touched, fondled and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillo's in Chanute, Kansas, when Angela was approximately nine years old.

9. Angela Johnson, if incarcerated in a federal penitentiary for life, would not be a danger to herself or others.

10. Angela Johnson was youthful, naive and notably immature at the time of the murders.

11. Angela Johnson was raised in a single parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, to long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela being

GRN000182

far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem.

12. Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her, in part, into the fated relationship with Dustin Honken from which the underlying murders sprung.

13. Angela Johnson has loving, lasting relationships with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson and Holly Dirksen, which will continue into old age if Angela is sentenced to life imprisonment without possibility of parole.

14. Angela Johnson suffers from chronic posttraumatic stress disorder and borderline personality disorder as a result of experiences endured in childhood and these mental conditions have greatly hampered her ability to make intelligent, thoughtful and wise choices in many of the important decisions in her life.

15. Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and Angela's death would have a profoundly disturbing effect on their young lives, now and for years to come.

16. Angela Johnson has felt genuine remorse for the role she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and particularly Kandi and Amber Duncan, which remorse will continue to plague her conscience every day of her life.

17. Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela be sentenced to death.

18. Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly effected her judgment, her personality, her relationships, and her ability to deal with difficult self-esteem and psychological issues which have plagued her since childhood.

19. Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her past kindness and helpfulness to other inmates, her interest in bible study and religion, her artistic endeavors, and the furtherance of her education, obtaining a G.E.D.

GRN000183

while incarcerated after having dropped out of school years earlier in the 9th grade.

20. Angela Johnson, in spite of all of her problems with drugs, men, and her own depression, has always held a steady job, and has consistently worked to provide for the care and comfort of her daughters, Alyssa and Marvea.

21. Angela Johnson's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired by stress, illicit drugs and/or the substantial domination of her boyfriend, Dustin Honken, at the time of the murders of Greg Nicholson, Lori Duncan, Kandace Duncan and Amber Duncan.

22. Although guilty of participating in these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to refute Mr. Honken, leave him, or turn him in to authorities; this is offered as an explanation for her conduct, not as excuse.

23. Angela Johnson committed the offense under severe mental and emotional disturbance.

24. Despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson has always been a good mother to her daughters; she communicates with them regularly, stays as active as possible in their lives, and attempts to pass on the values and beliefs which will help her daughters avoid her own fate.

25. That there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without parole, and against the death penalty.

GRN000184

I think that the law is that counsel can assert the privilege on behalf of the client, and we -- you know, I don't know how much more clear we can be that he intends to do that, and I'll make my professional statement that he's indicated that to me as well.

MR. PARRISH: And I would echo that and go with the conversation we had again yesterday on the same issue.

THE COURT: Well --

MR. PARRISH: Unreported conversation.

THE COURT: -- I want it on the record, so if I have to seal it to get it on the record, then I'm going to go ahead and seal the remainder of the hearing and ask the members of the public to leave the courtroom.

(Sealed proceedings are contained in a separate, sealed transcript labelled Volume 10A.)

(Proceedings reconvened in the presence of the Court, Mr. Williams, Mr. Berrigan, Mr. Stowers, and the defendant.)

MR. WILLIAMS: C.J. Williams.

2189

THE COURT: Mr. Williams, Mark Bennett.

MR. WILLIAMS: Yes, Judge.

THE COURT: We are on the record now in United States versus Angela Johnson. And I think we were going to have some discussion about the eligibility phase instructions.

MR. WILLIAMS: Very good.

THE COURT: Was there something the defense wanted to raise?

MR. STOWERS: I assume the court can be reopened.

THE COURT: Yeah, court can be reopened. Thank you for reminding me of that.

Page 5

MR. BERRIGAN: Your Honor, the defense has some --

THE COURT: Is your microphone on now?

MR. BERRIGAN: It's on now. The defense had some minor suggestions to the Court regarding the eligibility phase instructions. Most of them concern a very particular specific issue.

THE COURT: Okay.

MR. BERRIGAN: And that is that pursuant to this Allen decision which we provided at least a portion of to the Court we believe the language that appears throughout these instructions where the Court talks about the defendant is eligible for the death sentence, we would ask the Court's consideration of that being modified very slightly.

That is, our position is the defendant really isn't

2190

eligible for the death penalty even after the eligibility phase because the jurors haven't engaged in the weighing process. And she's really not eligible until -- really eligible until after they've made the weighing determination. And we think this is very easily corrected if the Court would put "consideration of" in between "for" and "the death sentence." So the language would be -- "is eligible for consideration of the death sentence" we believe would fix that problem to the extent it is a problem. And that language appears --

THE COURT: Throughout.

MR. BERRIGAN: -- on numerous occasions. I've noted them, and I'm sure we don't want to waste time going through them unless you'd like me to.

THE COURT: No, no, no. Let's just take them one at a time. Does the government have any objection to that change?

Page 6

MR. WILLIAMS: No, Your Honor.

THE COURT: I think it's a good suggestion.

MR. BERRIGAN: The other suggestion, Your Honor, is particular to instruction number 1, and it's in the -- it's in the top of page 2, the very first paragraph that begins, If you determine that the defendant is not eligible. The second sentence currently reads, I will then be responsible for determining the appropriate sentence for the defendant. And I realize this issue is still undecided.

But the defense preference would be that that read, I

2191

will then impose a sentence of life imprisonment without possibility of parole consistent with our position on this issue. I know you haven't made a determination about that, but I just wanted to bring that to your attention. This is the life-or-death question that we've been raising throughout.

THE COURT: Right.

MR. BERRIGAN: And then on page -- I think it's page 8, instruction number 3 --

THE COURT: Well, before we get to that --

MR. BERRIGAN: I'm sorry. I apologize. I'm jumping ahead.

THE COURT: Mr. Williams -- I think we have to change that sentence, I will then be responsible for determining the appropriate sentence.

MR. WILLIAMS: I think you could do it in a neutral manner by saying, I will then be responsible for imposing the sentence on the defendant without getting into what that sentence would be.

THE COURT: Although didn't I tell you at the end of

Page 7

the -- I am going to go with the -- what the parties have now agreed to.

MR. WILLIAMS: Okay.

MR. BERRIGAN: That discussion was off the record.

THE COURT: Right. Subject to --

MR. WILLIAMS: Then I have no objection to that change

2192

suggested by the defense, Your Honor.

THE COURT: Okay. And why don't you read back the language that you suggested, Mr. Berrigan.

MR. BERRIGAN: Yes, sir. The language would be, Your Honor, I will then impose a sentence of life imprisonment without possibility of parole.

THE COURT: Okay. Why don't we move on to the next.

MR. BERRIGAN: The next one would be on page 8, instruction number 3. The second sentence that begins, The gateway aggravating factors are also sometimes called threshold aggravating factors because the death sentence cannot be imposed unless the prosecution proves one such factor as to the count in question. We'd ask the Court's consideration to change "imposed" to "considered" consistent with our position on that language.

THE COURT: Any objection, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Consider that change made as well. Anything else?

MR. BERRIGAN: We addressed this yesterday, Your Honor, and I may not have done a good job. I wanted to revisit it just briefly. It's instruction number 4. It's on page 11, and it's the sentence, the second sentence in the paragraph, the

Page 8

one that says, These aggravating factors are called statutory aggravating factors because they are expressly identified in the

2193

statute authorizing the death penalty for conspiracy murder and CCE murder. I voiced a suggestion that we eliminate the language after "statute," and I think in hindsight to put that in context this would be a better sentence if "death penalty" preceded "statute" so that that language said, Expressly identified in the death penalty statute. And I know the Court may want the language about conspiracy murder, CCE murder, but our position was it was unnecessary.

THE COURT: So in your view how would the sentence read now?

MR. BERRIGAN: It would read, Your Honor, these aggravating factors are called statutory aggravating factors because they are expressly identified in the death penalty statute, period, which I think is an accurate reflection of the law. Our only concern with that sentence was the word "authorizing the death penalty," and that would eliminate that concern.

THE COURT: Do you have any problem with that, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. We'll make that change. What else?

MR. BERRIGAN: Nothing else other than --

THE COURT: You're on a roll. You shouldn't quit now.

MR. BERRIGAN: The "consideration of" language, Your Honor, is also applicable to the verdict form.

2194

Page 9

THE COURT: Yes.

MR. BERRIGAN: And I don't know if you want me to point that out or you'll figure it out, but there's just two places where I think it's applicable.

THE COURT: Okay. Why don't you point them out as long as you've identified them.

MR. BERRIGAN: I've got them right here. Step 2, just above checkmark where you'll see that's in bold, the checkmark.

THE COURT: Yes.

MR. BERRIGAN: There's a sentence in parentheses that says, You must unanimously agree on one or more of these factors as to a particular count for the defendant to be eligible for the death penalty, and we'd ask the Court to insert "for consideration of the death penalty."

THE COURT: Yes.

MR. BERRIGAN: And then that exact same change would take place on step 3, the very next page, at the very bottom line where it says, For the death penalty, we'd ask for "for consideration of the death penalty."

THE COURT: Yes.

MR. BERRIGAN: That's all, sir.

THE COURT: And, Mr. Williams, I assume you have no objection there either.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Anything else by either side on the

2195

eligibility phase instructions?

MR. BERRIGAN: Nothing else by the defense, sir.

MR. WILLIAMS: Nothing by the government, Your Honor.

Page 10

THE COURT: Okay. I think we'll defer further discussion on the penalty phase instructions should we need them until I've had a chance to incorporate what I told the lawyers off the record yesterday into a new proposed set. And we're making changes in it now. The set's going to be sent to me when I'm out of town tomorrow to review. And then we'll get it to you tomorrow by e-mail. You know, we'll have time to talk about it next week, but at least we'll have a set, more advanced set, of penalty phase instructions to work with.

MR. WILLIAMS: Very good.

THE COURT: Okay. Anything else?

MR. WILLIAMS: Your Honor, just one matter to bring to the Court's attention to think about. The victims' families all live three to four hours away from the courthouse, and at the last trial the Court agreed to give a period of time after the jury let us know that they had a verdict to allow the victims' families to travel -- along with the defendant's families to travel to the courthouse for the reading of the verdict.

Government's concern for that has only increased after the passage of the Justice For All Act in effect in November of 2004 which gives greater rights to the victims' families and suggest that they have a right to attend all public court

2196

hearings which the government understands to require the Court to do -- to make some accommodation when possible to allow that to occur.

And so in the same vein that last time we requested the Court to give a window of opportunity for the families of both the defendant and the victims to travel to the courthouse, we'd ask the same consideration in this case.

Page 11

GRN000191

MR. BERRIGAN: We're not opposed to that, Your Honor, except that my recollection is that you actually told them that in Mr. Honken's case, and we are opposed to that because it seems to emphasize unduly -- our concern is it emphasizes unduly that consideration in the jury's determination about the decision. It's fine with us that there's a delay. We just would ask the Court not to --

THE COURT: Let me ask you this. And I understand your point completely, and I agree with your point. And I'm just trying to balance, you know, inconvenience. Would it be permissible to tell them there would be a delay but not tell them the reason for the delay?

MR. BERRIGAN: Yes, exactly. Obviously you need to tell them something. They're going to sit there or even go home or whatever they're going to do for three and a half hours, but we just didn't want the reason to be so that the victim family members can be here present when you return the verdict.

THE COURT: Right, right, and I understand that.

2197

MR. BERRIGAN: Okay. That's all we had.

THE COURT: Is it okay if I tell them that before they reach their verdict without giving them the reason? And here's why. They may, for example, want to think about it overnight, come back, then know that there would be a four-hour delay, and it may affect their timing of it. And I wanted to give them a heads-up ahead of time.

MR. BERRIGAN: Yes, we're not opposed to that, Your Honor. We only had that one slight problem with that procedure.

THE COURT: Sure, which I not only understand, but I agree with it now that it's been pointed out.

Page 12

MR. BERRIGAN: Okay.

MR. WILLIAMS: And, Your Honor, along those lines, if I could just request that that be four-and-a-half-hour delay for this reason. I think last time the Court gave either three and a half or four hours, and a couple of the victims' families had trouble and one victim's family didn't get there in time because by the time we got the word and called them and they, you know, gathered up people and got in the car and headed over, it ate up more time than simply the drive time.

THE COURT: I assume the defense considers four and a half to be a friendly amendment to four?

MR. BERRIGAN: Yes, sir. It's not a time issue at all. Whatever they need is fine with us, and I'm sure the Court will have some explanation for the jurors. That's fine.

2198

THE COURT: Okay. Four and a half hours then.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Okay. Anything else, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing from the defendant, sir.

THE COURT: Okay. Thank you very much. We'll be in recess.

(The foregoing trial was adjourned at 1:02 p.m.)

Page 13

VOLUME 10, 5-19-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                          10-5-05
                                                  Date

Page 14

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 94 of 100

GRN000194

## Ketchmark, Roseann

**From:**      Whitworth, Matt
**Sent:**      Friday, May 20, 2005 3:25 PM
**To:**        Ketchmark, Roseann
**Subject:**   Fw: Johnson materials?

------------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: DAMartell@aol.com <DAMartell@aol.com>
To: Whitworth, Matt <Matt.Whitworth@usdoj.gov>
Sent: Fri May 20 15:29:49 2005
Subject: Johnson materials?

tmp.htm

 Dear Mr.            Whitworth,

I am writing to request that you approach Ms. Johnson's defense attorneys
and ask them if there is any additional information regarding their client that
they would like me to consider in rendering my opinions should her case
proceed. Specifically, it would be helpful for me to be able to  review:

     (1) any life history / timeline documents they  might have prepared;

     (2) any of her school, medical, or psychiatric  records they possess;

     (3) the names, telephone numbers, and relationships  to Mr. Johnson of
any collateral
        witnesses who have important  background information they want me to
aware of; and;

     (4) any other documents or materials their experts  have reviewed that
would assist me in
        coming to a full  appreciation of her history, background, and
related mitigation
        evidence.

Thanks for your efforts to obtain these materials.

Sincerely,

Daniel A. Martell, Ph.D., ABPP

1

GRN000195

## Whitworth, Matt

| | |
|---|---|
| **From:** | JoeltheD@aol.com |
| **Sent:** | Monday, May 23, 2005 6:52 PM |
| **To:** | Whitworth, Matt |
| **Cc:** | DAMartell@aol.com |
| **Subject:** | Re: FW: Johnson Trial |



tmp.htm

      In addition to Dan's note to you, I would add that we would like to speak with anyone that their experts spoke with and relied upon in forming any opinions to which they will testify.

Two people of particular interest that we might profit from interviewing would be Ms. Johnson ex-husband (Arlin Johnson) and her older sister (Wendy).

Thanks,
Joel

Joel A. Dvoskin, Ph.D., ABPP
Diplomate in Forensic Psychology

The information transmitted herewith is sensitive information intended only for use by the individual or entity to which it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, copying or other use of, or taking of any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender and delete the material from your computer.

1

Case 3:09-cv-03064-MWB-LTS    Document 294-14    Filed 06/23/11    Page 96 of 100
GRN000196



**U. S. Department of Justice**

*Todd P. Graves*
*United States Attorney*
*Western District of Missouri*

*Office of the United States Attorney          (816) 426-3122*
*Charles Evans Whittaker Courthouse  FAX (816) 426-4210*
*400 East 9th Street, Fifth Floor*
*Kansas City, Missouri 64106*

May 23, 2005

***SENT VIA FACSIMILE (816) 221-1636***

Mr. Patrick Berrigan
Watson & Dameron, LLP
2500 Holmes
Kansas City, Missouri 64108-2743

          Re:   **United States v. Angela Johnson**

Dear Pat:

        Before Dr. Martell and Dr. Dvoskin render their opinion regarding Ms. Johnson, they want to insure they consider all available relevant information, and must request your assistance. Generally, they would like to know if there is any additional information at your disposal that would assist them in coming to a more full understanding of Ms. Johnson's background and related mitigation evidence.

        Specifically, they would appreciate your sharing any relevant life history, school records, medical records, and psychiatric records in your possession. Additionally, if there are collateral witnesses who have important background information of Ms. Johnson, please provide Dr. Martell and Dr. Dvoskin with those names and telephone numbers so they may also have a chance to visit with them.

        I have attached the email request that our office received this morning from Dr. Martell. Pat, thank you in advance for your assistance. You may contact Dr. Martell and Dr. Dvoskin directly by email or telephone, or feel free to call Matt or me to coordinate your response.

                                        Sincerely,

                                        Roseann A. Ketchmark
                                        First Assistant
                                        United States Attorney

cc:   Dr. Daniel Martell
      Dr. Joel Dvoskin
      Matt Whitworth

                                        ** TOTAL PAGE.02 **



**U. S. Department of Justice**

*Todd P. Graves*
*United States Attorney*
*Western District of Missouri*

*Office of the United States Attorney          (816) 426-3122*
*Charles Evans Whittaker Courthouse  FAX (816) 426-4210*
*400 East 9th Street, Fifth Floor*
*Kansas City, Missouri 64106*

May 24, 2005

**_SENT VIA FACSIMILE (816) 221-1636_**

Mr. Patrick Berrigan
Watson & Dameron, LLP
2500 Holmes
Kansas City, Missouri 64108-2743

          Re:  **United States v. Angela Johnson**

Dear Pat:

          In addition to yesterday's request by Dr. Martell,
this morning I received a more specific request from Dr. Dvoskin.
I am likewise attaching his email request.

          Specifically, Dr. Dvoskin is requesting to speak with anyone
that your experts talked to that form any part of the basis for
their opinions to which they will testify.  Of particular
interest is allowing Dr. Martell and Dr. Dvoskin an opportunity
to speak with your client's ex-husband (Arlin Johnson) and her
older sister (Wendy).

          Pat, please forward contact information of these persons
(names and telephone numbers) directly by email or telephone to
Dr. Martell and Dr. Dvoskin, or call Matt or me to coordinate
your response.

                              Sincerely,

                              *RKetch*
                              Roseann A. Ketchmark
                              First Assistant
                              United States Attorney


cc:  Dr. Daniel Martell
     Dr. Joel Dvoskin
     Matt Whitworth

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

### UNDER SEAL—NOT AVAILABLE TO PROSECUTORS
(Copies only to defense counsel and "Outside Taint Attorneys" for mental health issues)

Case Number: CR01-3046-MWB                                    Date: 05/26/05

Case Title: UNITED STATES vs. ANGELA JOHNSON

JUDGE: Honorable MARK W. BENNETT

TIME IN COURT: Start: 1:15 P.M.     Adjourn: 1:48 P.M.
          Time in chambers: ALL
          Recesses: NONE

APPEARANCES:  Plaintiff: "OUTSIDE TAINT ATTORNEYS" MATT WHITWORTH AND
          ROSEANN KETCHMARK
               Defendant: PATRICK BERRIGAN

Court Reporter: SHELLY SEMMLER   Contract Reporter? NO (If yes, provide copy to financial)

PHONE? YES

TYPE OF PROCEEDING: SEALED HEARING ON MAY 26, 2005, SEALED REQUEST BY
          "OUTSIDE TAINT ATTORNEYS" FOR DISCLOSURE BY DEFENDANT OF RESULTS
          AND REPORTS OF ANY EXAMINATION ON MENTAL CONDITION

MOTION RULED ON BY THE COURT:
   A. Docket #s: 533
      (1) Ruling: GRANTED AS STATED ON THE RECORD
      (2) Order to follow: Yes__X__  No____


MISC:  COPIES ONLY TO MR. WHITWORTH, MS. KETCHMARK, AND MR. BERRIGAN;
       DOCUMENT NOT AVAILABLE TO PROSECUTORS


                                        _____/S/  ROGER W. MASTALIR_____
Co[                                              DEPUTY CLERK

FILED
U.S. District Court
Northern District of Iowa

5/26/05          By:  s/src

Copies mailed/faxed to counsel of record, pro se
parties
and others listed here:  faxed to defendant's attny's - and Taint attnys ONLY

```
MIME-Version:1.0
From:ndia.ecf.notification@iand.uscourts.gov
To:ndia.ecf.notification@iand.uscourts.gov
Bcc:stats,aewillett@tewlaw.net,amy@rosenbergstowersmorse.com,cj.williams2@usdoj.gov,iand_e
Message-Id:<228146@iand.uscourts.gov>
Subject:Activity in Case 3:01-cr-03046-MWB USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "
```

;OUTSIDE TAINT ATTYS" PER #328 ORDER "Motion Hearing" Content-Type: text/html

***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

## U.S. District Court

## Northern District of Iowa

Notice of Electronic Filing

The following transaction was received from src, entered on 5/26/2005 at 4:26 PM CDT and filed on 5/26/2005

| | |
|---|---|
| **Case Name:** | USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER |
| **Case Number:** | 3:01-cr-3046 |
| **Filer:** | |
| **Document Number:** | 538 |

**Docket Text:**
SEALED MINUTES - as to Defendant Angela Jane Johnson re [533] SEALED MOTION.(Court Reporter - Shelly Semmler) (src)

The following document(s) are associated with this transaction:


**3:01-cr-3046-1 Notice will be electronically mailed to:**

Patrick J Berrigan     pberrigan@kctriallawyers.com, rwalker@kctriallawyers.com

Thomas Henry Miller     tmiller@ag.state.ia.us,

Robert R Rigg     robert.rigg@drake.edu,

Dean A Stowers     amy@rosenbergstowersmorse.com

Alfred E Willett     aewillett@tewlaw.net, nlanoue@tewlaw.net

Charles J Williams     cj.williams2@usdoj.gov, usao.ian-crim-cr@usdoj.gov

**3:01-cr-3046-1 Notice will be delivered by other means to:**