# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br><br>ANGELA JANE JOHNSON,<br><br><br>　　　　Defendant. | No. CR 01-3046-MWB<br><br>**ORDER**<br><br>(UNDER SEAL: TO BE PROVIDED TO DEFENSE COUNSEL AND THE GOVERNMENT'S "OUTSIDE TAINT ATTORNEYS" FOR MENTAL HEALTH ISSUES ONLY) |

This matter comes before the court pursuant to the May 26, 2005, sealed Request by "Outside Taint Attorneys" For Disclosure By Defendant Of Results And Reports Of Any Examination On Mental Condition (docket no. 533). The court held a telephonic hearing on the request today at which the court advised the parties of its resolution of the various issues raised by the "Outside Taint Attorneys."

THEREFORE, the May 26, 2005, sealed Request by "Outside Taint Attorneys" For Disclosure By Defendant Of Results And Reports Of Any Examination On Mental Condition (docket no. 533) is **granted** on the terms and conditions stated on the record during the telephonic hearing.

**IT IS SO ORDERED.**

**DATED** this 26th day of May, 2005.

Filed by:
U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

copies faxed to Johnson attys and
"Outside Taint Attorneys" for Mental
Health Issued only
by: s/ des 5/26/05

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR01-3046-MWB |
| | ) | |
| ANGELA JOHNSON, | ) | FILED UNDER SEAL |
| | ) | |
| Defendant. | ) | |

### "OUTSIDE TAINT ATTORNEYS'" REQUEST FOR DISCLOSURE BY DEFENDANT OF RESULTS AND REPORTS OF ANY EXAMINATION ON MENTAL CONDITION

The United States of America, by "Outside Taint Attorneys" for the United States Attorney for the Northern District of Iowa, Roseann A. Ketchmark, First Assistant United States Attorney – Western District of Missouri, and Matt J. Whitworth, Deputy United States Attorney – Western District of Missouri, request disclosure by the defendant, to the "outside taint attorneys" and the government's mental health experts, of all results and reports of any examination on mental condition conducted by the defendant's experts about which the defendant intends to introduce evidence. This request is made pursuant to Rule 12.2(c)(3) and the Court's appointment of "outside taint attorneys." In support of this request the government offers the following:

Case 3:09-cv-03064-MWB-LTS     Document 284-15     Filed 06/23/11     Page 2 of 100

GRN000202

## I.  Rule 12.2(c)(3)

Rule 12.2(c)(3) provides for disclosure of the "results and reports" by the defendant

of their mental health experts as follows:

> **(3) Disclosing Results and Reports of the Defendant's Expert Examination.**  After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination on mental condition conducted by the defendant's expert about which the defendant intends to introduce expert evidence.

## II.  Affect of appointment of "Outside Taint Attorneys"

By order dated February 18, 2005, the Court appointed Roseann Ketchmark and Matt

Whitworth as "outside taint attorneys" to manage the government's mental health experts in

this case.  By order dated March 17, 2005, the Court found that "outside taint attorneys" are

not on the "prosecution team" and therefore, not restricted from receiving "raw testing data"

and "results and reports"under Rule 12.2(c).  The Court ordered disclosure by the defendant

and her experts of "raw testing data"obtained by her mental health experts.  The Court

concluded that because the "outside taint attorneys" are not on the prosecution team, "there

is no bar under Rule 12.2(c)(3) to disclosure at this time of the 'raw testing data' obtained

by Johnson's mental health experts to the taint attorneys for review by the government's

experts.  (Court Order at p. 36)  The Court went on to conclude the following in footnote 2:

> The court notes that this reasoning (for disclosure of 'raw testing data') would also permit the government's taint attorneys and the government's mental health experts to have access to the

2

Case 3:09-cv-03064-MWB-LTS          Document 284-15          Filed 06/23/11          Page 3 of 100

GRN000203

> defendant's experts' reports, as well as their 'raw testing data.'
> However, the taint attorneys seek only the defendant's experts'
> 'raw testing data' at this time.

Court Order at p.36.

### III. Conclusion

In conclusion, the United States respectfully requests this Court to enter an Order directing the defendant to disclose to the "outside taint attorneys" and the government's mental health experts, all results and reports of any examination on mental condition conducted by the defendant's experts about which the defendant intends to introduce evidence.

Respectfully submitted,

/s/ Roseann A. Ketchmark
Roseann A. Ketchmark #40697
First Assistant United States Attorney
Western District of Missouri
400 E. 9th Street - Fifth Floor
Kansas City, Missouri  64106
Telephone(816) 426-3122

/s/ Matt J. Whitworth
Matt J. Whitworth #33322
Deputy United States Attorney
Western District of Missouri
400 E. 9th Street - Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Outside Taint Attorneys for the
Northern District of Iowa*

3

Case 3:09-cv-03064-MWB-LTS     Document 284-15     Filed 06/23/11     Page 4 of 100
GRN000204

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served this 26th day of May 2005, by electronic notice under the Electronic Filing System (ECF) and by U.S. Mail, postage prepaid, on the following attorneys for the defendant:

Patrick J. Berrigan
WATSON 7 DAMERON, LLP
2500 Holmes Drive
Kansas City, Missouri 64108

Dean Stowers
ROSENBERG & STOWERS
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, Iowa 50309

/s/ Roseann A. Ketchmark
Roseann A. Ketchmark
First Assistant United States Attorney
Western District of Missouri
*Outside Taint Attorney for the*
*Northern District of Iowa*

| FILED |
| --- |
| U.S. District Court |
| Northern District of Iowa |
| 5/26/05          By:          s/src |
| Copies mailed/faxed to counsel of record, pro se parties and others listed here: |
| Per MWB chambers - only faxed to The above listed |
| "Taint" attnys & Defense Counsel only |

4

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 5 of 100
GRN000205

MIME-Version:1.0
From:ndia.ecf.notification@iand.uscourts.gov
To:ndia.ecf.notification@iand.uscourts.gov
Bcc:QC,aewillett@tewlaw.net,amy@rosenbergstowersmorse.com,cj.williams2@usdoj.gov,iand_ecfp
Message-Id:<227220@iand.uscourts.gov>
Subject:Activity in Case 3:01-cr-03046 MWB-USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "

;OUTSIDE TAINT ATTYS" PER #328 ORDER "Sealed Motion" Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge.
To avoid later charges, download a copy of each document during this first viewing.**

## U.S. District Court

## Northern District of Iowa

Notice of Electronic Filing

The following transaction was received from entered on 5/26/2005 at 12:17 PM CDT and filed on 5/26/2005

**Case Name:** USA v. Johnson**FAX MENTAL HEALTH ISSUES TO "OUTSIDE TAINT ATTYS" PER #328 ORDER

**Case Number:** 3:01-cr-3046

**Filer:**

**Document Number:** 533

**Docket Text:**
SEALED MOTION as to Defendant Angela Jane Johnson. (src)

The following document(s) are associated with this transaction:

**3:01-cr-3046-1 Notice will be electronically mailed to:**

Patrick J Berrigan    pberrigan@kctriallawyers.com, rwalker@kctriallawyers.com

Thomas Henry Miller    tmiller@ag.state.ia.us,

Robert R Rigg    robert.rigg@drake.edu,

Dean A Stowers    amy@rosenbergstowersmorse.com

Alfred E Willett    aewillett@tewlaw.net, nlanoue@tewlaw.net

Charles J Williams    cj.williams2@usdoj.gov, usao.ian-crim-cr@usdoj.gov

**3:01-cr-3046-1 Notice will be delivered by other means to:**

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 6 of 100

GRN000206

Thursday
5-26-05

re: MENTAL EVALUATIONS: A. Johnson

1:13pm Tel. Conf. Call w/ J. Bennett

at Request of Gov't Taint Attys.

Roseann Ketchmark →
Experts Reports to each other.
4 comments Pat made are of concern:

Prepare a Rpt.
list individual's
they relied upon

① Reports to be Prepared by Gov't, Not

② Defense Experts Not Preparing Reports
at PJB's reccomendation

③ Gov't Experts want more info.
— collateral witnesses , contact information

④ No Q's of offense to be asked of D
during evaluation

— opposed to a stipulation

what wd. it say — no Q's of D or
no impact of mental illness

March 14th → Letter Brief

1:43pm

May 26, 2005

Dr. Marilyn Hutchinson, Ph.D
Dr. William S. Logan, M.D.
Dr. Mark D. Cunningham, Ph.D

RE:   U.S. v. Angela Johnson
      Defense Mental Health Experts' Reports

Dear Doctors Bill, Marilyn, and Mark:

At 1:48 p.m. today, after a telephone hearing on the procedures to be employed in disclosing the *government's* expert's reports to the defense, Judge Bennett took issue with my position that the defense experts were under no legal obligation to produce reports in order to testify. Actually, he reluctantly *agreed* with my position- because he had to (it's *true*)- but decided it was unfair to force the government experts to produce reports and allow the defense experts to "surprise" the government prosecutors. Judge Bennett's solution was to order depositions of the defense experts in lieu of reports. Fearing the obvious logistical, time consuming, and strategic consequences which lengthy depositions would impose on all of us, I opted to get reports to the government as soon as possible.

I realize that "as soon as possible" does not mean that you guys, all very busy professionals, can drop everything to devote time to this request. However, if you could get me a rough draft of a report by this weekend, that would be wonderful. Mary and I could fact check it, get it back to you with suggestions, if any, and get the final reports to the government early next week.

The judge made a point of telling me that the report should include all sources of information on which you relied in forming your opinions. This is, in part, a response to a government complaint that I failed to provide a list of significant family members and friends, school, medical and other records, or any background material to Doctors Dan Martel and Joel Dvosky, as they requested *this week* (after interviewing Angela a month ago!). Presumably, although their reports will already have been on file, Martel and Dvosky could go out and interview relatives before they testify in an effort to bolster, or perhaps change, their opinions. I'm not worried about that happening.

Please call me with any questions that you might have (cell 816-590-3003). These reports do not need be terribly factually detailed, but must include at the very least "a written summary of the testimony that the defendant intends to elicit, including the witness's opinions, the basis and reasons for those opinions, and

GRN000208

the witnesses qualifications" (a separate CV will suffice).  I envision something of at least 6-8 pages at a minimum.

We will further talk on Friday and Saturday at our scheduled telephone interviews about the report, and any issues surrounding it.  In the meantime, thank you all so much for your continued dedication to this case, and all the work that involves.

Sincerely,

Pat Berrigan
Trial Lawyer
Watson & Dameron, LLP
Counsel for Angela Johnson

Cc:  Mary Goody (email: mitigate@silverstar.com)

GRN000209

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,

       Defendant.

_____/

No. CR01-3046

Sioux City, Iowa
May 26, 2005
1:13 p.m.

**TO BE FILED UNDER SEAL**

COPY

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff:<br>(via speakerphone) | ROSEANN KETCHMARK, ESQ.<br>MATT WHITWORTH, ESQ.<br>Assistant United States Attorney<br>Charles Evans Whittaker Courthouse<br>Room 5510<br>400 East Ninth Street<br>Kansas City, MO 64106 |
| For the Defendant:<br>(via speakerphone) | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO 64108 |
| Court Reporter: | Shelly Semmler, RMR, CRR<br>320 Sixth Street<br>Sioux City, IA 51101<br>(712) 233-3846 |

GRN000210

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good afternoon, Counsel. This is United States of America versus Angela Johnson, Criminal Number 2001-3046. I'm here in Sioux City, and I have my court reporter, and I'm not exactly sure what the purpose of the meeting is, of this conference is, but I know there was a request yesterday by the outside taint attorneys Roseann Ketchmark and Matt Whitworth from the Western District of Missouri who are the taint team lawyers in this case, and you did send me a courtesy copy of the outside taint attorneys' request for disclosure by defendant of results and reports of any examination on mental conditions, and that's about all I know.

MS. KETCHMARK: Yes, sir, that's correct. And I think yesterday Matt and I had a telephone conference with Pat Berrigan to discuss getting the experts' reports to each other and just talking about the mental condition. And there were basically four comments that Pat made that are of concern to us that because time is of the essence in some areas we thought it might be best to have a conference call and take it up immediately with you and go from there.

THE COURT: Okay.

MS. KETCHMARK: I can just kind of tell you what our four concerns are. The first one is in our discussing with Pat

reports and results of experts, Pat's opinion is that the rule requires the government's expert to prepare reports but not the defense experts. I just was not able to read that from the rule. I could be wrong. I just didn't find that the rule supported that, and that's of some concern. And Pat said that he is recommending that the defense experts not prepare reports.

And the third concern is --

THE COURT: Well, what's the second concern? I thought that was the first concern.

MS. KETCHMARK: The first concern is that the government's experts have to prepare reports and the defense experts do not.

THE COURT: Okay. That's two concerns or one?

MS. KETCHMARK: That's the first concern is that just that there are different rules for the experts.

THE COURT: And the second concern is the fact that apparently Mr. Berrigan has indicated he's instructed his experts not to prepare reports.

MS. KETCHMARK: Recommending that they not prepare reports.

THE COURT: Yeah.

MS. KETCHMARK: And then third, our experts are prepared to -- if needed prepare reports. They're believing that they should prepare a report and have asked Pat for additional information specifically to what information the

defense experts are relying on that they should also review, witnesses, collateral witnesses that may be important, if they can have contact information so they could call -- Pat told us yesterday he is not inclined to provide any of those requested information to our experts. And so that's our third concern.

And then our fourth concern is -- and this kind of is reflected in our letter brief, that the position we're put in and the prosecution, that the mental condition does not have any bearing on the defendant's thinking or behavior at the time of the offense and, therefore, we cannot ask questions about the offense, and we can sure live with that.

And our point is that although -- that the jury needs to understand that. Yesterday Pat said that the judge is clear, the prosecution team, the taint team, the experts, and that he are all clear on those parameters, but our point is the most important folks that need to have that basic understanding is the jurors, that this mental condition didn't affect the behavior and the thinking of the defendant at the time of the offense, yet Pat's opposed to preparing a stipulation to advise the jury of that, those parameters.

So those are our four concerns. And our experts are put in the position where they don't know what they're looking for. We've kind of tried to move forward with a lot of unknowns, and so we sure don't hold it against Pat in any way that he's been very strategic in trying to put himself in the

best advantage, but we're just trying to level the playing field.

THE COURT: Okay. Why don't we try to get through to the heart of the matter. Let's go through them one at a time.

Mr. Berrigan, what's your authority for the proposition that the government experts have to prepare reports but your experts don't?

MR. BERRIGAN: The rule, Your Honor, Rule 12.2(c)(3) talks about the disclosure of the results and reports of the defendant's expert examination. I don't see anywhere in the rule and I'm not aware of any other authority and, frankly, in the past I have not had experts prepare reports necessarily when they're testifying in the mitigation phase of a capital murder case and the testimony is not about the defendant's mental state at the time of the murders. So I don't think it's a situation where there's some burden upon the defense to put on -- put in reports, written reports in order to --

THE COURT: How do you get -- just a second. How do you get your construction out of the rule?

MR. BERRIGAN: I just don't think the rule -- the rule addresses government's examination and reports. It doesn't compel any reports from defense experts. So I don't think the defense is compelled to produce any reports. Certainly we, I think, need to provide by way of a general explanation about what the expert's testimony's going to be about. We need to

provide some explanation about what the testimony is going to be about.

THE COURT: I don't understand how you conclude that under the rule. Which specific rule are you looking at?

MR. BERRIGAN: I'm looking at 12.2.

THE COURT: Well, what part of 12.2?

MR. BERRIGAN: 12.2(c)(3).

THE COURT: After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination.

MR. BERRIGAN: Right.

THE COURT: What's ambiguous about that?

MR. BERRIGAN: Nothing. I think if there was a report we would absolutely have to disclose it.

THE COURT: Well, I think it's unethical for you to instruct an expert not to prepare a report.

MR. BERRIGAN: I haven't in -- well, okay.

THE COURT: Well, what have you done? You've told them not to prepare a report.

MR. BERRIGAN: The experts asked me, Your Honor, whether we want a report. I have not asked them for a report.

THE COURT: Well, here's the deal. I'm going to make it real simple. You can either have them prepare a report -- has the government -- has the government exchanged their results

and reports yet?

MR. BERRIGAN: No, sir.

THE COURT: Okay. And your -- let me ask the taint team lawyers. Your experts don't have their reports done?

MS. KETCHMARK: Not at this point. They have requested additional information before they prepare their report.

THE COURT: Well, we're out of time.

MS. KETCHMARK: They can prepare it very quickly.

THE COURT: Okay. Okay. I hear you. Well, here's what I'm ruling. Either your experts, Mr. Berrigan, prepare reports and turn them over, or I'm going to give the government the right to take their telephonic deposition.

MR. BERRIGAN: Okay.

THE COURT: So it's your choice.

MR. BERRIGAN: All right.

THE COURT: But I don't think you can do this. And I don't think you can evade the rule by not having them prepare reports.

MR. BERRIGAN: I'll have them prepare a report if I'm being directed to do so.

THE COURT: Well, either that or I'm going to give the government the right to take their deposition.

MR. BERRIGAN: Right. I understand the options.

THE COURT: So we've resolved number one. Have we --

is there anything else about number one that I need to rule on, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: No, sir. That takes care of 1 and 2.

THE COURT: Okay. Three is -- this is a little bit more problematic. The experts apparently relied on interviews of other individuals? Is that it? Is that what you're saying?

MS. KETCHMARK: We're saying we don't know what they've relied on, and they just want to make sure that they covered the important information.

THE COURT: Well, as part of their -- as part of the -- as part of their report, they're going to have to list all information they relied upon. And if it's interviewing individuals, they'll have to list the individuals and summarize the nature of the interview.

MS. KETCHMARK: Okay. Okay. They were interested in talking to like her ex-husband, her sister, and curious about contact information like phone numbers. Those folks would be helpful to get a better understanding.

MR. BERRIGAN: Your Honor?

THE COURT: Yes.

MR. BERRIGAN: These individuals, these two gentlemen that the government has hired to do the evaluation, talked to Miss Johnson for five and a half hours a month ago. And as far as I can tell, they've not done anything since. They certainly had the opportunity to ask her any questions they wanted about

GRN000217

who they should interview, how to get ahold of those folks. I have a copy of their transcript of that interview. They did not do that. Now you're kind of asking me at the eleventh hour to give the prosecution work product of the defense in order for them to kind of, I guess, get up to speed.

THE COURT: Well, who the experts talked to is not work product.

MR. BERRIGAN: No, I understand that. But they're apparently wanting me to put them in contact with people.

THE COURT: Well, I don't think you have to do it, but I think the experts do. The experts have to list all the information that they relied upon. And if they talked to somebody, they have to list identifying information about who it is they talked to and their address and phone number if they have it.

MR. BERRIGAN: Well, the rule -- and again, this is Rule 12.2(c)(3) -- anticipates that that report would go to the government after we have the government's report. So I don't know how they use our report to then be the base of their subsequent investigation to do their report when they should have done that from the beginning.

MS. KETCHMARK: I think the judge addressed that in his order how the taint team effects the raw data sent to the government's expert as well as the report.

THE COURT: Well, I don't remember what the order

said, but this was exactly the kind of problem I was trying to avoid. But you know, Mr. Berrigan, I just knew it was going to happen.

MR. BERRIGAN: Your Honor, I got a letter about this on Tuesday. I mean, these guys talked --

THE COURT: Yeah, but, Mr. Berrigan, to tell your experts not to prepare reports --

MR. BERRIGAN: Well, Your Honor, even if -- let's assume my experts had prepared a report. Let's assume that happened. The government would not get that until after they'd already given us a report, and now they're asking us for information that they want to use in preparation I guess to do some more investigation to prepare a report. I mean, they --

THE COURT: Okay. I under -- here's -- I understand what you're saying. I'm going -- here's what I'm going to do. The government has to turn over their reports without that additional information.

MS. KETCHMARK: Okay.

THE COURT: You then, Mr. Berrigan, have to give the government in your reports all of the information your experts relied upon. And if the government experts then want to go out and contact those people and change any opinions in their reports, they're free to do so.

MR. BERRIGAN: Okay.

MS. KETCHMARK: We understand.

THE COURT: But that solves -- and I think Mr. Berrigan's right. There's no requirement that that information be turned over in advance to the government -- to assist the government in conducting their investigation and report. But I think it's only fair that the government experts have the information that the defense experts relied upon. And they may, in fact, revise or modify any initial conclusions that they came to based on that new information.

MS. KETCHMARK: I understand.

THE COURT: And that's consistent or at least it's not inconsistent with 12.2.

MS. KETCHMARK: Okay. Okay.

THE COURT: What other problems are there?

MS. KETCHMARK: Our concern about the jury drawing the inference -- the common sense inference that if they're putting on mental condition as a mitigator that the jurors probably would say, well, that should -- that affected her behavior and thinking at the time of the offense, and they've clearly said that is not what they are arguing.

THE COURT: Did you ever enter into a written agreement about that?

MS. KETCHMARK: Well, we asked Mr. Berrigan about that yesterday, to enter into a stipulation that we had talked about on one of our previous conference calls. He said he was disinclined to enter a stipulation which I'm sure that's his

choice.

THE COURT: Yes. I think there's nothing that I can do to require him to stipulate to it. I just want you to reduce to writing what your agreement is, and then I'll decide if the jury should be told that in the instruction.

MS. KETCHMARK: Thank you. And I think that may be the best resolution is an instruction.

THE COURT: But right. Neither the government nor I can require Mr. Berrigan to stipulate to it. All I'm trying to do is see if you can agree on what the agreement was because I think we were all in agreement about it. And if not, I can go back and get a transcript done, but it would just be faster and easier if you would just reduce to writing what you agreed upon, and then I'll take up the question about whether at the appropriate time the jury should be informed of that agreement by way of either an oral instruction from me or include it in the written instructions.

MS. KETCHMARK: My notes reflect that that understanding is the mental condition did not affect the behavior or the thinking of the defendant surrounding the time of the offense.

THE COURT: Mr. Berrigan, is that in the ballpark?

MR. BERRIGAN: Well, it is, Your Honor, but there are really two issues. One is -- and I'm not sure which one the government's interested in or both. One is the limitations on

the experts in terms of questioning Miss Johnson, and none of the experts have questioned her about the actual homicides. And that was based upon our representation our expert did not do that as well, and this was a rebuttal evaluation.

What the government's asking for a little different I think which is kind of the -- some instruction to the jurors that tells them not to consider her mental state in some regard, and I'm not exactly sure, you know, what that pertains to.

THE COURT: Well, I thought you indicated in the prior hearing -- if I have to get the transcripts, I will -- that you were not taking the position that she had a -- that -- your mitigation had nothing to do with her mental state at the time of the offense.

MR. BERRIGAN: That's right, yeah. And I've tried to be consistent about that. We've not suggested at all that her mental condition affected her ability to in any way participate in the homicides. She does have a couple chronic conditions, chronic meaning going back almost her entire life -- one is depression, and one is posttraumatic stress disorder -- which certainly existed at the time of the homicide, but they don't go away, but we're not claiming that these homicides had anything to do with her conditions or vice versa. In fact, that will be our position certainly in the penalty phase. I'm not sure why we need a stipulation or something to that effect, Your Honor, when that's going to be clear from the testimony, but the

government's alleging we do. None of the experts are going to talk of any opinion different than what I've told you.

THE COURT: And, Mr. Berrigan, I'm not saying I'm going to instruct the jury about that. I'm just saying if I decide to I'd like agreed-upon language.

MR. BERRIGAN: Okay. Well, I guess we can see what they proffer and take a look at it.

MS. KETCHMARK: In our letter brief, we addressed our concern. This has been a concern from the --

THE COURT: Now just a second. When you say letter brief --

MS. KETCHMARK: Yes, sir.

THE COURT: -- I don't have a letter brief.

MR. BERRIGAN: I don't either.

MS. KETCHMARK: It was a March 14 letter brief that we mailed to you. Let's see. It's about --

THE COURT: Back in March?

MS. KETCHMARK: Yes. And Pat didn't submit one. And based on our letter brief and our conference call, you issued about a 36-page order.

THE COURT: Oh, okay. I thought you were talking about a letter brief filed in the last 24 hours.

MR. BERRIGAN: I did as well.

MS. KETCHMARK: This has been a concern from the beginning, and we addressed that on page -- specifically page 5

about the possibility -- and 6, the top of page 6, about possible stipulations and our beliefs that the jury would draw a wrong inference from this mental condition. And then in your -- in response to our letter brief and our conference call, in your order you addressed it specifically on page 34 about how we may enter into stipulations and that a stipulation would likely dissipate our concern, and you mentioned -- and I can't put my finger on it now but how an instruction may be necessary, and I just can't put my --

THE COURT: Yeah, okay. But the bottom line is I think a stipulation would be in order, but I can't make Mr. Berrigan stipulate to it nor can the government. And if he doesn't want to stipulate to it, he doesn't have to, and then I'll have to decide based on the evidence and probably the argument whether or not a further instruction is necessary. If I think the defense is trying to somehow get around this agreement -- and I don't suspect that Mr. Berrigan would ever do that -- I just want to be ready with language if I think I need to tell the jury something. And the language I would tell the jury would simply reflect what the parties have previously agreed to.

MS. KETCHMARK: Okay.

THE COURT: So I want to make it clear I'm not saying I'm going to tell the jury anything. I'm just trying to anticipate if I ever need to tell them which I kind of doubt

based on what Mr. Berrigan is representing to me, I'd be ready to go with some language that the parties at least can agree that that's what their agreement was. I don't expect Mr. Berrigan to agree that I should tell the jury that.

MR. BERRIGAN: Right.

THE COURT: Mr. Berrigan, are you tracking me?

MR. BERRIGAN: Yes, I am, Your Honor. Yes, I am.

THE COURT: Okay. And Miss Ketchmark and Mr. Whitworth, are you tracking me?

MS. KETCHMARK: Yes.

MR. WHITWORTH: Yes, Your Honor.

MS. KETCHMARK: It was page 7 of your order, I'm sorry, where it says it might be necessary for the Court to give an instruction.

THE COURT: Okay. Are there any other issues that are outstanding now? And how soon will the parties -- well, let me back up here. I guess under the rule the defendant has to confirm an intent to offer during the sentencing proceeding expert evidence on mental condition after the defendant is found guilty. And, Mr. Berrigan, you're doing that, aren't you?

MR. BERRIGAN: That's exactly right, Your Honor.

THE COURT: Yeah, there's no question about that.

MR. BERRIGAN: Right.

MS. KETCHMARK: Okay.

THE COURT: Do the parties anticipate problems in the

timing of the exchange of this information?

MR. BERRIGAN: No, sir. I guess it depends on when the government report comes in, but I think my experts can have their reports in very quickly I suspect. I'll call them right away.

MS. KETCHMARK: We will.

MR. WHITWORTH: Judge, we talked to our experts, and they had indicated to us they could have something -- they thought they could have something ready by the end of this week which is tomorrow or Saturday I would think. But as soon as we get it, we will get it to Pat.

THE COURT: And it's not likely, is it, Pat Berrigan, that you'll be putting on any experts next week?

MR. BERRIGAN: Well, no. That's right, Your Honor. I think our first expert is scheduled for 8:30 in the morning on Monday, the 6th. So I won't have any experts testifying next week. Of course, we do have the matter of opening statements.

THE COURT: Yes.

MR. BERRIGAN: And so it would be helpful obviously to have the information as soon as possible. But I don't anticipate expert testimony until the week following.

THE COURT: Okay. So we at least have some time to get these reports exchanged but not a whole lot of time.

MR. BERRIGAN: Right.

MS. KETCHMARK: I do have a couple of issues. When

does the wall actually come down? Will that be when --

THE COURT: I don't know. That's a good question. I was wondering the same thing.

MS. KETCHMARK: Surely by opening statement when they advise the jury? I don't know if maybe any sooner. Or maybe I'm wrong and it's later. But I think my plan is to go up and personally turn over our information we have, our collection of --

THE COURT: What's the need for the taint team after the finding of guilt?

MR. BERRIGAN: I suppose theoret -- well, we're not presenting any evidence, Your Honor.

THE COURT: Yeah, your eligibility argument?

MR. BERRIGAN: Right. That's the only thing I can think of.

THE COURT: But because there's no --

MR. BERRIGAN: It would seem to me there's no reason at all to have the taint team continue.

THE COURT: Now let me ask you this. Because we're not putting on any evidence on the eligibility phase, would you have any problem with the wall coming down now once the guilty verdicts had come in?

MR. BERRIGAN: I'm sorry. I didn't understand that question, sir.

THE COURT: Well, because we're not --

MR. BERRIGAN: No, I don't really -- no, I think after the exchange of the reports I've got no problem with the wall coming down.

MS. KETCHMARK: Okay.

MR. BERRIGAN: I think -- see, I think, Your Honor, the defense has an opportunity -- I'm not going to suggest we'd exercise it, but we'd have an opportunity once we got the government's reports I suppose theoretically to change our mind.

THE COURT: Yes.

MR. BERRIGAN: Withdraw our notice, so I don't think until we've made that determination that the wall can come down. But, you know, that's not going to take me any time at all, and I'd be very surprised if we made a change in our strategy in terms of putting on mental health evidence, but I suppose as a legal matter that should at least occur that we would have the government's evaluation and have made a determination about whether it was still going forward.

THE COURT: Well, why would it be necessary to keep the wall in effect if -- you're obviously not going to turn over your reports once you've seen the government reports unless you're going to proceed.

MR. BERRIGAN: Right. It's the government -- it's the trial attorneys' access to the government's report I think is the danger. They could potentially use that I suppose in the penalty phase if they have access to it, and I think that's the

GRN000228

whole idea, that if the defense isn't going forward, then that information does not become available to them, to the government attorneys that are trying the penalty phase. Did that make any sense?

THE COURT: Well, what was the original reason for the taint team anyway?

MR. BERRIGAN: Well, it's this whole idea under the rule that these reports not be available to the government's trial prosecutors until we're in the penalty phase and the defense has made the determination to go forward with mental health evidence, and one way that -- it's supposed to make the process a little easier I think for the government because they can have some attorneys that are out of the process that are kind of working on this evaluation, and that would be, of course, Miss Ketchmark and Mr. Whitworth, and they're going along preparing that evaluation for potential use by the trial team lawyers, and having a taint team would, you know, better enable that process. At least that was my understanding.

THE COURT: Well, but if you look at Rule 12.2(c)(2) --

MR. BERRIGAN: Uh-huh.

THE COURT: -- it says, "Must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing

proceedings expert evidence on mental conditions." You've already confirmed that intent.

MR. BERRIGAN: Yes, we have. And you could take the position that that's sufficient to turn it over. I think the danger in that is if we withdrew it to what extent that report then could be used by the government in penalty phase creates legal issues that at least it seems to me we might not want to deal with.

But having said that, it would be extremely unlikely that we're going to change our position, and I don't expect, you know, waiting for us to look at the government's report's really going to take any additional time at all, but it provides quite a bit of, I suppose, safety in terms of not having any possibility that the government's mental evaluation would be misused for any purpose for which it was not intended.

THE COURT: Okay. So your position, Mr. Berrigan, is that the wall doesn't come down until you've seen the government reports and reconfirm your intent to proceed with mental health evidence.

MR. BERRIGAN: Right, because at that point really it seems to me no need for the taint lawyers any longer since we're going forward and all the information's on the table.

THE COURT: And we don't know exactly when the government reports are going to be produced to you?

MR. BERRIGAN: Apparently not, sir.

THE COURT: Do you have a date in mind, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: Earlier this week they said they could have it by the end of the week, that they were waiting for Mr. Berrigan's response, so it sounds as if it could happen quickly.

THE COURT: Okay.

MR. WHITWORTH: Your Honor, as soon as we finish this phone call, we'll get in touch with them and ask them to get that done as quickly as possible.

THE COURT: Okay. And, Mr. Berrigan, I suspect that once you review those reports you'll know immediately whether you intend to proceed or not?

MR. BERRIGAN: Yes, sir, yeah. I have no reason to delay, Your Honor.

THE COURT: And then would you then make a commitment to me to inform the taint team that you're proceeding and that we can all agree that once you do that and you will do that as soon as reasonably practicable after receiving the government reports then the wall can come down?

MR. BERRIGAN: Absolutely. And I can't -- hopefully I'll have these reports this week, and I would hope that decision would be made no later than by the start of court on Monday morning if not sooner.

THE COURT: Well, I would think -- unless I'm missing

GRN000231

something here, I think you could read the reports and pretty much make a decision after you read them and let them know some time this weekend by e-mail.

MR. BERRIGAN: Yeah, absolutely. But they're talking about Saturday. I don't know -- yeah, we could send you an e-mail as well so you'd know ahead of time. Sure. I'll be happy to do that.

MR. WHITWORTH: Are you holding court Monday, or is it --

THE COURT: No, I'm not holding court, but I'll be in town, so if I get an e-mail and I have to hold court, I will.

MR. BERRIGAN: Yeah, I misspoke. I meant Tuesday, right.

THE COURT: No, I knew you meant on Tuesday. Yeah, but if issues come up, feel free to just e-mail me over the weekend. I've got a Blackberry, and I'm never far from it. And I deal with a lot of things that come up on short notice.

MR. BERRIGAN: Okay. We'll do that.

THE COURT: I think we've resolved everything we need to resolve.

There is this issue -- but I don't have the right lawyers on here -- about the proffer -- oh, but let me -- as long as I've got some government lawyers. They're not actually the right lawyers, but it's good enough for me, so, Miss Ketchmark and Mr. Whitworth, you're not exactly going to know

what I'm talking about, but all I need to know is a response from Mr. Berrigan. Mr. Berrigan, the government filed a motion -- the other taint team filed a motion about telling the victims' family members about the nature of the proffer.

MR. BERRIGAN: Yeah, we're opposed to that, Your Honor. I did read the motion. It's rather short.

THE COURT: Yes.

MR. BERRIGAN: It seems to rely on what effect this might have on the victims' family members. Frankly -- and I don't know. The Court hasn't made the decision yet on Mr. Vest, but, you know, if he testifies, the victim family members are already going to have heard very similar testimony. They already heard it in Mr. Honken's case.

THE COURT: I was going to say that's right, they've already heard it in Honken's case.

MR. BERRIGAN: Yeah, when Mr. Vest testified.

THE COURT: Right.

MR. BERRIGAN: So I don't know what their concern is, to be honest, and I don't --

THE COURT: Well, is the Honken proffer all that different than the Vest testimony?

MR. BERRIGAN: That's what I'm suggesting to you, sir. I know you haven't had a chance to see it, but it's not that much different. And there's no bombs in there that they would not have already heard having listened to Mr. Vest, so I'm not

sure what the concern is there. Maybe the taint team's unaware that Mr. Vest testified in the Honken case or is unaware of his testimony is the only thing I could surmise because it makes no sense, frankly. This testimony's been out there. The victims' families already heard it from a different source admittedly, but there's nothing new in this.

We are opposed to it. It seems like it creates a lot of potential problems because a lot of these folks are going to testify. And I don't know what effect, if any, it's going to have on their testimony. But, you know, I suppose if the government wanted to put the proffer in -- I doubt they're going to -- they could do that before the victims' family testified and they'd know about it. But other than that, we don't think it's appropriate.

THE COURT: Okay. I just wanted to know what your position is.

MR. BERRIGAN: Yes, sir.

THE COURT: We'll take it up with everybody Tuesday morning.

MR. BERRIGAN: We have a written response, Your Honor, that will be filed today.

THE COURT: Oh, okay. I made a decision that I'm not going to look at the proffer until af -- until after the eligibility phase determination.

MR. BERRIGAN: Sure.

THE COURT: And if there's a determination that's favorable to the defendant, then I never need to see the proffer.

MR. BERRIGAN: Right.

THE COURT: If the eligibility phase goes against the defendant, then I need to see it so I could rule on its admissibility.

MR. BERRIGAN: Right.

THE COURT: Right?

MR. BERRIGAN: Yes, sir. I think that makes sense, and it's not going to take long I don't think for the Court to make -- I mean, if we're at the penalty phase, I don't think it will take long to make a determination about the admissibility of the proffer, frankly.

THE COURT: Okay. Yeah, I've given it a lot of thought.

MR. BERRIGAN: I know. I know you have.

THE COURT: You know, I'd like to see it before I rule on it obviously, but if it's similar to Vest, I have a very good understanding of what that might be like.

MR. BERRIGAN: Right.

THE COURT: Okay. Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

MS. KETCHMARK: Since we're in a better position than the prosecution team to submit our understanding of the

agreement or proposed instruction that we should do that before we wrap up as taint counsel?

THE COURT: Yes, that'd be nice.

MS. KETCHMARK: And should that be a formal response or an informal correspondence?

THE COURT: You can kind of just do it informally.

MS. KETCHMARK: Okay.

THE COURT: Great. Thank you. Thank you all very much.

(The foregoing hearing was

concluded at 1:47 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Shelly Semmler, RMR, CRR

5-31-05
Date

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 36 of 100

GRN000236

FILED
U.S. DISTRICT COURT
SIOUX ...
NORTHERN DISTRICT OF IOWA

MAY 27 2005

By: _____
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR01-3046-MWB |
| | ) | |
| ANGELA JOHNSON, | ) | FILED UNDER SEAL |
| | ) | |
| Defendant. | ) | |

## "OUTSIDE TAINT ATTORNEYS'" REQUEST FOR JURY INSTRUCTION

The United States of America, by "Outside Taint Attorneys" for the United States Attorney for the Northern District of Iowa, Roseann A. Ketchmark, First Assistant United States Attorney - Western District of Missouri, and Matt J. Whitworth, Deputy United States Attorney - Western District of Missouri, request the following jury instruction for use in deliberation during the "penalty phase" of trial:

### I. Requested Instruction

INSTRUCTION NO. _____

You have heard mitigation evidence presented by the defendant as to her mental condition. The defendant does not claim that this mental condition affected her thinking or behavior at the time of the offenses.

GRN000237

MCRN65-005995

Although you may consider the defendant's mental health evidence for the purpose of (＿＿Defendant suggest language＿＿), you may not consider this evidence as a mitigating factor for the following purposes:

1) whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired; or

2) whether the defendant was under unusual or substantial duress; or

3) whether the defendant committed the offenses under severe mental or emotional disturbance.

II.　**Reasoning**

＿＿＿＿Counsel for the defendant argued to this Court during a telephone conference call held on Monday, March 7, 2005, that defendant does not claim that her mental condition affected her thinking or behavior at the time of the offenses. Counsel for the defendant further represented that the defense "would not argue for mitigation on the basis of any offense-specific mental condition. Johnson argued that, if her experts will not get into questions related to her involvement in the charged offenses, then the government should not be able to, either." (Memorandum and Court Order dated March 17, 2005 at p. 5) Johnson "also represented that she does *not* intend to rely on either 'duress' or 'lack of capacity.'" (Memorandum and Court Order dated March 17, 2005 at p. 33 (emphasis in original)).

2

GRN000238　　　　　MMCM08-005996

Based on the arguments and representation by the defendant, this Court ordered that there was "no need for...the government's mental health experts to inquire into offense-specific details during mental health examinations of Johnson, and no need for the court to compel Johnson to answer such questions, because Johnson has made an initial showing that neither 'need' nor 'fairness' requires such inquiries...Indeed based on her representations, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the 'penalty phase'... " (Memorandum and Court Order dated March 17, 2005 at p. 33).

It is the government's concern that without the Court specifically instructing the jury, the natural, common-sense tendency of the jury will be to draw the inference that Johnson's mental condition affected her thinking or behavior at the time of the offenses. As the government previously argued in the March 14, 2005, Letter Brief to this Court, "[k]eeping the mental condition and the offenses compartmentalized would be an unreasonable request of the jury." (Government's Letter Brief at p. 6) If the jury were to incorrectly draw the inference that Johnson's mental condition affected her thinking or behavior at the time of the offense, the government has been precluded "from using the most powerful and persuasive evidence it could muster to rebut that inference, that is, testimony from a qualified expert that Ms. Johnson's mental condition did not affect her thinking or behavior at the time of the charged crimes." (Government's Letter Brief to this Court dated March 15, 2005 at p. 6)

3

Case 3:09-cv-03064-MWB-LTS   Document 284-5   Filed 06/23/11   Page 39 of 100

GRN000239

## III.   Conclusion

In conclusion, the United States respectfully requests this Court to submit the proposed jury instruction for use by the jury in deliberation during the "penalty phase" of this trial.

Respectfully submitted,

/s/ Roseann A. Ketchmark
Roseann A. Ketchmark #40697
First Assistant United States Attorney
Western District of Missouri
400 E. 9th Street - Fifth Floor
Kansas City, Missouri 64106
Telephone (816) 426-3122

/s/ Matt J. Whitworth
Matt J. Whitworth #33322
Deputy United States Attorney
Western District of Missouri
400 E. 9th Street - Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Outside Taint Attorneys for the*
*Northern District of Iowa*

FILED
U.S. District Court
Northern District of Iowa

5/27/05        By:        s/src

Copies mailed/faxed to counsel of record, pro se
parties
and others listed here:
faxed ONLY to taint attnys and defendant's attnys

4

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served this 27th day of May 2005, by electronic notice under the Electronic Filing System (ECF) and by U.S. Mail, postage prepaid, on the following attorneys for the defendant:

Patrick J. Berrigan
WATSON 7 DAMERON, LLP
2500 Holmes Drive
Kansas City, Missouri 64108

Dean Stowers
ROSENBERG & STOWERS
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, Iowa 50309

/s/ Roseann A. Ketchmark
Roseann A. Ketchmark
First Assistant United States Attorney
Western District of Missouri

*Outside Taint Attorney for the*
*Northern District of Iowa*

5

Case 3:09-cv-03064-MWB-LTS     Document 284-15     Filed 06/23/11     Page 41 of 100

GRN000241

# FAX
# TRANSMISSION

*U.S. District Court*
*Northern District of Iowa*
*320 6th St. Room 301*
*Sioux City, Iowa 511011*
*Jud Watkins, Clerk*
*PH: 712-233-3900*
*FX: 712-233-8904*

## OFFICE OF THE CLERK
## NORTHERN DISTRICT OF IOWA

**FROM:**      SRCARLSON

**TO:**

COMPANY:

FAX NUMBER:      7, 816 221 1636

Time Sent :      Friday, May 27, 2005   04:25PM

Total. Pages :      7

Subject:      01cr3046 - Sealed document No. 541

## NEWS: ELECTRONIC FILING IS NOW REQUIRED IN THE NORTHERN DISTRICT OF IOWA

In June 2003 we implemented a new case management system in our office. This system allows for documents to be scanned onto the system and then accessed via the internet. Additionally, it allows attorneys to file electronically over the internet.

We have dedicated a portion of our web page (address below) to this project which is referred to as CM/ECF. Please take a few minutes to review this section of the web page for details on your required participation.

If you have any questions please feel free to call us or email us at ecfhelp.iand.uscourts.gov.

### WEBPAGE: www.iand.uscourts.gov

Note :

Case 3:09-cv-03064-MWB-LTS   Document 12-25   Filed 06/23/11   Page 42 of 100

U.S. District Court

Northern District of Iowa

Notice of Electronic Filing

The following transaction was received from entered on 5/27/2005 at 4:20 PM CDT and filed on 5/27/2005
Case Name: USA v. Johnson ***FAX MENTAL HEALTH ISSUES TO "OUTSIDE TADIT ATTYS" PER #338 ORDER
Case Number: 3:01-cr-3046
Filer: Dft No. 1 - Angela Jene Johnson
Document Number: 341

Docket Text:
Sealed Document as to Defendant Angela Jene Johnson. (crt)

The following document(s) are associated with this transaction:

3:01-cr-3046-1 Notice will be electronically mailed to:

Patrick J Berrigan pberrigan@atriallawyer.com, rworks@atriallawyer.com

Thomas Henry Miller tmiller@ag.state.ia.us.

Robert R Rigg robertrigg@drake.edu.

Dean A Stowers stay@cornerstowermacro.com

Alfred E Willett aewillett@terrlaw.net, mkroeger@terrlaw.net

Charles J Williams cjwilliams1@usdoj.gov, usaia-lm-crm-crt@usdoj.gov

3:01-cr-3046-1 Notice will be delivered by other means to:

Case 3:09-cv-03064-MWB-LTS  Document 284-15  Filed 06/23/11  Page 43 of 100

GRN000243

May 28, 2005

Honorable Mark W. Bennett                          by email to:  Mark.Bennett@iand.uscourts.gov
Chief Judge, U.S. District Court
Northern District of Iowa
U.S. Courthouse
320 6th Street
Sioux City, IA  51101

           RE:  Mitigation Mental Health Instruction
                U.S. v. Angela Johnson, No. 01-3046

Dear Judge Bennett:

       While the defense will resist the "Outside Taint Attorneys' Request for Jury
Instruction" in a written response, their concern about this issue prompts me to request
that the Court allow the defense to completely withdraw mitigating factor number
twenty-three (23), so as to avoid any confusion about the defendant's position. That
mitigator reads, "Angela Johnson committed the offenses under severe mental and
emotional disturbance." This mitigating factor currently appears on pages 8 and 24 of the
Court's preliminary and final penalty phase instructions.

           Thank you.

                                                    Respectfully submitted,

                                                    /s/ Pat Berrigan

                                                    Pat Berrigan
                                                    Trial Lawyer
                                                    Watson & Dameron, LLP
                                                    Counsel for Angela Johnson

    cc:  Matt Whitworth (Matt.Whitworth@usdoj.gov)
         Roseann Ketchmark (RoseannKetchmark@usdoj.gov)

Prev | **Next** | **Reply** | Reply **All** | **Forward** | **Delete** | **Print** | Move to folder... ▼

From: "Nancy Lanoue" <u>nlanoue@tewlaw.net</u> **Save Address** | **Headers**
To : <Mark_Bennett@iand.uscourts.gov>
CC : <Matt.Whitworth@usdoj.gov>,<Roseann.Ketchmark@usdoj.gov>
Date : Mon, 30 May 2005 15:23:25 -0500
Subject : **Johnson Mitigating Factors**

<u>Bennett_530_PB.doc</u> (Binary attachment)

Prev | **Next** | **Reply** | Reply **All** | **Forward** | **Delete** | **Print** | Move to folder... ▼

GRN000245

http://mail.tewlaw.net/Xa50fcb939d999cc9ce950aa104/rmail.44129.cgi?&mbx=Sent&ms...    5/30/2005

*Copy*

May 30, 2005

**VIA E-MAIL**

The Honorable Mark W. Bennett
Chief Judge, U.S. District Court
Northern District of Iowa
U.S. Courthouse
320 6th St.
Sioux City, IA 51101

  Re: <u>**U.S. v. Angela Johnson**</u>, **Case No. 01-3046 MWB**

Dear Judge Bennett:

  In the evolving process of refining the defense's mitigating factors, I have concluded that mitigating factor number twenty-one (21), which incorporates language from the statutory mitigator set out in 21 U.S.C. § 848(m)(1), may suggest the presence of a *mental* incapacity which the defense is *not* relying on in the penalty phase of the trial. Accordingly, I would respectfully request that the Court modify mitigating factor twenty-one by replacing it with the following language:

> At the time of the murders of Gregory Nicholson, Lori Duncan, Kandace Duncan and Amber Duncan, Angela Johnson was under the substantial domination of Dustin Honken, causing in her unusual stress, anxiety, and an impairment of her normal judgment.

  Because this wording incorporates mitigator number one, that mitigating factor should be deleted altogether.

  Additionally, based on consultations with the defense mental health experts, I now realize that a portion of mitigating factor number fourteen is in error. The defense respectfully requests that the present language, "disorder and borderline personality disorder" be replaced by, "anxiety and depression". Obviously, renumbering would make this mitigating factor number thirteen.

GRN000246

Thanks for your patience with this process, your honor. I suspect fewer changes as we proceed – or else I'll run out of mitigators.

Respectfully submitted,


Patrick Berrigan
Co-counsel for Angela Johnson


PB:ndl


CC:    Matt Whitworth (Matt.Whitworth@usdoj.gov)
       Roseann Ketchmark (Roseann.Ketchmark@usdoj.gov)

GRN000247

Copy

May 30, 2005

*Thanks Nancy! This looks great.
Can you kindly forward a copy to
our 3 doctors:
mdc @ markdcunningham.com
psyCXprt @ aol.com
lopepc @ aol.com, and wsl@ webtv.
Thanks Nancy. Pat* net

The Honorable Mark W
Chief Judge, U.S. Distri
Northern District of Io'
U.S. Courthouse
320 6th St.
Sioux City, IA  51101

Re:  **U.S. v. Ang**

Dear Judge Bennett:

In the evolving process of refining the defense's mitigating factors, I have concluded that mitigating factor number twenty-one (21), which incorporates language from the statutory mitigator set out in 21 U.S.C. § 848(m)(1), may suggest the presence of a *mental* incapacity which the defense is *not* relying on in the penalty phase of the trial. Accordingly, I would respectfully request that the Court modify mitigating factor twenty-one by replacing it with the following language:

At the time of the murders of Gregory Nicholson, Lori Duncan, Kandace Duncan and Amber Duncan, Angela Johnson was under the substantial domination of Dustin Honken, causing in her unusual stress, anxiety, and an impairment of her normal judgment.

Because this wording incorporates mitigator number one, that mitigating factor should be deleted altogether.

Additionally, based on consultations with the defense mental health experts, I now realize that a portion of mitigating factor number fourteen is in error. The defense respectfully requests that the present language, "disorder and borderline personality disorder" be replaced by, "anxiety and depression". Obviously, renumbering would make this mitigating factor number thirteen.

Prev | Next | Reply | Reply All | Forward | Delete | Print | Move to folder... ▾

From: "Nancy Lanoue" <nlanoue@tewlaw.net>   Save Address | Headers
To : <psycxprt@aol.com>,<lopepc@aol.com>, <wsl@webtv.net>
CC :
Date : Mon, 30 May 2005 16:05:25 -0500
Subject : **Johnson Mitigating Factors**

Bennett_530_PB.doc (Binary attachment)

Prev | Next | Reply | Reply All | Forward | Delete | Print | Move to folder... ▾

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 49 of 100

GRN000249

http://mail.tewlaw.net/Xbac7cbc8c99e9b9e93950aa104/rmail_11788.cgi?&mbx=Sent&ms...    5/30/2005

May 30, 2005


**VIA E-MAIL**


The Honorable Mark W. Bennett
Chief Judge, U.S. District Court
Northern District of Iowa
U.S. Courthouse
320 6th St.
Sioux City, IA 51101

      **Re:** <u>**U.S. v. Angela Johnson**</u>**, Case No. 01-3046 MWB**

Dear Judge Bennett:

    In the evolving process of refining the defense's mitigating factors, I have concluded that mitigating factor number twenty-one (21), which incorporates language from the statutory mitigator set out in 21 U.S.C. § 848(m)(1), may suggest the presence of a *mental* incapacity which the defense is *not* relying on in the penalty phase of the trial. Accordingly, I would respectfully request that the Court modify mitigating factor twenty-one by replacing it with the following language:

> At the time of the murders of Gregory Nicholson, Lori Duncan, Kandace Duncan and Amber Duncan, Angela Johnson was under the substantial domination of Dustin Honken, causing in her unusual stress, anxiety, and an impairment of her normal judgment.

    Because this wording incorporates mitigator number one, that mitigating factor should be deleted altogether.

    Additionally, based on consultations with the defense mental health experts, I now realize that a portion of mitigating factor number fourteen is in error. The defense respectfully requests that the present language, "disorder and borderline personality disorder" be replaced by, "anxiety and depression". Obviously, renumbering would make this mitigating factor number thirteen.

GRN000250

Thanks for your patience with this process, your honor. I suspect fewer changes as we proceed – or else I'll run out of mitigators.

Respectfully submitted,


Patrick Berrigan
Co-counsel for Angela Johnson


PB:ndl


CC:    Matt Whitworth (Matt.Whitworth@usdoj.gov)
Roseann Ketchmark (Roseann.Ketchmark@usdoj.gov)

GRN000251

From: "Matt.Whitworth@usdoj.gov" <Matt.Whitworth@usdoj.gov> **Save Address | Headers**
To : "'nlanoue@tewlaw.net'" <nlanoue@tewlaw.net>
CC :
Date : Mon, 30 May 2005 16:54:23 -0400 (EDT)
Subject : **Re: Johnson Mitigating Factors**

Pat, we thought you all were not contending that Ms. Johnson's mental condition, that is, her anxiety and depression, affected her decision making at the time of the offense. Is this a change in your position?  And if so shouldn't our Docs get to question her about this?
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: nlanoue@tewlaw.net <nlanoue@tewlaw.net>
To: Mark_Bennett@iand.uscourts.gov <Mark_Bennett@iand.uscourts.gov>
CC: Ketchmark, Roseann <Roseann.Ketchmark@usdoj.gov>; Whitworth, Matt <Matt.Whitworth@usdoj.gov>
Sent: Mon May 30 16:23:25 2005
Subject: Johnson Mitigating Factors

GRN000252

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 01-3046-MWB |
| Plaintiff, | |
| vs. | **PRELIMINARY "PENALTY PHASE" INSTRUCTIONS TO THE JURY** |
| ANGELA JOHNSON, | |
| Defendant. | |

## TABLE OF CONTENTS

PRELIMINARY "PENALTY PHASE" INSTRUCTIONS . . . . . . . . . . . 1
    NO. 1 - INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1
    NO. 2 - NATURE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . 3
    NO. 3 - EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    NO. 4 - BURDEN OF PROOF . . . . . . . . . . . . . . . . . . . . . 12
    NO. 5 - DUTY OF JURORS . . . . . . . . . . . . . . . . . . . . . . 14

GRN000253

# PRELIMINARY "PENALTY PHASE" INSTRUCTION
## NO. 1 - INTRODUCTION

Members of the jury, in the "eligibility phase" of the trial, you found defendant Angela Johnson "eligible" for consideration of a death sentence on the following offenses:

The "conspiracy murder" of Greg Nicholson in **Count 1**;

The "conspiracy murder" of Lori Duncan in **Count 2**;

The "conspiracy murder" of Kandi Duncan in **Count 3**;

The "conspiracy murder" of Amber Duncan in **Count 4**;

The "conspiracy murder" of Terry DeGeus in **Count 5**;

The "CCE murder" of Greg Nicholson in **Count 6**;

The "CCE murder" of Lori Duncan in **Count 7**;

The "CCE murder" of Kandi Duncan in **Count 8**;

The "CCE murder" of Amber Duncan in **Count 9**; and

The "CCE murder" of Terry DeGeus in **Count 10**.

Therefore, in this "penalty phase" of the trial, you must now consider whether or not a sentence of death or a sentence of life imprisonment without possibility of parole shall be imposed for commission of these crimes. This decision is left exclusively to you, the jury. If you find that a death sentence should be imposed on a particular Count, then I am required to impose that sentence. However, you are *never* required to impose a death sentence on any Count. If you find that a death

1

GRN000254

sentence should not be imposed on a particular Count, then I shall impose a sentence of life imprisonment without possibility of parole for that Count.

In these preliminary "penalty phase" instructions, I will introduce you to the factors that you must consider and the issues that you must decide to determine which sentence shall be imposed. At the end of the "penalty phase" of the trial, I will give you final written instructions on these matters. Because the final "penalty phase" instructions are more detailed, you should rely on those instructions, rather than these preliminary "penalty phase" instructions, where there is a difference.

2

# PRELIMINARY "PENALTY PHASE" INSTRUCTION NO. 2 - NATURE OF PROCEEDINGS

You must give separate consideration to whether a sentence of death or a sentence of life imprisonment without possibility of parole should be imposed on each Count on which you have found the defendant eligible for consideration of a death sentence. Therefore, you must return a separate "penalty" verdict on each such Count. Your determination of which sentence to impose on a particular Count will proceed in three "steps," which I will explain briefly below.

However, I must first explain that these steps require you to consider whether certain "aggravating" or "mitigating" factors exist in this case. These factors concern the circumstances of the crime or the personal traits, character, or background of the defendant, and the effect of the offense on the victim and the victim's family. The word "aggravate" means "to make worse or more offensive" or "to intensify." The word "mitigate" means "to make less severe" or "to moderate." An "aggravating factor," then, is a fact or circumstance that would tend to support imposition of the death penalty. A "mitigating factor," on the other hand, is any aspect of a defendant's character or background, any circumstance of the offense in question, or any other relevant fact or circumstance that might indicate that the defendant should receive a sentence of life imprisonment without possibility of parole instead of a death sentence.

The three steps that you must go through to make your final determination of which sentence should be imposed on each Count are the following:

3



### Step One:  "Non-statutory Aggravating Factors"

In **Step One**, you must consider whether the prosecution has proved beyond a reasonable doubt one or more "Non-statutory Aggravating Factors."  These aggravating factors are called "non-statutory," because they are not identified by the death penalty statute, although they are identified by other applicable law.  The prosecution contends that the following "Non-statutory Aggravating Factors" will be proved in this case:

(1) for **Counts 1 through 10**, the defendant would be a danger in the future to the lives and safety of other persons;

(2) for **Counts 1 through 10**, the defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities;

(3) for **Counts 1 through 4 and 6 through 9,** the defendant intentionally killed more than one person in a single criminal episode; and/or

(4) for **Counts 1 through 10**, the effect of the crime upon the victim's family was injurious.

You may consider in **Step Three**, below, any "Non-statutory Aggravating Factor" that you unanimously find that the prosecution has proved beyond a reasonable doubt.


### Step Two:  "Mitigating Factors"

In **Step Two**, you must consider whether the defendant has proved by the greater weight of the evidence any "Mitigating Factors."  You are specifically

4

GRN000257

*[handwritten note in top margin, illegible]*

instructed that the following list of "Mitigating Factors" is only preliminary. The defendant may ultimately assert that there are more, fewer, or different "Mitigating Factors" for you to consider in this case. I will give you a final list of "Mitigating Factors" in the Final "Penalty Phase" Jury Instructions. However, as a preliminary list, Angela Johnson contends that the following "Mitigating Factors" will be proved in this case:

(1) even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders;

(2) Angela Johnson does not have a prior criminal record;

(3) there is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela Johnson is sentenced to life imprisonment without possibility of parole;

(4) Another person, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, will not be punishable by death for those murders;

(5) Two victims, Greg Nicholson and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that significantly contributed to the circumstances of their deaths;

(6) Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices upon her;

5

GRN000258

(7) Angela Johnson was inappropriately touched, fondled, and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillos in Chanute, Kansas, when Angela Johnson was approximately nine years old;

(8) if incarcerated in a federal penitentiary for life, Angela Johnson would not be a danger to the lives and safety of others;

(9) Angela Johnson was youthful, naive, and immature at the time of the murders;

(10) Angela Johnson was raised in a single-parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem;

(11) Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her, in part, into the relationship with Dustin Honken from which the underlying murders sprung;

(12) Angela Johnson has loving, lasting relationships with her mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, which will continue into old age if Angela Johnson is sentenced to life imprisonment without possibility of parole;

(13) Angela Johnson suffers from anxiety and depression as a result of experiences endured in childhood, and these mental conditions have hampered her

6

GRN000259

ability to make intelligent, thoughtful, and wise choices in many of the important decisions in her life;

(14) Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and Angela Johnson's death would have a profoundly disturbing effect on their young lives, now and for years to come;

(15) Angela Johnson has felt genuine remorse for the role that she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and particularly Kandi and Amber Duncan, which remorse will continue to plague her conscience everyday of her life;

(16) Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela Johnson be sentenced to death;

(17) Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly affected her judgment, her personality, her relationships, and her ability to deal with difficult self-esteem and psychological issues, which have plagued her since childhood;

(18) Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her kindness and helpfulness to other inmates, her interest in Bible study and religion, her artistic endeavors, and the furtherance of her education by obtaining a G.E.D. while incarcerated after having dropped out of school years earlier in the ninth grade;

7

GRN000260

(19) in spite of Angela Johnson's problems with drugs, men, and her own depression, Angela Johnson has always held a steady job and has consistently worked to provide for the care and comfort of her daughters, Alyssa and Marvea;

(20) on the date of the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan, Angela Johnson was under the substantial influence of Dustin Honken, which caused in her unusual stress, anxiety, and an impairment of her normal judgment;

(21) although she is guilty of these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him in to authorities, which she offers as an explanation of her conduct, not as an excuse;

(22) despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson has always been a good mother to her daughters, in that she communicates with them regularly, stays as active as possible in their lives, and attempts to pass on the values and beliefs that will help her daughters avoid her own fate;

(23) there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without possibility of parole and against the death penalty.

In addition to these "Mitigating Factors," you may also consider, as an additional "Mitigating Factor," any residual or lingering doubts that any of you have as to Angela Johnson's guilt or innocence or her role in the offenses in determining whether or not to impose a sentence of death, even though those doubts did not rise

8

GRN000261

to the level of "reasonable doubts" under the instructions given to you during the "merits phase" of the trial.

Finally, you are permitted to consider *anything* else that is established by the greater weight of the evidence about the commission of the crime or about the defendant's background or character that would mitigate in favor of a sentence of life imprisonment without possibility of parole and against the death penalty, whether or not specifically argued by defense counsel.

Unlike "Aggravating Factors," which you must unanimously find have been proved beyond a reasonable doubt, the law does not require unanimous agreement with regard to "Mitigating Factors." Any juror who finds the existence of a "Mitigating Factor" must consider it in this case, regardless of the number of jurors who agree that the factor has been established. Furthermore, any juror may consider a "Mitigating Factor" found by another juror, even if the first juror did not find that factor to be mitigating.

### Step Three:  Weighing The Factors

At **Step Three**, for each Count, you must consider whether the "Gateway Aggravating Factor" and the one or more "Statutory Aggravating Factor" that you found for that Count during the "eligibility phase," together with any "Non-statutory Aggravating Factors" for that Count that you find to exist in **Step One** above, taken together, sufficiently outweigh any "Mitigating Factors" that you find in **Step Two** so that a sentence of death is justified for that Count. In the absence of any "Mitigating Factors," you must consider whether the "Aggravating Factors" are

9

GRN000262

themselves sufficient to justify a sentence of death.  Based on your weighing of *all* of the factors, you will decide whether to impose a sentence of death or a sentence of life imprisonment without possibility of parole for the Count in question. Furthermore, you must not simply count the number of "Aggravating Factors" and "Mitigating Factors" to reach your decision; rather, you must consider the weight and value of each factor.  Regardless of your findings with respect to "Aggravating Factors" and "Mitigating Factors," you are *never* required to impose a death sentence.

Your determination of the appropriate sentence for each Count is a decision that each of you must make independently, after consulting with your fellow jurors and individually engaging in the weighing process described in this Instruction.  You cannot consider imposing a death sentence unless and until you personally find that the "Aggravating Factors" outweigh the "Mitigating Factors," or, in the absence of "Mitigating Factors," that the "Aggravating Factors" are themselves sufficient to justify a sentence of death.

*A determination to impose a death sentence must be unanimous.*  If you each find that a death sentence should be imposed for a particular Count, then I am required to impose a death sentence for that Count.

On the other hand, if, after weighing the "Aggravating Factors" proved in the case and all of the "Mitigating Factors" found by any juror, any one of you finds that a sentence of death is not justified on a particular Count, then the death sentence *cannot* be imposed on that Count, and I will impose a sentence of life imprisonment without possibility of parole for that Count.

10

GRN000263

## PRELIMINARY "PENALTY PHASE" INSTRUCTION
## NO. 3 - EVIDENCE

In making all of the determinations that you are required to make in this "penalty phase" of the trial, you may consider any evidence that was presented during the "merits phase" as well as evidence that is presented in this "penalty phase." In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, only part of it, or none of it. In deciding what testimony to believe, consider the witness's intelligence, the opportunity the witness had to see or hear the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the witness's drug or alcohol use or addiction, if any, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe. In deciding whether or not to believe a witness, keep in mind that people sometimes see or hear things differently and sometimes forget things. You need to consider, therefore, whether a contradiction results from an innocent misrecollection or sincere lapse of memory, or instead from an intentional falsehood or pretended lapse of memory.

11

# PRELIMINARY "PENALTY PHASE" INSTRUCTION
## NO. 4 - BURDEN OF PROOF

The prosecution has the burden of proving the "Aggravating Factors" and all the other requirements for imposition of the death sentence *beyond a reasonable doubt*. A reasonable doubt may arise from the evidence produced by either the prosecution or the defendant, keeping in mind that the defendant never has the burden or duty of calling any witnesses or producing any evidence. It may also arise from the prosecution's lack of evidence. A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the more serious and important transactions of life. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

The defendant does *not* have the burden of disproving the existence of any "Aggravating Factor" or anything else that the prosecution must prove. The burden is wholly upon the prosecution; the law does not require the defendant to produce any evidence at all.

On the other hand, the defendant has the burden to establish any "mitigating factors" *by the greater weight of the evidence*. This is a lesser standard of proof than proof beyond a reasonable doubt. To prove something "by the greater weight of the evidence" means to prove that it is more likely true than not true. The

12

GRN000265

"greater weight of the evidence" is determined by considering all of the evidence and deciding which evidence is more believable.  If you find that the evidence is equally balanced on any issue in the case, then you cannot find that the issue has been proved.

The "greater weight of the evidence" is not necessarily determined by the greater number of witnesses or exhibits a party has presented.  The testimony of a single witness that produces in your mind a belief in the likelihood of truth is sufficient for proof of any fact and would justify a verdict in accordance with such testimony.  This is so, even though a number of witnesses may have testified to the contrary, if, after consideration of all of the evidence in the case, you hold a greater belief in the accuracy and reliability of that one witness.

13

## PRELIMINARY "PENALTY PHASE" INSTRUCTION
## NO. 5 - DUTY OF JURORS

The task of determining whether to impose a death sentence or a sentence of life imprisonment without possibility of parole for any Count in this case is an extremely important one. Therefore, please keep an open mind until you have heard all of the evidence in this "penalty phase," carefully considered that evidence and the evidence presented in the "merits phase," and discussed all of the evidence with your fellow jurors. Remember, whether or not the circumstances in this case justify a death sentence or a sentence of life imprisonment without possibility of parole on any of the Counts in question is *entirely* yours. You must not take anything I said or did during the "merits phase" of the trial or anything I may say or do during this "penalty phase" as indicating what I think of the evidence or what I think the sentence on any of the Counts in question should be.

You must still follow all of my prior instructions about how you must conduct yourselves during this trial. Therefore, among other things that I have previously told you, do not talk to anyone about this case or let anyone talk to you about this case until after you have completed your "penalty phase" deliberations. Your decision about which sentence to impose must be based exclusively on the evidence presented in court during the "merits phase" and the "penalty phase," not on anything else.

**DATED** this 31st day of May, 2005.

_Mark W. Bennett_
_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

MR. WILLIAMS:  Your Honor, with respect to the defense mitigating factors, I think there are a few that they failed to present any evidence on we could take up either now or we can take it up at some other time.

THE COURT:  There isn't another time where I'll have time to take it up, so we better take it up now.

MR. WILLIAMS:  Very good.  The first one would be the evidence of sexual molestation which is number 7 of the defense.

3930

I think it is at best extremely weak that there is any evidence that Angela Johnson was sexually abused.  Their own expert said -- I think it was Miss Hutchinson if I recall correctly -- that they really have no evidence, no proof, that she was ever sexually molested.  So that'd be the first one.

Do you want to take these seriatim or . . .

THE COURT:  Well, why don't we -- yeah, go ahead.  Why don't we do it that way, take them -- well, let's take them all, and then we'll come back for their response.

MR. WILLIAMS:  Okay.  Very good.  The next one would be -- and this is perhaps just the language here, but number 9, Angela Johnson was youthful.  She was -- if I got my math right, I think she was 29 years of age at the time she committed these offenses.  Naive and immature, I don't recall hearing any evidence during the mitigation phase whether she was naive and immature, and the facts would not support that she was youthful.

Number 11, that Angela Johnson was physically, emotionally abused as an adult by Terry DeGeus, no problem.  I think they can submit that to the jury.  Where I have a problem with is after that, And this abuse drove her in part to the

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-15   Filed 06/23/11   Page 68 of 100
GRN000268

relationship with Dustin Honken from which the underlying murders sprung.

There's no evidence presented either during the guilt phase or the mitigation phase suggesting that the physical abuse by Terry DeGeus drove her in any way to a relationship with

3931

Dustin Honken.

Number 13 -- see if I can read my handwriting here -- I'm going to withdraw any objection to that. I think the evidence is weak on any anxiety, but there's probably enough there that it should go to the jury.

Number 17 would be my next one. There is absolutely no evidence at all that her -- number one, that she was addicted to methamphetamine; number two, that this addiction to methamphetamine had any effect on her judgment or personality or relationships or her ability to deal with difficult self-esteem and psychological issues.

There are -- there is a diagnosis for drug addiction, drug dependence. She was not diagnosed by any of her psychiatrists with that affliction, and there was no evidence that her drug use affected her judgment and so forth.

And then finally the last one is number 20. Again, there is no evidence presented either during the guilt phase or during the penalty phase that she was under substantial influence by Dustin Honken which caused her unusual stress, anxiety, and impairment of her normal judgment. I don't think there's any evidence of that that should be submitted, particularly when it's premised with "on the date of the murders she was under substantial influence of Dustin Honken." No evidence, no evidence, of that whatsoever, and that should not

Page 2

be submitted to the jury.

3932

THE COURT: What about 21? I mean, there's no evidence that the pregnancy disadvantaged her in any way, is there?

MR. WILLIAMS: No. I think, though -- the reason I didn't object to that, Your Honor, is I think it's something they should be allowed to argue as kind of common sense. I think it's weak, but it's common sense. I think they can say, Gee, she's pregnant; and, therefore, she was going to be concerned about her response. That one I think is something they're probably allowed to argue.

THE COURT: But there's no evidence in the record that she was disadvantaged by her pregnancy.

MR. WILLIAMS: No, there isn't other than common sense. I mean, I think that's where that has to come in at is -- in other words, I think the defense is allowed to argue -- and I feel like I'm arguing their case for them, but I'm just trying to be straight with the Court. I think that the defense can argue that they can logically infer that if she's pregnant she's going to be influenced in her decision making about how much she's going to resist the father of her daughter under those circumstances. I agree there was no direct evidence at all.

THE COURT: You know, they have a lot of experts, and not one of them testified to that, and they clearly could have. It's clearly a subject that would be permissible subject of

3933

expert testimony or have fact witnesses testify to it. Not a

Page 3

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 70 of 100

GRN000270

shred of evidence to support it.

MR. WILLIAMS:  No, there was no direct evidence of it.

THE COURT:  Okay.  Let's hear the -- you're done, aren't you?

MR. WILLIAMS:  I am, Your Honor.  Thank you.

THE COURT:  Yeah.  You want to just take them up in order, Mr. Berrigan?

MR. BERRIGAN:  Yes, sir.  Number 7 which currently reads, Angela Johnson was inappropriately touched, fondled, and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillos in Chanute, Kansas, when Angela Johnson was approximately nine years old, there is evidence in the record, particularly the testimony of Wendy Johnson, that she had a discussion with Miss Johnson years later where Miss Johnson specifically admitted that that had occurred.  Arguably the state -- I mean the government might want to challenge the veracity of that, but the evidence is certainly there.

In addition, the psychologists have admitted that people frequently aren't all that forthcoming with this type of abuse, so there's a reasonable explanation as to why Miss Johnson might not have been so willing to disclose this the first time she talked to a mental health professional.

So our position is there's certainly evidence and it's enough evidence that it should be allowed.

3934

Mitigating circumstance number 9, Angela Johnson was youthful, naive, and immature at the time of the murders, our contention is that's certainly circumstantial evidence, that nobody's testified to that.  Youthful, I probably should look that up in the dictionary.  I suppose there's an argument that

Page 4

GRN000271

29's not youthful.

I don't feel strongly about that mitigating circumstance, so we're certainly willing to rephrase it. And if the Court thinks it's inappropriate, that's not one that has been directly addressed by the evidence. I'd certainly admit that. But I think the naive aspect of it certainly under the circumstances is warranted.

THE COURT: Well, what was she naive about?

MR. BERRIGAN: Well, our contention is that she was naive about the actual plan of Mr. Honken, and you'll recall that the jurors did not find substantial planning and deliberation as to the murders of the first four victims on July the 25th.

THE COURT: There's really no evidence of that other than the hearsay statement that the government didn't object to that came in through one of the sisters which was clearly hearsay. It wasn't admissible, but the government didn't object to it. But outside of that, there's not a shred of evidence to support that.

MR. BERRIGAN: Well, there is this evidence, Your

3935

Honor, that the professionals that testified, I think specifically Dr. Hutchinson, talked about how your development is stunted by use of drugs. And Miss Johnson's use of drugs started at a very early age.

THE COURT: But she didn't give the opinion that her development was stunted or naive at the time at age 29. She didn't testify to that.

MR. BERRIGAN: No, she didn't. What she testified was a person who engages in drug usage, particularly abuse, thereby

Page 5

stunts their growth as a result, and what we know from the evidence is that Miss Johnson certainly was heavily into drugs before the age of 29.

Number 17 --

THE COURT:  Well, there was an objection to 11.

MR. BERRIGAN:  Oh, I'm sorry.  My apologies.  Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her in part into the relationship with Dustin Honken from which the underlying murders sprung, I don't have any problem actually changing that language to the extent that it suggests that one necessarily caused the other because there's at least I think a period of time that goes by between the end of the relationship between Mr. DeGeus and the relationship that begins with Mr. Honken, and that was largely circumstantial.  So I think the government has a valid argument.

3936

THE COURT:  Do you have any suggested language changes now?  Well, why don't we keep going, and then we'll . . .

I think the next one the government objected to was --

MR. BERRIGAN:  Seventeen.

THE COURT:  -- seventeen.

MR. BERRIGAN:  Angela Johnson has been addicted to methamphetamine.  The government actually contends that because she wasn't diagnosed there's no evidence of that.  I'd suggest that there's no requirement for a diagnosis and of the millions of people that are addicted to this drug, probably very few actually have a formal diagnosis, but the evidence is very clear that she used it regularly.

In fact, Miss Hare, her friend, testified she loved

Page 6

cocaine (sic) and would use it every day or as much as she could if she could get ahold of it. The evidence really has been pretty uniform that she not only used methamphetamine but abused methamphetamine for most of her life.

And Dr. Cunningham even talked about that, that it took her years to realize the effects this drug had caused upon her.

So we don't -- and in addition, I guess they're objecting that the drug profoundly affected her judgment, personality, relationships, and her ability to deal with difficult self-esteem and psychological issues. And Dr. Evans talked about that at length, and I believe there was some

3937

testimony about --

THE COURT: This is simply a contention, and there's enough evidence in the record that the jury could find that.

MR. BERRIGAN: I don't want to belabor that.

THE COURT: Right.

MR. BERRIGAN: Number 20, substantial influence of Dustin Honken, certainly there's evidence of that.

THE COURT: There is?

MR. BERRIGAN: Yes, sir, quite a bit of evidence. There's the --

THE COURT: Not that I heard.

MR. BERRIGAN: Well, it's all the first-phase evidence that we would rely on for that. Mr. Honken is the one who's looking for Mr. Nicholson. This is his plan. Mr. Nicholson's about to testify against him. He's the one that does the shooting.

THE COURT: Yeah, but none of that indicates that

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 74 of 100

GRN000274

Angela Johnson was under the substantial influence of Dustin Honken.  It just indicates Honken had a superior motivation. There was not a shred of evidence in the record that she was under the substantial influence of Dustin Honken.

MR. BERRIGAN:  Well, that again has to be circumstantial.  She didn't testify, nor did Mr. Honken, so who else could be able to --

THE COURT:  Everybody who knew the two.  You had a lot

3938

of people.  The daughter just testified that she knew Mr. Honken.  She didn't testify that her mother was under the substantial influence.  You must have asked 25 witnesses the relationship between Dustin Honken and Angela Johnson.  Not one of them testified that Angela Johnson was under the substantial influence of Dustin Honken.

MR. BERRIGAN:  Well, this mitigator --

THE COURT:  There's no testimony about that.  Now, maybe somehow there's -- I don't even know where the inference comes from.

MR. BERRIGAN:  The mitigator's directed specifically to the time of the murders, and our position is nobody could testify about that in terms of any direct testimony.  It's not an allegation that she's always under the substantial influence of Mr. Johnson (sic) at all times.

THE COURT:  But there's no evidence on the date in question that she was under his --

MR. BERRIGAN:  We think the circumstantial evidence certainly supports that inference.

THE COURT:  How?

MR. BERRIGAN:  The government took that position in

Page 8

Mr. Honken's trial:  He's running the show; this is his plan; he's orchestrated it very carefully.

THE COURT:  Well, he may be the leader, but that doesn't show that she's under substantial influence.

3939

MR. BERRIGAN:  Well, I suppose --

THE COURT:  Because he took a superior role in the planning does not mean that anyone else involved was under substantial influence by Mr. Honken.

MR. BERRIGAN:  It isn't just the planning, sir.  I mean, even the government concedes that Mr. Honken's the one that's killing these people.  He's shooting them.

THE COURT:  But where's the evidence that she was under substantial influence by him?

MR. BERRIGAN:  The circumstances surrounding the events that day in our contention clearly establish that and the fact that the jury --

THE COURT:  Clearly establish that.  Now there's an overstatement.

MR. BERRIGAN:  That's our position.

THE COURT:  That it clearly establishes it.

MR. BERRIGAN:  Yes, that's our position, yeah.  When the jury comes back and finds substantial planning in Mr. Honken's case on the same murders and a different jury admittedly finds no substantial planning or at least they don't agree that it's proven beyond a reasonable doubt, we think that certainly suggests to us that Mr. Honken did the planning.

THE COURT:  Well, assuming he did the planning, just because Honken did the planning does not mean that Angela Johnson was under substantial influence.

Page 9

GRN000276

MR. BERRIGAN:  Well, our position --

THE COURT:  How do you jump -- how do you get there? There's not a shred of evidence to support that.

MR. BERRIGAN:  Not only does he do the planning, he carries out the murder.

THE COURT:  But that doesn't mean she's under any influence.

MR. BERRIGAN:  Our position is she's a surrogate as to these first four murders.  There's no other way to look at it.

THE COURT:  There's no other way to describe it.  I don't see the evidence that way.  I don't think there's any evidence to support this.

MR. BERRIGAN:  Well, I respectfully disagree.  The evidence is what it is, and we can't add evidence now.  So we think there's plenty of evidence for that mitigating --

THE COURT:  Plenty of evidence.

MR. BERRIGAN:  Yes, sir.

THE COURT:  What's the plenty of evidence?

MR. BERRIGAN:  What I've just been talking about. Without repeating myself over and over again, Mr. Honken is the one that had the motive to kill these people.  He's the one that planned the murders.  He's the one that carried out the murders. Angela Johnson was with him.  She aided and abetted him, no more than that.  He's the head honcho on these deals, and she's under his influence in carrying out the murders.

3941

And I think that's also amply demonstrated by her

Case 3:09-cv-03064-MWB-LTS    Document 284-15    Filed 06/23/11    Page 77 of 100
GRN000277

confession to Christi Gaubatz where she goes in and tells her in sobbing, tearful fashion kind of how this went down. It was never her intention to kill any children. Things went awry at the house. Well, the government's position would not be, I dare say, that anything went awry particularly as to the intention of Mr. Honken. Things went exactly as planned. Miss Johnson, on the other hand, found out too late, again our contention, what was going to happen.

THE COURT: Where is the evidence to support number 15?

MR. BERRIGAN: Well, that testimony I already mentioned, Christi Gaubatz, and Miss Johnson having an emotional breakdown as she's relating these things to her.

THE COURT: Yeah, and how does that establish which remorse will continue to plague her conscience every day of her life? There's no evidence of that.

MR. BERRIGAN: No, other than human nature. She repeated this story to various individuals throughout the period of time, the 7 years between 1993 to 2000 and then indeed after she was arrested under various circumstances.

THE COURT: But that could have been the subject of expert testimony.

MR. BERRIGAN: What would be the expert testimony? How would an expert --

3942

THE COURT: Psychologists interview people all the time about remorse.

MR. BERRIGAN: Well, they'd be interviewing somebody other than our client, Your Honor.

THE COURT: Well, no. Our psychologists interviewed

Case 3:09-cv-03064-MWB-LTS   Document 84-5   Filed 06/23/11   Page 78 of 100
GRN000278

your client.

MR. BERRIGAN: Yes.

THE COURT: I'm saying that could have been the subject -- you had ample opportunity to prove it is my point.

MR. BERRIGAN: Well, if we had done that, how could the psychologists talk to our client about remorse without talking about the murders? How would that work? What are you remorseful about, Miss Johnson? I mean, the next question has gotta be, well, didn't you kill those people, because there's no remorse unless you're going to talk about what it is that you're remorseful about.

THE COURT: You could talk about current remorse now. Matter of fact, you're not even arguing now. You're talking plagues her conscience every day of her life. You can simply ask, Do you have some remorse? Is it bothering you now? Do you think it's going to bother you in the future? That's something the experts -- all three experts clearly could have gone into.

MR. BERRIGAN: In the cross-examination I can just imagine it now: Aren't you remorseful that you got arrested and you left your children? I mean, the remorse could be about

3943

anything because nobody's asked her --

THE COURT: But you're the one that's asking for the mitigator, and you have the burden of proof, and I'm just saying there's no evidence.

MR. BERRIGAN: I'm just saying that none of our experts could have possibly offered evidence about remorse without talking to Miss Johnson about the crime which we had no intention of ever doing.

THE COURT: Of course they could have. You're just

Page 12

GRN000279

dead wrong on that. Of course they could have talked about remorse.

MR. BERRIGAN: I think that would be a meaningful discussion -- a meaningless discussion.

THE COURT: It would have been some evidence. Now you have no evidence. I'm just telling you there was an opportunity that you could have presented evidence on a point that you're arguing as mitigation and there's no evidence in the record that it continues to plague her conscience every day of her life. Where's the evidence of that?

MR. BERRIGAN: That it continued. It continued from the period of the 1993 murders at least through all these confessions that she's given in jail. So why is there any reason to suspect that wouldn't continue? Mr. Miller got up in closing argument I think at least once if not twice, admitted that she was remorseful about these murders, and now we're

3944

removed 8 years or more, 12 -- how far's it been? Twelve years since the time of the murders.

MR. WILLIAMS: Just to weigh in on that very briefly, Your Honor, the only remorse that was ever testified to at all was when she spoke with Christi Gaubatz. The other witnesses who testified about the confessions, to the contrary, said that she was -- had no reaction, had no expression, had no remorseful appearance when she was talking about the murders.

THE COURT: So the one you're agreeing to try and rewrite is number 11?

MR. BERRIGAN: Yes, sir, and also number 9 as to the youthful aspect of that.

THE COURT: Yes.

Page 13

MR. WILLIAMS:  Your Honor, if I could just very briefly revisit number 17 --

THE COURT:  Yes.

MR. WILLIAMS:  -- my concern is really with the word "addicted" because that carries with it in just the general population some belief of somebody addicted is out of control, cannot control their behavior and so forth.  It has that common understanding.  I have a concern.  I don't have a problem if they want to say Angela Johnson has used and abused methamphetamine for most of her life, so forth and so on, and that's what I heard Mr. Berrigan indicate was their evidence.  There is a way to determine if somebody is clinically addicted

3945

to a drug, and they had an opportunity to present that evidence, and they didn't.

THE COURT:  The only evidence that I know that remotely comes close to the addiction is the testimony of one of her friends who said she enjoyed it, she was going to continue to use it when the friend indicated she was going to quit.

MR. BERRIGAN:  That was Lou Ann Hare, sir.

THE COURT:  Yes.  But would you accept some other combination of words as a friendly amendment?

MR. BERRIGAN:  Well, if it's close to "addicted."  It wasn't just Lou Ann Hare.  I mean, government's --

THE COURT:  No, there are a number of witnesses who testified about the frequency of it.

MR. BERRIGAN:  Exactly, right.  I mean, the government's allegation is -- and they've continued to advance it -- that she used methamphetamine right up until the time she was arrested, not only used it but sold it.  And obviously

Page 14

GRN000281

through the testimony of Miss Hare -- and my recollection is there was testimony from at least one of the experts that she loved cocaine -- I mean methamphetamine and would use as much of it as she could.  And Dr. Evans testified that that's what these people do, that they get into the cycle and they can't stop using it and that that's very common in this drug -- with this drug particularly.

THE COURT:  Well, why don't you work on some language

3946

for that one as well.  So the three you're going to work on are 17, 9, and 11.

Well, getting back to number 20, where is the evidence that she was under unusual stress, anxiety, or impairment of her normal judgment on that date in July 1993?  Where's even the circumstantial evidence?  Even if you could overcome the substantial influence question, where is the evidence that unusual stress, anxiety, impairment in normal judgment?

MR. BERRIGAN:  Again, that would be largely in the confession that she gave to Christi Gaubatz where she told her that there was never any plan to kill people and she was upset about the kids particularly having been killed.  Miss Johnson, we contend, unlike Mr. Honken, never intended to kill any children, would not have participated in that but for the unusual stress and anxiety and an impairment that she was under at the time of those murders on July the 25th.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  It just doesn't support it because they're tying it to substantial influence, again, you know, which caused in her unusual stress, anxiety, and impairment.  So even if you accept for the sake of argument that you can read

Case 3:09-cv-03064-MWB-LTS  Document 284-5  Filed 06/23/11  Page 82 of 100
GRN000282

into the confession to Christi Gaubatz that she was upset about the killing of the children afterwards, number one, that doesn't equate to unusual stress, anxiety, and impairment of her normal judgment.   There's no evidence at all that her judgment was

3947

impaired as a result of anything, and there's no evidence of a causal link between any alleged substantial influence by Dustin Honken and those results.

And I just go back there's no evidence of substantial influence by Dustin Honken over her behavior that night.   She may not have liked what he did, and she may have been upset about it afterwards, but there is not a shred of evidence to suggest that he substantially influenced her that night.

MR. BERRIGAN:   Your Honor, not to belabor this point --

THE COURT:   Go ahead.   It's an important point.

MR. BERRIGAN:   -- but what she told Miss Gaubatz was that the plan was -- now, you can disbelieve this, but we think that at least some jurors think this is a possibility.

THE COURT:   Right.   The jurors are entitled to credit it.   Right.

MR. BERRIGAN:   That there's some jurors there that think she might have gone into that house thinking the plan was to videotape Greg Nicholson or maybe even perhaps kill Greg Nicholson but there weren't other people that were planned to have been killed.   And she tells Miss Gaubatz months later sobbing -- and that testimony was clear -- that things went awry in the house.   I don't know that that was the term.   She probably used some other term but that there was a sudden change in circumstances or sudden change in plans.   And what we know is

Page 16

GRN000283

that there was no change in plan for Mr. Honken.  That is, that was always the plan.

And so in the middle of this event, our contention is Miss Johnson participates with Mr. Honken.  He's got a gun, and clearly nobody else has put the gun in her hand certainly when these people are killed and he's going through with his plan. And it's too late for her to get out of it.  We contend she was under substantial influence.

And keep in mind that she is pregnant.  I understand from your discussion already you may have some doubt about whether that makes a difference.  I've never been pregnant, never will be, but I think that there's a -- and the government acknowledges that that makes some sense, that if you're carrying this man's baby that you might be under some influence.

And so we think these things very naturally go together and that her demeanor and her discussion with Miss Gaubatz suggests quite clearly -- more than suggest that this was a very unanticipated situation for Miss Gaubatz -- I mean Miss Johnson and certainly an impairment of her normal judgment. But, I mean, if the real contention is --

THE COURT:  Yeah, but the problem is it's a substantial influence that you're claiming caused the impairment in judgment.

MR. BERRIGAN:  Right, and I was just about to say that.  I can understand the causal argument.

3949

THE COURT:  Right.

MR. BERRIGAN:  That is, it wasn't the substantial

Page 17

influence. Because it's really more that Mr. Honken and the circumstances in which Miss Johnson found herself, and maybe that should be more clear.

THE COURT: Can we throw this into that --

MR. BERRIGAN: Yes, sir.

THE COURT: Personally I don't think there's any evidence of it. I'm probably going to submit some format of it.

MR. BERRIGAN: Yes, sir.

THE COURT: But you're much more likely to get it submitted if you revise it.

MR. BERRIGAN: I will address that causal aspect of that.

THE COURT: I'm not so sure that's going to be easy to do, but why don't you work on it.

MR. BERRIGAN: We can give it a shot.

MR. WILLETT: Your Honor?

THE COURT: Yes.

MR. WILLETT: I don't want to violate the double teaming.

THE COURT: That's fine. We're now under World Federation of Wrestling rules.

MR. WILLETT: Thank you. In regards to mitigator 17 and Mr. Berrigan and Mr. Williams' debate over the term

3950

addicted.

THE COURT: Yes.

MR. WILLETT: If it please Court, Your Honor, I know that when Mr. Williams stood up to make the comment that you know he was looking for some sort of diagnosis, if you will, that she was addicted or some clinical diagnosis --

Page 18

THE COURT:  Yeah, I'm not looking for that.

MR. WILLETT:  Okay.  I just want to draw the Court's attention to Title 21 section 802 subparagraph (1) which deals with definitions because it struck me, Judge, as I was listening to this that I've heard this term before.  And as the Court's aware, I've done some unlawful user of controlled substances cases while in possession of firearms, and the term addict is defined at Title 21 section 802, subsection (1).  The term addict means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

Judge, I would respectfully submit to the Court that my client certainly fits within the first prong of that definition of addict.  Therefore, I would suggest the Court consider allowing the word "addicted" to remain in mitigator 17 because under the statutory definition of addict, with all due respect to my client, I think she was an habitual user of

3951

methamphetamine and her conduct did endanger the public morals, health, safety, or welfare by the convictions which she stands before the Court now on if that would help.  Thank you.

THE COURT:  Well, I don't know why you wouldn't just agree to what Mr. Williams suggested, and that was used and abused but . . .

Well, why don't you do your best to revise them including number 20.  I'm not going to give 20 as is.  So it would take some substantial revision before I would give 20.

Twenty-one I'll probably -- I mean, I don't think

Page 19

GRN000286

there's any evidence to support it, but I'll probably give it anyway out of an abundance of caution.

So when do you think you'll be able to -- you'll have to e-mail me the results of your labors.  Why don't you do that in the next couple of days, and why don't we meet Sunday evening at seven o'clock because we'll have to finalize this and make our sets of instructions so we'll be ready to go at 8:30 Monday morning.  Would that work for -- would you rather do it Sunday afternoon?  Do you know what your travel plans are?

MR. BERRIGAN:  I think I'll be here at least by Thursday, Your Honor, so I'll be available at any time Sunday would be fine or sooner.

MR. WILLIAMS:  That would be fine, Your Honor. Whenever you want.

THE COURT:  I was assuming maybe people were traveling

3952

in on Sunday.

MR. WILLIAMS:  Yeah, we probably would, but if you want to meet earlier in the day . . .

THE COURT:  No, I'm confident between seven and ten Sunday evening we can get it resolved.

MR. WILLIAMS:  Or midnight.

THE COURT:  So we'll just plan on -- and I want obviously Angela Johnson here, and so we'll just have to make arrangements with the marshals to bring her over seven o'clock. This would be June 19; is that right?

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  That's correct, Your Honor.

THE COURT:  June 19 at 7 a.m.

MR. MILLER:  May it please the Court.

Page 20

GRN000287

MR. BERRIGAN:  P.m. or a.m.?

THE COURT:  Pardon me?

MR. BERRIGAN:  I thought you said p.m.

THE COURT:  P.m., I'm sorry, 7 p.m.

MR. MILLER:  Your Honor?

THE COURT:  Yes.

MR. MILLER:  Over here.

THE COURT:  Yes.

MR. MILLER:  Co-counsel assures me he can handle that without my assistance, and with the Court's permission, I'd --

THE COURT:  Absolutely.

3953

MR. MILLER:  Thank you very much.

Case 3:09-cv-03064-MWB-LTS   Document 284-5   Filed 06/23/11   Page 88 of 100

GRN000268

# Pat Berrigan

**From:** DEANSTOWERS@aol.com

**Sent:** Friday, June 10, 2005 11:00 AM

**To:** Pat Berrigan

**Subject:** Re: Limiting Instruction

I think we need to revisit the limiting instruction issue because it may be too broad in that it addresses her behaviors at the time of the offense and not just her mental condition at the time of the offense. Cunningham's testimony was not of a mental condition, but of risk factors that influence her likely life outcomes and choices. He did not testify to her mental condition at the time of the offense. He testified to her makeup as a person. I don't have the limiting instruction here, so I will try to get it from the court and propose some language. Give me a call to discuss. Dean

THE COURT: Please be seated. Happy Father's Day to all the fathers in the courtroom.

MR. WILLIAMS: Same to you, Judge.

THE COURT: And thank you so much for agreeing to meet this evening. We have a lot of matters to get through. And why don't we take up the -- I don't really have a particular order in which we want to take up things. Why don't we take up the mitigators and go through those. And why don't we -- we'll just go in number that anybody has an objection to. I think the first one is number 11.

MR. BERRIGAN: First one is number 9, Your Honor.

THE COURT: Okay. Number 9 but --

MR. BERRIGAN: We agreed to delete it.

THE COURT: Everybody's agreed to delete it.

MR. BERRIGAN: Right.

THE COURT: Nine is deleted. And then we go to 11. And there is disagreement I think concerning the language?

MR. WILLIAMS: I think there's kind of agreement and disagreement. I think we both agree to take out the phrase that's currently in there that starts with the word "and" and ends with the word "sprung." Then the defense wants to add in "causing her great fear and traumatic stress." I guess I don't have a problem with "great fear" because I think there's been

3967

some evidence of that. I'm not sure that there was really any evidence or testimony about "traumatic stress" or even what specifically that means.

THE COURT: It would seem to me, though, that this is one I kind of agree with the defense that a reasonable juror

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-15   Filed 06/23/11   Page 90 of 100
GRN000290

could infer from the severity of the beatings and the testimony about at least one beating where she was black and blue from head to toe basically -- there's evidence in the record that says that -- that one would have traumatic stress from that. I mean, that's a -- I just don't find that as a very big inference.

MR. WILLIAMS: And I don't have a big problem with that, but when we get to the point of inferences, then we're talking argument, and absent them having some evidence to support these things, they can argue from the evidence that it's clear that she must have had traumatic stress, but I just -- and I don't really have a big problem with that one.

Where I have more of a problem later on is where they've also argued an inference and, therefore, they ought to get an instruction on it. So I think there is a distinction between an inference and evidence.

MR. BERRIGAN: Our position on that, Your Honor, is Dr. Hutchinson testified about Miss Johnson's relationship with Mr. DeGeus at some length and that one of the repercussions from those beatings and the cycle of abuse was --

3968

THE COURT: You can just remain seated.

MR. BERRIGAN: -- she suffered from posttraumatic stress disorder which is why I got the specific language.

THE COURT: Yeah, I'm going to leave that in. That doesn't necessarily mean I'm going to leave in some of the inferential stuff later on, but I think 11 -- so just so we're all in agreement, it would read -- setting aside for the moment whether we'll use "Angela Johnson contends," so let's set that part aside. Angela Johnson contends that she was physically and

Page 2

emotionally abused as an adult by Terry DeGeus, her former

boyfriend, causing her great fear and traumatic stress; correct?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Now, the next one, 15, I've reviewed all of the transcripts you've indicated in your e-mail that you sent I believe on Friday. I've reviewed Wendy Johnson, Shelly Johnson. I went back -- and I think we provided for you Gaubatz's testimony. I don't see any evidence of remorse. I just don't see it. I mean, I realize that Gaubatz testified that the defendant was tearful at the time and upset but also that she was paranoid, wasn't sleeping well, and was worried about getting caught. That's what being upset is about.

There's absolutely not a shred of evidence in Gaubatz's testimony -- I reread it twice. I don't see a shred of evidence suggesting remorse.

And then you have the evidence that Angela Johnson was

3969

crying at the time she held up the message about she lured Terry DeGeus, but if you read the entire transcript of Shelly Johnson and Wendy Johnson -- and I realize Wendy Johnson's name is different -- it says she started crying at the beginning when she saw them. And there's really nothing to suggest remorse in that. I mean, it's something I guess you could argue somehow, but there's no evidence -- there's not a shred of evidence of remorse in my view, not a shred, nothing, zero.

So I'm a little bit at a loss what to do because I just don't see it. I mean, I reread those transcripts, and that's the evidence that you said was the evidence in the record. I just didn't see it.

MR. BERRIGAN: Well, with all due respect to the Court

Case 3:09-cv-03064-MWB-LTS    Document 28-15    Filed 06/23/11    Page 92 of 100

GRN000292

having reviewed the transcript, if you looked at Mr. Miller's closing argument, on two separate occasions he acknowledges before the jury that the government believed that Angela Johnson showed remorse.

THE COURT: Well, I don't care whether Mr. Miller says that. There's nothing in the record to suggest it.

MR. BERRIGAN: I'm just suggesting that there could be different views of that evidence than the one the Court took. And when the government who's obviously not acting in our interest admits to the jury in closing in the first phase that there was remorse exhibited by our client, we think that there's some evidence of that. The standard --

3970

THE COURT: Well, what is the evidence of it?

MR. BERRIGAN: What we've discussed many times, Your Honor. Christi Gaubatz testified that our client came to her, called her on the phone, said, I need to talk to you; I need to get something off my chest; come over to my house. Christi Gaubatz goes to Miss Johnson's house, and she basically through sobbing and tears confesses her involvement in the murders.

THE COURT: Why does that establish remorse?

MR. BERRIGAN: Well, Your Honor, that's clear -- and with all due respect again, when people come in and confess in sobbing state such as Miss Johnson did, I think a reasonable conclusion there is that's somebody who's remorseful. She's talking about getting something off of her chest.

With respect to Mr. DeGeus, she talked about having nightmares. Jurors can look at that certainly much as Mr. Miller did as evidence of remorse, and the Court may not view that. I respect your view about that. But to deprive the

Page 4

GRN000293

jury from making that determination based on the evidence that's before the jury would deprive our client certainly of her due process rights we believe under the 8th and 14th Amendments.

THE COURT: Certainly would, huh?

MR. BERRIGAN: Well . . .

THE COURT: Well, I don't think there's any evidence of remorse.

MR. BERRIGAN: Even the government's not alleging that

3971

this is inappropriate. They're not arguing the first part about the remorse. This is something the Court has raised, not the government. Again, I think the Court might be just a little out of step with the parties' view of the evidence here with all due respect.

THE COURT: Or you might be out of step with my view.

MR. BERRIGAN: I certainly am. I think I acknowledged that. But I raise that only because, again, the government's not acting in our interest when they come in before the jury and say there's evidence of remorse and now they don't argue that this is an inappropriate instruction in terms of the remorse element, then we think that that substantiates our position.

THE COURT: Mr. Williams?

MR. WILLIAMS: Well, I disagree.

THE COURT: You can remain seated. We're pretty informal tonight.

MR. WILLIAMS: Thank you, Judge. I disagree what Tom Miller said that during his closing argument. But I do recall Tom Miller couching his language in terms of let's even give her the fact that she was remorseful. I mean, he did it in a let's-assume-that-she-was-remorseful circumstance.

Page 5

I agree with the Court. I don't think there's evidence, direct evidence, of remorse. And there could have been. I mean, during the confession to Christi Gaubatz, she never did say, "And I feel horrible about what happened" or "I

3972

feel terrible" or "I'm so sorry about what I did." She never actually says anything that suggests remorse. The only evidence we have is that she cried, so I agree there is no --

THE COURT: And that she was worried about getting caught.

MR. WILLIAMS: Right.

THE COURT: That's what -- when I reread the transcript twice, I read her being upset, zero remorse but the fact that she was worried about getting caught and that's why she was losing sleep.

MR. WILLIAMS: And this also ties in about the same time as I understand it about when Christi finds the gun over at her house, you know, so she has to give some explanation what's going on.

So I agree with the Court that I don't think there's any direct evidence of remorse. I'm not -- I'm not absolutely opposed to this mitigator going in fully intending to point out to the jury let them contend it but there is no remorse in this evidence before them.

I do have a real problem with the last phrase of this, which remorse will continue to plague her conscience the rest of her life for every day of her life. There isn't a wit of evidence to support that, and I have a real concern with that. I think the Court would be within its bounds to not allow this mitigator at all, but I also don't oppose this going to the jury

Page 6

GRN000295

with the first part of that phrase with the full intention of pointing out to the jury that this mitigator is not supported by the evidence.

THE COURT: Mr. Berrigan, anything else you want to add?

MR. BERRIGAN: I don't think there's much I can add, Your Honor. The Court has taken an interpretation of this sobbing, crying Angela Johnson confessing to Christi Gaubatz as some indication she's afraid to get caught when there's no objective evidence of that.

THE COURT: Well, of course there is because right in the testimony of Gaubatz she says that Angela Johnson was paranoid. What was she paranoid of? She's paranoid of getting caught.

MR. BERRIGAN: She's on methamphetamine, Your Honor. You heard testimony after testimony how methamphetamine causes people to be paranoid. She called Miss Gaubatz --

THE COURT: There's no evidence she was on methamphetamine the day she asked to get this off her chest. There's not a shred of evidence about that.

MR. BERRIGAN: There's consistent evidence that she used methamphetamine regularly over a long period of time. Now, you're right. There's not specific evidence on that day she used methamphetamine. But one very reasonable view -- and again, I think Mr. Miller was quite candid in saying that this

3974

was remorse. It's an admission we believe by a party opponent that that's a factor that exists in this case, and for the Court

Case 3:09-cv-03064-MWB-LTS    Document 28-15    Filed 06/23/11    Page 96 of 100
GRN000296

to take that away --

THE COURT: If there was actually genuine -- you had all kinds -- I pointed this out before. You had all kinds of opportunities through family member witnesses, through three -- two psychologists -- or two psychiatrists -- I'm sorry, one psychiatrist and two psychologists to put in evidence of remorse, and there's no evidence of remorse. You want to infer from three different crying spells over a seven-year period that there is remorse. I'm not willing to infer that. I mean, there's all kinds of reasons why she was crying.

MR. BERRIGAN: Yeah, and one of the reasons is remorse.

THE COURT: Well, that could be.

MR. BERRIGAN: Right, and that's why it gets to go to the jury. We only have to prove a preponderance of the evidence at this point in the trial, Your Honor.

Mr. Miller -- once again, not to belabor or beat a dead horse, but when Tom Miller thinks it's remorse, I think it's reasonable to think that there might be one or two jurors who think it's remorse also. That's not an unreasonable interpretation to find what happened between Miss Johnson -- and for the Court to preclude even the possibility of a mitigator being considered -- and I'll point out remorse is a very

3975

important mitigating factor.

THE COURT: Then you should have put on evidence.

MR. BERRIGAN: You might have argued the evidence isn't as good as what it should have been.

THE COURT: It borders on being nonexistent in my view. It would have been very easy to put on evidence of

Page 8

remorse if there had been any remorse. I didn't hear any.

MR. BERRIGAN: Again, I think there are all kinds of problems with that not the least of which any evidence regarding remorse concerning the facts of the crime is an admission by Miss Johnson. That's exactly what happened with Miss Gaubatz. That has adverse repercussions. She's told very specifically not to discuss the case with anybody, and you heard both Shelly Johnson and Wendy Johnson say that.

THE COURT: Well, you could have had the psychologists interview her after the jury finding.

MR. BERRIGAN: They'd have to interview her about the murders, Your Honor. We specifically stayed away from that. That was not to be a topic of discussion. You can't talk to Miss Johnson about the murders.

THE COURT: Look, after the jury finding of guilt in this case, you could have had the psychologists, psychiatrists interview Angela Johnson about whether she had any remorse without getting into the day of the murders.

MR. BERRIGAN: You mean after they found her guilty?

3976

THE COURT: Yes.

MR. BERRIGAN: What significance would that possibly have? That would look ridiculous in my view for me to put on evidence that some psychologist interviewed her after the jury found her guilty and she said she was sorry. How self-serving can you get?

THE COURT: There would at least be evidence in the record.

MR. BERRIGAN: That would be horrible evidence. I wouldn't dare do that in a million years, frankly.

Page 9

THE COURT: Well, there's no evidence in the record of remorse.

MR. BERRIGAN: Well, we respectfully disagree, Your Honor.

THE COURT: Well, you're not -- well -- well, I'll let you put on -- well, you can have 15. I'm taking out the word "genuine" and ending it after Amber Duncan, period, and I don't think there's any evidence to support it, but I'm going to go ahead and give it anyway.

Now, on 17, did you ever have any meaningful discussion, Mr. Berrigan, with the government about their concern about the word "addicted"?

MR. BERRIGAN: No, sir, no.

THE COURT: Why is that?

MR. BERRIGAN: Well, because we just -- we disagree.

3977

We made a record at some length the other day about addiction. It's not some pie-in-the-sky standard. We believe it was met. Dr. Evans testified about it at length, the addictive nature of these drugs, methamphetamine. It's not a diagnosis that needs to be rendered, and there's all kinds of evidence that Miss Johnson used methamphetamine on a regular basis for a period of years. And you heard Miss Hare say that the difference she and Miss Johnson had regarding this drug is Miss Hare was able to quit it and Miss Johnson was not. That's addiction. So we don't think the alternative suggestion, user and abuser, frankly measures up.

THE COURT: What difference does it make?

MR. BERRIGAN: Well, it makes a difference to us.

THE COURT: Why?

Page 10

GRN000299

MR. BERRIGAN: Because addiction more accurately characterizes our client's --

THE COURT: How about regular user and abuser?

MR. BERRIGAN: Well, there's still this idea that you can quit any time, that this isn't going to be a problem, and addiction isn't that. Miss Hare, she's a regular abuser of methamphetamine, but she by her own admission quit when she decided to quit. Miss Johnson really has never been in that situation, was using drugs up until the time of her arrest.

THE COURT: Mr. Williams, what difference does it make?

3978

MR. WILLIAMS: It's not a big deal, Your Honor, one way or the other. I do differ with the defense. There was evidence that Miss Johnson quit using methamphetamine during both of her pregnancies, but regardless, it's not something that's that important to me. I don't think there's evidence of addicted, and if they want to keep it in, I'll point out to the jury they didn't prove it.

THE COURT: Well, I think I'll leave "addicted" in.

The next one in contention is 20. What's the evidence of that, Mr. Berrigan?

MR. BERRIGAN: We argued this at length also, Your Honor, at the last day of the trial. Our contention is that when Miss Johnson went to the Nicholson house with Mr. Honken on July the 25th, 1993, she believed the plan to be that they were to get a videotape of Greg Nicholson and move on. We think our position is substantiated at least in part by the jury's determination that they found no substantial planning and premeditation, or, more accurately, I should say they didn't

Page 11