## Effects of Abuse and Neglect on Children

> Abused and neglected children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including:

| | |
|---|---|
| Low self esteem | Withdrawal |
| Depression | Poor peer relations |
| Anger | Acting-out |
| Exaggerated fears | Anxiety disorders |
| Suicidal feelings | Sleep disturbance |
| Poor concentration | Lack of trust |
| Eating disorders | Secretive behavior |
| Overly compliant | Overly rebellious |
| Regressive behavior | Drug or alcohol problems |
| Health problems | |

American Psychological Association Presidential Task Force on Violence and the Family (1996)

Is there research that demonstrates a relationship between child maltreatment and problematic outcomes like psychological disorder and criminal conduct?

Dr. Cunningham, who would be asked to contribute to this task force?

What did this presidential task force conclude?

CUNN000101

## Effects of Abuse and Neglect on Children (2)

- Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulties in self-control.

- Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

- When abused children are not given appropriate treatment for the effects of abuse, the lifetime cost to society per abused child is very high.

What were the other conclusions of this blue ribbon panel of nationally respected researchers and child development experts?

CUN0001 62

## Outcomes of Maltreated Children

### Widom Study

- 908 children court identified as abused/neglected before age 11 in 1967-1971; and 667 matched controls
- 676 abused/neglected and 520 controls interviewed in late 1990's

|  | Abused/Neglected | Controls |
|---|---|---|
| **Criminal arrest** | 56.5% | 42.5% |
| **Arrest for violent crime** | 21.0% | 15.6% |

### Rochester Youth Development Study

- 1,000 7th and 8th graders in Rochester, New York in 1988
- 14% had maltreatment record
- Youths and primary caretakers interviewed every 6 months regarding violence

|  | Abused/Neglected | Controls |
|---|---|---|
| **Criminal violence** | 69% | 56% |

Kelley, B.T., Thornberry, T.P., & Smith, C.A. (August, 1997). In the wake of childhood maltreatment. *Juvenile Justice Bulletin*. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice

Widom, C.S. (January, 2000). Childhood victimization: Early Adversity, later psychopathology. *National Institute of Justice Journal*.

Widom, C.S. & Maxfield, M.G. (February, 2001). An update on the "Cycle of Violence." *National Institute of Justice: Research in Brief*

Earlier you described research sponsored by the United States Department of Justice - has DOJ sponsored any research studying the outcomes of maltreated children as part of their preventive investigations?

Please describe these studies and their findings.

CON0003603

## Types of Sexually Traumatic Experience or Abuse

✓ Exposure to graphic sexual behavior

✓ Sexually perverse family atmosphere

✓ Premature sexualization

✓ Observed sexual abuse or assault

✓ Direct physical sexual abuse

Dr. Cunningham, are there different types of sexual experiences or exposures that can damage a child psychologically?

What are those, and give me an example of each if you would.

CUN000104

**What Makes Sexual Trauma Damaging?**

**Traumatic Sexualization**
Inappropriate shaping of child's sexuality
➤ *Vulnerability to additional victimization. Fragile sense of masculine identity. Perception of self and others as objects.*

**Betrayal**
Someone on whom they were vitally dependent has caused them harm
➤ *Difficulty in loving or trusting others. Reduced identification with social ideals. Unreasoned loyalty.*

**Powerlessness**
Child's will and sense of control are overwhelmed
➤ *Avoids situations where he will not be in control. Aggressiveness. Substance abuse. Prejudice.*

**Stigmatization**
Badness, shame, and guilt become incorporated into child's self image
➤ *Deep seated feelings of shame and defectiveness. Avoidance of thinking about or acknowledging victimization. Substance abuse. Prejudice.*

Finkelhor, D., & Brown, A. (1985). The traumatic impact of child sexual abuse, a conceptualization. American Journal of Orthopsychiatry, 55, 530-541.
Conceptual basis for: Brief for Amicus Curiae, American Psychological Association, filed with the US Supreme Court in Maryland v. Craig, 1989.

Has there been research that looks at what is it about these sexual experiences in childhood that makes them damaging?

Has this research been summarized in an authoritative way?

Who developed this summary?

What are the conclusions of this summary?

Please describe each of these four primary ways that the child is damaged by sexual trauma.

*Interrupt as "Traumatic Sexualization" is being discussed:*

What are some of the outcomes that could stem from Traumatic Sexualization? *(And so on with each factor)*

CUN000105

## Sexual Trauma Damages Boys Too

- A history of childhood sexual victimization was associated with equal levels of later psychological dysfunction in both male and female clinical subjects:
  - dissociation
  - anxiety
  - depression
  - anger
  - sleep disturbance
  - post sexual abuse trauma

- Males were as disturbed as females though reporting less extensive and less extended abuse.

- *Hypothesis 1:* Equivalent impact on males and females regardless of any differences in its severity or duration between sexes.
  *Hypothesis 2:* Sexual abuse is more traumatic for males since lower male abuse levels were associated with symptoms equal to that of more severely abused females.

Briere, J., Evans. D., Runtz, M., & Wall. T. (1988). Symptomatology in men who were molested as children: A comparison study. American Journal of Orthopsychiatry, 457-461.

Dr. Cunningham, we usually think about girls being sexually abused rather than little boys – does sexual trauma damage boys as well?

Please describe this research.

CUN000106

## Impact of Sexual Trauma on Males

Long Term Effects:

- Depression
- Somatic disturbance
- Self Esteem Deficits
- Difficulty maintaining an intimate, emotional, and sexual relationship
- Problems with sexual adjustment, sexual compulsiveness, sexual dissatisfaction, sexual self esteem, and sexual identity
- Alcohol and substance abuse
- Violent criminal acts; sexual offending

Urquiza, A.J., & Capra, M., (1990). "The impact of sexual abuse: Initial and long-term effects." In The Sexually Abused Male, edited by M. Hunter, 106-135. New York: Lexington Books.

Gilgun, J.F., (1990). "Factors mediating the effects of childhood maltreatment." in The Sexually Abused Male, edited by M. Hunter, 177-190. New York: Lexington Books.

What are some of the long-term impacts of sexual trauma during childhood on outcome in adulthood for males?

CUN000107

## Effects of Observed Domestic Violence

- Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment.

American Psychological Association Presidential Task Force on Violence and the Family (1996)

What is the impact of observing violence and hostility perpetrated by parents?

CUN000108

## Outcomes in Family Violence

Rochester Youth Development Study
- 1000 children followed from 7th and 8th grade
- Interviews of children and caretakers every 6 months
- Three types of family violence exposure studied
  Spouse abuse
  Abuse of children
  Climate of violence and hostility

- Rates of serious youth violence:

  | | | |
  |---|---|---|
  | If no family violence | = | 38% |
  | If one type of violence | = | 60% |
  | If two types of violence | = | 73% |
  | If three types of violence | = | 78% |

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

Did any of the research studies sponsored by DOJ look at how family violence effected violent outcomes in children?

What were those findings?

CUN000109

> ## Effects of Insufficient Parental Structure and Guidance
>
> - Healthy child development requires structure, limit setting and guidance through discipline. This fundamental tenet is supported by research.
>
> - In the absence of parental limit setting there is grave risk to psychological health and positive socialization.
>
> - Children need order and external structures to develop internal structures and capacity for self-guidance.
>
> - When guidance is not provided self-control does not develop and aggression can unfold.
>
> - Children whose families fail to provide adequate supervision are more likely to exhibit delinquent behavior.
>
> - Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community.
>
> Cantelon, S.L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention. U.S. Department of Justice. Fact sheet #8.
> Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403–409.
> Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.
> Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

Dr. Cunningham, did Keith grow up in a stable predictable home?

Well, is it important for a child to grow up where things are stable and predictable, where the discipline is fair and deserved?

Why is that important to how a child grows up?

So what happens when parents don't provide a stable structure and reasonable discipline?

CUN000410

> *Disrupted development:*
> ## Implications of ADHD in Adolescence
>
> - 83% of hyperactive children still met criteria for ADHD as teenagers
> - Hyperactive children often have a co-existing behavior disorder:
>     - 59% Oppositional Defiant Disorder
>     - 43% Conduct Disorder
> - Hyperactive + Conduct Disorder teens abused substances at 2-5 times the rate of pure hyperactives or controls.
> - Three times as many hyperactive adolescents fail a grade as compared to normal adolescents (29.3% vs. 10%).
> - Hyperactive teens were suspended from school 10 times more often and expelled 7 times more often than normal teens.
> - Hyperactive teens are at substantially higher risk for negative outcomes:
>
> | | |
> |---|---|
> | psychiatric | social |
> | legal | academic |
> | family functioning | |
>
> Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.

What are the implications of ADHD for a teenager?

CUN000111

> ### Disrupted development:
> ## Implications of ADHD and Childhood Behavior Disorder in Adulthood
>
> - Adults with a history of ADHD are more likely to develop conduct disorders, alcoholism, and sociopathy.
> - Relatives of individuals with ADHD are more likely to suffer ADHD, antisocial behaviors, and mood disorders.
> - Individuals with a history of childhood hyperactivity are 7 times more likely to suffer from an antisocial personality disorder or drug abuse problem.
> - Childhood hyperactivity has a significant relationship with alcohol problems and violent offending.
> - The combination of ADHD and conduct disorder was a strong risk factor for adult criminality.
> - Only 11% of ADHD children as adults are free of any psychiatric diagnosis, function well, and have no significant symptoms of their disorder.
>
> - **A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates.**
>
> Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.
> Vitelli, R. (1996). Prevalence of Childhood Conduct and Attention-Deficit Hyperactivity Disorders in adult maximum-security inmates. *International Journal of Offender Therapy and Comparative Criminology, 40 (4),* 263-271.

Do the adverse effects of ADHD stop after childhood?

What are the implications of ADHD and childhood behavior problems in adulthood?

CUN000112



- A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates:

Conduct Disorder history:

Prison                 Community

63%

63% (vs. 6-16% community)

ADHD history:

41%

41% (vs. 3-5 % community)

You indicate that ADHD, particularly in combination with a Conduct Disorder are a strong risk for adult criminality, how do the rates of Conduct Disorder or ADHD compare between prison inmates and the free community?

Does a child chose to have either of these risk factors – Conduct Disorder or ADHD?

CUN000113

## Impact of School Failure and Drop-out

- Awareness of being different, deficient
- Recognition of failing performance
- Repeated experience of frustration and disappointment at school
- Peer isolation.
- Disrupted social and sexual development.
- Reduced self esteem
- Little feeling of safety or refuge at school
- Perception of being displaced by the system
- Marked risk to drop out
- Reduced employment capability and opportunity
- Increased susceptibility to influence
- Broad social risk vulnerability

Now moving outside of Keith's family background - What are some of the effects of learning disabilities - of failing in school and dropping out?

CUN000114

## Impact of Peer Isolation and Rejection

- Loneliness
- Reduced self-esteem
- Feelings of being different, defective, unlovable
- Lost "socialization" of childhood - competence, social skills, closeness to others, friendship, empathy, community, values, ambition
- No substitute adult mentors
- No alternative family models
- No alternative models for how to relate to others in a healthy fashion
- Broad social risk factor

Parker, J.G. & Asher, S.R. (1987). Peer relations and later personal adjustment: Are low-accepted children at risk? *Psychological Bulletin, 102,* 357-389.

How does it affect a child if his social skills are poor and his relationships with other children are disrupted?

CUN000115

*40*

> **Impact of Adult Prison**
> **on a Late Adolescent – Early Adult**
>
> *During the critical transition from childhood*
> *to adulthood:*
>
> - Separation from community relationships
> - Estrangement from community values
> - Inability to accomplish developmental tasks of late adolescent – early adulthood
>     - responsible independence
>     - career selection and preparation
>     - self-sufficient employment
>     - establish a network of pro-social relationships
>     - commitment to a marital partner
>     - identity as a full participant in community
> - Adoption of inmate attitudes and culture
> - Formation of an identity as a criminal
> - Risk of victimization
> - Hardening as a survival mechanism

Dr. Cunningham, Keith was confined to juvenile correctional facilities, and first went to adult prison at age 18. Even if appropriate as punishment and necessary for protection of society – are there some consequences or effects of being in prison at that crucial juncture between being a teenager and an adult?

What are those?

CUN000416



Dr. Cunningham, you've talked about the impact of damaging developmental experiences, including alcohol and substance abuse, on a child's life and outcomes – have you prepared a model to help explain how these combine in terms of risk for bad outcomes in adulthood?

Please explain that model

CUN000117



Psychological Disorder
Drug Dependency
Criminal Activity

CUN000118



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder

Case 3:09-cv-03064-MWB-LTS    Document 294-18    Filed 06/23/11    Page 19 of 100

CUN000119

51



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse

CUN000120



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder
✦
Modeled Substance Abuse
✦
Developmental Trauma / Abandonment / Instability

CUN000121



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder
✦
Modeled Substance Abuse        Alcohol & Drug Abuse
✦
Developmental Trauma / Abandonment / Instability

CUN000122



Positive Peer Relationships

Modeling of Positive Values

Consistency

Structure

Stability

Acceptance & Affirmation

Intact Family

Person

Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse

Alcohol & Drug Abuse

Developmental Trauma / Abandonment / Instability

CUN000123



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence
Modeled Substance Abuse    Alcohol & Drug Abuse
Developmental Trauma / Abandonment / Instability

CUN000124



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact
Family

CUN000125

61



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence

Modeled Substance Abuse          Alcohol & Drug Abuse

Developmental Trauma / Abandonment / Instability

CUN000126



Dr. Cunningham, would these same factors make a damaged defendant a high risk of violence in prison?

CUN000127

Draft Direct Exam of Dr. Cunningham
Regarding Mitigation

**Defense Attorney Work Product**

Do <u>Not</u> Distribute

CUN000128

> *U.S. Department of Justice Model*
>
> **Risk Factors for Violence and Delinquency
> In the Community**
>
> **Conception to age 6:**
> - Perinatal difficulties
> - Minor physical abnormalities
> - Brain damage
> - Family history of criminal behavior and substance abuse
> - Family management problems
> - Family conflict
> - Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

What risk factors has the Justice Department identified?

*Interrupt*

Doctor, let me stop you - do you mean that things that happen to a baby even before he's born affect his likelihood of delinquency and violence?

CUN000129

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency
In the Community**

**Age 6 through adolescence:**

- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- Transitions and mobility
- Availability of firearms
- Media portrayals of violence
- Family management problems
- Family conflict
- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- Early and persistent antisocial behavior
- Academic failure
- Lack of commitment to school
- Alienation and rebelliousness
- Association with peers who engage in delinquency and violence
- Favorable attitudes towards delinquent and violent behaviors
- Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

What factors did the Justice Department identify during the ages of 6 through adolescence?

CUN000130

*66*

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence
and Delinquency in the Community**

➢ **Individual characteristics:**

    Female gender

    Intelligence

    Positive social orientation

    Resilient temperament

➢ **Social bonding to positive role models:**

    Family members

    Teachers

    Coaches

    Youth leaders

    Friends

➢ **Healthy beliefs and clear standards for
behavior, including those that promote
nonviolence and abstinence from drugs.**

➢ **Effective early interventions**

What protective factors did the Justice Department identify?

CUN000131

U.S. Department of Justice (April 2000)

## Predictors of Youth Violence
### in the Community

➢ Office of Juvenile Justice and Delinquency Prevention coordinated

➢ 22 researchers brought together for 2 years

➢ Analyzed current research on risk and protective factors in the development of serious youth violence

➢ Synthesis of 66 studies, plus research reports, plus longitudinal data

➢ Identified individual, family, school, peer-related, and community/neighborhood risk factors

➢ Cumulative impact: the larger the number of risk factors the youth was exposed to, the greater the probability of violent behavior in the community.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Has the Justice Department sponsored any more research in this area since 1995?

Describe this study

*U.S. Department of Justice (April 2000)*

**Individual factors**
- Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- Aggressiveness (x .5 - 6)
- Early initiation of violent behavior (x 6)
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- Parental criminality (x 0 - 3.8)
- Child maltreatment
- Poor family management practices (x 2)
- Low levels of parental involvement
- Poor family bonding and family conflict
- Residential mobility (±)
- Parental attitudes favorable to substance abuse and violence (x 2)
- Parent-child separation

Hawkins et. al. (2000)

What individual risk factors were identified by the Justice Department?

*Interrupt*

What does the "x" and the numbers in parentheses mean?

What family risk factors did the Justice Department identify?

> *U.S. Department of Justice (April 2000)*
>
> **School factors**
> - Academic failure
> - Low bonding to school
> - Truancy and dropping out of school
> - Frequent school transitions
> - High delinquency rate schools
>
> **Peer-related factors**
> - Delinquent siblings
> - Delinquent peers
> - Gang membership (x 3-4)
>
> **Community and neighborhood factors**
> - Poverty (x 2)
> - Community disorganization (crime, drug-selling, gangs, poor housing)
> - Availability of drugs and firearms
> - Neighborhood adults involved in crime
> - Exposure to violence and racial prejudice
>
> **Situational factors**
>
> Hawkins et. al. (2000)

What school risk factors did the Justice Department identify?

What peer-related factors were found by the Justice Department?

What community and neighborhood factors did the Justice Department find?

What are situational factors?



How would you illustrate the balance between the cumulative impact of risk factors and minimal protective factors?

Case 3:09-cv-03064-MWB-LTS     Document 294-8     Filed 06/23/11     Page 35 of 100

CUN000135



Dr. Cunningham, how do you explain that someone has many risk factors for violence in the community and then is violent in the community, but when sent to prison is not violent?

Case 3:09-cv-03064-MWB-LTS    Document 294-18    Filed 06/23/11    Page 36 of 100

CUN000136

72



Dr. Cunningham, have you prepared a model to help explain to the jury how a combination of family problems and bad experiences in childhood can combine with substance abuse in terms of risk for bad outcomes in adulthood?

Please explain that model

CUN000137



CUN000138



CUN000139



Psychological Disorder
Drug Dependency
Criminal Activity

CUN000140

75



CUN000141



CUN000142



CUN000143



CUN000144

79



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

CUN000145



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

CUN000146



Person

Choices

Positive Peer Relationships

Modeling of Positive Values

Consistency

Structure

Stability

Acceptance & Affirmation

Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse

CUN000147



Person

Choices

Positive Peer Relationships

Modeling of Positive Values

Consistency

Structure

Stability

Acceptance & Affirmation

Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse

CUN000148



Choices
Positive Peer Relationships
Modeling of Positive Values
Consistency
Structure
Stability
Acceptance & Affirmation
Intact Family
Person
Psychological Disorder
Drug Dependency
Criminal Activity
Family History of Substance Dependence / Psychological Disorder
Modeled Substance Abuse



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder
✸
Modeled Substance Abuse
✸
Developmental Trauma / Abandonment / Instability

Case 3:09-cv-03064-MWB-LTS    Document 294-18    Filed 06/23/11    Page 50 of 100

CUN000150

*85*



Person

Choices

Positive Peer Relationships

Modeling of Positive Values

Consistency

Structure

Stability

Acceptance & Affirmation

Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder
✦
Modeled Substance Abuse
✦
Developmental Trauma / Abandonment / Instability

CUN000151

*86*



Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse

Developmental Trauma / Abandonment / Instability

CUN000152



Person

Choices
Positive Peer Relationships
Modeling of Positive Values
Consistency
Structure
Stability
Acceptance & Affirmation
Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

Family History of Substance Dependence / Psychological Disorder
⊕
Modeled Substance Abuse
⊕
Developmental Trauma / Abandonment / Instability

Alcohol & Drug Abuse

CUN000153

*88*



CUN000154

*89*



CUN000155



CUN000156



CUN000157



**Kansas Prison**

Person

Choices

Psychological Disorder
Drug Dependency
Criminal Activity

Staff
Structure
Supervision
Sobriety

Work
Treatment
Confinement

Dr. Cunningham, you have a ramp model to demonstrate how bad development and substance abuse can be associated with criminal outcomes – not just for Gordon, but for many individuals who are ultimately sent to prison. In light of these statistics demonstrating such low levels of inmate assault among high security inmates, how do you identify the impact of prison on this model?

CUN000158

# Issues in argument and qualifying exam of Mark D. Cunningham, Ph.D.:

Issues in opening argument:

1. will hear from the foremost expert in the United States on evaluating future dangerousness at capital sentencing:
   a. has published the primary peer-reviewed papers in the field
   b. has evaluated more federal capital defendants than any other mental health expert in the United States

2. extended length of testimony
   a. how to do a scientifically reliable violence risk assessment – to accurately estimate Mike's likelihood of successfully adjusting to prison
   b. a lot of data to plug into that method
   c. equip the jury to analyze this information for themselves rather than take his word for it

3. how expert testimony is dealt with by lawyers:
   - First try to counter the methodology and the data; present another nationally recognized expert to dispute the research and method. This approach is sound – you test the information.
   - If you can't challenge the data then attack the expert's credentials.
   - If you can't counter the data or challenge the credentials then try to ridicule it and talk about lying with statistics.

CUN0006159

- When you have nothing else you attack the expert as biased – without ever presenting any data that showed that he was incorrect.
- Finally, talk about the money the expert gets paid.

The last four are just ways for the lawyer to try to get over on the jury.

4. Whatever preview of the testimony you want to provide

## Qualifications

PB: *Please state your name?*
MDC:      Mark Douglas Cunningham.

PB: *What's your occupation?*
MDC:      I am a clinical and forensic psychologist in private practice

PB: *How long have you been a psychologist?*
MDC:      22 years

PB: *Could you please explain to the jury what is a clinical psychologist?*
MDC:      A clinical psychologist evaluates and treats psychological disorders.

PB: *Could you please explain to the jury what is a forensic psychologist?*
MDC:      Forensic psychology is the application of psychological research and techniques to legal issues - things like child custody evaluations, competency to stand trial, mental state at the time of the offense, sentencing determination issues, and other contexts where psychological expertise may be useful to the jury.

CUN0006160

PB:   *Where are you licensed as a psychologist?*
MDC:      Texas, New Mexico, Louisiana, Arkansas, Tennessee, South Carolina, Illinois, Indiana, Idaho, Colorado, Oregon,

PB: *Your practice is national in scope?*
MDC: That's correct.

PB:   *How long have you been licensed?*
MDC:      I was first licensed in Connecticut in 1979, and in Texas in 1981.

PB:   *Could you give us a brief summary of your educational background as it relates to psychology?*
MDC: I received my bachelors degree with high honors from Abilene Christian College in 1973 with majors in mass communications and psychology, and a minor in Bible.  I received my masters and doctorate degrees in clinical psychology from Oklahoma State University. That doctoral training was accredited by the American Psychological Association.

PB:   *What is the significance of accreditation by the American Psychological Association?*
MDC:  That accreditation signifies that the doctoral training program in clinical psychology has met very rigorous standards regarding faculty, curriculum, research activity, and library holdings. Only a limited number of doctoral programs have met this standard and are accordingly quite competitive in their admission requirements.

PB:        *Did you do an internship?*
MDC:  Yes, I did a one-year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland as an active duty naval officer.

PB: *What did you do after internship?*

CUN0006161

MDC: I was subsequently assigned as a staff clinical psychologist at the U.S. Submarine Base Medical center at Groton/New London, Connecticut for 3 years. My assignment to this position was an experiment for the Navy as they evaluated whether a clinical psychologist could be assigned to a position formerly occupied by a psychiatrist.

PB: *How did the experiment work out?*
MDC: Very well. Psychologists have continued to be assigned to the Submarine Base Medical Center.

PB: *Did you receive any personal recognition?*
MDC: Yes, I was decorated with a Navy Commendation Medal for my professional contributions – an unusual award for a junior officer in his first assignment.

PB: *Did you participate in any other professional activities while assigned at the Submarine Base?*
MDC: Yes, while stationed at the Submarine Base I completed a two-year part-time postdoctoral program at Yale University. During that time I also taught college classes part-time through university extension programs on base and a local community college.

PB: *Did you receive any recognition in the program at Yale University?*
MDC: Yes, at the conclusion of that training program I was given an award as the outstanding trainee.

PB: *What did you do after the Navy?*
MDC: I left the navy in 1981 for an academic position, and was a fulltime assistant professor at Hardin-Simmons University here in Abilene for two years. While teaching I began a private practice, and have been exclusively in practice since 1983. For many years that practice was primarily clinical - focused on doing counseling,

with an increasing emphasis on court related evaluations, particularly over the past 10 years.

PB: *Have you ever been published in the areas of clinical and forensic psychology?*
MDC: Yes, I have had a number of papers published in peer reviewed journals.

PB: *What are peer-reviewed journals?*
MDC: Peer review publications are how scientists communicate research findings with each other. Here's how it works: a research study or scholarly synthesis and analysis of research will be submitted to a peer-reviewed journal. The editor then sends the paper out to leading experts in the field who evaluate the research methodology, scholarly contribution, and extent to which the paper accurately represents other findings in the field. These reviewers may make suggestions for revisions and also recommend whether the paper should be accepted or rejected. Only a fraction of the papers submitted will be accepted by a major journal.

PB: *How many peer-reviewed papers have you authored or co-authored?*
MDC: A paper based on my doctoral dissertation research was published in a peer-reviewed journal. I have had 5 peer-reviewed papers published in the past three years in major forensic psychology journals. I have three other papers that are currently being reviewed by major journals and also have two book chapters in press, and an invited book chapter in review.

PB: *What have these peer-reviewed papers in the leading forensic psychology journals addressed?*
MDC: Sentencing evaluations of capital defendants, violence risk assessment, and characteristics of death row inmates.

*(you may want to talk to me about how much time goes into one of these papers, whether I get paid to do this publishing – I don't – and why I spend so much time in this research oriented activity.)*

PB:   *Are you board certified in any particular area?*
MDC:      Yes, I am. I am board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology.  The American Board of Professional Psychology is the only board certification recognized by the American Psychological Association.

PB:   *Could you explain board certification to the members of the jury?*
MDC:      Unlike medicine, most psychologists do not attempt board certification. In psychology it recognizes expertise and practice at the highest levels of excellence.  It requires at least 5 years of experience following the doctorate - though most forensic psychologists are at mid-career before attempting this board. The psychologist's record must be free of major ethical violations. Documentation of extensive training or continuing education in forensic must be submitted. If these prerequisites are accepted, the applicant is allowed to submit a work sample - scholarly examples of forensic reports prepared by the applicant in the course of his practice, which have been supplemented by discussion of relevant research, case law, and ethical considerations. This work sample is critically reviewed by two board certified forensic psychologists - many are rejected at this stage. If the work sample is accepted the applicant is allowed to sit for an oral exam administered by 3 board certified forensic psychologists and lasting three hours.

PB:   *What is the failure rate at that oral examination?*
MDC:      The historic failure rate at this culminating oral exam is 40%.

CUN000164

PB: *How many board certified forensic psychologists are there in the United States?*
MDC: Fewer than 200.

PB: *You mentioned continuing education earlier. Have you instructed in any continuing education for psychologists?*
MDC: Yes, I have.

PB: *Please tell the jury about that.*
MDC: Under the auspices of the American Academy of Forensic Psychology, I have provided workshops to other psychologists. A primary goal of the American Academy of Forensic Psychology - the scholarly association of board certified forensic psychologists - is to raise the quality of psychological consultations and testimony for the jury. So, the academy presents workshops in forensic psychology around the country. I am part of that teaching faculty.

PB: *What have your workshops addressed?*
MDC: Capital sentencing evaluations – including both the psycho-legal issues and research that are relevant to assessment of mitigation and future dangerousness.

PB: *What are psycho-legal issues?*
MDC: Those are the specific questions that information is being gathered and analyzed for.

PB: *What psycho-legal issues do you instruct psychologists about for their evaluations at capital sentencing?*
MDC: One of these is the concept of moral culpability –that is, what forces that an individual did not chose formed and shaped him – perhaps contributing to his participation in the capital offense or giving reason to have mercy on him. In other words, someone who grows up like I did like "Leave it to Beaver" has very different perceptions and choices than someone who grew up

CUN000165

being traumatized and abused. This notion of moral culpability is at the heart of mitigation. Another issue has to do with the likelihood that the defendant will successfully adapt to prison without serious violence – called future dangerousness or violence risk assessment.

PB:  *How many of the fewer than 200 board-certified psychologist are on this teaching faculty?*
MDC:      Approximately 30.

PB: *Have you provided any continuing education to prosecutors?*
MDC: Yes, in print form. One of the non-peer reviewed papers I co-authored appeared in the "Prosecutor's Brief" – a magazine that goes out to all the district attorneys in California – educating them about a diagnostic formulation called psychopathy.

PB:  *Do you attend continuing education as a student as well?*
MDC:  Yes, I have participate actively in continuing education, averaging between 60-100 hours annually  - well in excess of the 12 hours annually required by the Texas State Board of Examiners of Psychologists. Most of that continuing education has been directed toward forensic psychology.

PB:          *To what professional organizations do you belong?*
MDC: I am a fellow of the American Academy of Forensic Psychology - the scholarly association of board certified forensic psychologists. I am a member of the American Psychological Association, Texas Psychological Association, and Abilene Psychological Association. I am listed in the National Register of Health Service Providers in Psychology.

PB:  *Have you ever testified in any military, criminal, family, or civil court proceedings?*
MDC:  Yes, I have.

CUN000466

PB: *How many times?*
MDC: On Over 150 occasions.

PB: *Before what courts?*
MDC:        I have testified in state district courts in Texas, as well as Arkansas, New Mexico, Louisiana, Tennessee, Illinois, Indiana, New Jersey, Kansas, Colorado, Idaho, Nevada, and Oregon. I have testified in federal courts in Texas, Louisiana, Arkansas, Alabama, North Carolina, Virginia, Maryland, Illinois, and Colorado. I have testified before military courts in Connecticut and Texas.

PB: *Have you been recognized as an expert? In what area(s)?*
MDC:        Yes, in clinical and forensic psychology

PB: *Have you ever failed to qualify as an expert in clinical and/or forensic psychology?*
MDC:        No

PB: *When you have testified as an expert, were you paid?*
MDC:        Yes, I was.

PB: *For what?*
MDC:        For my time.

PB: *Have you ever been consulted, but not called as a witness?*
MDC:        Yes, there have been a number of cases where my testimony would not have been helpful to the party that retained me - so I was not called to testify.

PB: *Have you ever been called to testify by the State in a criminal case?*
MDC: Yes, I have – on many occasions.

CUN000167

PB: *Have you ever been called to testify by the State in a capital case?*
MDC: No, I haven't

PB: *Why not?*
MDC: My testimony is highly research based. This research is not particularly helpful to the State's position in most instances at capital sentencing.

PB: *Would you be willing to testify in a capital case if you were called by the State?*
MDC: Of course, I'd present the same research I will be presenting today. I understand why they don't call me to do that.

PB: *I'm going to show you what has been marked as defense exhibit # . Do you recognize this?*
MDC: That is my curriculum vitae or resume.

PB: *Is this current and does it accurately reflect your qualifications and experience?*
MDC: Yes, it does.

PB: *Your honor, we move to have Dr. Cunningham recognized as an expert in clinical and forensic psychology.*

**Basis of evaluation:**

*What records did you review regarding Gordon Martis, Jr. in preparing to testify regarding his likelihood of serious violence in prison or on old age parole?*

*What research did you review?*

*Is that research reliable and accepted in your profession?*

CUN000168

*Did you interview Mr. Martis or any third parties?*

*How does not engaging in a direct interview of Gordon affect your conclusions?*

*Have you prepared some demonstrative exhibits to assist the jury in understanding your testimony?*

*Permission for Dr. Cunningham to step down and present these exhibits.*

CUN000169

**MARK D. CUNNINGHAM, Ph.D.**
500 Chestnut Suite 1735
Abilene, TX  79602
Phone:  (915) 670-0545
FAX:  (915) 670-0566

NUMBER OF PAGES (NOT INCLUDING THIS COVER PAGE) ____/_____

IF ALL PAGES ARE NOT RECEIVED, PLEASE CONTACT THE SENDER.

DATE: _____5-8-01_____     TIME: ___12:50 pm___

ATTENTION: _Pat Berrigen_____

COMPANY: _Attorney at Law_____

FAX PHONE: _(816) 221-1636_____

FROM: _Mark Cunningham_____

COMMENTS: _April 2001 Billing re: Gordon Martin_

_(Original coming via mail)_____

# CONFIDENTIAL

### For Professional Use Only

The information contained in this facsimile message is legally
privileged and confidential information intended only for the use
of the individual or entity named above.   If the reader of this
message is not the intended recipient, you are hereby notified that
any dissemination, distribution or copy of this facsimile is
strictly prohibited.  If you have received this facsimile in error,
please immediately notify us by telephone and return the original
message to us at the address set forth above.

CUN000170

# MARK D. CUNNINGHAM, PH.D.

## CLINICAL & FORENSIC PSYCHOLOGY

*Diplomate in Forensic Psychology • American Board of Professional Psychology*

May 7, 2001

Patrick Berrigan
Attorney at Law
2500 Holmes
Kansas City MO 64108

In Reference To:      State of Kansas v Gordon Martis, Jr.,
                      #99CR1091 in Wyandotte County

### STATEMENT

Professional services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 4/20/01 | Telephone conference with Pat Berrigan (defense counsel), 50 minutes | 0.83 210.00/hr | 175.00 |
| 4/21/01 | Preparation of exhibits, 95 minutes | 1.58 210.00/hr | 332.50 |
|  | Preparation of exhibits and direct exam, 95 minutes | 1.58 210.00/hr | 332.50 |
|  | Preparation of exhibits and direct exam, 20 minutes | 0.33 210.00/hr | 70.00 |
|  | Preparation of exhibits and direct exam, 20 minutes | 0.33 210.00/hr | 70.00 |
|  | Preparation of exhibits and direct exam, 80 minutes | 1.33 210.00/hr | 280.00 |
|  | For professional services rendered | 5.98 | $1,260.00 |
|  | Balance due |  | $1,260.00 |

CUN000171

# WATSON & DAMERON, LLP

## TRIAL ATTORNEYS

Henri J. Watson • Russell S. Dameron

Patrick J. Berrigan • Kathleen M. Hagen* • Jason B. Billam*

Of Counsel: Ramón Murguía

*Licensed in MO & KS

All others licensed in MO only

November 2, 2001

Dr. Mark Cunningham, Ph.D.
500 Chestnut, Suite 1735
Abilene, TX 79602

**SENT VIA FACSIMILE: 915-670-0566**
**and MAILED, U.S. MAIL**

Re: *U.S. v. Keith D. Nelson*

Dear Dr. Cunningham:

As of this morning, Keith's case has been postponed until Tuesday, November 13th, when jury selection will begin. I do not know whether the evidence will begin on Monday, November 19th, or Monday, November 26th, although I hope it is the latter. If not, there will be a substantial delay between the government's evidence and the beginning of the defense litigation evidence, a delay which will substantially diminish our chances of success.

Next Wednesday, if not before, Judge Gaitan will determine whether Keith will undergo a mental comprehensive evaluation. The judge's decision on this evaluation could postpone the trial further, although I feel strongly that Judge Gaitan will want to have this case tried before Christmas. Our best case scenario is jury selection beginning on Monday, November 26th, with the evidence starting the following Monday, December 3rd. This would put your testimony in at Friday, December 7th, or Monday, December 10th.

Please share your thoughts about these dates. We know how busy your schedule is and will continue to keep you apprised of the ever-changing status of this case.

If you have an opportunity, I would very much appreciate a current exhibit list, so I can provide that to the Court (as has been requested). Feel free to fax that along as I will need to retype it in any case. Another alternative, which my secretary would prefer, is transmission by email (pberrigan@kctriallawyers.com).

I'd also like to take an hour of your time to discuss your testimony in Keith's case. I know you're on the road quite a bit in the next couple of weeks, but if you could reserve an hour, and have Linda let me know when, I'd greatly appreciate it.

I'll be in the office and easily available by phone during the next 10 days. Please call regarding the above at your convenience. Thanks, Dr. Cunningham.

Case 3:09-cv-03064-MWB-LTS Document 84-28 Filed 06/23/11 Page 72 of 100
2500 Holmes, Kansas City, MO 64108 • www.kctriallawyers.com • Fax (816) 221-1636 • (816) 474-9050

Sincerely,

Patrick J. Berrigan
Trial Lawyer
Watson & Dameron, LLP

PJB:rlw

Cc: Susan Hunt
    Keith Nelson

CUN000173

# WATSON & DAMERON, LLP

## TRIAL ATTORNEYS

Henri J. Watson • Russell S. Dameron
Patrick J. Berrigan • Kathleen M. Hagen* • Jesse B. Garcia* • Jason B. Billam**
Of Counsel: Ramón Murguía

*Licensed in MO & KS                                                    **Licensed in Kansas only

## FAX TRANSMITTAL

### COVER SHEET

TO                          : Dr. Mark Cunningham, Ph.D.

FROM                    : Patrick Berrigan

DATE                     : 11/2/01

RE                          : U.S. v. Keith D. Nelson

FAX NUMBER     : 915-670-0566

TOTAL NUMBER OF PAGES FAXED: 3 PAGES INCLUDING COVER SHEET

**NOTE:**

**IF YOU HAVE ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CONTACT 474-3350.**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

ORIGINAL MAILED _____          ORIGINAL NOT MAILED _____

2500 Holmes, Kansas City, MO 64108 • www.kctriallawyers.com • Fax: (816) 221-1636 • (816) 474-3350

TRANSACTION REPORT

Transmission
Transaction(s) completed

| NO. | TX DATE/TIME | DESTINATION | DURATION | PGS. | RESULT |
|---|---|---|---|---|---|
| 541 | NOV. 2 16:25 | 9156700566 | 0° 00' 56" | 003 | OK |

# WATSON & DAMERON, LLP

## TRIAL ATTORNEYS

Henri J. Watson • Russell S. Dameron

Patrick J. Berrigan • Kathleen M. Hagen* • Jesse B. Garcia* • Jason B. Billam**

Of Counsel: Ramón Murguía

*Licensed in MO & KS                                    **Licensed in Ka

# F A X   T R A N S M I T T A L

## COVER SHEET

TO              :  Dr. Mark Cunningham, Ph.D.

FROM         :  Patrick Berrigan

DATE         :  11/2/01

RE              :  U.S. v. Keith D. Nelson

FAX NUMBER   :  915-670-0566

TOTAL NUMBER OF PAGES FAXED: _3 PAGES INCLUDING COVER SHEET

**NOTE:**

11/9/01
Friday
3:10pm

Mental Health Evid.

Diagnosis w/ Psych. Testing

None of that here.

① Violence Risk Assessment

May be an issue — if gov't raises issue
of not being able to interview △, while
Mark did. ✓

Damon Smith — Beaumont Texas

② Mitigation

What is it that damaged this guy/
development
— developmental factors
— history
— what is nexus of these factors and
bad factors. (How do they effect actions?)

CUN000176

-1-

History is not from ~~history~~ anyway.

Future Dangerousness

①   Past adjustment in institution

②   Group statistical data

Don't need interview to establish these

Jury needs reliable info., Statistical
stuff, to give weight to

Usually, if I interview him, they interview him

Otherwise, I end up as a tiebreaker

"Willie Haynes" — Mark sat in crm.
Listened to lee Norton + mother
but when Mark testified He talked
generally about if this Risk assessment,
then this is what usually happens.

Case 3:09-cv-03064-MWB-LTS   Document 294-18   Filed 06/23/11   Page 77 of 100

CUN00011

Has had problem once w/ testifying where judge denied test. b/c it was *not* generalized.

Willis Haynes — teaching witness

Raheem + Shaheen Johnson — Alexandria, Va. case

Anthony Jones — Baltimore

Damon Smith — teaching witness

N.Y. — teaching witness

END
3:25pm

3:25pm – 3:45pm   Tel. call from Susan

11/9/01

Case 3:09-cv-03064-MWB-LTS   Document 294-18   Filed 06/23/11   Page 78 of 100

CUN000178

# WATSON & DAMERON, LLP
## TRIAL ATTORNEYS
Henri J. Watson • Russell S. Dameron
Patrick J. Berrigan • Kathleen M. Hagen* • Jesse B. Garcia* • Jason B. Billam**
Of Counsel: Ramón Murguía

*Licensed in MO & KS                                    **Licensed in Kansas only

## FAX TRANSMITTAL
### COVER SHEET

TO : DR. MARK CUNNINGHAM, Ph.D.

FROM : PAT BERRIGAN

DATE : 11-9-01                    9:15 pm

RE : Keith Nelson

FAX NUMBER : 1-915-670-0566

TOTAL NUMBER OF PAGES FAXED: 21 PAGES INCLUDING COVER SHEET

DR. CUNNINGHAM: Sorry I missed your call back on

**NOTE:** Friday afternoon. I'll try to catch you this weekend so we can talk. Please don't hesitate to call me when you have a few minutes (816-474-3350, ext. 113).

These materials pertain to Keith's 10/28 suicide attempt, for whatever they are worth.

Thanks for all of your help, Mark.    Sincerely,

Pat Berrigan

IF YOU HAVE ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CONTACT 474-3350.

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

ORIGINAL MAILED _____        ORIGINAL NOT MAILED _____

2500 Holmes, Kansas City, MO 64108 • wdlaw@kctriallawyers.com • Fax:(816) 221-1636 • (816) 474-3350

TRANSACTION REPORT

Transmission
Transaction(s) completed

| NO. | TX DATE/TIME | DESTINATION | DURATION | PGS. | RESULT | MODE |
|-----|-------------|-------------|----------|------|--------|------|
| 685 | NOV. 9 21:28 | 9156700566 | 0° 07' 06" | 021 | OK | N  ECM |

# WATSON & DAMERON, LLP

### TRIAL ATTORNEYS

Henri J. Watson • Russell S. Dameron

Patrick J. Berrigan • Kathleen M. Hagen* • Jesse B. Garcia* • Jason B. Billam**

Of Counsel: Ramón Murguía

*Licensed in MO & KS                                    **Licensed in Kansas only

# FAX TRANSMITTAL

## COVER SHEET

TO          :   DR. MARK CUNNINGHAM, Ph.D.

FROM        :   PAT BERRIGAN

DATE        :   11-9-01                           9:15pm

RE          :   Keith Nelson

FAX NUMBER  :   1-915-670-0566

TOTAL NUMBER OF PAGES FAXED: 21 PAGES INCLUDING COVER SHEET

DR. CUNNINGHAM: Sorry I missed your call back on
NOTE: Friday afternoon. I'll try to catch you this weekend
so we can talk. Please don't hesitate to call me when you
have a few minutes (816-474-3350, ext. 113).
These materials pertain to Keith's 10/28 suicide attempt
for whatever they are worth. ...

Case 3:09-cv-03064-MWB-LTS   Document 294-18   Filed 06/23/11   Page 80 of 100
NEL000180

Richard E. Whitlow, MD
3550 South Fourth Trafficway
Suite 200
Saint John Medical Plaza
Leavenworth, Kansas 66048

1 November 2001

The Honorable Fernando M Gaitan, Jr.
U.S. District Court
C.E. Whittaker Courthouse
400 E. 9th street
Kansas City, MO 64106

Dear Judge Gaitan,

I was asked by Mr. Berrigan to write you a letter regarding my interaction with Mr. Keith Nelson during my attendance of his hospital stay at Saint John Hospital in Leavenworth, Kansas from admission 29 October 2001 until discharge 31 October 2001. For your information as background on me, I am Board Certified in Internal Medicine, training at Fitzsimons Army Medical Center 1984-1987 and licensed to practice in Kansas since 1987 (KS 21644). I was on active duty U.S. Army 1984-1992 attending inmates as part of my responsibility at the U.S.D.B. from 1990-1992. While in private practice since 1992, I have attended numerous inmates from all facilities in Leavenworth: U.S.P., L.C.F., and C.C.A.

Mr. Nelson took a significant overdose of a tricyclic antidepressant (presumably Elavil) and Trazodone (another antidepressant.) The act was one propagated over time and very deliberate with; I think the clear intent of harming himself. As I understand from the Warden at CCA, he acquired the pills over many days, purchasing them from other inmates with candy and the like, with the pills being delivered in library books circulated between the inmates. This shows that he planned this action well in advance of 29 October and it was not a spontaneous act.

My initial contact with him on 29 October 2001 found him to be very sedated, a normal reaction to an overdose such as this. The following two days, he awoke and exhibited a very angry, depressed, withdrawn, flat, "I don't give a f***" affect. I have cared for inmates since 1990 during my time at Fort Leavenworth on active duty, as well as in private practice since 1992. His demeanor, affect, and behavior displayed by this calculated and significant overdose leads me to think he is very depressed, probably more so than any inmate I've seen in the past. Of course, I have honestly not been involved with a case such as this at this time (capital sentencing.) Whether this is a reaction or realization to his current situation or something more deep seated which could affect his ability to assist in his defense would take much more time to ferret out than that which I spent with him. If he were a civilian patient, I would seek to have him voluntarily incarcerated in an institution for further evaluation and treatment. If he did not consent to

CUN000181

voluntary treatment, I would seek to involuntarily commit him to Osawatomie for such treatment.

My recommendation for Mr. Nelson and you, sir, to go forward, would be to further evaluate his condition with a detailed examination by a trained psychologist (preferably with a team approach including females, which he may be able to talk to and trust more). Dr. John Spiridigliossi of Lawrence (785-749-4442) has developed such a team approach toward evaluations and would be an excellent choice locally to provide you with invaluable information and recommendations regarding Mr. Nelson.

Please contact me if you have any questions or observations I may not be aware of or overlooked, 913-772-8200.

Sincerely,

Richard E. Whitlow M.D.

CUN000182

PAT. NAME: NELSON, KEITH
ACCT. #: 62039342
DOB: 11/23/1974

MR #: 050717
ROOM #:
AGE: 26

DICTATING PHYSICIAN: Richard Whitlow, M.D.
ATTENDING PHYSICIAN: WHITLOW, RICHARD E.

ADMISSION DATE: 10/29/2001

HISTORY AND PHYSICAL

CHIEF COMPLAINT: Overdose tricyclic antidepressant.

HISTORY: A 26-year-old white male, inmate at CCA Leavenworth, admitted it was identified that he had taken an overdose of tricyclic antidepressant. He had only taken about 40 Elavil tablets at 11:30. He presented alert but drowsy with some slurred speech, talking incoherently with some jerky motions. He was given activated charcoal. Unfortunately, he did not present until well after 14 hours of the event. He remained somewhat sleepy and groggy. He does not wake up for the exam or interview today.

PAST MEDICAL HISTORY: None.

ALLERGIES: None.

DAILY MEDICATIONS: None.

SOCIAL HISTORY: No tobacco, alcohol, or illegal drugs.

Drug test is positive for TCA.

PHYSICAL EXAMINATION
VITAL SIGNS: Heart rate 122, pressure 141/67, respirations 20, afebrile. O2 saturations are good.

HEENT: Normal. Mouth is stained with charcoal.

NECK: Supple, no JVD, no lymphadenopathy, bruits, or thyromegaly.

CHEST: Clear to auscultation and percussion.

CARDIOVASCULAR: Regular rate and rhythm, no S3, S4, rubs, clicks, or murmurs. He is tachycardiac.

ABDOMEN: Soft, nontender, obese, no guarding or rebound, organomegaly or bruits.

EXTREMITIES: No clubbing, cyanosis, or edema.

NEUROLOGIC EXAM: Normal, although he seems somewhat depressed and groggy.

SAINT JOHN HOSPITAL, 3500 SOUTH FOURTH STREET, LEAVENWORTH, KANSAS 66048-5092 (913) 680-6000

PAT. NAME:   NELSON, KEITH
ACCT. #:      62039342

ASSESSMENT:   Tricyclic antidepressant overdose with resting tachycardia, obesity.

PLAN:   Monitoring, IV fluids.

ANTICIPATED LENGTH OF STAY:   72 hours.

_____

Richard Whitlow, M.D.

476804 / 31065 /
DD: 10/29/2001 07:04
DT: 10/29/2001 14:55

CC:   RICHARD WHITLOW, M.D.

2

CUN000184

NELSON, FRANK
26    M    11/23/1? ?
WHITLOW, RICHARD E.
10/29/01              1 ICU03
070        1.2039342
RM NO    050717

# St John Hospital

## Progress Record

| Date | Note progress of case, complications, consultations, change in diagnosis, condition on discharge and instructions to patient. |
|------|-------------------------------------------------------------------------------------------------------------------------------|
| 10/30/01 | Psychiatry |

26 y/o SBSM admitted 2° suicide attempt by overdose on trycyclic and trazodone.

S "I'm not suicidal. I just don't want to be in this life. If they want to take me out, they'll have to do it — and that's alright. I don't give a F-CK"

O — Obese, young adult white male. Admits to suicidal intent by OD. Mood is depressed, anxious, angry. Denies current SI, but then expressed feelings of hopelessness and despair related to his current situation.

A — Depressive disorder NOS

P — The patient is resistant to speaking 2 me in any detail, but appears depressed, angry and impulsive. I would suggest continued suicide precautions.

The patient might benefit from supportive psychotherapy and antidepressant medication if he were willing to accept them.

Thank you

S J [signature]

#24556

CUN000185

NS-38R1193
4 - Blue

# St John Hospital

## Progress Record

NELSON , KEITH
26    M    11/23/1974
WHITLOW, RICHARD E.
10/29/01            IICU03

L2039342

| Date | Note progress of case, complications, consultations, change in diagnosis, condition on discharge and instructions to patient. |
|---|---|
| 10/30/01 0650 | Med _(illegible handwriting)_ S: _(illegible)_ |
| | O: _(illegible)_ |
| | A: TCA OD _(illegible)_ |
| | P: _(illegible)_ |
| 10/31/01 0645 | Med _(illegible)_ S: _(illegible)_ Spoke _(illegible)_ O: _(illegible)_ exam _(illegible)_ |
| | A: TCA OD _(illegible)_ |
| | P: Plan DC in AM _(illegible)_ |
| 10/31/01 | Psychiatry S: "I've said everything to you that I have to say." Met c the patient, again, at his attorney's request. Mr. Nelson remains guarded and unwilling to speak c me _(illegible)_ S. _(illegible)_ M.D. |

NS-36H193
4 - Blue
CUN000186

10/31/01
**ID Data:** Keith Nelson
**Inmate #:** 07440031
**DOB:** 11/23/74

He's seen by me today 10/31/01. At about 11:30am. Our conversation took less than five minutes. He presented in the prison garment with both hands in cuffs. But did not appear to be in any overt distress.

**Reason for Interview:** Mr. Nelson had admittedly made a suicide attempt a few days earlier by ingesting some undisclosed amount for Trazadone and antidepressant. Commonly used as a sedative. Even though he admitted to taking this medication to overdose. He did not state to me how he got the medication since he had declined any form of psychiatric help. (See prior assessment dated 10/18/99.) It is however alleged that he had collected and obtained the drug from other inmates over time and he had hidden the pills in facial or body powder container to conceal their presence from the prison guards.

**Mental Status Exam:** He appeared to have gained weight since last interview. He is orientated to place, person and situation. He terminated our interview by repeating the same phrase that echoes all the time. "I don't intend to talk to you, my lawyer says not to talk to any shrink." I asked if he intends to make another suicide attempt? He said no.

**Impressions:** Based on the limited time spent together, I was not able to come to any conclusion Diagnostically, however references to my earlier assessment has not changed my clinical impressions significantly. There may be some depressive symptoms at this time but they are not overt.

**Recommendations:**
1. Mr. Nelson should be placed on suicide watch.
2. A full and comprehensive psychiatric assessment should be done when his cooperation can be fully enlisted.

**NB:** I am of the opinion that he will make another attempt soon.

Sincerely,
Dr Fadry
Dr. Fadare

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. 99-00303-01-CR-W-2
)
KEITH DWAYNE NELSON, )
)
Defendant. )

FILED
NOV 08 2001
P. L. BRUNE, CLK.
U.S. DISTRICT COURT
WEST DISTRICT
OF MISSOURI

## ORDER

Currently pending before the Court is Defendant's Motion to Determine Mental Competency to Proceed to Trial (Doc. # 357) and Defendant's Application for Continuance (Doc. # 356).

### I. BACKGROUND

Keith D. Nelson was originally charged by Indictment on October 21, 1999 with two counts, kidnapping resulting in death, in violation of 18 U.S.C. § 1201, and sexual abuse resulting in death, in violation of § 2245. On October 25, 2001, the defendant plead guilty to Count I of the Indictment.

On October 28, 2001, on the eve of jury selection for the penalty phase of the trial, defendant Nelson attempted suicide by taking an overdose of Tazadone and Elavil, antidepressant medications. Defendant apparently acquired this medication over the past two years from other inmates and hid the pills in containers of facial or body powder in order to conceal them from the guards. The Government indicates in its response to the Motion that on the evening of October 28, 2001, the defendant informed his brother that he had taken the medication and said good-bye to various family members. At approximately 11:45 p.m., the defendant contacted jail authorities

and informed them that he had taken the medication. The defendant was then taken to a local hospital for treatment. On October 31, 2000, the Court ordered defendant to meet with a mental health professional at Corrections Corporation of America ("CCA") where he is incarcerated, however defendant refused to do so.

## II. DISCUSSION

In <u>Drope v. Missouri</u>, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Supreme Court stated:

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. . . . we have approved a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'

<u>Id</u>. at 171-72, quoting, <u>Dusky v. United States</u>, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824(1960).

"Due process requires the trial court to hold a competency hearing, either on motion or sua sponte, whenever evidence raises a 'sufficient doubt' about the accused's mental competency to stand trial." <u>Reynolds v. Norris</u>, 86 F.3d 796, 800 (8th Cir. 1996).

> The exact nature and amount of evidence necessary to establish a sufficient doubt is uncertain–'no fixed or immutable signs . . .invariably indicate the need' for a hearing. . . According to the Supreme Court, factors to consider include: (1) evidence of irrational behavior by the accused, (2) the demeanor of the accused at trial, and (3) any prior medical opinion on the mental competency of the accused to stand trial. . . . Any one of these factors alone can, 'in some circumstances, be sufficient.' . . . In addition, the Supreme Court has stated that an express doubt by the attorney for the accused is a legitimate factor to consider, but

2

CUN0006189

alone is not enough to create a sufficient doubt.

Griffin v. Lockhart, 935 F.2d 926, 930 (8th Cir. 1991), quoting, Drope, 420 U.S. at 177-180, 95 S.Ct. at 906-908. One court has noted that "[i]n determining competency, the district court may rely on numerous factors, including expert medical opinions and the court's observation of the defendant's demeanor." United States v. Robinson, 253 F.3d 1065, 1067 (8th Cir. 2001), citing, United States v. Long Crow, 37 F.3d 1319, 1325 (8th Cir. 1994), cert. denied, 513 U.S. 1180, 115 S.Ct. 1167, 130 L.Ed.2d 1122 (1995).

## A. Irrational Behavior

Nothing in the defendant's records indicate that he has acted in an irrational manner when considered in the context of the crime with which he is charged and the circumstances of his incarceration or his most recent admission of guilt. Rather, the Court finds that the attempted suicide was the result of a plan formed over a period of months or years which was rationally conceived and rationally aborted. Defendant Nelson apparently began buying medication from other inmates by purchasing commissary food items for inmates who were not allowed to have these items. The medication would then be delivered to Nelson via a library cart or during outside recreation. Nelson hid the medication in containers of baby powder or lotion, to prevent discovery by the prison guards. Records from CCA indicate that at approximately 11:45 p.m., defendant Nelson asked to speak with the Chief of Security. He informed the Chief of Security that he was planning to kill himself, but that he had subsequently changed his mind. Other than the suicide attempt, there is no indication in the records from CCA that the defendant had a history of acting irrationally. The Supreme Court in

3

CUNO006190

396, 43 L.Ed.2d 103 noted: "we also

tween mental illness and suicide or suicide

empt need not always signal an inability to

ally and to make plans and carry them out in

ernal quotation and citation omitted).

serious, not 'every suicide attempt

erning the defendant's competency.'"

C.D.Cal. 1998), citing, United States v.

9 (9th Cir. 1997). See also, Funtanilla v.

1768 * 5, (N.D.Cal. Dec. 23,1997), aff'd,162

present evidence of a history of irrational

uicide attempt, would require further inquiry

milarly, in the instant case, there has been no

orneys that he has acted in an irrational

e Court does not believe that defendant's

ubt regarding the defendant's competency to

g the court proceedings which have

g other than calculated decisions to either

eedings at hand. Once he began to

guilty of this offense and decided to plead

4

l be normal under the circumstances.

lant's demeanor was calm and collected.

quiries. Defendant Nelson also listened

disagreed with certain representations

he was afforded an opportunity to

n reflected his objections. Defendant

e nature and scope of the proceeding.

idant by the Court.

d everything that's been discussed thus

ut anything that's been discussed?

rt will accept the defendant's plea of
Court makes the finding that the
ie charge against him and the
; that he's been advised of his rights,
iluntarily and intelligently waives
been ably assisted by counsel in this
o plead guilty has been made freely and
ercion; that there is indeed a factual

ceeding, there are a couple questions
they have been covered indirectly but

he time this crime was committed, you
disease or defect that would exclude

CUN000191

Nov. 8. 2001 11:12AM

criminal responsibility?

THE DEFENDANT: That I was not? No, I was not.

MS. HUNT:   Would you agree today you're not suffering from a mental disease or defect that makes you incompetent to enter this plea of guilty?

THE DEFENDANT: I would agree.

MS. HUNT: Okay.

THE COURT: All right. I need to – because I'm not clear on the response, I need you to state then once again if you would, and Mr. Nelson, you need to project your voice so I can hear you.

MS. HUNT:   At the time this crime occurred you were not suffering from a mental disease or defect that would exclude criminal responsibility; is that correct?

THE DEFENDANT: No.

MS. HUNT:   That's correct, you were not?

THE DEFENDANT: Right.

MS. HUNT: And today you're not suffering from a mental disease or defect that would exclude your competence to enter this plea. In fact you are competent and know what's going on and you are voluntarily entering this plea?

THE DEFENDANT: Right.

(Transcript of Nelson Plea Hearing, October 25, 2001, pp. 19-21).

Thus, during the hearing on the guilty plea, the issue of mental competency was addressed and it was determined not to be an issue at the time. Additionally, in all of the other appearances that the defendant has made in Court there has never been an indication that he was incompetent or lacked an understanding of the proceedings.

6

CUN000192

"constantly depressed, don't and won't take a phycological [sic] test with one of them doctors. Because I can't, But I need to not loose [sic] my mind. My back is herting [sic] all the time this concrete is two [sic] hard." On September 20, 2000, defendant submitted a Health Care Request form stating this time that he needed an appointment because of: "Absolute depression 24 hours a day, suffering from intense emotional depression, to keep in reality as much as possible. I don't need to see a mental doctor and won't, don't want to see your doctor eather [sic], but I don't want to be - in a paper gown eather." [sic].

In a Mental Health Evaluation conducted on January 27, 2000, the boxes for "Endorses suicidal or homicidal ideation" "Endorses auditory, visual or other hallucinations" and "Expresses delusional thought content" are all checked "No." It is also noted that defendant is smiling inappropriately, his affect is constricted, and he denies suicidal ideation.

In a Mental Health Evaluation performed on December 2, 1999, there is a notation that defendant can't answer whether he has a history of psychiatric hospitalization and/or outpatient psychiatric treatment. The boxes for "History of suicide attempts or suicidal ideation" and "Current suicidal ideation or intent" were checked "No." The box for "Endorses suicidal or homicidal ideation" is also checked "No." With regard to whether the defendant endorses auditory, visual or other hallucinations or expresses delusional thought content, there is a notation that defendant states "I can't answer." It is noted that defendant is unable to correctly state the date and that his affect is blunted and that his mood is depressed.

8

CUN0006193

On an Intake Mental Health Screening Form, dated October 18, 1999, the box for "Has psychiatric history" is marked "No," and it noted that defendant denies any history of psychiatric problems.

On October 18, 1999, Dr. Fadare noted that Patient denies previous psychiatric problems. He however stated that he had been seen on several occasions by psychiatrists and psychologists because of his previous incarcerations. He denies prior history of mood or anxiety symptoms. He acknowledges prior history of alcohol and drug problems but refused to state what they were. Patient emphasized that there were several things that we will not talk about unless his lawyer is present and if the lawyer approves that we talk about them. He also declined to talk about any prior psychotic symptoms. He indicated that there was no use to pursue certain questions that he was unable to answer. He denies prior history of suicide.

On August 23, 1995, defendant Nelson was incarcerated in the Bates County Jail on a misdemeanor charge of allegedly pouring a substance into a swimming pool which caused damage. The Sheriff of Bates County brought defendant Nelson to the Crisis Stabilization Unit of the Southwest Missouri Mental Health Center because Nelson told deputies that he would do anything to get out of jail, and he was sitting on the top of a bunk bed, getting ready to fall off backwards. The Clinical Director, Dr. B.U. Sreenarasimhaiah, indicated that Nelson denied any thoughts of hurting himself or others and that he was trying to get out of jail so that he could stay in a different jail because the Sheriff of the jail he had been in was mistreating him and it was crowded.

In a Nursing Assessment for Suicidal Clients Form, it was noted on August 23,

9

Case 3:09-cv-03064-MWB-LTS    Document 284-18    Filed 06/23/11    Page 94 of 100

CUN0006194

1995 that the defendant had made suicidal comments in the past to get attention. On an Admission Intake form it was noted that defendant claims to have psychiatric treatment all the time - Ft. Worth, Texas, Gainsville St., Texas, Brownwood Texas Detention Centers. However, in the discharge summary, it was noted that Nelson had no history of psychiatric hospitalizations. He was diagnosed under Axis I with no mental disorder; Axis II was personality disorder, antisocial type. It was also noted that because he does not suffer from mental illness, he was returned to the custody of the Bates County Sheriff's Department. He was not considered to be suicidal or homicidal.

Thus, a review of the medical records indicates that the defendant in the past has used suicide attempts as a way to gain attention or to control a situation. The records from CCA, where the defendant has been housed for the past two years, show that he has been depressed on occasion, but do not indicate any other mental or psychological problems.

### D. Examination by Dr. William Logan

On November 7, 2001, the court conducted a hearing to determine whether "sufficient doubt" exists regarding the defendant's competency to stand trial. Because there was no evidence presented by either side of a competency assessment of Keith D. Nelson conducted by either a licensed psychologist or psychiatrist, the Court ordered the defendant to be assessed by Dr. William Logan, a licensed psychiatrist. Dr. Logan was ordered to specifically address the following concerns of the Court:

1. Does defendant have sufficient present ability to consult with lawyers with a reasonable degree of rational understanding; and

10

Case 3:09-cv-03064-MWB-LTS    Document 294-8    Filed 06/23/11    Page 95 of 100

CUN000195

2. Does defendant possess a rational and a factual understanding of the proceeding against him?

Dr. Logan conducted an examination of the defendant at the conclusion of the hearing on November 7, 2001 and orally presented his findings to the Court and counsel. Counsel were given an opportunity to question Dr. Logan and also to raise any objections.

In his verbal report, Dr. Logan stated that he had reviewed various information including the CCA records from October 1999-December 2000, records from the Southwest Missouri Mental Health Center, records from St. John's Hospital, as well as reports from Drs. Hucke, Whitlow and Fadare. Additionally, Dr. Logan personally met with the defendant for approximately three hours. Dr. Logan stated that there was information which he had not been able to review, such as the transcripts of various telephone conversations the defendant had with family members before the suicide attempt as well as medical records from CCA covering the time period from December 2000 to October 31, 2001[1]. Regardless, the Court does not believe that this additional information would alter its decision on the issue before it.

It was Dr. Logan's assessment that the defendant has been suffering from chronic depression for some period of time, probably as long as a year before his incarceration and that this depression has continued until the present. Dr. Logan stated

---

[1] The Court had previously requested that CCA provide all medical records relating to the defendant. Although there appears to be a time gap in the records, the Court has no reason to believe that CCA withheld any medical records.

11

Case 3:09-cv-03064-MWB-LTS    Document 94-18    Filed 06/23/11    Page 96 of 100

CUN0000196

competency. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181. The Court will continue to exercise its responsibility in this regard.

## III. CONCLUSION

After reviewing all of the evidence, it is for the above stated reasons that the Court determines that there is not a "sufficient doubt" regarding defendant's competency and finds that the defendant is competent to stand trial. Defendant's request that Dr. Logan be appointed to consult with him throughout the penalty phase will be taken under advisement. Accordingly, Defendant's Motion to Determine Mental Competency to Proceed to Trial (Doc. # 357) is hereby **DENIED**, and Defendant's Application for Continuance (Doc. # 356) is **DENIED**. The case shall proceed with the penalty phase of the trial. Jury selection shall commence on Tuesday November 13, 2001 at 8:00 a.m.

Date: NOV 08 2001

Kansas City, Missouri

Fernando J. Gaitan Jr.
United States District Judge

13

CUN000197

11/9/01
Friday
3:10 pm

<u>Tel. Conv. w/ MARK CUNNINGHAM</u>

Mental Health Evid.

Diagnosis w/ Psych Testing

None of that here.

① <u>Violence Risk Assessment</u>

<u>May</u> be an issue — if gov't raises issue
of not being able to interview D, while
Mark did.

Damon Smith — Beaumont Texas

② <u>Mitigation</u>

What is it that damaged this guy's
development

— developmental factors

— history

— what is nexus of these factors and
bad factors. (How do they effect actions?)

CUN000198

PB_1-000

History is not from ~~history~~ anyway. D

Future Dangerousness
① Past adjustment in institution
② Group statistical data

Don't need interview to establish these


Jury needs reliable info., statistical stuff, to give weight to

Usually, if I interview him, they interview him. Otherwise, I end up as a teaching

"Willie Hayner" — Mark sat in crm. Listened to Lee Norton + mother but when Mark testified He talked generally about if this risk assessment, ~~this~~ this is what usually happens.

Case 3:09-cv-03064-MWB-LTS   Document 294-8   Filed 06/23/11   Page 99 of 100
CUN000195

PB 1-000244

Has had problem once w/ testifying where judge denied test. b/c it was ~~not~~ generalized

Willis Haynes — teaching witness
Raheen + Shaheen Johnson — Alexandria, Va. case
Anthony Jones — Baltimore
Damon Smith — teaching witness
N.Y. — teaching witness

END
3:25pm

3:25pm – 3:45pm   Tel. call from Susan

*Billy* 11/9/01

CUN000200

PB_1-000245