Q.    Exhibit 2171.

A.    Yes, sir, this is my current curriculum vitae.

        MR. STOWERS:  I'd offer 2171, Your Honor.

                        *   *   *   *

        (Defendant Exhibit 2171 was offered.)

                        *   *   *   *

        MR. WILLIAMS:  No objection.

        THE COURT:   2171 is received.

                        *   *   *   *

        (Defendant Exhibit 2171 was admitted.)

                        *   *   *   *

BY MR. STOWERS:

Q.    Are there some workshops that you've been involved in?

A.    Yes, sir.

Q.    Okay.  Can you tell the jury what a workshop is?

A.    Workshops are what psychologists call continuing education programs.  Typically a workshop is longer than just an hour or

3791

so.  It's a half-day or a day-long process.

        I'm an active student in attending continuing education myself, so there are many seminars and workshops that I attend.  And then I'm part of the teaching faculty of the American Academy of Forensic Psychology.  That's the scholarly association of board-certified psychologists.  And I teach day-long workshops on behalf of the academy in the area of capital sentencing evaluations.

        One of the primary goals of the academy is to raise the standard of practice of psychology as it comes into the courtroom, not in terms of making psychologists more persuasive or teaching them to talk better but instead equipping them with

Case 3:09-cv-03064-MWB-LTS    Document 234-26    Filed 06/23/11    Page 1 of 110

CUN000811

the best understanding of the psycho-legal issues that they're evaluating, this interface between psychology and legal issues, as well as the best methods for doing that and the best research that can illuminate their findings.

Q.    And who attends those workshops?

A.    Psychologists primarily, although sometimes attorneys do, defense attorneys and occasionally prosecuting attorneys.

Q.    Do you ever do any continuing education of attorneys?

A.    Yes, sir, I do, very frequently.

Q.    And what type of attorneys do you provide that for?

A.    To whatever group I'm asked to speak to.  Sometimes those are defense attorney organizations.  Sometimes they've been courses for judges and defense attorneys and prosecutors.  But

3792

primarily I've been invited to present by defense organizations.

Q.    And have you testified in court in the past?

A.    Yes, sir, I have.

Q.    In federal court?

A.    Yes, sir.

Q.    State court?

A.    Yes, sir.

Q.    All across the United States?

A.    Yes, sir.

Q.    About how many times do you think?

A.    Over 200 times.

Q.    Have you been recognized in connection with your work in this field as an expert?

A.    Yes, sir, in those cases as a clinical and/or forensic psychologist.

Q.    Now, let's talk about the work that you did in connection

Page 13

with the case of Angela Johnson; all right?

A.   Yes, sir.

Q.   Can you -- first of all, you've got a -- I'm sorry.  Let's go to one thing first.

Are you getting paid today?

A.   Yes, sir, I am.

Q.   Okay.  And is that something that happens frequently when you're employed in cases?

A.   Yes, sir, I'm paid for my time, for the hours that I spend.

3793

Q.   And can you tell the jury, first of all, what your hourly rate is?

A.   Yes, sir.  My rate in this case is $240 per hour.  That's reduced from my current standard rate of 270 an hour because my initial involvement in this case, at that time my rate was still 240, and so it stayed that through my involvement.

Q.   All right.  And is it common for persons in this field who do these evaluations and testimonies to be compensated?

A.   Yes, sir.

Q.   And are you familiar with the compensation that is paid to other experts that are frequently employed in such cases?

A.   Yes, sir.

Q.   And their rates.

A.   Yes, sir.

Q.   And there are people in your field who commonly testify in cases; is that correct?

A.   Yes, sir.

Q.   And how do your rates compare to their rates if you would?

A.   They're on the mid to lower end of the scale, on the lower end of the scale for folks that are involved in a national level

Page 14

CUN000813

as I am but in a mid-range for people that do work in one region.

Q. Now -- and I assume that you keep yourself abreast of the other people in the same area that you do work in which is these federal capital sentencings; is that correct?

3794

A. In general, yes, sir.

Q. Now, you've testified in cases other than federal capital cases; is that correct?

A. Oh, yes, sir, I have. This is a -- I think I've testified in about 37 federal capital cases, 37 or 38, something like that. But I've testified in over 200 cases all together. I've testified in about 65 state capital cases as well.

Q. You ever testified on behalf of the federal government?

A. I never testify in anybody's behalf. I may be called by the defense or by the government, but I'm not testifying for them or on their behalf. I have not been called by the office of the U.S. attorney in any cases. I have been called in court martial proceedings by the government. And I've been called by the state in state prosecutions.

Q. And are you surprised that you've not ever been called by the U.S. Attorney's Office in various locations across the country?

A. I guess the answer to that would be yes and no. I have offered to consult on behalf of the -- well, I've offered to consult with the U.S. Attorney's Office in federal capital cases and have not been taken up on that. But at the same time I'm not particularly surprised.

My testimony is highly research based in terms, for example, of how it is that childhood ends up affecting adult

Page 15

CUN000814

outcome.  I'm a student of that research, much of it published

3795

by the U.S. Department of Justice.  Those research findings that I'm a student of and that I testify routinely about, many of those findings are not particularly helpful to the government's position in these cases.

And also the research on risk assessment demonstrates that most capital offenders are not going to seriously hurt people in prison when you look at the numbers.  Those findings that I'm also a student of and have published research in, those findings are also not ones I would typically be called by the state to offer.

Q.  Now, I take it from your testimony and the number of times you've testified that the government would be familiar with the general testimony that you give, the methods, and the data that you rely on; is that correct?

A.  Yes, sir, that's correct.  The studies that I apply often have application in more than one case, and those are studies that the government has heard me testify about before.

Q.  Now let's turn to the work that you did in this case; okay?

A.  Yes, sir.

Q.  Dr. Cunningham, can you tell the jury what it is that you were asked to do in this case and when it is that you believe you were first asked to do it?

A.  Yes, sir.  I was asked to do basically two types of evaluations or to address two issues.  The first one is how did we get here; what factors in Angela's life were formative in

3796

Page 16

CUN000815

nature; what put her on this trajectory that brought her to this juncture in her life? And so that's the first one of how did we get here. And then the second issue is where do we go from here? How is she likely to adjust in prison?

The first issue involves an examination of her development and factors in her development that may have injured her. It's what we call mitigation or, more broadly, moral culpability which is the idea of what formed and shaped you, what brought you, made you the person who you are that brought you to a given place in your life.

Q.   Now, just so that it's clear to the jury, will you be giving any opinions about Ms. Johnson's mental state at the time of the killings for which she stands convicted by this jury?

A.   No, sir. My testimony will be about what formed and shaped her, not about her mental state at the time of the offense.

Q.   Now, have you put together some materials in preparation for your testimony in consultation with Ms. Johnson's attorneys that would aid you in presenting your testimony?

A.   Yes, sir, I have.

Q.   And are those in the form of what's known as a PowerPoint presentation?

A.   Yes, sir, they are.

Q.   What's PowerPoint?

A.   PowerPoint is a software program by Microsoft that is -- essentially it's a program for making slides so that information

3797

can be displayed visually.

Q.   And I believe that you'll see on the screen in front of you there --

A.   Yes, sir.

Page 17

CUN000816

Q.    -- which is being projected for the jury behind you there your first PowerPoint slide; is that correct?

A.    Yes, sir, that's correct.

Q.    And this is -- first of all, can you give the jury sort of an overview of the two areas that you're going to be talking to them about this morning?  One is the section that we have here which is headed Adverse Developmental Factors; is that right?

A.    Yes, sir, that's correct.

Q.    What's the second subject area?

A.    And the second subject area is violence risk assessment or the likelihood that Angela Johnson would make an adjustment to federal prison without serious violence.

Q.    And it's going to take some time for you to get through this material; is that correct?

A.    Yes, sir, it is.  There are many factors to describe, and I anticipate that my testimony on direct will last until lunch.

Q.    Now, there's a term that you'll be using in some of these slides, and I want to make sure that you have an opportunity to explain that.  There's a phrase "moral culpability."

A.    Yes, sir.

Q.    What are you referring to when you use that phrase?

3798

A.    Moral culpability is one of the two primary issues at capital sentencing that a forensic psychologist might be called on to address.  The two issues principally that psychologists are called to address are either, one, moral culpability -- that's kind of what formed and shaped the person -- or violence risk assessment, how are they likely to behave in prison.

It's important for the psychologist to know what questions he's trying to answer as he begins.  And that's part

Page 18

CUN000817

of what we teach psychologists about in these workshops. And that concept of moral culpability is distinct from an evaluation that might happen at the guilt phase where we would look at questions of criminal responsibility or whether somebody is sane or not.

Q. And you didn't do any evaluation whatsoever of Angela Johnson to determine whether or not she was sane or anything else.

A. No, sir. I was retained for the purpose of looking at her at sentencing, and so that naturally assumed that she would be -- that she was criminally responsible, that she was not insane at the time of the offense, that she knew right from wrong, that she had a choice, that all those questions were done because she -- by the time I would be called, she'd already be convicted of this offense. And so those issues were all concluded and were not a focus for me at all.

Q. Okay. Now, is there a slide that -- could you turn to your

3799

first slide there?

A. Yes, sir.

Q. And can you explain what you're trying to illustrate to the jury with this slide?

A. Yes, sir. You'll see on the right-hand side a moral culpability scale from high to low. And the question is as a psychologist would examine it, so that's the issue the jury will be examining or weighing is Angela's moral culpability. So what does that have to do with the damaging or impairing factors that may have happened to her as she was growing up, and what does that have to do with her exercise of choice in general as a person?

Page 19

Q. Now, Dr. Cunningham, can you give the jury a quick overview of the types of things that you looked at or did to evaluate Angela Johnson in connection with the testimony that you're going to be giving here?

A. Yes, sir, I can. I interviewed many individuals in her family and other folks as well, and I reviewed an extensive body of records. I think it fills about ten binders, and those include records from her background as well as records about her extensive four to five years of confinement in jail pretrial.

Q. And did you interview folks?

A. Yes, sir, I did, many individuals.

Q. And we're going to go through that in a later slide to sort of show the jury who exactly it is that you interviewed.

3800

A. Yes, sir, that's correct.

Q. Are these things that you did, that is, reviewing these records, interviewing these people, -- and those interviews were both by phone and in person; is that right?

A. Yes, sir. Most of them were in person, but there were a number of interviews I did by phone as well.

Q. And are those the types of things that somebody in your field trying to do such an evaluation as you did here would do and be expected to do in order to form conclusions and opinions?

A. Yes, sir.

Q. What is it, Dr. Cunningham, that during your workup on this case that you were looking for?

A. In terms of looking at this first issue of moral culpability or damaging developmental factors, I was looking for just that. I was looking for what happened in Angie's development that went awry.

Page 20

CUN000819

I was also looking for factors that might be considered protective in nature. In other words, what is there that might have insulated her from the effects of some of those bad experiences?

Q. And how are those factors relevant to the choices that a person might make throughout their life?

A. Quite simply, as the damaging and impairing factors increase, then choice is at an increasing angle, and moral culpability, if you will, is lower. It's the idea that we all

3801

get a choice, but we don't all get the same choice. The nature of the choice that we have, the angle that our choices are made from, is impacted by what forms us and shapes us. That's why we're so careful about how we raise our kids, because we know that what happens in childhood has such a lasting effect.

Q. Dr. Cunningham, we started to talk a little bit about the folks that you interviewed.

A. Yes, sir.

Q. Have you prepared a slide which sort of summarizes that for the jury?

A. Yes, sir, I have.

Q. And does this slide indicate that you interviewed these various folks, Pearl Jean Johnson, Jimmy Johnson?

A. Yes, sir. I interviewed her parents, both Pearl Jean and Jim, and also her stepmother Cookie. That's within this parent and stepmother area.

I also interviewed all of her brothers and sisters both in person and by telephone. Wendy I spoke to initially for about an hour and a half by phone and then followed up 70 minutes by phone.

Page 21

Jamie Jo -- I never saw Wendy in person.  Jamie I talked to for over an hour in person and then for 51 minutes by phone.

Jimmy, her brother, I also only spoke to by phone for 77 minutes.

3802

And Holly I spoke to for almost an hour in person and then about 45 minutes by phone.

Then I talked to Angie's children, Alyssa for 50 minutes and Marvea for 36 minutes.

Then I spoke to extended family members, many of them by telephone.  Rita Roach who is a maternal half aunt, Winnie Jergenson who is a paternal aunt, Wayne Hopp who's a paternal half uncle, Mark Jacobson who is Wendy's husband, and A.J. Johnson who is her ex-husband.  And then I interviewed some other individuals as well.  I talked to Kim Swalve, Carol Mann, Dave Nieman, and Mikell Olsen.  And I've identified their relationship or their role in Angie's life out beside their names.

Q.    And what was the reason you talked to these various different people?

A.    There are a number of reasons.  First, in forensic psychology unlike clinical psychology, you don't just interview the person and take their word for it.  Instead you want to interview other individuals and look at records to verify and corroborate what the individual who's facing charges has told you.

Additionally, there's a lot that a defendant or Angie won't know about her own life.  She may not know a lot of family history that has affected the family system genetically and in

Page 22

CUN000821

other ways.  Her early childhood she may not have -- obviously

3803

have good memory of herself.

In my experience often capital defendants rather than trying to make up a story about how bad their childhood was do just the opposite.  They tend to be kind of protective of their family in the reports that they give, and so you may not get accurate information in that way from the defendant.

And then all of these people have different -- they all have different perspectives and different views of the same events, and the more individuals you talk to, the more likely you are to get both an accurate and more complete picture.

And so in forensic psychology it's pretty routine to do third-party interviews and to look at records in capital cases because there are such grave stakes that are involved. This is kind of the heart surgery of forensic psychology.  Then much more efforts and time are spent in interviewing many more people and looking at many more records.

Q.   And how consistent was the history, if you will, that you obtained from Angela Johnson during your 5 hours and 25 minutes that you spent with her with the remainder of the history that you were able to gather in your work?

A.   I guess I would characterize it as broadly consistent.  She has her own view of some of the things that happened to her as a child.  Much of the traumatic experiences are very, very consistent.  There are some things like the way that she perceives her stepmother and the stepmother's role in her life

3804

that's somewhat different from how her siblings see their

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 12 of 110
CUN000822

stepmom. And so there's some things like that that are more perspective, but historical events were quite consistent.

Q. What records did you review? Could you just briefly list those out?

A. Yes, sir. I reviewed interview summaries that had been done by Mary Goody of a number of third parties, not as many as I ended up talking to. I reviewed the records from all of her jail incarcerations pretrial, and those were very extensive. I also reviewed things like birth certificates and marriage and divorce records and school records and hospital records. I reviewed some investigation records. I reviewed reports that had been filed by Dr. Logan and Dr. Hutchinson and also by a couple of forensic psychologists that had been retained by the government, Dr. Martell and Dr. Dvoskin. I reviewed their reports, and I also reviewed the transcript of their five- or six-hour interview that they had done of Angela Johnson.

I also reviewed the records of Dr. Michael Gelbort who had done some intellectual and neuropsychological assessment -- related assessment of Angela Johnson and looked at employment records.

I think that's kind of the broad spectrum. There may be some specific categories that I've neglected to mention.

Q. Okay. But you looked at a whole bunch of records that you've described as ten big binders?

3805

A. Yes, sir, fills a bookshelf.

Q. And did you, during your work on this case, your interviews, documents that you reviewed, find any evidence of damaging or impairing factors in connection with Angela's -- Angela Johnson's background?

CUN000823

A.   Yes, sir, I did.

Q.   And have you prepared a slide which sort of summarizes that?

A.   Yes, sir, I have.

Q.   And can you simply list those out for the jury?  I don't know that we need to go through them all.

A.   Yes, sir.  Under generational and biological factors, there is multi-generational family distress, genetic predispositions to substance dependence, genetic predisposition to psychological disorder, attention and learning difficulties in childhood, all of those in the generational and biological arena.

Then under parenting factors, there was maternal neglect and inadequate parenting, in other words, from her mom. There was inadequate parenting and neglect from her father. There was chronic marital conflict, domestic conflict, in early childhood between her parents.  There was her observation of the maltreatment of her siblings, a pathological divorce between Pearl Jean and Jim, instability of the home and recurrent relocations, physical and emotional abuse, bizarre religiosity in the home and associated maltreatment, inadequate supervision

3806

and guidance, psychological terror in the foster/orphanage setting of the Dillos, sexually traumatic exposures in the Dillos' home.  Those all were parenting-related factors.

Then under peer factors, there was peer harassment and rejection.  And then there's what I call disturbed trajectory which is the idea that as these sorts of damaging developmental influences push somebody's life off track, as they're off track, that has its own damaging effect and carries them further off track.

Page 25

And those include childhood onset psychological disorder, premature employment which then resulted in her dropping out of school and being economically exploited by her mom, premature marriage and teen pregnancy, early adolescent onset substance abuse and dependence, methamphetamine dependence, repeated violent victimizations in her relationship with Terry DeGeus -- and I apologize; I have misspelled his last name -- inadequate interventions, psychological disorders in adulthood, and her relationship with Dustin Honken.

Q.    And when you talk about damaging developmental factors from your field, what are you trying to get at there?

A.    As I talk about damaging developmental factors, these are things that increase the likelihood of bad outcomes, that increase the likelihood of psychological disorder and substance abuse and being victimized in relationships or being involved in crime and violence.  It's ways that a child is damaged as they

3807

grow up that forms them and shapes them.

It's the idea that I think all of us intuitively recognize that during childhood the concrete is wet, and so the things that happen in childhood have the capability of distorting the shape of the person, of leaving an indelible imprint in them which is why we're so careful about trying to protect our kids from being traumatized or emotionally injured.

When you're an adult and the concrete gets hard, the things that happen may put chinks in it, but they're less likely to shape it.  And that's what we're talking about are things that early on in childhood -- and some of this crosses that juncture -- that were formative and then how that began to push things on to a track that resulted in things getting further off

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 15 of 110
CUN000825

course as she went along.

Q.   Okay.   Now, is there -- I know you've shown an earlier slide with sort of a -- I don't know what it was.   It was a bar -- a moral culpability and then the damaging or impairing factors on the other side, and it was kind of --

A.   Yes, sir.

Q.   In the middle there was a box that said choices.   Do you have another way that you can illustrate what you're trying to explain to the jury?

A.   Yes, sir.   And in this way to talk about some of the -- I guess broadly the damaging factors and also what protective factors might insulate somebody, here's the person, and here are

3808

the bad outcomes:   Psychological disorder, victimized relationships, drug dependency, criminal activity.

An issue that developmental psychology and forensic psychology are critically concerned with that is also relevant to these evaluations of moral culpability in a capital case is how does this person get over here and how does that happen? What occurs there?

Well, fundamentally if when you're growing up there's no family history of addiction or psychological disorder and there's no childhood maltreatment or violence exposure and no developmental abandonment or instability, then that's a foundation that your whole life rests on, and the choices that you make in your life rest on that as well.

And what often goes along with that is that you come from an intact family where there's acceptance and affirmation and stability and structure and consistency.   Those are all the ways that we try to keep our kids' lives pretty much the same

Page 27

CUN000826

day in and day out, week in and week out in terms of not changing schools too often and bedtimes and standard meal times, that the routine in their life is predictable because we know that that's what helps them develop security and a sense of structure within themselves and modeling of positive values. And then we want our kids interacting with other kids that have come from similarly secure backgrounds.

Now, this person gets a choice, but it's a choice

3809

that's on this entire foundation. It's a choice that rests on this entire structure. Now, somebody who looks like this can still get to the bad outcomes, but it's quite a leap for them to do that. But if you grow up in a family where there is a history of addiction or psychological disorder, now it's as if we've ramped this thing up a little bit, and if there's childhood maltreatment and violence exposure, now we've ramped it up some more. And if there's developmental trauma and abandonment and instability, now we've ramped it up some more.

Now, if this person begins to drink or drug, it's as if we've put this thing on rollers in terms of the risk of these bad outcomes. Of course, if these are all the things that are going on in your family as you're growing up, it's very unlikely that you're going to have these. And so this person ends up looking like this. Now, they get a choice, not the same choice this person has. They have a choice that's on this ramp.

Now, the angle of that ramp, the angle of the ramp on which the choices are made is what we call mitigation or moral culpability. And that's this notion that we don't all come from the same place and that that fundamentally affects the way we perceive our life and our relationships and the choices broadly

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 17 of 110

CUN000827

that we make.

Q. Did you identify in Angela Johnson's family history that you researched any history of addiction or psychological disorders?

3810

A. Yes, sir, I did.

Q. Can you describe that?

A. Yes, sir. There is -- and I'll talk about that. I have a slide later on that gives the whole family tree and depicts that, but I can talk about it now if you would like for me to jump to that.

Q. We can save the details on that for later, but you did identify that. Did you also identify childhood maltreatment or exposure to violence?

A. Yes, sir, I did.

Q. And did you identify in your workup on this case developmental trauma and abandonment and instability?

A. Yes, sir, I did.

Q. Now, what about abuse and neglect? What impact does that have on the risk of a bad outcome for a person?

A. It much increases the risk of bad outcomes.

Q. And did you identify whether or not Angela Johnson had been mistreated in any way as a child?

A. Yes, sir, she was.

Q. And whether or not she'd been exposed to violence in her home as a child.

A. Yes, sir, she was.

Q. And how does emotional injury through these types of occurrences affect the choice and likelihood of bad outcome for people in life?

Page 29

A. It increases it.

Q. And was she, Angela Johnson, subjected to traumatic experiences as a child?

A. Yes, sir, she was.

Q. Now, I think on your chart there you've also got a category for drug dependency.

A. Yes, sir.

Q. Did you determine whether or not at some point in Angela Johnson's life she commenced consuming illicit drugs?

A. Yes, sir, I did.

Q. And did you determine whether or not she had become to some degree dependent on those drugs?

A. Yes, sir, I did, and she did become dependent.

Q. And, Mr. Cunningham, if someone like Angela Johnson has these factors in their life that you've identified in your various charts here, what happens then -- and I think maybe you've already kind of explained this -- to the choices that they have and to the likelihood of a bad outcome?

A. It puts those choices on a ramp, on an angle, and it increases the likelihood that they will find themselves in one of those bad outcomes. It doesn't make it inevitable. It doesn't remove choice from the equation, but it does much increase the likelihood that they end up there.

Q. So you're not saying that Angela Johnson had no choices with respect to the path that she took in life, are you?

A. No, sir. She gets a choice after the ramp is set. She

doesn't get a choice about the angle of the ramp. Most people don't. Most people don't get a choice about what factors stand between them and the bad outcomes. But after the ramp is created, after the blocks are taken away, then they have choices that are before them but, as I described, not the same choices that somebody has who grows up like this.

Q. With all of the -- with all of the support and insulating mechanisms that you've described.

A. Yes, sir.

Q. The peer relationships that are positive, the positive values being modeled. What do you mean by modeling of positive values, Dr. Cunningham?

A. That means that we don't just tell our kids the right thing to do, but we actively display that in our behavior. I guess it's the idea that the way that I act toward my -- the way that I act toward my children, the way I treat my spouse, the way I interact with other people, the way I go about living my life is a sermon every day. It's without ever saying anything. It's an instruction for good or ill, and it's the idea that -- I guess it's that little eyes are watching and are making their own value judgments and modeling their own behavior off of what they see.

Q. Now, Dr. Cunningham, this ramp that you've developed as an illustration, you've used that in other cases; true?

3813

A. Yes, sir, I have.

Q. Across the country?

A. Yes, sir, I have. I find it to be -- it's a useful model for me to conceptualize, so I often will present this.

Q. And slides of this nature you've used as a means of

Page 31

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 20 of 110
CUN000830

illustrating your testimony elsewhere; is that correct?

A.    Yes, sir, that's correct.

Q.    Is this just essentially, Doctor, some kind of a abuse excuse that you're explaining here to the jury?

A.    No, sir, not according to the U.S. Department of Justice it's not an abuse excuse.

Q.    And when you talk about the U.S. Department of Justice, do they do studies into these things?

A.    Yes, sir, they do.

Q.    And do you have a slide that quotes from that material?

A.    Yes, sir, I do.

Q.    And is that the type of material that people in your field would rely upon in rendering their opinions and conclusions?

A.    Yes, sir.    These studies are the best available research in the field.

Q.    And I don't know if you have that fully up.

A.    Yes, sir.    The U.S. Department of Justice is critically concerned with reducing the amount of criminal violence in our society.    One way to do that is to lock people up who've committed violent offenses.    Only then a tragedy has already

3814

occurred.    Much more effective if those crimes could be prevented from ever happening in the first place.

And so the U.S. Department of Justice has become a major sponsor of research examining the processes that cause or that are associated with a trajectory that starts off in a drug-abusing delinquent ultimately criminally violent sort of way with the idea that if those factors can be identified, that's then the beginning to what -- how to target prevention resources to interrupt those processes that -- in the word of

Page 32

CUN000831

this study, the processes that cause this trajectory beginning early in life and continuing on into adulthood.

Now, while this research is oriented toward targeting individuals when the concrete is soft, in fact, the research that this is based on includes follow-up of people up into their 50s. So it's not just about children or teenagers but also informs us about how -- the beginnings of individuals who find themselves in the criminal justice system even later in life.

And as the Department of Justice has looked at this research over the last 30 years summarized looking back over this period of time, they've identified risk factors for delinquency or criminal violence. Those are things that would increase the angle of the ramp as well as protective factors. Those are things that would push down the angle or put blocks up to stand between this person and the bad outcomes.

And, you know, obviously the best prevention is one

3815

that reduces the risk factors and increases the protective factors. And this slide is from a well-known study that was published in 1995 by the Department of Justice.

Q. Now, these factors that -- the risk factors and the protective factors that the Department of Justice has identified in this report from 1995 that you're displaying in part to the jury, is that -- are those factors the types of thing that correlate with a person's choices and outcomes in their life?

A. Yes, sir. That's what they're looking at. They're looking at the factors that are associated with what ultimately are bad choices, delinquency, criminality, drug abuse, violence, that kind of thing.

Q. And do they break that down into various time periods,

Page 33

developmental time periods, in an individual's life?

A.   Yes, sir.  In this 1995 study they did.  The first set of factors, risk factors, that they identified are ones that are present from conception to age 6.  And I've listed all of the factors, the risk factors, that were identified by the Department of Justice that may occur conception to age 6, and then I have checkmarks beside the ones that were present in Angie's life.

Now, this first factor, perinatal difficulties, has a plus-minus by it.  Her mother was in labor for about three days with her, and then she was a breech delivery.  So that has some potential complications to it, but it's not -- there's no

3816

evidence that her -- that she was necessarily injured by that or had developmental problems.  So that's why I don't have a checkmark by that.  I've got a plus-minus indicating that history but uncertain outcomes associated with it.

There is a family history of substance abuse, and her father at one time served a several-month jail sentence.  There were family management problems.  That means that there were problems in how this household is being run and the routine and procedures and discipline and that kind of thing.  There was family conflict, and there were parental attitudes that were favorable toward and parental involvement in substance abuse in the episodic heavy drinking of her father.

Q.   So of -- are those the risk factors that -- what is there? Seven of them there that the Department of Justice identified for the time period of an individual's life from conception to the age of 6?

A.   That's correct.

Page 34

CUN000835

Q.   And how many did Angela Johnson have?

A.   She has four of those and potentially a fifth but certainly four.

Q.   And did Angela Johnson have a choice, if you will, with respect to whether or not those risk factors were going to be in existence in her life?

A.   No, sir, none whatsoever.  We don't get to choose the family that we're born into.

3817

Q.   Is there another time period that the Department of Justice study from 1995 would have looked at in a person's life, additional risk factors?

A.   Yes, sir.  They also describe risk factors that are present from age 6 through adolescence.  And again, I've listed all of the factors, and I have checkmarks beside the ones that there was evidence of in Angie's background.

The ones that there's evidence of in her background include extreme economic deprivation; transitions and mobility; media portrayals of violence; family management problems; family conflict, parental attitudes that were favorable toward and parental involvement in, in this case, drinking and the early-on domestic violence; lack of commitment to school; alienation and rebelliousness; and potentially some attention or learning-related difficulties, although I don't have sufficient information to find that with certainty, so that also has a plus-minus by it.

Q.   And of those factors there's what?  How many are there that the Department of Justice study identified as influencing or being risk factors?

A.   I believe there are 15 here, and she has 2, 4, 6, about 8

Page 35

CUN000834

of them.

Q. And has the Department of Justice done additional research since this 1995 study?

A. Yes, sir. They've published a great deal of research in

3818

this area. One of the best studies that puts a lot of information together was published in April of 2000. The Department of Justice brought together 22 nationally prominent researchers for a couple of years to look at all of the research in this arena. They looked at 67 major research studies as well as studies that had been done within the Department of Justice, again trying to distill from all that research the factors that are associated with delinquency and criminality and violent outcome.

And this time one of the most important factors that they identified was that there's a cumulative impact. In other words, it's not just factors in isolation, but it's the added effect of one factor after another, A plus B plus C, the idea being that as you add on more risk factors, you are steadily increasing the likelihood of a bad outcome.

Q. Now, can you explain a little bit about this study and how it was done?

A. Yes. As I described, they were the nationally prominent researchers. They're brought together; they reviewed all the research; and they distilled out from that these primary factors.

Q. Are they just looking at people who committed crimes and going back in their life, or what was the method of the study?

A. Different studies have different designs. Many of them are longitudinal in nature. In other words, they start tracking a

Page 36

group of children at some point in childhood and then follow them for a period of time across their adolescence or even into adulthood.

One of the more well-known studies that I'll present a slide from later, some research that was initially published by Cathy Widom where she started out with almost 900 children who in elementary school had been identified as being abused and neglected and came before the courts as such.

And she began tracking as well a group of kids from the same elementary school, the same classrooms, the same area who had not come before the courts as abused or neglected. And those -- and seven or eight hundred of those control kids, and they then followed those children out fifteen to twenty-four years now on out into adulthood so they have some comparisons. And that's an example.

Others have looked at very large-scale studies in the community where they go in and interview the children and their caretakers every six months. The Rochester Youth Development Study is like that. These are large-scale studies that have been performed as well as looking back at 30 years of research in this area.

Q.   Are there some individual and family factors that the Department of Justice study also looked at?

A.   Yes, sir. This time instead of breaking it out by age they broke it out into different type of factors, individual factors,

3820

family factors, school factors, peer factors, community factors, and situational factors.

Page 37

CUN000836

And again, on these first two, individual factors and family factors, I've listed all of the factors that were identified in the study and then put checkmarks beside the ones that were present in Angie's life.

Those include descriptions of some problems in concentration or attention. Perhaps this should have a plus-minus by it. Again, as the -- there is only partial evidence for this. There is early aggressiveness in response to being kind of bullied and harassed by her peers that she begins to fight as a kid.

Most of the risk factors, though, are family factors. Those include parental criminality -- that's in response to her father's jail incarceration -- child maltreatment, poor family management practices, low levels of parental involvement, poor family bonding and family conflict, residential mobility, parental attitudes that are favorable to substance abuse and violence, and parent-child separation.

You'll notice out beside some of these that there is -- like this one, parentheses, x 2, dash, 5. Those are odds ratios. Some of the studies in this area report odds ratios. So, for example, if you were hyperactive as a child, then you were two to five times as likely to end up involved in criminality and violence simply from that factor alone

3821

regardless of the additive effects of other factors.

Now, in some studies you're only twice as likely. In other studies you're five times as likely. So that's that 2, dash, 5. Not all of the studies report odds ratios, so those -- I don't have odds ratios indicated for all of them.

Others of them, for example, residential mobility

Page 38

where I have this plus-minus beside, that means that sometimes moving around a lot as a child seems to be affected with bad outcomes and sometimes it's not. Likely it has to do with what other risk factors are there, how stable is the home.

So, for example, if you're a child that's moving around regularly in a military family where the marriage is intact and you move on to a base with other kids who are just now forming their social networks too and it's a familiar culture and Mom and Dad stay the same and you don't have any special needs in terms of learning problems or concentration problems or emotional problems, probably doesn't hurt you any to be moving around a lot.

As there are problems in the home, the more unstable it is, the more special needs of an emotional type or learning type the child has, the more likely it is that those moves will be destructive to their outcomes.

Q. Now, from this year 2000 study by the Department of Justice, they had these predictors of youth violence broken down into these four -- I guess five or six categories.

3822

A. Yes, sir, these two and then these next three.

Q. Okay. And how many of those risk factors in total did the Department of Justice study identify, and then how many of those that the Department of Justice study identified did Angela Johnson have in her life according to your work?

A. You know, I think there are about 25 factors that are here. She has all eight of the family factors, one or two of the individual factors. Eight plus two is ten. Her siblings are also involved in drug abuse and some problems but are not, frankly, delinquent, and there are a couple community

Page 39

neighborhood factors. She has someplace around 12 or 13. About half the risk factors that they identified were present in her life.

Q. And how would you characterize that?

A. That's seriously cumulative. It's a good number of risk factors. Sometimes somebody will have 23 of them or I'll call that catastrophic, and I guess I would term this seriously cumulative.

Q. Now, other than just looking at risk factors, has the Department of Justice also studied or evaluated what might be called factors that would reduce the risk, or I think you've called them protective factors?

A. Yes, sir, they have.

Q. And do you have a slide to --

A. Yes, sir. This is from that 1995 study, the first one we

3823

looked at, is they broke out not just risk factors but also protective factors and have those broken out into four primary areas: Individual characteristics, social bonding to positive role models; healthy beliefs and clear standards for behavior; and effective early intervention. Those are the four primary areas. And then there are some subgroups within these first two.

Q. And you've put some checkmarks there?

A. Yes, sir. I've listed all the protective factors. I put checkmarks beside those that were present to some degree in Angie's life.

Q. So for protective factors for Angela Johnson, you identified one of those obviously are gender?

A. Yes, sir. And, in fact, that's the most powerful
Page 40

protective factor.  Being female is the most powerful protective factor against delinquency, crime, and violence.  Now --

Q.    And one of the other factors is a positive social orientation.  What does that represent?

A.    That means that as Angie was relating to her siblings, for example, that she was not a bully, she wasn't aggressive, that she was protective and seemed oriented toward trying to assist them, that -- I mean, the problem in her adolescence along with the substance abuse is primarily that she's working so much, and that's what pulls her out of school.  And so there are some things about her general social orientation that have been

3824

positive, and so I've indicated that.

Q.    And then you've got a check by friends under social bonding?

A.    Yes, sir.

Q.    What does that denote?

A.    Well, that means that there were individuals that she was friends with who had positive values and constructive outlooks.

        THE COURT:  Mr. Stowers, I'd like to give the jury a stretch break.

        MR. STOWERS:  That's fine.  Thank you.

        THE COURT:  Please continue.  Thank you.

        MR. STOWERS:  Thank you.

BY MR. STOWERS:

Q.    Dr. Cunningham, can you tell us, is there some significance to family history in your work?

A.    Yes, sir, there is a great deal of significance.

Q.    And what is that?

A.    Family background ends up affecting people in a number of

Page 41

CUN000840

different ways.  One of those ways is by simple heredity, by genetics.  You know, risk of cancer and heart disease, high blood pressure, obesity, all kinds of things are associated with heredity; and in the psychological arena so are things like risk of substance abuse or dependence, alcoholism and drug addiction, psychological disorders, personality disorders.  Those all have very significant hereditary components.

3825

There are also other ways that family history ends up affecting somebody.  One of those is what we call scripts.  Scripts are sort of the unwritten story of how your life is supposed to go.

So, for example, in my clinical practice I've had a 16-year-old girl in my office who was pregnant and unmarried whose mother was pregnant and unmarried at 15 or 16 whose mother was pregnant and unmarried at 15 or 16.  This is a script in this family.  This is not just this little girl's personal decisions in the backseat of a car.  This is the story of how your life is supposed to go.

Positive scripts might include things like, you know, in some upper middle-class families it never occurs to the kid not to go to college, doesn't cross their mind to get married before they're 22 or 23 years old.  Again, it's the story of how your life is supposed to go.

Then there are things like modeling.  Modeling is where you catch yourself doing the same thing your parents did that you swore you never would.  It's that imitation effect.

And then there's what's called sequential damage, and that's the idea that as Mom was growing up, she was damaged as a person by the maltreatment that she got, and now when she gets

Page 42

CUN0006841

ready to be a parent, she loves her kids as best she can, but she ends up parenting them in a destructive way, and now the next generation gets damaged, and that's part of how you get

3826

damaged from generation to generation.

So all of those processes, both genetic and kind of family systems factors, are at work in influencing the person in this generation.

Q.    Now, have you prepared a family tree to kind of help the jury understand this family history?

A.    Yes, sir, I have.  This is on her mother's side of the family.  We have Albert Gomez Senior and Florence.  Those are Angie's maternal grandparents.  And out of this marriage there's Albert Junior.  And I've indicated that eventually he had three children, Pearl Jean.  Then their marriage ends, and Florence marries a man named Virgil Ashley, and from their marriage there's Darlene.  Then that marriage ends, and Florence later marries Andrew Jensen.  And these are the two individuals that were present then in Angie's life that were also involved in the religiosity and that sort of thing in the home were Florence, the maternal grandmother, and Andrew Jensen or Andy who was the maternal step-grandfather.

And then Albert Senior after the relationship ended with Florence, he later married a woman named Madelyn, and they had one daughter, a daughter named Rita.  And this is the maternal family system.

Then on the father's side, the paternal grandfather was Merlin Johnson, and he was married to Winifred.  And from their marriage there was Winnie and Jim.  Merlin Johnson died in

3827

Page 43

a single-vehicle accident when he was about 21 or 22. And after his death, Winifred married a man named Warren Hopp and from their marriage produced Wayne who is then a half paternal uncle of Angie. After she split up with Warren, then she married Kenneth Sund, and that's the paternal family system.

Then from Pearl Jean and Jim there's Wendy and Angela and Jamie and Jimmy. After the marriage ended between Pearl Jean and Jim, then later Pearl Jean got involved with a man named Robert Claus, and from their relationship Holly was born. Then Jim Johnson remarried a woman named Cookie, and Cookie had three children of her own, but Jim and Cookie had no children together.

Now, as we would look at some of the things that happened within this family system -- and initially I will talk about things that happened to the females in the family system. Remember I said that one of the most powerful protective factors against criminality and violence is being female. We know that demographically. Ninety percent of the people in prison are males. Ninety percent of homicide offenders are males or more.

So simply being female has tremendous protective effect. It doesn't mean, though, that women are undamaged by the bad things that happen to them in childhood. It means it comes out in different ways besides criminality in most instances. They become sexually active early. They drop out of school. They marry early. They're more likely to be in abusive

3828

relationships, have children early, depression, anxiety, substance abuse. Their lives may be a wreck, but it doesn't

Page 44

CUN000843

typically come out in criminality and violence. And you can see some different family processes in the females within the system.

Q. Yeah. Could you describe some of those processes as you call them with the females in this family tree?

A. Yes, sir. Everyone in the kind of violet color -- and by the way, the females are circles and the males are squares. Everyone in the violet color was a teenage mother. Everybody with the yellow designator at some time in their life had a history of alcohol or drug abuse. Everybody with the heavy red outlines -- and those would be Winifred and Pearl Jean and Angie and Holly -- those were all victims of domestic violence. Everybody with the gray dropped out of school.

With the wavy lines that go through the center of it, these are individuals who their children at some time in their childhood did not grow up with them as mothers. In other words, the children were in the care of somebody else for a period of time.

Let me back up here. The lines -- to describe both Pearl Jean and Albert during a good part of their childhood were in the home of the maternal grandmother as well as in a -- Pearl Jean was in kind of an institutional setting for a period of time and without a -- sometimes not knowing where Florence was

3829

or why it is that they weren't in their mother's care.

Darlene who is the product of Virgil Ashley, she grew up across most of her early childhood with the maternal grandmother, with Florence's mother.

Then additionally on this other side of the family, Jim and Winnie and Wayne also ended up being separated from

Page 45

Winifred who at one point was declared an unfit mother, and so they then are farmed out to relatives or to foster care settings.

Then Winnie's oldest -- her son, her oldest child, she relinquished custody of to her ex-husband and subsequently had very limited contact with. And, of course, Angela has ended up losing contact with her own children as a result of the situation that she's in.

Q. So what does this family tree at least on the female side of the family tell you?

A. That there are significant problems, and there's one more, by the way. Everybody in the dotted line had a psychological disorder or evidence of it. That doesn't mean that they've been to a psychiatrist and had a diagnosis. In many cases they haven't. It means that by their self-report, by the descriptions that others have of them that they have had some significant problems with their own emotions, with the way that they relate to other people, that there are indications that something is amiss emotionally.

3830

And what you see here is that while these women have not been involved in criminal activity that they have not come out unscathed either, that their lives have many of the problems that Angie's life had up to the time that she came into the criminal justice system.

Q. And how is this type of study of the family helpful to you in evaluating a case such as Angela Johnson's?

A. Well, it identifies things like genetic risk for psychological disorder, for substance abuse. It identifies family scripts and what kind of modeling and sequential damage

Page 46

is occurring within a family system.

It's not unlike I guess -- it's kind of like a miniseries on television like Roots or Captains and the Kings or something.  To really know what's happening in the current episode, you need to have seen the two episodes before where you see what's happened in this family across generations.  Then you understand the nature of the story that's in front of you now.

Q.    Now, if we can return I think to the list of protective factors, can you explain how intelligence, for example, is a protective factor?

A.    Yes, sir.  If -- and this means that you are extremely smart.  This is, you know, doctor, lawyer, graduate school bound kind of intelligent.  Then no matter how crazy things are at home, when you get to school, this is a place where you excel, where the world works just the way it's supposed to, and where

3831

you get a good deal of affirmation and attention and people talk to you about your future and where you can go and are more likely to be there to mentor you so that you have a zone of safety.  You have people that are paying positive attention to you, and you just have more horsepower to bring to bear to try to make sense of and cope with the situation you're in.

Q.    Where does Angela Johnson fit with respect to the intelligence?

A.    Angie doesn't have that kind of intelligence.  The IQ testing that was done on her in the last year or two, her full-scale IQ score as I recall was about a 91.  IQ is distributed on a curve.  The 50 percentile -- most people have an IQ score around a hundred.  Then if you go down to 85 which is about where her verbal IQ score is, that's about -- about 84

Page 47

percent of the population have an IQ score higher than that, and about 16 percent have an IQ score lower than that.

Her performance IQ score -- that means nonverbal kind of intelligence -- that's right about a hundred. Her verbal IQ score as I recall was about an 84. And her full-scale IQ score is then a 91.

I didn't look up the percentile on that. It would be in the -- that's at the bottom of the average range, just kind of bordering low average, a low average range. It's far below the IQ score, say, of 120 or 130 that we're talking about -- the average attorney has an IQ score of 125. And so Angie is --

3832

she's two standard deviations below that. She's a huge position down the curve from that kind of smart.

Q. I'm not going to ask you what your IQ score is; all right?

A. Yes, sir.

Q. Dr. Cunningham, do you have a graphic display that will illustrate or would help illustrate how these protective factors and the risk factors that have been identified by the Department of Justice and that you've been talking about and explaining in your testimony would -- would appear?

A. Yes, sir. Essentially the nature of this Department of Justice model is that -- and they're represented by weights representing this cumulative effect, that if there are lots of weights over here on this side, if there are a lot of risk factors for criminality and violence, then the likelihood of that happening is growing increasingly great if you've got lots of risk factors, not many protective factors.

Alternatively, if you look like this, this is how we're trying to raise our kids. If you have lots of protective

Page 48

CUN000847

factors and not many risk factors, then you're not very likely to end up in criminality and violence. That's the basic model that we're working with here.

Q. Now, have you also prepared a graphic display or a model, if you will, that explains your analysis of Angela's background?

A. Yes, sir, I have.

Q. And do you have that?

3833

A. Yeah. The model that I often find to be -- to be helpful in trying to understand both people more broadly in given individuals is one of a bridge. And it's the idea that the amount of stress or the amount of injury, emotional injury, that any of us can tolerate before something bad happens is based on three factors.

One of those is what's the integrity of the concrete in the span, how good's the concrete, and how much rebar is in it, and that's one factor.

Another is what kind of supports are here holding up the span? What's the quality of supports?

And the third factor is what kind of blocks or weights end up being piled on this bridge. And the outcome is often a function of the interaction of those factors.

To give you an example, in World War II what they found is they looked at who broke down in combat, that it wasn't just a function of how much combat somebody had faced -- that'd be kind of a stress of the weights -- but instead what was the quality of support they had within their unit because they found that new -- new soldiers being assigned to existing units were much more likely to break down. The guys that had been together for a long time and had strong bonds, they were much less likely

Page 49

to. It's an illustration of this process.

Q. What makes a strong span or a strong bridge?

A. Most importantly, if you have a strong and stable

3834

relationship with your parents, that dramatically adds to the concrete and the strength of it. Then in terms of the rebar going into this, if you're neurologically and developmentally healthy, if you're genetic resilient, in other words, if your family background is one that is full of resilient, successful people, low incidents of psychological disorders, not many drug- or alcohol-dependent folks, that adds rebar as well. And then if you were free from childhood trauma, that's how you get a strong, healthy bridge of a person. That's the background, early background, of somebody who is going to be best able to tolerate the adversities of life.

Q. Now, can you tell us what you found with respect to Angela's bridge, if you will?

A. Yes, sir. The bottom line with Angela's bridge is I thought -- found that the span of her bridge was weakened and weakened from a number of factors. The most important of those was the inadequacy, the parenting inadequacy, of both of her parents, particularly early in childhood, and that that factor is most powerful in terms of the kind of corrosive effect it has on the structure of the bridge.

Now, there are reasons why both Jim and Pearl were inadequate as parents. They were each the product of a dysfunctional family system on both sides of their own family, and it's the sequential damage idea as well as genetic vulnerabilities and modeling, that kind of thing, that they both

3835

Page 50

CUN0008845

were products of that, and I've described already these factors that are associated with what makes that family history so important as we would look at outcomes and look at generation to generation.

I had previously put up this slide that just shows the females in this family system. Here I've added the males as well. The additional legend on this, anybody with the vertical bars has been sentenced to prison or served a significant jail sentence, and the heavy black outline is an individual that was involved in spouse or child abuse.

And so you can see -- as you look at the dysfunctional family systems, both here on the mother's side as well as on the father's side, that -- and think about how that's impacting on these two parents, these are the family systems that these guys are growing up in. And then, of course, the outcomes of the children end up, you know, being pretty clearly damaged as we would look at this as well.

There's one other family dysfunction that's present on the mother's side of the family --

MR. WILLIAMS: Your Honor, I'd like to object. This is just becoming a narrative at this point.

MR. STOWERS: That's fine.

BY MR. STOWERS:

Q. Doctor, was there another point that you wanted to make about that graphic display?

3836

A. Yes, sir. There's another process that's happening on the mother's side of the family that is part of the sequential damage of Pearl. It's part of what damaged Pearl in her life.
Page 51

Q. And what would that be?

A. There is a history of sexual abuse that is generational in nature. Pearl described that she was repeatedly sexually abused including fondling and intercourse by her stepfather, by Virgil Ashley, for a considerable period of time when she was a kid. Now, there is an additional history of the maternal aunt Rita who --

Q. And what's that?

A. Well, she was sexually abused by Albert Gomez Senior's -- one of his brother's. Additionally, at the Dillos', Wendy is sexually abused. And then during that period of time while they're at the Dillos', Wendy turns to Jamie and asks -- and elicits Jamie who's younger to sexually stimulate Wendy, to fondle Wendy which is not an unusual thing for a child to do who's being sexually abused herself as she's processing that to then begin to act that out with another child, indications that Angela was also subjected to that sexual abuse at the Dillos', and then Holly was sexually abused by a pastor when they lived in Colorado.

Q. Let me stop you right there. You've mentioned Angela Johnson and the Dillos and sexual abuse. What information have you gotten with respect to that situation, that is, the

3837

possibility of sexual abuse of Angela while she was there in Chanute, Kansas?

A. Yes, sir. First, Angie was in a zone of high risk. The information that I got from Wendy, for example, was that Ted Dillo was making his own girls take naps with him and -- naps and that his girls then were part of who pushed Wendy into the room to also have to take her turn taking naps with Ted and that

Page 52

CUN000851

that nap consisted of her being sexually molested when she was there.

Now, typically individuals that are involved in sexually abusing multiple persons, as that's involving more people, the risk is increasing obviously for the other children who are in proximity. And so Angie's in the zone of risk.

Wendy described that years later as she talked to Angie about this experience of being molested that Angie confided in her that this same thing had happened to her as well.

Now, when I interviewed Angie and asked her about it, she denied that this had happened to her at the Dillos'. Wendy's report of their conversation was that it had and certainly she's in a zone of high risk.

Q. So it's somewhat unclear.

A. Yes, sir. At the very least, she's in a context that is sexually perverse in nature and as a third grader would -- living in this small household would certainly have been aware

3838

of this whole nap phenomena that the Dillos' daughters are having to participate in and that is occurring with Wendy as well.

THE COURT: Mr. Stowers, would now be a good time to take our break?

MR. STOWERS: Yes.

THE COURT: Members of the jury, we'll be in recess until 10:30, and please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence, had a chance to receive my final instructions on the penalty phase, hear the closing arguments of the lawyers, and, most

CUN000852

importantly, go back and begin your deliberations. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Please be seated.

MR. BERRIGAN: Your Honor, usually I've been at the podium where Mr. Stowers is today, but today I'm sitting here, and during the course of Dr. Cunningham's testimony, I have noticed on repeated occasions Juror 147 talking to Juror 274. I'm far enough away I can't hear what they're saying, but that concerns me.

I know the Court's been reminding them of the cautionary instruction, but certainly the jurors should not be

3839

talking to each other about the testimony, at least in my view, while it's going on.

So I wanted to ask the Court two things, if you'd pay particular attention and see if the Court's observations conform to my observations and, secondly, at every opportunity that we remind the jurors that they're not to discuss the evidence with each other.

THE COURT: Yeah, I've told them that, you know, 50 times or more in this trial.

MR. BERRIGAN: I know that.

THE COURT: And how do you actually know that that's what they're talking about?

MR. BERRIGAN: I don't, sir, and there's no way to know that without inquiring of the jurors. I'm not asking for that at this point.

Page 54

THE COURT: Okay. I'll monitor it.

MR. BERRIGAN: I appreciate it.

THE COURT: And -- yeah, I'll be happy to monitor it.

MR. BERRIGAN: Thank you. That's all I wanted to say.

THE COURT: Thank you. We'll be in recess.

(Recess at 10:08 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: Yes, Your Honor.

THE COURT: Thank you. Please be seated.

3840

Mr. Stowers?

BY MR. STOWERS:

Q.   Dr. Cunningham, you've got up in front of you a family tree with a number of different indicators on it of various things that symbolize various impact factors on this family throughout its existence, and I know that's based on your interviews and your workup on this case, and the jury's heard from all the siblings of Angela Johnson. You're aware of that?

A.   Yes, sir.

Q.   As well as her parents.

A.   Yes, sir.

Q.   As well as some of the people that you yourself interviewed --

A.   Yes, sir.

Q.   -- have testified here. So we're not going to go through those things that led you to form those conclusions. I think you've explained that chart there sufficiently. So let's move on to your next subject which is the risk factor of the parenting inadequacy if we could.

Page 55

A. Yes, sir. And this is essentially a continuation of that, that both Jim and Pearl Jean were themselves damaged as they grew up by the loss of their fathers. Jim's father died. Pearl Jean's father abandoned her. Both of them had inadequate mothers. Both of them were mistreated in childhood. They were damaged themselves so that when they got ready to be parents,

3841

understandably their resources and capabilities were limited.

Q. Were there other factors that you identified that led to the conclusion that there was inadequate parenting by the parents of Angela Johnson in this case?

A. Yes, sir. Jim drank heavily during Angela's early childhood. There was chronic marital conflict and Jim's domestic violence in the household.

Q. And what do you know from your work as an expert in this field about the effects of family violence that is observed by, for example, children?

A. One of the best summary statements I've seen comes from this study that was published by the American Psychological Association. Quite simply, it appears to damage children about as much to see one of their parents hit the other as it does for the child to be hit himself or herself.

I guess it's the idea that the wounds on your heart are slower to heal than the cuts on your skin. And so as this damages them emotionally, those results are at least equal to being directly physically abused.

Q. And this emotional -- you're talking about physical abuse here. Is there also another concept of an emotional aspect with regard to the parent-child relationship that you identified as somewhat missing?

Page 56

CUN000855

A. Yes, sir, there was.

Q. And can you describe that?

3842

A. Yes, sir, and that's this next factor, that it appears that Pearl Jean never really formed the kind of glue that you -- that a child needs from its mother, that she seems to never have effectively bonded as a momma to her children. And you see that in the things like the poor level of emotional nurturance, the absence of affection, her broad inattention to the emotional or social or physical needs that our kids have and seemed not to be tuned into that at all and then by acting in ways that are exploitative of the children or that caused them to have to suffer instead of her.

You know, for example, when they had the cafe and the children were sleeping on the floor of the basement of the cafe and she's staying in a motel across the street with a guy that she's seeing or that she gives Jim's Social Security Number to one of her friends or has her children drop out of school to work in a restaurant without getting paid much of anything, all these ways are just the opposite of what you think that a momma does which is that she puts her own needs aside for the outcome of the kids. And when that doesn't happen, you begin to wonder about what's missing from the glue that this person has with her children.

Q. What's the significance of strong parental -- child-parent bond?

A. It's the most important thing in emotional development. To have good glue, to have a good nurturing momma and hopefully a

3843

Page 57

CUN000856

good dad as well, that's the most important thing that happens in childhood, and that's what -- that's what essentially -- it's the most important ingredient to the span. That's the foundation that everything else is going to be built on.

Q. And what kind of difficulties can occur when this situation exists between a parent and a child where there isn't this bonding, this type of support, and this relationship?

A. When you don't have that, the effects are disastrous. I mean, that's -- the absence of that glue with a momma is a far greater injury than whatever kind of abuse and neglect might happen later. If you can have a really good momma for the first four years of life, that lays down all kinds of concrete to help insulate you from what happens after that.

Q. And is that supported by the research that's been done that you're aware of?

A. Yes, sir, it is. This is an issue that there is really no disagreement about in the field of psychology. We discuss the mechanism for why that bond with a parent is so important, but nobody really disagrees about its fundamental significance.

There's a core statement that I think helps illustrate the effects of this issue and the importance of it. And that says that the quality of attachments to parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult. That's kind of a way of distilling this down, that what

3844

happens there and the quality of the glue between these different members of the family, particularly with parents, that's what forms the basis this person will then use to be a

Page 58

good citizen later on.

This statement comes from the FBI's behavioral science unit as they were investigating a particular type of homicide. At the core cause of that homicide they found bad glue between family members.

And then additionally, again, this is a finding from the Department of Justice, that the influence of those family factors, the effects of whether you had that glue or not, don't just affect you as a child. The effects of that last a lifetime.

Q.   And that's from the Department of Justice?

A.   Yes, sir, that's correct.

Q.   Is that from one of these studies from the Department of Justice that you talked about earlier, or is it a different one?

A.   Yeah, this is a different one. This is authored by Cantelon, 1994, and published by the U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention.

Q.   What other factors impacted on Angela's ability to cope?

A.   There's a family history of alcohol abuse as reflected -- there's a family history -- well, there's a family history of alcohol abuse that has some important genetic implications for this family.

3845

Q.   And can you explain geneticism as it might relate to alcohol and drug dependence and what the works in your field of expertise show in that regard?

A.   Yes, sir. I'm just going to put up just two or three studies. There is a vast research literature that again is widely -- widely recognized and agreed with, and that is that if you have a first-degree relative -- that means mother, father,

Page 59

CUN000858

brother, sister -- who's alcoholic or drug dependent, then you are four to five times as likely to be alcoholic or drug abusing yourself, four to fivefold.

Now, that holds even if you are separated from them at birth and raised by a family that doesn't drink at all. Your risk of alcoholism or drug addiction does not track the family that raised you. It tracks your family of origin in terms of your biological family.

Now -- and finally, this risk is not just alcohol to alcohol like my dad was an alcoholic so, therefore, I only have a risk of alcohol abuse. Rather it's really substance abuse. If you have close relatives who have histories of substance abuse, drugs or alcohol, then you are at markedly higher risk for drugs or alcohol abuse.

Q.   So let's go to the family tree again of Angela Johnson. And what did you find in that regard with regard to alcohol or drug abuse according to your interviews and the other information that you reviewed in connection with your

3846

preparation for this case?

A.   There's a significant family history of alcohol abuse in this family system. The individuals that would not have a genetic relationship in that are Virgil Ashley and Warren Hopp. But the other individuals that are depicted here are all part of the genetic lineage or share a common genetic lineage in terms of her siblings. And as you can see, there is very significant -- what we would call penetration of drug and alcohol abuse in this family system.

Q.   Now, Angela's father you've got highlighted there in yellow, what's the basis for that?

Page 60

A. That's based on his own self-report that he described beginning to drink abusively at age 14 or 15. In early adulthood he ended up spending three months in jail for being involved in a bar fight that he and his brother were in when they were both intoxicated. He described drinking 12 to 18 beers at a time pretty regularly, most weekends, across his adulthood, that he and Cookie would split a case of beer on a Saturday. And so it's not getting drunk every day. It's not that he can't go to work. But it is episodic alcohol abuse typically on weekends, and this is by his report and also by descriptions of others as well.

Q. What other factors impacted on Angela's ability to cope if you will?

A. There's also a family history of psychological disorder.

3847

Q. And going again then to the family tree, what were your findings in that regard?

A. In this kind of violet yellow (sic) are the individuals who have histories of psychological difficulties. Again, in most instances not that they've been to a psychiatrist and been diagnosed but rather their descriptions of themselves, their life patterns, their relationships point to their having psychological difficulties.

Q. And you've labelled on that chart psychological disorder.

A. Yes, sir.

Q. That sounds pretty ominous just reading it. What are you intending to communicate there?

A. Those are things like depression, anxiety, significant relationship problems, suicidal ideation, bizarre religiosity that really crosses the threshold of sort of normal thought

Page 61

processes.

Q.    And are those the type of things that you would see and expect to see generationally according to the research data that exists and the information that exists within your field of expertise?

A.    Yes, sir, it is.  It's a part of a typical psychological interview that you interview about a family history of different psychological disorders much like your physician asks you if you have any family -- history in your family of cancer or heart disease or high blood pressure because those are things that he

3848

needs to be aware of because they're relevant to your risk.

In a similar way, if somebody comes into my office with a complaint of being depressed, I'm going to want to take a family history from them about the incidence of depression in their family because it helps illuminate the nature of the disorder that may be occurring and what sort of treatment is likely to be effective.

Q.    And does the research support the idea that there is a genetic element to psychological difficulties?

A.    Yes, sir, it does.  These are all summaries from DSM-IV, the Diagnostic and Statistical Manual, Fourth Edition, which is the handbook of diagnoses that psychologists and psychiatrists use so we can communicate using a common language.

And within that DSM-IV, there are descriptions or summaries of the research about what we know about what causes these disorders.  And so, for example, with schizophrenia, there's a ten-fold risk for first-degree relatives.

Now, I include that not because there is a diagnosis of schizophrenia in this family system.  But as Pearl Jean talks

Page 62

to me about having hallucinations as a child and as the children are describing the degree of distorted perception of reality that's occurring associated with this religiosity that they're involved in, it begins to approach a psychotic sort of disturbance.

Major depression, Angie has had childhood depressive

3849

symptoms, made a suicide attempt as an adolescent, and has been treated for depression as an adult as well, that that also has a significant genetic predisposition to it as well as an increased risk for concentration, attention problems.

Anxiety disorder has a family association to it.

Attention deficit disorder problems also tend to run in families and are associated with mood problems, personality disorders, learning problems, substance dependence, a number of things that you see some indication of in her family system as a whole.

Learning disabilities are more common among biological relatives. Angie's mother and father describe significant difficulty in school. Father was held back for two or three grades. And then Angie also talked about a personal perception of struggling to learn and descriptions of her reversing her letters. Then personality disorders are also more common in families.

Q. I'm sorry. At the bottom of that display there, you have some letters, DSM, dash, 4. What does that represent?

A. That's that Diagnostic and Statistical Manual, Fourth Edition, which is the current edition that we are now using. Actually the most current is TR, DSM-IV-TR, which, is text revision. These sort of factors have not changed in that text

Page 63

revision.

Q.   And the Diagnostic and Statistical Manual is what?

3850

A.   That's what we psychologists and psychiatrists use to communicate with each other.  That's what we put on our insurance forms, and it allows us to have a common language so we're all talking about the same thing when we talk about somebody being depressed or so that when research is done everybody's clear about who was identified as depressed to participate in this research study.

Q.   Is it in essence the uniform and accepted definitions and criterion that are used for evaluating and diagnosing mental conditions?

A.   Yes, sir.

Q.   Now, were there some symptoms that you identified from your review and work in this case and from your interview of Angela and her relatives of some continuing conditions that Angela herself was displaying?

A.   Yes, sir.

Q.   And what were those?

A.   When she was a kid, she described that she often felt sad and would cry in her room by herself.  She had low self-esteem, that she didn't feel like she was good enough for anybody or anything, that she was more of a problem than she was worth. She described a pervasive sense of guilt as a child, that she was disappointing to her mother, that she was not good enough for God to love, that she couldn't protect her brothers -- her sisters and brother from this religious stuff that was going on.

3851

Page 64

CUN000863

Even some of the good things that she did in early teens have this overwhelming guilt-driven quality to it. She talked about when she was 12 or 13 they had the Save the Children commercials that would come on television, and so she made $32 a week from babysitting, and she started out supporting one child for $7 a week and then ended up supporting 4 children for $28 a week. She was giving almost all of her babysitting money to this, and Pearl Jean stepped in and said, You gotta stop; this is getting out of hand.

And it's -- that degree of sense of kind of guilt about what's happening even other places also points to a kid that's taken a lot on herself.

Q. What -- I'm sorry.

A. Also she often felt lonely. She was having nightmares about her mother and the rabbits and pigs at the Dillos. She described first considering suicide in elementary school, and then at age 14 she overdosed on aspirin.

Q. And so at age 14 she did an overdose?

A. Yes, sir.

Q. Unsuccessfully?

A. Yes, sir.

Q. What other factors that you identified that impacted on this model that you've created which you've headed Angela's Bridge?

A. There are also descriptions of attention and learning

3852

problems, not a diagnosis that I have. In looking at her school records, it's difficult to detect the presence of learning disabilities, for example. There are descriptions, though, of her reversing her letters. The pattern of her IQ scores, of her

Page 65

CUN000864

verbal IQ being substantially less than her performance IQ, is often seen in learning disabilities and is a pattern that would contribute to problems with reading and spelling and those kinds of things.

Then her sister Wendy talked about her getting overengrossed in things and seeming not to be able to shift her attention. And this whole thing about casting out the deaf and dumb demons in Angie seemed to have been related to deaf, her not responding when she was called upon, being kind of preoccupied, and the dumb part being that she was having these problems in school and also that she seemed to be a greater target for both the discipline and the demon deliverances within the family as if there's some characteristics that she has that are calling for additional attention to be directed toward her.

Q.    In a negative way.

A.    In a negative way, yes, sir.

Q.    What other factors impacted on this model?

A.    There was what I would characterize as unrelenting trauma exposure, in other words, that the trauma begins early in childhood and it just keeps coming wave after wave after wave.

There's the chronic marital conflict of her parents,

3853

her father's physical abuse of her mother, this pathological divorce, and then inconsistent contact with her father. She's emotionally neglected and abused. She's physically abused.

There's this bizarre religiosity that crosses a good chunk of her childhood that involves her grandparents and friends of the family. And there's the terror, what I call the terror, of the Dillos that has a continuing traumatic legacy, just wave after wave of emotional injury.

Page 66

Q.    And I think we heard some testimony yesterday from Dr. Hutchinson regarding the effects of childhood trauma on the actual childhood brain, if you will.

A.    Yes, sir.

Q.    On a person's brain functions.

A.    Yes, sir.

Q.    And I don't want to go into that in a great deal of detail; okay?  But can you just briefly explain that to the jury?

A.    Yes, sir.  The research at this point identifies that traumatic experiences in childhood don't just create bad memories, but rather the brain of a child is what we call plastic.  In other words, it's in a state of formation.  And chronic trauma exposures in early childhood particularly, childhood in general, early childhood particularly, change the chemistry and architecture of the brain.  The chemical processes, the hormonal processes of the brain as well as the laying down of tracks and pathways end up being modified or

3854

impacted by those trauma experiences.

Q.    And do you have a way that you can illustrate this point to the jury?

A.    Yes, sir.  The model that I would describe is one -- in looking at the effect particularly of family trauma on this experience of wiring is that what happens in the family and the traumatic experiences there end up affecting the wiring, all of this being part of what forms the person who makes the choices to behave and, you know, to act in whatever they do.  And so it impacts on the quality of those choices.

Q.    And what, according to your review of materials and your interviews that you did, did Angela Johnson do when she was a

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 56 of 110
CUN000866

child to sort of support herself and support what you've used in your model as a device, this Angela's bridge?

A. Yes, sir. Early on there seems to have been this sort of fantasy position that her father had in her mind. She's not seeing him very often, but the kids are really excited when they do see him. And so he's kind of this magical figure who shows up periodically with presents or positive attention. So he's there as a dotted-line support because it's not like a father who's present, but it's the fantasy of who he is that seems to give her some reassurance. Unfortunately that's also accompanied by a weight on this bridge that his contact with her is very inconsistent in nature.

Q. And what additional weights were added?

3855

A. The next thing that happens is that -- let me skip through this. Essentially the notion is in terms of what effect it has to be without a father is that research tells us that fatherless children -- and functionally she is effectively fatherless for good chunks of her childhood -- that there are dramatically greater risk for drug and alcohol abuse, mental illness, suicide, poor educational performance, teen pregnancy, and criminality, all of those risks having been realized in Angie's life.

The next thing that happens then is there is a pathological divorce between her parents that the children are part and parcel of throughout the rest of their childhood.

Q. What's that mean, pathological divorce?

A. Well, divorce is never a vitamin for a child. It's never like this is a good thing that we would prescribe for them as a positive event. But parents that divorce can very significantly

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 57 of 110

CUN000867

reduce the damaging effect that has on a child if they continue to see that the first priority that they have is to raise these children.

Pathological divorce means that the goal of raising the children has been lost, and instead you have the bitterness that may have characterized the breakdown of the marriage being kept alive for years afterwards. It's talking bad about the other parent. It's enlisting the children as sort of on your side as your ally which Pearl Jean seems to have particularly

3856

done with Angie, to recruit her as an ally against her father and stepmother. It's the failure -- it's the keeping alive of the divorce conflict and the failure to nurture and continue to parent these kids effectively, and that's what I would characterize as a corrosive and ongoingly pathological process.

Q. And what other weights were piled up on this support bridge of Angela's?

A. There's her mother's physical and emotional neglect.

Q. And I think you've covered that and described that previously. And there you're talking about what again?

A. Well, there I'm talking about things like her not recognizing the emotional needs of the kids, there being no consistency in the household, little affection, putting her religious obsession above the children's welfare, failing to protect them from obvious risks like are happening at the Dillos', yelling at the children, exploiting them, all of those things.

Q. What is the impact on a child when they're emotionally neglected?

A. The effects of emotional abuse in many ways are greater

Page 69

than the effects of physical abuse.  Again, it's this notion of the wounds on your heart being slower to heal than the wounds on your skin.

There's disturbed attachment.  In other words, this glue that's supposed to connect the mom and the kid is --

3857

doesn't form well, and you end up with all kinds of problems as a result of that often beginning with some sort of fantasy of an idealized relationship that ultimately there's tremendous anger and disillusionment about because it doesn't happen and maybe problems in relationships as an adult as well.

When you think about what it means to be a child who is effectively emotionally alone and for whom it's not just that the world represents physical risks but there are ongoing risks to your self-esteem and even your boundaries -- your mother thinks you have demons.  There are these lengthy exorcisms where you're being held down and people are praying over you.  You think about what it's like to be a child and have this kind of thing going on that you can't control and don't understand that is terrifying and confusing and leads to psychological disorders and behavior problems.

Q.   What was the next item that came to bear on Angela's support?

A.   The next item was physical abuse.

Q.   And what are you talking about there?

A.   Those are things like the mother's frequent beatings of Angie with different instruments, the wide black belt, the bruises and welts, and these lasting until she's done venting. It's not that it's proportionate to what the child has done because often it's just for typical kid behaviors, but it's that

Page 70

CUN000869

Mom is venting in the process of this.

3858

Angie described that one of the disciplinary techniques of her mom was if you said something that she thought was a little smart or out of hand that she would wash your mouth out with soap but not just soap up her hand and move it inside your mouth but instead to rub the bar of soap back and forth across the teeth so that you'd have the taste of soap in your mouth for hours. Those are examples.

Q. Okay. And what is the impact according to the research of abuse and neglect in regard to criminality?

A. This is the study that I mentioned earlier by Widom where they started out following almost 900 kids with the matched controls and looked at them where we're now at 15 to 24 years of follow-up.

And here's what they found, the kids that were abused and neglected, the mistreated kids, were almost five times more likely to be arrested as juveniles. They were twice as likely to be arrested as adults, and they were three times more likely to be arrested for violent crime as an adult.

This series of studies were initially published in the peer-review literature with Cathy Widom as the lead author. This follow-up at this point has been published with English as the lead author. Widom's the second author, and it's been published by the Department of Justice.

Q. And what was the next item that was stacked up on her support mechanisms?

3859

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 60 of 110
CUN000870

A.   The next weight on the bridge was the abuse of her siblings that she is then there watching.

Q.   And there you'd be talking about just generally?

A.   Yes, sir.  I'm talking about that Angie's not always the target of these beatings.  Sometimes it's her brother or sisters or the mom is punching them or slapping the face enough that it leaves a hand print on the face.  On one occasion Pearl Jean put makeup on Angie's face to cover up the marks so that she could go to school.

Q.   And what does the research show about the effects of observing the abuse of siblings?

A.   There are a number of things.  Obviously it contributes to negative perceptions and feelings about your parents and not just the parent who's doing it but because your parents symbolize sort of the whole social order, they symbolize authority in general, it contributes to kind of a disaffection of generalized authority; a more fearful and vigilant posture toward adults in general; feelings of guilt and responsibility that they're being hit instead of you or it's because of something that you were involved with them about or you can't stop it; mixed feelings about the siblings; behavior problems; anxiety; shyness; fear of failure; believing that aggression is somehow a normal way to behave or that this is what's supposed to happen in families; problems learning how to modulate your own feelings.

3860

In other words, part of the way that children learn to control their own feelings is by observing their parents stay in control.  And finally psychological disorder is also a part of a potential legacy of observing the abuse of your sisters and

Page 72

brother.

Q.    Are there any studies that support what you're indicating here with regard to the effects of abuse?

A.    Yes, sir.  This one is another study published by the Department of Justice.  This is called the Rochester Youth Development Study.  To give you some idea of the scale of this research, here they're following a thousand children, and they're interviewing both the children and their caretakers every six months across their adolescence.  Think of the scale of this, of what's involved in interviewing a thousand children and their caretakers every six months.  And they're looking at three different types of abuse.

They're looking at spouse abuse which there was early on in this household; abuse of the children which was ongoing; and a climate of violence and hostility which was also present in the marriage and also as the children are growing up.

And here's what they found in terms of the outcomes for the kids, the rates of violence among the children growing up in these households.  And these were in zones of some risk. If there was --

Q.    What did the study show about the rates of serious youth

3861

violence?

A.    Well, if there was no family violence, if you didn't have any of these things, then 38 percent of the teens were violent. If there was one type of violence, it jumped to 60 percent.  If there were two types, it jumped to 73 percent.  If there were all three types of violence, then it was 78 percent of the children.

So you see the effects of that cumulative weight that

Page 73

we were talking about earlier.

Q.    And how many types of violence did you identify in your research with regard to Angela Johnson?

A.    All three types.

Q.    And what was the next weight that you added on to Angela Johnson's support bridge?

A.    The next weight was bizarre religiosity.

Q.    Of course, we've heard a good deal about that, and I know the jury has.  I think at this point it pretty well speaks for itself, but I assume that you did discuss that with Angela Johnson?

A.    Yes, sir, at great length and with others and with the other family members as well.

Q.    And are your findings that that weight existed supported by your interviews of all the family members?

A.    Yes, sir.

Q.    And of Angela?

3862

A.    Yes, sir.

Q.    And just very, very briefly, when you talk about that topic, I assume what you're talking about is topically the fear in the home; is that right?

A.    Yes, sir, that's part of it.  There's a climate of fear that that creates that your household is full of demons, that the end of the world may happen at any moment, that you're surrounded by forces that are malevolent and out of control.

Q.    And are you referring to the instances or incidents of casting out of demons that occurred?

A.    Yes, sir.

Q.    And those were described to you as they were to this jury,

Page 74

although I know you weren't here for the whole trial; is that right?

A.  That's right.  This is my first day in the courtroom.

Q.  But you've heard some of the descriptions that were relayed to you; is that correct?

A.  Yes, sir.

Q.  And those were told to you in interviews?

A.  Yes, sir, from all of the children that were old enough to remember this, they described this experience and in very consistent ways.

Q.  And then there was an episode about the end of the world and the three-day journey?

A.  Yes, sir.

3863

Q.  And you found out about that in your investigation?

A.  Yes, sir.

Q.  And the Bible studies that were going on at the home with these very young children?

A.  Yes, sir, daily studies that would last for an hour that are not child directed.  It's not like they're reading children's Bible stories.  It's Pearl reading the Bible, waving her hands, speaking in tongues, praying, rebuking the devil.

Q.  Also I think one of the other categories that you fit into this general heading of bizarre religiosity is the claims of messages that Pearl Jean would have been claiming to have received directly from God?

A.  Yes, she routinely saw almost every experience as representing some divine guidance, not that God infuses your perspective and then you bring your best problem-solving skills to bear.  But instead she gets pricked, gets a tinge, and opens

Page 75

CUN000874

the Bible. Whatever verse she sees, that's the instruction that she's supposed to apply.

This is pretty terrifying to the kids as she's told them the story about Abraham being prepared to sacrifice Isaac and that she would certainly do the same thing if she thought God called on her to do that and then you're having this experience where at any moment Mom opens the Bible, looks at the verse, and decides that's her instruction from God about how to proceed. It's -- not only is it -- not only is it such terrible

3864

modeling about how to go about solving problems in your life, but it's terrifying about what may happen next in response to some supposedly divine message.

Q. Did you find in your review that there were some suggestions of -- in this category as well of failure to provide medical care and relying on the power of healing, placing hands on people?

A. Yes, sir, only going to the doctor as a last resort.

Q. And, of course, you heard about the grandmother's behaviors with regard to this tire in the basement and beating the tire?

A. Yes, sir, and Wendy and Angie describing their fearfulness of the basement. That was where the shower was. If they had to go take a bath, they're scared to death to go down into the basement because of their fear of this whole demon phenomena.

Q. And you in your review heard about the fasting.

A. Yes, sir, routinely, that they're not eating all day, maybe only get to drink chocolate milk until that night, that they're simply hungry a good deal of the time.

Q. And was there some inconsistency or illogic, if you will, to the religiousness in the home?

Page 76

A.   Yes, sir, it's what I guess I would characterize as tortured logic because on one hand there's this intoning of spiritual values while at the same time the day-to-day behavior in the home is abusive and neglectful and even exploitative in nature.  So you've got this failure of all the spirituality

3865

issues that are there to somehow practically infuse behavior for any kind of a benevolent outcome.

Q.   And what are the implications that you identified in your work on this case of this bizarre religious behavior?

A.   There are many of these, and let me just try to capsule a few of them.

You know, one of the jobs of a parent is to provide a modulating and stabilizing influence for the child.  Children are scared of the boogieman.  Children think somebody's under their bed.  For children their world is full of things that are potentially terrifying.  And Mom and Dad are calm and reassuring and are not joining them in that terror.  And so they provide some reality testing and some soothing.  The child gets to where they look to Mom or Dad to see whether they're supposed to be afraid or not because the parent is providing that stabilizing effect.

In this household it's just the opposite.  The adults in the household are the ones that are coming up with the demons and the malevolent forces that are only very marginally in control.  And if you don't say just the right words, the demon will come out of one person and may go into another which is -- apparently on one occasion the demon went into the parakeets and then the parakeets have to be released because that's where the demon went.  It's just -- there's no modulation.  Mom is out of

Page 77

control in her abuse and her neglect and then this religiosity

3866

as well.

Obviously the adults aren't strong enough to provide security or safety because the demons are everywhere. It instills fearfulness and anxiety in the child. The child can't rely on the parent as a good test for what's reality. Because everything is kind of the demons and God and these things are going on and you're looking in the Bible, the child doesn't learn good cause and effect: If you do this, then this is what happens -- or good problem solving. It doesn't demonstrate personal responsibility or that I have control over my own outcomes because everything is kind of put off into the divine.

They ended up being alienated from their peers and isolated because if you had a kid come in the house, they'd have to go to Bible study. There's a violation of body boundaries and autonomy boundaries as the kid's being held down, certainly a grave risk of becoming alienated from organized religion and maybe with authority in general.

Q. And how did Angela Johnson, according to your work on this case, your interviews, the information you received, how did she deal with this bizarre or how did she attempt to cope with this bizarre religious behavior?

A. She was -- did the best she could to try to preserve a sense of autonomy. She was more resistive than the other kids. You know, if the requirement was that you pass gas in some way or belch or sneeze or speak in tongues, she resisted doing that.

3867

She kept struggling and fighting when she was being held down,
Page 78

CUN000877

that a part of the support system seemed to be I'm not going to let you take my individuality away from me.

Q. And was there a price that she paid for that?

A. Yes, sir, it was. The abuse that was directed toward her increased as did the casting out the demons. The exorcisms increased as well.

Q. So the more she fought, the more she got back in return.

A. Yes, sir.

Q. What was the next thing that was piled upon Angela's support system or her bridge as you've headed it?

A. There are indications of a failure to provide emotionally and physically before. But this religiosity also included a neglect of physical needs like the fasting and the medical care and those kinds of things. So at that point it's almost as if you now have two different issues at stake, one of them being Mom's broad emotional neglect and then also particularly joined with the religiosity the physical neglect that was a part of that.

Q. And so when you talk about neglect, is there known in the field in which you practice to be an impact on a child of neglect of a child's physical needs?

A. Yes, sir, there is.

Q. What is that?

A. Fundamentally, neglect is seen as more damaging than abuse.

3868

And here's the mechanism of that.

Often children that are abused get pretty good parenting in between the times that they're abused. Their parents love them. They get fed emotionally. It's just periodically the parent loses it and is abusive toward them.

Page 79

Now, neglect, though, particularly emotional neglect, is more like chronic emotional starvation. You just never do get the groceries, and that ends up being more damaging in the long run than, you know, kind of getting pretty good love and affection and nurturance but periodically you get hurt physically. So that's that understanding of why neglect is more problematic, is more damaging to the child than abuse is.

Q. And what else was stacked up on this support system of Angela Johnson? There you go.

A. The terror of the Dillos.

Q. And these would be the folks from Kansas that the jury's heard a fair amount about?

A. Yes, sir.

Q. There any reports there in connection with Angela Johnson's stay down there in Kansas that were made to you by Angela Johnson that you found to be noteworthy separate and apart from or in addition to the ones that had already been made to you by other family members?

A. Yes, sir, they were consistent, but they represented specific instances that I found pretty compelling.

3869

Q. Can you share those with the jury, just a couple of those?

A. Yes, sir. Angie described an instance where Ted Dillo had the children come out to the barnyard and they were feeding corn to the chickens. And she really liked that. She said it was like Snow White tossing the corn to the chickens. And in the middle of this, Ted Dillo picked up a couple of the chickens and threw them into the hog pen where the hogs immediately began to tear these chickens apart, and the corn that the chickens had just eaten was flying in the air and the horror of the sudden

Page 80

transformation of this scene that occurred.

She talked about there being an instance where Bobbi asked her to come into the barn and she sat down and put a rabbit in Angie's lap which Angie was petting, and after she petted the rabbit for a minute, Bobbi jerked the rabbit out of her arms, put it down on a stump, hit it in the head with a sledgehammer. The rabbit's eyes pop out, jerks it up, slits its throat, jerks the hide off of it and guts it, and the legs are still jerking, this little rabbit that she just had in her lap and was petting, instances that are not just life on the farm but instead seem to be designed to be terrorizing to the child.

Q. Or at least they were perceived that way.

A. Yes, sir, the experience of it from a kid's standpoint -- I mean, you have to remember that children think of themselves and animals as being kind of like all the same. You know, children's storybooks are about animals who talk to each other

3870

and have human emotions and personalities. And the cartoons that they see from The Lion King to The Little Mermaid and all these things are about animals that have personalities like people do.

And so when you do sudden violence like this to an animal, that's part of why these nightmares continue. It isn't that we saw an animal just being butchered. It's the identification that kids make with animals, particularly if you encourage them to with the whole petting thing and then suddenly violence is done to this little animal.

Q. Do you find it a little odd that the various Johnson children in their reports to you seem to be emotional in their descriptions of these events that occurred down in Chanute,

Page 81

Kansas, at least as they're recalling them many, many years after the fact?

A. No, sir. I think it's a testimony to how extraordinarily traumatic these experiences were that you have -- Jim is a high school or college student who's having nightmares about what happens to the animals at the Dillos'. I mean, it says something about the -- this sort of nuclear explosion that was set off in these kids in their little psyches in the period of just a few months living there with the Dillos.

Q. And can you talk a little bit about the sexual trauma that can occur to a person who is the subject of sexual abuse?

A. Yes, sir. This is based on a friend-of-the-court brief

3871

that was filed by the American Psychological Association that summarized some of the research about what is it about sexual trauma that injures children so much. And essentially there are four processes that appear to be responsible for that injury.

There's traumatic sexualization; in other words, this ends up inappropriately shaping the sexuality of the child. Jamie talked about how both Wendy and Angie after the Dillos were sexualized and were interested in pornography and became sexually active early and this whole -- this sort of evidence of the traumatic shaping of their sexuality.

There's betrayal. That's the idea that as a child you depend on the adults around you to be benevolent or to protect you, and that didn't happen.

There's powerlessness where the will of the child is overwhelmed and stigmatization which means that the kid -- the child takes on the bad feelings about what happened as if they were responsible for it, that they feel bad and defective in

Page 82

CUN000881

response to what happened.

Q.   Now, Dr. Cunningham, were there any other things that were added on to the support mechanisms or the bridge, if you will, of Angela Johnson according to your workup on this case?

A.   Yes, sir, there were recurrent moves.

Q.   What are you referring to there?

A.   I'm talking about the moves of this household from place to place.  Now, the ones that I have are essentially the moves to

3872

different cities.  As they describe the history, there were other moves between households within the same city that they had a real hard time nailing down exactly where they were living when.

Q.   And have you prepared a real quick chart that you can run through very quickly?

A.   Yes, sir.  This begins with Angie's birth which was here in this Wisconsin area.  There's a first move when she's 4 to an adjacent area in Wisconsin; then at age 5 to Pueblo, Colorado; in kindergarten to Mason City; in second grade to Thornton; in third grade to Chanute, Kansas; returning in third grade back to Thornton; fourth grade in Klemme; fifth grade, Forest City; seventh grade, Thompson; in seventh grade Forest City.  This is a significant amount of disruption of social network and school setting for a little girl whose life is already pretty out of control at home.

Q.   And very briefly, what does that -- recurrent moves and those frequent moves, what does the research show with regard to that?

A.   Well, not uncommonly it makes visitation more difficult in a divorce situation, and certainly it did here.  This is part of

Page 83

CUN000882

how Dad lost contact with the kids. It disrupts whatever beginnings of peer friendships you might have; increases the likelihood that the next place where you're the new kid that you'll be bullied or harassed; makes it more difficult to get

3873

interventions to detect abuse or neglect, to get special services psychologically or learning; increases the economic hardship of the household in most cases. Moving's expensive to set up another household. And it just broadly increases the experience of instability and chaos.

Q.  And, Dr. Cunningham, were there any other things that Angela Johnson attempted to do to cope and to support herself?

A.  Yes, sir. She began to abuse drugs.

Q.  And is that based upon your interviews of the various people in this case?

A.  Yes, sir, her siblings as well her.

Q.  And what do you know about teenage drug abuse and the dependence and what you found out in connection with this case?

A.  Let me describe the history of that. Obviously drug abuse is not an effective support system, although it may seem to be. That's why the lines are dotted. It's an additional weight on the bridge.

Angie described to me that she began smoking marijuana when she was 12, that she was introduced to it by her sister; that it made her happy and she laughed, and it gave her some relief from this -- from the anxiety and disturbance of the family. And that's why I've identified this -- often as teenagers begin to use drugs or alcohol, it reflects both the genetic predisposition as well as they're medicating themselves from the anxiety that they have.

Page 84

From age 14 to 18, she was buying her marijuana with her part-time jobs and smoking daily, actually full-time jobs as she was working at her mom's restaurant.

After age 14, she said she no longer wanted religion in her life, no more healing, no more speaking in tongues, no more demon possession. She just wanted to smoke pot and be happy.

Q. And there was some drinking as well that you've identified?

A. Yes, sir, at age 12 or 13 she began drinking. Between the ages of 13 and 16 she was drinking until she was intoxicated one night of the weekend.

Q. And then you've got something in there about LSD which is a hallucinogenic illegal substance; is that right?

A. Yes, sir, and she was using it on occasion when she was 14.

Q. And then what else did you find out about her substance abuse?

A. Those are the primary substances that she was using as a teenager. There are others then that she used later on. Later she begins to abuse cocaine and methamphetamines as well.

Q. So let's talk about that.

A. That will come later here as I . . .

Q. All right. Was there -- you've now put up another graphic which is the Angela's bridge graphic.

A. Yes, sir.

Q. And you've added a support post, if you will, underneath

there called employment.

Page 85

A.    Yes, sir.

Q.    She obviously learned -- was able to maintain employment despite her many difficulties.

A.    Yes, sir.  In fact, she began working when she was 13 or 14, and that seems to have been a mainstay in her life.  She worked very hard, often two shifts most of the time across a good part of her adolescent and adulthood, and that structure of working seems to have been an important support system for her.

         Unfortunately, as she was a kid, as she was working, she was being exploited by Mom who was having her work 50 or 60 hours a week in the restaurant, might give her 40 or $50 for all that work, might or might not.  And so largely Mom has free labor from her daughters in the restaurant which then results in them having to drop out of school in order to continue that pace of demand and the sense that they're somehow obligated to Mom to help her in this way.

Q.    So she drops out of school.  Is that another factor that you've illustrated?

A.    Yes, sir, it is.

Q.    And that as you learned occurred at -- I believe it was the ninth grade; is that right?

A.    Yes, sir.

Q.    And then she became married?

A.    Yes, sir.  Then she's working, and when she's 16 years old,

3876

she ends up marrying Steve Hugo in a marriage that lasts -- they're together just over a year.  She's 16 at the time.

Q.    And you've illustrated that by also knocking down the weak support of father.

A.    Yes, sir.  One of the things that happened in her -- in her

Page 86

CUN000885

mid-teens is that she became quite disillusioned with her dad and began to feel as if his absence from her life was evidence of his lack of caring for her and so became alienated and estranged from him and, you know, within a couple of years of that had found a substitute support system, had married.

Q.   And then what happened?

A.   Well, then she -- now that marriage ends.  She's with him for just over a year.  Then she marries A.J. and has a baby, and so now this support system has expanded into a parenting role as well.  Of course, she's a teenager when these things are happening, and that represents an additional weight and demand on the bridge.

Q.   Being a young mother and being married?

A.   That's correct.

Q.   And then what happened?

A.   Well, the marriage fails with A.J., and now we have two marital failures by the time she's in her very early 20s.

Q.   And then what happened to Angela's bridge?

A.   Then she -- she first begins to abuse cocaine and after about a year of that first tries methamphetamines, and that

3877

escalates very rapidly into a very serious problem.  Again, she's finding that it represents like her medication to her. She said the first time she tried it she realized that she was going to use this every day for the rest of her life if she could.  The problem is, of course, methamphetamine is not a legitimate support.  It's not a vitamin.  It's a tremendous additional weight on a life structure.

Q.   And these drugs that she was using did have, according to your evaluation, not unexpectedly I assume, an erosion on

Page 87

Angela; is that correct?

A.    Yes, sir, they did.

Q.    And can you describe that?

A.    Yes, sir.  Effectively, the methamphetamine abuse doesn't just represent a weight on the bridge, but it's a corrosive effect on the concrete itself.  It's changing the way that somebody looks at themselves, the way they look at other people, their emotional reactions.  Methamphetamine abuse promotes extreme mood lability in terms of fluctuations in mood and explosive irritability.

And later when she's involved with Terry DeGeus, she describes their mutual methamphetamine abuse as contributing to the conflicts they have there.  It contributes to the person becoming extremely suspicious, and with sufficient abuse, you may even see what's called a methamphetamine-induced psychosis which she does not report but gives you some sense of the

3878

continuum that may occur in response to methamphetamine abuse.

Angie described to me that she was in jail for two or three years before the lights began to come on about how destructive meth had been in her life.  When she was out in the world, she told herself that she wasn't dependent, that she could use it or not, that it had some helpful effect to her, kept her energized, let her work, those kind of things, and that she was -- it wasn't until she had been off of it and had had time to reflect for several years that she came to realize how fundamentally this had been distorting her priorities and her sense of herself and other people.

Q.    And what happened in her relationship with Terry DeGeus other than the methamphetamine consumption and abuse that she

Page 88

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 77 of 110

CUN000887

had participated in?

A.   In that relationship she was savagely battered.

Q.   Physically abused, and they've heard about that from various witnesses, so I'm not going to go through that with you in a good deal of detail.   But that obviously would be something that would impact somebody quite significantly as well as after the battering relationship came to an end, there was this additional pursuit aspect of it; is that right?

A.   Yes, sir, that's correct, that she ends up being stalked by Terry.   It's not surprising that somebody from this kind of background would be involved in a profoundly dysfunctional romantic relationship.   That's why all of this matters, because

3879

that ends up affecting the way you perceive yourself and the relationships around you.   And so women from this kind of background are far more likely to end up being stuck in a cycle with somebody who is -- who's abusive of them.

Q.   And now at this point Mr. DeGeus in her life is out of -- at this point in time on your display, he's now in a stalking role, if you will.

A.   Yes, sir.

Q.   And who comes into play then?

A.   Then Dustin Honken.

Q.   And the father of her second child?

A.   That's correct, who again is an emotional support of sorts, but that relationship is its own additional weight on this bridge.

Q.   And what happens?

A.   Ultimately her life comes apart.

Q.   Now, Dr. Cunningham, let's turn your attention now to the

Page 89

CUN000888

second area of your testimony.

A.   Yes, sir, if I could step up to change files.

Q.   Oh, okay.  Please.  Are you set up now?

A.   Yes.  Thank you.

Q.   One of the areas that you've taken an interest in in addition to the direct psychological aspects of persons in these types of situations, these very serious sentencing proceedings --

3880

A.   And I would like to clarify.  Much of this is more developmental as an explanation of their trajectory rather than necessarily a psychological biopsy in the present.

Q.   Right.  It's sort of a life study.

A.   Yes, sir.

Q.   And one of the things you've taken an interest in in addition to doing that aspect is in the areas -- in the area of what's called a violence risk assessment?

A.   Yes, sir, that's correct.

Q.   And can you tell the jury what a violence risk assessment is?

A.   Yes, sir.  That's simply a scientifically informed way of going about looking at the likelihood that somebody will be violent in the future.  Sometimes those risk assessments are done for risk of violence in the community.  And in a sentencing proceedings like the capital sentencing proceedings, it's looking at risk of violence in prison.

And I'm a student of that research and that methodology about violence risk assessments and have actively done research in this area particularly looking at factors that are associated with risk of violence in prison.

Page 90

Q. And, in fact, are these things that the government itself studies?

A. Oh, yes, sir, regularly. In fact, one of the publications that I'll be referring to next is a paper that's published by

3881

two government researchers, one Miles Harer who was with the Bureau of Prisons and is now with the National Corrections Commission and another who's a senior researcher at the Bureau of Prisons. So yes, sir, there's active research that's being done both government sponsored and by government personnel.

Q. And have you done some writings in this area as well?

A. Yes, I have. A number of my peer-reviewed publications have been in this area of violence risk assessment, both reviewing the research that's been done up to now as well as performing studies on large groups of inmates.

Q. In this case did you do an assessment of how it is that you believe Angela Johnson will handle herself in the context of a federal life prison sentence?

A. Yes, sir, I have.

Q. And do you have some slides that are going to help you illustrate the points that you'd like to have the jury understand from your testimony?

A. Yes, sir, I do. I think there are a number of factors that point to her being likely to have a positive adjustment in the federal Bureau of Prisons.

Q. And can you tell the jury what those are?

A. Yes, sir. That -- those include her being female; her age; that she's earned a GED; that she has a history, a longstanding history, of employment in the community; her behavior in jail over a lengthy period of time pretrial; the appraisal of the

Page 91

CUN000890

jail correctional staff, in other words, the degree of risk that the correctional professionals who are interacting with her every day, what level of security they have brought to bear on her, what practical steps they've taken as they would evaluate her; and her continued contact and relationship with family.

Q.   And what is your conclusion regarding the likelihood that Angela will make a positive adjustment if she's sentenced to serve a life sentence in prison?

A.   I think that she is likely to make a positive adjustment to the Bureau of Prisons, and by -- I would define positive adjustment in that there is a low likelihood that she would exhibit serious violence.

Q.   What did you look at to reach that conclusion?

A.   All of these factors that I have listed here.

Q.   Okay.  And the first one is the fact that she's a woman.

A.   Yes, sir.

Q.   And do you want to talk about that?

A.   Yes, sir.

Q.   What can you tell the jury about the fact that she's a woman and why that leads to your conclusion that she's likely to make a positive adjustment while in prison?

A.   As I said, risk assessment is a scientifically informed process, so as we look at factors, we want to identify what research is there that helps support that.

There is an extremely large study that was published

several years ago by Miles Harer and Dr. Langan that -- who are the government-related researchers of extraordinary size.  This

Case 3:09-cv-03064-MWB-LTS   Document 284-26   Filed 06/23/11   Page 81 of 110

CUN000891

is a study of almost 25,000 female inmates in the Bureau of Prisons and compares them with 177,000 male inmates in the Bureau of Prisons and looks at their rates of violence across a period of time from 1991 to 1998.

And here's what they found: There is no record of a female committing a homicide while in federal custody. As these researchers looked at data within the Bureau of Prisons, as they talked to people who had spent their careers there, as they looked in their archives, they could identify no instance where a female inmate had ever killed anybody, whether inmate or staff, in the Bureau of Prisons, never happened.

The second thing that they found is that it's extremely rare for women to commit serious assaults in the Bureau of Prisons, that that's an extremely rare event. In fact, women are involved in serious assaults only 1/12 the rate that men are in the Bureau of Prisons. In other words, if you're male, you are 12 times more likely to commit an act of serious violence in the Bureau of Prisons than if you're female. They have 8 percent of the rate.

Women use a sharp or pointed weapon at a third the rate of men. In other words, of all the women that were violent during this period of time, less than 2 percent of them used a sharp or pointed weapon as compared to 5 percent of the men who

3884

were violent.

The bottom line of this study was, in sum, women commit violence -- this is in the Bureau of Prisons -- at substantially lower rates than men, and the nature of the violence women commit is less serious.

So first they're not involved as often. And then when

Case 3:09-cv-03064-MWB-LTS    Document 284-26    Filed 06/23/11    Page 82 of 110

CUN000892

they are, it's much more likely just to be a fight and not to be an assault that results in serious injury.

Q. What we might refer to as a cat fight?

A. Yes, sir.

Q. Between two women?

A. Yes, sir.

Q. Pulling hair, screaming, yelling, slapping, pushing?

A. Yes, sir.

Q. Maybe even punching?

A. Yes, sir.

Q. What was another factor that leads you to your conclusion that Angela Johnson is likely to make a good adjustment to a life term?

A. The next factor is age. Angie is now 41 years old.

Q. Why does age matter?

A. Age is -- I suppose after being female, age is one of the most powerful factors in identifying who's going to get in disciplinary problems in prison and who's going to be violent in prison. And I'll show you a couple of studies that illustrate

3885

this.

Q. Yeah. Are there some?

A. Yes, sir. Now, the next two slides that I'll show are based on male data, but one of the findings of this very large study that I just described, the 25,000 female inmates and 177,000 male inmates in the Bureau of Prisons, is that the same risk factors apply to men and women in terms of risk of violence in prison. It's just what they're predicting in women is happening much less often and is much less serious, but the same kind of factors apply.

Page 94

This is a graph that shows disciplinary write-ups of any sort. This is in the New York prison system. This is the age of the inmate, and this is the frequency of those disciplinary write-ups. Could be for anything.

And what they found is that the rate of those write-ups peaks here at age 20 and then falls steadily across the life span until when you're out here where Angie is at age 41, you're down at about 40 percent of the level of the youngsters that are there.

Same kind of results from a study of state prisons nationwide. Again, this is the annual rate of disciplinary violations, and this is how old the inmates are, 17 or less, 18 to 24, 25 to 34. And your rate is peaking right in this zone, 35 to 44. Here's where Angie is right here, and you can see that that rate, the inmates at this age are getting disciplinary

3886

write-ups in prison at about 1/6 the rate or 1/5 the rate of these inmates that are in their early to mid-20s.

Q.  So the older inmates are less likely to have any type of rule infractions?

A.  Yes, sir, and less likely to be involved in violence as well.

Q.  And that's supported by the data and the research that you have reviewed and accumulated in your role not only in connection with this case but in your work in many, many cases over the years?

A.  Yes, sir, that's correct.

Q.  And what does -- the role of her having obtained a GED while she was in the Linn County Jail, where does that play into your analysis here?

Page 95

A.   One of the findings of this study that I just described out of the BOP with the 25,000 female inmates, one of their findings was that having a GED was associated with a better adjustment to prison, with being less likely to be involved in violence.  This is similar to some results that we have out of our own research looking in Missouri and also in Florida, that education -- the more education someone has, the less likely they are to be involved in prison violence.

Q.   So there's a correlation between educational level and violent activity by an inmate in a correctional institution.  Is that your testimony?

3887

A.   Yes, sir, that's correct.

Q.   Somebody who's obtained a GED or high school diploma or done better have lower rates of violence than those who haven't gotten that educational background?

A.   Yes, sir, that's correct.

Q.   Does it say anything that Angela Johnson obtained her GED while she was in the Linn County Jail?

A.   What that speaks to is the potential for her to use incarceration in a positive way.  The study that I described, it doesn't -- it isn't focused on when the person got their GED, but in terms of a risk assessment model, if somebody is working when they're incarcerated, which she has really not had the opportunity to do, or is pursuing education, which she did have the opportunity to do, it points to their making constructive use of their confinement.

Q.   Dr. Cunningham, was there another factor that you looked at, the employment in the community, as a factor that relates to violence risk assessment in prison?

Page 96

CUN000895

A.   Yes, sir, it is.  And quite --

Q.   Can you explain, first of all, to me how somebody's previous employment when they're out of prison can say anything about violence risk while they're in prison?

A.   Well, it speaks to a number of things.  First, if somebody has a history of being industrious in the community and that's how they occupy themselves is that they're industrious, they

3888

work hard, then when they come into confinement, you're more likely to see that in them, that they also work in prison.  And, in fact, most people in prison have jobs they go to almost every day.  They either work in the maintenance of the prison itself or there are prison industries there that they work in.

So when somebody has a history of having done that already when they get to prison, they're less likely to simply be trying to occupy themselves with one scam or another and instead are likely to continue that pattern.

It also demonstrates an ability to respond to authority, to exhibit self-discipline, to kind of keep your eye on the ball and be focused on longer-term, you know, goals or issues.  Those also translate into a prison setting.

Q.   And was there another factor which was the past pattern of behavior while in jail?

A.   Yes, sir.

Q.   And, of course, you know because you reviewed jail records related to her; is that correct?

A.   Yes, sir, I have.

Q.   And you know she's been in jail for almost five years now.

A.   Yes, sir.

Q.   July 29 of 2000 till now she's been in custody in various

Page 97

county jails.

A.    Yes, sir.

Q.    And you've just put up a graphic display which kind of

3889

summarizes -- summarizes her journey, if you will, across the state of Iowa from one county jail to another; is that right?

A.    Yes, sir, that's correct.

Q.    And Eldora County Jail is actually in Eldora, Iowa, but it's the Hardin County Jail.  Are you aware of that?

A.    I recall that the -- that Hardin is what my records say.

Q.    Okay.  In any event, you've made some observations about her past behaviors in jail as determined from the jail records and the materials that you've reviewed; is that correct?

A.    Yes, sir and also descriptions of how she was confined, some of which I observed, you know, in part when I came into the -- at least the local jail and others that she gave me a description of.

Q.    And what does her pattern of behavior in jail indicate to you as somebody who reviews jail records and things of this nature on a routine and recurring basis for cases all across this country?

A.    First, she has been involved in a high number of disciplinary incidents.  Almost all of those are minor in nature and are ones that are very -- that represent pretty typical inmate behavior and inmate interactions.

And I found the conclusion of one of the government's experts, Dr. Joel Dvoskin, because I reviewed his report, that was his observation as well, that while she has a lot of write-ups, they're behaviors that are pretty typically seen in

3890

Page 98

inmates and don't really cause a lot of concern.

What's most important is that there are no acts of serious violence. There are a couple of fights, but there are no serious assaults that take place. And that's what we are most focused on, not if tempers flare up or there is some sort of mutual confrontation that happens on occasion but is there a pattern of predatory assaults, are there physical assaults of staff members, those kind of things?

It's also important as you put that in some perspective, I think there are about 60 write-ups that she has in the Linn County Jail. As I understand it, about half of those are associated with a particular corrections officer that there seems to have been a conflict with. And again, those are largely minor in nature.

Jail is a very hard place to do time. Jails are not equipped for long-term confinement. You know, in a prison there are activities that you have the inmates in all day long. You have them programmed, that they're going to jobs and education and groups and one thing or another, and they're set up to house people for years at a time.

A jail is not. Most jails don't have anything except the people just kind of warehoused there together idle, and that's a setting that raises the likelihood of misconduct because everybody's there in that same mix, particularly if you're an inmate or jail detainee like Angie who's kind of high

3891

profile and may then get some extra attention from other inmates or staff.

Page 99

CUN000898

Q.   And I think in any of the records you've reviewed that you've referred to serious assault, can you give the jury your definition of serious assault?

A.   Yes, sir, that would be an assault with a weapon.  That would be going after a staff member where you begin to beat them down.  That would be jumping on and injuring another inmate unprovoked.  Those are the sorts of things that would rise -- where there's a use of a serious weapon or where some sort of significant injury occurs or where there is a -- an attack of some magnitude of the staff member.

Q.   All right.  Are you aware of anything in any of these records anywhere that says that Angela Johnson attacked any jailers?

A.   No, sir.

Q.   Are you aware of any comments that she made to any jailers or persons employed at the jails that the jailers subsequently took as threatening or that were obviously by what was said threatening in nature?

A.   Yes, sir.  There are many write-ups that she gets for being insolent or disrespectful or profane.  Angie shoots off her mouth, and there are -- there is an instance where an officer had -- as I recall had threatened to take away a visit with her children and she said something about you're dead or I know

3892

where you live or I'm going to get you or some things along -- a threat along those lines.

Q.   Anything she's ever carried out, any of those threats to any of those people that she's accused of threatening at these institutions?

A.   No, sir, no follow-up on that.  And additionally, what's

Page 100

important is that you don't see the institutions then proceeding to lock her down. When correctional institutions perceive that somebody is a imminent threat to other inmates or staff, they simply lock them in a cell by themselves, and they leave them there 23 hours a day and they come out an hour a day to exercise. And any time you let them out into the hall, they're handcuffed behind their back before you pop the door and you pass their meals to them for them to eat by themselves. That's a typical high-security setting that's employed whenever you've got an inmate who's outside the pale that you're going to -- and that you're particularly concerned about their violence potential.

Q. Now, are you aware of any treatment by correctional staff that would impact on your analysis of her past behavior and her likely future behavior?

A. Yes, sir.

Q. And what's that?

A. Well, as we look at each of these jail settings, even in knowledge of the charges that she has and eventually with

3893

knowledge of her accumulated disciplinary history, here's what happens: That she is double celled initially in Benton County and comes out and exercises with a cellie or the cellmate. Then she's single celled but has access with three other inmates. For two weeks she is simply single celled. That's what I'm talking about, not moved at all in Waterloo.

Then in Linn County at various times she's in an open bay dorm which means bunk beds and a common area until all the federal inmates were moved to single cells, not from her conduct but by a change in policy. Then she's single celled. But she's

Page 101

locked out of her cell from 7 in the morning until 10:30 at night with 4 other inmates that share a common area so you can't even get back by yourself during that time. And the write-ups are happening in this context.

Hardin or Eldora, she's single celled but shares a common dayroom room at will, can go in and out from 5:30 in the morning till 11 at night. Woodbury she's in an open bay with 20 inmates and then requests a single cell so that she can have a little bit more privacy.

Effectively what we see here is that as the correctional staff evaluates her day to day in terms of the housing assignments that they make, that she's been housed with routine access to other inmates and routine contact with staff. She was placed in an open bay dorm at the Woodbury County Jail.

When I went in to evaluate her, she was brought out to

3894

see me without restraints, without handcuffs, just walking along next to a staff member, put her in the room with me. They left. After a while a long line of inmates came through the room that we were in which is kind of a passageway on to the hall, and she spoke to them, and staff members were standing there. We took breaks, and they walked her up and down the hall. Nobody was reacting to Angie as if she was about to jump on somebody.

And as I am in jails and in prison facilities routinely, the degree of concern that's expressed only is reflected in how the inmate's restrained, and you simply don't see that in terms of the appraisals that are being made of her.

Q.  Are you aware of a situation where she was allowed to participate in a study with four civilians at the Linn County Jail who were writing some type of a teaching paper for teaching

Page 102

certification?

A.   Yes, sir, I'm aware of that.

Q.   Left in a conference room.  Would that be the type of thing you'd be talking about here?

A.   Yes, sir, it's not unlike my own interview with her except this involved some other civilians that are doing interviews for a school or university purpose.  That I think happened at Linn County which is also then the site of all these disciplinary records, that that's happening in the same context.

MR. STOWERS:  Your Honor, I'm almost done.

THE COURT:  We're going to go till you finish.

3895

MR. STOWERS:  That's fine.

BY MR. STOWERS:

Q.   Dr. Cunningham, what are the alternatives for how inmates are housed that relate to your analysis of this issue of future risk of violence?

A.   As I described, this is how she has been housed and treated, and I gave a brief summary of these very common features that are part -- that are brought to bear when there is concern with imminent violence by an inmate.

Q.   And what do these indicate just very briefly?

A.   Well, that these are not the sorts of things that are being done with Angie day in and day out despite knowledge of the charges and despite whatever disciplinary history that she has in the institutions.  These procedures are not being brought to bear, though they are routinely employed and routinely available if needed.

Q.   And you're talking about her being placed in a single cell, being locked in her cell for 23 out of 24 hours a day?

Page 103

A.    Yes, sir, exercising by herself for that hour out, meals in the cell, back up to the door and get handcuffed before they open it, exercise by yourself or with small groups, frequent searches of the inmate as well as their cell area.

Q.    Now, what does continuing relationships that she may have with family and friends have to do with your assessment of future risk of violence if she's sentenced to life?

3896

A.    Inmates who have continuing contact with family, in other words, if they have ongoing relationships, those inmates do better in prison partly because they have some anchor to community values and may be concerned with how they're perceived by their children or loved ones.  And partly they have an incentive to behave because they want to keep their visitation, and one of the things that will be taken away from them is that visitation contact for misconduct.

        And so in Angie's case, there are a number of family members who she continues to be involved with, most importantly, her daughters, for whom maintaining access to that visitation contact is very important, and so you've got some incentives that are there as well as some reasons to stay anchored to community values.

Q.    And have you come to learn that Angela Johnson, since her time in custody from the summer of 2000 till now, has actually developed closer family ties?

A.    Yes, sir.  Along with the growth in her perspective during this time, it appears that much of the bitterness and estrangement that she had with family members has subsided and the relationships with them have grown.

Q.    Are there any kind of studies that you look to that relate

Page 104

to the nature of the offense that the person stands convicted of as whether or not that has any bearing on conduct subsequently in prison by persons convicted of such offenses?

3897

A.    Yes, sir, there is research that looks at that.

Q.    And do you have some of that that you'd like to share with the jury to explain your testimony in that regard?

A.    Yes, sir.  These are -- this is data that's based on an analysis that I did with a colleague, John Sorensen, where the Florida Department of Corrections provided us with the disciplinary data for 51,000 inmates who were in the Florida Department of Corrections for the entire year of 2003.

And we're doing a number of different analyses of this data, but this one looks at the offense that sent the person to prison, disciplinary violations of any sort, potentially violent things like weapons possession or threats or those kind of thing, assaults, assaults with injuries, and assaults with serious injuries.  Serious injuries are typically considered things like a cut that requires stitches, a broken bone, a concussion, admission to the hospital.

And what we're looking at here, we're going to compare 5,000 murderers with 11,000 inmates that are there for property crimes, and we're going to compare them also to the whole prison population, 51,000 inmates.

Q.    And what does the -- what does this study by the Florida Department of Corrections show about the relative potential violenceness -- violentness, if that's even a word, of first-degree murderers versus property offenders versus all inmates as a whole?

3898

Page 105

CUN000904

A.  I would direct your attention in answering that question to these numbers that are in the parentheses here under each group. Your first-degree murderers are much less likely to have disciplinary write-ups or to be involved in potentially violent conduct than these other groups.  See 35 percent, 48 percent, 44 percent.  That's the number percentage of inmates involved in that in any given year.

So, for example, in 2003, 35 percent of the first-degree murderers got a disciplinary write-up for something as compared to 48 percent of the property offenders and 44 percent of all inmates.  And they also did better -- potentially violent infractions, you can see how much less frequent those are, 8.8 percent versus 11 percent for the property offenders versus 10 1/2 percent for all inmates.

When we start looking at from here over, of all assaultive misconduct, actual violence, not just write-ups or threats but actual violence, there's no difference in these groups.  The first-degree murderers who are here, their percentages are no different statistically than the other inmates who are in prison.  They're not involved in violent misconduct any more often than anybody else is.

The other thing that you see here is as the severity of violence increases, its frequency dramatically decreases. So, for example, in 2003, in each of these groups, between 2 1/2 and 3 percent of the inmates were involved in an assault, but

3899

only 1/5 of a percent or, in other words, about 1/13 that rate were involved in an assault with serious injury.  And that's one of the other findings that comes out of prison research is that

CUN000905

as the severity of the offense increases, its likelihood dramatically decreases.

Q. So it's a -- I think there's a word for that. What's the phrase that is used?

A. Well, they're inversely correlated.

Q. So that it's sort of counterintuitive I guess to what people might think, that the murderer would be the most dangerous type of an inmate in a prison, but you're telling us that the research shows actually the opposite; is that correct?

A. Yes, sir. And there's some -- and there's a pretty good understanding of why that's the case. And it has to do with how long a sentence the inmate is going to have to serve.

Inmates that are facing very long prison terms take a different approach to doing time. This is where they're going to be from now on or for decades at a time, and that makes it particularly important to them to go along with the program so that they can maintain their job, so that, you know, when you're eating institutional food for the next 30 years, your ability to purchase a package of potato chips from the commissary gets pretty important; to come out of your cell to go to a job as opposed to spending decades in a walk-in closet, that those things are more important for the inmates that are going to be

3900

there for a very long time.

These short-term offenders, they can kind of do this time standing on their head, and that's what seems to account for what we have here in the approaches to disciplinary infractions.

There are some other studies. Our Missouri data showed, for example, that the inmates serving life without

Page 107

CUN000906

parole were about half as likely to be involved in violent offenses in prison as the parole-eligible inmates that they were side by side with.

Q. So as you have chosen to use this Florida study, there are other studies that show the same darn thing as what the Florida study of this 51,000 inmates showed.

A. Yes, sir. In fact, some like our Missouri data that showed the life without parole do better, this is more conservative in showing that really sentence made no difference.

Q. So let's talk about Angela's -- Angela Johnson's prospects and how things are going to look for her in your estimation should she be sentenced to a life term in prison.

A. Yes, sir. If I were to use our same bridge model, here's how I would depict that.

Q. And can you explain what you're depicting there?

A. Yes, sir. I'm again using the bridge, and Angie still has lots of issues. There are still many weights on the bridge, although their magnitude seems to be shrinking in terms of her,

3901

you know, steady increase in perspective and sobriety and kind of making amends with family and that kind of thing. But most importantly, the quality of supports that are holding up this bridge have increased dramatically.

Q. Can you explain those?

A. Yes, sir, that there is the structure and staff of prison. That represents a very significant support and simplification of life that holds individuals in check even who weren't controlling themselves well in the community. That's why as we looked at those rates of violence in the Florida prisons, that the rates of serious violence were so low, because prison was

Page 108

CUN000907

working. It has a significant stabilizing effect.

In her case now she is regularly taking medication which addresses her emotional issues and without all the burden that the methamphetamines did in that regard. And there are work opportunities which is what she's availed herself of before, and her parenting investment continues to be important to her.

And so while her issues are there, there's no longer the methamphetamine dependence, and we've dramatically bolstered the supports that are holding the system up.

Q. And so how would you characterize the prospects for Angela Johnson on a going-forward basis should she be sentenced to life in prison?

A. I think there is a good expectation of a positive

3902

adjustment to prison, of an adjustment without serious violence. I think that serious violence is at a low likelihood.

MR. STOWERS: That's all I have.

THE WITNESS: Thank you, sir.

THE COURT: Members of the jury, we're going to take a noon recess. It won't be quite as long as usual. We'll be back at one o'clock, so you've got about 47 1/2 minutes. Enjoy it.

Remember my cautionary instruction about not discussing this case among yourselves or with anybody else. And most importantly, keep an open mind until all the evidence is in and you have a chance to go back and deliberate. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

Page 109

THURSDAY, 6-9-05

DR. MARK CUNNINGHAM (cont.) → from PAD

6PP

Drug Abuse as a Support System
discussed.
Talks about Angie's report — marijuana,
alcohol & LSD.
|
12-13

12

smoked daily
14-18

Employment Support

Has worked her whole Life.

School Drop-Out in 9th grade — another factor.

Then married Steve Hargo at age 14.
(by now, Jim the dad is really no longer
in her life & she no longer pretends
to fantasy / love him.).

Marital Failure w/ A.J.

Methamphetamine Abuse — Wd. use it the rest of
her life if she could.

CUN000909

Methamphetamine not just a weight on the bridge; it has a corrossive effect on the span.

It took her 2-3 in jail b/4 she realized how fundamentally this cocaine had fucked up her life. So far.

Not surprizing that with this background, She would end up with a guy in a stalking relationship.

Dustin Hawkes both a support + a wt on her bridge.

Bridge collapses.

RISK ASSESSMENT begins

Describes his expertise in this particular area.

Positive adjustment in prison — goes thru the factors.

Conclusion

Case 3:09-cv-03064-MWB-LTS   Document 334-26   Filed 06/23/11   Page 100 of 110

CON000910

PREPARED BY

DATE

positive adjustment in fed. prison.

Factor #1 → Being a Woman!

Factor #2 → Age ← she's 41 years old

FACTOR #3 → If have a GED, then if you're less likely to be involved in violence in prison.

AT her potential & view her prison experience in a constructive way.

FACTOR #4 → Employment in the community. If worked in the community, then likely to cont. to work in prison. That keeps you out of trouble.

FACTOR #5 → Past Behavior in JAIL.

Almost all of her disiplinary reports are minor, typical for inmates of her age. but No acts of serious acts of violence.

Case 3:09-cv-03064-MWB-LTS   Document 284-26   Filed 06/23/11   Page 101 of 110

CUN000911

½ of write-ups

Jail why Harsh place to do time. —
Not set up to keep people for a long
period of time.

High profile inmate wd. be likely to subject to
attn. by other inmates.

      — attack on Staff member
      — injury to any person

insolence, ~~slander~~, or profane
Angie shoots off her mouth

When ~~arrest~~ these things happen — threats —
jail does <u>not</u> respond to it.
If they were concerned — really
concerned — they would do something
about it.

He goes thru chart of her jail
history — Not Bad

Case 3:09-cv-03064-MWB-LTS   Document 234-26   Filed 06/23/11   Page 102 of 110

CON000912

Describes his own visit w/ Angie —

Nobody wanted to Angie like she was
going to spung on anyone.

Dean brings up teachers visiting — good.

She's not subjected to the high security
measures they could ~~bring by~~
put on her (if she was really
dangerous).

FACTOR # → Continuing Relationship
~~Continues~~ w/ Family & Friends.

Evid is Relationships w/ Her Family Has
grown.

RESEARCH on MISCONDUCT by Offense
of Conviction.

Has slide on m. Florida Dept. of Corrections
— First Degree M. are ~~has~~ best
— have lowest rates. — or at least
equal to other

CON000913

Note: No. 421 doesn't even look at the statistical chart that Cunningham has up on prison violence. Has head between his legs.

Closing = GET THIS STUDY. STUFF.

Uses his "good bridge" slide with the supports of stuff + "structure" in prison. "Parenting" "Medications" + "Work" also support.
Bridge says "Federal Prison".

Good expectation of a positive adjustment
Serious Violence

12:13pm Lunch Break.

CUN000914

# RISK FACTORS FOR ANGELA JOHNSON

Untreated maternal emotional instability caused by isolation,
sexual and physical abuse in her childhood
Physical violence between parents
Divorce
Withdrawal from father's love and affection by mother
Abrupt and sporadic isolation from father
Emotional distancing by mother
Emotional instability in grandmother and grandfather
Radical religious beliefs held by mother, aunt, grandmother,
grandfather and family friends
Hunger/malnutrition from repeated fasting
Fear of being possessed by the devil
Repeated exorcisms with struggling until exhaustion
Pregnancy out of wedlock by mother
Sexual abuse by Ted Dillow
Emotional and physical abandonment at Dillow farm by mother
Continuous financial instability
Repeated loss of home and stability through frequent and abrupt
moving from age 4 through age 14
Lack of structure from inconsistent parenting
Poverty of environment
Fear of environment
Potential for undiagnosed/untreated learning disability
Physical abuse by mother
Inability to bond with father and stepmother
Early drug use
Withdrawal from education at age 14
Early marriage at age 16
Anxiety and Depression in Angela
Angela's methamphetamine addiction since age 24

CON000915

TO: DR. MARK CUNNINGHAM
FROM: PAT BERRIGAN

FAX# 972-459-0958

Dear Dr. Cunningham:

NOT SURE I ever gave you a copy of the government's aggravating circumstances in Angela Johnson's case. A summary of the future dangerousness evidence is on pp. 2-3.

Looking forward to talking to you on Friday at 3:30 pm.
— Thanks Mark.
Sincerely,

PAT BERRIGAN
cell 816-590-3003

CUN000916

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Case No. 01-3046 MWB |
| v. | ) ) | |
| ANGELA JOHNSON, | ) ) ) | |
| Defendant. | ) ) | |

## SECOND NOTICE OF INTENT TO SEEK THE DEATH PENALTY UNDER TITLE 21 UNITED STATES CODE, SECTION 848

COMES NOW the United States of America, pursuant to 21 U.S.C. §§ 848(h)(1) (A) and (B), by and through its undersigned counsel, and notifies the Court and the defendant in the above-captioned case that in the event of the defendant's conviction of one or more of the intentional killings of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and/or Terry DeGeus, as charged in Counts 1 through 10 of the Superceding Indictment, the government will seek the sentence of death.

The government will seek to prove the following aggravating factors as the basis for imposition of the death penalty.

### COUNTS 1 & 6 - INTENTIONAL KILLING OF GREGORY NICHOLSON

A.     **Alternative Statutory Aggravating Factors Enumerated under 21 U.S.C. §§ 848(n)(1)(A) through (D)**

1. <u>Intentional Killing</u>. The defendant intentionally killed the victim. § 848(n)(1)(A).

2. <u>Intentional Infliction of Serious Bodily Injury</u>. The defendant intentionally inflicted serious bodily injury which resulted in the death of the victim. § 848(n)(1)(B).

CUN000917

3. <u>Intentional Acts to Take Life or Use Lethal Force</u>. The defendant intentionally engaged in conduct intending that the victim be killed and that lethal force be employed against the victim, which resulted in the death of the victim. § 848(n)(1)(C).

## B. Statutory Aggravating Factors Enumerated under 21 U.S.C. §§ 848(n)(2) through (12)

1. <u>Substantial Planning and Premeditation</u>. The defendant committed the offense after substantial planning and premeditation. § 848(n)(8).

2. <u>Heinous, Cruel, or Depraved</u>. The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim. § 848(n)(12).

## C. Other Non-Statutory, Aggravating Factors Identified under 21 U.S.C. §§ 848(h)(1)(B) and 848(k)

1. <u>Future Dangerousness of the Defendant</u>. The defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. <u>Simmons v. South Carolina</u>, 114 S.Ct. 2187, 2193 (1994). In addition to committing the murders charged in the Indictment, the defendant also participated in the following acts of violence, including but not limited to one or more of the following: During the investigation of Dustin Honken, the defendant assisted in locating witnesses. On at least one occasion, the defendant made threatening gestures at a potential witness. While incarcerated, the defendant made specific threats of violence directed toward an employee of the Benton County Jail and took steps to identify the employee and her vehicle. During the sentencing hearing of Dustin Honken in February 1998, the defendant made threatening statements about retaliating against the participants in the hearing, including prosecutors and agents, and

2

CONO00918

indicated she had photographed those individuals for that purpose. The defendant engaged in a continuing pattern of violence, including but not limited one or more of the following: In November 1993, the defendant lured Terry DeGeus to meet with Honken and assisted in the murder of Terry DeGeus. Regarding the later investigation of a methamphetamine laboratory operated by Dustin Honken in Mason City, the defendant assisted in locating cooperating individual Daniel Cobeen. After Dustin Honken was placed in Woodbury County Jail, the defendant attempted to bond out an individual Honken had approached to kill Timothy Cutkomp and Cobeen. Between March 24, 1998 and October 6, 1998, the defendant had contact with an undercover narcotics agent and an informant regarding the collection of money owed to Johnson for a drug debt from the distribution of methamphetamine. Johnson requested a price quote for the agent and CI to "put a hurt on someone" or words to that effect and Johnson expressed a desire to work as a "hit woman." While incarcerated in the Benton County Jail, the defendant discussed escape and harming a jail employee who was involved in disciplining the defendant. Throughout the course of this matter, the defendant has yet to demonstrate remorse for commission of the murders.

2. <u>Victim Impact Evidence</u>. The defendant caused injury, harm, and loss to the victim's family because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family. <u>Payne v. Tennessee</u>, 111 S.Ct. 2597, 2608-09 (1991). The victim's characteristics as an individual included one or more of the following: At the time of his death, Gregory Nicholson was a father of two children. The victim's father was still living and the victim

3

CON00009 19

maintained a close relationship with his father and assisted his father around the house. The victim maintained a close relationship with his children until the time of his death.

The family of the victim has suffered injury, harm, and loss, as a result of the victim's death, including but not limited to one or more of the following: Gregory Nicholson's children were raised without any monetary or emotional support from their father. The fact that his remains were buried and not recovered, delayed any payment of insurance proceeds to the beneficiaries. Nicholson's family also suffered extreme emotional distress from the absence of Nicholson's remains and the unknown nature of his disappearance.

3.    <u>Obstruction of Justice</u>. The defendant committed the offense with the intent to prevent the victim from or retaliate against the victim for providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the commission or possible commission of another offense. <u>See</u> 18 U.S.C. §§ 1121(a)(2), 1510, 1512(a)(1), 1513(a)(1); USSG § 3C1.1.

4.    <u>Multiple Killings or Attempted Killings in a Single Episode.</u> The defendant intentionally killed or attempted to kill more than one person. <u>See</u> 18 U.S.C. § 3592(c)(16).

## COUNTS 2 & 7 - INTENTIONAL KILLING OF LORI DUNCAN

**A.    Alternative Statutory Aggravating Factors Enumerated under 21 U.S.C. §§ 848(n)(1)(A) through (D)**

1. <u>Intentional Killing</u>. The defendant intentionally killed the victim. § 848(n)(1)(A).

4

CUN000920