# Michael J. Saks

Arizona State University College of Law
Box 877906
Tempe, AZ 85287-7906
480-727-7193 (office) / 480-330-9688 (mobile)
saks@asu.edu

## Education

| | | | |
|---|---|---|---|
| BA | Academic curriculum | 1965 | Philadelphia Central High School |
| BA | English | 1969 | Pennsylvania State University |
| BS | Psychology | 1969 | Pennsylvania State University |
| MA | Social Psychology | 1972 | Ohio State University |
| PhD | Social Psychology | 1975 | Ohio State University |
| MSL | Law | 1983 | Yale Law School |

## Professional Employment History

Arizona State University: Regents Professor (2009-present), Alan A. Matheson Professor of Law (2008-2009), Professor of Law (2000-2008), Professor of Psychology (2000-present), Faculty Fellow of the Center for Law, Science & Innovation (2000-present), Visiting Professor of Law (Spring, 1998)

University of Iowa: Edward F. Howrey Professor of Law (1998-2000), Professor of Law (1988-1998), Visiting Professor (1986-88), Professor of Psychology (1992-2000)

Ohio State University: Drinko-Baker & Hostetler Visiting Prof of Law (Spring, 1991)

Georgetown University Law Center: Visiting Interdisciplinary Professor (1985-1986)

University of Virginia Law School: Visiting Professor (Summer LL.M. Program for Appellate Judges 1981, 1983, 1985, 1987, 1989)

National Center for State Courts: Senior Staff Associate (1978-1980)

American University School of Justice: Adjunct Professor (1980)

Boston College: Department of Psychology, Assistant Professor (1973-1979), Associate Professor (1979-1988); School of Law, Adjunct Professor (1974-78, 1985)

## Honors, Awards, Etc.

University Fellow, Ohio State University (1969-1973)

Dissertation Award, 2d Prize, Society for the Psychological Study of Social Issues (1975)

Alumnus of the Year (1984) Ogontz Campus Alumni Society, Pennsylvania State University

Fellow of the American Psychological Association

Fellow of the American Psychology-Law Society

Fellow of the Society for the Psychological Study of Social Issues

Award for Distinguished Contributions to Psychology in the Public Interest, American Psychological Association (1987)

President, American Psychology-Law Society (1988-89)

Listed in Who's Who in the World, Who's Who in America, etc.

University of Iowa Faculty Scholar (1990-1993)

Chair, Section on Law and Social Science, AALS (1997)

## Professional Association Activities

Member, National Conference of Lawyers & Scientists (AALS & ABA)

Law School Admissions Council
    Test Development and Research Committee
    Grants Subcommittee (Chair)

American Psychological Association (1975-Present)
    Task Force on Psychology and Public Policy, Member (1980-84)
Task Force on Ethics [Education in APA Approved Graduate Programs], Committee on the Protection of
    Human Participants in Research (1984-87)

American Psychology-Law Society (Division 41 of APA)
    Secretary (1979-1984)
    Member of Executive Committee (1982-1990)
    President (1988-89)
    Co-chair, Pro Bono Amicus Project (1989-1994)

Society for the Psychological Study of Social Issues
    Member of Council (Directors)
    Founding Chair of Courtwatch Committee (1978-1984)

Association of American Law Schools, President, Section on Law and Social Science (1997)
Law & Society Association (Harry Kalven Prize Committee, 1990-91)
Evaluation Research Society
Policy Studies Organization
Society for the Advancement of Social Psychology

## Consulting and Other Professional Work (Selected)

National Science Foundations of – U.S., Canada, Switzerland
Best Practices Institute of the National Center for State Courts, member of Advisory Board
Center for Justice and Democracy, member of Advisory Board
Carnegie Commission on Science, Technology, and Government
National Science Foundation, Law & Social Sciences Program, member of advisory panel
U.S. Department of Health & Human Services, Task Force on Medical Liability and Malpractice
Los Angeles County Sheriff's Department Crime Laboratory
Judicial Evaluation Committee, District of Columbia Bar Association
Office of Technology Assessment, U.S. Congress
Expert witness in a number of cases on several topics
Law firm of Ennis, Friedman, Bersoff & Ewing, Washington (assistance in drafting Brandeis Brief for
    U.S. Supreme Court cases)
Law firm of Donovan, Liesure, Newton, and Irvine, New York, (strategy planning in international anti-
    trust case)
Social Science and Humanities Research Council of Canada
Federal Judicial Center, Washington, D.C.
American Bar Association/American Society of Law and Medicine
Attorneys General Massachusetts and North Carolina

SAK000002

Abt Associates, Cambridge, MA
National Resource Center for Consumers of Legal Services, Washington
Bureau of Applied Social Research, Columbia University
Orient State Institute, Orient, Ohio
College of Pharmacy, Ohio State University
Children's Hospital, Columbus, Ohio

## Teaching

### Undergraduate Courses

Social Psychology
Research Methods
Introduction to Psychology
Statistics
Applied Social Psychology
Law and Psychology
Environmental and Social Determinants of Behavior

### Graduate Courses

Social Psychology
Social Science and Public Policy

### Law Courses

Criminal Law
Criminal Law Reform
Evaluation and Use of Empirical Evidence
Evidence
Law and Psychology of the Litigation Process
Law, Litigation, and Science
Mental Health Law; Law and Psychiatry
Social Science in Law (in UVa Judges' Program titled: Social Science and Judicial Process)
Torts
Conflict: Its Nature and Resolution (Seminar)
Interdisciplinary Perspectives in Evidence and Procedure (Seminar)
Law and Forensic Science (Seminar)
Law and Technology: Assisted Death (Model act drafting seminar)
Law and Technology: Organ Transplantation (Model act drafting seminar)
Law and Technology: Scientific Expert Witnesses (Model act drafting seminar)
Erroneous Convictions: Their Prevention and Remedy (Model act drafting seminar)
Roots of Evidence Law (Seminar)
Tort Reform (Seminar)
Property II
Social Science Research and Legal Policy Making (Seminar)

SAK000003

## Editorial Service

Editor: Law & Human Behavior (1985-1987)
Editor: Jurimetrics (2003-2005)

## General Editor

APA MONITOR *Judicial Notebook* (founder) (1978-84)
Advances in Applied Social Psychology Series (founder) (LEA, 1988-1990)

## Member of Editorial Boards (past and current)

Journal of Personality and Social Psychology
Law & Society Review
Law & Human Behavior
Law & Policy
Applied Social Psychology Annual
Social Behaviour: An International Journal of Applied Social Psychology (Britain)
Ethics and Behavior
Expert Evidence (Britain)
Legal & Criminological Psychology (Britain)
Journal of the Forensic Institute (Britain)

## Ad Hoc Peer Reviewer

Forensic Science International
International Statistical Review
Journal of Organization Behavioral and Human Performance

## University Service

Pennsylvania State University: University Colloquy, member, executive committee (1969); Department of Psychology, member, curriculum committee (1968-69)

Ohio State University: Council of Graduate Students; Council of Student Affairs; Advisory Committee to the Vice- President for Business and Finance; Health Insurance Subcommittee; Faculty Council; University Senate; Grievance Procedures Subcommittee; University Court

Boston College Psychology Department: Undergraduate Curriculum Committee; Faculty Search Committee; Colloquium Committee

University of Iowa: Advisory Committee to V.P. for Research; Statistical Advisory Committee to Academic V.P. College of Law Committees: Speakers; Research and Professional Development; Faculty Appointments; Internal Procedures; Teaching Improvement; Retention Committee. Committee to Review Department of Management and Organizations (1994)

SAK000004

## Public Service

Ohio Civil Liberties Union: Board of Directors, Member (1972-73); Central Ohio Chapter, Board of Directors (1971-73), Chair (1972-73).

Civil Liberties Union of Massachusetts: Advisory Committee to the Board of Directors (1984-1986); Legislative Committee; Subcommittee on Victims' Rights, Chair

Subcommittee on Organ and Tissue Transplants, Special Legislative Commission on Experimental Biomedical Research, Massachusetts Legislature, 1975

Morse's Pond Association (local conservation group) (1975-1978)

Flaschner Judicial Institute (member of subcommittee which developed a series of continuing judicial education programs for Massachusetts trial judges) (1983-1986)

Iowa Social Science Institute (1995-2000)

Woodland Heights Association, President (1991-92)

Michael's Ranch HOA and Water Users Association, President (2002-2004)

Board of Directors, Iowa City Area Science Center (1992-2000)

Advisory Board, Center for Justice and Democracy (2001- )

Advisory Board, Best Practices Institute, National Center for State Courts (200-2002)

SAK000005

## Publications

### 1970

Saks, M.J., Edelstein, J., Draguns, J.G., & Fundia, T.A. de. *Social Class and Social Mobility in Relation to Psychiatric Symptomatology in Argentina.* 4 REVISTA INTERAMERICANA DE PSICOLOGIA 104-121.

### 1971

Saks, M.J. *Informational Influences on the Formation of Latitudes of Acceptance, Rejection, and Noncommitment.* Masters Thesis, Ohio State University.

### 1973

Saks, M.J. & Ostrom, T.M. *Anonymity in Letters to the Editor.* 37 PUBLIC OPINION QUARTERLY 417-422.

### 1974

Gross, A.E., Schmidt, M.J., Keating, J.P., & Saks, M.J. *Persuasion, Surveillance, and Voting Behavior.* 10 JOURNAL OF EXPERIMENTAL SOCIAL PSYCHOLOGY 451-460.

Saks, M.J. *Ignorance of Science is No Excuse.* 10 TRIAL 18-20.

Saks, M.J. Review of: *The Exorcist*. 303 SOCIETY 5.

### 1975

Saks, M.J. & Ostrom, T.M. *Jury Size and Consensus Requirements: The Laws of Probability Versus the Laws of the Land.* 1 JOURNAL OF CONTEMPORARY LAW (Spring) 163-173

Saks, M.J., Werner, C.M., & Ostrom, T.M. *The Presumption of Innocence and the American Juror.* 2 JOURNAL OF CONTEMPORARY LAW (Winter) 46-54.

Saks, M.J. *Jury Decision-making as a Function of Group Size and Social Decision Rule.* Doctoral Dissertation, Ohio State University, DISSERTATION ABSTRACTS INTERNATIONAL, XXXVI(3).

Saks, M.J. *On Thomas Szasz* (Comment) 2(3) THE CIVIL LIBERTIES REVIEW 8-9.

Saks, M.J. Review of: W. Pfennigstorf & S. Kimball, *Legal Service Plans: A Typology*, ABA Research Journal Monograph. 1(3) NEW DIRECTIONS IN LEGAL SERVICES 19,38

SAK000006

## 1976

Saks, M.J. *The Limits of Scientific Jury Selection: Ethical and Empirical.* 17 JURIMETRICS JOURNAL 3-22.

Versions reprinted in:

*Social Scientists Can't Rig Juries.* 9 PSYCHOLOGY TODAY (January) 48-57.

READINGS IN CRIMINAL JUSTICE (1977)

L.S. Wrightsman, S.M. Kassin & C.E. Willis (Eds.), IN THE JURY BOX: CONTROVERSIES IN THE COURTROOM, Sage Publications (1987)

Robert Krivoshey (ed.), JURIES: FORMATION AND BEHAVIOR, Garland Publishing Co. (1994)

Saks, M.J. & Benedict, A.R. *Evaluation and Quality Assurance of Legal Services: Concepts and Research.* In L. Brickman & R. Lempert (Eds.). THE ROLE OF RESEARCH IN THE DELIVERY OF LEGAL SERVICES, Washington: NRCCLS/NSF.

Saks, M.J. *Comments in Transcript of Proceedings: Conference on Determining a Research Agenda for Improving the Delivery of Legal Services.* In L. Brickman & R. Lempert (Eds.) THE ROLE OF RESEARCH IN THE DELIVERY OF LEGAL SERVICES. Washington, D.C.: NRCCLS/NSF

Reprinted in: *Transcript of the Conference on Determining a Research Agenda for Improving the Delivery of Legal Services to Middle Class Americans.* 11 LAW & SOCIETY REVIEW 319-386 (1976)

## 1977

Saks, M.J. *Jury Verdicts: The Role of Group Size and Social Decision Rule*, Lexington: D.C. Heath

## 1978

Saks, M.J. & Hastie, R. *Social Psychology in Court.* New York: Van Nostrand Reinhold

Republished in 1986 by Robert E. Krieger Publishers

A chapter reprinted as *Social Psychology in Court: The Judge*, in H.R. Arkes & K.R. Hammond (Eds.), JUDGMENT AND DECISION MAKING: AN INTERDISCIPLINARY READER (1986)

Republished in Chinese (1989) (translated by Guoan Yue, Department of Sociology, Nankai University, Tianjin)

Saks, M.J. & Benedict, A.R. *Evaluation and Quality Assurance of Legal Services: Concepts and Research.* 1 LAW & HUMAN BEHAVIOR 373-384. [A version of Saks & Benedict, 1976]

Saks, M.J. *Jury Case: Benchmark for Behavioral Research.* [American Psychological Association] MONITOR (December) 4

SAK000007

Ostrom, T.M., Werner, C.M., & Saks, M.J. *An Integration Theory Analysis of Jurors' Presumptions*. 36 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 436-450.

Saks, M.J. *Social Psychological Contributions to a Legislative Subcommittee on Organ and Tissue Transplants*. 33 AMERICAN PSYCHOLOGIST 680-690.

    Reprinted in B. Raven (Ed.), POLICY STUDIES REVIEW ANNUAL, VOLUME 4 (1980).

## 1979

Saks, M.J. & Miller, M.L. *A Systems Approach to Discretion in the Legal Process*. In L. Abt & E. Stuart (Eds.) SOCIAL PSYCHOLOGY AND DISCRETIONARY LAW. New York: Van Nostrand Reinhold

Saks, M.J. Review of: J. Tapp & F. Levine *Law Justice and the Individual in Society: Psychological and Legal Issues*. 77 MICHIGAN LAW REVIEW 892-898.

Saks, M. J. *Observers Observed*. Review of: G. McCall, *Observing the Law*. 24 CONTEMPORARY PSYCHOLOGY 416-418.

## 1980

Saks, M.J. & Baron, C.H. (Eds.) THE USE-NONUSE-MISUSE OF APPLIED SOCIAL RESEARCH IN THE COURTS. Cambridge, MA: Abt Books.

Kidd, R. F. & Saks, M. J. (Eds.) ADVANCES IN APPLIED SOCIAL PSYCHOLOGY, VOLUME 1. Hillsdale, NJ: Lawrence Erlbaum Associates

Saks, M.J. *The Utilization of Evaluation Research in Litigation*. In L.A. Braskamp & R.D. Brown (Eds.) UTILIZATION OF EVALUATIVE INFORMATION. San Francisco: Jossey-Bass.

    Portions reprinted in 14 EVALUATION NETWORK 32-22.

Saks, M.J. & Stapleton, W.V. *Eliminating Bureaucratic Impediments to Social Reality Testing*. In C. Abt (Ed.) PROBLEMS IN AMERICAN SOCIAL POLICY RESEARCH. Cambridge, MA.: Abt Books

Kidd, R.F. & Saks, M.J. *What is Applied Social Psychology?* In R.F. Kidd & M.J. Saks (Eds.) ADVANCES IN APPLIED SOCIAL PSYCHOLOGY, VOLUME 1. Hillsdale, NJ: Lawrence Erlbaum Associates

Saks, M.J. *The Wrong Path*. Review of: A.G. Smith, *Cognitive Styles in Law School*. 25 CONTEMPORARY PSYCHOLOGY 336-337.

# 1981

Saks, M. *Small-group Decision-making and Complex Information Tasks*. Washington, DC: Federal Judicial Center.

Saks, M.J. & Kidd, R.F. *Human Information Processing and Adjudication: Trial by Heuristics*. 15 LAW & SOCIETY REVIEW 124-160.

Reprinted in: Arkes & Hammond (eds.) JUDGMENT AND DECISION MAKING: AN INTERDISCIPLINARY READER (1986)

Portions reprinted in: Weinstein, Mansfield, Abrams & Berger EVIDENCE (1983)

Portions reprinted in: Green & Nesson EVIDENCE (1983; 1995)

Reprinted in: F. Schauer (ed.) THE PHILOSOPHY OF LAW: CLASSIC AND CONTEMPORARY READINGS WITH COMMENTARY (1996)

Portions reprinted in: Fiss & Resnik, ADJUDICATION AND ITS ALTERNATIVES: AN INTRODUCTION TO PROCEDURE (2003)

Saks, M.J. *American Somoa: Court Organization Profile.* Williamsburg, VA: National Center for State Courts

Keilitz, I., Saks, M.J., & Broder, P.K. *The Evaluation of the Learning Disabilities/Juvenile Delinquency Remediation Program: Evaluation Design and Interim Results*. Williamsburg, VA: National Center for State Courts

Saks, M.J. Review of: P. Lipsitt & B.D. Sales (Eds.) *New Directions in Psycholegal Research, 1980.* AMERICAN LEGAL STUDIES ASSOCIATION FORUM

# 1982

Kidd, R.F. & Saks, M.J. (Eds.) ADVANCES IN APPLIED SOCIAL PSYCHOLOGY, VOLUME 2. Hillsdale, NJ: Lawrence Erlbaum Associates

Rich, W.D., Sutton, L.P., Clear, T.R., & Saks, M.J. *Sentencing by Mathematics: An Evaluation of the Early Attempts to Develop and Implement Sentencing Guidelines.* Williamsburg: National Center for State Courts

Saks, M.J. *Innovation and Change in the Courtroom.* In R. Bray & N. Kerr (Eds.) THE PSYCHOLOGY OF THE COURTROOM. New York: Academic Press

Rich, W.D., Sutton, L.P., Clear, T.R., & Saks, M.J. *Sentencing by Mathematics*, 6 STATE COURT JOURNAL 33-41.

SAK000009

# 1983

Melton, G.B., Koocher, J.P., & Saks, M.J. (Eds.)  *Children's Competence to Consent*.  New York: Plenum

Saks, M.J. & Van Duizend, R.  *The Uses of Scientific Evidence in Litigation*.  Williamsburg:  National Center for State Courts

Saks, M.J.  *Social Psychological Perspectives on the Problem of Consent*. In G. Melton, J.P. Koocher, & M.J. Saks (Eds.)  CHILDREN'S COMPETENCE TO CONSENT.  New York: Plenum

Saks, M.J. & Van Duizend, R.  *Scientific Evidence in Litigation: Problems, Hopes, Accommodations, and Frustrations.* 7 STATE COURT JOURNAL 5-7, 23-28.

# 1984

Saks, M.J. *Some Data to Enlighten Some Doctrines*.  Review of: B.L. Bloom & S.J. Asher (Eds.), PSYCHIATRIC PATIENT RIGHTS AND PATIENT ADVOCACY: ISSUES AND EVIDENCE (1982)  29 CONTEMPORARY PSYCHOLOGY 8-9.

Saks, M.J. & Van Duizend, R.  *Scientific Evidence in Litigation*.  LAW ENFORCEMENT TECHNOLOGY (November) 48-50.  [A version of Saks & Van Duizend, State Court Journal, 1983]

Saks M.J. & Van Duizend, R.  *The Law's Love-Hate Relationship with Experts is Mutual.*  In H.D. Rosenheim (Ed.)  PROCEEDINGS OF THE FORENSIC PSYCHOLOGY CONFERENCE, 16-18 March, 1983, Fitzsimons Army Medical Center, Aurora, Colorado.

Saks, M.J. & Wissler, R. L.  *Legal and Psychological Bases of Expert Testimony*.  2 BEHAVIORAL SCIENCES & THE LAW 435

# 1985

Saks, M.J.  *Rights of Crime Victims*.  Review of: *The Rights of Crime Victims*.  [Civil Liberties Union of Massachusetts] DOCKET (October).

Wissler, R.L. & Saks, M.J.  *On the Inefficacy of Limiting Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt.* 9 LAW & HUMAN BEHAVIOR 37-48

   Reprinted in: Robert Krivoshey (ed.), INSTRUCTIONS, VERDICTS, AND JUDICIAL BEHAVIOR, Vol. 4, Garland Publishing Co. (1994)

# 1986

Saks, M. J.  *The Impact of Information: Data as Evidence*. In M. Kaplan (Ed.)  THE IMPACT OF SOCIAL PSYCHOLOGY ON PROCEDURAL JUSTICE. Springfield, IL: Charles C. Thomas

Melton, G. & Saks, M. J.  *The Law as an Instrument of Socialization and Social Structure.*  In NEBRASKA SYMPOSIUM ON MOTIVATION.  Lincoln, NE: University of Nebraska Press.

Saks, M.J. & Hastie, R.  *Social Psychology in Court*.  Malabar, FL: Robert E. Krieger Publisher (Re-issue of the 1978 book)

Saks, M.J. & Saxe, L. (Eds) *Advances in Applied Social Psychology, Volume 3*. Hillsdale, NJ: Erlbaum

Task Force on Psychology and Public Policy [Reppucci, N.D., Kimmel, P., Korchin, S.J., Saks, M.J., Seidman, E., Serrano-Garcia, I., & Tangri, S.S.] *Psychology and Public Policy*, 41 AMERICAN PSYCHOLOGIST 914-921

Saks, M.J. *If There be a Crisis, How Shall We Know It?* 46 MARYLAND LAW REVIEW 63

Saks, M.J. *The Law Does not Live by Eyewitness Testimony Alone* (editorial). 10 LAW & HUMAN BEHAVIOR 279

Saks, M.J. *In Search of the "Lawsuit Crisis."* 14 LAW, MEDICINE & HEALTH CARE 77
    Reprinted in 4 CTLA FORUM [Connecticut Trial Lawyers Association] 31 (Nov-Dec 1986)

Saks, M. J. *Social Psychology of Decision-making in the Criminal Justice System.* 6 WINDSOR YEARBOOK OF ACCESS TO JUSTICE 61

## 1987

Saks, M.J. *Blaming the Jury.* Review of: V. Hans & N. Vidmar, *Judging the Jury.* 75 GEORGETOWN LAW JOURNAL 693

Melton, G.B., Monahan, J. & Saks, M.J. *Psychologists as Law Professors.* 42 AMERICAN PSYCHOLOGIST 502

Saks, M.J. *Trials and Tabulations.* Review of: DeGroot, Fienberg & Kadane (Eds.) *Statistics and the Law* (1986). 236 SCIENCE 980

Saks, M.J. *Tort Law Balances Public Interest in Health Costs, Redress for Injury*, (April, 28) DES MOINES REGISTER 7A

    A version reprinted as: *Medical Malpractice Litigation: What Needs Reform?* 26 IOWA ADVOCATE 27

Saks, M.J. *Opportunities Lost: The Theory and the Practice of Using Developmental Knowledge in the Adversary Trial.* In G.B. Melton (Ed.) REFORMING THE LAW: IMPACT OF CHILD DEVELOPMENT RESEARCH. New York: Guilford.

Saks, M.J. *Accuracy v. Advocacy: The Dilemmas of Expert Witnesses in an Adversary System.* 90 TECHNOLOGY REVIEW 42.

    A portion reprinted in WILSON QUARTERLY (1988)
    Reprinted in Italian in EDINDUSTRIA (1989)

## 1988

Benedict, A.R. & Saks, M.J. *The Regulation of Professional Behavior: Electroconvulsive Therapy in Massachusetts*, 1987 JOURNAL OF PSYCHIATRY AND LAW 247.

SAK000011

Saks, M.J. & Krupat, E. *Social Psychology and its Applications*. New York: Harper & Row

Saks, M.J. *[Wise physicians do not build diagnostic decisions on shaky informational foundations]* (Letter) 35 YALE LAW REPORT 14-15.

Saks, M.J. *Enhancing and Restraining Accuracy in Adjudication*, 51 LAW AND CONTEMPORARY PROBLEMS 243-279

## 1989

Risinger, D.M., Denbeaux, M.P. & Saks, M.J. *Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise,"* 137 UNIVERSITY OF PENNSYLVANIA LAW Review 731-792

Saks, M.J. *The Courts Discover Criminology. And Vice Versa.* Review of: Anderson & Winfree, *Expert Witnesses: Criminologists in the Courtroom*. 34 CONTEMPORARY PSYCHOLOGY 177-178

Saks, M.J. *Prevalence and Impact of Ethical Problems in Forensic Science*, 34 JOURNAL OF FORENSIC SCIENCES 772-793.

Sieber, J.E. & Saks, M.J. *A Census of Subject Pool Characteristics and Policies*, 44 AMERICAN PSYCHOLOGIST 1053-1061.

Saks, M. J. *Legal Policy Analysis and Evaluation*, 44 AMERICAN PSYCHOLOGIST 1110-1117.

> Reprinted in: R. Lorion, I. Iscoe, P. DeLeon & G. VandenBos (eds.), PSYCHOLOGY AND PUBLIC POLICY: BALANCING PUBLIC SERVICE AND PROFESSIONAL NEED (1996)

Saks, M.J. "Foreword" to S. Lloyd-Bostock, *Law in Practice: Applications of Psychology to Legal Decision Making and Legal Skills* (American Edition) (Lyceum Books)

[Authored by Seminar students, co-taught with Sheldon Kurtz] *Model Aid-in-Dying Act*. 75 IOWA LAW REVIEW 125.

## 1990

Gittler, J., Quigley-Rick, M., and Saks, M.J. *Adolescent Health Care Decision-making: The Law and Public Policy*. Background Paper for Congressional Office of Technology Assessment and Carnegie Council on Adolescent Development.

Saks, M.J. *Expert Witnesses, Non-expert Witnesses, and Non-witness Experts*, 14 LAW & HUMAN BEHAVIOR 291.

> Reprinted in part as, *The Ambiguous Role of the Expert Witness and the Nonwitness Expert*, 16(2) FAMILY LAW NEWS 1 (1993) (publication of the State Bar of California Family Law Section).

> Reprinted in, Roesch & Thomsen (eds.) PSYCHOLOGY AND LAW, VOL II – CRIMINAL AND CIVIL PERSPECTIVES (2007)

SAK000012

Saks, M.J. *Judicial Attention to the Way the World Works*, 75 IOWA LAW REVIEW 1011.

Saks, M.J. *Uncovering the Secrets of the Common Law*. Review essay: K.L. Scheppele, *Legal Secrets: Equality and Efficiency in the Common Law* (1988). In 24 LAW & SOCIETY REVIEW 1277.

## 1991

Saks, M.J. *Turning Practice into Progress: Better Lawyering Through Experimentation*, 66 NOTRE DAME LAW REVIEW 801.

Grisso, T. & Saks, M. *Psychology's Influence on Constitutional Interpretation*, 15 LAW & HUMAN BEHAVIOR 205.

Saks, M.J. *Comment on "A Modest Proposal: Psychotherapists with Knowledge of Danger,"* 1 ETHICS & BEHAVIOR 212.

Saks, M.J. & Koehler, J.J. *What DNA "Fingerprinting" Can Teach the Law About the Rest of Forensic Science*, 13 CARDOZO L. REV. 361.

## 1992

Saks, M.J. *Normative and Empirical Issues About the Role of Expert Witnesses*. In D.K. Kagehiro & W.S. Laufer (Eds.) HANDBOOK OF PSYCHOLOGY AND LAW. New York: Springer-Verlag.

Charrow, R.P. & Saks, M.J. *Legal Responses to Allegations of Scientific Misconduct.* In D.J. Miller & M. Hersen (Eds.) RESEARCH FRAUD IN THE BEHAVIORAL AND BIOMEDICAL SCIENCES. New York: Wiley.

Saks, M.J. *Flying Blind in the Courtroom: Trying Cases Without Knowing What Works or Why*, 101 Yale L. J. 1177.

Saks, M.J. *Do We Really Know Anything About the Behavior of the Tort Litigation System – And Why Not?*, 140 PENNSYLVANIA L. REV. 1147.

Excerpts quoted at length in:

S. Daniels & J. Martin, CIVIL JURIES AND THE POLITICS OF REFORM, at 18.

S. Macaulay, L.M. Friedman & J. Stookey (eds.), LAW & SOCIETY: READINGS ON THE SOCIAL STUDY OF LAW, at 254-255.

Saks, M.J. & Blanck, P.D., *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts*, 44 STANFORD L. REV. 815.

Saks, M.J. *Obedience vs. Disobedience to Legitimate vs. Illegitimate Authorities Issuing Good vs. Evil Directives*, 4 PSYCHOLOGICAL SCIENCE 221.

SAK000013

# 1993

Saks, M.J. *Improving APA Science Translation Amicus Briefs*, 17 LAW & HUMAN BEHAVIOR 235.

Saks, M.J. *Malpractice Misconceptions and Other Lessons About the Litigation System,* 16 JUSTICE SYSTEM JOURNAL 7.

Saks, M.J. *Malpractice Roulette* [Op-ed column], NEW YORK TIMES (July 3, 1993).

Saks, M.J. *Judicial Nullification*, 68 INDIANA LAW JOURNAL 1281.

Saks, M.J. Progress in Identification Science, Proceedings of the Second International Conference on Forensic Statistics, Tempe, AZ, March, 1993.

Saks, M.J. Book review of A.L. Caplan, *If I were a rich man, could I buy a pancreas? and other essays on the ethics of health care.* (1992), 3 ETHICS & BEHAVIOR 207.

Saks, M.J., Testimony on S. 687, The Product Liability Fairness Act, Hearing before the Subcommittee on Consumer of the Committee on Commerce, Science, and Transportation, United States Senate, One Hundred Third Congress, First Session, 93-102, September 23, 1993 (S. Hrg. 103-490)

Saks, M.J. Commentary on *Expertise for Sale: The Professor's Perspective*, 3 ETHICS & BEHAVIOR 381, 388-391

# 1994

Saks, *Verdict: Assessing the Civil Jury System*, review of R.E. Litan (ed.), *Verdict*, 77 JUDICATURE 225.

Saks, M. J., *The Implications of Daubert for Forensic Identification Science*, 1 SHEPARD'S EXPERT AND SCIENTIFIC EVIDENCE QUARTERLY 427.

Saks, M.J. *Medical Malpractice: Facing Real Problems and Finding Real Solutions*. Review of Weiler et al., A Measure of Malpractice: Medical Injury, Malpractice Litigation, and Patient Compensation (Harvard University Press, 1993). 35 WILLIAM & MARY L. REV. 693.

Faigman, D.L., Porter, E., and Saks, M.J. *Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present, and Worrying about the Future of Scientific Evidence.* 15 CARDOZO L. REV. 1799.

# 1995

Saks, M.J. *The Phantom of the Courthouse*. Review of Cecil & Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 (Federal Judicial Center, 1993). 35 JURIMETRICS J. 233.

Saks, M.J. Review of: Adler, The Jury: Trial and Error in the American Courtroom (1994) and Abramson, We, the Jury: The Jury System and the Ideal of Democracy (1994), 6 BIMONTHLY REVIEW OF LAW BOOKS 1-5 (July-August, 1995).

Diamond, S.S., Dimitropoulos, L., Landsman, S., & Saks, M.J. *The Effects of Bifurcating Claims for Punitive Damages in Product Liability Cases*. A REPORT TO G.D. SEARLE

Saks, M.J. *Jury Reform: Is it About Time* (published comments excerpted from an on-line roundtable), THE AMERICAN LAWYER 48-51 (September).

## 1996

Saks, M.J. & Melton, G.B., *Is It Possible to Legislate Morality?  Encouraging Psychological Research Contributions to Problems of Research Ethics*, In Stanley, Sieber & Melton (Eds.), RESEARCH ETHICS: A PSYCHOLOGICAL APPROACH.  Lincoln, NE: University of Nebraska Press.

Saks, M.J., *The Smaller the Jury, the Greater the Unpredictability*, 79 JUDICATURE 263.

Kurtz & Saks, *The Transplant Paradox: Overwhelming Public Support for Organ Donation vs. Under-Supply of Organs: The Iowa Organ Procurement Study*, 21 JOURNAL OF CORPORATION LAW 767.

Saks, M. J. *The Role of Research in Implementing the U.N. Convention on the Rights of the Child*, 51 AMERICAN PSYCHOLOGIST 1262.

Saks, M.J., Larsen, H. & Hodne, C.J., *Is There a Growing Gap Among Law, Law Practice, and Legal Scholarship?  A Systematic Comparison of Law Review Articles One Generation Apart*, (From symposium issue in honor of Thomas F. Lambert, Jr.), XXX SUFFOLK L. REV. 353.

Risinger, R.M. & Saks, M.J.,  *Science and Nonscience in the Courts:* Daubert *Meets Handwriting Identification Expertise*, 82 IOWA LAW REVIEW 21.

## 1997

Faigman, D., Kaye, D., Saks, M.J. & Sanders, J. (eds.)  MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (Two volumes, West Publishing Co.).

Saks, M.J. *Scientific Method: The Logic of Drawing Inferences from Empirical Evidence*. In Faigman, Kaye, Saks & Sanders (Eds.)  MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, Volume 1.  (West Publishing Co.)

Wissler, R.L., Evans, D.I., Hart, A.J., Morry, M. & Saks, M.J.  *Explaining "Pain and Suffering" Awards: The Role of Injury Characteristics and Fault Attributions*, 21 LAW & HUMAN BEHAVIOR 181.

Hart, A.J., Evans, D.L., Wissler, R.L., Feehan, J., & Saks, M.J.  *Injuries, Prior Beliefs, and Damage Awards*, 15 BEHAVIORAL SCIENCES AND THE LAW 63.

Saks, M.J., Hollinger, L., Wissler, R., Evans, D. & Hart, A.J.  *Reducing Variability in Civil Jury Awards*, 21 LAW & HUMAN BEHAVIOR 243.

Reprinted in, Roesch & Thomsen (eds.) PSYCHOLOGY AND LAW, VOL II – CRIMINAL AND CIVIL PERSPECTIVES (2007)

SAK000015

Hart, A.J., Wissler, R.L., & Saks, M.J. 2 *Perceptions of Illness and Injury: The Role of Experience*, 2 CURRENT RESEARCH IN SOCIAL PSYCHOLOGY 30-37.
[http://www.uiowa.edu/~grpproc/crisp/crisp.2.4.htm]

Saks, M.J. & Marti, M. Weighner, *A Meta-analysis of the Effects of Jury Size*, 21 LAW & HUMAN BEHAVIOR 451.

> Reprinted in, The International Library of Essays in Law and Society, volume entitled, THE JURY SYSTEM: CONTEMPORARY SCHOLARSHIP (V. Hans, ed., 2006).

## 1998

Saks, M.J. *What Do Jury Experiments Tell Us About How Juries (Should) Make Decisions?*, 6 SOUTHERN CALIFORNIA INTERDISCIPLINARY LAW JOURNAL 1-53.

Wells, G. & Saks, M.J. AN ACT TO IMPROVE THE ACCURACY OF EYEWITNESS IDENTIFICATION PROCEDURES.

Landsman, S., Diamond, S.S., DiMitropoulos, L., & Saks, M.J., *Be Careful What You Wish For: The Effects of Bifurcating Claims for Punitive Damages in Product Liability Cases,* 1998 WISCONSIN L. REV. 297

Saks, M.J. *Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science*, 49 HASTINGS LAW JOURNAL 1069

Risinger, Denbeaux & Saks, *Brave New "Post-*Daubert *World" — A Reply to Professor Moenssens*, 29 SETON HALL L. REV. 405

Saks, *Public Opinion about the Civil Jury: Can Reality be Found in the Illusions?*, 48 DEPAUL L. REV. 221.

Diamond, Landsman & Saks, *Juror Judgements about Liability and Damages: Sources of Variability and Ways to Increase Consistency*, 48 DEPAUL L. REV. 301.

Saks, *Comments on the Vidmar and Diamond Studies*, 48 DEPAUL L. REV. 423.

## 1999

Faigman, Kaye, Saks & Sanders, MODERN SCIENTIFIC EVIDENCE, Supplement for Volumes 1 & 2.

Faigman, Kaye, Saks & Sanders, MODERN SCIENTIFIC EVIDENCE, Volume 3.

Saks, M.J., Tort Lawyers and their Plaintiffs (Introduction by the Special Editor to Mini-Symposium on Contingency Legal Practice), 21 LAW & POLICY 345.

Roselle L. Wissler, Allen J. Hart & Michael J. Saks, *Decision-making about General Damages: A Comparison of Jurors, Judges, and Lawyers*, 98 MICHIGAN LAW REVIEW 751-826.

SAK000016

## 2000

Faigman, Kaye, Saks & Sanders, *How Good is Good Enough?: Expert Evidence Under* Daubert *and* Kumho, 50 CASE WESTERN RESERVE L. REV. 645-667.

Faigman, Kaye, Saks & Sanders (eds.), MODERN SCIENTIFIC EVIDENCE, Supplement for Volumes 1, 2 & 3 (West)

Saks, M.J. *The Aftermath of* Daubert*: An Evolving Jurisprudence of Expert Evidence*, 40 JURIMETRICS JOURNAL 229.

Saks, M.J., *Banishing Ipse Dixit: The Impact of* Kumho Tire *on Forensic Identification Science*, 57 WASHINGTON & LEE L. REV. 879

Roselle L. Wissler, Patricia F. Kuehn & Michael J. Saks, *Instructing Jurors on General Damages in Personal Injury Cases: Problems and Possibilities,* 6 PSYCHOLOGY, PUBLIC POLICY & LAW 712.

## 2001

Victoria Phillips, Michael J. Saks & Joseph Peterson, *Signal Detection Theory and Decision-making in Forensic Science,* 46 JOURNAL OF FORENSIC SCIENCES 294.

Michael J. Saks et al., *Toward a Model Act for the Prevention of Erroneous Convictions,* 35 NEW ENGLAND L. REV. (Annual Symposium Issue) 669.

Roselle L. Wissler, Katie A. Rector & Michael J. Saks, *The Impact of Jury Instructions on the Fusion of Liability and Compensatory Damages,* 25 L. & HUMAN BEHAVIOR 125.

Michael J. Saks, *Equal Protection after* Bush v. Gore, 85 JUDICATURE (July-August 2001), at 8,42.

Saks & Vidmar, *A Flawed Search for Bias in the American Bar Association's Ratings of Prospective Judicial Nominees: A Critique of the Lindgren Study*, XVII J. L. & POL. 219 (2001).

*Model Prevention and Remedy of Erroneous Convictions Act*, 33 ARIZ. STATE L. J.665 (2001).

Saks, *Scientific Evidence and the Ethical Obligations of Attorneys* (Symposium: "Toward More Reliable Jury Verdicts: Developments in Law, Technology, and Media Impact Since the Trials of Dr. Sam Sheppard"), 49 CLEV. STATE L. REV. 421 (2001).

## 2002

Risinger, Saks, Rosenthal & Thompson, *The* Daubert/Kumho *Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion*, 90 U. CAL. L. REV. 1 (2002).

Faigman, Kaye, Saks & Sanders (eds.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, 2ND ED. (Four volumes, West, 2002).

Saks, *Ethical Standards of and Concerning Expert Witnesses, in* MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, 2nd ed. (Faigman, Kaye, Saks & Sanders, eds., West, 2002).

SAK000017

Saks, *Evidence,* in THE OXFORD COMPANION TO AMERICAN LAW (2002).

Saks, *Trial Outcomes and Demographics: Easy Assumptions versus Hard Evidence*, 80 U. TEXAS L. REV. 1877 (2002).

Michael J. Saks, *Expert Witnesses in Europe and America, in* ADVERSARIAL VERSUS INQUISITORIAL JUSTICE: PSYCHOLOGICAL PERSPECTIVES ON CRIMINAL JUSTICE SYSTEMS (P.J. van Koppen & S.D. Penrod eds., Kluwer Plenum, 2002).

Peter J. van Koppen & Michael J. Saks, *Preventing Bad Psychological Scientific Evidence in The Netherlands and The United States, in* ADVERSARIAL VERSUS INQUISITORIAL JUSTICE: PSYCHOLOGICAL PERSPECTIVES ON CRIMINAL JUSTICE SYSTEMS (P.J. van Koppen & S.D. Penrod eds., Kluwer Plenum, 2002).

Saks, *The Life and Times of Criminal Identification*, review of Simon Cole, Suspect Identities: A History of Fingerprinting and Criminal Identification (2001) (Harvard Univ. Press), 43 JURIMETRICS J. 141 (2002).

Saks, Review of "Ethics in Forensic Science: Professional Standards for the Practice of Criminalistics" (2001) (CRC Press), 43 JURIMETRICS J. 359 (2002).

## 2003

Faigman, Kaye, Saks & Sanders, MODERN SCIENTIFIC EVIDENCE 2D ED., Supplement (West, 2003).

Saks & Thompson, *Assessing Evidence: Proving Facts, in* HANDBOOK OF PSYCHOLOGY IN LEGAL CONTEXTS (2d ed., Carson & Bull, eds., 2003) (Wiley).

Saks, *Foreword*, in Douglas D. Koski (ed.), THE JURY TRIAL IN CRIMINAL JUSTICE (Carolina Academic Press).

Saks, Risinger, Rosenthal & Thompson, *Context Effects in Forensic Science: A Review and Application of the Science of Science to Crime Laboratory Practice in the United States*, 43 SCIENCE & JUSTICE 77.

Saks, *Commentary on "Individuality of Handwriting,"* 48 J. FORENSIC SCIENCES 916 (2003).

Saks, *The Legal and Scientific Evaluation of Forensic Science* (Symposium: Expert Admissibility: Keeping Gates, Goals and Promises) 33 SETON HALL L.REV. 1167 (2003).

Saks, [*On Capping General Damages in Medical Malpractice Cases*], syndicated op-ed column, numerous newspapers (August, 2003).

Saks & Vidmar, *Asserted but Unproven: A Further Response to the Lindgren Study's Claim that the American Bar Association's Ratings of Judicial Nominees are Biased*, XIX THE JOURNAL OF LAW & POLITICS 177 (2003).

Risinger & Saks, *Litigation-Directed Research in the Criminal Justice System*, XX ISSUES IN SCIENCE AND TECHNOLOGY 35 (Fall, 2003).

SAK000018

Risinger & Saks, *Rationality, Research and Leviathan: Prosecution-Sponsored Research and the Criminal Process* (Symposium: Visions of Rationality in Evidence Law), 4 MICH. ST. U. L.REV. 1023.

Saks & Risinger, *Baserates, The Presumption of Guilt, Admissibility Rulings, and Erroneous Convictions*, (Symposium: Visions of Rationality in Evidence Law), 4 MICH. ST. U. L.REV. 1051.

## 2004

Saks, *The Psychology of Medical Malpractice Litigation,* 15 THE PRACTICAL LITIGATOR 47 (Jan. 2004).

Saks, *Johnson v. Commonwealth: How Dependable is Identification by Microscopic Hair Comparison,* 26 THE ADVOCATE [Journal of Criminal Justice Education and Research] 14 (Jan. 2004)

Saks, *Comment on "Empiricism and Tort Law,"* 2004 ILLINOIS L. REV. 463

## 2005

Saks & VanderHaar, *On the "General Acceptance" of Handwriting Identification Principles*, 50 JOURNAL OF FORENSIC SCIENCES 119.

Saks, Faigman, Kaye & Sanders, ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE - SECOND (West) (2005).

Saks, Strouse & Schweitzer, *A Multi-attribute Utility Analysis of Legal Policy Responses to Medical Adverse Events*, 54 DEPAUL LAW REVIEW 277 (Symposium: Starting Over?: Redesigning the Medical Malpractice System).

Saks & Koehler, *The Coming Paradigm Shift in Forensic Identification Science*, 309 SCIENCE 892 (2005).

Faigman, Kaye, Saks & Sanders (eds.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (Four volumes, West, 2005).

Michael J. Saks & Jonathan J. Koehler, Comments on Bruce Budowle's Presentation at the Sackler Colloquium on Forensic Science, Digital Proceedings of the National Academy of Sciences (Sackler Colloquium) (2005).

Saks & Faigman, *Evidence after* Daubert, in 1ANNUAL REVIEW OF LAW & SOCIETY (2005).

Moriarty & Saks, *Forensic Science: Grand Goals, Tragic Flaws, and Judicial Gatekeeping*, 44 JUDGES JOURNAL 16 (Fall, 2005).

## 2006

Saks & Lanyon, *Pitfalls and Ethics of Expert Testimony*, in M. Costanzo, D. Krauss, & K. Pezdek (Eds.), EXPERT PSYCHOLOGICAL TESTIMONY FOR THE COURTS. Mahwah, NJ: Erlbaum.

Saks & Marti, *A Meta-analysis of the Effects of Jury Size*, 21 LAW & HUMAN BEHAVIOR 451(1997) – Reprinted in, The International Library of Essays in Law and Society, volume entitled, THE JURY SYSTEM: CONTEMPORARY SCHOLARSHIP (V. Hans, ed., 2006).

SAK000019

Park & Saks, *Evidence Scholarship Reconsidered: Results of the Interdisciplinary Turn*, 47 BOSTON COLLEGE L. REV. 949 (2006).

Saks, Book Review of *Forensic Evidence: Science and the Criminal Law, 2nd ed.* 51 J. FORENSIC SCI. 1446 (2006).

Faigman, Kaye, Saks & Sanders (eds.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (Four volumes, West, 2006-2007).

## 2007

Saks & Koehler, *Out to Lunch: Saks & Koehler Reply to Rudin & Inman's Commentary*, CAC NEWS: NEWS OF THE CALIFORNIA ASSOCIATION OF CRIMINALISTS 18-19 (First Quarter, 2007)

N. J. Schweitzer, Douglas J. Sylvester, Michael J. Saks, *Rule Violations and the Rule of Law: A Factorial Survey of Public Attitudes*, 56 DEPAUL LAW REVIEW 615 (Symposium: Is the Rule of Law Waning in America?)

Schweitzer & Saks, *The "CSI Effect": Popular Fiction about Forensic Science Affects the Public's Expectations about Real Forensic Science,* 47 JURIMETRICS JOURNAL 357 (2007).

Saks, Book Review of William R. Uttal, Human Factors in the Courtroom: Mythology Versus Science (2006), 47 JURIMETRICS JOURNAL 369 (2007)

Saks, The Need for a Paradigm Shift: What DNA Can Teach the Traditional Forensic Sciences, in Rettsmedisinsk sakkyndighet i fortid, natid og fremtid (Per Brandtzæg & Ståle Eskeland, eds.) (Cappelen, Oslo).

Saks, *Remediating Forensic Science*, 48 JURIMETRICS J. 119 (2007)

Saks, *Jury Size and Decision Rule*, *in* ENCYCLOPEDIA OF PSYCHOLOGY AND LAW (2007)

Articles reprinted in Roesch & Thomsen (eds.) PSYCHOLOGY AND LAW, VOL II – CRIMINAL AND CIVIL PERSPECTIVES (2007):
> Saks, M.J. *Expert Witnesses, Non-expert Witnesses, and Non-witness Experts*, 14 LAW & HUMAN BEHAVIOR 291 (1990)
> Saks, M.J., Hollinger, L., Wissler, R., Evans, D. & Hart, A.J. *Reducing Variability in Civil Jury Awards*, 21 LAW & HUMAN BEHAVIOR 243 (1997)

## 2008

Joseph Sanders, Michael Saks, & N.J. Schweitzer, *Trial Factfinders and Expert Evidence*, in MODERN SCIENTIFIC EVIDENCE (Faigman et al., eds.).(West Publishing Co.)

Faigman, Saks, Sanders & Cheng, eds., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (West Publishing Co.) (Annual update) (Five volumes)

SAK000020

Saks & Koehler, *The Individualization Fallacy in Forensic Science*, 61 VANDERBILT L. REV. 199 (2008)

Saks & Faigman, *Failed Forensics: How Forensic Science Lost Its Way and How it Might Yet Find it*, 4 ANNUAL REVIEW OF LAW AND SOCIAL SCIENCE 149-171 (2008)

Smith & Saks, *The Case for Overturning* Williams v. Florida *and the Six-Person Jury: History, Law and Empirical Evidence*, 60 FLORIDA L. REV. 441 (2008)

Saks, *Protecting Factfinders from Being Overly Misled, While Still Admitting Weakly Supported Forensic Science into Evidence*, 43 TULSA L. REV. 609 (Symposium: *Daubert*, Innocence and the Future of Forensic Science)

McQuiston & Saks, *Communicating Opinion Evidence in the Forensic Identification Sciences: Accuracy and Impact*, 59 HASTINGS L. J. 1159 (Symposium: The Faces of Forensics: Identification and Behavior)

Saks, *Explaining the Tension Between the Supreme Court's Embrace of Validity as the Touchstone of Admissibility of Expert Testimony and Lower Courts' Rejection of Same*, 5 EPISTEME 329-342 (2008) (Symposium on Law and Evidence)

## 2009

Schweitzer & Saks, *The Gatekeeper Effect: Judges' Influence on the Persuasiveness of Expert Testimony,* 15 PSYCHOLOGY, PUBLIC POLICY, AND LAW 1- 18 (2009)

Saks, *Law & Science*, in OXFORD INTERNATIONAL ENCYCLOPEDIA OF LEGAL HISTORY (2009)

Domitrovich & Saks, *NAS Calls for "Overhauling" a "Badly Fragmented" Forensic Science System: Major Reforms and New Research*, National Judicial College New (NJC website 4/10/09)

Domitrovich & Saks, *The National Conference of State Trial Judges: Celebrating 50 Golden Years, Planning for the Next 50*, 92 JUDICATURE 331 (2009)

Faigman, Saks, Sanders & Cheng, eds., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (West Publishing Co.) (Annual update) (Five volumes)

Saks, The Past and Future of Forensic Science and the Courts, 93 Judicature 94 (2009).

McQuiston-Surrett & Saks, *The Testimony of Forensic Identification Science: What Expert Witnesses Say and What Factfinders Hear,* 33 LAW & HUMAN BEHAVIOR 436-453 (2009)

Saks, *What's Wrong with Forensic Science*, FORENSIC SCIENCE, MEDICINE, AND PATHOLOGY (Australia) (2009) (abstract)

Saks, *Judging Expertise*, 35 JOURNAL OF CORPORATION LAW 135-157 (2009) (symposium papers from Institute for Law and Economic Policy conference)

SAK000021

**2010**

Saks, *Forensic Identification: From a Faith-Based "Science" to a Scientific Science,* 201 FORENSIC SCI. INT'L 14 (2010) (special issue, on the occasion of the Meeting of the International Organization of Forensic Odonto-Stomatology)

Koehler & Saks, *Individualization Claims in Forensic Science: Still Unwarranted,* 75 BROOKLYN L. REV. 1187 (2010) (Festschrift for Margaret Berger)

**In Press, Under Review, Under Contract**

Saks & Neufeld, *Parallel Evolution in Law and Science: The Structure of Decision-making Under Uncertainty*

Schweitzer, Saks, Murphy, Roskies, Sinnott-Armstrong, Gulley, *The Impact of Neuroimages on Juror Decision-making*

Schweitzer, Saks, Lovis-McMahon, *Reactions to Violations of Laws and Law-like Rules by Persons in Authority*

Schweitzer & Saks, *Juries' Understanding of Scientific Causation*

Saks & Spellman, [SOCIAL AND PSYCHOLOGICAL FOUNDATIONS OF THE LAW OF EVIDENCE] (NYU Press)

Thompson et al., A Reply to Thornton's, "A Rejection of 'Working Blind' as a Cure for Contextual Bias" [letter], Journal of Forensic Sciences (in press).

Faigman, Saks, Sanders & Cheng, eds., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (West Publishing Co.) (Annual update) (Five volumes) (2010-2011)

SAK000022

A006251




**IOWA DEPARTMENT OF PUBLIC SAFETY**
**DIVISION OF CRIMINAL INVESTIGATION**
**LABORATORY RECEIPT**

| DCI OFFICE USE ONLY | | | | | |
|---|---|---|---|---|---|
| ASSIGNED DATE/TIME | | | | CASE NUMBER | |

ASSIGNED DATE/TIME: 08-10-04 11:41
MO DAY YR HR MI

COUNTY: 1 7 0 9
CLASS: G
UNIT: O
AUTH: 1

CASE NUMBER
YEAR: 9 6 - 0 5 3 8 2 SEQUENCE

*Please Computer generate or type - DO NOT Handwrite*

CRIME: homicides

DATE OF OCCURRENCE  07-25-93 and 11-05-93

LOCATION OF OFFENSE  Cerro Gordo Co.

CITY, COUNTY, ZIP

METHOD  shooting

WEAPON  pistol

HOW REC'D AT LAB  person _Basler_

NAME OF CASE OFFICER (CO)  William Basler

CO E-MAIL ADDRESS  Mason City

AGENCY NAME  DCI

AGENCY/ADDRESS

CITY, ST, ZIP

AGENCY PHONE NUMBER

AGENCY CASE #

| VICTIM/S | RACE/SEX/DOB/SSN | SUSPECTS | RACE/SEX/DOB/SSN | (INCLUDE DCI #) | LAB SECTIONS |
|---|---|---|---|---|---|
| Greg Nicholson, Terry Degeus | | Dustin Honken | | | ☐ BAC  ☐ LPT<br>☐ CLA  ☐ PHO<br>☐ COM  ☐ RSN<br>☐ CRS  ☐ TMK<br>☐ DNA  ☐ TOX |
| Lori Duncan | | Angela Johnson | | | ☒ DOC  ☐ TRA |
| Kandi Duncan, Amber Duncan | | | | | ☐ DRG  ☐ UAC<br>☐ FIR |

SIGNATURE OF DELIVERY OFFICER: _William Basler_
PRINTED NAME: William Basler
RECEIVED IN LABORATORY BY: _Nancy Bowma_

SPECIAL REQUESTS OR INFORMATION
Compare the submitted known handwriting of Angela Johnson with laboratory exhibits BS, BT, & BU

| Laboratory Designation | DESCRIPTION OF EVIDENCE (INCLUDE SERIAL NUMBERS IF KNOWN)<br>*** Please Computer generate or TYPE - DO NOT Handwrite *** | Agency Designation | Section Involved |
|---|---|---|---|
| BP | (K1A) sealed envelope containing photocopies of Angela Johnson correspondence (RESUBMITTED) | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SAK000023

Supplemental to report of 09/17/2003

A006250



### Official Report Of
### Iowa Department of Public Safety
### DCI Criminalistics Laboratory
Wallace Building
Des Moines, Iowa 50319
(515) 281-3666

**96-05382**

**CASE NUMBER**

**08/12/2004**

**REPORT DATE**

See Code of Iowa Section 691.2 Presumption of qualification – evidence – testimony. "It shall be presumed that any employee or technician of the criminalistics laboratory is qualified or possesses the required expertise to accomplish any analysis, comparison, or identification done by the employee's employment in the criminalistics laboratory. Any report, or copy of a report, or the findings of the criminalistics laboratory shall be received in evidence, if determined to be relevant, in any court, preliminary hearing, grand jury proceeding, civil proceeding, administrative hearing, and forfeiture proceeding in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis, comparison, or identification had testified in person . . ."

**REPORT TYPE:**      Questioned Documents

**SUSPECT(S):**      Dustin Honken   Angela Jane Johnson

**VICTIM(S):**      Amber Duncan   Kandace Duncan   Terry Scott DeGeus   Gregory Nicholson   Lori Duncan

BE/(K1),
BP/(K1a),
BS, BT, BU.

It is the opinion of this examiner that the questioned writing on Exhibits BU(1), BU(2), BT(2), and the words, "TO BLACK TOP," on BT(3) were written by the writer of Exhibits BE/(K1) and BP/(K1a) which were submitted as the known writing of Angela Johnson. Also, there were indications that the words "FIELD, HOUSE, CYLO, and KILLDEER RD. on Exhibit BT(3) may have been written by the writer of Exhibits BE/K1 and BP/K1a.

The remainder of the handwriting on Exhibit BT(3) and the handwriting on BS(2) could neither be identified nor eliminated as having been written by the writer of Exhibits BE and K1a.

The handwriting on the envelopes, Exhibits BS(1) and BT(1) probably was not written by the writer of Exhibits BE and K1a.

It was also determined that Exhibits BS(2) and BT(3) were at one time joined and part of one piece of paper, and that Exhibits BT(2) and BU(1) were at one time joined and part of one piece of paper.

The questioned notes were examined by optical and instrumental methods to determine other facts about their origins. The Electrostatic Detection Apparatus (ESDA) was used to visualize handwriting impressions. These impressions were: 1) the partial text of the handwriting on envelope BS(1) found on notes BS(2) and BU(2), and 2) the partial text of the handwriting on envelope BT(1) found on note BT(3).

Exhibit BP should be picked up at your earliest opportunity. The remaining exhibits have already been returned to your agency.

Gary A. Licht, Criminalist

99853

Bill Basler      Cerro Gordo

Page 1 of 1



Official Report Of
**Iowa Department of Public Safety**
**DCI Criminalistics Laboratory**
Wallace Building
Des Moines, Iowa 50319
(515) 281-3666

**96-05382**

**CASE NUMBER**

**09/17/2003**

**REPORT DATE**

See Code of Iowa Section 691.2 Presumption of qualification – evidence – testimony. "It shall be presumed that any employee or technician of the criminalistics laboratory is qualified or possesses the required expertise to accomplish any analysis, comparison, or identification done by the employee's employment in the criminalistics laboratory. Any report, or copy of a report, or the findings of the criminalistics laboratory shall be received in evidence, if determined to be relevant, in any court, preliminary hearing, grand jury proceeding, civil proceeding, administrative hearing, and forfeiture proceeding in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis, comparison, or identification had testified in person . . ."

**REPORT TYPE:**     Questioned Documents

**SUSPECT(S):**     Dustin Honken   Angela Jane Johnson

**VICTIM(S):**     Amber Duncan   Kandace Duncan   Terry Scott DeGeus   Gregory Nicholson   Lori Duncan

BE, BS, BT, BU, K1a     It is the opinion of this examiner that the questioned writing on Exhibits BU(1), BU(2), BT(2), and the words "TO BLACK TOP." on BT(3) were written by the writer of Exhibits BE and K1a which were submitted as the known writing of Angela Johnson. Also, there were indications that the words "FIELD, HOUSE, CYLO, and KILLDEER RD. on Exhibit BT(3) may have been written by the writer of Exhibits BE and K1a.

The remainder of the handwriting on Exhibit BT(3) and the handwriting on BS(2) could neither be identified nor eliminated as having been written by the writer of Exhibits BE and K1a.

The handwriting on the envelopes, Exhibits BS(1) and BT(1) probably was not written by the writer of Exhibits BE and K1a.

It was also determined that Exhibits BS(2) and BT(3) were at one time joined and part of one piece of paper, and that Exhibits BT(2) and BU(1) were at one time joined and part of one piece of paper.

The questioned notes were examined by optical and instrumental methods to determine other facts about their origins. The Electrostatic Detection Apparatus (ESDA) was used to visualize handwriting impressions. These impressions were: 1) the partial text of the handwriting on envelope BS(1) found on notes BS(2) and BU(2), and 2) the partial text of the handwriting on envelope BT(1) found on note BT(3).

The submitted exhibits have been transferred to the Latent Print Section of this laboratory.

Gary A. Licht, Criminalist

72128

Bill Basler     Cerro Gordo

Page 1 of 1



GOVERNMENT EXHIBIT
3/8



GOVERNMENT EXHIBIT 3/1

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 28 of 263

EVERYTHING IS JUST THE WAY THE PAPER
SAID IT WAS. THEY WERE ALL TOGETHER IN ONE
I DON'T KNOW WHAT THEY WERE WEARING. I'M
SURE THE GIRLS WERE IN P.J.'S. ALL SITTIN IN THE
KITCHEN. I THINK THE WOMAN WAS SHOT MORE THEN
ONCE BECAUSE SHE HAD A HIT SOMEWHERE FROM BEHIND
THE SIDE OF HER HEAD.

(DAVID) I DON'T REMEMBER FIRST HOW I MET HER

GOVERNMENT
EXHIBIT
312A

Case 3:09-cv-02384-MVB-LTS Document 28447 Filed 06/23/11 Page 29 of 263

INCHES

SPECIMEN 96-5382 (BU) DATE 4/6/0?

GOVERNMENT EXHIBIT
CR01-3047

Case 3:09-cv-03064-MWB-LTS   DoSAK00284-27   Filed 06/23/11   Page 30 of 263

THE 1 LBS. BODIES IN THIS AREA DENE HE WOULD
[illegible] DATE WHEN I [illegible] [illegible] [illegible] (FACE DOWN)
HE [illegible] NEXT [illegible] [illegible] [illegible]
[illegible] [illegible] ([illegible])

INCHES

cm
S.O.
SPECIMEN   196-25372   BT 4/14/03
DATE

GOVERNMENT
EXHIBIT

Case 3:09-cv-03064-MWB-LTS    DoSARK000337    Filed 06/23/11    Page 31 of 263

## Questioned

## 96-5382
## Known

EVERY EVERY EVERY EVERY

THING THING EVERYTHING THINGS

JUST JUST JUST JUST JUST

THEY THEY THE

GIRLS GIRLS GIRLS GIRLS

I THINK I THINK I

SHOT IN THE HEAD IN HERE

SHOT SHOT HEAR THE THE

BECAUSE

RAN

GOVERNMENT
EXHIBIT
**319A**
CR01-3047

Case 3:09-cv-03064-MWB-LTS   DoSAK0000127   Filed 06/23/11   Page 32 of 263

## 96-5382 Letter Chart

### Questioned

### Knowns

GOVERNMENT
EXHIBIT
**319B**
CR01-3047

responsibility, Judge.

THE COURT: Thank you. We'll be in recess.

(Recess at 2 p.m.)

THE COURT: Ready for the jury?

MR. WILLIAMS: Yeah. Very quickly, Your Honor, we have another -- very quickly, Your Honor, we have a copy of our exhibit list that's updated. And to jump to my legal assistant's defense here, we checked, and it ends up she actually put our exhibits in your notebook.

THE COURT: Oh, they weren't on my list.

MR. WILLIAMS: Our fault is we failed to tell you about it in advance.

THE COURT: Clairvoyant I'm not.

MR. WILLIAMS: Thank you.

THE COURT: Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Miller, you ready to call your next witness?

MR. MILLER: Yes, Your Honor. The United States calls Gary Licht. Mr. Licht, if you'll please step forward and be sworn.

GARY LICHT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. And if you'd be so kind as to adjust the chair and the microphone so you can speak directly into the microphones. Scoot the chair up

a little bit, please. And when you're ready, would you state your full name and spell your last name.

VOLUME 10 9-29-04 witness testimony

THE WITNESS: My name is Gary Licht, L-i-c-h-t.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir?

A. I'm employed by the Iowa Division of Criminal Investigation laboratory in Des Moines, Iowa. I am a questioned document examiner.

Q. This jury heard some time ago from a Paul Bush. Is he a member of the same laboratory?

A. Yes, he is.

Q. Different section, same lab.

A. Yes.

Q. What sort of work goes on in the questioned document section of the crime lab?

A. Any documents, whether they be handwritten or machine produced, about which questions have been raised in a criminal matter can be submitted to the questioned documents section. And they involve a wide variety of case types, substrates, and a wide variety of situations.

Q. Would you briefly summarize for the jury your education, training, and experience that qualifies you to do such work.

A. My educational background is that I have a bachelor of science degree in zoology from Iowa State University and a

2299

master of science degree in biology from Florida State University. And when I was employed by the Iowa DCI lab, I began a training program. That training program was 32 months full-time on-the-job training in the analytical methods and instrumental techniques that I would need to characterize, compare, and identify questioned and known documents, whether

Page 155

SAK000034

they are handwritten or machine produced.

As part of that training, I read the pertinent books and scientific articles that were necessary for whatever area I was studying at the time. I did practical exercises. I took practical tests, written tests, and oral tests. I also completed a comprehensive examination when I was done with the training.

I also participated in something called supervised case work where I would pull a case that we had to be worked. I would work through it and then put my notes and my report in a separate file and then hand that over to the training examiner. He would then work through the case separately and write his report. When he was done, he would then open up what I had done, and then we would talk about what I had done in that particular case. And that part of the training began after I'd been there only about nine or ten months. So supervised case work was an integral part of the training program.

I attended specialized workshops ranging anywhere from four hours to two weeks that dealt with various areas pertaining

2300

to handwriting, a couple of workshops on difficult extended handwriting problems, another couple of workshops on difficult signature comparison problems. And I also spent two weeks with another examiner in Illinois to get an idea of how case work was done in the Illinois State Patrol laboratory system.

Q.    How many years' experience do you have in document examination, sir?

A.    Ten years.

Q.    And is that your full-time duty?

A.    Yes, it is.

Page 156

SAK000035

Q.   It's not a second career or a secondary responsibility. It's your focus, your professional focus.

A.   Yes, it is.

Q.   Mr. Licht, in connection with those duties and responsibilities, did you do some work in connection with the Nicholson, Duncan, DeGeus disappearance and death investigations?

A.   Yes.

Q.   And among the work that you did in connection with that case, did you recently examine what are referred to as inmate kites?

A.   Yes.

Q.   How many of them?

A.   I believe there were four of those that were written comprised of about ten sides of pieces of paper total.

2301

MR. MILLER:  And if I may approach the witness, Your Honor?

THE COURT:  You may, Mr. Miller.

BY MR. MILLER:

Q.   Just so it's clear that we're talking about the same item, is Government Exhibit 307 one of those four documents that you examined?

A.   Yes, it is.  These are four pages from that.

Q.   What examinations did you do in connection with those four kites, sir?

A.   I did a handwriting comparison to known writings that were submitted.  I also examined those pieces of paper to see if I could determine any other facts about them using instrumental techniques to see if any other handwriting or handwriting

Page 157

impressions that were not immediately visible would become visible.

Q. And when you indicated that you compared the documents with known writing, can you describe for us specifically whose known writing you compared it to and how you go about doing such work?

A. I had known writing submitted from two individuals. They were submitted and identified to me as that of Dustin Honken and Michael Kluver. The comparison process involves looking very carefully at the questioned writing to see if indeed it's all by one writer. And if it isn't, I have to separate it into groups based upon the handwriting characteristics.

2302

Then I look at each set of known writing, then look to see if within that set it's all by one writer. And if not, I have to subdivide it, and I do that with each set of known writings that I get. I can then look at the writing to see what significant characteristics are there, in other words, those characteristics which are different from what's called copy book style. Copy book is what we looked at when we learned to write in our early years somewhere in 3rd or 4th grade when we first looked at cursive or printing. I look for those characteristics that I can use that have some significance to them in the comparison process, and then I do a side-by-side comparison between questioned and known.

Q. Did you note anything noteworthy regarding the known samples?

A. Yes. In both sets of known writings, I had characteristics to work with in the comparison process.

Q. And did you arrive at any conclusion regarding authorship or in whose handwriting these four kites was?

Page 158

A.   Yes.

Q.   And please tell us what conclusion you arrived at, sir.

A.   I was able to conclude that the questioned material that was submitted as -- it was submitted to me as Exhibit BW; I don't know what the state's exhibit is with that -- were written by the same writer as exhibits that were submitted as the known writing of Dustin Honken and that those same questioned items

2303

were not written by the writer of the known writing submitted as that of Michael Kluver.

Q.   Mr. Licht, I believe we're following you clearly enough, but since you use different laboratory designations that may not be identical to our exhibit identifications, I want to hand four documents to you and ask you to let us know whether or not we're talking about the same thing here.  Handing you Government Exhibits 306, 307, 308, and 309, are those the four documents that you referred to as having examined?

A.   Yes.  Those -- 306, 307, 308, and 309 were submitted as the questioned documents.

Q.   And those four exhibits, 306, 307, 308, and 309, are the ones that you've expressed the conclusion were written by the author --

A.   Yes.

Q.   -- by Dustin Honken?

A.   Yes.  Those were submitted as the questioned documents.

Q.   And the ones that you arrived at the conclusion were authored by the same person who provided what was submitted to you as the known handwriting of Dustin Honken.

A.   Correct.

Q.   Were there any scratch-outs or write-overs on the

Page 159

documents?

A.    There were a few words that were scratched out, and there were a few corrections or other words written in.

2304

Q.    Is that uncommon in your experience in examining extended writings?

A.    It's not uncommon.  In extended writings I see scratch-outs.

Q.    Particularly in ink writing as opposed to pencil?

A.    Yes.

Q.    Were these in ink or pencil?

A.    These were in ink.

Q.    Just displaying for the record page 3 of Exhibit 307 --

MR. MILLER:  With the Court's permission.

THE COURT:  You may.

BY MR. MILLER:

Q.    Page 3 of Exhibit 307 is on the display.  You recognize that, sir, as one of the pages from one of the documents that you examined?

A.    Yes.

Q.    And that has, for example, a scratch-out on it.

A.    Yes, it does.

Q.    What, if anything, did you do in connection with any scratch-outs that were observed on the various documents?

A.    I used instrumental techniques that are useful for discriminating between similar inks but those that I potentially can discriminate using careful illumination and examination with various filters and cameras.  I use ultraviolet, visible, and infrared light to do those examinations.

2305

Page 160

SAK000039

And those examinations are useful when, for example, there are two black inks, one of which obscures another or for some reason there's something else obscuring some writing, and I use those instrumental techniques to try to read what is obliterated. In this particular situation I wasn't able to read what was scratched out.

Q. The ultraviolet and infrared lighting techniques did not allow you to read any of the underlying scratched-out writing?

A. Correct.

Q. Are you able to arrive at any conclusions because of that, sir?

A. If I can't discriminate the overwriting from what was underneath it, I have to conclude that either it's scratched out with the same pen or with another pen which has the same ink characteristics.

MR. MILLER: Thank you, sir. I have no further direct.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Mr. Licht.

A. Good afternoon.

Q. Mr. Licht, I have just a couple of short questions for you. The first is could you describe for the jury what proficiency testing you routinely go through?

A. In addition to the testing I did in training and also

2306

research, I take two proficiency tests each year, and I am proficient.

Page 161

Case 3:09-cv-03064-MWB-LTS    Document 884-37    Filed 06/23/11    Page 40 of 263
SAK000040

Q.   All right.  And in examining Government's Exhibits 306 through 309, you described for the ladies and gentlemen of the jury the testing procedures or the examination procedures that you go through.  And would I be fair in saying that probably the first thing you do is you just look at the document?

A.   Yes, I take a good hard look at all of the documents.

Q.   All right.  And then in addition to that you might do some microscopic or magnified examination of the documents?

A.   Correct.

Q.   And you look at it not only to see how a -- an author or a writer might form their letters but other distinctive characteristics about the person's writing?

A.   Yes.

Q.   And that would be just a way that any member of the jury or any of us could go about comparing the way a person writes to a questioned document like the ones you were asked to look at.

A.   I don't know if a layperson would spend as much time and as much detail looking at that as a document examiner does.

Q.   No, I understand that.  But it'd be a place that we could start.

A.   Yes.

Q.   And that would be something you would do to start in your examination of a questioned document, make observations about

2307

how letters are formed, how letters are grouped together, distinctive characteristics about crossing t's or dotting i's.

A.   Correct.

Q.   And in examining the questioned documents that you were asked to look at here, you did that as well as the other testing that you've described for us this afternoon.

Page 162

SAK000041

A.    Correct.

Q.    Did you do any chemical testing of the inks that were used in the formation of the letters and numerals in Government's Exhibits 306 through 309?

A.    No, I did not do any chemical testing.

Q.    So, for example, you've been trained as a document examiner that among the gross examination of a questioned document, the magnification that you can use to look at a questioned document, the use of different types of lights and instruments, you can also do chemical testing of the inks that were used in the formation of the letters.

A.    Yes.  If there's a particular question about that, I can do that.

Q.    And the reason you didn't do it with Government's Exhibit 306 through 309 is you knew that the pens that were used were standard-issue pens at the correctional institution where these letters came from.

A.    No, I didn't know that they were any sort of a standard issue.  I didn't have any questions to answer regarding the inks

2308

other than I looked at the overwriting or the scribbled-out areas to see if I could differentiate that, and that was about the only questions that I had related to the ink itself.

Q.    Okay.  And so, for example, in Government's Exhibit 307, specifically page 2 of Exhibit Number 307 that you see there on your monitor, when you were asked to examine the cross-outs on Government's Exhibit 307, you used, as I recall from your testimony, different types of light sources to see if you could detect any peculiarities about the cross-outs?

A.    Yes, I looked to see if I could read what had been crossed

Page 163

out.

Q.   All right.   And tell us a little bit more about how you tried to figure out what was underneath the cross-outs.

A.   I first look under the microscope to see if it's obvious under magnification if I can read it to the point where I'm sure what it says.  If I'm not sure what it says, then I don't want to offer any conclusion about that.  I then go to instrumental techniques to see if I can find the right combination of illumination and camera filters to make one ink appear different from the other.  And in this particular situation I still could not read what was scratched out.

Q.   It may be silly of me to ask you this, but did you look at the back of the paper to see if you could find out what was maybe obliterated?

A.   I looked at the backs, and I didn't see anything where it

2309

was plain and obvious what the words were.

Q.   All right.  Now, granted, what we're looking at here on the monitor and what you have before you and I think what has been received in evidence are photographs of the actual original documents; am I right?

A.   They're representations of the documents.  I'm not sure at this point if we're looking at photocopies or what, but they are representations of the documents.

Q.   All right.  But what you looked at were the originals.

A.   Yes.

Q.   Okay.  And are there also, Mr. Licht, computer programs that allow you to in essence photograph a writing and systematically remove cross-outs?

A.   There are programs that assist in discriminating between

Page 164

SAK000043

the inks.  There are not programs that, say, follow the scribble lines.

Q.  You're not aware of digitizing documents and being able to lift out overwrites?

A.  There have been attempts at that.  I haven't seen any that actually worked without someone trying to follow either straight lines or circles.  Under the situations that I've seen where it did work, it was -- the person was able to follow the scribbling lines over the top, and that was done manually more efficiently than the software.

Q.  All right.  And, in fact, you've read in the Journal of

2310

Forensic Sciences articles about digitizing writing and removing overwrites, haven't you?

A.  Yes, and, in fact, I do use some of those techniques.

Q.  Okay.  Now, finally, in trying to discern what's under the overwrites, do you also look at the pattern that a person uses in forming their letters and characters to see if you can deduce what some of the letters were underneath the overwrites?

A.  I did some of that, and in this situation without being able to be clear about what was written, I did not try to offer any particular discernment of what the words were exactly.

Q.  And finally, did you notice in your examination of the known writing of Dustin Honken that he tends to round off his r's?  And by r's, I mean the small r's.

A.  I would have to look at them, but rounded r's is reasonably common, and I would have to go back and look and see.  I mean, on this particular exhibit, I do see some rounded r's in front of us.

         MR. SPIES:  Thank you.  Appreciate your time.

Page 165

SAK000044

THE COURT: Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: You may step down.

Government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Michael Merino.

MICHAEL MERINO, PLAINTIFF'S WITNESS, SWORN

2311

THE COURT: Please be seated in the witness box. Please adjust the chair and the microphone so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Michael Joseph Merino, M-e-r-i-n-o.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Merino, could you tell the jury what you do for a living, sir.

A. I'm a jailer at the Benton County Sheriff's Office.

Q. Do me a favor, Mr. Merino. These microphones actually only work if you're within a few inches of those, so if you could just repeat what you do for a living, sir.

A. I'm a jailer at the Benton County Sheriff's Office.

Q. And the Benton County Sheriff's Office, where is that located at, sir?

A. Vinton, Iowa.

Q. How long have you been employed as a jailer there?

A. Seven years.

Q. Can you just describe generally for the jury what are your

Page 166

SAK000045

duties as a jailer at the Benton County Sheriff's Office?

A. To look out for the health and welfare of the inmates, feed them, their meds, that sort of thing.

2312

Q. How large of a jail is the Benton County Jail?

A. Thirty-one beds.

Q. And do you have both male and female inmates that are housed in your jail from time to time?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Merino, I'm showing you what's been marked as Government's Exhibit 318. Do you recognize that diagram there, sir?

A. Yes.

Q. And what is that?

A. That's a diagram of the Benton County Jail.

Q. Is that a reasonably accurate diagram of the layout of the interior of the Benton County Jail?

A. Yes.

MR. WILLIAMS: Your Honor, 318 has already been admitted into evidence. And permission to publish?

THE COURT: You may.

BY MR. WILLIAMS:

Q. On the screen in front of you, Mr. Merino, is the -- is that diagram; is that correct?

A. Correct.

Q. Okay. I'd like you to walk the jury through if you would

2313

Case 3:09-cv-03064-MWB-LTS    Document 284-7    Filed 06/23/11    Page 46 of 263

SAK000046

some of the locations there. First of all, there's a notation for front entrance here?

A. Yes.

Q. Okay. And then there's a lobby area that kind of comes from this area down through here?

A. Yes.

Q. Then there's a couple rows of cells; is that correct? There's cells 8 through 5 on that side, and then on the other side there's also some cells as well; is that correct?

A. Correct.

Q. There's an indication here of an outdoor recreation area. Do you see that indication there?

A. Yes.

Q. From the cells that are marked cells 5 through 8, are there windows on to that outdoor recreation area?

A. Yes, there are.

Q. And then is there a wall on the outside of the recreation area?

A. Yes.

Q. Right there?

A. (Witness nodded head.)

Q. Okay. Tell the jury if you would, sir, the windows out into that recreation area, can inmates see through them?

A. No, they're frosted.

Q. And can they be opened at all in any way?

2314

A. No.

Q. This is a relatively small jail. Is that fair to say?

A. That's fair to say.

Page 168

SAK000047

Q.   And when you have both -- let me ask it this way.  Do you often or on occasion have both male and female inmates in your jail at the same time?

A.   Yes.

Q.   Is there a particular row of cells that are designated female cells and a particular row designated male, or how do you determine what cells the males would go into and what cells the females?

A.   There is no certain cell that we put females or males in.  It's whatever's available at the time.

Q.   We see on TV sometimes pictures of jails that have the open bars down that people can see right through.  Is that how the Benton County Jail is set up inside?

A.   No.

Q.   Are there doors that would block views into the cells so that you wouldn't have to worry about males seeing females undressing or anything like that?

A.   Yes.

Q.   And so because of that, you can put a female and a male in any cell as long as they're not in the same cell?

A.   Correct.

Q.   And is it just the staff there that makes the determination

2315

on any given day if you've got both males and females in the jail what cell they would happen to go into?

A.   Yes.

Q.   Now, are there rules within the Benton County Jail concerning communication between inmates, whether they're male and male or male and female?

A.   We don't allow it.

Page 169

SAK000048

Q. Don't allow communication between inmates, period?

A. Correct.

Q. Now, some of those cells, do they hold more than one inmate within a cell?

A. Yes.

Q. And are the inmates allowed to talk with each other within the cell?

A. Yes.

Q. Are inmates allowed to talk with each other from cell to cell?

A. No.

Q. Explain a little bit on this outdoor recreation area. Are inmates from different cells allowed to use that outdoor recreation area at the same time?

A. No.

Q. And so, for example, if you had 2 inmates in cell 5, they might be let out to use the recreation area, but you're not going to have inmates from cell 5 and inmates from cell 6 using

2316

it at the same time.

A. No.

Q. There's a booking area up at the top here. And are inmates allowed periodically to have access up into that area?

A. Yes.

Q. And what's the purpose for that?

A. Shaving purposes, changing books, that sort of thing.

Q. You have a little bit of a library up there on shelves beneath the booking area?

A. Correct.

Q. And inmates can go up there and retrieve books on occasion?

Page 170

SAK000049

A. Yes.

Q. Is there any common area where all the inmates at the jail at one time can congregate and communicate with each other?

A. No.

Q. Now, Mr. Merino, you have these rules against communication within the Benton County Jail. Nevertheless, do inmates find ways to communicate with each other?

A. Unfortunately, they do.

Q. Do you make efforts to stop that communication?

A. We try our best.

Q. What are some of the ways that inmates have found around the rules against communicating with each other?

A. Talking through the walls, putting notes in books and exchanging them, just a lot of different ways, talking to

2317

outdoor rec. through the windows, just a lot of different ways like that.

Q. Let's talk about some of those ways you just talked about. You said putting notes in books. Do they hide notes inside books and then they take it back up to the library?

A. Then they exchange the books.

Q. And then talking in the outdoor recreation area through the windows I think you said is one way of doing it as well.

A. Yes.

Q. And you said the windows don't open. Can they -- if somebody's out in this yard, can they communicate with somebody, for example, in cell 6 somehow?

A. Yes.

Q. And how would they do that?

A. They just knock on the window and talk to them through the

Page 171

SAK000050

window.

Q.   Now, at some point in the year 2000, was an inmate by the name of Bobby McNeese an inmate at the Benton County Jail?

A.   Yes.

Q.   And was he a federal inmate?

A.   Yes.

Q.   Can you explain to the jury a little bit, Benton County Jail's a county jail; is that right?

A.   Correct.

Q.   Do you nevertheless hold federal inmates from time to time?

2318

A.   We hold quite a few federal inmates.

Q.   And how does that work?  How is it that you have federal inmates in your county jail?

A.   Well, I assume that they think our jail's pretty secure, so that's where they put our -- put their inmates.

Q.   Okay.  So there's some arrangements between the U.S. marshals and your jail administrator to allow federal inmates to be housed there.

A.   Yes.

Q.   All right.  And Bobby McNeese was one such federal inmate; is that correct?

A.   Yes.

Q.   And he was held in your jail at least from the time period of March of 2000 through October of 2000?

A.   I would say that's accurate.

Q.   Angela Johnson, did you become aware of her becoming an inmate at the Benton County Jail at some point in time?

A.   Yes.

Q.   And how did you become aware, first of all, that she became

SAK000051

an inmate there? Did you actually see her arriving at the Benton County Jail?

A. I believe Detective Pete Wright told me about a week before she came.

Q. And then at some point did you actually see her in the jail?

2319

A. Yes.

Q. Was she the only female in the jail at the time?

A. No.

Q. And was she housed with another female inmate?

A. Yes.

Q. Do you recall that she arrived at the jail on July 30 of the year 2000?

A. I would say that's around the time.

Q. Would it refresh your recollection -- you've testified about this matter before; is that correct, sir?

A. Yes.

Q. And would it refresh your recollection if you had an opportunity to look at your prior testimony?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. If you would just read down here to yourself, and when you're done reading, just let me know.

A. Okay. Okay.

Q. Sir, does that refresh your recollection that she arrived on July 30 of 2000?

A. Yes.

Page 173

SAK000052

Q.   While you were the jailer at the Benton County Jail in the summer of 2000 after Angela Johnson arrived there, did you

2320

become aware that there was communication occurring between Robert McNeese and Angela Johnson at the Benton County Jail?

A.   Yes.

Q.   And, in fact, was at least one note intercepted by the jail staff being passed by Miss Johnson to Mr. McNeese?

A.   Correct.

Q.   And that communication occurred more than once during that time period; is that fair to say?

A.   Yes.

MR. WILLIAMS:  At this point, Your Honor, the government would request permission to read into the record a stipulation entered into between the parties, between the United States and the defendant, Dustin Lee Honken.

THE COURT:  Okay.  You may.

MR. WILLIAMS:  Thank you.  The stipulation reads, The United States of America, Plaintiff, versus Dustin Lee Honken, Defendant.  Subject to the record previously made, the United States of America and the defendant, Dustin Lee Honken, stipulate and agree as follows:  During August and September of 2000, Angela Johnson was in the Benton County Jail awaiting trial on federal criminal charges relating to the deaths of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

While in the Benton County Jail, Johnson became acquainted with a fellow jail inmate named Robert McNeese.

2321

Page 174

SAK000053

MCNeese was and currently still is serving a federal sentence of life in prison on matters unrelated to the case. Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims.

McNeese told Johnson that in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies.

Johnson prepared and provided to McNeese certain maps and notes describing the location where the bodies of the five victims were buried. McNeese then turned over these maps and notes, Government's Exhibits 310, 311, and 312, to the Iowa law enforcement authorities.

Exhibits 310, 311, and 312 have been analyzed at the Iowa DCI criminalistics laboratory. Both fingerprint and handwriting analysts conclude that Angela Johnson authored or could not be eliminated as authoring Exhibits 310, 311, and 312. The stipulation was dated the 24th day of September, 2004. It's signed by myself and Thomas Miller on behalf of the United States and by the defendant and his three attorneys.

I have no further questions of this witness, Your Honor.

2322

MR. SPIES: Your Honor, no questions of this witness. Thank you.

THE COURT: You may step down.

Page 175

SAK000054

MR. WILLIAMS: Your Honor, I apologize. This is the first day this has happened. But we are out of witnesses for the day, and so we do not have any witnesses available to testify the rest of the day. I apologize.

THE COURT: Okay. Members of the jury, that will conclude the evidence for today. I did want to give you a handout. There's been a slight modification in our schedule, and next Thursday we were originally going to be off at 1, but we can now go till 4:30. I hope that doesn't disappoint anybody. I have a new schedule, but I don't really need to pass it out because that's the only change. And if you'd just hang on one second -- could I see the lawyers just at sidebar very briefly?

(At sidebar off the record.)

THE COURT: Just to kind of give you a heads-up on where we think we are in the case, Mr. Williams has informed me and the defense lawyers that he thinks the government will be resting sometime next week, so just to give you a heads-up. I still don't know how long the trial's going to last, but we do have the indication that the government thinks they'll be resting next week. I hope that's not like the lawyer who asked -- who said to me one time, I have one more question, and

2323

I always keep track when they say that, and he asked 167 additional questions. So you never know. But I'm fairly confident the government's going to rest next week.

Please keep an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and go back to the jury room and review the evidence and begin your

Page 176

SAK000055

deliberations. We'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Anything we need to take up on the record?

MR. WILLIAMS: Just a minor housekeeping issue -- and I don't think anybody has any problem with this -- Government's Exhibit 250 through 294 have to do with the floor plan of the Marion -- I'm sorry, of the Florence facility and photographs there. We produced those to the defense and produced them in court with the understanding from the defense, number one, that they will not provide copies to the defendant and they will not reproduce those copies other than for use among themselves. And we would ask the Court -- we will be asking the Court to seal those exhibits at the conclusion of this case so they don't become available to the public for security reasons.

THE COURT: Any objection on that?

MR. PARRISH: That was the understanding we had, and

2324

we will accept that. We have no problem with that.

THE COURT: Okay. I'll order that they be sealed, Exhibits 250 through 294, at the conclusion of the case.

MR. WILLIAMS: And then to the extent -- and I don't know if the defense will be doing this or not. But to the extent -- we also provided them a floor plan to Marion and photographs of Marion as well. And to the extent that those are produced, we would ask that those also be sealed for the same reasons.

THE COURT: Any objection?

MR. PARRISH: Same thoughts.

Page 177

SAK000056

THE COURT: Okay. I'll order those -- well, those aren't in evidence, though, are they?

MR. WILLIAMS: No, they aren't. If they're offered, I will be asking for it.

THE COURT: Okay. If they're offered, I'll go ahead and seal them.

MR. PARRISH: And with the status of the record, Your Honor, I'm not sure we're going to even get into Marion at this point, is that right, because you're not calling any more witnesses from Marion?

MR. WILLIAMS: That's correct.

MR. PARRISH: So I don't think that's going to be an issue at all, and they're not in our notebooks at the present time.

2325

THE COURT: Okay. Now, you've indicated that you think you're going to rest on Tuesday?

MR. WILLIAMS: As early as Tuesday, yes, Your Honor. A lot of this is going to be hard to tell just how long it's going to be to get through the rest of our case, but our best estimate is it could be as early as Tuesday. I don't think it will be any later than Wednesday that we'll be resting.

THE COURT: Okay. Now, Mr. Parrish, you indicated that you have a revised defendant's exhibit and witness list; is that correct?

MR. PARRISH: We do, Your Honor. I think we provided this afternoon the last list -- this morning at least the revised list. I told Carey we're going to work on it a little bit more this evening. I was thinking it was going to be next Thursday when the government was going to rest. We'll try to

Page 178

SAK000057

get as busy as we can on it now. I told her by Monday we would get her a final -- get to you at least a final list. I'm thinking now we'll make every effort to try to get it tomorrow.

The only problem we do have, Your Honor, is one of the witnesses. I told the marshal's office Monday I thought we'd be starting. The problem is I need to meet with this witness before he testifies. He would be in the U.S. marshal's custody. I have not talked to the marshal's office since this afternoon they told me now it might be Tuesday or maybe even Wednesday when they're called. So I don't know what the Court's thought

2326

might be on it, but I will meet with Duane right afterwards and see is there any way we could move up the schedule. I'm not sure we can at this point. But I can get back to the Court first thing in the morning and let you know.

THE COURT: Okay. That's fair. Now, are we going to be taking any defense witnesses by video conferencing?

MR. PARRISH: That's out now.

THE COURT: Okay. That's out.

MR. PARRISH: All of that's out. The other additional witnesses who are coming in from the prisons, I believe that's out at this point. We might want to make some brief record on it at some point with regard to Mr. Honken. But other than that, all of those witnesses would be out now except for Mr. Loparo.

THE COURT: And he's the one that you need to talk to Duane about.

MR. PARRISH: I do. We told him Monday. We were looking at Thursday as a close date.

THE COURT: You told him a week from next Monday.

Page 179

VOLUME 10 9-29-04 witness testimony

MR. PARRISH: Right.

THE COURT: Right.

MR. PARRISH: Because we had agreed I think on two a day, and after we met Mr. Honken last night or yesterday afternoon, we're down to just one who we think we'll need.

THE COURT: Okay. Anything else?

2327

MR. PARRISH: I can't think of anything.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. PARRISH: We'll try to get you a list in the morning now, our final list.

THE COURT: Okay. Thank you.

MR. WILLIAMS: I guess one other thing, Judge, and I'll just give this information both to you and to the defense by tomorrow. I think in light of the testimony from Mr. Altimus, I never did get him with it on the Cobeen issue, and that's my fault. All I listed was testimony about efforts to kill Cutkomp. And so we're going to have to revise the instructions and the verdict form on Count 6 to reflect that. But I will get a notation -- I'll get a letter to the Court by tomorrow regarding where I think those changes need to be made in the jury instructions.

THE COURT: Okay.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Would you be able to meet, Mr. Rogers or whoever else from the defense, and talk about the final draft of the instructions, the merits instructions, yet today?

MR. ROGERS: Sure.

THE COURT: Would somebody from the government be

Page 180

available?

MR. WILLIAMS: Certainly.

2328

THE COURT: Okay. I'd just like to go over those again. Why don't we meet at -- in half an hour at a quarter to four, and it's just informal. If you want to just come back in chambers, we can discuss it, just on the conspiracy issue and the issue Mr. Rogers has raised in his proposed jury instructions; okay?

MR. WILLIAMS: Very good.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was
adjourned at 3:13 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

1-5-05
Date

2329

Page 181

VOLUME 10 9-29-04 witness testimony

INDEX

WITNESS:                                                    PAGE:


JOHN GRAHAM
          MR. WILLIAMS                                      2130
          MR. SPIES                                         2193
          MR. WILLIAMS                                      2211

JOSEPH MCGEE
          MR. MILLER                                        2214
          MR. PARRISH                                       2249
          MR. MILLER                                        2286

MICHAEL KLUVER
          MR. MILLER                                        2287
          MR. PARRISH                                       2293
          MR. MILLER                                        2294

GARY LICHT
          MR. MILLER                                        2298
          MR. SPIES                                         2305

MICHAEL MERINO
          MR. WILLIAMS                                      2311

                         *****



EXHIBITS:

305                                                         2181
306 through 309                                             2293

                         *****

SAK000061

Q. And you first divulged the information you had in April of 2002 to Mr. Basler and Agent Graham; correct?

A. Correct.

Q. So even though you acquired this information in the summer and fall months of 2000, you didn't feel it was something you had to do until April of 2000 when you were -- had a pending federal methamphetamine charge and you had not been -- not yet been sentenced; correct?

A. Correct.

MR. WILLETT: Thank you, Judge.

THE COURT: Anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You may step down.

Everybody can take a stretch break.

And are you ready to call your next witness?

MR. MILLER: Your Honor, the United States calls Gary Licht.

GARY LICHT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. Adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Gary Licht, L-i-c-h-t.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

SAK000062

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Your occupation, sir.

A.   I'm a questioned document examiner employed by the Iowa Division of Criminal Investigation laboratory located in Ankeny.

Q.   And that's the same DCI lab at which Deb Davis, Paul Bush, and others work?

A.   Yes, it is.

Q.   How long have you been employed by that organization, sir?

A.   Ten years.

Q.   What is document examination, Mr. Licht?

A.   Forensic examination of documents is a broad field that involves the genuineness of handwritten and machine-produced documents, the characterization of the sources of the things that comprise documents, and the identification of writers and machines.

Q.   Before we get into your more specialized training and experience in that area, would you briefly summarize your formal education for the jury, sir.

A.   Yes.  I have a bachelor of science degree in zoology from Iowa State University and a master of science degree in biology from Florida State University.

Q.   And more specifically in the area of document examination, Mr. Licht, would you please summarize for the jury your formal training in that specialty and a brief description of the

SAK000063

experience you have in the field.

A. My training in questioned documents was over two and a half years full time on the job in an extensive training program. The training program was comprised of 64 units of study, and in those units of study I learned all of the analytical and instrumental techniques and methods that I would need to examine a very wide variety of documents. Some of those areas focused on handwriting, typewriting, copiers, office printers, professional print shops, ink and paper and writing instruments, photography, and the stabilization and reading of deteriorating documents.

I also attended specialized short courses and workshops. Some of those were difficult handwriting problems and signature problems taught in conjunction with meetings of the American Society of Questioned Document Examiners, a workshop on the comparison of ink taught by the IRS laboratory, printing processes taught by the FBI laboratory staff, and a number of other short courses and workshops.

In those two years I also spent two weeks with the document examiner trainer of the Illinois State Police at their training laboratory in Carbondale, and my training involved a tremendous amount of reading, practical exercises, testing, and supervised case work.

Q. In your job what types of evidence do you examine, sir?

A. I look at almost any substrate that has marks or symbols on

SAK000064

it that convey thoughts about which a question has been raised. Most of the time I am looking at handwriting or office-produced typewriting, if you will, on paper. The types of cases are wide ranging from death investigations to harassment to extortion, embezzlement, various types of frauds and forgeries.

Q. What needs to be submitted to you in order for you to do a complete examination and comparison?

A. I always ask for the original questioned documents or the best possible images that exist. And in the case of handwriting, I ask for adequate known writing of whatever individuals are involved such that I can determine the range of variation of that writer.

And that writing needs to be freely and naturally written. In other words, what the person does from day to day when they're writing is free of distortion. And I need to be able to encompass the sort of letters and numbers as are found in the questioned material, in other words, cursive for cursive, upper case for upper case, lower case, and hopefully even complete words.

Q. Mr. Licht, what is it that makes handwriting identifiable?

A. We have to presume several things: One, that in nature uniqueness exists. And we know that no two writers write exactly alike. Even identical twins don't write exactly alike. There may be some remarkable similarities, but no two people are precisely alike in their handwriting. Everybody has a certain

SAK000065

range of variation in their handwriting, and even though from day to day there are factors that are contributing factors to variation, but your handwriting is within a particular range.

What I need to see is can I determine that the questioned writing is freely and naturally written or at least some of it and is the range of variation that I find there found within the range of variation in the known.

Q. You mentioned that even identical twins have distinguishable handwriting. Have studies been done in this area?

A. Yes, there are a number of studies involving identical twins and fraternal twins.

Q. Would you please describe for us in general the procedures that are employed in your field in handwriting examination and comparison?

A. First thing to do is I look at the questioned material to see what it is. Is there something there that I need to compare, or do I need to ask for more? I look at the characteristics that are there to determine what it is that I'm going to be looking for.

Then I look at the known material from either one writer or a large number of writers. I look to see that I have writing that's free of distortion and hopefully original material, in other words, where I can look at the very subtle characteristics that are there.

SAK000066

And once I determine that I have adequate material, I do a side-by-side comparison. Most of it is pattern recognition or looking at shapes and the subtleties. Some of the things that I look at would be the gross shapes of the letters, the shapes of the individual parts of letters such as the stems and the bowls or the lower parts of the letters, the ascending parts and the descending, the ratios of the heights of those various components, the beginning strokes and ending strokes, retraces, curves, the little embellishments or particulars that may be there including the "i" dots and the "t" crossings.

At some point I reach a conclusion as to whether or not the range of variation of the questioned material is or is not found in the known writing.

Q.   Is there any standardization within your field as to the range of conclusions that are used to classify comparison findings?

A.   There are standard guidelines and protocols generally accepted by well-trained questioned document examiners.

Q.   What range of comparisons do you use?

A.   I use a nine-point scale of conclusions regarding handwriting. Every case starts at inconclusive, and that is one of the steps on the scale.

From there I have four steps one way or the other. If we work toward an elimination, I have indications that it may not have been written by, probably not written by, highly

SAK000067

probably not written by, and not written by.

Likewise, on the other side of the scale towards an identification indications may have been, which, I should add, is a weak conclusion. In other words, there's more there than I would expect based just purely on coincidence, but it's very limited; then probably was written by. In other words, it's unlikely that it was someone else; highly probable that it was written by; and then an identification of the writer.

Q. Do you in your work, sir, ever eliminate suspects in criminal investigations?

A. Yes, I do eliminate a lot of people.

Q. Mr. Licht, I'm showing you what have already been received in evidence as Government's Exhibits 10 -- excuse me,

Government's Exhibits 310, 311, and 312, the last of which consists of three documents, 312A, 312B, and 312C. I ask if you recognize those documents, sir.

A. Yes. These were submitted as questioned documents to me in this particular case.

Q. In connection with the Greg Nicholson, Lori Duncan, Christi -- excuse me, Kandi Duncan, Amber Duncan, and Terry DeGeus death investigations.

A. Correct.

Q. And in general what did you do in connection with your expertise as a document examiner?

A. The first thing that I did with these was to make them more

SAK000068

readable, and I did that simply by scanning them in on a computer and changing the contrast such that they were easier to work with.

I then had known writings to compare these to in this particular case to see if I could identify the writer on these five different pieces of paper.

Q.   And among the known writing submitted to you, were you provided with what was identified to you as known samples of the handwriting of the defendant in this case, Angela Johnson?

A.   Yes.

Q.   And from how many sources, sir?  Let me just ask you this.  Were you --

A.   I think I had three sources for the known writings.

Q.   Did you receive submitted to you known handwriting that was filled out as an exemplar voluntarily at the request of Agent John Graham?

A.   Yes, I did.

Q.   And did you also have a set of documents provided as photocopies of correspondence collected from jail?

A.   Correct.

Q.   And did you, in fact, conduct in connection with your training and experience a comparison of the known handwriting of Angela Johnson collected from those sources and the handwriting that you observed on those documents before you, Government's Exhibits 310, 311, and 312?

A.   Yes, I did.

Q.   First before we get into your examination and findings, sir, can you describe for us the known samples provided to you?

A.   The known handwriting of Angela Johnson had a wide range of variation in how many styles of handwriting there were.  There was very elaborate cursive writing, a little bit simpler cursive writing, and hand printing.  Some of the hand printing was done rather slowly and deliberately, and some of it was done with speed, so I had a number of styles of handwriting, and I had many pages of known writing.

Q.   How about the handwriting that was submitted from Agent Graham as the voluntarily submitted exemplar handwriting?

A.   Some of that was very elaborate cursive writing, and there was a very limited amount of printing on that.

Q.   Before I get into the basis for your findings, I want to ask you, sir, just for your conclusion.  Did you reach any conclusion or conclusions about the source of the handwritings or the handwriting, rather, in Exhibits 310, 311, and 312?

A.   Yes, I did.

Q.   Now, you've mentioned to us that before getting very far into your work you made digitized copies of these documents?

A.   That's correct.

Q.   And the purpose for that was what, sir?

A.   The first purpose was to make them readable, easily readable, from a distance.

SAK000070

Q. And in addition to that, we've already heard previously in this trial that there are a number of different sections of the DCI crime laboratory in which a number of different examinations and processes are employed. Are you the only one -- or excuse me, was the document examination section the only section that worked with these exhibits?

A. No.

Q. And would you just briefly describe for us how that works as far as the sequence of handling exhibits and the importance of reproducing them before passing them from one section to another?

A. It depends on the case. Oftentimes there's one section that has priority in looking at things. Sometimes it's the photography section. They photograph things before they go on to anybody else. I generally get the document evidence then before it goes on anywhere else. Sometimes I have to work in conjunction with the DNA section if indeed there is -- if there are envelopes submitted.

I then complete my analyses before sending it on for any further examination which in this case involved the latent print section. And I always get the documents before they go to the latent print section.

Q. Is there a reason you receive them before the latent print section, sir?

A. Yes. Once latents conducts chemical work on the documents

SAK000071

to look for latent impressions, the -- if there's ink on the documents, it may very well all run off. And also the documents start to take on color, sometimes gray and sometimes lavender or purple color, and it makes it more difficult to work with.

Q. In other words, work done by other sections of the laboratory, including the fingerprint examination section of the laboratory, can actually to some degree alter the appearance of the document?

A. Yes, very much.

Q. So it's important that you look at it before those sections do.

A. Yes.

Q. Okay. And it's also for that purpose that you reproduce it with digital photography?

A. Correct. The digital photographs then will be an accurate representation of the handwriting so that after latents is done there is still something to work with if further examinations are needed.

Q. Now, is the handwriting and the figures drawn on State's -- excuse me, Government's Exhibit 310, 311, and 312 legible even now?

A. It's legible if I look closely.

Q. Is it as legible as it was when first received by you?

A. I can't tell if it's as legible. It's certainly not more legible.

Q.   Okay.  If there are any changes whatsoever that are observable, I want to be sure you make clear to the jury what changes, if any, there are on those documents.

A.   Well, the paper is no longer white, and that does also obscure some of the pencil writing that's on there.

Q.   So age has an effect on paper.

A.   Yes.

Q.   And on the handwriting in the form of pencil, I assume.

A.   Yes.

Q.   Pencil fades?

A.   Yes.

Q.   And again, you indicated that that went to the fingerprint latent print examination sections of the laboratory as well after you looked at it first?

A.   Correct.

Q.   And did that at least to your visual observation result in any discoloration or any markings on those documents?

A.   Yes, they are now discolored.

Q.   And are there -- and you can feel free to take a quick look -- any notations by fingerprint examiners on there as well?

A.   Yes, there are notations by the latent print examiner.

Q.   With the exception of those notations -- and I assume they're initialed?

A.   Correct.

Q.   With the exception of those notations initialed by the

fingerprint examiner, the natural fading of the clarity of the pencil marking on that paper that has aged somewhat, and any discoloration that may have resulted from the latent print processing, are they substantially in the same condition as when received by you, sir?

A.   Yes.

Q.   With those exceptions.

A.   Yes.

Q.   And I've listed a few.  Nevertheless, you also told us that before all that was done you did latent -- excuse me, digital photography of it to preserve its clarity at the time that you received it.

A.   Correct.

Q.   Did you, sir, prepare enlargements of these exhibits, Government's Exhibits 310, 311, and 312A, B, and C, from that original digital photography that would be of assistance to you in describing your findings and assistance to the jury in understanding the basis for your findings?

A.   Yes.

      MR. MILLER:  And, Your Honor, strictly for demonstrative purposes, we do have those enlargements here. Again, they are for demonstrative purposes, but I would ask again with the Court's permission that the witness be allowed to don the portable microphone and use the easels and enlargements to describe for the jury the basis for his conclusions.

SAK000074

MR. STOWERS: No objection.

THE COURT: Okay. You may proceed.

BY MR. MILLER:

Q. Before you do so, we have five exhibits here, one for each of two maps and one for each of three notes; is that correct?

A. Yes.

Q. And also did you prepare -- in addition to those enlargements of the maps and notes, did you also prepare enlarged charts that showed the work that you did in comparing specific letters and phrases as they appeared between the questioned documents and the known handwriting of Angela Johnson?

A. Yes, I did prepare some comparison charts as a method of summarizing what I did and for demonstrative purposes.

Q. And I just wanted the record completely clear that that also is for demonstrative purposes, but that is a total of seven exhibits, no more than two of which would be necessary to place on easels at a time. Would that be fair?

A. That would be fine.

Q. I simply want to provide you an opportunity to explain the basis for your findings, but would that suffice, Mr. Licht?

A. I think that two at a time would be fine.

Q. Fine. Then if you would please with the Court's permission go to our law clerk, help her get that microphone on you, and I'll just leave it to you. Let me help you if you need some

SAK000075

help, but I'll leave it to you to place those easels wherever it would be most suitable.

THE COURT: And defense counsel's free to move wherever they want to.

A. Is there a particular placement in this courtroom that works best?

Q. Well, I'll direct you to the Court's attention, but the 18 people before you are the ones that most need to be able to see what you're showing, so put it close enough so that they can clearly see what you're about to show.

MR. MILLER: And again, Your Honor, with the Court's permission, I'll don one of those microphones myself and take a place where I can watch?

THE COURT: Yes. Thank you.

MR. MILLER: Thank you.

A. For the record, I have placed on the easels enlarged images of two of the notes, and this is after I did contrast adjustment to make them easier to read. And I do not have the government exhibit markings on the face. Each of these is just handwriting.

Q. Mr. Licht, I'm going to interrupt you briefly. There's a small yellow tag at the lower right-hand corner of each of those three that does have an exhibit number. And for the record, it's the same exhibit number as the original exhibit. It's not marked separately. But that which would appear before you as a

large document marked 310 is actually an enlargement of the actual Exhibit 310.

A.   Thank you.

Q.   Et cetera.  And just so we can be very clear, the first time you refer to each document, if it would help us identify which document is which the first time and the first time only, if you could read the contents of the writing, that would help us identify which document is which.

A.   Yes.  These are Government Exhibits 312A and 312B.  And if you'd like, I can read through them now if that would be of assistance.

Q.   Yes, please.

A.   In 312A, Everything is just the way the paper said it was. They are all together in one.  I don't know what they were wearing.  I'm sure the girls were in PJs, all shot in the head. I think the woman was shot more than once because she ran.  Hit somewhere from behind, then in the head.  And the last line on that one in parentheses, Buried, and then girls first, then him, then her.

        And on Exhibit 312B, it reads, Oh, yeah, him and her were gagged with kid socks with gray tape around their mouths. At one time they had gray tape around their hands, feet too.  I think they still have the tape around their wrists but not the feet.  Remain gagged, not the kids.

        In Government Exhibit 312C, also just handwriting, The

SAK000077

one is buried on his knees like he would make me be when I would beg for my life and face down. He is in a field next to -- and then a word that I can't read -- abandoned house on Killdeer Road, gravel road. And that is State's Exhibits 312A, B, and C.

Government's Exhibit 311 is in the form of a map, hand-drawn map. And for the record, I am pointing to the top of the map where it reads, House abandoned, lumber yard, then what appears to be the drawing of a road. It says, Old 18. And then for the purposes of the record, perpendicular to that particular road is another road. There's another road then drawn at the lower portion of the map with a little bit of handwriting that says, To blacktop, and there's an arrow.

The handwriting at the lower portion of Government's Exhibit 311 is handwriting that says, Field, what appears to say, Aband or abandoned house, silo, gravel road, and in parentheses, Killdeer Road, and there are little arrows on the map which appear to point a direction of travel to the location near the abandoned house and the field.

Government Exhibit 310, once again, a hand-drawn map with what appears to be roads, railroad track, and locations. The handwriting, if we start at the top, we see, Highway 18 in abbreviated form, the word Mason, RR for railroad, the handwritten word field, lumber yard, abandoned green house, Old 18, and at the bottom, Under the tree with the two tires under, and then an arrow back to the two tires, and then it says, Are

they -- are the four. I think it says, Are the four, not, Are they. Also on here are the directions of north, south, east, and west, once again with arrows that appear to be showing a direction of travel.

Q. Mr. Licht, having now described the five enlargements of the documents contained in Government's Exhibits 310, 311, and 312A, B, and C, I'll ask you to go, please -- using those and the other exhibits to the extent that it will help you do so describe for the jury what findings you made and the basis for those findings.

A. Yes. And before I put the comparison charts up, on Government Exhibit 310, the handwriting that's present on here is an example of writing that's not freely and naturally written. In other words, it's in a block form with a lot of straight lines instead of curves such that I can't use like the H-W-Y 18 and the word Mason, I can't use that particular type of writing as having been done freely and naturally.

Also on Government Exhibit 311, we have some writing that also falls into that category, and it limited the number of words that I could work with on that.

Q. Mr. Licht, does that tell you if anything the fact that you have handwriting that is not freely and naturally made?

A. I'm not sure that I follow your question. It doesn't particularly tell me anything about the writer when it's not freely and naturally written.

SAK000079

Q. Are you ever asked to examine or compare handwriting which appears to you to have been disguised?

A. Yes, very frequently.

Q. And is that at least one reason on occasion where you see handwriting that's not freely drawn?

A. Yes.

Q. Please continue, sir. And before you describe any document, I want to make sure that our record is clear. Please before referring to the contents of any document, whichever of these seven it might be, make sure that our court reporter hears and that our record is clear as to what exhibit number you're talking about.

A. Yes. I have placed on the easel two items, 319B which is a letter comparison chart and 319A which is a full word comparison chart.

One of the first things that I have to do in the comparison process is look at individual letter forms to see if there's even anything similar between the questioned and the known writing. And these charts help to summarize a little bit of what I look for when I do this particular process.

On 319B, the letter comparison chart, on the -- what you'll see as your left side under the word "questioned" is individual letters taken from the questioned writing, and these are individual letters where it was determined that they were freely and naturally written. In other words, there's some

speed there.  They're not slow and drawn.

On the right side of the chart, likewise, individual letters cut out from the known writing also freely and naturally written.  What I do with a comparison chart like this is show a range of variation in particular letter forms from the questioned writing and then a range of variation of those same letter forms in the known writing.

In this particular case, I'm summarizing for you an identification.  In other words, I'm displaying on these charts the range of variation in the questioned and showing that it is found in the range of variation of the known writings.

If we look just briefly at the letter A -- and I know that this is a little bit difficult to see -- but what we have for the most part are two-stroke A's, very short and wide in appearance with the pencil making sometimes a short beginning stroke and then either one movement of the pencil up and then a sharp angle back down or, in a situation of some of these A's, a curve where the pencil moves up and down and it's not two straight lines; it's actually a curve.  The second pencil stroke is the cross bar of the capital A.  And on some of these capital A's, the appearance is almost that it begins to look like a distorted P.  In other words, the right-hand side of the A is raised up off of the baseline.

Also found in the known writings, short A's, two strokes sometimes with a beginning stroke, and then the cross

SAK000081

stroke is the second stroke. Sometimes it looks more like straight lines, sometimes more like a curve, oftentimes the A beginning to take on the form of a distorted P. In other words, the pencil is moving rather quickly. That particular -- the right-hand side of the A is raised up off of the baseline.

If we look down at the letter E -- I'm going to skip a few lines here -- for the most part two-stroke Es, sometimes a third stroke, but for the most part the top stroke for the E is missing or it's very abbreviated, a down stroke of the pencil curving to the right to form the bottom of the E, and then the center stroke of the E to complete it oftentimes with no top stroke.

In other words, for the record, we're looking at the printed E where there would be a stem on the left side and two horizontal strokes. One of those horizontal strokes is missing, that being the one at the top of the E, also found in the known writing with the same overall shapes to the E's.

Skipping down to the N, a single stroke to create the N. In other words, the pencil doesn't have to leave the paper. There's a down stroke, the pencil moves back up, and then the capital N's take on the appearance of being an inverted U, also found in the known material.

And I do that with each letter of the alphabet. This particular writing I'm dealing for the most part with capital letters. It was hand printed using capital letters.

SAK000082

Government Exhibit 319A is for words because I also look to see if the letters are constructed into words the same way. Is there the same sort of spacing between the letters? Is there the same sort of spacing between words? How are things placed on the paper? How is the line used?

And in this particular situation, the words are either on the baseline or slightly above it. And as we can see using just pattern recognition, the way that the word "every" is put together looks the same in the questioned material and in the known material.

I had also the word "thing" in the questioned and in the known. And something that we see when the letters are put together in words is that the top stroke of the capital T quite often continues on into the left stem of the capital H, in other words, a connecting stroke even though this is hand printed. And for the record, I'm pointing to one of those strokes where the top of the capital T follows into the capital H with a capital H leaning back to the left.

This also occurs with the center stroke of the capital E, and for the record, I am pointing at a capital E in the word "every" where the center stroke leads on over into the left-hand stem of the capital R.

There are times when the capital T, capital H combination is so distorted that if I didn't have the rest of the word I would not know what the two letters are, also found

SAK000083

in the questioned and the known. And for the record, I'm pointing at T-H combinations in the word "the" and "they".

The way that "girls" is put together has another point that I use in the comparison in that the "I" does not have cross strokes. It looks like a lower case i, and the way that the words "girls" is put together is the same way, capital G, lower case i, capital R, capital L, capital S. The overall pattern of putting those together is the same between the questioned and the known.

I also look to see if the spacing between words holds true between the questioned and the known. In this particular case, I had comparable phrases to use in limited situations. One of those where I found something in the questioned material on one of the notes and in the knowns, combination of words "shot in the" and in another situation "in the head." And I look at the spacing between the words, the size of the words, and I find that also in the known material. Once again, the phrase "shot in the head" was found in the known material so that I can look to see that even the sentence construction or the phrase construction is the same between the questioned and the known material.

And if we look at the bottom of the chart which is marked as 319A, the ampersand even is compared, and that may be very difficult for the jurors to see, but I am pointing at the little ampersand that's used instead of the word "and" which was

SAK000084

found in the questioned and the known material also. Difficult to see, barely readable, but it is a pencil stroke which is what looks to be like a little bit of a loop on a stick, very small in both the questioned and the known, constructed the same way.

That's a brief summary of what I go through when I do the comparison process.

In this particular situation I'm showing you an identification. I could have constructed a court chart for another case where I had set it up to show an elimination, in other words, fundamental differences. In this one I'm pointing out significant similarities between the questioned and the known.

Q. And your findings were what, sir?

A. My findings was that the freely and naturally written writing on four of the five notes was written by the writer of the knowns which were submitted as that of Angela Johnson. There were a few words on one of the maps where all I could say was there are indications that those few words may have been written by the writer of the knowns submitted as that from Angela Johnson. And then on one of the maps, I was not able to determine who did that writing on that particular map.

Q. Just so we can be perfectly clear about it, the three notes marked Government's Exhibits 312A, B, and C, what were your conclusions as to those three notes that had handwriting on them, the three notes as opposed to the two maps, sir?

A. 312A, B, and C were freely and naturally written, and I was able to conclude that those were written by the writer of the knowns, in other words, the known writing of Angela Johnson.

Q. And as to 311 and 312, sir, what were your findings, if any -- excuse me, 310 and 311?

A. On 310, I was not able to reach a conclusion as to who did the writing on this particular note.

On 311, the phrase "to blacktop" was identified as by the writer of the knowns, and there were some words on that one -- I believe it was "field," "house," "silo," and "Killdeer Road" -- where I reached a lesser conclusion on those. In other words, it wasn't an identification on everything that was on that particular map.

Q. But there was an identification of the one phrase as being --

A. Yes, "to blacktop" on Exhibit 311 I did identify as the same writer as the known writing.

Q. The known writing of Angela Johnson.

A. Correct.

Q. And finally, sir, did you happen to do any fracture matching? And first explain to us what fracture matching is.

A. The fracture comparison process is looking at the edges of items that have either been broken or torn. In this particular case as we can see, these are smaller components of larger pieces of lined paper, and I did have some fracture matches of

SAK000086

notes to maps. And for the record, I'm looking to see if from this viewpoint I can pick that out.

And the first that I can see is 310 and 311, the tear contours at the base of 310 -- and for the record, let me hold this up over 311, and that might help the jury to see that -- a fracture match back to what is Government's Exhibit 311. In other words, they were at one time a single piece.

Now, these have been printed slightly different in size from each other, so there's a little bit of distortion in the printing process here. But Exhibits 310 and 311 were at one time a single piece.

I have a fracture match between two other pieces in this particular case, and right at the moment I'm not remembering which two those were.

Q. Putting 310 back up on the easel, sir, if you would, please -- no, on the other easel -- just so I'm perfectly clear, the two maps, 310 and 311, were in your opinion both at one time part of the same single piece of paper?

A. That's correct.

Q. And the handwriting or at least some of the handwriting on 311 is, in your opinion, the handwriting made by the same person who made the known handwriting of Angela Johnson?

A. Correct. I identified some of the words on 311 as the handwriting of Angela Johnson.

Q. And all three of the notes contained in Government's

SAK000087

Exhibits 312 contain, in your opinion, the known handwriting -- or excuse me, handwriting identified by you as being authored by the same person who wrote the known handwriting of Angela Johnson.

A.   Correct.

Q.   Thank you.  So in that sense all five documents are connected.

A.   Correct.

Q.   Either have the known handwriting in your opinion of Angela Johnson or were torn from the same piece of paper with such handwriting.

A.   Correct.

          MR. MILLER:  Thank you, sir.  I have no further direct.

          THE COURT:  Okay.  We'll take our noon break.  We'll start back up at 1:05.  Please remember my cautionary instruction about keeping an open mind and not discussing this case among yourselves.  Thank you.

          (The jury exited the courtroom.)

          THE COURT:  Anything we need to take up?

          MR. MILLER:  No, Your Honor.

          MR. STOWERS:  No, Your Honor.

          THE COURT:  Okay.  Thank you.

          (Lunch recess at 12:03 p.m.)

          THE COURT:  Did I understand you to say you were

SAK000088

finished?

MR. MILLER: Yes, sir.

THE COURT: Shall we take all this stuff down?

MR. STOWERS: I was going to use it.

THE COURT: Well, the jury can't see the witness.

MR. STOWERS: I was going to have him up there again once he testifies.

THE COURT: Okay.

MR. STOWERS: Yeah, so I wasn't going to have him testify from the stand.

THE COURT: Okay. Fine. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Stowers, you're going to start your cross-examination, and I understand you're going to have Mr. Licht step down?

MR. STOWERS: Yes. Thank you.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Licht, I wanted to make sure, first of all, that we understood your testimony -- is your microphone turned on, sir?

A. Yes, it is.

Q. Okay -- that we understood your testimony about these

SAK000089

pieces of paper. There appears to be five pieces of -- unless my counting -- how many pieces of paper did you examine in total?

A. There were five questioned pieces of paper.

Q. Okay. And these large blown-up exhibits are the digital photographs that have been enlarged for the purpose of helping you explain your testimony to the jury; right?

A. Correct.

Q. Okay. And the smaller items that are up there in front of the court reporter, in front of the judge are those same items in their original form after they went through the fingerprint processing; is that correct?

A. That's correct.

Q. Now, can you show the jury the exhibits and identify them by number that match up together with regard to these fracture or tear lines that you've been describing?

A. Yes. Do you want me to do it with the originals, or shall I hold up the charted enlargements again?

Q. Do it with the originals, and then if the enlargements will help you explain what you determined on that, use the enlargements.

A. Okay. Government Exhibits 310 and 311 were at one time joined and were a single piece, and I don't think that there's any way for the jurors to be able to see that using the original. So if I may, 310 and 311 as the enlargements were two

pieces that were at one time joined together. And in this enlargement, one is printed a little bit larger than the other.

So I cannot show you the exact placement unless we look at just a portion at a time where the fracture contours are, and it may be difficult to see, the contours that I look at such as these larger contour curves as we see in the middle of the top of Exhibit 311 and the complex curvature there matching to the corresponding curvature on 310. The --

Q. I'm sorry. You're just illustrating that 310 --

A. And 311.

Q. The top of Exhibit 311 fits with the bottom of Exhibit 310.

A. Correct.

Q. The top of Exhibit 310 is also torn; is that correct?

A. Yes, it is.

Q. Okay. And if you looked at the originals -- would you go over there and grab the original 310 and 311 rather than the blow-ups? And that's a type of a paper that's commonly used that's three-hole-punch paper it appears to be; is that right?

A. Correct.

Q. With lines preprinted on the paper?

A. Correct.

Q. And the original color of that paper I take it was some shade of white.

A. It was white.

Q. And if you hold those two piece -- I'm going to give you a

piece of white paper here to help you illustrate your testimony. If you have those two pieces of paper, Exhibit 310 and 311, and line them up, approximately how much of that original sheet of paper is missing?

A. If it's a standard notebook size, about a quarter of the top is missing.

Q. Because there's only -- when you put 310 and 311 together, you're missing one portion of the page where there's a hole.

A. That is correct.

Q. Were you ever given that portion of the page to examine?

A. No. I did not have the corresponding top piece for that piece of paper.

Q. So the top quarter of the page which would have been the remainder of the original piece of paper for 310 and 311 was not given to you for examination.

A. Correct.

Q. Now, there was another fracture item where you encountered a similar situation, and I want to make sure the jury understands which exhibits are connected together there.

A. Government Exhibits 312A and 312C. And for the record, 312A and 312C as enlargements are on the easel. I also have the originals in my hands, and there was a fracture match between those two items also.

Q. And would it be correct to say that the Exhibit 312A is the top of an original -- is the top of a three-ring

three-hole-punch piece of paper and that 312C would connect up to that torn piece of paper at the bottom?

A.   Yes.   312A appears to be the top, and 312C would be the middle of that sheet of paper.

Q.   Same type of paper as the preceding couple of exhibits we just talked about; is that correct?

A.   Yes, and I did not do a detailed paper comparison to see if they were out of the same batch of paper.

Q.   Okay.   There's another type of procedure you could do to figure out whether or not the paper's all from the same batch if you will; right?

A.   Or at least manufactured to the same specifications.

Q.   But in any event, did you find the bottom portion of 312A and C?

A.   No, I did not have the bottom portion of that piece of paper either.

Q.   Can you indicate for the jury how much of that sheet of paper, 312A and 312C, was missing?

A.   It's about half of a piece of paper.

Q.   Because there's only one hole of the three holes when you combine 312A and 312C, and it'd be the top hole.

A.   Correct.

Q.   So everything from approximately the middle hole on down was missing; is that right?

A.   Correct.

SAK000093

Q. Now, when you looked at these exhibits, you were attempting to determine the identity of the author; is that correct?

A. Correct.

Q. Or the writer. Is that how that works?

A. Yes.

Q. And you determined, of course, that these exhibits just as you've testified with the narrative writings, 312A, 312B, and 312C, appeared to have been written by Angela Johnson. Is that correct?

A. My report statement was that they were written by the writer of the known writing which was submitted as that of Angela Johnson.

Q. Now, does the writer of these writings -- for example, in 312A, does the writer of the writings describe what the writer believed the girls to have been wearing?

A. Are you referring to 312A?

Q. 312A.

A. In 312A, there is reference to the girls were in PJs if that answers that question.

Q. Pajamas; correct?

A. Yes.

Q. Although the abbreviation is used.

A. Correct.

Q. And the writer of 312A says, I think -- I think the woman was shot more than once because she ran. Do you see that?

SAK000094

A.   Yes, I do.

Q.   The writer of 312A does not indicate that she was the one that shot the woman.  She indicates that she thinks the woman was shot more than once because she ran.

A.   That's what is stated -- stated on 312 -- 312A, yes.

Q.   And it says, Hit somewhere from behind, then in the head.

A.   Yes, it does say that.

Q.   Indefinite with respect to the location of where they were hit from behind.

A.   Correct.

Q.   The writer indicates also "I do not know what they were wearing" prior to indicating that the girls were wearing or that the writer was sure that the girls were wearing PJs.

A.   Right.  The third line down is "I don't know what they were wearing," and then there's a period there, and the next sentence starts.

Q.   Writer of Exhibit 312B who you've identified as Angela Johnson indicated the manner in which these persons were believed to have been taped and gagged; is that correct?

A.   Yes, it does state that on 312B.

          MR. STOWERS:  That's all I have.  Thank you.

          THE COURT:  Mr. Miller, any redirect?  Where would you like the witness?

          MR. MILLER:  Just briefly.  You can stand up there.

                         REDIRECT EXAMINATION

SAK000095

BY MR. MILLER:

Q. Did the writer of those documents express certainty as to what was stuffed in the mouths of the adults?

A. I would have to read through them again to see.

In answer to your question, 312B begins with, Oh, yeah, him and her were gagged with kid socks with gray tape around their mouths.

MR. MILLER: No redirect, Your Honor.

MR. STOWERS: Nothing further.

THE COURT: Okay. Do you have any more witnesses?

MR. WILLIAMS: Yes, yes. United States calls Kevin Boldt.

KEVIN BOLDT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. And please adjust the chair and the microphones so you can speak directly into them. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's Kevin Boldt. Spelling of the last name is B-o-l-d-t.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

SAK000096

# Chapter 35

# Handwriting Identification

> **KeyCite®:** Cases and other legal materials listed in KeyCite Scope can be researched through the KeyCite service on Westlaw®. Use KeyCite to check citations for form, parallel references, prior and later history, and comprehensive citator information, including citations to other decisions and secondary materials.

*by*

*D. Michael Risinger**

◆ **Westlaw Electronic Research:** See Westlaw Electronic Research Guide preceding the Summary of Contents.

## I. LEGAL ISSUES

### § 35:1 Introductory note

**Research References**

West's Key Number Digest, Criminal Law ☞491(1), 491(2)
Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333
Am. Jur. 2d, Expert and Opinion Evidence § 128

Document examiners do many things. They examine typewriting for signs of idiosyncratic typeface alignment and wear which might indicate a common origin for two documents. This task is a form of toolmark analysis best considered in connection with that chapter. They analyze ink to reveal its physical and chemical properties, a task best considered in connection with the subject of forensic chemistry. In addition, they scrutinize the alignment of printed lines and the overlap of handwritten lines to determine if words or phrases have been after-inserted, and they analyze the composition, method of production, and watermark of paper in order to ascertain probable origin and, in some cases, age. These functions may, in some applications, involve elements of chemistry, but in addition they almost always depend on specialized knowledge of manufacturing processes and manufacturer specifications not unlike that employed in firearms identification concerning the relative number, spacing, pitch and direction of twist, of grooves and lands in various makes of rifled barrels.

All of these functions generally share the strengths and weaknesses otherwise associated with toolmark evidence, forensic chemistry, and the like. They are not, however, what this chapter is about. This chapter concerns the asserted skill that

---

*Professor of Law, Seton Hall University School of Law; B.A. Magna Cum Laude, Yale University, 1966, J.D. Cum Laude, Harvard Law School, 1969. Portions of this chapter appear in D. Michael Risinger (with Michael J. Saks) Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. 21 (1996); D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. 405 (1998); and D. Michael Risinger, Defining the "Task at Hand": Non-Science Forensic Science after *Kumho Tire v. Carmichael*, 57 Wash. & Lee L. Rev. 767 (2000).

1

historically formed the foundation of the document examiner's trade, and still comprises a surprisingly high percentage of the everyday work of document examiners both in and out of court.[1] This is the asserted ability to determine the authorship vel non of a piece of handwriting by examining the way in which the letters are inscribed, shaped and joined,[2] and comparing it to exemplars of a putative author's concededly authentic handwriting.

The balance of this section provides a discussion of the history of the courts' response to such asserted expertise.[3]

## § 35:2  Early legal history

**Research References**

Mnookin, Scripting Expertise: The History of Handwriting Identification, Evidence and the Judicial Construction of Reliability, 87 Va. L. Rev. 1723 (December 2001)

The notion that handwriting can be used to identify its author is very old,[1] as is the notion that a person can learn to make such an identification by study. Attempts to develop a system of such expertise appear to have started in Italy and France in the seventeenth century,[2] and by 1737 were well enough accepted in France to have been incorporated into the law. The Code du Faux (Code Concerning Forgeries) contained detailed provisions for regulating the collection of exemplars and their presentation to handwriting identification experts, which from the context of the code we may conclude formed a professional cadre of fair number.[3] However, no such claimed expertise then existed in the English speaking world. As we shall see, in Anglo-American courts a corps of asserted experts came into existence only after lawyers persuaded the courts to accept the idea that such an expertise might exist.[4]

Experts of any kind did not play a large role in litigation during the common law

---

**[Section 35:1]**

[1]For instance, in his January 1993 testimony in *In Matter of Extradition of Smyth*, 826 F. Supp. 316 (N.D. Cal. 1993), rev'd on other grounds, 61 F.3d 711 (9th Cir. 1995), opinion amended, 73 F.3d 887 (9th Cir. 1995), an international extradition case involving an alleged IRA terrorist, Special Agent Richard M. Williams, an FBI agent questioned a documents examiner with 17 years of experience who testified that "the bulk of" his work dealt with handwriting. Transcript at 231, on file with author. Nearly 90% of recent reported cases involving questioned document examiners concerned handwriting identification. See §§ 28:4 to 28:9.

[2]That is, by examining the characteristics of what is sometimes called the "static trace" left behind by the dynamic act of writing.

[3]A more extensive review of the legal history of handwriting identification expertise can be found in D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731, 751–771 (1989).

**[Section 35:2]**

[1]Huntington Hartford quotes Aristotle as observing that "[J]ust as all men do not have the same speech sounds, neither do they have the same handwriting." Huntington Hartford, You Are What You Write 43 (1973) (quoting Aristotle, On Interpretation, Part I).

[2]The earliest treatise in this line, of a definite graphological cast, appears to be Camillo Baldi, Trattato Come Da Una Lettera Missiva Si Conoscano La Natura, e Qualità Dello Scrittore (Milano, Geo. Batt Bidelli, 1625) [An Essay on the Means of Examining the Character and Qualities of a Writer from His Letters.] On graphology more generally, See § 28:13.

[3]See generally Francois Serpillon, Code du Faux, ou Commentaire sur l'Ordonnance du Juillet, 1737, Avec Une Instruction pour les Experts en Matiere de Faux (Lyon, Gabriel Regnault, 1774).

[4]It appears certainly true that there was no cadre of such experts in England, and that the common law courts were strangers to such expertise. However, the same may not have been true in the ecclesiastical courts. See Philip Floyer, The Proctor's Practice in the Ecclesiastical Courts 103 (Worrall, London, 1744), under the title "Evidence": "Where either party would produce any writing and give it in evidence, it must be exhibited with an allegation, and so proved. The Hand of a party signing may be proved by letters, or other his handwriting, which are to be exhibited

2

SAK000098

period, and when they occasionally did testify, they did so without a clearly defined set of legal principles governing their qualifications or their use. It was not until 1782, in the case of *Folkes v. Chadd*,[5] that a reported decision affirmed the propriety of the use of such "skilled witnesses,"[6] although the practice at trial was of course much older. The earliest trial use of skilled witnesses of which we have a record occurred in the trial of the Earl of Pembroke for the murder of Nathaniel Cony in 1678[7] (though it does not appear to have been regarded as a novelty in that case).

Until the very end of the 18th century, every example of expert testimony in the English speaking world involved witnesses whose expertise had primary application to practical affairs outside the courtroom, such as the physicians in the Earl of Pembroke's case or the engineers in *Folkes v. Chadd*. If expertise in general then played a small role in the law, claimed expertise limited to issues that were or might be involved in court cases (what one might call a dominantly forensic expertise), was non-existent. The first such forensic expertise allowed into the courtroom was handwriting identification expertise. Thus, handwriting identification expertise is the oldest "forensic science" although it did not secure a place in the common law courtroom until nearly a century after its introduction into French proceedings.

When handwriting identification expertise finally did enter the common law courtroom, it did so haltingly.[8] In 1792, Lord Kenyon, sitting as a trial judge, allowed two postal inspectors proffered by one of the parties to testify concerning authorship by comparing known exemplars of one party's handwriting to a document whose authorship was at issue in the case.[9] However, the next year Kenyon reversed himself and in two cases held such testimony inadmissible.[10] In the 1802 case of *R. v. Cator*[11] the court held that a postal inspector might give an opinion as to whether a signature was in a "feigned hand" by examination of the signature alone, but could not compare hands. This position was reaffirmed by a divided court

---

by an allegation, and being proved, Proctors or Approved Writers are to be assigned by the Judge to compare the same, who are to give Verdict thereon." This appears to describe more of a special jury practice than proof by expertise. Proctors were the cadre of practitioners in the Arches courts (which included Admiralty and the Ecclesiastical Courts), but who might qualify to sit as an "Approved Writer" is both fascinating and totally unclear.

[5]*Folkes v. Chadd*, 3 Dougl. 157, 99 Eng.Rep. 589 (K.B. 1782).

[6]In the 18th century the term "skilled witness" covered everyone we would today refer to as an expert. The term seems to have become recently used to refer to practical, as contrasted with scientific, experts. See, e.g., the original Advisory Committee Note to Fed. R. Evid. 702.

[7]The Trial of Philip, Earl of Pembroke and Montgomery, at Westminster, for the Murder of Nathaniel Cony (1678), in 6 Cobbett's Complete Collection of State Trials 1310 (1810). It appears that by the 1640s, surgeons were often, though by no means always, called upon to take part in coroners' inquests. Interestingly, the oldest surviving documentation of the practice currently known appears in the Maryland colonial records. See Helen Brock & Catherine Crawford, Forensic

Medicine in Early Colonial Maryland, 1633–1683, in Legal Medicine in History (M. Clark & C. Crawford eds., 1994). In addition to the Earl of Pembroke's case, there were two other *notorious* 17th century trials in which expert testimony was given: The Trial of Robert Green, Henry Berry, and Lawrence Hill, at the Kings-Bench, for the murder of Sir Edmundbury Godfrey (1679), in 7 Cobbett's Complete Collection of State Trials 159 (1810); and The Trial of Spencer Cowper, Ellis Stephens, William Rogers, and John Marson, at Hertford Assizes, for the Murder of Mrs. Sarah Stout (1699), 13 A Complete Collection of State Trials 1105 (T.B. Howell ed., 1812). The expertise involved in all three trials was medical expertise. See generally T.R. Forbes, Surgeons at the Bailey: English Forensic Medicine to 1878 (1985).

[8]This story is told in more detail in D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise", 137 U. Pa. L. Rev. at 751–771 (1989).

[9]*Goodtitle d. Revett v. Braham, 4 Term Rep. 497 (1792)*.

[10]*Carey v. Pitt, Esq., Peake Add Cas. 130 (1793)*; *Stranger v. Searle, 1 Esp. 14 (1793)*.

[11]*R. v. Cator*, 4 Esp 117 (C.P. 1802).

3

Case 3:09-cv-03064-MWB-LTS Document 284-37 Filed 06/23/11 Page 99 of 263

SAK000099

in *Doe d. Mudd v. Suckermore*[12] in 1836, and it was not until an 1854 statute was construed to authorize it that handwriting identification expertise became admissible in English courts.[13]

## § 35:3  Admissibility in American jurisdictions

**Research References**

Mnookin, Scripting Expertise: The History of Handwriting Identification, Evidence and the Judicial Construction of Reliability, 87 Va. L. Rev. 1723 (December 2001)

The story in the United States is even more complex. Until the passage of the English statute, most American jurisdictions followed English practice and rejected such expertise. There were some significant exceptions, however. In the 1836 case of *Moody v. Rowell*,[1] Massachusetts became the first common law jurisdiction[2] to authorize the use of such asserted expertise. The rationale of the *Moody* case is telling. Up to that time, in all Anglo-American jurisdictions, handwriting had been formally authenticated as to authorship by the recognition testimony of non-expert witnesses who were familiar with the putative author's handwriting, supplemented on occasion by direct jury comparison between challenged documents and other, authentic, writings of the putative author which might happen to be in the case for other purposes. This was taken to be such weak evidence that, without evaluating the validity of the proffered experts' claims to expertise, the *Moody* Court ruled that such asserted expert testimony should be admitted because it could not be any worse than what was traditionally relied on.[3] This seems to be the dominant rationale for the allowance of such testimony in those states which followed Massachusetts' lead over the next 50 to 75 years. While by 1900 a substantial majority of American jurisdictions accepted such testimony,[4] the prevailing attitude may be best exemplified by the opinion of the New York Court of Appeals in *Hoag v. Wright*:[5]

> The opinions of experts upon handwriting, who testify from comparison only, are regarded by the courts as of uncertain value, because in so many cases where such evidence is received witnesses of equal honesty, intelligence and experience reach conclu-

---

[12]*Doe d. Mudd v. Suckermore, 5 A. & E. 703 (K.B. 1836)*.

[13]Common Law Procedure Act, 1854, 17 & 18 Vict., ch. 125, § 27; See D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. at 757–758, especially n. 116 (1989).

**[Section 35:3]**

[1]*Moody v. Rowell*, 34 Mass (17 Pick.) 490 (1835).

[2]Louisiana's version of the French Civil Code provided for resort to handwriting experts, but it is not clear that at the time of its statehood there were any such experts in Louisiana. See D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. at 761, n.133 (1989).

[3]This was the rationale urged by the dissenters in *Doe d. Mudd v. Suckermore*. The *Moody* court concluded that "this species of evidence, though generally very slight, and often wholly im-

material, is competent evidence." 34 Mass (17 Pick.) 498.

[4]The earliest authority for the admission of such testimony in each U.S. jurisdiction is set out chronologically in Appendix 3 to D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. at 788 (1989). (There is an error in that Appendix. The earliest date for Arkansas should be 1920, on the authority of *Murphy v. Murphy*, 144 Ark. 429, 222 S.W. 721 (1920). In addition, there is evidence of unchallenged use of such experts as early as 1910 in *Strickland v. Strickland*, 95 Ark. 623, 129 S.W. 801 (1910) and 1932 in *State Board of Law Examiners v. Strahan*, 44 Wyo. 156, 8 P.2d 1090 (1932), and perhaps 1835 in *Bank of Muskingum v. Carpenter's Adm'rs*, 7 Ohio 21, PT. I, 1835 WL 5 (1835) (overruled in part on other grounds by, White v. Denman, 1 Ohio St. 110, 1853 WL 2 (1853)), where such evidence is adverted to in the reporter's summary of evidence but is not mentioned in the opinion. (Prof. Andre Moenssens called attention to these cases.))

[5]*Hoag v. Wright*, 174 N.Y. 36, 66 N.E. 579 (1903).

4

SAK000100

sions not only diametrically opposite, but always in favor of the party who called them.[6]

While some courts continued to reject such expertise, and most which allowed it remained skeptical, a group of professional experts was growing up and beginning to seek greater respectability. It is ironic that when expert handwriting identification testimony was first declared admissible in America and England, there were no experts. That is to say, the lawyers seeking to utilize such testimony had to proffer various witnesses who were willing to assert a kind of ad hoc expertise acquired as a side effect of being something else, such as a postal inspector or a bank teller. No practicing forensic document examiner today would concede any expertise to such witnesses.[7] When the legal system agreed to accept such testimony, however, it created a demand which was to be met by people who turned their entire attention to filling it. Not surprisingly, that resulted in people setting out to create a standard theory and practice giving the appearance of "science." Among the first of those people was Charles Chabot,[8] who, despite his name, was English. He was originally a lithographer by trade, but developed an interest in handwriting identification about the time such expert testimony was gaining admissibility in English courts. It is unclear how much he was influenced by contemporary French theory and practice, but in 1871, at the urging of his lawyer-disciple Edward Twistleton (who wrote a lengthy theoretical introduction to the book), he published The Handwriting of Junius Professionally Investigated, which was the first book in English to assert that there was a science of handwriting identification,[9] and to illustrate its methodology.[10]

In the United States three books were published in the 1890s, Persifor Frazer's The Manual of the Study of Documents (1894),[11] William E. Hagan's Disputed

---

[6]*Hoag v. Wright*, 174 N.Y. 36, 66 N.E. 579 (1903). See also *Miles v. Loomis*, 75 N.Y. 288, 1878 WL 12743 (1878); *Mutual Benefit Life Ins. Co. v. Brown*, 30 N.J.Eq. 193 (1878), aff'd, 32 N.J.Eq. 809 (1880); *In re Fuller's Estate*, 222 Pa. 182, 70 A. 1005 (1908).

[7]See, e.g., Albert S. Osborn, Questioned Documents at 286–287 (2d ed., 1929).

[8]Chabot and his contemporary Frederick G. Netherclift were the first full time handwriting identification consultants in England, both beginning their practices in the mid-1850s after earlier careers in engraving and lithography. Two short reports by Netherclift on aspects of the Junius controversy appear in Chabot's book. Chabot, at any rate, was a significant enough character in mid-Victorian London to have rated an entry in the Dictionary of National Biography.

[9]Twistleton refers to Chabot's work as a "scientific demonstration." Charles Chabot, The Handwriting of Junius Professionally Examined 220 (Edward Twistleton ed. 1871).

[10]Charles Chabot, The Handwriting of Junius Professionally Examined 220 (Edward Twistleton ed. 1871). The subject matter to which Chabot applied his methods was the authorship of the anonymous "Junius" letters, famed in the political controversy of late 18th century England. Interestingly, although Albert S. Osborn was a great admirer of the theoretical aspects of both Twistleton's and Chabot's writing in this book (See Albert S. Osborn, Questioned Documents 34–35 (1910);

Albert S. Osborn, Questioned Documents at 1000 (2d ed., 1929)), he disagreed with Chabot's conclusion that the Junius letters were written by Sir Philip Francis, asserting that Chabot and Twistleton had been misled by "improper standards" and "planted" documents. Albert S. Osborn, Questioned Documents at 1000 (2d ed., 1929). Osborn seemed to favor John Horne Tooke as Junius. After the publication of his book, Chabot's testimony in the Tichborne Claimant case (the O.J. Simpson case of Victorian England) brought him to the attention of the general public.

Note that while Chabot's book was the first book in English on the subject, it was not the first written source in English. In 1850, in Massachusetts, under the authority of *Moody v. Rowell*, Nathaniel D. Gould, a teacher of penmanship for 50 years, was called on behalf of the prosecution in the famous trial of Harvard Professor Dr. John W. Webster for the murder of Dr. George Parkman. Since this trial was a sensation in its day, a verbatim transcript was made and published. In his preliminary testimony, Mr. Gould sets out the two basic principles of the field, which he claims to have derived from his own observation and reflection. See Report of the Trial of John Webster, Phonographic Report 116 (2d ed. revised, 1850).

[11]Persifor Frazer, The Manual of the Study of Documents (Lippincott, Philadelphia, 1894) (retitled Bibliotics, or the Study of Documents, in the 1901 Third Edition). Frazer's book was to have no lasting influence, as its main original theses

5

SAK000101

Handwriting (1894)[12] and Daniel T. Ames' Ames on Forgery (1899),[13] but the event that was to turn handwriting identification expertise from ugly duckling to swan was the publication in 1910 of Albert S. Osborn's Questioned Documents, with an introduction by John Henry Wigmore.

Osborn's book, Osborn's personality, and Osborn's relationship with Wigmore, are the cornerstones upon which respect for asserted handwriting identification expertise in the United States was built.[14] As to Osborn's book, it set out the theory and practice of the claimed expertise so comprehensively that it is fair to say that all treatments of the subject since have simply been rearrangements or expansions of Osborn's 1910 book.[15] As to his personality, he was clearly a man of exceptional intelligence and critical abilities, but with a blind spot. He had a kind of mystical faith in the ability of the human mind to create a system of analytical expertise for the solution of virtually any class of problem. And, while he could be laudably skeptical regarding the claims of others,[16] he never seemed to notice that most of the generalities upon which he built his own system lacked empirical verification.[17] Nevertheless, he had faith in himself and his vision, and the ability to sell others on that vision, whether the audience was a jury, a group of students, or an audience of lawyers or judges. His most significant convert was Wigmore, the most influential figure in evidence theory of the last hundred years. Together, Osborn and Wigmore conducted a quarter century public relations campaign on behalf of "scientific" handwriting identification expertise as practiced by Osborn and described in his book.

The ultimate triumph of this vision was finally insured by the Lindbergh Baby kidnaping case, *State v. Hauptmann*, in 1936. Osborn was the chief witness called to testify that Bruno Richard Hauptmann had written all of the ransom notes found or sent after the abduction of the son of Charles A. Lindbergh. The public seemed to need to believe Hauptmann was guilty, wanted him convicted, and was grateful to those who supplied the evidence. Osborn became a celebrity. In the half century after the affirmance of *Hauptmann*,[18] no reported opinion rejected handwriting expertise, nor was much skepticism displayed towards it. Rather, it became universally accepted as scientific and dependable. This may be best summed up by the following quotation from Judge Cohalan dissenting in the 1977 case *In re Estate of Sylvestri*,[19] which contrasts sharply with the criticism found in *Hoag v. Wright*: "Since that rather cynical observation was made by our highest court in *Hoag*, examiners of questioned documents, as handwriting experts prefer to be called, have attained more respectable standing in the courtroom"[20] As a New Jersey court

---

were totally rejected by Albert Osborn and his followers. See Albert S. Osborn, Questioned Documents at 990 (2d ed., 1929).

[12]W.E. Hagan, Disputed Handwriting (1894).

[13]D.T. Ames, Ames on Forgery (1899).

[14]It also did not hurt that the book received a glowing review from Roscoe Pound, another of the legal giants of the era, in the Harvard Law Review, 24 Harv. L. Rev. 413 (1910).

[15]This includes Osborn's own 1929 second edition, which had surprisingly little new information on handwriting identification theory or practice. Most of its material on those topics is taken verbatim from the 1910 edition. Note that the text reference is only to the orthodox non-graphological literature. See § 28:13.

[16]Notably, graphologists, who claim to be able to determine personality traits from handwriting. See the quote from Osborn, 2d ed., at 442–444, set out in D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731, 751–771 n. 13 (1989).

[17]See §§ 28:14 to 28:38.

[18]*State v. Hauptmann*, 115 N.J.L. 412, 180 A. 809 (N.J. Ct. Err. & App. 1935).

[19]*In re Estate of Sylvestri*, 55 A.D.2d 916, 390 N.Y.S.2d 598 (2d Dep't 1977), judgment aff'd, 44 N.Y.S.2d 260, 405 N.Y.S.2d 424, 376 N.E.2d 897 (1978).

[20]*In re Estate of Sylvestri*, 55 A.D.2d 916, 390 N.Y.S.2d 598, 600, (2d Dep't 1977), judgment aff'd, 44 N.Y.S.2d 260, 405 N.Y.S.2d 424, 376 N.E.2d 897 (1978). Judge Cohalan's observation is literally

6

SAK000102

observed in 1957,[21] after the *Hauptmann* case, handwriting identification expertise could no longer be regarded as "the lowest order of evidence, and . . . accorded little evidential weight."[22]

## § 35:4 Recent developments

### Research References

West's Key Number Digest, Criminal Law ⟜491(1), 491(2)
Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333
The Daubert Challenge to the Admissibility of Scientific Evidence, 60 Am. Jur. Trials 1
Benedict, Fingerprints and the Daubert Standard for Admission of Scientific Evidence: Why
  Fingerprints Fail and a Proposed Remedy, 46 Ariz. L. Rev. 519 (Fall 2004)

Two events stimulated a reevaluation of handwriting identification expertise. The first was the publication of an article (Risinger et al.[1]) in the University of Pennsylvania Law Review in 1989, pointing out the lack of empirical validation of the claims of the expertise. The other was the U.S. Supreme Court's 1993 decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[2] rejecting previous approaches to acceptability of expertise under the Federal Rules of Evidence, and putting in play the validity of claims to scientific expertise[3] even for long accepted subjects. As a result there has been a flurry of litigation in the last seven years over the validity of handwriting identification expertise, resulting in several written decisions, all in criminal cases and all in federal courts:[4] *U.S. v. Starzecpyzel*,[5] *U.S. v. Ruth*[6] (hereaf-

---

accurate, but may have been intended sarcastically, since Cohalan was dissenting from a 2-1 decision (without opinion) finding that the conclusion of an asserted handwriting expert, contradicted by another such expert, was sufficient of itself to support a jury verdict of forgery in the face of contrary testimony by three disinterested witnesses to the signature. No such skepticism was entertained by the Court of Appeals in affirming the majority, however. *Matter of Estate of Sylvestri*, 44 N.Y.2d 260, 405 N.Y.S.2d 424, 376 N.E.2d 897 (1978).

[21]*Morrone v. Morrone*, 44 N.J. Super. 305, 130 A.2d 396 (App. Div. 1957).

[22]*Morrone v. Morrone*, 44 N.J. Super. 305, 130 A.2d 396, 400, (App. Div. 1957). Osborn recognized the centrality of the *Hauptmann* case. Concerning it, he wrote in 1940, "[i]t can be correctly stated that in that little one hundred year old courtroom at Flemington, N.J., the scientific examination and proof of the facts in document cases was nationally recognized and firmly established as a New Profession." Albert S. Osborn, A New Profession, 24 J. Am. Jud. Soc. No. 1 (1940), reprinted in Albert S. Osborn, Questioned Document Problems (2d ed., Albert D. Osborn ed., 1946), at 311. For a similar evaluation, see James V.P. Conway, Evidential Documents (1959), at 210.

**[Section 35:4]**

[1]§ 28:1.

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep.

(CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993).

[3]And, ultimately, "non-scientific" expertise as well. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999).

[4]It seems fair to say that controversy continues to surround the efforts of some academics and courts to come to grips with the perplexing issues involved in evaluating the reliability of proffered handwriting identification expertise. Given the intensity and public nature of this controversy, what is truly surprising is not the relatively small number of cases in which the issues have been examined, but the large number of cases in which the issues have simply been ignored by all sides, court and counsel alike. Since the date of the decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* the presence of questioned document examiner testimony has been noted in more than 300 reported cases, and nearly 90% of these have involved handwriting identification. Yet so far as can be determined from the opinions, dependability issues have been raised in only nine federal cases noted in the text. In the state courts, where the bulk of the cases arise (split about evenly between criminal and civil cases) only two reported opinions (one criminal and one civil) reflect the possible existence of significant reliability challenges to any aspect of standard document examiner practice. The single possible criminal case exception, *Basinger v. Com.*, 2000 WL 724037 (Va. Ct. App. 2000), appears to have been cursory both

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 103 of 263
SAK000103

ter, *Ruth I*), *U.S. v. Velasquez*,[7] *U.S. v. Jones*,[8] a second opinion in *U.S. v. Ruth*[9] (hereafter, *Ruth II*), *U.S. v. Paul*,[10] *U.S. v. Hines*,[11] *U.S. v. Battle*,[12] *U.S. v. Santillan*,[13] *U.S. v. Rutherford*,[14] and *U.S. v. Fujii*.[15] Before turning to the cases, however, we must address the potential impact of *Kumho Tire v. Carmichael*.[16]

In the case summaries that follow, quotations and specific holdings are generally given pinpoint citations, but fact summaries, though drawn from the opinions, are generally not burdened with citations. Sometimes, important facts are not specifically recited in an opinion but can be gleaned by fair inference from what is given in the opinion. Such circumstances are generally signaled by the use of the words "presumably" or "apparently."

---

in the way the issue was raised and in its disposition. In the single civil case, *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn. Ct. App. 2001), the appeals court affirms the trial court's allowance of document examiner testimony after a reliability hearing, but reverses the trial court's decision based on that testimony, finding it insufficient as a matter of law to constitute clear and convincing evidence of forgery, given the other evidence in the record. Compare with *Matter of Estate of Sylvestri*, 44 N.Y.2d 260, 405 N.Y.S.2d 424, 376 N.E.2d 897 (1978). Other than this, there is nothing, which is startling, especially in regard to criminal cases, given the controversies in federal court. While it is true that in some cases the non-expert evidence is so strong that mounting an attack on the reliability of the expertise might arguably be thought to be useless and a waste of resources, there are other cases, including criminal cases, where the handwriting identification is central and yet no challenge has been mounted.

[5]*U.S. v. Starzecpyzel,* 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[6]*U.S. v. Ruth,* 42 M.J. 730 (A.C.C.A. 1995), decision aff'd, 46 M.J. 1 (C.A.A.F. 1997).

[7]*U.S. v. Velasquez,* 64 F.3d 844, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[8]*U.S. v. Jones,* 107 F.3d 1147, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[9]*U.S. v. Ruth*, 46 M.J. 1 (C.A.A.F. 1997).

[10]*U.S. v. Paul,* 175 F.3d 906, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999).

[11]*U.S. v. Hines,* 55 F. Supp. 2d 62, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[12]*U.S. v. Battle,* 188 F.3d 519 (10th Cir. 1999).

[13]*U.S. v. Santillan,* 1999 WL 1201765 (N.D. Cal. 1999).

[14]*U.S. v. Rutherford,* 104 F. Supp. 2d 1190, 55 Fed. R. Evid. Serv. 201 (D. Neb. 2000).

[15]*U.S. v. Fujii,* 152 F. Supp. 2d 939, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000) (as yet unreported; slip opinion on file with author). Two other federal cases—*U.S. v. McVeigh,* 1997 WL 47724 (D.Colo., Transcript, 1997) (Oklahoma City Bombing Case) and U.S. v. Brown, No. CR 99-184 (C.D. Cal., order dated Dec. 1, 1999)—have also involved reliability challenges, but did not result in written opinions. Judge Matsch's decision in *McVeigh*, which was that unless document examiners could satisfy the requirements of *Daubert*, their testimony would be limited to pointing out similarities between the questioned document and the known exemplars, but not to give a conclusion about the authorship of the questioned document, has been influential, even though it was promulgated without formal opinion. (It was also influential in the *McVeigh* case itself, since the prosecution chose not to call its document examiner rather than to try to satisfy *Daubert*.)

*McVeigh* also illustrates the problem of defining what constitutes a "reported" "opinion" in the days of databases. The oral argument that led to Judge Matsch's decision is reported at *1997 WL 47724*. The colloquy, though extensive, does not reveal sufficient facts to determine exactly what task was at issue in the case, beyond the fact that some documents were going to be attributed to Defendant McVeigh by a document examiner after comparing them with known samples of McVeigh's handwriting. There may have been an issue of printing comparison, or printing to cursive comparison, but that is not clear. Clearly, Judge Matsch does not formulate the specific task at hand with the particularity required by *Kumho Tire*, but his result has been very influential, as evidenced by its impact on *U.S. v. Hines* and subsequent cases. See the discussion of *Hines*, infra at § 28:7; and *U.S. v. Santillan*, infra at § 28:7. *U.S. v. Brown*, which was decided by order without opinion, and is currently unreported in any sense, is also discussed, infra at § 28:7, for the sake of completeness.

Another federal case was decided after this chapter manuscript was completed. In *U.S. v. Saelee*, 162 F. Supp. 2d 1097, 57 Fed. R. Evid. Serv. 916 (D. Alaska 2001), the District Court excluded the expert testimony of the government's document examiner in its entirety.

[16]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999).

8

SAK000104

## § 35:5 Recent developments—Implications of *Kumho Tire v. Carmichael*

**Research References**

Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333

Denbeaux and Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15 (2003)

*Kumho Tire* is dealt with elsewhere in this work in some detail,[1] but for present purposes it is enough to point out two things: First, the court found a general obligation under Fed. R. Evid. 702 to determine that proffered expertise is sufficiently reliable that its admission can properly be said to aid the trier of fact in the task at hand, independent of whether that proffered expertise is appropriately classified as either "novel" or "scientific." And second, the proper focus is not on the dependability of the expertise in some global sense, but its dependability in its application to the task at hand. The question is whether the practitioners of the expertise can be shown to be able to do *what they are claiming to do in the particular case*. This latter point is important to proper understanding of *Kumho Tire*, and to proper treatment of claimed handwriting identification expertise. As evidence from research accumulates in the future, it may well show that questioned document examiners, or some subgroup of them with particular training, are good at some tasks (such as determining that a signature was not written by the person whose name the signature reflects[2]) and bad at others (such as identifying the actual author of the forged signature). Evidence with regard to dependability for one task does not establish dependability for the other, and courts have generally failed to keep this in mind, or even manifest an awareness of the problem. After *Kumho Tire* they are obliged to.

*Kumho Tire* emphasizes that the test for nonscience expertise is to be "flexible,"[3] and is to be reviewed by an "abuse of discretion" standard,[4] but reaffirms the observation made in *General Electric v. Joiner*[5] that the "ipse dixit" of the expert is

---

**[Section 35:5]**

[1]See Chapter 1. See also D. Michael Risinger, Defining the "Task at Hand": Non-Science Forensic Science After *Kumho Tire v. Carmichael*, 57 Wash. & Lee L. Rev. 767 (2000).

[2]This sentence was written before learning that there was to be a fourth Kam study which deals with this task, and lends some support to the claim of marginal superiority of some experts over lay persons, at least in some contexts, in performing this particular task, at least under test conditions. See the preliminary observations on that study, infra at § 28:31.

[3]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 145–150, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999). In my chapter on a legal taxonomy of expertise, at 1 Modern Scientific Evidence § 2, I have suggested that standards of reliability should depend on the kind of expertise, the kind of case and the kind of issue upon which it is being proffered. Without repeating all that was said there, I suggested that when an expertise was being offered by the prosecution in a criminal case on an issue of "brute fact guilt" such as identity, and when the expertise was of

the kind where errors in normal practice were not unambiguously revealed to the practitioner by unmistakable circumstances, there should be an especially high degree of proof of dependability before the results of the application of such claimed expertise are allowed before a jury.

[4]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 247, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999); following *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas. (BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997).

[5]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 247, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999); following *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas. (BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997).

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 105 of 263

SAK000105

insufficient.[6] Further, as pointed out by Justice Scalia in his concurrence, it is clear that failure to inquire into reliability with sufficient care and particularity may constitute an "abuse of discretion" in a given case.[7] With these points in mind, we turn to the issues of handwriting identification reliability reflected in the cases.

## § 35:6    Recent developments—Admissibility of asserted handwriting expert testimony before *Kumho Tire*

**Research References**

Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333
Graham, Handbook of Fed. Evid. § 702.6 (5th ed.)
Denbeaux and Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15 (2003)

*U.S. v. Starzecpyzel*[1] is the original handwriting expertise reliability case of the modern era. In that case Roberta and Eileen Starzecpyzel were charged with having stolen various works of art from Roberta's elderly (and now senile) aunt. They claimed that the paintings were a gift made prior to the aunt's impairment. Part of the evidence against them was the proposed testimony of a questioned document examiner who, after examining numerous authentic signatures of the aunt on checks and other documents, concluded that the aunt's signatures on deeds of gift for the artwork were forgeries. He did not claim to be able to identify either defendant as the forger.

Judge McKenna of the U.S. District Court for the Southern District of New York held an extensive hearing on the state of knowledge concerning the reliability of such asserted expertise. Judge McKenna's opinion examines the claims of handwriting identification expertise to scientific status at length, and rejects them.[2] Having done this, however, he concludes that since such experts are not practicing a science within the meaning of *Daubert*, *Daubert*'s validation requirements therefore do not apply. He then, as already noted, analogizes such a proffered expert to a harbor pilot who learns to do something dependably by experience. As to whether the prosecution's expert would be allowed to testify to his conclusion that the signatures on the documents which were the subject of the prosecution were forgeries, based on his examination of the numerous genuine signatures of the putative victim, the court says that the defense had "presented no evidence, beyond the bald assertions [of its experts], that FDEs [forensic document examiners] cannot reliably perform this task. Defendants have simply challenged the FDE community to prove that this task can be done reliably. Such a demonstration of proof, which may be appropriate

---

[6]*General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas. (BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997).

[7]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158–159, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999) (Scalia, J., concurring).

**[Section 35:6]**

[1]*U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). In keeping with the severest punctilio of disclosure, it should be noted that one defense expert at the *Daubert* hearing in this case was the author's friend and co-author and one of the editors of this treatise, Dr. Michael J. Saks, and that the author was a consultant to the defense.

[2]"Were the Court to apply *Daubert* to the proffered FDE testimony, it would have to be excluded. This conclusion derives from a straightforward analysis of the suggested *Daubert* factors—testability and known error rate, peer review and publication, and general acceptance—in light of the evidence adduced at the *Daubert* hearing." *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1036, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

SAK000106

for a scientific expert witness, has never been imposed on 'skilled' experts."[3] Judge McKenna then declares himself persuaded that the inferences as to genuineness of the signature at issue in the case before him "can be performed with sufficient reliability to merit admission."[4]

It should be clear that Judge McKenna's bifurcated standard of reliability based on the classification of proffered expertise as "science or non-science" with higher standards applied to science, does not survive *Kumho Tire*.

Finally, it should be noted, however, that, in anticipation of the particularization focus of *Kumho Tire*, Judge McKenna emphasized that the only claimed skill he was dealing with in the opinion was the skill of comparing a known signature with a questioned signature to determine whether the questioned signature was really signed by the person whose name was reflected, and not any other asserted skill or global claim of expertise. This point has generally been lost on later courts and commentators, who have tended to treat *Starzecpyzel* as if it dealt with global validity.

In *Ruth I*,[5] the Court of Military Appeals faced two issues, one dealing with the reliability of forensic handwriting identification and the other with a claim that the defense was denied due process of law by not being allowed to call its own expert to testify before the jury concerning the weaknesses of handwriting identification expertise. We will return to that issue in due course.[6] As to the reliability challenge, the *Ruth I* court first noted that handwriting expertise had been accepted in the military courts "for at least the past forty-four years."[7] It then declared that *Daubert* did not apply to nonscientific expertise, cited *Starzecpyzel* to establish the nonscientific nature of questioned document examination, and then declared "it has been generally understood that expert testimony on handwriting comparison can assist panel members by focusing their attention on minute similarities and dissimilarities between exemplars that panel members might otherwise miss when

---

[3]*U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1046, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). The implication that the ultimate risk of non-persuasion as to reliability is ever on the opponent of a proffer of evidence is startling, in light of Fed. R. Evid. 104 and the general notion that the party seeking admission must convince the court affirmatively of admissibility once the issue is seriously put in issue. Actually, Judge McKenna seems to have been aware of the problems that would be created by formally placing the burden of persuasion on the opponent of a proffer. The actual position taken by his opinion on that issue is ambiguous and unclear, and, one must conclude, intentionally so. In the only explicit discussion of the issue, he concedes that Professor Berger takes the (standard) position that the burden is on the proponent of admissibility, citing Margaret A. Berger, Evidentiary Framework, in Reference Manual on Scientific Evidence (1995). *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). He then cites an unexamined single line claim to the contrary from the middle of an article by a products liability practitioner whose main position is that *Daubert*'s effect should be viewed as allowing more to be admitted, not less. *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1031, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995), citing Arvin Maskin, The Impact of *Daubert* on the Admissibility of Scientific Evidence: The Supreme Court Catches Up with a Decade of Jurisprudence, 15 Cardozo L. Rev. 1921 (1994).

However, Judge McKenna attempts not to choose between these two positions, characterizing the question before him as "legal" rather than factual, as if that made the problem go away. *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1031, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). His later language from the passage cited in the text of this article seems to show his functional adoption of the problematical Maskin position, however, even though, as the text indicates, he goes on to say that he is affirmatively persuaded that handwriting identification testimony "can be performed" with "sufficient reliability to merit admission." *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1046, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[4]*U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1046, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). Judge McKenna went on to fashion a jury instruction to be given in advance of the expert's testimony to explain that the testimony was not the result of a scientific process, so that the jurors would have no misconceptions in that regard. *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1050–1051, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[5]*U.S. v. Ruth*, 42 M.J. 730 (A.C.C.A. 1995), decision aff'd, 46 M.J. 1 (C.A.A.F. 1997).

[6]See § 28:8.

[7]*U.S. v. Ruth*, 42 M.J. 730, 732 (A.C.C.A. 1995).

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 107 of 263 SAK000107

they perform their own visual comparison. . . . It is largely in the location of these similarities and differences that a professional documents examiner has an advantage over panel members."[8] As authority for this the court pointed to no data of any kind, but to an unpublished opinion in *U.S. v. Buck*,[9] and concluded on this basis that the challenged handwriting identification testimony was admissible as helpful to the trier of fact under Fed. R. Evid. 702. This unanalyzed global approach is now clearly unavailable after *Kumho Tire*. What it reflects, as much by implication as explicitly, is a combination of what may be called the "sufficient experience"[10] test, which emphasizes experience without testing to see if it has actually resulted in the claimed skill, and the "guild" test.[11] in which the existence of an organized group which supervises accreditation (and an expert's membership in it) is taken as a sufficient warrant to infer reliability for admissibility purposes. As we will see,

---

[8]*U.S. v. Ruth*, 42 M.J. 730, 732 (A.C.C.A. 1995).

[9]*U.S. v. Buck*, 1987 WL 19300 (S.D. N.Y. 1987).

[10]The "sufficient experience" approach is first set out in Edward J. Imwinkelried, The Next Step after *Daubert*: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Non-Scientific Testimony, 15 Cardozo L. Rev. 2271, 2292–2294 (1994). See also Lisa M. Agrimonte, The Limitations of *Daubert* and Its Application to Quasi-Scientific Experts, A Two Year Case Review of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993), 35 Washburn L.J. 134, 152–156 (1995); and L. Timothy Perrin, Expert Witness Testimony: Back to the Future, 29 U. Rich. L. Rev. 1389, 1457–1462 (1995).

To be fair to Professor Imwinkelried, the test was set out as a preliminary step in an article pointing out the difficulties of formulating reliability tests for nonscientific expertise, especially "clinical" or "experience-based" expertise. Professor Imwinkelried himself well understood that *Daubert* in its general aspects required gatekeeping vigilance as to all expertise. Unfortunately, the approach he set out was easily embraced by proponents of the status quo ante *Daubert*, since all that it required was the testimony of the witness that he had had lots of experience, and that much of it was in circumstances substantially like those in the case at hand. (See, e.g., testimony of Grant R. Sperry, Transcript of Testimony, *U.S. v. Jones, No. Cr. 3–95–24 (E.D. Tenn. June 29, 1995)*, discussed infra in this section.) Practitioners of all sorts of questionable claimed skills can pass this test. It is not that the test is not sufficient for some kinds of expertise in some circumstances. It works fine for what I have called "everyday summarizational" experts, who testify to such things as industry practice from their years in an industry. See Chapter 2.

The problem is that it supplies little in the way of validation for what I have called "translational" experts, who claim that they can translate their experience into particular adjudicative inferences, such as handwriting identification experts. Here, we must worry about the reliability of not only the subjective data base, but also the subjective translational system applied to it. In short, merely showing up at the scene after auto accidents, even hundreds of times, is a weak warrant to believe a witness's inferences about what happened in the accident itself.

[11]The "guild" test goes beyond the "sufficient experience" test by focusing inquiry on the existence of a group that certifies training, experience and methodology. Acceptance by such a group establishes reliability. Note this is not the "*Frye* Test*" applied to nonscientific expertise, since in the absence of such group acceptance an individual witness might be found reliable for other reasons, but, like the *Frye* test, acceptance by such a group guarantees admissibility. The problem, of course, is that astrology can pass this test. For the most extended and explicit assertion of the guild approach see Andre M. Moenssens, Handwriting Identification Evidence in the Post-*Daubert* World, 66 UMKC L. Rev. 251, 291–292 (1998). See also Thomas M. Reavley & Daniel A. Petalas, A Plea for Return to Evidence Rule 702, 77 Texas L. Rev. 493 (1998); Daniel J. Capra, The *Daubert* Puzzle, 32 Ga. L. Rev. 699, 741–746 (1998); and J. Brook Lathram, The "Same Intellectual Rigor" Test Provides an Effective Method for Determining the Reliability of All Expert Testimony, Without Regard to Whether the Testimony Comprises "Scientific Knowledge" or "Technical or Other Specialized Knowledge," 28 U. Memphis L. Rev. 1053 (1998). See also (or perhaps cf.) Peter B. Oh, Assessing Admissibility of Nonscientific Expert Evidence under Federal Rule of Evidence 702, 64 Def. Couns. J. 556 (1997) (explicitly advocating the *Frye* test for nonscientific evidence); Lisa M. Agrimonte, The Limitations of *Daubert* and Its Application to Quasi-Scientific Experts, A Two Year Case Review of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S. Ct. 2787 (1993), 35 Washburn L.J. at 155 (1995). The practical (though often inexplicit) adoption of the guild test by courts is dealt with in connection to numerous cases discussed infra at §§ 28:6 and 28:7.

12

SAK000108

elements of these two approaches, usually conflated,[12] have commonly been invoked in an effort to justify admission of claimed handwriting identification expertise, and we will henceforth refer to this conflated rendition simply as the "guild test."

It is important to note what application of expertise was being claimed reliable in *Ruth I*. It was not the ability to determine if a signature was genuine, as was the case in *Starzecpyzel*. It was the much more questionable ability to attribute the authorship of a very small sample of writing (like a forged signature) to a particular person based on comparison to examples of the asserted forger's true writing.[13]

The facts in *Ruth* are these. Some person or persons had put together a get-rich-quick scam which worked like this:[14] Someone opened a bank account in Lichtenstein in the fictitious name "William Cooper" using a falsified copy of a passport. They then gained access to the personnel and pay records of 30–35 American soldiers stationed at a base in Bamberg, Germany. Using the information on bank accounts in those records, they sent letters to the (American) banks of the soldiers directing wire transfers of the complete balance of their accounts to the "William Cooper" account at "one a.m Eastern Time Zone on 01 May 1992." The letters were apparently typed, with handwritten signatures. The scheme was uncovered when the banks were told by their depositors that the letters were fraudulent. (It is not completely clear whether this was before or after any transfers, but appears to have been before, as a result of bank inquiries concerning these unusual balance transfer directives).

Suspicion fell upon Private Joseph M. Durocher and Specialist Jeffrey A. Ruth, who were personnel action clerks in Bamberg with access to the relevant bank information. Durocher was interrogated, and apparently cooperated with prosecutors, confessing to the scheme and implicating Ruth. Durocher's testimony was the main evidence against Ruth. The only corroboration of Durocher's story was a questioned document examiner's testimony that Ruth signed one of the thirty-odd forged signatures on letters to banks, and that Ruth wrote one (but not all) of the signatures of William Cooper on the applications used to open the bank account in Lichtenstein.

By now the reader will see the problem. Under a proper *Kumho Tire* approach, the issue would have been "what if anything establishes that questioned document examiners can reliably identify the writer of a small sample of writing comprised of only 14–16 letters, under circumstances where the writing might or might not represent an attempt to simulate the writing of the named signatory (since whoever

---

[12]As will become apparent in the discussion of the cases *infra*, one often has to infer the test implicitly being used from the Court's recitation of training, experience and guild membership, followed by a conclusory declaration of reliability.

[13]Standard Osbornian theory of handwriting identification holds the latter a much easier task than the former. See D. Michael Risinger with Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. 21, 73 (1996). In this regard, consider the following quotations from three of the most respected authorities in the standard document examination literature: "It is much easier to show that a fraudulent signature is not genuine than it is to show that such a writing is actually the work of a particular writer," Albert S. Osborn, Questioned Documents 286–287 (2d ed., 1929). [If the questioned document is not in the natural hand of the forger] " . . . the entire

problem is an extremely difficult one, and if not handled carefully and cautiously, can lead to serious errors." Ordway Hilton, Can the Forger be Identified from His Handwriting?, 43 J. Crim. L., Criminology and Police Sci. 547, 547, 548, 555 (1953). And " . . . while it is often possible to express and justify a definite opinion as to whether a signature is genuine or forged, it is rarely that the identity of the forger can be established by comparing the handwriting of the forgery and specimens of the handwriting of suspects." Wilson R. Harrison, Suspect Documents: Their Scientific Examination 374(1966).

[14]The true crime narrative here given is reconstructed from the statements of fact in both the *Ruth I* and *Ruth II* opinions. I have avoided burdening the text with specific notes to each sentence.

13

SAK000109

created the scam had access to records containing their actual signatures), and where there is a high circumstantial likelihood of disguise of some sort being utilized in the writing in any event." This question was clearly neither asked nor answered by the court in *Ruth I*.

A similar problem is presented by *U.S. v. Velasquez*.[15] Again, the case presents both a reliability challenge and a challenge to the exclusion of a counter-expert, and again, discussion of the latter issue is deferred to a later section. As to the reliability issue, the case involved the conviction of Velasquez for a violation of 21 U.S.C.A. 848, engaging in a continual criminal enterprise involving 5 people or more, which carries a very long sentence. The only evidence establishing that five people rather than three were involved in the alleged drug scheme was testimony by a government questioned documents examiner that mailing labels used to ship drugs had been written at least partly by two alleged coparticipants of defendant. Thus, under a proper *Kumho Tire* approach, the issue would be, "What establishes that questioned document examiners can reliably attribute authorship of individual parts of a document, the whole of which is extremely short, to particular individuals" or something of that nature. Again, this question was neither asked nor answered by the *Velasquez* court, which once again adopted without analysis and by default what was functionally the "guild" test. The *Velasquez* court's "reliability" analysis consists of merely reciting the document examiners training and experience, and her own assertion that she had performed the analysis properly, and declaring that this established sufficient reliability.[16] Again, *Kumho Tire's* emphasis on reliability of expertise in regard to the task to which it is applied in the particular case would seem to dispose such a "guild test" as a dispositive approach, especially when applied globally, as it was in *Velasquez*.

In many ways the 6th Circuit opinion in *U.S. v. Jones*[17] is the standard against which all other unsatisfactory treatments of reliability issues in any area must be judged. And it sets a very high standard of unsatisfactoriness indeed. In *Jones*, a thief obtained a credit card promotional mailing sent to Kathleen Jones's daughter's husband's aunt and uncle, on whose property the daughter and her husband lived in a house trailer. The thief then rented a postbox in the name of a third party (who happened to be a coworker of the defendant), and filled out the credit card application, requesting that the card be sent to the postbox. When the card arrived, items were charged on it to the tune of $3748 over a two week period. When the credit card company came looking, somebody pointed a finger at Kathleen Jones. Part of the evidence against Jones[18] was testimony by a questioned document examiner. The exact nature of that testimony is obscured a little by the Court of Appeals right

---

[15]*U.S. v. Velasquez*, 64 F.3d 844, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[16]The *Velasquez* court initially took the position that *Daubert* did not apply to handwriting because it was not science, *64 F3d at 45*, citing *Starzecpyzel*, but then claimed that "in an exercise of caution" it would review the proffered expertise "for qualifications, reliability and fitness (sic) as those factors have been explicated in *Daubert*." *U.S. v. Velasquez*, 64 F.3d 844, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995). It then proceeds never to mention any reliability criteria beyond the testimony of the document examiner as to the very standard practice which was the subject of the challenge, and her experience. *U.S. v. Velasquez*, 64 F.3d 844, 850–851, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[17]*U.S. v. Jones*, 107 F.3d 1147, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997). The facts of the true crime narrative that is to follow are taken from the Court of Appeals opinion in *Jones*, supplemented to resolve minor ambiguities by the briefs of the parties at trial and on appeal and the transcript of the trial, on file with the author. Exact footnotes have been omitted to avoid burdening the text.

[18]There was other evidence against Jones independent of the handwriting identification. In addition to the coincidence that the postbox was in the name of a coworker whose purse had been rifled when Jones was around, there was an identification of Jones by the motel clerk, and an identification of her (by her daughter) from a bank camera photo (at a bank where she had no account) showing her doing a transaction at the approximate time the credit card was used to obtain money from that bank. Indeed, one significant is-

14

from the beginning, since the opinion states in paragraph 3 that the document examiner's testimony was that "Jones's signature was on: (1) the credit card application; (2) a post office box registration form for the post office box to which the card was sent; and (3) two Howard Johnson's motel registration forms, which contained the fraudulently procured number at issue."[19] However, Jones's signature was on none of these documents. What was on the documents was what purported to be the signature of the aunt, which the questioned document examiner attributed to Jones. So the core *Kumho Tire* reliability issue was in *Jones* virtually the same as in *Ruth* and close to the one in *Velasquez*, and as in those cases, it was neither asked nor answered. However, the way in which it was not answered is what raises *Jones* to new heights of unsatisfactory judgecraft.

The opinion first appropriately spends a page disposing of a trivial challenge to the authentication of an exemplar.[20] It then spends over five pages discussing the standard of review to be applied[21] (this was prior to the Supreme Court's opinion in *General Electric Co. v. Joiner*[22]). It then spends two pages and a half deciding that *Starzecpyzel* was right, handwriting expertise is not science, so *Daubert* is irrelevant.[23] (This was prior to *Kumho Tire*, of course). The Court then says "Without relying on *Daubert*, we now address whether handwriting analysis constitutes "technical, or other specialized knowledge" under the Federal Rules of Evidence and whether the expert handwriting analysis offered in this case was sufficiently reliable"[24] On these core issues of the case the court spends less than two and a half pages.[25] In this sparse treatment the court initially makes two points it appears to think are persuasive on issues of general reliability: (1) Other courts and commentators have uniformly found or assumed that handwriting identification expertise is (globally) a proper subject of court testimony, and that the appellant is therefore "asking us to do what no other court we have found has done,"[26] and (2) "The Federal Rules of Evidence themselves suggest that handwriting analysis is a field of expertise."[27] In trying to justify this latter statement, the court sets out an egregious version of what I call "the Rule 901(b)(3) fallacy,"[28] and flagrantly misquotes the rule in order to do it.

As is well known, Fed. R. Evid. 901(a) sets out the general standard for authentication of any evidence whatsoever, and Fed. R. Evid. 901(b) gives a non-exhaustive list of acceptable recurrent means of satisfying the general requirements of Fed. R. Evid. 901(a) for "evidence sufficient to support a finding that the matter

---

sue, had the courts bothered to go into the issues properly, would have been whether the document examiner was privy to such information, and its effect on his conclusion, consciously or unconsciously. See D. Michael Risinger with Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. at 64 (1996).

[19]*U.S. v. Jones*, 107 F.3d 1147, 1149, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[20]*U.S. v. Jones*, 107 F.3d 1147, 1149–1150, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[21]*U.S. v. Jones*, 107 F.3d 1147, 1150–1156, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[22]*General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas.

(BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997).

[23]*U.S. v. Jones*, 107 F.3d 1147, 1156–1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[24]*U.S. v. Jones*, 107 F.3d 1147, 1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[25]*U.S. v. Jones*, 107 F.3d 1147, 1159–1161, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[26]*U.S. v. Jones*, 107 F.3d 1147, 1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[27]*U.S. v. Jones*, 107 F.3d 1147, 1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[28]Fed. R. Evid. 901(b)(3).

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 111 of 263

SAK000111

in question is what its proponent claims."[29] One way of doing this is set out in 901(b)(3) "Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated." This is the full text of the rule. It is neither limited to documents (much less handwriting), nor does it reference them. In common practice it has been applied whenever an area of expertise, from fingerprints to DNA analysis, is shown or conceded to be reliable to make such comparisons under the standards of 702.[30] However, 901(b)(3) most certainly does not contain any suggestion that because there is a claim that an expert is comparing specimens, the existence of Fed. R. Evid. 901(b)(3) means that he or she meets the reliability requirements of rule 702. This is flagrantly backward reasoning, whether applied to handwriting identification expertise or anything else. Pursuant to *Daubert* and *Kumho Tire*, the existence of reliable expertise must be determined under Fed. R. Evid. 702. If reliable expertise involving comparison of exemplars is found to exist under the standards of 702, then 901(b)(3) may be referenced to establish its sufficiency for authentication purposes (assuming the expertise involves a comparison of standards).

The mistaken argument from 901(b)(3) just given is the standard form of the fallacy often put forward in prosecution briefs.[31] The *Jones* court, however, takes it one step further (presumably as a result of an embarrassing failure to read the actual text of the rule) when it says that 901(b)(3) provides for authentication of a document by "[c]omparison by . . . expert witnesses with specimens which have been authenticated."[32] It then compounds its error by claiming that if handwriting identification expertise were excluded "there would be no place for expert witnesses to compare writing on one document with that on another in order to authenticate a document. In other words, appellant's approach *would render Rule 901(b)(3) meaningless*."[33] Perhaps this would be true if the rule said what the court apparently thinks it says, but plainly, it does not.

To its credit, the court does realize, in instinctive anticipation of *Kumho Tire*, that what it has written does not "guarantee the reliability or admissibility of this type of testimony in a particular case. Because this is nonscientific testimony its reliability largely depends on the facts of each case."[34] However, it then sets out an approach to "reliability" which deals with actual reliability almost not at all. Perhaps not surprisingly, it adopts a global combination of the "experience" test and the "guild test."

*Jones* was, of course, as already noted, not the first court to adopt the "guild" test. However, it is in the details which the *Jones* court seems to believe help justify an inference of reliability where the unintentional humor of the opinion shows forth most strongly. After describing a fairly normal training history for a government questioned document examiner, the court notes that his primary job responsibilities consist of the "examination and comparison of questioned handwriting."[35] The court then notes that the witness estimated that throughout his career, he had conducted

---

[29]Presumably, by implication, it is what its proponent claims that makes the evidence relevant to a fact which is rendered material by the applicable substantive law.

[30]See Wright & Gold, Federal Practice and Procedure, Evidence, § 7102 at nn. 2–15 (collecting cases applying Rule 901(b)(3)).

[31]See, e.g., the government attempt to sell this argument in *U.S. v. McVeigh*, 1997 WL 47724 (D.Colo., Transcript, 1997), at 15–17. Judge Matsch catches the fallacy, at 16.

[32]*U.S. v. Jones*, 107 F.3d 1147, 1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[33]*U.S. v. Jones*, 107 F.3d 1147, 1159, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[34]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[35]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 112 of 263

SAK000112

"well over a million comparative examinations.[36] In addition he has published numerous articles in the field and testified approximately 240 times in various courts.[37] To put it bluntly, the federal government pays him to analyze documents, the precise task he was called upon to do in the district court."[38]

This may be the first case on record in which a person's government job description has been taken as evidence of the reliability of asserted expertise. Even more starkly, the passage illustrates the credulity of the court, and the collision between the court's approach and any even mildly skeptical approach to the dependability of information. This witness testified to conducting "well over a million comparative examinations."[39] If he had been doing document examination 18 hours a day every day for 50 years, he would still have to have done more than three comparative examinations per hour to reach a million.[40] Yet the court swallows the testimony without hesitation and cites it as substantiation for the reliability of his expertise. The *Jones* court then continues as follows: "See Imwinkelried, 15 Cardozo L. Rev. at 2292–2293 (stating that the reliability of non-scientific expert testimony increases with the more experience an expert has had and the similarity of those experiences to the expert's testimony)."[41] However, the cited article makes no such sweeping statement at the cited pages or anywhere else.[42]

The court then continues its unaccountable course by asserting that "handwriting examiners themselves have recognized the importance of experience"[43] (no doubt true), but it supports this with a quote from an article in the Journal of Forensic Document Examination which actually claims that the bulk of document examiner experience with handwriting forms is gotten outside the professional sphere and is common with the rest of the world. "For handwriting examiners, this experience comes mainly from the exposure we have to handwriting throughout the course of our life, the majority of which normally would occur before specializing in forensic handwriting examination."[44]

It is on these grounds, coupled with the fact that the document examiner described the process by which he arrived at his conclusions, that the court declared, "given Sperry's various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony in this case, the court did not

---

[36]J.A. [joint appendix] at 154.

[37]J.A. at 155

[38]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997) (Emphasis supplied.).

[39]Lest the reader believe that some transcription error has been made, the trial transcript does indeed reveal this to have been Mr. Sperry's Testimony.

[40]The real circumstances are even more extreme. Mr. Sperry began his training (a two year course) in 1979. Transcript of Testimony, *U.S. v. Jones, No. Cr 3-95-24 (E.D. Tenn. June 29, 1995), at 121* (on file with the author). Thus, at the time of trial, June 1995, he had 16 year of experience, 14 of which were post-training. This more than triples his actual hourly output, to over nine for every waking hour. Yet, besides his "well over a million comparative examinations" he also testified to having been assigned to "73, [or] 7400 cases" *Transcript, at 123*. This works out to at least one and a quarter cases, every day including Sundays and holidays, without a break, for all 16

years, including his training period.

[41]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[42]Which is not surprising, because this is the kind of unsophisticated global universal statement which Professor Imwinkelried would generally not make. The article does take the position that some kinds of inferences must be based on much experience as a precondition to any claim to reliability, but never says that such experiences alone guarantee or even necessarily increase accuracy in all cases.

[43]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[44]*U.S. v. Jones*, 107 F.3d 1147, 1160, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997), quoting Bryan Found & Doug Rogers, Contemporary Issues in Forensic Handwriting Examination: A Discussion of Key Issues in the Wake of the Starzecpyzel Decision, 8 J. Forensic Document Examination 1, 26 (1995).

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 113 of 263
SAK000113

abuse its discretion by admitting his testimony."[45]

If *Jones's* careless handling of both sources and reasoning is unusual, U.S. v. Paul[46] is in some ways stranger still. In *Paul*, the Court of Appeals statement of the facts and history of the case is precise and pertinent, and will be set out here in its entirety.

## I. FACTS

In May 1996, an unidentified person who stated that he was a bank investigator telephoned Ed Spearman, branch manager of Wachovia National Bank (Wachovia) at Atlanta, Georgia, and warned him that someone intended to leave a note at the bank in an attempt to extort money from the bank. The "investigator" instructed Spearman to follow the directions in the note. Spearman contacted bank security and the Federal Bureau of Investigation (FBI), who advised him to contact the agency immediately if he received an extortion demand. On the following morning, a security camera outside the entrance to Wachovia Bank videotaped a man, wearing a scarf and sunglasses, place an envelope under the front door of the bank. Inside the envelope, addressed to Spearman, was an extortion note that directed Spearman to deliver $100,000 to the men's restroom of a downtown Atlanta McDonald's restaurant. The note threatened violence if Spearman did not follow the instructions and make the payment. Spearman notified bank security and the FBI.

The investigating agents developed a plan to arrest the extortionist: an FBI agent, acting as Spearman, would drive Spearman's car to the McDonald's and place a briefcase in the men's restroom, while surveillance agents would watch the restroom and arrest the person who took the briefcase.

In executing the plan, FBI Agent Eric Bryant testified that upon his arrival at the McDonald's, he entered the men's restroom, observed appellant Sunonda Paul in a restroom stall, left a briefcase and exited the restroom. FBI surveillance agents testified that they later saw Paul sitting at a table near the restroom. As Bryant left the McDonald's, surveillance agents observed Paul enter the restroom again and then attempt to leave the establishment with the briefcase in his backpack. When confronted, Paul told the agents that he was in the area to visit a nearby gym and had stopped at the McDonald's for breakfast. He also told them that he decided to take the briefcase after he found it in the restroom. Paul, however, was dressed in casual street clothing and had no gym clothes or athletic equipment in his possession. The agents arrested him.

## II. PROCEDURAL HISTORY

A grand jury indicted Paul on one count of bank extortion, in violation of 18 U.S.C.A. § 2113(a), and Paul pleaded not guilty. Prior to trial, Paul moved in limine to exclude FBI document examiner Larry Ziegler's testimony regarding handwriting analysis. The district court, however, denied Paul's motion at the pretrial hearing.

The demand note left at Wachovia was the key evidence in determining whether Paul was the extortionist. Although FBI agents examined the videotape to determine the identity of the person who delivered the note, they could not identify the person conclusively. Consequently, the FBI conducted fingerprint and handwriting analysis tests on the note to establish the identity of the extortionist. A fingerprint expert concluded that the latent prints on the note and envelope did not match Paul's fingerprints.

Ziegler, the FBI document examiner, compared the handwriting on the note and the envelope to Paul's handwriting samples and concluded that Paul was the author of both. Specifically, Ziegler asked Paul to write the word restaurant. In the presence of an FBI agent, Paul misspelled the word as follows: "restaurant." In the extortion note the extortionist misspelled the word restaurant the same way. Ziegler also asked Paul to write out "Spearman." Paul spelled it "Sperman," the same way the extortionist had ad-

---

[45]*U.S. v. Jones*, 107 F.3d 1147, 1161, 46 Fed. R. Evid. Serv. 885, 1997 FED App. 0082P (6th Cir. 1997).

[46]*U.S. v. Paul*, 175 F.3d 906, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999).

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 114 of 263

SAK000114

dressed the envelope.[47]

What is odd about this is that the Court seems to have turned the case into one concerning the dependability of reasoning about the authorship of a document from misspellings in exemplars, without realizing that this is not necessarily an expertise issue, its proper role in document examiner practice is somewhat controversial even in document examiner literature, and it has little to do with the reliability of assignment of authorship based on comparison of form.

Suppose an investigator with no claimed skill in document examination notices what appears to him to be unusual misspellings in a typed robbery note. (The same misspelling, say, that was in the robbery note in Woody Allen's movie, "Take the Money and Run," which said (in part) "I am pointing a gub at you.") Acting on other information, he obtains a search warrant for the residence of a suspect and discovers numerous documents, typed or not, in which the suspect refers to "gubs" in contexts which clearly indicate he meant guns ("The NRA is right to oppose gub control legislation"). Virtually every court would receive such evidence authenticated by the investigator, though he claims no special knowledge about the uncommonness of this particular misspelling of "gun." Such a case raises interesting issues of jury notice and the accuracy of jury notice in regard to base rate occurrences of misspellings derived from common experience, but not of *Daubert/Kumho* reliability of expertise. Exactly how much a document examiner ought to rely or be influenced by misspellings is a subject of some controversy, and, as noted above, there have been warnings in document examiner literature against assuming uncommonness and making too much of misspellings.[48] All of this appears to have escaped the notice of the Court of Appeals, however, since these issues are never mentioned in the rest of the opinion.

Of course, though it is not explicitly noted by the court, the questioned document examiner in the case did perform a comparison-of-form analysis in addition to noting the misspellings, and it was that identification by comparison of form which was the subject of Paul's reliability objection. The court deals with that objection as follows:

### 1. Admissibility of Handwriting Analysis

Paul argues that Ziegler's testimony is not admissible under the *Daubert* guidelines because handwriting analysis does not qualify as reliable scientific evidence. His argument is without merit. In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 controls decisions regarding the admissibility of expert testimony. The Supreme Court declared that under rule 702, when "[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993). The Supreme Court stated that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one" and that "Rule 702 . . . assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993). The Court also listed several factors to assist in the determination of whether evidence is

---

[47]*U.S. v. Paul*, 175 F.3d 906, 908–909, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999).

[48]See D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise", 137 U. Pa. L. Rev. at 770–771 (1989) and authorities there cited.

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 115 of 263
SAK000115

scientifically reliable. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–595, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993).

Many circuits were split at the time of trial, however, on whether *Daubert* should apply to nonscientific expert testimony. Some held that the application of *Daubert* is limited to scientific testimony, while others used *Daubert*'s guidance to ensure the reliability of all expert testimony presented at trial. Compare *McKendall v. Crown Control Corp.*, 122 F.3d 803, 62 Cal. Comp. Cas. (MB) 1100, Prod. Liab. Rep. (CCH) P 15045, 47 Fed. R. Evid. Serv. 1 (9th Cir. 1997) (limiting the application of *Daubert* to the evaluation of scientific testimony); with *Watkins v. Telsmith, Inc.*, 121 F.3d 984, Prod. Liab. Rep. (CCH) P 15074, 47 Fed. R. Evid. Serv. 950 (5th Cir. 1997) (holding that the application of *Daubert* is not limited to scientific knowledge).

Recently, however, in *Kumho Tire Company, Ltd. v. Carmichael*, the Supreme Court held that *Daubert*'s "gatekeeping" obligation, requiring the trial judge's inquiry into both the expert's relevance and reliability, applies not only to testimony based on "scientific" testimony, but to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999). The Court further noted that rules 702 and 703 give all expert witnesses testimonial leeway unavailable to other witnesses on the presumption that the expert's opinion "will have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993)). Moreover, the Court held that a trial judge may consider one or more of the specific *Daubert* factors when doing so will help determine that expert's reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999). But, as the Court stated in *Daubert*, the test of reliability is a "flexible" one, and *Daubert*'s list of specific factors neither necessarily nor solely applies to all experts or in every case. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993)). Alternatively, *Kumho* declares that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas. (BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997)) (stating that courts of appeals are to apply "abuse of discretion" standard when reviewing district court's reliability determination).[49]

And that is the totality of the court's review of district court's decision on the reliability issue. The careful (or even careless) reader will have noted that, beyond declaring in the second line of the passage that Paul's "argument is without merit," the court never addresses the reliability issue, or addresses what if anything was before the district court which would have rendered its determination of reliability not an abuse of discretion. There is no formulation of the "task at hand," no description of a reliability test, no reference to information before the district court or the district court's reasoning concerning reliability, nothing.

==Having assumed the conclusion of sufficient reliability with no analysis of the is-==

---

[49]*U.S. v. Paul*, 175 F.3d 906, 909–910, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999) (footnotes and some parallel citations omitted).

20

SAK000116

sue whatsoever, the rest of the opinion on admissibility follows as a matter of course, finding after a recitation of the experts credentials, that the testimony of a qualified expert could assist the trier of fact, and that its prejudicial effect did not substantially outweigh its probative value.[50] All of this is based on the assumed conclusion to the reliability issue never explicitly addressed, but, given the recitative as to credentials, what emerges in the end is functionally the guild test.

And to complete the Court of Appeals reliability opinions extant as of this writing, we turn to *U.S. v. Battle*.[51] Battle was accused of coming from New York to Kansas to set up a drug distribution operation. The evidence against him was voluminous, and involved many witnesses and many episodes. The handwriting identification testimony figured in a single episode not particularly central to the case, but relevant nevertheless because, if believed, it would establish that Battle received money surreptitiously from an out-of-state source under suspicious circumstances. Western Union had a record of a money transfer showing a "Tyler Evans" as the sender and "Anthony Jenkins" as the receiver. The questioned document examiner was called to testify that he had examined exemplars of Battle's signature given when Battle was booked and, in his opinion, Battle signed the name "Anthony Jenkins" to the money transfer.

As usual, the court fails to realize that the document examiner is testifying to one of the subtasks in handwriting comparison most likely to be unreliable. There are 11 letters in "Shawn Battle" and 14 in "Anthony Jenkins" (which was signed only once). They share no capital letters and only 4 small letters (e, h, n, and t) and no letter combinations. One sample is in a presumably normal signature hand and the other is not unless someone named "Anthony Jenkins" in reality signed his own name. If the 10th Circuit had done what the Supreme Court did in *Kumho Tire*, it would have examined the reasons to believe or to doubt the accuracy of such a claimed identification. But though it cites *Kumho Tire* in a pro forma way, it does no such thing. It merely recites the document examiner's credentials (the guild test again) and declares that "[o]ur study of the record on appeal convinces us that McPhail's proffered testimony met the reliability and relevancy test of *Daubert*."[52] The opinion manifests some discomfort about its own conclusion, however, as it goes on to say, "Be that as it may, in any event any error in this regard is, in our view, harmless error when the evidence is considered as a whole."[53]

## § 35:7 Recent developments—Admissibility of asserted handwriting expert testimony after *Kumho Tire*[1]

**Research References**

Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333
Graham, Handbook of Fed. Evid. § 702.6 (5th ed.)
Denbeaux and Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15 (2003)

If the district court opinion in *Starzecpyzel* started the judicial struggle with

---

[50]*U.S. v. Paul*, 175 F.3d 906, 911, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999).

[51]*U.S. v. Battle*, 188 F.3d 519 (10th Cir. 1999). Once again, the narrative here given is drawn from the facts given in the Court of Appeals opinion. Specific footnotes have not been inserted to spare the reader, but can be easily inserted if required.

[52]*U.S. v. Battle*, 188 F.3d 519 (10th Cir. 1999).

[53]*U.S. v. Battle*, 188 F.3d 519 (10th Cir. 1999).

[Section 35:7]

[1]The opinions in *Paul*, *Battle* and *Hines* all were published after *Kumho Tire*, but sufficiently close in time that their failure to properly digest and apply it is perhaps understandable.

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 117 of 263
SAK000117

handwriting identification reliability, the opinion in *U.S. v. Hines*[2] contrasts sharply with the run of Court of Appeals opinions in taking the reliability issue seriously.

On January 27, 1997, someone robbed the Broadway National Bank in Chelsea, Massachusetts, using a demand or "stick up" note, and escaped. The teller who was robbed, Ms. Jeanne Dunne, described the perpetrator as a dark skinned black man with a wide nose and medium build. Ms. Dunne is white, and the court characterized the description as "as close to a generic identification of an African American male as one can imagine." Later, Dunne failed to pick Hines out of a mugbook where his picture appeared, and failed to positively identify him from an eight picture photo spread, though she said Hines "resembled" the robber. Months later, however, she picked Hines out of a lineup, and positively identified him at trial.

The main corroboration of this eyewitness identification came from an FBI questioned document examiner who compared the robbery note with exemplars of Hines' handwriting and concluded that Hines had written the note. A trial on this evidence ended in a hung jury. Before the retrial, Hines moved to disallow the document examiner testimony based on lack of sufficient reason to find it reliable under *Daubert*. The court (Judge Gertner), granted the motion in part, and wrote the published opinion during and after the second trial, which also resulted in a hung jury, in order to explain its ruling and give guidance to the parties in the event of a third trial.

As previously noted in regard to *Daubert*, Judge Gertner identifies what she takes to be a "mixed message" in both *Daubert* and in *Kumho Tire*, with the emphasis on reliability pointing in the direction of more rigor in the evaluation of expertise under Fed. R. Evid. 702 and the emphasis on "the uniqueness of the trial setting, the 'assist the trier' standard and flexibility" doing the opposite.[3] Nevertheless, the court concludes that the main emphasis is on insuring sufficient reliability, and that the Supreme Court "is plainly inviting a reexamination even of 'generally accepted' venerable, technical fields" such as handwriting identification.[4]

Which the court then proceeds to do, with a number of caveats. On what she has seen at the hearing which she held, and in writing, she seems inclined to bar the questioned document examiner testimony in its entirety. However, "[t]his handwriting challenge was raised at the eleventh hour. The hearing was necessarily constrained by the demands of the imminent trial and the schedules of the experts. The Court was unwilling on this record to throw out decades of 'generally accepted' testimony."[5]

In addition, the "compromise solution" Judge Gertner accepts was derived "largely from case law that pre-dated *Kumho*."[6] In other words, the court was not entirely comfortable that she had fully digested and applied the broader implications of *Kumho Tire* which might have been inconsistent with this compromise.

In any event, Judge Gertner proceeds to distinguish between a questioned document examiner's testimony comparing the robbery note with the exemplars and identifying similarities and differences, and testimony concerning the document examiner's inferences of authorship based on those similarities. In sum, she allows the former and bars the latter, essentially adopting the similar approach of Judge Matsch in the Oklahoma City bombing case, *U.S. v. McVeigh*, which she quotes.[7]

There is a certain commonsense appeal to this approach. The document examiner's

---

[2]*U.S. v. Hines*, 55 F. Supp. 2d 62, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[3]*U.S. v. Hines*, 55 F. Supp. 2d 62, 65, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[4]*U.S. v. Hines*, 55 F. Supp. 2d 62, 67, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[5]*U.S. v. Hines*, 55 F. Supp. 2d 62, 67, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[6]*U.S. v. Hines*, 55 F. Supp. 2d 62, 67, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999).

[7]*U.S. v. Hines*, 55 F. Supp. 2d 62, 70, 52 Fed. R. Evid. Serv. 257 (D. Mass. 1999), quoting deci-

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 118 of 263

SAK000118

extensive experience looking at handwriting may have sensitized the expert to the perception and identification of similarities or differences which an ordinary person might not notice, and at any rate the document examiner will be free to spend more time isolating such similarities and differences than we could expect jurors to do pursuant to their own examination during deliberations. Viewed this way, a document examiner appears to become a sort of summarizational witness,[8] and the notion of "expertise" becomes much less central to their function.

However, there is a serious problem with this, especially if the document examiner is allowed to recite his or her credentials, titles and job descriptions. By identifying a similarity or difference, the examiner is inevitably perceived as asserting the *significance* of those similarities or differences in regard to assigning authorship, so that the conclusions which are barred are easily inferred. In practice, this is profoundly true, since document examiners who believe they have identified the author of a writing by comparison will normally point out *only* similarities, and if differences are called to their attention they will dismiss them as not being significant or "real" differences, but merely manifestations of "individual variation."[9] Nevertheless, the Solomonic compromise of Judges Matsch and Gertner is clearly an improvement over surrendering the gatekeeping function entirely to the guild, as most other courts have done.[10] And there is evidence that it is becoming common practice, as reflected in *U.S. v. Santillan*,[11] *U.S. v. Rutherford*,[12] and *U.S. v. Brown*.[13]

In *Santillan*, the defendant, Rogelio Santillan, was charged with conspiracy to distribute false immigration documents. According to the opinion of the court, the prosecution's document examiner proposed to testify "that she has identified, using control samples of defendant's handwriting, Santillan's handwriting on numerous 'questioned' documents."[14] Note that, more than seven months after *Kumho Tire*, in an opinion referring to *Kumho Tire*,[15] this is as much information as we are given on the "task at hand" in the case before the court. Clearly, the requirements of *Kumho Tire* are not yet dependably appearing on the radar screens of the lower courts.

In any event, Judge Jensen then goes on to deal with the reliability issue globally. After briefly reviewing (and criticizing)[16] the extant research data, the court adopts the *Hines*/*McVeigh* approach.[17]

In *U.S. v. Rutherford* defendant Kent Rutherford was charged with bank fraud involving a scheme dealing with a "sale barn" and check. By reference to the opinion, this is all that one could tell. However, an inquiry to the defense attorney in the case reveals that someone registered at a cattle sale as one "George Hipke," a real person of repute. The imposter then purchased an expensive lot of cattle and paid

---

sion of Judge Matsch, discussed at §§ 28:4 to 28:9.

[8]See Chapter 2.

[9]This was one of the main problems that led Judge McKenna to conclude that handwriting identification was not science. See the extended discussion in *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1031–1033, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[10]Or perhaps not. If the law of unintended consequences holds, some court operating under the *Hines*/*McVeigh* approach is likely to disallow cross examination of a document examiner on known error rates, such as the 8% document examiner error rate shown on one task in Kam IV, on the ground that they are not giving an opinion, even though their implied opinion is clear to the whole courtroom. For a full discussion of Kam IV, see § 28:31.

[11]*U.S. v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999).

[12]*U.S. v. Rutherford*, 104 F. Supp. 2d 1190, 55 Fed. R. Evid. Serv. 201 (D. Neb. 2000).

[13]*U.S. v. Brown, No. CR-184ABC (C.D.Cal. Dec. 1, 1999)*.

[14]*U.S. v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999).

[15]*U.S. v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999).

[16]*U.S. v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999). Judge Jensen seems especially troubled that Dr. Moshe Kam, the government's chief researcher on handwriting expertise issues, refused to share his raw data.

[17]*U.S. v. Santillan*, 1999 WL 1201765 (N.D. Cal. 1999).

23

for them with a check bearing the signature "George Hipke." He then removed the cattle. As would be expected, the crime came to light when the real George Hipke learned of the check from his bank.

Rutherford was a retired banker. Exactly why he was charged is a bit unclear, since the people at the sale barn said he was not the person who tendered the check. However, the theory was that he was the mastermind, who sent somebody else to pay for the cattle with a pre-signed check. The proposed expert testimony was that Rutherford in fact signed a "buyer registration form" in Hipke's name, that as to the check bearing George Hipke's purported signature, Hipke did not sign it (a fact that was actually not disputed), and that there was a strong probability that Rutherford did sign it, and that as to a "load out" sheet from Columbus Sale Barn, the inscriptions on the bottom of the sheet were probably written by Rutherford. Once again, although *Kumho Tire* is cited, there is no further attempt to formulate the separate tasks involved in this scenario, or to examine them individually. This is perhaps a bit surprising, given the extensive nature of the *Daubert/Kumho* hearing that was undertaken.[18] And once again, the main task at issue is the attribution of authorship of a forged signature based on the limited amount of writing involved in the signature, though in this case there were two signatures to work with.

In any event, after criticizing the highly suggestive way in which the problem was presented to the expert by the government in obtaining his original opinion,[19] the court ultimately adopts the *Hines/McVeigh* approach, allowing the proffered expert to testify only by pointing out similarities and differences, and not allowing any explicit opinions concerning authorship or probability of authorship.

Additionally, in the unreported case of *U.S. v. Brown,*[20] another check forgery case involving an attempted attribution of authorship of the forged signature, the court also adopted the *Hines/McVeigh* approach by order without opinion after holding a *Daubert/Kumho* hearing.

Finally, in *U.S. v. Fuji,*[21] Judge Gottschall of the Northern District of Illinois has rendered the first decision in a handwriting identification case in modern times which excludes document examiner testimony completely. She has also written the first opinion on asserted handwriting identification expertise to manifest a proper *Kumho Tire* "task at hand" approach.

In this case, there was an allegation that defendant Masao Fujii had been involved in a scheme to obtain the fraudulent entry into the United States of two Chinese nationals. Certain immigration forms filled out in hand printing had been tendered in connection with their attempted entry at John F. Kennedy airport in New York City in December of 1999. As evidence of Fujii's participation, the prosecution sought to call an Immigration and Naturalization Service document examiner, who would testify that she had compared the printing on the forms with exemplars of printing by Fujii, and that in her opinion Fujii printed the fraudulent forms. The defense objected on *Daubert/Kumho* grounds, and a hearing was held on the issue.

In her opinion Judge Gottschall notes that in general "[h]andwriting analysis does not stand up well under the *Daubert* standards."[22] However, as to general issues of reliability, she concludes that "this court need not weigh in on this question, for whether handwriting analysis per se meets the *Daubert* standards, its applica-

---

[18]In keeping with the highest demands of complete disclosure it is here noted that the defense expert in this case was the author's friend, co-author, and one of the editors of this treatise, Dr. Michael J. Saks.

[19]*U.S. v. Rutherford*, 104 F. Supp. 2d 1190, 1193, 55 Fed. R. Evid. Serv. 201 (D. Neb. 2000).

[20]U.S. v. Brown, No. CR 99-184 (C.D. Cal., order dated Dec. 1, 1999), on file with author.

[21]*U.S. v. Fuji*, 152 F. Supp. 2d 939, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000)

[22]*U.S. v. Fuji*, 152 F. Supp. 2d 939, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000).

24

tion to this case poses more significant problems."[23] This is for two reasons. First, virtually all data on document examiner dependability in identifying the author of handwriting has dealt with cursive and not printed writing. The single recorded proficiency test involving hand printing[24] revealed a 45% error rate on that test. Perhaps more importantly, however, Fujii is a native Japanese who learned to print in English as a second language in Japan. The defense called as a witness Mark Litwicki, Director of Loyola University's English as a Second Language program, who had substantial experience with teaching English to Japanese students in both the United States and Japan. The essence of his testimony was that Japanese learn to print in English only after years of training in the exact copying of Japanese characters where "uniformity of characters 'is an important and valued principle of Japanese handwriting'," that they "spend many years attempting to maximize the uniformity of their writing," that this carried over into their learning to write in English, and that "it would be very difficult for an individual not familiar with the English handwriting of Japanese writers to identify the subtle dissimilarities in the handwriting of individual writers."[25]

Considering all this, the court concludes:

Does Ms. Cox [the document examiner] have any expertise which would allow her to distinguish between unique characteristics of an individual Japanese handprinter and characteristics that might be common to many or all native Japanese handprinters? In an analysis that depends entirely on what is similar between writing specimens and what is different, it would seem to this court essential that an expert have some ability to screen out characteristics which might appear eccentric to the writer, compared with native English printers, but which might in fact be characteristic of most or all native Japanese writers, schooled in English printing in Japan, in printing English. There is no evidence on the record that Ms. Cox has such expertise or has even considered the problem Mr. Litwicki has pointed out.

Considering the questions about handwriting analysis generally under *Daubert*, the lack of any evidence that the identification of handprinting is an expertise that meets the *Daubert* standards and the questions that have been raised—which the government has not attempted to answer—about the expert's ability to opine reliably on handprinting identification in dealing with native Japanese writers taught English printing in Japan, the court grants the defendant's motion [to exclude].[26]

Judge Gottschall's opinion is a masterful example of particularized "task at hand" analysis under the standards of *Kumho Tire*. It provides a model for other courts in how to approach the reliability of specific applications of claimed handwriting identification expertise, and all forms of nonscience forensic science.

It is interesting to note that in this set of 12 federal cases (including *McVeigh* and *Brown*), only eight of the 12 trial judges involved held full-scale reliability hearings,[27] and of those who did, seven out of eight manifested substantial reservations about handwriting identification expertise even on a global level.[28] Contrast this with the Court of Appeals judges who heard these cases, all of whom were institutionally insulated from *having* to come to grips with the actual state of

---

[23]*U.S. v. Fujii*, 152 F. Supp. 2d 939, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000).

[24]The 1986 Forensic Sciences Foundation test, the results of which are reported in D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. at 746–747 (1989), and also *U.S. v. Fujii*, 152 F. Supp. 2d 939, 941, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000) at §§ 28:15 to 28:20, and testified to in *Fujii* by Dr. Michael J. Saks as one of the expert witnesses for the defense.

[25]*U.S. v. Fujii*, 152 F. Supp. 2d 939 941, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000), quoting Litwicki.

[26]*U.S. v. Fujii*, 152 F. Supp. 2d 939 941, 56 Fed. R. Evid. Serv. 1029 (N.D. Ill. 2000).

[27]*Ruth*, *Velasquez*, *Jones* and *Battle* were disposed of at trial either without hearing or on voir dire of the government's proposed expert.

[28]Judges McKenna, Matsch, Gertner, Jensen, Collins, Bataillon and Gottschall. Only Judge Tidwell, the trial judge in *Paul*, seemed unconcerned. Apropos all this, consider the following quotation from Judge McKenna's opinion

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 121 of 263
SAK000121

knowledge concerning handwriting identification by cold records and appendices, and *all* of whom felt comfortable brushing off reliability challenges with some version of the "guild" test. The inertia of a venerable tradition of admissibility appears to be a powerful incentive to turn a blind eye to the evidence on the asserted expertise. In light of *Kumho Tire*, perhaps even appellate judges will have to pay attention to the issues raised by these cases.

*U.S. v. Jolivet*,[29] was a mail fraud case. This case has recently been cited in cases such as *Gricco*,[30] as determining the acceptable reliability of handwriting identification expertise. *Jolivet*, however, does no such thing. It is true that the government proffered a document examiner to testify that Jolivet had written certain important documents. Jolivet's attorney, however, *neglected to object*. When the case reached the circuit court, this issue was thus governed by the plain error standard, and it is hardly surprising that the appellate court found that the district court had not committed plain error in admitting document examiner testimony to which there had been no objection.[31] Its further observation that the document examiner's qualifications would have rendered the admission no abuse of discretion even in the face of an objection must be viewed as fairly weak dictum under the circumstances, since, not surprisingly, no one bothered to define what exactly the document examiner was claiming to be able to do in the case.

The next case decided, *U.S. v. Saelee*,[32] is the second case to completely exclude proffered handwriting identification expertise, and does so on broader grounds than *Fujii* had. In *Saelee* the defendant was charged with mailing packages containing cocaine concealed in Butterfinger candy bars. The three packages each bore an address label with "to:" and "from:" information which had been hand printed. The government sought the introduction of a document examiner from the U.S. Postal Service who would testify that he had compared the printing on the labels to known exemplars of Saelee's genuine hand printing, and had concluded that the labels had been printed by Saelee. After an extensive hearing, the trial court ruled that the proposed testimony could not be admitted under Fed. R. Evid. 701 as non-expert opinion, that the government bore the burden of establishing that the proffered testimony was sufficiently reliable to meet the requirements of Fed. R. Evid. 702, and that both globally, and as to the particular issue of the identification of hand printing, that the government had failed to prove that the identification was "the product of reliable methods" as required by Fed. R. Evid. 702(2).[33]

The next case, *U.S. v. Richmond*,[34] is the polar opposite of *Saelee* in its approach. The case involved an alleged mail fraud scheme. The court does not explain what the document examiner is being called to do, in apparent derogation the requirement of *Kumho Tire v. Carmichael* that threshold reliability be judged in regard to the particular function the expert is actually seeking to perform in the case. The three paragraph opinion does not discuss any evidence of reliability. Instead, it discusses recent cases calling handwriting identification expertise into question, and declines to follow them. The court ends by saying, "As a gatekeeper, the court will look to see if the expert's methods are reliable in nature and application to the

---

in *Starzecpyzel*: "If forensic document examination does rely on an underlying principle, logic dictates that the principle must embody the notion that inter-writer differences, even when intentionally suppressed, can be distinguished from natural variation. How FDEs might accomplish this was unclear to the Court before the hearing, and largely remains so after the hearing." *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[29]*U.S. v. Jolivet*, 224 F.3d 902, 55 Fed. R. Evid. Serv. 670 (8th Cir. 2000).

[30]Discussed, *infra.*

[31]*U.S. v. Jolivet*, 224 F.3d 902, 906, 55 Fed. R. Evid. Serv. 670 (8th Cir. 2000).

[32]*U.S. v. Saelee*, 162 F. Supp. 2d 1097, 57 Fed. R. Evid. Serv. 916 (D. Alaska 2001).

[33]*U.S. v. Saelee*, 162 F. Supp. 2d 1097, 57 Fed. R. Evid. Serv. 916, 1105 (D. Alaska 2001).

[34]*U.S. v. Richmond*, 2001 WL 1117235 (E.D. La. 2001).

26

SAK000122

facts."[35] The court says it "will" do this, but it never does it. After another sentence observing that, "cross-examination will help reveal whether the principles and methods used by the experts, as applied to the facts, are reliable,"[36] the court makes no explicit ruling on this issue even though such a determination would seem required by Fed. R. Evid. 702, but merely denies the motion in limine.

The next case was *U.S. v. Elmore*,[37] a decision of the U.S. Navy-Marine Corps Court of Criminal Appeals. Elmore was charged with abusing his position in the base post office at the Guantanimo Bay naval facility by stealing already purchased money orders out of the envelopes used to mail them to their intended recipients, and forging the intended recipient's signature in order to cash them. At issue in this case was the most troubling subtask issue in the area of handwriting identification—the assignment of authorship based on the limited writing involved in a concededly inauthentic signature,[38] though there was more writing here than usual because of the multiple forgeries involved. However, as in the previous military justice system case of *U.S. v. Ruth*,[39] the court was oblivious to the actual issue. In denying the defense motion to exclude the identifications under Fed. R. Evid. 702, the court appears to treat this case as an exercise in stare decisis rather than a determination of threshold reliability. Beyond making the motion, however, it is not clear that the defense attorneys gave the court much more to work with, since the only witness at the Fed. R. Evid. 702 hearing appears to have been the government's document examiner.

Even more troubling is the decision of a panel of the Ninth Circuit in *U.S. v. Johnson*.[40] Johnson was accused of a conspiracy to smuggle three aliens into the United States. Part of the evidence against him involved the testimony of a government document examiner that writing on certain forms was Johnson's. In two paragraphs, the court rules that the district court's rejection of the defense motion to exclude such testimony was not an abuse of discretion because, "it is undisputed that handwriting analysis is a science in which expert testimony assists a jury," citing a 1982 Ninth Circuit case to that effect, and revealing itself ignorant of (or perhaps willfully blind to) a decade of controversy over this issue since the decisions of *Daubert* and *Starzecpyzel*. In the court's defense, this appears to be another of those cases in which a defense attorney makes a pro forma motion and then provides the court with little other material on the issues. Such performances by the criminal defense bar do their clients little good and end up setting the stage for uninformed rulings by courts which impede the general progress of the development of the law in this area.

An interesting contrast to the use of case authority in *Johnson* is found in *Church v. State of Maryland*,[41] an employment discrimination case where, as to one aspect of the case, the district court ruled one particular document irrelevant, thus avoiding the issue of the admissibility of a proffered document examiner on the issue of the identity of handwriting in the document. The court observes, however, that even if the documents were relevant, it would exclude the document examiner, citing

---

[35]*U.S. v. Richmond*, 2001 WL 1117235 (E.D. La. 2001).

[36]*U.S. v. Richmond*, 2001 WL 1117235 (E.D. La. 2001).

[37]*U.S. v. Elmore*, 56 M.J. 533 (N.M.C.C.A. 2001), review denied, 57 M.J. 99 (C.A.A.F. 2002).

[38]The reader will recall that this is a task the document examiner community regards as bordering on impossible, and on which at least

one proficiency test showed massive errors by examiners. See § 28:17.

[39]See extensive discussion above.

[40]*U.S. v. Johnson*, 30 Fed. Appx. 685 (9th Cir. 2002), cert. denied, 537 U.S. 1241, 123 S. Ct. 1374, 155 L. Ed. 2d 213 (2003).

[41]*Church v. Maryland*, 53 Fed. Appx. 673 (4th Cir. 2002).

Case 3:09-cv-03064-MWB-LTS     Document 284-27     Filed 06/23/11     Page 123 of 263

SAK000123

*Saelee*.[42] While this invocation of case authority would be as questionable under *Kumho Tire* as those in *Johnson* or *Elmore*, it does show that in the federal courts the reliability of handwriting identification expertise has generated such divergent cases that both admission and exclusion can be undergirded by the inappropriate invocation of case authority.[43]

Another case that raises this issue is *U.S. v. Brewer*.[44] The defendant was charged with ripping off an elderly client of the bank for which he worked by using an ATM card to make unauthorized withdrawals. The defendant Brewer claimed he was helping out the client, who was very ill, and had been authorized to make the withdrawals. The elderly client, Steve Kruzic, told the FBI that he had no ATM card and had not authorized Brewer to make any withdrawals, but then he died. Brewer produced an authorization which bore what were purportedly signatures of Brewer, Kruzic, and Brewer's supervisor at the Bank, Donna Johnson. Johnson said she did not remember signing such a form, but the signature looked like her signature. The prosecution proposed to call a document examiner who would testify that the D. Johnson signature was a traced forgery, the source of which she claimed to have identified among various exemplars of Donna Johnson's true signature provided by Johnson. The reliability of a document examiner's methods in determining that a signature is not that of its putative author, but is, rather, traced from a determined source, has never been dealt with in any case under *Daubert* or *Kumho Tire*. Nevertheless, the district court ruled that the document examiner's testimony was inadmissible, based on its reading of *Hines*,[45] *Fujii*[46] and *Saelee*, concluding that "unless some new studies have been conducted in the past six months, the government would be hard-pressed to establish that Seiger's testimony would sufficient under *Daubert*."[47] What this overlooks is that there are proficiency tests dealing with traced forgery identification, the results of which were not dealt with in *Hines, Fujii* or *Saelee* because they were irrelevant to those cases, and one extant formal study,[48] actually bears on the general authenticity of signature issue in ways also not in play in those other cases. Whether the result would have been different after an appropriate hearing is difficult to say, but the reliance on precedent was totally misplaced.

A different criticism might be made of *U.S. v. Gricco*.[49] Gricco was charged with conspiracy to manufacture and distribute methamphetamine. In a search of his mother-in-law's residence, agents found two handwritten lists for ingredients and supplies used in making methamphetamine. The government proposed to call a document examiner who would testify that the handwritten lists were written by Gricco. Gricco's lawyer moved to exclude the document examiner pursuant to Fed. R. Evid. 702, but seems to have proffered little supporting information beyond a copy of a 14–year-old law review article.[50] This left the stage almost entirely to the

---

[42]*Church v. Maryland*, 180 F. Supp. 2d 708, 721, 87 Fair Empl. Prac. Cas. (BNA) 1513 (D. Md. 2002), aff'd, 53 Fed. Appx. 673 (4th Cir. 2002).

[43]Though it is significant to note that in only one case involving any real attempt at analysis of the problem, following competing presentations of the disputed underlying basis of the asserted expert evidence, has a district court admitted forensic handwriting experts without some substantial kind of limitation.

[44]*U.S. v. Brewer*, 2002 WL 596365 (N.D. Ill. 2002).

[45]Discussed above.

[46]Discussed above.

[47]*U.S. v. Brewer*, 2002 WL 596365 (N.D. Ill. 2002).

[48]See the discussion of "Kam IV", at § 28:31.

[49]*U.S. v. Gricco*, 2002 WL 746037 (E.D. Pa. 2002).

[50]D. Michael Risinger, Mark P. Denbeaux and Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731 (1989). A fine article it was, but a lot has happened since.

28

government, which managed to have its way in mischaracterizing the Kam studies[51] and the Srihari study,[52] and which mischaracterizations were incorporated into the court's opinion. Based on these plus an invocation of the Third Circuit *Velasquez* case, the court admitted the evidence. No attempt was made to formulate the actual issue at stake in the case as required by *Kumho Tire*. This case seems to be another example of what can happen when defense attorneys make pro forma motions and then fail to do the research to back them up.

Next is *U.S. v. Nadurath*.[53] In the most extreme example to date of inappropriate global disposition by unexplained invocation of selective precedent, Judge McBryde disposed of a challenge in one paragraph by citing three cases. There is no way to know what was at stake in the case factually, since the opinion does not bother to define the task at hand at all.

It is becoming increasingly clear that many judges would like a global precedent-based solution to hard problems of expert reliability which would spare them from the task of actually thinking about such problems. Unfortunately, both *Kumho Tire* and the text of revised Fed. R. Evid. 702 are against them, though so far many judges have proceeded without paying much attention to those requirements of the law.

The next federal case is *U.S. v. Hernandez*,[54] a tax fraud case involving a tax preparer. The government proposed to call a questioned document examiner to testify that the handwriting on many tax forms was the defendant's. Defendant moved to exclude as unreliable under Fed. R. Evid. 702. The trial court, after hearing, adopted the *Hines* approach, allowing the witness to testify to similarities but not to give an opinion regarding authorship. The defendant was convicted, and appealed the failure to exclude completely. The circuit court found the lower court's approach somewhat puzzling, but not an abuse of discretion.[55]

Two district court opinions within 10 days of each other in September 2002 illustrate well how even judges attempting to be careful can arrive at opposite results. The first of these was *U.S. v. Lewis*.[56] In *Lewis*, the defendant was charged with mailing threatening communications to the President and others, by mailing them envelopes containing white powder after the well-known anthrax powder mailings had killed several people and disrupted many federal agencies including Congress. Although there was apparently overwhelming evidence from multiple sources that defendant Lewis had sent the envelopes in question, the prosecution desired to gild this lily with the testimony of John W. Cawley, a "questioned documents analyst" so certified by the U.S. Postal Inspection Service after training by the U.S. Postal Service Crime Laboratory between 1977 and 1980. Mr. Cawley would have testified that he had compared the known writings of Defendant with the writing on the envelopes, and that the Defendant wrote the addresses on the envelopes.

The District Court excluded Mr. Cawley's proposed testimony. In so doing, however, it did not base its decision on any affirmative conclusion of the limits of handwriting identification expertise (though it seemed at times fairly skeptical),[57] nor did it concentrate on the weaknesses of such expertise in regard to the task at

---

[51]See, the discussion of the studies by Kam and his colleagues, at §§ 28:27 to 28:31.

[52]See discussion, infra.

[53]*U.S. v. Nadurath*, 2002 WL 1000929 (N.D. Tex. 2002), aff'd, 66 Fed. Appx. 525 (5th Cir. 2003).

[54]*U.S. v. Hernandez*, 42 Fed. Appx. 173, 89 A.F.T.R.2d 2002-3049 (10th Cir. 2002).

[55]*U.S. v. Hernandez*, 42 Fed. Appx. 173, 89 A.F.T.R.2d 2002-3049 (10th Cir. 2002).

[56]*U.S. v. Lewis*, 220 F. Supp. 2d 548 (S.D. W. Va. 2002).

[57]For instance, the court observed, "There were aspects of Mr. Cawley's testimony that undermined his credibility *U.S. v. Lewis*, 220 F. Supp. 2d 548, 554 (S.D. W. Va. 2002). Mr. Cawley testified that he achieved a 100% passage rate on the proficiency tests that he took and that all his peers *always* passed their proficiency tests. Mr. Cawley said that his peers *always* agreed with

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 125 of 263

SAK000125

hand (there was never any discussion of the amount of writing on the envelopes, whether it was cursive or printing, presence of disguise, etc.). Instead, having ruled that defendant's challenge to the reliability of handwriting identification in general was sufficient to trigger a *Daubert* hearing and place the burden of production and persuasion during that hearing on the prosecution, the court concluded that the prosecution failed to produce the required proof of reliability.[58] The prosecution relied entirely on the testimony of Mr. Cawley, whose lack of knowledge demonstrated during cross examination concerning the research record on reliability and error rates doomed the proffer.[59] The court is to be lauded for coming to the conclusion demanded by the logic of the *Daubert/Kumho* procedural structure, and (unlike some other courts) placing the burden of persuasion on the proponent of the expert evidence even when that is the government. The case also shows that it is not only the defense which sometimes fails to properly prepare for and marshal information in *Daubert/Kumho* challenges to handwriting identification.

A much more puzzling opinion was issued by Judge Lasnik in *U.S. v. Prime*,[60] and it is puzzling for unusual reasons. This was not the usual offhand opinion which characterizes many of the decisions admitting handwriting identification testimony. The charges against Michael Prime involved counterfeit U.S. postal money orders. The prosecution intended to call Kathleen Storer, a forensic document examiner for the U.S. Secret Service, to testify that Prime's handwriting "appeared on counterfeit money orders and other documents."[61] Later in the opinion, the court indicates that what Ms. Storer was asked to evaluate for authorship was made up of writing on 78 different documents (76 covered by her first report and 2 by her second report), including envelopes, money orders, "post-it notes," express mail labels and applications for postal boxes.[62] Some of the writing was cursive and some handprinting. Ms. Storer was given extensive known writings of three persons (Prime and codefendants Hiestand and Hardy), and asked if any of them wrote any of the writing on the 78 documents. She found that Hiestand wrote "portions of eight documents" and Hardy wrote "portions" of one document, and Prime wrote "portions" of 45 documents, and "probably" wrote "portions" of 14 more.[63] The documents contained 38 signatures, the authorship of which Storer indicated "could not be determined." Given these facts, it is obvious that, even in the opinion of Storer, the questioned writings presented multiple tasks, and the record is unclear concerning the extent of the writing involved in each separable task. This is important, because, though the court is one of the few to manifest an awareness, at least formally, of its obligation under *Kumho Tire* to evaluate reliability in regard to the specifics of the particular case,[64] it later functionally lumps all of the tasks performed by Storer into a single task for

---

each others' results and *always* got it right. Peer review in such a 'Lake Woebegone' environment is not meaningful." And the court further said, "Finally, while there may be general acceptance of the theories and techniques employed in handwriting analysis among the 'forensic document community,' this acceptance does not demonstrate reliability *U.S. v. Lewis*, 220 F. Supp. 2d 548 (S.D. W. Va. 2002). If courts allow the admission of long-relied-on but ultimately unproven analysis, they unwittingly perpetuate and legitimate junk science." *U.S. v. Lewis*, 220 F. Supp. 2d 548 (S.D. W. Va. 2002)

[58]*U.S. v. Lewis*, 220 F. Supp. 2d 548 (S.D. W. Va. 2002).

[59]It should be noted that the court did not appear to believe it likely that a better prepared witness would necessarily have been able to

provide the needed evidence.

[60]*U.S. v. Prime*, 220 F. Supp. 2d 1203 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

[61]*U.S. v. Prime*, 220 F. Supp. 2d 1203, 1204 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

[62]*U.S. v. Prime*, 220 F. Supp. 2d 1203 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004)*U.S. v. Prime*, 220 F. Supp. 2d 1203 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

[63]*U.S. v. Prime*, 220 F. Supp. 2d 1203, 1206 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

[64]*U.S. v. Prime*, 220 F. Supp. 2d 1203, 1210–1211 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

30

SAK000126

purposes of its analysis.

The first three sections of the court's opinion are (except perhaps for a few details) unexceptionable, even admirable. Section I analyzes *Daubert* and *Kumho Tire*, recognizing that, while they speak of "flexibility" and "discretion," the focus of that flexibility and discretion (its "overarching subject") is "evidentiary relevance and reliability," and that a flexible standard "does not imply a lax one."[65] Section II recounts the history of handwriting identification expertise in the federal courts, pre- and post-*Daubert*, including a very thoughtful examination of Judge McKenna's opinion in *Starzecpyzel*. It quite fairly notes that the Court of Appeals decisions are generally simply affirmations of whatever the district courts have done pursuant to the abuse of discretion standard of *General Electric v. Joiner*, and therefore are of limited use as pronouncements on actual reliability. It further notes that the results in the District Courts have been "uneven," with some admitting the proffers without restriction, some excluding them, and some admitting them with restriction. It then turns to the application of the *Daubert/Kumho* requirements to the facts of *Prime*.

The court's first decision was to properly reject the defense's argument that the 1998 Department of Justice formal solicitation of research proposals "to determine the scientific validity of handwriting identification" was a binding admission by the government that "in its present state, handwriting analysis cannot pass muster under *Daubert/Kumho Tire*." Directly after this ruling, the court proceeds to make "a few general observations" before it gets down to the business of applying "the *Daubert* factors to assess the admissibility of Storer's testimony."[66] It is at this point that the opinion rolls off the edge of the table. The court says, essentially, that *Daubert* and *Kumho Tire* were directed at "novel theories in civil cases," and not at "time-tested techniques used almost universally by law enforcement," and further, where "a novel theory is presented to a court, it makes sense to demand proof of statistically significant results and strict compliance with scientific methods. However, where a technique has been repeatedly applied and tested by law enforcement and the courts for over a century, the Court does not believe that the absence of scientific data, without more, should be the death knell for such testimony," citing Judge Pollak's *second Llera-Plaza* opinion.[67] In making these observations, the court comes as close to formally embracing the "civil plaintiff proffer vs. prosecution proffer" double standard as one can imagine a court explicitly doing, and does it without noting the difference between the use of a technique to generate investigatory leads and its use as evidence in a criminal trial. After these "preliminary observations" the result of the case seems a forgone conclusion.

Perhaps even more startling is the way that the court then deals with the requirements of *Kumho Tire*, which in the first part of the opinion it rightly noted requires some appropriate standards of reliability applied to the actual task the expert is performing in the case before the court, and which requirement it repeats at length at 1210–1211. How does Judge Lasnik define that task (or more properly, those tasks, since we have already noted that even Ms. Storer treated her comparison in this case as involving many discreet tasks applied to different parts of different

---

[65]*U.S. v. Prime*, 220 F. Supp. 2d 1203, 1204, (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004). One objection to the first part of the opinion is that, having said that the standard ought not to be lax, the court then implies that laxness is cured by the "equal intellectual rigor" test. *U.S. v. Prime*, 220 F. Supp. 2d 1203, 1205 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004). Of course, that test tests nothing when it is the accuracy of the group practice itself that is being evaluated.

[66]*U.S. v. Prime*, 220 F. Supp. 2d 1203, 1209 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004).

[67]The strange story which led to the two conflicting opinions of Judge Pollak (both of them unsatisfactory) in *Llera-Plaza* is well known, even if the reasons for it remain unclear. See Mark P. Denbeaux & D. Michael Risinger, *Kumho Tire* and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15, 66–74 (2003).

31

writings with different amounts and types of writing)? Well, at first he makes no attempt. He begins his analysis with a description of the governments claims about data on handwriting uniqueness generally, but he says that he need not decide the general question of uniqueness,[68] given the extensive nature of the "known documents" available to the document examiner, whose credentials are impeccable. (If the reader cannot follow this logic, he is no worse off than the writer). He then says that the Kam data establish (globally) that Questioned Document Examiners are generally more accurate than lay persons (ignoring the problems of the application of those data to handwriting identification practice on the ground), that QDEs have a method, and that they have "broad acceptance" among law enforcement. Hence it is sufficiently reliable and properly admitted.

The closest the judge comes to defining the "task(s) at hand" occurs in two footnotes. In footnote 7 he rejects the idea that he should analyze handprinting separately as a separate task, relying in part on the testimony of Professor Kam described below, and further in footnote 5 he says his opinion is limited to situations where there are extensive "questioned and known" documents for the document examiner to work with.[69] In essence, *Prime* defines the *Kumho Tire* task-specific issue as "identifying handwriting as to authorship when there is extensive known writing," which is almost inevitably true in every criminal case, given the power to compel the creation of exemplars. In the end, *Prime* becomes a standard-issue global opinion in *Kumho Tire* clothing.

*Prime* is also the first case in which the government called Dr. Moshe Kam to testify explicitly on the issue of handprinting. The limitations of Kam's first two studies are analyzed at length at §§ 28:27 to 28:31. Dr. Kam refuses to share the data from those studies in contravention of the usual norms of science. In spite of this, courts have neither ordered that he produce those data for reanalysis as part of criminal discovery, nor have they barred him from testifying as a result of the failure to produce the data for defense inspection. It seems unthinkable that a court would follow a similar course in regard to a proffered plaintiff's expert who relied on such research in any competently litigated civil case. Be that as it may, however, in *Prime* things reached a new low. As indicated above, the court in *Saelee* excluded document examiner testimony on handprinting, concluding that handprinting identification was a task which the document examiner literature indicated was more difficult than cursive identification, and which, whatever the status of the research record in regard to cursive, there were no data indicating that document examiners could assign authorship to handprinting reliably. In *Prime* the prosecution called Kam to fill that gap. He testified, apparently,[70] that he had gone back to the original raw materials of those studies and discovered a subset of exemplars in the original materials that were (in his judgment) not in cursive script but

---

[68]The court concedes in footnote 5 that the data cannot establish uniqueness.

[69]It is easy to see how the extent of the "known" documents in this case might be taken to enhance accuracy, but in reality the "questioned" documents were not "extensive" in the sense that the 3 page ransom note in the JonBenet Ramsey case was extensive, that is, displaying lots of writing in a single document clearly by the same person. Instead, it is as if the document examiner had been given 78, or 150 or 300 different tests to do (depending on the separable sub-parts, which were clearly present given her actual results). How the extensive nature of her multiple tasks enhanced generally her accuracy is a mystery. The only document that actually appears to have

been extensive was a three page document which was hand-printed, raising again the propriety of lumping printing and cursive together in making reliability judgments under the approach mandated by *Kumho Tire*. (Information on the nature of the individual documents is derived from the report of the prosecution's expert, supplied by Michael J. Saks, who testified for the defense in the case).

[70]The court references his testimony at *U.S. v. Prime*, 220 F. Supp. 2d 1203, 1313 n 7 (W.D. Wash. 2002), aff'd, 363 F.3d 1028 (9th Cir. 2004), but does not describe it. The presumed tenor is taken from the fuller summary of the testimony in *U.S. v. Hidalgo*, 229 F. Supp. 2d 961, n 4 (D. Ariz. 2002).

32

SAK000128

handprinted, that he broke out that subset and analyzed it, and that document examiner performance in regard to the handprinting subset was not significantly different from performance in regard to cursive.[71] The court allowed this testimony despite the fact that the data and raw materials still were not produced for inspection and the newly discovered handprinting subset was never mentioned in the original publication of the study. In the end, however, despite formally recognizing the particularizing requirements of *Kumho Tire*, the court explicitly treated handwriting identification including handprinting as a global skill to be globally evaluated

The next case is *U.S. v. Kehoe*,[72] a truly horrific case involving the prosecution of Chevie O'Brien Kehoe, a white supremacist, for inter alia three capital counts of murder in aid of racketeering. The evidence against Kehoe was as overwhelming as the case was horrific. The handwriting identification testimony at trial appears to have been cumulative, and a good candidate for a harmless error characterization if error had been found. Instead, the court found no abuse of discretion in its admission, citing only *Kumho Tire's* "wide latitude" language regarding trial court discretion, and the expert's credentials. Once again, there is no way of knowing what specific claim of expertise was involved in the case, since the court does not even describe what kind of documents were the subject of the testimony.

In *U.S. v. Hidalgo*,[73] the district court faced a challenge to a prosecution proffered document examiner's testimony in regard to both handwriting and handprinting. This was the second case in which Dr. Kam has been called to testify as to the results of his newly discovered subset of handprinting tests from his earlier research. Early in the opinion the court seemed to understand that handprinting and cursive writing presented two separate tasks for evaluation, but in the end (without reference to the specificity requirements of *Kumho Tire*), like the court in *Prime*, it specifically rejects this distinction, citing the Kam testimony in a footnote. The court then evaluates the research record globally (and as if it applied to handprinting), finding that the record established that document examiners possessed an advantage over ordinary persons in accurately determining relevant similarities and differences between known writings and questioned writings generally. As a result, the prosecution proffered witness would be allowed to testify to such similarities and differences. However, the court also concludes that the theoretical basis upon which an actual declaration of authorship was made (the theory of uniqueness: "no two person write exactly alike") was not established and therefore testimony of specific authorship would not be allowed. In short, with a slightly different rationale, the court adopted the *Hines* approach globally.

*United States v. Mooney*[74] is another case in which it is not possible to frame the expert task at hand with much specificity from the opinion. Dennis Mooney was prosecuted in federal court on charges arising out of the armed robbery of a motel in

---

[71]As if to confirm the elementary point of both science and law—that truth and accuracy are enhanced by making data public and accessible to scrutiny—it emerged at the *Daubert* hearing in *Hidalgo* that Kam's new analysis made the wrong comparison. It compared examiners' performance on handprinting to their performance on writing that was both script and *a mixture of script and handprinting*. Once that fact becomes known, it should be obvious even to nonscientists that what was tested was not the question that was at issue. Such a comparison between apples versus oranges with some apples mixed in will reduce and tend to obscure any true performance gap that might actually exist between examiner performance on handprinting compared to cursive writing. Why the simplest, most obvious and most appropriate comparison was not made, we cannot know. The procedural point here is that it was handled by the *Prime* court in a way that prevented anyone from learning of the problem and by the *Hidalgo* court in a way that made it possible for the error to become known.

[72]*U.S. v. Kehoe*, 310 F.3d 579, 59 Fed. R. Evid. Serv. 812 (8th Cir. 2002), cert. denied, 538 U.S. 1048, 123 S. Ct. 2112, 155 L. Ed. 2d 1089 (2003).

[73]*U.S. v. Hidalgo*, 229 F. Supp. 2d 961 (D. Ariz. 2002).

[74]*U.S. v. Mooney*, 315 F.3d 54, 60 Fed. R. Evid. Serv. 60 (1st Cir. 2002).

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 129 of 263
SAK000129

Waterville, Maine. Mooney and the other participants in the robbery were intercepted some distance away, after the motel clerk worked free from restraints and called police. They still had the items taken from the robbery, and the clothes and weapons used in the robbery, with them in the car when they were arrested. The other four participants plead out and testified against Mooney at trial. In addition, Mooney fit a detailed fresh complaint description given by the clerk and was identified by the clerk both before and at trial. At some point, letters purportedly from Mooney were received by Mooney's (former?) girlfriend admitting participation, but the court does not tell us if the letters were signed (though it seems likely that they were). It also does not tell us how long the letters were, or whether they were cursive or handprinted. The prosecution wished to establish Mooney's authorship partly by circumstances, partly by testimony from the (at least by then former) girlfriend recognizing Mooney's handwriting, and partly by testimony from a document examiner based on his comparison of the letters to known writings of Mooney. The defense moved to bar the expert testimony pursuant to *Daubert/Kumho*, or at least to limit it to the identification of similarities as was done in *Hines* and the cases that have followed it. The district court denied both requests, and the First Circuit found no abuse of discretion in these denials.

In coming to this conclusion, the Circuit found that the district court properly relied globally on the credentials of the document examiner and on his testimony that "he and other forensic document examiners employ the same methodology," that "this methodology has been subject to general peer review through published journals in the field" and that "its accuracy has been tested, with one study concluding that certified document examiners had a potential error rate of 6.5%."[75] However, it would seem that the first two of these statements are of little value when, in the words of *Kumho Tire*, the question is whether "the discipline itself lacks reliability."[76] As to the statement that the accuracy of the method employed by document examiners "has been tested," that certainly is not true in regard to the great majority of its subtasks. As to the proposition that "one study concluded that certified document examiners had a potential error rate of 6.5%," this chapter contains an exhaustive review of the studies evaluating document examiner skills and, as the reader can see, no such study exists. The only studies that have ever tested document examiner skills at all in regard to actual tasks of authorship attribution have all concentrated on signature authentication alone, and have not differentiated between "certified" and "uncertified" examiners (whatever that term may mean). No studies have found "potential" error rates of any kind (since individual studies can deal only in actual error rates revealed by the data in the study), and no study has found a global document examiner error rate of 6.5%. What the witness was probably referring to was Kam II, which found that document examiners doing a sorting task (not attributing authorship as in normal practice) had a 13% false negative error rate and a 6.5% false positive error rate under conditions much more favorable than found in actual practice.[77]

But perhaps we are overanalyzing. Perhaps this is another case where the defense failed to make an appropriately detailed record. Perhaps the circuit panel can be forgiven for just going through the motions, given the overwhelming evidence against Mooney. They even seem to adopt the problematical argument that the long history of handwriting identification admissibility establishes its reliability, and the

---

[75]*U.S. v. Mooney*, 315 F.3d 54, 62, 60 Fed. R. Evid. Serv. 60 (1st Cir. 2002).

[76]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999).

[77]For a full analysis, see §§ 28:27 to 28:31.

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 130 of 263

SAK000130

fallacious reading of Fed. R. Evid 901(b)(3)[78] which was discussed above.[79] What is a bit more troubling is their global suggestion that the *Hines* approach is never required when conclusions are based on the same methodology as observations (which is always), and that it may be the *Hines* approach which is the abuse of discretion (a conclusion which would be contrary to the 10th Circuit opinion in *Hernandez*, supra). Despite a wide following in various courts around the country, apparently there is less than universal respect for the *Hines* approach in the land of its birth.

*U.S. v. Crisp*[80] is the last of the federal criminal cases considered. It illustrates how bad facts and the best of a bad set of defense choices can help make bad law. On June l3, 1981, around 12:25 in the afternoon, a lone male wearing a mask and surgical gloves and carrying a handgun, entered the Central Carolina Bank in Durham, N.C. He approached a teller, threw a bag on the counter, and ordered her to fill the bag. The teller gave the gunman $7854. A car horn from the parking lot beeped twice, and the robber left the bank and was seen driving away in a purple Ford Probe. Police found a stolen purple Ford Probe abandoned on a local street later that day, which apparently contained no useful clues or evidence.

The next day authorities received a call on the Crimestoppers tip line from a man claiming to have information about the robbery. The caller agreed to meet the police at a local restaurant later in the afternoon. The caller turned out to be one Michael Mitchell, who said that the bank robbers were Patrick Crisp and Lamont Torain. The reason Mitchell knew who robbed the bank, he said, was that Crisp and Torain had tried to recruit him for the robbery, and Crisp had detailed the entire plan to him at that time. Mitchell said he declined to participate. (The opinion does not give any account concerning Mitchell's reason for coming forward and volunteering this information.) As a result of Mitchell's information, the police obtained an arrest warrant for Crisp.

The following day (June 15), in what the opinion makes out to be a totally unexpected coincidence, Mitchell and Crisp were driving together in a rented Pontiac Grand Am with Crisp at the wheel when they happened upon a police license checkpoint. Crisp had no driver's license, and gave his name as Jermaine Jackson. A search of the vehicle turned up a small amount of marijuana. While an officer or officers were interviewing Crisp, Mitchell informed another officer or officers of Crisp's real identity which led them to discover the outstanding arrest warrant. Crisp was arrested.

Another warrant was obtained for Torain, and he was also arrested. After police interrogation, Torain confessed. He admitted that Mitchell had begged off of participating in the robbery at the last minute, but he claimed that the original plan had been conceived by Crisp and Mitchell together. Initially, he had only agreed to drive the getaway car, but when Mitchell backed out, he agreed to be the one to go into the bank.

Torain was jailed in the same facility as Crisp. According to him, he passed Crisp's cell one day and a note was slid out under the door (which he then turned over to the authorities). The note read:

Lamont

You know if you don't help me I am going to get life in prison, and you ain't going to get nothing. Really it's over for me if you don't change what you told them.

Tell them I picked you up down the street in Kathy's car. Tell them tht I didn't drive the Probe. Tell them Mike drove the Probe. His is the one that told on us. Tell them the

---

[78]*U.S. v. Mooney*, 315 F.3d 54, 60 Fed. R. Evid. Serv. 60, 62 (1st Cir. 2002).

[79]See § 28:6.

[80]*U.S. v. Crisp*, 324 F.3d 261, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003).

35

gun and all that shit was Mike's That is what I am going to tell them tommorow.

~~Tell the Feds Mike drove you away from the bank.~~[81]

Patrick Crisp claimed that he had been with his cousin Cecilia Porter at the time of the robbery (and she so testified at trial). He also claimed that he was being framed by Mitchell and Torain. The viability of that claim (to the extent there was any[82] was heavily dependent on inducing belief that the note Torain gave to police had not been slid out of Crisp's cell, but was an invention of Torain's with or without police connivance. If the note were found to be written by Crisp, all of his defenses would collapse. There were two pieces of evidence proffered by the prosecution to bolster Torain's testimony that the note originated with Crisp. First, it appears undisputed that there was a palmprint on the note. The prosecution obtained an authentic palmprint from Crisp, and it was compared with the palmprint on the note by Mary Katherine Brennan, a fingerprint examiner with the North Carolina State Bureau of Investigation, who concluded that the palmprint on the note was Crisp's.

In addition, the prosecution obtained handwriting exemplars from Crisp. These were compared to the handwriting on the note by Thomas Currin, a document examiner with the same State Bureau of Investigation, who concluded that Crisp wrote the note.

Obviously, unless these witnesses were to be excluded (especially the fingerprint examiner), Crisp was unlikely to have a chance of acquittal. To that end, Crisp moved to exclude the proffered fingerprint and handwriting identifications on the ground that they did not meet the reliability standards of Rule 702. The motion was denied without (available) opinion as to both proffers. It is clear from the opinion in the Court of Appeals that there was a hearing on the motions, but it seems that the only testimony taken was from the government's document examiner, the defense relying on cross examination and published sources.

In addition, it seems clear that the attack that was made on both areas of expertise was global, in derogation of the requirements of *Kumho Tire*. In this case that is not surprising, certainly as to the fingerprint aspects of the case. Unless we are misled by the implications of the word "palmprint," it is likely that the latent print was extensive, rendering unavailable the attack on the "boundary problem," that is, the reliability of comparisons to latent prints which contain little detail. As I (and a co-author) have argued elsewhere, while a global attack on fingerprint comparison reliability for lack of formal data is interesting, it is only the boundary problem that is likely to create a viable issue under *Daubert/Kumho*.[83] We further observe there that quixotic global attacks on fingerprint identification are likely to have bad consequences downstream by making it easier for courts to dismiss skeptics as irresponsible bomb-throwers.[84] Something of that dynamic may have infected the majority's consideration of the handwriting identification issue in this case. Of course, the defense attorney really had no choice; assuming the palmprint was sufficiently extensive and clear, it was either a global attack on fingerprint identification or none at all, and he probably was obliged to take the one-in-a-

---

[81]*U.S. v. Crisp*, 324 F.3d 261, 264, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003). "Tomorrow" is spelled "tommorow" in original and strikethrough in original.

[82]In addition to the testimony of Mitchell and Torain, police had found surgical gloves in the back of Crisp's girlfriend Katherine Bell's car (she was apparently the "Kathy" referred to in the note), and a bulletproof vest and sawed-off shotgun in the bedroom of her residence, which Mitch-

ell, at any rate, said had been shown to him as intended for use in the robbery).

[83]Mark P. Denbeaux & D. Michael Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15, 68 (2003).

[84]Mark P. Denbeaux & D. Michael Risinger, *Kumho Tire* and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15, 68 at n. 183 (2003).

36

SAK000132

million shot for his client even though it might foul up the way in which later decisions would be approached by this court, and others influenced by its opinion. As was said above, what happened was the bad result of making the best of a bad set of available choices for his client.

The majority had little trouble dismissing the global attack on fingerprinting, in a rather slipshod opinion tacking together pieces of rationale without much analysis, including the "longstanding acceptance, not only in the expert community, but by courts," and "widespread agreement on standards"[85] within the expert community (which happens not to be true in regard to the boundary problem, by the way), and most startlingly, acceptance of the testimony by examiners that the error rate "was essentially zero" or "negligible," without supporting data, as establishing a low error rate generally and apparently across all conditions.[86] The court, like many others, seems unaware that none of this is very compelling when, in the words of *Kumho Tire*, the issue is whether "the discipline itself lacks reliability."[87] Finally, the court concludes that, in the face of these factors, the defense had failed to bring forward sufficient information even to raise an issue concerning reliability.

If the opinion of the majority on the fingerprinting issue was slipshod, there was a better opinion that could have been written reaching the same result in the case before the court.[88] A long history of, among other things, successful identification of cadavers later confirmed by other evidence (combined with other fairly indisputable general propositions about the nature of ridged skin) perhaps provides an acceptable belief warrant for the reliability of the process when there is extensive questioned print material to work with (as appears to have been the case here), even though there is a lack of formal science concerning the randomization mechanism involved, and a lack of statistical work that could generate information on random match probabilities.[89] The only caveat here is that the palm print may have been smudged in such a way that it did not provide sufficient detail to justify such an approach, especially considering the fact that the examiner's conclusions may have been contaminated by knowledge of other, fingerprint-domain irrelevant, evidence in the case (a point apparently never raised by the defense.)[90]

If an acceptable opinion on the fingerprint aspects of the case could perhaps have been written, the same is not so clearly true concerning handwriting identification, which lacks the characteristics of the fingerprint phenomenon which might provide the requisite belief warrant. Nevertheless, on the handwriting issue, the majority went on to reach a similar result that it reached in regard to palmprint identification (and on explicitly similar grounds).[91] First, the court observes that no circuit has ever found the admission of handwriting identification testimony to be an abuse

---

[85]*U.S. v. Crisp*, 324 F.3d 261, 26960 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003) *U.S. v. Crisp*, 324 F.3d 261, 27560 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003).

[86]*U.S. v. Crisp*, 324 F.3d 261, 269, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003).

[87]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999).

[88]Denbeaux & Risinger, supra note 53, at 60–63.

[89]Denbeaux & Risinger, supra note 53, at 60–63.

[90]For a general discussion of such issues, see D. Michael Risinger, Michael J. Saks, William C. Thompson and Robert Rosenthal, The *Daubert/Kumho* Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion, 90 Cal. L. Rev. 1 (2002).

[91]*U.S. v. Crisp*, 324 F.3d 261, 271, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003). ("Our analysis of *Daubert* in the context of fingerprint identification applies with equal force here.").

37

of discretion.[92] Next, the court recites the qualifications of Agent Curran, the government's proposed witness.[93] It then notes in a footnote that the witness testified to the results of what is apparently one of the Kam studies (but the actual study does not seem to have been produced by the parties or obtained by the court).[94] Finally it says, "The fact that handwriting comparison analysis has achieved widespread and lasting acceptance in the expert community gives us the assurance of reliability that *Daubert* requires,"[95] a most breathtakingly disregard of *Daubert* and *Kumho Tire* and an explicit adoption of the "guild test."[96]

The dissent opens thus:

> The majority believes that expert testimony about fingerprint and handwriting identification is reliable because the techniques in these fields have been accepted and tested in our adversary system over time. This belief leads the majority to excuse fingerprint and handwriting analysis from the more careful scrutiny that scientific expert testimony must now withstand under *Daubert* before it can be admitted. In Patrick Leroy Crisp's case, the government did not prove that its expert identification evidence satisfied the *Daubert* factors or that it was otherwise reliable. I respectfully dissent for that reason. In dissenting, I am not suggesting that fingerprint and handwriting evidence cannot be shown to satisfy *Daubert*. I am only making the point that the government did not establish in Crisp's case that this evidence is reliable. The government has had 10 years to comply with *Daubert*. It should not be given a pass in this case.

This paragraph sets out the themes of the dissent, but it is harder than one might think to determine its exact focus. The rest of the opinion shows great familiarity with the literature concerning the global reliability arguments surrounding both fingerprint and handwriting identification, and it is very effective in eviscerating the majority's reliance on "adversary testing" as a general matter. However, it is difficult to know whether the dissent is saying that the government failed to make an appropriate showing in Crisp's case because they merely called two examiners who were not themselves familiar enough with the extant disputes and data to make an appropriate record upon which to base a finding of reliability (which would mean that the dissent was arguing for a result like *U.S. v. Lewis*, supra), or whether the dissent was arguing that the current state of the research record is inadequate to establish admissibility of either fingerprinting or handwriting identification globally.[97] In addition, the dissent (like the majority) is too global in focus to comply with the mandate of *Kumho Tire* to judge reliability in regard to the particular proffer in the case. Finally, the dissent (like the majority) does not distinguish between fingerprint identification and handwriting identification when it comes to evaluating the reasons one might in many applications accept the reliability of one and not the other.

Although *Crisp* is the last federal criminal case to deal with handwriting identification reliability, there have been several federal civil cases that treat rele-

---

[92]*U.S. v. Crisp*, 324 F.3d 261, 270, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003)..

[93]*U.S. v. Crisp*, 324 F.3d 261, 270, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003)..

[94]*U.S. v. Crisp*, 324 F.3d 261, 270 n 6, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003)..

[95]*U.S. v. Crisp*, 324 F.3d 261, 271, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003)..

[96]For a discussion of the untenability of the guild test, see, § 28:6.

[97]At least as to fingerprints, it may be that the majority opinion also was based, like *Florence v. Com.*, 120 S.W.3d 699 (Ky. 2003), on the failure of the defendant to make a sufficient record regarding reliability issues, for it says at one point, "Put simply, Crisp has provided us with no reason today to believe that this general acceptance of the principles underlying fingerprint identification has, for decades, been misplaced." *U.S. v. Crisp*, 324 F.3d 261, 269, 60 Fed. R. Evid. Serv. 1486 (4th Cir. 2003), cert. denied, 124 S. Ct. 220, 157 L. Ed. 2d 159 (U.S. 2003).. Or this may simply reflect an erroneous misplacement of the general burden of persuasion by the majority.

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 134 of 263

SAK000134

vant issues. The first of these is *Wolf v. Ramsey*,[98] decided the same day as *Crisp*. This defamation case grew out of the unsolved 1996 murder of JonBenet Ramsey in Boulder Colorado. The opinion is worth reading just for its scrupulous and clear summary of the facts of that case and the subsequent investigation. To this date, as most of America knows, the case has not been solved, but various speculations about the perpetrator's identity have circulated. Those speculations directly concerned in this case involve the notion that there is reason to believe that JonBenet's mother Patricia (Patsy) Ramsey might have been the killer, and the notion that there is reason to believe that Robert Christian Wolf might have been the killer. The circumstances pointing toward Patsy Ramsey center around claims that it is unlikely that an intruder into the Ramsey home at night could have found JonBenet's room and abducted her into the basement, killed her, then had the time to draft a three page "ransom" note using materials found in the home and then make his escape without awakening somebody else in the house. The identification of Patsy Ramsey (as opposed to other members of the household such as her husband or son) is based on claimed identification of the handwriting on the ransom note as belonging to Patsy Ramsey.

On the other hand, if one accepts that the evidence establishes that JonBenet was killed by an intruder,[99] then the speculation about the identity of the intruder has tended to focus on a handful of named individuals, although almost everyone agrees that the perpetrator is at least as likely to be someone whose name has not yet surfaced to prominence. One of those named individuals was plaintiff Wolf. Suspicion in regard to Wolf resulted from the statement made by his girlfriend Jacqueline Dilson that she suspected him, based on the following facts she claimed were true: The murder occurred either near midnight on Christmas day or in the early morning of December 26, 1996. Wolf had spent Christmas day with Dilson, but then begged off from staying to have supper with her and her family. Dilson had gone to bed around 10:00 p.m. thinking Wolf had gone off on some sort of spree. Dilson was awakened around 5:30 a.m. by sounds coming from the bathroom. She realized that Wolf was just finishing a shower. Leaving dirty clothes all over the floor, Wolf climbed into bed and went to sleep. The next day Dilson and Wolf saw television news reports about the JonBenet Ramsey murder, and, to Dilson's surprise, Wolf became quite agitated. Wolf cursed and said that he believed JonBenet had been sexually abused by her father, and he brooded over the case for the rest of the night. Dilson also asserted that Wolf was fascinated with world political disputes and political violence, and hated big business. Finally, Dilson said that Wolf owned a sweatshirt with the initials SBTC (for Santa Barbara Tennis Club) which were the same initials as those used to sign the ransom note.

This information was communicated by Dilson initially to Pam Paugh, Patsy Ramsey's sister. Later it was given to the police, and they interviewed and investigated Mr. Wolf, who was never charged. In a book written by them, and on TV shows, Patsy Ramsey and her husband John Ramsey recounted the above in arguing that there were various people who were more likely to have been the murderer than Patsy Ramsey. As a result, Mr. Wolf sued.

To make a long story as short as possible, the court determined that the Ramseys' statements about Wolf suggested that he was a viable candidate to be JonBenet's murderer, and were thus presumptively defamatory, subject to two defenses: truth (which covered many of the statements) and good faith statements of opinion. To get around the "opinion" defense, the plaintiff asserted that the implications were

---

[98]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[99]The court makes it clear that the over-whelming weight of evidence points in this direction. *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1353–1357, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

Case 3:09-cv-03064-MWB-LTS Document 284-37 Filed 06/23/11 Page 135 of 263
SAK000135

knowingly false and malicious because the Ramseys knew for a fact that Wolf was not the killer, because they knew for a fact that Patsy Ramsey was the killer. This is where the handwriting identification experts come in.

The ransom note had been examined by six questioned document examiners during the police investigation. Four of those were commissioned by the police and two by the Ramseys. They were Chet Ubowski of the Colorado Bureau of Investigation, Richard Dusick of the U.S. Secret Service, and Leonard Speckin, Edwin Alford, Lloyd Cunningham and Howard Rile, all in private practice. All six agreed that John Ramsey could be eliminated as author of the note.[100] While none of the examiners eliminated Patsy Ramsey completely, all six agreed that the likelihood of her being the author of the note was very low. As the court said, "on a scale of one to five, with five being elimination, the experts placed Mrs. Ramsey at a 4.5 or a 4." However, Wolf claimed to have evidence that would satisfy the requirement of clear and convincing evidence (which was the applicable standard of proof) that Patsy Ramsey had written the note. This evidence was the testimony of two witnesses plaintiff claimed were handwriting identification experts, who had concluded that Patsy Ramsey had undoubtedly written the ransom note: Cina Wong and Gideon Epstein. In addition, apparently as part of the "peer review" of his work, Mr. Epstein had obtained affidavits from former FBI document examiners Larry Ziegler and Richard Williams, and private practitioners David Lieberman and Donald L. Lacey, approving his analysis and concurring in his results.

The Ramseys moved to strike the testimony of these two witnesses pursuant to *Daubert*, and for summary judgment. Judge Carnes first ruled globally (using what is functionally a variant of the guild test) that handwriting identification techniques used by trained forensic document examiners are sufficiently reliable in general to allow them to testify to similarities and differences to "aid the jury."[101] She then ruled that Cina Wong was unqualified.[102] Cina Wong was largely self taught, claimed 10 years experience, and had been vice president of the National Association of Document Examiners. The court noted, however, that this organization has no membership requirements beyond payment of a fee. The court perhaps goes too far in anointing the American Board of Forensic Document Examiners (ABFDE) as the "sole recognized organization for accreditation of qualified forensic document examiners."[103] However, the conclusion concerning Ms. Wong, especially given her initial approach to defendant's attorneys offering to "analyze the Ransom Note and point out the weaknesses in analysis by 'Government handwriting experts'"[104] seems unexceptionable.

Judge Carnes contrasts favorably the qualifications of Mr. Epstein with those of Ms. Wong.[105] They are indeed, from the perspective of the guild, impeccable. He is a past president of the American Society of Questioned Document Examiners and a member of its accrediting branch, the aforementioned ABFDE. He was trained at the U.S. Army Crime Laboratory and the Post Office Identification Laboratory, and has 30 years of experience. She ruled that he was qualified to testify in order to

---

[100]One interesting aspect of the case is the care that the court gives to explaining why, because of the nature of the felt-tipped pen with which the note was written, the document examiner community itself regarded the determination of authorship to be a difficult task.

[101]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1344, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003). Given the later specific findings, the only function of the global ruling seems to have been to allow the court to continue referring to and using the conclusions of the prosecution- and defense-hired document

examiners. It should be noted that, given those conclusions, the Ramseys had no real need to press the issue of global unreliability.

[102]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1345, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[103]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1345, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[104]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1339, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[105]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1345, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

40

SAK000136

point out similarities and differences between the ransom note and the handwriting of Patsy Ramsey.

However, she then turns (without citation) to the *Kumho Tire* part of the opinion, saying that she must "still determine the parameters of his expertise with regard to the opinions he seeks to offer."[106] It is here that Mr. Epstein strikes out. Judge Carnes notes that Epstein worked under what document examiner lore and his own previous writings hold are undesirable conditions, using photocopies instead of originals of both Patsy Ramsey's known writing and the ransom note. Still, he came to the conclusion "with absolute certainty" and "to a 100 percent certainty" that Patsy Ramsey wrote the note. Judge Carnes finds, in spite of the fact that his conclusion was joined by four other document examiners (who were not going to testify), that Epstein's methodological explanation for how he could be so sure failed to meet the required level of reliability, and on this basis she adopts a "*Hines*" result and bars him from testifying to his conclusions.[107] Without the benefit of the handwriting expert's conclusion, plaintiffs cannot prevail, and therefore she grants summary judgment.[108]

There are many interesting aspects of this opinion, among them: the two stage "global then particularized" approach, the willingness to examine the actual conditions of practice in judging reliability, and the willingness to be properly skeptical in the face of obvious overreaching. Judge Carnes' careful treatment of why it is sometimes required to treat reliability of conclusions separately from reliability of observations is in stark contrast to the First Circuit's summary declaration to the contrary in *Mooney*.[109] Would that more judges would follow her lead in criminal cases.

The next federal civil case of interest is *Deputy v. Lehman Brothers*,[110] a securities fraud action arising from the conduct of a Lehman Brothers investment advisor named Frank Gruttadauria, who had already pleaded guilty to fraud charges in regard to a scheme which the court characterized as "one of the largest scams of retail investors ever committed by an individual broker."[111] Lehman Brothers moved to stay proceedings pending arbitration pursuant to an arbitration agreement purportedly signed by Ms. Deputy. Ms. Deputy denied signing any arbitration agreement. Lehman Brothers produced an option approval form dated February 20, 1993, and three client agreements from 2001, all bearing what purported to be Ms. Deputy's signature, all of which apparently contained arbitration clauses applying to transactions Ms. Deputy complained of. Ms. Deputy denied signing these (the implication being that Gruttadauria forged them). Lehman then produced a document examiner, Dianne Marsh, who testified that she had compared the four signatures on the documents to genuine signatures of Ms. Deputy and, in her opinion, Deputy signed two of the four documents containing arbitration clauses. She was unable to reach a conclusion as to the other two.

The plaintiff attacked the tenability of this opinion in a variety of ways. First, she

---

[106]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1345, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[107]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1345–1348, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003).

[108]*Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1363, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003). Though Judge Carnes does not deal with it directly, it seems right to say that, although jurors are authorized to compare handwriting directly without expert testimony (see *U.S. v. Alvarez-Farfan*, 338 F.3d 1043, 61 Fed. R. Evid. Serv. 1413

(9th Cir. 2003)), it would be too much to say that in a case like this, they could base a finding satisfying the clear and convincing evidence standard on such direct examination.

[109]*U.S. v. Mooney*, 315 F.3d 54, 60 Fed. R. Evid. Serv. 60 (1st Cir. 2002).

[110]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003) (ellipses omitted).

[111]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 137 of 263

SAK000137

denied that one of the signatures that was used as a "known" by Marsh was genuine (it was on a letter purporting to be from Deputy to Lehman Brothers). Second, plaintiff pointed out that Marsh originally had been given only the single disputed "known" signature, and had on that basis declared that she was unable to form an opinion at all, but that when Marsh was supplied with a photocopy of a second "known" signature (from an affidavit filed in the case) she had then concluded that two of the questioned signatures were made by Deputy. Plaintiff contended that the number of "known" signatures was insufficient for the task and that working from a photocopy was not proper. Marsh herself in her original report indicated that, "Before a conclusion can be reached, additional samples (plural) of the genuine signature of Doris A. Deputy need to be submitted for examination." (parenthetical supplied). Since the questioned documents span a time period from of February 20, 1993, through July 26, 2001, it would be advisable to have known standards covering this time frame."[112]

The plaintiff also asserted that Marsh should not be believed because her findings had once been rejected by a court. When the judge in this case asked her generally whether "any court refused to accept you as an expert witness on this subject matter," she had said "no," but later when probed about a particular case, had said that she did not remember.[113] Here is where the trial court got into trouble. The judge rejected Marsh's testimony based partially on its unreliability as a matter of technique under Rule 702, and partially on his evaluation of Marsh's lack of frankness. He apparently overlooked the fact that the defendant had a right to an actual trial on the issue of the existence of the arbitration agreement under section 4 of the Federal Arbitration Act,[114] and that his sole role at the hearing was to determine admissibility at such a trial.[115] By basing his rejection of the handwriting expert on a mixture of reliability and credibility, he erred.[116] The circuit reversed, indicating that it was not concluding that Marsh's testimony was in fact sufficiently reliable to meet the requirements of Rule 702, but that the court had to evaluate it by proper Rule 702 standards.[117]

---

[112]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 499, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003). In her testimony, Marsh asserted that originals were preferable, but that in the absence of an original a "good" photocopy could be used. She also doggedly insisted that handwriting identification was a "science," though not an "exact science." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, *4, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003). It is interesting to note that the plaintiff does not appear to have attacked Ms. Marsh on the ground of her qualifications, though her qualifications appear to be no better than those of Ms. Wong, whom judge Carnes rejected in *Wolf v. Ramsey*, supra. Ms. Marsh was a member of the World Association of Document Examiners instead of the National Association of Document Examiners, but neither are recognized by the Osbornian establishment. Note that Ms. Marsh was a "diplomate of the American Board of Forensic Examiners," not the American Board of Forensic Document Examiners annointed by Judge Carnes. The standards of the "American Board of Forensic Examiners" appear to be decidedly lax.

[113]It appears that the case was 20 years earlier and that Ms. Marsh had not in fact testified, but that her expert report had been proffered and rejected. When that was pointed out, Marsh replied, "I'm not familiar with that." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 498, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003) It is unclear whether she would have know of this rejection even 20 years earlier.

[114]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

[115]The district court also erred in refusing to look at the signatures himself, in deciding that there was no triable issue based on juror comparison (see *U.S. v. Alvarez-Farfan*, 338 F.3d 1043, 61 Fed. R. Evid. Serv. 1413 (9th Cir. 2003), infra and compare with *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 61 Fed. R. Evid. Serv. 1715 (N.D. Ga. 2003), supra.), and in cutting off discovery in advance of that trial. *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

[116]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

[117]*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 62 Fed. R. Evid. Serv. 965 (7th Cir. 2003).

42

SAK000138

The final federal case is *U.S. v. Alvarez-Farfan*,[118] a case that deals, not with when handwriting experts can testify, but with when they are not required at all. Alvarez-Farfan was charged with selling to Rivera, a government informant, three-quarters of a pound of methamphetamine for $3750 inside a room at an Economy Inn in Winnemucca, Nevada, in what is known as a "controlled buy." After Rivera claimed to have arranged the purchase and delivery at the Economy Inn with one Blanco, agents watched Rivera go into the room without the drugs and exit with the drugs. The occupant of the room (if any) was not then arrested because the main target of the investigation was his boss, Blanco, who supplied the drugs. (Blanco was later arrested and convicted.) Alvarez-Farfan's theory of defense was that he was never in the room, that the room had been rented by Rivera, was empty at the time of the transaction, and that the drugs were placed there by Rivera as part of an attempt to satisfy his government handlers. In an attempt to get the jury to infer this, he wanted to show the jury a "confidential informant debriefing statement" written by Rivera, and also the motel receipt for the room (presumably the desk book). He would then argue that they should conclude that Rivera, not he, rented the room, based on their concluding from comparing the documents that the handwriting was the same. The trial court ruled that it would not allow this without a document examiner's testimony. The circuit reversed, ruling that such direct juror comparison was always competent, based in part on the mandate of a statute, 28 U.S.C.A. § 1731, which provides "the admitted or proved handwriting of any person shall be admissible for purposes of comparison to determine genuineness of other handwriting attributed to such person."[119] In addition, the court found that the admission was not harmless error, since the only witness against Alvarez-Farfan was Rivera, and, as an undocumented alien, Alvarez-Farfan would have had some difficulty actually renting the room himself.[120] Any other problems with the proffer might be dealt with under FRE 403, but the government had made no such motion.[121]

In the state courts, business has gone on generally as usual, with dozens of cases noting the existence of document examiner testimony, but with the issue of reliability being neither raised nor dealt with. There is a growing number of significant exceptions, however, including *Taylor v. Abernethy*,[122] *Williams v. Wyoming*,[123] *Spann v. Florida*,[124] *Florence v. Kentucky*,[125] and *Delaware v. Jones*.[126]

*Taylor v. Abernethy*[127] is a civil case involving the estate of Romer Gray Taylor. Romer had for much of his life been a ne'er-do-well, failing repeatedly at farming and other ventures and generally always being taken in and bailed out by his brother Harvey. In 1978, in connection with Harvey bankrolling (to the tune of $38,000) yet another start for Romer, Harvey claimed Romer signed a contract to make a will with Harvey the sole beneficiary. Romer died in 1998. Apparently he had been looked after by a nephew, child of another sibling of Romer and Harvey. Apparently also Romer had made a will naming not Harvey, but the nephew, as sole

---

[118]*U.S. v. Alvarez-Farfan*, 338 F.3d 1043, 61 Fed. R. Evid. Serv. 1413 (9th Cir. 2003).

[119]*U.S. v. Alvarez-Farfan*, 338 F.3d 1043, 61 Fed. R. Evid. Serv. 1413 (9th Cir. 2003).

[120]*U.S. v. Alvarez-Farfan*, 338 F.3d 1043, 1044, 61 Fed. R. Evid. Serv. 1413 (9th Cir. 2003). By implication, the court seems to be saying that such direct comparison is presumptively sufficient to raise a reasonable doubt.

[121]*U.S. v. Alvarez-Farfan*, 338 F.3d 1043, n 2, 61 Fed. R. Evid. Serv. 1413 (9th Cir. 2003). Presumably, the court is referring to questions of sufficiency and speculation.

[122]*Taylor v. Abernethy*, 149 N.C. App. 263, 560 S.E.2d 233 (2002), review denied, 356 N.C. 695, 579 S.E.2d 102 (2003) and review denied, 356 N.C. 695, 579 S.E.2d 102 (2003).

[123]*Williams v. State, 2002 WY 184*, 60 P.3d 151 (Wyo. 2002).

[124]*Spann v. State*, 857 So. 2d 845 (Fla. 2003).

[125]*Florence v. Com.*, 120 S.W.3d 699 (Ky. 2003).

[126]*Delaware v. Jones*, 2003 WL 21519842 (Del. Super. Ct. 2003).

[127]*Taylor v. Abernethy*, 149 N.C. App. 263, 560 S.E.2d 233 (2002), review denied, 356 N.C. 695, 579 S.E.2d 102 (2003) and review denied, 356 N.C. 695, 579 S.E.2d 102 (2003).

43

SAK000139

beneficiary. Harvey sued. The controlling issue was the authenticity of Romer's signature on the contract dated in 1978. Harvey said it was genuine. Harvey called a document examiner who proposed also to say that Romer's 1978 signature was genuine. The nephew's lawyer moved to exclude the document examiner. Apparently influenced by the federal cases, especially *U.S. v. Hines*, the trial court said the document examiner could point out similarities but could not offer a conclusion of authenticity. The jury found the signature not to be Romer's. The North Carolina Court of Appeals reversed and declared handwriting identification expertise to be globally admissible, adopting what is essentially the guild test.[128] By so doing, the Court of Appeals has apparently insulated even the most questionable exercises of handwriting identification expertise from any threshold reliability examination in North Carolina courts.

A similar result was reached in a criminal context by the Supreme Court of Wyoming in *Williams v. Wyoming*.[129] In or around early March of 2000, Victim (his name is never given) was a cab driver who met defendant Betty Jean Williams while she was riding in his cab. In conversation, he said he was needing to have some work performed at his house, including some painting, and she said she would be interested in working for him. Some sort of arrangement was arrived at, because a day or so later the defendant came to Victim's house and provided painting services. It is not clear from the opinion if Victim paid Williams, how he paid her, or how much he paid her.

Toward the end of March, Victim went to New Mexico for a week. When he returned he got his bank statement, and sat down to reconcile it. According to Victim, he discovered that five checks which he was sure he had not written had been cashed, totaling $900. The checks were apparently made out to cash, were signed with Victim's name, but had been endorsed with the name of the defendant. Victim called the police, who discovered that on March 23, 2000 Williams had taken the first check (which was for $150) to a local bank and initially tried to cash it, but the bank refused to handle the check unless she opened a savings account, which she did. She deposited the check into the savings account, and was allowed to take out $100 in cash. The next day she withdrew another $10. Then on March 27 and 28 she deposited four checks, one for $225, two for $275 and one for $200, and in a series of withdrawals interspersed with these deposits managed to leave the savings account with a balance of only one dollar at the close of business on March 28. When she was picked up she admitted to the officer who interviewed her that she had signed the endorsements on the back of the checks, but claimed Victim had given them to her. The checks were dated between March 24 and 28, when Victim was out of town.

It is important to note that Victim's testimony, coupled with that of the bank employees and the bank records and defendant's admission to the police concerning the endorsements, was sufficient evidence to support a conviction. Ever risk averse, however, the prosecution proceeded to supplement this evidence with the testimony of a Mr. Crivello, a document examiner with the Wyoming State Crime Laboratory. Mr. Crivello's examination and conclusions were unusual in their restraint. He did not claim to attribute either the signature on the front of the check or the rest of the entries on the front to defendant Williams. He said he had "no opinion" concerning that. He merely proposed to testify that the signature with the Victim's name on the front of the check "was not consistent with Victim's known signature, and that Victim "probably or very probably" did not write those signatures. He further testi-

---

[128]*Taylor v. Abernethy*, 149 N.C. App. 263, 560 S.E.2d 233, 240 (2002), review denied, 356 N.C. 695, 579 S.E.2d 102 (2003) and review denied, 356 N.C. 695, 579 S.E.2d 102 (2003).

[129]*Williams v. State, 2002 WY 184*, 60 P.3d 151 (Wyo. 2002).

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 140 of 263

SAK000140

fied that defendant Williams did write the endorsements in her name on the back of the checks. Thus, he proposed only to testify to the authenticity of the two apparent signatures on the checks, a subtask of handwriting identification about which some data exist. If that had been the focus of the defendant's attack, and therefore the decisions of both the trial and appellate courts, that would have been one thing. What happened was quite something else.

Wyoming has explicitly adopted the U.S. Supreme Court's approach in *Daubert*, *Joiner* and *Kumho Tire*.[130] The Rule 702 motion in Williams was made by the defense the day before trial was to begin. Initially, the trial court was of the opinion that Montana's version of *Daubert* doctrine did not require a hearing in regard to handwriting identification, citing *Starzecpyzel* (no one at the trial level seemed familiar with *Kumho Tire*). Finally, however, something of a hearing was held. The focus was completely global, addressing handwriting identification generally. The only witness was the state's document examiner, though the prosecution also apparently produced the Kam studies (the opinion refers to the prosecutor arguing at the hearing that "the peer-reviewed articles that we produced to the court from the Journal of Forensic Sciences also demonstrates (sic) that they come up with the right answer.")[131] We are not told what, if anything, the defense produced. The document examiner testified to his credentials, and to never having failed a proficiency test in 16 years, though what regime of individual proficiency testing he is referring to is not clear, since we are not familiar with such a regime of tests which issues passing and failing grades. At any rate, on this record, the trial court found handwriting identification testimony globally admissible, and the Supreme Court of Montana affirmed, saying that the record before the trial court was sufficient to find that "forensic document techniques have been and are tested and forensic document examination has been the subject of considerable peer review and publication. In addition the court found that there was adequate proof that "there existed appropriate testing procedures to assure and maintain the standards of the profession and that such profession had been accepted within the relevant scientific community for many years."[132] The court did indicate that its *Daubert*-like jurisprudence adopted the *Kumho Tire* requirement that all proffered expertise is subject to review for reliability. In addition, technically, the Supreme Court opinion was only a finding that admitting the testimony in this case was not an abuse of discretion. However, it seems clear that it will be the rare judge in Montana who does not take this opinion to be a global mandate to admit such evidence across the board, independent of the claims of expertise which were actually involved in the *Williams* case itself.[133]

At least the next case, *Spann v. Florida*,[134] has the virtue of reaching a similar result in a more straightforward, if no less questionable, way. The case involved a capital murder charge against Spann and others arising out of the murder of Kazue Perron, who was carjacked in order to get her car for use in a robbery, and then murdered execution-style so she could not identify the carjackers. The evidence against Spann was overwhelming, and will not be rehearsed here. Handwriting comes in, again, only peripherally. While in jail, Spann wrote to a co-defendant in

---

[130]*Williams v. State, 2002 WY 184*, 60 P.3d 151, 153–154 (Wyo. 2002), citing *Bunting v. Jamieson*, 984 P.2d 467 (Wyo. 1999).

[131]*Williams v. State, 2002 WY 184*, 60 P.3d 151, 157 (Wyo. 2002).

[132]*Williams v. State, 2002 WY 184*, 60 P.3d 151, 157 (Wyo. 2002). The court has an odd notion of a "scientific" community. These statements appear to be based on the guild test supplemented

by the existence of the Kam studies, for all their weakenesses, and the assumed existence of yearly graded proficiency tests.

[133]This appears to be another example of a slap-dash defense challenge leading to a poorly considered opinion that might place a whole jurisdiction's jurisprudence on the subject in a bad posture for the foreseeable future.

[134]*Spann v. State*, 857 So. 2d 845 (Fla. 2003).

45

Case 3:09-cv-03064-MWB-LTS    Document 84-27    Filed 06/23/11    Page 141 of 263
SAK000141

an attempt to coach him on how to testify. Authorities were given the note. Initially, Spann denied writing it, but when told that a handwriting expert was going to examine it, Spann admitted writing the note. However, the prosecution still wanted the questioned document examiner to testify. Specifically, the prosecution wanted the document examiner to testify that the writing on the note showed an attempt to disguise Spann's ordinary hand. The relevance of this was assertedly "consciousness of guilt" (the relevance of "consciousness of guilt" in regard to the note is not made clear; perhaps it was to cut off any claim that the text of the note could be given an innocent construction). At any rate, the defense challenged the reliability of the document examiner to conclude that a writing was "intentionally disguised" and the trial court decided that this issue was both "novel" and "scientific" enough to raise an issue under Florida's version of the *Frye* test. After a hearing, the trial court concluded that the proffered testimony "is indeed based on scientific principle, which has gained acceptance in the field of Forensic Document Examination" and admitted the testimony.

Here is where the case becomes procedurally unusual. The Supreme Court of Florida ruled that the defense had only preserved error on the issue of the ability of questioned document examiners to determine disguise, but that on appeal it had only raised the issue of the general reliability of handwriting analysis testimony.[135] Because the only issue argued was not preserved at trial, and because the only issue preserved was not raised on appeal, the defendant was without legal standing to challenge anything.[136] If the court had stopped there, the case would be of limited interest. However, the court goes on to say (in what must technically count as dictum, a distinction unlikely to have much practical effect on practice in Florida in the near future) that "even if the alleged error had been properly preserved, this claim would fail."[137] It then goes on to declare that the trial court was right on both issues, that the general reliability of handwriting identification testimony is not novel and therefore not subject to Florida's version of *Frye*,[138] and that the lower court's handling of the disguise issue was proper.[139]

A radical optimist might see the potential seeds of a *Kumho Tire* approach in the way this case was handled, with general issues being subject to no challenge for lack of novelty, but each specific issue being regard as "novel" because it had never been the subject of a particularized *Frye* hearing before. A realist, however, would have to admit that the Florida Supreme Court's approval of using the document examiner guild as the reference group for general acceptance under its *Frye* test makes a successful challenge to even the most unreliable of this and other questionable techniques of forensic identification "science" very unlikely in Florida for the foreseeable future. The irony here is that this is the same court that showed itself so capable of rational evaluation of the weaknesses of specific proffered expertise in *Ramirez v. Florida*.[140]

---

[135]*Spann v. State*, 857 So. 2d 845 (Fla. 2003). The Supreme Court of Florida issued a revised opinion in the case, 2003 WL 22349391 (Fla. 2003), which does not differ from the original in regard to the handwriting issues.

[136]*Spann v. State*, 857 So. 2d 845 (Fla. 2003).

[137]*Spann v. State*, 857 So. 2d 845 (Fla. 2003).

[138]"Forensic handwriting identification is not a new or novel science." *Spann v. State*, 857 So. 2d 845 (Fla. 2003). "Because expert forensic handwriting identification is not new or novel, *Frye* has no application." *Spann v. State*, 857 So. 2d 845 (Fla. 2003).

[139]The *Frye* hearing in the case was limited to the issue of whether the expert could testify that Spann distorted or disguised his handwriting. "[T]he trial court's consideration of the admissibility of expert testimony on the limited issue of distorted or disguised handwriting was properly considered and resolved." *Spann v. State*, 857 So. 2d 845 (Fla. 2003). The court cites no specific evidence or testimony dealing with the reliability of document examiners in performing this particular task.

[140]*Ramirez v. State*, 810 So. 2d 836 (Fla. 2001). There is in particular a stark and startling contrast between *Spann* and *Ramirez* in regard to

46

SAK000142

The opinion in the next state case, <mark>*Florence v. Kentucky*</mark>,[141] is in many ways the most sophisticated of the current group. It deals with the general issue of what may be called the "price of admission" burden (as opposed to the ultimate burden of persuasion on the issue of reliability once it is reached, which doctrinally is always on the proponent of the evidence) which was alluded to by the Supreme Court of the United States in *Kumho Tire*.[142] It arises when a particular process or technique is one which has a long history of admission. In such a case, the obligations of Rule 702 to determine sufficient reliability of the proffer still obtain, but it is reasonable to require that the challenger bring forth more than just a paper motion. Instead, the challenger must support the motion with some basis establishing a good reason to believe that reliability is a real and not merely a formal issue in the context of the case before the court.

The facts in *Florence* were these: On March 3, 1999, someone (apparently using a State of Kentucky identification card) opened an account in the name "William C. Vance" at the Whitaker Bank in Lexington by depositing $50 in cash. On March 4, he returned to the same bank branch and cashed a counter check on the account for $35. On March 5, he deposited a check for $3740 made payable to William C. Vance drawn on the account of a business called Rooftek at the Fifth Third Bank. For whatever reason, the check was deposited to cash instead of being accepted subject to collection. The next day the perpetrator showed up at a different branch of the Whittaker Bank and cashed another counter check for $3540. On March 7, the perpetrator wrote a $903 check on the "Vance" account for the purchase of an airline ticket. Shortly thereafter, Whittaker Bank was notified by the Fifth Third Bank that the Rooftek account had been closed some time before, and the $3740 check was dishonored. The police were notified. A check of records determined that there was no "William C. Vance" with a real State of Kentucky identification card.

Defendant was apprehended by a combination of good police work and luck. When police in Hamilton County, Ohio, searched the home of defendant's half brother pursuant to an unrelated investigation, they found a State of Kentucky identification card in the name of William C. Vance. The picture on the card was defendant. When they saw a bulletin regarding the Kentucky case, they notified the Kentucky authorities. Defendant was arrested and later identified by various bank employees as the person who had opened the account, negotiated the checks, and made the withdrawals.

This state desired to call Detective Chris White, a Secret Service trained questioned document examiner, to testify that he had compared authentic exemplars of defendant's handwriting to the handwriting on the checks, and that defendant had written the checks. White's testimony was remarkable on three counts. First, he did not obtain any new exemplars of defendant Florence's handwriting. For "known" exemplars he relied on two documents: The Kentucky ID card and the application made to open the bank account. The first of these bore little if any writing besides a signature. The second may have had a few more blanks to fill in besides

---

what counts as an appropriate reference community under *Frye*, the need for actual information on error rates, and the caution with which partisan experts should be approached. See *Ramirez v. State*, 810 So. 2d 836, 847–852 (Fla. 2001).

[141]*Florence v. Com.*, 120 S.W.3d 699 (Ky. 2003).

[142]The issue concerns when the reliability of a proffer has been "called sufficiently into question" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999), and therefore does not fall within that set of cases "where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999).

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 143 of 263

SAK000143

the signature, but it was not a "known" writing in the usual sense of the word, since its authentication depended on the testimony of witnesses that the defense, a fortiori, challenged as being mistaken in their eyewitness identification of Florence.[143] The ID card is a little better as a "known," since it appears to bear Florence's picture, but even this is an irregular way to establish the authenticity of a known exemplar, and it contained only a single signature.

Second, the "questioned" documents were four checks bearing four signatures, three of which were in the same name "William C. Vance." So, as to those, the examiner claimed to be comparing two signatures to each of three other signatures in the same name and determining that whoever wrote the first two wrote each of the others, based on very little material. In essence, what he was saying (and all he was saying) was that, based on comparing these five signatures alone, the same person wrote all five. The really important testimony, however, (if any of it was) was the testimony about the Rooftek check, which bore a signature in a name other than "William C. Vance" The claim that one can attribute authorship of a signature based on "known" exemplars comprising little more than two other signatures in a different name, and whose status as "known" documents is problematical, is one which even the document examiner literature would call into question. However, this was the testimony which undermined the argument at trial (weak as it was) that defendant really believed that the Rooftek check was good. One suspects that the departure from standard procedures in this case resulted from the fact that the examiner knew of the strong evidence in the case independent of handwriting comparison, and simply operated as much on that basis as on the exercise of any expertise (the familiar problem of observer effects contaminating forensic science practice which has been documented elsewhere[144]

Finally, at trial, Detective White testified that "handwriting is even more precise than DNA for identification purposes."

All of the above circumstances were known to the defense prior to trial (except perhaps the claim of superiority to DNA identification). However, instead of doing any homework and making a proffer which would have, in a practical way, shown the judge that this testimony had serious reliability problems when evaluated either by exterior standards of empirical justification or by the field's own claims about good practice, the defense relied on a formal motion apparently proffering little in the way of specific information. While it is fair to say that the Supreme Court of Kentucky seemed suspicious of the reliability of the proffered testimony, it ruled that plaintiff's mere formal motion without more was insufficient to trigger a full scale Rule 702 hearing in regard to testimony in an area with long judicial acceptance. The court was careful to say that a more serious effort might properly trigger an obligation to hold such a hearing. The court was clearly trying to strike a balance between requiring the proper consideration of serious reliability issues, and not allowing litigants to require the expenditure of substantial resources in every case involving experts merely for the price of a few pieces of paper.

Finally, as to the "better than DNA testimony," the court was clearly troubled, but the defense had failed to object to the testimony at trial, and on that basis

---

[143]There was, perhaps, another line of defense: that Florence had in fact opened the "Vance" account, but that someone else who looked like him had by coincidence written all the checks and stolen the money, which he failed to complain about when he found the money gone, but this is so pitiful as to not be worth arguing to a jury. As indicated in the text, Florence's real argument in front of the jury seems to have been, not that he didn't sign all the "Vance" checks, but that the jury should not conclude beyond a reasonable doubt that he knew that the Rooftek check was bad.

[144]See D. Michael Risinger, Michael J. Saks, William C. Thompson and Robert Rosenthal, The *Daubert/Kumho* Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion, 90 Cal. L. Rev. 1 (2002).

48

SAK000144

(perhaps also influenced by the large amount of other evidence against defendant) the court declined to rule on the issue.

*Delaware v. Jones*[145] is a case showing remarkable prosecutorial restraint. It involves yet another jailhouse note, this time an anonymous threatening note someone posted over a coffee station on "F" Tier in the Delaware Correctional Center. The note read:

> To: All Prisoners of War on Friday, April 19, 02 we as prisoners will start the elimination of all pigs, co's, cops or whatever you want to call them. On top of our list is co Hall, co Allen and co Jones. United we stand divided we fall.

Suspicion fell upon prisoner Bradford Jones. His fingerprints apparently were found on the note.[146] In addition, the note was sent for comparison to exemplars of Jones's known writing by Georgia Anna Carter, a 30 year veteran of the Delaware State Police who had been a document examiner for 17 years. Originally the state wanted Officer Carter to testify to and point out to the jury the similarities between Jones's writing and the writing on the note, and also to her conclusion that Jones had written the note. When the defense moved for exclusion and demanded a Rule 702 hearing, the prosecution voluntarily limited the document examiner's testimony to pointing out similarities, thus voluntarily limiting her to the functions of a *Hines* witness. After a hearing, the trial judge, Judge Gebelein, ruled globally that the document examiner could testify in the limited manner proposed. In so doing, his analysis was limited to the invocation of the results of other cases in which judges had accepted such testimony. There was no attempt at an independent evaluation of the reliability issue, and no attempt to frame the task before the court, even though Delaware claims to be a *Daubert* jurisdiction. (This should not be too surprising, since the defense attack appears to have been global and appears to have been supported mainly by citation to federal cases excluding handwriting identification expertise in other contexts.) *Kumho Tire* is cited only for its flexibility and discretion language, and for the "same intellectual rigor" test.[147] The judge seems to have been most persuaded by an unreported bench opinion of another Delaware judge which, having apparently skirted *Kumho Tire* by invoking its flexibility language, issued a ruling that was in essence a carbon copy of *Starzecpyzel* down to the limiting instruction.[148] So while the result is a *Hines* result, the judge clearly seems disappointed that, because of the limited nature of the prosecution's proffer, he could not admit the document examiner's conclusion as to authorship also.

Finally, while it does not deal with handwriting identification reliability issues directly, we must note the Pennsylvania case of *In Re Estate of Presutti,*[149] a will contest in which those relying on a will did not attack the reliability of handwriting identification expertise but instead claimed that the will challengers' expert (who was called to testify that the decedent's signature was not genuine) was unqualified. In regard to qualifications, the court announced the following test: "The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to special knowledge on the subject under investigation. If he does, he may testify."[150] It seems that the "any reasonable pretension test" may better capture the general attitude of most courts toward prosecution-proffered expertise in criminal cases more than those same courts are usually willing to admit quite so

---

[145]*Delaware v. Jones*, 2003 WL 21519842 (Del. Super. Ct. 2003).

[146]The court indicates that, besides their document examiner, the prosecution intended to call a fingerprint examiner, whose proposed testimony was apparently not challenged. *State v. Jones*, 2003 WL 21519842 (Del. Super. Ct. 2003).

[147]*State v. Jones*, 2003 WL 21519842 (Del. Super. Ct. 2003).

[148]*State v. Jones*, 2003 WL 21519842 (Del. Super. Ct. 2003).

[149]*In Re Estate of Presutti*, 783 A.2d 803 (Pa. Super. Ct. 2001).

[150]*In Re Estate of Presutti*, 783 A.2d 803, 807 (Pa. Super. Ct. 2001).

Case 3:09-cv-03064-MWB-LTS Document 284-7 Filed 06/23/11 Page 145 of 263

SAK000145

bluntly.

## § 35:8 Recent developments—Counter-testimony on FDEs' claimed skills

**Research References**

West's Key Number Digest, Criminal Law ⊶491(1), 491(2); Evidence ⊶563
Admissibility of handwriting expert's testimony in federal criminal case, 183 A.L.R. Fed. 333
Bergman and Hollander, Wharton's Criminal Evidence § 13:22 (15th ed.)

Another issue which was dealt with in three of these cases, *U.S. v. Ruth*,[1] *U.S. v. Velasquez*,[2] and *U.S. v. Paul*,[3] is the standard for admissibility of evidence tending to show the weaknesses of handwriting identification expertise after a questioned document examiner has been allowed to give testimony concerning the identification of the author of disputed handwriting in support of the prosecution in a criminal case. Stated this way, it would seem that a criminal defendant should have wide latitude in presenting counter-evidence, not merely through cross examination of the government's questioned document examiner, but through his own witnesses. *Daubert* itself emphasized the role of such counter-testimony as an important check on the unwarranted impact of expert testimony that managed to make it over the Rule 702 hurdle in spite of some doubts about its reliability.[4] Nevertheless, the handwriting cases are split 1-1 with one tie on the admissibility of such evidence. And there is nothing to account for this result except the courts' varying attitudes, since the proposed counter-expert was the same in each case and proposed to give largely the same testimony in each. One might even go so far as to say that these cases were decisions on the acceptability of Professor Mark P. Denbeaux.[5]

It is important before examining these cases to know what Professor Denbeaux claims to have information about which the average juror would not have, and what he does not claim. Professor Denbeaux has examined every empirical study on the reliability of handwriting expertise, and can review this literature, what it means and what it does not mean, for the jury. Further, he has studied the standard literature produced by questioned document examiners to explain what they claim to be doing, and he can summarize this literature, and further identify what he, upon reflection and evaluation, has concluded are the main weaknesses of the methodology there set out: high subjectivity, and no criteria to determine if any given similarity or difference between the questioned writing and the known exemplars is significant (an individualizing characteristic) or insignificant (merely intra-writer variation). Finally, he generally asserts that he can point out unaccounted-for dissimilarities between the questioned writing and the exemplars which are as apparently meaningful as the similarities upon which the document examiner witness has relied for identification. However, Professor Denbeaux claims no special skill at determining authorship or lack of authorship of any document as a result of similarities and dissimilarities. Indeed, his whole point is that it is doubtful whether those who claim such expertise possess it. Further, he makes it clear that he has never undergone whatever training document examiners undergo, and he is not a document examiner. He never asserts that any person did or did not

---

**[Section 35:8]**

[1]*U.S. v. Ruth*, 46 M.J. 1 (C.A.A.F. 1997).

[2]*U.S. v. Velasquez*, 64 F.3d 844, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[3]*U.S. v. Paul*, 175 F.3d 906, 51 Fed. R. Evid. Serv. 1464, 183 A.L.R. Fed. 773 (11th Cir. 1999).

[4]"Vigorous cross-examination, *presentation of contrary evidence*, and careful instruction on the burden of proof are the traditional and ap-propriate means of attacking shaky but admis-sible evidence." *Daubert v. Merrell Dow Pharma-ceuticals, Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 27 U.S.P.Q.2d (BNA) 1200, Prod. Liab. Rep. (CCH) P 13494, 37 Fed. R. Evid. Serv. 1, 23 Envtl. L. Rep. 20979 (1993) (emphasis supplied).

[5]In the spirit of full disclosure, it should be noted that Mark P. Denbeaux is a colleague, co-author, and longtime close friend of the author.

SAK000146

in fact write any questioned document, and eschews any claim of special skill in that regard.

In *Ruth II*, the presiding judge at the court martial refused to authorize the defense to call Denbeaux. Instead, he directed the defense to attempt to cross-examine the government's document examiner first, using material from Risinger et al.[6] The trial attorney made no attempt to cross-examine the document examiner using the published information, and the Court of Military Appeals ruled that by this lapse counsel had failed to demonstrate that Denbeaux's testimony would have been "relevant and necessary," and so the judge did not abuse his discretion in denying the defense request for the production of Professor Denbeaux.

The Court of Appeals for the Armed Forces granted discretionary review limited to this issue. It was clearly uncomfortable with the handling of the issue by the Court of Military Appeals, given the intervening decision in *Velasquez* from which it quoted extensively on the general point that Denbeaux was an appropriate witness. Nevertheless, it affirmed the conviction, shifting grounds somewhat. The trial judge had invited the defense attorney to renew his motion to call Denbeaux at the close of the testimony of the prosecution's document examiner, and this the defense attorney had failed to do. It was *this* failure, not the cross examination failure, which the Court of Appeals found rendered the actions of the trial judge not to be "an abuse of discretion." So *Ruth II* is in fact a non-decision, with the court of appeals apparently adopting the analysis of *Velasquez*.

In *Velasquez*, the Third Circuit declared that the trial court's refusal to allow Denbeaux to testify after the prosecution was allowed to present identification testimony by a document examiner was an abuse of discretion.[7] The court observed that "[t]he mere fact that the Professor is not an expert in conducting handwriting analysis to identify particular scriveners of specified documents does not mean that he is not qualified to offer expert testimony criticizing the standards of the field."[8] In doing this, the Court rejected the most extreme version of the "guild test," which would hold that not only may guild members testify, but only guild members may criticize. The court then found that "sufficient evidence exists to show that the Professor had 'good grounds' for his rejection of handwriting analysis," and further found that Denbeaux's "criticisms of the field of handwriting analysis generally, as well as Ms. Bonjour's analysis in this case, would have assisted the jury in determining the proper weight to accord Ms. Bonjour's testimony,"[9] and that its exclusion was not harmless because, Denbeaux's testimony "very well might have affected the jury's verdict on Count VIII."[10]

However, in *Paul* the 11th Circuit reached a different result, on even more compelling facts. You will recall that the case involved an extortion directed at a bank

---

[6]D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731, 751–771 (1989).

[7]Though the decision predated *Joiner*, the court stated the standard as follows: "We review the trial court's ruling on the admissibility of Professor Denbeaux's testimony for abuse of discretion," *U.S. v. Velasquez*, 64 F.3d 844, 847–848, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995), though it went on to observe: "[B]ut to the extent the district court's ruling turns on an interpretation of a Federal Rule of Evidence our review is plenary," *U.S. v. Velasquez*, 64 F.3d 844, 848, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995). However, the court never quarreled with the District Court's

specific construction of a rule. Rather, it addressed what a court should be mindful of "in exercising its discretion," and concluded that Denbeaux's testimony "should have been admitted," *U.S. v. Velasquez*, 64 F.3d 844, 848, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995), and should have been admitted "as a matter of law," *U.S. v. Velasquez*, 64 F.3d 844, 852, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995), which is another rubric for describing an abuse of discretion.

[8]*U.S. v. Velasquez*, 64 F.3d 844, 851, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[9]*U.S. v. Velasquez*, 64 F.3d 844, 852, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

[10]*U.S. v. Velasquez*, 64 F.3d 844, 852, 42 Fed. R. Evid. Serv. 1175 (3d Cir. 1995).

51

officer, and Mr. Paul was the gentleman arrested after he picked up the briefcase with the money in a McDonald's restaurant men's room and put it in his backpack. His story was that he just picked up what appeared to be an abandoned or lost briefcase. The main evidence contradicting this was the document examiner's identification of Paul as the writer of the extortion note. Paul was tried and both the document examiner and Denbeaux were allowed to testify. That trial ended in a hung jury. At the retrial the judge concluded upon government objection that Denbeaux's testimony would not be helpful to the trier of fact and barred him from testifying. This time the jury convicted Paul. On appeal, the circuit court disposed of Denbeaux in four paragraphs. They dismissed his academic research in the literature, saying that "his skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles." The rest of the opinion concentrated mainly on Denbeaux's lack of qualifications as a document examiner, thereby adopting the extreme "guild test," essentially holding that only those who are members of the guild may present testimony skeptical of its claims. (This would imply that only card carrying astrologers may criticize astrology.) The opinion then concluded, "because Denbeaux was not an expert on the limitations of handwriting analysis, the district court's exclusion of his testimony did not prejudice Paul." Unaccountably, the opinion does not mention the contrary conclusions, reasoning and result of the Third Circuit in *Velasquez*, or the apparent adoption of the *Velasquez* reasoning by the Court of Appeals in *Ruth II*.

What are we to say of the *Paul* opinion? True it is that Denbeaux is an "educational expert," one called to give the jury information derived from study which they might not be aware of, and which they therefore might not properly take into account. In this way he is like an experimental psychologist testifying about the problems of eyewitness identification. It is also true that some courts, and even commentators, have had problems with the acceptance of purely educational experts, though the irony is that, at least when it comes to courts, there is a certain asymmetry in their perception of the problem, with the government generally gaining admission of its educational experts and the defendant often not.[11] However, most attempts to account for the rejection of the experimental psychologist in the eyewitness cases center around some notion that the jury is somehow competent from experience to evaluate lay testimony without needing any supplementation from a person claiming to have special knowledge. While these objections are increasingly regarded as extremely weak,[12] they would seem to disappear altogether when the witness the jurors are supposed to evaluate is being presented as an expert. There is nothing about their presumed general experience which would even notionally prepare them to evaluate the weaknesses of claims being made by the expert. An intuition about the untenability of a blanket rule excluding educational counter-expertise in such a situation probably lay behind the Court of Appeals reliance on Denbeaux's lack of guild qualifications. Presumably, someone with those guild qualifications could testify to alert the jury to the weaknesses of the claims of the field, except there are no guild members who believe that there are such weaknesses. The result of *Paul*, if followed, is not only that handwriting experts may testify, but that they are virtually unchallengeable, even though there is plenty of rational reason to be skeptical of many of their claims.

## § 35:9 Recent developments—Law review literature

---

[11]See discussion in D. Michael Risinger, Navigating Expert Reliability: Are Criminal Standards of Certainty Being Left on the Dock?, 64 Albany L. Rev. 99, 131–134 (2000).

[12]See evolution of the case law on eyewitness experts, reviewed in Chapter 15.

52

Before undertaking a review of the empirical research which has been published concerning the accuracy of handwriting identification by questioned document examiners, a word should be said about the scholarly literature. There are two long articles which must be read by anyone interested in the issues raised by this chapter. They are Andre Moenssens, Handwriting Identification in a Post-*Daubert* World,[1] and Risinger, Denbeaux and Saks, Brave New Post Daubert World—Reply to Professor Moenssens.[2] In general, I will not try to summarize these articles, in part because they should be read and evaluated on their own merits together, and in part because Professor Moenssens' article is in large part an attack on the work of Professors Risinger, Denbeaux and Saks, and Professor Moenssens would never agree with any summary that I might attempt. Among much, much else, the Moenssens article contains the most explicit embracement of what is essentially the guild test to be found in the literature (though he would probably object to the label), and the *Reply* examines at length the weaknesses of that approach.

The reader may also be interested in two commentaries that appear in Forensic Science Communications, the online journal of the Federal Bureau of Investigation. One of them, by Michael J. Saks, outlines three types of research which—if conducted and depending upon the findings—could provide an informed, empirical, basis for the claims of forensic document examiners.[3] The second is by Jamie Orenstein,[4] who was the Assistant U.S. Attorney who handled the document examination evidence in the case of *U.S. v. McVeigh*, where the court refused to allow the expert opinion testimony of FDEs unless and until they could establish their dependability at a *Daubert* hearing, which the government declined to try to do. In what is ostensibly an essay on behalf of the admissibility of FDE opinion testimony, Orenstein concedes the lack of sufficient current evidence on that evidence, and discusses what prosecutors can do to prove handwriting authorship without the testimony of FDEs.

## II. SCIENTIFIC STATUS

### §35:10 Introduction

Handwriting identification experts believe they can examine a specimen of adult handwriting and determine whether the author of that specimen is the same person as or a different person than the author of any other example of handwriting, as long as both specimens are of sufficient quantity and not separated by years or the intervention of degenerative disease. They further believe that they can accomplish this result with great accuracy, and that they can do it much better than an average literate person attempting the same task. They believe they can obtain these accurate findings as the result of applying an analytical methodology to the examination of handwriting, according to certain principles which are reflected in the questioned document literature.[1] They believe that this literature explains how to examine handwriting for identifying characteristics, and that by applying the les-

---

**[Section 35:9]**

[1]Andre Moenssens, Handwriting Identification Evidence in the Post-*Daubert* World, 66 UMKC L. Rev. 251 (1998).

[2]D. Michael Risinger et al., Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. 405 (1998).

[3]J. Orenstein, Effect of the *Daubert* Decision on Document Examinations From the Prosecutor's Perspective, 1 Forensic Science Communications (Oct., 1999), at http://www.fbi.gov/programs/lab/fsc/backissu/oct1999/abstrcte.htm.

[4]M. J. Saks, Planning the Trip from Folk Art to Science: Why and How, 1 Forensic Science Communications (Oct., 1999), at http://www.fbi.gov/programs/lab/fsc/backissu/oct1999/abstrctf.htm.

**[Section 35:10]**

[1]What Osborn referred to as "true methods," Albert S. Osborn, Questioned Documents 6 (2d ed. 1929); and David Ellen refers to as "standard methods" and "proper method," David Ellen, The Scientific Examination of Documents: Methods and Techniques 9 (1989).

53

sons taught by this literature in connection with their experiences in various training exercises and in real world problems, they learn to identify handwriting dependably.

This portion of the chapter will examine the justifications for these beliefs, to determine if there exists any evidence that they are true.

### § 35:11 Areas of agreement: The possibility of a science of handwriting identification

**Research References**

Forensic Identification of Handwriting, 27 Am. Jur. Proof of Facts 3d 489

The main goal of all forensic identification, including handwriting identification, is individualization. Individualization is the establishment that a person or object now held is the same person or object associated with a past event in a particular way, to the exclusion of all other candidates. The major source of individualization evidence is what we may call a tagged residue.[1] A tagged residue exists when a person or thing leaves behind some residue of its presence at a relevant time and place, which residue contains information that can be used to conclude (with varying certitude) that a particular person or thing produced the residue. In addition, even when individualization is not confidently possible, exclusion may occur when a decision can be made that a particular source did not produce the tagged residue.

The notion of tagged residues is broader and covers more phenomena than one might at first glance conclude. For instance, eyewitness identification is a special example of the use of tagged residue information. In that case, the residue is not specifically physical, but exists as a memory in the mind of the identifier. Nevertheless, whether we are dealing with mental images or photographs or physical impressions or traces of bodily fluid, all tagged residue situations present some common characteristics and problems. The hope is that the information in the residue may be processed in such a way that one can properly conclude that one and only one object or person could have caused the residue. This hope is in one sense doomed, since all information about such factual relations is probabilistic. Thus, as Hume knew, for any identification whatsoever there is some residual probability of error. On the other hand, under some conditions, the probability of particular identification may be so great that it would be nearly deranged to worry about the probability of error.

The question becomes, what are the main circumstances that affect, or ought to affect, our confidence in particularized identification from a tagged residue, or in exclusion of an item or person as the source?

The main factors appear to be the following: First, what about the residue counts as a relevant characteristic bearing on specific identification (individualization). This question inevitably entails, consciously or unconsciously, some notion of separability and independence[2] of characteristics and some notion of base rate

---

**[Section 35:11]**

[1]The term "tagged residue" to describe this class of phenomena is a neologism. No functionally similar term exists in the forensic science literature.

[2]In regard to handwriting, Albert S. Osborn was much more willing to assume total independence of characteristics than some of his successors have been. Compare Albert S. Osborn, Questioned Documents at 229 et. seq. (2d ed. 1929) with W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 306–307; and Ordway Hilton, Scientific Examination of Questioned Documents, at 9, n. 11 (revised ed., 1982; reprinted 1993). However, all seem confident that in practice there is sufficient individuality to distinguish any two adults' handwriting dependably if the samples presented are large enough. With questioned writings, of course, in contrast to known exemplars, the writing sample often consists of very little.

SAK000150

incidences of those characteristics in the population of candidates for the source of the residue.

Second, referring to the particular person or object that in fact caused the residue as the source, we have the problem of potential intra-source variation. Residues from the same source may differ each time a residue is caused. For instance, the passage of a bullet through the barrel of a gun not only leaves marks from the barrel on the bullet, it changes the barrel slightly by friction, so that marks left on the next bullet may be slightly different.

Third, referring to the people or objects that might have caused the residue as candidates, we have the problem of inter-candidate similarity, that is, more than one object may have been capable of causing a residue indistinguishable from the one at hand in one or all dimensions. Thus, given two nearly new screwdrivers of the same size and make, the blades may be so much alike, and the wood on a jimmied windowsill may retain detail so imperfectly, that is impossible to tell which blade left marks on the sill.

Failure to accurately separate important from unimportant characteristics, accurately assess dependence and reflect accurate notions of base rate within the candidate population, whether conscious, analytic and quantified, or unconscious, impressionistic and unquantified, can obviously lead to error, though the fact that the conclusion is error may not be obvious. Failure to properly deal with the effects of intra-source variation or inter-candidate similarity is a further important potential source of error.

These problems are present in all tagged residue situations, though they may be at their most troublesome in the area of handwriting identification. It is obvious that each time a person writes, the individual letters are not formed with mechanical similarity to previously made letters. That creates a protean problem of intra-source (i.e., intra-writer) variation. Less obvious is that it may be that some writers write so much alike that their writing cannot be distinguished confidently, at least with limited samples.[3] This renders inter-candidate (inter-writer) similarity a significant problem. It seems fair to say that when intra-source variation, or inter-candidate similarity, or both, rise to a substantial level, dependable individualization becomes impossible.

In principle, there is nothing in the nature of a tagged residue problem that prevents a science of tagged residue individualization from being developed. For a source of asserted factual knowledge to qualify as scientific in the central modern sense, it must be the product of an enterprise displaying certain characteristics. Chief among these are:[4]

(1) a systematic encouragement for gathering and publishing reproducible sense observations;

2. a taxonomy for organizing such observations which lends itself to dependable reproducibility of observation, and to quantification;

3. a process of hypothesis generation which results in statements about the world and its interrelationships which are consistent with all known observations and which are potentially amenable to falsification through empirical observation; and

4. an established regime which attempts to falsify new hypotheses empirically (and which is rewarded for doing so).

Moreover, although it is not a logical sine qua non of science, there is virtually

---

[3]John Harris, How Much Do People Write Alike? A Study of Signatures, 48 J. Crim. L. & Criminology 647 (1958).

[4]For an expanded discussion, see D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. 405, 435–439 (1998).

55

SAK000151

universal recognition that academic institutions will play a significant role in the practice of science and the training of scientists in nearly every area.[5]

Some tagged residue individualization processes, such as DNA typing, are sciences, because they are the application of knowledge gained through the process of science. Indeed, there might some day be a science of handwriting identification, and some small first steps have been made in that direction.[6] However, what forensic document examiners do is not science. There is nothing in the enterprise which results in or encourages organized reporting and publication of observations in a reproducible form. There is no agreed taxonomy of sufficient refinement to yield dependably quantified data, or dependably comparable observations of any refinement. There has been no theoretical revision of any significance in nearly a century, and there is no professional encouragement or reward for attempts to falsify those theories that exist.

### § 35:12 Areas of agreement: The possibility of a science of handwriting identification—Proposed principles of handwriting identification

**Research References**

Graham, Handbook of Fed. Evid. § 702.6 (5th ed.)
Androphy, White Collar Crime § 38:17 (2d ed.)

The foundational principles of the expertise, as they were characterized by the expert relied upon by the prosecution in *Starzecpyzel*, are that no two people write exactly alike, and that no one person writes the same word exactly the same way

---

[5]By contrast, handwriting identification has no academic base. Training is by apprenticeship, and there is no standardization of training enforced either by any licensing agency or by professional tradition. Nor is there a single accepted professional certifying body. The Encyclopedia of Associations lists five different organizations: the National Association of Document Examiners; the National Bureau of Document Examiners; the World Association of Document Examiners; the Independent Association of Questioned Document Examiners and the American Society of Questioned Document Examiners. At least three of these organizations claim to grant certifications of competence. A glance at the credentials listed by document examiners advertising in various directories aimed at lawyers will quickly reveal at least four or five more such organizations. In an appendix to Andre Moenssens, Handwriting Identification Evidence in the Post-*Daubert* World, 66 UMKC L. Rev. 2 (1998), Prof. Moenssens lists no fewer than *55* membership organizations involving persons who may claim competence in handwriting identification, many of which grant certifications of competence. (Moenssens describes these organizations in detail. See D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. at 332–343 (1998)).

The American Society of Questioned Document Examiners, which one might characterize as the organization of the Osbornian establishment, is generally most vocal and aggressive in claiming its membership's superiority and, in fact, one object of the Moenssens article is to lend support to that claim. However, the certification testing program of its child, the American Board of Forensic Document Examiners (co-sponsored by the American Academy of Forensic Sciences) described by Mary Wenderoth Kelly (a member of that certifying board) in her testimony in *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995), leaves much to be desired. It was based on the administration of five from a pool of only seven or eight different test problems, only two or three of which involve handwriting identification. The same problems were used year after year on an honor system where they were sent to the candidates for certification through their teaching mentor, and left with them for a month unsupervised before the answers were returned. *Starzecpyzel Daubert* hearing transcript of testimony, 2/28/1995 at 48–59 (Kelly direct), at 175–192 (Kelly cross), 3/1/95 at 249–260 (Kelly cross), on file with the author. (Note: there may have been some changes in that certification procedure since Kelly's testimony as a result of criticisms like this one, but what, if any, the changes are is unclear, since the organization does not easily share information).

[6]See, e.g., references collected in D. Michael Risinger et al., Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731 739, n. 31 (1989); and those referred to in *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995), and see particularly the National Institute of Justice funded project described § 28:40.

56

twice.[1] It is most important to note that these two general principles are in their strong form nonscience metaphysical statements (though statements with an oddly commonsensical appeal). On some level, no two things can be *exactly* alike, and it is this intuition that underlies both statements. However, what science is concerned with is not metaphysical sameness, but *perceivable* similarities and differences that can be used to accurately assess common origin. When so recast, the statement that no two people write so alike that the differences are imperceptible is not intuitively obvious, nor is the claim that no one ever writes the same word so similarly that the differences are imperceptible. These forms are subject to potential testing by scientific methods, but they have been subjected to virtually no testing, and the small amount of data available do not provide much support for them. These were among the main reasons why Judge McKenna declared handwriting identification expertise to be nonscience in *Starzecpyzel*.[2]

What really occurs in practice is an example of the same kind of clinical empiric that also underlies eyewitness identification, and many other everyday processes. Such a process is at root probabilistically derived, just as is formal science, but with two important differences. First, it is not based on standardized measurements of any precision, and second, the database of examples that defines which characteristics are common and which are unusual is not public, recorded for all who will take the time to see and evaluate. Rather, it is private, based on the experiences of the individual practitioner over a long period of time, and stored internally in such a way that many or most of the individual data may be beyond conscious recall. The problem with such a process is that it is only as good as the unexaminable personal database of the practitioner, and the practitioner's not-fully-explainable method of deriving answers to such problems as, in the case of handwriting identification, what constitutes significant intra-writer variation and inter-writer similarity. The practitioner's opinion may be given the appearance of an explanation by pointing out similarities (or differences) between the questioned document and the exemplars, and by assertions that such characteristics are, in the practitioner's experience, common or uncommon. Arguably, however, any opinion of common authorship will have some similarities to support it, and any differences can be assigned to intra-writer variation (usually called "natural" variation[3]).

### § 35:13   Areas of agreement: The possibility of a science of handwriting identification—A summary of handwriting identification practice

**Research References**

Forensic Identification of Handwriting, 27 Am. Jur. Proof of Facts 3d 489
Identification of Handprinting and Numerals, 24 Am. Jur. Proof of Facts 3d 667

Handwriting identification theory does have some process principles and some general rules which are at least not counterintuitive, and which, if followed, cut the ring down somewhat on saying just anything. The following is an attempt to give a

---

**[Section 35:12]**

[1]Mary Wenderoth Kelly, quoted by Judge McKenna in *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1032, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995). At the time of her testimony Ms. Kelly was a document examiner with the Cleveland Police Department with 13 years of experience. She was a director of the American Society of Questioned Document Examiners and a Fellow in the Questioned Document Section of the American Academy of Forensic Sciences. She is certified by the American Board of Forensic Document Examiners and at the time of her testimony served on that board as Vice President and Chair of the Committee on Testing. Starzecpyzel Daubert hearing transcript of testimony, 2/28/95 at 17–19 (Kelly Direct).

[2]*U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1033–1034, 1038, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

[3]See the discussion in *U.S. v. Starzecpyzel*, 880 F. Supp. 1027, 1031–1033, 42 Fed. R. Evid. Serv. 247 (S.D. N.Y. 1995).

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 153 of 263

SAK000153

fair summary of the main outlines of those asserted principles and that process in regard to its two most common general applications, signatures and anonymous writings:[1]

(1) there is signal in a handwriting trace which will allow an observer to establish who wrote it dependably under conditions which are usually (but not always) present;[2]

(2) this is because of the development of many personal characteristics in handwriting over time which combine to make a virtually unique individual pattern;[3] which can be determined by observation of sufficient examples of the handwriting to derive the pattern[4] even in the face of inevitable variation around the pattern in any given piece of writing;[5]

(3) this individual pattern is almost impossible to duplicate undiscoverably even by someone of skill trying to do so, because the variables are too numerous and inconspicuous, and also because the unconscious conflicting personal habits of the writer will manifest themselves either from the beginning or in a very short time;[6]

(4) even when it cannot be established positively who left the trace, information in the trace may exclude a candidate writer;[7]

(5) the best way to dependably extract information from the trace is not by gestalt exam, which is not totally useless but often misleading;[8] but by a system of atomized analysis of elements;[9]

(6) atomized analysis breaks the trace down into components, some of which are measurable, some not.[10] The usual system is a frankly incomplete taxonomy[11] with many categories not suited to objective measurement, or to only imprecise estimate;[12]

(7) handwriting questioned documents are either signatures alone, or other more or less extended writing, with or without signatures;

---

**[Section 35:13]**

[1]No effort has been made to deal comprehensively with every area of handwriting examination doctrine. For instance, there is no specific treatment of disguise, juvenile handwriting, etc. The purpose of the text is to give the reader unfamiliar with orthodox handwriting examination doctrine a fair sample of its main positions and methodologies.

[2]Albert S. Osborn, Questioned Documents (1910) at 200–208. The first edition of Osborn's Questioned Documents has been chosen as the primary source of footnotes to emphasize its foundational status. Only on the rare occasions where some later book offered a clear qualification or variation is that other referenced. However, anyone wondering whether the main outlines of the summary given here still reflect current theory need only compare it to Ordway Hilton's article on the subject in 13 Encyclopedia Americana (1992), at 765. Other works thoroughly examined in preparing this summary include: Charles Chabot, The Handwriting of Junius Professionally Examined (Edward Twistleton ed., John Murray and Sons, London, 1871), William E. Hagan, Disputed Handwriting, (Banks & Bros., Albany, 1894); D.T. Ames, Ames on Forgery (Bancroft-Whitney, San Francisco, 1899) Albert S. Osborn, Questioned Documents 6 (2d ed. 1929); Albert S. Osborn, Questioned Document Problems (2d ed., Albert D. Osborn ed., 1946); F. Breasted, Contested Documents and Forgeries (1932); Ordway Hilton, The Scientific Examination of Questioned Documents (1956); Ordway Hilton, Scientific Examination of Questioned Documents, at 9, n. 11 (revised ed., 1982; reprinted 1993); J.V.P. Conway, Evidential Documents, (1959); W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 306–307; L. Caput, Questioned Document Case Studies (1982); David Ellen, The Scientific Examination of Documents: Methods and Techniques 9 (1989).

[3]Osborn, 1st ed., at 197.

[4]Osborn, 1st ed., at 196, 231.

[5]Osborn, 1st ed., at 196–197, 231.

[6]Osborn, 1st ed., at 237–238.

[7]Osborn, 1st ed., at 19.

[8]Osborn, 1st ed., at 206, 244–245, 262–263.

[9]Osborn, 1st ed., at 30, 209, 242–243, 253.

[10]Osborn, 1st ed., at 110.

[11]Osborn, 1st ed., at 209.

[12]Osborn, 1st ed., at 209.

58

SAK000154

(8) signatures generally are the most personal and uniform of writings;[13] though some people may have more than one signature for different uses or contexts;[14]

(9) when dealing with a signature, two questions are commonly asked: Did the person whose name is reflected sign it (is it genuine)? Second, did some other particular person sign it if it is not genuine? Under most circumstances determining whether or not a signature is genuine is the easier task to perform;[15]

(10) on the issue of genuineness, start with the questioned signature,[16] and observe:

(a) the signature as a whole, determining the dominant general underlying handwriting system it represents[17] (if possible; everybody learned some system to start, though some people have been exposed to more than one system even when learning by virtue of moving between schools or cultures);[18]

(b) the size of the writing compared to usual signatures of people in general on comparable documents;[19]

(c) location of words in regard to the (real or imaginary) signature line: above, below, trending up or down;[20]

(d) any oddities of letter alignment relative to the words, above or below the general alignment;[21]

(e) proportion of parts: the ratio of the height to the width of the various lowercase "minimum" letters (like a, o, i, c, etc.) and the base parts of the other lower case letters;[22] the proportion of tall lower case letters above the base line to the height of minimum letters;[23] the proportion of lower case letter extensions below the baseline to minimum letters,[24] and any divergences and oddities from the general pattern for individual letters;[25] proportion of capitals to minimums, and the height-width ratio of capitals;[26]

(f) slant of writing measured with glass protractor or goniometer,[27] with any divergences from general slant for individual letters noted. Some

---

[13]Osborn, 1st ed., at 210; see also Ordway Hilton, Scientific Examination of Questioned Documents, at 168, n. 4 (revised ed., 1982; reprinted 1993).

[14]Albert S. Osborn, Questioned Documents (1910) at 210.

[15]Albert S. Osborn, Questioned Documents (1910) at 13.

[16]Actually, Osborn takes the position that it is best to start with an analysis of the known standards before examining the questioned signature, but concedes this is often not possible in practice. Albert S. Osborn, Questioned Documents (1910) at 243–244.

[17]Albert S. Osborn, Questioned Documents (1910) at 190, 263.

[18]Albert S. Osborn, Questioned Documents (1910) at 190, 263. See generally Chapter 11.

[19]Albert S. Osborn, Questioned Documents (1910) at 144–145.

[20]Albert S. Osborn, Questioned Documents (1910) at 142.

[21]Albert S. Osborn, Questioned Documents (1910) at 123–124, 142.

[22]Albert S. Osborn, Questioned Documents (1910) at 146.

[23]Albert S. Osborn, Questioned Documents (1910) at 145–148, 215, 309–310.

[24]Albert S. Osborn, Questioned Documents (1910) at 246.

[25]Albert S. Osborn, Questioned Documents (1910) at 246.

[26]Albert S. Osborn, Questioned Documents (1910) at 145–148, 215, 309–310.

[27]Albert S. Osborn, Questioned Documents (1910) at 150–154, 246. Harrison supplies the word "goniometer." W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 330. Harrison asserts that by his date of publication (1959) most writing submitted to his laboratory in England had such variable slant (called "slope" by him) that it was not worth trying to measure. W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 330.

Here we must consider the role in document examination of that cornerstone of modern science, actual measurement in reproducible quanti-

59

slants may be nearly chaotic;[28]

(g) presence or absence of lines connecting words or initials, and their form;[29]

(h) presence and placement of punctuation relative to initials;[30]

(i) character and construction of connections between letters: smalls to

---

fied standard units of measurement. Osborn had a chapter on measuring instruments in both editions of his book, and the characteristics we are dealing with, such as proportion of parts of various letters, are potentially subject to standard quantified measurement, with mathematical expression of central tendency and variation, etc. In this regard Osborn was on some level aware of the potential value of measurement, and wrote: "The various parts of an ordinary signature when carefully measured bear a certain proportion to each other that with most writers is found to be surprisingly uniform . . . when a considerable amount of writing is in question and an adequate amount of standard writing is supplied for comparison, a system of measurements covering a sufficient number of features and examples may be very forceful evidence . . . any system of averages, to be reliable, must be based on an adequate number of examples." Osborn 1st Ed. at 146. However, Osborn then goes on to say, "Evidence based on the very great number of measurements necessary to show a very slight divergence is not usually of much weight in this or any similar inquiry, because it is practically impossible for court and jury to review and verify the basis of such an opinion. If the difference is apparent by inspection, then the measurements are of value in making definite what is apparently a fact without such proof." Osborn 1st Ed. at 146–147. In the rest of the book, Osborn recommended the actual quantified measurement of very few handwriting characteristics (as opposed to typewriting, for instance), slant being primary among them. Though Osborn occasionally refers to the "size," "position" and "distance" of characteristics (for instance, Osborn 1st Ed. at 246–247, 309–310), in practice all characteristics but slant seem to have been subject to rough subjective estimation with no precise standard measurement at all. Instead, visual charts are relied upon to illustrate assertions of "size," "position," and "distance." Certainly there is no indication in the *Hauptmann* trial testimony of Osborn, his son, or any of the other experts, of actual quantified measurement of characteristics. Albert S. Osborn testimony, 1/11/35, Hauptmann transcript at 881–1008; Albert S. Osborn testimony, 1/14/35, at 1009–1051; Elbridge W. Stein testimony, 1/14/35, at 1074–1153; John F. Tyrell testimony, 1/15/35, at 1154–1247; Herbert J. Walter testimony, 1/15/35, at 1248–1271; Harry M. Cassidy testimony, 1/16/35, at 1279–1301; Wilmer T. Souder testimony, 1/16/35, at 1301–1336; Albert D. Osborn testimony, 1/16/45, at 1337–1386; Clark Sellers testimony, 1/16/35, at 1386–1432. Actual measurement appears to play no greater role in standard practice today than in 1935. As Ordway Hilton said in his 1974 Preface to a facsimile edition of Bibliotics, "While certain workers continued to urge the use of measurements, the method has virtually been discarded as too time consuming for the little value which might be derived from it." Persifor Frazer, Bibliotics ii (3d ed. 1901, reprinted 1974). Frazer was one of the few who championed actual measurements. It is regrettable that his view was rejected.

Interestingly, one of the earliest exercises in analytic handwriting identification in the United States involved an attempt to be quite precise both in measurement and mathematics. In the famous Howland Will Case of 1865, which involved a claim to the substantial Howland fortune by the infamous Hetty Green (then Hetty Howland Robinson), Hetty was accused of forging by tracing the signature on the will upon which she relied. Renowned Harvard mathematician Benjamin Peirce and his (later) even more renowned son Charles Sanders Peirce were hired to examine the signature on the will. They devised a method which relied on defining the beginning point of downstrokes, of which there were 30 in the signature. Comparing 42 genuine Sylvia Ann Howland signatures, each to all others (which gave 25,830 comparisons), they determined that any given downstroke start position would coincide using their measurement system only about one time in five. They then compared the challenged will signature with the signature claimed to be the tracing model and found perfect coincidence of the start position of all 30 downstrokes. Using their previous examination to provide the base rate data, they gave the random match probability of one divided by 5 to the 30th power, or one over 2666 followed by 10 zeros. Benjamin Peirce then asserted that "so vast an improbability is practically an impossibility. Such evanescent shadows of probability cannot belong to real life . . . . It is utterly repugnant to sound reason to attribute this coincidence to any cause but design." See Louis Menand, She Had To Have It: The Heiress, The Fortune and the Forgery, The New Yorker, April 23 & 30, 2001, at 62–70.

[28]W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 330.

[29]Albert S. Osborn, Questioned Documents at 143 (2d ed. 1929).

[30]Albert S. Osborn, Questioned Documents at 143 (2d ed. 1929).

60

smalls and capitals to smalls;[31]

(j) initial strokes, presence or absence, and how formed;[32]

(k) presence and placement of any pen lifts within words,[33] and whether they result in discontinuities (spaces) between letters in the middle of words;[34]

(l) forms of each individual letter: general pictorial style, existence of loops, retraces, decorations and flourishes, open tops, etc., with observation of variation in form as letters are repeated;[35] whether variation correlates with position in the word, beginning or middle;[36] forms of endings of terminal letters,[37] method of crossing t's,[38] presence and form of i-dots,[39] etc. Generally, some judgement should be made concerning the rarity of those characteristics (like undotted i's) which diverge from the underlying system.[40] Look also for abbreviated letters (letters only partially made or suggested) which are likely to be relatively personal characteristics;[41]

(m) consider the dynamics that created the static trace.[42] Try to infer pen position and arm and finger movements from line quality[43] (much harder now that nib pen writing is uncommon);[44]

(i) direction of stroke—this detail was revealed by shading in the days of nib pens, and was not analyzed separately by Osborn, since stroke direction was then both obvious and apparently more standard. Non-standard stroke direction is not mentioned in Osborn's first edition and is mentioned only twice in the second edition.[45] With the coming of ball point pens and the degeneration of standard writing discipline, stroke direction appears to have taken on a more important role in attempted identification, especially of block printing, and principals for its inference from various characteristics of the static trace have been proposed.[46]

(ii) speed—by looking at smoothness and length of curves, classifying writing from slow to rapid (sometimes has evidence of both in different parts);[47]

(iii) blunt or pointed beginning or ending strokes showing drawn

---

[31]Albert S. Osborn, Questioned Documents (1910) at 225–226.

[32]Albert S. Osborn, Questioned Documents (1910) at 220.

[33]Albert S. Osborn, Questioned Documents (1910) at 121–123.

[34]Albert S. Osborn, Questioned Documents (1910) at 121–123.

[35]Albert S. Osborn, Questioned Documents (1910) at 246–247.

[36]W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 301.

[37]Albert S. Osborn, Questioned Documents (1910) at 220, 248.

[38]Albert S. Osborn, Questioned Documents (1910) at 218–219, 248.

[39]Albert S. Osborn, Questioned Documents (1910) at 248.

[40]Albert S. Osborn, Questioned Documents (1910) at 228; expanded upon in Albert S. Osborn, Questioned Documents at 264–266 (2d ed. 1929).

[41]Albert S. Osborn, Questioned Documents (1910) at 247; elaborated upon in Albert S. Osborn, Questioned Documents at 253–257 (2d ed. 1929).

[42]Albert S. Osborn, Questioned Documents (1910) at 106.

[43]Albert S. Osborn, Questioned Documents (1910) at 106.

[44]Ordway Hilton, Scientific Examination of Questioned Documents, at 156, n. 11 (revised ed., 1982; reprinted 1993); W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 330.

[45]Osborn 1st ed. at 360, 408. Both these mentions are in regard to photographic illustrations without further discussion in the text.

[46]David Ellen, The Scientific Examination of Documents: Methods and Techniques at 15–18 (1989). See also Ordway Hilton, Scientific Examination of Questioned Documents, at 211, n. 11 (revised ed., 1982; reprinted 1993).

[47]Albert S. Osborn, Questioned Documents

61

SAK000157

> starts and stops, or flying starts and stops;[48]

(iv) muscle movement[49] (very hard to infer accurately absent nib pen);

(v) pen alignment[50] (very hard to infer accurately absent nib pen);[51]

(vi) pen pressure—shown by depth of pen indentation into paper, heaviness of ink, width of line, etc.,[52]

(vii) impulse—sudden changes of direction, may require magnification to be counted accurately, can be counted for individual up strokes and downstrokes;[53]

(viii) impulse grades into tremor—rapid shaking (important to note on what strokes present, since tremor of old age or nervousness may be less on up strokes or final stroke than tremor of fraud result-

---

(1910) at 110, 113, 117.

[48]Albert S. Osborn, Questioned Documents (1910) at 248.

[49]Albert S. Osborn, Questioned Documents (1910) at 105–109.

[50]Albert S. Osborn, Questioned Documents (1910) at 128, 242.

[51]Ordway Hilton, Scientific Examination of Questioned Documents, at 156, n. 11 (revised ed., 1982; reprinted 1993).

[52]Albert S. Osborn, Questioned Documents (1910) at 132–134. This is as good a place as any to talk about the great cleavage in the handwriting identification community, the gulf between the orthodox Osbornians and the graphology-influenced practitioners. The orthodox Osbornians reject any role for theories developed by those seeking to read personality characteristics from handwriting in the identification of authorship, citing, ironically, the absence of validation for those theories. The graphology-oriented practitioners tend to believe in graphology, but they assert that one doesn't have to believe specific character traits are revealed by handwriting in order to gain useful insights into identification from graphological studies. While both Osbornians and graphological practitioners assert that inferences concerning dynamic aspects of writing from the trace can be important in identification of authorship, graphological practitioners tend to make them primary, with many paying particular attention to pen pressure. A number of further ironies must be reported in this regard. First, while it is true that the Orthodox Osbornians have occupied most prominent positions in the document examiner community in the last 90 years, and have controlled the membership of the American Society of Questioned Document Examiners and certification by the American Board of Questioned Document Examiners, there may be a greater number of graphologically-oriented practitioners doing everyday work in court, being heavily represented in the numerically larger membership of organizations such as the National Association of Docu-

ment Examiners, the World Association of Document Examiners and the Independent Association of Questioned Document Examiners. Second, it was only the more scientifically oriented of the graphologists, and none of the Osbornians, who performed any empirical studies on the handwriting phenomenon worthy of the name empirical from the 1920s to the 1980s, even going so far as to develop a specially instrumented pen called a graphodyne to record the dynamic aspects of writing as it was taking place, the forerunner of today's digitized pressure tablets used in academic motor control studies which utilize handwriting as a convenient motor control phenomenon. See generally, H. Hartford, You Are What You Write (1973), especially his account of C. A. Trip's invention of the graphodyne, at 107–108. Third, recent academic studies tend to indicate that the dynamic aspects of handwriting may indeed be more dependably indicative of individual authorship than other characteristics, though those studies have the advantage of analyzing the dynamic characteristics directly as they are performed, not by way of problematical inference back from the static trace. See 3/1/95 *Starzecpyzel Daubert* hearing testimony of Dr. George Stelmach, transcript pages 386–387, on file with the author. Finally, since government laboratories tend to be officially Osbornian, if there are few data on the dependability of identification of authorship by Osbornian practitioners, there are none on the dependability of graphologically oriented practitioners. For a description of this universe from a thoroughly Osbornian perspective (which excoriates even the mild credit where credit is due given graphologists in this footnote), see generally Andre Moenssens, Handwriting Identification Evidence in the Post-*Daubert* World, 66 UMKC L. Rev. 2 (1998). For a response, see D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. at 483–486 (1998).

[53]Albert S. Osborn, Questioned Documents (1910) at 111–114.

62

Case 3:09-cv-03064-MWB-LTS    Document 284-37    Filed 06/23/11    Page 158 of 263

SAK000158

ing from trying to draw a facsimile under pressure); and[54]

    (ix)    general line impression: flowing, free, rhythmic, halting, slow or drawn;[55]

  (n)  keep alert for retouching, and pen stops or lifts at angles, or on first or last stroke, or other unnatural places;[56]

(11)  at this point, even without exemplars, a signature may be classified as suspicious if it appears slow and drawn with blunt beginning and ending strokes, much retouching, odd pen lifts, many angular direction changes on what would usually be curves, coupled with tremor on other strokes, especially if all of this occurs in a signature which does not appear erratic and out of control on a gross level;[57]

(12)  to reach a firmer conclusion, one needs exemplars of genuine signatures, preferably from documents of like kind and like formality from the same time period during which the questioned signature was alleged to have been signed.[58] In addition, the examiner should know any claimed circumstances surrounding the making of the questioned signature that might affect the value of an exemplar, such as age or disease.[59] There should be as many exemplars as possible up to about 50–75,[60] though in some circumstances even one, sufficiently close in time will be enough to expose a crude forgery;[61]

(13)  the known exemplars should be analyzed just like the questioned signature, and a range of variation for each dimension should be determined, though it usually cannot be quantified, but can be observed by juxtaposition of letter examples.[62] If the characteristics of the known exemplars are consistent in every respect with the questioned signature, then it is genuine unless it can be shown to be a tracing,[63] though even a tracing should usually show evidence of being drawn rather than written.[64] If there are significant divergences it is not genuine, though what makes a divergence significant, how many divergences are necessary and how to weigh them is not quantified.[65] It is a fact-sensitive judgment, and even one inexplicable difference might show that the signature is not genuine;[66]

(14)  it is much harder to determine accurately who wrote a spurious signature than to determine that it is spurious.[67] This is because a forger is either simulating, tracing from a model, or writing with no model of the true signature. In a tracing, no personal writing of the forger is present, and an attempt at simulation will usually suppress individuality enough in the short space of a signature that no conclusions can be drawn.[68] Only when someone signs another's name in the signer's own usual hand is identifica-

---

[54]Albert S. Osborn, Questioned Documents (1910) at 116–121.

[55]Albert S. Osborn, Questioned Documents (1910) at 109–110.

[56]Albert S. Osborn, Questioned Documents (1910) at 248–249.

[57]Albert S. Osborn, Questioned Documents (1910) at 18, 245.

[58]Albert S. Osborn, Questioned Documents (1910) at 18, 22.

[59]Albert S. Osborn, Questioned Documents (1910) at 23–24, 216.

[60]Albert S. Osborn, Questioned Documents (1910) at 19.

[61]Albert S. Osborn, Questioned Documents (1910) at 19.

[62]Albert S. Osborn, Questioned Documents (1910) at 203, 243.

[63]Albert S. Osborn, Questioned Documents (1910) at 257–260, 266–301, 308.

[64]Albert S. Osborn, Questioned Documents (1910) at 267.

[65]Albert S. Osborn, Questioned Documents (1910) at 212, 214–215.

[66]Albert S. Osborn, Questioned Documents (1910) at 281.

[67]Albert S. Osborn, Questioned Documents (1910) at 13–14.

[68]Albert S. Osborn, Questioned Documents (1910) at 13–14.

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 159 of 263

SAK000159

tion a significant possibility, and even then the small amount of writing and the usual presence of some disguise makes a positive identification difficult.[69] However, there may be enough in a signature to exclude a person as a candidate. For instance, if the signature requires more skill and muscle control than the candidate can muster as determined by a sufficient set of exemplars, exclusion would be justified, because one cannot write with more skill than one has;[70]

(15) moving beyond signatures, affirmative identification of the writer of a questioned document depends on both the quantity of the questioned writing, and the quantity and quality of authentic exemplars of a candidate's writing that can be obtained.[71] Natural exemplars showing unselfconscious writing from about the time of the making of the questioned writing are best,[72] but demand exemplars may do if the questioned document is sufficiently recent and if care is taken to guard against disguise in the demand exemplars by the amount required, variations in speed of production required, etc.;[73]

(16) the analysis of both the questioned and the known writing will be done as above in regard to signatures.[74] In addition, such habits as the layout and margins of the writing on the page will be added.[75] If sufficient peculiarities correspond between the two writings and there are no significant differences, the writer of the exemplars will be established as the writer of the questioned writing.[76] Which peculiarities are rare enough to be significant, which ones are independent of each other in their occurrence, how many are necessary, and how to weight them is not defined, but the following general principles are instructive:

(a) system characteristics of writing systems, foreign and domestic, cannot establish identity, even in combination.[77] Thus an examiner must be conversant with a wide range of such systems and their characteristics;[78]

(b) the most diagnostic idiosyncrasies are those which diverge furthest from the underlying system, which are inconspicuous,[79] and which are not common products of carelessness or the desire for speed (such as open o's and omitted

---

[69]W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 387. How uncommon it is to be able to make such a positive identification from the one or two words in such a signature is apparently the subject of some controversy among practitioners, since many of them apparently undertake to do it rather frequently. See the discussion of *U.S. v. Ruth*, *U.S. v. Jones*, and *U.S. v. Battle*, supra at § 28:6; and *U.S. v. Rutherford*, supra at § 28:7. However, the authorities in the field are uniformly skeptical. See the quotations set out infra at § 28:32.

[70]Albert S. Osborn, Questioned Documents (1910) at 110–112.

[71]Albert S. Osborn, Questioned Documents (1910) at 321.

[72]Albert S. Osborn, Questioned Documents (1910) at 18–19.

[73]Albert S. Osborn, Questioned Documents (1910) at 24–25. Different authors have elaborate notions of the best ways to take demand exemplars. Compare Albert S. Osborn, Questioned Documents at 33–34 (2d ed. 1929), with W.R. Harrison, Suspect Documents: Their Scientific Examination (1958) at 442–451, and Ordway Hilton, Scientific Examination of Questioned Documents, at 310–322, n. 11 (revised ed., 1982; reprinted 1993). Note that both Osborn and Harrison refer to these writings as "request writings" and Hilton refers to them as "request standards," but I have used the term "demand" because in practice that is what is involved in the usual case. They are usually given under court order and failure to cooperate can result in being jailed for contempt.

[74]Albert S. Osborn, Questioned Documents at 322 (2d ed. 1929).

[75]Albert S. Osborn, Questioned Documents at 142–143 (1st ed. 1929).

[76]See Albert S. Osborn, Questioned Documents at 211 (2d ed. 1929).

[77]Albert S. Osborn, Questioned Documents at 169, 206, 210, 214 (2d ed. 1929).

[78]Albert S. Osborn, Questioned Documents at 214 (2d ed. 1929).

[79]Albert S. Osborn, Questioned Documents at 210, 308 (2d ed. 1929).

Case 3:09-cv-03064-MWB-LTS   Document 28467   Filed 06/23/11   Page 160 of 263

SAK000160

i-dots); and[80]

(c) each case is different and must be judged on its own particular circumstances.[81]

## § 35:14 Areas of disagreement: Testing document examiner expertise

Nothing in the above is mystical or visibly implausible, but, as previously noted, that does not a science make. As sensible as much of it seems, none of the assertions are self-validating, and all are amenable to formal empirical testing which has never been undertaken. Even the assertion that an atomistic analysis leads to better results is not inevitable, as any baseball player whose swing was harmed by a bad batting coach could tell you. Likewise,the notion that a learned technique of such analysis, with so many elements of subjective judgement, in an area where clear evidence of accurate conclusions is often not available, will enable all or most people completing such training to give accurate conclusions on both hard and difficult problems, is dubious.

This is not to say that all identification by comparison of hands is necessarily inaccurate. Common experience, once again, confirms that under some circumstances we can recognize a writer by handwriting. There is a tagged signal present, at least sometimes, but how specific or dependably perceived it is in various circumstances is subject to debate. It may be that document examiners, or some of them, pick up a not-fully-analyzable knack of accurate identification of handwriting just by being exposed to a lot of it. It may be that the atomized analysis called for by their method of practice improves the accuracy of some or all of them a little or a lot.

Indeed, there is evidence that not all of the propositions that underlie the claimed ability to identifying handwriting with a high degree of accuracy are shared within the field of forensic handwriting examiners. And there is even less agreement when the question is put to more scientific handwriting experts who are not forensic examiners.[1] This has implications, of course, for even the weakest prong of admissibility "general acceptance."

Since such a practical expertise does not have the internal validation of a developed science, it requires the external validation given to an instrument, a black box process, that may or may not lead to dependable results. Here is where science can again come into play, because science can examine the dependability of the results of such a process even when the process is not science. Beyond their own assertions,[2] however, what evidence, if any, exists to show that document examiners can accurately identify or exclude authorship by comparison of hands, or do so bet-

---

[80]Albert S. Osborn, Questioned Documents at 261 (2d ed. 1929).

[81]Albert S. Osborn, Questioned Documents at 308 (2d ed. 1929); see generally What Osborn referred to as "true methods," Albert S. Osborn, Questioned Documents at 249–269 (2d ed. 1929).

**[Section 35:14]**

[1]See Michael J. Saks & Holly VanderHaar, On the "General Acceptance" of Handwriting Identification Principles, 50 J. Forensic Sciences 119 (2005).

[2]In *General Electric Co. v. Joiner* and again in *Kumho Tire*, the Supreme Court of the United States warned the courts against the admission of proffered expert testimony based solely on the "ipse dixit of the expert," *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 157, 119 S. Ct. 1167, 143 L. Ed. 2d 238, 50 U.S.P.Q.2d (BNA) 1177, Prod. Liab. Rep. (CCH) P 15470, 50 Fed. R. Evid. Serv. 1373, 29 Envtl. L. Rep. 20638 (1999), quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508, 18 O.S.H. Cas. (BNA) 1097, Prod. Liab. Rep. (CCH) P 15120, 48 Fed. R. Evid. Serv. 1, 28 Envtl. L. Rep. 20227, 177 A.L.R. Fed. 667 (1997). We must distinguish among three types of evidence derived by reference to the experts "own assertions," to use the phrase in the text. The first type is simply self faith: "We know we're good because we believe we are," or, "we know we're accurate because we follow the revealed true method in reaching our results." The second type is anecdotal: "In such and such a case, I identified the right person, or was right concerning the forged nature of the

ter than the average person?

The answer is, relatively little. In an article published in 1989 in the University of Pennsylvania Law Review, Risinger, et al. reported a full literature search[3] and turned up only one published study bearing on the question, plus five unpublished studies carried out by the Forensic Sciences Foundation (FSF).[4] The only published

———————

document." These anecdotes can further be divided into a number of varieties: The first variety is: "I know I was right because other evidence in the case established the facts independently." In these cases, the examiner almost always, in today's practice, may have known these facts before the examination, so that the handwriting conclusions may be more the result of revelation to the examiner of other facts than the examiner's independent analysis. For example, the opinions in the Lindbergh case are all subject to this suspicion. The second variety is: "the trier of fact agreed with me." Obviously, there may be ego gratification in this, but this factor alone does not establish accuracy. The third variety is "after my opinion, the defendant confessed, or pleaded guilty, or otherwise admitted I was right." The problem with these anecdotes is that guilty pleas do not very clearly prove factual accuracy, and that the confession or admission cases are usually built on other evidence, which tends to make them overlap with the first kind of anecdote. All of these various versions of "taking the expert's word" as evidence of validity, are weak proxies for a third type of more defensible self-belief, based on a gold standard of empirically unmistakable knowledge of authorship against which the examiners may compare their conclusions, such as harbor pilots have in their actual practice, but which document examiners usually do not. The real risk is that the examiners themselves will make more out of the proxy feedback and self-affirmation than it is rationally worth. That is not to say that there is no anecdotal evidence of value. There are well known cases of miscarriage by document examiners, the existence of which contradicts at least the more extravagant claims concerning the dependability of the expertise, such as those attributed to FBI document section chief Ronald Furgerson by David Fisher in his book *Hard Evidence* that all "180" "certified" document examiners in the United States would reach the same conclusions in any given case as he would. See David Fisher, Hard Evidence (1995) at 196. *Vide* Albert S. Osborn's grandson Russell Osborn's mistaken authentication of Clifford Irving's Howard Hughes forgery (see Stephen Fay et al., Hoax 129–133 (1973)), the Hitler Diaries hoax, etc. See generally, K.W. Rendell, Forging History (1994). The data summarized, §§ 28:15 to 28:20, from the Forensic Sciences Foundation's proficiency studies, showing high rates of disagreement among document examiners, raise grave doubts about the validity such claims. On the other side, there are equally remarkable successes which suggest that under the right conditions and in the best hands,

handwriting comparison can do remarkable things. *Vide* the proof of Michele Sindona's 1981 return to the U.S. through the writing on one customs card among thousands in an assumed name (confirmed by a fingerprint on the card), and the 1956 capture of Joseph LaMarca, the Peter Weinberger kidnapper, by identification of his handwriting from among millions of public records documents. In both these cases there was a very striking and easily recognized peculiarity in the handwriting. See Fisher, Hard Evidence, supra, at 196–198.

[3]In their article, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners 7 (1995), Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith criticize the thoroughness of that search, and their title is even taken from the punch line to an old joke meant to ridicule the search as having looked where it was convenient to look rather than where the answer lay. Ironically, D. Michael Risinger et al., Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731 739, n. 31 (1989), took the unusual step of describing in some detail their literature search strategy, and it was a thoroughgoing one. The easiest way to prove that Risinger et al. overlooked important research, of course, would be simply to come forward with it. Despite years of grousing, it took nearly 13 years before anyone could cite a single empirical study or other test data bearing on the issue of handwriting examiner accuracy which existed at the time Risinger et al. was published which was not addressed in that article. See § 28:33.

[4]In 1975, under a grant from the Law Enforcement Assistance Administration, the Forensic Sciences Foundation (FSF) set out to create proficiency tests for forensic expert specialties, among them handwriting identification. The results of the 1975 pilot test were later reported in Joseph L. Peterson, Ellen L. Fabricant & Kenneth S. Field, Crime Laboratory Proficiency Testing Research Program, Final Report (1978). A permanent yearly testing program was begun in 1978 and a handwriting component was added in 1984. See D. Michael Risinger et al., Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. at 740, n. 31 (1989). These tests were "operated and maintained by Collaborative Testing Services, Inc." (a contract consultant in test design) "with assistance provided by the Fo-

66

SAK000162

study, Inbau's Lay Witness Identification of Testimony,[5] had such a small number of participants and was so methodologically flawed, that it yielded no informative data on any issue. Though Risinger et al. sparked controversy, in the years since there have been only a handful of new studies: one readministration of one of the FSF studies utilizing a control group of non-document examiner subjects,[6] two more relevant FSF studies,[7] and four studies by Dr. Moshe Kam and his colleagues, most commissioned by the FBI.[8] All of these will be examined in turn.[9]

### § 35:15    Areas of disagreement: Testing document examiner expertise—Forensic Sciences Foundation proficiency tests: 1975–1987

**Research References**

West's Key Number Digest, Criminal Law ☞491(1), 491(2)
Giannelli, The Supreme Court's "Criminal" Daubert Cases, 33 Seton Hall L. Rev. 1071 (2003)

The results of the original Forensic Sciences Foundation (FSF) studies may or may not have yielded significant data, depending on one's perspective. The studies were designed as proficiency tests for government crime laboratories. They were taken only by a voluntarily self-selected group of such laboratories who, for each test, decided to request the test materials and to return their results. The necessity of having comparable test materials administered to each participating laboratory meant that the test materials had to be photocopies rather than original documents, and the test-takers all knew that they were taking a test rather than working on a real case. The FSF itself officially took the position that the results were not necessarily representative of the actual level of performance in the field. However, the FSF could not have regarded the tests as so problematical as to be meaningless, or they would not have continued to administer them, and they have been continued under the supervision of the American Society of Crime Laboratory Directors.

Beyond these considerations, there is the ever-present problem of test design itself. Designing meaningful studies to test the validity and reliability of a diagnostic process like handwriting identification is not as easy as it might at first appear.[1] As we have seen, a process such as handwriting identification presents a number of potential subtasks dealing with variables such as writing instruments, forgery of

---

rensic Sciences Foundation," and technical supervision "by the Proficiency Advisory Committee, a committee of the American Society of Crime Laboratory Directors." See the Introduction to Crime Laboratory Proficiency Testing Program, Questioned Documents Analysis, Report No. 89-5 (1989). These tests are referred to collectively as the "FSF studies."

[5]34 Ill. L. Rev. 433 (1939).

[6]Reported in The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners 7 (1995), Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith.

[7]FSF tests, 1988 and 1989.

[8]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. 5 (1994) (hereinafter Kam I); Moshe Kam, Gabriel Fielding & Robert Conn, Writer Identification by Professional Document Examiners, 42 J. Forensic

Sci. 778 (1997) (hereinafter Kam II); Moshe Kam, Gabriel Fielding & Robert Conn, The Effects of Monetary Incentives on Document Examination Professionals, 43 J. Forensic Sci. 1000 (1998) (hereinafter, Kam III); Moshe Kam, Kishore Gummadidala, Gabriel Fielding & Robert Conn, Signature Authentication by Forensic Document Examiners, 46 J. Forensic Sci. 884 (2001) (hereinafter, Kam IV).

[9]Because the forensic document examination field's body of systematic empirical literature is so meager, averaging a little more than one study every two years since the publication of *Exorcism*, and virtually none in the century of practice before that, the close examination of each new study is warranted.

**[Section 35:15]**

[1]*Vide* the problems Kam et al. have had in design, resulting in a steady refinement from Kam I through Kam IV. See discussion of the Kam studies, infra at §§ 28:27 to 28:31.

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 163 of 263

SAK000163

various sorts, age, health, and so forth. No single test can map the abilities of any one practitioner, or any group of practitioners. A great many tests (certainly more than have yet been designed and administered) would be necessary to know what, if anything, they can do accurately, and under what conditions. A complete testing regime would have tests which covered the entire spectrum of conditions and difficulties. In addition, the law not only cares about the likely accuracy of results by putative experts, but also about whether the results obtained and testified to by the experts leads to more accurate conclusions than would result if the jurors did the comparisons directly without such testimony. "Expertise" exists only if there is a significant accuracy advantage of the putative expert over the average juror. Thus, the tests ideally should be administered to control groups of ordinary people to see if such an accuracy advantage exists.

With these caveats in mind, following is a summary of the tests and results available to Risinger et. al. through 1987 as the FSF reported them.[2]

### § 35:16 Areas of disagreement: Testing document examiner expertise—Forensic Sciences Foundation proficiency tests: 1975–1987—The 1975 test

In 1975, the participating laboratories were given a letter made up of both handwriting and typewriting. In addition, they received four examples of handwriting written by four different people. The problem was to determine whether the handwriting on the questioned document was written by any of the four "suspects." In reality, the questioned letter had been written by one of the suspects. Of the 74 laboratories that responded:

66 (89%) correctly identified the writer of the questioned letter;

1 (1%) gave a partially correct and partially incorrect answer (attributing part of the writing in the questioned letter to the right "suspect" but another part to another "wrong" suspect);

4 (5%) asserted that they could not reach any conclusion from the materials supplied them;

3 (4%) identified the wrong person.

### § 35:17 Areas of disagreement: Testing document examiner expertise—Forensic Sciences Foundation proficiency tests: 1975–1987—The 1984 test

In 1984 participating labs were supplied with three handwritten letters containing bomb threats, supposedly received by the news media and then followed by terrorist bombings. The labs were also given two pages of known handwriting samples for each of six suspects (a total of 12 pages). They were to determine if the three questioned letters had all been written by the same person, and whether any or all of the questioned letters had been written by any of the suspects. Two of the threat letters were in fact written by one person, who was not among the suspects and whose actual known writing was not given to the labs. The other threat letter was written by one of the suspects whose exemplars were in his normal hand, but who had tried to simulate the writing of the other two threat letters when producing *his* threat letter.

---

[2]In Risinger et al. there are extensive footnotes to specific pages of the FSF reports for virtually each line of text. These have been omitted and, further, no such notes have been inserted in regard to the more recent FSF studies. The FSF reports are short and not easily obtainable. If the reader does not obtain them, page references obviously are useless; if the reader manages to obtain them, page references are unnecessary.

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 164 of 263

SAK000164

Forty-one labs requested the test materials but only 23 submitted answers. Of those:

17 (74%) perceived the difference in authorship of letter 3;

6 (26)% said erroneously that the same person wrote all three threat letters;

23 (100%) failed to recognize that letter 3 was written by one of the suspects for whom they had known writings.[1]

### § 35:18 Areas of disagreement: Testing document examiner expertise— Forensic Sciences Foundation proficiency tests: 1975–1987—The 1985 test

Participating laboratories were given 12 checks all having signatures in the same name. They were asked to decide which, if any, of the signatures were made by the same person. In fact, two of the 12 had been signed by the real person whose name appeared on them. Of the remaining ten, one was an attempted freehand forgery by a person without known experience as a forger; another was a tracing. The remaining eight were signed by eight different people in their own normal handwriting. Forty-two labs requested test materials and only 32 returned them. Of those:

13 (41%) gave correct results;

2 (6%) wrongly attributed one of the forgeries to the real signatory;

10 (31%) reported that they were unable to reach conclusions;

7 (22%) were substantially wrong, making errors beyond a single misattribution

———————

**[Section 35:17]**

[1]Judging from comments at a meeting of the Document Examination Section of the American Academy of Forensic Sciences (February, 1996, Nashville, TN), this question and the finding of 100% error is the single greatest object of complaint by questioned document examiners concerning the FSF tests, a complaint that has some validity, but not as much as they assert. The usual form of their objection appears to be something like, "we don't claim to be able to determine the authorship of a writing made while trying to imitate some other person's writing." (Such an attempt is called "simulation" or "simulated forgery" in normal document examiner parlance.) First, as the authorities cited at § 28:13, point number 14, supra, demonstrate, the orthodox Osbornian position is not that such attribution of authorship is categorically impossible, but merely that it is extremely difficult, because attempting to imitate someone else's writing is an effective way to disguise one's own writing, and may be so effective at suppressing individuality that identification is impossible. Second, many examiners are willing to do such attributions in practice. See discussions of *Ruth*, *Jones*, and *Battle*, supra at § 28:6 and *Rutherford*, supra at § 28:7. The real underlying complaint concerning Question 2 in the 1984 FSF test seems to be that the skill of the simulator was unusual, and even though the writing was in a fairly generous amount, the simulator managed to suppress all identifying characteristics. (It should be noted that there is no specific evidence the simulator in fact was unusually skilled. The argument is circular: since we couldn't identify the writer, he or she must

have been exceptionally skilled.) Although this confirms empirically the possibility of false negatives already admitted by Osbornian theory in such cases, this level of skill (if it was exceptional) may be rare enough that the meaning of the universal failure of examiners on this question might be overstated, especially in aggregating it with the results of other tests or questions. However, standard Osbornian theory holds that the act of simulation suppresses individuality even for unskilled simulators. See quotes from Albert Osborn, Ordway Hilton, and Wilson R. Harrison set out at § 28:38. Certainly the results of Kam IV seem to indicated that document examiners are good at identifying simulations by naive and unskilled simulators as not genuine. See the discussion of Kam IV, § 28:31. However, there was no test was given to see if document examiners could attribute authorship of those simulations to the actual writer under the same conditions.

As to aggregation, it is true that all aggregation strategies applied to the FSF data are inherently flawed, since no one knows exactly how to measure either the ease or difficulty of a test task, or its statistical incidence in normal practice. However, it appears that more problems in the FSF studies as a whole come from what was assumed to be the easy end of the spectrum, so that the inclusion of the occasional hard task in an aggregation seems not as artificial as excluding it completely. Beyond aggregation objections, there can be no objection to asking the question and observing the results. In addition, it is at least a start to defining the outer limits of whatever expertise, if any, actually exists.

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 165 of 263

SAK000165

of authorship.

### § 35:19 Areas of disagreement: Testing document examiner expertise— Forensic Sciences Foundation proficiency tests: 1975–1987—The ==1986 test==

The 1986 test involved handwriting. Participating labs were told to assume that police had stopped a car with three known occupants. In the car they found a hand-printed holdup note and other evidence linking the note to a holdup apparently committed by only one person. The labs were given a copy of the holdup note. They were also given a copy of handwriting exemplars from the three occupants of the car. Suspect 1 had actually printed the holdup note. Suspect 2 had not, Suspect 3 had not printed the holdup note either, but he was a document examiner whose hand printed exemplar was an attempt to simulate the printing on the holdup note. Forty-eight labs requested materials and 31 returned reports. Of those:

==4 (13%) gave correct answers;==

3 (9%) said that none of the authors of the exemplars had written the hold-up note;

10 (32%) were unable to reach any conclusions;

14 (45%) assigned authorship to the forger.

### § 35:20 Areas of disagreement: Testing document examiner expertise— Forensic Sciences Foundation proficiency tests: 1975–1987—The ==1987 test==

Because of document examiner complaints concerning the difficulty of prior tests, the FSF decided to make the 1987 test easy. As its report of results said, "This test was designed to be a relatively easy and straightforward test, because of complaints about previous test design. All the writings in this test were natural and free of disguise." In this test, participating laboratories were given a copy of a handwritten extortion note. Exemplars of the handwriting of four persons were also supplied, one of whom actually had written the extortion note. The problem was to determine which, if any, of the "suspects" had written the extortion note. Fifty-five laboratories requested materials and 33 responded with reports. Of those:

==17 (52%) correctly identified the writer of the extortion note;==

1 (3%) incorrectly eliminated the correct suspect, asserting that none of the suspects wrote the extortion note;

0 (0%) incorrectly identified an innocent person as the author;

15 (45%) responded that their results were inconclusive.

### § 35:21 Areas of disagreement: Testing document examiner expertise— The Risinger et al. evaluation of the 1975–1987 FSF studies

==Here is what Risinger et al. said in evaluating the above results:==

What do all five FSF studies taken together suggest? A rather generous reading of the data would be that in 45% of the reports forensic document examiners reached the correct finding, in 36% they erred partially or completely, and in 19% they were unable to draw a conclusion. If we assume that inconclusive examinations do not wind up as testimony in court, and omit the inconclusive reports, and remain as generous as possible within the bounds of reason, then the most we can conclude is this: Document examiners were correct 57% of the time and incorrect 43% of the time.

But let us turn to more meaningful readings of the aggregate data. The pilot test in 1975 may have been unrealistically easy, like a line-up with four beefy white policemen and a skinny black person. Did this task present any real difficulty at all? There is no way of knowing whether a group of lay persons would have done any less well, since

70

none was tested. Omitting the 1975 data, the examiners were correct 36% of the time, incorrect 42%, and unable to reach a conclusions 22% of the time. Even these results are biased in favor of accuracy because of the intentional ease of the 1987 test. Disguised handwriting fooled them all and forged printing fooled two-thirds of those who hazarded an opinion about it.

Now consider the effect on the aggregate results of the laboratories that requested test materials but did not return them. More likely than not, these nonrespondents bias the results further in favor of correct conclusions. Some of the nonresponding labs, no doubt, did not even perform the tests due to the press of daily business. But some others very likely performed the tests and then did not return their reports. Assuming that an examiner who has worked on an answer and then decides not to return it has serious doubts about its accuracy, then the sample of respondents is composed of an unrepresentatively large proportion of those who obtained—or at least think they obtained—correct answers.

If a correct answer consists of a report containing correct conclusions returned pursuant to requested and submitted test materials, then of the total submissions to laboratories in the 1984 through 1987 tests, only 18% gave wholly accurate responses (without the 1987 test the figure drops to 13%).

Finally, consider the possible effect on any aggregate conclusions of the fact that, of the more than 250 . . . laboratories that perform handwriting examination (not to mention a large number of private practitioner document examiners), only a fraction even ordered test materials in the first place. It is at least arguable that, by self-selection, the sample is inherently biased in favor of the more conscientious and capable practitioners to begin with. If this is true, the reported results would overstate the accuracy of the handwriting examination field generally.

The 1984, 1985, and 1986 tests presented examiners with a variety of challenges. The results should provide anyone with cause for concern. The examiners who returned reports on the analysis disagreed among themselves a good deal of the time, suggesting limited reliability, and many of the opinions offered were incorrect, suggesting limited validity.

In addition, the studies failed to reveal that certification or experience enhanced accuracy. The 1987 Proficiency Advisory Committee Comments state that "[a]s usual, there were no correlations between right/wrong answers and certification, experience, amount of time devoted to document examination and length of time spent on this test." Consider what this independence means for a court's likely assumptions about whether to admit a proffered expert and for the weight a fact finder is expected to give such testimony. A court is likely to assume that an examiner who is certified, who has been on the job for many years, whose caseload is nothing but document examination, and who has spent a lot of time examining the evidence, is especially likely to have something useful to say to a jury. Yet these data provide no support for these assumptions. Examiners who are uncertified, have little experience, work on document examination only part time, and spend little time on the particular document, are just as likely to be right as someone with more impressive qualifications. Does any of this suggest the existence of expertise?

These are the sorts of findings about the nature and limits of asserted handwriting identification expertise about which both document examiners and the courts need to know but which could not have been known before such studies were undertaken. Though they are not without flaws, these studies represent a step toward systematic and scientific evaluation of the claimed capabilities of this asserted expertise. Perhaps some of the considerably larger number of needed tests yet to be designed and administered would show document examiners faring better, but on the present record we must say that the underpinnings of the "expertise" have degenerated from no data to negative data.

Finally, we cannot emphasize too strongly that from the viewpoint of the law each of these studies suffers from a major omission: the absence of a control or comparison group of lay test-takers. If a jury can compare handwriting no worse than proffered "experts," then the expertise does not exist. For any given task, the level of performance of professional document examiners may be no better than that of layperson. Indeed, lay persons might perform some tasks consistently better than "experts." While such superiority may seem intuitively improbable, it remains a logical possibility and one not

71

without analogues in other areas. For now, the kindest statement we can make is that no available evidence demonstrates the existence of handwriting identification expertise.[1]

### § 35:22    Areas of disagreement: Testing document examiner expertise—The Galbraiths' critique of *Exorcism* and their proposed reanalysis of the FSF studies

The Galbraiths' main explicit criticisms of Risinger et al. can be summarized as follows:

(1)  all the FSF studies are methodologically so flawed that they cannot be used as a proper basis for drawing substantive conclusions;[1] Risinger et al. failed to recognize this and as a result of that failure they drew inappropriate conclusions;[2]

(2)  even if the data were any good, the way Risinger et al. analyzed the data was wrong;[3] and

(3)  a proper examination of the data (which the Galbraiths claim to do in reexamination) would result in reclassification of many document examiner responses to the tests from incorrect to correct and reveal their performance to be better than Risinger et al. reported.[4]

We will examine each of these criticisms in turn.

The Galbraiths begin their criticisms by invoking "the four types of validity issues identified by Cook and Campbell" in their well respected book, Quasi-Experimentation: Design & Analysis Issues for Field Settings.[5] Unfortunately, while there are important criticisms to be made of the methodology of the FSF studies, the Cook & Campbell framework adopted by the Galbraiths is largely inapposite. The Galbraiths confused cause-effect studies (experiments and quasi-experiments) with research aimed more simply at measuring some skill or ability. Cook & Campbell make clear that their validity constructs address problems of inferring that a treatment (independent variable) caused the observed effects in a dependent variable.[6] The FSF tests were simply trying to measure accuracy of performance (much like testing how well marksmen can hit targets). They were not testing which

---

[Section 35:21]

[1]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995). (footnotes omitted).

[Section 35:22]

[1]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[2]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[3]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the

Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[4]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[5]Thomas D. Cook & Donald T. Campbell, Quasi-Experimentation (1979).

[6]Thomas D. Cook & Donald T. Campbell, Quasi-Experimentation (1979). This is evident throughout the book. But consider the following specifics: The second sentence of the preface: "The designs serve to probe causal hypotheses about a variety of substantive issues in both basic and applied research." *Quasi-Experimentation at ix*. The title of the first chapter: "Causal Inference and the Language of Experimentation." The word causation appears in 6 out of 10 section headings within the first chapter. *Quasi-Experimentation at v*. The first sentence of the first chapter: "The

72

SAK000168

of two or more treatment conditions produced better performance (such as testing which of two training methods produced more accurate marksmen). Cook and Campbell's book is concerned with the methodological problems of the latter. The FSF studies are of the former kind. The Galbraiths struggled to apply cause-effect methodological issues to research that aimed instead to measure a single variable, test performance, making no attempt to draw causal inferences because there were no independent variables. A far more apt research tradition to inform a critique of the FSF studies would have been the literature of psychometrics (i.e., testing). Moreover, virtually all of the methodological objections raised by the Galbraiths were, in fact, dealt with by Risinger et al., either in the text or in footnotes. In the few instances where this is not true, it is generally because the Galbraiths' objections are inapposite. Their fundamental misreading of Cook and Campbell leads the Galbraiths repeatedly into confusion.

For instance, the Galbraiths assert that one ought to discount or disregard the results of Question 2 on the 1984 test (which all examiners got wrong) because of "insufficient co-variation."[7] The Galbraiths assert that "in designing or evaluating *any* test or experiment (such as the FSF tests) one must make sure that there is, or will be, sufficient covariation in the data, that is, variation in the test results must be observed in order to relate the results to the issue under investigation."[8] This is simply untrue in the universal form in which it is expressed; it depends upon what the issue under investigation is. While true for cause-effect studies (which Cook & Campbell were discussing), it is not for more basic skill measurement studies (which we, the FSF, and the Galbraiths are discussing). If all we want to know is "can most human beings hold their breath for 10 seconds" the fact that a test administered to 100 humans results in *all* participants holding their breath for 10 seconds in no way undermines the validity of the result, statistically or any other way. It is true, as Risinger et al. discussed at length, that tests that are too easy or too hard can lead to results which may be misinterpreted. It is also true that a single test designed to discriminate levels of skill has been unsuccessful if everyone does equally well or equally poorly. However, as Risinger et al. point out, handwriting identification is not a unitary operation, but rather presents "a broad variety of circumstances and tasks. Tests must be designed carefully to present discriminations of meaningful difficulty and variety. Only results from such tests could begin to paint a picture of what both lay people and experts can and cannot do . . . ."[9] Within the context of such a testing regime, it is not a criticism that some particular question or subtest was so hard that none of the experts could do it. By themselves such data are not meaningless, as the Galbraiths seem to claim concerning Question 2 on the 1984 test. In combination with other data such results can help determine the limits of the expertise which were not known before the data were developed.[10]

Methodological misdirections aside, the Galbraiths' main critical thrust, in both

---

major purpose of this book is to outline the experimental approach to causal research in field settings." *Quasi-Experimentation at 1.*

[7]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[8]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic

Document Examiners at 11 (1995). (emphasis supplied).

[9]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995). (emphasis supplied). Ironically, the Galbraiths' own footnote 14 makes the same point in very similar terms.

[10]The Galbraiths also dispute the propriety of any cogitation on how non-responses may have resulted in sample biasing which overstated the skills of document examiners as a whole. They

Case 3:09-cv-03064-MWB-LTS    Document 84-27    Filed 06/23/11    Page 169 of 263

SAK000169

parts one and two, is that Risinger et al. erred by accepting the response classifications that had been given to answers in the FSF studies initially *by the responding document examiners themselves* and then *by the FSF in its own summary of results*. Specifically, they claim that many responses that the document examiners labeled "inconclusive" when examining what turned out to be a true author's writings, ought to be treated as correct answers because the explanatory remarks accompanying the answers can be taken to indicate some level of belief that the writer of the exemplar may have written the questioned writing. They assert that these responses should be treated as examples of "qualified opinion" rather than bet-hedging "inconclusives."[11]

Even assuming the validity of their classifications of the data, however, the results do not mean what the Galbraiths go on to claim. They claim to have discovered 18 additional truly correct answers out of 192 total responses.[12] However, all but one of these answers newly classified as correct occurred in response to the two clearly easiest tests, 1975 and 1987.[13] Indeed, 13 of the new corrects were on the 1987 test alone, changing the performance on that test from 52% correct by the reckoning of Risinger et al. (based on the FSF classification) to 91% correct (based on the Galbraith reclassification). Secondly, the Galbraiths discard respondents who actually returned the test but criticized the test materials and checked off "inconclusive." These, they argue, ought to be treated as non-responses,[14] and, they argue even more vigorously, no conclusion can ever be fairly made from a non-response.[15] They then throw out the bad results of Question 2 from 1984 (which they do not like for the "lack of co-variation" reasons discussed above, that is, all responses were wrong).[16] Finally, they aggregate all the results even though the dead easy 1975 test accounted for nearly 2½ times the number of responses of the next most responded-to test, and more than three times the responses of the hard 1984 test. Based on these adjustments, they claim that document examiners were correct 75% of the time.[17]

The fact remains, however, that the examiners did well at some tasks and poorly

---

rightly point out that the biasing results of self selection might plausibly have run the other way. The main disagreement between Risinger et al. on the one hand and the Galbraiths on the other seems really to be about who should bear the burden of persuasion and the risk of non-persuasion. The stance of Risinger et al. is clearly that validity is to be treated as unproven until there are sufficient unambiguous data supporting it. The position of the Galbraiths is that one should not doubt validity and "indict the whole field" without affirmative proof of invalidity. The Galbraiths' position appears close to that adopted by Judge McKenna in *Starzecpyzel*, and the opposite of the law's usual view that the burden is on the proponent of the evidence, as well as that of science that the burden of persuasion is on the one making the claim that some phenomenon exists.

[11]The Galbraiths show no examples of moving "inconclusives" to the "totally wrong" column.

[12]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[13]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[14]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[15]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[16]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[17]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific

74

SAK000170

on others. The Galbraiths' own analysis (pertinent data reproduced as Table 1 below) shows that, out of six tasks with data sufficient to conduct significance tests, the document examiners could not even exceed *chance* accuracy in two of the six tasks. Think about that finding. Even where the experts do exceed chance performance, is *chance* the criterion of expertise? If a driver manages to stay on the right side of the median stripe more often than chance, if a piano student hits the correct notes more often than chance, if a student scores above sheer guessing on an exam— are they to be regarded as "experts"? And the Galbraiths found that document examiners did not even perform at that level on one third of the tests they took.

**Table 1**

Comparison of Expertise Against Chance

(Correct Versus Incorrect)

| Exam Year (Question) | Observed Proportion Correct | | Chance Proportion Correct | Exact Probability | | Conclusion |
|---|---|---|---|---|---|---|
| | (M1) | (M2) | | (M1) | (M2) | |
| 1975 | 0.9429 (66/70) | 0.9469 (70/74) | 0.2000 | 0.0001 | 0.0001 | Experts outperform chance |
| 1984 Q1 | 0.5652 (13/23) | 0.5652 (13/23) | 0.2500 | 0.0174 | 0.0174 | Experts outperform chance |
| 1984 Q2 | 0.0000 (0/23) | 0.0000 (0/23) | 0.1429 | 0.0575 | 0.0575 | Experts no different than chance |
| 1985 | 0.5900 (13/22) | 0.5517 (16/29) | 0.0002 | 0.0001 | 0.0001 | Experts outperform chance |
| 1986 | 0.1905 (4/21) | 0.2500 (7/28) | 0.2500 | 0.2652 | 0.5000 | Experts no different than chance |
| 1987 | 0.9444 (17/18) | 0.9375 (30/32) | 0.2000 | 0.0001 | 0.0001 | Experts outperform chance |

Source: Galbraith et al., Table 3.

Put simply, beating chance hardly establishes expertise. Even by the law's generous definition, in order to have expertise one must be able to outperform non-expert average jurors.[18] On that issue, even the Galbraiths concede that no statistically meaningful data existed when Risinger et al. was published.[19] In an attempt to remedy this absence of data, the Galbraiths administered the 1987 FSF test to two groups of non-experts to see how their performance compared to the document

---

Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

[18]Also, even if it could be shown that a proffered expert outperforms jurors, if both do terribly, with lay persons being right one time in a thousand and experts one time in a hundred, such expertise still may not be dependable enough for admission.

[19]"[T]here certainly has been a shortage of studies comparing handwriting identification expertise to non-expertise . . . ." The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners n. 7 at 7 (1995), Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith; "admittedly sparse history of carefully controlled empirical studies . . . ." The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners n. 7 at 7 (1995), Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith.

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 171 of 263

SAK000171

examiners who had been tested earlier. We will analyze those results below, but first we will complete the review of FSF proficiency test data by reporting the results of the 1988 and 1989 tests.

### § 35:23 Areas of disagreement: Testing document examiner expertise— Forensic Sciences Foundation proficiency tests: 1988–1989

Since the publication of Risinger et al., only two more relevant FSF studies appear to have been undertaken that we have been able to obtain. In 1988 and in 1989 the FSF again administered handwriting identification proficiency tests to document examiners at crime laboratories.[1] The results of the 1988 and 1989 FSF studies have never been published by the FSF,[2] but summary reports containing the results were issued to participating laboratories by the Forensic Sciences Foundation, and those findings are published below.

### § 35:24 Areas of disagreement: Testing document examiner expertise— Forensic Sciences Foundation proficiency tests: 1988–1989—The 1988 test

The test design for the 1988 FSF proficiency test in handwriting identification was as follows: The written instructions told the labs to assume the following case scenario: Four complaints were received from (four separate) physicians' offices about shipments of narcotics that were not received. The delivery service produced four receipts (Q1–Q4) each containing a signature in the name of a secretary for one each of the four physicians. Each secretary denied writing her own signature or any of the others. (The same driver had apparently made all the deliveries.) Handwriting samples from the four secretaries (labeled K1–K4) and the driver for the delivery service (K5) were requested. The delivery service also sent along two other receipts bearing signatures of "unknown persons."

The labs were supplied with six receipts acknowledging the receipt of goods. Receipt Q1 bore the signature "Sharon D. Clayborne" but in fact was written by

------

**[Section 35:23]**

[1]In 1990, after the existence of Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)., became widely known, FSF quit testing on handwriting identification and began testing on such topics as rubber stamp identification (1990) and photocopying machine identification (1991). There was arguably a "handwriting" element in the 1992 test. However, comparison of form had little to do with obtaining the correct results. One could determine that the signature on the top (white) purchase order copy (copy 1) was photocopier generated and not hand signed, by direct examination without reference to exemplars (if appropriately skilled). The "carbonless carbon" on the yellow copy signature could then be determined to be a tracing of the photocopy signature by observing the ankles stylus indentation on the photocopied signature of the white copy, and the exact correspondence between the stylus indentation and the carbonless carbon signature. The determination that a particular one of the exemplars provided had been the signature from which the photocopy on the white purchase order had been generated might be called a "comparison of form" problem, but since perfect superimposition was the key to this determination, it is not a comparison of the kind under consideration in this article. (About three quarters of the 90 respondents identified the right exemplar as the source of the photocopy, but the other quarter simply said nothing, and since they were not explicitly asked, these non-responses cannot be counted as errors, given the fact that most of them correctly identified the signature on copy 1 as a photocopy and that on copy 2 as a tracing over the photocopy, which resolved the issue of genuineness about which they *were* asked). There have been rumors that proficiency tests with handwriting components have been renewed in recent years, but we have not been able to verify this or obtain the results of any which have been administered.

[2]Their first general publication was in the first edition of this treatise. They were, however, printed and distributed to the heads of participating laboratories and others, and were thus "semi-published."

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 172 of 263
SAK000172

Richard D. Osbourn, the driver. Receipt Q2 bore the signature "Lisa D. Bridgeforth" and in fact was signed by Lisa D. Bridgeforth. Receipt Q3 bore the signature "Cynthia Y. Boone" but in fact was written by Richard D. Osbourn, the driver. Receipt Q4 bore the signature "Joanna Neuman" and in fact was signed by Joanna Neuman. Receipt Q5 bore the signature "Linda N. Ninestine" and was not written by any of the five people who provided exemplars. Finally, receipt Q6 was signed "Linda D. Wentworth", but in fact was written by Richard D. Osbourn, the driver.

Sharon D. Clayborne, Lisa Bridgeforth, Cynthia Y. Boone, and Joanna Neuman each provided exemplars in which they signed their own names a number of times, and also signed all the other names appearing on the receipts a number of times. Richard D. Osbourn gave exemplars in which he signed all the names appearing on the receipts a number of times. These exemplars were provided to the labs through photographs.

These materials were submitted to 73 labs and returned by 49.[1]

For reasons set out more fully in the footnote, the 1988 FSF test must be ap-

----

[Section 35:24]

[1]Before examining the results of these tests, it is necessary to say something about the test design as reflected in the FSF report. The report fails to set out crucial information concerning the test design necessary to evaluate the difficulty of the task presented to the takers of the test. Fair inference from the report, however, indicates that there were in fact people named Lisa D. Bridgeforth and Joanna Neuman who signed the receipts bearing those names, and signed them in their normal signature hands. In addition, it appears that these two gave their exemplars of their own names in their normal signature hands. (If these things are not as stated in the text, the test is one of the worst that could be designed in terms of the standard internal precepts of the asserted expertise. It is a virtual postulate that signatures are special as to design, speed of execution, uniformity, etc. If supposedly authentic questioned signatures, and especially if assuredly known exemplars, are signatures by people for whom the writing is not a habitual signature, but represent someone else's name, the whole exercise would be, in the internal terms of the discipline, grossly and unfairly misleading to the test-takers.) If anything appears to correspond to reality in this field, it is that signatures are usually special manifestations of handwriting. It seems reasonable to believe that as a result of repetition, and psychological factors creating a personal stylistic identification with one's own signature, normal signatures are the most individual and uniform parts of a person's writing. This is not to say that signatures cannot be disguised. Nor is it to say that normal signatures of two people with the same name cannot evolve into confusingly similar forms. See John Harris, How Much Do People Write Alike? A Study of Signatures, 48 J. Crim. L. & Criminology 647 (1958). It is merely to say that it would presumably be rare for the normal signature of one person to look at all like another dissimilarly named person signing that name either in the second person's usual hand-

writing or in a disguised hand where no real signatures of person number one were available to imitate. Thus it would appear that perfect scores on Q2 and Q4 were, or ought to have been, giveaways.

In addition, the examiners being tested knew which of the sets of exemplars were from each secretary, and which set of exemplars was from the delivery man Osbourn. If they assumed that the original Clayborne and Boone signatures were natural signatures if genuine (as they had a right to do) and if they further assumed or concluded that the real Clayborne and Boone exemplars bore natural Clayborne and Boone signatures (as they had a right to do), then it would become a simple thing to eliminate all the secretarial exemplars as candidates for signing the Clayborne and Boone signatures, since none of the exemplar signatures would be likely to resemble the signatures on the receipts in any arguably significant way. This would reduce the question in regard to Q1 and Q3 to "did Osbourn sign these or not?" The difficulty of that question is presumably somewhat dependent on the nature of the writing presented (which was not reproduced in the report), but the results might also very well be influenced by the fact that Osbourn was the only candidate for those signatures left in the pool, and exterior circumstances already cast suspicion on him. Thus, his identification as the author may have resulted from the design of the test, not from the information derived from his handwriting.

Finally, the test-takers might assume (as one respondent explicitly did) that the secretaries were unlikely to be in a position to sign receipts for deliveries to other doctors, which tends to convert the question in Q5 and Q6 to a question of whether or not the "Linda Ninestine" and "Linda D. Wentworth" signatures were signed by Osbourn or not. The elimination of Osbourn as the signer of the "Linda Ninestine" signature was likely to be made easier by the fact that presumably the signature was signed by a real Linda

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 173 of 263
SAK000173

proached with a substantial grain of salt. Each identification is not an independent event, but rather, the test presented two connected sets of issues, one set relatively easy and one set somewhat more difficult. The easy set of issues asked: which if any of these secretaries signed a receipt bearing her name in her normal signature hand? The harder set asked: Of the four signatures left over after disposing of question one, which if any was signed by Richard Boone.

Not surprisingly, out of 48 responding labs,[2] all got each response to Q1 substantially right,[3] all but three got each response to Q2 substantially right,[4] and all but one got the answers to Q3 right. (The exception, Lab 531, eliminated Osbourn as the author of Q3.) A 49th lab was unable to reach any conclusions on any of the queries, and marked everything "inconclusive."

Apparently, Joanna Neuman has some significant intra-writer or "natural" variation in her signature, because the responses to Q4 were surprising. Out of 48 responses, 22 were right, but five were wrong in affirmatively excluding the real Joanna Neuman. Twenty-one gave various versions of "inconclusive," ranging from seven leaning toward Neuman to three leaning toward another writer. Our inclination in dealing with these responses is to throw out the inconclusives and to say that in this particular case, nearly a fifth of examiners with definite opinions were wrong. Clearly, even signatures are no guarantee of absolutely easy problems.

Up to this point the errors have been false negatives, assertions that the true writer did not write the questioned signature. Q5 presents the more troubling problem (for the legal system, especially in a criminal context) of false positives. (However, it should be noted that in a forgery case, an error asserting that a signature is not genuine when it is in fact genuine is wrongly inculpatory and in the legal context could be thought of as a false positive.) This time, only 17 labs were right,[5] but even among this group, the use of "probably did not" instead of "did not" rose in comparison to the answers to the previous questions. Only three labs manifested confidence that Osbourn did not write Q5. On the other hand, three labs affirmatively indicated Osbourn *did* write Q5,[6] and one lab (528) said Sharon D. Clayborne wrote Q5. Twenty-seven labs responded "inconclusive" to the Q5 questions, and in general these were unqualified inconclusives (not leaders in the Galbraith sense). Thus false positives made up 19% of the affirmative responses, and 25% of the responses with a confident finding.

---

Ninestine in her real signature hand, and the Richard Osbourn exemplars would not only fail to resemble it, the examiners would already have concluded what Richard Osbourn's attempts at fake signatures looked like from Q1 and Q3. This would also assist them in identifying Osbourn as the author of the "Linda D. Wentworth" signature.

On the other hand, they might decide that since Osbourn signed all the other receipts not signed by known secretaries, he was likely to have signed Q5 also. All this raises the question of bias resulting from the presentation of unnecessary context information. Why not just present the exemplars marked questioned and known, and ask who wrote what, if anything?

[2] One lab, #517, counted as responding by FSF, responded "inconclusive" to every part of every question, and in its narrative report protested the structure of the test. While we do not believe that inconclusives are categorically meaningless, under these conditions they are, and we have eliminated this lab from consideration.

[3] That is, with one exception, all answered either "did not write" or "probably did not write" to each of the secretaries and "did write" or "probably wrote" to the driver Osbourn. The one exception was lab 539, which said Osbourn probably wrote Q1, but responded "inconclusive" to all the secretaries.

[4] Labs 522, 539 and 542 failed to identify the true author of the signature, answering "inconclusive" to her.

[5] One lab was counted as right even though it had one inconclusive instead of five exclusions.

[6] Labs 516, 522, and 545. Lab 507 responded by saying that Osbourn wrote the signature also, but the accompanying narrative comments were inconsistent with an affirmative ID of Osbourn. Although this response was counted as a misidentification by the FSF, it seems to have been a typographical error, and we have not counted it. Lab 545 was counted as indicating Osbourn, even though it amended the answer from "probably" to "possibly."

78

Finally, as to Q6, there were 42 correct, two inconclusives that leaned toward Osbourn, three inconclusives, and one wrong exclusion of Osbourn (lab 514).

Thus, one can say that on the easy problems (Q1–Q3), document examiners gave 144 responses, of which 140 (97.2%) were correct or substantially correct, and 1 (0.5%) was an affirmative false exclusions, and 3 (2.5%) were inconclusive. Including Q6 as an easy problem, there were 192 responses, of which 181 (94.3%) were correct, 2 (1%) were affirmative false exclusions, and 9 (4.7%) were inconclusive. On the harder problems (Q4 and Q5), however, document examiners gave 96 responses, of which 39 (40.6%) were correct or substantially correct, nine (9.4%) were incorrect and 48 (50%) were inconclusive. Of the 48 answers reflecting firm conclusions on the harder problems, 19% were wrong, and of the 96 responses, only 41% were affirmatively right. The examiners did very well (but not perfectly) on the easy questions and substantially less well on the more difficult questions. And, as usual, there was no administration to a control group of non-experts to attempt to find out the relative performance advantage, if any, of experts over non-experts.

## § 35:25 Areas of disagreement: Testing document examiner expertise—Forensic Sciences Foundation proficiency tests: 1988–1989—The 1989 test

If document examiners might find some comfort in the 1988 results, at least as to the easier tasks, the 1989 results were less comforting. The test was designed to see how well examiners deal with adolescent handwriting. The participating labs were asked to assume that during the final week of the school year, a high school teacher found the tires on her car slashed in the school parking lot. A handwritten note was found on the windshield. The teacher reported the matter to her principal, who in turn notified the police. On advice of the police, the teacher searched exam papers of her students and identified five students whose writing she thought similar to the threatening note. The principal refused, however, to release these exam papers to the police. The police therefore advised the teacher to ask those students to write the contents of the note to dictation five times on separate sheets of paper. Unfortunately, the instructions were misunderstood, and the writings of each student were made on only one sheet of paper. The students have since dispersed for the summer and are not available to provide additional writings. Along with these facts, the labs were provided with photographs of the note (Q) and the exemplars from the five students (K1–K5), and asked to determine if Q was written by any of the writers of K1–K5.

The questioned document and the five exemplars had been generated in the following way: The questioned document had been written by a 15–year-old female tenth grader. Sixteen other tenth grade students ages 14–16 were asked to write exemplar sheets, and the five appearing closest to the questioned document in the opinion of the testers were used as the exemplars. Three points must be made. Sixteen people is a small set from which to hope to get five confusingly similar handwritings. We are not told if the person who selected the five exemplars claimed any expertise. And none of the people who wrote the exemplars wrote the threatening note.

The test materials were submitted to 72 labs of which 53 returned the answer sheets. Of those, 13 labs answered "inconclusive" to every exemplar, and one answered "other" with no specific explanation. Of the 39 remaining labs which offered an opinion actually including or excluding anybody, 16 misidentified one of the writers of the exemplars as the culprit. (Three more leaned that way). That's 41%

Case 3:09-cv-03064-MWB-LTS Document 284-7 Filed 06/23/11 Page 175 of 263

SAK000175

§ 35:25

<mark>false positives.</mark>[1]

### § 35:26 Areas of disagreement: Testing document examiner expertise— The Galbraith administration of the 1987 FSF test to non-experts

The Galbraiths obtained copies of the 1987 FSF handwriting test materials, and administered them twice, first to a group of 32 varied non-experts who received the materials in photocopy form, and then (much later) to a group of 33 who were given photographs of the materials. There are some methodological questions about the administration of these tests. We are told neither about the exam conditions, the time allotted, nor the instructions given to the non-experts tested. We do not know if they were administered in a way designed to prevent potential cuing. Further, it is likely that the non-expert test-takers suffered from problems of varying motivation, which are discussed in more detail in regard to the Kam et al. study, below. In addition, it seems possible that the non-experts were less likely to feel free to hedge their bets with some sort of inconclusive answer, perhaps not regarding such an answer as acceptable in the same way professional document examiners might regard it as acceptable.[1]

However, taking the data at face value, some interesting details emerge. First, even the lay people did significantly better than chance.[2] Second, if the FSF classification is utilized, <mark>the performance of the non-experts and the experts is virtually identical for true positives</mark> (17 out of 33 for the "experts," 16 out of 32 and 17 out of 33 for the two groups of non-experts). <mark>However, the non-experts were significantly worse when it came to false positives</mark> (34%, versus none for the document examiners). Finally, if we accept the Galbraith reclassification (and exclusion), document examiners significantly outperformed lay persons as a group (91% correct, no false positives, 3% false negatives; against 58% correct, 34% false positives, 8% false negatives). While these two limited and non-comparable administrations of these test materials cannot establish anything with any certainty, they seem to suggest that, at least as to the easiest tasks of handwriting comparison, the experts may have an approach which guarded against affirmative errors. The experts were no more affirmatively accurate than about half the "non-expert" population, but they were significantly less inaccurate than the other half. Any more confident conclusion as to whether this advantage truly exists, and whether it exists in relation to other more difficult tasks, must await further research.

### § 35:27 Areas of disagreement: Testing document examiner expertise— The studies by Kam and associates

---

**[Section 35:25]**

[1]Or 49% using the Galbraith methodology of including leaders. A strong defender of handwriting experts might say that this is the wrong way to look at the data. Each decision as to each exemplar should be treated as a separate judgment. Thus, the 39 responding labs made 195 judgements of inclusion or exclusion, of which only 16 were wrong. However, a strong critic could counter by saying two things: first, the judgements are clearly not independent. The more you are sure one wrote the note, the more you are sure the other four did not. Second, the important thing in an expertise is not absence of errors, for then a refusal to answer would be counted as establishing the existence of the expertise. The important thing is how often one makes a judgment which is wholly correct when given the opportunity. In this case, 72 labs were given the opportunity, and only 23 unambiguously did the job right. Of these various ways to view the data, we will stick to the position that ours is most meaningful, since it emphasizes the percentage of experts whose responses could lead to court testimony and who would then give mistaken inculpatory testimony: 41%.

**[Section 35:26]**

[1]This may reflect the instructions, or absence of instructions, on this issue.

[2]Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners at 11 (1995)..

80

SAK000176

**Research References**

Denbeaux and Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15 (2003)

Imwinkelreid, Flawed Expert Testimony: Striking the Right Balance in Admissibility Standards, 18-SPG Crim. Just. 28 (Spring 2003)

Risinger and Saks, Rationality, Research and Leviathan: Law Enforcement-Sponsored Research and the Criminal Process, 2003 Mich. St. L. Rev 1023 (Winter 2003)

In this section we begin examination of the studies undertaken by Dr. Moshe Kam and his colleagues under various FBI grants. But a word of caution as we start. Circumstances overtake us all, and if my interpretation of *Kumho Tire* is accurate, all but one of these studies have been rendered only tangentially relevant. That is because Kam I and Kam II were purposely designed to test aggregate global skills, and not to allow isolation of, much less identification of, subtasks such as identifying the handwriting of the foreign-born, adolescent handwriting, the handwriting of the aged and infirm, and so on, and Kam III was based on a readministration of Kam II. Only Kam IV is designed to test something that might be a "task at hand" in an actual case, (determination of signature authenticity). In addition, it must be emphasized that none of these studies address that most recurrent and controversial asserted skill, the ability to assign authorship based on extremely limited amounts of writing, in various contexts. With this in mind, we turn to Kam I.

### § 35:28 Areas of disagreement: Testing document examiner expertise—The studies by Kam and associates—Kam, Wetstein & Conn (1994) ("Kam I")

Under a research contract with the FBI, Kam, Wetstein and Conn designed a test intended to determine whether some professional document examiners had handwriting identification skills significantly better than those of non-experts.[1] Forty-five Drexel University undergraduates copied five test samples on to five sheets of paper. Thirteen of them copied one or another of the samples an extra time. All used their normal handwriting. Fourteen of the students wrote with whatever they had brought with them. Eighteen of the students wrote with medium point Bic pens supplied by the researchers. Thirteen students "randomly swapped pens with each other" between writings, but we are not told what the original source and type of their pens were.[2] This procedure resulted in 238 documents, from which 86 documents were randomly selected as the test materials. These randomly selected 86 documents represented the work of exactly 20 writers. These 86 were then tagged with a "non-trivial" code which would allow the holder of the code to connect each document to a particular writer.

The test consisted of handing each person taking the test the 86 documents and telling them to go into a room with a table and sort them into piles representing the work of a single writer per pile. Test subjects were not told how many writers were represented in the 86 documents, and no time limits were imposed on them. There were two groups of test subjects: seven FBI document examiners (presumably chosen by the FBI to take the test) who were administered the test in Washington, D.C. by

---

**[Section 35:28]**

[1]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 7–8 (1994). All the test design information is on these two pages.

[2]It is unclear why all were not simply supplied with medium Bics from the beginning. This variation in ink or pencil types introduced a variable into the study's design having unknown impact and no apparent relevance to the issue of identification from form. For example, it may have created a distraction which the non-experts were more susceptible to, leading to inflated differences in scores between experts and non-experts.

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 177 of 263

SAK000177

being handed the materials and given the instructions by one of their own supervisors; and 10 graduate students in the Drexel graduate engineering and MBA programs who were selected in an unspecified manner to participate, and who had the test materials administered to them by their "supervisors" (whatever this may mean in the context of graduate students).[3]

A perfect performance on the test would yield 20 piles, each containing from one to six documents. Each pile would contain all the documents written by a single writer and only the documents written by that writer. There were two possible types of error: a participant could put a document in a new pile when there was already a pile for that author's work. This type of error the authors called over-refinement—making distinctions that were not there.[4] Or a participant could put a document in a pile containing the work of another author. This type of error the authors called under-refinement—failing to make a distinction that should have been made.[5] Of the two, the authors observed that under-refinement errors were perhaps "more significant, since they represent a confusion between two writers," that is, they create the risk of false positives, as opposed to the risk of false negatives resulting from over-refinement.[6]

Since the test materials were not reproduced, we have no first hand way of judging whether this sorting test was inherently easy or difficult. However, since the samples were generated with no attempt to apply any standards of pictorial similarity, it would seem to be like matching photos of 20 randomly selected humans of all races and sexes: that is, many of the subtask matches would seem likely to have presented trivial challenges. In addition, as previously noted, the harder tasks are subject to confusion by virtue of the effect of the uncontrolled variable of writing instrument variation. Differences in result between two test-takers may actually reflect different assumptions concerning the test structure and the meaning assigned to writing instrument variation. In addition, we also do not know what relationship there is between the skills necessary for this test and the skills brought to bear in real-life document examination tasks, since document examiners are not called upon to do this kind of sorting task in their ordinary work. However, the ability to accurately perceive diagnostic patterns of similarity and difference in the writing represented by the test materials would seem likely to be common to both the test and to many kinds of real-life problems. At any rate, both test groups took the same test and the object was to see if there were differences in performance between the two, at least as to this test, for whatever reason.

The results obtained by the FBI document examiners are so good that one is tempted to conclude that the task was globally an easy one, especially given the differences in performance between easy and hard tasks which seem to be shown in the FSF studies. It may also be that the seven examiners selected to take the tests by the FBI were otherwise reputed to be the best in their employ. Nevertheless, taken at face value, their performance was impressive: five of the seven were perfect and the other two had only two errors each, one making one extra pile and having

---

[3]The form of test administration was selected to impress upon the participants "the importance that their respective institutions attach to these experiments." We suspect that the FBI document examiners were more impressed with this message than the graduate students.

[4]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 8 (1994).

[5]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 8 (1994).

[6]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 9 (1994).

82

one incorrect inclusion, and the other making two extra piles.[7]

It is also true that the performance of the non-expert test-takers was, in the aggregate, clearly inferior to that of the FBI document examiners. However, there is another uncontrolled variable which may account for much of the difference: test-taker motivation. Clearly, knowing the growing controversy over the bare existence of any such expertise, the FBI document examiners realized that the foundation of their careers may have been at stake when they took the test. The graduate students had nothing at stake beyond some varying individual notions of personal pride at doing the best job they could, if that.[8] In line with this, the striking thing about the performance of the graduate student group was its extreme bimodality. Four of the 10 made only between nine and 14 total errors, averaging 11, which were mainly errors of over-refinement (too many piles, one person's writing counted as two persons' writing).[9] Additionally, half of the graduate students made only 2 or 3 errors of under-refinement, assigning the authorship of a document to the wrong person, and one of the FBI examiners made one such error.[10] If the top 40% of non-experts represented the properly motivated performance of non-experts, the differences in performance between the experts and non-experts, while perhaps statistically significant, is less significant in practical terms.

At the other end of the performance scale, the bottom 40% of the graduate student group made between 31 and 45 errors, averaging 38.5.[11] One person made 21 extra piles (41 total piles) and then assigned 24 of the remaining 45 documents to the wrong piles. Another made a total of 58 piles (38 extra) and assigned 6 of the remaining 28 to wrong piles. (One suspects that there was a subset of 21 or 22 documents in the set of test materials which could have been given to almost anyone as a virtually unfailable test.)

A note on the method of administering the test to the FBI agents: First, we know that the tests were administered "in Washington, D.C." and that they were "administered through the agents' supervisors." But we do not know from the published record exactly what this means. Certain obvious questions concerning the method of administering the test to the FBI agents present themselves. Were the test materials sent to Washington and kept there during the period necessary for

---

[7]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 10 (1994).

[8]It would be interesting to know how much time was actually spent doing the tests by the members of each group, since there were no imposed time limits, but those data are not provided and, indeed, were not kept. In his phone conversation with one of the editors, Professor Kam indicated that he was present for each of the graduate student runs, and that all expended some hours on the task. However, according to Professor Kam, the test was designed after enquiry to document examiners concerning their notions of how long tasks take, to be a full working day's project for a document examiner, so there is some mild reason to believe that the document examiners spent significantly more time than the graduate students on the task, but there are no actual data to that effect.

One can argue that it is exactly the difference in motivation to expend time examining and comparing details of questioned writings and known exemplars that justifies the admission of

document examiner testimony, since the lay jury is not likely to spend the time analyzing the material assuredly necessary for peak performance even if they could perform as well as document examiners if they spent the time. This is an interesting notion, analogous to the rationale for allowing testimony regarding summaries of voluminous material. Cf. Fed. R. Evid. 1006. How this fits in with our usual notions of expertise is not clear. At this juncture there is insufficient information on the contours of both lay and document examiner accuracy to justify rethinking the role of or justification for allowing such expertise.

[9]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. (1994)

[10]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. (1994)

[11]Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. (1994)

83

the seven test runs, without the presence of a representative of Kam et al.? If so, this might severely undermine the validity of the results, raising as it does the distinct possibility of collaboration by substantially interested parties uncommitted to the standards of academic science. Further, while we are told that the test subjects were told nothing about the characteristics of the test materials and how they were generated, we are not told if their supervisors or others in the FBI were given such information. After all, the test was developed pursuant to an FBI contract with Professor Kam to study the methods of handwriting experts with an eye to developing a computerized scanner which could perform this work as a screening tool. If people in the FBI had information about the characteristics of the test materials, the possibility of intentional or unintentional disclosures cannot be ignored. Finally, there is the matter of the "non-trivial code" with which the test materials were inscribed, which allowed them to be matched later for statistical analysis. If it consisted merely of a randomly generated number which matched an identification key kept at all times by the researchers in Philadelphia, fine. However, if to make their computer work easier they embedded the identification information in the code itself, the entire test was compromised if the materials were sent to the FBI without researcher proctoring.

One of the editors contacted Professor Kam, who graciously filled in many of the missing details.[12] Professor Kam told us that no one in the FBI was given any information on the characteristics of the database from which the test materials were drawn, or on how they were selected. It was true that the tests were administered in Washington by sending the materials to an FBI contact after giving him instructions on how to administer the test. He was to administer the test to one agent, then return the results of the sorting to Professor Kam for scoring. Further, as to the code, it did consist of a randomly generated number, and to guard against those who had already taken the test sharing any useful tips with those who had not, the coding to the 86 papers was changed each time they were sent to Washington for administration. However, since there was nothing in the actual design of the test which would insure that the test materials were not photocopied the first time they were sent to the FBI by someone who gained access to them during the substantial time they were available for the first administration of the test, collaboration on the test by the FBI document examiners cannot be procedurally ruled out. On the other hand, the performance of the FBI document examiners was remarkable even if there was collaboration, though the results under those circumstances would be attributable only to the group, or to the best performer in the group.[13]

Where does this leave us? If the level of graduate student performance and its

---

[12]Telephone interview by Michael J. Saks (Autumn, 1994).

[13]Before speaking to Professor Kam, we thought that there was some reason to believe that the test administration was over-supervised, not under-supervised. In 1993, Agent Richard Williams testified in a proceeding in San Francisco that he was one of the test subjects, and that during the administration of the tests he was surrounded by people in white coats with clipboards asking him questions about what was going through his mind as he did the test. See *In Matter of Extradition of Smyth*, 826 F. Supp. 316, transcript at 127 (N.D. Cal. 1993), rev'd on other grounds, 61 F.3d 711 (9th Cir. 1995), opinion amended, 73 F.3d 887 (9th Cir. 1995). He referred to the test as a "quick and dirty" sorting. *Williams testimony, In Matter of Requested Extradi-*

*tion of Smyth*, 826 F.Supp. 316 (N.D.Cal.1993), transcript at 125. If the tests were conducted in this way, they would appear not to have been double blind, and the phenomenon of "Clever Hans" cuing (named after the famous German horse that was thought capable of solving arithmetic problems until he was tested under careful procedures which prevented subtle cues from reaching him) cannot be ruled out. However, at the time of his testimony Williams was trying to diminish the significance of the fact that *any* mistakes had been made by the professionals. In addition, he may not actually have been one of the 7 test subjects (though he insistently testified that he was, *Williams testimony, In Matter of Requested Extradition of Smyth*, 826 F.Supp. 316 (N.D.Cal.1993), transcript at 127) but merely one of those document examiners "interviewed at length after the testing" to try to determine the

84

<mark>variation are the product of motivational differences and the artifactual impact of the writing instruments, the data could no longer be taken to support a marginal performance advantage in the experts. These artifacts cannot be ruled out as insignificant.</mark> Kam III was an effort to examine this issue, but does not lay it to rest (see infra at § 28:30) If the variations mirror reality, then we potentially have an even stranger situation (but it is also consistent with the results of the Galbraith study). It may be that average people have a wide range of knacks, ranging from good to poor. It may be that, at least as to easy tasks, the expert is a lot better than half the non-experts but not much better than the other half. (This might simply result from people in the half of the non-expert population with the knack comprising most of those drawn to the work of document examination in the first place.) In the face of harder tasks, there is reason to believe tentatively that the marginal advantage may break down. What should be the law's response to a situation like that? The law is not well equipped to put such a situation into its usual paradigm, which assumes a substantial skill break between all members of the expert group and the overwhelming majority of the randomly selected population.

### § 35:29 Areas of disagreement: Testing document examiner expertise—The studies by Kam and associates—<mark>Kam, Fielding & Conn (1997) ("Kam II")</mark>

Between the beginning of May and the end of September 1996, Kam, Fielding and Conn administered a test of their own design to three groups of about 35 questioned document examiners each, a group of eight document examiner trainees, and a group of 41 untrained non-experts.[1]

Before we look at the published results of these tests, let us examine the test

-------

mental processes behind document examiner performance. See Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. at 13 (1994). It seems very likely that these interviews were conducted around an examination of the test materials, and that this is what Williams was involved in, not an actual run of the test itself. Williams' testimony does give rise to questions concerning the way these materials are presented to courts by document examiner witnesses, and the lengths to which they may go to bend the meaning of the tests in a desired direction.

**[Section 35:29]**

[1]All details of the Kam II test procedures are drawn from pages 779–781 of that eight-page article, §§ 28:14 to 28:38. Because the material is so short, specific footnote references to page are omitted as unnecessary and burdensome to the reader.

The test materials were generated as follows: 150 persons, ages 20 to 27, were selected by an unknown protocol to provide writing samples and they agreed to do so. Each writer worked on a wide and well lit table in a classroom setting. Each writer generated 12 documents on $8\frac{1}{2} \times 11$ in. 20 lb. white paper, copying three short assigned texts four times each. Each used pens supplied by the test designers. All writers were given both blue medium Bic pens and black medium Bic pens, and told to use both colors,

switching "every 2–3 documents," so each writer created both blue and black documents in no exact fixed ratio or order. This resulted in 1800 documents, four each of three texts by 150 writers. Thirty of those writers were then selected (presumably at random) and all the documents generated by those 30 (360 documents) were placed in a set. These documents were then random number coded for writer identity. Random documents were then drawn from the set of 360 until 6 documents by 6 different writers was obtained—that is, after drawing the first document, if the second document was by the same writer, it was returned to the pool and another was drawn, and so forth, until a set of 6 documents by 6 different writers was obtained, which documents could represent randomly any text and either color ink. This set of 6 was then labeled "Unknown A1". The same process was repeated until 12 such sets were obtained (Unknowns A1 . . . A12) which together contained 72 documents in 12 sets of 6 each, each of the six by a different writer in each set. The remaining 288 documents were then randomly distributed into 12 sets referred to as "database packages" (database A1 . . . A12), each containing 24 random documents. The use of the label "unknown" was somewhat problematical. Among document examiners, "unknown" is the label given to a document of unknown authorship to be compared with standards of known authorship. In the Kam II test, none of the documents in either the "unknown" sets or the "database" sets were unknowns in this sense. They were in fact func-

Case 3:09-cv-03064-MWB-LTS Document 284-7 Filed 06/23/11 Page 181 of 263

SAK000181

design, and the limits of what we might expect that it can and cannot tell us. First, like Kam I, this is a multi-document sorting test of a type encountered rarely if at all in actual practice.[2] This is not to say the results are meaningless. As noted elsewhere in regard to the similar characteristics of Kam I, "the ability to accurately perceive diagnostic patterns of similarity and difference in the writing represented by the test materials would likely be common to both the test and to many kinds of real-life problems."[3] It is merely to caution against simple extrapolation to actual practice without further thought.

Second, there are problems of motivation. Professional document examiners would be expected to put in more focused effort, given that their careers (and the fate of their profession) are in some sense on the line, than would students. This was a serious problem with Kam I.[4] However, in Kam II, the designers have made a commendable attempt to correct for this by offering the non-experts a schedule of monetary rewards and penalties. Unhappily, the schedule of rewards and penalties utilized was particularly unfortunate and problematical. The non-experts were told that they would receive a $25 participation fee, and that their payment would not go below this regardless of actual performance. They were then told they would receive an additional $25 for each true positive match, that they would lose $25 for each false positive match, that they would lose $10 for failing to see a true match, and that they would gain nothing for accurately rejecting a non-match. This payoff

---

tionally the same from that perspective: both sets were known to the testers and unknown to the test-takers. The test was thus the same kind of sorting test involved in Kam I. A similar process was undertaken with the remaining documents not in set A, generating a set B. with the same subset characteristics, and so on for set C, until there were five such universes, A–E, containing twelve 6-document "Unknown" sets each and twelve 24-document "database" sets each. Each test participant was tested by randomly selecting a Universe A–E, then within that Universe randomly selecting an "unknown" set from the 12, and randomly selecting a "database" set from the 12, explaining to the test subject that the "unknown" sets contained 6 writings by 6 different writers without disguise, and asking the test participant to determine whether any document or documents in the "database" set of 24 were written by any writer represented in the "unknown" set. Here we have a problem in figuring out the limiting conditions of the sets so generated. This is because the report of the study is a bit hazy on this point. It is inexplicit whether, once "Unknown A1" was generated, the writers there represented were removed, so that set A2 would have six writers who were different from each other and also all different from the ones in set A1, or whether the process was simply repeated on all the *documents* remaining after the generation of set A1, in which case set A2 could, in theory, contain the exact same writers as A1. It appears that the latter must be the case, because with 12 sets of 4, one would need 48 writers to have no overlaps, and there were only 30 writers in the pool. But in that case, it is possible (though unlikely) that each set A1 thru A12 represented exactly the same 6 writers, since each writer had generated 12 documents. Similarly, in regard to the "database" sets, in the event of the distribution just described,

a fortiori, no "database" set would, or could, contain a document truly matching one in an "unknown" set. This theoretical (and very remote) possibility is only important to understand the real meaning of the first three tables in the Kam II report. These tables are obviously descriptive of the distribution of matches in the actual tests as given to the participants, not of the probability of such matches resulting from the distribution process described above. Thus, while there is a statistical probability that some test might be administered which had no true matches, in the 154 tests actually run there was always at least one true positive match. Similarly, at the other extreme, though there is a remote possibility of as high as 18 true matches, in the actual 154 tests administered there were never more than 10.

[2]Kam states that the "format was selected to resemble a multi-suspect case in which extensive examination of documents was required," Kam II at 780, but in fact, because there were multiple documents in each comparison set, none of which were known as to origin by the examiner, it resembles no real case. Perhaps it would be better if real cases were presented to examiners in this blind a fashion, but they are not. See D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. 21, 64 (1996).

[3]D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. at 60 (1996).

[4]D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. at 61 (1996).

86

SAK000182

schedule can be schematically represented by Table 2.

**Table 2**
**The Payoff Matrix Used in Kam II for Non-experts**

|  |  | Reality | |
| --- | --- | --- | --- |
|  |  | Match | Non-Match |
| Decision | Match | True Positive +25 (Very Good) | False Positive -25 (Very Bad) |
|  | Non-Match | False Negative -10 (Bad) | True Negative 0 (Indifferent) |

Under this regime, if their objective was to maximize their payoff, the non-experts would guess a match whenever it appeared to them to be as likely as a non-match. This is because, over the long run, it would appear that such a strategy would at least break even, whereas guessing "no match" on such an evaluation would lose an average $5 per guess over the long run. Plus, there was no real incentive to avoid false positives for fear of actually losing something they already had at the beginning of the test, because they were guaranteed their starting $25 no matter how bad their performance. This reward schedule seems guaranteed to make the non-experts risk-preferring regarding finding matches, even in the face of instructions that they should declare a match only if they were really, really sure. This effect is on top of the well-known tendency for a most people to become risk preferring in circumstances of potential high rewards and low costs, regardless of rational odds (sometimes referred to as the "lottery effect").[5]

In contrast to this, the document examiners entered the test under quite a different effective payoff schedule. For one thing, they knew that the worst thing they can do on any proficiency test is to commit a false positive error.[6] (This risk averseness to false positives on known tests is not necessarily present in normal practice.[7]) Secondly, for the document examiners, a correct discovery of a non-match is also a

---

[5]Daniel Kahneman & Amos Tversky, Prospect Theory: Analysis of Decision Under Risk, 47 Econometrica 263 (1979); Lola L. Lopes, Remodeling Risk Aversion, in Acting under Uncertainty: Multidisciplinary Conceptions 267 (George M. von Furstenberg ed., 1990); Lola L. Lopes, When Time is of the Essence: Averaging, Aspiration and the Short Run, 65 Org. Berhavior & Human Decision Processes 179 (1996); Amos Tversky & Daniel Kahneman, Advances in Prospect Theory: Cumulative Representation of Uncertainty, 5 J. Risk & Uncertainty 297 (1992).

[6]See Andre Moenssens, Handwriting Identification Evidence in the Post-*Daubert* World, 66 UMKC L. Rev. at 315 (1998). This is because such a false positive in the real world can result in the conviction of an innocent criminal defendant, a result the official ideology of our criminal justice system disvalues much more than an inaccurate acquittal, as reflected in the requirement of proof beyond a reasonable doubt. Thus, to commit such an error on a proficiency test undermines the status of the expertise in the eyes of the law, and

must be avoided at all costs *in tests*.

[7]Whether false positives must be as stringently avoided in actual practice is a different issue. It cannot be stated too often that any superiority on the part of document examiners under test conditions will not necessarily carry over to practice, where the pressures on document examiners, as on other forensic practitioners, are to make matches that confirm positions already arrived at by other investigators, a fact recognized by Moenssens. Consider the following: "[E]ven where crime laboratories do employ qualified scientists, these individuals may be so imbued with pro-police bias that they are willing to circumvent true scientific investigation methods for the sake of 'making their points' . . . . Unfortunately, this attitude is even more prevalent among some 'technicians' (nonscientists) in the crime laboratories, for whom the presumption of innocence disappears as soon as police investigative methods focus on a likely suspect." Andre Moenssens, Novel Scientific Evidence in Civil and Criminal Cases: Some Words of Caution, 84 J.

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 183 of 263
SAK000183

highly desirable indicator of affirmative expertise. The incentive matrix for document examiners taking the Kam II test might be represented as in Table 3:

**Table 3**
**The Implicit Payoff Matrix in Kam II for Experts**

| | | Reality | |
|---|---|---|---|
| | | Match | Non-Match |
| Decision | Match | True Positive (Very Good) | False Positive (Extremely Bad) |
| | Non-Match | False Negative (Bad) | True Negative (Good) |

Thus, in a situation of equipoise, the reward structure would impel experts toward declaring a non-match, and the non-experts toward declaring a match. Hence, the non-experts and the experts took the tests under incentive structures which would be predictably expected to yield more false positives for the non-experts[8] even under equally accurate probability judgements about authorship.[9]

Third, and somewhat unaccountably, is the "ink color" variable. This problem was also present in Kam I. Why the writers of the exemplars were asked to use two different color inks is not at all clear, and the effects on the results, or on the aggregate results between groups, cannot be assumed a priori to be trivial. As noted elsewhere, this "introduced a variable into the study's design having unknown impact and no apparent relevance to the issue of identification from form."[10] Nevertheless, this is probably best regarded as simply another subtask variable of the variety inevitably present in the tests as designed, for reasons explained below.[11]

Fourth, passing beyond ink color to a much more serious problem, once again

---

Crim. L. & Criminology 1, 5 (1993). And further: "The temptation to fabricate or to exaggerate certainly exists. All experts are tempted, many times during their careers, to report positive results when their inquiries come up inconclusive, or indeed to report a negative result as a positive when all other investigative leads seem to point to the same individual. Experts can feel secure in the belief that their indiscretions will probably never come to light." Andre Moenssens, Novel Scientific Evidence in Civil and Criminal Cases: Some Words of Caution, 84 J. Crim. L. & Criminology 1, 17 (1993).

[8]To correct for this, future tests should impose high disincentives on the non-experts for false positive responses, substantially higher than the reward for true positives, and equalize the value of true negatives and false negatives (missed matches).

Scientists who study decision-making of the sort done by forensic scientists, an area of research called "Signal Detection Theory," have developed ways of measuring the raw acuity of examiners separate from the subjective threshold that an observation must cross in order for examiners to decide that what they have observed is a subma-

rine or a tumor or a handwriting "match." Such research has found that incentives for preferring to err in one way (a false negative: failing to detect a tumor) rather than another (a false positive: seeing a tumor where none is) typically have considerable impact on where the psychological threshold is placed, regardless of the raw perceptual accuracy of the examiner. See John A. Swets, The Science of Choosing the Right Decision Threshold in High-Stakes Diagnostics, 47 Am. Psychologist 522 (1992); Victoria Phillips, Michael J. Saks & Joseph Peterson, Signal Detection Theory and Decision-making in Forensic Science, 46 J. Forensic Sciences 294 (2001).

[9]Kam III administered the Kam II test materials to four sets of laypersons under four different incentive schemes in an attempt to meet these criticisms. See discussion of Kam III, § 28:30.

[10]See D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: *Daubert* Meets Handwriting Identification Expertise, 82 Iowa L. Rev. 21, 64 n. 142 (1996).

[11]See the discussion under our fifth consideration.

SAK000184

Kam et al. have apparently created the possibility that the document examiners, or some of them, had helpful information about the test in advance of its administration,[12] because apparently the earlier document examiner test subjects got to go over the results of their tests at some point before the next document examiner groups were tested.[13] Kam says he protected against this having any effect by making sure that no pairing of a set of "unknowns" and a set of "data base" documents was ever used twice. However, it should be obvious by now that quite a lot of useful test design information might be gleaned in such a debriefing session. For instance, if you know how the data base was generated, you can figure out pretty quickly how rich or poor in true matches the tests are likely to be, that is, what the rough probabilities are of maximum and minimum numbers of true positives, information not available to the non-experts, who might be expected to assume a universe much richer in matches, which might encourage guessing. And note that, while the document examiners were divided into three regional groups for statistical purposes, the members of at least the Northeast group were tested in at least two different subgroups at two different times, with their results being aggregated statistically. It seems especially unnecessary to have run the tests in such a way as to create this problem, since all that was necessary was to collect all the data before conducting any post-mortems.

Fifth, and finally, the actual tests presented an unknown variety of subtasks in an unknown distribution. In addition, some important varieties of subtask were clearly absent from the test, and as to those, the test can generate no direct data of any kind. Like the Kam I universe of writing exemplars, the much larger and more controlled universe generated for Kam II was generated with no attempt at isolating subtasks (comparing two exemplars with similar but unusual "class characteristics," for instance, such as the handwriting of two German immigrants of similar age and sex). Any given such subtask *might* have been present somewhere in some run of the test, but we don't know which were, which weren't, or when. This is not necessarily a criticism, but it must be kept in mind when determining what the test can tell us. Each test was a little different, presenting a different set of challenges, and the most that can be said is that the challenges are likely to be typical of a certain range of comparison situations. They are also unlikely to mirror those encountered in litigation. This is because many of the subtask problems are likely to be trivial, like distinguishing between two randomly selected humans of all races and sexes, since the exemplars were generated with no apparent attempt to make the set of materials richer in confusingly similar exemplars than random life would be.[14] Most importantly, some very critical subtasks were not under test at all, such as the effects of forgery or disguise, the particular problems of signatures or adolescent handwriting, or those of the elderly or infirm, or the like. However, with these limitations in mind, and within the range of aggregate subtasks present in the

---

[12]See the discussion, § 28:28, of this problem in regard to Kam I, which renders it impossible to know if individual performances are in fact group performances in regard to the document examiners tested.

[13]It is not fully explicit that this was the case. What Kam says is, because "unknown" and "database" pairings were never repeated "(e)ven if correct results from an early test were fully known to all test-takers in a later session, this information was practically useless. We do not believe that any attempt was made to record or share results from our tests between test-takers. However, if such attempts were made, they could not affect the results in a meaningful way." Kam II at

779. We take this to mean that results were provided the test-takers at some point in advance of the next group of tests. (In order to make sure this was what happened, repeated attempts have been made to obtain explicit clarification from Dr. Kam, both by e-mail and by regular mail, but Dr. Kam has not responded. Under the circumstances we proceed on the assumption that what was written was what happened.) This is one more illustration of the hidden pitfalls of human testing that may not be immediately apparent to a researcher more accustomed to computer modeling.

[14]See the discussion, § 28:28, of the same problem in regard to Kam I.

89

tests, the tests can generate important data, and would be expected to generate the following types of data:

- the aggregate performance of the professional document examiner group as to true positives, false positives, true negatives and false negatives
- the aggregate performance of each subgroup of professional document examiners as to the same categories of result
- the aggregate performance of the trainee group as to the same categories of result
- the aggregate performance of the non-expert group as to the same categories of result
- the distribution of performances among the professional document examiner group (best score, worst score, distribution in between, as to all categories of result)
- same for subgroups
- same for trainees
- same for non-experts

Indeed, these data are so important that, with a small domain like 154 tests, one might expect to see a frequency distribution, or even a data table giving each taker's (unidentified by name) individual scores, as was done in Kam I. In the Kam II report, however, all that is given is aggregate performance of groups, and that only in numerical averages. There is no distribution information given at all, even in the form of standard deviation values. It's not that this information does not exist or was not available to Kam et al. It just is not given. Important information is hidden (unintentionally or otherwise) behind the few aggregate statistics provided.[15]

The reader will have seen by now why Kam's conclusion that the results of Kam

---

[15]Think of what this means. We do not know how well the best lay people performed, or how poorly the worst document examiners performed. Kam et al. know, but no one else does. Even the aggregate data establish that there is no significant difference in average performance in regard to true positives. (Note that the proper conclusion is "no significant difference," not "accept" the null hypothesis as Kam et al. mistakenly conclude in Kam II (tables 10, 11, 13, 15, and accompanying text). A null hypothesis is only a starting point. Based on evidence, it can be rejected. But the failure to reject it as false is not the equivalent of "accepting" it as true.) In this particular study it is in regard only to false positives, the most dangerous type of error, that document examiners have a significant aggregate advantage. However, without distribution information, we do not know if, for instance, the best half of the non-experts is as good or better at avoiding false positives as the worst half of the document examiners. Averages can conceal important variations.

This is not as farfetched as it might sound. The data from the Galbraith study and from Kam I tended to indicate that non-experts were bimodal in their accuracy distribution, including false positives. If that trend were to hold in Kam II, the best of the non-experts could still be better than the worst of the experts, but the average for non-experts would be dragged down by the truly poor performance of the worst of the non-experts. Similarly, the high average for document examin-

ers could conceal a cluster of very poor performers on the low end. We are well aware that the test design, which resulted in each test administered being different from every other, and each test participant therefore taking a somewhat different test, makes statements about comparative individual performance problematical, absent some way to rate the relative difficulty of particular tests. Nevertheless, other moments of performance distributions have as much claim to meaning from these data as the one Dr. Kam chose to publish, and cannot be derived without the data. These data exist but were not published. What is worse, Dr. Kam was repeatedly requested to provide it to us and others, and repeatedly refused. For details, see D. Michael Risinger, Mark P. Denbeaux & Michael J. Saks, Brave New "Post-*Daubert* World"—A Reply to Professor Moenssens, 29 Seton Hall L. Rev. at 431–33 (1998). Finally, pursuant to an agreement, and consistent with general federal policy on data produced under federal contracts, Professor Kam and the FBI agreed to disclose the data to Dr. Michael Saks (March 28, 2000), but more than a year later, and after several reminders to send the data, the FBI explicitly reneged on its promise. Under such circumstances, one can be forgiven for suspecting that the distribution data would show bimodality for the performance of the non-experts and poor performance by a significant cluster of document examiners.

90

II "lay to rest the debate over whether or not the professional document examiners possess writer-identification skills absent in the general population" is more than a small exaggeration. A more proper conclusion would be that under test conditions not replicating actual practice in significant ways, and as to an undefined range of subtasks not including many of the most important ones of actual forensic practice, the aggregate average performance of document examiners in correctly identifying actual matches was virtually identical to layperson (layperson correctly matched authors 87.5% of the time, compared to 87.1% for experts), but document examiners were better at avoiding false positives than non-experts (layperson mistook a non-match for a match 38.3% of the time compared to 6.5% for experts), and the latter findings may be an artifact of the varying incentive and disincentive regimes applying to the two groups, perhaps compounded by other factors. More importantly, there is nothing to show that this relative advantage when performing on what is known to be a test, even if real, is robust enough to continue in the face of expectancy and suggestion effects (properly) excluded from the test, but present in normal practice. Only tests specifically directed toward this issue, or a regime of blind proficiency testing, can answer this.

### § 35:30 Areas of disagreement: Testing document examiner expertise— The studies by Kam and associates—Kam, Fielding & Conn (1998) ("Kam III")

Responding to criticisms concerning the confounding effect of the monetary incentives given to lay test subjects in Kam II, Kam, Fielding and Conn administered the Kam II test to four groups of 32–34 Drexel University College of Engineering sophomores, 87% of whom were receiving financial aid (and therefore might arguably respond sensitively to changes in monetary incentives.). One group repeated the Kam II test with its original reward scheme intact, that is, the subject was guaranteed $25 for participation, and beyond that, correct matches gained $25, inaccurate declarations of match lost $25, failure to declare a match when one was present lost $10, and accurately declaring a non-match neither gained or lost (see extensive description and criticism supra at § 28:29). The other three groups each took the test under different incentive schemes, which were as follows:

> Group 2: correct matches gained $25, inaccurate declarations of match lost $25, failure to declare a match when one was present lost $25, accurate declaration of a non-match neither gained nor lost. $25 minimum participation fee guaranteed.

> Group 3: correct matches gained $25, inaccurate declarations of match lost $50, failure to declare a match when one was present lost $5. Accurate declaration of non-match neither gained nor lost. $25 minimum participation fee guaranteed.

> Group 4: Participant starts with a bank of $100. Correct matches neither gain nor lose, inaccurate declarations of match lost $25, failure to declare a match when one was present lost $25. Accurate declarations of non-match neither gain nor lose. $25 minimum participation fee guaranteed.

Kam III does not give performance data for each group, merely aggregate numbers for all four groups combined regarding "hit rate" (actual accurate declarations of match as a percent of possible accurate declarations of match) and "wrong association rate" (inaccurate declarations of match as a percent of possible inaccurate declarations of match). However, Kam III does compare those rates between individual groups statistically, and finds that, as to hit rate and wrong association rate, there were no statistically significant difference among any of the four test groups. However, there is a small impediment to any general conclusion that incentive schemes, even incentive schemes at this level of reward, and which incorporate a gain floor, do not significantly influence test-taker behavior. The aggregate perfor-

Case 3:09-cv-03064-MWB-LTS Document 284-37 Filed 06/23/11 Page 187 of 263

SAK000187

mance of the four new test groups was significantly better than the original Kam II lay group. The hit rate was insignificantly lower, but the new wrong association rate was significantly better (0.227 compared with 0.338, a 41% better performance at avoiding wrong associations.) Kam III attributes this to the aggregate tendency of the new groups to declare fewer affirmative matches of any kind, as if this were an explanation. But to what do we attribute this new reticence? Both reward scheme 3 and reward scheme 4 would each seem to encourage risk averseness in declaring matches of any kind, which is what was observed in the aggregate data, as compared to Kam II. So the conclusion that the different incentive schemes did not significantly affect lay performance is hardly established by Kam III.

Finally, it should be noted that none of the tested incentive schemes had the characteristics of the scheme recommended, supra, in § 28:29, note 154. Number 3 came closest, by penalizing false positives more harshly than it rewarded true positives, but the penalty differential was not severe enough, and the scheme did not equalize the value of accurately perceiving a match and accurately perceiving a non-match (true positives and true negatives).

## § 35:31  Areas of disagreement: Testing document examiner expertise— The studies by Kam and associates—Kam, Gummadidala, Fielding & Conn (2001) ("Kam IV")

Between May and November of 1998, pursuant to their FBI contract, Dr. Moshe Kam and his associates initiated the first study ever designed to test the abilities of document examiners against the abilities of ordinary people in regard to a specific task that is actually a task commonly undertaken by document examiners in normal practice.[1] A number of preliminary observations must be made before dealing with the details and results of that study.

First, the task selected for examination, determining whether a signature is genuine (written by the person whose name is reflected by the signature) or nongenuine (not written by the person whose name is so reflected) is sui generis according to the standard theory of handwriting examination used by document examiners. This is because real signatures are regarded as a category of writing separate from all other writing insofar as it is common for them to manifest a high degree of personally unique characteristics, resulting from a combination of repetition and emotional or stylistic investment. If document examiners are right about this (and it is neither counterintuitive nor in conflict with existing empirical evidence), then it would be error to generalize from skill levels shown in this study to similarly high skill levels in separate and more difficult tasks, such as identifying the actual author of a concededly inauthentic signature.[2] This is in no way a criticism of design of the study. One must start somewhere, and it makes a certain sense to start with the easiest definable task and work on from there.

Determining the authenticity of a signature is an important task in many legal contexts, such as, inter alia, the probate of wills and, perhaps most commonly, asserted cases of check forgery. Broadly speaking, inauthentic signatures can be generated in three general ways. The forger can be in possession of a blank check,

---

[Section 35:31]

[1]Moshe Kam, Kishmore Gummadidala, Gabriel Fielding & Robert Conn, Signature Authentication by Forensic Document Examiners, 46 J. Forensic Sci. 884 (2001)

[2]Note that this lack of generalizability is not symmetrical. To the extent significant error rates are shown on this task, it is fair to infer, at least

tentatively, that error rates on harder tasks would be at least as high and probably higher, whereas good performance on this task is extremely weak evidence concerning good performance on other tasks. And it must always be kept in mind that performance under test conditions may not measure performance under the normal conditions of practice, which are subject to substantial forces of expectation and suggestion.

SAK000188

say, but have no model of an authentic signature to try to simulate. Signatures generated under those conditions, whether in the normal hand of the forger or in some sort of disguised hand, usually present trivial problems for determining authenticity. The new study (preliminarily titled "Signature Authentication by Forensic Document Examiners" and hereafter referred to as Kam IV) wisely did not include such circumstances.[3] Another possible way in which inauthentic signatures are generated is when the forger has a model of a genuine signature to use in attempted simulation and, in addition, is experienced in forgery, that is, has done simulations often before and has at least come to believe that they have mastered simulation skills sufficiently to do a good job. Kam IV was not designed to examine document examiner or non-document examiner skills in detecting forgeries under such conditions.

The final category of nongenuine signatures involves what we may call naive forgers, that is, people who have a model of a genuine signature for purposes of simulation, but who have no previous experience in forgery. Kam IV was designed to deal only with forged signatures of this type.[4] Note that the study could have been designed only to deal with such signatures, simply by insuring that all questioned signatures presented to participants were of this type. However, again wisely, the test was designed to present both authentic and inauthentic signatures, so it is in reality two subtests, one involving the ability to declare accurately that a naive forgery is a forgery, and the other the ability to declare accurately that a genuine signature is genuine.

Within certain limits,[5] the test design was quite well conceived. Test materials were generated as follows: 64 people provided 12 signatures each in their own names on 12 identical pieces of paper, according to a procedure well designed to obtain their normal everyday signature. These 64 sets of 12 were then each randomly divided in two, yielding 64 sets of six signatures to be used as "known authentic signatures" (like six randomly selected cancelled checks from a particular person), and 64 sets of 6 to form the basis for the "questioned signatures". It was then randomly determined how many, if any, authentic signatures would be removed from each set, to be replaced by simulations. Two sets were to have none removed (they remained all genuine), 7 sets one removed, 17 sets two removed, 21 sets 3 removed, 12 sets 4 removed, 4 sets 5 removed, and one set was to have every signature replaced by a simulation.

The simulations were then generated as follows. Seven people with no prior experience with signature simulation were hired to do all the simulations. Sets were

---

[3]One weakness of Kam I and Kam II was that the tests included a substantial though not exactly known number of such trivial tests. See discussion of those studies, §§ 28:14, 28:27 to 28:30. The design of Kam IV avoids this.

[4]One detail of the procedure for generating test materials might have undermined this to an unknown degree. All simulations were generated by only 7 simulators, and since, on average, they had to do 25 simulations each, they would of necessity have become relatively experienced simulators by the end of the process. Whether they became better simulators is another question.

[5]Explicit detailed evaluations of the limits of the test design will await the publication of the study. However, the main ones are the ages of the providers of both the genuine signatures and the simulated signatures (19–30, with an apparent skew toward the lower end of that age range), the incentive scheme for the non-expert test subjects (which once again does not mimic the incentives for the professional document examiner test subjects), and the allowance of the simulators to select for themselves the best method of simulation from a variety of potential methods explained to them before they undertook their simulations (including backlighting, carbon paper, overhead projection and, presumably but not explicitly, freehand simulation). Signatories of a different age group might have displayed more or less intra-writer variation in their signatures. The problems of incentives have already been discussed in connection with Kam II and Kam III, §§ 28:14, 28:27 to 28:30, and the problems presented by the unknown variation in simulation method are addressed below. Also, there was once again an unnecessary ink-color variability.

93

randomly selected and assigned to a simulator, who had unlimited time to examine the six genuine signatures in the "known" set, and to generate one or at most two simulations by whatever method seemed best to the simulator. If two simulations were required, the set was then assigned to another simulator to generate one of the two simulations. If more than three simulations were required, two or three simulators were used, with no more than two signatures per simulator allowed in any given set. Care was taken to make sure the simulations were indistinguishable from the originals in every way except handwriting. A test consisted of handing a test subject a randomly selected set of "known signatures" and the associated set of "questioned signatures" and explaining that the known signatures were real normal signatures and each of the questioned signatures might be either genuine or a simulation. The subjects were provided with a microscope, a light source and a handheld magnifier. The ordinal scale of certainty represented by ASTM standard E1658 was explained to them, and the subjects were then asked to determine whether each questioned signature was genuine by the standards of the top two degrees of certainty in that standard, a simulation by reference to the bottom two degrees, or to declare themselves "unable to determine."

The test was administered to three groups of professional document examiners, all of whom were either members of the American Society of Questioned Document Examiners or of the Southwestern Association of Forensic Document Examiners. In addition, an unknown number were certified by the ASQDE's associated certification board, the American Board of Forensic Document Examiners. The total number of document examiner test subjects was 69.

In addition, the test was administered to 50 non-experts connected in various ways to Drexel University, who were selected to resemble the educational profile of the document examiner subjects.

The resulting performance is summarized in Table 4.

### Table 4. Results from the "Kam IV" Study

| Research Participant's Decision: | | | | | | |
|---|---|---|---|---|---|---|
| | "Questioned Signature is Genuine" | | "Questioned Signature May or May not be Genuine" | | "Questioned Signature is Not Genuine" | |
| Ground Truth | FDEs | Non-FDEs | FDEs | Non-FDEs | FDEs | Non-FDEs |
| Questioned Signature: Genuine | 85.89% | 70.00% | 7.05% | 4.30% | 7.05% | 26.10% |
| Questioned Signature: Not Genuine | 0.49% | 6.47% | 3.45% | 1.40% | 96.06% | 92.00% |

Exact test format data are not given, merely statistical summaries, but a likely typical numerical distribution can be extracted from what is given, and is useful to illustrate approximately what the actual data set might have looked like. What follows is thus a typical distribution approximately consistent with the summaries given, but the real distribution is likely to have varied from these numbers by a few either way, and so what follows is for illustrative purposes only.

The universe of possible tests was comprised of 64 potential tests, which contained 384 potential judgements (6 × 64), containing 53.64% genuine signatures (206 out of 384) and 46.36% simulated signatures (158 out of 384). While individual test sets were potentially subject by random draw to as many as three repetitions between the three document examiner test groups (the lay group was tested all at once, and therefore not subject to test set repetition), we can be reasonably assume that both in the case of the 69 document examiners total 414 judgments, or the lay persons total 300 judgments, the distribution between genuine signatures and simulations

94

SAK000190

should track the distribution in the total test pool fairly closely. So for illustrative purposes it is fair to say assume there were likely about 224 times that document examiners faced genuine signatures. Assuming this, of those genuine signatures, the document examiners accurately identified 192 as genuine. But they expressed no opinion as to 16 of those genuine signatures, and they affirmatively misidentified 16 of them as simulations. Similarly, using the same assumptions, the document examiners faced approximately 190 simulations, and they got 177 right, offered no opinion on 12, and made only one error.

In the case of non-document examiners, they may fairly be taken to have faced about 162 genuine signatures. Of these, they got about 113 right. They expressed no opinion at a lower rate than document examiners (4.3% of the time, or about 7 cases), and they declared genuine signatures to be simulations 42 times (about 26%). Clearly, intra-writer variation creates a serious problem, making many genuine signatures appear questionable.[6] Though document examiners did better in sorting this out, they still had a fairly high rate of error.

Lay test subjects faced about 138 simulations. They correctly identified about 127 of these as simulations. Again, they responded that they admitted inability to determine genuineness less than the document examiners (in only 2 cases), and they wrongly declared more simulations to be genuine than did the document examiners (9 times, as opposed to the document examiners single error in a larger universe of decisions). However, it also appears fairly clear that most simulations were not very convincing to anyone, since both document examiners and ordinary folks identified more than 90% of them as simulations (96% for document examiners, 92% for ordinary people).

Another way to express the differences in performance between document examiners and non-document examiners is to describe the error rate when you hear the conclusion "genuine" or the conclusion "simulation" (omitting any time an examiner is unable to reach a conclusion).[7]

For document examiners, the conclusion "genuine" was given 193 times, which was right 192 times and wrong once. The conclusion "simulation" was given 193 times, and which was right 177 times and wrong 16 times.

With lay persons, the conclusion "genuine" was given 122 times, which was right 113 times and wrong 9 times. The conclusion "simulation" was given 169 times, which was right 127 times and wrong 42 times.

Thus, document examiners were right about 99.5% of the time when they said "genuine" and 92% of the time when they said "simulation." Lay persons were right 93% of the time when they said "genuine" and 75% of the time when they said "simulation."

What conclusions can be drawn from this study? Taken at face value, a reasonable interpretation of the results would be something like this:

- naive simulators do not on the whole appear to produce very convincing simulations. The overwhelming majority were properly identified as such by both document examiners and lay persons, though document examiners had a marginal advantage 96%–92%
- neither document examiners nor lay persons actually declare naive simulations to be genuine very often. However, simulations were found to be genuine by lay persons 6.5% of the time, and by document examiners only a half a percent of the time. The fact that one document examiner declared one of

---

[6]This is consistent with the results of the 1988 FSF test discussed §§ 28:15 to 28:26.

[7]Note that these values may differ from those in the table because these do not include inconclusives in the calculations.

Case 3:09-cv-03064-MWB-LTS Document 284-27 Filed 06/23/11 Page 191 of 263

SAK000191

these naive simulations genuine indicates that the expert error rate even for this easy task is not vanishingly small, but it is small, both absolutely and compared to the lay group, even though the lay group did not perform poorly itself

- intra-writer, or "natural," variation among genuine signatures written by a single person poses serious dangers when trying to determine whether a signature is genuine or simulated. Thus, 8% of what document examiners declared to be simulations were in fact genuine signatures, and 25% of what lay persons similarly declared to be simulations were genuine. While the document examiners were better than the lay persons in this regard, the document examiner error rate on this supposedly easy task is substantial, and much higher that the document examiner literature would lead one to believe[8] (This conclusion is also consistent with the results of the 1988 FSF study, wherein document examiners declared a genuine signature of Joanna Neuman to be not genuine 18.5% of the time (5 of 27 responses).[9])

- Document examiners are significantly better at avoiding being fooled by genuine signature variation than lay persons, and significantly better at most authentication subtasks than are lay persons under these test conditions. However, the advantage may partly be the result of a phenomenon which has by now been repeatedly observed in testing document examiners against ordinary people. Under test conditions, ordinary people seem generally less likely to choose indecision options than document examiners.[10]

However, before generalizing these results to the real world, caveats are in order.

First, none of the Kam tests have yet resolved the incentive problem. All reward schemes for lay subjects used so far would seem to bias lay subjects toward affirmative declarations and away from inconclusives. Both Kam III and internal variations in the reward schemes used in Kam IV have led Kam to conclude that variations in reward schemes do not significantly affect lay test-taker performance. However, Kam III itself contains internal evidence of the effect from incentive scheme variation, as we have seen above.[11] Beyond that, it seems virtually certain that *some* reward schemes could change the way lay subjects responded under various levels of uncertainty. None of the schemes used by Kam so far have imposed sufficiently high penalties on affirmative error[12] to mirror document examiner motivation in tests which may affect the continued existence of their profession. However, this caveat is perhaps rendered less serious by the notion that the lay test subjects need not be as motivated to avoid error as the document examiners, merely as motivated to avoid error as jurors, and the deficiencies of the incentive schemes in the tests are much less clear in this regard.

---

[8]See, e.g., statements of Ron Furgerson, FBI Document Section Chief, quoted supra §§ 28:14 to 28:38, and Irby Todd, Do Experts Frequently Disagree?, 18 J. Forensic Science 455 (1973).

[9]See supra § 28:24.

[10]This was observed in the Oliver Galbraith, Craig S. Galbraith and Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners 7 (1995), and in Kam II.

[11]See § 28:30.

[12]Especially error which could be identified as likely to be false positive error in criminal cases, a kind of error which all document examiners know would be the kiss of death if revealed *in test data*. (As has been discussed above, it is not at all clear that they are equally motivated to avoid such error in real practice.) Interestingly, this asymmetrical motivation to avoid error of a certain type is reduced in the Kam IV test, since erroneous declarations of authenticity and inauthenticity can both lead to false convictions in criminal cases, depending on the case and its facts, though erroneous declarations of authenticity would more commonly have that result, since check forgery is such a common crime.

96

SAK000192

What is more important, however, are the gross potential differences in document examiner performance between test conditions and real conditions of practice. Put simply, document examiner performance under test conditions is likely to be the best performance of which they are capable, and therefore error rates are likely to the lowest possible error rates under ideal conditions which do not apply to the real world. This is because of two linked variables: motivation and expectancy effects.

It is safe to say that, given the controversy of the last decade, there is not a document examiner in the country who does not understand that high error rates on tests, especially errors which would commonly be false positive errors in criminal cases, could lead to the widespread exclusion of document examiner testimony, and potentially, to the loss of their career. While this would be most clearly true in regard to non-blind proficiency tests, where individual performance might be discovered and compared to group norms, it is true even for tests like the Kam tests, which appear to have been designed to the extent possible to eliminate the potential for identifying and drawing conclusions about individual performance. Under conditions of normal practice, however, it is not at all clear that the sociology of the law enforcement agencies for which most of the document examiners work actually disvalues false positives to the same degree, or that inconclusive responses are as professionally acceptable in practice as on a test. The effect of different contexts with different intrinsic motivations is compounded by the highly suggestive manner in which cases are often presented to document examiners, complete with the theory of the investigators and the non-handwriting reasons for reaching one conclusion or another.[13] It would be startling if these circumstances did not affect performance and, consequently, error rates.

Nevertheless, these caveats are not really criticisms of the Kam IV test itself, and it is up to the legal system to fashion appropriate doctrines to take into account the difficulties in reasoning from the ideal conditions of tests to the predictably different and non-ideal conditions of practice. It may also be up to the legal system to require the conditions of practice to better mirror the ideal,[14] but failure as yet to do so cannot be laid at Dr. Kam's doorstep. Post hoc, the results of Kam IV can give some comfort to Judge McKenna, by providing evidence that, under test conditions, document examiners significantly outperform ordinary people in determining signature genuineness (which was the basic task at hand in *Starzecpyzel*).[15] And the same results can frustrate the defense attorneys in the same case, since they would have dearly loved to have had the data on the 8% document examiner error rate even under ideal conditions on the exact task that the document examiner performed in that case. And the results can give no comfort at all to the judges in all the other intervening cases where document examiner testimony was admitted on a different and more difficult "task at hand" (therefore, presumably at least, subject to much higher error rates), for which there still are no data, particularly attribution of authorship from a signature or other similarly limited sample. Kam IV shows the way. Ten or 20 further similarly designed tests devoted to different tasks will begin finally to map the contours of document examiner skill, and show other clinical forensic disciplines what is needed.

---

[13]See the court's comments in *U.S. v. Rutherford*, 104 F. Supp. 2d 1190, 1193, 55 Fed. R. Evid. Serv. 201 (D. Neb. 2000).

[14]See generally D. Michael Risinger, Michael J. Saks, William C. Thompson & Robert Rosenthal, The *Daubert/Kumho* Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion, 90 Cal. L. Rev. 1 (2002).

[15]Or was it? Kam IV deals with the dangers of authentic signature variation with regard to a set of 19–30 year olds. What does this tell us about the dangers of similar variations with regard to infirm elderly persons in the early stages of Alzheimers, which was in fact the issue in *Starzecpyzel*. This simply and clearly illustrates the problems of both over and under-specificity which must be dealt with carefully when formulating the "task at hand."

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 193 of 263

SAK000193

## § 35:32 Additional research

After nearly 13 years of effort by the document examiner community, a pre-1989 empirical validity study has finally been unearthed that was not reviewed in Risinger, Denbeaux and Saks's landmark article, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise."[1] It is a 1975 study published in German by Wolfgang Conrad,[2] the results of which do not, however, offer much support for the claims of document examiners. It will be summarized below.

In addition, three new studies and a set of studies have been obtained. One of the new studies is by two Australian practitioner-scientists, Bryan Found and Doug Rogers, who tested the accuracy of opinions of genuine, disguised, and simulated signatures among forensic document examiners in Australia and New Zealand. Another is by Jodi Sita, Found and Rogers, and once again deals with judgments of signature authenticity. The third study is by Sargur Srihari and associates, who try to test the hypothesis that all writing is unique and individualizable. The set of studies consists of the proficiency studies conducted by the Collaborative Testing Service, studies now supervised by the American Society of Crime Laboratory Directors, for the period 1990 through 2000. All will be dealt with in turn following the summary of the Conrad study.

## § 35:33 Additional research—Conrad (1975)

This study was conducted in Germany and reports comparisons among 25 professional handwriting experts, 100 laypersons who apparently were not specially motivated to perform well, 25 more motivated laypersons, and 6 college students who had taken courses in handwriting psychology and comparison. Each was presented with 10 known exemplar signatures and 6 questioned signatures (half of which were genuine and half of which were forged). With respect to the ability to identify forged signatures, judged by the respondents at any level of confidence, college students made errors of judging forged signatures to be genuine 5.6% of the time, experts made errors 17.3% of the time, highly motivated laypersons erred 12.0% of the time, and less motivated laypersons erred 21.7% of the time. Looking only at those judgments made with a confidence level "bordering on certainty," the college students erred 0.0% of the time, experts 2.7% of the time, and the motivated laypersons 5.3% of the time. With respect to the ability to identify genuine signatures, judged by the respondents at any level of confidence, college students made errors of judging genuine signatures to be forged 11.1% of the time, experts 12.0% of the time, highly motivated laypersons 28% of the time, and less motivated laypersons erred 41.6% of the time. Looking only at those judgments made with a confidence level "bordering on certainty," the college students erred 0.0% of the time, experts 5.3% of the time, and motivated laypersons 8.9% of the time.

The most important aspect of this study is that it informs the debate over the role of motivation in studies comparing experts and laypersons, suggesting that motivation is a confound in those studies. Here, the experts generally performed no better than motivated laypersons (most differences were not statistically significant). Conrad concludes that, "one cannot speak of a clear factual superiority on the part of the experts, especially since the findings did not show that experts are better

---

**[Section 35:32]**

[1]137 U. Pa. L. Rev. 731 (1989).

[2]Wolfgang Conrad, Empirische Untersuchunger über die Urteilsgüte verschiedener Gruppen von Laien und Sachverständigen bei der Unterscheidung authentischer und gefälschter Unterschriften [Empirical Studies Regarding the Quality of Assessments of Various Groups of Lay Persons and Experts in Differentiating Between Authentic and Forged Signatures], 156 Archiv. für Kriminolgie 169 (1975).

SAK000194

defended against serious or even extreme erroneous assessments in individual cases than lay persons working under favorable circumstances, are highly motivated and with a comparable educational level." The study further suggests that there are some non-experts (in this case, college students who had studied the psychology of handwriting) who generally performed significantly better than the experts did.

## § 35:34  Additional research—Found and Rogers

**Research References**

Risinger and Saks, Rationality, Research and Leviathan: Law Enforcement-Sponsored Research and the Criminal Process, 2003 Mich. St. L. Rev 1023 (Winter 2003)

The Australian study of signature identification by Bryan Found and Doug Rogers is part of a program of evaluation of forensic document examiner skills generally in which detailed feedback is provided to individual examiners to enable them to understand which specific kinds of tasks cause them difficulty.[1] The introduction to the study states:

> Forensic handwriting examination can simply be regarded as a skill. The skill is applied to cases which vary according to the amount and complexity of both the questioned and specimen material. No one test will determine the validity of the skill. Over time, given sufficient trials, a picture of the skill for individuals should emerge. This will allow us to determine which aspects of the skill claimed by examiners are valid, which are not and what the likely error rate is for different types of examination.

The questioned signatures in the study were: 43 genuine signatures written by the specimen writer in that writer's normal signature style; 160 simulated samples (written by 2 forgers freehand copying the signature characteristics of the specimen writer); 47 disguised signatures written by the specimen writer. These were to be compared to known writings by the specimen writer. In all, 51 answer booklets were submitted by document examiners for analysis. These booklets included 10 peer reviewed responses, 10 experimental responses (from individuals and trainees), and 31 individual responses (including 1 trainee).

A total of 10,250 opinions were expressed by the group. Of these opinions 49%

---

**[Section 35:34]**

[1]Bryan Found & Doug Rogers, Revision and Corrective Action Package: Signature Trial 2001 (Distributed on CD-ROM by the Forensic Expertise Profiling Laboratory, School of Human Biosciences, La Trobe University, Australia). By way of introduction, the report explains:

> The FEPL has evolved over the past 6 years through collaborations between the School of Human Biosciences (La Trobe University, Australia), the Special Advisory Group (which, under the direction of the Senior Managers of Australian and New Zealand Forensic Laboratories, represents police and government document examiners in Australia and New Zealand) and the National Institute of Forensic Science.

> The FEPL provides a program aimed at characterising skill and expertise associated specifically with human perceptual and cognitive processes related to forensic opinion formation. Forensic handwriting identification is a discipline that uses these processes almost exclusively when determining the authorship of questioned writings. In spite of the routine use of handwriting evidence in courts of law internationally, the nature of the skill, the expertise claimed, and the theoretical constructs articulated by the community of document examiners, until recent times, has remained almost devoid of empirical support.

> Since 1994 over 30000 blind trial opinions have been collectively expressed by the participants on handwriting and signature trials. The year 2000 marked the final stage in the evolution of this program where participants were given the opportunity to express at least 500 blind trial opinions on signatures and handwriting annually. Participants are issued with a certificate that profiles the nature of their skill in terms of error, conservatism and correct rates. This certificate will provide courts of law with information regarding forensic handwriting skills that has been previously unavailable. This package provides an overview of the first of the 2001 trials.

Forensic scientists outside of the U.S. are more likely to be trained as scientists, as in the case of these two doctoral level Australian behavioral scientists. In addition, there is more likely to be a connection between the forensic science service and university science departments. These roots in the community of science are reflected in their approach to the work and their interest in and ability to do empirical research on the topics of their professional interest. All of that is absent from American forensic document examination.

99

(5039) were correct, 7% (756) were in error, and 43% (4455) were inconclusive. If we omit the inconclusives from the computation, of the 5795 decisions offered, 87% were correct and 13% were in error.

These opinions were broken down according to whether the examiner was responding to writings that were, in actuality, genuine, disguised, or simulated. The results are presented in the following table.

### Table 5. Results from the Found & Rogers Study

| The Questioned Signatures Were | Correct | Erroneous | Inconclusive |
|---|---|---|---|
| Genuine | 92% | 2% | 6% |
|  | 98 | 2 | - |
| Disguised | 30 | 24 | 46 |
|  | 55 | 45 | - |
| Simulated | 43 | 4 | 53 |
|  | 91 | 9 | - |

The data indicate that when a signature was disguised, examiners had considerable difficulty accurately associating it to its actual author. Simulations caused 9% to offer conclusions that were erroneous. Even genuine signatures were not matched to their author 2% of the time.

Additional analyses suggested that errors tended to cluster among certain examiners, and those examiners often were from the same lab, and who often received their training under the same mentor, in the same training environment. For a field in which training takes place so much by apprenticeship, this is an important finding. It suggests that students tend to acquire the same practices and understandings as their mentors—for good or for ill. That suggests that, at least for forensic handwriting examiners, courts might benefit from learning of the backgrounds of the proffered witness and the track record of that witness and that witness's teacher, or at least to demand extensive proficiency data on each examiner, and condition admission on those data.

Finally, as with the FSF studies reported above,[2] further analyses also indicated no relationship between the number of years of experience and likelihood of being correct or in error.

## § 35:35   Additional research—Sita, Found & Rogers (2002)

**Research References**

Denbeaux and Risinger, Kumho Tire and Expert Reliability: How the Question You Ask Gives the Answer You Get, 34 Seton Hall L. Rev. 15 (2003)

Imwinkelreid, Flawed Expert Testimony: Striking the Right Balance in Admissibility Standards, 18-SPG Crim. Just. 28 (Spring 2003)

The participants in this study by Sita et al.[1] consisted of 17 professional handwriting examiners and 13 laypersons, all from Australia and New Zealand. Test materials consisted of 10 mock cases each containing 15 exemplar and 15 questioned signatures. The questioned signatures in different test packets contained different

---

[2]§ 28:21.

**[Section 35:35]**

[1]Jodi Sita, Bryan Found, and Doug Rogers, Forensic Handwriting Examiners' Expertise for

Signature Comparison, 47 J. Forensic Sci. 1117 (2002).

100

SAK000196

proportions of genuine and forged signatures. The results given in the study do not disaggregate the tasks of evaluating genuine versus forged signatures, but give combined results. Correct decisions were made by experts 54.8% of the time compared to 57.1% of the time by laypersons. This is not a statistically significant difference favoring laypersons, but it very nearly is. Similarly, experts achieved a mean number of accurate decisions of 81.9 compared to 85.6 for laypersons.

Incorrect decisions were made by experts 3.4% of the time compared to 19.3% by laypersons. Experts made a mean number of erroneous decisions of 5.0 compared to 29.0 for laypersons. Experts were unable to reach a decision 41.8% of the time compared to 23.6% of the time by laypersons. Experts averaged 63.1 inconclusive decisions compared to 35.4 by laypersons.[2]

The results of this study are similar in one way to those of the Kam IV signature authentication study, showing no superiority for experts over lay persons in calling a genuine signature genuine, but an apparent superiority among experts to refrain from calling a nongenuine signature genuine. In both studies, the superior expert performance was achieved mainly by the greater use among the experts of the "inconclusive" response. Whether the risk-averse decision threshold which generates that high percentage of inconclusives on known tests is typical of actual forensic practice is subject to doubt.

The Sita et al. study went on to evaluate the data generated for the document examiners in more detail. It found that, as the complexity of the signature goes up (and it therefore contains more information), the accuracy of document examiner performance also goes up.[3] This is the expected result correlating accuracy with the amount of information manifested in the questioned document, and it indirectly raises questions concerning tasks involving low information questioned sources (documents containing block printing, or only small amounts of writing whether or not printed).

Further, the study revealed that expert performance was by no means uniform, with five perfect performers and four with numerous errors.[4] While the same information is not given for the lay performers, it seems reasonably clear that there were some lay people who outperformed some "experts."

In addition, this study reports a higher overall error rate for document examiners than did Kam IV. In that study, when document examiners called "genuine" they were wrong about 8%[5] of the time, whereas in Sita et al. they were wrong 12.2% of the time. In Kam IV, when they said "simulation" they were wrong less than 0.5% of the time,[6] whereas in Sita et al. they were wrong 2.1% of the time. Sita et al. attribute this to likely variation in the difficulty of the tasks presented by the signatures and simulations in their test.[7]

Again, no significant correlation was found between accuracy and years of experience.[8]

## § 35:36   Additional research—Srihari, Cha, Arora, and Lee (2002)

---

[2]Jodi Sita, Bryan Found, and Doug Rogers, Forensic Handwriting Examiners' Expertise for Signature Comparison, 47 J. Forensic Sci. at 1119, Table 1.

[3]Jodi Sita, Bryan Found, and Doug Rogers, Forensic Handwriting Examiners' Expertise for Signature Comparison, 47 J. Forensic Sci. at 1120 (2002), Table 1.

[4]Jodi Sita, Bryan Found, and Doug Rogers, Forensic Handwriting Examiners' Expertise for Signature Comparison, 47 J. Forensic Sci. at 1121, Figure 2.

[5]See § 28:31.

[6]§ 28:31.

[7]Sita et al., at 1123.

[8]Sita et al., at 1121.

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 197 of 263

SAK000197

The study published recently by Sargur Srihari and his colleagues[1] was funded by the National Institute of Justice as part of its initiative to support empirical research concerned with the bases of forensic handwriting examination. For their project they drew handwriting samples from 1568 individuals, which they desired to make representative of the U.S. population.[2] Computer algorithms were used to extract features from scanned images of the handwriting. Attributes of the handwriting were compared at different levels to try to distinguish writers from each other, and the automated comparison routines were able to do so at varying levels of accuracy (about 95% at the document level, about 88% at the paragraph level, about 83% at the word level, and about 91% at the character level). The authors concluded that they were able to distinguish writers with a high degree of confidence. They state:

> Based on a few macro-features that capture global attributes from a handwritten document and micro-features at the character level from a few characters, we were able to establish with a 98% confidence that the writer can be identified. Taking an approach that the results are statistically inferable over the entire population of the U.S., we were able to validate handwriting individuality with a 95% confidence. By considering finer features, we should be able to make this conclusion with a near 100% confidence.[3]

The greatest value of this study is likely to prove to be that it will lead to a system of handwriting comparison which performs much better than human examiners, does so using a finite set of objective (observable, measurable, definable) procedures, and which facilitates the computation of the probability of error in the identification or exclusion. That would be an extremely important direction in which to take future stages of this research.

Oddly, those important potential benefits do not seem to be the focus of the study. Srihari et al. emphasize one unwarranted and speculative conclusion which they suggest is implied by their research.[4] In conjunction with the statement quoted above, the authors assert: "Our work has employed handwriting features similar to, but not exactly the same as, those used by document analysts in the field. However, the objective analysis that was done should provide the basis for the conclusion of individuality when the human analyst is measuring the finer features by hand."[5] In other words, they assert that the notion that handwriting is infinitely variable across writers ("uniqueness") has been all but established, based on their sample of

---

[Section 35:36]

[1]Sargur N. Srihari, Sung-Hyuk Cha, Hina Arora, and Sangjik Lee, Individuality of Handwriting, 47 J. Forensic Sci. 856 (2002) ("The work was motivated by U.S. high court rulings that require expert testimony be backed by scientific methodology. Since handwriting had not been subjected to such a study, we decided to undertake this endeavor.")

[2]The study seems to assert that its sample is representative of the U.S. population. But its sampling procedures were poorly designed to accomplish that (" . . . obtained samples by contacting schools in three states (Alaska, Arizona, and New York) and communities in three states (Florida, New York, and Texas) through churches and other organizations.") and at the end of the day it did not achieve a sample which reflects U.S. population with respect to the demographic variables to which the authors compared their sample. As discussed, *infra*, since the effort at obtaining a nationally representative sample is wrongheaded given the purposes of the study, the study is better for the authors having failed in

their attempt.

[3]Sargur N. Srihari, Sung-Hyuk Cha, Hina Arora, and Sangjik Lee, Individuality of Handwriting, 47 J. Forensic Sci. at 871 (2002).

[4]At various points in their article Srihari et al. characterize their work in the following terms: "[A] step towards providing scientific support for admitting handwriting evidence in court." "Our study is an effort to establish the individuality of handwriting." "A study was conducted for the purpose of establishing the individuality of handwriting."

This will sound to many readers more like the approach of advocates than of scientists, that is, the authors set out to prove a hypothesis in order to gain a field admission to court, rather than conducting a more disinterested inquiry into the truth or falsity of a hypothesis. But the authors' candor probably helps us to understand why they offer speculative conclusions which reach beyond what their study can support.

[5]Sargur N. Srihari, Sung-Hyuk Cha, Hina Arora, and Sangjik Lee, Individuality of Handwriting, 47 J. Forensic Sci. at 871 (2002).

102

1568 plus the assumption that because human examiners have available to them more features than were used by the computer algorithms, the human examiners will do an even better (a perfect?) job.

Their conclusion is reached by conflating two non-findings. The study itself was not able to distinguish all 1568 writers from each other. Likewise the study did not test any human examiners; comments on the capabilities of human examiners are entirely speculative. But by combining those two non-findings, the authors claim to have "provide[ed] the basis for the conclusion of individuality."

If nothing else, their conclusion would seem to be refuted both by studies of actual handwriting examiners, which usually do not find the accuracy levels Srihari et al. seem to say should be found and by Harris's study finding writings by different individuals which were indistinguishable from each other. That in turn suggests either that Srihari et al.'s inference of uniqueness is mistaken or that the algorithms outperform human examiners, or both.

Srihari et al.'s speculation relies heavily on the assumption that the more attributes taken into account, the more accurate one will be in distinguishing writers. That likely is true for computers. For humans it often leads to information overload. Research in cognitive science finds that humans often do not use the richness of information available to them. Instead, they rely inconsistently on a small number of factors to which they apply non-optimal weights.[6]

A finding of 98% accuracy does not establish unique individuality. Indeed, even a finding of 100% accuracy in Srihari et al.'s research would not establish unique individuality. That is because accuracy in this context depends upon the number and nature of features and the size of the sample. For example, if I can distinguish the writing of every student in my seminar of 10 students, that 100% accuracy would not prove anything about handwriting uniqueness (though it would affirm the obvious: that there is some amount of variability in writing). If I could accurately distinguish every one of a million writers from each other, that would be a more impressive achievement, and more useful for forensic purposes. But even that would tell us only that there is a lot of variability; it cannot assure us that the variability is virtually infinite.

Put most simply, then, Srihari et al.'s sample of 1568 is too small for a study aimed at establishing unique individuality.[7] The smaller the sample, the less likely it is that handwriting twins will be found. The extrapolation of their sample of 1568 to the population of the United States makes little sense given the goal of trying to establishing that every person's writing is distinguishably different from every other person's writing. In work of the kind done by Srihari et al., as the sample size increases (for example, approaching that of a metropolitan population), the likelihood of finding indistinguishably similar writers would rise, perhaps considerably, and the ability to distinguish those writers accurately would fall, perhaps considerably.

The attempt at maximizing writer diversity to the extent of the U.S. population reduced still further the ability of the study to establish infinite uniqueness among writers. The research actually benefitted from the fact that the attempt was not

---

[6]In other areas of research, as here, it was at first assumed that formal (mathematical) models of decision-making would provide a floor of accuracy below which human decision-makers would not be allowed to fall. Subsequent research, however, often found that the floor was a ceiling above which humans typically could not rise. The classic work on this topic is Paul Meehl, Clinical Versus Statistical Prediction (1954).

[7]Adequacy of sample size depends on the requirements of the research question and methodology. For some experiments, samples of 20 or 30 are adequate. For others, such as prospective epidemiological studies, samples in the tens of thousands often are necessary to provide useful findings.

SAK000199

achieved. Maximizing the diversity of the sample of 1568 makes the task of distinguishing writers easier (for the computer or humans). By inadvertently exploiting regional, ethnic, gender, age, and whatever other differences exist, the pool of writing was made more varied than it would be if (for example) all of the "suspects" grew up in one neighborhood and all learned to write at the same school. The results would have been more impressive and more useful (for both the research question and the forensic context) if the sampling method had been to collect a representative sample of *clusters* of writers around the country, with each cluster being composed of highly *similar* writers. That would have tested the degree to which highly similar writers can be distinguished, and replicated the finding among numerous groups of such writers.

Just as the size of the sample of writers affects inferences about the ability to distinguish writers, the amount of handwriting sampled also affects the conclusion. In the present study, the writing consisted of a special 156 word letter designed to include all letters and numbers and to sample a very wide range of significant writing, such as distinctions between capitals and small letters, at the beginning and end of words, and involving certain combinations of special interest. Again, this artificially maximizes the ability to distinguish writers. Were the writing sample to decrease in size, or contain less diverse writing—that is, to approximate something more typical of crime scene writing—accuracy would decline, perhaps only a bit, perhaps considerably.

As the type of writing changes from dozens of words of script to a single signature to printed letters or numbers (again, things which are more typical of the writing in forensic case work), the accuracy level is likely to decline. Srihari et al.'s research cannot be generalized to those other situations. The research on those other writings needs to be done. (That is, there needs to be testing of smaller *writing* samples, larger and more homogeneous *writer* samples, and kinds of writing that have fewer distinguishing features.)

Strictly speaking, to establish unique individuality it would be necessary to compare every member of the population to every other member. Srihari et al.'s shortcut is unconvincing for the various reasons discussed. But the obsessive and nearly impossible search for uniqueness is also unnecessary. A more feasible and scientifically defensible approach would be to develop a method to provide empirically based statements of the extent of variability in the population and the consequent probability of a coincidental match—much as is done with DNA typing, which is highly useful and diagnostic while at the same time does not rely on the notion of uniqueness or the requirement of empirically establishing the unique individuality of DNA. The population genetics of DNA typing avoids the paradox that has been recognized by mathematicians and thoughtful forensic scientists, namely, that there is no bridge from probability theory to a conclusion of unique individuality. One can use probability theory and data sampled from populations only to reach a conclusion about the random match probability, not to declare a unique pinpoint match.

The Srihari et al. research has something far more valuable to offer than to pursue the elusive and illusory quarry of uniqueness. Srihari et al.'s research forms the basis for an improved system of handwriting comparison. That is the future toward which it could be most usefully directed.

### § 35:37  Additional research—The CTS Proficiency Tests (1990–2002)

The CTS proficiency studies have not been published and not generally made available to anyone who is not a test-taker or a part of the forensic science

104

SAK000200

establishment.[1] We have been trying unsuccessfully for years to obtain these studies. They have now come to us as the result of a subpoena issued pursuant to a *Daubert* hearing. Of 15 test reports we have received, only 7 concerned handwriting. The rest were about other asserted skills of document examiners (e.g., concerning photocopiers, rubber stamps, ink, typewriting, and so on).

The 1992[2] proficiency test was provided to 125 of whom 84 returned the reports of their findings. The handwriting portion of the test was designed to see whether examiners could detect that a signature on a copy of a purchase order was created by the tracing of a genuine signature. About 92% (77 of 84) of examiners correctly concluded that the signature was a tracing. About 8% (7) mistook the tracing for an electromechanical creation.

The 1994[3] test was provided to 148 examiners, of whom 117 returned the reports of their findings. Examiners received three questioned checks and known writing standards of three people. Q1 and Q3 were written by K1 and Q2 was written by K3. This was designed to be "a straightforward handwriting identification problem," involving the writers' "natural writing." And all 100% of the respondents reached the correct answers. One interesting error, however, was that an examiner offered the conclusion that one of the writers was left-handed. There is no method of determining handedness that is recognized among document examiners. And the writer in question was in fact right-handed.

The 1996[4] test was provided to 174 examiners, of whom 137 returned the reports of their findings. This, too, was designed to be a "common handwriting problem in which the actual writer was not included in the suspect group." Examiners received one questioned note and three known writing standards of three suspects, all written in the natural writing of the writers, and all similar in skill level and overall style, so that there were no glaring differences. The correct conclusion would be to eliminate all of the suspects. Regarding suspect K1, only 38% (52 of 137) of examiners were able to exclude, 47% (64) were able to "probably exclude," about 9% (13) were in equipoise regarding inclusion or exclusion, and fewer than 1% (1) erroneously identified K1 as the author. Regarding suspect K2, only 25% (34) of examiners were able to exclude, 43% (59) were able to "probably exclude," about 15% (20) were in equipoise regarding inclusion or exclusion, and about 4% (5) erroneously identified or "probably" identified K2 as the author. Regarding suspect K3, only 28% (39) of examiners were able to exclude, 40% (55) were able to "probably exclude," about 20% (28) were in equipoise regarding inclusion or exclusion, and about 6% (8) erroneously identified K3 as the author.

The 1997[5] test was provided to 131 examiners, of whom 109 returned the reports of their findings. Examiners received two questioned checks and 15 checks known to have been produced by K1. All writing on the questioned checks had been made by K1 except the amount in both words and numbers on check Q1. Regarding check Q2, about 5% (5 of 109) of examiners failed to discern that all writing was made by K1. Regarding check Q1, about 43% (47) correctly eliminated K1 as the author of the amount in words and numbers. About 31% (34) could not determine whether or not K1 wrote the amount in words and numbers. About 9% (10) refrained from venturing any opinion on the issue. And about 10% (11) erroneously identified K1 as the writer of all the writings (both Q1 and Q2).

---

[Section 35:37]

[1]CTS has recently changed this policy, and now posts results on their internet website.

[2]Collaborative Testing Services, Questioned Documents Analysis, Report No. 92-6 (1992).

[3]Collaborative Testing Services, Questioned Documents Examination, Report No. 9406 (1994).

[4]Collaborative Testing Services, Forensic Testing Program, Questioned Documents Examination, Report No. 9606 (1996).

[5]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Report No. 9714 (1997).

Case 3:09-cv-03064-MWB-LTS    Document 284-27    Filed 06/23/11    Page 201 of 263
SAK000201

The 1998[6] test was provided to 141 examiners, of whom 119 returned the reports of their findings. This, again, was a "routine handwriting identification case," which the test-takers thought was quite easy, as the data seem to confirm. A single writer produced handwritten material and a signature, which was sent to examiners along with the known writing samples of three suspects. All of the examiners reported that Q1 was, or probably was, written by K3. Interestingly, there was a close correspondence of opinions about the body of the receipt and the signature on the receipt, that is examiners who were less than sure about the authorship of the body also were less than sure about the author of the signature. Several examiners made clerical errors (recording an incorrect conclusion after writing a correct narrative conclusion), which most likely would have been detected before going to trial.

The 1999[7] test was provided to 155 examiners, of whom 140 returned the reports of their findings. Examiners received six questioned documents, being partially completed state auto inspection certificates on which there was handprinting and numbers, plus specimen writing from three persons, K1–K3. Items Q1 and Q4 were written by K2. Items Q2 and Q3 were written by K3. Item Q6 was written by K1. And item Q5 was written by a person whose writing was not included among the known exemplars. All participants correctly concluded who wrote, or probably wrote, Q1, Q2, Q3, Q4, and Q6. The certificate without a suspect's exemplars, item Q5, gave examiners more difficulty. Six examiners (about 0.4%) erroneously concluded that Q5 was written by K2 or K3 or both of them together. About 13% (18 examiners) could not exclude K1 as the author of Q5; about 16% (23) could not exclude K2; and about 17% (24) could not exclude K3.

The 2000[8] test was provided to 150 examiners, of whom 135 returned the reports of their findings. Examiners were provided with a set of nurses notes for three shifts (day, evening, and night) and known writing samples from three "nurses," K1–K3. The day shift notes were written by K1. The night shift notes were written by K3. And the evening shift notes were written by someone whose writing was not included among the exemplars. Nearly all examiners correctly identified the author of the day shift notes as K1 (though 10 examiners thought the identification was only "probable" and one thought no identification could be made). Similarly, nearly all examiners correctly identified the author of the night shift notes as K3 (though nine examiners thought the identification was only "probable" and one thought no identification could be made). The evening shift notes, for which no correct author was among the exemplars presented examiners with some difficulty. Only 40% (54 of 135) were able to exclude (while 36% (49) were able to somewhat exclude) K1 as the author. Only 56% (75) were able to exclude (while 40% (54) were able to somewhat exclude) K2 as the author. And only 43% (58) were able to exclude (while 39% (53) were able to somewhat exclude) K3 as the author. One examiner erroneously thought that the evening shift notes "were written" by K1, and two examiners erroneously thought that these notes "probably were written" by K2.

The 2001 handwriting identification proficiency test[9] was built around a "weekend sign-in log." Apparently the log was in the normal form, with columns for "date," "name," "time arrived," and "time departed." Three such "questioned" entries were to be examined, which read as follows:

---

[6]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Report No. 9814 (1998).

[7]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Test No. 99-524 (1999).

[8]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Test No. 00-524 (2000).

[9]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Test No. 01-524 (2001).

106

| Q-1: | 20 Jan. | Kenny Bania | 8:30 | 11:15 |
| Q-2: | 20 Jan. | Kenny Bania | 11:24 | 15:40 |
| Q-3: | 21 Jan. | Kenny Bania | 11:30 | 12:45 |

These three questioned entries were to be compared to three sets of known writings: those of Kenny Bania (K-1), Sue Ellen Mischke (K-2), and David Puddy (K-3). The known writings were apparently fairly extensive and included material from both "course of business" writings (things written in the normal course without any controversy in mind) and "dictated" writings (also called "request" or "demand" writings) provided explicitly for the purposes of comparison. In reality, Kenny Bania, who gave the known writings K-1, actually wrote the Q-1 and Q-3 entries.

The Q-2 line was written by a person whose writing was not provided. She had written the Q-2 entry after examining Kenny Bania's real handwriting, having it taken away, and then attempting to simulate it from memory. None of this person's actual known writing was provided.

Sue Ellen Mischke (K-2) and David Puddy (K-3) wrote no part of Q-1, Q-2, or Q-3.[10]

Results of the tests were submitted by 131 people. They responded on a five category scale as follows A-was written by; B-was probably written by; C-cannot be identified or eliminated; D-was probably not written by; E-was not written by.

As to Q-1, 123 participants accurately said Kenny Bania wrote Q-1, and the other 8 said he probably wrote Q-1.[11]

As to Q-3, the numbers were similar, 122 positive identifications of Kenny Bania as the author and 9 who said Bania had probably written Q-3. On this test, declaring these particular authentic signatures authentic gave little problem. In this regard, the test was apparently similar to that presented by the "Lisa Bridgeforth" questioned document in the 1988 proficiency test.[12]

That leaves Q-2, and here the results are less heartening. Out of 131 responses, 16 said that Q-2 was written by Kenny Bania and 4 said it was probably written by him. In addition, one person said Sue Ellen Mishcke probably wrote Q-2, and another said David Puddy probably wrote Q-2. Thus, there were 22 incorrect responses. It gets worse. While 33 respondents positively eliminated Mishke, and 34 eliminated Puddy, only 20 eliminated Bania. Granted that Bania was given probable elimination by 55 respondents, the clarity of his authorship of Q-1 and Q-3 seems to have made some respondents reluctant to eliminate him altogether. Bania does not appear to have been a very good candidate for Q-2, despite the attempt at simulation from memory, since 75 respondents eliminated or probably eliminated him, compared to 63 and 66 respectively for Mishke and Puddy. All in all, more respondents refused to eliminate Mishke (66) than gave him any degree of

---

[10]Before giving the results, one detail requires comment. Though the name "Kenny Bania" appears on the sign-in sheets, it may not have been an actual signature, though there is reason to believe that it was a signature, or at least that it was in cursive, since the Manufacturer's Information mentions that the sign-in sheets contained both "printing and writing." If so, it presented a "signature authentication" problem. Signature authentication problems, of course, are supposed to present easy tests according to standard Osbornian handwriting identification tenets. Once again, this illustrates how difficult it is to determine just how easy a "test" has been made by test designers without seeing copies of the test materials themselves. One should always remember that it was not until the materials used in the FBI fingerprint proficiency tests were actually produced and examined by the Scotland Yard expert in *U.S. v. Llera Plaza* that their unrealistically easy design was discovered. See § 27:16.

[11]Interestingly, at least two respondents positively identified Bania as the author of Q-1, but did not positively eliminate either Mischke or Puddy as the author.

[12]*See* §§ 28:23 to 28:25.

107

elimination. Finally, comparing all positive responses in regard to Bania, 20 included him and 75 excluded him, for an error rate in regard to affirmative statements of 21.5%.

Some of the respondents apparently believed (correctly) that Q-2 was an attempt at simulation, or (incorrectly) disguise, and this may account for the high number of refusals to eliminate or identify. If the profession learned one thing from the 1984 proficiency test, it was to refuse to venture an affirmative opinion (at least on tests) when there are signs of simulation or disguise involved. Whether they are so circumspect in actual practice under the press of various circumstances which might generate powerful observer effects is questionable.

The 2002 proficiency test[13] contained serious design flaws. The first is attributable to the narrative "scenario" which was given with the testing materials in an attempt to put them in a realistic context (a practice that has been criticized before). Essentially, the details of the narrative made what turned out to be the true facts of the handwriting sources extremely unlikely. The fact that so many respondents failed to fall into the trap is probably more a tribute to the care and suspicion with which they approach tests and the artificial stories accompanying them than it is anything that might reflect actual practice.

The narrative was as follows:

Scenario

Wilson Temple has been divorced from his wife, Abby Newcomb, for 10 years. He was ordered by the divorce court to pay $600.00 alimony per month. His ex-wife just took him back to court, claiming that he is not paying the court-ordered alimony.

As partial proof that he has been paying the alimony, Mr. Temple produced four signed, handwritten receipts. He maintains that Ms. Newcomb wrote and signed all four of the receipts. Ms. Newcomb claims that she did not complete any part of these receipts, and has filed criminal forgery charges against Mr. Temple. As a result of this charge, the police detective sent in the disputed receipts and known handwriting samples of Mr. Temple and Ms. Newcomb for your examination. (Note that the body of the receipts was in fact hand printed, with the signature in cursive).

The answer sheet asks whether either Temple (K-1) or Newcomb (K-2) wrote the signatures on any of the receipts Q-1 through Q-4, and then asks separately whether either Temple or Newcomb wrote the body of the receipts Q-1 through Q-4. Note that under the scenario it might easily be that Ms. Newcomb wrote the body and signature on a receipt (which was in fact the case with Q-1 through Q-3), that Temple forged the body and signature on a receipt, or that Temple wrote out the receipt for Newcomb's signature. It is not easy to imagine how Newcomb could have genuinely signed a receipt that was written out by someone other than her or Temple, but that was exactly the case in regard to Q-4. This problem was compounded by the fact that the receipts were all in handprinting using both capital letters and lower case letters, but the exemplars of Temple's writing (both "course of business" and "request") contained only capital letters, which was apparently his normal way of printing.

Once again, the signature part of the test is an authentication problem, and performance was generally very good, with nearly all the respondents identifying Newcomb as the signature on all four documents.[14] (Q-1: 119 positive, 11 probable;[15] Q-2: 118 positive, 11 probable; Q-3: 120 positive, 10 probable; Q-4: 113 positive, 14

---

[13]Collaborative Testing Services, Forensic Testing Program, Handwriting Examination, Test No. 02-524 (2003).

[14]One "participant" apparently marked "could not identify or exclude" as the answer to all questions, in protest to the use of photographs instead of original writings as materials.

[15]The "probably wrote" responses are something of a problem, since they are generally linked to a refusal to completely exclude the other presented candidate (responding only "probably didn't write" for that one). Are these opinions

108

SAK000204

probable, 4 no opinion. The mild rise in the "probable" and "no opinion" responses in regard to Q-4 may well be due to the clash between the details of the narrative and the circumstances of the questioned documents set out above.)

The responses in regard to identifying Newcomb as the author of the body of the first three receipts were also very good. (Q-1: 121 positive, 9 probable; Q-2: 120 positive, 10 probable: Q-3: 122 positive, 8 probable). However, as to the body of Q-4, results were less good, as perhaps was to be expected. Three respondents positively identified Newcomb as the author, and one positively identified Temple. In addition, four identified Temple as the probable author and two identified Newcomb as the probable author. Further, only 13 positively excluded Temple, 19 probably excluded, and 90 couldn't identify or exclude, generally because of the "all-capitals" printing exemplars. So of the 37 actual opinions rendered concerning Temple's authorship, 13.5% were erroneous. (Things were a bit better in regard to Newcomb. There were 91 exclusion opinions as to her (36 positive and 55 probable), so of the 96 opinions rendered in regard to her, only 5.2% were in error.)

In an attempt to explain the errors in this set of responses, the test administrators did not lay the blame on the test (as they well could have, but that would show the impact of observer effects flowing from non-domain specific information). Instead, they indicated that nine of the 10 respondents who made errors were from countries where English was not a first language. How this affects a handwriting identification problem under traditional handwriting identification assumptions is unclear. What it does establish, however, is that the test administrators have a lot more data about the test and its takers, at least in regard to most respondents, than they disclose. One of their prominent disclaimers on every test is that these results cannot be used to make statements about error rates because the characteristics of the respondents are not known. However, it is clear that some such information is gathered for most of the respondents, and results could be given in such a way as to obviate that problem, to the extent that it exists. Once again, it is clear that those who are in charge of the program are withholding information in order to make it difficult to establish even a minimum for the error rates that the Supreme Court in *Daubert* and *Kumho Tire* has said are important to know.

Two comments might be made about these results, one methodological and one substantive.

The methodological observation is that these results are, in general, considerably better than the results of earlier tests. What explains the improvement? Have handwriting examiners improved abruptly and markedly? Or did the tests become easier? Most likely, the latter. The test manufacturers describe them as more straightforward, they appear to be simpler, and rather than complaining about test difficulty (as examiners did before the 1990s), examiners now commented about how easy the tests were. This question could be answered most usefully by seeing how well non-experts performed on the very same tasks. At the same time, that would answer the most basic question before a gatekeeping judge, namely, whether the experts provide some help beyond what a jury could do by examining the writing for itself. More important than how easy or hard the tests are, is the question *Kumho Tire* instructs courts to ask: how closely do these tasks approximate the task-at-hand that experts are offered to perform in the case at bar.[16]

The substantive finding worth noting is that document examiners have more difficulty when trying to exclude than to include (especially where the true match is

_____

merely properly circumspect, or improper attempts to hedge bets in the context of a case which seems to present something of a risky binary decision?

[16]In several instances the test manufacturer or proficiency advisory committee characterized the tests as being common handwriting problems.

109

not present among the knowns under consideration). The theory of forensic identification would lead one to expect the opposite, namely, that exclusion is easier than inclusion. A questioned and a known mark cannot be declared to match if there is any "unexplained" difference between them; yet the absence of any discernible differences is no assurance that the two share a common origin. But, for whatever reason—perhaps the considerable variability that exists within the writing of a single writer—handwriting examiners experience the opposite: they are more uncertain about exclusions than inclusions. This is somewhat analogous to the situation of eyewitnesses presented with a blank lineup (one from which the true perpetrator is absent). The eyewitnesses tend to make "relative judgments," that is, they ask themselves, in effect, which of those in the lineup comes nearest to looking like their memory of the perpetrator. That is a leading cause of eyewitness error. When asked to compare a questioned writing with knowns which do not include the actual match, document examiners apparently have some tendency to focus on the similarities between the known and the exemplars, rather than to exclude what in reality are non-matching exemplars. This seems to be an area of potential false positive error, much as it is for eyewitnesses. Perhaps researchers will some day take an interest in this phenomenon as it pertains to handwriting examiners. Meanwhile, it has implications for opinions in the courtroom. Where investigators have failed to provide the examiners with exemplars of the true source of the questioned writing, many examiners will not be able to confidently exclude all non-common-source suspects. (Thus, for example, on the 1996 test, only 28% of examiners were able to exclude suspect K3 as the writer of the questioned note, while about 20% were in equipoise regarding inclusion or exclusion, and about 6% erroneously identified K3 as the author.)

## § 35:38  Areas of disagreement: Testing document examiner expertise— Conclusions

In summary, what should we make of the available empirical data concerning handwriting identification expertise? First, any affirmative use of the data to support any hypothesis must be heavily qualified because of the small number of studies that have been conducted and their methodological problems. Even with this in mind, it seems fair to say that such a skill probably exists in some people for some tasks, but probably involves a large amount of inherent talent, and that while training and practice of "the true method" of atomized analysis may lead some people to become more dependable at some tasks, such credentials and experience alone do not necessarily establish the existence of a dependable skill.

Beyond this, if anything appears to be supported by the data, it is that there are many context-defined subtasks involved in handwriting identification, some easy, some very hard. Such skill as exists seems to be undependable even in many of those who have it, when it comes to many hard subtasks. Not even the most generous reading of currently available data could support a claim that we know how to define all of those subtasks. In addition, as a practical expertise, handwriting identification differs from many areas (such as Judge McKenna's harbor piloting) in that independent confirmation of the accuracy of one's results does not dependably emerge from everyday practice.

Finally, there is reason to believe that, like eyewitness identification, handwriting identification is strongly influenced by context cuing, that is, by the presentation of extraneous information to the examiner indicating the answer desired and non-handwriting reasons for its being the correct conclusion. Such presentations appear to be the norm in the submission of actual cases to document examiners, as even

110

SAK000206

the materials of the FSF studies reveal.[1] Here the founding fathers of the area were quite sensible, for Hagan, Ames, and Osborn all took strong positions that it was the professional duty of the document examiner to insist that such information not be presented and to take steps to set up modes of consultation to insure against such contamination.[2]

## § 35:39 Future directions: Interdependence of research and court decisions

**Research References**

Risinger and Saks, Rationality, Research and Leviathan: Law Enforcement-Sponsored Research and the Criminal Process, 2003 Mich. St. L. Rev 1023 (Winter 2003)

In the first edition of this treatise, this section emphasized that information on the actual contours of document examiner reliability would be forthcoming only to the extent the legal system forced it to be derived and produced in court, and, in its absence, was willing to reject proffered testimony. On this front there has been progress and there is reason to hope for future progress. The response of judges who have actually examined the empirical record in that regard has been overwhelmingly one of troubled concern and skepticism. The Supreme Court's decision in *Kumho Tire v. Carmichael* has made it clear that, at least for the federal courts, the nonscientific nature of a claimed expertise is no excuse for failing to evaluate its reliability by appropriate standards, and that such evaluation must be directed to the reliability of the expertise in the specific "task at hand" at issue in the particular case. Even before the lessons of *Kumho Tire* had been fully internalized, trial judges (in federal court, at any rate) had begun to place substantial restrictions on the kind of testimony that could be given by document examiners in handwriting identification cases under the *Hines/McVeigh* approach, allowing testimony concerning only similarities and differences, and forbidding conclusions. Unfortunately, this approach is flawed, in that it represents a Solomonic compromise not tied specifi-

---

**[Section 35:38]**

[1]*See* the discussion of the presentation of extraneous context information by the designers of the FSF studies, and the use of such information by test-takers, at § 28:24.

[2][T]he examiner must depend wholly upon what is seen, leaving out of consideration all suggestions or hints from interested parties; and if possible it best subserves the conditions of fair examination that the expert should not know the interest which the party employing him to make the investigation has in the result. Where the expert has no knowledge of the moral evidence or aspects of the case in which signatures are a matter of contest, there is nothing to mislead him, or to influence the forming of an opinion; and while knowing of the case as presented by one side of the contest might or might not shade the opinion formulated, yet it is better that the latter be based entirely on what the writing itself shows, and nothing else.

William E. Hagan, Disputed Handwriting at 85 (Banks & Bros., Albany, 1894).

No expert should permit himself to be *retained* in the sense in which an attorney is retained, viz., for the purpose of making the most of and winning a case, right or wrong . . . .

When the services of an expert are sought, he should, so far as is possible, avoid knowing the circumstances or the relations of the party asking his opinion as to the case.

D.T. Ames, Ames on Forgery at 89

(Bancroft-Whitney, San Francisco, 1899).

It should be understood that the chief source of error in these cases is this intense partisan spirit and the spirit of advocacy surrounding the whole proceeding. The scientific examiner deliberately endeavors to keep outside the circle of these influences. Too often the investigation of what is in fact a genuine document, or, of what is in fact a crude forgery, is not taken up as a scientific investigation but every argument and every influence is brought to bear in order to get favorable opinions and assistance from those who can assist in any way . . . .

There is of course certain legitimate information that the qualified examiner should have as to alleged conditions surrounding a document that is questioned but he does not need to know, and should not be told, why this or that should have been done or should not have been done by a testator or why, for other outside reasons, it is reasonable to assume that the alleged act was, or was not, performed. One who examines a document should have information as to the condition of an alleged writer or any alleged surrounding conditions that may have affected the result, or any facts that are a legitimate part of the technical problem which is submitted to him.

What Osborn referred to as "true methods," Albert S. Osborn, Questioned Documents at 2–3 (2d ed. 1929).

111

cally to required *Kumho Tire* "task at hand" analysis and evaluation. *U.S. v. Fujii*, however, provides an example of proper *Kumho Tire* analysis, and shows the way for the future.

Note that, just because *Fujii* resulted in full exclusion of document examiner's testimony in regard to the task of identifying whether a particular Japanese man trained in English as a second language in Japan was the author of a limited amount of handwriting on INS forms, this does not mean that all document examiner testimony should be excluded in regard to every "task at hand." Research can provide a warrant for believing that document examiners possess sufficient skills in regard to particular tasks to warrant admission, at least under test conditions. Kam IV shows for the first time how such specific "task at hand" research can be designed and administered. While one should be hesitant to base too much on a single unreplicated study, and while Kam IV involves only writers between the ages of 19 and 30, it would not be irrational for a judge to be influenced by the results in deciding whether to allow document examiner testimony on the question of signature authenticity, leaving the weight of the testimony to cross examination or counter-testimony concerning the document examiner error rates shown by the research on this, and perhaps other, tasks.

In June of 1998 the Justice Department's National Institute of Justice issued a formal solicitation for proposals for Forensic Document Examination Validation Studies to be funded by the Institute. To date, no results of such studies have been published.[1] However, one can hope that they will follow Kam IV's lead in testing document examiner performance against non-document examiner performance in regard to particular tasks of the kind that are commonly the subject of proffered testimony. After a couple of dozen such studies, we will finally begin to know what document examiner testimony ought to be admissible under *Kumho Tire*, and what ought to be excluded. Until the studies are produced, the proper response under the terms of Fed. R. Evid. 702 and *Kumho Tire* should be total exclusion. If this is true generally, it is even more certain in regard to those tasks clearly recognized as exceptionally problematical by the leading document examiner treatises themselves, such as attributing the authorship of forged signatures, or other very limited examples of writing.

Finally, even good research of the Kam IV variety cannot resolve one huge and protean problem undermining the reliability, not only of document examiner testimony, but potentially of all forensic science: context suggestivity in the way cases are presented to the expert for evaluation. This issue is both serious, and potentially curable, at least to a large degree, by changes in the practice of crime laboratories. Once again, however, crime labs are likely to do only what courts force them to do. And once again, there is at least some mild reason to believe that at least some courts are beginning to notice, as the criticism of the suggestive presentation by investigators to the document examiner in *United States v. Rutherford*[2] shows. Certainly the suggestive way a particular case is presented is an appropriate factor to be considered in any *Daubert/Kumho* reliability determination.[3] Whether courts will become more appropriately sensitive to this in the future remains to be

---

**[Section 35:39]**

[1]Instead, the funding was apparently directed toward the development of computerized handwriting identification. See § 28:40.

[2]*U.S. v. Rutherford*, 104 F. Supp. 2d 1190, 1193, 55 Fed. R. Evid. Serv. 201 (D. Neb. 2000) ("FDE Rauscher admitted that he was not given samples of anonymous writings and then given the questioned documents for the purposes of determining which one of the anonymous writers wrote the questioned documents (Tr. 68:18–25). Instead, prior to Rauscher's analysis, the government identified the author of the exemplars (samples) and explained its theory that the writer of the exemplars and the checks was the author of the questioned documents (e.g., check and load out sheet).")

[3]*See generally* D. Michael Risinger, Michael

112

seen. And when, if ever, any of this will percolate into the consciousness of courts in criminal cases to the same degree it already has in some civil case contexts[4] is another question that only time can answer.

## § 35:40 Future directions: Computer authentication and identification of handwriting

It is appropriate to note in closing the current activities of the United State Department of Justice regarding handwriting identification expertise validation. The Federal Bureau of Investigation formed a Technical Working Group on Forensic Document Examination (TWGDOC) in May of 1997.[1] The first task undertaken by TWGDOC was to develop an agreed upon set of standard procedures for performing handwriting comparisons.[2] The National Institute of Justice (N.J.) noted in 1998 that "[s]uch procedures must be based . . . on more than community-based agreement. Procedures must be tested statistically in order to demonstrate that following the stated procedures allows analysts to produce correct results with acceptable error rates. This has not yet been done."[3]

In July, 1996, N.I.J. held a "Workshop for Planning a Research Agenda for Questioned Document Examination (now called Forensic Document Examination)."[4] As a result of that workshop, and in recognition that since "the seminal ruling in *U.S. v. Starzecpyzel (S.D.N.Y.1995)* . . . the judicial system has challenged FDEs, especially handwriting identification, to demonstrate its scientific validity and reliability as forensic evidence,"[5] and further recognizing that this had not yet been accomplished, the N.I.J. solicited proposals for research concerning "the statistical validation of the individuality of handwriting,"[6] and the "statistical validation of standard operating procedures for handwriting comparison."[7] To date, no results of such research have been published. However, in an apparent attempt to explore instrumented alternatives to human document examiners, the N.I.J. funded research by a group at the State University of New York at Buffalo. This group has made some progress towards a computerized system which may one day be able to determine if handwriting was authored by a particular person with a defined degree of random match probability, at least under some circumstances. However, the research is still in the developmental stage.[8] Available information concerning both the design of validation tests and their results is not sufficient to evaluate the current state of their research, beyond saying that no claim is made that the system has been developed to the point that it could be confidently used in many recurrent tasks, especially those involving potential disguise. In addition, it appears clear that

---

J. Saks, William C. Thompson & Robert Rosenthal, The *Daubert/Kumho* Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion, 90 Cal. L. Rev. 1.

[4]*See generally* D. Michael Risinger, Navigating Expert Reliability: Are Criminal Standards of Certainty Being Left on the Dock?, 64 Albany L. Rev. 99 (2000).

**[Section 35:40]**

[1]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies 2 (June, 1998).

[2]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies 2 (June, 1998).

[3]To date, (May, 2001) TWGDOC has yet to

issue a report, at least publicly, or to publish such standards.

[4]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies 2 (June, 1998).

[5]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies 2 (June, 1998).

[6]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies 2 (June, 1998).

[7]National Institute of Justice, U.S. Department of Justice Solicitation: Forensic Document Examination Validation Studies at 3 (June, 1998).

[8]A visually impressive slide show summary of the research to date may be found at www.cedar.buffalo.edu.NIJ/pres/sld001.htm.

113

in any situation where the program must consider a significant number of potential candidates for authorship of a handwriting sample, its current accuracy drops precipitously. Nevertheless, future developments may lead to a system having the proven capacity to replace human document examiners with instrumentally generated information of known high validity and low error rates under the conditions actually applying to particular identification tasks in a particular case.

114

Case 3:09-cv-03064-MWB-LTS   Document 284-27   Filed 06/23/11   Page 211 of 263
SAK000211

SAK000212

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CR-00-N-0422-S |
| | ) | |
| ERIC ROBERT RUDOLPH, | ) | |
| Defendant. | ) | |

**AFFIDAVIT AND EXPERT WITNESS SUMMARY OF MICHAEL J. SAKS IN
SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF FORENSIC DOCUMENT
EXAMINER AND REQUEST FOR A DAUBERT HEARING**

**PROFESSIONAL BACKGROUND**

1. I am a Professor of Law at the Arizona State University, where I am also a Professor

of Psychology and a Fellow of the Center for the Study of Law, Science and Technology. My

doctoral training in experimental social psychology emphasized research design and statistical

analysis. One of my areas of professional interest is scientific evidence, which I have taught to

law students, law professors, attorneys, and judges for several decades, at the University of

Virginia, Duke, Georgetown, and elsewhere, as well as at my home institutions. I am co-author

and co-editor with Faigman, Kaye & Sanders of the treatise, MODERN SCIENTIFIC EVIDENCE:

THE LAW AND SCIENCE OF EXPERT TESTIMONY, SECOND EDITION (4 volumes, West, most recent

edition about to be published), in which I am the editor with primary responsibility for the

chapters on research methodology as well as on forensic science. I also am co-author and co-

editor with Faigman, Kaye & Sanders of the ANNOTATED REFERENCE MANUAL ON SCIENTIFIC

EVIDENCE, SECOND (2004). Additionally, I am the editor of JURIMETRICS (the journal of the

1

SAK000213

ABA Section of Science and Technology Law).

2. Of particular relevance to the issue of asserted handwriting identification expertise, I am co-author with Michael Risinger and Mark Denbeaux of several articles examining the claims of expertise associated with handwriting identification, beginning with, *Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise,"* 137 U. PENNSYLVANIA L. REV. 731 (1989) (reviewing the intellectual history and legal history of asserted handwriting identification expertise, as well as the limited empirical research then extant testing handwriting examiners' claims of expertise). In addition, see: Risinger & Saks, *Science and Nonscience in the Courts:* Daubert *Meets Handwriting Identification Expertise*, 82 IOWA LAW REVIEW 21 (1996) and Risinger, Denbeaux & Saks, *Brave New "Post-*Daubert *World" – A Reply to Professor Moenssens*, 29 SETON HALL L. REV. 405 (1998) and Saks & VanderHaar, *On the "General Acceptance" of Handwriting Identification Principles*, J. FORENSIC SCI. (in press).

**OVERVIEW AND SUMMARY**

3. This affidavit will address the history, research, and claims of the field of asserted handwriting identification expertise, and the limited data testing those claims. This "Overview and Summary" is in essence an executive summary. The sections following it discuss and document the issues in greater detail. [Note that articles and treatises are referred to briefly in the text and their full citations are provided in a reference section at the end of the affidavit.]

4. Serious question exists whether the expertise claimed by forensic handwriting examiners meets the requirements of FRE 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire*

2

SAK000214

*Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). (Following the Supreme Court's decision in *Kumho Tire*, most district courts giving thorough consideration to the issue have limited or entirely excluded the testimony of forensic handwriting examiners.

5. Not long ago, handwriting examiners commonly asserted that their conclusions about authorship were flawless. Those claims have had to be tempered in the wake of studies showing that for many handwriting identification tasks accuracy is far less than perfect. Error rates have ranged as high as 28% for efforts by examiners to identify the genuineness of signatures, as high as 54% for efforts to identify hand printing, and as high as 41% false positives (and as high as 100% false negatives) in the identification of the author of cursive writing. Every study which looked at the question has failed to confirm the assumption that examiners who are more experienced or who are certified are more accurate than examiners with little experience and no certification. The notion that all writing is unique (and thus that all writers in the world can be distinguished from each other), which is accepted as an article of faith among handwriting examiners, has only recently started to be tested, and so far without its validity being demonstrated.

6. Thornton and Peterson (2002, at 186-187) – one a past chair of the Criminalistics Section of the American Academy of Forensic Sciences and the other past executive director of the Forensic Sciences Foundation – have written: "Arguments that the identification of handwriting is a science are weak to the point of being indefensible," and that asserted handwriting identification expertise is "high" on vulnerability to a *Daubert* challenge. Edward Imwinkelried (2003, at 30), a prominent evidence scholar and supporter of liberal admissions standards, has commented that, "The critics of questioned document testimony have presented a

3

SAK000215

persuasive, even compelling, case that it does not qualify as science." Andre Moenssens, an emeritus law professor specializing in forensic science, has conceded that, "there was indeed a dearth of published empirical information relating to the proficiency of document examiners, as [the critics] had asserted ...." (Moenssens (1998), at 300). Elsewhere, concerning the lack of empirical evidence supporting document examiner claims, Moenssens stated: "On that the critics are absolutely correct." "Document examiners have not done the kind of empirical research that could have and should have been done." (Moenssens, 1997.) Wolfgang Conrad (1975), a German researcher who set out to rehabilitate the reputation of European handwriting examiners following a train of "publicized false conclusions of hand writing comparison expert opinions," nevertheless concluded that, "one cannot speak of a clear factual superiority on the part of the experts, especially since the findings did not show that experts are better defended against serious or even extreme erroneous assessments in individual cases than lay persons... who are highly motivated and with a comparable educational level."

**History**

7. Until the middle of the 19th Century, American courts generally excluded proffered handwriting experts. During the latter half of that century courts gradually admitted them more often, so that by the start of the 20th Century they typically were allowed to testify, though it was common for courts to voice skepticism about their value. The dawn of the era of unquestioning acceptance of handwriting experts did not come until the Lindbergh kidnaping trial (1936), ending only with the arrival of the *Daubert* era.

8. Through most of that history, from widespread exclusion to widespread admission, not a single court inquired into the actual soundness of the claims of expertise. (How well, if at all,

4

SAK000216

can asserted handwriting experts do what they claim to be able to do?) Beginning with *Daubert*, of course, the federal courts have been obliged to make precisely that kind of inquiry (if and when the issue is raised).

9. After *Daubert* (1993), skepticism about handwriting experts returned (see, e.g., *United States v. Starzecpyzel*, 880 F. Supp. 1027 (S.D.N.Y. 1995) and the cases which followed the reasoning of *Starzecpyzel).* After *Kumho Tire* (1999), courts again began to exclude document examiner opinions (see, e.g., *United States v. Hines*, 55 F.Supp.2d 62 (D.Mass. 1999) and the numerous cases which followed or extended the reasoning of *Hines*).

10. An extensive review of the legal history of handwriting expert testimony can be found in Risinger et al. (1989). An extensive discussion the post-*Daubert* and post-*Kumho Tire* case law can be found in Risinger (2002; 2003).

### Assertions Supported by Little or No Research

11. Virtually all, and perhaps literally all, of the claims forensic handwriting examiners make about the nature of the phenomena with which they work, and of their own skills, are the product of plausible impressions or wishful thinking, not systematic empirical testing of propositions critical to the claimed expertise.

12. The most important of these claims is the assertion that no two people write alike. This proposition is supported by little more than the *ipse dixit* of the examiners who believe it. Albert Osborn (1910; 1929), the modern parent of the field, defended the proposition with a thought experiment involving the statistical concept of the product rule: if you multiply together the probability of numerous independent attributes, you wind up with a very small probability. That small probability is the chance that a person selected at random from the population would

5

SAK000217

have the same characteristics as a given person (such as the writer of questioned writing). But that approach can never support the conclusion that each writer's writing is unique, as researchers in other areas of forensic science have pointed out (e.g., Cummins & Midlo (1943)). Some examiners argue that their own "experience" has revealed to them that no two writings are ever alike. But it is hard to imagine how this could be so, given that everyday casework exposes examiners to only a fraction of the writers who exist, and they do not go back and compare new writing to all of the old writing that has passed their way.

13. More recently, handwriting examiners have said that the claim of uniqueness is proven by the existence of databases such as "FISH."[1] But, on this issue, FISH is merely (and literally) *ipse dixit*. If an examiner says that two writings were made by the same person (whether or not that is correct), those writings go into the database labeled as having been made by one person; if an examiner says that two writings were made by different people (whether or not that is correct), those writings go into the database as having been made by two different persons. The first serious study to attempt to systematically test whether every writer writes in a uniquely different way (Srihari et al., 2002) failed to establish that all writing is unique. By its own terms, the study was unable to distinguish every writer in its sample from every other writer. And that failure occurred under conditions quite favorable to reaching the conclusion sought (for example, it used a small sample size (for such an inquiry) and used highly

---

[1] As explained in *United States v. Hidalgo, 229 F.Supp 2d 961, 962 n. 1* (D. Ariz. 2002), "the Forensic Information System for Handwriting ("FISH") [is] a computer system in use by the United States Secret Service. Evidently, the Secret Service has been able to match the handwriting of several individuals who have written threatening letters to government officials. The papers describing FISH do not allow us to draw a meaningful conclusion about FISH's effectiveness."

SAK000218

heterogeneous writers). See Saks (2003). See also, *United States v. Hidalgo*, 229 F.Supp 2d 961, 962 (D. Ariz. 2002) ("...(T)he Srihari study fails to establish uniqueness. At most, we can reasonably infer that among 1,500 writers, very few write in a similar way.")

14. Conversely, there is evidence that writings by different people can be mistaken one for another. Harris (1958) examined voter registration records in one city and found that, "So many of these signatures lacked individuality and looked alike that they were not worth photographing." Moreover, false positive errors in various empirical tests of handwriting experts often represent instances of handwriting examiners erroneously concluding that the writings of two different people were made by a single person. (These studies will be reviewed in detail below.) Further evidence against the uniqueness hypothesis comes from actual cases in which handwriting examiners opined that a match existed between the questioned writing and a suspect's writing when all other identification evidence in the case excluded the suspect. (See, *United States v. Brown*, CR 99-184 (C.D.Cal., Dec. 1, 1999); *United States v. Rutherford*,104 F.Supp.2d 1190 (D.Neb. 2000).)

15. Why do forensic handwriting examiners find it so important to believe in the doctrine of uniqueness? After all, DNA typing has done its work without having to adhere to such a belief. By contrasting the traditional practice of handwriting identification to that of DNA typing the reason becomes apparent. Forensic identification is a two-step process. First, an examiner must decide whether two objects are indistinguishably alike. Second, the examiner must evaluate whether the similarity (the "match") is attributable to the two objects originating from a common source or whether the similarity between them is only a coincidence. That evaluation is best performed – as DNA typing demonstrates – by calculating, in each case, the probability of a

7

SAK000219

coincidental match. The field of DNA typing has taken the trouble to collect the data to perform this second step and to report to factfinders the risk that a conclusion of common source is in error (is a "coincidental match"). Handwriting examiners have never collected the necessary data or determined whether the product rule (as suggested by Osborn) is applicable to handwriting features. But by assuming that no two writings from different writers are ever indistinguishably alike, handwriting examiners exempt themselves from doing the serious data collection and analysis required. And the inevitable result of that work would be that they would have to reduce their claims from absolute uniqueness and certainty to more modest, probabilistic claims. Now, they simply conflate the perception of a match with the conclusion of identity and ignore the problem of evaluating the meaning of a match. At the end of the day, by pretending that critical realities need not be dealt with, their job is made vastly easier and their opinions (usually) sound stronger than they would if the data needed to calculate the case specific probabilities existed.

### General Acceptance

16. There is evidence that forensic handwriting examiners do not agree among themselves about critical propositions related to identification. Perhaps more important, handwriting scientists (who study the nature of handwriting behavior more systematically and scientifically) do not endorse many of the beliefs of forensic examiners. (Saks & VanderHaar, forthcoming).

17. A sample of forensic handwriting examiners was surveyed and asked to indicate the degree to which their field accepts a series of propositions (found in the handwriting examination literature). Two propositions central to the idea that handwriting can be individualized – namely, that no two people write alike and that inter-writer variation greatly exceeds intra-writer

8

SAK000220

variation – were not fully endorsed as "well accepted as true," though more minor propositions concerning the process of handwriting examination did receive that strong endorsement. The "findings suggest that forensic document examiners regard with somewhat greater confidence the first order inferences they draw in the process of performing their examinations and with somewhat less confidence the underlying principles that are needed to make higher order inferences about genuineness or identity."

18. Of the 10 propositions inquired about in the survey, handwriting scientists said that *their* fields differed from forensic handwriting examiners on the acceptance of 8 of the propositions. The five propositions most significantly believed by forensic examiners were all subscribed to with significantly less credence by handwriting scientists. Three of these five involved beliefs by forensic examiners about their ability to accurately infer from the static trace on paper the writer's starts and stops, direction of strokes, and speed. The two other propositions were: "When writing in a natural way and with no attempt at disguise, no two people write sufficiently alike that one person's writing could be mistaken for that of another" and "An individual's writing pattern is sufficiently distinctive that it is virtually impossible to duplicate it (forge it) without detection by an experienced expert. (In other words, handwriting experts are able to determine whether a writing is genuine or forged.)"

**Poor Examination Procedures Susceptible to Observer Effects**

19. To make sure that they are not influenced by extraneous cues into making incorrect decisions, scientists and professionals in many areas of practice cause the decision-makers to be "blind" to those biasing cues (Risinger et al., 2002; Saks, 2003). In scientific research blind or double-blind procedures are commonly employed. In school, code numbers rather than names

9

SAK000221

are often used in grading exams. There are blind taste tests. And in eyewitness lineups and photospreads, the witness is not told which person is the suspect. But in handwriting examination, examiners typically are allowed to know exactly who the suspect is. For example, in the present case, the defendant's name appears on transmittal requests and on many of the laboratory reports. The result is that ambiguities will tend to be resolved in the direction of "confirming" investigative suspicions about the guilt of the defendant. (This would be true in any case, but it is especially true in a case with the notoriety of this one, where the suspect's name itself is a major cue to finding a "match" between inculpatory questioned documents and known writings of the defendant.) Procedures that are devoid of structured protections against such "observer bias" would be considered poor scientific practice, poor educational practice, poor market research practice, and poor police practice with eyewitnesses. The failure to employ proper masking procedures would cast doubt on the conclusions arrived at in all of those areas. Inexplicably, handwriting examiners make no comparable efforts to employ examination procedures calculated to prevent such errors.

20. To be sure, not all documents can be sanitized, such as where a signature is at issue. But, in many other situations, examiners could be made blind to biasing cues.

**Research Testing the Asserted Expertise**

21. Before the final decade of the 20th Century, research testing the claimed expertise of forensic handwriting examiners bordered on non-existent. The extensive search by Risinger et al. (1989) found one weak published study (from 1939) and five unpublished proficiency studies conducted in the 1980s, and those raised doubts about the claimed expertise. (We have since learned of one additional study (published in German in 1975 in a European journal), which

10

SAK000222

might have been included in that small 1989 collection, but its results do not change the conclusion – quite the contrary.) Thus, for decade after decade, handwriting examiners asserted expertise without having any solid foundation to support their claims. Once courts began asking about the basis of these claims, as they have done pursuant to *Daubert* and *Kumho Tire*, and especially once courts began ordering limitations to or exclusion of the expert testimony of handwriting examiners, then handwriting examiners became interested in seeing research done on their claims. Today there are about 15 proficiency studies by the Forensic Science Foundation and the American Society of Crime Laboratory Directors (FSF/ASCLD) and about half a dozen other studies testing the claims of handwriting examiners. What they teach us about the nature of the expertise at issue is less than clear.

22. A number of caveats must be kept in mind when evaluating the research that does exist. This is in part the point made by *Daubert* in its discussion of the purpose of peer review: we must be attentive to methodological flaws in research. First, all of the studies we will discuss may tend to overstate the accuracy of examiners because they know they are being tested and are likely to be working harder than in any ordinary case they might work. One indication of that might be the extensive refusal to make a decision. How does that compare to the rate of failures to reach conclusions in everyday casework when they are not being tested? The solution to this methodological problem is the use of "closed" as opposed to "open" proficiency testing, a method that one finds, for example, in the testing of medical laboratories. Second, in some or much everyday casework, examiners have access to other case information which suggests the guilt or innocence of the suspect, or signals the examiner as to what conclusion is desired by investigators. Those cues will lead to more errors than will occur in proficiency tests, where no

11

SAK000223

such extraneous biasing information exists. Third, all studies comparing laypersons to experts (with the possible exception of Conrad, 1975) failed to equalize the motivation of laypersons. Thus, the experts are exceedingly highly motivated to perform at their best, while the laypersons lack any similar motivation and may find the task dull. Removing this confound from tests comparing experts and amateurs, in order to obtain a measure of the ability differences between them, if any, is a challenge for future research. Meanwhile, we must entertain the possibility, if not the likelihood, that any observed differences between experts and laypersons are exaggerated (experts performing better than they normally do and laypersons lacking the motivation that jurors would have to reach a correct answer). Nevertheless, mindful of these limitations, let us review the findings of the studies that do exist.

23. Numerous proficiency studies sponsored by the Forensic Sciences Foundation and the American Society of Crime Laboratory Directors have found the following:

a. Cursive Writing. Writings in the natural cursive hand of the writers compared to known exemplar writing of several suspects, with the correct suspect *included* among the exemplars, sometimes resulted in correct answers from nearly 100% of examiners and sometimes from as few as 52% of examiners. Where the actual writer was *not included* in the group of exemplar writers, as many as 32% of examiners failed to exclude all of the "innocent" writers. Where the writers were *teenagers* and the actual writer's writing was *not included* in the group of exemplar writers, 41% of examiners made false positive identifications inculpating an innocent suspect. And a study presenting the problem of identifying the author of a *forged* document resulted in 100% erroneous answers (which is consistent with the field's literature, though there are examiners who nevertheless

12

SAK000224

claim the expertise to make such identifications and so testify in court.)

b. Signatures. Proficiency tests involving the determination of genuineness of signatures produced results ranging from 35% to 100% correct. The considerable range of accuracy and error suggests that problems vary in difficulty. Future research will need to determine on what sorts of tasks examiners are more dependable and on what sorts they are less dependable.

c. Printing. Proficiency tests involving hand printing produced results ranging from as low as 13% correct answers to as high as 100% correct answers. This even greater range of accuracy and error suggests even more so that problems vary in difficulty and future research will be needed to guide examiners and courts in knowing when examiners are likely to be dependable and when not.

24. These studies show the existence of considerable *unreliability* (that is, examiners sometimes or often disagree with each other on the proper conclusion about the authorship of a writing). The studies also show a lack of *validity*, that is, error (the answers reached by examiners are incorrect). Galbraith et al. (1995) performed further analyses on several years of the FSF studies and found that in two out of six tests examiners performed no better than if they were guessing. Risinger et al. (1989) performed further analyses on several years of the FSF studies and found no relationship between an examiner's accuracy and the number of years of experience the examiner had, or whether the examiner was certified, or how much of the examiner's caseload consisted of document examination work.

25. A series of studies has been conducted by Kam et al. Several of these studies took up

13

SAK000225

the suggestion of Risinger et al. (1989) that part of the inquiry should involve finding out on what tasks and to what degree asserted handwriting experts perform better than laypersons, and on what tasks they are no better than laypersons. The Kam studies generally report lower levels of error among examiners than the FSF/ASCLD proficiency studies: identifying the author of cursive writing (87% correct and 6.5% error), determining the genuineness of signatures (86% true negatives, 7% false positives), determining whether forged signatures are forged (96% true positives and 0.5% false negatives). In comparing the performance of examiners to laypersons (mostly college students), Kam et al. found that they did equally well with respect to matching authors to their writing but examiners did better in avoiding the error of declaring a non-match to be a match. Similarly, examiners and laypersons did equally well in identifying forgeries, but examiners were more successful in refraining from declaring non-forgeries to be forgeries. (These findings might in part be the result of some of the methodological flaws discussed above.)

26. In Australia, Found & Rogers, the only **two** handwriting examiners who are also research scientists, have undertaken what may prove to be the most informative series of studies yet. Thus far, their studies have reached the following conclusions: Examiners were more accurate with signatures of higher complexity and less accurate with signatures of lower complexity. Even within high or low complexity writing, other features caused some signatures to produce more accurate conclusions and others to produce less accurate conclusions. There was a wide range of skill across examiners, some being consistently more accurate and others persistently less accurate. Like the Risinger et al. findings, there was no relationship between the number of years examiners had been practicing and whether they tended to be correct or not.

14

SAK000226

27. The German study which recently came to light suggests that the suspected confounding of motivation and ability (discussed elsewhere in this statement) in studies attempting to compare experts and laypersons likely is distorting the results of those studies. It suggests that when the motivation of the two groups is made more similar, the differences in performance diminish. Conrad (1975) compared the performance of professional handwriting experts to two groups of laypersons and to college students who had taken courses in handwriting analysis. He states that one group of laypersons in his study were highly motivated to perform well. The result was that the laypersons came much closer in accuracy to the examiners (20% total error for the laypersons compared to 15% for the examiners). The college students made the fewest errors of all (only 8% total error).

## DETAILED SUMMARY OF RESEARCH ISSUES AND FINDINGS

28. This section discusses in greater detail the research issues and findings summarized above. Even greater detail and with more extensive documentation of most of these matters can be found in Risinger (2002; 2003).

### The Empirical Evidence of Expertise

29. Risinger et al. (1989) undertook an extensive search for studies testing the claimed skills of forensic handwriting experts, and found a grand total of one poorly conducted but published study by Inbau (1939) and five unpublished proficiency studies by the Forensic Sciences Foundation. What little was found raised rather than quieted any doubts about the claims of handwriting experts. This paucity of research contrasts sharply with the state of knowledge in most fields – especially those which claim to be "sciences" – where hundreds or thousands of studies have been performed testing which of the field's ideas are correct and

15

SAK000227

should be retained and which are incorrect and should be modified or discarded. Others who have searched this literature, all of them quite friendly toward the field of handwriting examination, agreed with Risinger et al. that there was a paucity of research: Galbraith et al. (1995) wrote that there is an "admittedly sparse history of carefully controlled empirical studies.... there certainly has been a shortage of studies…." Kam et al. (1994) wrote that there is "an acute lack of empirical evidence on the proficiency of document examiners" and therefore "it is widely agreed that testing of professional document examiners and acquiring data on their abilities... are necessary." Moenssens (1997, 1998) stated that, "Document examiners have not done the kind of empirical research that could have and should have been done.... On that the critics are absolutely correct." There is "indeed a dearth of published empirical information relating to the proficiency of document examiners…."

30. Specifically recognizing the paucity of research, the National Institute of Justice initiated a research funding program to facilitate testing the claims of asserted handwriting identification experts to determine which of their claims are valid. (NIJ, 1999 ("Validation of the scientific basis for handwriting examination... is extremely important... priority must be placed on demonstrating the scientific basis for identifications claimed during handwriting comparisons.")) The only study I am aware of to emerge from that program is Srihari et al., 2002, discussed below.

### The Belief That No Two People Write Indistinguishably Alike

31. The most fundamental assumption of forensic handwriting examiners is that "no two people write alike and no one person writes the same way twice." But those beliefs do not rest on any sound evidence or theory. They are articles of faith.

16

SAK000228

**The Product Rule**

32. The origin of handwriting examiners' belief in the uniqueness of writing among different writers comes from the father of the modern document examination field, Albert Osborn. Osborn defended the doctrine of uniqueness with a statistical thought experiment based on the "product rule" of probability theory.

33. The concept is that if we know the individual probabilities of a set of independent attributes, we can calculate the probability of their joint occurrence by multiplying them together. As he explained in his book, QUESTIONED DOCUMENTS (2d ed., 1929), which is still one of the leading treatises in forensic document examination: "This problem is capable of a mathematical solution if we can agree on the basis for the calculation.... We must first determine how often, or rather how seldom, each feature will be found separately and then, by a mathematical formula... we determine how often coincidence of all the features may be expected." This reasoning led Osborn and many of his followers to the conclusion that the probability that any two people would write indistinguishably alike was zero.

34. An important problem with Osborn's thought experiment is that probability theory is incapable of supporting the claim of unique individuality. The mathematics and logic of probability theory can lead only to a probability value – not to unique, one-of-a-kind certainty. If the exercise suggested by Osborn were carried out, the end product of handwriting examination would be a specified probability of a coincidental match (that is, the probability that a person's writing selected at random from the relevant population would have the same characteristics as the questioned writing, also known as the "random match probability") – rather than a bald assertion of (the examiner's subjective belief in) identity. That probability theory is

17

SAK000229

inherently incapable of leading to a conclusion of unique individuality is obvious to statisticians and probability theorists, and has been recognized by forensic scientists in other areas. See, e.g., Cummins & Midlo (1943) ("It is unfortunate that this approach [probability theory] carries the implication that a complete correspondence of two patterns might occur…" "... it is impossible to offer decisive proof that no two... bear identical patterns."). Also see Stoney (1991).

35. Probability theory could, however, be employed to reduce uncertainty in trying to match the correct writer to a writing, or, more correctly, to evaluate the likelihood that a writing was or was not made by the purported author. But handwriting examiners have never taken the trouble to do the research necessary to accomplish this. Instead of developing the basis for making objective probability estimates, they rely on what statisticians call "subjective probabilities" (personal guesstimates of probability), or they simply act as if it is literally true that no two writings are indistinguishably alike, and treat the probability of an erroneous match as being zero. Handwriting examiners have throughout most of the past century recognized the possibility of moving beyond metaphor into actually measuring and calculating probabilities for their examinations, but none of them have been willing to undertake the necessary work. See Hilton (1982).

36. The shortcomings of the handwriting examiner's assumptions and approach can be understood by contrasting what handwriting examiners do (they look and they opine) to the routine work of experts in DNA typing, who actually have collected data on the probability of occurrence in the population of individual genetic systems, have tested them for independence, apply the product rule, and report that probability of a coincidental match to the factfinder. DNA experts do in actuality what handwriting experts do only metaphorically.

18

SAK000230

37. Osborn and his followers never progressed beyond using the theory as a loose metaphor for what they were doing. In their practices, they take no measurements, they make no calculations, and they report no probability of coincidental matches. In short, they make no effort to apply Osborn's theory to their practice.

38. This failure of handwriting examination to take probability theory seriously can also be understood by contrasting contemporary practice to the first and (so far as I am aware) only time that handwriting was subjected to objective measurement and probability calculation – in the famous Howland Will Case of 1865, recounted recently by Menand (2001). That case dealt with the question of whether a signature was genuine or forged. The case involved a claim to the substantial Howland fortune by the infamous Hetty Green (then Hetty Howland Robinson). Hetty was accused of forging the signature on the will upon which her claim relied. It was suspected that she had traced the signature from another of the purported testator's signatures. Renowned Harvard mathematician Benjamin Peirce and his (later) even more renowned son Charles Sanders Peirce were hired to examine the signature on the will. They devised a method which relied on defining the beginning point of downstrokes, of which there were 30 in the signature. Comparing each of 42 genuine Sylvia Ann Howland signatures to each other (which gave 25,830 comparisons), they determined that any given downstroke start position would coincide with any other approximately one time in five. They then compared the challenged will signature with the signature claimed to be the tracing model and found perfect coincidence of the start position of all 30 downstrokes. Using the base rate data they had gathered, they found the random match probability of this occurring to be 1 divided by 5 to the 30th power, or about 1 divided by 2666 followed by 18 zeros – an extremely small probability that the signature looked

19

SAK000231

as it did owing to the normal variation in the testator's writing. In that same case there was no lack of handwriting "experts" who offered their subjective opinions on both sides of the question of whether the will was a forgery. But only the Peirces could offer real data and describe exactly how they arrived at their conclusions.

39. Contrast this to the usual work of today's handwriting experts: They reach their conclusions concerning authorship merely by intuiting a subjective sense of the likelihood that the questioned writing was authored by the defendant. They cannot explain how their subjective probability judgment was arrived at, because it is entirely intuitive. (See Judge McKenna's comments on this issue in *United States v. Starzecpyzel*, 880 F. Supp. 1027 (S.D.N.Y. 1995).) The typical "laboratory report" offers nothing but bottom line conclusions – a skimpiness which, in other areas of law, would be rejected. (See, e.g., *McMahon v. Bunn-O-Matic*, 150 F. 3d 651, 658 (7th Cir. 1998) ("We have stated before and reiterate, that 'an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process'."); *Travelers Property & Casualty Corp. v. General Electric Co.*, 150 F.Supp.2d 360 (D.Conn. 2001).

<b>Empirical Tests of the Uniqueness Theory</b>

40. Two studies have been carried out which test the assumption that all writers write discernibly differently, and both failed to confirm it.

41. The first of these studies attempted to see "how much people write alike." It collected signatures from voter registration records by people with the same name. The study found that the signatures of different people sometimes were so alike that it was impossible to distinguish one writer from another. Harris (1958) ("So many of these signatures lacked individuality and looked alike that they were not worth photographing."). The implications of this extremely

20

cautionary study by a prominent handwriting examiner have simply been ignored by the field. In so doing, the field went from assuming the truth of the proposition without evidence to asserting the truth of the proposition in spite of evidence to the contrary.

42. The more recent study, by Srihari et al. (2002), obtained specially designed, lengthy (156 words) standardized cursive writing samples from 1568 people in various places around the United States, used a computer to extract features from the writing and compare the writing in an effort to try to distinguish each writer's writing from every other writer's writing. The effort did not succeed. First of all, the study plainly failed to distinguish every writer from every other writer. This failure occurred even within a research design that was especially likely to find differences among the writers sampled. If the sample of writers were increased, the failure-to-accurately-distinguish-writers rate would increase. (For the purpose of establishing uniqueness among all writers in the United States, 1568 is a very small sample.) If the sample of writing were smaller, and therefore more forensically typical, the failure rate would increase. If the writer sample consisted of people with more similar backgrounds and therefore more similar writing appearance (analogous to a lineup), the failure rate would increase. If each writer were asked to give more samples than the three collected in this study, the intra-writer range would increase, would be more likely to overlap with the writing of other writers, and the failure rate would increase. In short, the study itself did not demonstrate unique individuality. And if the researchers had designed a more rigorous test of the hypothesis, its failure would have been even more obvious. The Srihari et al. study did not succeed in demonstrating uniqueness, does not say that it did, and does not say that it expects to do so in the foreseeable future. (See Saks, 2003).

21

SAK000233

**Other Arguments**

43. In the absence of conventional scientific evidence, a variety of other arguments have been put forward in an effort to prove that no two writers write indistinguishably alike.

44. One argument is that if this fundamental claim were not true, people would be unable to recognize their own handwriting. But is *that* true? It is one thing to be able to pick my writing out from that of my immediate family members or co-workers. It is quite another to say that my ability to do that proves that I could single out my writing from that of every other person in North America, or in a large city, or a small city. There is no evidence that any such thing is possible.

45. A second line of argument has to do with several studies of identical twins, in which each member of a pair of twins is reported to have writing that is distinguishable from the other. (See Beacom, 1960; Gamble, 1980; Newman, 1937; Wanscher, 1943.) The reasoning is that if two people are genetically identical and grow up in the same home, go to the same school, etc., they are as identical as two people can be, so that if *their* handwriting is not identical, then no two people will have indistinguishably similar writing. This reasoning is somewhat at war with the purpose for which twin studies were devised by geneticists and psychologists in the first place. Those researchers wanted a way to hold genetics constant so that they could observe the effects of environment on human development. No one expected even monozygotic twins reared together to have identical environments and experiences; they expected variation. Handwriting

22

SAK000234

experts, apparently, do not share those scientists' expectations. In any event, some of these twin handwriting studies report that the writing of some twins was in fact "identical" or "very similar," contrary to what the proponents of handwriting expertise offer those studies to prove. But handwriting examiners could reasonably object that those researchers were not document examiners and were not using fine enough distinctions to see the differences that existed. On the other hand, some of the studies were not conducted in properly blind fashion, so that someone expecting to find differences and knowing that she or he is looking at the writing of two different persons could attribute significance to variation that is no more than would exist intra-writer. In short, these studies were not designed to test the hypothesis of universal uniqueness, and they fail to establish it.

46. A third line of argument has to do with computer databases of handwriting, such as one called FISH. The claim that is made is that these databases contain thousands of writings and no two from different persons are indistinguishably similar. But the database does nothing more than reflect the conclusions of handwriting examiners. If an examiner looks at two writings and declares them to have come from the same person, they go into the database as being the writing of one person. If an examiner looks at two writings are declares them to have come from two different persons, they go into the database as being the writing of two persons. The argument that this proves uniqueness is pure question begging.

47. A final line of argument given by some handwriting examiners is that there have been thousands or millions of person-years of document examinations, and no one has yet found two writings made by different persons that are indistinguishably alike. This is much like the FISH argument, above. In the great majority of their casework, examiners have no way of knowing if

23

SAK000235

their conclusions are correct or not. Most often, they compare the questioned writing to the known writing of a suspect, and intuit their conclusion. So if an examiner concludes that two writings were made by the same person, that becomes the conclusion, right or wrong. If an examiner concludes that two writings were made by different persons, that becomes the conclusion, right or wrong. So it is hard to see how the hypothesis is being tested in such everyday casework. Like the FISH argument, this is nothing more than *ipse dixit*.

### Reliability of Conclusions

48. Handwriting examiners sometimes offer as an indication of their expertise the assertion that all handwriting experts always reach the same conclusion on the same writings. (E.g., FBI document section chief Ronald Furgerson asserted that all "certified" document examiners in the United States would reach the same conclusion as he would in any and every case. Fisher (1995), at 196.) Similarly, Todd (1973) has argued that because handwriting experts report that they rarely have their testimony contradicted by an opposing expert, that confirms the accuracy of their opinions.

49. This is a claim of *reliability* of performance, that is, that handwriting experts' conclusions, right or wrong, are in agreement with each other. *Validity*, that is accuracy, is another matter. Scientists draw a distinction between the two concepts.

50. The Supreme Court in *Daubert* took some pains to explain that what it termed "evidentiary reliability" is similar to what scientists call "validity." For scientists, "reliability" refers to the extent to which a measuring instrument (including a human decision-maker) produces the same result each time it measures the same thing. "Validity" refers to the correctness of the result. Thus, if handwriting examiners all gave the same opinion in regard to a

24

SAK000236

given handwriting comparison, they would have 100% reliability. But if they all gave *the wrong answer*, they would still have 0% validity.

51. The results of the 1984 FSF proficiency test illustrates the distinction between reliability and validity. Examiners around the country were sent three letters containing bomb threats to be compared to each other and to exemplars from six suspects. In fact, two of the questioned letters were written by one person (whose writing was not submitted) and the third letter was written by one suspect simulating the writing of the other letters. Every one of the tested handwriting examiners excluded the third letter's author from among the suspects. Thus, on this problem, they were 100% reliable (all in agreement) but 0% valid (all wrong).

52. In the wake of over two decades of proficiency tests, in which many document examiners were given the same problems, in response to which they often produced different answers, the claim of high reliability should now be tempered considerably. Where various tests produce varying answers, plainly there is less than perfect reliability. For example, where 41% of examiners give one answer, 22% give another answer, and the rest give some other answer, they obviously are not giving the same answers (which, for example, is what occurred in the 1985 FSF proficiency test).

**Validity of Conclusions**

53. Validity concerns the question of how often handwriting examiners arrive at correct answers. There are three sources of answers to these questions. One is the body of proficiency tests carried out by the Collaborative Testing Service, first under the supervision of the Forensic Sciences Foundation (FSF) and later under the supervision of the American Society of Crime

25

SAK000237

Laboratory Directors (ASCLD). The second is a series studies carried out by Moshe Kam and his students under contract to the FBI and the U.S. Army. The third is a new series of studies being carried out by Australian handwriting experts who are also doctoral level research scientists. (All of these studies are discussed in detail in Risinger (2002, 2003).

## Methodological Issues

54. Risinger et al. (1989) pointed out that no evidence existed showing even that handwriting examiners were more accurate than laypersons, which might be thought of as a minimum requirement of an expert in court, and suggested that one kind of research that could be performed would compare the performance of asserted experts to that of laypersons. Several studies have pursued that suggestion. Prof. Kam goes so far as to assert that research with comparison groups is the *only* kind of research on handwriting examiners that has any value. He is particularly critical of the FSF/ASCLD data for its lack of layperson comparison groups and lack of tight control over who takes the tests (implying that the poor performance observed is perhaps because foreign examiners or people who are not examiners at all might take the tests).

55. As to the lack of comparison groups, comparison groups are useful for many purposes but not a *sine qua non* of informative research. It all depends on the research question being asked. If a manufacturer of athletic socks wanted to know the distribution of foot sizes in Albuquerque, a representative sample of Albuquerque feet would permit an answer to be found; no comparison group is needed. Similarly, if we wanted to know how often handwriting examiners err in response to a certain kind of handwriting comparison problem, a representative sample of examiners asked to perform the comparison and provide their opinion would answer the question; no comparison group is necessary. Knowing how well laypersons perform could be

26

SAK000238

informative, but that is not the only important question. For example, if examiners did poorly on a certain kind of task, a court might well exclude their opinions notwithstanding a finding that laypersons did even worse.

56. As to the origins of examiners taking the FSF/ASCLD proficiency tests, the facts do not support Prof. Kam's suspicions. His criticisms cannot be true of the first tests, which went only to North American crime labs. They were imposed upon 200 crime labs by the FSF researchers working under a USDOJ grant. As to the next two decades of tests, I contacted the laboratory which conducts the tests and was informed by the director of the testing program that the percentage of foreign  subscribers varies from year to year, and has been gradually rising over time, but on no test has it ever exceeded 20%. Since few or zero non-American forensic document examiners took the tests in their earlier years, and more did so in more recent years, under Prof. Kam's theory, if we compared performance during the first decade of tests to that of the second decade, we would see declining accuracy as more foreign examiners and non-examiners dilute the pool. But the data show exactly the opposite. Measured performance has been going up, sometimes as high as 100% accuracy. See Appendix.  Furthermore, an examination of the background data on the participants shows that virtually all were document examiners, averaging more than 10 years of crime laboratory experience, having substantial or exclusively questioned document caseloads, and many were Board Certified examiners. Finally, analyses of the relationship between examiners' background and their accuracy showed no significant relationships. For example, whether a test taker was a board certified examiner or not made no difference in accuracy. Whether examiners had caseloads that consisted exclusively of

27

document examination or were mixed with other kinds of examinations also made no difference. Years in practice did not make a statistically significant difference. And the variability was most striking: Some examiners with 20 years experience got it wrong and others with only a few years got it right. Four FDEs working together, including the supervisor, with an *average* of 17.5 yrs experience could not get the right answer, while others with only a few years experience did get it right. (See Risinger et al., 1989.)

57. On the other hand, concerns have been raised about several aspects of Prof. Kam's research. (These are summarized below and discussed in detail in Risinger's chapter in MODERN SCIENTIFIC EVIDENCE (2d ed. 2002; Supplement 2003).)

58. The methodological difficulties of Prof. Kam's research center around the problem of trying to make examiners and the comparison group of laypersons equal in every respect except the possible difference in their handwriting examination skills. On this topic, it is impossible to conduct randomized experiments with true control groups, as it is in any research area where the differences between the groups are brought to the study by the participants and are not imposed by the researcher through random assignment. The result is that researchers conduct a quasi-experiment, in which they try to patch together something that approximates an experiment as closely as they can.

59. Document examiners are intrisically extraordinarily highly motivated to do well in Prof. Kam's studies – no doubt more than they are in their everyday practice, where no one is ready to announce that their answers are right or wrong. As Prof. Kam has noted: "The incentive [for questioned document examiners] is pretty serious. If I show in my test that they are not better than laypersons or if I show that they have excessive error rates... I may have wrecked the

28

SAK000240

profession." How can college students, for example, be motivated to perform at their very best on a task that probably seems dull to them? This has proven to be a problem.

60. Prof. Kam's first study offered the layperson comparison group no material incentives at all to be accurate and to avoid error. The incentive scheme introduced into the second study differed from the inherent incentive regime for experts in such a way that some of the observed differences might have been produced by the incentive scheme rather than by differential abilities of the participants. More simple and more worrisome, the overall incentives were modest: "[T]he average test that we administered to nonprofessionals would have netted a payment of $102 for a perfect score." (See Kam et al., 1997.)

61. The third study attempted to test whether different incentive schemes for layperson would produce different performances on the identification task. This study concluded that differences in incentives make no difference in how people performed. Such a finding is not plausible. There is a vast amount of psychological and economic research showing that the more you offer in incentives to people the more their behavior changes, sometimes dramatically. For example, consider research on physicians. In spite of years of professional training, ethical norms, the moral stakes, and the risk of malpractice suits, Stearns et al. (1992) found large changes in the rate of utilization of certain treatments when physicians were shifted from fee-for-service to capitation payment schemes. Another study compared patient hospitalization rates for physicians paid under a fee-for-service arrangement versus for physicians of the same group paid by the same employer under capitation. The study controlled extensively for patient characteristics. It found that hospitalization was significantly more likely when physicians were paid under a for fee-for-service basis. Greenfield et al. (1992).

29

SAK000241

62. The most likely reason that Prof. Kam found no differences is that the four different payment schemes he used did not differ in salient ways and in all conditions were still tiny compared to the incentives for examiners. Moreover, the likely payout may not have been any clearer to participants than it is to readers of the published article (in which they were both unclear and contradictory).

63. The persistent differences between the incentives that exist for the document examiners versus those for laypersons has not been solved. As Prof. Kam has said: "I cannot threaten the non-professionals that if they do bad on my test, I'll fire them from their job. I simply don't have this ability to create such a drastic incentive, no." This introduces a confound into the research, and makes the results uncertain.

64. Despite these difficulties, Prof. Kam insists that his research can be given full weight, even as he insists that decades of FSF/ASCLD proficiency studies deserve zero weight.

65. One study, which purports to have narrowed the motivation gap between laypersons and examiners, suggests that when the motivation of the two groups is made more similar, the differences in performance diminish. Conrad (1975), working in Germany, compared the performance of professional German handwriting experts to laypersons and to college students who had taken courses in handwriting analysis. The result was that the laypersons came closer in accuracy to the examiners (20% overall error compared to 15% overall error, respectively). Interestingly, the college students made the fewest errors of all (only 8% overall error).

66. Research is inevitably incomplete and imperfect in design, none of it is definitive, and therefore all of it (or most of it) must be considered together with each study's particular shortcomings in mind. Below, I review all relevant research findings, but recommend viewing

30

SAK000242

their results with due caution.

## Experience

67. More than anything else, handwriting experts claim that it is their "experience" that ensures that they have superior identification abilities. That is a comforting word to say and to hear, but what it ensures is far from clear.

68. Because formal educational programs that teach the science or art or folklore of handwriting identification practice are scarce, the field relies on apprenticeships: an experienced examiner takes on an apprentice, and a new handwriting examiner is created. The apprentice learns is to mimic the judgments of his or her mentor. The problem is that during training the criterion of accuracy is not reality but the opinion of the mentor. Recent research from Found & Rogers (2001), trying to figure out why error rates vary from one lab to another, concluded that the most likely answer is that high error rates cluster among examiners who studied under the same (high error rate) mentors and low error rates cluster among examiners who studied under other (low error rate) mentors.

69. No training method or system can teach a handwriting examiner truths that have not been tested to discover whether they are indeed truths. Learning something from someone does not make the thing learned correct. Unless a system is in place to test beliefs and, over time, to replace false hypotheses with correct ones, then the next generation of handwriting examiners may be in possession of nothing more than the erroneous assumptions of the previous generation of handwriting examiners. Consider that Osborn's 1929 treatise, which changed very little from his 1910 edition, remains one of the centerpieces of handwriting examiner education.

70. The drafters of revised Federal Rule of Evidence 702 cautioned against blind reliance

31

SAK000243

on claims of expertise resulting from "experience." While it is true that many things can be learned from experience, it is also true that many things cannot be learned from "mere experience." It is important to inquire into what, exactly, the experience has contributed to the proffered expert witness's conclusion in the case. (See the Advisory Committee's Note to revised Federal Rule of Evidence 702 ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion , and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"))

71. In *United States v. Starzecpyzel*, 880 F. Supp. 1027 (S.D.N.Y. 1995) , Judge McKenna likened the asserted experience-based expertise of document examiners to that of harbor pilots, namely, that by doing something over and over one becomes good at it. But the analogy is inapt. Feedback is essential to the learning of most skills. In the course of their daily work, harbor pilots learn instantly if they hit a sandbar or deliver a ship to the wrong wharf. Plumbers usually learn very quickly if they have failed to stop a leak. The same is true of many endeavors. From the feedback of their successes and failures people learn what works and what does not.

72. Not so with forensic handwriting examiners. Unlike harbor pilots and plumbers, forensic handwriting examiners receive no regular and immediate feedback concerning when they have correctly and when they have incorrectly linked a writing to its author, or whether a signature is genuine or not. It is precisely because only the writer knows whether he or she authored the questioned writing that the opinion of an "expert" is sought. Only in proficiency or

32

SAK000244

similar tests does the handwriting examiner receive such feedback on whether a correct conclusion was reached or not. A person becomes better at playing darts by seeing how near or far each throw comes to the bull's-eye. But if the person were blindfolded, and had no idea how close to the bull's-eye each throw came, the person could not improve his or her skill no matter how much "experience" the person got. Handwriting examiners are not in the position of harbor pilots; they are in the position of blindfolded dart players.

<b>The Influence of Extraneous Cues</b>

73. An additional and potentially serious problem is that in real cases handwriting examiners often or usually know what answer is expected or desired by the investigator or attorney who has engaged the document examiner, or which is suggested by other evidence in the case. Some examiners even advise that, "Before an attempt by the examiner to identify a handwriting, the investigator should consult and [obtain] as much circumstantial evidence as possible about the case." (Dines, 1998.) Though such information is extraneous to the expertise that is to be applied, the information creates an inevitable pull on the conclusion reached by the examiner – especially for an expertise which is overwhelmingly subjective and where the risk of a conclusion being demonstrated to be assuredly wrong is virtually zero. Put simply, the examiner often knows what the "correct answer" is that she or he is expected to give. That increases the likelihood that the examiner will inaccurately perceive the ambiguous writings in the manner desired by those requesting the examination.

74. In contrast, scientists and practitioners in other fields often take pains to avoid being exposed to such context cues through the use of bias control procedures, such as blind or double blind testing. Blind testing is familiar in areas of law and life, such as eyewitness lineups, blind

33

SAK000245

taste tests, and the grading of exams in school. But not in handwriting examination. In the present case, for example, the examiner was well aware of who the target of inquiry was, as is evidence from most of the examiner's reports themselves. This further reduces the dependability of handwriting examiners' conclusions. The problem of context cues and procedural cures are discussed in detail in Risinger et al. (2002).

75. As we suggest in Risinger et al. (2002) and Saks et al. (2003), it would be far better if examiners were required to conduct their examinations in the context of an evidence lineup. As the analogy to eyewitness lineups implies, examiners could be presented with the questioned writing and exemplars from five or ten different writers, all very similar to each other, all known to the examiner only as writer A, B, C and so on. If the examiner had to state which of the writings in the lineup was written by the writer of the questioned writing, it becomes possible for courts and factfinders to evaluate the examiner's accuracy. As with an eyewitness lineup, the foils need to be very similar to each other. (One suggestion has been: so similar to each other that laypersons cannot tell them apart.) Opinions offered under such conditions would be far more informative to factfinders than the present system of handwriting examination, which is analogous to a "show-up" and suffers from all of the problems that show-ups suffer from, if not more. Risinger et al. (2002).

76. In dealing with other kinds of empirical research, courts have recognized the need for experts to conduct their work in a manner that a minimizes such biasing cues. See *Schering Corp. v. Pfizer Inc*, 189 F.3d 218 (2nd Cir.1999), at 225 (in a case alleging false advertising, a court reviewing the admissibility and probativeness of survey research concluded that among the important factors to be considered were whether "sound interview procedures were followed by

34

SAK000246

competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted" and that "the objectivity of the entire process was ensured.").

## EMPIRICAL STUDIES OF EXAMINER ACCURACY

77. Pursuant to *Daubert* and especially *Kumho Tire*, it is necessary to view proffered expertise not broadly and globally, but with regard to the particular skill task an expert is offered to perform for the court. Experts in any given field may be much better at some things than at others; which is it that they are called upon to do in the case at bar: a task at which they are better or poorer?

78. The case at bar seems to involve three major handwriting examination tasks: identifying the author of hand printing, identifying the author of cursive writing, and determining the genuineness of signatures. The subsections below review the available research on each of these three kinds of tasks.

79. Though my review of the studies will take them at face value, drawing correct inferences from them requires weighing them in light of potentially misleading methodological deficiencies discussed above.

### Determining the Authorship of Hand Printing

80. At present, it is not known what the accuracy level (or error rate) is for identifying authors hand printing or how that accuracy level compares to identification of authors of cursive writing. Opinions and data are contradictory.

81. On the question of whether identifying printing versus cursive writing or signatures,

35

SAK000247

the document examination field's literature has reached contradictory conclusions based on anecdotal experiences and intuitive impressions. Albert D. and Albert S. Osborn (1944) concluded that determining the author of printing is <u>harder</u>: "The possibility of error is very great." This was so, they wrote, among other reasons, because there is less variability and less individuality in printing. Arthur J. Quirk (1930) concluded that identifying the author of hand printing is <u>easier</u>: "One of the easiest tasks the analyst is likely to undertake." James Conway (1955) felt that identifying hand printing is <u>harder</u> because important "bases of individuality [are] materially subtracted." He concluded that "the principle should be overcompelling that not all printings... will embody reliable bases for identification." Such differences in opinion from leading gurus of the field highlight the importance of systematic empirical testing as compared to relying on the impressions of various individuals, whatever their prominence.

82. In a field suffering from a scarcity of systematic empirical research, the ability of document examiners to identify the author of hand printed writing is one of the least studied questions.

83. In 1986, FSF/ASCLD carried out a proficiency study in which document examiners were given a hand printed "holdup" note. Of three suspects, one wrote the note, a second did not, and a third attempted to simulate the note. Of examiners providing reports, 13% correctly identified the writer of the note, 9% erroneously opined that none of the suspects wrote the note, and 45% erroneously identified someone other than the actual writer as being the note's author.

84. The 1999 FSF/ASCLD proficiency test presented examiners with six questioned auto inspection certificates containing hand printed letters and numbers. Some of the six certificates were written by two of the exemplar writers and one was written by an absent author (not among

36

SAK000248

the exemplar writers).  Examiners always correctly inculpated a writer were 100% correct when the actual writer was present among the suspects. Innocent writers could not be excluded 13-17% of the time when the actual writer was not among the exemplar writers (suspects).

85. In the course of pretrial hearings in two cases involving hand printing identification, Moshe Kam reanalyzed older data he had collected, which had originally mixed together cursive and printed writing tasks, and attempted to assess performance on the printed samples by selecting a subset of exemplars in the original materials that were (in his judgment) not in cursive script but hand printed. Unfortunately, Kam's analysis made the wrong comparison. It compared examiners' performance on hand printing to their performance on writing that was both script and a mixture of script and hand printing (and according to Kam revealed no statistically significant difference in accuracy between the two sets of writing). But it should be obvious that what was tested was not the question at issue in those or this case. That comparison – between apples versus oranges-with-some-apples-mixed-in – will reduce the performance difference between identifying printing versus cursive writing and therefore obscure any true performance gap that might actually exist. In short, the simplest, most obvious and most appropriate comparison was not made.

### Determining the Authorship of Cursive Writing

86. In this subsection I review the empirical studies focused on the ability of document examiners to distinguish genuine from forged signatures.

87. The 1975 FSF test presented the task of trying to identify the author of a letter. Known writing of four suspects was presented, and the true writer was present among the

37

SAK000249

suspects. Examiners correctly identified the writer of the letter 89% of the time, but 4.5% of them incorrectly identified someone else as being the writer.

88. The 1984 FSF test presented three bomb threat letters, two of which were written by one person and the third by another person simulating the writing of the other two letters. Seventy-four percent of examiners were able to tell that not all letters were written by the same person. All 100% failed to identify the forger of the third letter from among the suspects, though his exemplars were among those provided to the examiners.

89. The FSF 1987 test presented an extortion note, the author of which was present among the suspects. Of the examiners, 52% correctly identified the author of the letter, but 3% wrongly identified an innocent person as being the author. The remaining responses were inconclusive. Because this test was deliberately designed to be easy and straightforward, the test manufacturers were troubled that so many examiners took shelter in the "inconclusive" zone.

90. The 1989 FSF test involved a note said to have been written by a teenaged vandal. The actual writer of the not present among the suspects for whom known writings were provided for examination. Of the examiners, 45% correctly concluded that the author of the note was not among the suspects. But 41% incorrectly named one of the innocent suspects as having been the author of the note.

91. The 1996 ASCLD test involved a note to be identified, but the actual writer was absent from the suspects who provided exemplars. With respect to each known writing sample, 68-85% of examiners correctly excluded all writers, while 1-6% of examiners erroneously identified one or another of the innocent suspects as being the note's author. The remaining instances involved a failure to of examiners to either exclude or include exemplar authors as

38

SAK000250

being the note's author.

92. The test in 2000 involved three sets of nursing notes, two written by persons whose writing was included in the known exemplars and one written by someone who was not present. Just shy of 100% of the examiners identified the authors of the first two sets, and exemplar writers were correctly excluded as authors of the third set between 76-96% of the time. A person who was not in fact the author of the third set was "identified" by 2% of examiners.

93. Two additional the FSF/ASCLD proficiency tests involved cursive writing, but so little or so confounded with signatures, that they tell us little if anything about accuracy in identifying writers of moderate to large amounts of cursive writing (as is the situation in the case at bar). The 1997 test involve writing on checks (where the accuracy rate was 43% and the false positive error rate was 10%). And the 1998 test mixed cursive writing and signature (where the two together produced complete accuracy).

94. Kam et al. (1997) created a test of writer identification skill that involved having multiple writers create multiple writings of varying lengths. The task for examiners was to be presented with subsets of these writings (varying from examiner to examiner) and to try to match writings made by the same authors. The test resulted in 87% correct linkages and 6.5% false positive matches (concluding that a known writer wrote a questioned document that he or she had not in fact written).

**Determining the Genuineness of Signatures**

95. In this subsection I review the empirical studies focused on the ability of document examiners to distinguish genuine from forged signatures. This is the task on which most of the systematic empirical research testing forensic document examiner claims exists.

39

SAK000251

**Conrad (1975)**

96. The study by Conrad (1975) was conducted in Germany and reports comparisons among 25 professional handwriting experts, 100 laypersons who apparently were not specially motivated to perform well, 25 more motivated laypersons, and 6 college students who had taken courses in handwriting psychology and comparison. Each was presented with 10 known exemplar signatures and 6 questioned signatures (half of which were genuine and half of which were forged).

97. With respect to the ability to identify forged signatures, judged by the respondents at any level of confidence, college students made errors of judging forged signatures to be genuine 5.6% of the time, experts made errors 17.3% of the time, highly motivated laypersons erred 12.0% of the time, and less motivated laypersons erred 21.7% of the time. Looking only at those judgments made with a confidence level "bordering on certainty," the college students erred 0.0% of the time, experts 2.7% of the time, and the motivated laypersons 5.3% of the time.

98. With respect to the ability to identify genuine signatures, judged by the respondents at any level of confidence, college students made errors of judging genuine signatures to be forged 11.1% of the time, experts 12.0% of the time, highly motivated laypersons 28% of the time, and less motivated laypersons erred 41.6% of the time. Looking only at those judgments made with a confidence level "bordering on certainty," the college students erred 0.0% of the time, experts 5.3% of the time, and motivated laypersons 8.9% of the time.

99. The most important aspect of this study is that it informs the debate over the role of motivation in studies comparing experts and laypersons, suggesting that motivation is a confound in those studies. Here, the experts generally performed no better than motivated

40

SAK000252

laypersons (most differences were not statistically significant). Conrad concludes that, "one cannot speak of a clear factual superiority on the part of the experts, especially since the findings did not show that experts are better defended against serious or even extreme erroneous assessments in individual cases than lay persons working under favorable circumstances, are highly motivated and with a comparable educational level." The study further suggests that there are some non-experts (in this case, college students who had studied the psychology of handwriting) who generally performed significantly better than the experts did.

### 1985 FSF Proficiency Study

100. The 1985 FSF Proficiency Study reports the results of a test taken by handwriting examiners from 32 different labs around North America. The test required participants to examine 12 checks all bearing signatures in the same name. Two were genuine signatures, one a freehand forgery, one a tracing, and 8 by people writing the name in their normal handwriting.

101. The findings were that 41% of examiners reached entirely correct conclusions, 6% erred by calling a forgery genuine, 22% erred by making multiple misattributions of authorship, and 31% reported that they were unable to form any conclusions.

102. This study suggests a high level of error on the task of evaluating the genuineness of signatures. Note also the high rate of inconclusive opinions.

### 1988 FSF Proficiency Study

103. The 1988 FSF Proficiency Study reports the results of tests of participants from 49 different labs. The stimulus materials consisted of six receipts containing questioned signatures, and known exemplars from five persons. Three of the questioned signatures were forgeries, two were genuine, and one was made by someone who was not among the 5 persons who provided

41

SAK000253

exemplars.

104. The findings were: Q1, a forgery, was correctly identified as such by 98% of participants, and 2% were unable to decide. Q2, a genuine signature, was correctly identified as such by 92% of participants, and 8% were unable to decide. Q3, a forgery, was correctly identified as such by 96% of participants, incorrectly judged to be genuine by 2%, and 2% were unable to decide. Q4, a genuine signature, was correctly identified as such by 45% of participants, 10% incorrectly judged it to be a forgery despite high confidence that they were correct, and 45% were unable to reach a conclusion. Q5, the signature by a person not among the exemplar writers, was correctly identified as such by 35% of participants, 8% incorrectly judged it to be written by one of the exemplar writers, and 57% were unable to decide. Q6, a forgery, was correctly identified as such by 86% of participants, 2% incorrectly judged it to be genuine, and 12% were unable to decide.

105. This study, especially in conjunction with the 1985 proficiency test, suggests that the task of determining the genuineness of a signature can contain sub-varieties of greatly varying difficulty, some apparently quite easy and some much more difficult for examiners.

### 2001 ASCLD Proficiency Study

106. The 2001 ASCLD Proficiency Study reported the results of testing of 131 participants. The task involved a sign-in log containing three questioned entries, all in a single name. Two were genuine. One was written by a person simulating from memory and who was not among the exemplar writers.

107. The results as to the two genuine signatures were that all responding examiners correctly concluded that the genuine signatures "were" or "probably were" genuine.  As to the

42

SAK000254

forged signature, 15% of examiners incorrectly judged the forgery to be genuine, 27% could not decide whether or not it was made by the person in whose name it was signed, and 50% were unable to exclude one of the exemplar writers who had in fact not written it.

## Found and Rogers (2001)

108. Found and Rogers (2001) presented 51 participants, all or nearly all handwriting examiners (and several trainees) from Australia and New Zealand, with 43 genuine signatures written by the specimen writers, 160 simulated samples (written by 2 skilled forgers making freehand copies of the signature characteristics of the specimen writers), and 47 disguised signatures written by the specimen writer.

109. As to the forgeries, 43% of participants correctly concluded that forged signatures were forged, 4% incorrectly concluded that forged signatures were genuine, and 53% of the time participants were unable to decide.

110. As to the genuine signatures, participants correctly concluded that 92% of genuine signatures were genuine, incorrectly concluded that genuine signatures were forgeries 2% of the time, and were unable to decide 6% of the time.

111. These findings are an interesting contrast to those of Kam et al., to be summarized next. Whereas both studies found examiners to do well with genuine signatures, Found & Rogers' examiners had a much harder time assessing forgeries. The most plausible explanation is probably that Found & Rogers used two persons had some skill in the task of creating forgeries, whereas Kam et al. used college student "forgers" who were quite new to the task. This comparison between studies seems to underscore that variation in task difficulty can lead

43

SAK000255

examiners to do quite well or quite poorly.

## Kam et al. (2001)

112. Kam et al. (2001) tested 69 experienced document examiners and 50 laypersons matching the general educational profile of the experts. Each participant was given a packet of six questioned signatures, containing anywhere from 0 to 6 genuine signatures and the balance consisting of forged signatures. Each packet was drawn from a larger pool of 64 sets of genuine signatures, modified to contain the desired number of forged signatures. The forgeries were made by inexperienced forgers. Each participant also received a packet of six exemplar signatures to which to compare the questioned signatures.

113. Regarding evaluations of the forged signatures, experts correctly concluded that forgeries were forgeries 96% of the time, wrongly concluded that forgeries were genuine signatures 0.5% of the time, and 3.5% of the time were unable to decide. Laypersons correctly concluded that forgeries were forgeries 92% of the time, wrongly concluded that forgeries were genuine signatures 6.5% of the time, and 1.5% of the time were unable to decide.

114. Regarding evaluations of the genuine signatures, experts correctly concluded that genuine signatures were genuine 86% of the time, wrongly concluded that genuine signatures were forgeries 7% of the time, and 7% of the time were unable to decide. Laypersons correctly concluded that genuine signatures were genuine 70% of the time, wrongly concluded that genuine signatures were forgeries 26% of the time, and 4% of the time were unable to decide.

115. As discussed above, it is impossible to know from this study how much of the gap between the observed differences is due to the motivational confound between experts and laypersons. Compare to the Conrad study, as well as to the Sita et al. study, described next.

44

SAK000256

116. The participants in the Sita Found & Rogers (2002) study consisted of 17 professional handwriting examiners and 13 laypersons, all from Australia and New Zealand. Test materials consisted of 10 mock cases each containing 15 exemplar and 15 questioned signatures. The questioned signatures in different test packets contained different proportions of genuine and forged signatures.

117. The results given in the study do not disaggregate the tasks of evaluating genuine versus forged signatures, but give combined results. Correct decisions were made by experts 54.8% of the time compared to 57.1% of the time by laypersons. This is not a statistically significant difference favoring laypersons, but it very nearly is. Similarly, experts achieved a mean number of accurate decisions of 81.9 compared to 85.6 for laypersons.

118. Incorrect decisions were made by experts 3.4% of the time compared to 19.3% by laypersons. Experts made a mean number of erroneous decisions of 5.0 compared to 29.0 for laypersons.

119. Experts were unable to reach a decision 41.8% of the time compared to 23.6% of the time by laypersons. Experts averaged 63.1 inconclusive decisions compared to 35.4 by laypersons.

## CONCLUSIONS

120. Asserted handwriting identification experts have little actual systematic empirical research on which to base their work and their claims of expertise. The body of empirical research on the performance of handwriting examiners remains quite small. The result is that they themselves and any consumers of their services are left largely in the dark about how well

45

SAK000257

they can do what they say they can do. Any normal field of purported science that has been practicing for a century and a half would by now have produced hundreds if not thousands of reasonably well designed empirical studies testing their basic hypotheses, techniques and skills, providing a good map of what they can do well, what they can do less well, and what they do only poorly. Informed by such studies, forensic document examiners could in turn inform users of their services about the degree to which they can be relied upon for which tasks, and would themselves know which tasks to refrain from trying to perform or opine upon. As Found & Rogers (2001) have noted: "Forensic handwriting examination can simply be regarded as a skill. The skill is applied to cases which vary according to the amount and complexity of both the questioned and specimen material. No one test will determine the validity of the skill. Over time, given sufficient trials, a picture of the skill for individuals should emerge. This will allow us to determine which aspects of the skill claimed by examiners are valid, which are not and what the likely error rate is for different types of examination." Not nearly enough research exists yet to draw this map of the abilities and limitations of handwriting examiners. For a field that has been pressing its services on the courts for generations, this is a remarkable record of non-research.

121. Too little research has been done to be able to explain the causes of the great variability in performance seen in the studies which have been done. Why do examiners seem to perform so well on some tasks and so poorly on other tasks? What are the reasons that tasks of apparent close similarity produce different levels of accuracy? Although there is evidence that examiners are more accurate with writing of high complexity and less accurate with writing of low complexity (a finding that some examiners dispute), even within levels of complexity, other features caused some kinds of writing to facilitate more accurate performance and some other

46

SAK000258

writing to cause less accurate performance. What are those features? No one knows. (Does the questioned writing in the present case contain features that will tend to increase or decrease accuracy?)

122. Accuracy varies across examiners. But every study of the question shows accuracy to be unrelated to the amount of an examiner's experience, certification or lack of certification, or nature of caseload. It has, though, been found to be related to the level of accuracy of the examiner's mentor.

123. The current method of reaching conclusions on identity is for an examiner to reach into his or her intuitive impressions and to offer an opinion that expresses his or her subjective confidence in that conclusion. Though the words used to express that subjective confidence are enshrined in an ASTM "standard," they are no less a matter a guestimation. Such subjective probability estimation is prone to overestimations of confidence. This contrasts to the objective probability calculations employed in DNA typing and in most areas of normal science.

124. The above problems are compounded considerably by the failure of forensic handwriting examiners to employ "blind" examination protocols and by their frequent exposure to case information extraneous to their examination tasks. If nothing else, they know what conclusion an investigator or attorney hopes the examiner will reach, which imparts a spin to their perceptions and conclusions. In all or virtually all normal sciences, as well as in many other spheres of modern life, steps are taken to prevent the risk of error due to such biases. Why should those systematic preventives be dispensed with when the job is to provide expert evidence to courts?

47

SAK000259

125. Those federal district courts which have undertaken a thorough inquiry into the state of forensic handwriting identification knowledge pursuant to *Daubert* and *Kumho Tire*, and have become aware of the limited research or the worrisome performance disclosed by some of that research, have taken several different courses in their rulings. Some have excluded handwriting expert testimony entirely. Some have admitted it in its entirety. Most have taken the route of partial admission (first by *United States v. Hines*, 55 F.Supp.2d 62 (D.Mass. 1999) ). Still another reasonable approach might be to admit the testimony, including the expert's opinion on common source, but to require the expert to inform the jury of the likely accuracy of the opinions given, conditioned on the exact nature of the task-at-hand. Unfortunately, due to the limited amount of research to date, and the methodological shortcomings of much of that research, any such estimates of error rates would themselves be dubious.

I hereby swear and affirm the foregoing to be true and correct, under penalties of perjury. If called as a witness, I could and would testify to the matters set forth herein.

Date: December 20, 2004

_____/s/_____

Michael J. Saks

48

SAK000260

# REFERENCES

Mary S. Beacom, A Study of Handwriting by Twins and Other Persons of Multiple Births, 5 J. Forensic Sci. 121 (1960).

Wolfgang Conrad, Empirische Untersuchunger über die Urteilsgüte verschiedener Gruppen von Laien und Sachverständigen bei der Unterscheidung authentischer und gefälschter Unterschriften [Empirical Studies Regarding the Quality of Assessments of Various Groups of Lay Persons and Experts in Differentiating Between Authentic and Forged Signatures], 156 Archiv. für Kriminolgie 169 (1975).

Harold Cummins & Charles Midlo, Finger Prints, Palms and Soles: An Introduction to Dermatoglyphics 154 (1943).

J.E. Dines, Document Examiner Textbook (1998),

David Fisher, Hard Evidence (1995).

Bryan Found & Doug Rogers, Revision and Corrective Action Package: Signature Trial 2001 (CD-rom distributed by the Forensic Expertise Profiling Laboratory, School of Human Biosciences, La Trobe University, Australia) (2001).

Oliver Galbraith, Craig S. Galbraith & Nanette G. Galbraith, The "Principle of the Drunkard's Search" as a Proxy for Scientific Analysis: The Misuse of Handwriting Test Data in a Law Journal Article, 1 Int'l J. of Forensic Document Examiners 7 (1995).

D.J. Gamble, The Handwriting of Identical Twins, 13 Can. Soc'y Forensic Sci. J. 11 (1980).

S. Greenfield, E.C. Nelson, M. Zubko, W. Manning, W. Rogers, R. Kravitz, A. Keller, A. Tarlou & J. Ware, Variations in Resource Utilization Among Medical Specialties and Systems of Care: Results of the Medical Outcome Study, 267 Journal of the American Medical Association 1624 (1992).

John Harris, How Much Do People Write Alike: A Study of Signatures, 48 J. Crim. L. & Criminology 647 (1958).

Wilson R. Harrison, Suspect Documents: Their Scientific Examination (1966).

Ordway Hilton, Scientific Examination of Questioned Documents (revised ed., 1982)

Ordway Hilton, Can the Forger be Identified from his Handwriting?, 43 J. Crim. L., Criminology, and Police Sci. 547 (1952-53).

Fred Inbau, Lay Witness Identification of Handwriting, 34 Ill. L. Rev. 433 (1939).

Edward Imwinkelried, Flawed Expert Testimony: Striking the Right Balance in Admissibility Standards, 18 Criminal Justice 28 (Spring, 2003).

Moshe Kam, Kishore Gummadidala, Gabriel Fielding & Robert Conn, Signature Authentication by Forensic Document Examiners, 46 J. Forensic Sci. 884 (2001).

Moshe Kam, Joseph Wetstein & Robert Conn, Proficiency of Professional Document Examiners in Writer Identification, 39 J. Forensic Sci. 5 (1994).

Moshe Kam, Gabriel Fielding & Robert Conn, Writer Identification by Professional Document Examiners, 42 J. Forensic Sci. 778 (1997).

Moshe Kam, Gabriel Fielding & Robert Conn, The Effects of Monetary Incentives on Document Examination Professionals, 43 J. Forensic Sci. 1000 (1998).

Louis Menand, She Had To Have It: The Heiress, The Fortune and the Forgery, The New Yorker, April 23 & 30, 2001, at 62-70.

Andre M. Moenssens, Address to the Questioned Document Section of the American Academy of Forensic Sciences (Feb 17-22, 1997).

Andre M. Moenssens, Handwriting Identification Evidence in the Post-Daubert World, 66 UMKC L. Rev. 251 (1998).

National Institute of Justice, U.S. Department of Justice, Forensic Sciences: Review of Status and Needs (1999).

Horatio H. Newman et al., Twins: A Study of Heredity and Environment (1937).

Albert D. and Albert S. Osborn, Questioned Document Problems (1944).

Albert S. Osborn, Questioned Documents (1910).

Albert S. Osborn, Questioned Documents (2d ed., 1929).

Victoria Phillips, Michael Saks & Joseph Peterson, Signal Detection Theory and Decision-making in Forensic Science, 46 J. Forensic Sci. 294 (2001).

Arthur J. Quirk (1930) , on the other hand, (Forged, Anonymous, and Suspect Documents, 1930).

D. Michael Risinger, Handwriting Identification, in Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman, et al., eds., 2d ed. 2002; Supplement, 2003).

D. Michael Risinger, Mark Denbeaux & Michael Saks, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise," 137 U. Pa. L. Rev. 731 (1989).

D. Michael Risinger, Mark Denbeaux & Michael J. Saks, Brave New "Post-Daubert World" — A Reply to Professor Moenssens, 29 Seton Hall L. Rev. 405 (1998).

50

D. Michael Risinger & Michael J. Saks, Science and Nonscience in the Courts: Daubert Meets Handwriting Identification Expertise, 82 Iowa Law Review 21 (1996).

D. Michael Risinger, Michael J. Saks, Robert Rosenthal & William C. Thompson, The Daubert/Kumho Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion, 90 Cal. L. Rev. 1 (2002).

Michael Saks, Michael Risinger, Robert Rosenthal & William Thompson, Context Effects in Forensic Science: A Review and Application of the Science of Science to Crime Laboratory Practice in the United States, 43 Science & Justice 77 (2003).

Michael J. Saks, "Individuality of Handwriting" – A Critique, 48 J. Forensic Science 916 (2003).

Michael Saks & Holly VanderHaar, On the "General Acceptance" of Handwriting Identification Principles, J. Forensic Sci. (forthcoming).

J. Sita, Bryan Found, and Doug Rogers, Forensic Handwriting Examiners' Expertise for Signature Comparison, 47 J. Forensic Sci. 1117 (2002).

S. Stearns, B. Wolfe & D. Kindig, Physician Responses to Fee-For-Service and Capitation Payment, 29 Inquiry 416 (1992).

Sargur N. Srihari, Sung-Hyuk Cha, Hina Arora & Sangjik Lee, Individuality of Handwriting, 47 J. Forensic Sci. 856 (2002).

David Stoney, What Made Us Ever Think We Could Individualize Using Statistics?, 31 J. Forensic Sci. Soc'y 197 (1991).)

John Thornton & Joseph Peterson, The General Assumptions and Rationale of Forensic Identification, in Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman, et al., eds., 2d ed. 2002; Supplement, 2003).

Irby Todd, Do Experts Frequently Disagree?, 18 J. Forensic Science 455 (1973).

J.H. Wanscher, The Hereditary Background of Handwriting: An Investigation of the Handwritings of Mono and Dizygotic Twins, 18 Acta Psychol. et Neurology 349 (1943).

Case 3:09-cv-03064-MWB-LTS    Document 284-7    Filed 06/23/11    Page 263 of 263

SAK000263