**SEAN D. O'BRIEN**
Associate Professor
University of Missouri-Kansas City School of Law
5100 Rockhill Road
Kansas City, Missouri  64110
(816) 235-1644

**BAR MEMBERSHIP:**

Missouri Bar; U.S. District Court, Western District of Missouri; Eighth Circuit Court of Appeals; Tenth Circuit Court of Appeals; United States Supreme Court

**EDUCATION:**

University of Missouri-Kansas City, J.D., 1980
*Alumni Achievement Award*, 2002.

Northwest Missouri State University, B.A., *magna cum laude*, 1977.
Major, English;  Minor, Speech Communications
*Distinguished Alumni Award*, 2006

Benedictine College, Honorary Doctor of Humane Letters, 2005

**ACADEMIC POSITIONS:**

**Associate Professor, UMKC School of Law,** Criminal Law, Criminal Procedure, Problems and Issues in the Death Penalty, Post-conviction Remedies (Adjunct, 1995-2005; Visiting Professor, 2005-2007, Associate Professor, Sept. 1, 2007)

**Member, University of Missouri-Kansas City Doctoral Faculty**  (Appointment term: January, 2009, through December, 2013)

**Adjunct Professor of Law, Washburn University School of Law**, Death Penalty Seminar (2004-2005)

**Advocate in Residence**, Washburn University School of Law (April, 2005)

**Director, UMKC School of Law Death Penalty Representation Clinic**  (1989 - present)

**Director, Capital Defense Internships,** Center for Capital Punishment Studies, Westminster University, London (1994–present)

**Director, UMKC School of Law Public Defender Trial Clinic** (1985-1989)

**Director, UMKC School of Law Public Defender Appeal Clinic** (1983-1985)

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 1 of 226

OBR000001

**The Persuasion Institute, Cornell Law School,** Faculty member (2003-Present)

**The Supreme Court Advocacy Institute, New York University,** Faculty member (2009-present)

**The Habeas College, National Institute of Trial Advocacy,** Faculty Member (2002-present)

## PROFESSIONAL POSITIONS:

**Member, ABA Task Force on Postconviction Remedies** (2009-present)

**Regional Resource Counsel,** Administrative Office of the United States Courts, Defender Services Division. I assist with training lawyers appointed under the Criminal Justice Act to represent indigent habeas corpus petitioners under sentence of death.

**President/Executive Director, Public Interest Litigation Clinic** (Formerly the Missouri Capital Punishment Resource Center). The Clinic represents death row inmates, produces specialized training programs for lawyers defending death cases, supervises clinical law students, and consults on criminal justice issues. PILC also publishes a bi-monthly newsletter and an annually supplemented capital case defense manual. (1989–2007; Board Member, 1989-2010)

**Midwest Innocence Project, University of Missouri–Kansas City**, Member, Board of Directors. The Innocence Project is a clinical program in which law students investigate and pursue cases of actual innocence for indigent prisoners. (2000-present)

**Public Defender, Jackson County, Missouri**. I was responsible for operation of an urban public defender office, and directed or assisted the defense of many capital cases . (January, 1985--September, 1989)

**Assistant Public Defender, Jackson County, Kansas City, Missouri**. I defended poor people in felony cases, including capital cases, in trial, appeal and post-conviction proceedings. Chief Appellate Counsel, June, 1983, to December, 1984. (March, 1981--December, 1984).

**Member, National Association of Criminal Defense Lawyers** (1990-present)

**President, Missouri Association of Criminal Defense Lawyers** (1992-93)

**Chairman, Missouri Bar Criminal Law Committee** (1989 - 1992)

2

OBR000002

**PROFESSIONAL AWARDS:**

Daniel L. Brenner Faculty Writing Award, 2010

Midwestern Innocence Project *Sean O'Brien Innocence Award*, April, 2009

National Association of Sentencing Advocates and Mitigation Specialists *Sentencing Project Award*, 2009

Kansas City Metropolitan Bar Association *Lifetime Achievement Award*, December, 2005

*Jackson County Record* Kansas City *Legal Leaders Award*, 2005

The Lawyers Association of  Kansas City, *Justice Charles Whittaker  Award*, 2004

*Missouri Lawyer Weekly Lawyer of the Year*, 2003

ACLU *Civil Liberties Award*, 2003

University of Missouri-Kansas City *Alumni Achievement Award*, 2002

National Coalition to Abolish the Death Penalty, *Legal Service Award*, 1998.

Missouri Association for Social Welfare, *Annual Recognition Award*, 1994

Missouri Coalition to Abolish the Death Penalty *Annual Recognition Award*, 1994

Missouri Association of Criminal Defense Lawyers *Annual Recognition Award*, 1994

National Lawyers Guild *Social and Economic Justice Award*, 1993

UMKC Law Foundation *Don Quixote Award*, 1987

**PUBLICATIONS:**

*Harlow v. Murphy: Working With Law Students to Develop a Humanizing Narrative* (Work in progress)

*Unique Ethical Dilemmas in Capital Representation*, ___ TENN. J. L. & POL. ___ (2010)

*The Missouri Public Defender Crisis: Shouldering the Burden Alone,* 75 MO. L. REV. 853_ (2010)

*Death Penalty Stories: Lessons in Life-Saving Narratives,* 77 UMKC L. REV. 831 (2009).

*Mothers and Sons: The Lloyd Schlup Story,* 77 UMKC L. REV. 1021 (2009)

3

OBR000003

*When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams,* 36 HOFSTRA L. REV. 693 (Spring 2008). (Selected for Daniel L. Brenner Faculty Writing Award  [With related presentations at Oklahoma Criminal Defense Lawyers' Association (Oklahoma City, OK, April 23, 2009); Annual Death Penalty Seminar, Tennessee Association of Criminal Defense Attorneys, (Murfreesboro, TN, April, 2009); Life in the Balance, sponsored by the National Legal Aid and Defender Association (New Orleans, LA, March, 2009); Annual Death Penalty Defense Seminar, Florida Association of Criminal Defense Lawyers (Orlando, FL, March, 2009); California Attorneys for Criminal Justice Annual Death Penalty Seminar (Monterey, CA, February, 2009);  Annual Capital Punishment Training Conference sponsored by the NAACP Legal Defense & Education Fund (Warrenton, VA, July, 2006 and 2007); Annual Meeting of the National Association of Sentencing Advocates and Mitigation Specialists (Baltimore, MD, June, 2006);  Making the Case for Life, sponsored by the National Association of Criminal Defense Lawyers (Oklahoma City, OK, October, 2005, and Las Vegas, NV, 2006); Annual National Habeas Corpus Seminar, sponsored by the Administrative Office of the U.S. Courts (Pittsburgh, PA, August, 2005 and 2006, and Nashville, TN, August, 2007); Annual National Seminar on the Development and Integration of Mitigation Evidence sponsored by the Habeas Assistance and Training Counsel Project  (Salt Lake City, UT, April, 2005; Washington, DC, March, 2006 and 2007).]

*Capital Defense Lawyers: The Good, the Bad and the Ugly*, 105 MICH. L. REV. 1 (March, 2007).

*Presumed Guilty: Innocence and the Death Penalty,* Address to the Miscarriages of Justice Conference, Current Perspectives (February 20, 2007), *in* 7 J. INST. JUST. & INT'L STUD. 14 (2007).

*Kansas v. Marsh: Putting the Guesswork Back Into Capital Sentencing*, 105 MICH. L. REV. FIRST IMPRESSIONS 90 (Oct. 2006), http://students.law.umich.edu/mlr/ firstimpressions/vol105/obrien.pdf.

*Finding Redemption*, 92 ABA JOURNAL 59 (August, 2006) (Winner, American Bar Association Ross Essay Contest)

*Racism in White Decision*, NATIONAL LAW JOURNAL, Nov. 1, 1999, p. A-25.

*Voir Dire and Jury Selection*,  MISSOURI CRIMINAL PRACTICE DESKBOOK (MoBar CLE Publications, 1996; revised 2005).

*Jury Instructions*,  MISSOURI CRIMINAL PRACTICE DESKBOOK (MoBar CLE Publications, 1996; revised 2005).

*Addressing the Needs of Attorneys for the Damned*, 58 U.M.K.C. L. REV. 517 (Summer, 1990).

*Investigating Psychological Defenses*, MOBAR CRIMINAL PRACTICE INSTITUTE, October, 1990.

4

OBR000004

*A Step Toward Fairness in Capital Litigation*, 16 WM. MITCHELL L. REV. 633 (1990).

*Trial Objections*, MO. CRIM. PRACTICE DESKBOOK, (MoBar, January, 1989).

*Jury Instructions*, MO. CRIM. PRACTICE DESKBOOK (MoBar, 1989, revised, 1996 and 2008).

*Voir Dire*, MO. CRIM. PRACTICE DESKBOOK (MoBar, 1989, revised, 1996 and 2008).

## NOTEWORTHY CASES:

***Lloyd E. Schlup v. Delo*, 513 U.S. 298 (1995)**, protecting the right of innocent death row prisoners to challenge their convictions in federal court. After a subsequent hearing, the district court issued the writ of habeas corpus discharging Schlup from his conviction and sentence.

***Ramon Martinez-Villareal v. Stewart*, 523 U.S. 637 (1998)**, preserving the right of mentally ill prisoners to challenge their competence for execution.

***State of Missouri ex rel. Joseph Amrine v. Donald Roper***, 102 S.W.3d 541 (Mo. 2003) (en banc), establishing the right to relief on free-standing claims of innocence. Joseph Amrine was the 111th person to exonerated from death row in the United States; Joe was released from prison on July 28, 2003.

***In re Bobby Lewis Shaw***, Executive Clemency proceedings in which Missouri Governor Mel Carnahan on June 2, 1993, commuted the death sentence of a mentally ill man convicted of stabbing three prison guards. This was the first capital clemency in Missouri since 1947.

***State v. Theodore White, Jr,* 81 S.W.3d 561 (Mo. App. 2002)**, creating a prosecutorial misconduct exception to Missouri procedural bar doctrine (Client exonerated and released after trial by jury, February 7, 2005).

***State v. Larna Edwards*, 60 S.W.3d 602 (Mo. App. 2000)**, establishing right to accurate jury instructions on the defense of battered woman syndrome in homicide cases.

## PRESENTATIONS:

*Obtaining and Presenting Recantation Evidence,* Innocence Network Conference, University of Cincinnati College of Law, Cincinnati, Ohio, April 8, 2011.

*Litigating Actual Innocence Cases in Habeas: Navigating AEDPA,* Righting Wrongful Convictions: Challenging Flawed Forensics, National Association of Criminal Defense Lawyers, Cincinnati, Ohio, April 7, 2011

*Challenging Psychopathy Evidence,* and *Getting the Time and Money we Need,* Eighth National Seminar on the Development and Integration of Mitigation Evidence, Habeas Assistance and Training Counsel Project, Chicago, Illinois, March 31, April 3, 2011

5

OBR000005

*Representing Clients with Pervasive Developmental Disorders,* (With Kim Spence-Cochran, Ph.D.), *Plea Negotiations and Working with Clients,* (With Wilbert Rideau), and *Working with Mitigation Specialists,* Capital Case Defense Seminar, California Attorneys for Criminal Justice, Monterey, California, February 18-21, 2011

*Applied Theory and Litigation Strategies: Humanizing the Capital Client,* Vermont Law Review Symposium, South Royalton, Vermont, February 11, 2011

*Unique Issues Surrounding Competency to be Executed, Counsel's Ethical Responsibilities in Cases Involving Severely Mentally Ill Clients,* and *Strategic Issues in Competency Litigation,* The Fourth National Seminar on Mental Health and the Criminal Law, New Orleans, Louisiana, January 13-16, 2011

*Making the ABA Guidelines Work for Your Client,* Oklahoma Indigent Defense System and the Bureau of Justice Assistance, Norman, Oklahoma, December 3, 2010.

*Rebutting Aggravation: Prior Crimes and Anti-Social Personality Disorder,* Federal Death Penalty Strategy Session, Austin, TX, November 11-13, 2010

*Litigating Confession Claims Post-Berghuis & Shatz,* and *Litigating Innocence in Non-DNA and DNA Cases,* National Federal Habeas Corpus Seminar (Administrative Office of the U.S. Courts), Cleveland, OH, August 26-29, 2010.

*Unique Ethical Dilemmas in Capital Representation,* National Public Defense Symposium: Achieving the Promise of the Sixth Amendment, The ABA Standing Committee on Legal Aid and Indigent Defense & The University of Tennessee College of Law, Knoxville, TN, May 20-21, 2010.

*Accounting for Aggravation and Other Bad Facts,* Second Annual 2255 Training, Federal Capital Habeas Project, Indianapolis, IN, May 13-15, 2010.

*Keynote Address: What is the Standard of Care in Mitigation Development in Death Penalty Cases?* and *When the Client Wants to Die,* The Seventh National Seminar on the Development and Integration of Mitigation Evidence: New Science, New Strategies, Seattle, WA, April 24 & 25, 2010.

*Planning, Preparing and Presenting Mental Health and Mitigation Evidence in Death Penalty Cases,* The National Institute of Trial Advocacy Habeas College, Golden Gate University School of Law, San Francisco, CA, March 13, 2010.

*Broke and Broken: Missouri Public Defender Crisis,* University of Missouri, Columbia, February 26, 2010.

*Capital Defense Mental Health Training: Dealing with Government's Experts, Witnesses, and Evidence,* UMKC Law School, November 12-15, 2009.

*The Persuasion Institute,* Cornell University School of Law, September 11-13, 2009.

6

OBR000006

*Ethical Duties of Capital Defense Lawyers,* Florida Public Defender Association's Annual Life Over Death Seminar, September 11, 2009.

*Supreme Court Update* (with Keir Weyble and John Blume), *Funding Motions, Discovery, Expanding the Record* (with Denise Young), and *Litigating Innocence Post-Osborne*, 14th Annual National Habeas Seminar, August 20-23, 2009.

*The James Harlow Case: Using Narrative Techniques in Law School Clinical Representation,* Lewis & Clark Law School Storytelling Conference, Portland, OR, July, 2009.

*Ethics or No Ethics?* (with Larry Fox) NAACP Legal Defense Fund Annual Capital Punishment Conference, Airlie House Conference Center, Warrenton, VA, July, 2009).

*Supreme Court Advocacy Institute,* NYU, New York, NY (June 12-14, 2009).

*Ethical Duties in Mitigation Development,* and *Avoiding Landrigan,* Habeas Assistance and Training Counsel Project, Fifth National Seminar on the Development and Integration of Mitigating Evidence (Philadelphia, PA, April 16-19, 2009).

*Death Penalty Stories:  Lessons in Life-Saving Narratives,* UMKC School of Law Symposium, April 1-2, 2009.

*Serving Under-represented Populations Through Law School Clinical Programs*, Salmon P. Chase School of Law, University of Northern Kentucky, March 3, 2009.

When the Client Wants to Die: Landrigan v. Schriro, California Attorneys for Criminal Justice Annual Death Penalty Seminar (Monterey, CA, February 14, 2009).

*Keynote Address: Telling the Client's Story: The Big Picture,* and *Telling the Client's Mental Health Story,* Oregon Criminal Defense Lawyers' Association Annual Death Penalty Defense Seminar (Welches, OR, October 17-18-2008).

*Capital § 2255 Cases: Getting Resources, Case Budgeting and Investigating Cases Even When Funds Are Scarce,* (with Naomi Terr and Miriam Gohara); *Non-DNA Innocence Claims* (with Tiffany Murphy); and *Aggravation as Mitigation: Turning Bad Facts to Your Advantage,* Thirteenth Annual Federal Habeas Corpus Seminar (St. Louis, MO, August 21-24, 2008).

*A New Tool to Meet an Old Need: The Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* NAACP Legal Defense & Education Fund 29th Annual Capital Punishment Training Conference (Warrenton, Virginia, July 13, 2008).

*Planning, Preparing and Presenting Mental Health Evidence,* The Anthony G. Amsterdam Post-Conviction Skills Seminar (San Francisco, CA, June 12-15, 2008).

Case 3:09-cv-03064-MWB-LTS    Document 234-28    Filed 06/23/11    Page 7 of 226

OBR000007

**PRESENTATIONS (Continued)**

*Keynote Address: The Development, Integration and Presentation of Mitigating Evidence in Capital Cases,* and *Investigating, Developing and Presenting Evidence of Prison Culture,* (with Craig Haney, JD, Ph.D.), Habeas Assistance and Training Project (Baltimore, MD, May 31 and June 1, 2008).

*How to Get a Really Old, Procedurally Barred Non-DNA Case Back into Court and Win It,* Annual Innocence Network Conference (Santa Clara University School of Law, CA, March 26-28, 2008).

*Guidelines for Capital Mitigation Symposium*, Hofstra Law School (Dec. 5, 2007).

*Making the ABA Guidelines Work,* Arizona Capital Representation Project (Tucson and Phoenix, Arizona, May 24-25, 2007).

*Funding the Mitigation Investigation in Capital Cases,* Annual National Seminar on the Development and Integration of Mitigation Evidence sponsored by the Habeas Assistance and Training Counsel Project (Washington, DC, March, 2007).

*Prosecutorial Misconduct in Innocence Cases*, Eastern Jackson County Bar Association (March 31, 2005).

*Telling a New and Persuasive Story,* National Institute of Trial Advocacy and the Texas Association of Criminal Defense Lawyers (Houston, TX, February 22-25, 2005).

*Building the Mitigation Case*, Washburn University School of Law, Victim-offender Reconciliation in Capital Cases; Telling the Client's Story; Working With Mitigation Specialists. (Topeka, Kansas, November 11-13, 2004).

*The American Bar Association Guidelines on the Performance of Counsel in Capital Cases*, Arkansas Association of Criminal Defense Lawyers, (Fayetteville, AR, September 30, 2004).

*Jury Selection in Capital Cases*, Lecture and Demonstration, Arizona Association of Criminal Defense Lawyers (Phoenix, Arizona, April 22-23, 2004).

*Investigating Penalty Phase Defense: Working With a Multi-Disciplinary Team*, National Institute of Trial Advocacy (New Orleans, LA, April 19-22, 2004).

*Telling the Client's Story*, National Institute of Trial Advocacy (San Antonio, Texas, February 18-21, 2004).

*Representing the Innocent Capital Prisoner* (co-presentation with Barry Scheck); *Alternative Dispute Resolution in Capital Cases*; *Surviving the Capital Case*; California Attorneys for Criminal Justice (Monterey, California, February 12-16, 2004).

*Litigating Innocence*, Federal Public Defender Training Group, Annual National Habeas

8

OBR000008

**PRESENTATIONS (Continued)**

Corpus Training (Chicago, Illinois, August 22, 2003).

*Keynote Address: Abolitionists in the Mainstream*, NAACP Legal Defense & Education Fund Annual Airlie House Conference (Warrenton, Virginia, July 17, 2003).

*Telling the Client's Story,* The Persuasion Institute (New York University, May 15-17, 2003).

*Common Ethical Issues in the Defense of Capital Cases*, University of Arkansas-Little Rock (May 9, 2003).

*Jury Selection in High Publicity Cases*, Kansas City Metropolitan Bar Association, Tan-Tar-a Resort, Lake Ozark, Missouri (May 3, 2003); Kansas Association of Trial Attorneys, (Overland Park, Kansas, April 11, 2003).

*Litigating Competency Issues in Capital Trial, Appeal and Postconviction Cases*, Federal Public Defender Training Group, Annual National Habeas Corpus Training, (Nashville, Tennessee, August 22, 2003).

*Defending Battered Women in Criminal Cases*, The Missouri Bar, Lake of the Ozarks (March 1, 2002).

*Representing Habeas Petitioners in Capital Cases*, The National Institute of Trial Advocacy, (Orlando, Florida, January 2-6, 2002).

*Competency to Be Executed: Interdisciplinary and Ethical Considerations*, American Academy of Psychiatry and the Law, (Boston, Massachusetts, October 25-28, 2001).

*Executing the Mentally Retarded*, Yale Law School, First Monday in October Lecture Series (October 2, 2001).

*Defending Capital Cases: the Impact of Missouri's New Bar on Executing the Mentally Retarded*, Kansas City Metropolitan Bar Association (June 22, 2001).

*Jurors' Perceptions of Mitigating Evidence,* Clarence Darrow Death Penalty Defense College, University of Michigan Law School (May 15, 2001).

*The Key Ingredients of Wrongful Convictions: Eyewitness Testimony*, Federal Public Defender Training Group, Annual National Habeas Corpus Training, (Nashville, Tennessee, August, 2000).

*Federal Habeas Corpus–Common Issues Under the Antiterrorism and Effective Death Penalty Act*, NAACP Legal Defense & Education Fund Annual Airlie House Conference (Warrenton, VA, July, 2000).

9

OBR000009

**PRESENTATIONS (Continued)**

*What Every Lawyer Should Know about the DSM-IV,* and *Investigating and Presenting Pleas for Executive Clemency*, Federal Public Defender Training Group, Annual National Habeas Corpus Training (Atlanta, Georgia, August, 1999).

*Litigating Incompetency to Be Executed*, Federal Public Defender Training Group, National Seminar on Mental Illness and the Criminal Law (Washington, DC, July, 1999).

*Approaching Survivors of Homicide*, National Legal Aid and Defender Association, Life in the Balance (Atlanta, Georgia, March, 1999).

*Capital Defense in a Cruel and Unusual Era: Successful Plea Bargaining Techniques; Dealing with Survivors of Homicide*, California Attorneys for Criminal Justice/California Public Defender Association (Monterey, California, February, 1998).

Westminster University School of Law, London--First Annual A.J. Bannister Memorial Lecture, "*Issues of Concern in the American System of Capital Punishment*," (December 3, 1997).

*Keynote Address: The Importance of Investigation in Capital Cases*, *Working with Mental Health Experts*, and *Cross-Examination of State's Expert Witnesses,* Indiana Public Defender Council 1997 Defending Death Cases (Indianapolis, September, 1997).

*Anti-terrorism and Effective Death Penalty Act: Opt-in Provisions*, NAACP Legal Defense & Education Fund Airlie House Conference (Warrenton, VA, August, 1997).

*Winning Strategies in Capital Trials*, University of Arkansas-Little Rock (May, 1997).

*Keynote Address: Success in Spite of the New Habeas*, Seeking Justice in the Seventh Circuit; Training for Appointed Counsel in Capital Post-conviction Cases (Chicago, IL, April, 1997).

*The New Federal Habeas: What State Legislatures Should Do in Response,* National Conference of State Legislators Annual Convention (St. Louis, MO, August, 1996).

*Approaching the Families of Homicide Victims,* NAACP Legal Defense & Education Fund Annual Death Penalty Defense Conference, Georgetown University, (Washington, DC, August, 1996).

*Litigating Under the New Habeas,* University of Missouri-Kansas City, sponsored by Public Interest Litigation Clinic and the Administrative Office of the U.S. Courts, (Kansas City, MO, May, 1996).

Keynote address:, *Defending Condemned Prisoners,* Washington Council of Lawyers, Georgetown University School of Law (Washington, DC, May, 1996).

OBR000010

**PRESENTATIONS (Continued)**

*Counseling Clients and Co-workers Through the Execution of a Client,* Kentucky Department of Public Advocacy (Frankfort, KY, March, 1996).

*Dealing with Survivors of Homicide* and *Investigating Petitions for Executive Clemency,* National Legal Aid and Defender Association Annual Life in the Balance program (St. Louis, MO, March, 1996).

*Court-Appointed Attorney Fees and Expenses in Capital Cases,* Defender Services Committee of the United States Courts (Miami, Florida, December, 1995).

*Successful Practice in the United States Supreme Court,* Missouri Association of Criminal Defense Lawyers and the Missouri Bar (St. Louis, MO, April, 1995).

*Keynote Address: Life in the Balance*; *Jury Selection: Aggravating and Mitigating Factors,* and *Investigating Postconviction Claims of Innocence,* National Legal Aid and Defender Association Annual Death Penalty Defense Seminar (Kansas City, MO, March, 1995).

*Recent Decisions Affecting Capital Cases,* Missouri Capital Punishment Resource Center and Missouri Association of Criminal Defense Lawyers (Kansas City, MO, February, 1995).

*Procedural Bars--Preventing Losses on Federal Habeas Corpus,* and *Hot Issues: Getting Out Front on New Issues,* Kansas Association of Criminal Defense Lawyers, Death Penalty Seminar (Wichita, KS, September, 1994).

*Significant Developments in the Criminal Law,* University of Missouri-Kansas City School of Law CLE Annual Review of the Law (June, 1994).

*The Constitution and Innocence: The Right to Present Exculpatory Evidence,* Illinois Appellate Defender Annual Death Penalty Training Seminar (Edwardsville, IL, April, 1994).

*Writing Persuasive Appellate Briefs,* Missouri Bar and Missouri Association of Criminal Defense Lawyers (Kansas City, MO, April, 1994).

*Federal and State Postconviction Relief: Practice Tips Under Missouri Rules 29.15 and 24.035,* Missouri Bar and Missouri Association of Criminal Defense Lawyers (Springfield, MO, October, 1993).

*Independent Judiciary and the Rule of Law in the United States,* Greater Kansas City Chamber of Commerce International Visitors' Council (Kansas City, MO, August, 1993).

*Executive Clemency in Death Penalty Cases,* NAACP Legal Defense & Education Fund Annual Airlie House Conference (Warrenton, VA, August, 1993).

*Significant Developments in the Criminal Law,* University of Missouri-Kansas City School of Law CLE Annual Review of the Law (June, 1993).

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 11 of 226

OBR000011

**PRESENTATIONS (Continued)**

*Investigating and Presenting Psychological Defenses,* Missouri Bar and Missouri Association of Criminal Defense Lawyers (Kansas City, MO, October, 1992).

*Preparing Pleadings in Federal Habeas Corpus Cases,* University of Missouri-Kansas City and Missouri Association of Criminal Defense Lawyers (Kansas City, MO, September, 1992).

*Significant Developments in the Criminal Law,* University of Missouri-Kansas City School of Law CLE Annual Review of the Law (June, 1992).

*Cross-Examination of Trial Lawyers in Postconviction Hearings,* Missouri State Public Defender Appellate Training Conference (March, 1992).

*How State Court Lawyers Help--or Hurt--Their Clients' Federal Cases,* Missouri State Public Defender Appellate Training Conference (March, 1992).

*Representing Clients Under Sentence of Death,* Missouri Association of Criminal Defense Lawyers (Kansas City, MO, October, 1991).

*Losers in the Capital Punishment Lottery,* The Brenner Forum Series, All Souls Unitarian Church (Kansas City, MO, September, 1991).

*Protecting the Record for Appellate Review,* Missouri Public Defender Trial Skills Workshop (Columbia, MO, November, 1990).

*Missouri Approved Instructions: Recent Modifications,* Missouri Bar and Missouri Association of Criminal Defense Lawyers (Kansas City, Springfield and St. Joseph, MO, October, 1990).

*Significant Developments in the Criminal Law,* University of Missouri-Kansas City School of Law CLE (Kansas City, MO, June, 1990).

*Cross-examination of Expert Witnesses,* University of Missouri-Kansas City School of Law CLE (Kansas City, MO, March, 1990).

*Trial Objections: Preserving the Record for Appellate Review,* Missouri Bar and Missouri Association of Criminal Defense Lawyers (Kansas City, MO, October, 1990).

*Picking Jurors Who Will Vote for Life,* and *Talking to Survivors of Homicide: Sensitivity Training for Criminal Defense Lawyers,* National Legal Aid and Defender Association Annual Meeting (Kansas City, MO, October, 1989).

*Record Preservation in Capital Cases: The Importance of Federal Issues,* Missouri Public Defender Death Penalty Training Program (St. Louis, MO, November, 1988).

12

OBR000012

**PRESENTATIONS (Continued)**

*Missouri Appellate/Postconviction Practice: The New Unified System,* University of Missouri-Kansas City School of Law and Missouri Association of Criminal Defense Lawyers (Kansas City and St. Joseph, MO, October, 1988).

*Voir Dire: Challenges for Cause,* Missouri Public Defender System (St. Louis, MO, November, 1987).

*Record Preservation,* Missouri Public Defender Trial Skill Workshop (Columbia, MO, June, 1985).

OBR000013

**DECLARATION OF SEAN D. O'BRIEN**

I, Sean D. O'Brien, declare under penalty of perjury as follows:

1. I am an attorney duly licensed to practice before state and federal courts in the State of Missouri, the Eighth and Tenth Circuit Courts of Appeals, and the United States Supreme Court. I have specialized in the representation of persons in criminal matters since 1981. Since 1985, my primary area of criminal practice has involved the trial, appeal and post-conviction representation of individuals in capital cases.

2. From 1985 till 1989 I served as the chief public defender in Kansas City, Missouri, where I provided and supervised the direct representation of indigent defendants in all felony and all capital cases in Kansas City, and in most capital trial cases in the western one-third of Missouri. During my tenure as Public Defender, no defendant represented by my office was sentenced to death.

3. In October, 1989, I was appointed Executive Director of the Missouri Capital Punishment Resource Center, currently called the Death Penalty Litigation Clinic. I was responsible for recruiting and training attorneys in the representation of prisoners under sentence of death, and I also engaged in the direct representation of condemned prisoners in State and Federal courts, including the United States Supreme Court. Noteworthy cases I have litigated include *Schlup v. Delo*, 513 U.S. 298 (1995), which preserved federal habeas jurisdiction for prisoners who are actually innocent; *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), which preserved habeas jurisdiction over claims of incompetence for execution; and *Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003), creating the right to habeas corpus relief based on freestanding claims of innocence. I have been appointed *pro hac vice* to represent prisoners under sentence of

1

OBR000014

death in federal and/or state courts in Arizona, Kansas, Wyoming, and Arkansas, and I have qualified as an expert witness on the performance of counsel in capital cases in state and federal courts in Missouri, Georgia, Kansas, Idaho and in United States Military Court. I have also testified as an expert on capital punishment issues before the Missouri and Kansas Legislatures.

4. In 1996, the state of Illinois retained me to conduct a study of its system for providing representation in post-conviction capital cases and to make recommendations for reform. I am currently retained by the Administrative Office of the United States Courts to provide training to assistant federal public defenders and counsel appointed under the Criminal Justice Act to represent indigent persons in capital habeas corpus cases.

5. In addition to more than 25 years of practice in capital defense litigation, I have researched and published scholarly articles on issues pertaining to the performance of defense counsel in death penalty cases, including *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 36 HOFSTRA L. REV. 693 (Summer 2008); *Capital Defense Lawyers: The Good, the Bad and the Ugly,* 105 MICH. L. REV. 1 (March, 2007); *Presumed Guilty: Innocence and the Death Penalty,* Address to the Miscarriages of Justice Conference, Current Perspectives (February 20, 2007), *in* 7 J. INST. JUST. & INT'L STUD. 14 (2007); *Attorneys for the Damned*, 58 U.M.K.C. L. REV. 517 (Summer, 1990); and *A Step Toward Fairness in Capital Litigation*, 16 WM. MITCHELL L. REV. 633 (1990).

6. I have lectured nationally on issues relating to the performance of defense counsel and the mitigation function of capital defense teams, including the historical development and professional experiential foundation for the American Bar Association's Guidelines for the Performance of Counsel in Capital Cases; the necessity and protocols for working with

2

OBR000015

interdisciplinary teams to investigate and develop unifying and consistent defense strategies for a guilt and penalty phase defense; the essential steps for effectively investigating and presenting the narrative of a client's development and functioning, including strategies for overcoming barriers to disclosure of relevant social history information and effective methods for identifying and consulting with appropriate experts; the ethical considerations involved in representing and counseling clients who express a preference for execution over life imprisonment; and the duty to investigate the prosecution's guilt phase evidence and theories of culpability.

7. I have also directed a number of law school clinics providing legal services to indigent persons in criminal matters, including the Public Defender Appeals Clinic (1983-89), the Public Defender Trial Clinic (1985-89), and the Death Penalty Representation Clinic (1990-present) at UMKC School of Law, director of the Capital Defence Internships through Westminster School of Law, London, Amicus and Reprieve (1994-present), and the Death Penalty Representation Externship program through Washburn School of Law (2004-05); and I have taught courses in death penalty jurisprudence as an adjunct professor at UMKC School of Law (1995-2005) and Washburn School of Law (2004-05).

8. I am currently an associate professor at the University of Missouri-Kansas City School of Law, where I teach upper level graduate courses in criminal law, criminal procedure and capital punishment. I received a BA in English from Northwest Missouri State University in 1977, and in 2006 received the Distinguished Alumni Award. I earned a J.D. from the University of Missouri-Kansas City School of Law in 1980, and received the Alumni Achievement Award in 2002. In 2005 I received an Honorary Doctor of Humane Letters from Benedictine College. For my work in the field of capital punishment, I was recognized as Lawyer of the Year by the

3

OBR000016

*Missouri Lawyer's Weekly* in 2003, and in 2005 I received the Kansas City Metropolitan Bar Association Lifetime Achievement Award.

9. Between 2004 and 2008, at the request of the American Bar Association's Death Penalty Representation Project, I served as the principal investigator on studies examining national standards for the performance of capital defense attorneys and mitigation specialists in the preparation of a penalty phase case. Working with a core team that possessed strong legal and social science research skills, I participated in or supervised interviews with members of capital defense teams in every death penalty jurisdiction in the United States, including the federal capital defense counsel and the U.S. Military; circulated draft guidelines articulating the prevailing standards of performance for the mitigation function of capital defense teams; and conducted follow-up consultation with mitigation specialists, capital defense lawyers and mental health experts who participated in drafting Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases. The final version of the guidelines produced from the results of our studies are now published as *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 HOFSTRA L. REV. 677 (Spring 2008). The process of researching and articulating standards of performance for the prevailing practices is described in more detail in my article, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 36 HOFSTRA L. REV. 693 (Spring 2008). This article received the National Association of Sentencing Advocates and Mitigation Specialists annual National Sentencing Project Award in 2009, and the 2009 UMKC Law Faculty Daniel L. Brenner Faculty Writing Award.

10. Through my training, education, experience and independent research, I am very

4

OBR000017

familiar with the practical skills, resources and prevailing practice standards necessary for the competent representation of prisoners in proceedings, including trials, in which the government seeks a judgment authorizing the taking of a human life. In particular, as a capital defense attorney, who has qualified as an expert witness in multiple jurisdictions on the issue of the competent performance of counsel in capital cases, I am thoroughly familiar with federal constitutional standards governing the defense of capital cases.

11. The attorneys who are assisting Ms. Angela Johnson in her pending Motion for Relief from Conviction and Sentence Pursuant to 28 U.S.C. Sec. 2255 have asked me to address the performance of her trial counsel respect to the investigation into her mental health and related issues.

12. To enable me to address these questions, I reviewed a number of case related documents, including, but not limited to transcripts of testimony of Angela Johnson's defense team Patrick Berrigan, Al Willett, Dean Stowers and Mary Goody, and related exhibits; transcript summaries of Ms. Johnson's trial prepared by UMKC law students under my direction and supervision; transcripts of testimony and reports by mental health examiners George Woods, Marilyn Hutchinson, William S. Logan, Michael Gelbort, Mark Cunningham and Daniel Martell; and numerous witness declarations and documents pertaining to Angela Johnson's life history. It should also be noted that I have consulted with Ms. Johnson's 2255 counsel Michael Lawlor, Michael Burt, Marcia Morrissey, Nancy Pemberton, and mitigation specialists Scharlette Holdman, Lesa Watson and Lindsay Runnels on multiple occasions since April, 2010. I was initially contacted by Mr. Lawlor in my capacity as Eighth Circuit Resource Counsel, and my involvement and familiarity with the case increased during Mr. Lawlor's departure from the case

5

OBR000018

and the entry of successor counsel.

13. Based on the information I have reviewed, I am able to form an opinion on the adequacy of trial counsel's performance in areas that include attorney-client rapport and communications, investigation of Ms. Johnson's background and mental health, including her condition at the time of the offense. These issues also affect counsel's choice of defense in the guilt-innocence and penalty stages of trial and performance with respect to pursuit of a negotiated disposition that would have enabled Ms. Johnson to avoid the death penalty.

14. My assessment of counsel's performance is based on the level of competence required under the Sixth Amendment to the Constitution as enunciated in the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* first prong requires that defense counsel perform competently, and the second inquires whether an attorney's substandard performance may have affected the outcome of the case. The more recent cases of *Williams v. Taylor*, 529 U.S. 362, 396 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005), are important applications of the Strickland standard to the factual context of a death penalty case, and highlight the importance of counsel's duty to conduct a reasonable investigation. In *Williams v. Taylor*, the Court found Virginia trial counsel ineffective because they "did not fulfill their obligation to conduct a thorough investigation of the defendant's background." Similarly, in *Wiggins*, the Supreme Court found that trial counsel's failure to investigate Kevin Wiggins' life history "fell short of the professional standards that prevailed . . . in 1989." 539 U.S. at 524. The Court ruled that trial counsel's "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the

6

OBR000019

prosecutor." *Id*. Finally, in *Rompilla v. Beard*, trial counsel were found constitutionally ineffective because their interviews of Ronald Rompilla's parents and siblings failed to uncover a wealth of mitigation evidence that existed beneath the surface. 545 U.S. at 391.

16. Counsel's obligation of competence performance must be analyzed in the context of the representation. In capital cases, defense counsel are responsible for implementing key constitutional principles that govern the imposition of the death penalty. *Furman v. Georgia*, decided in 1972, fundamentally altered the landscape of death penalty litigation when it found that capital punishment, as then administered in the United States, was unconstitutional because of the lack of guided discretion on the part of the sentencer. In *Gregg v. Georgia* in 1976, the Supreme Court analyzed Georgia's capital punishment statute and explained how it satisfied Furman's concerns about the arbitrary imposition of the death penalty by requiring the jury to weigh aggravating and mitigating circumstances in determining punishment. In *Woodson v. North Carolina* in 1978, the United States Supreme Court ruled that the automatic imposition of the death penalty on persons convicted of murder violates the Eighth Amendment because the respect for human dignity mandated by the Eighth Amendment requires individualized consideration of punishment. A capital sentencer therefore must consider the circumstances of individual defendant in deciding whether to impose the death penalty. In *Lockett v. Ohio*, 438 U.S. 536 (1978), the Supreme Court ruled that a judge or jury in a capital case must be permitted to consider any aspect of the defendant's background and character tendered in mitigation of the offender's sentence. Numerous cases since *Lockett* have strictly applied this principle, overturning death sentences where statutes, jury instructions and rules of evidence precluded juries from considering specific matters in mitigation of punishment. *See, e.g., Skipper v. South*

7

OBR000020

*Carolina*, 476 U.S. 1 (1986) (exclusion of evidence that the defendant was a well-behaved good prisoner violated the Eighth Amendment); *Green v. Georgia*, 442 U.S. 95 (1979) (exclusion of reliable mitigating evidence based on Georgia's hearsay rule violated the Eighth Amendment); *Eddings v Oklahoma*, 455 U.S. 104 (1982) (sentencing statute precluding the trial judge's consideration of the defendant's turbulent family history violated the Eighth Amendment); *Mills v. Maryland*, 486 S. Ct. 367 (1988) (jury instruction precluding consideration of mitigating factors not unanimously found by the jury violated Eighth Amendment); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (the Eighth Amendment is violated by a sentencing scheme that did not permit a jury to return a life sentence if it found the defendant was cognitively impaired). Even though the federal sentencing statute sets forth a limited list of mitigating circumstances, the Constitution requires the Government to allow the sentencer to consider mitigating evidence and circumstances which are outside the statute. *Hitchcock v. Dugger*, 481 U.S. 393 (1987). All of these cases were decided well before Ms. Johnson's trial, and should have guided counsel's preparation for trial.

17. While *Strickland* creates a general presumption of validity of an attorney's informed strategy decisions, the Court specifically imposed a duty on counsel to conduct a reasonable investigation prior to deciding a course of action. Counsel's decisions in this case are reasonable only if based upon a reasonable investigation:

> Choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments
> support the limitations on investigation. In other words, counsel
> has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all

8

OBR000021

> the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. 668, 691 (1984). *Wiggins* clarified the scope of counsel's duty to investigate, finding that counsel's "failure to investigate thoroughly stemmed from inattention, not strategic judgment." 539 U.S. at 526. *See also, Williams v. Taylor, supra,* at 396, holding that the failure to uncover and present mitigating evidence could not be justified as a strategic decision because counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background." The duty to investigate is triggered if counsel is "on notice" that a particular line of investigation could produce relevant evidence. *Rompilla v. Beard, supra,* at 383. A decision to terminate a line of investigation is premature if counsel "uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless; this case is therefore distinguishable from our precedents in which we have found limited investigations into mitigating evidence to be reasonable." *Wiggins,* 539 U.S. at 525. Thus, in Ms. Johnson's case, for example, if counsel were "on notice" that she was mentally or emotionally impaired, they were under a duty to investigate thoroughly the potential factual and legal issues implicated by those impairments, especially those that might enable her to avoid the death penalty. By focusing on the duty to conduct a thorough investigation of matters to which counsel is "on notice," *Williams, Wiggins,* and *Rompilla* address *Strickland's* directive "that every effort be made to eliminate the distorting effects of hindsight." *Strickland v. Washington,* 466 U.S. 668, 689 (1984).

18. Courts have "long recognized . . .[the] critical interrelation between expert

9

OBR000022

psychiatric assistance and minimally effective assistance of counsel." *Blake v. Kemp*, 758 F.2d 523, 531 (11th Cir. 1985) (quoting United States v. Edwards, 488 F.2d 1154, 1163 (5th Cir. 1974)). Mental health issues abound in capital litigation. The ABA Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases caution that "the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that '[i]t must be assumed that the client is emotionally and intellectually impaired.'" Guideline 10.5, Commentary, quoting Rick Kammen & Lee Norton, *Plea Agreements: Working with Capital Defendants*, THE ADVOCATE, Mar. 2000, at 31, available at http://www.dpa.state.ky.us/library/advocate/mar00/plea.html. It is for this reason that the Guidelines provide that the defense team include "at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." Guideline 4.1. Typically, that person will be the mitigation specialist, although other team members can and should learn enough about mental health and symptomatology to assist in this critical function. Because only defense team members have access to the client over time, they must "act as the observational caretakers for the mental status symptoms of the client." Deana Dorman Logan, *Learning to Observe Signs of Mental Impairment*, 19 Cal. Atty's for Crim. Just. F. 40, 40 (1992) (footnote omitted). Although Ms. Johnson's defense team observed overt signs of mental and emotional impairment, there was a general failure to appreciate and respond to the significance of their observations.

19. Ms. Johnson's attorneys observed what they should have recognized to be symptoms of serious mental or emotional disturbances while she was incarcerated awaiting trial. She attempted suicide, and was under the care of Dr. Saffire, a psychiatrist at the Linn County Jail,

10

OBR000023

who prescribed medication.  Counsel minimized the significance of that event, apparently without talking to Dr. Saffire.  The testimony of trial counsel Patrick Berrigan indicates that he directly observed significant signs of mental health impairment:

> There are many notes where when I visit her in jail we're having discussions and she's behaving erratically, either overly emotional. Sometimes she engaged in this rocking back and forth behavior that was a little disconcerting. Sometimes she had difficulty focusing on the issues that I really wanted to discuss. And throughout her stay I think in most of these jails, maybe not all of them, she's on some type of antianxiety medication. So she was anxious about her situation. All clients are anxious in this situation, but she was extremely anxious.

Hearing Transcript, 2045.  It was not uncommon during attorney-client interviews for her to rock back and forth, sometimes hugging herself, showing obvious signs of distress, particularly when discussing stressful subjects, such as the government's evidence.  Trial counsel acknowledged that Ms. Johnson's history "is replete with examples of horribly abusive behavior, a lot of drug use. There's a lot of self-medication, depression, bad choices in men," and that "there are all kinds of mental health issues in her background." *Id.,* 2066.  In Mr. Berrigan's words, "she's got some issues, no question about it." *Id.,* 2063.  Therefore, the starting point for any analysis of counsel's performance begins with the fact that they were on notice, from their own observations and from independent sources, that Ms. Johnson is mentally ill.

20.  Another important aspect of counsel's duty of competent performance is to communicate effectively with the client.  This duty is universal in the practice of law, but has a special significance in capital cases for a number of reasons, including the gravity of the litigation, the complexity of legal and factual issues, the need to probe painful and potentially shameful aspects of the client's history, and the likelihood that the client is mentally impaired. A

11

OBR000024

committee of federal judges appointed by the Honorable Emmet Ripley Cox and chaired by the Honorable James R. Spencer studied the special demands and costs associated with capital representation, and found that while communication is important in every case, it is "vastly more time consuming and demanding in a death penalty case." COMM. ON DEFENDER SERVS., JUDICIAL CONFERENCE OF THE U.S., FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (1998), http://www.uscourts.gov/dpenalty/4REPORT.htm, 7. (Hereafter "Spencer Report.") The Spencer Committee explained:

> First, the nature of the penalty phase inquiry requires a relationship which encourages the client to disclose his or her most closely guarded life history with the lawyer. Experiences of mental illness, substance abuse, emotional and physical abuse, social and academic failure, and other "family secrets" must be revealed, researched and analyzed for the insight they may provide into the underlying causes of the client's alleged conduct. The establishment of trust and confidence is also vitally important if the lawyer is to convince the defendant to consider an offer to plead guilty, especially because what is offered is likely to be life imprisonment without the possibility of parole. Accepting such a "deal" requires tremendous faith in counsel.

Spencer Report, 7. Thus, building and maintaining rapport with Ms. Johnson was necessary to represent her effectively. In this context, the concept of rapport goes well beyond the ability to have a friendly relationship with the client in which visits are pleasant and difficult subjects are avoided. Rapport is "a relationship between the [client] and [the defense team] that reflects warmth, genuine concern, and mutual trust" in which information flows freely because "patients feel accepted with both their assets and liabilities." Benjamin James Sadock & Virginia Alcott Sadock, KAPLAN & SADOCK'S SYNOPSIS OF PSYCHIATRY 1 (9th ed. 2003). The duty to establish such a relationship has long been recognized as fundamental to the function of lawyers,

12

OBR000025

even in noncapital cases. "Defense counsel should seek to establish a relationship of trust and confidence with the accused and should discuss the objectives of the representation….Defense counsel should explain the necessity of full disclosure of all facts known to the client for an effective defense…" ABA Criminal Justice Standards: The Defense Function, Standard 4-3.1(a) (1993). The client interview "should seek to determine all relevant facts known to the accused" and "probe for all legally relevant information." *Id.,* Standard 4-3.2 (a). This duty is reflected in the ABA Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases as well. At all stages of the representation, counsel "should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client." Guideline 10.5A. This duty is ongoing, and includes the obligation to "engage in a continuing interactive dialogue with the client" about all material matters affecting the case, including the "progress of and prospects for the factual investigation,… the development of a defense theory,…presentation of the defense case,…[and] potential agreed-upon dispositions of the case." Guideline 10.5 C. The Commentary explains the special importance of this function in death penalty cases:

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense,… and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. Client contact must be ongoing. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Similarly, a client will not – with good reason – trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for

13

OBR000026

> support and advice.
>
> Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information, the lawyer must understand the client and his life history. To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.

ABA Guideline 10.5, Commentary.

20.  The testimony and evidence in this case show that the defense team fell short of these obligations with Ms. Johnson.  Part of this was due to the fundamental inconsistency between Mr. Willett and Mr. Berrigan in their approaches to the case and the client.  Mr. Berrigan understood the need to negotiate a non-death disposition of the case.  Mr. Willett communicated with Ms. Johnson in a manner that raised false and unrealistic hopes that he could win her freedom at trial, even telling her in a letter, "Hopefully I will be able to see you in something other than a blue jumpsuit in the near future."  Willett Letter to Angela Johnson 8-16-2000, RS-000281.  Mr. Berrigan testified that this was Mr. Willett's approach to Ms. Johnson "throughout the duration of the case preparation."  Hearing Transcript 2044.  Further, the function of reviewing with Ms. Johnson the discovery and evidence in the case was delegated to an untrained secretary, who, unknown to counsel, reinforced Ms. Johnson's unrealistic belief in that she could be acquitted of the charges. *Id.,* 2054-55.  In reality, the drug charges alone could result in a sentence of life imprisonment for Ms. Johnson; it is absurd to think that counsel could have won her freedom on the multiple homicide counts.  The failure to develop a meaningful rapport with Ms. Johnson obstructed meaningful communication about issues crucial to informed, rational

14

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 27 of 226

OBR000027

decision-making on her part.

21. An important context for analyzing the reasonableness of counsel's decision to forego investigation of Ms. Johnson's mental state at the time of the offense is the strength of the evidence of her involvement in the crime. The judge who presided over her detention hearing made the following observations about the evidence against Ms. Johnson:

> It's the ultimate, of course, crime of violence. The strength of the evidence, there is compelling evidence, circumstantial and direct, of her guilt. Her purchase of the alleged murder weapon; the fact that it was a Tec-9, a gun without a legitimate sporting purpose; her subsequent lie to the police about the purchase of that weapon; her consistent efforts to assist Dustin Honken either known or unknown in efforts to employ and assist a reported hit man in this case; her communication regarding the need for the 380-caliber handgun; her attempt to bond out, knowing or unknowing, the hit man; her admissions in the participation of the murders, and her intimate knowledge of the details of them; her threats against witnesses Cobeen and those at the sentencing; her express desire to an undercover police officer to be a killer all support the finding by clear and convincing evidence that the release of this defendant would pose a serious danger to the community.

Hearing Transcript, 2012-13. Since the court made those observations, the Government's evidence grew stronger, and included Ms. Johnson's admissions of guilt to Robert McNeese that were corroborated by a map to the grave site written in Ms. Johnson's own handwriting.

22. Trial counsel's decision to emphasize innocence over her impaired mental condition without adequate investigation of the latter was unreasonable in the same way that trial counsel's similar decisions in *Rompilla v. Beard* were unreasonable. Concurring in the decision to grant habeas corpus relief to Ronald Rompilla, Justice O'Connor observed that Rompilla's lawyers "structured the entire mitigation argument around the hope of convincing the jury that residual doubt about Rompilla's guilt made it inappropriate to impose the death penalty." 564 U.S. at 394-

15

OBR000028

95.  In light of the strength of the state's evidence, including the state's notice that it intended to present Rompilla's prior rape conviction as an aggravating factor, Justice O'Connor believed that "the prosecutor put Rompilla's attorneys on notice that the prospective defense on mitigation likely would be ineffective and counterproductive." *Id.,* 395. She went even further, stating that "Rompilla's attorneys' reliance on this transparently weak argument risked damaging their credibility." *Id.* In both Ronald Rompilla and Angela Johnson's cases, "Such a scenario called for further investigation, to determine whether circumstances of the prior case gave any hope of saving the residual doubt argument, or whether the best strategy instead would be to jettison that argument so as to focus on other, more promising issues." *Id.*

23.  The reinforcement of Ms. Johnson's unrealistic expectation of freedom was counterproductive to viable settlement and trial defense strategies.  Competent capital case litigators understand that a claim of innocence is a trap for clients and lawyers who do not face up to the likelihood of conviction when confronted with strong evidence of guilt.  This view is substantiated by empirical research published well before Ms. Johnson's trial.  Professor Scott Sundby's study of Capital Jury Project data revealed that "juries in denial defense cases imposed death sentences twice as often as they imposed life sentences, while juries in admission defense cases chose a life verdict over a death sentence by a three-to-two ratio." Scott E. Sundby, *The Capital Jury and Absolution: the Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1575 (1998). Conversely, a juror's perception that the defendant has accepted responsibility for her crime and is truly remorseful is highly mitigating. *See* Steven P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538, 1559 tbl.4, 1560-61 (1998); see also John H. Blume, Sheri Lynn Johnson, & Scott

16

OBR000025

E. Sundby, *Competent Capital Representation: Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, 1049-1050 (2008) (noting that remorse is an important factor that can lead jurors to choose life over death).  This is a primary reason for the directive in the ABA Guidelines that counsel "should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  Guideline 10.10.1 A.  The Guidelines explain that "if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer is lost and the defendant's chances for a life verdict reduced."  Guideline 10.10.1A, Commentary. Rather than function as a cohesive team pursuing a cohesive strategy designed to save their client's life, Ms. Johnson's lawyers functioned at cross purposes to the degree that opportunities to settle the case for a life sentence were lost, and Mr. Berrigan attempted to distance himself in the eyes of the jury from Mr. Willett's ill-advised pursuit of a hopeless theory for obtaining an acquittal.   Their mentally impaired client was not well served by this approach.

24.  In light of Mr. Berrigan's observations of Ms. Johnson in the jail and the history that was known to counsel prior to trial, it is a given that counsel knew they were dealing with an impaired client.  However, the issue of her mental state at the time of the crime—including the degree to which her impairments would make her vulnerable to the domination or influence of Dustin Honken—was never explored on any level.  "[C]ounsel in a death penalty case generally should obtain an expert opinion on a significant issue that can be addressed only by someone with technical expertise."  *Ringo v. Roper,* 472 F.3d 1001 (8th Cir. 2007).  Further, the Court of Appeals recognizes that the issue of the defendant's mental condition "cannot be neatly divided into sanity at the time of the offense as the relevant issue at the guilt phase, and mitigating

17

OBR000030

evidence as the relevant issue at sentencing.... [A criminal defendant's] intellectual understanding of his actions and their gravity [is] ... clearly in issue at both phases of the proceedings." *Starr v. Lockhart*, 23 F.3d 1280, 1290 n. 7 (8th Cir.1994). To the extent that trial counsel might claim that Ms. Johnson's preference for an innocence defense obstructed the exploration of her mental condition at the time of the crime, that problem was largely of counsel's own making, as discussed in the preceding paragraphs. Working together with counsel, a qualified mental health expert would have enabled counsel to ascertain the truth about the crimes, Ms. Johnson's role in the crimes, and her mental state at the time, as Dr. Woods was recently able to do. By instructing Dr. Logan and Dr. Hutchinson to avoid the subject of Ms. Johnson's mental state at the time of the offenses, trial counsel precluded the investigation of critical evidence that could have facilitated a negotiated plea or a persuasive strategy for avoiding the death penalty at trial.

25. In conclusion, it is my opinion that trial counsel performed deficiently by failing to acknowledge clear realities in their communications with Ms. Johnson, and in pursuing a defense of innocence in the face of overwhelming evidence and without exploring the critically important issue of her mental state at the time of the offense. In spite of the terrible nature of the crimes in which Ms. Johnson played a key role, adequate performance could have enabled her to avoid the death penalty.

I declare under penalty of perjury, under the laws of the United States of America and the State of Missouri, that the foregoing is true and correct.

Executed this 3rd day of June, 2010, at Kansas City, Missouri.

_____
Sean D. O'Brien

18

OBR000031

**TABLE OF CONTENTS**

**UNITED STATES V. JOHNSON**

**DEFENSE: PATRICK BERRIGAN, DEAN STOWERS, AND ALFRED WILLETT
PROSECUTION: C.J. WILLIAMS AND THOMAS MILLER**

Eligibility 2441-2532

    Prosecution's Argument 2458-2477

    Defense's Argument 2478-2498

    Prosecution's Rebuttal 2499-2503

    Penalty Phase Issues Before Court 2505-2529

    Eligibility Verdict 2530-2532

Penalty Phase 2533-2856

    Prosecution's Opening 2533- 2538

    Defense's Opening 2539-2547

    Prosecution's Case 2550-2856

        Steve Vest Direct 2550-2575
        Steve Vest Cross 2576-2618
        Steve Vest Redirect 2619-2622
        Steve Vest Recross 2623-2626

        Kathy Rick Direct 2627-2642
        Kathy Rick Cross 2643-2668
        Kathy Rick Redirect 2669
        Kathy Rick Recross 2669

        Alyssa Nelson Direct 2670-2683
        Alyssa Nelson Cross 2684-2695

        Jennifer Rinden Direct 2696-2698
        Jennifer Rinden Cross 2699

        Michael Mittan Direct 2701-2744
        Michael Mittan Cross 2744-2772
        Michael Mittan Redirect 2772

1

OBR000032

Kyla Davis Direct 2774-2779
Kyla Davis Cross 2779-2790
Kyla Davis Redirect 2790-2791

Laura Shelley Direct 2792-2794
Laura Shelley Cross 2794-2798

Bill Basler Direct 2799-2810
Bill Basler Cross 2810-2814

Transcript Issue Before Court 2815-2822

Subpoena Hearing 2828-2834

Bill Basler Cross (cont.) 2835-2856

2

Case 3:09-cv-03064-MWB-LTS    Document 284-38    Filed 06/23/11    Page 33 of 226

OBR000033

**UNITED STATES V. JOHNSON**

**DEFENSE: PATRICK BERRIGAN, DEAN STOWERS, AND ALFRED WILLETT**
**PROSECUTION: C.J. WILLIAMS AND THOMAS MILLER**

**BEGIN Volume 15, May 31, 2005, 7:42 a.m.**

**Preliminary Matters before Court - Eligibility**

2441   The Court instructed jurors not to discuss any aspect of the eligibility phase until deliberations. Both parties approved of the instruction.

2442   The Court revisited the issue concerning the instruction that the sentence would be life w/o parole or death and the effect of *U.S. v. Booker*, indicating that the options were really either death or imprisonment for 20 years up to life. Both parties earlier agreed to stick with the life w/o parole or death instruction and D proceeded to make a record concerning the instruction.

2443   D indicated client's understanding that the instruction of life w/o parole or death meant those were the only two possible sentences. D purports it was a tactical decision to stick with life or death instruction and that with such an instruction D would not get less than life w/o parole.

2444   D asked for life or death instruction and client indicated accuracy of D's statements and client agreed to life/death instruction and understood that a sentence less than life would not be possible.

2445   Ct. asked and D indicated life/death instruction was a matter of strategy. P declined to make a record on the issue. P brought up Mr. Honken's proffer and the desire to disclose it to the families.

2446   Disclosure to victim's families issue had been discussed w/o P present but D had spoke to P about it.

2447   D did not see need to disclose to victim's families as Mr. Honken's proffer would be similar to Mr. Vest's testimony and D was afraid it could change the testimony of family members.

2448   Ct.'s earlier order had prevented P from making disclosures to victim's family members. Ct. DENIED P's motion to disclose because disclosure could change testimony and because family members already heard or know about Vest's testimony.

3

2449 Ct. inquired about Honken's mention of polygraph and related statements during proffer.

2450 Neither D nor P are going to bring up the polygraph although some party might somehow introduce the accompanying statements.

2451 Ct. brought up issue of P's rebuttal argument and P doubted he would need one but wanted to reserve the possibility. P initially says he will stay under 4 hours, invoking the Tom Miller rule, but then reduces the time to 20-30 minutes.

2452 Ct. discusses getting through eligibility phase today and starting instructions and maybe opening arguments for penalty phase this afternoon. Recess.

2453 Jury brought in. Ct. directs jury to the instructions on their chairs.

2454 Ct. read the eligibility phase instructions 1-7 to the jury. Instruction No. 8 was saved until after argument.

2455-57 Ct. explained the verdict form to the jury and certification of the form.


**Government's Argument by Mr. Williams – Eligibility**

2458 7 days ago each of the jurors convicted D for aiding and abetting Honken in the slaughter of 5 people. We're not here to determine the punishment but to determine what the options are because Congress decided this decision would be for the jury. D had the necessary intent and all of the necessary aggravators are present.

2459 The question for the jury is whether facts are present that sets this apart from other murders. A person should be considered for death if there is intent.

2460 You are to consider if there are statutory factors present. Both intent and at least one aggravating factor must be present to consider death. The U.S. has alleged 3 factors: substantial planning and premeditation, the crime was particularly heinous, cruel or depraved, and the little girls were vulnerable victims.

2461 Somebody capable of planning and premeditation is somebody for whom death should be considered. Death should be considered if the victim is killed in an especially cruel or tortured way. "Somebody capable of killing children is somebody that should be considered for the death penalty." Greg Nicholson was killed to prevent him from testifying against D. D helped Honken hunt Nicholson down as an animal.

2462 D deceptively gained entry into the Duncan house to kill Nicholson. D held the gun or tied Nicholson up. D and Honken didn't care who was in the house.

2463 Everybody in the house is going to have to die so no witnesses would be left. D knew she was helping Honken kill everybody in the house.

4

OBR000035

DeGeus could be a witness against Honken so there was motive. D wanted DeGeus dead because he had been mean to her.

2464 DeGeus was afraid because of the Nicholson murder. DeGeus could testify so he had to be eliminated.

2465 D lured him to his death. Honken was a planner but not a doer. Honken was not involved in violence before meeting up with D. D was somebody who acts. D's conduct led to these murders.

2466 Substantial planning and premeditation existed as to all of the murders. D purchases a Tec-9 close to the murders way out in Waterloo, IA at a pawn shop. No other purpose for this than violence.

2467 She had to know people were going to die. At any time D could have decided not to go further. The intent was not just to drive over and make a videotape, because they drove over in a borrowed car.

2468 Borrowing the car was part of the plan to kill. The deception took some planning.

2469 Premeditation doesn't take much time. Loading the clip knowing what you're going to do with it is premeditation. Substantial planning and premeditation was done because D and Honken came up with an elaborate plan, and somebody capable of that should be considered for death. D entered the house with the weapon, duct tape, rope, and a video camera. They located a hidden grave.

2470 Their surveillance of the house was good because they knew would the kids would be home. They didn't have time to wait because Honken was to plead guilty in 5 days so they had to act.

2471 They had to have gone out and found a place to bury these people ahead of time. Same thing with DeGeus. They had to retrieve the gun and come up with a plan to lure DeGeus out.

2472 At any step, D could have backed out. But no, D continues with her conduct despite 3 months to think about killing 4 people, including 2 little kids. D not only brought the gun but brought a bat to beat DeGeus in revenge for beating her. They chose a burial site in advance. 2473 That kind of person should be eligible for death.

The adults were murdered in an especially cruel manner involving torture or substantial physical abuse. Nicholson and Lori Duncan were bound and gagged with girl's socks and shot twice.

2474 Lori was helpless to keep these people from killing her children.

DeGeus wasn't bound or gagged but he was beaten and shot multiple times to inflict pain.

5

OBR000036

Vulnerable victims – applicable to the little girls. Just consider how young they were. They weren't bound or gagged but they didn't run. They didn't fight or did they? The holes in the back of the head tells you something more. Honken walked them out together, shot one, then shot the other in the back of the head.

If they weren't taken out together, maybe they hear the gunshots or maybe they don't.

The youngest one sees her mother and sister disappear, then the man with the gun comes for her.

The death penalty should be considered for these intentional acts. D intentionally helped. Each of the statutory aggravating factors is present. The government suggests you check the boxes for intent and aggravating factors on the verdict form.

**Defendant's Argument by Mr. Stowers – Eligibility**

We understand and accept your verdicts and appreciate you going through the evidence. These were horrible killings at the hands of Honken.

You said she's guilty, now let's move on. The law doesn't say every murder under these statutes warrants death. Only certain things warrant the death penalty.

It is your exclusive decision to decide of D should be considered for death. If she's not eligible for death, D will get life w/o parole. I won't argue the girls weren't vulnerable.

The intent requirement requires some additional heightened desire above that needed to find D guilty. The intent requirement must be proven beyond a reasonable doubt. Intent is more than impulse, it is considering something important.

What's the evidence that D had a conscious desire to kill? You heard Sara Bramow but she's nobody you would put somebody else's life on the line for. D said the kids weren't supposed to die.

What do we really know about the last night of DeGeus's life? D did, in fact, lure DeGeus to his death but when did she find out about that?

Substantial planning and premeditation. We're not talking about what Honken did, we're talking about whether D substantially planned and premeditated. Are you sure beyond all reasonable doubt that she planned and premeditated these 4 killings?

What's the evidence of that? Christi Cole Gaubatz was aware her car was being borrowed to make a video of Nicholson exonerating Honken.

The vehicle being used really doesn't tell you much about anything. It tells you the car was used to approach Nicholson without him fleeing to force him to make a videotape.

6

OBR000037

Showing that D planned to go along with Honken to forcibly make a videotape is not enough to prove substantial planning and premeditation.

2488 The evidence does show that Honken may have had a plan to kill these people. But the videotape that Honken destroyed shows that Nicholson was calm, cool, and collected, not under duress or fear at that time. But things somewhere went out of control. These people were led out of the house, killed, and buried, only to be found 7 years later.

2489 P said D prodded Honken along and turned him into this horrible murderer. But there is no evidence to support that. D didn't buy the gun to kill, she went to the sheriff's office, filled out the forms, and got a permit.

2490-91 Honken persuaded Mr. Held to buy him a gun despite his new charges and wearing electronic surveillance. This shows you how persuasive Honken could be. And Honken operated on a need to know basis.

2492 How did D walk up to this house with a tripod, camera, duct tape, rope, and a gun in a cosmetic bag and gain access pretending to be lost? This is improbable and there's no evidence that's what happened.

P suggested D and Honken planned how to tie people up. But there's no evidence D read Honken's materials on the subject before July 1993, and these materials weren't recovered until 1996.

2493 The evidence is really in the zone of speculation and takes a horrible case of murder and brings it where you folks have to weigh D's life. The evidence just isn't there.

2494 Especially heinous, cruel, or depraved. They haven't alleged this to the children because they were just shot to death. We're talking about some additional degree of cruelty here. It requires more than being shot to death. It requires more than being restrained. We're not talking about what Honken did, we're talking about what D did.

2495 DeGeus – There was a gunshot wound to the head. A bullet can cause the type of fracture that DeGeus had to his head. The grave DeGeus in was up to 2.5 feet deep. The local people unearthed his remains. The care they used to unearth his remains was not up to the standard that Mr. Hochrein used when he unearthed the four other remains. But DeGeus's skull was shattered.

2496-97 Whether DeGeus's skull was shattered before or after death, and with what, is speculation and not proven beyond a reasonable doubt. Fill out the verdict forms showing D not eligible for death and you may indicate LWOP (life without parole).

2498 (The Court holds a sidebar and it is determined that P will give a short rebuttal)

7

Case 3:09-cv-03064-MWB-LTS    Document 204-38    Filed 06/23/11    Page 38 of 226

OBR000038

**Prosecution's Rebuttal – Eligibility**

2499 The intent question is whether D intended for people to die in this case. D and Honken acted as a group to carry out these crimes. Without either of them these crimes would not have occurred, certainly in the way they occurred D knew so much about the household that she felt she could criticize Duncan about how she took care of the children. They knew the kids and Lori Duncan would be home. Why take duct tape and rope to make a videotape? [Ed. In rebuttal, the Prosecution appears to be blurring the intent of Honken and D, somewhat like a collective intent between the two of them to kill)

2500 Even if the kids weren't originally part of the plan, time was running out. If it had to be done on Sunday night when Lori and the kids were home, so be it. Once in the house, everybody had to be killed.

2501 Looking at the weapon, what other possible purpose could it have than to kill. D knew there was a silencer on the gun and you don't have a silencer on a gun without intending to kill somebody.

2502 DeGeus – Cause of death. There was nothing indicating the skull was fractured after death. A tractor didn't run over it.

2503 D brought us here by her actions to have to make these types of decisions. We ask the jury return a verdict finding D eligible for death.

**Final Jury Instruction – Eligibility**

2504 Ct read Instruction No. 8. Ct. instructs that alternate jurors will be separated and that if third phase is needed the Ct. will move straight into it today, though perhaps not very far.

2505 Alternates kept in building in case needed for third phase. Jury out.

**Matters Before Court w/o Jury – Penalty Phase**

2505 The wall is down for the taint team for mental health issues. Williams can now communicate with U.S. Attys. from W.D. Mo. 4.5 hour rule will not be applied to penalty phase and P did not think it was necessary.

2506 P presents to Ct. answering machine tapes from calls made to Kathy Rick's phone. Honken split up with D and took his answering machine to Rick's home, and the calls were made to Rick's phone and ended up on Honken's machine.

2507 It's D's understanding that Honken wasn't living with Kathy Rick at the time the calls were made but the calls were made to Honken. The calls were not addressed to Rick but and it's unclear if she possessed the tape.

8

OBR000039

2508  P is concerned about preliminary instructions because after a phone call with K.C. counsel he may have objections to mitigating factors listed.

2509  P may have objections to final instructions after getting information from K.C. counsel.

(answering machine tape, Exh. 1148, played in open court)

**Defense's argument to Exclude Exh. 1148 by Mr. Berrigan**

2509  D is moving in limine to exclude Exh. 1148 because the tape is hard to hear and is mostly profanities of D screaming at Honken because she thinks he's out with another woman.

2510  D's anger at Honken is not relevant to future dangerousness and is arguably justified under the circumstances. D has just had a child with Honken weeks earlier and does say she will come over and beat the fuck out of Miss Rick but this doesn't happen. There are threats to Honken because he needs to come take care of his child.

2511  Despite threats on the tape, Honken never got beat up by D. Title 24, 848(j) should specifically exclude this tape. Probative value is significantly outweighed by danger of unfair prejudice, confusion of issues, or if it misleads jury – the tape misleads the jury and has great danger of unfair prejudice. The jury could use the tape to decide they don't like D.

2512  It would be wholly inappropriate to rely on the tape to determine life or death.  It advances the arbitrary and capricious infliction of the death penalty. It should be excluded for these and Due Process reasons.

**Prosecution's argument to Include Exh. 1148 by Mr. Williams**

2512  P is offering the tape to show D was not under duress or influence of Honken

2513  This is somebody who can stand up for herself and tell Honken what to do. It shows what their relationship was like. If D wants to withdraw mitigating factors that D was under influence of Honken, then P won't play the tape.

Ct.: Wouldn't the tape be more properly admissible in P's rebuttal

P wasn't planning on using it in case in chief at this point until talking to Kathy Rick

2514  Unless Rick tells P something he doesn't know, then its most appropriate for rebuttal.

**Defense's Rebuttal to Exclude Exh. 1148 by Mr. William**

2514  This conversation takes place at least one year after the murders and is not probative because of the circumstances

9

OBR000040

2515  D is angry because of Honken's relationship with Rick. Rick and D were pregnant with Honken's children at the same time. Rick will say she didn't know anything about D until after giving birth to her son. D finds out about the relationship one night and gets angry. This says nothing about D and Honken's relationship during the murder.

2516  P is using this to prejudice D. If Rick testifies about threats made to her that is appropriate but threats to Rick have no connection to the tape.

2517  These women are calling each other, neither happy with Honken. The tape's admissibility should be revisited before rebuttal.

**Discussion of Mitigator No. 21 and admissibility of the Exh. 1148**

2517  D says at the time of the murders D knew nothing about a plan to kill the children or Lori Duncan. No. 21 does not apply to DeGeus. The plan was to get the tape of Nicholson and things went awry, that's not the case with DeGeus.

2519  D says D isn't claiming that through the whole relationship D was dominated by Honken, just at the time of the first 4 murders.

2520  D argues there is circumstantial evidence to support that D didn't go to the Duncan house to kill but the plan for her changed because of Duncan's desires. The evidence for domination by Honken is that he had the gun, maybe.

2521  D says maybe the word domination can come out but if the plan changed from making a video, D was under great stress and Honken was calling the shots for the first 4 murders. D suggests "substantial influence" as a substitution.

2522  D says he probative value of substantial influence is to show D's role. Even with DeGeus Honken was in charge. Honken manipulated D and led her astray.

2523  P states D is arguing D is easily manipulated by a conniving Honken. P – The tape shows D is not easily manipulated. D is ready to kick ass and abuse Honken. It runs contrary to D's assertion that D was a timid woman. Maybe the court should review the issue after the evidence is heard to see if D paints herself as a timid, easily manipulated woman

2524  P is concerned that P's experts didn't get to ask D about her mindset at the time of the crimes. D says D's experts won't testify about D's mindset at the time of the murders.

2525  Ct. doesn't think the tape is admissible in P's case in chief but is leaning towards admitting it under Title 21, 848(j) but will reserve ruling until after D's mitigation case. D will waive foundation for the tape to clear up a problem with P using the tape in rebuttal.

2526  D will stipulate that the tape is of D calling Honken, at his house

10

OBR000041

2527  Now ct. is leaning towards prejudice of the tape outweighing probative value but will reserve ruling. Need to revise Instruction No. 21 immediately so there will be instructions if we go into the penalty phase.

2528  D is comfortable with changing No. 21 language from "domination" to "influence" and changing to a more specific timeframe.

2528  Ct. asks P if he is ready to start working on some of the 12.2 psychiatric and psychological problem areas. P is not ready because it all got dumped on him in the last hour.

2529  Ct. wants to start working on any mental health expert issues as soon as possible so the jury isn't kept waiting. D represents that D's experts won't testify until next week.

**Eligibility Verdict**

2530  Ct. asks P how he wants to handle the verdict. Should they have copies made and have the lawyers review it to make sure there are no inconsistencies? P thinks that would be fine. Ct. decides it will just review it and call a sidebar if necessary.

2531  The jury enters the room. Step 3, Nicholson, the jury found D eligible for the death penalty

2532  Count 6, Nicholson, eligible. Counts 2 and 7, Lori Duncan, eligible. Counts 3 and 8, Kandi Duncan, eligible. Counts 4 and 9, Amber Duncan, eligible. Counts 5 and 10, Terry DeGeus, eligible. The jury exits and a sidebar occurs off the record.

11

OBR000042

## UNITED STATES V. JOHNSON

**DEFENSE: PATRICK BERRIGAN, DEAN STOWERS, AND ALFRED WILLETT
PROSECUTION: C.J. WILLIAMS AND THOMAS MILLER**


**Prosecution's Opening Statements by Mr. Williams – Penalty Phase**

Jury re-enters. Ct reads preliminary instructions 1-5.

P begins argument: You have two choices, death or life in prison. It's a tough decision

Congress set this up so that it would be the citizens' decision. There will be a number of steps. P will be producing evidence of additional aggravating factors. You will eventually way aggravating and mitigating factors. The government listed four aggravating factors: Future dangerousness, obstruction of justice, killing more than one person in a single episode, and the impact on the victims and their families.

P will present most of its evidence on future dangerousness and victim and family impact.
After Honken went to prison, D was again dealing meth. She was in the middle of a supply chain and was distributing to a number of people.

D hired a couple people, including an undercover FBI agent, to collect money she was owed when shorted on dope. The agent, Mike Mittan, will testify. You will see a videotape of a meeting with Mittan. Mittan and the other person were to do whatever was necessary to get D her dope or money, or to bring Jimmy Rodriguez (her supplier) to her.

Ultimately nothing came of the meeting.

When D was in jail, she threatened to kill a dispatcher in the Benton Co. Jail.

When D was in the Linn Co. jail, she controlled any block she was in and was involved in inmate assaults. We're talking about future danger to jail employees, inmates, and others

As to victim impact, we'll hear from family members.

Ultimately, we're going to ask you to consider all the aggravating factors found in the eligibility and proven in the penalty phases. I will ask you to impose the death sentence for these murders.

12

**Defendant's Opening Statement by Mr. Berrigan – Penalty Phase**

You decided D should spend the rest of her life in prison a week ago, that's settled now even though we thought otherwise. We respect and honor your decision. The decision now is whether to remove this woman from the human race. We will show you mitigating factors. This decision is an individual one to you that you are going to make and have to live with the rest of your life.

Up to now you've made your decision as a group. Now that changes. Weighing aggravators and mitigators isn't a group dynamic. You are absolutely never required to impose death.

This is the only time where jurors get to disagree. Because you have to live with it it's okay to disagree. Any one of you can decide this will be a life sentence.

D is going to present 5 categories of mitigators: 1) D suffered a traumatic and abused childhood. 2) There are people who are going to tell you why D is important to them and her to them.

3) We're going to present evidence about Honken's case. 4) She is not a danger to other people in prison. 5) We're going to present evidence from her daughters because D and those girls are the people most affected by this decision.

D's traumatic childhood had effects on her later in life.

But D's childhood doesn't excuse her conduct. There are no excuses but explanations should be taken into account in deciding whether to execute her.

We're going to present evidence that Honken got life sentences for Nicholson, Lori Duncan, and DeGeus.

We'll present evidence that D has been locked up in little county jails for 5 years. With all the women going in and out, there is conflict in these jails.

D has never hit a guard or hurt an inmate. She's got ten days lock down four times in 5 years for pushing matches. Nobody is going to get hurt if she's in a federal penitentiary.

D's daughters are going to testify. In a week or so I'm going to argue that you render a just punishment in this case and you don't have to kill D

Ct: That concludes the opening statements of the penalty phase. We're going to send you (the jury) home now. Don't talk to anybody about the case. Don't listen to any media reports. (Jury exited the courtroom).

(The trial was adjourned at 2:50 p.m.)
**END VOLUME 15,   May 31, 2005, 2:50 p.m.**

13

**BEGIN Volume 16, June 1, 2005, 8:29 a.m.**

**Prosecution's Case**

**Steve Vest, Prosecution**

**Steve Vest – Direct Exam by Mr. Williams**

Jury enters court, witness sworn

I am from Kansas City and made it through eleventh grade. Before I was incarcerated I owned a forklift company and a car wash. I am married with 2 kids.

I am in prison for drug conspiracy, 2 homicides, money laundering, and arson. They are federal crimes. I was convicted after a guilty plea in '96 and received four life sentences.

I agreed to cooperate with the Honken and D investigation. I have received no sentence reduction for cooperation to this point. I testified in the Honken case but my sentence was not reduced.

(Ct. corrected P's misstatement implying Vest's Kansas City Prosecutor could unilaterally reduce his sentence).

I was incarcerated from '96 to 2000 in USP, Florence, a high-level penitentiary. I was housed at B unit during part of this time where I came to know Honken.

I met Honken in Spanish class first then I started hanging out with him in B unit a little after moving there. We were in the same unit about a year. We became closer over that year. This last year I was at USP, Florence is when I was housed with Honken.

Honken and I shared information about the crimes we were in for and attended religious groups together that formed a closer friendship. Honken talked to me about plans to escape from USP, Florence.

Honken planned to kill a couple guards and escape that way. I went and talked to the SIS guy since I'd already talked to him about somebody getting hurt. The SIS guy said to talk to Honken more so I went back and told him I'd be interested. SIS is like the FBI inside the prison

SIS investigates crimes inside prison. I had previously told the SIS about a stabbing that was planned over a drug argument. Drugs come in the prison all the time. This previous report formed a business relationship with SIS so I went to SIS after hearing Honken's plan.

14

**Case 3:09-cv-03064-MWB-LTS** Document 284-8 Filed 06/23/11 Page 45 of 226
OBR000045

2560* Honken never escaped but he further disclosed the circumstances the led him to in prison and the murders. **<u>Obj.</u>** by D on 6th A. grounds that D does not have the opportunity to cross examine Honken who is being a witness against her.

2561 Honken told me he was in prison at that time on a meth charge. He was going to Ariz. to cook meth and bringing it back to Iowa to sell it. He said it was the best meth around.

2562 Honken told me he sold meth to Nicholson and DeGeus. D met Honken at DeGeus's place and then D wet up a meeting with Honken where D gave him $10K for meth. Honken had thought the meeting might be a set-up at first.

2563 The $10K D brought to Honken was drug money. They started having sex and dating after that. Honken explained the circumstances leading to his arrest.

2564* Either Honken bought drugs from Nicholson or vice versa. After Honken left, he got pulled over and arrested. Honken said he had conversations with D while in local jail. D said she wanted to break Honken out of jail. Once Honken's charges were federal he got out on bond and D told Honken that Nicholson was going to testify against him. **<u>Obj.</u>** The answer was unresponsive to the question. P rephrased the question.

2565 Honken said he was looking at 10 years and the only way to do something about it was if they got rid of Nicholson and D said she'd help. There was an agreement from the beginning to kill Nicholson. D went to Nicholson's house, somehow got in the door, and pulled a gun the Vs.

2566 Honken said he told Nicholson that since he was going to testify against Honken in court, Honken was going to take Nicholson to a house until his court date passed. After that, Honken took Nicholson and his wife to the woods and shot them. Honken didn't say they were tied up or bound in any way.

2567 Honken didn't tell me where he took them, what they were driving, who was driving, or what kind of gun he had but D was with him. Out at this remote location, "He takes them out to here the kids and – away from the car, and he shots them." He didn't say where he shot them.

2568 Honken said that while he was shooting the adults the girls were in the car. He said when he shot the adults the kids hugged each other. D said to the girls that the noise was just fire crackers and the girls would be with the adults shortly. Honken then took the girls to where the parents were and shot them in the back of the head. D didn't protest any of this conduct. They buried the bodies.

2569 Honken didn't say whether the grave was dug ahead of time. Honken told me about another murder he was involved in. After the Nicholson and Duncan killings, he thought DeGeus was going to testify against him so they decided to kill him. Honken said D called him and said to meet her somewhere.

15

OBR000046

They got out of the car and Honken had a pistol in his waistband. Terry pulls up. D is already at the site with Honken.

DeGeus asked what the gun was for and Honken said protection. Honken and DeGeus started arguing about the $30K DeGeus owed Honken. Honken says he's not here to argue about the $30K but that DeGeus is going to testify against him. Then Honken starts shooting DeGeus multiple times. First he shot him in the stomach and DeGeus's last words are "I wasn't going to say anything."

Honken went and got an aluminum bat he bought for the occasion. Hoken asked D to hand him the bat and she did. Honken beat DeGeus until he couldn't swing the bat no more. When he comes back to the car D screams a little because he's got blood all over.

D said Honken looked like that guy out of the shining. Honken said D would have to help her because he was too tired. Honken got the shovel out of the care and DeGeus was still barely breathing so he finished him off with the shovel. They each grabbed a leg and pulled him into the woods. He made a noise, D asked if that was his soul, and Honken said no it's just air. Honken didn't say who dug the grave or how long it took.

While digging Honken started singing and making jokes and grabbing DeGeus's foot and shifting it like a 4-wheel transmission. He didn't say whether the DeGeus murder used the same weapon as the Nicholson/Duncan murders. Honken was concerned about DeGeus's body being dug up.

Honken said he had his friend Tim melt down the gun. Honken hatched the escape plan when he found out he was under investigation for the murders. Honken was mad because D had given somebody a map to use to find the bodies.

**Steve Vest – Cross Exam by Mr. Berrigan**

I was one of the first federal death penalty prosecutions in Kansas City. They were 33 codefendants and I was alleged to be the head guy. I am the oldest of 7 children and 3 of my younger brothers were charged with me. Darrell (younger brother) got drug and not murder charges.

Mark, James, and I all faced capital murder charges in 1994 in Kansas City. I pled shortly before trial to avoid the death penalty. I told Honken about my case and the circumstances under which I pled guilty.

Either all three of us had to plead guilty or we would go to trial. I never really had the chance to cooperate after finding out these were murder charges. Darrell had agreed to testify against us. The drug dealers killed were handcuffed and suffocated with duct tape.

I am 44 years old and have been in jail for 11 years. I had a wife and 2 very young buys at the time. It was a difficult situation for someone who had never been to jail or prison. I'm not placed anywhere near my family.

16

OBR000047

Its expensive to call home. 300 minutes a month for $70. Wanting to get back with my wife and kids have nothing to do with me being a cooperating witness.

I started talking to the SIS people out of the goodness of my heart. I they would give me a sentence reduction I would take it. I don't know that people in prison have been given sentence reductions for being snitches.

Nobody talks to snitches, they'll run them off the yard. I've heard of Rule 35 motions but that's all I know about it. I started living with Honken in November of '99 in BB unit and in early 2000 he started talking to me about his case.

After talking to the SIS agent, I got close to Honken over time by working out together, eating together, and participating in the same activities. Honken and I joined the Odinists, a religious group, an old style pagan religion. They say it's really a white supremacist group.

There aren't any African Americans in the group and the group has some really strong views about them. An inmate does the ceremony. I wasn't doing drugs in prison.

I never saw Honken doing drugs in prison. One of the first contacts I had about Honken had to do with Ron McIntosh, a cellie of mine. Honken said McIntosh was going to testify against him.

I had a number of conversations with Mr. Basler, starting January 29, 2001. (Mr. Berrigan handed the witness a report Basler made regarding a telephone conversation with Vest).

I don't remember a letter Honken asked me to write to

Honken was relating information to me in a confidential setting. Honken had also talked to Arti Dufur about his case.

McIntosh was already gone when Honken said he was going to be a witness. I assume that McIntosh left because he had already indicated to prison authorities he was going to be a witness against Honken. It's unlikely McIntosh would have told me he was going to be a witness against Honken.

You don't advertise being a rat. I never took notes when talking to Honken. I related the general nature of the talk with Honken to Basler and them he came to visit three weeks later.

There was another fella named John Graham. I was operating based on memory when talking to Basler. Honken wasn't happy about the maps because they led to discovery of the bodies.

17

OBR000048

Honken told D not to worry about the maps. He acted like he had an ace up his sleeve. Honken didn't explain how the discovery of the bodies wasn't going to hurt him. Honken was mad that she gave them the maps.

D gave the maps to a guy who she met in jail that was also a federal inmate she'd only known for 2 months. Honken thought she was pretty stupid to have done that. I don't know if she was pretty easily manipulated by this federal snitch in the county jail. Dean Donaldson doesn't ring a bell

I don't know anything about Honken supposedly bonding out Donaldson to kill witnesses. Honken said he wanted D dead. He had another girlfriend named Kathy Rick who wanted him to come live with her. Honken had children with both of these women. Rick wanted Honken to leave D. Honken said he couldn't do that because it might piss D off.

Honken was scared because D could tell on him and because she was crazy. Honken isn't really a planner and schemer. Killing 2 children and a woman isn't very good planning. Supposedly Rick said she would help Honken kill D.

Honken claimed Rick knew about the murders and would have helped him with them. I don't know Rick or D.

I don't personally know anything about Rick or D's credibility. Honken said he was planning on killing D right before he got arrested. At the time Honken was getting guns to kill D. I don't remember him mentioning Rick Held. Kathy Rick had volunteered to help him kill D before he went to jail.

Honken's plan to kill D was foiled when he got arrested. Honken first really meets D in early '93. He gets arrested in March of '93. D offers to break him out of jail.

When he got out he went to D saying he was looking at 10 years and needed help killing Nicholson. I guess Honken had known D for 2 months at this point. Supposedly she agreed to participate in a murder with a guy she's known for 2 months. Honken got arrested after going to Nicholson's house for a drug transaction.

When Nicholson said he hadn't heard anything about a bunch of people being arrested for drugs in Minn., it's a red flag to Honken. Honken and Nicholson do their deal and Honken is arrested leaving the house.

Honken didn't say when he started dealing to Nicholson or when he started making drugs in Ariz. or how well he knew Nicholson. The people killed are Nicholson, his wife, and 2 kids.

Honken didn't say anything to me about Nicholson's wife having moved out. He just told me the story, I'm not asking questions. Honken told me it was Nicholson's wife and kids he killed.

18

OBR000049

It didn't really come up that Nicholson had only been in the house a week and Honken didn't really know the woman and kids. D supposedly goes in first and pulls the gun, then Honken goes in. He doesn't say anything about duct tape or rope. Honken says he's taking Nicholson to another house but nothing about the videotape.

When Honken arrives, the 4 people are being held at gunpoint. Honken said when you rat on somebody you're putting your whole family in danger, so it didn't matter to him that the woman and kids were there. Honken didn't say once he got in the house he realized the kids were too old and he was going to have to kill them. I gave grand jury testimony in this case.

(Mr. Berrigan hands Honken his grand jury testimony and tells him to turn to P. 44 and Mr. Berrigan reads Vest's testimony that he couldn't very well leave the kids there because they were old enough to identify him). Honken didn't say he didn't know Nicholson had 2 kids.

Honken didn't say how many drugs Nicholson was selling for him or how often they met. **Obj.** by P that Berrigan is reciting testimony that was not what Vest said. Overruled. Vest: He just told me the story.

Honken never explained how he didn't know that Nicholson had 2 children that were old enough to be witnesses. Nicholson supposedly buys Honken's story about the videotape and stashing Nicholson away until trial. Honken doesn't say anything about Nicholson being bound up with duct tape and rope in the house.

Honken takes Lori Duncan and Nicholson and walks them away from where D was with the kids. Honken didn't say anything about a silencer. He didn't say how far he walked them away. Honken didn't say how many times he shot the two adults. There's a lot of stuff we don't know from Honken's account.

Honken didn't say anything about where or how many times the adults were shot. I assume D told him about the girls hugging and D saying the shots were firecrackers. Honken must have been some distance from the car. I'm only repeating the story Honken told me.

You don't go around prison saying you killed kids, because it has adverse consequences.

Honken justified killing the kids because they were the family of a snitch. D lured DeGeus out to a field somewhere, he drove out there himself.

DeGeus sees Honken and D and drives right up to them, so he wasn't afraid of them. He walked up and started talking to Honken and D got in the car. Honken purchased the baseball bat.

19

OBR000050

2613 Honken had a shovel. When D sees Honken she screams at him because he has blood all over him. According to Honken, D was surprised to see blood on him.

2614 D said Honken looked like the guy from the Shining. He'd been shooting and beating DeGeus to death for some time. Honken claimed D helped drag DeGeus to some grave.

2615 D was six months pregnant at the time.

Honken's plan to break out of Woodbury Co. Jail: He was going to take a shower. He would overpower the guard, take his keys, and let everybody out.

2616 Honken said he knew where the jail kept guns. They would go to a grocery store, take a hostage, switch cars, and then go rob a bank. Honken planned to kill the hostage and then go to Canada to train.

2617 The odonists don't have a branch in Canada that I'm aware of. Honken was going to come back and kill everybody who testified against him. He was going to torture people and their families. He was going to cut people's heads off and keep them in bags. He was going to take the skulls and make bowls. The victims would be Prosecutors and FBI agents.

2618 This was a pretty wild story.

**Steve Vest – Redirect by Mr. Williams**

2619 I wouldn't say I joined the Odinists, I went to the meetings. I'm not currently a member. I ultimately left the group. I am in a witness security program because of my involvement in this case.

2620 The witness protection program protects me even while I'm in custody. Ron McIntosh used a helicopter to aid in the escape of a female prisoner at another prison. I don't recall D obtaining a thousand dollars to bail out an inmate who would kill people.

2621 Honken said he was a little physically afraid of D. They would come home from a party and she would knock him down and wrestle with her. I don't know whether it was dark or not at the time of the DeGeus murder.

2622* I'm not aware Artie Dufur was caught on the roof of the Marion penitentiary during an escape attempt. **Obj. –** Irrelevant, overruled, fact already in evidence so the objection is untimely.

**Steve Vest – Recross by Mr. Berrigan**

2623 I don't know if I ever told Bill Basler about Honken being physically afraid of D.

2624 I'm hopeful they bring back parole, you know.

20

OBR000051

The motivating factor for me to say anything about Honken was that he killed an innocent woman and two innocent kids.

(Recess)

**Kathy Rick, Prosecution**

**Kathy Rick – Direct Exam by Mr. Williams**

I have been living in Minnesota for eight year. Prior to that I lived in Mason City, Iowa. I went to some college. I work part time at a resort. I lived in Mason City until '98.

I was born and raised in Mason City. In Mason City I worked at a printed circuit company, Wellborn Industries. I met Honken there. He was working at Wellborn then.

I worked at Wellborn from 1983 until 1998. Honken and I became friends and eventually started dating. We were friends about a year before we dated. Honken never lived with me. We have a child together, born in '93.

Honken was living in Ariz. in '93 and there we no commitment plans but he planned to be a part of his child's life. There was no agreement for it to be an exclusive relationship. I met Honken in '89. Honken was a good friend. He was involved with my children. He was going to college and liked to read.

He read books and magazines. I don't think either person controlled our relationship, and he wasn't violent to me. He never threatened me. In March of '93 I was aware he was arrested in Iowa. I didn't know he was back in Iowa at the time. Agents told me he may have been involved with some other person.

I didn't know anything about D before then. I was upset. Honken was there as my friend, he didn't lie about D. At that point in our relationship Honken would drop by but I didn't see him often.

He never changes specifically up until '96 when he's arrested. We got somewhat romantically involved between '93 and '96. We were parents of a child and Honken wanted to be a part of that. We were friends.

I learned Honken was seeing D in the fall of '93. I found out she was pregnant with Honken. I know Honken lived with D at some point around Feb. 1994.

Honken was living a couple places between '94 and '96. He lived with Tim Cutdomp on Eighth St., with D, he stayed with his father in Steamboat Rock. D and Honken maintained some sort of relationship between '94 and '96.

21

OBR000052

I had contact with D from '94 to early '96. I would have confrontations with her. One time she followed me to the bank, and I pulled over after I left the bank, and she got out of the car.

She screamed and banged on the car windows. My 3 children were with me. I was concerned for my safety. I left after D went back to her car. I went back to Dustin's mother's because we were taking the kids to the carnival. Dustin's mother said D might be on her way with a gun and we should leave, and we left.

Another time, D came to my house at 5 or 6 in the morning on a weekend. She was screaming to get into the house. I called Honken and he didn't know why she was there and said I should call the police. She had left the property but then came back and I called the police.

She was threatening to break into the house. I think she thought Honken was at my house and my children were there.

Then in '95 my car was vandalized. It was in the garage, and when I went to go to work it had 4 slashed tires and damage inside and out. There were cuts on the seat and scratches on the hood.

The scratching looked like an A. A letter was later found from D to Honken that mentioned the vandalism. I talked to Honken about the vandalism. **Obj.** Honken's testimony coming through witness and no opportunity to cross-exam. – violation of 5th, 8th, and 14th Amends. OVERRULED. Mr. Berrigan is given a continuing objection.

I called him the morning of the vandalism and he said to report it to the police. Honken didn't know who had done the vandalism at that time. Honken said he didn't leave D because he wasn't strong enough – he knew what she was capable of.

I think he was afraid. D is sitting at the defense table wearing a cream-colored sweater.

**Kathy Rick – Cross Exam by Mr. Berrigan**

(witness indicates she has an appointment and Berrigan says he will be as brief as possible). Honken's child was born Aug. 11, 1993. That was my 2d pregnancy involving Honken. My first was 1 or 2 years before the second.

I allowed myself to get pregnant by him twice. Detectives came out and talked to me about Honken being involved with Melissa Friesenborg. I'd never heard that name before then. The detectives didn't specifically say Honken and Melissa were engaged.

I eventually got in touch with Melissa because I wanted to know what was going on. According to Melissa, her and Honken were engaged. That came as a surprise. Honken hadn't told me about it.

The detectives didn't specifically mention D's last name or say Honken was having a relationship with her.

The detectives took me to the police station to look at a picture of a mirror in a hotel room that D had wrote a Happy B-Day message on for Honken. I didn't know anything about Honken's relationships until the detectives told me.

I was upset that I didn't know about it. In Mar. '93 I knew Honken got arrested for manufacturing and distributing meth.

I didn't know anything about him making a selling meth in Mason City and Clear Lake. It was a secret life. But I continued to see him but we didn't have a sexual relationship for more than a year.

I knew D was pregnant a month before she delivered the child.

I was behind a parked car when D approached my car (yelling bank incident). D's car was parked behind me. I didn't get out of the car to ask for help or call the police.

I didn't know Honken had a gun. I never saw him with one. D never threatened me with a gun. She never hit or tried to strike me.

I have no idea what D suspected when she came to my house and banged on the door (in response to whether D suspected a sexual rel. with witness). D didn't want Honken near me. Honken hadn't slept at my house the night before D came over screaming and knocking.

I don't recall whether I was sleeping with Honken at that time. I loaned Honken some money but not for the purpose of him moving out of D's house.

(Witness is confronted with grand jury testimony that witness loaned Honken money to move out of D's place.) (Grand jury testimony – I gave him between 500 and 1,000 dollars).

That is the grand jury testimony that I gave. My memory was probably fresher 8 years ago for the grand jury testimony. I called Honken for a ride to work after my car was vandalized. I have no idea whether I was sleeping with Honken at that time.

I didn't know anything about the murders Honken allegedly committed. I never said I would have helped Honken with the murders. Honken never told me of a plan to kill D. I never volunteered to help kill D.

I was involved in bonding out Dean Donaldson. I did that at Honken's request. Honken said I would make some money by bonding out Donaldson. I got $500 from Honken's dad and pledged my house to get Donaldson out of jail.

23

OBR000054

I was told Donaldson needed to go sign out some retirement money. I was going to make $500 or $1000 by bonding Donaldson out.

I don't know how much Donaldson's bond was. Somebody from the bonding company had me sign papers putting a lien on my house.

I understood the situation to be a good-will gesture by Honken to get Donaldson out of jail to be with his family. But I have since learned differently.

I didn't know anything about Dusting having anything to do with drugs. I had a video camera in '93 that used 8mm tapes. Honken knew about it from taping the kids. He could have used it if he wanted.

It was a regular size camera for '93.

Honken didn't lie about his relationship with D when I asked him about it. I didn't know that D was having sex with Honken when the police came to talk to me, I found out later.

Honken didn't say anything to me about all the drugs he was getting from Ariz. and selling in Mason City and Clear Lake. I didn't know about his relationship with DeGeus or Nicholson. I certainly didn't know he had executed 5 people. I didn't know anything about Donaldson's 2 motives for getting out of jail. Honken operated on a need-to-know basis.

Honken still communicates with his children. I read the letters he sends them before they do. (Mr. Berrigan approaches with a letter to Brandon Rick from Honken). The kids have been getting letters from Honken for years. "I can't say I've read every letter.'

Brandon isn't Honken's child. Brandon is 15 but was 14 at the time of the letter. (D offers Exh. 2137 with no obj.)

(the witness reads a letter suggesting that Brandon get a subscription to Maxim, Stuff, or FHM magazines so that he can get knowledge about women and get what he wants). Rick – I don't know what these magazines are. I haven't talked to Honken about his attitude towards women.

**Kathy Rick -Redirect by Mr. Williams**

I never saw Honken use violence or force towards anyone from '89 until '93.

**Kathy Rick - Recross by Mr. Berrigan**

I wasn't anywhere near Honken on July 25th 1993 and didn't see him execute 4 people. I never saw him shoot and beat DeGeus. Killing somebody with a baseball bat and a shovel sounds like use of force.

24

OBR000055

**Alyssa Nelson, Prosecution**

**Alyssa Nelson – Direct Exam by Mr. Williams**

I'm originally from Britt, Iowa and now live in South Sioux City, Neb. I am employed by the state of Neb. as a probation officer.

I am married and my husband is a police officer. I got a bachelor's in criminal justice from Morningside College in '93. I worked in Sioux City, IA at the Boys and Girls Home for 5 years before becoming a probation officer in Neb. Honken is my brother. He is 3 years older than me and we had a regular brother-sister relationship growing up. We got along well.

We would have arguments like any brother and sister. We got closer as we got older. I maintained contact with Honken sporadically until '93. I never knew Honken to engage in violence or use force before '93.

Honken would start little projects here and there in high school, but mostly it was karate.

Q: "Did he follow through with plans he started?"

A: "Quite a bit. He was - - like he was in high school band where he played the trombone for a while, and then he stopped doing that. He never - - he'd start something, and he wouldn't finish it."

Honken told me about D on the drive back from my test for the Iowa State Patrol. He always told me about his girlfriends.

**Obj.** – D not having an opportunity to cross examine Honken in violation of 5th, 8th, and 14th Amends. OVERRULED. Continuing objection granted. Nelson: Honken always wanted me to meet his girlfriends and get some approval. Honken said D used to date DeGeus and I asked him what he was doing dating a woman who used to date DeGeus? I heard rumors DeGeus wasn't very nice.

Honken said Terry used to physically abuse D. Honken said D was a nice person and I needed to meet her. I had no idea at this time that my brother was involved with drugs. Eventually I met D.

Honken sat me down and told me Kathy was pregnant. I told him he needed to take responsibility. Then he said D was pregnant too. "I was just floored speechless." I was angry and called him an idiot and jumped up and smacked him. He deserved it because that was very stupid. He was worried and wanted to break it to me before he told our mother, because he worries about disappointing us.

I eventually met D multiple times. She came to my wedding and was there when I went into labor with my son Nolan. Honken was very good with his children.

25

OBR000056

He'd take care of the baby. I didn't observe Honken controlling D. He didn't order her around. I never saw him get physical with D or intimidate her. Honken did say D had a horrible temper and she scared him sometimes. She goes crazy.

Honken said one time he woke up and D had a gun pressed to his head. It scared him. I know my brother has been convicted of 5 murders.

Q: "Knowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?"
**Obj.** Calls for speculation. SUSTAINED.

I attended Honken's sentencing on drug charges in Feb. '98. I also saw D there. I was outside with D during a break. She said she needed to go to her car. She got out a camera and was taking a picture of people sitting on the courthouse steps.

She put the camera away and came back over. I asked her what she was doing and she told me I didn't want to know. I left it at that. She came and sat beside me during the sentencing. I was getting distraught during the sentencing. She took out a golf and silver cigarette case and told me to calm down. She took out a cigarette and started playing with it and told me to put it between my fingers.

I don't smoke and told her to put it away. But to appease her I took it. At one part she started singing "it was something like dong, dong, whatever, and she was making implications toward the prosecutor at that time, something Angie's coming for you and made it toward the prosecution." I looked at her and was crying.

At the end, D got up and police officers were standing in the back. There was one female and D asked her what she was looking at and called her a chick with a dick. Honken says he wished his trial would have been after this one so he could have testified that he didn't do it.

**Alyssa Nelson – Cross Exam by Mr. Berrigan**

Honken told me "I didn't do this." He said that from when he was accused.

Honken's story has been that he didn't have anything to do with these murders. I am a probation officer.

I've been told that our mail has been read and our phones are tapped. I would like to know what he would tell me if we could sit down in one room. He never told me about the people who were killed before he was arrested. He did admit he was a meth dealer.

I found out my two brothers were involved in a meth scheme when Dustin was indicted for it. He was at least tangentially involved in a bank robbery but I don't consider that violence. So he'd never used violence as far as I know until 1993.

26

I had an adverse reaction when I heard my brother was dating a woman who used to date DeGeus. It had to do with what I'd heard about DeGeus. Honken has a hard time disappointing my mother and I. Being involved in murders would be disappointing.

I didn't know Honken was engaged to Friesenborg at the same time D and Rick were pregnant. Honken didn't have a bad temper towards any of the women he dated.

Honken is not impulsive. He thinks about things carefully before carrying them out. None of us are impulsive. Honken told me he was innocent but he was convicted of the murders and received a death verdict for the 2 girls.

For the adults the jury returned a life w/o parole verdict. I wasn't present when either my brother or D were using meth. I wasn't aware at Honken's sentencing that D was a regular meth user. I don't remember D leaving the sentencing to go out on regular breaks.

I told the grand jury I thought D was a nut. I told the grand jury she behaved oddly during Honken's sentencing and I didn't want to sit by her but couldn't get away.

She would go out and smoke a cigarette during the sentencing and she was really wired the whole time. As a probation officer, some of my clients use meth. D's behavior the day of sentencing was consistent with meth use. She was taking pictures directly at the court house.

I don't know why she was taking the pictures. She was singing and gave me a cigarette to hold during the sentencing. I thought that was strange behavior.

I haven't seen D strike anybody or threaten anybody in the courtroom. There was a metal detector downstairs right inside the front door.

**Jennifer Rinden, Prosecution**

**Jennifer Rinden – Direct Exam by Mr. Williams**

I live in Cedar Rapids, Iowa and am an attorney since '97.

I do civil defense trial work for a private firm. When I first got out of law school I was an employee of the United States Clerk's Office for the district court from '97-'99. I worked in the courthouse on the third floor. I was in the hallway after Honken's sentencing.

I heard D say some profanities then she said something like "You'll be sorry." It was a threat. She was upset and angry. I believed it to be a serious comment.

27

OBR000058

**Jennifer Rinden – Cross Exam by Mr. Berrigan**

2699 I took D's comment as threatening. I wasn't sure who it was directed to. I have no idea why she would make that comment to me. (jury exits the courtroom for lunch).

**Matters Before Court**

2700 Mr. Miller brings up a telephone hearing transcript and P wants the ex parte portion to be included in the transcript. The court doesn't really know what Mr. Miller is talking about so it will be taken up afterwards. (jury enters)

**Michael Mittan, Prosecution**

**Michael Mittan – Direct Exam by Mr. Williams**

2701 I'm a special agent with the Iowa Division of Narcotics Enforcement ("DNE"). I have been there 14.5 years.

2702 I have a criminal justice degree. I attended the DPS academy in August of '90 where I became a certified police officer.

2703 I have been to numerous schools, taught about drug investigation, and testified as an expert witness in state and federal court. The DNE is the lead agency for drug crimes at the state level.

2704 All that we investigate stems from narcotics usually. We sometimes provide undercover officers for local operations.

2705 We have to have someone already involved in the drug world to introduce the undercover officers to it. It takes bad guys to catch bad guys. It takes the use of informants. We usually use some sort of recording device for undercover operations.

2706 There is usually a tape recording so people know what is said. There is always a back up or surveillance team on hand in case of an emergency.

2707 I would sometimes go undercover as a buyer. There are also reverse buys were I pretend to be a seller.

2708 In '98 I was asked to become involved with an undercover operation involving D. There was an individual wanting to act as a CI in D and Honken's case. The person had been in jail with Honken. He had an arrangement to help D collect debts for Honken when he got out of jail.

2709 He was Duane White. He contacted cops instead when he got out of jail. D contacted White on Mar. 22 and wanted him to collect some debts owed to her. White then contacted the FBI.

28

OBR000059

2710* There were some vacation and manpower issues and we were trying to do what we could to maintain White's contact with D, so I got involved. **Obj.** 6th A. issue concerning things told to witness by other people. OVERRULED. Continuing objection granted.

2711 Jaime Rodriguez was supplying D with meth at the time. Rodriguez and Honken had served time together in the Woodbury Co. Jail. D's drug involvement with Rodriguez had been going on about a year at that time.

2712 D made her first contact with White about a month after Honken was sentenced to fed. prison. On Mar. 24, '98 a meeting with White and D took place at the Holiday Inn. The purpose of the meeting was so that White and D could meet face to face for the first time.

2713 I was initially present at the meeting. We had rented two adjoining rooms at the hotel. We had the room wired. The surveillance team was in the room adjoining the one where the meeting would take place.

2714 D showed up. D was very paranoid and nervous when she showed up. She was upset about my presence in the room. She said she didn't have a firearm, but reached into her purse and pulled out what turned out to be a lighter. She was uneasy with my presence.

2715 So we decided I would wait out in my vehicle. I wasn't present for the conversation but it was recorded and I reviewed it. White and D searched each other. D searched the room. They were both uneasy with each other.

2716 White and myself would be collecting the money for Rodriguez on behalf of D. D wanted to take part in the collection but White indicated if she wanted the collection done she couldn't participate. We would get to keep 50% of the money collected. We next met with her at her room at the Travelodge in South Sioux City.

2717 That morning she would give us names and addresses of the debtors. I waited in the car and White went in and came out with a list of names and vehicle descriptions of people owing Rodriguez money. D said she had just purchased an Uzi with a silencer that she need a magazine clip for.

2718 We met with two people who indicated they had gotten meth from Rodriguez and owed him money. D was somewhere else during these collection attempts.

2719 D and Rodriguez may have been doing counterserveillance on us during the collection attempts. The Blue Ford they had been in was seen in some of the areas we went. We actually didn't collect any money and met up with D later. All we seized was a small amount of meth.

2720 When we met with D, there were some Guns and Ammo magazines in the room. I don't know many women who read Guns and Ammo.

29

OBR000060

We ultimately went from Sioux City to LeMars and met with a debtor. Then we met D in a parking lot. She said she wanted to put a word of hurt on a male subject. She didn't say why or who. She was upset about Honken getting sentenced on the federal drug charge.

I sat in her car for a short period of time when we returned to her hotel room and observed a roll of duct tape that was between 5 and 6 inches wide in the trunk when she got something out of it. "And being a guy and liking duct tape, I just kind of thought that was very unique and how big it was." We didn't collect any money but D gave White $25 for his effort.

There wasn't a lot more contact between this time and June of '98 but there were several recorded calls to see if they still needed us to collect some money. On Apr. 17, we met up with Rodriguez to see if he had collected any money to pay us. At some point we learned D's relationship with Rodriguez had soured.

D had provided Rodriguez with $1,500 to purchase 2 oz. of meth. She never received her product. At the end of June she wanted to hook up with us for further instruction.

(Mr. Williams hand the witness a tape and transcript of the June 30 phone call from D).

(Exhibit 1120A offered and received). No objection is made to listening to the recording and giving jurors copies of the tape.

In the tape the CI asked D how Honken was. He was in the fed. pen. The CI says he is with Pizza Guy, who is me. There is a reference to the big roll of duct tape.

I was looking for a roll of duct tape that big to tie people up or use as an intimidation factor. I told D I wanted to use duct tape for that purpose. A child answered the phone when she was called the next day for a meeting. Her children hadn't been with her during the earlier meetings.

We met with D July 1, '98 at the American Inn in Clear Lake, Iowa. Again, the room was set up with undercover video. D showed up.

(Mr. Williams handed witness Exhibits 1121A and 1121B, the video cassette of the July 1 meeting) (Exh. 1121A offered and admitted).

(The transcript of the video is handed out to the jury and the video is played in open court).

During the conversation, there were multiple references to a young girl, probably under 18, named Alicia Medina. We had confronted her while trying to find Rodriguez. Re-upped means coming to get more drugs.

Alicia Medina was Rodriguez's ex-girlfriend. D took a buddy and shook up Alicia Medina and her momma trying to find Rodriguez.

30

OBR000061

My memory was refreshed. The $1200 was for the 2 oz. of meth and the $1500 she wanted was like for interest.

2734 If Rodriguez didn't get her the 2 oz. of meth, it's going to cost him $1500 now. During the meeting she provided us handwritten notes with what she wanted us to do. (Mr. Williams hands witness the notes, marked as Exh. 83).

2735 (Exh. 83 offered and admitted w/o objection). Exh. 83 is a list of instructions. Locate Rodriguez. Rodriguez fucked her out of $600 twice.

2736 Rodriguez owes her 2 oz. of rock or $1500. Bring him to me or call me to come to him. It says to do whatever it takes. It says not to scare Patty Rodriguez. It contained a fair amount of detail and planning.

2737 After the meeting, we went to North Beach, a bar and restaurant where D was employed. We sat out on the deck and she bought us some drinks. I don't remember White or I drinking alcohol. We discussed everything.

2738 We discussed her boss at North Beach, George Barlas. D gave us a business card with her home and cell numbers on the back. We were at the bar 45 min. to 1 hr.

2739 D talked about how her older daughter didn't know what to say when other kids told what their parents did, because hers were dope dealers. And she liked it better when D smoked pot because she was easier to deal with. D talked about trying to get meth into the fed. prison so that either D or Honken could get a lot of money.

2740 D expressed an interest in becoming a hit woman due to Honken's connections with some John Gotti men. D's eyes lit up when she was talking about it. After the meeting we made several attempts to find Rodriguez.

2741 We were never able to find Rodriguez. In fall '98, White got arrested on drug-related charges. We made a decision not to use White anymore.

2742 White was our link to D. D trusted White more than she trusted me. I made an arrangement to meet D at a hotel room again. D couldn't get away because of her youngest child.

2743 It came out during a conversation with D that her and Honken thought Luis might be an informant. D asked if White was an informant and I said he was not and that I was with him all the time. I questioned D about being an informant because she wasn't in jail even though Honken was. She said she told him what to do but he didn't listen and now he's got to fend for himself.

2744 (Witness identified D in the courtroom)

31

OBR000062

**Michael Mittan – Cross Exam by Mr. Stowers**

White contacted law enforcement prior to March 22.

White contacted law enforcement probably sometime in January or February of '98. He had just gotten out of custody. White had a somewhat lengthy criminal history and he's served prison time.

In 1998 he would have been in his mid to late 30s.

I don't know how long White had been in the Woodbury Co. Jail. White had met Honken in jail.

My contact with White was within weeks of when he was serving time with Honken. White didn't know D until the meeting at the Holiday Inn. White's only contacts with D would have been when he was working with law enforcement.

All White's contacts with D should have been monitored by law enforcement. I didn't get involved until Mar. 24 so I'm not familiar with the initial contacts on Mar. 22.

White probably called D 50 times over the course of his cooperation with law enforcement. D never called me personally. Sometimes D would contact white through his pager. Sometimes White would attempt to reach D but couldn't get a hold of her.

D would call White back in response to his attempts to contact her. I haven't listened to all the recordings of the calls recently but I have looked over the transcripts. At one point we lost contact with D and didn't have any way to reach her.

D switched numbers and didn't leave a number for White to contact her. She somehow contacted us through White's sister.

I was role playing an enforcer type individual in my dealings with D. We were to collect debts. We were trying to be tough guys or bad asses taking care of business. It was a natural role for White.

White didn't have to role play too much. I did have to do a little role playing. Most of the talking was done by White.

We would kind of script the call before we made it. The videotape you saw is pretty much real for the drug world.

No two people act the same when they are on or off drugs. There is a lot of tough talk coming from White on the videotape. We did go to people's houses who were on D's list.

We did knock on people's doors and act like we were trying to actually collect something. We initially were trying to collect money for Rodriguez.

32

OBR000063

I think this was a test. If we could get something done for Rodriguez then maybe we could get something done for D or Honken. We did not collect any money from these people. The woman up in LeMars owed $9000. The $9000 was the big amount.

Some of the other amounts were in the $1000 range. We didn't collect any money. In LeMars we were thinking about collecting firearms but didn't do it because we didn't want to turn them over to D. Rodriguez was not arrested in this investigation but he was ultimately arrested.

Nobody was arrested from this work with White for a drug crime. D had a conversation with White about an Uzi.

I never saw the Uzi or attempted to locate it. I have the ability to go to a judge and get a search warrant but it wasn't the right time because we were undercover.

We never got search warrants after contacts with D ended to look for this Uzi and we never purchased meth from D. She offered us some but we declined to use it. I saw behaviors indicating D used meth, including mood swings.

Her extreme paranoia and untrustworthiness were other indicators. The further the investigation went, the more she trusted us.

Patricia Rodriguez was somehow involved in the drug trade. Duct tape is often used in the packaging of drugs, including meth.

Duct tape is used to wrap the package. The duct tape will conceal the contents and some people believe it will mask or hid the odor from a dog, but it doesn't work. It's also to compress the stuff. Then you can conceal it either. Contact paper and shrink wrap is used the same way.

Duct tape is commonly used to wrap drugs that are wrapped underneath in plastic. White is currently in prison. White was actually two-timing us when he was working for us.

He either pled guilty or was found guilty of something involving drugs. White was cut-off because of his reliability and trustworthiness. I wouldn't want to be involved with somebody who was committing crimes at the same time he was working with us.

There were some follow ups down to the investigation of Gotti's men being interested in D as a hit woman. Despite all of Honken's mail and phone calls being recorded, I'm not aware of any of them telling D these guys want her to be a hit woman.

Q: "So this appears to simply be some kind of a fanciful role playing on her part perhaps?" A: "I don't know. She told me, and that's what I went off of." I'm not sure which associates of Gotti were in prison with Honken. I'm not aware of any correspondence from these people to D wanting her to be a hit woman.

33

OBR000064

The \$1200 we were supposed to collect for D was a lot of money to her and she was quite upset about it. It was the last of the money she had. She was broke.

In one of the conversations she announces she's gotten a job as a waitress. I didn't check any bank records to see what her financial situation was during this time.

I had no reason to disbelieve D when she said she was broke.

**Michael Mittan – Redirect by Mr. Williams**

I don't believe D was playing a role during this undercover operation.

**Kyla Davis, Prosecution**

**Kyla Davis – Direct Exam by Mr. Williams**

I'm from Vinton, Iowa, a small town just north of Cedar Rapids. I have lived there all my life of 28 years. I graduated high school and I'm a dispatcher for the Benton Co. Sheriff's Office.

I answer 911 calls and the phones for the police and sheriff's office. She sheriff's office is connected to the county jail. There always has to be a female employee at the jail when there are female inmates, so I sometimes search inmates. I watch monitors and can see what is happening in the cells.

I have worked at the jail 8 years. It's a fairly small jail with as many at 30 inmates. In July to Oct. 2000, one of the inmates was D. D was in the cell and did not have her uniform on properly.

She did not have her pants on. I asked her over the intercom whether she had her pants on and she said she did, and then went to get her pants. I told her not to lie to us because she didn't have them on. She said "I'll find out who you are; you'll be dead."

I was shocked and scared. I took it as a serious threat. I haven't had anybody say anything like that to me before. I found out later that steps were taken to find out who I was, what I drove, and where I lived.

(Witness identified D in the courtroom).

**Kyla Davis – Cross Exam by Mr. Stowers**

I was 23 in Aug. and Sept. of 2000. I had been working at the jail 5 years. I worked in the kitchen facility for maybe 6 months before becoming a dispatcher.

34

OBR000065

For the most part the dispatcher is a nonconfrontational position but we are the first people an inmate sees when they come to jail. I dispatch for everything and monitor the activities of the jail.

I can and do go into where the inmates live. I have to walk through the jail to get to the room where I dispatch. At the time D was booked she was 5'7'' and 145 lbs.

D was wearing boxer shorts and the jail issues full length pants.

They are like cotton type pajama pants. They are navy blue. D had on lycra tight black shorts. That is not something the jail issues. It was the end of August but it wasn't hot because our jail has air conditioning.

I saw D at 10:00 in the evening wearing these shorts, she may have been wearing them as underwear. She was wearing a top. 10:30 is when the TVs are turned off and that sort of thing. The lights never really go off in the Benton Co. Jail. The inmates have to sleep with the lights on. It was a problem with the jailer for D to be wearing shorts and a shirt at 10:00 p.m. The policy is until they are in their cell they have to have their tops and pants on. This was in the day area.

D asked another inmate if they (the jail staff) could watch the inmates.

(Mr. Stowers shows witness her handwritten statement from the time of the incident). D said what are you going to do about me not having on pants. I said her privileges could be taken away, and she wanted her family to be able to come and see her.

I was trying to communicate to D that she needed to follow the rules. Serious things like taking visitation privileges away happen, people can get locked down.

Jail staff threatens to take visiting privileges away to get inmates to comply. I was aware D had had her 2 daughters visit her at the jail. I wasn't aware that it was important to D to have her family visit her.

I wasn't aware D was on Excedrin P.M. because she couldn't sleep. I wasn't aware she was taking Seroquel. I don't have access to medical records. D: "And so when you said, I'm going to take your family visitation away." **Obj.** by Mr. Williams that the witness did not say that. Mr. Stowers rephrases. Witness: I wasn't intending to get a rise out of her. I was trying to get her to put her pants on.

I don't think it was a threat to say her family visitation privileges could be taken away. I don't see written disciplinary actions so I wouldn't have been aware of any disciplinary actions taken against D for not having pants on.

**Kyla Davis – Redirect by Mr. Williams**

It is part of my job to enforce the rules.

35

OBR000066

It is part of my job to inform the inmates of the consequences of them violating the rules. When informed her that her ability to be with somebody close to her may be affected, she threatened to kill me.

**Laura Shelley, Prosecution**

**Laura Shelley** – **Direct Exam by Mr. Williams**

I was formerly known as Miss Getty. I have lived in Des Moines for 4 years. I graduated high school and went to EMT-B school and CNA. I am the purchasing manager for the Iowa Orthopedic Center. I have worked there since 2001. Prior to 2001, I worked in Vinton, Iowa.

I was a dispatcher for the Benton Co. Sheriff's Office. I was working with Kyla Davis on Aug. 30, 2000. I remember a confrontation between D and Davis concerning the pants.

I overheard the conversation because of the way the intercom system worked.

**Laura Shelley – Cross Exam by Mr. Stowers**

I wrote a handwritten statement concerning the event. I reviewed it last night.

After D got her pants on Davis got on the intercom and said it wasn't very smart to lie about things like that. Davis just used the tone of voice she uses with everyone else.

Davis said, "You want to keep your privileges, don't you?" Then D said "I'll find out who you are and you're dead." D did put her pants on. Only after D threatened to take D's family visits away did it provoke that response from D.

D: Do you think D interpreted it as that Davis was going to cause D to lose her family visits with her children? **Obj.** by Mr. Williams, calls for speculation. OVERRULED. Witness: I'm not sure how D took it. D: Do you think D took it as a threat to disrupt her ability to see her children? **Obj.** Speculation. OVERRULED. Witness: I don't know.

I didn't have much verbal communication with D during her stay. I wasn't aware she was having medicine dispensed. I'm not aware of an inmate complaint system where complaints about inmate behavior are documented by the jail. I just wrote it all down back then so I could remember it.

36

OBR000067

**Bill Basler, Prosecution**

**Direct Exam of Bill Basler by Mr. Williams**

I was the case agent in this investigation. I obtained records on D's behavior while she was at the Linn Co. jail. There were discipline reports written up on inmates that violated jail rules.

There were 2 different levels of violations. The more serious was a formal report and then there was the less serious behavioral warning. Formal reports go through almost a mini-trial. There is also an appeal process. D received 4 formal reports.

(Mr. Williams hands witness Exhs. 1142, 1143, 1144, and 1145). These exhibits are the documentation of D's formal reports. (The exhibits are admitted w/o obj.).

D received formal reports in Feb. 2001, Dec. 2001, Mar. 2002, and Jan. 2004. D received 2 formal reports for assaulting inmates.

D received 89 behavioral warnings from Nov. 2000 to June 2004. These warnings were tracked on a log, identified as Exh. 1146. (Exh. 1146 admitted w/o obj.).

I was present at the autopsy of Nicholson, and the 3 Duncans. No rings or billfold was recovered from Lori Duncan although a gold necklace that she had possibly worn was recovered. In the investigation, rings were recovered that once belonged to Lori Duncan.

These items were recovered from the Winnebego River near Fertile, Iowa, 20-25 miles northwest of Mason City. These items were recovered by a boy playing in the river. He dropped his glasses and when he picked them up he felt an object that turned out to be a woman's purse. The boys looked through it and found a driver's license, video card, small change, game tokens, and two rings. They kept the tokens and the two rings and threw the rest back into the river.

The boys contacted their parents who in turn contacted law enforcement. The purse with the driver's license and family photos that got thrown back in the river was never recovered. A pretty thorough search of the river area was done with no success.

(Mr. Williams hands witness Exh. 1113). The exhibit is 2 game tokens, a ring with 2 pearls, and a class ring. (Exh. 1113 admitted w/o obj.). There is an inscription on the class ring. It says Lori Milbrath, which was Lori Duncan's maiden name.

I measured the amount of time it would take to travel from the Duncan residence to the location on Lark Ave. where the murders occurred. (Witness is allowed to step down to demonstrate this on Exh. 1, a map).

37

OBR000068

Agent Graham and I were brainstorming how the murderers got from the Duncan residence to where the murder took place. We assumed that the kidnappers would drive the speed limit to avoid undue attention.

Gram and I drove the route outlined observing all posted speed limits. The distance was 5.3 miles and it took us just over 11 min.

**Bill Basler – Cross Exam by Mr. Stowers**

I've been to the Linn Co. jail a few times

As far as a sentence, you can only go to a county jail for a year. I have been to some state correctional facilities.

There's certainly better privileges in state facilities. There are educational and exercise opportunities. There is the ability to get out in the sunshine. You can't do that in the Linn Co. Jail for any extended period of time. I wasn't aware D wasn't allowed any outdoor privileges at the Linn Co. Jail. Many state facility inmates are given jobs.

There are fewer opportunities to do things in county jails. County jails are certainly more confining.

(The Court interrupts and after some discourse the judge ends the evidence for the day and reminds the jury of his cautionary instruction to keep an open mind until all evidence is in) (The jury exits).

**Transcript Issue Before the Court**

P asks the Court to include ex parte portions of a conference concerning the extent of P's expert questioning of D on mental health issues in a transcript. Mr. Berrigan for D says he doesn't have an objection to P getting it. The Court says he doesn't think P is entitled to it. Mr. Berrigan doesn't care if P gets it.

The Court wonder's what the relevance of the ex parte conversation is. Mr. Miller for P thought that the transcript with ex parte portions included would be the best way for him to get up to speed on mitigating factors.

The Ct. asks if there will be any Rule 12.2 issues. P thinks possibly. D doesn't think so. P's concern is possibly mitigating issue number 20, which appears to be a duress issue. If the expert reports or findings don't address it, then it probably won't be a problem.

D says the experts won't testify about duress or anything to do with the murders b/c they weren't allowed to interview D about the murders. P believes D's representation that the experts didn't interview about no. 20 but he hasn't really looked at the reports yet.

38

OBR000069

P might want its experts to sit in on the testimony of D's experts but he's not sure yet. It might be a reciprocal request so D doesn't have any opposition to it.

The Ct. thinks the bottom line is each side has the right to have their experts sit in on the other's experts and nobody really has an issue with that.

P might move for an instruction that the expert testimony has nothing to do with D's mindset at the time of the murder. A proposed instruction has been filed, P thinks. D has objected to that instruction already and will file a short written response on it.

The Ct. asks the parties to attempt to agree on the language of the instruction, though he hasn't decided to give it or not. D said that exact request was made to the taint team but they haven't done it. (Trial was adjourned for the day)

**END VOLUME 16,  June 1, 2005, 4:41 p.m.**

39

OBR000070

**BEGIN Volume 17 June 2, 2005, 8:03 a.m.**

**Hearing on Subpoena**

2828 Ct. convenes the proceeding in open ct. Mr. Rogers, for Honken, interrupts and requests the ct. revisit the issue of closing it to the public due to a danger to Honken. The Ct. denies Rogers' request. The ct. believes the only issue is which lawyer will appear for the subpoena and D confirms this is the issue.

2829 D has decided Mr. Rodgers should appear and D recently learned Rodgers had vacation plans. D offered to substitute Mr. Spies or Mr. Parrish if available. Mr. Parrish might have a trial. D believes the evidence is admissible as exculpatory evidence. The only issue is who is going to present it. D is not seeking to invade atty-client privilege.

2830 D doesn't care which attorney appears but Honken's attorneys are in the best position to give us the information. Rogers' claims he told Mr. Stower's office about his vacation plans over a month ago and has talked to him about it recently.

2831 Rogers says whether or not the conversation was privileged, it is certainly confidential. The Ct. says they will have to move for a protective order and the only issue is who will show up. Mr. Berrigan doesn't care which day next week one of the three lawyers shows up. D would be willing to put the lawyer on out of order.

2832 Mr. Parrish still has a trial next week. Mr. Spies had a trial next week but thinks it's been bumped but he does have hearing on Wednesday. He thinks he and Mr. Rodgers can figure out who will show up. Mr. Rogers has an issue about not being served with the subpoena but he's not going to quibble about it.

2833 The Ct. reminds the Honken team that they are free to file a protective order but should consult with Williams and Berrigan first.

2834 The possible days for the Honken lawyer to show up is Monday, Tuesday, or Wednesday. They're being flexible. (Mr. Honken's attorneys withdrew from the hearing by hanging up).

**Bill Basler – Cross Exam by Mr. Stowers (cont.)**

2835 D was arrested in July and remained at Benton Co. Jail until the beginning of Oct.

2836 Then D was in the Black Hawk Co. Jail for 13 or 14 days, including time spent in the hospital after her suicide attempt. D checked into the Linn Co. Jail in the middle of Oct.

2837 (D is directed to Exh. 2121, inmate activity log) I don't know how the log showing behavior warnings is created.

40

OBR000071

(Exh. 2121 admitted w/o obj.). Exh. 2121 shows D was in Linn Co. until Aug. 6, 2004. D was at Linn. Co. 2 months shy of 4 yrs.

Then D was transferred to the Hardin Co. Jail. I think there was a reason for each move. D was moved from the Linn Co. Jail at the discretion of U.S. Marshalls. There were some threats being directed towards D by Honken.

D remained in Hardin Co. Jail until shortly before trial. There were times when she would be transferred to and from court by the U.S. Marshalls.

I did request the jails housing D to monitor her phone calls and to copy her mail sometimes. Her mail was copied for periods of time.

For the nearly 4 years that D was in Linn Co., we didn't have access to her phone calls or mail because the jail didn't have the manpower or capability to do all that monitoring. They logged D's incoming mail in Linn. Co. and presumably her outgoing mail as well.

The jail has logged all of D's mail, including who it was sent from or to. They just said they couldn't copy the mail. When D was in Benton Co, I had success getting copies of her correspondence.

I asked for both incoming and outgoing mail. I didn't request recording of visits with visitors and am not aware that was done. I requested all of her letters and correspondence at the Hardin Co. Jail and I believe I got them all.

At first when D arrived at Hardin Co., they told me recording her phone calls would be sporadic at best. Later, the system became fully automated and they could retrieve those calls. I listened to recordings of her calls. (D gives the witness Exhs.1142-45).

In exh. 1142, a disciplinary report, D was found in possession of some improper items. D was found with carbon paper, white typing paper, envelopes, square pieces of cardboard, and a matchstick.

It wasn't an assault. D's explanation was that she didn't realize she couldn't have certain kinds of items.

D denied knowing anything about the matchstick. It was taped under her bed. Exh. 1143 is a disciplinary packet for an event occurring on Dec. 28, 2001.

D had an argument over an inmate named Rawhouser's body odor. D denied assaulting Rawhouser but admitted to physical contact on both sides. The Linn Co. Jail has a tape depicting at least part of the situation. I don't know where the tape is and I haven't seen it. I would assume the tape would be the best way to illustrate the situation to the jury.

When investigating these incidents, the Linn Co. staff apparently tries to talk to other inmates and get statements. Some of these statements corroborate D's story that she was

41

OBR000072

actually punched by the smelly inmate. A statement reports that the alleged victim called D an f'ing bitch and pushed her. I didn't interview this inmate or any witnesses

A: "That incident was an assault." Q: "Or so you say." A: "So the report says and the videotape showed." Witness: I didn't look into whether Rawhouser was disciplined for the incident. (Next D directs the witness to Exh. 1144 concerning D yelling at female inmates).

This incident was about D yelling at inmates, it's not an assault. D was disrupting the security, tranquility, or orderly running of the institution because she was yelling at other women.

In a letter to the sheriff, D talks about episodes occurring at the Linn Co. Jail. D says people weren't listening to her. D complained about the confinement, including shared shower and toilet facilities.

D says she's in there was a bunch of unhappy women and has had her share of run-in with other inmates. D concedes she was wrong for pushing Rawhouser during the earlier assault. The Rawhouser incident resulted in a charge being filed in court but it was dismissed. She talks about how she's tried to avoid conflict and that people have pulled her hair, threatened her, stolen from her, etc. and she didn't retaliate.

D says she has gotten along with more inmates than she didn't get along with.

D says she doesn't run the block though she has been accused of it. D had a complaint about a jailer named Vicki Kosina.
(Next D moves on to Exh. 1145 concerning the Jan. 28, 2004 incident).

The rule violation was for fighting with another person. Angela said it was in self-defense.

**Objection by Prosecution (Williams)- Compound Question**
**Court- Rephrase**
**Defense: "Well, yeah, I will"**

The altercations was with Jefferson.

I don't think the complaint was ever filed by the local county attorney. She was hit in the head with a closed fist, but I don't know .

I don't know the extent of Jefferson's injuries if any.

I do not know if Jefferson received any discipline.

I have talked to numerous female inmates that had been locked up with Angela, but I'm not sure if I talked to any of them while they were at Linn Country Jail.

42

OBR000073

Angela may have been referred to as "baby killer" by other inmates in jail.

Angela wrote a letter to the sheriff in which she talked about several grievances.

Mr. Stowers hands the witness Exhibit 2120, inmate grievance forms from Angela Johnson at Linn County Jail.  Offered, no objection, entered.

Exhibit 2028 are inmate request forms or kites.  Offered, no objection, admitted.

Angela is making requests, but she is being polite in doing so.

Exhibit 1146 is a list of 89 behavior warnings concerning Angela during her four years at Linn County.  This are incidents that do not rise to the level of formal reports.

I am not aware of Angela ever being on a suicide watch or being on a blue watch where they checked and recorded everything she was doing every 15 minutes.

On January 15, 2001 the computer sheet states that Angela was caught passing a letter, but the blue sheet does not mention it.

At 10:11 pm on the February 3there is no blue sheet entry that corresponds with the computer sheet.  Entries on the computer sheet do not .

Numerous incidents are not supported by corresponding blue sheet entries.  I do not know why this is.

Jailer's identification numbers are associated with the entries.  While sometimes the jailer is not identified, Jailer Kosina, 428, is often listed under the activity column.

I have no knowledge of any physical assaults on staff by Angela.  I have no reports on any assaults.

We once went from Lori Duncan's house to the gravesite in Mason City, IA.  We took a route that avoided the city, because I doubt the killer would have wanted to drive through the city.

The alternative route through the city, would have been a shorter distance but a longer time since it ran through the city.  But, we never actually timed it.

I don't know why you'd bind someone up after you kill them.

I assume that the victims were taken from the house.  I remember some testimony about the victims being told to pack up and my investigation did turn up that Ms. Duncan had taken a purse with her.

**Redirect  by Prosecution (Mr. Williams)   NONE**

43

Case 3:09-cv-03064-MWB-LTS     Document 284-28     Filed 06/23/11     Page 74 of 226
OBR000074

**Ronda Francis, Plaintiff's Witness**

**Direct Exam - by P (Mr. Williams)**

I am 27 years old, lived most my life in Britt, Iowa and am married to Jerry Francis with three kids.

I have worked for Alliant Energy for the past 7 years reading meters.

My married name is Francis and my maiden name was DeGeus, Terry was my brother. Our parents are Ed and JoAnne Degeus and they live in Britt.

P- provides Ronda exhibits 1110, 1111, 1114, 1157, 1158, 1161, 1162, and 1164. These are pictures of her family, P moves to pictures entered into evidence, D states no objection.

My brother Terry loved to be outside as a kid.

Terry and I remained close as we got older. Terry struggled in his faith after his divorce, but always encouraged his daughter with her faith, which is strong in our family.

When Terry disappeared it was very hard on our family. We went through the grieving process and then when they found his remains we were forced to go through it again. In fact, it has been so hard on my Mom that her Doctor has suggested she not come to the trial anymore.

We spent 7 years between Terry's disappearance and the discovery of his remains. It was mentally and physically hard on the whole family to not know if we'd ever see him again. We've had issues with our blood pressure and depression.

It has been very hard for us as a family to hear of the things they did to him.

The Terry that has been described by witnesses is not the Terry we know. He was a good family member, hard worker and good father.

Terry at one time dated Angela Johnson.

Terry brought Angela Johnson to family functions in the past. Evidence 1114 is a picture of the family with Angela Johnson at a picnic.

**Cross Examination- By D (Mr. Pat Berrigan)**

The trial has been very hard on my family. There is a victim's fund that has helped us some with the financial burden of attending the trial.

I never noticed Angela Johnson wearing sunglasses inside during the time he dated Terry.

44

OBR000075

I was never aware of Terry physical abusing Angela Johnson.  I did not know anything about Terry selling drugs for Mr. Honken or that he owed Mr. Honken $30,000.

**Wendy Jensen, Plaintiff's Witness**

**Direct Examination- By P (Mr. Williams)**

I am Terry's ex-wife and mother of his daughter Ashley.

Terry and I started dating when I was 16, were married in 1982 and he left me in 1989, before we finally got divorced in 1990.  Terry was a good provider.

Terry was a great father to Ashley.  Exhibit 1110 is a picture of Ashley and Terry.  Exhibit 1111 is also a picture with Terry and Ashley that was taken in 1991.

Exhibit 1109 is a picture of Terry holding Ashley at her first birthday party.

State moves to enter Exhibit 1109 into evidence.   No objections by Defense (Mr. Berrigan)

Terry and I divorced because he left me for Angela Johnson.  I was upset during the separation and divorce but by 1993 we were friends again.

When I had my son by new husband, Ashley called to tell her father and he was the first person at the hospital to see my new son.  He gave me a kiss and a card and then my new husband took him to see our new son.

Terry and I would talk about once or twice a week.  We would talk about his love life.  I always knew that if Ashley needed something Terry would provide it for her.

Terry's disappearance was very hard on Ashley.  Ashley could not understand why her father had left her.

After Terry disappeared Ashley was very afraid to be alone.  Kids at school would tease her about her dad being dead in a ditch.

Bill Basler called me in 2000 to tell me Terry's remains had been found.  I fell to the ground crying, called my mother over and called Ashley home from school to tell her.  Ashley took it hard, but was glad she could finally bury her dad, but we couldn't for another 4-5 years.

Ashley was expelled from school when she confronted some students who were teasing her about her father again.

**No Cross Exam – By D (Mr. Berrigan)**

45

OBR000076

**Witness- Ashley Degeus**

**Direct Examination- By P (Mr. Williams)**

I am 21 years old now and was 10 when my father disappeared.  My father was always there for me and was the father any kid would want to have.

Even when my parents were no longer together I never noticed them not getting along.

Exhibit 1116 is a picture of my father holding me when I was very small and feeding me a bottle.  State moves to admit 1116, no objections by D.

It was hard on me when my father left.  He was not able to be there at important times in my life and he won't be there when I get married.

I knew he was hurt or dead, because he would never just leave me.  This made me worry about other people I loved and if this could happen to my dad I knew it could happen to anyone.

The mean drug-dealing Terry is not the father I knew.

**Cross Exam- by D (Mr. Berrigan)**

I did not know anything about my dad dealing drugs and he never took me to meet any drug dealers.

**Plaintiff's witness Kathy Nicholson**

**Direct Exam- by P (Mr. Williams)**

Greg Nicholson, another victim, was my ex-husband.

We met in junior high, got married in 1980, had two kids and were divorced in 1989.  Greg was a friendly guy, that played in a band.

Greg worked for 13 years, while we were married, at Curry Manufacturing making industrial metal doors.

Greg was involved in the drug trade during our marriage, and that is what led to our divorce.

Mr. Williams hands Ms. Nicholson Exhibits 1112, 1155, 1156, 1163.  D does not object.

These pictures are of Greg interacting with myself and our daughters.

46

OBR000077

Greg was never late paying his child support

Greg and I became friends again after the divorce and would sit down and have conversations. I had moved on to a new boyfriend and Greg was dating other people too.

Greg actually married a woman for a period after we divorced. Greg would bring over his dates for me to meet and give him some feedback on.

Greg brought Lori Duncan over at least four times. The last time he brought her over was on July 25, 1993, the day he was murdered. They visited for a couple hours on their way back from introducing Lori to Greg's parents.

Greg told me about his drug charges in 1993, and after that his left fell apart.

After his arrest in March of 1993 Greg had quit doing drugs. He changed and stopped caring about what people thought about him. After he was arrested he started stopping by the house a couple times a week to talk.

Greg's father called and told me he didn't show up for court and he was worried and knew that Greg had planned to stop by my house afterwards.

For the next three years I spent time looking for Greg. It was very hard on the family to deal with his disappearance.

In 2000 Mr. Basler called and told me they had found Greg's remains. I told the girls, they took it very hard.

**Cross Exam- By D (Mr. Berrigan)**

Greg and I were together for 15 years.

Despite his drug use Greg was still a good father to our children.

His wife left him after the drug charges and then he moved in with Lori Duncan after spending some time living with his parents.

**Robert Milbrath, Plaintiff's Witness**

**Direct Exam- By P (Mr. Williams)**

I'm a 42 year old truck driver and auctioneer, I graduated high school and served in the military for 6 years.

Lori Duncan was formerly Lori Milbrath, she was my younger sister by 2 years.

P presents witness exhibits 1150, 1165, 1166. D does not object.

47

OBR000078

These are all pictures of my family, including Lori.

My parents have always lived in Mason City, IA. They have lived in their house for over 40 years.

My mother worked for Metalcraft Industries after we were old enough to take care of ourselves.

Exhibit 1151 is entered into evidence without objection. 1151 is a picture of my sister's little girl Jada.

My sister, Lori, was a loving and caring older sister. She was never involved in drugs, nor anything illegal.

Lori always wore her high school finger on her ring finger. This is the same finger that forensic anthropologist, Dawnie Steadman, testified Lori had a spiral fracture in.

The ring was found two years later in the Winnebago River.

Exhibits 1105 and 1106 were entered into evidence, without objection. 1105 and 1106 are pictures of Lori's daughters, Kandi and Amber.

Kandi was a fairly quiet kid that liked to be close to her mom and dad. While Amber was a more playful kid that loved to be out playing.

Kandi was very attached to her father after the divorce.

Lori and her ex-husband John got along well after the divorce and worked well together to ensure the girls got to see their dad and grandparents.

Amber was an energetic kid that always wanted to play and have fun.

At the time of death Lori was working at Fieldstone Cabinetry in Northwood. My other sister and I had worked there too.

Prosecution asks if Robert can guess what was going through Lori's mind at the time of her death.

**Objection- By Defense, Conjecture and Speculation- Sustained**

**Court Recesses at 12:00 PM for one hour**
   **Note: Judge reminds the jury to "keep an open mind until you've heard all the evidence at the end of the evidence in the penalty phase."**

**Jury leaves the courtroom**

48

OBR000079

**Proceedings proceed (no time given)- Direct Exam by P of Mr. Milbrath**

My sister was very protective of her girls.  I think about what they went through the night they were all killed everyday.  The lose has been hard on my sister Mary too.

My son was three when Lori and the girls died, he has no real memory of them or the events surrounding their deaths.

I would describe my relationship with my siblings as pretty typical.  We would keep up with each other and talk from time to time.

**Prosecution attempts to enter into evidence a poem that was written by a friend of Amber's at her funeral.  Defense objects that it is improper victim impact evidence.**
**Overruled**

Poem is read to jury.  Poem describes the feelings of Amber's friend.

**Cross-exam by Def- NONE**

**Direct Exam by Prosecution**
**Marge Milbrath**

I live in Mason City with my husband David.  We have lived in Mason City for 45 years.  Lori was my daughter.

Lori was baptized at a local church in Mason City as a child.  She went on to school and graduated before serving in the Navy for four years.  While in the Navy she became pregnant.  After moving back to Mason City, Lori and I remained close and would often attend cooking classes together.

Exhibits 1100-1104, 1159 are presented to the witness.  Exhibits are pictures of Lori, Kandi, Amber and Lori's ex-husband.  Exhibits are entered into evidence.  No objections.

Lori graduated from high school in 1982 and then served four years in the Navy.

While in the Navy she met her husband Jay (Prosecutor referred to him as Jim).

Jay and Lori got married and had Amber and Kandi.  Jay left the service before Lori.  After she left the service they moved to Des Moines, IA.

After Jay and Lori divorced, Lori moved back to Mason City, IA.  Lori moved into a house just down the street from us, but never asked for much help because my husband raised the kids to be very independent.

49

OBR000080

While they lived there I was able to witness Lori's parenting and housekeeping abilities. She was a very good mother and kept a very clean house. We were also able to interact with our grandchildren very regularly.

On the night of the murder Kandi asked to spend the night with us, my husband said no because we had to work the next day. He has a very hard time with the fact that if he would have said yes she would be with us today.

I drive by their house everyday and it is very hard.

This has taken such a toll that I have sought professional help and am currently taking medicine for depression and was advised by my Doctor not to attend this trial everyday. My husband doesn't talk much about the girls or their deaths, because every time we do we both just sit down and cry.

During the Iowa floods of 1993 Jay, Amber and Kandi's father, volunteered to help with the sandbagging. During his work there he developed spinal meningitis and became paralyzed from the waist down. He also has some mental problems as a result of the spinal meningitis.

Jay asks his mother if he has two girls and she will remind him that he does. She chooses not to remind him about the rest unless he asks. I don't know how much or for how long he remembers.

Lori, Kandi and Amber were all buried together in the same casket.

**Cross- Exam by Defense (No questions)**

**Prosecution/United States rests its case in the Penalty Phase**

**Defense reserves the right to make a brief record outside the presence of the jury. Court allows. Court assures the Defense counsel that the record will reflect the motion as taking place directly after the Prosecution rests.**

**Direct Exam by Defense of Pearl Jean Johnson (Mr.Berrigan)**
I live in Mason City and Angela Johnson is my daughter. I have four other children (Wendy Jean- 43, Angela 41, Jimmy 37 lives in Chicago, IL, Jamie 38 or 39 lives in MN, Holly 32 lives in Klemme, IA)

I am 65 and work by taking care of a woman with MS. I live with her 24 hours and dress her, make her meals, help her into bed with a Hoyer lift, etc.

Before working in home-care I ran a truck stop or a café in Leland, IA.

50

OBR000081

Wendy and Angela worked for me in the truck stop café when my partner quit. They worked very long hours. Wendy was about 16 and Angela was 14 or 15. I call Angela, Ang it is my nickname for her.

I have been married once in my life and am not currently married. I have lived most of my life in Mason City, IA.

Exhibit 2001D (Marriage License of Pearl Jean and Jim Johnson). The marriage started off poorly. We both brought a lot of baggage into the relationship and there was a lot of conflict from the beginning.

I was alone a lot as a kid and my brother and I had to basically raise ourselves. We had a mother, Florence Jensen, and a father, Al Gomez, but they divorced when we were young. I lived with my grandmother in Mason City most the time after that.

We lived with my grandmother because my mom only made $25 a week waiting table and could not support us. My mom remarried a man, Virgil Ashley (2978) that was an alcoholic and he physically abused my brother and sexually abused me.

My grandparents spoke Norwegian in the house and we did not understand what they were saying. My brother and I were not talked with, we were not seen or heard by them.

The abuse I suffered from my stepfather caused problems in my first marriage.

I never told anyone about the abuse, in my family we didn't talk about those things. I never got any treatment for this.

We had Wendy in 1962, about 9 months after we got married. Then we had Angela in 1964. In between Wendy and Angela I lost a baby too.

Angela was born Jan 17, 1964. (Exhibit 200A- Angela's Birth Certificate is entered as evidence, no objection). She was born in Burlington, Wisconsin. We had moved there because Jim wanted to be close to his mother and stepfather.

Angela's birth was very hard physically, she was breach and caused a great deal of pain. I then had Jamie and Jimmy.

The marriage was not going well at all. Plus, I was not relating well to the children because I was brought up alone and took care of myself. I brought them up the way I was brought, I was hard on them, I abused them, but I got better. I did not take birth control because there were babies being born deformed and I was afraid of birth control.

Jim and I divorced in 1968. During the marriage we fought a lot, he hit me a few times.

The first time Jim hit me, he slapped me with the back of his hand so hard I fell into the wall. I was holding Wendy when he slapped me.

51

OBR000082

Jim liked to drink and fight.

I left Jim. I had gotten a job at a factory and made some friends, which I'd never had before. One day they asked me to go out to the bars with them, I had a babysitter so I thought it was ok. Jim was mad when I got home and hit me, so I left with the kids.

We eventually went to live with my mom and her third husband, Andrew Jensen in Colorado. He was a great man, that was great with my kids.

Jim was not happy that I was going to Colorado, but he didn't fight about it. I had an auction and proceeds from a car accident to help pay for the trip. We went to Colorado in 1969.

In Colorado I worked for Families with Dependent Children as an aid, we lived in Pueblo, Colorado. Jim was ordered to pay $200 a month in child support, he never did.

Jim was strangely close to his mother.

My mom and stepdad came back to Iowa to take care of my grandmother. We stayed in Pueblo for a little while longer, but eventually came to Iowa in 1970-71 (within a year of arriving in Pueblo).

When we came back to Iowa I was on ADC, until all the kids started school.

We were in Iowa less than a year before we had a problem. My mother and I started getting into fights because I think she had a nervous breakdown

Note: Defense attorney, "this had something to do with her religion…"

**Prosecution objects- leading the witness**
**Defense Attorney- I'll rephrase**

My mother had gotten some tapes of a Bishop Whitlock who claimed to be able to help take things out of you. I never watched them, but she would show them to my kids and they would tell me about them. My mom and I got in an argument about this.

My mom and some other followers of Bishop Whitlock built a room in the basement that was separated by blankets and had an automobile tire in it.

My mom would go down there everyday and beat the tire with a bat. She would only play the tapes in her room or when I was gone because I didn't let her play them when I was there.

Note: Defense asks about what happen when she was gone

52

**Case 3:09-cv-03064-MWB-LTS** **Document 284-38** **Filed 06/23/11** **Page 83 of 226**
OBR000083

**Objection by Prosecution- Calls fore Hearsay**
**No ruling stated in record**

3002 This was all happening around 1975 in the first house I ever owned. My stepfather had died so my mom called and had asked to live with us.

3006 In 1975 I fixed up my house, sold it for twice what I paid for it and went into the restaurant business.

3007 I leased the truck stop, called it Lavern and Shirley's.

3009 While we were visiting Jim's family in Wisconsin back in the early 70's we received a call from Robert Claus. We had dated when I was divorcing Jim. Robert was married and had told me he was separating.

3010 Robert wanted to resume our relationship now, so we moved to Kansas.

3011 I found out I was pregnant with Holly, I was 32 and could not tell my parents.

3012 I did not mind telling my mom about my relationship, I just couldn't tell her about the baby. I knew she couldn't take it.

Note: Defense states, "not only did you not tell her, but you took some affirmative steps…"

**Objection by the Prosecution- Leading**
      **Defense- "I'll rephrase"**

3013 Carol Mann told me about an orphanage in Chanute, Kansas that I could go stay in while I was pregnant with Holly. Robert and I were not ready to move in together and I was thinking about giving up Holly after she was born. I loved my children but had problems showing it.

3014 I was three months pregnant when I went to Chanute, KS. Ted and Bobbi Dillo owned the orphanage.

3015 We went to the orphanage in the summer of 1972. There were 6 kids in the orphanage, they were just getting it started.

3016 I only told my sister Carol that I was going to Kansas. Jim may have known that I was going.

3017 Originally, Mr. Claus and I planned on me staying in Kansas until his divorce was finalized, but he was killed in a car wreck.

53

OBR000084

3018 I was surprised by the condition of the orphanage.  For awhile we slept without beds.  Then we slept together in a garage.

3019 I worked around the house and then gave my food stamps to help buy food for everybody

3020 The kids had chores while we were there.  At first it was ok there, then it turned bad.

3021 They made my kids go out and pick up sticks and stuff after an ice storm.  I did not want my kids to, because they did not have on any boots or anything.  But, I was outnumbered.

3022 At times I left the kids alone with the Dillo's.  He was in town when I'd leave them at the house to go help with a half-way house they were setting up.

3023 Wendy was upset one day when I came home, she had been protecting the children…

**Prosecution Objection- Hearsay**
**Court- "Just a second, there's a hearsay objection"**
**Defense- asked for relaxed rules for sentencing.**
**Prosecution- going too far**
**Court- Objection overruled**

3024 There was some fighting between my kids and the older children at the orphanage.  And Wendy told me Ted had been molesting them (note:  witness mentions molesting almost in passing and seems to treat it as an immaterial event).  I talked to Ted's youngest daughter about it one night.

**Court recesses for the weekend**
**To resume Monday at 8:30 AM**

**Defense raises motion at the end of Prosecution's closing**
**Re:  Aggravating Circumstance- Future danger to the lives and safety of others**
**"there's a nonstatutory aggravating circumstance alleged"**

**Defense believes that the facts do not support this claim.**
- **She has only had two physical altercations in prison**
- **Most others have been verbal**
- **No physical harm in drug dealings**

**Prosecution Resists Defenses motion to strike-**
- **She is a threat to prisoners based upon her actions and words in the past**

**Court-**
**Wouldn't the fact that she was involved in 5 murders alone suffice?**

**Prosecution-**
**That is part of our argument**

54

**Defense (3029)**
-   **If that were the case this aggravating circumstance would stand in almost all murder cases**

**Court**
-   **These are separate murders at two different times**

**\*Motion Denied**

3031    Court asks Prosecution if they will be calling their experts next week, Prosecution does know at this time.

Trial adjourned at 3:10 PM

**June 6, 2005**
**8:03 AM**

3036    Court reconvenes outside the presence of the jury

3036    Pending motion for protective order by Mr. Spies on behalf of Dustin Honken. Defense believes the issue has been resolved because the defense is not going to ask about the Honken proffer, Prosecution agrees.

**Witness- Mr. Spies**

3037    (Mr. Spies prepared two briefs for the court). I am only going to be asked about the nature of the prosecution against Mr. Honken, the resulting verdict in the merits and penalty phase, so I believe the issue is moot and I withdraw my motion.

3037    (Judge assures Mr. Spies that he has not read the proffer)

**End of Mr. Spies**

3037    Memorandum for Allucation- court does not formally rule, but hears the parties case orally and indicates that he is not inclined to grant the motion. Note: Judge also indicates that he believes the defense missed citing a key case from Hawaii on this issue, though the Judge indicates it would not likely have made any difference.

3039    Defense indicates that they emailed the prosecution a suggested jury instruction regarding mental health evidence over the weekend and the Prosecution has not responded yet. Court asks both parties to work together and keep the court updated.

**Court recesses at 8:09 am, to reconvene at 8:30 am**

**Direct Exam- by Defense (Con't)**
**Witness- Pearl Jean Johnson**

55

OBR000086

The first time Jay hit me I was carrying my daughter Wendy and the hit was so severe I had to go to the emergency room. I told the hospital staff I had fallen.

I was abusive to my children. I hollered at them and hit them. I slapped them.

**Objection by Prosecution- she said she did not slap them**
**Witness is asked to speak clearly and Defense will re ask to confirm answer**

I slapped them on the back of the arms and heads, I hollered at them a lot. I also used a belt to spank them with as they got older.

I only used the belt for a short time because it disappeared and I was glad it was gone.

I did not report Mr. Dillo for abusing my children because I did not know what he would do. My stepfather had locked us in the basement and I did not know what Mr. Dillo would do. I did not confront Mr. Dillo until we left the orphanage and came back to Iowa.

I had Carol Mann come back to Kansas to pick us up in late January 1973. I told her about what was going on. I had Holly on Feb 5, 1973 in Iowa.

When we lived on J Street in Iowa with my mother and stepfather the kids were shown the Bishop Whitlock tapes when I was gone.

In Mason City, Angela was hearing voices under her bed and I was scared because when my brother and I were locked in the basement we could always hear a lion growling.

I was very scared for her, so I prayed that whatever it was would leave her. I would anoint her arms and head with oil as my stepfather and mother would hold her arms.

We would pray over her and call it out. We would command the spirit or whatever it was to come out in Jesus name. We would command it out in a fearful tone. We would use loud voices.

I did not know if she was possessed by some evil spirits. We only did this once with Angela. As the kids got older I prayed over all of them.

The kids watched cartoons and some sitcoms on television. If I wasn't there they didn't want too much and if they watched any it had to be very quiet so my mother couldn't hear it.

We would fast, all of us, because in the bible everyone fasted. We would fast until the evening meal. The kids never fasted during school.

Once my mother burned the kids toys because she said we were making them an idol and putting them in between us and the lord.

56

OBR000087

My  parents burned and  smashed the toys in front of my children who were 8 and under at the time.

In Mason City my mother woke me up in the middle of the night and we had to leave the house because she had seen a wolf in the window and it frightened her.  She was convinced it was the end of the world.  We took the kids and my stepfather just drove us all around as we huddled together, we were all so scared.

We probably told the kids or they heard us say it was the end of the world.  We went and parked at a mission and I got out and prayed to God to do something.  I heard words say that  a man would lay hands on my mother and she would recover.  We went to a mission in Charles City and a evangelist named Bennett prayed over my mother and she was better.

We stayed in the Mission until the next afternoon, my mom was afraid to leave, but I took the kids home.

Exhibits 2045, 2049, 2033, 2057, 2092, 2080, 2089 are shown to the witness.  They are photographs Barbara Jean Johnson's children and ex-husband.

Exhibits 2092, 2057, 2033, 2049, 2045, 2089, 2080 were offered without objection and admitted.

These are pictures of my children when they were younger (3062-3064)

Exhibit 2006 to 2010 are Angela's report cards.  (Offered, no objection, admitted).  I did not get involved with the kids school or parent teacher conferences very much.

I never went anywhere really, I was a recluse.  I didn't really go to any graduations, dances or other events of the kids.

I was on ADC for the first few years of the kids' lives.  I went off it after I sold my house and bought the business.  The kids' father never paid child support.

Exhibit 2021A are my social security records.  (Offered, no objection, admitted).

Years later when the kids were grown I received a child support settlement.  I used that money to pay off a loan and I gave each of the kids a thousand dollars.  They were all grown by this time.  I received $17,000 total.

Wendy quit high school in the 10th grade and Angela quit school in the 9th grade.

I felt like it was my fault that they quit because they were working a lot for me after my partner quit.  They were working pretty close to full-time jobs for me.  I quit school in the 10th grade.

57

OBR000088

Angela worked as a waitress at the truck stop after she quit school. When she was 15 she got engaged to Steve Hugo, they were married when she was 16.

Exhibit 2001A is the marriage certificate of Angela and Steven Hugo. I consented to their marriage. Wendy was married at 16 or 17 too. They both left the house when they got married.

The marriage to Steven did not last very long. She married Arlyn Johnson next.

My father wanted my children and I to go to Colorado to live there, so I sold everything and moved the kids out there. Angela had been dating Arlyn Johnson for awhile, but she went along anyway. She was not happy and could not find work in Colorado.

Angela came back home to be with AJ. They got married and Angela said they were going to have a baby.

Angela never used drugs growing up as far as I know. The first I heard about it ,I heard she was smoking pot. She was around 18 when I heard she had smoked pot.

I knew Terry DeGeus because my daughter was going with him.

At first I didn't know Terry very well, he'd come in the store and say hi. But, later on Angela came to me and said that Terry was beating her badly and he'd hurt her.

Angela asked me to lead him to the lord. So I prayed with him and for him.

After the prayer I never saw him again. I had went on a vacation and he had come looking for me at the store, but I was gone.

I know Dustin Honken.

Exhibits 2101, 2097, and 2095 are pictures of Angela and Marvea. (Offered, no objection, admitted).

Marvea is Angela's second daughter. It is also Dustin Honken's child. Dustin was always polite, clean cut but aloof the whole time I knew him.

Marvea is 11 now, her older daughter is Alyssa. Alyssa will be 22 in August. Marvea lives with Jamie in Minnesota. Alyssa lives in Forest City, about 30 miles from me.

Angela and I talk on the phone every week and I write her 2 or 3 letters a week. If she were incarcerated for life I could keep writing talking with her.

Angela has always been a caring and loving person.

58

OBR000089

3086 Exhibits 2145 and 2147 offered, no objections, admitted.

**Cross-Exam by P (Mr. Williams)**

3087 My husband liked to drink, it wasn't real bad from time to time.  He never did any drugs that I know of.  He left Angela's life when she was four years old.  I never did any drugs.

3088 Angela played with other kids, watched T.V. when we had one, went to school and was never expelled and never got in trouble with the law.

3089 She eventually ran a restaurant/bar.  She was a good mother and held a job.  I don't know of Steven Hugo ever abusing Angela.  None of my other children have had any legal troubles, Wendy is troubled but she is doing ok.

**Direct Exam by Defense (by Mr. Stowers)**
**Witness Leon Spies**

3091 I'm a lawyer in Iowa City, Iowa.  I have represented Mr. Honken since 2002.

3092 I represented Mr. Honken on charges of Murder or homicide.  Mr. Honken was charged with the same murder or homicides as Angela Johnson.

3093 Mr. Honken was found guilty of all charges he was facing.  He was convicted of all 5 killings.  In the penalty phase the jury returned a verdict of life without possibility of release for Greg Nicholson.  It returned a verdict of life without possibility of parole for the murder of Lori Duncan.  For the two children the jury returned penalties of death.  In regards to Mr. DeGeus the jury returned a verdict of Life without the possibility of release.

**No Cross-Exam**

**Direct Exam by Defense**
**Witness James Jeffrey Johnson**

3095 I am 62 years old and live in Chippewa Falls, Wisconsin.  I am retired from Uniroyal Goodrich and we had a small supper club.

3095 I have been marred to Pamela Jean Johnson for 36 years.  She is my second wife.  My first wife was Pearl Jean Johnson.

3097 When I was 14 I got sent away to a reformatory for beating up a kid.  Things were never the same after the reformatory.  I took my name back after that, I had been called Wayne and Jim Hopp.

3098 I met Pearl Jean at a New Year's party and we were married 3 or 4 months later.

59

OBR000090

We were living at Mason City, IA when we got married.  I was working at Higgley's Cold Storage.  I unloaded and loaded box cars and freezers.  Higgley's laid me off so we moved to Eau Claire, Wisconsin to live with my folks.  We saved up some money from my job at Nash Rambler and got an apartment in Kenosa after a few months.

We had Wendy 9 months and 4 days after we got married.  Pearl was pregnant about every year, we lost one child in between Wendy and Angela.

Our marriage was alright at first, but I noticed that Pearl wouldn't let the kids be kids.  They couldn't touch anything, they couldn't make a mess.  Pearl could never show affection towards the kids, she always had a paddle or a belt.  She got more satisfaction out of whipping them then letting them be kids.

She would paddle thie kids and stuff when they were very little, 2, 3, 4 years old.  She wouldn't paddle them in my presence.  Pearl and my mom, Grandma Sund, got along well.

I thought things were going well and then one day I came home and Pearl was gone.  She had gone back to Iowan to live with her mother.  I went down to Iowa and convinced her to come back, she had found religion while she was there.

Pearl left with the kids without notice more than once.  I believe that Pearl cheated on me several times.

I caught her once in a car naked with another man.

I did slap Pearl once because she and her coworkers were making fun of me for catching her with another man.

I have always enjoyed drinking beer.  I only drink beer and have never been treated for alcohol abuse.

Pearl filed for divorce, I did not want to get divorced.

Pearl and I worked out a visitation plan at first, where I could still see the kids on weekends and such.  She was still living in the same house we had when we were married and I was staying with my mom.  I got the kids as much as I could.

Even after she moved to Iowa I would still go pick up the kids for weekends.

When she moved to Colorado I did not know it.  Someone told me she went to be with her dad, but I did not know where he lived.  Before that my time with the kids had decreased because of the cost and time associated with getting them.

I got remarried to my current wife in 1969.  This was about a year and a half or two years after Pearl and I divorced.

60

OBR000091

I tried to find my kids when they moved to Colorado by calling Pearl's mother and this and that. But, I couldn't find them, so I sort of gave up and stopped paying child support.

I paid child support up until the point I couldn't see my kids anymore. Eventually she took me to court and I had to serve 90 days in jail for non-support. Then I started making my payments to Cook County, Illinois' clerk of the court.

I don't think Pearl wanted the kids, she just used them as a meal ticket. I asked for the kids, but she was mad because I remarried.

Pearl sued me for $25,000, my wife and I did not have that money. Pearl was getting money from the state of Iowa and Wisconsin to support the kids. I was going to pay Pearl, but I wanted the money to go to the state of Iowa to pay them back for all she had took from them.

Pearl was awarded $25,000.

After we had divorced I went to Iowa to try and get back together. We went to a revival Pearl had been going to and during the stay she said she saw angels, all I saw was the light coming through a curtain, but I couldn't convince her that there weren't any angels.

**Court recesses from 10:25 am until 10:50 am**

I was married to Pearl Jean Gomez for a little over 7 years. I think we got divorced in 1967.

Exhibit 2005 are the divorce papers from Pearl and my divorce. (Exhibit offered, without objected and admitted)

When we visited the kids in Iowa the kids told my mom that Pearl used the belt for whipping them. So my mom took the belt. While we were together I was always throwing away her paddles and belts, but she would always find more.

I would spank the kids on occasion, but not that hard. It was hard for me to spank the kids. I would tell Pearl to not hit the kids that hard, but she wouldn't listen.

When I was a kid, my brothers dad would beat us. He broke my brother's collarbone and burned me. I was the youngest person ever sent to the reformatory.

We were forced to work in the heat at the reformatory and we would have to work for the guards at their houses. I was never sexually abused there.

I dropped out after the ninth grade.

61

OBR000092

After Pearl and the kids moved back from Colorado we would go get the kids and keep them for weekends and some summers. We would even take Holly, who was the daughter of a boyfriend of hers.

Wendy stayed with us and was getting straight A's until her mom called her back to work in the restaurant. Angela always lived with her mother. I never knew they went to Kansas until they got back.

Wendy told me about Kansas and the abuse. I don't believe we'd be here today if it wasn't for that abuse.

Wendy told me that when they were in Kansas she, Angela, and Jimmy were abused. They threatened to feed Jimmy to the pigs and would drag him to the pig pens.

Angela thought my current wife broke up her mother and I. She resented us a lot for this.

Wendy, Jimmy and Jamie came and spent time with us. I would go to a lot of the parent teacher conferences and see the kids at school events. Pearl never went to school functions.

Pearl would not take care of the kids very well, she would buy expensive things like leather jackets for herself, but the kids would have nothing. For Christmas we would take the kids to a motel to open their presents because Grandpa Jensen would smash the toys with a hammer and say they were of the devil.

Pearl's family became fanatic about religion. They were always fasting and my son Jmmy is still troubled by the thoughts of going to bed hungry.

Pearl's mother was nuts. Her neighbors even signed a petition to have her kicked out. They would spit in a bucket, hit on a tire, hold Angela down, cast out devils. I think they should burn in hell for that.

Exhibits 2068, 2103, 2105, 2050, 2044, 2039 and 2037 are pictures of myself with Pearl and the kids. (Offered, no objection, admitted)

We lost a lot of pictures when Pearl had her auction and threw out a lot of our pictures.

When I was sentenced to 90 days, the jailer let me go home during the week to work if I came back on the weekends.

I never knew Angela quit school and would have never allowed it. I don't know what she did after she quit school.

The first time I heard that Angela got married at 16 was here in court. I never knew Steve Hugo. I never knew Arlyn A.J. Johnson. I learned about him in court too.

62

OBR000093

I love all my kids the same and will no matter what.

My wife has favorites though. She did not like the bigger girls, Wendy and Jamie. She liked Angela because she was thin and pretty like Pearl.

Since Angela has been in jail we have become closer. Angela has written me letters and calls me collect. If she is incarcerated I will be here for her until the day I die.

**Cross-Exam by Prosecution**

I was abused as a child, spent time in a reformatory. I have been married for 36 years. I have been charged with some misdemeanors, but no felonies.

**Direct Exam by Defense**
**Witness Wendy Jacobson**

I live in Balch Springs, Texas which is about 17 minutes outside of Dallas. I am married and have two children (Brian- 26, Brooke- 23) plus a stepdaughter.

Angela Johnson is my younger sister. I am the oldest of the five siblings. I am 43. My memories of my parents being together were not very good.

I was born in 1962 and I was in Kindergarten when my parents divorced. I don't remember the physical altercations, just the yelling. After we moved to Iowa we had very little contact with my father.

We did not realize until junior high that we could even call him

I was in Kindergarten or First Grade in Colorado. We lived with my grandparents Florence and Andy Jensen. My grandmother was overreligious. My grandparents whole life revolved around religion. They thought demons lived with us or within us. We started listening to Bishop Whitlock tapes in Pueblo and they continued through Mason City. My mom participated in all this.

My grandparents and mom would cast demons out of us. They would hold Angela down on the floor and hold her arms and legs down. Talk in tongues and wave a bible over her head until she was physically exhausted. Angela would scream and look to me for help, but I was powerless.

The demons would only be delivered out of her when she stopped fighting. They would lift their hands up in the air and talk in a language they believed only God could understand.

I remember witnessing this a lot as a young girl. Then they did it to me when I was older.

63

OBR000094

Angela would get in trouble for focusing on something and it would be hard to get her attention. I think she had ADD.

She would get her letters backwards when we would draw pictures like she was dyslexic. They would try and cast the demons out for this too.

The casting out of demons was frequently throughout the weeks.

The casting out would continue until you made a noise like a burp or a cough or something. During my junior high years they stopped holding us down, they would just lay hands on us. I basically remember Angela getting this treatment. We went to Park Church in Charles City and they did demon deliverance there.

At the demon deliverances they tell you that the demon can find anyone that has an empty space in their heart. We all lived in fear of going to hell. We would look for the mark of the beast on each others heads.

One night our grandparents woke us up in the middle of the night and we drove around for 3 days and nights with no food or water because they were convinced the world was ending. They based where we went on the direction of a scar on Pearl's leg and we would follow the stars at night.

It was not just overnight and the preacher from the church is who brought us food. We ate it so fast because we were hungry that we threw it all up. We fasted all the time, even Holly who was 10 or 11 years younger than me.

We were told to tell everyone what we were taught about the bible. We would tell other kids Jesus was coming soon and would get beat up for it.

**Lunch Recess at 12:02 p.m.**

The prayer closet is where we were sent if our hearts weren't pure so that we could pray until "she" was ready for us to come out.

Pearl would hit us with a belt so that welts would appear, she would also use a paddle on us all.

Pearl would hit us until she got tired of hitting us. My mom would also use her hands to hit me in my face if she lost her temper.

My grandfather would burn our toys and smashed our television with a hammer because he felt they were false idols.

In Forest City, Florence had a room with hanging sheets and a tire. Next to the tire was a coffee can. She thought she had demons so she would go down and beat the tire and spit

OBR000095

in the can.  It scared us kids, because we thought there were demons going around the basement.

3164  Our mother would tell us time and time again that she wished she had given us to our father.

3165  Pearl once said that she would sacrifice me if God asked her to.  My mom was never there, it was always me watching my brothers and sisters emotionally and physically.  I don't know where she went when she was gone for long periods.

3166  When I was in the fifth grade my mom started to show and then she told me we were going to Kansas to help start an orphanage and Holly was going to be the first orphan.

3167  In Dillon, we lived in an old farmhouse until the garage/hut was finished.  It did not have running water, it was a garage with cement floors.

3168  Most of the time we were there my mom would go to a little church store and try and raise money for the orphanage.  While we stayed home and did physical labor.

3169  We had to cut off chicken's heads, and smash rabbit's heads with hammers.

3172  Jeanine and Shirley (Ted's daughters) and I were in the house.  They told me I had to take a nap with their dad because they had to too.  They led me to his room where he had me lay next to him as he rubbed all over me until he finished his arousal.

3173  Angela told me years later that she was molested too.

3174  While we were there,  the Dillons once made the three Indian boys drink from the baby pigs bottles because they chewed holes through their shirts.

3176  We were forced to pick up branches after an ice storm even though we didn't have boots or coats.  A few days later Carol Mann was there to pick us up.

3176  I dropped out of school in the ninth grade.  I quit school to work at the restaurant because my mom needed me.

3177  I had attended about one school every different year.  My dad would come to PTA meetings, but my mom never did.

3178  Mom never went to any of our school stuff.  Jamie and Jimmy were the only ones to graduate from high school..

3179  I did not have much of a relationship with my father in between our moving to Colorado and about 7th grade.

3180  I lived with my father for a couple years, but my mother wanted me to come back.

65

OBR000096

Both Angela and I were first married when we were 16.

Arlyn Johnson, Angela's second husband, was quite the catch. He was handsome, personable and owned a nice truck.

Terry DeGeus dated my sister after Arlyn, we noticed bruises on Angela and my husband at the time said Terry had put his ex-wife in the hospital before. Angela told me about the abuse and would come to see me covered in bruises.

I was once present when Terry was abusing Angela. We were in the next room and could hear him strangling her and hitting her head on the headboard. He came out of the room and said he regretted what he had done.

Dustin Honken was a preppy nerd, highly intelligent and unlike other men Angela had been around.

Angela has a strong bond with her children.

My sister and I are close and I would continue to support her if she were imprisoned.

**NO CROSS**

**Direct Exam by Defense**
**Witness Arlyn Johnson**

I live in Forest City, IA and work as a shop supervisor for Waldorf College.

I am currently married to Carey Johnson. We have been married for 5 years. I met Angela when I was young, we got married and we had a child together.

We dated for a few months and then Angela moved to Colorado. While she was there she found out she was pregnant so she moved back so we could get married and raise the baby. We married in early 1983. We had Alyssa, our daughter.

Alyssa is 23 and a full-time student. She also has a 2 and a half year old daughter named Angeleah.

Angela did a very nice job mothering Alyssa. I was glad she stayed home with her even though we did not have a lot of money.

The times that I was around Pearl Jean Johnson she seemed fine and her relationship with Angela seemed normal.

Over time we lost the spark in our relationship, we started out having fun and going out, but then we had a kid and that all changed.

66

OBR000097

I heard rumors that she was having an affair, but she denied them.

We had an argument and I broke some things. She left the next day to go live with her mom.

We did like to party. We smoked marijuana and drank in moderation. But never used any other drugs.

Even after we divorced I was pleased with Angela's parenting of Alyssa. She kept a clean house, my daughter was clean, well fed and never complained.

The divorce was fairly amicable and we maintained a good relationship afterwards.

Angela told me she was dating Mr. Degeus, I did not know him personally but I had seen him around. I did notice a lot of bruises on her while they were together.

She never said he was beating her, but I just drew assumptions. She would wear sunglasses in the house and she never did that when we were married.

I never investigated Angela's bruises myself. I just hoped it did not affect Alyssa. I also worried that Angela was taking some other drugs. She was much more talkative and she seemed to be on some form of a stimulant.

I once did stop in on her and found a white powder substance. At the time she was dating Dustin Honken.

I saw Mr. Honken several times during our exchanges of Alyssa and he seemed like a great individual.

Alyssa and Angela have always had a good relationship and gotten along well.

Alyssa and Angela communicate a lot by phone and letter.

Angela told me she had a restraining order against Mr. Degeus. She never mentioned to me owning a firearm for protection from him.

Angela and I have always gotten along and I am pleased with the way she has raised Alyssa.

**Cross exam by Plaintiff (Mr. Williams)**

Kirby Thompson was the other man Angela was involved with when we were married. She was also involved with Todd Graham.

Angela did not change around the time of the murders.

67

OBR000098

Angela provided me with meth once or twice during my second divorce. I smoked marijuana with Dustin Honken and Angela during this time. Angela was a little excitable with her temper.

I did tell DEA agents in 1997 that Angela had a very hot temper, but I was trying to get custody of my daughter and I might have stretched things a little bit. Dustin Honken would calm her down.

Angela made threatening comments to me before.

Angela also threatened Dustin Honken's other girlfriends.

**Redirect by Defense (Mr. Berrigan)**

My second divorce happened in 1995 to 1996.

My second divorce was contentious. I diagnosed with bi polar disorder and during the lows on occasion the meth would help bring me up.

During the second divorce Angela and I were also arguing about custody. We would both raise our voices at times and I said things that I did not mean too.

**Direct Exam by the Defense**
**Witness Eva Hanawalt**

I'm 32 and currently incarcerated in Greenville, Il for aiding and abetting the manufacture of meth.

I was sentenced in Feb of 2002 and am currently serving an 8 year sentence that has since been reduced to 6. I should be released in January of next year because of appearing here.

I met Angela in June 2002 in a cellblock in Linn County.

I had never been in a jail like that before, I was scared and from a small town, so I asked the jailer to put me in a cell with someone safe.

Vicky Kosina, the guard, told me there was only one cell open and it had two murderers in it. Cellblock N. Vicky pointed at two girls in the cell and told me to stay with them and I'd be ok and to stay away from Angie because she was the meanest.

Cellblock N was designed to be an isolation area as a punishment for prisoners who did not follow the rules, but the jail was full so we were put in there. We were more restricted then the other prisoners.

68

OBR000099

The two girls that the guard told me to stick close to were the meanest and I stayed away from them.

Angie was the only one that was nice to me. Offered me sanitary supplies and asked about me. I had never met her before being in the jail.

I didn't ask for it, but Angie brought me stuff to use. She did not ask for anything in return.

Angela always talked about her kids, she loved them so much and showed off their pictures.

Vicky the guard hated Angie and would treat you very differently if you were in the cell with her.

Vicky and Angela had an verbal altercation . Vicky became physically upset and brought 5 guards to take Angela away. She also tossed the cells of us so we wouldn't challenge her like Angela.

We sent a kite to the jail administrator telling him what had happened and about the behavior of Vicky. Then I was moved out of N block to K block, where the only way to see Angela was to go to church or bible study.

Then Vicky separated us from going to church together. I did not ask to be separated from Angela.

Seperatees are usually something someone asks for, but neither Angela nor I asked for it.

The night guards found no seperatees between us, so they allowed us to start seeing each other again.

I plead guilty to my charges. My 8 year sentenced was reduced to 6 because I testified against my co-defendants brother. My Co-defendant was my boyfriend at the time.

I had a problem with meth. Meth is so powerful and addictive. Meth takes over your mind, your choices, your responsibilities, your priorities.

I have been clean since my incarceration. Before I was not the mother I should have been because of the meth.

Angie is the one that convinced me to go to bible study and church at Linn County.

At first I just went to service to get out of my cell, but then I started going faithfully. While I was in Cellblock N with Angie she never had any physical altercations with anyone. Fights do happen in women's prisons.

69

OBR000100

Angela too Brandy Byrd under her wing and looked out for her.  Brandy was in for murder too.

During the evenings I would listen to how Angela would talk to her daughters and it was so nice to hear how she loved them.  She taught me to be a better mother.

Angie would write little bedtime stories for Marvea.

For completing an 800 hour drug program you get a year off your sentence.  Since I came here I delay my release by a few  months.

I do not regret coming here.

**Cross Exam by Plaintiff (Mr. Williams)**

I was in Pekin with Valli Williams.

**Objection by Defense- beyond the scope of direct examination**
**Court- Overruled**

Valli did not tell me about her plans to publish a book about Angela's life and crimes.

**ReDirect by Defense**

I knew Valli, she used to be a lawyer, I never asked if she had been disbarred.  I don't know anything about her stealking a million dollars from people.


**Court takes afternoon recess from 3:00 p.m. to 3:25 p.m.**

**Direct Exam by Defense (Mr. Williams)**
**Witness Holly Dirksen**

I am Angela Johnson's younger sister.  I live in Klemme, Iowa and am a home healthcare worker.

I am married to Michael Dean Dirksen for 7 years.  I have one girl Haley Thornton.

I am 32 and am 9 years younger than Angela.

I had some contact with James Johnson, my siblings father, growing up and he was always kind to me.  But I never considered him my father.

My mother cast out demons from me a few times.  She would lay hands and call out the demons and speak in tongues.  We had a guest named Kim Swalve that would help with casting out demons for awhile.

70

OBR000101

Casting out demons was pretty regular most of my childhood.  My mother would do it until she felt the demons were gone.  She would wait until we stopped fighting.

My mother would often send me to the front of the church to be healed.

As kids we were encouraged to share our beliefs with others.

I can only remember being hit with a paddle or belt once.

I started helping in the restaurant in 8th grade.  I dropped out of school during the 11th grade.

My boyfriend died in front of me when I was 14 and it was hard for me to process.  So I started taking drugs to deal with bouts of depression.  The drugs ruined my relationship with my mother.

I used drugs and drank while in high school.  My mother disapproved the entire time and I spent some time in rehab.  But, they tried to keep me from my sister so I signed myself out.  Because one of the staffers knew my sister and banned her from coming to visit.

I was closest with Angela when I was little.

Angela was always looking out for me.  My mom was always working.  When I lost my boyfriend Angela was there for me to talk to and lean on.

We did not have a lot of money growing up, so Angela would help buy me stuff like clothes.

I remember fasting a few times, but not all the time.  Mom made it seem fun and it never really bothered me.

I rebelled against my mom's beliefs when I was a teenager.  None of my older siblings were following my mom's beliefs by then.

I am a supporter of my mother.  I was never close to Jim Johnson.

My siblings would try to keep a relationship with my mom, but then we'd have trouble for awhile before we'd all come back together.  Sometimes we'd go months to a year not talking to each other.  I haven't spoken with Jim for four years.

I hadn't spoken to my sister Wendy until the last 2 days.  I understand my older siblings may have encountered different things than I had.  I was not in the orphanage nor in Colorado.

71

OBR000102

After Angela got arrested I took custody of her daughter. When the arrested Angela it was at my house, both Angela and her daughter Marvea were staying with us. Marvea no longer lives with us due to the harassment she was receiving in town and at school.

I knew Terry DeGeus. I was around at times when they were dating. My sister was often bruised from head to toe and feared for her safety, but she loved him very much .

Once Angela and I ran away to Wisconsin to get away from Terry's abuse. She called to check on him once from Wisconsin and the next day he was there.

Angela once told me to call the police if Terry showed up. When Terry showed up I called the police and blocked the door so he couldn't get inside. He laughed at me, but I think he left before the police arrived.

I knew Dustin Honken. He was a nerdy, nice, intelligent and very different from other guys my sister had dated.

Before Angela was arrested we were very close. Since she has been arrested we have remained close. We talk on the phone, write letters and I bring her children to see her.

Alyssa lived with me for a short while after Angela was arrested. Angela loves her mother and Alyssa loves her mother too.

Angela being arrested has been very hard on Marvea.

**Cross-Examination by Prosecution (Mr. Williams)**

Dustin Honken was never violent towards Angela.

I was in rehab when I was 14 or 15.

Some of the rings, tokens and pursues of the victims were fonud in Fertile, IA in 1993. I was living in Fertile for a few months of 1993.

Angela gave me meth a few times.

I believe that Angela told me Terry DeGeus was dead before the body was ever found.

She told me Terry was missing, not that he was dead.

I was best friend with Leslie Nedved in 1997, I had known her since 1992 or 1993. I did not tell her that I knew where Terry DeGeus' body was.

I did not tell her that the police we messing up the mistake. I did not tell her that I killed Terry. I did not tell her deny any knowledge of Terry's disappearance.

72

OBR000103

I told her that she did not have to appear to the grand jury if she was not subpoenaed. I don't remember if I went to her house the morning she went to testify to the grand jury.

I know Amy Wonsmos.

I was attacked by Aaron Ryerson in a bar and I did not tell Amy Wonsmos that Aaron will end up like Terry DeGeus.

I was mad at my sister Wendy for testifying to the grand jury about things Angela had told her about killing Terry DeGeus. I think Wendy made some things up and I never threatened to kill her.

**ReDirect Examination by Defense (Mr. Berrigan)**

I know Aaron Ryerson. He was a meth user. I don't know if he was high when he attacked me at the bar, but I know for sure he was at least drunk. He attacked me because he didn't like my sister and was friends with Terry DeGeus.

As far as I know Leslie Dedved does not have any independent information about the murder of Terry DeGeus. Neither does Amy Wonsmos.

**Concludes testimony for the day**
**Will start at 8:30 am tomorrow morning**
**Jury exits the courtroom**

Mr. Berrigan is asked who will be called to testify. He states that since they will not be putting on testimony about Mr. Honken's proffer, Steve Badger and Ray Fielder will not be testifying. Mr. Berrigan believes everyone else on the mitigation witness list will be testifying.

Mr. Williams adds that Kim Swalve, number 4, is off and so is Al Haubrich is too.

Mr. Berrigan states that he will be calling 3mental health experts,Logan, Cunningham and Hutchison. And Dr. Evans a psychopharmacologist.

Mr. Williams informs the court he may call rebuttal witnesses depending on the direction things go with the defense's experts.

**Adjourned at 4:13 p.m.**

OBR000104

**Trial Transcript Digest**
**STATE V. ANGELA JOHNSON**
 **Tom Williams – P**
**Pat Berrigan and Stowers – D**

**Begin Volume 19, pp. 3285-3462**

**Direct Examination of Dr. William Logan by Mr. Berrigan**

3287 – Dr. Logan called to the stand, Searle is his middle name

3288 – Dr. is moving from Topeka, KS to Lawrence, KS and is a physician specializing in psychiatry, undergrad in Biology and psychology, med school in U of Texas S. Western Med school in Dallas

3289-90 – Graduated in '77 and then did a 4 year psychiatry residency at Baylor Hospital in Dallas and at a private hospital called Timberlawn; he then did his Public Health Service commitment at a federal prison facility in Springfield, MO. At the facility he did over 500 evaluations for federal courts to determine if prisoners were competent to stand trial

3291-92 – Then did a fellowship at the Menninger Clinic (the Mayo of psychiatry) in Topeka at the time, it is now at Baylor in TX. W is licensed in TX, MO, KS, and NE. W is board certified in psychiatry.

3293-94 – After the fellowship, he stayed on at Menninger as director of the department of law and psychiatry. W was there until '93. Then his department broke away and formed a private practice in Kansas City; the practice is still ongoing.

3295 – W gives expert opinions on legal issues involving mental state, eg assessing emotional damages. W has also been asked to design an entire prison mental health system for Nevada.

3296 – W's work involves testifying in court frequently. He has been called by both prosecutors and defense. In Iowa, mostly defense. Sometimes by judges as well.

3297 – W has been involved in cases where judges have asked him to do evaluations in capital murder cases. W is a member of a number of standard professional societies (e.g., American Psychiatric Association)

3298 – As to Angela Johnson, W was first contacted by Al Willett in Cedar Rapis, Iowa, Johnson had a serious suicide attempt and W saw her in 2001 in Linn County Jail. He saw her 4 months after the attempt. (the attempt was on Friday, Oct 13).

3299-00 – W saw her to make recommendations about treatment, she was still on daily suicide watch. He made medication recommendations. She was initially on Elavil and Trazadone, W suggested switching Elavil to Paxil since Elavil can be deadly in overdose, eventually, she did well on Zoloft and Seroquel.

3301 – W wrote a brief letter to the jail on the request of Mr. Willett in Jan 01 as a progress report. W also did a follow up with Johnson in Jun 01. W did not hear about the case for years after that. She was no longer suicidal in June.

74

OBR000105

3302 – W's next contact was receiving some mental health records from M. Goody in Jun 02 w/ little explanation. The next contact was from Mr. Berrigan in Nov. 04. W was asked to reassess Johnson, with capital sentencing in mind. W has done this in other cases and interviewed Johnson in Jan of 05 (the current year). Additionally W received 2 boxes of info in April.

3303 – W had other interviews set up by Mary Goody, who did some mitigation work. Goody lives in Wy, W knew her from the 80s. Goody set up a two day period to interview people in May 05

3304 – They interviewed all siblings, Holly, her youngest sister; James, her brother; her older sister Wendy; her younger sister Jamie; her mother, father, and step mother, Carol Mann, a friend of her mother; several of her friends, including Mikell Olson and Dave Nieman; Kim Swalve, a woman who was a friend of her mother and lived with them growing up; both of her daughters Marvea and Alyssa; her former husband Arlyn Johnson, and Todd Graham, another friend. Berrigan enters W's CV.

3305 – W also reviewed a chronology prepared by Goody, including SS Admin records, family med records, various mental health and police records. W also looked at correctional records since her arrest in 07 (including Benton County, Black Hawk County, Linn County, and Hardin County.

3306 – W is being paid at $225/hr and is pretty standard. W is sometimes asked to assess mental states at the time of the incidents.

3307 – This happens at pretrial and sometimes if an attorney previously fails to offer a defense, at post-trial. W did not attempt to assess Johnson's mental state at the time of the murders and was specifically asked not to do so because the defense was not going to raise mental health issues. W was looking generally for her life experiences and her emotional stability.

3308 - W concluded Johnson had a very stressful childhood, including physical abuse, divorce, emotional abandonment, potential sexual abuse, traumatic religious experiences. This makes people more likely to be depressed, have anxiety attacks, poor life adjustment, higher rates of things like drug use. W found existing depression with Johnson.

3309 – W describes conflict in Johnson's family during her childhood, her mother was the victim of physical and sexual abuse as a child, her mother often blew up. The mother and grandparents also became heavily involved in religion, they had exorcisms. Johnson was held down for 3 hours one time.

3310 – W continues to detail events such as the burning of the children's toys and leaving the house one night because the end of the world was coming. The family drove around without food or water for 3 days following a scar on the mother's leg. Grandmother performed rituals in the basement and the kids had to check each other for the mark of the beast.

3311 – W says he heard it from Wendy, and the mother admitted it. The siblings and the mother's stories all seem to agree about the abuse and the exorcisms.

75

OBR000106

3312 – kids would eventually pretend demons left them in order to end the exorcisms. These religious experiences both terrified the kids and isolated them from other kids in the community.

3313 – They were treated as town freaks. The family moved a lot, which also had an isolating effect. Finally, the mother was so obsessed with religion that she was not there for them in any other way.

3314 – The mother was sexually abused by stepdad, then raised by a grandma that spoke primarily Norwegian and thought kids should be seen not heard. Mother's father died early. Mother fought a lot with Johnson's dad as well.

3315 – W says that fasting during daylight was another component of early life. The mother also read the story of Abraham sacrificing Isaac and when asked by the children, said "yes" she would kill them if led to.

3316-17 – Mother left a healthy relationship to see a married man who would become the dad of the youngest sister Holly, that man died as well. She then drove to Teardrop Orphanage in KS. The Dillos ran the orphanage and were religious. Dillos performed sadistic practices that scared the kids. Dillos had the brother Jim touch electric fences and feed scary hogs and cut the heads off chickens and have them chase the kids. They had the kids witness rabbit butchering.

3318 – W says Wendy said Ted Dillo sexually abused her and Angie, Angie did not remember though.

3319 – W says it is hard to get details about childhood sexual abuse since its taboo and traumatic. The living conditions with the Dillos was very bad and the mother was so absent that some of the kids don't remember her being there.

3320 – after hearing about the sexual abuse from Wendy, the mother finally took the kids away from the Dillos. Older brother described their childhood as being under siege.

3321 – The effects of such a childhood: they have a very poor self image. There have been known to have been shrinkage in certain areas of the brain in children with those sorts of experiences. They can be impulsive, prone to drug abuse and early sexual experiences. This was the case with the two older girls, Wendy and Angie.

3322 – Angie was drinking in 5th grade and doing harder drugs soon… she was depressed and tried to OD when she was 13. Each of the other kids dealt differently, escaping home as early as possible. Angie left school in 9th grade to work at her mother's new restaurant.

3323 – For Angie, it would be hard to single out sexual abuse from all the other stressors. Angie's childhood really predisposed her to being mentally ill. The children were a band of survivors taking different roles.

3324 – angie was the protector. Angie sent her babysitting money to Cambodian orphans, she really needed to rescue people. It is unsurprising they did not get psychiatric care, given its stigma, especially in a small community.

3325 – Angie really wanted to be better for her kids than her mother was for Angie.

76

OBR000107

3326 – W said Angie was married at 16 to Steve Hugo to get away from the home. Then she moved back home and married Arlyn Johnson, they had Alyssa and then broke up. Her family and Angie also talked about a relationship with Terry DeGeus.

3327 – W said there were also police reports about abuse Angie suffered from DeGeus. She had been bloodied by him and hid in motels with her daughter. Angie ran to Wisconsin, but DeGeus called her and claimed to be suicidal, she took him back.

3328 – court takes a break

3329 – kids often felt abandoned by the mother. Mother called the kids a burden at times. As to actual records of depression for Angie, there was a time in 1996 that she went to a mental health center.

3330 -  Angie first discussed some of her suicidal thoughts at the North Iowa Mercy Health Center in Mar 1996, she was referred for additional care to the Mental Health Center of North Iowa, both near mason City.

3331 – Alyssa also suffered from mental problems. The most consistent records as to Angie were after she was incarcerated in july 00 through april 05, from Benton County Jail.

3332 – introduction of some exhibits

3333 – Angie was put on Serzone in Benton County and continued in Black Hawk but then changed to Elavil.

3334 – Elavil can be used for suicide though. W actually interviewed Angie about her suicide attempt.

3335-36 – Angie was depressed that the judge had not granted her bail and about being separated from kids. She tied a sheet around her neck and jumped off the second rail but another inmate saw her. There were signs, letters mentioning death. The attempt nearly worked and was very serious.

3337 – W has dealt with suicide "gestures" and this was not one of them in his opinion.

3338 – it is not unusual for someone deprived of oxygen to be combative when regaining consciousness. W had been aware that Angie had used illicit drugs.

3339 – there is a large correlation between drug use and depression, sometimes places called dual diagnosis units treat both the depression and the addiction. W describes Meth.

3340 – there is a very strong rebound depression from meth use. It is used often by people who are overworked.

3341-42 – Initially they had trouble finding a good antidepressant for Angie, she went through a lot of them, then they came up with Zoloft and Serzone and that seems to be working. She has been trying to work on her family relations. She is not currently suicidal.

3343 – W thinks it is unlikely that Angie will attempt suicide again.


**Cross-Examination of D. Logan by Mr. Williams**

3344-3345 W says that the people chosen for him to interview by Goody were people who knew her that he would have chosen and is reprimanded by the court for being non-responsive.

77

OBR000108

3346 – W did not interview any enemies of Angie or any law enforcement officers. All the people said Angie was a good mother.

3347-48 – W would agree she was a good mother. W would not suggest good mothers buys Tec-9s and deals drugs or gets arrested. W says the time in KS at the Dillos was less than 9 months. W says sadistic is a strong work and the location was a farm and the slaughtering is normal for a farm.

3349 – W says that they placed the children in the path of the dead chickens. W did not hear that the kids help with farm chores.

3350 – W cannot tell the jury that he knows Angie was sexually abused. W says part of the history of Angie he took down included when she was pregnant, her drug use, and what boyfriends she had.

3351 – Angie told W that she did not use illicit drugs during her pregnancy. W did come to the conclusion that Angie suffered from depression.

3352 – W will take Williams word that right before the first report of depression in 96, Angie was busted for the meth lab with Honken. Being incarcerated would be depressing for anyone.

3353 – W agrees 4 murder victim bodies were discovered right before the suicide attempt. Angie drew the map leading to the bodies and now her family would know she was involved in the murder of children.

3354 – depression never cause Angie to fail to hold a job, she was quite productive. The depression did not affect her ability to act on a day-to-day basis. W is not providing an opinion on whether her depression affected her at the time of the offenses in this case and was instructed not to.


**Redirect Examination of Angela Johnson by Mr. Berrigan**

3355 – W says sometimes people can't have the mental state to commit a crime

3356 – W says sometimes mental state can affect charges but he was told nobody was making those kinds of allegations.

3357 – W says there was no insanity claim and he did not look into it at all. The suicide attempt was explained by the fact that Angie realized she was going to be away from her children.

3358 – W says pre 96, other than Honken, Angie was in the process of moving again, to Urbandale, Iowa. She and her daughter were distressed by the move. Alyssa said she wanted to be with her father.

3359 – W said when he said Angie was a good mother, he meant how she was loving and her emotional improvements related to trying to be a good mother. Angie was not always a responsible parent.

3360 – Women in prison can still be good parents. The people W interviewed were people that had known Angie a long time. There were no police officers or enemies in that category.

78

OBR000105

3361 – As for the Dillos, W did not interview them but did interview Carol Mann, who drove them there and suggested they go there. W did not spend much time on farms when he was growing up. W has talked to many KS farmers and has not heard of plucking squirrel's eyes out, or touching electric fences or watching hogs eat kittens.

3362 – the experiences of the Johnson kids were not typical farm experiences in W's opinion.

**Direct Examination of Jamie Hays by Mr. Berrigan**

3363 – full name is Jamie Jo Hayes is from Faribault, Minnesota, 45 mi north of the Iowa border off I-35.

3364 – W lived there 17 years and is married to a bus mechanic. W works at Hy-Vee at night. W is technically part time but puts in 40 hours a week. W has 3 children.

3365 – Jamie is Angela's younger sister. W is 3rd born and is 39 years old. W got married in 85 and moved away from Iowa.

3366 – W's mother is Pearl and father is James Johnson Senior. Father lives in Chippewa Falls, Wisconsin. W does not have any memories of her parent's marriage. They divorced in 68 and W was born in 65.

3367 – W remembers living in Pueblo, CO. Jim is W's younger brother. W remembers moving back to Mason City and living with her mom. W remembers her grandparents being around a lot.

3368 – W says she was not involved with the religious practices but she was subjected to it. The mom and grandparents had a lot of fear in what they believe and W and siblings were intimidated by it. W remembers grandmother playing records about people being exorcised of demons.

3369 – There was a lot of praying and screaming, W thought it was stupid. W says they would lay hand on them and pray until the kids gave some sort of physical reaction. If there was a serious need, the kid would be taken into a room by themselves with the grandparents.

3370 – It happened to W once. W remembers Angie being subjected to the private room treatment. W thinks the grandparents saw stuff in Angie and her mom's personality they didn't like so they tried to get it out. Angie was terrified, they were holding her down and she was just a little kid.

3371 – she was petrified of the bible version about Satan being a roaring lion, the grandparents were obsessed with Satan devouring. There were always demons lurking around the corner somewhere.

3372 – The kids got used to the demon talk. W says Wendy and Angie were more afraid of the demons, W was more afraid of her mom. Angie and Wendy were terrified of the basement.

3373 – When W became a teenager, she and Kim Swalve had to go through the exorcisms. W didn't have fear but a lot of hurt feelings

3374 – Fasting and making the kids watch Billy Graham and doing bible study was boring. They fasted from morning till night every week. Most of the fasting happened in Thornton Iowa.

79

OBR000110

3375 – Mother used to use the belt, they would hide the belt cause they were afraid. If one acted up, they all got beat. They tried to protect each other. Mother took good care of them, they were clean, but she was not very intimate.

3376 – Grandpa Kenny was the best father figure. Andy Jensen too. W did not have a good relationship with her father. He would visit once a year and it was wonderful. W felt very loved and safe around him.

3377 – There was no real joy around mom though, lots of sadness and depression. Most of their toys came from their father. W remembers the TV being smashed in front of them.

3378 – W remembers going to KS, she thinks she was 5, it was very traumatic. They did not feel liked and there was always trouble and fighting. Wendy was very very angry and Angie was fearful.

3379 – W remembers having to feed the pigs and that a pig ate a kitten. W generally did what she was told.

3380 – Her sisters outwardly rebelled. They would oppose mother. W remembers Wendy jumping on the back of someone. W remembers being babysat a lot. W liked the cottage, but doesn't remember where it was.

3381 – W says she was so happy when Carol came to get them, she felt saved. They moved a lot when they were children

3382 – W never really brought friends home, they were isolated, mother would try to proselytize people. W remembers being treated differently than other kids at school.

3383 – W was isolated, kids didn't like her. W had a lot of confusion growing up about right and wrong. Truth was whatever mother said it was.

3384 – W did not rebel, she took it until she married and left. W's brother was very hurt by the religious beliefs, he would go stay with friends. W remembers each of the siblings leaving home around 15 or 16, except Jim who graduated high school first. W graduated from high school as well. W is not close to her mother, but loves her.

3385 – W does not hate her mother, but stays away because W is afraid of how W would feel. Mother would refer to W as stupid and get angry, slap her and pull her hair.

3386 – W was subjected to more serious exorcisms when she was 14 or 15 because she was klutzy and nervous. One time she had a basement exorcism, the other times, just silly praying over her. The basement was not silly. The basement made her feel like a bad person.

3387 – W never confronted her mother about these things. Angie reacted in anger though. W went to counseling in 96 for a couple of years.

3388 – W does not initiate contact with her siblings, but she loves them and is there for them. W says her dad is her best friend. Angie's daughter (Marvea)lives with W.

3389 – Holly had a hard time with Marvea, and there was lots of harassment from school children, so they moved Marvea to W. Since Marvea has lived with W, there has been no harassment.

80

OBR000111

3390 – Marvea will have been with W for 2 years in Aug 05.  She has done well and W is close with her.  Marvea has maintained contact with Angie via letters, visits and phone calls.

3391 – letters from Angie to Marvea were entered into evidence.  W says Marvea gets a letter from her mom about once a week, sometimes they come with gifts.

3392 – W does write Angie and will talk to her on the phone if need be, but it is better that Angie spend her time talking with Marvea.  The calls are expensive and they are collect.

3393 – Angie does speak to W about Marvea's upbringing.  W looks at one of the letters, to her from Angie.

3394 – the letter  contains concerns about Marvea.  W says Angie is active in Marvea's life.  Angie has always been concerned.

3395 – Angie and her daughter talk a lot

3396 – W looks at 2 pictures and says they are of her Aunt Winnie, her dad, her cousins, and one of her on her grandmother's couch. W understands this is a sentencing hearing and that the decision will affect W.

3397 – W has maintained contact with Angie throughout her incarceration.


**Direct Examination of Marvea Johnson Honken by Mr. Berrigan**

3398 – W is nervous and is 11 years old.

3399 – W lives in Faribault, Minnesota with Aunt Jamie, Uncle Tim, Harmony, Heather, and Stephan. W is youngest. W is in 5th grade and is doing well in school.

3400 – W's dad is Dustin Honken, he was in Marion, IL last time W saw him, in prison.  W has to visit him through the glass.

3401 – W also calls and writes her dad.  W has some bracelets on, one from her dad.

3402 – W calls Alyssa Johnson Sissy, Alyssa is in Iowa, they see each other when W visits Aunt Holly.  W is proud of Alyssa for having a good life, Alyssa has a baby.

3403 – W buys presents and clothes for the baby and keeps in touch with the baby and thinks she is a pretty good aunt.  W visits her mom through the glass in Eldora.

3404 – W has not hugged her mom since she was 6.  W never went to a special school for kids with parents in jail, but went to camp last year called Angel Tree Camp.  It is a camp for kids with a parent in jail.

3405 – W says the camp made her realize she was not the only kid with parents in jail.  W used to live with Holly but she was getting teased at school about her parents crimes so she moved out of the state.

3406 – It is better in Minnesota, but sad to live away from her sister.  W was close to Haley too.

3407 – W keeps busy helping her aunt with the foster care and day care and chores.

3408 – W would call her mom every day if she was allowed.  Angie calls W once or twice a week.

81

OBR000112

3409 – W remembers listening to tapes of telephone calls last night with Mr. Berrigan. A tape is played.

3410 – court takes a break, **Mr. Berrigan notifies judge that they want the court to reconsider the motion re: a contact visit.**

3411 – W identifies a pic of W and her aunt.

3412 – W has played the piano for a year and a half. W plays while on the phone with her mom sometimes. W says they don't normally get to talk very long.

3413 – after the voice says one minute remaining they have to say good bye very quickly. W likes to draw, like in the Celebration of Faith book.

3414 – W says the Celebration of Faith book is like an advertising book and she drew a picture of Jesus and a cross and a dove that is in the book. It won a prize.

3415 – W won one other prize from drawing. The drawing contains a drawing of a cross that W wears and received from her mom.

3416 – A friend of W's mom from jail made it and her mom sent it to W. W's mom dyed it red by crushing a colored pencil. W's hair is growing out so she can cut it and give it to Locks of Love.

3417 – W does not tell people where her parents are, instead she says they are spies or in government business. W thinks most people believe her. W has memory binders, collections of things you get like letters and news clips from her mom.

3418 – Aunt Jamie came up with the idea for memory binders. W just started filling them herself a couple weeks ago. Aunt Jamie did it before that.

3419 – W recounts the day her mom got arrested. W was playing with Haley and Mike called them down. She came down and saw her mom handcuffed. Mike and Holly said Angie was going to Cedar Rapids. W thought they said rabbits and that her mom was going to play with rabbits. W hugged her mom.

3420 – W was in first grade at the time. In a picture taken the year before, W is getting ready to play basketball.

3421 – W says her mom painted the gym in her kindergarten. W says her mom says she loves her on the phone and W believes that her mom loves her.

**Direct Examination of Shelly Johnson by Mr. Berrigan**

3422 – W lives in Chicago area and is married to Angie's brother Jim. W has two children.

3423 – Morgan is 9, Gable is 7. W is a substitute teacher. W met Jim and his family in Forest City Iowa when W was junior in high school, Jim was a junior as well.

3424 – W says Jim was handsome with an excellent personality. W was introduced to most of the family after they were dating. Jim was self-conscious about his family.

3425 – W thought Jim seemed pretty normal. W realized Jim's mom was very different right from the beginning. Jim's mom never attended any of Jim's sports games.

3426 – W says neither Jim nor his mom would attend any awards banquets and they would not discuss it. It was a touchy subject. W and Jim graduated from high school. Jim had a

82

OBR000113

full scholarship to U of Iowa for football.  Jim would not have attended college without the scholarship.

3427 – W and Jim dated throughout college.  Jim's mother was not supportive of Jim leaving her.  Jim had a hard time the first year of college.

3428 – Jim's mom told him to quit college and come home, but friends and coaches convinced him to stay.  Angie loved Jim very much, W was closest with Angie and believed she was protective of Jim.

3429 – Angie came to some of Jim's sport events.  Jim stopped having contact with his mom when W and Jim got engaged.  Mom had decided not to attend the wedding among other factors.  They were married on June 1, 1991.  Pearl Jean did not attend Jim's college graduation.

3430 – Jim confided in W about his nightmares and some childhood experiences starting in high school and throughout their relationship.  W saw Jim have a nightmare.  The nightmares have now stopped.

3431 – W says they did revisit some of the memories in preparation for the trial but they are careful and don't talk about it very much.  Jim's childhood affected the way he treated his kids, he would not let his kids go to bed hungry, even if trying to teach them they have to eat their dinner.

3432 – Jim also did not make the kids eat things they did not like.  W says usually he is very laid back, so that is unusual that he would take such strong positions.  There was no discussion of why he felt strongly about it.

3433 – Jim said he might need help dealing as the kids grew up.  W says that he is a great father, but that he was nervous.  W's kids do not have any contact with Pearl Jean, they know nothing about her. W has had contact with Angie and do provide her with some financial support, to allow Marvea to continue to have contact with Alyssa and Angie.

**Direct Examination of James Jeffrey Johnson Junior by Mr. Berrigan**

3434 – W lives in Chicago

3435 – W lives with his wife Shelly and their two kids Morgan and Gable.  W is Angie's sister.  W is 38, Angie is 41.  W works for a small appliance company, managing sales professionals.

3436 – W majored in liberal arts and graduate from U of Iowa in May 91.  W's father is James Johnson and his mother is Pearl Jean.  W does not remember his parents being married.

3437 – W's first memories are from living in Thornton Iowa with Pearl Jean.  W says they often got beaten with belt or hand, if one goes down, everyone does. W says no one would say anything in an attempt to protect all the siblings.

3438 – W's mom used a belt and a paddle, and her hand.  She hit hard, hard enough to leave welts.  W said you just knew it was coming.  Fear was a common thing in the house.

3439 – The feared demons and the power of good.  W's mom made them live in fear of God and discussed the devil a lot.  W said he never heard tapes of religious stuff.

83

OBR000114

3440 – W's mom would lay on hands and speak in tongues, to physically heal people. She also tried to rebuke devils in the children in that way. Mom would convince the kids they had a bad spirit in them, then go through a prayer session, if the kid gave some physical sign, like a yawn or something, it would be over.

3441 – Some of the practices involved physical restraint. W remembers a time in first grade, it started with Wendy, it was loud, it was done in W's room. The kids would come out crying, beat, and worn down. W said he heard bodies getting thrown against walls, and loud noises and speaking in tongues.

3442 – Angie would coach them to not resist to avoid the exorcisms. The sisters didn't take it though. W says they would have 2 hour bible study sessions. Additionally, they would go through day long fasting. W never complained to other adults.

3443 – W says they thought it was normal. W says her grandmother Florence was a nut job, she thought the TV was the devil. W does not remember a lot of toys. W says Jim Johnson was in Wisconsin and they did not see him regularly.

3444 – W says him mom did not like them seeing their dad. W was about 4 when they went to KS. W says they lived in a shed with mice. W felt alone there.

3445 – W does not remember his mother being there. W remembers being chased by a bull and remembers the hogs eating kittens. W remembers touching an electric fence cause Ted Dillo made him.

3446 – W says behavior toward himself and his sisters was aggressive. Angie and Wendy tried to defend them. W remembers having a bar of soap put in his mouth for not eating black-eyed peas. W remembers seeing a cow butchered on a table.

3447 – W does not remember incidents involving chickens or rabbits. W has never had any counseling but has had reoccurring nightmares from the time in KS.

3448 – When W got back to Mason City, he developed friends and began to realize his home life was not normal. W started to spend more time at friends homes.

3449 – During elementary school, the kids were mean to W, but he developed close friends later. W's mom was not supportive of school or other activities. W had coaches provide him with what he needed to succeed in sports.

3450 – The same was true for Holly. W likes to think that the lack of financial support was due to lack of money.

3451 – W's attitude about religion changed as well, he learned it wasn't normal. W believes his mom loved them, but it was a different kind of love. But she made him miss his greatest day in high school, the awards banquet.

3452 – W's mom said she couldn't go because she did not prepare anything. After W went to college, he distanced himself from his mom. She was embarrassing with trying to lay hands on roommates, etc.

3453 – W says Angie escaped the house, she didn't leave. Wendy escaped too. It was hard on them because the sisters protected W. W became distant when he left, even with respect to Angie. W says conversations with the sisters always ended up with "remember when" and he was beyond that. W has no contact with his mother now.

84

OBR000115

3454 – It has been over 14 years since W had contact with his mother. W's kids do not know W's mom by design as a result of W's experiences. W's kids have a normal life and it is important to W to protect that.

3455 – W had good success playing football in college. Dan McCarney was W's coach in college. W did not know what he had his first year.

3456 – W says he was lucky to have his wife and coach to help him. W has had contact with Angie over the last 5 years, letters mostly and mostly from Angie. W says Angie is consistent and loves them.

3467 – W has provided some financial support so Angie can speak to her daughter. The sentencing decision will affect W, he will maintain contact with Angie if she is given life. W identifies a picture of himself as a little boy.

3468 – W says he is probably 3 or 4 in the picture.

**Direct Examination of Carol Mann by Mr. Stowers**

3459 – W is from Mason City, Iowa and had lived there probably 30 years. W is retired but had several real estate rentals, residential.

3460 – W is not married but was in the past and has a couple children. W mean Pearl Jean in '71. They were introduced through W's ex-sister-in-law, W was pregnant.

3461 – The second visit, W initiated because she liked Pearl Jean. W came to know the family, but not Jim Johnson, Pearl's husband, they were already divorced.

3462 – the very first time W visited, there was a lot of praying going on and W just sat for a long time. W came to know Pearl's mom and step dad, who were living with Pearl at the time. W sat for an hour or two while people walked and prayed and spoke in tongues. Pearl Jean asked W what she felt and W said all she felt was a bunch of fear.

**CAROL MANN – DIRECT EXAMINATION BY DEFENDANT [MR. STOWERS]**

*Continued from Vol. 2*

3463    I remember receiving religious tapes by a Bishop Whitlock. He described a kind of deliverance by hitting things to release anger. I gave some of the tapes to Jean in the '70s. Jean's mother got the tapes and "got a little strange with them."

85

OBR000116

Jean said she made a mistake letting her mother listen to the tapes because her mother thought they were "the answer." *Q: Did you observe any other unusual religious practices?* Jean's mother and stepfather wouldn't let them have any ornamental items, calling them idols that distract people, making them worship material things.

Jean and her mother fasted a lot, and her mother made the children fast. They took a trip where they drove around for three days and the children didn't eat at all, I think. It had something to do with end times, like the end of the world.

I believed Jean's heart was "right in the things of God," but her mother's influences were a problem. Jean would feel sensations like a pinprick that she thought was God getting her attention, then she'd flip her Bible open to find his message.

Jean told me God communicated with her. He instructed Jean to move, saying the words "Jerusalem" and "Paul," so they moved to a place on Jerusalem St. in Klemme. Jean also made predictions.

In 1973, Jean told me to put her affairs in order because I was going to die. I believed Jean got messages from God. I had a breakdown, I was so afraid.

*Q: Did you know Ted and Bobbi Dillo in Chanute, KS?*

86

OBR000117

3470 I moved to Chanute with my ex and met the Dillos at a church in '69. They were friendly, had two adopted kids, invited us to Bible study, and I regarded them highly.

3471 I met Jean in 1971 and found out about her pregnancy in about 1972.

3472 The pregnancy scared Jean. She was worried about her mother finding out and considering adoption. I told her about the Dillos, who wanted to adopt. I called and they agreed to take care of Jean and her children and support them.

3473 I drove Jean and her children to Chanute shortly thereafter because Jean didn't drive. I didn't stay.

3474 Jean and her four children lived in an old garage in Chanute.

3475 Jean maintained her home in Thornton, IA, the whole time she was in KS, but I wasn't sure how she was supporting herself. Jean said she was miserable and frightened. One night Jean called me very upset and wanting to leave.

3476 I left immediately to pick her up. I didn't know what was wrong, but I knew it was important. I drove to KS through a snowstorm.

3477 Jean's kids were ecstatic to see me arrive.

87

OBR000118

3477-78   [*Ct dismisses jury; P & D discuss jury* instruction. *D has proposed a modification to an instruction, but no reference is made to which instruction or how it was modified . P has agreed to the new language. The Ct asks to see it, and D promised to provide a copy. Jury returns.*]

**Comment [SO1]:** Can you elaborate on what instruction? What was the issue? Who wanted what instruction? Was there a court ruling involved?

3479   I packed Jean and her children up and headed right back to IA. A few days later, Jean told me she believed Dillo was molesting her daughters.

**END OF CAROL MANN'S DIRECT EXAMINATION.**

**NO CROSS-EXAMINATION**

88

OBR000119

**HARVEY DESOTEL – DIRECT EXAMINATION BY DEFENDANT [MR. STOWERS]**

Witness sworn in.

I'm a sergeant for the Linn Co. Sheriff's Dept. in Cedar Rapids, IA.

89

OBR000120

I've been in law enforcement since 1971. I joined the Linn Co. Dept. in 1977 and have been there ever since in several positions. During the period of October 2000 through August 2004, I was one of 5 sgts. working in the Linn Co. Jail.

My duties included day-to-day operations of the jail and oversight. We worked 12-hour shifts, 80 hours over a two-week period. About 80 people total work at the jail.

At that time, our average daily count was about 350 inmates. About 30 of those would be women, who are housed on the 3rd floor in the M, N, and K blocks. The men's medical unit (I block) is up there too.

M block is dormitory style, with bunk beds in an open area, and houses 20-25 women. N block contains 5 individual cells where the inmate is locked down by herself at night. K block contains 2 cells with bunk beds, so it houses 4 prisoners.

The 3rd floor houses federal inmates, work release inmates, and people awaiting trial. Pre-arraignment, they're held on the 1st floor, then we move them to the 3rd floor to await trial. Federal inmates could be there because they're testifying, or because they have cases pending.

90

OBR000121

Linn County is the second-largest jail in IA. On average, one female CO feeds the female inmates in all three blocks. I came to know about D, just like other inmates, because the staff reports problems to me.

D's probably the only female Linn Co. inmate I know who served that long continuously. I recall she and CO Vicki Kosina didn't like each other—it's not uncommon for that to happen between particular COs and inmates.

COs make entries into our "B map log" for inmate activity. CO Kosina's number is 428. [*D shows Gov't Exhibit 1146, a computer printout showing Angela Johnson's behavior warnings from jail.*] I counted 60 different warnings on this exhibit.

*Q: 60? Not 89?* No. I can see why someone might miscount it. When you log an incident on the computer and run out of space, the computer starts another entry. The same incident will show up on multiple lines.

Johnson wasn't a model prisoner, but she wasn't the worst. She's pretty average.

She had a few disagreements with staff, one fight with an inmate. Behavior warnings are minor infractions that don't warrant disciplinary action: an argument with a CO, having pictures on cell walls, not showering.

91

OBR000122

Most of D's infractions in that document were minor, like clothing infractions, or not having her green uniform top on. Most were reported by CO Kosina.

A CO could enter lots of behavior warnings if she disliked an inmate, but a supervisor would note it and talk to them. *Q: Did Johnson indicate she was acting in self-defense in that fight you mentioned?* Yes, but I haven't read the report recently.

When inmates fight, both get charged and put in lockdown for 24 hours while we investigate. Jail is a different world. If you don't defend yourself one day, you'll have to fight the next day too.

If we find one person was trying to back out of the situation, we charge the other (the attacker). Johnson's record [regarding fighting] is way below the norm. And 60 behavior warnings sounds high, but over 4 years, it's only 1-2 a month.

Female inmates are supposed to wear their green jump-top uniforms in the day room but often don't, or they roll their pant legs up.

Those are some of the warnings I saw on Johnson's record. Also not coming out of cells at the right time, bad attitude or language toward the staff.

Inmates have their own routines and rules. D would always sit at the same spot. New inmates don't know the rules and there are conflicts. There are rules within rules.

92

OBR000123

3499 Inmates on N and M blocks had very little room. The day room has bolted-down steel tables and an open steel toilet without any privacy.

3500 The stools are steel and bolted in place. The only other thing is a TV. Inmates had to spend from lockout till rest times and then till lockdown there. It's very cramped.

3501 D wasn't a prisoner we had to watch all the time, other than minor scrapes and arguments. She was a typical inmate.

3502 [*DEFENSE EXHIBIT 2118, a computer record of jail visits to Johnson, received.*]

3503 Johnson got her GED at Linn Co. through the program handled by our chaplain. [*DEFENSE EXHIBIT 2026, paperwork related to Johnson's GED, received.*]

3504 The jail has a voluntary alcohol and substance abuse counseling [ASAC] program for inmates. Carol Meter ran it during time in question. [*DeSotel identifies a letter from her. Letter received as DEFENSE EXHIBIT 2168.*]
{Ed.: Why bother? D never establishes she was in the program or explains what was in the letter or its relevance. Why the record of visits?}

3505 About 3 years ago I got certified to teach. I have to recertify every year.

93

OBR000124

In March 2003 we (a group of teachers) did a study about how inmates read and what they liked to read. I passed out questionnaires to the inmates.

[Johnson read a lot.] One of my jobs at the jail was to buy books, and I'd get kites asking for new books. I think Johnson enjoyed the study because it broke the routine.

I selected D because she liked to read. I asked her if she'd participate and she agreed. She had a Q-and-A session with the other 4 teachers. I didn't participate because inmates speak more freely when staff isn't around.

She talked to the teachers in an open conference room while I watched through the window. D was unshackled. The teachers found it very interesting.

**HARVEY DESOTEL – CROSS-EXAMINATION BY PROSECUTOR [MR. WILLIAMS]**

[DeSotel agrees with Williams that rules are needed for orderly, safe operation of the jail, and even rules that seem odd have reasons.]

Inmates wear different colored suits so that we can tell automatically when a person is not where they should be. [Jail staff has to enforce those rules. Their job can be dangerous.] *Q: How many female COs were working in that area during daytime?* Kosina worked 4 to midnight.

94

OBR000125

2 COs usually work days, but Kosina worked nights alone. When there were warnings for minor infractions, COs would go ahead and enter them. Sometimes they'd call a sgt., and that's where you see her number and the sgt's in the log.

Kosina was very uncomfortable around D. *Q: Wasn't the person D fought with half her size and half her age? Didn't she pull her hair, throw her into a wall, then hit her face with a closed fist?* I haven't reviewed the report, so yes, if that's what you say happened, sure. I didn't handle the disciplinary part of it, so I don't know what happened with her self-defense claim.

**END OF HARVEY DESOTEL'S CROSS-EXAMINATION.**

**NO REDIRECT EXAMINATION.**

THE COURT ends for the day, telling jurors it's possible they'll be done with the evidence on Thurs. Regardless, they'll take a break and return the following Mon., June 20.

95

OBR000126

If there's no remaining evidence, the case will go to the jury Mon.. If there is still evidence, it might go to the jury on Tues.

[*The jury leaves the courtroom;  THE COURT addresses the attorneys.*]

C: Any concerns other than the limiting instruction?

P [MR. WILLIAMS]: No.

C: I haven't ruled on D's allocution motion, but I haven't read P's resistance.

D [MR. BERRIGAN]: OK. We don't have any other concerns.

D:  We have a final matter before recess.

C:  OK.

JOHNSON: Your honor, I'd like to thank you for the contact visit with my daughter Marvea. … I can't tell you how grateful I am. Thank you very much.

C:  I'm pleased to do it. I'm unsure we need this limiting instruction. The D has opposed it. There's nothing wrong with giving it; it can't be error to do so.

D:  No. It's a matter of waiting to hear all the evidence. We feel we won't need it—

C:  You made it clear with Dr. Logan, and I assume you'll do so with the others. I'm not enamored with the [new] wording.

P:  It was D's wording.

D [MR. STOWERS]: Figures.

C:  Which you agreed to.

P:  We're open to changes.

C:  Do we need to instruct it? Where would it go? It doesn't fit well with the others.

96

OBR000127

P: Penalty phase final instructions don't mention expert testimony, which is where it would normally go.

C: It's probably a stand-alone. Let's run through it, but I'm not sure I'll give it. I'm thinking "Mental Health Expert Testimony" for a title. 1st sentence OK: *You have heard expert testimony concerning D's mental condition.* 2nd sentence OK: *This evidence has not been offered for the purpose …*

*of exploring her thinking or behavior at the time of the offenses charged.* I'd say "charged offenses." (Or, but the D won't like it, "at the time of the 5 murders," or "the murders," then list them.) Then *You may not consider it for that purpose.* I'm not sure we need this last sentence: *You may, however, consider it for any other purpose.* The evidence isn't really relevant for any purpose in the world. But I don't feel strongly about it.

D [MR. BERRIGAN]: Without it, there may be a question about what the testimony is to be considered for, if at all—that's our problem with the instruction. We'll make it clear the experts aren't offering a quasi-defense to the crimes…

It's unnecessary. It raises an issue about why they're here. But we'll try rewording it.

C: I thought you'd tie it to mitigation.

D: That's the point. Maybe we should suggest the testimony's purpose now that we're saying it doesn't go to her mental state at the time of the offenses.

P: Maybe we should tie it specifically to the mitigating factor the D is arguing this evidence supports.

97

OBR000128

D: Jurors can consider any aspect of her background and character in making a determination—

C: Do we give that one a number?

D: Yes.

C: We could tie it to the numbered mitigation factors and to the general catchall.

D: We could.

C: Generally a limiting instruction tells the jury you can't consider it for A but can consider it for B. That's why it makes sense to tie it to the mitigators, but I don't have strong feelings about it.

D: We give limiting instructions because we're concerned the jury will consider evidence in an inappropriate way. So far, there's no danger of that. We're making it very clear this has nothing to do with her mental state at the time.

C: Assuming they do so, P, why do we need the instruction?

P: Because it's an instruction to the jury. They've heard this expert say, "I'm not offering it for that purpose," and D saying, "I'm not asking you about it for that purpose," and the jury needs to be instructed not to use it inappropriately.

C: Either leave the last sentence alone or tie it to the mitigation. I think I'm going to give it. Even though D wouldn't argue it inappropriately, the jury's entitled to hear it. But I don't want to overemphasize it.

98

OBR000129

3522    C: Let's work on wrapping it into the 1st introductory instruction and iron it out by tomorrow. Any issues about closing arguments?

D:  The Court gives attorneys as much time as they want. I'm not opposed, as long as both parties are held to equal time and we know how much beforehand. It's not fair that P's rebuttal could be longer than the D's closing, as happened in this trial and Mr. Honken's trial. …

3523    If the P gets up for 1.5 hrs after the D used 45 min. for closing, it disadvantages the D, esp. if we don't know beforehand how much time they'll take.

P:  I've never sandbagged anyone in closing. …

3524    I don't know how long rebuttal will take until I know what D says.

D:  I have no problem with him saying, "I need 3 hrs." "OK, you've got 3 hrs."

C:  How is that different from saying take as much time as you need?

D:  We're not going to need 3 hrs. The point is it's a rebuttal.

C:  The concern I'm sensitive to …

3525    … is lawyers who sandbag, give a very brief opening, kind of sucker punch the D, then come back with everything in rebuttal. That's not fair. I put a stop to that. I don't see a need for imposing that rule because P has no history of doing it.

D:  In 20 years I've never had a closing that wasn't timed, or where one side got one minute more than the other.

C:  Judges give you time limits?

99

OBR000130

D: Absolutely. And you can't use more time for rebuttal than for your 1st close.

Even if P had 60 min., if they used 20 in the first half, then all they had for rebuttal was 20. The advantage is the jury doesn't see P any more than they see me. When our client's life is on the line, that means something to me. I don't want him to have 1 more min. than I do to argue about whether my client dies.

C: How much time will you need?

D: One hour.

C: So I'd give you each an hour, and P can't take any more time in rebuttal—

D: He tells you how he wants to split it, like 30/30, so he'd go for 30 min., I'd go for an hour, he would go for another 30.

C: I'll consider it. We'll talk about it tomorrow. [*Trial adjourned.*]

100

OBR000131



**THERESA MILTON – DIRECT EXAMINATION BY DEFENDANT [MR. BERRIGAN]**

[*THE COURT reconvenes the next morning.*] Witness sworn in.

101

OBR000132

I am in custody for 5 counts of forgery, but it all ran concurrent. I was convicted about 5 years ago, got probation, but got revoked.

I've been in jail just a month. I met Angela Johnson at Black Hawk Co. Jail in 2000 for the same charge I'm doing time on now. I had 5 yrs probation but I kept messing up and doing the same thing, doing drugs bad.

I violated my probation because I kept using crack and dropped dirty. Johnson was there when I arrived. The jail had areas for women and men. F pod was for ladies.

She and I were in a maximum security pod, 4 cells for 4 ladies. There's a separate place for eating, then you go back to your individual cell. There were 2 floors in F pod. I was on the 2nd, she was on the 1st. We got along great.

She was easy to talk to and understood my problems. She was a wonderful person. We were both mothers, and had problems with drugs and bad things guys did to us. We talked about personal stuff. She loved her kids unconditionally.

We had talked about suicide. When I got to F pod, I was thinking about killing myself. I saw the psych nurse. Then I started talking about that stuff with Johnson.

102

OBR000133

I told her about it, but I didn't attempt suicide. I started getting better with medications for my depression. I don't know if she took any meds.

She didn't say she planned to do it. She asked what I would do. I said I'd get an extra sheet and take some cleaning stuff. I didn't worry about her at the time.

We talked about suicide for a couple days. *Q: Did you see/hear Johnson using the pod telephone around Oct. 13?* Yes, I was listening. She cares for her kids a lot.

She was like saying goodbye to them. She talked about if anything happened to her, her sister would take care of them. She didn't mention suicide. That day we had to clean our cells. We stripped our beds and put the sheets in a cart where the guard was.

We get 2 sheets. Johnson wasn't herself, she seemed really antsy and like she had a lot on her mind. The guard gives us a spray bottle of cleaning solution to clean our cells with. He has to know where it is at all times. You could take the cap off.

As we cleaned, the guard lost track of the bottle. She had it and wouldn't give it back to me until after she went back in her cell. We had talked before about what would happen if we killed ourselves. I read in the Bible that if you take your own life you won't get in to heaven, and I told her about that.

103

OBR000134

When she came back from her cell with the bottle, she said she didn't find that part about not getting into heaven in the Bible. I didn't see if any cleaner was gone. I first noticed something was wrong when I asked her for stuff to write a letter. She brought it to me, but there was no envelope. She left to get one, but she never came back.

I heard something like a person breathing really fast, trying to catch their breath. Another woman saw Johnson hanging there. We banged on the door for the guards. From my cell I could see them trying to get her down. She was hanging by some sheets from the top of her cell.

I see now she was making plans on the phone and knew what she was going to do. She'd been upset because her boyfriend was no good, she was afraid of him, she'd heard that her appeal—maybe a bond reduction—was denied. She told me earlier her lawyer had visited, she didn't want to talk to him or anyone else. She was taken out of Black Hawk and never came back while I was there.

**THERESA MILTON – CROSS-EXAMINATION BY THE PROSECUTOR**

**[MR. WILLIAMS]**

*Q: You shared personal info?* Yes. *Q: About how much she cared for her daughters?* Yes. *Q: About buying  her boyfriend an assault weapon, helping him locate Greg Nicholson, or helping her boyfriend enter his house?* No.

104

OBR000135

*Q: Did she tell you she bound up or held a gun on Nicholson, Lori Duncan and 2 girls, helped take them to the woods, held the 6- and 10-year-olds while Honken shot Nicholson and their mother, then held them until Honken blew their faces off?* No.

**THERESA MILTON – REDIRECT EXAMINATION BY DEFENDANT [MR. BERRIGAN]**

We didn't discuss the allegations against her or the facts of either of our cases. We didn't ask any questions about them.

**DAVID NIEMAN – DIRECT EXAMINATION BY DEFENDANT [MR. BERRIGAN]**

105

OBR000136

I live in Forest City, IA.

I was born there. I graduated from the high school in '81. I do construction work.

My mother was good friends with Angela Johnson's mom. We had siblings about the same age, Angie and I are about a year apart, so we kind of grew up together.

Angie was a year behind me in school. I didn't know her mom very well. I avoided her because she scared me. She practiced religion a different way.

Religion is mostly what our moms had in common. They were both very religious, but in different ways. My mom talks a lot about Jesus and God, but Angie's mom believes in casting out demons, that everybody's possessed. I went to a couple of times where she tried to cast out the devil.

She accused me of being possessed by demons. I saw Pearl Jean attempt to cast out the devil on her own children. She'd hold her down, put a cross up to her, pray over her—"the kind of stuff to where I don't really want to remember much." It was scary. Her children hated it. [He also knows Wendy, Jamie and Jim.]

Angie dropped out and married Steve Hugo. I know him by name and face, but that's about it. I didn't see her much after that.

106

OBR000137

We grew apart, but then later she married my friend Arlyn Johnson. I saw them regularly and bought the trailer next to theirs. I went to their wedding reception.

Pearl Jean wasn't at their wedding. I don't think she was there when Angie married Steve Hugo. I know she was against that. It surprised me when she and Arlyn married, but I think it had a lot to do with her being pregnant.

I was pretty close to Arlyn (who goes by A.J.) at the time. Their marriage was kind of one-sided, like he neglected her. She had no ring. Once he bought her a vest for Christmas that didn't fit her, but fit him, so he kept it. She got nothing.

They broke up and she ended up with Kirby Thompson, who I know from around town. I never met Angie's father, Jim. She hated him and didn't talk about him.

He neglected her and said he didn't want anything to do with the kids. She didn't talk about her childhood. "There's some things I think she don't want to remember." Next she dated Terry DeGeus. He had a temper and was known as a "bad-ass." I never fought him.

I've seen him fight, mostly in bars. He gets such an adrenaline rush you could hit him with a bat and it wouldn't faze him. I thought their relationship was good until one

107

OBR000138

time I saw her walking down the highway. Terry had beaten her, pushed her from the car while it was rolling, and left her to walk home.

I picked her up. It was nighttime. She was scratched and cut up from rolling on the ground and had red marks on her face. I took her to a gas station to clean up.

Terry showed up there, they talked, and she left with him. I told her she should get away from him. I avoided both of them because "Terry was trouble."

Terry dealt meth. I met Dustin Honken once, when Angie dated my friend Todd Graham. We went by her place. Honken was there and she introduced us. She and I reconnected after she broke up with Terry and Honken and started seeing Todd.

We've kept in touch while she's been in jail. I know her daughter Alyssa well. Angie calls me collect and I put her daughter and granddaughter on the phone to talk. This happens maybe 2-3 times a month, costs $10-15 a week.

Angie and I talk on the phone and she writes me letters. She has a really good relationship with her daughters. When they talk there's often lots of crying.

**DAVID NIEMAN – CROSS-EXAMINATION BY PROSECUTOR [MR. WILLIAMS]**

108

OBR000135

I had contact with her after she was involved with DeGeus and Honken. She also dated Rick Summers around 1997-98. I introduced them. *Q: Because you knew Johnson paid $600 per oz. for meth and Summers was paying 4 times that from his source?* No. No, I've never bought meth from her.

*Q: Was Terry Olson her customer then?* They were friends. *Q: You didn't get meth from Johnson?* No. *Q: You've used?* Yes. *Q: Where'd you get it?* Not from Angie. If someone turned me on to some, I'd do it. *Q: Did DeGeus beat her?* I know that once for sure. *Q: Was that a motive for revenge?* I don't know how she feels about that.

She loved him, so what revenge could there be? *Q: Did Alyssa Johnson stay with you?* Yes, when Arlyn was. *Q: Did she move in after Johnson's arrest?* No. *Q: Who's Rita Chumbly?* My ex. *Q: Did Alyssa spend lots of time with you?* She was doing yard work for money. *Q: Wasn't there discussion among you, Rita, and Johnson about you and Alyssa?* She thought we were doing something, but we weren't.

*Q: Wasn't Johnson angry with Rita sometime last fall?* I wasn't there but I heard they argued over the phone. *Q: Didn't Johnson tell Rita if she didn't leave Alyssa alone she'd take Dave [you] away and come after her?* Rita said Angie threatened to take me away from her, but not to come after her.

109

OBR000140

**DAVID NIEMAN – REDIRECT-EXAMINATION BY DEFENDANT [MR. BERRIGAN]**

It would be hard for Johnson to come after Rita. Rita lives in Forest City.

She has a car and knows where Sioux City is. Rick Summers lives in Belmond, 35 miles away. He has a car and he knows where Sioux City is.

**END OF DEFENSE WITNESS DAVID NIEMAN'S TESTIMONY**

110

OBR000141

111

OBR000142

**ROSWELL LEE EVANS JR. – DIRECT EXAMINATION BY DEFENDANT**

**[MR. BERRIGAN]**

I have been a professor and dean of the Auburn U. School of Pharmacy for 10 yrs. Education: BA, U. Ga.; Pharm. D., U. Tenn.

Residency: Med. U. SC. I taught at Tenn., then at UMKC, where I taught psychiatric medicine for 19 years. I'm a pharmacist, not a psychiatrist, but psychiatric illnesses are primarily treated with medication, so I'm an expert in treating psychiatric illnesses with meds.

I went to Auburn in '94/95. I oversee our three departments, research, social behavior, and practice, and our faculty of 66.

I maintain a clinical practice. I'm licensed in MO and GA, not AL. But 95% of my work is administrative, and I work with a licensed practitioner there.

I'm a board certified psychiatric pharmacist. I've testified about 20 times, the first time in 1985 at [Berrigan's] request. I've testified for the P a few times.

I belong to several professional associations. I'm usually asked to testify about substance-induced behavioral problems, often in capital cases. I get $2500/day.

112

OBR000143

You contacted me to appear and provide background information about meth. I have never seen Johnson, nor received any material on her case. *Q: Are you here to testify about anything having to do with her state of mind at the time of the offenses?* No.

Meth is an upper, a psycho stimulant, originally used therapeutically for ADD and weight loss. It's never used medically anymore: it's incredibly addictive, it hit the black market and was being abused, and now it's made illicitly and abused often. Its most familiar street names are chalk, crank, or crystal.

About 7% of adults have been exposed to it and about 1% abuse it. That's startlingly high. It's become an epidemic over the last 10 yrs because it's so easy to cook and has a high street value.

The most common way to make it is to take pseudoephedrine—cold medicine—and convert it. Pseudoephedrine is readily available. There are some controls in the U.S., but not in Canada or Mexico. A huge amount comes in.

The Midwest has a serious meth problem. You can smoke meth, like you would cocaine. There's an immediate, intense effect. You can also inject it, snort it, or take it orally, but there's less of an impact.

113

OBR000144

The difference between crack and meth is that the meth high lasts much longer. Users describe an intense, euphoric rush, and that reinforces using the drug. Meth causes the intense release of neurotransmitters.

When you first use it, your receptors repair themselves. Over time, they become kind of worn out so you have to use the drug more often to get the same high. Neurotransmitters are substances that control thinking, motion …

and heart rate. The transmitter's released, goes across the synapse, and impacts the other side of the neuron, causing the transmission of an electrical impulse that helps us communicate internally. We always suspected meth addicts suffered long-term damage, but that was based on post-mortem brain studies.

Now PET scans let us see meth's effect on the brain while people abuse it. We know that chronic meth and cocaine abusers start having fewer of those receptor sites. It improves a little when they stop using, but some effects are permanent.

As far as we know, this problem is unique to meth. Antipsychotics work on receptors, but not with this effect. A person with this type of damage might have difficulty controlling outbursts or anger, maybe memory issues, a higher propensity for readdiction or psychosis. Organ systems would be affected too.

114

OBR000145

The only treatment is abstinence; there are no meds. You have to get the user into a program to stay off the drug and allow the brain to heal to the extent it can.

**ROSWELL LEE EVANS JR. (PHARM. D.) – CROSS-EXAMINATION BY THE PROSECUTOR [MR. WILLIAMS]**

In KC in the late 60s/early 70s I treated a lot of meth users. 43% of the psychiatric population we treated was involved with stimulants, meth as well as cocaine.

*Q: Have you been treating users in the last 10 years?* In Auburn, I mostly treat psych patients. I see some users, but not like in KC where I was on the frontline every day. *Q: Some people are in the meth trade for profit, not to use?* Yes. *Q: It affects people differently?* Yes. *Some get addicted, others can use it recreationally?* Yes.

*Q: Are people involved in the drug trade contributing to this epidemic?* Yes. *Q: Is drug dependency a recognized psychiatric diagnosis?* Yes. *Q: Was Johnson diagnosed?* I don't know. *Q: You don't know anything about the D, weren't asked to evaluate her?* No. *Q: You could have if they asked?* Yes. *Q: Any idea what Johnson's drug usage was?* No.

*Q: You don't know when or how often she used meth, or how much?* No. *Q: You have no reason to dispute the report she quit while she was pregnant?* No. *Any reason to*

115

OBR000146

*dispute that  when she helped murder 5 people she wasn't using?* No idea. *Q: Any idea whether meth had any impact on her ability to function?* No. *Q: You're here to tell the jury the  effects meth could have, but you have no basis to suggest these long-term effects apply to Johnson?* No.

**ROSWELL LEE EVANS—REDIRECT EXAMINATION BY DEFENDANT**

**[MR. BERRIGAN]**

[Compared to other drugs,] we know exposure to meth has a very high likelihood of leading to addiction, especially with repeated use.

**END OF TESTIMONY BY ROSWELL LEE EVANS**

116

OBR000147

117

OBR000148

**DOUGLAS BOOK—DIRECT EXAMINATION BY DEFENDANT [MR. STOWERS]**

Witness sworn in.

I entered law enforcement in '68 and have been the Forest City chief of police since '74. I have a BA in Law Enforcement from Truman State.

Our dept. was 4 people when I started and has grown to 9. I knew Terry DeGeus through my role as a police officer. I had some contact with him in 1985.

I was called to assist some officers were having difficulty controlling him Terry during an arrest. He was handcuffed when I arrived. It took 3 of us to get him in the patrol car because he was doing everything to resist: kicking, head-butting us. He was very strong and in excellent physical condition.

I had contact with Johnson when she and Terry lived in Leland and ran the Silver Bullet. Dispatch reported a person lying alongside Hwy 69 who'd been thrown from a car or needed medical help. I went and found a woman lying there, obviously injured, beat up, with blood all over her swollen face and clothes.

118

OBR000145

I'd known her before, but I didn't recognize her that night because she was so beaten and bloody. She didn't want the police involved and didn't want to talk. I assumed Terry assaulted her, but she didn't say he had. She didn't want to file charges.

I assumed it was him because there were a lot of domestic abuse incidents during that time, mostly outside Forest City, in both Hancock and Winnebago Co. The ambulance checked her out but she refused to go with them. She didn't have a car. I don't think she was left there, but I had already left when she did leave.

I returned to Forest City to find Terry. His car was in a parking lot, kind of trying to watch the highway. He was defiant and wouldn't admit anything. He had abrasions on his knuckles, but basically said we couldn't prove or do anything. He was right— we couldn't pursue it unless Johnson wanted us to.

[It's common for women not to press charges,] and that's one of many frustrations of this job. In '85, Johnson was a good-looking young lady. But we never dated.

I'd known of her for years because she'd lived in Forest City for quite a while. There was another incident with Terry in May 1992.

An officer and I made some drug buys in Kanawha, a small town in Hancock Co., as part of a drug task force. I was riding with Deputy Scott Dodd [from Hancock Co.] to show him the locations when we saw a speeding pickup. We stopped it; Terry was

119

OBR000150

driving. Dodd gave him two breath tests and he was over the limit. Dodd put Terry in the front passenger seat. I sat directly behind him.

Dodd asked him to get out and Terry started talking about his terrible life. Dodd arrested him and told him to put his hands on the car, Terry got rigid. He turned and started fighting for what seemed like forever. It was very violent, going back and forth from the road to the ditch and flying all over.

I pulled him off Dodd and we rolled down into the ditch, where I got hit. We wrestled around trying to cuff him. I didn't realize I was injured until later when I couldn't make a fist. My thumb was broken.

I think we only succeeded in restraining him because we shoved his face in the dirt and he couldn't breathe. *Q: Were you aware Terry viewed injuring you as a badge of honor?* I don't think he was ashamed of it. I didn't see it, but I was told later that Terry wore a T-shirt that said "Fuck Doug Book."

## DOUGLAS BOOK—CROSS-EXAMINATION BY THE PROSECUTOR
### [MR. WILLIAMS]

*Q: Such a bad guy is probably better off dead, right?* It's not for me to decide. *Q: In spite of everything he did, you were actively involved in trying to determine who murdered Terry after 1993.* Yes. *Q: It's still a crime to murder a bad guy.* Yes. *Q: And that investigation evolved into a drug investigation because you learned Johnson*

120

OBR000151

*was distributing in the Mason City and Forest City area?* Yes. *Q: Was she involved with Rick Summers?*

Yes.

**OBJECTION** - **D**: outside of the scope of direct.

C: How is it within the scope?

P: It's going to Johnson's own involvement with violence.

[THE COURT *dismisses the jurors.*]

P: Rick Summers' house was searched in this investigation and a grand jury subpoena was served on all of the Johnsons. After that Book got threatening messages on his answering machine from Johnson.

D: It's got nothing to do with the direct exam.

C: How does it relate to the scope of direct?

P: The D is portraying Terry as a horrible person who abused Johnson, who suffered some psychological impact the jury should consider as a mitigating factor. To the extent we can show she was equally violent, it detracts from their position that she was an innocent victim.

C: It may be beyond the scope. I'm not sure you're limited to that in the penalty phase because it's a relaxed proceeding. I'll allow it without addressing whether

121

OBR000152

C: it's technically beyond the scope. **OBJECTION OVERRULED.**

D: Could I ask the witness a few questions about whether there are materials that relate to this evidence that he has not brought but do exist—

C: "You had more discovery than you're ever entitled to, so the answer is no." Ask him on redirect.

{Ed.: He's a witness <u>for the D</u>—how did they put him on the stand not knowing this? }

[THE COURT *brings the jurors back to the courtroom.*]

*Q: You executed a search warrant at Rick Summers' house in 1998?* Yes. *Q: Did you receive messages from Johnson?* Yes, on my home voice mail. I recognized [her voice], and I think she said who it was. She said I was in over my head, and I should back off or I could get hurt.

*Q: Did you serve a grand jury subpoena on Holly Johnson?* Yes. *Q: After that did you receive any further messages from Johnson?*

**OBJECTION – D:** The same reasons as before and § 848(j).

**OVERRULED.**

Yes, on my answering machine. It was a leave her family alone, back off, you could get hurt type of thing. She was screaming, irate, and out of control.

122

OBR000153

*Q: Did you write reports about these messages?* No. *Q: Did you have enough evidence to charge her for leaving the messages?* No. *Q: Did you assist Mr. Basler in arresting Johnson on these charges?* Yes.

**DOUGLAS BOOK—REDIRECT EXAMINATION BY DEFENDANT [MR. STOWERS]**

*Q: Did you save these messages you remember receiving?* No. *Q: Did you follow up on them or contact her?* No. *Q: Did you stop doing any work connected with your investigation after getting them?*

No, it kind of encouraged me. I was concerned about them, though. But the elements of the terrorism charge that would have been appropriate then weren't there. *Q: You're aware that under IA law you can charge a person with harassment for threatening calls.* Yes. *Q: That law existed at the time of these calls. I think it's a misdemeanor.* Yes. *Q: But she wasn't charged with harassment?* No.

*Q: You destroyed the tapes?* Yes, when another call came it recorded over them. *Q: When was the first time you reported these calls to someone at P's table?* I probably talked to Agent Graham or Agent Lewis about it at the time. *Q: Seen any documents by anybody documenting these phone calls?* No.

**END OF DOUGLAS BOOK'S TESTIMONY**

123

OBR000154

**MARILYN HUTCHINSON – DIRECT EXAMINATION BY DEFENDANT**

**[MR. BERRIGAN]**

I'm a psychologist and have owned my own practice, Hutchinson and Assoc., in Kansas City for 19 yrs.

Half of my work is clinical, half is doing [forensic] evaluations for court cases and testifying. I see about 18 clients a week, mostly adults. My emphasis is trauma and violence survivors. I've been a psychologist longer than 19 yrs.

Ph.D.: Purdue, 1975. Taught at U. WI for 7 yrs, then moved to KC.

I took a position at UMKC, then 2 yrs later went to full-time private practice and opened H&A. I have an inactive license in WI and an active license in MO.

I started out doing [forensic work] on battered women's cases and abused teenagers who attempted to murder, murdered, or hired someone to murder their abusers. I've done about 300 of those cases in 15 yrs. Lately I've been working with criminal D's mental health and abuse issues. I usually work for the D.

124

OBR000155

The court-ordered work I do is mostly competency evaluations. I've done evaluations of people in and out of custody testified in state and federal courts.

*Q: What is your rate for a cap murder case?* When I'm reading/writing reports, $150/hr; $140/hr for PD or state case. $160/hr for a civil case. On the road, $160/hr and $175/hr. Testimony is $175/hr. [*D EXHIBIT 2170, Hutchinson's c.v., received.*]

You [D] called me, gave me a summary of the case, and asked me if I would do an evaluation for mitigation.

I got a big file box of information: her indictment, family background documents, employment, police, medical and divorce records, neurological and psychological testing, etc. Then I met with Johnson for 9 hrs.

I met her mother for 2.5 hrs. and sister Holly for 1.5. I had explicit instructions that I was doing this investigation for mitigation purposes only.

Johnson and I didn't talk about the murders at all. In my evaluation I tried to understand how this tragedy could occur. I did a mental status exam, checking psych symptoms and psych health, paying attention to her childhood and its impact. I met with her family to get their perspective on that same info. I'm like a psych investigator, looking at her mind and they way she looks …

125

OBR000156

at the world to say how could this have happened and how does it make sense. There were many significant [findings related to her childhood].

In evaluating someone's childhood, I look at the standard developmental stages and compare their experiences at those points to see if they could have learned what they needed to. I also look at how the person presents and how and to what extent their adult history matches up with the outcomes of childhood abuse.

The widely accepted model of child development was developed by Erik Erikson. It's the model I used. I brought a document to help explain it.

THE COURT: It's on the screen in front of you.

D: Thank you.

Hutchinson: I was just checking it was up there. That's pretty cool.

D: I didn't see it. I apologize.

THE COURT [*to witness*]: "That's not your job, okay?"

H: OK.

You'll see on the left guidelines of the ages at which children usually move through the stages. It's sort of a slow evolution.

The top shows the stages: what crisis does the person have to resolve? Which people are significant? What behaviors are associated? What virtues will they have if they

126

OBR000157

successfully negotiate that stage, and what maladaptions or malignancies will they have if they don't? You look at the adult behavior, the maladaptions and malignancies, and look back at their experiences at those stages.

You can make inferences about what interfered with their progress. I believe she had some lack of success in the infant stage that left her overtrusting and mistrusting. She didn't trust that the world was safe, but she overtrusted men she though would protect her even though they wouldn't—a defense to maintain a Pollyanna stance. That's kind of blithely or naively not dealing with the reality of serious things.

When Johnson was in the infant stage, her mom was likely overwhelmed. She probably didn't get a holding, trusting atmosphere. There was a lot of marital tension and domestic violence that would affect her mom's ability to be reliable and nurturing.

This continued in the 2- to 3-yr.-old stage, where you're learning autonomy, dependency, impulsivity, attachment, etc. At this time, violence between her parents increased. Her mother felt like she had to make her children perfect to compensate for her own badness.

Pearl Jean was sexually abused as a child and felt inadequate. She was strict and used physical punishment often. Angela ended up with impulsivity and attachment issues. As she entered stage 3, her father left them. He broke into the house. Her mother was

127

OBR000158

very upset and would leave for weekends. They moved in with her grandparents. A number of the children report substantial abuse at that period.

Her mother thought the world was ending. She drove the kids around for 3 days without food, following religious symbols. The kids hallucinated from hunger. Angela's life was chaos. Adults who had these experiences at this stage often have attachment issues, and she does: she couldn't let go of DeGeus, and in other relationships we might have thought would be stable for her, she couldn't hold on. Part of it comes from children learning to confuse love and abuse.

That's difficult to break. "We find evidence that she, like many other battered women, believed if he's really jealous, if he's really possessive, he loves me so much he hits me." *Q: What about the next stage?* The family's more influential from 3-6. A child's sense of adequacy develops. They learn to trust their feelings if parents give them age-appropriate decisions to make. Without that autonomy …

They end up with less initiative or overinitiative and guilt. She became estranged from her father during this period. There was neglect as far as clothes and food. They began fasting. The maladaptations that result from these experiences are ruthlessness or inhibition, or some of both.

The 7-12 stage was the worst of the worst. Jim called this period a "siege." Exorcisms and spitting the devil out became common. They had to throw out their toys. They

128

OBR000155

were beaten. Their mom said if they were possessed the number 6 would appear on them. The kids would check each other regularly. They thought they'd never go to heaven. Johnson believed her father didn't love her.

She fantasized he would rescue her, but he never did. This pattern repeated with her boyfriends. Her grandparents were crazy, her mother had a "religious disorder," they lived in poverty. Then they went to the "orphanage" in KS. They knew Pearl Jean planned to leave her baby and feared she'd leave them in that horrible place too. They saw animal abuse regularly: rabbits beat with sledgehammers, kittens thrown to hungry pigs.

Wendy was sexually abused and assumed Angela was too because she also had to "nap" with the man. They lived in a garage with rodents and their mother was gone often. They watched 2 boys being sadistically abused. It was probably a torturous situation beyond what any child could handle. In the 7-12 stage kids learn to handle projects, complete things, make plans and follow through.

This gives a sense of competence. Instead, she suffered religious abuse and adults treating her like she didn't matter. She left this stage with extremely poor self-esteem and social skills. She developed PTSD from the abuse and trauma and had nightmares and sadistic and masochistic repetitions.

OBR000160

We treat ourselves the way we are treated. She directed her abusive treatment at herself—self-hatred, self-sabotaging—which is masochism. As an adult, she did this by tolerating abuse and unhealthy situations. In the 12-18 stage, you learn to be yourself, which happens by having your individual differences supported.

By experiencing support, validation, and others being loyal to them, children learn to be loyal to others. Angie didn't have this: her mother would disappear, leaving them in inadequate housing. Angie began to be attracted to bad boys. She said "it was better to be feared than loved." She wanted someone to protect her.

She started using drugs. For kids who never fit in, using drugs suddenly gives them a group to belong to. She had an anxiety disorder, and dope helped her escape her family's craziness. She also wanted a man to rescue her.

She never wanted to be alone. She described her life theme as, "I was looking for love in all the wrong places." She didn't feel love. She was a teen mother, something kids often do to have someone love them. Instead of learning loyalty, she repudiated society: smoking dope, living on the edge, like why should I follow rules if nobody's ever followed the rules in relation to me.

In this stage people discover what kind of adult they want to be. Johnson had no direction. She decided being bad was better than being a nobody. In the early 20s

130

OBR000161

people are supposed to learn to connect to a partner. She was using meth daily. She got involved with Terry DeGeus.

He regularly abused her. She called the police, but they'd just tell Terry to leave her alone. She didn't feel like society worked for her. She said, "I felt like my whole life I'd been fighting, struggling, and defending, and I never got a break. But when I did crank, I got a break from that." She was a "prolific" meth user, probably to fight her depression and block memories of her PTSD.

It gave her energy to function and helped block out her past so she could care for her daughter. At this stage people should be learning love, but with an abnormal history, you develop jealousness or possessiveness, making your partner everything.

*Q: Did she have other experiences that would contribute to PTSD?* The abuse and stalking by DeGeus was likely traumatizing, which means when you are so overwhelmed by something you can't process it. If the trauma is intense or you don't have the psychic resources to work through something, you get PTSD.

When you're traumatized, you develop a range of compensatory behaviors. PTSD is a recognized psychological disorder. To be diagnosed you have to have some of each of these elements. First, you have to reexperience the trauma repetitively.

131

OBR000162

You have to have a way you try to numb that experience and avoid feeling those things. You also have to have anxiety that breaks through anyway, kind of sideways.

Johnson had nightmares, terror and intrusive recollections, especially of the stalking. She had hyperarousal and tried to numb her feelings with drugs. She believed that Terry would kill her; she believed that she was going to die at a young age at his hands. She had reexperiencing, numbing, and breakthrough anxiety.

[THE COURT *dismisses the jurors for lunch.*]

P:  The witness is reading statements that there's nothing in her report about. I need to look at the materials she's using to adequately cross-examine her.
D:  I don't know what they are either, but we'll get them for P.

C:  You had a matter?
D:  I raise this reluctantly. The Court addressed Dr. Hutchinson … "maybe curtly might be the nicest way I could describe it, in terms of 'that's not your job.'" …

There was a similar incident with Dr. Logan. The jurors "don't know these experts from Adam until they … testify. [W]hen the Court addresses them in what I would have to describe at least as a hostile manner right at the beginning of their testimony for what I perceive … to be very minor infractions, it sets a tone with the expert that's very difficult … to overcome.… I very much fear the effect that it has on the jurors,

132

OBR000163

and we still have at least one more expert to go." I'm making a record because if I don't someone will ask about it, and they probably will because of my silence with Dr. Logan. I'd like the court to consider it.

C:  Anything else you'd like to say?

D:  No.

[THE COURT *recesses, then later the attorneys return and speak with the Court before the jury returns.*]

C:  Where's the witness?

D:  I don't know. We're looking for her. We have other witnesses ready.

C:  I have questions about her CJA voucher. I won't do that in the jury's presence.

[*The witness, Hutchinson,  enters the courtroom.*]

C:  You're late.

D [Willett]: Can I say something on her behalf?

C:  Not really. You're late. Get in the witness box. I don't keep the jury waiting.

H:  I was sitting upstairs. I was told I couldn't stay here or I wouldn't have left.

C:  Whatever. You knew we were starting at 1. It's after 1. I'm confused by your rates, and you seemed confused on the stand. What's the hourly charge for a person who's private pay?

H:  Private pay clinical work is $110.

C:  What if there's insurance?

133

OBR000164

H: $90 - $110.

C:  What's the rationale for $170 for forensic work?

H:  That's only for testimony … it involves travel, more stress.

C:   I've never seen an expert block bill. You don't show the rate or the amount of time you spent.

…

H:  I'm sorry that's confusing.

C:  It's more than confusing.

C:  You're going to have to indicate the time you spend on each unit and what you do. And "review of records" is insufficient. I can't determine whether that's reasonable. Because it's not reasonable to just say review of records.

H:  Yes, sir.

C:  I passed on your first bill, but I'm going to be a lot more careful this time.

D [Berrigan]:  I should apologize because regarding Dr. Gelbort's bill—

C:  His was worthless too. His didn't indicate anything.

D:  I have an obligation—

C:  I'm sending Gelbort's back too.

D:  We sent it back.

C:  No, the new one. It hasn't met any of my criteria.

[*The jurors re-enter the courtroom. Direct Examination of Dr. Hutchinson resumes.*]

134

OBR000165

*Q: How did Johnson's experiences relate to her choice in men?* We unconsciously repeat patterns that were established early in our lives. Her patterns are an unavailable father and an abusive mother, so she repeatedly found men who were abusive and abandoned her. DeGeus was abusive. Others were married.

Honken was involved with another woman. These men couldn't provide the day-to-day nurturance a healthy relationship needs. It's not conscious. We're unconsciously drawn to those things we're trying to resolve.

With DeGeus, when it was good it was very good, and when it was bad it was really bad. He was the strong person she had wanted her dad to be for her as a child. His drug use made him jealous, paranoid, and possessive, and their relationship became violent. Battered women get hooked to the cycle of violence because of the honeymoon period. This is the behavior DeGeus showed.

Battered women deny the violence, pretending that the honeymoon phase is the real relationship. Over time, the honeymoon gets shorter and the violence grows. *Q: Were there any instances where Johnson responded to DeGeus's violence with violence?* No.

135

OBR000166

*Q: What does her choice to be feared rather than loved mean?* She decided at 10 she wouldn't be a victim anymore. She had this bravado. She didn't act like a lady. She rode motorcycles and ran a bar. It was a way to try to be big and tough.

Kids exposed to violence develop different brain chemistry. After repeated events triggering fight-or-flight responses they end up with excess cortisol. They respond to more quickly and to a greater extent, so they try to self-medicate. She used marijuana to calm things down, and later meth.

The antidepressants she's taken while incarcerated treat PTSD too. Talking about the trauma helps. This investigation caused her to talk about her childhood. She's made a lot of progress, like forgiving her parents.

Developmental stuff is more difficult to treat. It's crucial to stop doing drugs. Being drug-free and emotionally stable on meds has allowed her to grow up. Three other things help people with bad childhoods: psychotherapy, religious experiences, and loving long-term relationships. She's working on all three.

She's discovered her own spirituality, and with her new stability she has established substantial, loving relationships with members of her family.

**MARILYN HUTCHINSON – CROSS-EXAMINATION BY THE PROSECUTION**

**[MR. WILLIAMS]**

136

OBR000167

*Q: One of the significant events that helped you diagnose Johnson was what happened with the Dillos, and your understanding was that the Dillos engaged in "sadistic practices" with animals.* Yes. *Q: You based your analysis in part on her young pregnancy, an outgrowth of some trauma?* Yes. *Q: You put this at the 12-18 stage, married and had a child?* Yes.

*Q: When do you think she had her first child?* At18. *Q: How about 19½?* OK. I made a mistake. *Q: She married at 16, but didn't get pregnant in that marriage. So she could decide whether or not to have a child pretty young.* I don't know if it was a decision or accident. *Q: She was attracted to "bad boys," abandoners?* Yes.

*Q: Her first husband, Steve Hugo, was blind in one eye and she left because she was bored?* Yes. *Q: Not exactly a bad boy.* That's why she left. *Q: She thought her next husband, Arlyn Johnson, was boring and acted like a married man.* Yes. *Q: Her only two marriages were not to bad boys?* Those were short relationships. *Q: You say she's got poor self-worth, but she's described herself as good.* Those aren't incompatible. *Q: She's described herself as a good worker, good mother, and good person.* Yes.

*Q: To diagnose PTSD, you have to rely on her self-reported nightmares/flashbacks.* Neither are requirements. They're possibilities. *Q: One of the possibilities you relied on in diagnosis was her nightmares.* True. *Q: Without them would you have arrived*

137

OBR000168

*at the diagnosis?* I would have to look at the criteria I used. *Q: But you relied on nightmares she reported after being charged in a capital case?* Yes.

*Q: And you were hired for mitigating evidence?* Yes. *Q: Was she diagnosed with PTSD in 1996?* No. *Q: Do you know the woman you're relying on to tell you these events and symptoms repeatedly appeared before the grand jury and lied?* I don't know that testimony. *Q: And she was not a juvenile delinquent, and she wasn't involved in the criminal system as a child or after marrying at 16.* No.

*Q: She was able to act within the dictates of society after her early 20s and wasn't arrested for any criminal activity?* She was not arrested. *Q: She held jobs, raised kids, had no criminal involvement until her late 20s?* She used drugs. That's criminal activity.

*Q: People with bad drug habits get arrested for possession, their attendance slips at work, they can't take care of their kids—doesn't describe Johnson, does it?* Some of that occurred occasionally. *Q: Nothing stopped you from asking questions about her state of mind at the time of these murders?* Correct.

*Q: You're not offering an opinion about whether PTSD affected her thinking or behavior at that time?* I've been clear that I'm not saying it contributed to it. *You're not asserting she acted under duress, had a mental defect, wasn't able to understand*

138

OBR000165

*what she was doing when she purchased the gun for Honken, when she helped him gain entry and tie up and gag victims.*

**OBJECTION – D:** This line of inquiry was repeated with an earlier witness, the questions have been asked and answered.

**COURT:** It's getting awful close. Wrap this part of your cross up.

P: I will.

*Q: You're not indicating she did not know exactly what she was doing and acted with free will?* I haven't discussed them with her. *Q: Despite our problems, we can all make choices?* We all have ability to make choices within our biological, psychosocial histories.

*Q: You're not asking this jury to conclude that Johnson suffered mental defects that affected her ability to make choices?*

**OBJECTION – D:** Asked and answered again. Repetitious.

**OVERRULED.** [*The witness answers.*]

Yes, I've said that.

### MARILYN HUTCHINSON—REDIRECT EXAMINATION BY DEFENDANT
### [MR. BERRIGAN]

*Q: Are choices for someone with Johnson's background the same as for someone with a "normal" one?* The biology is different.

139

OBR000170

If your parent is an alcoholic, there's a 50% chance you'll be genetically predisposed to alcoholism. You don't have trust. You're unlikely to have a family to rely on when things get tough. That changes your available choices. Being able to pay bills or work doesn't mean Johnson wasn't psychologically impaired. She used meth to function.

In 1996 she was diagnosed with major depression. It was an axis1 diagnosis, which means a diagnosis based on the clinical symptoms she was manifesting most at that time. She received medications for it.

As far as her difficult history, the psychiatrist's records just have a couple of sentences saying her childhood was tough but she didn't want to talk about it. Her describing herself as a good person now doesn't indicate she had high self-worth, it reflects the growth she's made in the last few years improving her self-esteem.

*Q: Do you think you'd have much of a forensic practice if a judge gave you specific instructions for an evaluation and you violated those?* It would be unethical and stupid.

**END OF DEFENSE EXPERT MARILYN HUTCHINSON'S TESTIMONY**

140

OBR000171

141

OBR000172

**LOU ANN HARE—DIRECT EXAMINATION BY DEFENDANT [MR. BERRIGAN]**

I'm a nurse's aide at a nursing home in Mason City, IA.

I grew up in the Clear Lake/Mason City metro area. Johnson is a friend of mine.

We've known each other since 7th grade at Forest City Middle School.

I think she dropped out in 7th grade. We lost touch until about 1986. I happened to stop at a Perkins where she worked and we became friends again. She was divorced.

She wasn't dating anyone steady, but lots of men were taking her out and stuff. She started seeing Terry DeGeus exclusively.

He was an acquaintance before they started dating. I'd thought he seemed nice. They had a very up-and-down, rocky relationship. He was physically and verbally abusive.

142

OBR000173

I didn't see him do it, but she came to my house with 2 black eyes and a busted nose. She said Terry did it. She was leaving town for a few months while her face healed. She did, but I believe they got back together.

We started doing drugs together in about 1988. Once or twice a month we'd get an 8-ball of crank and do it Thurs. p.m. through Sunday a.m.. We didn't sleep at all.

We did nothing. It was kind of wasted energy. An 8-ball cost $250 and we split it.

We both enjoyed it at first. But at one point I'd help her at her bar we'd do lines every 15-30 min. I thought I was getting addicted, so I quit. But she said she loved crank and wanted to do it every day for the rest of her life.

I believe she continued to use meth and that it increased. *Q: While you were using, you had a full-time job, paid your bills—did it affect other parts of your life?* No.

She was in kind of a different situation. I quit hanging around with her so I could get away from the meth. It wasn't that we weren't friends. I also moved.

It helped me. Sometimes if you change the people you hang out with you're not as apt to do drugs. I got my nursing degree. *Q: Do you know Christi Cole Gaubatz?*

143

OBR000174

She and I are coworkers, not friends. I haven't had any contact with DeGeus after I moved. I met Dustin Honken a 2-3 times at Angie's house.

**END OF VOL. 3**

144

OBR000175

**US V. ANGELA JOHNSON**
**Trial Transcript Digest**
**Volume 4**
 **C.J. Williams, Thomas Miller – P**
**Pat Berrigan, Dean Stowers, Alfred Willett – D**


<u>TABLE OF CONTENTS</u>

DEFENSE WITNESSES

| Witness Name | Transcript page # | Summary page # |
|---|---|---|
| Lou Ann Hare | 3701 | 2 |
| Verleen Vanderpool | 3706 | 3 |
| Reed Corson | 3719 | 4 |
| Susan Marsolek | 3727 | 5 |
| Brandy Byrd | 3753 | 8 |
| Dr. Cunningham | 3779 | 10 |
| Alyssa Johnson | 3903 | 16 |

CAST OF CHARACTERS………………………………….. p. 32 of Summary
**CAST OF CHARACTERS**

**1. Lou Ann Hare**

Lou Ann Hare is Angela Johnson's friend.  She questioned Angela's taste in men and recognized that Dustin Honkin was not a typical choice for Angela. Lou Ann knew Angela was a stripper out of town so as not to embarrass her daughter, Alyssa. She said Angela never was paid for sex. She testified that her own daughter loves Angela very much.


**2. Verleen Vanderpool**

Verleen Vanderpool was Angela's boss at her restaurants. Angela first worked for her in Mason City. Verleen invited Angela to follow her to Des Moines to work in her new restaurant there because she was a good waitress. Angela accepted because she wanted a fresh start for Alyssa. She never sensed Angela used drugs. They bonded over being pregnant together.  She started sensing stress in Angela's life when she wouldn't show up for work, asked if Verleen would come over to talk, and when she heard of the FBI at Angela's house.

145

OBR000176

### 3. Reed Corson

Reed Corson is the off-duty lieutenant for Black Hawk Sheriff's Department in Waterloo, IA. He was off-duty when he received a call at home to assist with a suicide attempt at the jail. He first went to the jail to help and take pictures. From there, he went to the hospital to help secure it. He spoke with Angela who asked, "Didn't I do it right?" and said when asked if okay, "I only hurt in my heart."

### 4. Susan Marsolek

Susan Marsolek knew Angela from working in restaurants together. At the time of her testimony, she was in a half-way house under a conviction for conspiracy to manufacture. Before the halfway house, she saw Angela at the Cedar Rapids jail and said Angela took her under her wing. They went to AA meetings, Bible study, etc. together. Upon cross-examination, Susan says she lied to law enforcement officers about her case and pled guilty. She also lied about notes found on her regarding drug debts that she said was about a rummage sale. She also "didn't remember" Angela admitting to fighting in jail via a letter.

### 5. Brandy Byrd

Brandy Byrd was 20 years old when she met Angela in the Linn County jail. When she got there she picked one bed, but was moved via a racial slur. Angela offered her socks and other commodities because Brandy couldn't afford to buy anything at the commissary because her family didn't send her money. "She was my mother. I was her son." They did Bible and drug classes together. During Brandy's trial, Angela volunteered to go to Brandy's holding cell with her.

### 6. Dr. Cunningham

Dr. Cunningham is an expert witness. He testifies to his credentials in the field and what he studies and teaches. He gives testimony about the effects of drugs, alcohol, abuse, sexual abuse, and the religious episodes in Angela's home. Specifically, he talks about how even though people have choices, they can't choose their background. He does this via a PowerPoint presentation of a "trajectory" metaphor. He also testifies that he doesn't think it's likely that Angela would be violent in prison.

### 7. Alyssa Johnson

Alyssa Johnson is Angela's oldest daughter. At the time of her testimony, she was in college, which she pays for with grants and scholarships, which helps since she has her

146

OBR000177

daughter, Angeleah. She has worked in restaurants with her mother. She is very close with her half-sister, Marvea. Angela was a more lenient mother, but a very good, affectionate mom. She remembers when Angela and DeGeus were together. There was a violent sexual episode when she was little that scared her. Once Angela and DeGeus were off and on, she hated when DeGeus came back. She later learned that her mother was an exotic dancer and did drugs. She learned of the drugs because of how her mother would be up late and wake up early, then sleep for days

147

OBR000178

**US V. ANGELA JOHNSON – DEFENSE CASE**

**LOU ANN HARE – Defense witness (cont'd from Vol. 20)**

**Direct Exam – by D**

3701   Angela and Dustin were in a relationship and had a daughter. Dustin was unlike her old boyfriends who were rough, biker type guys. Dustin Honking was geeky. She was still involved with meth then.

3702   I did question her choices in men, but it was her decision and she didn't ask me. She worked as a waitress and later a stripper. She was very attractive.

3703   I would visit her where she danced out of town on the weekends. She didn't want everyone in her hometown to know what she was doing. She was very well paid. There was no prostitution involved.

3704   Some girls got paid to have sex, but she was about the dancing. She later stopped dancing because she was afraid kids her daughter knew would give her a hard time. We still write to each other.

3705-06        My daughter is 14 and loves Angie. The decision about punishment would affect my daughter and me. If Angie gets life, I will keep in contact with her.

[NO CROSS EXAMINATION]


**VERLEEN VANDERPOOL – Defense witness**

**Direct Exam – by D**

3707   I grew up in Clear Lake, IA and have lived in the Des Moines area since 1995. I now live in Adel, and before that I was in Mason City.

3707-08        I run upscale restaurants and bistros for a living. I travel between the restaurants to supervise. I went on my own in 2000 after working in the country club business for many years.

3709-10        I was responsible for the whole country club except the golf course. Angela worked for me in Mason City as a waitress. She made good money and often worked 40 hours a week.

3711   She got along well with customers and other staff. At a country club, the waitresses' tips come in the paycheck, not as cash on the table.

148

Case 3:09-cv-03064-MWB-LTS   Document 284-28   Filed 06/23/11   Page 179 of 226

OBR000175

Angela could take lots of tables at a time and sold a lot, so she made a lot. Angela worked there from approximately 1992 or 1993 to 1995 and I didn't permit or see her do any illicit drugs.

I never sensed she was on drugs. I even asked her to come work for me in Des Moines at Urbandale Country Club which had the same payment setup as in Mason City. We had a relationship beyond employer-employee since Mason City because we were pregnant together there. I was the 2nd pregnancy for us both.

I knew her older daughter Alyssa. I had met Dustin Honkin at an employee party in Mason City towards the end before I moved. At Urbandale Country Club, Angela worked for me for 2-3 years.

She did well, but eventually I sensed stress in Angela's life. The FBI would come by and her house was being searched. She wouldn't come to work or she'd ask me to come over so she could have someone to talk to. When I went, she seemed depressed so I recommended mental health treatment.

When Angela followed me to Des Moines, she said she wanted to give her daughter Alyssa a fresh start. I didn't know details of the situation.

I have a pattern of helping out single parents.

[NO CROSS EXAMINATION]

**REED CORSON – Defense witness**

**Direct Exam – by D (Stowers)**

I have been a lieutenant for the Black Hawk Sheriff's office in Waterloo, IA for 25 years. I am the second shift commander for the jail in Waterloo.

I was not working there in fall 2000, but on October 13, 2000 I was contacted at home to assist with a suicide attempt relating to Angela Johnson. I first helped Sergeant Peterson with photos. (Identifies photos as the ones he took)

Black Hawk jail has a four-cell female pod. You have to be 18 to visit an inmate.

149

OBR000180

3724  From the jail I went to Allen Hospital in Waterloo to secure the hospital and get security lined up while Angela was in the ER.

3725-26  Waterloo fire transferred her to the hospital. I had contact with her in the intensive care unit where she said, 'Didn't I do it right?' I asked her if she was hurt and 'she said that she was only hurt in her heart.' I told her we couldn't have her trying to hurt herself again. She was crying and visibly upset.

[NO CROSS EXAMINATION]

**SUSAN MARSOLEK – Defense witness**

**Direct Exam – by D (Berrigan)**

3727-29  I have 6 months to do in a halfway house in Waterloo. I can leave to look for a job and come back to my room that has a key. I have an approved visiting list of people who can visit once a week.

3730-31  I was convicted of conspiracy to manufacture in September of 2000, received a seventy-month sentence in Greenville, IA and was released March 28, 2005. I get out of the halfway house in September. I took a plea for the charge but didn't testify against anyone to get my deal. I had 3 co-D's.

3731  Angela and I worked together at the Waterfront Restaurant and were good friends. We first met in May of '98.

3733-34  I was arrested September 11, 1999. Released, indicted June 2001 and went to Cedar Rapids jail when re-arrested. Then convicted September 2001. I saw Angela at the jail. We were both housed in the M block.

3735  That was my first jail experience. M block had all the inmates all together in one room and Angela was in there when I got there. Angela took me under her wing, "like a sister to me"

3736  There was a fight in the M block once, so they took us to N block where all the inmates were individually locked down. Angela was not supposed to be in the fight.

3737  I never got in a fight. Angela and I did Bible study, went to a few AA meetings, the law library, and the gym. I didn't know if the drug treatment program was there while I was there

3738  In Greenville prison, I did drug classes and Bible study. Before I got indicted I was doing continued care. I'll be clean for 5 years Oct. 1.

3739  Angela got along well with other inmates and "took them under her wing." There was no one named Brandy Byrd at the jail when I was there

150

OBR000181

3740-41        I knew both of Angela's daughters, Alyssa and Marvea. I have a son and daughter who I could observe. Angela was a good mother. The jail lets Angela and me write letters back and forth and have since 2002. I would like to continue to write.

**Cross-Exam – by P (Mr. Williams)**

3741    When I pled guilty, law enforcement officers interviewed me about my knowledge of criminal activity of people involved in my case.

3742    Q: And you lied to the law enforcement officers?

\*       Obj. (by D) – beyond the scope of her direct; OVERRULED
Overruled b/c it goes to her credibility
Continued obj. granted

I did not tell the whole truth when I said J.D. Starkey didn't know about the meth lab in the car. He was my friend and he asked me to lie for him. I didn't tell law enforcement that Michael Vieth sold some meth later to my contacts.

3743    I never obtained meth from Angela

Q: You had notes seized off of you at your arrest and you told Agent Grahm they were drug notes reflecting drug debts owed to you?

\*       Obj. (by D) - Not in evidence, contrary to evidence; OVERRULED

I don't remember if I told him that, but I don't think I did.

3744    I said it was for a rummage sale. I did not say they were drug notes when asked. When asked why Angie's name was on the notes, I said I bought a computer from her and owned her $140.

3745    I never knew of Angela distributing meth. I was questioned about a fight in the jail but it did not involve Angela.

3746    [P approaches; shows a statement] I made a statement at Linn County jail that Angela was in an argument but not a fight. I was not aware she was involved in a fight or remember making that statement.

Q: Did you know she was videotaped fighting?

\*       Obj. (by D) – No videotape we've seen in this trial;

151

OBR000182

I don't remember that Angela admitted in a letter to the fight.

**Redirct – by D (Mr. Berrigan)**

[re-approaches, shows statement]

The statement and the exhibit are the same. [Reads exhibit to jury] The fight was about a lady's body odor. I didn't see any pushing match.

The 4th person in our indictment was on the run and I wouldn't snitch on them.

**Recross – by P (Mr. Williams)**

I testified in the trial of Michael Vieth and got a reduction for cooperating. "I just debriefed and told you what you wanted to hear"

**BRANDY BYRD – Defense witness**

I'm 23 and was incarcerated in Michellville, IA for a life sentence plus 25 for first-degree murder and robbery. I'm originally from South Carolina and moved a lot. I was caught in Marion, IA in Linn County, so I was in Linn County jail with Angela. I was 20 at the time.

In Linn country, I would move around a lot but started in M Block where Angela was. The block was almost full.

I first picked a bed by the window, but a CO with a sergeant said it was "too dark" and moved me up front where Angela was in front of the camera. I took it racially and didn't believe it had anything to do with lighting conditions.

Angela and I got along well. She and Nancy aka "Indian" offered me socks, T-shirt, etc. They helped me because I had no money from the outside to buy things at the commissary.

I don't know of anyone who had been there longer than Angela (3 years) and my time in Linn County was also long. There was a time when Angela and I got separated when I was moved to a different block, maybe for as long as 2-3 months.

We did bible studies and drug classes together. She always read books off the cart. I graduated from high school. We were bunkmates just about the whole time I was there.

152

OBR000183

3766-67 I told Angela about my bad childhood in foster homes and we developed a great relationship. "She was my mother, and I was her son." I knew about her daughters and that she loved them very much. She'd call them and ask when they would visit. She wrote letters to them, her mom, and her granddaughter for when she grew up.

3768-69 They moved me to the hold during my trial, and Angela was allowed to stay with me which was very helpful. But after I was moved to Mitchellville, we couldn't write anymore. If Angela got the death penalty, I would be greatly affected.

**Cross-Exam – by P (Mr. Williams)**

3770 Q: You got a life sentence for killing a single adult male; is that right?

* Obj. (by D) – we're not allowed to get into the specific facts of the conviction; SUSTAINED
Sustained b/c even though rules "relaxed in penalty phase", it is not for credibility purposes.

P has no more questions

[Witness Dismissed]

3771-72 Court has issue – it would be inappropriate to submit aggravator or mitigator w/ no evidence and has questions about several.

Berrigan, "we'd at least like some guidance… I haven't gone through the playbook, quite frankly, because we've been putting on witnesses.... Obviously we might take a contrary position… I don't want to suggest that we might not argue about it."

Court won't tell him yet because he hasn't closed evidence yet. But put "?" marks next to 5

**END VOL. 20, June 8, 2005, 3:50 P.M.**

153

OBR000184

**BEGIN VOLUME 21, June 9, 2005, 8:37 a.m.**

**DR. MARK CUNNINGHAM – Defense witness**

**Direct Exam - by D (Mr. Stowers)**

I'm have been a clinical and forensic psychologist for 27 years. I interview, test, and provide counseling for those with psychological disorders. Forensic psychology applies psychological research to legal issues.

My offices are in Dallas, but my practice is national. My psychological education was at accredited schools. I did an internship for the Nave in D.C. where I provided evaluation and treatment for active duty and their families. I also taught college classes on base.

I then taught at Harden-Simmons University in Alibene, TX and during my time started my own private practice and eventually moved to my private practice full time with no teaching.

I've authored many published books and articles, with the topic of most of them being capital sentencing, specifically violent risk assessment. One included a Missouri study, and it was interesting because MO didn't have a death row but they integrated all prisoners together.

I don't know of anyone else in this specific field who is more published than me in peer-reviewed journals. I'm not longer a professor, and it is rare for someone outside an academic institution to be involved in so much publishing.

I'm among only about 200 psychologists who are board certified in forensic psychology. [D presents curriculum vitae as Exhibit 2171] I also attend many workshops.

The goal of these workshops is to raise the standard of practice psychology as it comes to the courtroom. I also speak for attorneys at continuing legal education events, mostly defense attorneys. I've testified in many courts in the country.

I've testified in about 37 or 38 capital cases.

I addressed 2 issues in Angela Johnson's case: First, what factors in Angela's life were formative to get her at this juncture in her life and second, how is she likely to adjust in prison. I examined her development to see what might have injured her. I will not be giving opinions about her mental state at the time of the killing.

I will present both issues on PowerPoint.

Moral culpability is what forms and shapes a person. We did not examine Angela to determine her sanity or insanity.

154

OBR000185

3799 I interviewed many people in Angela's family and her life.

3800-02 I was looking for what went wrong in Angela's development and for what might have protected her from those bad experiences. I interviewed her mother, Pearl Jean, her father, Jimmy, her stepmother, Cookie, her brothers and sisters, Jamie Jo, Jimmy, and Holly, her children, and extended family members. I interview these people to corroborate the story and to find things out about Angela that she doesn't know about herself.

3803-04 In interviews, many capital defendants will hide their bad childhood to protect their families. The traumatic experiences in Angela's life were very consistent in the various interviews. She sees her step-mom differently than her siblings. I reviewed interview summaries, jail incarceration records, birth certificates, marriage and divorce records, school record, employment records, and hospital records. I also reviewed the investigation records and the record by the Government's forensic psychologists.

3805-06 Q: Did you… find evidence of damaging or impairing factors? … Can you simply list those out for the jury? I don't know that we need to go through them all"

A: Multi-generational family distress, genetic predisposition to substance dependence, genetic predisposition to psychological disorder, attention and learning difficulties in childhood, maternal neglect, paternal neglect, chronic marital conflict, domestic conflict, maltreatment of her siblings, instability in the home, multiple re-locations, physical and emotional abuse, bizarre religiosity in the home and associated maltreatment, inadequate supervision, psychological terror in foster homes, sexually traumatic exposures in foster homes, peer harassment, disturbed trajectory (life pushed off track – carries them further off track) including childhood onset psychological disorder, premature employment (dropped out of school), economically exploited by mom, premature marriage and teen pregnancy, early adolescent substance abuse, meth dependence, violent victimization with relationship to Terry DeGeus, inadequate interventions, adult psychological disorders, and relationship with Dustin Honkin. These all increase the likelihood of bad outcomes.

3807-08 All of these things affect who you are and your moral culpability.

3809-12 It's easier for someone with Angela's background to make the wrong choices than someone who had a good background. Abuse and neglect increases the likelihood of bad outcomes. In the PowerPoint, there's a picture metaphor. You have choices, and a ramp to bad outcomes. Bad background gives the ramp larger angle, making bad choices more likely. You can make choices, but you can't choose the angle of the ramp.

3814-15 The Dept. of Justice does similar research because they are concerned about crime and have identified similar risk factors.

155

OBR000186

3816    The Department of Justice has identified 7 risk factors from the ages of conception to the age of 6, and Angela has maybe 5, but certainly 4. Angela did not have a choice of these risk factors being in her life.

3817    There are also 15 risk factors from the age of 6 until adolescence and Angela has 8 of them.

3818-19    There is a cumulative impact of these risk factors. This is found from many different important studies.

3820    Most of the risk factors are family factors.

3821-22    The Dept. of Justice also studied predictors of youth violence. They identified 25 factors, and Angela had 10 of them in her life, which is "seriously cumulative." They can also reduce the effect of any protective factors.

3823    As for protective factors, it helped Angela that she was female and that she has positive social orientation, especially because of her siblings.

3824-25    Family history is a big factor in increasing risk of problems, one of which is "scripts" which is an unwritten story of how your life is supposed to go, and so you believe it and live it. "Modeling" also occurs, which is when you do the same things your parents did.  It's cyclical.

3826-29    I have prepared a family tree and will focus mainly on the women family members. Being female is an insulator, but it doesn't mean you're protected all the way from ending up in prison. Bad history comes out in other ways for females. Angela had many family members with a history of alcohol abuse, who are victims of domestic violence, children who did not grow up with their mothers, and family members with psychological disorders or evidence of it.

3830-31    Intelligence is a protective factor, which Angela did not have. Her IQ is 91, less than the 50th percentile.

3832-35    The more risk factors you have, the more likely you are to end up in a life of violence. The  more protective factors you have, the more unlikely you are to end up in violence. I use a bride model/metaphor to explain this.  Angela's bride is like this: the span of it was weakened mostly because of bad parenting, which is a result of previous problems, etc.

*    Obj. – by P – This is just becoming a narrative – D CONCEDES

3836-37    Pearl and Angela's aunt were also sexually abused, which is generational in nature. And    Angela was well within a zone of risk because she stayed at these peoples' houses.

156

OBR000187

[Court takes break]

3838-39    Berrigan shares concern with court that Jurors 147 and 274 are talking to each other. Court says he'll monitor it.

[Break is over]

3840    Move on to parental inadequacy

3841-44    Jim drank heavily; there was marital conflict and domestic violence. Pearl never formed a bond with her daughter. The strong child-parent bond is important to emotional development. If it's gone, it damages how the child relates to and values other members of society in adulthood.  The Dept. of Justice says these effects last forever.

3845-46     If you have a relative who's alcohol dependent like Angela did, you are 4-5 times more likely to abuse alcohol and drugs, even if you are away from your family during childhood. Her dad started drinking abusively at age 14-15.

3846-48    There is also a history of psychological disorder, which is genetic in nature. Pearl talks to me about having hallucinations as a child and as the children are describing the degree of distorted perception of reality that's occurring associated with this religiosity that they involved in, it begins to approach a psychotic disturbance.

3849    Angie has had depression and a suicide attempt.

3950-51    The DSM-IV is the book that unifies psychological disorders. Angela had low self-esteem and felt she couldn't protect her brother and sisters from religious stuff that was going on. She would feel overly guilty about things and have nightmares. She first considered suicide in elementary school and OD'd on aspirin when she was 14.

3852    There is evidence of a learning disability and would have problems shifting attention.

3853-54    There was bizarre religiosity in much of her childhood. Traumatic experiences in childhood change the chemistry of the brain, which impacts a person's choices. There is also a fantasy position Angela's father had in her mind. He wouldn't come around much, but when it did it was "magical"

3855-57    Being fatherless leads to greater likelihood of bad outcomes. There was a damaging pathological divorce (goal of raising children lost, children are expected to take sides). They were emotionally neglected, which can cause disillusionment and creating fantasy, idealized relationships. Angela was also physically beaten.

3858    Pearl would violently wash their mouths out with soap. Kids like this grow up to be 5 times more likely to be arrested as juveniles, 2 times more likely to be arrested as adults, 3 times more likely to be arrested of a violent crime.

157

OBR000188

Angela also had to watch her siblings get beaten, which causes disaffection with authority, vigilant posture towards adults, guilt, behavior problems, anxiety, shyness, aggression, etc.

Studies back this finding up. They looked at spouse abuse, abuse of children, and a climate of violence, which were all in Angela's life and have a cumulative effect. There was also a bizarre religiosity. Berrigan said, "We've heard a lot about that, and … it pretty well speaks for itself."

There is a climate of fear, that you're surrounded by forces, etc. There were instances of casting out demons in Angela's home. There was also a bizarre episode about the end of the world and a 3-day journey. They had overly adult bible studies, but Pearl would say she got messages from God. She told her kids she would sacrifice them like Abraham did if God asked her to. If they were sick, they got "hands laid" on them, not a doctor visit. They would fast. The effect of these episodes was constant fear, anxiety, inability to learn cause and effect, lack of personal responsibility, isolation from peers, etc. Angela did the best she could, but was more restrictive than most kids. She tried to be more individualistic and resistant, but was abused for it, and exorcisms increased.

The effect of this neglect is more damaging than intermittent physical abuse. The foster family, the Dillos were also damaging. They would make the kids watch hogs eat chickens, or watch them kill rabbits, which was very damaging.

Angela was traumatically sexualized (became sexually active too early), betrayed, and powerless (her will was overcome). The frequent moves from house to house.

Angela started abusing drugs. Started marijuana at age 12 to escape

Angela was buying her own at 14. She said she didn't want to have religion in her life, just smoke pot and be happy. She started drinking at 12 or 13. At 14, she occasionally used LSD.

She worked at age 13 or 14 for her mom for very little money. She dropped out of school to work in 9th grade and married when she was 16.

She was only married to Steve Hugo for just over a year. At this time she also lost touch with her dad. She then married A.J. and they have a baby. That marriage also failed. She began to use cocaine and meth. She used drugs as medicine. The meth can change how you view people and the world. Her and Terry DeGeus' mutual use created conflicts.

Angela was in jail for 2-3 years before she understood the detrimental effects of her meth use. Terry DeGeus "savagely battered" and stalked her.

Then, Dustin Honkin, the father of Angela's 2nd daughter, comes into her life.

158

OBR000185

3880 I also study violence risk assessment, which is studying the likelihood someone will be violent in the future, and in this case, in prison.

3881-82 The government also studies this. I've been published many times on this topic. In Angela's case, I think there are a number of factors that point to her being likely to have a positive adjustment in federal Bureau of Prisons: her being female, her age, she has her GED, she has an employment history in the community, her behavior in jail for a long time prior to trial, the degree of risk that correctional professionals have brought to bear on her, and her continued contact with family. I think there is a low likelihood that she would be violent in prison.

3883-86 Studies show that women rarely kill and assault each other in prison. Women commit violence at substantially lower rates than men, and when they do it's less serious. They are more like cat fights. She is also less likely to be violent in prison because of her age of 41. Once you are past the peak age for fighting (24-34), they are much less likely to have any time of infraction.

3886 Because Angela has her GED, she is more likely to adjust better and less likely to participate in violence.

3887-88 Because she obtained her GED during incarceration, it says she can use incarceration in a positive way. If someone has a good work history, it says they're more likely to work hard in prison. It also says they respond well to authority.

3889 She was involved in many minor and typical disciplinary incidents.

3890 There were no acts of serious violence. Half of her write-ups were associated with one officer in particular.

3891 Angela never went after a jailer unprovoked. Her mouth sometimes got her in trouble.

3892-93 Most of the trouble came at times when she was never moved around from cell to cell in Waterloo. In Linn County, she was locked out of her cell for most of the day in a common area shared with 4 others, which the context in which the write-ups occurred.

3894-95 When I went to visit her she was unrestrained and very talkative with the staff members. She also participated in a study for a school or university purpose. She should not be housed in a single cell all day.

3896 Prisoners who have family relationships do better because they still have an anchor in the community and have an incentive to impress their families. Angela gets along very well with her daughters.

3897-98 We're doing a study about the offense that sends a person to prison, disciplinary actions, etc. People who are in prison for first degree murder are no more likely to be violent in prison.

159

OBR000190

3899  The more violent the crime, the less frequent disciplinary action needs to be taken because when you're facing a longer sentence, you want to get along with the program better.

3901-02  Angela has support from the prison staff, is taking medication for her emotional issues. I think that she will adjust positively to prison.

[NO CROSS EXAMINATION]

[LUNCH RECESS]


**ALYSSA JOHNSON – Defense witness**

**Direct Exam – by D (Mr. Berrigan)**

3904  I'm 21 and have lived in Forest City, IA for 2 years now. I go to Waldorf College full-time. I'm going into my sophomore year and am a business management major, but I might change to psychology.

3905  I love school and am excelling. I pay for it with grants and scholarships. I have a 2 ½ year old daughter, Angeleah.

3906  My dad is Arlyn Johnson who lives 2 blocks from me. He helps me by babysitting.

3907  My parents have been divorced since I can remember. My earliest memories are living with my mom in Leland. I've got my GED which is how I got to college.

3908  I've worked with my mom at North Beach. My sister Marvea and I are very close. Exhibit 2181 is a picture of Marvea holding my daughter when she was 4-5 months old.

[Three more pictures of Marvea and Angeleah are submitted]

3910-11  When Marvea lived closer, I could see her more. Now I only see her for a little more then holidays, and we talk on the phone. As for my mother working, she always made sure I had what I needed with the babysitters.

3912  My mom was more lenient than most.

[2 pictures of Alyssa and Angela submitted]

3913  I'm about 7 in the picture. My mom always went to school events and teacher conferences.

160

OBR000191

3914-16　She has always been very affectionate and open with my. She was not neglectful. When I was in kindergarten, Terry DeGeus entered my mom's life. He was very loud and violent towards my mom. He would manhandle her in front of me. When I was in 2nd grade, I was sick and sleeping in my mom's bed, which was next to the living room where they were. I heard sexual activity and my mom saying "no more" so I yelled for her.

3917　They were off and on all the time. I was devastated when he would come back. My mom liked that Terry's daughter, Ashley, and me were the same age and could play.

3918　I met Dustin Honkin when I was about 10. He was smart and laid back, but at first acted like he was an authority figure in my life.

[More photographs submitted]

3919　That is a photo of my mother in her mid-20s

3920-21　I learned later in my life that my mom was an exotic dancer and used drugs when I was younger. I knew because she would be up late and wake up early all the time. Then she would sleep for 2 days. She didn't use drugs in front of me. I was home when she got arrested.

3922　There were cop cars and people everywhere. I could hug her and say goodbye briefly. That was in 2000 and I've got to hug her twice since then.

3923　I could visit her in Benton County, but not in Black Hawk County jail because I was under 18, which really upset me. Marvea and I could visit at Linn County.

3924　We also write letters and talk on the phone. I just update her on my life and vent. She was in jail when my daughter was born.

3925　For the first year of her incarceration, I wrote her long letters about twice a week. She would write often too. We talk on the phone also, but she has to call me.

[Letters from Angela to Alyssa submitted]

3926-27　My mom's incarceration has been hard and I miss her. If my mom was imprisoned, all I would want was a hug and the opportunity to continue our relationship.

[NO CROSS EXAMINATION]

**THE DEFENSE RESTS**

[NO REBUTTAL EVIDENCE BY P]

161

OBR000192

[P'S OBJECTIONS TO MITIGATORS]

P has problems with mitigators and lack of evidence. Number 9, Angela Johnson was youthful, naïve and immature. She was 29 at time of offenses. Number 11's contention that her abusive relationship with DeGeus drove her to her relationship with Honkin, from which the underlying murders sprung.

Number 17 – there is no evidence that she was addicted to meth or that it had an effect on her judgment or personality. Number 20 – there is no evidence that she was under substantial influence of Honkin causing her stress, anxiety, and impairment of normal judgment.

I did not object to Number 21, that her pregnancy disadvantaged her because that's something the jury should be able to argue as common sense.

[D's response to P's objections]

Number 7 – The testimony of Wendy Johnson is evidence of sexual abuse. Our experts have also said that victims are not forthcoming with this evidence.

Number 9 – I concede that there is only circumstantial evidence supporting the contention that Angela was youthful, naïve and immature. So we're willing to rephrase it. She was naïve about the plan of Honkin. The jurors did not find deliberation of murders of 1st 4 victims.

Our professional, Dr. Hutchinson testified that development is stunted by use of drugs. Angela used drugs well before the age of 29.

Number 11 – I don't have any problems changing the language of this one that says her relationship with DeGeus drove her to Honkin.

Number 17 – Angela has been addicted to meth. For this drug's effects, there isn't a diagnosis required and the evidence is clear she used it regularly. Dr. Cunningham told us it took Angela years to realize the effects of meth.

Number 20 – There's "certainly" evidence of Honkin's substantial influence. In the first phase, there's evidence that Honkin was the one looking for Mr. Nicholson.

[Court rejects this evidence as unrelated to Honkin's influence over Angela, just that he was the leader]

D: It's evidenced in her sobbing confession to Christi Gaubatz.

As to Number 15, that Angela's remorse will plague her for the rest of her life, Christi Gaubatz's testimony of Angela's sobbing confession serves as supporting evidence. Besides that, the only evidence is human nature.

162

OBR000193

[Court says this could have been the subject of expert testimony]

D: None of our experts could have possibly offered evidence about remorse without talking to Angela about the crime

P: I have a problem with 17's wording that she was "addicted" to meth because this implies that she was out of control.

Court: There is plenty of evidence regarding the frequency of her drug use.

Court has issue with number 20, that Angela was under stress and anxiety. Thinks that there's not even circumstantial evidence.

D: The sobbing confession she gave to Christi Gaubatz. She was upset that she never intended to kill anyone, especially the children.

P: that still doesn't support any causal connection between Honkin and her stress.

D: Jurors can reasonably believe that Angela went into the house thinking they would videotape, and perhaps kill, Nicholson, but that others weren't supposed to be killed. And Angela confessed to Gaubatz that things went awry. She was also pregnant with Honkin's baby.

Court still has issues with causal element of mitigator Number 20. Tells D to revise.

Mr. Willett jumps in to say in regard to mitigator 17 that Title 21 §802(1) defines "addict" means "any individual who habitually used any narcotic drug so as to endanger the public morals, health, safety, or welfare or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." Angela fits within first prong.

[D'S OBJECTIONS TO AGGRAVATORS]

Number 1 – Danger to lives and safety of others in the future. There's no evidence supported beyond a reasonable doubt. I just wanted to preserve it for the record.

Number 3 – aggravator suggests that Angela herself intentionally killed, which is not supported by any evidence.

P agrees to amend.

Court: P has to prove that modifying it to aiding and abetting would qualify as a non-statutory aggravator.

163

OBR000194

D asks for time limits for closing arguments as previously discussed.

3956    D also asks that Angela get to visit Alyssa. Court grants

3957    Court imposes 2-hour time limit on closing arguments

3960    P alerts court to telephone hearing in Honkin case on June 22. Per Justice For All Act, court is required to attempt to accommodate the victims' families. Court agrees.

3961-62    D expresses concern that if jury hears of arguments regarding Honkin's post-trial motions, they will know that Honkin's proceedings are still being litigated.

[RECESS]
**END VOLUME 21, June __ 2:20 p.m.**

164

OBR000195

**BEGIN VOL. 22, June 19, 2005, 6:56 p.m.**

[Proceedings reconvene]

D: We've agreed to delete mitigator Number 9.

For Number 11, the Court agrees with defense that there was "traumatic stress" from the physical abuse can be implied due to testimony regarding "at least one beating where she was black and blue from head to toe."

Court agrees with defense that jury can infer from Dr. Hutchinson's testimony that Angela suffered from post-traumatic-stress disorder from DeGeus' beatings that she was "traumatically stressed"

Court rejects mitigator Number 15 because there is no evidence that Angela suffered remorse.

D insists that a sobbing confession to Gaubatz is evidence of remorse, along with the government's closing argument at the guilt phase.

P and Court contend that she was sobbing because she was afraid of getting caught due to Gaubatz's testimony that Angela was also "paranoid" and that it would have been easy to provide evidence of remorse. D contends she was paranoid because she was on meth.

D contends that they only have to prove it by a preponderance of the evidence.

Court says D should have had the psychologists interview her after the guilt phase and ask her about remorse. D says that would be too self-serving, horrible evidence. Court lets them put on mitigator 15, but takes out the word "genuine."

For mitigator 17, D insists that the word "addicted" should stay because there is not a high standard, specific definition. He says replacing it with "regular user and abuser" gives it the idea that she could quit at any time. Court lets "addicted" stay.

As to mitigator 20, that she was under substantial influence of Honkin, D contends that the change in circumstances at the crime scene caused Angela stress, anxiety, and impairment of normal judgment. P disagrees because there's no evidence of Honkin's influence on Angela. Court agrees and strikes mitigator 20.

D preserves a letter to the judge for the record. He is concerned that repeating the fact that the defendant has the burden of proof for each mitigator. Applying the same rule to that government's non-statutory aggravators wouldn't help because the Court has expressed that they've already proven them.

165

OBR000196

3984 D says it makes a difference, especially with the "Angela Johnson contends" language that doesn't appear in the preliminary instructions. The jury could infer that the Court ruled on that for whatever reason. Court offers a compromise to put "the prosecution contends" in front of their non-statutory aggravators.

3985-88 D doesn't have a problem with compromise, except that the "contends that" will be italicized. Court says that's what he gets because he's admitting mitigators that don't have any evidence.

3989 Court decides to put the whole sentence in italics and take out "Angela Johnson contends"

3990 D moves for allocution, which is denied.

3991 D raises issue that was in the letter regarding preliminary instructions. Court grants.

3994 D also suggests changing "thinking or behavior" to "mental state" in instruction number 5 and court grants.

3995 P has book of witness that he would like jurors to have access to in deliberations. No objections.

[1-HOUR RECESS – Mr. Berrigan is absent for the remainder of the day's proceedings]

3997 Parties agree on final jury instructions

[ADJOURNED]
**END VOLUME 22, June 19, 2005, 8:25 p.m.**

166

OBR000197

**BEGIN VOLUME 23, June 20, 2005, 8:15 a.m.**

**Preliminary Jury Instructions – by Court**

4000-01 The Court tells parties how/which instructions will be in preliminary instructions. He also tells the parties what he will do in the event of needing an alternate juror.

4002-08 Court reads final penalty instructions numbers 1 through 8 in open court. He tells them to check the counts they unanimously think have an aggravating factor or mitigating factor. He then reads the mitigating factors to the jury. Tells them to weigh the aggravators and the mitigators. He then says to determine which sentence they would impose for each count.

**CLOSING ARGUMENTS – by P (Mr. Williams)**

4009 You told us back in April at jury selection that you would impose the death penalty in the appropriate case.

4010 The defendant willingly joined a drug conspiracy that was a long-term, premeditated decision. The reason was greed, money, and drugs. The defendant wanted to get to the top of the conspiracy, above her ex-boyfriend who owed her a lot of money.

4011 The drug conspiracy produced over $100,000 per year. After Dustin's arrest and pre-trial release, they planned to kill Greg Nicholson and she was willing to do it. They planned it out carefully, including borrowing Gaubatz's car, surveilling, and buying a handgun.

4012 The defendant knew that Lori and the girls were home. She told Lori, who answered the door, that she needed to use the phone, at which time she would see the girls. This was all before she ever pulled the gun out of the cosmetic bag.

4013 Steve Vest said she held the gun to hold the family there until Honkin showed up. She drove them to the murder site, which was an 11-minute car ride, "11 minutes of pure terror."

4014 While Honkin took the adults into the woods, the defendant could have told the girls to run for their lives, but she didn't. Over the next 3 months, "life goes on for her."

4014-15 She is questioned by the grand jury on 10/27/93 about Honkin's and DeGeus' drug relationship. Nine days later, she kills DeGeus. We know from Gaubatz that DeGeus was afraid for his life after hearing about Nicholson's disappearance. Honkin was hesitant to shoot DeGeus, but the defendant got in the car as a signal for Honkin to hurry up. She handed Honkin the baseball bat and helps bury him. In the note to McNeese, she said "buried him on his knees like he used to make me be."

167

You found beyond a reasonable doubt that the defendant intended and premeditated this murder. They had to kill Nicholson because he was going to testify against Honkin. The others had to be killed because they were witnesses.

Let's go through the aggravators. You found substantial planning as to the killing of DeGeus since defendant purchases a gun from a remote pawn shop. The gun had a silencer attached. The defendant was the one who manipulated DeGeus into the place he was murdered.

You also found substantial abuse to the adult victims. DeGeus and Duncan were bound, gagged, and shot multiple times. DeGeus was beaten with a bat and shovel. You've found that the girls were vulnerable victims. Neither of them had the power to protect themselves.

We ask you to find that the defendant is also a future danger to society. Honkin's sister testified that at Honkin's sentencing, the defendant threatened law enforcement officers. Afterwards, she hired thugs to collect her drug debts. The defendant was violent. She bragged about a young girl that she had to "put in her place." She told her thugs to kidnap Rodriguez. What do you think would've happened to him?

She also threatened a dispatcher in county and assaulted other inmates. We also ask you to find obstruction of justice. Someone like the defendant who kills witnesses has no fear of authority. If we do not punish the killing of witness with death, what deterrence is there?

It should also be an aggravating factor that she killed more than one person in a single criminal episode. The defendant has no respect for life. Another aggravating factor is victim impact. Their family continues to suffer. Nicholson sold meth, got arrested, and decided to turn his life around. DeGeus was a tough guy, but had a big heart and met his daughters every weekend and brought flowers to his ex-wife in the hospital. Duncan was a completely innocent woman who was never into drugs or crime. She was a Navy veteran. She was bound and gagged and knew she and her kids would die. Kandi and Amber's lives were cut short. Nicholson's daughters will grow up never knowing their dad. DeGeus parents, Ed and JoAnn lost their son. JoAnn has a doctor's order not to attend this trial anymore.

Ashley didn't know where her father was and worried about whether he had shelter, not knowing he'd been murdered. The Milbraths also lost a whole branch of their family tree.

Mary struggled in having to identify the girls' clothes and drives down the same street where her daughter and granddaughters lived. Dave Milbrath blames himself and wouldn't let Amber stay overnight. Jay Duncan and his family have no branch in the family anymore. Jay got a disease in a flood and can't walk and barely remembers he has daughters.

168

OBR000199

4026 Mitigating factors 1,4, and 19 deal with the defendant's role in the offense. It doesn't matter that the defendant didn't pull the trigger, but that she helped and manipulated the victims. We saw in Tim Cutkomp's testimony that it was the defendant who pushed Honkins to finish manufacturing the meth.

4027 Tim Cutkomp said that he was mostly afraid of Angela Johnson because she was pushing Honkin to kill again. She is not less culpable because she was pregnant.

4028 The mitigator that she had no prior record just means that there's no evidence of a prior record. You should give this no weight because she was simply just not caught. We know she was distributing meth and hired people to kidnap for her.

4029 The impact a death sentence would have on the defendant's family is a result of her own choice. She put her family in that position. In mitigating factors 5 and 10, the defendant blames the victims.

* Obj. by D – inappropriate because this is a statutory mitigating factor – OVERRULED

She blames them in that they were involved in the drug trade, but that's not what killed them. She says DeGeus abused her.

4030 This abuse occurred years before the murders. Mitigating factors 8 and 17 say that the defendant is no future danger. Her expert could not guarantee this, only that violence was a "low probability."

4031 When considering the fact that she was abused in the past, also consider that she has since grown up. The experts were instructed not to talk to the defendant about her crimes, so there is no evidence linking any abuse to her mental state during the murders.

4032 There is also no evidence of remorse. She was crying when she confessed the crime to Gaubatz, but she was basically paranoid and afraid of getting caught.

4033 We impose life for just killing one person; this defendant killed five. The murder of children cannot be mitigated.

4034 Dustin Honkin got the death penalty for the same crime

[END OF CLOSING ARGUMENT BY P]


**CLOSING ARGUMENT – by D (Mr. Berrigan)**

4035-36     You are not required to impose the death penalty because Honkin is more culpable than Johnson.  Steve Vest is the only person that said Honkin told him that he told Angela that the plan was to kill Nicholson. At this time, Honkin was also planning to

169

kill Angela. Christi Gaubatz testified that Johnson had told her that the plan was to get a videotaped statement from Nicholson.

4037 They didn't expect Lori or the kids to be there. To Angela, something went horribly wrong. The prosecutor's statement that the drug trade didn't kill Nicholson is misleading. The drug trade is a very dangerous business.

4038 Angela got the gun after getting a permit for it and saying she wants to protect herself from DeGeus. Is there evidence that Angela tied them up?

4039 There's also no evidence that Lori rode in the car with her daughters. It was Honkin who marched them out to the field. It's up to you whether or not to believe Steve Vest's testimony.

4040 There is no evidence that the silencer was on the gun before Honkin got a hold of it. The gun was not sold with the silencer. Yes, Angela should have saved the girls while Honkin was away.

4041-42 I don't think Lori or Amber had any time to think about what just happened to Nicholson or Kandi because Honkin didn't hesitate. As for the DeGeus murder, DeGeus gets out of the car and walks toward Johnson and Honkin, even though he's supposedly deathly afraid of them. Angela gets in the car, supposedly to telepath to Honkin to hurry up and shoot him, but it was cold outside. The prosecution says this is a retaliatory murder, but she doesn't have a big part in her own retaliation by sitting in the car while DeGeus is shot and beaten.

4043 We don't know that Angela even watched because she was surprised that he was so bloody. She had never threatened him; she was afraid of him.

4044 Angela lied in the grand jury proceedings in favor of DeGeus. Honkin uses Angela "like all the other tools in his bag." He wrote a letter to a kid that said the more you know about women, the more you can get what you want.

4045 Honkin is able to keep the two pregnant women in his life completely separate because he's scheming and conniving. It does make a difference that she didn't pull the trigger, but was aiding and abetting. Johnson and Honkin should not receive the same punishment.

4046 Angela did not "egg on" Honking to kill DeGeus because he didn't need egging on. He didn't want DeGeus to testify against him. As for the 4 aggravating factors you are now asked to find, I will not contest that multiple people were killed or that Nicholson and DeGeus were killed because they were potential witnesses.

4047 I also will not dispute the impact of the murders. The number of people at your funeral should not be the measure of someone's life.

170

OBR000201

4048 We as jurors cannot base a sentence on the emotion of grief.

4049 Angela will not be a future danger. She's been in jail for 5 years. She's gotten into 2 fights, but no one was ever hurt because they were hitting and punching matches. DeSotel's testimony says that most people stay in county for 90 days and move on; if they're there longer, they get institutionalized and treat the place as their home.

4050 Mitten and White spent 6 months video and audio taping her undercover, and you heard the best that they got – that Rodriquez owes her $1200.

4051 She said "bring Jimmy to me" but that didn't mean she'd hurt him. The 18 year old girl she needed to put in her place is nowhere to be found. There is confusion about 2 different cars, and which had the duct tape. Kathy Rick said Angela threatened to throw a brick in her house, but nothing bad ever happened.

4052 Rick was never so scared of Angela that she stopped sleeping with her boyfriend. According to Vest, Rick was, according to Honkin, ready to help Honkin kill people.

4053 Alyssa Nelson, a PO, said that Angela looked like she was on meth at Honkin's sentencing hearing, but that no one was injured. Kyla Davis was an ex-dispatcher at Benton County who told Angela once to put her pants on. When Angela said she had (and hadn't) Davis told her not to lie, at which time Angela asked her "what are you going to do about it?" Davis responded by alluding to her family visitation privileges being taken away. So Angela tells her she's going to get her.

4054 Davis is the only one who said anything because it happens all the time. This is not evidence of future dangerousness. The DOJ's own statistics say that women are less violent and aggressive than men and even more so once you hit 40 years old and have long sentences.

4055 It's normal for women in prison or drug dealers to swear at each other.

4056 Acting tough as a defense mechanism is not future dangerousness. She positively affected the lives of several women in prison.

4058 Honkin was going to subpoena many inmates so they could plot a breakout and kill guards if necessary. That's future danger.

4059-60 We know Angela is remorseful from many sources. Her sobbing confession to Gaubatz. The government wants her to say she's sorry, but confessing to five murders should be enough. She tells her sister Wendy and sister-in-law Shelly during a jail visit that she lured DeGeus, despite her lawyers adamancy not to talk. She has nightmares about DeGaus, she's on anti-depressants, and she tries to kill herself (because of limited daughter visits and because of what she's done).

171

OBR000202

4061 She told the lieutenant she had a "broken heart." Life in prison is still a very long time for Angela.

4063-64 Angela's metaphorical "egg carton" got dropped a lot. It had her and her siblings in it. Angela tried to resist the bizarre religious practices and wouldn't play along. If you don't play along, you get an abuse exorcism. And your mother, who is supposed to be the one protecting you, is the one doing it to you. The absence of her father led her to trouble in that she desired "tough" guys.

4065 All of you said in jury selection that you were capable of imposing a sentence of life. You said you would consider her abuse, neglect, lesser role, and lack of a criminal record.

4066 She didn't think she deserved anything better than a guy who beat her because she had never had anything better than that.

4067 We keep our kids from watching violence because it is an innate negative thing. Dr. Cunningham talked about choices. You do choose to commit a criminal act, but we should assess what choices you did and did not have in your background. Angela was predisposed to become an alcoholic.

4068 As for her sexual abuse, it does not excuse her crime. But she should not be weighed against those who grew up in a loving home.

4069 Angela's mom had problems. She even tried to drag her son Jimmy home from college to work in the restaurant. This damages kids, which makes bad choices easier to make.

4070 You should not be weighing premeditation. You should decide the factors for yourself, not as a group. You will have to live with this decision forever.

4071 The law doesn't require you to agree.

4072 The idea that Cutkomp was afraid of Angela more than Honkin is ridiculous. Honkin was the one planning to kill people. There is no evidence Angela had some magic control over Honkin.

4073 If Angela wanted DeGeus dead because he beat her, it would have happened a long time ago. The idea that murder against children cannot be mitigated is not supported in the law. It doesn't make sense that Honkin gets life and Angela gets death.

4074 The law gives the defense an advantage in saying that the jurors never have to vote for death.

4075 Humans don't want to decide life or death because they believe it should go to a higher province. But you have to, so why not use your responsibility to exercise mercy?

172

OBR000203

The Beatitudes are talking about people who have sinned and failed. Angela believes in God and believes and hopes He'll be merciful, but she wants to become a better person first. She wants to be there for her daughters more than anything.

You should give her life because of her dad who blames himself. Or Jim, Wendy, Alyssa, or Marvea.

[END OF D'S CLOSING ARGUMENT]


**REBUTTAL** - **by P (Mr. Williams)**

It doesn't matter how long her life imprisonment sentence would be because the victims will still be dead longer no matter what. Angela's cell would still be larger than their coffins.

Sending Angela back to prison is like sending her back home to her room, where she is relatively comfortable. Lawyers can paint two very different pictures. I've said she was manipulative; the defense says the opposite.

But look at the evidence. The abuse the defense refers to is given as an excuse. We as a society are tired of people not taking responsibility for their crimes. The defense never connected their expert testimony to Johnson's state of mind during the murder.

Dr. Cunningham's analogies and metaphors are not illustrative. People have choices. Lots of people with terrible backgrounds don't end up being murderers.

Johnson's background seems irrelevant because she doesn't start messing up until she's 28 or 29. The best predictor of future behavior is past behavior. She has a history of violence, killing, reflection, more killing and no fear of authority, so she is a future danger.

You are not bound by the sentence in Honkin's trial because you didn't hear the evidence. Johnson had a greater motive to kill DeGeus than Honkin, revenge.

The evidence of remorse the defense produces is only evidence of her paranoia and fear of getting caught. When her sister and sister in law visited her in jail, she didn't have a breakdown when she said she lured DeGeus; rather, she was crying the whole time. Suicide is not evidence of remorse. If so, why wasn't it attempted earlier?

When Johnson told Bramow, NcNeese and Hoover her story, she showed no remorse or emotion. She should not be shown mercy because the victims were never shown mercy. Mercy should be earned.

173

OBR000204

4086 Let God have mercy on her, but that's not your job here on earth. We give life to someone who kills one person. She killed five people and should receive the death penalty.

4087 The jury decision is somewhat individual, but ultimately a group decision. You are all in the same room together. If you choose the death penalty, it won't rest on the shoulders of each of you individually. If this is not a case that's death penalty appropriate, what is?

[END OF P'S REBUTTAL]

[COURT READS FINAL PENALTY PHASE INSTRUCTION IN OPEN COURT]

4088 Court tells jury what will be in deliberation room with them. Tells alternative jurors they are not discharged and can not talk with anyone about the case.

4089 Court compliments both parties on representation. "No stone was left unturned."

**END VOLUME 23, June 21, 2005, 11:55 A.M.**

174

OBR000205

**BEGIN VOLUME 24, June 21, 2005, 1:52 p.m.**

4094 [JURY ASKS FOR CLEAN VERDICT FORM – GRANTED]

4095-96 Court advises that motion for new trial must be filed within 7 days of verdict, but I'll be out of town. D requests to have up until 7/29/2005. Court agrees.

4097 [JURY HAS REACHED A VERDICT]

4098 Court asks members of the public to retain the "excellent decorum" when I do announce the verdict.

"The jury imposed the death sentence on all counts except Counts 1 and 6 upon which they imposed a sentence of life imprisonment w/o parole"

4099 [COURT POLLS THE JURY]

[ADJOURNED]

**END**

175

OBR000206

176

OBR000207

Dick:   ...the intensity of the payment she'd do. And... and hence, she'd been able to do it with a legal set of drugs that might not have created other consequences but that creates its own...

Pat:   ... I wished I had written that all down but I couldn't. (Laughter)

Dean:   Yeah. Repeat all that. (Laughter)

Dick:   Does that help?

Dean:   No. It kinda... I understand the theory why you want something...

Pat:   ... Do you mind if I tape this Dick?

Dick:   No, no. Go right ahead.

Pat:   It really is helpful later on.

Dean:   I, I... I wanna hear...but I want, you know. I'm just sort of trying to get the words out of your mouth because I... I really do wanna. We do wanna figure out and pick your brain. That's why you're here but... I mean, one of the problems I'm having is, as I have with this whole case is, is... is maybe that the problem that a lot of bias jurors are gonna have. Maybe that's why I would never be a good juror in this kind of case.

Dick:   No, but your instincts are ones that ...

Dean:   ... but my, my thinking...

Dick:   Keep, keep, keep us related through reality...

Dean:   Yeah. My thinking is...okay... My thinking is, "Okay, so she's takin' dope. She's pregnant. How frickin irresponsible. Now she's running around with this doper with a gun. Buying a gun for him. This drug dealer guy – Honken and then she's participating in kidnapping people, including two kids and whackin them and throwing them in the ground and, you know, she's a frickin disaster, why is her life worth saving? She's a complete fuckin wreck. And, um, you know, it's just one more example of somebody who is totally irresponsible, not only with herself and the way she treats her own body even when she's pregnant, and then carried through involved in killing two young children. Uh, you might as well have been trying to kill her own unborn child at the time and now she's coming in here as this convicted woman, asking for our mercy, and putting her 11-year-old

OBR000208

*Pat –*

*I'm passing on to you Hutchinson's latest billing & I completed the tape on Dick Burr's conversation. Talk to you soon. ♡ Becky*

Dick: ...the intensity of the payment she'd do. And... an.
it with a legal set of drugs that might not have creat
creates its own...

Pat: ... I wished I had written that all down but I couldn'

Dean: Yeah. Repeat all that. (Laughter)

Dick: Does that help?

Dean: No. It kinda... I understand the theory why you want something...

Pat: ... Do you mind if I tape this Dick?

Dick: No, no. Go right ahead.

Pat: It really is helpful later on.

Dean: I, I... I wanna hear...but I want, you know. I'm just sort of trying to get the words out of your mouth because I... I really do wanna. We do wanna figure out and pick your brain. That's why you're here but... I mean, one of the problems I'm having is, as I have with this whole case is, is... is maybe that the problem that a lot of bias jurors are gonna have. Maybe that's why I would never be a good juror in this kind of case.

Dick: No, but your instincts are ones that ...

Dean: ... but my, my thinking...

Dick: Keep, keep, keep us related through reality...

Dean: Yeah. My thinking is...okay... My thinking is, "Okay, so she's takin' dope. She's pregnant. How frickin irresponsible. Now she's running around with this doper with a gun. Buying a gun for him. This drug dealer guy – Honken and then she's participating in kidnapping people, including two kids and whackin them and throwing them in the ground and, you know, she's a frickin disaster, why is her life worth saving? She's a complete fuckin wreck. And, um, you know, it's just one more example of somebody who is totally irresponsible, not only with herself and the way she treats her own body even when she's pregnant, and then carried through involved in killing two young children. Uh, you might as well have been trying to kill her own unborn child at the time and now she's coming in here as this convicted woman, asking for our mercy, and putting her 11-year-old

daughter on the stand saying, "Oh save me because of her." Who was she thinking about when she was doing all this shit? You know, and that's sort of like...

Dick: Yeah...

Dean: ...I mean that's sort of looking cynical...

Dick: No.

Dean: ...But I mean, you know...

Dick: No, that, that's...

Dean: ...and what the hell, so she's using drugs. Does that excuse the fact that she participated killing a 6 and 10 year old?

Dick: Well, you mean the drug use is only a small part of her whole life.

Dean: Right.

Dick: And...and, you know, when you.... When the jury really gets deep in the excruciating stuff of her childhood, uh, I think they will come away with a disceral sense that she is absolutely fucked up.

Dean: Okay.

Dick: And, and, and it is ... and, and not withstanding that, she doesn't have a bunch of kids. Uh, she has one child and she does her best to support that child. She finds... she loses a job, she finds another one. If she's hurt, she gets some help but she goes back to work. If she gets laid off cause she's been hurt for so long, she finds another job. I mean, you know, she does try. She does...she does exercise to me an amazing amount of responsibility for somebody who had no sense of responsibility instilled in her growing up. No sense of self-esteem. No sense of self-worth.

?: And she's ??

Dick: And so somehow there is some really good, I mean, heroic is probably too much but there is a kind of overcoming stuff that most of us have never had to deal with that she did pretty well with.

Dean: Uh, huh.

Dick: You know? She, uh. She made money. She supported her kids. Uh, she, she did well, uh, until at some point all of that stuff just began overwhelming her too

OBR003210

much. And that I suspect... you know she probably has a kind of addictive vulnerability to her. I mean anybody. I don't know if you are a smoker but, you know, she was a smoker most of her life. I mean that's a sign of, you know, having a kind of addictive vulnerability. Uh, uh, and it's a, you know, it's sort of easy to, to turn to drink or turn to drugs to try to deal with, you know, to face each day. I mean that's what was happening with her. This is not a, you know, a young woman who had had a pretty good life and wanted to get high. It is absolutely not that kind of drug take. It is drug taking of necessity.

Dean: Now what...

Dick: ... And the fact that she did it during pregnancy... I mean think that somewhere in there she even tried to stop.

Dean: Right.

Dick: She, she tried to cut back. Um, and the fact that she was aware of that and then couldn't cut back or couldn't quit, this speaks how powerful the need for it was.

Dean: Well what about.... What are you finding or what is your impression of using drug use and the impact of drugs on the mind and thought processes as a part of sort of an argument of reducing culpability reference to the crime itself?

Dick: Well I think... I think as long as you, as long as you have this sort of whole life context explanation for why she started taking this stuff...

Dean: ...right...

Dick: ...and that she took it for awhile without, you know, without doing anything bad. And, and...but you can... the psychopharmacologist, or Dr. Logan ...

Dean: ...Right.

Dick: ... or whoever or both can help people understand that over time as you take this stuff, it sort of builds up and it can create the potential for really clouding your judgment.

Dean: Uh, huh.

Dick: And, and, you know, and she's ... she gets pregnant. She now has an attachment to Honken that she might not of had otherwise.

Dean: Right.

Dick: Um, and, and and...that whole having a child, you know, floods her back with all her own childhood stuff and how horrible it was to be a child in her family. And,

OBR000211

and that makes her want to cling to Honken and make him be somebody he probably could never be. But, you know, to, to… cause everybody had got in the back of their head, especially kids who grow up the way he did, they've got the notion that I can have a family that's different. You know, and so…and so her, her connection to Honken got deepened by that. And, and that was right at about the time that this happened. There was little… she was pregnant what… a couple of months probably…

Dean: Right.

Pat: Yeah.

Dick: … at the time this all happened?

Pat: Right. Yeah.

Dean: One of the things, yeah, cause one of the things I kind of, you know, we've all have wanted to play with is to do as much as we can to contrast her from Honken and put him in the driver's seat, if you will, and to put him in the action role and her in back seat.

Dick: Yeah.

Dean: And him as the leader. Him as the manipulator. He's the one that got her to get the gun. He's the one that got her to go up to that door and knock on that door…

Dick: Yeah.

Dean: …where Nicholson was.

Dick: And, and, you know, I don't …

Dean: …in that, you know… and he's the one that was supplying her with the drugs.

Dick: Yeah. And it, and it… I would not over-rely on the drug in that…

Dean: Right.

Dick: …because it's not just the drugs…

Dean: …right…

Dick: …it's her relationship with Honken that has been formed by her relationship…all the relationships she's had in her whole life. Many of which have been horrible.

Dean: Okay.

OBR000212

Dick: Relationships with people who are suppose to protect you and care for you and love you.

Dean: Right.

Dick: Uh, turned out to be just the opposite. And what that creates is this enormous need to have somebody treat you well. And, and you will...and that clouds your judgment. You know, that makes you do things that a person without that life history wouldn't even come near to do.

Dean: Uh, huh.

Dick: So it's not just the drugs. I think you don't want to over-rely on it. The drugs are a factor. But I... it seems to me that this could have happened without the drugs. You know...

Pat: Yeah...right.

Dick: Because of who she was and what she had gone through and endured and survived through her life. And how it had scarred her and disabled her. That seems to me a more powerful explanation.

Pat: Right.

Dick: The drugs are, you know, uh, she was very disabled, barely functional sort of just keep... you know, able to keep her nose above water and gasp some air every now and then. And the drugs probably made it, you know, so that she rarely got to the straights.

Dean: So, so you just kind of see in one part, you sort of see the drugs as the symptom and her drug is a symptom of the underlying problem and also a way for her to treat it but also...

Dick: And also...

Dean: and also having its side effect of the impact of the drugs on her ...

Dick: ...but in that sense, probably a straw effect. You know, it's the straw that...that just overloaded her too much.

Dean: Sort of like this potent cocktail that somebody is mixing up and you just add one more ingredient which kind of ...

Dick: ...I mean her life was the cocktail...

OBR000213

Dean: Yeah…

Dick: …The myth was that extra ingredient that probably just made it that much harder for her to function probably.

Pat: We can see that with this McNeese relationship, too. You know, she knows this guy for just a few short weeks but he convinces her that he thinks she's attractive, uh, that he's in love with her, that he wants to have a life with her. Um, she falls for this in the face of a direct line from her own lawyer that this guy is a snitch. You know, don't talk to him.

Dick: Which guy is this?

Pat: This is Bobby McNeese. This is the guy…

Dean: …she writes the maps for…

Pat: … that she writes the maps for. This is the big snitch. The government sends. Gets him all the way from Atlanta. Sticks him in the cell next to her.

Dick: A guy?

Pat: A guy.

Dick: In a cell next to a woman?

Pat: This is the only coed jail…

Dean: It's not like they're ??

Pat: … in the whole State of Iowa. (Laughter)

Dick: He, he was incredulous about this.

Pat: Yeah. Exactly. The only jail in the whole State of Iowa. It's a county jail where they have this physical set up …

Dick: …wow…

Pat: …that they are in adjacent cells.

Dick: So it's not… I mean, it's, it's Messiah plus.

Pat: Yeah. No, absolutely.

OBR000214

Dick: It's playing...it's not just somebody there. It's playing to her peculiar vulnerabilities.

Pat: Well they got this guy. And he, he was used on a number of cases.

Dean: He'd been snitchin. And ironically, one of the cases he had worked on immediately prior to this is one of Al Willett's client in the same jail...

Pat: Right.

Dean: ...About three or four months before this, he worked the guy over.

Pat: He was a psychiatrist.

Dean: Yeah.

Pat: He's charged with killing his wife and this inmate...

Dick: McNeese was a psychiatrist?

Pat: No. The, the client was a psychiatrist. But was a bright guy...

Dean: ...not killing his wife of being involved in uh, supplying prescription drugs inappropriately.

Pat: I thought it was a murder case?

Dean: Schultecks? Well, yeah, but what happened was then, McNeese engaged in a conversation about this...

Pat: Oh, okay. That's right.

Dean: About John Weatherson (?)

Pat: The guy was unbelievable.

Dick: Oh my God (laughing).

Pat: And so Al...Al's own client has already been snitched out by this guy and Al comes to Angie and says watch out for this guy, you know. He's already given testimony against one of my clients. But she still was kind of drawn to him. And it's the idea that he can think that she's an attractive woman and he wants to have a relationship.

Dean: But, but McNeese has a hell of a resume.

OBR000215

Pat:   She falls like that. I mean, just like that.

Dean:  He's got a resume where he's...

Pat:   ...She's not on drugs now...

Dean:  ... McNeese says he's connected to the Mob. Okay? That he, uh, that he knows Mob figures. That he's been continuing to be in contact with those boys. A whole array of things that are partially true. He's got a long rap sheet and, uh, claims he can fix her case for her if she just tells him enough things.

Pat:   But I think that we don't want to emphasize that he's a skilled snitch. The emphasis is on...

Dean:  ...No, but...

Pat:   ... how gullible she is...

Dean:  Right...

Pat:   ... and so easily sucked in. And this guy, she doesn't even know.

Dean:  Right. Yeah, we need to have him saying it was easy.

Dick:  But her gullibility is a function of her life.

Dean:  Right and that's the problem.

Dick:  Not, not drugs.

Pat:   Right.

Dick:  And it really is, uh...

Dean:  Yeah, she was easy.

Pat:   And not so much McNeese. I mean any reasonable snitch would have done. I mean anybody could have come in and say...

Dean:  ...but the only part of it...the reason that she was putty in her hands, I think in part, is this figure he represented himself to be, which is kind of identical to Honken...

Pat:   Yeah...

Dean:  ...his brilliance and his...

OBR000216

Pat:  Yeah. This is a powerful guy. He's strong. He has friends. He can get things done. Uh, he knows his way in the world, you know. He's gonna take care of her. That's the thing.

Dick:  Protect her.

Pat:  Yeah.

Dick:  Since she's always been looking.

Pat:  Yeah.

Dick:  But that really is. Protector.

Pat:  Yeah.

Dick:  A trustworthy protector.

Pat:  Yeah.

Dick:  That is like...

Pat:  Right. And they all fit that bill...

Dick:  Her Holy Grail.

Pat:  They all fit that bill. Even Honken. He's not a physically big and permittible fellow, but he is smart. Very smart. And extremely manipulative. And he controls these other guys that are physically strong, tough guys like DeGeus and Honken runs him. And he runs Nicholson, too, you know. He's the big, big cheese. So man, she's drawn to him like a moth to a ball.

Dean:  Right.

Dick:  But it is. It's terribly...to the extent that you do... and I think that I would underplay the drugs...

Dean:  Yeah.

Dick:  ...rather than risk overplaying them.

Dean:  Right, right, right.

Dick:  Cause I really think in context, they are just a small factor.

OBR000217

Dean: They are. That's an addiction.

Dick: The big factors are, you know, chronically having somebody try to grab your groin when you are five years and seven and eight and ten years old. You know, seeing these caregivers throw kittens to pigs. I... gee, I can't... or smash kittens heads. I mean.

Pat: Jim remembers the kittens with the kids.

Dick: Oh!

Pat: He isn't interested.

Dean: Oh.

Pat: He did. It's kind of come back to him since we talked to him about this.

Dick: I mean those are, those are ...those are the or...

Pat: ...that's the scar...the non-healing scar. He had done everything he could to get that completely out of his mind and that's why this has been so difficult for him because it is opening up these old psychic wounds.

Dick: And see, I mean another piece of this...this is probably on your list, Pat. And I'm sure you thought about it, but you need to use these other siblings. The jury will say well they went through all this too and they didn't turn out to be like her.

Dean: Right.

Dick: But I think you can...they can help you help the jury understand why they did better than her. You know somehow, I mean, Jimmy was smart and stayed in school and went to college.

Pat: He's a great athlete. Then he got away. That's the story.

Dick: And he got out. And Wendy got out early.

Pat: Right.

Dick: Uh, Jamie I don't know about. But, uh, Holly was...by the time Holly, the caboose came along, you know she was.... Uh, she had older siblings to protect her.

Pat: Yeah. She was...she didn't have the ...

OBR000218

Dick: And Angela...Angela had this personality that was kind of "in your face" personality so she was much more the target of direct abuse and, you know, getting the devil out of her and all that shit. Um, but, but the pain that Jimmy, the most successful sibling still has, which the jury will... and he'll cry. I mean he will be the straw and they will understand that if ...if you have that kind of pain in you and you had enough breaks in your life to be able to do what he's done, what if you are somebody that has that kind of pain plus other sources of other pain and you've never been able to get out of it. You, you know you kept having to rely on all the abusive mom and grandparents and all that and you know you'd rise out of it with some guy who turned out to be just like them.

Pat: Yeah.

Dick: You know, that, and that's the difference. With the women siblings, they probably had husbands or partners or whoever that weren't...didn't replicate the abuse.

Pat: Yeah.

Dick: Uh, and so....my image of her is somebody who just...who has actually got a formidable amount of internal strength because she has endured and kept coming up. You know, she kept coming up. She...and her employment history is so emblematic of that. She'd lose a job and she'd get another one. You know maybe she got a little welfare here and there, but most of the time she was earning money to take care of her kids. She worked through her physical pain. Uh, and she kept coming back and working and trying to support these kids. And she never had anybody to be ...to support her in that. The men that she got involved with wanted to fuck her and either...

Dean: Right...

Dick: ...leave her or abuse.

Dean: Right.

Dick: Or stalk her or frighten her. I mean, she...that's the difference between her and her siblings. Uh, and that's, I mean... so that's the enormous abuse and horrors that were visiting on these children could never get cabined off to the part of her life she didn't have to...where it could just be sealed in a locked room because everyday, she had something else that brought that stuff out of the room.

Dean: Right, right.

Dick: Some other person. Some other experience. Bad luck. Uh, I don't know...one of you wasn't in the room... I've never seen anybody that had so many ???

OBR000219

Dean: No.

Dick: I mean, you know, just one month, two months later another one.

Dean: Yeah.

Dick: You know, she wasn't killed. No. You know. But still. I mean automobile accidents, even if you don't get hurt bad are traumatic. And so she'd never…just never got a sustained refuge from trauma. All of that lifelong trauma kept coming back every time she'd get re-traumatized in some other way. And that's what distinguishes her from her siblings I suspect. I mean, does that sound right?

Pat: Yeah.

Dick: And so…and it does seem to me that she survived as well as she did and was as responsible a parent as she was…single mother, uh, and kept going back and working. You know, that to me is amazing. I mean, how you keep… I mean why she didn't kill herself? Why she just didn't give up? You know and just. She never gave up. So I think that's… and the siblings I suspect can help tell that story. Can help under…the jury understand why…why she ended up where she has compared to them.

Pat: Yeah. Right. Right.

Dick: They found, each of them in their own way, found somebody to let them keep the door locked on the part of their lives that she could never walk away. It just kept coming back and back and revisiting her like a nightmare but it was all the time. It wasn't just when she was asleep.

Pat: Yeah.

Dick: I mean that…so, so, what the government would think is their strength, becomes your strength. You know, which the other kids haven't done anything. And that's true. But that's because of what happened after they got older. Not because they didn't all experience the same thing. And the pain that each of them will express will tell people how hard it… I mean it… you know hearing the facts I suspect will be enough, but then they will see these siblings' pain when they think about all this stuff that they went through.

That's a long diversion from what your question was but the critical thing is that the drug thing is small and it's in context.

Dean: Right.

OBR000220

Dick: The context makes the way that any of the jurors would think about drug use is irrelevant. I mean it's not like deciding to get high. It's not...that is far from her experience as night is from day.

Dean: What? You take this case...what you've seen is a slow chronology. We ultimately...we still gotta deal with the core of the case which is their case...the government's. Five dead on two separate occasions including two young children. Dumped in the ground and so much refuge left there...horrible.

Dick: Is she the one, by the way, who ??? this map that she...

Dean: Yeah. For their informant.

Dick: Yeah. But she did it for self-serving reasons.

Dean: Right. Extensively, this McNeese fella said, "I know somebody who is already doing a life term. The most you can get is life. Expo Facto Clause." Would write this letter to her. We're saying the prosecutor planted that for him. I don't think he came up with that on his own. But...and actually he was right about that because at that time, she was charged with a Title 18.15 12 murder counts after which there was no effective death penalty. But nevertheless, he convinces her that he knows somebody who will take the rap for her but that person, in order to be able to do that will need to have sufficient, credible information, including, you know, bodies. The number one thing. To be able to, uh... to be able to provide that information and, "get it to me and I can get it to my friend through my contacts and connections." Yeah. He gets the map.

Pat: He just needed to know... that sufficient detail convinced them best that apparently he had done the murders.

Dean: Right.

Pat: So that was the whole deal.

Dean: So and she was willing...and she was even planning that after this plot was successful and this other guy had taken the rap, then she was going to sue the government for falsely prosecuting her and make a lot of money.

Dick: He was getting her... I mean that was his suggestion to her. Or she...

Dean: I think it might have been cause it might have been her. She was all on bar with that. Sue for money. Get a lot of money. And then she and McNeese would split the proceeds out of her lawsuit with him for falsehood charges. I mean it's quite diabolically done and it's really worthy of a book all in of itself. But,...

Dick: He's now going to be allowed to testify?

OBR000221

Dean: Cause she's not charged with level 21 murder but...

Dick: ... But even, even his account of what she said is not that different from what Dustin told us.

Dean: I, I...

Dick: ... It doesn't have her killing anybody.

Dean: No. Right.

Dick: Or knowing that they were gonna kill.

Dean: True.

Pat: The financial thread re-raises itself months later when Angie is ...Angie meets a woman as a lawyer whose basic charges are for some type of a financial fraud. I don't know. It involved a lot of money. And she being in the county jail with Angie and they become friends. And this woman is bright and I think very manipulative. Of course she and everybody else read about Angie's case and so on. So, uh, this woman gets some time. She does her time. She's out on probation and gets in touch by letter. She convinces Angie she should write a book or have a book written about Angie's life in the sense of what is true about these murders. And this correspondence goes back and forth and Angie has a copy of the chronology that she's reviewed extensively with corrections, she sends it all to this woman. This is how the government gets it because it's not legal mail and of course they open the mail and inspect these things. This woman lost her law license. She never represented Angie. We have a big hearing about this later on much to do about nothing. But the fact that this was for financial motives, that they're writing this book to make money, was just a horrible fact and we were thinking this woman being a potential mitigation witness. She has a lot of good things to say about Angie's behavior in jail and how she really looked out for some of the weaker inmates that were subject to being abused and otherwise. But this idea that she could be cross-examined that Angie was contemplating making money off of these murders, especially these two kids, you know, really takes her out of the picture. Although, I wouldn't be surprised to see her on the government's witness list, uh, not ours. And I don't know, I mean, there's not a whole lot I guess to be done about it.

Dean: Our client claims she just wanted to write a book all along.

Pat: Yeah, exactly. And then she's, you know, the money is for the kids, not her. She knows she's not getting out of jail. Blah, blah, blah. I don't know. I guess we can't really do anything about it. I brought it up cause it's there.

Dick: Yeah.

OBR000222

Pat:     And I wanted this woman... and still there's a chance that we might be able to get the lawyer...the ex-lawyer to say it was her idea. Although when I mentioned this, she was reluctant to do that. But... okay.

Dick:    So this lawyer didn't go to the government with all this?

Pat:     No she didn't.

Dick:    She was just...

Pat:     Yeah. Basically a guy had talked to her after the chronology. I mean they knew who she was. She had been an assistant and they knew that they were corresponding but they didn't really care about any of that until this chronology was sent out. And that's accompanied by references to books. Yeah, writing a book. You know that was that really tipped our hand. When they found out that they were thinking about writing a book together... and the other thing is this gal owes like a million dollars in restitution so she can't get the money herself so she's got some ghost writer. You know they got this big team basically. But it's this financial profit motive. It's not helpful. You know?

Dick:    Well, but you know all of that stuff you've gotta... I mean, it comes out of this person who is so needy in so many ways and so vulnerable to other people's suggestions.

Pat:     Right.

Dick:    For a better life. You know. Some... I, I think you just flip it back to the themes that are there.

Pat:     Right.

Dick:    As much as you can.

Pat.:    Right.

Dick:    Uh, because, I mean, she is that. She's incredibly needy and incredibly desirous of many of the effects because nothing could ever come easy to her. And that creates a earning for stuff... I mean the stuff with McNeese just seems so naïve. You know?

Pat:     Yeah.

Dick:    I mean that's easier to expect.

Pat:     Yeah.

OBR000223

Dick: You know this is a little harder.

Pat: Yeah.

Dick: But it does seem to me that it comes out of that same thing. And I would guess the lawyer sort of planted these ideas about writing the book…

Pat: Right…

Dick: and making money…

Pat: Exactly…

Dick: …and that appealed to Angie.

Pat: Yeah.

Dick: You're damn right it appealed to her. I mean she's never had much more than…I mean, growing up she didn't even have three meals a day.

Pat: Yeah.

Dick: You know? I mean, someone… a kid who grows up not having three meals a day or even two, uh, you know, I mean, just imagine the vulnerability that creates.

Pat: Yeah, right.

Dick: God, I mean. Of course you want money. You know? There's every reason in the world to want money because you've had…your whole life has been so fundamentally deprived at so many fronts. How could you not want money? How could you not want it to come easily? And that has no connection with feeling… it's not even connected to her how she really feels about these murders which is bad.

Pat: Right.

Dick: It has to do with, "Okay, you mean I could…something happened…something good could come out of this that could help me or my kids."

Pat: Right.

Dick: That's all. It's a disconnect. She doesn't have enough perspective to step back and say, "Gee, I can't do that."

Pat: Right. Exactly.

OBR000224

Dick: Cause if she could do that, she wouldn't be where she is.

Pat: That's right.

Dick: I mean it's that ability to step back and have a perspective that appreciates sort of, you know, this from the way other people might see it.

Pat: Okay. Yeah.

Dick: And that's a part of her. That's her heritage.

Pat: Yeah.

Dick: Um. It doesn't excuse it. It doesn't make it savory.

Pat: Yeah.

Dick: But it does at least…again, it's not a kind of a bad character trait when you put it in context.

Pat: Right.

Dean: Right.

Dick: It's more understandable.

Dean: What do you think works on these cases?

Dick: I don't think there's any…

Dean: …Is there a formula? (Laughter) Fucking case.

Dick: No, I think…the more people can… I, I, what I think is so powerful here is that what yawl's information you have is so powerful is there's no mystery to me about why she is where she is and how she ended up with Dustin Honken. And how she ended up being involved in this to whatever extent she wants to see.

Dean: You want to get into that inevitability type of …

Dick: It's not so much that it's inevitable. It is just that it explains it. You know, it explains it in very human terms. It's not that you have to conceive of her as somebody who is different. It is… if I had lived in her shoes her entire life, I could be there too. It's that. It's developing empathy.

Pat: Right.

OBR000225

Dick:  And lessening the distance between her and those 12 people in the box.

Dean:  Okay.  So when you're…

Dick:  The history that you all have allows you to do that because you can understand if you put yourself in her shoes, you can very real readily understand how you might have not done as well as her.

Dean:  Right.

Dick:  You know, how you might have given up.

(End of Tape)

OBR000226