**CURRICULUM VITA**

**George W. Woods, Jr., M.D.**

**4200 Park Boulevard, #545**
**Oakland, California 94602**

**57 Executive Park South, #360**
**Atlanta, Georgia  30326**
**United States of America**

EDUCATION

1981-1982:  American Psychiatric Association/National Institute of Mental Health
Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981:  Residency- Psychiatric - Pacific Medical Center
 San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978:    Internship—Medical/Surgical, Highland Hospital
 Oakland, California

1977:  MD, University of Utah
 Salt Lake City, Utah

1969:  BA, Westminster College
 Salt Lake City, Utah


LICENSES & CERTIFICATIONS


2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004:  Fellow: American Psychiatric Association

1992:  Certified by the American Board of Psychiatry and Neurology

1979:  Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

1

WOD000001

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

2

WOD000002

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981: Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California


INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania


ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of

3

WOD0000003

Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

CLINICAL LECTURES

2011: Neuronal Plasticity: **Cognitive Skills Retraining for students with acquired brain injuries or learning disabilities**. College of Alameda, Alameda, California

2011: "The Neurobiology of Trauma In Children: Lessons About Early Childhood; Families First, Atlanta, Georgia

2010: From the Plantations/Asylums to the Prisons: The Relationship between Humiliation, Stigma, Economics and Correctional Care for the Mentally Ill : 2010 Workshop on Transforming Humiliation and Violent Conflict*  representing the  16th Annual HumanDHS Conference  and the Seventh Workshop on Humiliation and Violent Conflict    Columbia University, Teachers College, New York

2010: Applying the Institute of Medicine Quality Chasm Framework to Improving Health

4

WOD000004

Care for Mental and Substance Use Conditions; Morehouse School of Medicine, Department of Psychiatry, Journal Club

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009: Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007: Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine, Atlanta, Georgia

2006: Moderator & Respondent (Representing Morehouse School of Medicine) Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003: Law, Mental Health, and Popular Culture: University of San Francisco College of Law

5

WOD000005

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

6

WOD0000006

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

American Association for Intellectual and Developmental Disabilities


CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

7

WOD000007

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California (Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association, Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy, University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Greenspan, Switzky, Woods: *Intelligence Involves Risk-Awareness and Intellectual Disability Involves Risk-Unawareness: Implications of a Theory of Common Sense*, Journal on Intellectual & Developmental Disability*, 2011, in press.*

WOD000008

Woods, Greenspan, Agharkar: *Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders:* American Academy of Psychiatry and the Law, 2011, in press.

Bradford, Fresh, Woods: Not all patients are alike: *Ethnopsychopharmacology of Bipolar Disorder in African Americans*. Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

FORENSIC PROFESSIONAL LECTURES

2010:   The Trial of Hamlet, Morrison and Foerster, LLP, Law College, San Diego, California

2009:  Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of  Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on

Case 3:09-cv-03064-MWB-LTS    Document 334-39    Filed 06/23/11    Page 9 of 287
WOD0006609

Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999: Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist? Can You Tell

10

WOD0000010

WOTD00011

11

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995:  Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Violence in the Workplace:  A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1996:  Dangerousness: Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention


PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995. (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

Anatomy of a Trial: 1994 (Available for the California State Bar).


PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health


PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2010:  Forefront Behavioral Telecare, LLC: Chief Medical Officer

WOD0000012

2009: AgeServe Communications, LLC: Director of Research/Director of Government Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:    In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II- Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 13 of 287

WOD0000013

Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006). Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters: Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College. (pp. 99-116). New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000). Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.


Updated May 7, 2011

14

WOD0000014

Johnson, Angela          8/5/2009

Kitty. 3 weeks old. Feral cats. Tortoise Shell.

Started comparand Mouse a toy string. 45 minutes.

Ribbing up against everybody. A year.

20 days. Aor much affection you show.

Laspla. Poortol. I have thought

One of the nurses is say to take. One is blind. Nishing the cat. Poop on her butt. Blood.

Rissis before I got indicted. Where's your cat.

Akynste. Put them in the box. They're my cats.

I made you a birdhouse. Specialty.

WOD000015



Johnson, Argela                8/5/2009

Popsickle sticks - Rec. corn. Points.
4000 popsickle sticks -          Log cabin birdhouse.

Modary nor a log cabin - Keep it & Only it
out

Iona - Whale heth yhry started with the
forners -

County Jail for 6 - hocked up for, I can
go outside - Wash my own clothes

Realy clean - Gone phobe. I watch the Shows -
Joncy 15th TV was so cool - TV noun.

Labile - Alone in my reom -

I didn't tell you how bad of place it was -
Religious fanatic - Phoenstrration. I couldn't
be the place.

I get angry If I seen unapproachable, I
don't have to discuss

WOD000016

I have 2 daughters. I don't like the feeling of vulnerability.

It was easier for me. I trust everybody. They didn't seem interested in me.

I hear someone say I would. Angry at myself, I feel vulnerable.

Always a single mom. I had to put on this big brave front. Of course, it didn't.

Drug addict. Angry I did over the next day. I knew it all.

Jump tall. My favorite color was red. I like to do meth & I loved my kids.

I thought I was doing such a great job, I was doing such a shitty job.

Mobile. I don't think a lot about my childhood. I have hit my kids.

WOD000017

Johnson, Angela          8/5/2009.

My ___ dad. My dad ___. I ___ ___ bars of soap.

My ___ used to ___ me in the corner. ___ ___ soap.

___.

happy to ___ in 2.4 seconds. People disrespecting me. Just ___ me through the ___.

I don't remember being six. I had by ___ ___ little girl.

Being with my dad. Take turns. 4 of us. I was sixty by ___.

Your secret is safe with me.

___ years old. I want to visit him & ___ the ___. I ___ ___ to ___ my ___.

WOD000018

(5)

Johnson,                     8/5/2009

I didn't tell her. Anytime I was with my Grandma, I was a good kid.

Burlington Wisconsin → 4 years old. Gypsies. Always a gypsy.

Looking for something she could have. Fnd - Very religious to the point where I could considered a religious.

Light under the bushel. Physical discipline. More so than anyone else.

No church - Her mother had an even bigger religious disorder - I think my son took on her religious disorder.

I always knew God loved him - Read bible study it seemed like everyday. Theo & Theos.

Couple with had long been - friends over, who had religious disorders.

WOD000019

⑥

Johnson, Argda              8/5/2009              1/19/67

Exercise — lay on the floor — Everybody's bad
to put your heads on the ad prey — You're doin'
Leaving you.

Yawn — No Yawns —

Timothy Zoloft — Seroquel 300y — 300y of Zoloft —
Wellbutrin 150y — Mov are single bed flesh.

IV lets we feel my emotions now — I don't want feeling
emotions — See a funny commercial.

I could be at work — Santa Claus > it would cry —

Why would she think she had to do it in them. I
could have figure out why she couldn't care you for
who she was —

Problem — I would always find it — I don't
think I had the down in we —

I knew I wasn't measuring up — If he can't care
we, I must be terrible —

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 20 of 287

WOD000020

Johnson, Angela                    8/5/2009

School. Trying to Learn School - School was really hard for us Wendy says we leant read, tell us we odd -

I couldn't understand - House / mouse - I realized early - Nervous -

Freeze up - Mom raise my bad- Freeze up-

I would so hardly for word to say to y dads. Sneaky horrible woman - Teach my reprove -

Once a year, in June - A couple of weeks out of the year.

Jimmy - Holly - I would tell that I did it.

I didn't get it. Big Mouth - I thought my mouth was big - Moed make my mouth smaller.

Concrete - He came to my area by himself. I got to see anybody you loved

WOD0000021

Johnson, Angela    8/5/2009
Anxy-chied. Marsville

During the train, I just. When I can't control
it, I just dissociate. I would go to a
different place.

I would do it afterwards. I hated how I
felt, it made me feel angry

A lot of time I wouldn't know why I slept the
day. So worthless.

Go through the lessons. I don't remember school
before the third grade.

Cont- No one stood up for us kids. Safety
on the school.

I couldn't learn to tell time. She was the only
one that could even teach me anything. I hated
that she was so smart & I was so stupid.

She is the only person who cared about what happened.
Lives in Texas. County school.

WOD000022

⑨

Johnson, Angela                    8/5/2009

I hate really bad choices — [illegible] them
through.

I'm incapable of help at both sides when I feel
vulnerable or scared, I'm [illegible] anything.

12 — My friend from school. I inhaled. It made
me feel independence. I liked it.

Smoky pot — really liked that. East Woods.
[illegible] I saved the girl's light up

Alyssa — Don't rebuke anything out of her.
She believes that God will heal [illegible] through
her.

Jimmy — Plays football — Mom used his [kids].
Wouldn't throw water on her —

She had agoraphobia — My dad, my dad, my dad.
Mom [illegible] about before I was [illegible].

Wrecked Orderly. Moving to night. Trash kitchen.
Holidays.

WOD000023



Johnson, Angela                    8/5/2009
7:30, Prepare my coffee. Computer class- T-Th.
Back to bed and 10 AM.

Michell gets up around lunch- Walk for an hour- Hot
& sweaty. Take a shower-

No soap opera 4 pm- Lock down for count.
5 pm--come out 6 ed-

Work on my project- curfew 9 PM-

24 hrs- Hair was down to my rearend- Piece of
shit-

Didn't want me to answer any questions- "Just that!"

Thought I was guilty off the top- Wouldn't
investigate anything-

You just don't know what's going to happen- I
held out some hope-

Patrick Reinard- Prosecuting atty- Lynn County
vs- Benton County-

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 24 of 287
WOD000024

Ⓦ

Johnson, Angela          8/5/2005

The Message. Smoked over 20 years. Leaving
to you that I can tell you.

The only way he could help him - Doing too
life sentences.

He told me - All I had to give him a few facts
of the case - & would be here. I told
him

I told him everything I knew - Superstitious. Very
Spiritual. Don't like ghosts. Restless, spirits at
peace.

She lived with us, off & on, until the 5th grade. Mean.
I believe she had a very, very severe problem.

I have to go back & go back. I'll be watching
a movie.

9pm. take a shower. lay in bed. Read.
flick y light off.

WOD000025

⑬

Johnson, Angela                    8/5/2009.

I'd be up all night - help u sleep
Cocaine - Shortly - First time I did a line of
Meth -

I always did - As soon as I w̄. Put it
in my coffee -

Very Euphorie→ Shortest, wisest time I ever had.
My own connection

Powerful - Independence - Confident - Feeling stupid.
Looking dumb -

Get the girls off to school - Good for the day.
Chronic dust - Dust 3x/week. Vacuum -

Don't put your socks on the floor - My verses
organized - Keep organized - Letters are
short & sweet -

Alyssa - 26 → Clear Lake, Ia. Myr. at a nursing college
Nhonea → followed by Satan - tends to lie + embellish things -
4/4 → Holly -

WOD000026



Clear Holy-Cross In. Mercy Hospital as a Nurse tech
A.B. Patty Cor of Amonea. Holey- Co rents.

Crystal Ayela → 3 o

I thought I was one back on - Move f,10 for
the - Above things. Awcho new hours of the day
Onset everything.

I won't worry Gesty sore - delivery. Stund
fenpous. Cna Vardino - Wads on - Mov patio
Turn ca fu

3 years before I had a colon with drugs.
Slid tapend.

Maca je thats - lon I slive with any girls - I
had two types of Srueds. with drys + with no
Oveps.

Seel ony tj more to oehtheart places, Not over
egain.

Omit Drostvi care arount I wated to get any
Shan how. Gave down to work.

WOD000027

⑭

Johnson, Angela                8/5/2001

In her Phoenix area, I started using drugs a lot.

Feels were really bothering me - I f I didn't cooperate. My kids could get killed at any minute.

Threat pictures. After a few years to county Jail. I'm not going to see the victim.

I had to plead guilty, testify against Justin - I'm going to testify at his trial.

Video visits + small screen.

I've never been to Europe, but I've been abroad. I never thought my dad could be. Never gave up for me.

I've he thought I was pretty short. They might he would like me.

Cookie Ducky my dad for years. All y'all are worried, but not Perry

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 28 of 287

WOD000028



Johnson, Brenda                    8/5/2009

Butler → Black & Silver. Alyssa started kindergarten.
8 ball at a time. Ace brought Deny into y bar.
Showed in with co —

Drug use — Possession & jealous. I'll see him — The drug
use was "too much —

He was downgrading. He was doing so much meth.
Abusing + obsessive bus He started daily drugs
so bad.

20,000- $2,000
       5,000 in his pocket. Take this dope. He
was Dustin.

By the ounce — 900/ounce — 4 ounces. Only with
I ever got. I refused to see it —

Dustin made it believe that it was less than it was. Hidely
my pregnant. I was freaky out. 4 months when
I found out.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 29 of 287

WOD000029

(16)

Johnson, Angela          8/5/2009

Trying to work - Being a mom ē Melissa.

I was scared of Perry - Perry throw keys my base all the
$10 - I agreed.

I went and said a gun - Pawnshop. That's perfect.
I had a gun before.

Dirty look - dope & money. I trusted.

There's this gun in my closet. I had slowed his
fired gun while I said hi.

Now & Tim - I mean say it again - Co-defendants
Destur & Tim - I hadn't seen him

I get off work & Lets sitting in the parking lot.
I'm 7 months pregnant. Both in their own
cars.

Mom calls to the end day & says, "Where's Perry?"
Dropped his son off -

WOD000030

(17)

Johnson, Angela          8/5/2009
Waverdrav - Christmas

Shallow affect -

Terry killed Greg. Thorder. I told Kristy

8/6/2009

Leroy in front of judge Bennett. (Suicide)

I an exhausted. I took a nap. Crom
So much in a short visit

I've always had suicidal tendencies - always. Aspirin
& coca cola. Eat the lining. Hospital too late
So pump & stoned -

I told my son - Before I moved to Des Moines,
I was suicidal then. What he might do to
the girls.

I actually. I have to remove Talking to Eliza Seth
& Holly -

WOD000031



Johnson, Brenda                    8/6/2009

Everythg get ready Brenda - Blame your arrest
on me, Leo.

I was giving him my milly - I know it costed.
I couldn't tell you the dates of the time.

I got here Janey 11. I could hardly stay awake.
I wanted to

Slept awake. I had tried many different types.
Elavil - gained weight. Trazadone for awhile.
Seratina. Serothru.

Seroquel - 50ty. Gradually got you up there -
200mg / 200mg. I'm freaking out, man -

I wanted to stay awake. he would argue &
argue about everythg. That was a lie.

6th grade. Between classes. Straight pin.
Oh my God. Oh easy.

I fall h' to the near was spring. I've never.

WOB000032

Johnson, Angela                          8/6/2009

(19)

During Jury selection. I have cheated, stole, fucked bitches in the ass, and can't deny.

He was staring up — yelling at me — I just looked at him — I can't believe he just said that to me —

It made me feel lower than any bottom feeding parasite

I always kidded myself in shielding her from the violence —

He would hurt me — In a frenzy. He hit me. Kicked me in the stomach. Sexually assault me. She saw the after

Fuck me to hurt you — It was always better to just be submissive cause I could get away.

I hated pot. I didn't want him on my case. Rather that, I wouldn't tell him anything anyhow.

He had me fooled where Carly was concerned. Never helped me with Bills. Never helped me & Never —

WOD000033



Johnson, Angela                    8/6/2009

I was afraid he was to hurt my girls. I felt
like he was capable of anything. Perry, you
were aware. He could

I had to keep my eye on him all the time. I didn't
know what I was dealing with.

Neighbor Lards c Alyssa— Played softball in the street.
Grab her in the back of the neck.

"I guess I'm in a lesson in respect." Very good at probably
to be sure

He took her car + he was gone all night. She had
his car. I called his cell. He drives her places
all night.

He led her at Kathy's— He car back. Switched
cars.

Started two years before the individual. He
was talking about being in the lab. McAleese.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 34 of 287

WOD000034

Johnson, Angela            8/8/2009        I oughta [illegible] around
like all the other plants & [illegible].

Big born. 1 hour after [illegible] real. Brandy had
just gotten there.

Above my bunk. Mary Bradshaw (Indian) Ready
directions of a Tampon Box.

Maxi-Pad puppet. She was a nosy bitch.

Neighborhood watch Rat. Told him they had [illegible]
wrong.

Peeped [illegible] emotionality. Knowledged he. Meth.
I never had any [illegible] who couldn't [illegible].

Drugs made me feel good. Trying to escape from
the pain.

Medicated. Several times. I don't think they
ever knew the walls.

Childhood money. Sick. He would sleep in Lou's
bed if he was sick.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 35 of 287
WOD000035

(22)

Johnson, Angela                    8/6/2009

Crawl underneath the bed - him. It's ok.
My dad got arrested + he'd climbed in the
window.

Deaf + dumb. Going deaf. Muffled + quiet.
While exorcism.

I do believe UFOs. Ho[]in. 24-25. I was driving
I saw a giant Eagle at my window.

Red eyes badly in my window. That was the devil.
I got exorcised.

Instruments. All been there. I saw the shadow
of a devil, walking across the wall.

unconscious choice so you go on to a restify place.
Live again.

Spiritual realm. Honest. Losers. Auroos. Stuff
Sylvia Brown. Psychic. Mr Lolibansis

I was told I was deaf + dumb devil. Save
into an Dove.

(24)

Johnson, Angela                    8/6/2009

8) Stomach - 5th & 6th grade. I would throw up
a lot. I had ulcers. Milk throughout the day.

My dad told me - Holly can come -
9) Feed. oily pretzels. Shoes were always too tight.
hoes. bunions. Yoga toes

Math →
March -
Fort Worth, Iowa -                   Hat, Cherry Cheese
D - Obama, Bush-2 term, Clinton (Bush) - Reagan
E) I don't know, had - didn't make friends easily   made fun of a lot
                                                    I had to continue -
F) Points to the floor, points to the wall -
G) Ray watch, toilet paper -
H) ok
I) Newspaper → Cascade oil -

Racing thoughts - Cascading. Reminds me of my mom
Mom's (scattorbrained) -
J) Angie Johnson
   I am so stupid
K) 54.3  I don't know - 3×10=30, 3×15=45, I would
   figure it out later    3 -
L) 100 - 7 - 93, 84,  95, 94, 91
M) Right ear & left thm.
N) New teeth - Show, Carb yourself, can of soda -

WOD000037



WOD000038

Jons, Angela            8/6/2009

R)had & peh. jhate o fish
B) Frost, Vehicles
S) - Ø

Crow ions

a) ore
B) basw finoca
c) Pup PURPLA 2
   Too bald,

H 5 - Drawtu & bockwords
   (a ft hao).

WOD000039

Johnson, Angela          6/17/2010

I put all my stuff away.
Scrubbj my Shower. I cons all those.
I'm try no con sequenc.

Lay in my bed. Do it with my toe. Do it
on my hand. Consting

I'll hear a number + up or down Sequence of
4.

Spells Mause. Mause Fingers 4 or 5 tax. Sequence
Go Pira. I try to stop.

I have to do it. I I can Move my finger to
Do it

xooooo o thirty I didn't do it in the
next seggent.

As I child - Same thing only new

Never Listened to any try I said. Cousins
in county Jail. I got arrested. Doch he
Go to Slaughter house

Never Listened to her. They didn't

I want there. Fany Regous thing.
Dush fed

WOD0000440

②

Johnson, Angela          6/17/2010

I felt very good about being dead broke.
Don't want to.

It took me a car. Greg Nicholson. I told
them to get me a place bargain.

I think about it every single. ~~A~~ Nobody's
fool.

Since birth. I could not let anybody touch
the little girls.

This kid is a chemist. He's really [?]. It
makes you feel so better.

Then I was going to do it every day of my life.
All the ways [?]

I was always disgusted. Glenn and Carried
[?] in an other side of the track kind of
guy.

He was smart. I was intimidated. Busted
to a different school in 5th, 6th.

From as long as I can tell. until 15.
I somehow stopped doing it off.

After by I'm taught the truth stop, very occurred

WOD0000441

③

Johnson, Angela        6/17/2010
Religiosity in'sane. Let home... My gradma
Lutheran.

In her room in the basement. On J Street
In Forest City.

She would be in and out- Nosy. Doing
st.

Mom. I can hear her deny it saying proudly.
He never went in the house- Outside/yard

Always outside. Guarded. Very secret.

I know they put up and could but he- I was
trying still.

Can't remember 1st sexual experience. I'd just.
Barnes Boy. Maybe 14

Remember kissing- Older. My only. Once I
get to county jail. Marty.

No one ever controlled Dustin. Pissed at him
for hanging out @ Kathy Rich's.

He's the only guy I thought didn't.

You don't get your cycle-

WOD000642

Johnson, Angela        6/17/2010

Not competent. Didn't pick the good Letters.

I was too doped up. I couldn't make suggestions.

Drug Counselor lady - one week. Threat. Linn County Jail.

Religious services every week. 4 Teachers

I don't think I could read 2 people score higher than you.

It happened in Alaska? Nome, Alaska. Unexplainable phenomena.

I could see this Eagle - Red eyes - hovering out my windows.

Owl hovering out my window.

I believed these are threats. I do believe that people are exercised. The craziest

I would lay on court. Step Back.

Rich Serrano - 2 kids

Case 3:09-cv-03064-MWB-LTS    Document 284429    Filed 06/23/11    Page 43 of 287

WOD000043

⑤

Johnson, Angela          6/17/2010

I think I was running and She Des Moines.
Had to save from the shop.

Sorry search trouble. Subpoenaed take great
tiny

Kept arresting up. Quit my job + home in
the middle of the night

Bids - hoped. few thousand. Get off Nissht
for awhile.

I was doing the dope to get high, I was doing the
dope to get through the day

Got myself a job. Stay there. Couldn't with Ds.
I can till now

He didn't hold up his end.

fish tailing →

14 → Regular.   Very thin. Coughy   98 lbs.
5'5"   5'9"

Very painful → ache. Always Dorethiosis
Endochriosis.

Stethoscope

WOB000044

Johnson, Angela.      6/17/2010
Thunnel - Funnel, Sleeping.
Cotton candy.

Angry ___ the ___ at ___ ___

Always in survival mode - From day to
day.

She called & told you there's a gun.

I'm pregnant - Scared of ___ ___
say ___ get a gun. He'll just ___
___ for quite some time.

She knew I was going to buy D. Christie

Bullet hole in my pictures

PMS → Wendy.

I didn't think I could help Alyssa ___ ___
work

I could never comprehend what I was really
___ about I ___

Making change. Age 14 - 1052. I couldn't
___ ___ day.

WOD000045

Johnson, Angela          6/17/2010

Poverty of thoughts.

I was awake 4-6 hours out of the day.

I'm eating. Showering.

WOD000046

①

Johnson, Angela    6/16/2010

I'm not be content. I guess why really registered Dre.

I'm sorry to ask — I wouldn't bother [?]

I would sleep on the couch — I'm not ready

Very tired — This is the 1st time in [?] years

Clean freak —

16 — Had a zero 160

[?] — Welburn — Ewell Toney

↳ 2005 — I can't remember —

I can't remember when I last served [?]
[?] did → months before [?]

Birdhouse

Exposure —
FASD? Just ask, no — I'll [?]
your own

WOD000047

②

Johnson, Angela    6/16/2010

Dakota County Jail - Nebraska   Govaphobe -

I can tell you right astern Thys are living
Locler

Even by first Drawer - I noticed that the
1st thg I would do to get upset, I
S. A to organize

If I could keep - I've never been in
Complete control

I've having such a hard time - can't go
any higher

soog - Seroqual - Check those records -

Just seeing them - Seeing my dad was huge
Just don't anyg - I was sleepy w/o
a chug

Ren - woobling
Medicate
Depress to tired, depressed.

My jury "hard no" Saying. Convicted
Me!

WOD000048



Johnson, Angela      6/16/2010

Maurya - the nasty, Loners, monarchs, Indian
princes

Cathy pictures. Drew in colored pencil. The
sky was yellow

Mom looked at anything like that. Mostly
Maurya on the head.

She would ask me, Mom, are you going to get
the death penalty

Marshalls said & Lynched came in. Cried.

Benton County Jail. Moved to Cedar Rapids.
McNeese - Leave his slot open.

Cathy ogre through the office. Moved me to
the under rec yard. Sit at my window
for hours.

Took a long time for Math to clean. I had
been doing it for 20 years.

Talked to him at the window.

WOD000049

(4)

Johnson, Angela      6/16/2010

I hadn't seen anyone, but Dr. Carroll.
Couple of times per month

He'd go out 2x/week. Smoking a cigarette.
Pizza Hut Pizza.

Got me a visit for my kids. Got my daughter
in to see her

Just tell me where these beds are. Roslin
told me.

Woodbury County Jail. I visited there
for him.

Ghost, she's like that. He held up a little up
I travel the road — I was too scared.

Even after they are in prison he would have
me go there.

Christi — having an affair = her husband
knows she's a fucking liar.

Pressured speech — Christi calls me — Why are
you fucking her husband

We had coffee — talked for hours

WOB000650

⑤

Johnson, Angela        6/16/2010

Record him coming over there - I kept the tapes.

His last paycheck went over - we left together. Ok.

Staying off to California - I changed Christi. She would come over my day I helped her get it furnished.

I did a line - wanna do a line

I don't have a lot of money of two - Dustin wanted to borrow my car.

Is it ok if I used your car - He did a car back to your car - Dustin's car

Take my car - Kathy's house - I'm pissed. Bring Christi's car back -

Went to Kathy's house - Is he going to leave to get my house and go

After Maringa - a year - I let him know that.

I knew he had a case against him. Nicholson was going to testify against him -

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 51 of 287

WOD000051

⑥

Johnson, Angela          6/16/2010

Labeler I was concerned about Tony
finding out I was pregnant

Made at night - Job party. Marryce. Before
she turned one

Bad mommy - He had made a comment about Tony
I started to cry

Dustin was shocked that I even cared about him - If
it went up to Dustin, Tony could have killed me
a long time ago

I'm glad they were sued. I couldn't have them
around my kids anymore

that shit has relevance to me.

I was afraid of him - I thought he was a punk.
He was a real nerd. I looked at him in a
whole new light.

I can't talk unless you make me - I have had my
whole life

3-5 - I remember being in a while night saw
a longhorn.

My knees holding up - up in the corner of the
room. I had died.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 52 of 287

WCD000052



Johnson, Angee    6/16/2010

Well, if ... I would give into the ...

Go someplace else - I can remove myself from the situation.

Don't go there - Also I'm still there. My ... would do the thing.

I could make myself leave - The ... caught - I couldn't ...

It wouldn't be a trigger - Her ... to do something

Don't ... again → They decided this so → I had to be ...

... got ... all the ... Are you losing your ...

Remove yourself - I just was there -

Resource class - 3rd grade - Pueblo, Colorado. Going to school -

Dropping my crayons all over the ... Would you have been able to ... so ... Cheaper -

I probably could have left ... there - I ... the ... bus -

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 53 of 287
WOD000053

⑧

Johnson, Angela        6/16/2010

I remember going to resource

I couldn't concentrate - I couldn't learn -
I couldn't learn -

Who lala lala lala

Sometimes I'll drool on yself - I go deaf
cold -

Muffled - I can still hear, but I can't hear.

Needles I would sell cigarettes - I
would go with the boys bathroom -

Put out all the crazy in - Put the needle
baby on -

I'd felt good + felt bad at the same time.
I could handle it - I was like party time -

Degrading - humiliating - beat - birdye

Never happened

WOD000054

Johnson, Angela    6/16/2010

The only thing they talked to us - you need to plead out. Get to.

They wouldn't come & see me - First time.

Different County jail - Cell block.

I tried to kill myself. I feel a bunch of

A lot of bad experiences in my life in - I can't really remember it.

I'm afraid to remember it - I know it happened.

Whatever ly you would nah us hope, I don't know how

You had to give some indication - I think I always went for the yawn -

Cough - Yawn - I pretty sure.

Pueblo, Kansas - 3rd grade - On the way. Not quite o you.

WOD000055

Johnson, Angela    6/16/2010

I [remember] living in the big square [room]

rabbits, cats, chickens. So cute, cuddly.
[green grass].

[Standing] on the floor in the hay. Daddy Bill
picked up up took a sledge hammer & its
eyes popped out.

I don't remember anything — [cut the body] & [pulled]
his [intestines]

The man [wanted] me to sit on his lap. Greeting
me —

Terry and Dustin a bunch of [news].
Sell the rest of this stuff for you.

Is there stuff in your house that you didn't
Did your handwriting just change

handwriting so completely different.
Your handwriting is so different.

Too hard for me — [they]'re [traumatic] points
in your life.

WOD000056

# EXHIBIT 1

WOD000057

*G*

*WW* George W. Woods, Jr. MD

1-866-646-0509

E-mail:gwoods@georgewoodsmd.com

Oakland Seattle Atlanta San Antonio

October 5, 2009

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 701 McGill Park Avenue NE, Atlanta, Georgia, 30312; 1511 M Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

Sycamore Avenue # 258, Hercules, California, 94547; and 139 Harmon Drive, San Antonio, Texas, 78209.

## I.    Curriculum Vitae

I am a Fellow of the American Psychiatric Association, a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am

1

also a member of the American Association of Individuals with Intellectual and Developmental Disabilities (AAIID)

I am the current Secretary General of the International Academy of Law and Mental Health, based at the University of Montreal. I am also on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

I teach Clinical Aspects of Forensic Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry. I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento.

I was on the faculty of the University of Washington, Bothell campus, where I taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California, Medical Center.

I received by Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm.

The neuropsychiatric assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline. @ (American Neuropsychiatric Association (ANPA) Web Page)

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical

2

WOD000059

training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders, mental retardation, developmental disability, and dysmorphology (the study of structural abnormalities often related to developmental disorders).

The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and synergistic with both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status in undertaken. (ANPA web page)

The training encouraged by the American Neuropsychiatric Association is explicit:

Develop clinical expertise regarding the psychiatric care of persons with disorders of brain function to include diagnostic skills, neurologic and mental status examinations, cognitive testing, electrophysiological testing, neuroimaging, differential diagnosis, crisis intervention, application of time-limited psychotherapy, and referral for rehabilitative therapies.

Gain broad knowledge in the field of neuropsychiatry though extensive exposure to the core literature in neuropsychiatry, neuropsychology, and behavioral neurology. Neuroanatomy and neurochemistry of behavior should be emphasized.

Gain an advanced understanding of psychopharmacology, including neuropsychopharmacology, with special emphasis on anticonvulsants, psychostimulants, and the interactions of psychotropic medications with other medications on the central nervous system. (ANPA web Page)

My early medical training focused on primary care medicine as well as psychiatry. My internship at Alameda county Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, general surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital, in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

3

Case 3:09-cv-03064-MWB-LTS    Document 28-9    Filed 06/23/11    Page 60 of 287

WOB000060

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United States Farmworkers. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had developmental disabilities, neurological impairments, and significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

The focus of my American Psychiatric Association/National Institute of Mental Health Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges. First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated.

Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly with mentally retarded clients in my clinical practice, as well as forensic populations. Both populations experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long term psychiatric facility, dedicated to treating severely ill patients, often with mental retardation and accompanying mental disorders. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common

4

Case 3:09-cv-03064-MWB-LTS   Document 84-29   Filed 06/23/11   Page 61 of 287

WOB0000061

among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many mentally retarded clients manifest a "Cloak of Competence," which must be recognized as an attempt to mask deficits that define mental retardation. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations.

During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital was one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many neuropsychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these drugs are not utilized for their primary psychiatric indication. For example, anti-psychotics, anti-depressants, and anti-seizure medications may be effective in diabetic limb and phantom pain.

Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention. During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California.

Sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all neuropsychiatric disorders. Substance abuse is also often related to impairment of

5

WOD000062

normal sleep patterns. From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic.

We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance.

From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, developmentally disabled, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients who presented with what are called co-occurring disorders. Persons with co-occurring disorders are persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, cardiologists, neurologists, and hospital pharmacologists on all patients in the Intensive care unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological tests, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not

6

WOB000063

limited to, the Minnesota Multiphasic Personality Inventory (MMPI_1 and 2), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

Doctors Hospital had a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry. I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia. I teach third and fourth year residents Clinical Aspects of Forensic Psychiatry.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

Prior to being installed as Secretary General, I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November, 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that,

7

WOD000064

even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in geriatric psychiatry, neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

## II. Referral Questions

At the request of counsel, I performed a neuropsychiatric evaluation of Ms. Angela Johnson, a 45 year old divorced white female. The specific referral questions I was asked to address are:

- Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

- Could the defendant have reasonably foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.

- Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

- Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?

- Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Did the defendant's impairments and medications inform her demeanor at trial?

- Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?

8

WOD000065

## III. Materials Reviewed/Bases for Analysis

In order to answer these referral questions, I interviewed Ms. Johnson over the course of two days, August 5th and 6th, 2009. I performed a neurological examination of Ms. Johnson, limited to some degree by the lack of visual privacy in the room.

I also reviewed multiple materials, including, but not limited to the records and testimony of Mark Cunningham, PhD, Marilyn Hutchison, PhD, and William Logan, M.D. I reviewed the IQ and neuropsychological battery of Michael Gelbort, PhD. I reviewed the medical records from the various county jails in which Ms. Johnson was housed, including the Woodbury County Jail. I reviewed declarations from a number of family members, persons who lived with Ms. Johnson and her family while she was growing up. I reviewed testimony from the trial, and discovery from the investigation. These are the types of materials relied upon in coming to an expert opinion.

## IV. Clinical Formulation

The following is a preliminary formulation, to be supplemented after further testing and analysis.

### A. Angela Johnson's Childhood

Angela Johnson was born into a cognitively impaired family, a family in which the abnormalities of their brains manifested in paranoid, delusional, and, in the long run, violent behavior.

Ms. Johnson's early life was fertile ground for the development of complex trauma. Complex trauma must be differentiated between simple trauma as described in the Diagnostic and Statistical Manual-IVTR (DSM-IVTR). The DSM-IVTR describes Type I trauma, typically a single incident or event. Complex trauma is caused by ongoing, chronic, often pervasive stressors.

The role of parents in the modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her. Parents model for children appropriate responses to various stressors in life, so the child will be able to respond directly and in a manner that fits the degree of stress presented.

...Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological

9

WOD0000066

dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones ... Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal ... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage ... (Bessel Van Der Kolk, Traumatic Stress: The effects of Overwhelming Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185)

These buffering qualities, such as playing and comforting, were absent in Ms. Johnson's home, replaced by ongoing terror, masked as religious fervor. The terror was a manifestation of the neurological abnormalities shared by generations of Ms. Johnson's family.

The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome (Perry and Pollard 1998; Teicher 2000, 2002). Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences (Teicher 2000; Heim and Nemeroff 2001; Repetti 2002; Gutman and Nemeroff 2002; Gorman 2002; De Bellis and Thomas 2003a; Bremner and Vermetten 2001). Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems (Sanchez 2001; Bremner 2003a). (Anda et al, *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, European Archives of Psychiatry and Clinical Neuroscience (2006) 256 : 174)

Ms. Johnson underwent a ritualized terror in her childhood that even her mother, one of the perpetrators, cannot speak of. Under the neurologically-derived hyper religiosity of her mother and grandmother, Mr. Johnson was consistently abused and, ironically, Ms. Johnson was often "exorcised," as her personal terror was described, due to the very neurological abnormalities that created her mother's and grandmother's religious terrorism.

Ms. Johnson, who was a small and slender child, was regularly "exorcised," which typically consisted of being held down against her will by several grownups, being hit, shaken,

WOB000067

thrown and beaten, in the hopes of curing the "deaf and dumb demon." Her inability to respond, the behavior that was translated into the "deaf dumb demon," was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements, the violent shaking commonly associated with seizures. Ms. Johnson's deaf and dumb demon, a visible sign of the inherited aberrant electrical activity in Ms. Johnson's brain, was the catalyst for her mother, herself suffering from the same inherited aberrant electrical activity, to repeatedly abuse Angela Johnson.

### B. Ms. Johnson Suffers From Profound, Complex Trauma

These rituals, performed over critical developmental childhood years, coupled with multiple moves, sexual abuse by a caregiver, perceived abandonment by her father, and cognitive deficits, were the foundation for the profound, complex trauma from which Ms. Johnson suffered, documented abuse from the hands of those that were supposed to love her, abuse that, itself, was the product of multigenerational cognitive impairment.

Complex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than Type I trauma described in DSMIV-TR. The irrational behaviors that often result from complex trauma shape neurological, academic, social, emotional, and contextual landscapes with well-documented symptoms.

> We define *complex psychological trauma* as resulting from exposure to severe stressors that (1) are repetitive and prolonged, (2) involve harm or abandonment by caregivers or other ostensibly responsible adults, and (3) occur at a developmentally vulnerable times in the victim's life, such as early childhood or adolescence (when critical periods of brain development are rapidly occurring or being consolidated, see Ford, Chapter 2, this volume). (Treating Complex Traumatic Stress Disorders: an evidence-based guide; Guilford Press, 2009 Ford et al, page 13)

> *Complex posttraumatic sequelae* are the changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotion dysregulation, somatic distress, or relational or spiritual alienation, hereafter referred to as complex traumatic stress disorders. (Ford et al, page 13)

It was the ritualized trauma that allowed Ms. Johnson to stick pins in her arm, with no show of emotion. It was also the ritualized trauma that allowed Ms. Johnson to fall apart at the smallest sign of true stress, as her daughter and sisters describe. It was the ritualized trauma that allowed Ms. Johnson to "go to her special space," as described by her sisters and Ms. Johnson, and dissociate from life threatening reality. Ms. Johnson describes dissociative experiences, developing out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state, a

11

WOD0000068

clinically significant period following a seizure. Her sister reported that Ms. Johnson returned from her dissociative episodes at times and announced, "I'm back."

### C. Ms. Johnson Suffers From Electrical Abnormalities: Temporal Lobe Dysfunction/Seizures

Ms. Johnson's profound emotional impairments, secondary to the complex trauma, were augmented by the electrical abnormalities Ms. Johnson experienced. This aberrant electrical activity was inherited from her mother, Jean, who inherited it from her mother.

### i. Description of Temporal Lobe Dysfunction

We describe a new syndrome of familial temporal lobe epilepsy in 38 individuals from 13 unrelated white families. The disorder was first identified in 5 concordant monozygotic twin pairs as part of a large-scale twin study of epilepsy. When idiopathic partial epilepsy syndromes were excluded, the 5 pairs accounted for 23% of monozygotic pairs with partial epilepsies, and 38% of monozygotic pairs with partial epilepsy and no known etiology. Seizure onset for twin and nontwin subjects usually occurred during adolescence or early adult life. Seizure types were simple partial seizures with psychic or autonomic symptoms, infrequent complex partial seizures, and rare secondarily generalized seizures. Electroencephalograms revealed sparse focal temporal interictal epileptiform discharges in 22% of subjects. Magnetic resonance images appeared normal. Nine affected family members (24%) had not been diagnosed prior to the study. Pedigree analysis suggested autosomal dominant inheritance with age-dependent penetrance. The estimated segregation ratio was 0.3, indicating an overall penetrance of 60% assuming autosomal dominant inheritance. The mild and often subtle nature of the symptoms in some family members may account for lack of prior recognition of this common familial partial epilepsy. This disorder has similarities to the El mouse, a genetic model of temporal lobe epilepsy with a major gene on mouse chromosome 9, which is homologous with a region on human chromosome 3. (Berkovic et al, *Familial temporal lobe epilepsy: a common disorder identified in twins*; Annals of Neurology, 1996,

Temporal lobe dysfunction, a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, appears to run in the maternal side of Ms. Johnson's family. The table below describes the kinds of behavior associated with temporal lobe dysfunction; many of these behaviors describe Ms. Johnson's grandmother, mother, and her own behavior.

12

WOB0000069



**TABLE 1.** Characteristics Historically Attributed to Temporal Lobe Epilepsy[a]

| Inventory Trait | Reported Clinical Observations |
|---|---|
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Aggression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

[a]Adapted from Bear and Fedio,[30] with permission.

In addition to these behavioral manifestations, brief **psychotic episodes** can also develop when seizures are infrequent or fully controlled. These psychoses last from days to weeks, they are usually self-limiting, and their separation from postictal psychoses may be difficult. The favored description is of an alternating psychosis, i.e., a brief psychosis alternating with periods of increased seizure activity such that the seizures and psychosis appear antagonistic. The phenomenology is characterized by paranoid delusions and auditory hallucinations, but multiple other features, including affective symptoms, may

13

WOB0000070

occur. (Sachdev et al, *Schizophrenia-Like Psychosis and Epilepsy: The Status of the Association*, American Journal of Psychiatry *155:3, March 1998*, page 327.)

### ii.  Family History of Temporal Lobe Dysfunction

Jean Johnson, Ms. Johnson's mother, continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity. She has a life long history of behaviors recognized as temporal lobe based: heightened emotionality, guilt, obsessionalism, circumstantiality, sense of personal destiny, hypergraphia, dependence, paranoia, and humorlessness. Angela's mother's mother was also a woman with apparent religious delusions, auditory hallucinations, intense emotionality, and dependence. Yet there is not the significant social deterioration typically seen in shizophreniform disorders such as schizophrenia, particularly when not treated. Rather, a labile, heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances are neurocognitive traits Ms. Johnson shares with her mother.

### iii.  Angela Johnson's Temporal Lobe Dysfunction

Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister. She was placed in special education throughout her school years. She could not learn how to make change, and although she worked as a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks. Many of these academic functions require intact temporal lobes.

Ms. Johnson's IQ testing, administered prior to her trial, also reflect left hemisphere vulnerability, in the face of overall adequate intellectual functioning. Ms. Johnson's Verbal IQ, more sensitive to left temporal functioning, was 18 points lower than her performance IQ, which is more sensitive to right hemisphere functioning. There are specific motor tasks that, due to right hand dominance, will also be focused in the left temporal lobe. For example, Ms. Johnson and her sister appear to have a tremor of the right leg, consistent with left motor strip involvement.

Ms. Johnson's intellectual testing captured her extremely limited fund of knowledge. She did not know how many weeks there were in a year, guessing 48. Vocabulary, Similarities, Mathematics, and Information were her lowest subtests on her intelligence testing.

Ms. Johnson also has a remarkable history of migraine disease, which is a soft sign of neurological dysfunction. Her migraines are accompanied by a gastrointestinal aura, severe, and debilitating.

14

WODB0000741

Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

## D. Methamphetamine Abuse

Ms. Johnson suffers from methamphetamine abuse, severe, chronic, currently in institutional remission. Methamphetamine can have lasting effects on the brain, so observing the testing after she had been off the drug for a significant period of time is important. This is especially true since the behavioral effects of methamphetamine can last long after the drug has been metabolized.

Methamphetamine's primary neuroanatomic focus is the frontal lobes, although there are other parts of the brain impacted by amphetamine compounds. Two tests of frontal lobe function, The Wisconsin Card Sorting Test and the Booklet Category Test, were within normal limits. Yet Ms. Johnson's symptoms of mood lability, altered spirituality, impaired strategic thinking, losses of consciousness, heightened emotionality, and headaches continue, requiring looking past methamphetamine use as the primary disorder.

Ms. Johnson's methamphetamine use further eroded her ability to effectively judge and respond accordingly. We are now seeing the interaction, for example, between the paranoid scanning associated with trauma, the paranoid ideation of her temporal lobe impairment, and the added paranoia of the methamphetamine. These are the symptom interactions that, much like drug interactions, lead to atypical and severe presentations and behaviors.

## E. Dissociation

Ms. Johnson has a maternal history of a religiously delusional mother and grandmother who experience auditory, visual, and tactile hallucinations, among other perceptual disorders. She has cognitive testing suggestive of left hemisphere dysfunction, and she has, all her life,

15

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 72 of 287

WOD0000072

manifested symptoms of deepened emotionality, irritability, impaired judgment, and altered spirituality.

Ms. Johnson's familial neurological inheritance led to the profound destruction of her will. Ms. Johnson describes dissociative experiences, out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state. Her childhood trauma's most important clinical symptoms, in terms of her trauma, are Ms. Johnson's dissociation and her affective dysregulation. These symptoms are synergistic with her temporal lobe dysfunction, particularly in times of stress, to overwhelm her functioning.

Dissociation, as defined by Spiegel et al is:

"The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings, and attitudes." Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

Ms. Johnson, in her childhood, dissociated multiple times over years of ritualistic abuse, Many of her rebukings may have been in response to absence seizures, rendering her the deaf and dumb demon. Dr. Dvoskin acknowledges Ms. Johnson's abuse history, now well-documented, met the criteria for traumatic disease.

Ms. Johnson's symptoms are synergistic, in the same way cholesterol impacts heart disease. Her symptoms of cognitive dysfunction, deepened emotionality, mood lability, impaired judgment, and poor decision making are augmented by her trauma symptoms, her dissociation, loss of self, hyperreactivity, and inability to modulate her emotional state.


**V. Mental Status Examination of Angela Johnson**

Angela Johnson is a white female who looks younger than her chronological age of 45. She was dressed appropriately. She flung her hands up, initially using broad gestures, in an attempt to control her extreme anxiety. As each interview progressed, she became less anxious, although not less symptomatic in other ways.

Ms. Johnson's level of consciousness was variable. Throughout my two interview periods, Ms. Johnson had moments when she did not spontaneously answer my question. She would blink, look away, and then say, "What?" She describes periods when a person's voice sounds muffled, or she loses time. She stated, "Sometimes I go deaf" and don't hear what people say. She notes that she often will have to reread pages of a book she has just read. What

16

WOD000073

she describes is not a retrieval of memory problem. Rather, it appears as brief losses of consciousness, consistent with absence seizures, among other possible cognitive impairments.

Ms. Johnson regularly shook her right leg, consistent with a tremor. The right leg is, of course, controlled by the left motor strip, imbedded in the left hemisphere of her brain.

She attended to the environment appropriately, although she tended to be easily distractible.

Her language comprehension was within normal limits. Her understanding of complex sentences was good, although she would often ask to hear the question again. Her voice was normal in tone, although occasionally rapid. She was able to follow simple commands, and was hesitant with more complex (3 step) commands. She typically, with reassurance, could complete a 3 step command. Speech was fluid, both spontaneous and impulsive, often requiring redirection. There were no signs of perseveration. Her language usage was not complex. She was able to name common objects like a fork, a comb, and a coin. She was able to name simple colors and shapes.

Ms. Johnson was able to name body parts appropriately. She could determine coin denomination in both hands. She experienced writing on her left palm to be reversed, reflecting sensorimotor abnormalities.

The authors show convincingly that a left inferior temporo-occipital area is differentially engaged in normal control subjects as early as 180 msec after onset of the visual word. It is important that both the electrophysiological and the anatomical data are consistent with results obtained by other methods (eg, depth electrodes and positron emission tomographic results [7, 81]). Salmelin and colleagues [3] suggest that the primary reason for adult dyslexia is probably the left inferior temporoparietal area dysfunction implicated by their study. (Poeppel et al, *Magnetic Source Imaging and the Neural Basis of Dyslexia*, Annals of Neurology, Volume 40, Issue 2, page 137)

Ms. Johnson's thought processes reflected tangentiality and, at times, flight of ideas. Her thought content displayed some referential thinking and oddities of thought, including hyperreligiosity, beliefs in spiritual concepts like ghosts, aliens, and witches. She acknowledged childhood auditory, visual, and tactile hallucinations. She also describes an "engine" in her head, a constant noise that has been in her head her entire life. Seroquel initially quieted this noise, but it has returned.

Affective range was extremely broad. Ms. Johnson was often literally laughing and crying at the same time. This was accompanied by a deepened emotionality on both poles. As noted before, she strode into the room with her arms outstretched. At other times, she was sitting in her chair, almost in a fetal position.

17

WOB0000074

Mood was labile, with little impediment on either end. Her sense of humor, while ready, was often inappropriate to the content of the interview. She denied suicidality. She was future oriented, in terms of recognizing the potential options for her future.

Insight was impaired by her heightened emotionality and mood lability. She acknowledged that her emotionality prevented her from being able to work through a problem, even if she had the technical ability to do so. She understands her current circumstances. Her ability to describe her personal psychological state is impaired by significant negativity.

Judgment is grossly impaired by her disinhibition and affective dysregulation. Ms. Johnson acknowledged poor decision making skills. She is unable to develop strategies to solve certain problems.

Ms. Johnson could not describe how to divide 54 by 3. She did describe a strategy of multiplying 5 x 3, which would give you 15, then adding three 15s, which would give you 45. She was unable to solve this problem in her head.

Her constructional ability was impaired. She was asked to draw a clock and make the hands say 6:25. She initially drew 3 hands, erased one hand, and the other hands were placed backward on the clock to read 5:35.

Abstract thought was impaired. Consistent with limited IQ testing at the time of her trial, her impaired similarities and vocabulary, plus a poor fund of information, limit abstracting ability.

## VI. Prior Observations by Government Experts

Ms. Johnson's cognitive deficits, and the impairment in mood stability resulting from her cognitive dysfunction, were recognized by other experts in earlier evaluations. Dr. Martell listed symptoms consistent with temporal lobe dysfunction in his report.

Her observable affect impressed as broad, bright, and comfortable. She was affable, easy-going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children. (Dvoskin/Martell, page 31)

She did endorse a number of behavioral symptoms in childhood, including:

o Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother

o Behavioral problems at school: including difficulty paying attention

18

WOD000075

o Bedwetting 2x per week until the 4th grade

o Nail biting and picking at her fingers

o Difficulty paying attention

o Depression: "I'm sure I was depressed my whole life."

o Aggression: Fights with her sister, and at school

o Shyness: "Came as I got older."

o Nightmares: "Bad dreams about my mother; pig and rabbit things."

o Poor self-esteem: "Mom beating devils out of me; made me feel stupid

and ugly."

o Unpredictable: "I've always been impulsive."

o Frustrates easily: "If I couldn't do or accomplish something."

o Daydreaming

o Easily distracted: "Couldn't concentrate; now it's OK."

o Fidgety / Trouble sitting still: "foot rocking" (Dvoskin/Martell, page 31)

Dr. Martell noted distractibility, a "foot rocking," daydreaming, depression, difficulty paying attention, and difficulty paying attention at school. Dr. Dvoskin noted the shaking of Ms. Johnson's right leg as well.

Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety. She made good eye contact. (Dvoskin/Martell report, page 29)

VII. **Present Diagnoses** (based on the DSM-IV-TR Multiaxial system)

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

19

WOD000076

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

IV. LEGAL PROBLEMS

V. 60


**VIII.  Ms. Johnson's Diagnoses at the Time of Trial**

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

D. ZOLOFT INTOXICATION, ACUTE

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

C. METHAMPHETAMINE ABUSE, CHRONIC, SEVERE

20

WOD0000077

IV. LEGAL PROBLEMS

V. 40

Ms. Johnson's mental state was impaired at the time of trial. Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe, as noted in the Persinger article above. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft, identified by Astra Zeneca as having double the incidence of seizure activity than placebo, was the medication regimen Ms. Johnson was taking during the time leading up to her trial. These medications were increased precipitously just days into Ms. Johnson's trial. Zoloft, already at 200mg. per day more than 4 times the recommended dosage, was increased to 300mg per day, 100mg. above the 50mg-200mg dosage Goodman and Gilman's The Pharmacological Basis of Therapeutics, 11th edition describes as an "extreme dose.' (Goodman and Gilman's, page 435, table 17-1).

Ms. Johnson reported to medical staff at the jail that she was unable to tolerate the stress of the trial. Her family noted that her behavior changed noticeably after trial started. She appeared child like and in a daze, according to her daughter and sisters, who also reported Ms. Johnson was "different" from the way she was before trial. She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide. She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." She felt "hopeless" and "was unable to do anything that mattered." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For instance, after I testified, she gave me a big smile and waved at me, like we were in school."

The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Ms. Johnson experienced each of these, consistent with both her circumstances and her faulty medication regimen.

**Forensic Formulation**

- **Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?**

21

WOD000078

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction and methamphetamine abuse at the time of the offenses. Her capacity to conform her conduct to the requirements of law was significantly impaired by these disorders, which manifested themselves under ordinary circumstances in grossly impaired judgment and insight, inability to develop strategies, problem solve, and understand consequences. Extreme stress would have also exacerbated her underlying paranoia, hyperractivity, and dissociative reactions. Her pregnancy would have significantly heightened her mood lability. The lingering affects of methamphetamine use would also have increased her already abnormal paranoid feelings.

- **Could the defendant have reasonably have foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was incapable as a result of impairments in judgment and insight, and in ability to plan and predict consequences, of understanding and predicting outcomes of situations in a normal way.

- **Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction at the time of the crimes. These conditions result in severe mental and emotional disturbances. Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally. Her moods are extremely labile, cycling inappropriately from grandiosity to depression. She dissociates and functionally disappears from consciousness periodically as result of her disorders. All of these conditions are exacerbated by incidents of extreme stress, methampehamine use and withdrawal, and pregnancy.

- **Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was under unusual and substantial duress at the time of the offenses. Dustin Honken has been described as a calculating and manipulative person. As a result of Ms. Johnson's brain impairment, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living. Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through. Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken.

22

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 79 of 287

WOD0008079

- **Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?**

Ms. Johnson was at the upper limit of her antidepressant medication, Zoloft, at the start of her trial. The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose. She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. She had also complained of headaches, another symptom of Zoloft intoxication. However, Ms. Johnson has experienced headaches her entire life.

Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg. Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction. Dr. Martell described Ms. Johnson's mood as "labile."

When her antidepressant was increased to 300mg daily a couple of days into her trial, Ms. Johnson was no longer a part of the process. She was unable to focus, drawing most of the day. She waved to family members, and her affect was often inappropriate. Her serotonin toxicity, with extreme levels of her antidepressant Zoloft, impaired her ability to rationally assist her attorneys during trial.

- **Did the defendant's impairments and medications inform her demeanor at trial?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's mood impairments, dissociative tendencies, sleep disorders, trauma history, and medications caused and explained her disengaged appearance, largely flat and absent affect, and inability to show emotion at trial.

- **Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty that Ms. Johnson's use of profanity and verbal threats are consistent with a history of hyperreactivity, hypervigilance, and affective dysregulation.

Thank you for allowing me to examine Ms. Johnson,



23

WOD000080

George Woods, MD

WOD000081



# R A D I O L O G Y ⭐ A S S O C I A T E S

## PET/CT Center Of Fort Worth

### 800 W Magnolia, Suite 100
Fort Worth, TX 76104
Phone: (817) 321-0300     Fax:  (817) 321-0329
www.ratc.com

| | | | |
|---|---|---|---|
| **Patient Name:** | JOHNSON, ANGELA | **MRN:** | RA3657815 |
| **DOB:** | 01/17/1964     **SEX:** F | **Date of Exam:** | 02/07/2011 |
| **Physician:** | LOGAN, WILLIAM SEARLE, MD | **Accession:** | 3839182 |

**Exam:**     PET/CT BRAIN (78608)

**Reason:** INMATE #08337-029/SEIZURE DISORDERS

### Final Report

## POSITRON EMISSION TOMOGRAPHY/COMPUTED TOMOGRAPHY (PET/CT) BRAIN STUDY:

HISTORY: Seizure disorder.

TECHNIQUE: Approximately 45 minutes following the IV administration of 6.75 mCi of 2 -[18F] fluoro-2-deoxy-D-glucose (FDG), brain imaging is performed from a Siemens Biograph Sensation-16 PET/CT scanner. Imaging is performed through the brain only.

COMPARISON STUDIES: None.

FINDINGS:

There is normal bilateral cerebral cortical activity. There is normal deep gray matter and cerebellar activity. The correlating CT images, bones and surrounding soft tissues are unremarkable.

IMPRESSION:

Negative brain PET/CT.

| | | | |
|---|---|---|---|
| Transcribed By: | 1I | 2:33 PM | 02/07/2011 |
| Electronically Approved and Signed by: | DAVID, JAMES K, MD | 2:33 PM | 02/07/2011 |

This Facsimile may contain PRIVILEGED, CONFIDENTIAL AND/OR OTHERWISE PROTECTED INFORMATION intended only for the use of the addressee. Unauthorized distribution or use of the facsimile or its contents is strictly prohibited. If you are not the addressee, the person responsible for delivering this message to the addressee, or have received this facsimile in error, please immediately notify us by telephone at the number above and destroy this information. Thank you.






WOD000082

# TARRANT COUNTY HOSPITAL DISTRICT

### 1500 South Main Street
### Fort Worth, Texas 76104

## *IMAGING SERVICES CONSULTATION*

MR#: 36614337     Acc#: 4116799
NAME: JOHNSON, ANGELA
ADM#: 030089966185
DATE OF BIRTH: 01/17/1964
PT. CLASS:  O
LOCATION:  -
DATE OF EXAM:  02/08/2011
REQUESTING     PHYSICIAN:          HARICHANDAN

ATTENDING PHYSICIAN:  HARICHANDAN MUKKAMALLA
RIS Ord#:  90001     A2K Ord#:

Description:   MRI BRAIN W&W/O CONT

**\*\*\*\*\*\*\*\*\*\*THIS IS A FINAL REPORT\*\*\*\*\*\*\*\*\*\***

DISCUSSION:

INDICATION:  neuro eval

PROCEDURE:

Multiplanar, multisequence MRI of the brain was performed with and without intravenous contrast.

FINDINGS:

The CSF containing spaces are normal in size, shape and position. Small scattered bilateral subcortical and periventricular FLAIR and T2 hyperintensities involve the deep white matter of bilateral cerebral hemispheres. The brain parenchyma is otherwise of normal signal and contour characteristics. No focal mass, midline shift, intracranial hemorrhage or acute infarction.  Gray/white differentiation is normal. The pituitary, midbrain, brainstem, as well as the craniocervical and cervicomedullary junctions are within normal limits. The visualized flow -voids of the central arteries and the major dural sinuses are within normal limits. No abnormal areas of enhancement.

IMPRESSION:
1. Atrophic changes.
2. No acute infarct or hemorrhage.
3. Nonspecific T2/FLAIR hyperintensities. Differential considerations include but are not limited to microvascular ischemic changes, multiple sclerosis, vasculitis, Lyme disease and other demyelinating/dysmyelinating processes.

If you have received this document by facsimile, the information contained in this transmission may contain medical record information and is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this communication in error, please notify us immediately by telephone (collect) and return the original message to us at the address indicated via the US Postal Service.

Received   Feb-16-11  02:35pm          From-JPS                    To-UNT CORRECTIONAL MED    Page  001

Case 3:09-cv-03064-MWB-LTS     Document 291-29     Filed 06/23/11     Page 83 of 287
WOD000083

# TARRANT COUNTY HOSPITAL DISTRICT

1500 South Main Street
Fort Worth, Texas 76104

*IMAGING SERVICES CONSULTATION*

MR#: 36814337          Acc#: 4116799
NAME: JOHNSON, ANGELA
ADM#: 030089966185
DATE OF BIRTH: 01/17/1964
PT. CLASS:  O
LOCATION:  -
DATE OF EXAM:  02/08/2011
REQUESTING     PHYSICIAN:          HARICHANDAN

ATTENDING PHYSICIAN:   HARICHANDAN MUKKAMALLA
RIS Ord#:  90001     A2K Ord#:

Interpreting Physician: HAYDEN M JACK
Reviewing Physician: HAYDEN M JACK
Transcribed by / Date:  PSC / Feb 8 2011 10:48A
Approved Electronically by / Date: HAYDEN M JACK / Feb 8 2011 10:48A
Distribution:   HARICHANDAN MUKKAMALLA
            HARICHANDAN MUKKAMALLA

If you have received this document by facsimile, the information contained in this transmission may contain medical record information and is
privileged and confidential.  It is intended only for the use of the individual or entity named above.  If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you
received this communication in error, please notify us immediately by telephone (collect) and return the original message to us at the address
indicated via the US Postal Service.

TCHD IMAGING SERVICES CONSULTATION
Page 2

Johnson,Angela     Sex:F        BD:01/17/1964       MR#:36614337       PT#:30089980202

**ALL EEGS**                                                           **Feb 09, 2011 08:24**

TARRANT COUNTY HOSPITAL DISTRICT
FORT WORTH, TEXAS 76104

Name: ANGELA JOHNSON
MR#: 36614337
Admit Date:

REASON FOR EEG: Rule out seizure focus.

MEDICATIONS: None.

ELECTRODE DERIVATIVE SYSTEM: 10 to 20 international system.

EEG DESCRIPTION: The patient was maximally awake, 9 to 10 Hz background
rhythm was seen in the posterior head region bilaterally. Similar
activity but of a low voltage was seen in the anterior head region.
Throughout the recordings, recurrent, blink eyeballs, lots of electrode
artifacts were seen. There was no evidence of any asymmetry, epileptiform
discharges, or electrographic seizure. On photic stimulation, there was
no evidence of any photic drive. On hyperventilation, there was no
evidence of any abnormal slowing. The EKG showed the regular rhythm.
During drowsiness, intermittent theta slowing was seen.

INTERPRETATION: This is awake and drowsy EEG.

_____

Saud Iqbal. Khan, MD

D: 02/08/11 21:11
T: 02/09/11 08:24
SJN: 42637954
DJN: 121061002
849977

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 85 of 287

Marilyn Hutchinson, PhD

She told us what happened. She has confessed her involvement. Temporal lobe activity. In her notes, Gelbort talks to Goody about a cognitive disorder NOS.

Tower of London and mental status exam. Do not remember.  I did not have the information. Consistent with her notes at trial.

Johnson impressions-wanted me to hear the story, in spite of  not being able to talk about the crime.

My report was a summary of developmental history stuff.. I do hate Dustin. I hate him for not saying I'm innocent.

Because I fell for this stupid federal informant in jail. he used fear to control me, fear for my children, fear of going to jail.

It's been my experience that they will confess to me, even when attorneys think they are innocent. As a psychologist, I listen to persons. Given some of the things she hinted at.

Smart people were so intimidating for her. She was so damaged. Capital casess that I've done since then, I've always seen people more.

Can't get at the secrets of a family in one cirumstances.

In spite of all the abuse, she still loved him. I was supposed to talk about her developmentally.

Only case where I've been told not to talk about the crime.

Dependent personality traits. You usually battering me have bee little boys in that relationship, and the women have this incredible interdependency. She could think in an completely emotionless task, but if there is emotion, she breaks down. She probably impulsively.

There was some hint that she did ADD. Midly impaired. Cognitive Disorder NOS. Great difficulty seeing consequences. Low average in reading/spelling.

Very behind in math. Visual spatial. No physical lab work. Problem solving and categories worse on intituitive. Likely mixed learning disability.

She would have a positive PET scan should be scanned. I would not have gotten a PET scan. I don't get PET scan.

WOD0000086

Ruthlessness?  Right out of Erikson's third stage-preschool. I remember that by the time the appeal comes down, they are on the verge of trial.

I think prep was a meeting the night before trial 5/7 or so...

She wanted her baby because he was smart. He was desiring her, smoothng her feelings of inadequacy.

WOD000087

Right leg twitching. more commonly. I have to put my hand on it to sot it. I'm very su[erstitiouys. If I believe all of it. I see them differently. I don'
t relate superstitiousness with Godd. I see them differently.

Being cautious. People with ESP. I think it's a gift. I never seen it in anyone before. I thought of it as more you. I caused her to be that way.

So they did not put a cap on your leads on your head, with glue, on your head. Stuck them in your hair. Whole process took about 1/2 hour. Not asleep. Had your medicine.

Welbutrin and Zooolooft. I think. 100 Zoloft and 300 Welbutrin. When it came closer to coming back to hearing.

I was there 5.5 years. No changes with the Zoloft.

Panic stuff-how do they come. I can't breathe. MY CHEST gets heavy. I get hot. In the Jail, I had an hour long run. I thought I had an hour long rtun. I was really struggling. I had another anxiety attack.

It's like eating. Becayse if nt statys, I could hear people in the next room. That was distracting.

A humm that is a 50 second hum Watching tv. I don't recvall what I'm reading. Let me go bacvk. I have to go back rered it. A cpu[le A couple of page4s. I'm I did not read. I didn't read my first book until I came into jail.

Now I'm reading anything with romance. No more O[[rah club books.

How to do this. Teacher would say how to do something, I would miss it all. I can't separate the two, between hearing it all. I feel like I hear things underwater. My underwater hearing worse.

I go deaf. I CAN'T HEAR. HEARING STUFF WHEN I'M UNDERWATER I DO DEAF FOR A SECOND.

I DON'T EVER REMEMBER IT NOT HAPPENING. I JUST THOUGHT IT WAS NORMAL.

WHEN YOU SAID TO YOUR SISTER, "I'M BACK." BEING AWAY. CHECKING.  I DON'T THINK I CONTROLLED IT. IF I COULD, I COULD CHECK OUT RIGHT NOW.

WHEN I DIED. I REMEMBER BEING IN MY MOM'S BEDROOM, AND TELLING MY MOM THAT I WAS GIONG AWAY. II WE4NT UP TO THE VORNER OF THE ROOM.

I WAS FLOATING. MY HAIR WAS SO LONG. SHE WAS REALLY CRYING.  IN A REAL EMOTIONAL SITUATION. I RALLY AM BESIDE MYSELF.

WOD000088

WHEN HE WOULD BE SO ANGRY AND MAD. KNOWS YOU'RE GETTING HIT, BUT I WOULDN'T FEEL IT.

WHEN I WAS IN 6TH GRADE, THESE BOYS WERE DOING IN THE BATHROOM.THEY HAD SLOWLY STICKING A PIN IN THEIR ARM. WHAT A PIN. AND I DIDN'T FEEL.

THAT HAPPENED A LOT. THAT STRESSFULL. PRETTY SHELTERED. 5/5 YEARS IN COUNTY JAILS.

TEMPORALFRONTAL AREA IS IMPAIRED. PARIETAL AREA IS IMPAIRED.

TREMENDOUSLY. HORRIBLE READING. I DON'T THINK HE ASKED ME ABOUT HOW WELL I COULD READ.

HE PAINTED SUCH A PICTURE. TERRY WASN'T. MY DAUGHTER WAS GOING TO BE HAPP. RIGHT AWAY.

HE HAD BEEN LOOKING FOR SOMEONE THAT COULD MAKE THAT HAPPEN. HE HAD THIS BIG. WE'RE GOING TO BE FILTHIY RICVH. YOU, RATHER THAN WE.

AT THE COUNTRY CLUB. I WAITRESSING. THERE WAS NO MNEY. THERE WERE ACCOUNTS. SET UP EVERYTHING. IT WOULD BE REALLY, REALLY LATE. I LOVED MY BOSS.

They had accounts. I didn't have handle money.

We would just relocate.

Terry physically abused me and Justin mentally abused me. If I had an opinion about something, he would talk and talk until he convince me. He would overwhelm me. His way was the right way.

I felt stupid,inadequate. How I felt, and he took advantage of it.

There was no other choice. I don't recall the conversation. I remember the decision. I think I didn't really was made until that moment. It was I called Terry to meet me at the country club. He did. We met Dustin somewhere. We followed him. They were just going to talk about the grand jury. Dustin separately.

To an abandoned place out in the county. Terry and Dustin were talking. I was in the car. Dustin shot him. I went from Terry'sw car to Dustin's car. I couldn't hear what they were saying.

Before. I really didn't want to ride in the car with Terry. Terry knew too much. He was going to continue to abuse me. Iit was a do and die.

WOD000089

Anything I said didn't matter, andaa this ws going to happen. I'm sure I did. T Dustin, tery was no one. I loved Terry. I really cared about it. I would have never wanted to hurt Terry.

I went from living in fear of Terry to living in fear of Dustin. He said that if someone would snitch on him.Kill his whole family for him.

When he got arrested. I told him I didn't snitch on him. Cause I was scared.  Him being arrested.

I was reallly focused on being pregnant. Most of our conversations would be about him talking over me. Not, you're not. You don't have  a choice.

I was afraid he would kill my family.

I think I remember getting in the first car, but III don't have a recollection of everything that night.  I remember him shooting him. I don't know. I'm sure Atartle. I didn't believe it

I don't know what I thought.

That was before Terry. Nicholson's. I took the gun, gained access. I  told them I needed to use the phone. Then I went in,  Lorie Duncan. Took the gun out of a makeup vase.Wait for Dustin to get there.

A couple of minutes. Then Dustin came in. Took control of the whole situation. He wanted NICHOLLSON TO MAKE A VIDEO. THEn he tied  up. Little girls were in the front seat with me.

I don't know. I was probably freaking

It was not my idea. I think it was just getting so close to his trial date. I had no choice. I thought. He couldn't rEACH THEM. Dustin takes Lortie and Greg and shoots them. Then he came back and got the little girls. I don't remember. I remember to the passengers die, lifted the little girl out and shot her, then came back and took the other little girl and shot himi.

I was crying. Not wanting him to do that. There is no choice. I think I was just scared, period. Just petrified, scared. I wanted to protect the girls.

He was going to kill all of us. I can make this worse than it had to be. Either I'm with hiim or I wasn't. I had Allysa.

The whole time, knowing about that was really hard for me. Having t lie to the grand jury. I really had a hard time. I wanted them to be found.

WOD0000090

MY kids would be safe. Pat Berrigan came by. I saw the proffer. This was a factual statement that he got from Dusitin. I told him I had to be on board. I told him ok.

I was stunned. I agreed to do that proffered too make a deal for a life sentence. They never discussed it with him. I told him I was going to talk to judge Bennet.

Fine,  I justt give up. I get bullied into saying, whatever you want to do. I just feel defeated. It makes me feel weak.

I got on the Zoloft.  I think the combination of Seroquel and 300mg of each. Non coherentness. I didn't really have knowledge of everything that was going on.  They did increase both of them. I was taking 300 mg.  Sleep all day and all night.

Getting up for court.

WOD0000091

I didn't have ant advance notice. I Talked to Lawlor. He called me and told me two days before that Martell. He called my counselor. The government's expert. I had to talk with him.

Martell says we are going to talk about the crime. Why would tell him? He's the enemy, trying to kill me.

We talked about my childhood. I was not willing to talk with her-Mary Goody.

I understand my team is behind me. You want to really know.
If I tried to say anything to Pat, he would yell at me and tell me not to say anything.

Dr. Hutchinson would have been someone I could have talked to. I asked my daughtert to go see her.

She was a woman. She would be able to relate to it. She might have understood how defeated I felt.

I wanted to tell her how I trusted McNease. I don't want to tell you, but I'm scared

I told Pat that's what's happened.
He made the proffer. I agreed that what he said was true.
I'm not going to insult the jury by telling them anything you say.
I told him. Could he come and be there. I saw him. 5 maybe.

Shortly before the 4th of July. I felt like my stomach was getting bigger. I started showing right away.

Tender breasts. Blowing. How quickly did you stop. A couple of weeks later, after I was told I was not having an abortion.

Dustin said that he had a right to have a baby. I struggled with telling him. I had asked a guy at work.

About a month. Oh, no.      I had not gone a month before that.

Very erratic. Very stressful.

I was overwhelmed by the idea of having another child. We had a good relationship, my daughter and i

I was taking birth control pills and I started taking antibiotics.

It's the intimacy, not the sex. Being with the guy. It was a challenge.

I did love him.

WOD0000092

I kept thinking my dad was going to resvue me.

I was always looking for a guy who wasgoingto rescue me.

Mixed phase

When I see the laughter, I can look for the tears.

One big grave. I had nothing to do with digging it. I got out of the car when he went and took the kids.

The kids were asleep. Dustin put them in there.

I told the kids to pack up.

Very  upset
I was going to buy a gun for myself. You were choosing a smaller gun, but he wanted a bigger gun.

Acquiesecence. I went a got a gun permit and everything.

It was about a gun getting protection against Terry. Because

I don't this gun, it's too big. it's the gun we're going to get.

OKAY

I was defeated anytime I tried tro discuss anything with my mom. I was defeated anytime I tried to work with my Dad.

We argued over the kids. He was taking the kids out, and there ws nothing he could do, because they were going to be witnesses.

Either I was gong to be with him, and I had Allyssa to think about.

I dreamt about Allyssa a lot, of someone hurting her. I had

The oldest girl was the same age as Alyssa.

I'm not sure.

I went in. Christi was there. He took a shower, and I stayed an talked with Christie.

I don't remember whether I took a shower.

I don't recall any conversation. I think I was probably crying.

WOD0000093

I was making sure he understood you were not going to go to the police.

She was afraid of Dustin, too. She was sympathetic.

He met me through the wall at the jail-McNease
He told me about his mob connections, etc.

It took about two months. He talked to me like 4/5 hours per day through the window.
I had brought his name up to Al Wilette. He had broken into Al Willette's office.

private investigator. He would tell him that I am a rat. He doesn't want me talking t him. I knew him better.
I don't know why I thought i had to have man around. Someone around.

When Honken decides it time.

The Kentucky Fried Chicken-A chance meeting.

He heard that  I was pregnant.  I was upset.

It was during the day. He had me call Terry's mom, and have Terry call me back.
Terry to meet me at the Country Club.

He was out there when I got off work. He was in a different car.

I was getting in my car. Terry said, "Hey." Obviously I'm pregnant.

He did call me back. He knew we were meeting Dustin.

Dustin got there, and told Terry to follow him.

I rode with Terry. I told him that I was sorry.

He said he knew it was Dustin's. I had to be careful around him because he was a dangerous guy.

I was very paranoid. I was sure people were out to get her.

He wanted to talk with Aaron Ryerson.
I don't recall Dustin opening the trunk.

I never heard him gurgling.

It had to b e done, and he told me I knew that it had to done.

WOD0000094

I'm upset but I'm on board.

I felt like being pregnant with Marvea was keeping me safe, because he won't hurt his own kid.

I often reassured him about that I was on his side.

I don't think I let myself think that.

hat wasn't Dustin on the streets.
I was still doing his bidding. I was taking Marveya. I had him pick up $2000 for a meth lab recipe.

He had me call this guy. He didn't want that pup anymore.

When I moved out of my house, there were a few things there. He moved all his stuff to my house.

I had to get rid of it.

FBI

If they would have sat and talk to me. I get don't like feeling vulnerable. Come at me aggressive, or you're going to die.

We know this guy is a fucking killer.

 That was hard keeping that stuff to my kid.

I knew about Kathy Rick all the while
Yes, my daughter and I have this underwater hearing. When I was a child, it was like I was listening underwater as well.
I still miss him-Terry

WOD000095

William Logan, MD

He asked for Gelbort's report, which he did not get.
They abandoned..
They had offered less than life
Told him not to ask about the offense
Saw her early, then did not see her for several years. Made some treatment recommendations

I was pretty well aware that she did not want to go to trial. She was not the type of person who would hold out to the bitter end.

I thought that Dr. Hutchinson would bring out her dependency. She was totally shocked.

I thought looking at the her own retraumatization during the offenses themselves would speak to her dependency issues.

No neuropsych evaluations to follow up on, no neuroimaging.

WOD000096

## Michael Burt

**From:** "James Merikangas, MD" <neuropsych2001@hotmail.com>
**Date:** Wednesday, May 25, 2011 7:09 AM
**To:** "George Woods" <gwoods@georgewoodsmd.com>; "george woods" <gwwoods@comcast.net>; "george woods" <gwwoods@gwwoods.cnc.net>; "Michael Burt" <michael.burt@prodigy.net>; "michael burt" <michael@michaelburtlaw.com>
**Subject:** RE: mri

James R. Merikangas, M.D. 4938 Hampden Lane #428 Bethesda, MD 20814 (301) 654-1934 (office) (301) 654-1834 (fax)

---

From: neuropsych2001@hotmail.com
To: gwoods@georgewoodsmd.com; gwwoods@comcast.net; gwwoods@gwwoods.cnc.net; michael.burt@prodigy.net; michael@michaelburtlaw.com
Subject: mri
Date: Mon, 23 May 2011 11:21:44 -0400

I concur with the radiologist's reading of the MRI of the brain of Angela Johnson,and by my reading the PET and EEG were both abnormal with left temporal and frontal dysfunction.

James R. Merikangas, M.D. 4938 Hampden Lane #428 Bethesda, MD 20814 (301) 654-1934 (office) (301) 654-1834 (fax)

WOD0000097

5/31/2011

GEORGE W. WOODS, Jr., MD-APC
4200 Park Boulevard # 545
Oakland, California 94602
(866)-646-0509 phone
gwoods@georgewoodsmd.com

May 26, 2011

Michael Burt, Esq.
600 Townsend Street, Suite 329e
San Francisco, California

*RE: United States v. Angela Johnson,  Case No. C 09-3064*-MWB

Dear Mr. Burt,

In accordance with your request to provide the government with a supplemental summary and outline of my testimony, I submit the following supplemental report. The purpose of this supplemental report is to further elaborate upon and to update the expert opinions previously provided to the Court in a 23 page report filed in this case on October 5, 2009 [Doc. 1-2] .

Prior to writing my earlier report, I reviewed a substantial amount of relevant material, as outlined in my report at page 9. I also conducted lengthy examinations of Ms. Johnson on August 5th and 6th, 2009. Following completion of my earlier report, the defense team developed additional social and medical history information relevant to my opinions. In addition, Ms. Johnson underwent MRI, PET/CT, and EEG testing in Fort Worth Texas in February 2010, as recommended by me. She also was subjected to additional interview and testing by Dr. Martell in March, 2010. In addition, beginning in March, 2011, several of the trial participants and other witnesses testified in an evidentiary hearing that is still ongoing. I have reviewed all of this material and do not find anything in it which calls into question the opinions I previously reached. On the contrary, as I will attempt to outline below, this additional information lends additional and significant weight to the evidence I previously cited in support of my earlier opinions.

**THE DATA OR OTHER INFORMATION CONSIDERED IN FORMING OPINIONS**

The data or other information considered by me in forming the opinions expressed in my October 5, 2009 report are listed in Exhibit A, attached hereto. The additional data or other information considered by me in forming the opinions expressed in this supplemental report are

1

WOD000098

cited in this supplemental report. It should also be noted that in preparation of this supplemental report and for my upcoming testimony, I conducted clinical interviews with Ms. Johnson at Ft. Leavenworth, Kansas on May 24th and 25th, 2011. The substance of my opinions as expressed in my reports can be summarized in a Powerpoint should you desire one as an Exhibit for the evidentiary hearing.

## QUALIFICATIONS, PUBLICATIONS, EXPERT WITNESS EXPERIENCE, AND COMPENSATION RATE IN THIS CASE

My qualifications, publications, and expert witness experience are fully set forth in my earlier report at pages 1-8. My compensation rate in this case is $ 300.00 per hour.

## STATEMENT OF MY OPINIONS AND THE BASES AND REASONS FOR THOSE OPINIONS

### I.     Referral Questions

At the request of counsel, I performed a neuropsychiatric evaluation of Ms. Angela Johnson, a  46 year old divorced white female.  The specific referral questions I was asked to address were:

Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

Could the defendant have reasonably foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.

Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?

Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

Did the defendant's impairments and medications inform her demeanor at trial?

Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological  impairments?

2

WOD000099

## II. Clinical Formulation

Ms. Johnson's mental diseases/defects have affected every part of her life, including her mental state at the time of the offenses in the present case. Ms. Johnson suffers from temporal lobe disease, on both sides of her brain. It appears as though her temporal lobe dysfunction is familial, and her mother, Pearl, and maternal grandmother share consistent symptoms of unusual religious/spiritual beliefs, obsessionalism, gullibility, a deepening of affective responses, mood lability, language-related disorders, and academic impairment.

Ms. Johnson demonstrates cognitive deficits more global than her temporal lobe dysfunction. According to neuropsychological examination and neuroimaging studies, she has deficits in frontal and parietal lobe functioning, as well. These deficits impair her ability to adequately weigh and deliberate, sequence her thinking and actions, and understand as well as respond to social cues. She is also vulnerable to dissociative episodes, periods when her perceptions of reality are altered or lost completely to memory. This vulnerability in her is neurologically mediated and environmentally induced.

Ms. Johnson has also suffered from profound, chronic trauma, which would have been identified at the time of her trial as Complex Post Traumatic Stress Disorder. Her cognitive impairments created several of the causative stressors for her PTSD, and contributed significantly to her development of inadequate and destructive coping mechanisms.

Ms. Johnson was prescribed psychiatric medications during her pretrial incarceration that were consistently maximum doses. She complained of symptoms consistent with medication side effects for much of her incarceration. Eventually, her medication dosages were increased to levels much higher than recommended by leading authorities. Ms. Johnson suffered severe side effects of this toxic dosages during her trial, and the side effects impacted her presentation before the jury and trier of fact.

Although there was some exploration of Ms. Johnson's traumatic history at the time of trial, the reasons why the trauma occurred were poorly addressed, and the impact of that trauma was underestimated and incompletely presented. Ms. Johnson's cognitive deficits were never elucidated. More importantly, the relationship between Ms. Johnson's brain impairment and trauma and their impact on her poor decision making before, during, and after the offense, and on her unusual and harmful trial demeanor, was not explained., Further, her multiple impairments impacted her ability to rationally assist trial counsel in the conduct of her defense, most particularly in the area of plea negotiations.

Much of the foundation of Ms. Johnson's tribulations rest on her cognitive deficits, especially what appears to be her familial temporal lobe deficits. Ms. Johnson also has significant deficits in other parts of her brain, including the remaining left hemisphere of her brain, her frontal lobes, and her right parietal lobes.

3

WODB000100

## A. TEMPORAL LOBE AND OTHER BRAIN IMPAIRMENTS

Ms. Johnson and her family manifest symptoms of unusual spiritual/religious beliefs, a heightening of emotion (mood lability), elation, obsessionalism , paranoid ideation, dependence, circumstantial speech, and aggression.  These symptoms together point to temporal lobe dysfunction, a neurological disorder with psychiatric manifestations.[1] Ms. Johnson, and many of her family, share the symptoms and their tragic aftermath.

Temporal Lobe dysfunction, alternately called temporal lobe epilepsy, was described by Norman Geschwind, MD (1926-1984). A brilliant clinician and academician, Dr. Geschwind identified cardinal symptoms caused by electrical problems in the temporal lobes, those parts of the brain most central to brain functioning. Below is an illustration of the mesial (middle) temporal lobe and the limbic system, which allows one to see how close the temporal lobes are to adjacent  brain structures:



The corpus callosum, the connection between the right and left hemispheres of the brain, is the thick, lighter area shown. Other structures shown are part of the limbic system, the fear, emotional recall, and initial memory circuits of the brain. Below is an illustration of this system, nestled inside the brain and abutting the mesial temporal lobe, but also connecting to the frontal, parietal, and occipital lobes, and beyond:

---

[1] Shetty, T. and M. Trimble "The Bear Fedio Inventory: Twenty years on." Journal of Epilepsy 10(5): 254-262.

4

WOD000101



These brain structures in and adjacent to the temporal lobes impact fear, memory, academic function, the depth of emotion, and psychosis, among many other cognitive tasks. Dr. Geschwind understood that abnormal brain electrical activity could also manifest in behavior, rather than motor activity. He predicted that more sensitive electrophysiological techniques would identify many patients with behavioral changes who never had clinical seizures. " 'It would not be surprising if it eventually turned out that a majority of patients with this condition had temporal spikes without epilepsy'". [2]

There are other types of defective electrical activity that occur in the brain without motor activity. Aberrant electrical activity in Broca's area, in the left side of the brain, results in difficulty understanding language or speaking for short periods of time, and may mimic day dreaming. Typically, these is no motor component to these seizures. Broca's area is depicted in the following diagram:[3]

[2]Devinsky, J. and S. Schachter (2009). "Norman Geschwind's contribution to the understanding of behavioral changes in temporal lobe epilepsy: The February 1974 lecture." Epilepsy & Behavior 15(4): 417-424.

[3] CNS forum images 2011.

5

WOD000102



Geschwind recognized specific symptoms could occur when the temporal lobes were not functioning properly. The symptom cluster, each of which had been identified as a symptom of temporal lobe problems previously, included hypergraphia, increased religiosity, aggression, deepened emotionality, altered sexual interest, and viscosity. [4] This list has been expanded with the work of Bear and Fedio, who compiled the following Inventory of symptoms: [5]

---

[4] Geschwind, N. (2009). "Personality changes in temporal lobe epilepsy." Epilepsy & Behavior 15(4): 425-433.

[5] Shetty, T. and M. Trimble "The Bear Fedio Inventory: Twenty years on." Journal of Epilepsy 10(5): 254-262.

6

WOD000103



By

## TABLE 1. Characteristics Historically Attributed to Temporal Lobe Epilepsy*

| Inventory Trait | Reported Clinical Observations |
| --- | --- |
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease. |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Aggression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

*Adapted from Bear and Fedio,[10] with permission.

7

Case 3:09-cv-03064-MWB-LTS    Document 284-22    Filed 06/23/11    Page 104 of 287

WOD000104

Not each of these symptoms occur in every manifestation of temporal lobe dysfunction. However, each of these symptoms is neurological in origin, rather than psychiatric, although their manifestations may appear-and be treated- as mania, psychosis, or delusions:

> In recent times, especially with the unraveling of cerebral circuitry for the expression of emotions, notably with a fuller understanding of the limbic lobe and the role of such structures as the hippocampus and the amygdala in emotional behaviors, a biological interpretation of many behaviors previously thought of as socially driven becomes possible. Epilepsy very often relates to chronic neurophysiological changes in such limbic structures, and its relation to religiosity provides an opportunity to explore in more detail the neurobiology of such behavioral predispositions.[6]

Temporal lobe symptoms, such as altered spirituality, dissociation, deepened emotionality, and gullibility are ongoing, rather than being temporally related to overt seizure activity. These behaviors are the manifestations of aberrant electrical activity, rather than physical manifestations like limbs going akilter or incontinence. These manifestations of bad wiring in the temporal lobes are "interictal," rather than "peri-ictal," meaning these behaviors occur all the time, not just around the time of greatest brain electrical abnormality:

> Geschwind emphasized interictal, rather than peri-ictal behavioral changes. Chronic change in personality in TLE is very common- not an acute change in personality, but one that develops, continues, and typically gets more striking with the passage of time; a personality that the patient manifests all the time, not an acute and self-limited change related to a seizure; behavioral changes that typically follow the onset of the seizures and continue for many years, often gradually getting more intense. Dramatic ictal or perictal changes in personality could occur, but were rare. But even here, a chronic interictal state eventually prevailed... [7]

---

[6] Trimble, M. and A. Freeman (2006). "An investigation of religiosity and the Gastaut-Geschwind syndrome in patients with temporal lobe epilepsy." Epilepsy & Behavior 9(3): 407-414.

[7] Devinsky, J. and S. Schachter (2009). "Norman Geschwind's contribution to the understanding of behavioral changes in temporal lobe epilepsy: The February 1974 lecture." Ibid. 15(4): 417-424.

8

WOD000103

Bipolar-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, run in the maternal side of Ms. Johnson's family. The literature supports a familial inheritance of these symptoms, and also indicates that MRI findings for the disorder are often normal:

> We describe a new syndrome of familial temporal lobe epilepsy in 38 individuals from 13 unrelated white families. The disorder was first identified in 5 concordant monozygotic twin pairs as part of a large-scale twin study of epilepsy. When idiopathic partial epilepsy syndromes were excluded, the 5 pairs accounted for 23% of monozygotic pairs with partial epilepsies, and 38% of monozygotic pairs with partial epilepsy and no known etiology. Seizure onset for twin and nontwin subjects usually occurred during adolescence or early adult life. Seizure types were simple partial seizures with psychic or autonomic symptoms, infrequent complex partial seizures, and rare secondarily generalized seizures. Electroencephalograms revealed sparse focal temporal interictal epileptiform discharges in 22% of subjects. Magnetic resonance images appeared normal. Nine affected family members (24%) had not been diagnosed prior to the study. Pedigree analysis suggested autosomal dominant inheritance with age-dependent penetrance. The estimated segregation ratio was 0.3, indicating an overall penetrance of 60% assuming autosomal dominant inheritance. The mild and often subtle nature of the symptoms in some family members may account for lack of prior recognition of this common familial partial epilepsy. This disorder has similarities to the El mouse, a genetic model of temporal lobe epilepsy with a major gene on mouse chromosome 9, which is homologous with a region on human chromosome.[8]

Pearl Johnson, Angela Johnson's mother, suffered from "paralyz[ing]" depression all her life.[9] She began to hear voices when she was a child, and continues to this day to hear things she now understands other people do not hear.[10] Pearl Johnson continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity. She has a

---

[8] Berkovic, S. F., A. McIntosh, et al. (1996). "Familial temporal lobe epilepsy: A common disorder identified in twins." Annals of Neurology 40(2): 227-235.

[9] Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 1.

[10] Id., p. 2.

9

WOD000108

life long history of behaviors recognized as temporal lobe based:  heightened emotionality, guilt, obsessionalism,  circumstantiality, sense of personal destiny, hypergraphia, dependence, paranoia, and humorlessness.  Angela's mother's mother was also a woman with apparent religious delusions, auditory hallucinations, intense emotionality, and dependence.[11]   Yet there is not the significant social deterioration typically seen in schizophreniform  disorders such as schizophrenia.  Rather, a labile, heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances are neurocognitive traits Ms. Johnson shares with her mother.

Pearl Johnson acknowledges profound religious experiences starting early in her life, guided by Florence Jensen, her mother, who experienced similar psychotic experiences. Pearl Johnson began to hear voices after Angela was born. She began to experience increasingly unusual religious experiences as well as beliefs of having special powers. To this day, she maintains a belief in her special powers:

> I started hearing things that others couldn't hear and seeing things that others couldn't see when I was a child.  My stepfather was very cruel and locked me in the basement for long periods of time.  When I was in the basement, I heard a lion growling, even though no one else heard the lion.  After I gave birth to Angela, I heard voices that others could not hear.  I had to listen hard to understand what they told me. I still hear voices and commands from God, have the power to heal, and see special meaning in ordinary things. Recently, God gave me two words, Angela and seven, and I am trying to figure out what they mean.
>
> ....

---

[11] As a family friend put it, "I thought the mother was off the wall. She was a little bit odd-lot of it was behavior. She seemed extremely nervous to be around people. [Pearl has] that but Florence [her mother] was way worse." (Carol Mann Interview with Pat Berrigan and Mary Goody, 2/10/05, MG 007166).

Ms. Johnson's childhood friend Sarah Ewing described some of the grandmother's bizarre behavior in these terms:

> Jean's mother was very strange.  She never spoke a word to Sarah during all the years Sarah lived in the same house with her and knew her.  Sarah heard the grandmother hitting a tire hanging from the ceiling for hours at a time.  She hit the tire with a bat, over and over again.  Thump.  Thump.  Thump.  She yelled and screamed the entire time she hit the tire.

(Sarah Ewing Interview with Scharlette Holdman, July 20, 2009).

WOD000107

I have special powers that others do not have. I can see the future. I can hear and see things that others can not hear and see. Sometimes these things are scarey and bring me to my knees. Sometimes these things make me full of joy. Sometimes I only hear one word and it takes me a long time to figure out what the word means.[12]

Pearl Johnson began to experience religious delusions, not related to any particular religion, that required her to "exorcise" her children, Angela most of all. Pearl Johnson specifically would exorcise Angela when Angela would not answer her, or appeared to be day dreaming and did not respond:

When Angela was small I thought she was retarded and possessed by demons because she had periods when she did not answer me and did not respond to things around her. She stared off to the side or straight ahead as if she was not in her body or as if she was in another world. It frightened me and I thought I had to do something or she would be taken over forever by demons.[13]

During her elementary school years, Ms. Johnson reports that her maternal grandmother, Florence Jensen, and her husband Andy Jensen came to live with Ms. Johnson's family. She reports that they and her mother, believing her to be troubled by "evil spirits," would hold her down for hours at a time and pray loudly over her.[14] These forced sessions typically involved much more than praying loudly. According to Ms. Johnson's older sister Wendy Jacobson:

Mother and her friend or our grandmother were always on the lookout for signs of the devil or demons and they watched every little thing we did to see if we had the devil in us. As children, we came to believe that the devil or demons were in us and were terrified of our own selves. It was very confusing to think that another being or thing could take over our bodies and minds and destroy us. Mother's decision that we were showing signs of being possessed did not make any sense to us and came out of the blue from hour to hour or day to day. If she thought she observed something demon like in us or our behavior, she immediately began to exorcise or get rid of the spirit. Everyone of us kids but Angela figured out how to avoid her thinking we were possessed or how to show the demon had left us if we were possessed. Angela could never figure out how to change her behavior so Mother would not want to exorcise her.

---

[12] Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 2-3.

[13] Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 2-3.

[14] Dvoskin/Martell report, p. 18.

11

WOD000108

Mother made up names for all these demons and at one time named them after twelve Indian tribes like Algonquin. She also made up a special demon for Angela and announced that Angela was possessed by the Deaf and Dumb Demons. She and my grandparents did terrible things to Angela to get rid of the Deaf and Dumb Demons. They held her down on the floor or on the dining room table, they put her in a closet, they hit, shook, and screamed at her, they threatened her, they chanted over her, and they stayed ever alert to see if she showed any signs that they needed to do it again. These exorcisms happened over and over again and terrified Angela. She screamed, begged, cried, and ran from them, but they caught her and held her down. She fought back as hard as she could to make them let her go, but they never gave up. She was totally powerless and no one protected her. I couldn't protect her, either, even though I tried to make them stop hurting her. [15]

Wendy Jacobson also recalls her mother's altered religiosity and psychotic behavior associated with her religious fervor:

> Our mother has always been different from any one else I've ever known. She hears and sees things that others do not hear or see. She sees special meanings in ordinary events. She believes she has special powers to heal. Although she believes these things are God speaking to and through her, her beliefs are not from any particular church or religion. She and sometimes her friends made it up as they went along. For instance, my mother believed in laying out in the spirit, laying on hands, fasting, speaking in tongues, and accepting God's gifts. She interpreted everything that happened as a sign from God with special meaning for her, or worse, a sign from the devil. She believed that demons and devils and evil spirits lived in us children and tried to take us over. She fought these demons and devils by having these special rituals that she made up.[16]

These exorcisms were initiated by Pearl's attempts to engage Angela and Angela not responding. Angela describes periods when she felt like "I couldn't understand what my mother was saying, almost like her voice was coming through a cloud or something." Given the very close proximity of the left temporal lobe and Broca's Area, impairments in the left temporal lobe can generalize to the language center, causing the types of occasional response problems Ms. Johnson describes occurring during her childhood.[17] These response problems have lessened as

---

[15] Wendy Jacobson declaration, Doc. 1-13, p. 3-4.

[16] Wendy Jacobson declaration, Doc. 1-13, p. 2.

[17] Vercuell (2011) Aphasic Seizure. Medlink Neurology

12

WOB000109

Ms. Johnson's brain matured. Many children grow out of seizure activity, which is often greatest in childhood, when the brain is developing.

But other impairments remain.  Pearl Johnson, Angela Johnson, and Jamie Hayes, Angela's younger sister, all have motor dysfunction consistent with partial  electrical dysfunction. Pearl Johnson describes one incident consistent with clonic tonic seizures, and multiple incidents consistent with partial  seizures also known as absence seizures.[18]  Partial  electrical dysfunction often is misread as day dreaming, losing track of time, or not paying attention. Loss of consciousness is not a requirement in partial  activity, particularly in the temporal lobes.

Angela Johnson has a tic of the right leg and foot, consistent with motor dysfunction on the left side of their brain.[19]  Angela's younger sister Jamie Hayes had a similar problem.[20] Again, when comparing the proximity of the left temporal lobe and the motor cortex, unusual electrical problems with the temporal lobe could well affect the right lower extremity, since the right leg is represented in the left side of the brain, along the motor cortex, again in close proximity to the temporal lobe.

Myla Young, PhD, administered a comprehensive neuropsychological battery to Angela Johnson. Dr. Young concluded that Ms. Johnson's motor functioning was impaired on both motor strips, nondominant (left) more than right:

---

[18] "Once, I fell to the floor, shaking and trembling, and frozen with fear.  Sometimes I don't know what just happened, like I've been in a daze or have gone someplace else in my mind. It makes me scatter brained." (Pearl Johnson declaration, p. 2)

[19] "Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety." (Dvoskin/Martell report, page 32). Contrary to the implication of this sentence, this condition is not just a transient by-product of anxiety stemming from an interview with Dr. Martell. Ms. Johnson's childhood friend Sarah Ewing has stated:

> Angie had it the roughest of all the children.  She was funny, cute, and always on the go but she hurt inside.  She dissociated frequently.  She shook her leg all the time.  She hurt herself.  She took inch long straight pins and stuck them straight into her arm and walked around with them.

(Sarah Ewing interview with Scharlette Holdman, July 20, 2009)

[20] "When Jamie was growing up, she had nervous tics, especially one where her head jerked to the right all the time." (Jamie Hayes interview with Scharlette Holdman, July 10, 2009.)

WOD000110

Angela Johnson's abilities across Halstead-Reitan tests were significantly impaired, with impairment ranging from borderline/mild to severe. Using the Reitan-Wolfson Neuropsychological Deficit Scale (1985), her abilities on the Tactual Performance Test, Seashore Rhythm Test, and Speech Sounds Perception Test were in the range of mild/borderline impairment. Her abilities on Category Test, Finger Tapping Dominant Hand, Trail Making B, and Finger Tip Number Writing were in the range of moderate impairment. Her Finger Tapping-Non-Dominant Hand was severely impaired. Using the proportion of tests which have been demonstrated to be most sensitive to differentiating brain damaged from non-brain damaged persons, her abilities were in the range of borderline/mild impairment (Impairment Index).[21]

Wendy Jacobson described episodes consistent with partial dysfunction in both Pearl Johnson and Angela Johnson:

> Angela has always went into her own world. We called it her "special place," where she would go in her mind and stay for awhile. When she came out of her special place, she'd say, "I'm back." At other times, she seemed to check out of what was going on for a few seconds and then come back as if she hadn't left. She had to ask me to repeat things all the time. It infuriated my mother who decided Angela was possessed by the Deaf and Dumb Demon and that's why Angela didn't respond when Mother called her. I have seen videos of children who have petit mal or absence seizures, and they look exactly like Angela looked when she went into a daze. My mother also goes into a daze like Angela does. Mother calls herself scatter brained, and she's right. She jumps from one subject to the next, repeats herself as if she hasn't already told us the same thing, and forgets what she's said. [22]

Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister.[23] She initially could not learn how to make change, and although she worked as

---

[21] Myla Young, PhD report, page 10

[22] Wendy Jacobsen Declaration, Doc. 1-13, p. 4

[23] Ms. Johnson told Dr. Hutchinson: "School w[a]s really hard for me. I [definitely] had [ADD]. Because I [was] like beyond le[ar]ning anyt[h]ing. Almost like not hear what was being said, not really there....[Y]ou know, the only person, who could teach me anything was [W]endy" (Hutchinson Interview notes)

14

WOD0001711

a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks.[24]  Many of these academic functions require intact temporal lobes.

Angela Johnson has many other indications of temporal lobe dysfunction on both sides of her brain. Her Wechsler Adult Intelligence Scale III (WAIS-III), administered by Dr. Gelbort, showed an 18 point differential between her verbal and performance IQ, with her verbal IQ being lower. This significant differential points toward left temporal dysfunction, where many verbal neurological skills reside. As Dr. Martell has pointed out,

> Testing with the WAIS-3 revealed that Ms. Johnson has a Full Scale IQ in the "Average" range (91), with a Verbal IQ in the "Low Average" range (84) and a Performance IQ in the "Average" range (102). The 18-point difference between her verbal and performance IQ scores is statistically significant ($p < .05$), occurring in only 10.7% of the normative population. This finding indicates that her verbal abilities are not as well developed as her visual-spatial problem solving skills, and reflects her lack of formal education after the 9th grade. [25]

Ms. Johnson's intellectual testing captured her extremely limited fund of knowledge. She did not know how many weeks there were in a year, guessing 48.  Vocabulary, Similarities, Mathematics, and Information were her lowest subtests on her intelligence testing.

---

[24] "Angela has had the most difficult time of all my children and has had the most problems. She could not learn to read and write in school and was in special education classes. School was very hard for her, and I needed her to help me in my restaurant so I had her drop out of school after the eighth grade to be work for me as a waitress. She was a good waitress, and customers liked her, but she could not add, subtract, make change or run the cash register. She had to bring the check and the customer's money to someone else who could run the cash register." (Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 2-3.)

"Angela got the worst of [my mother's abuse], because Angela always had trouble learning. Angela could not learn to read, write, add, and tell time until she was in the third grade. I spent hours and hours teaching her how to tell time and how a quarter past three didn't mean there was a quarter, as in a coin, on the clock. She always had trouble in school and was in special education classes. Angela had to quit school after the eighth grade to work in our mother's restaurant as a waitress." (Wendy Jacobson Declaration, p. 3)

[25] Dvoskin/Martell report, page 28.

15

WOD000112

Ms. Johnson also has a remarkable history of migraine disease, which is a soft sign of neurological dysfunction.[26] Migraine disease has a high co-morbidity with both bipolar disorder and aberrant electrical activity. Her migraines are accompanied by a gastrointestinal aura, severe, and debilitating.[27]

Angela Johnson's inherited brain dysfunction was the substrate upon which her documented history of severe, chronic, and life altering trauma was layered. Not only was her brain dysfunction not presented at trial,[28] the impact on her ability to effectively weigh and

---

[26] "This patient was admitted by Dr. Magat because of nausea, vomiting, severe general headache, and malaise of approximately 14 months duration….Headaches have been recurring on and off since the summer of 1975." (Angela Johnson's Forest City Medical Center Records, Jan. 1, 1976)

[27] Alvarez, W. A. (2010). "Migraine Aura without headache" Medlink Neurology; Andermann, F. (1987). "Migraine-epilepsy relationships." Epilepsy Research 1(4): 213-226.

[28] At one point in the trial, Dr. Hutchinson was asked about the " the effects of childhood trauma on the actual childhood brain..." (Trial Transcript, p. 3853). She was asked to "briefly" describe what the literature demonstrated without any reference to Ms. Johnson, and she was admonished by Mr. Berrigan, "I don't want to go into that in a great deal of detail." (Id.) Dr. Logan at one point commented that "there have been known to be shrinkage in certain areas of the brain" in children with "pyrotic trauma", but he never testified that Angela Johnson had any brain shrinkage. (Id. p. 3321) Similarly, Dr. Evans testified briefly about the *possible* effects of methamphetamine use on the brain and the use of PET to discern brain impairment, but because he was never asked to examine Ms. Johnson or even to review her drug history he was forced to admit on cross examination that he had " no basis to suggest to this jury that any of these ... possible long-term damage to the brain , any of these physiological effects has any application whatsoever to Angela Johnson." (Id. p. 3593) Dr. Cunningham alluded to the fact that Ms. Johnson's mother was in labor with Ms. Johnson for about three days and that Ms. Johnson was a breech delivery, but he quickly added, "[s]o that has some potential complications to it, but ...there is no evidence that...she was necessarily injured by that or had developmental problems." (Id. at 3515-3516). He also testified that Ms. Johnson has "potentially some attention or learning related difficulties, although I don't have sufficient information to find that with certainty..." (Id. p. 3817) "Again,... there is only partial evidence of this." (Id. p. 3820). He testified that her intelligence was in the "low average range", but he stressed that "[i]n looking at her school records, it is difficult to detect the presence of learning disabilities, for example." (Id. p. 3831-3832, 3851-3852). He mentioned that Ms. Johnson "talked about a personal perception of

16

WOD000113

deliberate crucial decisions, her high potential for dissociative experiences at her greatest time of stress, and the need for an understanding in working with clients with brain impairment and trauma, an understanding her attorneys could not have developed without this specific knowledge, were all missing from the defense teams' presentation to the trier of fact.

In addition to frontal lobe dysfunction, Ms. Johnson has deficits in her executive functioning. Executive functioning, as described by Dr. Young, is:

> ...the ability to think, reason, problem solve, anticipate consequences of actions, and change actions based on information received from the environment. Executive functioning is also the ability to think, reason, problem solve, inhibit impulses and monitor actions, and is needed for planning, impulse control and self-regulation.[29]

Angela Johnson's executive functioning, mediated by her frontotemporal lobes, is significantly impaired. Wendy Jacobson describes how impaired Angela's decision-making processes were in the community:

> In many ways, Angela is like our mother. Neither one of them can really function on their own. Angela tried as hard as she could, and worked hard, just as Mother worked hard. They are both so gullible, though, they believe anything and can't plan ahead to know what will work and what won't work. Just like my mother's thrift store could not make enough money to stay open, Angela's attempt to own her own business failed. She opened and had to close her bar within a year. Angela always had to move from place to place after she moved out - just like my mother always moved from place to place, from one failed idea to the next. Angela also depended on other people, the same way Mother needed others.

> Angela depended on other people to help her manage day to day life. She got her own places to live in but lost them and had to move in with me or my sister or a friend.[30]

---

struggling to learn and descriptions of her reversing her letters." (Id. p. 3849). As with Dr. Hutchinson, Dr. Cunningham was asked to briefly describe the general effect of childhood trauma on the child brain, but Mr. Stowers prefaced the discussion with the statement, "I don't want to go into that in a great deal of detail." (Id. p. 3853). Ms. Johnson's brain was never mentioned in the discussion.

[29] Young report, page 8

[30] Wendy Jacobsen Declaration, p. 5.

WOD000114

Angela's sister Holly Dirksen comments:

> Angela was never realistic and always gullible; she had no judgment about people at all.... Angela never was able to live independently and on her own; she always depended on friends, her family, or men to help her. She always needed someone to make things work for her and she did not want to be alone.[31]

Holly Dirksen also describes Ms. Johnson's lack of impulse control and her erratic mood swings:

> Angela always had little ability to control her emotions which were up and down, up and down, happy for five seconds and then totally different. Her temper went off for no reason at all and no one could predict or guess what set it off. Once she got mad, she just got madder and madder, and no one could calm her down. She got so mad she tore up clothes, threw things on the floor and against the wall, screamed, and yelled. She got mad over silly things like when I put pink and blue clothes together in the laundry or the children made a mess. When she was sad, it was the same thing – as sad as sad could be. She cried and sobbed with deep grief and pain. At the moment of her sadness, she was completely wrapped in it. When she was up and not sad or upset, she was on top of the world. When she got in these moods, she said she felt like she was queen of the world, even when she had absolutely nothing. That's the way her moods went, from one extreme to the other.[32]

Ms. Johnson's daughter Alyssa Johnson observes:

> My mother is a wonderful, giving and loving woman who was never able to look out for herself, regardless of how hard she tried. She believed every story she heard, always saw the best in people, and could not understand how things always went sideways on her. When I was a teenager, I had to look out for her because she just didn't have any common or practical sense.
>
> She worked as hard as she could, sometimes working two shifts in the same day. It was all she could do to support us, but from time to time we had to live with one of her sisters or friends when my mother wasn't able to keep up with

---

[31] Holly Dirksen Declaration, p. 4.

[32] Holly Dirksen Declaration, p. 1-2.

18

WOD000113

day to day demands of working, paying all the bills, balancing a budget, and being a single mom.

All of my mother's emotions were intense.   There were times my mother lost all control of herself and could not think clearly.  Sometimes it was over little things, like when we lost car keys, she lost her purse, the dishes weren't done, or something in the house was misplaced.  She flew into rages that made no sense over insignificant things, screaming, crying, and stomping around until she exhausted herself.  She stayed mad and upset for a long time.  When she was sad, she cried and sobbed because she could not fix things and make it better for us. Sometimes, when she was happy, she was on cloud nine, as if she were the luckiest person in the world.  She was obsessed with keeping everything in order and could not handle it if anything was out of order.  She was more than neat and scrubbed everything like there was no tomorrow, staying up all night to clean the house.

My mother had terrible episodes of depression in between her times of activity.  When she was depressed, she could barely move or do anything.  She stayed in bed, in her room, or on the couch, as if she were so sick she had no energy.  I worried about these moods when they came over her, but just did my best to be there for her.  After my little sister was born, I had to take care of her when mother was so depressed she couldn't do anything.  I spent a lot of time at my dad's but always worried when I was there about how my mother was doing alone, without me.  She really couldn't take care of herself when depression came on.  It was the exact opposite when her mood changed and she started projects or new jobs.  She went from one extreme to the other.  At the other end of depression was her thinking everything was perfect, wonderful, and marvelous, even when I knew we were headed for disaster.  Nothing could change her mind, though.  She had absolutely no judgment; it was like she was in another world.[33]

Neither Dr. Martell nor the defense trial experts completed a comprehensive neuropsychological battery with Ms. Johnson. Indeed, it does not appear that Dr. Martell administered any neuropsychological tests in 2005, but relied instead on the partial and preliminary neuropsychological tests administered by Drs. Hutchinson and Gelbort.[34] According

---

[33] Alyssa Johnson Declaration, p. 1-2.

[34] Dr. Hutchinson only performed the Tower of London, a screening neuropsychological test, and this test is not mentioned in Dr. Martell's report. Dr. Gelbort did not issue any report

19

WOD000116

describing the results of his testing. But according to a letter that Dr. Gelbort wrote to Patrick Berrigan on March 2, 2005, the testing he administered consisted of the following: "On January 24, 2005 I performed a neuropsychological evaluation on Angela Johnson. She was administered the Wechsler Memory Scale-Third Edition (Logical Memory I, Faces I, Verbal Paired Associates I, Family Pictures I, Logical Memory II, Faces II, Verbal Paired Associates II, and Family Pictures II), Halstead Category Test, Wide Range Achievement Test-Revision 3, Trails, and the Wechsler Adult Intelligence Scale-Third Edition. Also administered was Mental Status Testing, some items from the Luria Nebraska, and diagnostic interview." Dr. Martell observes in his report that "Dr. Gelbort chose not to administer some subtests in both the Wechsler IQ and memory scales, which made claculation of some index scores impossible." (Martell/Dvoskin report, p. 28)

It is interesting to note that in another federal death penalty case with which I am familiar, Dr. Martell was retained as a defense expert to review the work of Dr. Gelbort. Dr. Martell's report in that case states in part:

> Dr. Gelbort's evaluation was informed by an inadequate and incomplete set of background materials, and therefore fell short of the standard of care expected in forensic practice due to a failure to recognize the full extent of Mr. Allen's neurobehavioral history, particularly in view of the fact that this was a capital case.

> It appears that he undertook a brief "screening" battery of neuropsychological tests, rather than the comprehensive examination that a full appreciation of Mr. Allen's history would have clearly indicated. Unfortunately, he also relied on outdated test materials, ignored normative databases, and did not integrate his findings with the extant research literature, largely because he was not made aware of the full extent of Mr. Allen's neuropsychiatric history by defense counsel at that time.

> He chose not to administer a full Halstead-Reitan Battery, neglecting to administer five out of 11 tests including: the Tactual Performance Test, the Speech Sounds Perception Test, the Seashore Rhythm Test, the Finger Oscillation Test, and the Tactile Form Recognition Test.
> Further, he mis-administered some of the parts he did give such as grip strength, where it appears he did not use the Hand Dynamometer apparatus, and did not record any obtained scores, yet reported findings as if he had done so. Failing to administer the complete H-R battery severely undermines its diagnostic utility for accurately detecting brain damage.

> Next, he relied on versions of the Wechsler Adult Intelligence Scale and the Wechsler Memory Scale that were out of date. Worse, he failed to administer the complete Wechsler Memory Scale-Revised, and neglected even to score the portions that he did administer, rendering accurate interpretation impossible. He did not rely on available up-to-date norms for the interpretation of the test data, relying instead on his own unreliable, impressionistic, and idiosyncratic interpretations of test performances that in many cases he did not actually score.

20

WOD000117

to Dr. Martell, "[h]er neuropsychological testing reveals a pattern of strengths and weaknesses, but no significant brain impairment." [35] More specifically, "Ms. Johnson completed several tests that tap executive functioning, including her higher leve-order problem-solving ability [Halstead Categories Test] and ability to switch quickly and efficiently between competing stimuli (multri-task) [Trails A & B]. Scores on each of these tests was within normal limits, indicating no impairment in her executive control functions." (Id. p. 28) .

Although Dr. Martell interprets these tests as being within normal range,  it does not appear from his report that he spoke to Dr. Gelbort about his findings and he did not perform any neuropsychological tests of his own until March 2010 when he administered the type of partial neuropsychological testing battery that he was so critical of in the Allen case.

Mitigation specialist Mary Goody did speak to Dr. Gelbort shortly after he concluded his testing and according to her notes he told her that Ms. Johnson "had some memory disturbance", that  "she had an 18-point differential spread between her verbal and performance IQ which is statistically significant as if one hemisphere is -- one hemisphere of the brain has damage and the other doesn't", that she had "difficulty seeing consequences for her actions", that "her intuitive reasoning is mildly impaired", that "that her brain has holes in it, ... like cheese, Swiss cheese, has holes in it, so there are areas of her brain that are not working properly and just, you know, they could be dead areas of her brain", that "[i]n...the categories test, her problem solving was more impaired on intuitive but better on rote", that "[s]he has bad judgment and not terribly well

---

Because he was not provided with a complete neurobehavioral history, and decided to administer a brief and incomplete examination and test battery, Dr. Gelbort failed to identify all of Mr. Allen's neurobehavioral deficits; failed to reach the proper diagnosis; and therefore was unable to tie together Mr. Allen's history and test performances appropriately and completely for the trier of fact.

Further, Dr. Gelbort failed to test for psychopathology, which was standard practice in neuropsychology at that time, and serves to place neuropsychological test findings into their overall proper context.

Dr. Gelbort also failed to administer any standardized tests of effort or malingering that could have been used to support the veracity of his test findings when confronted on cross-examination by Mr. Holtzhauser; or, had they shown a lack of effort by Mr. Allen at that time, could have served as the basis for a re-examination and acquisition of a valid data set.

Finally, Dr. Gelbort failed to investigate the extant research literature adequately in order to tie Mr. Allen's history to his neurobehavioral deficits and psychosocial outcomes. (Report of Dr. Martell in United States v. Billie Jerome Allen, W.D. Mo., June 30, 2009, pp. 30-34)

[35] Martell/Dvoskin report, p. 31.

WOB000118

thought...in intuitive communication and in personal communication and relations with other people, her dealings with other people", that she "she's bad on nuances and cannot apply long-term logical thinking [and] [h]er insight is not great", that "she tried really hard on the tests", but that "she would rush through things sometimes which would cause her to become... unravelled", that the "diagnosis that he would give would be cognitive disorder NOS", that "with meth all her symptoms get worse", that "she had Swiss cheese before the meth and the meth made it worse", that "[a] pharmacology consultation would be useful to touch on how it affects her brain, the meth.", and that "she's one that shows a positive finding on a PET scan if there's no downside to it."[36]

Although Dr. Gelbort subsequently told Ms. Goody that he did not want to testify because "there's nothing huge or useful, nothing useful, too much crap", clearly Dr. Gelbort's own preliminary test results called for a fuller neuropsychological and neuroimaging work-up of the case, as Ms. Goody herself acknowledged.[37]

Following trial, Dr. Young did a series of tests of frontal lobe function, examining multiple areas of executive functioning. As she explains,

The frontal cortex is comprised of four regions, the motor, orbitofrontal, dorsolateral, and mesial region. Each of these regions is responsible for executive functioning, but each region provides for differing aspects of executive functioning.The motor region is primarily responsible for fine motor movement, motor speed, and strength. The dorsolateral region is primarily responsible for problem solving, planning, monitoring actions, and cognitive flexibility. The orbitofrontal region is primarily responsible for judgment, inhibition of actions, and affective experiences (irritability, euphoria, lability, hypomania). The mesial region is primarily responsible for motivation, spontaneity, demeanor)[38]

Dr. Young continues:

Angela Johnson's executive functioning was evaluated using subtests from the Executive Functioning Test (EFT), Wisconsin Card Sorting Test (WCST), Comprehensive Affective Testing System (CATS), Tactual Performance Test (TPT) and Category Test. Although she was successfully able to complete some

---

[36] Testimony of Mary Goody, March 7, 2011, pp. 186-191.

[37] Goody testimony at 194-197.

[38] Young report, p. 8.

22

WOD000119

of these executive functioning tasks, her ability across most tests was significantly impaired. Impairment ranged from mild to severe.

Although her abilities on several EFT tests were within the average range, her ability to scan, and sequence both numbers and letters was significantly impaired (Trail Making Tests). Her ability to initiate, simultaneously and flexibly process verbal information was significantly impaired (Verbal Fluency). Her ability to inhibit and flexibly shift thinking was significantly impaired (Color-Word Interference). Her ability to categorize and use information that was provided to solve a problem was significantly impaired (20 Questions). Impairment ranged from mild to severe.

Angela Johnson's abilities on WCST variables were also significantly impaired. She made a significant number of errors in her ability to respond to information that she was provided by the test. Her ability to identify the problem, respond in a way which accurately solved the problem, and flexibly change her problem solving actions based on information as to whether her actions were accurate or inaccurate were significantly impaired.

On the CATS, her ability was significantly impaired. Overall facial recognition (ARQ), overall emotional recognition (ERQ) and overall ability to identify emotion by the tone of voice (PRQ) were all in the impaired range. Her ability to discriminate facial affect, match facial affects, process emotional tone of voice, match tone of voice with facial emotional expression, identify emotional tone, identify meaning of emotional tones, match emotional tone with facial expression, and identify emotional content with congruent or conflicting emotional tone were all impaired. Prefrontal, anterior temporal, limbic amygdala dysfunctions are indicated. Impairment within orbitofrontal, dorsolateral, and mesial prefrontal cortex was indicated, with impairment ranging from mild to severe. [39]

Dr. Young's neuropsychological testing, corroborating problems with impulse control, judgment, inhibition, recognition of social cues, as well as her ability to organize and utilize information to solve a problem; is reinforced by historical information from multiple sources, as indicated above.

---

[39] Young report, pp. 9-10.

WOD000120

Nowhere is Ms. Johnson's lack of impulse control and poor judgement more evident than in her several short-lived relationships with men, culminating in her toxic and fatal relationships with Terry DeGeus and Dustin Honken.[40]

First there was Steve Hugo. Ms. Johnson had sex with him when she was close to age 15, she married him at age 16, and divorced him nine months later. As she told Dr. Martell in 2005, "I just had no plan, and I couldn't stand Steve anymore, and after nine months, I moved back home."[41]

Approximately one year later, Ms. Johnson was impregnated by Arlyn Johnson. The pregnancy was unplanned, Ms. Johnson explaining that "my [birth control] prescription ran out or something like that and I didn't get it renewed."[42] Johnson proposed marriage, and Ms. Johnson accepted, although she told Dr. Martell that " I wasn't in love with him, and I knew that."[43] This relationship too was short-lived: "Life got too boring for me, The next thing you know, I'm having an affair."[44] She then abandoned her marriage and started seeing a construction worker who turned her on to cocaine. She then found crank, her "new love."[45] As she explained to Dr. Martell, "I wasn't a happy person. Life was a struggle for me, I think I was trying to make a safe haven for myself, but I could never find that out."[46] From this point forward, her life spun out of control as she increased her drug intake, entered into an extremely abusive relationship with Terry DeGeus and then an equally dysfunctional relationship with Dustin Honken.

---

[40] Not coincidentally, Dr. Martell's 2010 administration of the Personality Assessment Inventory to Ms. Johnson resulted in a computer- generated interpretive report which states that "[i]t is likely that she has a history of involvement in intense and volatile relationships and tends to be preoccupied with consistent fears of being abandoned or rejected by those around her." Although there are many problems in relying upon such computer-generated profiles, a base line requirement is that the profile in fact match up with the patient's social history. Here, it does match up with Ms. Johnson's relationship history.

[41] Transcript of Martell Interview, p. 48.

[42] Id. p. 50-51.

[43] Id., p. 53.

[44] Id., p. 53.

[45] Id., p, 54.

[46] Id., p. 55

24

WODO0060121

Her sister Holly Dirksen provides this snapshot of her in 1993, the year the charged offense took place:

> I visited Angela often in 1992 and 1993, and moved in with her in 1994, when my daughter was a little more than a year old. It was the worst year of Angela's life. Angela was shattered and stepped out of herself in 1993; she was literally insane that year.....

> It got in worse in 1993. Living with Angie was like living in a rant all the time. She could not control her emotions. She stayed in bed for days and then worked nonstop. She was always moving, shaking, talking, working, and doing something just for the sake of moving. Angie was unpredictable. I moved out in the spring of 1995 because it was too insane trying to live with her. Anything could set her off, and she stayed irritated and upset, angry with everyone and everything for little or no reason.

> Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together. Her mood swings got worse. She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her. Her pregnancy made everything worse. Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin. She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently. Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him. She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times. The slightest thing irritated and overwhelmed her. [47]

Many years later, Dr. Martell describes Angela's mood as "labile," a clinical term denoting mood instability, and most often used in bipolar disorder. Indeed, Angela exhibits symptoms consistent with bipolar disorder, a psychiatric disorder with mood swings, impulsive judgment, disinhibition, and a primary depressive presentation in women. The relationship between bipolar disorder and seizure activity is well-established, and the current first line

---

[47] Holly Dirksen Declaration, pp. 1- 2.

WOD000122

treatment for both partial complex seizures and bipolar disorder is antiseizure medication like Depakote and Lamictal.

Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

Current neuroimaging reinforces Dr. Young's finding of Ms. Johnson's multiple cognitive impairments. Ms. Johnson underwent Magnetic Resonance Imaging(MRI) and an electroencephalographic (EEG) study at the Tarrant County Hospital District on February 8, 2011. She also underwent Positron Emission Tomography (PET), coupled with Cathode Tomography (CT) testing at Radiology Associates of Fort Worth on February 7, 2011. Cutting edge EEG investigation could not be completed since this was a forensic assessment, rather than preparation for neurosurgery or for treatment. Nevertheless, MRI, PET, and EEG studies were all consistent with cognitive impairment.

The Tarrant County Hospital District Imaging Department, under the supervision of Dr. Mukkamalla, performed a "Multiplanar, multisequence MRI of the brain ... with and without intravenous contrast". The MRI revealed:

FINDINGS:

The CSF containing spaces are normal in size, shape and position. Small scattered bilateral subcortical and periventricular FlAIR and T2 hyperintensities involve the deep white matter of bilateral cerebral hemispheres. The brain parenchyma is otherwise of normal signal and contour characteristics. No focal mass, midline shift, intracranial hemorrhage or acute infarction. Gray/white differentiation is normal. The pituitary, midbrain, brainstem, as well as the craniocervical and cervicomedullary junctions are within normal limits. The visualized flow -voids of the central arteries and the major dural sinuses are within normal limits. No abnormal areas of enhancement.

IMPRESSION:

1. Atrophic changes.

2. No acute Infarct or hemorrhage.

26

WOD000123

3. Nonspecific T2/FI.AIR hyperintansities. Differential considerations include but are not limited to microvascular ischemic changes, multiple sclerosis, vasculitis, Lyme disease and other demyelinating/dysmyelinating processes.[48]

T2 and Flair Intensities are signs of a breakdown of the covering of the brain, the myelin sheath. Here, the brain was also atrophic, meaning Ms. Johnson was losing brain matter, although she was only 46 at the time of the neuroimaging. Ms. Johnson's MRI is consistent with someone suffering from other potentially cognitive impairing diseases, such as multiple sclerosis. These diseases have a strong psychiatric component to their presentation as well. Angela's MRI is also consistent with the neuroimaging literature on temporal lobe dysfunction, particularly when religiosity is a central component in the impairment.[49] Angela's MRI shows distinct defects in her brain, in both hemispheres of her brain, that are scattered throughout the various lobes. These defects are consistent with what the literature has found in persons having aberrant electrical activity and many of the symptoms on the Bear Fedio Inventory:

> We have examined two groups of patients with epilepsy, one identified as having strong religious preferences.The latter attained high scores on the Bear-Fedio Inventory and, as a group, reflect the profile of Gastaut-Geschwind syndrome. They differ from the other group not only in their religiosity, but also in the **greater number of bilateral changes** on investigation and the greater number of experiences with postictal psychosis. Their religious experiences differ from those of ordinary churchgoers, with respect not only to content, but also to intensity. [50] (emphasis added)

---

[48]Tarrant County Hospital District Imaging report,  2/9/2011

[49] Trimble, M. and A. Freeman (2006). "An investigation of religiosity and the Gastaut-Geschwind syndrome in patients with temporal lobe epilepsy." Epilepsy & Behavior 9(3): 407-414.

[50] <u>Id.</u>

27

WOD000124

I consulted with James Merikangas, MD, a practicing neurologist Board-certified in Neurology and Psychiatry, regarding the interpretation of the EEG and PET testing. Dr. Merikangas reviewed the EEG and PET raw testing data and reported to me that the EEG "looks like it has bitemporal slowing," and that "(t)he PET and the EEG show left temporal lobe hypometabolism and and lesser frontal lobe hypometabolism." Again, Ms. Johnson's bilateral brain abnormalities, reflecting impairment in her temporal, frontal, and parietal lobes are supported by neuropsychological testing and neuroimaging.

The totality of Angela's cognitive deficits explain the poor decision making, limited recognition of social cues, and difficulty effectively solving problems that hampered Angela all her life, but at no time more crucial than at the time of the charged offenses and following her arrest when she was confronted first with complex plea negotiations and then with a stressful trial process.

### B. COMPLEX POST TRAUMATIC STRESS DISORDER

The impairments of Angela Johnson's brain create the vulnerability to trauma. Ms. Johnson's neurologically-derived difficulties weighing and deliberating, understanding context, making decisions, and understanding the big picture are the bases for much of the trauma she has suffered. The multiple types of trauma she has undergone are consistent with chronic trauma, not the single episode trauma simplistically described in the Diagnostic and Statistical Manual IVth Edition Text Revised (DSM-IVTR).

Angela Johnson was born into a cognitively impaired family, a family in which the abnormalities of their brains manifested in paranoid, delusional, and, in the long run, violent behavior. The extent of Ms. Johnson's impairments are clear.

Ms. Johnson's early life was fertile ground for the development of complex trauma. Complex trauma must be differentiated from simple trauma as described in the Diagnostic and Statistical Manual-IVTR (DSM-IVTR). The DSM-IVTR describes Type I trauma, typically a single incident or event. Complex trauma is caused by ongoing, chronic, often pervasive stressors.

The role of parents in the modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her. Parents model for children appropriate responses to various stressors in life, so the child will be able to respond directly and in a manner that fits the degree of stress presented.

Further,

28

Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones ... Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage ...[51]

These buffering qualities, such as playing and comforting, were absent in Ms. Johnson's home, replaced by ongoing terror, masked as religious fervor. The terror was a manifestation of the neurological abnormalities shared by generations of Ms. Johnson's family.

"The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome .... Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences .... Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems."[52]

---

[51] Bessel VanDer Kolk, Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185

[52] Anda, R., V. Felitti, et al. (2006). "The enduring effects of abuse and related adverse experiences in childhood." European Archives of Psychiatry and Clinical Neuroscience 256(3):

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 126 of 287

WOD000128

Ms. Johnson underwent a ritualized terror in her childhood that even her mother, one of the perpetrators, cannot speak of. Under the neurologically-derived hyper religiosity of her mother and grandmother, Mr. Johnson was consistently abused and, ironically, Ms. Johnson was often "exorcised," as her personal terror was described, due to the very neurological abnormalities that created her mother's and grandmother's religious terrorism.

Ms. Johnson, who was a small and slender child, was regularly "exorcised," which typically consisted of being held down against her will by several grownups, being hit, shaken, thrown and beaten, in the hopes of curing the "deaf and dumb demon." Her inability to respond, the behavior that was translated into the "deaf dumb demon," was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements, the violent shaking commonly associated with seizures. Ms. Johnson's deaf and dumb demon, a visible sign of the profound trauma and the inherited aberrant electrical activity in Ms. Johnson's brain, was the catalyst for her mother, herself suffering from the same inherited aberrant electrical activity, to repeatedly abuse Angela Johnson.[53]

These rituals, performed over critical developmental childhood years, coupled with multiple moves, perceived abandonment by her father, and cognitive deficits, were the foundation for the profound, complex trauma from which Ms. Johnson suffered, documented abuse from the hands of those that were supposed to love her, abuse that, itself, was the product of multigenerational cognitive impairment.

Complex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than Type I trauma described in DSMIV-TR. The symptoms that often arise from complex trauma shape neurological, academic, social, emotional, and contextual situations with volatile and dissociative behaviors.

We define *complex psychological trauma* as resulting from exposure to severe stressors that (I) are repetitive and prolonged, (2) involve harm or abandonment by caregivers or other ostensibly responsible adults, and (3) occur at a developmentally

174-186.

[53] Vercuell (2011) Aphasic Seizure. Medlink Neurology

30

WOD000127

vulnerable times in the victim's life, such as early childhood or adolescence when critical periods of brain development are rapidly occurring or being consolidated...

*Complex posttraumatic sequelae* are changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotional dysregulation, somatic distress, or relational or spiritual alienation, hereafter referred to as complex traumatic stress disorders.[54]

It was the ritualized trauma that allowed Ms. Johnson to stick pins in her arm, with no show of emotion.[55] It was also the ritualized trauma that allowed Ms. Johnson to fall apart at the smallest sign of true stress, as her daughter and sisters describe. It was the ritualized trauma that allowed Ms. Johnson to "go to her special space," as described by her sisters and Ms. Johnson, and dissociate from life threatening reality. Ms. Johnson describes dissociative experiences, developing out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state, a clinically significant period following a seizure. Her sister reported that Ms. Johnson returned from her dissociative episodes at times and announced, "I'm back."

Her dissociation, acquiescence even in the face of attempting to maintain some sense of self, is the hallmark of Angela's trauma, and she manifests continued symptoms of revictimization after the trauma of her home.[56] Much of her life was traumatic, but the stressors and chaos arising from her toxic and fatal relationships with Terry DeGeus and Dustin Honken stand out.

Terry DeGeus was - and continues to be - the love of Angela Johnson's life. In spite of overwhelming violence and sexual abuse, Angela continues to believe in the goodness of Mr. DeGeus. There is no question that Terry DeGeus was violent towards Angela. She attempted to

---

[54] Ford, et. al, Treating Complex Traumatic Stress Disorders; an evidence-based guide; Guiliford Press, 2009, p. 13.

[55] "Angie had it the roughest of all the children. She was funny, cute, and always on the go but she hurt inside. She dissociated frequently. She shook her leg all the time. She hurt herself. She took inch long straight pins and stuck them straight into her arm and walked around with them." (Sarah Irving interview with Scharlette Holdman, July 20, 2009)

[56] Widom, C. S., S. J. Czaja, et al. (2008). "Childhood victimization and lifetime revictimization." Child Abuse & Neglect 32(8): 785-796.

WOD000128

move away from him, called the police on him numerous times, and feared for her life. A sampling of police complaints she filed against DeGeus around the time of the present homicides gives some insight into the relationship:

2/23/92 A. Johnson calls Clear Lake PD at 2:07 pm. She lives at 5 S 19 in Clear Lake (515) 357-6374. Dispatcher writes "Comp calling from Angie Johnson res advised her ex- boyfriend was outside pounding on door & they would not let him in. Would like him removed #5 advised ex had left in green older (72?) Chev p/up with topper Poss 10-55 (Put out on LEA Make your own case) Rodney Nicholson called in for Angie."

3/29/92 A. Johnson calls Clear Lake PD at 5:48 pm. She resides at 5 S 19 St. Clear Lake (515) 357-6374. Dispatcher writes: " Angie Johnson called on 911 then advised us she had no problem. She called right back and said Terry DeGeus was knocking on her door and she wanted him removed. The she advised that police need not come down, that DeGeus had left the area in a black car. Unknown direction of travel. If he comes back she will call us. Contacted by #9. She advised no problem now. If he come back she will call us."

3/30/92 A. Johnson calls Clear Lake PD at 4:21. Dispatcher says: "Angie Johnson has been harassed by old boyfriend, Terry DeGeus, several times, he has called and threatened her and harassed her at her work place. Cty Kitchen. She talked to #1 and he told Angie to call us if it happened again and we would file charges whether at her residence or somewhere else. Ref CR 92-1824 Terry DeGeus lives in Britt w/ parents 843-3071.

4/10/92 A. Johnson calls the Clear Lake PD at 5:19 pm. She resides at 5 S 19th Clear Lake, IA. (515) 357-6374. Dispatcher says: "Terry Degeus and a female are on Johnson's lawn, harassing her.

3/7/93 Angela Johnson calls the Clear Lake Police Department at 1:35 p.m. Her address is 5 South 19 St, Clear Lake. Dispatcher writes: "Angie Johnson drove to Police Department (right up on sidewalk) in VVIF159. Came into PD and requested information on stalking law. Talked to #6. Apparently she is being stalked by male subject. She did not want to tell me who was doing this. She just wanted info on stalking law. I gave her a copy of the house file and she left."

32

WOD000129

| | |
|---|---|
| 3/14/93 | Angela Johnson calls the Clear Lake Police Department at 1:39 p.m. Her address is 5 South 19 St, Clear Lake. Dispatcher states: Terry DeGeus has been harassing Angie since last night, calling and stopping by residence, trying to get into residence.  Angie would like to file charges.  Subject left when #10 arrived but said he would come back as soon as officer left residence. #10 took report and told Angie to call if her returned VIF159 Blu 92 Toyota. |
| 3/14/93 | A. Johnson calls police at 1:56 pm. Dispatcher writes: "Angie called on 911 to report that Terry Degeus was back at res. Parked in front drive. Brought a friend with him who came into house and told Angie he did not want to go back out to car with Degeus TNE330brotan 78 Olds Edward Degeus Britt IA".Addendum states: ARRESTED: DEGEUS, TERRY SCOTT OLN/480 90 1262 DOB/11.19.60.  TERRY DEGEUS WAS AT ANGIE JOHNSON S HOUSE AND WAS TOLD MORE THAN ONCE NOT TO BE AT THE RES.  AFTER THE SECOND CALL THAT TERRY WAS AT THE HOUSE HARASSING ANGIE HE WAS PLACED UNDER ARREST FOR STALKING.  TERRY WAS BROUGHT THE PD.  AND PROCESSED AND RELEASED ON HIS OWN. |
| 3/14/93 | Angela Johnson calls the Clear Lake Police Department at 3:46 p.m. Her address is 5 South 19 St, Clear Lake.  Dispatcher states: Bro veh by comps res she would like to leave TNE330 Bro/tan 78 Olds to Edward DeGeus RR2 Box 51 Britt Talked to Terry DeGeus & told him to leave and he did #14JL. |
| 6/30/93 | Angela Johnson applies and is approved for a permit to acquire pistols or revolvers. |

Despite all of DeGeus's harassing and violent behavior, Ms. Johnson told Dr. Martell in 2005:

Q And you came back to Terry?

A I went back to Leland to the trailer and Terry and I got back together because I would forgive him for everything. I did not want to forget him because he was so easy to forget because I loved him so much.

Case 3:09-cv-03064-MWB-LTS    Document 284-20    Filed 06/23/11    Page 130 of 287

WOD000130

Q Do you think he was really sorry?

A Well, he was really sorry. He hated it when he did that and I bruise so easily so when I got a black eye and it would be black forever. And he hated it, he hated it.

Q So when he-The first time he abused you badly you left for three months

A Uh-huh

Q And then you voluntarily came back because you loved him.

A. I came back because Alyssa had to go to school and stuff. And yeah, I took him right back[57]

Angela's inability to effectively weigh and deliberate drew her to Terry DeGeus over and over. Often she would make plans without being able to see the bigger picture, and would become involved with him again. Yet, Angela understood something about Terry DeGeus that prevented her from hating him. She believed his violence and mistreatment of her was secondary to his drug use, not a reflection of his true personality:

> A. Sometimes, you know, he would be decent and he wasn't always like that, you know. Sometimes he'd come over and be just really nice during the day and we'd just sit and shoot the shit and we got along, but when he was freaking out, it was like two Terry's. And, you know, we'd be having a good conversation and all of a sudden, he'd be like -just turn mad, his, his whole face would just change. He would just- he was using too much crank.[58]

Angela felt a measure of understanding with Terry DeGeus that transcended her ability to control his actions. Although the relationship between Angela Johnson, Mr. Degeus and Mr. Honken have been compared, this difference is the difference between mutual chaos and domination. Mr. DeGeus stalked Ms. Johnson. There were times when, secondary to his methamphetamine use, she thought she knew she would be beaten, but she loved him anyway. She described him to Dr. Martell as "the sexiest man in the world"; someone who "took [her]

---

[57] Martell/Dvoskin interview, p. 79.

[58] Martell/Dvoskin interview, p. 86.

34

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 131 of 287

WOD000131

breath away."[59]  In contrast, she described Mr. Honken as someone she "wasn't crazy about or anything."[60] The relationship was "solely to benefit Dustin."[61] She elaborated:

> ...Dustin mindfucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from and knew the results with Dustin. Everything that came out of his mouth was a lie.[62]

She feared and was dominated by Honken because of whom she saw him to be, someone who could kill her without feeling, casually, to cover his trail; rather than because he could not stand her being with someone else. He had her "thinking he was this big drug dealer."[63] She had only slept with him once before his arrest in 1993 but she nevertheless went to visit him in jail "[b]ecause I didn't want him to think I set him up."[64] When he got out shortly after his arrest they began a relationship that resulted in the birth of Marvea in February, 1994. When she became pregnant around July 1993 she was "freaked out because [she] knew Terry would freak out if Terry found out [she was pregnant. Whoo. It was not a good situation."[65] She wanted to have an abortion, but "Dustin...was very adamant about me not getting an abortion." [66]

 Repeatedly, and rightly so, it appears, she feared he would kill her, before he went to prison and while there. A summary report prepared for Dr. Martell by retired FBI agents documents multiple instances of others reporting that Mr. Honken said he had considered killing her in the same manner he killed Terry DeGeus and the Nicholsons. Angela  was rightfully in fear of Honken, and in fear of her life. She continued to be in fear of her life even when he was locked up, because she understood he was willing to reach beyond the bars to kill her. She was "easily scared" and she was "trying to protect [her]self from Dustin" and it was "very stressful."[67]

---

[59] Martell/Dvoskin interview, p. 73.

[60] Id. at 88.

[61] Id. at 94.

[62] Id. at 91.

[63] Martell/Dvoskin inetrview, p. 87.

[64] Id. at 89.

[65] Id. at 95.

[66] Id. at 96.

[67] Id. at 100.

35

WOD000132

The number and type of stressors that Ms. Johnson was subjected to in 1993 would have been difficult for any mentally healthy person to handle. For Ms. Johnson, with her history of brain impairments and her complex post traumatic stress disorder, the stressors were overwhelming.  Ms. Johnson's sister Holly Dirksen describes her situation at that time:

> Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together.  Her mood swings got worse.  She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her.  Her pregnancy made everything worse.  Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin.  She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently.  Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him.  She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times.  The slightest thing irritated and overwhelmed her. [68]

Ms. Johnson's difficulty effectively weighing and deliberating her options was often compounded by her irritability, her acquiescence in the face of danger (while often putting on a fierce demeanor). Her misunderstanding of social context, completely skewed by her traumatic upbringing, did not ring the alarm bells to monitor and stay away from danger in the same way someone less impaired might respond. She knew to obey Dustin Honken, and she did.

Ms. Johnson's affective dysregulation and emotional numbing are core symptoms of chronic trauma. Chronic trauma leads to revictimization[69],  which then leads to retraumatization,

---

[68] Holly Dirksen Declaration, pp. 2-3.

[69] "Table 1 presents the prevalence of lifetime traumas and victimization experiences for the entire sample and for abused and neglected individuals and matched controls, separately. Two major points are worth noting. First, the results show relatively high rates of traumatic events and victimization experiences for the sample as a whole. Second, a higher percent of abused and neglected individuals reported experiencing 16 of the different types of traumas or victimization experiences assessed on the LTVH compared to controls, with odds ratios ranging from a low of 1.34 (having a family or friend murdered) to highs of 3.22 (seen another person sexually attacked) and 3.56 (physically abused as a child). These differences were primarily

36

WOD000133

and the symptoms become cyclical. Ongoing traumatic symptoms, combined with Ms. Johnson's cognitive dysfunction, augments her potential for dissociative experiences when under the greatest stress. Dissociation is a well-documented phenomena not only in trauma, but in temporal and parietal lobe dysfunction similar to Ms. Johnson's. [70]

### C. METHAMPHETAMINE ABUSE

Ms. Johnson's drug use began at an early age, with marijuana and some alcohol. When she discovered methamphetamine, along with Terry DeGeus, who first introduced her to it, she was hooked, and her life took a downhill turn along the way.

Ms. Johnson suffers from methamphetamine abuse, severe, chronic, currently in institutional remission. Methamphetamine can have lasting effects on the brain, so observing the testing after she had been off the drug for a significant period of time is important. This is especially true since the behavioral effects of methamphetamine can last long after the drug has been metabolized.

Methamphetamine's primary neuroanatomic focus is the frontal lobes, although there are other parts of the brain impacted by amphetamine compounds. Two tests of frontal lobe function, The Wisconsin Card Sorting Test and the Booklet Category Test, were within normal limits, reflecting parts of her frontal lobes that are intact. Yet Ms. Johnson's symptoms of mood lability, altered spirituality, impaired strategic thinking, losses of consciousness, heightened emotionality, and headaches continue, requiring looking past methamphetamine use as the primary disorder.

---

accounted for by interpersonal traumas and victimization experiences. For the other 14 types of traumas and victimization experiences, the prevalence in abused and neglected individuals and matched controls did not differ significantly." Widom, C. S., S. J. Czaja, et al. (2008). "Childhood victimization and lifetime revictimization." Child Abuse & Neglect 32(8): 785-796.

[70] " Twelve patients with clinical and EEG manifestations reminiscent of temporal lobe epilepsy reported symptoms of dissociative states. In seven of these patients, the clinical picture was consistent with multiple personality, whereas the other five had the illusion of supernatural possession. These cases suggest that in selected instances dissociative states may constitute complex behavioral manifestations of chronic limbic epilepsy." Mesulam, M.-M. (1981). "Dissociative States With Abnormal Temporal Lobe EEG: Multiple Personality and the Illusion of Possession." Arch Neurol 38(3): 176-181.

WOD000134

Ms. Johnson's methamphetamine use further eroded her ability to effectively judge and respond accordingly. We are now seeing the interaction, for example, between the paranoid scanning associated with trauma, the paranoid ideation of her temporal lobe impairment, and the added paranoia of the methamphetamine. These are the symptom interactions that, much like drug interactions, lead to atypical and severe presentations and behaviors.

Ms. Johnson was a chronic user, and the drug took over her life. Much of her behavior was driven by the use of this particular drug, a stimulant for someone who was chronically depressed, anxious from her long stand PTSD, cognitively impaired. There is a strong correlation between traumatic stress and chemical dependency, secondary only to the co-morbidity between bipolar disorder and chemical dependency:

> The high prevalence of the comorbidity of substance use disorders and PTSD has been reported in a number of studies. Initial reports focused on veterans with PTSD, of whom 64%-84% met the criteria for a lifetime alcohol use disorder and 40%-44% met the criteria for a lifetime drug use disorder, including nicotine dependence (54, 55). In civilian populations with PTSD, estimates of the lifetime prevalence of substance use disorders range from 22% to 43% (56, 57), far higher than the estimates for substance use disorders in the general population.[71]

The numbers are similar for mood disorders and symptoms of bipolar disorder. This is particularly true, since current literature points to a higher rate of women staying in the depressive phase of all mood disorders, and have a higher rate of co-occurring chemical dependency. It is not surprising that methamphetamine, an addictive stimulant, would be her drug of choice.

Ms. Johnson has brain changes consistent with long term methamphetamine use as well, although aberrant electrical symptoms occurred before her drug use. Again, it is impossible to separate the settled deficits secondary to her drug abuse and the symptoms of brain dysfunction and trauma. These conditions are synergistic, and create more severe symptoms than a singular disorder or deficit.

---

[71] Brady (2005). "Co-Occurring Mental and Substance Use Disorders:The Neurobiological Effects of Chronic Stress." American Journal of Psychiatry: 1483-1493.

38

WOD000135

Profound depression, unusual spiritual beliefs, problems modulating affect, numbing of emotion, difficulty making decisions, acquiescence, gullibility, drug use, inability to see the big picture, dissociation, impaired academic functioning, impaired motor functioning; all these are symptoms of Ms. Johnson's disorders, symptoms which are at play, except for the drug use, at all times, disrupting her ability to conform her behavior to the law. Each of these symptoms are secondary to brain injury and/or traumatic circumstances beyond her control, starting in her earliest years of childhood.

### D. DISSOCIATION

Ms. Johnson has a maternal history of a religiously delusional mother and grandmother who experience auditory, visual, and tactile hallucinations, among other perceptual disorders. She has cognitive testing suggestive of left hemisphere dysfunction, and she has, all her life manifested symptoms of deepened emotionality, irritability, impaired judgment, and altered spirituality.

Ms. Johnson's familial neurological inheritance led to the profound destruction of her will. Ms. Johnson describes dissociative experiences, out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state. Her childhood trauma's most important clinical symptoms, in terms of her trauma, are Ms. Johnson's dissociation and her affective dysregulation. These symptoms are synergistic with her temporal lobe dysfunction, particularly in times of stress, to overwhelm her functioning.

Dissociation, as defined by Spiegel et al is:

> The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings, and attitudes.[72]

Ms. Johnson, in her childhood, dissociated multiple times over years of ritualistic abuse. Ms. Johnson's symptoms are synergistic, in the same way cholesterol impacts heart disease. Her symptoms of cognitive dysfunction, deepened emotionality, mood lability, impaired judgment, and poor decision making are augmented by her trauma symptoms, her dissociation, loss of self, affective numbing, hyper reactivity, and inability to modulate her emotional state.

---

[72] Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 136 of 287

WOD000138

### E. DEPENDENT PERSONALITY DISORDER

Ms. Johnson clearly has met the diagnostic criteria for dependent personality disorder for most of her life. She has had limited social relationships, even before her drug use, and her sister and daughter documented her extreme dependence on others, including men and other family members.

Ms. Johnson has clearly been in multiple dependent relationships, starting when she was 16, with her first marriage. Her inability to take personal initiative is reflected in her first pregnancy, when she ran out of her birth control prescription and did not take the time to refill it. Her daughter, Alyssa, acknowledged that she felt like the adult in her relationship with her mother, because her mother was both so ineffectual and dependent.

Ms. Johnson's dependent traits, as described in a 1996 psychiatric report, define her relationships with others, particularly men, and are the result of long standing abuse and cognitive impairment.[73] In many circumstances, Ms. Johnson had no choice but to rely upon others because she could not make independent, successful decisions. Attempting to run a bar is one classic example. Ms. Johnson quickly lost the business she had leased, after bringing in the same crowd she did drugs with.

Ms. Johnson's tough facade was just that, a facade that quickly crumbled in the face of minimal tensions, disagreements, or external pressure. From childhood, she was isolated from others, unable to effectively socialize, and subject to peer pressure. The story of sticking a straight pin into her arm captures the vulnerability to external pressure and peer decision making Ms. Johnson exhibited all her life, including at the time of the current offenses.

### F. MENTAL STATUS EXAMINATION

Angela Johnson is a white female who looks younger than her chronological age of 45. She was dressed appropriately. She flung her hands up, initially using broad gestures, in an attempt to control her extreme anxiety. As each interview progressed, she became less anxious, although not less symptomatic in other ways.

Ms. Johnson's level of consciousness was variable. Throughout my two interview periods, Ms. Johnson had moments when she did not spontaneously answer my question. She would blink, look away, and then say, "What?" She describes periods when a person's voice sounds muffled, or she loses time. She stated, "Sometimes I go deaf" and don't hear what people say. She notes that she often will have to reread pages of a book she has just read. What she describes is not a retrieval of memory problem. Rather, it appears as brief losses of

---

[73] A March 25, 1996 psychiatric evaluation by Dr. Lassise resulted in an Axis I diagnosis of major depression and an Axis II disorder of "dependent personality features." (Mental Health Center of Northern Iowa Rrecords). These records focus almost exclusively on Ms. Johnson's dependent relationship with her daughter and do not take into account Ms. Johnson's pathological relationships with Terry DeGues or Dustin Honken.

40

WOD000137

connectedness, consistent with partial seizures, among other possible cognitive impairments.

Ms. Johnson regularly shook her right leg, consistent with a tremor. The right leg is controlled by the left motor strip, imbedded in the left hemisphere of her brain, adjacent to the language area and the left temporal lobe.

She attended to the environment appropriately, although she tended to be easily distractible.

Her language comprehension was within normal limits. Her understanding of complex sentences was good, although she would often ask to hear the question again. Her voice was normal in tone, although occasionally rapid. She was able to follow simple commands, and was hesitant with more complex (3 step) commands. She typically, with reassurance, could complete a 3 step command. Speech was fluid, both spontaneous and impulsive, often requiring redirection. There were no signs of perseveration. Her language usage was not complex. She was able to name common objects like a fork, a comb, and a coin. She was able to name simple colors and shapes.

Ms. Johnson was able to name body parts appropriately. She could determine coin denominations in both hands. She experienced writing on her left palm to be reversed, reflecting sensorimotor abnormalities. [74]

Ms. Johnson's thought processes reflected tangentiality and, at times, flight of ideas. Her thought content displayed some referential thinking and oddities of thought, including hyperreligiosity, beliefs in spiritual concepts like ghosts, aliens, and witches. She acknowledged childhood auditory, visual, and tactile hallucinations. She also describes an "engine" in her head, a constant noise that has been in her head her entire life. Seroquel initially quieted this noise, but it has returned.

Affective range was extremely broad. Ms. Johnson was often literally laughing and crying at the same time. This was accompanied by a deepened emotionality on both poles. As noted before, she strode into the room with her arms outstretched. At other times, she was sitting in her chair, almost in a fetal position.

---

[74] "The authors show convincingly that a left inferior temporo-occipital area is differentially engaged in normal control subjects as early as 180 msec after onset of the visual word. It is important that both the electrophysiological and the anatomical data are consistent with results obtained by other methods (eg, depth electrodes and positron emission tomographic results [7, 81]). Salmelin and colleagues [3] suggest that the primary reason for adult dyslexia is probably the left inferior temporoparietal area dysfunction implicated by their study." Poeppel (1996). "Magnetic Source Imaging and the Neural Basis of Dyslexia." Annals of Neurology 40: 137-138.

41

WOD000138

Mood was labile, with little impediment on either end of her affective range. She would cry, and the laugh out loud. Her sense of humor, while ready, was often inappropriate to the content of the interview. She denied suicidality. She was future oriented, in terms of recognizing the potential options for her future.

Insight was impaired by her heightened emotionality and mood lability. She acknowledged that her emotionality prevented her from being able to work through a problem, even if she had the technical ability to do so. She understands her current circumstances. Her ability to describe her personal psychological state is impaired by significant negativity.

Judgment is grossly impaired by her disinhibition and affective dysregulation. Ms. Johnson acknowledged poor decision making skills. She is unable to develop strategies to solve certain problems.

Ms. Johnson could not divide 54 by 3. She did describe a strategy of multiplying 5 x 3, which would give you 15, then adding three 15s, which would give you 45. She was unable to solve this problem in her head.

Her constructional ability was impaired. She was asked to draw a clock and make the hands say 6:25. She initially drew 3 hands, erased one hand, and the other hands were placed backward on the clock to read 5:35.

Abstract thought was impaired. Consistent with limited IQ testing at the time of her trial, her impaired similarities and vocabulary, plus a poor fund of information, limit abstracting ability.

She denies homicidal, suicidal ideation.

### G. OBSERVATIONS BY GOVERNMENT EXPERTS

Ms. Johnson's cognitive deficits, and the impairment in mood stability resulting from her cognitive dysfunction, were recognized by other experts in earlier evaluations. Drs. Martell and Dvoskin listed symptoms consistent with temporal lobe dysfunction in his report:

Her observable affect impressed as broad, bright, and comfortable. She was affable, easy-going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children.[75]

They also noted the shaking of Ms. Johnson's right leg as well: "Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety." [76]

---

[75] Dvoskin/Martell report, page 31.

[76] Dvoskin/Martell report, page 29.

WOD000139

Dr. Martell also noted that Ms. Johnson endorsed a number of behavioral symptoms in childhood and medical problems, including:

Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother

Behavioral problems at school: including difficulty paying attention

Bedwetting 2x per week until the 4th grade o Nail biting and picking at her fingers

Difficulty paying attention

Depression: "I'm sure I was depressed my whole life."

Aggression: Fights with her sister, and at school

Shyness: "Came as I got older."

Nightmares: "Bad dreams about my mother; pig and rabbit things."

Poor self-esteem: "Mom beating devils out of me; made me feel stupid and ugly."

Unpredictable: "I've always been impulsive."

Frustrates easily: "If I couldn't do or accomplish something."

Daydreaming

Easily distracted: "Couldn't concentrate; now it's OK."

Fidgety I Trouble sitting still: "foot rocking"

Childhood headaches [77]

Dr. Martell further noted that "Ms. Johnson did report greater than 20 beatings to her head during her abusive relationship, but stated that none resulted in loss of consciousness."[78]

Dr. Martell re-examined Ms. Johnson in March 2010, but no report from that examination has yet been produced.

### H. PRESENT DIAGNOSES

AXIS I:

A. MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF

---

[77] Dvoskin/Martell report, p. 30.

[78] Dvoski/Martell report, p. 29.

WOD000140

MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.

B. COGNITIVE DISORDER NOS

C.  POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

D.  SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

AXIS II: DEPENDENT PERSONALITY DISORDER

AXIS III:

A.  HISTORY OF DAYDREAMING,  RIGHT LOWER EXTREMITY  INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY  SIGNIFICANT DECREASED VERBAL PERFORMANCE  ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY,  ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B.  HISTORY OF MIGRAINES WITH GASTROINTESTINAL  AURAE, PHOTOPHOBIA.

C.  DYSEXECUTIVE SYNDROME, SECONDARY TO  FRONTAL LOBE IMPAIRMENT.

D. PARIETAL LOBE DYSFUNCTION

AXIS IV: LEGAL PROBLEMS

AXIS V: GAF = 60

Ms. Johnson has global cognitive deficits. However, those most relevant to this case are her temporal lobes, frontal lobes, and right parietal lobes:

1. Her temporal lobe dysfunction manifests in emotional lability and deepening of emotional poles,  unusually spiritual beliefs, academic impairments, gullibility, impaired autobiographical memory, irritability, grandiosity and depression.

2. Her frontal lobe dysfunction, dysexecutive function, impairs her ability to effectively weigh and deliberate circumstances, to respond to social cues and context, to inhibit impulsive behavior, and to modulate her affect. These neurological deficits lend themselves to her significant dependency issues.

3. The right parietal lobe is the seat of neurologically-induced dissociation and augments Ms. Johnson's traumatogenic dissociation.

Ms. Johnson also had dysfunction of other neurological systems, as Dr. Young and Dr. Martell have noted. These include her motor functioning, including fine motor functioning and right lower extremity functioning. Ms. Johnson has significant attentional problems, and limbic dysfunction as well.

44

WOD000141

**I. DIAGNOSES AT THE TIME OF TRIAL**

AXIS I:

A.  MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.

B. COGNITIVE DISORDER NOS

C.  POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

D.  SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

E.  ZOLOFT INTOXICATION,  ACUTE

AXIS II: DEPENDENT PERSONALITY DISORDER

AXIS III:

A.  HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY  INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY  SIGNIFICANT DECREASED VERBAL PERFORMANCE  ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT  WITH TEMPORAL LOBE DYSFUNCTION.

B.  HISTORY OF MIGRAINES  WITH GASTROINTESTINAL  AURAE, PHOTOPHOBIA.

C.  DYSEXECUTIVE SYNDROME, SECONDARY TO  FRONTAL LOBE IMPAIRMENT.

D. PARIETAL LOBE DYSFUNCTION

AXIS IV: LEGAL PROBLEMS

AXIS V: GAF = 40

**J. DIAGNOSES AT THE TIME OF OFFENSE**

AXIS I:

A.  MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.

B. COGNITIVE DISORDER NOS

C.  POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

D.  SUBSTANCE ABUSE, METHAMPHETAMINE, CHRONIC

45

WOD000142

AXIS II: DEPENDENT PERSONALITY DISORDER

AXIS III:

A. PREGNANCY

B. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

C. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

D. DYSEXECUTIVE SYNDROME, SECONDARY TO FRONTAL LOBE IMPAIRMENT.

E. PARIETAL LOBE DYSFUNCTION

AXIS IV: EXTREME INTIMIDATION INTER-PERSONAL RELATIONSHIPS

AXIS V: GAF = 40

### K. FORENSIC FORMULATION

**1. Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from a complicated cascade of medical and neurobehavioral disorders as set forth above, and that these disorders then interacted synergistically with an early childhood and adult history of extreme and prolonged trauma that produced both brain damage and psychiatric disorders which substantially impaired her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law. She was significantly impaired by these disorders, which manifested themselves under ordinary circumstances in grossly impaired judgment and insight, inability to develop strategies, problem solve, and understand consequences. Extreme stress would have also exacerbated her underlying paranoia, hyper reactivity, and dissociative reactions. Her pregnancy would have significantly heightened her mood lability. The lingering effects of methamphetamine use would also have increased her already abnormal paranoid feelings.

Ms. Johnson's description of the offenses to Christie Gaubatz is significant. According to Ms. Gaubatz, Ms. Johnson was "very upset" when she told her that she "had something to get off her chest.".[79] She continued:

---

[79] Gaubatz Trial Testimony, Volume 3, 5/9/05; at p.606-610

46

WOD000143

[S]he said that they did end up finding [Nicholson] that night and couldn't once again find him alone, so they just went ahead and were going to confront him with whoever he was with, and I had never heard Lori Duncan's name before this, and she said that Greg had been staying at this woman's house. And she said that she had taken the cosmetics bag that night, and they went -- her and Dustin Honken had gone to the house, to Lori Duncan's house. And she described how she knocked on the door, and when Lori answered it, she said that she was supposed to be giving a demonstration but she couldn't find the address, didn't have the correct address, could she please use her look at her phone book. And Lori let Angela Johnson in, and she said Dustin Honken had followed her in.....*She described that it was very chaotic in the house.....*She said that Dustin Honken ended up shooting both of them, both of the adults, and he ultimately came back to the car and -- and took the little girls and did the same....She was very emotional while she was telling me about it.[80]

Gaubitz also described that after the killings, Ms. Johnson told her that "[s]he had been having trouble sleeping, nightmares, thinking that there was people outside her house, somebody was coming to get her. She was very, very paranoid." [81] In a separate conversation during which Ms. Johnson again said that "she needed to again get something off of her chest", Ms. Johnson admitted to her involvement in the killing of Terry DeGeus:

She said that she had -- she was working at the Mason City Country Club at this time, and she had called Terry DeGeus up, and he -- I think he was at --she said he was at his parents' house, and he was going to come over and meet her at the country club, and he did. And she -- the two of them had left in his car and went to where Dustin Honken was already at. It was an abandoned farmhouse. And Dustin Honken was there waiting, and Angela Johnson and Terry DeGeus arrived, and I don't know of any conversation that took place. All I know is she said that Dustin Honken had pointed the gun at ...Terry DeGeus and emptied an entire clip into him, and he still wasn't dead. And he -- Dustin Honken went to the trunk, went to his car, and had gotten either a bat or something hard, and then he was beaten with it. [82]

Ms. Johnson was straightforward in relating the events of the homicides in my interviews with her on May 24th and 25th, 2011. She stated that, similar to her telling Mr. McNeese and Ms. Gaubatz what had occurred, she felt the need to tell someone because she was so overwhelmed,

---

[80] Id.

[81] Id. at p. 611-614.

[82] Id. at p. 611-614.

Case 3:09-cv-03064-MWB-LTS    Document 284-22    Filed 06/23/11    Page 144 of 287

WOD000144

humiliated, and remorseful.[83]

Ms. Johnson reports she initially went to buy a gun as protection. She applied for a gun registration in her name, and once she was approved to purchase a gun, she and Dustin Honken went to buy the gun.

Ms. Johnson wanted to buy a gun she could manage, and when Mr. Honken insisted she buy a Tech 9, a large powerful gun, she resisted and told him she could not handle such a large weapon. Mr. Honken insisted that she buy the gun, and said if Terry DeGeus was confronted with such a large gun, he would stop immediately. Ms. Johnson told Mr Honken that Mr. DeGeus would actually take the gun from her because it was too large and awkward for her to control. However, Mr. Honken insisted, and she bought the gun.This was the same gun Mr. Honken used in both offenses.

Mr. Honken and Ms. Johnson had discussed her relationship with Mr. Degeus and when she became pregnant, she was scared. Mr. Honken discussed with her his own concerns about Mr. DeGeus becoming a witness against him. Ms. Johnson was afraid of Ms DeGeus, yet she loved him. She said she still loves him. It was her belief that Mr. Honken would move her and her daughters to Arizona.

The night of the homicide of Mr DeGeus, Mr. Honken told Ms. Johnson to call Mr. DeGeus and have him meet her at the country club where she was employed. He was to meet them there as well. Ms. Johnson called Mr. DeGeus's mother, and asked her to have Mr. DeGeus to call her.

He returned her call, and she told him to meet her in the parking lot. When she got off work, she looked for his car, and not seeing it, began to get into her car. Mr. Degeus was driving a different car, and called out to her.

By this time, she was obviously looking pregnant and could no longer deny it, as she had the last time they had met. She said when he looked at her, he started crying.

---

[83] This examiner is aware that in March 2010, Ms. Johnson told Dr. Martell that she was innocent of the crimes, a claim she repeated to her trial team until a point in time when she indicated in writing a desire to plead guilty and latter agreed to the truth of a proffer prepared by her attorney Pat Berrigan. Ms. Johnson explained to me, as she did to Dr. Martell back in 2005, that she would have been willing to cooperate against Dustin Honken had law enforcement ensured the safety of her family. She also indicated that the proffer prepared by Mr. Berrigan was truthful and that she told him that she was willing to attest to its truthfulness in court. She further indicated that she did not tell Dr. Martell the truth because she had no rapport with him, did not trust him, and knew he was there to help the government. It is this examiner's opinion that what got Ms. Johnson to open up about her crimes was her present defense team building a trusting relationship with Ms. Johnson, a process which she said never took place with her trial or first habeas team.

48

WOD000143

Mr. Honken arrived, and told them to follow him. Ms. Johnson and Mr. DeGeus followed. She recalled she and Mr. Honken crying together. She was telling him how sorry she was about being pregnant. He was telling her that she was with a dangerous man, Mr. Honken, and that he was not the person he portrayed himself to be.

When they arrived at the farmhouse, Mr DeGeus and Mr. Honken got out of the car and walked away from the car. Contrary to Ms Gaubautz's testimony, Mr. Johnson denies seeing Mr. DeGeus after he left the car. She heard the gunshots. She does not recall Mr. Honken getting a bat out of the trunk. She does not remember Mr. DeGeus struggling or gurgling before he did, and she did not see Mr. Honken bury Mr. DeGeus.

Ms. Johnson acknowledges that, even though she was crying and terribly upset, she tried to assure Mr. Honken that she understood what he had done, because she was afraid for her own life. When asked if she understood that Mr. DeGeus was going to be killed, she initially denied that she knew. She then said, I don't think I could let myself think that."

Ms. Johnson hoped Mr. Honken would not hurt her because she was the mother of his child. Her fear of him was palpable, and she felt her only reliable way to keep herself and her family alive was to be what she had always been, acquiescent.

Ms. Johnson gained entry into the Nicholson home by claiming to need the telephone. Once allowed entry she pulled a gun and Mr. Honken followed soon. Ms. Johnson took the mother and children upstairs under the guise of packing for a trip. Mr. Honken stayed downstairs and forced Mr. Nicholson to create a tape exonerating Mr. Honken.

Mr. Honken bound the adults, and the children, now sleeping, were placed in the front seat of the truck, while Ms. Johnson drove. Mr. Honken drove another vehicle. When they arrived, Mr. Honken took the adults out of the back of the truck and shot them. He then took the children, one by one, and shot them as well. Ms. Johnson reports she attempted to talk Mr. Honken out of killing the children. He told her that there was no choice, they could be witnesses. He told her either she was with him, or she was with the victims. She understood clearly that he was capable of killing her.

Mr. Johnson was crying, fearful, but went along. She did not bury any of the bodies, and did not go to the grave site. She states she had no idea how or when the grave was dug.

Ms Johnson described recurring dreams of her daughter, Alyssa, being hurt after the Nicholson homicide. When asked about her remorse, she was initially unable to respond, then cried deeply. "I think about what I've been a part of every day of my life. The oldest child was my daughter's age."

I asked Ms. Johnson why she had lied to Dr. Martell, particularly in their 2010 interview, and why she was able to discuss her role in these crimes today. Ms. Johnson says she received a call from Mr. Lawlor one or two days before Dr. Martell was scheduled to arrive. He gave her no direction and no understanding of what she should expect.

49

WOD000148

She saw Dr. Martell as the "enemy." Ms. Johnson believes she responds to support and direction, two things she feels she did not have with either her trial attorneys nor Mr. Lawlor. Her attorneys yelled at her often, and she feels her current legal team and experts have proven their dedication to her needs as well as her legal proceedings.

She also noted that Mr. Berrigan did not want to discuss the facts of the case and, at those times when she would attempt to discuss the facts of the case with him, he would yell at her and immediately stop her from talking. She describes her attempts to talk with her attorneys about her case as similar to other situations in her life when she has felt "defeated." She was defeated by her mother, holding her down while exorcising her. She felt defeated secondary to her academic deficits in school. She felt defeated as a mother, and in her multiple disastrous relationships. This sense of inadequacy was a result of her cognitive impairments, her environmental insults, and her long standing self medication. Each of these were in play at the time of the homicide of Mr. DeGeus, Mr. Nicholson, and the Duncans.

Ms. Johnson's diffuse brain deficits were the faulty foundation of her life. Her temporal lobes, the seat of memory, heightened emotionality, academic prowess, mood lability, and fear; did not work from childhood.

At the time of both offenses, Ms. Johnson was unable to expand her options, bound by old behaviors of dependency, acquiescence, and an inability to create new options for herself. She describes both incidents in similar fashion, an initial resistance, followed by giving in, intimidation, and difficulty understanding her options and acting in her and her children's best interest.

Ms. Johnson's mood lability creates impulsivity, often derailing her focus and attention. This mood lability, a temporal lobe deficit, throws off a sense of direction and undermines not only her emotions, but her thinking and planning.

Her neurologically derived heighten emotionality made her a slave to the extremes of her feelings, not allowing her to control her emotions so that she could grow, modulate, and inhibit her emotional responses to danger, sexual seduction, drugs, and danger.

Ms. Johnson had a simplistic view of the world, in part due to her limited fund of knowledge and academic difficulty. She was not able to acquire a deeper understanding of what she needed to withstand the exaggerated emotional range of her life, moving from joy to pain without control over either.

Ms. Johnson frontal lobes were undermined by any stress. Her executive functioning, those neurological skills that allow one to effectively weigh and deliberate, to understand social cues and context, to create new options for problem solving; are impaired in Ms. Johnson, particularly when she is under stress.

Ms. Johnson's frontal lobe also are part of her limbic system, that part of the brain that, over time, creates a template of fear responses, allowing one to understand danger, respond appropriately, and protect oneself by learning new strategies. Ms. Johnson's frontal lobes did not

50

WOD000147

function in a self protective way, creating not only the gullibility Ms. Johnson was known for, but problems learning from her past mistakes or environmental cues.

She says was warned about Dustin Honken She saw behavior that should have warned her. She did recognize his potential, yet, like most persons with impaired frontal lobes, could not overcome her own limitations to take actions to save the lives of others. She received very little from Dustin Honken. He did not take care of their daughter. He was seeing another woman for most of her and Ms. Johnson's relationship, even when she was pregnant, and she knew it. He did not pay bills and constantly belittled and controlled her.

Her frontal lobe dysfunction played a important role in precluding her from changing her downward spiral. She could not think of what to do, a pattern that is prevalent in her life.

When her mother tied her up and exorcised her, she acquiesced. When Terry DeGeus beat her and wanted to return, she acquiesced. When Dustin Honken convinced her a gun was necessary to have for protection, she legally applied for the gun, and signed her name, then bought a gun that would have very little use in her situation.

When Dustin Honken told her she had no choice, she could not, secondary to her limited ability to weigh and deliberate, create and act on other options. When her trial attorneys would not let her talk about the events that were eating her up inside, yelling at her to not talk about the offenses, she acquiesced.

This lack of resistance was not the result of effective deliberation. It was certainly born of fear and intimidation in her relationship with Mr. Honken, but this passivity in the face of stress was based in frontal lobes that never worked effectively, particularly under stress.

The right parietal lobes help us see the larger picture. It is said that Albert Einstein had some of the most developed parietal lobes ever seen. As noted above, the right parietal lobe is also that part of the brain that control experiences of altered perception like deja vu and dissociation, experiences that are very familiar to Ms Johnson.

She describes dissociation frequently in her life, especially when under extreme stress. Of course, Ms. Johnson had the history of stress from the extreme trauma, but the right parietal lobe dysfunction made her even more vulnerable to dissociation than usual, much like an egg shell plaintiff. Her descriptions of waiting while Dustin Honken killed are consistent with dissociative states fostered by her past dissociative experiences and the vulnerability of her bad brain.

Additionally, Ms. Johnson had multiple other factors in play at the time of the Nicholson/Duncan homicides. She was pregnant and everyone, including herself, describes her mental state as the worst of her life. Her home was chaotic. She was coming off years of methamphetamine abuse. She was trapped and fearful for her own life and the lives of her family, particularly her own kids.

Each of these factors were instrumental in impairing her ability to conform her behavior to the law but, most importantly, their impact must be taken collectively, for collectively they are

51

WOD000148

additive, creating atypical and more severe symptoms than would be seen individually.

**2. Could the defendant have reasonably have foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was incapable as a result of impairments in judgment and insight, and in ability to plan and predict consequences, of understanding and predicting outcomes of situations in a normal way. I do believe that, after the death of Greg Nicholson and the Duncans, Ms. Johnson may have understood the potential consequences of aiding Mr. Honken. Her own life was at stake, and her ability effectively weigh options was cognitively compromised. Her parietal lobe deficits point to someone who cannot get the bigger picture, yet I believe it was overwhelming fear of - and domination by - Mr. Honken that precluded her being able to act.

**3. Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from anxiety, hyper-reactivity, numbing of affect, exaggerated startle response, and continuing fear for her life and that of her children. She has impaired ability weigh and deliberate her actions or the actions of others. These conditions result in severe mental and emotional disturbances. Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally. Her moods are extremely labile, cycling inappropriately from grandiosity to depression. She dissociates and functionally disappears from consciousness periodically as result of her disorders. All of these conditions are exacerbated by incidents of extreme stress, methampehamine use and withdrawal, and pregnancy.

**4. Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was under unusual and substantial duress at the time of the offenses. Abundant evidence establishes that Dustin Honken is a calculating and manipulative person. As a result of Ms. Johnson's multiple brain impairments and psychiatric disorders, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living. Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through. Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken, and this domination manifested itself even after he was in jail and the police were telling her that Honken was placing her life in danger.

Ms. Johnson described the sense of intimidation she immediately felt from Mr. Honken,

52

WOD000149

in part due to his education and stories about being a big time drug dealer who had connections in Arizona and Mexico that would kill entire families, if necessary, at his beck and call. His demeanor with her was consistent with the stripping of individuality seen in mentally abusive relationships, particularly with dependent persons.

Dr. Carl Malmquist describes how individuals with dependent personalty disorders are often led to violence because of a distorted perception of "an internalized, pervasive threat that survival was not possible without this other person, no matter what the price", and this was certainly the case with Ms Johnson.[84] Her history of dependency on men, starting with her first marriage at 16, through her relationship with Terry DeGeus, had always been one of dependence. In Dustin Honken, Ms. Johnson found that combination of emotional abuse and terror that destroyed what little ability she had shown in the past, to escape from disastrous relationships and dependence upon others.

Mr. Honken consistently belittled and negated Ms. Johnson, often making her feel unheard and feeling as though her opinions and options could not be counted. This emotional dismissal was reinforced by her life long history of submission of her will to the needs and desires of others, being in an exorcism by her mother or a sexual assault by Terr Degeus.

Yet, Mr. Honken was different. Ms. Johnson, on some levels had become immune to the physical abuse. She describes being in the 6th grade and watching her fellow students, primarily boys, sticking straight pins in their arms. In an attempt to be part of the group, she walked up, took the pin, stuck it to the hilt in her arm, pulled it out and walked away.

Due to her upbringing, she had, in many ways, become numb to physical pain. Often, when Terry DeGeus would hit her, she said she did not feel the blows until later. Her dissociation at times of stress was well-honed.

Dustin Honken brainwashed Ms. Johnson. She believed he was smarter, and he constantly belittled her, denying her ideas and ignoring her emotional reactions. Added to this denial was the initially subtle and later more overt direct intimidation. "I went from being physically afraid that Terry would kill me to being afraid that Dustin would kill me and my family."

It was against this backdrop of her dependence and his manipulation that Dustin Honken began to tell Ms. Johnson that there was "no choice" but to kill Greg Nicholson and Lori Duncan and her children.

According to Ms. Johnson, she gained entry in the Duncan home by asking to use the telephone, and, once inside, pulled a gun, and told Nicholson and the Duncans to wait until Mr. Honken arrived. He arrived within minutes and forced Mr. Nicholson to make the video tape

---

[84] Malmquist, Carl, "Dependent Personality Disorders and Killing", in, <u>Homicide: A Psychiatric Perspective</u>, American Psychiatric Press, Washington, DC, 1996, p. 145.

Case 3:09-cv-03064-MWB-LTS    Document 84-20    Filed 06/23/11    Page 150 of 287

WOD000150

exonerating Mr. Honken.

Mr. Honken then tied and bound Nicholson and Ms. Duncan, and put them in the back of the truck. The girls were placed in the front. Ms. Johnson drove the truck while Mr. Honken drove his car. Once they arrived at the secluded area, Mr. Honken took Nicholson and Ms. Duncan out of the truck and shot each of them. He then came back and took the girls, one by one, and shot them.

Ms. Johnson was terrified. When asked repeatedly about what was going through her mind, she describes the terror and sadness she felt. Initially, she attempted to talk Mr. Honken out of killing the children. He told her there was "no choice," a refrain he returned to again and again in his successful efforts to inveigle her. He also told her that "no choice" meant either the two children would die or she and the two children would die.

As indicated above, Ms. Johnson was straightforward in relating the events of the homicides in my interviews with her on May 24th and 25th, 2011. She stated that, similar to her telling Mr. McNeese and Ms. Gaubatz what had occurred, she felt the need to tell someone because she was so overwhelmed, humiliated, and remorseful.

Mr. Honken repeatedly discussed with Ms. Johnson the difficulties Terry DeGeus was causing in their lives. He promised her a different life in Arizona, where she and her kids could live free of her fear of Mr. DeGeus and, importantly, could have she and her children taken care of, something Ms. Johnson was poorly equipped to do.

By this time Ms. Johnson had experienced having her child living with her father, a direct slap in the face of this mother. She had failed to keep a business running, and had moved multiple times, most often with no realistic plan. Dustin Honken's promises and thinly veiled intimidations were overwhelming to Ms. Johnson, who saw him as smarter and more capable.

Mr. Honken repeatedly told Ms. Johnson there was "no choice" but to kill Mr DeGeus. She was initially resistant to the idea because, as noted above and in Dr. Martell's report, she loved Mr. DeGeus. Mr. Honken eventually made her believe, though, that there was "no choice."

The controlling and limitation of options played directly into Ms. Johnson's dysexecutive functioning, her effective inability to weigh and deliberate, and to understand and response to social context.

Ms. Johnson called Mr. DeGeus and asked him to meet her at the country club she was working. Ostensibly, the meeting was between Mr. Honken and Mr. DeGeus. When Mr. DeGeus arrived, Mr. Honken had not yet arrived.

When he arrived soon after, she and Mr. DeGeus drove to an area, while Mr. Honken followed in his car. Mr. Honken and Mr. DeGeus got out of the respective cars, and Mr. Honken had a gun. She recalls hearing the shooting, although she could not recall how many shots were fired. She transferred from Mr. DeGeus's car to Mr. Honken's car, and they left together.

54

WOD000151

Ms. Johnson still recalls her startle response at the gunshot, although she knew what Mr. Honken had planned.

I inquired if she had asked Mr. Honken why he had not had his hired hit men to kill Mr. DeGeus. He replied that he had not been able to contact them, and it was his belief that there was "no choice," but to act in both situations.

The relationship between dependency and aggressive acts is well-documented. Much of this relationship is based upon the deep ambivalence dependent personalities have toward the relationship and their inability to live outside of a relationship. As Dr. Malmquist points out,

> A question arises as to why a DPD (Dependent Personalty Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. An personal involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level. [85]

Ms. Johnson's dependency is compounded by both her difficulty recognizing larger, more complex issues, and her inability to effectively problem solve, both life long, well-documented failures. Her own limitations and well-documented aquiescent behavior from childhood, was based on more than just a desire to live better, but also a drive, at this point, to make sure her family lived better but also stayed alive.

Ms. Johnson expressed profound sorrow for the death of all the victims, particularly the children. She expressed relief at finally having told someone beside Mr. McNeese and Mr. Gaubautz. However, she is also clear that she had been willing to tell her story even before 2003, if she had been provided some protection by the FBI, as noted above. She continued to live in fear of Mr. Honken after he had been imprisoned, based upon her understanding of his callousness and her belief in his allegedly extensive ties. Sadly, she did not recognize that if, in fact, these ties were true, she would never have been coerced into participation, another of the myriad examples of her cognitively-derived gullibility.

---

[85] Malmquist, Carl, "Dependent Personality Disorders and Killing", in, Homicide: A Psychiatric Perspective, American Psychiatric Press, Washington, DC, 1996, p. 149.

WOD000152

As Dr. Malmquist points out,

> Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such destructive relationships, reveals a limited perspective and narrow focus to their existence....[I]t is a prominent awareness of the limitations existing in the degrees of freedom they have in their lives....They have a sense of being caught in the grips of powerful forces with which they cannot deal. Even more ominous is a situation in which a person is not aware of the degree to which he or she is distorting the assessment of the person with whom he or she is involved. [86]

This limitation in her degrees of freedom and in her distorting assessment of Dustin Honken, fostered by a brain that could neither create nor switch between new, effective options, was also augmented by a life long history of profound and spirit-breaking traumatogenic training in acquiesence, affective numbing, and affective dysregulation. And then, there was the very real intimidation and terrorism of Dustin Honken. Each of these factors was in place at the time of the homicides of Terry DeGeus, Greg Nicholson and the Duncans.

As indicated above, there can be no doubt that Dustin Honken was and is a calculating and manipulative person. Dustin Honken has consistently been described as such. Fred Tokars, a fellow inmate at USP Florence and former attorney and judge, described Mr. Honken to the Grand Jury on May 17, 2000 as "an evil person." He told them he had "never met anyone who can be so charming and evil like that."[87]

The prosecutor in this case, arguing to the jury in the penalty phase of Mr. Honken's trial, stated:

> We know that he purchased a handgun through his girlfriend Angela Johnson. Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there? Do you think Angela Johnson picked it out? Defendant picked it out....The defendant plans, schemes, thinks out these things long in advance. [88]

Ms. Johnson was particularly susceptible to Mr. Honken's manipulation and scheming due to her multiple brain impairments, her history of trauma, her mood disorder, and her

---

[86] Ibid, page 156.

[87] GJ Testimony 5/17/2000 at 53.

[88] Honken Trial Transcript, p. 3905-3908.

56

WOD060153

dependent personality disorder. The information I relied upon regarding Mr. Honken's manipulation of Ms. Johnson includes but is not limited to the following:

<u>Ms. Johnson's reports of manipulation</u>

Ms. Johnson reported to Drs. Dvoskin and Martell that she was not crazy about Dustin Honken but she thought he was going to be her dope (methamphetamine) connection [89]. Mr. Honken portrayed himself as a big drug dealer ; he promised to relocate Ms. Johnson to Arizona, freeing her from the abuse of Terry DeGeus.[90] She told Drs. Dvoskin and Martell that Mr. Honken "was never any good for me, never any good in my life. He was such a fucking liar and I believed – I don't know why I believe everyone else. I'm trying not to be that way anymore. I think because I say I'm going to do something, I do it – I have – I'm not a liar. I don't bullshit people, and I don't think that anybody is going to do that to me, but they do all the time, and then I think, 'You're so fucking stupid.' When will you learn? I'm stupid that way. I am better now, but I do say that all the time." [91]

She also told Drs. Dvoskin and Martell, "He was just a fucking liar (inaudible) and he was getting me in debt, and it was just fucking ridiculous. It was the worst relationship I ever had. . . . Dustin mindfucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from and knew the results with Dustin. Everything that came out of his mouth was a lie." [92] Ms. Johnson reported trying to get away from Mr. Honken by moving to Des Moines. She said about their relationship, "It was never a real good, you know, like, 'Ah, Dustin,' no, never like that. Our relationship was solely to benefit Dustin." [93]

Ms. Johnson told Marilyn Hutchinson, Ph.D., that she became involved with Dustin while attempting to intervene on Terry DeGeus' behalf when Mr. DeGeus owed Mr. Honken $20,000. While Mr. Honken was out on bail in 1993, Mr. Honken's co-meth maker, Tim Cutkomp started dating Ms. Johnson's best friend, Christi [Gaubatz] and the four began double-dating. Ms. Johnson reported to Dr. Hutchinson that "[o]ur whole relationship, Dustin and I, was short and full of lies. All he did was lie to me. And he is such a fucking ass manipulator." [94]

Ms. Johnson reported that Mr. Honken was adamant that she was not to have an abortion when she became pregnant with their daughter. He reassured her that everything would be

---

[89] Martell/Dvoskin 2005 Interview, p. 88.

[90] <u>Id.</u> p. 87.

[91] <u>Id.</u> p. 89.

[92] <u>Id.</u> p. 91.

[93] <u>Id.</u> p. 94.

[94] Hutchinson notes @10-11 .

57

WOD000154

okay.[95]

Later, Ms. Johnson noted that "Dustin took her credit cards and ran them up and promised and never paid off. I had to pay off. He got me in debt. During and after [her pregnancy]. Just ridiculous. I didn't have any credit. I had perfect credit till he came along. He was never apologetic. He is a liar, never the truth. She said she did not love him, did not even like him, and they were together for not a really long time".[96]

Ms. Johnson reported that Dustin did not love her; that he did not know how to love. She knew she did not want to be with him from the time that Marvea was born. The more she pulled away from him, the more he tried to be with her. He controlled her. He used fear to control her. Fear for her safety and for her children. Fear of going to jail.[97] She allowed him to be around because she thought he would get back into the crank thing and she would finally get her dope from him. [98] She thought he would be a success; she believed him when he said he was writing a book about making meth and it would be published. He told her he wanted to be a science teacher. "He talked so much shit. I really believed he could succeed in these things. Until I realized all fuckin' talk. She realized that when she told him she did not want to be with him, not have a relationship, he would also be Marvea's dad, she was sick of not trusting and being lied to and shit." [99]

She indicated that "Dustin was different; he was like Doogie Howser. She was never sexually attracted to him. Sex was never good. Nothing was ever good." [100]

<u>Ms. Johnson's family members reports of manipulation</u>

Ms. Johnson's protests that she was not attracted to Dustin Honken were contradicted by her sister, Holly Dirksen. Ms. Dirksen told Dr. Hutchinson that Ms. Johnson had "fallen hard for Dustin. He was not like the others. He excited her. Something about him. She wanted to like him, so different than others. All others were rough. But Dustin was different and she liked that. Said she liked his mind. Very smart. And she liked that. Dustin not the type of person she was seen with and that is what attracted her. Dustin seemed to be a gentleman, open car door . . . polite. Well spoken. . . . He didn't put her down but he made it all her fault. Never would understand why she was upset. Tell me, I don't understand why so upset. Holly thought Dustin

---

[95] <u>Id.</u> p. 11.

[96] <u>Id.</u> p. 13.

[97] <u>Id.</u> p. 14-15.

[98] <u>Id.</u> p. 15.

[99] <u>Id.</u> p. 16.

[100] <u>Id.</u> p. 16.

58

WOD000155

did not listen.  He was not paying the bills, living off her and helping with psycho Kathy and not pay bills. . . . He tried to make her feel crazy."[101]

Ms. Johnson's daughter, Alyssa Johnson, also reported that Dustin Honken "took over their lives." [102] He acted like he was going to lay down the law.  Mr. Honken and Ms. Johnson fought about money because Ms. Johnson worked double shifts while Mr. Honken spent her money on things they did not need.  During their relationship Ms. Johnson was depressed and cried all the time.  Mr. Honken did not appear to care for Ms. Johnson at all, and did not seem to have any emotion for her. Ms. Johnson looked to Mr. Honken to take control of their lives because she could not handle things herself.  Mr. Honken promised Ms. Johnson a better life but he never intended to give it to her.  He had another woman the entire time they were together . [103]

Alyssa Johnson made similar reports to Mary Goody in December 2004.  Then, she told Ms. Goody that Dustin Honken "tried to overstep his boundaries" with her right away, that he tried to play the "dad" role and over extended.[104]  She also told Ms. Goody that Mr. Honken "put us in debt with various credit card expenses, which in turn caused my mom to get more stressed out and lost her temper more easily." [105] She mentioned that her mother suffered post partum depression after the birth of Marvea and, because she was already stressed, her depression was worse.[106] Alyssa Johnson opined that Dustin "sees Mom as someone to manipulate.  I hate the fact Mom and Marvea went to see him," and commented that he is a bad influence whose contact with Marvea should be monitored.[107] Alyssa Johnson cited Mr. Honken's efforts to wrest custody of Marvea from Ms. Johnson's family as evidence of his using Marvea as a "pawn.  He is very very smart criminally.  He's not smart enough to quit ahead of time." [108]

<u>Mr. Honken's ability to get others to finance his operations</u>

Mr. Honken's ability to get Ms. Johnson to run up credit card debt was confirmed by his own reports to Dan Cobeen and Tim Cutkomp.  Dan Cobeen testified before the Grand Jury that

---

[101] Hutchinson notes of interview with Holly Dirksen at 7.

[102] Alyssa Johnson interview with Lindsay Runnels 2/15/11 at 2.

[103] <u>Id.</u> p. 2.

[104] MG005451.

[105] MG005452.

[106] MG005452.

[107] MG005453.

[108]  MG005453.

59

WOD000156

Angela Johnson had financed the costs of equipment for a methamphetamine lab.[109] Tim Cutkomp testified that Mr. Honken told him that Angela Johnson got a $5,000 cash advance on her credit card to purchase chemicals and glassware.[110]

Ms. Johnson was not alone in financing Mr. Honken's activities. Mr. Honken got his brother, Jeffrey Honken, to finance the methamphetamine lab operations in Arizona and again in Mason City later in 1995.[111] Mr. Honken also obtained funds from his stepbrother to finance the 1995 methamphetamine operations.[112] He borrowed his father's credit card and ran it up to the limit of $1400 during the summer of 1995 of which he repaid only $200.[113] Mr. Honken got a friend, Russell Miller, to "invest" $1,000 in Jeff Honken's business in April 1992, the time when Mr. Honken first began methamphetamine operations in Arizona, which was never repaid.[114]

Mr. Honken convinced his sister to put money on the jail accounts of fellow inmates in 1996.[115] He convinced his mother, who worked in a bank, to open an account for a fellow inmate, Artie Dufur, and deposit checks sent to her from USP Florence.[116]

<u>Mr. Honken's use of women for his benefit</u>

During the period that Mr. Honken was involved with Ms. Johnson, he was involved with two other women, Melissa Friesenborg and Kathy Rick with whom he had a child. Mr. Honken told Ms. Friesenborg that Ms. Johnson was "a convenience," someone he "needed" although he would not say why.[117] He told Ms. Rick, when she asked him why he did not leave Ms Johnson, that he was "not strong enough" to leave her.[118]

Despite their knowledge that Mr. Honken was involved with other women, both Ms. Friesenborg and Ms. Rick agreed to assist Mr. Honken with his criminal activities. Ms. Friesenborg

---

[109] Cobeen Grand Jury Testimony, 4/9/96, at 24.

[110] Cutkomp Grand Jury testimony, 4/25/97 at 50.

[111] Cutkomp Grand Jury testimony, 4/25/97 at 14, 56.

[112] Id. at 56.

[113] Bates A969 at 970.

[114] Bates A50 at A52.

[115] Alyssa Nelson Grand Jury testimony, 7/20/01 at 8.

[116] Marvea Smidt Grand Jury testimony, 7/19/01 at 20-21.

[117] Melissa Friesenborg declaration signed 8/10/09 at 5.

[118] Kathy Rick Grand Jury testimony, 8/30/01 at 14.

60

WOD000137

destroyed evidence at the behest of Mr. Honken and Mr. Cutkomp after their arrest in March 1993.[119]  Ms. Rick, in 1996, posted bond on behalf of Mr. Honken's fellow inmate, Dean Donaldson.  Mr. Honken lured Ms. Rick into posting the bond by telling her that she would get some money from Mr. Donaldson but she never received any money.[120]  Ms. Rick is also reported to have passed on $30,000 to another fellow inmate of Mr. Honken.[121]

<u>Mr. Honken's use of men for his own benefit</u>

Mr. Honken's manipulation of others was not limited to women.   According to an offer of proof made by Mr. Williams in Mr. Honken's trial, Mr. Honken tried in May 1985 to enlist the support of three high school friends in a robbery of the bank where his mother worked.  That effort failed when he went too far by suggesting that two of the friends kill the third after the robbery so they would not have to share the money.[122]

In 1992, Mr. Honken convinced his friend, Tim Cutkomp, to become involved in the manufacture of methamphetamine, even though Mr. Cutkomp initially declined to be involved.  Mr. Honken got Mr. Cutkomp to move to Arizona and then used Mr. Cutkomp to rent apartments, purchase equipment, and make methamphetamine under Mr. Honken's direction.  Although Mr. Cutkomp tried to disengage from Mr. Honken's illegal activities, Mr. Honken was able to lure Mr. Cutkomp back into his scheme despite Mr. Cutkomp receiving very little remuneration for his efforts.  He later got Mr. Cutkomp to destroy evidence for him and to assist Mr. Honken in casing a building where he believed the government was storing chemicals seized from Mr. Honken's house.  Despite their friendship, Mr. Cutkomp told the Grand Jury, "He kind of had a way of manipulating me to do the things he wanted," and agreed with a Grand Juror that Mr. Honken had a way of mesmerizing people, that he was a "smooth talker." [123]

Dan Cobeen described Mr. Honken's ability to get others involved in his schemes as follows: "He had me doing all the dirty work, so if anything came his way, it would fall on me."[124]

While his 1996 drug case was pending, Mr. Honken reportedly solicited several people to assist him in killing witnesses, both while on release and in custody.   He also enlisted several

---

[119]  Friesenborg testimony at Honken trial, 9/13/04 at 366-367.

[120]   Kathy Rick Grand Jury testimony, 8/30/01 at 26-27.

[121]  Walter Dean Grand Jury testimony, 4/25/97 at 14-16.

[122]  *United States v. Honken*, 10/19/04 transcript at 3677-3679.

[123]  Tim Cutkomp Grand Jury testimony, 4/25/97 at 6-15, 18-23, 44, 71-72, 82.

[124]  Dan Cobeen Grand Jury testimony 4/9/96 at 9.

WOD000458

inmates at the Woodbury County Jail in a scheme to escape.[125]

When he was sent to USP Florence, Mr. Honken again involved other inmates in his schemes. Mr. Tokars was enlisted to aid in Mr. Honken's legal work by veiled threats to expose Mr. Tokars' prior history as a prosecutor and judge to other inmates.[126] He enlisted the assistance of inmates Mike Llorente and John Swanson in a complicated scheme to fool the government into believing exculpatory statements by Mr. Honkin. The plan was to have Mike Llorente write the Assistant United States Attorney to say that he knew an individual who had information about Dustin Honken. When the government responded, Mr. Llorente would lead them to Mr. Swanson. Mr. Swanson would agree to record Dustin Honkin's admissions but, when Mr. Swanson was wired, Mr. Honkin would instead place the blame on Tim Cutkomp.[127]

Mr. Tokars was impressed with Mr. Honken's ability to manipulate a group of inmates, Aryan Brotherhood types first known as Dirty White Boys and then Odinists. Mr. Tokars described these inmates as "30 or 40 of these guys, and they stab people and kill people and steal and do these things. At first he [Mr. Honken] was just, you know, befriending them, but after awhile he became very influential, and because of his skills at manipulating people and because of his brains, he was able to influence these people."[128]

<u>Other evidence of Mr. Honken's control over Ms. Johnson</u>

Ms. Friesenborg's assessment of the impact of Mr. Honken on her is similar to Ms. Johnson's assessment of Mr. Honken. Ms. Friesenborg stated, "Dustin took from me my ability to trust in relationships. Dustin was such a good liar, and at the same time made me feel so special and so good – I can't let that happen to me again." [129]

Mr. Honken's ability to make a woman feel "so special" is evident from his letters to Ms. Johnson in 1996. On July 1, 1996, he wrote her, "There is no better woman that you!! When there's trouble I need not look becuse you are always there. I sit here and look at you picture and your beautiful indeed. The picture can't do you justice for what comes from inside your heart. I feel unjustly rewarded for getting these feelings radiated towards me. One man could only wish to have a woman who stands by them as you do. I hope someday I can make you feel this special. . . . I will protect you till the end of my life, never fear. . . . You gave me the two greatest

---

[125] Final Forensic Report, CC00001 - CC00006.

[126] Fred Tokars Grand Jury testimony, 5/17/00, at 11-12.

[127] Wayne Byerly Grand Jury testimony, 7/19/01 at 20-21.

[128] Fred Tokars Grand Jury testimony, 5/17/00 at 11-12.

[129] Friesenborg declaration, 8/10/09, at 8.

62

WOD000159

things a woman could ever give her man.  Those things are your heart and Marvea. . . ."[130]

On December 3, 1996, Mr. Honken wrote Ms. Johnson, "I probably shouldn't be writing this letter right now because I'm kinda in the dumps for a mood. . . . I hope things are going better for you and the kids. . . . One thing for sure is that my friend will definitely help you out!  It's bad enough that I'm in jail in the first place but now I can't talk or see you at all! . . . Oh I have things to make me upset enough to cry over but I dare not think of them.  You know I'm not much good at being alone.  Well, this is definitely changing certain things about me.  I always thought the most dangerous emotion was envy, but I now know it is self-pity.  For now I must find happiness in that my friend can at least help you.  I can take care of myself.  A time will come when the table will turn againt those who lie and try to keep me from my woman and children.  I'll do my best to take care of you and build friends until then.  I must go.  I love you.  Love, Dustin.[131]

In the same time frame that Mr. Honken wrote these letters to Ms. Johnson, he told his fellow inmate Terry Bregar that he was concerned Ms. Johnson would disclose information to law enforcement about him (Terry Bregar Grand Jury testimony, 3/14/97 at 17).  These letters can be interpreted as an effort to keep her under his control rather than an expression of his true feelings.

A further example of Mr. Honken's efforts to control Ms. Johnson while he is in custody can be found in the taped telephone conversations by Mr. Honken from MCC Chicago in the Fall of 1997.

Transcripts that I was told were of telephone calls that Mr. Honken made from MCC Chicago suggest that, during this time frame, Mr. Honken was concerned that Ms. Johnson was falling outside his sphere of influence.  In the calls, Ms. Johnson described going through difficult times, without resources, and told Mr. Honken that she was not thinking about their life together when he got out but how to get through each day.[132]   She began seeing another man, whom she told Mr. Honken she needed, but he asked for assurance that she did not like him.  She told him that she was not calling it quits with Mr. Honken.[133]

Included in the transcripts was a call between Mr. Honken and Alyssa Johnson in which Mr. Honken told Alyssa that his parents have been trying to reach Ms. Johnson "because I'm kind of wondering if your mom's all right you know cause they had that grand jury stuff Monday,

---

[130] Bates G1182-G1184.

[131] Bates G1179-G1181.

[132] See, e.g., Tape 9A - 7746 I at 6-7.

[133] Tape 9A - 7746 I at 5-6.

63

WOD000160

she's fine though huh?"[134]  During the same call, he asked, "She's not mad at me for anything is she?" and Alyssa Johnson assured him, "No."[135]

In the call between Ms. Johnson and Mr. Honken following the above-described call with Alyssa, Mr. Honken told Ms. Johnson, "I just love you very much and I think about you every fucking day woman, more than I ever have.  More than ever.  You know they – you probably have to fucking – you'd be sick of me if I got out cause I'd fucking be attached at the hip to you the whole fucking time."  Later in the same call, he expressed his concern about Ms. Johnson's involvement with the law: "Okay if you ever hear anything, if anything bad happens, if you ever – if you were to ever get arrested or anything, I would hope you'd call mom immediately."  Ms. Johnson assured him that she would.  He reiterated his request, "Cause I talk to mom twice a week at least or dad even.  Cause I talk to dad twice a week usually.  So if you – you know she's expect – always expecting AJ if something happens."  He told Ms. Johnson that his mother would pick up Alyssa from school if Ms. Johnson were arrested.  And then he told her, "Okay cause you know they might do crazy shit for my sentencing here you never fucking know."[136]

The staff at MCC Chicago, unaware of the ongoing investigation into Mr. Honken and Ms. Johnson, interpreted Mr. Honken's behavior differently.  Mr. Honken was referred for treatment of anxiety due to his legal difficulties and the "emotional disruption" he experienced when he learned that his girlfriend was involved with another man.[137]

Further evidence of Mr. Honken's continued efforts to control Ms. Johnson can be found in his correspondence from the period immediately following Ms. Johnson's arrest.  Although Mr. Honken expressed anger and a desire for revenge against Ms. Johnson following her arrest,[138] he wrote letters to Ms. Johnson and Ms. Johnson's counsel, Al Willett, offering his assistance in her case.[139]  He obtained affidavits from fellow inmates undermining the credibility of witnesses against Mr. Honken (see, e.g., affidavits of Artie Dufur and John T. Hunter.[140]

On September 23, 2000, Mr. Honken wrote Ms. Johnson in response to reports that she

---

[134] Tape 10A – 7746 J at 1.

[135] Tape 10A - 7746 J at 2.

[136] Tape 10B - 7746 J at 7, 9-10.

[137] Final Forensic Report, CC00001 at CC00006.

[138] Wayne Byerly Grand Jury testimony, 7/19/01 at 23.

[139] See, e.g., Honken letters to Willett of 8/13/00 and  8/29/00.

[140] MG002287-MG002289; MG002290-MG002293.

WOD000161

was convinced Mr. Honken intended to kill her.[141]  He repeatedly assured her that he still loved her, that it was the government attempting to divide and conquer, that he knew she still loved him.  He berated her for not believing in him, and cast aspersions on her attorney because he would not respond to Mr. Honken's efforts to manipulate her defense.  The letter suggests mantras she should chant: "Dustin is not trying to put me in prison, the government is.  Dustin is trying to help me out of prison, the government is not.  Dustin wants me home with our daughter and Alyssa, the government wants me to rot in prison until I die, and then bury me standing up to do the rest of my time.  Dustin is my lover, the government is my enemy. Etc."[142]

Although Mr. Honken could have been truthful in his expressions of love, he conveyed different feelings about Ms. Johnson to Wayne Byerly.  Mr. Byerly testified that after Ms. Johnson attempted suicide, Mr. Honken told him, "Why couldn't the bitch have just died?"[143]

**5. Did the defendant's  impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's multiple impairment and disorders, combined with her medications, affected her ability to rationally assist her counsel prior to and during the trial.

Ms. Johnson was at the upper limit of her antidepressant medication,  Zoloft, at the start of her trial.  The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose.[144]  She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity.  She had also complained of headaches, another symptom of Zoloft intoxication.  However, Ms. Johnson has experienced headaches her entire life.

Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg.  Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction.  Dr. Martell described Ms. Johnson's mood as "labile."

When her antidepressant  was increased to 300mg daily a couple of days into her trial, Ms. Johnson was no longer a part of the process.  She was unable to focus, drawing most of the day. She waved to family members, and her affect was often inappropriate.   Her serotonin toxicity, with extreme levels of her antidepressant  Zoloft, impaired her ability to rationally assist her attorneys during trial.

---

[141] Bates A001284-A001289

[142] Bates AA001288.

[143] Wayne Byerly Grand Jury testimony, 7/19/01 at 74.

[144] Goodman and Gilman's Pharmacological Basis of Therapeutics, 12th Edition, Table 15-1 Antidepressants: Chemical Structures, Dose and Dosage Forms, and Side Effects.

WOD000162

Ms. Johnson's mental state was impaired at the time of trial. Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft was the medication regimen Ms. Johnson took during the time leading up to her trial. Her prescription for Zoloft was increased precipitously, just after opening statements were made in Ms. Johnson's trial. Already at 200mg per day, the prescription was increased to 300mg per day. That dosage is 150mg to 200mg above the 100mg-150mg dosage described as the usual daily dose.[145]

On May 6, 2005, Ms. Johnson reported to medical staff at the jail that she was unable to tolerate the stress of the trial.[146] Her family noted that her behavior changed noticeably after trial started. She appeared child like and in a daze, according to her daughter[147]; both her daughter and sister reported that Ms. Johnson was "very different" from the way she was before trial.[148] She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide.[149] She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For

---

[145] Goodman and Gilman's The Pharmacological Basis of Therapeutics, 12th edition (Table 15-1).

[146] Angela reported to Dawn Nolan, PA-C, that "she wanted help because her stress level is too high as she is currently on trial. She is specifically asking for her Zoloft to be increased because she believes it will help her stress level and help her get through the trial. When asked why the Zoloft was originally prescribed, Angela states 'I have been on it for years because I have been in jail a long time.' 'I have been terribly depressed and have been having a hard time even helping in my own defense.'" Woodbury County Jail Medical Records (WCJMR) at 13.

[147] "My mother seemed deaf and blind to the trial. She sat there next to her attorneys drawing with colored pencils. She looked different; she didn't act like she had been acting in jail. It was as if the trial wasn't going on." Decl. of Alyssa Johnson at 4.

[148] "I could tell that she was very depressed and very different, as if she were a zombie, especially in the mornings in court. Sometimes she sat there like she was not aware of what was going on and if she was not in any pain at all. She looked like she had no feelings. I knew differently because she was devastated by the deaths of all those people." Decl. of Wendy Jacobson at 8.

"After trial started, she wasn't her normal self and didn't show any interest in the case. She acted like she was not in a trial, as if it was all hopeless." Decl. of Holly Dirksen at 7.

[149] Decl. of Wendy Jacobson at 8.

66

WOD060463

instance, after I testified, she gave me a big smile and waved at me, like we were in school."[150]

The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Higher dosages (200mg and 400mg) cause mood deterioration.[151] Ms. Johnson experienced each of these symptoms, consistent with both her circumstances and her faulty medication regimen.

Ms. Johnson had complained of headaches, continued depression, and problems focusing for much of her incarceration in the county jail. From her initial arrest incarceration at Benton County Jail through her conviction and incarceration at Woodbury County Jail, Ms. Johnson was given prescription dosages of pain medication for headaches and cramps.[152]

Also from the outset of her incarceration, she was prescribed various medications, typically or atypically prescribed for depression.[153] In Benton County Jail, she was on Serzone 150mg/day.[154] When she was moved to Blackhawk County Jail, that dosage was reduced to 75mg/day despite Ms. Johnson's report, "I am depressed. I cry a lot to sleep; reduced appetite. I feel life is hopeless, helpless & worthless."[155] Less than a week later, she attempted suicide. When she was returned to a correctional facility, she was prescribed Amitriptyline 50mg/day for about four months, at which time the jail's doctor changed her medication to Prozac 20mg/day

---

[150] Id.

[151] Zoloft dosages in higher ranges, 200mg to 400mg, "had mostly detrimental effects. All doses caused pupillary dilatation at 4-8 hours post-dose and caused either no effect on subjective mood (100mg) or caused mood deterioration (200mg and 400mg)..." Baselt (2001) Drug Effects on Psychomotor Performance, Foster City, California, Biomedical Publications.

[152] Benton County Jail Records (BCJR) at 11; Blackhawk County Jail Records (BHCJR) at 52; Linn County Jail Records (LCJR), Vol III at 20,30,90, Vol I at 90; Hardin County Jail Records (HCJR) at Vol 1, 34-87, Vol 2 at 39-64); Woodbury County Jail Records (WCJR) at 2-10.

[153] Ms. Johnson was first prescribed an antidepressant for Major Depression in 1996. She was first prescribed Prozac 20mg/day. When she continued to have panic attacks and problems sleeping, her medication was switched to Zoloft, first at 50mg/day, then quickly increased to 100mg/day when she remained upset and tearful. The medication was switched again to Paxil 20mg/day when Zoloft caused her face to break out. Mental Health Center of North Iowa, Inc. Records.

[154] BHCJR at 52.

[155] Id. at 53.

67

WOD000164

and Trazodone 50mg/day.[156]

Throughout 2001, the Linn County Jail doctor continues to change Ms. Johnson's medications, and to increase the dosages. On November 14, 2001 she complained of anxiety and poor sleep although she appeared giddy, talkative and very social with the staff.[157] Less than two weeks later, she told the jail's doctor that she felt depressed and irritable, not wanting to do much, and reported variable sleep and appetite.[158] By the end of 2001, Ms. Johnson is on Paxil 40mg/day and Trazodone 100mg/day.[159]

In 2002, Ms. Johnson's medications were again changed and dosages increased. Trazadone dosage is increased to 150mg/day on May 9, 2002.[160] In July 2002, Ms. Johnson complains of very bad headaches and asks for migraine medication. She is given prescription dosages of Ibubrofen or Naprosyn.[161]

In 2003, Angela was prescribed increasing doses of Zoloft, an antidepressant, because of her complaints that the medication was not relieving her depression.[162] The prescribed doses went from 50mg at the beginning of the year, increased to 100mg on May 29, 2003, then to 150mg on October 29, 2003. By July 2004, the prescribed dose was 200mg per day.[163] Goodman and Gilman's Pharmacological Basis of Therapeutics, 12th Edition, notes that 150mg per day of Zoloft is the usual top dosage range.

By December 11th, 2003, Angela was not sleeping, in spite of 150mg per day of Trazadone. She felt miserable and tearful, and complained that she felt "hung over and groggy in the morning." Her doctor discontinued Trazadone, and started her on Seroquel, a sedating antipschotic that has also found to be useful in bipolar depression.[164]

Angela requests an increase in the Seroquel of January 7th, 2004. She continues to be

---

[156] LCJR Vol III at 65, 70, 73.

[157] Id. at 49.

[158] Id. at 31, 49.

[159] Id. at 37, 58.

[160] Id. at 21.

[161] Id. at 66, 68.

[162] LCJR Vol I at 54, 58, 87-89.

[163] LCJR II at 44.

[164] LCJR Vol II at 65.

68

WODB060165

depressed. On January 8th, Seroquel is increased to 200mg. per day.

Medical records for June 1, 2004 are telling. She complains of lightheadedness, headache, and "just feel terrible all over." These are common side effects of her medication and drug regimen, although, as noted previously, she has a long history of headaches, and was taking ibuprofen daily for headaches. Angela was clear that her feeling poor was "not the flu."[165]

The type of reaction Angela was experiencing is called a toxicokinetic reaction, a drug metabolism reaction when one's metabolism is becoming overwhelmed by multiple drugs and/or larger doses of a drug than the person can property metabolize.[166] These excessive doses, like with her Zoloft, given her particular metabolism, cannot be broken down rapidly and become to back up, causing atypical responses.

Linn County Jail medical records record Angela with severe headaches and sickness on June 3rd, 18th, and 24, 2004. It is reported that "she looks sick...has a bad headache, appears to be crying, doesn't have much of an appetite, and appears 2/b(sic) sick..."

When Angela was transferred to the Hardin County Jail on August 16th, 2004, she was on Seroquel 200mg for sleep, and Zoloft 200mg per day for her depression. She complained regularly of headaches, and was given Ibuprofen, which she had used for years to treat her ongoing migraine headaches.[167] The same medications were administered throughout the rest of 2004 and up to May 6, 2005.[168]

On May 6, 2005, Ms. Johnson's Zoloft was increased to 300mg per day,[169] twice the upper dosage recommended in Goodman and Gilman. She was manifesting side effects on lower dosage, and became increasingly toxic while on the Zoloft.

Angela does not recall much of the time prior to the trial. She states that she often would lay on the floor for hours at a time, outside her cell. When the increase in Zoloft was made, she became increasingly withdrawn. She was listless, and found it even more difficult to follow what was going on in court. She found herself drawing, rather than listening to the testimony or writing down questions for her attorneys. Ms. Johnson's internal perceptions of her functioning are confirmed by the descriptions of her affect and behavior at the trial by her family members, cited above in footnotes , and the description of her counsel, Pat Berrigan in his testimony in

_____

[165] LCJR Vol I-ML2 at 60.

[166] Ousterhoudt (2011). Drug Toxicity and Poisoning. Goodman and Gilman's Pharmacologic Basis of Therapeutics. Brunton. China, McGraw-Hill.

[167] HCJR, ML2(1) - Vol II at 2, 39-64, ML2 Vol I at 34-87.

[168] WCJR at 2-11.

[169] Id. at 9, 13-16.

WOD000166

May 2011:

> She had some lucid moments and other times where she didn't appear to be with it, so she was kind of in and out. . . I think she was spacing out during the trial. I don't know if that was a defense mechanism because she didn't want to hear the testimony or she was afraid about how she might react. . .  And I was at the time thinking, well, you know, it's better if she's zoned out than if she's going to react. That was a bit of a concern.  So that was my observation when I was sitting next to her that she was scribbling, not taking notes or drawing pictures."[170]

During Pat Berrigan's testimony on March 14, 2011, he testified that Ms. Johnson had an "unrealistic perception of [her] situation."[171]   In response to the question of whether Mr. Berrigan felt Ms. Johnson's unrealistic view was driven in part by her mental illness problems, Mr. Berrigan responded, "I think yes, to give the short answer.  There are many notes where when I visit her in jail we're having discussions and she's behaving erratically, either overly emotional. Sometimes she engaged in this rocking back and forth behavior that was a little disconcerting. Sometimes she had difficulty focusing on the issues that I really wanted to discuss.  And throughout her stay I think in most of these jails, maybe not all of them, she's on some type of antianxiety medication.  So she was anxious about her situation.  All clients are anxious in this situation, but she was extremely anxious."[172]

Mr. Berrigan testified specifically about a meeting with Angela Johnson on August 21, 2003, in which he had taken notes, and they discussed the current posture of the case.  Mr. Berrigan testified that he arrived before his co-counsel, Mr. Willett, and described her as "doing this (demonstrating) back and forth, is shaking back and forth. . . . Rocking - right, rocking, and she sometimes hugs herself like this.  Sometimes she has her hands down like this, but it's obvious she's in some distress.  And so the first ten minutes that we're talking this keeps up.  And it wasn't uncommon.  I didn't always note it, but this would happen, particularly when we're - she and I are talking about the government's evidence.  When I'm confronting her with the government's evidence, she's doing this rocking.  And then Al [Willett] arrived, and then she was fine.  She seemed markedly more relaxed.  I didn't make a note that the discussion changed or that the subject discussion changed, but I suspect it did.  And then I wrote down I pretty much tried to shut up as a result.  And I think probably I was talking about this plea.  She was getting upset.  So I stopped."[173]

Mr. Berrigan also testified, however, that he did not necessarily recognize Ms. Johnson's

---

[170] 2255 Hearing Transcript, Vol 11 at 3137-3138.

[171] Berrigan testimony, 3/14/11 at 2045.

[172] Id.

[173] Berrigan testimony, 3/14/11 at 2052.

behavior as a mental health issue, acknowledging that he had no mental health training, unlike a mitigation specialist.  He testified, "Yeah, well I may be misperceiving this all together.  I mean, my view of the situation here is Angie with her daughters is just stressing out.  You know, this is just stressful, very, very painful.  I don't know that I looked at it as a mental health issue, that this rocking back and forth means there's something mentally going on there that's a bad.  She's a mother.  I don't - we don't typically have a lot of female capital defendants, frankly.  I think I've had maybe two or three.  And then when they have children on top of it, that relationship is just - it's inviolate.  They don't think of anything else.  So I'm sort of looking at it as she's worried about leaving her children.  Maybe that's not how Miss Goody would look at it or somebody who has mental health training.[174]

Mr. Stowers described Ms. Johnson's behavior in similar terms during his testimony on March 10, 2011.  While testifying about one of his first meetings with Ms. Johnson, he was referred to his notes which stated, "Met Angela Johnson at jail, emotional, attempted suicide, no plea bargaining desired, asked questions - asked various questions, showed photos - show photos of girls and first boyfriend."   Mr. Stowers testified that "I remember meeting her that first time, and I had a recollection that Pat [Berrigan] was there, so I'm not remembering that meeting all that well.  But I remember she was very emotional, and if this was the one meeting that I had described to you on the phone where she was in her chair sort of rocking like this - [Mr. Burt notes for the record, "You're sort of rocking back and forth with your hands on your lap?].  Yeah, and she was looking down and rocking back and forth in the chair as Pat was confronting her with - with the facts of life.  But I'm not certain that was on April 3 as I sit here at this moment right now.  It was one of the early meetings."[175]

At trial, Mr. Stowers recalls Ms. Johnson passing notes or commentary about the witnesses to her attorneys "very sporadic[ally]."  Nothing else about her behavior at trial gave him a concern that she was not competent, or that she could not render assistance, understand the proceedings, and give assistance in representing herself.[176]

Angela's cognitive abilities, impaired as they already were, became increasingly disordered, secondary to the elevated Zoloft dosages. As Ousterhoudt  noted, long term elevated dosages may accumulate, creating increasingly toxic impairment, actually causing a deterioration of the brain the medications are trying to fix. This toxicity is part of the predicament of trying to treat brain-impaired persons with psychiatric medications that are designed to treat mental illness, not necessarily cognitive deficits. While attempting to fix the depression, the side effects of the same medication may impair other areas of cognitive functioning, like sedation, motor

---

[174]  Berrigan testimony 3/14/11 at 2061-2062.

[175] Stowers testimony, 3/10/11, at 1114.

[176] Stowers testimony, 3/11/11 at 1559.

71

WOD000168

functioning, attention, and focus.[177]

Ms. Johnson's disinhibition was evident during the trial. She was not able to effectively participate in her defense and is often descrbed as "detached." Her ability to draw pictures of the witnesses seems intact, but it is not clear to me how this translated into useful information for her defense team. In short, her Zoloft toxicity, combined with her multiple impairments, disengaged her from the legal proceedings and rendered her incompetent to stand trial.

**6. Did the defendant's impairments and medications inform her demeanor at trial?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's cognitive and psychiatric impairments and medications caused and explained her disengaged appearance, largely flat and absent affect, and inability to show emotion at trial.

The jury consultant, Ms. Dahl, noticed Ms. Johnson's demeanor during jury selection. At the hearing on March 8, 2011, Ms. Dahl testified, "She had at times somewhat of a girly or giddish sort of demeanor, twirling of hair. She also at times would have somewhat of a harsh appearance or judgmental appearance, and so that's the demeanor that I saw." Ms. Dahl's view of Ms. Johnson's demeanor was that "[t]here was a sense that her appearance and her affect didn't represent that she appreciated the gravity of the situation. I think it could be read that way."[178]

On cross-examination, Ms. Dahl described Ms. Johnson's demeanor during jury selection as "a difficult demeanor." She expressed her concerns to counsel about Ms. Johnson's demeanor, and advised them that "we needed to work with her on calming herself in other ways than flipping her hair" as well as discussing the need to have her maintain composure on her face so she didn't show the judgmental appearance Ms. Dahl had noticed. Ms. Dahl testified on cross-examination that she did not have concerns during the jury selection process that Ms. Johnson was incompetent, or unable to communicate with her lawyers, or not acting rationally. However, she also testified that Ms. Johnson "could understand in a very simplistic way what was going on. I mean, I don't know what she understood in terms of the depth of what was going on." Finally, she testified feeling "[t]hat it would be difficult for a jury to see past what they were seeing in court which was what I felt was the essence of her. . . . I thought the jury would see someone at that point who would be too - too giddy for the situation and who didn't appreciate her situation or the victims' situation and that that may always be present."[179]

Nancy Lanoue, who was Al Willett's legal assistant, attended the trial every day except

_____

[177] Chew, E. (2009). "Pharmacological management of neurobehavioral disorders following traumatic brain injury: A state of the art review." Journal of Rehabilitative Research and Development 6:851-878.

[178] Dahl testimony, 3/8/11 at 338.

[179] Dahl testimony, 3/8/11 at 350-354.

72

WOD000169

during jury selection.  She sat behind Ms. Johnson during the trial, and she testified at the hearing on March 8, 2011 that Ms. Johnson "was very - almost like she was kind of drugged, just seemed very out of it. . . . She was very just blah."   Ms. Lanoue did not think Ms. Johnson was emotional, jittery, or nervous.  As someone who had spent a lot of time with Ms. Johnson during Ms. Johnson's pretrial incarceration, Ms. Lanoue thought Ms. Johnson's state of mind was that "[s]he just left everything in the hands of the attorneys but I think just felt like her fate was in their hands."[180]

On cross-examination, Ms. Lanoue testified that she was not aware of Ms. Dahl's concerns about Ms. Johnson's demeanor, and was asked, "So if there were instructions given to Miss Johnson that she should act more serious and note show emotion and not be that way, then that would explain why she was acting that way [not showing emotion] which is a little bit different from what you'd seen before."  Ms. Lanoue responded, "Possibly some of it."

Melissa Launspach, the legal assistant for Dean Stowers, testified on March 8, 2011 about what she observed of Ms. Johnson's demeanor at trial.  Ms. Launspach was present, seated in the back of the courtroom, during the presentation at the penalty phase.  She was able to observe Ms. Johnson during breaks and lunch, and going to and from the courtroom.  She could also see her from behind during questioning.  Ms. Launspach observed Ms. Johnson "doodling a lot, and you know, kind of her head down with her paper," and confirmed with the attorneys that her observations were correct.  Although there were times when Ms. Johnson would raise her head, if family members were testifying, for example, but she "looked more as though she were looking down at the table."  This demeanor appeared to Ms. Launspach as "disinterested."  Ms. Launspach noticed Ms. Johnson respond emotionally to her family members and friends but did not notice "consistent emotion throughout the time, just maybe when she first saw them."[181]

Al Willett testified about Ms. Johnson's demeanor at trial on cross-examination.  During his testimony, he recalled the attorneys discussing with Ms. Johnson that she had to be "what I call a good poker face.  Ms. Johnson's voice is similar to mine in that it tends to carry, and we were worried that she might react audibly to something that could be overheard.  And, you know, we didn't want any mannerisms that might put her in a negative light, rolling of the eyes, guffawing, something audible that the jury could overhear." Mr. Willett said that when Ms. Johnson "would get exasperated she might say something under her breath and think that she said it quietly, but in these federal courtrooms with these microphones, you know, if you're near a live mike, what you think is quiet is not."[182]

Mr. Willet agreed with the prosecutor that Ms. Johnson "wasn't completely absent from participating in her defense," and testified that he "never picked up" that she was incompetent in

---

[180] Lanoue testimony, 3/8/11 at 430-431.

[181] Launspach testimony, 3/8/11 at 509-510.

[182] Willett testimony, 3/9/11 at 963-964.

WOD000170

any way, nor that "she was not tracking or not able to follow what's going on in court."[183]

Mr. Willett was generally aware that Ms. Johnson was taking medication. He thought her emotional affect in court to be appropriate to the occasion, and was not concerned that she was overly medicated. He had no concerns about her drawing during trial.[184]

Dean Stowers testified about the instructions the attorneys gave Ms. Johnson: " Well, don't make - you know, don't glare at witnesses. Don't appear to be sort of giving an intimidating stare-down. Try to be interested. Pay attention to what they're doing. Try to have a pen in your hand and a notepad and appear to be interested in what's going on, it's your trial, this sort of thing. That kind of commentary would have been given to her, yeah." Mr. Stowers testified of his own concern that, particularly during the guilt phase that Ms. Johnson "most often was looking down and doodling and drawing pictures and this sort of thing in a notepad and appeared to be very detached from the proceedings themselves because, you know, she was doing these things. Now, did I have concerns about that? Not really because I figured given what the evidence was and the extensive autopsy-related evidence and pictures of human remains and descriptions of things, I could certainly understand why she might want to be, you know, detached from that. There were times when I wish I might have been detached a little more from it in some ways. But, you know, so it wasn't really a concern because in my mind I was attributing it to her need to keep some kind of psychological separation, if you will, or mental separation from the evidence of the crimes, you know."[185]

Mr. Stowers went on to say, "And during the penalty phase she was much more attentive. She often would sit up. She would smile often at witnesses. She was emotional, cried many times, and that sort of thing during the penalty phase, and that was when, you know, a lot of family members and people whom in many instances she hadn't seen for a long time testified." [186]

Mr. Stowers recalls Ms. Johnson passing notes or commentary about the witnesses to her attorneys "very sporadic[ally]." Nothing else about her behavior at trial gave him a concern that she was not competent, or that she could not render assistance, understand the proceedings, and give assistance in representing herself. [187]

Ms. Johnson's daughter, Alyssa Johnson, attended the trial, although not every day. She sat behind her mother, but at an angle so she could see some of her face. Alyssa Johnson testified about her observations. "She would just sit there with a very blank expression on her

---

[183] Willett testimony, 3/9/11 at 965-966.

[184] Willett testimony, 3/9/11 at 966-967.

[185] Stowers testimony, 3/11/11 at 1557-1558.

[186] Stowers testimony, 3/11/11 at 1559.

[187] Id.

74

WOD000171

face.  To me it didn't seem like she was maybe hearing everything coming through, understanding and taking in the actual proceeding itself."  This was not like the mother that she knew.  Her mother had always been "very happy-go-lucking, upbeat, always tries to keep a good sense of humor, you know."  Alyssa Johnson observed her mother often using colored pencils during trial.  When Alyssa visited her mother during the trial in the US Marshal's office, her mother was "different."  "She almost immediately, you know, pepped up a little bit, just you know, how are you, it's so good to see you.  It didn't seem as though she had just walked out of a courtroom in session for her trial.  She spoke of the proceedings "very minimal[ly]."[188]

Ms. Johnson's sister, Wendy Jacobson, testified at the penalty phase of Ms. Johnson's trial.  She was not able to attend the proceedings prior to her testimony, but Ms. Jacobson was able to observe her sister while she testified and she was allowed to be present after she testified.  Ms. Jacobson also visited with her sister in the United States Marshal's office during breaks and at the jail.  (Jacobson testimony, 3/14/11 at 1949).  Ms. Jacobson described Ms. Johnson's demeanor during the times she saw her at trial.  "I would say she was not aware of what our trial - what the trial - what the intensity or the magnitude of this trial was about.  She seemed to be scribbling circles on the paper during the trial.  And it was pretty - it seemed that it was - she was working below - I mean, acting below her age, you know, in a - she just didn't understand or comprehend what was going on." Jacobson testimony, 3/14/11 at 1949.  Ms. Jacobson described the scribbling "like - a kindergarten drawing. . . . You know how they make circles and kind of scribble?  That's what it looked like."[189]

Ms. Jacobson observed her sister looking at her during Ms. Jacobson's testimony, and "[s]he smiled frequently.  She did not seem to be concerned about what was going on with her.  She didn't seem to understand that this was a very serious matter.  She blew me kisses and smiled frequently."

During the visits at the Marshal's office, Ms. Johnson did not seem to comprehend what was going on.  "She seemed - she just seemed real uncon - unconcerned.  I don't know.  Confused?  She wasn't really aware of what was going on.  It just - she was kind of in a state of - a childlike state."  Ms. Jacobson did not think Ms. Johnson behaved in a manner appropriate for someone who is on trial literally for their life in a death penalty case."[190]

---

[188] Alyssa Johnson testimony, 3/12/11 at 1657-1658.

[189] Jacobson testimony, 3/14/11 at 1949-1950.

[190] Jacobson testimony, 3/14/11 at 1950-1951.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 172 of 287
WOD000172

Pat Berrigan testified that during trial, Ms. Johnson "would sometimes interact with us and sometimes just act - act out." He also testified that "[s]he wrote notes, but mostly she scribbled and drew pictures. . . I don't remember a lot of subtantive writing. She might have written a note here or there. She had some lucid moments and other times where she didn't appear to be with it, so she was kind of in and out." Mr. Berrigan did not think Ms. Johnson was incompetent to proceed but he thought "she was spacing out during the trial. I don't know if that was a defense mechanism because she didn't want to hear the testimony or she was afraid about how she might react. I do remember vividly throughout the trial buying these little boxes of candy, these Nips which I never had any experience with, and she started getting me to eat them. I bet she went through a dozen boxes of those things during the trial. And I was at the time thinking, well, you know, it's better if she's zoned out than if she's going to react. That was a bit of a concern. So that was my observation when I was sitting next to her that she was scribbling, not taking notes or drawing pictures. She drew some phenomenal pictures of I think some of the jurors, maybe some of the witnesses, but she's really a pretty talented artist."[191]

Mr. Berrigan testified that. ". . . She wasn't - as I said, I mean, she had her lucid moments, no question." He agreed with the prosecutor that he would have done something if he had concerns that she was incompetent. He said, "She was zoned out either voluntarily or involuntarily, but she was not paying attention to the proceedings going on. Any my perception of that was particularly when you had like victims' family members testifying, it's a painful thing. It's painful for all of us. It was way too painful for her. So she wasn't - she wasn't listening. She was - I don't know what she was doing, just drawing pictures and eating candy."[192]

Mr. Berrigan thought the jury would see Ms. Johnson writing, and think she was writing notes, so he did not think "that presented a portrait to the jury of inappropriate behavior."[193]

Mr. Berrigan testified that when he asked Ms. Johnson questions, she was able to answer them. "She came to. What was going on in between the questions, who knows, you know? I don't know."[194]

The foregoing summary of testimony leaves little doubt that Ms. Johnson's demeanor at trial had a detrimental impact, a fact acknowledged by jurors in post-trial interviews. There is also no doubt that her harmful demeanor, as described above, was caused by her multiple impairments and medication regime, specifically her use of Zoloft in amounts far above the recommended dosage.

### 7. Was the defendant's use of profanity and verbal threats consistent with her

---

[191] Berrigan testimony, 5/14/11 at 3136-3138.

[192] Berrigan testimony, 5/14/11 at 3138-3139.

[193] Berrigan testimony, 5/14/11 at 3139.

[194] Berrigan testimony, 5/14/11 at 3139-3140.

WOD000173

**longstanding neurological, psychiatric, and psychological impairments?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty that Ms. Jolmson's use of profanity and verbal threats are consistent with with her longstanding neurological, psychiatric, and psychological impairments, particularly her history of hyperreactivity, hypervigilance, and affective dysregulation.

Thank you for allowing me to examine Ms. Johnson.



George Woods, MD

**BIBLIOGRAPHY**

Alvarez, W. A. (2010). "Migraine Aura without headache." Medlink Neurology.

Anda, R., V. Felitti, et al. (2006). "The enduring effects of abuse and related adverse experiences in childhood." European Archives of Psychiatry and Clinical Neuroscience 256(3): 174-186.

Andermann, F. (1987). "Migraine-epilepsy relationships." Epilepsy Research 1(4): 213-226.

Baselt (2001). Drug Effects on Psychomotor Performance. Foster City, California, Biomedical Publications.

Berkovic, S. F., A. McIntosh, et al. (1996). "Familial temporal lobe epilepsy: A common disorder identified in twins." Annals of Neurology 40(2): 227-235.

77

WOD000174

Brady (2005). "Co-Occurring Mental and Substance Use Disorders:The Neurobiological Effects of Chronic Stress." American Journal of Psychiatry: 1483-1493.

Chew, E. (2009). "Pharmacological management of neurobehavioral disorders following traumatic brain injury-A state-of-the-art review." Journal of Rehabilitative Research and Development 6: 851-878.

Dao, D. T., P. B. Mahon, et al. (2010). "Mood disorder susceptibility gene CACNA1C modifies mood-related behaviors in mice and interacts with sex to influence behavior in mice and diagnosis in humans." Biological psychiatry 68(9): 801-810.

BACKGROUND: Recent genome-wide association studies have associated polymorphisms in the gene CACNA1C, which codes for Ca(v)1.2, with a bipolar disorder and depression diagnosis. METHODS: The behaviors of wild-type and Cacna1c heterozygous mice of both sexes were evaluated in a number of tests. Based upon sex differences in our mouse data, we assessed a gene x sex interaction for diagnosis of mood disorders in human subjects. Data from the National Institute of Mental Health Genetics Initiative Bipolar Disorder Consortium and the Genetics of Recurrent Early-Onset Major Depression Consortium were examined using a combined dataset that included 2021 mood disorder cases (1223 female cases) and 1840 control subjects (837 female subjects). RESULTS: In both male and female mice, Cacna1c haploinsufficiency was associated with lower exploratory behavior, decreased response to amphetamine, and antidepressant-like behavior in the forced swim and tail suspension tests. Female, but not male, heterozygous mice displayed decreased risk-taking behavior or increased anxiety in multiple tests, greater attenuation of amphetamine-induced hyperlocomotion, decreased development of learned helplessness, and a decreased acoustic startle response, indicating a sex-specific role of Cacna1c. In humans, sex-specific genetic association was seen for two intronic single nucleotide polymorphisms, rs2370419 and rs2470411, in CACNA1C, with effects in female subjects (odds ratio = 1.64, 1.32) but not in male subjects (odds ratio = .82, .86). The interactions by sex were significant after correction for testing 190 single nucleotide polymorphisms (p = 1.4 x 10, 2.1 x 10; p(corrected) = .03, .04) and were consistent across two large datasets. CONCLUSIONS: Our preclinical results support a role for CACNA1C in mood disorder pathophysiology, and the combination of human genetic and preclinical data support an interaction between sex and genotype.

Devinsky, J. and S. Schachter (2009). "Norman Geschwind's contribution to the understanding of behavioral changes in temporal lobe epilepsy: The February 1974 lecture." Epilepsy & Behavior 15(4): 417-424.

Case 3:09-cv-03064-MWB-LTS    Document 284-28    Filed 06/23/11    Page 175 of 287

WOD000173

Ding, J., D. Powell, et al. (2009). "Dissociable frontal controls during visible and memory-guided eye-tracking of moving targets." Hum Brain Mapp 30(11): 3541 - 3552.

Geschwind, N. (2009). "Personality changes in temporal lobe epilepsy." Epilepsy & Behavior 15(4): 425-433.

Illman, N. A., C. J. Rathbone, et al. (2011). "Autobiographical memory and the self in a case of transient epileptic amnesia." Epilepsy & Behavior 21(1): 36-41.

Lanius, R. A., E. Vermetten, et al. (2010). "Emotion Modulation in PTSD: Clinical and Neurobiological Evidence for a Dissociative Subtype." The American journal of psychiatry 167(6): 640-647.

AbstractIn this article, the authors present evidence regarding a dissociative subtype of PTSD, with clinical and neurobiological features that can be distinguished from nondissociative PTSD. The dissociative subtype is characterized by overmodulation of affect, while the more common undermodulated type involves the predominance of reexperiencing and hyperarousal symptoms. This article focuses on the neural manifestations of the dissociative subtype in PTSD and compares it to those underlying the reexperiencing/hyperaroused subtype. A model that includes these two types of emotion dysregulation in PTSD is described. In this model, reexperiencing/hyperarousal reactivity is viewed as a form of emotion dysregulation that involves emotional undermodulation, mediated by failure of prefrontal inhibition of limbic regions. In contrast, the dissociative subtype of PTSD is described as a form of emotion dysregulation that involves emotional overmodulation mediated by midline prefrontal inhibition of the same limbic regions. Both types of modulation are involved in a dynamic interplay and lead to alternating symptom profiles in PTSD. These findings have important implications for treatment of PTSD, including the need to assess patients with PTSD for dissociative symptoms and to incorporate the treatment of dissociative symptoms into stage-oriented trauma treatment.

McIntyre, R. S., J. Z. Konarski, et al. (2006). "The Prevalence and Impact of Migraine Headache in Bipolar Disorder: Results From the Canadian Community Health Survey." Headache: The Journal of Head and Face Pain 46(6): 973-982.

Mesulam, M.-M. (1981). "Dissociative States With Abnormal Temporal Lobe EEG: Multiple Personality and the Illusion of Possession." Arch Neurol 38(3): 176-181.

79

WOD000176

* Twelve patients with clinical and EEG manifestations reminiscent of temporal lobe epilepsy reported symptoms of dissociative states. In seven of these patients, the clinical picture was consistent with multiple personality, whereas the other five had the illusion of supernatural possession. These cases suggest that in selected instances dissociative states may constitute complex behavioral manifestations of chronic limbic epilepsy.

Nordahl, T. E., R. Salo, et al. (2003). "Neuropsychological Effects of Chronic Methamphetamine Use on Neurotransmitters and Cognition: A Review." The Journal of neuropsychiatry and clinical neurosciences 15(3): 317-325.

Methamphetamine use is on the rise, with an imminent upsurge of abuse and dependence reported across the United States. Currently, preliminary evidence suggests that methamphetamine dependence may cause long-term neural damage in humans, with concomitant deleterious effects on cognitive processes such as memory and attention. This selective review provides an outline and synthesis of studies that assess the neurotoxic mechanisms of methamphetamine, as well as those that evaluate the cognitive sequelae of methamphetamine abuse.

Ousterhoudt (2011). Drug Toxicity and Poisoning. Goodman and Gilman's Pharmacologic Basis of Therapeutics. Brunton. China, McGraw-Hill.

Paulus, M. P., S. F. Tapert, et al. (2005). "Neural Activation Patterns of Methamphetamine-Dependent Subjects During Decision Making Predict Relapse." Archives of general psychiatry 62(7): 761-768.

Context Relapse is a common clinical problem in individuals with substance dependence. Previous studies have implicated a multifactorial process underlying relapse; however, the contribution of specific neural substrates has not yet been examined. Objective To determine whether results from functional magnetic resonance imaging (fMRI) shortly after drug cessation could predict relapse in stimulant-dependent individuals. Participants and Design Treatment-seeking methamphetamine-dependent males (N = 46) underwent fMRI 3 to 4 weeks after cessation of drug use. Of the 40 subjects who were followed up a median of 370 days, 18 relapsed and 22 did not. Main Outcome Measure Blood oxygen level-dependent fMRI activation during a simple 2-choice prediction task. Results The fMRI activation patterns in right insular, posterior cingulate, and temporal cortex obtained early in recovery correctly predicted 20 of 22 subjects who did not relapse and 17 of 18 subjects who did. A Cox regression analysis revealed that the combination of right middle frontal gyrus, middle temporal gyrus, and posterior cingulate activation best predicted the time to relapse. Conclusion To our knowledge, this is the first investigation to show that fMRI can be used to predict relapse in substance-dependent individuals.

80

WOD000177

Poeppel (1996). "Magnetic Source Imaging and the Neural Basis of Dyslexia." Annals of Neurology 40: 137-138.

Sekine, Y., Y. Ouchi, et al. (2008). "Methamphetamine Causes Microglial Activation in the Brains of Human Abusers." J. Neurosci. 28(22): 5756-5761.

Methamphetamine is a popular addictive drug whose use is associated with multiple neuropsychiatric adverse events and toxic to the dopaminergic and serotonergic systems of the brain. Methamphetamine-induced neuropathology is associated with increased expression of microglial cells that are thought to participate in either pro-toxic or protective mechanisms in the brain. Although reactive microgliosis has been observed in animal models of methamphetamine neurotoxicity, no study has reported on the status of microglial activation in human methamphetamine abusers. The present study reports on 12 abstinent methamphetamine abusers and 12 age-, gender-, and education-matched control subjects who underwent positron emission tomography using a radiotracer for activated microglia, [11C](R)-(1-[2-chlorophenyl]-N-methyl-N-[1-methylpropyl]-3-isoquinoline carboxamide) ([11C](R)-PK11195). Compartment analysis was used to estimate quantitative levels of binding potentials of [11C](R)-PK11195 in brain regions with dopaminergic and/or serotonergic innervation. The mean levels of [11C](R)-PK11195 binding were higher in methamphetamine abusers than those in control subjects in all brain regions (>250% higher; $p < 0.01$ for all). In addition, the binding levels in the midbrain, striatum, thalamus, and orbitofrontal and insular cortices ($p < 0.05$) correlated inversely with the duration of methamphetamine abstinence. These results suggest that chronic self-administration of methamphetamine can cause reactive microgliosis in the brains of human methamphetamine abusers, a level of activation that appears to subside over longer periods of abstinence.

Shetty, T. and M. Trimble "The Bear Fedio Inventory: Twenty years on." Journal of Epilepsy 10(5): 254-262.

Spiegel, D. (1997). "Neurobiological and Clinical Consequences of Stress: From Normal Adaptation to Post-Traumatic Stress Disorder." The Journal of neuropsychiatry and clinical neurosciences 9(1): 114-115.

Spiegel, D. (2006). "Recognizing Traumatic Dissociation." The American journal of psychiatry 163(4): 566-568.

Tamm, L., V. Menon, et al. (2004). "Event-related FMRI evidence of frontotemporal

81

WOD000178

involvement in aberrant response inhibition and task switching in attention-deficit/hyperactivity disorder." J Am Acad Child Adolesc Psychiatry 43(11): 1430 - 1440.

Tepper, S. J., A. J. Dowson, et al. (2006). "Abstracts and Citations." Headache: The Journal of Head and Face Pain 46(6): 1024-1034.

Thompson, P. M., K. M. Hayashi, et al. (2004). "Structural Abnormalities in the Brains of Human Subjects Who Use Methamphetamine." J. Neurosci. 24(26): 6028-6036.

We visualize, for the first time, the profile of structural deficits in the human brain associated with chronic methamphetamine (MA) abuse. Studies of human subjects who have used MA chronically have revealed deficits in dopaminergic and serotonergic systems and cerebral metabolic abnormalities. Using magnetic resonance imaging (MRI) and new computational brain-mapping techniques, we determined the pattern of structural brain alterations associated with chronic MA abuse in human subjects and related these deficits to cognitive impairment. We used high-resolution MRI and surface-based computational image analyses to map regional abnormalities in the cortex, hippocampus, white matter, and ventricles in 22 human subjects who used MA and 21 age-matched, healthy controls. Cortical maps revealed severe gray-matter deficits in the cingulate, limbic, and paralimbic cortices of MA abusers (averaging 11.3% below control; $p < 0.05$). On average, MA abusers had 7.8% smaller hippocampal volumes than control subjects ($p < 0.01$; left, $p = 0.01$; right, $p < 0.05$) and significant white-matter hypertrophy (7.0%; $p < 0.01$). Hippocampal deficits were mapped and correlated with memory performance on a word-recall test ($p < 0.05$). MRI-based maps suggest that chronic methamphetamine abuse causes a selective pattern of cerebral deterioration that contributes to impaired memory performance. MA may selectively damage the medial temporal lobe and, consistent with metabolic studies, the cingulate-limbic cortex, inducing neuroadaptation, neuropil reduction, or cell death. Prominent white-matter hypertrophy may result from altered myelination and adaptive glial changes, including gliosis secondary to neuronal damage. These brain substrates may help account for the symptoms of MA abuse, providing therapeutic targets for drug-induced brain injury.

Trimble, M. and A. Freeman (2006). "An investigation of religiosity and the Gastaut-Geschwind syndrome in patients with temporal lobe epilepsy." Epilepsy & Behavior 9(3): 407-414.

Vercuell (2011) Aphasic Seizure. Medlink Neurology

Widom, C. S. (1999). "Posttraumatic Stress Disorder in Abused and Neglected Children Grown

WOD000179

Up." The American journal of psychiatry 156(8): 1223-1229.

OBJECTIVE: The purpose of this study was to describe the extent to which childhood abuse and neglect increase a person's risk for subsequent posttraumatic stress disorder (PTSD) and to determine whether the relationship to PTSD persists despite controls for family, individual, and lifestyle characteristics associated with both childhood victimization and PTSD. METHOD: Victims of substantiated child abuse and neglect from 1967 to 1971 in a Midwestern metropolitan county area were matched on the basis of age, race, sex, and approximate family socioeconomic class with a group of nonabused and nonneglected children and followed prospectively into young adulthood. Subjects (N=1,196) were located and administered a 2-hour interview that included the National Institute of Mental Health Diagnostic Interview Schedule to assess PTSD. RESULTS: Childhood victimization was associated with increased risk for lifetime and current PTSD. Slightly more than a third of the childhood victims of sexual abuse (37.5%), 32.7% of those physically abused, and 30.6% of victims of childhood neglect met DSM-III-R criteria for lifetime PTSD. The relationship between childhood victimization and number of PTSD symptoms persisted despite the introduction of covariates associated with risk for both. CONCLUSIONS: Victims of child abuse (sexual and physical) and neglect are at increased risk for developing PTSD, but childhood victimization is not a sufficient condition. Family, individual, and lifestyle variables also place individuals at risk and contribute to the symptoms of PTSD.

Widom, C. S., S. J. Czaja, et al. (2008). "Childhood victimization and lifetime revictimization." Child Abuse & Neglect 32(8): 785-796.

Widom, C. S., N. R. Marmorstein, et al. (2006). "Childhood Victimization and Illicit Drug Use in Middle Adulthood." Psychology of Addictive Behaviors 20(4): 394-403.

Zeman, A. Z. J., S. J. Boniface, et al. (1998). "Transient epileptic amnesia: a description of the clinical and neuropsychological features in 10 cases and a review of the literature." Journal of Neurology, Neurosurgery & Psychiatry 64(4): 435-443.

OBJECTIVES To clarify the clinical and neuropsychological aspects of transient epileptic amnesia (TEA) based on 10 personally studied cases as well as review of 21 previously published cases; and to propose tentative diagnostic criteria for the diagnosis of TEA.METHODS All 10 patients and informants underwent a standardised clinical interview. The radiological and neurophysiological (EEG) data were also reviewed in all cases. The diagnosis of transient epileptic amnesia was made on the basis of the following criteria: (1) there was a history of recurrent witnessed episodes of transient amnesia; (2) cognitive functions other than memory were judged to be intact during typical episodes by a reliable witness; (3) there was evidence for a diagnosis of epilepsy. This evidence was provided by either (a) wake or sleep

83

WOD000180

EEG, or (b) the co-occurrence of other seizure types (if their roughly concurrent onset or close association with episodes of transient amnesia suggested a connection), or (c) a clear cut response to anticonvulsant therapy, or by a combination of these three factors. In addition all patients were administered a comprehensive neuropsychological test battery designed to assess verbal and non-verbal anterograde memory and retrograde memory for famous personalities and personal events. Their results were compared with those of 25 age and IQ matched normal controls.RESULTS TEA usually begins in later life, with a mean age of 65 years in this series. Episodes are typically brief, lasting less than one hour, and recurrent, with a mean frequency of three a year. Attacks on waking are characteristic. Repetitive questioning occurs commonly during attacks. The anterograde amnesia during episodes is, however, often incomplete so that patients may later be able to "remember not being able to remember". The extent of the retrograde amnesia during attacks varies from days to years. Most patients experience other seizure types compatible with an origin in the temporal lobes, but transient amnesia is the only manifestation of epilepsy in about one third of patients. Epileptiform abnormalities arising from the temporal lobes are most often detected on interictal sleep EEG. Despite normal performance on tests of anterograde memory, many patients complain of persistent interictal disturbance of autobiographical memory, involving a significant but variable loss of recall for salient personal episodes. The epochs affected may predate the onset of epilepsy by many years.CONCLUSIONS TEA is an identifiable syndrome and comprises episodic transient amnesia with an epileptic basis, without impairment of other aspects of cognitive function. Future studies should consider the question of whether TEA reflects ictal activity or a postictal state, and the mechanism of the persistent autobiographical amnesia. It is hypothesised that the latter may result in part from impairment of very long term memory consolidation as a result of epileptic activity in mesial temporal structures.

WOD000181

EXHIBIT A - DATA OR OTHER INFORMATION CONSIDERED BY ME IN FORMING
THE OPINIONS EXPRESSED IN MY OCTOBER 5, 2009 REPORT


1.      Grand Jury Testimonies

        A.      Fred Tokars

        B.      Steve Ferguson

        C.      William LeBaron

        D.      Mike Llorente


2.      Trial Testimonies

        A.      Christy Gaubatz

        B.      David Neimann

        C.      Doug Book

        D.      Kathy Rick

        E.      Pearl Jean Johnson

        F.      Robert McNeese

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 182 of 287

WOD000182

G. Steve Vest

H. Wendy Jacobsen


3. Witness Packets Produced to Trial Experts by Trial Team

A. George Barlas

B. Verleen Vanderpool

C. Wendy Jacobsen

D. Holly Dirksen

E. Jamie Jo Hayes

F. Arlyn Johnson

G. Alyssa Johnson

H. Jim and Cookie Johnson

I. Jim and Shelly Johnson

J. Pearl Jean Johnson

K. Carol Mann

L. David Neimann

M. Janet Neimann

N. Norman Olson

O. Mikell Olson


4. Declarations, Interviews, and Materials Generated Post Conviction by Habeas Team

A. Holly Dirksen (IV and Dec)

B. Sarah Irving (IV)

C. Pearl Jean Johnson (IV and Dec)

D. Alyssa Johnson (IV and Dec)

E. Angela Johnson Interviews

86

WOD000183

F.     Angela Johnson - Woods Assessment

G.     Angela Johnson Referral Questions

H.     Angela Johnson Mitigation Memos by Scharlette Holdman

I.     Angela Johnson Social History Appendix

J.     Index to Background Packets - Dr. Edwards

K.     Wendy Jacobsen (Dec)

L.     Jail Time Lines Generated by Jake Watson

M.     Habeas Team Interviews with Woods

N.     Woods Declaration

O.     Social History Drafts (2) by Scharlotte Holdman

P.     Woods Notes

Q.     Letter for Woods Visitation of Johnson

R.     Woods letter to Burt


5.     Trial Discovery, Notes, Pleadings, Correspondence, Miscellaneous

A.     Angela Johnson Proffer

B.     Government's Amended Resistance to Petitioner's Amended 2255 Petition

C.     Angela Johnson Amended 2255 Petition


6.     Medical Records for Angela Johnson

A.     University of Iowa Hospitals and Clinics, Iowa City, Iowa

B.     Jack Konene Chiropractic Clinic, Forest City, Iowa

C.     Mason City Clinic, Mason City, Iowa

WOD000184

D.    Memorial Hospital, Burlington, Wisconsin

E.    Regency Center Family Clinic, Mason City, Iowa

F.    Mental Health Center of North Iowa, Mason City, Iowa

G.    FCC Carswell, Texas

7.    Social, Police, and Financial Records for Angela Johnson

A.    Social Security Administration Records

B.    Winnebago Industries, Forest City, Iowa

C.    Clear Lake, Iowa, Police Department

D.    Cerro Gordo County, Iowa Sheriff's Department

E.    Mason City, Iowa, Magistrate Court

F.    Wisconsin Department of Vital Statistics

G.    Iowa Department of Vital Statistics

H.    Winnebago County, Iowa, Clerk of Court

8.    Educational Records for Angela Johnson

A.    Mason City, Iowa, Community School District

B.    Meservy-Thornton, Iowa, Community School District

C.    Chanute Public Schools, Neosho County, Kansas

D.    North Iowa Middle School, Community School District

E.    Forest City, Community Middle School and High School

9.    Expert Reports and Data for Angela Johnson Used by Woods

WOD000485

A. Cunningham Report and Notes

B. Dvoskin and Martell Report

C. Gelbort Digital Symbol, Halstead Category Test, Notes, Scoring, Trail Making, WAIS III, WMS III, Wrat 3

D. Hutchison Report

E. Logan Report

F. Young Report, Halstead-Reitan, Data Tables

10. Angela Johnson Family Records

A. Eau Claire County, Wisconsin Clerk of Court

B. Garner-Hayfield High School

C. Mercy Hospital, Mason City, Iowa

D. Pearl Jean Johnson Writings

WODO000188

GEORGE W. WOODS, Jr., MD-APC
4200 Park Boulevard # 545
Oakland, California 94602
(866)-646-0509 phone
gwoods@georgewoodsmd.com


June 9, 2011

Michael Burt, Esq.
600 Townsend Street, Suite 329e
San Francisco, California


*RE: United States v. Angela Johnson,  Case No. C 09-3064*-MWB


Dear Mr. Burt,

In preparation for my upcoming testimony, I have been reviewing my report and in doing so I have discovered a couple of errors that I wanted to bring to your attention. They are:

Page 19: "In addition to frontal lobe dysfunction..."

This should read: "In addition to temporal lobe dysfunction..."

Page 39 : "Two tests of frontal lobe function, The Wisconsin Card Sorting  Test and the Booklet Category  Test, were within normal limits, reflecting parts of her frontal lobes that are intact."

This should read "The Booklet Category Test was within normal limits, reflecting parts of her frontal lobes that are intact."

Page 42, n. 73: "A March 25, 1996 psychiatric evaluation by Dr. Lassise resulted in an Axis I diagnosis of major depression and an Axis II disorder of 'dependent personality features.' (Mental Health Center of Northern Iowa Rrecords). These records focus almost exclusively on Ms. Johnson's dependent relationship with her daughter and do not take into account Ms. Johnson's pathological relationships with Terry DeGues or Dustin Honken."

Records has an extra capital R and Mr. DeGeus's name is incorrectly spelled.


1

WOD000187

Page 50: "Mr. Honken arrived, and told them to follow him. Ms. Johnson and Mr. DeGeus followed.  She recalled she and Mr. Honken crying together. She was telling him how sorry she was about being pregnant. He was telling her that she was with a dangerous man, Mr. Honken, and that he was not the person he portrayed himself to be."

The third sentence should read "She recalled she and Mr. DeGeus crying together."

Page 52: " She says was warned about Dustin Honken She saw behavior that should have warned her."
These sentences should read, "She says she was warned about Dustin Honken. She saw behavior that should have warned her. "


Page 56: " The controlling and limitation of options played directly into Ms. Johnson's dysexecutive functioning, her effective inability to weigh and deliberate, and to understand and response to social context."

Response should be respond

I apologize for these errors and look forward to seeing you next week.


George Woods, MD

2

WOD000188

# Angela Johnson

George Woods, MD

June 15th, 2011

Case 3:09-cv-03064-MWB-LTS    Document 264-29    Filed 06/23/11    Page 189 of 287

WOD000189

# Referral Questions

- **I.** **Referral Questions**

- At the request of counsel, I performed a neuropsychiatric evaluation of Ms. Angela Johnson, a 46 year old divorced white female. The specific referral questions I was asked to address were:

- Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

- Could the defendant have reasonably foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.

- Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

- Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?

- Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Did the defendant's impairments and medications inform her demeanor at trial?

- Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?

WOD000190

# Conclusions

- Ms. Johnson suffers from temporal lobe disease.

- Ms. Johnson suffers from cognitive impairments more global than her temporal lobe disease.

- Ms. Johnson's medications at the time of trial impaired her cognition and her ability to rationally assist her attorneys.

WOD060191

# Conclusion

- Ms. Johnson suffers from profound trauma. At her trial, the relationship between her genetic inheritance, her trauma, her social deterioration, and the offenses for which she was charged were not allowed to be made.

WOD000192

# Symptoms of temporal lobe dysfunction

- unusual spiritual/religious beliefs,
- a heightening of emotion (mood lability),
- elation,
- obsessionalism ,
- paranoid ideation,
- dependence,
- circumstantial speech,
- and aggression.

WODo00193

# Temporal lobe dysfunction

- A neurological disorder with psychiatric manifestations



WOD000194

# Temporolimbic system

- Fear, emotional depth, attention, psychosis



WOD000195

# An Emotional Memory System



WOD000196

# Electrical activity affects language, behavior, thinking



WOD000197

# Characteristics attributed to temporal lobe epilepsy



B4

TABLE 1. Characteristics Historically Attributed to Temporal Lobe Epilepsy*

| Inventory Trait | Reported Clinical Observations |
| --- | --- |
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease. |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Agression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

*Adapted from Bear and Fedio,[10] with permission.

Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 198 of 287

WOD000198

# From Psychiatric to Neurological…

- In recent times, especially with the unraveling of cerebral circuitry for the expression of emotions, notably with a fuller understanding of the limbic lobe and the role of such structures as the hippocampus and the amygdala in emotional behaviors, a biological interpretation of many behaviors previously thought of as socially driven becomes possible. Epilepsy very often relates to chronic neurophysiological changes in such limbic structures, and its relation to religiosity provides an opportunity to explore in more detail the neurobiology of such behavioral predispositions.[1]

  - 1 Trimble, M. and A. Freeman (2006). "An investigation of religiosity and the Gastaut-Geschwind syndrome in patients with temporal lobe epilepsy." Epilepsy & Behavior 9(3): 407-414.

WOD000199

# Temporal lobe dysfunction:

- Familial

- Ongoing

- Displayed as thinking, emotion, rather than motor behavior

- Inter-ictal, not just peri-ictal

- Bipolar and psychotic presentations

Case 3:09-cv-03064-MWB-LTS    Document 384-39    Filed 06/23/11    Page 200 of 287
WOD000200

# Florence Jensen

- "Sarah heard the grandmother hitting a tire hanging from the ceiling for hours at a time." (Sarah Ewing Interview with Scharlette Holdman, July 20, 2009)
- (Angela Johnson)reports that they and her mother, believing her to be troubled by "evil spirits," would hold her down for hours at a time and pray loudly over her.[1]
  - 1Dvoskin/Martell report, p. 18.

WOD000201

# Florence Jensen

- She and my grandparents did terrible things to Angela to get rid of the Deaf and Dumb Demons.
- They held her down on the floor or on the dining room table,
- they put her in a closet,
- they hit, shook, and screamed at her,
- they threatened her,
- they chanted over her, and
- they stayed ever alert to see if she showed any signs that they needed to do it again.
- These exorcisms happened over and over again and terrified Angela.

WOD000202

# Pearl Johnson

- Pearl Johnson-paralyz[ing]" depression all her life. [1]

  - 1  Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 1.

- Pearl Began to hear sounds as a child, and voices after Angela's birth

- Able to work, got married, had children

- Has the power to heal

WOD000203

# Pearl Johnson

- I have special powers that others do not have.
- I can see the future.
- I can hear and see things that others can not hear and see.  Sometimes these things are scarey and bring me to my knees.  Sometimes these things make me full of joy.
- Sometimes I only hear one word and it takes me a long time to figure out what the word means.[1]
  - 1 Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 2-3.

WOD000204

# The Deaf dumb demon

- When Angela was small I thought she was retarded and possessed by demons because she had periods when she did not answer me and did not respond to things around her. She stared off to the side or straight ahead as if she was not in her body or as if she was in another world. It frightened me and I thought I had to do something or she would be taken over forever by demons.[1]

  - 1 Declaration of Pearl Jean Johnson, Sept. 27, 2009, p. 2-3.

WOD000205

# Deaf Dumb Demon

- Angela describes periods when she felt like "I couldn't understand what my mother was saying, almost like her voice was coming through a cloud or something." (Woods interview)

- Her daughter suffers from the same "underwater language."

WOD000206

# Deaf Dumb Demon

- **Differential diagnosis**
Suspension of ongoing speech often occurs during epileptic seizures. However, in most cases, it relates to an altered state of consciousness, namely "loss of contact," making the patient unable to purposefully interact with his environment, either verbally or not. Such patients are not truly aphasic, but don't use language, since they are not able to use it. Another challenging task is to correctly distinguish between isolated mutism and aphasic seizures. Mutism is represented by a refusal to speak although the mechanism of speech is not damaged. In ictal mutism the patient is denying any verbal relationship with relatives or caregivers during the seizure. (Vercuell (2011) Aphasic Seizure. Medlink Neurology )

WOD000207

# Angela Johnson's brain problems-More than lack of formal education

- Testing with the WAIS-3 revealed that Ms. Johnson has a Full Scale IQ in the "Average" range (91), with a Verbal IQ in the "Low Average" range (84) and a Performance IQ in the "Average" range (102). The 18-point difference between her verbal and performance IQ scores is statistically significant ($p < .05$), occurring in only 10.7% of the normative population. This finding indicates that her verbal abilities are not as well developed as her visual-spatial problem solving skills, and reflects her lack of formal education after the 9th grade. [1]
  - 1 Dvoskin/Martell report, page 28.

WOD000208



Case 3:09-cv-03064-MWB-LTS    Document 284-29    Filed 06/23/11    Page 209 of 287
WOD000209

THE NEW ENGLAND JOURNAL of MEDICINE

# Episodic Memory

- Left medial temporal and left frontal lobes are most active when a person is learning words[6]

- Right medial temporal and right frontal lobes are most active when learning visual scenes

WOD0002 10

# Angela Johnson's brain problems

- Mr. Braun recalled that Ms. Johnson was a "resource" student, a designation term that replaced "special ed." (Post declaration)

- (Jim Jacobsen)  recalled that Ms. Johnson was a resource student and that she was not disruptive. (Post declaration)

- The letter grade A stood for Acceptable in the Colorado school system

WOD0002 11

# Angela Johnson brain problems

- "Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety." (Dvoskin/Martell report, page 32)

WOD000212

# Education is not the same as information

- Ms. Johnson thought there were 48 weeks in a year

- Her lowest WAIS-III subtests were similarities, mathematics, vocabulary, and information

WOD000213

# Angela Johnson's brain problems

- Ms. Johnson "talked about a personal perception of struggling to learn and descriptions of her reversing her letters." (Cunningham Testimony, p. 3849)

- Angela was never realistic and always gullible; she had no judgment about people at all... [1]

  – 1 Holly Dirksen Declaration, p. 4.

WOD000214

# All of my mother's emotions were intense

- She really couldn't take care of herself when depression came on.
- It was the exact opposite when her mood changed and she started projects or new jobs.
- She went from one extreme to the other.
- At the other end of depression was her thinking everything was perfect, wonderful, and marvelous, even when I knew we were headed for disaster.
- Nothing could change her mind, though.
- She had absolutely no judgment; it was like she was in another world.[1]
  - 1 Alyssa Johnson Declaration, p. 1-2.

WOD0002 15

# Angela Johnson

## Frontal lobe impairments

WOD000216

# Executive functions monitor stressful situations

- Executive functions refer to high-order functions operating in non-routine situations such as novel, conflicting or complex tasks…

- Impairment of frontal-damaged patients was mainly due to the deficit of generation of abstract principles, and to a lesser extent, to deficit of cognitive flexibility and inability to use knowledge to regulate behaviour. … (Godefroy, *Frontal syndrome and disorders of executive functions;* Journal of Neurology, 2003, page 1)

- .

WOD000217

# Specific deficits were found on tests of executive function

- …her abilities on several EFT tests were within the average range, (pointing out anatomic areas within the frontal lobes that work)
- her ability to scan, and sequence both numbers and letters was significantly impaired (Trail Making Tests)
- Her ability to initiate, simultaneously and flexibly process verbal information was significantly impaired (Verbal Fluency).
- Her ability to inhibit and flexibly shift thinking was significantly impaired (Color-Word Interference).
- Her ability to categorize and use information that was provided to solve a problem was significantly impaired (20 Questions).
- Impairment ranged from mild to severe. (Young report)

WOD000218

# Specific deficits were found on tests of executive function

- Angela Johnson's abilities on WCST variables were also significantly impaired.

- She made a significant number of errors in her ability to respond to information that she was provided by the test.

- Her ability to identify the problem, respond in a way which accurately solved the problem, and flexibly change her problem solving actions based on information as to whether her actions were accurate or inaccurate were significantly impaired. (Young report)

WOD000219

# Ms. Johnson's' understanding of social context is impaired.

- On the CATS, her ability was significantly impaired.
- Overall facial recognition (ARQ), overall emotional recognition (ERQ) and overall ability to identify emotion by the tone of voice (PRQ) were all in the impaired range.
- Her ability to discriminate facial affect, match facial affects, process emotional tone of voice, match tone of voice with facial emotional expression, identify emotional tone, identify meaning of emotional tones, match emotional tone with facial expression, and identify emotional content with congruent or conflicting emotional tone were all impaired.
- Prefrontal, anterior temporal, limbic amygdala dysfunctions are indicated. Impairment within orbitofrontal, dorsolateral, and mesial prefrontal cortex was indicated, with impairment ranging from mild to severe. [1]
  - 1 Young report, pp. 9-10.

WOD000220

# What does it mean to have problems with executive functioning?

- Impulsivity

- Poor Judgment

- Dependence

- Impaired decision making

- Inappropriate social actions

- Cannot effectively weigh and deliberate

Case 3:09-cv-03064-MWB-LTS     Document 284-29     Filed 06/23/11     Page 221 of 287

WOD000221

# What did it mean for Angela Johnson to have frontal lobe problems?

- In many ways, Angela is like our mother.  Neither one of them can really function on their own.
-  Angela tried as hard as she could, and worked hard, just as Mother worked hard.
-  They are both so gullible, though,
-  they believe anything and can't plan ahead to know what will work and what won't work.
- Angela always had to move from place to place after she moved out - just like my mother always moved from place to place, from one failed idea to the next.
- Angela also depended on other people, the same way Mother needed others. (Wendy Jacobsen declaration)

WOD000222

# Angela Johnson's temporal and right parietal lobe impairments make her vulnerable to dissociative phenomena

It has long been thought that DP may have an organic etiology. Mayer-Gross14 regarded it as resulting from a "preformed functional response of the brain," and Ackner15 as "the result of a cerebral dysfunction, which itself is specific, but which may be set in motion by a number of different causes." Ackner15 asserted that DP occurs in a variety of conditions, including epilepsy, head injury, encephalitis, tumor, chorea, intoxication, carbon monoxide poisoning, and toxic and delirious states. Despite this extensive list, most subsequent studies have focused on the first two conditions.

(Lambert et al; *The Spectrum of Organic Depersonalization:* A Review Plus Four New Cases; Journal of Neuropsychiatry and Clinica Neuroscience, 2002, page 1142)

WOD000223

- Clock in here

WOD000224

# Neuroimaging supports historical, neurospychological and clinical findings

WOD000225

# Significant changes in Angela Johnson's brain

- FINDINGS:
- The CSF containing spaces are normal in size, shape and position. Small scattered bilateral subcortical and periventricular FlAIR and T2 hyperintensities involve the deep white matter of bilateral cerebral hemispheres. The brain parenchyma is otherwise of normal signal and contour characteristics. No focal mass, midline shift, intracranial hemorrhage or acute infarction. Gray/white differentiation is normal. The pituitary, midbrain, brainstem, as well as the craniocervical and cervicomedullary junctions are within normal limits. The visualized flow -voids of the central arteries and the major dural sinuses are within normal limits. No abnormal areas of enhancement.
- IMPRESSION:
- 1. Atrophic changes.
- 2. No acute Infarct or hemorrhage.
- 3. Nonspecific T2/FI.AIR hyperintensities. Differential considerations include but are not limited to microvascular ischemic changes multiple sclerosis, vasculitis, Lyme disease and other demyelinating/dysmyelinating processes.[1]
- 1Tarrant County Hospital District Imaging report, 2/9/2011

WOD000226

# Significant findings on Angela Johnson's EEG tracing and PET

- "(t)he PET and the EEG show left temporal lobe hypometabolism and and lesser frontal lobe hypometabolism." (James Merikangas, MD, Board-certified Neurologist and Board-certified Psychiatrist)

WOD000227

# Dr. Gelbort's discussion with Mary Goody

- Mitigation specialist Mary Goody did speak to Dr. Gelbort shortly after he concluded his testing and according to her notes he told her that Ms. Johnson "had some memory disturbance",

- that "she had an 18-point differential spread between her verbal and performance IQ which is statistically significant as if one hemisphere is -- one hemisphere of the brain has damage and the other doesn't",

- that she had "difficulty seeing consequences for her actions",

- that "her intuitive reasoning is mildly impaired",

- that "that her brain has holes in it, ... like cheese, Swiss cheese,

WOD000228

# Angela Johnson has impaired cognitive functioning

- Temporal lobe dysfunction-academic impairments, mood lability, deepened emotionality, religiosity

- Frontal lobe dysfunction-poor understanding of social context, mental inflexibility, poor problem solving skills, dependency, impulsivity

- Parietal lobe dysfunction-cannot see big picture, vulnerable to dissociation

WOD000229

Angela Johnson's impaired brain was the fragile foundation for her profoundly traumatic upbringing.

The combination created greater and more atypical symptoms, more severe behaviors, and deeper deficits

WOD000230

# Trauma adds to disinhibition, impulsivity, poor judgment

- Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. **For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults**. In addition, interpersonal traumas are likely to have more profound effects than personal ones ... The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage ...[1]
  - 1 Bessel VanDer Kolk, Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185

WOD000231

# Complex Trauma

- We define *complex psychological trauma as resulting from exposure to severe stressors that*

- *(I) are repetitive and prolonged,*

- *(2) involve harm or abandonment  by caregivers or other ostensibly responsible adults, and*

- *(3) occur at a developmentally  vulnerable times in the victim's life, such as early childhood or adolescence when critical periods of brain development are rapidly occurring or being consolidated... Complex posttraumatic sequelae are changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotional dysregulation, somatic distress, or relational or spiritual alienation, hereafter referred to as complex traumatic stress disorders.[1]*

  - 1 Ford, et. al, Treating Complex Traumatic Stress Disorders; an evidence-based guide; Guiliford Press, 2009, p. 13.

# The combination of trauma and brain impairment created

- Revictimization/acquiescence

- Dependence

- Chemical dependency

- Multiple psychiatric symptoms

- Disastrous Relationships

- Poor decision making

WOD000233

# Brain problems plus trauma

`   As children, we came to believe that the devil or demons were in us and were terrified of our own selves. It was very confusing to think that another being or thing could take over our bodies and minds and destroy us. Mother's decision that we were showing signs of being possessed did not make any sense to us and came out of the blue from hour to hour or day to day. If she thought she observed something demon like in us or our behavior, she immediately began to exorcise or get rid of the spirit. **Everyone of us kids but Angela figured out how to avoid her thinking we were possessed or how to show the demon had left us if we were possessed. Angela could never figure out how to change her behavior so Mother would not want to exorcise her.** (Wendy Jacobsen declaration)

WOD000234

# Brain problems plus trauma

- Mother made up names for all these demons and at one time named them after twelve Indian tribes like Algonquin. She also made up a special demon for Angela and announced that Angela was possessed by the Deaf and Dumb Demons. She and my grandparents did terrible things to Angela to get rid of the Deaf and Dumb Demons. They held her down on the floor or on the dining room table, they put her in a closet, they hit, shook, and screamed at her, they threatened her, they chanted over her, and they stayed ever alert to see if she showed any signs that they needed to do it again. These exorcisms happened over and over again and terrified Angela. She screamed, begged, cried, and ran from them, but they caught her and held her down. She fought back as hard as she could to make them let her go, but they never gave up. She was totally powerless and no one protected her. I couldn't protect her, either, even though I tried to  make them stop hurting her. [1]
    - 1  Wendy Jacobson declaration, Doc. 1-13, p. 3-4.

WOD000235

# Brain problems plus trauma

- Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together.
- Her mood swings got worse.
- She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her.
- Her pregnancy made everything worse.  Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it.
- She was just as worried, if not more, about Dustin.  She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently.
- Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him.  She was pregnant and her hormones seemed to push her over the edge.
-  She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times.
-  The slightest thing irritated and overwhelmed her. [1]
    - 1 Holly Dirksen Declaration, pp. 1- 2.

WOD000236

# Revictimization: Terry DeGeus and Dustin Honken

- Her dissociation, acquiescence even in the face of attempting to maintain some sense of self, is the hallmark of Angela's trauma, and she manifests continued symptoms of revictimization after the trauma of her home. [1]  Much of her life was traumatic, but the stressors and chaos arising from her toxic and fatal relationships with Terry DeGeus and Dustin Honken stand out.

    - 1 Widom, C. S., S. J. Czaja, et al. (2008). "Childhood victimization and lifetime revictimization." Child Abuse & Neglect 32(8): 785-796.

WOD000237

# Terry DeGeus

- Multiple police interventions
- Feared for her life
- Sexually assaulted
- Beaten
- Stalked
- Yet…

WOD000238

# The Love of her life

- Angela's inability to effectively weigh and deliberate drew her to Terry DeGeus over and over.

- Often she would make plans without being able to see the bigger picture, and would become involved with him again.

- Yet, Angela understood something about Terry DeGeus that prevented her from hating him.

- She believed his violence and mistreatment of her was secondary to his drug use, not a reflection of his true personality:

WOD000239

# Her relationship with Dustin Honken was different

- …Dustin mindfucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from and knew the results with Dustin. Everything that came out of his mouth was a lie.[1]
  - 1 Martell/Dvoskin interview. at 91.

WOD000240

# Ms. Johnson was intimidated by and fearful of Mr. Honken

- She feared he would kill her because she was a witness

- He told her he knew contract killers

- She had seen his manipulation of others as well as herself

- She had seen him kill and says he threatened her with her knowledge

- She hoped having his child would keep her and her family alive

WOD000241

# Trauma and brain impairment created Ms. Johnson's vulnerability to drug abuse

- The high prevalence of the comorbidity of substance use disorders and PTSD has been reported in a number of studies. Initial reports focused on veterans with PTSD, of whom 64%-84% met the criteria for a lifetime alcohol use disorder and 40%-44% met the criteria for a lifetime drug use disorder, including nicotine dependence (54, 55). In civilian populations with PTSD, estimates of the lifetime prevalence of substance use disorders range from 22% to 43% (56, 57), far higher than the estimates for substance use disorders in the general population.[1]

    - 1 Brady (2005). "Co-Occurring Mental and Substance Use Disorders:The Neurobiological Effects of Chronic Stress." American Journal of Psychiatry: 1483-1493.

WOD000242

# Trauma and brain impairment created Ms. Johnson's vulnerability to dissociation

Dissociation, as defined by Spiegel et al is:

The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings, and attitudes.[1]

1 Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

WOD000243

# Ms. Johnson meets the criteria for Dependent Personality Disorder

- **Individuals with Dependent Personality Disorder are often characterized by pessimism and self-doubt**,
- **tend to belittle their abilities and assets**,
- **and may constantly refer to themselves as "stupid."**
- They take criticism and disapproval as proof of their worthlessness and lose faith in themselves.
- **They may seek overprotection and dominance from others**.
- Occupational functioning may be impaired if independent initiative is required. They may avoid positions of responsibility and become anxious when faced with decisions.
- **Social relations tend to be limited to those few people on whom the individual is dependent. There may be an increased risk of Mood Disorders, Anxiety Disorders, and Adjustment Disorder.**
- Dependent Personality Disorder often co-occurs with other Personality Disorders, especially Borderline, Avoidant, and Histrionic Personality Disorders.
- Chronic physical illness or Separation Anxiety Disorder in childhood or adolescence may predispose the individual to the development of this disorder.
- **Many individuals display dependent personality traits. Only when these traits are inflexible, maladaptive, and persisting and cause significant functional impairment or subjective distress do they constitute Dependent Personality Disorder** (DSM-IVTR)

WOD000244

# Dependent Personality Disorder

- Diagnostic criteria for **301.6** Dependent Personality Disorder
- A pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following: has difficulty making everyday decisions without an excessive amount of advice and reassurance from others
- **needs others to assume responsibility for most major areas of his or her life**
- has difficulty expressing disagreement with others because of fear of loss of support or approval. **Note:** Do not include realistic fears of retribution.
- **has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)**
- **goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant**
- **feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself**
- Many individuals display dependent personality traits. **Only when these traits are inflexible, maladaptive, and persisting and cause significant functional impairment or subjective distress do they constitute Dependent Personality Disorder**(DSM-IVTR)

WOD000245

# Dr. Lassise considered dependency

- A March 25, 1996 psychiatric evaluation by Dr. Lassise resulted in an Axis I diagnosis of major depression and an Axis II disorder of "dependent personality features." (Mental Health Center of Northern Iowa records). These records focus almost exclusively on Ms. Johnson's dependent relationship with her daughter and do not take into account Ms. Johnson's pathological relationships with Terry DeGeus or Dustin Honken.

WOD000246

# Angela Johnson Mental Status Examination

- Oriented to person, place, date, circumstance
- Occasional lapses of concentration.
- Labile mood
- Easily distractible
- Attended to environment appropriately
- Right leg shaking most of interviews
- experienced writing on her left palm to be reversed, reflecting sensorimotor abnormalities. [1]
  - 1 "The authors show convincingly that a left inferior temporo-occipital area is differentially engaged in normal control subjects as early as 180 msec after onset of the visual word. It is important that both the electrophysiological and the anatomical data are consistent with results obtained by other methods (eg, depth electrodes and positron emission tomographic results [7, 81]). Salmelin and colleagues [3] suggest that the primary reason for adult dyslexia is probably the left inferior temporoparietal area dysfunction implicated by their study." Poeppel (1996). "Magnetic Source Imaging and the Neural Basis of Dyslexia." Annals of Neurology 40: 137-138.

WOD000247

# Angela Johnson Mental Status Examination continued…

- Ms. Johnson's thought processes reflected tangentiality and, at times, flight of ideas.
- Her thought content displayed some referential thinking and oddities of thought, including hyperreligiosity, beliefs in spiritual concepts like ghosts, aliens, and witches.
- She acknowledged childhood auditory, visual, and tactile hallucinations.
- She also describes an "engine" in her head, a constant noise that has been in her head her entire life.

WOD000248

# Angela Johnson Mental Status Examination continued…

- Affective range was extremely broad.  Ms. Johnson was often literally laughing and crying at the same time.
- This was accompanied  by a deepened emotionality on both poles
- Mood was labile, with little impediment on either end of her affective range. She would cry, and the laugh out loud.
-  Her sense of humor, while ready, was often inappropriate to the content of the interview.
-  She denied suicidality.
- She was future oriented, in terms of recognizing the potential options for her future.
- Insight was impaired by her heightened emotionality and mood lability.  She acknowledged that her emotionality prevented her from being able to work through a problem, even if she had the technical ability to do so.
- She understands her current circumstances.
- Her ability to describe her personal psychological state is impaired by significant negativity.
- Judgment is grossly impaired by her disinhibition and affective dysregulation.

WOD000249

# Angela Johnson Mental Status Examination continued…

- Ms. Johnson could not  divide 54 by 3.  She did describe a strategy of multiplying 5 x 3, which would give you 15, then adding three 15s, which would give you 45. She was unable to solve this problem in her head.

- Her constructional ability was impaired.  She was asked to draw a clock and make the hands say 6:25.  She initially drew 3 hands, erased one hand, and the other hands were placed backward on the clock to read 5:35.

- Abstract thought was impaired.   Consistent with limited IQ testing at the time of her trial, her impaired similarities and vocabulary, plus a poor fund of information, limit abstracting ability

WOD000250

# Dr. Martell/Dvoskin recorded Ms. Johnson's impairments

- Her observable affect impressed as broad, bright, and comfortable. She was affable, easy- going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children.[1]

  - 1 Dvoskin/Martell report, page 31.

WOD000251

# Dvoskin/Martell observations continued…

- "Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety." [1]
  - 1 Dvoskin/Martell report, page 29.
- "Ms. Johnson did report greater than 20 beatings to her head during her abusive relationship, but stated that none resulted in loss of consciousness."[1]
  - 1 Dvoski/Martell report, p. 29.

WOD000252

# Drs. Martell/Dvoskin report behaviors consistent with brain problems and trauma

- Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother
- Behavioral problems at school: including difficulty paying attention
- Bedwetting 2x per week until the 4th grade o Nail biting and picking at her fingers
- Difficulty paying attention
- Depression: "I'm sure I was depressed my whole life."
- Aggression: Fights with her sister, and at school
- Shyness: "Came as I got older."
- Nightmares: "Bad dreams about my mother; pig and rabbit things."
- Poor self-esteem: "Mom beating devils out of me; made me feel stupid and ugly."
- Unpredictable: "I've always been impulsive."
- Frustrates easily: "If I  couldn't do or accomplish something."
- Daydreaming
- Easily distracted: "Couldn't concentrate; now it's OK."
- Fidgety I Trouble sitting still: "foot rocking"
- Childhood headaches [1]
  - 1 Dvoskin/Martell report,  p. 30.

WOD000253

# Current Diagnoses

- AXIS I:
- A. MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.
- B. COGNITIVE DISORDER NOS
- C. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC
- D. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION
- AXIS II: DEPENDENT PERSONALITY DISORDER
- AXIS III:
- A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.
- B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.
- C. DYSEXECUTIVE SYNDROME, SECONDARY TO FRONTAL LOBE IMPAIRMENT.
- D. PARIETAL LOBE DYSFUNCTION
- AXIS IV: LEGAL PROBLEMS
- AXIS V: GAF = 60

- Ms. Johnson has global cognitive deficits. However, those most relevant to this case are her temporal lobes, frontal lobes, and right parietal lobes:
- 1. Her temporal lobe dysfunction manifests in emotional lability and deepening of emotional poles, unusually spiritual beliefs, academic impairments, gullibility, impaired autobiographical memory, irritability, grandiosity and depression.
- 2. Her frontal lobe dysfunction, dysexecutive function, impairs her ability to effectively weigh and deliberate circumstances, to respond to social cues and context, to inhibit impulsive behavior, and to modulate her affect. These neurological deficits lend themselves to her significant dependency issues.
- 3. The right parietal lobe is the seat of neurologically-induced dissociation and augments Ms. Johnson's traumatogenic dissociation.
- Ms. Johnson also had dysfunction of other neurological systems, as Dr. Young and Dr. Martell have noted. These include her motor functioning, including fine motor functioning and right lower extremity functioning. Ms. Johnson has significant attentional problems, and limbic dysfunction as well.

WOD000254

# Diagnoses at the time of the offense

- AXIS I:
- A.  MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.
- B. COGNITIVE DISORDER NOS
- C.  POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC
- D.  SUBSTANCE ABUSE, METHAMPHETAMINE, CHRONIC
- AXIS II: DEPENDENT PERSONALITY DISORDER
- AXIS III:
- A. PREGNANCY
- B.  HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY  INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY  SIGNIFICANT DECREASED VERBAL PERFORMANCE  ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.
- C.  HISTORY OF MIGRAINES  WITH GASTROINTESTINAL  AURAE, PHOTOPHOBIA.
- D.  DYSEXECUTIVE SYNDROME, SECONDARY TO  FRONTAL LOBE IMPAIRMENT.
- E. PARIETAL LOBE DYSFUNCTION
- AXIS IV: EXTREME INTIMIDATION INTER-PERSONAL RELATIONSHIPS
- AXIS V: GAF = 40

WOD000255

# Diagnoses at the time of trial

- AXIS I:
- A.  MOOD DISORDER, SECONDARY TO A GENERAL MEDICAL CONDITION. TYPE OF MOOD DISORDER: BIPOLAR. TYPE OF GENERAL MEDICAL CONDITION: TEMPORAL LOBE DYSFUNCTION.
- B. COGNITIVE DISORDER NOS
- C.  POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC
- D.  SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION
- E.  ZOLOFT INTOXICATION,  ACUTE
- AXIS II: DEPENDENT PERSONALITY DISORDER
- AXIS III:
- A.  HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY  INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY  SIGNIFICANT DECREASED VERBAL PERFORMANCE  ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.
- B.  HISTORY OF MIGRAINES  WITH GASTROINTESTINAL  AURAE, PHOTOPHOBIA.
- C.  DYSEXECUTIVE SYNDROME, SECONDARY TO  FRONTAL LOBE IMPAIRMENT.
- D. PARIETAL LOBE DYSFUNCTION
- AXIS IV: LEGAL PROBLEMS
- AXIS V: GAF = 40

WOD000256

# Forensic Formulation

Case 3:09-cv-03064-MWB-LTS    Document 384-29    Filed 06/23/11    Page 257 of 287

WOD000257

**1. Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?**

- Yes
- Suffered from neurologically derived problems with problem solving, understanding social contexts, protecting herself, making good judgments, controlling her emotions, responding to stress
- Coupled with trauma based acquiescence, dependency, dissociation, affective dysregulation, poor coping skills, dependency
- Faced with realistically dangerous, life threatening intimidation to her and her family

WOD000258

# Testimony of Ms. Gaubautz

- [S]he said that they did end up finding [Nicholson] that night and couldn't once again find him alone, so they just went ahead and were going to confront him with whoever he was with, and I had never heard Lori Duncan's name before this, and she said that Greg had been staying at this woman's house. And she said that she had taken the cosmetics bag that night, and they went -- her and Dustin Honken had gone to the house, to Lori Duncan's house. And she described how she knocked on the door, and when Lori answered it, she said that she was supposed to be giving a demonstration but she couldn't find the address, didn't have the correct address, could she please use her look at her phone book. And Lori let Angela Johnson in, and she said Dustin Honken had followed her in.....*She described that it was very chaotic in the house.....She said that Dustin Honken ended up shooting both of them, both of the adults, and he ultimately came back to the car and -- and took the little girls and did the same....She was very emotional while she was telling me about it.*[1]

  1 Gaubatz Trial Testimony, Volume 3, 5/9/05; at p.606-610

- "[s]he had been having trouble sleeping, nightmares, thinking that there was people outside her house, somebody was coming to get her. She was very, very paranoid." [1]
  - 1 Id. at p. 611-614.

# Ms. Johnson's description of Nicholson homicide

- Mr. Honken told her she needed protection against Mr. DeGeus.
- She applies for gun permit in her correct name.
- Tech 9 is bought. She disagrees with Mr. Honken about choice, but acquiesces.
- Her tells her there is no choice but to kill Mr. Nicholson.
- She pretends she is lost. Gains entry to the home.
- Mr. Honken follows.
- She takes the children and mother upstairs. They pack a bag.
- Mr. Honken binds mother and father. Children ride in front of truck with Ms. Johnson.
- They drive to location, unknown to Ms. Johnson.
- Mr. Honken takes parents out and shoots them.
- In spite of her protestations, he tells her she has no choice.
- He takes the children out of the truck and shoots them.
- Mr. Honken buries them.

WOD000260

# Ms. Johnson's description of the DeGeus homicide

- Mr. Honken continually discussed there was no choice but to kill Mr. DeGeus.
- When Mr. Honken told her to call Mr. DeGeus to meet her, she initially said she did not know why. When pressed, she said could not admit to herself she knew what was going to happen.
- Ms. Johnson called Mr. DeGeus's mother and asked her to have Mr. DeGeus to call her.
- He returned her call, and she asked him to meet her at her employer's parking lot.
- He met her, and shortly thereafter, Mr. Honken arrived.
- She and Mr. DeGeus rode in the same car. She told him how sorry she was to be pregnant by Mr. Honken.
- According to Ms. Johnson, they both cried, and he told her to watch out for Mr. Honken.
- When they arrived at the location, Mr. Honken and Mr. DeGeus got out and walked away.
- Ms. Johnson denies hitting Mr. DeGeus or seeing him after he and Mr. Honken walked away.

WOD000261

# Mental state at the time of the offense

- Ms. Johnson describes recalling patches of the events, consistent with dissociation

- She describes herself being frantic, crying, fearful, consistent with Ms. Gaubatz's testimony

- She also recalls telling Mr. Honken on both occasions not only would she never tell anyone, and that there was no choice, as he had said.

- She believed his assertion that he would and could have her killed.

WOD000262

# Factors at work at time of the offense

A. Trauma
1. Acquiescence
2. Numbing of affect
3. Revictimization
4. Affective dysregulation
5. Overwhelming fear
6. Dependency
7. Intimidation

B. Brain Deficits
1. Impaired emotional control
2. Defective ability to weigh and deliberate
3. Limited coping mechanisms
4. Vulnerability to dissociation
5. Impaired judgment, especially under stress

WOD000263

**Could the defendant have reasonably have foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person?**

- As it relates to Mr. DeGeus's death, Ms. Johnson was incapable as a result of impairments in judgment and insight, and in ability to plan and predict consequences, of understanding and predicting outcomes of situations in a normal way.

- After the death of Greg Nicholson and the Duncans, Ms. Johnson may have understood the potential consequences of aiding Mr. Honken.

- Her own life was at stake, and her ability effectively weigh options was cognitively compromised. Her parietal lobe deficits point to someone who cannot get the bigger picture, yet I believe it was overwhelming fear of - and domination by - Mr. Honken that precluded her being able to act.

WOD000264

# Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

Yes. In my professional opinion, Mr. Johnson was suffering from the following symptoms at the time of the offenses.

- anxiety,
- hyper-reactivity,
- numbing of affect,
- exaggerated startle response,
- continuing fear for her life and that of her children.
- She has impaired ability weigh and deliberate her actions or the actions of others.
- These conditions result in severe mental and emotional disturbances. Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally.
-  Her moods are extremely labile, cycling inappropriately  from grandiosity to depression.
- She dissociates and functionally disappears from consciousness periodically as result of her disorders.
- All of these conditions are exacerbated by incidents of extreme stress, methampehamine use and withdrawal, and pregnancy.

WOD000265

# Multiple impairments create more severe symptoms

Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such destructive relationships, reveals a limited perspective and narrow focus to their existence....[I]t is a prominent awareness of the limitations existing in the degrees of freedom they have in their lives....They have a sense of being caught in the grips of powerful forces with which they cannot deal. Even more ominous is a situation in which a person is not aware of the degree to which he or she is distorting the assessment of the person with whom he or she is involved. [1]

- 1 Malmquist, Carl, "Dependent Personality Disorders and Killing", in, Homicide: A Psychiatric Perspective, American Psychiatric Press, Washington, DC, 1996, page 156.

WOD000266

**Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?**

- Yes
- Abundant evidence establishes that Dustin Honken is a calculating and manipulative person.
-  As a result of Ms. Johnson's multiple brain impairments and psychiatric disorders, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living.
- Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through.
- Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken, and this domination manifested itself even after he was in jail and the police were telling her that Honken was placing her life in danger.

# Dependency may lead to violence

- Dependent personality disorders are often led to violence because of a distorted perception of "an internalized, pervasive threat that survival was not possible without this other person, no matter what the price", and this was certainly the case with Ms Johnson.[1]
- Her history of dependency on men, starting with her first marriage at 16, through her relationship with Terry DeGeus, had always been one of dependence.
- In Dustin Honken, Ms. Johnson found that combination of emotional abuse and terror that destroyed what little ability she had shown in the past, to escape from disastrous relationships and dependence upon others
  - 1 Malmquist, Carl, "Dependent Personality Disorders and Killing", in, Homicide: A Psychiatric Perspective, American Psychiatric Press, Washington, DC, 1996, p. 145.

WOD000268

# The intensity of dependency

A question arises as to why a DPD (Dependent Personalty Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. An personal involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level. [1]

- 1 Malmquist, Carl, "Dependent Personality Disorders and Killing", in, Homicide: A Psychiatric Perspective, American Psychiatric Press, Washington, DC, 1996, p. 149.

WOD000269

# Ms. Johnson's dependency is augmented by brain problems, trauma and reality

- Ms. Johnson's dependency is compounded by both her difficulty recognizing larger, more complex issues, and her inability to effectively problem solve, both life long, well-documented failures.

- Her own limitations and well-documented aquiescent behavior from childhood, was based on more than just a desire to live better, but also a drive, at this point, to make sure her family lived better but also stayed alive

WOD000270

# Mr. Honken did manipulate Ms. Johnson

- Mr. Honken "was never any good for me, never any good in my life. He was such a fucking liar and I believed – I don't know why I believe everyone else. I'm trying not to be that way anymore. I think because I say I'm going to do something, I do it – I have – I'm not a liar. I don't bullshit people, and I don't think that anybody is going to do that to me, but they do all the time, and then I think, 'You're so fucking stupid.' When will you learn? I'm stupid that way. I am better now, but I do say that all the time." [1]
  - 1 Martell/Dvoskin interview p. 89.

Case 3:09-cv-03064-MWB-LTS     Document 384-29     Filed 06/23/11     Page 271 of 287
WOD000271

# Mr. Honken manipulated her

- He controlled her.
- He used fear to control her.  Fear for her safety and for her children.  Fear of going to jail.[1]
- She allowed him to be around because she thought he would get back into the crank thing and she would finally get her dope from him. [2]
- She thought he would be a success; she believed him when he said he was writing a book about making meth and it would be published.
- He told her he wanted to be a science teacher.  "He talked so much shit.  I really believed he could succeed in these things.
- Until I realized all fuckin' talk.  She realized that when she told him she did not want to be with him, not have a relationship, he would also be Marvea's dad, she was sick of not trusting and being lied to and shit." [3]

1  Dr. Hutchinson notes, p. 14-15.

2  Id. p. 15.

3  Id. p. 16.

WOD000272

# Mr. Honken "…took over our lives."

- .  He was not paying the bills, living off her and helping with psycho Kathy and not pay bills. . . He tried to make her feel crazy."[1]
  - 1 Hutchinson notes of interview with Holly Dirksen at 7.

- Dustin Honken "took over their lives." [1]
  - 1 Alyssa Johnson interview with Lindsay Runnels 2/15/11 at 2.

WOD000273

# Mr. Honken lived off others

- He used relatives as well as Ms. Johnson to finance his drug operations
- All three women he was involved with participated in his criminal activities
- He described Ms. Johnson as a "convenience" (Melissa Friesenborg declaration signed 8/10/09 at 5)
- Enlisted the aid of 3 high school friends to rob the bank where his mother worked. Asked two to kill the third
- Wrote manipulative letters due to his concern she was falling out of his sphere of influence
- "Why couldn't the bitch have just died?"[1]
  - 1 Wayne Byerly Grand Jury testimony, 7/19/01 at 74.

WOD000274

# Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Yes
- Ms. Johnson was at the upper limit of her antidepressant medication, Zoloft, at the start of her trial.
- The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose.[1]
- She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity.
- She had also complained of headaches, another symptom of Zoloft intoxication. However, Ms. Johnson has experienced headaches her entire life.
  - 1 Goodman and Gilman's Pharmacological Basis of Therapeutics, 12th Edition, Table 15-1 Antidepressants: Chemical Structures, Dose and Dosage Forms, and Side Effects.

WOD000275

# Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg.
- Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction.
- Dr. Martell described Ms. Johnson's mood as "labile.“
- When her antidepressant was increased to 300mg daily a couple of days into her trial, Ms. Johnson was no longer a part of the process
- She was unable to focus, drawing most of the day.
- She waved to family members
- her affect was often inappropriate.
- Her serotonin toxicity, with extreme levels of her antidepressant Zoloft, impaired her ability to rationally assist her attorneys during trial.

WOD000276

# Ms. Johnson's family noticed a change in her mental state

- Her family noted that her behavior changed noticeably after trial started.
- She appeared child like and in a daze, according to her daughter[1];
- Both her daughter and sister reported that Ms. Johnson was "very different" from the way she was before trial.[2]
- She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide.[3]
- She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For after I testified, she gave me a big smile and waved at me, like we were in school."[1]
    - 1 Decl of Wendy Jacobson at 3
- "My mother seemed deaf and blind to the trial. She sat there next to her attorneys drawing with colored pencils. She looked different; she didn't act like she had been acting in jail. It was as if the trial wasn't going on." Decl. of Alyssa Johnson at 4.
- "I could tell that she was very depressed and very different, as if she were a zombie, especially in the mornings in court. Sometimes she sat there like she was not aware of what was going on and if she was not in any pain at all. She looked like she had no feelings. I knew differently because she was devastated by the deaths of all those people." Decl. of Wendy Jacobson at 8."
- After trial started, she wasn't her normal self and didn't show any interest in the case. She acted like she was not in a trial, as if it was all hopeless." Decl. of Holly Dirksen at 7.
    - 3 Decl. of Wendy Jacobson at 8.

WOD000277

# Zoloft Toxicity

Zoloft has known cognitive side effects, including

- agitation,
- irritability,
- increased depression, and suicidal ideation.
- Higher dosages (200mg and 400mg) cause mood deterioration.[1]
  - 1   Zoloft dosages in higher ranges, 200mg to 400mg, "had mostly detrimental effects. All doses caused pupillary dilatation at 4-8 hours post-dose and caused either no effect on subjective mood (100mg) or caused mood deterioration (200mg and 400mg)..."  Baselt (2001)  Drug Effects on Psychomotor Performance, Foster City, California, Biomedical Publications.

WOD000278

# Toxicokinetic Reaction

- An overwhelming of one's metabolism by a medication regimen, leading to increasingly toxic behavior [1]

  - 1 Ousterhoudt (2011).  Drug Toxicity and Poisoning. Goodman and Gilman's Pharmacologic Basis of Therapeutics.  Brunton.  China, McGraw-Hill

- On May 6, 2005, Ms. Johnson's Zoloft was increased to 300mg per day,[1] twice the upper dosage recommended in Goodman and Gilman. She was manifesting side effects on lower dosage, and became increasingly toxic while on the Zoloft

  - 1 WCJR at 9, 13-16.

WOD000279

# Delirium: Waxing and Waning of Consciousness

- She had some lucid moments and other times where she didn't appear to be with it, so she was kind of in and out. . . I think she was spacing out during the trial. I don't know if that was a defense mechanism because she didn't want to hear the testimony or she was afraid about how she might react. . .  And I was at the time thinking, well, you know, it's better if she's zoned out than if she's going to react. That was a bit of a concern. So that was my observation when I was sitting next to her that she was scribbling, not taking notes or drawing pictures."[1]
  - 1 2255 Hearing Transcript, Vol 11 at 3137-3138.

WOD000280

# Ms. Johnson suffered from an altered mental state at the time of trial

Angela's cognitive abilities, impaired as they already were, became increasingly disordered, secondary to the elevated Zoloft dosages. As Ousterhoudt noted, long term elevated dosages may accumulate, creating increasingly toxic impairment, actually causing a deterioration of the brain the medications are trying to fix. This toxicity is part of the predicament of trying to treat brain-impaired persons with psychiatric medications that are designed to treat mental illness, not necessarily cognitive deficits. While attempting to fix the depression, the side effects of the same medication may impair other areas of cognitive functioning, like sedation, motor functioning, attention, and focus.[1]

- 1 Chew, E. (2009). "Pharmacological management of neurobehavioral disorders following traumatic brain injury: A state of the art review." Journal of Rehabilitative Research and Development 6:851-878.

WOD000281

# Did the defendant's impairments and medications inform her demeanor at trial?

- The combination of Ms. Johnson's cognitive and psychiatric impairments and medications caused and explained

- her disengaged appearance,

- largely flat and absent affect,

- and inability to show emotion at trial

WOD000282

# How did others see Ms. Johnson's demeanor?

- "[t]here was a sense that her appearance and her affect didn't represent that she appreciated the gravity of the situation.  I think it could be read that way."[1]

  – 1 Dahl testimony, 3/8/11 at 338.

  Ms. Johnson "was very - almost like she was kind of drugged, just seemed very out of it. . . . She was very just blah."

  -Lanoue testimony, 3/8/11 at 430-431.

  Mr. Willet saw no problems with her overmedication during the trial.

  Mr. Stowers saw her as more active during the penalty phase

WOD000283

# Mr. Berrigan's observations

- Mr. Berrigan testified that. ". . . She wasn't - as I said, I mean, she had her lucid moments, no question." He agreed with the prosecutor that he would have done something if he had concerns that she was incompetent. He said, "She was zoned out either voluntarily or involuntarily, but she was not paying attention to the proceedings going on. Any my perception of that was particularly when you had like victims' family members testifying, it's a painful thing. It's painful for all of us. It was way too painful for her. So she wasn't - she wasn't listening. She was - I don't know what she was doing, just drawing pictures and eating candy."[1]
  - 1 Berrigan testimony, 5/14/11 at 3138-3139.

WOD000284

# Wendy Jacobson's observations

- Ms. Jacobson observed her sister looking at her during Ms. Jacobson's testimony, and "[s]he smiled frequently.  She did not seem to be concerned about what was going on with her. She didn't seem to understand that this was a very serious matter.  She blew me kisses and smiled frequently."

-         During the visits at the Marshal's office, Ms. Johnson did not seem to comprehend what was going on.  "She seemed - she just seemed real uncon - unconcerned.  I don't know.  Confused?  She wasn't really aware of what was going on.  It just - she was kind of in a state of - a childlike state."  Ms. Jacobson did not think Ms. Johnson behaved in a manner appropriate for someone who is on trial literally for their life in a death penalty case."[1]

  – 1 Jacobson testimony, 3/14/11 at 1950-1951.

WOD000285

# Mr. Johnson's trial demeanor was impacted by her toxic medication regimen

- Ms. Johnson's behavior during the trial was inappropriate for someone facing the death penalty.

- She provided little input into her own defense.

- She often appeared detached, consistent with her medication intoxication

- Her flattened and, at times, inappropriate affect was also consistent with her toxic medication regimen.

WOD000286

**Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?**

- Her use of profanity was consistent with:

- Hyperreactivity

- Impulsivity

- Affective numbing

- Irritability

- Dependent traits

- Impaired social understanding

WOD000287