IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )        No. CR 00-3034
vs.                            )
                               )        DETENTION HEARING
ANGELA JOHNSON,                )
                               )
        Defendant.             )

APPEARANCES:

PATRICK J. REINERT, ESQ., Assistant United States Attorney, United States Attorney's Office, The Hach Building, Suite 400, 401 First Street SE, Cedar Rapids, Iowa 52401-1825, on behalf of the Plaintiff.

THOMAS MILLER, ESQ., Special Assistant United States Attorney, Hoover State Office Building, Second Floor, Des Moines, Iowa 50319, on behalf of the Plaintiff.

ALFRED E. WILLETT, ESQ., Terpstra & Epping, 118 Third Avenue SE, Suite 500, Cedar Rapids, Iowa 52401-1424, on behalf of the Defendant.

DETENTION HEARING HELD BEFORE
THE HONORABLE JOHN A. JARVEY,

taken at the Federal Building, 101 First Street SE, Cedar Rapids, Iowa, on the 2nd day of August, 2000, commencing at 12:05 p.m., reported by Kay C. Carr, Certified Shorthand Reporter in and for the State of Iowa.

Kay C. Carr, CSR, RPR
U.S. Courthouse & Federal Building
101 First Street SE
Cedar Rapids, Iowa 52401
(319) 286-2324

```
                         I N D E X

WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

GOVERNMENT'S:

WILLIAM BASLER            4        32
```

THE COURT: The record can reflect that we're here in the matter of United States of America versus Angela Johnson. It's Criminal Case 00-3034.

The defendant was before the Court the other day for an arraignment on the July 26, 2000, indictment. At her initial appearance, the Government moved for her detention pending trial.

She's present and represented by Al Willett and the Government is represented by Pat Reinert.

Mr. Reinert, are you ready to proceed?

MR. REINERT: We are, Your Honor, and also at counsel table and also representing the United States is Special Assistant United States Attorney Tom Miller.

THE COURT: Welcome.

Mr. Willett, are you ready to proceed?

MR. WILLETT: We are, Your Honor.

THE COURT: Call your first witness.

MR. REINERT: Call William Basler.

WILLIAM BASLER, called as a witness, being duly sworn, was examined and testified as follows:

THE CLERK: Thank you. Please be seated. Please state your name and spell your last name for

the record.

THE WITNESS: My name is William Basler. Last name is spelled B-a-s-l-e-r.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Agent Basler, by whom are you employed?

A. I'm employed by the State of Iowa. My job title is Special Agent with the Iowa Division of Criminal Investigation.

Q. And as part of your duties with the Iowa Division of Criminal investigation, do you investigate homicide cases, missing person cases?

A. Yes, sir.

Q. And did you participate in the investigation of Ms. Johnson and Mr. Honken?

A. Yes, I did.

Q. Agent Basler, do you see the defendant, Ms. Johnson, in court?

A. Yes, I do.

Q. Would you identify her, please.

A. She's the dark-haired lady sitting in the blue jumpsuit next to the gentleman with the gray suit.

MR. REINERT: The record should reflect the witness has identified the defendant.

Q. Going back to 1993, are you aware of any

relationship between Angela Johnson and Terry DeGeus?

A.   Yes, I am.

Q.   Would you describe that relationship, please.

A.   I believe that early in 1993, there was a romantic relationship between Ms. Johnson and Terry DeGeus.

Q.   And are you aware of any change in that relationship in early 1993?

A.   Yes.  Sometime prior to March of 1993, Ms. Johnson quit her relationship with Mr. DeGeus -- her romantic relationship and started seeing an individual by the name of Dustin Honken.

Q.   Was there an undercover investigation on Mr. Honken in March of 1993?

A.   Yes, there was.

Q.   And how did that investigation -- the undercover portion of that investigation begin?

A.   That was done by a local drug task force in northern Iowa and southern Minnesota.  They made a number of arrests and followed those arrests by approaching the defendants to cooperate, which led to more arrests.  Eventually, there was an arrest in Mason City that involved an individual by the name of Gregory Nicholson.

Q. Was there a seizure of methamphetamine at Mr. Nicholson's residence?

A. Yes, there was.

Q. And what steps did Mr. Nicholson take once he agreed to cooperate against Mr. Honken?

A. Mr. Nicholson told the investigators who his source of methamphetamine was -- which was Dustin Honken -- and agreed to wear a wire when Mr. Honken came to pick up the money that was owed to him by Mr. Nicholson for drugs.

Q. Where was Ms. Johnson in proximity to Mr. Honken on that -- the time around that controlled transaction?

A. At some point that evening, she had been waiting for Mr. Honken in a motel room in Mason City.

Q. And how do you know that?

A. The investigative report prepared by the police officers indicated that and I believe there was a note written on the mirror of the motel room in lipstick with a signature.

Q. Also in the -- was Mr. Honken ultimately arrested after that controlled transaction?

A. Yes, he was.

Q. In the course of that, were there some searches

done of both his person and the hotel room?

A.   Yes, there was.

Q.   Were there any drug ledgers seized that showed Mr. Honken's relationship with others in drug trafficking?

A.   Yes.  There was a note seized that had the notation of T-Man and G-Man with an amount following each of those.

Q.   Through subsequent interviews, were you able to identify who T-Man and G-Man were?

A.   Yes.  T-Man was told to us that that indicated Terry DeGeus and G-Man was Gregory Nicholson.

Q.   When Mr. Honken was arrested and ultimately taken to federal court, was he detained or released?

A.   He was released on pretrial supervision with the additional caveat that he had a no contact order specifically with Mr. Nicholson.

Q.   And did Mr. Nicholson subsequently testify before the grand jury prior to Mr. Honken's indictment in 1993?

A.   Yes, he did.

Q.   And were there any discussions -- or has your investigation disclosed any discussions between Mr. Honken's counsel at the time in 1993 -- Mr. Thinnes -- and Government counsel about

Mr. Honken's desire to plead guilty to this offense?

A.   Yes.  There apparently was discussion between Mr. Honken's attorney and the Government's attorney and it was agreed upon that Mr. Honken was going to change his plea to guilty and a date for that was set for July 30th of 1993.

Q.   In that same time period in early July -- specifically July 7th -- what did the defendant do with regard to a firearm?

A.   On July 7th of 1993, Ms. Johnson went to a pawn shop in Waterloo and bought a handgun; specifically a Tec-9 9 mm.

Q.   Now, is a Tec-9 9 mm a small handgun you would carry in a purse?  Could you describe it in more detail for the Court.

A.   Absolutely.  It's the opposite of that.  It's a large handgun that had a rather long magazine that hangs below it.

Q.   When you say "a rather long magazine," I saw you gesture with your hand.  Is that about an eight, nine inch clip?

A.   Yes, sir.  And also has a rather large device that is often mistaken as a silencer around the barrel of it.

Q.   Are you aware of any steps taken by Mr. Honken

and the defendant to locate Mr. Nicholson?

A.   Yes.  After Mr. Nicholson's grand jury testimony, Mr. Nicholson moved from his residence where he had been living in Mason City and, unbeknownst to the defendant and to Mr. Honken, had moved in with another girl in Mason City by the name of Lori Duncan.  I don't think I answered your question there, but after that move was made by Mr. Nicholson, why there was some efforts by Mr. Honken and Ms. Johnson to find out Nicholson's new location.

Q.   And Mr. Nicholson, Ms. Duncan, and her children; when were they last seen?

A.   Mr. Nicholson, Ms. Duncan, and her two little girls were last seen on July 25, 1993.

Q.   After July 25th, you indicated earlier that there was a court hearing set for July 30th of 1993.  What occurred then on that day?

A.   On that date -- July 30th -- Mr. Honken and his attorney indicated that Mr. Honken no longer wanted to plead guilty and the comment was made that the Government's case wasn't as good as they thought it was.  Additional information was learned that there apparently had been a videotape made by Mr. Nicholson and that this videotape exonerated any

wrongdoing by Mr. Honken.

Q.   And was that videotape in the custody of Mr. Thinnes?

A.   Mr. Thinnes had the videotape for a time and also viewed the videotape.

Q.   Going back, you mentioned the T-Man G-Man note and Ms. Johnson's relationship with Mr. DeGeus. After late summer of 1993, how was that relationship between Mr. DeGeus and the defendant?

A.   I don't think it was a very good relationship. I think that Mr. DeGeus was having problems accepting the fact that that particular relationship was over.

Q.   Was there then going into the fall of 1993 a continued investigation into the Honken drug conspiracy focusing on the relationship with Mr. DeGeus; T-Man on the note?

A.   Yes, there was.

Q.   And what -- was Mr. DeGeus aware of that investigation?

A.   Yes, he was, to the point where he was described by friends and family as being extremely nervous and oftentimes asking his mother if anyone had been there to serve him with a subpoena.

Q.   And was the defendant called to the grand jury

and questioned about her knowledge of the relationship between Mr. Honken and Mr. DeGeus?

A.   Ms. Johnson appeared before the grand jury here in Cedar Rapids on October 27th of 1993 and during that grand jury, questions were asked about DeGeus' relationship with Mr. Honken in regards to drugs.

Q.   Going back to the firearm for a moment, I see something I missed on my list.  Was Ms. Johnson ever questioned by law enforcement regarding that firearm?

A.   She was questioned by law enforcement about -- about firearms in general.  During an interview in 1996 by one of our agents in Des Moines, Ms. Johnson was asked if she had ever purchased any firearms and she mentioned that the only firearm that she had ever bought was perhaps a shotgun.

Q.   Now, directing your attention to November 5th of 1993, just a few days after the defendant's appearance before the grand jury, what contact did the defendant have with Mr. DeGeus' family?

A.   On July 5th, which -- excuse me -- on November 5th of 1993, which happened to be a Friday, Ms. Johnson had called Terry DeGeus' mother at her home and had asked that Mrs. DeGeus give Terry a message when he got off work that Ms. Johnson wanted

to talk to him.

Q.   And did Mr. DeGeus ultimately leave the residence?

A.   Yes, he did.  Mr. DeGeus had his daughter for the weekend and he had to make some other arrangements for her care; ending up leaving his daughter at Terry's mother's house and indicated that he had to go talk to Angie and that he did not anticipate being gone long.

Q.   And did Mr. DeGeus return?

A.   Mr. DeGeus has never been seen again.

Q.   On -- was the defendant questioned or did she make statements to any friends or relatives regarding whether she had seen Mr. DeGeus on the evening of November 5th.

Q.   Yes.  Ms. Johnson was asked by a number of people -- both friends and family and law enforcement -- and some of the people she told that she had seen Terry that night; an equal number of people she told that Terry had never arrived that night.

         MR. WILLETT:  I'm sorry; I didn't hear your answer, agent.  What did the defendant tell law enforcement?

         THE WITNESS:  Specifically law enforcement

are you asking?

MR. WILLETT: In regards to the last part of your answer; if you could repeat it for us.

THE WITNESS: There was an equal number of persons that Ms. Johnson admitted having seen Terry DeGeus that evening and an equal number of people that she denied to having seen Terry.

Q. The large firearm you talked about -- the Tec-9 -- was that ever seen after that November 5th time period?

A. I believe so.

Q. Where was that discovered?

A. At one point in time, I believe that that firearm was in a closet of a friend of Ms. Johnson's.

Q. And did that friend then contact Ms. Johnson to have Ms. Johnson pick up the weapon?

A. Yes.

Q. And what happened to that weapon?

A. Ultimately, that weapon was taken by Dustin Honken to the farm belonging to Tim Cutkomp's father, at which time the weapon was cut into small pieces with a torch and then strewn around the countryside in road ditches.

Q. And Mr. Cutkomp had told you that?

A.   Yes, sir.

Q.   And were you able to search the roadside ditches and recover any metal pieces similar to what Cutkomp described?

A.   We certainly did search and the only thing we found was a piece of galvanized metal that had iron drippings on, if you will, and Mr. Cutkomp indicated that the gun had been cut up on a similar piece of metal.

Q.   What about Ms. Duncan?  Was there any physical evidence found regarding that disappearance or personal items belonging to Ms. Duncan?

A.   Yes.  During June of 1993 (sic), three young boys were playing along the Winnebago river near Fertile, Iowa, which is located in Winnebago County approximately ten miles north of Clear Lake.  As they played along the bank of the river, they found in the water a purse that they retrieved and from that purse recovered a number of items, most notably a class ring with the inscribed name of Lori Milbrath, which is Lori Duncan's maiden name.

Q.   After the initial case in 1993 against Mr. Honken was dismissed, did Mr. Honken and Mr. Cutkomp then again continue in the methamphetamine business?

A.   Yes, they did.

Q.   And what was the defendant's role in that based upon interviews with witnesses?

A.   Mr. Cutkomp and Mr. Honken were setting up a methamphetamine laboratory in a house in Mason City and we have been told by witnesses that Ms. Johnson's part of that was as an investor and also as someone that had control over whomever was going to be involved in this particular situation.

Q.   Was there an individual who was approached and recruited by Mr. Honken to participate in the lab?

A.   Yes, there was; an individual by the name of Dan Cobeen.

Q.   And did Mr. Cobeen cooperate in an undercover capacity against Mr. Honken?

A.   Yes, he did.

Q.   Was there a search in which a meth lab was seized at Mr. Honken's residence on or about February 7th of 1996?

A.   Yes.

Q.   Once Mr. Honken and Mr. Cutkomp -- were they ultimately indicted?

A.   Yes, they were.

Q.   When Mr. Honken was brought back into court in 1996, was he then released or detained?

A. He was released on electronic monitoring. He was wearing an ankle bracelet at the time of his release.

Q. Ultimately, did Mr. Cutkomp agree to cooperate?

A. Yes, he did.

Q. When Mr. Cutkomp was interviewed, what did he tell you about the plans Mr. Honken had while Mr. Honken was on pretrial release and subject to electronic monitoring?

A. At the time of Mr. Honken's pretrial release with the electronic monitoring, Mr. Honken was again planning to kill witnesses against him in this most current case, including Dan Cobeen and Special Agent Graham who had initiated this meth lab investigation.

Q. What did Mr. Cobeen tell you about -- were there any efforts to find Mr. Cobeen or Mr. Graham?

A. There were. Specifically, Mr. Honken asked Tim Cutkomp to drive past Mr. Cobeen's residence to find out for sure if that's where he was living and if that's -- excuse me -- if the vehicles being used by Mr. Cobeen were located at that residence in Clear Lake.

Independent of Mr. Cutkomp, Mr. Honken made other efforts to find out where John Graham

lived -- the special agent that was investigating Honken's meth lab -- to the point of Honken was talking to friends of friends who knew Mr. Graham and also tearing out pages of city directories trying to find his name to match to an address.

Q. What was the defendant's actions regarding location of cooperating individuals who had cooperated against Mr. Honken?

A. Ms. Johnson's involvement?

Q. Yes, sir.

A. I'm not sure what you mean.

Q. You mentioned Mr. Cobeen.

A. Mr. Cobeen had an encounter with Ms. Johnson in Mason City sometime after this second arrest of Mr. Honken. It was at the scene of a minor traffic accident where Mr. Cobeen had stopped. While Mr. Cobeen was at that location, he saw Ms. Johnson drive up to where he was standing and make a gesture at him with her hand forming the form of a gun.

Q. During the time when Mr. Honken was on pretrial release, were there steps being taken by him to obtain a firearm?

A. Yes, there were.

Q. Would you describe those for the Court.

A. Mr. Honken had talked to another employee at

the Kraft Foods plant in Mason City where Mr. Honken was working while he was out on release and this individual eventually purchased a .380 semiautomatic pistol for Mr. Honken and kept it in his possession.

Q. Now, once Mr. Honken was detained due to a violation of his pretrial release, what happened to that handgun?

A. Eventually, it was hidden by the person that had it, but prior to it being hidden, this person that had gotten the handgun for Dustin had been called by Ms. Johnson and was told that Dustin did not have a use for this weapon any longer.

Q. Now, was this person who had identified themself as Ms. Johnson -- how was the person identified on the phone?

A. The person that called the person with the weapon identified herself as Dustin's girlfriend.

Q. And did she specifically mention the gun or use some kind of euphemism?

A. She did not specifically say gun. She mentioned to this person that Dustin did not want the pup any longer.

Q. Once Mr. Honken was put in jail and detained federally at the Woodbury County jail, did he meet, for instance, Dean Donaldson?

A.    Yes, he did.

Q.    What was his actions regarding Mr. Donaldson?

A.    By this time, Dustin has discovered that not only has Mr. Cobeen testified against him, he has also discovered that Mr. Cutkomp as well has testified against him.  While in the jail in Sioux City, Dustin approached Dean Donaldson and solicited Mr. Donaldson to go to Clear Lake -- if Dustin could get Donaldson out of jail -- and to kill Dan Cobeen and to threaten Tim Cutkomp and his family.

Q.    And was Mr. Donaldson to pick up any items that he could use in this effort?

A.    Yes.  There were going to be maps available, letters of introduction available from Dustin to people on the outside and the possibility of obtaining the weapon that we talked about earlier.

Q.    And did Mr. Donaldson get released on bail?

A.    Yes, he did.

Q.    Did he ultimately not follow through on the plan to -- and get rearrested?

A.    Yes.  He did not follow through on the plan that he had agreed upon with Mr. Honken and was later put back in the Woodbury County jail.

Q.    After being unsuccessful in his venture with

Mr. Donaldson, did he then meet or approach other individuals, including Anthony Altimus?

A.   Yes, he did.

Q.   What was his arrangement with Mr. Altimus?

A.   His arrangement with Mr. Altimus was going to be similar to Dustin's arrangement with Mr. Donaldson; that being Dustin wanted to get Mr. Altimus out of jail on bond so that Mr. Altimus could, in turn, kill witnesses against Dustin who were outside the jail system.

Q.   How was the money to be raised to bail Mr. Altimus out?

A.   It's kind of a convoluted story, but another inmate in the jail by the last name of Johnson was interested in purchasing a recipe for manufacturing methamphetamine and agreed to pay Dustin $1,000 for this recipe.  Obviously, they were both in jail, so Mr. Johnson didn't have the money with him.  But arrangements were made for Ms. Johnson to meet with Mr. Johnson -- Ms. Johnson to meet with the inmate Johnson's ex-wife in order to pick up this thousand dollars.

Q.   And did the defendant meet with the inmate's ex-wife to pick up the money?

A.   Yes, she did.

Q. And was there an attempt to bail Anthony Altimus out of jail?

A. There was an attempt made, although when Ms. Johnson got to the bail bondsman's, she found she was a few hundred dollars short and wasn't able to get that bond posted.

Q. Was there also an escape attempt by Mr. Honken and an inmate named Dennis Putzier?

A. Yes.

MR. WILLETT: Your Honor, at this time I'm going to make an objection as to relevance because I have no idea where this is going and why it's relevant to the issue you have to determine.

THE COURT: Overruled. Answer the question.

Q. Was there any other discussion between Mr. Honken and Mr. Putzier about a plan to harm witnesses in that case?

A. Yes, there was.

Q. Would you describe that for the Court and the defendant's role in that plan.

A. Initially, both Mr. Putzier and Mr. Honken hoped to successfully break out of the jail in Sioux City. But as a fallback plan, Honken talked to Putzier about if Putzier was able to escape from

the jail, that Mr. Putzier would contact Ms. Johnson and that Ms. Johnson would show him where Tim Cutkomp was living so that Putzier could kill Cutkomp.

Q.   In soliciting these individuals and others, did the defendant make -- did Mr. Honken make admissions to inmates both in the Woodbury County jail and at other institutions regarding his and the defendant's involvement in the killing of informants in his past cases?

A.   Yes.

Q.   Could you describe those for the Court.

A.   Mr. Donaldson, who we spoke of earlier who was a co-inmate at the jail in Sioux City with Dustin, told us that Dustin admitted to Mr. Donaldson that Dustin and Ms. Johnson had killed Greg Nicholson, Lori Duncan, and Lori Duncan's two children.

Q.   In addition to Mr. Donaldson, were there other inmates to whom he made those kinds of admissions?

A.   Yes, a number of them.  Mr. Altimus told us that Dustin bragged about killing witnesses against him in the past and also indicated that he would not be afraid to kill law enforcement officers.

Q.   Was there ever a concern by Mr. Honken -- expressed by Mr. Honken about the bodies needing to

be moved or not being buried to a sufficient depth?

A.    Yes, there was.

Q.    What --

A.    Mr. Honken stated to a number of people that the bodies had been buried and that Mr. Honken was concerned -- because of the depth that the bodies were placed at, Mr. Honken was concerned that the freezing and thawing and the frost would bring these bodies to the top where they would ultimately be discovered.

Q.    Was there a plan when Mr. Honken was in federal prison to attempt to have someone hired who could come to Iowa and move the bodies and re-bury them?

A.    Yes.  There was a plan between Mr. Honken and another federal inmate in that Mr. Honken wanted this other inmate to find someone on the outside that would travel to north Iowa and meet with Angela Johnson, at which time this person would relocate the bodies, digging them -- excuse me -- burying them at an appropriate depth.  And then as a final act, Dustin wanted this person to kill Ms. Johnson so that all of the witnesses would be dead.

Q.    Has the defendant also made admissions about her involvement in these murders?

A.    Yes.

Q.   What did the defendant say regarding the Nicholson/Duncan murders?

MR. WILLETT:  Excuse me, Your Honor. Could we get some type of framework as to time when we're talking about here?

THE COURT:  Yeah.  Go ahead.

Q.   Was this -- to whom -- without identifying the name of the individual, was -- specifically on the night of Nicholson/Duncan murders on July 25th of 1993, was this individual aware that the defendant was out of her residence?

A.   Yes.

Q.   And at what point in time did the defendant return on that morning?

A.   The witness indicated that Ms. Johnson and Mr. Honken returned at approximately the time that the sun came up that morning.

Q.   Was that an unusual time for Mr. Honken and Ms. Johnson to return to their residence?

A.   Yes.  This witness indicated that on previous occasions, Mr. Honken and Ms. Johnson normally returned around midnight, but on this particular date, they didn't get back until around 5 a.m.

Q.   And what occurred when they got back to their residence?

A.   There apparently was a lot of whispering between Ms. Johnson and Mr. Honken and then both of them immediately went into the bathroom and showered.

MR. WILLETT:  I'm sorry; I didn't hear the last part.

THE WITNESS:  Showered.

MR. WILLETT:  Thank you.

Q.   At some point, did this individual have a discussion with the defendant about those events and subsequent events?

A.   Yes.

Q.   When did that discussion occur?

A.   The discussion occurred some months after all these people had disappeared and the discussion involved information that on the night that Mr. Nicholson, Ms. Duncan, and her two little girls disappeared, that the defendant and Dustin Honken had gone to Lori Duncan's house in Mason City and that the defendant had used some type of a ruse by posing as a salesperson to get into the house.

Q.   And what occurred once they got into the residence?

A.   After they got in the residence, the videotape that we talked about earlier was made and apparently

there was some discussion that Mr. Nicholson, Ms. Duncan, and the two little girls should prepare to go away for a while.

Q. Where did they get taken?

A. They were taken out into the country and one at a time taken out of the car and shot.

Q. And what was the defendant's involvement there at the killing scene?

A. The defendant's involvement was to remain in the car with the victims that had not yet been removed from the vehicle.

Q. Was there also a discussion about Terry DeGeus' murder with this same witness?

A. Yes, there was.

Q. And what did the defendant say about her involvement in Terry DeGeus' murder?

A. The defendant said that when Terry DeGeus was murdered, that he had died hard; that he had had to have been shot a number of times and eventually beaten to death.

Q. And is that description of Mr. DeGeus' murder consistent with admissions Mr. Honken made to others?

A. Yes, it is.

Q. When Mr. Honken was sentenced in February of

1998, was the defendant present?

A.   Yes.

Q.   And what, if anything, occurred at the end of that sentencing after the Court imposed sentence with regard to the defendant's conduct?

A.   There was a court employee that was outside the courtroom after sentence had been pronounced that heard the defendant make threats against persons that were involved with this sentencing to the point where this employee notified the Judge that his safety may be at risk.

Q.   Was there any correspondence or statement made by the defendant trying to explain her comments?

A.   It's my understanding that the defendant wrote a letter to Judge Bennett explaining her actions, but I have, as of now, been unsuccessful in getting a copy of that letter.

Q.   Have you had discussions with any other individuals?  I know this is going to be probably at least double hearsay.  Have you talked to other individuals regarding statements made by the defendant on what she was doing or her attitude toward persons involved in that prosecution of Mr. Honken?

MR. WILLETT:  Your Honor, if I may just

for purposes of the record -- I realize the rules of evidence are relaxed in a proceeding such as this. I am going to interpose an objection for the record. If Mr. Reinert is telling us in advance that this question calls for hearsay within hearsay, I want to object to any answer brought by Agent Basler based upon hearsay; based upon the form of the question articulated by Mr. Reinert. His question may also call for speculation what the perceptions of various witnesses were about the scenario that he's about to discuss and I think whatever answer the agent is able to articulate to Mr. Reinert's question is going to cause more confusion than clarity in this record and I would object.

THE COURT: Overruled. Answer the question.

A. We learned from Jeff Honken -- the brother of Dustin Honken -- that Jeff had had a conversation with Jeff's sister Alissa about the sentencing of Dustin. Alissa told Jeff that Angie Johnson had been at the sentencing and was attempting to take photographs of the persons that were involved and also commented that she would get even with the people that were involved in Dustin's incarceration if it took the rest of her life.

Q.   Was there an undercover investigation looking into the defendant for drug trafficking in the summer of 1998?

A.   Yes, there was.

Q.   During the course of that investigation, was the defendant -- did the defendant meet with an undercover DNE agent?

A.   Yes, she did.

Q.   During the course of those meetings, did the defendant make any statements regarding involvement in drug trafficking or violent activities?

A.   During Ms. Johnson's meeting with the undercover state agent, she indicated to the agent that she wanted to be a -- to be a hit woman at some point in her life.

Q.   And were these -- were there -- what was the agent going to do for Ms. Johnson?  What was the purpose of these meetings?

A.   There were some discussions that this agent would assist Ms. Johnson in collecting drug debts that were --

Q.   Are you aware that the -- whether the defendant is currently employed?

A.   I am aware and she is not.

Q.   Does the defendant have a permanent residence

at this time?

A.   Not any longer that I'm aware of, other than her motor home.

Q.   And when did she acquire that motor home?

A.   Ms. Johnson bought a motor home I believe early in June of this year.

Q.   In acquiring that motor home, did she make any statements to the seller about her purpose or intention for that motor home?

A.   Yes.  Ms. Johnson stated that she was going to do a lot of traveling.

Q.   Have you interviewed an individual recently who had recent contact with the defendant and her motor home in the Des Moines area?

A.   I didn't interview that person personally.  I caused that interview to take place, yes.

Q.   And what did that -- who was that individual? Was he --

A.   He was a tow truck owner that lives in the Des Moines area.

Q.   And what did the tow truck driver say about his contact with the defendant and her motor home?

A.   The tow truck owner indicated that Ms. Johnson had broken down in Des Moines with her motor home. The owner further stated that Angie told him that

she had been to Missouri and had also been to Colorado to visit her boyfriend, who was in prison.

Q. And where did the motor home get towed?

A. The motor home was towed from the Des Moines area where it broke down to Klemme, Iowa, which is where Ms. Johnson's sister lives.

Q. Is that where Ms. Johnson was also arrested?

A. Yes, sir.

Q. Were there any other statements made by the defendant regarding drugs, drug usage, or drug trafficking to the tow truck driver?

A. The only thing was that the tow truck driver indicated that during the trip from Des Moines to Klemme, Ms. Johnson asked him if it would be all right if she used some drugs during the trip.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Willett?

MR. WILLETT: Your Honor, I've been awaiting the arrival of the agent's grand jury testimony pursuant to Jencks. I'm not sure if it's arrived yet, but I would sure like to have it.

THE COURT: Mr. Willett?

MR. WILLETT: Yes, Your Honor.

If the Court will indulge me a second, I'm just reviewing some notes and then I'll be ready.

THE COURT: Go ahead.

MR. WILLETT: I'm ready, Your Honor, if you are.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. WILLETT:

Q. Is it Basler or Basler?

A. Basler.

Q. Agent, I know -- I'm Al Willett. I know we've met before. I can't remember from which case, but I'm defending Ms. Johnson. How long has there been an active investigation against my client?

A. By myself?

Q. By yourself or your fellow officers.

A. By myself since November of 1993.

Q. Okay. And I take it at least initially, you had focused on whatever participation, if any, my client may have had with Dustin Honken in the circumstances that you detailed to Mr. Reinert?

A. That's correct.

Q. And then there was, I take it -- toward the end of your testimony on direct, there was some indication that my client may have been the subject of a drug investigation?

A. Yes.

Q.   Okay.  And it's fair to state, isn't it, since 1993, the only thing my client has been charged with in federal or state court within the state of Iowa is this current charge?

A.   I believe that's true, yes.

Q.   And it's also true that my client has testified to the grand jury in the Northern District of Iowa on more than one occasion during the last several years; correct?

A.   Yes, sir.

Q.   Okay.  And in regards to the situation you discussed with the Honken sentencing and the information that was communicated to Judge Bennett about comments that were purportedly made by my client, no criminal charges were brought out of those events; am I correct?

A.   You are correct.

Q.   Do you know anything about the facts surrounding my client's arrest within the last several days?

A.   I arrested her.

Q.   Did she surrender peacefully to you?

A.   Yes.  Other than verbally, she was peaceful.

Q.   Okay.  You don't often find people handing you verbal bouquets of flowers when you put them under

arrest?

A.   It doesn't happen near as often as we would like.

Q.   She didn't try to run?

A.   No, sir.

Q.   She didn't try to physically resist your attempts to place her under arrest?

A.   Not at all.

Q.   I'll try to go chronologically.  I've been taking notes during Mr. Reinert's direct.  During '93, the relationship, if we can call it that, between my client and Mr. DeGeus ceased; am I correct?

A.   In her mind it did, yes.

Q.   Okay.  Do you know anything about the facts or circumstances of that relationship?

A.   No.

Q.   Okay.  So you don't know if Mr. DeGeus was abusive towards my client?

A.   I think that on occasion he possibly was.

Q.   Okay.  Emotionally as well as physically abusive?

A.   Yes.

Q.   Okay.  Now then, it's my understanding in 1993 there was a seizure of meth from Mr. Nicholson;

correct?

A. Yes, sir.

Q. And he told you that his source was Dustin Honken; correct?

A. Well, he didn't tell me. By the time that I started my investigation, he was already dead.

Q. Okay. But he confided to your fellow law enforcement officers that his source was Dustin Honken?

A. Yes, sir.

Q. Not my client?

A. Yes.

Q. Correct?

A. Correct.

Q. Now then, you spoke with Mr. Reinert about this incident of Ms. Johnson waiting for Mr. Honken in a motel room in the Mason City area; correct?

A. Yes, sir.

Q. Okay. And the only thing that was found that was of a questionable nature were purported drug ledgers?

A. I believe that's correct, yes.

Q. Large amounts of cash weren't found in that motel room where my client was?

A. I believe there was less than a thousand

dollars found in there.

Q. Okay. Controlled substances weren't found in that motel room where my client had been registered or had been staying?

A. I don't recall, but I don't believe so. At least no large quantity.

Q. Okay. No weapons?

A. No.

Q. Okay. The drug ledgers -- they weren't in my client's handwriting, were they?

A. I'm not sure.

Q. Okay. Did you test them for latent fingerprint analysis?

A. No.

Q. Okay. Now then, you testified with Mr. Reinert on direct that in July of 1993 -- early July of 1993, my client purchased a handgun?

A. Yes, I did.

Q. And did she go through all the correct legal procedures to purchase a handgun?

A. Prior to that purchase, she did get a permit to purchase, so to answer your question, yes, she did.

Q. So she went to the Black Hawk County Sheriff's Office; filled out the appropriate paperwork for a permit?

A.   No; actually, Cerro Gordo County, but she did do what was appropriate to buy a gun.

Q.   Okay.  And notwithstanding Mr. Reinert's description of this revolver, a Tec-9 is a legal weapon that one can purchase through a pawn shop or a gun owner or a sporting goods company that sells firearms; correct?

A.   Yes.  A Tec-9 isn't illegal to possess.

Q.   Okay.  And in regards to the fact that it's a large weapon that has something on it that looks like a silencer, it's really not a silencer, is it?

A.   No, it's not.

Q.   It's a uniquely shaped barrel, for lack of a better description?

A.   That's fair.

Q.   Okay.  Now, my notes are a little skimpy here. You discussed with Mr. Reinert that after Greg Nicholson moved in with Lori Duncan, there were efforts made by my client to find this location?

A.   Yes.

Q.   What efforts?

A.   Surveillance, if you will, for lack of a better term, where Ms. Johnson and Mr. Honken were driving around trying to locate Mr. Nicholson.

Q.   Okay.  And what are you basing that testimony

on?

A. Information from witnesses.

Q. Okay. Are these people who were passengers in the vehicle? Are these people who say Angela Johnson made this admission to me? What type of witness testimony are you basing that assertion on?

A. Individuals who were told that information by Ms. Johnson.

Q. Okay. An attempt to locate a person's residence, in and of itself, there's nothing illegal about that, is there?

A. No.

Q. Now then, it's my understanding that in regards to Greg Nicholson and Lori Duncan and her children, the last date they were seen was July 25th of 1993; am I correct?

A. Yes, you are.

Q. Okay. The house in Mason City where Mr. Nicholson was at with the -- Ms. Duncan, was there any DNA testing done there?

A. Yes.

Q. Okay. Did the DNA testing give you any evidence to go on after that was done?

A. No.

Q. Okay. Was that house dusted or super fumigated

Q. for latent fingerprint analysis?

A. No.

Q. Okay. You related to Mr. Reinert that my client had been questioned about her possession of firearms in 1996. Do you remember that line of testimony, sir?

A. Yes, I do.

Q. And you remember testifying that my client mentioned that she had bought a shotgun?

A. Yes.

Q. Did you ever do any investigation to ascertain if she ever had a shotgun?

A. No. I really didn't care if she ever had a shotgun.

Q. You wouldn't want to try to include or exclude that information to determine her credibility on the issue of weapons?

A. I did not pursue that shotgun, no.

Q. Thank you. In regard to the events of November 5th of 1993, it's my understanding in relation to Mr. DeGeus in the conversations that you related to Mr. Reinert is Mrs. -- or Terry DeGeus' mother related that she had talked with Angela Johnson. Angela Johnson wanted to see Mr. DeGeus; correct?

A.   Yes, sir.

Q.   And then Mr. DeGeus relates to his mother that he's going to see Angela?

A.   And his daughter, yes.

Q.   You don't have anybody to corroborate whether or not there was a meeting between my client and Mr. DeGeus, do you?  Corroborate, or excuse me, even confirm that a meeting took place on the evening of November 5, 1993, between my client and Mr. DeGeus.

A.   Well, I have at least three people that say that they were told by Angie that that meeting took place.

Q.   I realize that, sir, but my question was more precise.  Do you have any investigative facts, testimony, evidence -- however you want to describe it -- of any witness who can say I saw Terry DeGeus and Angela Johnson together on the evening of November 5, 1993?

A.   No.

Q.   You related to Mr. Reinert on direct in regards to this Tec-9 revolver that it was found in a closet of a friend of the defendant's; am I correct about that testimony, sir?

A.   Yes, you are.

Q.   Okay.  You don't have any information as to how

the Tec-9 got to this friend's closet?

A. No.

Q. Okay. And in regards to the destruction or the purported destruction of this weapon by Mr. Honken and Mr. Cutkamp --

A. Cutkomp.

Q. Cutkomp -- you don't have any information or you don't have any information that Ms. Johnson was involved in the destruction of that weapon, do you?

A. No, I don't.

Q. Or that she knew anything about it?

A. About the destruction or the weapon?

Q. Yes, about the destruction of the weapon.

A. No, I don't have any information that she was aware of the weapon being destroyed.

Q. Okay. In regards to the personal effects that were found by the young boys in the river in Winnebago County, I realize this may be a silly question, but I'll get it out of the way. Was there any attempt to check the items that were found -- either the purse or the contents of the purse -- for latent fingerprint analysis?

A. After the boys removed the items that I described, the purse was thrown back into the river, so the only thing they kept were two rings and some

video arcade tokens.

Q. Okay. Was there any attempt to check those few items for latent fingerprint analysis?

A. No.

Q. So you don't have any physical evidence connecting those items to my client?

A. No.

Q. Now then, you spoke with Mr. Reinert on direct about a meth lab that was in Mr. Honken's house in Mason City during a period of time when Mr. Honken and Mr. Cutkomp were, for lack of a better term, business associates; correct?

A. Yes.

Q. My client wasn't living at that residence in Mason City with Mr. Honken at that time, was she?

A. No. I believe she was living in Clear Lake at the time.

Q. And it was your testimony on direct, I believe, that my client's role was that of investor?

A. Yes.

Q. Okay. Was she employed at the time?

A. I'm not sure, but I would be surprised if she wasn't.

Q. Okay. At times in her adult life, she's held a job as a waitress, hasn't she?

A. Yes.

Q. Even good waitresses don't make a lot of money, do they?

A. I'm not sure what waitresses make for a salary.

Q. Okay. And it's your assertion, or at least your testimony on direct, that her other role in regards to this meth lab was it was her role to control who was going to participate?

A. No. What I said was that she was involved in the decision with Dustin as to who would participate.

Q. Okay. So was she the decision maker or is Dustin or are you saying it's some sort of combined effort?

A. I'm saying it was some type of combined effort.

Q. Now then, you also testified to Mr. Reinert on direct that after Mr. Honken -- or at least immediately prior to the time Mr. Honken was incarcerated, there were various people he wanted to see, for lack of a better term, eliminated; would that be correct?

A. Yes.

Q. Okay. One of them was a Mr. Cobeen?

A. Yes.

Q. Okay. Prior to this minor traffic accident you

discussed with Mr. Reinert on direct, do you have any information that Angela Johnson knew Daniel Cobeen?

A. Yes.

Q. Okay. And what is that?

A. Through witness testimony in regards to her involvement with the methamphetamine laboratory.

Q. Okay. When you talked on direct about Honken's plans as far as Honken planning to kill witnesses -- including Special Agent Graham -- there was no reference made to my client's name during direct; is that correct?

A. Specifically regarding Special Agent Graham?

Q. Right.

A. No, there wasn't.

Q. So you aren't asserting today that my client somehow had knowledge of what Mr. Honken was trying to do in regards to Mr. Honken -- or excuse me -- in regards to Mr. Cobeen, Mr. Cutkomp, and Special Agent Graham?

A. No.

Q. Okay.

A. With the exceptions I mentioned earlier, obviously, with the attempts of bail.

Q. And I don't think we've talked about bail.

We'll get there in a second. Unfortunately, I've still got a few pages of notes to go through with you.

You mentioned that this situation with Cobeen when there was a minor traffic accident and my client made a gesture to Mr. Cobeen of a person having their hand in the form of a gun -- was that your testimony on direct?

A. Yes, it was.

Q. Okay. Was there any testimony from Mr. Cobeen that my client said anything to him during this minor traffic accident while making this purported gesture?

A. No.

Q. Okay. Just as easily the purported gesture could have been related to the traffic accident as opposed to any alleged history she had with Mr. Cobeen, couldn't it?

A. I guess I'm not familiar with anyone making the shape of a gun with her hand at a traffic accident other than on this occasion.

Q. People lose their temper in traffic accidents?

A. I'm not indicating that Ms. Johnson was involved in the accident.

Q. Okay.

A.   I'm indicating that she drove by the accident site.

Q.   Okay.  But you have no purported conversation or comment from my client that happened at the time of this gesture?

A.   No.

Q.   How far was Mr. Cobeen away from my client when this gesture was purportedly made?

A.   I don't know.

Q.   What was his line of vision towards my client when this report of a gesture was reportedly made?

A.   Apparently he was looking right at her.

Q.   Okay.  But we don't know how far away?

A.   I don't.  I'm sure he does.

Q.   Was Mr. Cobeen -- at some point during the history of all this, did he turn into a cooperating individual?

A.   Yes.

Q.   And he was facing federal charges?

A.   I'm not aware of it if he was.

Q.   Okay.  Was he facing state charges?

A.   I don't know.

Q.   Okay.  If he was a cooperating individual, he certainly would have an incentive to help law enforcement investigate and prosecute other

individuals, wouldn't he?

A.   He was cooperating with Special Agent Graham in the investigation of the methamphetamine laboratory.

Q.   Okay.  And arguably, one incentive might be to lessen his own situation?

A.   Arguably.

Q.   You talked about the issue with Mr. Reinert on direct about Mr. Honken attempting to get a firearm and going through some people, and then was it your testimony that my client allegedly had a conversation with another individual saying that Dustin did not want the pup any more.  Did I understand your testimony correctly?

A.   I don't think you did.  What I testified to was that Dustin Honken solicited a coworker at Kraft Foods to purchase this gun for him, which he did, and that the telephone call was made by Ms. Johnson to this person that had purchased the gun.

Q.   Okay.  And the comment was that Dustin didn't want the pup any more.  Did I understand your testimony correctly there?

A.   Yes, you did.

Q.   Okay.  Do you have any information that Ms. Johnson knew that what Mr. Honken was trying to do was obtain a weapon from this individual?

A. No.

Q. Okay. The person who had acquired the weapon for Mr. Honken, did you ascertain whether or not that person had dogs?

A. I believe we did and he wasn't selling pups at the time.

Q. Did he own a dog?

A. I don't know.

Q. Okay. So you didn't check that out?

A. I'm saying I didn't check that out.

Q. Okay. Did any of your other peers, your other law enforcement agents check to see if the person who had a weapon owned a dog?

A. I would expect they might have, but I'm not certain.

Q. Thank you. It was my understanding that while Mr. Honken was incarcerated, he approached a Dean Donaldson about Mr. Cutkomp and Mr. Cobeen and taking steps, for lack of a better term, to eliminate them. Did I understand your testimony on direct correctly?

A. Yes, you did.

Q. And it was my understanding that he was soliciting Mr. Donaldson to go to Clear Lake. There might be maps or letters of introduction to

facilitate that mission. Did I understand your testimony correctly?

A. Yes.

Q. You never mentioned my client's name, did you?

A. No.

Q. You don't have any information that my client had any knowledge about that, do you?

A. No.

Q. Okay. In regards to the scenario you discussed with Mr. Reinert about a Mr. Altimus, the inmate whose last name was Johnson that you mentioned, that person is not related to my client; correct?

A. I don't believe so.

Q. Okay. It was your testimony on direct that -- that my client did pick up a thousand dollars?

A. Yes.

Q. Was a meth recipe exchanged?

A. I believe the agreement was that it was going to be given verbally at some point in time.

Q. Did you have any information to confirm that my client ever orally passed on a methamphetamine recipe to the other party in exchange for the $1,000 that was received?

A. No. I don't -- if I indicated that earlier, I didn't mean to. The recipe was going to be passed

between Dustin and the Inmate Johnson. Your client's role was to pick up the thousand dollars from the female associate of Inmate Johnson's.

Q. Okay. And the same form of question that I asked in regards to Mr. Donaldson. You don't have any information, I take it, to show that my client had any knowledge about Mr. Honken's discussions with Mr. Altimus; correct?

A. You lost me about halfway through that.

Q. We talked about -- we talked just a couple minutes ago about Mr. Honken's discussion with Mr. Donaldson to solicit him to go to the Clear Lake area and look for Mr. Cobeen and Mr. Cutkomp?

A. Yes.

Q. And my understanding of your testimony a few minutes ago was you didn't have any knowledge that my client had any knowledge or understanding about that scenario; correct?

A. Of Mr. Altimus?

Q. You don't -- when -- when he discussed Mr. Donaldson, you don't have any facts to show my client had any knowledge of that situation; that discussion between Mr. Honken and Mr. Donaldson?

A. No.

Q. Same question of Mr. Honken in regards to

Mr. Altimus. You don't have any knowledge; any facts to show that my client had knowledge of any jailhouse discussions between Mr. Honken and Mr. Altimus regarding the elimination of witnesses; correct?

A. I don't know how she would be privy to jailhouse conversations, no.

Q. Okay. And you don't have any information period to show that she had any knowledge --

MR. REINERT: Well, Your Honor --

Q. -- whatsoever?

MR. REINERT: -- I think this is argumentative. I think the circumstances can certainly show she had knowledge given that she took action.

MR. WILLETT: Judge --

THE COURT: Overruled. Answer the question.

MR. WILLETT: Thank you. Do you need the question back?

A. I don't think so. What I know that her part was in regards to Mr. Altimus was to retrieve the thousand dollars and then to attempt to bond Mr. Altimus out of jail.

Q. Okay. In and of itself, obtaining $1,000 in

cash from another individual and going to a bail bond company to ascertain whether or not they can bond an individual out; that scenario, in and of itself, there's nothing illegal about, is there?

A.   No.

Q.   Do you have any information that Mr. Putzier ever contacted my client after his discussions with Mr. Honken?

A.   No.  I don't believe he ever got out of jail.

Q.   One of the things you told Mr. Reinert on direct was that Dustin Honken allegedly bragged to Mr. Altimus about killing witnesses.  Mr. Altimus was a cooperating individual at some point in time with the Government?

A.   If he was, I'm not aware of it.

Q.   Okay.  Since he was in jail, we can assume he was at least facing state charges out of Woodbury County?

A.   I think you could assume that, yes.

Q.   Do you know if he received any benefit for his testimony to the Government?

A.   I don't believe that he did.

Q.   Okay.  You've been in law enforcement how many years?

A.   Almost 25.

Q. People brag when they're in jail, don't they?

A. Sometimes; sometimes not.

Q. Some people want to brag so they can look tough?

A. Some do; some don't.

Q. You testified on direct about a discussion that you had with Mr. Reinert concerning Mr. Honken's discussion with another federal inmate to move bodies and then to contact the defendant and ultimately kill the defendant?

A. Yes, sir.

Q. Okay. You don't have any information that my client was aware of this plan, do you?

A. No.

Q. You discussed with Mr. Reinert the events of July 25, 1993, as related to you or your law enforcement agents by cooperating individuals. Do you remember that testimony?

A. Yes.

Q. My understanding is my client and Mr. Honken returned around dawn of that day?

A. Yes.

Q. Unusual was how it was termed?

A. Yes.

Q. Not illegal to come home late?

A.    No.

Q.    Okay.  No information about the purported whereabouts of my client by this individual -- this cooperating individual between the time my client left and the time my client returned?

A.    Yes.

Q.    Besides this cooperating individual saying this is when my client left and this is when she returned, do you have any information from that individual about her whereabouts?

A.    Yes.

Q.    What?

A.    As I testified earlier, the information about going to Ms. Duncan's home and your client using the ruse to get herself and Mr. Honken into the home.

Q.    Okay.  This cooperating individual who's not yet been identified, did this person receive any benefit from the Government in exchange for his or her testimony?

A.    No.

Q.    What was the purported relationship between this person who was relaying this information and these purported admissions?  Someone who's supposedly close to my client?

A.    Yes.

Q. Okay. And this conversation was supposedly related several months after the events?

A. Yes. And I'm generalizing there. I don't have the exact date in mind, but --

Q. I'm not going to hold you to an exact date, but this isn't some sort of instantaneous remorse where later on July 26th or within the few days following that, my client has this purported discussion with this other cooperating individual?

A. No. It was sometime later.

Q. If we covered this already, I apologize, but in regards to Mr. Honken's sentencing, I take it no charges -- no federal charges were ever brought against my client regarding any comments she may have made in exiting the courtroom?

A. No.

Q. Do you know if my client took photographs of people at Mr. Honken's sentencing?

A. No, I don't.

Q. You discussed towards the end of your testimony on direct with Mr. Reinert that in the summer of 1998, an undercover drug -- an undercover agent with the DNE had discussions with my client about the collecting of drug debts. Do you remember that testimony?

A.   Yes.

Q.   Those were Mr. Honken's drug debts?

A.   I'm not certain, but I was led to believe that they were Ms. Johnson's drug debts.

Q.   But I take it by the answer you just gave me, you're not certain whose drug debts they were?

A.   I wasn't involved in that particular activity.

Q.   In regards to the fact of my client's present status as being unemployed, you're aware she's worked in the Mason City area in the past as a waitress?

A.   Yes.

Q.   You're aware that my client has family in the Mason City area?

A.   North Iowa area.  I'm not sure about Mason City specifically.

Q.   Okay.  The fact that my client has taken trips to Missouri and Colorado recently; nothing illegal about that, is there?

A.   No.

Q.   Okay.

     MR. WILLETT:  Your Honor, if you give me just a minute or so, I just want to scroll through my notes.

Q.   In regards to Mr. DeGeus for just a moment --

and eventually after the night -- I think it was November 5, 1993, which was the night in question?

A. Yes, sir.

Q. Eventually you located Mr. DeGeus' vehicle?

A. I didn't, but it was located by law enforcement.

Q. Excuse me; your peers in the Mason City area located his vehicle?

A. Yes.

Q. And it was dusted for latent prints, wasn't it?

A. If it was, I'm not aware of it.

Q. You didn't find anything of evidentiary value in connection with the finding of his car, did you?

A. I never saw his car. I don't believe that anything of evidentiary value was found by the officers that were involved.

Q. Okay. So you didn't find anything connecting my client to Mr. DeGeus' car of an evidentiary nature?

A. Yes. I never saw the car.

Q. Okay. Do you remember giving your grand jury testimony on June 15, 2000?

A. Yes, sir.

Q. Would it refresh your memory if I showed you one portion of your testimony?

A.   Sure.

MR. WILLETT:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. WILLETT:  Mr. Reinert, it's page 15, lines 2 through 7.

Q.   Agent, if you will, I'm going to -- this is a scrunch copy of your testimony.  Page 15 is in the upper right-hand corner.  If you would read to yourself lines 2 through 7 for just a moment; then I'll ask you a question.

A.   I've read it.

Q.   Thank you.  That portion of your testimony on that date dealt with Mr. DeGeus' vehicle, didn't it?

A.   Yes, it did.

Q.   And it appears that it was checked out by your peers in the community; other law enforcement agents?

A.   It was checked out by the Mason City Police Department.

Q.   They didn't find anything of evidentiary value in the car, did they?

A.   No.

Q.   They didn't find anything connecting Angela Johnson to that vehicle, did they?

A.   No.

MR. WILLETT:  Thank you.  No further cross.  Thank you.

THE COURT:  Mr. Reinert, anything else?

MR. REINERT:  Not at this time, Your Honor.

THE COURT:  Thank you, sir.  You're excused.

THE WITNESS:  You're welcome.

(Witness excused.)

THE COURT:  Do you have additional evidence?

MR. REINERT:  No, Your Honor.

THE COURT:  Do you have evidence you wish to present?

MR. WILLETT:  Your Honor, I do.  If the Court would allow me about a five minute break to decide if I want to do it by proffer of testimony which the rules allow me to do at a detention hearing or if I want to put on a live witness.

THE COURT:  We'll begin again at 1:30.

(Recess at 1:25 p.m., until 1:33 p.m.)

THE COURT:  Mr. Willett?

MR. WILLETT:  Your Honor, if it please the

Court, pursuant to the rules, I'm allowed to make a proffer into the record. I do have the same witness here that I would put on the stand, but in the interest of judicial economy, I'm going to make a proffer. Ms. Dirksen -- who is my client's half sister -- is here in open court. She's the blond lady sitting right behind me. After the representation, if the Court has any questions I haven't covered and we need to put her on the stand, I'm more than willing to.

Your Honor, you've had a chance to see the pretrial services report that's been prepared for you. Holly Dirksen is my client's half sister. She has no prior criminal record. She lives in Klemme, Iowa, with her husband Michael. They have one child of their own; a little girl by the name of Hallie. There are no weapons in their home.

Ms. Dirksen works as a home health aid with Mercy Hospital in Mason City where she's been employed for the last five years. Her work shifts vary a little bit, Your Honor, in that she might either start at six in the morning or seven in the morning, but she's usually off by three or four in the afternoon.

Her husband Michael works at Curries,

which is a business in the Mason City area which is a steel door manufacturer. He works the graveyard shift of 11 p.m. to 7 a.m. There's some fluctuation to his shift, but the import of this is he's usually home during the days.

It's important to note about Mr. Dirksen that he is a sergeant in the Iowa National Guard based in Algona. He's been in the Iowa National Guard for the last 13 years.

Ms. Dirksen and her husband are willing to be the supervisor and the third-party custodian of my client if the Court decides to release her from the Benton County jail on conditions.

As the Court is aware, my client's 16 year old daughter and her six year old daughter -- Ms. Dirksen's nieces -- are currently living with the Dirksens at their home in Klemme, Iowa, and my client is welcome to relocate there with her daughters during the pendency of this proceeding.

Ms. Dirksen has represented to me that she has a valid driver's license; that either she or her husband would transport my client to whatever pretrial events occur; whether it be testing for random urinalysis; whether it be psychological testing if the Court orders; whether it be court

appearances, or whether it be visits to my office in Cedar Rapids for legal counseling.

Also, I asked Ms. Dirksen the hard question if your sister screws up on pretrial release, would you report her to the probation office and she assured me she would.

Your Honor, that's the extent of the proffer that we would enter into the record at this time.

Obviously, I'm entering this information for the issue as to whether or not my client is a risk of flight and we believe that she's not.

THE COURT: Thank you.

MR. WILLETT: Does the Court have any questions they would like to ask of Ms. Dirksen?

THE COURT: Mr. Reinert, do you know of any reason I should not accept this evidence as true for the purpose of this hearing?

MR. REINERT: Other than I will -- given my contact with Ms. Dirksen, I would have concern as to whether she, in fact, would report her sister for that, but --

THE COURT: I'll accept those statements as true for the purpose of this hearing.

MR. WILLETT: Thank you, Judge. That's

all the evidence we have.

THE COURT: Okay. Do you have argument you would like to make, Mr. Reinert?

MR. REINERT: Well, Your Honor, this is a very serious offense; crime of violence. In fact, there are five mandatory life terms set forth. The type of offenses are witness tampering offenses. It's a strong circumstantial case. The Court can take into account the weight of the evidence along with the defendant's admissions.

This defendant has minimal ties; has traveled recently; has continued to engage in this conduct over a long period of time to help thwart law enforcement efforts first on behalf of Mr. Honken. She saw that was successful in 1993. Worked with him again in 1996 to try and defeat his criminal case there; this time unsuccessfully.

This is a defendant who would engage in that conduct herself to try and now get out of her problem with the continuing investigation.

This defendant is a danger to the witnesses that we have to whom she has made admissions and others.

She is clearly a flight risk as well and we would ask that she be detained.

THE COURT: Thank you. Mr. Willett?

MR. WILLETT: Thank you, Your Honor. If it please the Court. The first thing, obviously, I want to bring to the Court's attention in the pretrial services report is my client has no prior criminal history.

What's interesting about this case is that my client has, in essence, been under investigation for the last seven years and neither state nor federal authorities have chosen to bring any accusations against her until this time.

A lot of what was discussed in Agent Basler's direct was very compelling if we were discussing Dustin Honken in terms of detention or issues of guilt or innocence. As it pertains to my client, a lot of it is style over substance.

What we have here for the most part by the Government are allegations that because of her relationship, for lack of a better term, or association, for lack of a better term, with Dustin Honken for the last seven years, then she must be guilty of the crimes charged in the indictment, and because of the severity of the crimes alleged, then she must be detained.

But what we do know from cross-examination

of Basler is a lot of these issues I cross-examined him on, vis-a-vis Dustin Honken was involved in this scenario or discussed this scenario; what evidence do you have tying my client to having any knowledge about this, he didn't.

There was a lack of physical evidence connecting my client to the disappearance of Greg Nicholson and the Duncans. There's a lack of physical evidence connecting my client to the disappearance of Mr. DeGeus.

There are conditions that this Court has under its discretion that will allow my client to go home to her 16 year old daughter; to go home to her six year old daughter, and to be free pending pretrial release.

The client -- or excuse me -- the Court has every authority to put an electronic bracelet on my client for the purpose of monitoring her movement. The Court has every opportunity to curfew her movement in terms of hours that she must be at her sister's residence during such and such time or to restrict her movement either between residence, employment, medical facilities, or legal facilities, or the courthouse, and the Court can do that.

It's our position that the Government has

come nowhere close to showing that she's a risk of flight in this case. We would also suggest that she is not a threat to the community because what I know the Court will not forget is that pursuant to the statute of 3142, subparagraph J, nothing that the Government has said is construed to modify or limit the presumption of innocence that my client has at this stage.

Now then, over my long career of appearing in front of this Court and having various detention hearings with various clients, I was trying to think if I ever had had any case in court that would come close to what we were discussing. I thought of two cases.

Back when I was a very young lawyer when I had a lot more brown hair and a lot less gray hair, there was a case of United States versus Donald Geason (phonetic) where Mr. Geason was charged with a robbery of the bank in Lowden; was caught 30 minutes later with the money from the bank under the front seat of his car. In that case, the Court exercised its discretion and released my client to his wife during the pendency of pretrial release without any problems whatsoever before that case was finally resolved.

In the case of United States versus the Sons of Silence motorcycle club, the Court -- or the Government brought not one, but two detention hearings against my client, Jacob "The Bear" Hazlet, and in large part talked amply about the alleged beating of Jerry Van Brocklin. The Court released Mr. Hazlet on conditions he wear an electronic monitor; that travel be limited; that he have certain hours of curfew, and Mr. Hazlet never violated that until his situation was resolved -- violated the conditions.

As far as the defense is concerned, we're not overwhelmed or impressed by the fact there's seven felony counts or that five of them deal with the aiding of first degree murder or that five of the counts carry a mandatory life sentence.

What there is in the record that's been made this afternoon before this Court is a lack of evidence tying my client to anything that Dustin Honken did or didn't do. They haven't carried the burden that she's a threat to this community. She has no prior criminal record. She's never been charged with a crime leading up to this offense and they've come nowhere close to proving to this Court and carrying their burden that she's a risk of

flight.

And we have -- we have a relative who is a third-party custodian who will help with her husband to allow my client to go home to her family and look after her daughters, which is what she should be doing pending trial instead of being in the Benton County jail.

Your Honor, for all of these reasons, we would ask you to release her with whatever strict conditions the Court wants to impose, but to release her nonetheless to her family. Thank you.

THE COURT: Thank you. Government's motion for detention is granted. The nature of the offense supports this finding. It's the ultimate, of course, crime of violence.

The strength of the evidence; there is compelling evidence -- circumstantial and direct -- of her guilt. Her purchase of the alleged murder weapon; the fact that it was a Tec-9, a gun without a legitimate sporting purpose; her subsequent lie to the police about the purchase of that weapon; her consistent efforts to assist Dustin Honken -- either known or unknown -- in efforts to employ and assist a reported hit man in this case; her communication regarding the need for the .380

caliber handgun; her attempt to bond out -- knowing or unknowing -- the hit man; her admissions in the participation in the murders and her intimate knowledge of the details of them; her threats against witnesses -- Cobeen and those at the sentencing -- her express desire to an undercover police officer to be a killer all support the finding by clear and convincing evidence that the release of this defendant would pose a serious danger to the community.

Her recent itinerant behavior; her uncooperativeness with the probation office and the marshal service is indicative of a risk of flight.

The defendant is committed to the custody of the Attorney General or her designee for detention pending resolution of these charges. The Attorney General or her designee shall afford the defendant a reasonable opportunity to consult with counsel while detained.

You have the right to take an immediate appeal of this order of detention. The Bail Reform Act assures that any appeal shall be resolved promptly.

We're in recess.

MR. WILLETT: Your Honor, may I raise two

issues of housekeeping before the Court departs?

THE COURT: Yes.

MR. WILLETT: First of all, I'm looking at the Government's discovery file, which was placed in front of me for the purpose of this hearing. My client gave grand jury testimony in 1993 and 1996. I just want to make a record that pursuant to Rule 16 of the Federal Rules of Criminal Procedure, we're asking for copies of those grand jury testimony of my client to be forwarded to the defense.

The second thing I would like to be able to bring up at a later date if necessary; my client has no problems with the Benton County jail. She's concerned about whether or not that will hamper visitation with her daughters based upon the length of distance between Benton County and Mason City and we also reserve the right to request the Court at a later time consider her transfer either to Fort Dodge or Waterloo, which would be closer to Mason City and might facilitate more visits with her daughters.

THE COURT: I expect that her placement would in large part depend on the informed discretion of the marshal service. If you're

dissatisfied with that, that's what you would bring to the attention of the Court.

Her statements --

MR. REINERT:  We always provide those as part of Rule -- and this is only a portion of our discovery file, and what I routinely do on the discovery matter, I presume you're going to do open file discovery.  If defense counsel wants, we would allow them to go through the file.  If he sees anything he feels he needs to have copies of or is entitled to copies under Rule 16, I always have them flag it -- Mr. Willett and I have been through this a hundred times -- flags it; tells me what he wants and I look at it.  If it's something he gets under Rule 16, we copy it for him.  If it's something that we have a dispute about, we'll bring it to the Court.

MR. WILLETT:  Judge, I'm just putting everybody on notice.  I know pursuant to the rules I'm entitled to a copy of my client's grand jury testimony.

THE COURT:  You are.

MR. WILLETT:  So I'm flagging those two pieces of grand jury to be copied and forwarded to my office.

THE COURT:  You're entitled to them and he doesn't dispute it.  It's an order.  It's granted.

MR. WILLETT:  Thank you.

THE COURT:  Then I want you to examine the discovery materials and make the best of your plans in the next couple days.  And I envision that since this is a Central Division case, that you would be meeting by telephone with perhaps Judge Zoss to determine an appropriate trial date.  I'll let him know that I had this event and, of course, I'll enter a written order on these proceedings, but I suspect that we need to hear from you about an appropriate trial date.

MR. WILLETT:  Your Honor, if it please the Court, the only input I can give to that right now is Mr. Reinert has described the Government's discovery file to me as huge.  This might be an appropriate case where we waive my client's speedy trial rights -- I'll discuss that with her -- and that we ask for a trial date that's out in the future with pretrial motions deadlines out in the future that's really reasonable to hope for and not something that's going to come up quick where we're going to file a motion for continuance after motion for continuance.

THE COURT: I knew that. That's why I purposely did not embark upon setting a trial date today.

MR. WILLETT: Thank you, Judge.

THE COURT: We're in recess.

(Proceedings concluded at 1:47 p.m.)

C E R T I F I C A T E

I, Kay C. Carr, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the proceedings in the above-entitled matter at the time and place indicated.

That I reported in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to print by means of a computer-aided transcription device under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

I further certify that I am not related to or employed by any of the parties to this proceeding, and further that I am not a relative or employee of any attorney of counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 19th day of September, 2000.


Kay C. Carr, CSR, RPR
U.S. Courthouse & Federal Bldg.
101 First Street SE
Cedar Rapids, IA 52401
(319) 286-2324

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, )
) CASE NO. CR00-3034-MWB
    Plaintiff, )
) RECORD SEALED BY ORDER
vs. ) OF THE COURT
)
ANGELA JOHNSON, ) PAGES 1 - 24
)
    Defendant. )

COPY

The Defendant's Application for Protective Order held before the Honorable Paul A. Zoss, Judge of the United States District Court for the Northern District of Iowa, Western Division, at the Federal Courthouse, Sioux City, Iowa, on November 6, 2000, commencing at 3 p.m.

APPEARANCES

PATRICK J. REINERT, U.S. Attorney's Office, P.O. Box 74950, Cedar Rapids, Iowa 52407-4950, appearing on behalf of the plaintiff;

ALFRED E. WILLET, Attorney at Law of Terpstra & Epping, 118 3rd Avenue SE, Suite 500, Cedar Rapids, Iowa 52401-1424 appearing on behalf of the defendant.

Also appearing telephonically: Angela Johnson.

Reported by Carolyn Plueger, CSR, RPR

**SCHUETTS REPORTING**
CERTIFIED SHORTHAND REPORTERS

P.O. BOX 1325
SIOUX CITY, IA 51102-1325
PHONE: 712-239-1300

Case 3:09-cv-03064-MWB-LTS Document 284-61 Filed 06/23/11 Page 75 of 100

THE COURT: Mr. Reinert?

MR. REINERT: Hi, Judge.

THE COURT: Mr. Willett?

MR. WILLETT: Good afternoon. Can you hear me?

THE COURT: Yes, I can.

MR. WILLETT: I am in the marshal's holding area here in Cedar Rapids. And about 6 feet away from me is my client Angela Johnson. I am going to have her say good afternoon to you so you know she's here.

MS. JOHNSON: Good afternoon, Judge.

THE COURT: Good afternoon. Then we have the defendant present. We have Mr. Willett and we have Mr. Reinert. Is that all that is present for this hearing?

MR. WILLETT: Yes, Your Honor. My cocounsel, Mr. Parrish, is out of state this afternoon so I'm handing this.

THE COURT: That's fine. Can everyone hear okay?

MR. WILLETT: I can hear you fine. And Angela can hear you fine too, Judge.

THE COURT: Okay. We have two motions that I am going to deal with. One is the motion to continue trial. There is no resistance filed yet. Mr. Reinert, what is your position on that?

MR. REINERT: If he needs more time, Your Honor, we're certainly willing to give it to him.

THE COURT: How many trial days are you looking at, Mr. Willett? I know it is awful early to come up with that number.

MR. WILLETT: Reinert and I have talked initially, before the discovery of the bodies, that we felt this might be a 3-week trial; basically opining that the government would take a couple of weeks and the defense might make take a week. I am assuming with the discovery of these four bodies, we're adding on at least 1 week because now we're going to get into a lot of expert testimony. And Pat disagrees with me. He thinks I am wrong, but I think we are probably talking about a full month.

MR. REINERT: I think that probably would be a fair estimate, Judge.

THE COURT: Okay. Mr. Willett has asked for a trial date in October or November of 2001. As you know, to find a month in Judge Bennett's schedule, we will schedule it as close to then as possible. I will grant the motion to continue. I will not be able to say if it might not be in December or January even. We will do the best we can. But getting out a block of time that much from Judge Bennett will require some work.

MR. WILLETT: Your Honor, we understand. And this is something I discussed with Angie before I ever filed the motion and she understands the necessity of the delay.

THE COURT: Now, I am concerned about having a pretrial motions deadline four months before the trial date. That's really -- Understanding it is going to take you a lot of time to get ready, but I would like to have the motions filed. And then if you have some reason for some late filed motion, you either can't get it ready or it's something newly discovered, you certainly would be given leave to file the motion later. But I would like the initial pretrial motions deadline to be like sometime in April or so.

MR. WILLETT: Oh, we can live with that, Judge.

THE COURT: And what I'll do is I will probably set an April 1st pretrial motion deadline. And if you have got something that is not going to be ready by then, you don't have to do it, but at least, you know, if you are going to file a bunch of motions, you can get what you have ready by then on file so we can start working on it.

MR. WILLETT: That's fine. Judge, the only reason I picked four months is that's sort of the time frame we had in the first trial schedule order.

THE COURT: Sure. And that's fine. And that may

not be a problem. But, you know, for example, if you have some motions you know about now, you might as well file them now and we can start working on them earlier rather than later. But I'm just going to do that. And we will enter that as an order.

Anything else we have to deal with before we talk about the motion for protective order?

MR. REINERT: I don't think so, Judge, on the continuance.

THE COURT: On anything else other than the motion for protective order that anybody has that is a problem we need to deal with?

MR. WILLETT: No. Probably the only procedural thing we're dealing with later this week, Your Honor, is Judge Jarvey has scheduled a telephone conference with Mr. Williams, with Al Parrish and myself to keep discussing this idea of expert witnesses and the information that may come out of the discovery of the four bodies, but --

THE COURT: Yeah, and I talked to him and he is going to continue to handle that matter.

MR. WILLETT: That's fine. That's the only thing that is on the immediate horizon.

THE COURT: Okay. Then let's move to the application for protective order.

First of all, Mr. Reinert, I think that a lot of

your resistance dealt with really what a contempt type or sanction type situation would be. And I am not really -- Since there has been no request for that, I am not really concerned with willfulness or lack of willfulness. I'm concerned with what the Shepard standard is going to require us to do to protect the case from prejudicial pretrial publicity.

MR. REINERT: I agree, Judge. And I didn't have a chance to really -- the court only gave me a couple of days.

THE COURT: I'm not being critical. I am going to cut to the chaste.

MR. REINERT: I just wanted to try to be as thorough as I could and cover the waterfront because I didn't know exactly where the defendant was coming from.

THE COURT: Why do we have these press conferences with these inflammatory remarks going in a case like this?

MR. REINERT: Well, I am not sure what -- part of it -- partly it was the context of the case. We started the -- I guess most -- The initial press comments that Mr. Willett was concerned about were the August comments where it was just an announcement of the charges.

THE COURT: When was she arrested?

MR. REINERT: She was arrested -- I don't have

the date. Late July.

THE COURT: So these --

MR. WILLETT: August 9, Your Honor, and August 10th. And the hearing, I believe, was August 1st in front of Judge Jarvey.

THE COURT: So all of these comments were post arrest?

MR. WILLETT: Yes.

MR. REINERT: It was the initial -- She had appeared in court -- I believe it was August 1st or 2nd. I think we had the continuation of the detention hearing until August 2nd.

THE COURT: Now why would he -- Let's just go through it. Why would he say at a news conference that Johnson and Dustin Honken, who is in prison, were involved in the disappearances?

MR. REINERT: Well, that was what she was charged with.

THE COURT: Well, he didn't say she's charged with being involved with the disappearances. The quote is -- And maybe -- If you are telling me it is misquoted, that's another thing. The quote is, "She's involved with the disappearances." That's a direct comment on the weight of the evidence and the resolution of the case. That's the answer, not the question or the issue.

MR. REINERT: Well, part of the problem you run into I think with print media is difficulty in having a direct quote.

THE COURT: Are you saying that's a misquote?

MR. REINERT: I don't know if it's a misquote or not. I don't -- I don't recall if I was even at the press conference to say 100 percent whether it was a misquote or not.

THE COURT: Well, let me ask you about this. When asked if it would be difficult to prosecute Honken and Johnson without having evidence from the victims' bodies, Rapp said, "Rest assured, there is evidence from other witnesses." Isn't it a direct -- Why is that not a direct violation of the local rule?

MR. REINERT: Well, that was also included in the indictment.

THE COURT: He didn't say the indictment charges that there is evidence from other witnesses. The indictment doesn't say what's from witnesses and what's not from witnesses. The indictment doesn't say "rest assured." That's not from the indictment, Mr. Reinert. How is that from the indictment? "Rest assured there is evidence from other witnesses." What's in the indictment that has anything like that? Point it to me. That's just a misstatement, Mr. Reinert. That's just not true. Is

it?

MR. REINERT: Well, Your Honor, I --

THE COURT: Come on. You can fess up on that one. Does the indictment say anywhere, "Rest assured, there is evidence from other witnesses"?

MR. REINERT: You want me to answer the court's question, then?

THE COURT: Yeah. That's the question.

MR. REINERT: You're correct, the quote "rest assured" is not in the indictment. However, the subject matter in answering the question that is posed by the media, the answer to that question is in the indictment.

THE COURT: Does the indictment say something about what evidence you have without the victims' bodies?

MR. REINERT: It does talk about evidence because the indictment has in there an overt act as well as background summary of the act, statements, and other evidence contained therein. For instance, the purchase of the firearm is specifically discussed as an act committed by the defendant. So the indictment, having a fair amount of detail in it, does answer that question. So the subject matter is contained specifically in the indictment about other evidence available.

THE COURT: Well, I think what the rule says is you can talk about things in the public record without

comment. Isn't that what the rule is? Let me find the rule.

MR. REINERT: I think that's --

THE COURT: "Quoting from or referring without comment to the public records of the court of the case," that's what the rule says you can do. Now I am not -- You know, maybe these are misquotations, but --

MR. WILLETT: Your Honor, can I just insert one small thing? I was very careful -- And I attached the newspaper articles to my motion. I was very careful to reference these quotes to what was contained in the newspaper articles.

THE COURT: Yeah, the quotes are from the newspaper articles. I am just saying the newspaper reporter could have misquoted Mr. Rapp, if that's -- that can happen.

MR. WILLETT: That can happen, Judge. I just want the court to be aware that I was very careful of what I placed into the motion.

THE COURT: Mr. Reinert, you were not on the -- at the press conference, and I am not on your case or anything, but I read this and it kind of incensed me. I don't see any -- You know, this isn't where you are out trying to catch somebody and you are giving information to the public so that you can do it or you are announcing what

is in the public record.

The code of professional responsibility and the local rules are pretty clear that you are not supposed to say these kinds of things to the press. I don't think it is even close. I don't understand this. I guess, you know, you can say: Here's what the indictment says, and read from it without comment, but you can't start commenting on what the evidence is. And you certainly can't talk about how reliable your jailhouse informant is. What's -- what's the -- what's the exception to the rule that allows you to do that?

MR. REINERT: I am not sure which part you are talking about, the reliability.

THE COURT: "Rapp suspected there was a high probability of finding DeGeus' remains because the information provided by the jailhouse informant proved so accurate in the finding of four bodies at the other site."

MR. REINERT: Well, in part, remember, the court has to look at this as a case. You can't just rely only on the initial issue -- You have to take that comment in context. What we're looking at is questions about what's going on out in the -- in the investigative stage, what evidence they seized, what are they working on. And that's the context in which they were dealing with. And you are allowed to inform the public of the evidence that had been

seized other than a confession by or admission by a defendant, Your Honor.

THE COURT: Well, wait a second. Wait a second, Mr. Willett.

MR. WILLETT: Well, Your Honor --

THE COURT: Mr. Willett, just a second.

MR. WILLETT: I want (inaudible) --

COURT REPORTER: I can't hear him.

THE COURT: Mr. Willett, just a second. I will give you your turn.

MR. WILLETT: Okay.

THE COURT: Where does it say that, that you can discuss the evidence?

MR. REINERT: It is in -- Let me look here. Rule 57.1, the end of subparagraph C.

THE COURT: What -- Subparagraphs, or what?

MR. REINERT: Subparagraph C, at the end of that, it says, "The foregoing shall not be construed to preclude a lawyer or a law firm from announcing the facts and circumstances of an arrest, identity of the investigating and arresting officer or agency --

THE COURT: Slow up.

MR. REINERT: -- with the investigation.

THE COURT: Slow up. Slow up. There is a court reporter here.

MR. REINERT: I'm sorry. -- the identity of the investigating and arresting officer or agency, lengthy investigation, from making an announcement at the time of seizure of any physical evidence, other than the confession, admission or statement, which is limited to the description of the evidence seized."

THE COURT: Okay. That's what you can do. You can describe exactly what you received without comment.

MR. REINERT: And I think that's what they were talking about. They were describing what the investigation -- what the scope of the investigation was that they were looking for, four bodies at one location, apparently one body --

THE COURT: Wait a second.

MR. REINERT: Pardon me?

THE COURT: Wait a second. "High probability that the remains would be found because the information provided by the jailhouse informant proved so accurate in the finding of the four bodies at the other site." That's not announcing the evidence received without comment. The evidence received is we have located four bodies. Period. The evidence is: This means our informant is really good. What's the justification for commenting on the high probability because your informant was so good? Give me the context that says that that is an exception from this

rule.

MR. REINERT: Well, I think the context you are looking at is the scope of the investigation, you are allowed to discuss.

THE COURT: Where does it say "scope of the investigation"?

MR. REINERT: The -- Where they talk about the identity of the investigating and arresting agency, lengthy investigation --

THE COURT: Wait a minute. You can say this was investigated by the FBI, this is a 6-month investigation, we have discovered four bodies. What -- you know, you're -- you're really talking mush, Mr. Reinert. This is really not what this says. That's not what the rule says. I know you have got to defend these comments because that's your job, but this is baloney.

Well, defend this for me. "You can kill your way out of cases. This is not the kind of message a civilized society can tolerate." What kind of comment is that for a prosecutor to make pretrial?

MR. REINERT: Well, Your Honor, I am not prepared to parse each and every comment today. I have only had about 2 days to look at this and had to get ahold of all of the law.

THE COURT: Well, I think with this -- with these

comments, there was some urgency if we're going to have press conferences about "Mother Theresa doesn't always go along with the hit man." What is -- This is not -- Mr. Reinert, this isn't close. I looked at the law. The law is not real complex in this area. We have a duty to make sure that neither side contaminates the jury pool. And this stuff is way beyond -- way beyond anything I can see. And I looked at the rule. And, you know, you can make a good faith defense, but a good faith defense isn't just we're entitled to describe the investigation.

And if you want more time to discuss this and you will admit you won't make any comments to the press or hold any press conferences while we wait while you respond to this, I will be glad to give you the time you need, if you want another week to brief this, but I don't want any press conferences or any communications or releases to the press until we have had a chance to hear, or until you've had a chance to agree that you're not going to do this stuff. All they are asking for is you not do it anymore. Nobody is asking for sanctions. Nobody has asked for anything other than a protective order. And I guess I don't want to see this happening again. I don't -- I don't -- You know, I don't get very angry about most things, but this is ridiculous. I will just say it. You want a quote for the press, this is way beyond the bounds of what I think is

appropriate to announce in a pending murder case.

Do you want more time?

MR. REINERT: Well, Your Honor, I guess we could take it twofold. Insofar as the court feels these comments are inappropriate, we certainly would not make any comments of that nature again. We don't -- I don't feel we should -- should or can admit that we have strayed beyond the rule; but insofar as the court feels these are beyond that, we certainly will not do that.

If the court wants to enter a protective order that follows the scope of the current existing Criminal Rule 57.1, that's fine. I don't think it is necessary to enter a rule -- to enter a specific order beyond that.

THE COURT: Well, if you don't admit that what you've done already is a violation of the rule, I think it is necessary. And I am going to file a Shepard and do an appropriate gag order rule if we don't have some kind of ground rules that you are willing to agree to.

That's -- I am just telling you, Mr. Reinert, you are a good lawyer, and I know you would like more time to come up with something to come up with this, but this is -- those comments should not be made to the press in a case like this. That's just -- It is common sense. I mean it is not even close. This is --

I am going to seal this record. I am ordering it

sealed now.  Of course the parties have access to it. But -- but do you want more time to give me some law?  I am going to enter a short order today that is just going to prohibit anything until I had this legal issue resolved. But --

MR. WILLETT:  Your Honor, can I be heard on that?

THE COURT:  Go ahead.

MR. WILLETT:  Your Honor, my position is this: That the court -- the court has read our intention correctly.  I mean if I am remembering the authority, I did cite DR7-107.  I started looking at the local rule and reading some of the law in this issue, it appears to me that DR7-107 was at least a partial mirror of the local rule, if not a complete mirror.

THE COURT:  It is probably vice versa.

MR. WILLETT:  I'm not asking for sanctions against Mr. Rapp or any of the assistants to that office. I am trying to guarantee my client's right to a fair trial under the 6th Amendment to the United States Constitution. And I don't believe that can be done with comments that the court has already mentioned pertaining to Mother Theresa, nor the quote at the top of page 3 of my motion.  "That kind of message - that you can kill your way out of cases - is not the kind of message a civilized society can

tolerate, he said." "He" being Mr. Rapp.

THE COURT: The problem, Mr. Reinert, is that we haven't heard any of this over in Sioux City, for example. And I am pretty sure you are not going to be trying this case in Cedar Rapids, especially with this kind of press coverage. But you don't want to have so many of these quotes out here that when the, quote, case finally gets handled in Sioux City, or wherever it ends up, that the press here picks up your articles from the Cedar Rapids Gazette and starts quoting about killing your way out of cases on the morning of jury selection.

MR. REINERT: I agree, Your Honor. I think that's the key, is we need to protect the jury pool at this point. Insofar as the comments are inappropriate, they won't happen again.

THE COURT: Okay. Well, that's what I am looking for. Why don't we -- Do you want to brief it some more or do you want me to just get out an order?

MR. WILLETT: I am going to resist allowing Mr. Reinert to brief it some more and I will tell you why. I took, from those 25 pages of newspaper articles that I attached to my motion, the quotes that I felt -- in my probably biased opinion, but the quotes that I felt, nonetheless, were the most egregious and the most startling. And Mr. Reinert is a good lawyer, but I am not

sure giving him any more time to read the case law will enable him to come up with any better argument.

THE COURT: Well, you filed your motion on November 1st. It is November 6th. He gets --

MR. WILLETT: All I am asking for is, you know, "Al, what do you want?" All we want is for an appropriate gag order not allowing the United States Attorney's Office to comment beyond the local rule. And we want the court to put the United States Attorney's Office on notice that if they violate this protective order, there will be remedies that the defendant can pursue. What we're trying to make sure of, Your Honor, as I stated earlier, that my client gets a fair trial.

THE COURT: Well, if all you are looking for is an order that says they won't go beyond the local rule, I can do that right now. I don't have -- You're right, I wouldn't need any further legal research. I wouldn't need anything. Mr. Reinert has indicated, as I understand the record, that he consents to that kind of order.

MR. WILLETT: And we agreed to that, Judge. And right now, this case will be tried in Sioux City because, as the court knows, it is a simple addition case. I don't want Mr. Rapp to think that he can keep entertaining our audiences with these type of press releases because eventually, then, we're going to be in Northern Idaho, not

in Northern Iowa, if he keeps up.  We just want a fair trial.

THE COURT:  Well, I can say that right now, nobody in Sioux City has heard much about this case.  And, you know, without giving opinions about what the jury pool has or knows, there just hasn't been much coverage here.  I read the local papers.  It is pretty well uncontaminated, as far as I can tell.  There was some mention of it, I think, back when Mr. Honken was originally sentenced over here.  But it looks pretty clear.  But we can't have this kind of comment in the front page of the Sioux City papers or we're going to have -- we're going to have a real problem of getting a decent jury anywhere.

MR. REINERT:  Well, I think the delay also, Your Honor, assists in purging any taint that may exist in the pool as well because people have a relatively short memory after the --

THE COURT:  Well, I will just enter a short order requiring the local rules.  We have got this record of this hearing.  And if -- You know, at least you know, Mr. Reinert, how I think about how the rules apply to the statements that have already been made.

I can go through the additional statements, if you want.  Some of them are just fine.  Some of the things Mr. Willett pulled out, I don't think were a problem and I

think were appropriate. But things like: "I want to make it clear to people that if you bury the bodies deep and we never discover them, you don't get away with murder." That's a closing argument. That's not a pretrial announcement of untainted information to the press. That's a -- that's -- that's just not the kind of stuff that you are supposed to do with the press in a case that is going to be tried, particularly a serious case like this.

Now a lot of the quotes I didn't think were a problem, but if you want more guidance in how they -- how they impressed me, I just tell you that many of them I saw as real problems under the local rules. You can't comment on the credibility of witnesses. And there were several quotes that were buttressing the credibility of the informant. "He is so reliable, we just really believe the evidence is going to be true." You know, that's classic prohibited comments.

But, anyway, I will enter the short order. I appreciate it. It sounds like both parties agree to, at least, the same kind of order. I'll enter the order. I will order the record of this thing sealed. I won't seal my order because my order will be fairly generic.

Anything else we need to do on the application?

MR. WILLETT: Your Honor, I am assuming -- And, first of all, I am hoping that we don't have to revisit

this issue before my client's trial. But if for some reason I think we need to revisit this issue, all I would need to do is to file the appropriate motion and this issue of pretrial publicity will be brought back before you?

THE COURT: Sure. If something further happens and -- or -- You can file whatever motion you want by the motions deadline, or after, if you have justification for filing it after, and we will consider it. I don't see this order as -- as preclusive if there is some evidentiary thing that you think is appropriate, but I -- I will say this: I think if there were no further statements made and nothing else happens, that I wouldn't do anything about what has happened so far.

MR. WILLETT: And I am not going to, Judge. I wasn't trying to imply that. I'm just hoping that, quite frankly, both sides will learn that silence would be the best thing to do here until the case is over.

THE COURT: Yeah. And I say this is a two-way street, too, that to the extent anybody of the defendant decides to try the case in the press, I'll have the very same reaction. If there is a -- If, for example, defense attorney in this case, or in any other related cases, would start telling the press that the informant is a lying scum bag and nobody should believe him, I would have the very same response.

MR. WILLETT: Your Honor, we understand. We haven't done that. We're not about to do that.

THE COURT: I didn't say you did and I didn't say you would.

MR. WILLETT: And if we have that opinion of the informant, you will just hear us say it in court.

THE COURT: That's where it should be said.

Thank you both. Anything further?

MR. WILLETT: Not for us, Judge. Thank you.

MR. REINERT: No, Your Honor.

THE COURT: Thank you both.

* * * *

END OF PROCEEDINGS AT 3:30 P.M., 11-6-00.

* * * *

CERTIFICATE

I, Carolyn Plueger, appointed the official court reporter for this proceeding, hereby certify:

That I acted as such reporter on the hearing commencing on November 6, 2000, and took down in shorthand the testimony offered and proceedings had on said hearing.

That the foregoing pages are a true and correct transcript of said stenographic notes so taken by me in said hearing at the times therein shown.

Dated at Sioux City, Iowa this 13th day of November, 2000.

*Carolyn Plueger*
Certified Shorthand Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,       )     CR 00-3034 MWB
                                )     VOLUME I
        VS.                      )     **SEALED**
                                )
ANGELA JOHNSON,                  )
                                )
                Defendant.       )

APPEARANCES:

ATTORNEY C.J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., P.O. Box 74950, Cedar Rapids, Iowa 52407-4950, appeared on behalf of the United States.

ATTORNEY ALFRED E. WILLETT, of the firm of Irvine & Robbins, 417 First Avenue S.E., P.O. Box 2819, Cedar Rapids, Iowa 52406-2819,
                            AND
ATTORNEY PATRICK J. BERRIGAN, of the firm of Watson & Dameron, 2500 Holmes Street, Kansas City, Missouri 64108-2743,
                            AND
ATTORNEY ROBERT R. RIGG, Drake University Law School Legal Clinic, 2400 University Avenue, Des Moines, Iowa 50311, appeared on behalf of the Defendant.

SUPPRESSION HEARING IN RE THE ABOVE MATTER,

held before the Hon. Mark W. Bennett on the 11th day of April, 2001, at the Federal Building, 101 First Street S.E., Cedar Rapids, Iowa, commencing at 1:00 p.m. before Patrice A. Murray, Certified Shorthand Reporter in and for the State of Iowa.

                Patrice A. Murray, CSR, RPR, RMR
                        Federal Building
                    101 First Street S.E.
                   Cedar Rapids, Iowa 52401
                        (319) 286-2324

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )    CR 00-3034 MWB
                                   )    VOLUME I
        VS.                        )    SEALED
                                   )
ANGELA JOHNSON,                    )
                                   )
                Defendant.         )

APPEARANCES:

ATTORNEY C.J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., P.O. Box 74950, Cedar Rapids, Iowa 52407-4950, appeared on behalf of the United States.

ATTORNEY ALFRED E. WILLETT, of the firm of Irvine & Robbins, 417 First Avenue S.E., P.O. Box 2819, Cedar Rapids, Iowa 52406-2819,
                AND
ATTORNEY PATRICK J. BERRIGAN, of the firm of Watson & Dameron, 2500 Holmes Street, Kansas City, Missouri 64108-2743,
                AND
ATTORNEY ROBERT R. RIGG, Drake University Law School Legal Clinic, 2400 University Avenue, Des Moines, Iowa 50311, appeared on behalf of the Defendant.

SUPPRESSION HEARING IN RE THE ABOVE MATTER,

held before the Hon. Mark W. Bennett on the 11th day of April, 2001, at the Federal Building, 101 First Street S.E., Cedar Rapids, Iowa, commencing at 1:00 p.m. before Patrice A. Murray, Certified Shorthand Reporter in and for the State of Iowa.

Patrice A. Murray, CSR, RPR, RMR
Federal Building
101 First Street S.E.
Cedar Rapids, Iowa 52401
(319) 286-2324

Page 2

INDEX

| WITNESS | D | C | RD | RC | COURT |
|---------|-----|-----|-----|-----|-------|
| Mark Fischer | 10 | 37 | 66 | 67 | |
| | | | 72 | 72 | |
| Michael Merino | 74 | 98 | 123 | 126 | 128 |
| | | | | 132 | |
| Andrew Rich | 135 | 147 | 154 | | 157 |
| | | | 159 | | |
| William Reese | 162 | 173 | | | |

EXHIBITS

| | O | R |
|---|---|---|
| Gov. Exhibit Nos. 1 through 14 | 7 | 7 |
| Def. Exhibits A through T | 8 | 8 |
| Joint Exhibit 1 | 56 | 56 |

Page 3

THE COURT: This is United States of America versus Angela Johnson, criminal number 2000-3034. And we're here in what has been denominated as Government's request for evidence and request for evidentiary hearing, which is really kind of morphed into a suppression motion, would you agree with that, Mr. Willett?

MR. WILLETT: I would agree completely, Your Honor.

THE COURT: Is there any significance to continuing to treat it as the notice of intent to use evidence versus treating it as a suppression motion?

MR. WILLETT: Not that I can see, Your Honor.

THE COURT: Mr. Williams, what's the Government's view?

MR. WILLIAMS: The same, Your Honor. I think it evolved into a suppression motion. I see no procedural or otherwise legal significance to treating it as such.

THE COURT: Okay. Now, you both have briefed it, provided me with copies of exhibits, exhibit lists, witness lists from the Government. I just want to talk to you a little bit about procedure. Here's my thinking. It sounds like we're going to go into Friday, and depending upon when we finish Friday, I

Page 4

might want some relatively short argument, but it's obviously an exceptionally important issue and exceptionally important case to both sides, and I don't think I'd surprise you by saying I don't intend to rule from the bench. I only ruled from the bench in one matter in nine and a half years and I'm not going to make this the second, so I have read the briefs. I have read most of the cases cited by the parties, a considerable number of cases not cited by the parties, but I haven't read all the exhibits, and I need a lot of time to think about this. And so my plan would be to not have -- if you want to have maybe a short cursory closing argument on Friday, and then after I've had a chance to get the realtime transcript, review that several times, review all the exhibits, and probably get a pretty substantial start on the draft opinion, then I'd like to bring you all back to Cedar Rapids and have closing arguments because I'd be in a better position to ask the questions I want to ask at that point than I will be on Friday. I've used this procedure a couple of times in civil nonjury trials, where I have taken all of the evidence and then taken a delay, come back some period of time later and had closing arguments and I found it to be a very, very helpful experience, and so I was

Case 3:09-cv-03064-MWB-LTS   Document 284-61   Filed 06/23/11   Page 100 of 100