going to say unless somebody has an objection -- but even if you do have an objection, I'm going to do it that way, so I won't say that, but do you have any objection Mr. Williams, in proceeding that way?

MR. WILLIAMS: No, Your Honor.

THE COURT: And we'll find a time that's mutually convenient for all the lawyers in the case to come back and have the arguments and then I would anticipate being able to get an opinion out after seven to ten days after the arguments.

MR. WILLIAMS: Very good.

THE COURT: Mr. Willett, any problems?

MR. WILLETT: No objections whatsoever, Your Honor. And if the Court's docket allows Friday morning, if there's some time for cursory argument, we've asked Professor Rigg to present that argument for us. One very brief matter in housekeeping, Your Honor, I forgot to mention it in chambers, when witness McNeese takes the stand, based upon the Court's prior ruling regarding the representation issue, the defense would like to split up that cross-examination between myself and Mr. Berrigan from Kansas City. I would like to stay away from areas that might touch upon Dr. Shultice, Scotter Clark, or Geoffrey Garrett, and I think the best way to handle

this is to split that portion off if the Court would allow that to be done.

THE COURT: Yeah, my general rule is I don't allow what I call World Federation of Wrestling tag team examination of witnesses, but there's always exceptions to general rules, and it seems to me that this would be a wise course of action. And Mr. Williams, does the United States have any objection?

MR. WILLIAMS: None, Your Honor, thank you.

THE COURT: Okay. That's fine. You have permission to divide up your questioning with regard to witness McNeese. Are there any other preliminary matters before we get started, Mr. Williams?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Mr. Willett.

MR. WILLETT: Your Honor, at some point early on, Mr. Williams and I may be introducing our exhibits, but I guess we don't have to do that at this moment.

THE COURT: Are there any objections to each others' exhibits, other than I note some are duplicative of others, but --

MR. WILLIAMS: Your Honor, the counsel

conferred just before the hearing started, and I think the positions are that neither of us have any objections to the others' exhibits, and if that's the case it may speed things along, and we can treat them as already being admitted into evidence.

MR. WILLETT: And I would concur, Your Honor. Obviously this all comes from the common discovery file, and we're aware of it, so --

THE COURT: Okay. So with regard to Government's Exhibits 1 through 14, you have no objection, Mr. Willett?

MR. WILLETT: None, Your Honor.

THE COURT: 1 through 14 with regard to the Government's exhibits are admitted. And Mr. Williams, have you had a chance to look at the Defendant's exhibit list?

MR. WILLIAMS: I have, Your Honor.

THE COURT: Let me ask you something, Mr. Willett, about your system of exhibits.

MR. WILLETT: Yes, Your Honor.

THE COURT: Do I take it that every time you have a multiple page exhibit, then you've got A through A2.

MR. WILLETT: That's exactly correct, Your Honor.

THE COURT: So, for example, Exhibit L would be a single page because there's no designation.

MR. WILLETT: That is correct, Your Honor.

THE COURT: Okay. But for purposes of admission, I could refer to them as Defendant's Exhibits A through T, is that correct?

MR. WILLETT: That is correct.

THE COURT: Does the United States have any objection to Defendant's Exhibits A through T?

MR. WILLIAMS: No, Your Honor.

THE COURT: A through T are then admitted into evidence.

MR. WILLIAMS: Counsel, I think, are intending to try to work together at the end of today's evidence anyway and see if we can eliminate some of the duplication in the file here, and we'll alert the Court first thing in the morning on that issue.

THE COURT: Okay. Thank you. Any other preliminary matters you can think of?

MR. WILLETT: Not that I can think of, Your Honor.

THE COURT: Rule 615 on sequestration of witnesses is in effect?

MR. WILLIAMS: Yes.

MR. WILLETT: As far as we're concerned, Your Honor.

MR. WILLIAMS: I do have an agent, Special Agent Randy VanGent, that I intend to have here and I understand that that's an exception to Rule 615.

THE COURT: It is. Okay. Ready to proceed with the evidence?

MR. WILLIAMS: We are, Your Honor.

THE COURT: Okay. The United States may call its first witness.

MR. WILLIAMS: The United States calls Mark Fischer.

MARK FISCHER, called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable, and speak directly into the microphone. And when you're ready, will you please state your full name and spell your last name.

THE WITNESS: It's Mark Fischer, F-I-S-C-H-E-R.

THE COURT: There's the first mistake on the Government's list.

MR. WILLIAMS: I noticed that this morning too late to change it, Your Honor.

THE COURT: You know, it's amazing, I'd say nine out of ten trials, both sides cannot get through a witness list with getting their witnesses' names spelled correctly. It's kind of a surprise, but okay. You may proceed.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. How are you employed, sir?

A. I'm a detective with the Cedar Rapids Police Department.

Q. How long have you been in law enforcement?

A. Thirty-one years.

Q. How long have you been a detective with the Cedar Rapids Police Department?

A. I was promoted to detective in 1983.

Q. Was there a period of time when you served with the DEA Task Force based here in Cedar Rapids?

A. Yes.

Q. How long was that?

A. Well, currently -- I'm still, I guess you'd say, a de facto member. I'm a special federal officer and I've worked numerous cases with the task force here locally.

Q. And for how long have you worked in connection with the task force?

A. I think I was deputized in '97 or '98. I don't recall which date.

Q. Do you have any special responsibilities in the area of narcotics enforcement?

A. Yes.

Q. Okay. Explain that to the Court, please?

A. I'm assigned by the Cedar Rapids Police Department to investigate the use, sale, distribution, manufacture of controlled substances within the City of Cedar Rapids. I'm also assigned part-time to the DEA Task Force, and I have worked several cases in conjunction with that entity.

Q. Pursuant to your duties, have you -- did you become involved in the investigation of a person by the name of Scotter Clark?

A. Yes.

Q. Could you briefly summarize to the judge the nature of that investigation?

A. This was an investigation that began in the summer of 1997, involved Scotter Clark and Floyd McNeese and a marijuana trafficking organization. The investigation ultimately led us to Floyd McNeese's brother, Robert, who at that time was incarcerated at the Atlanta Federal Penitentiary.

Q. And Scotter Clark was somebody who lived in the Cedar Rapids area?

A. Yes, both he and Floyd McNeese.

Q. What type of controlled substances was it suspected that Scotter Clark and Floyd McNeese were trafficking in?

A. Marijuana.

Q. How did you first become informed about this connection between Scotter Clark and Floyd McNeese?

A. We had two informants approach -- actually approach myself in August of '97 with information that they were involved in a marijuana trafficking organization where the marijuana was coming from some place near the Chicago, Illinois, area.

Q. Could you explain to the judge how that evolved to having contact with Bobby McNeese, or Robert McNeese?

A. As best as I can, and it's -- we had -- a couple of things happened almost simultaneously in October and November of '97. We had received a phone call from the federal penitentiary in Atlanta that some of the recorded phone calls that the inmates had made had been overheard, specifically one from Robert McNeese, and in that phone call, they felt there were some type of criminal activity in this conversation, and they in turn contacted the Cedar Rapids Police Department.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 2 of 100

Page 13

Also, about that time we became aware of another individual whose name was Joey Gross that was involved with the New York crime family, who had been to Cedar Rapids on a couple of occasions, and we were actually able to surveil him at least -- on at least one occasion. And through phone records, etcetera, we found that there was an active connection between Mr. Gross and the New York crime family. We also learned that Joey Gross had been incarcerated in Atlanta, Georgia, and we further learned that he was an associate of the Lucchese crime family, that he knew Robert McNeese, and in fact, were close associates in the Atlanta penitentiary.

Q. As part of your ongoing investigation, did you have an opportunity then to review some of the recorded calls from the Atlanta Penitentiary?

A. Yes, I actually made three trips to Atlanta where phone calls had been recorded with Robert McNeese. We listened to the calls and actually made copies of them for our investigation.

Q. At some point in time, did you approach Robert McNeese concerning whether he was willing to provide information in aid of the investigation?

A. In July of '98, myself and Agent Stonestreet from the FBI went to Atlanta and approached Mr. McNeese

Page 14

concerning this drug trafficking operation in Cedar Rapids involving Scotter Clark and his brother Floyd.

Q. When you approached Robert McNeese in the Atlanta prison, what was his reaction? Did he agree at some point during that interview to cooperate?

A. At some point he did, yes.

Q. Was there any written document drafted to reflect his cooperation at that point in time?

A. Not that I recall.

Q. How did Robert McNeese's cooperation with law enforcement then evolve from this date, I think it was July 28 of 1998, when you interviewed him in the Atlanta penitentiary?

A. He was subsequently brought back to the Linn County Jail, I believe in September of '98.

Q. For what purpose?

A. I believe it was to testify at the Grand Jury concerning the Scotter Clark marijuana trafficking organization.

Q. And did he ultimately on February 17 of 1999 testify in the federal Grand Jury here in the Northern District of Iowa?

A. Yes, he did.

Q. While he was in jail here locally from September of 1998 through February 17 of 1999, was there

Page 15

additional contact that Robert McNeese had with anybody else where he furthered any cooperation with the Government?

A. Well, he continued to cooperate with Mr. Clark. Mr. Clark actually thought that he was not cooperating with the authorities, and gave us additional information concerning Mr. Clark. We came to visit him on several occasions. He also had become associated with Steve Stefani, who was a local attorney at the time. And I don't recall if he was pending federal charges or -- I believe he was locked up because of a probation violation, and he would provide us information concerning Steve Stefani, which we were able to corroborate.

Q. I want to focus for a moment on the contact between Scotter Clark and Robert McNeese. At the time that Robert McNeese had contact with Scotter Clark and was providing information to law enforcement concerning their communications, was Scotter Clark formally charged with any crime at that point in time?

A. Not at that time.

Q. And was he incarcerated at that time?

A. No, he was not.

Q. Now, you indicated that Steve Stefani was incarcerated during the time period that they had

Page 16

contact with each other, they being Robert McNeese and Steve Stefani, on what you believe to be a probation violation, is that correct?

A. That's correct.

Q. During that same time period that Robert McNeese was providing information about Steve Stefani, was Steve Stefani doing the same thing regarding Robert McNeese?

A. Exactly.

Q. Would you explain that to the judge?

A. McNeese would contact us about information that Stefani was providing to him, and conversely, Stefani would contact us and want to give us information about Mr. McNeese and his crime activity.

Q. Now, in March of 1999, was Robert McNeese returned to a federal penitentiary in Indiana?

A. I'm sorry, what was the date?

Q. In March of 1999?

A. I believe so, yes.

Q. And --

A. Excuse me, he was returned where?

Q. Indiana, to a federal penitentiary.

A. Yes, he went to Terre Haute.

Q. At some point during this time period, did Robert McNeese also provide some additional assistance in an

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 3 of 100

investigation concerning somebody potentially involved in organized crime in California?

A. Yes, he did.

Q. What was the nature of the cooperation that Robert McNeese provided to the Government concerning that individual?

A. Prior to his leaving Linn County Jail and going to Terre Haute, he had contacted me and given me information concerning actually the childhood friend by the name of Daniel Dice, who had confided in him that he was involved in a large scale importation of controlled substances across the border into San Diego/Tijuana, Mexico, area. And I was able to subsequently contact US customs out in San Diego and pass the information on to them.

Q. And at that point, did Robert McNeese provide any additional cooperation in the form of either making recorded calls or providing testimony in any way?

A. Yes, I began working with an agent out in San Diego. He and I visited McNeese in Terre Haute, sat down with him, basically had him layout to us his knowledge of Mr. Dice's involvement, what Dice had in turn told McNeese when he was back here at Linn County. And he ultimately agreed to assist customs in California. And I believe it was on November 5

McNeese was taken to California, where he placed a recorded phone call to Mr. Dice concerning this trafficking operation.

Q. And Mr. Dice was, again, not in custody or formally charged with any crime at that time?

A. No, he was not.

Q. After the cooperation that Robert McNeese provided regarding Danny Dice, was Robert McNeese brought back to the Cedar Rapids area on March 15 of 2000?

A. Yes, and I believe that was in conjunction with the Scotter Clark trial.

Q. And at this time, McNeese already has an attorney appointed for him because of his own potential culpability in the Scotter Clark activities, is that accurate?

A. Yes.

Q. When Robert McNeese is brought back to Cedar Rapids on March 15, is he initially housed in the Linn County Jail?

A. Yes, he was.

Q. On March 22, was he moved to the Benton County Jail?

A. Yes.

Q. Do you know why he was moved to the Benton County Jail back then?

A. No, I don't.

Q. Was -- let me ask it this way, to your knowledge, was he placed in the Benton County Jail for any -- for the purpose of obtaining any information from any inmate up there? Was he placed in there to solicit any information from any inmate in the Benton County Jail?

A. No, I think my impression was that Robert McNeese was a security risk because he's a lifer, and that he was placed in Benton County because of that, and also I think he may have -- I don't know if he had been disruptive there or not previously. I guess I don't know the exact reason why he was taken to Benton County.

Q. But you --

A. It was a decision made by others.

Q. As far as you know, it had nothing to do with putting him there to try to gain information from any inmate up at the Benton County Jail?

A. No, absolutely not.

Q. While he was incarcerated in the Benton County Jail, did he provide additional cooperation with regard to somebody by the name of Garrett?

A. Yes.

Q. Could you explain to the judge what happened at

that point?

A. Well, I continued to have contact with Mr. McNeese because of the Danny Dice investigation. Dice had subsequently returned to the Cedar Rapids area, and Mr. McNeese was attempting to help us in that and cooperate in that investigation, that drug trafficking organization. While he was there, I believe just a day or two, he had approached Pete Wright, who is a special federal officer with the DEA and also a Benton County deputy, indicated that a man by the name of Jeff Garrett, who was a private investigator, had in his possession some documents, I believe transcripts and possibly tapes of telephone calls, that he had gotten illegally, that involved the investigation involving Scotter Clark and specifically a girl by the name of Marissa Manasse, who was an associate of Scotter Clark, and that he had brought these documents to the Benton County Jail to show Mr. McNeese. Garrett and McNeese at that time had a relationship where he had been hired -- "he" being Garrett -- had been hired by Mr. McNeese to do some private investigation for him.

Q. What ended up happening as a result of the information that Robert McNeese provided concerning Garrett?

A. Well, the long and short of it is we obtained permission from the Department of Justice to make a recorded phone call using Robert McNeese to Mr. Garrett and also received permission to record a one-on-one conversation that McNeese was to have with Mr. Garrett concerning these documents. He had indicated these documents had been stolen from a local attorney's office, and obviously we were very concerned about that. Ultimately we did make the phone call and the recorded conversation, where Garrett came to the Benton County Jail, had allegedly these documents with him, and McNeese was able to review again, and -- which led to the issuance of a search warrant for Mr. Garrett's private investigation office.

Q. Who was the attorney's office who Mr. Garrett allegedly broke into and stole these documents from?

A. Mr. Willett.

Q. As a result of that investigation, regarding Garrett, did Robert McNeese remain in the same jail at that point? Was he moved in any way as a result of that investigation?

A. No, at that time, he remained in the Benton County Jail.

Q. Now, while still in the Benton County Jail, and

looking more into the April of 19 -- I'm sorry, of 2000, did you receive any information from Robert McNeese pursuant to your continued contact with him, that he had information concerning a Dr. Shultice?

A. Yes.

Q. Could you explain to the Court how you first became aware that he had any information concerning Dr. Shultice?

A. I -- I was in Benton County speaking with McNeese, and this was concerning the Danny Dice drug investigation.

Q. And let me interrupt you, approximately when did you have this conversation with him, if you can remember?

A. That was the first part of April, I believe.

Q. Okay.

A. 2000.

Q. Please continue.

A. During this conversation, McNeese told me that he was incarcerated in the same jail cell with Dr. Robert Shultice, and that Shultice had given him -- had confided to him that he was attempting to have at least two persons testify falsely for him at his sentencing in Federal Court. And with that information, I relayed that to the US Attorney's

Office, to yourself, and was advised that Mr. McNeese should be provided with a Massiah letter outlining his duties as a listening post in the county jail.

MR. WILLIAMS: May I approach, Your Honor.

THE COURT: You may. And you needn't ask as long as you're approaching with a document or for some legitimate purpose.

MR. WILLIAMS: Very good, Your Honor, thank you.

Q. And I'm going to show you Exhibit 3 and ask you if you can identify that for the judge, please?

A. This is a copy of the memorandum of instruction dated April 11 of 2000 that I provided to Mr. McNeese.

Q. Does that bear your signature?

A. Yes.

Q. And did you see Robert McNeese sign that as well?

A. Yes.

Q. Explain to the judge what process you went through in obtaining and explaining to Mr. McNeese the terms and conditions laid out in this memorandum of instruction?

A. We basically went through it line by line. I asked him if he had any questions about it. He seemed to understand exactly what it meant. Mr. McNeese is somewhat of a jailhouse lawyer and understands legal

terminology probably better than I do. He was instructed that basically he was to be considered a listening post, that his duty -- or his -- what he was allowed to do was to listen to whatever Dr. Shultice had to say and not ask questions other than to respond to whatever Mr. -- or Dr. Shultice was saying.

Q. And if you would take a look at the first page of Exhibit 3, and the first paragraph of that -- on that page. Is this memorandum of instruction limited to basically authorizing Robert McNeese to obtain information under the conditions laid out in this memorandum of instruction with regard to Mr. Shultice only?

A. Yes.

Q. In other words, this isn't a general instruction to Robert McNeese to go out in the Benton County Jail and obtain information from just any old inmate he can get information from, it's specifically limited to Dr. Shultice?

A. That's correct.

Q. At any point after having Exhibit 3 -- going over Exhibit 3 with Robert McNeese and having him sign it, did he ever question you about the meaning or whether he understood the terms and limitations placed on him under that memorandum of instruction?

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 5 of 100

Page 25

A. At that time?

Q. At any time thereafter in relation to the Shultice investigation.

A. Not that I recall.

THE COURT: Mr. Williams, could you hold it one second, please.

(Whereupon, a discussion was held off the record.)

MR. WILLIAMS: May I resume.

THE COURT: You may.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: I don't want to keep you in too much suspense. The note said they're deadlocked so we'll get Mr. Nadler over here --

MR. WILLIAMS: Very good.

THE COURT: -- and have a hearing on it, okay.

MR. WILLIAMS: Why not? Thanks, Judge.

Q. After you have this -- I'm sorry, let's just make sure we have a date on this. What is the date of this memorandum of instruction that you signed with Robert McNeese concerning obtaining information from Mr. Shultice?

A. It's April 11 of 2000.

Q. After April 11 of 2000, did there come a time that

Page 26

Robert McNeese advised you that he was getting additional information from Dr. Shultice concerning soliciting perjury or any other criminal activity?

A. Yes.

Q. What did you do at that point when you got this additional information from Dr. Shultice -- or from Robert McNeese about Dr. Shultice?

A. Basically, I contacted Scott French from the FBI, and essentially turned this investigation over to him, where he was the lead investigator.

Q. Now, Scott French is going to be the next witness in this case. Did you maintain active involvement in the Shultice investigation from that point forward or was that primarily something that Scott French covered?

A. It was primarily Scott French, however, I was involved at several points during the investigation.

Q. Briefly describe for the judge how you were involved with that investigation after you contacted Scott French and got him involved?

A. Again, we contacted the Department of Justice, and they authorized a recording to be made between a conversation from Mr. McNeese and Dr. Shultice. I was present when McNeese was wired up and had the conversation with Dr. Shultice. Shultice also

Page 27

indicated to McNeese that he wanted to hire, first off, a hit man, someone to kill a couple of the witnesses that were involved in this investigation -- or in Dr. Shultice's investigation, and that he also wanted to hire a couple of females to lie at his sentencing. I was present when Agent Greg Brugman from the DEA had spoken in a interview room with Dr. Shultice, which was recorded, where the actual solicitation for the -- the hit was perpetrated.

Q. And in that case, Agent Brugman was acting in an undercover capacity as an alleged hit man?

A. Yes, he was undercover at that time. Also, I was present when one of our female officers, Melissa Henderson, was acting in an undercover capacity, had met with Dr. Shultice in a interview room where they discussed him paying her and a friend to provide false testimony at his sentencing.

Q. Going back to the various parties, on Scotter Clark, you, law enforcement, approached Robert McNeese concerning soliciting his cooperation, is that accurate?

A. Yes.

Q. Thereafter, with regard to Danny Dice and Steve Stefani, Jeff Garrett, and Robert Shultice, at any point, had law enforcement, to your knowledge, and you

Page 28

at any point contacted Robert McNeese and asked him to obtain information or to give information on any of these individuals?

A. No. These were persons, incidents, we were just totally unaware of until he contacted us.

Q. After the Shultice investigation concluded, did you continue to have contact with Robert McNeese?

A. Yes.

Q. And what was the nature of the contact you continued to have with him?

A. It was basically on the telephone, where he would call me, just -- I think he just needed to talk to somebody on the outside world.

Q. What was happening with his case at this point in time in relation to his criminal activity in the Scotter Clark conspiracy?

A. At some point in time, he signed a plea agreement. Frankly, I don't remember when that was. But he did agree to plead to, I believe, a money laundering charge concerning his involvement with the Scotter Clark trafficking case, and, of course, he -- he continued to contact me concerning that. And, I mean, I had frequent contact with McNeese, but I don't recall any specific conversations other than, you know, "How you doing," and complaining about one thing

Patrice A. Murray, CSR, RPR, RMR

or another in the county jail, to tell me what was going on or to tell me something about maybe Danny Dice, things of that nature.

Q. At any point up until -- we're going to get to Robert McNeese's involvement with Angela Johnson. At any point had you ever instructed Robert McNeese to elicit or to solicit any information from any other inmate at the Benton County Jail?

A. No, not at all.

Q. Had you ever asked him to solicit information from anybody else, other than the ongoing investigation with Danny Dice at that time?

A. Absolutely not.

Q. When was the first time you received or became aware that Robert McNeese had any information pertaining to Angela Johnson?

A. I can't put a date on it. I recall that he contacted me on the phone and was telling me about Angela Johnson, who at that time I didn't have a clue who she was. And it sounded like he had struck up some type of conversation with her through notes that they were passing back and forth in the jail, and it sounded more like a flirtatious type of relationship, the way he described it. Basically, that was my first, I guess, knowledge of Angela Johnson.

Q. What did you do with that information once you learned who Angela Johnson was?

A. I don't recall I did anything.

Q. Were you aware at some point that there were other law enforcement officers involved in the Angela Johnson investigation?

A. Yes.

Q. And did you have conversations at some point that they were -- that they became aware of this contact between Angela Johnson and Robert McNeese as well?

A. I don't know if I contacted them or I heard through just the law enforcement rumor mill, from Pete Wright or one of the other agents, that -- who Angela Johnson was, and that McNeese had struck up some type of relationship with her.

Q. Did you have any active involvement with the investigation in which Robert McNeese provided information concerning Angela Johnson up until October of 2000?

A. No.

Q. Did you become aware at some point in time that there had been the creation of a so-called taint team in the United States Attorney's Office, and also at the instruction of the United States Attorney's Office, among local law enforcement officers?

A. Yes.

Q. And could you explain to the judge what this taint team was, the purpose of it and why it was constructed?

A. I knew there was a prosecution taint team concerning the prosecution of Angela Johnson, that involved several investigators, US Attorneys, and I believe support personnel. And then the other side where those of us who had -- I guess I lost my train of thought here. Could you kind of direct me back here to where we're going?

Q. If you could just explain what you understood the nature of the taint team was and why it was established?

A. Well, it was established -- the information did go from one side to the other that may be tainted, as far as to the prosecution learning information, concerning the prosecution of Angela Johnson and I think Dustin Honken, that they should not have.

Q. Do you recall being contacted by Robert McNeese on October 2 of 2000?

A. Yes.

Q. What was the -- what did he say when he contacted you and how did he contact you?

A. Well, I know at that time, and on that date, there

was a meeting going on in the US Attorney's Office between yourself and several other people, I know at least Scott French was there, and that McNeese had indicated he had in his possession, I believe, a map and possibly some other documents involving the location of several bodies in the Mason City area. And there was some concern that McNeese may attempt to destroy those documents as he at that time was not very happy with the US Attorney's Office.

THE COURT: Mr. Williams, excuse me. Hold that thought.

THE WITNESS: Sure.

THE COURT: We have the Defendant and the defense lawyer and I think we need to proceed with that matter, so the case of United States of America versus Angela Johnson will be in recess. I think we'll be able to wrap this up in fifteen minutes or less. You can just keep all your stuff at counsel table if you'd like.

MR. WILLETT: Thank you, Judge.

(Whereupon, the proceedings were interrupted briefly.)

MR. WILLIAMS: May I continue, Your Honor.

THE COURT: You may Mr. Williams.

MR. WILLIAMS: Thank you.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 7 of 100

## Page 33

Q. Detective Fischer, right before the break, we left off -- we were talking about contact with Bobby McNeese on October 2. And let's just go back over it. Could you again explain to the Court how you received that contact and essentially what was related to you during the conversation?

A. Robert McNeese had called me, and I believe that was in response to a call that I placed or Pete Wright placed to the Benton County Jail asking McNeese to contact me. He called me at my desk phone at the police department, and at that time, I was aware that he had in his possession I believe some maps or documents outlining the location of the bodies that were buried near Mason City, Iowa. I had a conversation with Mr. McNeese, where he basically read what was on the document and the map outlining where these bodies were.

Q. Did you record that conversation?

A. Yes, I did.

Q. And did Mr. Robert McNeese make any statements to you about his willingness to turn these maps over to law enforcement?

A. He indicated he would turn them over to me.

Q. Did he want anything in exchange for turning them over to you?

## Page 34

A. Well, at the time that I contacted him, he was in the hole, I believe it would be solitary confinement, at the Benton County Jail. He had some concern that he wanted to get out of the hole, back into the general population. It's kind of hard -- I reviewed the tape and it's kind of hard to tell whether he was jokingly saying, you know, that, you know, "I'll do this for you if you'll do this for me," or if he was serious, that he wanted to exchange the information to get out of the hole.

Q. Did Robert McNeese tell you that he would do anything with the maps if anybody attempted to take them from him forcibly?

A. My impression was that he would probably try and destroy them.

Q. Do you recall if he indicated how he was going to destroy them if anybody tried to take them from him?

A. I think he said he was going to eat them.

Q. Once you obtained this information from Robert McNeese, what did you do?

A. Well, I contacted the US Attorney's Office, and we decided that it would be best if I went up to Benton County and sat down with Mr. McNeese and obtained these documents as soon as possible.

Q. Had -- over the years of you working with him, had

## Page 35

you developed some rapport with Robert McNeese better than other law enforcement officers have been able to develop?

A. I believe I had, yes.

Q. And in your experience, does Robert McNeese engage in jokes and make statements that he doesn't really mean over time?

A. Yes, he's done that several times in conversations and meetings that I've had with him.

Q. Once you decided that -- let me rephrase that. Once it was decided that it would be best for you to make contact with him and attempt to obtain the maps from him, what did you do?

A. I went to the Benton County Jail, where I met Pete Wright, and we met with McNeese in I believe it was the attorney room.

Q. And what happened then?

A. He had the documents with him, which he voluntarily turned over to me and explained some things on the documents, such as pointed out different things on the map that he had, and I recall that Pete Wright was very adamant of the fact that he was not turning them over just to get out of the hole, and McNeese agreed with that.

Q. And what did you do with the maps then at that

## Page 36

point?

A. Pete Wright I believe took custody of the actual documents.

Q. And you understood these to be maps of the locations of the victims who had been murdered in this case?

A. Yes.

Q. Through your experience of working with Robert McNeese as a cooperator, relate to the judge your impression of whether he has generally followed instructions you have provided to him?

A. Generally, yes. There have been times that he's done things that he was advised probably were not in his best interest and the Government's best interest to do.

Q. Such as?

A. Well, he had a habit for contacting the media. He liked to talk to the local newspaper reporter, and I believe other reporters from other newspapers had tried to contact him and I believe spoken with him. He was advised that we couldn't tell him not to do that, but it probably was not a good idea.

Q. As far as any instructions you gave him in relation to his cooperation on targets of investigations, did he generally follow those

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 8 of 100

Page 37

instructions?

A. Yes.

Q. At any point that you've worked with Robert McNeese, did you ever ask him to obtain any information from Angela Johnson?

A. No.

Q. Did you ever ask him or instruct him to generally solicit information from other inmates either in the Linn County Jail, the Benton County Jail, or any jail he happened to be in?

A. No, I did not.

Q. Are you aware of any law enforcement officer or any agent of the Government, prosecutor or anybody else, giving instructions like that to Robert McNeese?

A. Not that I'm aware of.

Q. Are you aware of Robert McNeese being promised any favorable treatment as an inmate as a result of his cooperation?

A. No.

MR. WILLIAMS: No further questions of this witness, Your Honor.

THE COURT: Mr. Willett.

MR. WILLETT: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WILLETT:

Page 38

Q. Detective Fischer, good afternoon.

A. Good afternoon.

Q. Always good to see you.

A. Thank you.

Q. Now, then, I believe in your direct with Mr. Williams, you testified that your first opportunity to discuss the idea of cooperation with Mr. McNeese was in the fall of 1997, at the federal penitentiary in Atlanta, am I correct?

A. Well, it was actually the summer of '98.

Q. And that was in Atlanta?

A. Yes.

Q. What made you go to Atlanta?

A. This was concerning the investigation that we were conducting on Scotter Clark, Floyd McNeese, his involvement with that organization.

Q. Why did you think he'd cooperate?

A. I guess you never know until you try.

Q. Okay. Were you aware that he had any agreement with any federal or state law enforcement agency in place, be it written or unwritten, before you just went off to Atlanta to give it a shot?

A. Agent Stonestreet that I was working with had contact with an agent in the Atlanta office. And as I recall, McNeese had contacted this agent concerning

Page 39

information he had about organized crime activities, and I believe he had spoken with McNeese prior to our arrival. Our feeling was that if he would speak with this agent, possibly he would be willing to speak with us.

Q. But you're not aware that he had any type of verbal agreement or anything else with other law enforcement agencies prior to your arrival?

A. No, not that I'm aware of.

Q. Okay. Now, then you mentioned that Mr. McNeese himself initiated contact with this special agent in Atlanta. That was sort of his pattern of conduct during the next few years, wasn't it? He would initiate contact of various law enforcement agents or agencies saying "I got something"?

A. Yes.

Q. Okay. And at the time you visited Mr. McNeese at the federal penitentiary in Atlanta, he was serving a life sentence, wasn't he?

A. Yes, he was.

Q. And during your discussion with Mr. McNeese in Atlanta, about the Scotter Clark case, did he mention that to you?

A. Certainly.

Q. Did he mention that he'd like to see something

Page 40

done about reducing that life sentence or at least discussing the possibility of reducing that life sentence?

A. No, I don't believe there was any discussion about that at the time --

Q. Okay.

A. -- in Atlanta.

Q. Was he doing this out of the goodness of his Christian heart?

A. No.

Q. Okay. Was he hoping to achieve a benefit from it?

A. Certainly.

Q. Did he articulate what that benefit would be?

A. I don't think there was ever any conversation on the benefit to him. I have my impressions why he wanted to cooperate at that time.

Q. Okay. And what were your impressions as a professional law enforcement agent with over two decades of experience at that time?

A. Robert McNeese had been incarcerated since 1988, approximately ten years at that time. And he had been in several institutions. During that time, he had contact with family members by phone, we were aware of at least two visits by his brother down to Atlanta, but other than that, he really -- he had not been back

to Cedar Rapids. He had not seen his mother, his child, his wife, in a period of time of about ten years. My impression was that he saw this as an opportunity to basically come home, to establish contact with these family members, friends. He may have had in the back of his mind at the time about being able to talk to the media, to build himself up to be somebody important in organized crime. That, of course, you know, came later. At that time, it didn't even enter my mind. But I think he saw it at the time as an opportunity to come home, because we really didn't offer him anything. There was really nothing we could offer him. He was a lifer, and there's nothing that we could do to change his situation.

Q. Was the possibility discussed that maybe you'd be able to talk to prosecuting attorneys to see if that life sentence issue could be reviewed?

A. No, I don't think that discussion came up in Atlanta, as I recall.

Q. Come up at a later time then?

A. Certainly.

Q. Okay. Now, then, you mentioned that it was your impression he wanted to come home. This is another theme of Mr. McNeese's conduct, isn't it? Whichever facility he happens to be in, he'd like to be in a

different facility?

A. He seems to be unhappy with wherever he's at. Very few places he's been happy with.

Q. Fair enough. Nobody wants to be in jail?

A. True.

Q. If he's in Linn County, he might like to be in Benton County where the meals are home cooked?

A. I think Benton County was probably a place that he was more comfortable with than any other facility.

Q. Okay. He didn't like Scott County, did he?

A. That's my understanding, yes.

Q. Okay. So beginning in the fall of 1997, he assisted the Government in recording phone calls involving his own brother?

A. Not his brother, no.

Q. Excuse me, Joey Gross, I guess?

A. No.

Q. What did he do for you initially in the fall of '97?

A. He agreed to cooperate and testify at Grand Jury.

Q. Okay. And then in September of 1998, he did testify to the federal Grand Jury here in Cedar Rapids?

A. I believe it was in February of '98 that he -- or was it '99? I believe it was February of '99 that he

testified at Grand Jury.

Q. And it's my understanding between September of 1998 and February of 1999 he cooperated in the Scotter Clark case?

A. Yes.

Q. Now, I believe you told Mr. Williams that there wasn't a written agreement in place, am I correct?

A. Not that I'm aware of.

Q. He was certainly working for your team, wasn't he?

A. Well, we were hoping so, yes. He was also working for his own team.

Q. Okay. And that seems to be one of his themes of his conduct, isn't it?

A. Absolutely.

Q. Likes to work both sides against the middle?

A. Yes, he does.

Q. Okay. There were certainly times in '97 and '98 where he was working for the Government?

A. Yes.

Q. And the Steve Stefani case, he was involved in the investigation of Mr. Stefani's conduct?

A. Not so much the investigation. He would just provide us with information concerning what Mr. Stefani was up to.

Q. Okay. And how did he come across that?

A. The information?

Q. Sure.

A. He struck up a relationship with him in the Linn County Jail.

Q. And that's another one of his themes of conduct, isn't it, Mr. McNeese will initiate conversation?

A. I believe so.

Q. Okay. He'll initiate friendships for lack of a better label?

A. I don't know if I'd say friendships, but, yes, he would initiate contact with individuals.

Q. He would be flirtatious with female inmates?

A. That was my understanding.

Q. And then after his cooperation -- or after some -- providing some information on Scotter Clark and Steve Stefani in March of 1999, he goes to the prison in Terre Haute?

A. Yes.

Q. Okay. And he's brought back to Cedar Rapids when?

A. I believe it was March of the following year, 2000.

Q. And in that interim, he's cooperating against a childhood friend?

A. Yes.

Q. Okay. And that's happening in the federal

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 10 of 100

**Page 45**

district in California?

A. Actually, there and here, yes.

Q. Okay. And once again, at this time, he's working for the Government?

A. Well, he's providing information for the Government.

Q. Okay. Are you aware that he has any agreement or understanding with federal authorities in California?

A. I believe that the prosecutor in California had made an agreement that he would be involved in writing a letter to his sentencing -- to McNeese's sentencing jurisdiction indicating his cooperation with the Government.

Q. Okay. I certainly won't hold you to an exact date, but do you have sort of a time frame of when that agreement with the California prosecutors might have been entered into?

A. He was in California in November of that year.

Q. Of which year?

A. '99.

Q. Okay.

A. And it would have been in that time frame.

Q. Okay. Now, up to this point, has he brought up the idea of, "Hey, it sure would be nice if I wasn't looking at life in the Middle District of Florida"?

**Page 46**

A. Sure.

Q. Any discussions with him about "Maybe we can talk to the US Attorney's Office here and see what they can communicate to the US Attorney's Office in Florida"?

A. Well, I think that was the general agreement, or understanding, that from these other investigations, that the US Attorney's Office in the Northern District of Iowa would send a letter to his sentencing jurisdiction in Florida indicating what the nature of his cooperation had been and that it was up to the sentencing jurisdiction down there if they wanted to take that into consideration or not.

Q. Well, what was your understanding of the time frame when this agreement came to pass, or this understanding, if you will?

A. I'm not sure when that understanding -- I assume it was probably during the Scotter Clark investigation.

Q. And if my notes serve me right, that would be somewhere between the fall of '98 and February of 1999 when he was back to assist on that investigation?

A. That would be my best assumption. I don't know that for a fact.

Q. Okay. And I take it, Mr. McNeese stays at Terre Haute until he's brought back to Linn County in March

**Page 47**

of 2000?

A. He went to San Diego in November of '99.

Q. And would that be to help on the Dice case in California?

A. Yes.

Q. Okay. He's in the Linn County Jail for a week when he gets back?

A. Yes.

Q. And he's moved to the Benton County Jail because he's a security risk?

A. Again, I'm speculating. I'm not sure why he was moved. I don't know who made that decision, whether it was the marshals, the US Attorney's Office, BOP. I guess I really don't know.

Q. Well, let me ask a question, and with no disrespect intended to the Benton County Sheriff's Office or the Benton County Jail authorities, if he's a security risk in a metropolitan jail, in Linn County Iowa, why is he moved to a small rural county correctional facility that's thirty miles from the nearest metropolitan area?

A. Well, I know Benton County is a secure facility and newer jail, but why, I can't speak to that.

Q. Benton County has had escapes, haven't they, Benton County Jail?

**Page 48**

A. Again, I'm not aware of that.

Q. Okay. Now, it's about this time, I take it, in roughly March of 2000 where Mr. McNeese approaches Deputy Wright about one Geoffrey Garrett?

A. Yes.

Q. Okay. And it was your understanding that Mr. McNeese had hired Mr. Garrett as his investigator?

A. Yes, actually I knew that from previously.

Q. Previously from whom or previously from what time period?

A. When he was back here on the Scotter Clark investigation, before he went to Terre Haute, he had hired Geoffrey Garrett.

Q. How does a federal inmate who is incarcerated hire a private investigator?

A. I assume he has family on the outside that actually does the hiring.

Q. Why would he hire an investigator?

A. That's a good question for Mr. McNeese when he's on the stand.

Q. Thank you, I'll save it for him. Now, then, there was certainly some discussion about the issues that took place in terms of stolen documentations and search warrants all involving my office. And that was part and parcel of the cooperation that he gave in

regards to Mr. Garrett, am I correct?

A. Yes.

Q. Okay. Mr. McNeese remains in the Benton County Jail?

A. Yes, he does.

Q. Okay. Why -- why not move him?

A. Again, that's a decision made by someone else. I have no input into that.

Q. The marshal's service or the Benton County Sheriff's Office?

A. I -- I don't have a clue. I don't know why they move him, what their criteria is. He did remain in the Benton County Jail at that time.

Q. Okay. April of 2000 is when there's conduct involving his cooperation with Dr. Robert Shultice, am I correct?

A. Yes.

Q. Okay. And that cooperation was reflected in a memorandum of instruction, correct?

A. Yes, it was.

Q. And is Government Exhibit 3 still in front of you, Detective?

A. Yes.

Q. And the date on that is April 11 of last year, am I correct?

A. Yes.

Q. Okay. And in Paragraph 1 of that agreement, it says, "You may listen and respond to statements, but you should not begin to question Mr. Shultice or to elicit further information," correct?

A. Yes.

Q. Now, he advises you that he has information about Dr. Shultice before signing this agreement, correct?

A. Yes, he did.

Q. And you weren't there to see how he was able to generate that assistance, were you?

A. No, I was not.

Q. Okay. So you certainly can't tell us that he never approached Dr. Shultice, he never initiated conversation, he never befriended himself to him, or he never elicited information in order to generate this cooperation, can you? And I apologize, that was a multiple compound question, so if I need to break it up, I will.

A. I think the best way I can answer that is McNeese indicated to me that Dr. Shultice was very chatty. He couldn't shut him up. As a matter of fact, he drove Bobby nuts. He couldn't watch TV, couldn't read, because Dr. Shultice would just continually talk. And at one point McNeese related to me that he actually

told Dr. Shultice that the cell was bugged and that he shouldn't be talking so much.

Q. Okay. Did Mr. McNeese ever say to you "I never asked the doctor any questions about his -- what he was telling me"?

A. No, he never specifically said that.

Q. Okay. You said something that I found interesting during your direct, among the many interesting things you said on your direct, Mr. McNeese was somewhat of a jailhouse lawyer?

A. Yes.

Q. And I believe my notes were your comment was "He knows the law almost better than I do"?

A. I think he probably does.

Q. Okay. Fairly conversant with sentencing issues under the federal Sentencing Guidelines?

A. At least that pertain to him.

Q. Fair answer. Ever hear him say things like Rule 35?

A. Yes.

Q. 3553(e)?

A. No. I know he talked about a 2255, and Rule 35, and that's really the only federal statutes I recall that he quoted.

Q. Okay. Did he ever use the buzz words "substantial

assistance"?

A. I don't recall --

Q. Okay.

A. -- him using those exact words.

Q. Cooperation?

A. Sure.

Q. Motion for downward departure?

A. I believe so.

Q. Reduction in sentence based upon his assistance?

A. Not that specifically.

Q. He had a general idea of things that affected his future?

A. Certainly.

Q. And my understanding is, based upon the fact that I see -- I believe I see your signature, you were certainly present when Mr. McNeese signed the memorandum of instruction as it pertained to Dr. Shultice, correct?

A. Yes.

Q. And Mr. McNeese ended up signing a plea agreement, regarding some of his criminal conduct that stemmed from the Scotter Clark case, didn't he?

A. Yes, he did.

Q. And are you aware of the circumstances of that plea agreement or the timing of it?

A. I think it was September of 2000.

Q. Okay.

A. And I recall that there was a meeting at the Benton County Jail between McNeese's lawyer, Pat Reinert from the US Attorney's Office, myself, and I believe Pete Wright.

Q. Okay. So you happened to be present at the meeting?

A. Yes.

Q. Were you present when the perimeters of the plea agreement was discussed or the contents or were you just kind of there to see the signatures memorializing the agreement?

A. I was there during the discussion, but to be honest with you, McNeese will tell you this, because he brings it up quite frequently, that I was nodding off, and I guess I wasn't paying that much attention. I think I had been up late the previous evening or something, and I didn't listen to the specifics as far as the plea agreement. I know McNeese had numerous questions and was not happy with a couple of things, but specifically, I don't recall what those were.

Q. Okay. Now, were you present on September 11 when he signed Government Exhibit 4, which is the memorandum of instruction as to how he should conduct

himself with my client, Ms. Angela Johnson?

A. No, I was not.

Q. Now, although you testified that Mr. McNeese has been instructed in the past as to not soliciting information, at least in my client's case, he never wore a wire, did he?

A. No, he did not.

Q. And so you didn't have any way to closely monitor his conduct or conversations when he was outside of your presence, did you?

A. Concerning your client?

Q. Concerning my client.

A. Actually, I had very limited involvement with your client. I think the only involvement I had was procuring those documents and maps on October 2 of 2000.

Q. Okay. And my understanding is when you procured those documents, he was somewhat upset, wasn't he?

A. Actually, no, quite calm. Actually, quite excited to turn them over, wanted to explain the documents to us.

Q. Okay. Prior to that time, was he upset about these documents being procured from him or taken from him?

A. He was upset with, I think, his treatment by the

US Attorney's Office.

Q. Okay. And did he feel he was not getting a big enough bang for his buck?

A. No, it was a matter of respect. That was a big thing with him, and I think he probably learned that from his association with the organized crime members. He didn't like the way he was being talked to and treated by members of the US Attorney's Office, and that was real important to him.

Q. Okay. One of the things you mentioned on direct is that he was able to obtain information from my client, Ms. Johnson, because of notes they were passing back and forth, correct?

A. That was my understanding, yes.

Q. Okay. Now, the passing of notes between inmates would not be allowed in a county correctional facility, would it?

A. Not to my knowledge.

Q. And you would agree with me that the passing of notes by Mr. McNeese might be considered an attempt to elicit information, wouldn't it?

A. Well, again, it depended on the context of the note.

Q. Certainly. And I believe you mentioned on direct that he mentioned -- that Mr. McNeese mentioned he was

flirtatious with my client?

A. That was my impression in talking to him on the telephone.

Q. Trying to establish a rapport, if you would?

A. I think it was more of a sexual thing to be honest. I think that's how he got his jollies.

Q. Okay. Now, I believe you said on October 2, a conversation we just touched upon, you recorded the agreement -- or, excuse me, recorded the conversation?

A. Yes.

Q. Your Honor, if it please the Court at this time, I would offer into evidence -- and we can refer to it as Joint Exhibit 1, which is the taped conversation that Detective Fischer made of his phone call with Mr. McNeese. I'm not asking the Court to listen to this now and take time from this hearing to do so, but when the Court reflects upon this matter, I think the Court might find this interesting, and we would offer this tape into evidence at this time.

MR. WILLIAMS: No objection, it's a joint exhibit.

THE COURT: Joint Exhibit 1 is received, and just so that I can clarify, that's a copy of a tape?

MR. WILLIAMS: That's correct, it's a copy that the United States Attorney's office provided to

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 13 of 100

the Defendants. The original is in our custody.

THE COURT: Great, thank you. I just didn't want to be responsible if I lost it. That's all. I was going to suggest making a copy of it, but I assumed it was a copy.

Q. And just so the record's clear, on October 2, once again, it's Mr. McNeese who is initiating contact towards you saying "I've got some information I think you'd like to hear"?

A. No, actually, I believe -- and I think it was Pete Wright, as I think about it, had called the Benton County Jail and said "Have McNeese get ahold of me and then he called me collect from the Benton County Jail."

Q. But Detective Wright -- is McNeese reaching out to Detective Wright saying "I have some information"?

A. No, as I said, there was a meeting going on at the US Attorney's Office that I was not involved in, and it had been communicated to me that he had these documents and maps and there was some concern about them being destroyed.

Q. Okay.

A. And that's why they contacted me to try and get these documents.

Q. Okay. It seems like one of the themes of

Mr. McNeese's cooperation with the Government is he works on one case, and then seems to have information on something new, wouldn't that be true?

A. I don't know if you'd call it a theme. He's given information on several different cases.

Q. Okay. But for example, in the Shultice case, he's being interviewed at the Benton County Jail, and then says, "By the way, I'd like to talk to you about Dr. Shultice"?

A. Yes, that's correct.

MR. WILLETT: May I approach, Your Honor.

THE COURT: You may.

Q. Defendant's Exhibit K, Detective Fischer, is some verbatim transcription of your discussion with Mr. McNeese on October 2, and I have a question about that. Do you see the first full paragraph, Detective?

A. Yes.

Q. I believe the last sentence reads "McNeese explained that he was currently in the hole and had no form of outside communication, however, he was able to convince a jailer to let him use the phone at the booking area at the Benton County Jail," did I read that sentence correctly?

A. Yes, but I don't know where that came from.

Q. Here. Right behind it, I have --

A. Okay.

Q. -- what appears to be your signature on an internal memorandum?

A. Yes, I do recognize that.

Q. Okay. And am I correct in how I read that statement?

A. Yes.

Q. Okay.

A. Yes, he must have initiated the conversation.

Q. Okay. If you're in the hole, how do you get the phone privileges to call the Cedar Rapids Police Department?

A. You'll have to ask somebody the Benton County Jail.

Q. Okay. That's not something you would normally expect to have happen, is it?

A. Sure. I mean, if somebody in the hole wants to talk to law enforcement, usually they're allowed to do so.

Q. Okay. Now, then, between October 23 and November 6 of last year, you received a series of different phone calls from Mr. McNeese while he was incarcerated at the Scott County Jail, correct?

A. Yes.

Q. And, Your Honor, I would just direct the Court's

attention to Defendant's Exhibit J, Pages 4 through 12. He didn't like being in the Scott County Jail, did he?

A. No, he did not.

Q. He didn't like the visiting hours, did he?

A. That's correct.

Q. He didn't like being in segregation, did he?

A. I don't recall that specific issue.

Q. He was concerned that other Scott County inmates might be aware that he was what some people would refer to as a rat?

A. Yes.

Q. And he didn't appreciate the treatment rats get, did he?

A. Yes.

Q. And he continued to suggest that he had other information, didn't he, that might be of use?

A. Sometime in October, I was advised by the US Attorney's Office to start documenting all the phone calls that I had received from Mr. McNeese, and I began doing that. And of course, there's quite a voluminous amount of phone calls that I received and documented, and I'd have to look at the actual phone call that you're referring to to speak to that as far as a time frame and the nature of the conversation.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 14 of 100

Page 61

Q. Okay. Why were you advised to document your phone calls with him?

A. I don't know. They had some concerns evidently about McNeese, and they wanted to document any contact that we had with him.

Q. Okay. Now, on Defendant's Exhibit J-5, the first full paragraph, you have a telephone conversation on October 26, am I correct?

A. Yes.

Q. And he mentions to you that he takes a polygraph examination, correct, in the first full paragraph?

A. Yes. Are these documents that you copied off of my documents, because these aren't my original phone logs.

Q. And we can pull those if you want, if you have any doubt about the accuracy?

A. I mean, are these verbatim?

Q. Those are verbatim transcriptions of the Government's discovery file.

A. So many phone calls, I can't remember them all.

Q. I understand. Any time you want to see the original, between Mr. Williams and I, we can dig them out.

A. No, that's fine.

MR. WILLIAMS: Your Honor, if I could just

Page 62

interrupt and talk to counsel for a moment.

(Whereupon, a discussion was held off the record.)

Q. There was reference to the fact he took a polygraph exam, correct?

A. Yes.

Q. Has it been your experience as a law enforcement agent that people take polygraph exams when there's no issue as to their credibility as a witness?

A. Well, I mean, you've got to understand the context of the polygraph examination.

MR. WILLIAMS: If I could interrupt, Your Honor, I don't know that this witness has been advised of the concerns expressed.

THE COURT: What we talked about in chambers regarding the matter that we're going to take up in the cleared courtroom?

MR. WILLIAMS: That's correct, Your Honor. If I could have a minute, I could alert this witness.

MR. WILLETT: Okay. Your Honor --

THE COURT: Just a second, once he's tendered for cross, you can alert him, but I'm going to have Mr. Willett accompany you.

MR. WILLIAMS: That's fine, I have no problem at all.

Page 63

THE COURT: I just don't want any -- well, we won't get into that. You both should just approach and take care of the problem that we all know is here.

THE COURT: We'll be in recess until 3:05. Thank you.

(Whereupon, a brief recess was taken.)

THE COURT: Mr. Willett.

MR. WILLETT: Thank you, Your Honor.

Q. Let me go back to the subject we were on before the break. Out of curiosity, during the time period when Mr. McNeese was phoning you at the Cedar Rapids Police Department, were those collect calls?

A. I believe the vast majority of them were. They probably all were.

Q. Did he have a number specific to you or did he have a switchboard number or a general information number?

A. I have a number that goes directly to my desk.

Q. And that was provided for his use if necessary?

A. Yes.

Q. Okay. Besides the phone calls that we've discussed on October 2 and between October 23 and -- excuse me, November 6, were any other phone calls recorded of Mr. McNeese by you?

Page 64

A. No, I don't think I've recorded any phone calls after that date.

Q. Okay. Were you aware that a federal search warrant was issued to search Mr. McNeese's cell before he left the Benton County Jail?

A. Yes, I was.

Q. Was that for the purpose of seeing if he had any more documentation regarding my client's purported conduct in this case and that being Angela Johnson?

A. Yes.

Q. So there was some issue as to what he was willing to give and not give, wasn't there?

A. I don't know if it was an issue. I guess they -- it was decided that they wanted to make sure that they had everything that was pertinent to the investigation.

Q. On Defendant's Exhibit J at Page 7, in the first full paragraph, there's reference to the fact that he's curious as to what the outcome of a Rule 35B motion might be, isn't there?

A. Yes.

Q. And that he's concerned about how the results of this hearing might affect that, correct?

A. Exactly.

Q. Okay. In the second paragraph, on that page, he

makes an offer to tape his Philadelphia counsel, correct?

A. Yes.

Q. Okay. And he's advised against that?

A. Yes.

Q. And in the following pages of that exhibit, you try to return a call to him to give him some indication of how he should -- of what he should be aware of as far as this Rule 35B motion and how -- what impact this hearing may or may not have on that motion, correct?

A. Yeah, I was kind of the go-between between he and the US Attorney's Office.

Q. Okay. No promises is the basic message, right?

A. Yes.

Q. And he also expressed frustration at his own Cedar Rapids counsel, attorney Mark Meyers, who had given him advice to just quit talking about -- to anyone about his cases, correct?

A. Yes, he did say that.

Q. And although you ended your direct with Mr. Williams by saying that no one had promised him any favorable treatment, it's certainly fair to say that Mr. McNeese is hoping for favorable treatment on a Rule 35B motion, isn't that correct?

A. Certainly that is his goal.

MR. WILLETT: Thank you, Your Honor. No further cross. Thank you, Detective.

THE COURT: Mr. Williams.

MR. WILLIAMS: A few, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Just to make sure we have this clear for the record, when Robert McNeese told you that he had told Robert Shultice that his cell was bugged, it wasn't actually bugged, is that correct?

A. That's correct, it was not.

Q. He told that simply to get Shultice to shut up?

A. Exactly.

Q. You were asked questions about why did McNeese provide information, cooperation, with regard to Scotter Clark. Had you alerted McNeese at the time you visited with him that he potentially had some criminal exposure himself in connection with the Scotter Clark investigation and that cooperation would be taken into account and what would happen with his own disposition?

A. I don't recall. Is that specifically documented someplace in a report? Robert McNeese was a lifer. I don't think that was a consideration.

Q. And with regard to -- you were asked a question about the relationship, whether there was again a theme of him developing relationships and initiating conversations with people like Shultice and other people. Do you know who initiated the contacts between Shultice and him concerning Shultice's desire to elicit false testimony at sentencing?

A. Of course, I only know what McNeese told me, which is that Shultice came to him.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Willett, anything further?

RECROSS EXAMINATION

BY MR. WILLETT:

Q. And, Detective, that's one of the problems in this investigation, is at times you have to rely on what Mr. McNeese tells you and there's no corroboration for it, correct?

A. A lot of things obviously are uncorroborated, yes.

MR. WILLETT: Thanks.

THE COURT: Detective Fischer, I just have a couple of questions for you.

THE WITNESS: Sure.

THE COURT: I have never been, to the best of my recollection, to either the Benton County Jail or

the Linn County Jail, but I wanted to follow-up with a couple of questions on what Mr. Willett asked you about. And that is, you testified as I understand your testimony, that you thought one of the reasons why McNeese was placed in Benton County was that he was a security risk, and then I understood you to say that you thought Benton County Jail was a secure facility. Being familiar with both the Benton County Jail and the Linn County Jail -- and I'm assuming you're familiar with the Linn County Jail. Are you?

THE WITNESS: Well, actually, the only areas I have been in that jail is probably the interview areas, booking areas. I have never actually been back into the cellblocks, so I'm not really familiar with that jail, as with Benton County. I have never actually been beyond the dispatchers.

THE COURT: Well, then what was the basis for your opinion that Benton County was a secure facility?

THE WITNESS: I base that on the fact that the US Marshal's office uses that frequently to house federal prisoners.

THE COURT: Isn't that due to overcrowding though?

THE WITNESS: There's only a few facilities

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 16 of 100

that I'm aware of that the marshals office actually uses for federal prisoners. Every county jail doesn't qualify, and since Benton County does, I know it's a relatively new facility, and at least in my limited experience, just getting in and out, it's what I consider a secure facility.

THE COURT: Do you have an opinion?

THE WITNESS: That was my speculation.

THE COURT: Okay.

THE WITNESS: I don't know that for a fact.

THE COURT: Do you have an opinion as to whether the Benton County Jail is more secure or less secure than the Linn County Jail?

THE WITNESS: Linn County is obviously a bigger jail. Unless held in some kind of solitary room, my assumption is that Benton County may be the more secure facility because it's smaller and easier to keep track of the inmates. But again, I don't know that for a fact.

THE COURT: Okay. The only other area I wanted to ask you a question about, the very last question that Mr. Williams asked you was as follows, "Are you aware of Robert McNeese being promised any favorable treatment as an inmate as a result of his cooperation," and the answer is "No." Now, maybe we

can quibble over the word "treatment" and maybe that's what caused you to answer the question the way you did, but here's what I'm wondering, you've testified that I think at least two US Attorney's Offices, the one in California and the Northern District of Iowa, were in all likelihood going to contact the sentencing judge in the Middle District of California (sic) who gave McNeese a life sentence, about his prospects for a Rule 35B motion. That's not favorable treatment? I mean, how many people with a life sentence do you know where there are two US Attorney's Offices halfway across the country going to bat for that individual trying to get their sentence reduced from a life sentence? I have never heard of that.

THE WITNESS: I have less experience than you do. I can't speak to that. I didn't consider that to be favorable treatment or a benefit -- favorable treatment. Basically it was he had done this, therefore, they would do that.

THE COURT: Well, I guess if you have a life sentence, it seems to me it's pretty favorable treatment, compared to all those folks who have a life sentence who don't have US Attorney's Offices working to try to get their sentences reduced potentially.

THE WITNESS: Certainly, his goal is to have

his sentence reduced, that's very obvious.

THE COURT: Were you taking "treatment" in a more narrow sense, like he didn't get the extra privileges, like double the mashed potatoes or desserts, something like that?

THE WITNESS: My understanding of "treatment" is, in jail, is it's meant to be overall treatment.

THE COURT: I think it's ambiguous.

THE WITNESS: And actually he has not received that yet, and so he has not gotten any treatment.

THE COURT: He's got the hope of treatment though.

THE WITNESS: Certainly.

THE COURT: Okay. Any follow-up questions, Mr. Williams?

MR. WILLIAMS: I guess, just touching on your question. And I apologize to the Court. It was ambiguous, I see that now. I did tend for it to be more limited for favorable treatment than mashed potatoes or whatever.

THE COURT: Conditions of confinement I think is the legal phrase.

MR. WILLIAMS: Correct, correct.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. But, Detective Fischer, with respect to the letters, the -- or the statements made in the letters to be sent down to the Southern District of Florida on his behalf, did you understand those promises to him that he would ultimately have a reduction in his sentence?

A. It was made very clear to him, not only by law enforcement, but especially by the US Attorney's Office, that they were not promising him anything other than the fact that whatever cooperation he had provided would be communicated to the sentencing judge.

Q. Nothing further.

A. That was my understanding.

THE COURT: Mr. Willett, anything further?

MR. WILLETT: Two questions, Your Honor.

RECROSS EXAMINATION

BY MR. WILLETT:

Q. So Mr. McNeese is in limbo, awaiting this decision, while he continues to cooperate and continues to cooperate and continues to cooperate, hoping as he does that this will bring him something?

A. My understanding is that when these matters are

resolved, at that time, the letter of communication will be sent.

Q. Okay. One other question, you may not know the answer. My understanding is the Department of Justice may have statistics on correctional facilities and which are -- you know, as far as their security placement. Are you aware, is Linn County the most secure facility in the state, and Benton County is the third most secure facility, or any empirical information to back up your claim that Benton County is a secure facility?

A. I know Benton County is a secure facility. As far as rating them, I don't have a clue. I don't know how that's done. Frankly, I don't know why the decision was made to place him in Benton County. That was speculation on my part.

MR. WILLETT: Fair enough.

THE COURT: Mr. Williams, any follow-up?

MR. WILLIAMS: None, Your Honor.

THE COURT: Okay. Thank you, Detective Fischer.

THE WITNESS: Thank you.

MR. WILLIAMS: United States calls Mike Merino.

MIKE MERINO,

called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable, and see if you can adjust the microphone there so you can speak directly into the microphone. And when you're ready, will you please state your full name and spell your last name.

THE WITNESS: Michael Joseph Merino, M-E-R-I-N-O.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Merino, you are you employed, sir?

A. I am with the Benton County Sheriff's Office as a jailer.

Q. How long have you been employed in that capacity?

A. About three years now.

Q. And have you had prior law enforcement or correctional employment before that?

A. No.

Q. Could you describe for the judge the duties you have as a jailer at the Benton County Jail?

A. The care and welfare of the inmates. We feed them. Outdoor rec., just general duties that you'd do in the jail. Other than that, I can't think of anything. It's pretty mundane, boring stuff there.

Q. What's the capacity of the Benton County Jail? How many inmates can it hold?

A. Thirty-one.

Q. And I have in front of you a diagram of the interior of the Benton County Jail. Is that a fair and accurate, albeit not to scale, diagram of the interior of the Benton County Jail?

A. I would say that's accurate.

Q. Could you walk the judge through -- and if you would, just step down from the witness stand, and I'd like you to just explain to the judge the various areas of the jail.

A. Okay. This is where the booking area is. This is where the jailers sit, and this is the intake area. The sally port area is where they bring the inmates in. We book them there. We usually put them in holding for a small period of time. This is our dispatch center for the whole jail. Our attorney visitation is here. And public and prisoner -- there's a window separating these two. That feeds into our lobby. We go down the hallway to our isolation cell. These -- this is a one man cell, Cell 1. These actually mirror each other. Cell 2 is a two man cell. 3 is a three man cell, and four is a dorm cell. 6, 7 and 8 mirror 2, 3, and 4. 5 is a two man

cell. Then we go down to 9, that's a dorm cell. And then out into our outer recreation.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

Q. When you say dorm cell, what do you mean by dorm cell?

A. There's five to six people in a dorm cell, where there would be, like, two or three in cell 3 or cell 2.

Q. Do the cells have telephones in them for use by the inmates?

A. Yes.

Q. Are those as matter of routine monitored by the jail staff or at least capable of being monitored by jail staff?

A. Yes.

Q. Are inmates when they're checked into the Benton County Jail advised that their phone calls could be recorded?

A. Yes.

Q. Are there other telephones that on occasion you allow inmates to use?

A. Administrative phones, when attorneys call.

Q. And where are those located at?

A. That would be in the attorney visitation room.

Q. What are the circumstances under which you would allow an inmate to use a telephone that could not be monitored?

A. If the attorney calls up and needs to speak with them, if they can't get the call through through the cell phone, we usually let them do it through the attorney visitation phone.

Q. In the case of Robert McNeese, when he was cooperating with law enforcement, would you also allow him also on occasion to use those phones to contact law enforcement?

A. Yes.

Q. Is there a section in this jail that contains law books and other books that the inmates can access?

A. Attorney visitation.

Q. The outdoor recreation area, if you would explain this to me. Is this surrounded by a wall?

A. There is an outer wall here and here, and then there is windows from these cells along this wall.

Q. Can you see through the windows from cells 8 through 5 into the outdoor recreation area?

A. From the cell to the outdoor?

Q. Or vice versa.

A. I think -- I don't believe you can see -- well, you may be able to see shadows through there, I

believe so.

Q. But they're not clear glass?

A. No, they're frosted.

Q. The doors to these cells, describe the door cells. Do they have windows in them? Do they have slots?

A. The outer door to the cell has a peek window in it. And then you go into the inner chamber of it, and there's what they call a day room door that unlocks, and then they have individual cell doors that they're also locked in.

Q. Now, is that the case necessarily with cell 1 and the isolation cell, do they have double doors like that?

A. No.

Q. Those just have a single door that goes straight in?

A. Correct.

Q. Are there windows to the doors, other than the food slots?

A. Yes.

Q. Are -- and as a matter of routine in the jail are they left open or shut?

A. They're shut.

Q. What is -- please take your seat again. Could you

explain to the Court what availability inmates at the Benton County Jail have to use the outdoor recreation area?

A. Well, when the weather is appropriate, we let them out as much as we can. We try to let them out like the manual says, twice a week, for an hour.

Q. And you let them all out at one time to congregate out there or how do you do that?

A. Usually it's just a cell at a time.

Q. What about the population at the Benton County Jail? You hold both males and females?

A. Yes.

Q. Do you allow them to be in the same cell together?

A. No.

Q. Do you ever allow them to be out in the outdoor recreation area together?

A. No.

Q. What is the rules of the Benton County Jail for contact between male and female inmates?

A. It's forbidden.

Q. Over time in your experience as a jailer at the Benton County Jail, have you on occasion had inmates communicating to each other from those out in the outdoor recreation area through the windows to the inmates that are maybe in cells 5 through 8?

A. Yes.

Q. Did that happen just in the case of Robert McNeese or is that an ongoing issue?

A. That's an ongoing issue.

Q. What are the rules concerning that?

A. Well, the rules are, usually they're written up for that, and then there's a lock-down period. If they waive their hearing, then there's a lock-down period, but yeah, that is an ongoing problem, and that's the way that we deal with it.

Q. And it's prohibited?

A. Correct.

Q. What about the passing of notes between inmates in different cells, is that allowed?

A. No.

Q. Nevertheless, does that occur on occasion?

A. Yes, it does.

Q. Did it occur just in this case between Robert McNeese and Angela Johnson or has it occurred numerous times over time?

A. I would say numerous times.

Q. What steps has the jail taken to stop the flow of communications in the jail?

A. Well, we try to stay on top of things, as far as security checks. We've put -- we've gone to lengths

Page 81

where we're putting towels in front of doors to stop letters from flowing. They're pretty ingenious and they find ways to do it though.

Q. Have you discovered that they've used the books in the library on occasion as a means of communicating through notes?

A. Yes.

Q. And do you make attempts to check those periodically to try to intercept those notes?

A. Yes.

Q. Who makes the decision -- let's say you catch an inmate violating the rules, either passing the notes or talking through the windows in the -- outside of the rec. area, who makes the decision of whether the inmate is going to be reprimanded and what, if anything, punishment, would be imposed for violating those rules?

A. Well, initially, we write them up. They have a decision on whether they can waive a hearing or not. And we get a hearing board together, if they don't waive the hearing. And there's a -- there's three personnel that are not attached to the jail so much, and they set up a board, and they deal with it from there.

Q. Who -- in your experience, have you written up

Page 82

inmates every time you see them violating a rule, like passing a note or talking through a window?

A. No.

Q. And what goes into your decision in making -- as a jailer there, as to whether you're willing to write somebody up for that behavior?

A. I think repeated violations would be one of my problems with that. If I can -- if I can get them to stop the first time and don't notice that they're doing it again, I think that's appropriate.

Q. In respect to those two violations, and I assume there are other ways that the inmates violate various rules of the jail, do you take into account whether you're willing to reprimand them, taken into account their general behavior and performance in the jail?

A. Yes.

Q. One area I failed to point out when you were up here but I want to do that now, there's an area here you described where the dispatchers sit, is that correct?

A. Yes.

Q. Do the dispatchers have any general responsibility for taking care of the inmates in the Benton County Jail?

A. No.

Page 83

Q. Is there a window, however, that faces from the dispatchers office down the hallway where the cells are located?

A. Yes.

Q. On occasion, do the dispatchers report to the jailers that they observed activity that they think may be in violation of the jail rules?

A. Yes, they have.

Q. Do you recall anybody by the name of Robert McNeese?

A. Yes.

Q. You have memorized the dates of his arrival, departure, and the various cells he was in during the stay at the Benton County Jail?

A. Memorized them?

Q. Memorized --

A. I wouldn't say I memorized them.

Q. Is there, in fact, a print-off of information that would -- you could look at that would give you that kind of information?

A. Yes.

Q. May I approach, Your Honor?

THE COURT: You may.

Q. I have not marked this. I'm just going to elicit the testimony from it. Could you relate to the judge,

Page 84

first of all, what is that document you're looking at?

A. This is the Benton County Sheriff's Office booking sheet.

Q. And does -- with respect to Robert McNeese, does it contain the information that tells you what cell he was in at what time?

A. Yes.

Q. Could you tell the judge what it relates there?

A. When he was initially booked in, he was in cell 8.

Q. And when was he initially booked in?

A. 3-22 of 2000.

Q. And then at what point was he moved to any other cell?

A. For a routine movement, it looks like he went to 2A on 4-10 of 2000.

Q. Just a moment, Your Honor.

(Whereupon, a discussion was held off the record.)

Q. Okay. And if you could then relate when was he move from there?

A. He was moved to cell 1 on 6-9 of 2000.

Q. And how long did he remain in cell 1?

A. It was an extended period of time. I really don't recall.

Q. Well, what does the booking sheet show the next

Page 85

time he was moved to any other cell?
A. On -- it looks like he was moved to isolation on 9-26 of 2000.
Q. And was that the last location he was in before he was removed from the Benton County Jail?
A. I believe initially we moved him back -- we moved him into 5 and then into isolation, but that isn't reflected here.
Q. And then from isolation, out from there?
A. Correct.
Q. What -- what the first -- or when was the first time you became aware that Robert McNeese was cooperating with the Government on any matter?
A. I believe it was during his stay with Dr. Shultice.
Q. What, if any, involvement did you have with Robert McNeese's cooperation in the investigation of Robert Shultice?
A. All I can really say is I was in on meetings with several different people.
Q. Do you recall much about those meetings?
A. Not unless you can refresh my memory, it's so long ago.
Q. What was your role in those meetings?
A. Well, to just basically know what was going on in

Page 86

the jail, so I knew what was going on. I was the only one working the day shift at the time, so I think I was probably the only one that knew what was going on.
Q. And did you participate in the wiring of Robert McNeese to gain information from Robert Shultice or the wiring of the visitation rooms when any undercover officers came in?
A. Yes.
Q. Did you at any point become involved with giving instructions of any sort to Robert McNeese concerning how or when he was supposed to obtain information from Robert McNeese (sic)?
A. No.
Q. After the taping and the undercover officers came in on -- in relation to the Robert Shultice investigation, was that the time when Robert McNeese was moved to cell 1 on June 9 of 2000?
A. I believe so.
Q. And that's a single cell, is that right?
A. Correct.
Q. He would not have any other inmates in that cell then?
A. No.
Q. And at any point until he left that cell and was moved to, I think you said, 5 temporarily, and then

Page 87

into isolation, did he ever have any other roommate in that cell?
A. No.
Q. Could you describe the walls between the cells, how thick they are, approximately, and whether you can communicate through them?
A. You can hear what's going on in between them. I think they're only probably a block or two, a cinder block or two thick.
Q. Are there any windows between the cells at all?
A. There's no windows.
Q. Did you become aware at some time that Angela Johnson was brought to the Benton County Jail?
A. Yes.
Q. I want to hand you a booking sheet with a number of attachments to it pertaining to Angela Johnson, and ask you, first of all, on the booking sheet itself, does it tell you in her case what cell she was in at what times?
A. Yes.
Q. On the booking sheet itself or is it --
A. On her initial booking in?
Q. Yeah, tell the judge, what does the initial cell show she was in.
A. 2.

Page 88

Q. And does it indicate there how long she remained in 2 before she was moved?
A. It does not.
Q. Are there other commissary records attached to that booking sheet that you can look to to see what cell she was in for various times?
A. Yes.
Q. If you could look through there, at the commissary records, is it correct to say that from the time that she was admitted to the Benton County Jail on July 30, until at least the last commissary sheet on September 15, she remained in cell 2?
A. That's correct.
Q. And then does it indicate from the commissary sheets that she was in cell 6 from August -- at least August -- I'm sorry. August 15, September 30 -- I'm sorry, July 30 to August 15, is that right, on cell 2?
A. Yes.
Q. And then from August 19 to August 29, does it indicate that she was in cell 6?
A. Yes.
Q. And then the commissary sheet indicates that she was then in cell 7 from September 2 until she was out of the jail?
A. Correct.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 21 of 100

Q. At some point, did you learn that there was contact between Robert McNeese and Angela Johnson in the jail?

A. Yes.

Q. How did you first learn that there was contact between them?

A. Bobby McNeese approached me and said she was talking through the wall.

Q. And was this during the time period that he was in cell 1 and she was in cell 2?

A. Yes.

Q. Were you aware that prior to that, Robert McNeese had been talking to other females that were being housed in cell 2?

A. No.

Q. What, if anything, do you recall Robert McNeese telling you that Johnson was telling him during their conversations through the wall?

A. At first, he really didn't say much at all. He just said that he was talking to her, and then he -- down the line, as it got further on in conversation, he got a lot more descriptive about things that she said.

Q. Did you first become aware of this contact on or about August 13 of 2000?

A. Yeah, I would say that's accurate.

Q. And do you recall one of the dispatchers alerting you at some point that she thought she saw Angela Johnson either passing a note to Robert McNeese in cell 1 through the food slot or vice versa?

A. Yes.

Q. Were you aware on August 14 that there was a meeting between Deputy Wright, Les Wood, and Robert McNeese concerning this activity?

A. I wasn't aware of that meeting.

Q. Were you contacted at some point after that meeting by Robert McNeese concerning his possession of some notes that he had from Angela Johnson?

A. Yes.

Q. What did he tell you about that?

A. He just said he had received some letters from Angela.

Q. Did he mention the meeting he had with Deputy Wright and Jailer Les Wood?

A. I don't believe he did at that time.

Q. What did you do once he told you about the possession of these notes?

A. I believe I went to Detective Wright and talked to him about it.

Q. Do you know what happened after that?

A. I don't recall offhand.

Q. Do you recall this happened on 8-14 of 2000, is that right?

A. Yes, I would say that's correct.

Q. And from your previous recitation of Angela Johnson's locations in the jail, she remained in cell 2 until 8-15 and the next commissary note we have is on 8-19 and she had been moved to cell 6?

A. Correct.

Q. Do you know why she was moved or who moved her?

A. I was directed to move her.

Q. Who directed you to move her?

A. Detective Wright.

Q. For what purpose were you told you were moving her to a different cell?

A. I don't remember the specific reason.

Q. Did you move just Angela Johnson out of cell 2 or did you move the other female inmates out of --

A. I moved her cellmate too.

Q. Did you become aware at some point that on September 11 of 2000, Robert McNeese was -- entered an agreement or signed a memorandum of instructions with Deputy Wright concerning getting information or obtaining information from Angela Johnson?

A. I wasn't actually privy to that information, but

it was told to me that he was doing that.

Q. At that point, what, if any, instructions did Deputy Wright provide to you concerning whether you should allow or prohibited any further communication between Angela Johnson and Robert McNeese?

A. I was told to let them pass.

Q. And how were you aware that they were having communication?

A. Well, I could -- I could observe them communicating through outdoor rec. He would -- he would inform me pretty much daily what was going on.

Q. And this is all after September 11 of 2000?

A. Yes.

Q. Prior to that time, did you willfully allow any communication between Robert McNeese and Angela Johnson?

A. No.

Q. Did you even -- after that date, were you ever aware of or ever observe the passing of notes between them that you allowed to occur?

A. No.

Q. The communication you indicate that you were aware of and allowed to take place was when Robert McNeese was in the outdoor recreation area and Angela Johnson was either in cell 6 or cell 7?

A. Yes.

Q. That's when they would communicate through the window?

A. Yes.

Q. Do you know, was any other jail staff member brought into the loop, so to speak, like you were, and told that Robert McNeese was cooperating on an investigation involving Angela Johnson at that time?

A. Yes.

Q. Who else was advised of this cooperation?

A. Andrew Rich.

Q. And any other jailers advised of this?

A. No.

Q. I'd like to direct your attention to September 18, about seven days after the memorandum of instruction was signed with Robert McNeese. You indicated that Robert McNeese would tell you information from time to time. On September 18 of 2000, did he tell you that he had information about the location of bodies in this case?

A. Yes.

Q. What, if anything, do you recall him telling you about the location?

A. He described how things were done and the location, and he also said he had a map.

Q. Do you recall September 26 of 2000 when I and another Assistant US Attorney or Special Assistant US Attorney came up to the Benton County Jail?

A. Yes.

Q. Did you have any contact with Robert McNeese the morning of September 26 prior to our arrival?

A. Yes.

Q. What, if anything, did Robert McNeese tell you on that date concerning his knowledge or possession of information that would give the locations of the bodies?

A. He told me that he had the map.

Q. Did you pass that information on to Deputy Wright and to me?

A. Yes.

Q. What do you recall happening after that?

A. As far as McNeese?

Q. As far as McNeese.

A. As far as his demeanor? I guess I don't understand --

Q. Let me rephrase, that was a poor question.

A. I'm sorry.

Q. Were you present at the meeting that took place between Robert McNeese, Deputy Wright, and the Assistant US Attorneys?

A. Yes.

Q. And did that come to a close, the meeting come to a close at some point in time?

A. Yes.

Q. And at whose request?

A. Mr. McNeese's.

Q. And what did you do with Mr. McNeese at that point?

A. We put him back in cell 1.

Q. Were you given any instructions or did you take any actions with respect to Robert McNeese at that point or his cell?

A. No.

Q. At some point, did you end up searching his cell on that day?

A. I believe we did search the cell.

Q. And what were you looking for at that point?

A. I don't recall what we were looking for at the time.

Q. Did you find anything that was illegal or improper under the rules for him to possess?

A. No.

Q. Did you find any letters or other documents from Angela Johnson or pertaining to her case?

A. I don't believe we did.

Q. Were you able to search his legal mail at that point?

A. No.

Q. And is that part of the jail rules, that you can search and shake down their cells, but you can't -- you're not allowed to look through their legal mail, legal documents?

A. Correct.

Q. And on this occasion, on September 26, you did not do that?

A. No.

Q. What happened then later on the day of September 26? Was there an altercation with Robert McNeese?

A. Yes.

Q. What happened?

A. He was very irate. We had to get a cell extraction team in to -- to get him out and into isolation.

Q. Describe to Judge Bennett the process that you went through with Mr. McNeese with the SORT team.

A. I wasn't actually there physically.

Q. Describe for the judge what is typically done in a cell extraction like that.

A. They're -- I think we -- well, we dress up in our riot gear, and we go in force, usually anywhere from

five to seven officers.

Q. And what's done with the inmate?

A. He's usually wrestled to the ground, as easily as we can, handcuffed. He was strapped to the board that night because he didn't -- he wouldn't cooperate.

Q. And this is Robert McNeese?

A. Yes.

Q. And what ended up -- what, if you recall, led to having to extract him from the cell that night? What was he doing that led to that?

A. I was getting updates from the jail to home, so I don't recall. It all happened so fast that I don't really recall what happened in that time period.

Q. Suffice it to say, he was behaving in some way that, under the jail rules, regardless of who he was --

A. I would say that he was really misbehaving because we don't make a practice of that.

Q. After his removal, forced removal, from the cell on September 26 until -- until he was removed from the Benton County Jail, did you receive any new instructions concerning whether any contact should be allowed between Robert McNeese and Angela Johnson at all?

A. After that point, there was no contact.

Q. Did you receive instructions to allow no contact as well?

A. Yes.

Q. Are you aware of any contact that took place between them after September 26?

A. No.

Q. Was -- during your tenure there, other than to allow Mr. McNeese to use the telephone to contact law enforcement, was Robert McNeese afforded any favorable treatment in jail as far as cell privileges or outdoor rec. privileges or food or anything like that?

A. No.

Q. Were you ever instructed to give him any favorable treatment in the jail there?

A. No.

Q. Did you ever advise or instruct Robert McNeese at any point to elicit or solicit information from any other inmate in the Benton County Jail?

A. No.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Willett.

MR. WILLETT: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WILLETT:

Q. Good afternoon, it's nice to see you again.

A. Nice to see you.

Q. I'm never sure, is it Deputy Merino or Mr. Merino?

A. Mr.

Q. Mr. Merino. You've been a jailer at the Benton County Jail for the last three years?

A. Yes.

Q. Okay. And is it my understanding that cell 1, as is shown in that diagram, is a one man cell?

A. Yes.

Q. And that was the cell that Bobby McNeese stayed in from March until late September when he acted up?

A. Correct.

Q. Okay. And upon Ms. Johnson's arrival, she was placed in cell 2, correct?

A. Yes.

Q. Right next-door?

A. Right next-door.

Q. Okay. Are there any Benton County Jail policies about -- and you'll have to educate me. Are female inmates allowed to be placed in cells adjacent to male inmates?

A. Well, we -- I think it's -- it's availability of cells. I mean, we try our best to do that --

Q. Okay.

A. -- to separate sight and sound, and we do a pretty good job there.

Q. Okay. If I can interject --

A. Sure.

Q. Is there a female portion or a female wing of this jail?

A. No, there's no designated area.

Q. Okay. Are there cells that are traditionally thought of as the female cells?

A. No.

Q. Okay. So why is Ms. Johnson placed in cell 2 in July of last year?

A. I think it was just somebody had placed her there.

Q. Were there other women in the jail in July of last year?

A. I'd have to go back and see the record. I couldn't remember back then if there was some more females there or --

Q. Go ahead. I didn't mean to step on your answer?

A. That's all right. Go ahead.

Q. Is cell 2 the only cell that women are placed in?

A. No.

Q. Is it possible that in July of last year you had women in other cells besides cell 2?

A. I imagine it's possible.

Patrice A. Murray, CSR, RPR, RMR

Q. Okay. You made the statement that the cells are capable of being monitored. There's security cameras within the confines of the cellblock, am I correct?

A. Yes.

Q. Within the confines of each cell or just like looking down the hallway?

A. There's a day room camera and also a lock-down cell camera.

Q. And I don't want to violate the security secrets of the Benton County Jail, but could you give Judge Bennett an idea of where these cameras would be?

THE WITNESS: Can I --

THE COURT: You may, sure, step down. Thank you.

A. It doesn't show it here, but I would say half this cell would be considered the day room, and the cameras are in this area.

Q. And just for the purposes of our written record, you're indicating cell number 1, am I correct?

A. Yes.

Q. Thank you. Go ahead.

A. And in -- there's a lock-down portion of the cell there that we close at like 10:30 at night. And the camera's up here to watch them while they're in bed, there's two different cameras there.

Q. Have we pointed out all the cameras?

A. As far as cell 1 is concerned.

Q. Where else in the jail, Mr. Merino?

A. It's similar with all of the lock-down cells. There's a camera in the day room, and a camera in each individual cell.

Q. Okay. So throughout cells 2 through 8, the camera configuration is going to be as you just described?

A. Yes.

Q. Cell 9, cameras?

A. Yes.

Q. Outdoor rec., cameras?

A. Yes.

Q. Okay. Have I missed any cameras?

A. There's a booking camera.

Q. And that would be in the booking area?

A. Booking area.

Q. Okay. And there are phones in each cell?

A. Correct.

Q. Okay. One phone?

A. Yes.

Q. Certain hours for phone calls?

A. We're pretty liberal on that, but, yes.

Q. Phones can be monitored unless they're talking to their attorney, and then I assume you don't monitor an

attorney-client call?

A. Correct.

Q. Okay. Feel free to have a seat. In July of 2000, when my client arrives at the Benton County Jail, you certainly had knowledge about Mr. McNeese's interaction with Dr. Shultice prior to that time, hadn't you?

A. Yes.

Q. Okay. Whose decision would it have been to place her in cell 2? Is that your call? Is that one of your colleagues' calls?

A. I would say -- I believe I was there when she got brought in.

Q. Okay.

A. And I think that probably was my call.

Q. Okay. And any specific reason?

A. No, just two, it worked.

Q. Okay. Well, you were aware at that time in July of 2000 that Mr. McNeese had previously cooperated with law enforcement, based upon his conduct with Dr. Shultice?

A. Yes.

Q. Okay. And were you aware of the Jeff Garrett episode or incident?

A. Jeff Garrett?

Q. Mr. Garrett being an investigator coming out to the Benton County Jail to see Mr. McNeese, allegations that there was criminal conduct involved in that visitation.

A. I'm not aware of that.

Q. Okay. The windows, cells 8, 7, 6 and 5, look out to the outdoor rec.?

A. Correct.

Q. And if we were standing in front of the Benton County Jail in Vinton, Iowa, that front wall is in essence the wall of the outdoor rec. area, correct?

A. Yes.

Q. And just on the other side of that is the interior of the outdoor recreation area?

A. Yes.

Q. A roof overhead?

A. Chain link fence.

Q. Okay. Certainly possible that if one is in cell 8, 7, 6, or 5, you have a window out to that outdoor rec. area?

A. Yes.

Q. Certainly possible that people within the cell could have conversations with people in the outdoor rec. area?

A. Yes.

Q. Okay. And you knew Bobby McNeese was doing that with my client?

A. Yes.

Q. When?

A. When was it?

Q. When did you first become aware of that fact?

A. I -- wow, I -- I am not sure about that.

Q. Prior to Labor Day?

A. I don't recall.

Q. Okay. Possible?

A. Possible.

Q. Okay. You testified that communicating through windows was an ongoing issue. Bobby McNeese was guilty of this violation, wasn't he?

A. I would say he would be considered in violation of that.

Q. Okay. Possibly prior to Labor Day?

A. I don't know that for a fact.

Q. Okay. Maybe, maybe not?

A. Possibly.

Q. Certainly his infractions involve my client, Ms. Johnson?

A. Possibly.

Q. Okay. Others?

A. Others that McNeese talked to?

Q. Sure.

A. May have been.

Q. Okay. Are you aware of any other people that Mr. McNeese was violating that rule with besides my client?

A. Not that I'm aware of.

Q. Okay. Passing of notes, not allowed. It happens, however. Unfortunately it happens numerous times. That was your testimony on direct?

A. I would agree with that.

Q. Okay. Every inmate who arrives at the Benton County jail receives a manual, correct?

A. Yes.

MR. WILLETT: May I approach.

THE COURT: You may.

Q. Thank you. Turn your attention to Defendant's Exhibit P as in Paul. I'll have you take a look at that. Would that appear to be a Benton County Jail policy manual?

A. It would.

Q. And that would be the type of manual that would be the -- disseminated to inmates upon their arrival?

A. Correct.

Q. And a manual just like that or maybe that very manual would have been given to my client?

A. Yes.

Q. Now, towards the back of that manual, one of the last pages, there's a list of infractions, correct?

A. Yes, there is.

Q. What's infraction number 66?

A. "Communicating between inmates in separate cells is prohibited. This includes knocking on doors or walls, looking in windows, verbal, or any other form of communication. Letters may be mailed through the Postal Service to other inmates within the facility."

Q. Okay. So the only exception to mailing a letter to another inmate in the facility is they have to use the US postal system?

A. Yes.

Q. Okay. And there's no exclusion there for "We're going to let women talk to men or men talk to women." It's just inmates shall not talk to each other, correct?

A. It says it pretty cut and dried there I guess, yes.

Q. And they shouldn't pass notes?

A. No.

Q. Okay. And Bobby McNeese violated that infraction, didn't he?

A. Yes.

Q. He passed notes, didn't he?

A. I believe he may have.

Q. Okay. Certainly possibly prior to Labor Day of last year, correct?

A. I couldn't tell you that for sure.

Q. Okay. What -- what set of memories are you relying upon that make you believe that he did violate that infraction, that he, himself, passed notes? Are you thinking of a specific instance or a specific conversation with one of your colleagues?

A. No, just in general terms, just thinking that it goes on a lot, and I would -- I could see it happening.

Q. And see him doing it?

A. I have never seen him doing it personally.

Q. Okay. But you believe that he may have violated that infraction?

A. He may have.

Q. Okay. You told Mr. Williams on direct that it's about a one cinder block difference in the cell walls, am I correct?

A. I'm speculating, but I would say one cinder block.

Q. And I certainly won't hold you to the specifications of the Linn (sic) County Jail. People can have conversations between those walls, can't

they? A. Yes.

Q. Okay. Certainly possible that Mr. McNeese initiated conversations with my client, isn't it?

A. I suppose it's possible.

Q. Okay. Certainly possible that he did it before Labor Day of last year, correct?

A. I wouldn't know that.

Q. Okay. Was Mr. McNeese ever written up for communication violations?

A. I'd have to look at his file. I don't know that he was.

Q. Was my client?

A. I believe so.

Q. Okay. So you do have a memory of my client being written up for violating the communications paragraph, but you don't have any memory of Mr. McNeese being written up?

A. I don't believe he ever was.

Q. Okay. You told Mr. Williams on direct that when it comes to these types of violations, you try to get them to stop the first time?

A. We try.

Q. What do you do?

A. Verbally talk to them.

Q. Okay.

A. I mean, explain the situation, you know, "You guys know the rules, and let's try and follow the rules here. It will make it a lot easier," basically.

Q. Okay.

A. Trying to take the calm approach, work my way up.

Q. I understand. You did have an internal memorandum about when Mr. McNeese came to see you on September 18, didn't you?

A. Yes.

Q. Okay. And is that your internal memorandum, sir?

A. Yes.

Q. Would you be so kind as to read that slowly into the record for us?

A. Yes. It's reference inmate Robert McNeese, the week of the 18th of September, "I, Michael J. Merino, was talking with Robert McNeese in his cell. He told me that Angela Johnson -- excuse me, had spoke to him and told him where the body -- bodies of her victims were and how she had killed them and disposed of them."

Q. Okay.

A. "Mr. McNeese then added he was going to get more information from Angela because she was telling him everything."

Q. Okay. Was he written up for a violation of the communications paragraph of the jail manual?

A. No.

Q. Okay. And I believe the last sentence you read was that he was going to get more information from Angela?

A. Yes.

Q. Now, September 18, exactly, or just sometime during that week?

A. I would say that week. I don't know the specific date.

Q. Would Mr. McNeese do what you tell him?

A. As far as?

Q. You gave me the example that in terms of rule infractions, you try to get them to stop the first time and say, "Listen, you know the rules. You know what's right. You know what's wrong." Did you ever have a discussion like that with him, "Listen, you're not doing the right thing. I want you to" --

A. I don't believe so, because at that time, I think he was -- he had signed that paper saying he was working with the US Attorney or whoever it was. I'm not sure.

Q. And that was around September 11, correct?

A. I would say so.

Q. Okay. You mentioned that during the time Mr. McNeese was cooperating against Dr. Shultice there were meetings with several different people, do you remember that line of testimony?

A. As far as Shultice was concerned?

Q. Yes, as far as Dr. Shultice was concerned.

A. Yes.

Q. Okay. Just to educate me, who were some of those people that were parts of those meetings?

A. Detective Wright, Pete Wright.

Q. Anybody else?

A. Fischer. I'm only going by last names, because I'm not -- and French.

Q. I understand. I understand completely.

A. I'm sorry, and French.

Q. Okay. Did you have the same types of meetings when it evolved to Bob McNeese and Angela Johnson?

A. I believe we had some.

Q. Okay. What was discussed in some of those meetings?

A. I was directed to let them pass.

Q. Who directed you to let it pass?

A. I believe it was Detective Wright, and -- I think -- what it was, we had the okay to do that now, so "Go ahead and let them pass." That's the general

**Page 113**

conversation of what was taking place.

Q. Okay. And as far as "let it pass," just so the record's clear, that would be communications between Bobby McNeese and Angela Johnson?

A. Correct.

Q. Whether they be verbal or note passing or whispering between windows?

A. That's the way that I took it.

Q. Okay. And you may have testified about this on direct, do you have a time frame of when this direction was issued to you by Detective Wright?

A. As far as dates and times?

Q. Uh-huh.

A. I don't.

Q. Okay. Would it have been before your internal memorandum of September 18, which we discussed?

A. Yes, it would have had to have been.

Q. Okay. Would it have been before September -- approximately September 11, when you became aware that Mr. McNeese signed an agreement with the Government?

A. I am not sure of that.

Q. Okay. Before Labor Day or after Labor Day?

A. Mr. Willett, I -- I am not sure on that date-wise.

Q. Okay. But there was no doubt in your mind, based upon Detective Wright's instructions, that you were to

**Page 114**

let this pass?

A. That's the way I interpreted it.

Q. Okay. Let me talk about the cell placement for just a second. My understanding with the exception of the week that Mr. McNeese spent in the hole, he spent his entire time between March of 2000 and October 2 of 2000 in cell 1, am I correct?

A. I'd have to look at that again.

Q. I'm sorry, I'll be more than happy to --

A. I'm sorry.

Q. Do you have it in front of you?

A. No.

Q. Okay.

A. And your question again, I'm sorry.

Q. Did Mr. McNeese stay in cell 1 during the entire time of his tenure at the Benton County Jail?

A. No.

Q. What other cells?

A. He was in cell 2.

Q. Okay. It's safe to assume he was moved to cell 2 after Ms. Johnson was removed from cell 2, isn't it?

A. That was before Ms. Johnson got there.

Q. Okay. And then he went back to cell 1?

A. Yes.

Q. Okay.

**Page 115**

A. He was in there with Mr. Shultice.

Q. When did Mr. McNeese move out of cell 2?

A. It shows on here he moved out of cell 2 on 6-9 of 2000.

Q. And why was he moved back to cell 1? Why not any other cell in the Benton County Jail?

A. I think it was just a -- it was a move because of the Shultice deal.

Q. Okay. My client was in cells 2, 6, and 7 at various times during her stay, correct?

A. Correct.

Q. Okay. You described to the Court how these front doors, if I can call them that, to these cells work. There's like a peek door?

A. Yes, actually, there's a door a foot by a foot that you can open on the outer door that you can look through.

Q. From the outside?

A. Yes.

Q. Okay. Is there any type of a flap or a door that the inmates can push or open or anything like that?

A. No, those are only on the isolation doors and the dorm cells for food slots.

Q. And isolation is right next to cell 1?

A. Correct.

**Page 116**

Q. Okay. Possible for the inmates to communicate across the hall in any direction?

A. That would be very difficult from those two cells, other than them yelling down the hallway when we get them out for outdoor rec.

Q. Inmates yell in jail?

A. Yes.

Q. Okay. Mr. McNeese ever yell?

A. Not that I'm aware of. He never yelled on my shift.

Q. Good point. What was your shift?

A. At that time, I can't remember if we changed, but I think it was 0800 to 1600 in the afternoon, which is four o'clock.

Q. Certainly. And that would be true during the time frame of July to October of last year?

A. Yes.

Q. Okay. And when was -- I'm sorry, when was your first indication that Mr. McNeese made some communication to you that he was receiving information from my client?

A. I don't know a specific date.

Q. Okay. You did make some reference on direct that there was an incident with Angela Johnson passing a note on August 14, correct?

Case 3:08-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 28 of 100

## Page 117

A. I became aware of that after I believe Detective Wright was telling me about it.

Q. Okay. We don't know if Ms. Johnson was initiating communication to Mr. McNeese or whether she was responding to a communication by Mr. McNeese, do we?

A. No.

Q. And my client was moved right after that time, correct, from cell 2 to a different cell?

A. And the date was on that.

Q. Somewhere around August 14, August 15, somewhere right in there.

A. August 19, according to the commissary records.

Q. And do you have any indication of why she was moved?

A. I was told the communication was to stop.

Q. Okay.

A. Or not on that day, not on that day. I'm sorry, I'm getting my dates mixed up.

Q. I'm not --

A. I am sorry.

Q. That's okay. I'm not trying to confuse you.

A. I think there was a period of time there that -- well, I'm trying to recall that. She was moved on the 19th.

Q. Okay. My understanding from your testimony is

## Page 118

Jailer Andrew Rich was in what I'll call this loop of information about how to treat this information with Mr. McNeese and my client, correct?

A. Yes.

Q. Bill Reese was not?

A. No.

Q. Why not?

A. I don't know.

Q. Okay. Did you ever ask?

A. No.

Q. Did Jailer Reese ever ask, "Hey, what's going on with McNeese or Johnson or the both of them?"

A. Yes.

Q. What was he told?

A. Not much. I don't know any other way to answer it. He wasn't in the loop.

Q. Okay. The meeting that Mr. Williams talked about that took place with McNeese and Deputy Wright and Mr. Williams and I believe another colleague from his office, Ms. Gibson, Mr. McNeese requested to close the meeting?

A. I believe so.

Q. Why?

A. I'm not sure.

Q. Okay. Was the meeting done?

## Page 119

A. I think Bobby ended that meeting.

Q. Okay.

A. It was done in his mind.

Q. Okay. You mentioned that when you did a shakedown of the cell, you left things alone that said legal mail?

A. Correct.

Q. Now, were these -- and you took part in that search, correct?

A. Yes.

Q. Okay. Did you actually see envelopes from law firms in Mr. McNeese's cell?

A. I would say that I did.

Q. Okay. Did you --

A. I would see heading on letters -- or not letters but envelopes, maybe, I would say that's accurate.

Q. Kinnamon and Meyer, for example?

A. Possibly.

Q. Did you see any Benton County Jail envelopes that had legal mail scrolled across it in cursive writing?

A. That very well could have been.

Q. Did you search those?

A. No.

Q. What was the altercation with Bobby McNeese on September 26?

## Page 120

A. He started getting belligerent.

Q. About what?

A. He was upset, I guess, at the US Attorney.

Q. And any specific reason?

A. Not that I can recall.

Q. Okay. Strapping --

A. I'm sorry.

Q. Strapping an inmate to a board is not something you do very often, is it?

A. No, it's not a fun thing to do.

Q. Okay. Neither for the jailer or the inmate?

A. No, it's not fun.

Q. My understanding is Bobby McNeese was allowed to use phones to contact law enforcement?

A. Yes.

Q. What phone?

A. The attorney visitation phone.

Q. Okay. Was that normal procedure?

A. Normal in my sense that I had clearance to do that, yes.

Q. Clearance from whom?

A. Detective Wright.

Q. Okay. Do you have any time frame for the period of time in which you allowed Bobby McNeese to make communications and let them pass? Do you have any

## Page 121

idea of the time frame, like, "Mr. Willett, this lasted two weeks, or three weeks, or a month, or a month and a half"?

A. I couldn't give you an accurate count.

Q. Okay. Is my -- am I correct in my understanding that towards the very end you were given instruction not to let him have any contact, correct?

A. Yes.

Q. And when did that occur?

A. I believe that happened two or three days before the US Attorney showed up.

Q. Which would be somewhere around September 26?

A. I'm speculating, but I think it's in that area.

Q. Okay. And are you guaranteeing that Mr. McNeese didn't have any contact with my client after that point?

A. I am not guaranteeing that.

Q. Okay.

A. I would -- I would be -- it would be safe to say that we were not allowing them to make contact though. I was instructed to make sure that they would not have any contact.

Q. Okay. Did Mr. Rich know that?

A. I believe he did.

Q. Did Mr. Reese know that?

## Page 122

A. No.

Q. Okay.

A. Not that I'm aware of.

Q. Okay. And my understanding, and I think you still have Mr. McNeese's jail information in front of you, he left --

A. Yes.

Q. -- he left the friendly confines of your facility on October 3?

A. Yes.

Q. And was transferred to the Scott County Jail?

A. I don't know. The marshals didn't tell me where he was going.

Q. And right up until October 2, he was in the hole, or segregation, at the Benton County Jail, correct?

A. I believe so. He may have been moved back into 1 after he calmed down in isolation.

Q. But you're not sure?

A. I am not sure.

Q. Possible he was in isolation right up until October 2?

A. Possibly.

Q. And then on October 3, he's gone?

A. Yes.

Q. Okay. Is he in your jail now?

## Page 123

A. Bobby McNeese?

Q. Yeah.

A. No.

MR. WILLETT: No further questions.

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Do you recall -- you indicate you're not sure, other than it was just a place to put her when Angela Johnson checked in, you put her in cell 2, do you recall if there was already a female inmate in cell 2?

A. I don't recall at the time.

Q. Did you make the decision to place her in cell 2 for any reason motivated by the thought that somehow Robert McNeese could gain information from her if you placed her in the cell next to him?

A. That was never an issue and never even thought of.

Q. Until you were given the clearance after the memorandum of instruction was signed with Robert McNeese, at any point prior to that, did you ever knowingly allow any communication to occur between Robert McNeese and Angela Johnson?

A. No.

Q. And do you know on the times prior to the

## Page 124

communication that occurred after September 11, do you know who initiated the contact at all?

A. No.

Q. I mean, once you learned that they had had some prior contact, you have no idea who initiated what contact with whom?

A. I don't think there would be any way of finding that out.

Q. But it's just as possible that Angela Johnson contacted and initiated the communication with Robert McNeese every time it occurred?

A. That would be very possible also.

Q. How was Angela Johnson as an inmate at your facility? What was her performance?

A. Demanding. She thought she pretty much, you know, ruled that cell. She pretty much thought she ran that jail.

Q. Did she violate rules of the jail?

A. Yes.

Q. Did she threaten employees of the jail?

A. Yes.

Q. Did she ever threaten you?

A. Yes.

Q. What threats did she make to you?

A. She told me that she'd kill me.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 30 of 100

Q. Did she tell other employees of the jail that she was going to kill them?

A. Yes.

Q. Did she threaten to kill dispatchers at the jail?

A. Yes.

MR. WILLETT: Your Honor, if it please the Court, I'm going to interpose an objection at this time. I tried to give Mr. Williams sufficient latitude but I believe this is beyond the scope of my cross. I don't think this was brought up in direct at all.

THE COURT: It is, but I'm going to allow it, and then I'll allow you to go back and get into it. You're absolutely right, it is beyond the scope.

MR. WILLETT: Thank you, Your Honor.

MR. WILLIAMS: I don't know that I agree with that, and maybe this question will clarify it, Your Honor, just so you don't think I'm abusing.

THE COURT: I don't think you're abusing anything yet.

Q. Okay. You indicated --

THE COURT: I said "yet." I'm just teasing you.

Q. You indicated that an inmate's performance is one of the factors you take into account whether you write

somebody up or not?

A. Sure, it is.

Q. What was Bobby McNeese's performance in the jail up until the time that he basically got angry at me?

A. Quiet, clean, he never caused a problem.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Willett.

MR. WILLETT: Thank you, Your Honor.

RECROSS EXAMINATION

BY MR. WILLETT:

Q. Upon my client's arrival at the Benton County Jail in late July of last year, was there any open cells besides cell 2 that she could have been placed into?

A. There may have been.

Q. Okay. Cell 1, am I correct that cell 1 has a food tray slot that can be opened?

A. Yes.

Q. And that's something that can be controlled by the inmate on the other side of the door?

A. Well, we have a lock on the outside. We can lock it.

Q. Okay. Is it ever unlocked?

A. Sure.

Q. Okay. The threats that you discussed with

Mr. Williams, any threats to you documented anywhere?

A. No.

Q. Okay. Is it fair to say that during your career as a jailer you have received threats from other inmates besides my client?

A. I would say that's accurate. Most every day.

Q. Okay. Your Honor, if you could just give me a second to check my notes, I think I'm wrapping up, pretty close.

Just one thought, Mr. Merino, my understanding, just so the record's clear, it was approximately August 14 when you learned from Mr. McNeese that he was having communications with my client, correct, and that he was receiving information?

A. August 14? I have to look back on this to kind of help me recall.

Q. Go right ahead. Whatever you need to establish a timeline in your mind is fine with me.

A. And could you ask the question again, I'm sorry.

Q. Certainly. It was approximately August 14 of last year when Mr. McNeese first approached you to advise you that he was gaining information from my client?

A. I'm not sure on that date.

Q. Would it have been somewhere near that date?

A. Possibly could be.

Q. Okay. So it's fair to say that prior to August 14, whether you were allowing it or not, there were obviously communications between Mr. McNeese and my client, weren't there?

A. I'm not aware of that.

Q. You're aware that somewhere around August 14 is when you first received notice of it, correct?

A. On or around that date, I would say she -- or he said that she was talking to him. I would say, you know, that.

Q. Okay. He didn't preface it by saying, "Today for the very first day, she told me X," did he?

A. No, no.

Q. It's certainly possible that prior to that time he had started to receive information, notwithstanding the best efforts of the jail staff, to ensure compliance with the jail regulations?

A. He may have, but he didn't make me aware of that.

MR. WILLETT: Thank you.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

EXAMINATION

BY THE COURT:

Q. Mr. Merino, are you sure you're the one that made

**Page 129**

the decision where to place Angela Johnson on July 30?

A. Yes.

Q. Because I thought you were a little bit equivocal about that, maybe you weren't sure?

A. I was. I remember her coming in. There's another jailer that booked her in, but I placed her in 2.

Q. Who brought her to your facility, do you know?

A. I don't remember, Your Honor.

Q. Did you know what she was charged with at that time?

A. I was under the understanding that she was arrested for capital murder. I don't know if that's accurate.

Q. Did you know that before you made the decision which cell to place her into?

A. I don't think that even came into play, Your Honor.

Q. When did you first find that out?

A. The charge?

Q. Yeah.

A. I believe Detective Wright told us maybe a week prior to that, that we would have a female high profile -- well, he didn't say high profile, but I assumed it was because he made an issue of it. He doesn't always, you know, do that, so I assumed that

**Page 130**

she was fairly dangerous, and we needed to keep an eye on her so we put her close.

Q. And you knew that before she even arrived at your facility?

A. Yes.

Q. And did you know about this capital murder charge before she arrived?

A. I believe he may have mentioned that. That's my recollection. He made us aware that she was coming.

Q. Had you read anything about this case or her boyfriend's case, Mr. Honken? Do you recall reading anything about it in the newspapers, because there was a fair amount in the newspapers in this area?

A. I don't remember, Your Honor. I don't remember anything dealing with her case.

Q. When she was brought in or -- during that time period, where you had notice that she was coming to your facility and then on the day she was brought in, did that trigger any recollection about anything you may have read or heard about the case?

A. No.

Q. Do you -- I assume you would have records that you could accurately tell me exactly what the population of your jail was on the day she was brought in and who was in what cell, is that correct?

**Page 131**

A. I believe I could.

Q. Is it pretty easy to ascertain that information on any given date? I don't know how you keep your data.

A. It would take a little bit of work, but I think somehow we could figure it out.

Q. Okay. That's something I'd like to know, and so we could do it a variety of ways. I know we have other -- you have other Benton County people coming. Maybe they can get the data. Maybe you can do it. I hate to drag Mr. Merino back here this week. Maybe you could get the data, and if the other side agrees to it, you can maybe have the witness prepare an affidavit and then submit the affidavit post hearing or however you want to do it is going to be fine with me, but it's something I'd be interested in just to complete my knowledge of the situation?

MR. WILLIAMS: I will get that information. Hopefully I'll get that information before Detective Wright testifies, and he can lay the foundation for it, and indicate that. I don't know what's involved. I don't know how long it's going to take, and if we can do it in a day, we'll do it in a day and get that information to you.

THE COURT: It would be nice if we could not inconvenience any of the jailers from Benton County.

**Page 132**

MR. WILLIAMS: Absolutely. We'll do our best.

THE COURT: Okay.

MR. WILLETT: And, Your Honor, I'm not asking Mr. Merino to come back. And if for some reason time does not allow this information to be presented during the course of the hearing, I think it would be feasible to have Mr. Merino sign a written affidavit with the information attached to the affidavit for the Court's review.

THE COURT: Assuming that the information is in the format that I could understand it and figure out who was in what cell on that date, sure.

MR. WILLIAMS: We'll do what we can, Your Honor.

THE COURT: Okay. Any follow-up questions?

MR. WILLETT: Very briefly, Your Honor.

RECROSS EXAMINATION

BY MR. WILLETT:

Q. When Ms. Johnson was brought to your jail in late July, and you were, of course, advised prior to her arrival that this was a fairly high security situation, did you do anything special at the jail to prepare for the arrival?

A. No. I just assumed that I would probably put her

in a lock-down cell, so that it would be --

Q. Were other -- were the other cells, the other inmates, locked down in any particular way until Ms. Johnson was processed?

A. Not locked down. When I say "lock-down," I mean they get locked down at night, in contrast to the dorm cells, where they're wide open, they don't get locked down at night.

Q. Okay. And maybe I wasn't clear or maybe I didn't understand, and if not, I apologize. Were the other inmates locked down when Ms. Johnson arrived until she was processed and put in her cell?

A. No.

Q. Okay.

THE COURT: Mr. Williams, any follow-up questions?

MR. WILLIAMS: None, Your Honor.

Q. I did just think of one item, and maybe I was daft and I don't recall now. Mr. Merino, do you recall, were there any other females in cell 2 when you placed the Defendant in cell 2 on the day she arrived or was that cell empty?

A. I don't remember. There may have been, Your Honor. I am not really sure about that. I'm sure our records reflect that someplace.

Q. Yeah. I don't know how one could remember that, but I just thought I'd ask. I guarantee, I wouldn't remember if I was in your shoes, but you have records that would indicate one way or the other, I assume, right?

A. I believe so.

THE COURT: Any follow-up questions?

MR. WILLIAMS: None, Your Honor.

THE COURT: Mr. Willett, any follow-up questions?

MR. WILLETT: No thank you.

THE COURT: Okay. Thank you.

MR. WILLIAMS: United States calls Andrew Rich.

ANDREW RICH,
called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable. And try and adjust the chair so you can speak directly into the microphone. And Mr. Williams, I'm betting now that you're going to go from O for two on the spelling of the witness' name list to one out of three.

Would you state your full name and spell your last name, please.

THE WITNESS: Andrew James Rich, R-I-C-H.

THE COURT: Could you move forward a little bit and speak directly into the microphone, please.

DIRECT EXAMINATION
BY MR. WILLIAMS:

Q. Mr. Rich, how are you employed?

A. At the Benton County Sheriff's Department, as a correctional officer.

Q. How long have you been a correctional officer there?

A. Four and a half years in June.

Q. Prior to working as a correctional officer at the Benton County Jail, have you had any other prior correctional officer experience?

A. (Witness indicated negatively.)

Q. What was your shift at the Benton County Jail when you -- directing your attention to the period of roughly August of 19 -- I'm sorry, August of 2000 through October of 2000?

A. I was working a swing shift. I believe I worked Friday, Saturday, and Sunday, four to midnight. And Monday and Tuesday, I worked midnight to eight.

Q. I want to direct your attention to the spring of 2000, and ask you if you were aware at all during that time period that Robert McNeese was cooperating with

law enforcement in connection with an investigation of Robert Shultice?

A. After the fact, I heard about it. I wasn't aware at the time.

Q. You weren't aware at the time it was actually going on?

A. No.

Q. Do you remember how long after that happened that you became aware that he was involved in any investigation there?

A. I'm not really sure. I can't say.

Q. The inmate, Robert McNeese, could you describe for the judge how he performed as an inmate at the Benton County Jail up until September 26, when he was moved to isolation?

A. He was polite. He was a model inmate in my opinion.

Q. Do you recall Angela Johnson becoming an inmate of the Benton County Jail?

A. Yes.

Q. Were you told about her before she arrived at the jail?

A. I believe the weekend that they were going to try to arrest her, Detective Wright called me in and told me to make sure I had a cell open for a female.

Q. And did you then try to figure out if you had a cell open for her?

A. I looked on the rooster. I don't know how many we had then, but --

Q. Did you make any determination or indicate where she was going to be or would that have only happened when you would have been on duty if she happened to be brought in at that time?

A. If she had been brought in on my shift, she would have went in the holding cell, where is where most initial arrests would go.

Q. And how long did she remain in the holding cell?

A. Until we can make other arrangements, whether it's moving other inmates around or getting something else figured out.

Q. Are we talking a number of hours or number of days or --

A. Usually less than twelve hours.

Q. And then had she come in on your shift, then you would have designated whatever cell she would have gone to at that point?

A. Right.

Q. Did you have -- did she come in on your shift?

A. No.

Q. Did you have any input then on where she was

placed?

A. No.

Q. What were you told about -- what, if anything, were you told by deputy -- or, I'm sorry, Detective Wright, concerning the charges against Angela Johnson or what kind of -- what to expect with her?

A. He said there were several federal warrants and that she probably would be a handful, that was about all he said.

Q. Did you have contact with Angela Johnson during the time period then that she was an inmate at the Benton County Jail?

A. Yes.

Q. How was her performance as an inmate?

A. She had a short temper. There's a couple of instances where she got pretty upset with us over a couple of things, but she wasn't too bad.

Q. Did she violate the rules on occasion there?

A. Occasionally.

Q. Did she ever threaten you while you were employed there?

A. Not directly.

Q. Indirectly?

A. I was told at one point in time by I believe Detective Wright, that she had made threats towards

staff.

Q. Were you ever present whenever -- when she ever threatened any staff with harm?

A. No.

Q. At some point, did you become aware that -- that McNeese was cooperating with law enforcement with respect to Angela Johnson?

A. Later on, after the incident, when we had locked him down, I found out more about it.

Q. Were you ever told by anybody that there was a period of time where you should allow any contact to occur between Robert McNeese and Angela Johnson?

A. No.

Q. Do you recall intercepting a note that was passed to Angela Johnson at some point in time?

A. Yes.

Q. How did you become aware the note had been passed?

A. I was at the booking counter, and the dispatcher came out and told me that she saw Angela put a note in McNeese's cell, or the other way around I think maybe it was.

Q. When the dispatcher told you that, what did you do?

A. I went back, confiscated the note, and placed Angela in her lock-down cell.

Q. I'm going to hand you Exhibit 8 and ask you if you can identify that as a report that you wrote concerning that note and with the note attached to it?

A. Yeah, this is the one.

Q. And what's the date on that note?

A. September 3, 2000.

Q. And you indicate on the front of this -- what is this document on the front by the way?

A. It's a written rule infraction that we use in the jail for any rule violation.

Q. Okay. This rule infraction form that you filled out here, what do you describe happened on the front page here?

A. It says "On September 13, 2000, Officer Rich was informed by dispatcher that Angela Johnson received a note from another" --

Q. Mr. Rich, if you could slow down a little bit. The court reporter has to keep up with you.

A. "That Angela Johnson received a note from another inmate through a cell door. Officer Rich stopped Angela Johnson in the hallway, took the note from her and locked Angela Johnson down in her cell."

Q. Once you wrote up the infraction here, what did you do with it?

A. I made a photocopy and placed -- I believe I

Page 141

placed the printed infraction and the letter in Detective Wright's tray.

Q. At some point, did Angela Johnson then sign-off on this?

A. Yes.

Q. And did you sign-off on it or whose officer's signature is that that's at the bottom of Exhibit 8?

A. That's mine.

Q. And what is the signatures indicated at the bottom of this infraction?

A. The officer's signature is the officer that did charge the inmate with the infraction and the inmate's signature is basically the acknowledgment of the charge and whether they want to waive or request a hearing.

Q. If you could turn to the letter that you intercepted attached on the next page, and turn to actually what's Page 3 of Exhibit 8, I want to direct your attention to the third full paragraph, the bottom that starts "For real, Angie," do you see that?

A. Yes.

Q. Now, this is a note written by Robert McNeese that was intercepted by you in the hands of Angela Johnson, is that correct?

A. Yes.

Page 142

Q. And at that paragraph, does Robert McNeese tell Angela Johnson that he could be an informant and could testify against her and not to trust him?

A. Yes.

Q. Does he further indicate that he just started -- that "Angela Johnson just started rattling things off to me without me even asking about it," do you see that?

A. Yes.

Q. Now, was there some arrangement whereby you knew that Robert McNeese was going to send this so you could intentionally intercept it at some point?

A. You're asking if I knew about it?

Q. Yes, did you know about it ahead of time?

A. No, no.

Q. This is something the dispatcher alerted you to?

A. Yes.

Q. And your reaction in this case by stopping it and writing somebody up for it, was that in the normal course that you would do with any inmate?

A. Yeah.

Q. Now, did you write up Robert McNeese for sending this note?

A. No, I didn't.

Q. Why not?

Page 143

A. It's usually in the jailer's discretion. The -- he has never given me any problems up to that point, and I just made a judgment call.

Q. And in contrast, Angela had given problems up to that point?

A. To other staff members.

Q. And looking at the last page, Page 4 of Exhibit 8, is there an indication there at the top that Robert McNeese is telling Angela Johnson "Just take the advice of your attorney. Yes, I have heard of Al Willett. A lot of people say he is a great lawyer. I'd just listen to him and take it from there"?

A. Yeah, yes.

Q. Prior to intercepting this note on September 3 of 2000, were you ever made aware of any other notes being passed between Angela Johnson and Robert McNeese, either by dispatch or by either of the parties or by any other staff members?

A. No, I don't believe so.

Q. Did you ever facilitate the passing of any notes between these two parties, either before or after September 3?

A. No.

Q. We've had some testimony on it already from Mr. Merino, but note passing is something that happens

Page 144

in the Benton County Jail from time to time?

A. Typically.

Q. And you take steps to try to prevent that as much as you can?

A. We try.

Q. Do you remember at any point Robert McNeese telling you that he overheard Angela Johnson talking on the phone with her boyfriend about escape?

A. I listened to a phone call where comments were made about specific -- not specific tools, but that there was the availability to have tools to possibly break her out of jail.

Q. I may have misunderstood then the source of this information. So this is one of the conversations that maybe you monitored on her telephone?

A. I had picked up the receiver and listened to one yeah.

Q. This isn't something McNeese told you. This is something you overheard yourself?

A. Right.

Q. And at some point, you become aware that there was some concern and possibly investigation concerning whether she was attempting to break out of the Benton County Jail?

A. I think the staff was notified that there might be

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 35 of 100

an attempt at some point in time.

Q. Did you ever give instructions to Robert McNeese at any point to elicit information from Angela Johnson?

A. No, I did not.

Q. Did you ever give any instructions to Robert McNeese to elicit information from any inmate at the Benton County Jail?

A. No.

Q. To your knowledge, was Robert McNeese given any special treatment in jail, in the form of special privileges there, special food, anything like that, while he was at the Benton County Jail?

A. No.

Q. Were you involved at all in the team that went in to take Robert McNeese out of his cell on September 26?

A. Yes.

Q. Could you describe for the judge what that was like?

A. Basically, I believe I was called in, I was working for the Vinton Police Department. I was told he had somehow barricaded himself into his cell and was sitting back in the shower and had threatened to assault jail staff or whoever came into his cell.

Some deputies and myself basically went in there and just removed him, restrained him and moved him out of the cell.

Q. Did he put up any struggle when you went in?

A. Not really.

Q. What did you do with him once you removed him from the cell?

A. He was placed on a restraint board for about an hour, that's our policy. And after he was taken off, he was placed in isolation.

Q. Describe the isolation cell?

A. I'm not sure of the exact dimensions. It's got a cement bunk, with a stainless steel sink and a toilet. That's about it. No TV, no privileges.

Q. Pretty sparse privileges?

A. Yes.

Q. Were you ever instructed by any law enforcement personnel or anybody from the Federal Government to not go in and take him down or to give him any special privileges when he was acting up like that?

A. No.

Q. Did you handle him like you would any inmate who had barricaded themselves in their cell?

A. Yes.

Q. Were you asked by any member of the Federal

Government or any other law enforcement officer to restrain -- or act any differently with him as you would with any other inmate under this condition?

A. No.

Q. Was that the only time in your experience with Robert McNeese that he proved to be difficult in the Benton County Jail?

A. Yes.

MR. WILLIAMS: No further questions.

THE COURT: Mr. Willett.

MR. WILLETT: Thank you.

CROSS EXAMINATION

BY MR. WILLETT:

Q. Mr. Rich, I've been to the Benton County jail several times, but never between four and midnight and never between midnight and eight so I don't think we ever met. I'm Al Willett I defend Angela Johnson. You were aware based upon communications from your colleagues that on September 3, Mr. McNeese had passed a note to my client, correct?

A. Yes.

Q. Did you have any information or intelligence that that had occurred between Mr. McNeese and my client prior to that time?

A. No.

Q. Okay. Were you privy to a meeting sometime during the month of September when Detective Wright may have instructed you and your colleague, Jailer Merino, that if there was communications between McNeese and Angela Johnson to let them pass?

A. No.

Q. You weren't present?

A. I don't believe so.

Q. Were you ever advised of that in a singular meeting with either Mr. Merino or Deputy Wright?

A. No.

Q. Okay. After September 3 of last year, did you ever witness any further communications between Mr. McNeese and Ms. Johnson?

A. I don't believe so.

Q. Okay. Any communications between the outdoor recreation area and the windows of cells 6, 7, or 8?

A. Inmates will sometimes talk through the windows to other inmates, and if we catch them doing it, we bring them inside.

Q. Do you have any memory of that happening with Mr. McNeese, trying to communicate through the windows of cells 6, 7, or 8?

A. Caught him once and brought him back in.

Q. And would that have been -- do have you an idea as

Q. to the time frame of when you caught him doing that?

A. I have no idea.

Q. Okay. Did you ever witness any note passing taking place in any manner between Mr. McNeese and my client after September 3?

A. I don't recall any.

Q. Okay. Did you ever witness any other inmate possibly acting as an intermediary to pass a note?

A. No.

Q. For example, Sarah Bramow?

A. I don't believe so.

Q. Did you ever facilitate the passing of notes from Mr. McNeese to my client?

A. No.

Q. How about vis-a-versa?

A. No.

Q. Okay. Now, then, you were certainly working at the jail during the time that Dr. Robert Shultice was an inmate there?

A. Yes.

Q. And were you aware of Mr. McNeese's conduct in regards to Dr. Shultice and his cooperating with the Government?

A. As it was going on, no. Working nights, I didn't get in on that stuff.

Q. After the fact, you became aware?

A. Yes.

Q. Okay. Were you ever advised that Mr. McNeese was cooperating with the Government to obtain information from my client?

A. Not directly, no.

Q. Indirectly?

A. Later on, as I advised the US Attorney after the incident with him being locked down, I was filled in a little bit more on what was going on.

Q. So sometime after September 26 when he was locked down?

A. Yeah.

Q. Okay. What were you advised?

A. We were advised of the reason why we were going to the cell to take him. It was that he was in possession of something and was trying to use that as a bartering tool for something else, and he refused to give it to the US Attorney.

Q. Okay. Who advised you of this?

A. Detective Wright. We all got together in the conference room before we went into the cell.

Q. Okay. And who's "we"?

A. Several deputies, myself, a couple jailers.

Q. Okay. Benton County Jail deputies?

A. Yes.

Q. Okay. And were you advised as to what Mr. McNeese was holding this information in exchange for? You said some benefit, but --

A. We didn't get into any details. No, I don't know.

Q. You had been alerted the weekend prior to my client's arrival that she might be placed in the Benton County Jail?

A. Yes.

Q. And that was by Detective Wright?

A. Yes.

Q. Now, I realize she didn't come in on your shift. Where would you have put her?

A. Initially in holding, if I didn't have any other place to put her. Otherwise if I had something open, I would put her there.

Q. Then where?

A. In one of the regular general population cells.

Q. Okay. Which one?

A. Which one would I have put her in?

Q. Yeah.

A. Whichever one was empty, I guess, for a female.

Q. Did you have empty cells available for females besides cell 2 at that time?

A. The weekend that Detective Wright called me?

Q. Uh-huh.

A. I can't recall that. That was a long time ago.

Q. Okay. Do you keep records on that kind of stuff?

A. We keep a roster, but that's usually a daily thing, so it's not on record, no.

Q. Did anyone advise you to have my client placed in the vicinity of Mr. McNeese?

A. No.

Q. You were certainly aware that after my client's arrival, that for a period of time, my client was adjacent to Mr. McNeese, correct?

A. May have been.

Q. You don't know?

A. I don't remember, honestly.

Q. Okay. Is there certain cells in that jail that are considered female cells?

A. No, no, there's no specific cell assigned for that.

Q. Okay. You knew about Mr. McNeese's conduct with Dr. Shultice before my client's arrival, didn't you?

A. Yes.

Q. And it's my understanding that you had no knowledge whatsoever of any communications between my client and Mr. McNeese, either verbal or written --

A. No, no.

Q. -- facilitated by any third party?

A. No.

Q. And there was only one occasion when you monitored a phone call involving my client, correct?

A. The only one that I can recall, yeah.

Q. Did you monitor others?

A. May have. It's just something that we just -- we can lean back, pick up a receiver, and listen if we want to.

Q. And in terms of how Bobby McNeese was treated at the jail, was he ever given little perks, like maybe an extra dessert or a can of Coca-Cola or a little longer time in the yard?

A. Not from me.

Q. Okay. Was there ever a time -- excuse me, let me strike that and rephrase. When inmates are given access to the outdoor recreation area, is there ever a time when males and females are allowed to be interacting in the outdoor reaction area together?

A. No.

Q. Are there ever times when males and females might be passing in the hallway -- and when I say "hallway," let me be specific, I'm talking about the area separating the cells or maybe the area leading out to the outdoor recreation area. Is it possible that male

and female inmates might be in close proximity, unlocked, outside at the same time?

A. Not at the outdoor recreation, but there are times where males and females pass in the hallway, when they're taken to their cells.

Q. On any of your shifts, between July and October of 2000, was there ever a time when you allowed Bobby McNeese and Angela Johnson to be outside in the hallway at the same time?

A. No.

MR. WILLETT: Let me check my notes, Your Honor. Thank you, Judge. Thank you, Mr. Rich.

THE COURT: Any redirect?

MR. WILLIAMS: Perhaps to try to clarify some things.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Rich, if you could clarify for the judge, let's say you have an inmate that's up looking in the booking area at -- this is where the law books and other books are kept, up here?

A. Right.

Q. Let's say you have an inmate up there and they're done and it's time for them to get back to their cell, are they escorted back by a jailer or what happens?

A. Sometimes. It depends. If we're busy, sometimes not.

Q. Is there a locked door between the booking area out here and back into the cell hallway?

A. It's a fire door. It locks -- when the fire alarms go off, it can be locked, yes.

Q. And if an inmate is out in this area and you say, "Time's up. Go back to your cell. I can't escort you back at this point," can they open this door and just go back?

A. It's always open. I mean, it's got a magnetic lock so it's always open but --

Q. How do they get into their cells then, if you're not escorting them?

A. Depending on -- well, it happens a lot. We leave the door propped unlocked, and typically, they just go back, open the door, and we make sure it shuts when they go in.

Q. And can you do that from the control room up here and the booking area or do you have to go back physically and lock the door?

A. If they don't shut it behind them, we go back and lock it.

Q. And then are there occasions where -- you're saying there's occasions where some -- a male inmate

may be up in the booking area, it's time to go back, and the female will be out in the rec. area and it's time for them to go back, and by chance, they both run into each other in the hallway at that point?

A. We try not to, but when it's busy, there's only one of us on duty -- used to be at that time. There used to be only one on shift and it happened occasionally.

Q. Not intentionally?

A. No.

Q. And you have cameras so you can monitor?

A. No, there's no cameras in the hallway.

Q. So can you see the hallway from the booking area?

A. Not from behind the counter, no.

Q. Can the dispatchers see in the hallway?

A. Yes.

Q. Do the dispatchers sit at this window and constantly look down the hallway to monitor the traffic?

A. No, there's one console that's directly in front of that window so they can just look right down and see what's going on.

Q. And you're indicating the window that kind of looks out into the booking area itself?

A. That one and --

Q. This console in that area?

A. And there's one right there where your finger is.

Q. Where the window is pointing right down the hallway on this exhibit?

A. Right.

MR. WILLIAMS: No further questions.

THE COURT: Mr. Willett, anything further?

MR. WILLETT: No, thank you, Your Honor.

EXAMINATION

BY THE COURT:

Q. Mr. Rich, I've got a couple of questions for you. Is there any general policy or custom about separating females as far as you can from males?

A. It depends on what the jail houses at the time.

Q. Sure, I understand that. Let me give you a hypothetical. Let's say you have a man in cell 1, and cells 2, 3, and 4 are empty, and then you have a woman come in. Would you -- where would you put the woman?

A. Usually we like to keep everybody in the lock-down cells if we can, which are cells 1, 2, 3, 4, 5 -- 5, 6 and 7. They have individual lock-down cells inside.

Q. So let's say -- and I don't know if this ever happens. Let's just say nobody is in cell 4. Nobody's in cell 3. Nobody's in cell 2. And all the rest of the cells are full. And they all have men in

it and then you have a woman come in. Would you put the woman in cell 3 over cell 2 or --

A. Probably not, because there's three lock-down cells in cell 3 and only two in cell 2. We usually hold more males than females.

Q. And you'd pick cell 2 because there's only two lock-down cells on it?

A. I don't think I was specifically picking a particular cell but I would put her in a cell with a lock-down.

Q. I thought 3 had a lock-down?

A. It does.

Q. Okay. Wouldn't you put her in 3 because you'd try and separate her from the man in 1 or not?

A. I may. We usually don't have a problem with them talking through the walls.

Q. So there really isn't any effort made to separate them?

A. Our policy, I believe, states they have to be sight and sound segregated, which typically, they are. I mean, this -- if they're loud enough to talk through the walls, we're going to hear them, and if need be, we'll put them in different areas.

Q. If you had a male in 1 and you didn't have any males in cell 4, and 2 and 3 were empty, wouldn't you

by putting the woman in cell 3 have more sound separation?

A. Yeah.

Q. Now, you indicated that there wasn't any specific policy about having a so-called, you know, female cell?

A. Uh-huh.

Q. Is there a -- something short of a policy? By that I mean just a custom or kind of tradition or practice that females wind up more often in cell 7 than 6 or 2 than 3 or anything like that that you have observed while you worked there?

A. No, it's a random placement. Wherever the beds are open, that's where they go.

THE COURT: Okay. That's all I have. I'll see if the lawyers have any follow-up questions for you. Mr. Williams, do you have any follow-up questions?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. I hesitate to say this, but I think one. Mr. Rich, do other factors, like whether an inmate may pose more of a danger or maybe a higher risk, influence whether you try to put them closer to the booking area versus farther down in the cell at all?

A. As long as they're in a lock-down cell, not really, no.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Willett, anything further?

MR. WILLETT: No thank you, Your Honor.

THE COURT: Okay. Thank you, Mr. Rich. You're excused.

MR. WILLIAMS: With your pleasure, Your Honor, I've got more witnesses. I can keep going. I can stop here for the night. Wherever you want to go.

THE COURT: How early are you prepared to start in the morning.

MR. WILLIAMS: You name it. Seriously, I can -- well, let me rephrase. I heard you talk about four o'clock.

THE COURT: That's a dangerous invitation, Mr. Williams.

MR. WILLETT: Can I confer? I know what the Court means by early.

MR. WILLIAMS: I remember at one point, you mentioned you started working at four o'clock in the morning. I think I can reasonably get people here at eight o'clock. I can be that early or perhaps even a little bit earlier, 7:30 if you want to start that early.

Page 161

THE COURT: And I think I have to end tomorrow at 4:30, so how about if we start at 8:15?

MR. WILLIAMS: Great.

THE COURT: Anybody have any objection to starting at 8:15?

MR. WILLETT: No, Your Honor, we're all -- my counsel are staying in town. We're all going to be here, and I'm a block away.

THE COURT: Okay.

MR. WILLIAMS: Do you want to keep going tonight or do you want to stop now? I'm not quite sure. I've got another jailer that may be about as quick as Rich.

THE COURT: Okay. Let me check.

(Whereupon, a discussion was held off the record.)

MR. WILLIAMS: Bill Reese.

THE COURT: And, Mr. Williams, I'm teasing you about the spelling, because I know you don't personally prepare it, but it's always surprising to me how rare it is that lawyers get the spellings of their witnesses correct on the witness list. It's just surprising, that's all.

MR. WILLIAMS: It's -- it is one of my faults. I don't have a lot of attention to -- I

Page 162

prioritize. When you get to the point of a witness list, I delegate it. I tend not to go back over and proof it, and I should, and I apologize.

(Whereupon, a discussion was held off the record.)

WILLIAM REESE, called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable, and please adjust the chair so you can speak directly into the microphone. And when you're ready, would you state your full name, please, and spell your last name for us.

THE WITNESS: I'm sorry, I didn't hear you, sir.

THE COURT: Can you spell your last name for us?

THE WITNESS: Reese, R-E-E-S-E.

THE COURT: What's your full name?

THE WITNESS: William Joseph.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Reese, you have some difficulty hearing, is that correct?

Page 163

A. Yes, sir, I hear mainly out of my left ear.

Q. If at any point during my questioning or anybody else's questioning you have difficulty and don't fully hear the question, don't hesitate to let us know and we'll try to repeat it louder, okay?

A. Okay.

Q. How are you employed, sir?

A. I'm employed by the Benton County Sheriff as a senior jailer.

Q. How long have you been a jailer at the Benton County Jail?

A. January of 1994.

Q. Do you hold any -- you say you're a senior jailer, is that correct?

A. Yes, sir.

Q. Does that generate any different duties as a senior jailer than as any other jailer there?

A. Basically, it's just a pay scale.

Q. Direct your attention to the period of August of 2000 through October of 2000. Do you recall what shift you were working during that time period?

A. I worked the three to eleven or four to midnight. It was right in that area we switched, slid the shift an hour.

Q. Did you become aware at some point that Robert

Page 164

McNeese became an inmate at the Benton County Jail?

A. I'm sorry, what was that, sir?

Q. Do you recall Robert McNeese, Bobby McNeese, becoming an inmate at the Benton County Jail?

A. Yes, I do.

Q. Did you have much contact with Robert McNeese?

A. Normal amount of contact.

Q. During your experience with him, how did he perform as an inmate?

A. Well, some days he was all right. Some days he was obnoxious.

Q. Did he -- was he one of the inmates that often violated rules or did he generally comply with rules?

A. Oh, he violated them when he thought he could get away with them.

Q. What kind of rules do you think he violated that you recall he violated?

A. Oh, he was trying to make contact with one of the other inmates several times.

Q. And what inmate was that?

A. Angela Johnson.

Q. And aside from his attempts to contact or have contact with Angela Johnson, does anything else stick out in your mind of rules he violated while there?

A. Oh, he -- at this time, not really. I mean, I'm

Case 3:09-cv-03064-MWB-LTS Document 284-62 Filed 06/23/11 Page 40 of 100

just drawing a blank at the moment. I'm sorry.

Q. Nothing significant enough to stick out in your mind anyway?

A. Nothing -- nothing more than normal. I mean, he'd get loud and boisterous if he didn't get exactly what he wanted.

Q. And that's common for a lot of inmates you have there?

A. A lot of them are like that, yes.

Q. Were you aware at any time that Robert McNeese was cooperating with law enforcement in the investigation of Dr. Shultice while he was staying at the Benton County Jail?

A. Not -- none whatsoever, until it was over with.

Q. Okay. And do you recall how soon after it was done with that you learned that Robert McNeese had had some involvement in the investigation of Dr. Shultice?

A. When I read it in the newspapers.

Q. And do you recall when that occurred, how long after Robert Shultice was removed from the jail?

A. Within several days.

Q. Okay. Is it fair to say that you knew it before Angela Johnson became an inmate at the jail?

A. I'm sorry, did I know what?

Q. Let me rephrase, is it fair to say that you knew

that Robert McNeese had assisted in the investigation of Dr. Shultice prior to Angela Johnson becoming an inmate there?

A. Yes, I did. It was in the newspapers. That's how I learned about it.

Q. Did you have any understanding that Robert McNeese was supposed to be at the jail as some general informant for the Government in any way?

A. I never had any knowledge of that myself, no.

Q. Were you ever given any instructions by anybody to allow Robert McNeese to elicit information from other inmates there?

A. No.

Q. Were you ever given any instructions to allow Robert McNeese to have contact with other inmates against the rules there?

A. No.

Q. During the time period that Angela Johnson was an inmate at the jail, did you ever witness any contact between Robert McNeese and Angela Johnson either in person, through the windows in the outside rec. yard, or through notes or mail?

A. I caught Bobby McNeese trying to make contact with her through the windows in the outdoor rec. area on the closed circuit TV camera once.

Q. Do you recall approximately when that was?

A. It was sometime in, I believe, early October. I'm not sure exactly the date.

Q. If I told you that the jail records indicate that Robert McNeese was removed from the jail on October 3, does that -- and if -- let me back up. Did you -- do you recall -- were you present when Robert McNeese was forcibly removed from the isolation cell?

A. He was forcibly removed from cell number 5, yes, that was on my shift.

Q. Okay. And did that take place about September 26?

A. It -- that sounds about right.

Q. Sounds about right?

A. Yes, I don't have the dates in front of me, so --

Q. Let's try to work off of that date. The time that you caught Robert McNeese trying to have communication with Angela Johnson through the outside rec. windows, was it before or after the time that Robert McNeese was forcibly removed from the cell?

A. That would have been several weeks before.

Q. What did you do when you saw him attempting to communicate through the window?

A. I went to the outdoor rec. area, told Bobby his outdoor rec. privileges were terminated at that time for trying to communicate with another inmate, and

placed him back in his cell.

Q. And how long did you terminate his outdoor privileges?

A. It was -- I'm not sure exactly how long it was. I don't have that information in front of me, I'm sorry.

Q. When you did that, did you generate any documents or was that kind of an informal punishment that you imposed?

A. That was -- a lot of times -- it did happen all the time. I'd just say to the people, "That's it. You're done for the day. You're going back to the cell." You'd warn them once or twice and then write them up, and they could be terminated for up to two weeks, I think. But at that time, I just put them back in their cell.

Q. You don't recall generating any type of --

A. I don't think I generated any paperwork, no.

Q. Did the decision by you not to write him up with infractions or deprive him of outdoor rec. privileges for a long period of time, did that have anything to do with the fact that Robert McNeese had assisted in the investigation of Dr. Shultice?

A. No.

Q. Were you aware at that time that Robert McNeese had any authorization from law enforcement to have

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 41 of 100

Page 169

contact with Angela Johnson?

A. I had no knowledge of anything that was going on between the two.

Q. So is it fair to say that your decision not to write him up or punish him more severely in that instance had nothing to do with whether he was working for the Government, was an informant or not?

A. Most of the time, like I say, I didn't write him up unless they violated several times. It happens all the time.

Q. Other than this occasion when you witnessed this contact between Robert McNeese and Angela Johnson, during which you punished Robert McNeese, were you aware of any other contact between them during any shift you worked?

A. One other time, I believe one of the -- one of the dispatchers said she thought she had seen Angela Johnson put her hand in the door, the open door where we pass trays through, cell 1 where Bobby McNeese was. And she hollered on the intercom to me and I went over, and Angela was going back down the hallway to get in her cell door then, and I went back and I didn't see anything that had been passed, and I told her not to try to make contact with any other inmates in the hallway.

Page 170

Q. Did you write her up at that point?

A. No, I didn't.

Q. Did you write up Robert McNeese at that point?

A. No, I didn't see it. I was just relying on what the dispatcher thought she had seen. She wasn't sure, but she thought she had seen her stick her hand in there on the way back, and she wasn't quite sure.

Q. Did anybody tell you to allow that kind of contact to occur between Robert McNeese and Angela Johnson at any point?

A. No, they did not. As a matter of fact, I asked Detective Pete Wright, and he said no, absolutely, there's no contact between the two.

Q. And do you recall when you asked Detective Wright that?

A. Oh, it was during -- right at that same time frame.

Q. And why did you ask Detective Wright whether in this case that should be allowed or not?

A. Well, I just had a feeling there was something going on, but I didn't know what, and so I just point blank asked him.

Q. And do you recall when this occurred, this time that you saw -- or the dispatcher told you that there was potentially some passing or something or Angela

Page 171

reached her hand into Robert's cell. Did that occur before or after the time that you caught him outside trying to communicate through the window to her?

A. I believe that would have been after.

Q. Do you recall how soon before or prior to the time that he was taken down in his cell that would have occurred?

A. It was probably a week, a good week before.

Q. What made you think something was up?

A. It just -- you get a feeling for the way things are going on in the jail and it just didn't seem right.

Q. What didn't seem right?

A. It just -- people are talking, and you just -- I didn't know what was going on. If there was something going on, I wanted to know it, and I point blank asked Detective Wright if there was anything going on back there and if I should know it, and he said, "No, there's not."

Q. Why did you go to Detective Wright to ask that question as opposed to somebody else?

A. Well, I figured he knew what was going on and I didn't.

Q. Why is it you thought Detective Wright would know what was going on?

Page 172

A. Why, I just figured he was involved with this case. That's all I knew.

Q. Does Detective Wright have any, I guess, as a matter of practice or just de facto up there, when there's a federal inmate being held in the jail, does Pete Wright tend to be the one that you all contact as jailers up there if you have a question concerning a federal inmate?

A. Normally, I do, yes, if there's something going on, if there's a problem with one of the federal inmates, that's who I usually get ahold of.

Q. Were you ever instructed by anyone to allow any contact to occur between Robert McNeese and Angela Johnson?

A. Was I ever instructed to allow it?

Q. Yes.

A. No.

Q. Did you ever allow contact to occur between the two of them?

A. No, I didn't.

Q. Did you have experiences -- an opportunity to experience what Angela Johnson was like as an inmate in the jail?

A. She could be very obnoxious. If she didn't get her way, she would throw a temper tantrum, scream,

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 42 of 100

Patrice A. Murray, CSR, RPR, RMR                          Page 169 - Page 172

yell, swear at you, throw stuff across the cell.

Q. Did she violate rules on occasion?

A. All the time.

Q. Were you ever the subject of any threats by her?

A. Oh, quite a few times. She threatened to kill me all the time. I just kind of ignored it.

Q. Is that -- I assume you get a lot of threats as a -- as a jailer from inmates from time to time?

A. It happens all the time, yes.

Q. Do other inmates threaten to kill you?

A. Oh, they threaten bodily harm all the time. Mostly we just let it roll off your back. You just can't take everything serious most people say back there. I don't turn my back on them.

Q. Are you aware of Robert McNeese ever receiving any special privileges while an inmate at the Benton County Jail, such as extra chocolate milk with his food tray or anything like that?

A. Nothing.

MR. WILLIAMS: No further questions.

CROSS EXAMINATION

BY MR. BERRIGAN:

Q. May it please the Court. Mr. Reese, my name is Pat Berrigan. I'm going to try to keep my voice up, but if there's a point where you don't hear me or

understand me as I sometimes slur my words, please let me know, okay?

A. Okay.

Q. You've been a jailer for I guess at least seven years?

A. Yes, sir.

Q. And did you have experiences as a jailer before this job with Benton County, sir?

A. I worked as a part-time jailer back in the early '70s for Cherokee County.

Q. How long did you do that?

A. '73, '74, '75.

Q. So you've had a considerable amount of experience as a jailer?

A. Quite a bit, I have four years in the military.

Q. I want to talk just very briefly about the threats that we were -- you were asked about. Did you take the threats against you by Ms. Johnson seriously?

A. I didn't, until Detective Wright came back and told all the jailers to take everything she said serious.

Q. Detective Wright told you that?

A. Yes.

Q. Did you ever write up Ms. Johnson for any of these threats?

A. No.

Q. And I mean -- when I say "write up," did you give her any disciplinary action or take away any privileges or do anything to her for any of these threats?

A. No.

Q. Did -- you've testified she occasionally loses her temper, would that be fair to say?

A. Oh, yes.

Q. And are there other women in your experience in the jail that sometimes have that problem as well, men included?

A. Nothing like she did.

Q. Okay. Did you know she was on medication, sir?

A. I'm sorry, what?

Q. Did you know Ms. Johnson was on medication?

A. I believe I was giving her medication, but I don't have it in front of me so I don't know what she was on.

Q. You don't know what the medication was for?

A. Not right now. I can't recall what she was on, but I knew she was on something.

Q. And were there occasionally problems in her getting her medication?

A. From us?

Q. Yes.

A. Giving it to her?

Q. Yes.

A. Not that I recall.

Q. Okay. You work the three to eleven shift, is that what you said?

A. Yes.

Q. Okay. And at the time that you were working, sir, were you usually the only jailer on that shift?

A. Normally I had another gentleman there working part-time that worked with me.

Q. Who was that?

A. David Jensen.

Q. David Jensen. From what you testified about, you at least treated Robert McNeese as you did any other inmate?

A. I tried to, yes, tried to treat them all the same.

Q. You gave him no special privileges, didn't tolerate any unusual behavior?

A. I didn't, no.

Q. And when Mr. McNeese violated the rules, you punished him?

A. Yes, I did.

Q. And you've talked about that at least twice. Mr. McNeese was trying to contact Angela Davis (sic),

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 43 of 100

is that right?

A. I'm sorry, who?

Q. I'm sorry, Angela Johnson. I'm going back to the '60s. I guess we're after five o'clock. Angela Johnson, yes.

A. Can you rephrase the question?

Q. I will, sir, I'm sorry. I'm confused myself now. I think I heard you testify, correct me if I'm wrong, that at least twice you, yourself, observed Mr. McNeese trying to contact Ms. Johnson?

A. Once he was trying to contact her. And once she was trying to contact him.

Q. The once that he was trying to contact her, that was the incident where he's outside in the rec. yard and he's trying to talk to her through a window?

A. Yes.

Q. Is that right?

A. Yes.

Q. What cell would she have been in at that time, do you know?

A. Cell number 7.

Q. Cell number 7. And you only caught him doing that once?

A. Yes.

Q. And then you say that at least -- maybe you just

said once. Was there just one occasion where there were some notes passed in your view?

A. Just once that -- I didn't see it. The dispatcher thought she had seen it and told me.

Q. Okay. And the dispatcher thought that Angela Johnson had passed the note to Mr. McNeese?

A. She told me she thought she put her hand in the open door where the tray -- for the tray to pass through. She didn't know if anything was passed or not.

Q. Is it possible that Mr. McNeese was passing a note at that time to Angela Johnson?

A. It could have went either way. I don't know. I didn't see it.

Q. He -- this tray door, that opens from the inside or the outside, isn't it, if --

A. No, it opens from the outside. At the time, we had some problems with ventilation, and we had some damper motors upstairs burned out and we had that door open so we had a little air moving in there.

Q. In other words, the tray door, the food tray door, was open to Mr. McNeese's cell?

A. Yes, it was.

Q. So he wouldn't have even had to have opened it because it was already open?

A. It was open.

Q. And you went and you talked to Angela Johnson about this incident?

A. I talked to her briefly. I told her, you know, don't make any contact with the other prisoners going down the hall.

Q. Did you talk to Mr. McNeese about that?

A. I asked Mr. McNeese, I said, "What was going on," and he said she stuck her hand in the door on the way by and that was it. And I asked if they were passing anything back and forth, and they both said "no."

Q. They both said "no"?

A. Yes.

Q. And Mr. McNeese denied passing any note?

A. Yes, he did.

Q. Were you working on August the 14th -- let me take that question back for just a minute, Mr. Reese. Do you know the date of this particular incident?

A. I don't.

MR. BERRIGAN: All right. I wonder if I might have an exhibit marked, Your Honor.

THE COURT: You can if you can have an exhibit sticker.

Q. I'm going to identify this as a report. I'm not going to mark it. I'm handing you, sir, what purports

to be a report dated August the 14th. It's titled a memorandum to Assistant United States Attorney Pat Reinert from Detective Pete Wright, dated August the 14th, 2000. It consists of four pages, the last two of which are purportedly E-mails, and I'm handing you this, sir, and I'm asking you if you would take a look at the E-mails for just a moment. And I want to ask you, after you look at them, if they refresh your recollection as to the date of this incident with the notes being passed?

A. This is the first I've seen this.

Q. And I know you didn't prepare it, sir. I'm just using this, if I could, to aid your recollection of the time of the event. Does that help you at all recollect when it is that this incident took place where the dispatcher came to you and complained about note passing between Mr. McNeese and Angela Johnson?

A. Well, in my mind, I thought it was another dispatcher that said something to me.

Q. I'm sorry?

A. I thought it was a different dispatcher that said something to me.

Q. Okay. So this dispatcher in the report is a lady named Michelle?

A. Uh-huh.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 44 of 100

Page 181

Q. Is that right?
A. I thought it was Kila (phonetic).
Q. Kila?
A. Kila.
Q. Kila?
A. Kila Davis.
Q. Is it possible that this happened more than once, Mr. Reese, that a dispatcher came to you complaining of having observed notes going back and forth between Mr. McNeese and Ms. Johnson?
A. I'm sorry, is it possible what?
Q. That that happened more than one occasion, that a dispatcher came to you?
A. Not -- not to my recollection, no.
Q. Okay, all right, sir. When Mr. Williams was first asking you about Mr. McNeese violating the rules, I thought you said he did it when he thought he could get away with it?
A. All of them do.
Q. All of them?
A. Yes.
Q. And you went on to say that some of the rules that Mr. McNeese violated, or one of them, was that he tried to contact Angela Johnson several times?
A. Yes.

Page 182

Q. Are there times that we haven't spoken about here today that you know that Mr. McNeese tried to contact Ms. Johnson?
A. The only times I'm talk -- know about is the outdoor rec. area and this one right here.
Q. What you have discussed today?
A. Yes.
Q. Before you came in to testify this afternoon here on April the 11th, did you have an occasion to talk to either Mr. Williams or anybody else from the US Attorney's office about your testimony today?
A. About my testimony today?
Q. Yes, sir, in preparation for your testimony.
A. He interviewed me several months ago, yes.
Q. Several months ago?
A. I believe, I'm not sure of the exact date.
Q. Have you since learned, that is, since October of 2000, have you since learned, Mr. Reese, that there was stuff going on behind your back where your fellow employees were allowing contact between Ms. Johnson and Mr. McNeese?
A. Yes, I have.
Q. And how did you learn that, sir?
A. I read it in the newspaper, that -- what was happening.

Page 183

Q. So when -- you went to Detective Wright and you asked him, because you suspected that's what was going on, didn't you?
A. I had a feeling, yes, there was something going on, but I didn't know.
Q. But Detective Wright explicitly denied that there was any agreement to let these people have contact with each other?
A. Detective Wright told me to, if I caught them, to discipline them, according to the jail regulations.
Q. Okay. So certainly Detective Wright didn't let you know that there was some kind of an agreement to let these people communicate with each other?
A. I know nothing of any agreement.
Q. You learned about that sometime after you read it in the newspaper?
A. I read it all in the newspaper, yes.
Q. Mr. Reese, do you know of any reason, sir, why your colleagues at the Benton County Sheriff's Department would have kept you kind of out of the loop if there was an agreement that Mr. McNeese could have contact with Angela Johnson?
A. If there was any agreement, I didn't -- they probably didn't want me to know about it.
Q. And I'm asking you, do you know of any reason why

Page 184

they would not want you to know about something like that?
MR. WILLIAMS: Your Honor, I'm -- I think this calls for speculation, if he knows the reason.
MR. BERRIGAN: I'll rephrase.
THE COURT: Let's just see if he can answer the question.
A. Could you repeat the question now?
Q. Yes, sir. I wanted to know if you knew why, if there was any reason why your colleagues would not have informed you if there was some understanding that Mr. McNeese and Ms. Johnson could have contact with each other?
A. I have no reason why.
Q. And nobody's explained that to you since?
A. No, and I haven't asked.
Q. Would it be fair to say, Mr. Reese, given what you know now, what you have read in the newspapers and learned since about this agreement, that Ms. Johnson and Mr. McNeese may have had a good deal more contact than what you observed during your shifts at the Benton County Jail?
A. It would appear so, yes.
Q. Yeah. Would you excuse me for one moment. Could I have just a second?

Case 3:08-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 45 of 100

THE COURT: You may.

MR. BERRIGAN: Those are all the questions I have. Thank you, sir.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: None, Your Honor.

THE COURT: Thank you, Mr. Reese.

MR. WILLIAMS: Shall we adjourn for the night, Your Honor? I could -- I could keep calling witnesses, but I understand you probably want --

THE COURT: I think it's been a long day for our court reporter --

MR. WILLIAMS: Certainly.

THE COURT: -- and the other -- the marshals, and -- I worry about imposing my hours on others, except my law clerks. They're exempt. Okay. That will conclude the testimony for today, and we'll start in tomorrow morning at 8:15. Thank you very much.

(Proceedings recessed for the evening.)

Page 186

CERTIFICATE

I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable Mark W. Bennett; that I reported in shorthand the proceedings of said hearing, reduced the same to print by means of computer-assisted transcription under my direction and supervision, and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 24th day of July, 2001.

Patrice A. Murray, CSR, RPR, RMR
Federal Building
101 First Street S.E.
Cedar Rapids, Iowa 52401

-'-

'60s [1] 177:4
'70s [1] 174:10
'73 [1] 174:12
'74 [1] 174:12
'75 [1] 174:12
'97 [5] 11:2　12:11
12:19　42:19　43:17
'98 [7] 11:2　13:24
14:15　38:10　42:24
43:17　46:20
'99 [4] 42:25　42:25
45:20　47:2

-0-

00-3034 [1]　1:4
0800 [1] 116:13

-1-

1 [31] 2:23　2:25
7:10　7:13　50:2
56:13　56:22　75:23
78:12　84:21　84:22
86:17　89:10　90:5
95:9　99:8　101:19
102:2　114:7　114:15
114:23　115:5　115:24
122:16　126:16　126:16
157:16　157:20　158:14
158:24　169:19
10 [1]　2:5
101 [3]　1:20　1:24
186:18
10:30 [1]　　101:23
11 [10] 23:13　25:24
25:25　49:24　53:23
91:21　92:12　111:24
113:19　124:1
11th [2] 1:20　182:9
12 [1]　60:2
123 [1]　2:8
126 [1]　2:8
128 [1]　2:8
13 [2]　89:25　140:14
132 [1]　2:9
135 [1]　2:11
14 [11]　2:23　7:10
7:13　90:7　116:25
117:10　127:12　127:16
127:21　128:3　128:7
147 [1]　2:11
14th [3] 179:16　180:1
180:4
15 [6]　18:9　18:18
88:12　88:16　88:17
117:10
154 [1]　2:11
157 [1]　2:11
159 [1]　2:12
1600 [1] 116:13
162 [1]　2:14
17 [2]　14:20　14:25

173 [1]　2:14
18 [5]　93:14　93:18
110:9　111:8　113:16
18th [1] 110:16
19 [4]　22:1　88:19
117:12　135:18
1983 [1] 10:16
1988 [1] 40:20
1994 [1] 163:12
1997 [3] 11:21　38:8
42:12
1998 [4] 14:12　14:25
42:21　43:3
1999 [7] 14:20　14:25
16:15　16:18　43:3
44:16　46:20
19th [1] 117:24
1:00 [1]　1:21

-2-

2 [51]　31:21　33:3
54:15　56:7　57:6
58:15　63:23　75:23
75:25　76:9　87:25
88:2　88:12　88:17
88:23　89:10　89:14
91:7　91:17　99:15
100:11　100:21　100:24
102:7　103:10　114:6
114:19　114:20　114:21
115:2　115:3　115:9
117:8　122:14　122:21
123:11　123:12　123:14
126:14　129:6　133:20
133:21　151:24　157:17
157:20　157:24　158:2
158:4　158:6　158:25
159:11
2000 [41]　　18:9
22:2　22:17　23:13
25:24　25:25　30:19
31:21　44:21　47:1
48:3　49:14　53:1
54:16　84:11　84:15
84:21　85:3　86:17
89:25　91:2　91:21
92:12　93:18　94:1
103:3　103:19　114:6
114:7　115:4　135:18
135:19　135:24　140:6
140:14　143:15　154:7
163:20　163:20　180:4
182:18
2000-3034 [1]　3:2
2001 [2] 1:20　186:15
22 [1]　18:21
2255 [1] 51:22
23 [2]　59:20　63:23
2400 [1] 1:17
24th [1] 186:15
2500 [1] 1:15
26 [13]　61:8　94:1
94:6　96:9　96:13
97:20　98:5　119:25
121:12　136:14　145:17
150:11　167:11

28 [1]　14:12
2819 [1] 1:13
286-2324 [1]　1:25
29 [1]　88:19
2A [1]　84:15

-3-

3 [28]　23:10　24:8
24:21　24:22　49:21
75:24　75:25　76:8
122:9　122:23　140:6
141:18　143:14　143:22
147:19　148:12　149:5
157:17　157:20　157:24
158:2　158:4　158:11
158:13　158:25　159:1
159:11　167:5
3-22 [1] 84:11
30 [4]　88:10　88:16
88:17　129:1
319 [1]　1:25
35 [2]　51:19　51:22
3553 [1] 51:21
35B [4]　64:19　65:9
65:25　70:9
37 [1]　2:5
3:05 [1] 63:5

-4-

4 [8]　53:24　60:1
75:25　143:7　157:17
157:20　157:23　158:25
4-10 [1] 84:15
400 [1]　1:10
401 [1]　1:10
417 [1]　1:13
4:30 [1] 161:2

-5-

5 [11]　17:25　75:25
77:21　79:25　85:7
86:25　104:6　104:19
157:20　157:20　167:9
50311 [1]　　1:17
52401 [2]　　1:24
186:18
52406-2819 [1]
1:13
52407-4950 [1]
1:11
56 [2]　2:25　2:25

-6-

6 [14]　59:21　63:24
75:25　88:15　88:20
91:8　92:25　104:6
104:19　115:9　148:17
148:23　157:20　159:11
6-9 [2]　84:21　115:3
615 [2]　8:23　9:5
64108-2743 [1]
1:15

66 [2]　2:5　107:5
67 [1]　2:5

-7-

7 [15]　2:23　2:23
64:17　75:25　88:23
92:25　104:6　104:19
115:9　148:17　148:23
157:21　159:10　177:21
177:22
72 [2]　2:6　2:6
74 [1]　2:8
74950 [1]　　1:10
7:30 [1] 160:24

-8-

8 [15]　2:24　2:24
75:25　77:20　79:25
84:9　102:7　104:6
104:19　140:1　141:7
141:18　143:7　148:17
148:23
8-14 [1] 91:2
8-15 [1] 91:7
8-19 [1] 91:8
8:15 [3] 161:2　161:5
185:17

-9-

9 [3]　76:1　86:17
102:10
9-26 [1] 85:3
98 [1]　2:8

-A-

A2 [1]　7:23
able [14] 5:9　13:5
15:14　17:13　21:12
32:17　35:2　41:7
41:16　50:10　55:11
58:20　77:25　96:1
above [2]　　1:19
186:10
absolutely [6]　19:20
29:13　43:14　125:14
132:1　170:12
abusing [2]　125:18
125:19
access [2]　　77:14
153:17
accompany [1]　62:23
according [2]　117:12
183:10
account [4]　66:21
82:13　82:14　125:25
accuracy [1]　61:16
accurate [9]　18:15
27:21　75:6　75:8
90:1　119:16　121:4
127:6　129:13
accurately [1]　130:23
achieve [1]　40:11

acknowledgment [1]
141:13
act [1]　147:2
acted [1]　99:12
acting [4]　27:10
27:14　146:20　149:8
action [4]　6:7
175:3　186:12　186:13
actions [1]　95:11
active [3]　13:7
26:12　30:16
activities [2]　18:14
39:1
activity [6]　12:24
16:14　26:3　28:15
83:6　90:9
actual [3]　27:8
36:2　60:23
adamant [1]　35:22
added [1]　110:23
additional [7]　15:1
15:6　16:25　17:17
19:22　26:2　26:6
adjacent [2]　99:21
152:11
adjourn [1]　185:7
adjust [3]　74:4
134:19　162:10
Administrative [1]
76:23
admission [1]　8:5
admitted [4]　7:5
7:14　8:11　88:10
advice [2]　65:18
143:10
advise [3]　98:16
127:22　152:6
advised [19]　23:1
26:1　36:13　36:21
60:18　61:1　62:13
65:4　76:18　93:10
93:12　132:21　148:9
150:3　150:8　150:14
150:15　150:20　151:2
advises [1]　50:7
affect [1]　64:23
affected [1]　52:11
affidavit [4]　131:13
131:13　132:8　132:9
afforded [1]　98:9
afternoon [5]　38:1
38:2　99:1　116:13
182:8
again [18]　18:4
21:13　26:21　33:4
45:3　47:11　48:1
49:7　55:22　57:7
67:2　69:18　78:25
82:10　99:1　114:8
114:14　127:20
against [8]　43:15
44:22　65:4　112:2
138:5　142:3　166:16
174:18
agencies [2]　39:8

39:15

agency [1] 38:20
agent [14] 9:3
9:4 13:24 17:19
27:6 27:10 37:13
38:23 38:24 38:25
39:4 39:11 40:18
62:8
agents [2] 30:13
39:14
ago [4] 85:23 152:2
182:14 182:15
agree [7] 3:6 3:8
14:4 28:19 55:19
106:10 125:16
agreed [3] 17:24
35:24 42:20
agreement [25] 28:18
38:19 39:7 43:7
45:7 45:10 45:16
46:5 46:14 50:2
50:8 52:20 52:25
53:11 53:13 53:20
56:9 91:22 113:20
183:7 183:12 183:14
183:21 183:23 184:19
agrees [1] 131:11
ahead [6] 100:19
100:20 101:21 112:25
127:18 142:14
ahold [2] 57:12
172:11
aid [2] 13:23 180:13
air [1] 178:20
Al [2] 143:10 147:17
alarms [1] 155:6
albeit [1] 75:6
alert [3] 8:17 62:19
62:22
alerted [3] 66:17
142:16 151:6
alerting [1] 90:2
ALFRED [1] 1:12
allegations [1] 104:2
alleged [1] 27:11
allegedly [2] 21:11
21:17
allow [22] 6:2
6:4 76:22 77:2
77:9 79:13 79:15
92:4 92:14 98:1
98:8 123:22 125:12
125:13 132:6 139:11
166:11 166:14 170:8
172:12 172:15 172:18
allowed [15] 24:4
55:16 59:18 80:14
92:20 92:23 96:6
97:23 99:21 106:7
120:13 120:24 153:18
154:7 170:19
allowing [3] 121:20
128:3 182:20
allows [1] 5:14
almost [2] 12:18
51:13

alone [1] 119:5
along [2] 7:4
77:19
altercation [2] 96:13
119:24
always [6] 6:5
38:3 129:25 155:11
155:12 161:20
amazing [1] 10:1
ambiguous [2] 71:8
71:19
America [3] 1:3
3:1 32:15
among [2] 30:25
51:8
amount [4] 60:22
130:13 164:7 174:13
Andrew [6] 2:11
93:11 118:1 134:13
134:15 135:1
Angela [92] 1:6
3:2 29:5 29:16
29:19 29:25 30:2
30:5 30:10 30:13
30:18 31:6 31:18
32:16 37:5 54:1
64:9 80:19 87:12
87:16 89:2 90:3
90:13 90:17 91:5
91:17 91:24 92:5
92:15 92:24 93:8
95:24 97:23 110:18
110:24 111:6 112:17
113:4 116:24 123:10
123:23 124:9 124:13
129:1 136:18 138:5
138:10 139:7 139:12
139:15 139:19 139:25
140:15 140:19 140:21
140:22 141:3 141:23
142:2 142:6 143:4
143:9 143:16 144:7
145:3 147:17 148:4
154:8 164:21 164:23
165:23 166:2 166:18
166:20 167:17 169:1
169:12 169:17 169:21
170:9 170:25 172:13
172:22 176:25 177:3
177:4 178:5 178:12
179:2 180:17 181:24
183:22
Angie [1] 141:20
angry [1] 126:4
answer [8] 50:20
51:18 69:25 70:2
73:4 100:19 118:15
184:6
anticipate [1] 5:9
anyway [2] 8:15
165:3
apologize [4] 50:17
71:18 133:10 162:3
appear [2] 106:18
184:23
APPEARANCES [1]
1:9
appeared [2] 1:11

1:17
appointed [1] 18:13
appreciate [1] 60:13
approach [10] 12:10
12:11 13:21 23:4
58:11 63:2 76:3
83:22 106:14 110:6
approached [7] 13:25
14:3 20:8 27:19
50:14 89:7 127:22
approaches [1] 48:3
approaching [1]
23:6
appropriate [2] 79:4
82:10
April [9] 1:20
22:1 22:15 23:13
25:24 25:25 49:14
49:24 182:9
area [52] 11:5 12:2
12:14 17:13 18:9
20:4 32:6 47:21
58:22 69:20 75:13
75:14 75:15 77:16
77:21 79:3 79:16
79:24 81:14 82:17
82:18 92:24 100:7
101:17 102:16 102:17
104:11 104:14 104:20
104:24 121:13 130:13
148:17 153:17 153:19
153:23 153:24 153:25
154:20 155:3 155:7
155:20 156:1 156:2
156:13 156:24 157:1
159:25 163:23 166:24
167:23 182:5
areas [6] 5:23 68:11
68:13 68:13 75:12
158:23
argument [4] 4:1
4:13 5:15 5:16
arguments [4] 4:18
4:24 5:8 5:10
arrangement [1]
142:10
arrangements [1]
137:13
arrest [1] 136:24
arrested [1] 129:12
arrests [1] 137:11
arrival [12] 39:3
39:8 83:12 94:6
99:14 106:22 126:12
132:22 132:24 151:7
152:10 152:20
arrived [5] 130:3
130:7 133:11 133:21
136:21
arrives [2] 103:4
106:11
articulate [1] 40:13
ascertain [1] 131:2
aside [1] 164:22
assault [1] 145:25
assigned [3] 11:8
11:11 152:17

assist [2] 17:24
46:21
assistance [4] 16:25
50:11 52:1 52:9
Assistant [5] 1:10
94:2 94:2 94:25
180:2
assisted [3] 42:13
166:1 168:21
associate [2] 13:11
20:16
associated [1] 15:9
associates [1] 13:13
association [1] 55:6
assume [8] 46:16
48:16 82:11 102:25
114:20 130:22 134:4
173:7
assumed [4] 57:5
129:24 129:25 132:25
assuming [2] 68:9
132:11
assumption [2] 46:22
69:16
Atlanta [20] 11:25
12:20 13:10 13:13
13:16 13:17 13:25
14:3 14:13 38:9
38:11 38:13 38:22
38:24 39:12 39:18
39:22 40:7 40:24
41:19
attached [5] 81:22
88:4 132:9 140:3
141:17
attachments [1] 87:16
attempt [4] 32:7
35:12 55:20 145:1
attempted [1] 34:12
attempting [4] 20:5
22:22 144:23 167:21
attempts [2] 81:8
164:22
attention [9] 53:17
60:1 93:14 106:16
135:17 135:23 141:19
161:25 163:19
attorney [26] 1:10
1:10 1:12 1:14
1:16 1:15 18:12
35:16 65:17 75:18
76:25 77:4 77:7
77:15 94:2 94:3
102:25 111:22 120:3
120:17 121:11 143:10
150:8 150:19 180:2
186:13
attorney's [24] 21:8
21:16 22:25 30:23
30:24 32:1 32:9
34:21 46:3 46:4
46:7 47:13 53:5
55:1 55:8 56:25
57:18 60:19 65:13
70:4 70:11 70:23
72:10 182:11

attorney-client [1]
103:1
attorneys [4] 31:7
41:16 76:23 94:25
August [24] 12:11
88:15 88:16 88:16
88:17 88:19 88:19
89:25 90:7 116:25
117:10 117:10 117:12
127:12 127:16 127:21
128:2 128:7 135:18
135:18 163:19 179:16
180:1 180:3
authorities [3] 15:6
45:8 47:17
authorization [1]
168:25
authorized [1] 26:22
authorizing [1] 24:10
availability [3] 79:1
99:23 144:11
available [1] 151:23
Avenue [2] 1:13
1:17
awaiting [1] 72:21
aware [67] 7:8
13:1 22:7 29:15
30:4 30:9 30:21
33:11 37:12 37:15
37:16 38:19 39:6
39:9 40:23 43:8
45:7 48:1 52:24
60:10 64:3 65:9
69:1 69:23 73:7
85:12 87:12 89:12
89:24 90:7 90:10
91:20 92:7 92:19
92:22 98:4 103:18
103:23 104:5 105:6
106:3 106:6 113:19
116:9 117:1 122:3
128:6 128:7 128:19
130:9 135:24 136:3
136:5 136:9 139:5
139:17 143:15 144:21
147:18 149:21 150:1
152:9 163:25 165:10
168:24 169:14 173:15
away [5] 5:23 161:8
164:15 175:3 181:18

-B-

bad [1] 138:17
bang [1] 55:3
barricaded [2] 145:23
146:23
bartering [1] 150:18
base [1] 68:20
based [7] 5:19
10:18 52:9 52:14
103:20 113:24 147:18
basic [1] 65:14
basis [1] 68:17
bat [1] 70:12
bear [1] 23:14
became [11] 13:1

22:7     29:14     30:9
85:12     113:19     117:1
136:9     150:1     164:1
165:23

**become** [13]     11:15
12:8     15:8     30:21
86:9     87:12     89:24
91:20     105:6     139:5
139:17     144:21     163:25

**becoming** [3]     136:18
164:4     166:2

**bed** [1]     101:24

**beds** [1]     159:13

**befriended** [1]     50:15

**began** [3]     11:20
17:19     60:21

**begin** [1]     50:4

**beginning** [1]     42:12

**behalf** [4]     1:11
1:17     6:15     72:6

**behaving** [1]     97:14

**behavior** [3]     82:6
82:15     176:19

**behind** [4]     58:25
155:22     156:14     182:19

**belligerent** [1]     120:1

**bench** [2]     4:5
4:5

**benefit** [5]     40:11
40:13     40:15     70:17
151:4

**Bennett** [4]     1:20
96:19     101:11     186:7

**Benton** [109]     18:21
18:24     19:3     19:6
19:10     19:13     19:19
19:21     20:9     20:18
21:11     21:23     21:25
22:9     24:16     29:8
33:9     34:3     34:22
35:14     37:9     42:7
42:8     47:9     47:16
47:17     47:22     47:24
47:25     49:3     49:9
49:13     53:4     57:11
57:13     58:7     58:22
59:13     64:5     67:25
68:5     68:7     68:8
68:15     68:18     69:3
69:12     69:16     73:8
73:10     73:12     73:15
74:13     74:21     75:1
75:5     75:7     76:17
79:2     79:10     79:18
79:22     82:23     83:14
88:10     94:3     97:21
98:18     99:5     99:19
101:10     103:4     104:2
104:9     106:11     106:18
114:16     115:6     119:19
122:15     126:12     131:8
131:25     135:7     135:13
135:16     136:13     136:19
138:12     144:1     144:23
145:8     145:13     147:7
147:14     150:25     151:8
163:8     163:10     164:1
164:4     165:12     173:16

174:8     183:19     184:22

**Berrigan** [7]     1:14
5:22     173:22     173:24
179:20     184:5     185:2

**best** [12]     5:25     12:17
34:22     35:11     36:14
36:14     46:22     50:20
67:24     99:24     128:17
132:2

**better** [5]     4:19
24:1     35:1     44:9
51:13

**betting** [1]     134:21

**between** [62]     5:22
12:9     13:7     15:16
26:22     30:10     32:2
43:2     46:20     53:4
55:15     59:20     61:22
63:23     65:12     67:6
79:19     80:13     80:18
87:4     87:7     87:10
89:2     89:6     90:8
92:5     92:15     92:19
94:24     97:23     98:5
107:6     108:25     113:3
113:7     114:6     123:22
128:4     139:12     143:16
143:21     147:15     147:16
147:23     148:4     148:13
148:16     149:4     152:23
154:6     155:3     166:20
169:3     169:12     169:14
170:9     170:13     172:13
172:18     180:17     181:9
182:20

**beyond** [3]     68:16
125:9     125:14

**big** [2]     55:2     55:4

**bigger** [1]     69:15

**Bill** [2]     118:5     161:17

**bit** [8]     3:23     129:3
131:4     135:3     140:17
150:10     160:24     174:15

**blank** [3]     165:1
170:22     171:16

**block** [5]     87:8
87:9     108:20     108:22
161:8

**board** [5]     81:20
81:23     97:4     120:8
146:8

**Bob** [1]     112:17

**Bobby** [21]     12:16
33:2     50:23     89:7
99:11     105:1     105:13
107:23     113:4     119:1
119:24     120:13     120:24
123:1     126:3     153:10
154:7     164:3     166:23
167:23     169:19

**bodies** [6]     32:6
33:13     33:17     93:19
94:11     110:19

**bodily** [1]     173:11

**body** [1]     110:19

**boisterous** [1]     165:5

**book** [1]     75:16

**booked** [3]     84:9

**booking** [21]     58:22
68:13     75:13     84:2
84:25     87:15     87:17
87:21     87:22     88:5
102:15     102:16     102:17
139:18     154:20     155:3
155:20     156:1     156:13
156:24     159:25

**books** [5]     77:14
77:14     81:4     154:20
154:21

**BOP** [1]     47:13

**border** [1]     17:12

**boring** [1]     74:25

**bottom** [3]     141:7
141:9     141:19

**Box** [2]     1:10     1:13

**boyfriend** [1]     144:8

**boyfriend's** [1] 130:11

**Bramow** [1]     149:10

**break** [5]     33:1
50:18     63:11     144:12
144:23

**brief** [2] 5:17     63:7

**briefed** [1]     3:20

**briefly** [6]     11:18
26:18     32:22     132:17
174:16     179:4

**briefs** [1]     4:8

**bring** [4]     4:17
72:24     75:15     148:19

**brings** [1]     53:16

**broke** [1]     21:17

**brother** [5]     11:24
14:2     40:24     42:14
42:15

**brought** [19]     14:14
18:8     18:17     20:17
44:19     45:23     46:25
87:13     93:6     103:13
125:10     129:7     130:16
130:18     130:24     132:20
137:8     137:9     148:24

**Brugman** [2]     27:6
27:10

**buck** [1] 55:3

**bugged** [3]     51:1
66:10     66:11

**build** [1]     41:7

**Building** [3]     1:20
1:23     186:17

**bunk** [1] 146:13

**buried** [1]     33:14

**burned** [1]     178:19

**busy** [2] 155:1     156:5

**buzz** [1] 51:25

-----

**-C-**

-----

**C** [3]     2:3     186:4
186:4

**C.J** [1]     1:10

**California** [11]     17:2
17:25     18:1     45:1

45:8     45:9     45:16
45:18     47:4     70:5
70:7

**calls** [24]     9:11
12:21     13:16     13:18
13:19     17:18     20:13
42:13     59:22     60:20
60:22     61:2     61:20
63:13     63:22     63:24
64:1     73:23     76:18
77:4     102:22     103:11
134:13     184:4

**calm** [2] 54:19     110:6

**calmed** [1]     122:17

**camera** [7]     101:7
101:8     102:5     102:5
102:7     102:15     166:25

**camera's** [1]     101:24

**cameras** [10]     101:2
101:11     101:16     101:25
102:1     102:10     102:12
102:14     156:11     156:12

**cannot** [1]     10:2

**capable** [2]     76:14
101:2

**capacity** [4]     27:11
27:14     74:15     75:1

**capital** [2]     129:12
130:6

**care** [3]     63:3     74:22
82:23

**career** [1]     127:3

**case** [32] 4:3     5:7
7:4     26:12     27:10
28:14     28:21     32:15
36:6     39:22     43:4
43:20     47:3     52:22
54:5     58:2     58:6
64:9     77:8     78:12
80:2     80:18     87:18
93:20     95:24     130:10
130:11     130:15     130:20
142:18     170:19     172:2

**cases** [6]     4:8
4:9     10:23     11:12
58:5     65:19

**catch** [2]     81:11
148:19

**caught** [7]     148:24
149:1     166:23     167:16
171:2     177:22     183:9

**caused** [2]     70:2
126:5

**Cedar** [24]     1:10
1:13     1:21     1:24
4:18     10:10     10:14
10:18     11:8     11:11
12:2     12:25     13:3
14:1     18:9     18:17
20:4     41:1     42:22
44:19     59:11     63:12
65:16     186:18

**cell** [173] 22:20     51:1
64:4     66:10     75:22
75:22     75:22     75:23
75:24     75:24     75:25
76:1     76:1     76:5
76:6     76:7     76:8

76:8     77:6     77:22
78:7     78:10     78:12
78:13     79:9     79:13
84:5     84:9     84:13
84:21     84:22     85:1
86:17     86:19     86:21
86:24     87:2     87:18
87:23     88:6     88:12
88:15     88:17     88:20
88:23     89:10     89:10
89:14     90:5     91:6
91:8     91:15     91:17
92:25     92:25     95:9
95:12     95:14     95:16
96:16     96:23     97:9
97:19     98:10     99:8
99:9     99:11     99:15
100:11     100:21     100:21
100:24     101:5     101:8
101:16     101:19     101:22
102:2     102:6     102:10
102:18     103:10     104:18
104:22     108:20     110:17
114:3     114:7     114:15
114:19     114:20     114:21
114:23     115:2     115:3
115:5     115:6     115:24
117:8     117:8     119:5
119:12     123:11     123:12
123:14     123:17     124:16
126:14     126:16     126:16
129:15     130:25     132:13
133:1     133:12     133:20
133:21     133:22     136:25
137:2     137:10     137:12
137:20     139:20     139:25
140:20     140:22     145:16
145:23     145:25     146:3
146:7     146:11     146:23
150:16     150:22     151:24
152:17     154:24     155:4
155:8     157:16     157:23
157:24     157:24     158:2
158:2     158:4     158:4
158:6     158:9     158:9
158:25     159:1     159:6
159:10     159:25     160:1
167:8     167:9     167:19
168:1     168:12     168:15
169:19     169:22     171:1
171:6     173:1     177:19
177:21     177:22     178:22

**cellblock** [1]     101:3

**cellblocks** [1]     68:14

**cellmate** [1]     91:19

**cells** [46]     76:10
77:19     77:20     78:4
78:5     79:25     80:14
83:2     83:13     87:4
87:10     96:5     99:21
99:24     100:8     100:9
100:24     101:1     102:4
102:7     104:6     107:6
114:18     115:9     115:13
115:23     116:3     126:13
133:2     133:7     148:17
148:23     151:18     151:23
152:15     152:16     153:24
154:5     155:13     157:17
157:20     157:20     157:21
157:25     158:4     158:7

**cement** [1]     146:13

center [1] 75:18
certain [2] 102:22
152:15
certainly [30] 39:24
40:12 41:21 43:9
43:17 45:14 48:22
50:13 52:13 52:16
55:24 65:23 66:1
70:25 71:14 103:5
104:18 104:22 105:21
108:3 108:23 109:3
109:6 116:15 127:21
128:15 149:17 152:9
183:11 185:12
Certified [2] 1:21
186:5
certify [2] 186:6
186:11
Chain [1] 104:17
chair [2] 134:19 162:10
chamber [1] 78:8
chambers [2] 5:18
62:15
chance [3] 4:14
7:15 156:3
change [2] 9:25
41:14
changed [1] 116:12
charge [5] 28:20
129:19 130:6 141:12
141:14
charged [3] 15:20
18:5 129:9
charges [2] 15:11
138:5
chatty [1] 50:21
check [4] 81:8
127:8 154:11 161:14
checked [2] 76:17
123:11
checks [1] 80:25
Cherokee [1] 174:10
Chicago [1] 12:14
child [1] 41:2
childhood [2] 17:9
44:23
chocolate [1] 173:17
Christian [1] 40:9
cinder [3] 87:8
108:20 108:22
circuit [1] 166:25
circumstances [2]
52:24 77:1
cited [2] 4:8 4:9
City [5] 1:15 5:23
11:10 32:6 33:14
civil [1] 4:22
claim [1] 73:10
clarify [4] 56:23
125:17 154:14 154:18
Clark [30] 5:24
11:16 11:21 12:1
12:5 12:9 14:2
14:18 15:4 15:5
15:7 15:16 15:17

15:19 18:11 18:14
20:15 20:17 27:19
28:16 28:21 38:15
39:22 43:4 44:15
46:17 48:11 52:22
66:17 66:20
clean [1] 126:5
clear [7] 57:6 66:8
72:9 78:2 113:3
127:11 133:9
clearance [3] 120:19
120:21 123:19
cleared [1] 62:17
clerks [1] 185:15
client [32] 54:1
54:11 54:12 54:14
55:12 56:1 103:4
105:2 105:21 106:5
106:25 109:4 109:13
109:15 115:9 116:21
117:7 118:3 121:15
127:5 127:14 127:23
128:5 147:20 147:23
149:5 149:13 150:5
152:6 152:10 152:24
153:4
client's [6] 54:5
64:8 126:12 151:7
152:9 152:20
Clinic [1] 1:17
close [8] 13:12 95:2
95:3 101:23 118:20
127:9 130:2 154:1
closed [1] 166:25
closely [1] 54:8
closer [1] 159:24
closing [3] 4:13
4:18 4:24
clue [3] 29:19 49:11
73:13
Coca-Cola [1] 153:12
colleague [2] 118:19
148:3
colleagues [4] 108:10
147:19 183:19 184:10
colleagues' [1] 103:11
collect [2] 57:13
63:13
comfortable [5]
9:17 42:9 74:4
134:19 162:10
coming [6] 12:13
104:1 129:5 130:9
130:17 131:8
commencing [1]
1:21
comment [1] 51:12
comments [1] 144:9
commissary [7] 88:4
88:8 88:11 88:14
88:22 91:7 117:12
common [2] 7:7
165:7
communicate [9]
46:4 87:6 93:2
116:1 148:22 167:22

167:25 171:3 183:13
communicated [2]
57:19 72:13
communicating [5]
79:23 81:5 92:10
105:12 107:6
communication [16]
58:20 73:1 92:4
92:8 92:15 92:22
107:9 109:10 116:20
117:4 117:5 117:15
123:22 124:1 124:10
167:16
communications [13]
15:19 80:23 109:16
111:2 113:3 120:25
127:13 128:4 147:18
148:4 148:13 148:16
152:23
compared [1] 70:22
complained [1] 180:16
complaining [2]
28:25 181:8
complete [1] 131:16
completely [2] 3:8
112:14
compliance [1] 128:18
comply [1] 164:13
compound [1] 50:18
computer-assisted [1]
186:8
concern [4] 32:7
34:3 57:20 144:22
concerned [7] 9:1
21:9 60:9 64:22
102:2 112:5 112:6
concerning [41] 13:22
14:1 14:18 15:7
15:13 15:19 17:1
17:5 17:9 18:2
20:24 21:6 22:4
22:7 22:10 25:22
26:2 27:20 28:20
28:22 30:18 31:6
31:17 38:14 38:25
43:23 54:11 54:12
67:6 80:5 86:10
90:9 90:12 91:23
92:3 94:9 97:22
138:5 140:3 144:22
172:7
concerns [2] 61:3
62:14
conclude [1] 185:16
concluded [1] 28:6
concur [1] 7:6
condition [1] 147:3
conditions [3] 23:20
24:11 71:22
conduct [14] 39:12
41:24 43:13 43:21
44:5 49:14 52:21
53:25 54:9 64:9
103:20 104:3 149:21
152:19
conducting [1] 38:15
confer [1] 160:18

conference [1] 150:22
conferred [1] 7:1
confided [2] 17:10
22:22
configuration [1]
102:8
confinement [2]
34:2 71:22
confines [3] 101:3
101:5 122:8
confiscated [1] 139:24
confuse [1] 117:21
confused [1] 177:7
congregate [1] 79:7
conjunction [2] 11:13
18:10
connection [5] 10:25
12:9 13:7 66:19
136:1
consider [2] 69:6
70:16
considerable [2]
4:9 174:13
consideration [2]
46:12 66:25
considered [5] 24:2
55:20 101:16 105:15
152:16
consists [1] 180:4
console [2] 156:20
157:1
conspiracy [1] 28:16
constantly [1] 156:18
constructed [1] 31:4
contact [81] 12:16
15:1 15:15 15:17
16:1 16:11 16:13
17:14 20:2 22:3
28:7 28:9 28:22
28:23 30:9 31:24
33:2 33:5 33:10
35:12 36:20 38:24
39:11 39:14 40:23
41:5 44:11 57:7
61:4 70:6 77:10
79:19 89:2 89:5
89:24 94:5 97:22
97:25 98:1 98:4
98:8 120:14 121:7
121:15 121:20 121:22
124:2 124:5 124:6
138:10 139:11 164:6
164:7 164:18 164:22
164:23 166:15 166:19
166:23 169:1 169:12
169:14 169:24 170:8
170:13 172:6 172:13
172:18 176:25 177:10
177:11 177:12 177:13
179:5 181:24 182:2
182:20 183:7 183:22
184:12 184:20
contacted [17] 12:25
17:8 26:8 26:19
26:21 28:1 28:5
29:18 30:11 31:20
31:23 34:1 34:21

38:25 57:23 90:11
124:10
contacting [1] 36:17
contacts [1] 67:5
contain [1] 84:5
contains [1] 77:13
contents [1] 53:11
context [2] 55:22
62:10
continually [1] 50:24
continue [3] 22:18
28:7 32:23
continued [6] 15:4
20:2 22:3 28:10
28:22 60:16
continues [3] 72:22
72:23 72:23
continuing [1] 3:11
contrast [2] 133:6
143:4
control [1] 155:19
controlled [4] 11:10
12:4 17:12 126:19
convenient [1] 5:7
conversant [1] 51:15
conversation [23]
12:24 21:5 21:10
22:13 22:19 26:23
26:25 29:21 33:6
33:15 33:18 40:14
44:6 50:15 56:8
56:9 56:13 59:9
60:25 61:7 89:21
108:10 113:1
conversations [10]
28:24 30:8 35:8
54:9 67:4 89:18
104:23 108:25 109:4
144:14
conversely [1] 16:12
convince [1] 58:21
cooked [1] 42:7
cooperate [10] 14:5
15:4 20:6 38:17
40:16 42:20 72:22
72:23 72:23 97:5
cooperated [2] 43:3
103:19
cooperating [11]
15:5 44:22 77:9
85:13 93:7 112:2
135:25 139:6 149:22
150:4 165:11
cooperation [26]
14:8 14:10 15:2
17:4 17:17 18:7
19:22 27:20 36:24
37:18 38:7 44:14
45:12 46:10 48:25
49:15 49:18 50:17
52:5 58:1 66:16
66:20 69:25 72:12
85:17 93:10
cooperator [1] 36:9
copied [1] 61:12
copies [2] 3:21

13:19

copy [5] 23:12 56:23 56:24 57:4 57:5

correct [88] 7:24 8:3 8:6 8:7 16:3 16:4 24:20 38:9 43:7 49:1 49:16 49:19 49:25 50:5 50:8 52:18 55:13 56:24 58:10 59:5 59:23 60:6 61:8 61:11 62:5 62:18 64:23 65:2 65:11 65:19 65:25 66:11 66:12 67:18 71:24 71:24 78:18 80:12 82:20 85:10 86:20 88:9 88:13 88:25 91:4 91:9 96:8 99:13 99:15 101:3 101:19 102:19 103:2 104:8 104:11 106:12 106:23 107:3 107:18 108:4 108:21 109:7 111:24 113:5 114:7 115:10 115:11 115:25 116:25 117:8 118:3 119:7 119:9 121:5 121:7 122:15 126:16 127:14 128:8 130:25 141:24 147:20 152:11 153:4 161:22 162:25 163:14 177:8

correctional [8] 47:20 55:16 73:5 74:18 135:8 135:9 135:12 135:14

correctly [2] 10:4 58:23

corroborate [1] 15:14

corroboration [1] 67:17

counsel [8] 6:25 8:13 32:18 62:1 65:1 65:17 161:7 186:13

count [1] 121:4

counter [2] 139:18 156:14

country [1] 70:12

county [137] 14:15 17:7 17:24 18:19 18:21 18:24 19:3 19:6 19:10 19:14 19:19 19:21 20:10 20:18 21:11 21:23 21:25 22:9 23:3 24:16 29:1 29:8 33:9 34:3 34:23 35:14 37:9 37:9 42:6 42:7 42:8 42:10 44:4 46:25 47:6 47:9 47:16 47:17 47:18 47:19 47:22 47:24 47:25 49:3 49:9 49:13 53:4 55:16 57:12 57:13 58:7 58:22 59:13 59:23 60:2 60:9 64:5 67:25

68:1 68:5 68:7 68:8 68:9 68:10 68:15 68:18 69:2 69:3 69:12 69:13 69:14 69:16 73:7 73:8 73:10 73:12 73:15 74:13 74:21 75:1 75:5 75:7 76:18 79:2 79:10 79:18 79:22 82:23 83:14 84:2 85:5 87:13 88:10 94:3 97:21 98:18 99:6 99:19 101:10 103:4 104:2 104:10 106:12 106:18 108:24 114:16 115:6 119:19 122:11 122:15 126:12 131:8 131:25 135:7 135:13 135:16 136:14 136:19 138:12 144:1 144:24 145:8 145:13 147:7 147:14 150:25 151:8 163:8 163:11 164:1 164:4 165:13 173:17 174:8 174:10 183:19 184:22

couple [12] 4:21 12:17 13:4 27:2 27:5 53:21 67:22 68:2 138:15 138:17 150:24 157:11

course [8] 6:7 28:21 41:9 60:21 67:8 132:7 132:21 142:20

court [129] 1:1 2:3 3:1 3:10 3:14 3:20 5:6 5:12 6:1 6:3 6:11 6:17 6:22 7:9 7:13 7:18 7:21 8:1 8:4 8:8 8:11 8:17 8:19 8:23 9:6 9:9 9:16 9:22 10:1 11:7 22:6 22:24 23:5 25:5 25:10 25:12 25:16 32:10 32:13 32:24 33:4 37:22 56:11 56:15 56:17 56:18 56:22 57:2 58:12 62:15 62:21 63:1 63:5 63:8 66:4 67:12 67:21 67:24 68:17 68:23 69:7 69:9 69:11 69:20 70:20 71:2 71:8 71:12 71:15 71:18 71:22 72:17 73:18 73:20 74:3 76:4 79:1 83:23 98:22 101:13 106:15 115:12 123:5 125:7 125:12 125:19 125:22 126:8 128:21 128:24 131:24 132:3 132:11 132:16 133:15 134:7 134:9 134:12 134:18 135:2 140:18 147:10 154:13 157:7 157:10 159:15

160:4 160:6 160:11 160:16 160:19 161:1 161:4 161:9 161:14 161:18 162:9 162:16 162:19 162:21 173:23 179:22 184:6 185:1 185:4 185:6 185:10 185:11 185:13

Court's [4] 5:14 5:20 59:25 132:10

courtroom [1] 62:17

covered [1] 26:15

CR [1] 1:4

creation [1] 30:22

credibility [1] 62:9

crime [10] 13:3 13:8 13:11 15:20 16:14 17:2 18:5 39:1 41:8 55:6

criminal [7] 3:2 12:24 26:3 28:15 52:21 66:19 104:3

criteria [1] 49:12

cross [7] 37:24 62:22 66:3 98:24 125:10 147:12 173:21

cross-examination [1] 5:22

CSR [2] 1:23 186:17

culpability [1] 18:14

curiosity [1] 63:11

curious [1] 64:19

cursive [1] 119:20

cursory [2] 4:13 5:15

custody [3] 18:4 36:2 57:1

custom [2] 157:12 159:9

customs [2] 17:14 17:24

cut [1] 107:19

-D-

D [1] 2:3

daft [1] 133:18

daily [2] 92:11 152:4

Dameron [1] 1:15

damper [1] 178:19

danger [1] 159:23

dangerous [2] 130:1 160:16

Daniel [1] 17:10

Danny [6] 18:8 20:3 22:10 27:23 29:2 29:12

data [3] 131:3 131:9 131:11

date [26] 11:3 14:11 16:17 25:20 25:20 29:17 31:25 45:15 49:24 64:2 92:18 94:9 111:11 116:22 117:9 127:24 127:25

128:9 131:3 132:13 140:5 167:3 167:15 179:18 180:9 182:16

date-wise [1] 113:23

dated [3] 23:13 180:1 180:3

dates [4] 83:12 113:12 117:18 167:14

David [2] 176:13 176:14

Davis [2] 176:25 181:6

days [7] 5:10 93:15 121:10 137:16 164:10 164:10 165:21

de [2] 10:22 172:4

DEA [4] 10:18 11:12 20:9 27:7

deadlocked [1] 25:13

deal [4] 80:10 81:23 115:8 184:20

dealing [1] 130:15

decades [1] 40:19

decided [4] 34:22 35:10 35:11 64:14

decision [15] 19:16 47:12 49:7 72:22 73:14 81:11 81:14 81:19 82:4 103:9 123:14 129:1 129:14 168:18 169:4

Def [1] 2:24

defend [1] 147:17

Defendant [4] 1:7 1:17 32:13 133:21

Defendant's [8] 7:15 8:5 8:9 58:13 60:1 61:6 64:17 106:16

Defendants [1] 57:1

defense [2] 5:21 32:14

delay [1] 4:23

delegate [1] 162:2

Demanding [1] 124:15

demeanor [1] 94:19

denied [2] 179:14 183:6

denominated [1] 3:3

department [13] 10:11 10:15 11:8 12:25 21:2 26:21 33:11 59:12 63:13 73:4 135:7 145:22 183:20

departure [2] 52:7 83:13

depended [1] 55:22

depending [2] 3:25 155:15

deprive [1] 168:19

deputies [3] 146:1 150:24 150:25

deputized [1] 11:2

deputy [12] 20:10 48:4 90:8 90:18 91:23 92:3 94:13 94:24 99:3 118:18 138:4 148:10

Des [1] 1:17

describe [10] 26:18 74:20 78:4 87:4 96:19 96:22 136:12 140:12 145:19 146:11

described [5] 29:24 82:19 93:24 102:8 115:12

descriptive [1] 89:22

designated [2] 100:7 137:20

designation [1] 8:2

desire [1] 67:6

desk [2] 33:10 63:19

dessert [1] 153:12

desserts [1] 71:5

destroy [3] 32:8 34:15 34:17

destroyed [1] 57:21

details [1] 151:5

detective [48] 10:10 10:14 10:16 33:1 38:1 49:22 56:14 57:15 57:16 58:13 58:16 66:3 67:15 67:21 72:3 73:20 90:23 91:13 112:10 112:23 113:11 113:25 117:1 120:22 129:21 131:18 136:24 138:4 138:25 141:2 148:2 150:21 151:10 151:25 170:12 170:14 170:18 171:17 171:20 171:24 172:3 174:19 174:22 180:3 183:1 183:6 183:9 183:11

determination [1] 137:5

develop [1] 35:3

developed [1] 35:1

developing [1] 67:3

diagram [3] 75:4 75:6 99:9

Dice [12] 17:10 17:22 18:2 18:4 18:8 20:3 20:3 22:10 27:23 29:3 29:12 47:3

Dice's [1] 17:22

Diego [3] 17:14 17:20 47:2

Diego/Tijuana [1] 17:13

difference [1] 108:20

different [13] 35:20 42:1 58:5 59:21 80:14 85:20 91:15 101:25 112:3 117:8 158:23 163:16 180:21

differently [1] 147:2

Case 3:09-cv-03064-MWB-LTS Document 284-62 Filed 06/23/11 Page 51 of 100

**difficult** [2]    116:3
147:6

**difficulty** [2]    162:24
163:3

**dig** [1]    61:22

**dimensions** [1]    146:12

**direct** [22]    10:7
31:10    38:5    51:8
51:9    55:10    55:24
59:25    65:21    74:10
93:14    106:9    108:19
109:20    113:10    116:23
125:10    135:4    135:23
141:18    162:22    163:19

**directed** [4]    91:11
91:12    112:21    112:22

**directing** [1]    135:17

**direction** [3]    113:11
116:2    186:8

**directly** [9]    9:17
63:19    74:5    134:20
135:3    138:22    150:6
156:20    162:11

**disciplinary** [1]
175:3

**discipline** [1]    183:10

**discovered** [1]    81:4

**discovery** [2]    7:8
61:19

**discretion** [1]    143:1

**discuss** [1]    38:7

**discussed** [8]    27:16
41:15    53:11    63:23
112:19    113:16    126:25
182:6

**discussing** [1]    40:2

**discussion** [12]    25:7
39:21    40:4    41:18
48:22    53:14    58:14
62:2    84:17    111:18
161:15    162:4

**discussions** [1]    46:2

**dispatch** [2]    75:18
143:17

**dispatcher** [14]    139:18
139:22    140:15    142:16
170:5    170:24    178:3
178:5    180:16    180:19
180:21    180:23    181:8
181:13

**dispatchers** [10]
68:16    82:19    82:22
83:2    83:5    90:2
125:4    156:15    156:17
169:17

**disposed** [1]    110:20

**disposition** [1]    66:22

**disrespect** [1]    47:16

**disruptive** [1]    19:12

**disseminated** [1]
106:22

**distribution** [1] 11:9

**district** [9]    1:1
1:1    14:22    45:1
45:25    46:7    70:5
70:7    72:5

**divide** [1]    6:12

**docket** [1]    5:14

**doctor** [1]    51:4

**document** [7]    14:7
23:6    33:16    61:1
61:4    84:1    140:8

**documentation** [1]
64:8

**documentations** [1]
48:23

**documented** [3]
60:23    66:23    127:1

**documenting** [1]
60:19

**documents** [24]    20:12
20:17    21:6    21:7
21:12    21:17    32:5
32:8    33:13    34:24
35:18    35:20    36:3
54:15    54:18    54:20
54:23    57:20    57:24
61:12    61:13    95:23
96:7    168:6

**doesn't** [4]    35:6
69:2    101:15    129:25

**done** [14]    6:2
35:8    36:13    40:1
70:18    73:14    93:24
96:22    97:2    118:25
119:3    154:24    165:16
168:11

**door** [25]    78:4
78:7    78:9    78:16
115:14    115:15    115:16
115:20    126:20    140:20
155:3    155:5    155:9
155:16    155:17    155:21
169:18    169:18    169:22
178:8    178:15    178:19
178:21    178:21    179:9

**doors** [8]    78:4
78:10    78:13    78:19
81:1    107:7    115:13
115:22

**dorm** [7] 75:24    76:1
76:5    76:5    76:7
115:23    133:6

**double** [2]    71:4
78:13

**doubt** [2]    61:16
113:24

**down** [33]    17:21
34:23    40:24    46:11
72:5    75:10    75:21
76:1    83:2    89:21
96:5    101:6    101:13
116:4    122:17    133:3
133:5    133:6    133:8
133:11    139:9    140:17
140:22    146:19    150:9
150:12    156:18    156:21
157:3    159:25    169:21
171:6    179:6

**downward** [1]    52:7

**Dr** [35]    5:24    22:4
22:8    22:20    22:4
24:6    24:18    26:2
26:6    26:7    26:23

26:25    27:4    27:7
27:15    49:15    50:8
50:14    50:21    50:24
51:1    52:17    58:8
85:14    103:6    103:20
112:2    112:6    149:18
149:22    152:20    165:12
165:17    166:2    168:22

**draft** [1]    4:17

**drafted** [1]    14:7

**drag** [1]    131:10

**Drake** [1]    1:16

**drawing** [1]    165:1

**dress** [1] 96:24

**dried** [1] 107:19

**drove** [1]    50:22

**drug** [3]    14:1    20:6
22:10

**due** [1]    68:23

**duly** [4]    9:14    74:1
134:16    162:7

**duplication** [1]    8:16

**duplicative** [1]    6:24

**during** [39]    14:5
15:25    16:5    16:24
22:19    26:17    33:6
39:13    39:21    40:22
46:17    51:8    53:14
63:11    83:13    85:14
89:9    89:17    98:7
111:9    112:1    114:15
115:10    116:15    127:3
130:16    132:6    135:24
138:10    148:1    149:18
163:2    163:21    164:8
166:18    169:13    169:14
170:16    184:21

**Dustin** [1]    31:18

**duties** [5]    11:14
23:3    74:20    74:23
163:16

**duty** [3]    24:3    137:7
156:6

─── **-E-** ───

**e** [4]    1:12    51:21
186:4    186:4

**E-mails** [2]    180:5
180:7

**ear** [1]    163:1

**early** [7] 6:18    160:11
160:19    160:23    160:25
167:2    174:9

**easier** [2]    69:17
110:4

**easily** [1]    97:3

**easy** [1] 131:2

**eat** [1]    34:18

**educate** [2]    99:20
112:8

**effect** [1]    8:24

**effort** [1]    158:17

**efforts** [1]    128:17

**eight** [3] 135:22    147:16
160:23

**either** [14]    17:17
37:8    67:25    81:12
90:4    92:25    143:17
143:17    143:21    148:10
152:24    166:20    178:13
182:10

**eleven** [2]    163:22
176:5

**elicit** [9] 29:7    50:5
55:21    67:7    83:24
98:17    145:3    145:7
166:11

**elicited** [1]    50:16

**eliminate** [1]    8:15

**empirical** [1]    73:9

**employed** [9]    10:9
74:12    74:15    135:6
138:20    163:7    163:8
186:12    186:13

**employee** [1]    186:12

**employees** [3]    124:20
125:1    182:20

**employment** [1]
74:18

**empty** [5]    133:22
151:22    151:23    157:17
158:25

**end** [4]    8:14    95:14
121:6    161:1

**ended** [5]    20:23
52:20    65:21    97:8
119:1

**enforcement** [31]
10:12    11:5    14:11
15:18    27:19    27:25
30:5    30:12    30:25
33:22    35:2    37:12
38:20    39:8    39:14
40:18    59:18    62:7
72:10    74:17    77:9
77:11    98:9    103:20
120:14    136:1    139:6
146:17    147:1    165:11
168:25

**engage** [1]    35:5

**ensure** [1]    128:17

**enter** [1] 41:10

**entered** [2]    45:17
91:21

**entire** [2]    114:6
114:15

**entity** [1]    11:13

**envelopes** [3]    119:11
119:16    119:19

**episode** [1]    103:24

**equivocal** [1]    129:3

**escape** [1]    144:8

**escapes** [1]    47:24

**escort** [1]    155:8

**escorted** [1]    154:25

**escorting** [1]    155:14

**especially** [1]    72:10

**essence** [1]    104:11

**essentially** [2]    26:9
33:5

**establish** [3]    41:4
56:4    127:18

**established** [2]    31:14
31:15

**etcetera** [1]    13:6

**evening** [2]    53:18
185:18

**event** [1]    180:14

**everybody** [1]    157:19

**evidence** [9]    3:4
3:12    4:23    7:5
8:12    8:15    9:7
56:12    56:19

**evidentiary** [1]    3:5

**evidently** [1]    61:3

**evolve** [1]    14:11

**evolved** [3]    3:17
12:15    112:17

**exact** [5]    19:13
45:14    52:4    146:12
182:16

**exactly** [10]    7:24
16:9    23:24    64:24
66:14    111:8    130:23
165:5    167:3    168:4

**exam** [1]    62:5

**examination** [22]
6:5    10:7    37:24
61:11    62:11    66:6
67:13    72:1    72:19
74:10    98:24    123:7
126:10    128:23    132:18
135:4    147:12    154:16
157:9    159:19    162:22
173:21

**examined** [4]    9:15
74:2    134:17    162:8

**example** [5]    8:1
58:6    111:14    119:17
149:10

**exams** [1]    62:8

**except** [1]    185:15

**exception** [3]    9:5
107:11    114:4

**exceptionally** [2]
4:2    4:3

**exceptions** [1]    6:6

**exchange** [3]    33:24
34:9    151:3

**excited** [1]    54:19

**exclusion** [1]    107:15

**excuse** [8]    16:21
32:10    42:16    56:9
63:24    110:18    153:15
184:24

**excused** [1]    160:7

**exempt** [1]    185:15

**exhibit** [28]    2:23
2:25    3:21    7:16
7:22    8:1    23:10
24:8    24:21    24:22
49:21    53:24    56:13
56:21    56:22    58:13
60:1    61:6    64:17
65:6    106:17    140:1
141:7    141:18    143:7

157:4  179:21  179:23

**exhibits** [13]  2:19
2:24  3:21  4:10
4:16  6:20  6:23
7:3  7:10  7:14
7:19  8:6  8:9

**expect** [2]  59:16
138:6

**experience** [15]  4:25
35:5  36:8  40:19
62:7  69:5  70:15
79:21  81:25  135:14
147:5  164:8  172:22
174:13  175:10

**experiences** [2]  172:21
174:7

**explain** [14]  11:7
12:15  16:10  19:25
22:6  23:18  31:2
31:12  33:4  54:20
75:11  77:16  79:1
110:2

**explained** [3]  35:19
58:19  184:15

**explaining** [1]  23:19

**explicitly** [1]  183:6

**exposure** [1]  66:19

**expressed** [2]  62:14
65:16

**extended** [1]  84:23

**extra** [3] 71:3  153:12
173:17

**extract** [1]  97:9

**extraction** [2]  96:17
96:23

**eye** [1]  130:1

### -F-

**F** [1]  186:4

**F-I-S-C-H-E-R** [1]
9:21

**faces** [1] 83:1

**facilitate** [2]  143:20
149:12

**facilitated** [1]  153:1

**facilities** [2]  68:25
73:5

**facility** [22]  41:25
42:1  42:9  47:20
47:22  55:17  68:8
68:19  69:4  69:6
69:17  73:8  73:9
73:11  73:12  107:10
107:12  122:8  124:14
129:7  130:4  130:18

**fact** [18] 13:12  35:22
46:23  50:22  52:14
62:4  64:18  68:20
69:10  69:19  72:12
83:18  105:6  105:18
136:3  150:1  168:21
170:11

**facto** [2] 10:22  172:4

**factors** [2]  125:25
159:22

**failed** [1]  82:17

**fair** [13]  42:4  51:18
65:23  73:17  75:5
127:3  128:2  130:13
165:22  165:25  169:4
175:8  184:17

**fairly** [3]  51:15
130:1  132:22

**fall** [4]  38:8  42:12
42:18  46:20

**false** [2] 27:16  67:7

**falsely** [1]  22:23

**familiar** [3]  68:8
68:10  68:14

**family** [6]  13:3
13:8  13:11  40:23
41:5  48:16

**far** [21]  9:1  19:17
31:16  36:23  53:19
60:24  65:9  73:6
73:12  80:24  94:17
94:18  94:19  98:10
102:2  111:13  112:5
112:6  113:2  113:12
157:13

**farther** [1]  159:25

**fast** [1]  97:12

**faults** [1]  161:25

**favorable** [11]  37:17
65:23  65:24  69:24
70:9  70:17  70:17
70:21  71:20  98:9
98:13

**FBI** [2]  13:25  26:8

**feasible** [1]  132:8

**February** [6]  14:20
14:25  42:24  42:25
43:3  46:20

**federal** [30]  1:20
1:23  10:22  11:25
12:20  14:21  15:11
16:16  16:22  20:9
22:24  38:8  38:20
39:18  42:22  44:25
45:8  48:14  51:16
51:23  64:3  68:22
69:2  138:7  146:18
146:25  172:5  172:8
172:10  186:17

**Federation** [1]  6:4

**feed** [1]  74:22

**feeds** [1]  75:20

**feeling** [4]  39:3
170:20  171:10  183:4

**fellow** [1]  182:19

**felt** [1]  12:23

**female** [16]  27:13
44:12  79:19  91:18
99:20  100:5  100:5
100:9  123:12  129:22
136:25  151:22  152:16
154:1  156:2  159:5

**females** [12]  27:5
79:11  89:13  100:18
133:20  151:23  153:18
153:21  154:4  157:13
158:5  159:10

**fence** [1]  104:17

**few** [5]  39:13  42:3
66:5  68:25  173:5

**fifteen** [1]  32:17

**figure** [3]  131:5
132:12  137:1

**figured** [3]  137:15
171:22  172:1

**file** [4]  7:8  8:16
61:19  109:11

**filled** [2]  140:11
150:9

**financially** [1]  186:13

**finding** [1]  124:7

**fine** [5]  6:11  61:24
62:24  127:19  131:14

**finger** [1]  157:2

**finish** [1]  3:25

**fire** [2]  155:5  155:5

**firm** [2]  1:12  1:14

**firms** [1]  119:12

**first** [43] 1:10  1:13
1:20  1:24  8:17
9:10  9:14  9:22
12:8  22:6  22:15
24:7  24:8  27:1
29:14  29:25  38:6
58:16  61:6  61:11
64:17  74:1  82:9
84:1  85:11  85:11
87:17  89:5  89:19
89:24  105:6  109:22
111:15  116:19  127:22
128:8  128:13  129:18
134:16  162:7  180:11
181:15  186:18

**Fischer** [12]  2:5
9:12  9:13  9:20
33:1  38:1  56:14
58:13  67:21  72:3
73:21  112:12

**five** [3]  76:7  97:1
177:4

**flap** [1]  115:20

**flirtatious** [3]  29:23
44:12  56:1

**Florida** [4]  45:25
46:4  46:9  72:5

**flow** [1]  80:22

**flowing** [1]  81:2

**Floyd** [7]  11:21
11:23  12:3  12:5
12:9  14:2  38:15

**focus** [1]  15:15

**folks** [1] 70:22

**follow** [2]  36:25
110:3

**follow-up** [9]  68:1
71:15  73:18  132:16
133:15  134:7  134:9
159:16  159:17

**followed** [1]  36:10

**following** [2]  44:20
65:6

**follows** [5]  9:15
69:22  74:2  134:17
162:8

**food** [8]  78:20  90:5
98:11  115:23  126:16
145:12  173:18  178:21

**foot** [2]  115:15  115:15

**forbidden** [1]  79:20

**force** [5] 10:18  10:23
11:1  11:12  96:25

**forced** [1]  97:19

**forcibly** [4]  34:13
167:8  167:9  167:19

**foregoing** [1]  186:9

**forgot** [1]  5:18

**form** [5]  17:17  58:20
107:8  140:11  145:11

**formally** [2]  15:20
18:5

**format** [1]  132:12

**forth** [4] 29:22  55:13
179:11  181:9

**forward** [2]  26:13
135:2

**found** [4]  4:24
13:7  51:7  139:9

**foundation** [1]  131:19

**four** [10] 75:24  116:14
135:11  135:21  147:15
160:15  160:21  163:22
174:15  180:4

**frame** [10]  45:15
45:22  46:14  60:25
113:10  116:16  120:23
121:1  149:1  170:17

**Frankly** [2]  28:18
73:14

**free** [1]  103:3

**French** [8]  26:8
26:11  26:14  26:16
26:20  32:3  112:13
112:15

**frequent** [1]  28:23

**frequently** [2]  53:16
68:21

**Friday** [6]  3:25
3:25  4:13  4:21
5:14  135:21

**friend** [3]  17:9
27:16  44:23

**friendly** [1]  122:8

**friends** [1]  41:5

**friendships** [2]  44:8
44:10

**front** [15]  49:21
75:4  81:1  104:9
104:10  114:11  115:12
122:5  140:7  140:8
140:12  156:20  167:14
168:5  175:18

**frosted** [1]  78:3

**frustration** [1]  65:16

**full** [11]  9:18  58:16
61:7  61:11  64:18
74:6  134:24  141:19
157:25  162:12  162:19

**fully** [1] 163:3

**fun** [2]  120:10  120:12

**furthered** [1]  15:2

**future** [1]  52:12

### -G-

**gain** [3]  19:18  86:5
123:16

**gaining** [1]  127:23

**Garrett** [19]  5:25
19:23  20:11  20:19
20:20  20:25  21:4
21:6  21:11  21:16
21:20  27:24  48:4
48:7  48:13  49:1
103:23  103:25  104:1

**Garrett's** [1]  21:14

**gear** [1]  96:25

**general** [15]  6:3
6:6  24:15  34:5
46:5  52:11  63:17
74:23  82:15  82:22
108:11  112:25  151:18
157:12  166:7

**generally** [5]  36:10
36:12  36:25  37:7
164:13

**generate** [4]  50:11
50:16  163:16  168:6

**generated** [1]  168:17

**generating** [1]  168:16

**gentleman** [1]  176:10

**Geoffrey** [3]  5:25
48:4  48:13

**Georgia** [1]  13:10

**Gibson** [1]  118:20

**girl** [1]  20:15

**given** [17]  17:8
22:21  58:4  65:17
95:10  106:25  121:6
123:19  131:3  143:2
143:4  145:10  153:11
153:16  166:10  166:14
184:17

**giving** [4]  37:14
86:9  175:17  176:2

**glass** [1] 78:2

**go-between** [1] 65:12

**goal** [2]  66:1  70:25

**goes** [5]  44:16  63:19
78:16  82:4  108:12

**gone** [3] 80:25  122:23
137:21

**good** [13]  5:11
23:8  25:15  36:22
38:1  38:2  38:3
48:19  99:1  100:2
116:11  171:8  184:20

**goodness** [1]  40:8

**Gov** [1]  2:23

**Government** [20]
3:22  15:3  17:5
37:13  42:13  43:18
45:4  45:6  45:13
49:21  53:24  58:1
85:13  113:20  146:18
147:1  149:23  150:4

166:8 169:7

**Government's [7]**
3:4 3:15 7:10
7:14 9:23 36:14
61:19

**Grand [5]** 14:17
14:21 42:20 42:22
43:1

**great [3]** 57:2 143:11
161:3

**Greg [1]** 27:6

**Gross [4]** 13:2
13:8 13:9 42:16

**ground [1]** 97:3

**guarantee [1]** 134:2

**guaranteeing [2]**
121:14 121:17

**guess [19]** 6:20
10:21 19:12 29:25
31:9 38:18 42:16
47:14 53:17 64:13
70:20 71:17 94:19
107:19 120:3 151:22
172:3 174:4 177:4

**Guidelines [1]** 51:16

**guilty [1]** 105:14

**guys [1]** 110:2

-H-

**habit [1]** 36:17

**half [4]** 4:6 101:15
121:3 135:11

**halfway [1]** 70:11

**hall [2]** 116:2 179:6

**hallway [18]** 75:21
83:2 101:6 116:4
140:21 153:22 153:22
154:4 154:9 155:4
156:4 156:12 156:13
156:15 156:18 157:4
169:21 169:25

**hand [8]** 87:15 140:1
169:18 170:6 171:1
178:7 179:9 186:14

**handcuffed [1]** 97:4

**handful [1]** 138:8

**handing [2]** 179:25
180:5

**handle [2]** 5:25
146:22

**hands [1]** 141:23

**happening [7]** 20:23
28:14 44:25 94:16
108:13 148:21 182:25

**happy [4]** 32:9
42:3 53:21 114:9

**hard [2]** 34:5 34:6

**harm [2]** 139:3 173:11

**hate [1]** 131:10

**Haute [6]** 16:23
17:8 17:20 44:17
46:25 48:12

**he'd [4]** 38:17 39:25
41:25 165:4

**heading [1]** 119:15

**hear [8]** 51:18 57:9
87:7 158:22 162:14
163:1 163:4 173:25

**heard [7]** 30:11
70:14 130:20 136:3
143:10 160:14 177:8

**hearing [18]** 1:19
3:5 7:1 25:16
56:16 64:23 65:10
80:8 81:19 81:20
81:21 131:13 132:7
141:15 162:24 186:6
186:7 186:10

**heart [1]** 40:9

**held [9]** 1:20 25:7
62:2 69:15 84:17
161:15 162:4 172:5
186:7

**help [4]** 20:5 47:3
127:17 180:14

**helpful [1]** 4:25

**Henderson [1]** 27:14

**hereby [1]** 186:6

**hereto [1]** 186:13

**heretofore [1]** 186:6

**hesitate [2]** 159:21
163:4

**Hey [2]** 45:24 118:11

**high [3]** 129:22 129:23
132:22

**higher [1]** 159:23

**himself [7]** 39:11
41:7 50:15 54:1
66:19 108:8 145:23

**hire [4]** 27:1 27:5
48:14 48:18

**hired [4]** 20:20 20:21
48:7 48:13

**hiring [1]** 48:17

**hit [3]** 27:2 27:9
27:11

**hold [8]** 25:5 32:10
45:14 75:2 79:11
108:23 158:5 163:13

**holding [5]** 75:17
137:10 137:12 151:3
151:14

**hole [9]** 34:2 34:4
34:10 35:23 58:19
59:10 59:17 114:5
122:14

**hollered [1]** 169:20

**Holmes [1]** 1:15

**home [5]** 41:4
41:11 41:23 42:7
97:11

**Hon [1]** 1:20

**honest [2]** 53:15
56:6

**honestly [1]** 152:14

**Honken [2]** 31:19
130:11

**Honor [72]** 3:9
3:13 3:16 5:5

5:14 5:18 6:10
6:16 6:18 6:25
7:7 7:12 7:17
7:20 7:25 8:3
8:10 8:22 9:2
9:8 9:25 10:6
23:4 23:8 25:11
32:23 37:21 37:23
56:11 58:11 59:25
61:25 62:13 62:18
62:20 63:9 66:2
66:5 67:11 72:18
73:19 76:3 83:22
84:16 98:21 98:23
123:6 125:6 125:15
125:18 126:7 126:9
127:7 128:22 129:8
129:17 130:14 132:4
132:15 132:17 133:17
133:24 134:8 154:12
157:8 160:5 160:9
161:6 179:21 184:3
185:5 185:8

**Honorable [1]** 186:7

**hope [1]** 71:12

**Hopefully [1]** 131:18

**hoping [4]** 40:11
43:10 65:24 72:24

**hour [3]** 79:6 146:9
163:24

**hours [5]** 60:5
102:22 137:16 137:18
185:14

**house [1]** 68:21

**housed [2]** 18:18
89:14

**housekeeping [1]**
5:17

**houses [1]** 157:14

**hypothetical [1]**
157:16

-I-

**idea [9]** 36:22 38:7
45:24 52:11 101:11
121:1 124:5 148:25
149:2

**identify [3]** 23:11
140:2 179:24

**ignored [1]** 173:6

**illegal [1]** 95:20

**illegally [1]** 20:14

**Illinois [1]** 12:14

**imagine [1]** 100:25

**impact [1]** 65:10

**important [4]** 4:2
4:3 41:8 55:9

**importation [1]** 17:11

**imposed [2]** 81:16
168:8

**imposing [1]** 185:14

**impression [6]** 19:8
34:14 36:10 41:3
41:23 56:2

**impressions [2]** 40:15
40:17

**improper [1]** 95:20

**incarcerated [9]**
11:24 13:9 15:22
15:25 19:21 22:20
40:20 48:14 59:22

**incident [9]** 103:24
116:24 139:8 150:9
177:14 179:3 179:18
180:9 180:15

**incidents [1]** 28:4

**included [1]** 175:12

**includes [1]** 107:7

**inconvenience [1]**
131:25

**INDEX [1]** 2:1

**Indiana [2]** 16:16
16:22

**indicate [11]** 88:1
88:14 88:20 92:22
123:9 131:20 134:4
137:5 140:7 142:5
167:4

**indicated [15]** 15:24
20:10 21:7 27:1
32:4 33:23 34:16
50:21 93:16 125:21
125:24 135:15 141:9
159:4 186:6

**indicates [1]** 88:22

**indicating [4]** 45:12
46:9 101:19 156:23

**indication [4]** 65:8
116:19 117:13 143:8

**Indirectly [2]** 138:23
150:7

**individual [6]** 13:2
17:6 70:12 78:10
102:6 157:21

**individuals [2]** 28:3
44:11

**influence [1]** 159:24

**inform [1]** 92:11

**informal [1]** 168:7

**informant [3]** 142:2
166:8 169:7

**informants [1]** 12:10

**information [94]**
12:11 13:23 15:7
15:13 15:18 16:6
16:11 16:13 17:9
17:15 19:4 19:6
19:18 20:24 22:2
22:4 22:7 22:25
24:11 24:17 24:18
25:22 26:2 26:6
28:2 28:2 29:7
29:10 29:15 30:1
30:18 31:15 31:17
34:9 34:19 37:5
37:8 39:1 43:23
44:1 44:15 45:5
50:5 50:7 50:16
54:5 55:11 55:21
57:8 57:16 58:2
58:5 60:17 63:17
66:16 73:10 83:18
83:20 84:5 86:5

86:11 91:23 91:24
91:25 93:17 93:19
94:10 94:13 98:17
110:24 111:5 116:20
118:2 118:2 122:5
123:16 127:15 127:23
128:16 131:2 131:17
131:18 131:23 132:6
132:9 132:11 144:14
145:3 145:7 147:22
150:4 151:3 166:11
168:5

**informed [3]** 12:8
140:15 184:11

**infraction [10]** 107:5
107:23 108:8 108:17
140:9 140:11 140:23
141:1 141:10 141:12

**infractions [4]** 105:21
107:3 111:15 168:19

**ingenious [1]** 81:2

**initial [3]** 87:22
87:23 137:11

**initiate [4]** 39:14
44:6 44:8 44:11

**initiated [8]** 39:11
50:14 59:9 67:5
109:4 124:2 124:5
124:10

**initiating [3]** 57:7
67:3 117:3

**inmate [53]** 19:5
19:6 19:19 24:17
29:8 37:17 48:14
69:24 77:2 81:12
81:15 97:2 98:18
106:11 107:12 110:15
120:8 120:11 123:12
124:13 126:20 136:12
136:13 136:16 136:18
138:11 138:14 140:20
141:12 142:20 145:7
146:22 147:3 149:7
149:19 154:19 154:23
155:7 155:25 159:22
164:1 164:4 164:9
164:20 165:23 166:3
166:19 167:25 172:5
172:8 172:22 173:16
176:16

**inmate's [2]** 125:24
141:12

**inmates [49]** 12:21
37:8 44:12 55:15
60:9 69:18 74:22
75:2 75:15 76:11
76:17 76:22 77:14
79:1 79:19 79:22
79:25 80:13 82:1
82:12 82:23 86:21
91:18 99:21 99:22
106:22 107:6 107:10
107:17 115:21 116:1
116:6 127:5 133:3
133:11 137:14 148:18
148:19 153:16 154:1
164:12 164:19 165:7
166:12 166:15 169:24
172:11 173:8 173:10

**inner [1]** 78:8

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 54 of 100

input [2]  49:8
137:25
inside [3]  148:20
157:21  178:15
instance [2]  108:9
169:6
instances [1]  138:16
institutions [1] 40:22
instruct [2]  37:7
98:16
instructed [9]  24:2
29:6  54:4  98:13
121:21  146:17  148:3
172:12  172:15
instruction [14] 23:12
23:21  24:9  24:12
24:15  24:25  25:21
30:24  49:19  52:17
53:25  93:15  121:6
123:20
instructions [15]
36:11  36:23  37:1
37:14  86:10  91:22
92:2  95:10  97:22
98:1  113:25  145:2
145:6  166:10  166:14
intake [1]  75:14
intelligence [1] 147:22
intend [2]  4:4
9:4
intended [1]  47:16
intending [1]  8:14
intent [1]  3:11
intentionally [2]
142:12  156:9
interacting [1] 153:19
interaction [1]  103:6
intercept [2]  81:9
142:12
intercepted [2] 141:17
141:23
intercepting [2] 139:14
143:14
intercom [1]  169:20
interest [2]  36:14
36:14
interested [2]  131:15
186:13
interesting [3]  51:7
51:8  56:18
interim [1]  44:22
interior [3]  75:5
75:7  104:13
interject [1]  100:3
intermediary [1]
149:8
internal [4]  59:3
110:7  110:11  113:15
interpose [1]  125:7
interpreted [1]  114:2
interrupt [3]  22:12
62:1  62:12
interrupted [1] 32:21
interview [4]  14:5

27:7  27:15  68:12
interviewed [3] 14:12
58:7  182:14
introducing [1] 6:19
investigate [1]  11:9
investigation [46]
11:15  11:19  11:20
11:23  13:14  13:20
13:23  17:1  20:3
20:6  20:14  20:22
21:14  21:19  21:22
22:11  25:3  26:9
26:13  26:17  26:19
27:3  27:4  28:6
29:11  30:6  30:17
38:14  43:21  43:22
46:18  46:21  48:12
64:16  66:20  67:16
85:17  86:16  93:8
136:1  136:10  144:22
165:11  165:17  166:1
168:22
investigations [2]
36:25  46:6
investigator [6] 20:11
26:10  48:7  48:15
48:18  104:1
investigators [1]
31:7
invitation [1]  160:16
involve [1]  105:21
involved [22]  11:15
11:21  12:12  13:2
17:1  17:11  20:14
26:17  26:19  26:20
27:3  30:5  31:7
43:20  45:10  57:18
86:9  104:3  131:20
136:9  145:15  172:1
involvement [10]
17:22  26:12  28:20
29:5  30:16  38:16
54:13  54:14  85:16
165:17
involving [8]  14:2
20:15  32:5  42:14
48:24  49:15  93:8
153:4
Iowa [15]  1:1
1:11  1:13  1:17
1:21  1:22  1:24
14:22  33:14  46:8
47:19  70:5  104:10
186:6  186:18
irate [1]  96:16
Irvine [1]  1:12
isolation [15]  75:22
78:13  85:2  85:7
85:9  87:1  96:18
115:22  115:24  122:17
122:20  136:15  146:10
146:11  167:8
issuance [1]  21:13
issue [13]  4:2
5:21  8:18  41:17
60:8  62:9  64:11
64:13  80:3  80:4
105:13  123:18  129:24

issued [2]  64:4
113:11
issues [2]  48:22
51:15
item [1]  133:18
itself [3] 87:17  87:21
156:24

### -J-

J [4]  1:14  60:1
64:17  110:16
J-5 [1]  61:6
jail [171] 14:15  14:24
17:7  18:19  18:22
18:25  19:3  19:7
19:19  19:22  20:18
21:11  21:20  21:24
21:25  22:20  23:3
24:16  29:1  29:8
29:22  33:9  34:3
35:14  37:9  37:9
37:9  42:4  44:4
47:6  47:9  47:17
47:18  47:23  47:25
49:4  49:13  53:4
57:12  57:14  58:7
58:22  59:14  59:23
60:2  64:5  67:25
68:1  68:7  68:9
68:9  68:10  68:12
68:15  69:2  69:12
69:13  69:15  71:7
74:21  74:24  75:1
75:5  75:7  75:12
75:18  76:14  76:15
76:18  77:13  78:22
79:2  79:11  79:18
79:22  80:22  80:23
81:22  82:13  82:15
82:24  83:7  83:14
85:5  86:1  87:13
88:10  88:24  89:3
91:6  93:5  94:3
96:4  97:11  97:15
97:21  98:10  98:14
98:18  99:6  99:19
100:6  100:14  101:10
102:3  103:4  104:2
104:10  106:12  106:18
108:24  111:2  114:16
115:6  116:6  119:19
122:5  122:11  122:15
122:25  124:17  124:18
124:20  125:1  125:4
126:3  126:12  128:17
128:18  130:24  132:20
132:23  135:13  135:16
136:14  136:19  136:22
138:12  140:10  144:1
144:12  144:24  145:8
145:11  145:13  145:25
147:7  147:14  149:18
150:25  151:8  152:15
153:11  157:14  163:11
164:1  164:4  165:13
165:20  165:23  166:7
166:19  167:4  167:5
171:11  172:5  172:23
173:17  175:11  183:10
184:22

jailer [26]  58:21
74:14  74:21  79:21
82:5  90:19  99:5
118:1  118:11  120:11
127:4  129:6  148:3
154:25  161:12  163:9
163:10  163:13  163:17
163:17  173:8  174:4
174:7  174:9  174:14
176:9
jailer's [1]  143:1
jailers [7]  75:14
83:6  93:12  131:25
150:24  172:7  174:20
jailhouse [2]  23:25
51:10
James [1]  135:1
January [1]  163:12
Jeff [4]  20:11  27:24
103:23  103:25
Jensen [2]  176:13
176:14
job [2]  100:2  174:8
Joey [3]  13:2  13:9
42:16
Johnson [103]  1:6
3:2  29:5  29:16
29:19  29:25  30:2
30:6  30:10  30:14
30:18  31:6  31:18
32:16  37:5  54:1
55:12  64:9  80:19
87:13  87:16  89:2
89:17  90:4  90:13
91:17  91:24  92:5
92:16  92:24  93:8
95:24  97:23  100:11
105:22  110:18  112:17
113:4  114:21  114:22
116:24  117:3  118:12
123:11  123:23  124:9
124:13  129:1  132:20
133:4  133:11  136:18
138:5  138:10  139:7
139:12  139:15  140:15
140:19  140:21  140:22
141:3  141:23  142:2
142:6  143:9  143:16
144:7  145:4  147:17
148:5  148:14  154:8
164:21  164:23  165:23
166:2  166:18  166:20
167:17  169:1  169:12
169:18  170:9  172:14
172:22  174:18  174:24
175:16  177:3  177:5
177:10  178:6  178:12
179:2  180:17  181:10
183:22  184:12  184:19
Johnson's [2]  91:6
99:14
joint [4] 2:25  56:13
56:20  56:22
jokes [1]  35:6
jokingly [1]  34:7
jollies [1]  56:6
Joseph [2]  74:8
162:20

jailer [26]  58:21
jailer's [1]  143:1

judge [26]  11:18
12:15  16:10  19:25
23:11  23:18  25:18
26:18  31:2  32:20
36:9  70:7  72:14
74:20  75:9  75:11
83:25  84:8  87:23
96:19  96:22  101:10
136:13  145:19  154:12
154:18
judgment [1]  143:3
July [15] 13:24  14:12
88:10  88:17  100:12
100:14  100:23  103:3
103:18  116:16  126:13
129:1  132:21  154:6
186:15
June [2] 86:17  135:11
jurisdiction [3] 45:12
46:9  46:11
Jury [5]  14:17  14:21
42:20  42:22  43:1
Justice [3]  21:2
26:21  73:4

### -K-

K [1]  58:13
Kansas [2]  1:15
5:23
keep [13]  25:12
32:18  69:18  130:1
131:3  140:18  152:3
152:4  157:19  160:9
161:10  173:24  185:8
kept [2]  154:21  183:20
Kila [5]  181:2  181:3
181:4  181:5  181:6
kill [6]  27:2  124:25
125:2  125:4  173:5
173:10
killed [1]  110:10
kind [21]  3:5
10:4  31:10  34:5
34:6  53:12  65:12
69:15  83:20  110:13
127:16  138:6  152:3
156:23  159:9  164:16
168:7  170:8  173:6
183:12  183:20
Kinnamon [1]  119:17
knew [16]  13:12
31:5  48:8  86:1
86:3  105:1  130:3
142:10  142:13  152:19
165:22  165:25  171:22
172:2  175:22  184:9
knocking [1]  107:7
knowingly [1]  123:22
knowledge [12] 17:22
19:2  27:25  29:25
55:18  94:9  103:5
131:16  145:10  152:23
166:9  169:2
knows [2]  51:13
184:4

**-L-**

L [1] 8:1
label [1] 44:9
Labor [6] 105:8
105:17 108:3 109:7
113:22 113:22
lack [1] 44:8
lady [1] 180:23
laid [2] 23:20 24:11
large [1] 17:11
last [26] 9:19 49:24
58:18 59:21 69:21
74:7 85:4 88:11
99:6 100:12 100:14
100:23 107:3 108:4
109:7 111:4 112:12
116:16 126:13 127:21
134:25 143:7 148:12
162:13 162:16 180:4
lasted [1] 121:2
late [5] 9:25 53:18
99:12 126:13 132:20
latitude [1] 125:9
laundering [1] 28:20
law [36] 1:16 10:12
14:10 15:18 27:19
27:25 30:5 30:12
30:25 33:22 35:2
37:12 38:20 39:7
39:14 40:18 51:13
59:18 62:7 72:9
74:17 77:9 77:11
77:13 98:8 103:20
119:11 120:14 136:1
139:6 146:17 147:1
154:20 165:11 168:25
185:15
lawyer [5] 23:25
32:14 51:10 53:4
143:11
lawyers [3] 5:7
159:16 161:21
lay [1] 131:19
layout [1] 17:21
lead [1] 26:10
leading [1] 153:24
lean [1] 153:8
learn [3] 89:1 89:5
182:23
learned [12] 13:9
13:10 30:2 55:5
124:4 127:12 165:16
166:5 182:17 182:18
183:15 184:19
learning [1] 31:17
least [18] 13:5
13:5 22:23 32:3
40:1 40:24 51:17
54:5 69:4 70:4
76:14 88:11 88:15
174:4 176:15 176:24
177:9 177:25
leave [1] 155:15
leaving [1] 17:7
led [4] 11:23 21:13

97:8 97:10
left [8] 33:1 64:5
78:23 86:24 119:5
122:6 122:8 163:1
legal [9] 1:17 3:18
23:25 71:23 96:1
96:6 96:7 119:5
119:20
legitimate [1] 23:7
lengths [1] 80:25
Les [2] 90:8 90:19
less [4] 32:18 69:12
70:15 137:18
letter [7] 23:2 45:11
46:8 73:1 107:11
141:1 141:16
letters [8] 72:4
72:4 81:2 90:16
95:23 107:9 119:15
119:15
liberal [1] 102:23
library [1] 81:5
lie [1] 27:5
life [10] 39:19 40:1
40:2 41:17 45:25
70:8 70:10 70:13
70:20 70:22
lifer [3] 19:9 41:13
66:24
liked [1] 36:18
likelihood [1] 70:6
Likes [1] 43:15
limbo [1] 72:21
limitations [1] 24:24
limited [5] 24:9
24:18 54:13 69:4
71:20
line [4] 23:22 23:22
89:21 112:4
link [1] 104:17
Linn [17] 14:14
17:7 17:23 18:18
37:9 42:6 44:3
46:25 47:6 47:18
68:1 68:9 68:10
69:13 69:14 73:7
108:24
list [7] 7:16 9:23
10:3 107:3 134:22
161:22 162:2
listen [8] 24:4
50:3 53:19 56:15
111:16 111:18 143:12
153:8
listened [3] 13:19
144:9 144:16
listening [2] 23:3
24:3
lists [2] 3:22 3:22
lived [1] 12:1
lobby [1] 75:21
local [4] 15:9 21:7
30:25 36:18
locally [2] 10:24
14:24

located [2] 76:24
83:3
location [6] 32:6
33:13 85:4 93:19
93:23 93:25
locations [3] 36:5
91:6 94:10
lock [5] 126:21 126:21
155:12 155:21 155:23
lock-down [15] 80:7
80:8 101:7 101:22
102:4 133:1 133:5
139:25 157:19 157:21
158:3 158:7 158:10
158:11 160:1
locked [13] 15:11
78:11 133:3 133:5
133:6 133:7 133:11
139:8 140:22 150:9
150:11 155:3 155:6
locks [1] 155:5
logs [1] 61:14
longer [1] 153:13
look [17] 7:15 24:7
60:23 83:19 88:5
88:8 96:6 104:6
106:17 109:11 114:8
115:16 127:16 156:18
156:21 180:6 180:8
looked [1] 137:3
looking [9] 22:1
45:25 84:1 95:17
95:18 101:6 107:8
143:7 154:19
looks [3] 84:14
85:2 156:24
loop [4] 93:6 118:1
118:16 183:20
loses [1] 175:7
lost [2] 31:9 57:3
loud [2] 158:21 165:5
louder [1] 163:5
Lucchese [1] 13:11

**-M-**

M-E-R-I-N-O [1]
74:9
magnetic [1] 155:11
mail [5] 96:1 96:6
119:6 119:20 166:22
mailed [1] 107:9
mailing [1] 107:11
maintain [1] 26:12
majority [1] 63:14
makes [3] 65:1
81:11 81:14
male [5] 79:19 99:21
153:25 155:25 158:24
males [7] 79:11
153:18 153:21 154:4
157:13 158:5 158:10
man [10] 20:10 27:2
27:11 75:22 75:24
75:24 75:25 99:9
157:16 158:14

Manasse [1] 20:16
manner [1] 149:4
manual [8] 79:6
106:12 106:19 106:21
106:24 106:25 107:2
111:2
manufacture [1]
11:10
map [5] 32:4 33:16
35:21 93:25 94:12
maps [8] 33:12 33:21
34:12 35:12 35:25
36:4 54:15 57:20
March [11] 16:15
16:18 18:9 18:18
18:21 44:16 44:20
46:25 48:3 99:12
114:6
marijuana [5] 11:22
12:7 12:12 12:13
14:18
Marissa [1] 20:16
mark [8] 1:20 2:5
9:11 9:13 9:20
65:17 179:25 186:7
marked [2] 83:24
179:21
marshal's [2] 49:9
68:21
marshals [4] 47:13
69:1 122:12 185:13
mashed [2] 71:4
71:20
Mason [2] 32:6
33:14
Massiah [1] 23:2
matter [13] 1:19
4:6 5:17 32:15
50:22 55:4 56:17
62:16 76:13 78:22
85:13 170:11 172:4
matters [3] 6:14
8:20 72:25
may [54] 6:19 7:4
9:9 10:5 19:11
23:4 23:5 25:9
25:10 31:16 32:7
32:23 32:24 41:5
50:3 58:11 58:12
65:10 65:10 69:16
73:3 73:5 76:3
76:4 77:25 83:7
83:22 83:23 101:13
106:2 106:14 106:15
107:9 108:2 108:16
108:18 113:9 122:16
126:15 128:19 130:8
130:20 133:23 144:13
148:2 152:12 153:7
156:1 158:15 159:22
161:12 173:23 184:20
185:1
McNeese [291] 5:19
6:13 11:21 12:3
12:5 12:9 12:16
12:16 12:22 13:12
13:18 13:22 13:25
14:3 15:1 15:16

15:17 16:1 16:5
16:8 16:11 16:14
16:15 16:25 17:5
17:16 17:20 17:23
18:1 18:7 18:8
18:12 18:17 19:8
20:2 20:5 20:18
20:19 20:21 20:24
21:3 21:5 21:12
21:20 22:3 22:9
22:19 23:1 23:13
23:16 23:19 23:24
24:10 24:16 24:22
25:22 26:1 26:7
26:23 26:24 27:1
27:19 28:1 28:7
28:23 29:6 29:15
30:10 30:14 30:17
31:20 32:3 32:7
33:3 33:7 33:9
33:15 33:20 34:11
34:20 34:23 35:1
35:5 35:15 35:24
36:9 37:4 37:14
37:16 38:8 38:15
38:25 39:2 39:10
39:17 39:21 40:20
44:6 46:24 48:3
48:7 48:19 49:3
50:20 50:25 51:3
51:9 52:16 52:20
53:15 53:20 54:3
55:20 55:25 56:15
57:7 57:12 57:15
58:15 58:18 59:22
60:20 61:4 63:12
63:25 65:24 66:9
66:15 66:17 66:24
67:8 67:17 68:5
69:23 70:8 72:21
77:8 80:2 80:19
83:10 84:4 85:12
86:5 86:10 86:12
86:16 89:2 89:7
89:12 89:16 90:4
90:9 90:12 91:21
92:5 92:15 92:23
93:7 93:16 93:17
94:5 94:8 94:17
94:18 94:24 95:7
95:11 96:13 96:20
97:6 97:23 98:8
98:9 98:16 99:11
103:19 104:2 105:1
105:13 105:25 106:4
107:23 109:3 109:9
109:17 110:8 110:15
110:17 110:23 111:12
112:2 112:17 113:4
113:20 114:5 114:15
115:2 116:8 116:19
117:4 117:5 118:3
118:12 118:18 118:20
119:24 120:13 120:24
121:14 123:1 123:16
123:21 123:23 124:11
127:13 127:22 128:4
135:25 136:12 139:6
139:12 141:22 142:1
142:11 142:22 143:9
143:17 144:6 144:18
145:2 145:7 145:10
145:16 147:6 147:19

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 56 of 100

147:23 148:4 148:14
148:22 149:4 149:13
150:3 151:2 152:7
152:11 152:24 153:10
154:8 164:1 164:3
164:3 164:6 165:10
165:16 166:1 166:6
166:11 166:15 166:20
166:23 167:5 167:7
167:16 167:18 168:21
168:24 169:12 169:13
169:19 170:3 170:9
172:13 173:15 176:15
176:21 176:25 177:10
178:6 178:11 179:7
179:8 179:14 180:17
181:10 181:16 181:23
182:2 182:21 183:21
184:12 184:20

**McNeese's** [18] 11:23
14:10 29:5 41:24
45:11 53:4 58:1
64:4 85:17 95:6
103:5 119:12 122:5
126:3 139:20 149:21
152:19 178:22

**meals** [1] 42:7
**mean** [18] 28:23
35:7 59:17 61:17
62:10 70:10 76:5
99:24 100:19 110:2
124:4 133:5 155:11
158:21 159:9 164:25
165:4 175:2
**meaning** [1] 24:23
**means** [3] 81:5
160:19 186:8
**meant** [2] 23:24
71:7
**media** [2] 36:17
41:7
**medication** [5] 175:14
175:16 175:17 175:20
175:24
**meeting** [16] 32:1
53:3 53:8 57:17
90:8 90:10 90:12
90:18 94:23 95:2
118:17 118:21 118:25
119:1 148:1 148:10
**meetings** [8] 35:9
85:19 85:21 85:24
112:3 112:9 112:16
112:20
**Melissa** [1] 27:13
**member** [3] 10:22
93:5 146:25
**members** [6] 40:23
41:5 55:7 55:8
143:6 143:18
**memorandum** [17]
23:12 23:20 24:9
24:12 24:25 25:21
49:19 52:17 53:25
59:3 91:22 93:15
110:7 110:11 113:16
123:20 180:2
**memorializing** [1]
53:12

**memories** [1] 108:6
**memorized** [4] 83:12
83:15 83:16 83:17
**memory** [4] 85:22
109:15 109:17 148:21
**men** [4] 107:16 107:16
157:25 175:11
**mention** [4] 5:18
39:22 39:25 90:18
**mentioned** [10] 39:10
41:22 55:10 55:24
55:25 55:25 112:1
119:4 130:8 160:21
**mentions** [1] 61:10
**Merino** [19] 2:8
73:24 73:25 74:8
74:12 99:3 99:3
99:5 102:3 110:16
127:10 128:25 131:10
132:5 132:8 133:19
143:25 148:3 148:10
**message** [1] 65:14
**met** [4] 27:15 35:14
35:15 147:17
**metropolitan** [2]
47:18 47:21
**Mexico** [1] 17:13
**Meyer** [1] 119:17
**Meyers** [1] 65:17
**Michael** [3] 2:8
74:8 110:16
**Michelle** [1] 180:24
**microphone** [6] 9:17
74:4 74:5 134:20
135:3 162:11
**middle** [3] 43:15
45:25 70:7
**midnight** [5] 135:21
135:22 147:15 147:16
163:22
**might** [15] 4:1
5:24 42:6 45:16
55:20 56:18 60:10
60:17 64:20 64:23
144:25 151:7 153:21
154:1 179:21
**Mike** [2] 73:23 73:25
**miles** [1] 47:20
**military** [1] 174:15
**milk** [1] 173:17
**mill** [1] 30:12
**mind** [8] 41:6 41:10
113:24 119:3 127:19
164:24 165:3 180:18
**mine** [1] 141:8
**minute** [2] 62:19
179:17
**minutes** [1] 32:17
**mirror** [2] 75:23
75:25
**misbehaving** [1]
97:17
**missed** [1] 102:14
**Missouri** [1] 1:15
**mistake** [1] 9:22

**misunderstood** [1]
144:13
**mixed** [1] 117:18
**model** [1] 136:16
**Moines** [1] 1:17
**moment** [7] 6:21
15:15 62:1 84:16
165:1 180:7 184:24
**Monday** [1] 135:22
**money** [1] 28:19
**monitor** [5] 54:8
102:25 153:6 156:11
156:18
**monitored** [7] 76:13
76:14 77:3 101:2
102:24 144:15 153:3
**month** [3] 121:2
121:3 148:2
**months** [2] 182:14
182:15
**morning** [7] 5:15
8:17 9:24 94:6
160:12 160:22 185:17
**morphed** [1] 3:5
**most** [7] 4:8 73:7
73:9 127:6 137:10
169:8 173:13
**Mostly** [1] 173:12
**mother** [1] 41:1
**motion** [9] 3:6
3:12 3:17 52:7
64:20 65:9 65:11
65:25 70:9
**motivated** [1] 123:15
**motors** [1] 178:19
**move** [10] 49:6
49:12 84:20 91:11
91:12 91:17 91:18
115:2 115:7 135:2
**moved** [28] 18:21
18:24 21:21 47:9
47:12 47:19 84:12
84:21 85:1 85:2
85:6 85:6 86:17
86:25 88:2 91:8
91:10 91:10 91:19
114:20 115:3 115:5
117:7 117:14 117:23
122:16 136:14 146:2
**movement** [1] 84:14
**moving** [3] 91:14
137:14 178:20
**Ms** [22] 54:1 55:12
99:14 100:11 105:21
114:21 114:22 117:3
118:20 132:20 133:3
133:11 148:14 174:18
174:24 175:16 177:10
181:10 182:3 182:20
184:12 184:19
**multiple** [2] 7:22
50:18
**mundane** [1] 74:25
**murder** [2] 129:12
130:6
**murdered** [1] 36:5

**Murray** [4] 1:21
1:23 186:5 186:17
**must** [1] 59:9
**mutually** [1] 5:7
**MWB** [1] 1:4

**-N-**

**Nadler** [1] 25:14
**name** [20] 9:19
9:19 11:16 13:2
17:10 19:23 20:10
20:16 74:7 74:7
83:9 134:22 134:24
134:25 160:13 162:12
162:13 162:16 162:19
173:23
**named** [1] 180:24
**names** [2] 10:3
112:12
**narcotics** [1] 11:5
**narrow** [1] 71:3
**nature** [7] 11:19
17:4 28:9 29:3
31:13 46:9 60:25
**near** [3] 12:14 33:14
127:25
**nearest** [1] 47:21
**necessarily** [1] 78:12
**necessary** [1] 63:20
**need** [5] 4:11 32:14
50:18 127:18 158:23
**needed** [2] 28:12
130:1
**needn't** [1] 23:5
**needs** [1] 77:4
**negatively** [1] 135:15
**neither** [2] 7:2
120:11
**never** [22] 38:18
50:14 50:14 50:15
50:16 51:3 51:6
54:5 67:24 68:13
68:15 70:14 99:3
108:15 116:9 123:18
123:18 126:5 143:2
147:15 147:16 166:9
**Nevertheless** [1]
80:16
**new** [5] 13:3 13:8
58:3 69:4 97:21
**newer** [1] 47:23
**newspaper** [4] 36:18
182:24 183:16 183:17
**newspapers** [6] 36:19
130:12 130:13 165:18
166:4 184:18
**next** [7] 26:11 39:13
84:25 91:7 115:24
123:17 141:17
**next-door** [2] 99:17
99:18
**nice** [4] 45:24 99:1
99:2 131:24
**night** [7] 97:5 97:9
101:23 133:6 133:8

160:10 185:8
**nights** [1] 149:24
**nine** [2] 4:6 10:2
**nobody** [2] 42:4
157:23
**nobody's** [3] 157:24
157:24 184:15
**none** [7] 6:10 7:12
73:17 133:17 134:8
165:14 185:5
**nonjury** [1] 4:22
**normal** [5] 120:18
120:19 142:19 164:7
165:4
**normally** [3] 59:15
172:9 176:10
**Northern** [4] 1:1
14:21 46:7 70:5
**Nos** [1] 2:23
**note** [29] 6:23 25:13
55:23 82:2 90:4
91:7 113:6 116:25
139:14 139:17 139:19
139:24 140:3 140:3
140:5 140:16 140:19
140:21 141:22 142:23
143:14 143:25 147:20
149:3 149:8 178:6
178:11 179:14 180:17
**notes** [26] 29:21
46:19 51:12 55:12
55:15 55:20 80:13
81:6 81:9 81:12
90:13 90:22 92:19
106:7 107:21 108:1
108:8 127:8 143:15
143:20 149:12 154:11
166:22 178:2 180:10
181:9
**nothing** [12] 19:17
41:12 41:14 72:15
160:3 165:2 165:4
165:4 169:6 173:19
175:13 183:14
**notice** [4] 3:11
82:9 128:8 130:17
**noticed** [1] 9:24
**notified** [1] 144:25
**notwithstanding** [1]
128:16
**November** [6] 12:19
17:25 45:18 47:2
59:20 63:24
**now** [43] 3:20 15:24
16:15 21:25 26:11
38:5 39:10 41:22
43:6 45:23 48:2
48:21 50:7 53:23
54:3 55:15 56:7
56:16 59:20 61:6
69:25 71:19 74:16
78:12 82:18 107:2
111:8 112:24 119:8
122:25 133:19 134:21
141:22 142:10 142:22
149:17 151:12 159:4
161:11 175:21 177:7
184:8 184:18

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 57 of 100

number [14] 3:2
4:9 63:16 63:17
63:18 63:19 87:15
101:19 107:5 137:16
137:16 167:9 177:21
177:22

numerous [5] 10:23
53:20 80:19 80:21
106:8

nuts [1] 50:23

-O-

O [2] 2:21 134:21
o'clock [5] 116:14
160:15 160:21 160:23
177:4

objection [9] 5:1
5:2 5:4 6:9
7:11 8:9 56:20
125:7 161:4

objections [3] 5:13
6:22 7:3

obnoxious [2] 164:11
172:24

observe [2] 92:9
92:19

observed [5] 83:6
159:12 177:9 181:9
184:21

obtain [8] 24:10
24:17 28:2 35:12
37:4 55:11 86:11
150:4

obtained [3] 21:1
34:19 34:23

obtaining [4] 19:4
23:19 25:22 91:24

obvious [1] 71:1
obviously [6] 4:2
7:7 21:8 67:19
69:14 128:4

occasion [15] 13:6
76:21 77:10 79:22
80:16 81:5 83:5
96:9 138:18 153:3
169:11 173:2 178:1
181:12 182:9

occasionally [4]
138:19 156:8 175:7
175:23

occasions [4] 13:4
15:8 155:24 155:25

occur [10] 80:16
80:18 92:20 121:9
123:22 139:12 170:9
171:1 172:13 172:18

occurred [7] 80:19
124:1 124:11 147:23
165:19 170:23 171:7

October [25] 12:18
30:18 31:21 33:3
54:15 56:7 57:6
58:15 59:20 60:18
61:8 63:23 63:23
114:6 116:16 122:9
122:14 122:21 122:23
135:19 154:6 163:20

167:2 167:5 182:17
off [16] 6:1 25:7
27:2 33:2 38:22
53:17 61:12 62:2
84:17 142:6 146:9
155:6 161:15 162:4
167:15 173:12

offer [5] 41:12 41:13
56:12 56:18 65:1

offhand [1] 91:1
office [32] 21:8
21:15 21:16 23:1
30:23 30:25 32:1
32:9 34:21 38:24
46:3 46:4 46:7
47:13 47:17 48:24
49:10 53:5 55:1
55:8 56:25 57:18
60:19 65:13 68:21
69:1 72:11 74:13
83:2 84:2 118:20
182:11

officer [11] 10:22
20:9 37:12 135:8
135:9 135:12 135:14
140:14 140:20 141:11
147:1

officer's [2] 141:6
141:11

officers [7] 27:13
30:5 30:25 35:2
86:7 86:14 97:1

Offices [3] 70:4
70:11 70:23

often [3] 120:9 159:10
164:12

old [1] 24:17
once [21] 30:1
34:19 35:10 35:11
45:3 57:6 62:21
90:21 124:4 140:23
146:6 148:24 166:25
168:12 177:11 177:11
177:13 177:23 178:1
178:3 181:7

one [73] 4:6 5:17
12:22 13:5 25:6
27:13 28:25 30:13
31:16 43:12 44:5
48:4 50:25 55:10
57:25 58:2 65:22
67:15 68:4 70:5
73:3 75:22 79:7
82:7 82:17 86:2
86:3 90:2 99:9
102:20 103:10 104:18
107:2 108:10 108:20
108:22 125:24 127:10
128:25 133:18 134:1
134:4 134:22 138:24
140:4 144:14 144:16
151:18 151:19 151:20
151:22 153:3 153:5
156:6 156:7 156:20
156:25 157:2 159:21
160:20 161:24 164:12
164:18 169:16 169:16
169:16 172:6 172:10
178:1 181:12 181:23
182:5 184:24

one-on-one [1] 21:5
ongoing [6] 13:14
29:11 80:3 80:4
80:9 105:13

open [19] 78:23
115:16 115:21 126:13
133:7 136:25 137:2
151:15 155:9 155:11
155:12 155:17 159:14
169:18 178:8 178:20
178:22 178:25 179:1

opened [2] 126:17
178:24

opens [2] 178:15
178:17

operation [2] 14:1
18:3

opinion [6] 4:17
5:9 68:18 69:7
69:11 136:17

opportunity [5] 13:15
38:7 41:4 41:11
172:21

opposed [1] 171:21
order [1] 50:16
organization [5]
11:22 12:13 14:19
20:7 38:16

organized [4] 17:2
39:1 41:8 55:6

original [3] 57:1
61:13 61:22

others' [2] 6:23
7:3

otherwise [2] 3:18
151:15

outcome [1] 64:19
outdoor [28] 74:23
77:16 77:21 77:22
79:2 79:15 79:24
92:10 92:24 98:10
102:12 104:7 104:11
104:14 104:19 104:23
116:5 148:16 153:17
153:19 153:25 154:3
166:24 167:23 167:24
168:2 168:19 182:5

outer [4] 76:2 77:18
78:7 115:16

outlining [3] 23:2
33:13 33:16

outside [15] 28:13
48:16 54:9 58:20
81:13 115:18 126:21
154:2 154:8 166:21
167:17 171:2 177:14
178:16 178:17

overall [1] 71:7
overcrowding [1]
68:23

overhead [1] 104:16
overheard [3] 12:22
144:7 144:19

own [5] 18:13 42:14
43:11 65:16 66:22

-P-

P [1] 106:17
p.m [1] 1:21
P.O [2] 1:10 1:13
page [11] 7:22
8:2 24:7 24:9
64:17 64:25 140:13
141:17 141:18 143:7
143:7

pages [4] 60:1
65:6 107:3 180:4

paper [1] 111:21
paperwork [1] 168:17
paragraph [11] 24:8
50:2 58:16 61:7
61:11 64:18 64:25
109:16 111:2 141:19
142:1

parcel [1] 48:25
part [6] 13:14 22:15
48:25 73:16 96:4
119:8

part-time [3] 11:11
174:9 176:11

participate [1] 86:4
particular [3] 133:3
158:9 179:18

parties [7] 4:9
4:10 27:18 143:18
143:21 186:12 186:13

parts [1] 112:9
party [1] 153:1
pass [16] 17:15 46:14
92:6 94:13 107:21
112:21 112:22 112:25
113:2 114:1 120:25
148:5 149:8 154:4
169:19 178:8

passed [11] 108:1
108:8 139:14 139:17
143:16 147:19 169:23
178:2 178:6 178:9
180:10

passing [22] 29:22
55:13 55:15 55:19
80:13 81:12 82:2
90:4 92:19 106:7
113:6 116:24 143:20
143:25 149:3 149:12
153:22 170:25 178:11
179:10 179:14 180:17

past [1] 54:4
Pat [3] 53:4 173:24
180:2

Patrice [4] 1:21
1:23 186:5 186:17

PATRICK [1] 1:14
pattern [1] 39:12
Paul [1] 106:17
pay [1] 163:18
paying [2] 27:16
53:17

peek [2] 78:7 115:14
pending [1] 15:11

penitentiary [9]
11:25 12:20 13:13
13:16 14:13 16:16
16:22 38:9 39:18

people [22] 32:2
60:10 62:8 67:4
67:5 70:10 76:7
85:20 104:22 104:23
106:3 108:24 112:3
112:9 131:8 143:11
160:22 168:10 171:14
173:13 183:7 183:13

perform [1] 164:9
performance [5]
82:15 124:14 125:24
126:3 138:14

performed [1] 136:13
perhaps [2] 154:14
160:23

perimeters [1] 53:10
period [26] 4:23
10:17 15:25 16:5
16:24 41:2 48:10
63:11 75:17 80:7
80:9 84:23 89:9
97:13 117:22 120:23
130:12 135:17 135:25
138:11 139:11 152:10
163:19 163:21 166:18
168:20

periodically [1]
81:9

perjury [1] 26:3
perks [1] 153:11
permission [3] 6:12
21:2 21:4

perpetrated [1] 27:9
person [2] 11:15
166:21

personally [2] 108:15
161:20

personnel [3] 31:8
81:22 146:18

persons [2] 22:23
28:4

pertain [1] 51:17
pertained [1] 52:17
pertaining [3] 29:16
87:16 95:24

pertinent [1] 64:15
Pete [12] 20:8 30:12
33:8 35:14 35:21
36:2 53:6 57:10
112:10 170:12 172:6
180:3

Philadelphia [1]
65:1

phone [35] 12:19
12:21 12:23 13:6
13:18 18:2 21:3
21:10 29:18 33:10
40:23 42:13 56:14
58:21 59:11 59:22
60:19 60:22 60:23
61:1 61:13 61:20
63:22 63:24 64:1
76:18 77:6 77:7

Case 3:09-cv-03064-MWB-LTS Document 284-62 Filed 06/23/11 Page 58 of 100

Patrice A. Murray, CSR, RPR, RMR Index Page 12

102:20 102:22 120:16
120:17 144:8 144:9
153:4

**phones** [5] 76:23
77:10 102:18 102:24
120:14

**phonetic** [1] 181:2
**phoning** [1] 63:12
**photocopy** [1] 140:25
**phrase** [1] 71:23
**physically** [2] 96:21
155:21

**pick** [2] 153:8 158:6
**picked** [1] 144:16
**picking** [1] 158:8
**place** [22] 12:14
38:21 42:8 43:7
48:23 73:15 92:23
94:23 98:4 103:9
113:1 118:18 123:10
123:14 129:1 129:15
149:4 151:15 167:11
180:15 186:6 186:10

**placed** [26] 18:1
19:3 19:5 19:10
24:24 33:8 33:9
68:5 99:15 99:21
100:11 100:13 100:21
123:17 126:14 129:6
133:20 138:1 139:24
140:25 141:1 146:8
146:10 151:7 152:6
168:1

**placement** [3] 73:7
114:3 159:13

**places** [1] 42:3
**Plaintiff** [1] 1:4
**plan** [1] 4:12
**play** [1] 129:16
**plea** [5] 28:17 52:20
52:25 53:10 53:20

**plead** [1] 28:19
**pleasure** [1] 160:8
**point** [71] 4:20
6:18 13:21 14:5
14:6 14:8 15:20
16:24 17:16 20:1
21:21 24:21 26:5
26:13 27:25 28:1
28:14 28:17 29:4
29:6 30:4 30:8
30:21 36:1 37:3
45:23 50:25 82:17
84:12 86:9 86:24
89:1 90:3 90:11
91:20 92:2 95:3
95:8 95:12 95:14
95:17 96:2 97:25
98:17 116:11 121:16
123:21 137:21 138:24
139:5 139:15 141:3
142:12 143:2 143:5
144:6 144:21 145:1
145:3 155:9 156:4
160:20 162:1 163:2
163:25 170:1 170:3
170:10 170:21 171:16
173:25

**pointed** [2] 35:20
102:1

**pointing** [1] 157:3
**points** [1] 26:17
**police** [8] 10:10
10:15 11:8 12:25
33:11 59:11 63:13
145:22

**policies** [1] 99:19
**policy** [6] 106:19
146:9 157:12 158:19
159:5 159:8

**polite** [1] 136:16
**polygraph** [4] 61:10
62:5 62:8 62:11

**poor** [1] 94:21
**population** [4] 34:5
79:10 130:23 151:18

**port** [1] 75:15
**portion** [3] 6:1
100:5 101:22

**pose** [1] 159:23
**position** [1] 4:19
**positions** [1] 7:2
**possess** [1] 95:21
**possession** [7] 20:12
32:4 33:12 90:12
90:22 94:9 150:17

**possibility** [2] 40:2
41:15

**possible** [19] 34:24
100:23 100:25 104:18
104:22 105:10 105:11
109:3 109:5 109:6
116:1 122:20 124:9
124:12 128:15 153:25
178:11 181:7 181:11

**possibly** [13] 20:13
32:5 39:4 105:17
105:20 105:23 108:3
119:18 122:22 128:1
144:11 144:22 149:8

**post** [3] 23:3 24:3
131:13

**postal** [2] 107:10
107:13

**potatoes** [2] 71:4
71:21

**potential** [1] 18:13
**potentially** [4] 17:1
66:18 70:24 170:25

**practice** [3] 97:18
159:10 172:4

**preface** [1] 128:12
**preliminary** [2] 6:13
8:20

**preparation** [1] 182:13
**prepare** [4] 131:12
132:24 161:20 180:12

**prepared** [1] 160:11
**presence** [1] 54:10
**present** [12] 5:16
26:24 27:6 27:13
52:16 53:7 53:10
53:23 94:23 139:2

148:7 167:7
**presented** [1] 132:6
**pretty** [14] 4:16
70:21 74:25 81:2
92:11 100:1 102:23
107:19 124:15 124:16
127:9 131:2 138:16
146:15

**prevent** [1] 144:3
**previous** [2] 53:18
91:5

**previously** [5] 19:12
48:8 48:9 48:9
103:19

**primarily** [2] 26:14
26:16

**print** [1] 186:8
**print-off** [1] 83:18
**printed** [1] 141:1
**prioritize** [1] 162:1
**prison** [2] 14:4
44:16

**prisoner** [1] 75:19
**prisoners** [3] 68:22
69:2 179:5

**private** [4] 20:11
20:21 21:14 48:15

**privileges** [14] 59:11
71:4 98:10 98:11
145:12 146:14 146:15
146:20 167:24 168:3
168:19 173:16 175:4
176:18

**privy** [2] 91:25
148:1

**probation** [2] 15:12
16:2

**problem** [7] 62:24
63:3 80:9 126:5
158:15 172:10 175:11

**problems** [7] 5:12
67:15 82:8 143:2
143:4 175:23 178:18

**procedural** [1] 3:18
**procedure** [3] 3:23
4:21 120:18

**proceed** [3] 9:6
10:5 32:14

**proceeding** [1] 5:4
**proceedings** [4] 32:21
185:18 186:7 186:9

**process** [2] 23:18
96:19

**processed** [2] 133:4
133:12

**procured** [2] 54:17
54:23

**procuring** [1] 54:15
**professional** [1]
40:18

**Professor** [1] 5:16
**profile** [2] 129:23
129:23

**prohibited** [3] 80:11
92:4 107:7

**promised** [3] 37:16
65:22 69:23

**promises** [2] 65:14
72:6

**promising** [1] 72:11
**promoted** [1] 10:16
**proof** [1] 162:3
**propped** [1] 155:16
**prosecuting** [1] 41:16
**prosecution** [4] 31:5
31:6 31:17 31:18

**prosecutor** [2] 37:13
45:9

**prosecutors** [1] 45:16
**prospects** [1] 70:8
**proved** [1] 147:6
**provide** [9] 13:22
15:13 16:25 17:16
19:22 27:16 43:23
66:16 92:3

**provided** [11] 3:21
17:5 18:7 20:24
23:2 23:13 30:17
36:11 56:25 63:20
72:13

**providing** [6] 15:18
16:6 16:12 17:18
44:15 45:5

**proximity** [1] 154:1
**public** [1] 75:19
**pull** [1] 61:15
**punish** [1] 169:5
**punished** [2] 169:13
176:22

**punishment** [2] 81:16
168:7

**purported** [1] 64:8
**purportedly** [1] 180:5
**purports** [1] 179:25
**purpose** [6] 14:16
19:4 23:7 31:3
64:7 91:14

**purposes** [2] 8:4
101:18

**pursuant** [2] 11:14
22:3

**push** [1] 115:21
**put** [24] 29:17 75:16
80:25 95:9 123:10
123:11 130:2 132:25
133:12 139:19 146:4
151:13 151:15 151:16
151:20 157:18 158:1
158:9 158:13 158:23
159:24 168:14 169:18
178:7

**putting** [3] 19:18
81:1 159:1

**-Q-**

**qualify** [1] 69:3
**questioning** [3] 6:12
163:2 163:3

**questions** [26] 4:20

23:23 24:5 37:20
51:4 53:21 66:15
67:10 67:22 68:2
71:15 72:18 98:20
123:4 126:6 132:16
133:16 134:7 134:10
147:9 157:6 157:11
159:16 159:18 173:20
185:2

**quibble** [1] 70:1
**quick** [1] 161:13
**Quiet** [1] 126:5
**quit** [1] 65:18
**quite** [8] 53:16 54:19
54:19 60:21 161:11
170:7 173:5 174:15

**quoted** [1] 51:24

**-R-**

**R** [3] 1:16 2:21
186:4

**R-E-E-S-E** [1] 162:18
**R-I-C-H** [1] 135:1
**ran** [1] 124:16
**random** [1] 159:13
**Randy** [1] 9:4
**Rapids** [24] 1:11
1:13 1:21 1:24
4:18 10:10 10:15
10:18 11:8 11:11
12:2 12:25 13:4
14:2 18:9 18:18
20:4 41:1 42:23
44:19 59:11 63:12
65:17 186:18

**rapport** [2] 35:1
56:4

**rare** [1] 161:21
**rat** [1] 60:11
**rating** [1] 73:13
**rats** [1] 60:13
**rattling** [1] 142:6
**RC** [1] 2:3
**RD** [1] 2:3
**RE** [1] 1:19
**reached** [1] 171:1
**reaching** [1] 57:15
**reaction** [3] 14:4
142:18 153:19

**read** [16] 4:7 4:8
4:10 33:15 50:23
58:22 59:5 110:13
111:4 130:10 130:20
165:18 182:24 183:15
183:17 184:18

**reading** [1] 130:11
**reads** [1] 58:18
**ready** [4] 9:6
9:18 74:6 162:12

**real** [2] 55:9 141:20
**realize** [1] 151:12
**really** [19] 3:5
35:6 40:25 41:11
41:12 47:14 51:23

68:14    84:23    85:19
89:19    97:13    97:17
133:24   136:11   146:5
158:17   160:2    164:25
**realtime** [1]    4:14
**reason** [12]    19:13
91:16    103:16   120:4
123:15   132:5    150:15
183:18   183:25   184:4
184:10   184:14
**reasonably** [1]   160:22
**reasons** [1]    68:4
**rec** [18]   74:23    81:14
92:10    98:11    102:12
104:11   104:20   104:24
116:5    156:2    166:21
166:24   167:17   167:23
167:24   168:19   177:14
182:5
**rec.** [1]    104:7
**receive** [4]    22:2
97:21    98:1    128:16
**received** [14]    12:19
21:4    29:14    33:5
56:22    59:21    60:20
60:22    71:10    90:16
127:4    128:8    140:15
140:19
**receiver** [2]    144:16
153:8
**receives** [1]   106:12
**receiving** [3]   116:20
127:14   173:15
**recess** [3]    32:16
63:5    63:7
**recessed** [1]   185:18
**recitation** [1]   91:5
**recognize** [1]   59:4
**recollect** [1]   180:15
**recollection** [6] 67:25
130:9    130:19   180:9
180:13   181:14
**record** [13]    21:4
25:8    33:18    62:3
66:9    84:18    100:16
101:18   110:14   152:5
161:16   162:5    186:9
**record's** [3]    57:6
113:3    127:11
**recorded** [13]   12:21
13:16    13:18    17:18
18:2    21:3    21:10
27:8    56:8    56:9
63:25    64:1    76:19
**recording** [2]   26:22
42:13
**records** [9]    13:6
88:4    88:9    117:12
130:22   133:25   134:3
152:3    167:4
**recreation** [12]   76:2
77:16    77:21    79:2
79:16    79:24    92:24
104:14   148:17   153:17
153:25   154:3
**RECROSS** [4]    67:13
72:19    126:10   132:18

**redirect** [6]    66:6
72:1    123:7    154:13
154:16   159:19
**reduced** [4]    70:13
70:24    71:1    186:8
**reducing** [2]    40:1
40:2
**reduction** [2]    52:9
72:7
**Reese** [15]    2:14
118:5    118:11   121:25
161:17   162:6    162:18
162:24   173:23   179:17
181:8    182:18   183:18
184:17   185:6
**refer** [3]   8:5    56:12
60:11
**reference** [4]    62:4
64:18    110:15   116:23
**referring** [1]   60:24
**reflect** [2]    14:7
133:25
**reflected** [2]   49:18
85:8
**reflects** [1]   56:17
**refresh** [2]    85:22
180:8
**refused** [1]   150:18
**regard** [8]    6:12
7:9    7:13    19:23
24:12    27:23    66:16
67:1
**regarding** [7]    5:20
16:7    18:8    21:19
52:21    62:16    64:8
**regardless** [1]   97:15
**regards** [2]    49:1
149:22
**regular** [1]   151:18
**regulations** [2] 128:18
183:10
**Reinert** [2]    53:5
180:3
**relate** [3]    36:9
83:25    84:19
**related** [3]    33:5
50:25    186:11
**relates** [1]    84:8
**relation** [4]    25:2
28:15    36:24    86:15
**relationship** [5] 20:19
29:23    30:15    44:3
67:2
**relationships** [1]
67:3
**relative** [1]   186:12
**relatively** [2]   4:1
69:4
**relayed** [1]   22:25
**rely** [1]   67:16
**relying** [2]   108:7
170:4
**remain** [4]    21:20
49:12    84:22    137:12
**remained** [4]   21:23

88:1    88:12    91:6
**remains** [1]   49:3
**remember** [18]   22:14
28:18    61:20    91:16
100:17   112:4    116:12
129:5    129:8    130:14
130:14   133:23   134:1
134:3    136:8    144:6
152:14   160:20
**removal** [2]    97:19
97:19
**removed** [10]    85:5
97:20    114:21   146:2
146:6    165:20   167:5
167:8    167:9    167:19
**repeat** [2]    163:5
184:8
**repeated** [1]   82:7
**rephrase** [7]    35:10
94:21    153:16   160:14
165:25   177:6    184:5
**report** [6]    66:24
83:5    140:2    179:24
180:1    180:23
**reported** [1]   186:7
**reporter** [5]    1:22
36:18    140:18   185:11
186:6
**reporters** [1]   36:19
**representation** [1]
5:20
**reprimand** [1]   82:14
**reprimanded** [1]
81:15
**request** [4]    3:4
3:4    95:5    141:14
**requested** [1]   118:20
**resolved** [1]   73:1
**respect** [6]    55:4
72:3    82:11    84:4
95:11    139:7
**respond** [2]    24:5
50:3
**responding** [1]   117:5
**response** [1]   33:8
**responsibilities** [1]
11:4
**responsibility** [1]
82:22
**responsible** [1]  57:3
**rest** [1]   157:25
**restrain** [1]   147:2
**restrained** [1]   146:2
**restraint** [1]   146:8
**result** [5]    20:23
21:19    21:21    37:17
69:24
**results** [1]    64:22
**resume** [1]    25:9
**return** [1]   65:7
**returned** [3]   16:15
16:21    20:4
**review** [5]    4:15
4:15    13:15    21:13

132:10
**reviewed** [2]    34:5
41:17
**Rich** [18]    2:11
93:11    118:1    121:23
134:14   134:15   135:1
135:6    140:14   140:17
140:20   147:14   154:12
154:18   157:11   159:22
160:6    161:13
**Rigg** [2]  1:16    5:16
**right** [41]    33:1
46:19    58:25    65:14
86:19    88:17    91:3
99:17    99:18    100:20
111:17   111:19   115:24
117:7    117:11   122:14
122:20   125:14   127:18
134:5    137:22   144:20
154:22   156:21   157:2
157:3    157:5    163:23
164:10   167:12   167:13
170:16   171:12   171:13
175:21   177:1    177:17
179:20   181:1    181:15
182:5
**riot** [1]   96:25
**risk** [5]    19:9    47:10
47:18    68:6    159:23
**RMR** [2]    1:23
186:17
**Robbins** [1]    1:13
**Robert** [144]    1:16
11:24    12:16    12:22
13:12    13:18    13:21
14:3    14:10    15:1
15:16    15:17    16:1
16:5    16:7    16:15
16:24    17:4    17:16
18:7    18:8    18:17
19:8    20:24    21:3
21:20    22:2    22:20
23:16    24:10    24:16
24:22    25:21    26:1
26:7    27:19    27:24
28:1    28:7    29:5
29:6    29:15    30:10
30:17    31:20    33:7
33:20    34:11    34:19
35:1    35:5    36:8
37:3    37:14    37:16
40:20    49:15    66:9
66:10    66:24    69:23
77:8    80:2    80:18
83:9    84:4    85:12
85:16    85:17    86:4
86:5    86:10    86:12
86:15    86:16    89:2
89:12    89:16    90:4
90:8    90:12    91:21
92:5    92:15    92:23
93:7    93:16    93:17
94:5    94:8    94:24
95:11    96:13    97:6
97:23    98:9    98:16
110:15   110:17   123:16
123:20   123:23   124:10
135:25   136:2    136:12
139:12   141:22   142:1
142:11   142:22   143:8
143:16   144:6    145:2

145:6    145:10   145:16
147:6    149:18   163:25
164:3    164:6    165:10
165:16   165:20   166:1
166:6    166:11   166:15
166:20   167:5    167:7
167:16   167:18   168:21
168:24   169:12   169:13
170:3    170:9    172:13
173:15   176:15
**Robert's** [1]    171:1
**role** [1]   85:24
**roll** [1]   173:12
**roof** [1]   104:16
**room** [11]    27:7
27:15    35:16    69:16
76:25    78:9    101:7
101:16   102:5    150:22
155:19
**roommate** [1]   87:1
**rooms** [1]    86:6
**rooster** [1]   137:3
**roster** [1]   152:4
**roughly** [2]    48:3
135:18
**routine** [3]    76:13
78:22    84:14
**RPR** [2]  1:23    186:17
**rule** [16]    4:5    6:3
8:23    9:5    51:18
51:22    64:19    65:9
65:25    70:9    82:1
106:4    111:14   140:9
140:10   140:11
**ruled** [2] 4:5    124:16
**rules** [25]    6:6
79:18    80:5    80:6
81:12    81:17    82:13
83:7    95:21    96:4
97:15    110:3    110:3
111:16   124:18   138:18
164:13   164:13   164:16
164:24   166:16   173:2
176:21   181:16   181:22
**ruling** [1]    5:20
**rumor** [1]    30:12
**run** [1]   156:3
**rural** [1] 47:19

### -S-

**S.E** [5]    1:10    1:13
1:21    1:24    186:18
**safe** [2]   114:20   121:19
**sale** [1]   11:9
**sally** [1] 75:15
**San** [4]    17:12    17:14
17:19    47:2
**Sarah** [1]    149:10
**sat** [2]    17:20    34:23
**Saturday** [1]   135:21
**save** [1]   48:21
**saw** [6]    41:3    41:10
90:3    139:19   167:21
170:24
**says** [5]   50:3    58:8

79:6   107:19   140:14
**scale** [3] 17:11   75:6   163:18
**School** [1] 1:16
**scope** [2] 125:9   125:14
**Scott** [11] 26:8   26:11   26:14   26:16   26:20   32:3   42:10   59:23   60:2   60:9   122:11
**Scotter** [27] 5:24   11:16   11:21   12:1   12:5   12:9   14:2   14:18   15:16   15:17   15:19   18:11   18:14   20:15   20:17   27:18   28:16   28:21   38:15   39:22   43:3   44:15   46:17   48:11   52:22   66:17   66:20
**scream** [1] 172:25
**scrolled** [1] 119:20
**SEALED** [1] 1:5
**search** [9] 21:14   48:24   64:3   64:4   95:16   96:1   96:5   119:9   119:22
**searching** [1] 95:14
**seat** [2] 78:25   103:3
**seated** [4] 9:16   74:3   134:18   162:9
**second** [7] 4:7   25:6   62:21   64:25   114:4   127:8   184:25
**secrets** [1] 101:9
**section** [1] 77:13
**secure** [11] 47:22   68:7   68:18   69:6   69:12   69:13   69:17   73:8   73:9   73:11   73:12
**security** [9] 19:9   47:10   47:18   68:6   73:6   80:25   101:2   101:9   132:22
**see** [42] 3:13   3:17   8:15   23:16   38:3   39:25   41:16   46:3   50:10   52:15   52:15   53:12   58:16   61:21   71:19   74:4   77:20   77:24   77:25   82:1   88:5   99:1   99:2   100:16   104:2   108:12   108:14   110:8   119:11   119:15   119:19   141:20   142:7   156:13   156:15   156:22   159:16   169:23   170:4   178:3   178:14   184:6
**seeing** [1] 64:7
**seem** [2] 171:11   171:13
**segregated** [1] 158:20
**segregation** [2] 60:7   122:15
**send** [2] 46:8   142:11

**sending** [1] 142:22
**senior** [3] 163:9   163:13   163:17
**sense** [2] 71:3   120:19
**sent** [2] 72:5   73:2
**sentence** [16] 39:19   40:1   40:3   41:17   52:9   58:18   58:23   70:8   70:10   70:13   70:14   70:21   70:23   71:1   72:8   111:4
**sentences** [1] 70:24
**sentencing** [12] 22:24   27:6   27:17   45:11   45:11   46:8   46:11   51:15   51:16   67:7   70:6   72:13
**separate** [4] 100:1   107:6   158:14   158:17
**separating** [3] 75:20   153:24   157:12
**separation** [1] 159:2
**September** [42] 14:15   14:24   42:21   43:2   53:1   53:23   88:11   88:16   88:23   91:21   92:12   93:14   93:18   94:1   94:6   96:9   96:12   97:20   98:5   99:12   110:8   110:16   111:8   111:24   113:16   113:18   113:19   119:25   121:12   124:1   136:14   140:6   140:14   143:14   143:22   145:16   147:19   148:2   148:12   149:5   150:11   167:11
**sequestration** [1] 8:23
**series** [1] 59:21
**serious** [3] 34:9   173:13   174:21
**seriously** [2] 160:13   174:18
**serve** [1] 46:19
**served** [1] 10:17
**service** [2] 49:9   107:10
**serving** [1] 39:18
**set** [3] 81:23   108:6   186:14
**seven** [4] 5:10   93:15   97:1   174:4
**several** [22] 4:15   11:12   15:8   26:17   31:7   32:2   32:6   35:8   40:22   58:5   85:20   112:3   138:7   147:15   150:24   164:19   165:21   167:20   169:9   181:24   182:14   182:15
**severely** [1] 169:5
**sexual** [1] 56:5
**shadows** [1] 77:25
**shake** [1] 96:5

**shakedown** [1] 119:4
**shall** [2] 107:17   185:7
**sheet** [8] 84:3   84:25   87:15   87:17   87:21   88:5   88:11   88:22
**sheets** [1] 88:15
**Sheriff** [1] 163:8
**Sheriff's** [6] 47:16   49:10   74:13   84:2   135:7   183:19
**shift** [16] 86:2   116:10   116:11   135:16   135:20   137:9   137:19   137:23   151:12   156:7   163:21   163:23   167:10   169:15   176:5   176:9
**shifts** [2] 154:6   184:21
**shoes** [1] 134:3
**short** [5] 4:1   4:13   21:1   138:15   159:8
**shorthand** [3] 1:21   186:5   186:7
**shot** [1] 38:22
**show** [5] 20:18   23:10   84:25   87:24   101:15
**showed** [1] 121:11
**shower** [1] 145:24
**shown** [1] 99:9
**shows** [1] 115:3
**Shultice** [57] 5:24   22:4   22:8   22:21   22:21   24:4   24:6   24:12   24:19   25:2   25:23   26:2   26:6   26:7   26:13   26:23   26:25   26:25   27:8   27:15   27:24   28:6   49:15   50:4   50:8   50:14   50:21   50:24   51:1   52:18   58:6   58:9   66:10   66:13   67:4   67:6   67:9   85:15   85:18   86:5   86:15   103:6   103:21   112:2   112:5   112:6   115:1   115:8   136:2   149:18   149:22   152:20   165:12   165:17   165:20   166:2   168:22
**Shultice's** [2] 27:4   67:6
**shut** [5] 50:22   66:13   78:23   78:24   155:22
**shuts** [1] 155:17
**sic** [4] 70:7   86:12   108:24   176:25
**side** [5] 31:8   31:16   104:13   126:20   131:11
**sides** [3] 4:3   10:2   43:15
**sight** [2] 100:1   158:20
**sign** [3] 23:16   24:22   132:8
**sign-off** [2] 141:3   141:6

**signature** [6] 23:14   52:15   59:2   141:7   141:11   141:13
**signatures** [2] 53:12   141:9
**signed** [9] 25:21   28:17   52:16   53:24   91:22   93:16   111:21   113:20   123:20
**significance** [2] 3:10   3:18
**significant** [1] 165:2
**signing** [2] 50:8   52:20
**similar** [1] 102:4
**simply** [1] 66:13
**simultaneously** [1] 12:18
**single** [3] 8:2   78:16   86:19
**singular** [1] 148:9
**sink** [1] 146:13
**sit** [3] 75:14   82:19   156:17
**sitting** [1] 145:24
**situation** [4] 41:14   110:2   131:16   132:23
**six** [1] 76:7
**slid** [1] 163:23
**slot** [2] 90:5   126:17
**slots** [3] 78:6   78:20   115:23
**slow** [1] 140:17
**slowly** [1] 110:13
**slur** [1] 174:1
**small** [2] 47:19   75:17
**smaller** [1] 69:17
**so-called** [2] 30:22   159:5
**solicit** [5] 19:5   29:7   29:10   37:8   98:17
**solicitation** [1] 27:9
**soliciting** [3] 26:3   27:20   54:4
**solitary** [2] 34:2   69:15
**someone** [2] 27:2   49:7
**someplace** [2] 66:24   133:25
**sometime** [6] 60:18   111:8   148:1   150:11   167:2   183:15
**sometimes** [5] 148:18   155:1   155:1   174:1   175:11
**somewhat** [3] 23:25   51:9   54:18
**somewhere** [6] 46:20   117:10   117:10   121:12   127:25   128:7
**soon** [3] 34:24   165:15

171:5
**sorry** [28] 16:17   22:1   25:19   88:16   88:17   94:22   112:15   114:9   114:10   114:14   116:18   117:17   117:20   120:7   127:20   135:18   138:4   162:14   164:2   165:1   165:24   168:5   175:15   177:2   177:3   177:7   180:20   181:11
**sort** [4] 39:12   45:15   86:10   96:20
**sound** [3] 100:1   158:20   159:1
**sounded** [2] 29:20   29:23
**sounds** [3] 3:24   167:12   167:13
**source** [1] 144:13
**Southern** [1] 72:5
**sparse** [1] 146:15
**speak** [12] 9:17   39:3   39:4   47:23   60:24   70:16   74:5   77:4   93:6   134:20   135:3   162:11
**speaking** [1] 22:9
**special** [13] 9:3   10:22   11:4   20:9   39:11   94:2   132:23   145:11   145:11   145:12   146:19   173:16   176:18
**specific** [15] 28:24   60:8   63:16   91:16   103:16   108:9   108:9   111:10   116:22   120:4   144:10   144:10   152:17   153:23   159:4
**specifically** [8] 12:22   20:15   24:18   51:6   52:10   53:22   66:23   158:8
**specifications** [1] 108:24
**specifics** [1] 53:19
**speculating** [3] 47:11   108:22   121:13
**speculation** [3] 69:8   73:16   184:4
**speed** [1] 7:4
**spell** [5] 9:19   74:7   134:24   162:13   162:16
**spelled** [1] 10:4
**spelling** [2] 134:22   161:19
**spellings** [1] 161:21
**spent** [2] 114:5   114:5
**split** [2] 5:21   6:1
**spoke** [1] 110:18
**spoken** [4] 27:7   36:20   39:2   182:1
**spring** [1] 135:23
**staff** [10] 76:14   76:15   93:5   128:17

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 61 of 100

139:1 139:3 143:6
143:18 144:25 145:25
**stainless** [1] 146:13
**stand** [3] 5:19
48:20 75:10
**standing** [1] 104:9
**start** [6] 4:16 60:19
160:12 160:24 161:2
185:16
**started** [7] 6:14
7:1 120:1 128:16
142:5 142:6 160:21
**starting** [1] 161:5
**starts** [1] 141:20
**state** [8] 1:22 9:18
38:20 73:8 74:6
134:24 162:12 186:6
**statement** [2] 59:6
101:1
**statements** [4] 33:20
35:6 50:3 72:4
**states** [17] 1:1
1:3 1:11 3:1
6:8 6:16 8:8
9:9 9:11 30:23
30:24 32:15 56:25
73:23 134:13 158:19
180:2
**statistics** [1] 73:5
**statutes** [1] 51:23
**stay** [6] 5:23 80:24
83:14 85:14 114:15
115:10
**stayed** [1] 99:11
**staying** [2] 161:7
165:12
**stays** [1] 46:24
**steel** [1] 146:13
**Stefani** [12] 15:9
15:13 15:24 16:2
16:6 16:7 16:12
16:12 27:24 43:20
43:24 44:16
**Stefani's** [1] 43:21
**stemmed** [1] 52:21
**step** [3] 75:10 100:19
101:13
**steps** [2] 80:22 144:3
**Steve** [9] 15:9
15:13 15:24 16:2
16:6 16:7 27:23
43:20 44:15
**stick** [3] 164:23 165:2
170:6
**sticker** [1] 179:23
**still** [4] 10:21 21:25
49:21 122:4
**stole** [1] 21:17
**stolen** [2] 21:7
48:23
**Stonestreet** [2] 13:24
38:23
**stop** [8] 80:22 81:1
82:9 109:22 111:15
117:15 160:10 161:11

**stopped** [1] 140:20
**stopping** [1] 142:18
**straight** [1] 78:16
**strapped** [1] 97:4
**Strapping** [2] 120:6
120:8
**Street** [5] 1:10
1:15 1:21 1:24
186:18
**strike** [1] 153:16
**struck** [3] 29:20
30:14 44:3
**struggle** [1] 146:4
**stuck** [1] 179:9
**stuff** [6] 32:18 74:25
149:25 152:3 173:1
182:19
**subject** [2] 63:10
173:4
**submit** [1] 131:13
**subsequently** [3]
14:14 17:14 20:4
**substances** [3] 11:10
12:4 17:12
**substantial** [2] 4:16
51:25
**such** [4] 3:19 35:20
36:16 173:17
**Suffice** [1] 97:14
**sufficient** [1] 125:8
**suggest** [2] 57:4
60:16
**Suite** [1] 1:10
**summarize** [1] 11:18
**summer** [2] 11:20
38:10
**Sunday** [1] 135:21
**supervision** [1] 186:9
**support** [1] 31:8
**suppose** [1] 109:5
**supposed** [2] 86:11
166:7
**suppression** [4] 1:19
3:6 3:12 3:17
**surprise** [2] 4:4
10:4
**surprising** [2] 161:20
161:23
**surrounded** [1] 77:17
**surveil** [1] 13:5
**suspected** [2] 12:5
183:2
**suspense** [1] 25:13
**swear** [1] 173:1
**swing** [1] 135:20
**switchboard** [1]
63:17
**switched** [1] 163:23
**sworn** [4] 9:14
74:1 134:16 162:7
**system** [2] 7:19
107:13

### -T-

**T** [6] 2:24 8:6
8:9 8:11 186:4
186:4
**table** [1] 32:19
**tag** [1] 6:4
**taint** [4] 30:22 31:2
31:5 31:13
**tainted** [1] 31:16
**takes** [2] 5:19 61:10
**taking** [5] 71:2
82:23 113:1 149:4
186:9
**tantrum** [1] 172:25
**tape** [4] 34:6 56:19
56:23 65:1
**taped** [1] 56:13
**tapes** [1] 20:13
**taping** [1] 86:14
**targets** [1] 36:24
**task** [4] 10:18 10:23
11:1 11:12
**team** [10] 6:5
30:22 31:3 31:5
31:13 43:9 43:11
96:17 96:20 145:15
**teasing** [2] 125:22
161:18
**telephone** [7] 20:13
28:11 56:3 61:7
77:2 98:8 144:15
**telephones** [2] 76:10
76:21
**telling** [9] 29:18
51:5 89:17 89:17
93:22 110:24 117:2
143:9 144:7
**tells** [2] 67:17 84:5
**temper** [3] 138:15
172:25 175:8
**temporarily** [1] 86:25
**ten** [4] 5:10 10:2
40:21 41:2
**tend** [3] 71:19 162:2
172:6
**tendered** [1] 62:21
**tenure** [2] 98:7
114:16
**terminate** [1] 168:2
**terminated** [2] 167:24
168:13
**terminology** [1]
24:1
**terms** [6] 23:19
24:24 48:23 108:11
111:14 153:10
**Terre** [6] 16:23
17:8 17:20 44:17
46:24 48:12
**testified** [13] 9:15
38:6 43:1 54:3
68:3 70:3 74:2
105:12 113:9 134:17

162:8 175:7 176:14
**testifies** [1] 131:19
**testify** [8] 14:17
14:21 22:23 42:20
42:22 142:3 177:8
182:8
**testimony** [13] 17:18
27:17 67:7 68:4
83:25 106:9 112:4
117:25 143:24 182:11
182:12 182:13 185:16
**thank** [37] 6:10
8:19 10:6 23:8
25:11 32:20 32:25
37:23 38:4 48:21
57:2 63:6 63:9
66:2 66:3 73:20
73:22 98:23 101:13
101:21 106:16 123:6
125:15 126:9 128:20
134:11 134:12 147:11
154:12 154:12 157:8
160:5 160:6 162:21
185:3 185:6 185:17
**Thanks** [2] 25:18
67:20
**theme** [3] 41:24
58:4 67:3
**themes** [3] 43:12
44:5 57:25
**themselves** [1] 146:23
**thereafter** [2] 25:2
27:23
**therefore** [1] 70:19
**they've** [1] 81:4
**thick** [2] 87:5 87:9
**thinking** [3] 3:24
108:9 108:11
**third** [3] 73:9 141:19
153:1
**thirty** [1] 47:20
**Thirty-one** [2] 10:13
75:3
**thought** [28] 15:5
31:10 32:11 68:4
68:7 90:3 100:9
123:15 123:18 124:15
124:16 127:10 129:3
134:2 158:11 164:14
169:17 170:5 170:6
171:24 178:4 178:5
178:7 180:18 180:21
181:2 181:17 181:17
**threaten** [6] 124:20
124:22 125:4 138:20
173:10 173:11
**threatened** [3] 139:3
145:24 173:5
**threats** [11] 124:24
126:25 127:1 127:4
138:25 173:4 173:7
174:16 174:18 174:25
175:5
**three** [12] 13:17
74:16 75:24 76:8
81:21 99:6 121:2
121:10 134:23 158:3
163:22 176:5

**through** [58] 2:23
2:24 7:10 7:13
7:23 8:6 8:9
8:11 10:2 13:6
14:25 23:18 23:22
29:21 30:12 36:8
60:1 75:9 77:5
77:5 77:6 77:20
77:21 77:25 79:24
79:25 81:6 81:13
82:2 87:6 88:8
89:8 89:18 90:5
92:10 93:2 96:6
96:20 102:7 105:12
107:9 115:17 135:19
140:20 148:18 148:22
158:16 158:22 163:20
166:21 166:22 166:24
167:17 167:22 169:19
171:3 177:15 178:9
**throughout** [1] 102:7
**throw** [2] 172:25
173:1
**Time's** [1] 155:8
**timeline** [1] 127:19
**times** [24] 4:15
4:21 35:8 36:12
43:17 67:16 80:20
80:21 87:19 88:6
106:8 113:12 115:10
123:25 147:15 153:21
154:3 164:19 168:9
169:9 173:5 181:24
182:1 182:4
**timing** [1] 52:25
**titled** [1] 180:1
**today** [6] 128:12
182:2 182:6 182:11
182:12 185:16
**today's** [1] 8:15
**together** [6] 8:14
79:13 79:16 81:20
150:21 153:19
**toilet** [1] 146:14
**tolerate** [1] 176:19
**tomorrow** [2] 161:2
185:17
**tonight** [1] 161:11
**too** [4] 9:25 25:12
91:19 138:17
**took** [10] 36:2 48:23
62:4 94:23 98:4
113:8 118:18 119:8
140:21 180:15
**tool** [1] 150:18
**tools** [2] 144:10 144:11
**top** [2] 80:24 143:8
**totally** [1] 28:5
**touch** [1] 5:24
**touched** [1] 56:8
**touching** [1] 71:17
**towards** [4] 57:8
107:2 121:6 138:25
**towels** [1] 81:1
**town** [1] 161:7
**track** [1] 69:18

tradition [1] 159:9
traditionally [1] 100:8
traffic [1] 156:19
trafficking [8] 11:22 12:6 12:12 14:1 14:18 18:3 20:6 28:21
train [1] 31:9
transcript [2] 4:15 186:9
transcription [2] 58:14 186:8
transcriptions [1] 61:18
transcripts [1] 20:12
transferred [1] 122:11
tray [8] 126:17 141:2 173:18 178:8 178:8 178:15 178:21 178:21
trays [1] 169:19
treat [4] 3:11 7:4 118:2 176:17
treated [3] 55:8 153:10 176:15
treating [2] 3:12 3:18
treatment [20] 37:17 54:25 60:13 65:23 65:24 69:24 70:1 70:9 70:17 70:18 70:22 71:2 71:6 71:7 71:11 71:12 71:20 98:10 98:14 145:11
trial [1] 18:11
trials [2] 4:22 10:2
tried [7] 34:17 36:20 125:8 176:17 176:17 181:24 182:2
trigger [1] 130:19
trips [1] 13:17
true [4] 42:5 58:3 116:15 186:9
trust [1] 142:3
try [28] 8:14 19:18 34:14 38:18 57:23 65:7 70:24 79:5 80:24 81:9 99:24 109:21 109:23 110:3 111:15 134:19 136:23 137:1 144:3 144:5 154:14 156:5 158:13 159:24 163:5 167:15 169:24 173:24
trying [18] 56:4 70:13 110:6 117:21 117:23 148:22 150:17 164:18 166:23 167:16 167:25 171:3 176:25 177:10 177:11 177:12 177:13 177:15
Tuesday [1] 135:22
turn [9] 12:25 17:23 33:21 33:23 54:20 106:16 141:16 141:17

173:14
turned [2] 26:9 35:19
turning [2] 33:24 35:23
TV [3] 50:23 146:14 166:25
twelve [1] 137:18
twice [4] 79:6 168:12 176:24 177:9
two [29] 12:10 20:8 22:23 40:18 40:24 70:4 70:11 72:18 75:20 75:23 75:25 76:8 82:11 87:8 87:9 101:25 103:17 116:3 121:2 121:10 134:21 143:21 158:4 158:6 168:13 169:3 170:13 172:19 180:4
type [9] 12:4 12:23 29:21 29:23 30:14 39:6 106:21 115:20 168:16
types [2] 109:21 112:16
typically [4] 96:22 144:2 155:16 158:20

-U-

U.S [1] 1:10
ultimately [5] 11:23 14:20 17:24 21:9 72:7
unaware [1] 28:5
uncorroborated [1] 67:19
under [9] 24:11 24:25 51:16 77:1 95:21 97:15 129:11 147:3 186:8
undercover [5] 27:11 27:12 27:14 86:6 86:14
understand [15] 9:5 23:24 61:21 62:10 68:3 72:6 94:20 110:7 112:14 112:14 132:12 133:10 157:15 174:1 185:9
understands [1] 23:25
understood [4] 24:24 31:12 36:4 68:6
Unfortunately [1] 106:8
unhappy [1] 42:2
United [16] 1:1 1:3 1:11 3:1 6:8 6:15 8:8 9:9 9:11 30:23 30:24 32:15 56:25 73:23 134:13 180:2
University [2] 1:16 1:17
unless [5] 5:1

69:15 85:22 102:24 169:9
unlocked [3] 126:23 154:2 155:16
unlocks [1] 78:9
unusual [1] 176:19
unwritten [1] 38:21
up [87] 5:21 6:12 15:12 19:5 19:19 20:23 26:24 29:4 29:20 30:14 30:18 32:17 34:22 41:7 41:18 41:20 43:24 44:3 45:23 45:23 46:10 50:19 50:22 52:20 53:16 53:18 62:16 66:13 73:10 77:4 80:6 81:18 81:23 81:25 82:6 82:17 94:3 95:14 96:24 97:8 99:12 101:24 109:9 109:16 109:18 110:6 111:1 117:18 121:11 122:14 122:20 125:10 126:1 126:4 127:8 136:14 140:18 140:23 142:19 142:22 143:2 143:4 144:16 146:4 146:20 153:8 154:19 154:21 154:23 155:8 155:19 156:1 159:10 167:6 168:13 168:13 168:18 169:5 169:9 170:1 170:3 171:9 172:4 172:7 173:24 174:24 175:2
updates [1] 97:11
upset [5] 54:18 54:22 54:25 120:3 138:16
upstairs [1] 178:19
used [4] 4:21 81:4 156:6 156:7
uses [2] 68:21 69:2
using [3] 21:3 52:4 180:13
usually [15] 59:18 75:16 77:6 79:9 80:6 96:25 97:3 137:18 143:1 152:4 157:19 158:4 158:15 172:11 176:9

-V-

VanGent [1] 9:4
variety [1] 131:7
various [7] 27:18 39:14 75:11 82:12 83:13 88:6 115:10
vast [1] 63:14
ventilation [1] 178:18
verbal [4] 39:7 107:8 113:6 152:24
Verbally [1] 109:25
verbatim [3] 58:14 61:17 61:18

versa [2] 77:23 90:5
versus [4] 3:2 3:12 32:16 159:25
vice [2] 77:23 90:5
vicinity [1] 152:7
victims [2] 36:5 110:19
view [2] 3:15 178:2
Vinton [2] 104:10 145:22
violate [6] 82:12 101:9 108:7 124:18 138:18 173:2
violated [10] 107:23 108:16 164:13 164:14 164:16 164:17 164:24 169:9 176:21 181:23
violating [6] 81:12 81:16 82:1 106:4 109:16 181:16
violation [7] 15:12 16:3 83:7 105:14 105:15 111:1 140:10
violations [4] 82:7 82:11 109:10 109:21
vis-a-versa [1] 149:15
visit [1] 15:7
visitation [7] 75:19 76:25 77:7 77:15 86:6 104:4 120:17
visited [3] 17:20 39:17 66:18
visiting [1] 60:5
visits [1] 40:24
voice [1] 173:24
VOLUME [1] 1:4
voluminous [1] 60:22
voluntarily [1] 35:19
VS [1] 1:5

-W-

W [2] 1:20 186:7
waive [4] 80:8 81:19 81:21 141:14
walk [1] 75:9
wall [7] 77:17 77:18 77:19 89:8 89:18 104:10 104:11
walls [6] 87:4 107:8 108:20 108:25 158:16 158:22
wants [2] 42:4 59:17
warn [1] 168:12
warrant [2] 21:14 64:4
warrants [2] 48:24 138:7
watch [2] 50:23 101:24
Watson [1] 1:14
ways [3] 81:3 82:12 131:7

weather [1] 79:4
week [10] 47:6 79:6 110:16 111:9 111:10 114:5 129:21 131:10 171:8 171:8
weekend [3] 136:23 151:6 151:25
weeks [4] 121:2 121:2 167:20 168:14
welfare [1] 74:22
whatsoever [3] 5:13 152:23 165:14
whereby [1] 142:10
WHEREOF [1] 186:14
wherever [3] 42:2 159:13 160:10
Whichever [2] 41:24 151:22
whispering [1] 113:7
whole [1] 75:18
wide [1] 133:7
wife [1] 41:2
Willett [67] 1:12 3:7 3:8 3:13 5:12 5:13 6:17 6:18 7:6 7:11 7:12 7:19 7:20 7:24 8:3 8:7 8:21 9:1 21:18 32:20 37:22 37:23 37:25 58:11 62:20 62:23 63:8 63:9 66:2 67:12 67:14 67:20 68:2 72:17 72:18 72:20 73:17 98:22 98:23 98:25 106:14 113:23 121:1 123:4 125:6 125:15 126:8 126:9 126:11 128:20 132:4 132:17 132:19 134:9 134:11 143:11 147:10 147:11 147:13 147:17 154:11 157:7 157:8 160:4 160:5 160:18 161:6
willfully [1] 92:14
William [3] 2:14 162:6 162:20
Williams [107] 1:10 3:14 3:16 5:4 5:5 5:11 6:8 6:10 6:14 6:15 6:19 6:25 7:14 7:17 8:10 8:13 8:25 9:3 9:8 9:11 9:24 10:6 10:8 23:4 23:8 25:5 25:9 25:11 25:15 25:18 32:10 32:23 32:24 32:25 37:20 38:6 43:6 56:20 56:24 61:22 61:25 62:12 62:18 62:24 65:22 66:4 66:5 66:7 67:10 69:22 71:16 71:17 71:24 72:2 73:18 73:19 73:23 74:11 76:3 98:20 108:19

109:20   118:17   118:19
123:5    123:6    123:8
125:8    125:16   126:6
127:1    128:21   128:22
131:17   132:1    132:14
133:15   133:17   134:8
134:13   134:20   135:5
147:9    154:14   154:17
157:6    159:17   159:20
160:3    160:8    160:13
160:17   160:20   161:3
161:10   161:17   161:18
161:24   162:23   173:20
181:15   182:10   184:3
185:4    185:5    185:7
185:12

**willing** [5]          13:22
39:4     64:11    82:5
82:14

**willingness** [1] 33:21

**wind** [1] 159:10

**window** [13]          75:20
78:7     82:2     83:1
93:3     104:19   156:17
156:21   156:23   157:3
167:22   171:3    177:15

**windows** [18]         77:19
77:20    78:5     78:19
79:24    81:13    87:10
87:11    104:6    105:13
107:8    113:7    148:17
148:18   148:22   166:21
166:24   167:17

**wing** [1] 100:5

**wire** [1] 54:6

**wired** [1]            26:24

**wiring** [2]           86:4
86:6

**wise** [1] 6:7

**within** [6]           11:10
101:3    101:5    104:22
107:10   165:21

**without** [1]          142:7

**witness** [46]         2:3
3:22     5:19     6:13
9:10     9:14     9:20
10:3     26:11    32:12
37:21    62:9     62:13
62:19    67:23    68:11
68:20    68:25    69:8
69:10    69:14    70:15
70:25    71:6     71:9
71:14    73:22    74:1
74:8     75:10    101:12
131:12   134:16   135:1
135:15   148:13   149:3
149:7    161:22   162:1
162:7    162:14   162:18
162:20   166:19   186:14

**witness'** [1]         134:22

**witnessed** [1]        169:11

**witnesses** [6]        6:5
8:24     27:3     160:9
161:22   185:9

**witnesses'** [1]  10:3

**woman** [5]            157:17
157:18   158:1    158:2
159:1

**women** [6]            100:14
100:21   100:24   107:16
107:16   175:10

**wonder** [1]           179:20

**wondering** [1]   70:3

**Wood** [2]             90:8
90:19

**word** [1] 70:1

**words** [5]            24:15
51:25    52:4     174:1
178:21

**wore** [1] 54:6

**worked** [12]          10:23
10:25    11:12    37:3
103:17   135:20   135:22
159:12   163:22   169:15
174:9    176:11

**works** [1]            58:2

**world** [2]            6:4
28:13

**worry** [1]            185:14

**wow** [1] 105:7

**wrap** [1] 32:17

**wrapping** [1]         127:8

**wrestled** [1]         97:3

**Wrestling** [1]   6:4

**Wright** [51]          20:8
30:13    33:8     35:15
35:22    36:2     48:4
53:6     57:11    57:15
57:16    90:8     90:19
90:23    91:13    91:23
92:3     94:13    94:24
112:10   112:10   112:23
113:11   117:2    118:18
120:22   129:21   131:19
136:24   138:5    138:25
148:2    148:10   150:21
151:10   151:25   170:12
170:14   170:18   171:17
171:20   171:24   172:3
172:6    174:19   174:22
180:3    183:1    183:6
183:9    183:11

**Wright's** [2]         113:25
141:2

**write** [12]           81:18
82:5     125:25   142:22
168:12   168:18   169:5
169:8    170:1    170:3
174:24   175:2

**writing** [3]          45:10
119:20   142:19

**written** [14]         14:7
38:21    43:7     80:6
81:25    101:18   109:9
109:16   109:18   111:1
132:8    140:9    141:22
152:24

**wrong** [2]            111:17
177:8

**wrote** [2]            140:2
140:23

-X-

**X** [1]        128:13

-Y-

**yard** [3] 153:13   166:21
177:14

**year** [14] 44:20   45:18
45:19    49:24    59:21
100:12   100:15   100:23
108:4    109:7    116:16
126:13   127:22   148:12

**years** [11]           4:6
10:13    34:25    39:13
40:21    41:3     74:16
99:6     135:11   174:5
174:15

**yell** [3]  116:6   116:8
173:1

**yelled** [1]           116:9

**yelling** [1]          116:4

**yet** [3]   71:10   125:20
125:22

**York** [2] 13:3    13:8

**yourself** [8]         9:16
23:1     32:2     74:3
134:18   144:19   162:9
177:9

Patrice A. Murray, CSR, RPR, RMR

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )    CR 00-3034
                                   )    VOLUME II
         VS.                       )    **SEALED**
                                   )
ANGELA JOHNSON,                    )
                                   )
                    Defendant.     )



                    APPEARANCES:

ATTORNEY C.J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., P.O. Box 74950, Cedar Rapids, Iowa 52407-4950, appeared on behalf of the United States.

ATTORNEY ALFRED E. WILLETT, of the firm of Irvine & Robbins, 417 First Avenue S.E., P.O. Box 2819, Cedar Rapids, Iowa 52406-2819,
                    AND
ATTORNEY PATRICK J. BERRIGAN, of the firm of Watson & Dameron, 2500 Holmes Street, Kansas City, Missouri 64108-2743,
                    AND
ATTORNEY ROBERT R. RIGG, Drake University Law School Legal Clinic, 2400 University Avenue, Des Moines, Iowa 50311, appeared on behalf of the Defendant.


    SUPPRESSION HEARING IN RE THE ABOVE MATTER,

held before the Hon. Mark W. Bennett on the 12th day of April, 2001, at the Federal Building, 101 First Street S.E., Cedar Rapids, Iowa, commencing at 8:15 a.m. before Patrice A. Murray, Certified Shorthand Reporter in and for the State of Iowa.

                Patrice A. Murray, CSR, RPR, RMR
                      Federal Building
                    101 First Street S.E.
                  Cedar Rapids, Iowa 52401
                      (319) 286-2324

Page 383

speak directly into the microphone, and can you pull that chair up a little closer, please? And if that -- is that gum you're chewing?

THE WITNESS: No.

THE COURT: Cough drop.

THE WITNESS: Yeah, I've got a sore throat.

THE COURT: Would you like some water?

THE WITNESS: Yeah, please.

THE COURT: Why don't you state your full name, please, and spell your last name for us.

THE WITNESS: Robert McNeese, M-C-N-E-E-S-E. Thank you.

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. McNeese, how old are you, sir?

A. Thirty-five.

Q. How far did you go in school?

A. High school -- or GED.

THE COURT: Mr. McNeese, would you slide that chair a little closer?

THE WITNESS: Sure.

THE COURT: Thank you.

Q. Are you currently serving a federal sentence?

Page 384

A. Yes, I am.

Q. What's the term of that sentence?

A. Life.

Q. And for what crime?

A. Importation.

Q. Of what?

A. Heroin.

Q. Did that occur while you were already in a federal facility?

A. Yes, it did.

Q. What were you originally in the federal facility for?

A. Bank robbery.

Q. Was that based on a conviction from 1988?

A. Yes, it was.

Q. Was that a crime you committed here in the Northern District of Iowa?

A. Yes, it was.

Q. What was the term, sentence, you got on the original bank robbery charge, if you recall?

A. I believe it was 105 months.

Q. And then once you were convicted of the heroin importation while you were an inmate, you got moved up to life in prison?

A. Correct.

Page 385

Q. Prior to the bank robbery charge in 1988, had you other felony convictions?

A. Yes, I had.

Q. In 1983, you were convicted of theft second and forgery?

A. Yes.

Q. In 1987, you were convicted of theft third, does that sound right?

A. Yes.

Q. And in 1988, in addition to the bank robbery charge, you were also convicted of forgery and theft second?

A. Yes.

Q. In addition to the life term you're serving on the importation of heroin, have you also pled guilty to a new charge in the Northern District of Iowa here recently?

A. Yes, I have.

Q. And what charge is that?

A. Money laundering.

Q. Do you recall approximately when you pled guilty to that charge?

A. I believe September 29.

Q. And explain to the judge what was the criminal behavior that you engaged in that led to that

Page 386

conviction?

A. I was receiving funds from illegal drug sales.

Q. And was that in connection with Scotter Clark and Joey Gross and others?

A. Yes, it was.

Q. And needless to say, you committed that crime while you were also incarcerated?

A. Yes.

Q. Did you plead guilty to this money laundering charge pursuant to a written plea agreement?

A. Yes, I did.

Q. I'm going to hand you Exhibit 14, and ask you if you recognize that to be a copy of your plea agreement?

A. Yes, it is.

Q. And does that bear your signature?

A. Yes, it does.

Q. What's the date on which you signed this plea agreement?

A. September 12.

Q. Do you recall that prior to receiving this plea agreement that you had received draft -- other draft plea agreements?

A. Yes.

Q. Do you recall the other draft plea agreements,

Page 387

what charges they contemplated you pleading guilty to?

A. Career criminal, money laundering, and drug conspiracy.

Q. Now, the plea agreement to which you pled guilty in this case has you pleading guilty to money laundering and not to any type of drug trafficking, is that correct?

A. Yes.

Q. What's your understanding of why the plea agreement was changed so that you were not pleading guilty to drug related charges?

A. There was an incident that took place where money was seized and drugs, and I had no knowledge of it until after the fact, and so I didn't feel comfortable on the advice of my attorney to plead to something that I actually wasn't guilty of.

Q. So through negotiations through your attorney, and that's Mark Meyer --

A. Yes, it is.

Q. -- with the United States Attorney's Office, ultimately the plea agreement reached with you was for money laundering, is that correct?

A. Yes.

Q. During the negotiations that you participated in with the United States Attorney's Office, did the

Page 388

decision to have you plead guilty to money laundering versus the drug trafficking have anything to do with your cooperation and providing information to law enforcement concerning Angela Johnson?

A. No, it did not.

Q. Mr. McNeese, what's your understanding concerning what the requirements are placed on you under the cooperation provisions of your plea agreement, Exhibit 14?

A. That I must be truthful and must cooperate with the US Attorney's Office.

Q. What's your understanding of what, if any, benefit you may receive as a result of cooperating with the United States?

A. At the end of my cooperation if the Government feels that I was truthful and honest with my cooperation, that they would likely request a sentence reduction, and it would be up to the judge then at that time.

Q. Has any promise been made to you that you're definitely going to receive a reduction in your charges?

A. No.

Q. And, in fact, in this case, Mr. McNeese, you have a couple different sentences really you're going to

Page 389

have to reduce because of your cooperation -- or if you get a reduction, you have a life sentence in Florida, is that correct?

A. Yes.

Q. And so to the extent that you've cooperated, is it fair to say you have the hope that your cooperation may affect that sentence in Florida?

A. Yes.

Q. Is it fair to say then you also hope that any cooperation you provide may affect this new sentence that you may get -- or that you will be getting in connection with this new charge, the money laundering charge?

A. Yes.

Q. And you've not been sentenced for that charge yet, is that correct?

A. Correct.

Q. When is the sentencing date for you on that charge?

A. I believe it was April 27, but my attorney's going to -- I guess we're waiting for some documents to come.

Q. So your attorney made an attempt to get that moved?

A. Yes.

Page 390

Q. Now, going back to 1988, was there a -- a Grand Jury investigation into the bank robbery that you committed back then?

A. Yes, there was.

Q. Were you subpoenaed to appear before the Grand Jury at that time?

A. Yes.

Q. And in that case, like today, you were sworn to tell the truth during the Grand Jury session, is that correct?

A. Yes, it is.

Q. Did you tell the truth concerning your knowledge of the bank robbery?

A. No, I did not.

Q. Did you later recant the statements, the false statements you made in that Grand Jury testimony?

A. Yes, I did.

Q. How did you do that?

A. I had written a letter to the US Attorney's Office explaining that I did give false testimony.

Q. Okay. And so you contacted the Government to tell them that you had lied in the Grand Jury, is that accurate?

A. Yes, it is.

Q. It's not the situation where the Government

Page 391

contacted you and accused you of lying and then you --

A. No.

Q. -- agreed to it? In the letter that you sent to the US Attorney's Office, admitting that you lied during the Grand Jury session, did you request anything of them?

A. Yes, I believe I was hoping that I wouldn't be charged with perjury.

Q. Were you ultimately charged with perjury in connection with that case?

A. No, I was not.

Q. But in the sentence that you received for the bank robbery, was there an enhancement made in your sentence because of the perjury you committed in the Grand Jury?

A. Yes, there was.

Q. Do you recall what effect that had on your sentence?

A. I believe I was -- received approximately eighteen more months.

Q. Mr. McNeese, I want to talk to you concerning prior cooperation that you provided to the Government. And it may be helpful for us to go through a little bit of a timeline. You committed -- I'm sorry, you were convicted of the bank robbery

Page 392

charge in 1988, and at that point, you were incarcerated in the federal penitentiary?

A. Correct.

Q. And where were you placed?

A. Oxford, Wisconsin.

Q. And how long, if you recall, were you in Oxford, Wisconsin?

A. Two or three years.

Q. At that point, where were you moved to?

A. Marianna, Florida.

Q. And how long were you in Florida?

A. One year.

Q. And from Florida, where were you moved to?

A. To Sandstone, Minnesota.

Q. And then from Sandstone, where did you go?

A. Talladega, Alabama.

Q. Do you remember approximately what year that was?

A. I believe October of 1994.

Q. And let's go back a little bit on this. You were in Oxford from '88 to what, do you recall?

A. The end of '91 or beginning of '92.

Q. Okay. And you were in Florida from '90 -- roughly '92 for about a year?

A. I believe so.

Q. So '93. And then you were at Sandstone from

Page 393

1993 -- for about a year?

A. Right.

Q. And then from Alabama, where do you go?

A. Atlanta, Georgia.

Q. And how long do you remain there?

A. Till 1998.

Q. Was it while you were in the Florida facility that you were engaged in the heroin importation?

A. No.

Q. Where were you located at the time that you engaged in that activity?

A. Talladega, Alabama.

Q. And the heroin was imported through Florida?

A. Yes.

Q. Up until 1998, had you provided cooperation to law enforcement in any other state or in any other facility?

A. No.

Q. In 1998, did you provide any cooperation to law enforcement, and I mean not just Iowa law enforcement, any law enforcement?

A. Yes, I did.

Q. What was the first cooperation you provided?

A. Against -- concerning organized crime.

Q. And who did you work with? Who were the law

Page 394

enforcement agencies you worked with in connection with that cooperation?

A. Pennsylvania and FBI.

Q. And that took place during 1998?

A. Yes.

Q. Now, is that some of the cooperation that you were hoping will -- could result in a reduction in your life sentence?

A. Yes.

Q. Did that involve obtaining any information from anybody that was incarcerated?

A. Yes, it did.

Q. Describe for the judge, if you would, the type of information -- or the situation under which you obtained information from this incarcerated individual?

A. The type of information?

Q. Well, I don't want to get into the type of information as much as I'm concerned you describe to the judge what were the conditions under which you got it, did you wear a wire, was it a cellmate, that type of thing.

A. No, I was associating with individuals who were engaged in criminal activities while incarcerated.

Q. Did you have any contact with them while they were

incarcerated?

A. Yes.

Q. And in what form?

A. I was with them daily.

Q. Did you have any recordings made of any conversations you had with these individuals while you were incarcerated?

A. No.

Q. Did you generally just provide historical information to the FBI about these people that they had provided you while you were incarcerated or did you engage in active collection of information while you were incarcerated with them?

A. Active.

Q. Did you wear a wire at any time?

A. No, I did not.

Q. Were any phone conversations recorded at that time?

A. Yes.

Q. Now, in 1998, were you approached by Iowa law enforcement officers concerning your involvement and knowledge of drug activities that involved your brother Floyd McNeese and Scotter Clark?

A. Yes.

Q. Do you recall that occurring on approximately July

28 of 1998?

A. Yes, I do.

Q. Did you decide to cooperate with law enforcement at that point?

A. Yes.

Q. And why?

A. Well, when they approached me, I actually had asked if it would benefit my brother Floyd at all.

Q. And what were you told?

A. It could be possible, possibly.

Q. And so did you end up providing information concerning your knowledge of Scotter Clark and other people involved in drug trafficking in Iowa?

A. Yes, I did.

Q. During that same interview that they visited you down in the jail?

A. In Atlanta, yes.

Q. In Atlanta. Could you -- I don't want to get into a lot of detail, but could you briefly describe to the judge, what was your involvement with your brother Floyd and Joey Gross and others in this drug trafficking that occurred?

A. My brother contacted me in Atlanta. Somebody had stole some money from him. He had asked for my help. I went and asked some friends, and they agreed to

help, so we sent Joey here to Cedar Rapids to speak with my brother and Scotter. And to take care of the problem my brother had.

Q. And the money that was stolen from your brother was drug related money?

A. Yes, it was.

Q. The person you had sent out here was Joey Gross?

A. Yes.

Q. And he was at least connected in some manner to organized crime families?

A. Yes, he was.

Q. And what did you do that was -- how was it that you got any money that grew out of this connection?

A. I was receiving a percentage off all the narcotics that were being sold.

Q. And what were you doing in exchange for getting this percentage of narcotics money?

A. I really -- I wasn't really doing anything. I was just sort of like making sure they were okay and to solve disputes among them, that's basically about it.

Q. Was that in a way kind of your cut for setting up Joey Grosso (sic) with your brother and Scotter Clark?

A. Yes.

Q. Once you decided to cooperate in July of 1998, at some point, were you brought back here to Linn County?

A. Yes, I was.

Q. And what did you understand the purpose to be for being brought here to Linn County?

A. To be debriefed and for Grand Jury.

Q. And did you ultimately provide Grand Jury testimony in Scotter Clark's case in February of 1999?

A. Yes.

Q. While incarcerated at the Linn County Jail, pending your testimony in the federal Grand Jury, did you engage in any other active investigation on behalf of law enforcement in relation to the Scotter Clark case or any other case?

A. While in Cedar Rapids?

Q. Yes.

A. Yes.

Q. And I'm talking about the time period before you testified in Federal Grand Jury in the Scotter Clark case.

A. I believe so, yes.

Q. Okay. And in what manner did you provide additional assistance?

A. I believe I introduced Scotter to an undercover agent.

Q. And this is while you were incarcerated?

A. Yes.

## Page 399

Q. What else did you do?

A. I really -- oh, Scotter would come and visit me, friends would come and see me and people that weren't friends, and I would debrief to the law enforcement concerning those conversations.

Q. Did you ultimately provide testimony in the Scotter Clark sentencing against him?

A. Yes, I did.

Q. Did you provide any cooperation at any point with regard to somebody by the name of Stefani?

A. Yes, I did.

Q. Describe for the Court the extent of your cooperation with that person?

A. I spoke with, again, law enforcement concerning illegal activities that Steve was involved in.

Q. Steve Stefani?

A. Yes.

Q. And was that while he was incarcerated?

A. Yes.

Q. Did you later find out that he was also providing information he thought, about criminal activity, you were contemplating?

A. Yes.

Q. And was it -- so at the same time you were both informing on each other at that point?

## Page 400

A. Correct.

Q. You didn't know it at the time though?

A. Huh?

Q. You did not know that at the time?

A. Oh, yes.

Q. You knew he was informing on you at the time?

A. Yes.

Q. Did the Government ask you or did any Government agent ask you to obtain information from Steve Stefani?

A. No.

Q. How was it -- did you just advise one of the agents working on the Scotter Clark case that you had engaged in some conversations with Steve Stefani that you thought might be criminal?

A. Yes.

Q. Who did you approach on that --

A. I think --

Q. -- if you recall?

A. -- Mr. Fischer.

Q. At some point after you testified in the Grand Jury against Scotter Clark, were you removed from Linn County and taken to another location?

A. Yes.

Q. Do you recall approximately when that was?

## Page 401

A. After a sentencing or --

Q. After the initial Grand Jury testimony on Scotter Clark, were you temporarily taken to another federal facility?

A. I was taken back to Atlanta Penitentiary.

Q. And at some point, did you spend some time in Terre Haute --

A. Yes.

Q. -- Indiana? And in addition, in 1999, did you provide cooperation on a person involved in criminal activity out in California?

A. Yes.

Q. Describe for the judge the nature of the cooperation you provided there?

A. Concerning methamphetamine, I knew an individual that was selling large quantities of meth, 50 pounds or more at a time, and bringing it from Mexico to the United States.

Q. And how were you aware of this activity?

A. I was -- he was a friend of mine.

Q. Did you end up recording a phone call with him?

A. Yes.

Q. And did you also testify in Grand Jury against him?

A. Yes, I did.

## Page 402

Q. And that was out in California?

A. Yes, it was.

Q. And was he incarcerated at the time you had any contact with him?

A. No.

Q. At some point in March, approximately March 15 of 2000, were you brought back to Linn County?

A. Yes, I was.

Q. And what did you understand you were being brought back to Linn County for?

A. Scotter Clark's sentencing.

Q. And Scotter Clark was incarcerated at this time?

A. Yes, he was.

Q. And where was he incarcerated at, if you know?

A. I don't know.

Q. How long did you stay in the Linn County Jail when you were initially brought back?

A. I believe it was seven days.

Q. And where were you moved to at that point?

A. Benton County.

Q. At the time you were moved to Benton County, did any law enforcement officer ask you to gather any information from any inmate in the Benton County Jail?

A. No.

Q. While you were at the Benton County Jail, did you

Page 403

have contact then with some law enforcement officers concerning the Scotter Clark sentencing that was coming up?

A. Yes.

Q. And in the process of meeting with law enforcement officers on that matter, did you mention to them that you had some contact with somebody by the name of Jeff Garrett?

A. That was prior to Benton County.

Q. Okay. Where did that take place at?

A. That was in Linn County, and that's why they moved me to Benton.

Q. During that seven day time period?

A. Yes.

Q. Okay. Describe for the judge what happened with regard to Jeff Garrett?

A. I spoke with Mr. Reinert and Mr. Fischer I believe on the 21st -- I mean the 22nd of March, early in the morning. They wanted to wire up a room where I would have a conversation with Mr. Garrett, and I guess Benton County was the closest location they could do it at, so I went to Benton County then, and approximately a week later, I called Garrett to come and see me at the jail.

Q. Now, up to this point you must have told law

Page 404

enforcement that you knew something about Garrett and him being involved in some type of illegal activity, isn't that fair?

A. Yes.

Q. What did you tell them?

A. That he had broken into Al Willett's office.

MR. BERRIGAN: I'm sorry to interrupt you, Mr. McNeese, and I know you have a sore throat, but, Your Honor, it's very difficult to hear Mr. McNeese. I'm not sure we can do anything about that.

THE COURT: I think we can have him get closer to the microphone, and when we get back from our twenty minute recess, we'll see if it's improved, so we'll be in recess until three o'clock. Thank you.

(Whereupon, a brief recess was taken.)

THE COURT: Mr. Williams.

MR. WILLIAMS: Mr. McNeese, make sure you have your chair up about as far as it can go given your voice problems today.

MR. WILLETT: Your Honor, if it please the Court, could we have the last question and answer read back by our court reporter.

(Whereupon, the requested portion of the record was read by the Court Reporter.)

Page 405

Q. And I think, Mr. McNeese, we'll kind of start over on that question so that you can answer. At some point, you must have -- I think my question to you is at some point you must have told law enforcement that you had some information about Jeff Garrett that ultimately led to the recording of a meeting with him?

A. Yes.

Q. What is it that you told law enforcement that you knew about Jeff Garrett?

A. That he had broken into Al Willett's office.

Q. How did you come by that knowledge?

A. He had told me that.

Q. What relationship did you have to Jeff Garrett?

A. He worked for me and another attorney from New York.

Q. And for what purpose had you hired him?

A. To be my eyes and ears concerning the Scotter Clark situation.

Q. And what do you mean by that?

A. Just to try to find out what everyone else was -- at the time I thought that -- I wasn't sure if I was going to be indicted for racketeering or not, and so the guys from New York didn't feel that I was cooperating, so they had wanted to get some attorneys here from Cedar Rapids and investigators, and so I had

Page 406

asked Garrett to, you know, look for possible attorneys to represent other people.

Q. Okay. I'm not following with you too much. I think you're going to have to explain a little bit. You say the guys from New York didn't think you were cooperating?

A. Right.

Q. What guys from New York are you talking about?

A. Organized crime members.

Q. What you're saying is they didn't know that you were cooperating with law enforcement in connection with the Scotter Clark case at this time?

A. Correct.

Q. So you thought you might have to get some attorneys for some of these people from New York?

A. Well, we had thought that there was going to be an indictment here in Cedar Rapids because of the Scotter situation.

Q. And so again, what was it that Garrett -- what was it that you asked Garrett to do for you?

A. To come here to the courthouse, look through files, to sit in on hearings, and get a list of potential attorneys who would be willing to represent organized crime members.

Q. And while this was going on, did you advise the

## Page 407

law enforcement officers you were cooperating with that you had done this?

A. No.

Q. Had you instructed or asked Garrett to break into Al Willett's office?

A. No.

Q. How did you first become aware of that?

A. He had informed me that Mr. Willett was representing one of Scotter Clark's codefendants and that Mr. Willett had asked him to pick up some telephonic recorded conversations, I believe from the US Attorney's Office, and to make copies. He had told me that. And I asked him if he had listened to them, and he said that he's got some. That was actually the -- the first time that I knew Mr. Willett was representing someone, and that was on a Sunday evening. I believe that Monday he came back and had a bag full of documents that he had taken from Mr. Willett's office.

Q. And at what point after that Monday did you alert law enforcement that you were aware that Jeff Garrett had broken into Willett's office?

A. That Monday.

Q. And it was after that that you were moved to Benton County because there -- there was a room that

## Page 408

they could place you in in a meeting with Jeff Garrett?

A. Correct.

Q. And at that point, that meeting was recorded?

A. Yes.

Q. After -- and just to make sure the record's clear, Jeff Garrett obviously was not incarcerated at that time?

A. No, he wasn't.

Q. Was he able to visit you in the so-called attorney room at the Benton County Jail because he was a private investigator?

A. Yes.

Q. So you were able to meet person-to-person in that room?

A. Yes.

Q. After the recording that you made of the conversation with Jeff Garrett, did you have any further involvement in the investigation of Jeff Garrett's activities?

A. No.

Q. When you were placed in the Benton County Jail -- and I may have asked this, and I apologize if I have already -- were you asked to obtain any information from any inmate in the Benton County Jail?

## Page 409

A. No.

Q. Had anybody asked you to obtain any information for that seven day period when you were placed in the Linn County Jail from any inmate over there?

A. No.

Q. At some point, did you become a cellmate with Dr. Robert Shultice while at the Benton County Jail?

A. Yes.

Q. Do you know how that came about that you guys got celled together?

A. Yes.

Q. How did that come about?

A. They had placed me in I believe it was a six or eight man dormitory style cell, and, you know, I had been down for, you know, over ten years in prison, and I didn't feel comfortable with all these people around, and so I had requested to be moved into a -- actually I requested to be moved into a one man cell, but since they only had one, they put me in their two man cell and Dr. Shultice was in there.

Q. Did you know prior to getting moved into there that Dr. Shultice would be your cellmate?

A. No, I didn't even know who he was.

Q. Had you been asked by anybody when you got moved in there to gather any information from Dr. Shultice?

## Page 410

A. No.

Q. At some point while you're a cellmate with Dr. Shultice, were you -- did you obtain information from him or did he give you information concerning his case?

A. Yes, he did.

Q. At some point, did the topic come up of wanting to do something, either obtain witnesses or do something to witnesses connected with his criminal case?

A. Yes.

Q. Who initiated that conversation about his case and his witnesses?

A. Mr. Shultice.

Q. Describe for the judge, what was the -- what was it like being a cellmate with Dr. Shultice? Was he a quiet man, was he talkative?

A. He talked all the time, to the point where it was aggravating.

Q. What would you do because he was talking so much?

A. Just tried to tune him out.

Q. Was he the first one to bring up the topic of wanting to do something about cell mates -- or I'm sorry, about his witnesses?

A. Yes.

Q. How did he bring that up?

Case 3:09-cv-03084-MWB-LTS    Document 284-62    Filed 06/23/11    Page 72 of 100

Page 411

A. He had read about my exploits, I guess, in the newspapers and was talking about it, and I believe he -- he asked what he could get done for five grand, something like that. I believe that was the initial. And I didn't even pay any attention to it, actually. And then he asked me a second time about it. And I mean, I just says -- well, you know, I really couldn't believe that he was saying it. I really didn't -- the first week or so, I didn't even, you know, respond to him too much. I didn't want to, you know. I didn't think he was being truthful or didn't -- you know, I didn't think he knew what he was talking about or something, I don't know.

Q. Did you have any suspicions about whether he had been placed in your cell to get information from you or try to set you up in something illegal?

A. No.

Q. At some point did it evolve from simply him asking you what can he get for $5,000 into something more?

A. Yes, it did.

Q. Describe for the judge what happened?

A. He -- he wanted a man and a woman killed, who were the parents of one of his victims. And he also wanted individuals to -- two girls to come forward to say that one of the victims had ODed on pills.

Page 412

Q. Now, did he specifically raise the idea of killing or murdering some -- some people or is that -- did you read that into some things he was saying? How did that come about?

A. No, he actually said it. I don't really remember the exact words, but yeah, he wanted them dead and told how he wanted them dead and how he wanted them killed and where he wanted them killed at, and you know, I was just -- I would just listen.

Q. Did you suggest in any way that a solution to his problems may be to kill these people at all?

A. No.

Q. At some point, did you suggest that you could assist in this effort to harm these people and to come up with some witnesses to give false testimony?

A. Yes.

Q. What did you say?

A. He said, "Good."

Q. I'm sorry, what did you say? What did you tell Dr. Shultice that you could do?

A. That I had a friend that might possibly be interested in taking care of that, and I introduced him to my friend.

Q. Now, do you recall in early April alerting Detective Fischer that Dr. Shultice was making

Page 413

comments to you as your cellmate about wanting to do something to witnesses or to get witnesses to lie?

A. Yes.

Q. Do you recall shortly thereafter meeting with Mr. Fischer and having him provide you with a memorandum of instruction, Mr. Fischer and Mr. Wright? May I approach, Your Honor?

THE COURT: You may.

Q. I'm going to hand you Exhibit 3 and ask you if you recognize that?

A. Yes.

Q. What's the date on that, Mr. McNeese?

A. April 11 of 2000.

Q. And so Page 2, of Exhibit 3, is that your signature at the bottom?

A. Yes, it is.

Q. Do you recall who went over these instructions with you on April 11 of 2000?

A. Mark Fischer.

Q. Did you understand those instructions when they were given to you at that time?

A. Yes.

Q. Do you recall, did you have any clarifying questions to ask him or did he give you any other verbal instructions that were different from what was

Page 414

reflected in Exhibit 3?

A. No.

Q. Now, you indicated at some point you introduced a person then to Dr. Shultice who was allegedly going to be able to help him with what he wanted done, is that correct, do you remember saying that?

A. Yes.

Q. Okay. Prior to that, did you actually participate in recorded conversation with Dr. Shultice?

A. Yes, I did.

Q. Could you explain to the judge what happened on that event -- in that event?

A. I believe Pete Wright and Mark Fischer and maybe Scott French, I'm not really sure, had me sign some papers talking about wearing a body wire. They put one on me, and me and Dr. Shultice went outside and walked back and forth, and he talked.

Q. And you talked as well during this conversation?

A. Yes.

Q. And what was the gist of the conversation you had out there?

A. That he wanted these two people killed and how he wanted them killed and where he wanted them killed at.

Q. And did you indicate at that point that your friend was going to come to the jail and meet with Dr.

Shultice?

A. I don't remember.

Q. Do you recall being moved -- or I'm sorry, do you recall that tape recording taking place on June 8 of 2000?

A. Yes.

Q. Do you recall being moved the next day?

A. Yes.

Q. Do you recall why you were moved or what was -- what explanation was given to Dr. Shultice why you were moved the very next day?

A. No, I don't.

Q. And where were you moved to, do you recall at that time?

A. Yes, to cell 1.

Q. Why were you moved to cell 1, if you know?

A. Because Dr. Shultice had spoken with law enforcement concerning his desire to have these people murdered, and I understood that since they had recordings, I guess, handwriting from him discussing it, they didn't want me next to him any longer.

Q. Now, during the time period you were cellmates with Dr. Shultice, at some point did you guys in addition to talking about these issues, his witnesses and his desire to either get people to lie or to kill

them, did you also write things out to each other?

A. Oh, yes, yes.

Q. Do you recall writing notes to each other from time to time?

A. Yeah.

Q. You guys were cellmates at that point, is that correct?

A. Right.

Q. And so didn't you just talk about these things instead of writing notes to each other?

A. He felt that people were listening or also he wanted -- actually, I wanted to be completely sure that, you know, what he was wanting to do was correct.

Q. Do you know what happened to any of the notes that you wrote to him during that time period?

A. Are you referring to the note that the -- that he had changed some things on?

Q. No, I'm just referring to any of the notes that you guys would have written to each other back and forth during the time period that he thought that maybe somebody might be listening in. Do you recall what happened to the scraps of paper on which you would have written notes that would have had your handwriting on them?

A. I think maybe he would have flushed them or -- I

don't know. They may have been seized by the Government. I don't know.

Q. What did you do with some of the notes that he gave to you?

A. I gave them -- turned them over to the Government.

Q. Did you ever flush any of those during that time period as well?

A. I think when he was standing right there watching me or something, I had no alternative but to.

Q. Did you request -- specifically request to be moved into cell 1 at any point, do you recall?

A. I -- actually, yes, I did.

Q. I think you previously have testified you once asked for that before, and they couldn't do it and they put you in the two man cell?

A. Right, right.

Q. At this point, you got moved into cell 1, right after the Shultice -- your involvement in the Shultice investigation?

A. Yeah, that afternoon.

Q. Was anybody else ever celled with you in cell 1?

A. No.

Q. Once the -- you had worn the wire on Dr. Shultice and participated in that investigation. Did you have any further involvement in having any contact with Dr.

Shultice after that day?

A. No.

Q. Did any law enforcement officer or any representative of the United States Government ask you to obtain any additional information from any other inmate at the Benton County Jail?

A. No.

Q. Do you recall in the summer of 19 -- I'm sorry, the summer of 2000, Angela Johnson becoming an inmate of the Benton County Jail?

A. Yes.

Q. Between the time of your involvement with Dr. Shultice in early June of 2000 until Angela Johnson came into the jail, had any other -- had you received any other information from any other inmate in that jail concerning criminal activity?

A. No.

Q. Prior to Angela Johnson becoming an inmate at the Benton County Jail, were there female inmates, one or more inmates, located in the cell next to yours in the Benton County Jail?

A. Yes.

Q. Do you recall who that was?

A. Who they were?

Q. Yes.

Page 419

MR. WILLETT: Excuse me, Your Honor, it seems like earlier this afternoon we had concerns about privacy issues involving inmates who are not parties to this litigation being disclosed, and I'm not sure that they should be just inadvertently named, unless Mr. Williams is now changing his position on that.

MR. WILLIAMS: I'm not, Your Honor. I could move on. I was looking toward a single individual who the defense has already named in this case as being a witness.

Q. Do you recall Sarah Bramow being an inmate there at the Benton County Jail?

A. Yes.

Q. And prior to Angela Johnson becoming an inmate at the Benton County Jail, had you engaged in any conversation with Sarah Bramow?

A. Yes.

Q. For what purpose?

A. Just to talk with.

Q. Did you elicit any information from her concerning any criminal activity, past or present, from her?

A. No.

Q. How did you communicate with Sarah Bramow?

A. The way the cells are situated, you can yell back and forth.

Page 420

Q. Did you -- prior to Angela Johnson becoming an inmate at the Benton County Jail, were you able to pass any notes back and forth with Sarah Bramow now?

A. I believe so.

Q. Prior to Angela Johnson becoming an inmate there, did any law enforcement officer contact you and advise you that Angela Johnson was going to be housed at the Benton County Jail?

A. No.

Q. Did any law enforcement officer advise you that there was going to be somebody housed at the Benton County Jail and they wanted you to get some information from this new inmate at any point?

A. No.

Q. How soon after Angela Johnson became an inmate at the Benton County Jail did you have any contact with her?

A. I think maybe a week.

Q. And what was the manner in which you had any communication with her at that time?

A. Just yelling through the walls.

Q. And how often did you yell through the walls with the female inmates in the cell next to you?

A. Whenever they were there.

Q. Did you ever get in trouble for that?

Page 421

A. I mean, I was told not to do it, but I mean, I wasn't never really in any trouble for it, no.

Q. Do you recall who initiated the contact between you and Angela Johnson, who yelled through the wall at whom first, if you recall?

A. I believe that I did.

Q. And what was the purpose of the communication you had with Angela Johnson at the beginning?

A. Earlier that day, she was yelling at one of the jailers there, yelling pretty loud. And so later that afternoon, I just yelled over and asked if -- you know, what was going on, if she was all right. I didn't know her name or anything at that time.

Q. When you found out her name, was it during this conversation, this first conversation you had with her?

A. Yes, I believe so.

Q. Did you know anything about her case before?

A. No.

Q. When you learned her name, did it ring any bell or refresh your recollection that you had any information concerning her crimes?

A. No.

Q. How soon after this initial conversation you had with her did you become aware of the criminal -- or

Page 422

the crimes that she was charged with?

A. She told me.

Q. And how soon after that initial conversation with her did she tell you?

A. Could have been that day or the next day. It was -- it was close.

Q. What do you recall today -- what do you recall her telling you initially about her, what she was charged with?

A. Murdering witnesses.

Q. Did she tell you anything about whether she did that or not at that point?

A. No.

Q. Did you ask her any questions about her case?

A. No, not at that time, no.

Q. Now, you indicated that your first conversation with her would have taken place at approximately a week after her arrival in jail, is that correct?

A. Approximately, yes.

Q. And so we're talking, you know, maybe the first week of August sometime?

A. Yes.

Q. Do you recall being approached on August 14, by Pete Wright and Jailer Les Wood concerning whether you've had -- whether you had some contact with Angela

Case 3:04-cv-03035-MWB-LRR Document 284-62 Filed 06/23/11 Page 75 of 100

Johnson?

A. Yes.

Q. What do you recall about that initial discussion that you had with Pete Wright and Les Wood?

A. Pete called me out of my cell pretty early in the morning, between six and seven a.m., and had asked me if I had been yelling at the women in cell 2 or if I had been passing notes to the women in cell 2.

Q. And what did you say?

A. I said that I had been talking to them, but I didn't have any -- or that I did write notes, and they wrote me notes and I threw them away.

Q. What if you -- what do you recall, if anything, that Pete Wright or Les Wood told you at that time concerning whether you should -- whether that was appropriate or whether you could do that or not?

A. Pete Wright told me not to be doing that, and asked me if I had any letters or notes from her.

Q. Now, the statement you made to her concerning -- I'm sorry, the statement you made to Pete Wright and Les Wood that you had destroyed the notes, is that true?

A. That I made that statement? Yes.

Q. Was that a true statement?

A. No.

Q. Did you have notes at that point?

A. Yes, I did.

Q. Why didn't you tell Pete Wright at that point that you had notes?

A. Because he was with Les.

Q. Why was that an issue?

A. Les likes to talk a lot and I didn't want him actually knowing that I had letters.

Q. Why not?

A. Well, I just didn't want him telling everybody in the jail.

Q. At that point, did you recognize that you had some information that may be valuable to law enforcement?

A. I wasn't sure.

Q. So did you have any contact with any other jail employees then later that same day concerning these notes?

A. Yeah, about a half an hour later, the shift changed, and a new jailer came on.

Q. Who was that?

A. Mike.

Q. And what -- did you have contact with Mike about these notes?

A. Yeah, when he made his rounds when he first got there, I told him I wanted to speak with him.

Q. And what did you tell him when you spoke with him?

A. I told him that I did have notes and could he please contact Pete, and I explained that I didn't want to turn them over because Les was there.

Q. So what happened next?

A. I believe I gave the notes to Mike. I think Mike went and talked with Pete, and I turned them over to Mike, I think, and Pete had left the facility.

Q. Did you have any further discussion that day with Pete Wright?

A. I think maybe he might have stopped back and talked to him later that day or evening.

Q. Do you recall telling Pete Wright that day anything about whether Angela Johnson provided you information about her participation in some murders?

A. I don't remember.

Q. At that point, do you recall what, if any, instructions Pete Wright gave you, whether you should continue having contact with Angela Johnson?

A. He told me not to.

Q. In fact, was Angela Johnson moved out of the cell that she was in next to yours at that point?

A. Yes, I believe so that day.

Q. After she was moved out of that cell, do you recall whether any male or female inmates were placed

in the cell next to you, cell 2?

A. If any other women were placed there?

Q. Yeah, any other inmates placed there.

A. Male inmates.

Q. Now, after August 14, did you have any further contact then with Angela Johnson?

A. Yes.

Q. Did anybody direct you to have that contact with Angela Johnson?

A. No.

Q. How did it take place?

A. I believe I was outside walking, and Sarah or Angie was pounding on the window. I don't remember.

Q. If you can, Mr. McNeese, there's a diagram right in front of you that is an attempt at a floor plan of the Benton County Jail. Does that look reasonably accurate to you on the layout of the Benton County Jail?

A. Yes.

Q. And when you say you were outside, are you talking about being outside in the outside recreation area, that's depicted at the bottom of this floor plan?

A. (The witness indicated.)

Q. Okay. When you indicate that one of -- somebody was knocking on a cell window, do you recall today

which cell that was along there?

A. Cell 7, I believe.

Q. What happened when you said it was either Sarah or Angie that was knocking on this window, what did you do?

A. I think I knocked back.

Q. And were you able to communicate through those windows then?

A. Yes.

Q. Prior to that occasion, had you ever tried to communicate with any inmates through the window before?

A. Yes.

Q. How often have you done that?

A. Whenever girls were over there, on the side.

Q. And had you ever been caught doing that by any of the jail personnel before?

A. Yes.

Q. And what happened when they caught you?

A. Told me to knock it off.

Q. Do you recall whether they ever called a halt to your outdoor recreation at that point and brought you in early?

A. Yes.

Q. And was that a form of punishment for catching you

doing that?

A. Yeah, yeah.

Q. How often then during the -- from August 14 until the first time you met with Bill Basler do you think you had contact with Angela Johnson then through this outdoor rec. area?

A. How many times?

Q. If you remember.

A. I don't remember.

Q. In addition -- more than once?

A. Yes.

Q. In addition to communicating with her through the window, when you were out at the outdoor recreation, did you continue to receive and pass any notes to her during this time period?

A. Yes.

Q. How did you get that accomplished?

A. My door to my cell had a food slot that was always opened to allow the air to circulate because of my asthma. Angela would walk by going to a visit or exchanging a book or going to rec. and would throw a letter into me. And if I had one, I would give it to her at that time. Or they had cabinets for books, I would put a letter in the book and she would come up and get the book.

Q. How would she know what book to get?

A. We had arranged that it wasn't really the book, it was where the location was, so a shelf of the book cabinets.

Q. This may be obvious but explain this a little more. Up in the booking area, there was shelves of books that inmates could use and read?

A. Yes, cabinets below the desk.

Q. And you would hide notes inside those books?

A. Yes.

Q. And so then you would, after you had hidden a note inside a book that you had placed on the shelf, you would somehow communicate to her where that note was?

A. No, I'd just tell her, you know, she would know -- assume there was a note there.

Q. And how would you tell her that? Is that through the window or --

A. Yeah, through the window, or it was -- actually, we really didn't even have to say anything, but -- because she would try to get out once a day and so would I to go over there and check to see if there was anything in the book.

Q. So you always put it in the same place each time?

A. Yes.

Q. Now, after the 13th when you get caught with this

note and you're approached by Detective Wright, did you start to take down any notes concerning the information you were getting from Angela Johnson?

A. Yes, I did.

Q. Had anybody directed you to take down those notes?

A. No.

Q. Why did you do it?

A. So I could have a record of our conversations.

Q. Why did you want to have a record of your conversations?

A. She was telling me things that I felt were -- told me things concerning her crimes.

Q. Now, you had received, I think you said, instructions from Detective Wright on the 14th of August, not to have any further communications with Angela Johnson, is that correct?

A. Yes.

Q. And yet you continued to have contact with her during this time period, is that correct?

A. Yes.

Q. And you knew at that time that that was against the instructions that had been provided to you by Pete Wright?

A. Yes.

Q. Now, do you recall on September 3 that a note that

Page 431

you wrote was intercepted by one of the jailers that you had attempted to get to Angela Johnson?

A. I don't -- I know that I had given her a note and I believe one of the women in the office there had seen it, and they went down to her cell and got it from her.

Q. And you just don't recall the date precisely?

A. No, I don't remember the date.

Q. Let me hand you Exhibit 8 and ask you if that's a -- the last three pages of that is the note that you wrote, the one that was intercepted?

A. Yes.

Q. Did you in any way plan for that to be intercepted by the jailers?

A. No.

Q. Did you alert any jailer that you were about to pass a note so they could get ahold of it?

A. No.

Q. Did you write that note in any way thinking that it would ever end up in the hands of law enforcement or the jailers?

A. No.

Q. And that is your signature and your handwriting on Exhibit 8?

A. Yes.

Page 432

Q. On the first page of Exhibit 8, it's an infraction notice that indicates that this occurred on September 3 of 2000. Do you see that at the top of the first page of Exhibit 1 -- or I mean Exhibit 8?

A. Yes.

Q. Does that sound about the date -- approximately the date that you recall a note being intercepted of yours?

A. Yes.

Q. I want to direct your attention to September 6 of 2000. Do you recall having a meeting with Agent Bill Basler on that day?

A. Yes.

Q. Prior to having that meeting with Bill Basler, had you been contacted by Pete Wright indicating that there was an agent who wanted to speak to you?

A. Yes.

Q. What do you recall saying back to Pete Wright when you were told that there was an agent that wanted to talk to you?

A. I think I said okay.

Q. Now, between the time period of August 14, when you have this meeting with Pete Wright, and he -- and you indicate that you've had communications with Angela Johnson, until you have this meeting with Bill

Page 433

Basler on September 6, did Pete Wright or any other law enforcement officer or any jailer ask you to get information from Angela Johnson?

A. No.

Q. Did Pete Wright ever change his instructions to you that he left you with on August 14 not to have any further communication?

A. Yes.

Q. He changed that between August 14 and September 6?

A. I'm not sure of the date, but with this instructions here.

Q. You have instructions in front of you --

A. I mean, I was given instructions like the ones Dr. Shultice here.

Q. Okay. Until that time, until you were given those instructions, did anybody tell you that it was okay to have communications with Angela Johnson?

A. No.

Q. Let's go to this meeting you had with Bill Basler on September 6. Do you recall during that meeting providing him with information that you had obtained from Angela Johnson?

A. Yes.

Q. And in what form did you give him that information?

Page 434

A. I believe verbally and I think that I had some letters or pictures or something. I turned over some documents to him.

Q. Did you -- do you recall today what kind of information you provided to Bill Basler during that meeting on September 6?

A. Just that Angie had been speaking to me and writing to me concerning her case.

Q. And do you recall today what she told you about her case prior to this meeting with Bill Basler?

A. I believe she said that -- I think I said something like "If they don't have any bodies, you're not going to get found guilty" or -- and said something about if they were alive or something, and she said that they were dead, and I told him that. I really don't remember the exact dates or -- I mean, I just told them what I knew up to that point.

Q. Do you recall at the end of that interview that you had with Agent Basler, did he give you any instructions about whether you should or should not have any communications with Angela Johnson?

A. Actually, yeah, he -- he didn't know anything about the thing that I had signed or the listening post. And he told me not to do anything until he spoke with I believe Pat Reinert.

Page 435

Q. Do you recall having, a few days later on September 11, having another meeting with Bill Basler, Special Agent John Graham and Pete Wright?

A. Yes.

Q. Let me hand you Exhibit 4, and ask you if this is the instructions that you were referring to that you received?

A. Yes.

Q. And what's the date on Exhibit 4?

A. September 11.

Q. And that's the same date that you met with Agent Basler, Special Agent Graham, and Pete Wright?

A. Yes.

Q. Did you understand that as a result of those instructions that you had some limited ability to gather information then from Angela Johnson?

A. Yes, I think that Mark Fischer had told me that not to be -- he told me to remember the listening post concerning Shultice, and so I was going to inform prior to that, and so when Basler came up to see me, I explained it to him and he didn't know anything about it, and so then the next day he came up again, and then a couple days later.

Q. And when Basler got done meeting with you on the 6th of September, I think your testimony was he said

Page 436

"Don't talk to her. Don't have any communications with her"?

A. Right.

Q. Now, after that meeting with Bill Basler on the 6th, until you met with him again on the 11th, did you obtain any other information or notes from Angela Johnson?

A. I could have, yes.

Q. Do you recall talking with her again during that time period through the windows?

A. I'm sure that I did, yes.

Q. Now, at any point up to this time on September 11, when you signed the instructions there, did any jailer ever assist you in passing notes to Angela Johnson or vice versa, to your knowledge?

A. No.

Q. Did anybody ever facilitate or allow you and Angela Johnson to have any meeting face-to-face at any time?

A. No.

Q. Did you ever have a time where you and Angela Johnson had a face-to-face meeting?

A. Yes.

Q. How did that take place?

A. I believe she was coming off a visit, and I was

Page 437

coming in from the rec. or vis-a-versa, and we met there at the end of the hallway.

Q. How long did you meet at the end of the hallway?

A. Ten, twenty seconds.

Q. Were either one of you being escorted by a jailer during that time period?

A. Well, the jailer came through the doorway there.

Q. And once the jailer came through the doorway, did you guys have to go your separate ways at that point?

A. Yeah, put me in my cell.

Q. Did you have any physical contact with Angela Johnson during that brief ten or twenty second interlude in the hallway?

A. No.

Q. Do you recall her passing you any note or you passing her any note during that brief time period?

A. No.

Q. Do you recall that you had any conversation with her, the gist of any conversation you had with her at that point?

A. I don't recall what the conversation was.

Q. Other than that brief interlude where you guys were passing in the hallway, were there any other times where you were face-to-face with Angela Johnson?

A. Again, my food slot was open, and she would stop

Page 438

there and we would talk.

Q. Would the jail personnel allow that to occur?

A. No.

Q. What would they do when that was happening?

A. It would be -- usually the dispatchers in there would start screaming, and then they'd come over and chase her away.

Q. When you received the instructions on September 11, Exhibit 4 that you just looked at, did you understand those instructions?

A. Yes.

Q. Did you have any questions at that time about what they meant or about what you could or could not do?

A. Yes.

Q. And were those questions answered to your satisfaction at that time?

A. No.

Q. What did you understand that you could or could not do as of September 11 in communicating with Angela Johnson?

A. Not to initiate any conversations concerning her crimes and not to ask her any questions concerning her crimes.

Q. What do you understand that you could do if she brought up a subject of her crimes?

Page 439

A. At that time, I was still -- I didn't really know any -- I didn't really know until the next day when I spoke with Mr. Reinert. He explained it to me, you know, the next day.

Q. And what happened the next day after, you know, you received these instructions, the day that you signed your plea agreement?

A. Yes.

Q. And what did you understand -- what did Pat Reinert explain to you that you could or could not do?

A. He said that if I was speaking with her or writing or something and she had asked a question or was -- it would look odd if I didn't respond to something that she had said or that it was okay for me to, you know, respond.

Q. And did he give you any further instructions at that point?

A. No, just that -- told me -- basically reiterated the listening post, and just basically said, you know, don't -- don't try to pump her for any information at all.

Q. And just so we're clear, when you say "he just reiterated the listening post," you're referring to the instructions that are Exhibit No. 4?

A. Yes.

Page 440

Q. Did you feel like you had a pretty good idea of what you could or could not do at that point?

A. Yes.

Q. During this meeting on September 11, between Bill Basler, yourself, John Graham, and Pete Wright, did you provide -- or just prior to that meeting, had you provided anybody with some notes that you had made concerning the various contacts you had had with Angela Johnson up until that time?

A. I don't remember. I know that I had given Basler -- the first time I'd seen him, I had given him notes. I had mentioned that I had some in the cell, and he had asked me if I would give them to him.

Q. I'm going to hand you Exhibit 5, and ask you if you can identify Exhibit 5 for the judge, please?

A. Yes.

Q. What are these?

A. Notes that I had taken.

Q. And the dates that are reflected on the notes?

A. Yes.

Q. And they -- they span from August 13 of 2000 up until Sunday, the 10th of 2000?

A. Yes.

Q. And these are your handwriting?

A. Yes.

Page 441

Q. And you recall at some point providing these to some member of law enforcement, either Pete Wright or Bill Basler or somebody --

A. Yes.

Q. -- is that correct? I'd like you to take a look at Exhibit 5, and I'm going to ask you about some of the entries in here. Turn to Page 2, and if you look, each page of this exhibit has exhibit stickers to it. Exhibit 5, and then it has a page number next to it, so those are the page numbers I'm referring to, not yours that are at the top, okay?

A. Yes.

Q. So Page 2, Exhibit 5, you see an entry at the top where it says, "Angie responds," do you see that?

A. Yes.

Q. Turning back the previous page, and what was she responding to?

A. She had stated that, "They have me charged with five murders." Told her the people had stated they were hiding for some reason, and she said, "They're fucking dead."

Q. What else does she say there?

A. "They deserved everything they got."

Q. And then further down on that same page, do you see the entry that says "Angie states"?

Page 442

A. Yes.

Q. You had responded to that previous statement as "Do you think they will ever find the bodies," and what did she respond?

A. She stated that, "Hell, no, they won't find the bodies. And if they ever do, it won't be because I talked. I'll never be a rat."

Q. I'd like you to turn to Page 6 again, referring to the exhibit stickers for the page reference. On Page 6, are there some entries in which you're relating a conversation you had with Angela Johnson on August 18, 2000?

A. Yes.

Q. And this is pertaining to a girl friend of hers to whom she admitted some of her criminal activity, is that fair?

A. Yes.

Q. At the bottom of the page, there's a reference by you, you say, "Well, you shouldn't have done your girl friend wrong," referring to her statement that her girl friend was upset because she had an affair with her husband. Do you see those entries there?

A. Yes.

Q. What does Angela Johnson then say to you in response to your statement?

Page 443

A. "The bitch better watch her back. She doesn't know who she is fucking with. She can get the same thing the witnesses got. The snitch has a drug problem, which my people say we can use against her."

Q. Then I'd like you to turn to Page 11 of Exhibit 8 -- I'm sorry, Exhibit 5. Do you see the entry there, at the top of the page?

A. Yes.

Q. And that's -- at some point you indicated "If the people die in Iowa and the bodies are in Iowa, then you're not facing any more than life." Was that your understanding of what the law was in Iowa?

A. What page is that?

Q. Page 11.

A. I'm sorry, what was that?

Q. At the top of the page, do you see -- this is a conversation you had with her on August 20, is that correct?

A. Yes.

Q. And you were having a discussion with her, and you told her that "If the people died in Iowa and the bodies are in Iowa, then you're not facing anything more than life," do you see that entry there?

A. Yes.

Q. And was that your understanding of what the law,

Page 444

perhaps, was in Iowa, as far as what punishment could be imposed on her?

A. Yes.

Q. And what was her response?

A. "These mother fuckers are going to pay for doing this bullshit to me."

Q. Let me stop you, I was referring to the direct response in the previous paragraph, where it says "Angie said," do you see that?

A. Yes.

Q. What does she say there?

A. "They were killed in Iowa and they're still in Iowa, so I guess all I really have to worry about is getting a life sentence."

Q. Now, turning to Page 12, Exhibit 5, there's an entry there on Sunday, the 3rd of September, and you indicate there, "Jailer Andy seized a letter from Angie that I had written her," does that refresh your recollection that that was the day then that that letter was seized from you?

A. Yes.

Q. And at the bottom of that page, on September 8, you have an entry there that indicates that you spoke to Basler via phone, and he told you to only be a listening post, don't write any notes to Angie, and

Page 445

don't ask Angie any questions concerning her case, do you see that?

A. Yes.

Q. And did Agent Basler give you those instructions?

A. Yes.

Q. Now, after this meeting on the 11th of September, do you recall sending a letter to Pat Reinert?

A. Yes.

Q. I can't find that right now, so I'll ask you if you recall from your own recollection what was the gist of that letter?

A. No, I can't recall.

Q. Okay. Now, after the meeting you had on September 11, up until September 26, this is a time period you're operating under that memorandum of instruction, is that correct?

A. Yes.

Q. During that time period, did you comply with that memorandum of instruction?

A. I believe so, yes.

Q. Did you intentionally question Angela Johnson concerning her case?

A. No.

Q. Did she continue to provide information to you?

A. Yes, she did.

Page 446

Q. In what form?

A. Verbally and written.

Q. And verbally, would that take place in the same manner as you described before, when you are out in outdoor rec., you would communicate through the window?

A. Yes.

Q. And during this time period, when you say "in writing," this is the notes that you guys were passing back and forth as well?

A. Yes.

Q. Now, during this time period, did you also continue to take some additional -- continue to make notes concerning your conversations with Angela Johnson?

A. Yes.

Q. I hate to do this, but I want to jump back to the letter on September 19, and hand you Exhibit 9, and ask you if you recognize that letter?

A. Yes.

Q. And is that your signature on the second page?

A. Yes, it is.

Q. And is that -- what's the date on that letter?

A. September 19.

Q. In that letter, you indicate in the second full

Page 447

paragraph there, that you understand you were only a listening post and cannot ask her, referring to Angela Johnson, questions concerning her current charges, and then you go on to say, "But she has told me some guy named Terry Degoose (phonetic) used to stalk her and beat her up and that's why we killed the son of a bitch. I could not ask her questions so I've not gotten any more information concerning this." Do you see that entry?

A. Yes.

Q. And is that information true?

A. Yes.

Q. And I apologize, I'm going to go back to the conversation I was just having with you during the time period of September 11 through September 26. Was there a meeting established on September 26 of 2000 that was going to take place between you, me, and some other people?

A. Yes.

Q. Prior to that meeting on September 26, had you come into possession of any maps indicating the location of any bodies?

A. No.

Q. Had you provided to law enforcement some letters and some notes that you had made up to that point in

Page 448

time concerning information that Angela Johnson provided to you?

A. I believe so.

Q. I'm going to hand you Exhibit 6 and ask you if you can identify that?

A. Yes.

Q. What is Exhibit 6?

A. Notes.

Q. And these are the notes again that you wrote during this time period?

A. Yes.

Q. And this Exhibit 6 spans the time frame of the 11th of September through September 24?

A. Yes.

Q. And, again, this relates information that Angela Johnson provided to you verbally, is that correct?

A. Yes.

Q. And sometime prior to the meeting on September 26, you had provided those to some member of law enforcement?

A. These notes?

Q. Yes, those notes.

A. Yes.

Q. In addition, you had also provided some notes that she had actually sent to you as well?

Page 449

A. Yes.

Q. What happened -- let me go back to the maps. You indicated that on the morning of September 26, as of that time, you had not been provided any maps to the location of any bodies, do you recall that testimony?

A. Yes.

Q. You don't recall ever telling anybody that you had maps that gave locations of bodies?

A. I may have told someone that I knew the location of the bodies.

Q. Do you recall ever telling anybody that you had maps of the bodies or had anything in writing indicating location of the bodies?

A. Not that I can recall.

Q. What do you recall happening during the meeting on September 26?

A. That was our first meeting?

Q. That's correct.

A. You introduced yourself and another attorney, I can't recall her name, and Pete Wright and you informed me at that time that you were part of a taint team and that -- you explained that to -- you know, the reasons why you were there. You or Pete had requested that I consent to my room being searched. And I said that, you know, "You don't need my

Page 450

permission. I'm in jail." And I got a little upset then.

Q. Do you recall during that conversation being asked about whether you had any maps or papers indicating location of bodies?

A. I can't remember.

Q. Do you remember being asked whether you had turned over to law enforcement up to that point everything you had in your possession pertaining to Angela Johnson?

A. Yes.

Q. And in addition to requesting to search your cell, do you remember, were you ever requested permission to search your legal papers as well?

A. I think so.

Q. Did you agree to allow us to search your legal papers?

A. At that time?

Q. At that time.

A. No.

Q. During that meeting on the 26th, do you recall indicating to Pete Wright whether you had anything in your cell that was not permitted?

A. I believe Pete said, you know, "If you've got some food in there," or something like that, he doesn't

care about that. And again, I was upset for -- I mean, that was the first time I was ever asked if it was okay to search my jail cell, and so I says, "Yeah, I've got something in there, but you'll never find it" or something -- something of that nature.

Q. At this point, describe to the judge, were you agitated, were you upset with the situation?

A. I was upset with Pete. You know, he gets a little forceful, and I was just -- yeah, I was pretty pissed off.

Q. Did you, in fact, have anything in your cell that you weren't allowed to have under the jail rules?

A. No.

Q. Nevertheless, did that get you into some trouble?

A. It got me moved to a two man cell.

Q. And as a result of that, was your cell also searched then at that point?

A. I don't know.

Q. At -- during this meeting on the 26th -- I'm sorry, after the meeting on the 26th, after you were moved to another cell, what happened at that point?

A. Pete came in with his guys in the body armor.

Q. What had you done or what did they say you had done at that point to cause them to come in with body armor?

A. I believe that Bill -- I don't know his last name -- brought me a plastic thing with my food all in there instead of the regular metal tray with a metal spoon and fork. And that just, like, you know, upset me even worse, and so I -- at that time, I covered the camera and told Bill that I didn't want any, "take the food away," and he did.

Q. And the Bill you're talking about is Bill the jailer --

A. Yes.

Q. -- not Bill Basler, just to make sure.

A. No.

Q. Ultimately, were you forcibly extracted then from your cell at that point?

A. A little bit later, the marshal came, and the marshal came and asked me if we could resolve this, and -- if we could resolve it verbally. And I said, "yes," and I took the toilet paper down, and he said he'd be right back with Pete. And then three minutes later, they came in with their helmets and stuff, and then they extracted me.

Q. Did you hold a pen and threaten anybody with a pen?

A. No, you're not allowed to have pens in that jail.

Q. Did you threaten anybody with any object?

A. No.

Q. Did you threaten to throw anything on anybody?

A. No.

Q. After you were removed from the cell, where were you placed at that point, if you recall?

A. On a board, in the middle of the jail.

Q. And after a little while on the board, were you ultimately put back in some cell?

A. Yes, the hole or single cell.

Q. And let me direct your attention then to October 2, do you recall having contact with Detective Fischer on October 2 concerning the possession of some maps?

A. Yeah, I think. No, I -- no, I don't.

Q. Do you recall at some point having contact with Detective Fischer claiming -- or saying that you had some maps with location of bodies?

A. Yes.

Q. And did that occur after you were removed from that cell?

A. Yes.

Q. If you did not have the maps prior to the 26th of September, when and where did you receive those maps?

A. From the books.

Q. Do you recall when you obtained those maps?

A. I had the map of one location prior to my

sentencing -- or, I mean, my coming here to plead guilty, and I believe I told Mark Fischer here, when I was here, that I had one map, and I believe I told Pat Reinert also, and I think that was on a Friday. And then Saturday evening or Sunday -- Saturday evening, I believe, I received the map of the other location. And then that Monday I was -- I was upset because I had informed Fischer that I had a map, and so I had the entire weekend, and so I called him up and told him. I said, you know, "I have both of them now. What do you want me to do with them?" And he said something to the effect that -- or he asked if he could come get them, and I said, "Yeah." I said, "Don't bring Pete Wright or I'll eat him" or something like that, you know, joking with him, because of our little dispute we had prior.

Q. During this conversation you had with Detective Fischer, did you indicate that you wanted out of the hole or you weren't going to give up the maps?

A. No, I don't think so. I mean, it's possible. I don't believe so. I do know that when I ultimately did give him -- Fischer came up there with Pete, and Pete acted like he didn't know what was going on, you know. I come out of the cell, and there's Fischer there and Pete. And Pete is saying "I don't know

Page 455

what's going on here. Why don't you explain it to me, tell me what's going on." And I just told him, I says, "Well, it's got nothing to do with me being in the hole." I said, "I want to give these to Mark, and, you know, the problem between you and I is between you and I. It has nothing to do with anything else." And Pete says, "I'm glad you said that," and that was that.

Q. When did you enter your guilty plea?

A. I believe September 29.

Q. And the meeting that you and I attended was on the 26th, is that correct?

A. Yes.

Q. So you're telling the Court at some point between the meeting on the 26th and the 29th when you pled guilty you had received one of the maps?

A. Yes.

Q. Do you recall how you received that?

A. Yes, I do. I had got out in the evening because -- to take a shower and get a book, and, of course, I didn't need a book, but you know, there was a map and a letter talking about she heard about the disturbance, one of the guards told her, and she was proud as a peacock, strutting, talking about me getting in an altercation with the SWAT Team, whatever

Page 456

they were.

Q. And had you -- prior to receiving that note, did you have any other communication with her before getting that note, verbally or in writing?

A. I think that I had written her also concerning the incident.

Q. And how did you get that note to her?

A. Through the books. I don't want it to seem like I just put them in the books. I mean, I did use, you know, magazines that I had descriptions to to place letters in the magazines and would ask one of the jailers if they would pass the magazine for me. Generally they would.

Q. Did you inform the jailers that there were notes inside the magazines?

A. No.

Q. After providing Pete Wright and Mark Fischer with the maps to the location of the bodies on October -- on or about October 2, when was your cell and you searched under the execution of a federal search warrant?

A. I think it was the following day.

Q. Let me hand you Exhibit 7 and ask you if you recognize that document?

A. Yes.

Page 457

Q. What is that?

A. It's an envelope that I had written the names of four of the victims on.

Q. And what's it followed by?

A. A listing of what had happened, what had happened to the people.

Q. Is this a -- kind of a running summary by you of the information that you had received from Angela Johnson over a long period of time or is this something that she told you all this stuff in one conversation, in one note?

A. It was in a conversation and a note.

Q. Do you recall when you drafted this document, Exhibit 7?

A. The morning of -- or, actually, when I received this information from her.

Q. Do you recall when that was?

A. Saturday or Sunday.

Q. And was this the Saturday or Sunday after your guilty plea?

A. Yes.

Q. During the meeting that occurred on the 26th that led to you getting removed from your cell and so forth, were you given any instructions to cease contact with Angela Johnson at that point?

Page 458

A. Yes.

Q. Did anybody ever rescind those instructions to you at any point and tell you it was okay now to have contact again with Angela Johnson after the 26th?

A. No.

MR. WILLIAMS: No further questions, Your Honor.

MR. WILLETT: Your Honor, may I approach for just a moment before I start my cross?

THE COURT: You may.

(Whereupon, a side-bar was held out of the hearing of the gallery.)

MR. WILLETT: Just logistically, Your Honor, I can go for ten minutes. I was going to take a very early part of this, and then pass off to Mr. Berrigan. I know the Court said 4:30. I'll do whatever the Court wants me to.

THE COURT: No, but why do we need to have a bench conference?

MR. WILLETT: I wanted to get some guidance. I didn't know if you wanted to say, "Al, let's stop and come back tomorrow morning."

THE COURT: No, we can stop. What about the issue of the WITSEC, you weren't going to get into that?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )     CR 00-3034 MWB
                                   )     VOLUME III
          VS.                      )     **SEALED**
                                   )
ANGELA JOHNSON,                    )
                                   )
                    Defendant.     )

APPEARANCES:

ATTORNEYS C.J. WILLIAMS AND JUDITH A. WHETSTINE,
Assistant U.S. Attorneys, Suite 400, 401 First Street
S.E., P.O. Box 74950, Cedar Rapids, Iowa 52407-4950,
appeared on behalf of the United States.

ATTORNEY ALFRED E. WILLETT, of the firm of Irvine &
Robbins, 417 First Avenue S.E., P.O. Box 2819, Cedar
Rapids, Iowa 52406-2819,
                    AND
ATTORNEY PATRICK J. BERRIGAN, of the firm of Watson &
Dameron, 2500 Holmes Street, Kansas City, Missouri
64108-2743,
                    AND
ATTORNEY ROBERT R. RIGG, Drake University Law School
Legal Clinic, 2400 University Avenue, Des Moines, Iowa
50311, appeared on behalf of the Defendant.

SUPPRESSION HEARING IN RE THE ABOVE MATTER,

held before the Hon. Mark W. Bennett on the 13th day
of April, 2001, at the Federal Building, 101 First
Street S.E., Cedar Rapids, Iowa, commencing at 8:15
a.m. before Patrice A. Murray, Certified Shorthand
Reporter in and for the State of Iowa.

Patrice A. Murray, CSR, RPR, RMR
Federal Building
101 First Street S.E.
Cedar Rapids, Iowa 52401
(319) 286-2324

Page 478

not think it was probably going to be a problem, but you don't know, and you don't know until he testifies, and you weren't, understandably, going to be issuing an order predicting how the outcome is going to be, and so given that, it's up in the air. And given that it's up in the air, it poses a risk.

THE COURT: Anything else?

MR. WILLETT: If the Government took my comment as meaning we were implying that they were hiding Mr. Reinert, that wasn't what was intended or meant. We want the record to be full. We heard the Court's questions and concerns at the end of the day yesterday, and that's our motivation. Mr. Williams is not trying to jam me up on the rigmarole of subpoenaing a federal employee because he's already told me that if I will deliver to him a federal subpoena, he will produce Mr. Reinert, and so we're ready to go.

THE COURT: Okay. Now, what about scheduling this morning? I've changed my plans so I'm available until at least 3:30 and potentially can be available until about 5:30 today.

MR. WILLETT: The only fly in the ointment, if you will, Your Honor, is I did make a representation to Mr. Jackowski that when he and his

Page 479

client arrived, you know, shortly before nine a.m., which is when Mr. Garrett is subpoenaed for, that we would try as quickly as we could to take that out of order, with the Court's permission, because Mr. Jackowski I guess has commitments in Des Moines at 1:30. Other than that, I will proceed initially on cross-examination with Mr. McNeese. I will then pass to my co-counsel Mr. Berrigan. There may be an issue that we'll want to discuss towards the end of Mr. McNeese's testimony. Somewhere in there, we would like to break for Mr. Jackowski's client.

THE COURT: Why don't we break right at nine.

MR. WILLETT: I think that's wonderful, Your Honor, if the Court's willing to do that.

THE COURT: Let me ask you this, I believe one or both of you told me that you anticipate that Mr. Garrett is going to invoke his Fifth Amendment right.

MR. WILLETT: The defense believes that to be the case, Your Honor.

THE COURT: And he signed a plea agreement with the Government?

MR. WILLIAMS: No, Your Honor, not at this point.

THE COURT: Oh, he hasn't signed a plea

Page 480

agreement?

MR. WILLIAMS: That's correct.

THE COURT: Okay. So he clearly has a Fifth Amendment right.

MR. WILLIAMS: Absolutely.

THE COURT: He may have had one even after signing the plea agreement, but -- okay. Anything else?

MR. WILLETT: Not at this time, Your Honor.

THE COURT: Okay. Are you ready to begin your cross-examination?

MR. WILLETT: I am, Your Honor.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. WILLETT:

Q. Mr. McNeese, we've met before?

A. Yes, good morning.

Q. Good morning. You've been cooperating with the United States Attorney's Office since 1988, haven't you, sir?

A. No, sir.

Q. Okay. Do you remember having communications with Assistant United States Attorney Robert L. Teig --

A. Yes, sir.

Q. -- in October, November, and December of 1988

Page 481

offering your services in regards to a bank robbery and criminal conduct surrounding that bank robbery?

A. Yes.

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

Q. I'm going to place in front of you Defendant's Exhibit Q, Defendant's Exhibit R, Defendant's Exhibit S, and ask you to take a moment to look at each one of those exhibits. Have you had a chance to look at those exhibits, sir?

A. Yes.

Q. Your handwriting?

A. Yes.

Q. Your signature?

A. Yes.

Q. Your communications with Assistant United States Attorney Teig on all three occasions?

A. Yes.

Q. Okay. At that time, you were facing a bank robbery charge?

A. Yes.

Q. Okay. Through the context of those three letters you were also concerned about being charged with perjury?

A. Correct.

Q. And you were offering your assistance to Mr. Teig to possibly clean-up the bank robbery case and other criminal conduct, correct?

A. Can I have a moment to read this?

Q. Certainly.

A. Yes, that's correct.

Q. Okay. And I think in one of those letters you even volunteered to wear a wire, if that would be deemed appropriate?

A. Yes.

Q. How old of a man are you, sir?

A. Thirty-five.

Q. I want to make sure that we discussed all of your criminal history. Your first conviction occurred at age seventeen?

A. Adult conviction?

Q. May have been in juvenile court, theft in the second degree in Linn County.

A. In juvenile court, yeah.

Q. Age eighteen, false use of a financial instrument?

A. Yes.

Q. Age twenty-two, theft in the third degree?

A. Yes.

Q. Age twenty-two, forgery?

A. Yes.

Q. Again, while you were twenty-two years old, two charges of theft in the first degree?

A. Yes.

Q. Again, while you were twenty-two years old, a charge of theft in the second degree?

A. Yes.

Q. And then bank robbery at age twenty-two?

A. Yes.

Q. And then my understanding from your testimony yesterday is although you were not charged with perjury by Mr. Teig, you received a sentencing enhancement at the time of your sentencing on the bank robbery case?

A. Correct.

Q. And that was in relation to the fact that in regards to some sworn Grand Jury testimony, you lied, correct?

A. What's that, sir?

Q. The reason for the perjury enhancement is you lied to the Federal Grand Jury?

A. I gave false testimony, yes.

Q. That would have been in April of 1988?

A. Somewhere around there, yes.

Q. And you testified to the Grand Jury on subsequent

occasions, correct?

A. Yes.

Q. February of 1999, in the Scotter Clark investigation?

A. Yes.

Q. June of 2000 in the Robert Shultice investigation?

A. Yes.

Q. You also testified at the sentencing of Scotter Clark on August 1 of 2000 in front of United States District Judge Michael J. Melloy?

A. Yes.

Q. Okay. Have you testified to any other grand juries in any other investigations?

A. Yes, I have.

Q. Okay. In Pennsylvania?

A. No.

Q. In California?

A. Yes.

Q. Okay. Have you been asked to testify at any Grand Jury involving one Geoffrey Garrett?

A. No.

Q. Have you lied on any other occasions to the Grand Jury?

A. No.

Q. Okay. At the time of your conviction for heroin

trafficking in the district of Florida, did you have a chance to review your Presentence Report?

A. Yes.

Q. And were you aware that there were some opinions regarding your mental health?

A. Yes.

Q. Okay. Are you aware you've been diagnosed as having a passive aggressive personality disorder?

A. I believe that was when I was younger.

Q. Okay.

A. Since that time, I have been rediagnosed.

Q. Okay. And that rediagnosis amounts to antisocial personality?

A. No.

Q. Aggressive -- undersocialized nonaggressive conduct disorder and passive dependent personality disorder?

A. No.

Q. What do you believe the diagnosis is?

A. Well, it's not what I believe. It's what I know, sir.

Q. What do you know?

A. That I was diagnosed by a psychiatrist from Kansas City as having a passive personality disorder and anxiety.

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

Q. I believe you'll find this to be your Presentence Report from your charges in Florida, if you'd like to take a look at Paragraphs 78 through 80, on Page 16 and the following page.

A. Approximately twenty-three years ago.

Q. But isn't it true that it reflects in those paragraphs that you at one point in your life had been diagnosed with antisocial personality?

A. Yes, at one point, yes.

Q. And that some of the acting out of those diagnoses include stealing and lying?

A. I believe that was his opinion, yes.

Q. Okay. I'm sorry, how old did you tell me you were?

A. Well, 1983, I was eighteen. 1978, that would make me twelve or thirteen.

Q. How old are you as we sit here today, sir?

A. Thirty-five.

Q. How many years have you been incarcerated?

A. All together?

Q. All together?

A. Sixteen or seventeen.

Q. Almost half of your adult life has been spent in correctional facilities?

A. Yes.

Q. If I could retrieve these exhibits?

A. Sure.

MR. WILLETT: Your Honor, at this point, if it please the Court, I'm going to pass this cross-examination off to Mr. Berrigan on some of the issues that we've previously discussed.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, Mr. McNeese.

A. Good morning.

Q. How are you today, sir?

A. Fine, thank you.

Q. Mr. McNeese, in the early part of 1998 -- I'm sorry, 1996, you received a life sentence on a charge of conspiracy to import heroin into the United States, is that correct, sir?

A. Yes, it is.

Q. And that offense occurred while you were already serving your sentence for bank robbery as a result of the conviction here in the Northern District of Iowa?

A. Correct.

Q. You were actually in a penitentiary at the time that crime was committed, the importation of heroin?

A. Yes.

Q. And as a result of that conviction, well, first of all, there was a trial held in that case, was there not?

A. Yes.

Q. And you were charged in conjunction with two other individuals?

A. Yes, I was.

Q. One of the Defendants at that time was your wife, a lady by the name of Fanny McNeese, is that right?

A. Yes.

Q. And that's a lady that you had met while you were in the penitentiary in Alabama?

A. No.

Q. When did you meet her, sir?

A. When I was in Florida.

Q. In Florida?

A. Yes.

Q. In the penitentiary in Florida?

A. Low security facility.

Q. You were in jail or some type of confinement when you met this woman?

A. Yes.

Q. And you subsequently married her?

A. Correct.

Q. And that all occurred without you ever getting out of the confinement, whatever it was that you were confined in?

A. Correct.

Q. And this lady, your wife, testified against you at your trial, isn't that right?

A. Yes, she did.

Q. It was after that sentence in early 1996 that you started actively cooperating with the Government officials, would that be fair to say, Mr. McNeese?

A. 1998, yes.

Q. Weren't you talking to federal agents while you were in the penitentiary in Atlanta before you were approached in the summer of 1998 by Mark Fischer?

A. Yes, in 1998.

Q. And, in fact, you were talking to the federal agents about criminal activities, as you said yesterday, both in Pennsylvania and New York?

A. Correct.

Q. And that cooperation involved information about organized crime, isn't that right?

A. Yes.

Q. Because you had met individuals that were highly

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 88 of 100

placed in New York City organized crime families?

A. Yes.

Q. And, in fact, you met these individuals while you were in the penitentiary?

A. Yes.

Q. And one of the men that you met was a man named Vic Amuso. Am I pronouncing that correctly?

A. Yes.

Q. All right. And what place does Mr. Amuso have in organized crime?

A. He's the boss.

Q. He's the boss. You and he became close while you were both serving time in the federal penitentiary in Atlanta?

A. Yes.

Q. And Mr. Amuso essentially took you in, adopted you into this organized crime family that he headed, isn't that true?

A. Yes.

Q. And you thereafter continued to become involved with that activity?

A. To be involved with Mr. Amuso, yes, sir.

Q. Yes, sir?

A. Yes, sir.

Q. And then in July, July the 28 of 1998 to be

specific, you were approached by a gentleman by the name of Mark Fischer, isn't that right?

A. Yes.

Q. And Mr. Fischer was investigating a conspiracy that allegedly had taken place here in the Northern District of Iowa involving a man by the name of Scotter Clark and others, isn't that true?

A. Yes.

Q. Before Mr. Fischer approached you in July of '98, no other law enforcement officers had approached you about this particular conspiracy, have they?

A. No.

Q. The information that you were giving to law enforcement officers before July of '98 had to do with criminal activity in other places other than Iowa, isn't that right?

A. Yes.

Q. And you were giving this information to law enforcement officers while you were incarcerated with the very individuals that you were talking to the law enforcement officials about, isn't that right?

A. With some of them, yes.

Q. And then Mr. Fischer came down and he indicated to you that taped conversations had been collected from phone conversations that you had had with your

brother, Floyd McNeese, and a fellow by the name of Jerry (sic) Gross or Grosso, concerning a conspiracy involving drugs and money laundering in the Northern District of Iowa, isn't that right, sir?

A. Yes.

Q. And not only did he indicate to you that the Government had taped conversations, but these men actually had photographs of your family's residences, where your son lived and some of the other members of your family, do you remember that?

A. Yes.

Q. And that quite surprised you at the time?

A. Yes.

Q. And they wanted you to cooperate in that investigation, isn't that right?

A. Yes.

Q. And you agreed to do that very shortly or at the time that you met them, isn't that true, sir?

A. Yes.

Q. You already had a taped conversation of some communications between yourself and Scotter Clark that you had recorded or had recorded before these men had even approached you, isn't that true?

A. No, sir.

Q. It's not. May I approach, Your Honor?

THE COURT: You may.

Q. I want to hand you, Mr. McNeese, Defendant's Exhibit U, as in uniform. It's a photocopy, and not very well copied, but if you could look at that for just a moment, sir, I wanted to ask you a question.

A. Yes.

Q. Would you look at the last sentence in the first paragraph of Exhibit U?

A. Yes, that was a conversation my brother had recorded with Scotter.

Q. Okay.

A. I don't believe I was ever involved in that conversation.

Q. Okay. So you, I guess to put it more precisely, you had in your possession a -- or more specifically your wife had in her possession a taped telephone conversation between your brother Floyd and Scotter Clark?

A. Yes.

Q. And this letter, Exhibit U, is to Mr. Fischer, isn't that right?

A. Yes.

Q. And you were telling Mr. Fischer on August the 2, 1998, that he could have that tape, if he went to your wife --

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 89 of 100

A. Correct.

Q. -- and asked for it, correct?

A. Yes, sir.

Q. So by at least August the 2, 1998, at the very latest, you agreed to cooperate with these officers in this investigation pertaining to Mr. Clark?

A. Yes.

Q. And, of course, they wanted information respecting all of the participants in this conspiracy, did they not?

A. Yes.

Q. In other words, they wouldn't allow you to exclude your brother, Floyd, as a participant, you couldn't leave him out?

A. Floyd was already cooperating.

Q. Okay. And you included him in the information that you gave to these Government officials?

A. Yes.

Q. Your brother Floyd?

A. Yes.

Q. As a result of your willingness to cooperate in that investigation, and I -- I guess just to be clear, I know we've covered a little bit of this yesterday, Mr. McNeese, but for the Court's benefit, the activity that we're talking about involved a conspiracy wherein

the mob people or the organized crime people that you knew in New York would be essentially selling marijuana to Scotter Clark in Cedar Rapids who would then distribute it thereafter, isn't that right?

A. Yes.

Q. And in return for the marijuana being provided to Mr. Clark, there was a tax that he paid to you and Mr. Gross, isn't that right?

A. Yes.

Q. You and Mr. Gross were supposed to split that money?

A. Yes.

Q. And it was supposed to be a hundred dollars for every pound of marijuana?

A. Yes.

Q. And then once you began cooperating, you were moved back here to Cedar Rapids, were you not?

A. Yes.

Q. And at that time, of course, you were continuing to talk to the law enforcement officers, correct?

A. Correct.

Q. And you were also talking to Mr. Clark, isn't that true?

A. Yes.

Q. He was visiting you, and you had telephone

communications with him?

A. Yes.

Q. And, of course, Mr. Clark did not know that you were cooperating with the law enforcement officers?

A. No.

Q. And you certainly didn't tell him that?

A. No.

Q. And you led him to believe that you were continuing to be a member in the conspiracy that you had all engaged in, isn't that right?

A. Yes.

Q. And this is the information that you later provided to a Grand Jury in an effort to assist the Government in indicting Mr. Clark?

A. Some of the information, yes.

Q. Some of it obtained before you had agreed to cooperate and some of the information that you gave to the Grand Jury was a result of your meetings with Mr. Clark conducted after you had agreed to cooperate?

A. Yes.

Q. Okay. Mr. Clark is the only person in that conspiracy that you've actually given testimony against, is that fair to say, Mr. McNeese?

A. I believe so.

Q. You never actually testified against Jerry Grosso

or Josh Schwartz or Marissa Manasse, or your brother Floyd, did you?

A. No.

Q. And a lot of these people ended up cooperating themselves in that investigation, you know that now, don't you?

A. Yes.

Q. That case that began in the fall of 1997, that really just concluded here fairly recently, did it not?

A. With me entering a guilty plea.

Q. Yes, sir, and the guilty plea was in September of 2000?

A. Yes.

Q. Isn't that right?

A. Yes.

Q. And the charges were modified from the original complaint of conspiracy to distribute marijuana, more than 50 kilograms, to conspiracy to commit money laundering, isn't that right, Mr. McNeese?

A. Yes.

Q. And, of course, there are differences in the maximum penalties in those two crimes, you're aware of that?

A. Yes.

Q. You are a category six on their criminal history score that the Federal Government uses in its Sentencing Guidelines, isn't that right?

A. Yes.

Q. That's the high end of the criminal history scale, you're aware of that?

A. Yes.

Q. And the maximum punishment for the commission of the offense of conspiracy to distribute more than 50 kilograms was thirty years, without possibility of parole, you were aware of that?

A. No.

Q. Okay. May I approach, Your Honor?

THE COURT: You may.

Q. I'm going to hand you, sir, two exhibits that I have not marked, but I'll identify them for the record, one is dated June the 15th, 2000. It's a letter to Mr. Mark Meyer, and in it is a proposed plea agreement concerning your case. The other exhibit I'm handing you is July the 12th, 2000. It also is a letter to Mr. Mark Meyer, again, concerning your proposed plea agreement in this case. First of all, Mark Meyer was your lawyer in this matter involving the Scotter Clark conspiracy?

A. Yes.

Q. Okay. And you, I assume, reviewed those documents, did you not?

A. Yes.

Q. And would you take a look, sir, at the first paragraph there under "charges and penalties." Have you had a chance to look at that, Mr. McNeese?

A. Yes.

Q. And what does the -- what do those documents indicate that you were to be charged and plead guilty to, sir?

A. More than 50 kilograms of marijuana.

Q. And could you tell the Court what the maximum punishment is for that offense?

A. Maximum penalty is up to thirty years in prison without the possibility of parole.

Q. All right.

A. My guidelines were only twelve to fourteen years I believe, though.

Q. You believed there were only twelve to fourteen years?

A. Yeah, something like that. It wasn't thirty years.

Q. It wasn't?

A. I don't believe it was, no.

Q. Okay. You have a prior drug conviction, don't

you, Mr. McNeese? We've already discussed that, importation of heroin?

A. Yes.

Q. And, in fact, even after the charge was reduced to money laundering, did you not receive a sentence of twenty years on that?

A. For what?

Q. What was the sentence that you eventually received in this case?

A. For what, the money laundering?

Q. Yes, sir.

A. I haven't been sentenced yet.

Q. You're still awaiting sentencing, that's right?

A. Yes.

Q. You pled guilty in September of 2000, and we're here in April, and you've yet to be sentenced for this offense?

A. Correct.

Q. Thank you, sir. There's a provision in the plea agreement that you did sign in September that calls for you to submit yourself to a polygraph examination when requested by the Government?

A. Yes.

Q. And that was also in your original plea proposals that you've just looked at of June the 15th and July

the 12th of 2000?

A. Yes.

Q. But you modified the final plea agreement respecting the polygraph, when you met with Mr. Reinert the day that you signed the plea agreement, did you not?

A. Yes.

Q. And the polygraph provision was changed from the original agreement, which was that if you failed the polygraph, the plea agreement, one, shall be null and void; two, if you failed the polygraph, the plea agreement may be null and void?

A. I passed the polygraph.

Q. You passed the polygraph concerning something wholly different than the charges that you pled guilty to, isn't that true, Mr. McNeese?

A. Yes.

Q. We're going to discuss that later, if you permit us to skip that for now --

A. Sure.

Q. -- in some detail, but the truth is that you've never taken any other polygraphs respecting any of the information that you've given to the Government about any of these other individuals that you have implicated and the various criminal charges that you

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 91 of 100

have implicated?

A. No.

Q. And not only did the plea agreement in September reflect that a failed polygraph would not automatically render your plea agreement null and void, but you had inserted in this final plea agreement a provision wherein the Government was required to give you notice ahead of time through your lawyer about the issues they wanted to discuss with you and the polygraph, isn't that right?

A. Yes.

Q. Kind of a heads up on what they were going to be asking you --

A. Yes.

Q. -- so you could be prepared?

A. No.

Q. At the time that you were giving testimony to a Grand Jury here in Cedar Rapids in February of 1999, you were also cooperating with Government officials in the state of California regarding a drug conspiracy case there, were you not?

A. When was that?

Q. This would be early part of 1999.

A. Yes, I'm not sure on the dates.

Q. Okay. And I'm -- understandably, there's a lot of

dates to remember. But you remember the individual that you implicated in California?

A. Yes.

Q. What was his name, sir?

A. Dan Dice.

Q. Dan Dice?

A. Yes.

Q. And Mr. Dice was a childhood friend of yours, was he not?

A. Yes.

Q. Somebody you had known essentially most of your life?

A. Yes.

Q. And the drug conspiracy Mr. Dice was involved in was in California?

A. Yes.

Q. And you weren't a participant in that?

A. No.

Q. But you were able to obtain information from Mr. Dice?

A. Yes.

Q. And you were able to get him to trust you to implicate himself in that drug conspiracy?

A. Yes.

Q. And then give that information to the Government?

A. Yes.

Q. And I understand that there was no request made of you to do that, was there?

A. By the Government?

Q. Yes, sir.

A. No.

Q. You didn't have any type of instructions regarding being a listening post or anything like that regarding your conversations with Mr. Dice?

A. No.

Q. Indeed, your conversations with Mr. Clark, you had received no instructions from the Government as to the appropriate conduct respecting your conversations with Mr. Clark either, had you?

A. No.

Q. And you were clearly cooperating with the Government at least as of August the 2, 1998?

A. Yes.

Q. Do you know whatever happened to Mr. Dice?

A. He's left the country.

Q. You testified at his Grand Jury, however?

A. Yes.

Q. Okay. And you were doing this in an effort, Mr. McNeese, would it be fair to say, to try at some point to get a Rule 35 reduction in your life

sentence?

A. I did that because he got my sister addicted to crack cocaine.

Q. I see. So you were doing this in response to something Mr. Dice had done to your sister?

A. Yes.

Q. Well, you, yourself, were addicted to drugs at one time, weren't you, Mr. McNeese?

A. Years ago, yes.

Q. And Mr. Dice, you say, left the country before he could be prosecuted?

A. Yes.

Q. Did you wear a wire or have any of your conversations with Mr. Dice tape recorded?

A. Yes.

Q. Did the -- as far as you know, has the district in which Mr. Dice was prosecuted written any letter or done anything as a result of the cooperation that you provided to them in Mr. Dice's case?

A. I have no idea.

Q. You don't know. You were certainly hopeful that that would occur?

A. Yes, I was.

Q. You are a father, aren't you, Mr. McNeese?

A. Yes, I am.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 92 of 100

Q. In fact, I think you and I have sons, and I'm not going to mention your son's name out of respect for his privacy, but we have sons about the same age, thirteen or fourteen, is that right?

A. Yes.

Q. And I saw in the Presentence Report that Mr. Willett showed you that despite your criminal difficulties it's been reported that you are indeed a very good father, is that a statement you'd agree with?

A. I love my son, yes.

MR. WILLIAMS: Your Honor, I object to this line of questioning. I'm trying to figure out what relevance it would have in this hearing, and I would just -- I'm concerned about where this is going. I can't figure out what relevance it has.

MR. BERRIGAN: I think it obviously goes to his motivation and cooperation, Your Honor.

THE COURT: Yeah, the objection's overruled.

Q. In fact, why don't we just cut to the quick, Mr. McNeese. Would it be fair to say, sir, that this effort to get your sentence reduced, this life sentence that you have, it's actually life plus twenty years, right?

A. I have twenty concurrent with the life sentence.

Q. Well, didn't the judge in Florida, Mr. McNeese, give you a life sentence consecutive to the twenty year bank robbery sentence that you already have?

A. I had a hundred and five month sentence.

Q. I understand you had two charges in Florida and that they were run concurrently?

A. Right.

Q. Life plus twenty concurrently. But the fact of the matter is that you already had a twenty year sentence for bank robbery, isn't that right, before your conviction in Florida?

A. No, sir.

Q. Well, what was your sentence for the bank robbery conviction here in the Northern District of Iowa?

A. I believe it was eight years nine months.

Q. Oh, I'm sorry. You received a sentence of eight years nine months, and then you got a life sentence consecutive to that?

A. Yes.

Q. And in any case, you have at least a life sentence. Would it be fair to say that one of the primary motivations, Mr. McNeese, in your efforts to get that sentence reduced is because you do have a son, who you love and you'd like to eventually get out of jail to see?

A. Yes, that's correct.

Q. And in that regard, you also provided information to the Government regarding a gentleman by the name of Jeff Garrett, is that right?

A. Yes.

Q. Mr. Garrett was -- is a private investigator here in town, isn't that right?

A. Yes.

Q. And you knew Mr. Garrett before you began giving the Government information about him, isn't that true?

A. Yes.

Q. In fact, you had hired Mr. Garrett -- or more accurately, the organized crime family that you were associated with had hired Mr. Garrett to kind of look out for your interests here in Cedar Rapids after you were incarcerated, isn't that true?

A. Yes.

Q. He was paid money through a lawyer in New York by the name of Martin Gidelli (phonetic), am I pronouncing that correctly?

A. Gidelli.

Q. You certainly weren't paying Mr. Garrett, yourself?

A. I had gave him money, yes.

Q. You have. And I think you testified yesterday, I

don't want to misquote you, but he was your eyes and ears here in Cedar Rapids, did you say that?

A. In a sense, yes.

Q. And at the time that you were talking to Mr. Garrett -- and this would be March of 2000 that you were getting information from him?

A. What type of information?

Q. Well, this would be after you were transported back here to Cedar Rapids, and Mr. -- you were waiting -- or had already testified in Mr. Clark's Grand Jury. Mr. Garrett was visiting you at the Linn County Jail, was he not?

A. Yes.

Q. And he was doing that for some purpose related to you having hired him, was he not?

A. Yes.

Q. What was he doing, Mr. Garrett? What had you employed him to do?

A. I hadn't employed him to do anything. He came to say hello to me because I was back in town.

Q. He just came to say hello?

A. Yes.

Q. There weren't any discussions with Mr. Garrett about the Scotter Clark case?

A. Yes, he did mention it.

Page 510

Q. He mentioned it?

A. Yes.

Q. You weren't trying to obtain any information from Mr. Garrett pertaining to the other conspirators in that case?

A. Mr. Garrett had mentioned that Mr. Willett was representing one of the co-conspirators.

Q. Mr. Garrett brought that up?

A. Yes.

Q. And my question was, to you, Mr. McNeese, whether you were trying to obtain information from Mr. Garrett pertaining to the other folks that were involved in that conspiracy; Mr. Gross?

A. In March of 2000?

Q. Yes.

A. No.

Q. I thought you mentioned something yesterday about being concerned that you might receive another charge in connection with that Scotter Clark case?

A. Yes, that was earlier.

Q. I'm sorry?

A. That was prior to March.

Q. Prior to March?

A. Yes.

Q. Did you direct Mr. Garrett to get some information

Page 511

about Mr. Willett's client?

A. Excuse me, I didn't hear what you said.

Q. I asked you if you had directed Mr. Garrett as your investigator to procure for you information respecting Marissa Manasse, a codefendant in the Scotter Clark conspiracy?

A. He had told me he had some information, evidence, and I did say I would like to see it.

Q. And I asked you whether you had directed Mr. Garrett to get that information?

A. I think what you're meaning is did I have him break into Mr. Willett's office. No, I did not.

Q. That would be my next question. Had you first asked Mr. Garrett to procure any information respecting Marissa Manasse?

A. Yeah, he told me that he had information in his possession.

Q. And you did not request that?

A. I said I would like to see it.

Q. I'm not trying to be difficult, Mr. McNeese, but all I'm really asking you is before Mr. Garrett gave you the information, before he showed it to you, had you requested of Mr. Garrett that he procure information for you regarding Marissa Manasse?

A. I didn't know he had information until he had it

Page 512

in his possession.

Q. Okay. So you did not ask him to get information respecting that woman?

A. I didn't ask him to steal any information.

Q. Well, did you ask him to get information regarding that lady by legal methods?

A. As I have said, Mr. Garrett came to the jail. Mr. Garrett told me he had information. I said, "Well, I would like to take a look at it," and that was the extent of the conversation.

Q. Okay. So Mr. Garrett showed you this information regarding Marissa Manasse before you had asked him to procure that type of information?

A. No, I didn't see it.

Q. Okay. And you had nothing to do with Mr. Garrett having broken into Mr. Willett's office?

A. No.

Q. Is that your testimony?

A. Yes.

Q. By the way, do you know if Mr. Garrett's ever been charged with that offense?

A. I have no idea.

Q. You haven't testified at his Grand Jury yet?

A. No.

Q. You wore a wire on Mr. Garrett, didn't you?

Page 513

A. No.

Q. No. You had conversations in the jail that were monitored with Mr. Garrett?

A. Yes, they monitored a room that I was in.

Q. And "they," we're talking about law enforcement officers?

A. Correct.

Q. And that was done after you brought to the officers's attention that Mr. Garrett had broken into Mr. Willett's office?

A. Mr. Garrett brought the information. I had seen in the information that it contained a document showing I was cooperating. I contacted law enforcement to yell at them, because I was told that my cooperation would not be known, and that's when law enforcement learned of it. I didn't call and tell them about it. I called to scream at them for allowing the information to be released.

Q. Didn't Mr. Garrett, in fact, tell you, Mr. McNeese, that he had gone above and beyond the call of duty in obtaining the information respecting Ms. Manasse?

A. Yeah, I'm sure he would have said something like that.

Q. Didn't he disclose to you before you alerted law

Case 3:09-cv-03864-MWB-LTS   Document 284-62   Filed 06/23/11   Page 94 of 100

enforcement officers that he had in fact broken into Mr. Willett's office?

A. Did I do what now?

Q. Didn't Mr. Garrett tell you when he gave you this information regarding Ms. Manasse that he had gotten it from Al Willett's office?

A. Did he tell me he got it from Al's?

Q. Yes, sir.

A. Yes.

Q. That he had broken into Mr. Willett's office to get it?

A. Yes.

Q. And you're the one that told the law enforcement officers about that?

A. Yes.

Q. And at the time that you told them, Mr. Garrett ostensibly was your investigator?

A. Yes.

Q. Working for you?

A. And also working for New York.

Q. New York, your organized crime family run by your boss, Mr. Vic Amuso?

A. Yes.

Q. Steve Stefani, do you know Mr. Stefani?

A. Yes, I do.

Q. I guess he is or was a lawyer here in town?

A. Yes.

Q. How did you know Mr. Stefani?

A. He was Scotter Clark's attorney.

Q. And you ended up getting information regarding Mr. Stefani that you turned over to law enforcement officials?

A. Yes.

Q. He wasn't your lawyer?

A. No.

Q. How did you do that, Mr. McNeese?

A. How did I do what?

Q. How did you obtain this information from Mr. Stefani?

A. I spoke with Mr. Stefani.

Q. While you were incarcerated?

A. Yes.

Q. Was Mr. Stefani incarcerated at that time?

A. Yes.

Q. And what type of information did you obtain from Mr. Stefani?

A. Just drug information.

Q. Could you be a little more specific, sir?

A. I can't really recall exact information.

Q. Did it involve Mr. Stefani's participation in some

type of illegal drug related activity?

A. Yes.

Q. And when you obtained this information from Mr. Stefani, you were both incarcerated, is that correct?

A. Yes.

Q. And was that here at the Linn County Jail?

A. Yes.

Q. And you, getting this information, then alerted law enforcement officers?

A. Yes.

Q. Now, Mr. Stefani, had he done something to you to cause you to be angry with him?

A. No.

Q. Mr. Garrett, I guess, you were angry at him because it was information in his file that indicated you were a Government informant?

A. No, I wasn't angry with him.

Q. You weren't angry at him?

A. At Mr. Garrett.

Q. And so your motivation in bringing this information to law enforcement officials regarding Mr. Garrett's illegal activities, breaking into Mr. Willett's office, and Mr. Stefani's illegal activities related to drugs, was what, sir?

A. Mr. Garrett's was, as I told you earlier, that the Government had assured me that they would not release information that I was cooperating. Mr. Garrett obtained the information and faxed it to New York. So essentially, my life was put in danger because of the Government's error. I called the Government, I found out Monday morning. I called the Government immediately after that and expressed how upset I was about it. They came to see me. I explained everything, and they moved me that day.

Q. And included in explaining everything, that's when you told them about Mr. Garrett --

A. Yes.

Q. -- as we've discussed? And Mr. Stefani, why did you implicate him in drug related activity?

A. He was discussing things with me.

Q. I see. Did you wear a wire respecting Mr. Stefani?

A. No.

Q. Had no listening post instructions respecting your conversations with Mr. Stefani?

A. No.

Q. He was prosecuted here in the Northern District of Iowa?

A. Yes.

substantial conversations with Assistant United States Attorney Pat Reinert concerning this particular case. We have explored several different resolutions, but to date, I have no information to suggest when it might be resolved. I -- I do know that the Government has -- the United States Government has indicated to me that in the event that a plea agreement couldn't be reached, that it would be their intent to indict Mr. Garrett federally. However, we have been exploring potential non-Federal charges in State court to resolve this matter. And, however, Mr. Garrett has not accepted any plea offers, although there have been plea offers that have been made throughout the course of the last nine months or so.

THE COURT: What's difficult for me in determining the Fifth Amendment privilege here, you have to look at the scope of all potential federal crimes, all potential State crimes, and make a decision whether some information could tend to incriminate a Defendant. And given the breadth of federal criminal law and the breadth of state law, it's virtually impossible to -- I've been trying to mull through my mind what some of the obvious charges are, but then there are a lot of kind of nonobvious charges and so it's very difficult for me to say that

while I may be skeptical of a claim of a Fifth Amendment, in certain respects, you have to look at all potential charges that could be filed, and that's -- that's a dauntingly impossible task, or at least for me, to undertake. So any other argument? I think in this case, you have to err on the side of enforcing the witness' Fifth Amendment.

MR. RIGG: I understand the ruling, but I thought -- in response to Mr. Williams, I thought we did broach this issue on the motion to disqualify, based on the brief supplied to the Court, that we were trying to alert to everybody that we knew this was coming up. That was a couple of months ago. We've assumed that the US Attorney's Office would do something one way or another, knowing this issue was coming up. It hasn't resolved itself. Mr. Reinert's still in charge of this case and still in charge of Mr. Garrett's case. That's all I have, Your Honor.

THE COURT: Well, I'm going to go ahead and enforce Mr. Garrett's Fifth Amendment privilege.

MR. JACKOWSKI: Thank you, Your Honor.

THE COURT: Thank you, Mr. Jackowski. Mr. Garrett, you can step down.

THE WITNESS: Thank you, sir.

MR. RIGG: Thank you, Your Honor.

THE COURT: Thank you, Mr. Rigg.

MR. WILLIAMS: Your Honor, do you mind if my case agent leaves for a while?

THE COURT: No, that's fine, thank you. Counsel, are we going to save the matter that requires closing the hearing until the end of Mr. McNeese's cross-examination?

MR. WILLETT: Absolutely, Your Honor. We want to try to keep this ball moving.

THE COURT: And we're waiting for Mr. McNeese to be brought back down. Thank you.

(Whereupon, a discussion was held off the record.)

THE COURT: Could you pull your chair up a little bit more, Mr. McNeese?

MR. BERRIGAN: May it please the Court.

THE COURT: Mr. Berrigan, whenever you're ready, thank you.

CONT. CROSS EXAMINATION

BY MR. BERRIGAN:

Q. Mr. McNeese, if you'll permit me, I want to jump back for just a couple of questions respecting Mr. Garrett, okay?

A. Yes.

Q. Do you remember our discussion about your contact

with Jeff Garrett in the early part of 2000, about March 2000?

A. Yes.

Q. Okay. In fact, you had hired Mr. Garrett almost two years before that, had you not?

A. Yes.

Q. In September of 1998?

A. Yes. I'm not sure on the date.

Q. It would have been shortly after you got back to the Linn County Jail, transferred from Atlanta, does that sound about right?

A. Yes.

Q. And this is after you had already agreed to cooperate with the investigators in the Scotter Clark case?

A. That's when I was in an attempt to help my brother, but in the same sense, I wasn't fully cooperating.

Q. What do you mean by that, sir?

A. Well, I call it like fence jumping. I wasn't -- I mean, I didn't want to cooperate. I wanted to help my brother with the Scotter situation, but at the same time, I wanted to go back to prison and be able to continue the life-style that I had in prison.

Q. I thought you told me earlier that when you agreed

to speak to Agent Fischer in August, in fact, August 2, you recall I showed you the letter, 1998?

A. Right.

Q. That your brother had already agreed to cooperate by that time?

A. Yes.

Q. And so now we're in September, a month later, and you're still concerned about your brother?

A. Yes.

Q. And you hire Mr. Garrett --

A. Yes.

Q. -- as your investigator?

A. Yes.

Q. And this isn't something, I don't imagine, you talked to the law enforcement officers about, that you were hiring an investigator?

A. Well, when they brought me back here?

Q. Yes.

A. I stopped communicating with them, you know. I wasn't cooperating on other things, and I had refused to go to the Grand Jury.

Q. So you were essentially having a change of heart about your initial thought that you would cooperate?

A. Yes.

Q. And you hired Mr. Garrett in September of 1998 for

what purpose, Mr. McNeese?

A. I had felt that the Government may possibly bring racketeering charges against myself and others. I wanted him to do his best to investigate that.

Q. All right. And so he was in your employ then up through March of 2000?

A. Yeah, I mean, I would say in March of 2000, he was more in the employment of Martin Gidelli than myself.

Q. And Mr. Gidelli, as we mentioned, is the New York lawyer that you believe represents the organized crime family headed by Vic Amuso?

A. Yes.

Q. Okay. You recall that it was Assistant United States Attorney Pat Reinert who was the lead prosecutor in the Scotter Clark investigation?

A. Yes.

Q. And when you were giving information to the law enforcement officials, in fact, set up a conversation in which the officers were able to overhear your discussion with Mr. Garrett, Mr. Reinert was also in charge of the Geoffrey Garrett investigation, was he not?

A. Yes, he was.

Q. In fact, you met with Mr. Garrett -- excuse me, you met with Mr. Reinert personally and talked to him

about what you knew respecting Geoffrey Garrett having broken into Al Willett's office?

A. Well, sir, as I explained earlier this morning, Sunday evening Mr. Garrett came and seen me. Monday morning, he brought the information. As soon as I was through talking with Mr. Garrett, I contacted law enforcement and met with Mr. Reinert shortly after that.

Q. Okay. And if you said that, I'm sorry. I missed that, Mr. McNeese. In fact, you met with Mr. Reinert the day after you had received this information from Mr. Garrett that he had broken into Al Willett's office?

A. It was either the same day -- I thought it was the same day.

Q. All right. Well, we could say very shortly after you received information respecting Mr. Garrett's illegal activities, you were in a face-to-face meeting with Pat Reinert discussing the information you had received from Mr. Garrett?

A. I was discussing more the fact that he had released information showing that I was cooperating with the Government.

Q. Well, in truth, there were a number of matters discussed. I don't mean to split hairs, Mr. McNeese.

There were tape recorded conversations between Mr. Reinert and Mr. Willett, weren't there?

A. That's what I was led to believe, yes.

Q. And you claim to have in possession -- be in possession of taped -- secretly taped conversations between Al Willett and Pat Reinert?

A. That I was in possession? No.

Q. Well, you had seen those, or been led to believe Mr. Garrett had them?

A. I had been led to believe, yes.

Q. Well, one of the matters you discussed with Mr. Reinert certainly was that Mr. Garrett had broken into Al Willett's office, correct?

A. Yes.

Q. And it was after your meeting with Mr. Reinert, in fact, just about a week later, that there was the tape recorded -- videotape recorded conversation with Mr. Garrett, you and Mr. Garrett?

A. Video, I don't --

Q. Well --

A. There was an audio, an audiotape, I believe.

Q. Okay.

A. I don't know about a videotape.

Q. Well, I have a report that says there was a videotape recording of the meeting between Garrett and

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 97 of 100

McNeese made from a separate room. You're not aware of that?

A. No.

Q. If that's true or not?

A. No.

Q. At least there was an audiotape recording?

A. Yes.

Q. And this recording had to be made at the Benton County Jail, do you remember that?

A. Yes.

Q. You were moved from Linn County to Benton County to get this done?

A. Yes.

Q. And this was right after or within a week of your meeting with Mr. Reinert?

A. I believe I left the same day.

Q. Okay. Respecting Mr. Reinert, the final plea agreement that you signed, we've looked at that already, was signed on September the 12, do you recollect that?

A. Yes.

Q. However, it was attached to a letter to your lawyer, Mr. Meyer, the letter dated September the 7, 2000, did you know that?

A. Yes.

Q. And that, coincidently, was one day after you met with Special Agent William Basler at the Benton County Jail to discuss Angela Johnson?

A. Yes.

Q. And that's when you told Agent Basler about Ms. Johnson purportedly having admitted to you that she had participated in these five homicides, that was during your September 6 meeting with William Basler?

A. The 6th, yes.

Q. The next day, you got a revised plea agreement mailed to your lawyer?

A. If that's what the date is, yes.

Q. Okay. We can get back to Mr. Shultice for just a moment. Mr. Shultice was already incarcerated in Benton County when you were placed in with him in March, specifically March the 23 of 2000, is that right?

A. Yes.

Q. Okay. And so if I understand the dates correctly, Mr. McNeese, you are moved to Benton County to arrange this tape recording of your conversation with Mr. Garrett, on March the 23, that's the date of your movement?

A. Yeah, again, I'm not sure of the dates, but that's why I was moved.

Q. Okay. And within a week, you're giving a video -- or audiotaped conversation, you and Mr. Garrett, within a week after being at the Benton County Jail, is that -- does that seem to comport with your recollection?

A. Yes.

Q. And at that time, Mr. Shultice and you were sharing a cell?

A. Yes.

Q. And I don't suppose you discussed the fact that you were cooperating with law enforcement officers against Mr. Garrett, you didn't discuss that with Dr. Shultice, did you?

A. No.

Q. There's been some testimony that Dr. Shultice liked to talk, that he, in fact, talked incessantly to you. Did I hear you say that on your direct examination?

A. Yes.

Q. You found it almost annoying?

A. Correct.

Q. And you didn't ask him any questions about his offenses?

A. The offenses that he was in --

Q. Yes, sir.

A. Actually, no, he was more than willing to, you know, give me detail.

Q. He gave you a remarkable amount of detail about the charges, did he not?

A. Yeah, I knew some of the people that were involved.

Q. And he had a plan that he wanted to have you participate in, wherein he would solicit the murder of two of the witnesses against him?

A. That was discussed.

Q. The Robinsons, do you recollect their names?

A. Yes.

Q. And apparently Mr. Shultice thought that you could help him with this?

A. Correct.

Q. Now, Mr. Shultice -- did you know Mr. Shultice had been in the Benton County Jail for six months before you met him?

A. No.

Q. He also, Mr. Shultice, that is, wanted you to procure perjured testimony from two other witnesses that you would come up with to testify at a sentencing hearing, isn't that right?

A. Yes.

Q. And these witnesses would testify about the

Case 3:09-cv-03064-MWB-LTS    Document 284-62    Filed 06/23/11    Page 98 of 100

victim, the young lady that had died, talk about her drug usage, isn't that right?

A. Yes.

Q. And that was going to be false testimony, of course?

A. Yes.

Q. And Mr. Shultice apparently thought you could help him with that also?

A. Yes.

Q. You and Mr. Shultice passed notes back and forth to each other, did you not, Mr. McNeese?

A. Yes.

Q. In fact, you had a limited supply of paper there at the Benton County Jail I understand?

A. Yes.

Q. Three pieces of paper per day per inmate, is that your recollection?

A. Normally they wouldn't count them out every morning, but they would just give you, you know, a few pieces. Some days you might get five or six.

Q. Okay. And you at some point told Dr. Shultice that your cell was being bugged or monitored. Did you tell them that?

A. I think that he was nervous about that, and I says, "Yeah, could be possible the cell was

monitored."

Q. And so that wasn't your idea. He felt that the cell was bugged. You didn't tell him it was bugged?

A. No.

Q. And as a result, your communications with Dr. Shultice respecting his case and this plot to kill witnesses and suborn perjury, much of that was communicated in writing, was it not?

A. I would say that most of it was communicated in talking.

Q. And did Dr. Shultice, in fact, write some of it down for you?

A. Yes, he did.

Q. On pieces of paper provided by the jail?

A. I'm not sure.

Q. Well, isn't it true, Mr. McNeese, that you actually had to tear up these pieces of paper into smaller pieces so you would have sufficient paper to communicate back and forth with Dr. Shultice?

A. I don't recall.

Q. You were giving notes to Dr. Shultice as well as he providing notes to you, isn't that right?

A. Yes.

Q. And your notes, were any of those notes recovered that you wrote to Dr. Shultice as far as you know?

A. I have no idea.

Q. You're not aware of any?

A. I didn't ask. I don't know.

Q. Well, you have never provided to law enforcement officers any notes that you purportedly wrote to Dr. Shultice during the period that you were both incarcerated together in Benton County, have you?

A. Yes.

Q. Well, wasn't that a copy of a note that Dr. Shultice wrote to you?

A. I don't remember.

Q. You don't remember?

A. No, I mean, I can't -- I can't really recall. I know that there was a note given to the law enforcement.

Q. That you wrote?

A. Yes.

Q. And --

A. I believe so.

Q. And you don't remember that being in fact a copy of Dr. Shultice's note to you regarding the plan to procure the murder of the two witnesses, that doesn't ring a bell with you?

A. No.

Q. Now, with Dr. Shultice, you actually had some

instruction respecting the perimeters of your conversations with him, what you were supposed to do, what you were not supposed to do, isn't that right?

A. Yes.

Q. And would it be fair to say, Mr. McNeese, that this is the first time in your history of having communicated with individuals and subsequently implicated them in various criminal conduct, this is the first time that anybody's given you any specific instructions as to what you should be doing or not doing, would that be true?

A. No.

Q. No. Could you point to any other documents that you've received before your memorandum of instruction with respect to Dr. Shultice?

A. Oh, concerning Dr. Shultice?

Q. No, sir, concerning other individuals.

A. Yes, the organized crime task force from Philadelphia.

Q. And did the organized crime task force in Philadelphia give you a similar type of document or instruction?

A. They instructed me not to discuss with them or any other person in law enforcement any legal matters that came up in the course of conversations that I had.

Case 3:09-cv-03064-MWB-LTS   Document 284-62   Filed 06/23/11   Page 99 of 100

Page 550

Q. Was that the sum and substance of their instructions to you, the organized crime task force?

A. Yes.

Q. And this was respecting an investigation in Philadelphia?

A. Investigation of a -- yeah, people in Philadelphia.

Q. And this would have been, I suppose, back before you even met Agent Fischer in the summer of 1998?

A. Yes.

Q. So between that instruction from the organized crime task force not to discuss any legal matters, up until the time that you received a memorandum of instruction.

MR. BERRIGAN: May I approach, sir?

THE COURT: You may.

Q. Up until the time that you received that document that I have just handed you, Government Exhibit 3, have there been any other instructions to you, Mr. McNeese, from any Government or law enforcement officials, as to how to conduct yourself in speaking to people that you were conversing with about their criminal activity?

A. No.

Q. Mr. Fischer gave you this particular document,

Page 551

Government's Exhibit No. 3?

A. Yes.

Q. And he gave it to you on April the 11, 2000?

A. Yes.

Q. Sir, could you read the next to -- your signature appears on the second page of that document, does it not?

A. Yes.

Q. We've received some information that you usually read legal information or documents very carefully. Did you read this document carefully?

A. I'm sure I perused it, yes.

Q. And the next to the last paragraph, sir, if I could direct your attention, begins, "However," do you see that?

A. Yes.

Q. "However, keep in mind that our function is to listen for and possibly elicit crime related conversations. Not to indiscriminately invade the privacy of our subject and others." Did you have any questions about that?

A. I don't recall.

Q. Did you prepare any calendars to indicate your conversations with Dr. Shultice, that is, when he had discussed certain matters with you, the contents of

Page 552

those discussions, specifically, when the discussions had occurred?

A. I kept notes, yes.

Q. You kept notes?

A. Yes.

Q. You kept notes from Dr. Shultice?

A. Yes.

Q. And you took notes?

A. Yes.

Q. And was this in a calendar form that you comprised similar to what you did with Ms. Johnson?

A. No.

Q. It wasn't?

A. I don't believe so.

Q. You did have an actual calendar that you used with Ms. Johnson to keep track of your conversations, is that right?

A. Yes.

Q. And whose idea was that?

A. It was my idea.

Q. Your idea?

A. Yes.

Q. In fact, that's not the first time you had used calendars to record information between yourself and other people involved in criminal activity, is it?

Page 553

A. No, it's not.

Q. The first time that you did that was back in 1995, in your own importation of heroin case, isn't that right?

A. The first time?

Q. Had you done it --

A. One of the times.

Q. Had you done it before? That was one of the times?

A. Yes.

Q. You remember that, don't you?

A. I remember making a calendar, yes.

Q. Because the calendar was blown up into a large exhibit that was used at your trial, wasn't it?

A. Yes.

Q. And your ex-wife went through that calendar line by line with the Assistant United States Attorney prosecuting you for importing heroin into the United States, isn't that true?

A. Yes.

Q. And your wife testified under oath repeatedly as to each entry that you had made up or falsified, the information in the calendar, isn't that true, Mr. McNeese?

A. Did she testify to that?