Page 554

Q. Yes, sir.

A. She testified and has also testified recently that, in fact, she had gave false information at that trial.

Q. I see. And not only did your wife testify that you had falsified this calendar, but the probation office conducting your presentence reports in that case gave you a two point adjustment for obstruction of justice based upon you having falsified the information in that calendar, isn't that true?

A. Yes.

Q. Your wife also testified under oath that you passed her notes while you were both incarcerated awaiting trial, indicating to her what her testimony should be. Did you hear that testimony when she testified against you?

A. Yes, I did.

MR. BERRIGAN: Could I have just a moment, Your Honor?

THE COURT: You may.

MR. BERRIGAN: Your Honor, the defense has unfortunately lost track of our exhibit listing. We think we're at X, but I wanted to check with the Court to see if he might have a record.

THE COURT: Let's see, I'm not sure I've kept

Page 555

very good track either.

MR. BERRIGAN: Well, we're going to --

THE COURT: W's been introduced.

MR. WILLETT: Yes.

MR. BERRIGAN: We're going to take a guess at X, if that's all right.

THE COURT: Sounds good.

Q. I'm going to finish, Mr. McNeese. There's one other thing I wanted to discuss with you, sir. Mr. Willett's going to have a few more questions if you permit us. Last October, specifically on October the 17, 2000, do you recall writing a letter to Mr. Richard Murphy, Assistant United States Attorney, here in Cedar Rapids, Iowa?

A. Yes.

Q. There's a suggestion -- let me show you the letter, sir. I'm handing you Defendant's Exhibit Number X. Do you recognize that three page document, Mr. McNeese?

A. Yes.

Q. It appears to be a photocopy of an original. Is that your handwriting that appears on that document?

A. Yes, it is.

Q. And did you sign it?

A. Yes.

Page 556

Q. And, in fact, does that appear to be a fair and accurate copy of the October 17, 2000, letter that you sent from -- sent to Mr. Richard Murphy?

A. Yes.

Q. All right. I want to direct your attention -- at this time, Your Honor, the defense will offer Defendant's Exhibit X?

THE COURT: Any objection?

MR. WILLIAMS: No objection, Your Honor.

THE COURT: X is received.

Q. I want to direct your attention, sir, to the second page of Exhibit X, the paragraph that begins "prior to the Johnson situation." Tell me if I'm reading this correctly, "prior to the Johnson situation, I agreed to aid Mr. Reinert in a meeting with Detective Wright, Detective Fischer, Mr. Reinert, Mark Meyer, and myself. Mr. Reinert had saw that he -- I'm sorry, had said that he was pleased with my cooperation, referring to Dr. Shultice, Mr. Garrett, Mr. Clark, and Mr. Dice. He stated that he would not have a problem recommending a 50 percent reduction on my life sentence. What he would do is 50 percent from thirty years, since my range was thirty years to life." Did I read that correctly?

A. Yes.

Page 557

Q. This suggests that Mr. Reinert, at some point before you wrote this letter, had agreed, irrespective of your cooperation in Ms. Johnson's case, to recommend to the Middle District of Florida that you receive a 50 percent reduction in your life sentence, or fifteen years, is that right?

A. Prior to the Johnson situation.

Q. Does that paragraph read prior to the Johnson --

A. Yes, it does.

Q. Yes, sir.

A. He did not imply or promise me a 50 percent reduction. I had, during the course of a conversation, had asked how they do it, and he said in this district, they do it by percentages, whereas in the Middle District, they do it by levels.

Q. I understand that Mr. Reinert has no control over what some federal judge in Florida may choose to do with you, Mr. McNeese, but did Mr. Reinert tell you, prior to the Johnson situation, he was pleased with you to the point, of your cooperation, that he would recommend to that judge that you receive a 50 percent reduction in your sentence?

A. I believe he said it was possible.

Q. Is there a possible in that paragraph that I missed?

A. No, there's not.

MR. BERRIGAN: That's all I have, thanks.

THE WITNESS: Thank you.

MR. WILLETT: Your Honor, if it please the Court, I'm going to resume questioning. It's going to take a few minutes to clean the deck. Does the Court wish to take a midmorning break at this time?

THE COURT: I don't wish to, but I know the court reporter would love one, so we will. So we'll be in recess for twenty minutes. We'll reconvene at 10:40. Thank you.

CONT. CROSS EXAMINATION
BY MR. WILLETT:

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

MR. WILLETT: Thank you.

Q. Mr. McNeese, let's start by discussing exhibits, and we'll start with some Government exhibits and then we'll talk about some Defendant exhibits. Yesterday during your testimony it was my understanding that you understood Government's Exhibit 3, which was the memorandum of instructions as to how to conduct yourself with Dr. Shultice, but a few months down the road you had some confusion or some questions about

Government Exhibit 4, which was the memorandum of instruction that you signed on September 11, did I understand your testimony correctly?

A. Yes.

Q. Now, sir, I have placed both exhibits in front of you. What was your confusion about Government Exhibit 4, based upon your prior instructions from the organized crime task force in Philadelphia, based upon your instructed conduct in the Shultice case, what about Government Exhibit 4 was confusing to you?

A. The same -- I mean, I asked questions on all of them.

Q. Specifically, as to what?

A. To try to clarify, you know, what was proper and what was not proper.

Q. Okay. And what were you trying to clarify in terms of your conduct with Angela Johnson?

A. During the course of our conversations, if I was able to -- if she talked about things, if I was able to respond to those things.

Q. And what were you told?

A. I was told that if it was in a situation where, in fact, she was asking something, that I could respond.

Q. Okay. And is that what you did?

A. A few times, yes.

Q. A few times, no?

A. Excuse me?

Q. A few times, no?

A. No, I said a few times.

Q. Okay. So you did attempt to elicit information on a few times?

A. No -- as I said, she would ask me a question and I would respond. I didn't say anything about elicit anything.

Q. You didn't violate the rules at all?

A. I believe that if she did ask me questions, I would answer, or if we were in a conversation, I would answer, discuss the conversation.

Q. Okay. Now, then, on Government Exhibit 3, Page 2, Paragraph D, you were told in that third full paragraph that you could possibly elicit crime related conversations, correct?

A. Right.

Q. And that's in regards to Dr. Shultice, correct?

A. Yes.

Q. Now, please turn your attention to Government Exhibit 4. Do you see the second full paragraph on the front page?

A. On the front page?

Q. Starts out "Although you remain incarcerated"?

A. Right.

Q. You were certainly trying to work out a resolution to your criminal conduct, which included cooperation, correct?

A. Yes.

Q. And that's stated there specifically in that paragraph?

A. Yes.

Q. And it goes on to say that you acknowledge, "you" meaning Mr. McNeese, acknowledge that you were not told to have contact with Angela Johnson or any other inmate incarcerated with you, correct?

A. Yes.

Q. However, that agreement goes on to detail how prior to this time, you had violated those perimeters, correct?

A. Yes.

Q. On September 3, a note that you were trying to send to Ms. Johnson was seized, correct?

A. Yes.

Q. And in that note, and also through your own oral admissions, you admitted prior contact with my client, correct?

A. Yes.

Q. And you certainly knew that that was not

Page 562

appropriate conduct, didn't you?

MR. WILLIAMS: Your Honor, I would object to the point in time. And also, I don't know if this came out right, but the exhibit says he was not told to have contact with Angela Johnson, not that he was not to have contact with Angela Johnson. There was a period where he was told not to have contact with her. He received no contact with her before saying not to have contact with her, so I think it's important to establish a time frame whether it's wrong or not.

THE COURT: Yeah, I think it would be helpful to have a time frame.

MR. WILLETT: Thank you, Judge.

Q. Starting on September 11, what was your understanding of what contact you could or could not have with my client?

A. From September 11 on?

Q. Yes.

A. That if I did have contact with her -- I mean, first of all, nobody wanted me to have contact with her. They were upset that I would, you know, do these things.

Q. But you did it anyway, right?

A. Yeah, but not only with Angie. I talked to every

Page 563

woman in that jail, wrote every woman in that jail.

Q. You also talked to a lot of other individuals and a lot of other jails before you ever met Ms. Johnson, correct?

A. Not females, so -- you know, I mean, I had been in prison for many years, and so I enjoyed writing letters back and forth with, you know, females, and you know, that was the whole -- that was -- I mean, in the beginning, when Angie and I started talking, it was nothing to do with her case. It was about, I mean, she was telling me things, but I was more trying to just be polite.

Q. You were still working -- at the time Ms. Johnson arrived in the Benton County Jail in July of 2000, you were certainly trying to work on a Rule 35B motion with the Government, weren't you?

A. Yeah, I don't know if I was working on one, but I was hoping for one.

Q. Certainly. And you were hoping for one by cooperating in different cases, correct?

A. My cooperation I believe had ended at that time.

Q. But you had already cooperated with the organized crime task force in Philadelphia, hadn't you?

A. Yes.

Q. You already had cooperated with federal

Page 564

authorities in California, hadn't you?

A. Yes.

Q. You had already cooperated on Dr. Shultice's case, hadn't you?

A. Yes.

Q. You had already cooperated on Scotter Clark's case, hadn't you?

A. Yes.

Q. You had already cooperated to some extent in the investigation of Geoffrey Garrett, correct?

A. Yes.

Q. All right. The second paragraph of Government Exhibit 4 basically details some of the prior violations of conduct in terms of communication with Ms. Johnson, correct? What had happened prior to September 3? What had happened around August 15?

A. I believe that was the weekend that I had learned that she was there. Actually, she was yelling, screaming at the deputy there or the jailer, and I had asked, you know, "Who's that over there," and actually I had asked Sarah, I believe.

Q. Well, let's put a time frame on that. What is your testimony as to when you first learned as to the arrival of my client, Angela Johnson?

A. I really don't know the date that she arrived. I

Page 565

mean, I can remember first -- my first contact with her.

Q. Okay.

A. And I'm not sure of the date of that either.

MR. WILLETT: Okay. May I approach the witness, Your Honor.

THE COURT: You may.

Q. Sir, I'm going to hand you what has been marked as Government Exhibit 5.

A. All right.

Q. Take a look at that for a moment and make sure you're familiar with it. I think you'll find that you are familiar with it.

A. Yeah, I believe this is Saturday, August 13.

Q. Okay. These are a series of notes that start on August 13 of 2000, and conclude on what appears to be September 10 of 2000, am I correct?

A. Yes.

Q. And these notes are in your handwriting, and this is your work product, isn't it?

A. Yes, it is.

Q. Okay. And the keeping and retention of notes was something that you had employed in other cases you had cooperated on prior to this time, correct?

A. I think it should be known that I keep notes for

everything.

Q. Okay.

A. And I have for many years.

Q. That's fine. Page 2 of Government Exhibit 5. Now, that's a notation on August 13 of 2000, correct?

A. Yes.

Q. Do you see the second full paragraph that starts out, "I then say"?

A. Yes.

Q. It says, "I then say, do you think they will ever find the bodies?" Did I read that correctly?

A. Yes, you did.

Q. You're trying to obtain information about my client's case, aren't you?

A. Well, if you'll go back to the first page, you'll see that Angie was speaking to me about what she was in jail for, talking about the bodies. I just asked. That was one of the, you know, things that I think -- this listening post was one of the reasons they were concerned about that, was because of things like this.

Q. Okay. And this occurred before you ever signed the September 11 listening post instruction, didn't it?

A. Yeah, they never told me about -- I mean, yes, it did.

Q. They never told you what?

A. Well, I mean, you're trying to make it seem like I interrogated her, when, in fact, I didn't. She was more than willing to discuss who she was and what she had done. And for me not to respond to her questions or what she discussed with me would, you know, be highly unusual, so in the course of the conversation, when the bodies were mentioned, I did ask her, "Do you think they'll ever find the bodies?"

Q. And you asked her questions about the case during this time period, didn't you?

A. I -- I partaked in a conversation with her.

Q. Okay. Would you please turn to Page 6 of Government Exhibit 5. That's your notations from August 18 of 2000, am I correct?

A. Yes.

Q. The first paragraph, "I say to Angie, hopefully you can get out of this entire mess." You were trying to be friends with her during this incarceration, weren't you?

A. Actually, yes.

Q. Okay. Two paragraphs down, I ask, "Why were you talking to her about it anyway?" Did I read that correctly?

A. Yes, you did.

Q. Once again you are -- you're asking a question during these conversations, correct?

A. Well, as I previously said to you, above that, you know, where Angie said -- I'm not going to just ignore what she had said. I mean, of course I'm going to respond.

Q. Okay. Page 10 of Government Exhibit 5. Would you please turn to that page, sir. Do you see the paragraph in the middle that starts out "Angie asked me"?

A. Yes.

Q. "Angie asked me, 'Can they give me the death penalty?'

"I told her, 'No, I don't think so.'

"Then asked, 'Did the people die before April 1 of 1996?'

"Angie said, 'Yes.'"

You're asking her questions about the case again, aren't you?

A. Well, again, she had asked me a question.

Q. Okay.

A. She had asked me about the death penalty.

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

Q. In fact at one point you sent correspondence to my client giving her your jailhouse lawyer advice about the death penalty, didn't you?

A. Yes.

Q. Defendant's Exhibit M, is that your handwriting, sir?

A. Yes.

Q. That's your work product?

A. Yes.

Q. That's your letter to my client, Ms. Johnson?

A. I think this is the -- the last page of a letter.

Q. Okay. Do you have any memory as we sit here today as to when you might have penned that letter to my client?

A. Well, I'm sure there's additional pages. We'd probably have to look at the top of the page. I'm sure it's dated.

Q. Just as we sit here today, do you have an independent memory of when you might have written that letter?

A. Sometime probably after August 20, when she had discussed the death penalty with me.

Q. Okay. So sometime after August 20, you passed on your thoughts about the federal death penalty statute?

A. When she asked me, yes.

Q. Okay. And in the third paragraph of that letter, you say, "If the people died prior to September 1994, then you cannot face a punishable sentence of death. See Page 988, Section 3281." Am I correct?

A. At that time, I thought that there was no death penalty applied, but I've learned I was wrong.

Q. Okay. And let's go on to the next paragraph so we can discuss this in context, "Therefore, the offenses are not capital and have a five year statute of limitations. See Page 988, Section 3282." Did I read that correctly?

A. Yes.

Q. The compliment for the day is every member of my defense team was impressed. How did you learn that?

A. I don't understand.

Q. Did somebody tell you that? Did you read it? Did you research it? Did your lawyer, Mr. Meyers, pass that on to you?

A. Why don't you ask Mr. Meyers that.

Q. You're on the stand, sir. How did you find out?

A. I really don't know. I knew that they had -- the Antiterrorism Crime Bill Act sometime was initiated after '95 or '96, somewhere around there, and I didn't think that there was any death penalty, you know. As you know, it was the wrong advice.

Q. But do you have a memory as to how you came upon that information?

A. No.

Q. Okay. And then the last paragraph of this letter -- oh, excuse me, I forgot, you have a PS, "ex post facto applies"?

A. Does it apply?

Q. Do you know what the ex post facto provision is, sir?

A. No.

Q. Okay. How did you know to write it down?

A. I really don't. I mean, as I say, if you'd probably give me the first page of this letter, it would probably, you know, refresh my memory as to what book I used or what newspaper or wherever I read it at.

Q. Okay. Obviously, you sign-off with your first name, you make -- is that your smiley face that you drew?

A. Yes.

Q. Okay. But the paragraph right before your signature, I'll be out after dinner tonight and talk to you about it?

A. Correct.

Q. Did I read that correctly?

A. Yes.

Q. Talk to her about these issues concerning the death penalty?

A. Yes, she had asked me to.

Q. Talk to her -- excuse me, I'm sorry.

A. Yes, she had asked me to talk to her about it.

Q. Talking to her about her case, correct?

A. Talking to her about the death penalty.

Q. Okay. Now, you wrote another letter to my client early on in her incarceration, didn't you?

A. Possibly, yes.

Q. Okay. Let me place in front of you what has been marked as Defendant's Exhibit L. Is that your handwriting, sir?

A. Yes, it is.

Q. Your signature?

A. Yes, it is.

Q. Your work product?

A. Yes.

Q. The letter's undated, isn't it?

A. Yes.

Q. Would you agree with me that from the contents of that letter it's almost like a letter of introduction?

A. Correct.

Q. Okay. So you -- was that the first letter you

ever sent my client?

A. I don't remember.

Q. Okay. Do you have any idea when you sent it?

A. No.

Q. Would it have been shortly after you learned that she was in that jail?

A. Yes.

Q. Now, in that letter, you mention some of the things you're facing, correct?

A. Yes.

Q. Racketeering charges?

A. Yes.

Q. You mentioned that people may think you're violent?

A. Yes.

Q. You dispute that description?

A. Yes.

Q. Okay. Just sort of letting my client know who you are and what's up about you, huh?

A. Yes.

Q. Okay. If I may. Thank you. Government Exhibit 5, is that still in front of you?

A. Yes, it is.

Q. Okay. Page 12, please. Top of the page, on Friday, September 1, you wrote my client a letter,

correct?

A. Yes.

Q. On Sunday, September 3, you wrote my client a letter on that date, didn't you?

A. She wrote me also, yes.

Q. Okay. But you also wrote a letter?

A. Yes.

Q. Now, when you say -- when you mention Jailer Andy, is that Andy Rich?

A. From Benton County?

Q. Yes.

A. Yeah.

Q. And what was your relationship like with Jailer Rich?

A. He was the jailer.

Q. Okay. Was he aware that you were passing notes with my client?

A. No.

Q. Okay. Did he facilitate your passing notes in any way?

A. I think that I may have asked Andy to pass magazines to Angela, and I would have letters hidden in there, but if I had ever asked him to pass letters, no.

Q. Okay. On Tuesday September 5, you wrote a letter

to my client, didn't you?

A. In response to a letter that I received from her.

Q. Okay. And on Wednesday September 6, you spoke to my client outside, correct?

A. Yes.

Q. Tell me about that. Were you in the same hallway, or what was going on?

A. Where it says "spoke to Angie outside"?

Q. Yeah.

A. No, I would be in the rec. area. They would knock on the window.

Q. Was there ever a time during your incarceration at the Benton County Jail when my client Ms. Johnson was there that you were able to speak to her face-to-face for approximately ten or twenty seconds without any monitoring from law enforcement or jailhouse staffers?

A. Yes.

Q. When was that?

A. I can't recall the date.

Q. Okay. Who allowed that to happen?

A. I don't think anyone actually allowed it to happen. I believe it was an error on the part of a jailer.

Q. What did you say to her?

A. I can't recall.

Q. Okay. Now, on Wednesday, September 6, you got to meet DCI Agent Basler, correct?

A. Yes.

Q. And we'll talk about that a little later. On Friday, the 8th, you have a notation that you were told to only be a listening post and not to write any notes to Angie, correct?

A. Yes.

Q. And not to ask Angie any questions determining her case, correct?

A. Yes.

Q. Now, after September 8, you continued to write notes to my client, didn't you?

A. Yes, I did.

Q. And after September 8, you continued to talk to my client about her case, didn't you?

A. I believe that she was talking to me about her case, and again, I would -- during the course of the conversation, it would seem odd if I didn't say certain things.

MR. WILLETT: Okay. May I approach the witness, Your Honor.

THE COURT: You may.

MR. WILLETT: Thank you.

Q. Mr. McNeese, I'm going to put in front of you what

has been previously marked as Government Exhibit 6, have you turn your attention to that. Have you had a chance to peruse that exhibit, sir?

A. Yes.

Q. Okay. Your handwriting?

A. Yes.

Q. Your work product?

A. Yes.

Q. Your notes from September -- Monday, September 11, through it appears to be Sunday the 24th?

A. Yes.

Q. Back to Page 1, very top of the page, Monday, 11th, "I turned over to Pete Wright per his instructions notes I had made dating September 1 through September 11 concerning Angela Johnson." What had Pete Wright told you about making notes?

A. I don't understand what do you mean, what did he tell me?

Q. It says "Turned over to Pete Wright per his instructions notes I had made." What were Pete Wright's instructions to you, sir?

A. I believe in September that Angie was discussing with me escaping and committing some additional violent acts. I believe that I was informed that, and law enforcement was very concerned of her desire to

escape and to harm other individuals, and that they -- they had requested that I keep notes of those conversations.

Q. The notes also involved conversations about my client's case, didn't they?

A. Yes.

Q. Okay. The very bottom of Page 3 of Government Exhibit 6, "I told Angie I am pleading guilty to money laundering so the US Attorney does not recommend lock-down at ADX Florence"?

A. Yes.

Q. How did you come upon the information that someone was going to recommend lock-down at ADX Florence?

A. I think that during the course of my trial or sentencing in Florida, when I was taken to Atlanta Penitentiary, I was informed there that if I screwed up, I would be going to ADX.

Q. Okay. And just for the benefit of all, ADX Florence is what some people refer to as the super max penitentiary?

A. That's correct.

Q. Where people like John Gotty and Manuel Noriega are serving their sentences?

A. Manuel Noriega is serving his in Florida and John Gotty is serving his in Springfield, Missouri.

Q. I'm glad you're up-to-date on that. There's not many benefits in that prison, are there?

A. I have never been there, sir.

Q. Okay. What's the purpose of telling Angie this? Is time beginning to be of the essence?

A. No, I don't believe so.

Q. Well, you don't have -- you don't have maps yet on September 12, do you?

A. No, no, I don't.

Q. Did anybody at the US Attorney's Office in the Northern District of Iowa suggest that you should be locked down at ADX Florence?

A. No, not that I'm aware of.

Q. Okay. And then on Page 5, at the top of that page, there's a notation on Thursday the 14th, correct?

A. Yes.

Q. And once again, you gave notes dated 9-11 to 9-14 to Pete Wright per his instructions, correct?

A. Yes.

Q. Page 10, bottom third of the page, notation, Tuesday the 19th, do you see that, sir?

A. Yes.

Q. "I spoke to Mr. Basler twice today concerning my role and asked him to contact Mr. Reinert." Why did

you contact Mr. Basler twice about your role?

A. Again, I was having some confusion as to what exactly I was permitted to do or not to do. I mean, I didn't want to violate, you know, anything.

Q. You certainly had prior interaction on other cases when you were given instructions, didn't you?

A. The instructions that -- on other cases were not as complicated for some reason.

Q. What reason?

A. I didn't have people asking me questions and -- as far as referring to Ms. Johnson wanting to ask me millions of questions.

Q. Okay. You certainly testified earlier yesterday and today that when it came to your instructions in Shultice you had no trouble understanding those instructions, correct?

A. I'm sure I did have questions.

Q. But you understood what to do?

A. I think that Mr. Shultice and Ms. Johnson are totally different types of situations.

Q. Okay. And in your notes on the following page, on Page 11, at the top of the page, you write, "It is okay for me to discuss the subject with her again as long as I did not bring the subject up." Did I read that correctly?

A. Yes.

Q. Page 12, the first large paragraph at the top of the page, there's a discussion of weapons, correct?

A. Yes.

Q. Now, you write in there, "Since she was talking about the gun, I figured it was safe to ask her where the gun was." Did I read that correctly, sir?

A. Yeah, she wanted a gun to use in an escape, so I wanted to know where it was at, yes.

Q. Okay. And then at the top of the next page, on Page 13, it says "I spoke to Angie about cooperating with the authorities," correct?

A. Yes.

Q. Now, you knew she had a lawyer, didn't you, at that time?

A. Yes.

Q. And you certainly knew who her lawyer was, didn't you?

A. I believe that I was discussing my case where my ex-wife had testified against me.

Q. I understand that, but my question was that at the time of this notation, which appears to have been dated somewhere around Tuesday the 19th of September, you knew who -- you knew that my client had a lawyer, didn't you?

A. I knew that you represented her, yes.

Q. Thank you. Middle of that page, on Page 13, Wednesday, 20th, "Spoke to Mr. Basler about a jailer here, Bill, who has been asking questions about Angie and I. Pete Wright was contacted by Mr. Basler or Mr. Reinert, informed of the situation. Pete called and I spoke to him about the jailer, Pete -- excuse me, to him about the jailer, period. Pete told me he would take care of it." Why did you tell Mr. Basler about Bill Reese?

A. If you'll notice that these notes concern Angie's desire to escape and to murder a jailer. I was told that I could speak to her about that.

Q. You didn't want anybody finding out what you were doing with Angie, did you?

A. Well, Bill was asking questions that I felt I wasn't in a position to answer, so I contacted Mr. Basler.

Q. What kind of questions was Bill asking you?

A. Well, just wanting to know, you know, if I had something going on with Angie, you know. I mean, he's chased me from -- not chased, but he had seen me talking to her before, and has told me that -- to leave, put me back in my cell and stuff like that.

Q. Page 15, Saturday the 23rd, top of the page, "I

told her that you would have to trust me 100 percent and also be truthful and honest with me. I additionally explained to her that I would have to ask my friend if he would help." You're certainly trying to gain her trust, aren't you?

A. Again, this -- what this is stating is that, in fact, she had learned that Dustin was going to, I guess, try to kill her or something. She had learned that from one of her attorneys. Dustin had a gentleman in Colorado who was going to come forward and lie.

Q. Okay. And that's a -- that's a story that was discussed between you and Angie, wasn't it?

A. She discussed that with me, yes.

Q. But you also said you knew somebody who was serving a life sentence at Fort Leavenworth who could fill that role, didn't you?

A. Well, what happened was --

Q. Excuse me, sir, could you answer that question before you answer my question with a different answer?

A. Well, you're trying to ask me questions that you're taking clearly out of context, which --

Q. We'll let the judge decide who is out of context. You had somebody at the federal penitentiary in Fort

Leavenworth that you suggested to my client could fill the role as someone who could admit guilt for what my client was charged with, correct?

A. After she said Dustin -- she didn't want Dustin to do it, yes.

Q. Now, then, you certainly never told my client that you were cooperating with the Government, did you?

A. No.

Q. Never told any of the other people you cooperated against what you were doing when you were doing it to them, did you?

A. No.

Q. And I believe you told me that you've been in jail roughly half of your adult life?

A. Yes.

Q. And were you aware that my client had never been in jail a day of her life before these charges were brought?

A. No, actually, I didn't know that.

Q. And one of the threads of this Saturday the 23rd communication is you want her to trust you so you can help her, right?

A. Yes.

Q. Government Exhibit 7, your handwriting, sir?

A. Yes.

Q. Your work product?

A. It's in my handwriting, yes.

Q. Okay. Your notes?

A. My notes, yes.

Q. Okay. I'm curious about something, at or about the time that you prepared Government Exhibit 7, were you upset with the US Attorney's Office?

A. Yes, I was.

Q. Okay. And you threatened to withdraw your guilty plea to the money laundering charge, correct?

A. I hadn't pled guilty yet.

Q. Okay. But you -- didn't you try to send a note or -- send a note to Mr. Williams and Mr. Reinert and Mr. Wright and Judge Melloy that you would be withdrawing your plea and you would not be pleading guilty?

A. I could have, because of me being in the hole, yes.

Q. Okay. And you think that that was around the time you were in the hole?

A. Yes.

Q. And that would have been from September 26 to October 2?

A. Yes.

Q. Okay. Does that help to refresh your memory?

A. Yes.

Q. Okay. Your handwriting, your signature, your statement?

A. Yes.

Q. Why were you upset that you were in the hole?

A. I wasn't really upset about the hole. I was upset about the situation that got me in the hole.

Q. What got you in the hole?

A. What got me in the hole?

Q. Yes.

A. The guys from Benton County came in and -- or I'm sorry, I got upset with Mr. Williams and Mr. Wright earlier that day.

Q. About what?

A. They came out to the jail, discussed with me that they were part of a taint team.

Q. Good point. What was your understanding of what a taint team was?

A. I was just told then that a taint team was someone that was a go-between. Actually, I believe they used the term Chinese wall.

Q. What was your understanding that it was necessary in this situation, where you were cooperating against my client?

A. I think because they didn't want any inference on

it that I was pumping her for information or that Basler or Pat Reinert learned any -- learned any of the information.

Q. Okay. And prior to that time, upon your meeting with Mr. Williams and his colleagues, you had sent notes to my client, correct?

A. After that meeting?

Q. Before.

A. Yes.

Q. You had spoken to her outside her cellblock window, correct?

A. Yes.

Q. Okay. And you had talked to her about her case prior to September 26?

A. She talked to me about her case, yes.

Q. Okay. And you asked questions, didn't you?

A. Again, I was part of the conversation.

Q. Mr. McNeese, turn your attention to Government Exhibit 9. That's your handwriting, sir?

A. Yes, it is.

Q. Okay. Your letter to Mr. Reinert?

A. Yes.

Q. Okay. Starts out by saying "I understand you were having me plead guilty Thursday morning"?

A. Yes.

Q. And that would be the following Thursday?

A. (Witness indicated affirmatively.)

Q. Correct?

A. I believe so, yes.

Q. Was your guilty plea somewhere around the -- either September 21 or September 28 of last year?

A. September 29, I think.

Q. Okay. You see the second full paragraph where it starts out "The Saturday newspaper"?

A. Yes.

Q. "The Saturday newspaper article actually worked very well with Angela Johnson." Did I say that correctly, sir?

A. Yes.

Q. Okay. Let me place in front of you Defendant's Exhibit N. The Gazette, Saturday, September 16, 2000. Had you conveyed that article to my client?

A. Did I give that to her?

Q. Yeah.

A. No.

Q. Okay. Well, what do you mean "The Saturday newspaper article actually worked very well with Angela Johnson"?

A. I had asked that my -- I had asked that the cooperation that I was giving not be put in the

newspaper.

Q. Okay. That article talks a lot about you, doesn't it?

A. Yes, it does.

Q. It talks about your connections to organized crime?

A. Yes, it does.

Q. Okay. Well, your sentence in your letter to Mr. Reinert says "The Saturday newspaper article actually worked very well with Angela Johnson"?

A. Yes.

Q. Trying to impress her?

A. Trying to make sure that the article didn't say that I was an informant.

Q. How did you get the idea for the article?

A. It wasn't my idea to write the article.

Q. How did you get the idea that the article should be conveyed to Ms. Johnson?

A. I don't understand what you mean "conveyed." I don't understand.

Q. Well, let me read this sentence of your Government exhibit again, "The Saturday newspaper article actually worked very well with Angela Johnson." And we have a Gazette article of Saturday, September 16, 2000, "CR Man Facing Additional Mafia Charges,"

written by Mr. Smith, talks all about your history, all about your conduct in the Scotter Clark case, and it would appear from your letter of September 19, 2000, to Mr. Reinert, that this article was conveyed to my client?

A. I don't understand. What do you mean, Mr. Reinert conveyed?

Q. Well, you -- isn't the letter to Mr. Reinert dated September 19, 2000?

A. Right.

Q. The first sentence of the second paragraph, "The Saturday newspaper article actually worked very well with Angela Johnson." Here it is, big as life.

A. Well, I think what you're trying to get at is -- well, I mean, Mr. Smith is in the courtroom and he is a friend of mine. I had asked Mr. Smith not to, you know, and he said he would do that, and I had informed Mr. Reinert of that.

Q. So did anyone tell you to get this article to my client?

A. No.

Q. Okay. And you didn't facilitate the conveying of this article to my client --

A. No.

Q. -- trying to impress her about your abilities with

organized crime?

A. No.

Q. So what did you mean when you wrote down that sentence?

A. That it worked very well?

Q. Yeah. What did you mean?

A. That, in fact, Angie read the article, that it would not, you know -- it would not show that I was cooperating with the Government.

Q. So you knew Angie read the article?

A. Well, I knew that Angie received the Cedar Rapids Gazette, and I knew that that article was in the Gazette.

Q. And did you have communication with her that she had indeed read this article?

A. Yes.

Q. Was she impressed with you?

A. I don't know if she was impressed or not. She seemed -- she seemed happy about it.

Q. Let's turn to your federal plea agreement for a second that resolved your money laundering prosecution by Mr. Reinert. Government Exhibit 14, Mr. McNeese. I think you'll find that that's the final draft. I mean, I realize there were intermediary drafts, but that's the one you approved of, and take a look and

see if you agree with me.

A. Yeah, this is -- that's correct.

Q. Okay. Dated September 7, 2000?

A. Correct.

Q. Signed by you and your counsel, Mr. Meyer, on September 12?

A. Yes.

Q. Signed by Pat Reinert on September 12?

A. Yes.

Q. Okay. Page 2 of the exhibit, Paragraph 4, the first paragraph under "cooperation"?

A. Yes.

Q. "Defendant agrees to fully and completely cooperate with United States Attorney's Office and other law enforcement agencies in the investigation of criminal activity, within the Northern District of Iowa and elsewhere," correct?

A. Yes.

Q. No limitations to what cases we're talking about in that paragraph, is there?

A. Standard plea agreement. I don't believe so.

Q. Okay. So you could certainly read that to mean that you could cooperate in the investigation of any criminal activity at that point, correct?

A. Yes, you could read it like that.

Q. Okay. You could do that by providing intelligence information, correct?

A. Yes.

Q. You could do that by providing information to secure search warrants if necessary, correct, Subparagraph D?

A. Yes.

Q. Subparagraph E, to provide testimony before the Federal Grand Jury or testimony in court, correct?

A. Yes.

Q. You could provide any documents or items in your custody, that are relevant to this or any related investigation, correct?

A. Yes.

Q. So this was given you carte blanche, wasn't it? It was open hunting season on any criminal activity that you had knowledge of, wasn't it, sir?

MR. WILLIAMS: Objection, calling for speculation and conjecture, Your Honor.

THE COURT: Overruled.

A. Not at all. As you know, it's a standard plea agreement here, the Government gives all individuals.

Q. It may be a standard plea agreement, but in regards to Paragraph 4, there's no limitation as to the language as to what criminal activity we're

Page 594

talking about, is there?

A. Again, standard plea agreement, there's not.

Q. Okay. And you admitted that a few minutes ago, didn't you, that there was no limitation as to the perimeters of Paragraph 4, in the investigation of criminal activity within the Northern District of Iowa and elsewhere, not just Scotter Clark, not just Dr. Robert Shultice, not just Jeff Garrett; criminal activity?

A. And again, I believe that that's standard in any plea agreement with the Government.

Q. Okay. And you certainly tried to continue to cooperate on Angela Johnson after that time, didn't you?

A. Yes.

Q. Paragraph 16 of your plea agreement, on Page 7, that's not a standard paragraph in any federal plea agreement, now, is it? That talks about what the US -- what the United States and the United States Attorney's Office in this federal district will and will not do in regards to placing the United States Attorney's Office for the Middle District of Florida on notice about a motion to reduce your life sentence, doesn't it?

A. That they possibly would, yes.

Page 595

Q. Okay. And they agreed to notify the US Attorney's Office for the Middle District of Florida of the nature and extent of your cooperation, correct?

A. Yes.

Q. And the final decision, I guess, comes from the Middle District of Florida about a Rule 35 to reduce your life sentence, doesn't it?

A. Yes.

Q. And regardless of what the US Attorney's Office for this district may think of you at this point, it's still up to the Middle District of Florida, correct?

A. Yes, it is.

Q. So when you signed this on September 12, you were still trying to actively cooperate to gain a benefit with the US Attorney's Office from the Middle District of Florida, correct?

A. I was still cooperating, yes.

Q. And you knew it was premised at least in part on the extent of your cooperation, correct?

A. I don't believe that I was thinking on that line.

Q. Okay. There's one other provision in this we're going to talk about. We're not going to talk about it right now, okay. And just so you know what I'm talking about, Page 8, Paragraph 22, you don't have to say what it is. We're going to talk about this later,

Page 596

okay?

A. Well, I'll tell you now.

Q. No, no.

THE COURT: No.

MR. WILLETT: The judge doesn't want to handle it that way.

THE COURT: We're not going to get into it now. We're going to have a closed hearing on that.

THE WITNESS: That's fine.

Q. Did you ever send Ms. Johnson newspaper articles about the history of your money laundering cases that was being reported in the Cedar Rapids Gazette?

A. I believe I did.

Q. Okay. Let me place in front of you Defendant's Exhibit O. Mob associate McNeese pleads guilty, which I assume would be an article written by the Cedar Rapids Gazette, sometime very shortly after your guilty plea?

A. Yes.

Q. And we know that that was sometime after -- well, excuse me, I guess it was in late September, correct?

A. Yes.

Q. What's the purpose in sending that to Ms. Johnson?

A. I believe that I left the facility, and I wanted to let her know that I went to court to plead guilty.

Page 597

Q. Why did you want her to know that?

A. I didn't want her to think that I had left the facility to testify against anyone.

Q. Okay. Including her?

A. Correct.

Q. If I may retrieve that, please.

MR. WILLETT: Your Honor, if you give me one moment, I'm trying to find an provision in one of these Government exhibits.

Q. Did you ever offer to write a letter to Leon Spies on Ms. Johnson's behalf?

A. Yes.

Q. Why?

A. She had asked me to.

Q. Okay. And just for the purposes of the record, who is Leon Spies?

A. He's an attorney from Iowa City.

Q. Okay. Criminal defense?

A. I believe so, yes.

Q. Okay. And you had suggested that maybe Angie should obtain different counsel?

A. When you told her that I was a rat, an informant on your associate and your client Dr. Shultice, she didn't believe it. She said that you refused to go to Colorado to speak with Dustin and this other person

that was going to admit to doing the crimes, and so she wanted you -- actually, her sister had contacted Leon Spies, and he agreed to represent her, but she would have to write a letter and so on and so forth, so I stated that I would write the letter for her.

Q. Now, you denied being a rat, didn't --

A. Yes, I did.

Q. Okay. And did you tell her that I would plea her and that I wouldn't defend her and that's what I did with my clients, that I didn't go to trial?

A. Well, I think, let the record show that.

Q. Okay. We're here in court, aren't we?

A. Yes, we are.

Q. So are you saying you never said those things to her?

A. What's that, that you like to plead your clients out?

Q. Yeah, and that I never go to trial.

A. No, you go to trial, maybe three or four out of every hundred.

Q. Okay. We'll let the record reflect what it reflects, won't we?

A. Yes, we will, sir.

Q. Okay. There's several examples of this, Mr. McNeese, but I just pulled out one page so we

could discuss it. Let me hand you Government Exhibit 13, and ask you to turn to Page 9. Do you see that there?

A. Yes.

Q. Copy of an envelope?

A. Yes.

Q. Legal papers?

A. Yes.

Q. Bobby?

A. Yes.

Q. Is any of that your handwriting?

A. What, on the envelope?

Q. Yes.

A. The date.

Q. The date is your handwriting, okay. You would pass notes to my client, wouldn't you?

A. What?

Q. You would pass notes to my client, correct?

A. Yes.

Q. And would you put them in envelopes?

A. Sometimes, yes.

Q. Were they Benton County Jail envelopes?

A. Yes.

Q. Would you ever put anything on the front of them?

A. Yes.

Q. What?

A. "Angie," "legal papers," several different things.

Q. Okay. Government Exhibit 13, Page 20, right, at the very bottom, do you see that, "help me"?

A. Page 13?

Q. Yeah. Excuse me, Exhibit 13, Page 20, I apologize.

A. Yes.

Q. "Help me to trust you 100 percent. I can't just do it on my own. I'm too scared. I'm sorry, baby. Don't be mad at me. I know you can't help me unless I help myself, but something is holding me back." That was before you had any maps, wasn't it?

A. Yes.

Q. Okay. So what did you do?

A. I don't know the date on this.

Q. What did you do to get her to trust you?

A. There's no date on this that I'm aware of.

Q. Okay. But what did you do to get her to trust you?

A. Talked to her.

Q. Okay. Told her you were leaving soon, that you were going to be moved out because of your guilty plea?

A. Did I think that?

Q. I didn't hear you this time.

A. Did I think I was going to get moved out?

Q. Did you suggest to her that you needed to know something soon because you were going to be moved out because of your guilty plea?

A. Not that I can recall.

Q. What else did you do to have her trust you, besides talk to her?

A. Just talked to her.

Q. Okay. And you've gotten other people to trust you in the past, haven't you?

A. You trusted me.

Q. Shultice trusted you, Garrett trusted you?

A. Yes.

Q. Correct?

A. Yes.

Q. Scotter Clark trusted you?

A. Yes.

Q. Your childhood friend, Mr. Dice, trusted you?

A. Yes.

Q. Did you tell DCI Agent Basler that on one occasion you were allowed by a Benton County jailer to meet with Angela Johnson face-to-face?

A. No.

Q. You never said that to him?

Page 602

A. I believe I told Mr. Basler that I had ran into Angie.

Q. Okay. But you never said to him that you were allowed by a Benton County jailer to meet with Angela face-to-face?

A. Not that I can remember.

Q. Is it possible?

A. I don't believe so, no.

Q. Okay. You had a direct phone number that you could use to contact Detective Fischer?

A. I had his -- the police department phone number.

Q. Okay. Besides meeting with -- did you meet with Mr. Reinert on September 11 when you signed the memorandum of instruction?

A. No.

Q. Did you meet with Mr. Reinert on September 12 when you signed the plea agreement?

A. Yes.

Q. Did you talk about the status of your cooperation in this case at that time?

A. I don't believe we did.

Q. Okay. Did you have any other meetings with Mr. Reinert where you discussed the status of your cooperation in this case?

A. I met with Mr. Reinert several weeks ago

Page 603

concerning -- concerning me being upset with the Government.

Q. Okay. Why were you -- excuse me, we're going to leave that for later, as to why you would have been upset, how's that, we'll leave that for a little bit later today. You're certainly hoping you can get a Rule 35 reduction, aren't you?

A. Yes, I'm hoping.

Q. Okay. What are your expectations as you sit here right now?

A. My expectations?

Q. Uh-huh.

A. That I don't die in prison.

Q. Okay. Are you hoping to have a life sentence reduced to fifteen years?

A. I'm hoping to have my life sentence reduced, yes, but no one can promise me that. It's left up to the judge out there.

Q. If this has been asked of you previously, I apologize. Did the Government know you had a private investigator working for you?

A. I believe they learned later.

Q. Do you know when later was?

A. No, I don't.

Q. You were discussing the Shultice case with my

Page 604

co-counsel, Mr. Berrigan, yesterday. In regards to Dr. Shultice, you said "I introduced him to my friend," do you remember that testimony?

A. Yes.

Q. Your friend was Special Agent Greg Brugman, wasn't it?

A. I -- what's his name?

Q. Greg Brugman, a tall gentleman, balding.

A. Gus, Gus is all I know him by.

Q. Gus, okay.

THE COURT: Mr. Willett, we're going to have to take a noon break. I may keep it a little bit less than an hour.

MR. WILLETT: I'm close, Your Honor.

THE COURT: Do you want to stop now or do you want to keep going?

MR. WILLETT: I'd like to forge ahead in the interests of time, but I am close. I'm just trying to go through my notes and pick up any spare parts.

THE COURT: Okay.

Q. Now, you were told at the Benton County Jail not to pass notes or yell through the walls, weren't you?

A. Yes.

Q. That's something you chose not to do, correct?

A. Correct.

Page 605

Q. And you were the first one to make contact with Ms. Johnson, weren't you? You yelled through the wall first, I believe you testified to?

A. Yeah, I was wanting to know who the crazy woman was yelling.

Q. Okay. This discussion with Pete Wright and Les Woods around August 14, did you have any notes or did you not have any notes from my client?

A. As you know, I did have notes.

Q. Okay. So you were lying to Agent Wright initially because of Mr. Woods' presence?

A. I was just -- yes, yes, I guess I was lying.

Q. And I believe you testified yesterday that you weren't sure if these notes that you had in your possession around August 14 were valuable to law enforcement, "I wasn't sure"?

A. Yeah, I wasn't sure.

Q. You certainly have been in several cooperation situations before that, hadn't you?

A. Yes.

Q. And my understanding is you kept notes, correct, or made notes on your own in prior situations?

A. Yes.

Q. You would try to collect notes from the people you were talking with if that was feasible?

Case 3:08-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 13 of 100

A. I don't know about tried to. I don't believe that I tried to keep notes from other people.

Q. Tried to have people taped or monitored if that was feasible?

A. Yes.

Q. Certainly tried to talk to them, gain their trust, gain their rapport?

A. Yes.

Q. And you weren't sure if the notes were valuable?

A. Well, if you read the notes, I don't believe they contain much of anything.

Q. Okay. And Pete Wright told you on or about August 14, no contact, correct?

A. Yes.

Q. And you certainly continued to have contact between then and September 3, didn't you?

A. Yes, I did.

Q. Where were these book cabinets where the books and magazines were kept which is what you say were used as a vessel for these notes? And I tell you what, I think we still have Government Exhibit 2 up there. Yeah. Would you agree with me, sir, that that appears to be a floor plan of the Benton County Jail?

A. Yes.

Q. Okay. Can you just indicate from where you're

standing where the book and magazines were?

A. Yes, where it says booking area.

Q. Booking area?

A. Yes.

Q. The shelves are in the booking area?

A. The booking area is like this. The shelves are down below.

Q. Okay. That's an area that the jail staff has access to, correct?

A. Yes.

Q. Was there a certain book that was the vessel or is there a certain place on the shelf that was the area?

A. A certain place on the shelf.

Q. Okay. Still in an area where jail staff had access to it?

A. They've got access to the whole jail.

Q. Now, you had a note intercepted on September 3 by Jailer Rich, correct?

A. I had a note intercepted, yes.

Q. Okay. But you also had notes intercepted two weeks, three weeks before that in the middle of August, correct?

A. I think so. I can't really remember.

Q. So you certainly knew after the middle of August that there was a possibility that your notes could get

intercepted if you continued to pass them, correct?

A. Yes.

Q. And you kept doing it, kept passing notes?

A. Yes.

Q. After August 14, after September 3?

A. Yes.

Q. After September 11?

A. Yes, I did.

Q. After September 12?

A. Yes.

Q. Have we discussed all the reasons as to why you were upset about being searched and having your cell shook down after September 26? Did we forget to mention anything?

A. I don't think so.

Q. Okay. Do you think it was basically a form of disrespect to you?

A. What do you mean?

Q. Well, you didn't like being treated that way, did you?

A. No, I didn't like being treated that way.

Q. And it's your testimony that you never tried to threaten anybody with a piercing-like object or threaten anybody with any liquid or any other type of object?

A. There was no liquid available, and I had no object --

Q. Okay.

A. -- that was in my cell.

Q. I believe you stated yesterday that you told them "I got something in there you'll never find"?

A. I told Pete Wright that, yes.

Q. Was that a lie?

A. Yes.

Q. You're in the hole from October -- from September 26 to October 22?

A. Yes.

Q. And then the very next day, you were moved, October 3?

A. I believe so.

Q. You wanted out of the hole, didn't you?

A. I would have liked to have got out, but I had books, so I was all right.

Q. Now, you gave some other reasons to Mr. Berrigan as to why you were cooperating, but the common theme throughout all these cooperations is you'd like to get your life sentence reduced, correct?

A. Yes.

Q. What was your life-style that you had in prison? You mentioned to my co-counsel that you wanted to

"continue the life-style I had in prison." What life-style was that?

A. Just being with my friends, walking the yard together.

Q. And at one point during the Scotter Clark case, I believe you said you refused to go to the Grand Jury?

A. Yes.

Q. Why?

A. I didn't want to.

Q. Why not?

A. During the course of my cooperation, I didn't, you know -- I mean, I didn't want to cooperate any longer.

Q. And why was that?

A. I think that I wanted to continue to go back to prison.

Q. And so how was that going to be facilitated by just refusing to go to the Grand Jury? You wanted to be done with this and go back to prison and serve your life sentence?

A. Yes, that's exactly what I said.

Q. You changed your mind?

A. Well, actually, on January 29, I -- with Mr. Williams and Mr. Reinert, and my attorney present, I told them that they could send me back to prison now and I'll do my life sentence.

Q. Okay. And how do you feel as you sit here today? You've told me that you'd like to have that life sentence reduced today, is that correct?

A. Yes, I would like to have the life sentence reduced.

MR. WILLETT: Okay. Thank you, Judge.

THE COURT: Mr. Willett, you're not going to ask about Government's Exhibit 5, Page 8, Paragraph 2, Line 2?

MR. WILLETT: I think it's been covered in earlier testimony, Judge.

THE COURT: Okay. Why don't we take a break. Which lawyer estimated we would be done with the whole hearing by noon today?

MR. WILLETT: It wasn't me.

THE COURT: How about -- well, let me ask you this, what's the new estimate for when we'll be done with the hearing today, or are you all going to invoke your Fifth Amendment rights at this time? Mr. Williams, what do you think?

MR. WILLIAMS: Assuming -- after we come back, I'm suspecting that the closed session may take up to an hour, I don't know. I hope it wouldn't take that long, but I'm trying to be conservative. It could be possible that that closed session with

Mr. McNeese could take up to an hour. If that's the case, then we may be here until five. I think Mr. Basler would probably take me an hour and a half. Randy VanGent will probably be half an hour, forty-five minutes. Pat Reinert, I understood that the defense was going to call him and find out why he decided to put Angela Johnson. The list they gave us is much broader than that at this point, and I don't know how far they're going to go at this point. The first assistant Judy Whetstine is defense -- discussing with defense counsel their scope of their examination with Mr. Reinert. If it goes as broadly as they suggested in the initial outline, we'll be here until five.

THE COURT: Are we going to take up the closed portion of Mr. McNeese's testimony when we come back?

MR. WILLETT: We can do that.

THE COURT: Okay. That way the members of the public who are going to be excluded -- do you think it's going to take about an hour? Why don't we take a recess until 12:45, would that be enough?

MR. WILLIAMS: Certainly, Your Honor.

THE COURT: Is that enough for the lawyers or do you need an hour?

MR. WILLETT: No, 12:45.

THE COURT: Why don't we just take an hour and come back at one and then we'll take up the closed portion of the testimony and then open the hearing. Now, let me ask one other question.

MR. WILLIAMS: Yes, Judge.

THE COURT: So that I'm not surprised by the scope of the request of the defense inquiry with regard to AUSA Reinert, do you have any problems sharing with me what they intend to get into at this point so I can at least be thinking about whether or not I'm going to let them get into that?

MR. WILLIAMS: Not at all. Your Honor, right now I've stepped out of that role and asked Judy Whetstine to cover that and so she's talking with defense. I don't know where they're going at this point or whether Judy Whetstine has been able to work out the scope, but as soon as we find out what that scope is, we'll be glad to share that with the Court.

THE COURT: Okay. That's fine. Thank you.

(Whereupon, a brief recess was taken. The following portion of the record is sealed.)

THE COURT: Okay. We're now at that portion of the hearing where we're closing the courtroom, and who's going to be doing the cross-examination of

Page 614

Mr. McNeese at this point?

MR. WILLETT: Mr. Berrigan will, Your Honor.

THE COURT: Okay. Mr. Berrigan.

MR. WILLETT: Yes, sir, thank you.

THE COURT: And then is the understanding, Mr. Williams, that you'll then do your redirect on that matter that we closed it on, and then we'll do the redirect, recross, redirect, however far we go, and then we'll finish this area and go back and open it up?

MR. WILLIAMS: That's my understanding, Your Honor.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. BERRIGAN:

Q. It's been a long morning, Mr. McNeese, but I'm going to ask you if you can recollect, when I was asking you questions earlier, there was an area of your plea agreement that we didn't discuss, and I asked if we could put that off and that's what we're going to talk about now, and it has to do with the provision regarding the United States Attorney agreeing to try to get you into the witness security program, that is part of your plea agreement, is it not?

Page 615

A. On the advice of my attorney, I'm going to have to defer answering any questions at this time.

Q. On what basis?

A. Concerning the witness protection program.

Q. Well, that's why we have a closed hearing here, Mr. McNeese. We've taken precautions so that this information is not shared with the public. I'm sure the Court and counsel could assure you that we have no intention of discussing this with anybody outside the purview of the hearing.

THE COURT: Mr. McNeese -- excuse me, Mr. Berrigan, what's the basis for your refusal to answer the question?

THE WITNESS: Because we don't want to discuss anything where Angie is going to learn things more than she's -- she's already been given, sir, my wife's phone numbers at work and home, where she works, all of that.

THE COURT: Yeah.

THE WITNESS: So we're concerned about that.

THE COURT: Just a second. That's not a proper basis that I know of to decline to answer the question.

MR. BERRIGAN: And I'm not sure that concern addresses the question that I asked. Perhaps if I

Page 616

could advise Mr. McNeese.

THE COURT: Mr. Meyers, do you want to jump in on this one or --

MR. MEYERS: Well, I think counsel has the right idea. I think Mr. McNeese could probably answer some of these questions without getting into any of the information that he's -- might be concerned about.

THE COURT: Well, no. Well, that may be, and it will be because I'm going to compel him to answer the question, but what's the basis for his refusal to answer the question? He's claiming it's based on your advice. Now, I mean, I don't know if that claim is true or not, but do you know of a legal basis to object to questions about the witness security program?

MR. MEYERS: No, not -- not specifically. The only thing I can think of is that he's concerned about information being divulged to Ms. Johnson and somehow that that would compromise his situation, maybe the pros or something, I don't know, but I think --

THE COURT: A due process right to not divulge information about potentially getting into the witness protection program, I don't think so, but in any event, the Government also has an interest, and as

Page 617

a matter of fact, their interest goes much broader and much deeper than your interest or Mr. McNeese's interest and the Government, the US Attorney's Office has agreed that this area could be explored as long as it's done in a closed hearing, but they have interests that far exceed your client's interests, in my view.

MR. MEYERS: Yeah, I would just ask -- you have advised Mr. McNeese. That's his concern, and I think you've addressed it.

MR. WILLIAMS: Your Honor, it may be of some assistance, I have not had an opportunity to talk with Mr. McNeese to the extent to which we're going into this, and it may be apprehension on his part about where this is going, and if you like, I could summarize where I think we're going with this for Mr. McNeese's benefit. I think that would allay some of his fears that may facilitate what we're doing on this.

THE COURT: Let me ask, what do you think of that suggestion?

MR. BERRIGAN: I'm fine with that, Judge, I think either one of us could do that.

THE COURT: Well, do you have any objection to Mr. Williams doing it?

MR. BERRIGAN: No, not at all.

THE COURT: Thank you.

MR. WILLIAMS: It's my understanding that where we're going to go with this line of inquiry is not into the details of the specifics of Mr. McNeese's WITSEC program, where he would go if he would go, the names of people that he is going to have contact with, addresses, or anything like that. It's going to be to the fact that he is -- the possibility of being in the WITSEC program is something that was agreed to in the plea agreement, and the reason we're getting into it is because it may go to his motivation for providing information to the Government. I think the defense is going to want to get into, you know, what promises were made to him about his availability -- his likelihood of getting into the WITSEC program, the timing of those promises about getting into the WITSEC program, and possibly the status of his -- his status in the WITSEC application process, but as far as the details of anything in his application, anything in his personal history or -- anything like that is not going to be a subject of inquiry here.

THE COURT: Mr. Berrigan.

MR. BERRIGAN: I think that's a fair rendition, Your Honor, with one additional item, and that is there's been some testimony as the Court knows

about a polygraph exam used as part of the application process, and I just had a few very brief questions about that, otherwise I think Mr. Williams has fairly summarized the scope of the examination.

THE COURT: Okay. Why don't you proceed with the examination.

Q. Mr. McNeese, it is true that the plea agreement that you signed on September the 12, 2000, contains a specific provision wherein the United States Government through the US Attorney's Office has agreed as part of the negotiations in your money laundering case to make an application for you to be in the witness security program, is that true?

A. Yeah, but that agreement was -- I had an agreement with them in March of 2000.

Q. Could you tell us a little bit about the March 2000 agreement, sir?

A. Yes.

THE COURT: Could you pull your chair up, please, get a little closer to the microphone?

THE WITNESS: Yes.

THE COURT: Thank you.

A. When I had learned through Jeff Garrett that there was documents or a document that showed that I was living -- or I was cooperating with the Government and

Mr. Garrett was sending that to New York, at that time, the Government felt that -- actually, they had no choice but to move me and put me in Benton County for the reasons I have discussed earlier, and also to process a WITSEC application for me.

Q. And who is it that told you that specifically?

A. Pat Reinert.

Q. Could you tell us, was that during the meeting that you had with Mr. Reinert, the day of or the day after you told him that Mr. Garrett had broken into Al Willett's office?

A. Yes.

Q. So during the course of this meeting with Mr. Reinert, specifically, on March the 24th, 2000, he told you that he would make application for you or the US Attorney's Office would make application for you to be in the witness security program?

A. Yes, and that wasn't the first occasion.

Q. Could you tell us when the first occasion was that that was discussed, sir?

A. When I was here the first time, I was asked to cooperate and to -- that they would assure me -- actually, they assured the strike force from Georgia, Atlanta, that I would be placed in the WITSEC. They were concerned that -- not of what the situation here

in Iowa was but the situation of my cooperation concerning other individuals.

Q. And just to refresh, perhaps, the Court doesn't need refreshing, but that strike force in Atlanta, they were speaking to you before July the 28th, 1980 -- 1998, before Mr. Fischer came down to talk to you?

A. Yes.

Q. You were already cooperating with the strike force in Atlanta regarding other individuals in this organized crime family?

A. Correct.

Q. And John Simmons, was he a member of the organized strike force that you were speaking to?

A. I believe he's the leader of it, yes.

Q. Okay. And did Mr. Simmons give you some promise that you would be in the witness security program?

A. No. What had happened was I didn't want to be in the program. Mr. Simmons is the one that introduced me to Mark Fischer and some other agent, who I don't remember the name, and he spoke to me because I was very hesitant to talk with them people, and -- because I was in -- you know, I feared that it would get back to the people that I was with, and Mr. Simmons said that from what he was under -- that he was told that

they would process an application for the WITSEC program.

Q. In fact, you expressed your concern about the other inmates that you were with in the Atlanta Penitentiary finding out about your conversations with Mr. Fischer and thinking you were imparting information to law enforcement?

A. Yes.

Q. You wrote a letter to Mr. Simmons about that, do you remember that?

A. No, I don't.

Q. I'm going to hand you Defendant's Exhibit V, sir. That appears to be a two page letter dated August the 2, 1998, addressed to Mr. Simmons, signed "Sincerely, Bobby," do you recognize that handwriting?

A. Yes.

Q. Is that yourself, sir?

A. Yes, it is.

Q. Does this appear to be a fair and accurate copy of the letter that you wrote to John Simmons on August the 2, 1998?

A. Yes, it is.

Q. Okay. Right there in the first paragraph, it expresses the concern that you have about other inmates suspecting cooperation as a result of your

visit with Mr. Fischer?

A. Yes.

Q. And that was a concern that you had at that time?

A. Yes.

Q. And you discussed that with Mr. Simmons on or about August the 2, 1998?

A. I wrote the letter August 2.

Q. All right. Sometime after this letter did you talk to Mr. Simmons about the witness security program?

A. I don't remember if I did or not.

Q. Let me ask you, sir, would it be fair to say you did not discuss witness security with Mr. Simmons before you sent him the August the 2 letter?

A. I -- this was after the meeting with Mr. Fischer?

Q. The meeting with Mr. Fischer purportedly was on July the 28th, 1998, about five days before this letter?

A. Yeah, it was discussed at -- during that meeting.

Q. Okay. During your meeting with Mr. Fischer?

A. Yeah, Mr. Simmons had -- Mr. Simmons had assured me that Iowa would process the application on my behalf.

Q. And that was the result of cooperation that you were already giving apparently, to Mr. Simmons?

A. Yeah, and for the cooperation on the Scotter Clark case, because it would be made public, and then, you know, the people in Atlanta or New York would find out about it.

Q. And the people we're talking about are people in this organized crime family or their associates?

A. Yes.

Q. The same organization that you were a member of at that time?

A. Four other organizations also.

Q. Four other organized crime organizations?

A. Yes.

Q. And was there an application made on your behalf by either Mr. Simmons or somebody in the US Attorney's Office there in Atlanta, Georgia, or any other Government or law enforcement officials at that time?

A. I don't know.

Q. Well, you've gone more recently through a process, have you not, to get in or attempt to get into the witness security program?

A. Yes, I had a guy come and see me, yes.

Q. Interviewed you?

A. Yeah, I guess, yeah.

Q. Did you submit to a polygraph examination in connection with your application to the witness

security program?

A. Yes, I did.

Q. Had you ever done that before the recent application?

A. No.

Q. And when I say "recent," I guess I need to ask you, when did you do that? When is it that you had this polygraph examination in connection with your efforts to get into the witness security program?

A. November or December, I believe, somewhere around there. I'm not real sure, but --

Q. November or December of 2000?

A. Yes.

Q. So far almost -- I guess actually over two years, there had been discussions about you applying or somebody applying on your behalf for the witness security program, but no application actually ever made, is that right?

A. Well, when I came to Iowa, again, like I mentioned earlier, I was upset with the Government, and I really wanted to just go back to prison, be left alone, and that was my choice. It wasn't the Government's or -- I chose to go back to prison.

Q. And when you say "go back to prison," you don't mean go back to prison in Atlanta?

| Page 626 | Page 628 |
|---|---|
| A. Yes.<br><br>Q. Yes?<br><br>A. Yes.<br><br>Q. Didn't Mr. Reinert specifically guarantee you at your request that after you testified at Scotter Clark's Grand Jury proceedings, you would not go back to Atlanta, that he would write to the Bureau of Prisons to prevent that from happening?<br><br>A. They don't care what Mr. Reinert or anyone has to say.<br><br>Q. Well, did Mr. Reinert make that representation to you, sir?<br><br>A. He told me he would write a letter, yes.<br><br>Q. In fact, you put it on the record during your Grand Jury testimony, do you recollect that?<br><br>A. No, I don't. And if he did write a letter, it certainly didn't work.<br><br>Q. I'm going to hand you -- may I approach the witness, Your Honor?<br><br>THE COURT: You may.<br><br>Q. I'm going to hand you what purports to be a photocopy of your Grand Jury testimony, given in Scotter Clark's case. I'll refer you specifically to Page 11. First, I guess, Mr. McNeese do you recognize that document I've given you as a transcript of your | A. Yes.<br><br>Q. Decided you weren't going to do that?<br><br>A. It was decided that I was just fed up with the whole thing, yes.<br><br>Q. And you wanted to go back to the penitentiary, the federal penitentiary in Atlanta, from hence you had come?<br><br>A. Yes.<br><br>Q. And you didn't care about the witness security program at that time?<br><br>A. No, I didn't.<br><br>Q. Because obviously if you're going back to that penitentiary, they're not going to put you in any witness security program, right?<br><br>A. Correct.<br><br>Q. And then sometime before you testified at the Grand Jury proceedings in early '99, you again had some concerns about going back to Atlanta?<br><br>A. Yes, I mean --<br><br>Q. Did you discuss with anybody in the fall then of 1998, Mr. McNeese, the first part of '99, did you discuss with some law enforcement officer or Assistant United States Attorney or any Government official applying to be in the witness security program?<br><br>A. I'm sure that I probably had asked or talked to |

| Page 627 | Page 629 |
|---|---|
| sworn testimony in the Scotter Clark Grand Jury proceedings?<br><br>A. Yes.<br><br>Q. And on Page 11, is there reference there by Mr. Reinert to the witness security -- I'm sorry, to the promise that he made to you that he'd attempt to influence the Bureau of Prisons to not return you to Atlanta?<br><br>A. Yes, he said he would send a letter.<br><br>Q. To the Bureau of Prisons?<br><br>A. Yes.<br><br>Q. Okay. So that happened during the Grand Jury proceedings on Scotter Clark?<br><br>A. He mentioned that, yes.<br><br>Q. So apparently you had a change of heart again about going back to Atlanta sometime between coming to the Linn County Jail in the fall of 1998 and that Grand Jury testimony first part of 1999?<br><br>A. Yes.<br><br>Q. We could get back to this witness security issue again, sir. If I understand your testimony correctly, when you came back to Linn County in the fall of 1998, after initially agreeing to cooperate in the Scotter Clark investigation, you changed your mind about your cooperation? | people about it, yes.<br><br>Q. When you say people, sir, could you be a little more specific who you might have talked to about that?<br><br>A. I really -- it could be Mr. Reinert or Mr. Fischer or the other guy, I don't remember his name. He was an FBI agent.<br><br>Q. I -- I'm assuming that Mr. Reinert, when he spoke to the Grand Jury about -- on the record, saying that he was going to send a letter to the Bureau of Prisons asking them not to send you back to Atlanta, that's something you wanted. That wasn't his idea, was it?<br><br>A. No, I believe it was something I wanted.<br><br>Q. And you undoubtedly would have had to have discussed that with somebody at the US Attorney's Office or your lawyer on your behalf?<br><br>A. Yeah, I spoke with someone I'm sure. I just can't remember.<br><br>Q. Did you talk to Mr. Reinert yourself?<br><br>A. I really can't remember.<br><br>Q. In any case, you came here to Linn County in the fall of '98, and did you later go back into the penitentiary system?<br><br>A. Yes.<br><br>Q. And obviously you weren't in the witness security program at that time? |

A. No, I wasn't.

Q. Were you still seeking an application to the witness security program when you went back to the penitentiary in 1999?

A. I don't -- I don't think so.

Q. And apparently at some point you decided that you did want to get into the witness security program, at some point either during 1999 or 2000?

A. What had happened was I was -- I was sent back to Atlanta. I had put a request in to be transferred to Leavenworth, and that was denied, but they did grant me a -- my request, Your Honor, to be redesignated, maybe three months or two months after I was in Atlanta and I got sent to Terre Haute, Indiana. While I was in Terre Haute, Mark Fischer and -- I don't remember the -- some officials from California came to the prison to see me.

Q. And did that pertain to the Denny Dice investigation?

A. Yes, it did.

Q. And what did the appearance at the prison in Terre Haute, of these California officials -- what did that have to do with witness security?

A. Well, when I went into the visiting room and seen them, I turned around and left. I didn't want to

speak with anybody. The SIS department there said, you know, I didn't really have a choice and so I went back into the visiting room, and you know, I was upset with Mr. Fischer, and, you know, for even coming to the prison. And he told me that they had, you know, evidence that Danny Dice had told me things concerning his illegal activities. I, you know, told them I didn't know what he was talking about. And he stated that they had plenty of information and evidence concerning -- or stating otherwise and that if I did not cooperate, that they would release the information to him anyway.

Q. Release what information, sir?

A. I don't know. I didn't -- they had a big suitcase there saying, you know, patting it, saying they had this stuff.

Q. Well, you told us earlier under oath that you were not involved in any of the criminal activity in which Mr. Dice was involved?

A. No, I -- no, as I just said, that information that I knew about of what Danny's criminal activities were.

Q. Are you suggesting that Mr. Fischer essentially threatened to inform Mr. Dice that you were cooperating with the Government against Mr. Dice?

A. I mean, I'm just telling you what he told me, you

know. I mean, I'm not going to lie about it.

Q. Well, was that your impression or understanding of what Mr. Fischer had told you when he came up to see you at the federal prison in Terre Haute?

A. Yes, basically, it was.

Q. Basically, "You'll cooperate with these California law enforcement officials or we're going to tell Mr. Dice that you are cooperating anyway, and by doing that, of course, you might be placing yourself in danger physically," is that right?

A. Yes.

Q. You were angry at Mr. Fischer for showing up at the prison unexpectedly?

A. Yes.

Q. And as is pointed out in the letter that you've already looked at, Exhibit U, this is a problem for inmates not only in federal penitentiaries but any penitentiaries when inmates are perceived as talking to law enforcement officials?

A. Yes.

Q. And so Mr. Fischer has done this twice to you now, once in Atlanta and once in Terre Haute?

A. Yes, he has.

Q. During this visit in Terre Haute, did Mr. Fischer discuss with you the witness security program?

A. Yes, he did.

Q. All right. And whose idea was it to bring up the witness security program?

A. I really don't remember. I mean, it was discussed -- they asked me if I would go to California. I asked him if it would be, you know, made public, and they said no, that it wouldn't be made public. And so I agreed to go. And when I got out there, I talked with the guys from California, the US Attorney there, and they agreed to be co-sponsors or something like that for an application for the WITSEC program.

Q. And co-sponsors with whom, sir?

A. It could be Mr. Reinert or -- I'm really not sure.

Q. The person that initially talked to you at Terre Haute about the witness security program is Mr. Fischer?

A. Yeah, there was -- yeah, I mean, he brought it up to me.

Q. And this is coming up in conjunction with the conversation wherein he's told you essentially you'll need to cooperate with the California investigation regarding Danny Dice, or we're going to leak information to Mr. Dice that you were cooperating anyway?

Page 634

A. I think he put it a little bit more eloquently, but yeah, that's the impression that I got.

Q. So this witness security program may have been offered, I suppose, to appease your concerns about your physical safety and engaging in this cooperative agreement with the officials in California, is that your perception of things?

A. Yes.

Q. And then you go down and talk to the US Attorney's Office in California and they agreed to do this, that is, co-sponsor a petition for you to enter the witness security program?

A. Yes.

Q. And your understanding is that the other co-sponsor would be Mr. Reinert or somebody from the Northern District of Iowa US Attorney's Office?

A. They left me in a room and went and made phone calls and stuff, and I don't know. I really don't know who they talked to. I just knew that they were going to co-sponsor.

Q. And it's the "they" that I'm interested in. When you say "they were going to co-sponsor," who are you referring to?

A. I don't know.

Q. Well, is it Mr. Fischer that's making the calls?

Page 635

A. No, it was the US Attorney.

Q. All right. And were they calling somebody in Iowa?

A. I wasn't -- I mean, I really don't know. They left me in the room, and as a matter of fact, Mr. Fischer and one of the agents stayed with me, and the US Attorney came and told him, you know, said that we were going to co-sponsor him.

Q. Who is this US Attorney in California that told you this?

A. The one that was investigating Danny Dice. I don't know his name.

Q. And when this US Attorney in California told you that his office would co-sponsor your application of the witness security program, he also informed you that there was another co-sponsor?

A. Yes, he did.

Q. Somebody else was co-sponsoring you?

A. Yes.

Q. And you said earlier, you thought it would be Mr. Reinert or somebody up here in the Northern District of Iowa or you have just no idea?

A. I really don't have any idea, because, you know, they -- they wanted me to talk about organized crime and other things there, so you know, I've talked to

Page 636

the people in New York and Pennsylvania and Georgia and Florida.

Q. Right.

A. So I --

Q. So there are other candidates to co-sponsor you, potential candidates other than the Northern District of Iowa is what you're saying?

A. Yes.

Q. And you don't know who it was that agreed along with California to co-sponsor your application to the witness security program when you were cooperating with the California law enforcement officers against Mr. Dice?

A. No, you'd probably have to just call out and ask him. I don't really know.

Q. You don't know?

A. No.

Q. And was there an application made then, sir, to the witness security program on -- as a result of these representations made to you by the US Attorney in California?

A. Not that I'm aware of.

Q. I think we have some information that you testified in Mr. Dice's Grand Jury proceedings sometime in the early part of 2000, does that sound

Page 637

right?

A. No, I -- no, I think it was before that. I think -- yeah, I think it was before 2000.

Q. Okay.

A. 1999.

Q. When there was no application made, Mr. McNeese, after the representation by the US Attorney in California, to the witness security program, what was your response, sir?

A. I went to Leavenworth. I went to Terre Haute, and they transferred me to Leavenworth.

Q. So you went back to Terre Haute, after your cooperation against Mr. Dice?

A. Yes.

Q. And the transfer to Leavenworth from Terre Haute, did that have anything to do with any concerns about your physical safety at Terre Haute?

A. I had -- actually I had mentioned to Mark Fischer that -- as a matter of fact, I -- Mr. Reinert said that he would write a letter about me going to Leavenworth, Your Honor, a year before or two years, or whatever it was, and so I was -- told Mr. Fischer that -- whatever happened to that, and I called John Simmons, and he said, "Well, I thought you were in Leavenworth," and so they did get me transferred from

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 21 of 100

Terre Haute to Leavenworth.

Q. I want to make sure the representation from Mr. Reinert that he would get you transferred to Leavenworth --

THE COURT: Mr. Berrigan, can I ask you a question?

MR. BERRIGAN: Yes, sir.

THE COURT: I mean, I appreciate your level of preparedness and the level of detail, but my question for you is don't we need to be calling the animal rescue league about beating dead horses? I mean, isn't the point that this witness at some time wanted to be in the witness protection program, because he feared for his safety, because he had cooperated against many individuals, and beyond that, I just want to make sure I'm not missing something? Why are the details important?

MR. BERRIGAN: They're important in that, Your Honor, I think the witness has fluctuated in terms of his desire to be in the program. That is, there are periods of time that he seems to be interested in the program. There are other periods of time where he does not, and, of course, we are interested in Ms. Johnson's case in whether he's interested in that, and we have some, of course,

information about that. But if that -- what I'm trying to establish is sort of the history of this on and off again interest in the witness security program in an effort to show, I guess, you know, how genuine it was; Number 2, how much of a motivating factor that may have been in his cooperation with the Government in Ms. Johnson's case, and I am not sure that I can do that without kind of going through this process.

THE COURT: Okay, that's fine, that's fine.

MR. BERRIGAN: And I'll try to speed it up.

THE COURT: Well, no, I'm not -- I'm not trying to pressure you to speed things up. I think I got your point, but I want you to make whatever record you want to make, and it's a very important matter, and I really -- I just thought I'd express my point here, and you're free to --

MR. BERRIGAN: I understand.

THE COURT: You're free to go on, and free to do it your way, not my way, so --

MR. BERRIGAN: Point taken.

Q. Mr. McNeese, you've obviously just heard our discussion here. It seems as if this interest that you have in the witness security program kind of wanes periodically, that is, sometimes you're interested in it and sometimes you're not that interested in it. Is

that true?

A. Yes, if I could avoid entering the program, I would want to avoid that.

Q. Okay. And at least what we know is that when you were out in California, at least cooperating with Mr. Dice, you were interested in the program?

A. Yes.

Q. And -- because people had made promises to you that they would co-sponsor an application for you?

A. I was interested in a program because I felt that the information would be made public of my cooperation, and since it was not made public, I didn't want the program.

Q. All right. And could you tell us when you made that decision that you were no longer interested in the program, after cooperating in Mr. Dice's investigation?

A. May I -- when I just went to Leavenworth and I was there, they called me March 1 of 2000 --

Q. Okay.

A. -- told me that I was leaving, coming to Cedar Rapids. I -- I went to my counselor there, and asked him what it was concerning, and he said that -- he looked on his computer, and it was a writ from the -- from Pat Reinert.

Q. And what was the writ for, sir?

A. Well, at that time, I didn't know. I had my counselor call Mr. Reinert and tell him I didn't want to be involved in any writs or leave the prison or I didn't want to cooperate about anything.

Q. And apparently nobody, such as Mr. Fischer or anybody else, had come to the prison at Leavenworth and told you that you would be soon or requested or required to be back in Cedar Rapids?

A. No, nobody.

Q. You had no forewarning of this transfer in other words?

A. No.

Q. In any case, you were brought back in March of 2000, and you began to participate in an investigation regarding Mr. Garrett?

A. Correct.

Q. But that wasn't why you were brought back, was it?

A. No, I was brought back for -- well, anyway, the counselor called Reinert. Reinert said I'm coming here anyway. So I came here, and they wanted me to testify at Scotter Clark's trial. He was going to go to trial, but he ultimately pled guilty.

Q. Okay. All right. And then you've already explained, and I don't want to go back through this

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 22 of 100

Page 642

again, but you've already explained your concern after you learned Mr. Garrett had some information that he was imparting to people in New York suggesting your cooperation in the Scotter Clark investigation. We've been through that, haven't we?

A. Yes.

Q. Did that rekindle your interest in the witness security program?

A. That is when I knew that I had no choice, that there was no fence jumping per se. I mean, I knew that I had to be going into the program.

Q. And that's March of 2000 then?

A. Yes.

Q. You finally had made the decision you're going to try to get into the witness security program?

A. Well, it was a decision made by someone else.

Q. Well, and you attribute that, I guess, to Mr. Garrett?

A. I attribute that to Pat Reinert for releasing the documents, and he said -- you know, he apologized to me.

Q. He apologized to you during your meeting on March the 24th?

A. Yes.

Q. And he told you he would try to do what he could

Page 643

to get you in the witness security program?

A. Yes.

Q. But still nothing happened on that, did it, that is, that there was no observable effort to get you into the witness protection program, was there, until the fall of 2000?

A. Actually, I -- I thought that they were started in March of 2000.

Q. Your impression was the application process started in March of 2000?

A. Yeah, they told me it takes many months to process it, and things like that.

Q. Did you ever see some kind of an application form, Mr. McNeese, or some kind of written documents pertaining to the witness security program?

A. No, I still haven't ever seen any.

Q. And you don't know when your polygraph examination was for the witness program application?

A. Did I know that?

Q. No. You don't know when it was?

A. It was after I left Benton County, and so it was -- I left there, I believe, October of 2000.

Q. Which was after you had cooperated with law enforcement authorities against Angela Johnson?

A. Yes.

Page 644

Q. In other words, not until you had finished your cooperation with the law enforcement officers and Government officials in the Angela Johnson case did you go for a polygraph in connection with this application process to be in the witness security program?

A. No. Actually, prior to that, Mr. Reinert had told me that the application was complete.

Q. When did Mr. Reinert tell you that, sir?

A. July or August.

Q. In July or August of 2000?

A. Yes.

Q. Mr. Pat Reinert, Assistant US Attorney here, told you that your application for the witness security program had been complete?

A. Yeah, his portion of the application was complete, yes. And again, the days could be -- you know, I'm not certain of the exact date. I'm sure it's written down somewhere. I mean --

Q. Is this a personal meeting you had with Mr. Reinert?

A. A meeting with my attorney and Mr. Reinert.

Q. Were there any other individuals there, just the three of you?

A. I believe Mark Fischer was present.

Page 645

Q. Did Mr. Fischer -- did he contribute to the discussion regarding the witness security program in July of 2000?

A. Not that I can remember.

Q. Did anybody at that time say that you need to complete a polygraph examination as part of the application process?

A. Was I informed of that?

Q. Yes, sir.

A. Yes.

Q. During that meeting in July of 2000?

A. I think before that even. I knew that that was part of the process.

Q. You also had some interest in your brother being in the same program, isn't that right?

A. Yes, I did.

Q. And you communicated that to Mr. Reinert?

A. To Mr. Reinert or Mr. French, some -- I did communicate with the Government, yes.

Q. I'm going to hand you, sir, Government's Exhibit No. 9. That's already in evidence, purports to be a letter you wrote to Mr. Reinert September the 19th, 2000. Is that what that document is?

A. Yes, it is.

Q. On the second page of Exhibit 9, paragraph

Page 646

beginning "concerning my brother Floyd"?

A. Yes.

Q. You specifically ask Mr. Reinert to get your brother Floyd into the witness protection program?

A. Yes, I spoke with Agent French about it, and I also learned that, in fact, that he could, you know, come into the program if I was accepted.

Q. Mr. French told you this?

A. No, French, as I say here, I says -- I don't want -- or shouldn't say that Scott told me Floyd would get into the program because he didn't. He didn't tell me, but he thought that there was a way to, and in fact, I later discovered that there was.

Q. What your letter says is that "I met with Scott French last week and I discussed Floyd with him. He said that Floyd would be able to get in the program with me, because of my cooperation. I should not say Scott told me Floyd could get into the program because he didn't. He said it could be possible now because of me. Can you please look into this for me?" Is that an accurate rendition of what Scott French told you?

A. Yes.

Q. And the cooperation that you're referring to in this letter of September the 19th, Government Exhibit

Page 647

9, is, of course, your cooperation in Ms. Johnson's case?

A. Yes.

Q. And, sir, did I hear you just say a minute ago you were in the program as of the date of this letter, that is, you had been accepted into the program as of September the 19th, 2000?

A. No, I didn't say that.

Q. Okay.

A. I said that Pat Reinert said that he was done with his portion of the application.

Q. Well, he told you that two months before, in July of 2000, correct?

A. Right.

Q. Well, had you received any information? Apparently you were talking to Mr. French. Had you received information about your application?

A. Actually, yes. Actually, Mr. French had been coming to see me, and we were -- I had to give him a list of, you know, people that I wanted to be able to contact while incarcerated, and he wanted to get all of the information concerning my cooperation starting back with the strike force.

Q. These visits from Mr. French, sir, do you know when they were?

Page 648

A. No, I'm sure they've got a record of that too. I don't know exact dates.

Q. Well, we have some records, and I'll represent to you that Mr. French has testified that he visited you about once a week during the course of the Robert Shultice investigation, specifically on May 17, May 22, and June 2 of 2000. Did you have more than those visits with Mr. French?

A. In 2000?

Q. Yes, sir.

A. Well, yeah, this letter says I just met with him.

Q. Well, and I'm sorry, I -- I should have been more precise. Did you have more visits with Mr. French about the -- let me withdraw that question. Do you recollect meetings with Mr. French in May of 2000 and early June respecting Dr. Shultice and your cooperation in that investigation?

A. I know that during the course of the investigation that I spoke with Mr. French several times.

Q. And are you having different or separate meetings about the witness security program? Are you discussing the witness security program with Mr. French while you are talking to him about the Dr. Shultice investigation?

A. I can't remember.

Page 649

Q. Did Mr. French at some point indicate to you that you had been accepted into the program, the witness security program?

A. No, Mr. French was putting his portion -- actually, it's called the threat assessment. That, he said, would take several months, and from my understanding, it's been completed.

Q. And this is something completely apart from what Mr. Reinert was doing, his portion of the application?

A. From my understanding, yes.

Q. Okay. The last conversation you had with Mr. French about the witness security program was when?

A. When I met with Mr. French and the agent sitting down there.

Q. Agent sitting where?

A. Right there.

Q. Oh, I'm sorry.

A. Next to Mr. Williams.

Q. What did they tell you about your application?

A. That -- well, actually he was just there. Mr. French was going through the names and wanted to re -- well, actually -- well, yeah, actually it was done -- or the threat assessment had been put in like three or four times, and they kept kicking it back

because they wanted Mr. French to be more specific. And so we met several times concerning that, and the last meeting was concerning the threat assessment and just had discussed the people that were on the list.

Q. The threat assessment was completed, and what was the result, sir?

A. As I said, it was three or four times they needed to be -- that Mr. French told me that he submitted it to the Justice Department, and they sent it back saying that they needed additional information, and so I met with him several times concerning that, and the last time was, as I said, with the gentleman sitting there.

Q. Agent VanGent, do you know his name?

A. No, I don't.

Q. I hope I didn't slur that too badly. But in any case, he didn't participate in the discussion?

A. No, he didn't.

Q. And after your last visit with Mr. French, have you had any contact with Pat Reinert or anybody from the US Attorney's Office about this witness security application?

A. Yes, I have.

Q. And could you tell us about that, sir?

A. I'm trying to remember. I know that we met. I

don't -- I know that I met Mr. Reinert after I left Scott County, which was in Davenport. I don't remember, you know, specifically what we discussed.

Q. Well, you don't know if you talked about the witness security program with Mr. Reinert after your last visit with Mr. French?

A. Well, no, I guess I have talked to him, I think maybe two or three times, concerning the program.

Q. And what has Mr. Reinert told you?

A. Well, I was asking the status of it. The last time he said that -- that it's in the hands of Washington, D.C., and that it's, you know. It hasn't been a definite yes or no at this time.

Q. You've -- you've been here in Cedar Rapids, I guess, at least the last two or three days, haven't you?

A. Several months.

Q. Okay. And the last time you talked to Mr. Reinert, there had been no decision made on whether or not you were in the program?

A. Correct.

Q. And --

A. I believe that that was -- I believe I was told that -- actually, I was told by the deputy marshal here, the chief deputy, that they would wait until I

was through here in Cedar Rapids with everything because of the expense of transporting and placing people in the program instead of bringing me back and forth.

Q. You mean they'd wait to put you in the program until things here in Cedar Rapids were through?

A. Right, so, you know, they said it was for the manpower and expense.

Q. Okay. And that certainly suggests that you're going to be admitted into the program?

A. I mean, I hope so, but no one's told me anything yet.

Q. When you did that threat assessment paperwork survey, Mr. McNeese, that was to identify people that you thought might potentially cause you some harm?

A. Yes, and people that I have cooperated against.

Q. Okay. So having cooperated against Ms. Johnson, I assume her name would be on that list, is that right?

A. Well, actually -- actually, Mr. Reinert had mentioned that me -- or, no, I'm sorry, Mr. French did when the agent -- when they came up to see me, that they were going to -- that actually her name hadn't been added but they were going to add it.

Q. Because you hadn't put it on there?

A. Yeah, I didn't put it on there, I don't believe.

Q. You didn't consider her a threat?

A. Well, I'm -- I'm sure that I -- I mean, I don't know.

Q. Well, isn't there like forty or fifty names on this list?

A. Sixty.

Q. Sixty. And she's not one of them?

A. No. Now I believe she is, yes.

Q. Because somebody else added her?

A. Yes.

MR. BERRIGAN: I appreciate the Court's patience. Those are all the questions I have. Thank you, Mr. McNeese.

THE WITNESS: Thank you.

MR. WILLIAMS: May I have just a moment, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. McNeese, this last meeting you had with Mr. Reinert, do you recall that occurring approximately March 9 of this year, just about a month ago or so?

A. Yes.

Q. And that was the last meeting you recall having

with Mr. Reinert?

A. Yes.

Q. Do you recall during that meeting while Mr. Reinert didn't have a final answer and it was still in Washington, did he indicate to you that there was some trouble or there was the possibility you weren't going to get accepted into the program?

A. He said he wasn't concerned, but that people -- or the marshals were concerned that I might get in the program and tell where people are at.

Q. And do you recall him saying that one of the problems that they had in the threat assessment was contact with the press you had in the past, do you recall that discussion?

A. I believe that he brought that subject up, yes, I remember now.

Q. And what do you recall Mr. Reinert telling you about whether that had caused a problem or was an issue with the threat assessment people?

A. Actually -- actually, you had written a letter to my attorney, and I -- that was the first time that I could mention it to Mr. Reinert, stating that during the September 12 meeting, I was hesitant to sign, I believe, Paragraph 9 or Paragraph 12 of my plea agreement because, in fact, Rick Smith is a friend of

mine that I have known for many years. And he indicated to me that he wasn't concerned with me talking with Rick Smith. So when I received the letter that you had sent to my attorney, I was kind of upset because Mr. Reinert had told me that. And during that meeting with Mr. Reinert, I brought that up to him, that, in fact, you had told me that -- or because of my hesitation, you had told me you were concerned about me talking with the press, and that's -- that is basically what I told him. That's what we discussed concerning the press.

Q. I understand that. I guess what I'm getting at is do you recall whether Mr. Reinert told you that your previous contacts with the press and discussing with them the fact that you were cooperating and the fact that you provided information on the Angela Johnson case was causing concerns to the people who were assessing whether you were going to be eligible to the -- to get into the WITSEC program, do you remember him bringing up that topic with you?

A. Actually, I don't.

Q. Has any promise been made to you along the lines of if you cooperate on Angela Johnson, you will get into the WITSEC program?

A. No.

Q. Was there any connection between continued cooperation against Angela Johnson and whether they were going to continue to process the application for the WITSEC program?

A. No.

Q. It's fair to say the application process for the WITSEC program and your desire to get in it and, as you related, representations that they would make the application started long before Angela Johnson and you had any contact whatsoever?

A. That's true.

Q. And did anything change in the -- has your status as being processed for the WITSEC program changed at all, as a result of you providing information concerning Angela Johnson's case?

A. Not that I'm aware of. Again, I have never seen an application, so I don't know what it says or --

Q. Nobody came to you though and told you that anything changed as a result of the information you're providing on Angela Johnson?

A. No.

Q. It wasn't a case where anybody said, "Boy, we weren't going to process, but now that you're working on Angela Johnson's case or if you continue to work on Angela Johnson's case, we'll process it," it wasn't

anything like that?

A. No.

Q. As far as you knew, was the process just going through the normal process, regardless of what came up with Angela Johnson?

A. Yes, they had represented to me that it takes several months to process it.

Q. And as far as you know, that process began back -- as far back as March of 2000?

A. Yes.

MR. WILLIAMS: Nothing further on the WITSEC issue.

MR. BERRIGAN: Just a very brief redirect, thank you, Judge.

RECROSS EXAMINATION

BY MR. BERRIGAN:

Q. Mr. McNeese, we already looked at this but Government Exhibit 9, the letter of September 9, 2000, wherein you ask Mr. Reinert to get your brother into the program, that's the first time you have asked Mr. Reinert to get your brother into the witness security program, isn't it?

A. No, it isn't.

Q. It's not. When did you ask your brother to be in the program, make that request of Mr. Reinert?

A. When I was in Cedar Rapids, they said that -- well, actually, my brother had told me that they were going to process an application for him to enter the program. I later learned that he was denied entrance in the program, so, you know, I was -- I was upset about that. I mean, but, you know, when I asked about -- I had asked them several times if there was something that they could do to help my brother.

Q. You had asked who?

A. I had asked everybody, Mark Fischer, Scott French, Mr. Reinert.

Q. If I could refer you to the second paragraph on Page 2 of Exhibit 9, sir, this sentence, in the middle of the paragraph, "I met with Scott French last week and I discussed Floyd with him. He said Floyd would be eligible to get in the program with me because of my cooperation. I should not say Scott told me Floyd could get into the program because he didn't. He said it could be possible now because of me."

A. Could be possible, yeah, because I'm in -- or when they said my brother was going into the program, processing the application, I wasn't being processed at that time, but now that I have been getting processed, that Scott felt that there could have been a provision in the statute concerning family or

friends or associates.

Q. Well, Mr. McNeese, that doesn't refer to your processing. That refers to your cooperation in Angela Johnson, does it not?

A. No.

Q. Aren't you saying in this letter that because of your cooperation in Angela Johnson's case, now your brother might have a chance to get into this program, even though he had been previously denied, isn't that what you're telling Mr. Reinert here?

A. No, I actually asked Mr. Reinert if he had submitted the WITSEC papers or is he waiting to clear up the Angela Johnson stuff.

Q. We're talking about your brother here, Mr. McNeese?

A. Right.

Q. Are you telling me that Mr. Reinert had submitted papers respecting your brother to get into this program in the fall of 2000, before you wrote him this letter?

A. No, I believe it was 1998.

Q. And he had been denied?

A. Yes.

Q. And you knew that before you wrote this letter in September of 2000, you knew your brother had already

once been denied, didn't you?

A. Yes.

Q. And so now you're trying to get him back in, right?

A. Well, actually, you know, I mean, I didn't know anything about it. Scott said there was a possibility, so I got -- you know, he's my brother, and I'd like to help him.

Q. Now you're trying to get him back in, September the 19th, 2000?

A. Yes.

Q. And you think you've got a shot because Mr. French told you that you had a chance to get your brother into the program, a chance?

A. There's the possibility, yes.

Q. And that was due to your cooperation in Angela Johnson's case?

A. No, Angela Johnson wasn't brought up at that time, I don't believe.

MR. BERRIGAN: That's all I have. Thank you, sir.

THE COURT: Mr. Williams, anything further on the WITSEC issue?

MR. WILLIAMS: Just a moment, Your Honor. I don't believe so.

THE COURT: Okay. I want to -- before we open the hearing, I want to go over a couple of things here. We technically didn't seal the record this time, but any time I close the hearing, the record is automatically sealed. I want to take that a couple of steps farther now. If there are post-trial briefs, I assume the briefs can avoid referring to any matter contained in the sealed record, or if you're unable to contain yourself in that regard and you're compelled to put something in your brief about it, I want you to file a separate brief that would be under seal because I'm generally opposed to sealing things as a general matter of judicial philosophy, and I want the seal to be of the least restrictive means possible, so that would be a second supplemental brief that would only refer to the matters contained in the transcript that are sealed, and then you'll get permission to file those supplemental briefs under seal, if there are supplemental briefs. Second matter is I think we need to decide now any use of the transcript by the Defendant personally. And I understand the parties are going to be ordering a copy of this transcript. And here's my view. My view is that -- I mean, I don't think I get involved in whether or not lawyers can share a transcript of hearings with their

respective clients, but I'm going to get involved in it to the extent that the matters that are sealed in this transcript of this hearing can be reviewed by the Defendant only with counsel present, and she is not allowed to have a copy of any sealed portion of the transcript of this hearing.

MR. WILLETT: That's fine, Your Honor, I'll make it very easy, we'll stipulate to that.

THE COURT: I didn't think you'd have any objection.

MR. WILLETT: None, none at all.

THE COURT: And that would also mean that she's not allowed to take notes about any of the matters contained in the transcript when you go over the transcript with her. You can spend as much time as you want to talking about it but I don't want notes of the transcript. I don't find that part of the transcript to be any big deal in any event, but I want to make sure that we take all the reasonable steps to see the sealing of the transcript be carried out. Do you have any objection to that, Mr. Williams? It's to the Government's benefit.

MR. WILLIAMS: None whatsoever. In fact, I would ask to go a slight step farther, and ask that the Court instruct the Defendant not to discuss with

anybody, other than her lawyers, the contents of the -- of the testimony that's been brought out during this hearing concerning the witness security -- witness protection program.

THE COURT: I would have done that had I thought it would do any good, but --

MR. WILLETT: Well, the Defendant's lawyer's one step ahead of Mr. Williams' request. The Defendant's lawyer did that with his client yesterday.

THE COURT: Okay. I appreciate it. I just think we did seal it, and, Ms. Johnson, I'm going to instruct you not to reveal any portions of the sealed record to anybody. You can discuss it all you want with your lawyers, but not with anybody else, okay, or any investigators on behalf of the your lawyers.

MR. WILLETT: Yes, sir.

THE COURT: Anything else? Are we ready to open the hearing?

MR. WILLETT: I think so.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Why don't we take a short fifteen minute break, and then we'll open the hearing at 2:30. Thank you.

(Whereupon, a brief recess was taken. The following was held in open court.)

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. McNeese, do you recall there was a series of questions of you concerning some legal advice that you were giving to Angela Johnson in the Benton County Jail, do you remember that series of questions you got?

A. Yes.

Q. Was any law enforcement officer or member of the Government in any capacity providing you with any legal information to pass on to Angela Johnson?

A. No.

Q. Was that just your own legal research you had performed based on your own knowledge you had gained over the years of the law?

A. Yes.

Q. Do you recall -- I'm going to hand you Exhibit 9, and do you recall being questioned about Exhibit 9, particularly with respect to the reference about that article working well, do you recall that?

A. Yes.

Q. Did you have any agreement or understanding with any law enforcement officer or Mr. Reinert that

information was going to somehow be planted in the local Gazette in order to try to have some influence over Angela Johnson?

A. No, not at all.

Q. What -- when you say the article worked well, what were you referring to there?

A. That the article didn't state that I was a cooperating witness.

Q. That was your concern, is that if an article was written, that it not have in anything about you being a cooperator?

A. Yes.

Q. Because I assume you were concerned if it did come out you were a cooperator, that that would affect Angela Johnson's ability to -- or would affect her willingness to talk to you at all?

A. Actually, I didn't want anybody to know actually.

Q. And had you received any instructions from any member of law enforcement on what to say to Rick Smith at any point?

A. No.

Q. Had you received any admonitions from law enforcement or from the US Attorney's Office not to talk to the press?

A. Yes.

Page 666

MR. WILLIAMS: Nothing further, Your Honor.

MR. BERRIGAN: No further cross.

THE COURT: Thank you. You may step down.

MR. WILLIAMS: United States calls Special Agent Bill Basler.

WILLIAM BASLER, called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable. Try and pull up the chair so you can speak directly into the microphone, and when you're ready, will you please state your full name and spell your last name for us.

THE WITNESS: My name is William Wayne Basler, last name is B-A-S-L-E-R.

THE COURT: Thank you. Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, how are you employed, sir?

A. I am employed as a special agent with the Iowa Division of Criminal Investigation.

Q. How long have you been with the DCI?

A. Since 1975, it will be twenty-six years this fall.

Q. Prior to joining the DCI in 1975, did you have

Page 667

prior law enforcement experience?

A. No, sir, I did not.

Q. Is there an area in which you specialize within the DCI?

A. Yes, sir.

Q. And what is that?

A. I'm assigned to what's called the general criminal investigations unit, which primarily handles violent crime type situations, oftentimes death investigations.

Q. Did you become involved at some point in the investigation of the disappearance and possible murder of five people in the Mason City area back in the 1993 time frame?

A. Yes, I did.

Q. And whose murders or disappearances were you investigating at that point?

A. During 1993, I was asked by the Hancock county Sheriff's Office to assist with their investigation into Terry Degoose's disappearance, that was in December of 1993.

Q. And were you -- did you become involved in the disappearance of other individuals at about the same time period?

A. I did just because there appeared to be some

Page 668

linkage from Terry's disappearance. Yes, I became involved in additional missing persons as well.

Q. And who were they?

A. They were Greg Nicholson, Laurie Duncan, and Laurie's two daughters, Amber and Candy.

Q. Could you advise the Court in summary the type of information that you developed from the time you got involved in the investigation of these -- the disappearances of these individuals in 1993 up until the time of the indictment of Angela Johnson in July 26 of 2000?

A. We had talked to a number of individuals that provided us information regarding Angela Johnson's involvement in these people's disappearance and death.

Q. What type of information did you get concerning -- let me rephrase that. Did you have any information that purportedly came directly from Angela Johnson concerning any type of admissions or confessions she made concerning her involvement in the murders of these individuals?

A. Yes, we did.

Q. What was the type of information you got prior to indictment in July of 2000?

A. We had a witness who told me that Angela Johnson had admitted being involved with the disappearance and

Page 669

murder of the five people that I mentioned earlier, and gave some detail about those disappearance and murders.

Q. And were there other individuals and witnesses who had information as well concerning those murders and disappearances?

A. Yes.

Q. As a result of the sources that you had on this, did you have an idea prior to July of 2000 of how these individuals were murdered?

A. I had an idea. We received a number of different methods as to how these people were killed. We were told that they were shot. We heard that they were strangled. We even heard that the little girls had been suffocated.

Q. Did you have information prior to the indictment of Angela Johnson concerning what had happened with the bodies of these murder victims?

A. Yes, we did.

Q. What was that type of information?

A. As opposed to the manner of death of these individuals, every person that provided us information about the disappearances and death indicated that all of them had ultimately been buried.

Q. Did you have some type of -- did you have

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 29 of 100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA


UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )     CR 00-3034 MWB
                                   )     VOLUME III
     VS.                           )     **SEALED**
                                   )
ANGELA JOHNSON,                    )
                                   )
                 Defendant.        )


                    APPEARANCES:

ATTORNEYS C.J. WILLIAMS AND JUDITH A. WHETSTINE,
Assistant U.S. Attorneys, Suite 400, 401 First Street
S.E., P.O. Box 74950, Cedar Rapids, Iowa 52407-4950,
appeared on behalf of the United States.

ATTORNEY ALFRED E. WILLETT, of the firm of Irvine &
Robbins, 417 First Avenue S.E., P.O. Box 2819, Cedar
Rapids, Iowa 52406-2819,
                         AND
ATTORNEY PATRICK J. BERRIGAN, of the firm of Watson &
Dameron, 2500 Holmes Street, Kansas City, Missouri
64108-2743,
                         AND
ATTORNEY ROBERT R. RIGG, Drake University Law School
Legal Clinic, 2400 University Avenue, Des Moines, Iowa
50311, appeared on behalf of the Defendant.


     SUPPRESSION HEARING IN RE THE ABOVE MATTER,

held before the Hon. Mark W. Bennett on the 13th day
of April, 2001, at the Federal Building, 101 First
Street S.E., Cedar Rapids, Iowa, commencing at 8:15
a.m. before Patrice A. Murray, Certified Shorthand
Reporter in and for the State of Iowa.

             Patrice A. Murray, CSR, RPR, RMR
                   Federal Building
                 101 First Street S.E.
                Cedar Rapids, Iowa 52401
                   (319) 286-2324

A. Correct.

Q. And you were offering your assistance to Mr. Teig to possibly clean-up the bank robbery case and other criminal conduct, correct?

A. Can I have a moment to read this?

Q. Certainly.

A. Yes, that's correct.

Q. Okay. And I think in one of those letters you even volunteered to wear a wire, if that would be deemed appropriate?

A. Yes.

Q. How old of a man are you, sir?

A. Thirty-five.

Q. I want to make sure that we discussed all of your criminal history. Your first conviction occurred at age seventeen?

A. Adult conviction?

Q. May have been in juvenile court, theft in the second degree in Linn County.

A. In juvenile court, yeah.

Q. Age eighteen, false use of a financial instrument?

A. Yes.

Q. Age twenty-two, theft in the third degree?

A. Yes.

Q. Age twenty-two, forgery?

A. Yes.

Q. Again, while you were twenty-two years old, two charges of theft in the first degree?

A. Yes.

Q. Again, while you were twenty-two years old, a charge of theft in the second degree?

A. Yes.

Q. And then bank robbery at age twenty-two?

A. Yes.

Q. And then my understanding from your testimony yesterday is although you were not charged with perjury by Mr. Teig, you received a sentencing enhancement at the time of your sentencing on the bank robbery case?

A. Correct.

Q. And that was in relation to the fact that in regards to some sworn Grand Jury testimony, you lied, correct?

A. What's that, sir?

Q. The reason for the perjury enhancement is you lied to the Federal Grand Jury?

A. I gave false testimony, yes.

Q. That would have been in April of 1988?

A. Somewhere around there, yes.

Q. And you testified to the Grand Jury on subsequent

occasions, correct?

A. Yes.

Q. February of 1999, in the Scotter Clark investigation?

A. Yes.

Q. June of 2000 in the Robert Shultice investigation?

A. Yes.

Q. You also testified at the sentencing of Scotter Clark on August 1 of 2000 in front of United States District Judge Michael J. Melloy?

A. Yes.

Q. Okay. Have you testified to any other grand juries in any other investigations?

A. Yes, I have.

Q. Okay. In Pennsylvania?

A. No.

Q. In California?

A. Yes.

Q. Okay. Have you been asked to testify at any Grand Jury involving one Geoffrey Garrett?

A. No.

Q. Have you lied on any other occasions to the Grand Jury?

A. No.

Q. Okay. At the time of your conviction for heroin

trafficking in the district of Florida, did you have a chance to review your Presentence Report?

A. Yes.

Q. And were you aware that there were some opinions regarding your mental health?

A. Yes.

Q. Okay. Are you aware you've been diagnosed as having a passive aggressive personality disorder?

A. I believe that was when I was younger.

Q. Okay.

A. Since that time, I have been rediagnosed.

Q. Okay. And that rediagnosis amounts to antisocial personality?

A. No.

Q. Aggressive -- undersocialized nonaggressive conduct disorder and passive dependent personality disorder?

A. No.

Q. What do you believe the diagnosis is?

A. Well, it's not what I believe. It's what I know, sir.

Q. What do you know?

A. That I was diagnosed by a psychiatrist from Kansas City as having a passive personality disorder and anxiety.

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 31 of 100

Page 486

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

Q. I believe you'll find this to be your Presentence Report from your charges in Florida, if you'd like to take a look at Paragraphs 78 through 80, on Page 16 and the following page.

A. Approximately twenty-three years ago.

Q. But isn't it true that it reflects in those paragraphs that you at one point in your life had been diagnosed with antisocial personality?

A. Yes, at one point, yes.

Q. And that some of the acting out of those diagnoses include stealing and lying?

A. I believe that was his opinion, yes.

Q. Okay. I'm sorry, how old did you tell me you were?

A. Well, 1983, I was eighteen. 1978, that would make me twelve or thirteen.

Q. How old are you as we sit here today, sir?

A. Thirty-five.

Q. How many years have you been incarcerated?

A. All together?

Q. All together?

A. Sixteen or seventeen.

Page 487

Q. Almost half of your adult life has been spent in correctional facilities?

A. Yes.

Q. If I could retrieve these exhibits?

A. Sure.

MR. WILLETT: Your Honor, at this point, if it please the Court, I'm going to pass this cross-examination off to Mr. Berrigan on some of the issues that we've previously discussed.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, Mr. McNeese.

A. Good morning.

Q. How are you today, sir?

A. Fine, thank you.

Q. Mr. McNeese, in the early part of 1998 -- I'm sorry, 1996, you received a life sentence on a charge of conspiracy to import heroin into the United States, is that correct, sir?

A. Yes, it is.

Q. And that offense occurred while you were already serving your sentence for bank robbery as a result of the conviction here in the Northern District of Iowa?

A. Correct.

Page 488

Q. You were actually in a penitentiary at the time that crime was committed, the importation of heroin?

A. Yes.

Q. And as a result of that conviction, well, first of all, there was a trial held in that case, was there not?

A. Yes.

Q. And you were charged in conjunction with two other individuals?

A. Yes, I was.

Q. One of the Defendants at that time was your wife, a lady by the name of Fanny McNeese, is that right?

A. Yes.

Q. And that's a lady that you had met while you were in the penitentiary in Alabama?

A. No.

Q. When did you meet her, sir?

A. When I was in Florida.

Q. In Florida?

A. Yes.

Q. In the penitentiary in Florida?

A. Low security facility.

Q. You were in jail or some type of confinement when you met this woman?

A. Yes.

Page 489

Q. And you subsequently married her?

A. Correct.

Q. And that all occurred without you ever getting out of the confinement, whatever it was that you were confined in?

A. Correct.

Q. And this lady, your wife, testified against you at your trial, isn't that right?

A. Yes, she did.

Q. It was after that sentence in early 1996 that you started actively cooperating with the Government officials, would that be fair to say, Mr. McNeese?

A. 1998, yes.

Q. Weren't you talking to federal agents while you were in the penitentiary in Atlanta before you were approached in the summer of 1998 by Mark Fischer?

A. Yes, in 1998.

Q. And, in fact, you were talking to the federal agents about criminal activities, as you said yesterday, both in Pennsylvania and New York?

A. Correct.

Q. And that cooperation involved information about organized crime, isn't that right?

A. Yes.

Q. Because you had met individuals that were highly

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 32 of 100

placed in New York City organized crime families?

A. Yes.

Q. And, in fact, you met these individuals while you were in the penitentiary?

A. Yes.

Q. And one of the men that you met was a man named Vic Amuso. Am I pronouncing that correctly?

A. Yes.

Q. All right. And what place does Mr. Amuso have in organized crime?

A. He's the boss.

Q. He's the boss. You and he became close while you were both serving time in the federal penitentiary in Atlanta?

A. Yes.

Q. And Mr. Amuso essentially took you in, adopted you into this organized crime family that he headed, isn't that true?

A. Yes.

Q. And you thereafter continued to become involved with that activity?

A. To be involved with Mr. Amuso, yes, sir.

Q. Yes, sir?

A. Yes, sir.

Q. And then in July, July the 28 of 1998 to be

specific, you were approached by a gentleman by the name of Mark Fischer, isn't that right?

A. Yes.

Q. And Mr. Fischer was investigating a conspiracy that allegedly had taken place here in the Northern District of Iowa involving a man by the name of Scotter Clark and others, isn't that true?

A. Yes.

Q. Before Mr. Fischer approached you in July of '98, no other law enforcement officers had approached you about this particular conspiracy, have they?

A. No.

Q. The information that you were giving to law enforcement officers before July of '98 had to do with criminal activity in other places other than Iowa, isn't that right?

A. Yes.

Q. And you were giving this information to law enforcement officers while you were incarcerated with the very individuals that you were talking to the law enforcement officials about, isn't that right?

A. With some of them, yes.

Q. And then Mr. Fischer came down and he indicated to you that taped conversations had been collected from phone conversations that you had had with your

brother, Floyd McNeese, and a fellow by the name of Jerry (sic) Gross or Grosso, concerning a conspiracy involving drugs and money laundering in the Northern District of Iowa, isn't that right, sir?

A. Yes.

Q. And not only did he indicate to you that the Government had taped conversations, but these men actually had photographs of your family's residences, where your son lived and some of the other members of your family, do you remember that?

A. Yes.

Q. And that quite surprised you at the time?

A. Yes.

Q. And they wanted you to cooperate in that investigation, isn't that right?

A. Yes.

Q. And you agreed to do that very shortly or at the time that you met them, isn't that true, sir?

A. Yes.

Q. You already had a taped conversation of some communications between yourself and Scotter Clark that you had recorded or had recorded before these men had even approached you, isn't that true?

A. No, sir.

Q. It's not. May I approach, Your Honor?

THE COURT: You may.

Q. I want to hand you, Mr. McNeese, Defendant's Exhibit U, as in uniform. It's a photocopy, and not very well copied, but if you could look at that for just a moment, sir, I wanted to ask you a question.

A. Yes.

Q. Would you look at the last sentence in the first paragraph of Exhibit U?

A. Yes, that was a conversation my brother had recorded with Scotter.

Q. Okay.

A. I don't believe I was ever involved in that conversation.

Q. Okay. So you, I guess to put it more precisely, you had in your possession a -- or more specifically your wife had in her possession a taped telephone conversation between your brother Floyd and Scotter Clark?

A. Yes.

Q. And this letter, Exhibit U, is to Mr. Fischer, isn't that right?

A. Yes.

Q. And you were telling Mr. Fischer on August the 2, 1998, that he could have that tape, if he went to your wife --

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 33 of 100

A. Correct.

Q. -- and asked for it, correct?

A. Yes, sir.

Q. So by at least August the 2, 1998, at the very latest, you agreed to cooperate with these officers in this investigation pertaining to Mr. Clark?

A. Yes.

Q. And, of course, they wanted information respecting all of the participants in this conspiracy, did they not?

A. Yes.

Q. In other words, they wouldn't allow you to exclude your brother, Floyd, as a participant, you couldn't leave him out?

A. Floyd was already cooperating.

Q. Okay. And you included him in the information that you gave to these Government officials?

A. Yes.

Q. Your brother Floyd?

A. Yes.

Q. As a result of your willingness to cooperate in that investigation, and I -- I guess just to be clear, I know we've covered a little bit of this yesterday, Mr. McNeese, but for the Court's benefit, the activity that we're talking about involved a conspiracy wherein

the mob people or the organized crime people that you knew in New York would be essentially selling marijuana to Scotter Clark in Cedar Rapids who would then distribute it thereafter, isn't that right?

A. Yes.

Q. And in return for the marijuana being provided to Mr. Clark, there was a tax that he paid to you and Mr. Gross, isn't that right?

A. Yes.

Q. You and Mr. Gross were supposed to split that money?

A. Yes.

Q. And it was supposed to be a hundred dollars for every pound of marijuana?

A. Yes.

Q. And then once you began cooperating, you were moved back here to Cedar Rapids, were you not?

A. Yes.

Q. And at that time, of course, you were continuing to talk to the law enforcement officers, correct?

A. Correct.

Q. And you were also talking to Mr. Clark, isn't that true?

A. Yes.

Q. He was visiting you, and you had telephone

communications with him?

A. Yes.

Q. And, of course, Mr. Clark did not know that you were cooperating with the law enforcement officers?

A. No.

Q. And you certainly didn't tell him that?

A. No.

Q. And you led him to believe that you were continuing to be a member in the conspiracy that you had all engaged in, isn't that right?

A. Yes.

Q. And this is the information that you later provided to a Grand Jury in an effort to assist the Government in indicting Mr. Clark?

A. Some of the information, yes.

Q. Some of it obtained before you had agreed to cooperate and some of the information that you gave to the Grand Jury was a result of your meetings with Mr. Clark conducted after you had agreed to cooperate?

A. Yes.

Q. Okay. Mr. Clark is the only person in that conspiracy that you've actually given testimony against, is that fair to say, Mr. McNeese?

A. I believe so.

Q. You never actually testified against Jerry Grosso

or Josh Schwartz or Marissa Manasse, or your brother Floyd, did you?

A. No.

Q. And a lot of these people ended up cooperating themselves in that investigation, you know that now, don't you?

A. Yes.

Q. That case that began in the fall of 1997, that really just concluded here fairly recently, did it not?

A. With me entering a guilty plea.

Q. Yes, sir, and the guilty plea was in September of 2000?

A. Yes.

Q. Isn't that right?

A. Yes.

Q. And the charges were modified from the original complaint of conspiracy to distribute marijuana, more than 50 kilograms, to conspiracy to commit money laundering, isn't that right, Mr. McNeese?

A. Yes.

Q. And, of course, there are differences in the maximum penalties in those two crimes, you're aware of that?

A. Yes.

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 34 of 100

Page 498

Q. You are a category six on their criminal history score that the Federal Government uses in its Sentencing Guidelines, isn't that right?

A. Yes.

Q. That's the high end of the criminal history scale, you're aware of that?

A. Yes.

Q. And the maximum punishment for the commission of the offense of conspiracy to distribute more than 50 kilograms was thirty years, without possibility of parole, you were aware of that?

A. No.

Q. Okay. May I approach, Your Honor?

THE COURT: You may.

Q. I'm going to hand you, sir, two exhibits that I have not marked, but I'll identify them for the record, one is dated June the 15th, 2000. It's a letter to Mr. Mark Meyer, and in it is a proposed plea agreement concerning your case. The other exhibit I'm handing you is July the 12th, 2000. It also is a letter to Mr. Mark Meyer, again, concerning your proposed plea agreement in this case. First of all, Mark Meyer was your lawyer in this matter involving the Scotter Clark conspiracy?

A. Yes.

Page 499

Q. Okay. And you, I assume, reviewed those documents, did you not?

A. Yes.

Q. And would you take a look, sir, at the first paragraph there under "charges and penalties." Have you had a chance to look at that, Mr. McNeese?

A. Yes.

Q. And what does the -- what do those documents indicate that you were to be charged and plead guilty to, sir?

A. More than 50 kilograms of marijuana.

Q. And could you tell the Court what the maximum punishment is for that offense?

A. Maximum penalty is up to thirty years in prison without the possibility of parole.

Q. All right.

A. My guidelines were only twelve to fourteen years I believe, though.

Q. You believed there were only twelve to fourteen years?

A. Yeah, something like that. It wasn't thirty years.

Q. It wasn't?

A. I don't believe it was, no.

Q. Okay. You have a prior drug conviction, don't

Page 500

you, Mr. McNeese? We've already discussed that, importation of heroin?

A. Yes.

Q. And, in fact, even after the charge was reduced to money laundering, did you not receive a sentence of twenty years on that?

A. For what?

Q. What was the sentence that you eventually received in this case?

A. For what, the money laundering?

Q. Yes, sir.

A. I haven't been sentenced yet.

Q. You're still awaiting sentencing, that's right?

A. Yes.

Q. You pled guilty in September of 2000, and we're here in April, and you've yet to be sentenced for this offense?

A. Correct.

Q. Thank you, sir. There's a provision in the plea agreement that you did sign in September that calls for you to submit yourself to a polygraph examination when requested by the Government?

A. Yes.

Q. And that was also in your original plea proposals that you've just looked at of June the 15th and July

Page 501

the 12th of 2000?

A. Yes.

Q. But you modified the final plea agreement respecting the polygraph, when you met with Mr. Reinert the day that you signed the plea agreement, did you not?

A. Yes.

Q. And the polygraph provision was changed from the original agreement, which was that if you failed the polygraph, the plea agreement, one, shall be null and void; two, if you failed the polygraph, the plea agreement may be null and void?

A. I passed the polygraph.

Q. You passed the polygraph concerning something wholly different than the charges that you pled guilty to, isn't that true, Mr. McNeese?

A. Yes.

Q. We're going to discuss that later, if you permit us to skip that for now --

A. Sure.

Q. -- in some detail, but the truth is that you've never taken any other polygraphs respecting any of the information that you've given to the Government about any of these other individuals that you have implicated and the various criminal charges that you

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 35 of 100

have implicated?

A. No.

Q. And not only did the plea agreement in September reflect that a failed polygraph would not automatically render your plea agreement null and void, but you had inserted in this final plea agreement a provision wherein the Government was required to give you notice ahead of time through your lawyer about the issues they wanted to discuss with you and the polygraph, isn't that right?

A. Yes.

Q. Kind of a heads up on what they were going to be asking you --

A. Yes.

Q. -- so you could be prepared?

A. No.

Q. At the time that you were giving testimony to a Grand Jury here in Cedar Rapids in February of 1999, you were also cooperating with Government officials in the state of California regarding a drug conspiracy case there, were you not?

A. When was that?

Q. This would be early part of 1999.

A. Yes, I'm not sure on the dates.

Q. Okay. And I'm -- understandably, there's a lot of

dates to remember. But you remember the individual that you implicated in California?

A. Yes.

Q. What was his name, sir?

A. Dan Dice.

Q. Dan Dice?

A. Yes.

Q. And Mr. Dice was a childhood friend of yours, was he not?

A. Yes.

Q. Somebody you had known essentially most of your life?

A. Yes.

Q. And the drug conspiracy Mr. Dice was involved in was in California?

A. Yes.

Q. And you weren't a participant in that?

A. No.

Q. But you were able to obtain information from Mr. Dice?

A. Yes.

Q. And you were able to get him to trust you to implicate himself in that drug conspiracy?

A. Yes.

Q. And then give that information to the Government?

A. Yes.

Q. And I understand that there was no request made of you to do that, was there?

A. By the Government?

Q. Yes, sir.

A. No.

Q. You didn't have any type of instructions regarding being a listening post or anything like that regarding your conversations with Mr. Dice?

A. No.

Q. Indeed, your conversations with Mr. Clark, you had received no instructions from the Government as to the appropriate conduct respecting your conversations with Mr. Clark either, had you?

A. No.

Q. And you were clearly cooperating with the Government at least as of August the 2, 1998?

A. Yes.

Q. Do you know whatever happened to Mr. Dice?

A. He's left the country.

Q. You testified at his Grand Jury, however?

A. Yes.

Q. Okay. And you were doing this in an effort, Mr. McNeese, would it be fair to say, to try at some point to get a Rule 35 reduction in your life

sentence?

A. I did that because he got my sister addicted to crack cocaine.

Q. I see. So you were doing this in response to something Mr. Dice had done to your sister?

A. Yes.

Q. Well, you, yourself, were addicted to drugs at one time, weren't you, Mr. McNeese?

A. Years ago, yes.

Q. And Mr. Dice, you say, left the country before he could be prosecuted?

A. Yes.

Q. Did you wear a wire or have any of your conversations with Mr. Dice tape recorded?

A. Yes.

Q. Did the -- as far as you know, has the district in which Mr. Dice was prosecuted written any letter or done anything as a result of the cooperation that you provided to them in Mr. Dice's case?

A. I have no idea.

Q. You don't know. You were certainly hopeful that that would occur?

A. Yes, I was.

Q. You are a father, aren't you, Mr. McNeese?

A. Yes, I am.

Q. In fact, I think you and I have sons, and I'm not going to mention your son's name out of respect for his privacy, but we have sons about the same age, thirteen or fourteen, is that right?

A. Yes.

Q. And I saw in the Presentence Report that Mr. Willett showed you that despite your criminal difficulties it's been reported that you are indeed a very good father, is that a statement you'd agree with?

A. I love my son, yes.

MR. WILLIAMS: Your Honor, I object to this line of questioning. I'm trying to figure out what relevance it would have in this hearing, and I would just -- I'm concerned about where this is going. I can't figure out what relevance it has.

MR. BERRIGAN: I think it obviously goes to his motivation and cooperation, Your Honor.

THE COURT: Yeah, the objection's overruled.

Q. In fact, why don't we just cut to the quick, Mr. McNeese. Would it be fair to say, sir, that this effort to get your sentence reduced, this life sentence that you have, it's actually life plus twenty years, right?

A. I have twenty concurrent with the life sentence.

Q. Well, didn't the judge in Florida, Mr. McNeese, give you a life sentence consecutive to the twenty year bank robbery sentence that you already have?

A. I had a hundred and five month sentence.

Q. I understand you had two charges in Florida and that they were run concurrently?

A. Right.

Q. Life plus twenty concurrently. But the fact of the matter is that you already had a twenty year sentence for bank robbery, isn't that right, before your conviction in Florida?

A. No, sir.

Q. Well, what was your sentence for the bank robbery conviction here in the Northern District of Iowa?

A. I believe it was eight years nine months.

Q. Oh, I'm sorry. You received a sentence of eight years nine months, and then you got a life sentence consecutive to that?

A. Yes.

Q. And in any case, you have at least a life sentence. Would it be fair to say that one of the primary motivations, Mr. McNeese, in your efforts to get that sentence reduced is because you do have a son, who you love and you'd like to eventually get out of jail to see?

A. Yes, that's correct.

Q. And in that regard, you also provided information to the Government regarding a gentleman by the name of Jeff Garrett, is that right?

A. Yes.

Q. Mr. Garrett was -- is a private investigator here in town, isn't that right?

A. Yes.

Q. And you knew Mr. Garrett before you began giving the Government information about him, isn't that true?

A. Yes.

Q. In fact, you had hired Mr. Garrett -- or more accurately, the organized crime family that you were associated with had hired Mr. Garrett to kind of look out for your interests here in Cedar Rapids after you were incarcerated, isn't that true?

A. Yes.

Q. He was paid money through a lawyer in New York by the name of Martin Gidelli (phonetic), am I pronouncing that correctly?

A. Gidelli.

Q. You certainly weren't paying Mr. Garrett, yourself?

A. I had gave him money, yes.

Q. You have. And I think you testified yesterday, I

don't want to misquote you, but he was your eyes and ears here in Cedar Rapids, did you say that?

A. In a sense, yes.

Q. And at the time that you were talking to Mr. Garrett -- and this would be March of 2000 that you were getting information from him?

A. What type of information?

Q. Well, this would be after you were transported back here to Cedar Rapids, and Mr. -- you were waiting -- or had already testified in Mr. Clark's Grand Jury. Mr. Garrett was visiting you at the Linn County Jail, was he not?

A. Yes.

Q. And he was doing that for some purpose related to you having hired him, was he not?

A. Yes.

Q. What was he doing, Mr. Garrett? What had you employed him to do?

A. I hadn't employed him to do anything. He came to say hello to me because I was back in town.

Q. He just came to say hello?

A. Yes.

Q. There weren't any discussions with Mr. Garrett about the Scotter Clark case?

A. Yes, he did mention it.

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 37 of 100

Q. He mentioned it?

A. Yes.

Q. You weren't trying to obtain any information from Mr. Garrett pertaining to the other conspirators in that case?

A. Mr. Garrett had mentioned that Mr. Willett was representing one of the co-conspirators.

Q. Mr. Garrett brought that up?

A. Yes.

Q. And my question was, to you, Mr. McNeese, whether you were trying to obtain information from Mr. Garrett pertaining to the other folks that were involved in that conspiracy; Mr. Gross?

A. In March of 2000?

Q. Yes.

A. No.

Q. I thought you mentioned something yesterday about being concerned that you might receive another charge in connection with that Scotter Clark case?

A. Yes, that was earlier.

Q. I'm sorry?

A. That was prior to March.

Q. Prior to March?

A. Yes.

Q. Did you direct Mr. Garrett to get some information

about Mr. Willett's client?

A. Excuse me, I didn't hear what you said.

Q. I asked you if you had directed Mr. Garrett as your investigator to procure for you information respecting Marissa Manasse, a codefendant in the Scotter Clark conspiracy?

A. He had told me he had some information, evidence, and I did say I would like to see it.

Q. And I asked you whether you had directed Mr. Garrett to get that information?

A. I think what you're meaning is did I have him break into Mr. Willett's office. No, I did not.

Q. That would be my next question. Had you first asked Mr. Garrett to procure any information respecting Marissa Manasse?

A. Yeah, he told me that he had information in his possession.

Q. And you did not request that?

A. I said I would like to see it.

Q. I'm not trying to be difficult, Mr. McNeese, but all I'm really asking you is before Mr. Garrett gave you the information, before he showed it to you, had you requested of Mr. Garrett that he procure information for you regarding Marissa Manasse?

A. I didn't know he had information until he had it

in his possession.

Q. Okay. So you did not ask him to get information respecting that woman?

A. I didn't ask him to steal any information.

Q. Well, did you ask him to get information regarding that lady by legal methods?

A. As I have said, Mr. Garrett came to the jail. Mr. Garrett told me he had information. I said, "Well, I would like to take a look at it," and that was the extent of the conversation.

Q. Okay. So Mr. Garrett showed you this information regarding Marissa Manasse before you had asked him to procure that type of information?

A. No, I didn't see it.

Q. Okay. And you had nothing to do with Mr. Garrett having broken into Mr. Willett's office?

A. No.

Q. Is that your testimony?

A. Yes.

Q. By the way, do you know if Mr. Garrett's ever been charged with that offense?

A. I have no idea.

Q. You haven't testified at his Grand Jury yet?

A. No.

Q. You wore a wire on Mr. Garrett, didn't you?

A. No.

Q. No. You had conversations in the jail that were monitored with Mr. Garrett?

A. Yes, they monitored a room that I was in.

Q. And "they," we're talking about law enforcement officers?

A. Correct.

Q. And that was done after you brought to the officers's attention that Mr. Garrett had broken into Mr. Willett's office?

A. Mr. Garrett brought the information. I had seen in the information that it contained a document showing I was cooperating. I contacted law enforcement to yell at them, because I was told that my cooperation would not be known, and that's when law enforcement learned of it. I didn't call and tell them about it. I called to scream at them for allowing the information to be released.

Q. Didn't Mr. Garrett, in fact, tell you, Mr. McNeese, that he had gone above and beyond the call of duty in obtaining the information respecting Ms. Manasse?

A. Yeah, I'm sure he would have said something like that.

Q. Didn't he disclose to you before you alerted law

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 38 of 100

enforcement officers that he had in fact broken into Mr. Willett's office?

A. Did I do what now?

Q. Didn't Mr. Garrett tell you when he gave you this information regarding Ms. Manasse that he had gotten it from Al Willett's office?

A. Did he tell me he got it from Al's?

Q. Yes, sir.

A. Yes.

Q. That he had broken into Mr. Willett's office to get it?

A. Yes.

Q. And you're the one that told the law enforcement officers about that?

A. Yes.

Q. And at the time that you told them, Mr. Garrett ostensibly was your investigator?

A. Yes.

Q. Working for you?

A. And also working for New York.

Q. New York, your organized crime family run by your boss, Mr. Vic Amuso?

A. Yes.

Q. Steve Stefani, do you know Mr. Stefani?

A. Yes, I do.

Q. I guess he is or was a lawyer here in town?

A. Yes.

Q. How did you know Mr. Stefani?

A. He was Scotter Clark's attorney.

Q. And you ended up getting information regarding Mr. Stefani that you turned over to law enforcement officials?

A. Yes.

Q. He wasn't your lawyer?

A. No.

Q. How did you do that, Mr. McNeese?

A. How did I do what?

Q. How did you obtain this information from Mr. Stefani?

A. I spoke with Mr. Stefani.

Q. While you were incarcerated?

A. Yes.

Q. Was Mr. Stefani incarcerated at that time?

A. Yes.

Q. And what type of information did you obtain from Mr. Stefani?

A. Just drug information.

Q. Could you be a little more specific, sir?

A. I can't really recall exact information.

Q. Did it involve Mr. Stefani's participation in some

type of illegal drug related activity?

A. Yes.

Q. And when you obtained this information from Mr. Stefani, you were both incarcerated, is that correct?

A. Yes.

Q. And was that here at the Linn County Jail?

A. Yes.

Q. And you, getting this information, then alerted law enforcement officers?

A. Yes.

Q. Now, Mr. Stefani, had he done something to you to cause you to be angry with him?

A. No.

Q. Mr. Garrett, I guess, you were angry at him because it was information in his file that indicated you were a Government informant?

A. No, I wasn't angry with him.

Q. You weren't angry at him?

A. At Mr. Garrett.

Q. And so your motivation in bringing this information to law enforcement officials regarding Mr. Garrett's illegal activities, breaking into Mr. Willett's office, and Mr. Stefani's illegal activities related to drugs, was what, sir?

A. Mr. Garrett's was, as I told you earlier, that the Government had assured me that they would not release information that I was cooperating. Mr. Garrett obtained the information and faxed it to New York. So essentially, my life was put in danger because of the Government's error. I called the Government, I found out Monday morning. I called the Government immediately after that and expressed how upset I was about it. They came to see me. I explained everything, and they moved me that day.

Q. And included in explaining everything, that's when you told them about Mr. Garrett --

A. Yes.

Q. -- as we've discussed? And Mr. Stefani, why did you implicate him in drug related activity?

A. He was discussing things with me.

Q. I see. Did you wear a wire respecting Mr. Stefani?

A. No.

Q. Had no listening post instructions respecting your conversations with Mr. Stefani?

A. No.

Q. He was prosecuted here in the Northern District of Iowa?

A. Yes.

Page 534

substantial conversations with Assistant United States Attorney Pat Reinert concerning this particular case. We have explored several different resolutions, but to date, I have no information to suggest when it might be resolved. I -- I do know that the Government has -- the United States Government has indicated to me that in the event that a plea agreement couldn't be reached, that it would be their intent to indict Mr. Garrett federally. However, we have been exploring potential non-Federal charges in State court to resolve this matter. And, however, Mr. Garrett has not accepted any plea offers, although there have been plea offers that have been made throughout the course of the last nine months or so.

THE COURT: What's difficult for me in determining the Fifth Amendment privilege here, you have to look at the scope of all potential federal crimes, all potential State crimes, and make a decision whether some information could tend to incriminate a Defendant. And given the breadth of federal criminal law and the breadth of state law, it's virtually impossible to -- I've been trying to mull through my mind what some of the obvious charges are, but then there are a lot of kind of nonobvious charges and so it's very difficult for me to say that

Page 535

while I may be skeptical of a claim of a Fifth Amendment, in certain respects, you have to look at all potential charges that could be filed, and that's -- that's a dauntingly impossible task, or at least for me, to undertake. So any other argument? I think in this case, you have to err on the side of enforcing the witness' Fifth Amendment.

MR. RIGG: I understand the ruling, but I thought -- in response to Mr. Williams, I thought we did broach this issue on the motion to disqualify, based on the brief supplied to the Court, that we were trying to alert to everybody that we knew this was coming up. That was a couple of months ago. We've assumed that the US Attorney's Office would do something one way or another, knowing this issue was coming up. It hasn't resolved itself. Mr. Reinert's still in charge of this case and still in charge of Mr. Garrett's case. That's all I have, Your Honor.

THE COURT: Well, I'm going to go ahead and enforce Mr. Garrett's Fifth Amendment privilege.

MR. JACKOWSKI: Thank you, Your Honor.

THE COURT: Thank you, Mr. Jackowski. Mr. Garrett, you can step down.

THE WITNESS: Thank you, sir.

MR. RIGG: Thank you, Your Honor.

Page 536

THE COURT: Thank you, Mr. Rigg.

MR. WILLIAMS: Your Honor, do you mind if my case agent leaves for a while?

THE COURT: No, that's fine, thank you. Counsel, are we going to save the matter that requires closing the hearing until the end of Mr. McNeese's cross-examination?

MR. WILLETT: Absolutely, Your Honor. We want to try to keep this ball moving.

THE COURT: And we're waiting for Mr. McNeese to be brought back down. Thank you.

(Whereupon, a discussion was held off the record.)

THE COURT: Could you pull your chair up a little bit more, Mr. McNeese?

MR. BERRIGAN: May it please the Court.

THE COURT: Mr. Berrigan, whenever you're ready, thank you.

CONT. CROSS EXAMINATION

BY MR. BERRIGAN:

Q. Mr. McNeese, if you'll permit me, I want to jump back for just a couple of questions respecting Mr. Garrett, okay?

A. Yes.

Q. Do you remember our discussion about your contact

Page 537

with Jeff Garrett in the early part of 2000, about March 2000?

A. Yes.

Q. Okay. In fact, you had hired Mr. Garrett almost two years before that, had you not?

A. Yes.

Q. In September of 1998?

A. Yes. I'm not sure on the date.

Q. It would have been shortly after you got back to the Linn County Jail, transferred from Atlanta, does that sound about right?

A. Yes.

Q. And this is after you had already agreed to cooperate with the investigators in the Scotter Clark case?

A. That's when I was in an attempt to help my brother, but in the same sense, I wasn't fully cooperating.

Q. What do you mean by that, sir?

A. Well, I call it like fence jumping. I wasn't -- I mean, I didn't want to cooperate. I wanted to help my brother with the Scotter situation, but at the same time, I wanted to go back to prison and be able to continue the life-style that I had in prison.

Q. I thought you told me earlier that when you agreed

Page 538

to speak to Agent Fischer in August, in fact, August 2, you recall I showed you the letter, 1998?

A. Right.

Q. That your brother had already agreed to cooperate by that time?

A. Yes.

Q. And so now we're in September, a month later, and you're still concerned about your brother?

A. Yes.

Q. And you hire Mr. Garrett --

A. Yes.

Q. -- as your investigator?

A. Yes.

Q. And this isn't something, I don't imagine, you talked to the law enforcement officers about, that you were hiring an investigator?

A. Well, when they brought me back here?

Q. Yes.

A. I stopped communicating with them, you know. I wasn't cooperating on other things, and I had refused to go to the Grand Jury.

Q. So you were essentially having a change of heart about your initial thought that you would cooperate?

A. Yes.

Q. And you hired Mr. Garrett in September of 1998 for

Page 539

what purpose, Mr. McNeese?

A. I had felt that the Government may possibly bring racketeering charges against myself and others. I wanted him to do his best to investigate that.

Q. All right. And so he was in your employ then up through March of 2000?

A. Yeah, I mean, I would say in March of 2000, he was more in the employment of Martin Gidelli than myself.

Q. And Mr. Gidelli, as we mentioned, is the New York lawyer that you believe represents the organized crime family headed by Vic Amuso?

A. Yes.

Q. Okay. You recall that it was Assistant United States Attorney Pat Reinert who was the lead prosecutor in the Scotter Clark investigation?

A. Yes.

Q. And when you were giving information to the law enforcement officials, in fact, set up a conversation in which the officers were able to overhear your discussion with Mr. Garrett, Mr. Reinert was also in charge of the Geoffrey Garrett investigation, was he not?

A. Yes, he was.

Q. In fact, you met with Mr. Garrett -- excuse me, you met with Mr. Reinert personally and talked to him

Page 540

about what you knew respecting Geoffrey Garrett having broken into Al Willett's office?

A. Well, sir, as I explained earlier this morning, Sunday evening Mr. Garrett came and seen me. Monday morning, he brought the information. As soon as I was through talking with Mr. Garrett, I contacted law enforcement and met with Mr. Reinert shortly after that.

Q. Okay. And if you said that, I'm sorry. I missed that, Mr. McNeese. In fact, you met with Mr. Reinert the day after you had received this information from Mr. Garrett that he had broken into Al Willett's office?

A. It was either the same day -- I thought it was the same day.

Q. All right. Well, we could say very shortly after you received information respecting Mr. Garrett's illegal activities, you were in a face-to-face meeting with Pat Reinert discussing the information you had received from Mr. Garrett?

A. I was discussing more the fact that he had released information showing that I was cooperating with the Government.

Q. Well, in truth, there were a number of matters discussed. I don't mean to split hairs, Mr. McNeese.

Page 541

There were tape recorded conversations between Mr. Reinert and Mr. Willett, weren't there?

A. That's what I was led to believe, yes.

Q. And you claim to have in possession -- be in possession of taped -- secretly taped conversations between Al Willett and Pat Reinert?

A. That I was in possession? No.

Q. Well, you had seen those, or been led to believe Mr. Garrett had them?

A. I had been led to believe, yes.

Q. Well, one of the matters you discussed with Mr. Reinert certainly was that Mr. Garrett had broken into Al Willett's office, correct?

A. Yes.

Q. And it was after your meeting with Mr. Reinert, in fact, just about a week later, that there was the tape recorded -- videotape recorded conversation with Mr. Garrett, you and Mr. Garrett?

A. Video, I don't --

Q. Well --

A. There was an audio, an audiotape, I believe.

Q. Okay.

A. I don't know about a videotape.

Q. Well, I have a report that says there was a videotape recording of the meeting between Garrett and

## Page 542

McNeese made from a separate room. You're not aware of that?

A. No.

Q. If that's true or not?

A. No.

Q. At least there was an audiotape recording?

A. Yes.

Q. And this recording had to be made at the Benton County Jail, do you remember that?

A. Yes.

Q. You were moved from Linn County to Benton County to get this done?

A. Yes.

Q. And this was right after or within a week of your meeting with Mr. Reinert?

A. I believe I left the same day.

Q. Okay. Respecting Mr. Reinert, the final plea agreement that you signed, we've looked at that already, was signed on September the 12, do you recollect that?

A. Yes.

Q. However, it was attached to a letter to your lawyer, Mr. Meyer, the letter dated September the 7, 2000, did you know that?

A. Yes.

## Page 543

Q. And that, coincidently, was one day after you met with Special Agent William Basler at the Benton County Jail to discuss Angela Johnson?

A. Yes.

Q. And that's when you told Agent Basler about Ms. Johnson purportedly having admitted to you that she had participated in these five homicides, that was during your September 6 meeting with William Basler?

A. The 6th, yes.

Q. The next day, you got a revised plea agreement mailed to your lawyer?

A. If that's what the date is, yes.

Q. Okay. We can get back to Mr. Shultice for just a moment. Mr. Shultice was already incarcerated in Benton County when you were placed in with him in March, specifically March the 23 of 2000, is that right?

A. Yes.

Q. Okay. And so if I understand the dates correctly, Mr. McNeese, you are moved to Benton County to arrange this tape recording of your conversation with Mr. Garrett, on March the 23, that's the date of your movement?

A. Yeah, again, I'm not sure of the dates, but that's why I was moved.

## Page 544

Q. Okay. And within a week, you're giving a video -- or audiotaped conversation, you and Mr. Garrett, within a week after being at the Benton County Jail, is that -- does that seem to comport with your recollection?

A. Yes.

Q. And at that time, Mr. Shultice and you were sharing a cell?

A. Yes.

Q. And I don't suppose you discussed the fact that you were cooperating with law enforcement officers against Mr. Garrett, you didn't discuss that with Dr. Shultice, did you?

A. No.

Q. There's been some testimony that Dr. Shultice liked to talk, that he, in fact, talked incessantly to you. Did I hear you say that on your direct examination?

A. Yes.

Q. You found it almost annoying?

A. Correct.

Q. And you didn't ask him any questions about his offenses?

A. The offenses that he was in --

Q. Yes, sir.

## Page 545

A. Actually, no, he was more than willing to, you know, give me detail.

Q. He gave you a remarkable amount of detail about the charges, did he not?

A. Yeah, I knew some of the people that were involved.

Q. And he had a plan that he wanted to have you participate in, wherein he would solicit the murder of two of the witnesses against him?

A. That was discussed.

Q. The Robinsons, do you recollect their names?

A. Yes.

Q. And apparently Mr. Shultice thought that you could help him with this?

A. Correct.

Q. Now, Mr. Shultice -- did you know Mr. Shultice had been in the Benton County Jail for six months before you met him?

A. No.

Q. He also, Mr. Shultice, that is, wanted you to procure perjured testimony from two other witnesses that you would come up with to testify at a sentencing hearing, isn't that right?

A. Yes.

Q. And these witnesses would testify about the

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 42 of 100

victim, the young lady that had died, talk about her drug usage, isn't that right?

A. Yes.

Q. And that was going to be false testimony, of course?

A. Yes.

Q. And Mr. Shultice apparently thought you could help him with that also?

A. Yes.

Q. You and Mr. Shultice passed notes back and forth to each other, did you not, Mr. McNeese?

A. Yes.

Q. In fact, you had a limited supply of paper there at the Benton County Jail I understand?

A. Yes.

Q. Three pieces of paper per day per inmate, is that your recollection?

A. Normally they wouldn't count them out every morning, but they would just give you, you know, a few pieces. Some days you might get five or six.

Q. Okay. And you at some point told Dr. Shultice that your cell was being bugged or monitored. Did you tell them that?

A. I think that he was nervous about that, and I says, "Yeah, could be possible the cell was

monitored."

Q. And so that wasn't your idea. He felt that the cell was bugged. You didn't tell him it was bugged?

A. No.

Q. And as a result, your communications with Dr. Shultice respecting his case and this plot to kill witnesses and suborn perjury, much of that was communicated in writing, was it not?

A. I would say that most of it was communicated in talking.

Q. And did Dr. Shultice, in fact, write some of it down for you?

A. Yes, he did.

Q. On pieces of paper provided by the jail?

A. I'm not sure.

Q. Well, isn't it true, Mr. McNeese, that you actually had to tear up these pieces of paper into smaller pieces so you would have sufficient paper to communicate back and forth with Dr. Shultice?

A. I don't recall.

Q. You were giving notes to Dr. Shultice as well as he providing notes to you, isn't that right?

A. Yes.

Q. And your notes, were any of those notes recovered that you wrote to Dr. Shultice as far as you know?

A. I have no idea.

Q. You're not aware of any?

A. I didn't ask. I don't know.

Q. Well, you have never provided to law enforcement officers any notes that you purportedly wrote to Dr. Shultice during the period that you were both incarcerated together in Benton County, have you?

A. Yes.

Q. Well, wasn't that a copy of a note that Dr. Shultice wrote to you?

A. I don't remember.

Q. You don't remember?

A. No, I mean, I can't -- I can't really recall. I know that there was a note given to the law enforcement.

Q. That you wrote?

A. Yes.

Q. And --

A. I believe so.

Q. And you don't remember that being in fact a copy of Dr. Shultice's note to you regarding the plan to procure the murder of the two witnesses, that doesn't ring a bell with you?

A. No.

Q. Now, with Dr. Shultice, you actually had some

instruction respecting the perimeters of your conversations with him, what you were supposed to do, what you were not supposed to do, isn't that right?

A. Yes.

Q. And would it be fair to say, Mr. McNeese, that this is the first time in your history of having communicated with individuals and subsequently implicated them in various criminal conduct, this is the first time that anybody's given you any specific instructions as to what you should be doing or not doing, would that be true?

A. No.

Q. No. Could you point to any other documents that you've received before your memorandum of instruction with respect to Dr. Shultice?

A. Oh, concerning Dr. Shultice?

Q. No, sir, concerning other individuals.

A. Yes, the organized crime task force from Philadelphia.

Q. And did the organized crime task force in Philadelphia give you a similar type of document or instruction?

A. They instructed me not to discuss with them or any other person in law enforcement any legal matters that came up in the course of conversations that I had.

Page 550

Q. Was that the sum and substance of their instructions to you, the organized crime task force?

A. Yes.

Q. And this was respecting an investigation in Philadelphia?

A. Investigation of a -- yeah, people in Philadelphia.

Q. And this would have been, I suppose, back before you even met Agent Fischer in the summer of 1998?

A. Yes.

Q. So between that instruction from the organized crime task force not to discuss any legal matters, up until the time that you received a memorandum of instruction.

MR. BERRIGAN: May I approach, sir?

THE COURT: You may.

Q. Up until the time that you received that document that I have just handed you, Government Exhibit 3, have there been any other instructions to you, Mr. McNeese, from any Government or law enforcement officials, as to how to conduct yourself in speaking to people that you were conversing with about their criminal activity?

A. No.

Q. Mr. Fischer gave you this particular document,

Page 551

Government's Exhibit No. 3?

A. Yes.

Q. And he gave it to you on April the 11, 2000?

A. Yes.

Q. Sir, could you read the next to -- your signature appears on the second page of that document, does it not?

A. Yes.

Q. We've received some information that you usually read legal information or documents very carefully. Did you read this document carefully?

A. I'm sure I perused it, yes.

Q. And the next to the last paragraph, sir, if I could direct your attention, begins, "However," do you see that?

A. Yes.

Q. "However, keep in mind that our function is to listen for and possibly elicit crime related conversations. Not to indiscriminately invade the privacy of our subject and others." Did you have any questions about that?

A. I don't recall.

Q. Did you prepare any calendars to indicate your conversations with Dr. Shultice, that is, when he had discussed certain matters with you, the contents of

Page 552

those discussions, specifically, when the discussions had occurred?

A. I kept notes, yes.

Q. You kept notes?

A. Yes.

Q. You kept notes from Dr. Shultice?

A. Yes.

Q. And you took notes?

A. Yes.

Q. And was this in a calendar form that you comprised similar to what you did with Ms. Johnson?

A. No.

Q. It wasn't?

A. I don't believe so.

Q. You did have an actual calendar that you used with Ms. Johnson to keep track of your conversations, is that right?

A. Yes.

Q. And whose idea was that?

A. It was my idea.

Q. Your idea?

A. Yes.

Q. In fact, that's not the first time you had used calendars to record information between yourself and other people involved in criminal activity, is it?

Page 553

A. No, it's not.

Q. The first time that you did that was back in 1995, in your own importation of heroin case, isn't that right?

A. The first time?

Q. Had you done it --

A. One of the times.

Q. Had you done it before? That was one of the times?

A. Yes.

Q. You remember that, don't you?

A. I remember making a calendar, yes.

Q. Because the calendar was blown up into a large exhibit that was used at your trial, wasn't it?

A. Yes.

Q. And your ex-wife went through that calendar line by line with the Assistant United States Attorney prosecuting you for importing heroin into the United States, isn't that true?

A. Yes.

Q. And your wife testified under oath repeatedly as to each entry that you had made up or falsified, the information in the calendar, isn't that true, Mr. McNeese?

A. Did she testify to that?

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 44 of 100

Q. Yes, sir.

A. She testified and has also testified recently that, in fact, she had gave false information at that trial.

Q. I see. And not only did your wife testify that you had falsified this calendar, but the probation office conducting your presentence reports in that case gave you a two point adjustment for obstruction of justice based upon you having falsified the information in that calendar, isn't that true?

A. Yes.

Q. Your wife also testified under oath that you passed her notes while you were both incarcerated awaiting trial, indicating to her what her testimony should be. Did you hear that testimony when she testified against you?

A. Yes, I did.

MR. BERRIGAN: Could I have just a moment, Your Honor?

THE COURT: You may.

MR. BERRIGAN: Your Honor, the defense has unfortunately lost track of our exhibit listing. We think we're at X, but I wanted to check with the Court to see if he might have a record.

THE COURT: Let's see, I'm not sure I've kept

very good track either.

MR. BERRIGAN: Well, we're going to --

THE COURT: W's been introduced.

MR. WILLETT: Yes.

MR. BERRIGAN: We're going to take a guess at X, if that's all right.

THE COURT: Sounds good.

Q. I'm going to finish, Mr. McNeese. There's one other thing I wanted to discuss with you, sir. Mr. Willett's going to have a few more questions if you permit us. Last October, specifically on October the 17, 2000, do you recall writing a letter to Mr. Richard Murphy, Assistant United States Attorney, here in Cedar Rapids, Iowa?

A. Yes.

Q. There's a suggestion -- let me show you the letter, sir. I'm handing you Defendant's Exhibit Number X. Do you recognize that three page document, Mr. McNeese?

A. Yes.

Q. It appears to be a photocopy of an original. Is that your handwriting that appears on that document?

A. Yes, it is.

Q. And did you sign it?

A. Yes.

Q. And, in fact, does that appear to be a fair and accurate copy of the October 17, 2000, letter that you sent from -- sent to Mr. Richard Murphy?

A. Yes.

Q. All right. I want to direct your attention -- at this time, Your Honor, the defense will offer Defendant's Exhibit X?

THE COURT: Any objection?

MR. WILLIAMS: No objection, Your Honor.

THE COURT: X is received.

Q. I want to direct your attention, sir, to the second page of Exhibit X, the paragraph that begins "prior to the Johnson situation." Tell me if I'm reading this correctly, "prior to the Johnson situation, I agreed to aid Mr. Reinert in a meeting with Detective Wright, Detective Fischer, Mr. Reinert, Mark Meyer, and myself. Mr. Reinert had saw that he -- I'm sorry, had said that he was pleased with my cooperation, referring to Dr. Shultice, Mr. Garrett, Mr. Clark, and Mr. Dice. He stated that he would not have a problem recommending a 50 percent reduction on my life sentence. What he would do is 50 percent from thirty years, since my range was thirty years to life." Did I read that correctly?

A. Yes.

Q. This suggests that Mr. Reinert, at some point before you wrote this letter, had agreed, irrespective of your cooperation in Ms. Johnson's case, to recommend to the Middle District of Florida that you receive a 50 percent reduction in your life sentence, or fifteen years, is that right?

A. Prior to the Johnson situation.

Q. Does that paragraph read prior to the Johnson --

A. Yes, it does.

Q. Yes, sir.

A. He did not imply or promise me a 50 percent reduction. I had, during the course of a conversation, had asked how they do it, and he said in this district, they do it by percentages, whereas in the Middle District, they do it by levels.

Q. I understand that Mr. Reinert has no control over what some federal judge in Florida may choose to do with you, Mr. McNeese, but did Mr. Reinert tell you, prior to the Johnson situation, he was pleased with you to the point, of your cooperation, that he would recommend to that judge that you receive a 50 percent reduction in your sentence?

A. I believe he said it was possible.

Q. Is there a possible in that paragraph that I missed?

A. No, there's not.

MR. BERRIGAN: That's all I have, thanks.

THE WITNESS: Thank you.

MR. WILLETT: Your Honor, if it please the Court, I'm going to resume questioning. It's going to take a few minutes to clean the deck. Does the Court wish to take a midmorning break at this time?

THE COURT: I don't wish to, but I know the court reporter would love one, so we will. So we'll be in recess for twenty minutes. We'll reconvene at 10:40. Thank you.

CONT. CROSS EXAMINATION

BY MR. WILLETT:

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

MR. WILLETT: Thank you.

Q. Mr. McNeese, let's start by discussing exhibits, and we'll start with some Government exhibits and then we'll talk about some Defendant exhibits. Yesterday during your testimony it was my understanding that you understood Government's Exhibit 3, which was the memorandum of instructions as to how to conduct yourself with Dr. Shultice, but a few months down the road you had some confusion or some questions about

Government Exhibit 4, which was the memorandum of instruction that you signed on September 11, did I understand your testimony correctly?

A. Yes.

Q. Now, sir, I have placed both exhibits in front of you. What was your confusion about Government Exhibit 4, based upon your prior instructions from the organized crime task force in Philadelphia, based upon your instructed conduct in the Shultice case, what about Government Exhibit 4 was confusing to you?

A. The same -- I mean, I asked questions on all of them.

Q. Specifically, as to what?

A. To try to clarify, you know, what was proper and what was not proper.

Q. Okay. And what were you trying to clarify in terms of your conduct with Angela Johnson?

A. During the course of our conversations, if I was able to -- if she talked about things, if I was able to respond to those things.

Q. And what were you told?

A. I was told that if it was in a situation where, in fact, she was asking something, that I could respond.

Q. Okay. And is that what you did?

A. A few times, yes.

Q. A few times, no?

A. Excuse me?

Q. A few times, no?

A. No, I said a few times.

Q. Okay. So you did attempt to elicit information on a few times?

A. No -- as I said, she would ask me a question and I would respond. I didn't say anything about elicit anything.

Q. You didn't violate the rules at all?

A. I believe that if she did ask me questions, I would answer, or if we were in a conversation, I would answer, discuss the conversation.

Q. Okay. Now, then, on Government Exhibit 3, Page 2, Paragraph D, you were told in that third full paragraph that you could possibly elicit crime related conversations, correct?

A. Right.

Q. And that's in regards to Dr. Shultice, correct?

A. Yes.

Q. Now, please turn your attention to Government Exhibit 4. Do you see the second full paragraph on the front page?

A. On the front page?

Q. Starts out "Although you remain incarcerated"?

A. Right.

Q. You were certainly trying to work out a resolution to your criminal conduct, which included cooperation, correct?

A. Yes.

Q. And that's stated there specifically in that paragraph?

A. Yes.

Q. And it goes on to say that you acknowledge, "you" meaning Mr. McNeese, acknowledge that you were not told to have contact with Angela Johnson or any other inmate incarcerated with you, correct?

A. Yes.

Q. However, that agreement goes on to detail how prior to this time, you had violated those perimeters, correct?

A. Yes.

Q. On September 3, a note that you were trying to send to Ms. Johnson was seized, correct?

A. Yes.

Q. And in that note, and also through your own oral admissions, you admitted prior contact with my client, correct?

A. Yes.

Q. And you certainly knew that that was not

appropriate conduct, didn't you?

MR. WILLIAMS: Your Honor, I would object to the point in time. And also, I don't know if this came out right, but the exhibit says he was not told to have contact with Angela Johnson, not that he was not to have contact with Angela Johnson. There was a period where he was told not to have contact with her. He received no contact with her before saying not to have contact with her, so I think it's important to establish a time frame whether it's wrong or not.

THE COURT: Yeah, I think it would be helpful to have a time frame.

MR. WILLETT: Thank you, Judge.

Q. Starting on September 11, what was your understanding of what contact you could or could not have with my client?

A. From September 11 on?

Q. Yes.

A. That if I did have contact with her -- I mean, first of all, nobody wanted me to have contact with her. They were upset that I would, you know, do these things.

Q. But you did it anyway, right?

A. Yeah, but not only with Angie. I talked to every

woman in that jail, wrote every woman in that jail.

Q. You also talked to a lot of other individuals and a lot of other jails before you ever met Ms. Johnson, correct?

A. Not females, so -- you know, I mean, I had been in prison for many years, and so I enjoyed writing letters back and forth with, you know, females, and you know, that was the whole -- that was -- I mean, in the beginning, when Angie and I started talking, it was nothing to do with her case. It was about, I mean, she was telling me things, but I was more trying to just be polite.

Q. You were still working -- at the time Ms. Johnson arrived in the Benton County Jail in July of 2000, you were certainly trying to work on a Rule 35B motion with the Government, weren't you?

A. Yeah, I don't know if I was working on one, but I was hoping for one.

Q. Certainly. And you were hoping for one by cooperating in different cases, correct?

A. My cooperation I believe had ended at that time.

Q. But you had already cooperated with the organized crime task force in Philadelphia, hadn't you?

A. Yes.

Q. You already had cooperated with federal

authorities in California, hadn't you?

A. Yes.

Q. You had already cooperated on Dr. Shultice's case, hadn't you?

A. Yes.

Q. You had already cooperated on Scotter Clark's case, hadn't you?

A. Yes.

Q. You had already cooperated to some extent in the investigation of Geoffrey Garrett, correct?

A. Yes.

Q. All right. The second paragraph of Government Exhibit 4 basically details some of the prior violations of conduct in terms of communication with Ms. Johnson, correct? What had happened prior to September 3? What had happened around August 15?

A. I believe that was the weekend that I had learned that she was there. Actually, she was yelling, screaming at the deputy there or the jailer, and I had asked, you know, "Who's that over there," and actually I had asked Sarah, I believe.

Q. Well, let's put a time frame on that. What is your testimony as to when you first learned as to the arrival of my client, Angela Johnson?

A. I really don't know the date that she arrived. I

mean, I can remember first -- my first contact with her.

Q. Okay.

A. And I'm not sure of the date of that either.

MR. WILLETT: Okay. May I approach the witness, Your Honor.

THE COURT: You may.

Q. Sir, I'm going to hand you what has been marked as Government Exhibit 5.

A. All right.

Q. Take a look at that for a moment and make sure you're familiar with it. I think you'll find that you are familiar with it.

A. Yeah, I believe this is Saturday, August 13.

Q. Okay. These are a series of notes that start on August 13 of 2000, and conclude on what appears to be September 10 of 2000, am I correct?

A. Yes.

Q. And these notes are in your handwriting, and this is your work product, isn't it?

A. Yes, it is.

Q. Okay. And the keeping and retention of notes was something that you had employed in other cases you had cooperated on prior to this time, correct?

A. I think it should be known that I keep notes for

everything.

Q. Okay.

A. And I have for many years.

Q. That's fine. Page 2 of Government Exhibit 5. Now, that's a notation on August 13 of 2000, correct?

A. Yes.

Q. Do you see the second full paragraph that starts out, "I then say"?

A. Yes.

Q. It says, "I then say, do you think they will ever find the bodies?" Did I read that correctly?

A. Yes, you did.

Q. You're trying to obtain information about my client's case, aren't you?

A. Well, if you'll go back to the first page, you'll see that Angie was speaking to me about what she was in jail for, talking about the bodies. I just asked. That was one of the, you know, things that I think -- this listening post was one of the reasons they were concerned about that, was because of things like this.

Q. Okay. And this occurred before you ever signed the September 11 listening post instruction, didn't it?

A. Yeah, they never told me about -- I mean, yes, it did.

Q. They never told you what?

A. Well, I mean, you're trying to make it seem like I interrogated her, when, in fact, I didn't. She was more than willing to discuss who she was and what she had done. And for me not to respond to her questions or what she discussed with me would, you know, be highly unusual, so in the course of the conversation, when the bodies were mentioned, I did ask her, "Do you think they'll ever find the bodies?"

Q. And you asked her questions about the case during this time period, didn't you?

A. I -- I partaked in a conversation with her.

Q. Okay. Would you please turn to Page 6 of Government Exhibit 5. That's your notations from August 18 of 2000, am I correct?

A. Yes.

Q. The first paragraph, "I say to Angie, hopefully you can get out of this entire mess." You were trying to be friends with her during this incarceration, weren't you?

A. Actually, yes.

Q. Okay. Two paragraphs down, I ask, "Why were you talking to her about it anyway?" Did I read that correctly?

A. Yes, you did.

Q. Once again you are -- you're asking a question during these conversations, correct?

A. Well, as I previously said to you, above that, you know, where Angie said -- I'm not going to just ignore what she had said. I mean, of course I'm going to respond.

Q. Okay. Page 10 of Government Exhibit 5. Would you please turn to that page, sir. Do you see the paragraph in the middle that starts out "Angie asked me"?

A. Yes.

Q. "Angie asked me, 'Can they give me the death penalty?'
"I told her, 'No, I don't think so.'
"Then asked, 'Did the people die before April 1 of 1996?'
"Angie said, 'Yes.'"
You're asking her questions about the case again, aren't you?

A. Well, again, she had asked me a question.

Q. Okay.

A. She had asked me about the death penalty.

MR. WILLETT: May I approach the witness, Your Honor.

THE COURT: You may.

Q. In fact at one point you sent correspondence to my client giving her your jailhouse lawyer advice about the death penalty, didn't you?

A. Yes.

Q. Defendant's Exhibit M, is that your handwriting, sir?

A. Yes.

Q. That's your work product?

A. Yes.

Q. That's your letter to my client, Ms. Johnson?

A. I think this is the -- the last page of a letter.

Q. Okay. Do you have any memory as we sit here today as to when you might have penned that letter to my client?

A. Well, I'm sure there's additional pages. We'd probably have to look at the top of the page. I'm sure it's dated.

Q. Just as we sit here today, do you have an independent memory of when you might have written that letter?

A. Sometime probably after August 20, when she had discussed the death penalty with me.

Q. Okay. So sometime after August 20, you passed on your thoughts about the federal death penalty statute?

A. When she asked me, yes.

Q. Okay. And in the third paragraph of that letter, you say, "If the people died prior to September 1994, then you cannot face a punishable sentence of death. See Page 988, Section 3281." Am I correct?

A. At that time, I thought that there was no death penalty applied, but I've learned I was wrong.

Q. Okay. And let's go on to the next paragraph so we can discuss this in context, "Therefore, the offenses are not capital and have a five year statute of limitations. See Page 988, Section 3282." Did I read that correctly?

A. Yes.

Q. The compliment for the day is every member of my defense team was impressed. How did you learn that?

A. I don't understand.

Q. Did somebody tell you that? Did you read it? Did you research it? Did your lawyer, Mr. Meyers, pass that on to you?

A. Why don't you ask Mr. Meyers that.

Q. You're on the stand, sir. How did you find out?

A. I really don't know. I knew that they had -- the Antiterrorism Crime Bill Act sometime was initiated after '95 or '96, somewhere around there, and I didn't think that there was any death penalty, you know. As you know, it was the wrong advice.

Q. But do you have a memory as to how you came upon that information?

A. No.

Q. Okay. And then the last paragraph of this letter -- oh, excuse me, I forgot, you have a PS, "ex post facto applies"?

A. Does it apply?

Q. Do you know what the ex post facto provision is, sir?

A. No.

Q. Okay. How did you know to write it down?

A. I really don't. I mean, as I say, if you'd probably give me the first page of this letter, it would probably, you know, refresh my memory as to what book I used or what newspaper or wherever I read it at.

Q. Okay. Obviously, you sign-off with your first name, you make -- is that your smiley face that you drew?

A. Yes.

Q. Okay. But the paragraph right before your signature, I'll be out after dinner tonight and talk to you about it?

A. Correct.

Q. Did I read that correctly?

A. Yes.

Q. Talk to her about these issues concerning the death penalty?

A. Yes, she had asked me to.

Q. Talk to her -- excuse me, I'm sorry.

A. Yes, she had asked me to talk to her about it.

Q. Talking to her about her case, correct?

A. Talking to her about the death penalty.

Q. Okay. Now, you wrote another letter to my client early on in her incarceration, didn't you?

A. Possibly, yes.

Q. Okay. Let me place in front of you what has been marked as Defendant's Exhibit L. Is that your handwriting, sir?

A. Yes, it is.

Q. Your signature?

A. Yes, it is.

Q. Your work product?

A. Yes.

Q. The letter's undated, isn't it?

A. Yes.

Q. Would you agree with me that from the contents of that letter it's almost like a letter of introduction?

A. Correct.

Q. Okay. So you -- was that the first letter you

ever sent my client?

A. I don't remember.

Q. Okay. Do you have any idea when you sent it?

A. No.

Q. Would it have been shortly after you learned that she was in that jail?

A. Yes.

Q. Now, in that letter, you mention some of the things you're facing, correct?

A. Yes.

Q. Racketeering charges?

A. Yes.

Q. You mentioned that people may think you're violent?

A. Yes.

Q. You dispute that description?

A. Yes.

Q. Okay. Just sort of letting my client know who you are and what's up about you, huh?

A. Yes.

Q. Okay. If I may. Thank you. Government Exhibit 5, is that still in front of you?

A. Yes, it is.

Q. Okay. Page 12, please. Top of the page, on Friday, September 1, you wrote my client a letter,

correct?

A. Yes.

Q. On Sunday, September 3, you wrote my client a letter on that date, didn't you?

A. She wrote me also, yes.

Q. Okay. But you also wrote a letter?

A. Yes.

Q. Now, when you say -- when you mention Jailer Andy, is that Andy Rich?

A. From Benton County?

Q. Yes.

A. Yeah.

Q. And what was your relationship like with Jailer Rich?

A. He was the jailer.

Q. Okay. Was he aware that you were passing notes with my client?

A. No.

Q. Okay. Did he facilitate your passing notes in any way?

A. I think that I may have asked Andy to pass magazines to Angela, and I would have letters hidden in there, but if I had ever asked him to pass letters, no.

Q. Okay. On Tuesday September 5, you wrote a letter

to my client, didn't you?

A. In response to a letter that I received from her.

Q. Okay. And on Wednesday September 6, you spoke to my client outside, correct?

A. Yes.

Q. Tell me about that. Were you in the same hallway, or what was going on?

A. Where it says "spoke to Angie outside"?

Q. Yeah.

A. No, I would be in the rec. area. They would knock on the window.

Q. Was there ever a time during your incarceration at the Benton County Jail when my client Ms. Johnson was there that you were able to speak to her face-to-face for approximately ten or twenty seconds without any monitoring from law enforcement or jailhouse staffers?

A. Yes.

Q. When was that?

A. I can't recall the date.

Q. Okay. Who allowed that to happen?

A. I don't think anyone actually allowed it to happen. I believe it was an error on the part of a jailer.

Q. What did you say to her?

A. I can't recall.

Q. Okay. Now, on Wednesday, September 6, you got to meet DCI Agent Basler, correct?

A. Yes.

Q. And we'll talk about that a little later. On Friday, the 8th, you have a notation that you were told to only be a listening post and not to write any notes to Angie, correct?

A. Yes.

Q. And not to ask Angie any questions determining her case, correct?

A. Yes.

Q. Now, after September 8, you continued to write notes to my client, didn't you?

A. Yes, I did.

Q. And after September 8, you continued to talk to my client about her case, didn't you?

A. I believe that she was talking to me about her case, and again, I would -- during the course of the conversation, it would seem odd if I didn't say certain things.

MR. WILLETT: Okay. May I approach the witness, Your Honor.

THE COURT: You may.

MR. WILLETT: Thank you.

Q. Mr. McNeese, I'm going to put in front of you what

has been previously marked as Government Exhibit 6, have you turn your attention to that. Have you had a chance to peruse that exhibit, sir?

A. Yes.

Q. Okay. Your handwriting?

A. Yes.

Q. Your work product?

A. Yes.

Q. Your notes from September -- Monday, September 11, through it appears to be Sunday the 24th?

A. Yes.

Q. Back to Page 1, very top of the page, Monday, 11th, "I turned over to Pete Wright per his instructions notes I had made dating September 1 through September 11 concerning Angela Johnson." What had Pete Wright told you about making notes?

A. I don't understand what do you mean, what did he tell me?

Q. It says "Turned over to Pete Wright per his instructions notes I had made." What were Pete Wright's instructions to you, sir?

A. I believe in September that Angie was discussing with me escaping and committing some additional violent acts. I believe that I was informed that, and law enforcement was very concerned of her desire to

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 50 of 100

**Page 578**

escape and to harm other individuals, and that they -- they had requested that I keep notes of those conversations.

Q. The notes also involved conversations about my client's case, didn't they?

A. Yes.

Q. Okay. The very bottom of Page 3 of Government Exhibit 6, "I told Angie I am pleading guilty to money laundering so the US Attorney does not recommend lock-down at ADX Florence"?

A. Yes.

Q. How did you come upon the information that someone was going to recommend lock-down at ADX Florence?

A. I think that during the course of my trial or sentencing in Florida, when I was taken to Atlanta Penitentiary, I was informed there that if I screwed up, I would be going to ADX.

Q. Okay. And just for the benefit of all, ADX Florence is what some people refer to as the super max penitentiary?

A. That's correct.

Q. Where people like John Gotty and Manuel Noriega are serving their sentences?

A. Manuel Noriega is serving his in Florida and John Gotty is serving his in Springfield, Missouri.

**Page 579**

Q. I'm glad you're up-to-date on that. There's not many benefits in that prison, are there?

A. I have never been there, sir.

Q. Okay. What's the purpose of telling Angie this? Is time beginning to be of the essence?

A. No, I don't believe so.

Q. Well, you don't have -- you don't have maps yet on September 12, do you?

A. No, no, I don't.

Q. Did anybody at the US Attorney's Office in the Northern District of Iowa suggest that you should be locked down at ADX Florence?

A. No, not that I'm aware of.

Q. Okay. And then on Page 5, at the top of that page, there's a notation on Thursday the 14th, correct?

A. Yes.

Q. And once again, you gave notes dated 9-11 to 9-14 to Pete Wright per his instructions, correct?

A. Yes.

Q. Page 10, bottom third of the page, notation, Tuesday the 19th, do you see that, sir?

A. Yes.

Q. "I spoke to Mr. Basler twice today concerning my role and asked him to contact Mr. Reinert." Why did

**Page 580**

you contact Mr. Basler twice about your role?

A. Again, I was having some confusion as to what exactly I was permitted to do or not to do. I mean, I didn't want to violate, you know, anything.

Q. You certainly had prior interaction on other cases when you were given instructions, didn't you?

A. The instructions that -- on other cases were not as complicated for some reason.

Q. What reason?

A. I didn't have people asking me questions and -- as far as referring to Ms. Johnson wanting to ask me millions of questions.

Q. Okay. You certainly testified earlier yesterday and today that when it came to your instructions in Shultice you had no trouble understanding those instructions, correct?

A. I'm sure I did have questions.

Q. But you understood what to do?

A. I think that Mr. Shultice and Ms. Johnson are totally different types of situations.

Q. Okay. And in your notes on the following page, on Page 11, at the top of the page, you write, "It is okay for me to discuss the subject with her again as long as I did not bring the subject up." Did I read that correctly?

**Page 581**

A. Yes.

Q. Page 12, the first large paragraph at the top of the page, there's a discussion of weapons, correct?

A. Yes.

Q. Now, you write in there, "Since she was talking about the gun, I figured it was safe to ask her where the gun was." Did I read that correctly, sir?

A. Yeah, she wanted a gun to use in an escape, so I wanted to know where it was at, yes.

Q. Okay. And then at the top of the next page, on Page 13, it says "I spoke to Angie about cooperating with the authorities," correct?

A. Yes.

Q. Now, you knew she had a lawyer, didn't you, at that time?

A. Yes.

Q. And you certainly knew who her lawyer was, didn't you?

A. I believe that I was discussing my case where my ex-wife had testified against me.

Q. I understand that, but my question was that at the time of this notation, which appears to have been dated somewhere around Tuesday the 19th of September, you knew who -- you knew that my client had a lawyer, didn't you?

## Page 582

A. I knew that you represented her, yes.

Q. Thank you. Middle of that page, on Page 13, Wednesday, 20th, "Spoke to Mr. Basler about a jailer here, Bill, who has been asking questions about Angie and I. Pete Wright was contacted by Mr. Basler or Mr. Reinert, informed of the situation. Pete called and I spoke to him about the jailer, Pete -- excuse me, to him about the jailer, period. Pete told me he would take care of it." Why did you tell Mr. Basler about Bill Reese?

A. If you'll notice that these notes concern Angie's desire to escape and to murder a jailer. I was told that I could speak to her about that.

Q. You didn't want anybody finding out what you were doing with Angie, did you?

A. Well, Bill was asking questions that I felt I wasn't in a position to answer, so I contacted Mr. Basler.

Q. What kind of questions was Bill asking you?

A. Well, just wanting to know, you know, if I had something going on with Angie, you know. I mean, he's chased me from -- not chased, but he had seen me talking to her before, and has told me that -- to leave, put me back in my cell and stuff like that.

Q. Page 15, Saturday the 23rd, top of the page, "I

## Page 583

told her that you would have to trust me 100 percent and also be truthful and honest with me. I additionally explained to her that I would have to ask my friend if he would help." You're certainly trying to gain her trust, aren't you?

A. Again, this -- what this is stating is that, in fact, she had learned that Dustin was going to, I guess, try to kill her or something. She had learned that from one of her attorneys. Dustin had a gentleman in Colorado who was going to come forward and lie.

Q. Okay. And that's a -- that's a story that was discussed between you and Angie, wasn't it?

A. She discussed that with me, yes.

Q. But you also said you knew somebody who was serving a life sentence at Fort Leavenworth who could fill that role, didn't you?

A. Well, what happened was --

Q. Excuse me, sir, could you answer that question before you answer my question with a different answer?

A. Well, you're trying to ask me questions that you're taking clearly out of context, which --

Q. We'll let the judge decide who is out of context. You had somebody at the federal penitentiary in Fort

## Page 584

Leavenworth that you suggested to my client could fill the role as someone who could admit guilt for what my client was charged with, correct?

A. After she said Dustin -- she didn't want Dustin to do it, yes.

Q. Now, then, you certainly never told my client that you were cooperating with the Government, did you?

A. No.

Q. Never told any of the other people you cooperated against what you were doing when you were doing it to them, did you?

A. No.

Q. And I believe you told me that you've been in jail roughly half of your adult life?

A. Yes.

Q. And were you aware that my client had never been in jail a day of her life before these charges were brought?

A. No, actually, I didn't know that.

Q. And one of the threads of this Saturday the 23rd communication is you want her to trust you so you can help her, right?

A. Yes.

Q. Government Exhibit 7, your handwriting, sir?

A. Yes.

## Page 585

Q. Your work product?

A. It's in my handwriting, yes.

Q. Okay. Your notes?

A. My notes, yes.

Q. Okay. I'm curious about something, at or about the time that you prepared Government Exhibit 7, were you upset with the US Attorney's Office?

A. Yes, I was.

Q. Okay. And you threatened to withdraw your guilty plea to the money laundering charge, correct?

A. I hadn't pled guilty yet.

Q. Okay. But you -- didn't you try to send a note or -- send a note to Mr. Williams and Mr. Reinert and Mr. Wright and Judge Melloy that you would be withdrawing your plea and you would not be pleading guilty?

A. I could have, because of me being in the hole, yes.

Q. Okay. And you think that that was around the time you were in the hole?

A. Yes.

Q. And that would have been from September 26 to October 2?

A. Yes.

Q. Okay. Does that help to refresh your memory?

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 52 of 100

A. Yes.

Q. Okay. Your handwriting, your signature, your statement?

A. Yes.

Q. Why were you upset that you were in the hole?

A. I wasn't really upset about the hole. I was upset about the situation that got me in the hole.

Q. What got you in the hole?

A. What got me in the hole?

Q. Yes.

A. The guys from Benton County came in and -- or I'm sorry, I got upset with Mr. Williams and Mr. Wright earlier that day.

Q. About what?

A. They came out to the jail, discussed with me that they were part of a taint team.

Q. Good point. What was your understanding of what a taint team was?

A. I was just told then that a taint team was someone that was a go-between. Actually, I believe they used the term Chinese wall.

Q. What was your understanding that it was necessary in this situation, where you were cooperating against my client?

A. I think because they didn't want any inference on

it that I was pumping her for information or that Basler or Pat Reinert learned any -- learned any of the information.

Q. Okay. And prior to that time, upon your meeting with Mr. Williams and his colleagues, you had sent notes to my client, correct?

A. After that meeting?

Q. Before.

A. Yes.

Q. You had spoken to her outside her cellblock window, correct?

A. Yes.

Q. Okay. And you had talked to her about her case prior to September 26?

A. She talked to me about her case, yes.

Q. Okay. And you asked questions, didn't you?

A. Again, I was part of the conversation.

Q. Mr. McNeese, turn your attention to Government Exhibit 9. That's your handwriting, sir?

A. Yes, it is.

Q. Okay. Your letter to Mr. Reinert?

A. Yes.

Q. Okay. Starts out by saying "I understand you were having me plead guilty Thursday morning"?

A. Yes.

Q. And that would be the following Thursday?

A. (Witness indicated affirmatively.)

Q. Correct?

A. I believe so, yes.

Q. Was your guilty plea somewhere around the -- either September 21 or September 28 of last year?

A. September 29, I think.

Q. Okay. You see the second full paragraph where it starts out "The Saturday newspaper"?

A. Yes.

Q. "The Saturday newspaper article actually worked very well with Angela Johnson." Did I say that correctly, sir?

A. Yes.

Q. Okay. Let me place in front of you Defendant's Exhibit N. The Gazette, Saturday, September 16, 2000. Had you conveyed that article to my client?

A. Did I give that to her?

Q. Yeah.

A. No.

Q. Okay. Well, what do you mean "The Saturday newspaper article actually worked very well with Angela Johnson"?

A. I had asked that my -- I had asked that the cooperation that I was giving not be put in the

newspaper.

Q. Okay. That article talks a lot about you, doesn't it?

A. Yes, it does.

Q. It talks about your connections to organized crime?

A. Yes, it does.

Q. Okay. Well, your sentence in your letter to Mr. Reinert says "The Saturday newspaper article actually worked very well with Angela Johnson"?

A. Yes.

Q. Trying to impress her?

A. Trying to make sure that the article didn't say that I was an informant.

Q. How did you get the idea for the article?

A. It wasn't my idea to write the article.

Q. How did you get the idea that the article should be conveyed to Ms. Johnson?

A. I don't understand what you mean "conveyed." I don't understand.

Q. Well, let me read this sentence of your Government exhibit again, "The Saturday newspaper article actually worked very well with Angela Johnson." And we have a Gazette article of Saturday, September 16, 2000, "CR Man Facing Additional Mafia Charges,"

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 53 of 100

written by Mr. Smith, talks all about your history, all about your conduct in the Scotter Clark case, and it would appear from your letter of September 19, 2000, to Mr. Reinert, that this article was conveyed to my client?

A. I don't understand. What do you mean, Mr. Reinert conveyed?

Q. Well, you -- isn't the letter to Mr. Reinert dated September 19, 2000?

A. Right.

Q. The first sentence of the second paragraph, "The Saturday newspaper article actually worked very well with Angela Johnson." Here it is, big as life.

A. Well, I think what you're trying to get at is -- well, I mean, Mr. Smith is in the courtroom and he is a friend of mine. I had asked Mr. Smith not to, you know, and he said he would do that, and I had informed Mr. Reinert of that.

Q. So did anyone tell you to get this article to my client?

A. No.

Q. Okay. And you didn't facilitate the conveying of this article to my client --

A. No.

Q. -- trying to impress her about your abilities with

organized crime?

A. No.

Q. So what did you mean when you wrote down that sentence?

A. That it worked very well?

Q. Yeah. What did you mean?

A. That, in fact, Angie read the article, that it would not, you know -- it would not show that I was cooperating with the Government.

Q. So you knew Angie read the article?

A. Well, I knew that Angie received the Cedar Rapids Gazette, and I knew that that article was in the Gazette.

Q. And did you have communication with her that she had indeed read this article?

A. Yes.

Q. Was she impressed with you?

A. I don't know if she was impressed or not. She seemed -- she seemed happy about it.

Q. Let's turn to your federal plea agreement for a second that resolved your money laundering prosecution by Mr. Reinert. Government Exhibit 14, Mr. McNeese. I think you'll find that that's the final draft. I mean, I realize there were intermediary drafts, but that's the one you approved of, and take a look and

see if you agree with me.

A. Yeah, this is -- that's correct.

Q. Okay. Dated September 7, 2000?

A. Correct.

Q. Signed by you and your counsel, Mr. Meyer, on September 12?

A. Yes.

Q. Signed by Pat Reinert on September 12?

A. Yes.

Q. Okay. Page 2 of the exhibit, Paragraph 4, the first paragraph under "cooperation"?

A. Yes.

Q. "Defendant agrees to fully and completely cooperate with United States Attorney's Office and other law enforcement agencies in the investigation of criminal activity, within the Northern District of Iowa and elsewhere," correct?

A. Yes.

Q. No limitations to what cases we're talking about in that paragraph, is there?

A. Standard plea agreement. I don't believe so.

Q. Okay. So you could certainly read that to mean that you could cooperate in the investigation of any criminal activity at that point, correct?

A. Yes, you could read it like that.

Q. Okay. You could do that by providing intelligence information, correct?

A. Yes.

Q. You could do that by providing information to secure search warrants if necessary, correct, Subparagraph D?

A. Yes.

Q. Subparagraph E, to provide testimony before the Federal Grand Jury or testimony in court, correct?

A. Yes.

Q. You could provide any documents or items in your custody, that are relevant to this or any related investigation, correct?

A. Yes.

Q. So this was given you carte blanche, wasn't it? It was open hunting season on any criminal activity that you had knowledge of, wasn't it, sir?

MR. WILLIAMS: Objection, calling for speculation and conjecture, Your Honor.

THE COURT: Overruled.

A. Not at all. As you know, it's a standard plea agreement here, the Government gives all individuals.

Q. It may be a standard plea agreement, but in regards to Paragraph 4, there's no limitation as to the language as to what criminal activity we're

talking about, is there?

A. Again, standard plea agreement, there's not.

Q. Okay. And you admitted that a few minutes ago, didn't you, that there was no limitation as to the perimeters of Paragraph 4, in the investigation of criminal activity within the Northern District of Iowa and elsewhere, not just Scotter Clark, not just Dr. Robert Shultice, not just Jeff Garrett; criminal activity?

A. And again, I believe that that's standard in any plea agreement with the Government.

Q. Okay. And you certainly tried to continue to cooperate on Angela Johnson after that time, didn't you?

A. Yes.

Q. Paragraph 16 of your plea agreement, on Page 7, that's not a standard paragraph in any federal plea agreement, now, is it? That talks about what the US -- what the United States and the United States Attorney's Office in this federal district will and will not do in regards to placing the United States Attorney's Office for the Middle District of Florida on notice about a motion to reduce your life sentence, doesn't it?

A. That they possibly would, yes.

Q. Okay. And they agreed to notify the US Attorney's Office for the Middle District of Florida of the nature and extent of your cooperation, correct?

A. Yes.

Q. And the final decision, I guess, comes from the Middle District of Florida about a Rule 35 to reduce your life sentence, doesn't it?

A. Yes.

Q. And regardless of what the US Attorney's Office for this district may think of you at this point, it's still up to the Middle District of Florida, correct?

A. Yes, it is.

Q. So when you signed this on September 12, you were still trying to actively cooperate to gain a benefit with the US Attorney's Office from the Middle District of Florida, correct?

A. I was still cooperating, yes.

Q. And you knew it was premised at least in part on the extent of your cooperation, correct?

A. I don't believe that I was thinking on that line.

Q. Okay. There's one other provision in this we're going to talk about. We're not going to talk about it right now, okay. And just so you know what I'm talking about, Page 8, Paragraph 22, you don't have to say what it is. We're going to talk about this later,

okay?

A. Well, I'll tell you now.

Q. No, no.

THE COURT: No.

MR. WILLETT: The judge doesn't want to handle it that way.

THE COURT: We're not going to get into it now. We're going to have a closed hearing on that.

THE WITNESS: That's fine.

Q. Did you ever send Ms. Johnson newspaper articles about the history of your money laundering cases that was being reported in the Cedar Rapids Gazette?

A. I believe I did.

Q. Okay. Let me place in front of you Defendant's Exhibit O. Mob associate McNeese pleads guilty, which I assume would be an article written by the Cedar Rapids Gazette, sometime very shortly after your guilty plea?

A. Yes.

Q. And we know that that was sometime after -- well, excuse me, I guess it was in late September, correct?

A. Yes.

Q. What's the purpose in sending that to Ms. Johnson?

A. I believe that I left the facility, and I wanted to let her know that I went to court to plead guilty.

Q. Why did you want her to know that?

A. I didn't want her to think that I had left the facility to testify against anyone.

Q. Okay. Including her?

A. Correct.

Q. If I may retrieve that, please.

MR. WILLETT: Your Honor, if you give me one moment, I'm trying to find an provision in one of these Government exhibits.

Q. Did you ever offer to write a letter to Leon Spies on Ms. Johnson's behalf?

A. Yes.

Q. Why?

A. She had asked me to.

Q. Okay. And just for the purposes of the record, who is Leon Spies?

A. He's an attorney from Iowa City.

Q. Okay. Criminal defense?

A. I believe so, yes.

Q. Okay. And you had suggested that maybe Angie should obtain different counsel?

A. When you told her that I was a rat, an informant on your associate and your client Dr. Shultice, she didn't believe it. She said that you refused to go to Colorado to speak with Dustin and this other person

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 55 of 100

that was going to admit to doing the crimes, and so she wanted you -- actually, her sister had contacted Leon Spies, and he agreed to represent her, but she would have to write a letter and so on and so forth, so I stated that I would write the letter for her.

Q. Now, you denied being a rat, didn't --

A. Yes, I did.

Q. Okay. And did you tell her that I would plea her and that I wouldn't defend her and that's what I did with my clients, that I didn't go to trial?

A. Well, I think, let the record show that.

Q. Okay. We're here in court, aren't we?

A. Yes, we are.

Q. So are you saying you never said those things to her?

A. What's that, that you like to plead your clients out?

Q. Yeah, and that I never go to trial.

A. No, you go to trial, maybe three or four out of every hundred.

Q. Okay. We'll let the record reflect what it reflects, won't we?

A. Yes, we will, sir.

Q. Okay. There's several examples of this, Mr. McNeese, but I just pulled out one page so we

could discuss it. Let me hand you Government Exhibit 13, and ask you to turn to Page 9. Do you see that there?

A. Yes.

Q. Copy of an envelope?

A. Yes.

Q. Legal papers?

A. Yes.

Q. Bobby?

A. Yes.

Q. Is any of that your handwriting?

A. What, on the envelope?

Q. Yes.

A. The date.

Q. The date is your handwriting, okay. You would pass notes to my client, wouldn't you?

A. What?

Q. You would pass notes to my client, correct?

A. Yes.

Q. And would you put them in envelopes?

A. Sometimes, yes.

Q. Were they Benton County Jail envelopes?

A. Yes.

Q. Would you ever put anything on the front of them?

A. Yes.

Q. What?

A. "Angie," "legal papers," several different things.

Q. Okay. Government Exhibit 13, Page 20, right, at the very bottom, do you see that, "help me"?

A. Page 13?

Q. Yeah. Excuse me, Exhibit 13, Page 20, I apologize.

A. Yes.

Q. "Help me to trust you 100 percent. I can't just do it on my own. I'm too scared. I'm sorry, baby. Don't be mad at me. I know you can't help me unless I help myself, but something is holding me back." That was before you had any maps, wasn't it?

A. Yes.

Q. Okay. So what did you do?

A. I don't know the date on this.

Q. What did you do to get her to trust you?

A. There's no date on this that I'm aware of.

Q. Okay. But what did you do to get her to trust you?

A. Talked to her.

Q. Okay. Told her you were leaving soon, that you were going to be moved out because of your guilty plea?

A. Did I think that?

Q. I didn't hear you this time.

A. Did I think I was going to get moved out?

Q. Did you suggest to her that you needed to know something soon because you were going to be moved out because of your guilty plea?

A. Not that I can recall.

Q. What else did you do to have her trust you, besides talk to her?

A. Just talked to her.

Q. Okay. And you've gotten other people to trust you in the past, haven't you?

A. You trusted me.

Q. Shultice trusted you, Garrett trusted you?

A. Yes.

Q. Correct?

A. Yes.

Q. Scotter Clark trusted you?

A. Yes.

Q. Your childhood friend, Mr. Dice, trusted you?

A. Yes.

Q. Did you tell DCI Agent Basler that on one occasion you were allowed by a Benton County jailer to meet with Angela Johnson face-to-face?

A. No.

Q. You never said that to him?

Page 602

A. I believe I told Mr. Basler that I had ran into Angie.

Q. Okay. But you never said to him that you were allowed by a Benton County jailer to meet with Angela face-to-face?

A. Not that I can remember.

Q. Is it possible?

A. I don't believe so, no.

Q. Okay. You had a direct phone number that you could use to contact Detective Fischer?

A. I had his -- the police department phone number.

Q. Okay. Besides meeting with -- did you meet with Mr. Reinert on September 11 when you signed the memorandum of instruction?

A. No.

Q. Did you meet with Mr. Reinert on September 12 when you signed the plea agreement?

A. Yes.

Q. Did you talk about the status of your cooperation in this case at that time?

A. I don't believe we did.

Q. Okay. Did you have any other meetings with Mr. Reinert where you discussed the status of your cooperation in this case?

A. I met with Mr. Reinert several weeks ago

Page 603

concerning -- concerning me being upset with the Government.

Q. Okay. Why were you -- excuse me, we're going to leave that for later, as to why you would have been upset, how's that, we'll leave that for a little bit later today. You're certainly hoping you can get a Rule 35 reduction, aren't you?

A. Yes, I'm hoping.

Q. Okay. What are your expectations as you sit here right now?

A. My expectations?

Q. Uh-huh.

A. That I don't die in prison.

Q. Okay. Are you hoping to have a life sentence reduced to fifteen years?

A. I'm hoping to have my life sentence reduced, yes, but no one can promise me that. It's left up to the judge out there.

Q. If this has been asked of you previously, I apologize. Did the Government know you had a private investigator working for you?

A. I believe they learned later.

Q. Do you know when later was?

A. No, I don't.

Q. You were discussing the Shultice case with my

Page 604

co-counsel, Mr. Berrigan, yesterday. In regards to Dr. Shultice, you said "I introduced him to my friend," do you remember that testimony?

A. Yes.

Q. Your friend was Special Agent Greg Brugman, wasn't it?

A. I -- what's his name?

Q. Greg Brugman, a tall gentleman, balding.

A. Gus, Gus is all I know him by.

Q. Gus, okay.

THE COURT: Mr. Willett, we're going to have to take a noon break. I may keep it a little bit less than an hour.

MR. WILLETT: I'm close, Your Honor.

THE COURT: Do you want to stop now or do you want to keep going?

MR. WILLETT: I'd like to forge ahead in the interests of time, but I am close. I'm just trying to go through my notes and pick up any spare parts.

THE COURT: Okay.

Q. Now, you were told at the Benton County Jail not to pass notes or yell through the walls, weren't you?

A. Yes.

Q. That's something you chose not to do, correct?

A. Correct.

Page 605

Q. And you were the first one to make contact with Ms. Johnson, weren't you? You yelled through the wall first, I believe you testified to?

A. Yeah, I was wanting to know who the crazy woman was yelling.

Q. Okay. This discussion with Pete Wright and Les Woods around August 14, did you have any notes or did you not have any notes from my client?

A. As you know, I did have notes.

Q. Okay. So you were lying to Agent Wright initially because of Mr. Woods' presence?

A. I was just -- yes, yes, I guess I was lying.

Q. And I believe you testified yesterday that you weren't sure if these notes that you had in your possession around August 14 were valuable to law enforcement, "I wasn't sure"?

A. Yeah, I wasn't sure.

Q. You certainly have been in several cooperation situations before that, hadn't you?

A. Yes.

Q. And my understanding is you kept notes, correct, or made notes on your own in prior situations?

A. Yes.

Q. You would try to collect notes from the people you were talking with if that was feasible?

A. I don't know about tried to. I don't believe that I tried to keep notes from other people.

Q. Tried to have people taped or monitored if that was feasible?

A. Yes.

Q. Certainly tried to talk to them, gain their trust, gain their rapport?

A. Yes.

Q. And you weren't sure if the notes were valuable?

A. Well, if you read the notes, I don't believe they contain much of anything.

Q. Okay. And Pete Wright told you on or about August 14, no contact, correct?

A. Yes.

Q. And you certainly continued to have contact between then and September 3, didn't you?

A. Yes, I did.

Q. Where were these book cabinets where the books and magazines were kept which is what you say were used as a vessel for these notes? And I tell you what, I think we still have Government Exhibit 2 up there. Yeah. Would you agree with me, sir, that that appears to be a floor plan of the Benton County Jail?

A. Yes.

Q. Okay. Can you just indicate from where you're

standing where the book and magazines were?

A. Yes, where it says booking area.

Q. Booking area?

A. Yes.

Q. The shelves are in the booking area?

A. The booking area is like this. The shelves are down below.

Q. Okay. That's an area that the jail staff has access to, correct?

A. Yes.

Q. Was there a certain book that was the vessel or is there a certain place on the shelf that was the area?

A. A certain place on the shelf.

Q. Okay. Still in an area where jail staff had access to it?

A. They've got access to the whole jail.

Q. Now, you had a note intercepted on September 3 by Jailer Rich, correct?

A. I had a note intercepted, yes.

Q. Okay. But you also had notes intercepted two weeks, three weeks before that in the middle of August, correct?

A. I think so. I can't really remember.

Q. So you certainly knew after the middle of August that there was a possibility that your notes could get

intercepted if you continued to pass them, correct?

A. Yes.

Q. And you kept doing it, kept passing notes?

A. Yes.

Q. After August 14, after September 3?

A. Yes.

Q. After September 11?

A. Yes, I did.

Q. After September 12?

A. Yes.

Q. Have we discussed all the reasons as to why you were upset about being searched and having your cell shook down after September 26? Did we forget to mention anything?

A. I don't think so.

Q. Okay. Do you think it was basically a form of disrespect to you?

A. What do you mean?

Q. Well, you didn't like being treated that way, did you?

A. No, I didn't like being treated that way.

Q. And it's your testimony that you never tried to threaten anybody with a piercing-like object or threaten anybody with any liquid or any other type of object?

A. There was no liquid available, and I had no object --

Q. Okay.

A. -- that was in my cell.

Q. I believe you stated yesterday that you told them "I got something in there you'll never find"?

A. I told Pete Wright that, yes.

Q. Was that a lie?

A. Yes.

Q. You're in the hole from October -- from September 26 to October 22?

A. Yes.

Q. And then the very next day, you were moved, October 3?

A. I believe so.

Q. You wanted out of the hole, didn't you?

A. I would have liked to have got out, but I had books, so I was all right.

Q. Now, you gave some other reasons to Mr. Berrigan as to why you were cooperating, but the common theme throughout all these cooperations is you'd like to get your life sentence reduced, correct?

A. Yes.

Q. What was your life-style that you had in prison? You mentioned to my co-counsel that you wanted to

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 58 of 100

"continue the life-style I had in prison." What life-style was that?

A. Just being with my friends, walking the yard together.

Q. And at one point during the Scotter Clark case, I believe you said you refused to go to the Grand Jury?

A. Yes.

Q. Why?

A. I didn't want to.

Q. Why not?

A. During the course of my cooperation, I didn't, you know -- I mean, I didn't want to cooperate any longer.

Q. And why was that?

A. I think that I wanted to continue to go back to prison.

Q. And so how was that going to be facilitated by just refusing to go to the Grand Jury? You wanted to be done with this and go back to prison and serve your life sentence?

A. Yes, that's exactly what I said.

Q. You changed your mind?

A. Well, actually, on January 29, I -- with Mr. Williams and Mr. Reinert, and my attorney present, I told them that they could send me back to prison now and I'll do my life sentence.

Q. Okay. And how do you feel as you sit here today? You've told me that you'd like to have that life sentence reduced today, is that correct?

A. Yes, I would like to have the life sentence reduced.

MR. WILLETT: Okay. Thank you, Judge.

THE COURT: Mr. Willett, you're not going to ask about Government's Exhibit 5, Page 8, Paragraph 2, Line 2?

MR. WILLETT: I think it's been covered in earlier testimony, Judge.

THE COURT: Okay. Why don't we take a break. Which lawyer estimated we would be done with the whole hearing by noon today?

MR. WILLETT: It wasn't me.

THE COURT: How about -- well, let me ask you this, what's the new estimate for when we'll be done with the hearing today, or are you all going to invoke your Fifth Amendment rights at this time? Mr. Williams, what do you think?

MR. WILLIAMS: Assuming -- after we come back, I'm suspecting that the closed session may take up to an hour, I don't know. I hope it wouldn't take that long, but I'm trying to be conservative. It could be possible that that closed session with

Mr. McNeese could take up to an hour. If that's the case, then we may be here until five. I think Mr. Basler would probably take me an hour and a half. Randy VanGent will probably be half an hour, forty-five minutes. Pat Reinert, I understood that the defense was going to call him and find out why he decided to put Angela Johnson. The list they gave us is much broader than that at this point, and I don't know how far they're going to go at this point. The first assistant Judy Whetstine is defense -- discussing with defense counsel their scope of their examination with Mr. Reinert. If it goes as broadly as they suggested in the initial outline, we'll be here until five.

THE COURT: Are we going to take up the closed portion of Mr. McNeese's testimony when we come back?

MR. WILLETT: We can do that.

THE COURT: Okay. That way the members of the public who are going to be excluded -- do you think it's going to take about an hour? Why don't we take a recess until 12:45, would that be enough?

MR. WILLIAMS: Certainly, Your Honor.

THE COURT: Is that enough for the lawyers or do you need an hour?

MR. WILLETT: No, 12:45.

THE COURT: Why don't we just take an hour and come back at one and then we'll take up the closed portion of the testimony and then open the hearing. Now, let me ask one other question.

MR. WILLIAMS: Yes, Judge.

THE COURT: So that I'm not surprised by the scope of the request of the defense inquiry with regard to AUSA Reinert, do you have any problems sharing with me what they intend to get into at this point so I can at least be thinking about whether or not I'm going to let them get into that?

MR. WILLIAMS: Not at all. Your Honor, right now I've stepped out of that role and asked Judy Whetstine to cover that and so she's talking with defense. I don't know where they're going at this point or whether Judy Whetstine has been able to work out the scope, but as soon as we find out what that scope is, we'll be glad to share that with the Court.

THE COURT: Okay. That's fine. Thank you.

(Whereupon, a brief recess was taken. The following portion of the record is sealed.)

THE COURT: Okay. We're now at that portion of the hearing where we're closing the courtroom, and who's going to be doing the cross-examination of

Mr. McNeese at this point?

MR. WILLETT: Mr. Berrigan will, Your Honor.

THE COURT: Okay. Mr. Berrigan.

MR. WILLETT: Yes, sir, thank you.

THE COURT: And then is the understanding, Mr. Williams, that you'll then do your redirect on that matter that we closed it on, and then we'll do the redirect, recross, redirect, however far we go, and then we'll finish this area and go back and open it up?

MR. WILLIAMS: That's my understanding, Your Honor.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. BERRIGAN:

Q. It's been a long morning, Mr. McNeese, but I'm going to ask you if you can recollect, when I was asking you questions earlier, there was an area of your plea agreement that we didn't discuss, and I asked if we could put that off and that's what we're going to talk about now, and it has to do with the provision regarding the United States Attorney agreeing to try to get you into the witness security program, that is part of your plea agreement, is it not?

A. On the advice of my attorney, I'm going to have to defer answering any questions at this time.

Q. On what basis?

A. Concerning the witness protection program.

Q. Well, that's why we have a closed hearing here, Mr. McNeese. We've taken precautions so that this information is not shared with the public. I'm sure the Court and counsel could assure you that we have no intention of discussing this with anybody outside the purview of the hearing.

THE COURT: Mr. McNeese -- excuse me, Mr. Berrigan, what's the basis for your refusal to answer the question?

THE WITNESS: Because we don't want to discuss anything where Angie is going to learn things more than she's -- she's already been given, sir, my wife's phone numbers at work and home, where she works, all of that.

THE COURT: Yeah.

THE WITNESS: So we're concerned about that.

THE COURT: Just a second. That's not a proper basis that I know of to decline to answer the question.

MR. BERRIGAN: And I'm not sure that concern addresses the question that I asked. Perhaps if I

could advise Mr. McNeese.

THE COURT: Mr. Meyers, do you want to jump in on this one or --

MR. MEYERS: Well, I think counsel has the right idea. I think Mr. McNeese could probably answer some of these questions without getting into any of the information that he's -- might be concerned about.

THE COURT: Well, no. Well, that may be, and it will be because I'm going to compel him to answer the question, but what's the basis for his refusal to answer the question? He's claiming it's based on your advice. Now, I mean, I don't know if that claim is true or not, but do you know of a legal basis to object to questions about the witness security program?

MR. MEYERS: No, not -- not specifically. The only thing I can think of is that he's concerned about information being divulged to Ms. Johnson and somehow that that would compromise his situation, maybe the pros or something, I don't know, but I think --

THE COURT: A due process right to not divulge information about potentially getting into the witness protection program, I don't think so, but in any event, the Government also has an interest, and as

a matter of fact, their interest goes much broader and much deeper than your interest or Mr. McNeese's interest and the Government, the US Attorney's Office has agreed that this area could be explored as long as it's done in a closed hearing, but they have interests that far exceed your client's interests, in my view.

MR. MEYERS: Yeah, I would just ask -- you have advised Mr. McNeese. That's his concern, and I think you've addressed it.

MR. WILLIAMS: Your Honor, it may be of some assistance, I have not had an opportunity to talk with Mr. McNeese to the extent to which we're going into this, and it may be apprehension on his part about where this is going, and if you like, I could summarize where I think we're going with this for Mr. McNeese's benefit. I think that would allay some of his fears that may facilitate what we're doing on this.

THE COURT: Let me ask, what do you think of that suggestion?

MR. BERRIGAN: I'm fine with that, Judge, I think either one of us could do that.

THE COURT: Well, do you have any objection to Mr. Williams doing it?

MR. BERRIGAN: No, not at all.

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 60 of 100

THE COURT: Thank you.

MR. WILLIAMS: It's my understanding that where we're going to go with this line of inquiry is not into the details of the specifics of Mr. McNeese's WITSEC program, where he would go if he would go, the names of people that he is going to have contact with, addresses, or anything like that. It's going to be to the fact that he is -- the possibility of being in the WITSEC program is something that was agreed to in the plea agreement, and the reason we're getting into it is because it may go to his motivation for providing information to the Government. I think the defense is going to want to get into, you know, what promises were made to him about his availability -- his likelihood of getting into the WITSEC program, the timing of those promises about getting into the WITSEC program, and possibly the status of his -- his status in the WITSEC application process, but as far as the details of anything in his application, anything in his personal history or -- anything like that is not going to be a subject of inquiry here.

THE COURT: Mr. Berrigan.

MR. BERRIGAN: I think that's a fair rendition, Your Honor, with one additional item, and that is there's been some testimony as the Court knows

about a polygraph exam used as part of the application process, and I just had a few very brief questions about that, otherwise I think Mr. Williams has fairly summarized the scope of the examination.

THE COURT: Okay. Why don't you proceed with the examination.

Q. Mr. McNeese, it is true that the plea agreement that you signed on September the 12, 2000, contains a specific provision wherein the United States Government through the US Attorney's Office has agreed as part of the negotiations in your money laundering case to make an application for you to be in the witness security program, is that true?

A. Yeah, but that agreement was -- I had an agreement with them in March of 2000.

Q. Could you tell us a little bit about the March 2000 agreement, sir?

A. Yes.

THE COURT: Could you pull your chair up, please, get a little closer to the microphone?

THE WITNESS: Yes.

THE COURT: Thank you.

A. When I had learned through Jeff Garrett that there was documents or a document that showed that I was living -- or I was cooperating with the Government and

Mr. Garrett was sending that to New York, at that time, the Government felt that -- actually, they had no choice but to move me and put me in Benton County for the reasons I have discussed earlier, and also to process a WITSEC application for me.

Q. And who is it that told you that specifically?

A. Pat Reinert.

Q. Could you tell us, was that during the meeting that you had with Mr. Reinert, the day of or the day after you told him that Mr. Garrett had broken into Al Willett's office?

A. Yes.

Q. So during the course of this meeting with Mr. Reinert, specifically, on March the 24th, 2000, he told you that he would make application for you or the US Attorney's Office would make application for you to be in the witness security program?

A. Yes, and that wasn't the first occasion.

Q. Could you tell us when the first occasion was that that was discussed, sir?

A. When I was here the first time, I was asked to cooperate and to -- that they would assure me -- actually, they assured the strike force from Georgia, Atlanta, that I would be placed in the WITSEC. They were concerned that -- not of what the situation here

in Iowa was but the situation of my cooperation concerning other individuals.

Q. And just to refresh, perhaps, the Court doesn't need refreshing, but that strike force in Atlanta, they were speaking to you before July the 28th, 1980 -- 1998, before Mr. Fischer came down to talk to you?

A. Yes.

Q. You were already cooperating with the strike force in Atlanta regarding other individuals in this organized crime family?

A. Correct.

Q. And John Simmons, was he a member of the organized strike force that you were speaking to?

A. I believe he's the leader of it, yes.

Q. Okay. And did Mr. Simmons give you some promise that you would be in the witness security program?

A. No. What had happened was I didn't want to be in the program. Mr. Simmons is the one that introduced me to Mark Fischer and some other agent, who I don't remember the name, and he spoke to me because I was very hesitant to talk with them people, and -- because I was in -- you know, I feared that it would get back to the people that I was with, and Mr. Simmons said that from what he was under -- that he was told that

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 61 of 100

they would process an application for the WITSEC program.

Q. In fact, you expressed your concern about the other inmates that you were with in the Atlanta Penitentiary finding out about your conversations with Mr. Fischer and thinking you were imparting information to law enforcement?

A. Yes.

Q. You wrote a letter to Mr. Simmons about that, do you remember that?

A. No, I don't.

Q. I'm going to hand you Defendant's Exhibit V, sir. That appears to be a two page letter dated August the 2, 1998, addressed to Mr. Simmons, signed "Sincerely, Bobby," do you recognize that handwriting?

A. Yes.

Q. Is that yourself, sir?

A. Yes, it is.

Q. Does this appear to be a fair and accurate copy of the letter that you wrote to John Simmons on August the 2, 1998?

A. Yes, it is.

Q. Okay. Right there in the first paragraph, it expresses the concern that you have about other inmates suspecting cooperation as a result of your

visit with Mr. Fischer?

A. Yes.

Q. And that was a concern that you had at that time?

A. Yes.

Q. And you discussed that with Mr. Simmons on or about August the 2, 1998?

A. I wrote the letter August 2.

Q. All right. Sometime after this letter did you talk to Mr. Simmons about the witness security program?

A. I don't remember if I did or not.

Q. Let me ask you, sir, would it be fair to say you did not discuss witness security with Mr. Simmons before you sent him the August the 2 letter?

A. I -- this was after the meeting with Mr. Fischer?

Q. The meeting with Mr. Fischer purportedly was on July the 28th, 1998, about five days before this letter?

A. Yeah, it was discussed at -- during that meeting.

Q. Okay. During your meeting with Mr. Fischer?

A. Yeah, Mr. Simmons had -- Mr. Simmons had assured me that Iowa would process the application on my behalf.

Q. And that was the result of cooperation that you were already giving apparently, to Mr. Simmons?

A. Yeah, and for the cooperation on the Scotter Clark case, because it would be made public, and then, you know, the people in Atlanta or New York would find out about it.

Q. And the people we're talking about are people in this organized crime family or their associates?

A. Yes.

Q. The same organization that you were a member of at that time?

A. Four other organizations also.

Q. Four other organized crime organizations?

A. Yes.

Q. And was there an application made on your behalf by either Mr. Simmons or somebody in the US Attorney's Office there in Atlanta, Georgia, or any other Government or law enforcement officials at that time?

A. I don't know.

Q. Well, you've gone more recently through a process, have you not, to get in or attempt to get into the witness security program?

A. Yes, I had a guy come and see me, yes.

Q. Interviewed you?

A. Yeah, I guess, yeah.

Q. Did you submit to a polygraph examination in connection with your application to the witness

security program?

A. Yes, I did.

Q. Had you ever done that before the recent application?

A. No.

Q. And when I say "recent," I guess I need to ask you, when did you do that? When is it that you had this polygraph examination in connection with your efforts to get into the witness security program?

A. November or December, I believe, somewhere around there. I'm not real sure, but --

Q. November or December of 2000?

A. Yes.

Q. So far almost -- I guess actually over two years, there had been discussions about you applying or somebody applying on your behalf for the witness security program, but no application actually ever made, is that right?

A. Well, when I came to Iowa, again, like I mentioned earlier, I was upset with the Government, and I really wanted to just go back to prison, be left alone, and that was my choice. It wasn't the Government's or -- I chose to go back to prison.

Q. And when you say "go back to prison," you don't mean go back to prison in Atlanta?

A. Yes.

Q. Yes?

A. Yes.

Q. Didn't Mr. Reinert specifically guarantee you at your request that after you testified at Scotter Clark's Grand Jury proceedings, you would not go back to Atlanta, that he would write to the Bureau of Prisons to prevent that from happening?

A. They don't care what Mr. Reinert or anyone has to say.

Q. Well, did Mr. Reinert make that representation to you, sir?

A. He told me he would write a letter, yes.

Q. In fact, you put it on the record during your Grand Jury testimony, do you recollect that?

A. No, I don't. And if he did write a letter, it certainly didn't work.

Q. I'm going to hand you -- may I approach the witness, Your Honor?

THE COURT: You may.

Q. I'm going to hand you what purports to be a photocopy of your Grand Jury testimony, given in Scotter Clark's case. I'll refer you specifically to Page 11. First, I guess, Mr. McNeese do you recognize that document I've given you as a transcript of your

sworn testimony in the Scotter Clark Grand Jury proceedings?

A. Yes.

Q. And on Page 11, is there reference there by Mr. Reinert to the witness security -- I'm sorry, to the promise that he made to you that he'd attempt to influence the Bureau of Prisons to not return you to Atlanta?

A. Yes, he said he would send a letter.

Q. To the Bureau of Prisons?

A. Yes.

Q. Okay. So that happened during the Grand Jury proceedings on Scotter Clark?

A. He mentioned that, yes.

Q. So apparently you had a change of heart again about going back to Atlanta sometime between coming to the Linn County Jail in the fall of 1998 and that Grand Jury testimony first part of 1999?

A. Yes.

Q. We could get back to this witness security issue again, sir. If I understand your testimony correctly, when you came back to Linn County in the fall of 1998, after initially agreeing to cooperate in the Scotter Clark investigation, you changed your mind about your cooperation?

A. Yes.

Q. Decided you weren't going to do that?

A. It was decided that I was just fed up with the whole thing, yes.

Q. And you wanted to go back to the penitentiary, the federal penitentiary in Atlanta, from hence you had come?

A. Yes.

Q. And you didn't care about the witness security program at that time?

A. No, I didn't.

Q. Because obviously if you're going back to that penitentiary, they're not going to put you in any witness security program, right?

A. Correct.

Q. And then sometime before you testified at the Grand Jury proceedings in early '99, you again had some concerns about going back to Atlanta?

A. Yes, I mean --

Q. Did you discuss with anybody in the fall then of 1998, Mr. McNeese, the first part of '99, did you discuss with some law enforcement officer or Assistant United States Attorney or any Government official applying to be in the witness security program?

A. I'm sure that I probably had asked or talked to

people about it, yes.

Q. When you say people, sir, could you be a little more specific who you might have talked to about that?

A. I really -- it could be Mr. Reinert or Mr. Fischer or the other guy, I don't remember his name. He was an FBI agent.

Q. I -- I'm assuming that Mr. Reinert, when he spoke to the Grand Jury about -- on the record, saying that he was going to send a letter to the Bureau of Prisons asking them not to send you back to Atlanta, that's something you wanted. That wasn't his idea, was it?

A. No, I believe it was something I wanted.

Q. And you undoubtedly would have had to have discussed that with somebody at the US Attorney's Office or your lawyer on your behalf?

A. Yeah, I spoke with someone I'm sure. I just can't remember.

Q. Did you talk to Mr. Reinert yourself?

A. I really can't remember.

Q. In any case, you came here to Linn County in the fall of '98, and did you later go back into the penitentiary system?

A. Yes.

Q. And obviously you weren't in the witness security program at that time?

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 63 of 100

## Page 630

A. No, I wasn't.

Q. Were you still seeking an application to the witness security program when you went back to the penitentiary in 1999?

A. I don't -- I don't think so.

Q. And apparently at some point you decided that you did want to get into the witness security program, at some point either during 1999 or 2000?

A. What had happened was I was -- I was sent back to Atlanta. I had put a request in to be transferred to Leavenworth, and that was denied, but they did grant me a -- my request, Your Honor, to be redesignated, maybe three months or two months after I was in Atlanta and I got sent to Terre Haute, Indiana. While I was in Terre Haute, Mark Fischer and -- I don't remember the -- some officials from California came to the prison to see me.

Q. And did that pertain to the Denny Dice investigation?

A. Yes, it did.

Q. And what did the appearance at the prison in Terre Haute, of these California officials -- what did that have to do with witness security?

A. Well, when I went into the visiting room and seen them, I turned around and left. I didn't want to

## Page 631

speak with anybody. The SIS department there said, you know, I didn't really have a choice and so I went back into the visiting room, and you know, I was upset with Mr. Fischer, and, you know, for even coming to the prison. And he told me that they had, you know, evidence that Danny Dice had told me things concerning his illegal activities. I, you know, told them I didn't know what he was talking about. And he stated that they had plenty of information and evidence concerning -- or stating otherwise and that if I did not cooperate, that they would release the information to him anyway.

Q. Release what information, sir?

A. I don't know. I didn't -- they had a big suitcase there saying, you know, patting it, saying they had this stuff.

Q. Well, you told us earlier under oath that you were not involved in any of the criminal activity in which Mr. Dice was involved?

A. No, I -- no, as I just said, that information that I knew about of what Danny's criminal activities were.

Q. Are you suggesting that Mr. Fischer essentially threatened to inform Mr. Dice that you were cooperating with the Government against Mr. Dice?

A. I mean, I'm just telling you what he told me, you

## Page 632

know. I mean, I'm not going to lie about it.

Q. Well, was that your impression or understanding of what Mr. Fischer had told you when he came up to see you at the federal prison in Terre Haute?

A. Yes, basically, it was.

Q. Basically, "You'll cooperate with these California law enforcement officials or we're going to tell Mr. Dice that you are cooperating anyway, and by doing that, of course, you might be placing yourself in danger physically," is that right?

A. Yes.

Q. You were angry at Mr. Fischer for showing up at the prison unexpectedly?

A. Yes.

Q. And as is pointed out in the letter that you've already looked at, Exhibit U, this is a problem for inmates not only in federal penitentiaries but any penitentiaries when inmates are perceived as talking to law enforcement officials?

A. Yes.

Q. And so Mr. Fischer has done this twice to you now, once in Atlanta and once in Terre Haute?

A. Yes, he has.

Q. During this visit in Terre Haute, did Mr. Fischer discuss with you the witness security program?

## Page 633

A. Yes, he did.

Q. All right. And whose idea was it to bring up the witness security program?

A. I really don't remember. I mean, it was discussed -- they asked me if I would go to California. I asked him if it would be, you know, made public, and they said no, that it wouldn't be made public. And so I agreed to go. And when I got out there, I talked with the guys from California, the US Attorney there, and they agreed to be co-sponsors or something like that for an application for the WITSEC program.

Q. And co-sponsors with whom, sir?

A. It could be Mr. Reinert or -- I'm really not sure.

Q. The person that initially talked to you at Terre Haute about the witness security program is Mr. Fischer?

A. Yeah, there was -- yeah, I mean, he brought it up to me.

Q. And this is coming up in conjunction with the conversation wherein he's told you essentially you'll need to cooperate with the California investigation regarding Danny Dice, or we're going to leak information to Mr. Dice that you were cooperating anyway?

A. I think he put it a little bit more eloquently, but yeah, that's the impression that I got.

Q. So this witness security program may have been offered, I suppose, to appease your concerns about your physical safety and engaging in this cooperative agreement with the officials in California, is that your perception of things?

A. Yes.

Q. And then you go down and talk to the US Attorney's Office in California and they agreed to do this, that is, co-sponsor a petition for you to enter the witness security program?

A. Yes.

Q. And your understanding is that the other co-sponsor would be Mr. Reinert or somebody from the Northern District of Iowa US Attorney's Office?

A. They left me in a room and went and made phone calls and stuff, and I don't know. I really don't know who they talked to. I just knew that they were going to co-sponsor.

Q. And it's the "they" that I'm interested in. When you say "they were going to co-sponsor," who are you referring to?

A. I don't know.

Q. Well, is it Mr. Fischer that's making the calls?

A. No, it was the US Attorney.

Q. All right. And were they calling somebody in Iowa?

A. I wasn't -- I mean, I really don't know. They left me in the room, and as a matter of fact, Mr. Fischer and one of the agents stayed with me, and the US Attorney came and told him, you know, said that we were going to co-sponsor him.

Q. Who is this US Attorney in California that told you this?

A. The one that was investigating Danny Dice. I don't know his name.

Q. And when this US Attorney in California told you that his office would co-sponsor your application of the witness security program, he also informed you that there was another co-sponsor?

A. Yes, he did.

Q. Somebody else was co-sponsoring you?

A. Yes.

Q. And you said earlier, you thought it would be Mr. Reinert or somebody up here in the Northern District of Iowa or you have just no idea?

A. I really don't have any idea, because, you know, they -- they wanted me to talk about organized crime and other things there, so you know, I've talked to

the people in New York and Pennsylvania and Georgia and Florida.

Q. Right.

A. So I --

Q. So there are other candidates to co-sponsor you, potential candidates other than the Northern District of Iowa is what you're saying?

A. Yes.

Q. And you don't know who it was that agreed along with California to co-sponsor your application to the witness security program when you were cooperating with the California law enforcement officers against Mr. Dice?

A. No, you'd probably have to just call out and ask him. I don't really know.

Q. You don't know?

A. No.

Q. And was there an application made then, sir, to the witness security program on -- as a result of these representations made to you by the US Attorney in California?

A. Not that I'm aware of.

Q. I think we have some information that you testified in Mr. Dice's Grand Jury proceedings sometime in the early part of 2000, does that sound

right?

A. No, I -- no, I think it was before that. I think -- yeah, I think it was before 2000.

Q. Okay.

A. 1999.

Q. When there was no application made, Mr. McNeese, after the representation by the US Attorney in California, to the witness security program, what was your response, sir?

A. I went to Leavenworth. I went to Terre Haute, and they transferred me to Leavenworth.

Q. So you went back to Terre Haute, after your cooperation against Mr. Dice?

A. Yes.

Q. And the transfer to Leavenworth from Terre Haute, did that have anything to do with any concerns about your physical safety at Terre Haute?

A. I had -- actually I had mentioned to Mark Fischer that -- as a matter of fact, I -- Mr. Reinert said that he would write a letter about me going to Leavenworth, Your Honor, a year before or two years, or whatever it was, and so I was -- told Mr. Fischer that -- whatever happened to that, and I called John Simmons, and he said, "Well, I thought you were in Leavenworth," and so they did get me transferred from

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 65 of 100

Page 638

Terre Haute to Leavenworth.

Q. I want to make sure the representation from Mr. Reinert that he would get you transferred to Leavenworth --

THE COURT: Mr. Berrigan, can I ask you a question?

MR. BERRIGAN: Yes, sir.

THE COURT: I mean, I appreciate your level of preparedness and the level of detail, but my question for you is don't we need to be calling the animal rescue league about beating dead horses? I mean, isn't the point that this witness at some time wanted to be in the witness protection program, because he feared for his safety, because he had cooperated against many individuals, and beyond that, I just want to make sure I'm not missing something? Why are the details important?

MR. BERRIGAN: They're important in that, Your Honor, I think the witness has fluctuated in terms of his desire to be in the program. That is, there are periods of time that he seems to be interested in the program. There are other periods of time where he does not, and, of course, we are interested in Ms. Johnson's case in whether he's interested in that, and we have some, of course,

Page 639

information about that. But if that -- what I'm trying to establish is sort of the history of this on and off again interest in the witness security program in an effort to show, I guess, you know, how genuine it was; Number 2, how much of a motivating factor that may have been in his cooperation with the Government in Ms. Johnson's case, and I am not sure that I can do that without kind of going through this process.

THE COURT: Okay, that's fine, that's fine.

MR. BERRIGAN: And I'll try to speed it up.

THE COURT: Well, no, I'm not -- I'm not trying to pressure you to speed things up. I think I got your point, but I want you to make whatever record you want to make, and it's a very important matter, and I really -- I just thought I'd express my point here, and you're free to --

MR. BERRIGAN: I understand.

THE COURT: You're free to go on, and free to do it your way, not my way, so --

MR. BERRIGAN: Point taken.

Q. Mr. McNeese, you've obviously just heard our discussion here. It seems as if this interest that you have in the witness security program kind of wanes periodically, that is, sometimes you're interested in it and sometimes you're not that interested in it. Is

Page 640

that true?

A. Yes, if I could avoid entering the program, I would want to avoid that.

Q. Okay. And at least what we know is that when you were out in California, at least cooperating with Mr. Dice, you were interested in the program?

A. Yes.

Q. And -- because people had made promises to you that they would co-sponsor an application for you?

A. I was interested in a program because I felt that the information would be made public of my cooperation, and since it was not made public, I didn't want the program.

Q. All right. And could you tell us when you made that decision that you were no longer interested in the program, after cooperating in Mr. Dice's investigation?

A. May I -- when I just went to Leavenworth and I was there, they called me March 1 of 2000 --

Q. Okay.

A. -- told me that I was leaving, coming to Cedar Rapids. I -- I went to my counselor there, and asked him what it was concerning, and he said that -- he looked on his computer, and it was a writ from the -- from Pat Reinert.

Page 641

Q. And what was the writ for, sir?

A. Well, at that time, I didn't know. I had my counselor call Mr. Reinert and tell him I didn't want to be involved in any writs or leave the prison or I didn't want to cooperate about anything.

Q. And apparently nobody, such as Mr. Fischer or anybody else, had come to the prison at Leavenworth and told you that you would be soon or requested or required to be back in Cedar Rapids?

A. No, nobody.

Q. You had no forewarning of this transfer in other words?

A. No.

Q. In any case, you were brought back in March of 2000, and you began to participate in an investigation regarding Mr. Garrett?

A. Correct.

Q. But that wasn't why you were brought back, was it?

A. No, I was brought back for -- well, anyway, the counselor called Reinert. Reinert said I'm coming here anyway. So I came here, and they wanted me to testify at Scotter Clark's trial. He was going to go to trial, but he ultimately pled guilty.

Q. Okay. All right. And then you've already explained, and I don't want to go back through this

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 66 of 100

## Page 642

again, but you've already explained your concern after you learned Mr. Garrett had some information that he was imparting to people in New York suggesting your cooperation in the Scotter Clark investigation. We've been through that, haven't we?

A. Yes.

Q. Did that rekindle your interest in the witness security program?

A. That is when I knew that I had no choice, that there was no fence jumping per se. I mean, I knew that I had to be going into the program.

Q. And that's March of 2000 then?

A. Yes.

Q. You finally had made the decision you're going to try to get into the witness security program?

A. Well, it was a decision made by someone else.

Q. Well, and you attribute that, I guess, to Mr. Garrett?

A. I attribute that to Pat Reinert for releasing the documents, and he said -- you know, he apologized to me.

Q. He apologized to you during your meeting on March the 24th?

A. Yes.

Q. And he told you he would try to do what he could

## Page 643

to get you in the witness security program?

A. Yes.

Q. But still nothing happened on that, did it, that is, that there was no observable effort to get you into the witness protection program, was there, until the fall of 2000?

A. Actually, I -- I thought that they were started in March of 2000.

Q. Your impression was the application process started in March of 2000?

A. Yeah, they told me it takes many months to process it, and things like that.

Q. Did you ever see some kind of an application form, Mr. McNeese, or some kind of written documents pertaining to the witness security program?

A. No, I still haven't ever seen any.

Q. And you don't know when your polygraph examination was for the witness program application?

A. Did I know that?

Q. No. You don't know when it was?

A. It was after I left Benton County, and so it was -- I left there, I believe, October of 2000.

Q. Which was after you had cooperated with law enforcement authorities against Angela Johnson?

A. Yes.

## Page 644

Q. In other words, not until you had finished your cooperation with the law enforcement officers and Government officials in the Angela Johnson case did you go for a polygraph in connection with this application process to be in the witness security program?

A. No. Actually, prior to that, Mr. Reinert had told me that the application was complete.

Q. When did Mr. Reinert tell you that, sir?

A. July or August.

Q. In July or August of 2000?

A. Yes.

Q. Mr. Pat Reinert, Assistant US Attorney here, told you that your application for the witness security program had been complete?

A. Yeah, his portion of the application was complete, yes. And again, the days could be -- you know, I'm not certain of the exact date. I'm sure it's written down somewhere. I mean --

Q. Is this a personal meeting you had with Mr. Reinert?

A. A meeting with my attorney and Mr. Reinert.

Q. Were there any other individuals there, just the three of you?

A. I believe Mark Fischer was present.

## Page 645

Q. Did Mr. Fischer -- did he contribute to the discussion regarding the witness security program in July of 2000?

A. Not that I can remember.

Q. Did anybody at that time say that you need to complete a polygraph examination as part of the application process?

A. Was I informed of that?

Q. Yes, sir.

A. Yes.

Q. During that meeting in July of 2000?

A. I think before that even. I knew that that was part of the process.

Q. You also had some interest in your brother being in the same program, isn't that right?

A. Yes, I did.

Q. And you communicated that to Mr. Reinert?

A. To Mr. Reinert or Mr. French, some -- I did communicate with the Government, yes.

Q. I'm going to hand you, sir, Government's Exhibit No. 9. That's already in evidence, purports to be a letter you wrote to Mr. Reinert September the 19th, 2000. Is that what that document is?

A. Yes, it is.

Q. On the second page of Exhibit 9, paragraph

beginning "concerning my brother Floyd"?

A. Yes.

Q. You specifically ask Mr. Reinert to get your brother Floyd into the witness protection program?

A. Yes, I spoke with Agent French about it, and I also learned that, in fact, that he could, you know, come into the program if I was accepted.

Q. Mr. French told you this?

A. No, French, as I say here, I says -- I don't want -- or shouldn't say that Scott told me Floyd would get into the program because he didn't. He didn't tell me, but he thought that there was a way to, and in fact, I later discovered that there was.

Q. What your letter says is that "I met with Scott French last week and I discussed Floyd with him. He said that Floyd would be able to get in the program with me, because of my cooperation. I should not say Scott told me Floyd could get into the program because he didn't. He said it could be possible now because of me. Can you please look into this for me?" Is that an accurate rendition of what Scott French told you?

A. Yes.

Q. And the cooperation that you're referring to in this letter of September the 19th, Government Exhibit

9, is, of course, your cooperation in Ms. Johnson's case?

A. Yes.

Q. And, sir, did I hear you just say a minute ago you were in the program as of the date of this letter, that is, you had been accepted into the program as of September the 19th, 2000?

A. No, I didn't say that.

Q. Okay.

A. I said that Pat Reinert said that he was done with his portion of the application.

Q. Well, he told you that two months before, in July of 2000, correct?

A. Right.

Q. Well, had you received any information? Apparently you were talking to Mr. French. Had you received information about your application?

A. Actually, yes. Actually, Mr. French had been coming to see me, and we were -- I had to give him a list of, you know, people that I wanted to be able to contact while incarcerated, and he wanted to get all of the information concerning my cooperation starting back with the strike force.

Q. These visits from Mr. French, sir, do you know when they were?

A. No, I'm sure they've got a record of that too. I don't know exact dates.

Q. Well, we have some records, and I'll represent to you that Mr. French has testified that he visited you about once a week during the course of the Robert Shultice investigation, specifically on May 17, May 22, and June 2 of 2000. Did you have more than those visits with Mr. French?

A. In 2000?

Q. Yes, sir.

A. Well, yeah, this letter says I just met with him.

Q. Well, and I'm sorry, I -- I should have been more precise. Did you have more visits with Mr. French about the -- let me withdraw that question. Do you recollect meetings with Mr. French in May of 2000 and early June respecting Dr. Shultice and your cooperation in that investigation?

A. I know that during the course of the investigation that I spoke with Mr. French several times.

Q. And are you having different or separate meetings about the witness security program? Are you discussing the witness security program with Mr. French while you are talking to him about the Dr. Shultice investigation?

A. I can't remember.

Q. Did Mr. French at some point indicate to you that you had been accepted into the program, the witness security program?

A. No, Mr. French was putting his portion -- actually, it's called the threat assessment. That, he said, would take several months, and from my understanding, it's been completed.

Q. And this is something completely apart from what Mr. Reinert was doing, his portion of the application?

A. From my understanding, yes.

Q. Okay. The last conversation you had with Mr. French about the witness security program was when?

A. When I met with Mr. French and the agent sitting down there.

Q. Agent sitting where?

A. Right there.

Q. Oh, I'm sorry.

A. Next to Mr. Williams.

Q. What did they tell you about your application?

A. That -- well, actually he was just there. Mr. French was going through the names and wanted to re -- well, actually -- well, yeah, actually it was done -- or the threat assessment had been put in like three or four times, and they kept kicking it back

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 68 of 100

because they wanted Mr. French to be more specific. And so we met several times concerning that, and the last meeting was concerning the threat assessment and just had discussed the people that were on the list.

Q. The threat assessment was completed, and what was the result, sir?

A. As I said, it was three or four times they needed to be -- that Mr. French told me that he submitted it to the Justice Department, and they sent it back saying that they needed additional information, and so I met with him several times concerning that, and the last time was, as I said, with the gentleman sitting there.

Q. Agent VanGent, do you know his name?

A. No, I don't.

Q. I hope I didn't slur that too badly. But in any case, he didn't participate in the discussion?

A. No, he didn't.

Q. And after your last visit with Mr. French, have you had any contact with Pat Reinert or anybody from the US Attorney's Office about this witness security application?

A. Yes, I have.

Q. And could you tell us about that, sir?

A. I'm trying to remember. I know that we met. I

don't -- I know that I met Mr. Reinert after I left Scott County, which was in Davenport. I don't remember, you know, specifically what we discussed.

Q. Well, you don't know if you talked about the witness security program with Mr. Reinert after your last visit with Mr. French?

A. Well, no, I guess I have talked to him, I think maybe two or three times, concerning the program.

Q. And what has Mr. Reinert told you?

A. Well, I was asking the status of it. The last time he said that -- that it's in the hands of Washington, D.C., and that it's, you know. It hasn't been a definite yes or no at this time.

Q. You've -- you've been here in Cedar Rapids, I guess, at least the last two or three days, haven't you?

A. Several months.

Q. Okay. And the last time you talked to Mr. Reinert, there had been no decision made on whether or not you were in the program?

A. Correct.

Q. And --

A. I believe that that was -- I believe I was told that -- actually, I was told by the deputy marshal here, the chief deputy, that they would wait until I

was through here in Cedar Rapids with everything because of the expense of transporting and placing people in the program instead of bringing me back and forth.

Q. You mean they'd wait to put you in the program until things here in Cedar Rapids were through?

A. Right, so, you know, they said it was for the manpower and expense.

Q. Okay. And that certainly suggests that you're going to be admitted into the program?

A. I mean, I hope so, but no one's told me anything yet.

Q. When you did that threat assessment paperwork survey, Mr. McNeese, that was to identify people that you thought might potentially cause you some harm?

A. Yes, and people that I have cooperated against.

Q. Okay. So having cooperated against Ms. Johnson, I assume her name would be on that list, is that right?

A. Well, actually -- actually, Mr. Reinert had mentioned that me -- or, no, I'm sorry, Mr. French did when the agent -- when they came up to see me, that they were going to -- that actually her name hadn't been added but they were going to add it.

Q. Because you hadn't put it on there?

A. Yeah, I didn't put it on there, I don't believe.

Q. You didn't consider her a threat?

A. Well, I'm -- I'm sure that I -- I mean, I don't know.

Q. Well, isn't there like forty or fifty names on this list?

A. Sixty.

Q. Sixty. And she's not one of them?

A. No. Now I believe she is, yes.

Q. Because somebody else added her?

A. Yes.

MR. BERRIGAN: I appreciate the Court's patience. Those are all the questions I have. Thank you, Mr. McNeese.

THE WITNESS: Thank you.

MR. WILLIAMS: May I have just a moment, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. McNeese, this last meeting you had with Mr. Reinert, do you recall that occurring approximately March 9 of this year, just about a month ago or so?

A. Yes.

Q. And that was the last meeting you recall having

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 69 of 100

Page 654

with Mr. Reinert?

A. Yes.

Q. Do you recall during that meeting while Mr. Reinert didn't have a final answer and it was still in Washington, did he indicate to you that there was some trouble or there was the possibility you weren't going to get accepted into the program?

A. He said he wasn't concerned, but that people -- or the marshals were concerned that I might get in the program and tell where people are at.

Q. And do you recall him saying that one of the problems that they had in the threat assessment was contact with the press you had in the past, do you recall that discussion?

A. I believe that he brought that subject up, yes, I remember now.

Q. And what do you recall Mr. Reinert telling you about whether that had caused a problem or was an issue with the threat assessment people?

A. Actually -- actually, you had written a letter to my attorney, and I -- that was the first time that I could mention it to Mr. Reinert, stating that during the September 12 meeting, I was hesitant to sign, I believe, Paragraph 9 or Paragraph 12 of my plea agreement because, in fact, Rick Smith is a friend of

Page 655

mine that I have known for many years. And he indicated to me that he wasn't concerned with me talking with Rick Smith. So when I received the letter that you had sent to my attorney, I was kind of upset because Mr. Reinert had told me that. And during that meeting with Mr. Reinert, I brought that up to him, that, in fact, you had told me that -- or because of my hesitation, you had told me you were concerned about me talking with the press, and that's -- that is basically what I told him. That's what we discussed concerning the press.

Q. I understand that. I guess what I'm getting at is do you recall whether Mr. Reinert told you that your previous contacts with the press and discussing with them the fact that you were cooperating and the fact that you provided information on the Angela Johnson case was causing concerns to the people who were assessing whether you were going to be eligible to the -- to get into the WITSEC program, do you remember him bringing up that topic with you?

A. Actually, I don't.

Q. Has any promise been made to you along the lines of if you cooperate on Angela Johnson, you will get into the WITSEC program?

A. No.

Page 656

Q. Was there any connection between continued cooperation against Angela Johnson and whether they were going to continue to process the application for the WITSEC program?

A. No.

Q. It's fair to say the application process for the WITSEC program and your desire to get in it and, as you related, representations that they would make the application started long before Angela Johnson and you had any contact whatsoever?

A. That's true.

Q. And did anything change in the -- has your status as being processed for the WITSEC program changed at all, as a result of you providing information concerning Angela Johnson's case?

A. Not that I'm aware of. Again, I have never seen an application, so I don't know what it says or --

Q. Nobody came to you though and told you that anything changed as a result of the information you're providing on Angela Johnson?

A. No.

Q. It wasn't a case where anybody said, "Boy, we weren't going to process, but now that you're working on Angela Johnson's case or if you continue to work on Angela Johnson's case, we'll process it," it wasn't

Page 657

anything like that?

A. No.

Q. As far as you knew, was the process just going through the normal process, regardless of what came up with Angela Johnson?

A. Yes, they had represented to me that it takes several months to process it.

Q. And as far as you know, that process began back -- as far back as March of 2000?

A. Yes.

MR. WILLIAMS: Nothing further on the WITSEC issue.

MR. BERRIGAN: Just a very brief redirect, thank you, Judge.

RECROSS EXAMINATION

BY MR. BERRIGAN:

Q. Mr. McNeese, we already looked at this but Government Exhibit 9, the letter of September 9, 2000, wherein you ask Mr. Reinert to get your brother into the program, that's the first time you have asked Mr. Reinert to get your brother into the witness security program, isn't it?

A. No, it isn't.

Q. It's not. When did you ask your brother to be in the program, make that request of Mr. Reinert?

A. When I was in Cedar Rapids, they said that -- well, actually, my brother had told me that they were going to process an application for him to enter the program. I later learned that he was denied entrance in the program, so, you know, I was -- I was upset about that. I mean, but, you know, when I asked about -- I had asked them several times if there was something that they could do to help my brother.

Q. You had asked who?

A. I had asked everybody, Mark Fischer, Scott French, Mr. Reinert.

Q. If I could refer you to the second paragraph on Page 2 of Exhibit 9, sir, this sentence, in the middle of the paragraph, "I met with Scott French last week and I discussed Floyd with him. He said Floyd would be eligible to get in the program with me because of my cooperation. I should not say Scott told me Floyd could get into the program because he didn't. He said it could be possible now because of me."

A. Could be possible, yeah, because I'm in -- or when they said my brother was going into the program, processing the application, I wasn't being processed at that time, but now that I have been getting processed, that Scott felt that there could have been a provision in the statute concerning family or

friends or associates.

Q. Well, Mr. McNeese, that doesn't refer to your processing. That refers to your cooperation in Angela Johnson, does it not?

A. No.

Q. Aren't you saying in this letter that because of your cooperation in Angela Johnson's case, now your brother might have a chance to get into this program, even though he had been previously denied, isn't that what you're telling Mr. Reinert here?

A. No, I actually asked Mr. Reinert if he had submitted the WITSEC papers or is he waiting to clear up the Angela Johnson stuff.

Q. We're talking about your brother here, Mr. McNeese?

A. Right.

Q. Are you telling me that Mr. Reinert had submitted papers respecting your brother to get into this program in the fall of 2000, before you wrote him this letter?

A. No, I believe it was 1998.

Q. And he had been denied?

A. Yes.

Q. And you knew that before you wrote this letter in September of 2000, you knew your brother had already

once been denied, didn't you?

A. Yes.

Q. And so now you're trying to get him back in, right?

A. Well, actually, you know, I mean, I didn't know anything about it. Scott said there was a possibility, so I got -- you know, he's my brother, and I'd like to help him.

Q. Now you're trying to get him back in, September the 19th, 2000?

A. Yes.

Q. And you think you've got a shot because Mr. French told you that you had a chance to get your brother into the program, a chance?

A. There's the possibility, yes.

Q. And that was due to your cooperation in Angela Johnson's case?

A. No, Angela Johnson wasn't brought up at that time, I don't believe.

    MR. BERRIGAN: That's all I have. Thank you, sir.

    THE COURT: Mr. Williams, anything further on the WITSEC issue?

    MR. WILLIAMS: Just a moment, Your Honor. I don't believe so.

    THE COURT: Okay. I want to -- before we open the hearing, I want to go over a couple of things here. We technically didn't seal the record this time, but any time I close the hearing, the record is automatically sealed. I want to take that a couple of steps farther now. If there are post-trial briefs, I assume the briefs can avoid referring to any matter contained in the sealed record, or if you're unable to contain yourself in that regard and you're compelled to put something in your brief about it, I want you to file a separate brief that would be under seal because I'm generally opposed to sealing things as a general matter of judicial philosophy, and I want the seal to be of the least restrictive means possible, so that would be a second supplemental brief that would only refer to the matters contained in the transcript that are sealed, and then you'll get permission to file those supplemental briefs under seal, if there are supplemental briefs. Second matter is I think we need to decide now any use of the transcript by the Defendant personally. And I understand the parties are going to be ordering a copy of this transcript. And here's my view. My view is that -- I mean, I don't think I get involved in whether or not lawyers can share a transcript of hearings with their

respective clients, but I'm going to get involved in it to the extent that the matters that are sealed in this transcript of this hearing can be reviewed by the Defendant only with counsel present, and she is not allowed to have a copy of any sealed portion of the transcript of this hearing.

MR. WILLETT: That's fine, Your Honor, I'll make it very easy, we'll stipulate to that.

THE COURT: I didn't think you'd have any objection.

MR. WILLETT: None, none at all.

THE COURT: And that would also mean that she's not allowed to take notes about any of the matters contained in the transcript when you go over the transcript with her. You can spend as much time as you want to talking about it but I don't want notes of the transcript. I don't find that part of the transcript to be any big deal in any event, but I want to make sure that we take all the reasonable steps to see the sealing of the transcript be carried out. Do you have any objection to that, Mr. Williams? It's to the Government's benefit.

MR. WILLIAMS: None whatsoever. In fact, I would ask to go a slight step farther, and ask that the Court instruct the Defendant not to discuss with

anybody, other than her lawyers, the contents of the -- of the testimony that's been brought out during this hearing concerning the witness security -- witness protection program.

THE COURT: I would have done that had I thought it would do any good, but --

MR. WILLETT: Well, the Defendant's lawyer's one step ahead of Mr. Williams' request. The Defendant's lawyer did that with his client yesterday.

THE COURT: Okay. I appreciate it. I just think we did seal it, and, Ms. Johnson, I'm going to instruct you not to reveal any portions of the sealed record to anybody. You can discuss it all you want with your lawyers, but not with anybody else, okay, or any investigators on behalf of the your lawyers.

MR. WILLETT: Yes, sir.

THE COURT: Anything else? Are we ready to open the hearing?

MR. WILLETT: I think so.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Why don't we take a short fifteen minute break, and then we'll open the hearing at 2:30. Thank you.

(Whereupon, a brief recess was taken. The following was held in open court.)

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. McNeese, do you recall there was a series of questions of you concerning some legal advice that you were giving to Angela Johnson in the Benton County Jail, do you remember that series of questions you got?

A. Yes.

Q. Was any law enforcement officer or member of the Government in any capacity providing you with any legal information to pass on to Angela Johnson?

A. No.

Q. Was that just your own legal research you had performed based on your own knowledge you had gained over the years of the law?

A. Yes.

Q. Do you recall -- I'm going to hand you Exhibit 9, and do you recall being questioned about Exhibit 9, particularly with respect to the reference about that article working well, do you recall that?

A. Yes.

Q. Did you have any agreement or understanding with any law enforcement officer or Mr. Reinert that

information was going to somehow be planted in the local Gazette in order to try to have some influence over Angela Johnson?

A. No, not at all.

Q. What -- when you say the article worked well, what were you referring to there?

A. That the article didn't state that I was a cooperating witness.

Q. That was your concern, is that if an article was written, that it not have in anything about you being a cooperator?

A. Yes.

Q. Because I assume you were concerned if it did come out you were a cooperator, that that would affect Angela Johnson's ability to -- or would affect her willingness to talk to you at all?

A. Actually, I didn't want anybody to know actually.

Q. And had you received any instructions from any member of law enforcement on what to say to Rick Smith at any point?

A. No.

Q. Had you received any admonitions from law enforcement or from the US Attorney's Office not to talk to the press?

A. Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 72 of 100

Page 666

MR. WILLIAMS: Nothing further, Your Honor.

MR. BERRIGAN: No further cross.

THE COURT: Thank you. You may step down.

MR. WILLIAMS: United States calls Special Agent Bill Basler.

WILLIAM BASLER, called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please be seated. Make yourself comfortable. Try and pull up the chair so you can speak directly into the microphone, and when you're ready, will you please state your full name and spell your last name for us.

THE WITNESS: My name is William Wayne Basler, last name is B-A-S-L-E-R.

THE COURT: Thank you. Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, how are you employed, sir?

A. I am employed as a special agent with the Iowa Division of Criminal Investigation.

Q. How long have you been with the DCI?

A. Since 1975, it will be twenty-six years this fall.

Q. Prior to joining the DCI in 1975, did you have prior law enforcement experience?

A. No, sir, I did not.

Q. Is there an area in which you specialize within the DCI?

A. Yes, sir.

Q. And what is that?

A. I'm assigned to what's called the general criminal investigations unit, which primarily handles violent crime type situations, oftentimes death investigations.

Q. Did you become involved at some point in the investigation of the disappearance and possible murder of five people in the Mason City area back in the 1993 time frame?

A. Yes, I did.

Q. And whose murders or disappearances were you investigating at that point?

A. During 1993, I was asked by the Hancock county Sheriff's Office to assist with their investigation into Terry Degoose's disappearance, that was in December of 1993.

Q. And were you -- did you become involved in the disappearance of other individuals at about the same time period?

A. I did just because there appeared to be some

Page 668

linkage from Terry's disappearance. Yes, I became involved in additional missing persons as well.

Q. And who were they?

A. They were Greg Nicholson, Laurie Duncan, and Laurie's two daughters, Amber and Candy.

Q. Could you advise the Court in summary the type of information that you developed from the time you got involved in the investigation of these -- the disappearances of these individuals in 1993 up until the time of the indictment of Angela Johnson in July 26 of 2000?

A. We had talked to a number of individuals that provided us information regarding Angela Johnson's involvement in these people's disappearance and death.

Q. What type of information did you get concerning -- let me rephrase that. Did you have any information that purportedly came directly from Angela Johnson concerning any type of admissions or confessions she made concerning her involvement in the murders of these individuals?

A. Yes, we did.

Q. What was the type of information you got prior to indictment in July of 2000?

A. We had a witness who told me that Angela Johnson had admitted being involved with the disappearance and

Page 669

murder of the five people that I mentioned earlier, and gave some detail about those disappearance and murders.

Q. And were there other individuals and witnesses who had information as well concerning those murders and disappearances?

A. Yes.

Q. As a result of the sources that you had on this, did you have an idea prior to July of 2000 of how these individuals were murdered?

A. I had an idea. We received a number of different methods as to how these people were killed. We were told that they were shot. We heard that they were strangled. We even heard that the little girls had been suffocated.

Q. Did you have information prior to the indictment of Angela Johnson concerning what had happened with the bodies of these murder victims?

A. Yes, we did.

Q. What was that type of information?

A. As opposed to the manner of death of these individuals, every person that provided us information about the disappearances and death indicated that all of them had ultimately been buried.

Q. Did you have some type of -- did you have

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 73 of 100



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. CR 00-3034 |
| | ) SUPPRESSION HEARING |
| ANGELA JOHNSON, | ) VOLUME IV |
| | ) SEALED |
| Defendant. | ) |

APPEARANCES:

C. J. WILLIAMS, ESQ., Assistant United States
Attorney, United States Attorney's Office, The
Hach Building, Suite 400, 401 First Street SE,
Cedar Rapids, Iowa 52401-1825, on behalf of the
Plaintiff.

DEAN STOWERS, ESQ., 1010 Insurance Exchange
Building, 505 Fifth Avenue, Des Moines,
Iowa 50309, on behalf of the Defendant.

PATRICK J. BERRIGAN, ESQ., Watson & Dameron,
2500 Holmes Street, Kansas City,
Missouri 64108-2743, on behalf of the
Defendant.

SUPPRESSION HEARING HELD BEFORE
THE HONORABLE MARK W. BENNETT,

taken at the Federal Building, 101 First Street SE,
Cedar Rapids, Iowa, on the 27th day of July, 2001,
commencing at 12:34 p.m., reported by Kay C. Carr,
Certified Shorthand Reporter in and for the State of
Iowa.

Kay C. Carr, CSR, RPR
U.S. Courthouse & Federal Building
101 First Street SE
Cedar Rapids, Iowa 52401
(319) 286-2324

Case 3:09-cv-03064-MWB-LTS     Document 284-63     Filed 06/23/11     Page 74 of 100

PAGE 1  SHEET 1

791

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

UNITED STATES OF AMERICA,    )
          Plaintiff,    )
                              )    No. CR 00-3034
vs.                           )    SUPPRESSION HEARING
                              )    VOLUME IV
ANGELA JOHNSON,               )    SEALED
                              )
          Defendant.    )

APPEARANCES:

C. J. WILLIAMS, ESQ., Assistant United States
Attorney, United States Attorney's Office, The
Hach Building, Suite 400, 401 First Street SE,
Cedar Rapids, Iowa 52401-1825, on behalf of the
Plaintiff.

DEAN STOWERS, ESQ., 1010 Insurance Exchange
Building, 505 Fifth Avenue, Des Moines,
Iowa 50309, on behalf of the Defendant.

PATRICK J. BERRIGAN, ESQ., Watson & Dameron,
2500 Holmes Street, Kansas City,
Missouri 64108-2743, on behalf of the
Defendant.

SUPPRESSION HEARING HELD BEFORE
THE HONORABLE MARK W. BENNETT,

taken at the Federal Building, 101 First Street SE,
Cedar Rapids, Iowa, on the 27th day of July, 2001,
commencing at 12:34 p.m., reported by Kay C. Carr,
Certified Shorthand Reporter in and for the State of
Iowa.

Kay C. Carr, CSR, RPR
U.S. Courthouse & Federal Building
101 First Street SE
Cedar Rapids, Iowa 52401
(319) 286-2324

PAGE 2

792

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| Andrew Rich | 881 | 884 | 900 | 903 |
| | | | | |
| DEFENDANT'S: | | | | |
| Sara Bramow | 793 | 816 | 840 844 | 844 |
| Anthony Flowers | 851 | 867 | 872 | 875 |

PAGE 3

793

THE COURT: This is United States of
America versus Angela Johnson and we're here to take
some additional testimony on the United States vs.
Massiah issue. And I understand the defense is
requesting to be calling two witnesses. Who's kind
of lead counsel today? Will it be Mr. -- oh,
Mr. Stowers? Okay. Is your first witness here?

MR. STOWERS: She's in the building.

THE COURT: Okay; on her way.

MR. STOWERS: I hear chains rattling.

THE COURT: Okay. Good afternoon. Would
you raise your right hand, please.

SARA ANN BRAMOW,
called as a witness, being duly sworn, was examined
and testified as follows:

THE COURT: Please be seated. Would you
state your full name, please, and spell your last
name.

THE WITNESS: Sara Ann Bramow;
B-r-a-m-o-w.

THE COURT: Okay. Mr. Stowers, any time
you're ready.

DIRECT EXAMINATION
BY MR. STOWERS:

Q.   Is it pronounced Bramow?

PAGE 4

794

A.   Yes.

Q.   Okay. Would you like to be addressed as Ms. or
Mrs. Bramow?

A.   Sara.

Q.   Okay. Sara, you're currently incarcerated most
recently in the Johnson County Jail; is that
correct?

A.   Yes.

Q.   You've been brought here to testify in
connection with this case on a hearing that we're
having in which you were approached by another
attorney representing Ms. Johnson in May of this
year. Do you remember that?

A.   Yes.

Q.   And you signed an affidavit for Mr. Willett?

A.   Yes.

Q.   And at that time you were in the Benton County
Jail; is that correct?

A.   Benton County Jail, yes.

Q.   Ms. Bramow, was there a time in August of 2000
when you had occasion to be a resident, if you will,
or an inmate at the Benton County Jail?

A.   Yes.

Q.   Okay. And when -- when did that occur? When
did you first arrive at the Benton County Jail?

KAY C. CARR, CSR, RPR

795

A. August 6, 2000.

Q. Do you remember, were you at the Benton County Jail when Ms. Johnson -- Angela Johnson left the Benton County Jail?

A. Yes, I was there.

Q. And she did not return to the Benton County Jail while you were at the Benton County Jail; is that correct?

A. No, she didn't.

MR. STOWERS: And I believe, Your Honor, the record reflects what date that was that Ms. Johnson was actually removed from the Benton County Jail.

Q. Are you aware of when Ms. Johnson left?

A. I think it was like October 4th.

Q. Approximately?

A. Yeah.

Q. Now, during the time that you were in the Benton County Jail, did you have contact with Angela Johnson?

A. Yes.

Q. And were you, in fact, her cellmate?

A. Yes.

Q. And why don't you tell the Court when did you first become Ms. Johnson's cellmate?

796

A. When did I first become Ms. Johnson's cellmate?

Q. Right.

A. It was August 6th when I did a report to jail for 60 days.

Q. Were you her cellmate then continuously for the whole time you were in the jail?

A. For 58 days.

Q. Was there a time when you were in the jail when you had some contact with an individual named Bobby McNeese?

A. Yes.

Q. And when did you first become aware of that person, Mr. McNeese?

A. I would say about the second day I was there.

Q. And how did you become aware of him?

A. Somebody was beating on the walls and was checking to see who it was and he sent a letter over in a crossword puzzle book with newspaper articles on who he was and wanted to know who we were; what we were in there for.

Q. Was the contact with Mr. McNeese, as you learned of it in early August there, was that a contact that was initiated by Ms. Johnson or by Mr. McNeese?

797

A. By Bobby McNeese.

Q. And --

A. She didn't care about him.

Q. Based on what you observed, was that contact between Mr. McNeese and Ms. Johnson something that had been going on prior to your arrival --

A. Huh-uh.

Q. -- on August the 6th?

A. No. They had no contact before then.

Q. And how did Mr. McNeese manage to communicate? I think you said a note in a crossword puzzle book. How did he manage to get that through?

A. Through Andy.

Q. I'm sorry?

A. Through Andy, one of the jailers.

Q. And how did Andy get that magazine to the cell in which you and Angela were located?

A. He just walked in and handed it to us.

Q. Do you remember him saying anything at the time that he did that?

A. Yeah. This is from another cellmate who wanted to pass it on.

Q. And was there a note within the magazine; is that what you're indicating?

A. Yeah, there was.

798

Q. And do you remember anything about the note as you sit here today?

A. Do I remember anything about the note?

Q. What it said.

A. Oh, just all about him; who he was. He was in with the mob and -- and it -- that he was in life in prison; where he was going to prison or where he had been and where he was finishing.

Q. It was kind of his resume?

A. Yeah, kind of.

Q. And were there subsequent contacts between Mr. McNeese and -- and your roommate Angela Johnson after this first note?

A. Was there contact?

Q. Yeah.

A. Yeah.

Q. And can you describe -- first of all, was there additional written communications between the two of them?

A. Yeah. There was a lot of letters.

Q. How did the letters get passed back and forth?

A. Me or somebody else and Andy in magazines and books.

Q. And how would you, for example, pass a note either from Mr. McNeese to Ms. Johnson or from

799

Ms. Johnson to Mr. McNeese?

A.   Because they always had his flap down where you slide in the dinner tray.  It was always down.  When you was walking by, you just toss it in there to him or he would be right there at the door and take it.  He would give you one.  He would be handing it out the hole at the --

Q.   Would the flap that you're talking about be a flap that would either be put up and closed or put down and opened from the outside or from the inside?

A.   Outside.

Q.   And would a person who was locked within their cell be able to open -- open that flap?

A.   Huh-uh.  I've tried.  They have like a dead bolt on the outside.  It's a square box like a dead bolt on your house.

Q.   And would the dead bolt -- are you saying that there was a dead bolt for the flap or the cell door?

A.   For the flap.

Q.   For the flap as well as the cell door?

A.   The cell door just had big locks.

Q.   And this flap that's on the door was open on Mr. McNeese's cell?

A.   It was open every day all day long.

Q.   Was that different than the other cells?

800

A.   Yeah.

Q.   And how?

A.   Nobody else got theirs opened unless they were being fed or handing mail through.

Q.   Did that in any way strike you as odd or unusual that his door flap was open while everybody else's was closed?

A.   Yes.  He said it was because of who he is and people do what he say -- what he says.

Q.   Just to be clear, who are you talking about?

A.   Bobby McNeese.

Q.   And you've also indicated that there were instances when notes were passed by Andy; is that correct?

A.   Yes.

Q.   Approximately how many times do you recollect as you sit here today that Andy would have passed a note either from Mr. McNeese to Ms. Johnson or from Ms. Johnson to Mr. McNeese?

A.   Every day.  Sometimes twice a day.  Just like a mail run.

Q.   And these notes, were they always concealed in magazines in some way?

A.   No.

Q.   If they weren't concealed, how were they handed

801

then?  Were they just --

A.   Handed in an envelope sealed.  Andy just take it over to Bobby or bring it in and stick it in the bars to Angela.

Q.   Do you remember him making any comments when he would deliver these notes?  I know you talked about one comment on the first note.  Do you remember any comments that Andy would have made?

A.   Not to me.

Q.   Do you remember overhearing any statements that he made in connection with these deliveries?

A.   Not that I remember.  I can't remember.

Q.   Now, you've talked about notes being passed.  In addition to that, was there other communication occurring between Mr. McNeese and Angela Johnson orally, talking?

A.   Yeah, through the windows.  It was from our cell to the yard and once or twice face-to-face in the yard.

Q.   All right.  Why don't we talk about the through the windows communications first.  Now, I think the Court is well aware there's -- there's a recreation area, I believe, within the jail facility; is that correct?

A.   Yes.

802

Q.   Do some of the cells have some windows that face out to this recreation area; is that right?

A.   Yeah.

Q.   Did you and Angela have a cell in which you had a window that faced out to the recreation area at some point in time?

A.   Yes, we did.

Q.   Did Mr. McNeese ever have such a cell himself?

A.   No.

Q.   So this would be communications that you're describing through this window and the window we're talking about would be the window of the cell that you and Angela were assigned to?

A.   Yes.

Q.   Now, was that the cell that the two of you first were placed in?

A.   No.

Q.   Were you and she put in that cell at some point after you arrived at the Benton County Jail?

A.   Yes.  It wasn't too long after I got there we were moved across the hall to that cell --

Q.   Now --

A.   -- because we were too loud.

Q.   Too loud?  Is that the explanation that was given?

803

A.   Yeah.

Q.   And the cell that you were in before you got moved to the cell with the window to the yard, there's been some testimony we've heard was that the cell that was right next to Mr. McNeese?

A.   The one we was at first?

Q.   Yes.

A.   It was right beside Bobby McNeese.

Q.   Shared a common wall?

A.   Yeah.  Yes, it was.  I'm sorry.

Q.   Was it possible to talk through that wall?

A.   Yes, you could.

Q.   Is that commonly done there at that jail?

A.   Yeah.  Yes, it was.

Q.   It was pretty well known, wasn't it?

A.   Yeah.  You just holler at the wall and go right through the whole cell.

Q.   And were the jailers, to your knowledge, aware that people could communicate through the cells that way?

A.   Yes.

Q.   It was pretty obvious to you?

A.   Yes.

Q.   That they knew of that method of communication between inmates?

804

A.   Oh, yes.

Q.   Now, this cell then that you were moved to you say for making too much noise with the window to the yard, where was that cell in relation to Mr. McNeese's cell?

A.   It was directly across the hall from where we were and one cell over.

Q.   Across the hall and one cell down?

A.   Uh-huh.

Q.   Now, did that movement of you and Angela slow down the communications in any way between Mr. McNeese and Mrs. Johnson?

A.   No.

Q.   And you've indicated there was communication through the windows or through the window of that cell that you were in and the yard between Ms. Johnson and Mr. McNeese

Is that what you're saying?

A.   Yes.

Q.   Do you remember about how many times that would have occurred?

A.   Sometimes three times a day.  He would get out to come and start pounding on the windows and he would get really mad when Angela wouldn't go over there and talk to him.  And he wouldn't give up.  He

805

would come over; just keep pounding on the window; tell me to go get her; make her come over and talk to him.  It was up to three times a day.

Q.   Now, what -- what were the general -- If there were rules at this jail, what were the rules about inmates being allowed out into this yard area; this recreation area of the jail?

A.   Once every three times a week -- or three times a week, once a day for an hour.

Q.   And are you indicating to Judge Bennett that Mr. McNeese was allowed out in the yard area of this jail up to three times a day?

A.   Yes.

Q.   Now, was this yard area of the jail an area that in any way was monitored by the jail people?

A.   Three cameras.

Q.   There were three cameras monitoring the recreation area?

A.   Yes.  They were always on.

Q.   Would the area where Mr. McNeese was pounding on your cell window be an area that, to your knowledge, was within the camera eyeshot?

A.   All three.

Q.   Did you ever ask Mr. McNeese how it was that he was allowed to obtain or receive these yard

806

privileges?

A.   Yes.  It always made me mad.  I asked him how -- how do you rate that you get to go outside every day three times a day even and he said, "Because that's who I am and I can."

Q.   You know if there was anybody at the jail there that seemed to be allowing Mr. McNeese to have these opportunities for being out of his cell a little bit more than others?

A.   Well, yeah.  It was Andy or Les and everybody but Bill.  He wouldn't let anybody do anything wrong.

Q.   And when Mr. McNeese would get Ms. Johnson to come to the window, would they talk?

A.   They would talk.

Q.   And do you remember conversations occurring there between the two of them where Ms. Johnson is in her cell at the window and Mr. McNeese is at the window?

A.   Yeah.

Q.   And were they short 15 second conversations that we're talking about or --

A.   No.  We're talking 15 minutes or longer.  He would be outside for an hour.

Q.   Was Ms. Johnson pursuing contacts with

807

Mr. McNeese?

A. No.

Q. Even during this time that you had been moved to this cell with the window, were there notes still being passed at that time?

A. They slowed down a little bit but, yes, there was.

Q. Were the same methods being used during that time for the passing of the notes?

A. Yes.

Q. And did Andy pass any of those notes during that time when you were in the cell with the window?

A. Yes.

Q. Now, apart from Mr. McNeese having access to this yard where he could talk to Angela and you directly through this window that was on your cell, did Mr. McNeese have any other apparent extra freedoms within the jail that other inmates did not appear to also receive?

A. Oh, he was always out of his cell. And yeah, when me and Angela was coming in from the yard, they don't let other male inmates being out. They let him go out there and talk to her physically.

Q. Do you remember an occasion when he actually did go out into the yard and talk to Angela?

808

A. Yes.

Q. And why don't you just describe what happened for the Court.

A. We were coming back in from being outside and he was standing over in this little corner. When Andy come and get us to walk by, he stopped Angela. Then they went out and talked and I went back to my cell.

Q. Do you remember how long they were within --

A. It was longer than five minutes, but I don't think it was 15 minutes maybe.

Q. And do you remember any other times when you think that the two of them were able to have contact with each other outside of the jail cell or cells?

A. I think it was just two times over by the yard and that was it. I don't remember.

Q. And you've indicated that -- I think you said that when you and Angela were in the yard, nobody else was to be in the yard?

A. No, nobody.

Q. Why do you say that?

A. They just never let anybody else go out there with us. It was clear up to almost the end of our stay there when they finally moved us to a three man cell where we would have other inmates in there with

809

us.

Q. In your cell or in the yard?

A. In the cell.

Q. And when you say other inmates, do you mean other female inmates?

A. Yes.

Q. And you've also indicated that -- that Mr. McNeese was out of his cell -- I think you said a lot or often?

A. Yes.

Q. What were, for the ordinary inmates, the out-of-cell privileges that they were allowed?

A. You go to court or visiting. Visiting was three times a week or go out to the yard and go back to your cell and that was all.

Q. And so your observation, what was the rule with regard to Mr. McNeese?

A. Oh, he was always up at the front counter. He was always outside. I mean every day all day long.

Q. Were there times when Mr. McNeese was personally able to deliver notes to your and Angela's cell?

A. To our cell?

Q. Yes.

A. I don't think so. I don't remember.

810

Q. On the notes that came to your cell, would it have been possible for Mr. McNeese to pass a cell -- or a note into your cell if that flap was not open?

A. No, because we never had a flap.

Q. You didn't have a flap on your cell?

A. No. We had a big metal door and a cage.

Q. Explain that. Are you talking about a cage meaning a bar?

A. Bars. It was a big metal door and then it had metal bars come around like a little cage enclosing the door. That's the way if they bring you food; they would step into the cage; come in the doorstep of the cage and hand you through the -- the little slot the food.

Q. Were you able to see out of your cell?

A. Yes. They would leave the windows open once in a while.

Q. Not to the yard. Out into the inside.

A. Yeah, hallways. You had little doors with windows, one on the door and one in the middle of the cell. They would leave them open. You could see all over out there.

Q. Would those windows, as you call them, to the inside area of the jail, would those be closed?

A. They're supposed to be.

811

Q. And how would they get closed; from the inside or outside?

A. The hallway.

Q. Well, those little doors, would those have -- would you be able to pass a note through those doors?

A. No.

Q. Why not?

A. Because they're solid glass and there's no -- they don't open. Just little metal door that covers the outside and the hallway door open and shut over the window like a shutter.

Q. How did the notes then that were passed to you or Angela from Mr. McNeese get into your cell?

A. By Andy.

Q. And how would he get them into the cell is what I'm figuring out?

A. He would open the door and come in and sit them in the bars of the cage that went around the door.

Q. Was there any way that anybody could slip a note into your cell other than by having a key to open the cell door when you're in the cell that you're describing?

A. No.

Q. How was it that you're aware that Mr. McNeese

812

was out of your cell in areas of the jail other than in the yard?

A. He would come over to the window so we could see.

Q. And was this the window --

A. In the hallways.

Q. -- in the hallway? Would that window sometimes be shut but not locked?

A. They don't lock.

Q. And how many times do you remember him opening the window on your cell?

A. Quite often.

Q. Would that area of the jail where he would be out roaming be an area of the jail that would be monitored by the jail personnel?

A. Yes.

Q. Such that they would be able to see -- see this happening?

A. Yes, because Bill would get mad or Mike and come down and slam them shut real hard and they would echo through the whole building and he would come back and open them.

Q. Now, these contacts that Mr. McNeese was attempting to have with your cellmate, Ms. Johnson, was there a basic theme to what he was trying to

813

talk to her about?

A. He wanted to help her in any way he could about her case, lawyers, and he wanted to know everything and then he was going to help her by having somebody else take the blame.

Q. You overheard some of these conversations then, I take it?

A. Yes.

Q. Was Ms. Johnson, in your estimation, willing to discuss her case with Mr. McNeese?

A. No, because Al kept telling her not to say anything to anybody and I told her not to because there was -- I told her that Bobby was a person that squealed on somebody else that was in the jail from -- my daughter's uncle was in there and was witness to this.

Q. So even despite that, according to Mr. McNeese, she did ultimately share some information with him?

A. Yeah.

Q. And even though she was reluctant to talk to him, what did he do in your observation to get her to talk to him?

A. What did he do to get her to talk to him?

Q. Yes.

A. Just kept bugging her. See he could do all

814

these things for her, help her. He could get her off; get her out of jail. He would take care of it all, but she had to tell him everything.

Q. Now, in addition to notes being passed to Mr. McNeese that were from Ms. Johnson, did you pass any notes to Mr. McNeese --

A. Yes.

Q. -- that were your own?

A. Yeah.

Q. And who passed those notes for you?

A. I did.

Q. Did any of the jailers help you?

A. Andy did.

Q. And did you receive any notes back from Mr. McNeese?

A. Yes.

Q. And how did you get those notes from him?

A. Well, either he would hand them when I was walking down the hallway or Andy would bring them in.

Q. Do you ever remember any time when books -- there's an area in the jail where there are books; a library?

A. Yup.

Q. Did Mr. McNeese utilize those books as a place

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 80 of 100

815

Q. to pass notes?

A. Yes.

Q. Did he pass notes to you through those books?

A. Yes.

Q. I guess what I'm describing, so we're clear, was there a time when notes were placed in the books and then word was gotten to somebody to look in a certain book for a note?

A. Yes.

Q. How did that happen?

A. How did that happen?

Q. Yeah.

A. He would holler it through the window when he was out in the yard to look in a certain row behind all the books and I did. Used to pass gum there.

Q. Gum?

A. Uh-huh.

Q. And how -- was gum allowed in the jail?

A. Oh, no.

Q. Mr. McNeese had gum?

A. Yes.

Q. Do you know how he got it?

A. Through his daughter, I think. That's what he said.

Q. Mr. McNeese ever get any food items that other

816

Q. inmates weren't allowed to have at the jail?

A. Did he?

Q. Yeah.

A. I don't know that for a fact, but --

Q. Did he ever tell you that he had?

A. Yes.

Q. What did Mr. McNeese tell you?

A. What did Mr. McNeese tell me? Oh, that he would -- I really don't remember exactly what it was, but I keep thinking it was that he could have a steak if he wanted to, but I don't know, but he didn't like meat.

Q. He didn't like you?

A. He didn't like meat.

Q. I thought you said he didn't like me.

A. No.

MR. STOWERS: That's all I have, Your Honor. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. What are you in jail for right now, ma'am? What's the charge?

A. For intent to manufacture.

817

Q. What are you looking at for a sentence now?

A. Five years each.

Q. Is that state or federal charges?

A. State.

Q. What else do you have? Have you ever been convicted of any other felonies?

A. Of any other felonies? Third offense drunk driving.

Q. All right. You testified that Andy would help pass these notes back and forth. Now, some of the notes were passed, you said, in books or magazines that came; correct?

A. Yes.

Q. And they were hidden inside the books or magazines?

A. Yes.

Q. And sometimes those would be passed to you guys by Andy, the jailer, and sometimes by other jailers; correct?

A. Les tried, but Angela didn't trust him and didn't want to send any notes because she didn't feel he would do it.

Q. But it was common in that jail not just between you and Bobby McNeese or Angela Johnson and Bobby McNeese, but from time to time an inmate would get

818

Q. done reading a magazine or newspaper or something like that; they would hand it to the jailer and the jailer would pass it on to another person so they could read the magazine and newspaper and so forth. Wasn't that a common practice in the jail?

A. No.

Q. It wasn't?

A. Each cell got their own newspapers and these magazines were mailed to him. They were his. They had his name on the mailing address and nobody else was supposed to get them.

Q. And so Andy, you say, is the one who would pass these notes either hidden inside the magazine or just openly?

A. Yeah. Yes.

Q. So he -- he passed both magazines with notes hidden in them and then he would pass notes just openly?

A. In an envelope.

Q. And then sometimes notes would be hidden in books up in front where the library was; correct?

A. Yes.

Q. Now, you were aware that Andy wrote up Angela Johnson and sanctioned her for passing a note; correct?

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 81 of 100

819

A. Yes.

Q. At one point, you indicate that -- in your testimony that once or twice there was a face-to-face meeting between Angela Johnson and Bobby McNeese out in the yard. First of all, which was it; one time, two times?

A. It was two, but the second time wasn't as long as the first. The first time he was standing right there in the corner. Then they went out in the yard together and talked. And the second time it was she was just right behind me, but he was right at the same corner and caught her when I was walking by.

Q. Okay. Let's go to the first time, okay? When was that approximately?

A. When was it?

Q. Yeah.

A. That was, I would say, about middle of August.

Q. Who else was present that saw this?

A. Me and Andy.

Q. Anybody else?

A. No.

Q. Okay. So Andy was there?

A. Yes.

Q. Did Andy see them go out in the yard together?

A. Yes.

820

Q. How do you know that? Where was he at?

A. He was walking right behind me.

Q. And then where did you go after he was walking right behind you?

A. We both went to put me in the cell.

Q. And so you and Angela are walking in from the yard?

A. Yes.

Q. Angela stops?

A. She was ahead of me, yes. She stops and talks to Bobby.

Q. Your testimony is you and Andy just kept walking to your cell?

A. Yes.

Q. Do you know what happened then with Angie and Bobby McNeese outside there?

A. No.

Q. Do you know that, in fact, they went out into the yard?

A. Because we -- when Andy turned around he said, "Let's leave the door open."

Q. Andy said what?

A. Leave the door open.

Q. To whom did he say that?

A. Bobby.

821

Q. Okay. And you're referring to the yard to the -- the door to the yard?

A. Yes.

Q. Did you actually see them go out into the yard?

A. Yes. They were standing right outside the door.

Q. In the yard?

A. In the yard.

Q. And then you came back to your cell?

A. Yes.

Q. And you don't know what they did then in the yard?

A. No.

Q. For all you know, they immediately came back inside the hallway?

A. They could have.

Q. And you estimate the first time was maybe five or 15 minutes; somewhere between those two?

A. Yeah.

Q. Did Angela tell you what she said to him?

A. No.

Q. Do you know if Angela even talked to him at all about her crime or anything that occurred?

A. That day?

Q. On that occasion.

822

A. On that occasion, no, I don't.

Q. Okay. So let's go to the second occasion. When did that occur?

A. That was just right after -- not even a week.

Q. A week after the first one?

A. Yeah.

Q. And again, the circumstances were the same. You and Angela were coming in the yard?

A. Yes.

Q. And Andy was again the guard?

A. Yes.

Q. And are you saying that the same thing happened; that Angela stopped and met with Bobby and you guys -- you and Andy went on?

A. Yes.

Q. And --

A. She was immediately after.

Q. Okay. How soon after you got to your cell did -- did she come down then?

A. Just minutes.

Q. Okay. Did you actually see her and Bobby speaking?

A. Yes, face-to-face.

Q. And what were they talking about?

A. I don't know.

823

Q. Did she ever tell you what they talked about?

A. No.

Q. So you don't know if they talked about the case at all?

A. No.

Q. The cell that Bobby McNeese was in was unique in that jail in that it was a one person cell; is that correct?

A. Yes.

Q. It was the only one person cell in the jail; correct?

A. Yes.

Q. It had a different configuration for the door because it didn't have that iron cage; is that correct?

A. Yes.

Q. It had a food slot where the other cells didn't have food slots?

A. There are a couple other cells that have food slots.

Q. Did you know about the ventilation problem in cell one?

A. No.

Q. Did you know it was necessary to keep the food slot open in order for the food to properly vent?

825

A. Yes. They would never let him go out with anybody else.

Q. Now, you testified that Bobby was always out on his own up front?

A. By the booking counter.

Q. By the booking counter?

A. Yes.

Q. But how did you know that if you weren't allowed out there?

A. Because he come and opened our windows and you could see right up to the booking counter.

Q. You could see to the booking counter from your windows?

A. From our cell windows.

Q. That's interesting. What you're saying is that you could see -- from inside your iron cage, you could see out the cell door, down the hall, around the corner --

A. It's just --

Q. -- to the booking counter?

A. It's a diagonal shot all the way up there.

Q. Interesting. Well, we'll have to take a look at that.

A. Yes.

Q. Now, this affidavit that you prepared or that

824

A. No, I didn't.

Q. You spoke about the rules that existed for the number of hours that inmates could go out into the yard and have exercise and so forth. Well, that was the rule. In practice, the guards actually try to get people out in the yard as much as they can?

A. Yes, they did.

Q. It was common practice for the guards to let you out a lot more often than they would have to with the rules?

A. Yes, sometimes once a day.

Q. Sometimes more than once a day?

A. No, they never did that.

Q. Some of the other inmates got more than once a day, didn't they?

A. I've never seen anybody else out there that many times.

Q. You indicate in your testimony here today that it was sometimes three times a day that Bobby would be out in the yard; is that correct?

A. Yes.

Q. And that he was out there for as much as an hour at a time?

A. Yes.

Q. By himself?

826

was prepared for you, how did that come about?

A. The affidavit for --

Q. The affidavit that you signed on behalf of Mr. Willett. Tell me about that.

A. When a private investigator come to talk to me.

Q. Who was the private investigator?

A. I don't remember her name.

Q. Was it a female or male?

A. Female.

Q. She take notes of what you guys talked about?

A. Yes.

Q. Did she have you write up an affidavit?

A. No.

Q. So how did this affidavit come to be?

A. Off her notes.

Q. Okay. And so she handed to you that typed up as it is?

A. Yes.

Q. Did you make any changes to it?

A. When Al come down, we went over it and he changed some things.

Q. Okay. So there's another draft at some point that had some changes to it?

A. Yes.

Q. Did you write anything down yourself?

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 83 of 100

827

A. No.

Q. Now, this occurred right after you got arrested on your current drug charges; correct?

A. Yes.

Q. Give a little background to the Judge. After Angela was moved to the Black Hawk County Jail from the Benton County Jail, you and her continued to communicate; correct?

A. Yes.

Q. You sent letters to each other; right?

A. Yes.

Q. You and her had become fairly close in the jail together; correct?

A. Yes.

Q. Then after you got incarcerated on your drug charges, you communicated with her again; correct?

A. Yes. One letter.

Q. Well, actually there's a few letters --

A. Was there?

Q. -- that got exchanged?

A. Well, yeah, I mailed her one. She could have mailed me one or two.

Q. In at least some of those letters that got exchanged, you asked her about whether there was some way she could help you post bond so you could

828

get out, didn't you?

A. I asked her to help me post bond?

Q. Yeah.

A. No.

Q. You never asked her to help post bond or find a way to get out of jail?

A. No. She asked me what my bond -- if I had one what it was, and I wrote her and I told her what it was.

Q. And you asked -- you said something to the effect, "I sure hope you could help me."

A. No. I said, "If you think if there's any way you could do that one from in there," you know, if she's locked up, how is she going to get me out of jail?

Q. Now, while you were in jail, you weren't working for the Government -- I'm sorry; let me specify. When you were in jail with Angela Johnson at the Benton County Jail, you were not working for the Government; correct?

A. No.

Q. You were not a cooperator; correct?

A. No.

Q. No one had asked you to obtain information from Angela Johnson concerning anything; correct?

829

A. Correct.

Q. And yet she shared a lot of information about these crimes with you, didn't she?

A. To an extent, yes.

Q. She told you -- well, let's just go through this a little bit. She told you, for example, that she was out with -- with Dustin Honken looking for this guy named Nicholson who had testified against him; right?

A. Testified against him?

Q. Right. I'll just go back over it. She told you without you asking this or without asking a question, she told you that she and Dustin Honken went out looking for Greg Nicholson because he had testified against Dustin Honken; correct?

A. Correct.

Q. She also told you that they ended up finding Nicholson over at his girlfriend's place?

MR. STOWERS: I'm going to object to this, Your Honor. It's a little bit beyond the scope of direct.

MR. WILLIAMS: Judge, the allegation here is that somehow Bobby McNeese had to pump Angela Johnson for information. What we're attempting to establish here is that --

830

THE COURT: Well, I understand what you're attempting to establish, but that begs the question of whether it's beyond the scope of direct examination.

MR. WILLIAMS: I think it's within the scope of direct examination because the nature of the direct examination was to suggest that the information was dragged and pulled out of Angela Johnson, and in this case, I think the testimony is going to be that Angela Johnson willingly told another person all about her crimes without it being dragged or pulled out of her.

THE COURT: I'll allow it.

A. That was when -- when she was going over her ex-boyfriend's trial transcript.

Q. Okay. Bobby McNeese wasn't around; right?

A. No.

Q. He had nothing to do with this conversation you and Angela Johnson had about her crime?

A. No.

Q. She told you that they found Nicholson over at Nicholson's girlfriend's place?

A. Right.

Q. She told you the girlfriend was there with two kids there as well?

831

A.   She told me she had two kids.

Q.   Two girls; right?

A.   Yes.

Q.   She told you that they took a videotape of Nicholson?

A.   They went there to do that.

Q.   Okay.  And did she tell you whether they accomplished that or not?

A.   She did not say that, but --

Q.   She told you she had a weapon or that a weapon was involved in this confrontation with Nicholson?

A.   That he had one.

Q.   That who had one?

A.   Dustin used one.

Q.   Okay.  She told you about DeGeus as well?

A.   The goose?

Q.   Terry DeGeus, her ex-boyfriend.

A.   That she talked to him.  He was supposed to go out and meet her at her work.

Q.   The night that he disappeared?

A.   Yes.

Q.   She indicated to you at one point that -- that these bodies were buried near a tree line someplace so that the disk of the farmer wouldn't dig up the bodies?

832

A.   That was in the trial transcripts.

Q.   And she confirmed that to you, didn't she?

A.   Yes.

Q.   She told you that the bodies must be dug pretty deep because there was a mention in the trial transcript about whether frost would heave the bodies out of the ground?

A.   I said that.  I asked that.

Q.   And she confirmed that they must have been buried pretty deep?

A.   She said, "Well, would have had to have been." In the trial transcripts, yeah.

Q.   And all these statements she gave to you without you asking for them; correct?

A.   Well, no.  I asked her questions and then when she started to tell me, I told her I didn't want to know.

Q.   And she would keep telling you?

A.   Well, she would pretty much listen.  She didn't tell me, you know, when I would say stop.

Q.   Okay.  She would share all this information with you and you would tell her to stop and yet the conversation would go back and she would tell you more information.  You would tell her to stop again and so forth?

833

A.   Just talking between two people living quarters for 58 days, you know.

Q.   You weren't pumping her for information, were you?

A.   No.

Q.   You weren't asked by anybody to try to drag this information out of her, were you?

A.   No.

Q.   The statements that -- that she made to Mr. McNeese, were you present during all those conversations?

A.   With Bobby McNeese?

Q.   Yeah.

A.   Through the windows pretty much.

Q.   And did you overhear the nature of the conversation then?

A.   Yeah.

Q.   Did you take notes?

A.   Did I?

Q.   Yes.

A.   No, I didn't.

Q.   Do you recall that at some point, Angela Johnson put together some notes and put it in an envelope and she indicated to you that they indicated the location of the bodies of these

834

victims.  Do you recall that?

A.   The envelope was sealed up in a white envelope with --

Q.   Yes.  And she told you it had a map giving the location of the bodies in it?

A.   No.  She said, "This will free me or send me to prison for the rest of my life."

Q.   And did you understand where that was going to?

A.   Yes.

Q.   What did you understand?

A.   That was going to Bobby McNeese.

Q.   What did you understand was in that that was going to set her free or put her in prison for the rest of her life?

A.   He wanted to know details for her -- for him to get her off; for him to help her.

Q.   Now, you indicated during your testimony that the conversations that -- that she didn't want to engage in these conversations with Bobby McNeese; is that your testimony?

A.   There was -- there was times she told him not to talk to her and he would get mad.

Q.   And there were times that she voluntarily talked to him; right?

A.   Yes.

835

Q.   And she voluntarily wrote him notes and sent him notes; right?

A.   Yes.

Q.   Now, the hallway that you're talking about where people were brought in and out, that doesn't have a video camera placed to cover that area, does it?

A.   Well, it's got a video camera in the outside that shoots right into the jail through the door and then there's windows through the control room.  I always call it control tower.  There were great big mirror of windows.

Q.   And jailers don't sit in there.  The dispatchers do?

A.   Dispatcher and jailers.

Q.   Okay.  And there's not somebody there constantly looking out the window conducting surveillance, are there?

A.   Oh, there was when Angela was around.  There was always somebody that would see her getting a note from Bobby or something.  That's when she got wrote up -- when Andy had to write her up because the girl in the control room caught them.

Q.   Now, these statements that she made to you concerning some of these other events, the fact of

836

going over to Nicholson's girlfriend's place the night that they disappeared and the video camera and the gun and all that stuff, that was made in a conversation to you, but there were other inmates present as well, weren't there?

A.   No.

Q.   Didn't she make some statements right in front of Teri Hawkins as well?

A.   I don't know what she said to him -- her; I'm sorry -- because they sat up and talked, but I don't know what it was.

Q.   Now, when you passed notes to Bobby McNeese, you tried to hide that as you were going down the hallway, didn't you?

A.   Yes.

Q.   Because you knew you would get written up if somebody caught you passing notes?

A.   Yes.

Q.   Now, do you remember talking with Special Agent Bill Basler on May 22nd of 2001?

A.   Yes.

Q.   Do you remember he interviewed you while you were out at the Benton County Jail?

A.   Yes.

Q.   Do you remember telling Special Agent Basler

837

that Angie tried to talk to you about her charges and you told her you didn't want to know?

A.   Yes.

Q.   But she tried to talk to you about her charges, didn't she?

A.   She wanted me to know what they were.

Q.   And you had to stop her?

A.   I didn't want to know.

Q.   You and Angela had some fights from time to time concerning the fact that there were a couple of children killed in this case; is that right?

A.   Arguments.

Q.   And in these arguments, you just couldn't believe that she could be involved or something where you asked her how she could be involved in something where children were killed; right?

A.   Yes.

Q.   Do you have any fear yourself of Angela Johnson or Dustin Honken?

A.   No.

Q.   Do you remember being interviewed by Special Agent J. E. Smith along with Scott French of the FBI on October 6th of 2000 in the Benton County Jail?

A.   Yes.

Q.   And this was right before you got released;

838

correct?

A.   Three hours before I was released.

Q.   October 6th of 2000?

A.   Yes.

Q.   And they asked you about the communications that Ms. Johnson had with Mr. McNeese, didn't they?

A.   Yes.

Q.   Do you remember telling the agents at that time that Johnson claimed to be using McNeese?

A.   Johnson claimed to use McNeese?  I don't remember.

Q.   You don't remember, "Johnson claims to be using him," referring to McNeese?

A.   No.

Q.   Do you remember indicating to the agents that, "Johnson's communication with McNeese was to pass the time and get what she" -- Johnson -- "wanted."  Do you remember saying that to the agents?

A.   Yes.  It was something for her to pass time.

Q.   And to get what she wanted?

A.   Get what she wanted?  She never got nothing from him.

Q.   Do you remember making that statement to the agents?

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 86 of 100

839

A. I think so.

Q. You indicated when the first communication that you had between you and Angela Johnson and Bobby McNeese, he wanted to know who you guys were; correct?

A. Yes.

Q. You indicated during your testimony that you were asked the question of who allowed Bobby McNeese to have all this extra time in the yard and you said Andy or Les?

A. Uh-huh, yes.

Q. How do you know that?

A. Bobby would say. And I always asked him, "How do you get out of here every day three times a day? This is your third time," and he would say, "Do you want me to fix it for you?", and he would go and tell them to let us out right after him.

Q. And did that happen then?

A. Yes.

Q. So there were times when you got out more than once a day?

A. No. Just during every day, because otherwise you only get out three times a week. I -- and never after four.

MR. WILLIAMS: No further questions, Your

840

Honor.

THE COURT: Any redirect, Mr. Stovers?

REDIRECT EXAMINATION

BY MR. STOWERS:

Q. Ms. Bramow, did you testify in front of the federal grand jury last week?

A. Yes.

Q. And who was the attorney who was questioning you, if you remember?

A. He was.

Q. This attorney here?

A. Yes.

Q. And did you volunteer to come in front of the federal grand jury?

A. No.

Q. And did you testify to some of the same subject matters that you've testified to here today last week?

A. No. I didn't testify to anything on Bobby McNeese.

Q. Did you testify about alleged statements that Ms. Johnson made to you in the jail?

A. Yes.

Q. And do you have some fear that the U.S. Attorney's Office here is going to prosecute you?

841

A. Yes.

Q. Has that been expressed to you that you might be prosecuted by the federal authorities?

A. That's what my lawyer told me.

Q. When you testified before the federal grand jury last week, were you given any form or assurance of immunity?

A. No.

Q. Now, you and Ms. Johnson did discuss the allegations that were brought against her; is that correct?

A. Yes.

Q. In fact, you reviewed a transcript, I believe it is, of a pretrial hearing on her case --

A. Yes.

Q. -- that her attorney had provided to her?

A. Yes.

Q. And you discussed what the allegations were --

A. Yes.

Q. -- that were contained in that transcript?

A. Yes.

Q. Is this the conversation that you're talking about that you had with Ms. Johnson --

A. A lot of them.

Q. -- was about what was said in the transcript --

842

A. Yes.

Q. -- not about what she said. It was what was contained in the transcript; is that correct?

A. That's how all our conversations started.

Q. There was a period of time at the very end when Mr. McNeese was moved to I think it's been called an isolation cell?

A. Yes.

Q. Was he still able to communicate with you and Ms. Johnson from that cell?

A. Yes.

Q. And how did he do this then?

A. Andy had brought him a pen and he wrote on a card and sent Angela a note on a little magazine card telling her what happened; where he was.

Q. Even though he was in this so-called isolation cell, he was given a pen and card to write on and pass a card to Ms. Johnson on?

A. Yes.

Q. In addition to that, was he ever let out of this so-called isolation cell --

A. I don't know.

Q. -- do you ever remember?

A. I don't remember him even being in isolation, but he was strapped down and beat.

PAGE 53   SHEET 14

843

Q. Do you know if that happened or did you see that happen?

A. No, I don't. Supposedly.

Q. Why are you smiling about it?

A. Because I didn't see no bruises or nothing and I've never heard of anybody -- any of the sheriffs in Benton County beating up an inmate.

Q. Now, you've described, I believe in some questioning from Mr. Williams, a particular note you think you remember Ms. Johnson making some remarks about that she was handing out that this will either get her life or set her free. Do you remember that testimony you gave just a couple minutes ago?

A. Yes.

Q. And in relation to when Ms. Johnson left the Benton County Jail for good --

A. Yes.

Q. -- in October, when do you recollect it is that that note that's being described in that testimony you just gave was sent out of the jail?

A. That morning.

Q. You think it was that morning?

A. Yes. It was that afternoon the whole jail got locked down when they took her.

MR. STOWERS: That's all I have. Thank

PAGE 54

844

you.

THE COURT: Mr. Williams?

MR. WILLIAMS: One follow-up.

                    RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ms. Bramow, you indicated that Andy was the one who gave McNeese a pen in order to pass a note after he was placed in isolation, although you don't remember him actually being placed in isolation. How is it that you know it was Andy that passed the pen to him?

A. Because he said so.

Q. Who said so?

A. Bobby.

MR. WILLIAMS: Nothing else, Judge.

THE COURT: Anything further, Mr. Stowers?

                    FURTHER REDIRECT EXAMINATION

BY MR. STOWERS:

Q. Was the Benton County Jail doing everything it could to keep Angela Johnson and Mr. McNeese apart?

A. No.

MR. STOWERS: That's all I have.

THE COURT: Mr. Williams, anything further?

PAGE 55

845

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. The witness is excused.

(Witness excused.)

THE COURT: Let me raise something. I had a discussion with Mr. Flowers' lawyer and I guess that's in dispute. He's appealing Judge Zoss' -- Judge Jarvey's order. Mr. Flowers is trying to fire the assistant federal public defender, so there's some dispute. And Ms. Lilledahl alerted me to the fact that he's always disruptive in her presence. So I'm soliciting any advice from counsel as to how we ought to handle this matter. She feels she has to be here because she's technically still his lawyer, apparently because of Judge Jarvey's ruling. I don't know anything about it. It's not my case, although I'm familiar with Mr. Flowers just based on what I've read in the newspaper.

MR. BERRIGAN: With his lawyer's consent, I spoke to Mr. Flowers briefly about his testimony at least coming to court today, Your Honor, yesterday. There was no animosity. We had a very pleasant conversation. I don't anticipate any problems --

THE COURT: Okay.

PAGE 56

846

MR. BERRIGAN: -- whatever that's worth.

THE COURT: You don't. Ms. Lilledahl does, but his lawyer indicated it was mostly because of their relationship.

MR. BERRIGAN: Right.

THE COURT: And Ms. Lilledahl was concerned that in her purpose for being here obviously was to ensure that Mr. Flowers' Fifth Amendment rights were protected, so I discussed that with Ms. Lilledahl and she thought rather than her making a record about his Fifth Amendment rights, that I should advise him about his Fifth Amendment rights. And I assume that -- and this is what I told her -- that the lawyers in the room were savvy enough to be aware of Mr. Flowers' Fifth Amendment rights and they would avoid getting into questions concerning his own criminal involvement or alleged criminal involvement.

MR. BERRIGAN: We've also advised Ms. Lilledahl and Mr. Flowers at least the direct examination will cover only conversations with Robert McNeese about Angela Johnson and no subject matter that would possibly implicate his Fifth Amendment rights.

THE COURT: And I kind of assumed that

847

that's what it might cover. Okay. So it doesn't sound like we're going to have a problem.

MR. BERRIGAN: I don't think so.

MR. WILLIAMS: I don't know. From the Government's standpoint, for me to effectively cross-examine Mr. Flowers, I need to go down the same track and that is that Mr. Flowers tells anybody who will listen about his criminal activity. And so if the allegation, again, is that Bobby McNeese had to pump information about his crime out of Mr. Flowers, I think it's relevant to delve into the fact that Mr. Flowers had admitted his criminal conduct to a highway patrol officer when he was pulled over for a headlight.

THE COURT: Except he has a Fifth Amendment right not to answer those questions.

MR. BERRIGAN: Not only that, Your Honor, but our position is that's entirely inappropriate. Mr. Flowers isn't going to be asked about conversations about his crime elicited by Robert McNeese. He's going to be asked questions about what Mr. McNeese told him about Angela Johnson. There's no pumping for information here. So I don't think that that cross-examination would be all relevant, to the extent it was relevant.

848

THE COURT: Even if it was relevant, I think he would be able to invoke his Fifth Amendment right not to answer any questions.

MR. WILLIAMS: He probably would I think at that point.

THE COURT: So why would you ask a question that you know would cause a witness to invoke their Fifth Amendment right?

MR. WILLIAMS: Well, I don't know that he would necessarily because, Judge, his history is he'll admit what he did to anybody who asked. So I don't know that he would invoke his Fifth Amendment right, but it sounds like this is becoming mute. It sounds like they're calling him for a reason different from what I anticipated and if the testimony from Mr. Flowers has to do -- to do with admissions Bobby McNeese made to Mr. Flowers about his communications to Angela Johnson, then I doubt that I'm going to get into that.

THE COURT: Well, here's the deal. I have some obligation to ensure that witnesses Fifth Amendment rights are protected. I have a little less of an obligation, I think, when their lawyer is visibly present in the courtroom. I don't know whether Ms. Lilledahl is going to be physically

849

present. I thought she was, but she thought that would aggravate Mr. Flowers and the situation would spiral out of control. So I'm just putting everybody on notice that I'll probably be a little bit more zealous in protecting Mr. Flowers' Fifth Amendment rights because he doesn't have a relationship with a lawyer that would effectively allow the lawyer to do that and I would like to avoid things spiraling out of control.

MR. WILLIAMS: Sure. It sounds, Judge, like we may not get into that area, so we'll just see where things go and before I get into anything that I think may delve into his own criminal conduct, I'll alert the Court that I may be going there so you can have your --

THE COURT: -- Fifth Amendment radar up and running. I appreciate that. Thank you.

Now, while we're waiting for Mr. Flowers, let me ask you one other thing. I would, I think, like oral argument on the issues pending in front of me on this continuation of the Massiah hearing. And my problem is I've either been out of town or in trial since the beginning of June, and I tried a five week civil case. Then I tried a criminal case this week. When I wasn't over here, I was over in

850

Sioux City. I tried a criminal case. I have another one next week and then a series of a couple more and I probably don't see any time in my schedule until September; maybe the end of August to try to schedule oral argument. It's probably something we could do telephonically as well, I would think.

MR. WILLIAMS: Yeah. I think so, Judge, on behalf of the Government. I don't think we have an objection to a telephonic hearing.

MR. BERRIGAN: I guess our preference would be to argue to you personally, Your Honor. If that's a scheduling problem, we'll certainly be available by telephone.

THE COURT: Well, we could do it personally, but it most likely would be in Sioux City.

MR. BERRIGAN: Well, we could certainly appear in Sioux City.

THE COURT: But I have some other things that I would have to come over for, but I could coordinate that. We'll talk about it later.

Case 3:09-cv-03064-MWB-LTS    Document 284-63    Filed 06/23/11    Page 89 of 100

851

ANTHONY CURTIS FLOWERS, called as a witness, being duly sworn, was examined and testified as follows:

THE COURT: Okay. Thank you. Please be seated. Would you state your full name for us, please, and spell your last name.

THE WITNESS: Anthony Curtis Flowers, F-l-o-w-e-r-s.

THE COURT: Just like it sounds; right?

THE WITNESS: Yes.

THE COURT: Okay. Who's going to be conducting --

MR. BERRIGAN: I am, Your Honor. May I stand here?

THE COURT: You may, Mr. Berrigan.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Mr. Flowers, would you state your full name again for the record?

A. Anthony Curtis Flowers.

Q. Mr. Flowers, my name is Pat Berrigan. I'm one of the lawyers representing Angela Johnson. Have you and I met before today, sir?

A. No, sir.

Q. We did speak briefly on the telephone

852

Q. yesterday, did we not?

A. Yes.

Q. You called me at my office in Kansas City --

A. Yes.

Q. -- to discuss some problems that you were having with your representation?

A. Yes.

Q. All right. And I advised you I couldn't help you with that?

A. Yes.

Q. But that we had procured your attendance at court this afternoon to testify at a hearing regarding conversations you had had with Robert McNeese about Angela Johnson?

A. Yes.

Q. Was that essentially the subject of our discussion?

A. Yes.

Q. All right, sir. Do you know the gentleman -- well, let me ask you, do you know the young lady in the green outfit seated to your left at the table?

A. I just met her about an hour ago. She was in the next cell to me upstairs in the marshals office.

Q. Do you know that now to be Angela Johnson?

A. Yes.

853

Q. Before meeting her an hour ago, had you had any contact or communications with her?

A. No.

Q. Never met her in your life before?

A. No.

Q. Mr. Stowers is the gentleman seated on her right. Have you ever met Mr. Stowers or seen him before?

A. No.

Q. All right. I'm going to ask you questions specifically in this area, Mr. Flowers, so we have a clear understanding. Questions pertaining to conversations that you purportedly had with Robert McNeese about Angela Johnson, okay, and that's all. Do you understand?

A. Yes.

Q. Now, if there are questions that are asked of you pertaining even remotely to the pending charges that you have, you know -- you understand you have a Fifth Amendment right not to testify about anything that might implicate you in a crime? Do you understand that?

A. I understand.

Q. And your lawyer certainly has made you aware of that, hasn't she, or your former lawyer at least or

854

whatever Ms. Lilledahl's status is?

A. Yes.

Q. And the Judge would certainly be happy to re-advise you of your right not to incriminate yourself.

THE COURT: And I think I will at this point. I just want to make sure, Mr. Flowers, that you understand that you have a Fifth Amendment right under the United States Constitution not to incriminate yourself. So if the lawyers -- I don't think they're going to ask anything about your situation or any pending charges against you that might implicate you in criminal conduct. My understanding is they're going to be questioning you about conversations you may have had with some other individual, but if the answer to any question would even tend to incriminate you in any criminal conduct, you have an absolute right under the Fifth Amendment to invoke the Fifth Amendment and not answer the question. And I just want to make sure you understand that.

THE WITNESS: Yes, I understand.

THE COURT: Okay. Thank you.

Q. The only thing I would need to ask you, Mr. Flowers, you're obviously in jail garb and

KAY C. CARR, CSR, RPR

855

incarcerated, are you not?

A.   Yes.

Q.   Is it true you're facing allegations as a pending charge against you in the Northern District of Iowa for bank robbery?

A.   Yes.

Q.   That's the allegation that's been lodged against you, yes?

A.   That and other charges.

Q.   That caused you to be housed presently in the Linn County Jail; is that right?

A.   Yes.

Q.   Would you tell us, sir, how long you've been in the Linn County Jail.

A.   Eight weeks today.

Q.   Eight weeks today.  So what was the date you came to the jail?

A.   Late June 1st, probably about 11:30 -- 11:30 p.m.

Q.   Okay.  And where is it that you're housed at the jail, sir?

A.   I'm on the fifth floor.  There's two solitary confinement cells.

Q.   And you happen to be in one of them?

A.   Yes.

856

Q.   Have you been in that solitary confinement cell since you arrived at the jail on June 1st?

A.   Yes, I have.

Q.   All right.  When you say solitary confinement cell, I wonder if you could just describe for the Court -- I think we have an idea of what that involves physically.  What's the situation in a solitary confinement cell?

A.   Well, actually a solitary confinement cell has two different status.  You have administrative segregation and disciplinary segregation.  Cells are identical as far as physical structure, but as far as privileges go, they differ.

Q.   They're different?

A.   Their approximately ten feet by eight feet; concrete block for a bed; stainless steel toilet and sink with no window; just solid steel door, a food slot, and a little screen at the bottom where you can talk to your cell neighbors.

Q.   Have you been in the same cell the whole time you've been in Linn County?

A.   Yes.

Q.   During this past eight weeks, Mr. Flowers, have you met a person by the name of Robert McNeese?

A.   Yes, I have.

857

Q.   Could you tell the Judge where it is you met Mr. McNeese?

A.   I met Mr. McNeese -- I didn't actually meet him.  I talked to him through the door.  We've never shook hands or nothing like that.

Q.   And meet might not have been a good word.  You've been able to have some communications with Mr. McNeese?

A.   Yes.

Q.   And where was Mr. McNeese at the time you were having these communications with him?

A.   He was in the cell 502 and I was cell 503.

Q.   And are you physically adjacent to each other; one next to the other?

A.   Whereas if I knocked on the wall, the vibrations would go into the cell.

Q.   You share a wall?

A.   We share a wall.

Q.   Do the doors both face in the same direction?

A.   Well, they're aligned with each other.

Q.   They're aligned with each other.  His cell is immediately to your left or right?

A.   To my right.

Q.   To your right.  How long has Mr. McNeese been in the cell immediately to your right?

858

A.   Well, I came to Linn County Jail on -- like I said, on the evening of June 1st and then June 25th at approximately -- I'm guessing because we don't have a clock in there -- but it was sometime after lunch.  They feed us lunch at approximately 11:30 a.m.  About an hour after lunch, they moved him down to third floor, so I assume it was about 12:30 p.m. June 25th he was moved.

Q.   Moved into the cell next to you?

A.   He was moved to the third floor.

Q.   Moved out of your area?

A.   Right.  From June 1st to June 25th we celled next to each other.

Q.   So for that 24, 25 days, you and Mr. McNeese were in adjacent cells in the solitary confinement area of the Linn County Jail?

A.   Yes.

Q.   The fifth floor?

A.   Yes.

Q.   All right.  And you were obviously able to communicate to each other.  You've already mentioned that.

A.   Off the wall.

Q.   How were you able to do that?

A.   At the bottom of each door, they have a

859

screen.  So if you want to speak to the Jailers outside, there's Jailers -- they have an office right there in front of our wall.  Actually, the office is more in front of my cell than his cell.  You can holler out the screen and get the Jailers' attention, because they have got no alarms in the cell or you can speak back and forth to your cell neighbors.

Q.  Are there any rules against speaking to your cell neighbor; somebody like Mr. McNeese?

A.  No.

Q.  That's not prohibited conduct?

A.  It's not in the rule book and it's not prohibited.

Q.  You haven't gotten into any trouble as a result of communications with Mr. McNeese or he with you?

A.  No.

Q.  Have you communicated with him other than orally?  That is, have you passed notes with him or communicated with letters or anything like that?

A.  Well, passed notes -- when you say communicate with him, Mr. McNeese had a relationship with the Linn County Jail deputies that other inmates up there didn't have.  He was able to -- whenever he wanted to, he could pass over newspapers or

860

magazines or whatever, but we couldn't pass anything.  He was allowed to do that and he had sent over newspapers now and then and some magazines.

Q.  Mr. McNeese could pass items to you, but you couldn't pass them to him?

A.  Yes.

Q.  I'm not sure if I understand how it is Mr. McNeese could do this if he's locked up in the cell next to you.  How does he physically get newspapers and magazines to you?

A.  Well, the Jailers would pass them.

Q.  The Jailers would give them to you?

A.  Yeah.

Q.  Well, how do you know they were from Mr. McNeese?

A.  Well, McNeese lives right next door to me.  I have a screen.  I can see the guards get them from him and bring them.  It's only like eight or ten feet away.

Q.  Well, has Mr. McNeese acknowledged doing this?

A.  Yeah.

Q.  Okay.  And you haven't sent him anything?

A.  I haven't got anything.

Q.  Sir, let's turn our attention to Ms. Johnson's case, if we could.  I'm sure you've probably had

861

many conversations with Mr. McNeese over the 24, 25 days that you were next to each other 24 hours a day, but I would like to direct your attention to any conversations you had with Mr. McNeese about Angela Johnson.  Have you had any conversations with Mr. McNeese about Angela Johnson?

A.  Yes, it was very brief.

Q.  Could you tell the Court roughly when these conversations occurred.  Obviously, it was sometime after June 1st, but about how long after June 1st did you have your first conversation with Mr. McNeese about Angela Johnson?

A.  I would say probably a week.

Q.  About a week?

A.  Yeah.

Q.  And how did that come up, sir?

A.  Well, every night, usually about nine, 9:30 or something like that, it would get a little quieter, because during the evenings, inmates are allowed visits on other floors.  It's kind of noisy up until 9:30 and then the visits quit and that's when McNeese would holler over to my cell and ask me a question.  We would get into a conversation.  I had spent 15 years in federal prisons and McNeese had spent 13, so we knew a lot of the same people and we

862

had had conversations about that.  And we had conversations about security procedures and just about security procedures and people we knew and conversations about people we knew on the streets.  And we talked about our charges and like that, and then one evening, I asked him how it was that he was placed next to Angela when it's common practice for county jails and U.S. Marshal services to keep inmates separated.

Q.  Well, let me ask you, Mr. Flowers, how did you know that Mr. McNeese had been placed next to Angela Johnson?

A.  There was a guy that -- okay.  Like I said, there's two solitary confinement cells up there.

Q.  Yes, sir.

A.  They have another cell that's about eight feet to the left of nine across the hall.  It's called a psych cell, okay?  There was an inmate in there named Ross Hrycyshyn.

Q.  Hrycyshyn?

A.  Hrycyshyn.  Ross had sent me over a couple of newspaper clippings.  I suppose they were like three or four months old and they were lengthy.  They were Cedar Rapids Gazette newspaper clippings and in that newspaper clipping, I gained some information.

Case 3:09-cv-03064-MWB-LTS   Document 284-63   Filed 06/23/11   Page 92 of 100

PAGE 73 SHEET 19

863

Q. Were the newspaper clippings about Mr. McNeese or about Angela Johnson; have something to do with either one?

A. It was entirely about that case that she's involved in right now.

Q. Okay. And do you know, sir, why it is that Mr. Hrycyshyn would be sending you newspaper clippings about Angela Johnson's case?

A. Well, Ross had told me that -- or Hrycyshyn that McNeese had been making threats to him, you know, like sometimes when I would be talking to Ross, McNeese would say, "Why you talking to the rat snitch?", when McNeese himself is an informant. Well, I had been an informant myself for the past ten years and Ross was just trying to share with me that at certain times when McNeese and him were allowed to go to recreation together, that McNeese was trying to get information from him. Ross is in Jail for burglarizing a gun store and Ross was trying to bring it to my attention that I should watch what I say to Mr. McNeese because he may be trying to get information from me.

Q. So this is purportedly evidence that Mr. McNeese is an informant?

A. Yes.

PAGE 74

864

Q. And you asked Mr. McNeese questions about the articles?

A. Yeah.

Q. All right. And he related information to you in response to your questions?

A. Yes.

Q. Well, what was Mr. McNeese's response to that particular issue of how it is that he became celled next to Angela Johnson at the -- do you know what Jail they were housed at together?

A. Benton County.

Q. Benton County. What did Mr. McNeese say in response to your question about that?

A. So that I could work her.

Q. I'm sorry?

A. So that I could work her.

Q. So that I could work her?

A. Work her.

Q. Was there further explanation or did you understand what that meant, Mr. Flowers?

A. Well, there was more of an explanation.

Q. Could you tell us what that was, sir?

A. He wanted to get information from her for the FBI. It wasn't really Angela Johnson they wanted. It was Mr. Honken. The Feds wanted to kill his ass

PAGE 75

865

is the words he used.

Q. These are words Mr. McNeese used?

A. Yeah. And that Mr. Honken was involved in killing two kids and that McNeese would do anything he can to assist the FBI to -- to convict him.

Q. All right. Mr. Flowers, do you, in fact, know whether or not Angela Johnson was at the Benton County Jail before Mr. McNeese or Mr. McNeese was at the Benton County Jail before Angela Johnson?

A. I believe Mr. McNeese was there first.

Q. You believe Mr. McNeese was there first?

A. That's what the newspaper said.

Q. And that Angela Johnson then was placed in the Benton County Jail after Mr. McNeese was there?

A. She was placed right next to him.

Q. And Mr. McNeese had an explanation for that in your conversation with him?

A. Yes.

Q. That this is something --

A. So they could work her.

Q. So they could work her?

A. He could work her.

Q. He could work her. Was there any other explanation, Mr. Flowers, from Mr. McNeese about the specifics of this arrangement; that is, what role

PAGE 76

866

Mr. McNeese had in this placement of Ms. Johnson next to him or what individuals -- Government officials were involved in Ms. Johnson being placed next to Mr. McNeese in the Benton County Jail?

A. No.

Q. That was it?

A. Yeah.

Q. Was there any other subject matter discussed about Angela Johnson's case with Mr. McNeese?

A. Well, Mr. McNeese celled next to me for about three-and-a-half weeks. We had discussed it briefly, you know, about him being transferred around to different Jails and he named off about six or seven individuals that he had gotten information on and provided to the FBI and she was one of the cases.

Q. She was one of the cases?

A. Yeah.

Q. All right.

MR. BERRIGAN: Could you excuse me one second, Mr. Flowers. Could I have a moment, Your Honor?

THE COURT: You may.

Q. Mr. Flowers, did Mr. McNeese tell you, sir, what he was supposed to get as a result of this

KAY C. CARR, CSR, RPR

867

agreement with the Government? What his end of the bargain was.

A. Yes, he did.

Q. Could you tell the Court what that was, sir?

A. He said it would be recommended that he get at least five years less.

Q. Five years less on his sentence?

A. He would get his life sentence and his bank robbery sentence all communicated down to a five year sentence or less.

Q. For his cooperation in Ms. Johnson's case?

A. In the entirety.

Q. The entirety?

A. Yeah.

Q. Including her case; is that your understanding?

A. Yeah.

MR. BERRIGAN: Okay. Thank you, sir. That's all I have.

THE WITNESS: Okay.

THE COURT: Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Flowers, how is it that you got word to the

868

attorneys representing Ms. Johnson that you had information concerning Bobby McNeese?

A. From the newspaper clipping. I read Mr. Willett's name in the newspaper clipping.

Q. So did you contact Mr. Willett then?

A. Yes, I did.

Q. Did you meet with Mr. Willett?

A. No, I didn't.

Q. Who did you meet with?

A. I haven't met with anybody until today.

Q. Did you talk to somebody over the phone?

A. Yes, I did.

Q. Who did you talk to?

A. I spoke with -- I guess she would be a secretary and I spoke with Mr. Cornell.

Q. And Mr. Cornell, who do you understand him to be?

A. Mr. Ray Cornell, I understand, is a private investigator.

Q. Do you know if Mr. Cornell took any notes of the conversation you had with him?

A. Mr. Cornell was somewhere else in Cedar Rapids and I was locked in a little cell. I could not see what he was doing.

Q. I understand that. Did he make any reference

869

to taking notes? Did he pause as he was doing saying, "Hold on a second; I'm writing notes down."

A. No. I don't recall any of that.

Q. Why did you call Mr. Willett?

A. Well, I think it's kind of sinister in a way that the jail and the marshals move Mr. McNeese next to people that are, you know, in very serious trouble and he's at these times soliciting information from these people trying to get these people a lot of time and at the same time get himself off.

Q. Mr. McNeese is a snitch; right?

A. Yes.

Q. Snitches -- you don't like snitches, do you?

A. I'm an informant.

Q. But you certainly don't like snitches in this instance?

A. Well, snitches is a derogatory term. Regardless of that, informant would be appropriate. I wouldn't say that I don't like them, because after I worked with the system, I realized that just because I'm in jail right now on the charges makes it wrong what you're trying to do by calling me a snitch.

Q. Are you concerned at all that Mr. McNeese is

870

attempting to be a snitch on you?

A. I believe everybody in the county jail, if they had an opportunity, would do the same thing.

Q. Has anybody told you at all that Mr. McNeese is attempting to provide information concerning you in statements you've made?

A. Common sense tells me that he's doing that.

Q. You've been previously convicted of felony offenses; is that correct?

A. Yes.

Q. You've been convicted of armed robbery before; is that correct?

A. Yes.

Q. You've been convicted of bank robberies before; is that correct?

A. Yes.

Q. Those are felony offenses?

A. Yes.

Q. And Bobby McNeese didn't tell you who it was that aided him in any way in placing him next to Angela Johnson, did he?

A. Of course not.

Q. Didn't give you the names of any marshals or prosecutors or jailers or anybody else that allegedly aided him in doing this?

871

A.   No.  We didn't get into that.

Q.   There wasn't anybody else who was a witness to this conversation you had with Bobby McNeese?

A.   Yes, there was.

Q.   Who was it?

A.   Ross Hrycyshyn.

Q.   And how was he a party to this conversation?

A.   Well, as I said earlier, he cells -- he's to the left of my cell and sometimes when I would be talking to Ross, McNeese would holler out his door, "Flowers, why you talking to that fucking snitch rat," and he would talk in very derogatory terms about Ross when McNeese is in the same situation as him.

Q.   Let me reask my question.  How is it that you know Ross Hrycyshyn heard the conversation you had with Bobby McNeese?

A.   Because at the bottom of his door, just like our doors, is a screen and you can hear conversations in the hallway from cell to cell.

Q.   And when did this conversation occur that you had with Bobby McNeese?

A.   Well, like I say, we were in jail for -- celled next to each other for 25 days.  This particular conversation was probably the first week.

872

Q.   And Mr. Hrycyshyn was in his cell at the time the conversation took place?

A.   Yes.

Q.   Approximately what time of day did this conversation take place?

A.   Usually our conversations took place after 9 p.m., 9:30.  That's when visits were over and things got a little bit quieter.

Q.   Did Mr. Hrycyshyn participate in this conversation?

A.   Well, a few times he would try to say something and McNeese would threaten him and intimidate him and so Ross would be quiet.  Ross is only 18 years old.

Q.   Is Ross currently celled in that same location with you today?

A.   Yes.

     MR. WILLIAMS:  No further questions, Your Honor.

     THE COURT:  Mr. Berrigan, any redirect?

     MR. BERRIGAN:  Just very briefly, Your Honor.

          REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Mr. Flowers, has anybody promised you anything

873

in return for your testimony today?

A.   No, sir.

Q.   Are you expecting any reward, any type of a benefit as a result of testifying here today?

A.   No.

Q.   You understand, based on what you've told us, you yourself understand Mr. McNeese to be an informant?

A.   Yes.

Q.   Working with the Government and in prosecutions?

A.   I've done the same for the past 12 years, ten years.

Q.   Mr. Hrycyshyn, is he still at the jail?

A.   Yes, he is.

Q.   Now, Mr. Hrycyshyn being 18 years old obviously didn't know the same people; hasn't spent 12 or 13 years in prison?

A.   He's pretty naive.

Q.   And would it be fair to say your relationship with Mr. McNeese was quite different than the relationship Mr. Hrycyshyn and Mr. McNeese had?

A.   Certainly.

Q.   The transfer of Mr. McNeese from the fifth floor I think you said to the third floor?

874

A.   Yes.

Q.   Do you know if that had anything to do with any problems that you and Mr. McNeese were experiencing?

A.   Prior to me coming to the jail on June 1st, McNeese was allowed to use the gymnasium, and when they brought me up there, jail administrator Michael Carr had put a memo out stating that McNeese and I would start walking together at 12 to one.  I would go to A block.  He would go to B block.  They discontinued McNeese's gymnasium.  He got very upset over it and I heard him on at least three or four occasions arguing and hollering to the jailers about he wanted to be transferred down to third floor and get away from me so that he could continue his gymnasium use.  And then finally on June 25th, they allowed him to go down to the third floor and he's resuming his gymnasium use.

Q.   From what you've told us, Mr. Flowers, it sounds as if Mr. McNeese had different privileges than other inmates housed in the administrative or disciplinary segregation unit of the Linn County jail.

A.   Yes.  Because he's a high profile informant, it's usually the custom of county jails and U.S. Marshal Service; FBI, U.S. Attorney's Office to

875

pamper and show favoritism towards high profile informants. I know this because I was involved with several high profile cases.

Q. And received that kind of treatment?

A. Yes.

MR. BERRIGAN: Okay. Thank you, sir. That's all.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: I do have a follow-up, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Did you tell Mr. Cornell or anybody else with the defense team that you had sent a letter to the Cedar Rapids Gazette?

A. Yes, I did.

Q. You told them it was a seven page letter?

A. No. It was a 298 word. I got a seven page letter I never did mail.

Q. And did it have anything to do with this case?

A. Not directly.

Q. Indirectly?

A. Yes.

Q. How did it have something to do with this case

876

indirectly?

A. The favoritism and special treatment that McNeese was getting.

Q. And you claim you sent this letter to the Cedar Rapids Gazette?

A. No. I was going to send it. I didn't.

Q. What happened with it?

A. I ripped it up.

Q. What did you tell Ray Cornell or the defense team? Did you tell them that you had sent it.

MR. BERRIGAN: Just for the record, Judge, I certainly haven't asked questions about some mystery letters from the Cedar Rapids Gazette. This is well beyond the scope of either the direct exams and I'll object.

MR. WILLIAMS: Your Honor, I think it goes to his veracity.

MR. BERRIGAN: I don't know how it goes to his veracity more than any other question that would be asked of him unless Mr. Williams is going to call some defense investigators to testify. We certainly haven't been made aware of that. Our position is it's irrelevant and beyond the scope of direct examination.

THE COURT: You may proceed.

877

Q. Did you tell Ray Cornell or any of the defense team that you sent it to the Cedar Rapids Gazette?

A. I told him that I planned to send it and that I didn't. Mr. Steve Gravelle came to see me on I believe it was June 27th, 28th, and they came to verify a letter to the editor I had written that was 298 words. During that interview, I had mentioned to Mr. Gravelle that I had written another letter to the editor that involved some conversations between McNeese and I and Mr. Gravelle asked me to send it also. The following day, when I thought that my article would have been published like Mr. Gravelle said it would be, instead he wrote a profile. What he wrote in the profile, he misquoted me and took out of context some things I had said, so I decided not to mail the letter about McNeese and I's conversations.

Q. What was in the letter about you and McNeese's conversation -- well, let me ask it this way. Did the letter you wrote about your conversation with McNeese have anything to do with his contact with Angela Johnson?

MR. BERRIGAN: I wonder if I could have a continuing objection to this line of questions so as not to continue to interrupt?

878

THE COURT: You may.

MR. BERRIGAN: Thank you, Judge.

Q. Can you answer that question?

A. Can you repeat it?

Q. Certainly. Did the letter that -- this additional letter you talked about here about conversations you had with McNeese reference in any way or have anything to do with his contact with Angela Johnson?

A. Indirectly.

Q. And I guess that goes back to our previous answer indirectly because you were complaining about the privileges he was getting over at the jail?

A. I wasn't complaining. I was just reciting.

Q. And what was the purpose in your mind for sending this letter to the editor about Bobby McNeese?

A. Well, I think because the public it seemed has a interest in both of these cases. The case that McNeese is involved in is a high profile case and my case appeared to be a high profile case and they had them celled right next to each other and McNeese has been on record as going around with these different jails soliciting information from other inmates. I thought it was rather sinister of them to place him

KAY C. CARR, CSR, RPR

879

right next to me.

Q. So you think that the Government placed Bobby McNeese next to you in order to get information out of you?

A. Actually, they placed me next to him.

Q. That was the allegation you made in the letter to the editor?

A. Yeah.

MR. WILLIAMS: All right. Nothing further, Your Honor.

MR. BERRIGAN: Nothing further in response to that. Thank you.

THE COURT: Thank you. You may step down. Thank you, Mr. Flowers.

(Witness excused.)

THE WITNESS: Excuse me. May I say something? I fired my lawyer and I want to turn in this -- this appeal -- Judge Jarvey's appeal and my motion to fire her, so I was told that I could write an appeal on that and you're the chief judge.

THE COURT: I'm not the judge in your case, but I'll see that this gets filed on your behalf.

THE WITNESS: I addressed it to you, Judge.

880

THE COURT: Before I leave today -- I think this -- unless I'm mistaken, I think your case is assigned to Judge Melloy, but I'm not --

THE WITNESS: The lady told me you're the chief judge of the Northern District of Iowa.

THE COURT: I'm the chief judge and I'll make sure that this gets filed today.

THE WITNESS: Have a nice day.

THE COURT: I'm going to hand it to the clerk, and waive any requirements about the copies and everything. We just want to make sure it gets filed on Mr. Flowers' behalf.

Mr. Berrigan, do you have any more witnesses?

MR. BERRIGAN: We do not, Your Honor.

THE COURT: Okay. Mr. Williams, do you have any rebuttal testimony?

MR. WILLIAMS: I do. I would like to call Andy Rich, Your Honor. Mr. Rich is in the hallway. I'll get him.

THE COURT: Good afternoon. Would you raise your right hand, please.

881

ANDREW JAMES RICH, called as a witness, being duly sworn, was examined and testified as follows:

THE COURT: Please be seated. State your full name and spell your last name.

THE WITNESS: My name is Andrew James Rich. The spelling of my last name is R-i-c-h.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Rich, how are you currently employed?

A. By the Benton County Sheriff's Department as a correctional officer.

Q. And you've been in that capacity for about five years?

A. Yes.

Q. You previously testified in a hearing back in April, I believe, in this case concerning contacts between Bobby McNeese and Angela Johnson; is that correct?

A. Yes.

Q. I want to ask you a few specific questions. Did you ever at any point knowingly hand any notes or letters from Bobby McNeese to Angela Johnson or

882

vice versa?

A. No.

Q. Were there times that you would hand magazines or newspapers from one inmate to another inmate within the jail?

A. Yes.

Q. Was that a practice you did just for Bobby McNeese or is that something that you and other jailers would do for other inmates there too?

A. Happens all the time.

Q. Have you learned at some point that sometimes inmates will hide notes inside those magazines and newspapers?

A. It happens.

Q. Do you attempt to catch those when you can?

A. If we think about searching through the games sometimes or books or whatever it may be.

Q. At any point during the time period that Bobby McNeese was an inmate at the Benton County Jail along with Angela Johnson, did you ever allow them to have any personal contact; one-on-one contact?

A. On purpose, no.

Q. Did you ever see them have any accidental one-on-one contact?

A. Occasionally, if they're going back through the

883

hallway from visitation, Mr. McNeese was kept in cell one, which was a one man cell and had a food slot that we kept open just for air flow reasons. They could have contact that way face-to-face in passing.

Q.  Did you ever catch them in the act of doing that?

A.  I don't believe so.

Q.  Did you ever hear whether anybody else caught them in the act of doing that?

A.  Not that I'm aware of.

Q.  Was there ever an occasion where Angela Johnson and Sara Bramow were coming in from the exercise yard and Bobby McNeese was up front in the -- the booking area where you recall ever allowing -- escorting Sara Bramow back to her cell but allowing Bobby McNeese to have a meeting with Angela Johnson near the exercise yard or in the exercise yard?

A.  I don't recall that.

Q.  Did that ever happen?

A.  To my knowledge, no.

Q.  Do you recall that at some point Bobby McNeese was basically taken down, put on a board, and then placed in a solitary confinement cell?

A.  Yes, he was.

884

Q.  After that occasion, did you ever hand Bobby McNeese a pen or allow him in any way to write notes to be passed to Angela Johnson or anybody else?

A.  No.

Q.  Now, was Sara Bramow an inmate at the Benton County Jail?

A.  Yeah.

Q.  How was she?  How did she perform?

A.  She wasn't a problem.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  Mr. Stovers?

CROSS-EXAMINATION

BY MR. STOVERS:

Q.  Mr. Rich, my name is Dean Stovers.  I don't think we've met before.  How are you this afternoon?

A.  All right.

Q.  You usually speak that softly?

A.  I'm not very loud.

Q.  Are you nervous today?

A.  A little bit.

Q.  You understand what the issue is and you understood what the issue is for your being here today before you came here today; is that correct?

A.  Yes.

885

Q.  And when did you first find out that there was an allegation being made that you had passed notes between Mr. McNeese and Ms. Johnson?

A.  I think the allegation was made the first time that I was brought in to testify.

Q.  And you found out that Ms. Bramow had surfaced thereafter; is that correct?

A.  That's correct.

Q.  Did you ever pass any magazines from Mr. McNeese to Ms. Bramow?

A.  Probably.  Like I said, it happens all the time.

Q.  Or from Ms. Bramow to Mr. McNeese?

A.  Most likely.

Q.  Did you pass magazines from Mr. McNeese to Ms. Johnson?

A.  I don't specifically recall, but like I said before, we exchange books, games, puzzles, magazines to all the inmates throughout the jail.  Newspapers too.

Q.  I'm sorry?

A.  Newspapers too.  We circulate --

Q.  When you say puzzle, do you mean puzzle books?

A.  Crossword puzzles and then the actual puzzle pieces themselves.

886

Q.  Do you remember distributing any items from Mr. McNeese to Ms. Johnson?

A.  Outside of the scope of games and books, no.

Q.  Okay.  Do you ever remember distributing any games or books to Ms. Johnson from Mr. McNeese?

A.  Specifically, no, I can't say when or --

Q.  Let me ask you a question.  Are you denying that you did this?

A.  Not denying.  I just can't specifically state when I did this, but I'm sure I did.

Q.  You're sure you did do that.  Are we to that point now, Mr. Rich?  Are you sure you did do that?

A.  Yes.  I guess I can honestly say I did exchange books and magazines.

Q.  So you do remember that now; is that correct?

A.  Yes.

Q.  And just three or four questions ago you said you didn't remember doing that?

A.  I think I remember saying not specifically when.  I'm sure they did.  She was in our jail for quite some time.

Q.  Are you nervous today, Mr. Rich?

A.  Well, this is my second time in federal court.  Yeah.

Q.  I understand that.  Do you understand the

KAY C. CARR, CSR, RPR

887

questions I'm asking of you?

A. Yes.

Q. Okay. I'm going to ask you again. Did you distribute magazines, puzzle books, items from Mr. McNeese to Ms. Johnson?

A. Yes.

Q. And on how many occasions do you believe you did that, to the best of your memory?

A. I have no idea.

Q. More than five?

A. Probably.

Q. More than ten?

A. I would guess. I don't know.

Q. Probably more than 20 times?

A. In the time period that they were both there, probably.

Q. Okay. And you don't have any problem remembering that that occurred, do you, more than 20 times?

A. Like I said, it happens all the time. Still happens now.

Q. But you're not having a problem remembering that you delivered items from Mr. McNeese to Ms. Johnson more than 20 times, are you?

A. No.

888

Q. Okay. Now, how many of those did you open up and look inside of them?

A. Probably none.

Q. Well, do you remember opening any of them?

A. No.

Q. Were you aware that some of those contained notes?

A. No.

Q. Were you aware after you delivered any of those items that they did once contain notes, even if you didn't know it when you delivered the item?

A. After the episode with Mr. McNeese being removed from cell five, we were advised that -- from what I found out later -- they were being allowed to have correspondence or talk or whatever.

Q. And you continued to deliver items from Mr. McNeese to Ms. Johnson; isn't that correct?

A. After his lockdown period? I don't believe so.

Q. But you might have?

A. I don't remember.

Q. If I ask you again, are you going to say you do remember now?

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Overruled.

Q. When you say you don't remember, do you mean

889

that you don't remember or that you don't want to say?

A. I don't remember. I don't honestly know how long he was in our facility after he was locked down, but when you're in lockdown, you don't have the privilege of exchanging items.

Q. You're not supposed to?

A. You're not allowed to.

Q. You're not supposed to, is that what you mean, unless some jailer such as yourself would allow that to occur; is that correct?

A. If someone allowed it, which I wouldn't.

Q. Well, we've been told that inmates are not to pass items from cell to cell at your facility, I believe.

A. It happens quite regularly.

Q. Now, did you pass items from Ms. Johnson to Mr. McNeese?

A. Such as?

Q. Items of any kind.

A. Beyond the scope of games, books, and magazines, no.

Q. Do you remember passing games, books, or magazines from Ms. Johnson to Mr. McNeese?

A. Like I said before, yes, I probably did. I

890

probably did.

Q. Now, give us your estimate on that number of times.

A. Probably the same as before.

THE COURT: I don't understand that answer. Probably the same as before. You mean probably with the same frequency as you passed it from Mr. McNeese to Ms. Johnson? Is that what you mean? I don't know what you mean.

THE WITNESS: The question, I thought, was the same as the first in passing from Ms. Johnson to Mr. McNeese and same thing from passing from Mr. McNeese to Ms. Johnson.

THE COURT: So you estimated you did it in excess of -- of more than 20 times and your testimony is you would pass items in excess of 20 times from Ms. Johnson to Mr. McNeese?

THE WITNESS: I guess -- I can't honestly testify to the exact number of times.

THE COURT: He didn't ask you the exact number.

THE WITNESS: Well, probably.

THE COURT: Well, you said more than 20 times with regard -- here's what you testified to, because you seem to have difficulty remembering

891

what you testified to. You testified that you passed items more than 20 times from Mr. McNeese to Ms. Johnson. And I want to know is it your testimony that you passed items from Ms. Johnson to Mr. McNeese more than 20 times?

THE WITNESS: Yes. That would probably be safe to say.

THE COURT: Thank you.

Q. Now, Mr. Rich, you've also testified that you knew that it happens -- that notes are contained in the items that you pass -- that that occurs at the Benton County Jail. Do you remember saying that, first of all?

A. I believe so, yeah.

Q. Is that a true statement that that does happen and that you knew that at the time that Ms. Johnson was there at your jail?

A. That it was going on?

Q. That notes would be passed through this methodology of magazines, newspapers, puzzle books, et cetera.

A. Inmates typically can communicate that way.

Q. And you're aware of that at the time that Ms. Johnson was at the jail?

A. Yeah. It's a constant knowledge. It's been

892

going on since I started there.

Q. Do you remember opening a note and reading it before you gave it to Mr. McNeese from Ms. Johnson?

A. No.

Q. Are you sure about that?

A. Besides the jail infraction that I wrote, no.

Q. You don't remember that happening?

A. The day that she dropped a note into his cell that I wrote her up on a jail infraction for and locked her down, yes.

Q. That was the note that you opened and read?

A. Yes.

Q. Did you open and read any other notes from Ms. Johnson to Mr. McNeese?

A. No.

Q. Did you open and read any notes from Mr. McNeese to Ms. Johnson?

A. No.

Q. How many notes do you think you passed between the two of them?

A. I have no idea.

Q. How many do you remember passing between the two of them?

A. If there was a note in every book and game that I passed, there was probably more than 20.

893

Q. How many notes do you remember passing that way?

A. I didn't have any knowledge of passing notes that way.

Q. Now, Mr. McNeese's food slot was left open. Was that done with regard to other cells that their food slots --

A. The only other two cells are four and eight and usually one is open. They're right across the hall from each other, so typically cell four, for some reason, that side the building gets a little more stuffy than the other. I can tell you right now cell four's food slot is always open.

Q. It just so happens that that was the cell Mr. McNeese --

A. He was in cell one. It has the same problems, so we leave that open also.

Q. Cell four's is always open, but Mr. McNeese was in cell one. Are you now telling us that cell one's food slot was always open?

A. Yeah.

Q. And your assertion is this is due to a circulation problem in the Benton County Jail?

A. It keeps -- it keeps the cells cooler with those open.

894

Q. Would having that slot open facilitate one being able to pass notes either from Mr. McNeese's cell to somebody on the outside of the cell?

A. Sure.

Q. Or from the outside to the inside?

A. If they wanted to do that they could.

Q. Isn't it correct that the only way that that slot can get open is by one of the jailers opening it with a key apparently?

A. No, that's not true.

Q. Can it be opened from within the cell?

A. No.

Q. It has to be opened from outside the cell?

A. There's just a little switch lock. All you've got to do is turn it and it flips down. If that lock -- if it's not locked down, then it can be opened from the inside of the cell. You just push it open.

Q. Okay. What is the purpose of the lock on the slots?

A. To keep it locked when -- usually if we have an inmate that's a problem especially in cell one, we leave it locked.

Q. Who has the key to the lock on the cell?

A. The jailer does.