895

Q. Would you have had a key to that lock?

A. I would have had possession if I was working alone.

Q. Did you ever open that slot for Mr. McNeese?

A. Like I said, there's not a key for the slot itself. There's only a key for the actual cell door, but probably 95 percent of the time those slots are down.

Q. Would you have ever opened the slot for Mr. McNeese?

A. I think usually it was probably left down from the day shift, but if -- yes, if he complained it was hot in there, I would open it up.

Q. So it wasn't always open?

A. I'm not there 24 hours a day. I can't say.

Q. Well, if you had to open it, it wasn't always open, was it?

A. No.

Q. Now, he was also allowed to go out in the yard; Mr. McNeese was?

A. Yes.

Q. What was the rule with regard to yard use at the Benton County Jail?

A. Oh, we try to get the inmates out as much as we can for outdoor rec purposes.

896

Q. There was a rule three times a week?

A. I think in the state code there's something that says they have to have at least an hour, but we try to get them out more than that.

Q. Did the Benton County Jail have a practice or a rule of allowing inmates access to the yard three times a week?

A. If we can get each cell out every day, we do it. It keeps the inmates happier.

Q. Did you understand the question that I just asked you? Did the Benton County Jail have a practice or a rule of allowing inmates out three times a week?

A. No.

Q. And how often was Mr. McNeese allowed yard privileges?

A. I believe like everybody else, he was allowed to go out every day if he could.

Q. Do you remember him being allowed up to three times a day?

A. I work second shift. If he got out on my shift, that's the only time I know about him going outside.

Q. You tried to let him out every day?

A. I try to let everybody out every day as long as

897

It's light.

Q. Including Mr. McNeese?

A. Yes.

Q. And you're aware that the cell that Ms. Johnson was in had a window to that yard that you let Mr. McNeese into?

A. Yes.

Q. And you were aware that Mr. McNeese would visit with Ms. Johnson at the cell window?

A. He's been caught doing it.

Q. And you were also aware that Mr. McNeese, in addition to being allowed out of his cell into the yard, was allowed out of his cell upon request for a variety of other purposes as well; is that correct?

A. Other than shaving or to get books, that was about the only other reason.

Q. In fact, his cell oftentimes wasn't even closed for the entire day, was it?

A. If he wasn't in there, probably not.

Q. He would be out of his cell actually for extended periods of time?

A. I wouldn't know what for.

Q. Were his privileges identical to those of the other inmates then --

A. Yes.

898

Q. -- and his freedoms --

A. Yes.

Q. -- at the jail; is that what you're telling the Court?

A. Yes.

Q. No different?

A. In my dealings --

Q. Now, was there a time when you did provide Mr. McNeese a pen or a piece of paper?

A. While he was in lockdown or which?

Q. Either time.

A. A pen, no, but I'm certain I probably gave him paper at one point in time or another.

Q. What type of writing utensils would you have provided him?

A. Pencil.

Q. Do you remember providing him with pencils?

A. I'm sure I did.

Q. Do you remember providing him with paper?

A. I'm also sure I did that.

Q. Do you remember providing him with paper while he was in the lockdown?

A. They're allowed to write letters when they're in lockdown and send them out. That's the only privilege they have.

KAY C. CARR, CSR, RPR

899

Q.   So you might have allowed him to have pen and paper while he is in lockdown?

A.   Pencil and paper.

Q.   Pencil and paper; I'm sorry.  You would have been doing that under the belief he was going to write a letter to somebody; is that correct?

A.   Yes.  They're allowed postage.

Q.   Now, do you specifically remember allowing Mr. McNeese to have pen and paper while he was in lockdown -- pencil and paper?

A.   It's been a long time ago.  Yes, he did have pencil and paper while he was in lockdown.

Q.   And you would have provided that to him?

A.   Had he asked for it, he didn't already have it, yes.

Q.   Do you remember taking any letters from Mr. McNeese to mail out from his lockdown cell?

A.   No, I don't.  It's been a long time ago.

Q.   Did you take any letters, any notes, or any puzzle books from the lockdown cell and give them to Ms. Johnson --

A.   No.

Q.   -- for Mr. McNeese?

A.   No.

Q.   Not that you remember?

900

A.   No.

Q.   Not that you remember?

A.   When he's in lockdown, he's not allowed those types of things.

Q.   But he is allowed to write letters?

A.   Yes.

MR. STOWERS:  Thank you.

THE COURT:  Mr. Williams, anything further?

MR. WILLIAMS:  Yeah.  I just wanted to clarify.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   The events we're talking about occurred about a year ago; is that right, Mr. Rich?

A.   Yeah, probably.

Q.   So when you were asked these questions trying to estimate the number of times that magazines would have gone back and forth between these people, I mean do you have a specific recollection today as you sit here of taking a note -- or I'm sorry -- a magazine or a newspaper or a game from McNeese and walking it down to the cell that Angela Johnson and Sara Bramow or Teri Hawkins was in?

A.   No.

901

Q.   So when you were asked these questions and you said yeah, it happened, are you saying that because you're sure just because of the way the jail operated it had to have happened?

A.   That's what I'm saying, yeah.

Q.   But you don't have a specific recall of it actually occurring between these particular inmates during that time frame?

A.   No.

Q.   And you never -- let's assume, based on the way things operated there, at some point it did happen and it happened on a number of occasions that you would take a magazine or newspaper and pass it from McNeese to the cell that Angela Johnson was in.  Did you ever do that knowing that there was a note inside -- hidden inside the pages of any of those magazines or anything else?

A.   No, I did not.

Q.   Did you ever receive any instruction from anybody at the jail to allow communication to occur between Bobby McNeese and Angela Johnson?

A.   No.

Q.   Were you ever told by anybody to allow Bobby McNeese and Angela Johnson to have personal contact with each other?

902

A.   No.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  I've got a question for you.  You know inmates try to communicate with each other through the passage of notes; correct?

THE WITNESS:  Correct.

THE COURT:  And you know a magazine would be a good place to put a note in; correct?

THE WITNESS:  (No audible response.)

THE COURT:  You have to answer yes aloud.

THE WITNESS:  Yeah.

THE COURT:  You don't have to answer yes, but you have to -- you were shaking your head yes and you have to give an oral answer.

And it's my understanding you really didn't look for notes?

THE WITNESS:  True.  Which in passing, we still don't.  I mean we're down to four guys trying to run this.  It's extremely busy.

THE COURT:  You're overworked.  You've got a lot of duties.  You just don't look for notes?

THE WITNESS:  No.

THE COURT:  Okay.  Any follow-up questions from anybody?  -

903

MR. WILLIAMS: No, Your Honor.

RECROSS-EXAMINATION

BY MR. STOWERS:

Q. Let me make sure I understand your position. Do you or don't you remember passing 20 items of whatever variety from Angela Johnson to Bobby McNeese? Do you or don't you remember that?

A. Like I said, yes, items were passed.

Q. What about --

A. But I don't remember specific --

Q. -- more than 20?

A. Yeah.

Q. In both directions?

A. It would be safe to say, yes.

Q. And that's more than safe to say, because the number is a whole lot more than that and you know that, don't you?

A. I can't honestly say.

Q. They were passing notes every day; did you know that?

A. I can't honestly say how many times that they exchanged books or games or whatever it was.

Q. You're passing items between the two of them every day that they were at the -- at jail, weren't you, on your shift?

904

A. May have. I doubt it. I doubt if it was every day.

Q. Virtually every day?

A. It couldn't have been every day. I worked two midnight shifts and off two days. I was only there about three days where actual things with the inmates actually happened as far as exchanging things.

Q. So virtually every day that you worked, you passed items between Ms. Johnson and Mr. McNeese?

MR. WILLIAMS: Your Honor, asked and answered.

THE COURT: Sustained.

MR. STOWERS: That's all. Thank you.

THE COURT: Thank you, Mr. Rich. You may step down.

(Witness excused.)

THE COURT: Does the Government have any additional testimony?

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you. Okay. Well, I'll just have my secretary contact you and we'll set up an argument date. I want to try to get to it as quick as we can. You know, it may be in Sioux City. It's probably not going to be in

905

Sioux City because I probably don't want to burden the marshals with transporting Angela Johnson, but I'm not thrilled about a ten hour trip coming over here for oral argument and that's -- you know, I may just do it by telephone. You know, it's one thing or we can do it by video conferencing, which is virtually live.

MR. BERRIGAN: We can live with the telephone. We have a preference of doing it in person, but it's not a big deal.

THE COURT: I would like to accommodate the preference if I can, but we're just so busy, it's hard.

MR. BERRIGAN: I understand.

THE COURT: If I can accommodate it, I will, because it will probably be a long telephone bill because I'll have lots of questions for you. I just want to ask our court reporter one question about the transcript.

Well, let me ask the lawyers. You previously ordered the transcript and have I approved a CJA to order the original transcript -- the hearing or did the Government order it or somebody ordered --

MR. WILLIAMS: I believe the defense

906

ordered it on the first go round and you, I understood, approved the CJA on that, but --

MR. BERRIGAN: Mr. Willett handled that, Your Honor.

THE COURT: I believe that's true. The defense is now requesting a copy of this transcript; is that correct?

MR. BERRIGAN: We are, correct.

THE COURT: And I'll sign the appropriate CJA voucher so the court reporter can be paid for all her hard work and we can all get the benefit of the transcript when we have the hearing.

MR. BERRIGAN: I think this is virtually the identical discussion we had at the conclusion of the Massiah hearing.

THE COURT: I have no doubt. Okay. Anything else on that we need to do on the record?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

Mr. Stowers, anything else?

MR. STOWERS: No. Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings concluded at 2:45 p.m.)

907

# C E R T I F I C A T E

I, Kay C. Carr, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the proceedings in the above-entitled matter at the time and place indicated.

That I reported in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to print by means of a computer-aided transcription device under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

I further certify that I am not related to or employed by any of the parties to this proceeding, and further that I am not a relative or employee of any attorney of counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 9th day of August, 2001.

Kay C. Carr, CSR, RPR
U.S. Courthouse & Federal Bldg.
101 First Street SE
Cedar Rapids, IA 52401
(319) 286-2324

## &

& 791:15 907:21

## 1

101 791:24
1010 791:13
11:30 855:18,19 858:6
12 873:12,17 874:8
12:30 858:8
13 861:25 873:18
15 806:21,23 808:11 821:18 861:24
18 872:13 873:16
1st 855:18 856:2 858:2,12 861:10,10 874:4

## 2

20 887:14,19,24 890:15,17,24 891:2,5 892:25 903:5,11
2000 794:20 795:1 837:23 838:3
2001 791:20 836:20
22nd 836:20
24 858:14 861:1,2 895:15
25 858:14 861:2 871:24
25th 858:2,8,12 874:15
27th 791:20 877:5
286-2324 791:25
28th 877:5
298 875:19 877:7
2:45 906:23

## 3

319 791:25

## 4

400 791:11
401 791:11
4th 795:15

## 5

502 857:12
503 857:12
50309 791:14
52401 907:22
58 796:8 833:2

## 6

6 795:1
60 796:5
64108-2743 791:16
6th 796:4 797:8 837:23 838:3

## 7

793 792:8

## 8

816 792:8
840 792:8
844 792:8

## 9

9 872:7
95 895:7
9:30 861:17,21 872:7
9th 907:17

## A

a.m 858:6
able 799:13 808:13 809:21 810:15 811:5 812:17 842:9 848:2 857:7 858:20,24 859:24 894:2
about 796:15 797:3 798:1,3,5 799:8 800:10 801:6,13,20 802:12 804:20 805:5 806:22 810:7 813:1,2 819:17 821:23 822:24 823:1,3,21 824:2 826:1,4,10 827:24 829:2 830:11,19 831:15 832:6 835:4 837:1,4 838:5 840:21 841:23,25 842:2 843:4,11 845:16,20 846:11,12,22 847:8,10,19,20,21,22 848:17 850:22 852:14,22 853:14,20 854:11,15 855:18 858:6,7 861:4,6,10,12,14,17 862:1,2,3,4,5,16 863:1,2,4,8 864:1,13 865:24 866:9,10,12,13 871:13 874:12 876:12 877:16,18,20 878:6,6,12,16 880:1 881:15 882:16 892:5 896:23 897:16 900:

absolute 854:18
access 807:14 896:6
accidental 882:23
accommodate 905:11,15
accomplished 831:8
according 813:17
acknowledged 860:20
across 802:21 804:6,8 862:17 893:9
act 883:6,10
action 907:16
activity 847:9
actual 885:24 895:6 904:6
actually 795:12 807:24 821:4 822:21 824:5 827:18 844:9 856:9 857:3 859:3 879:5 897:20 901:7 904:7 897:12
additional 793:3 798:18 878:6 904:19
address 818:10
addressed 794:2 879:24
adjacent 857:13 858:15
administrative 856:10 874:20
administrator 874:6
admissions 848:17
admit 848:11
admitted 847:12
advice 845:12
advise 846:12
advised 846:19 852:8 888:13
affidavit 794:15 825:25 826:2,3,12,14
after 798:13 802:19,20 820:3 822:4,5,17,18 827:2,5,15 839:17,24 844:7 858:4,6 861:10,10 865:14 869:20 872:6 884:1 888:9,12,18 889:4
afternoon 793:11 843:23 852:12 880:21 884:16
again 822:7,10 827:16 832:24 847:9 851:19 887:3 888:21
against 829:8,10,15 841:10 854:12 855:4,8 859:9
Agent 836:19,25 837:22
agents 838:8,15,19,25
aggravate 849:2
ago 843:13 852:22 853:1 886:17 899:11,18 900:15
agreement 867:1
ahead 820:10
aided 870:20,25
air 883:3
Al 813:11 826:20
alarms 859:6
alert 849:14
alerted 845:10
aligned 857:20,21
allegation 829:22 847:9 855:7 879:6 885:2,4
allegations 841:10,18 855:3
alleged 840:21 846:17
allegedly 870:25
allow 830:13 849:8 882:20 884:2 889:10 901:20,23
allowed 805:6,11,25 809:12 815:18 816:1 825:9 839:8 860:2 861:19 863:17 874:5,16 888:14 889:8,12 895:19 896:15,17,19 897:12,13 898:23 899:1,7 900:3,5
allowing 806:7 883:15,16 896:6,12 899:8
almost 808:23
alone 895:3
along 837:22 882:20
aloud 902:11
already 858:21 899:14
although 844:8 845:17
always 799:2,3 800:22 805:19 806:2 807:20 809:18,19 825:3 835:11,20 839:13 845:11 893:13,18,20 895:14,16
Amendment 846:9,11,12,15,24 847:16 848:2,8,12,22 849:6,16 853:20 854:8,19,19
AMERICA 791:3 793:2
ANDREW 881:1,6
Andy 797:13,15,16 798:22 800:13,17 801:2,8 806:10 807:11 808:6 811:15 814:13,19 817:9,18 818:12,23 819:19,22,24 820:12,20,22 822:10,14 825:22 826:10 842:13 841:6 assurance 841:6

10 880:19
ANGELA 791:6 793:2 795:3,19 797:17 798:12 801:4,15 802:4,13 804:10,24 807:15,21,25 808:6,18 811:14 817:20,24 818:23 819:4 820:6,9 821:20,22 822:8,13 827:6 828:18,25 829:23 830:8,10,19 833:22 835:19 837:9,18 839:3 842:14 844:21 846:22 847:22 848:18 851:22 852:14,24 853:14 861:5,6,12 862:7,11 863:2,8 864:9,24 865:7,9,13 866:9 870:21 877:22 878:9 881:20,25 882:20 883:12,17 884:3 900:23 901:14,21,24 903:6 905:2
Angela's 809:22
Angie 820:15 837:1
animosity 845:22
ANN 793:13,19
another 794:11 797:21 818:3 826:22 830:11 850:2 862:16 877:8 882:4 898:13
answer 847:16 848:3 854:16,20 878:3,12 890:6 902:11,13,15
answered 904:12
ANTHONY 851:1,7,20
anticipate 845:23
anticipated 848:15
anybody 806:6,11 808:22 811:20 813:12 819:20 824:16 825:2 833:6 843:6 847:8 848:11 868:10 870:4,24 871:2 872:25 875:14 883:9 884:3 901:20,23 902:25
anything 797:19 798:1,3 806:11 813:12 821:23 826:25 828:25 840:19 844:16,24 845:16 849:12 853:20 854:11 859:20 860:2,22,23 865:4 872:25 874:2 875:8,21 877:21 878:8 900:8 901:17 906:17,20
apart 807:14 844:21
apparent 807:17
apparently 845:15 894:9
appeal 879:18,18,20
appealing 845:7
appear 807:19 850:19
appeared 878:21
appreciate 849:17
approached 794:11
appropriate 869:19 906:9
approved 905:22 906:2
Approximately 795:16 800:16 819:14 856:15 858:3,5 872:4
April 881:19
area 801:23 802:2,5 805:6,7,11,14,14,18,20,21 810:24 812:13,14 814:22 835:6 849:11 853:11 858:11,16 883:15
areas 812:1
argue 850:12
arguing 874:12
argument 849:20 850:5 904:23 905:4
Argumentative 888:23
Arguments 837:12,13
armed 870:11
around 810:10 811:19 820:20 825:17 830:16 835:19 866:13 878:23
arrangement 865:25
arrested 827:2
arrival 797:6
arrive 794:25
arrived 802:19 856:2
article 877:12
articles 796:19 864:2
ask 805:24 848:6 849:19 852:20 853:10 854:11,24 861:22 862:10 877:19 881:23 886:7 887:3 888:21 890:20 905:18,20
asked 806:2 827:24 828:2,5,7,10,24 832:8,15 833:6 837:15 838:5 839:8,13 847:19,21 848:11 853:17 862:6 864:1 876:12,20 877:10 896:11 899:14 900:17 901:1 904:11
asking 829:12,12 832:14 887:1
ass 864:25
assertion 893:22
assigned 802:13 880:3
assist 865:5
Assistant 791:10 845:9
assume 846:13 858:7 901:10
assumed 846:25

attempt 882:15
attempting 812:24 829:24 830:2 870:1,5
attendance 852:11
attention 859:6 860:24 861:3 863:20
attorney 794:12 840:8,11 841:16
Attorney's 840:25 874:25
attorneys 868:1
audible 902:10
August 794:20 795:1 796:4,23 797:8 819:17 850:4
authorities 841:3
available 850:14
avoid 846:16 849:9
aware 795:14 796:13,16 801:22 803:18 811:25 818:23 846:15 853:24 876:22 883:11 888:6,9 891:23 897:4,8,11
away 860:19 874:14

## B

B-r-a-m-o-w 793:20
back 798:21 808:4,7 809:14 812:22 814:14 817:10 821:9,14 829:11 832:23 859:7 878:11 881:18 882:25 883:16 900:19
background 827:5
bank 855:5 867:8 870:14
bar 810:8
bargain 867:2
bars 801:4 810:9,10 811:19
Based 797:4 845:18 873:6 901:10
basic 812:25
basically 883:23
Basler 836:20,25
beat 842:25
beating 796:17 843:7
became 864:8
Because 799:2 800:8 802:23 806:4 810:4 811:9 812:19 813:11,12 817:21 820:20 823:14 825:10 829:14 830:6 832:5 835:22 836:10,16 839:22 843:5 844:12 845:14,15 846:3 848:10 849:6 858:3 859:6 861:19 863:21 869:20,22 871:18 874:23 875:2 878:12,18 890:25 901:2,3 903:15 905:1,16,17
become 795:25 796:1,13,16 827:12
becoming 848:13
bed 856:16
BEFORE 791:18 797:9 803:2 837:25 838:2 841:5 849:12 851:23 853:1,4,8 865:8,9 870:11,14 880:1 884:16,24 885:18 889:25 890:4,6 892:3
beginning 849:23
begs 830:2
behalf 791:14,16 826:3 850:9 879:23 880:12
behind 815:14 819:11 820:2,4
belief 899:5
believe 795:10 801:23 837:14 841:13 843:8 865:10,11 870:2 877:5 881:19 883:8 887:7 888:18 889:15 891:14 896:17 905:25 906:5
benefit 873:4 906:11
Bennett 805:10
Benton 794:17,19,22,25 795:2,4,6,7,12,19 802:19 827:7 828:19 836:23 837:23 843:7,16 844:20 864:11,12 865:7,9,14 866:4 881:13 882:19 884:5 891:12 893:23 895:23 896:5,11
BERRIGAN 791:15 845:19 846:1,5,19 847:3,17 850:11,18 851:13,15,17,21 866:20 867:17 872:20,21,24 875:6 876:11,18 877:23 878:2 879:11 880:13,15 905:8,14 906:3,8,13
beside 803:8
Besides 892:6
best 887:8
between 797:5 798:11,18 801:15 803:25 804:11,16 806:17 817:23 819:4 821:18 833:1 839:3 877:9 881:20 885:3 892:19,22 900:19 901:7,21 903:23 904:10
beyond 829:20 830:3 876:14,23 889:21
big 799:25 810:6,9 885:11 905:10

Bill 806:11 812:19 836:20 905:17
bit 806:8 807:6 829:6,20 849:5 872:8 884:21
Black 827:6
blame 813:5
Bldg 907:21
block 856:16 874:9,9
board 883:23
Bobby 796:10 797:1 800:11 801:3 803:8 813:13 817:24,24 819:5 820:11,16,25 822:13,21 823:6 824:19 825:3 829:23 830:16 833:12 834:11,19 835:21 836:12 839:3,8,13 840:19 844:14 847:10 848:17 868:2 870:19 871:3,17,22 878:16 879:2 881:20,25 882:7,18 883:14,17,22 884:1 901:21,23 903:6
bodies 831:23,25 832:4,7 833:25 834:5
bolt 799:15,16,17,18
bond 827:25 828:2,5,7
book 796:19 797:11 815:8 859:13 892:24
booking 825:5,6,11,12,20 883:15
books 798:23 814:21,22,25 815:3,6,15 817:11,14 818:21 882:17 885:18,23 886:3,5,14 887:4 889:21,23 891:20 897:15 899:20 903:22
both 818:16 820:5 857:19 878:19 887:15 903:13
bottom 856:18 858:25 871:18
box 799:15
Bramow 792:8 793:13,19,25 794:3,20 840:5 844:6 883:13,16 884:5 885:6,10,13 900:24
brief 861:7
briefly 845:20 851:25 866:12 872:21
bring 801:3 810:11 814:19 860:18 863:20
brought 794:9 835:5 841:10 842:13 874:6 885:5
bruises 843:5
bugging 813:25
Building 791:11 793:8 812:21 893:11
burden 905:1
burglarizing 863:19
buried 831:23 832:10
busy 902:20 905:12

## C

cage 810:6,7,10,12,13 811:19 823:14 825:16
call 810:23 835:11 869:4 876:20 880:18
called 793:14 842:6 851:2 852:3 862:17 881:2
calling 793:5 848:14 869:23
came 810:1 817:12 821:9,14 855:17 858:1 877:4,5 884:24
camera 805:22 835:6,8 836:2
cameras 805:16,17
can 798:17 806:5 824:6 849:15 856:19 859:5,7 860:17 865:5 871:19 878:3,4 882:15 886:13 891:22 893:12 894:8,11,16 895:25 896:8 904:24 905:6,8,12,15 906:10,11
can't 801:12 886:6,9 890:18 895:15 903:18,21
capacity 881:15
card 842:14,15,17,18
care 797:3 814:2
Carr 791:23 874:7 907:7
case 794:10 813:3,10 823:3 830:9 837:11 841:14 845:17 849:24,24 850:1 860:25 863:4,8 866:9 867:11,15 875:21,25 878:19,20,21,21 879:22 880:2 881:19
cases 866:16,17 875:3 878:19
catch 882:15 883:6
caught 819:12 835:23 836:17 883:9 897:10
cause 848:7
caused 855:10
Cedar 791:20 862:24 868:22 875:16 876:5,13 877:2 907:22
cell 797:16 799:13,18,20,21,23 801:18 802:4,8,12,15,18,21 803:2,3,5,17 804:2,4,5,7,8,16 805:21 806:8,18 807:4,12,16,20 808:8,14,25 809:2,3,8,15,22,23 810:1,2,3,5,15,24 810:19 821:20 828:14 MWB-LTS

constant 891:25
constantly 835:17
Constitution 854:9
contact 795:19 796:10,22,24 797:4,9 798:14 808:13 853:2 868:5 877:21 878:8 882:21,21,24 883:4 901:24 904:22
contacts 798:11 806:25 812:23 881:19
contain 888:10
contained 841:20 842:3 888:6 891:10
context 877:15
continuation 849:21
continue 874:14 877:25
continued 827:7 888:16
continuing 877:24
continuously 796:6
control 835:10,11,23 849:3,9
conversation 830:18 832:23 833:16 836:4 841:22 845:23 861:11,23 865:17 868:21 871:3,7,16,21,25 872:2,5,10 877:19,20
conversations 806:16,21 813:6 833:11 834:18,19 842:4 846:21 847:20 852:13 853:13 854:15 861:1,4,5,9 862:1,2,4 871:20 872:6 877:9,17 878:7
convict 865:5
convicted 817:6 870:8,11,14
cooler 893:24
cooperation 867:11
cooperator 828:22
coordinate 850:22
copies 880:10
copy 906:6
Cornell 868:15,16,18,20,22 875:14 876:9 877:1
corner 808:5 819:9,12 825:18
correct 794:7,18 795:8 800:14 801:24 817:12,19 818:21,25 823:8,11,15 824:20 827:3,8,13,16 828:20,22,25 829:1,15,16 832:14 838:1 839:5 841:11 842:3 870:9,12,15 881:21 884:24 885:7,8 886:15 888:17 889:11 894:7 897:14 899:6 902:6,7,9 906:7,8
correctional 881:14
correspondence 888:15
couldn't 837:13 852:8 860:1,5 904:4
counsel 793:6 845:12
counter 809:18 825:5,6,11,12,20
County 794:6,17,19,22,25 795:2,4,6,7,13,19 827:6,7 828:19 836:23 837:23 843:7,16 844:20 855:11,14 856:21 858:1,16 859:23 862:8 864:11,12 865:8,9,14 866:4 870:2 874:21,24 881:13 882:19 884:6 891:12 893:23 895:23 896:5,11
couple 823:19 837:10 843:13 850:2 862:21
course 870:22
COURT 791:1 793:1,9,11,16,21 795:24 801:22 808:3 809:13 816:19 830:1,13 840:2 844:2,16,24 845:2,5,21,25 846:2,6,25 847:15 848:1,6,20 849:14,16 850:15,20 851:4,9,11,15 852:12 854:6,23 856:6 861:8 866:23 867:4,20 872:20 875:8 876:25 878:1 879:13,21 880:1,6,9,16,21 881:4,8 884:12 886:23 888:24 890:5,14,20,23 891:8 898:4 900:8 902:4,8,11,13,21,24 904:13,15,18,21 905:11,15,18 906:5,9,10,16,19,22 907:8
Courthouse 907:21
courtroom 848:24
cover 835:6 846:21 847:1
covers 811:10
crime 821:23 830:19 847:11,20 853:21
crimes 829:3 830:11
criminal 846:17,18 847:8,13 849:13,24 850:1 854:13,17
CROSS-EXAMINATION 816:21 847:24 867:23 868:3
cross-examine 847:6 867:21
crossword 796:19 797:11 885:24
CSR 791:23
current 827:3
currently 794:5 875:25 881:11

CURTIS 851:1,7,20
custom 874:24

## D

Dameron 791:15
date 795:11 855:16 904:23
daughter 815:23
daughter's 813:15
day 791:20 796:15 799:24,24 800:20,20 804:22 805:3,9,12 806:4,4 809:19,19 821:24 824:11,12,15,19 839:14,14,21,22 861:3 872:4 877:11 880:8 892:8 895:12,15 896:8,18,20,24,25 897:18 903:19,24 904:3,4,9
days 796:5,8 833:2 858:14 861:2 871:24 904:5,6
dead 799:14,15,17,18
deal 848:20 905:10
dealings 898:7
DEAN 791:13 884:15
decided 877:15
deep 832:5,10
Defendant 791:7,14
DEFENDANT'S 792:7
defender 845:9
defense 793:4 875:15 876:9,21 877:1 905:25 906:6
DeGeus 831:15,17
deliver 801:6 809:21 888:16
delivered 887:23 888:9,11
deliveries 801:11
delve 847:12 849:13
denying 886:7,9
Department 881:13
deputies 859:23
derogatory 869:18 871:12
describe 798:10 808:2 856:5
described 843:8,19
describing 802:11 811:23 815:5
despite 813:17
details 834:15
diagonal 825:21
didn't 795:9 797:3 810:5 816:12,13,14,15 817:20,21,21 823:14,17 824:1,15 828:1 829:3 832:2,16,19 833:21 834:18 836:7,14 837:2,5,8 838:6 840:19 843:5 857:3 859:24 868:3 870:19,23 871:1 873:17 876:6 877:4 886:18 888:11 890:20 893:3 899:14 902:17
differ 856:13
different 799:25 823:13 848:15 856:10,14 866:13 873:21 874:19 878:23 898:6
difficulty 890:25
dig 831:24
dinner 799:3
DIRECT 793:23 829:21 830:3,6,7 846:20 851:16 861:3 876:14,23 881:10
direction 857:19 907:12
directions 903:13
directly 804:6 807:16 875:22
disappeared 831:20 836:2
disciplinary 856:11 874:21
discontinued 874:10
discuss 813:10 841:9 852:5
discussed 841:18 846:9 866:8,11
discussion 845:6 852:17 906:14
disk 831:24
Dispatcher 835:15
dispatchers 835:14
dispute 845:7,10
disruptive 845:11
distribute 887:4
distributing 886:1,4
DISTRICT 23:1 855:4 880:5
DIVISION 791:2
does 835:6 846:3 860:9 891:15 894:25 904:18
doesn't 835:5 847:1 849:6
doing 844:20 860:20 868:24 869:1 870:7,25 883:6,10 886:18 897:10 899:5 905:9
done 803:13 818:1 873:12 893:6
door 799:5,18,20,21,22 800:6 810:6,9,11,20 811:10,11,18,19,22 820:21,23 821:2,6 823:13 825:17 835:9 856:17 857:4 858:25 860:16 871:10,18 895:7
doors 818:19 811:4,6 857:19 871:

---

818:8 820:5,13 821:9 822:18 823:6,7,10,22 825:14,17 842:7,10,17,21 852:23 856:1,5,8,9,19,20 857:12,12,16,21,25 858:9 859:4,4,7,7,10 860:9 861:22 862:16,18 868:23 871:9,20,20 872:1 883:2,2,16,24 888:13 889:14,14 892:4 893:10,13,14,16,18,19,19 894:3,3,11,13,17,22,24 895:6 896:8 897:4,9,12,13,17,20 899:17,20 900:23 901:14
celled 858:12 864:8 866:10 871:23 872:15 878:22
cellmate 795:22,25 796:2,6 797:21 812:24
cells 799:25 802:1 803:19 808:14 823:17,19 855:23 856:11 858:15 862:14 871:8 893:6,8,24
certain 815:8,14 863:16 898:12
certainly 850:13,18 853:24 854:3 869:16 873:23 876:12,21 878:5
Certified 791:21 907:7
certify 907:14
cetera 891:21
chains 793:10
changed 826:21
changes 826:19,23
charge 816:24 855:4
charges 817:3 827:3,16 837:1,4 853:18 854:12 855:9 862:5 869:22
checking 796:18
chief 879:20 880:5,6
children 837:11,16
circulate 885:22
circulation 893:23
circumstances 822:7
City 850:1,17,19 852:3 904:25 905:1
civil 849:24
CJA 905:22 906:2,10
claim 876:4
claimed 838:9,10
claims 838:12
clarify 900:11
clear 800:10 808:23 815:5 853:12
clerk 880:10
clipping 862:25 868:3,4
clippings 862:22,24 863:1,8
clock 858:4
close 827:12
closed 799:9 800:7 810:24 811:1 897:17
code 896:2
come 804:23 805:1,2 806:14 808:6 810:10,12 811:18 812:3,20,22 822:19 825:10 826:1,5,14,20 840:13 850:21 861:16
coming 807:21 808:4 822:8 845:21 874:4 883:13 905:3
comment 801:7
comments 801:5,8
common 803:9 817:23 818:5 824:8 862:7 870:7
commonly 803:13
communicate 797:10 803:19 827:8 842:9 858:21 859:21 891:22 902:5
communicated 827:16 859:18,20 867:9
communication 801:14 803:24 804:14 838:16 839:2 901:20
communications 798:18 801:21 802:10 804:11 838:5 848:18 853:2 857:7,11 859:16
complained 895:12
complaining 878:12,14
concealed 800:22,25
concerned 846:7 869:25
concerning 828:25 835:25 837:10 846:17 868:2 870:5 881:19
concluded 906:23
conclusion 906:14
concrete 856:16
conduct 847:13 849:14 854:13,18 859:12
conducting 835:17 851:12
conferencing 905:6
configuration 823:13
confinement 855:23 856:1,4,8,9 858:15 862:14 883:24
confirmed 832:2,9
confrontation 831:11
connection 794:10 801:11
consent 845:19

---

KAY C. CARR, CSR, RPR

doorstep 810:12
doubt 848:18 904:1,1 906:16
down 799:2,3,10 804:8,11 807:6 812:20 814:19 822:19 825:17 826: 20,25 836:13 842:25 843:24 847:6 858:7 867:9 869:2 874:13,16 879: 14 883:23 889:5 892:10 894:15,16 895:8,11 900:23 902:19 904:16
draft 826:22
drag 833:6
dragged 830:8,12
driving 817:8
dropped 892:8
drug 827:3,15
drunk 817:7
due 893:22
dug 832:4
duly 793:14 851:2 881:2
during 795:18 807:3,8,11 833:10 834:17 839:7,22 856:23 861:19 877:7 882:18 901:8
Dustin 829:7,13,15 831:14 837:19
duties 902:22

## E

each 808:14 817:2 818:8 827:10 857:13,20,21 858:13,21,25 861:2 871:24 878:22 893:10 896:8 901: 25 902:5
earlier 871:8
early 796:23
echo 812:21
editor 877:6,9 878:16 879:7
effect 828:11
effectively 847:5 849:7
Eight 855:15,16 856:15,23 860:18 862:16 893:8
either 798:25 799:9 800:18 814: 18 818:13 843:11 849:22 863:3 876:14 894:2 898:11
elicited 847:20
else 798:22 800:3 808:19,22 813: 5,14 817:5 818:10 819:18,20 824: 16 825:2 844:15 868:22 870:24 871:2 875:14 883:9 884:3 896:17 901:17 906:17,20
else's 800:7
employed 881:12
employee 907:15
enclosing 810:10
end 808:23 842:5 850:4 867:1
ended 829:17
engage 834:19
enough 846:15
ensure 846:8 848:21
entire 897:18
entirely 847:18 863:4
entirety 867:12,13
envelope 801:2 818:19 833:24 834:2,2
episode 888:12
escorting 883:16
especially 894:22
ESQ 791:10,13,15
essentially 852:16
establish 829:25 830:2
estimate 821:17 890:2 900:18
estimated 890:14
estimation 813:9
et 891:21
even 806:4 807:3 813:17,20 821: 22 822:4 842:16,24 848:1 853:18 854:17 888:10 897:17
evening 858:2 862:6
evenings 861:19
events 835:25 900:14
ever 802:8 805:24 814:21 815:25 816:5 817:5 823:1 842:20,23 853: 7 881:24 882:20,23 883:6,9,12,15, 20 884:1 885:9 886:4 895:4,9 901: 15,19,23
every 799:24 800:20 805:8 806:3 809:19 839:14,22 861:17 892:24 896:8,18,24,25 903:19,24 904:1,3, 4,9
everybody 800:6 806:10 849:4 870:2 896:17,25
everything 813:3 814:3 844:20 880:11
evidence 863:23
ex-boyfriend 831:17
ex-boyfriend's 830:15
exact 890:20

exactly 816:9
EXAMINATION 793:23 830:4,6,7 840:3 844:18 846:21 851:16 872: 23 876:24 881:10 900:12
examined 793:14 851:2 881:2
example 798:24 829:6
exams 876:14
Except 847:15
excess 890:15,16
Exchange 791:13 885:18 886:13
exchanged 827:20,24 903:22
exchanging 889:6 904:7
excuse 866:20 879:16
excused 845:3,4 879:15 904:17
exercise 824:4 883:13,18,18
existed 824:2
expecting 873:3
experiencing 874:3
Explain 810:7
explanation 802:24 864:19,21 865:16,24
expressed 841:2
extended 897:21
extent 829:4 847:25
extra 807:17 839:9
extremely 902:20
eyeshot 805:22

## F

F-l-o-w-e-r-s 851:8
face 802:2 857:19
face-to-face 801:18 819:4 822:23 883:4
faced 802:5
facilitate 894:1
facility 801:23 889:4,14
facing 855:3
fact 795:22 816:4 820:18 835:25 837:10 841:13 845:11 847:12 865: 6 897:17
fair 873:20
fairly 827:12
familiar 845:17
far 856:12,12 904:7
farmer 831:24
favoritism 875:1 876:2
FBI 837:22 864:24 865:5 866:15 874:25
fear 837:18 840:24
fed 800:4
federal 817:3 840:6,14 841:3,5 845:9 861:24 886:23 907:21
Feds 864:25
feed 858:5
feel 817:22
feels 845:13
feet 856:15,15 860:19 862:16
felonies 817:6,7
felony 870:8,17
female 809:5 826:8,9
few 827:18 872:11 881:23
Fifth 846:8,11,12,15,23 847:15 848:2,8,12,21 849:5,16 853:20 854:8,18,19 855:22 858:18 873:24
fights 837:9
figuring 811:17
filed 879:22 880:7,12
finally 808:24 874:15
financially 907:16
find 828:5 885:1
finding 829:17
finishing 798:8
fire 845:8 879:19
fired 879:17
First 791:11,24 793:7 794:25 795: 25 796:1,13 798:13,17 801:7,21 802:16 803:6 819:5,8,8,13 821:17 822:5 839:2 861:11 865:10,11 871:25 885:1,4 890:11 891:13 906:1
five 808:10 817:2 821:17 849:24 867:6,7,9 881:15 887:10 888:13
fix 839:16
flap 799:2,8,9,13,18,19,20,22 800: 6 810:3,4,5
flips 894:15
floor 855:22 858:7,10,18 873:25, 25 874:13,16
floors 861:20
flow 883:3
Flowers 845:8,17,20 846:20 847: 6,7,11,12,19 848:16,17 849:2,18 851:7,8,20 853:3 854:17,23,24

856:23 862:10 864:20 865:6,24 866:21,24 867:25 871:11 872:25 874:18 879:14
Flowers' 845:6 846:8,15 849:5 880:12
follow-up 844:3 875:10 902:24
following 877:11
follows 793:15 851:3 881:3
food 810:11,14 815:25 823:17,18, 19,24,25 856:17 883:2 893:5,7,13, 20
foregoing 907:12
form 841:6
former 853:25
forth 798:21 817:10 818:4 824:4 832:25 859:7 900:19
found 830:21 885:6 888:14
four 839:24 862:23 874:11 886:17 893:8,10 902:19
four's 893:13,18
frame 901:8
free 834:6,13 843:12
freedoms 807:18 898:1
French 837:22
frequency 890:7
front 809:18 818:21 825:4 836:7 840:5,13 849:20 859:3,4 883:14
frost 832:6
fucking 871:11
full 793:17 851:5,18 881:5
further 839:25 844:16,18,25 864: 19 872:18 875:9 879:10,11 884:10 900:9 902:2 907:14,15

## G

gained 862:25
game 892:24 900:22
games 882:16 885:18 886:3,5 889:21,23 903:22
garb 854:25
gave 832:13 843:13,20 844:7 892: 3 898:12
Gazette 862:24 875:16 876:5,13 877:2
general 805:4
gentleman 852:19 853:6
gets 879:22 880:7,11 893:11
getting 835:20 846:16 876:3 878: 13
girl 835:23
girlfriend 830:24
girlfriend's 829:18 830:22 836:1
girls 831:2
give 799:6 804:25 827:5 860:12 870:23 890:2 899:20 902:15
given 802:25 841:6 842:17
giving 834:4
glass 811:9
goes 876:16,18 878:11
Good 793:11 843:16 857:6 880:21 902:9
goose 831:16
got 800:3 802:20 803:2 815:22 818:8 822:18 824:14 827:2,15,20, 23 835:8,21 837:25 838:22 839:20 843:23 859:6 860:23 867:25 872:8 874:10 875:19 894:15 896:21 902: 4,21
gotten 815:7 859:15 866:14
Government 828:17,20 850:9 866:2 867:1 873:10 879:2 904:18 905:23
Government's 847:5
grand 840:6,14 841:5
great 835:11
green 852:21
Greg 829:14
ground 832:7
guard 822:10
guards 824:5,8 860:17
guess 815:5 845:6 850:11 868:14 878:11 886:13 887:13 890:18
guessing 858:3
gum 815:15,16,18,20
gun 836:3 863:19
guy 829:8 862:13
guys 817:17 822:14 826:10 839:4 902:19
gymnasium 874:5,10,15,17

## H

Hach 791:11
hall 802:21 804:6,8 825:17 862:17 893:9
hallway 811:3,11 812:7 814:19 821:15 835:4 836:14 871:20 880: 19 883:1
hallways 810:19 812:6
hand 793:12 810:13 814:18 818:2 880:9,22 881:24 882:3 884:1 907: 17
handed 797:18 800:25 801:2 826: 16
handing 799:6 800:4 843:11
handle 845:13
handled 906:3
hands 857:5
happen 815:10,11 839:18 843:2 855:24 883:20 891:15 901:11
happened 808:2 820:15 822:13 842:15 843:1 876:7 901:2,4,12 904:7
happening 812:18 892:7
Happens 882:10,14 885:11 887: 20,21 889:16 891:10 893:14
happier 896:9
happy 854:3
hard 812:20 905:13 906:11
having 794:11 807:14 811:21 813: 4 852:6 857:11 887:22 894:1
Hawk 827:6
Hawkins 836:8 900:24
he'll 848:11
head 902:14
headlight 847:14
hear 793:10 871:19 883:9
heard 803:4 843:6 871:16 874:11
HEARING 791:5,18 794:10 841: 14 849:21 850:10 852:12 881:18 905:23 906:12,15
heave 832:6
HELD 791:18
help 813:2,4 814:1,12 817:9 827: 25 828:2,5,11 834:16 852:8
here 793:2,7 794:9 798:2 800:17 824:18 829:22,25 839:14 840:11, 17,25 845:14 846:7 847:23 849:25 851:14 873:4 878:6 884:23,24 900:21 905:4
here's 848:20 890:24
hereto 907:16
hidden 817:14 818:13,17,20 901: 16
hide 836:13 882:12
high 874:23 875:1,3 878:20,21
highway 847:13
himself 802:8 824:25 863:13 869: 11
history 848:10
Hold 869:2
hole 799:7
holler 803:16 815:13 859:5 861:22 871:10
hollering 874:12
honestly 886:13 889:3 890:18 903:18,21
Honken 829:7,13,15 837:19 864: 25 865:3
Honor 795:10 816:18,20 829:20 840:1 845:1,21 847:17 850:12 851:13 866:22 872:19,22 875:11 876:16 879:10 880:15,19 881:9 884:11 888:23 902:3 903:1 904: 11,20 906:4,18,21
hope 828:11
hot 895:13
hour 805:9 806:24 824:23 852:22 853:1 858:6 896:3 905:3
hours 824:3 838:2 861:2 895:15
house 799:16
housed 855:10,20 864:10 874:20
how 796:16 797:10,12,16 798:21, 24 800:2,16,25 804:20 805:24 806: 2,3 808:9 811:1,13,16,25 812:10 814:17 815:10,11,18,22 820:1 822: 18 825:8 826:1,14 828:14 837:15 839:12,13 842:4,12 844:10 845:12 855:13 857:24 858:24 860:7,9,14 861:10,16 862:10 863:4 867:25 871:7,15 875:25 876:18 881:12 884:8,16 887:7 888:1 889:3 892: 15,22 893:1 896:15 903:21

Hrycyshyn 862:19,20,21 863:7,9 871:6,16 872:1,9 873:14,16,22
Huh-uh 797:7 799:14

## I

I's 877:16
IA 907:22
idea 856:6 887:9 892:21
identical 856:12 897:23 906:14
immediately 821:14 822:17 857: 22,25
immunity 841:7
implicate 846:23 853:21 854:13
inappropriate 847:18
incarcerated 794:5 827:15 855:1
including 867:15 897:2
incriminate 854:4,10,17
indicate 819:2 824:18
indicated 800:12 804:14 808:17 809:7 831:22 833:24,25 834:17 839:2,7 844:6 846:3 907:9
indicating 797:24 805:10 838:15
indirectly 875:23 876:1 878:10,12
individual 796:10 854:16
individuals 866:2,14
informant 863:13,14,24 869:15,19 873:8 874:23
informants 875:2
information 813:18 828:24 829:2, 24 830:8 832:21,24 833:3,7 847: 10,23 862:25 863:18,22 864:4,23 866:14 868:2 869:9 870:5 878:24 879:3
infraction 892:6,9
initiated 796:24
inmate 794:22 817:25 843:7 862: 18 882:4,4,19 884:5 894:22
inmates 803:25 805:6 807:18,22 808:25 809:4,5,11 816:1 824:3,14 836:4 859:23 861:19 862:9 874:20 878:24 882:9,12 885:19 889:13 891:22 895:24 896:6,9,12 897:24 901:7 902:5 904:7
inside 799:10 810:18,24 811:1 817:14 818:13 821:15 825:16 882: 12 888:2 894:5,17 901:16,16
instance 869:17
instances 800:13
instead 877:13
instruction 901:19
insurance 791:13
intent 816:25
interest 878:19
interested 907:16
interesting 825:15,22
interrupt 877:25
interview 877:7
interviewed 836:22 837:21
intimidate 872:12
investigator 826:5,6 868:19
investigators 876:21
invoke 848:2,8,12 854:19
involved 831:11 837:14,15 863:5 865:3 866:3 875:2 877:9 878:20
involvement 846:17,18
involves 856:7
Iowa 791:14,20 855:5 880:5
iron 823:14 825:16
irrelevant 876:23
isn't 847:19 888:17 894:7
isolation 842:7,16,21,24 844:8,9
issue 793:4 864:8 884:22,23
issues 849:20
item 888:11
items 815:25 860:4 886:1 887:4, 23 888:10,16 889:6,14,17,20 890: 16 891:2,4,11 903:5,8,23 904:10
itself 895:6

## J

jail 794:6,18,19,22,25 795:3,4,7,7, 13,19 796:4,7,9 801:23 802:19 803:13 805:5,7,12,14,15 806:6 807:18 808:14 810:24 812:1,13,14, 15 813:14 814:2,22 815:18 816:1, 23 817:23 818:5 823:7,10 827:6,7, 12 828:6,15,16,18,19 835:9 836:23 837:23 840:22 843:16,20,23 844: 20 854:25 855:11,14,17,21 856:2 858:1,16 859:23 863:19 864:10 865:8,9,14 866:4 869:6,22 870:2 871:23 873:14 874:4,6,22 878:13

jailer 817:18 818:2,3 889:10 894: 25
jailers 797:15 803:18 814:12 817: 18 835:13,15 859:1,2 860:11,12 870:24 874:12 882:9 894:8
jailers' 859:5
jails 862:8 866:13 874:24 878:24
JAMES 881:1,6
Jarvey's 845:8,15 879:18
JOHNSON 791:6 793:2 794:6,12 795:3,3,12,14,20 796:24 797:5 798:12,25 799:1 800:18,19 801:15 804:12,17 806:13,17,25 812:24 813:9 814:5 817:24 818:24 819:4 828:18,25 829:24 830:9,10,19 833: 23 837:18 838:6,9,10,12,17 839:3 840:22 841:9,23 842:10,18 843:10, 15 844:21 846:22 847:22 848:18 851:22 852:14,24 853:14 861:5,6, 12 862:12 863:2 864:9,24 865:7,9, 13 866:1,3 868:1 870:21 877:22 878:9 881:20,25 882:20 883:12,17 884:3 885:3,16 886:2,5 887:5,24 888:17 889:17,24 890:8,11,13,17 891:3,4,16,24 892:3,14,17 897:4,9 899:21 900:23 901:14,21,24 903:6 904:10 905:2
Johnson's 795:25 796:1 838:16 860:24 863:8 866:9 867:11
Judge 805:10 827:5 829:22 844: 15 845:7,8,15 848:10 849:10 850:8 854:3 857:1 876:11 878:2 879:18, 20,21,25 880:3,5,6
July 791:20
June 849:23 855:18 856:2 858:2, 2,8,12,12 861:10,10 874:4,15 877: 5
jury 840:6,14 841:6

## K

Kansas 852:3
Kay 791:23 907:7
keep 805:1 816:10 823:24 832:18 844:21 862:8 894:21
keeps 893:24,24 896:9
kept 813:11,25 820:12 883:1,3
key 811:21 894:9,24 895:1,5,6
kids 830:25 831:1 865:4
kill 864:25
killed 837:11,16
killing 865:4
kind 793:5 798:9,10 846:25 861: 20 869:5 875:4 889:20
knew 803:24 836:16 861:25 862: 3,4 891:10,16
knocked 857:15
know 796:20 801:6 806:6 813:3 815:22 816:4,11 820:1,15,18 821: 11,14,22 822:25 823:3,21,24 825:8 828:13 832:17,20 833:2 834:15 836:9,11 837:2,6,8 839:4,12 842: 22 843:1 844:10 845:16 847:4 848:7,9,12,24 852:19,20,24 853:19 860:14 862:11 863:6,11 864:9 865:6 866:12 868:20 869:7 871:16 873:17 874:2 875:2 876:18 887:13 888:11 889:3 890:9 891:3 896:22 897:22 902:5,8 903:16,19 904:24 905:4,5
knowing 901:15
knowingly 881:24
knowledge 803:18 805:22 883:21 891:25 893:3
known 803:15

## L

lady 852:20 880:4
last 793:17 840:6,17 841:6 851:6 881:5,7
Late 855:18
later 850:22 888:14
lawyer 841:4 845:6,15 846:3 848: 23 849:7,8 853:24,25 879:17
lawyer's 845:19
lawyers 813:3 846:14 851:22 854: 10 905:20
lead 793:6
learned 796:23 882:11
least 827:23 845:21 846:20 853: 15 864:16

leave 810:16,21 820:21,23 880:1 893:17 894:23
left 795:3,14 843:15 852:21 857: 22 862:17 871:9 893:5 895:11
lengthy 862:23
Les 806:10 817:20 839:10
less 848:23 867:6,7,10
let 806:11 807:22,22 808:22 824:8 825:1 828:17 839:17 842:20 845:5 849:19 852:20 862:10 871:15 877: 19 886:7 896:24,25 897:5 903:4 905:20
Let's 819:13 820:21 822:2 829:5 860:24 901:10
letter 796:18 827:17 875:15,18,20 876:4 877:6,8,16,18,20 878:5,6,16 879:6 899:6
letters 798:20,21 827:10,18,23 859:20 876:13 881:25 898:23 899: 16,19 900:5
library 814:23 818:21
life 798:6 834:7,14 843:12 853:4 867:8
light 897:1
like 794:2 795:15 799:14,15 800: 20 810:10 811:12 816:12,13,14,15 818:2 847:2 848:13,14 849:8,11,20 851:9 857:5 858:1 859:10,20 860: 18 861:3,18 862:5,13,22 863:11 869:14,16,20 871:18,23 877:12 880:18 885:11,17 887:20 889:25 895:5 896:17 903:8 905:11
likely 850:16 885:14
Lilledahl 845:10 846:2,6,10,20 848:25
Lilledahl's 854:1
line 831:23 877:24
Linn 855:11,14 856:21 858:1,16 859:23 874:21
listen 832:19 847:8
little 806:8 807:6 808:5 810:10,13, 19 811:4,10 827:5 829:6,20 842:14 848:22 849:4 856:18 861:18 868: 23 872:8 884:21 893:11 894:14
live 905:7,8
lives 860:16
living 833:1
located 797:17
location 833:25 834:5 872:15
lock 812:9 894:14,16,19,24 895:1
lockdown 888:18 889:5 898:10, 22,24 899:2,10,12,17,20 900:3
locked 799:12 812:8 828:14 843: 24 860:8 868:23 889:4 892:10 894:16,21,23
locks 799:21
lodged 855:7
long 799:24 802:20 808:9 809:19 819:7 855:13 857:24 861:10 889:4 896:25 899:11,18 905:16
longer 806:23 808:10
look 815:7,14 825:22 888:2 902: 17,22
looking 817:1 829:7,14 835:17
lot 798:20 809:9 824:9 829:2 841: 24 861:25 869:10 902:22 903:16
lots 905:17
loud 802:23,24 884:19
lunch 858:5,5,6

## M

ma'am 816:23
mad 804:24 806:2 812:19 834:22
made 801:8,11 806:2 833:9 835: 24 836:3 840:22 848:17 853:24 870:6 876:22 879:6 885:2,4
magazine 797:16,23 818:1,4,13 842:14 900:22 901:13 902:8
magazines 798:22 800:23 817:11, 15 818:9,16 860:1,3,10 882:3,12 885:9,15,18 886:14 887:4 889:22, 24 891:20 900:18 901:17
mail 800:4,21 875:20 877:16 899: 17
mailed 818:9 827:21,22
mailing 818:10
make 805:2 826:19 836:7 854:7, 20 868:25 880:7,11 903:4
makes 869:22
making 801:5 804:3 838:24 843: 10 846:11 863:10
male 807:2 894:8

man 808:24 883:2
manage 797:10,12
manufacture 816:25
many 800:16 804:20 812:10 824: 17 861:1 887:7 888:1 892:19,22 893:1 903:21
map 834:4
Marshal 862:8 874:25
marshals 852:23 869:6 870:23 905:2
Massiah 793:4 849:21 906:15
matter 845:13 846:23 866:8
matters 840:17
May 794:12 836:20 849:11,13,14 851:13,15 854:15 863:21 866:23 867:20 876:25 878:1 879:13,16 882:17 904:1,15,24 905:4
maybe 808:11 821:17 850:4
McNeese 796:11,14,22,25 797:1, 5,10 798:12,25 799:1 800:11,18,19 801:15 802:8 803:5,8 804:12,17 805:11,20,24 806:7,13,18 807:1, 14,17 809:8,17,20 810:2 811:14,25 812:23 813:10,17 814:5,6,15,25 815:20,25 816:7,8 817:24,25 819:5 820:16 823:6 829:23 830:16 833: 10,12 834:11,19 836:12 838:6,9, 10,13,16 839:4,8 840:20 842:6 844:7,21 846:22 847:10,21,22 848: 17 852:14 853:14 856:24 857:2,3, 8,10,24 858:14 859:10,16,22 860: 4,8,15,16,20 861:1,4,6,12,22,24 862:11 863:10,12,13,16,17,21,24 864:1,12 865:2,4,8,8,10,11,14,16, 24 866:1,4,9,10,24 868:2 869:6,12, 25 870:4,19 871:3,10,13,17,22 872:12 873:7,21,22,24 874:3,5,7, 19 876:3 877:10,16,21 878:7,17, 20,22 879:3 881:20,25 882:8,19 883:1,14,17,22 884:2 885:3,10,13, 15 886:2,5 887:5,23 888:12,17 889:18,24 890:8,12,13,17 891:2,5 892:3,14,17 893:15,18 895:4,10,20 896:15 897:2,6,8,11 898:9 899:9, 17,23 900:22 901:14,21,24 903:7 904:10
McNeese's 799:23 804:5 864:7 874:10 877:18 893:5 894:2
mean 809:4,19 885:23 888:25 889:9 890:6,9,9 900:20 902:19
meaning 810:8
means 907:11
meant 864:20
meat 816:12,14
meet 831:19 857:3,6 868:7,9
meeting 819:4 853:1 883:17
Melloy 880:3
memo 874:7
memory 887:8
mention 832:5
mentioned 858:21 877:7
met 822:13 851:23 852:22 853:4,7 856:24 857:1,3 868:10 884:16
metal 810:6,9,10 811:10
method 803:24
methodology 891:20
methods 807:8
Michael 874:6
middle 810:20 819:17
midnight 904:5
might 841:2 847:1 853:21 854:13 857:6 888:19 899:1
Mike 812:19
mind 878:15
mine 862:17
minutes 806:23 808:10,11 821:18 822:20 843:13
mirror 835:12
misquoted 877:14
Missouri 791:16
mistaken 880:2
mob 798:6
moment 866:21
monitored 805:15 812:15
monitoring 805:17
months 862:23
more 806:9 824:9,12,14 832:24 839:20 849:5 850:3 859:4 864:21 876:19 880:13 887:10,12,14,18,24 890:15,23 891:2,5 892:25 893:11 896:4 903:11,15,16
morning 843:21,22
most 794:5 850:13 885:14

**mostly** 846:3
**motion** 879:19
**move** 869:6
**moved** 802:21 803:3 804:2 807:3 808:24 827:6 842:6 858:6,8,9,10, 11
**movement** 804:10
**Mrs** 794:3 804:12
**Ms** 794:2,12,20 795:3,12,14,25 796:1,24 797:5 798:25 799:1 800: 18,19 804:17 806:13,17,25 812:24 813:9 814:5 838:6 840:5,22 841:9, 23 842:10,18 843:10,15 844:6 845: 10 846:2,6,10,20 848:25 854:1 860:24 866:1,3 867:11 868:1 885: 3,6,10,13,16 886:2,5 887:5,24 888: 17 889:17,24 890:8,11,13,17 891: 3,4,16,24 892:3,14,17 897:4,9 899: 21 904:10
**much** 804:3 824:6,22 832:19 833: 14 895:24
**must** 832:4,9
**mute** 848:13
**myself** 863:14
**mystery** 876:13

# N

**naive** 873:19
**name** 793:17,18 818:10 826:7 851:5,6,18,21 856:24 868:4 881:5, 5,6,7 884:15
**named** 796:10 829:8 862:19 866: 13
**names** 870:23
**nature** 830:6 833:15
**near** 831:23 883:18
**necessarily** 848:10
**necessary** 823:24
**need** 847:6 854:24 906:17
**neighbor** 859:10
**neighbors** 856:19 859:8
**nervous** 884:20 886:22
**never** 808:22 810:4 824:13,16 825:1 828:5 838:22 839:23 843:6 853:4 857:4 875:20 901:10
**newspaper** 796:19 818:1,4 845: 18 862:22,24,25 863:1,7 865:12 868:3,4 900:22 901:13
**newspapers** 818:8 859:25 860:3, 10 882:4,13 885:19,22 891:20
**next** 803:5 850:2 852:23 857:14 858:9,13 860:9,16 861:2 862:7,11 864:9 865:15 866:2,4,10 869:6 870:20 871:24 878:22 879:1,3,5
**nice** 880:8
**Nicholson** 829:8,14,18 830:21 831:5,11
**Nicholson's** 830:22 836:1
**night** 831:20 836:2 861:17
**nine** 861:17
**Nobody** 800:3 808:18,20 818:10
**noise** 804:3
**noisy** 861:20
**none** 888:3
**Northern** 855:4 880:5
**note** 797:11,23 798:1,3,13,24 800: 18 801:7 810:3 811:5,21 815:8 818:24 835:21 842:14 843:9,19 844:7 892:2,8,11,24 900:21 901:15 902:9
**notes** 800:13,22 801:6,13 807:4,9, 11 809:21 810:1 811:13 814:4,6, 10,14,17 815:1,3,6 817:10,11,21 818:13,16,17,20 826:10,15 833:18, 23 835:1,2 836:12,17 859:19,21 868:20 869:1,2 881:24 882:12 884:2 885:2 888:7,10 891:10,19 892:13,16,19 893:1,3 894:2 899:19 902:6,17,22 903:19 907:11,13
**nothing** 830:18 838:22 843:5 844: 15 857:5 879:9,11 884:10 902:2
**notice** 849:4
**Now** 795:18 801:13,21 802:15,22 804:2,10 805:4,14 807:14 812:23 814:4 816:23 817:1,10 818:23 825:3,25 827:2 828:16 834:17 835:4,24 836:12,19 841:9 843:8 849:18 852:24 853:17 860:3 863:5 869:22 873:16 884:5 886:12,15 887:21 888:1,22 889:17 890:2 891:9 893:5,12,19 895:19 898:8 899:8 906:6
**number** 824:3 890:3,10,21 900:11

901:12 903:16

# O

**object** 829:19 876:15
**objection** 850:10 877:24
**obligation** 848:21,23
**observation** 809:16 813:21
**observed** 797:4
**obtain** 805:25 828:24
**obvious** 803:22
**obviously** 846:8 854:25 858:20 861:9 873:16
**occasion** 794:21 807:24 821:25 822:1,2 883:12 884:1
**Occasionally** 882:25
**occasions** 874:12 887:7 901:12
**occur** 794:24 822:3 871:21 889:11 901:20
**occurred** 804:21 821:23 827:2 861:9 887:18 900:14
**occurring** 801:15 806:16 901:7
**occurs** 891:11
**October** 795:15 837:23 838:3 843:18
**odd** 800:5
**off** 814:2 826:15 834:16 858:23 866:13 869:11 904:5
**offense** 817:7
**offenses** 870:9,17
**Office** 840:25 852:3,23 859:2,4 874:25
**officer** 847:13 881:14
**official** 907:8
**officials** 866:3
**often** 809:9 812:12 824:9 896:15
**oftentimes** 897:17
**oh** 793:6 798:5 804:1 807:20 809: 18 815:19 816:8 835:19 895:24
**Okay** 793:7,9,11,21 794:2,5,24 819:13,13,22 821:1 822:2,18,21 826:16,22 830:16 831:7,15 832:21 835:16 845:2,25 847:1 851:4,11 853:14 854:23 855:20 860:22 862: 13,18 863:6 867:17,19 875:6 880: 16 886:4 887:3,17 888:1 894:19 902:24 904:21 906:16,19
**old** 862:23 872:14 873:16
**once** 801:18 805:8,9 810:16 819:3 824:11,12,14 839:21 888:10
**one** 797:15 799:6 801:7 803:6 804:7,8 810:20 818:12 819:2,6 822:5 823:7,10,22 827:17,21,22 828:7,13,24 831:12,13,14,22 844: 3,6 849:19 850:2 851:21 855:24 857:14 862:6 863:3 866:15,17,20 874:8 882:4 883:2,2 893:9,16,19 894:1,8,22 898:13 905:5,18
**one's** 893:19
**one-on-one** 882:21,24
**only** 823:10 839:23 846:21 847:17 854:24 860:18 872:13 893:8 894:7 895:6 896:22 897:16 898:24 904:5
**open** 799:13,13,22,24 800:6 810: 3,16,21 811:10,11,18,22 812:22 820:21,23 823:25 883:3 888:1 892:13,16 893:5,9,13,17,18,20,25 894:1,8,18 895:4,13,14,16,17
**opened** 799:10 800:3 825:10 892: 11 894:11,13,17 895:9
**opening** 812:10 888:4 892:2 894: 8
**openly** 818:14,18
**operated** 901:4,11
**opportunities** 806:8
**opportunity** 870:3
**oral** 849:20 850:5 902:15 905:4
**orally** 801:16 859:19
**order** 823:25 844:7 845:8 879:3 905:22,23
**ordered** 905:21,24 906:1
**ordinary** 809:11
**original** 905:22
**other** 799:25 801:14 807:17,18,22 808:12,14,25 809:4,5 811:21 812:1 815:25 817:6,7,18 823:17,19 824: 14 827:10 835:25 836:4 849:19 850:20 854:15 855:9 857:13,14,20, 21 858:13,21 859:18,23 861:2,20 865:23 866:8 871:24 874:20 876: 19 878:22,24 882:8,9 892:13 893: 6,8,10,12 897:14,15,16,24 901:25 902:5
**others** 806:9

**otherwise** 839:22
**ought** 845:13
**out** 799:6 802:2,5 804:22 805:6,11 806:8 807:20,22,23,25 808:7,22 809:8,14 810:15,18,22 811:17 812: 1,14 814:2 815:14 819:5,9,24 820: 18 821:4 824:3,6,9,16,20,22 825:1, 3,9,17 828:1,6,14 829:7,14 830:8, 12 831:19 832:7 833:7 835:5,17 836:23 839:14,17,20,23 842:20 843:11,20 847:11 849:3,9,22 858: 11 859:5 871:10 874:7 877:15 879:3 885:1,6 888:14 895:19,24 896:4,8,12,18,21,24,25 897:12,13, 20 898:24 899:17
**out-of-cell** 809:12
**outdoor** 895:25
**outfit** 852:21
**outside** 799:10,11,15 806:3,24 808:4,14 809:19 811:2,11 820:16 821:5 835:8 859:2 886:3 894:3,5, 13 896:23
**over** 796:18 801:3 804:7,24 805:1, 2 808:5,15 810:22 811:11 812:3 826:20 829:11,18 830:14,21 836:1 847:14 849:25,25 850:21 859:25 860:3 861:1,22 862:21 868:11 872:7 874:11 878:13 905:3
**overhear** 833:15
**overheard** 813:6
**overhearing** 801:10
**Overruled** 888:24
**overworked** 902:21
**own** 814:8 818:8 825:4 846:17 849:13

# P

**p.m** 855:19 858:8 872:7 906:23
**page** 875:18,19
**pages** 901:16
**paid** 906:10
**pamper** 875:1
**paper** 898:9,13,19,21 899:2,3,4,9, 10,12
**participate** 872:9
**particular** 843:9 864:8 871:24 901:7
**party** 871:7
**pass** 797:22 798:24 807:11 810:2 811:5 814:5 815:1,3,15 817:10 818:3,12,17 838:16,20 842:18 844: 7 859:25 860:1,4,5,11 885:9,15 889:14,17 890:16 891:11 894:2 901:13
**passage** 902:6
**passed** 798:21 800:13,17 801:13 807:5 811:13 814:4,10 817:11,17 818:16 836:12 844:10 859:19,21 884:3 885:2 890:7 891:2,4,19 892: 19,25 903:8 904:10
**passing** 807:9 818:24 836:17 883: 5 889:23 890:11,12 892:22 893:1,3 902:18 903:5,19,23
**past** 856:23 863:14 873:12
**Pat** 851:21
**PATRICK** 791:15
**patrol** 847:13
**pause** 869:1
**pen** 842:13,17 844:7,11 884:2 898:9,12 899:1,9
**Pencil** 898:16 899:3,4,10,12
**pencils** 898:17
**pending** 849:20 853:18 854:12 855:4
**people** 800:9 803:19 805:15 824:6 833:1 835:5 861:25 862:3,4 869:7, 9,10 873:17 900:19
**percent** 895:7
**perform** 884:8
**period** 842:5 882:18 887:15 888: 18
**periods** 897:21
**person** 796:14 799:12 813:13 818:3 823:7,10 830:11 856:24 905:10
**personal** 882:21 901:24
**personally** 809:21 850:12,16
**personnel** 812:15
**pertaining** 853:12,18
**phone** 868:11
**physical** 856:12
**physically** 807:23 848:25 856:7 846:13 869:23

**piece** 898:9
**pieces** 885:25
**place** 814:25 829:18 830:22 836:1 872:2,5,6 878:25 902:9
**placed** 802:16 815:6 835:6 844:8, 9 862:7,11 865:13,15 866:3 879:2, 5 883:24
**placement** 866:1
**placing** 870:20
**Plaintiff** 791:4,12
**planned** 877:3
**pleasant** 845:23
**please** 793:12,16,17 851:4,6 880: 22 881:4
**point** 802:6,18 819:2 826:22 831: 22 833:22 848:5 854:7 881:24 882:11,18 883:22 886:12 898:13 901:11
**position** 847:18 876:22 903:4
**possession** 895:2
**possible** 803:11 810:2
**possibly** 846:23
**post** 827:25 828:2,5
**postage** 899:7
**pounding** 804:23 805:1,20
**practice** 818:5 824:5,8 862:7 882: 7 896:5,12
**preference** 850:11 905:9,12
**prepared** 825:25 826:1
**presence** 845:11
**present** 819:18 833:10 836:5 848: 24 849:1
**presently** 855:10
**pretrial** 841:14
**pretty** 803:15,22 832:4,10,19 833: 14 873:19
**previous** 878:11
**previously** 870:8 881:18 905:21
**print** 907:11
**prior** 797:6 874:4
**prison** 798:7,7 834:7,13 873:18
**prisons** 861:24
**private** 826:5,6 868:18
**privilege** 889:6 898:25
**privileges** 806:1 809:12 856:13 874:19 878:13 896:16 897:23
**probably** 848:4 849:4 850:3,5 855:18 860:25 861:13 871:25 885: 11 887:11,14,16 888:3 889:25 890: 1,4,6,7,22 891:6 892:25 895:7,11 897:19 898:12 900:16 904:25 905: 1,16
**problem** 823:21 847:2 849:22 850:13 884:9 887:17,22 893:23 894:22
**problems** 845:24 852:5 874:3 893:16
**procedures** 862:2,3
**proceed** 876:25
**Proceedings** 906:23 907:8
**procured** 852:11
**profile** 874:23 875:1,3 877:13,14 878:20,21
**prohibited** 859:12,14
**promised** 872:25
**pronounced** 793:25
**properly** 823:23
**prosecute** 840:25
**prosecuted** 841:3
**prosecutions** 873:11
**prosecutors** 870:24
**protected** 846:9 848:22
**protecting** 849:5
**provide** 870:5 898:8
**provided** 841:16 866:15 898:15 899:13
**providing** 898:17,19,21
**psych** 862:18
**public** 845:9 878:18
**published** 877:12
**pulled** 830:8,12 847:14
**pump** 829:23 847:10
**pumping** 833:3 847:23
**purportedly** 853:13 863:23
**purpose** 846:7 878:15 882:22 894:19
**purposes** 895:25 897:14
**pursuing** 806:25
**push** 894:17
**put** 799:9,9 802:18 820:5 833:23, 23 834:13 874:7 883:23 902:9
**putting** 849:3
**puzzle** 796:19 797:1 885:23,23,

Case 3:09-cv-33064-MW/Biers    Document 284664    Filed 06/23/11    Page 9 of 100

24 887:4 891:20 899:20
**puzzles** 885:18,24

## Q

**quarters** 833:1
**question** 829:13 830:2 839:8 848:7 854:16,20 861:23 864:13 871:15 876:19 878:3 886:7 890:10 896:10 902:4 905:18
**questioning** 840:8 843:9 854:14
**questions** 832:15 839:25 846:16 847:16,21 848:3 853:10,12,17 864:1,5 872:18 876:12 877:24 881:23 886:17 887:1 900:17 901:1 902:24 905:17
**quick** 904:24
**quiet** 872:13
**quieter** 861:18 872:8
**quit** 861:21
**Quite** 812:12 873:21 886:21 889:16

## R

**R-i-c-h** 881:7
**radar** 849:16
**raise** 793:12 845:5 880:22
**Rapids** 791:20 862:24 868:22 875:16 876:5,13 877:2 907:22
**rat** 863:12 871:12
**rate** 806:3
**rather** 846:10 878:25
**rattling** 793:10
**Ray** 868:18 876:9 877:1
**re-advise** 854:4
**read** 818:4 845:18 868:3 892:11,13,16
**reading** 818:1 892:2
**ready** 793:22
**real** 812:20
**realized** 869:21
**really** 804:24 816:9 864:24 902:16
**reask** 871:15
**reason** 848:14 893:11 897:16
**reasons** 883:3
**rebuttal** 880:17
**rec** 895:25
**recall** 833:22 834:1 869:3 883:15,19,22 885:17 901:6
**receive** 805:25 807:19 814:14 901:19
**received** 875:4
**recently** 794:6
**reciting** 878:14
**recollect** 800:16 843:18
**recollection** 900:20
**recommended** 867:5
**record** 795:11 846:11 851:19 876:11 878:23 906:17
**recreation** 801:22 802:2,5 805:7,18 863:17
**RECROSS-EXAMINATION** 844:4 875:12 903:2
**redirect** 840:2,3 844:18 872:20,23 900:12
**reduced** 907:11
**reference** 868:25 878:7
**referring** 821:1 838:13
**reflects** 795:11
**regard** 809:17 890:24 893:6 895:22
**regarding** 852:13
**Regardless** 869:19
**regularly** 889:16
**related** 864:4 907:14
**relation** 804:4 843:15
**relationship** 846:4 849:7 859:22 873:20,22
**relative** 907:15
**released** 837:25 838:2
**relevant** 847:11,25,25 848:1
**reluctant** 813:20
**remarks** 843:10
**remember** 794:13 795:2 797:19 798:1,3 801:5,7,10,12,12 804:20 806:16 807:24 808:9,12,16 809:25 812:10 814:21 816:9 826:7 836:19,22,25 837:21 838:8,11,12,15,18,24 840:9 842:23,24 843:10,12 844:9 886:1,4,15,18,19 888:4,20,22,25 889:1,3,23 891:12 892:2,7,22 893:1 896:19 898:17,19,21 899:8,16,25 900:2 903:5,7,10

**remembering** 887:18,22 890:25
**remotely** 853:18
**removed** 795:12 888:13
**repeat** 878:4
**report** 796:4
**reported** 907:10
**Reporter** 791:21 905:18 906:10 907:7,8
**representation** 852:6
**representing** 794:12 851:22 868:1
**request** 897:13
**requesting** 793:5 906:6
**requirements** 880:10
**resident** 794:21
**response** 864:5,7,13 879:11 902:10
**rest** 834:7,14
**result** 859:15 866:25 873:4
**resume** 798:9
**resuming** 874:17
**return** 795:6 873:1
**reviewed** 841:13
**reward** 873:3
**Rich** 880:19,19 881:1,7,12 884:15 886:12,22 891:9 900:15 904:15
**right** 793:12 796:3 799:5 801:20 802:2 803:5,8,16 816:23 817:9 819:8,11,11 820:2,4 821:5 822:4 825:11 827:2,10 829:9,11 830:16,23 831:2 834:24 835:2,9 836:7 837:11,16,25 839:17 846:5 847:16 848:3,8,13 851:9 852:8,19 853:7,10,20 854:4,8,18 855:11 856:4 857:22,23,24,25 858:12,20 859:3 860:16 863:5 864:4 865:6,15 866:19 869:12,22 878:22 879:1,9 880:22 884:17 893:9,12 900:15
**rights** 846:9,11,13,16,24 848:22 849:6
**ripped** 876:8
**roaming** 812:14
**robberies** 870:14
**robbery** 855:5 867:9 870:11
**Robert** 846:22 847:20 852:13 853:13 856:24
**role** 865:25
**room** 835:10,23 846:14
**roommate** 798:12
**Ross** 862:19,21 863:9,12,15,18,19 871:6,10,13,16 872:13,13,15
**roughly** 861:8
**round** 906:1
**row** 815:14
**RPR** 791:23
**rule** 809:16 824:5 859:13 895:22 896:1,6,12
**rules** 805:5,5 824:2,10 859:9
**ruling** 845:16
**run** 800:21 902:20
**running** 849:17

## S

**safe** 891:7 903:14,15
**said** 797:11 798:4 800:8 806:4 808:17 809:8 815:24 816:15 817:11 820:20,22 821:20 828:10,12 832:8,11 834:6 836:9 839:9 841:25 842:2 844:12,13 858:2 862:13 865:12 867:5 871:8 873:25 877:13,15 885:11,17 886:17 887:20 889:25 890:23 895:5 901:2 903:8 907:11
**same** 807:8 819:12 822:7,12 840:16 847:7 856:20 857:19 861:25 869:10 870:3 871:13 872:15 873:12,17 890:4,6,7,11,12 893:16
**sanctioned** 818:24
**Sara** 792:8 793:13,19 794:4,5 883:13,16 884:5 900:24
**sat** 836:10
**savvy** 846:14
**saw** 819:18
**say** 796:15 800:9 804:3 808:21 809:4 813:11 818:12 819:17 820:24 831:9 832:20 839:13,15 856:4 859:21 861:13 863:12,21 864:12 869:20 871:23 872:11 873:20 879:16 885:23 886:6,13 888:21,25 891:7 895:15 903:14,15,18,21
**saying** 797:19 799:17 804:18 822:12 825:15 838:18 869:2 886:19 891:12 901:25
**says** 800:9 896:3
**schedule** 850:4,5
**scheduling** 850:13
**scope** 829:20 830:3,6 876:14,23 886:3 889:21
**Scott** 837:22
**screen** 856:18 859:1,5 860:17 871:19
**SE** 791:11,24
**SEALED** 791:6 801:2 834:2
**searching** 882:16
**seated** 793:16 851:5 852:21 853:6 881:4
**second** 796:15 806:21 819:7,10 822:2 866:21 869:2 886:23 896:21
**secretary** 868:15 904:22
**security** 862:2,3
**see** 796:18 810:15,22 812:17,17 813:25 819:24 821:4 822:21 825:11,12,16,17 835:20 843:1,5 849:12 850:3 860:17 868:23 877:4 879:22 882:23
**seem** 890:25
**seemed** 806:7 878:18
**seen** 824:16 853:7
**segregation** 856:11,11 874:21
**send** 817:21 834:6 876:6 877:3,10 898:24
**sending** 863:7 878:16
**sense** 870:7
**sent** 796:18 827:10 835:1 842:14 843:20 860:2,22 862:21 875:15 876:4,10 877:2
**sentence** 817:1 867:7,8,9,10
**separated** 862:9
**September** 850:4
**series** 850:2
**serious** 869:7
**Service** 874:25
**services** 862:8
**set** 834:13 843:12 904:22 907:17
**seven** 866:14 875:18,19
**several** 875:3
**shaking** 902:14
**share** 813:18 832:21 857:17,18 863:15
**Shared** 803:9 829:2
**shaving** 897:15
**Sheriff's** 881:13
**sheriffs** 843:6
**shift** 895:12 896:21,22 903:25
**shifts** 904:5
**shook** 857:5
**shoots** 835:9
**short** 806:21
**Shorthand** 791:21 907:7,10,11,13
**shot** 825:21
**should** 846:12 863:20
**show** 875:1
**shut** 811:11 812:8,20
**shutter** 811:12
**side** 893:11
**sign** 906:9
**signed** 794:15 826:3
**since** 849:23 856:2 892:1
**sinister** 869:5 878:25
**sink** 856:17
**Sioux** 850:1,17,19 904:25 905:1
**sir** 851:23,24 852:19 855:13,21 860:24 861:16 862:15 863:6 864:22 866:24 867:4,17 873:2 875:6
**sit** 798:2 800:17 811:18 835:13 900:21
**situation** 849:2 854:12 856:7 871:13
**six** 866:13
**slam** 812:20
**slide** 799:3
**slip** 811:20
**slot** 810:14 823:17,25 856:18 883:3 893:5,13,20 894:1,8 895:4,5,9
**slots** 823:18,20 893:7 894:20 895:8
**slow** 804:10
**slowed** 807:6
**smiling** 843:4
**Smith** 837:22
**snitch** 863:13 869:12,24 870:1 871:11
**Snitches** 869:14,14,16,18
**so-called** 842:16,21
**softly** 884:18
**soliciting** 845:12 869:8 878:24

**solid** 811:9 856:17
**solitary** 855:22 856:1,4,8,9 858:15 862:14 883:24
**some** 793:3 796:10 800:23 802:1,1,6,18 803:4 813:6,18 817:10 824:14 826:21,22,23 827:23,25 833:22,23 835:25 836:7 837:9 840:16,24 843:8,10 845:10 848:21 850:20 852:5 854:15 857:7 860:3 862:25 876:12,21 877:9,15 882:11 883:22 886:21 888:6 889:10 893:10 901:11
**Somebody** 796:17 798:22 813:4,14 815:7 835:16,20 836:17 859:10 868:11 894:3 899:6 905:24
**somehow** 829:23
**someone** 889:12
**someplace** 831:23
**something** 797:5 818:1 828:10 835:21 837:14,16 838:20 845:5 850:6 861:18 863:2 865:19 872:11 875:25 879:17 882:8 896:2
**sometime** 858:4 861:9
**Sometimes** 800:20 804:22 812:7 817:17,18 818:20 824:11,12,19 863:11 871:9 882:11,17
**somewhere** 821:18 868:22
**soon** 822:18
**sorry** 797:14 803:10 828:17 836:10 864:15 885:21 899:4 900:21
**sound** 847:2
**sounds** 848:13,14 849:10 851:9 874:19
**speak** 851:25 859:1,7 884:18
**speaking** 822:22 859:9
**Special** 836:19,25 837:21 876:2
**specific** 881:23 900:20 901:6 903:10
**specifically** 853:11 885:17 886:6,9,19 899:8
**specifics** 865:25
**specify** 828:18
**spell** 793:17 851:6 881:5
**spelling** 881:7
**spent** 861:24,25 873:17
**spiral** 849:3
**spiraling** 849:9
**spoke** 824:2 845:20 868:14,15
**square** 799:15
**squealed** 813:14
**stainless** 856:16
**stand** 851:14
**standing** 808:5 819:8 821:5
**standpoint** 847:5
**start** 804:23 874:8
**started** 832:16 842:4 892:1
**State** 791:21 793:17 817:3,4 851:5,18 881:4 886:9 896:2
**statement** 838:24 891:15
**statements** 801:10 832:13 833:9 835:24 836:7 840:21 870:6
**STATES** 791:1,3,10 793:1,3 854:9
**stating** 874:7
**status** 854:1 856:10
**stay** 808:24
**steak** 816:11
**steel** 856:16,17
**step** 810:12 879:13 904:16
**Steve** 877:4
**stick** 801:3
**still** 807:4 842:9 845:14 873:14 887:20 902:19
**stop** 832:20,22,24 837:7
**stopped** 808:6 822:13
**stops** 820:9,10
**store** 863:19
**STOWERS** 791:13 793:7,8,10,21,24 795:10 816:17 829:19 840:2,4 843:25 844:17,19,23 853:6,7 884:12,14,15 900:7 903:3 904:14 906:20,21
**strapped** 842:25
**Street** 791:11,24
**streets** 862:4
**strike** 800:5
**structure** 856:12
**stuff** 836:3
**stuffy** 893:12
**subject** 840:16 846:22 852:16 866:8
**subsequent** 798:11
**such** 802:8 812:17 889:10,19
**suggest** 830:7

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 10 of 100

Suite 791:11
supervision 907:12
suppose 862:22
supposed 810:25 818:11 831:18 866:25 889:7,9
Supposedly 843:3
SUPPRESSION 791:5,18
sure 828:11 849:10 854:7,20 860: 7,25 880:7,11 886:10,11,12,20 892:5 894:4 898:18,20 901:3 903: 4
surfaced 885:6
surveillance 835:18
Sustained 904:13
switch 894:14
sworn 793:14 851:2 881:2
system 869:21

**T**

table 852:21
take 793:2 799:5 801:2 813:5,7 814:2 825:22 826:10 833:18 872:5 899:19 901:13
taken 883:23 907:13
taking 869:1 899:16 900:21
talk 801:20 803:11 804:25 805:2 806:14,15 807:15,23,25 813:1,20, 22,23 826:5 834:22 837:1,4 850:22 856:19 868:11,13 871:12 888:15
talked 801:6,13 808:7 819:10 821: 22 823:1,3 826:10 831:18 834:24 836:10 857:4 862:5 878:6
talking 799:8 800:10 801:16 802: 12 806:22,23 810:7 822:24 833:1 835:4 836:19 841:22 863:11,12 871:10,11 900:14
talks 820:10
team 875:15 876:10 877:2
technically 845:14
telephone 850:14 851:25 905:5,9, 16
telephonic 850:10
telephonically 850:6
tell 795:24 805:2 814:3 816:5,7,8 821:20 823:1 826:4 831:7 832:16, 20,22,23,24 839:17 855:13 857:1 861:8 864:22 866:24 867:4 870:19 875:14 876:9,10 877:1 893:12
telling 813:11 832:18 836:25 838: 8 842:15 893:19 898:3
tells 847:7 870:7
ten 856:15 860:18 863:15 873:12 887:12 905:3
tend 854:17
Teri 836:8 900:24
term 869:18
terms 871:12
Terry 831:17
testified 793:15 817:9 825:3 829: 8,10,15 840:17 841:5 851:3 881:3, 18 890:24 891:1,1,9
testify 794:9 840:5,16,19,21 852: 12 853:20 876:21 885:5 890:19
testifying 873:4
testimony 793:3 803:4 819:3 820: 12 824:18 830:9 834:17,20 839:7 843:13,19 845:20 848:16 873:1 880:17 890:16 891:4 904:19
Thank 816:18,20 843:25 845:2 849:17 851:4 854:23 867:17,22 875:6 878:2 879:12,13,14 881:9 891:8 900:7 904:14,15,21 906:21, 22
that's 799:22 806:5 810:11 815:23 816:17 825:15 835:21 841:4 842:4 843:19,25 844:23 845:7 846:1 847:1,18 850:13 853:14 855:7,7 859:12 861:21 862:16 865:12 867: 18 872:7 875:7 885:8 894:10,22 896:22 898:24 901:5 903:15 904: 14 905:4 906:5
theirs 800:3
theme 812:25
themselves 885:25
there's 801:22,22 803:4 811:9 814:22 826:22 827:18 828:12 835: 10,16 845:9 847:23 855:22 859:2 862:14 894:14 895:5,6 896:2
thereafter 885:7
thing 822:12 849:19 854:24 870:3 890:12 905:5
things 814:1 826:21 849:9,12 850: 20 872:8 877:15 900:4 901:11

904:6,8
think 795:15 797:11 801:21 808: 11,13,15,17 809:8,25 815:23 828: 12 830:5,9 839:1 842:6 843:10,22 847:3,11,24 848:2,4,23 849:13,19 850:7,8,9 854:6,11 856:6 869:5 873:25 876:16 878:18 879:2 880: 2,2 882:16 884:16 885:4 886:19 892:19 895:11 896:2 906:13
thinking 816:10
Third 817:7 839:15 858:7,10 873: 25 874:13,16
those 807:11 810:23,24 811:4,4,5 814:10,17,25 815:3 817:17 821:18 827:23 833:10 847:16 870:17 882: 12,15 888:1,6,9 893:25 895:7 897: 23 900:3 901:16
though 813:20 842:16
thought 816:15 846:10 849:1,1 877:11 878:25 890:10
threaten 872:12
threats 863:10
three 804:22 805:3,8,8,12,16,17, 23 806:4 808:24 809:14 824:19 838:2 839:14,23 862:22 874:11 886:17 896:1,6,12,19 904:6
three-and-a-half 866:11
thrilled 905:3
throughout 885:19
time 793:21 794:17,20 795:18 796:7,9 797:19 802:6 807:3,5,9,12 814:21 815:6 817:25,25 819:6,7,8, 10,13 821:17 824:23 837:9,10 838: 8,17,20 839:9,15 842:5 850:3 856: 20 857:10 869:10,10 872:1,4 882: 10,18 885:4,12 886:21,23 887:15, 20 891:16,23 895:7 896:22 897:21 898:8,11,13 899:11,18 901:8
times 800:16 804:20,22 805:3,8,8, 12 806:4 808:12,15 809:14,20 812: 10 819:6 824:17,19 834:21,23 839: 14,20,23 863:16 869:8 872:11 882: 3 887:14,19,24 890:3,15,17,19,24 891:2,5 896:1,7,13,20 900:18 903: 21
today 793:6 798:2 800:17 824:18 840:17 845:21 851:23 855:15,16 868:10 872:16 873:1,4 880:1,7 884:20,24,24 886:22 900:20
together 819:10,24 827:13 833:23 863:17 864:10 874:8
toilet 856:16
told 813:12,13 828:8 829:5,6,11, 13,17 830:10,21,24 831:1,4,10,15 832:4,16 834:4,21 837:2 841:4 846:14 847:22 863:9 870:4 873:6 874:18 875:18 877:3 879:19 880:4 889:13 901:23
took 831:4 843:24 868:20 872:2,6 877:14
toss 799:4
towards 875:1
tower 835:11
town 849:22
track 847:7
transcript 830:15 832:6 841:13, 20,25 842:3 905:19,21,22 906:6,12
transcripts 832:1,12
transfer 873:24
transferred 866:12 874:13
transporting 905:2
tray 799:3
treatment 875:4 876:2
tree 831:23
trial 830:15 832:1,5,12 849:23
tried 799:14 817:20 836:13 837:1, 4 849:23,24 850:1 896:24
trip 905:3
trouble 859:15 869:8
true 855:3 891:15 894:10 902:18 906:5
trust 817:20
try 824:5 833:6 850:5 872:11 895: 24 896:4,25 902:5 904:23
trying 812:25 845:8 863:15,18,20, 22 869:9,23 900:17 902:19
turn 860:24 879:17 894:15
turned 820:20
twice 800:20 801:18 819:3
two 793:5 798:18 802:15 806:17 808:13,15 819:6,7 821:18 827:22 830:24 831:1,2 833:1 855:22 856: 10 862:14 865:4 892:20,23 893:8

type 873:3 898:14
typed 826:16
types 900:4
typically 891:22 893:10

**U**

U.S 840:24 862:8 874:24,25 907: 21
Uh-huh 804:9 815:17 839:11
ultimately 813:18
uncle 813:15
under 854:9,18 899:5
understand 793:4 830:1 834:8,10, 12 853:15,19,22,23 854:8,21,22 860:7 864:20 868:16,18,25 873:6,7 884:22 886:25,25 890:5 896:10 903:4 905:14
understanding 853:12 854:14 867:15 902:16
understood 884:23 906:2
unique 823:6
unit 874:21
UNITED 23:1 791:3,10 793:1,3 854:9
unless 800:3 876:20 880:2 889:10
until 850:4 861:20 868:10
unusual 800:6
up 799:9 804:25 805:3,12 808:23 809:18 818:21,23 825:4,11,21 826: 12,16 828:14 829:17 831:24 834:2 835:22,22 836:10,16 843:7 849:16 859:23 860:8 861:16,20 862:14 874:6 876:8 883:14 888:1 892:9 895:13 896:19 904:22
upon 897:13
upset 874:10
upstairs 852:23
us 797:18 808:6,23,24 839:17 851:5 855:13 858:5 864:22 873:6 874:18 890:2 893:19
use 838:10 874:5,15,17 895:22
used 807:8 815:15 831:14 865:1,2
using 838:9,12
usually 861:17 872:6 874:24 884: 18 893:9 894:21 895:11
utensils 898:14
utilize 814:25

**V**

variety 897:14 903:6
vent 823:25
ventilation 823:21
veracity 876:17,19
verify 877:6
versa 882:1
versus 793:2
very 842:5 845:22 861:7 869:7 871:12 872:21 874:10 884:19
vibrations 857:16
vice 882:1
victims 834:1
video 835:6,8 836:2 905:6
videotape 831:4
Virtually 904:3,9 905:7 906:13
visibly 848:24
visit 897:8
visitation 883:1
visiting 809:13,13
visits 861:20,21 872:7
voluntarily 834:23 835:1
volunteer 840:13
voucher 906:10
vs 791:5 793:3

**W**

waiting 849:18
waive 880:10
walk 808:6
walked 797:18
walking 799:4 814:19 819:12 820: 2,3,6,13 874:8 900:23
wall 803:9,11,16 857:15,17,18 858:23 859:3
walls 796:17
want 817:21 832:16 834:18 837:2, 8 839:16 854:7,20 859:1 879:17 880:11 881:23 889:1 891:3 904:23 905:1,18
wanted 796:20 797:21 813:2,3 816:11 834:15 837:6 838:18,21,22 839:4 859:25 864:23,24,25 874:1,3

894:6 900:10
wasn't 802:20 803:15 818:5,7 819:7 830:16 849:25 864:24 871:2 878:14 884:9 895:14,16 897:17,19
watch 863:21
Watson 791:15
way 793:9 800:5,23 803:20 804:11 805:15 810:11 811:20 813:2 825: 21 827:25 828:6,12 869:5 870:20 877:19 878:8 883:4 884:2 891:22 893:4 894:7 901:3,10
we'll 825:22 849:11 850:13,22 904:22
we're 793:2 794:10 802:11 806: 22,23 815:5 829:24 847:2 849:18 900:14 902:19 905:12
weapon 831:10,10
week 805:8,9 809:14 822:4,5 839: 23 840:6,18 841:6 849:24,25 850:2 861:13,14 871:25 896:1,7,13
weeks 855:15,16 856:23 866:11
well 799:20 801:22 803:15 806:10 811:4 814:18 824:4 825:22 827: 18,21 829:5 830:1,25 831:15 832: 11,15,19 835:8 836:5,8 848:9,20 850:6,15,18 852:20 856:9 857:20 858:1 859:21 860:11,14,16,20 861: 17 862:10 863:9,14 864:7,21 866: 10 869:5,18 871:8,23 872:11 876: 14 877:19 878:18 886:23 888:4 889:13 890:22,23 895:16 897:14 904:21 905:20
WESTERN 791:2
What's 816:24 856:7
whatever 846:1 854:1 860:1 882: 17 888:15 903:6,22
whenever 859:24
Whereas 857:15
WHEREOF 907:17
whether 827:24 830:3 831:7 832: 6 848:25 865:7 883:9
white 834:2
Who's 793:5 851:11
whole 796:7 803:17 812:21 843: 23 856:20 903:16
whom 820:24
Will 793:6 794:21 834:6 843:11 846:21 847:8 854:6 882:12 905: 16,16
Willett 794:15 826:4 868:5,7 869:4 906:3
Willett's 868:4
WILLIAMS 791:10 816:19,20,22 829:22 830:5 839:25 843:9 844:2, 3,5,15,24 845:1 847:4 848:4,9 849: 10 850:8 867:20,22,24 872:18 875: 8,10,13 876:16,20 879:9 880:16,18 881:8,9,11 884:10 888:23 900:8, 10,13 902:2 903:1 904:11,20 905: 25 906:18
willing 813:9
willingly 830:10
window 802:5,11,11,12 803:3 804:3,15 805:1,21 806:14,18,19 807:4,12,16 811:12 812:3,5,7,11 815:13 835:17 856:17 897:5,9
windows 801:17,21 802:1 804:15, 23 810:16,20,23 825:10,13,14 833: 14 835:10,12
within 797:23 799:12 801:23 805: 22 807:18 808:9 830:5 882:5 894: 11
without 829:12,12 830:11 832:14
witness 793:7,14,19 813:15 845: 2,4 848:7 851:2,7,10 854:22 867: 19 871:2 879:1 881:2,6 890:10,18,22 891:6 902:7, 10,12,18,23 904:17 907:17
witnesses 793:5 848:21 880:14
wonder 856:5 877:23
word 815:7 857:6 867:25 875:19
words 865:1,2 877:7
work 831:19 864:14,16,17,18 865: 20,21,22,23 896:21 906:11
worked 869:21 904:4,9
working 828:17,19 873:10 895:2
worth 846:1
wouldn't 804:24,25 806:11 831:24 869:20 889:12 897:22
write 826:12,25 835:22 842:17 879:19 884:2 898:23 899:6 900:5
writing 869:2 898:14
written 798:18 836:16 877:6,8

KAY C. CARR, CSR, RPR

Page 7

**wrong** 806:12 869:23
**wrote** 818:23 828:8 835:1,22 842:13 877:13,14,20 892:6,9

## Y

**yard** 801:18,19 803:3 804:4,16 805:6,11,14,25 807:15,21,25 808:15,18,19 809:2,14 810:18 812:2 815:14 819:5,9,24 820:7,19 821:1,2,4,7,8,12 822:8 824:4,6,20 839:9 883:14,18,18 895:19,22 896:6,15 897:5,13
**year** 794:13 867:10 900:15
**years** 817:2 861:24 863:15 867:6,7 872:13 873:12,13,16,18 881:16
**yesterday** 845:22 852:1
**yet** 829:2 832:22
**young** 852:20
**yourself** 826:25 837:18 854:5,10 873:7 889:10
**Yup** 814:24

## Z

**zealous** 849:5
**Zoss'** 845:7


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,)
         ) NOS. 00-3034MWB
   Plaintiff,  ) AND 01-3046MWB
         )
vs.       ) MOTION FOR BILL OF
         ) PARTICULARS
ANGELA JOHNSON,   )
         ) PAGES 1 THROUGH 31
   Defendant.  )

* * * *

APPEARANCES

   PATRICK J. REINERT, Assistant U.S. Attorney's Office, PO Box 74950, Cedar Rapids, Iowa 52407-4950, appearing telephonically on behalf of the plaintiff.

   DEAN A. STOWERS, Attorney at Law of Rosenberg Law Firm, Insurance Exchange Building, 505 Fifth Avenue, Suite 1010, Des Moines, Iowa 50309, appearing telephonically on behalf of the defendant.

* * * *

   The telephonic motion for bill of particulars held before the Honorable Paul A. Zoss, Judge of the United States District Court for the Northern District of Iowa, Western Division, at the Federal Courthouse, Sioux City, Iowa, on Wednesday, November 7, 2001, commencing at 10:07 a.m.

* * * *

   Reported by Jami L. Johnson, CSR-RPR-CP.

* * * *

SCHUETTS REPORTING
CERTIFIED SHORTHAND REPORTERS

P.O. BOX 1325
SIOUX CITY, IOWA 51102-1325
PHONE: 712-239-1300

THE COURT: I understand, Mr. Stowers, you're making the argument for all counsel --

MR. STOWERS: Yeah.

THE COURT: -- with respect to both of these matters. We have basically a bill of particulars that, I believe, is addressed to and filed in both cases. Is that correct, Mr. Stowers?

MR. STOWERS: Well, there was an order entered by Judge Bennett consolidating the new indictment with the old one. The motion for bill of particulars that was filed really goes to or is referenced by the count number of the indictment that was filed on August the 30th of this year.

THE COURT: So it's 01-3046. That's the --

MR. STOWERS: That's the number that's on the indictment that was filed on August 30, and I put both numbers on there, for lack of a better idea.

THE COURT: And that's fine. There's no problem. I think that's the way to handle, under the local rules, a case that's consolidated. I'm just -- I want to make sure I am open to the right indictment as we talk about it, and you're talking about the indictment that was filed August 30, 2001; is that correct?

MR. STOWERS: Right.

THE COURT: Okay.

MR. STOWERS: Ten counts.

THE COURT: And I have that available and ready. Mr. Stowers, I've read your brief and -- or at least the brief filed on behalf of Miss Johnson, and this is a serious matter, and I want to give you a chance to argue, so why don't you just present any argument you wish in addition to your brief?

MR. STOWERS: Well, what we have asked for as set forth in the motion in the brief is a bill of particulars with respect to -- There's really two sets of counts as you can see from the new indictment. Counts 1 through 5 charge a series of five separate killings on two separate occasions in 1993.

The dates specified and the indictment in Counts 1 through 5 alleges that those killings were done in -- essentially in furtherance of a drug conspiracy -- a methamphetamine conspiracy that is alleged to have occurred from 1992 -- or between, I should say, 1992 and the year 2000, an eight- or nine-year time period.

And one of the essential ingredients of that charge, which is under Section 848(e) of Title 21, is not just that there be a killing but that it be done in furtherance of or while the person was engaging in the underlying drug trafficking offense.

And in this case we're talking about a conspiracy to distribute methamphetamine, so one of the things that

we've sought in our bill of particulars is that the government be directed to disclose in a filing the names or identities of all known but unindicted coconspirators who were members in this alleged 1992 to 2000 conspiracy that the killing that occurred in 1993 was done in furtherance of, and that's one of the principal requests with regard to Counts 1 through 5.

Now, we've also asked that the government identify for us, so that we have a better idea of what the parameters of this conspiracy that she's charged with are, the overt acts that were perpetrated in furtherance of the conspiracy separate and apart from the alleged killings. And we've provided the Court with the authorities for those things.

I think coconspirators can be important to know in a case like this for all the reasons that I know you're aware of, Judge, but what we've got here is a case where apparently we're talking about an eight- or a nine-year time period. We're probably going to be dealing with a number of legal issues as well as evidentiary issues including the admissibility of potential coconspirator declarations occurring during that eight- or nine-year time period.

There may be some significant questions -- and I sense that there are going to be -- about the manner in

which this offense is alleged versus what they can actually prove at the time of trial and then variances between the indictment and the proof.

And I don't want to get into all that now, but I sense that there are some real questions that we have about the indictment on Counts 1 through 5 that will be largely eliminated for us and for the Court when they identify who the known but unindicted coconspirators are.

As for Counts 6 through 10, what we have is the same statutory violation which is Section 848(e), again under Title 21. Really what they've done, which is not at this point objectionable to us, is these are really what I call an alternative means of committing the same statutory violation, and it's just a manner in which they were charged; but they're -- these killings rather than being killings -- And, again, they're the same persons that were purportedly killed in Counts 6 through 10 as were involved in Counts 1 through 5.

These counts, though, allege that the continuing criminal enterprise killing theory under 848(e) -- There's two ways that you can have liability under that particular subsection, and one way that you can do it is by committing an intentional killing in violation of the drug law statute, the general drug offenses; or it can be done while working in furtherance of a continuing criminal

enterprise.

And Counts 6 through 10 concern the continuing criminal enterprise theory of committing that offense, and so these -- Just like the prior five counts alleged, conspiracy is the underlying crime that was being committed that the killings were done in furtherance of. These counts allege that it was a continuing criminal enterprise that the killings were done while Ms. Johnson was working in furtherance of that continuing criminal enterprise.

And, of course, the continuing criminal enterprise as distinct from a conspiracy involves a number of different legal elements where a conspiracy simply involves an agreement between two or more people to commit the unlawful drug activities. And some of the legal elements that are required is that they're going to have to prove the requisite number of people that were acting in concert with one another. They're going to have to prove, for example, that there was an actual organization over which somebody was a manager or supervisor, and they're going to have to prove that there was a series of underlying felonious drug trafficking offenses.

And in order for us to really know what the parameters and the outlines are of Counts 6 through 10, we need to know those things so that we know what the continuing criminal enterprise offense is that Miss Johnson

is alleged to have worked in furtherance of and in furtherance of which these counts were perpetrated.

So we've asked for the names of the alleged supervisees as well as the names of the alleged supervisors so that we can start to work through those issues and understand who those people are and develop many possible defenses that might exist as to whether or not they were, in fact, supervisors or supervisees and whether or not they were acting in concert with one another.

We've also asked for them to specify the underlying offenses that were committed, again in the same time period, '92 to 2000, as part of the series of violations, and the government is required to prove the series in order to prove the continuing criminal enterprise offense.

And there's some cases that deal with issues of jury anonymity and whatnot with regard to which offenses were perpetrated in furtherance of the series that are out there, and those can be significant when we start to analyze these counts which are just -- really frankly these counts are bare-bone counts.

So we've asked for these things so that we can understand what the charges are, pin the charges down a little bit better, prepare our defenses and get ready for trial. And obviously we're going to have some complex

issues as we go forward also with jury instructions and things like that that the parties in court are going to have to be working on, so everybody's going to need to know with more specificity than what these counts provide what the particular charges are and what the particulars of these alleged offenses are that are charged in this latest indictment.  And so that's why we filed the bill of particulars in this case, and that's really why we think we need one.

THE COURT:  Let me ask you, Mr. Stowers, a real important part of the case law that deals with bills of particular relates to other information available to the defense.  Obviously, the more information that's available, the less likely it is the Court will order a bill of particulars.

In the ordinary case in this district where there's a stipulated discovery order, the discovery order, in my view in most of the times I've dealt with bills of particular, has fully satisfied any of the cases and situations where a bill of particular might otherwise be appropriate.

In this case I note that in the older indictment, the earlier indictment -- in 00-3034 there was entered a stipulated discovery order apparently with the joint agreement of the attorneys for both sides.  I don't see

such an order was entered in the second case, but as a consolidated case and just because of the nature of the two cases, I'm assuming, Mr. Reinert, that you're -- Clarify me. Are you considering that the discovery order applies in one case and not the other, or what?

MR. REINERT: No, Your Honor. We consider that the discovery order applies in both cases under both case numbers. In fact, Mr. Willett and I are working on kind of a unique one-of-a-kind modification to actually give the defense greater access and additional materials.

THE COURT: Mr. Stowers, what is the discovery you believe you've received? Why don't you describe it for the record and tell me what it is that you haven't received? For example, the discreet things you've requested, one would be unindicted coconspirators. If those are all named within the discovery materials, whether they're identified as such or not, whether they're at least named and indicated that they are involved in a drug conspiracy or in a criminal enterprise, to me that's enough.

The government doesn't have to make some kind of list of the coconspirators and then be bound by -- to prove that all the people they have listed are in the conspiracy at trial and to -- you know, and to not be able to prove other people whose names come up are also part of the

conspiracy. I just don't think that that's the purpose of a bill -- bills of particular.

But, in fact, if the discovery is limited and there's potential people that just the government's refusing to provide you with or there are people or areas where the discovery file is not addressing things and you need some assistance there, that may be a different story. Why don't you describe for the record what the status of discovery is from your perspective?

And then, Mr. Reinert, I'd like you to clarify that matter from your perspective.

MR. STOWERS: Well, there's a variety of discovery that's been provided. There's a bunch of grand jury testimony, agent reports of a variety of subject matters and documentary materials as well in the nature of several raw documents and that sort of thing, so there is a wide variety of discovery.

It's one of those cases actually where there's a huge volume of discovery, and in some ways -- I know what your point is which is, if it's in discovery, then why do you need a bill of particulars? I guess --

THE COURT: That's what -- that's not my -- that's actually not my point. That's the point of the case law. You know, I certainly did a lot of civil practice. I know you do, Mr. Stowers, as well. It certainly would be

nice to have something in the federal criminal law akin to the civil interrogatory, list all people with knowledge of relevant facts, that sort of interrogatory. But the cases have said that's not appropriate in federal cases, particularly where there's -- the information is provided in another format.

MR. STOWERS: Well, I -- I dispute that the information, first of all, is provided.

THE COURT: Well, that's my question.

MR. STOWERS: I think the issue in a bill of particulars is what is it that the government is alleging, and that's something that the discovery doesn't answer, and --

THE COURT: Well, the --

MR. STOWERS: -- it's not for me to say what the allegations are or to reach conclusions about that. It's for the government to do that. That's not the role of the defendant.

And the cases, frankly, are all over the map on this, but they do recognize that it's a discretionary thing with the trial court whether or not -- whether or not a bill of particulars is ordered, and there are factors that are to be considered, one of which is what do you get in discovery.

THE COURT: I guess my first question is -- I

know we've been through these bill of particulars cases before, and I haven't looked yet specifically at your citations; but my -- I agree they're all over the map because they deal with a bunch of fact-specific cases, but my recollection is and my prior research indicates that in those cases where the government has given full, open-file discovery or something approaching that, that bills of particular have almost unanimously been denied in those situations.

Now, you're saying you want to -- What I hear you saying is you want to pin the government down on their theory, and that's an admirable goal; but I don't think that's what the legal purpose of a bill of particulars is.

The purpose is to provide you with information you need that -- not in the way of discovery, but you need to properly prepare your case based on issues such as whether you're going to have preclusion from any result in the case and you make sure you've got -- you know what this case involves as opposed to some other type of thing the government could produce or just what you essentially need to respond to the indictment but not just -- not to pin the government -- I don't think it's permissible just to try to pin the government down.

MR. STOWERS: Well, I -- I don't know. You know, if you get into the issue of motivation, well, sure, we

want to pin them down, but we want to know what the charges are. You start off with the proposition that the indictment is supposed to give us enough notice of what it is that this woman is charged with apart from just citing to a statute and paring back the language of the statute so that we know. And in this case these counts are about as vague as you could -- as you could have conceived of.

THE COURT: Well, you know, the law with respect to drug conspiracies has eliminated the pleading of overt acts, and right or wrong -- When I was a prosecutor, I'll tell you, I did a drug indictment once, and I included a whole group of overt acts in a drug case. And the judge promptly struck it because you're not supposed to do that, and the case law's pretty uniform that it's not necessary. In fact, it's not permitted.

So I don't know that overt acts exist as a -- as anything that -- even exist at all in drug cases. Therefore, it would be pretty hard to have them list something that isn't even a part of the law. You know, overt acts has no meaning in a drug case. They don't have to prove that.

MR. STOWERS: Well, they may not have to prove it, but when you have a case where you know that there were overt acts committed -- that the government is going to claim were committed in furtherance of it --

THE COURT: Well, in the sense of a --

MR. STOWERS: -- knowing what they are will aid the defendant in knowing what the crime is, and that's fundamentally what we're asking for. And there are cases that have ordered that very thing on drug conspiracy counts, and they rely on the fact that in a drug conspiracy count, the very fact that the government is not required to include overt acts in the indictment is one of the best arguments for why a bill of particulars requiring such an overt act would, in many cases, be appropriate because the indictment itself does not give much notice. And there's cases that say that that are in our brief.

And the same thing is true of a continuing criminal enterprise where we aren't really talking about overt acts. We're talking about crimes that the government is required to prove that were committed as a part of a series. That's an element of the offense. It's not included in these last five counts of this new indictment.

But -- And there's many cases that have ordered the government to provide lists of known but unindicted coconspirators. In fact, the cases on that topic actually support rather than disfavor granting that type of a request in recognition of the fact that it's easy for the government to do.

But this case, as far as the discovery goes, one

thing that needs to be realized is, the more discovery you get, in some ways the more cloudy the issues become than clear. And so in this case we've got almost so much discovery that by the time we're done going through it, we're actually less clear about what it is that she's charged with than we were before we got it.

And that's like when you dump a dump truck in somebody's lap and say to them, well, you got all the stuff now -- which is where we are at this point -- figure it out. That's really what a bill of particulars is for, and that's what clarity in the indictment is for, and that's why we've asked for these things because we think we need them. And that's, I think, what we're asking for, so I'll just leave it at that.

THE COURT: Okay. Mr. Reinert, why don't you respond to the discovery -- to what you believe the discovery has entailed so far.

MR. REINERT: Well, Your Honor, I can summarize, I think, where we're at on discovery. The file itself is upwards of -- The discovery file we've made available to the defense is upwards of 15,000 pages or so excluding photographs. Each photograph and audiotape also has a separate Bates number as a separate document, so excluding that, papers we have probably 15,000 pages or so we've made available.

Included in that is a transcript of a sentencing hearing of Dustin Honken which was a very detailed, lengthy sentencing which I think the defense already has a copy -- actually has had in their office that they obtained from the court reporter.

That sentencing hearing -- discussion where the government attempted to prove that it was an organization of five or more persons, drug crimes, in various overt acts that occurred during the course of that charged drug conspiracy which would certainly be relevant with this defendant's charge with regard to Mr. Honken, so that would be a good place to kind of start.

THE COURT: Are you saying that's a general outline of your current case?

MR. REINERT: That's a general outline of -- of a substantial portion of at least the drug involvement. It didn't focus extensively on the homicide information, but we've got a lot of other information on that since as well.

But that focuses a lot on the manufacture of methamphetamine in Arizona and the ties between Mr. Honken and two of the victims in drug trafficking and some other features, so we -- And we had a number of people who testified who were coconspirators -- admitted coconspirators with Mr. Honken. We have at least two

volumes of grand jury transcript, three-inch binders, that have a variety of people talking about admissions made by the defendant as well as coconspirators in the drug case, discussing their drug trafficking activities not only the conspiracy -- in the conspiratorial agreement but also the specific acts committed to carry out or further that agreement.

The discovery file -- Besides those two items, we have numerous volumes of witness interviews that are organized in -- like, by the DCI file and all of the witness interviews related to specific topics, so it's not, just as Mr. Stowers will say, a dump truck. It's organized because that's the same file I use, so it's organized for us to be able to find what we need to find by event, by investigative agency that the DCI breaks their reports out, different events that occurred, the reason they occurred, prisoner interviewers, occurrence interviews. The Iowa Commissioner of Narcotics organized their files in the same way.

We took it a step further and organized it by time period when we talked about the D&E reports from 1993 through '96 versus the ones from '96 through '98. We've labeled those, identified those, so we can assist the defense in understanding that these reports deal with this specific time period. So we've taken a lot of steps in the

open-discovery file not only to disclose the information but to disclose it in a way that was user friendly.

We've also taken additional steps with Mr. Willett and Mr. Stowers and I -- We discussed ways to get the information more accessible to the defense team, and we're in the process of working -- We, in principal, agreed to modify the stipulated discovery order, and we're in the process of getting that modification order completed and -- by the parties to get to the Court.

THE COURT: Would you summarize -- without binding anyone -- either side, summarize what the current status of those negotiations are? You know, just generally what are you working on getting that modified to?

MR. REINERT: Currently the current discovery order basically, as the Court knows, allows the defense can dictate virtually anything they want from the file but, of course, that can be kind of a labor-intensive process. So in order to help the defense cut some of that labor out, Mr. Willett has agreed to make certain security arrangements at his office to ensure whatever material we give him would be and remain secure.

In the letter we exchanged, we discussed providing a hard copy of the grand jury transcripts, allowing him to check out a volume of -- one of the AC volumes where he would have a volume -- one of the DCI

reports, for instance. He could check that out, take it to his office, go through it.

And instead of having to sit here and mindlessly dictate the whole volume, he could go through it and selectively dictate, you know, whatever he wanted to out of the file to assist him in the comfort of his own office and with his support staff being able to use a regular full-sized computer as opposed to a laptop to pull the materials out.

And he can even take those original agency documents to review them personally with the defendant in the presence of a defense counsel so basically allow him to check out a volume at a time --

THE COURT: Okay.

MR. REINERT: -- at his leisure. I think that's probably the best thumbnail I could do on that.

THE COURT: Okay. Does that conclude your description of the discovery, basically?

MR. REINERT: In addition to the witness interviews that are contained in the agency reports, there are a number of raw documents, phone tolls and things of that nature, and we have provided -- Mr. Stowers can correct me if I'm wrong -- probably a box of materials of phone tolls, you know, phone information we got from pen registers, telephone bills, items seized from --

photocopies of items seized from Miss Johnson or places that we believe are controlled by Miss Johnson, interview reports of Miss Johnson when she was interviewed. So I don't have an exact page count on that, but it's probably close to a box of those types of materials.

THE COURT: Mr. Reinert, to your knowledge, are all of the coconspirators that you -- of whom you are now aware at this point, are all of those people listed in the discovery materials somewhere?

MR. REINERT: Yes, Your Honor. To the great extent, they are. The only -- and the only -- Every one of the witnesses that we have already identified or person who has been a coconspirator in either the specific drug crime or in some kind of obstructive conduct is in the file.

The only time we have held anything back from the discovery file has been a temporary hold-back. For instance, if I had an individual who was providing information about obstructed activity by Mr. Honken who was in prison with Mr. Honken, we certainly didn't disclose that to anyone until we were able to get that witness out of harm's way and secure the witness.

THE COURT: And let me ask you, in that example, let's say you had somebody that you believed was in harm's way, and you withheld it from the discovery file until the person was out of harm's way. When the person was out of

harm's way, did Mr. Stowers and Mr. Willett have some kind of notice that, you know, back in Volume 3, let's say, there was a new statement put in that wasn't there previously?

MR. REINERT: What we're doing with new materials is I've got an empty volume that just is labeled new materials, and we notify the defense when new materials come in, and they go into that binder. Once they're in that binder -- Initially, we were doing it for about 30 days, and then we would integrate it into the rest of the file.

Now that we've Bates stamped the whole file, we're going to be including those materials into the -- As I recall, we're going to include those materials into the -- integrated into the file and in the new materials file, we will annotate what the new materials are and where they're at, and if -- For some reason it sticks in my head my secretary is going to copy the new materials on a different-colored paper as well, but --

THE COURT: So they're identifiable.

MR. REINERT: We are going to make them identifiable to make sure that there's -- that we're able to keep everybody current.

THE COURT: To your knowledge, are there currently known coconspirators who have, because of

security reasons or other reasons, not yet been disclosed in the discovery materials?

MR. REINERT: Not that I recall. There may be -- there may be one that we just have requested to be transferred to get the individual into a secured area.

THE COURT: Yeah. And I'm not asking you any secure information. I'm just -- I'm trying to get a handle on whether the defense with some amount of work could make their own list of coconspirators by reading the discovery file.

MR. REINERT: I think they could relatively easily by doing it the same way I'm doing it. You focus on, first, look at the drug conspiracy, who are the drug coconspirators and then looking at the obstructive conduct to cover up the drug conspiracy which makes those people also drug coconspirators. And once you use that as two focal points, it's pretty easy to identify the coconspirators.

THE COURT: Let me ask you this: How easy would it be for you to create a list of all actual, alleged or potential coconspirators, you know, just without -- a list that would not require you to prove everybody was in the conspiracy, but a list that would include everybody who might -- that you know of that might be in the conspiracy? How difficult would it be for you to put together that

list?

MR. REINERT: And to try and make it absolutely 100 percent complete, it would take a lot of sorting through. I think I could get the vast majority of it, probably 90-plus percent of them relatively quickly out of the grand jury -- If you just pare it down to try to get the vast majority of it? If you go to the grand jury and the sentencing transcript of Mr. Honken, you've got probably 95 percent of them right there, which is only three volumes of material.

THE COURT: I mean, at some point before trial you're going to have, I assume, some chart or diagram or at least a listing of all the people you're going to claim are coconspirators, and -- Isn't that going to happen?

MR. REINERT: Well, I'm not exactly -- There's a certain amount of preparation that has to go into doing this, and that's an ongoing -- an ongoing event.

THE COURT: Well, let me go back to Mr. Stowers.

Mr. Stowers, I focused with Mr. Reinert on what's in the discovery file. Do you want to respond to that?

MR. STOWERS: Well, there's a whole bunch of, you know, stuff in the file. I think what they've done is put largely -- And this is, you know, what they've agreed to do is to put their -- essentially their whole investigation in the file, as far as I understand. I don't think that's

properly overstating it or understating it either, but I think they tried to put everything that they have in there.

THE COURT: Well, do you -- do you have any authorities that grant bill of particulars where the government has provided their whole investigation to the defense?

MR. STOWERS: I'd just cite to the brief. I haven't looked at them from that point of view. You know, I guess I haven't looked at them from that point of view.

THE COURT: Okay. I'll look too. I'm not trying to put you on the spot. I just want to know if offhand you knew that any of those cases dealt with that situation.

MR. STOWERS: Yeah. I mean, I really do think that there's a difference, though, between discovery which includes a whole lot of stuff, you know, that isn't really going to be part of the case --

THE COURT: Well, when --

MR. STOWERS: -- versus a bill of particulars which is to define the charges.

THE COURT: Mr. Stowers, I guess I had you argue, and then I've asked the parties to describe what the discovery's been, and you responded to that. Mr. Reinert responded to that. And I wanted you to basically reply if you wanted at all. Then I'm going to let Mr. Reinert make

his argument.

MR. STOWERS: Oh.

THE COURT: And then I'll let you reply to his argument.

MR. STOWERS: Okay. I'm sorry.

THE COURT: No. That's okay. Is there anything else you want to say about discovery? I think you've said enough, but if there's anything else you want to clarify about that --

MR. STOWERS: No.

THE COURT: Okay. Mr. Reinert, go ahead and -- and make any argument you wish at this time about any of the issues Mr. Stowers has raised.

MR. REINERT: Well, Your Honor, one issue that Mr. Stowers discussed was the fact that he wants to find out what overt acts were committed in furtherance of an 846 conspiracy -- a drug conspiracy. There's no requirement to prove an overt act.

The drug conspiracy laws don't focus on an act in furtherance of conspiracy or an element of proof. The only thing that has to be proven is the fact of the agreement, and the fact that even no overt acts were committed or attempted to be committed or any act in furtherance were committed is irrelevant for purposes of an 846 drug conspiracy.

That's slightly different, but the fact we have provided open-file discovery and the cases -- When you look at the open file -- and I'll rely on the cases we've cited in our brief -- really do talk about in the matter of providing notice to the defense. They've got the same materials that we have. They've got the theory of proof whether as an aider and abettor in the first five charges. The defendant in the 01-3046 is charged as an aider and abettor in that context, and in the last one she's charged as working in furtherance. That gives the defense the elements.

It gives the defense the theory of the manner in which we intend to prove the crime, and their discussion or desire to get the theory of proof or get evidentiary detail is specifically not what a bill of particulars is for. This defendant has adequate notice, has open-file discovery, has a great deal of discovery that many districts don't provide at all. And it's designed to not have bill of particulars where you have to have the extensive litigation, pretrial where you end up trying to pin down government theories.

The bill of particulars, when viewed in light of the open-discovery file, is not necessary. The open file provides the defendant with adequate information and even focused information and detailed information which is

organized in a manner which will assist them in extracting it to the point where they don't need to have any bill of particulars, and it would be inappropriate to grant a bill of particulars in this case.

THE COURT: Okay. Mr. Stowers, you want to reply?

MR. STOWERS: Well, my thing is basically what we're talking about is trying to get this case defined, and that's really what we're trying to figure out is what are the particular charges in the indictment and what are the offenses with which this woman is charged, and how is the Court going to go ahead and instruct ultimately in a set of jury instructions a jury unless we know what it is with some degree of particularity what the charges are. And the current indictment doesn't get us there.

As to the issue of what's in discovery, well, there's a whole lot. There's 15,000 pages of material in discovery, and that's part of the problem. Although on one hand it could be viewed as a saving grace from the government that they've given us so much stuff that we've got all this information, it's all there, but it's just got to be found and located.

I think that certainly, if one is going to compare who is it easier for to determine these things, it's easier for the government because it's their case, and

they know their case better than anybody else. They've been working on it for, you know, the better part of seven, eight years. And they certainly are able to set forth, you know, what the allegations are with greater detail than what's in the indictment.

If the issue is is the government somehow going to be trapped by its own filing? Well, maybe to some extent they will be attempting to give us notice through a bill of particulars, but the rule also says that a bill of particulars may be amended at any time subject to such conditions as justice required.

So if they file a bill of particulars and they determine that it needs to be amended, they can certainly do that. And I know no requirement that if they list, for example, known but unindicted coconspirators that they would be required to prove that each and every person on the list was a member of the conspiracy in order to prove the charge.

I think they need to prove, in essence, that the conspiracy that they proved is the same one that was charged, but it wouldn't have to include each and every person on the list just like in a multi-defendant drug conspiracy, the equivalent of one defendant on a charge does not mean that all other drug conspirators who are charged in the same count are to be acquitted either. I

think the rule would be the same with regard to giving a list of known but unindicted coconspirators.

As to the issue of overt acts and in the first five counts, the government is correct that generally they don't have to prove any of that stuff, but where we have knowledge that those things exist and have gone on, and they're going to attempt to prove those to prove their conspiracy, then that's a legitimate area of inquiry for us.

Whether or not the Court grants that aspect of it is certainly of matter within the Court's discretion, but as to the last five counts, I think the analysis is different because there, one of the elements of the offense is that they have to prove that there was a series of drug law violations in order to prove the continuing criminal enterprise counts.

And in order to prove those, those are, in fact, an element of the CCE offenses, and those are eventually going to have to be the subject of some proof. They'll have to be the subject of some kind of jury instructions that require that they be proven and found by the jury, and we're going to need to know if those are as well as the trial judge, so that's why we've asked for those things.

THE COURT: What's the trial date now?

MR. STOWERS: May somewhere of next year.

MR. REINERT:  May 6th, Your Honor.

THE COURT:  Any further argument by either party?

MR. STOWERS:  Not from me.  Thank you.

MR. REINERT:  No, Your Honor.

THE COURT:  I'll take it under advisement and get out a written order.  Thank you both for your fine presentation.

MR. STOWERS:  Thank you.

MR. REINERT:  Thanks, Judge.

* * * *

END OF PROCEEDINGS AT 10:51 A.M. ON 11-7-01.

* * * *

REPORTER'S CERTIFICATION

I hereby certify that the foregoing is a true and accurate transcript to the best of my ability of the proceedings recorded by me and reduced to typewriting at my direction.

_____
Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,　　　　　　　　　No.　CROO-3034

　　　　　Plaintiff,

　　vs.

ANGELA JANE JOHNSON,　　　　　　　　　Transcript of
　　　　　　　　　　　　　　　　　　Hearing

　　　　　Defendant.
　　　　　　　　　　　　/

The Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, January 16, 2002, commencing at 2:55 p.m.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA　52401 |
| For the Defendant: | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA　50309 |
| | ALFRED E. WILLETT, ESQ.<br>Terpstra, Epping & Willett<br>Higley Building - Suite 500<br>118 Third Avenue Southeast<br>Cedar Rapids, IA　52401 |
| Court Reporter: | Shelly Semmler, RMR, CRR<br>320 Sixth Street<br>Sioux City, IA　51101<br>(712) 233-3846 |

Case 3:09-cv-03064-MWB-LTS　Document 284-64　Filed 06/23/11　Page 44 of 100

THE COURT: Good afternoon. Please be seated. This is United States of America versus Angela Johnson, Criminal Number 2000-3034. We're here for oral argument on the alleged Massiah violation. Who do we have over in Cedar Rapids?

MR. WILLETT: Your Honor, if it please the Court, Attorney Alfred Willett and Attorney Dean Stowers on behalf of the defendant, Angela Johnson. Miss Johnson's seated to my immediate right. And Mr. Stowers will be making the presentation for the defense and answering any questions from the Court this afternoon.

THE COURT: Okay. Thank you.

And, Mr. Williams, do you have a counterpart over in Cedar Rapids that's appearing?

MR. WILLIAMS: I do not, Your Honor.

THE COURT: Okay. So -- okay. So Mr. Williams is appearing for the government. Okay.

Mr. Stowers, why don't we hear from you first. And, Mr. Stowers, let me ask you a question. Do you have the burden of proof on this issue, and is it by a preponderance of the evidence?

MR. STOWERS: Yes and yes.

THE COURT: Okay. That's a nice succinct answer. Then you may proceed at your pleasure.

MR. STOWERS: Okay. Can you hear me?

THE COURT: I can.

4

MR. STOWERS: I think I'm supposed to hold this button down so long as I'm talking, and so that's what I'm going to be doing with my left hand while I've got my pen in my right hand, so if I look a little bit odd over here, it's only because I'm

Case 3:09-cv-03064-MWB-LTS   Document 284-64   Filed 06/23/11   Page 45 of 100

working with this system.

THE COURT: Well, there may be other reasons.

MR. STOWERS: There could be, but I don't accept any of those as valid.

THE COURT: Okay. And I won't have to rule on any; right?

MR. STOWERS: No. Those would be unnecessary for you to dispose of this motion, Your Honor.

THE COURT: Okay. Thank you.

MR. STOWERS: Judge, we're here today on this motion which, interestingly, was first brought to the Court's attention by the government in their filing in the fall of 2000 wherein they noted for the Court what had been very difficult and substantial issues regarding the circumstances of activities that's occurred at the Benton County Jail in August and September and I think the first day or two of October of 2000 after Angela Johnson was placed there at the request of the assistant United States attorney, Mr. Reinert.

I think the record, Your Honor, has obviously been transcribed for you. You've probably got it in electronic form, and we've attempted to summarize it in the brief that we filed

5

on May the 21st.

But basically what we think that the record shows is that the government starting at some point in time in August set about a course of action to utilize somebody that they had utilized in this capacity in the past, that is, Mr. McNeese, to pump Angela Johnson for what information they could get from her about a variety of things. It's not exactly clear who was behind this activity or who was involved in it except that it's

Page 3

pretty clear that at least Agent Wright was involved early on from the Benton County Jail, and I believe Mr. Fisher according to the record was involved quite early as he had been more or less Mr. McNeese's handler going back for many, many months prior to this time in connection with a variety of things.

So there was an effort made by the government to utilize Mr. McNeese to elicit information from Angela Johnson. And that was -- that was done knowingly, and it was done with some purposefulness. And the particulars of that appear to be that at least by early August there was a note intercepted by a jailer that caused quite a stir at the U.S. Attorney's Office and at the jail, and that note resulted in contacts between the jail and the U.S. Attorney's Office, Mr. Reinert, and in contacts between Mr. McNeese and Mr. Wright at the Benton County Jail who was in communication with Mr. Reinert during this time.

After that contact and after those events in mid August, Mr. McNeese started to keep very copious notes of

6

various conversations that he said he was having with Ms. Johnson. Those notes then in turn were turned over to Agent Wright per what Mr. McNeese had noted in one of his notes per Mr. Wright's instructions. Mr. Wright confirms in his testimony that he, in fact, did instruct Mr. McNeese to keep notes, although he indicates that he had limited his instructions to Mr. McNeese to topics relating to an alleged escape that was of concern to him and an alleged assault that was of concern to him. And he testifies to those things I think at pages 323 and 324 and 338 of the transcript of the hearing.

It's apparent that as this relationship between Mr. McNeese and Ms. Johnson develops in the jail including a

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 47 of 100

jailer by the name of Mr. Rich who provided some enlightening testimony in July, although he was certainly reluctant to fess up to this, the contacts that were going on between Miss Johnson and Mr. McNeese were being facilitated through the passing of materials from Ms. Johnson to Mr. McNeese and back from Mr. McNeese to Ms. Johnson. Mr. Rich alone recollects that he's confident he passed more than 20 notes in each direction for a total of more than 40 items in each direction and that he also was aware and may have provided a pencil and paper to Mr. McNeese when Mr. McNeese was in lockdown at the very end of the period.

The government has conceded and stipulated that -- certainly by September the 11th they would agree that even by

7

that date Mr. McNeese was then their agent for purposes of Sixth Amendment issues, but the record shows really that it was at least two weeks if not earlier than that time that Mr. McNeese was, in fact, the government's agent because they were using Mr. McNeese prior to that according to Agent Wright to investigate through contacts with Angela Johnson and through notations that were supposed to have been kept by Mr. McNeese per Pete Wright's instructions. They were investigating the assault and the escape issues.

The government apparently has attempted to explain its actions by asking this Court essentially to overrule I guess the U.S. Supreme Court, and I think their position at least initially is that because they were attempting to investigate uncharged crimes when they were having McNeese engage in these contacts and conversations with Ms. Johnson that that's okay because she didn't have a Sixth Amendment right as to those

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 48 of 100

uncharged crimes; and, therefore, we can use anything she said in connection with a prosecution on the charged offenses.

But that's actually not what the law is, and that's not what the U.S. Supreme Court said in 1985 in Maine versus Moulton, and the government concedes that in its initial brief that they filed way back on November the 14th of 2000.

And really what we're talking about is a rather purposeful effort that was undertaken by the government to get Ms. Johnson to engage in conversation with Mr. McNeese, and it

8

was done by multiple law enforcement officials with the knowledge, some of it contemporaneous to the contact, some of it shortly after the contact, some of it after the instructions.

But as this flowed, the government became more and more interested in utilizing Mr. McNeese to carry out its investigation of Ms. Johnson at the Benton County Jail and slowly slip down the slope into a very treacherous area for them which is why they filed their request to have the Court resolve this issue. And it's not like the government wasn't aware of the problems that they had created because they had in their media disclosures on this topic through the U.S. attorney Mr. Rapp and through their very earliest statements on this topic noted the problem that they had created. And as best as we can decipher, it appears that there was conceivably at some point in time an error in legal judgment that the U.S. Attorney's Office made about what they could and couldn't do with regard to this circumstance.

THE COURT: Why do you say that, Mr. Stowers, an error in legal judgment?

MR. STOWERS: I think the -- I think that the

Page 6

government believed that they could -- for some reason I'm getting a feedback here, but in any event, I think the government believed that they could make contacts and engage in communications with Angela Johnson ostensibly about uncharged crimes and use anything that was disclosed in the context of

9

that investigation without violating any constitutional principles and they could use those statements in the pending case. And they're just wrong about that because that's not what the U.S. Supreme Court said in Maine versus Moulton, and that's just -- they're just wrong about that, and that's apparently what they were attempting to do was to --

THE COURT: Let me ask you another question. The government characterizes -- I'm sorry? Can you not hear me?

MR. STOWERS: No. I can hear you.

THE COURT: I can't do anything about the feedback.

MR. STOWERS: Yeah, that's fine. I can follow you.

THE COURT: We've got the feedback too. I don't know why we have it, but let's not worry about that. Doesn't the government mischaracterize the holding in Moulton when it refers to the holding as a plurality opinion? It's actually a majority opinion. I believe wasn't it written by Justice Stevens with four members joining in it? It's not a plurality opinion at all. There happens to be a dissent, but that doesn't make the majority opinion a plurality opinion. And they refer to it as a plurality opinion. Did you pick up on that at all?

MR. STOWERS: I did, and I ignored their statement to that effect because I figured that you could count to five just like I could, and I was aware that there was five justices in the majority. And besides that, on April 2 of last year, Texas

Page 7

versus Cobb came down from the U.S. Supreme Court, and I think

that reemphasizes that aspect of Maine versus Moulton as well which that's a majority opinion as well, five to four.

THE COURT: Okay.

MR. STOWERS: That really -- that really is all that I had to argue other than just I'd really -- if you've got some specific questions, I'd be more than happy to try and answer them. I think that we've got a real problem with what the government did, and that's obvious. We're not here for any other reason.

But the situation is that the record really supports granting relief -- which let's be honest about it. I mean, I think the government has put the Court in a heck of a position here because what we're talking about is excluding this evidence of what Ms. Johnson purportedly said to Mr. McNeese which includes certain maps which were used to uncover physical evidence in this case, the remains of five human beings. And that's not a small thing. But I think that that's a position that the government has put the Court in --

THE COURT: Well, I don't consider that the government's put me in any type of position at all. There's a motion which is really a motion to suppress, and I have to rule on it, and that happens frequently in criminal cases. And I don't look at what the evidence is or the impact that it might have on the trial. I just decide whether it was legally obtained or illegally obtained.

So I don't feel put upon or in any particularly
Page 8

difficult position. If I think the evidence is impermissibly obtained and the remedy is suppression, I'll order it suppressed regardless of the evidence and regardless of the facts of the case and regardless of whether it's a high-profile case like this one or a case that nobody knows about but the lawyers. So I'm not moved by that argument.

But let me ask you this. Do you have the supplemental brief that the government filed back on May 21 of last year in front of you?

MR. STOWERS: Yeah, I do.

THE COURT: Okay. I'd like you to turn to page 4, first full paragraph, first sentence of that paragraph. And my question is, isn't that really the crux of this matter, aside from the last half of the sentence which really deals with the Maine versus Moulton question, but isn't the crux of this matter finally, the government asserts that the evidence does not support a finding that McNeese deliberately elicited incriminating statements from Johnson? Isn't that really the crux of the matter?

MR. STOWERS: That's one frame -- one way to frame the issue I think. I think that the test is stated differently in different cases. One phraseology of what we're required to show is that there has to be a knowing exploitation of the opportunity to confront and obtain statements from Ms. Johnson

12

or that there was a deliberate elicitation.

THE COURT: So my question for you is really regardless of how you frame it, what is the evidence that you think I should find that supports your position that McNeese deliberately elicited incriminating statements from Johnson?

Page 9

MR. STOWERS: Well, the evidence is that Mr. McNeese engaged in conversation with her, and there's a lot of evidence of that. Some of it's right in McNeese's notes where he notes that he asked her this, he asked her that. Some of it's in the trial transcript sprinkled throughout it that there was conversation back and forth. There's evidence that the officers told McNeese that although he wasn't supposed to, quote, unquote, bring up the topic of the current case he could talk to her and engage her in conversations about other offenses.

And then McNeese expressed in some of his testimony confusion about what he should do if the topic of the case then came up in such a conversation which apparently it had. And he was told, Well, you'll have to keep the flow of the conversation going to make it seem natural so that she doesn't figure it out that you're an informant for us. There's a whole series of testimony to that effect where it's clear that what the government concedes it was doing and where the agents have testified agree this is what we were doing is McNeese was trying to get information from her about, under their theory, uncharged offenses which they could use elicitation to obtain that

13

information and then turn around and try to defend that by saying, That didn't concern the charged offenses, so we're okay. And then as to the charged offenses we told him don't elicit, but if it comes up, try to keep the conversation going without asking questions. Don't pump her for information.

There's also the evidence from Mr. Flowers who testified in the summer about what Mr. McNeese said the reason for his being placed next to Angela was, and there's just witness after witness who has indicated that.

Page 10

There's also a lot of indications that the jailers, including Mr. Rich, were passing communications from Mr. McNeese to Angela Johnson and back the other way from Ms. Johnson to Mr. McNeese, over 20 occasions of each direction. Claiming that he didn't know what was in those materials is somewhat suspect since he's the guy who found the first note and the first communication. There's indications in the testimony of a comment by one of the jailers whose name I can't recollect right now. I think it was Mr. Fisher made a comment, Let the communications pass, let it pass. He made those comments early on, and that's in the record as well.

So there's a whole lot of evidence here that they were creating an environment of communication between Ms. Johnson and Mr. McNeese. They were facilitating it directly in many instances, allowing those things to happen and allowing Mr. McNeese to use the yard and to communicate with Miss Johnson

14

through the window of her cell.

The little door -- I don't know if they call it the food slot or whatever on Mr. McNeese's cell was left open purportedly for ventilation into his cell, but actually as we heard from Miss Bramow it was used as a means to facilitate communications. There was a whole lot of testimony about their knowledge of communications between these two, the allowing of it to go on and the, in fact, in some instances telling them you can communicate, directly communicate, about these so-called uncharged offenses.

And then we have I think an inference you can draw from what they did once they got what they were after which was these drawings which is at that point they took the obvious step

which was to move Mr. McNeese to another jail immediately at that point.

So sort of by the result of the actions that had been taken up to that point in time, they then took the step of removing Mr. McNeese after they got what they were after which was these maps. I think there's an inference that you can draw from what they did once the communications reached their ultimate objective which is they separated them and moved him out. And I think you can draw a certain amount of an inference from that that really that's what they were after all along. And if they really were trying to separate them, they certainly could have taken that step earlier, but they didn't, and the

15

reason they didn't was because they knew darn well what was going on. They were involved in it, and they were attempting in some way to cloak what they were doing including from some of the other folks that were employed right there at the jail. But once they got what they wanted, then they separated the two of them because mission accomplished and now we move on to the next person for Mr. McNeese to prey on.

THE COURT: Mr. Stowers, if I were to find a Massiah violation, what's your argument that the government should not be able to use the evidence in the criminal 01-3046 matter?

MR. STOWERS: I hope we might get to that point at some time. I don't have a full and complete answer to that question today. As you know -- as you know, that the indictment on that second matter was filed after all the briefing was done. I think there are some issues that we want to raise if the evidence is excluded as to any offenses to which the Blockburger test would be satisfied which is the standard under Texas versus

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 55 of 100

Cobb, and I think the ruling that we're looking for is a ruling that says any offense that satisfies the Blockburger test including any charges in the original indictment, the evidence is excluded from that.

But the second thing is I think there's going to be a substantial issue about whether or not they can use it in connection with the new indictment which now has been consolidated with the old indictment and in order to use it

16

would have to be severed.  We'd have to have a separate trial on that indictment for the government to be able to use it in connection with that.

So what I'm trying to say inartfully in a roundabout way is at this point given the fact that these two indictments are together, I think the Court would have to exclude it from the joint trial that's presently scheduled.  Then I think the government should come in and say, We move to sever because we want to use the evidence in connection with the second indictment that we filed.

And then the Court can evaluate under the severance principles whether or not in its discretion it believes a severance is appropriate in this case so that the government could potentially use that evidence.  And then, secondly, we can argue the point as to whether or not, in fact, those offenses are subject to that.

And I would just say that I think one of the issues regarding what transpired here is potentially -- under this Cobb versus Texas or Texas versus Cobb case is a Miranda question that may arise in connection with the government's utilization of a person employed by them to question Miss Johnson while she

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 56 of 100

was in custody, and I think that may be a question under that case that we'd like to pursue.

But I would also say that I don't think that the fact that the government has charged under the new indictment

17

alternative theories of murder gets them around the Sixth Amendment problem.

And then the final point which we did note in our initial brief was that under the ethical principles that apply to lawyers contacting represented persons, it strikes us as problematical for the government under the Hammad case from the Second Circuit to try and utilize statements that they obtained through their informant from a represented person when they knew Ms. Johnson was represented by counsel and had those communications with her and engaged in those communications. And the Hammad case recognizes that the Court does have some authority under the ethical principles governing lawyers' communications or their represented -- or the persons that they have employed by them communicating with a represented party and that the Court can take steps to protect the integrity of the process through the use of suppression power. And that's what the Hammad case is about.

THE COURT: Anything else, Mr. Stowers?

MR. STOWERS: No, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. I guess to begin with, I note a dramatic departure in the defendant's position in this case as a result of the hearing today. We spent many hours of testimony and hearing before Your Honor on the issue of the defendant's allegation that the whole placement

Page 14

of Miss Johnson into the Benton County Jail was an intentional attempt by the government to orchestrate a situation where Robert McNeese could have access to her and interrogate her.

Today we hear for the first time -- and they made this allegation as late as April 6 of 2001 in their brief. Today they appear to be abandoning that position, not that they shouldn't because I think the evidence was wholly lacking at the hearing to support that allegation. But today they're alleging that the first time the government became involved now was the middle of August after she had been placed in the Benton County Jail for some time and when we first became aware of the notes being passed.

The defendant's position, going through the three prongs in the Massiah test, is that in the first instance that the defendant was -- or that Robert McNeese was an agent of the government's. The government's conceded as of September 11 he was clearly an agent of the government's. Certainly prior -- even according to the defendant's argument today, prior to August, middle of August, they're not even alleging today that Robert McNeese was an agent for us.

So to the extent that there's any information that was gained by Robert McNeese from the time that Miss Johnson was placed in the Benton County Jail up until the time that we've first learned of the communication occurring between them, I don't think there's a factual basis to support an allegation

that Robert McNeese was an agent of the government's at that

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 58 of 100

point. To that extent the Massiah -- under the Massiah rule her Sixth Amendment rights were not violated, even if she had Sixth Amendment counsel as to those charges and even if she -- Robert McNeese deliberately elicited information from her.

The government still maintains that Robert McNeese was not an agent of the government's until September 11. There was testimony that was uncontroverted and pretty direct that the law enforcement officers involved in this gave direct instructions to Robert McNeese not to have any communication with Angela Johnson until they could sit down with him, that they could actually talk about this and give him some instructions which ultimately occurred on September 11.

When law enforcement officers learned about the communication, Pete Wright sent a contemporaneous e-mail to his supervisor the same day he found out about it advising his supervisor he had just learned about this contact and advising his supervisor that they've got to stop this communication. They immediately moved Robert -- I'm sorry, Angela Johnson to a different cell in there to prevent the communication.

So the idea that somehow Robert McNeese was an agent of the government's during that time period, the evidence simply doesn't support that allegation.

THE COURT: Well, the government agents knew he was a loose cannon. They knew he was such a loose cannon that he

20

didn't qualify for the Witness Protection Program, although that decision came later. But they were aware of his propensity to go off on his own, so to speak, which is, as I recall it, the reason why he didn't make it into the Witness Protection Program because they didn't trust him to follow directions.

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 59 of 100

MR. WILLIAMS: I believe, Your Honor, that the testimony was, if I recall correctly, that the reason he did not get into the witness protection program was that when he was given a lie detector test that looked into whether the -- why he wanted into the witness protection program and so forth they weren't satisfied that he was not going to pose a risk to other people in the witness protection program as I recall. I could be wrong on that.

But did they know he was a loose cannon? They did. They knew because he was violating the internal jail rules that he was trying to communicate with her and I think in good faith did what they could to prevent the communication up until the point that we attempted to bring him under control and gave him instructions on how to proceed from there on out.

THE COURT: They also knew he was one of the most highly motivated informants probably that's ever been in Iowa because he was serving a mandatory life sentence and his only possibility of getting out of that life sentence was to get a Rule 35(b) reduction from a trial court judge who had made the decision to give him the mandatory life sentence rather than 360

21

because his guideline range as I recall was 360 to life; isn't that right?

MR. WILLIAMS: That's correct, Your Honor. And they did know that. There's no doubt about it. But I think there's a difference between the officers at this time -- and we're talking about a period of approximately a month, between the middle of August when they first find out there's communication occurring and September 11 when we sit down with him, give him instructions, and say, Okay, this is what you can talk to her

Page 17

about, and this is what you're not supposed to talk to her about that they realized they had somebody who wasn't obeying the rules. They realized that it was somebody who had a motivation for trying to help himself, and they did what they could to prevent him from having communication until we could control him I think because they knew the potential was there for this guy not to follow directions if we didn't sit down and really try to control the situation.

Whether a person under those circumstance becomes an agent of the government when the government is doing everything it can in its power to control him up to that point I don't know. I think the case law can go both ways. I know the case law suggests that it's just like any other police officer. You have a police officer on your staff. They violate the rules. He's still a police officer, and he's still an agent, and I realize that.

22

If the Court finds he was our agent at some point during that one-month period, it's not enough simply to say we gave him instructions and he violated it, and I recognize that. I just don't know if the evidence is there at this point to suggest that he was an agent of ours during that time period.

I agree with the Court. I think the central issue really in this case -- because even if we deal with that issue, the government's conceded after September 11 he was an agent of ours, so that doesn't really get to the issue and certainly doesn't get to the ultimate disposition of the key pieces of evidence that led to the discovery of the bodies in this case. So to some degree, it's a fall-back position to the government.

We did learn some information early on through Robert

Page 18

McNeese before the time period we allege he was an agent of ours, that in the end if the other evidence was suppressed we would still want to use that evidence.

But ultimately I think one of the key issues for the Court to decide in this case is whether or not there was any evidence of deliberate elicitation. The defendant did not testify in this case. There's no evidence from her indicating that he pumped her for information, so we have nothing other than Robert McNeese and the notes and the circumstances for the Court to look at to determine if there was an attempt by Robert McNeese to deliberately elicit information from her.

I think we start, first of all, with the fact he was

23

given instructions on not deliberately eliciting information from her. Again, I think that was fairly uncontroverted evidence that every agent who had any communication with Robert McNeese told him not to question her about anything to do with her current charges.

I also don't think that there's any question at this point that the government was legitimately investigating whether she posed a risk of escape, whether she posed a danger to other people in the jail, and whether she was attempting to obstruct justice by having somebody else take blame for the crime. There's evidence of that. It was uncontroverted, and I think the instructions given to Robert McNeese is that he could attempt to get information from her on those issues, not just about -- not on the issue or not on the charges for which she was currently incarcerated.

Once you go from the instructions that he received, I think then you look at the circumstantial evidence of whether he

Page 19

deliberately elicited information from her. We have actually the testimony of Bramow's. Sara Bramow testified that Defendant Johnson gave her information and shared information with her as well. Robert McNeese testified that Angela Johnson freely spouted out information, that she talked very freely about what was going on, that it wasn't a case where he was trying to or had to pump her for information or ask her repeatedly about things, that she freely confided to him information.

24

The allegation that somehow that the notes were passed knowingly by the jail staff there I don't think is supported by the evidence in this case. Number one, Mr. Rich testified that on the only note he ever saw he seized and he wrote up Angela Johnson for that note. He testified in the July hearing to what is obvious, and that is that in these jails, inmates learn how to beat the system. They learn how to pass notes back and forth. He acknowledged that. He acknowledged that yes, in all likelihood they were passing notes back and forth without me knowing about it.

THE COURT: Wasn't there evidence that the jailers actually facilitated the transfer of magazines back and forth that could have contained notes and didn't check?

MR. WILLIAMS: Certainly.

THE COURT: That's what I recall.

MR. WILLIAMS: Yes. He said that he would pass magazines back and forth between these people and that there could have been notes in there. I think there's a big difference between not doing your job well, not looking in there for notes every time you do it, and intentionally knowing that there's notes in there, passing a note to another inmate. I

Page 20

think he acknowledged that it happens.

Was it a slack jail in that regard? Possibly. But there's a big difference I think between that and the -- where the defense is at in their -- they reach the position where

25

they've said he knowingly passed more than 40 notes back and forth between these people.

I think that's a heck of a jump to make off of the evidence before this Court. I think Mr. Rich acknowledged that it happens, that he knows it happens, that they try to stop it. Do they do the best job? Probably not. Are there times they pass magazines back and forth that probably contain notes? Yeah. And he was asked, How many times do you think that happened? And he guessed. He said probably 20. There's a big difference between that and the defense allegation today that that was an intentional passing of notes between them.

So the government's position -- and, Your Honor, you've heard a lot of testimony. You saw the people testify, and you've seen the evidence in this case. It's ultimately a judgment call by you. It's ultimately a credibility call by you to determine based on the evidence you have on whether there was deliberate elicitation. I could argue for a long time there wasn't. The defense could argue there was. Ultimately it's your call to make as a credibility finding I think on the evidence.

THE COURT: Why don't you give me your position or your theory as to how it is McNeese obtained the information that the defendant seeks to suppress without deliberately eliciting any information.

MR. WILLIAMS: How did he get the information about

Page 21

the location of the bodies ultimately?

THE COURT: Without deliberately eliciting any information.

MR. WILLIAMS: The defendant in this case, I believe Mr. McNeese testified, wanted him to help her find somebody to falsely take blame for the murders in this case and in the process of doing that wanted him to find somebody serving a life term that could do that. I believe his testimony was that in order to facilitate that she gave him the notes that showed the location of the bodies so that that person who would come in and claim responsibility could do that.

I don't know that that necessarily reaches the conclusion that he deliberately elicited information from her to get that. There was a communication back and forth where she was seeking his assistance in committing a new crime, obstruction of justice, and in the process of doing that, he received the notes because that was what he was supposed to do is pass them on to somebody who could take responsibility for it.

THE COURT: And he was able to do all that without eliciting any information in your view.

MR. WILLIAMS: I think he was. I think it was a case where for whatever reason Defendant Johnson believed that she had a soul mate in there, that she believed that this was somebody who was there that could help her, and I think she saw

him as an opportunity to escape, an opportunity to get out of jail, an opportunity to get out from underneath her charges. I

don't think it took much for anybody other than to have open ears and be receptive for her to try to take advantage of that.

And I think part of that you can derive from Sara Bramow's testimony when Sara Bramow indicated that she was in that jail for a very short period of time with the defendant and yet the defendant confided a lot of information to her about the same crimes, didn't know her from Adam's off ox and still gave her all that information.

So I think under those circumstances I don't think it's a stretch to conclude that there wasn't deliberate elicitation under the circumstances.

Going to the third prong of the Massiah test -- and that is whether the defendant had a Sixth Amendment right -- and this is where we get into Maine versus Moulton -- all I can do is apologize to Your Honor about that. I wish I could say, boy, I caught the fact that that was a majority opinion. I didn't. I don't know if when I originally read it I just looked at the four names or what I did, but I apologize. It's an embarrassing move on my part, but all I can say is I got it wrong on that.

My position still is, though, that I think Maine versus Moulton, be it a majority opinion or not, I think it was wrongly decided. If the Court concludes ultimately that -- and hopefully I'm making -- Your Honor's smiling, but hopefully I'm

28

making a logical argument to extend the law beyond where it is because I recognize this is what the law is. Right now the law says that even if the officers are acting in good faith investigating a new crime and in the process of that obtain information about the crime for which the person has a Sixth Amendment right we're suppressing it anyway.

Page 23

And I think if you go and you look at the reason for the suppression rule, it does not make sense to suppress evidence under those circumstances if the purpose or the intent of the suppression rule is to deter wrongful government conduct. If the conclusion wasn't wrongful, it simply does not make sense to me that you would suppress that evidence.

I recognize that's not what the law says at this point. I simply want to preserve -- I'd like to convince you to rule the other way; lacking that, hopefully preserve that on the record. I don't know if it's going to do any good down the road or not. But it just struck me when I was briefing this thing as wrong, and I just felt obligated to bring it up and argue that point.

THE COURT: Anything else you want to add?

MR. WILLIAMS: I do want to address for a moment if I could, Judge, the new charges and the effect of Texas v. Cobb on them. I think it is something we have filed a supplemental or amended brief on. I think it is something that we'd like to have the Court address in this case.

29

Under the Blockburger test, we've laid out the elements of the offenses that she was originally charged with and had Sixth Amendment counsel for and the new charges against her. Under Texas v. Cobb, I think in the government's view it's pretty clear that this evidence comes in with regard to those new charges regardless of whether they come in with regard to the former charges.

They would also likewise come in if we were to charge her with the obstruction of justice and the attempt to elicit false testimony for taking blame -- of having somebody else take

Page 24

blame for the murders in this case.

So the government's position is I think it is before the Court. I think it is something the Court can address at this point. And for us to know where any of us are going in this case down the road with the trial pending in -- what is it? May of this year? -- that it's an issue we're going to have to wrestle with pretty soon. And I think it's before the Court.

If I could with the Court's permission, I want to go back for just a moment and address a couple issues brought up by the defense, one of which was a suggestion that the government somehow by statements that Mr. Rapp made at some point acknowledge or that's somehow evidence that we knew what we were doing was wrong.

I think it's nothing more -- in the filing of the motion by the government, it was nothing more than an

30

acknowledgment by the government that we can recognize when legal issues arise, and I think it shows nothing more than that. I don't think it's evidence of anything.

With regard to the allegation that there was an ethical violation by Assistant United States Attorney Pat Reinert by instructing people to have contact with represented parties, that is not an ethical violation if the purpose is to investigate ongoing or new crimes, new criminal conduct.

And again, as I've said before, I don't think there's really any contradiction or contesting of the fact that there was a legitimate factual basis for the government to be concerned about obstruction, about possible assault, about escape, and that under those circumstances, as the courts have said before, there was actually a duty by the government under

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 68 of 100

those circumstances to investigate those crimes whether the person's represented or not because they are not represented as to those new crimes. And so I don't think there's even slightly an ethical violation in this case by Mr. Reinert. Thank you, Your Honor.

THE COURT: Thank you, Mr. Williams.

Mr. Stowers, anything else you'd like to respond to?

MR. STOWERS: Let me direct the Court's attention to page 12 of our brief filed May 21 at the bottom under the heading elicitation. I think this kind of gets to the issue of what is and what isn't what has been labeled as elicitation.

31

The first issue is does it matter who initiates this conversation or contact, whichever one we're talking about, and the Supreme Court said no, it doesn't in Maine versus Moulton. It doesn't matter who initiates the conversation.

Now, in this case there was evidence that in the instance where Ms. Johnson initiated, although there's evidence that Mr. McNeese frequently initiated conversations with Ms. Johnson, but where Ms. Johnson initiated conversation or where conversation got into areas where the government did not ask Mr. McNeese to initiate conversation that what Mr. McNeese was told was that he could respond, he could respond.

If you read the Eleventh Circuit opinion in Henry from 1981 which ultimately went to the U.S. Supreme Court and became the Supreme Court's Henry case, you see in the Eleventh Circuit case that they discuss in that case directly -- and this is one of the issues that went to the Supreme Court, and the Eleventh Circuit I believe was upheld in that case -- that engaging in general conversation with somebody such as Miss Johnson would be

Page 26

enough to constitute elicitation.

So you don't have to have interrogation. You don't have to have direct questioning. But we have some evidence that that is what Mr. McNeese was doing based on some of the statements that are attributed to him both by Sara Bramow and also by Mr. Flowers who said that he was put next to Ms. Johnson so he could, quote, work her, unquote, meaning pump her for

32

information. View it in context, that's what he was talking about.

So there's a whole lot of indication that there was conversation going on. He was beyond being more than a mere listening post. He was engaging in conversation and contacts with Miss Johnson. A listening post does not pass notes to somebody. A listening post does not respond. A listening post does not inquire about uncharged offenses which is what he was told to do.

Let's talk about September 11 which has significance in this case as a date of note but another significance that came about a year after this case's September 11 date. But we're talking about September 11 of 2000. That's the date the government says McNeese was our agent. And let's look at what they're really saying.

What they're saying is he was our agent in this case for the purpose of eliciting statements or being our listening post as to these charged offenses. But the real thing the government has never conceded and it had to be drawn out of their witnesses and pulled out of them is when was McNeese their agent for the purpose of visiting with Ms. Johnson about uncharged offenses because if he was their agent for eliciting

Page 27

statements or contacting her about uncharged offenses at an earlier time which is what the record shows, then he's their agent for the Sixth Amendment purpose that we're talking about.

33

They are trying to subdivide agency into this case, these offenses, and uncharged offenses, and the law doesn't allow them really to do that. He's either their agent or not their agent. And what they're stipulating to is he was their agent on this case on these offenses as of September 11.

What they're not saying to you and what they've really tried to mask underlying that is that he was their agent as to uncharged offenses several weeks earlier than that. And that's evident from the testimony of Agent Wright and some of the other witnesses who said that they had asked McNeese to keep notes and do things with Angela regarding those other things earlier. So that argument doesn't fly.

We've been said to have abandoned issues. Obviously we're arguing things here. We aren't intending to limit our arguments to what's stated orally. If there are things argued in our brief that are more expansive than what I've argued orally, I'm not walking away from those issues. I just focused in on what I think our strongest case is.

But I just point out that there is evidence here that would indicate and the Court could make certain inferences that Mr. McNeese was put in a location where he could have contact with Miss Johnson and Miss Johnson was put in the Benton County Jail for the purpose of doing an investigation of her using all the resources available to the Benton County jailers which included using Mr. McNeese. I think that's pretty clear, and

34

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 71 of 100

that's what they did.

They started to use McNeese who was their guy for a long time before this, immediately after he had contact with Angela in the middle of August, and they started to use him taking notes and conversing with her. I don't think that's a surprise to anybody that that was going on, and that's exactly what they were doing, and that's why they put her there was to investigate her. That's what the evidence was. She was put in that jail to investigate her and to track her and monitor her and to find out what she was doing and what she was saying and what she was writing and what she was saying on the phone. That's why she was there.

And she was put there under very serious circumstances as the evidence showed, so a lot of indications that the whole relationship that existed between McNeese and the government was one that was in contemplation at the time that Angela Johnson was put in that jail and that he had been a longstanding informant and his services were likely to be called upon specifically in relation to Miss Johnson after she got into that jail.

And that's all I have to say. If you have any questions, I'd be happy to answer them.

THE COURT: Let me ask you this, Mr. Stowers. With regard to the original placement of the defendant at the Benton County Jail, my recollection is Assistant U.S. Attorney Reinert

35

indicated when he testified that he wanted to place her in the Benton County Jail because there was better surveillance of her

Page 29

and he concerned -- he was concerned that she was an escape risk. Is there anything in the record to support that the Benton County Jail would be a more secure or better facility for somebody considered to be an escape risk than with the Linn County Jail?

MR. STOWERS: I think the evidence, although there was suggestion that that was one of the potential reasons for it -- and I don't remember which witness it was that said that -- is that there's no objective evidence to support that claim. I think there was sort of a subjective assertion to that effect by one witness. It may have been the U.S. marshal. But I don't think there's any evidence to support the claim that Benton County Jail has some heightened security over Linn County.

THE COURT: Well, it's your burden of proof, so let me flip the question around on you. Is there any evidence to the contrary, that the Linn County Jail was actually the more secure facility, because if that were true, that would raise a question of whether or not Assistant U.S. Attorney Reinert's testimony was pretextual or not?

MR. STOWERS: I don't think there's specific evidence one way or the other, but there was some testimony that I'm reminded of by Mr. Willett by the U.S. marshal that he originally was going to put her in Linn County until he was

36

directed to put her in Benton County by Mr. Reinert. And that I think is some indication that the Linn County Jail was viewed to be a facility of sufficient and adequate security in comparison to the other options which included Benton County and that the U.S. marshal is the person who is responsible for the security of the people who are brought into their custody and having

Page 30

selected Linn County was some type of an assessment or judgment on the U.S. marshal's part that that was an adequately secure facility.

But I don't really think we have to establish as part of our case that she was put there for one reason or another, that is, the Benton County Jail. I think the point of why she's put there is there's been so many different explanations as to why she was put there offered by the government, some of which appear to be red herrings, that it raises the inference perhaps that the reason we can't get a clear answer to that is that the clear answer is one that the party in possession of the answer doesn't want to provide it because it might be helpful to us.

And secondly, I do think it's significant that she was slated to be placed at Benton County for the purpose of investigating her, and that's what they did, and that's what this whole motion is kind of about is they investigated her through the means available.

Now, they want to limit that to lawful means, that is, the listening in on phone calls, taping phone calls, and

37

monitoring her mail. But the point is they're actions with McNeese that we believe they've shown, that is, they used him, one of their investigative tools, early on in her stay there.

So all their actions that they took and their stated reasons for having her there are consistent with our theory that they used their other investigative tool, Mr. McNeese, very early on, early as August -- early August to mid August I should say to help them out in monitoring Ms. Johnson.

And lo and behold, even though the government stipulates that September 11 is the first date Mr. McNeese is

Page 31

their agent, then the witnesses start to leak out that they had asked McNeese to monitor Miss Johnson, to keep track of her in connection with these so-called uncharged things much earlier, and that's what the evidence started to show and that he should remember the listening post instructions he was given on the Shultice case which talked about possibly eliciting statements.

And there's a whole range of things and that Mr. Wright says that he was telling him to keep notes and turn them over. And Mr. McNeese notes that in his notes that he produces that are one of the exhibits, that he was told to keep these notes by Agent Wright all before September 11, all before the government concedes he's an agent.

So why aren't they just coming clean and telling us he was their guy earlier? Well, the reason is it kills them. It kills their argument largely, and they concealed that fact from

38

the Court and from us as best they could. But, frankly, it's out there, and the gate is kind of up, and they've done the best they could with what they got. But we're here now in a very serious case, and why don't they just come out and say what the truth is if the U.S. Attorney's Office even knows what its people were doing? Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: I want to address -- I'm sorry. I'd like to address the issue of the placement in the jail because apparently that's not a dead issue.

The evidence before the Court was that the marshals have never had a federal inmate escape from the Benton County Jail. Arechiga testified that he considered it a secure jail. There was no testimony that I recall by Mr. Arechiga that his

Page 32

statement that he originally planned on placing Miss Johnson in the Linn County Jail was a result of his exhaustive review of the security precautions and the measures that were available and that he had decided and come to the conscious conclusion that somehow Linn County was more secure than Benton County and only moved her to Benton County after Reinert told him to.

I believe his testimony was they're both secure. He thought they were equally secure, that there was some advantages to Benton County that he recognized because it was a lower inmate number; that it was easier to monitor them; that unlike Linn County, Benton County systematically records or at least

39

has the ability to record every single phone call made out of the jail; and that they have a higher jail personnel to inmate ratio than does Linn County.

I don't recall any evidence that the defense apparently does that we placed her there to investigate her. I don't think there was ever any testimony along those lines. I think the testimony was actually quite consistent among all the people that were involved in that the reason for placing her there was she was considered a security risk and for good reason.

She -- there was evidence we had that she aided and assisted Dustin Honken in his attempts to escape custody out in Woodbury County, and we had every reason to believe that she was a significant security risk.

And so the idea that we placed her there to investigate her I don't think has support in the record. We placed her there because we thought -- rightly or wrongly, we thought that we were going to be able to monitor her ability to

Page 33

escape easier in the Benton County Jail because we could listen in on her phone calls which we couldn't do in Linn County and that we would have a better ability to watch her there than we would in Linn County.

THE COURT: Do you know where Dustin Honken was placed when he was arrested on -- you know, it would be the second indictment, you know, that he pled guilty and that I sentenced

40

him on? Do you know where he was placed?

MR. WILLIAMS: After you sentenced him?

THE COURT: No, when he was taken into custody. He was originally out on pretrial release, and then he was taken into custody after Cutkomp wore a wire. Do you know where he was placed?

MR. WILLIAMS: I do not, Your Honor.

THE COURT: Well, under your theory it should have been the Benton County Jail; right?

MR. WILLIAMS: If the decision had been made to do that, yeah. I mean, if people had looked at it and thought about where they wanted to place him, they could have made the decision to place him there.

THE COURT: I think it was the Linn County Jail, and then he was ultimately transferred over here because the sentencing hearing took place over here. But would you agree with me that the record indicated that it was exceedingly rare for an assistant United States attorney to direct the facility for the United States marshals to place a pretrial detainee?

MR. WILLIAMS: I take issue, Your Honor, only with the characterization of extremely rare. I believe Mr. Arechiga said that it happens on occasion and that Mr. Reinert's asked for it,

Page 34

and I don't recall. I think he may have said other AUSAs have asked for it.

I can represent as an officer of the Court I've asked

41

to have inmates placed in the Benton County Jail for -- not for security issues in my case but because there was threats against them in the Linn County Jail and I need to get them someplace other than where there might be threats against them.

So it doesn't happen in every case. I agree with that. I don't know that it's extremely or exceedingly rare. I'd probably agree that it's rare. I mean, this is all getting nicety with the words on it. It doesn't happen all the time.

I think more importantly in the analysis, I get a kick out of the conspiracy theorists, and this is one of them because having worked for the government, the government isn't that good. We can't carry out a conspiracy and succeed very easily in my experience working for the Department of Justice. The thought that we would orchestrate Roger Arechiga and Pete Wright and Pat Reinert into this whole plan to get Angela Johnson in the Benton County Jail for the purpose of eliciting information from her through McNeese falls apart when the uncontroverted evidence before the Court was the person who decided where McNeese was -- or where Johnson was going to be placed was a lowly employee of the Benton County Jail who placed her where the only other female in the jail was located.

It's one of these things that people want to look at the facts and they're going to think in a conspiracy theory and draw negative conclusions from everything they see, and yet they're not dealing with that one key fact that they've not

42

Page 35

controverted in any way. It was Mr. Moreno who was working the shift when she came in who made the decision where to place her. If there was some, you know, conspiracy here, why would they leave a lowly jail employee to make that critical decision on where to place her, and how could they orchestrate weeks before that to put the only other female in the jail in the cell next to McNeese? I mean, it's one of those things that falls apart when you actually start to look at the evidence in this case.

So I just don't think there was any support to it. I'm surprised, frankly, that the defendants have maintained this. I thought their abandonment of that issue was a wise one. Apparently they've not abandoned it. I just don't think the evidence supports it in any way in this case.

THE COURT: Mr. Stowers, anything else you'd like to add?

MR. STOWERS: Well, there's a couple of the points about this issue, and I don't think that -- again, I don't think we have to prove that he was put there specifically for the purpose of eliciting from her. But remember what Mr. Arechiga said about Mr. Reinert in characterizing this contact that he had with him. He characterized Mr. Reinert as a very aggressive prosecutor in describing the contact that he got from Mr. Reinert in which Mr. Reinert directed that she be put in the Benton County Jail. That was a comment I think at the time that the Court responded to in some fashion, and then Mr. Arechiga

43

modified his answer to say, Well, he's just very much into details; he pays a lot of attention to details, as if that was explaining what he meant when he originally said that the

Page 36

contact that he received was from Mr. Reinert and he characterized that as a very aggressive prosecutor who he had been getting this contact from in response to a question about why -- wouldn't this be unusual to get this type of a contact. He said he's a very aggressive prosecutor, and I think that's sort of a pregnant answer and carried with it a lot of meaning.

And then there was the testimony of Mr. Reinert in which he admitted that at the time that he had directed Ms. Johnson to go to the Benton County Jail Mr. Reinert who had been summoned over to the Linn County Jail by Mr. McNeese in April and caused Mr. McNeese to move from Linn County to Benton County at Mr. McNeese's request, that he was aware when Miss Johnson was asked to be put in Benton County that Mr. McNeese was in Benton County. That's what Mr. Reinert testified to.

And the other thing about the initial placement is that Pete Wright was involved in that initial placement and he becomes a central character in the sequence over the next two months. And Pete Wright's job is not as a jailer. He is not a jailer. He is an investigator who does investigations at the jail, of inmates at the jail. That's one of the things that he performs as a function for that jail. And he was contacted at the first.

44

So there's some inferences that can be drawn. How much of them the Court needs to draw, cares to draw, or feels it appropriate to draw is up to the Court. But there's a lot of indications here of a lot of flags going up on something that creates a certain smell about what was happening here that hasn't passed us by, and that's our point of it.

THE COURT: Mr. Williams, any need to respond?

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 80 of 100

MR. WILLIAMS: Not unless Your Honor would like me to respond. I don't feel a need to.

THE COURT: I don't think so. Let me ask you this. Do you want to argue your continuance motion today now, or would you like me to set it for oral argument next week sometime? I know it wasn't on the agenda, so I'd be happy to set it for argument next week if you'd like. We'll just do it telephonically.

MR. WILLETT: Your Honor, if it please the Court, this is Mr. Willett, and I'm going to intercede on this issue. All of the defense counsel for Angela Johnson will be present in Cedar Rapids at various points or at various times Wednesday through Friday of next week. I would like to argue that telephonically some time next week if those days would fit with the Court's schedule. If not, I realize Monday is a federal holiday, but we could certainly be available Tuesday. Mr. Berrigan could not be here today. I'm sure he'd like to weigh in on that. I could certainly argue it now if the Court

45

directs that this is the appropriate time. But I think a telephonic hearing next week might allow us to be better suited to argue it then.

THE COURT: Well, Mr. Willett, I'm very curious about one of your comments. Do you even think for a second I'll be taking Monday off?

MR. WILLETT: No, Your Honor. I know you well enough that you'll be at your desk working on some part of your docket. And we will be available Monday also.

THE COURT: We can do it later in the week, Wednesday through Friday, when everybody's over in Cedar Rapids, and that

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 81 of 100

will work fine. I'll have my secretary Jennifer set it up, try and do it at the convenience of counsel. I was originally going to be gone all next week, but now I'm going to be here, so I have virtually no matters set. And we'll be able to accommodate that request to have it argued next week.

You know, again, I apologize for the delay. Delay is not something I'm accustomed to in my other cases, but I've certainly added to the delay in this case. I don't know what to tell you when I'll get an opinion off. I've just come off -- I'm in my sixth jury trial in the last 35 days including the holidays, and so I've just been in trial virtually every day for the last month and then some.

And with my case load and all, I just don't know when I'll get to it, so I'll get to it as quick as I can, and

46

obviously that's going to weigh in on the continuance motion because I realize that I have not resolved the pending matters with the speed that I'm either accustomed to or that I expect of myself, and that's certainly not -- it shouldn't reflect the parties, you know, the fact that I didn't get this ruling out as early as I had hoped it would. It's way beyond when I hoped I would have had it decided.

MR. WILLETT: Your Honor, you don't need to explain anything to us. We know you give all of your cases the best efforts, and we know when you have the time to devote to this you'll give it your best effort, and we appreciate it. Thank you.

THE COURT: Well, I will, and it's a very, very, very, very, very important matter, and I wish I would have been able to give it more time. I think you all know this about me. I'm

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 82 of 100

not going to decide it without giving it the time it's entitled to and it deserves because I don't do that with anything, so I'll definitely do it. I just wish I had done it quicker. But having said that, I'll do it as quickly as I can under the circumstances.

Appreciate counsel's willingness to do argument by the ICN. I just wanted to state on the record, have the lawyers state on the record -- I should have done it at the beginning; I was remiss -- that, one, I didn't have to have to hold oral argument on this at all but, recognizing that, that the parties

47

were willing to do it on the ICN and that nobody had an objection to it. Would that be right, Mr. Williams?

MR. WILLIAMS: Absolutely, Your Honor.

THE COURT: And either Mr. Stowers or Mr. Willett, is that correct that on behalf of Defendant Angela Johnson you had no objection to appearing on the ICN?

MR. WILLETT: That is correct, Your Honor. The communications have been fine. Miss Johnson's been seated next to me for the entire proceeding. She's heard every word that the Court and Mr. Williams and Mr. Stowers has said, and she's been able to see you and Mr. Williams in Sioux City at all times. This has worked very nicely.

THE COURT: Okay. Thank you very much. We'll adjourn the proceeding now. Thank you.

(The foregoing hearing was
concluded at 4:11 p.m.)

Page 40

                              CERTIFICATE

          I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.




                                          2-21-06
          Shelly Semmler, RMR, CRR              Date

Page 41

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 84 of 100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.

ANGELA JOHNSON,

      Defendant.

_____/

ORIGINAL

No. CR00-3034
    CR01-3046

TRANSCRIPT OF
PHONE HEARING

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, January 23, 2002, commencing at 9 a.m.

Case 3:09-cv-03064-MWB-LTS    Document 284-64    Filed 06/23/11    Page 85 of 100

APPEARANCES

For the Plaintiff:          C. J. WILLIAMS, ESQ.
                            PATRICK J. REINERT, ESQ.
                            Suite 400 - Hach Building
                            401 First Street Southeast
                            Cedar Rapids, IA   52407

For the Defendant:          ALFRED E. WILLETT, ESQ.
                            Terpstra, Epping & Willett
                            Higley Building - Suite 500
                            118 Third Avenue Southeast
                            Cedar Rapids, IA   52401-1424

                            PATRICK BERRIGAN, ESQ.
                            2500 Holmes
                            Kansas City, MO   64108

                            DEAN STOWERS, ESQ.
                            Rosenberg & Stowers
                            1010 Insurance Exchange Building
                            505 Fifth Avenue
                            Des Moines, IA   50309

Reported by:                Shelly Semmler, RMR, CRR
                            320 Sixth Street
                            Sioux City, IA   51101
                            (712) 233-3846

THE COURT: This is United States of America versus Angela Johnson, Criminal Numbers 2000-3034 and 2001-3046. We're here on the defendant's motion to continue trial and pretrial deadlines. Mr. Willett, are you going to be arguing, or will it be Mr. Stowers?

MR. WILLETT: Well, I can start, Your Honor, if that's okay. Your Honor, I have you on speakerphone because Mr. Berrigan is here in my office also.

THE COURT: Oh. Good morning, Mr. Berrigan. I didn't realize you were there.

MR. BERRIGAN: Morning, Your Honor.

MR. WILLETT: Your Honor, I think our motion is fairly self explanatory. Where we find ourselves is this: We're sort of at a crossroads where we still have a great deal of discovery to obtain from the U.S. Attorney's Office. We were there yesterday visiting the file now that it's been renumbered and reorganized and bate stamped, and I can tell you that there are 63 discovery notebooks for the government's discovery file in this case. And when I say discovery notebooks, Your Honor, you should envision three-inch to four-inch binders that are three-ring notebooks, so notebooks of significant size.

So we were worried about the pretrial motions deadline of February as it related to motions relating to trial because the one thing we have to work through with

Mr. Stowers' help is there were numerous search warrants executed in this case. And we are, quite frankly, behind in terms of our analysis of any of those type of suppression issues.

The other thing, as the Court is aware, we're awaiting the Court's ruling on the Massiah hearing. And depending upon what the Court rules, the government may envision an interlocutory appeal. That could affect our situation.

But quite frankly, Your Honor, the biggest problem we have right now is the discovery issue. As the Court is aware, we've tried to resolve that with the government. To date there's been no agreement. And as the Court is aware, we're going to have a hearing of some nature with Judge Jarvey tomorrow afternoon to try to start to get some relief on that. Quite frankly, Your Honor, we're just -- we're running very hard to catch up, and this is a very important case, and we want to be ready. And we're not sure that we can be ready by the month of May with these other issues that are interacting with the trial date. As I said, we can be ready later in the year.

The only trial conflict we have, Mr. Berrigan has a death-penalty case in the state of Kansas that starts on September 16 and would last approximately one month. I have the end of the year open. Mr. Stowers has told me he's

available any time during the last quarter of the year. I think -- and the government can correct me if I'm wrong. I think we're still envisioning a trial of approximately one-month duration, and that's where we're at.

And in terms of -- if the Court's curious if this case might resolve itself through plea negotiations, I can advise the Court that we're nowhere close to resolving the case through plea negotiations at this time. So I don't have any type of a comfort level that I can give the Court advice that, gee, whiz, we're talking or, gee, whiz, there's a plea agreement that's being negotiated. We're nowhere near that situation, so Angela's defense team is at this point envisioning a trial date.

THE COURT: Well, I hope to give you one. Who's going to argue for the government?

MR. REINERT: I will, Your Honor. This is Mr. Reinert.

THE COURT: Yes, Mr. Reinert. Good morning.

MR. REINERT: Morning, Judge. Well, Your Honor, as we responded -- I think we set out our position in our brief, and I hope the Court got that.

THE COURT: I did, and I read it, and I appreciate it.

MR. REINERT: But in essence we understand the defendant needs additional time; however, we don't think it

should be an inordinately long delay. I know the Court's concerned about selecting a jury during the summer months for a trial of this length which is why I think we initially set it in the spring. We're also concerned if we start pushing it too far into the fall given the demographics of the western division with a significant farm population that if we get too far into the fall and the fall harvest season we're going to have difficulty selecting a jury as well or finding a significantly large pool since I anticipate the Court's going to have to call in an inordinately large jury pool to do jury selection in this case.

So we would suggest that in the event the Court grants the defendant's motion that it be somewhat limited and avoid some of those peak time periods when we know a large population base will be absent.

MR. WILLETT: Your Honor, one thing if I can add for just a second, I should advise the Court that I have had a conference with Angie where I talked to her about our motion for continuance. She understands. She's accepting of it. She was just hoping -- and she knows you're busy, but she was hoping that in the perfect world we could try this case before the end of the calendar year 2002.

THE COURT: Well, I had a trial date in mind which was September 23, but that obviously conflicts with Mr. Berrigan's trial conflict. And, you know, I'm not

sure -- any time in the fall we're going to have the problem with the farmers not being able to serve on a trial anywhere near this length. You might be able to get them on a three-day trial, and we pretty much -- we just excuse them from the panel because any more there's no point bringing them in and saying, hey, I farm 200 acres, and I can only be gone 2 days. And so we wouldn't even, you know . . .

So that was the date I was looking at. You know, I wanted to try and avoid weather problems, you know, when we get later into the year. Of course, this year's been a breeze. We haven't had a weather-related problem in any of my six jury trials in the last two months. Mr. Berrigan, what's the likelihood that your case will go to trial?

MR. BERRIGAN: It's virtually a hundred percent, Your Honor. My client's charged with capital murders in both Kansas and Missouri. There are three bodies in each state and two other people missing. There will be no plea offers forthcoming, and this case is set in stone on our promise to get involved. It was a change of counsel. Not too long ago I became involved in the case, and we've committed to the judge we'll be ready on September the 16th. He has no inclination to continue that case. And we're not predisposed to do that either, frankly.

THE COURT: No. I understand that. Is that case in state court or federal court?

MR. BERRIGAN: State court, and it's state of Kansas, Your Honor, right outside of Kansas City.

THE COURT: Okay. And when do you think you'll be done with that trial?

MR. BERRIGAN: It's a four-week trial, sir. I think it will be over in a month.

THE COURT: Well, and then you obviously can't go from one death-penalty case to another. You know, it's not like trying a contested divorce where you could go from one to the other without a whole lot of delay. I'm not trying to make light of it, but, you know, that's an additional problem it seems to me because even if we started the beginning of November that would push things for you, wouldn't it?

MR. BERRIGAN: Yes, sir.

THE COURT: We certainly couldn't start any earlier -- you know, assuming your case does go to trial -- and I understand everybody thinks it will. Stranger things have happened. But assuming your case goes to trial, let me ask you this, Mr. Berrigan. Assuming your case goes to trial and assuming -- state court cases really take a month?

MR. BERRIGAN: Well, this one will, Your Honor, because they're going to introduce evidence of six murders, all separate murders that occurred over a span of approximately five years. So I expect it will take quite a long time. And there's going to be a significantly long

penalty phase as well. Plus we have some jury selection issues in that case. It's gotten quite a bit of publicity in our area. There's a paperback written about it, and it's been on Dateline and a number of other things. So we do think this is going to take quite a bit longer than most state death-penalty trials.

THE COURT: Well, let me phrase the question this way: When do you think you would be reasonably ready for the Angela Johnson case?

MR. BERRIGAN: I think at the earliest, sir, I need just at least a couple of weeks or so. I'd like to assure the Court I could be ready by the middle of November.

THE COURT: Mr. Reinert, hearing what Mr. Berrigan's situation is, what's your view?

MR. REINERT: Well, starting the trial in the middle of November will certainly be some issues related to scheduling with the holidays, and I know we have a number of incarcerated witnesses that will have to be brought back with the airlift. I know the marshals don't run their airlift during certain times during the holidays. It's possible if we try to schedule a month-long trial over the course of the Thanksgiving and Christmas holiday that we may have difficulty getting some prisoner witnesses in.

THE COURT: Well, here's just kind of what I'm tentatively thinking. I mean, this is obviously a problem.

And I'm sensitive to the issues that Mr. Reinert raised about, you know, the public has an interest in a speedy trial too, and I have to balance that versus the defendant's interest and the lawyers' conflicts and the like. But it doesn't seem very feasible to me to do it in the fall given Mr. Berrigan's situation. If he didn't have that case, you know, it would be very feasible to start in September and finish up before the bad weather.

So here's what I'm thinking just because there don't seem to be any good options. And the other problem I'm having is, as you all know, Judge Melloy has his confirmation hearing tomorrow. And we'll be without half of our Article 3 judicial horsepower for anywhere for the next year to 18 months, how ever long it takes to fill Judge Melloy's vacancy, and I'll be the only full-time active Article 3 judge in the district. We do have the sixth heaviest criminal case load in the nation. We led the nation in trials last year. We've led the nation in contested sentencings. We led the nation in almost every -- well, that's an ex -- not almost every statistical category, but we were at the top in virtually every statistical category. And that presents a huge problem too, you know, finding a month-long period of time to try a case like this given all of the other criminal cases in the district and the fact that we're down 50 percent of our case load.

So having said all that, I mean, I think we're really looking at maybe the Honken trial date of -- I believe that case was set to start January -- was it 6th?

MR. REINERT: Yes, Your Honor. This is Mr. Reinert. The Honken trial date has not yet been set. We have another scheduling hearing. The last hearing we had to set it for some reason Mr. Honken was out in the yard and couldn't come back to the phone.

THE COURT: Well, I've got it on my calendar for trial starting actually January 7. I don't know where that came from.

MR. REINERT: It could be that -- I know we were discussing and kicking some dates around, but I don't think we actually have an order setting that yet, and it could be since we're having our hearing relatively soon with Mr. Honken that Judge Zoss has anticipated and taken time off your calendar.

THE COURT: That's odd because normally it doesn't get on my calendar unless there's an order setting it, but maybe that was -- you know, between the various judges, the magistrate judges, there was something lost in the translation. But I have it down on my calendar for January -- starting on January 7 of 2003. That appears to be news to the government; right?

MR. REINERT: That was a date that we discussed

during our last telephone conference, and then it wasn't -- I never got an order on it. I know that was kind of a date we kicked around, and then there was some further discussion because Mr. Honken was discussing his speedy trial rights with Judge Zoss.

THE COURT: Oh, I see. You know what probably happened? Somebody informed me of that date, and we just probably put it on the calendar to lock it in, but it was actually never set based on what you're telling me. So how do you feel about using that date, January 7?

MR. WILLETT: Judge, the only thing we were going to suggest is we'll do whatever the Court wishes. We didn't see the Thanksgiving holiday as that big of a problem because you're really only talking about a couple days like a Thursday, Friday with the trial being recessed, but I do understand the Court's concern about weather and things of that nature. But we didn't see the Thanksgiving holiday as that big of a problem.

THE COURT: Okay. So you'd rather go on November?

MR. WILLETT: Quite frankly, Judge, yeah. We'd start I think in November.

MR. BERRIGAN: In Kansas City, Your Honor.

THE COURT: Right.

MR. WILLETT: Kansas City is beautiful during the holidays. I'll tell you that.

THE COURT: Well, here's the good news. I had lunch last week with a judge here in Sioux City, a state court judge, who is on the Iowa appellate courts, and we were just chatting about our cases, and he said did I have anything interesting, and I said, Well, not really, but I've got this one case, so I started telling him a little bit about this case, the Angela Johnson case. He had never heard of it. He had never heard of five bodies. He didn't know what I was talking about.

MR. STOWERS: He's not going to be on our jury I guess.

THE COURT: Well, but I think the good news really is that -- and he's a very well-informed individual, makes a lot of trips to Des Moines, reads multiple newspapers a day. He had never even heard of it. And so I know for the lawyers in the case it's the center of your universe as well it should be because it's a very important matter. For northwest Iowans, I'd be willing to bet not one out of a hundred has even heard of the facts. Now, that could easily change between now and the trial date. I understand that. And that's why I'm going to defer ruling on the change-of-venue motion until we get a lot closer to trial.

MR. STOWERS: Right.

THE COURT: So you're back now to wanting a November date. What day in November could you be ready?

MR. WILLETT: Judge, we'd be willing to start mid November if the Court could work us into your docket, maybe the week of the 11th of November. I know the 11th is Veteran's Day, so we'd probably be looking at the 12th.

THE COURT: Well, I'm just looking.

MR. WILLIAMS: Judge, this is C. J. Williams. I'm going to weigh in here a little bit if I could.

THE COURT: Yes.

MR. WILLIAMS: I think that the estimate of this trial lasting a month, frankly, is a little optimistic given what we have to get through. And, frankly, I think it might take up to six weeks, and I think the idea of trying to schedule this in not only through the holidays of Thanksgiving but also the Christmas holidays and also given the fact you're going to be the only Article 3 judge in all likelihood during this time period I think, frankly, it's unrealistic. I think it's going to put the jurors, the Court picking the jury, the Court and all the parties in a fairly untenable position.

And, frankly, you know, government's prepared to go to trial now. In May it was set originally, and if the defense wants a continuance, I think, frankly, it would be wiser to put it off to the January date that you originally proposed. As much as we dislike any continuance, if you're

going to do it, I think it's better to put it off where it's more realistic we're going to be able to get this thing accomplished.

THE COURT: I think it's doubtful we'll have Judge Melloy's replacement on board by then. I think that's doubtful.

MR. WILLETT: Judge Bennett, I agree with you knowing the politics of Washington, D.C., at this moment. The other thing I'm trying to balance is that although Angela's being very gracious about understanding the need for a continuance, she's hoping to get some resolution to this also. And, of course, I have to keep in mind that she's been incarcerated since the last day of July of 2000.

THE COURT: I understand that.

MR. WILLETT: And that's certainly something I have not lost track of. So I appreciate Mr. Williams' concern. I mean, you know, we all have to go home to our loved ones. I can imagine what my wife's going to say about me being in Sioux City during Thanksgiving and Christmas. But --

THE COURT: Try Cheyenne, Wyoming.

MR. WILLETT: Wyoming's beautiful in December, Judge. I would go to Cheyenne in a heartbeat.

THE COURT: Centrally located for the convenience of witnesses.

MR. WILLETT: And we'll do some skiing on the

weekends. But, you know, if we started on the 12th of November, Your Honor, that gives us six weeks up to the Christmas holidays. And I'm not going to say Mr. Williams is wrong. Maybe this is a six-week jury. But I still think we can wedge this thing in before the end of the year.

THE COURT: Well, I've only been in one other trial that went through Thanksgiving and Christmas, and it was really difficult logistically and hard on the jurors. You know, you say now it's going to be six weeks, and then it could turn into eight weeks, and I just think we -- you know, the maximum number of jurors we can use is 16. And when you go through Thanksgiving and Christmas, you just run the risk of -- I don't know. I just think that would be difficult and increase the likelihood that we might have a problem with a number of jurors. Certainly in jury selection, I mean, you know, how much are we -- if it goes into Christmas, then are we going to take two weeks off because people will be traveling and going out of state? And I intend to go out of state. I don't get much vacation time, and I always take time off between Christmas and Thanksgiving to spend it with the in-laws, hardly a vacation. You know what the difference between in-laws and outlaws are?

MR. WILLETT: No, Your Honor.

THE COURT: Outlaws are wanted.

MR. WILLETT: I feel your pain, Judge.