THE COURT: So, you know, ideally November would be better, but I just think the holidays present a problem and doesn't really give Mr. Berrigan much time to transition into this case.

MR. WILLETT: Well, I know Mr. Berrigan would not have said he could be ready if he thought otherwise.

THE COURT: Mr. Williams, what's your best estimate of the length of the government's case?

MR. REINERT: Judge, we would suggest probably three weeks or so, maybe a bit more than that for the government's trial days.

THE COURT: And then anybody know anything about the death-penalty phase? Mr. Berrigan does. He may be the only one. I know nothing about it really.

MR. WILLIAMS: We're taking that into account in our estimations and what Mr. Reinert just indicated was just the trial phase. We think the penalty phase obviously won't take nearly as long as the guilt phase, but we're probably thinking that the Court's going to have to set aside at least a week and maybe as much as two weeks for the penalty phase, but I think we can probably accomplish it in a week.

MR. BERRIGAN: Your Honor, this is Pat Berrigan. I'm sure that defense penalty phase evidence will take less than a week, and I agree with Mr. Williams. We probably should be able to finish the penalty phase in a week or just

a little over.

THE COURT: And is there usually a break between the two?

MR. BERRIGAN: Well, that would be ideal, but given our schedule we may not be able to do that.

THE COURT: Yeah. Maybe take a day off or something.

MR. BERRIGAN: Yeah. Frankly, that's as much as I've ever had off between both phases.

THE COURT: Well, I don't really know what to do actually. I'm paralyzed with indecision. I hate to keep moving it and all. So really I hear the defense saying you would really rather have November than January?

MR. WILLETT: Yes.

THE COURT: And the earliest you could start it in November would be the 11th? I mean, I imagine -- how long do you think jury -- were you factoring in -- how much time were you factoring in for jury selection, Mr. Reinert and Mr. Williams, in your three-week estimate?

MR. REINERT: Your Honor, I think we were anticipating on top of that probably upwards of a week for jury selection. I think it could go a little bit faster if we use a detailed questionnaire, and I know -- and I can -- Judge Melloy provided me a copy of a questionnaire they were using as a draft model for death-penalty cases.

THE COURT: Yeah. I've used questionnaires in both civil and criminal cases, and I'm really a big believer in them.

MR. REINERT: Well, this questionnaire that the circuit was looking at was actually focused on --

THE COURT: On the death-penalty issues in jury selection.

MR. REINERT: Right, and there's a few modifications that we would suggest on nullification and things of that nature. I'll put together with a letter and attach a copy to counsel and the Court, but it's about a 15-page questionnaire. It's very detailed.

MR. BERRIGAN: Your Honor, this is Pat Berrigan again. I've tried two federal death-penalty cases now, and each time we used questionnaires numbering over 30 pages, just under a hundred questions. They were extremely valuable in shortening jury selection.

THE COURT: And how long did jury selection take, Pat, in both of those cases?

MR. BERRIGAN: Less than a week, sir. Four days in one case and less in the other. Of course, one of those cases was only a penalty phase, so that shortened things considerably, but we really think we could do jury selection in less than a week, and if we started on the 12th, I anticipate we'd be done with jury selection that week.

I should point out, Your Honor, this would anticipate the Court being available before jury selection to make strikes for cause based on some of the responses in the questionnaire.

THE COURT: No. I understand that. Yeah. Well, now has anybody -- if we start this on the 12th of November and take off a good chunk of Thanksgiving week because I'm going to New York City that week and then we come back -- so that'd give us really just two weeks before Thanksgiving; right?

MR. BERRIGAN: Yes, sir.

THE COURT: And then one week of that would be jury selection. One week of evidence. We'd come back into December, and we'd take the next two weeks with the government's evidence, and then that only gives us -- that only gives us like six or seven trial days to do any defense evidence, deliberations. I mean, I'll plead ig -- I don't know anything about how the death-penalty case works. I think I've seen on TV or read. You know, I feel like a total -- well, I am totally uninformed. The jury comes back on guilt or innocence. Then you go into the penalty phase.

MR. BERRIGAN: Yes, sir.

THE COURT: So then how does that give us time to do the penalty phase before the holidays? And this is kind of a best-case scenario it sounds like. That gives us time to do

that because you haven't factored in any time for deliberations.

MR. WILLETT: Well, Your Honor, if it please the Court, I just asked Mr. Berrigan if he could be ready by the 4th, and he nodded that he could. I guess we could start this thing on Monday, the 4th of November, and that builds a week in there for unforeseen circumstances.

MR. BERRIGAN: My part of the trial, Your Honor, will be the penalty phase, so, frankly, the first three weeks I'll be not as involved as Mr. Willett and Mr. Stowers. So I think we could start early. If we could get it done by the end of the year, we'd really like to do that.

THE COURT: Okay. That seems a little more realistic. Mr. Reinert or Mr. Williams, what do you think of November 4?

MR. REINERT: We're available, Judge.

THE COURT: Well, why don't I set it for November 4, and we'll go from there. I'll go ahead and get a trial scheduling order. Now, would the parties be able to agree on the deadlines? You know, part of the problem is to the extent that there are extensive pretrial motions, I just don't have much time anymore to work on things, you know. We're just so busy. And I don't have the luxury of the assistant U.S. attorneys that they can focus on a couple of cases. I've got 560 pending cases. And they can't all come

to a halt because you file a bunch of motions in this case. And so, you know, I'll say this. I'll put it down for November 4, but to the extent that it generates a lot of my judicial time, I'm just going to move the trial again because I'm already working 7 days a week, 80 to 100 hours a week. I'm not going to work any harder than that. I can't.

MR. WILLETT: Your Honor, Mr. Berrigan -- if it please the Court, Mr. Berrigan just suggested to me that we use May 6 which was our trial date for Angela as our pretrial motions deadline, and that would give the Court all summer, you know, with the aid of the magistrates to work through any other pretrial motions.

MR. STOWERS: Can I make a suggestion, Judge?

THE COURT: Yeah.

MR. STOWERS: I think this case is kind of crying out for a pretrial conference with the Court where we can go through, you know, how we're going to actually get to trial because we haven't gotten in a position yet on our side where we're ready to go to trial, and a lot of that has to do with the fact that we're attempting to work with the government and they're telling the Court they're ready for trial, but they, frankly, haven't given us a lot of help in getting ready for trial on our side, and we need --

THE COURT: I didn't know that was their job.

MR. STOWERS: We need some help from the Court in

getting some of these issues like the production of Jencks materials prior to trial so --

THE COURT: I thought you were going to take up all discovery matters with Magistrate Judge Jarvey tomorrow.

MR. STOWERS: We're going to attempt to get some of those issues addressed. I don't have a lot of optimism that it's really going to happen. But maybe it will. But I'm just thinking that a lot of these issues that we're going to have about how this trial is conducted is going to be, you know, something that prior to trial, maybe a month before trial, you're probably the only one that can address it.

THE COURT: Well, yeah. We'll probably have to have a pretrial a month or two before trial. And, you know, the other thing I'm considering is after I rule on the Massiah issue, I may see if we can get a judge from outside the district to come in and handle this case because I just -- I don't have the time to do this case, handle my docket, and help out on Judge Melloy's docket. I mean, that's just impossible.

MR. STOWERS: And the other thing with the trial, Judge, is as I understand it, if the motion on the Sixth Amendment issue is sustained in whole or in part, the government will be back in asking the Court to sever the second indictment and set it for a separate trial so that they can use that excluded evidence under their theory in

that separate trial.

THE COURT: No. I understand that too.

MR. STOWERS: So you may be talking about another trial of equal length or at least under consideration.

MR. WILLIAMS: If we try the second indictment first, it may become a moot issue on the first trial, first indictment, frankly.

MR. STOWERS: Well, that's another issue.

THE COURT: Right. Right. That's a potential issue too. But you're assuming an awful lot on what your view of the scope of the Massiah holding is too.

MR. STOWERS: Right. We gotta get a ruling first.

THE COURT: Right. And I'm a ways away from getting a ruling out, although I've been working on it.

Well, I'll go ahead and set it for November 4. I have serious reservations whether it's going to go to trial on November 4, but I'll set it on November 4.

Now, what other deadline are we talking about other than the -- I don't have the scheduling order in front of me.

MR. WILLETT: Well, Your Honor, we would establish a pretrial motions deadline, and then the only other traditional deadlines would be when the Court wants proposed voir dire and jury instructions and trial briefs if we decide that that would aid the Court. Those would be the only other traditional deadlines I could think of besides pretrial

motions.

THE COURT: Wasn't there a discovery -- wasn't there a nontrial-related motion deadline?

MR. WILLETT: Yes, Your Honor. That was January 4 I believe.

THE COURT: And that passed.

MR. WILLETT: Yeah, and that's why we got our motion to continue on file. And then there was a motions deadline related to trial motions set for the month of February which might have been Valentine's Day. I don't have the order in front of me, Judge, but that was set in February. So the Court had basically given us two different pretrial motions deadlines, one relating to trial issues and one relating to nontrial issues.

THE COURT: Well, don't we need to have both those deadlines now?

MR. WILLETT: Fine, Your Honor.

THE COURT: I mean, you haven't resolved your discovery problem so . . .

MR. WILLETT: You're correct.

THE COURT: Well, can you guys at least get together and agree on dates for those deadlines?

MR. WILLETT: We will be glad to, Your Honor. The defense team is here this week, and we will be glad to meet with Mr. Reinert and Mr. Williams.

THE COURT: Why don't you do that. And also why don't you pick a time for a final pretrial conference, and I think we probably ought to go out maybe six or eight weeks. You know, maybe we could have one six or eight weeks out and then one, you know, two to three weeks out.

MR. WILLETT: Maybe we could envision something where we have one pretrial conference before Mr. Berrigan starts his Kansas trial and maybe one shortly after its conclusion.

THE COURT: Yeah, something like that. Why don't you just put together a letter telling me what deadlines you pick for the pretrial discovery related matters, for the trial-related motions, and for the pretrial conferences. Just send it to me in an agreed-upon letter, and then I'll enter a formal order accordingly. But I'll go ahead today and grant the defense motion for a continuance and continue it to November 4.

MR. WILLETT: Thank you, Judge.

MR. WILLIAMS: Judge, just to raise one other issue in this case in particular -- and we can work on dates for these as well with defense counsel, but I think it would be appropriate for us to actually schedule any deadlines for any Daubert challenges to expert testimony from either side. So I think what we'll do is we can work together to come up with a date of designation for experts by both sides, a date for

filing any Daubert challenges to the expert testimony, and then -- and if there are any, then we can have plenty of time in advance of trial so the Court can have a hearing on it if necessary to resolve any Daubert issues, but I think that's something we may want to do separately as a separate deadline.

THE COURT: That's fine, but to the extent I have to hold a hearing and rule on Daubert issues, I can guarantee you a November 4 trial date is totally unrealistic for me.

MR. WILLIAMS: And I don't know, Judge, that there's to go to be any.

THE COURT: Right, but I think it's a very wise idea to schedule it. And if they're simple, fine. But if we get into some complicated Daubert issues, I mean, you know, I'll do the best I can, but I got a lot on my plate.

MR. WILLETT: And, Judge, we have no problem with that idea. We think it's a sound idea also.

THE COURT: Okay. Good. Anything else we need to chat about now?

MR. WILLETT: No. We're doing fine, Your Honor. Thank you.

THE COURT: Okay. Mr. Williams, Mr. Reinert, anything else?

MR. REINERT: No, Your Honor.

THE COURT: Okay. Thank you, gentlemen.
(The foregoing hearing was concluded at 9:37 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Shelly Semmler, RMR, CRR

11-30-02
Date

 ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,)
                          ) NOS. 00-3034MWB
     Plaintiff,           ) AND 01-3046MWB
                          )
vs.                       ) MOTION TO COMPEL
                          )
ANGELA JOHNSON,           )
                          ) PAGES 1 THROUGH 39
     Defendant.           )

                    *   *   *   *

                    APPEARANCES

     PATRICK J. REINERT and JUDITH WHETSTINE, Assistant
U.S. Attorney's Office, PO Box 74950, Cedar Rapids, Iowa
52407-4950, appearing telephonically on behalf of the
plaintiff.

     DEAN A. STOWERS, Attorney at Law of Rosenberg Law
Firm, Insurance Exchange Building, 505 Fifth Avenue,
Suite 1010, Des Moines, Iowa 50309, appearing
telephonically on behalf of the defendant.

                    *   *   *   *

     The telephonic motion to compel held before the
Honorable Paul A. Zoss, Judge of the United States District
Court for the Northern District of Iowa, Western Division,
at the Federal Courthouse, Sioux City, Iowa, on Tuesday,
May 21, 2002, commencing at 10:36 a.m.

                    *   *   *   *

          Reported by Jami L. Johnson, CSR-RPR-CP.

                    *   *   *   *

**SCHUETTS REPORTING**
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 1325
SIOUX CITY, IA 51102-1325
PHONE: 712-239-1300

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 13 of 100

THE COURT: We're on the record. Why doesn't everybody identify themselves for the record.

MR. STOWERS: Dean Stowers for Angela Johnson.

MR. REINERT: Pat Reinert and Judy Whetstine for the government.

THE COURT: We're getting some feedback from somebody.

MR. REINERT: Pardon me?

THE COURT: We're getting some feedback from someone. It's gone now. Go ahead.

MR. REINERT: Pat Reinert and Judy Whetstine for the government.

THE COURT: Is that all that's on the phone here today?

MR. REINERT: That's correct, Your Honor.

THE COURT: Okay. Just one second.

* * * *

(An off-the-record discussion was held.)

* * * *

THE COURT: Okay. We're back on the record.

We're here today to talk about the motion filed in both cases, motion to compel discovery. It's Docket No. 44 in 3036, and it's Docket No. 254 in 3034. I've read the motion. I've read the resistance. I've read the reply, and it seems -- Correct me if I'm wrong. This

motion involves three different categories of documents; is that correct, Mr. Stowers?

MR. STOWERS: Right.

THE COURT: Basically, Series E documents are documents that either have been provided completely or partially depending on the position of the parties but that were provided before they had Bates stamps numbers on them, and the defense wants copies with Bates stamps numbers on them. And -- some or all -- I'm not clear of that -- they want without the water marking on it so they can use as exhibits. Is that a correct statement of Series E -- the issues?

MR. STOWERS: That's right.

THE COURT: Mr. Reinert, do you agree that's the issue?

MR. REINERT: Yes, Your Honor, I think that's the issue on Series E.

THE COURT: Series K involves materials that again were either completely or totally provided, depending on the position of the parties -- completely or partially provided -- excuse me -- depending on the position of the parties as Jencks material at the prior hearings in front of Judge Bennett.

And, again, the defense wants another copy with Bates stamps numbers and I believe possibly some without

water marks so they can use them as exhibits. Is that a correct summary of the Series K documents?

MR. STOWERS: I think that's right too.

THE COURT: Do you agree, Mr. Reinert?

MR. REINERT: Yes, Your Honor.

THE COURT: Series J documents are documents that have not been provided in terms of copies. They're -- Access to Series J has been provided in the discovery material, and that issue concerns construction of the following sentence in the stipulated discovery order that was drafted by the parties and submitted to the Court and then signed by the Court -- amended stipulated discovery order -- excuse me -- which is Docket No. 254.

I may have given the wrong docket number of the pending motion. That's Docket 254. The sentence is as follows: Should defense counsel want copies of noninterview documents or tapes from these discovery files, the parties shall determine the most expeditious manner for copying.

As I understand the position of the parties -- I'm not completely clear because I don't think you've actually stated your positions, but the defense states that that clearly means that everything in the file is -- must be provided in terms of copies. It's just that the manner of copying is something that was left for further

negotiation.

And the government doesn't think that that's what that language means at all, that -- I'm not quite clear what the government's position is, but I think their position is that the further discussion is whether to be copied or not, not whether or how to get them copied.

Mr. Reinert, what is your position on that language?

MR. REINERT: I think that's correct, Your Honor. Our position is that that language does not open up the entire file for copying but rather a case-by-case discussion about those documents -- about whatever other documents, and the balance of the agreement is all limited to the DCI, DEA and FBI reports --

THE COURT: You have to speak up and into the microphone a little better, Mr. Reinert. We're not going to get a good record.

MR. REINERT: I'm sorry, Your Honor. The balance of the agreement sets forth copying requirements based upon the DEA, DNE files, the DCI files and the FBI reports --

THE COURT: You'll have to speak up.

MR. REINERT: That that language does not open up the entire file for copying but is really a suggestion of whether documents would be copied in addition to those already provided in the agreement.

THE COURT: Well, the reason I asked that Miss Whetstine to be here is that in Mr. Stowers' motion he recites that she helped negotiate the documents with him and maybe Mr. Willett. I'm not sure who else was involved in those negotiations, but despite the statements in the motion that this language is entirely clear, I don't think it's clear. It appears to be pretty awkwardly drafted -- this particular sentence. Although the rest of the document is a good example of cooperation between the parties.

Let's start out and deal with Series E, first of all, and Series K. We'll talk about the easier issues. Mr. Stowers, why don't you tell me what your position is on Series E? I know that you want these documents. Why do you need another copy?

MR. STOWERS: Well, we don't have a complete copy of those documents at this time.

THE COURT: Okay. What are you missing?

MR. STOWERS: Well, the problem is is to identify specific documents that were missing would require us to do an actual manual comparison of pieces of paper that we do have --

THE COURT: Well, name one document that you know you're missing.

MR. STOWERS: Oh, there's a number -- there's a

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 18 of 100

number of letters in that correspondence file, either written to or from our client, that we don't have copies of at this time.

THE COURT: That you know are in the file --

MR. STOWERS: And, frankly, I think we have very few of the letters to or from our client from Series E.

THE COURT: How many documents are in Series E all total?

MR. STOWERS: I think it's basically one binder.

THE COURT: I mean, are we talking thousands, hundreds or --

MR. STOWERS: Maybe 500 pieces of paper or so.

THE COURT: Mr. Reinert, do you agree that there's documents in Series E that were not included in what's already been provided?

MR. REINERT: I believe that is probably correct, but to explain the scope of Series E, Series E is four notebooks, Notebook Nos. 8, 9, 10 and Notebook 31. 8, 9 and 10 contain the correspondence such as letters written by the defendant or to the defendant, letters exchanged between McNeese and Johnson, for instance. I believe all of 8, 9 and 10 have been provided to the defense earlier.

No. 31 is the jail records which are the local, you know, county sheriff's records related to reports of the defendant's conduct while in jail and things of that

nature. That was not provided, but the earlier ones that were all correspondence I believe all were.

And when Mr. Stowers asked about that, I asked that -- I told him we would give him a full copy of the correspondence from Series E and just basically trade it, getting the Bates stamps ones with the water mark on it. And if he found a document in the Bates stamped file that he wanted a clean copy of that he wanted to use an exhibit, we could make a clean copy of that exhibit.

THE COURT: And that was for 8, 9, 10 and 31?

MR. REINERT: That was for 8, 9 and 10. Mr. Stowers and I did not specifically discuss 31 which is the local jail records.

THE COURT: Does he have copies of those or not?

MR. REINERT: Those are available in our discovery files. I do not believe he has a copy of 31.

THE COURT: Is that something that was included in the discovery agreement that he gets a copy of?

MR. REINERT: 31 would be local jail records that would not be included as part of the copying agreement.

THE COURT: Mr. Stowers, what's your response to Mr. Reinert's comments?

MR. STOWERS: I don't believe we have all of 8, 9 and 10 at this time.

THE COURT: I mean, what's your response --

MR. STOWERS: I know we don't have any of the Notebook No. 31. And, you know, the facts -- the fact is is that when we worked out this discovery order, it was known to the government that we had unBates stamped paper.

THE COURT: My question is this: First of all, with respect to 31, do you believe 31 is directly provideable under the agreement, or are you relying on the language -- that last sentence in paragraph 6?

MR. STOWERS: Yeah, I think -- I think I'm relying on paragraph 6, but I think it's very well maybe covered elsewhere in the order as well as law enforcement reports that are not agent reports of interviews.

THE COURT: Well --

MR. STOWERS: The way the order was set up was we had agent reports of witness interviews which was the one area that the government was adamant about not providing us with physical copies of. Those are being transcribed.

The rest of the material was specifically identified -- for example, grand jury testimony -- as being copied early on. And then the rest of the material, what was left to be determined, which included a smorgasbord of different categories of papers, was identified as noninterview materials. And those materials -- The issue there was that the parties would determine the manner that they would be copied and the most expeditious way of

getting that done because those were a little bit different.

THE COURT: Okay. I don't want to get to that issue --

MR. STOWERS: And that was the way the order was set up.

THE COURT: I don't want to get to that issue right now. I just want to identify our problem. In terms of the jail records, No. 31, is that covered specifically by any part of the agreement other than paragraph 6?

MR. STOWERS: I think, if it consists of law enforcement reports that are not witness interview reports, then it would be.

THE COURT: As I understand it, these are jail records? Mr. Reinert, is that what you're saying these are?

MR. REINERT: Yes, Your Honor. (Inaudible).

THE COURT: We can't hear a word you're saying.

MR. REINERT: I had to grab a notebook. Notebook 31 has phone logs, visitors' information, incident reports --

THE COURT: Please speak closer into the microphone.

MR. REINERT: Incident reports of misconduct both at Linn County, the suicide attempt in Black Hawk County,

and activity logs which would be --

THE COURT: Mr. Reinert, why don't you just pick up the phone? If Miss Whetstine has to talk, we'll put it back on speaker phone.

MR. REINERT: Yes, Your Honor. And I can put it on mute when we're not talking. That would take the background out.

THE COURT: Okay. But the main problem is we can't hear you.

MR. REINERT: To go back on Notebook 31, it includes the Linn County Jail activity log which is apparently when visitors -- when individuals other than (inaudible) --

THE COURT: We're not hearing you. You're going to have to speak up and talk more slowly.

Mr. Stowers?

MR. STOWERS: Yeah.

THE COURT: Are you on speaker phone?

MR. STOWERS: No.

THE COURT: Okay. And there's only the three of us on; right?

MR. STOWERS: That should be right.

THE COURT: Okay.

MR. REINERT: It also includes phone logs of phone calls made --

THE COURT: We just have two phone lines here? I'm going to call you both back.

Mr. Stowers, what's your phone number?

MR. STOWERS: 515-243-7600.

THE COURT: And, Mr. Reinert, what number are you at?

MR. REINERT: 319-363-6333.

THE COURT: 6333. Mr. Reinert, you're sounding like somebody who is missing a tooth and whistling. Every time you speak we're hearing --

MR. REINERT: Okay. I'll hang up then.

THE COURT: We're going to try it again.

* * * *

(An off-the-record discussion was held.)

* * * *

THE COURT: Mr. Reinert, why don't you pick up where you were describing what's in jail record -- what's in Notebook 33?

MR. REINERT: Notebook 31.

THE COURT: 31. Excuse me.

MR. REINERT: It has a section on Linn County Jail activity log which is basically visitors and mail that's been received, just a log of mail and visitors done by the defendant. A phone log of phone calls made at -- from various places of incarceration, just phone tolls.

And I believe we actually gave them phone toll information at some point, but I'm not 100 percent sure if they got this or not.

Visitor information when the defendant had visitors, incident reports from Linn County and the suicide attempt from Black Hawk County. Those are all records created by the local sheriff's department where the defendant is incarcerated.

THE COURT: Okay. First of all, Mr. Stowers, what's wrong with Mr. Reinert's offer to trade you a Bates stamped copy for your nonBates stamped copy?

MR. STOWERS: Well, you know, first of all, we have an order in place at this point.

THE COURT: I'm asking you what's wrong with it.

MR. STOWERS: It's just not acceptable to us, Judge.

THE COURT: Why?

MR. STOWERS: The government has continually done this --

THE COURT: I don't want to hear this invective. I want to know why it's a problem.

MR. STOWERS: It's a problem because we're just -- we're not willing to modify the order.

THE COURT: Well, fine. It's ordered. Your order -- If you want the Bates stamped copy, you're going

to trade it for the nonBates stamped copy; all right?

Next issue. Let's talk about jail records, Notebook No. 31.

MR. STOWERS: Okay.

THE COURT: I'm not going to hear arguments that we've got an order in place. You guys had a stipulation, and the language isn't that clear. If you're not going to agree, I'm not going to have anybody saying they're being reasonable by trying to shove something down somebody's throat and not giving me a reason.

When I ask you a reason and you say I don't have one, I'm just not willing to do it, that's not a reason. And I'm not going to accept it, and I don't want to hear that kind of stuff.

MR. STOWERS: Judge, let me explain to you where we are on this stuff.

THE COURT: Well, I gave you a chance, and you didn't. And I don't want to hear a history of invective. We're not going to have that here.

MR. STOWERS: Well, that's fine, but the problem is every time we try to get discovery on this case there's been added conditions placed on our efforts to obtain things that we think we're already able to get.

THE COURT: I asked you what the problem was with switching the one record for the other, and you haven't

given me an answer yet.

MR. STOWERS: The first problem was they refuse to give us the copies at all. Then --

THE COURT: I don't want the history. I want to solve the problem.

MR. STOWERS: Well, I want to solve it too, but the problem is is that we've run into this issue time and again, and I want to settle the issue of what the heck we're entitled to under this order once and for all because --

THE COURT: I just --

MR. STOWERS: -- the problem is we're going to come back and ask for other things.

THE COURT: That's what I'm doing right now. I'm deciding what you're going to be entitled to under this order, so I've ruled on Series E with respect to Notebooks 8, 9 and 10. Let's talk about No. 31.

MR. STOWERS: Okay. I understand. 31, as I understand what the description is, is a bunch of different law enforcement related records emanating from the jail. We don't have any of that stuff.

THE COURT: Have you looked through it yet?

MR. STOWERS: We have browsed through it, looked at it, and there's a wide variety of material there as well, and we're still interested in receiving it.

THE COURT: Okay. Mr. Reinert, what's the problem with producing these records -- the jail records?

MR. REINERT: Well, Your Honor, I believe they already have the phone toll information. We can probably provide a copy of this. I just don't want to have our acquiescence in providing this copy which goes outside, you know, what we believe is the tailored portion of the agreement as some indication that we're just going to copy the whole file.

THE COURT: The problem with Jail Records 31 -- I'm not sure that that's not just regularly discoverable under Rule 16, and I don't see there's any problems. There's nothing confidential.

You know, this is stuff that -- I just don't see a problem, so I'm going to order that within general discovery procedures that the government file -- require that the government provide the defense with a copy of Notebook 31.

Let's turn to Series K. Again, what's the -- does the defense have all of Series K or not?

MR. REINERT: Your Honor, Series K is two notebooks -- this is Mr. Reinert, for the record -- is two notebooks of Jencks material provided prior to Mr. McNeese testifying and given to defense. It may have even been before Mr. Stowers was involved in the case for them to

cross-examine Mr. McNeese, and we just never got that material back after the hearing.

THE COURT: Well, it seems like as Jencks material you should get it back, and then if it's producible under the agreement, you should be giving them copies under the agreement. Is this -- Again, is this nonBates stamped, or what's the deal with this?

Mr. Stowers, what's --

MR. REINERT: I can answer that. The copy that was provided to the defense prior to the hearing as Jencks material was before we Bates stamped the file. There was a time in the file we had -- it was unBates stamped. And, actually, the first step Mr. Stowers and I took on this discovery issue was to get the final Bates stamps so we could try and track documents a little better.

THE COURT: Mr. Stowers, what is it that you don't have that you need in Series K?

MR. STOWERS: Well, okay. The goal was to insure ourselves that we had the same thing that is now in the file with the Bates stamps on it. The only efficient way to do that is to get a copy of it. Now, this material which is generically called McNeese-Jencks material, again, is a wide variety of stuff.

THE COURT: How big is the file?

MR. STOWERS: It's two three-inch binders.

THE COURT: So we're talking a thousand pages or more?

MR. STOWERS: Probably about right. And that material, by and large, I think it's correct was provided to the attorneys that were representing her prior to my involvement, which is Al Willett and Pat Berrigan prior to the April 2001 hearing.

THE COURT: Let me ask you a question about this: You're not sure you've got everything, and that's something you want to make sure of. Doesn't that mean that at some point you're going to have to sit down with what you've got and with exhibit -- or excuse me -- Series K and the discovery file and do a comparison, document by document, and see what you're missing, if anything? And what's -- Why is that -- why isn't that something you couldn't do in their office as well as in your office or anywhere else?

MR. STOWERS: If we had a copy with the stamps on it, we'd know we have the same pieces of paper. At this point we have paper without stamps on it that you have to do a visual comparison, and that's the challenge.

THE COURT: Okay. Mr. Reinert, are you offering the same deal where they can trade their copies for Bates stamped copies?

MR. REINERT: Well, Your Honor, I think this is a

bit different because this is Jencks material that we provided, and the Jencks material includes, you know, prior testimony made by the witness, transcripts. It includes any kind of latest prior conviction.

It's really pure Jencks material that we would suggest needs to be returned. We're going to have to provide that Jencks material, and I think we've drafted a new -- an order for the Court to enter -- or at least to consider entering on time lines for trial.

Under the trial management order we'll have to provide Jencks material again in excess -- in advance of trial, but this material would be available. We suggest this material should be returned to us. Then we'll provide it as Jencks material in accordance with the trial management order once that order is entered.

THE COURT: So this is -- Well, some of this is under paragraph 2; right?

MR. STOWERS: It should be.

MR. REINERT: There are some -- Yeah, the grand jury transcripts were already provided under separate -- in separate binders. First, it's the Jencks -- these are Jencks binders including just Jencks related to Mr. McNeese whereas the grand jury binders include the grand jury of all the witnesses, so --

THE COURT: But there's a Jencks that's not grand

jury that you provided for Mr. McNeese.

MR. REINERT: Right.

THE COURT: Okay. Mr. Stowers, what is it that you want with respect to Series K, and what's your authority for getting it?

MR. STOWERS: I guess my thought was that -- And I didn't know there was any controversy because I wasn't involved prior to the April hearing. I actually became involved in this case right in the middle of the hearing, but -- And that would be in April of 2001.

But I did not think there was any controversy over the defense having a copy of the so-called McNeese-Jencks material since they had had it for a year. And if it was supposed to have been returned and it didn't get returned, then apparently that wasn't an issue. And so what I wanted to do was to ensure we had a duplicate of K with the stamps on it so that we were safe and assured ourselves out of our obligation to be -- emphasizing due diligence that we had that file. And that's why I asked for it.

And there's a lot of things in there -- It's labeled the McNeese-Jencks file, but there's a lot of things in there that are agent reports of interviews with Mr. McNeese. Certainly those are categorically things that the government has declined to provide us with regard to

other witnesses, but I don't think there was an issue whether -- really until we asked for a copy of it with the stamp numbers on it, and then we ran into this issue.

THE COURT: Well, I don't have in front of me a request to have the items returned. That hasn't been made, so I'm not going to rule on that; but what's the -- I understand -- and I understand your thought that that wasn't an issue, but I guess the question is what authority do I have to order the government to produce those items unless I get to paragraph 6 and start --

MR. STOWERS: Right. I think to the extent that the material is covered elsewhere by the order, then the Court would have the authority, for example, on the grand jury testimony, noninterview reports relating to McNeese, those sorts of things. Criminal history would certainly be something the Court could order to be produced and elsewhere in the order.

THE COURT: Mr. Reinert, let me ask you, with respect to Series K, I don't know what -- What does the Series K mean?

MR. REINERT: Your Honor, we took the file, and in order to assist both ourselves and the defense review, we took the file and divided it into categories alphabetically, and then the notebooks were numbered. So, for instance, the DCI report, you know, would state DCI is

all Series A.

THE COURT: And what is Series K?

MR. REINERT: Series K -- The only thing that's in Series K is the McNeese-Jencks.

THE COURT: So that is the information that was, in fact, provided.

MR. REINERT: It was, in fact -- All of Series K was, in fact, provided.

THE COURT: Okay. Well, I think the only -- only way to resolve this, and it's going to be cumbersome but, Mr. Stowers, somebody from your office or the defense team's going to have to sit down with the government's discovery file and go through Series K and compare it with the documents you've got --

MR. STOWERS: I understand.

THE COURT: -- and see if you've got everything, unless we have something else on paragraph 6 --

MR. STOWERS: Right.

THE COURT: -- that we'll talk about right now.

MR. STOWERS: Okay.

THE COURT: As I look at this amended discovery order -- I'm not sure who signed -- Let me see. Judge Jarvey signed it. I'm not sure how involved he was in the negotiation, if at all. It seems like the document was presented to him for signature, and he signed it.

Can anybody tell me whether he made any changes in the document from what was proposed?

MR. STOWERS: He didn't.

MR. REINERT: He did not, Your Honor.

THE COURT: Okay. Then let's go through it. So this is what the parties agreed and tried to use to put their discovery problems behind them. The first paragraph talks about the restrictions on what defense counsel can do with the documents and how they have to maintain them. Is that correct generally?

MR. STOWERS: Right.

THE COURT: I don't want anybody -- I'm not going to try and by verbiage leave anything out, but I'm just trying to categorize what's in the agreement, so somebody tell me if I'm off base. Although the agreement, of course, is what you've actually agreed.

The second paragraph says that after defense counsel confirms that paragraph 1 requirements have been made, the U.S. Attorney's office will provide three sets of grand jury transcripts from their file which can't be copied. And there's restrictions on how they can be reviewed, but -- and what they can be used for. Is that basically what's in the paragraph 2?

MR. REINERT: That's correct, Your Honor.

THE COURT: Paragraph 3 says the defense counsel

are going to get copies of agency reports and forensic analysis relating to the recovery of the victims' remains and their restrictions on what could be done with those. The documents can be water marked at the discretion of the United States Attorney, and if they're given to experts for the defense, they're not to be copied or disseminated by the experts and he's required to secure them to prevent -- the experts -- he or she, the experts, are required to secure them to prevent unauthorized disclosure.

And if defendant wants to see them, he has to -- he or she -- or in this case it's a she -- has to do so in the presence of a member of the defense team. Is that basically what's in paragraph 2 -- 3? Excuse me.

MR. STOWERS: I think so.

MR. REINERT: Yes, Your Honor.

THE COURT: Paragraph 4 just says U.S. will provide copies of laboratory reports. Paragraph 5 says that the U.S. will provide three copies of DCI, DNE and FBI reports to the defense counsel and significant portions of DEA reports.

The remaining DEA reports will be available in the discovery file as described in paragraph 6, and the government can remove attachments which contain interviews of individuals. And defense counsel agrees to dictate or otherwise produce those interview statements in a way that

doesn't mirror graphically the actual statements.

So you can look at the statements that are attached to those reports, but you don't get a copy of them. And, again, the government could water mark documents provided in paragraph 5. Is that a good generic summary of paragraph 5?

MR. STOWERS: That's fine.

MR. REINERT: Yes, Your Honor.

THE COURT: Now, paragraph 6 is the paragraph at issue, and the last several paragraphs after that basically talk about procedural matters. Paragraph 6 says that Al Willett can check out any single volume of the discovery file at a time but can't copy it. It must be secured in a locked container in his office when it's not being worked on and that, if defense counsel wants the defendant to review the materials, they have to do so in -- the defendant has to do so in the presence of a member of the defense team and that no copies can be provided to the defendant.

And then the last sentence, should defense counsel want copies of noninterview documents or tapes from these discovery files, the parties shall determine the most expeditious manner for copying. Now, you read that -- the sentence, and I'll just tell you the sentence itself implies that anything in the discovery file can be copied.

But when viewed in the context of the agreement, it's pretty silly to have all these other restrictions and requirements when the defendants get a copy of anything anyway and it's just an issue of what's the procedure for copying.

So somebody tell me what this sentence is supposed to mean and what the parties intended by putting it in there, and somebody tell me if there was a meeting of the minds on what this sentence means.

Mr. Stowers, you go ahead first.

MR. STOWERS: Well, the sentence was discussed specifically and probably haggled over between Miss Whetstine and myself a little bit but -- And part of the problem is is that there are so many different types of documents in the file that identifying them by name would only leave you with the potential of leaving something out.

So my effort was -- in working with Miss Whetstine in this language, was to identify the things that the government definitely didn't want to give us copies of, which were the agent reports of witness interviews. And that's why the phraseology copies of noninterview documents, meaning documents other than witness -- or agent reports of witness interviews, would be provided because we knew that at the end of the day what was going to be

withheld from us under paragraph, I think, 5 and maybe -- well, I guess paragraph 5 principally was going to be law enforcement reports that were witness interviews that the government had decided they weren't going to provide us copies of. And then we were going to have to go through the arduous process of transcribing that stuff.

There were other categories of documents which included and which were discussed which included these things like letters back and forth that were being intercepted by jail personnel and things of this nature that we wanted but which we didn't need to address on an up-front basis because the primary issue, as you'll recall at the time that all this came about earlier this year, was the huge job that we were facing of potentially having to transcribe thousands of pages of grand jury testimony and all the law enforcement materials and everything else.

And we were told to go meet with Judge Jarvey and deal with that, but this -- And we attempted to do that. We had a hearing with him, and then after that hearing the parties got together, beat each other's head against the walls and came up with this order which was very extensively worked on as far as drafting goes back and forth.

THE COURT: What's in Series J?

MR. STOWERS: Series J is going to be similar to

Series E, but it would be related to Dustin Honken. So Series E would be the Angela Johnson jail correspondence and records. Series J would be the Dustin Honken correspondence and records.

THE COURT: How many pages are in Series J?

MR. REINERT: Your Honor, I've got Series J in front of me, and that is approximately -- it's like two volumes -- two three-inch binders.

THE COURT: So 500, 600 pages? Is that what you're thinking?

MR. REINERT: That's probably a good approximation, Judge.

THE COURT: Okay. Go ahead, Mr. Stowers. I'm sorry.

MR. STOWERS: Well, I guess when we left this order the way it was, I think it was clear that what we were talking about is getting copies of other documents that were not specifically addressed in the order, but the need for the copies at the time was not absolutely clearly known. And identifying those documents specifically in the order, we were either going to kill each other trying to deal on a document-by-document basis, or we were just going to reach an agreement that we would get those copies upon request at a later time and we'd determine the most expeditious manner for that.

The government's main concern throughout all these negotiations was with reports of witness interviews and earlier on, before they got over that hurdle, with the grand jury testimony itself. But that's what the purpose of the thing was was so that we could get this type of other material copied, and we determined the expeditious way to do that at the time that we got to that. And so we completed the earlier discovery copies as set out in the earlier paragraphs. Then we get to the issue of copying some of this additional material, and we run into an immediate impasse on that.

THE COURT: Miss Whetstine, you were in the negotiations. What's the -- what's your take on this?

MS. WHETSTINE: Your Honor, I did retain copies of some of the various drafts as Mr. Stowers and I were working through them, and I note that this particular sentence, which is the last sentence of paragraph 6, was added fairly early on in the negotiations.

I cannot, at this point in time, tell you exactly what was said when the sentence was added. I don't have any notes, and I don't have a memory specifically. I certainly know that there was concern by the defense attorneys regarding expeditious copying of documents. I know that was a major concern.

I do recall Mr. Stowers talking about the Angie

Johnson jail records. I recall him talking about some banking records.

I don't know. He may have talked about the Honken jail records. I don't specifically recall one way or another.

THE COURT: Here's the problem. The way this language reads, it sounds like there was an agreement that the government would provide copies of noninterview documents or tapes from these discovery files, and the only thing that was at issue was how to get it done expeditiously, and --

MS. WHETSTINE: I agree reading that paragraph that it's -- as in the context of the whole agreement, it's somewhat fuzzy. All I can say is if it was our intent to say we will provide everything except for noninterview documents --

THE COURT: Except for -- Yeah, except for interview documents.

MS. WHETSTINE: Well, yes, except for interview documents, then I would have assume we would have said it. So, you know, I suppose one can argue that the sentence implies the defense identifies what they want. We discuss it. And then if we decide, then we try and figure out an expeditious manner of copying.

THE COURT: Well, what was your --

MS. WHETSTINE: But I can't -- I can't tell you specifically at this time what my intent was. I'm, unfortunately, going to have to rely on what's down in the document and, by implication, that we don't say everything is available except interview documents.

THE COURT: Well, Mr. Stowers is right that this document is going to prevent -- or present a template for a myriad of other potential discovery issues. If the document is intended to be an agreement that the parties are going to just work out the details of providing copies of all noninterview documents, then it's going to dictate the results of a lot of other discovery disputes if this language is intended to be or, in fact, as it comes out really means that should defense counsel want copies of noninterview documents or tapes from these discovery files and the government decides to provide those documents, the parties shall determine the most expeditious manner for copying.

That phrase that I put in, and should the government decide to provide those documents, isn't in the sentence. But as Miss Whetstine says that, if the sentence is read as it is, it seems like there would be something else in the document that says United States will provide all other -- copies of all other noninterview documents, and it doesn't say that either.

There's just kind of a gap as to -- There's nothing in there about whether the government will or will not provide those noninterview documents. The sentence as written seems to assume there was such an agreement, but the fact that there is such painstaking specificity with regard to what is being produced kind of is -- runs contrary to having such an assumption.

So it really puts me in a quandary because this is an order of the Court. Everybody's wanting us to enforce the order of the Court as written, but the parties drafted the order. And there was no intent, I'm sure, by Judge Jarvey as to what was to happen in this situation because he signed the orders the parties produced. And I guess I'm not even sure what the law is on the enforcement of a stipulated order when there's an ambiguity in the stipulated order.

MS. WHETSTINE: I did a -- I actually did a quick check under the parol evidence rule. Hadn't looked at it in years, and it's -- I think the cases I found indicated that if there's ambiguity, then it's within the Court's discretion to interpret it.

THE COURT: Well, I think -- you know, my impression is that there was a mutual mistake. Both sides left this ambiguous. And the government thought we're putting all these restrictions on, and we're going to just

be giving what we've agreed to specifically.

And the defense thought -- Mr. Stowers thought, well, I've got this sentence in there. It lasted through several drafts. I'm assuming if it's noninterview stuff, I'm going to get it. We might have to argue about who's going to copy it or how it's going to be maintained, but I'm going to eventually get it.

And if I'm right and there's a mutual mistake of not a meeting of the minds on this issue, are we back to enforcing the tenor of the agreement, or am I back to what the federal discovery laws provide?

MR. STOWERS: Well, Judge, I don't think there was a mistake at all. I -- There was no mistake in understanding what this provision said. There was expressed conversations about this paragraph, and it's not like the sentence was put in there without the government seeing and also actually making some language changes to that agreement, as I remember it, that this was something that was discussed.

We were going to get additional copies above and beyond what was provided and that the manner by which that would happen and the timing would be matters that would be determined by the parties later once we identified what those additional materials were.

THE COURT: Well, let me just ask --

MR. STOWERS: Somewhere else in the order we talk about dates for production and specificity, and then there's a whole other category of discovery that everybody knew about in this huge cart that was going to have to be identified what we wanted out of there.

We weren't going to go in and say we want you to copy everything on the cart other than witness interviews because that would not be necessary or appropriate, and so we didn't do that. That's why the order doesn't say that.

What we did know was what we did want and what we needed right away which is the things that are specified. And then there was this remainder of material, which is a good amount of stuff, that we still needed, and it included things like these documents.

THE COURT: Miss Whetstine, do you -- I know you say you don't have any memory of your specific intent. Do you have a memory that contradicts what Mr. Stowers just indicated was his intent in these negotiations?

MS. WHETSTINE: The only comment I have is that I don't recall the intent was that everything be copied other than the interview documents. And, like I say, I do specifically recall discussions about the Johnson jail records and some of those specific items, bank records. There were some categories of documents that he was referencing.

THE COURT: Let me ask -- Mr. Reinert, let me ask you this: With respect to just Series J -- One way to resolve this issue is to just go ahead and resolve each request as it comes up for noninterview -- And -- and it's a little broader than that. I think it's agency reports, interviews and other related matters that Mr. Willett gets to check out.

I'm not sure that -- I'm not sure whether noninterview documents and tapes refers to the reports or related matters or what. You know, there's not an exact overlap on this, but maybe the only way to resolve this is to -- I hesitate to suggest this, but I'm thinking that's the only way to resolve it -- is to look at each request as they come out. And if you're not able to work something out, we'll rule on it based on the law and the reasonableness and the general tenor of the agreement.

And if I do that, I guess I'd want to know with respect to Series J -- not setting any precedent with respect to any other request that may or may not come up, what's the particular problem with Series J?

And, Mr. Reinert, I'm not going to ask you to give up your right to argue about anything else. I'm not. But I'm just saying it seems like Series J, if this is correspondence to and from Honken in jail, this isn't like an interview report that if something gets out, some

witness is going to put in jeopardy or that some position of the government is going to be compromised. It seems like this is something that, if it's maintained under the same type of restrictions that are in paragraphs 1, 2 and 3, that wouldn't really cause the government any heartburn. Why don't you address that?

MR. REINERT: Well, Your Honor, Series J is -- as I said, it's two volumes. One volume is letters written -- As I recall, these are all letters written by Defendant Honken to various individuals including some letters to Miss Johnson.

The other volume is all related to a correspondence request to Woodbury County, the jail log that shows the visitors. As I recall, the escape attempt stuff is in there as well, the attempt to escape by Mr. Honken and all the records maintained by the jail.

I know my intent when I first started with the discovery issue before I had to leave town and go to a course, we had in there -- at least in some of the earlier drafts -- discussions about this would be kind of a final agreement. And we were trying to give them copies of what they absolutely needed to have like the DCI report, DNE reports, the very important -- that actually included or encompassed actually a lot of other reports, but the balance of the file was not going to be copied unless they

came in, made a specific request, kind of document by document. We needed this as exculpatory evidence or that one.

THE COURT: Mr. Stowers, why don't you tell me, how is this information going to help you be admissible, or what's it going to do to help your case without giving away strategy or anything? I have some trouble seeing who visited -- how who visited Honken in jail is going to have anything to do with the trial of your client.

MR. STOWERS: Well, there's a lot of writings by Mr. Honken that -- as well as writings to him that are very interesting for a lot of different reasons to the way it worked, approaching not only the so-called guilt phase of the case but also the sentencing phase of the case.

And I don't know that I'm really able to say a lot more than that about it right now without getting into too many things that relate to how we're thinking about the case. There's a number of issues with Mr. Honken as an inmate, and one of the things that the indictment reflects is that the indictment time period and the conspiracy time period extends I think into the year 2001, I believe, and -- or at least up to 2001, and a lot of these writings are writings by Mr. Honken within the time frame of the conspiracy as well as writings to him by other parties. And then there's additional jail record materials

which relate to some events that the government is going to try and prove up, as I understand it, in doing their case in chief.

THE COURT: None of these documents are like government reports or anything like that. They're all just independently citizen-produced type documents or jail records? Is that right, Mr. Reinert?

MR. REINERT: No, Your Honor. The one volume is letters written by Mr. Honken, so that would be produced by Mr. Honken. The other volumes are all records produced by the Woodbury County Jail.

THE COURT: That's what I meant to say. That's what I thought I said. That's what I meant to say. There's no government agent -- investigative agent or prosecution agent that's produced anything that's in this report, no laboratory or DEA or anything like that. It's all either produced by a citizen, that being a defendant or somebody visiting a defendant in another case or by a jail facility; is that correct?

MR. REINERT: That is correct, Your Honor.

THE COURT: Okay. Well, I'm going to think about it, and I'm going to give you all a week to submit any kind of authorities or suggestions for my ruling in that week, and then I'll get out an order.

Does anybody have anything else they want to say

about it?

MR. REINERT: No, Your Honor.

MR. STOWERS: Just on that final sentence of paragraph 6, if noninterview documents didn't include Series J, then I don't know what it did include. I really haven't heard the government explain why they don't think these were included within that description, so --

THE COURT: That's a dilemma, and maybe I'll hear something in a week, maybe not, but thank you all.

MR. STOWERS: Thank you.

THE COURT: We're in recess.

* * * *

END OF HEARING AT 11:28 A.M. ON 5-21-02.

* * * *

REPORTER'S CERTIFICATION

I hereby certify that the foregoing is a true and accurate transcript to the best of my ability of the telephonic hearing recorded by me and reduced to typewriting at my direction.

_Jami L. Johnson_
Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,  No. CROO-3034

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,  Transcript of
                            Phone Hearing

      Defendant.
                          /

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, June 17, 2002, commencing at 9:57 a.m.

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                        Assistant United States Attorney
                        Suite 400 - Hach Building
                        401 First Street Southeast
                        Cedar Rapids, IA  52401

                        THOMAS HENRY MILLER, ESQ.
                        Iowa Attorney General's Office
                        Area Prosecutions Division
                        Hoover State Office Building
                        Des Moines, IA  50319

For the Defendant:      DEAN STOWERS, ESQ.
                        Rosenberg, Stowers & Morse
                        1010 Insurance Exchange Building
                        505 Fifth Avenue
                        Des Moines, IA  50309

                        ALFRED E. WILLETT, ESQ.
                        Terpstra, Epping & Willett
                        Higley Building - Suite 500
                        118 Third Avenue Southeast
                        Cedar Rapids, IA  52401

Court Reporter:        Shelly Semmler, RMR, CRR
                        320 Sixth Street
                        Sioux City, IA  51101
                        (712) 233-3846

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 53 of 100

THE COURT: Thank you. Good morning, counsel. Whose idea was this, to have this conference? Wasn't my idea.

MR. STOWERS: I think it was the defense, Your Honor.

THE COURT: Okay. What do we need to talk about?

MR. STOWERS: Well, the government, as you know, has filed an interlocutory appeal from the April ruling on the suppression issue which seems to us very likely will have an impact on the scheduling of further things in the case including the trial date because of the fact that there's a stay that results at least to some extent from an interlocutory appeal.

THE COURT: And?

MR. STOWERS: Well, we just think that we all ought to visit about what we're going to do with the scheduling of the case since there's a trial date currently set for November and there were some motion dates suggested to the Court earlier in the year that I don't believe an order's ever been entered on, and the parties I don't think are really clear on where we stand as far as what the dates are for motions, what the date is for trial and those sorts of things in light of this interlocutory appeal.

THE COURT: Let me ask Mr. Williams. C.J., how long do you think it will take to get your interlocutory appeal resolved? What's been your experience?

MR. WILLIAMS: Usually we could get that resolved anywhere between 90 days and maybe 4 months I think. We've only

had -- I've only been involved in about, I think, three of them

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 54 of 100

that I can recall. Usually they move them pretty quickly, and we usually get them resolved in 90 days.

Now, we have, Your Honor, asked to have the briefing scheduling stayed in the Eighth Circuit on this interlocutory appeal until we get a ruling on this.

Kind of the second prong under the test would be the Texas v. Cobb briefing we're doing right now with the fact it makes sense to us if we lose on that issue that the Court has everything at one time and if we take a look whether it's necessary to appeal the first case to begin with.

So we've asked for a stay on our briefing schedule. But even with that stay, I mean, we're early enough at this point I'd be hopeful we could get this thing accomplished still by the November date.

THE COURT: So you think we ought to keep the November trial date?

MR. WILLIAMS: Yes, Your Honor. I mean, I think we're prepared to go forward on this. And the fact we started an interlocutory appeal doesn't stay or move off the trial date. You know, until and unless the briefing schedule or the arguments is delayed so far as to go beyond the trial date, then the parties would be coming to the Court asking for a continuance, but that's not happened at this point. So I think any motion to continue the trial would be premature at this

5

point.

MR. STOWERS: Judge, this is Dean Stowers. I did an interlocutory appeal that the government took in a case about two years ago in a case called U.S. versus Davis, and that interlocutory appeal took -- before the mandate was issued by

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 55 of 100

the circuit, it took a full year, and the issue in that case was a very simple issue that was a single brief point involving a discretionary exclusion of evidence that the government had revealed in an untimely way in discovery. And Judge Longstaff had excluded it, and then the government appealed that decision, and it took over a year for that interlocutory appeal to be resolved. So I don't know about this 90- to 120-day prediction for movement particularly given the length of the record on this issue and the complexity of it.

THE COURT: It'd take them that long to read my opinion, wouldn't it?

MR. WILLIAMS: They're going to get that reduced to a book on tape, though, Judge.

THE COURT: There you go, C.J. Good idea. It's -- I kind of -- you know, I haven't had much experience with it, and the experience I've had, I don't pay any attention to it, and I had a brief conversation with C.J. I didn't even look -- I've never once ever looked to see if a party appealed one of my rulings. The only thing I know about this interlocutory appeal is what I've heard from the lawyers in the case. Was it some

6

kind of limited appeal, Mr. Williams?

MR. WILLIAMS: Yeah. I think at this point it's going to be a structured and limited appeal. We've on our end did our initial analysis. We submitted the analysis to main Justice, but my anticipation at this point is we're going to be looking at focusing on a time period between the first time we learned of contact between McNeese and Johnson, September 11 when we adopted him, formally adopted him as an agent, looking at that period of time and the information we obtained during that

Page 4

period of time only.

THE COURT: But, you know, I think the appeal's going to be slowed up by my ruling on the second part of it. You know, I've just got so many cases right now with Judge Melloy being on the circuit that it's really slowed -- you know, normally I try and get my rulings out quickly. Obviously I did not get my ruling out quickly on the suppression issue, but it was a complicated issue. You know, I'm up to almost 1,200 cases now, and I just don't know when I'm going to be able to get the ruling out.

The parties, you know, wanted the briefing extended and all, and that's fine. But it seems to me that it's highly unlikely that we could keep this November trial date. Now, I'm not saying that we shouldn't keep it for scheduling purposes and defer the decision to continue it if at all down the road. I'm just saying it seems to me highly unlikely that you would have

7

this case argued and the circuit issuing an opinion in sufficient time. You know, we can't have an opinion the day before trial. The parties have a right to have a reasonable period of time to prepare in response to whatever it is that the circuit in their wisdom is going to do with it.

MR. WILLETT: Judge?

THE COURT: Yes.

MR. WILLETT: This is Al Willett if I may interject.

THE COURT: Al, you didn't pause long enough. I couldn't figure out who it was. You said it was Al Willett. I thought it was Al Willett.

MR. WILLETT: There you go, one in the same.

THE COURT: Okay.

Page 5

MR. WILLETT: My thought, Your Honor, the only thing I would like to add is this: I tend to agree with where the Court's assessment is of the viability of this trial date. Part of what is sort of confusing us, for lack of a better term, is the fact that the parties had sent I think the Court a letter earlier suggesting pretrial deadlines for the Court to consider and if the Court agreed, you know --

THE COURT: The January 25 letter?

MR. WILLETT: Pardon me?

THE COURT: The January 25 letter from Pat Reinert?

MR. WILLETT: Bingo.

THE COURT: And I never entered an order.

8

MR. WILLETT: We never had that letter memorialized with any type of order. So as we're progressing towards the November trial date, Dean and I are wondering out loud, okay, should we be concerned about July 1? Should we be concerned about August 1?

THE COURT: Well, you've only missed one of the deadlines.

MR. WILLETT: You know, I have no problem keeping this November trial date for right now. My client realizes that the viability of the November trial date is not good. Her only request was that if she got bumped she'd like to be in front of you as soon as your docket would allow, you know, pursuant to the schedule. But it would probably help give us some guidance if we knew that, okay, for right now motions related to trial are going to be due this date, motions not related to trial are going to be due this date just to sort of keep us percolating along.

Page 6

THE COURT: Yeah. You know, another factor is actually -- you know, I'd just as soon try this case after Judge Reade gets on board. I don't want to be involved in a month-long trial and try and manage all of the other administrative duties and all the other cases I have. I mean, we can keep this November date, but really, C.J., do you really think it's very realistic?

MR. WILLIAMS: Well, the only way I think it's

9

realistic, frankly, Judge, is I suppose if we -- if the Eighth Circuit denied our request to stay the briefing schedule and we started briefing immediately on the -- on your order and we prevailed on the second prong of this on Texas v. Cobb, then I think it could be realistic we could capture that November date.

Absent either one of those things working out in that manner, you know, it probably is not realistic. And if you recall when we originally scheduled the November date, we were suggesting it might be better to put it off after the first of the year because we thought trying to try a case over the holidays was unrealistic, but the defense was insisting on the November date.

As a practical matter I agree with Your Honor. It makes more sense to wait until Judge Reade's here. It makes more sense in my view to wait until after the holidays are over to actually have a month-long trial.

MR. WILLETT: I apologize if I missed it. Do we have any time table for Judge Reade's arrival?

THE COURT: No, she hasn't been nominated yet.

MR. STOWERS: Maybe we should set the trial date after that.

Page 7

THE COURT: Well, there will still be no time table. There never is a time table.

MR. WILLETT: Judge, here's my only reason for concern about that, and I completely understand where the Court's coming

10

from, that if you're going to be seeing our smiling faces for four to six weeks, you need some more help in this district before you embark on that venture. It's just the fact of my client's lengthy incarceration in jail and specifically the Linn County Jail, and it's just -- it's not doing her any good waiting -- it's doing her less good waiting if she doesn't have a goal to aim towards to like a trial date. I mean, in a perfect world, I'd like to put her in a different facility, and we're not arguing that motion today. I'm not trying to imply that's why we're here today. The longer we go with my client being incarcerated and the less of a judgment day she has to point towards to, the more difficult this whole situation becomes from the defense attorneys' end.

THE COURT: And I understand that. But what are you saying? You want to keep the November trial date?

MR. WILLETT: Well, I guess what I heard -- from what I've heard so far this morning, it sounds like the assessment is let's keep the November trial date even though we realize it's not really viable, and I guess if we get bumped, we're just going to have to get bumped into the first available opportunity your schedule allows.

I'm not sure if it does us -- I mean, one idea would be we could set up an alternative trial date today. I'm not sure if that's doing us or the Court any good. But, you know, I guess given the choice of a November trial date that's not

Page 8

really viable but we'll keep it or you're bumped off November with no date to point towards to at all --

THE COURT: Well, see, the problem is, you know, our district has led the nation the last two years in numbers of trials per federal district court judges.

MR. WILLETT: Oh, I know. Judge Zoss was educating me when I was up in Sioux City about a week ago.

THE COURT: I can't hold four to six weeks open much longer than -- you know, because I don't set trials on short notice. It's just not fair to the lawyers. I mean, I'd hold this open if I thought there was -- I'm kind of thinking out loud now. I'd be willing to hold it open if I thought there was a realistic chance the case would go. But if it's unrealistic, I need to be scheduling other trials now in that time frame.

MR. WILLETT: I understand, Judge, and I guess my only request then is if we're going to get bumped out of November, I'd like to be -- at the end of this phone conversation I'd like to be able to call up Angela and say, Well, we did get bumped, but this is your new date as opposed to having to call her and say, We got bumped, and I don't have a date for you yet.

THE COURT: Well, I think a lot of it depends on how I rule on the second issue and whether or not -- you know, if I rule against the government, obviously they're going to take -- they should take an interlocutory appeal.

MR. WILLETT: Certainly.

THE COURT: I think that's really going to be kind of the ace in the hole. And also, C.J., I kind of doubt that

even -- regardless of what happens on the Texas versus Cobb issue that you'll even get this appeal resolved in time. I don't know. I just think it would be surprising that you could get it briefed, argued, and the circuit could rule that quickly.

MR. WILLIAMS: Yeah, it's hard to say. The last one I had was in the Roggeman case. And but for the September 11 bombing, I think we would have been -- you know, we probably would have gotten that done close to the 90 days, but that, of course, pushed the whole briefing -- or the whole oral argument schedule back a couple months.

THE COURT: Yeah, but the error was much clearer in that case. I'm just kidding you.

Well, I don't know. I'm kind of stymied at what to do. Maybe -- maybe we could -- see, we could hold the trial date for another month or two. Do you think we're really going to know anything in another month or two?

MR. STOWERS: I don't see -- Judge, I don't see how it makes any sense to hold it. I don't see any way we're going to be ready for trial even with this interlocutory appeal resolved.

THE COURT: Why?

MR. STOWERS: Well, we've got thousands of pages of discovery that we're still --

THE COURT: Yeah, but you've had a couple years to go

13

through it.

MR. STOWERS: Huh?

THE COURT: You've had a couple years to go through it.

MR. STOWERS: I haven't.

THE COURT: Well --

Page 10

MR. STOWERS: I came in the case later than that.

THE COURT: Yeah, but there's supposed to be some division of labor which is a whole 'nother problem, but anyway . . .

MR. STOWERS: Well, we got -- we're dictating and transcribing till we're going blue in the face, and it's coming along at a great pace, but it's a process, I'll tell you. We've got two people typing full time on agent reports, and that's slowed things down substantially. So it's going to be difficult.

MR. WILLETT: Well, that discussion is best left for another day if we need to discuss it, but I guess, Your Honor, if I understand where the direction of this hearing is going, what the Court is open minded to doing is taking us off the November trial date so the Court can use that time to help reduce its docket and I guess maybe schedule a hearing a month or so down the road as to when the new trial date is because hopefully in 30 or 60 days we'll have a better understanding of what the forest looks like.

14

MR. WILLIAMS: Your Honor, the government's greatest concern with, you know, moving things off is if we keep the preliminary case requirements for briefing and all that stuff, I think it's important we keep all those, we keep this case moving along so we don't have any unnecessary delays and again push it off one more time.

So if the Court moves the trial date -- and, you know, the government doesn't have a great problem with that -- that we keep all the other deadlines in place and that the letter that we've sent kind of be incorporated in an order so that we can

keep everything moving.

THE COURT: Well, some of the -- one deadline has already passed, and some of the other deadlines would make no sense. Like the final pretrial conference deadline would make no sense if we're going to move the trial date.

MR. WILLIAMS: Right.

THE COURT: And then the question is if we move it, you know, how far out do we move it?

Just ignore that ringing. It will go away in about another ring or two.

MR. WILLETT: Your Honor, if I may?

THE COURT: Yes.

MR. WILLETT: What trial setting does Dustin Honken have with Mr. Parrish and Mr. Spies?

THE COURT: That's a great question, and I'm not --

15

C.J., do you recall? Did we even set a trial date? I'm not sure a trial date's been set. Let me see here. No. I'm seeing it. It looks like March 10 of 2003.

MR. WILLETT: I'm sorry? January 10 of 2003?

THE COURT: March.

MR. WILLETT: Pardon me. March 10 of 2003. And are they scheduled for sort of the same four-week approximate block that we were?

THE COURT: Let's see here. Yeah, it's scheduled for a month.

MR. WILLETT: Why can't we have their trial date and then bump Dustin Honken?

THE COURT: Well, you could. You know, I really have some reservation whether actually the circuit will have resolved

Page 12

all this by then, but, you know, maybe they will. But I think we have to set a realistic trial date. Then if the circuit -- either I don't get my work done in time or the circuit doesn't, we'll have to move it again. I hate to keep moving it because on the civil side I rarely move trial dates.

C.J., what do you think about taking Honken's trial date, March 10?

MR. WILLIAMS: I think that sounds fine, Judge. I guess the only concern I would have -- I'm trying to think of -- it's like playing chess in a way. If we lose on the second prong of this motion to suppress and we take the entire case up

16

on interlocutory appeal, then I could see that delaying everything in such a way that, frankly, we're more prepared --

THE COURT: Go Honken first.

MR. WILLIAMS: Right.

THE COURT: Right, right.

MR. WILLIAMS: I guess my thought would be for the present time maybe the thing to do is to put them both for the March trial date.

THE COURT: And see which one's ready to go.

MR. WILLIAMS: And whoever's ready to go by March goes. And, you know, by the first of the year, we'll have a more realistic idea of who needs to be moved off, you know, if either one does.

THE COURT: It makes a lot of sense to me. What does the defense think of that?

MR. WILLETT: Can we have the number-one slot as opposed to the 1A slot?

MR. STOWERS: I prefer to go after Honken.

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 65 of 100

THE COURT: Pardon me?

MR. STOWERS: I think we'd probably rather go after Honken.

MR. WILLETT: That's never been my sense of it, but defense counsel will agree essentially.

THE COURT: I'm not going to make a decision on who it's better trial strategy for. Whoever can go on March 10 is

17

going. I don't care.

MR. WILLETT: Okay.

THE COURT: Matter of fact, I may assign the other one to Judge Reade.

MR. WILLIAMS: Johnson would be the older case between the two of them.

THE COURT: You bet.

MR. WILLIAMS: So Johnson would automatically I think go forward before Honken.

THE COURT: I'd probably stay with Johnson because I've had more of the rulings, but, you know, I've already sentenced Honken once, and I may very well see if Judge Reade would like to take the Honken case off me, or I may just exercise my prerogatives as chief judge and give it to her. But I think that has some appeal to it. We'll just set it for the 10th -- March 10 and then later in the year or, you know, hopefully before the first of the year obviously we'll be able to make a decision about who's going where.

MR. WILLETT: Sounds fair.

THE COURT: Does that sound good? Now, why don't you do this. Why don't you do what you did back in January of 2002 and come up with some new deadlines.

Page 14

MR. WILLETT: Send you a new letter?

THE COURT: Send me a new letter, and this time I'll try and get an order entered. How's that?

18

MR. WILLETT: That's okay, Judge.

C.J., you going to be around this week?

MR. WILLIAMS: Yes.

MR. WILLETT: Why don't we touch base after this phone hearing, and we'll figure out a time when you and I can get together and realign the letter.

THE COURT: And you put a bold on it, "please enter order accordingly," or something like that. No. We'll get an order entered this time around.

MR. WILLETT: We'll flag it, Judge.

THE COURT: C.J., do you have any real problem with doing it this way?

MR. WILLIAMS: No. I think this is realistic, and it's going to make a lot more sense having a trial after the holidays. That was my major concern to begin with was trying to get jurors to sit for a month during the middle of holidays.

THE COURT: And I'm worried about weather problems in a long trial like that. I mean, the most jurors we can seat under the rules is 16, and you could easily lose, you know, more than 4 jurors in a long trial like that weather related and all.

Okay. I am going to get out a ruling later this week on the appeals from Judge Zoss's discovery rulings on the bill of particulars and the motion to transfer.

MR. WILLETT: Thank you, Judge.

THE COURT: So I'll have that ruling out. I'm just

19

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 67 of 100

putting the finishing touches on it right now actually. But I'm coming over to Cedar Rapids early tomorrow morning, and I'll be there till -- most of the week. But I'll try and get it out while I'm over there.

Anything else we need to talk about?

MR. WILLETT: I don't think so. Dean, have we forgotten anything?

MR. STOWERS: No.

MR. WILLIAMS: No, Judge. Thank you very much.

THE COURT: Okay. Thank you, gentlemen. Appreciate your cooperation. Thank you.

(The foregoing hearing was

concluded at 10:21 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-21-06
Shelly Semmler, RMR, CRR                    Date

Page 16

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

            Plaintiff,

    vs.

ANGELA JANE JOHNSON,                         Transcript of
                                             Phone Hearing
            Defendant.
                                /

        The Phone Hearing held before the Honorable Mark W.
Bennett, Chief Judge of the United States District Court for the
Northern District of Iowa, at the Federal Courthouse, 320 Sixth
Street, Sioux City, Iowa, August 2, 2002, commencing at 8 a.m.

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

For the Defendant:        DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

♀

2

        THE COURT:  Thank you.  This is United States of
America versus Angela Johnson, Criminal Number 2001-3046 and
2000-3034.  Who's going to be arguing on behalf of the
defendant?

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 69 of 100

MR. STOWERS: Dean Stowers, Your Honor.

THE COURT: Okay.

MR. STOWERS: Are you ready to go?

THE COURT: I am.

MR. STOWERS: Okay. I'm not sure who all's on the line this morning.

MR. WILLETT: Your Honor, if it please the Court, I'm here, Al Willett.

MR. WILLIAMS: Your Honor, C.J. Williams on behalf of the United States.

THE COURT: Okay. Thank you.

MR. STOWERS: Thank you. Your Honor --

THE COURT: Why didn't you cite United States versus Allen in your briefing?

MR. STOWERS: Well, it's one among many, many cases that are out there that deal with these double jeopardy issues.

THE COURT: Well, it's a better case than anything you cited.

MR. STOWERS: It might be. It depends on how you read it and what significance it's perceived to have. I think it helps our argument in many ways, but I don't think it really

3

changes our argument in any way. If you want to talk about that case to start with, that's fine.

THE COURT: Well, you can talk about whatever you want to. I've got about 15 minutes per side.

MR. STOWERS: Okay. I think that case basically follows the analysis that we put forward in our brief which was -- essentially was our argument. Our argument is is that the counts of murder in the first indictment, the 18 U.S.C. 1512

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 70 of 100

counts, constitute the same offenses as are now charged in the first five counts of the second indictment and that in essence the murders and/or killings, how ever it's phrased, are the same offense for Blockburger.

And, secondly, I think our argument is that Count 7 of the first indictment which charges a conspiracy in violation of Title 18 section 371 is part and parcel of the same conspiracy, the same offense that's charged in Counts 1 through 5 of the second indictment, and that it's really the same conspiratorial agreement in Count 7 of the first indictment that's being alleged in Counts 1 through 5 of the second indictment.

And that's the argument that they're the same offenses, and I think it's -- the real problem with all these issues is that we're really trying to use this Texas versus Cobb case and trying to figure out this rule that was adopted in that case which says that the Blockburger test is to be used to some extent in certain situations in resolving the issue of trying to

4

figure out what offenses a defendant's Sixth Amendment right attached to. And then we take a rule that was adopted in that case under particular circumstances and particular facts of that case, and the government's position is it applies sort of blindly to the circumstances of this case which are almost at every crossing different than the circumstances that were before the Supreme Court in the Cobb decision.

So really I'm not sure that that test applies to the circumstance that we have here now in that it's really -- I'm not sure it's the right way to approach the issue.

We -- in that case the way the court got to the answer they got to is by first finding that the interrogation was a

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 71 of 100

lawful interrogation because the interrogation that was being conducted of Mr. Cobb concerned the murder. The murder had not been charged at that time, and the defendant had waived his right to counsel. And so they determined that the interrogation of Mr. Cobb was lawful because the subject matter of the interrogation. The subject matter of the discussion the police were having with Cobb when he was arrested for the murder concerned the murder. And since it was a lawful interrogation for an offense that had not been charged and for an offense that was clearly factually and legally distinct from the burglary, they said since that's the case we'll let them use the evidence that was obtained in a lawful interrogation for an offense not yet subject to the Sixth Amendment protections; we're going to

5

let the police use the evidence in the prosecution of murder.

But in this case the Court has found that the interrogation of Angela by Mr. McNeese was an unlawful interrogation and that the interrogation clearly was directed at the murders that were charged in the first indictment. That was the focus of it. That was the purpose of it. That was the scope of it.

And the Cobb case really doesn't even go to the question of what do you do when there's been an unlawful interrogation in the first instance. And so I'm not sure it really applies to that. They really don't deal with this issue which is sort of a fruit of the poisonous tree question almost.

What they looked to in Cobb which we point out in the brief is they seem to be looking closely at what was the interrogation that was being conducted, and if the interrogation was an unlawful one because it was directed at offenses to which

the Sixth Amendment had attached, then the evidence that was obtained would be inadmissible and obtained unlawfully. So that's one point about that case.

The other way to read the Cobb case is that it doesn't matter whether the interrogation was lawful or unlawful. What matters is whether or not the offenses in the case in which they're seeking to use the evidence obtained in the interrogation are different than the offenses that were charged at the time of the interrogation.

6

And so that's sort of the two readings of Cobb that could be had. I think when the case is read somewhat carefully -- it is a short case for the Supreme Court, but it seems to really focus in on the interrogation rather than -- rather than the offenses that are charged that the evidence is to be used in.

Was somebody going to say something? I'm sorry. I hear somebody's phone ringing.

THE COURT: Well, just ignore it and keep going.

MR. STOWERS: So that's one thing. The other aspect, of course, is whether or not there was a waiver of Ms. Johnson's Sixth Amendment right to counsel. We don't think there was a waiver of her Sixth Amendment right to counsel in terms of her contacts with Mr. McNeese. And we think there are also Fifth Amendment issues that the Court needs to address because Ms. Johnson did request counsel.

She requested it very early on including on the day of her arrest in response to some conversations that the police were attempting to initiate with her, and she said, I want a lawyer. And she told the jailers that when she got there. They

identified that on their intake forms. Ironically she gave the name of a lawyer at that time of Mr. Parrish who's Mr. Honken's counsel, but she did request counsel. And once she did that, under the Edwards case, the government wasn't allowed to approach her at any point in time without her counsel being

7

present either directly or through an agent of theirs like Mr. McNeese without violating -- without violating the Edwards rule.

And I think the -- we put in our briefs a number of other points that I don't intend to argue orally. But I do think sort of overall at this point given the procedural status of the case, I'm not sure -- and I know the Court's anxious to really rule on this question, but I'm not sure that the issue since these two indictments are joined together is really necessary to reach because I think the government really needs to file a motion to sever and address it in that context because I don't see any authority out there in any cases that suggest in any way that the evidence that's been excluded as a Sixth Amendment problem could be used in a prosecution of Miss Johnson where both indictments are joined together.

And in the absence of some severance of these two indictments, I don't really think the issue is completely ripe, but I know the Court's already indicated its thoughts on that so -- but that's all I have to say, but I'd be happy to answer any questions that the Court has.

THE COURT: I don't have any. Thank you.

Mr. Williams?

MR. WILLIAMS: Good morning, Judge.

THE COURT: Good morning.

Page 6

MR. WILLIAMS: I guess, first of all, I'd just note

8

that the cases were joined together simply as a matter of efficiency. They were joined together conditionally with the idea that either party could sever it. If that's the only issue here, obviously the government would move to sever to eliminate those concerns.

I guess the United States has a very different reading of Texas v. Cobb and the importance of the holding in Texas v. Cobb. I disagree that the Supreme Court in Texas v. Cobb was focusing on the interrogation and not on the offenses. I think quite to the contrary. The very thing that they were trying to decide in that case is when the two offenses arise out of the same set of facts, is there a Sixth Amendment counsel for all possible charges that could arise out of those same set of facts, and that's what we have here.

We have a set of facts, a crime that was committed, murders that occurred, and the question is even though she was charged at the time that Mr. McNeese had contact with her with one crime, did she have counsel for every possible crime that occurred or that could be charged in connection with the underlying facts of the case?

And our position clearly is that it's not under Texas v. Cobb the case so long as under the Blockburger test there are separate offenses. We've kind of laid out in our briefs why we think that under the Blockburger test there are separate offenses.

9

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 75 of 100

I was not aware of the Allen case, Your Honor. I did not see that in my research. I've since reviewed it. The reason I think that doesn't really apply to this case, although I agree with the Court that it -- even though it's been vacated and remanded, it was on a completely separate ground. The case was remanded because of the Supreme Court's decision finding that only a jury can impose the death penalty. So obviously it wasn't remanded or vacated for anything on the merits of Judge Hansen's argument or order.

But that case involved a felony murder statute which the court points out at page 768 of the opinion, and I don't think that the statutes the government has charged the defendant with in this case are felony murder indict -- or charges.

The other thing I would point out in this decision, although I have a ton of respect for Judge Hansen, I don't know that I agree with his conclusion here. If you look at page 767 of his opinion, he points out that examining the two statutes at issue, Count 2 requires two facts which Count 1 does not, and that is a crime of violence and murder by use of a firearm. He then goes on to discuss at page 768 the felony murder indictment and then concludes kind of near the end of page 768 that in the present case the underlying bank robbery satisfies the crime of violence element; and, therefore, by definition there's no proof of any facts in one that doesn't require facts in the other.

All he did there was deal with the first of the two

10

facts that he points out on page 767 that are different, and that is the crime of violence. What he doesn't address is the requirement that it be shown that there was use of a firearm in that case.

Page 8

So I don't know if I on the merits and on the facts of the decision in Allen agree with the court's conclusion there since he only dealt with one of the two facts he points out are different ultimately.

But I think the indictments in this case are very different from the indictments or the charges, I'm sorry, in the Allen case in that it doesn't involve felony murder. And if you look at the facts that the government's required to prove with regard to the first indictment, they are, in the government's analysis, very different from the facts that we have to prove with respect to the second indictment. You know, we have to prove with respect to the first one that, you know, the reason for the murders was because they are witnesses. In the second indictment we don't have to prove anything like that. A murder can occur in relation to the CCE because it's a competitor in the drug business, because it's the cop that may be trying to capture them, may be a ton of different things.

And the -- I think the holding of Texas v. Cobb is, hey, don't look at the underlying facts. You don't look at, you know, whether this arose out of the same set of facts and these two different charges arose out of the same set of facts, but

11

you step back, and you look at the elements under the Blockburger test. And if they're different, then they're separate offenses, and even though she had Sixth Amendment counsel as to the original indictment, she did not have Sixth Amendment counsel as to the second indictment.

With regard to that, it makes no difference there whether she waived her Sixth Amendment right to counsel or not. With regard to the Fifth Amendment issues the defendants have

Page 9

raised, number one, there is no factual basis before the Court at this point establishing that she ever invoked her Fifth Amendment right. To the contrary, I got a fax from Mr. Stowers asking me to stipulate to that fact that was sent over here a couple days ago. There's nothing on the court record at this point establishing that she ever invoked her Fifth Amendment right to counsel.

Second of all, it's irrelevant because the court -- the courts have clearly held that under the circumstances where it's a jailhouse informant there isn't Fifth Amendment rights invoked by questioning by a jailhouse informant as there would be if it was by a known law enforcement officer.

So I don't think -- I think that's a red herring in this case and doesn't really apply.

I hope that answers or at least sets forth some of the government's position. Again, I would be, like Mr. Stowers, happy to answer any questions you may have, Your Honor.

12

THE COURT: I don't have any for you either.

Mr. Stowers, would you like the last word?

MR. STOWERS: Um?

THE COURT: Um?

MR. STOWERS: I'm not sure if the government is contesting the issue of whether or not she did invoke her right to counsel. My understanding is they're aware that she did and that, you know, if that's the position that they're taking that she didn't, then we have a dispute but --

MR. WILLIAMS: If I could, Your Honor, I don't know the answer to it. This is the first I've heard -- this fax that we got was the first I've heard. None of the agents told me she

Page 10

had invoked it, and while Mr. Stowers cited to some document that indicates that she asked for a lawyer, I'm personally not aware of it. Now, it may be out there. I'm just not aware of it, and I don't know that it's an exhibit and it's been offered to the Court.

THE COURT: Mr. Stowers, anything else?

MR. STOWERS: Well, I guess we might have to have a hearing on that.

THE COURT: Well, I don't think so. Anything else?

MR. STOWERS: Not today.

THE COURT: Mr. Williams, anything else?

MR. WILLIAMS: No, Your Honor. Thank you very much.

THE COURT: Okay. I'll take it under advisement and

13

try and rule as quickly as I can. Thank you.

MR. WILLIAMS: Thank you, Judge.

(The foregoing hearing was

concluded at 8:18 a.m.)

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 79 of 100

HEARING 3, 8-2-O2

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    2-21-06
                                            Date

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 80 of 100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS, DIVISION
_____

UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
   vs.                    )          No. 2001-3047
                          )
DUSTIN LEE HONKEN,        )
                          )
        Defendant.        )
_____)  TRANSCRIPT OF PROCEEDINGS
UNITED STATES OF AMERICA, )
                          )
   vs.                    )          No. CRO1-3046-MWB
                          )
ANGELA JANE JOHNSON,      )
                          )
        Defendant.        )
_____)

                                     Federal Courthouse
                                     Cedar Rapids, Iowa
                                     December 22, 2003
                                     2:33 p.m.

BEFORE:
          THE HONORABLE MARK W. BENNETT

EDWARDS REPORTING BOX 1663 IOWA CITY, IA 52244 319-338-3776

APPEARANCES:

For the Plaintiff:

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 81 of 100

MR. CHARLES J. WILLIAMS
Assistant United States Attorney
401 1st Street SE, Suite 400
Cedar Rapids, Iowa 52407-4950

MR. THOMAS H. MILLER
Assistant Attorney General
2nd Floor, Hoover State Office Bldg.
Des Moines, Iowa 50319

For Defendant Honken:

MR. LEON F. SPIES
Mellon & Spies
Suite 411, Iowa State Bank Bldg.
Iowa City, Iowa 52240

MR. ALFREDO PARRISH
Parrish, Kruidenier, Moss, Dunn,
Boles, Gribble & Cook, L.L.P.
2910 Grand Avenue
Des Moines, Iowa 50312

MR. CHARLES M. ROGERS
Wyrsch, Hobbs & Mirakian
1000 Walnut, Suite 1600
Kansas City, Missouri 64151

For Defendant Johnson:

MR. ALFRED E. WILLETT
Terpstra, Epping & Willett
118 3rd Avenue SE, Suite 500
Cedar Rapids, Iowa 52401

MR. DEAN STOWERS
Rosenberg, Stowers & Morse
505 Fifth Avenue, Suite 1010
Des Moines, Iowa 50309

MR. PATRICK J. BERRIGAN
Watson & Dameron
2500 Holmes Street
Kansas City, Missouri 64108

3

P R O C E E D I N G S

(December 22, 2003; 2:33 p.m.)

THE COURT: Quite a cast of characters. This is United States of America, plaintiff, versus Dustin Lee Honken, Criminal No. 2001-3047 and the companion case United States of America versus Angela Johnson. I have a court reporter with me here in Cedar Rapids, so when you speak,

Page 2

you'll need to identify yourself so that she knows who's speaking.  This involves a December 19th letter that I faxed to the parties I believe last Friday which involves an issue raised in a telephone status conference on December 16th concerning the potential unavailability of Charles Rogers due to his current lengthy trial in a death penalty case in -- I believe it's Benton, Illinois?

MR. ROGERS:  That's correct, Your Honor. Charles Rogers here.

THE COURT:  Mr. Rogers, any further update on the prospects in your case?

MR. ROGERS:  When we left Thursday evening, the Government said that they would be ready to rest their case on January 15th, I believe.  We anticipate about a month of defense evidence among the three defendants, and that sets all for the guilt or innocence phase, so I think it is very unlikely that if there is a penalty phase, it would be over before sometime in mid march.

4

THE COURT:  Okay.  Mr. Rogers, have you had a chance to see the Government's resistance?

MR. ROGERS:  Yes.  To the continuance?

THE COURT:  Yes.

MR. ROGERS:  I did, Your Honor.

THE COURT:  What's your view of that?

MR. ROGERS:  There's a couple of comments I have.  First of all, even though they faxed the provisions, that talk about two counsel being appointed, and even though Mr. Spies and Mr. Parrish are both appointed to represent Mr. Honken, there is -- they omit the provision that requires

Page 3

Title 21, Section 848, as I recall, that requires capital learned in the law of capital cases, and my understanding is that either Mr. Spies nor Mr. Parrish has experienced in capital cases because even though they're well-seasoned, experienced lawyers, Iowa is a nondeath state, and then there's been no reason for them to do that with the exception of Mr. Parrish working with me on the Leur (phonetically spelled) case, as you know.

THE COURT: Well, let me ask you this: How feasible do you think it would be for another lawyer -- if I were to appoint another lawyer, you know, on January 5th or today or tomorrow, assuming we could find somebody, do you think somebody could come in and take over?

MR. ROGERS: Frankly, that's not outside the

5

realm of possibility. I mean certainly if she had somebody who knows what they're doing and has nothing else going on in the next three and a half months, that's very possible, and I say that in view -- especially, in the fact that I am by no means ready for trial, and I would contemplate spending at least pretty much a solid couple of months to get myself ready even though I've been involved in the case for some time, so if you could find somebody who was qualified and who was able to start right now -- and I don't think it is inconceivable that they would be able to be ready by that time. Now, having said all that, I don't think that's an efficient use of the Court's resources because the role has to be some things that I've done that has to be redone and double done, and I quite frankly doubt that you can find someone who's qualified who couldn't just drop everything else and do nothing but this case for the next, say, five and

Page 4

a half months until the end of trial.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: What do you say with the problems that I outlined in my proposal in the December 19th letter about combining 'em for trial?

MR. WILLIAMS: The primary difficulty would just be the Bruton issue which I think can be overcome one of two different ways. One is by redaction of statements. I

6

think that would be a more difficult manner and the one more fraught with possibility of error. The easier way of overcoming that difficulty would be to impanel two juries simultaneous, send one out while we bring in evidence admissible against one defendant and not the other and vice versa.

THE COURT: How much Bruton stuff is there?

MR. WILLIAMS: Quite a bit, Your Honor, both ways. Both defendants have made a number of admissions to other inmates while they've been incarcerated implicating the other defendant, and so I would anticipate, with respect to each of the defendants, probably having as many as eight or nine, maybe more witnesses that would have Bruton testimony, basically.

THE COURT: Okay. Well, let me ask Willett, Stowers, and Berrigan -- why can't you be ready to go on March 15th.

MR. WILLETT: Pat Berrigan, this is Al Willett. Do you want to go and respond to the judge first?

MR. BERRIGAN: Your Honor, I guess we, to a

Page 5

large extent, are relying on the earlier representations of the Court that we'd have a full four months at least after the mandate from the Eighth Circuit came down in the Shonell (phonetically spelled) -- maybe not Shonell. The defense is preparing a motion for rehearing. We have high

7

hopes that's going to be successful. That's due on January the 12th and probably won't get filed much before then. We don't see the likelihood of a mandate probably until the end of February, if we lose, and we're very hopeful that's not going to be the case. So we -- certainly not anticipating and going in March. We really have kind of counted on having the four months that the Court had indicated we would have in order to be ready, and I know -- I, for one, certainly have scheduled other matters coming up here that certainly could be changed but not without great difficulty, and even if we were able to do that, I'm not sure we could have our ducks in a row, frankly, by March. I understand March 7th is the anticipated Honken trial date, so it's largely a matter of just having the time to get our resources together.

MR. WILLETT: Your Honor, this is Al Willett. I know when my defense team spoke earlier this morning, I know Dean Stowers had the same concern about Bruton issues that Mr. Williams did. Dean, do you want to elaborate on that?

MR. STOWERS: No. I think C.J., actually, covered that.

MR. BERRIGAN: This is Pat Berrigan, Your Honor. I didn't know we were addressing the legal problems as well, but if we are, there's also the potential problem of inconsistent legal defenses which we don't know what

Page 6

Mr. Honken's defense is, obviously. But I think there's a great possibility that his defense and Miss Johnson's defense are not at all compatible. We also have some really grave concerns, frankly, that the case against -- what we view the case against Mr. Honken certainly being much stronger -- much stronger case than that against Miss Johnson. We're very concerned that the state of the evidence against Mr. Honken is going to kind of wash up on us as well. We think Miss Johnson, given the severity of the charges, deserves a chance to be tried on the merits of the Government's case alone against her.

THE COURT: Mr. Williams, how risky would a joint trial be in your view?

MR. WILLIAMS: I don't think it would be risky at all if we would have two different juries, Your Honor.

THE COURT: Well, the courtroom's not really set up for that. That would be very difficult.

MR. WILLIAMS: Yeah, I recognize that. No courtroom's really set up for two juries at the same time, but yet it's been done, and it's been done on numerous occasions, so it's possible. It's a logistical nightmare, I understand, Your Honor, and there would, obviously, have to be alterations done to the courtroom or at least some setup would have to be arranged, but it's, you know -- it's a possibility. If done with two different juries, I don't

think there's much difficulty at all of doing this in a way that would not run afowl the Sixth Amendment concerns. You

know, I'd be a little bit more concerned, and frankly, I've not sat down and thought in great detail about how to do this as far as redacting Bruton statements if we just went with one jury, although it's a possibility of doing that as well.

THE COURT: Well, Mr. Stowers, what do you think about the possibility of using redacted statements to try and alleviate the Bruton problem?

MR. STOWERS: Well, I haven't gone through all of the statements that Mr. Honken made to try and analyze what would be left if they were redacted, so I don't know that I'm really in a position to answer that for the Court, but there's a ton of material that the Government has been producing of statements that he, Mr. Honken, has allegedly made since he went off to serve his prison term. That would seem to me -- to other inmates. That would seem to me -- and also, I think, there's some family members, and things, that would seem to me to be inadmissible against our client and probably pretty difficult to redact effectively, but I haven't really -- I can't really say that I've gone through and analyzed whether or not they're redactable, if that's even a word at this time, but I think it would be pretty hard to do that. Now, I guess it would be for Mr. Honken to speak as to whether or not Miss Johnson's statements Mr. Mcneese

10

(phonetically spelled) would be, you know, sufficiently redactable so as to remove all reference to Mr. Honken, and that I haven't really thought through either. Been mostly worried about trying to keep those out entirely so --

THE COURT: Well, anybody on the Honken team want to comment on the redactability, if that's a word, of Angela Johnson's statements that implicate Honken? I guess

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 88 of 100

not.

MR. ROGERS: This is Charlie Rogers, Your Honor. I was hoping somebody else would leap into the breach.

THE COURT: They ought to give you a break. You've been in trial for many months.

MR. ROGERS: That is right, and I'm really the least familiar with this justice statement than anybody on the conference.

THE COURT: But that won't stop you? I like that.

MR. ROGERS: Yeah. As Terry McCarthy up in Chicago says, "The bottom of the public defender system is always ready, never prepared." So, basically, the problem comes with redacting in a way where it's less than obvious that there's somebody else being referred to and less than obvious who this somebody else is, and I don't -- it may deprive the statements of so much meaning that their value --

11

their evidentiary value to the Government would be severely impacted if they were redacted enough to eliminate a possible Bruton prejudice.

THE COURT: Well, why would that bother you?

MR. ROGERS: It doesn't bother me.

THE COURT: Oh, okay.

MR. ROGERS: I think when Mr. Williams talks about redaction as a possibility as opposed to the two-jury scenario, that he hasn't really sat down and considered the extent of the redaction that would be necessary.

THE COURT: Okay. What about this,

Page 9

Mr. Williams? I've got two suggestions, and I'm just thinking out loud now. Mr. Williams, are you there?

MR. WILLIAMS: Yes, I am, Your Honor. I was just waiting for --

THE COURT: Yeah. Here's the first suggestion. I'll grant your resistance, and we'll keep the March trial date as long as you go off the case, and we can put a new assistant attorney on the case with two-and-a-half-months' notice that will balance out losing Charlie Rogers. What do you think about that alternative?

MR. WILLIAMS: I don't particularly like that alternative.

THE COURT: Okay. Here's my second alternative. You might like this a little better. What

12

about I set both cases for trial. We'd actually start jury selection on August 15th. At three weeks we'd really start the trial after Labor -- or Memorial -- I get those holidays confused -- Labor Day, which I believe would be on Tuesday, September 7th. We would set both cases. Then you could work on the redaction, and we can have a hearing to determine whether it's possible to try the defendants and get around the Bruton problems, and we can have that hearing, you know, in two months or so, and if I determine that it's not -- I don't think I'm going to use two juries. I'm intrigued by it. I just think the courtroom would be too crowded. We couldn't use any of the technology because the only place to put the other jury -- I don't think they'd be able to see it, and just with the security concerns in this case, it's just -- it's just -- I can't imagine how we could get two juries in there given the security issues, so I'm going to probably

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 90 of 100

rule that out of hand, but we could -- and then we could go with both defendants if we can properly redact, and if we can't, we'll just try Honken first, and the reason why I'm suggesting August 15th, I think if we try and do it in the summer, we're just not going to have enough -- you know, most jurors have summer vacation plans, and for a lot of people that's the only vacation they get to take. You know, a lot of companies close down for a week or two in the summer. They have to take their vacation. I just think starting to

13

pick a jury in June or July doesn't make any sense. I think picking one on August 15th starting then for three weeks would make a lot of sense, and you know, I understand your concern about the speedy trial issues, and you know, I was impressed at how incredibly slow and what a lousy case manager I am at looking at your chart, and I hate to have the case that's taken the longest, but if it means I've given the fairest trial I can give, then maybe that's a tradeoff. I'm just lear -- you know, I gave Mr. Rogers a curve ball, and he didn't exactly hit it out of the park. He said it was possible to find a lawyer, and it may be, you know, but I don't know how, and I just think that's asking a lot, and you know, I realize the Government's position, and I think most of the continuances, if not all of them, have been at the request of the defense, and you know, the Government has a good position, but I'm just not willing to have another lawyer substitute this late into the case.

MR. ROGERS: Judge, this is Charlie Rogers again. I appreciate everything you said, and I have maybe a fowl ball here because I just got Friday an order continuing

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 91 of 100

another case of mine until August the 2d. The case is -- Xavier Lightfoot is my client. His co-defendant is Cornelius Peoples. It's a retrial of the case that was reversed by the Eighth Circuit.

THE COURT: Were you trial counsel in the

14

first case?

MR. ROGERS: Yes. And it's a not a question of getting ready. I mean I've been ready, and it's a case that was set for --

THE COURT: Is this a death penalty case?

MR. ROGERS: Yes. It's a case where they sought the death penalty the first time, and the nonunanimous verdict was reentered as to Mr. Lightfoot, and so he got a life sentence, and then I was unappointed from the appeal because he was no longer a capital case, and my co-counsel got the case reversed, so -- and we're back, and they have announced their intention to seek death this time as well, and under Sattazahn versus Pennsylvania, they probably can get away with it. At least that has been the ruling so far.

THE COURT: And who's that? Who's the trial judge in that case?

MR. ROGERS: Judge Gaitan. It was Judge Sachs the first time around.

MR. WILLIAMS: Judge, this is C.J. Williams. And I understand the Court's position on this. Obviously, we have real concerns with any continuance in this case for the reasons where I articulated, and please don't take that as any criticism of the Court at all. I think you've been put in a position where you've had to continue this trial before to accommodate the defendant and for his counsel, and we

Case 3:09-cv-03064-MWB-LTS   Document 284-65   Filed 06/23/11   Page 92 of 100

recognize that, and we're not being critical of the Court in the least on this.  At the same time we have an obligation to do what we think is proper on behalf of the United States and on behalf of the public, so we take the position we have to take on this.  What we're hearing, I think, from Charlie Rogers is the same old problem we've been having in this case from the get-go, and I think it demonstrates the difficulty of trying to accommodate some counsel from case to case to case to case, and what we're running into, once again here, is Mr. Roger's trial schedule, and you know, God bless him. Obviously, he's a great defense attorney, and everyone wants him, and he's on a number of cases, but you know, we're running into a difficulty, once again, with trying to schedule a case -- our case around his other cases, and I think it just shows that we can't continue to schedule this case around Mr. Roger's trial schedule or anybody else's trial schedule.  I think the Court needs to set this case for a trial, and people need to work their schedules around this case.  It's too old.  It's got to be older than practically any other death penalty case pending, and I think it screams for us to get this case tried as soon as possible, and my suggestion is if Charlie Rogers is in the bind he's in right now, and the Court's not inclined to appoint new counsel, that one of two things.  Either we appoint new counsel and put off the trial until -- let's say pick the jury at the

beginning of May which gives plenty of time for any new counsel to get up to speed, or put it at the end of May, and

it gives Charlie Rogers time to get up to speed after he gets done with his current trial, but rather than to put this off to the end of the summer, I think my proposal would be we start this case in May and go.

MR. WILLETT: Your Honor, this is Al Willett. May I respond to that?

THE COURT: Yes.

MR. WILLETT: I understand where Mr. Williams is coming from.

THE COURT: Well, just a second. Before you respond, I believe -- C.J. Williams, were you just talking about trying Honken in May?

MR. WILLIAMS: Yes, Your Honor, and I mean, I can also take a look at --

THE COURT: Well, I don't want to hear from Mr. Willett if you were talking about trying Honken in May. That doesn't affect Mr. Willett.

MR. WILLETT: Okay.

MR. PARRISH: Well, Your Honor, this is Alfredo Parrish. May I speak for a second on the issue?

THE COURT: Yes.

MR. PARRISH: First of all, I disagree with Mr. Williams -- can everyone hear me?

17

THE COURT: Yes.

MR. PARRISH: Hello? Oh. I'm getting some interference, I think. Hello --

THE COURT: Yeah.

MR. WILLIAMS: We hear you.

MR. PARRISH: First of all, a regional delay in the case was caused by the fact that the Government did

not put Mr. Honken in a place where he could be visited with.

Second of all, the visit in Colorado was scrapped many times because of problems with the visitation out there because of lock-downs they had.

Third of all, the visits -- he never got his discovery material even though Judge Zoss tried to work out several ways he could get his discovery material out to him. That could not be taken care of.

Fourth of all, the Government through Mr. -- the Attorney General's Office hired our juror expert about four months ago which caused an additional delay in our ability to be prepared for this case.

Fifth of all, Mr. Honken was transferred from Colorado out to Marion, Illinois which caused further delay in our ability to meet with him.

Sixth of all, he's never yet to this day -- we were out -- Mr. Spies and I were out there this morning, and we're just getting back now -- has been able to review his

18

discovery that the Government claimed was so liberally given to him because of the restriction placed on our ability to be able to discuss it with him, meet with him, and then review it.

And seventh of all, when we got to the issue of getting the first counsel, Mr. Rogers is exactly right. I, personally, was the one who tracked him down after I talked to two other lawyers who are death penalty qualified who are not able to take the case. He was one of the people I talked to because I worked with him on the Leur case, but two others I was also contacting at the same time had difficulty in

Page 15

being available and able to assist us with the trial of this case, so all of the continuances were not attributable to us. The Government also had some delays in the first testing of the DNA when Judge Jarvey first contacted me and asked to assist in this case. The Government is the one who has a problem with getting some of the testing completed, so it's not all a one-way street that led to this situation. The Government acquiesced in a couple of these continuances.

Now, we also mentioned the fact of the bodies. I have no problem -- we said earlier and Mr. Honken said again today, he did not resist these victims being buried, but I believe it was the counsel for the other side who had some concern about that. But if that was one of the concerns, we can lay those fears and have been -- go ahead at least far as

19

Mr. Honken is concerned. That was our position earlier, but that's the record we wanted to make. That is not all a one-way street as Mr. Williams argues, and he knows that and Mr. Reinert knows that.

THE COURT: Any other lawyer want to add anything? Mr. Rogers, what's the name of your case in front of Judge Gaitan?

MR. ROGERS: The name is United States versus Cornelius Peoples and Xavier Lightfoot. And it's Case No. 4:98-CR-149.

THE COURT: So that's a 1998 case?

MR. ROGERS: Right. And it's a case that we tried -- God, seems like three years ago and then --

THE COURT: Well --

MR. ROGERS: We got reversed on appeal.

THE COURT: Yeah, I heard that. I'll call

Judge Gaitan but -- knowing Judge Gaitan, I think the chances of him deferring to my case are none and noner, not even slim and none, but I will call him to see if he will, but heck, his is probably an older case.

MR. ROGERS: It is older in total in terms of filing. It is newer in terms of this particular --

THE COURT: Right, being remanded --

MR. ROGERS: -- issue.

THE COURT: -- right. But let me -- I'll talk

20

to him, but I'm not optimistic.

MR. ROGERS: And that is the date that was just set at a scheduling conference in my absence as a result of my --

THE COURT: How recently was this date set? Very recently, I take it?

MR. ROGERS: Yeah. The order was issued Friday.

THE COURT: Okay. Well, here's my preference. If I can -- and when is that case set to start? August 15th?

MR. ROGERS: August 2d.

THE COURT: No, August 2d. If I can, respectfully, request Judge Gaitan to continue it and he does, which I doubt, my preference would be the August 15th jury selection, September 7th trial date and keep both cases on that schedule unless the Bruton problems become unsuperable, and then if they do, try Honken on that date. But failing that, it's really a toss-up. I would be willing to move -- I mean it's really the defense -- Parrish, Spies, and Rogers' call. I'd be willing to move it to May if we

Page 17

can't -- if this doesn't work out to keep Rogers in the case. One of two choices. We could start sometime in May, and Mr. Rogers would stay in the case, or we can let Mr. Rogers out, and then I doubt if I would be willing to start in May with a new lawyer. I would probably bump it over to the

21

September -- August, September period with new death penalty counsel, so does the defense have a preference whether you'd rather start in May with Rogers or August 15th with a new death penalty lawyer, or you need some time to talk about it and let me know ASAP?

MR. ROGERS: Probably good to talk about it, Judge.

MR. PARRISH: Yes, Your Honor. Alfredo. We would like to talk about it, and we met Mr. Honken, and at the end of the hearing, I want to add a couple of points he added about his hearings, but we'd like at least this evening to talk about and maybe get back with the Court tomorrow.

THE COURT: That's fine. You can just fax me a letter tomorrow. I'm not going to do anything right way.

MR. PARRISH: We can -- this is Alfredo, Judge. We can do that.

THE COURT: I mean I'd like to do something next week on it, get a ruling out.

MR. PARRISH: We can -- judge, we can get back with you by -- say, is Wednesday good?

THE COURT: Sure.

MR. PARRISH: Okay. We'll do it by Wednesday. And for the record, this is Alfredo speaking.

THE COURT: And what else did you want to add about -- you said something about Honken and hearing?

Page 18

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 98 of 100

MR. PARRISH: Right. He did not -- Mr. Spies and I met with him this morning for about an hour and a half. He does not want to come back for the January hearing. I told him you might require a waiver, and I told him we would go ahead and prepare one if that was necessary. For the anonymous jury question and the security issues, he does not want to be transferred back, and he gave us a list of reasons which we'd like to at least state some of them.

THE COURT: Well, why don't you put it in a waiver and have him sign it, but now we're switching gears. Let me talk about that. I have some problems with what the Government suggested, and that is that they do it by affidavit. What about the defendant's right of confrontation? How is it that you could get an anonymous jury based on information contained in an affidavit? I mean you can't cross-exam an affidavit. This is an important matter, and it's, particularly, going to be important because most of what you're going to offer is probably going to be hearsay except it's not going to be offered for the -- probably the truth of the matter asserted, so it might not be hearsay, but I just have a hard time understanding about how we can proceed with such a critical matter by way of affidavit. The defense didn't say anything about it, but if they don't have a problem, I don't have a problem, but I think this has to be a waiver of -- isn't there a

confrontation right with regard to evidence, Mr. Williams?

MR. PARRISH: I think there was, Your Honor,

and they did not make it clear -- Alfredo Parrish speaking here.  They did not make it clear that that was the only way they were going to do it.

THE COURT:  They made it clear to me that they were going to submit two affidavits and they weren't going to call any live witnesses.

MR. PARRISH:  I'm sorry.  I thought Mr. Miller left that as an option not saying it was definitely going to be the case.

MR. MILLER:  Your Honor, this is Tom Miller.  I recall saying and it is our suggestion that we would proceed both by affidavit and by a request for judicial notice of the transcript of the sentencing in '97, '98.

MR. WILLIAMS:  Your Honor, this is C.J. Williams.  I'm not sure the defendant has a Sixth Amendment Right in a preliminary matter like this.  I think the case law -- and I can submit a supplemental memorandum to the Court, if you'd like, but the case law suggests that it's within the Court's inherent power to regulate a trial to a response to establish an anonymous jury based on nothing more than the nature of the charges brought against the defendant and --

THE COURT:  I recognize that, but if I'm going

24

to do it, I'm going to have something more than that.

MR. WILLIAMS:  Certainly.  And we intend to give you something more than that, but I think that give you an idea, Your Honor, of the ability of the Court to do it and the fact the defendant doesn't have an inherent Sixth Amendment Right on the issue like this.  I think the --

THE COURT:  Well, just a second, and you may

Case 3:09-cv-03064-MWB-LTS    Document 284-65    Filed 06/23/11    Page 100 of 100