be right. I have the inherent right to order it without evidence, but if you put on evidence, doesn't he have a right to confront the evidence?

MR. PARRISH: Absolutely. This is Alfredo. Absolutely.

THE COURT: I don't know the answer to that, and the Government's going to say, "No," and the defense is going to be, "Absolutely," but I think that's the difference, Mr. Williams. I think I have the authority to do it without -- matter of fact, I know I have the authority to do it without an evidentiary hearing. But I don't think that means that if you have an evidentiary hearing the Sixth Amendment doesn't apply to that evidentiary hearing.

MR. WILLIAMS: Your Honor, this is C.J. Williams. I agree if we were going to put on live witnesses, I believe he has the right to cross-exam them and be present for it. The difference I think, Your Honor, is some of the cases suggest that the Court can base this on affidavits,

25

including an affidavit from a prosecutor in one of the cases alone, basically giving a professional statement about the nature of it, and we intend to the give the Court far more than that, and the main thing we're relying on --

THE COURT: Is the sentencing transcript.

MR. WILLIAMS: The evidence this Court heard over about four days -- three or four days of a sentencing trial in which the Government put on evidence at which the defendant was present, at which Mr. Parrish was present. He cross-examined the Government's witnesses and evidence concerning the defendant's statements as those came out.

Page 21

We're supplementing that key evidence that we're relying on combined with the nature of the charges against him with an affidavit, but we don't think affidavits are the main thing. I think there's more than enough before the Court on that transcript from that prior sentencing alone, so the Court to find that this case calls for an anonymous jury combined with the nature of the charges against the defendant, but that's my decision, Your Honor, and if you'd like, I can certainly do a supplemental memorandum in which I can try to explore a little bit more detail exactly the scope of the Court's authority or to the extent to which the defendant has a Sixth Amendment Right to confront in a situation like this.

THE COURT: That would be helpful.

MR. WILLIAMS: I would be glad to do that,

26

Your Honor.

THE COURT: And --

MR. ROGERS: Judge, this is Charlie Rogers again.

THE COURT: Yes.

MR. ROGERS: And I'm assuming that Mr. Parrish and Mr. Spies since they're on their way back from Marion, Illinois have not had an opportunity to review the Government's response to your order of November 26th in which they state their intent to present two affidavits and rely on the record of Mr. Honken's sentencing hearing. This is not entirely unrelated to the issue of joining the two cases because I don't know that Miss Johnson -- that there's any indication that her trial would -- if she were tried separately -- be appropriate for an anonymous jury or the Court mentioned heightened security measures to be taken as

Page 22

well, but leaving that aside, I think under Section 34, 32, the defendant is entitled to a list of the jurors unless there has been a showing made.

THE COURT: Well, we're not arguing the merits of the anonymous jury today.

MR. ROGERS: Okay.

THE COURT: We're having a hearing on that.

MR. ROGERS: Fair enough.

THE COURT: And at that point we'll argue the

27

merits of it.

MR. ROGERS: My point being, that since they have to make a showing, it ought to be a showing that's subject to the rules of evidence.

THE COURT: Well, I -- you know, even though if I can use affidavits, I doubt if I will. I mean I think I'm going to make -- unless there's absolute clear authority in the circuit for this exact thing, I'll probably try and make my judgment based on what I think is admissible evidence, and I think the transcript, of course, would be. Of course, the defense will have some reason why that isn't, but I think they had a right to confront, and as I recall, Mr. Parrish very aggressively confronted virtually all of the Government witnesses who testified at the sentencing, but we'll save that and some of those issues for the hearing.

MR. BERRIGAN: Your Honor?

THE COURT: Yes.

MR. BERRIGAN: This is Pat Berrigan. The Johnson defense team has not been copied on any of the motions regarding an anonymous jury. We have no concern

Page 23

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 3 of 100

about that if Mr. Honken's trial goes forward in May and these are separate.  Obviously, if they're together in August, we'd certainly like an opportunity to be heard on this issue, and if there's a hearing scheduled -- at least, I for one, don't know anything about it.

28

THE COURT:  I understand that.

MR. BERRIGAN:  Okay, sir.

THE COURT:  And I appreciate your raising that.  I'm not getting you all involved in that right now.  I'm going to rule on the Honken issue, and if I decide to use anonymous jury and combine the cases, then you can come in and ask me to reconsider it.

MR. BERRIGAN:  All right, sir.  Thank you.

THE COURT:  And that might be a reason if I decide to do it, maybe not to combine the cases.  You know, maybe part of your argument for severance in addition to the Bruton issue.  But you're right.  Just because I rule that applies to Honken, of course, you can't really do it.  You can't have an anonymous with one defendant and not with the other.  I don't think there's a way to do that without everybody running a risk of totally blowing it, you know, so I doubt if I'm going to go down that path, but you know, we're a long ways from deciding whether both cases are going to be tried together, and I'm not sure the Bruton problems are -- we can overcome those, but you know, I think what I want to know from the Honken defense is do you prefer to go to trial in May, or do you prefer and try and talk to Judge Gaitan into continuing his trial or getting crosswise in that battle, or do you want to go in September -- August and September with new death penalty counsel?  Mr. Rogers, I hate

Page 24

to replace you.  It would be horribly inefficient and costly thing to happen, but the last thing in the world I'm going to do is continue this trial to accommodate one of your other trials.

MR. PARRISH:  Right.  Your Honor, Alfredo. Are you going to have an opportunity to speak with the other federal judge about Mr. Rogers' availability between now and Wednesday?

MR. BENNETT:  I'm going to call him this afternoon.  My plane doesn't leave until tonight, so I'm in Cedar Rapids today, and I'm going to call him, but put it this way.  I know him, and I'm not optimistic.

MR. PARRISH:  Okay.  Well, we'll try to set up --

THE COURT:  He's not happy with me.

MR. PARRISH:  -- a conference with Mr. Rogers and Mr. Spies.

THE COURT:  He's still unhappy with me about a social security case I reversed him on about six years ago when I was sitting on the circuit.  And it was --

MR. PARRISH:  You know these federal judges. They have these long memories.

THE COURT:  It was a one-paragraph opinion that said, "After careful review," and then he denied relief, and I thought, you know, if the review was careful, it

wouldn't be one paragraph, but that's a whole other matter, so I'm not sure he's going to be willing do any favors for

me, but he's a really nice guy, and I'll certainly ask him.

MR. SPIES: Your Honor, this is Leon Spies. In meeting with Mr. Honken this morning, we did learn that they do have video-conferencing facilities there.

THE COURT: Oh, they do?

MR. SPIES: Yes.

THE COURT: Well, would he want to participate in this hearing by video conference?

MR. SPIES: Yes.

MR. PARRISH: He indicated that, right. He said if audio was the only thing, that would be acceptable to him also.

THE COURT: Well, we should be able to do it by video conference.

MR. PARRISH: Right.

THE COURT: But I still think we should -- why don't you prepare a waiver assuming we'll be able to do it either by video if it works, or if video doesn't work, certainly by audio.

MR. PARRISH: Right. We will work on that, and we told him that you would, perhaps, require that, and we told him we would work on that and try to get one over to the Court.

31

THE COURT: It will actually make the marshals very happy.

MR. PARRISH: Okay.

THE COURT: But we'll need to -- you need to get that waiver ASAP because the marshals are going to have to figure out how to transport him.

MR. PARRISH: We'll do that. It will make

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 6 of 100

Mr. Honken very happy, too, and for reasons we'll lay out to the Court.

THE COURT: Is there anything else we need to talk about, and when you send me a letter tomorrow about what your pref -- you're going to be able to do that, I guess, by Wednesday?

MR. PARRISH: Wednesday, Your Honor.

THE COURT: What your is preference, obviously. You know, send it to all the lawyers in both cases.

MR. PARRISH: We'll do that, Your Honor. There is one other thing. You asked for other issues. I don't want to make it long, but Mr. Honken is concerned, and Mr. Williams and also Mr. Miller can comment on this. He is not getting discovery in the manner that he feels comfortable. You know you have the restrictions on the ones with the names etched across them. Is there a problem if we sent him summaries, and is there a problem if I sent a

32

paralegal out to Illinois for three days which he might find acceptable and go over it with him, or is there a problem if I boxed all of the discovery up and shipped it out to him for his review?

THE COURT: Who are you asking that question of?

MR. PARRISH: Well, I'm asking that of the prosecutors.

MR. WILLIAMS: Your Honor, C.J. Williams. I don't feel this is a topic that we really should be taking the Court's time up on. I'm not familiar enough with exactly

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 7 of 100

what the problem is or what the proposals are to be able to comment on it right now.

THE COURT: That's right. Here's my advice on that. I agree with Mr. Williams. Try and work it out. If you can't --

MR. PARRISH: Fine, Judge.

THE COURT: If you can't -- just a second. Just a second. Try and work it out. If you can't, call Judge Zoss and have him rule.

MR. PARRISH: Well, we have really tried. It has never worked.

THE COURT: That's fine. I'm asking you to try again. I assume that's why you brought it up rather than filing a motion. You brought it up to ask the prosecutor.

33

I asked you who you were talking to, and you said, "The prosecutor."

MR. PARRISH: It's not resolved. I'm talking to the Court about it. We tried to resolve it before, and it has never been resolved.

THE COURT: Well, take it up with Judge Zoss. He's dealing with discovery matters in this case. I'm not.

MR. PARRISH: All right.

THE COURT: So I hope you can get it worked out. And if you can't, take it up with Judge Zoss, and he'll rule, and if anybody is not happy and it's an appealable order, then you can appeal it to me.

MR. PARRISH: All right.

THE COURT: But I'm not getting involved with a discovery in the first instance. I have too full of plate.

MR. PARRISH: Not the first instance, Judge.

Page 28

THE COURT: I understand it's not the first instance for you guys, but Judge Zoss hasn't ruled on this. That's what I meant by the first instance. I'm not ruling on anything related to the discovery that Judge Zoss hasn't had an opportunity to rule on first.

MR. PARRISH: He has had an opportunity to look at it first already.

THE COURT: Well, nobody's filed an appeal from any of his rulings. Nobody's filed an appeal from any

34

of his rulings that I'm aware of.

MR. PARRISH: That's correct. We have --

THE COURT: I hate to encourage you, but it sounds like I just did.

MR. PARRISH: It's a real problem, Judge.

THE COURT: I assume it is. I'm not trying to minimize your problem. I'm just trying to say it's one I'd like to avoid unless I have to get into it. That's all.

MR. PARRISH: Well, I'm assuming that --

THE COURT: Yeah.

MR. PARRISH: -- but if it can lead to some additional time that we need to get the case ready, and that's what's happened already.

THE COURT: Okay. Any other lawyer want to say anything else?

MR. WILLIAMS: On behalf of United States, Your Honor.

THE COURT: And Mr. Williams, can I just comment on one thing you said?

MR. WILLIAMS: Yes, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 9 of 100

THE COURT: I wasn't at all offended to the position you took in your brief. You're an advocate. You've got to advocate the position on behalf of your client. I don't know why you would even think that I might have been offended by it.

35

MR. WILLIAMS: Your Honor, the only thing that I didn't want you to take -- you said something about the time this has been on waiting trial compared to the other ones I cited in my brief, and I certainly didn't want you to take me citing or what the average time is in my brief as any type of criticism to the Court.

THE COURT: No, I --

MR. WILLIAMS: I just wanted to give --

THE COURT: -- didn't take it that way at all. It's my own self-criticism. That maybe I should have --

MR. PARRISH: The language on it bothers me -- on the memorandum.

THE COURT: Maybe I should have managed this case, you know, better than I have, but no, I didn't take it personally from the Government. I just looked at that, and you know, one thing I saw -- of course it was the Eastern District of Virginia that had the fastest cases to trial and --

MR. WILLIAMS: Rocket docket.

THE COURT: And that's why we have the 70-day rule in the speedy trial. You can't make a defendant -- or I'm sorry. That's why they have the 10-day rule in the speedy trial act because the rocket docket used to make them go to the trial less than 10 days after arrest. That's why that 10-day period is put in there, so it's not really a

court I've tried to emulate, so I wasn't too concerned about that, but obviously, a lot of these other cases got to trial a lot quicker. Of course, a lot of them were guilty pleas, too.

MR. WILLIAMS: Yeah, that chart -- and that's why I said in my brief -- this is C.J. Williams. What I said in the brief, apparently, because that chart is very hard to read, and I was doing my best to read it and take the averages.

THE COURT: Well, some of them went to trials and went to trials a heck of a lot quicker than this case has, and I'm aware of that, and I'm just brand new to this Defender Services Committee of the judicial conference, and we were talking about death penalty representation at our meeting first week in December and looking at budgets, and I was shocked by how high our budget is compared to the national average, and you know, part of the reason our budget is so high is this case has taken longer, and I understand all that, and there's no point in beating anybody about it. It's taken as long as it's taken and but it's as though --

MR. PARRISH: If they were death qualified, got six months earlier either. Like this case just became death-qualified, Judge.

THE COURT: Yeah, that could be. Could be a lot of explanation.

MR. PARRISH: Mr. Williams didn't even bother to mention --

Status Conference - 12-22-03

THE COURT: Okay.

MR. PARRISH: -- the chart.

THE COURT: On that note let me wish all counsel a happy holiday, and you know, maybe that we have to have another telephonic hearing at least with the Honken lawyers to make sure we lock in a trial date, but I'm going to -- when I got off the phone now, I'm going to call down to Kansas City and see what we can do about United States versus Peoples and Lightfoot.

MR. SPIES: Your Honor, this is Leon Spies. How do you communicate the results of your inquiry of the judge to Honken counsel?

THE COURT: Consider this. He's unwilling to do anything to help us out unless you hear otherwise from me --

MR. SPIES: Okay.

THE COURT: -- by fax and letter. Okay? Counsel, this is Mark Bennett. I'm signing off. Thank you.

(The deposition concluded at 3:19 p.m.)

38

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated; that I took in shorthand all of the proceedings had at the said time and place; that said shorthand notes were transcribed under my

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 12 of 100

direction and supervision; and that the foregoing pages are a full and complete transcript of the shorthand notes so taken.

Dated at Wyoming, Iowa, this 13th day of February, 2006.

_____

CERTIFIED SHORTHAND REPORTER

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 13 of 100

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

        Plaintiff,

  vs.

ANGELA JANE JOHNSON,                         Transcript of
                                             Phone Hearing
        Defendant.
                                   /

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, November 17, 2004, commencing at 11:02 a.m.

APPEARANCES:

For the Plaintiff:       C. J. WILLIAMS, ESQ.
                         Assistant United States Attorney
                         Suite 400 - Hach Building
                         401 First Street Southeast
                         Cedar Rapids, IA  52401

                         THOMAS HENRY MILLER, ESQ.
                         Iowa Attorney General's Office
                         Area Prosecutions Division
                         Hoover State Office Building
                         Des Moines, IA  50319

For the Defendant:       PATRICK J. BERRIGAN, ESQ.
                         Watson & Dameron
                         2500 Holmes
                         Kansas City, MO  64108

                         DEAN STOWERS, ESQ.
                         Rosenberg, Stowers & Morse
                         1010 Insurance Exchange Building
                         505 Fifth Avenue
                         Des Moines, IA  50309

                         ALFRED E. WILLETT, ESQ.
                         Terpstra, Epping & Willett
                         Higley Building - Suite 500
                         118 Third Avenue Southeast

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 14 of 100

HEARING 4, 11-17-04
Cedar Rapids, IA  52401

Court Reporter:            Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

                                                    3

THE COURT:  Good morning.  I have my court reporter here in Sioux City, and so she probably knows most of your voices, but if you'd please identify yourself when you speak, that would be helpful.

I wanted to -- I have a number of issues I wanted to raise.  First would be motion for change of venue.  Once again, I think the defense totally missed the mark on your motion. Your motion was just this kind of general brief about the general law of change of venue which I found totally not helpful in this case.

It seems to me you missed the issue.  The issue as I see it is whether or not knowledge of the outcome of a codefendant's trial precludes the ability to get a fair trial. I think that's really what the issue is, because I think we'd have a very difficult time finding people who didn't know about the Honken case and didn't know about the outcome.  But you just phrased the -- and I would think that you probably could pick a jury as long as they could be fair and impartial with regard to the evidence of a codefendant.

And I assume that there's law out there on codefendants' trials when there's been significant publicity with regard to the first defendant to go to trial.  But that was never raised in the motion.  And to me that's exactly what the issue is.  If the issue is what the defense thinks it is, I could just deny the motion right now.  So you totally need to

                                                    4
                        Page 2

rebrief the issue based on what I see the issue to be.  Do you have a problem with that?

MR. STOWERS:  No.  We, Judge, raised it as early as we could after the Honken trial was over in sort of a broader sense.  I think the authority that we found indicates -- and I think we cited a case in there to this effect -- that the codefendant trial, knowledge of that, knowledge of that type of thing, by the potential jury pool is not per se an automatic basis for a change of venue, but it's a factor that the Court is to consider in determining whether or not a change of venue is warranted.  I think we cited a case to that effect.

THE COURT:  Well, you didn't indicate -- I haven't read the cases you cited, but there weren't any parentheticals or anything indicated you cited any codefendant case.  But you may have.  But there again, you know, if you had a case that was specific like that, it would have been helpful I think had you pointed it out, but maybe I just missed it because I just gave it a relatively cursory reading.

And so I think you need to be more specific.  For example, the government in their responsive brief made a point that while you talk about evidence that was admitted in the Honken case that was discussed in the media that wouldn't be admitted in your case, you need to be more specific.  So on the second round of briefing, I'd like you to be a little bit more specific about that.

5

I don't have any real preconceived notion whether or not to change venue or not.  But if I change venue, it's

Page 3

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 16 of 100

unlikely that I would keep the case in Iowa because it just -- I don't see any advantage of going to Des Moines or Cedar Rapids to be honest with you. I just don't see it. Cedar Rapids, you know, half the jurors come from Mason City. I guess maybe there's authority -- I think the government might have cited it in their brief or suggested that I could somehow gerrymander the pool of jurors and only take from the eastern half of the Cedar Rapids division to eliminate jurors from the Mason City area. But the Mason City newspaper clearly had the most press coverage.

And so I'm either going to probably try the case in Sioux City or move it to -- my first choice would be Minneapolis if I decide to move it. So you can comment on that too if you want to in the brief.

I have a simple reason for being in Minneapolis. To my knowledge there was virtually no coverage of the case. It's a large courthouse. It's a new courthouse. It's a very secure courthouse. And it's one flight from Sioux City. Any other city would be more than one flight if I were to fly, so that's my big reason for Minneapolis.

I'd also maybe take a look at Sioux Falls, but it's an antiquated courthouse. I'm not sure of their space availability, but I don't think this got much, if at all,

6

publicity up there, maybe none, so that might be a possibility. It's 75 miles northwest of Sioux City. And I think we're going to have to kind of decide that pretty soon.

So I don't know how long -- do you want deadlines, or how long will it take to file briefs, or do you want to just file simultaneous briefs and pick a deadline but -- Mr. Stowers,

Page 4

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 17 of 100

what's your view?

MR. STOWERS: Whatever your pleasure is. I'd just let you know that we have been using a clipping service to clip all of the printed news media --

THE COURT: Yeah.

MR. STOWERS: -- covered by the clipping service throughout the whole state of Iowa, and the articles have been coming in from them throughout the time of the Honken trial, and they continue to come in. In fact, just today we got another 50-some newspaper articles from the papers that are covered by the clipping service, and those take us up, according to that batch, pretty much through the last aspects of that case. We've been planning to submit that as an appendix to the Court. I think if we submitted it now this week we would probably wind up with and we probably will continue to wind up with more media, and we could submit a supplemental appendix later.

THE COURT: Yeah, because there will be ongoing articles because I'm going to have a hearing on the Honken post-trial motions in the middle of December, and that's going

7

to generate a new round of articles. Any rulings in Johnson's case will probably generate articles. So yeah, there will be ongoing articles.

MR. STOWERS: I guess the way this clipping -- there's a lag time between when the clipping service receives the papers, reviews them, and then clips them and then gets them up to us. But it looks like that lag time's probably about a two- to three-week lag time. So I think we're pretty well through the trial. There will probably be some additional articles trickling in about the Honken trial that they haven't yet

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 18 of 100

clipped and sent to us. But I'll try and send that in this week unless you just want to get it all at once.

THE COURT: I don't care how you do it.

MR. STOWERS: Okay. But other than that, I'd be happy to do it how ever the Court wants to do it.

THE COURT: Well, how much time -- I mean, you can supplement it up until the time I rule on the number of newspaper articles. I doubt if that's going to be what I decide the issue on, though.

MR. STOWERS: Right.

THE COURT: I mean, I'm aware of the fact that it's probably had the most widespread publicity of any case tried in Iowa. I think we can probably assume that.

MR. STOWERS: Uh-huh.

THE COURT: And --

8

MR. STOWERS: Right. And we haven't done anything with radio or television coverage because those are, according to what we've found, almost impossible to get good or accurate information on those because of the way those are stored. And in the case of the television materials, generally to obtain, for example, footage of a news coverage on TV, it requires you to know when the thing aired, and then they can retrieve those for a certain time period, and I don't think the content of those materials is particularly important. But they certainly exist, but that's not going to be within the scope of what we're probably going to present.

THE COURT: Right. What's everybody's reaction to Minneapolis? I just sent Chief Judge Rosenbaum up there an e-mail. He's on the bench, but he's going to call me this

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 19 of 100

afternoon to -- I just wanted to get his sense, one, if they had room for us because they're pretty crowded. And I know the St. Paul judges are going to be moving out when they start a 60-million-dollar remodel of the St. Paul courthouse. So I don't know that they have the space for us. But I can find out. But anybody have a tentative reaction to Minneapolis?

MR. WILLIAMS: Judge, this is C.J. Number one, it's cold. But beyond that, no. I mean, I'll be happy to try this case wherever. I think another alternative -- and I don't know what the flight situation is, Judge, but, you know, St. Louis has a new courthouse as well that would work which is another

9

option. Used to be when I lived out there there were flights directly from Sioux City to St. Louis but --

THE COURT: The only place you can fly to from Sioux City now is Minneapolis. It's the only city.

MR. WILLIAMS: Yeah. TWA used to fly, but obviously they're out.

MR. WILLETT: Your Honor, this is Al Willett. I'm fine with the idea of Minneapolis. I have no -- I have no objection to that idea.

THE COURT: And I think Minneapolis would just be a plane flight away for Pat Berrigan too. I'm sure there are a lot of direct flights I would think.

MR. BERRIGAN: Yes, sir. I think you're right.

THE COURT: And I would certainly authorize flying. I wouldn't expect you to obviously be driving that every week. So I think you'd be in pretty good shape, Mr. Berrigan, being able to travel. The other thing we could consider maybe is Kansas City.

Page 7

MR. BERRIGAN: We have a new courthouse here, Your Honor. This is Pat Berrigan. You'd certainly be welcome. I'm sure they can find room. We have lots of room.

THE COURT: Do you have any thoughts about trying it in a death penalty state versus a nondeath penalty state?

MR. BERRIGAN: Yes, sir. To the extent that's a consideration, I mean, this case arose in Iowa which is a

10

nondeath penalty state. Missouri, as you know, is fourth in the nation I think in -- at least our rate of execution, so we're very much a pro-death penalty state. I understand Minnesota is a nondeath penalty state, so I think that would be a fairer venue, frankly, than Missouri and would be my preference, even though I live in Kansas City, that we be in Minneapolis.

THE COURT: I mean, I think it's a consideration. I'm not sure it's going to be a key consideration but -- and I didn't know actually how that cut when I asked you the question. I didn't know if you'd prefer to be in a venue where the jurors -- potential jurors have been exposed to death penalty cases and maybe their views are a little bit more concrete and may be easier to flesh out in jury selection.

What I found in Honken -- and I don't know if the government lawyers agree -- but that there was wide discrepancies between the juror questionnaire answers and what they answered in court, much wider than I've ever seen before in any other case where I've used a pretrial questionnaire.

And I suspect -- but there's no way of knowing this for sure -- that part of the reason was they hadn't really thought much about the death penalty, and once they got the questionnaires, it caused them to think more about it once they

Page 8

found out they were going to be a juror. And there were a lot of changes in attitudes. I'm not saying that's a good thing or a bad thing. I'm not even sure that was the cause, but I did

11

notice there was wide discrepancy between answers in jury selection and answers in the pretrial questionnaire. I don't know if that's good or bad.

MR. BERRIGAN: This is Pat Berrigan again, Your Honor, and frankly, that's been my experience even in a death penalty jurisdiction that this is not an issue people give such serious thought to until they're called for jury service in a case such as this. So I don't think your experience in Missouri would be any different in that regard.

THE COURT: Okay. And I also wanted to talk to you -- I just wanted to have a general discussion about jury selection, and I think the defense lawyers have a sense of how we did jury selection in Honken. Would that be a fair statement? At least some of you were there for some of it. I don't remember if all three were there, but have you discussed it among yourselves, and do you have a pretty clear understanding of how we did it in Honken?

MR. WILLETT: Yes, Your Honor. This is Al Willett. Mr. Berrigan and I were both there, and we have a very fair sense of how -- and what I observed, Your Honor, was the individual voir dire. But we have a very fair sense of how that was conducted.

Obviously I've tried enough cases with you that I know how you do your introduction to a case. And Mr. Berrigan was there that day I believe to observe some of that also. And then

12

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 22 of 100

obviously I've conducted trials in your courtroom, and I've done voir dire in cases, so I'm familiar with your approach there.

THE COURT: Well, I'm thinking about, you know, one of the guiding principles in my life is a quote from Thomas Edison who said there's a better way to do everything; go find it. And having done jury selection now in one death penalty case, I think I have a better way. And so the real purpose why I called this conference -- I've got other things on my agenda -- was to, while you're all sitting down at least -- are you all sitting down?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay -- share with you what I think might be a better way to do it. This is a tentative view, but it's one that I might say I'm leaning -- I wouldn't say fairly strongly. I'll just say it's a tentative view, and I'm leaning towards doing it this way unless the parties can convince me there's a better way to do it. And here's what it would look like.

We would bring in probably 14 or 15 jurors just like we did in Honken, and I would spend the same hour and a half talking with them about primarily presumption of innocence and burden of proof, but then I would do it quite differently.

Rather than bringing each juror in individually and questioning them, I would bring them in either seven or eight at a time, and then I would allow the lawyers to take the lead on

13

the questioning which I assume would focus primarily on their views on the death penalty, but you could ask them anything about any of their questionnaire answers or anything else you

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 23 of 100

want to ask them.  But instead of doing it individually, we'd be doing about seven or eight at a time.

My theory there is if we had a situation where -- which I've actually never seen before but we came close that final day in Honken where you have something that actually supposedly poisons the well, then you could just eliminate those seven and you'd just be out a couple hours.  And what I'd do is, you know, we'd bring some in right -- well, 7 of them would stay in the courtroom or we'd take a break, and then the other 7 or 8 would come back later in the afternoon and we'd question them, but all 15 would come in the morning.

Now -- then there are a couple of twists that I think might surprise you.  I'm toying with the idea of not following United States versus McVeigh on the issue of individual case-specific questions, and I think for the most part in Honken I let the lawyers ask individual questions because they were certainly allowed to ask about how would a juror feel about the death of a six-year-old and a ten-year-old if the evidence showed they were shot in the back of the head at close range and that kind of stuff.  But at some point in United States versus Honken I did invoke United States versus McVeigh to limit some of the case-specific questioning.

14

And I think one of the things I did not do well in jury selection in United States versus Honken was have a clearer understanding with the lawyers about what they could ask questions on, how far could they get into mitigation issues, how far could they get into aggravating issues.

My reading of United States versus McVeigh indicates that their reading of Morgan versus Illinois is that a trial

Page 11

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 24 of 100

judge has discretion to totally eliminate any case-specific questions and I can limit you, at least the Tenth Circuit says, to just core questions about the jurors' attitudes about the death penalty which means how do they feel about the death penalty in the abstract.

And assuming that the Eighth Circuit would follow McVeigh, while I have the right to limit you under that case, I'm not so sure that's the wiser approach because after having sat through it, it seems to me that it's kind of easy to have a view of the death penalty in the abstract but that view can change dramatically when you learn about what the specifics of the case are or are not, for that matter.

So I'm inclined to allow both sides to do much more specific questioning about case-specific questions, and it would apply equally to both sides.

Now -- and that's something that my reading of McVeigh indicates that I don't have to do. But there's a tradeoff for that. And this is what's going to come as a surprise to the

15

lawyers. Here's what I view the tradeoff is, because if we carry this to the logical extension and I allow a lot of case-specific questions, instead of picking a jury in four weeks, we could easily go eight weeks, and I'm kind of unwilling to do that for a whole lot of reasons.

So what I -- here's what I'm suggesting, and this is the most tentative part of my suggestion. I'm suggesting that here's what it would look like. Well, here's what I'm suggesting, that while I would give you all of the peremptory challenges authorized by the rule and by statute we would not -- you would not exercise your peremptory challenges in the

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 25 of 100

traditional way, and here's what I mean by that.

We would -- let's say the first group we have, we have 15 jurors. I do the general questioning. We send 7 of them away, tell them to come back at 2 in the afternoon, and about 10:30 in the morning we start with our first 7. After you're done questioning them, including all your case-specific questions, we would do our challenges for cause just like we did in Honken. All seven would leave. We'd take up challenges for cause. Let's say I excused two for cause, we brought the five back in. At that point I would then say to both the government and the defense you can exercise a peremptory challenge against any of the five. On the first round the government would go first, and then we would just alternate so that you would each have to go first. You could either exercise a peremptory

16

challenge against any of the five or accept any of the five as jurors. But if you didn't exercise your peremptory challenge, neither side did, then that person would now be -- would be on the jury, and we would go through this procedure until we got 12 jurors and 6 alternates, and that might be that you'll all run out of peremptory challenges early, or it may be that we seat 18 jurors before either side uses all their peremptory challenges.

Now, the downside would be that you wouldn't get all 76 jurors sitting in a room and be able to exercise your peremptory challenges that way. But my reading of the rule and case law is you're not entitled to do it that way. That's just the way it's traditionally done. I know of no legal barrier to my suggestion, but that's why I wanted to get it out early for the lawyers.

And it seems to me it's a tradeoff. The tradeoff is,

Page 13

particularly for the defense, you get to examine in detail case-specific questions of potential jurors that you might not otherwise get to do if I followed the holding of the McVeigh case.

On the other side, you're not going to be able to exercise your peremptory challenges with regard to an assembled group of 75 jurors. You're going to have to exercise them on the fly, so to speak. Personally, I don't see anything at all unfair about that. I recognize it's totally different than probably how you've done it in the past, and I don't see

17

anything in the rule or in the case law that precludes it. But obviously I'm going to give you an opportunity to research it and convince me that it's either unfair, illegal, or whatever.

But any -- first of all, let me start with the government. Either Mr. Williams or Mr. Miller, do you at least understand -- I'm not asking you to agree to it, but do you at least understand what I'm proposing?

MR. WILLIAMS: C.J. Williams on behalf of the government, Your Honor. Yes, we understand what you're proposing.

THE COURT: Okay. Do you have a tentative reaction to it?

MR. WILLIAMS: My gut reaction, Judge, is that I have a -- some problems with where we're going with McVeigh issues for this reason, and that is that when you allow a certain amount of questioning about facts of the case and then you're asking the jurors to give a reaction to that, you're asking them to predict in a way what they're going to vote on on a case with only part of the facts.

Page 14

THE COURT: Okay. But can I cut you off for a second?

MR. WILLIAMS: Yeah.

THE COURT: And I'm going to let you talk all you want, but let me give you my reaction to that. McVeigh used the phrase stake-out questions and then cited a big long string cite including a bunch of state Supreme Court opinions on stake-out

18

questions.

Here's my understanding of a stake-out question: If we show X, Y, Z in mitigation, would you be able to impose a life sentence? I'm not going to allow that, because I don't think you're allowed to get a commitment or a stake-out with regard to either the death penalty or life imprisonment. I think all you're entitled to do is find out is each juror open to both potential penalties. And it seems to me that unless I allow case-specific questions, the answer we get is too abstract.

In other words, if they just know this is a death penalty case where the defendant's eligible for the death penalty, could you fairly consider the death penalty and life imprisonment? I think most jurors would say yes. Once you say, Oh, by the way, the evidence will show that a six-year-old and ten-year-old were executed at close range in the back of the head, a substantial number of people who just said that they were open to both possibilities would now not be open to both possibilities. That's why I'm convinced that you have to ask some case-specific questions without asking them in a so-called stake-out manner. Do you see the difference, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor, I do, and I think that allays some of my concerns. To the extent that the end question

Page 15

after the fact is pointed out, the end question to the juror is can you still be fair and impartial and consider both

19

possibilities, I think that's okay.

What I'm afraid of and I think where the Court I think properly stopped the defense in the Honken case after they -- they didn't start off this way, but it ended up down this road. They started asking, Well, what if I tell you two kids; now, you would automatically vote for death under those circumstances, wouldn't you?

THE COURT:  And I'm not going to allow that type of questioning.

MR. WILLIAMS:  And I think given what you've just said, clarified for me, I think that allays some of my concerns on the McVeigh issue then.

I agree, and you allowed that in Honken to a certain degree to let the jurors know some of the facts because, as you recognized, it is important for them to be able to give some opinion that means something with some facts.

As far as the exercise of peremptory strikes, you know, my gut reaction I think is probably like any trial lawyer.

THE COURT:  You don't like it.

MR. WILLIAMS:  Yeah.  Anything that's not what we're used to we don't like.  And obviously, you know, the idea is if you have -- if you know what your body of people are, you're going to be able to more intelligently exercise your peremptory strikes than if you're kind of betting on the fact that today's the worst group you've seen to exercise your strike and then you

20

Page 16

find out tomorrow's worse. You know, if you wait till the end, then you have the whole body there and you can more intelligently exercise your strikes.

As far as whether there's any legal prohibition, I don't know of any. But I guess what I would ask on behalf of the government anyway is let us put some thought into this and maybe -- I don't know if we want to brief it or give you our thoughts on paper in some way on what we think about it or come up with any other proposal that we think would achieve the Court's goal of trying to cut down the length of time that we're going to use in doing jury selection.

THE COURT: Well, actually that's only one of my goals. One of my goals is to -- is to do a better job in less time. And so I actually have twin goals. I think I want to allow more case-specific questioning, but as a quid pro quo for that, I also don't want to dramatically increase the length of the trial. So I really have twin goals.

And my own belief is -- but it's only intuitive; I have no way of knowing -- that it would lead to -- I think the way we did it in Honken was extremely fair to both sides. I think this would be extremely fair to both sides, but I think it would actually lead to a better jury. But that's just my own view.

And what I suggest is you don't even have to brief it. Unless you can find -- the only briefing would be just -- if you

21

find a case that precludes something like this, then just send me a letter. But do it within the next couple -- next two weeks or so. And then I want to get the defense tentative view. And

Page 17

then I think it would be easier rather than filing briefs if we just have a series of phone calls and hash it out.

MR. WILLIAMS: Sure.

THE COURT: And I'm not saying that this is the best that we can come up with. This is what I came up with all by myself. I assume with five highly skilled lawyers we can come up with a better idea than what I've come up with. But if we don't, I'm probably going to impose what I came up with, unless somebody convinces me that it's unconstitutional or violates the rule or is somehow illegal.

Anybody from the defense want to give me a tentative reaction?

MR. WILLETT: Judge, this is Al. I certainly understand the concept you've described to us. It makes -- the idea of exercising peremptories on the fly makes me nervous.

THE COURT: Only because you haven't done it, Al.

MR. WILLETT: Judge, you're right. You're right. You know, I'm reminded of one of my old law school classmates, and she always said, I don't like anything different, and she was a marvelous woman, so I don't want to become that. But it just makes me a little nervous.

I would certainly like to confer with my co-counsel

22

Mr. Berrigan who's been involved in more of these death penalty jury selections than I have, and I'd like the opportunity to get back to you. I'm not saying it's impossible. It just at first -- at first glance it just makes me nervous.

THE COURT: It should make you nervous. I don't have a problem with that. But, you know, here's one of the potential tradeoffs. One of the potential tradeoffs is, okay, we can do

Page 18

individual questioning or do it in groups of 7 and build up a pool of 75 jurors, but I'm not going to let you ask any -- any case-specific questions.

MR. WILLETT: Sure. And, Judge, one thing I want to be very clear on, the idea of group voir dire does not bother me at all. Bringing these people in five, six, seven, or eight at a time I think is a tremendous idea. It's just when you said exercise peremptories on the fly, I'm sort of a born pessimist. I'd probably agree with Mr. Williams that, gee, maybe this is the worst pool we'll see in two weeks, and then the next day we go, Oh, my God. So that's what I'm thinking of internally, but I'm not saying that I can't come around at all.

THE COURT: Okay. Mr. Stowers, your tentative view?

MR. STOWERS: I'm going to defer to Pat Berrigan on that.

THE COURT: Okay. Pat Berrigan?

MR. BERRIGAN: Your Honor, I had two questions.

THE COURT: Yes.

23

MR. BERRIGAN: One is will there be a general voir dire at all, and, if so, when does that happen? Should it be in the groups that we ask questions such as, you know, related to police officers or do you know witnesses or the things that would typically be asked?

THE COURT: Yeah. I'd kind of do it like I did in Honken where I'd start in the morning, I'd talk about reasonable doubt, presumption of innocence, and then we'd probably do the same thing where we'd have a written witness list of all the witnesses in the case. And then we'd give it to the jurors, and then they'd have a chance to look at the written list on the

Case 3:09-cv-03064-MWB-LTS     Document 284-66     Filed 06/23/11     Page 32 of 100

first break and then come back.  And in the group of seven or eight, we could ask them if anybody knows any of the potential witnesses.

And in that group setting of seven or eight, you could ask -- it wouldn't just be limited to death penalty questions, but it could be on anything, answers to their questionnaires or anything else you want to ask them about.  To the extent that there are questions that you would want me to ask, then I could do that with regard to the group of 15 in the morning when we first start like hardship, whatever else that might apply to everybody.

MR. BERRIGAN:  Okay, sir.  The other question I have is -- and I don't -- I didn't see this in Mr. Honken's trial, and I'm not even sure the defense requested it, but we would

24

certainly request to be able to alternate the order in which we address the jurors.  That is, if we're going to do this in small groups and we're talking about alternating peremptories, we should, we believe, get to go first every other time with the groups in terms of the questioning process, that the government not always precede the defense in questioning the groups.

THE COURT:  Yeah, I could be open to that possibility.  C.J. and Tom, would you have a problem doing that?

MR. WILLIAMS:  Your Honor, this is C.J.  My gut reaction is no, I don't think so.  You know, we'd still have the burden of proof in the case, and typically that's why we always go first on everything.  But in jury selection I don't know that I necessarily have a strong reaction to that.

THE COURT:  So, you know, all of this is kind of open for possibilities.  Actually I know the defense lawyers aren't

Page 20

going to like this, but in the Honken case the government lawyers did a better job of questioning the jurors and got at the fairness issues much better than the defense did. There's no question about that.

Well, let me tell you, I sent an e-mail in the middle of jury selection to my law clerk in the courtroom with me, and here's what I said: If we had a hundred people in the courtroom and they watched either Mr. Williams or Mr. Miller do the voir dire but they didn't know they were prosecutors and we asked them were they the prosecutors in the case or the defense

25

lawyers, I believe she said 90 percent would say they were defense lawyers, and I said 80 percent would say they were defense lawyers.

So unless you do a substantially better job than the Honken lawyers, Mr. Berrigan, which I'm open to the possibility that you will, you'd actually be better off letting the government lawyers go first.

MR. WILLETT: C.J. missed his true calling, Judge.

THE COURT: Well, I guess he did. That's right. And my law clerk's sitting in the room with me now, and she's laughing because that's exactly -- that was exactly the question I sent her, and both of our answers -- because both Mr. Williams and Mr. Miller approached it from a totally open -- and you would have thought they were defense lawyers, not prosecutors. So I actually don't think who goes first would make a whole lot of difference if they do it in a similar way, but I'm open to that possibility.

Mr. Berrigan, what do you think about having to exercise the peremptories kind of on the fly for lack of a

Page 21

better term?

MR. BERRIGAN: I know that's done in some jurisdictions, Your Honor. In fact, in Kansas, my neighboring state, I think they do it that way there. And I doubt there's any legal problem with it, frankly. I'm like the rest of these guys. Haven't done it before, and it would be a new experience,

26

but I'm not innately averse to it.

THE COURT: Okay. Well, why don't we just postpone this for another day.

MR. MILLER: Judge?

THE COURT: Yes.

MR. MILLER: Tom Miller. Just so I'm clear I'm understanding this, with each group of 5 or 6 that's been passed for cause, each side would have an opportunity to use any portion of its total reservoir of 20 strikes alternating them one at a time back and forth?

THE COURT: Correct, correct, yeah, exactly.

MR. MILLER: Okay.

THE COURT: Have you ever thought about that, Tom?

MR. MILLER: No, but I do think that's a traditional, old-fashioned way that was used many years ago in most jurisdictions. It's kind of scary, but it's a dilemma for both sides.

THE COURT: It's a dilemma for both sides, and I think it would dramatically speed up the jury selection process which I'm not interested in speed for the sake of speed, but if it's not unfair, I'd be in favor of it. And I think by asking case-specific questions you get a lot more out of it.

So I actually think it'd be -- I think it'd be a good

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 35 of 100

way to do it or I wouldn't have proposed it, but that doesn't mean it is a good way to do it. That's why I want you to all

27

cogitate on it for a while, and we can talk about that at some later point.

There are a number of pending motions. And let me ask you this, Mr. Williams. Is it possible to just consolidate the indictment so that we'd just -- and consolidate the cases?

MR. WILLIAMS: Yes, Your Honor. In fact, I was going to bring that up today. Given the ruling you handed down the other day on a motion to dismiss the first indictment, that vastly simplifies things in my view. What I intend to do in the first place is go back and supersede on the indictment. I've alerted the defense I'm going to do this on what we now call the second indictment --

THE COURT: Yes.

MR. WILLIAMS: -- to clean up some of the language, clarify things that weren't clear, to eliminate what we called overt acts which weren't acts at all and things like that, eliminate some of the issues that -- you know, eliminate, for example, some of the overt acts for some of the offenses under the CCE that we just don't want to bother with, they're not necessary to prove, and cut it down a little bit more. So I intended to go back to the grand jury to do that in the first place.

My intent would be -- at this point would be to then supersede on that indictment to add what remains of the first indictment as new counts on the second indictment and then

28

Page 23

simply move to dismiss the first indictment all together so we end up with all new counts in one indictment.

THE COURT: Yes, that's what I was hoping for.

MR. WILLIAMS: And so that's my intent at this point. I needed to figure out what the Court was going to do on our motion to dismiss before I move to do that.

THE COURT: Yes. What's your time frame on when do you think you can do that?

MR. WILLIAMS: Within -- we have grand jury the second week of December. Let me look here, Judge. Yeah, on December 8 we have grand jury, and so my intent would be to do this on December 8.

THE COURT: Okay. Now, there are a number of pending motions, and I'm not sure all of them are still live controversies or not.

MR. STOWERS: Uh-huh.

THE COURT: But I'm not sure. And I was looking at the scheduling order, and it's kind of unrealistic with regard to a couple of things, and that would be the juror questionnaires because there's no point sending out juror questionnaires for northwest Iowa if we're going to be in Sioux Falls or Kansas City or St. Louis or Minneapolis.

So I guess we'll have to figure out the change of venue motion, you know, relatively quickly so we can get started on whatever jury selection process we're ultimately going to use

29

but -- and I guess hand in hand with that is the government's motion for an anonymous jury?

MR. WILLIAMS: Judge, if I could jump back actually -- this is C.J. again -- on the issue of the change of venue, you

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 37 of 100

had raised the idea -- and we never really addressed it -- of timing on supplemental briefs because I agree; I think this is going to be important, and it's going to dictate the questionnaire and everything else. I'm wondering if we can't agree to submit whatever additional briefing we're going to submit to the Court on the issue of venue no later than December 3 which would be a Friday after -- the last Friday of -- well, the first Friday of December.

THE COURT: That's fine.

MR. WILLIAMS: And then go from there.

THE COURT: And what I'd like to do is I'd like to hold a hearing on December 20 if that works for everybody just so that we can hear all pending motions that are ripe at the time so that -- I'm already behind the eight-ball on the pending motions, and we'd still keep open the -- I think there's a January 7 deadline for filing all other motions that are kind of trial related. And I would encourage the parties to voluntarily move that up so that you could file as many -- if you have motions you're thinking about filing, get them filed, get the other side to resist them so we can take them up on the 20th.

MR. WILLIAMS: Very good, Your Honor.

30

THE COURT: Would that work?

MR. STOWERS: That includes any in limine motions?

THE COURT: Yeah, I'd just as soon -- if you know what you're going to be moving in limine on, I'd like to get at least as much of it as you can filed.

MR. STOWERS: All right.

THE COURT: But, you know, you'd have to -- if we're going to have a hearing on the 20th, you'd probably have to get

Page 25

it filed by, you know, December 7 or so.

MR. STOWERS: Okay.

THE COURT: So that they could be resisted.

MR. STOWERS: Right. Could we do like a cutoff date for any motions filed by a particular date could be heard on the 20th and any after that would have to be heard at a later date? Would that make sense?

THE COURT: Yeah, I guess we could do it that way. Well, let me ask you this. If I gave you all till December 7, could you file all your motions by then, or do you really need till January 7?

MR. WILLETT: Your Honor, this is Al on behalf of the Johnson team. I think a prime example of why we would want January 7 is the motion in limine because between Mr. Berrigan, Mr. Stowers, and myself, we're trying to make sure that we have everything inclusive in the motion in limine, and we'd probably look at that as one of the more labor-intensive motions to put

31

together. That would be an example of a motion I would suggest that if you would allow us to have it till January 7 for that particular motion I think would be beneficial.

THE COURT: It doesn't give me much time to resolve it.

MR. WILLETT: I understand.

THE COURT: You know, you've had this case for four years. Why you can't file a motion in limine by next week or the week after or two weeks from now is a little bit beyond me.

MR. STOWERS: No. I think we're going to be able to file some, Your Honor.

THE COURT: Well, can you do this? I'll leave the

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 39 of 100

January 7 date open, but can you at least file everything you know of that you can get to?

MR. STOWERS: Right. That's what we'll do.

THE COURT: You might not be able to get to it because you're all busy. I understand that.

MR. WILLETT: That's absolutely fair, Your Honor. If you would allow us to have the January 7 deadline as sort of a safety valve if you will --

THE COURT: Exactly, for things you either didn't think of or couldn't get to.

MR. WILLETT: Yes. And everything else, we'll just keep it in fifth gear.

THE COURT: Can we say -- I don't even know what day

32

of the week December 7 is. Let me look.

MR. STOWERS: It's a Tuesday.

THE COURT: Yeah, it is a Tuesday.

MR. WILLETT: And January 7's a Friday, Your Honor.

THE COURT: Okay. But if you could file all pretrial motions that you can by December 7 and then have resistances filed by the 17th, then we'll have the hearing on the 20th, and that's a hearing that we would bring the defendant over for or maybe I'd just go to Cedar Rapids. It might be -- I think it's probably easier -- well, everybody but Pat Berrigan and I, I guess.

MR. WILLETT: Your Honor, you are aware that Miss Johnson is no longer in Cedar Rapids.

THE COURT: No, I wasn't aware of that.

MR. WILLETT: She was moved, Your Honor, prior to the Honken trial to a location in north central Iowa.

Page 27

THE COURT: Oh, okay.

MR. WILLETT: So if you wanted to have this in Sioux City, Miss Johnson's in a location that would arguably be equidistance from either Sioux City or Cedar Rapids.

THE COURT: Well, we can hold off on the -- why don't we hold off on the location for a little bit. If I can maybe spend another day or two in Cedar Rapids and help Judge Reade out doing some other things, then it might make sense to have the hearing in Cedar Rapids.

33

MR. WILLETT: Fine, Judge. You're welcome here. I just didn't want you to think you had to come here because this is where Angela was.

THE COURT: Right. But you and Mr. Williams are there.

MR. BERRIGAN: Your Honor, this is Pat Berrigan. I have no problem coming to Cedar Rapids, but we have a great concern that our client not be returned to the Linn County Jail. That's been nothing but a problem from the beginning. As you know, we've tried to get her out of there on many occasions, and she's doing quite well where she is. And by having a hearing in Cedar Rapids, we have some concern that the marshal's service is going to take her there and leave her there which is the last thing that the defense team wants.

THE COURT: Okay. In that case we'll probably have the hearing in Sioux City on the 20th.

MR. STOWERS: Des Moines's still open, but it's not in the Northern District of Iowa, Your Honor.

THE COURT: Well, I've -- actually I've tried a jury trial in the Southern District in a Northern District case.

Page 28

But --

MR. STOWERS: It has some --

THE COURT: It has some appeal to you at least, Mr. Stowers, having it in Des Moines.

MR. STOWERS: And to Mr. Miller I'm sure.

34

MR. MILLER: I'll second Mr. Stowers on that suggestion.

MR. STOWERS: That's fine, whatever you want to do.

THE COURT: Okay. Anything else that we should be talking about now?

MR. WILLETT: Your Honor, let me ask a question if I may, and this gets back -- and this is Al. This gets back to C.J.'s mention that you'll be having a superseding indictment for us in the beginning part of December. I know Judge Zoss has a legal vessel now where on a superseding indictment a defendant can file basically a written appearance and plea of not guilty. Is that something that the Court would be open to in regards to this superseding indictment, that I could draft a legal document so that Miss Johnson could file a written plea of not guilty and the marshals would not have to transport her back and forth?

THE COURT: Well, what would it be? An initial appearance?

MR. WILLETT: Basically an initial appearance, yes.

THE COURT: Couldn't we just do that on the 20th of December at the hearing?

MR. WILLETT: Sure.

THE COURT: Or if you want to file something in writing, one less thing I'd have to do.

MR. WILLETT: Okay.

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 42 of 100

THE COURT:  That's fine with me.

35

MR. WILLETT:  Okay.  Thanks, Judge.

THE COURT:  Yeah.  Anything else on the agenda?

MR. STOWERS:  The instructions, Your Honor --

THE COURT:  Yeah.

MR. STOWERS:  -- I think are -- until we see the superseding indictment, I don't know where we're going to be as far as being able to draft any of the instructions on the particular counts, and I think that date was an early December date.

THE COURT:  Yeah, I'll tell you what.  I'm not too concerned about the instructions because am I wrong, Mr. Williams?  Aren't most of these counts going to parallel the counts from Honken?

MR. WILLIAMS:  They're largely identical, Judge.  The only thing -- if we went with Honken, we'd basically eliminate -- the first five counts on Honken are now gone because they were the first five counts of the first indictment on Johnson.

THE COURT:  Right.

MR. WILLIAMS:  What is now Count 6 and 7 of the first indictment against Johnson were identical to Count 6 and 7 against Honken.  And those we've cut back as far as our motion to dismiss, and then those will be moved to the end of the counts against Johnson.  And then the last -- and all ten counts in the second indictment in Johnson are identical to the last ten counts against Honken.  So by and large they're going to be

36

Page 30

identical.

The only change would really be the first five counts we had against Honken are gone and then Count 6 and 7 -- Count 7 in particular is going to be vastly smaller and limited on overt acts and alleged crimes than what it was in Honken.

But what I can do, Judge -- why don't I propose this -- is that within a week of our superseding the indictment in advance of the hearing on the 20th, I will get a draft of the instruction on those counts that have been changed to defense counsel and to the Court to get an idea of how it might impact the instructions. That would be the only real impact I think would be, frankly, what is now Count 7 of the first indictment.

THE COURT: And, you know, those instructions were hashed out and hashed out and rehashed out, and unless you've got some new kind of arguments or something, it's going to be hard to persuade me not to use those instructions.

MR. STOWERS: Uh-huh.

THE COURT: I'm just giving you a heads-up. I mean, you're going to have to have some awfully persuasive reasons for me to deviate from those instructions because I have a lot of faith in them. That's not to say they can't be improved, but I'm not going back to the drafting board and starting from scratch. I've got a set that I have a very, very, very high level of confidence in, and it's going to take some extraordinary effort to persuade me to make any changes in them.

37

MR. STOWERS: No. That's fine. That's good to know. I just was concerned about the --

THE COURT: So I don't think we need that date, and I think we could just kind of leave it open because I don't see

Page 31

the instructions changing a lot. Now, maybe I'm missing something. Who on the defense team is primarily going to be responsible on instruction issues? Would it be Mr. Stowers, Mr. Berrigan?

MR. STOWERS: I will be for the main phase, and then Pat is going to hopefully be greatly helpful on the second part of the case if there is a second part.

THE COURT: Yeah.

MR. STOWERS: So I think that's kind of what we're planning on the instructions. That's why I asked.

THE COURT: And, Pat Berrigan, the only thing I'd ask you would be actually a couple of the mitigators are going to be the same, but we'd have to change the names.

MR. BERRIGAN: Yes, sir.

THE COURT: But, I mean, is it -- is it somehow prejudicial to the defense if I have you disclose the mitigating factors kind of early just to help me get the instructions set up?

MR. BERRIGAN: Well, in all honesty it sort of is, Your Honor. I mean, I certainly wouldn't have any problem doing that ex parte.

38

THE COURT: Well . . .

MR. BERRIGAN: But, you know, it requires -- as long as we can amend them as appropriate I suppose.

THE COURT: And I'm not trying to be a wise guy. I just want you to help educate me. It's prejudicial in the sense that it tips off the government to penalty phase evidence?

MR. BERRIGAN: Well, it commits us I think on some issues to a position that the evidence at trial might not bear

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 45 of 100

us out, and, frankly, we're not settled all together on some of the mitigation evidence that's going to be presented.

THE COURT: Yeah.

MR. BERRIGAN: We're working hard on that.

THE COURT: Well, okay. Well, I'm not going to require you to disclose it real early then because I think it's something that we're prepared to deal with on fairly short notice because I have a much better understanding of what the scope of mitigation evidence is now than I did when I was worrying about jury instructions in the Honken case. So I don't really feel I need a whole lot of time to sort it out.

So why don't you concentrate more on the merits instructions. I would like to have any of those issues resolved as early as possible.

MR. STOWERS: Right.

THE COURT: And then we could hold off talking about the penalty phase instructions. But I guess what I'd like you

39

to do, if you're going to have -- I don't have a big need to have you disclose your specific mitigators way in -- even in advance of trial. But if you have some kind of structural objections to the penalty phase instructions --

MR. BERRIGAN: Yes, sir.

THE COURT: -- you know, I totally missed the boat on the balancing or whatever, I guess I'd like to know about that early so I'd have time to think about it.

MR. BERRIGAN: Yes, sir, I understand, substantive --

THE COURT: Yeah, right. Does that make sense?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Anything else anybody wants to talk

Page 33

about?

MR. WILLIAMS: Your Honor, this is C.J. Just to give you a heads-up on a potential issue that we may have in this case that we never did have to struggle with in Honken, and that is the defense may or may not have some type of psychological mitigating evidence, and the way we have it right now the Court entered some orders -- it's my understanding I think the defense -- if I recall correctly, the order said 12 weeks in advance of trial they need to notify us of any defense --

THE COURT: I think it's January 3, defense designation of expert witnesses, parentheses, guilt phase and mitigating factor penalty phase.

MR. WILLIAMS: Okay. And depending on where that

40

comes out, I just want to give you a heads-up. It may or may not become an issue, but that could obviously affect timing if we're then trying to figure out if we need to get her evaluated by one of our people and so forth. And it may be a nonissue, or it may become one. I just wanted to let the Court know that's something that may come up here that we never had to struggle with in Honken.

THE COURT: And let me ask you this, the defense team. If you know you're going to have a mitigation expert, while January 3 is the deadline, do you have to wait until the deadline to disclose it?

MR. BERRIGAN: This is Pat Berrigan. No, not necessarily, Your Honor. Again, this is an issue we're currently working on. Mr. Williams and I had a conversation I want to say at least a week ago, and he asked me specifically, you know, whether I could tell him that we were going to present

Page 34

mental health mitigation evidence. And what I told him was that he should plan on that. To certainly not take any action would deprive him of the ability to put on rebuttal evidence. So I presume he's taken some action in that regard. But in terms of the specifics, the specific disclosure, we're really not in a position to do that quite yet.

THE COURT: But will you be in a position to do it by January 3?

MR. BERRIGAN: Yes, sir, absolutely. That's the

41

deadline we've been operating under, so we recognize we have to have it done by January 3. That still gives the government two months to do whatever it is they're inclined to do, and they have notice that that's a very real possibility, even a probability.

THE COURT: Yeah. But I can envision that there could be quite a bit of argument over that.

MR. BERRIGAN: Yes, sir, and certainly we could set up a hearing in anticipation of that. There probably will be argument about that I suspect.

THE COURT: Well, but I guess rather -- yeah, I'm sure there will be a hearing, but what I'd really like is as soon as you find out you're going to have it, even though January 3 is the drop-dead deadline, disclose it to them earlier once you know so that we can then have time to sort through the issues that I could see arising over the government wanting to do an independent evaluation.

MR. BERRIGAN: We'll do that, sir.

MR. WILLIAMS: And, Judge, I do appreciate Mr. Berrigan has been talking about this. I called him up

Page 35

because obviously we need to budget money for potential experts and that kind of stuff, and Pat's been very cooperative in telling me kind of where they are and what they're doing. So I appreciate that.

THE COURT: So I'll go ahead and set the December 20

42

date for all pending pretrial motions that are filed by whatever date I said in December. I think the 7th?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And then ten days for people to file responses to it. And then maybe at the December 20 hearing would be soon enough to talk about what we intend to do in jury selection. And then I'm going to have to decide very quickly about the venue.

Where are the parties on a questionnaire? Have you taken the Honken questionnaire and modified it, or is that something you actually haven't gotten to yet?

MR. WILLIAMS: Your Honor, C.J. Yes, we have actually. We've modified it. We tried to correct all the errors that we found during the Honken case in using that, tried to simplify it much more than what it was, and we've recently sent a draft of that revised questionnaire to Mr. Willett I think maybe last week or the week before or somewhere in there.

MR. WILLETT: And, Your Honor, this is Al. I did receive that from C.J., and I think within 24 hours of my receipt of it I sent it on to Mr. Berrigan for his review.

THE COURT: Okay. Well, good. It doesn't sound like there are going to be any problems with it, does it?

MR. BERRIGAN: This is Pat Berrigan, Your Honor. To be quite honest, I really haven't had a chance to look at it,

Page 36

but I'm not anticipating any big problems. I presume this is

one of those things that was somewhat hashed out in Mr. Honken's trial as well.

THE COURT: Yeah, it was. And isn't there a website somewhere that has a bunch of these questionnaires on there? I'm pretty sure there is.

MR. BERRIGAN: The Eighth Circuit has their own model questionnaires. I don't know to what extent this questionnaire matches up.

THE COURT: Yeah, I don't know. I know I authorized one heck of a lot of money to a jury consultant that had some input into it.

MR. BERRIGAN: Yes, sir.

THE COURT: I'm not sure I can see the results, but in any event, as long as you're making progress on the questionnaire, that's a good thing.

Okay. I think probably I'll just see you all on the 20th, and given the situation with Ms. Johnson, we'll probably just hold that hearing here in Sioux City.

MR. BERRIGAN: Your Honor, what time would that be?

THE COURT: Would you be coming up the morning of?

MR. BERRIGAN: It doesn't really matter, Your Honor. I could come up the night before. I just want to be on time.

THE COURT: What about the Des Moines lawyers? Would they --

MR. STOWERS: It may depend on -- I can drive up that

morning even if it's set early in the morning. But if Pat's

going to be up the night before, it might be the kind of thing where we get up there the night before and then meet together.

THE COURT: Yeah, that might be helpful. So why don't we just start it at nine o'clock.

MR. STOWERS: Yeah.

THE COURT: And that way the early risers can get up early even from Kansas City and drive up, or they can come in the night before.

MR. BERRIGAN: Thank you, Your Honor.

THE COURT: Okay. So we'll set that for December 20 at 9:00. Anything else from any of the lawyers?

MR. STOWERS: Thank you.

MR. WILLIAMS: Not from C.J., Your Honor.

MR. WILLETT: Thank you, Judge.

THE COURT: Thank you all very much. Bye now. Have a good Thanksgiving.

(The foregoing hearing was

concluded at 12:02 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-21-06
Shelly Semmler, RMR, CRR                    Date

Page 38

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,                         Transcript of
                                             Hearing

      Defendant.
                                 /


       The Hearing held before the Honorable Mark W. Bennett,
Chief Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, December 20, 2004, commencing at 9:36 a.m.

2

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 52 of 100

Court Reporter:     Shelly Semmler, RMR, CRR
                    320 Sixth Street
                    Sioux City, IA   51101
                    (712) 233-3846

♀

3

THE COURT:  Good morning.  Please be seated.  This is United States versus Angela Johnson, Criminal Number 2001-3046. And we're here on all the pretrial motions that have been filed by the parties.  I've previously given the parties an agenda, and we have a revised agenda that I think you found at counsel table this morning.

As a preliminary matter, is the government moving to close the hearing?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  And, Mr. Willett, are you kind of lead counsel this morning?

MR. WILLETT:  Well, at times, Your Honor.  I'm going to have a very limited role this morning.  Mr. Stowers and Mr. Berrigan are doing most of the heavy lifting.  But as I said to the Court in my previous e-mail, we have no objection to this hearing being closed today.

THE COURT:  Okay.  No, I think you do have an objection to it being closed.

MR. WILLETT:  Excuse me.

THE COURT:  I think you wanted an open hearing.

MR. WILLETT:  Yes, excuse me.  We wanted an open hearing.

THE COURT:  Okay.  Well, nobody's moved to close the hearing, so we're going to have an open hearing.

Do the parties have any objection to proceeding in the

♀

4

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 53 of 100

order that I outlined in the agenda for the hearing?
Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Willett?

MR. WILLETT: None, Your Honor.

THE COURT: Okay. We're going to start with the government's motions, so Mr. Williams?

MR. WILLIAMS: Your Honor, the first motion you've listed down here is the government's motion for an alibi defense notice. We've been back and forth on some pleadings on this issue. The latest pleading from the defense is somewhat along the lines of the government has evidence and knows what it's going to put on and knows about where the defendant's been and not been that they reserve the right to raise issues about her whereabouts later on, but they've apparently waived the alibi defense. I'm not quite sure what their response means, and my concern is this, and I don't anticipate we're going to get this because we've done some investigation in this area.

I don't want to suddenly see a witness take the stand during the defense case and say, I was with Angela Johnson on the night of July 25, and she couldn't possibly have committed these murders because we were in Kansas City at the time.

Now, that's all the government's looking for is to bar that kind of a witness, and we think the defense has an obligation to give us notice of that. They've not done that,

5

and so the government's request is simply for an order telling the defense they're barred from presenting that type of witness.

THE COURT: But let's talk about for a minute the

Page 3

scope of the remedy that you're seeking for noncompliance with the alibi defense rule, because there are certain things I think that you would probably agree with are beyond the scope of the rule in terms of remedies that you would be entitled to for failure to disclose under the rule. For example, I think the defendant always has the right to testify with regard to an alibi, and I don't have the power to preclude that. Would you agree with that?

MR. WILLIAMS: Correct. I think the -- under the alibi notice requirement, even if it's only the defendant who is going to testify to an alibi, the notice requirement still requires the defense to give us notice, but then you run into the question of what is the remedy if they violate that because the Court can't bar the defendant from testifying. I think the Court could bar the defendant from testifying about an alibi defense, though. I don't know that that's not prohibited.

THE COURT: Well, I'll tell you what. I'm going to give you a very brief period of time to file a supplemental brief on that because I think you will find that the law is contrary. I think you will find that.

MR. WILLIAMS: And if I find that as I'm sure I will given that apparently you've done the research on this area, I

6

will just let you know by letter that I --

THE COURT: Okay. But maybe you'll find something that we didn't find, so I want to give you an opportunity to do it.

MR. WILLIAMS: And if I find something, I'll file a supplemental brief, Your Honor.

But beyond the defendant testifying, the government --

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 55 of 100

the scope we're asking for is simply an order barring the defendant from presenting or arguing any defense -- alibi defense in this case, presenting any evidence of an alibi defense since they've not given us any notice of an alibi.

THE COURT: Well, does the -- do you think the rule also applies to documentary evidence if you weren't going to call a witness?

MR. WILLIAMS: I think it does. I mean, the whole purpose of the alibi defense is to eliminate surprise at trial, and to the extent that the defense has some type of evidence whether it is testimonial in nature or not that presents an alibi, it strikes me the purpose of it is get that out front and let the parties prepare for that so we don't have surprises at trial. But I've not looked at that issue in particular, Judge.

THE COURT: Okay. Anything else you want to add on your alibi motion?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Stowers?

7

MR. STOWERS: With regard to their request, Judge, this was a matter that initially was litigated before Magistrate Zoss, that is, whether or not their demand for an alibi notice was adequate or not. And then you might recall that was decided adverse to our position on that. And then you undertook to consider that when we asked you to review the magistrate ruling, and you upheld the magistrate ruling on that.

But I think it -- the resolution if there is one of their request to exclude what they consider to be all alibi evidence or any evidence which would -- I think their motion says tend to support an alibi-type defense is -- partly goes

Page 5

back to those issues. And one of the problems is is that their original notice -- the notice under the rule says that they have to state the date, the time, and the place of the crime. That's where the beginning of the problem is for --

THE COURT: Yeah, but I've already ruled on that.

MR. STOWERS: I know that. I realize that, but I think when --

THE COURT: And if I'm wrong, you can appeal it, but it doesn't give you a right not to comply with Rule 12.

MR. STOWERS: The problem is -- right. But the problem for us is that the way this has proceeded is we've got two days per each occasion of murder activity as alleged by the government, over two calendar dates. We are not alleging that we have an alibi for those full two calendar dates. And we're

8

not really relying at all on an alibi defense in this case, but there will be evidence -- and we don't want to have us precluded from that. There will be evidence in their case as well as in our case that -- perhaps in our case that -- as to her whereabouts during those two calendar dates. They're going to offer evidence of that themselves. Whether -- I don't think that rises into the alibi defense. It's just talking about where she was at different times.

Now, it doesn't preclude their theory of the case which is that at some point in time during those two calendar days on those two separate occasions she allegedly participated in these homicides in some manner. But to say that we can't have any evidence as to what she was doing or where she was during those days which is I think the full scope of their motion, that was a concern we had. But we're not planning to

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 57 of 100

rely on an alibi defense, as what we understand to be an alibi defense.

So I think there's no real easy way to deal with this sort of in the abstract at this point, and I think this is the kind of an issue where if we present some kind of evidence on our own and the government becomes concerned about the fact that this falls within the scope of the alibi rule, then they can make their record at that point, and it can be addressed in a specific context of a particular witness or piece of evidence.

But I'm not sure what the particular remedy is that

9

they're asking for. They don't want us to be able to offer apparently any evidence as to her whereabouts on four calendar dates in 1993, and I don't think that the rule is that broad.

So that's kind of where we are, and we're not -- we haven't given notice of an alibi defense because we aren't relying on one, so when they asked to have us precluded from offering that, we think we've complied with what we're required to do, but the question is what are the -- there may be a dispute there, and I think the only way to resolve that is at the time of the presentation of evidence, if any, in a concrete way. Thank you.

THE COURT: Thank you, Mr. Stowers.

Mr. Williams?

MR. WILLIAMS: Your Honor, and perhaps we don't have a problem here, but here's my concern. The remedy that the defense suggests is, jeez, if they put a witness on, we'll just take it up at that point. Well, if the witness says she couldn't have committed this offense because she was with me or she was in Kansas City or something else, too late to remedy

Page 7

that problem, and telling the jury to disregard that doesn't help the government. And their failure to give us proper notice in advance bars it.

I think, though, what I'm hearing from them is they don't plan on doing that and if -- I guess what we're looking for is, given what I understand their position to be, an order

10

saying that they cannot present any evidence of any witness or documents concerning that she's in a location that would have precluded her from committing these murders as alleged.

If they want to put on a witness saying that earlier that day she was seen in Mason City and she was talking to, you know, some third party or something like that but it's not a witness who would suggest that she couldn't have committed the offense in question, we don't have a problem with that.

We just have a problem with them putting on witnesses that would suggest she couldn't have been at the location at the time the murders took place. And perhaps we don't have a dispute. But I just want to make sure the government has some remedy here if we suddenly get that kind of evidence.

THE COURT: Well, why don't you take a look at Rule 12.1(e), and that's the remedies or sanctions section of the rule. And I'm going to give you time to file a supplemental brief. But I believe the last sentence of that rule -- I mean, it's ambiguous. It says, If a party fails to comply with this rule, the Court may exclude the testimony of any undisclosed witness regarding the defendant's alibi. This rule does not limit the defendant's right to testify.

Now, if they're not talking about the defendant's -- limiting the defendant's right to testify about an alibi, the

Page 8

language would be superfluous I would think, so I think that is what they're talking about in the rule.  But I'm going to give

11

you an opportunity to persuade me otherwise.  How much time would you like?

MR. WILLIAMS:  I can do it by the end of this next week, by, what, Friday?

THE COURT:  Okay.

MR. WILLIAMS:  It won't take me long to look up this finite issue.

THE COURT:  And while you're at it, you might want to take a look at an Eighth Circuit decision, United States versus Jones, 255 Fed. 3d 916, decided in 2001 where the court distinguished between witnesses under the rule and evidence under the rule albeit in a different context than we have here. And that goes to the second part of the inquiry about whether I have authority under the sanctions provision, 12.1(e), to bar the defense from putting on evidence if it's not by virtue of a witness.

MR. WILLIAMS:  And I recognize that, Your Honor.  I reread this rule while you were talking with defense counsel. The difficulty with that is that nevertheless, 12.1 requires the defense if they have an alibi defense, period, if they have an alibi defense, to give us a notice in advance of where they claim the defendant was at the time of the alleged offense.  And whether they intend to present that through a document or through a witness, we are entitled to that notice up front.  And the failure to give us notice has to carry some sanction.

12

Page 9

They can't put a document into evidence without a witness, and so I think the remedy would be you bar that witness who's going to put in that document that allegedly establishes where the defendant was at the time of the alleged offense. One way or the other, if they fail to give us notice of an alibi defense, we have a remedy.

THE COURT: Well, there are certain documents that are self-authenticating, I mean, hypothetically. But no, I understand what you mean. If they have to call a witness to lay a foundation for a document and the purpose of the document is to establish an alibi, then that may fall within the rule. But that's one thing you can -- when you file your supplemental brief you can take a look at.

MR. WILLIAMS: Okay.

THE COURT: I think you're entitled to relief, and I intend to issue an order certainly foreclosing witnesses, but how far I can go with that order I want to be very careful.

MR. WILLIAMS: Certainly, Your Honor.

THE COURT: And that's all I'm suggesting. I think they don't really have an alibi defense and it's kind of in some ways almost a moot question, but . . .

MR. WILLIAMS: Probably is. I just don't know what's going to come at us.

THE COURT: But you want to know going into it what they'll be allowed to present and what they aren't, and that's

13

the purpose of the rule, and I intend to do an order to that effect, but I don't want to do anything that would, under established case law, unduly limit the defense in the case.

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 61 of 100

MR. WILLIAMS: I understand completely, Your Honor. I will make sure I get a supplemental pleading by the end of this week addressing both those issues.

THE COURT: And if you want to file a supplement on it, I'll just take them simultaneously. I assume you probably don't want to file anything, but if you do, you'll have the right to file it by Friday. And instead of a formal brief, you can just submit a letter brief to me in the form of a letter. It's a little quicker. Just give me your citations. You can go ahead and file that letter brief if you want because it's public record, so you can go ahead and file it. But you can just do it in the form of a letter.

Okay. Ready to move on to the next motion?

MR. WILLIAMS: Yes, Your Honor. I'm not sure, Your Honor, how you want to handle this given our discussion in chambers on this issue. The government's going to be withdrawing its motion for an anonymous jury, and I don't know if you want to handle that at a later time.

THE COURT: Yeah. We can make a record on that at a later time under seal, but the government is withdrawing its motion for an anonymous jury.

MR. WILLIAMS: Yes, Your Honor.

14

THE COURT: Okay.

MR. WILLIAMS: The next one is the government's request to introduce evidence of the defendant's suicide attempt in the Black Hawk County Jail.

Just for quick background on this, while the defendant was in the Benton County Jail, the government's evidence is going to be at trial that she provided to Robert McNeese the

Page 11

locations of the murder victims in this case and that we recovered those murder victims in October -- the first four in October of the year 2000. Immediately after we obtained those maps or possibly even before that -- I think it was immediately after we obtained those maps from Mr. McNeese -- we had the defendant transferred to the Black Hawk County Jail.

Immediately after we recovered the first four bodies, the press learned of that. It hit the press, and on the same day that it hit the press, they recovered the remains, the defendant attempted to commit suicide in the Black Hawk County Jail by hanging herself. She was cut down and revived and saved. The government intends to introduce that evidence as consciousness of guilt, and we've provided a brief that outlines our arguments in favor of that.

As I understand the defense position on this, they aren't denying that the case law would allow us to bring in this type of evidence. They want us to limit it for the purpose for which we've put it in which I take to mean that they want a

15

limiting instruction from the Court concerning instructing the jury as to what they can consider that evidence for, and we have no objection to any type of limiting instruction that would make sure the jury understood the limited purpose for the evidence.

They also then object, though, as 403 argument basically unfair prejudice substantially outweighing probative value, and the government simply disagrees. We think that's a judgment call for this Court to make, but we don't think 403 would prohibit introduction of this evidence.

THE COURT: Thank you.

Mr. Stowers?

Page 12

MR. STOWERS: I think Mr. Williams correctly stated our resistance to their request on this issue, but I guess the one concern we have I think Mr. Williams has touched on which is the unfair prejudice component. One of the issues that we're a little bit concerned about is the way that this evidence is presented and argued, particularly given the nature of the case being a death penalty case that we think it would be inappropriate to essentially suggest to the jury that basically they should finish what she attempted by imposing a death sentence upon her, and we think that kind of thing would be improper and inappropriate argument and maybe something that even with a limiting instruction a jury would be thinking about in their minds. So that's the reason for our resistance to it. And I don't really have a lot more to say about it than that.

16

Thank you.

THE COURT: Thank you, Mr. Stowers.

MR. WILLIAMS: Your Honor, I've not put thought at this point into what my closing argument would be during the penalty phase if we reached one in this case.

THE COURT: But you appreciate suggestion from defense counsel.

MR. WILLIAMS: Yeah, I do. And I don't know that it's inappropriate. I mean, I can't envision why during a penalty phase of a case I should be barred from suggesting to the jury that the defendant herself believed that death was an option for her and that they should consider that as an option as well. I don't know that I would do that. I don't know that it's a good argument to make, but I certainly don't know of any law that would prohibit me from making that argument.

Page 13

THE COURT:  How about 403 itself?

MR. WILLIAMS:  403 is a rule of evidence, not a rule that goes to what we can argue from the evidence.  And I don't know that 403 would allow the Court to instruct me what I can argue and what I can't argue from the evidence.  It's not a violation of her constitutional rights, and it's not -- it's certainly not prohibited from any of the principles of the death penalty portion of the trial on arguing to the jury on why death would be appropriate punishment.

And so I'm just -- I'm not saying I'm going to argue

17

that, and my gut reaction, frankly, is it doesn't seem to me like a good argument to make to the jury.  But I don't want to have my hands tied before I even get to the point of considering what I'm going to argue to the jury.  I would ask that we just -- to the extent that this has turned into a motion in limine to limit the government's closing argument in the penalty phase, I'd ask the Court to lay that aside for now.  And we can revisit, if we get to that point, what we do during closing arguments.  And it may become moot.  I may not make that argument anyway.  But I just don't want an order at this point limiting what I can say.  And I just don't think --

THE COURT:  I'm not going to do such an order without briefing from the parties.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  But I do think I have authority to limit overly prejudicial arguments in either parties' closing if I'm aware of them ahead of time.  I'm not saying that this would fall into that category.  But I'm saying I believe I have the authority to do that.

Page 14

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 65 of 100

MR. WILLIAMS: I think you have a lot of authority to --

THE COURT: Whether it's under Rule 403 or somewhere else.

MR. WILLIAMS: Certainly. I think the Court has a lot of inherent power to control the lawyers' closing arguments.

18

The case law is replete in that. I'm just not sure that -- and I guess my point was I'm not sure that it was 403, but I'm also not sure that this is inappropriate in any way. And so that's all I'm saying. I recognize the Court has a lot of discretion to limit our closing arguments and it's proper. I just don't think this would necessarily be an improper argument to make.

THE COURT: And I don't know the answer to that question so -- but I'd be happy to defer it.

MR. WILLIAMS: Very good. Thank you.

THE COURT: Okay. Thank you.

Anything else, Mr. Stowers, you wanted to add on this motion?

MR. STOWERS: No thank you.

THE COURT: Okay. Thank you.

Next?

MR. WILLIAMS: Next argument, Your Honor, is the government's request for introduction of the statements of the two decedents in this case who made statements to both civilians and law enforcement officers. It's the request for admissibility of the out-of-court statements made by Gregory Nicholson and Terry DeGeus. We have briefed this at length, and so I don't want to repeat what I said in the brief. And the Court's already ruled on a similar motion in the Honken case in

Page 15

the government's favor on the same issues.

The one thing I do want to address because this is a

19

new argument made by the defense in this case that was not raised by the defense in the Honken case and that is that --

THE COURT: The ex post facto argument?

MR. WILLIAMS: Correct. And the ex post facto law simply doesn't apply to a rule of evidence of this nature. I've read the Carmell versus Texas case the defense cites for the proposition that a rule of evidence -- that the ex post facto law applies to a rule of evidence, and I read the cases that are cited in there and some additional cases.

In the Carmell versus Texas case, the ex post facto law was applied because the statute that established the crime was changed after the commission of the crime to set forth the minimum amount of evidence that was necessary to achieve a conviction for the crime in that case. And as described in this opinion, it's the mirror image of removing an element of the offense to make it easier for the government to prove it.

The difference between that case and this case is this is not a rule going to the sufficiency of the evidence to establish the guilt of the defendant. 804(b)(6) says that a defendant forfeits her right to complain about their inability to confront a witness and to cross-examine a witness if they are responsible for that witness's disappearance or murder in this case is what the government's alleging. That does not establish whether the evidence is sufficient or insufficient to establish guilt.

20

Page 16

And it's distinguishable easily from the Carmell v. Texas case where the statute was setting forth the amount of evidence necessary to achieve a conviction on a particular crime. And there's a big difference I think between that.

There is a number of cases including Collins versus Youngblood and Thompson versus Territory of Utah which are Supreme Court cases that say that the ex post facto law does not apply to the regular rules of evidence. And so from that standpoint, that's the only new issue that was raised in this brief that we haven't dealt with in the Honken case, and I just don't think it applies in this case for the reasons I gave.

THE COURT: Thank you, Mr. Williams.

Mr. Stowers?

MR. STOWERS: Thank you. I think this is the -- sort of one of the more interesting issues that the Court has today as far as --

THE COURT: Very creative argument by the defense.

MR. STOWERS: Well, that's sort of what I special --

THE COURT: One that eluded the defense team in Honken.

MR. STOWERS: Right. Well, no comment about that. But I would say that -- here's my brief on this, and we've argued it in a brief. It's somewhat of a difficult issue to get the arms around at this point, and the law with regard to ex post facto statute of limitations is kind of continuing to

21

evolve -- ex post facto and confrontation clause I should say is continuing to evolve at the Supreme Court level in some unpredictable ways to some degree. And the cases are not certainly 100 percent clarity in their explanation of what the

Page 17

appropriate standards are.

But with regard to this issue, the government, as I understand it, is relying on a Federal Rule of Evidence which was enacted after the crimes were purportedly committed, several years after, to support the admissibility of the statements of Mr. Nicholson, the alleged statements of Mr. Nicholson, which includes his grand jury testimony, his entire grand jury transcript, and also Mr. DeGeus's prior statements. And then Mr. Nicholson's proffer interview I believe as well is the other main thing they're after here with the motion of theirs.

We think our client is positioned differently than was Mr. Honken on this question. And, first of all, we're raising a different issue which is this ex post facto question, and we think this falls within the fourth of the four categories of laws that the Supreme Court talked about in -- I think it's Calder versus Bull, that is, a type of a law which alters the legal rules of evidence and makes it easier basically for the government to prove their case. And if you can prove your case through otherwise inadmissible evidence, it's our position that that -- that now is admissible after the crime and made admissible by a change in the rules --

22

THE COURT: Does it make any difference in any of the analysis that she was charged after the effective date of the rule? Does that affect anything in your view?

MR. STOWERS: I don't believe so, not on the -- not on the ex post facto argument.

THE COURT: So you look at when the crime was committed rather than when the person was charged?

MR. STOWERS: Right, for ex post facto. It's the date

Page 18

of the offense that matters for -- you've got to look at the law in effect on the date of the offense, and whatever that law was would be the governing law for ex post facto purposes, and then the underlying question to that is whether or not this is a law that's subject to ex post facto analysis at all which I know you already understand that. We contend it is. They say it isn't.

Even if it isn't, though, that's not the end of the analysis as you know. There's an additional issue in this case with regard to these prior statements, and that is the issue of confrontation clause and whether or not this falls within what I would call a constitutionally recognized exception to the confrontation clause.

Now, what I mean by that is I think 804(b)(6), the rule, is actually broader than what might have been recognized in ancient common law in this country as a forfeiture by wrongdoing exception. And the Crawford versus Washington case which is the most recent decision of the U.S. Supreme Court on a

23

confrontation clause question did recognize a forfeiture by wrongdoing exception and cited to a case the name of which doesn't strike me between the eyes from 1875 I think it was, a prior U.S. Supreme Court case on that question.

In all of the prior cases, it appears to me you had some where they recognized a forfeiture by wrongdoing exception at common law. What they had was some scenario that was pretty clear in each one of those cases where the particular defendant who was claiming a violation of their confrontation clause right in the particular proceeding at issue had had a prior opportunity to confront the witness, cross-examine them, for example, in a deposition or in another hearing, and then had

Page 19

done something to cause the witness then to be absent from the subsequent proceedings such as a trial or in the one case there was a prior trial. Defendant had the opportunity to confront and cross-examine in that trial, then caused the absence of the witness for the retrial I believe.

So in those cases you had a witness adverse to the defendant who had given prior testimony against the defendant oftentimes in a trial-like situation or in a confrontation-type situation in a prior proceeding and the witness was an adverse witness to the defendant and the defendant knew what the person was going to say if they appeared at the subsequent proceeding and the defendant was shown to have done something to cause them to be absent.

24

Now, looking at that under this situation, that's not where we are. I think we're in a completely different context because as the Court knows, Mr. Honken was charged. Mr. Nicholson did grand jury against Mr. Honken, not against Ms. Johnson. Mr. Honken was made aware through discovery of Mr. Nicholson's prior statements, his prior grand jury testimony. Mr. Honken was preparing with counsel for a trial, and according to the verdicts in Mr. Honken's trial, Mr. Honken caused Mr. Nicholson then to be absent from the subsequent proceedings, okay, which were to be held against Mr. Honken.

Now, Ms. Johnson was not a party in that action. There's no showing that she had any knowledge of his grand jury testimony or his prior proffers, et cetera. Same with Mr. DeGeus, no evidence of that. And so she wasn't in a posture to be needing to deal with them in a confrontation setting in a proceeding from which it could be said by absenting them through

Page 20

conduct that she would have in any way waived her right in that proceeding to confront and cross-examine those witnesses. So her involvement in this case comes later obviously.

So our position is that because she wasn't a party, because these weren't adverse witnesses to her because there's no showing that she had notice that they were going to give any evidence against her that she did not waive any right to confront or cross-examine these folks.

Now -- and we don't think that the old common law

25

exception of forfeiture by wrongdoing as defined in these ancient cases and as recognized by the Supreme Court in Crawford versus Washington supports the admission of the evidence in this case. And we think that old common law ruling or common law exception of forfeiture by wrongdoing was narrower than the current Federal Rule of Evidence.

Then the other thing I think just sort of stepping back from this, I think it's the government's sort of argument here that there's some exception to the hearsay rule for murder victims' statements. That's really what they're arguing is that in any case where you have a statement of a murder victim that they wish to present in a trial against a defendant accused of participating in killing in some fashion that they have the right under these rules of evidence to admit any statement of the victim, and there's no problem with the confrontation clause or hearsay rule.

I think the rule isn't that broad, and that's kind of the fundamental disagreement we have, whether or not there is, as they would say, a murder victim statement exception to the hearsay rule or whether or not it's much, much narrower than

Page 21

that. We think it's much, much narrower than that. We think the Constitution makes it so, and that's our position on that. Thank you.

THE COURT: Thank you, Mr. Stowers.

Mr. Williams?

26

MR. WILLIAMS: Your Honor, the defense has suggested that because some of the prior cases had facts that were different from this case that somehow that established prior law. None of the holdings of any of those cases premise the holdings on the existence of those facts. So in other words, none of those cases said, We're only going to recognize this exception because in this particular case the defendant had that right, looked at the discovery file, and then killed the witness. That's not what the rules say. That's not what the holdings are. The holdings are broader than that.

While this -- while we can all look at the facts of Honken's situation and Johnson's situation and try to discern factual differences from it, it doesn't cut away from the fundamental fairness of the government to present evidence of the murder victims' statements against Johnson when she's the one who assisted Honken in eliminating those witnesses to begin with. The forfeiture by wrongdoing equitable principle applies regardless.

Now, I can quibble with the factual allegations by the defense, but I don't think that's going to advance the ball. Quick exception -- you know, one example is that she had no interest, she wasn't under investigation, she wasn't the one being -- well, she was. She herself was pulled into the grand jury before DeGeus was killed. She was a participant in the

Page 22

drug conspiracy with Honken.  She was under investigation along

with Honken for drug dealing.  She was every bit as much of a target and subject of this investigation as the other players were.

And so we can go through and quibble with the facts. But the facts don't really matter.  The factual differences addressed by the defense don't really matter to the underlying holding here.

The government is not arguing that there is somehow some broad general exception that every statement by a murder victim comes in.  But the rule's pretty broad the way it's written, and it certainly comes in if it's offered against the defendant in the case in which she's responsible for causing the disappearance of the witness.  And so there may be some limitations and it has to be brought in against the defendant, but beyond that, there's not a whole lot of limitations on the scope of that equitable principle.

So we think the Court's ruling in this case ought to be the same as it was in the Honken case.  The factual differences between the two are not material.  And we think this evidence is admissible.

THE COURT:  Thank you, Mr. Williams.

Mr. Stowers, anything else you want to add on this point?

MR. STOWERS:  No thank you.

THE COURT:  Okay.  Thank you.

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 74 of 100

Ready to move on to the next government motion?

MR. WILLIAMS: Yes, Your Honor. The government moved to -- again, similar as we did in the Honken case, to bar the defendant from raising issues concerning the death penalty. Let me find the defense response.

The defense filed a response in which it pointed out a couple things. One is with regard to paragraphs A and B they thought that McNeese will raise this, and this is the -- let me go back to our motion so we can make sure. "A" was the death penalty or other punishment during the guilt phase at trial should not be mentioned, and "B" was the availability of the death penalty as a form of punishment in Iowa, and the government was asking the Court to enter a motion in limine barring the defense from raising these during the guilt phase.

They point out that through the testimony of Mr. McNeese in his advice to Miss Johnson that that issue may come up, and we agree that with regard to that evidence it may come up. There was some correspondence back and forth, and McNeese was purporting to give his thoughts on what he understood the Iowa law to be and availability of the death penalty and so forth.

In that context the government has no objection to it coming in. The defense agrees that the opinions of the state of Iowa officials regarding the death penalty and agrees the government's motion doesn't tend to get into that, so that

29

becomes moot.

And the defense argues that it believes that the deterrent effect of the death penalty may be an appropriate subject for argument or evidence during the penalty phase of

Page 24

this trial. And again, the government's position remains the same. The deterrent effect and whether it has a deterrent effect or not is not an appropriate subject of evidence or argument in the government's view during the penalty phase of the trial. The jury is not here to right the wrongs of society or determine a legislative policy about whether the death penalty has an effective deterrent effect or not. Their decision is whether the death penalty is an appropriate punishment for the crime committed given the circumstances of the crime and the nature of this defendant.

If we open the door into this issue, then it opens the door to the government bringing in evidence about why the death penalty is appropriate. We both get experts on the stand to talk about philosophical debate about the appropriateness of the death penalty and what it advances and what it doesn't advance, whether it affects deterrent effect or not. And it simply is not something that is appropriate argument in the penalty phase let alone the guilt phase.

And so I think that's the only remaining fighting issue as I discern their response to our motion is whether they can get into that during the penalty phase.

30

THE COURT: Well, let me ask you this about it in the penalty phase. While there is case law suggesting that it's inappropriate to put evidence on of the deterrent effect, is it permissible argument in closing argument, or would this be an example of a situation where the Court should exercise its authority to limit the closing argument in the penalty phase, presumably under some provision, either 403 or some other provision?

Page 25

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 76 of 100

MR. WILLIAMS: I don't know that -- I don't know that I would object if the defense wants to say you're not going to deter other people from committing this crime if they're arguing it. What I do object to is them putting on evidence suggesting that because for as many studies that they would cite suggesting that it has no deterrent effect, I could probably get some studies going the other way. In fact, I think there are at least one -- or two out there going the other direction.

But I'm not asking necessarily the Court to limit their argument as much as their evidence, and it's a motion in limine to bar evidence in this case.

THE COURT: Okay. Thank you.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court. If you'll allow me a personal observation, Your Honor, in 18 years of doing death penalty litigation, this is the first time a prosecuting attorney has argued that they should not be allowed

31

to argue the deterrent effects of the death penalty in closing arguments. Frankly, that's quite unique in my experience, and I admire Mr. Williams for taking that position.

I can assure him we will present no evidence regarding the deterrent effect of the death penalty but that this issue will come up. It will come up in the questionnaires when jurors are asked their views about the death penalty. Many times jurors indicate that they believe in the deterrent effect of the death penalty, and I think that's a legitimate area of inquiry, frankly, in that some jurors may feel so strongly about that that they're unable to consider alternative punishments.

And I don't know that Mr. Williams is intending to

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 77 of 100

bind himself -- perhaps he is -- in closing argument to not arguing this position. I suspect that if the government doesn't argue deterrent effect the defense may not either. But many jurors are going to believe whether there's argument or not that the death penalty serves essentially two purposes. One, that it does have a deterrent effect no matter what studies say. It at least has a deterrent effect as to the individual on trial, that that person will no longer be in a position to commit further murder, and they also believe in retribution as an alternative reason for the death penalty. So it's a subject that naturally comes up in closing argument.

I don't know of any case law that would prohibit argument if it's proper during the course of the closings in the

32

penalty phase regarding this issue. But certainly we're not going to present any evidence of it and have no intent to, and I don't think we have any disagreement regarding the other positions given in Mr. Williams' argument. Thank you.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, sir.

THE COURT: You raised an issue -- I want to digress for a minute, and that is on the jury questionnaires.

MR. BERRIGAN: Yes, sir.

THE COURT: Where are the parties on their agreement or lack thereof with regard to a juror questionnaire in this case?

MR. BERRIGAN: There's not an agreement, but I want to be clear. That is solely and exclusively the responsibility, the fault of the defense in that we got the questionnaire to Mr. Williams at a very late date last week. I think it was

Page 27

Wednesday. And he had responsibilities on Thursday as you know, and I also did, and neither one of us have been able to talk to each other. But there is a proposed defense questionnaire in the hands of the U.S. Attorney's Office. We certainly have their questionnaire. We will endeavor to speak -- and I know I've said this before, but we will endeavor to speak to each other about our respective questionnaires very shortly.

THE COURT: Oh, you've each committed kind of -- it's like a cross motion for summary judgment in a civil case?

33

MR. BERRIGAN: Yes, sir, I'm afraid so. And no reflection on Mr. Williams. I don't know who's responsible for the earlier questionnaire. Frankly, it's certainly no comment about the Court's role in that. But it is a questionnaire that we did not favor, and I have submitted a wholly different alternative questionnaire that's quite different.

Now, there are many areas that are very similar in terms of people's backgrounds and work experiences and experience with police officers. But respecting the issues I think that both sides care about regarding the death penalty, the questions are markedly different than the Honken questionnaire. There's no multiple choice question. We feel the multiple choice question is a particularly damaging question in that it tends to lead jurors to responses that might not reflect their true views. It's too easy for them to pick a choice, and so we really prefer open-ended questions, and most of the questions we've submitted are open-ended questions regarding their views on the death penalty.

But I know we need to deal with that very quickly, Your Honor, because the issue of venue is certainly before the

Page 28

Court, and whatever time table you'd like to put on us, we'll endeavor to meet it.

THE COURT: Let me ask you this, and I'm not going to be offended if you think my offer of help is a hindrance rather than an assistance. I primarily left it to the parties to

34

develop a questionnaire, but then I did weigh in on it once they had one that they kind of agreed on, and I did make some changes and suggested other changes. It's not often that we get you all here. I think we're making fairly rapid progress on these motions, although I think some may slow us down a little bit later. But are you willing to spend some time this afternoon with me and all the lawyers going over the questionnaire and getting some input from me?

MR. BERRIGAN: Certainly.

THE COURT: Or maybe you don't want it.

MR. BERRIGAN: No, we're fine with that, Your Honor. If you'd like, we could all discuss both of the questionnaires this afternoon.

THE COURT: But it might resolve coming up with a joint questionnaire a little more easily if I get involved now rather than later because it sounds like you have -- unlike the situation in the Honken case, you have quite differing views probably as to what should be in the questionnaire, and so maybe my involvement early on might help bring that to resolution because we do need to get those questionnaires out to potential jurors probably in January in order to give the lawyers sufficient time to review all of the questionnaires from the potential jurors. So we need to make some progress quickly.

MR. BERRIGAN: We're happy to do that, Your Honor. It

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 80 of 100

may be -- this is the level of our failure to communicate.  It

may be that there aren't significant problems with our proposal. I don't know.  Mr. Williams may not have even had much of a chance given this briefing schedule here to look at it.  Maybe we should take an opportunity, he and I, just to talk informally before wasting your time about matters we already agree on because there is some potential for that I hope.  But we could take it up perhaps like right after the holiday by a conference call or whatever you'd like if there's still areas of disagreement, or I'm certainly happy to stay today and discuss it as well.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Your Honor, I don't think there's going to be a lot of disagreement.  This is more not a battle necessarily between the government's view and the defense view as it is between the defense view in the Honken case and the defense view in the Johnson case.  We don't have the benefit of a jury consultant, but both defense teams have, and the questionnaires have been generated, my guess is, from the jury consultants.  And apparently their jury consultant doesn't like the Honken jury consultant's questionnaire.  And we've just taken them as they've come, and we've tried to work with getting our interest in there.

I have had a chance to review the Johnson's proposed jury questionnaire, and really with the exception that they -- a couple areas where they -- for example, there's no questions

about drugs in this questionnaire.  We think that's obviously an
Page 30

important issue that we want to get back into this questionnaire.

They cut back the questions about people's views of firearms, and we want to beef up that area. But I think that's stuff that, frankly, there's not going to be a lot of dispute about, and we don't have a huge dispute with the way their questionnaire is drafted. In fact, I agree with the defense. I think open-ended questions on the death penalty is better than the multiple choice in getting a candid response.

And so by and large I don't think we're going to have a lot of dispute. I would ask -- and I think it would probably not be productive of the Court's time today to get you involved. For example, Tom hasn't even had a chance to look at this yet, and I want to have his input into it. But my guess is that I can sit down and I'd ask to sit down with Mr. Berrigan this afternoon on this issue, but I know my concerns about the questionnaire, and I bet we can have a joint proposed questionnaire to you probably by the end of this next week -- or the end of this week.

THE COURT: Would you have -- if you don't want to meet with me today, let me ask you this. Would you have any problem with me seeing each side's proposal?

MR. WILLIAMS: Not at all.

MR. BERRIGAN: Nor do we, Your Honor.

37

THE COURT: I mean, I can wait until you have an agreed-upon one, but there may be things in either proposal that I think ought to be in the questionnaire that you don't, and ultimately the way I look at it even though it's sent from me with a cover letter, it's really the parties' questionnaire, and

Page 31

so I don't want to intrude in it, and it would be hard for me to imagine a situation where I would foist on the parties a question that neither side wanted asked. But it's not out of the realm of possibility, although I would be very disinclined to do that. But I might want to suggest it and at least find out why you don't want to ask it and be convinced that it's not a proper question to ask. So I would like to have some involvement in the questionnaire if the parties don't have any objection to it.

MR. WILLIAMS: Absolutely. None at all, Your Honor. My recollection from the Honken case is you had some good suggestions for us in the questionnaire.

THE COURT: I've actually had a lot of experience with questionnaires both from a kind of statistically significant look at questionnaires, so it's something I have an interest in. I take it the death penalty question in the questionnaire that was used in U.S. versus Honken, wasn't that out of the kind of standard Eighth Circuit questionnaire? That doesn't mean that it's any good. I understand that. But isn't that the origin of it?

MR. BERRIGAN: Yes, sir, and there's just two different schools of thought, frankly. And we certainly are consulting with the jury expert for lack of a better term, but I don't want to foist responsibility of the questionnaire on someone other than myself because that wouldn't be true. I used the multiple choice questions in the past similar to Mr. Honken's, and our experience has been not, frankly, that there's a lot of research on this but that that multiple choice questionnaire has a tendency of not truly and accurately

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 83 of 100

reflecting the jurors' view about the death penalty.

THE COURT: Probably taking them a little towards the middle.

MR. BERRIGAN: It's a little too simplistic, so we get better responses in terms of more truthful responses if we just ask them, you know, basically how do you feel about the death penalty. And so you're right. That is an Eighth Circuit -- I believe the Eighth Circuit proposed questionnaire. Certainly it's not required that I know of, and we've deviated from it a number of times.

THE COURT: No, and I don't have any problem deviating from it. I just thought that might be the origin of it, but that doesn't mean you have to use it by any means.

MR. BERRIGAN: Thank you.

THE COURT: Thank you. Any response on the motion part of it because I diverted to the jury questionnaire issue?

39

MR. WILLIAMS: No, not at all. It sounds like we don't have a problem. They're not going to present any evidence, and that was my only concern on the motion in limine.

THE COURT: Okay.

MR. WILLIAMS: Likewise the next motion up for discussion the defense has indicated they don't have any objection to, and that's the government's motion regarding motion in limine to limit the evidence of Tim Cutkomp's instances of public exposure. So the defense has not objected to that one as well.

THE COURT: Okay. Want to move on to the next government motion?

MR. WILLIAMS: Next one is the government's motion for

Page 33

admission of a replica firearm. And the defense position on this is that they don't dispute the law as we've set forth in this. But what they are arguing in this case is that the -- essentially as I understand it they're suggesting that the law -- or that the facts because there is some question about whether the firearm itself can be directly linked to the murder that, therefore, the government ought not to be able to use that weapon as part of its case.

And the government's position -- and, frankly, the Court's in the best position to rule on this issue having seen the Honken case -- is that the government's evidence, frankly, is fairly overwhelming that this Tec-9 was used in the murders,

40

both the timing of the purchase of the firearm, the nature of the firearm, the fact that it was seen in Johnson's possession after the murders took place, that she made a comment about Honken will take care of it and then the fact that the weapon was cut down and melted, that both Tim Cutkomp and Christi Gaubatz have both been able to identify that weapon as the weapon they saw and the fact that the rifling and grooves from at least one of the bullets from the head of Mr. DeGeus matched the rifling and the grooves from a Tec-9 all strongly, strongly suggest that this was the murder weapon that was used, and there's no real explanation for anything else.

The fact that it could have been possibly some other weapons that did this is always there for the defense to argue, but it certainly shouldn't prohibit the government from introducing an actual version of the gun that Tim Cutkomp and Christi Gaubatz saw and to be able to establish the credibility of those witnesses that they both saw the same gun in the

defendant's -- or both saw the same gun during these events. And so we think you're in the best position to rule on this having seen the evidence in the Honken case, and we think we should be able to use that replica.

THE COURT: Let me ask you this. Can you represent to the defense lawyers and to me that the evidence on this issue will be the same or nearly the same in Angela Johnson's case as it was in Dustin Honken's case?

41

MR. WILLIAMS: It will be almost identical with the exception it may actually be more, and it's been a while since I've read Christi Gaubatz's full statement. What didn't come in during the Honken case was all the statements that the defendant Johnson made to Christi Gaubatz about her participation in this crime. And, frankly, I just can't recall today whether she mentions the weapon in that. So there may actually be additional evidence.

THE COURT: And it didn't come in because it would have created Bruton problems?

MR. WILLIAMS: Correct, Your Honor.

THE COURT: I just want you to know I'm a little bit hesitant to make judgments based on evidence in the Honken case because I don't know what the evidence is going to be in Angela Johnson's case. You know what you're planning on doing, but I wouldn't know that, and so I just want to be cautious about that.

MR. WILLIAMS: Makes sense. Makes sense. And the government doesn't have an objection to the Court reserving ruling like you did in the Honken case to see how the evidence starts to come in.

Page 35

What I wanted to do is alert the Court to possible issues that you may have to grapple with during the trial by filing these motions, and we can certainly wait as the evidence starts to come in to deal with this.  I don't plan, for example,

42

in opening statement to pull out the Tec-9 or anything like that.  So we don't have an objection holding off.  But it's more or less I wanted to alert the Court to these issues and allow the Court to have time to prepare for them.

THE COURT:  Thank you.  And that I greatly appreciate.

Mr. Stowers?

MR. STOWERS:  We filed a very short resistance to this.  I'm not familiar with the evidence to that degree in the Honken case such that I can deal with the particular testimonies and whatnot.  We attended various portions of that trial.  We didn't attend the entire trial.  But -- and I know that the case law says that they have the right to offer an exhibit of this nature as a demonstrative exhibit sort of to show the jury what the witness is testifying about as a demonstration, if you will, or a representation of what they're trying to represent which is the gun.

But my concern is from what I recall of the testimony there were some discrepancies in the descriptions of the weapon from witness to witness.  I remember some testimony about differences in the appearance of the stock of the weapon.  When it came to the ballistics evidence, I think the ballistics evidence was very sort of amorphous in that they said the one particular bullet that was in a sufficient state for some limited comparison purposes, I think that was a class characteristic type of a testimony, not a particular testimony.

Page 36

In other words, that the -- I think the bullet in question that Mr. Murillo I think it may have been --

THE COURT: Was consistent with a Tec-9, and maybe I didn't understand your argument or maybe I misheard it or maybe you didn't recollect it correctly or maybe my recollection is faulty. Could be a combination of any of them. But I thought the forensic evidence on the bullet was that it was consistent with a Tec-9 but also consistent with others.

MR. WILLIAMS: Certainly, and I didn't mean to misrepresent anything else. They said it was consistent with a Tec-9, the lands and grooves on it was consistent with a Tec-9, and a limited class of additional weapons has the same types of lands and grooves on it, but it was not inconsistent with a Tec-9.

THE COURT: Right. We have the same recollection.

MR. STOWERS: And that's what Mr. Berrigan had told me because he was apparently here for that portion of the trial. But the concern we have with this evidence is just -- partially is sort of how far can they go with it, how far should they be allowed to go with it in the context of the case because I think the evidence with regard to the identity of the actual murder weapon or weapons is far from -- far from clear. And there's an inference that they're attempting to draw in the evidence that a particular weapon was the weapon later melted down, et cetera, and that's an inference, you know, to be made I guess from the

evidence and argued. But how far they should be allowed to go

with that is the area that we're having some difficulty wrestling with, and I think that's --

THE COURT: Well, can you flesh out for me what you mean by that, because the bottom line is if there's similar evidence presented in Angela Johnson's case that there was in Honken, I'm going to admit it as a replica.

MR. STOWERS: Right.

THE COURT: And I can kind of assume there's probably going to be similar evidence. But you raise this issue about how far can they go, and I'm not sure I understand what you mean by that.

MR. STOWERS: Well, I'm told that during closing argument some of what was done was they held the gun up, displayed it to the jury, and said, This is the gun that was used in the murders. And I'm kind of having mental anguish over that if you will as I play through this in my mind as to whether or not that's a proper use of that evidence.

THE COURT: Is that a new rule of evidence, the mental anguish of defense counsel?

MR. STOWERS: I think that comes somewhere under 403, one of the --

THE COURT: I would think so.

MR. STOWERS: That would be unfair prejudice to counsel. But I'm just -- and that's not something right before

45

the Court right now, but I'm just thinking about it in my mind, and we've discussed it over on our side of the courtroom, and we're not sure where we are on that as to whether or not that's a proper and permissible use of that particular evidence which is offered demonstratively on the record that will be made once

Page 38

we're in the middle of a long trial.  So that's all.  Thank you.

THE COURT:  Okay.  Thank you, Mr. Stowers.

Mr. Williams, anything you want to reply on that?

MR. WILLIAMS:  No.  Thank you.

THE COURT:  Okay.

MR. WILLIAMS:  Your Honor, I believe that exhausts the government's motions on your agenda and we're to the defense motions at this time.

THE COURT:  Okay.  Why don't we take a 20-minute recess, give our court reporter a little bit of a break, and come back at 11:00, and we'll take up the defense motions.  I do -- do you have any objection to taking an hour break at noon?

MR. WILLIAMS:  No, not at all, Your Honor.

THE COURT:  Okay.  Thank you.  We'll be in recess until 11:00.  Thank you.

(Recess at 10:40 a.m.)

THE COURT:  Please be seated.  I think we start with -- excuse me.  I didn't have my microphone on.  Excuse me.  I think we start with the defendant's motion for change of venue.  Who's going to be arguing that on behalf of the defense?

46

MR. WILLETT:  Mr. Stowers, Your Honor.

THE COURT:  Thank you.  Mr. Stowers, any time you're ready.

MR. STOWERS:  Your Honor, we raised this issue shortly after the Honken trial was concluded based largely on the publicity associated with his trial and the outcome of that trial and the fact that during that trial and the outcome of that trial as well that we felt that there was substantial information brought forth in that trial in the form of evidence

Page 39

Case 3:09-cv-03064-MWB-LTS   Document 284-66   Filed 06/23/11   Page 90 of 100

as well as the verdict and the sentencing outcome from the jury itself that a jury in our case would not be hearing about, and there's a number of witnesses that the prosecution had called to testify about things that Mr. Honken had said to them in jailhouse settings after he was in jail and in custody that -- concerning his admissions of activities regarding the murders that will not be heard by our jury.

And then, secondly, the verdict itself is not a point of proof that they can offer up in our trial, at least certainly not in the first phase of the case, probably not in the second phase either I don't believe. And then the sentence of the jury being a death sentence on at least two of the victims, that's something that a jury in our case should not hear about unless, for example, we chose to bring that up.

I guess our position right now is we filed our motion primarily under the prejudice component both under Rule 21(a) of

47

the Federal Rules of Criminal Procedure as well as the constitutional principles upon which that rule is based. And we submitted to the Court now four volumes of materials spanning hundreds of pages of articles that have appeared from all across the state of Iowa for the time period mid August until quite recently. In the last week or so we supplemented for the Court the most recent articles since we originally filed our motion.

I think all those articles together show basically one thing, that there has been a saturation of media coverage associated with the Honken case throughout the state of Iowa. I think it would be fair to say that there's probably never been a case where there's been more publicity associated in the recent history that I'm familiar with -- and I say recent -- last 15,

Page 40

20 years in the state of Iowa where you've had one single case and set of alleged crimes that have generated more publicity than this case and Mr. Honken's case.

And our initial understanding when we came here today was that the Court had pretty well decided that it was going to be changing venue, so we felt that the materials that we submitted to the Court were going to be sufficient in and of themselves to support the Court's decision on this.

This morning you indicated you're having some difficulty with that under the legal standards set forth in the Eighth Circuit on this prejudice argument for changing venue. So let me talk about what I think is a little different aspect

48

to this without discussing the prejudice at this moment because I think we feel that we really should do some type of a jury study of the community here in the Northern District of Iowa if this is a problem at this point.

And we understand the hearing was today scheduled by the Court, but I think everybody, all the parties, kind of thought this issue was the one the Court was setting a hearing on but had given strong indications of what his sentiments were. And now we're -- I've been caught offguard a little bit anyway. And I haven't been a party to those conversations, so I just say that. But that's where we are.

But let me back up to Rule 21(b) which is the change of venue for the convenience of the parties and the witnesses and in the interest of justice. And under Rule 21(b) it seems to me that a large part of what the identified concerns are that we have in this case relate to 21(b)-type considerations, and that is that in this case if we try to do this case in the state

Page 41

of Iowa or the Northern District of Iowa specifically what we're going to run into is a very substantial problem, and I think it's going to come in a couple different ways which we noted in our filings.

One, it's going to require us to spend a whole lot more time in the jury selection phase talking to jurors including on an individual basis than we had anticipated doing in a venue where there was not the coverage that we've had here

49

in Iowa. That's going to cause -- assuming that we can do that and do it successfully which is a huge question and we contend it can't be done successfully, what it's going to cause is a substantial prolongation of the trial, particularly the jury selection by a period -- I would say it could easily double or more the time that we're going to spend in jury selection because we're going to have to go back and deal with individual voir dire.

We may run into scenarios where as we've wanted to do it with panels of eight, ten jurors at a time rather than the individual process and do the strikes as we go which we're going to discuss later, I can see that the problem is going to be that when you have a panel of eight or ten and one of them says something, they could say something in the presence of the others that would necessitate excusing panels of eight to ten.

And there -- if that happens, you blow conceivably a half of day of time of everybody. If we're able to identify those folks who have some publicity issues, then we're going to have to deal with them on an individualized basis which will create other slow-down problems.

The coverage is so saturated here -- and we've

Page 42

provided the Court not only with the papers but with the circulation information that we have had available from these various papers that it's hard to imagine that there's too many people that if honest would respond that they are not familiar

50

to some degree with the case.  So what you're going to wind up with is needing to probe that degree of familiarity on an individualized basis.

It's no secret in this case that the trial at this point based on Mr. Honken's trial, Honken's trial was ten weeks. I think the government's already indicated at an earlier point -- I've been told that they believe the evidence portion of our case will actually be longer than the evidence portion of Honken's trial by a period of -- I think I was advised up to two weeks.

THE COURT:  Well, actually I think it could be longer than that unless I misunderstood what Mr. Williams said, depending upon whether there are stipulations to foundation that there were in Honken.  But I may be wrong about that.  I thought the government indicated it might have two weeks of additional testimony whether or not there were those foundation issues resolved, and if there were the foundation issues, then the trial could be a month longer, but I'm not sure I got that correctly.  Mr. Williams, do you want to chime in?  Did I mischaracterize?

MR. WILLIAMS:  Not much, Your Honor.  I think we do have probably two weeks of additional evidence.  The failure to waive or stipulate to some of these foundation may add probably, you know, another two or three, maybe four days of testimony. They'll all be quick.  There's a lot of foundation witnesses if

Page 43

we're going to go down that road.  So I don't know if it would add a whole month, but it would probably add another week.

THE COURT:  So we're talking probably two to three weeks longer than the Honken trial in your best judgment?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  And even if there was a stipulation, we're probably talking about a week or two longer trial?

MR. WILLIAMS:  That's my best estimate.

THE COURT:  And we're just talking about the trial portion not including jury selection.

MR. WILLIAMS:  That's correct.

THE COURT:  Okay.  Thank you.

MR. STOWERS:  Thank you, Your Honor, Mr. Williams.

The concern here from our point of view is kind of simple on one level, and that is that this trial is going to be a three-month or conceivably longer trial.  All three of us are private counsel, been appointed by the Court for Ms. Johnson, and we're rapidly clearing our calendars, doing other things including turning down work, getting ready for what we anticipate is a situation where we're going to be out of our offices -- I being from Des Moines; Mr. Willett, Cedar Rapids; Mr. Berrigan, Kansas City -- for a period of three months conceivably not counting, of course, the pretrial preparation time which is going to be substantial between now and the trial date.

The sacrifice for us which on one level is not even a concern I guess under the law but I think it is under 21(b) a
Page 44

concern that the Court can look at is that we're going to wind up in a situation where we've cleared our decks and the Court's cleared its decks for three months anticipating a trial and government counsel same thing, and we get up here to start this jury selection process and we get into it and the process becomes one that we can't deal with, we can't get over the prejudice problem, we can't get over the publicity, we can't get over the jurors who have heard about evidence and other things that have previously been deemed inadmissible in our trial and those jurors aren't able to put those things out of their mind to anybody's degree of comfort so they could sit, and the process becomes one that is not only prolonged but one that we just can't go forward on in which case we'd be at the point where we'd be looking at a change of venue at that time, and we'd basically have to push the restart button and redo things.

I'm sure the Court's got a busy calendar up here and is dealing with its calendar as well and other cases and other parties that are impacted by the length of this trial and the shortage really of judges up in the Northern District of Iowa as well. But our position is that's a major consideration that you may not have in a lot of other cases.

The next thing is if -- I've already pointed out the jury selection here, if we are able to do it, is going to be

53

much longer. So we think under Rule 21(b) for the convenience of the parties and the witnesses -- many of the witnesses, frankly, are equidistant between Sioux City, the current location of this case, and Minneapolis, that the convenience of the witnesses would be served by having the case tried in the Twin Cities which is no further away, frankly, than is the Mason

City, Iowa, area to Sioux City.

THE COURT:  And it's all interstate.

MR. STOWERS:  And it's all -- it's a straight shot up Interstate 35.  The other thing is we really think, Judge, that the jury selection, if it's done the way that we've been discussing doing it with these panels and everything, can be accomplished in a two-week time period and conceivably several days short of that.  That's based on Mr. Berrigan's experience which he's got extensive experience in dealing with death penalty jury selection because we're going to be dealing there with a jury that isn't needing to be dealt with on an individualized basis for the most part or to a great degree. There may be individual instances of individual voir dire that's required, but the trial's going to go much quicker in a venue where we've got a larger jury pool such as the Twin Cities which is a major metro area and where counsel can do the panels without needing to go back into substantial individual voir dire sessions with individual persons.

And so we think the trial will be cut down by, on the

54

jury selection phase, at least a couple weeks.  I know the Honken jury selection took three weeks.  In this case if we stay here or in Iowa, I would say that the jury selection is certainly going to be longer than that, four, five weeks easily, just because of the process that we're going to have to go through in an effort to do what we think is an impossible mission to set out to do which is to find an untainted jury.

Now, the other aspect of this that I haven't seen it addressed in a clear way in any cases that we found is that if you think about who you're going to wind up with if you stay

Case 3:09-cv-03064-MWB-LTS    Document 284-66    Filed 06/23/11    Page 97 of 100

here in Iowa as your jurors. If we exclude the people who have been exposed to inadmissible evidence and concede that during the jury selection and if those jurors are stricken for cause during the jury selection process which we believe that the Court should do in the interest of preserving our client's right to a fair trial, if that's where we are, then we're concerned about whether or not the jury that we're going to wind up with is truly going to be a fair cross-section of the community or whether it's going to be some stilted slice of the cross-section of the community, that being a cross-section that doesn't read the newspapers, doesn't listen to the media, doesn't have an interest in public affairs or matters going on in the community.

We don't think that's consistent with our client's right under the Constitution to a fair cross-section of the community. And in this case when you have this much publicity,

55

we think we're going to lose a whole segment of the potential jury pool based on their exposure to the publicity.

THE COURT: Mr. Stowers, wouldn't that be true only if a juror wasn't able to set aside anything they read or heard about the case and judge Angela Johnson's case fairly and impartially? I mean, doesn't the case law suggest that mere knowledge of the facts of a case isn't sufficient in and of itself to challenge a juror for cause, that the question is whether the juror can then set aside that and judge the case fairly?

MR. STOWERS: Well, there's a couple of cases that we cited in our brief that indicate what I call the theoretical possibility that somebody could have heard that Mr. Honken was convicted, could have heard about all his jailhouse statements,

Page 47

could have heard that he was sentenced to death and then they would say when being questioned under oath, I can set all that aside. There's the legal fiction as I would call it, the theoretical possibility that such a juror could be seated under those circumstances.

Our position is we're certainly hopeful that the Court would not engage in that kind of a decision-making process where the juror after having disclosed their awareness of things that are inadmissible and things, frankly, that we believe might necessitate if they came out during the trial causing a mistrial which is the craziness of the -- with all respect to the Court

56

or the courts that have held this is kind of the craziness and the inconsistency that we see in this line of the law, that you could wind up with a situation where this evidence was brought out in front of the jury that was empanelled causing a mistrial but if a juror hears about it before trial and assures everybody they can set it aside, then that juror can sit on the case. I don't understand the logic of those cases, and I suggest they're inconsistent with one another. And we wouldn't be comfortable with any juror who had heard about inadmissible evidence of the type we're talking about being allowed to sit on this case no matter what they said because we just find that almost impossible.

THE COURT: What about any juror who maybe doesn't recall any, you know, statements made by Mr. Honken but knows the result of Mr. Honken's case but then says, well, they can -- that was Mr. Honken and they can judge Angela Johnson based on the facts of her case? How would you feel about that type of a juror?

Page 48

MR. STOWERS: We would want them excused for cause, yeah, because we just feel that they can say that but that's something we feel as a party in the case since it's not admissible evidence, we have the right not to have that bell rung, if you will, by anybody who's going to sit on the case.

And for them to have heard about that we feel is quite prejudicial to our position because it may very well create the

57

scenario, number one, that the jury believes there's been a prior determination of the same essential facts with respect to Mr. Honken. It sort of undermines the presumption of innocence that our client enjoys.

And number two, I think that a jury having heard that another jury kind of crossed that threshold from life to death penalty may make it easier for them, may in some psychological sense give them permission to move in that direction more easily than would a jury unexposed to that information.

And we believe that the approach that was taken in the cases where that particular issue came up by the trial courts which was to exclude such jurors in at least the two cases that we identified, the one from the Eighth Circuit and another one from another circuit, is the better approach to take. And it's the more proper approach, and it's the more consistent approach with the case law dealing with -- particularly with mistrials and particularly the case law that would even allow us to move in the direction of doing a jury selection in this district because in order to get to that point one of the things, if this case ever winds up in an appellate posture --

THE COURT: If?

MR. STOWERS: -- on the second prong --

Page 49