THE COURT: You mean when.

MR. STOWERS: I know the government has already appealed, but as I understand it, they wouldn't be able to

58

appeal after a jury is empanelled. So I think once we've -- they've appealed a couple of your rulings on an interlocutory basis, but, you know, the issue in this case is first going to be whether or not the jury returns a guilty verdict and then whether or not they impose the death penalty. Obviously if they return a guilty verdict or impose a death penalty or both or either, there will be an appeal from the defense.

But my concern is hauling everybody up here to attempt sort of a mission impossible on a three-week or three-month calendar basis or longer is really -- is really hard to -- it's just going to be almost impossible to get anywhere in this jury selection process I think, Judge. And for the convenience of the parties and the witnesses who have to be prepared for trial testimony who themselves have to arrange their calendars, we would suggest we do this case, you know, just one time, do it right, and do it in the most reasonable amount of time possible.

Now, with regard to the prejudice component which is under Rule 21(a) and the constitutional concept that's set forth in the case law that we've provided to the Court, we would ask the Court to provide us some time so that we can do a jury study to determine and make further record on that issue if the Court is not inclined to grant a change of venue on the present record.

THE COURT: How much time do you believe that that would take?

59

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 1 of 200

MR. BERRIGAN: Probably a month. It would involve very much the process that you indicated earlier, that people would be polled. It's usually done by telephone, frankly, but the pollers have to be assembled. That would be hopefully part of our jury consultant budget that we can incorporate already. But it does take some time. It has to be done in a random basis. They have to be eligible to be jurors. It'd obviously involve some work. And we have the holidays imminent obviously. And our best guess would be that it would probably take till the end of January to have it done.

THE COURT: And I'm not suggesting necessarily that we do this, but it would be possible to hold off my ruling, proceed with questionnaires in the western division, questionnaires in the Cedar Rapids division to potential jurors. I think in Dustin Honken's case, I think we started with six -- was it 500 or 600, Mr. Williams? Do you recall?

MR. WILLIAMS: I think it was 600, Your Honor.

THE COURT: 600. And out of that, there were about what? 220 approximately that the parties agreed we would just exclude without bringing them in to Sioux City. So it would be possible to proceed with simultaneous -- it'd be expensive, and it'd be a lot of work, but we could theoretically proceed with questionnaires, assuming you get one done, in both divisions, do the jury study, and then very early in February make a final determination which could include transferring it to another

60

district where we'd still have time but we would be pressed to do a jury questionnaire. I mean, it would be possible to

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 2 of 200

proceed in that manner. It would be a tremendous amount of work on our clerk's office and on the lawyers in the case because you'd have to review the -- twice the number of questionnaires. But it's possible to do that, isn't it?

MR. BERRIGAN: Yes, sir.

THE COURT: And wouldn't that be a more prudent way to proceed rather than just waiting until we got the results of the polling by your jury consultant and any polling that the government wanted to do?

MR. BERRIGAN: Only if you didn't think that the convenience of the parties was a sufficient reason in and of itself, Your Honor. But if we're talking about the prejudice, obviously. If you wanted to keep the trial date that we have, we need to get questionnaires sent out to the prospective venues, wherever they may be, as soon as possible. And we can analyze those questionnaire responses which have questions about what people have heard about the case in the questionnaires themselves. So that would be an additional source of information before the venue study is actually done.

THE COURT: Does your proposed jury questionnaire include much information trying to elicit prior knowledge of the jurors based on pretrial publicity in Angela Johnson's case?

MR. BERRIGAN: Yes, sir.

61

THE COURT: Okay. I'm sorry to interrupt, Mr. Stowers.

MR. STOWERS: No, that's fine. Thank you. One of the issues we can address -- I can address briefly is the standard on the prejudice component. I understand from the prior conversations of the Court that the Court believes that the

Page 52

two-tier standard that the Eighth Circuit has set forth in several cases is the one that this Court is to apply when it's evaluating this question in the first instance.

We believe that the trial court is actually invested with more discretion than what the Eighth Circuit applies when it goes to evaluate this on an appellate review basis after a trial court has denied a motion to change venue, there's been a conviction, and then the defendant appeals to the Eighth Circuit.

The rule itself merely refers -- Rule 21(a) to whether or not the Court is satisfied, i.e., the trial court, that there exists in the district where the prosecution is pending, the Northern District of Iowa in this case, so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that district.

And our position is that you as the trial judge make that call first based on the record before you. It's not required that we show it's an impossibility that there be a fair and impartial jury selected in the district. It's a degree of

62

probability. Is there a reasonable probability, is there a good probability that we can't get this job done here in the Northern District? If that's the case, then you're well within your discretion in granting the change of venue at this point on this record. It's not a requirement in our view under the law that there be an absolute showing that there's an absolute unfair atmosphere that you could never select a jury in this area. That's not a requirement we don't believe.

We believe it's sufficient to show a substantial likelihood, a reasonable probability, if you will, that there is

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 4 of 200

going to be an infringement on the defendant's right to a fair and impartial jury. And that's what we believe the standard is. We don't believe it's a case where we have to show the Court completely that there's directly inflammatory articles declaring that the defendant, Angela Johnson, is guilty or anything quite going that far.

Where you have this type of saturation of media coverage that we have here, we think the question is whether or not this jury's been so exposed to the prior determinations, the prior evidence, the jury pool, if you will, that the venue with a reasonable degree of probability ought to be changed out of the interests of the defendant's right to a fair trial.

THE COURT: There aren't really a whole lot of cases out there that have a somewhat analogous situation to what we have here. I was surprised that the codefendant cases weren't

63

more prevalent.

MR. STOWERS: Well, we looked, and I think it's probably more prevalent in state court than federal obviously. But we didn't find a whole lot. And what we found was fairly unilluminating, and it often involved cases in -- I shouldn't say often, but I believe the cases that we found were in larger metro areas. I think one of the cases might have been out of Kansas City or St. Louis which are certainly a larger metro area than Sioux City.

And I think when you're into a larger metropolitan population, then you're getting into a situation where you have a better chance of getting some jurors in there because your pool is so much greater in size than our pools are here, our potential jury pools are here. Our potential people we draw

Page 54

from here are relatively small compared to the population base in other locations such as Minneapolis/St. Paul.

And so I can kind of see in those cases, yeah, another murder case, publicity, yeah, some people read the paper but this is a community of a million people or more, and, therefore, the degree of impact on the potential jury would be smaller.

Well, when you're here in Sioux City, we're kind of in the converse of that. When you're over in the Mason City area, you're in the converse of that. When you're in the Cedar Rapids area, you're kind of reverse on that because small community, everybody talks, everybody knows. Large community, some people

64

don't even know their next-door neighbor.

So I think you're right. There aren't many cases, but to the degree there are cases and to the degree they involve situations where there was no change of venue, I think to the degree that they involve larger metro areas, it's more understandable that there would be a denial of a change of venue than it would be in a case here.

I'd just say if this isn't a case where you change venue on a pretrial basis, I don't know what case would be. You know, I suppose you can read about things like that in the textbooks.

THE COURT: You mean change venue out of district.

MR. STOWERS: Yeah. I can't imagine a case with more coverage, with more adverse information being disseminated to your potential jurors, with more or less prejudgment really of the facts being conveyed through those articles than you would have in this case. I just -- I mean, they probably read about cases in textbooks and ancient articles and ancient Supreme

Page 55

Court cases and things like that. But this is a case where you've got a ton of media coverage. There's been no more interest in this case by the media than this case.

And so media coverage even involves this motion which is that we're seeking to change venue because we don't think we can get a fair jury here, and I don't know how that would impact on our potential jurors if they read about that, but that's

65

another interesting question.

But that's kind of where we are, and we understand the Court's got a difficult task at hand, that the Iowa -- or the Eighth Circuit has said it's a rare case, if you will, but this is the rarest case. This is the rarest -- this is the rare case right here. This is it. There has not been a more publicized case in the history of the state of Iowa in the last 20, 25 years if not longer than this case. And so if this isn't the case, then I don't know what case it would be the right case to change venue on on a pretrial basis without getting into jury selection than this case. Thank you.

THE COURT: Thank you, Mr. Stowers.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. First of all, the government doesn't see there's any other way to read the cases other than to establish that the two-tier test is the one that the district court has to apply. It's not simply an appellate court analysis but one that the appellate court has required that this Court apply as well.

And the first tier of that is for the defense to -- pretrial before we even start to pick a jury to succeed in a change of venue motion because of substantial pretrial publicity

Page 56

requires them to show two things:  That there was a saturation of press coverage about this trial and, second, that that coverage was inflammatory in such a way that any reasonable

66

judge would conclude that there's no way the defendant could obtain a fair trial.

The case law looks at, among other things, whether the coverage has been factual in nature or whether it's been inflammatory in the sense that there's a public outrage, a public outcry for justice to be done that it appears in the press.

In this case there simply hasn't been and the defense has not cited any cases that incite the public to justice in any way.  There have not been articles to the editor calling for Johnson's conviction or execution.  There weren't articles written asking for that to happen on Honken.  There haven't been letters to the editor seeking that.  The press coverage in this case has been nothing but factual.  And under the case law, simply having factual coverage of the facts of the case is not a sufficient basis for a change of venue because of pretrial publicity.

THE COURT:  Well, just a second.  It could be if the press coverage is so extensive and corrupting, and corrupting would include, would it not -- it's not a criticism of the press in any way.  They were reporting on the Honken trial.  They had probably a duty or whatever to report it, and they did a good job from what limited coverage I read.  But, for example, all of the "Dustin Honken confessed to me" witnesses of which there were several, including some very kind of high-profile

67

Page 57

individuals -- the lawyer from Atlanta and the helicopter -- would-be helicopter pilot who landed his plane in a prison yard -- that testimony I assume will not be coming in.

MR. WILLIAMS: That's correct.

THE COURT: You do agree with that.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And how many total witnesses were there in the -- what I call the "Dustin Honken confessed to me" witness group?

MR. WILLIAMS: That will not be testifying in this case? I think there was --

THE COURT: About eight?

MR. WILLIAMS: I don't know if it got that high. Maybe five, maybe six, but there weren't that many. There was Tokars and McIntosh and -- help me, Tom.

MR. MILLER: Vest and McGee.

MR. WILLIAMS: Vest and McGee. Four.

THE COURT: There were only four?

MR. WILLIAMS: Yeah. We had listed and we could have called a lot more than that, and we chose not to. But only four actually testified in that case about the "Honken told me this" type of testimony. Ferguson. There was Ferguson.

MR. MILLER: Ferguson is five. There were also some from the Woodbury County Jail which will be offered in this case.

68

MR. WILLIAMS: Right. There were some from the -- Woodbury County, but those same witnesses are going to be testifying here, and they're going to be testifying that Angela

Johnson was part of the scheme to help Honken escape for the purpose of retaliating against witnesses. And so those are going to be the same ones. So Ferguson would be added to that. Ferguson, my recollection, though, didn't have a whole lot of information about the murders themselves or Johnson. Mostly it was his role to go out and kill the people that already agreed to testify against Honken about the statements he made about the prior murders. So his testimony was limited.

I would agree with Your Honor where you're going with this, and I agree with you. That can be corrupting, and that can also satisfy, I suppose, the defendant's burden if they show that the coverage of that type of evidence was so pervasive that it would corrupt the jury pool.

In this case I just don't think that was the situation. Even where that testimony was covered by the papers, it is at most passing references, particularly on the coverage on the eastern side of the state, passing references that "And, oh, by the way, Angela Johnson is accused of participating in these crimes with Dustin Honken." There was not significant press coverage about what witnesses in the Honken case said about Angela Johnson's involvement in the murders. That wasn't the focus of the testimony. It wasn't the focus of the press

69

coverage. And so that type of evidence simply -- or that type of coverage simply didn't appear in this case.

THE COURT: Can I ask you a more basic question? How fair do you think it is to seat a juror in this case who says during jury selection, I'm aware of the fact that Mr. Honken was convicted and got the death penalty, but I can set that aside and judge this case fairly?

Page 59

MR. WILLIAMS: If the Court deems that that person is credible by watching them, I think it's fair and for this reason: I think that a fair person can recognize and very easily, easily -- and we have cases where we have codefendants going to trial at the same time that some are guilty and some aren't. And simply because one other person has been convicted of this crime doesn't mean that this defendant's guilty of it or that she deserves the same punishment. And we ask juries in multiple-defendant cases all the time to be able to judge each defendant individually. And we trust that they can do that, and they do do that.

THE COURT: Well, how do you explain then the first alternate juror that we lost within an hour of having the jury sworn in -- I may be wrong about that. That's my recollection. It was pretty fast after we swore the jury in --

MR. WILLIAMS: This was the lawyer?

THE COURT: The lawyer. And remember what she said? Remember she said that in her office they passed around the

70

advance sheets, the Fed. Supps., and she recalled reading them, some of my opinions in the Johnson case? And then I asked her an open-ended question: What do you recall? And she recalled that Angela Johnson was found guilty when, in fact, she hadn't had a trial yet. And then I asked another follow-up question, and I'm paraphrasing now: Well, how would that affect your ability to be fair and impartial to Angela -- or to Dustin Honken? And she said something like, Well, if she was guilty, he must be. And she's a trained lawyer. Doesn't that cause you some concern about this guilt by association and that, you know, if somebody wants to serve on the jury all they have to say is,

Case 3:09-cv-03064-MWB-LTS     Document 284-67     Filed 06/23/11     Page 11 of 200

Yes, I can be fair and impartial? But if this trained lawyer thought that, I thought it was kind of a frightening experience that a trained lawyer would assume because one defendant was guilty when -- and assumed that she was guilty when, in fact, she had never had a trial but she remembered reading enough about the case her conclusion was that she had had a trial and been found guilty when, in fact, that wasn't true, that this adverse pretrial publicity can lead to some pretty dangerous results. That's my concern.

MR. WILLIAMS: And it's a legitimate concern, but I think that's what the voir dire process is all about. I think it's designed for us to be able to weed out jurors like that that have the -- this judgment ahead of time and striking them from the jury.

71

THE COURT: But if the case were moved to Minneapolis, for example, we would virtually eliminate that problem in jury selection, don't you think?

MR. WILLIAMS: That's a strong probability, yes. There's going to be coverage up there, but it's going to be much, much less than what it was down here obviously, and I think the chances are going to be a lot easier for us to pick a jury. But that's not the test.

And the reason for this I think, the underlying reason for change of venue and why the test enunciated by the Eighth Circuit is so strong, is because the citizens of the state have a right to have justice done within their state and not to have venue changed simply because it might be easier for a defendant or easier for the Court to pick a jury or more likely --

THE COURT: Or easier for the government.

Page 61

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 12 of 200

MR. WILLIAMS: Or easier for the government. I mean, the cases ought to be tried where the crime occurred because the citizens of that state have a right to see justice done within their state borders. And so that's why I think the test is the way it is. If Congress or the higher courts thought that that's not as strong of a principle, they'd make it a lot easier for us to change venue if we just said, Hey, looks like publicity's pretty bad around here; let's just change venue to eliminate that problem all together. And they'd enunciate that's the test, and it'd be easy for us to grant that in this case and

72

move on. But that's not what the test is, and the government believes that the citizens of the state do have a right.

Now, I -- and this is all, again, speculation. I'll speculate the opposite of the defense that I don't think we're going to have that much of a difficulty picking a jury in this state. But the very fact that the defense is up here speculating and I'm up here speculating calls attention to the fact that this is not the proper case pretrial to be granting a change of venue. We don't know what the jury pool knows about this case. We don't know to what extent that it affected their ability to be fair and impartial jurors. And the only way we can know that is to engage in the jury selection process.

Now, does that raise the specter that there's a possibility we could get into the jury selection process and realize we can't pick a fair jury? Sure. But that's the way the case law's set up. That's required of us to do because the principle of trying a case in the state where the crime occurred is so strong that the courts have said you gotta try that. You gotta try that first, and only if that doesn't work do you move

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 13 of 200

it to another district. And so the government believes we try that.

Now, as to the polling the jury pool, obviously the Court can grant that motion or not if they want to. I guess the government's view is this. We're going to essentially poll the relevant people we care about through our questionnaire. And

73

we're going to ask them about publicity. What other people might know or not know about this trial, if they're not in our potential jury pool, who cares?

And so to spend the money to go out, to have phone calls made to a bunch of people who are never going to serve on this jury, are not going to be pulled as potential jurors, to have them say, Oh, gee whiz, I heard about this case or I didn't hear about this case, who cares? I think it's only relevant on what the potential jurors in this case know. And so to me it's a waste of government's money.

What I would suggest we do is we send out the questionnaire that we have which asks about the jury publicity, and we can tell from that questionnaire as well as we could tell from a poll of other people who will never serve on this jury whether we think the -- in more going with what the Court thinks that the exposure of the publicity was so great that the defendant's met its burden to change venue.

So our recommendation would simply be let's send out those questionnaires. Let's get them back as soon as we can. Let's take another look at them, maybe have another hearing, and I'll be the first one to concede if we get back these questionnaires and 90 percent of the people in there say, I know all about this case, and it bothers me, and I've already made up

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 14 of 200

my mind, I'll come in here, and I'll agree to change of venue because . . .

74

THE COURT: I think you would even if it was 89 percent.

MR. WILLIAMS: Or even lower possibly. I just don't think we're going to get that. Now, I could be surprised, and if I'm surprised and we get it and it comes in and it just doesn't look like we can get a fair jury or it's just going to take forever to get it or we have to send out another 600 questionnaires, then I'll look at this and I'll talk to my superiors and see if we can agree to a change of venue. But I'm bound by the case law the way it is right now to argue that change of venue's not appropriate at this time.

THE COURT: A couple follow-up questions. How many questionnaires do you think we should send out this time if I don't change the venue out of district initially?

MR. WILLIAMS: You know, frankly, I think we send out the same number of questionnaires and for this reason, Judge. While we had a lot of publicity at the trial, we had a ton -- we had a ton of publicity pretrial on Honken, and the questionnaires that came back to us even there was very few of those people have ever heard about the case, surprisingly. But we had the same papers covering the pretrial issues in Honken with the same circulation, and when we sent out those questionnaires, we got them back, very few people heard anything about the case.

Now, sure, since then we've had a trial and there's

75

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 15 of 200

been more publicity. But I'll be surprised if the numbers are that much off of what we had before. So I would suggest the same number would be appropriate.

THE COURT: Would you like to comment on your proposal in the brief to do an intradistrict transfer to Cedar Rapids?

MR. WILLIAMS: Yes, Your Honor. Our assessment -- and it is just a layperson's assessment because we don't have anybody -- you know, we don't have a consultant or anybody actually crunching numbers or anything. But looking at the publicity over on the eastern side of the state, it appears to us to be less intense than it was in the western side of the state, and it makes sense since the trial was out here there's going to be more publicity.

The Court has a lot of discretion and -- if we keep it within the district of pulling the jury from certain portions of the state where it's most likely the publicity was the least. And our suggestion would be that we have the case over in Cedar Rapids, that we pull the jury from a number of counties bordering the eastern side of the state where there's not a lot of major newspaper coverage, there's not a lot of major newspaper distribution. The Des Moines Register isn't distributed in large numbers up in that area. Sioux City Journal isn't at all in that area, and the Cedar Rapids Gazette even is not carried substantially in the northeastern side of the state and pull the jury from those limited counties and see

76

if we can't get a higher likelihood of getting a jury over there who know virtually nothing about this case.

THE COURT: How much of a burden would it be on

counsel in your view if we proceed with 600 juror questionnaires here in the western division and simultaneously or as near as simultaneously as we can proceed with 600 questionnaires to potential jurors in the Cedar Rapids division and then once we get back the juror questionnaires make a decision if there's any meaningful difference between the exposure of the case and the knowledge of pretrial and then make a decision which venue in the Northern District of Iowa would be the fairest venue to try the case and also keeping open the option of, you know, moving it to Minneapolis?

MR. WILLIAMS: I really don't think it'd take that long. The defense proposed questionnaire as I recall it had -- I want to say it seems to me a half a dozen questions about publicity, maybe a little bit more, maybe a little bit less but not that many. It would not take much for us on those questionnaires to go directly to that point, look at it, and to see to what extent they've been affected by the publicity. In fact, each of us could use our staff people to go through and weed out the ones that clearly have said, nope, don't know nothing about the case, put that in a pile, and let us only have to turn our attention to the ones where they claimed to know something about the case and make an assessment of how much they

77

know about it.

So I think it will only take a few days to go through the questionnaires if that's the only focus we have. You could go through, you know, easily a questionnaire a minute. So I don't think it'd take that much time.

THE COURT: What do you think about the defense's argument under Rule 21(b)?

Page 66

MR. WILLIAMS: I've not taken a look at the case law in that area, so I'm not sure what the standard is to begin with, so I'll premise my remarks with that.

Their argument strikes me was kind of dovetailing back into the change of venue for -- because of pretrial publicity. Really what they're arguing as I understood it was time. It's going to take us a long time to pick a jury because of the publicity and so transfer; we ought to change venue for convenience. Only marginally do they mention the convenience of the witnesses in this case.

To me I think that's a bootstrapping attempt to evade the requirements under the law for change of venue for pretrial publicity. It's a creative one, but I just don't think it's an appropriate one in this case. If it was convenience for parties because of some other reason other than pretrial publicity, then it would make more sense. But in this case it seems to me it's bootstrapping.

THE COURT: What about "and in the interest of

78

justice" prong of the rule?

MR. WILLIAMS: I don't know. I apologize, Your Honor. I'm just not familiar with the case law in this area on what that phrase means and what discretion it gives to the Court to take that into account. And again, I frankly don't think it's going to take that long to pick a jury. I know there's a lot of horror stories that are being imagined about how bad this is going to be. But using the Court's method of having us strike jurors as we go as part of this process, I'm just not convinced that even if we have to do more individual voir dire because of the pretrial publicity that somehow that's going to make it an

Page 67

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 18 of 200

even longer jury selection process. Would it be longer than Minneapolis? Yeah, it probably will be. Would it be a month or two months to pick a jury? I don't think so. I just don't -- particularly given the way the Court's set up or proposed doing jury selection, I think that's going to speed up the process itself. And so we may still end up at three weeks if we do it here, but it could be less than that. It could be more. I just don't see a horror story coming.

THE COURT: I know we were talking about various systems for jury selection and trying to think outside the box a little bit and trying to be as flexible as we could to address the needs of the parties. And I think we had consensus on some things and not on others. One of the things we had consensus on was that we were going to try and do panels rather than

79

individual questioning of jurors.

Don't you think when we get into the pretrial publicity issue that almost invariably you have to do that individually because you're going to have -- particularly if a juror knows of Tokars or McIntosh testimony and why would you want -- and the other panel members do not, that could be the type of thing where an individual juror could poison the panel. I'm generally suspicious of that argument. I think it's overused and it doesn't happen very often, but there are situations where it can happen, and isn't this the type of situation where it could happen if we did panel questioning on pretrial publicity rather than individually?

MR. WILLIAMS: It could, Your Honor, with this caveat, though. The questionnaire as proposed by the defense at this point -- and I know I have the benefit of knowing what that is

Page 68

and you don't -- but it asks the very question that we'd be asking in the individual voir dire: Exactly what is it do you know about this case?

THE COURT: But the problem's going to be, Mr. Williams, that if the questionnaires go out in January, for example, and we start the trial either March 7 or April 1 or 2 or whatever, there will probably be a series of articles between when the jurors filled out the questionnaire. So not only do we have to worry about the Honken publicity, but we have to worry about interim publicity between when the jurors answer the

80

questionnaires and when the trial starts.

Now, we could maybe move that schedule back or up depending upon your perspective, send the questionnaires out closer to trial which I don't have a problem with, but I just didn't want to burden the lawyers with 600 or 1,200 questionnaires, you know, 3 weeks before trial or a month before trial. And that's why I think we picked a longer time period. But that longer time period makes the questionnaire answers less reliable on the issue of pretrial publicity. Would you agree with that?

MR. WILLIAMS: I would agree. That's a good point. I think it does date it. And I wasn't going to suggest that it would eliminate all need for individual questioning. Are we going to have to do individual questioning? Yeah, I think we are in a lot of cases, not necessarily every one of them, but I think that, you know, out of a given panel -- let's say we start with six people in these panel sections we're going to do. You know, four of those people have knowledge of pretrial publicity and we are convinced that, you know, three of them out of the

Page 69

questionnaire have substantial knowledge of it. We're going to want to address that outside the presence of the rest of the jury, and we will have to do some individual questioning. I think it may be reduced in part because of the answers in the questionnaire, but it's not going to eliminate it. I didn't want to suggest otherwise.

81

THE COURT: Getting back to the alternate juror/lawyer problem that we encountered in Honken, isn't it troubling to have a juror say, Yeah, you know, I read some about the Honken case and I remember seeing the headline that he got the death penalty, but I can set that aside? How do you know if somebody is capable of setting that aside? I mean, I don't have any magic wand or litmus paper I can wave in front of the juror to find out. Or is that just a juror that really wants to be on this trial because it's a once-in-a-lifetime event? I mean, you don't know those things. And, you know, I have to judge the credibility of witnesses, but sometimes it's very difficult. And judging the credibility of jurors is I think in some ways even more difficult.

And even though the law says that I can seat that juror as long as, I guess, I believe that person, boy, it's unsettling to me to have a bunch of jurors who knew the outcome of the Honken case. That's very unsettling, and I really wonder -- I mean, I realize what the case law says, but sometimes what the case law says and what reality is don't necessarily match up as well as maybe I would like. And that really troubles me in this case.

And I just think it would be much fairer if we had jurors who didn't know about the result in the Honken case. Am

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 21 of 200

I -- is it wrong for me to be deeply concerned about this?

MR. WILLIAMS: Not at all. I think you should be. I

82

think we should all be deeply concerned to make sure we get a jury on there who in fact, not just in word, can give the defendant a fair trial. It's all of our obligation, and so I think we all need to be concerned about that.

The -- I go back, though, to the fact that we are constantly trying defendants in multi-defendant cases and we call upon the jury and we rely upon the jury and in my experience for good reason to separate that.

THE COURT: I don't -- excuse me, but I don't think that's a good analogy because in a codefendant case the jurors don't know the result. So when you try codefendants jointly, they have to decide guilt or innocence for each of the codefendants, and I think jurors do a good job of that.

But it'd be a whole 'nother thing when they know the result. I mean, I guess sometimes they know the result because they're cooperators who were part of the conspiracy and they pled guilty and that all comes out in the mix. So I guess that would be the analogy, wouldn't it, not so much trying codefendants together but trying a former codefendant of a now cooperating witness?

MR. WILLIAMS: Yeah. No. You're right. I think that is a better analogy. I think the Court's concerns are completely legitimate that we do have to be concerned if a juror says or potential juror says, Yeah, I know the outcome of the Honken case, but I think I can still judge the facts -- this

83

Page 71

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 22 of 200

defendant on the facts of the case before -- that we need to be concerned about whether that's a sincere and truthful expression of their opinion.

But I think that's what the jury selection process is designed to do. And I think there are jurors out there who can do just that and we could rely upon them to do that. This is a different case. These are different facts from the standpoint of what the defendant's role was in this, and this isn't Dustin Honken, and so the defense is going to be pointing it out from the moment we start jury selection process until the end of this case that this is not Dustin Honken, and the jury is going to have to make a determination on the facts that we present whether this defendant's guilty or not. And I think they're smart, and I think they can do it.

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: We're going to take a break, but when we come back, Mr. Berrigan, I want you to respond to the government's argument that a poll is unnecessary and the best poll would be the 600 or so questionnaires if that's the number we ultimately send out and then this issue that really troubles me about, oh, yeah, I read that Honken got the death penalty, but that's not going to be a problem for me in this case. I think the law says if I believe that juror I can seat them, but it doesn't say I necessarily have to seat them.

84

MR. BERRIGAN: I'm prepared to do that this very instant, Your Honor, if you'd like, but I'm happy to wait until the break's over. I've been contemplating discussion with Mr. Stowers. I'm sure you have a local rule that prohibits

Page 72

double teaming in most circumstances.

THE COURT: We started off with the presumption of that rule in the Honken case, but it was honored in the breach quite often.

MR. BERRIGAN: We can do it after the break or whenever you'd like.

THE COURT: Why don't we do it at one o'clock; okay? Thank you. We'll be in recess.

(Lunch recess at 12:03 p.m.)

THE COURT: Please be seated. I'm very sorry I'm late, but I ran an errand, and it is very, very, very icy out there, so you may be here longer than you think or want to be for that matter.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court. A few years ago, Your Honor, there was a popular movie with Harrison Ford and Tommy Lee Jones called The Fugitive. I'm sure the Court remembers it.

THE COURT: I do.

MR. BERRIGAN: It was based on a real case, a surgeon who killed his wife in Chicago or he was accused and convicted

85

of that, and then he was -- escaped and was pursued by the U.S. Marshal's Service. That case is in the United States Supreme Court Reporters as Maxwell versus Sheppard, and it was reported in 1966, and in 1966 the U.S. Supreme Court had the very same concern that this Court does respecting alternate juror, slash, attorney who knew something about Miss Johnson's -- Mr. Honken's case and that information was wrong. And that concern is what do these people know? And if we know what they know, can we

Page 73

trust them to be fair merely because they tell us so?

In Mr. Sheppard's case, the Supreme Court said that even though each juror indicated he could render an impartial verdict despite exposure to prejudicial newspaper articles, we set aside the conviction holding, With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion. And the court went on to say that a fair trial in a fair tribunal is a basic requirement of due process.

Fairness, of course, requires an absence of actual bias in the trial of cases, but our system of law has always endeavored to prevent even the probability of unfairness. And I would submit that that's what changes of venue are all about is to reduce the probability of unfairness.

We do know -- I would argue respectfully with Mr. Williams that we do know what these jurors know if they've read the paper. And what they know are in these volumes of the

86

appendix. It's over 700 pages, literally hundreds of articles throughout the state. They do vary in number and intensity depending on where in the state you are, but they have one thing in common, Your Honor, every one of them. The jurors that have read the articles in their local papers are going to know that Dustin Honken was tried by a jury of his peers, that evidence was heard for weeks, that he was convicted beyond a reasonable doubt of five counts of first-degree murder and sentenced to death, and that is critically important information that is not admissible in the trial of Angela Johnson, period.

Now, this case markedly differs than codefendants who go to trial in that respect alone. But it's also different in

Page 74

that the relationship between Miss Johnson and Mr. Honken is markedly different. The jurors are going to learn that these people were essentially like husband and wife. They're not merely drug conspirators conspiring together. They have a child together. And they're going to know and learn that -- and they may know and learn and undoubtedly do from these newspaper articles that they're inextricably intertwined, the lives of these two different people. And it is very prejudicial that the jurors would know that Mr. Honken received this punishment after being convicted. It's prejudicial to Miss Johnson.

I'll remind you also that as Mr. Williams has pointed out, there were at least some witnesses who testified against Mr. Honken whose accounts appear in the newspapers at some

87

length whose testimony will not be admissible against Miss Johnson. Steven Vest who I did not have a chance to listen to during the trial, for example, certainly in his reports to law enforcement officers and I presume during his testimony gave testimony that Miss Johnson was with these two children, Amber and Kandi Duncan, when Lori Duncan and Greg Nicholson were shot some 50 yards away, and she explained to them that those were fire crackers. That's what Mr. Vest told. And I can't cite the Court to any particular article, but I dare say that that was covered at least by the local papers, and there's other information equally prejudicial.

So it becomes a question about, you know, why are we taking a chance on this. And the government's response is, oh, we have to because the case law seems to require that we have to undergo jury selection and determine as a result during the process that we can't seat a fair jury. And we just

Page 75

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 26 of 200

respectfully disagree about what the law is there.

The case that's being relied on, the Eighth Circuit case, this Blom case, is really the case of Keith Nelson. That's the case that's relied on by the Eighth Circuit. I represented Mr. Nelson at trial. The case is somewhat misleading in that Mr. Nelson actually entered a guilty plea and he was tried only for the punishment portion of the trial.

But even in his case the Eighth Circuit said that if you could show that pretrial publicity is so extensive and

88

corrupting that a fairness of constitutional magnitude must be presumed, the court must order a new trial. That's the language, is "must." In Mr. Nelson's case that endeavor was unsuccessful, and I would submit to the Court that his guilty plea had a lot to do with that. It's one thing when you come into court and actually plead guilty. It's quite a different situation than Miss Johnson presently stands in where she has advanced her innocence and has pled not guilty just even this morning.

Mr. Nelson, frankly, had a hard row to hoe complaining about pretrial publicity after he himself had entered a guilty plea admitting the crime. So predictably he was unsuccessful in his effort.

And it's only if that standard is not met that the Eighth Circuit said in review we'll look to the actual jury selection, and it was Mr. Nelson's case I mentioned informally the other day off the record we each had 20 minutes a panel. So you can imagine how much prejudice was uncovered with each party questioning 12 jurors at a time for 20 minutes in total, Your Honor. We went through nine panels in a single day. That jury

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 27 of 200

selection went till ten o'clock at night. I mention that only to put that case in the context in which it was tried. It was quite an anomaly in my opinion.

The Court asked me to talk about the jury poll versus the process that's being considered as an alternative which is

89

to actually send out questionnaires. Jury polls are typically done by individuals that have particular expertise in these areas. They are few in number.

I don't want to suggest it's not an expensive proposition, but it is far less expensive than having three criminal defense lawyers and two fine prosecutors go through these questionnaires to determine the same information that essentially one individual could determine if there's a poll. It involves telephoning jurors who have to meet certain criteria. That is, they have to answer initial questions that would suggest they're eligible for jury service in the venue in which the case would be tried. And when they answer those preliminary questions, they're given certain background information about the case that we would have expected they might have seen from the newspaper, television, or radio accounts.

And just as an aside, we haven't even discussed television coverage or radio coverage during this entire argument, but certainly if we were allowed to do so, we would present that evidence as well.

But the jurors are given this preliminary information. Then they're asked, What do you know about this case? And it's an interactive process where they give feedback to the questioner. Then the questioner's supposed to say, What else do

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 28 of 200

you know?  And then the jurors are supposed to answer again, and

90

then they say, What else do you know?  And then they're asked a series of questions about whether they have any fixed opinions about the case.  And one of the questions that they're asked is do they have fixed opinions about the defendant's guilt, and those are also on a graduated scale.  They're asked whether or not their opinion is that the accused is definitely guilty or whether the accused is somewhat guilty, definitely not guilty, somewhat not guilty, or unsure.

Sometimes we ask them questions about other things other than merely the guilt.  We might, for example, address specific issues about children or drugs or guns.

But the idea is to get a fair sampling of the community without sending out questionnaires which have the undesirable effect of essentially heightening juror awareness in the community for the people that are getting the questionnaires.  I mean, we call somebody on the phone.  It's not likely that person's going to be an actual juror.  They may or may not have known a lot about the case, but after that telephone call, they're interested in that case.  And so it doesn't really matter to us whether they decide to follow the case at that point and go back and look at the articles on the Internet.

Now, that's a whole different situation for actual jurors.  You give them a questionnaire and they fill it out, and that danger is really a problem.  And as the Court recognized

91

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 29 of 200

already, there's a substantial period of time that takes place between the questionnaire being filled out and then the trial during which time we have no idea whether or not these folks are on their computers looking -- putting in Dustin Honken on the Internet and coming up with these series of horrible articles or Angela Johnson for that matter.

And then there's also this problem with the questionnaires which is inherent with questionnaires. But they're filled out sort of in secret. You know, we don't really know for sure that there's no cooperation between a husband and a wife. I've certainly had that experience, and I'm sure the Court probably has too where there's been some collaboration on the questionnaires. That doesn't happen with the telephone poll. Whoever's on the other end of the phone is the person that's answering the questions, and so it's not a conference call. There's just those two individuals.

And then finally there's a statistical analysis applied. It's more than the lawyers looking at it and saying, boy, this looks bad. There's a statistical analysis that's actually applied by the juristic psychologist, who ever's doing the analysis, and they come in and give testimony much as an expert witness would under the Daubert standard to advance to the Court whatever proposition the telephone polling discloses.

It's expensive. It varies, you know, depending on how many people are going to be questioned. Most of the

92

questioning's done by temporary workers or people who are specifically trained, labor pool type of people, frankly.

It has this advantage, though, Your Honor, is that we could use Minneapolis/St. Paul as a target area in addition to

Page 79

any other areas that you were contemplating. That is, we have a comparison. It's one thing to compare Sioux City to Cedar Rapids, but if we're sending out questionnaires, that's all we get. The telephone poll would enable you to also in addition call people in the Minneapolis/St. Paul district to find out if what we think is true, that is that their exposure to the publicity is vastly different than those in Iowa in the areas that we're talking about.

So we've used it a number of times in capital cases in Missouri and Kansas and in the federal courts in Kansas City, Missouri, and judges seem to rely on that in making determination about whether or not venue's appropriate.

That doesn't -- I don't want to suggest they always go with it. But they almost always consider it very heavily in making their determination one way or the other. And it has the benefit of being fairly objective. That is, I mean, the parties can participate in the formation of the questioning. It's not designed to be any kind of an adversarial process. The information's equally available to both sides obviously and to the Court.

So if the Court is contemplating taking evidence on

93

this issue, I would suggest that that's certainly one way to do it, and in my view, it's less expensive, not more expensive, than the contemplated sending 500 questionnaires, although I understand the time constraint to be a major concern that the Court has in making that decision.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, sir.

THE COURT: Are you in a position to estimate the

Page 80

cost?

MR. BERRIGAN: I'm not, Your Honor, but I could get that information I think relatively quickly. I tried to do it over lunch, and I wasn't able to. My prior experience suggests to me that it's going to be in the neighborhood of $25,000 probably depending on how many people are called in what areas. You know, whether the calls have to be made long distance or not is certainly a consideration, whether we could find somebody up here in Iowa. I haven't ever done a jury poll in Iowa, and I don't know what resources are readily available to do that. So these are matters that would need to be investigated rather quickly. And I could report back to the Court after having done that, but I did not do it over lunch.

I'm sure that it is done. I suspect that civil litigants in this state just like they do in my state do these type of things on a fairly regular basis on important cases, and I'm sure there are people that do it. I just don't happen to

94

know who they are right now as I stand here.

I wanted to address the issue of Cedar Rapids as an alternative, Your Honor, even though I want it to be clear that the defense position is very firmly that you have the ability and the discretion to order this venue be changed to Minneapolis/St. Paul. At least the defense hasn't found any cases where an appellate court has reversed a trial court because it changed a venue to more accurately assure that the defendant would have a fair trial. I just haven't seen those cases, and if they're out there, maybe the prosecution could enlighten us.

But if the Court is determined to try the case in

Page 81

Iowa, certainly from the defense standpoint, we'd just as soon have Des Moines as a target venue as opposed to Cedar Rapids. It has relatively the same convenience factor. Mr. Miller's office is in Des Moines, and so is Mr. Stowers'. The rest of us would have to travel, but it's certainly less travel for me, and Mr. Williams and Mr. Willett would have to drive a couple of hours and I think the Court probably at least a couple of hours. It has convenience for the witnesses because it also is, of course, on Interstate 35, and it's a straight shot southwest from Mason City, so probably isn't all that much different than driving to Minneapolis/St. Paul, although I'll confess I don't know the relative distances there as to whether Des Moines is closer or further to Minneapolis/St. Paul from Mason City, but

95

they are on the interstate.

And it has one additional factor that I think's significant, and that is that there's a larger jury pool available there. We believe -- and we respectfully disagree with the prosecution -- that a lot of people know about this case and that they've read about it, and we're going to find that out during the jury selection process.

But, you know, there is a certain percentage of the population, relatively small, that essentially does kind of live under a rock, and they're not watching the news, and they're not reading the paper, and they've got their own lives to lead, and they have maybe good reasons for not paying attention to the media. Whatever that population is, it's larger in Des Moines than it is in the other venues that you're considering.

And so although we're going to have to go through a whole lot of jurors to find those people, I think there's

Page 82

probably more of them in terms of the actual numbers in the Des Moines area than probably anywhere else in the state of Iowa merely because it has the largest population.

But having said that, Your Honor, as a caveat, it is unfair, we believe, that the defendant has to be tried by a bunch of people who don't read the paper, that don't watch the television news, that really don't pay attention to current events. That's not what the United States Constitution contemplates as a fair cross-section of the community in our

96

view. We should be entitled to people that are paying attention that just aren't exposed to the horrible publicity the case has generated in the state of Iowa.

Finally, Your Honor, I think as Mr. Stowers has probably amply pointed out -- and I think Mr. Williams' argument, frankly, has some merit -- this bootstrapping position that, you know, we haven't been talking about convenience so much when we've been litigating this issue, but it's there. It's in the rule. It says the Court may transfer for the convenience of the parties and witnesses and in the interest of justice. There are plenty of cases that say that this is certainly within the broad discretion of the trial court in making its decision about whether it's convenient. I think the argument that it's in the interest of justice, frankly, is much stronger than the argument about convenience.

But I think this situation really is analogous to this issue, that if Mr. Honken were to come back for a retrial, if that happened, would we contemplate for a minute trying the case here in Sioux City? I don't think so. I think the Court would determine that you know what? I don't think that's fair, that

Page 83

if a juror knew that this person had already been convicted and sentenced to death, even if you knew it and you said you could be fair and impartial, that's not a risk that we should be willing to take when Mr. Honken's life's on the line.

Miss Johnson's in no different position, frankly, none

97

whatsoever. And I think in answering that question the Court should, could, and we hope will err on the side of caution in considering her Sixth Amendment right to a fair trial. Thank you.

THE COURT: Thank you very much, Mr. Berrigan.

Mr. Williams?

MR. WILLIAMS: Your Honor, I'm not going to repeat any arguments I previously made. I do want to address just very briefly, though, about this poll issue. To the extent that the defense has additional questions that their pollster would ask, give them to us. We'll put them in the questionnaire, and they can go out to the actual jurors who we're going to get. I mean, if one of their arguments is, oh, jeez, we would ask different questions of this poll, then let's get those questions, put them in the questionnaire, and we can ask those same questions.

To the extent that they are concerned that the questionnaire is going to result in the prospective jurors going out and investigating this case, we're always going to have that potential problem, and the polling doesn't eliminate that problem unless we're going to eliminate the questionnaire, and that problem can be addressed simply by an admonition in the questionnaires from the Court's instruction that once they receive the questionnaire they shouldn't be watching the news, reading newspaper articles, and so forth about this case.

Page 84

THE COURT: And you have that problem no matter what

venue the case is tried in.

MR. WILLIAMS: That's exactly right. We're always going to have that potential.

THE COURT: Given the advent of the Internet.

MR. WILLIAMS: Right. And I think it would be appropriate. I mean, it's a good point by the defense that that potential exists. It's one we hadn't thought about in the Honken case, and I think it would be appropriate for the Court in its instructions to tell prospective jurors that you're expecting them to live under the typical admonition you give them during trial from here on.

And then to the extent that they argue, well, we can use statistical analysis based on these responses, again, they can do that with response to the questionnaire. If their position is we want to have some expert look at this and do a statistical analysis based on the questions we asked, then have that same person do the analysis on the questionnaire that we send out.

And then finally to the extent they say, Well, jeez, you know, it'd be less costly to do it this way than have a bunch of lawyers to do it because we're going to rely on our expert to do it, then rely upon your expert to go through the questionnaires. Then if the lawyers want to do that instead of look at it themselves, then let them do that, and they can rely on that questionnaire.

I just -- it strikes me as really a waste of

government money to do the poll. I mean, frankly I shouldn't care and I don't care other than I'm a taxpayer and I don't want to see money wasted when we're going to be asking a bunch of people who aren't going to be our jurors what they think about the case and what they know about the case.

THE COURT: But to the extent that the poll would be statistically significant and accurate, can't you extrapolate from the poll that we'd have problems once we send out the questionnaire?

MR. WILLIAMS: You could other than we do have a timing issue here. And if we're going to be sending out questionnaires anyway and I think we should because I think, you know, we've had this trial delayed long enough, that why incur the additional expense to also do a poll at the same time we're sending out the questionnaire? I mean, had the defense raised this issue months ago and proposed months ago doing a poll and we're going to do it months before we got the questionnaire sent out, we'd be in a different point. But they've not proposed this before, and we're at the point where, frankly, the questionnaire I think under the Court's scheduling order was supposed to go out on the 28th or 29th of December. And we've hit the point where we need to get that questionnaire out. And I think we just do that.

THE COURT: But until the jury came back with a

100

verdict in the Honken case, they really weren't in a position to request the poll I don't think.

MR. WILLIAMS: I agree. But the jury came back in Honken in October.

THE COURT: 27th.

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 37 of 200

MR. WILLIAMS: Right. But we've had November and December. If they really thought a poll was appropriate -- and clearly they had thought about a change of venue all along in the Honken case -- we could have been in a position to get that polling done beforehand. And I'm not fundamentally opposed to the poll. I could care less what the answer of that thing is. In other words, I'm not saying I don't want a poll because I'm afraid of the answer. I'll take the answer, whatever it is. I just think it's a waste of money if we're already at the point of sending out the questionnaire. And that's my only position. Otherwise I don't have an objection to the idea of sending out a poll or doing a polling. I just object to the spending of the money unnecessarily.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Your Honor, I agree. I don't think it would be cost effective to do both a questionnaire, particularly to two different venues, and in addition polling. I hope I didn't suggest that. I was responding earlier to your question, well, wouldn't it be prudent for me to send out a questionnaire also, and I can't disagree with that if the Court's made a

101

decision to keep the case in Iowa, we should send out a questionnaire undoubtedly to whichever venue the Court deems as most appropriate.

But the purpose of the poll would help the Court make that decision, that is, should we even be in Iowa. As far as I'm concerned, if we're not going to include Minnesota, Minneapolis/St. Paul, in the questionnaire, then let's not -- in the poll, let's not do a poll. I agree because I have the very firm view and so do my colleagues that the publicity in this

Page 87

case is pervasive throughout the state of Iowa. Everywhere in the state of Iowa this case has been in the paper, and everybody in Iowa knows what happened. That's our view.

So given that view, it really doesn't matter to us if we're going to do the questionnaire. I think the Court might more appropriately rely on its innate sense of where is it going to be easiest for us to get a jury, and I suppose the poll could help to some extent, but I'm advancing --

THE COURT: But that's not the standard. If the standard were my innate sense of where it'd be easiest to pick a fair jury, you'd be making reservations in downtown Minneapolis this afternoon. And I guess I would be too. And so would Mr. Williams and Mr. Miller. But that's not how I read the Eighth Circuit standard.

MR. BERRIGAN: Well, the rule -- and you have it in front of you.

102

THE COURT: I do. I'm looking at it right now.

MR. BERRIGAN: The Court must transfer if the Court is satisfied that so great a prejudice against the defendant exists that the defendant cannot obtain a fair and impartial trial there. And so what the "there" we're talking about is right here in Sioux City. If the Court really has a legitimate question about that based on the articles in the newspaper and the newspaper coverage and the media attention that this case has garnered in the television and in the radio, then we really -- we do have a large hurdle, and we should have a poll just to show you how pervasive it really is. It seems so inherent to us that that part is at least true, that in Sioux City in this district this case has gotten a huge amount of

Page 88

attention.

THE COURT: Wouldn't we learn that from the questionnaires and you could modify the questionnaires, you know, to incorporate more information about this issue in conjunction with your jury consultant? And you could do some statistical analysis with regard to the questionnaires, although I'm not sure that's necessary. But wouldn't the questionnaires essentially -- particularly if we did them simultaneously in both divisions of the district, wouldn't that kind of be the proof in the pudding and maybe based on the questionnaires I would be able to make a determination -- a stronger determination? We'd have a better record under 21(a) for a

103

transfer out of district.

MR. BERRIGAN: It will make a record as to which of the two is better, Your Honor, I suspect. I mean, probably you can look at the questionnaires and apply some statistical analysis, and there's probably some difference, minor difference perhaps, but some difference between the two areas of the district that are being contemplated. And if that's the standard, then our position is we're in a world of hurt because that suggests we can't get out of the district. I mean, how does it happen? Do we actually have to start trial and --

THE COURT: No, but based on the questionnaire answers, then you can come back -- it would be much like a poll. You'd come back based on the questionnaire answers and say, Look, we should not even engage in the process of jury selection in either the western division or the Cedar Rapids division and based on the juror questionnaire answers and any expert testimony from your jury consultant that this case needs to be

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 40 of 200

transferred to a venue outside the district. But you'd have a stronger record for making that argument post-jury questionnaire responses than pre.

MR. BERRIGAN: That's true, Your Honor, because now, right now, we have no evidence other than the four volumes of materials that we've submitted to you. That is, we haven't brought in jurors or conducted any type of a poll. But it would certainly be faster and, in my view, still less costly to do a

104

poll than have jurors -- questionnaires read -- 500 questionnaires read by the lawyers.

I mean, we are going to have to read these questionnaires at some point, and it seems to me that we would be engaged in that process right away, and that's expensive. It's $375 an hour if Mr. Willett, Mr. Stowers, and I are doing that at the same time, although I dare say we won't have time to all of us engage in that process. But I think it would be wrong to suggest that that's not going to also be a very expensive process. And it only involves us comparing two areas where in our view we could easily undertake the third at least if we did the poll.

And it also gives the Court in our view again a better contrast, although I understand what you're saying, that there's some minimum threshold upon which the defense would need to meet I guess in analyzing these questionnaires for us to even determine that we're going to get a change of venue to begin with. I don't know what the Court has in mind in terms of that number. Is it a 90 percent recognition rate, or do they have to know so much about the case or what's the Court's thinking about that, but I do think the process is probably faster and not more

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 41 of 200

costly if we did a poll, and it certainly has scientific advantages in terms of being a little more accurate, more reliable for the Court rather than this kind of ad hoc look at the questionnaires and come back to me and tell me what you

105

think approach that we're contemplating now.

THE COURT: Anything either one of the defense lawyers -- I'll waive the World Federation of Wrestling tag team rule. Anything either Mr. Stowers, Mr. Willett would like to add?

MR. STOWERS: No. I think you've got it, Your Honor.

MR. WILLETT: Your Honor, I can't be more eloquent than Mr. Stowers or Mr. Berrigan. It's a tough decision, but the bottom of all bottom lines is, as the Court realizes, my client is entitled to a fair trial, and this isn't like the normal case where we're dealing with the guidelines and we're lamenting a 10-year mandatory minimum or a 20-year mandatory minimum for an offender. The government -- the U.S. attorney -- the Department of Justice has given this U.S. Attorney's Office discretion to legally execute my client. These are the highest stakes. And that's why we think a change of venue is appropriate.

THE COURT: Mr. Williams, Mr. Miller, anything else either one of you would like to add?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Why don't we move on to the next agenda item.

MR. STOWERS: Your Honor, I think the next three are actually sort of interrelated.

THE COURT: Sure.

Page 91

MR. STOWERS: And what I would suggest that we do -- what I would suggest we would like to do is make a brief record in support of the third motion that's up and then go ahead and just argue the three issues together very briefly.

THE COURT: Oh. That's fine. What kind of record do you want to make on which motion now? The --

MR. STOWERS: I'm calling it the third one which is item number 4 on your agenda.

THE COURT: Docket number 210, the Johnson motion to suppress?

MR. STOWERS: Amended -- well, it says 211 and then it says something about 210 not included.

THE COURT: Yeah, 210 as amended by 211, the November 17, 2004, motion.

MR. STOWERS: Yes. And there's -- I would just -- first of all, I believe that we have an agreement with counsel that the attachments to that motion which are the booking form with the Benton County Jail in which the defendant indicated that Mr. Parrish was her attorney whom she wished to communicate with and then a transcript of a recorded phone conversation on the day of her -- or the day after her arrest a conversation that she had there at the Benton County Jail in which she discussed the fact that she had sought counsel on the day of her arrest and was denied counsel, that those two exhibits would be received without the need for any further record. Is that

right, Counsel?

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 43 of 200

MR. WILLIAMS: Your Honor, we don't object to the foundation and admission of those documents. I don't agree with the characterization and description given to them, but the documents speak for themselves. We have no objection to the foundation.

THE COURT: Okay. Then they'll be considered part of the record for purposes of the motion.

MR. STOWERS: Okay. And then we would like to call Ms. Johnson for some brief testimony.

THE COURT: Okay. You can just come right over to the witness box, and I'll swear you in there.

ANGELA JOHNSON, DEFENDANT, SWORN

THE COURT: Okay. Please be seated.

THE WITNESS: Here?

THE COURT: Yeah. You gotta go around the other direction towards Mr. Berrigan. And then if you could please adjust the chair and scoot it up as far as you can so you can speak directly into the microphones. And you can adjust those microphones and pull them closer to you.

THE WITNESS: I think they're okay.

THE COURT: Yeah. If you could pull them a little closer, that'd be great. Okay. Would you state your full name, please.

THE WITNESS: Angela Johnson.

108

THE COURT: Okay.

Mr. Stowers?

DIRECT EXAMINATION

BY MR. STOWERS:

Q. Ms. Johnson, I'm going to ask you a few questions about the

Page 93

day of your arrest. Remember the day you were arrested in July of 2000?

A. I do.

Q. Do you recall where you were arrested?

A. I do.

Q. Okay. Can you tell the Court about that?

A. I was at my sister's house in Klemme, Iowa.

Q. Okay. And after you were arrested, were you advised of anything concerning your rights?

A. I was.

Q. And do you remember what they told you at that time?

A. That they would appoint an attorney for me if I couldn't afford one.

Q. Okay. And have you ever heard of something called your Miranda rights?

A. Yeah.

Q. Did they read you your so-called Miranda rights?

A. They did.

Q. Did they tell you, for example, that you had a right to remain silent?

109

A. Right.

Q. Had a right to an attorney?

A. Yeah.

Q. If you couldn't afford one, they'd appoint one to you?

A. Right.

Q. This sound familiar?

A. Yes.

Q. Do you remember when that happened?

A. On July 29, 2000.

Page 94

Q. Okay. And do you remember where that would have occurred, that is, they read you your rights?

A. In Klemme, Iowa.

Q. Okay. And what did you do in response to that advisement of your rights?

A. I said I wanted a lawyer.

Q. Okay. And were you then transported from the Klemme area to somewhere else?

A. To Garner.

Q. Okay. And I don't know where Garner is, but maybe the Court does, but can you give us an idea?

A. Just north of Klemme.

Q. Okay. And in Garner where were you taken if you recall?

A. To the police station.

Q. Okay. Did anybody attempt to question you there?

A. Not there.

110

Q. Okay. And then what happened after you were there at the police station in Garner?

A. They -- I went from the police station to Bill Basler's SUV.

Q. And is this all on the same day or different day?

A. Same day.

Q. Okay. And then what happened when you went to Mr. Basler's SUV?

A. It was -- Bill Basler was driving. I was in the passenger front seat, and Lori Lewis was in the backseat. And they several times asked me several things about my charges, and I just kept repeating I wasn't going to say anything, I just wanted to talk to a lawyer.

Page 95

Q.     Okay.  And where did they take you?

A.     To Benton County.

Q.     And when you got to Benton County, do you remember filling out a booking sheet?

A.     Yes, I do.

Q.     And do you remember putting down there -- there was a place on there I believe or a question that they asked you where there was a question about who your attorney was?  Do you remember that?

A.     Yeah.

Q.     And did you indicate anything at that time about who you considered to be your attorney or who you wanted to be your

111

attorney?

A.     Only because I didn't know anything about Al Willett, I put down Alfredo Parrish.

Q.     All right.  And that'd be the other Al; right?

A.     Right.

Q.     And I believe I've shown you your booking form before, and you've seen that name on there?

A.     Yes, I have.

Q.     Misspelled as it is?

A.     Yes.  I don't think I wrote it.

Q.     And then there was a conversation you had -- I believe it was on the telephone -- with another female that there's a recording of.  Do you remember that?

A.     I'm sure there's several.

Q.     Okay.  Do you remember talking to -- I think was it your sister?

A.     My sister.

Page 96

Q.	Okay.

A.	Holly.

Q.	And complaining to her that you hadn't been given an attorney yet?

A.	Right.

Q.	And that they wouldn't give you one?

A.	Right.

Q.	Okay.

112

MR. STOWERS:  That's all I have.  Thank you.

THE COURT:  Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.	I want to direct your attention to the time that you were in the Benton County Jail and you were having conversations with Mr. McNeese.  In any of the conversations you had with Robert McNeese, did you ever refuse to talk to him and invoke your right to have an attorney present?

MR. STOWERS:  I'm going to object to that, Your Honor, as outside the scope of the direct examination which concerned her invocation of her right to counsel on the day of her arrest.

THE COURT:  Why isn't it outside the scope, Mr. Williams?

MR. WILLIAMS:  Because the scope is whether, in fact, she invoked her right to counsel.  The government's position is whether she invoked her right to counsel is legally significant only if she invoked her right to counsel with regard to any of the conversations with Robert McNeese that's being introduced against her.  The fact that she invoked her right to counsel -- let's assume for sake of the argument that she did when she was

Page 97

first arrested.  The government's position legally -- and we've briefed this issue -- is they're irrelevant unless she invokes her right to counsel when she talks to Robert McNeese.

THE COURT:  Well, then if his whole examination is

113

irrelevant, then you would be beyond the scope of direct to now try to get into an area that you believe is legally relevant.

MR. WILLIAMS:  Only to the extent though, Your Honor, they're talking about the invocation of the right to counsel. Unless the defense wants to stipulate she never invoked her right to counsel in any conversations she had with McNeese, it is irrelevant to the extent the issue we're talking about is when did she invoke her right to counsel and did she invoke her right to counsel.

THE COURT:  Well, there's nothing in the record that she invoked her right to counsel with regard to McNeese, so you don't have a burden to disprove something that hasn't been claimed.

MR. WILLIAMS:  I suppose that's right in a technical sense, but to the extent that she's claiming she invoked her right to counsel ever, I think I have the right within the scope of that to find out if she invoked her right to counsel with regard to Mr. McNeese.

THE COURT:  Mr. Stowers, are you willing to stipulate that she didn't?  There's nothing in the record -- in any record that I know of that she ever did.

MR. STOWERS:  I'm sorry, Your Honor?

THE COURT:  Yeah.

MR. STOWERS:  I think we may be talking about different rights to counsel.  Obviously shortly after her arrest

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 49 of 200

in the next day or so she did invoke her Sixth Amendment right to counsel and was appointed an attorney, Mr. Willett, to represent her throughout the course of these proceedings that had been brought against her by indictment. So there was an invocation of a Sixth Amendment right to counsel.

What we're talking about now is -- what I think is important is that she invoked her Fifth Amendment right to counsel on the date of her being taken into custody and being arrested on the present charges. And so that's the right to counsel that I'd been driving at because I think previously and in the record and the court files shows that she did invoke her Sixth Amendment right to counsel as well. But we've already dealt with that at the Eighth Circuit and with you extensively and may again here in a few minutes.

But I don't think there's anything -- whatever the record is I guess on what happened with regard to her conversations with McNeese and discussions of counsel are either in the letters or in the extensive record we've already made, and I don't think it's our position that she reinvoked her Fifth Amendment right to counsel when she was talking with Mr. McNeese. That's not our position.

THE COURT: Phrase your question again for me, Mr. Williams.

MR. WILLIAMS: I think it was something to the effect of in any of the conversations you had with Robert McNeese, did

you ever refuse to talk to him unless counsel was present, or did you ever tell him that you were not going to talk to him

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 50 of 200

without counsel being present or something to that effect?

THE COURT: Well, I think that's beyond the scope of the direct examination.

BY MR. WILLIAMS:

Q. When you indicated that you invoked your right to counsel when you were first arrested, who did you tell that to?

A. Can you ask me that again? I don't understand.

Q. You were asked during direct examination if on the day of your arrest on July 29, 2000, you indicated after you were advised of your rights that you wanted an attorney. Who did you tell that to?

A. I told everybody.

Q. Okay. Who?

A. Everybody that was there that arrested me: Bill Basler, the trooper that drove me to the police station, the police at the police station, Bill Basler again, and Lori Lewis. I told everybody.

Q. And so your testimony is you repeatedly told people you wanted an attorney.

A. Right, that I wasn't saying anything without talking to an attorney.

Q. You had not contacted Alfredo Parrish by the time that you were in the Benton County Jail; is that right?

116

A. I wouldn't have had time to, no.

Q. So the answer is no?

A. No.

MR. WILLIAMS: I have no further questions, Your Honor.

THE COURT: Thank you, Mr. Williams.
Page 100

Mr. Stowers?

MR. STOWERS: Nothing further.

THE COURT: Thank you. You may step down, Miss Johnson.

THE WITNESS: Thank you.

MR. STOWERS: And that's all the record that we wish to make evidencewise on this question.

THE COURT: Okay. Why don't we hear argument on it now.

MR. STOWERS: Thank you, Your Honor. This situation with -- this confusing situation as I see it with regard to Ms. Johnson's motion to suppress, first let me start with a pleading I don't have in front of me which is the Fifth Amendment motion, the Fifth Amendment motion first.

THE COURT: And what's the docket number of that one?

MR. STOWERS: That docket number is 211 which replaced 210 because of the -- I think we had a problem with the electronic filing on that.

With regard to that motion, our position is that the

117

Fifth Amendment right to counsel which is not offense specific as is the Sixth Amendment right to counsel was invoked by the defendant from the first of her being arrested.

Having invoked her Fifth Amendment right to counsel, the government -- either directly through its named law enforcement agents or its attorneys or its agents who were in its employ or acting at its behest, the government was precluded from reapproaching the defendant or talking to her unless counsel was present. That's our position on that motion. We believe that the evidence shows that she invoked her right to

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 52 of 200

counsel on the date of her arrest and that she was, in fact, reapproached by an agent of the government, i.e., Mr. McNeese, and he was certainly an agent as the government has stipulated as of September the 11th. We believe the evidence shows he was actually an agent at an earlier time from the prior hearing; okay?

THE COURT: But didn't the circuit specifically reject that argument in their holding?

MR. STOWERS: Well, and that goes to one of the other filings that I have which is the interesting way in which the Eighth Circuit addressed that issue. To answer your question this way, you had issued your ruling which the Eighth Circuit, frankly, didn't like the way that you approached the issue and the way that you didn't -- what they characterized as you didn't follow the Moore decision which is the decision that said he's

118

not an agent unless there's explicit instructions to elicit Sixth Amendment testimony that they set forth for when Mr. McNeese was to have become an agent.

I think, of course, the Eighth Circuit's plainly wrong on that. I don't even think it's really -- shouldn't have been a close question, frankly, but they've decided it. We gotta live with that decision, and we will unless and until the Supreme Court clarifies the situation or corrects it. That holding of the Eighth Circuit is a holding on one side of a circuit split at this point on that issue. And, frankly, I just think it's a wrong decision because -- for 25 reasons that I won't get into because we can't reargue that decision to you and expect you to overrule the Eighth Circuit.

But their holding was that basically in your decision
Page 102

when you reached the conclusion that you didn't really need to find that there were defendant-specific instructions and then you went ahead and applied this more expansive test to agency, it was your conclusion as I read your opinion that you did not need to determine whether or not prior to September 11 there were such specific instructions, and so you didn't make that alternative finding of fact of whether or not the evidence showed prior to September 11 Mr. McNeese was, in fact, an agent because there were such instructions.

And so you didn't go there. You just stopped your analysis at what you thought was a factually and legally

119

sufficient determination which was that there was this implied and implicit understanding and arrangement that was adequate to satisfy the Sixth Amendment agency test. That you were overruled on.

Now, the Eighth Circuit admittedly in their decision went beyond that sitting in the role of the appellate court to reach some conclusion in their decision, the first decision being a two-to-one opinion, to say that not only did you apply the wrong legal test but if you had applied the right legal test there was, quote, unquote, no evidence to support that which, of course, is equally problematic because that's not, in fact, what the record showed. There was a good deal of evidence in the record, and you sitting as the trier of fact and the person who heard the witnesses and had the opportunity to observe their demeanor and make findings of credibility, et cetera, were there in the position to make those determinations. It really wasn't a role for the appellate court to go ahead and attempt to do that on their own not having sat through the many days of

Page 103

hearings and had that opportunity.

Our position is that that's your job as the trial court judge to make such findings applying what they say at the Eighth Circuit is the correct legal test which is this defendant-specific instruction test of the Moore case.

And so our request on docket number 208 is for you to go back now and make those findings that you never made before

120

under the Sixth Amendment right to counsel test of agency and find that Mr. McNeese was an agent starting in roughly the middle of August based on the record made under the Moore test and then suppress all evidence obtained thereafter by Mr. McNeese as having been obtained in violation of her Sixth Amendment right to counsel.

We'll get to the complexity of this later because we've now got different indictments superseded and whatnot. But that's what we're asking you to do in number 208, and I think you understand that based on your nodding from behind the bench there.

Now, on number 416 -- I'm sorry, my number is 416, your docket number 211 which is the Fifth Amendment invocation issue, I've stated what the argument is on that, but as to that one, we think it necessary for the Court to evaluate when Mr. McNeese became their agent for Fifth Amendment purposes as well, and there I don't think the test is really any different when he's an agent for Fifth Amendment or Sixth Amendment purposes. I actually think the case law in that regard is probably interchangeable.

I still don't agree, however, with the Eighth Circuit statement in the Moore case and now in the Johnson case of what

Page 104

they characterized as the proper test is.

But in any event, it would be our position that the evidence that they obtained, whether it be prior to September 11

121

when we first believe he became an agent of the government or September 11 and after when the government has conceded he was their agent, that that evidence is not admissible as to any count of the current pending indictment in 01-3046.

And the reason for that is that it doesn't matter if they're the same offenses or different offenses for Fifth Amendment purposes because the Fifth Amendment invocation of counsel is not offense specific. And once invoked, it is invoked and cannot be waived by the defendant in the absence of counsel, and that's what the case law says.

Now, I think in anticipation of what they're going to say -- I think they're going to come back to Illinois versus Perkins which is a case from the U.S. Supreme Court, and all that Illinois versus Perkins really holds is that in the jailhouse setting it is not necessary for the government through its surreptitiously planted informant -- in that case I think an officer posing as an inmate -- to re-Mirandize the person who might be their cellmate or fellow inmate. They don't have to re-Mirandize them. In other words, that person doesn't have to read them their Miranda rights before they talk to them.

Well, that's fine. That's not what we're arguing. What we're saying is she was already Mirandized by an agent of the state. They can't then turn around and tap some other person on the shoulder and say, Well, she told me I've got -- she told me I want counsel, but I'm going to send you in there,

122

Page 105

Mr. McNeese, and you can go in and do what I can't do. Doesn't work that way. They can't do that. And that's what the case law teaches us. And they can't do it overtly through an officer in a uniform with a badge and a gun going in and talking to her, Mirandizing her first or not, and they can't do it covertly through somebody else. And that's what the Fifth Amendment case law holds.

Now, docket number 209 deals with what I think is a very interesting situation. And, of course, the determination on each one of these motions is potentially impacted and potentially impacts the other in terms of how the Court will wind up ruling. Obviously if the Fifth Amendment issue is resolved in our favor, then the Court doesn't have to go into, for example, docket 209 because the evidence would be suppressed as to all counts that remain in this case.

But if we're not successful on that motion and then we're into then docket number 209 which is -- I think this is where we are in the Eighth Circuit opinions. We had a first indictment, the '00 indictment which has now been dismissed by the government a week or so ago on their motion because of the second superseding indictment in 01-3046. I think where we are, though, is is that the first appellate ruling of the Eighth Circuit on the Sixth Amendment question which addressed the first indictment and the evidence's admissibility on the first indictment would still be applicable to the last two counts of

123

the second superseding indictment which is currently pending and set for trial in 01-3046.

Page 106

And in that situation we're in this odd scenario where the evidence which has been suppressed which is all statements of the defendant after September 11 of 2000 made to McNeese and all writings including the maps and all fruits thereof which would include the remains of five human beings are suppressed and inadmissible as to Counts 11 and 12 of the second superseding indictment assuming that those counts in their present form are the same offenses as were charged in the first indictment.

So the first suppression order that you issued, that is, that all evidence post-September 11, 2000, is out, that first part of your ruling which was upheld on appeal because the government didn't even challenge it would be a valid ruling and be binding in subsequent proceedings in this case.

Now, the question arises then, they've consolidated through this second superseding indictment those last two counts and put them together with what were the original counts of the second indictment as to which the Eighth Circuit said the evidence was not suppressed.

So where does that leave us? Well, I think it leaves us in a position where the evidence that's admissible is not admissible in a joint trial of those counts together. In other words, if all 12 counts of the second superseding indictment are

124

to be tried together, you can't admit the evidence that has been suppressed by virtue of the first ruling.

That's a long way of saying probably what you had already concluded in your own mind I was trying to say a long time ago. But in any event, the evidence would not be admissible in a joint trial.

Page 107

Now, the theoretical issue arises as to whether or not the Court could issue some type of a limiting instruction which would tell the jury you can only consider all that stuff of September 11 and after in considering the first ten counts of the second superseding indictment. But you can't consider it as to the last two counts, the solicitation and the Title 18 conspiracy counts.

I don't know of any law which would allow that to occur when you have a suppression on Sixth Amendment grounds as we have here. What we have here is about as clear of a Sixth Amendment violation as you can have at least as far as September 11 onward goes as to the first indictment's counts, and the evidence has been suppressed. It's gone through the appellate process. It's still suppressed. And there's no procedure I can find in any case law where evidence suppressed on constitutional grounds can be admitted on some counts but not others in a joint trial.

So I don't think we can get there. But assuming theoretically that this concept is one that the government is

125

going to foist upon the Court and they've gotta be thinking of it, I think where we are is we may be into a situation -- I hate to say this -- but where we may be into the situation where the Court's required to sever Counts 11 and 12 and set them, frankly, for separate trial if the government -- if the Court deems it possible to give such a limiting instruction.

Our position is that any limiting instruction which told a jury of 12 people that, you know, you've just heard about the defendant making all these statements to Mr. McNeese after September 11, you've seen these maps she drew, you know that

Page 108

they then went and dug up five human remains, you've heard the autopsy evidence, you've seen the autopsy photos, but I'm going to tell you don't consider any of that when you're thinking about whether or not Ms. Johnson is guilty on Counts 11 or 12, you can't give that any consideration on those counts, I think sometimes in the law it's recognized in the jurisprudence that sometimes a limiting instruction just ain't good enough, and this would be one of those situations.

And so it's our position at this point as long as all 12 counts are presently joined that it is not possible to use the suppressed evidence on the trial of the second superseding indictment in 01-3046.

THE COURT: Now, you haven't actually moved to sever yet, have you?

MR. STOWERS: No, because our position right now is

126

that we would just prefer that that evidence be excluded. I don't mean to be cute about it, but maybe that is a cute answer. But the reality is I think our position is we didn't ask to join them. They came back and joined them. Our position is you can't legally join them and use the evidence, and that was an election they made when they joined them.

Now, if they don't like the outcome of this, then they can come back to the Court as we've urged them to do before and move to sever them. But they have avoided getting into the severance problem by trying to come back with a superseding indictment. And one of the complaints that we had a long time ago with the way the so-called second suppression issue and the issue in the second indictment was being presented was that the government never did come in and ask the Court to sever the

Page 109

first and second indictments. It just wanted rulings on what the law would be if they were tried separately.

And frankly, the second decision out of the Eighth Circuit when it's read carefully talks about the fact that the evidence that was suppressed as to the first indictment would still be suppressed. Then they go on to say that if there were a trial of the second indictment it could be used in that trial almost as if there were to be two separate trials. And that's the posture in which the case was addressed by the Eighth Circuit despite the fact that those two indictments were joined for a single trial at that point, admittedly as a matter of

127

convenience I think at the time.

But I don't think the second opinion of the Eighth Circuit, frankly, even goes to the issue we now have which is whether or not it's admissible now that the two indictments essentially have been joined in this matter.

And so I don't think the second opinion really bears on that at all because the second opinion presupposed that the second indictment and the counts of the second indictment would be prosecuted separately before a separate jury. And they never addressed this particular issue. So this is one that you've got all to yourself at least for now.

I think we raised a number of other issues that I'm not going to argue about here that concern, frankly, the way that the Eighth Circuit has interpreted the Cobb case I think again wrongly. It continues to be our position -- and this second superseding indictment is really the best evidence of that fact -- that the Cobb case suppresses this evidence from this single prosecution, and I know that the government has had

Page 110

two separate indictments. Now we've got one indictment.

And I think under the Cobb case when you have a single consolidated prosecution as opposed to that scenario of Cobb where you had a separate burglary prosecution, defendant's released, and then you rearrest on a murder and you're going to prosecute the defendant separately on a murder, the Cobb case recognized in that case what was important is is that you had

128

separate prosecutions, you didn't have a single prosecution.

And in this case you have a single prosecution of a defendant now in black and white in the second superseding indictment, a single prosecution, a single coordinated prosecution, not a prosecution that was conjured up as a means to avoid suppression. And we think the evidence is out from this trial at this point on this state of the record and the state of the second superseding indictment.

THE COURT: Thank you, Mr. Stowers.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. I guess the government's position we've set forth in our responses to the defendant's briefs, and largely it's this. The Eighth Circuit has ruled on all this already. They've ruled on the Eighth Circuit arg -- on the Fifth Amendment argument already. They've ruled on the suppression issue already. To the extent that we have superseded the indictment, this is different from the first indictment. What is now Counts 11 and 12 are not identical to the counts that were pending against this defendant at the time of the first indictment, at the time that she provided information to McNeese that was the subject of the motion to suppress.

Page 111

HEARING 5, 12-20-04

We have excised from -- I'm sorry, Count 11 is identical, and that has to do with the solicitation of people over in Woodbury County to go out and kill additional witnesses,

129

nothing to do with the murders. Has nothing to do with the murders. There's no evidence involved there about the murders. What it has to do with is a whole different crime of soliciting the murders of additional witnesses.

And so none of the evidence that was suppressed in the first indictment would ever have been introduced against the defendant to prove that crime.

With regard to Count 12 which was the conspiracy to murder witnesses and tamper with witnesses, the government excised from what is now Count 12 any reference to any of the crimes that had anything to do with the murder. The original count which was 7 in the first indictment alleged among the crimes that she conspired to commit the murders of people in 1993. Count 12 doesn't have any of that in there.

So again, none of the evidence having anything to do with McNeese has anything to do with what now exists on Count 12. Count 12 is now limited to nothing but the post-1996 activity of Johnson and Honken engaging in a drug conspiracy and attempting to intimidate and kill additional witnesses, not the original five that were killed in 1993.

So to that extent I don't think that on this last argument that the evidence needs to be suppressed. There's nothing that we're going to be introducing that has anything to do with those last two counts. They're just different counts, completely different crimes.

130

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 63 of 200

It's analogous -- I guess you would say if we were proceeding only on Counts 1 through 10 on the second superseding indictment and we didn't have 11 and 12, we would be arguing 11 and 12 come in as 404(b) evidence to show that she continued to engage in plots to kill people and, therefore, if the jury's trying to figure out what's in her mind back when she was dealing with Honken, they can take that into account to consider that. The evidence would be admissible for that purpose, and in this case the only difference is we've actually charged her with those crimes as opposed to bringing it in simply as 404(b) evidence.

As to the issue about wanting to supplement the record about the Fifth Amendment invocation of counsel, just briefly, again, I think the Eighth Circuit's already ruled that she didn't have Fifth Amendment rights at the time.

But the defense is asking -- they're saying they want you to make a factual finding, but in reality what they're wanting you to do is make a legal finding because even the defense has stated that based on the record made they want you to find something.

Well, what they want you to find based on the record, based on the facts that you had and the Eighth Circuit had that they want you to make a legal finding that the -- McNeese received the equivalent of instructions at some time prior to September 11. That's a legal conclusion from the record as

131

made, and so there isn't really a factual finding. It's a legal conclusion to be reached from those facts, a legal conclusion that the Eighth Circuit was able to make based on the record

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 64 of 200

that the defendant is not contesting exists at this point.

So we don't think the record needs to be supplemented and this Court needs to make any other findings, and we think these have been ruled on or obviated as moot, frankly, because of the superseding indictment.

THE COURT: Mr. Stowers, any response?

MR. STOWERS: Well, I think the government I guess is taking the position that Count 12 is not the same as what was Count 7 in the prior indictment because of the changes in the allegations that were made to that count. There will be a motion filed that will address the significance of that, but since the end date for that count is in 1998 and that count would be subject to a 5-year statute of limitations, then it would seem that that count is subject to dismissal on statute of limitations grounds which might address that problem.

But as to Count 11 which is the solicitation count, the argument I guess is that the suppressed evidence is not relevant on Counts 11 or 12; and, therefore, I guess the fact that it's suppressed would not impact on anything. I'm not sure I understand the argument.

But the issue of the remedy of suppression isn't whether the evidence that's been suppressed would be, you know,

132

relevant or admissible. It's whether or not the evidence has been suppressed, and it's been suppressed as to those counts, and there was no limitation on the scope of the suppression, that it was suppressed as to only the first five counts of the first indictment or anything of that nature. It was suppressed as to all the charges in the first indictment. And so the government is wrong about that in that respect.

Page 114

Beyond that, I think to the extent the government continues to argue these things were addressed by the Eighth Circuit, in fact, the Eighth Circuit opinion did not address this Fifth Amendment issue and whether or not the defendant had invoked her Fifth Amendment such that they had to go through or that they could only approach her again with counsel present. The Eighth Circuit did not address that issue.

What -- they for whatever reason addressed this as a question of whether or not she needed to be Mirandized which, of course, we had never argued that the Eighth Circuit should overturn Illinois versus Perkins which is a Supreme Court case, so I don't know what their discussion was on that. But it was not responsive to the issue, and we think this issue remains pending.

And then with regard to the second opinion of the Eighth Circuit again, the Eighth Circuit said the evidence that was suppressed on the first indictment could be admitted on the second indictment, but the way it was decided was such that they

133

were presuming clearly in that opinion that the second indictment would be tried separately which, in fact, wasn't the case at the time, but that's what they were saying in their ruling which is really the ruling that the government requested, and then the government came back now, and they've combined the two indictments.

So I don't know what to say about that other than the fact that this issue has not been decided by the circuit yet which is whether or not the suppressed evidence would be admissible at a joint trial which we tried to get the Eighth Circuit to address, but they wouldn't address it. They wanted

to deal with it that way, and that's the way they dealt with it. So it left us in the state where this issue was unresolved and apparently was sent back so that you could address it. Thank you.

THE COURT: Thank you, Mr. Stowers.

Mr. Williams?

MR. WILLIAMS: I have nothing further to add, Your Honor.

THE COURT: Okay. The only motion I think we have left is your request for a copy of the transcript from United States versus Honken.

MR. WILLETT: Your Honor?

THE COURT: I assume the government has no resistance to that.

134

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: That motion is granted.

MR. WILLETT: Thank you, Judge.

THE COURT: I'm not sure about the timing of it, but we can work that out.

MR. WILLETT: We'll take it as Miss Semmler can produce it.

THE COURT: And I think you requested everything, all trial testimony, opening statements, and closing arguments.

MR. WILLETT: That's correct, Your Honor.

THE COURT: Okay. Now, there are some motions that have been filed since the scheduling of this hearing that I'm not sure if the government's actually resisted yet, and that was in paragraph 3 -- that's in paragraph 3(a)(1) of my agenda. Does the government want to proceed with argument on those

Page 116

motions, or do you want to defer?

MR. WILLIAMS: If I could defer, Your Honor, number 1 on the first motion, the motion to strike the death penalty discussion -- and I think what they're saying there is any discussion about what happened in the Honken case -- I don't think we're largely going to be objecting to that, but I'd like to have some time to respond to that, and I think I can get a response on file by the end of this week.

With regard to the other issue which is the motion in limine regarding -- I'm sorry. I guess that's the second

135

motion. Their first motion is a motion to strike the death penalty which has to do with prohibiting us from seeking the death penalty against Johnson as to the three adults because the jury in the Honken case did not impose the death penalty as to those three victims, I would actually ask, if we could, to have a week -- I don't have my calendar with me, whatever the Friday is two weeks from now to respond to that because that's something I want to run by capital crimes unit out in Washington, get their response to it, find out what they suggest our response ought to be, and we may or may not have an objection to that issue as well.

So I think those are actually -- the second one will probably -- in my best estimate would go away anyway, and the first one I don't know. I just don't know.

THE COURT: And you'd like two weeks from this coming Friday?

MR. WILLIAMS: Yes, if I could, Your Honor.

THE COURT: Any objection from the defense?

MR. WILLETT: No objection.

Page 117

MR. STOWERS: No, I had already agreed with that to Mr. Williams.

MR. WILLIAMS: I should have mentioned that. I spoke with Mr. Stowers on the phone with that issue, and he didn't have any objection.

THE COURT: You'll have two weeks from that Friday,

136

whenever that will be.

MR. WILLETT: January 7, Your Honor, 2005.

THE COURT: January 7, 2005, okay.

Now, are you in a position to tell me if you're going to be filing other pretrial motions and give me a heads-up or not?

MR. STOWERS: I can tell you that, number one, we will, and number two --

THE COURT: You can't tell me; right?

MR. STOWERS: No, I can't. I can't tell you. I can't tell you.

THE COURT: Okay. But I'll find out by January 7; right? Is that the deadline?

MR. STOWERS: Yes.

MR. WILLETT: Yes, Your Honor.

THE COURT: Okay. Do you know how many other motions you're going to be filing?

MR. STOWERS: There's going to be -- it's probably going to get into the double digits, but they aren't going to be --

THE COURT: Double digits?

MR. STOWERS: -- what I would consider to be more than -- at this point more than argument-type motions. There

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 69 of 200

wouldn't be anything that there would be any evidence. They're just going to be primarily what I would call more interesting

137

legal issues and some evidentiary questions for you to ponder.

THE COURT: Are they going to be phrased, do you think, as Rule 104 motions?

MR. STOWERS: There will be some motions in limine on issues that we either identified during the Honken trial or that we're identifying as we go through the materials in preparation for testimony at our trial.

And then one of the motions that I would anticipate us making would relate to the manner in which the case proceeds and whether or not the trial should be trifurcated or bifurcated which is -- gets into some technical death penalty issues that Mr. Berrigan I think knows best about. I think it has to do with separating really what's generally considered to be the penalty phase from -- into two phases, if you will.

THE COURT: Right. I've read about trifurcation, so I'm sure I'm not as up to speed as Mr. Berrigan is on it, but I have an understanding of the concept.

MR. STOWERS: And there will be some other motions relating to the second superseding indictment that -- some of those are going to be reiterations of prior motions that there have been prior rulings on, but we want to have the same rulings apply to the second superseding indictment. Government may very well agree with those things, bills of particulars and things like that. And then some of them will relate to the form of the second superseding indictment as well as the timing of it in

138

Page 119

relation to the statute of limitations.

THE COURT: Are you aware of the local rule that requires you to file a brief with the motion?

MR. STOWERS: Right.

THE COURT: Okay.

MR. STOWERS: And that's why they actually aren't filed now because there's a series of motions that have been drafted, but they're needing briefing, and that's what we're going to be doing.

THE COURT: And when do you respond to their double digit motions?

MR. WILLIAMS: I'm not sure. I think there is a deadline already set out in the scheduling order for that. I'm just not sure what that is.

THE COURT: But I'm not sure -- well, I'm sure of this. I'm sure I wasn't contemplating double-digit motions in the second round.

MR. WILLIAMS: I wasn't either.

THE COURT: And I was fairly confident you weren't either. So you need to take a look at how realistic that deadline is in light of what the defense suggested in terms of the sheer number of motions, and then you may want to wait until you receive those motions before you move for an extension. But I would look with favor upon granting an extension because it isn't exactly what I had contemplated. I thought it was going

139

to be one or two motions left over that they couldn't quite get to, not double-digit motions all of which I think would have been filed on some previous deadline but for whatever reason

Page 120

weren't. But, you know, I've given you till January 7, so you'll have till January 7.

So . . .

MR. WILLIAMS: Very good.

THE COURT: Okay.

MR. WILLIAMS: We will probably have maybe two additional motions in limine or I guess you'd call them something, but I don't think they're going to be controversial at all.

One is we filed a motion in Honken regarding the ability of the family members to be present during portions of the guilt phase even though they would testify during the penalty phase. We're going to file a similar motion here on this case. And I haven't had a chance yet to talk to defense counsel. They might not have a dispute with that.

And then again just to flesh out to make sure we don't have an issue, I'm going to file a motion like we did in Honken concerning the admissibility of the audio tapes that we had enhanced just to make sure there isn't some dispute that because we enhanced them somehow we don't have valid foundation for them or something along those lines. And if we need to get into that, we can do a preliminary hearing of some sort to lay the

140

foundation for the enhancement.

THE COURT: Okay. Now, there are a couple other matters that I've listed on the agenda and then I think one that you raised by the e-mail sent by your administrative assistant on 12-15, 2004, at 1:55 p.m. that indicates everybody got a copy of it, and that would be -- we've already talked about the jury questionnaire, but the defense was supposed to notify the

Page 121

government in writing of its intention to present expert testimony concerning the mental state of Miss Johnson. That deadline was 12-13, and the government has not received anything from the defense regarding that.

MR. WILLIAMS: That's changed as of today. I was handed a notice by the defense that listed their three experts. And I'm contemplating -- and I think maybe the best way to handle this is, frankly, for me to discuss this issue with defense counsel and propose maybe some deadlines that we would ask the Court to impose in this case. They've advised me that they have three experts, all of whom are going to be testifying at the penalty phase, that no, quote, unquote, testing has been done of the defendant as of yet, although some interviewing has been done.

I don't have any reports. I'm not sure what the timing on when they think they're going to get their -- they're contemplating doing some testing. I'm not sure when they contemplate that testing is going to take place, but this

141

creates, as you know, a whole number of issues about reciprocal rights of the government to have the defendant tested and so forth.

So my suggestion would be that I sit down with the defense, that we come up with some proposed realistic deadlines for them to get -- if they're going to have her tested, have her tested and get the report to us, to give us an opportunity to argue to you that we have a right to have her tested ourselves.

THE COURT: Yeah, there's some kind of weighty issues floating around there --

MR. WILLIAMS: Right.

Page 122

THE COURT: -- that may or may not arise depending on what you can agree to and what you can't. So I'd just encourage the parties to make your best efforts to try and agree. And if you can't, then get me involved as soon as possible to kind of resolve those, because I don't want this -- nor do the lawyers I'm sure on both sides want this to sidetrack the trial.

MR. WILLIAMS: And what I would propose, Your Honor, is that we try to get together by the end of this week with a proposed outline of deadlines and what we agree and don't agree can happen, and to the extent that there's any pending dispute about that that the parties have that briefed as well by the January 7 deadline so we can take that up at the next evidentiary or motions hearing that we have.

THE COURT: Okay.

142

Now, there are a few remaining matters that I have on my agenda, and why don't we address those. We had this problem that arose right before closing arguments I believe on the merits phase in Honken about the use of your demonstrative exhibit. Does the defense know what I'm talking about?

MR. BERRIGAN: Yes, Your Honor.

THE COURT: Okay. And one of the reasons I ruled the way I did was the time constraints that I had to think about it, and so you shouldn't assume that I would rule the same way, although I might with more time to think about it. So I think that's something that needs to be raised.

There was some discussion but not with these lawyers but with the Honken lawyers about alternative ways that it could have been done that might have alleviated the problem.

And so, for example, one suggestion -- I don't

Page 123

remember who suggested it, but it was kind of a postmortem of what happened on that issue after it went to the jury -- would be that, for example, a court official could take a photograph of each witness immediately after they testify probably right in the witness box depending on which courtroom we're in in which city in which district, and then that could go in a notebook. And then if everybody agreed, then the jurors would have that notebook to take back so that they would have a photograph with the name underneath it of every witness who testified in the trial. I guess we could do that for the merits phase. We could

143

also do it for the penalty phase, although there probably aren't as many witnesses there, but certainly whatever the parties agree, we could do that. So that's just a suggestion.

And that can -- doesn't necessarily mean you can't use your chart either. It's not necessarily an and/or thing. But we need to flesh it out before the last minute. So I assume the parties can put that on their agenda of things to talk about among themselves. Do you have any preliminary reaction, Mr. Berrigan?

MR. BERRIGAN: My reaction is much the same as the Honken team when they saw the chart, Your Honor. I happened to be here that morning, and my recollection is that there was a large board.

THE COURT: Several.

MR. BERRIGAN: Yes, sir, with a series --

THE COURT: Were there two or three, Mr. Miller?

MR. MILLER: I believe there were three.

THE COURT: Three.

MR. BERRIGAN: They had a bunch of eight-by-ten

Page 124

photographs of all of the government witnesses, and my recollection is the Honken team thought that was prejudicial, and the suggestion by having a board such as that with all of the witnesses that that's the amount of evidence, if you will, against Mr. Honken. Some of those witnesses were fairly inconsequential, and the board was going to be left up in front

144

of the jury during the closing argument. At least that was my understanding from sitting in the audience, that while Mr. Miller was arguing he'd go to the board, pick off a photograph, and show it to the jurors while the board's in front of them and then go back and put it back and pick up another one, but the board stayed there. And that was really their complaint, and that would be ours as well.

We, frankly, have no problem with the jurors being reminded of who the witnesses are in terms of their appearance if that's necessary, and some people think it is over the course of a long trial. But it was the manner in which it was contemplated being done. And it seemed to me, frankly, that it didn't need to -- the government didn't need to have the boards up in front of the jury. It didn't seem to hamper Mr. Miller's presentation which I thought was excellent, and he was able to give his closing argument merely by going over to the board which was not in view of the jury, taking the photograph he wanted, and bringing it over. And I would not have any problem with that, again, if they chose to proceed in that fashion.

It's not clear to me what the government intends to do with those boards, whether they want them in front of the jury as they initially contemplated in Mr. Honken's case or not. We've not discussed that, frankly. But I don't think you'll

Page 125

have any more ingenious arguments than have already been presented to you by the Honken team regarding the boards.

145

We'd obviously want access to them ourselves if the government was going to use them. And I don't think the Honken team was familiar enough with the photographs to be able to use those which was somewhat of a disadvantage.

THE COURT: I'm not sure you actually -- absent agreement from the government you have any right to use their demonstrative exhibits.

MR. BERRIGAN: Well, I guess that would be a contention --

THE COURT: Right.

MR. BERRIGAN: -- we would raise is that if they are going to be used that both parties have access to them so that they're equally available, for example. That's all.

MR. WILLIAMS: And we wouldn't have any objection to the defense using our demonstratives, so we'll agree to that. That's not a problem.

THE COURT: You wouldn't mind if they put up all three boards during their closing argument.

MR. WILLIAMS: No, not at all. And what I'm hearing from the defense is, jeez, that's so argumentative to put those boards up. Of course it is. It's closing argument, and I think the government has a right to present the evidence in whatever way we think is most persuasive to the jury. And if part of that is look at the number of witnesses who testified against this defendant, we have the right to present that in any way we

146

Page 126

think is the most persuasive manner to the jury.

And so our argument's going to be we should be able to put them on the boards and we should have them up in front of the jury during the closing argument.

And so I appreciate the Court raising this issue early on. It was going to be a motion, 104 motion, that I was going to raise until I saw it on your agenda. But if you'd like -- and maybe this would be appropriate -- is for us to go ahead and brief this a little bit so we can at least flesh out what we think our rights are.

THE COURT: Sure. Why don't you file a formal motion and brief on it.

MR. WILLETT: Judge, if I may?

THE COURT: Yes.

MR. WILLETT: I think our concern arises from what Mr. Williams just said which is look at the number of witnesses who testified against Dustin Honken. This Court knows as well as anybody else that it's not the quantity of witnesses, it's the quality of their testimony and whether it carries the burden of proof.

THE COURT: Well, that's what I say in the jury instruction, but that doesn't mean that the government can't argue the number of witnesses. I don't know that there's a prohibition -- matter of fact, it would be hard for me to imagine that there is a prohibition that would prevent you from

147

arguing the number of witnesses that testified.

MR. WILLIAMS: And I think your instruction says it's not necessarily the number of witnesses --

THE COURT: Yes.

MR. WILLIAMS: -- but the quality of them. And I think the number of witnesses is absolutely part of the proof the government has. If I've got ten witnesses to the bank robbery, then I have clearly a stronger case than if I have two. And so the number of witnesses is quite necessarily part of the weight of the government's case.

THE COURT: You have a stronger case depending upon the quality of what the witnesses testify to.

MR. WILLIAMS: Certainly that's what the defense has a right to raise is that their quality was crappy. But I have the right to say, Well, all ten of them were crappy, but I got ten people, all of whom saw something, you know. So I think it's both parts, and that's what closing argument's all about, so I think the parties ought to have free rein to use the demonstrative exhibits as they see fit.

THE COURT: Well, we'll take it up in your motions.

MR. WILLIAMS: Very good.

THE COURT: Residual doubt, there's no reason for me to rule on that now because, Mr. Williams, you indicated in an informal conversation with Mr. Berrigan present that you weren't going to be able to take an interlocutory appeal from my ruling

148

if I allowed residual doubt as a mitigation instruction; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. So I'm not going to do anything on residual doubt until jury instructions. But, you know, it's obvious that if I instructed on it in Honken I'm probably going to instruct on it in Johnson.

MR. WILLIAMS: Yeah. We're going to assume you're
Page 128

going to instruct on it. We'll be prepared for that. Thank you.

THE COURT: Okay. Now, the jury selection procedure, is there any value in talking any more about that now?

MR. BERRIGAN: I don't think there's much value, Your Honor, because as you made it very clear and I think we could all agree, the venue will largely determine in our view whether we can do group voir dire or not. I think when we were discussing that, at least I was anticipating not being in this venue, and I agree that -- I think Mr. Miller mentioned it -- that if we are in this venue we're going to need to do individual voir dire. I don't know how we could do groups and actually do that very effectively without the danger of tainting the entire group by encouraging jurors to give information about what they know about the case in that kind of a setting.

So unfortunately -- and I don't say this -- obviously the Court's going to make its decision about the voir dire one

149

way or the other, but I do think that severely impacts our ability to do group voir dire.

THE COURT: Well, I don't disagree with that, but I think you could do a combination.

MR. BERRIGAN: Sure.

THE COURT: You could do some group voir dire, but probably on pretrial publicity, that would have to be individual questioning.

MR. BERRIGAN: Yes, sir, and I guess my -- I haven't analyzed this, frankly. My thought is certainly our time savings aren't going to be as great if we're doing individual on pretrial publicity and then group on death penalty questioning,

Page 129

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 80 of 200

but you're right. We could absolutely do that, and maybe it's better than doing individual death penalty as well. I guess my preference would be we wait and see where we are and then address that with the Court. We've all discussed it at some length, and I think we're more or less on the same page perhaps about how the process is going to go.

THE COURT: Well, setting aside for now the question of whether it will be individual questioning like we did in Honken or more panel questioning with some individual questioning, is there any agreement on either the first proposal or the second proposal that I floated to the lawyers about the overall process of jury selection in terms of exercising peremptory challenges?

150

MR. WILLIAMS: I think the government's position is that, you know, we will obviously live with whichever way the Court goes. We prefer the last proposal the Court had, and that is we have the five-strike kind of safety valve, if you will, at the end. Clearly the Court has full discretion to set up whatever procedure it wants to. We can live with that. As trial lawyers obviously we are a little antsy about striking as you go, but at the same time we can handle it, and we don't have an objection to it if that's the way we're going to go.

THE COURT: But you found preferable the second proposal which was you exercise 15 strikes on the fly for lack of a better word and then you'll have 5 reserved for bringing the jurors back at the end.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: And you don't object to doing it that way.

MR. WILLIAMS: That's correct.

Page 130

THE COURT: Okay. What about the defense?

MR. BERRIGAN: Nor do we, Your Honor. And I see no reason to repeat the long colloquy we had about this the other day informally. But we were happy with the Court's first suggestion that we do them on the fly after we had contemplated how that would work. And it should save us some time. So if the --

THE COURT: Do you have any problem with the second suggestion?

151

MR. BERRIGAN: No, not really. It's sort of a hybrid between the way it was done earlier in Mr. Honken's case and your initial proposal, but we're fine with that if you choose that method.

THE COURT: I actually feel a little bit -- having never done it that way, I feel a little bit more comfortable doing it pursuant to my second proposal where each side would have five peremptory challenges left when we bring all of the jurors back, but we have to bring back substantially less jurors doing it that way.

MR. BERRIGAN: We're fine, Your Honor, and again, this has been alluded to. Mr. Stowers didn't specifically mention it -- and maybe I should -- that there may very well be a motion for additional peremptory challenges depending on the Court's choice for venue, and how that would factor in I suppose is something to be considered if the Court entertained it and if it were granted. But other than that, we're satisfied with either of the two proposals that the Court has initiated.

THE COURT: Okay. Well, right now I plan on proceeding along the second proposal which would be that after

Page 131

we finish challenges for cause on the jurors then the parties would have a right to exercise a peremptory challenge using their first 15 peremptory challenges that way, and we would kind of alternate. The government would go first; the defense would go first (sic) and see who exercises their peremptory

152

challenges.

And then when we arrived at enough jurors -- I think my number was 34, but I threw in 6 extra for things that might go wrong between when we finish the individual or panel questioning and when we did the final day, so we'd bring back about 40 -- a total of 40 jurors which would be -- we would then need to qualify -- I think in Honken we qualified 78, 77, right around there. So -- and we averaged I think about 4.5 jurors a day or 5 jurors a day, something like that.

So there would be a substantial savings -- of course, that assumes everything else being equal which it won't be. But there should be a substantial savings in time. And there will be a substantial savings in time just picking -- how ever we do it, picking 40 jurors rather than 76 or 78 jurors. There's going to be a substantial savings of time that way.

On the question of whether or not I would grant additional peremptory challenges, I'd want that briefed because Mr. Williams has raised some opposition to that. I'm fairly confident I would have discretion to do it, but I'm not a hundred percent sure. I'm confident I would in a nondeath penalty case because the circuit has indicated that.

Matter of fact, the case that was so favorable to the government on the change of venue, United States versus -- I think it's Blom; it's just one "o" -- indicated that that was

Page 132

one of the options available to the trial court. And I think in

153

that case Judge Tunheim actually did grant extra peremptory challenges to the defense. So I'm open to the possibility. And if you file that motion, I'll take a hard look at it.

Why don't -- can we take a ten-minute recess and then come back and talk about the scope of voir dire, because I'm a little bit uncomfortable that that is still rather amorphous?

MR. WILLIAMS: Your Honor, if I could just touch one more thing on the jury selection procedure, the defense has asked for -- and we don't have an objection to -- alternating who starts off the questioning of the jurors. But we think consistent with that then there ought to be a change-off in who initiates the first strikes in the case. In other words, typically the government always exercises their strikes first, then the defense does.

THE COURT: No. We would alternate. I thought I already indicated I'd do that.

MR. WILLIAMS: And you had. And then I want to take it one step further. And that is at the last five, I wasn't sure where the Court was going to go with how we were going to exercise those last five strikes. And we don't mind starting, but we think it ought to be strike, strike, strike.

THE COURT: One, one, one. With five I don't have a problem with five passes because that will go very quickly.

MR. WILLIAMS: It should go fairly quickly. That's all I had. Thank you.

154

Page 133

THE COURT: Why don't we take a -- why don't we come back at ten after three and wrap it up with the scope of voir dire which I think is no easy task either. Thank you.

(Recess at 2:56 p.m.)

THE COURT: Please be seated. You want to make a brief record on the anonymous jury issue agreement?

MR. WILLIAMS: Yes, Your Honor, assuming we don't have any press. Yeah, okay. The government withdraws the motion for an anonymous jury with the understanding what we agreed to back in chambers, and that is we're going to have what you'd call an innominate jury, and that is one where they will -- the jurors will still be referred to and will wear numbers in the courtroom, but counsel and counsel only will know the actual names and addresses of the jurors.

And under those circumstances the government believes the concerns we had that gave rise to the motion for an anonymous jury can be taken care of through that situation. So given that, we don't have a need for an anonymous jury as such.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We're opposed to innominate jury. It's ironic that we aren't concerned as much as the defense thinks we should be about trying the case here for publicity purposes, but we are concerned that the newspaper people are going to hound the jurors, so we're going to assign numbers to them to prevent that from happening when, in fact, that's never happened in the

155

history of the country as far as I'm aware, and I challenge the government -- we noted in our brief --

THE COURT: Oh, I've read cases where the press has contacted jurors mid trial.

Page 134

MR. BERRIGAN: We have not.

THE COURT: I have. Now, they were state cases.

MR. BERRIGAN: Well, as far as we know, when that's happened, it's been willing communication by the juror with the media. We see that all the time unfortunately.

THE COURT: I've seen it the other way where the press actually contacted jurors and do interviews --

MR. BERRIGAN: I'll stand corrected if the Court's had that experience. I have not.

THE COURT: I just read the case last week actually.

MR. BERRIGAN: And given the case that you're talking about, Your Honor, my argument would be that is extremely rare.

THE COURT: I would agree with that. It is rare.

MR. BERRIGAN: Certainly I've never had that experience, and we haven't been using these innominate jurors all that often in cases that have gotten a lot of publicity. Frankly, I don't think the newspaper people are interested in violating the court order if there is an order in place not to bother these people.

But we've discussed this at length, and I don't think we need to prolong it. The main objection is that whatever the

156

Court says to these jurors about numbers the defense firmly believes that there are going to be some jurors who believe that a portion of the reasoning has to do with security issues; that is, that they're being identified by number because there's some danger in them being identified by name and that there's a danger that they might be found out in terms of where they live or where they work and that there might be some personal danger to themselves.

Page 135

I know the Court doesn't intend for that to happen and is going to say something to them about the purpose of this innominate juror system and having numbers having nothing to do with security, but this is something merely to prevent them being harassed by the press.

Nonetheless, we don't think the Court can prevent some group of maybe 20 people who are going to sit there at the end of the day, some of those folks are going to think this is a security problem, and that obviously inures to the detriment of Miss Johnson, not the government because it's not the government that's putting them in jeopardy. They're worried about the defendant who, by the way, is charged with killing five people who are alleged to be witnesses in a drug conspiracy, at least some of them. So it's not without reason that they would think that in this particular case that they're in jeopardy.

And so, frankly, we see no reason for it, no need for it. To the extent that the Court is concerned about the jurors

157

being contacted, then the Court could certainly advise them as to appropriate steps to take if that occurred that we could then take measures to ensure that it not go any further, and that would be our preference.

THE COURT: And, Mr. Berrigan, it's not just contact by the media, but if the names of the jurors were made public through the use of the media, I do believe that it dramatically increases the likelihood of busy bodies and whackos contacting potential jurors; it has absolutely nothing to do with Angela Johnson but that there are a lot of people out there who take an interest in cases, an unusual interest in cases, and if they saw the name of a juror would feel free to call them up and give

Page 136

them their two cents' worth, and that's really what I'm trying to avoid.

It's not so much the press doing it because I think they're fairly responsible, but I think if they had access to the names, they might feel compelled to print it, and then it's just -- you know, anybody in the community that knows that person would then say, Oh, they're on this jury; even if we do it in Minneapolis, Oh, they're on this first death penalty trial in Minnesota in -- you know, in Iowa it's 41 years. I don't know how many years it'd be in Minnesota; I'm going to call them up and give them a piece of my mind pro or con.

MR. BERRIGAN: The only thing I could say about that, Your Honor, is if it occurred we could certainly sequester the

158

jurors in response or as an alternative.

THE COURT: You know, that's a much -- you know how --

MR. BERRIGAN: I'd agree.

THE COURT: For a trial of this length --

MR. BERRIGAN: We are required by statute to sequester jurors in capital cases in Missouri. We do it all the time. I think it creates more problems, frankly, by doing it. So I don't suggest that that would be my first choice. But at least if we could use their last names -- I mean, if the fellow's name is Williams, for example, I don't see why me asking Mr. Williams really causes any identification problems assuming that the questionnaire's not available or the list of the actual names with the full names is not available to the media. Then we could talk to these folks just like we would anybody else, Mr. Jones, Mrs. Smith.

THE COURT: Yeah, it's fine with Jones and Smith and

Page 137

Williams and, if it were in Minneapolis, Johnson and Johannsen and Swenson, but if you say Mr. Braunschweiger from Osseo, Minnesota, what's the odds there aren't too many Braunschweigers in Osseo? You know, Smith and Johannsen, that's fine. But we probably won't have all jurors with common names.

MR. BERRIGAN: I understand, Your Honor, and I do understand the Court's concern truly. I just think that it's exaggerated, frankly. I think this is extremely rare, and I don't know why it would occur in this particular case. Maybe if

159

we were in New York City, but I doubt the jurors here in Iowa are going to be called by their fellow citizens about the case. I don't envision that happening. And your wanting to take a precaution to prevent it, I understand the reasoning. We think that has a detrimental effect to Miss Johnson which I don't think we can do anything about that, frankly. There's no cure for that the Court can impose.

THE COURT: Well, I think there is when I tell them in open court that the parties have their names or that the lawyers have the names. They're not going to infer anything sinister about that and that the reason why I'm doing it is to protect them from the curiosity seekers and whackos that populate the world by contacting them.

MR. BERRIGAN: Well, we do appreciate that.

THE COURT: Well, it's true. I wouldn't be telling them anything that isn't true. That's my motivation for doing it.

MR. BERRIGAN: I think we've made our position clear. We respect the Court's views. And if we are to take this route, certainly we can do that.

Page 138

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 89 of 200

THE COURT: Just so we make a thorough record on it, while you're objecting to it, I believe you prefer it to me granting the government's motion for an anonymous jury which I wasn't saying that I was necessarily going to do that.

MR. BERRIGAN: Oh, no.

160

THE COURT: It is a lesser evil.

MR. BERRIGAN: Right. No, the record should be clear we understand the government is withdrawing that motion because of some informal discussions we had off the record before this hearing started, that the Court was inclined to use this innominate jury, and that's why the government withdrew the motion. We're clear on that. We would have objected to the government's motion had they kept it, but we're objecting to this process as well.

I don't want to suggest that this is by agreement. We understand the Court's concern, and we can abide by whatever decision's made. It's certainly preferable, absolutely, to the government's request, Your Honor, which we thought was wholly unfounded that might have been appropriate for Mr. Honken. It is not for Miss Johnson. But certainly we don't think Miss Johnson's any different, frankly, than anybody else that might come into trial in this courtroom that there's no need --

THE COURT: Well, she's charged with a little more serious offenses than most defendants I see.

MR. BERRIGAN: Right, all the more reason that her constitutional rights should be upheld, and that's -- the constitutional right includes, as the Court well knows, a Sixth Amendment right to a fair and impartial jury, and that's the right that we think is best advanced if we can treat these

Page 139

jurors just like any other jurors as opposed to calling them by

161

numbers.

THE COURT: But would you agree with me that the Eighth Circuit gives wide discretion to use the innominate jury system?

MR. BERRIGAN: Yes, absolutely this is within the Court's discretion. That's not my argument, Your Honor. Right. You bet.

THE COURT: Okay. Thank you. Getting back to the scope of voir dire, we had a lengthy discussion informally with Mr. Berrigan and Mr. Miller and Mr. Williams last Thursday. And I just want to know if you've given it any more thought. And it comes down to whether or not I should allow so-called case-specific questions and, if so, where to draw the line on case-specific questions and the difference between case-specific questions and so-called stake-out or commitment questions. And I don't think there's really much agreement between the two sides on it so . . .

MR. WILLIAMS: Well, Your Honor, I guess the government's position is this. We don't have an objection to voir dire questions that alert the jury to facts of this case with a couple caveats.

One is that it's clear that when we do it we're not giving them all the facts of the case. So, for example, if I say, Well, Miss Juror, if you hear in this case that two children were killed that it's understood that this is just one

162

of many facts that they're going to have and there's going to be

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 91 of 200

mitigating facts, there's going to be aggravating facts, and I'm just alerting them to a couple facts, and I think that's going to be clear from the context of the question, and I'm not saying you have to preface every question with "I'm just giving you some facts."

And the other caveat is that the end question can never be, Now knowing that fact, are you going to vote for whatever, or will you always vote for whatever, whether it's life or death? That is a stake-out question. That's trying to precommit the witness on -- or the juror on only part of the facts that are going to be available to that juror, and I think it's inappropriate to try to get a prior committal from them on that.

We have no objection to telling them facts of the case and trying to get their views on how do you think that might affect your ability to make a decision in this case or now that I've told you that, what do you think of that, and what do you think that has on your impact on the view of the death penalty? I don't have problems with open-ended questions like that.

What I do object to is any attempt to commit the juror based on only one or several facts instead of all the facts of the case. And I think that gives -- and I don't think we have to take that position.

I mean, the government could take a very hardball

163

position here and say, We don't think any facts ought to come out, that this ought to all be completely based on your theoretical concept of the theoretical death penalty case, and you're not entitled to know any facts of the case. And I think the case law would support my position in that case if we took

Page 141

that position. Personally I just don't think that's probably the fairest way of doing it. I think it gives the defense a better defense and the government a better opportunity to pick a fair jury in this case.

THE COURT: Well, it's a two-way street I think. I don't think this is a pro-defense view to allow fact-specific questions. I think it helps the government too.

MR. WILLIAMS: I think it can help both. I think it's more helpful to the defense than it is to the government, but I think it helps both ways. And bottom line, I mean, the government's interest in this case is get a jury that's actually going to uphold their oath and be able to consider both punishments. And so to the extent that to get facts out there to really push their views on the death penalty to get that response to let us all make a good judgment call on this, I think it's the appropriate way to go even though legally I don't know that it's required.

And so we don't have an objection. We would draw the line, though, when there's an attempt to commit that juror on how they're going to vote based on only part of the facts.

164

THE COURT: Mr. Berrigan?

MR. BERRIGAN: I'm not sure we're as far apart perhaps as the Court thinks.

THE COURT: Well, I'll tell you why I think we are a little bit.

MR. BERRIGAN: Yes, sir.

THE COURT: I think we were on the same wave length until you gave me an example of a couple of questions that you would like to ask which were great questions, but they were
Page 142

clearly what I consider stake-out commitment questions. And I'm intrigued by the notion that your juror questionnaire you've now decided you need to ask open-ended questions and you don't like the Honken questionnaire because they were so specific with the multiple choice, but now if I let you ask case-specific questions which I'm fairly confident I don't have to even let you ask but if I let you ask those, you have to ask a commitment question, or maybe I'm misinterpreting what you said.

MR. BERRIGAN: It's a process, Your Honor. I mean, the initial questioning might very well be open ended. But once the jurors start responding, I think with any trial lawyer we have a sense of kind of where this is going. And we need to get to that place at some point, and the best way is to start asking leading questions.

Now, it's hard really to describe this without having an actual jury pool here. But what I mentioned the other day,

165

if some juror answers preliminarily, Well, Mr. Berrigan I've got two little girls myself, and I can't imagine something as horrible as them being killed, any case involving children I'm going to give the death penalty, blah, blah, blah, I --

THE COURT: Let me ask you there, why wouldn't you just challenge for cause and stop?

MR. BERRIGAN: Well, I think that there's more to it. They have to say, I wouldn't be able to consider alternative punishments, I mean, life imprisonment, for example. This standard works both ways, and the article that you gave to us -- I think all the parties received -- regarding Selecting Capital Jurors Uncommonly Willing to Condemn a Man to Die points out that the case law's been used more to the advantage of the

Page 143

prosecution in allowing case-specific questions than the defense, and I certainly wouldn't argue with that. Prosecutors commonly get up and say, Well, there might be this mitigating circumstance or that presented. You know, would that enable you to be unable to render the death penalty? I mean, it advantages both sides to be able to find jurors that can follow the law which includes consideration of aggravating and mitigating circumstances both.

And so I do think the parties are entitled -- I understand there's some case law to the contrary. But it's very much a debatable issue if the question is -- which it is and does the person hold views that would make them -- prevent them

166

or substantially impair the ability to follow the law. How can you make that determination without asking them about mitigating and aggravating circumstances? Lockett versus Ohio requires jurors to consider mitigating circumstances in a realistic way. They have to give weight to mitigating circumstances.

So our position would be how could you find out if somebody was willing to do that without asking them about mitigating circumstances? They could do the same thing with aggravating circumstances. I understand the Court's problem is more the manner of the questioning, and I don't know how three and a half months from trial I can say, Well, this is the question I'm going to ask of Juror Number 17 or this is the question I'd ask of Juror Number 71.

When it happens if the government thinks it's inappropriate or the Court, I'm sure I'll be called on the carpet at that time and somebody will say that's a stake-out question and I'll have to deal with that, Your Honor. I

Page 144

understand your concern. And I'm going to be governed by it during the course of the voir dire.

But it is not a process, frankly, as we discussed the other day where you merely ask jurors can you consider both punishments fairly. It just doesn't work that way because the response is always going to be yes whenever the question --

THE COURT: Well, the response isn't always yes.

MR. BERRIGAN: Well, mostly in my experience it's yes.

167

THE COURT: Well, you have much more experience than either I or Mr. Williams or Mr. Miller in death penalty cases. We've each had one, but our experience was quite to the contrary. We had a lot of jurors say, No, I couldn't fairly consider the death penalty or, No, I couldn't fairly consider life imprisonment.

MR. BERRIGAN: Well, I understood that was frequently coupled with the fact that the question involved the killing of two children as opposed to this sort of amorphous concept about life penalty and the death penalty in very general terms without talking about any fact-specific questions. There is a difference between somebody's views about the death penalty generally and perhaps their views about the death penalty involving the deaths of two children who are --

THE COURT: Yes, so don't -- let me try and get one thing straight. Setting aside the moment of -- setting aside for the moment the stake-out question issue and the commitment issue and let's say that I don't allow any stake-out or commitment questions, don't you think you're better off and we're more likely to get a fairer jury by me allowing both sides, which would include your side, to ask case-specific

Page 145

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 96 of 200

questions based on case-specific facts even if I required you to ask it in a nonleading way? Or are you worse off? Would you rather just not have any case-specific questions?

MR. BERRIGAN: No, I can't imagine that we'd be better

168

off if there were no case-specific questions because I think more than half the jurors are going to be sitting there wondering why when the opening statements start nobody said anything about two children being killed because their answers might have been very, very different. And we're all concerned about that. I think the Court's acknowledged that we need to talk about case-specific questions. But I don't know why they're, you know, mutually exclusive.

I mean, if the Court has a problem with the manner of the questioning, it seems to me that's something we take up during the questioning that, Berrigan, you're asking these questions, and I think you're staking out the jury. Fine. Ask it a different way or don't ask any more questions. I can deal with that. It happens all the time.

But to try to settle it at this point, I don't know how to satisfy your concerns. I can't commit to asking these open-ended questions as a defense attorney picking a jury for a woman who's on trial for her life because I don't think that works.

Now, if you're going to require it of me, fine. You know, I'll make a record, and we'll move on. But I can't agree to it ahead of time. I don't think it works. And I don't think you're going to be as concerned about this process as you are now once it starts.

THE COURT: I think I'm going to be more concerned
Page 146

only because you're so skilled.

MR. BERRIGAN: It isn't -- my view is this is an adversarial process including the voir dire. I think I made that clear informally because it is.

THE COURT: But, Mr. Berrigan, I firmly believe that even though at least in the Tenth Circuit fact-specific questions -- you have no right to ask a fact-specific question, I firmly believe that in order to fairly pick a jury you have to be able to ask fact-specific questions.

But I'm concerned about this stake-out and commitment issue, and there is no case I know of that has allowed that type of questioning when there's been an objection to it. And I've read the McVeigh case very closely. And I've read -- you know, there's that long string cite in McVeigh about stake-out questions. I've read every one of those cases, and I've read every one of those cases that they've cited in those cases. I read some law review articles. I mean, I've done a lot of work trying to think this through. It's not something I'm taking lightly at all.

MR. BERRIGAN: No, sir. It's clear to me you're not. But the purpose of voir dire in my view is to not only seat qualified jurors which we all want to do, but we also have to be able to intelligently exercise our peremptory challenges. And in order to do either one of those things, we have to get honest, forthright, complete responses from the jurors.

And as I mentioned to you the other day informally, I

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 98 of 200

believe that there are a large group of people, a large percentage of the population, that favors the death penalty, and I think that despite the fact that Iowa doesn't have the death penalty there are a lot of folks I suspect in Iowa that have strong feelings about it. They are not, at least in my experience in doing this work, as forthcoming about their feelings about the death penalty as those people who have problems or scruples with the death penalty. The people who have death scruples, they're raising their hand; they don't want to sit in judgment of somebody who's on trial for her life. They want to get out of jury service, and they are going to very quickly identify themselves as such. And they're easy pickings, if you will, for lack of a better term for the prosecution.

The people who favor the death penalty, this is their opportunity to put their thoughts and opinions in action. They can sit on this jury and make a determination about whether or not this woman should live or die. And sometimes it's difficult to get their true feelings about that because they think -- in some cases rightly so -- that if we knew their true feelings they wouldn't be qualified jurors. They would give the death penalty in every case involving children absolutely.

But they're going to learn that if they come right out and say that they're not going to be able to sit on this panel, and so they don't initially give out that information quite

171

readily, and it takes some skill and some questioning for me to at least give you the information that you need to make a decision about whether the juror's qualified to serve. The juror may very well stick with their position, hey, I could be fair; sure, I think killing anybody that kills children's the

Page 148

great thing, and I could do it myself, and when can we, you know, pull the trigger, but they'll say, But, you know, I could consider life. Well, the Court has to make that determination as to whether he or she stays or goes. But I need to be able to question that person in order for you to make, it seems to me, an intelligent decision about that.

THE COURT: Well, why do you think you would get more information by using a commitment or stake-out question than by an open-ended question?

MR. BERRIGAN: Well, because the open-ended question allows the juror sort of the easy out. They can always come up with the typical response which is, Oh, I'm sure I could consider both punishments. That's what they say all the time. But when they're asked really in a little more detail, Well, what about children, what about two children, what if I told you they're two little girls and they're six and eight years old and all of a sudden -- well, maybe not all of a sudden but they're thinking about that more and more revealing, well, if you tell me they're two children and they're six and eight years old, forget about it. But it takes a series of questions --

172

THE COURT: It does, but actually in the example you just used, you asked only open-ended questions.

MR. BERRIGAN: Well, see, that's why I don't think you should be worried. I maybe used a bad example the other day. I wish I hadn't. But it's very much -- you know, Mr. Williams doesn't want his hands tied in closing argument about whether he gets the ability to argue the deterrence of the death penalty. I feel the same way about voir dire. Based on an informal discussion off the record, I'm on the carpet about how this is

Page 149

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 100 of 200

going to be conducted, and I haven't done one yet.

THE COURT: No, you're not --

MR. BERRIGAN: So I'd just like a chance to do it and see what happens.

THE COURT: You're misunderstanding my questions. You're not on the carpet. I mean, you are physically on the carpet. You're standing on a carpet, but I'm just trying to get a dialogue going.

MR. BERRIGAN: Well, I could send some transcripts, Your Honor, if that would help you because we certainly have plenty of them. We've had very little success with these cases at the trial level, and they all have had appeals in one form or another, so there's a lot of transcripts of Berrigan doing voir dire in these cases out there, and I'd be happy to -- if you wanted me to to give that to you and Mr. Williams.

THE COURT: I'd be interested in seeing how you do it.

173

MR. BERRIGAN: Okay. Great.

THE COURT: Well, but I'm not sure you could -- well, that's probably a bad idea because it probably isn't -- you probably don't want to show Mr. Williams, and I don't want to receive it ex parte.

MR. WILLIAMS: I already have them.

MR. BERRIGAN: Yeah, so there you go.

THE COURT: Should have figured.

MR. BERRIGAN: And he's not provided you with one specific example from those transcripts where he thinks I'm over the line apparently, so I take some comfort in that, and I hope the Court would as well.

THE COURT: Well, let me ask you this. Should we

Page 150

question the premise about this ban on stake-out and commitment questions?

MR. BERRIGAN: No, sir. I think it's just a matter of what you think is a stake-out question or a commitment question. This vote, for example, I do think that's appropriate under most circumstances, and I typically don't use that word because I think that's just like a red flag stake-out question, so I think that probably is a bad idea. I mean, the law says, Could you consider, could you consider, and I sometimes use the word "realistically consider."

THE COURT: And I used -- when I asked questions, I just kind of locked on to this phrase "fairly consider" because

174

I don't think it's enough to just consider it. I think you have to be able to fairly consider it, and I think there's a huge difference. You can consider something where you already have your mind made up. Yeah, I considered it; it's rejected. I don't think that's fair consideration. And I'm not tied to the word "fairly." There are other words that could be used. But I thought that was a good kind of question when I asked the jurors, and maybe coming from me it seemed to work. When I asked them could they fairly consider both penalties, I got a lot of people who said no both ways, both ways.

So I guess it's -- you're telling me it's kind of like pornography. I'm going to know it when I see it when you ask the stake-out question?

MR. BERRIGAN: Yes, sir. I suspect that's true.

THE COURT: Well, you didn't bite on my opportunity to say maybe we should challenge the fundamental assumption that stake-out questions are bad.

Page 151

MR. BERRIGAN: Well, I think it depends on, again, I mean, the definition of a stake-out question. The specific example used was by Mr. Williams, you know, would you vote this way, and I do think that's largely inappropriate in most circumstances. And I typically don't ask that question.

But if you thought, for example, well, would you realistically consider a sentence other than the death penalty, Mr. Jones, if you thought that was a stake-out question, that's

175

a stake-out question. I mean, I think that's a very flexible definition, if you will, and I think it's flexible because it's different really for each juror. Sometimes it's going to be very clear to you, Your Honor, Mr. Williams as well and I that a juror's feelings are different than what he's telling us, that they've given a response maybe to Mr. Williams that's wholly different than the response I'm getting and vice versa. It happens.

THE COURT: We had that happen a lot.

MR. BERRIGAN: Right, exactly.

THE COURT: And it was totally different from their questionnaire answer.

MR. BERRIGAN: Exactly, and then at the end of the day you have to make a call on that. But we each need to be able to kind of explore from our respective opposite positions the juror's views that we're concerned about. Mr. Williams is concerned there's going to be jurors up there that can't realistically consider a sentence of death, that no matter what they're saying that's not really what they're thinking, and I have exactly the opposite concern. And we both need some latitude to explore that.

Page 152

THE COURT: Is that a stake-out question in your view, can you realistically consider a penalty other than death?

MR. WILLIAMS: I don't think so. I don't think I have that big of a problem with the way that's phrased, but I have a

176

problem with his leading questions that say, you know, based on this one fact I'm going to give you, isn't it true you would always vote for death under those circumstances? That to me is a commitment on one fact, and that's -- I think there's a big distinction in my view between that and given this one fact now does that impact your ability to realistically consider any other option other than death. That's much less a concern to me, and I don't know that that's necessarily a stake-out question at that point that I would be objecting to.

MR. BERRIGAN: I very seldom, if ever, ask always vote, Your Honor, because in my experience they won't fess up to that. If you ask them a question as always, the answer's always going to be no. Nobody would always do anything.

THE COURT: You need to be more subtle than that.

MR. BERRIGAN: That's exactly right, sure.

THE COURT: Okay. Well, this discussion is helpful. What else do we need to take up?

MR. WILLIAMS: Nothing on behalf of the United States, Your Honor.

MR. STOWERS: I think you have in here that you were interested in possibly getting a date for another hearing on the motions that are filed by the 7th of January. Maybe we could discuss that.

THE COURT: That depends a little bit upon how much time Mr. Williams is going to need. So why don't we wait and

Page 153

see. How will we know how much time you're going to need? How'd we leave that?

MR. WILLIAMS: By the 7th -- as soon as I get their motions and their briefs in support of the motions, I think I can get to the Court by the next day and let you know -- I'll let Jen know and let the defense know how long I think I'm going to need.

THE COURT: Okay. Then we'll set a hearing for a short period of time after that.

MR. WILLIAMS: And maybe I can just do that by e-mail to Jen suggesting how long I think I might need? I'll copy obviously the defense on it and go from there.

THE COURT: Sure.

MR. STOWERS: And I'm hoping to file several of those motions by the end of this week, so that will give the government more time than just dumping all them by the 7th.

THE COURT: Right. The 7th is the outside deadline. Doesn't mean you have to wait till the 7th.

MR. STOWERS: Right, and I'm aware of that, and a lot of the motions relate to the latest indictment. They aren't like new -- or they aren't old issues. They're more new ones. And a lot of them are just technical things so . . .

THE COURT: Now, do you think it'd be helpful to informally sit down and go over the questionnaires back in chambers? Or are you all anxious to hit the road?

MR. WILLIAMS: Well, two things. I'm anxious to hit the road, but I also don't think it'd be terribly productive at

this point until we get a little bit firmer version of what we think we're going to be using at this point. I do want the Court's input into it. I just think it wouldn't be terribly productive at this point given that we've not even had a chance to fully discuss the two versions.

THE COURT: Do you have copies of your various proposals that you can at least leave with me?

MR. BERRIGAN: I can have one e-mailed to the Court right away, Your Honor.

THE COURT: That's fine. Actually I've got so many sentencings and a big summary judgment hearing to get ready for tomorrow I wouldn't have time to look at it.

MR. BERRIGAN: The defense would like to talk to the Court ex parte about --

THE COURT: CJA stuff?

MR. BERRIGAN: Right, before the end of the day.

MR. WILLIAMS: The only other matter that would be pending, Judge, is we talked off the record about the trial date and just -- we have no objection to a continuance to starting in April. We have no objection, I don't think, to starting jury selection in March and then taking a week off. We can go either way. We'd just ask that the Court ultimately rule on that as soon as you can so that we can start to do our planning along

179

those lines.

THE COURT: Sure.

MR. WILLETT: Your Honor, I've spoken with Miss Johnson since our conversation this morning, and she understands the reasons for a continuance, and she's not offended by those reasons.

Page 155

THE COURT: It's fine if she says no.

MR. WILLETT: She's not objecting, Your Honor. She understands.

THE COURT: Well, I appreciate that.

MR. WILLETT: So the Court shouldn't be concerned. Miss Johnson understands, and she doesn't object. And if she did, she'd tell me.

THE COURT: Thank you. Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: On this matter of the trial date starting, Your Honor, based on our discussion last week, we really thought it would be April 4. I've talked to some expert witnesses about that already, not to suggest we can't change them back. But I did want to make it clear that not only we're not opposed to that but we could use the extra two weeks to prepare. Obviously we could always use extra time, so it would be our preference that we start in April actually, although we certainly will be ready to start in March if you decide to go forward.

180

THE COURT: And you're basically opposed to starting jury selection in March and the trial in April.

MR. BERRIGAN: We are, Your Honor, and I understand exactly what you're talking about. There's going to be a delay anyway, but it just seems to me it's just exacerbated by a week and people sitting around.

THE COURT: Yeah, it's not without problems. Yeah. But I'll let you know on that real quickly so that everybody can plan.

Let me ask you this. Including the trial date, would

it be a problem if I let you know the first week in January, or do you need to know before then?

MR. WILLIAMS: No, that'd be fine.

THE COURT: Okay. Because I think I'm going to be able to rule on everything by then. I'm really troubled by this change of venue issue, troubled in the sense that I'm not sure I know what to do. I'm just trying to be honest with you. I'm not sure I know what to do. But I have to rule on it, so I have to figure out what to do. But I'll tell you, the most I could do would be to say we'll proceed with jury questionnaires and then reevaluate it after we get the questionnaires back. I mean, I'm not prepared to say this case is not going out of district under any circumstance. I'm not prepared to say that. And whether I say I'm going to transfer it out of district or we're going to proceed at least with jury questionnaires either

181

in Sioux City, Cedar Rapids, or both and then take a look at it, I just don't know. I just don't know. But I will have to decide that quickly because you need to know. But then, on the other hand, you don't have your questionnaires done either. When do you think you'll have questionnaires ready to go?

MR. WILLIAMS: You know, frankly, I would hope we'd have a draft of it by the end of this week. My intent is to get ahold of one or more of the defense counsel first thing in the morning tomorrow, whoever's in charge of this, and start hashing this out and try to get a version together that works. I don't think we're that far away from getting one.

THE COURT: Is it going to be longer or shorter than the Honken questionnaire, do you think?

MR. BERRIGAN: Frankly, I don't remember, Your Honor,

Page 157

but it's probably close.

THE COURT: 31 pages, 90-some questions.

MR. BERRIGAN: Oh, no, shorter than that.

MR. WILLIAMS: Yeah. It's marginally shorter but not a whole lot. In the end I think about the same number.

THE COURT: The other thing I'd like you to do because you may overlook it, I don't recall if I incorporated my cover letter into the questionnaire itself or if I sent a separate cover letter with it. But the questionnaire went out with something from me.

MR. WILLIAMS: And I'll have to go back and take a

182

look at that, Judge. I'm not sure.

THE COURT: You can actually stop in the clerk's office and ask them, and they can make copies for you. But I want input from the parties about what I should be telling the jurors.

MR. BERRIGAN: We submitted that in our proposal, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: It's a two-page kind of cover sheet, if you will, that instructs the jurors about the questionnaire.

THE COURT: But I actually put it on my letterhead as I recall and sent it. I may be wrong about that. I thought I did.

MR. WILLIAMS: I think that's correct, Your Honor.

THE COURT: And I think there was some of each. I think there was something in the questionnaire as a preface, but I also sent a cover letter, and I obviously want everybody to sign off on that because I'm communicating with potential

Page 158

jurors. I don't want to say anything that the parties don't agree to; okay?

MR. WILLIAMS: Very good.

THE COURT: Okay. Thank you. We'll be in recess.

I wasn't clear whether you wanted to supplement the record on jury -- on change of venue with other media information than the print media.

183

MR. STOWERS: We researched what it would take to actually do a historical look back with the television and the radio people to determine what broadcasts had been made, and the information we got back was that it's not really readily or easily determinable unless you know a particular broadcast to look for like if you knew on this date they had a big story and this and that. If you go back, they can pull that from archives, but otherwise they're generally not researchable without physically going through hundreds of hours of tape, so that material is not available in any kind of a way that we can gather. So we aren't asking for that, and that's why we haven't presented it. It's out there, but --

THE COURT: There's no readily ascertainable way to get it.

MR. STOWERS: Yeah, there is no service like a clipping service that monitors the TV station in this area that I know of, so it's not something we're going to be able to present.

MR. BERRIGAN: And I may have misspoke. There is a company in Kansas City that does just that, Your Honor. They monitor all the news broadcasts. They keep them, and then they charge exorbitant rates to get the clips later on, so you can do

Page 159

it.  It's very expensive.  I misspoke if -- I didn't mean to mislead you.

THE COURT:  Okay.  Thank you.
(The foregoing hearing was concluded at 3:48 p.m.)

184

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    2-26-06
                                            Date

INDEX

WITNESS:                                              PAGE:

ANGELA JOHNSON
        MR. STOWERS                                    108
        MR. WILLIAMS                                   112

* * * * *

Page 160

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                          Transcript of
                                    Phone Hearing

   vs.

ANGELA JANE JOHNSON,                          TO BE FILED
                                   UNDER SEAL
       Defendant.
                           /

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, January 18, 2005, commencing at 9:29 a.m.

APPEARANCES:

For the Plaintiff:        JUDITH WHETSTINE, ESQ.
                          C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

For the Defendant:        DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

For Dustin Honken:        ALFREDO PARRISH, ESQ.
                          Parrish, Kruidenier, Moss, Dunn
                            Boles, Gribble & Cook
                          2910 Grand Avenue
                          Des Moines, IA  50312

Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 112 of 200

THE COURT: Okay. Thank you. This is United States versus Angela Johnson, 2001-3046. We're here on a motion to produce proffer and polygraph of Dustin Honken filed by the Johnson defense team. I have my court reporter here.

And, first of all, Mr. Stowers, I was a little bit taken aback that you didn't file your motion under seal. You seem to be the one so concerned about pretrial publicity. This would have been a good idea to file it under seal.

MS. WHETSTINE: Well, Your Honor -- oh, I'm sorry.

MR. PARRISH: This is Alfredo Parrish.

THE COURT: Well, I'm talking to Mr. Stowers.

MR. PARRISH: Oh, okay, Judge.

THE COURT: Mr. Stowers, why didn't you file your motion under seal?

MR. STOWERS: Well, I don't think it needed to be, Your Honor. I guess we thought about it, but I don't believe that it needed to be. I don't think it's prejudicial to our position.

THE COURT: Well, I disagree, and I went ahead and sealed it a few minutes ago. I realize you're unhappy with my ruling on the change of venue, but I'm not going to let you generate publicity to try and affect my ultimate decision in the case. So I went ahead and sealed it. If you want to appeal my order sealing it, please do.

Okay. Now, Mr. Parrish, what did you want to say?

4

MR. PARRISH: Yeah, Judge. I didn't know he had filed this as a public document. It really jeopardizes my client's safety. I didn't realize -- I appreciate the Court sealing it,

Page 2

but I'm just shocked that happened.

THE COURT: Well, I agree with you, but it is sealed now, and I've solved the problem. If anybody wants it unsealed, they can file a motion to reconsider or appeal my order sealing it, but I think to me there are obvious reasons why it should be sealed.

Let's move on. And, Mr. Parrish, let me ask you this. Do you have an objection to me ordering it turned over as long as I don't see it?

MR. PARRISH: Well, it depends, Judge, on the protective order that is required of these defense lawyers for Johnson. Our concern is that when we did establish this matter, we had made commitments to our client that no one would see it, and the government had made those commitments to us. That was the arrangement that we made it under.

THE COURT: Well, I appreciate that that's the arrangement that you made. You wouldn't suggest, though, that I'm bound by that agreement. And that's one question. And secondly, if you were in Mr. Stowers' shoes, I think you'd be making the same argument asking for it.

MR. PARRISH: There is no dispute, Judge, if I was in Mr. Stowers' shoes I would be making the same argument for it.

5

However, I think that's the basis of the conflict now. The government made an agreement with us they would not disclose it to anyone. We made that commitment to Mr. Honken, and those are the circumstances it was made. But I don't disagree with the Court that our position would be very much like that of Mr. Stowers.

THE COURT: Do you think I have really any choice but

to turn it over to the defense?

MR. PARRISH: I do, Your Honor. I think there is a choice. I think the choice is because you're still hearing the additional motions both by Mr. Honken and getting ready to try this case based on our representation, it's our thought that at least an independent arbiter -- I don't know if that's the correct word -- or a separate judge should take a look at the document, make a determination if there is something of value for Mr. Stowers and his team, and, if they decide it's not, let the document remain sealed and not distribute it to anyone.

THE COURT: Let me ask Mr. Stowers. Do you object to that procedure?

MR. STOWERS: Well, I guess the parties in the Johnson case I think are in agreement that the material would be exculpatory or mitigating, at least in some respects with respect to the penalty aspect in her case or at least that that would be a reasonable argument for us to make based on the material which we haven't seen but which I have a fair

6

understanding of what would be in there. And as a result of that, I don't think there's really a dispute between the parties on that question that would require the Court to review the matter in camera if there were. I understand Mr. Parrish may want to have the Court do that. I don't know that that's his argument to make, and I would suggest it isn't.

THE COURT: Well, why do you -- I don't understand what you mean when you say you suggest it isn't his argument to make.

MR. STOWERS: Well, it's not his argument to make that the material either is or is not exculpatory. It's his argument

Page 4

to make that his client has some interest in seeing it not --

THE COURT:  Yeah, he wasn't taking a position on whether it was exculpatory or not I don't think.  I think he was suggesting if that was an issue in the case that some other judge other than myself should make that decision.

MR. STOWERS:  Oh.  Well, with regard to that, I don't have any problem with the magistrate, for example, Judge Zoss, doing that if that's necessary.  I just don't think it's necessary because I don't think that's an issue between the parties.  I think the parties are in agreement that it is discoverable under the --

THE COURT:  Miss Whetstine, are you saying that in your professional opinion you have an obligation to turn the material over to the Johnson defense team?

7

MS. WHETSTINE: Yes.

THE COURT:  Well, here's kind of the problem that I see looking down the road.  It's kind of a timing problem.  I understand why the Honken defense does not want me to see it.  And believe me, I have no interest in seeing it.  Well, I'm curious.  I'm curious, but other than that, I have no interest in seeing it.  And I don't feel I have any need to see it.

The problem is that it's kind of a multi-faceted problem, and I will try and lay it out for you.  Given the length of time that the briefing in the Honken post-trial motions is taking -- and I'm not being critical of anybody for that -- it's going to push a decision on the Honken pretrial -- post-trial motions, excuse me, you know, either right before the Johnson trial starts or very early in the Johnson trial I would probably be ready to rule.  And I don't really want to rule on

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 116 of 200

Honken's post-trial motions regardless of how I rule and generate publicity for the Johnson case.

If I could rule -- if I could have ruled on everything back in January, some time had passed, and then we could have questioned the jurors in their questionnaires about any post-trial ruling on Honken and how that might affect them if they even knew about it, that's one thing. But now the questionnaires are out. We're going to have a timing problem. And I was thinking I would probably hold my decision in Honken, whatever it is that I'm going to rule, until after the Johnson

8

verdict.

So then it becomes a problem in terms of the defense in Honken doesn't want me to see anything in the proffer agreement. And like I said, while I'm very curious about it, I have no need to see it, but it may come out in the trial in Johnson before I rule on Honken. But I don't see any way around that other than ruling, you know, quickly in Honken. But I'm not sure I want to do that.

So that's the dilemma that I see. I mean, when I say it's the dilemma, that's the dilemma from the Honken defense team. I can honestly say that no matter what he said in the proffer that's not going to affect my ruling on the post-trial motions. But I understand why the defense would be concerned that it could.

MR. PARRISH: Right, Your Honor. Could I add one other point, Judge?

THE COURT: Sure.

MR. PARRISH: The other issue Miss Whetstine and Leon and I discussed a couple of days ago was whether or not there

might be redaction issues involved. And I understand Mr. Stowers' argument that they're entitled to the document. But I think there might be some redaction issues that could come into play that a judge would need to decide on. I don't agree they're entitled to, you know, the entire document a la carte.

THE COURT: Okay. Why don't we hear -- Miss

9

Whetstine, do you have anything to add?

MR. WILLIAMS: Judge, this is C.J. Williams, and I'm just becoming a little concerned that as we go down this argument I'm going to be exposed to potentially something I'm not supposed to be exposed to. I know nothing about the proffer, nothing about the agreement, and I'd like to keep it that way. So with the Court's permission, I'm thinking it might be a good idea for me to step out. You all can have a little bit more candid conversation than maybe you could have or should have with me present.

THE COURT: That's fine. The only reason I had you included in the call was because the motion was served on you and not on -- no courtesy copy that I could tell was served on the Honken defense team, and it actually mentions in the motion that there were discussions with you and Miss Whetstine in paragraph 3. So I figured you knew that this was in the works even though you didn't know what the nature of the proffer was and that because Honken's defense team didn't want me to know about it you wouldn't learn any more than I would in this hearing.

MR. WILLIAMS: That's fine. I'm just -- and maybe I was premature in speaking up. I just was a little concerned that if we start getting into whether there is or isn't stuff

Page 7

that should be redacted that the danger could raise it. But Judy's telling me that it's okay to go forward, so I'll just be

10

quiet.

THE COURT: Okay. But, you know, feel free to jump in if you think you need to because I understand --

MR. PARRISH: That's going to be hard for you to do, C.J., keep quiet.

THE COURT: That's hard for all of us. But I understand, C.J., your concern.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: So, Miss Whetstine, where does that leave us?

MS. WHETSTINE: Thank you, Your Honor. I had suggested to the Honken defense team that perhaps they might want to review any of the proffer material first with proposed redactions, and they said -- they declined. Just out of an abundance of caution, my preference would be to just disclose the entire proffer material to the Johnson defense team. If there is some argument that the Honken defense team has that a portion should not be disclosed, then obviously that would need to be handled in an in camera matter -- manner. But my preference would be merely to have the court, whichever court, rule on the issue of disclosure and that the disclosure be a complete disclosure.

THE COURT: Well, here's what I was contemplating doing. I would issue an order saying it has to be disclosed, and you can't really -- in my view you can't disclose it to the

11

Page 8

Johnson defense team without also disclosing it to Mr. Williams. That's my view. But the order would also say that Mr. Williams and the U.S. Attorney's Office and the United States government is barred from ever using any of that information in any of the Honken post-trial or appeal matters because that was your agreement with the Honken defense team that's been represented, and I have a need to judicially enforce that agreement. Do you understand what I mean?

MS. WHETSTINE: Yes, I understand.

THE COURT: Or were you just going to disclose it to --

MS. WHETSTINE: Initially per the agreement that's attached to the motion, my plan was to merely disclose it to the Johnson team, and then should they decide that they wanted to use a portion of it at trial or in some other pretrial motions or even post-trial motions, they would then notify me. We could I suppose at some point -- well, I guess that's all I have to say. That was my initial plan, not to disclose it to Mr. Williams or any of the Johnson prosecution team and then after the Johnson team decided what they wanted to do, they would notify me.

THE COURT: And then if they were going to use it in any way at some point, it seems to me you'd have to disclose it to the Johnson prosecution team.

MS. WHETSTINE: Correct, and -- yes.

12

THE COURT: But if for some reason the defense isn't going to use it, then I guess the Johnson prosecution team doesn't need to have it.

Page 9

MS. WHETSTINE: Correct.

THE COURT: Now, does anybody object to that in theory?

MR. PARRISH: In theory, yes, Your Honor. Our position is that as you -- as we've stated already, we don't think it ought to be disclosed, and we think we should at least have some built-in opportunity to get this information to our client and maybe determine if there is some appeal protection here. But I understand what the Court is saying as to its proffer. I don't have a real issue with that.

THE COURT: Well, you've had virtually no notice of this as far as I can tell. So do you want me to give you some more time to file a formal written objection?

MR. PARRISH: We would, Your Honor, and that the defense team for Johnson be instructed in the future any documents along this line to file under seal because two things we brought up that were -- we were absolutely emphatic about, that no information ever be disclosed that Mr. Honken presented a proffer to the government for two reasons: One, that he would be subject to jeopardy in prison if they found that out. And the second reason was that it never be allowed to be utilized against him in any way, shape, fashion, or form. And those were

13

the two standards that we used to enter into this agreement, and that's the commitment we made to our client which I'm sure Miss Whetstine will verify. So we did not have any notice, Judge, that was adequate to object to this.

MR. STOWERS: Could I just interrupt and say a couple things about that, Your Honor?

THE COURT: You may, Mr. Stowers.

Page 10

MR. STOWERS: This issue has been under discussion with Honken's attorneys going all the way back into early December where we had requested that they advise the government that we could have access to this. Mr. Berrigan has had several conversations with Mr. Rogers about that going all the way back to prior to the post-trial motion hearing in December on the Honken case. I think Mr. Berrigan was up there for that. Ms. Whetstine sent a letter to Honken's attorneys outlining the terms under which she was attempting to accommodate their concerns about the disclosure. That letter was sent out I think perhaps two weeks ago. They were given until late last week to reply to it. And then they replied after the deadline that she set forth in her letter.

I'd also like the Court to know that Honken's own attorneys, Mr. Parrish and Mr. Spies, discussed in a statewide CLE held at the Des Moines Club in December the fact that Mr. Honken had during the jury selection given such a proffer as part of an effort to work out a plea agreement at the last

14

minute, and that was a proceeding attended by well in excess I think of 50 lawyers from across the state, and it was attended at one point later in the day by Judge Melloy, and it was attended by a Des Moines Register Journalist, Rekha Basu, who wrote an article about the public defender from Cedar Rapids whose name for some reason escapes me at the moment --

THE COURT: Jane Kelly?

MR. STOWERS: Yeah, the woman who was attacked.

THE COURT: Jane Kelly.

MR. STOWERS: Yeah, and there was an article put in there about the fact that that had occurred and she'd been

Page 11

provided with some kind of an award at the session.  And so this matter was -- has already been sort of put out there in the public light by Mr. Parrish and Mr. Spies, at least the fact that a proffer was given.

MR. PARRISH:  We disagree with that, Mr. -- there was no -- we said negotiations were taking place.  I think you're incorrect when you said we made the statement that a proffer was offered.  I think you're totally wrong, Mr. Stowers.

MR. STOWERS:  Well, I was there, Al.

MR. PARRISH:  I was there also.  I spoke, and so did Leon.  You're wrong on that.

MR. STOWERS:  Okay.  So, I mean, I feel that it's been out there, and it's not been -- it's not been a secret I don't believe.

15

THE COURT:  I never knew about it till this motion was filed, but, you know, I'm up here in the hinterlands.  I'm the last to learn of anything.

But in any event, I'm going to give the defense ten days to file a written objection to this motion to produce.  Be sure and file it under seal.  And then I'll rule.  Nobody's really addressed what I see down the road is the kind of problem, and that would be, sure, we can have a magistrate judge rule on any redaction.  I don't really quite understand the redaction issue and how that might arise.  I don't even want to get into that.  If there's a need for -- somebody thinks there's a need for redaction, it will be assigned either to a magistrate judge or Judge Reade, and they can sort it out.  But nobody's really addressed, largely I think because there is no answer to it, how do we protect the Honken defense concern that I not

Page 12

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 123 of 200

learn of the proffer if the proffer somehow becomes admissible in either the merits or penalty phase of the Johnson trial?

MR. STOWERS: Well, I understand the concern that they have. I don't know what the legal premise for that objection is other than they have an agreement with the government. So I don't really -- not to make light of it, but, I mean, it's fairly common that people proffer in cases and the court becomes aware of that fact including what they said.

THE COURT: Sure. You suppress some evidence but you still wind up sentencing somebody and, you know . . .

16

MR. STOWERS: Well, I don't think that's necessarily a constitutional issue per se. But they have an agreement with the government. That's an issue I guess for them to raise and argue over. But I --

THE COURT: Well, I just thought you could solve the problem for them.

MR. STOWERS: Well, I don't have -- the problem we have is without knowing precisely what was said, what form it's in, et cetera, in evaluating it amongst our three attorneys, particularly Mr. Berrigan, it may be the case that we wind up during the Johnson trial seeking to offer evidence of what it is that Mr. Honken reported to the authorities in his interview session. I could see that as a possibility. But we haven't gotten to that point in the road yet. We're just trying right now to get access to the materials. And then once we've done that, we'll have to cross that point in the road subsequently. And I don't want to prematurely get into that before we're there, although I can see that happening.

But I think the way that we addressed it in our

Page 13

agreement which we attached to the motion was that we'd come back to the Court in the eventuality that that situation came to pass and we would advise the Court that we wanted to go there, and then the Court would address that particular issue at that particular time in that particular setting. And from the sounds of it, based on the timing of the case before you on the Honken

17

case, you very well may no longer have that case in front of you by the time that that issue in our case arises.

THE COURT: Well, except that I don't want to rule on Honken right before the trial or during the Johnson trial.

MR. STOWERS: Yeah, and I --

THE COURT: Because guess who will be screaming bloody murder about the pretrial publicity? You will be.

MR. STOWERS: Well, we already are, so that won't change. But you're right. That's an issue. And I don't know exactly how to --

THE COURT: It won't change, but it might make your argument better.

MS. WHETSTINE: Your Honor, this is Judy Whetstine. C.J. Williams and I were just talking. We'll just throw this out. Depending on the timing of your conclusion in analyzing the post-trial motions in Honken --

THE COURT: I could file my ruling under seal.

MS. WHETSTINE: Correct.

THE COURT: Is that what you were going to say, Miss Whetstine?

MS. WHETSTINE: Yes, it is what we were going to say.

THE COURT: Yeah, I could file it under seal and then unseal it after the Johnson verdict.

Page 14

MS. WHETSTINE: Correct.

THE COURT: I'm just kind of reluctant to file such a

18

major merits ruling under seal, but that would be one option.

MR. PARRISH: Judge, Al Parrish here. Let me just ask what they -- the motion that we're talking about right now -- I know you said you were going to give us ten days. Was any copy ever sent out to us other than the conference we had with Miss Whetstine last week? I didn't get anything. I was in Judge Pratt's courtroom when Jen called me, but I have not seen anything on his motion.

THE COURT: Well, you weren't listed on it in the proof of service.

MR. PARRISH: Oh, okay.

THE COURT: Mr. Stowers, did you even send him a courtesy copy?

MR. STOWERS: It should have gone out yesterday, and I believe it went out by fax.

MR. PARRISH: Okay. All right. Well, I'll look at that because you said an agreement was attached to it as to what had been proposed, but I thought what we were doing was working with Miss Whetstine which we did a conference last week. And after we heard back from Mr. Honken, we told her his position is that it is not to be disclosed. So I just want to be sure that the Court understands we did get back -- Miss Whetstine and I and Leon Spies did conference on this matter.

THE COURT: Okay.

MR. PARRISH: As a follow-up on that.

19

Page 15

THE COURT: Okay. Why don't you take ten days from today's date to file any written response, and then I'll go ahead and rule on it. And if anybody else has any great ideas, they can file something within the ten-day period too.

MR. PARRISH: Okay. Thank you, Your Honor.

THE COURT: Okay? Thank you. Bye now.

(The foregoing hearing was

concluded at 9:54 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    2-27-06
                                             Date

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 127 of 200

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,                         Transcript of
                                             Hearing

      Defendant.
                                    /


      The Hearing held before the Honorable Mark W. Bennett,
Chief Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, January 27, 2005, commencing at 1:03 p.m.

2

APPEARANCES:

For the Plaintiff:          C. J. WILLIAMS, ESQ.
                            Assistant United States Attorney
                            Suite 400 - Hach Building
                            401 First Street Southeast
                            Cedar Rapids, IA  52401

                            THOMAS HENRY MILLER, ESQ.
                            Iowa Attorney General's Office
                            Area Prosecutions Division
                            Hoover State Office Building
                            Des Moines, IA  50319

For the Defendant:          PATRICK J. BERRIGAN, ESQ.
                            Watson & Dameron
                            2500 Holmes
                            Kansas City, MO  64108

                            DEAN STOWERS, ESQ.
                            Rosenberg, Stowers & Morse
                            1010 Insurance Exchange Building
                            505 Fifth Avenue
                            Des Moines, IA  50309

                            ALFRED E. WILLETT, ESQ.
                            Terpstra, Epping & Willett
                            Higley Building - Suite 500
                            118 Third Avenue Southeast
                            Cedar Rapids, IA  52401
                        Page 1

Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA   51101
                       (712) 233-3846

⚥

3

THE COURT:  Good afternoon.  Please be seated.  This is United States versus Angela Johnson, Criminal Number 2001-3046.  Miss Johnson is personally present along with her three defense lawyers, and the prosecution team is present, and we're here on a motion hearing on a multitude of pretrial motions.  I previously sent out an agenda.  I don't believe I had any proposed objections or changes to the agenda, so we'll start with the government motions.  The first motion is the motion to permit victim witnesses to observe the guilt phase of the trial.

Mr. Williams?

MR. WILLIAMS:  Your Honor, thank you.  I don't have a lot to add over my brief.  We'd just point out that the law did change effective November of 2004.  It gives victims the absolute right to appear and be present throughout the entire trial including the guilt phase absent defense proof that the victim witnesses would somehow change their testimony, and they have to prove that by clear and convincing evidence.

In this case we know that all the victim witnesses sat through the Honken trial.  They've seen the testimony.  They've seen what's going to come out already.  I think the Court saw their testimony, and there wasn't anything suggesting that they tailored their testimony somehow to what came out.  And to the extent that there would be any danger that they can tailor their testimony, that danger's already passed because they've already

⚥

4

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 129 of 200

seen what the testimony is going to be.

So given that, the government doesn't see how the defense could meet that burden, and we would ask for a pretrial ruling allowing the victims' families to attend the entire trial.

THE COURT: Well, let me ask you this. Some of the evidence is going -- I realize there's going to be a lot of overlap, but some of the evidence is going to be different.

MR. WILLIAMS: Some of the evidence is going to be different but nothing I don't think that would pertain to what the victim witnesses would be testifying about. We're going to have evidence of a suicide attempt in the jail. Well, none of the victim witnesses are going to be talking about that. We're going to have evidence from other inmates talking about confessions that the defendant made in this case. And again, the victim witnesses wouldn't be testifying about that.

I suppose there could be some things that would be testifying about that might be different that in theory they would be testifying about. For example, statements that the defendant made to them concerning whether she, in fact, saw Terry DeGeus on the night of the murder or not. But again, a lot of that came out in the first trial. There might be a little bit more of it, but a lot of it already came out.

THE COURT: Okay. Thank you.

MR. WILLIAMS: Thank you.

5

THE COURT: Who's going to argue this one for the defense? Mr. Stowers?

MR. STOWERS: I think that --

Page 3

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 130 of 200

THE COURT:  I think your microphone's not on.

MR. STOWERS:  No.  I did it again.  I think that we filed a response to their original motion, and they recited the new and improved statute.  I don't think there's a lot to say about that subject.

There's one slight concern, though, that we believe we would like the Court to consider addressing, and that is from our observation of the Honken trial -- and I don't know that this courtroom is going to be used for the Johnson trial or precisely what the layout is in Cedar Rapids if that's where the trial is, but it seems to us from the limited attendance that we had in the trial that there was sort of this group gathering which included certain family and witness members all in one section of the courtroom, and it became obvious I think to all present that they were there sort of on behalf of and in support of the case for the government.

And we think that impression, particularly when they then step up from the gallery and walk up to the jury -- or to the witness stand, is one that we think is somewhat unfairly prejudicial.  And I don't know how to capsulize it exactly other than I think it gives the impression that there's a group of people here in the community who are trying to -- who are trying

6

to, through their presence, which they're certainly entitled under the law to be present in a public trial, but through their presence and their group presence en masse sitting in one particular area of the courtroom send a message essentially to their fellow members of the community that they want them to do what they obviously will tell the jury in their testimony they want them to do which is to punish the defendant.

Page 4

We think there's some aspect to that that we think is something that the Court should consider perhaps the seating arrangement in the gallery to be somewhat different than what it was in Honken so that there isn't sort of a mass of people in the audience associated with what I would call the victim group and the victim witness group all in one zone of the courtroom in that way because we think that's somewhat influential on the jurors.

THE COURT: Mr. Williams?

MR. WILLIAMS: I think that's -- I guess two things. One is I hear no allegation from the defense that the family members behaved in any way improperly at any point during the Honken trial. We certainly didn't witness that, and I don't think there's any allegation that they behaved improperly.

And so what the defense is saying is simply by sitting together in one location they are improperly creating some impression on the jury. I think that's rank speculation that you can derive any meaning from the fact they're sitting

7

together.

The other concern I have is the fact that we're forgetting that they are victims. They have been traumatized. A number of them testified about having psychological consequences about the crime that happened in this case. By sitting together as a group, they gain some relief by sitting together in a group. We have a witness victim coordinator that works with them. And by suggesting they should disperse and potentially sit near people who they think may be involved in the crime in this case I think is insensitive to the fact that they are, in fact, victims of this crime.

Page 5

And so to suggest that somehow the Court has a responsibility to create seating arrangements for the victims' family on the speculation that somehow an impression is created to the jury that is unfair to the defendant, I just don't think there's a basis for it, and we'd ask that you deny that request.

THE COURT: Seems pretty speculative to me. I mean, I guess if I were a juror I would expect that family members on both sides of a lawsuit would be present, whether it's civil or criminal, and that to the extent that they have a common interest they'd be seated together. What's prejudicial about that? I'm kind of missing something here.

MR. STOWERS: Well --

THE COURT: And I think it would be kind of an abuse of my power based on -- you know, if there had been disruptions

8

or fights or something and I needed to separate people, I could understand where I'd get involved in a seating chart. But short of that, it just seems that I would be intruding into something that I -- I just don't -- I try and be sensitive, but I don't see the problem that you see.

MR. STOWERS: No, I understand, but I think it already occurred. Maybe you weren't aware of it. But it's my memory that during the trial there was a couple of rows that the marshal's office had reserved on that side of the courtroom behind government counsel table for people, quote, unquote, on the government's side of the case.

THE COURT: Yeah, but the same thing was true for the defendant. They had seating on the other side.

MR. STOWERS: Okay. I know. But there's obviously some official involvement in -- not on the Court's part but

somebody's part in deciding where folks would sit in the courtroom.  And the impression of that which is an impression if I've got a client in a community with a large family or a lot of supporters, I would like to be able to convey to a jury and I think it's very -- something that a defendant sometimes will attempt to do which is to pack the courtroom with supporters because of the message that that sends to the jury which is that this defendant has the community support of all these folks here and the jurors ought to pay attention to that fact.  That's the communication which is the implicit one that we're talking

⚥

9

about.

We're just drawing it to your attention.  I understand.  I think it's totally within your discretion.  And if there's obviously a problem that arises during the trial, we'd bring that to your attention, but I just think it's something that's of concern to us is the impression that's created out of that, and it is of concern.  Thank you.

THE COURT:  I appreciate it.  I'm sure you have much greater concerns, but it doesn't mean you shouldn't point this one out.  But I don't really see it as a problem.  I think, you know, perhaps there's some potential out there which we can monitor, but I'm not going to grant any relief at this time because I just don't see it.

In light of the change in the statutory provision, there really isn't a basis to deny the government's motion, is there?

MR. STOWERS:  I don't believe so.

THE COURT:  Which is why you didn't file a resistance when they brought the new provision to light which I wasn't

Page 7

aware of. You might have been. I know I wasn't.

MR. STOWERS: I was unaware of it.

THE COURT: Yeah.

MR. STOWERS: As I think they were when they filed their original request.

THE COURT: Obviously, right. But I'm glad somebody

10

caught it.

Okay. Let's see. Next is the use of the photographs, and we've had some discussions -- I don't remember if they were on the record or off the record back in chambers -- about this issue, but now is the time to try and ferret it out and come up with a solution.

MR. WILLIAMS: Thank you, Your Honor. It appears to me from the defense response that they don't have an objection to the concept of being able to display photographs of witnesses as I understand it. They talk about wanting to be on the same -- or on a fair playing field or level playing field. I'm not sure whether that means they want photographs taken of all their witnesses and, if so, what they expect the logistics to be or what the Court's role in that should be.

The government's proposal would be we would do it the same way we did it in the Honken case, and that is immediately after the witness testifies we take them downstairs; we'd have the photograph taken in the clothes they wore when they testified; and then that would be the photo that we would use in the display at the end.

To the extent that the defense is objecting that somehow we can't talk about the number of witnesses we have or that somehow that's improper, we just don't think there's a

Page 8

basis for it.  The jury instructions that talk about quantity talk about it being not the only factor.  And the instruction to

11

the jury is, you know, quality over quantity.  If -- you can reject ten witnesses if you believe one, and that's fine, and we're suggesting that's an entirely appropriate instruction to give the jury.  That doesn't negate the fact that there is some weight to be given to the number of witnesses all of whom say the same thing.

THE COURT:  Or at least you ought to be able to argue that.

MR. WILLIAMS:  Right, we should be able to argue it, and the defense can say no, you should believe the one witness who is contrary to that.  But we should be able to argue that, and we should be able to, in whatever way is the most persuasive way for a lawyer to convey meaning to a jury about the weight of the evidence, be able to convey what we believe the weight of our evidence to be.  And if that is in a photographic display of the number of witnesses who testified on behalf of the government in this case, so be it.  If it's in a droning continuum of us listing off every witness for an hour who testified in this case and summarizing each person's testimony, so be it.

But for the defense to somehow suggest that we should be limited in how we argue our case, I just don't think there's a basis for it.

Granted, the Court has discretion to structure closing arguments and to weigh in on how closing arguments are

12

Page 9

presented.  But I think the intent there is to use the discretion to prevent unfair prejudice, unfair statements of what the evidence is, something that is clearly unfair.  And talking about the number of witnesses and trying to graphically display that in some manner the government submits isn't unfair.

THE COURT:  And implicit in your argument I believe is your position that you would like to be able to use the display boards, for lack of a better word, with the photos Velcroed on in your closing argument and not have the restrictions that I placed on it in the Honken trial.

MR. WILLIAMS:  That's correct, Your Honor.  And I suppose just to lay a good record, in the Honken trial I think the Court granted the defense request that we not be able to display all of our boards at once, we have the boards stacked by the bench not facing the jury, and we were allowed to take individual photos off and use those in closing arguments.

I'm not completely convinced that those boards are the best way to go.  I've toyed with the idea of doing it on a PowerPoint display.  The photos were far away, so I'm not convinced that's necessarily the best way to do it.  But we would like to display in some manner the number of witnesses we have in this case and do it in such a way that it's easy for the person doing closing arguments to then highlight a certain person as they're talking about it, whether that's on the computer screen or whether that's in a physical display of

13

Velcroed pictures.  I'm not sure which way we'll go at this point but something along those lines.

THE COURT:  Okay.  Now, let me ask you this.  Part of

the reason the way I ruled in the Honken case was that I had no time to think about it.

MR. WILLIAMS:  Right.

THE COURT:  Caught me totally by surprise.

MR. WILLIAMS:  And that was our fault.

THE COURT:  Well, it wasn't really anybody's fault. It's just the way it arose.  I'm not being critical of anybody.

And as I've been thinking about it some -- I mean, I don't really spend a whole lot of time thinking about this issue, but I've given it slightly more thought than I did that day it arose -- it seems to me that you probably should be allowed to show the display boards or, if you want to do it in PowerPoint, to show all of the witnesses for some period of time, but I'm not so sure I'm convinced that I'd allow you to do it for a four-hour closing argument.

MR. WILLIAMS:  And that's fine, Your Honor.  We understand, and we think that's appropriate.  I mean, we should do it in a reasonable manner, and at some degree perhaps a display like that becomes onerous or something.  And we don't have an objection to being able to display it for a limited period of time as necessary to cover that topic.

THE COURT:  To make your point about the weight of the

14

evidence and the number of witnesses and then still be able to use the individual pictures as you talk about the witnesses, but I'm not sure I want it in front of the jury for a three- or four-hour closing argument.

MR. WILLIAMS:  No problem.  I understand that, and we don't have an objection to that limitation.

THE COURT:  Okay.  And the other thing, I think rather

Page 11

than having the executive branch of the government be involved in the picture taking, I was thinking to make it a more neutral manner in which the pictures were taken that perhaps -- and I haven't discussed it with Carey but that -- we have a digital camera and that she would take -- immediately upon swearing in the witness, the witness would be seated and we'd take their picture before they testified, or we could take it at the end. I haven't given that any thought. And then the picture would be taken of each witness in the witness box, a head shot, or as they were being sworn in or something but that the picture would actually be taken in the presence of the jury and then be made available to both sides and be made available to the jury.

You know, we talked about having a separate maybe exhibit book for each juror. But this would have to be I think by stipulation because the pictures are demonstrative. And so I think it would be helpful that the jury actually have the pictures when they go back to deliberate so when they're talking about a witness they can all be looking at the picture.

15

MR. WILLIAMS: I agree, and I have no objection to that.

THE COURT: But I don't think it's technically admissible because it's demonstrative. I'm just saying I think it would aid the jury, and it's not something that I feel -- I don't know whether I have authority to do it in the absence of an agreement. I just know it would be helpful to the jury.

MR. WILLIAMS: We have no objection to that, Your Honor. Yeah, we'd be glad to stipulate to that. Can I talk just a second?

The Court may have inherent authority to send any

Page 12

demonstrative exhibit back to the jury if it aids their --

THE COURT: I suspect that I might, but it's something I'd want to research and be confident that I have the authority to do it in the absence of an agreement. The easiest way to do it is by agreement.

MR. WILLIAMS: Sure. And as to the Court's proposal of taking a photograph of the witness in the chair, I'd never thought about that before. Nothing strikes me as inappropriate of that if it's done for every witness and the Court explains that this is just something to aid the jury, you know, at some point when we close up the case that they may be able to use those photographs to remind them of testimony. That may be the easiest and fairest way to do it. I don't think I have an objection to that.

16

THE COURT: And then, you know, if you want to tape the picture and make it into the Velcro thing, that's fine.

MR. WILLIAMS: Sure.

THE COURT: But we would be the ones taking the picture.

MR. WILLIAMS: Yeah. No objection to that.

THE COURT: Who's going to handle this one? Mr. Stowers?

MR. STOWERS: Thank you. I think -- first of all, I think in a trial of this length there's, you know, a utility to having a photograph of a witness to show to the jury during closing arguments so that they can recollect the witness and hook them back up in their memory with the trial. And I think that there's obviously case law that says that that's a permissible thing to do.

Page 13

Now we get into some of the particulars which is where you get into the difficulties.

Number one, we would like to have the same opportunity to have access to those photos that will be used in that fashion.

THE COURT: Oh, absolutely.

MR. STOWERS: And that's --

THE COURT: Yeah, that goes without saying.

MR. STOWERS: Right.

THE COURT: That's why particularly making it a court

17

function --

MR. STOWERS: Right. And that part I understand you just discussed with Mr. Williams. That was something, though, that the parties didn't have an agreement on.

THE COURT: In the Honken case you mean --

MR. STOWERS: In this case.

THE COURT: Oh, in this case, yeah.

MR. STOWERS: And then secondly --

THE COURT: Now let's back up. I don't think that necessarily means that you would have access to whatever demonstrative aid they use, whether they did it by PowerPoint or boards or something else.

MR. STOWERS: Right.

THE COURT: It's to each one of you to figure out how you're going to do that, although I don't think the government had any problem with the defense using those -- the pictures, and I don't remember if they did or they didn't.

MR. WILLIAMS: They did, and we did not object.

THE COURT: Yeah.

Page 14

MR. STOWERS: Right. That's fine. Yeah, we don't want to be using their exhibit unless there's an agreement with them that we be able to do it, that is, their demonstrative exhibit or their displays during closing argument, any more than we want them to use ours so -- whatever they might be. But once they've gotten to a point where they figured out what they want

18

to do with those photos, we would like to at that time have the opportunity to look at that prior to argument to determine what our objection might be at that point, because I'm not sure what they're planning to do.

One of our concerns is this issue of arguing based on numbers. And I'm not sure that I agree with their contention, though, on that point, and we certainly believe that it's not a correct statement of the law that the jury should be told in argument by counsel that, you know, we called more witnesses than them, this sort of thing, and that means we have a greater weight of the evidence and you should convict this defendant and sentence her to death because of that. I mean, it again depends on the particular argument, and it's hard to anticipate that as we sit here now.

But I can see that crossing a line between permissible argument about the number of witnesses that they called, what they testified to, you know, the detail of their case and their evidence versus talking about the fact that they called 75 witnesses and, therefore, because they called 75 witnesses that means the defendant is guilty. And I don't think that's proper.

THE COURT: Yeah, and I don't think either Mr. Miller or Mr. Williams would argue that.

MR. STOWERS: Right.

Page 15

THE COURT: But that's kind of actually a separate issue.

19

MR. STOWERS: Right.

THE COURT: That's really what's permissible argument which you would have -- you would have that issue out there regardless of this particular motion that the government filed.

MR. STOWERS: Right. And I think the use of the photos during closing argument in a way that is solely for the purpose of assisting the jury in recalling the individuals who appeared in front of them over many weeks of trial is something that's well within the discretion of the Court.

THE COURT: Okay. Well, let me ask you this: Would you agree then that each juror at the time of deliberation would be allowed to have a notebook -- you obviously would all see the notebook; you'd have copies too -- that would have the photo and the name of each witness that testified in the case?

MR. STOWERS: Well, that goes beyond what I was thinking their motion addressed at the time they filed it. I thought they were talking about using it during arguments.

THE COURT: Yeah, it does go beyond that.

MR. STOWERS: Yeah.

THE COURT: It's something I'm raising.

MR. STOWERS: I guess my initial reaction to it is we would object to that because that -- without looking at the law and what our reason would be, it just seems to me that at that point it goes beyond the evidence that's in the record and gets into a different area that I can't quite articulate at this

20

Page 16

moment standing on my feet. I'm usually lighter on my feet than I feel at this moment. But I can't quite explain what my thinking would be on why the use of photos as evidence in that manner would be improper, whether demonstrative or otherwise.

It just seems to me that it gets into -- it gets into the very issue that we have a problem with some of the discussion about how they would be used in closing argument in part. But I know what the idea is. I think it's a noble concept. It's just a question of whether or not we -- whether or not we believe it's proper. And I don't have an answer for you at this moment. But I think at this point we certainly can't say anything other than we're not comfortable agreeing to that --

THE COURT: Okay.

MR. STOWERS: -- at this moment.

THE COURT: Why don't you file a -- if the government -- I mean, it's really my idea. I think we've talked about it before, though. I just think it would help the jury so that when the jurors go back and deliberate they would -- I mean, it's the same reason why both sides would want to use it in closing argument, assist the jury in recalling the testimony.

Now, I could understand why a defendant in a criminal case wouldn't want to assist the jury in recalling the testimony. But -- and I'm not sure I -- I'm not saying that I have the authority on my own to send a notebook back of

21

pictures. I don't know whether I have the authority or not. And I'm certainly not going to jeopardize the defendant's right to a fair trial on something that I'm not sure I have pretty clear authority on.

Page 17

So if the government wants the notebooks -- the picture notebooks to go back to the jury, then you'll have to file another motion or you can just file -- you can just make it simple, do a letter brief if you want, to find out if I have the authority to do it. But if you don't want -- I don't feel strongly enough about it that I'm going to kind of pursue it on my own. I mean, I think it would be helpful to the jury, and as I recall, wasn't it one of the first notes we got? Shelly just reminded me of that. One of the first notes we got from the jury was, Can we have the pictures?

MR. WILLIAMS: I think that's right, Your Honor. I'll be glad to look into this and see if there's some inherent authority for the Court to do that. I don't know -- I mean, when I did some initial research in this area, I had trouble finding any cases that talked about this concept at all. I think it's kind of breaking new ground here, just the idea of taking photographs of witnesses.

THE COURT: That's not new ground. That's been done routinely in complex at least civil cases I know for years and years and years and years. And, you know, this whole issue about, well, it's demonstrative and it doesn't go back to the

22

jury which seems to be the black letter law, I don't even know where that comes from. I'm not even sure I understand the rationale for it. I mean, if you can show it to them in closing argument, why is it that it can't go back? Well, it's not in evidence, but so what? You were able to show it to them and discuss it in closing argument. So I'm not sure that rule makes a whole lot of sense either.

MR. WILLIAMS: I'll be glad to look into it, Judge,

and I'll brief you on it one way or the other here.

THE COURT: I just know if I were a juror and I saw these photographs being taken and the lawyers on both sides used them to varying degrees in closing argument, I'd probably be sending a note just like the Honken juror did, Where are the pictures, because it's not very intuitive to a juror, this distinction between demonstrative and evidence. We talk about it, but that's not something a juror would ever think of. They'd be thinking, well, if they used the photos in closing argument, why can't we have them, I would think.

MR. WILLIAMS: Absolutely.

THE COURT: Yeah. Mr. Berrigan, I'm sorry. Were you rising to speak on this one?

MR. BERRIGAN: Well, I was, and then I sat down, discretion being the better part of valor, Your Honor.

THE COURT: Well, but I'd be interested in your views.

MR. BERRIGAN: Well, I probably should consider them

23

longer. I feel somewhat like Mr. Stowers. We were talking off the end of our cuff. But, frankly, that's a jury decision as to what evidence they choose to consider, not the court's, and the reason we don't give them trial transcripts in my view is the same reason we don't give them photographs. That is, it's suggesting to them what evidence they should choose to consider and weigh. When you send photographs to them, that does the same thing. It's up to them to make that determination.

THE COURT: Well, let's say we get a note, We want the photographs.

MR. BERRIGAN: Well, if they're in evidence --

THE COURT: Should we be able to send them back?

Page 19

MR. BERRIGAN:  If they're in evidence.

THE COURT:  Well, they're not in evidence.

MR. BERRIGAN:  Obviously if they're not in evidence they don't go back.

THE COURT:  Why?

MR. BERRIGAN:  Because they have that obligation just like the testimony.  Would you give them a trial transcript if they ask for it?

THE COURT:  I have the discretion to, and there's case law that says I have the discretion to, and a lot of judges do do it.  They do read-backs, or if they have realtime, they can print it out and give them a transcript.  I certainly have discretion to do that.

24

MR. BERRIGAN:  Sure.  But they make the request, Your Honor.  They're making a specific request.  If they wanted to see a photograph I suppose of a particular witness and they made that request, perhaps we could consider at the time whether that was appropriate.

THE COURT:  Well, what would your view be if they said, We want all the photographs?

MR. BERRIGAN:  Photographs that we took?  I mean, I guess as a preliminary matter --

THE COURT:  Well, you know what I'm talking about.

MR. BERRIGAN:  Yes, sir.  The idea is we're going to take photographs of all the witnesses.

THE COURT:  And I understand you don't have an objection to that.

MR. BERRIGAN:  Well, I guess our position is that depends on how they're used.  We weren't contemplating them

Page 20

going back to the jury. We've never contemplated that.

THE COURT: I understand that. You don't have an objection to my law clerk taking the photographs, supplying it to both sides, and letting both sides use them in some way in closing argument. Now, depending upon what that some way is, you may or may not have an objection.

MR. BERRIGAN: Yeah.

THE COURT: Right?

MR. BERRIGAN: Under that specific proposal that they

⚲

25

not go back to the jury, we have no problem with that.

THE COURT: Right. But then you do object to them going back to the jury.

MR. BERRIGAN: Absolutely, yes.

THE COURT: Even if they ask for them.

MR. BERRIGAN: Well, and it's the same -- the other argument that Mr. Stowers advanced, not to belabor it, but this in our view is not a matter of making a stack or spreading out how many government witnesses there are versus how many defense witnesses there are, and we feel that is a grave danger under this proposal. It's one thing --

THE COURT: Well, I think it would be a danger if they said, We called 75 witnesses, and you only called 3.

MR. BERRIGAN: It's implicit when we show them the photographs -- if they see 75 on this side and they see 3 on that side, nobody has to say anything. These are bright people, and they get the idea. That's why the government wanted it if you recall. That was their argument, that they wanted to show the jury how many witnesses we have.

THE COURT: Well, does that mean if they wanted to

Page 21

start their closing argument by saying, We've called 108 witnesses in this case, I wouldn't let them say that?

MR. BERRIGAN: No, sir. But if they argued there's 108 witnesses and that's evidence of guilt, the number of witnesses, we would object. We think the case law supports

26

that.

THE COURT: What if they said 14 witnesses testified to this point? They're allowed to say that, aren't they?

MR. BERRIGAN: It's not the number -- they can say whatever they want about the numbers. It's a fact. It's the suggestion that numbers equal evidence and giving the jury a stack of photographs that they can lay down or stack up.

THE COURT: Well, I don't think it's that simple because it'd be a permissible argument for you or the government to say there were seven witnesses that testified on this point, and you ought to believe it because seven people wouldn't get it wrong. That's a perfectly permissible argument.

MR. BERRIGAN: That's not the same, Your Honor. That's not the numbers. That's going now to the substance of their testimony. If they want to talk about the substance of the 114 witnesses' testimony, you can talk about that all day. But you can't say, We got 114 witnesses --

THE COURT: Therefore, the defendant's guilty.

MR. BERRIGAN: Right.

THE COURT: Yeah, I can't imagine them arguing that.

MR. BERRIGAN: Well, they're not. They just want to put up the 114 and then keep quiet because the suggestion's there. Look at. That's our case, 114 people, so there. You got 3, Miss Defendant, and, jurors, you draw your own

Page 22

conclusions.

27

THE COURT:  Okay.  Anything else you want to add, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Audio tapes.

MR. WILLIAMS:  Your Honor, on the audio tapes, again, I'm not sure that we have a lot that's really at issue here. The defense basically says if we lay the foundation then we'll do the foundation.  I think we'll be able to lay a foundation without a problem.

To the extent that -- they suggested in their response that the jury be instructed that the tapes have been enhanced. I don't have an objection to that I guess, but I don't want to be on record suggesting that if we fail to advise the jury that a particular tape has been enhanced that somehow we've erroneously laid a foundation for a tape to go in.  I don't think there's anything in the case law that suggests that we have to do anything other than have the witness say, That fairly and accurately reflects the conversation I had.  If we had to enhance the tape to get them to the point to be able to hear it to be able to say that, that's a side issue.  But I don't think that's something the jury has to be told.  I don't have an objection --

THE COURT:  But it's something the defense has to be told.

MR. WILLIAMS:  Oh, yes, and we've told them that we've

28

Page 23

done it.

THE COURT: Right.

MR. WILLIAMS: And I don't have an objection if the jury hears about it. I just don't want to suddenly have a post-trial motion saying that the Court erroneously allowed this tape in because the government never advised the jury the tape was enhanced. I don't think that's what the law is.

The defense says the recordings of Cutkomp and Honken don't fit co-conspirator hearsay statement, but they've not laid out in any way why they don't think those tapes or those conversations fit co-conspirator hearsay. We've laid out in our brief why they do, and I'd rest on what we said in our brief.

THE COURT: Well, let me stop you right there. Why is it that you didn't file a motion in limine on that point?

MR. STOWERS: Your Honor, I don't know that it's capable in a trial to resolve all of the evidentiary issues on a pretrial basis, nor is that the way we're planning to approach those questions. So we have not filed a motion in limine on that point. That's true. They have a piece of evidence. They think it's admissible. We'll make our objections as they proceed. And that's kind of the way we are planning to try the case, sort of in the usual way where if there's something highly, highly inflammatory or something that is clearly and obviously inadmissible, something like that, then we would file a motion in limine on it and seek a pretrial ruling from the

29

Court on that matter. Or if it was a really, really big issue that we felt we should get guidance or counsel from the Court on how that was going to be handled --

THE COURT: I would say the Cutkomp/Honken tapes are a

Page 24

pretty big issue.

MR. STOWERS: Well, they could be. And, you know, the other thing is this has changed now because they went and dismissed 11 and 12 after they filed their motion, Counts 11 and 12, that is. And to me that may impact on how these tapes now fit as well.

So I guess our position is they want the Court to tell them on a pretrial ruling in limine that the Court's position is going to be that should the things they represent in their motion wind up being shown out in the evidence that the Court would rule that this stuff is admissible. I don't think it's quite capable of being done. I know they've already gone through the trial of Dustin Honken with you once and you've heard some of this evidence. We, of course, weren't there for the whole trial. We don't know everything about it, although we now have transcripts.

I guess our position is we don't think it's really capable of being decided on an in-limine pretrial basis so easily. But if the Court does, then the Court will rule how ever it will at this point. And then when the matter comes up during trial, we'll still have to make our objection at that

30

time because any ruling at this point is not going to be, you know, a permanent type of ruling. It's going to be an in-limine ruling that in order for us to preserve the record on it anyway we gotta make it at trial as well.

THE COURT: Actually not.

MR. STOWERS: My understanding --

THE COURT: Rule 104's been changed. You don't have to make -- am I mistaken about that, Mr. Williams?

Page 25

MR. WILLIAMS: No, I think that's correct, Your Honor.

THE COURT: The rule's been changed. Once you make the record in a 104 motion in limine ruling, you don't have to make an additional record at trial.

MR. STOWERS: Well, then I stand corrected on that point. But that's kind of the way we've been looking at some of these issues. And I don't have anything more to say other than what's in our resistance.

THE COURT: Well, I mean, I don't have any authority to make you file a Rule 104 motion that I know of, but -- and I don't know how to say this diplomatically. I mean, I try and raise as many issues and concerns that I have early to make the case easier for trial for the lawyers and to give you plenty of -- you know, I'm going to try and rule very quickly on these to help you in your presentation of your trial. And I maybe am reading too much into your comments, but I kind of sense that you're adopt -- you're saying you're adopting a trial strategy

31

that you're more interested in trying to surprise me at trial and not raise these issues early and sandbag me. And I guess you have a right to do it that way. But you won't get the kind of cooperation out of me that lawyers usually do if I sense you're doing that because it's not going to be a one-way street.

MR. WILLETT: Your Honor, let me respond to that. We're not trying to sandbag this Court at all. We're not trying to lay in ambush at trial.

THE COURT: Well, I think you probably have a right to do that.

MR. WILLETT: I think Mr. Stowers was being very sincere when he said to you that he did not think that this

Page 26

particular issue was capable of pretrial resolution.

THE COURT: Well, now, wait a minute. Whether or not the tapes are co-conspirator hearsay can be resolved prior to trial.

MR. WILLETT: Certainly.

THE COURT: Well, he just told me they couldn't.

MR. WILLETT: Well, I understand where the Court's coming from. I understand where Mr. Stowers is coming from. And we're stepping forward here with all candor and telling the Court what our opinion is. I've been --

THE COURT: Well, if your opinion is -- actually you now have a difference of opinion because you just told me you agreed with me that whether or not they're co-conspirator

32

hearsay statements could be addressed prior to trial, and Mr. Stowers said they couldn't.

MR. WILLETT: I understand where both parties are coming from. I understand where the Court's coming from on the issue of co-conspirator hearsay, and I side with my co-counsel that maybe not all of these tapes and not all of these issues can be decided before trial.

THE COURT: I agree not every evidentiary issue can be decided before trial.

MR. WILLETT: And that's what we're saying to the Court.

THE COURT: Well, nobody disagrees with that, but that isn't what you're saying to me because you're saying that you don't want to have the Cutkomp/Honken tapes decided prior to trial as to whether or not they're co-conspirator hearsay. That's what you're saying too. And I'm saying if that's your

Page 27

position, fine, but then you're not going to get the kind of cooperation from me that you routinely get if that's how you're going to try the case. I can't stop you, but I don't have to bend over backwards to help you.

MR. WILLETT: I realize that, Judge. All I'm saying is is we're going to defend our client the best way we know how. That does not necessarily equate to any indication that we're trying to be obstreperous with this Court.

THE COURT: I never labeled the word obstreperous. I

33

think you have a right to take that position that you don't have to file any Rule 104 motions, that you can raise it all in trial. I'm not saying you don't have the right to do that. So, therefore, if you adopt that as a matter of strategy, it wouldn't be obstreperous. It'd be well within your right. But then it'd be well within my right not to be as cooperative either.

MR. WILLETT: We understand where the Court's coming from.

THE COURT: And that's not a threat. It's just I'm not going to lay things out for you ahead of time and give you all kinds of early rulings that help you in your preparation for the trial if you're not willing to reciprocate.

MR. WILLETT: We're not taking anything the Court says to us as a threat, Your Honor. We're just saying we do not believe every issue can be ruled on pretrial.

THE COURT: Well, let me ask you this one more time because it's what the subject of the motion is. Can the Honken/Cutkomp tapes be ruled on prior to trial as to whether or not they fulfill the 801 (d)(2)(E) co-conspirator hearsay

Page 28

exception?  Yes or no.

MR. WILLETT:  No.

THE COURT:  Why not?

MR. WILLETT:  Because I think there's a lot of complexity to those tapes, and I'm not willing to stipulate at

34

this time or concur or agree or concede at this time that they can be.

THE COURT:  I'm not asking you to stipulate or agree that they're co-conspirator hearsay.  I'm asking you to disclose to me why you think they're not, and that isn't going to change between now and when they're offered for admission at trial.

MR. WILLETT:  I'm not sure that those tapes will indicate that they fall within that exception.  That's my position, Judge.

THE COURT:  Well, then I appreciate that.  Why can't you tell me the "why" in a written motion now?

MR. WILLETT:  Well, then that's something that myself and my co-counsel will discuss.  And if we somehow need to supplement the record, then we will but . . .

MR. STOWERS:  Judge, I'm sorry.  I think this is actually the government's motion.  They have asked the Court to bless the admissibility of those tapes.

THE COURT:  Right.

MR. STOWERS:  And they've made representations to the Court about what their record is going to be to get those tapes admitted.  Our position is that we have resisted that.  We're not comfortable that all of the things that they say about what the record will be is what the record will be.  And we don't believe that the tapes in the end, particularly now that they've

Page 29

dismissed Counts 11 and 12, are going to fall within the

35

co-conspirator exception to hearsay because they have to be made during the course and in furtherance of the charged conspiracies in Counts 1 through 10 of the remaining indictment. And the tapes, as I understand it, occur many years later and involve conversations between Cutkomp and Honken years after the alleged homicides that are charged in this case which occurred in 1993.

And particularly now that Counts 11 and 12 are dismissed, I think that raises significant questions about whether or not they're admissible. The government wants you to tell them affirmatively they are. We're saying we don't think the Court can quite go that far based on what it knows right now, but if the Court feels comfortable enough in relying on the representations that they've made about those tapes and the record that they will develop during the trial to go ahead and rule on their request at this point, that's fine. But --

THE COURT: Well, it would only be conditional.

MR. STOWERS: Right, and that's my point.

THE COURT: Because things can change in trial. I understand that.

MR. STOWERS: Yeah. Okay.

THE COURT: But I guess what I'm asking you, if you've got a good argument why they're not, tell me. I mean, you don't have to tell me this minute, but don't wait till --

MR. STOWERS: I think I've just made it basically. These conversations occur years after the murders, and they are

36

concerning other matters, and they aren't during the course or

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 157 of 200

in furtherance of the charged conspiratorial activities which essentially ended, in our view, in 1993. Now, the indictment alleges a longer period of time. That's fine. But our view is --

THE COURT: Well, if I had adopted your view, there wouldn't be a trial.

MR. STOWERS: Why do you say that? Well, I don't know why you would say that, I mean, because I don't think that -- maybe I'm missing something. But I don't know why you'd say there wouldn't be a trial. The trial in this case is that there were five homicides alleged in two different ways that were committed in 1993 either in connection with a large-scale drug conspiracy as charged in five of the counts or in furtherance of a continuing criminal enterprise. And those are the charges and that those events occurred in 1993, and that's what's charged.

Now, the alleged drug conspiracy, the alleged continuing criminal enterprise supposedly carried on for longer periods of time after that. But again, I don't think those statements are made during the course or in furtherance of the conspiracy. And I just -- that's the way I feel about them and in my mind as I think about it, particularly now that Count 12 which was formerly a conspiracy count that involved conspiracy to solicit the murder, has been dismissed after they filed their motion.

37

So I think the Court's being asked to rule on this in favor of the government pretrial. If the record that the government has presented is the record that they're going to make at the trial and the Court feels confident in that record and the admissible -- the admissibility, I should say, of that

Page 31

evidence based on what they're representing their evidence will be, then the Court can go ahead and rule on a 104 basis for the government which is what they're asking for.

And then as the record develops during the trial, when they get to that point in the trial and then they start to offer that evidence, we will make our objections because our belief is that the record that they'll develop throughout the course of the trial and the evidence as it develops will not support the admission of that evidence and it will not be quite the way the government has represented.

So I don't -- we're not -- I don't think there's anything unclear about that I hope.  But that's where we are on it a month before trial and jury selection.  So if the Court feels confident in their representations based on having sat through Honken's trial, heard that evidence in ruling on it, then the Court should go ahead and do that.  I just don't -- I don't have the confidence that they have, and I don't feel that it's really capable of a meaningful final -- in a 104 final sense decision.  That's all.

THE COURT:  Okay.  Thank you.  Why don't we move on to

38

the peremptory challenges.

MR. WILLIAMS:  Your Honor, we've set out in our brief what our position is on this.  As I read in on this -- and I'll tell you I went in just figuring the Court must have discretion in this area to add peremptory strikes.  I anticipated that's what my research would show.  And, frankly, I was a little surprised.  My reading of the rule is that you don't and that the only discretion you have to add peremptory strikes is with regard to multiple defendants in this case -- or in a case, and

Page 32

in this case we don't have multiple defendants.

THE COURT: Is -- the discretion to add peremptories for multiple defendants, is that in the actual rule, or is that by case law?

MR. WILLIAMS: That's in the actual rule.

THE COURT: Oh, it is in the actual rule.

MR. WILLIAMS: Yeah, Rule 24. The first section of Rule 24 says that the Court shall have discretion -- let me get to my copy of the rule here.

THE COURT: And you're not going to voluntarily agree to take less.

MR. WILLIAMS: That's correct, Your Honor, I can't. Rule 24(b) says that the Court may allow additional peremptory challenges for multiple defendants. And that's the only place where the rule explicitly gives the Court permission to give additional peremptory challenges.

♀

39

Now, this whole concept, the whole thought that the Court had -- and you invited us to brief this issue to aid you on this -- was in the event that publicity appears to be such a problem, you contemplate the idea of giving the defense more peremptory strikes to deal with that issue. So we're presupposing at this point there isn't going to be a problem with publicity. I'm not so sure even looking at the few questionnaires I've looked at so far that there is going to be one. But in the event there is one, I don't think the Court has discretion to give the defense more peremptory strikes in lieu of that. There's a number of other things the Court can do to deal with publicity. Giving one side versus the other side more peremptory strikes I don't think is one of them.

Page 33

THE COURT: Do I have discretion to give both sides more peremptory challenges based on pretrial publicity?

MR. WILLIAMS: You know, frankly, strictly reading the rule I don't think so. Now, would either side be in a position to appeal and complain about it? I don't think so. And there was -- I think there was one case I came across where the court gave both sides additional peremptory strikes.

THE COURT: Wasn't that Judge Tunheim's case?

MR. WILLIAMS: Yes, yes. But strictly reading the rule, I don't see where that discretion was granted to the court to give either side additional strikes.

THE COURT: But the Eighth Circuit did.

40

MR. WILLIAMS: The Eighth Circuit --

THE COURT: Well, I guess they said he took other -- they didn't --

MR. WILLIAMS: Right, and he mentioned that among other measures he took, but that was never challenged, and it wasn't an issue on appeal.

THE COURT: That's right, yeah.

MR. WILLIAMS: And so implicitly they didn't have a problem with that, but it really wasn't something debated at that point.

THE COURT: Well, let me ask you this. Assume for the sake of argument I have discretion to give both sides extra peremptory challenges.

MR. WILLIAMS: No objection.

THE COURT: No, I wasn't asking whether you object to that. I was just asking you to assume that.

MR. WILLIAMS: Okay. I'll assume that.

Page 34

THE COURT: Okay. Why wouldn't I have discretion to give one side more?

MR. WILLIAMS: Because the -- assuming you have the discretion in the first place, the discretion would be premised I think on the idea that you're dealing with a problem that could affect both sides. And to give one side more than the other, I just -- I just don't see it, particularly when the capital cases specifically say each side gets the equal number

41

of peremptory strikes. To then negate that balancing that Congress specifically put into the rule in capital cases in favor of one defendant over another one I think would fly in the face of what Congress was intending to do with the rule. To increase both of them so they're both equal at least would follow the spirit and the intent of the rule. But then just to give one side more than the other, I don't see that that would be appropriate.

THE COURT: Well, did Judge Tunheim give them more strikes proportionally?

MR. WILLIAMS: I'd have to go back and take a look at that case. I don't know that it says in the opinion as I recall.

THE COURT: Let's suppose he didn't. Let's suppose he just gave each side X number of strikes but he gave the same amount. That wouldn't be consistent with what Congress intended when they gave the defendant 16 strikes and the government 10, would it?

MR. WILLIAMS: I'm sorry. Ten and six I think is what you meant.

THE COURT: Ten and six, I'm sorry, right.
Page 35

MR. WILLIAMS: I'm not sure -- if, in fact, he changed that proportionality, no, that wouldn't be consistent with what Congress intended. But, I mean, just reading the rule, I just don't think under Rule 24 under any scenario the Court has

42

discretion to give additional peremptory strikes to either side, whether it's proportionate or disproportionate. I just don't think the Court does under this rule.

THE COURT: Well, I disagree with you. I'm not sure this is the appropriate case to do it in but . . .

MR. WILLIAMS: Well, and one of the things that I think is indicative of that is the attempted 1970 amendment to the rule which the Supreme Court proposed which was rejected by Congress which specifically had a provision in there that was going to give the district court the discretion for good cause, quote, unquote, to add additional peremptory strikes, and that was rejected. And I think that means something. So anyway, that's the --

THE COURT: I'm sure it means something. Just what it means I'm not quite sure.

Okay. Mr. Stowers?

MR. STOWERS: Thank you. In the Blom case, B-l-o-m, that's the case I think that the Court and Mr. Williams were talking about where there was I think a pretrial publicity issue in that case. We've talked about it in the change of venue context before.

THE COURT: Yes, that's right.

MR. STOWERS: And then -- and I've cited that in my brief on the first page there. In any event, in that case when the case went up on appeal, the court I would say approvingly

Page 36

recited the remedies that the trial court had undertaken to deal with the pretrial publicity issues that were adversely impacting the defendant. And I would characterize their recitation of those things that they described the trial court as having done, one of which was to increase the number of peremptories for the defendant, another one of which was to strike all jurors who had heard about the verdict in the -- I call it a codefendant -- in the coparticipant's prior trial under cause strikes as being done with the Eighth Circuit's blessing. That's the way I read that passage.

You know, obviously they aren't reaching holdings on those things, but at least as to the striking of those jurors who had heard about the codefendant's verdict which isn't what we're talking about here now, the court clearly talked about that subject and also issued some dicta in that regard saying that that wouldn't necessarily have been required to have been done with respect to all jurors. So I think they were approvingly reciting what the trial court had done in light of the change of venue issue.

The other thing is I think there is, after a lot of combing through cases, one case we found from the Ninth Circuit from 1967 that we cited in our brief which is A-m-s-e-l-e-r versus U.S., and we cited that at page 2 of our brief, and I believe that that case holds that the Court does have the discretion to grant more than 20 strikes to the defendant.

That's the best I can do for the authority. This isn't a

multi-defendant case, so we don't have that scenario. We have a single defendant capital trial. We don't have any more, any noncapital counts. So that issue which we addressed in our motion is no longer there.

But even assuming that the text of the rule and its intent doesn't allow the defendant or I should say doesn't allow the Court any wiggle room with regard to the number of strikes for each side, then our position would be that the Court must as a constitutionally required remedy, together with perhaps some other things such as were done in the Blom case, then the Court must intervene through its obligation to -- I would say it's a greater obligation to uphold the defendant's right to a fair trial free from the taint of prejudicial pretrial publicity. Then the Court must grant to the defendant such number of additional peremptory strikes as would be necessary to secure the defendant their right to --

THE COURT: Why can't you do that with unlimited challenges for cause?

MR. STOWERS: Well, because challenges for cause are different in that there's very narrow grounds legally upon which they must be granted. Now, if the Court --

THE COURT: But if pretrial publicity doesn't render a juror other than fair and impartial, why would it be constitutionally based that you'd have more challenges because

45

you'd have unlimited challenges for any juror who would be influenced by pretrial publicity to the extent that they couldn't be fair and impartial?

MR. STOWERS: Well, I think it's maybe the way we're both saying the same thing, just different ways, and that is I

Page 38

guess it depends on what particular answers jurors give under the particular voir dire questioning that will be sufficient or not be sufficient to warrant the granting of a defense challenge for cause which is really not the subject.

But you're right. That's one way that the Court can -- as they recognized in Blom that the Court can ameliorate the effect of not changing venue out of the district in which there has been extensive publicity. Obviously jurors don't get struck for cause just because they heard about a case, and that's not what we're claiming. We're talking about something a little different. It's about particular things about the prior case that are particularly troublesome that we've already discovered previously that we don't need to belabor at this point I think.

But in any event, we think it's one of the things within the Court's arsenal, if you want to call it that, that the Court has available to it to do, and that is to increase the number of peremptories. We haven't yet reviewed the jury questionnaires to evaluate where we are on the publicity question with reference to Cedar Rapids or Sioux City.

46

THE COURT: Or Minneapolis.

MR. STOWERS: Well, we don't have any questionnaires in Minneapolis.

THE COURT: Right, right.

MR. STOWERS: Or Minneapolis. But we haven't reviewed any of the jury questionnaires yet to see where we are. Obviously if we go out of district, we don't see any likelihood at all that we're going to be asking the Court, nor would we -- maybe I'm speaking out of school -- nor would we expect the

Page 39

Court to grant us any additional peremptories, and I'm not speaking out of school based on the reaction of Mr. Berrigan. But we wouldn't be seeking any additional peremptories if we moved to a different location because we don't think we have the basis for it that we have here given the unique situation that we have with this publicity.

Now, apart from that, we've raised, only for the purpose of raising it, an issue that's been rejected by the court in Hawaii which is the issue that there's this, to me, semi inexplicable disparity between the ratio of strikes that's granted to the government and the defendant in a noncapital case versus the ratio of strikes granted to the defendant and the government in a capital case. We don't think there's any test under equal protection, whether it's the rational basis test or the heightened scrutiny test or the strict scrutiny test, that can validly justify the disparity in the ratio.

47

Obviously in the noncapital cases, it's 10 to 6, defendant to government strikes, a 5-to-3 ratio. In the capital arena it's one to one. We don't know why that is. We don't think there's any rational basis for it. If anything, you know, one would think that in a capital case given particularly the issues that you have with jurors who are unwilling to consider the death penalty and the skewing of the jury pool that that already creates that the ratio that's set forth in the rule violates Ms. Johnson's right to equal protection and is, in fact, irrational and a violation of the equal protection clause.

THE COURT: Does it make any difference to your constitutional argument that peremptory challenges aren't constitutionally required?

Page 40

MR. STOWERS: Well, it's certainly something that's been pointed out in some of the cases that they aren't constitutionally required. The use of peremptories, however, having said that they're not, quote, unquote, constitutionally required is, in fact, a fundamental component of the procedure set forth in federal court for both parties to be able to select a fair and impartial jury from a cross-section of the community. And it's the means by which the defendant secures her right to a fair and impartial jury not only through challenges for cause but also through peremptory challenges which are set forth and provided for in the rule.

So I guess although they're not provided for, once

48

they're provided for and once they are set forth in there as a -- as something that both sides have, it's our position that providing those things to both sides doesn't give Congress -- although they're not constitutionally required, it doesn't give Congress a blank check to allocate those in irrational means or in an irrational manner. It doesn't make, frankly, any sense at all to us humbly.

THE COURT: Anything else?

MR. STOWERS: No. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Just to respond very quickly to two things, first of all, in the Amseler case, the court most certainly did not hold in that case that the Court has discretion. That language in that decision is dicta. The issue of that case was whether the nature of the charges the government brought entitled the defendant to 20 strikes versus 10 strikes. The court said 20 strikes and then in dicta said,

Page 41

And whatever additional strikes that the district court may want to give. So it's certainly not a holding of that court by any stretch of the imagination.

And further, it was -- that decision was handed down three years before Congress rejected the proposal that district courts be given -- expressly be given the discretion to give more peremptory challenges.

As to the constitutional argument, frankly I can't

49

make the argument any better than the court did in the Tuck Chong case for why that's just not a winner for the defense.

THE COURT: Let me ask you this, getting back to my discretion. It's just a hypothetical. Let's suppose that shortly before a death penalty trial the U.S. attorney in the district in which the case was being prosecuted held a press conference. Now, you and I don't know any U.S. attorneys who ever hold press conferences, but let's just suppose that one did. And in the press conference the U.S. attorney went beyond the code of professional responsibility and started giving personal opinions about the guilt of a defendant or the credibility of the witnesses that the government might call or the strength of the government's case and that publicity was pervasive on the eve of trial. Do you seriously doubt for a moment in that situation that I would have discretion to give extra peremptory challenges?

MR. WILLIAMS: I do with this caveat. First of all, the nature of peremptory challenges is to allow the parties to make gut reaction judgment calls based on what they believe, you know, either on psychology or body language or whatever is a better juror for them. It's not intended, never was intended to

Page 42

address the constitutional right of a defendant to have a fair and impartial jury. That's taken care of by challenges for cause.

And so to the extent that the U.S. attorney did

50

something like that that jeopardized the jury pool, the remedy is for the Court to exercise its discretion in granting motions for challenge for cause for things that go to the ability of jurors to be fair and impartial, not to change the peremptory strikes that are granted to both sides.

The caveat I attach to that is I'm not sure what the Court's discretion is as a sanction for the violation of local rules and how broad that might be, and perhaps under that authority you might have the ability to do that.

THE COURT: Okay. Why don't we move to the mental examination. Lots of issues there.

MR. WILLIAMS: As I understand the defense response, they have no objection to allowing us to have the defendant examined. They have no objection to us establishing a taint team for that purpose in order to wall off the prosecution team from learning the results of that examination. It's at that point that I think we start to break down on where we are and what agreements we have.

First of all, the defense suggests that before we conduct any examination that we ought to be able -- we ought to tell them what tests we're going to conduct so that they can challenge those tests. That seems to me to be totally inappropriate. The defense apparently can go out and conduct whatever tests they want to, whether they're good, bad, or ugly, but the government can't unless they run it -- we run it by the

Page 43

Court ahead of time.

Whether a test can be used, whether it's admissible, whether it's valid or not is something to be handled after the test is done as part of a Daubert hearing, not preliminarily to give the defense advance notice of what type of tests we're going to conduct. And I don't see anything in the rule that would give the defense the right to pass on what kind of examination the government's going to conduct.

I think there is some right by the defense to have an idea of the nature of the examination we're going to conduct in order for them to be able to advise their client concerning that. But as to the exact nature of the tests and examinations and so forth, I don't think they have a right to pass on that or to ask for a pretrial ruling on the admissibility of that test.

The other place we break down is the defense thinks that the trial team shouldn't have the right to know what type of examinations or tests they've conducted. Rather that's something that should be only disclosed to the taint team, and the taint team can be told that information but not the trial team. I disagree.

It's the trial team, it's Tom and I, who have the right and obligation to make a decision on who's going to be our witness for the government. The taint team is there simply to take the results of the examination and to hold them in such a way that they're not revealed to the government and to work with

the expert. I think it's my call and Tom's call to decide who we're going to hire on behalf of the government.

Page 44

And so I think that information comes to us. I don't think it goes to the taint team. It's the results of the examination and the examination itself that is walled off from the trial team.

That then brings up another ground that we have disagreement on, and that is what notice are they going to provide us? I believe that we have the right to have some idea of the nature of the type of mental disease or defect they're claiming because -- and I give the example in my brief -- they may not conduct any tests. What their expert may be is somebody who conducts nothing more than an interview of the defendant and off of that interview of the defendant, the oral examination of the defendant, arrives at a conclusion about what her mental difficulties may be.

To tell us then that all they've done is orally examined her gives us no idea whether I need to hire somebody for posttraumatic stress disorder, whether I need to hire somebody for a battered spouse syndrome, whether, you know, I need to have somebody hired for something else.

So for me to intelligently figure out who I need as an expert, I think we're entitled to have some rough idea of what it is they're claiming. And I don't think that's equivalent to telling us the results of their examination. I don't want to

53

know what their doctor came up with. I'd just like to know they hired somebody to look at these areas, and I don't need to know at this point what the results are of the examination.

But I gotta know what type of doctor they hired and what are the nature of the things you asked them to examine her for so we can be in an intelligent decision to respond because I

Page 45

can see it going down this way. If we don't get any more notice than what the defense is proposing we get to the penalty phase and all of a sudden I get to trial and find out, jeez, they've got a battered wife syndrome defense here, I didn't hire that kind of expert, we had no idea that's where they're going to, I'm going too have to be asking for a delay in the trial at that point for me to go out and get another expert to have that expert examine this defendant now for that issue because we never knew that we should be asking those questions up front. So I think there's some requirement now.

To the extent that --

THE COURT: Would the taint team be able to make that decision?

MR. WILLIAMS: Well, but the problem I have with the taint team making that decision, it's my trial, and I think I have the right as the prosecutor to decide who I want as an expert. I think that's fundamentally the trial lawyer's decision on who they're going to have as an expert. I don't want to delegate that to somebody that's going to make that

54

decision for me and then I'm stuck with their result.

Now, I'm not saying I'm going to be unhappy with it. I just don't think that's something I ought to have to delegate. If that's the only way the Court's going to require the defendant to -- defense to give us realistic notice of where they're going, then I would take that in the alternative as a fall-back position. But up front I think I'm entitled to get that information so I can make the decision who to hire and not delegate that to somebody else.

And then the last issue that I think we're at odds on

Page 46

are the defendant's right to have counsel present during the examination. I alerted the Court to the case by e-mail that the government's relying on. We just don't think that it's appropriate. We don't think there's a constitutional basis for it.

The Hinckley case back in 1981 reached the same conclusion, the D.C. district court, that the Mikos case did. There just isn't a basis for it, and it impacts, it clearly impacts, the ability of the psychiatrist or a neuropsychologist to conduct an examination to have defense counsel sitting there and have the defendant making eye contact with defense counsel and interacting with defense counsel during the process. So I guess that's the government's position on those issues, Your Honor.

THE COURT: Mr. --

55

MR. BERRIGAN: May it please the Court?

THE COURT: Yes.

MR. BERRIGAN: The government made three requests, and we've agreed to two of those, Your Honor. We need not to have agreed with the evaluation to begin with. I'll point out the language that's obvious: Government may have an obligation. Doesn't say must unless you have a first phase mental health defense, and we do not, and the record should be clear about that because it's very significant to some of the issues we'll discuss.

Second, the government requests an extension for notifying us about their experts which we've agreed to, but I just want to point this out. Two years ago we told the government the names of two of the four experts we still have.

Page 47

We filed a notice on November the 12th of 2002 that Dr. William S. Logan and Dr. Michael Gelbort would be testifying in this case in the penalty phase as defense mental health experts. And the government has yet apparently to take any action given that notice, and now they're yet again requesting an extension.

Again, we're not objecting to that. It's clear to me that the reason that they've not done anything is because they want more information than they're entitled to respectfully, than the rule and the law permits them to have. And so we have --

56

THE COURT: Which I think the rule's silly. Here's what I don't understand.

MR. BERRIGAN: Yes, sir.

THE COURT: And maybe I misunderstand the rule. When does the government have to give you the results of their tests?

MR. BERRIGAN: The government gives us the results of the tests after the conclusion of the first phase assuming there's a finding of capital murder, when we're starting the penalty phase and the defendant indicates an inclination or a decision to go forward with the mental health evidence. And that decision doesn't have to be made until after we get the government's mental health evaluation.

So I suppose it's really after the findings in the first phase if the defense indicates an intention to go forward with that type of evidence. And that's a decision we can then retract after --

THE COURT: Oh, sure, you can always retract it.

MR. BERRIGAN: Exactly right.

Page 48

THE COURT: But here's what I don't understand. And I just must be missing something. I don't see the prejudice to the defendant that the rule appears to want to protect. In other words, I don't know why you wouldn't just voluntarily waive the rule and agree to exchange all the reports in advance of trial.

MR. BERRIGAN: Well, because the purpose of the

57

evaluation that the government seeks is different than it is in the typical case. You know, in most cases that we deal with, noncapital cases, this issue only comes up if the defense has asserted a mental disease or defense excluding responsibility.

THE COURT: Right.

MR. BERRIGAN: And in doing so, the defendant waives certainly privileges, one of which is obviously a Fifth Amendment privilege. And there's this presumption that an evaluation done in that context is going to be a test of that defense; that is, the defendant has hired an expert, and the government has the ability to rebut that expert's conclusions particularly given that defense. It's not an information-gathering tool that the government can use against the defendant. That is, if the defendant doesn't go forward with that defense, then there's nothing disclosed. It's kind of no harm, no foul.

But that's not true on this part of the case. The defendant in the penalty phase on the government evaluation has not necessarily waived her Fifth Amendment right. So what would happen? The government's expert comes in and says, Well, Miss Johnson, I know you didn't plead mental disease or defect as a defense, but I want you to talk to me about these murders.

Page 49

And there's no scenario under which -- other than this where they get to do this evaluation, no scenario where the government gets to go to our client and say, Tell us about the

58

crime where the defendant hasn't waived her Fifth Amendment privilege.

It's really an amazing thing when you think about it. Here's a woman who has contended she's not guilty. She's asserted to a jury that she's not guilty. We've had a trial. And before the trial even started, a government expert was able to go to her and say, Tell me about the murders. Well, of course you can see the danger if that information is disclosed to these gentlemen prior to trial or if the defense gives that type of information to the government before trial. It will be used to her detriment on the very issue that the trial's taking place about which is is she guilty or not.

So the rule makes perfect sense to me that there be no danger whatsoever, not even a possibility that the government could use anything at all that our client is compelled to give their expert as a result of this rule in trying to convict her in the first place. So I think that's the reasoning of the rule if that makes any sense.

THE COURT: Not a whole lot because as a practical matter I can't imagine it would have any implication in this case. But anyway, I'm going to have to enforce the rule whether I think it's wise or not.

MR. BERRIGAN: Right. And then the rule provides for certain procedures and information. One of the things the government wants is they want a finding of the defense experts

59

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 177 of 200

before they go and hire their experts themselves, this battered woman's syndrome, for example, that's being used as an example, and they're claiming prejudice because we don't know what questions to ask which, frankly, makes no sense to me.

First of all, the government experts should ask, I suspect, a broad series of questions to explore any possible mental disease or defect that they think might be present that might be exhibited during the second phase of the trial.

But more importantly, the rule specifically prevents disclosure of this type of information. It says that there's to be no disclosure whatsoever until this rule kicks in in the second part of the trial. Now, even given that prohibition, the defense is willing to give the taint team information that will enable the government to hire relevant experts. That is, if we're going to use a neurologist, we think that they should be able to use a neurologist. If we're going to use a --

THE COURT: But it's like looking for a needle in a haystack for the responding side. They don't know what condition it is you're claiming the defendant has that they can even look for. They have to look at the whole universe of every possible neurological condition. It seems like a huge waste of time and money and expense to me.

MR. BERRIGAN: Well, the rule's not designed to prevent time and money and expense.

THE COURT: How are you prejudiced by having to

60

disclose to the taint team that you're relying on a battered woman's syndrome? How are you prejudiced on the merits?

Page 51

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 178 of 200

MR. BERRIGAN: Because the government goes out and hired some, quote, unquote, battered woman's expert that they determine is going to be helpful to them. They're not entitled to get that type of warning under the rule. It doesn't provide for that. It's supposed to be a rebuttal examination. They're supposed to --

THE COURT: But they don't know what to rebut.

MR. BERRIGAN: They do. They know what to rebut. It's a mental health defense. That's all the rule says.

THE COURT: It seems to me what's going to happen is -- let's just stick with the battered woman's syndrome. They find out that's what you're relying on. Then they'll come in and ask for a continuance to go find a battered woman expert.

MR. BERRIGAN: Well, if they were concerned about that, that's something the expert would ask. You know, the DSM-IV, the DSM-TR now, it's not an infinite number of mental diseases or defects.

THE COURT: I'm very familiar with it, and it's not infinite, but it's unbelievably extensive.

MR. BERRIGAN: Well, it's the same thing any psychologist does when he's evaluating a new patient. He considers all possibilities. That's not asking too much of a mental health professional to consider all of the available

61

possibilities. A battered woman's syndrome is one.

And you should know in the context of this, Your Honor -- and it's an issue we'll discuss later, but there's been some recent attorney-client work product documents that have fallen into the hands of the government that disclose a great deal of this evidence the defense is going to rely on in the

Page 52

mitigation portion of the trial, and Mr. Williams already has a great leg up on what he anticipates the penalty phase evidence from the defense to be.

THE COURT: I don't know what you're talking about.

MR. BERRIGAN: I know that.

THE COURT: Oh.

MR. BERRIGAN: I don't want to prematurely raise it other than to point out the danger that I think the rule is designed to prohibit, that the government doesn't get to tailor make their rebuttal evidence to what the defense is going to present. That's not the purpose of the rule. This is supposed to allow the defense -- I mean the prosecution to bring in a mental health expert to conduct an evaluation of the defendant to see if they think there's anything there. We don't have to disclose to them what the diagnosis has been or the findings of our experts have been, and the rule specifically says to the contrary. And Mr. Williams offers no support whatsoever for his position in that regard. But we're still, again --

THE COURT: But the rule doesn't prevent me from, once

62

the disclosure is made, continuing it to allow the other side to get an appropriate expert or to have the experts reexamine the defendant in light of the condition that you now claim in the penalty phase.

MR. BERRIGAN: I'm only suggesting the Court's giving a much broader interpretation to the government's rights than the framers of the rule intended. They undoubtedly anticipated that maybe, you know, the defense might have a conclusion that the government might not have, and the government doesn't get to go out and get a particular expert who's skilled in this

Page 53

particular area to rebut the defendant's conclusions. Our psychologists aren't necessarily particular experts in any field. We hire a psychologist. He's a psychologist. He goes and examines the defendant. He comes to a conclusion about a specific finding, bipolar disorder. Doesn't mean that we have to tell them, hey, it's bipolar disorder; go get yourself an expert in bipolar disorder. We didn't have an expert in bipolar disorder to begin with, but if we wanted to get one, we could. That's our prerogative.

THE COURT: Right, but they don't have the prerogative to do it.

MR. BERRIGAN: They're not provided that by the rule. It doesn't contemplate equal footing in that regard. We have access to the defendant as a matter of right. They have access to the defendant only by way of this rule and within the

63

constrictors of the rule, and they are very constrictive -- I'll grant you that -- and the Court may disagree with them, but they are what they are, and they do not require the defense to tell the government what our findings are before they hire an expert. It doesn't require that.

And I think Mr. Williams discloses something in his argument that he wants to hire the expert, not the taint team. That suggests to me that they're not looking for some independent evaluator here to make a determination about whether Miss Johnson has a mental disease or defect. They want somebody that can blow our people out of the water. He's not going to be happy with the taint team picking that person because that might not be the person that he would have chosen.

And again, the rule is not contemplating that the

Page 54

government have equal footing with the defense on this point, only that they have access for this very limited purpose of providing rebuttal evidence regarding mental health testimony generally. That's all it allows.

So I think there's nothing unfair, frankly, about the defendant's position or the rule, for that matter, or for the taint team prosecutor making the decision about who to hire. The government, frankly, has a whole cadre of experts, and federal prosecutors hire all over the country the same people, so I don't expect any huge surprises, frankly, about who's going to show up and testify in this case.

64

But it is what it is, and the courts have very strongly supported this idea about a taint team for good reason. They don't want any danger whatsoever that the information that's going to be procured by the government expert talking to the defendant face to face is going to fall into the hands of the men that are trying to convince the jury to kill her until that's appropriate, and that's in the second part of the trial.

Regarding the presence of defense counsel, Your Honor, the rule doesn't speak to this obviously. We've cited some cases in our brief. I'll tell you from practical experience, I have sat in on four mental health evaluations conducted of my client in capital cases, one as recently as last summer.

THE COURT: State or federal?

MR. BERRIGAN: In state court. I was present in the room in that particular instance, and sometimes we've been behind glass where the concern Mr. Williams expresses about, you know, the defendant looking to you for answers is somewhat alleviated by one-way mirrors. I mean, there are ways to

Page 55

accommodate this. The purpose of the defense counsel being present is to protect that Fifth Amendment right that is still intact. It would not be intact.

And this is the significance of the Mikos case that Mr. Williams has provided. That defendant's evaluation was on the basis of a first-phase defense. His defense was mental disease or defect. He waives his Fifth Amendment privilege in

65

asserting that defense. What is there for counsel to do almost in that circumstance?

That's not true here. This evaluator could ask Miss Johnson about the crimes. That in my view would be an area where defense counsel could say, Wait a minute, Miss Johnson; you have a right not to answer that based on your Fifth Amendment privilege. We have not waived that by choosing to put on mental health evidence in the second stage.

There's also this tremendous issue about future dangerousness and what questions might be asked Miss Johnson about that and whether counsel thought that was a Fifth Amendment problem. For example, you know, do you plan to kill anybody else; have you killed anybody else in the past? I mean, you can envision myriad of a particular area of questions that can be very damaging if they're asked and answered without the guiding hand of counsel to be there to protect the client's Fifth Amendment privilege.

And the manner in which that's done, frankly, in terms of the physical locale, I think that can be changed, whatever the psychologist or examiner requires. They don't have -- the attorney doesn't have to be in the room, but they do have to have access, realtime access, to what's being discussed and the

Case 3:09-cv-03064-MWB-LTS   Document 284-67   Filed 06/23/11   Page 183 of 200

ability to physically get up and -- if they need to consult with counsel. And having said that, Your Honor, I've never done that. That is -- and every time I've sat through these

66

evaluations, there's never been the need for that. I've always had the ability to be able to consult with the client, but we've never really had to do that. It was always understood that given the attorney's presence some of these areas wouldn't be discussed, and sometimes we ask ahead of time if you would not discuss those because the client would then have to say, I'm relying on my Fifth Amendment right, and what's the point of doing that if we know that's all going to happen?

So we think this is a critical element of the evaluation, particularly under these circumstances where Miss Johnson has not pled insanity defense in the first phase of the trial.

THE COURT: What's your own view of the Sampson, U.S. versus Sampson, resolution of that issue?

MR. BERRIGAN: Could you refresh my recollection?

THE COURT: Yeah, videotaping.

MR. BERRIGAN: I don't think that cures the defense attorney problem, Your Honor. That is, once it's videotaped it's too late. I mean, I -- it's the disclosure of the information that's protected under the Fifth Amendment, not going back later and taking it out.

We have had evaluations that have been videotaped, frankly. We've had them audio taped. I prefer the audio taping because I think it's less intrusive, and I do think that when the defendant or the client is on a videotape that there's that

67

Page 57

problem with the camera being focused on them and they're always cognizant of that where the audio tape is a much less intrusive means of doing the same thing, that is, accurately recording what was said. I wouldn't have an objection to an audio record being made of the evaluation if the government requested that. I don't understand that to be on the agenda today.

But to answer your question, the idea that it's recorded in some fashion doesn't trouble me nearly as much as not being able to be present to act as counsel for Miss Johnson during the course of the evaluation.

THE COURT: What type of facility would have these two-way mirrors or one-way mirror I guess?

MR. BERRIGAN: We've done them specifically in mental health centers in Missouri. There's one in St. Joseph and, there's another one in Fulton, Missouri, where they actually have these rooms that they use. That is, the facility uses them for like-minded purposes. They have students sometimes watch experienced evaluators conduct an interview, a clinical interview. And so they have the students lined up behind the one-way mirror, and it's very easy to substitute Pat Berrigan for students and have a tape going.

I don't know, frankly, what's available locally. I do know that in the facility where Miss Johnson is right now there's a very large room. It's a library that has windows. I don't know if -- I can't imagine we couldn't put a tape

68

recording machine in there in some fashion. I could sit in a room behind Miss Johnson so she wouldn't be looking at me. I would be in the background and yet be able to hear the

Page 58

evaluation and, if absolutely necessary, intervene, and only under the most dire circumstances would I do that, but that would protect her Fifth Amendment privilege. I don't think there's any real special facilities required for this particular purpose. We have done them in the county jails also where we've just physically had the attorney not in eye contact with the defendant so they're in a -- if we did it in a big room the attorney would sit on the back wall, and the evaluation would kind of take place at the front of the room but within hearing distance.

THE COURT: Mr. Williams?

MR. WILLIAMS: Two things, Your Honor. First on the nature of the notice, the rule is not as strictly drafted as the defense would ask the Court to see it. Nowhere in the rule does it indicate what that notice the defense has to give the government should consist of. Nowhere is it defined or explained what the nature of the notice could be, and a notice without meaning is worthless.

And so I think the Court has discretion under that provision to structure the notice in such a way that it has meaning as long as it doesn't result in providing the government with the results of the examination which is the only thing in

69

the rule that is prohibited that the government know up front, that the trial team know.

And so I think you have discretion to come up with a common-sense solution for giving meaningful notice to the government as long as it doesn't end up providing us with the results of the examination.

Now, to me this has no common sense to the extent that

Page 59

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 186 of 200

we are being asked to rebut their case without knowing what their case is. And to me that's just asinine. I don't -- I understand that the rule's set up the way it is because of the unique nature of a bifurcated capital case. But I think the taint team removes that concern. The existence of a taint team to cover and to protect the trial team from hearing any of the information protects the defendant's Fifth Amendment rights.

I have a real concern imagining this examination down the road. I've got my expert in there wanting to ask the defendant a question that my expert thinks is absolutely necessary to ask the defendant in order to arrive at a diagnosis as in -- let's assume it's a battered woman syndrome and he wants to ask a question about did you think about being beaten up when you were killing somebody and Mr. Berrigan jumps in and says, objection, Fifth Amendment; I'm not going to allow her to answer that question. Well, my expert's in a position, well, how can I evaluate this defendant's alleged mental process and problems if I can't ask the questions that I need to ask to get

70

there.

Now, I think the defendant's Fifth Amendment rights are protected by the existence of a taint team. That information will not come to the government, the trial team, without the defendant fronting it, by mounting this defense at the penalty phase. So she is free to say whatever she wants to say during the examination knowing that that information's not going to come to the government unless and until she puts it on the table.

But to hamstring the government by allowing Mr. Berrigan to object to questions that could implicate the

Case 3:09-cv-03064-MWB-LTS    Document 284-67    Filed 06/23/11    Page 187 of 200

defendant to me just throws the entire examination out the window. We might as well not even have it if we can't ask questions that go to the crime.

Mr. Berrigan, in explaining this whole thing, talked about the fact that she may be talking about the murders and that our expert's going to be talking about the murders and yet in the next breath he wants to be there to object to being asked about the murders. It just doesn't work that way.

And so I think as a common-sense approach that's what the existence of the taint team would do. It would protect the defendant's Fifth Amendment rights. I don't think defense counsel has a right to be present. And I think the Court can structure a common-sense notice requirement for the defense to give us some meaningful way to come up with an expert to rebut

71

their case.

MR. BERRIGAN: May I respond briefly, Your Honor?

THE COURT: You may, and you don't have to be brief. These are very weighty issues.

MR. BERRIGAN: I don't mean to be obtuse, but I fail to see how a taint team protects Miss Johnson's Fifth Amendment rights in the second phase of the trial. It seems to me that if the mental health expert said, Miss Johnson, have you killed any other people, for example, people uncharged in this present indictment, that that implicates her Fifth Amendment rights. Well, does that help her if that's not disclosed until the penalty phase? She has a Fifth Amendment right in the penalty phase as well. She has no obligation whatsoever to waive that right even with a mental health evaluation, even if she puts on mental health testimony in the second part of the trial.

Page 61

And I'll state for the record that our experts have been admonished and are following the admonishment that we've not waived her Fifth Amendment rights in regards to the charges that she's facing. That is, government need not worry that our experts are going to get up in the penalty phase of the trial and assert some quasi-mental health defense to these charges that they can't answer because they weren't able to ask her about the murders. That's not going to happen on either side. There will be no discussion about these murders during any mental health evaluation by the defense or the government

72

because it's going to be used in the penalty phase of the trial.

And I don't see the reasoning that Mr. Williams advances that if we have a taint team somehow her Fifth Amendment rights are protected in the penalty phase of the trial. Oh, they're protected in the first phase. I'll give you that. But not in the penalty phase.

THE COURT: But wouldn't they be protected in the penalty phase if it was videotaped or audio taped by your ability to then come in and say the government experts can't testify to this based on this response because it violates her Fifth Amendment right?

MR. BERRIGAN: No, Your Honor, but it leads -- the problem is those initial questions lead down paths that we then can't control. There might be an initial question that's responsive to a Fifth Amendment concern. That very quickly leads to discussions of other areas that we've lost the ability to control that now in coming in later on and saying, Well, Judge, this flows to this to this to this. It can be a very difficult proposition that we frankly need not engage in.

Page 62

I think the purpose of the individual -- at least as I understand it, when experts have asked for permission to videotape or audio tape these examinations, it's to accurately record what it is that was said so that later if they come in and say, Miss Johnson said this or this or this, they're very less subject to cross-examination, frankly, when they've got an

73

audio tape and a transcript that says exactly that. It's for their own protection. And I can see that. But it's not really used I think for the -- perhaps for the purpose you're thinking about.

Secondly, this is what the rule says. The government quotes the rule. I didn't draft this. It says, After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination on mental condition conducted by the defendant's expert about which the defendant intends to introduce expert evidence.

Now, I understand the government would like that information at the time that they're hiring their people, but the rule addresses this issue. We've quoted in our brief one decision that has specifically addressed this, and I think the Court has made reference to this Sampson case a number of times.

THE COURT: Yeah, Judge Mark Wolf's opinion.

MR. BERRIGAN: Yes, sir. He specifically says this about this particular issue. Before the enactment of the new Rule 12.2, the courts were split on the propriety of the government's first request for, quote, the nature of the proffered mental conditions. I'm going to omit the citations. And he cites cases in that regard on both issues, both sides of

Page 63

the aisle, that is, some circuits requiring the defense to comply with that request and some saying no.

74

Under the new rule, however, requiring the defendant to provide such information is no longer permissible because, quote, the nature of the proffered mental condition, end of quote, is essentially the same as the, quote, results and reports, quote, for which early disclosure is barred under Rule 12.2(c(2). That's exactly the issue that we're addressing, do we have to give that specific type of information. And at least Judge Sampson thought not, and we urge the Court to adopt that position.

THE COURT: Judge Wolf. He wasn't the defendant.

MR. BERRIGAN: Judge Wolf, yes, sir. I'm sorry. My apologies.

THE COURT: You know, while personally I kind of think -- I mean, I'm somewhat sympathetic to your position, Mr. Williams -- I think it's hard to rebut something that you don't know what it is -- it seems to me that for them to disclose the nature of any alleged mental disease, defect, diagnosis does -- at least it arguably runs afoul of the word results, not so much reports. It doesn't run afoul of the word reports, but if result doesn't mean posttraumatic stress disorder, battered woman syndrome, or whatever condition the defense experts come up with, what does results mean?

MR. WILLIAMS: Well, and I guess -- and maybe I need to be clear in what I'm asking for. What I'm asking for is that we be advised what she was tested for, what she is examined for,

75

Page 64

not what they found but did you examine her -- if it was nothing more than an oral examination, did you examine her for this diagnosis, this diagnosis, this diagnosis, this diagnosis. Don't tell us what the results are. Just tell us what did you test her for so we can test her for the same thing.

THE COURT: I think they're going to say, We had her examined to determine whether or not there's any potential mental disease, defect, illness, condition that could assist the defense, and that's not going to help you.

MR. WILLIAMS: And if that's the answer, then that's the answer. But I think if that is, in fact, what happened, then so be it. But, in fact, if they hired somebody who has a specialty in a particular area like Mr. -- or Dr. Gelbort who has an expertise in a particular area of frontal lobe injury and they specifically tested her for frontal lobe injury, then I think that's something that would help us to determine whether we need to have a neuropsychologist hired that specializes in frontal lobe injury. So that's the kind of thing I guess we're looking for. And the Court can arrive at I think just a common-sense result in this.

The other thing I just want to raise -- and I think it's a minor issue but perhaps not -- at some point to the extent that they've raised a psychological defense here, I think they waive the psychotherapist privilege. We know that she has seen at least one psychiatrist in the past in addition to their

76

expert. We would like to have a waiver from the defendant of her psychotherapist privilege so we can obtain those documents to assist us in looking into this matter. And we can't get

Page 65

those documents absent a waiver from the defendant.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We have no intention of signing a waiver absent some motion and order by the Court, Your Honor. I can assure you of that.

THE COURT: Somehow I'm not surprised by that.

MR. BERRIGAN: Secondly, you know, Mr. Williams' argument belies his position, frankly. He's known about Dr. Gelbort, the man he just mentioned, for two years. He knows he has this particular subspecialty, and he's coming in here asking us to tell us what his subspecialty is. Dr. Logan has testified in a number of federal cases, and I'm sure, quite confident knowing Mr. Williams, he knows that and probably has transcripts of his testimony.

THE COURT: I would assume so.

MR. BERRIGAN: Right. And the other two people are very easily found out about, if you will, if you spend five minutes online as we all know. So this whole idea that, you know, we're kind of hiding the ball is belied by the fact that we've given him the names and addresses of the four people -- and there are only four -- that they're contemplating testifying, and one of them is Mark Cunningham who Mr. Williams

77

saw on the witness stand in Mr. Honken's case, and what big surprise could there possibly be from Mark Cunningham so --

MR. WILLIAMS: Because Mark -- I'm sorry.

MR. BERRIGAN: I don't know what more really they would need to start this process of hiring somebody. Of course, I want somebody else to do the hiring, so I'm glad they haven't done that yet. I think the taint team should be entrusted with

Page 66

that responsibility.  But certainly they can't complain, I don't think legitimately, that they haven't been able to do something because they haven't had sufficient information to begin that process.

THE COURT:  Let me ask you this.  On the taint team issue, you know, I really don't think that anybody's more skeptical of government power than I am, even most defense lawyers.  I've been quite satisfied with the taint team.  It seems like it's worked very well.  And while my impression would be if we were kind of doing it on a fresh canvas I'd pick a taint team from another district, if it was just presented and there hadn't been a taint team, I'd just say, hey, let's -- I have no track record personally with the taint team, I'd say let's go to some district, prob -- not the Southern District of Iowa because they have a relatively close relationship; pick Minnesota or Illinois or somewhere.  But the taint team here seems to have worked very well.  I had a lot of exposure to it in Honken.  They were protective I think of Miss Johnson's

78

rights by infuriating Honken's defense counsel who now alleges that they violated their written agreement by disclosing to you all -- you know what I'm talking about?

MR. BERRIGAN:  Yes, sir, I do.

THE COURT:  -- the information that still is subject to a motion.  And they did that without any prompting from me or anything.

I guess what I'm saying is while I don't have faith in all of the assistant United States attorneys in the Northern District and if some who will go unnamed were assigned to the taint team, we'd be in another district so fast everybody's head

Page 67

would spin, I don't really have a problem with the taint team here, and actually I think it might work better simply because we've had a good working relationship and there's less chance of a screw-up than if we go outside the district. I just want to know your thoughts on that.

MR. BERRIGAN: I want to be very clear, and I think we were in our motion. I hope we are.

THE COURT: You were.

MR. BERRIGAN: The two gentlemen on the opposite side of counsel table as far as I can tell have always honorably conducted themselves, and I have no fear whatsoever not in the least that they would do anything inappropriate regarding that. That needs to be said. It doesn't need to be said. It should be assumed. But I want everybody to know that. We have no

79

concern about Mr. Miller or Mr. Williams.

But these are prophylactic measures, Your Honor. That's the whole idea. We're trying to prevent the risk and danger that even inadvertently we could have this spillover effect, and we've already had two taint teams in this case. You recall with Mr. McNeese we had this issue and then again recently with Mr. Honken. And, frankly, our experience recently dealing with the Honken problem has suggested to me that these people are -- although they're very hard trying to keep their separate responsibilities, they're just so -- just physically so close that we find ourselves talking to both members of the taint team and people that aren't on the taint team about the same issue because they're in the same office. Sometimes it's who's there, and if Mr. Williams isn't there, then we're talking to the taint team member or vice versa. And there's this

Page 68

danger, frankly. It's not an overt thing. It's not something where we're worried about anybody doing anything inappropriate.

But something inadvertent is in our view much more likely to happen with people in the same office than if you had somebody outside. It's really the difference between, you know, just using a condom and a contraceptive versus one or the other. We can make it better than it is if we have people from another district acting as the taint team. And I don't frankly see any problem with that. Their role is rather limited, at least in my regard. We're not asking them to do a whole lot other than hire

80

some people and get some reports and then at the appropriate time disclose those to the appropriate parties.

So it's -- of course, you know, this is clearly up to the Court. We know you're comfortable with the personnel that have been involved in the taint team, and nobody's suggesting that anything inappropriate's happened to date. But why take a chance that even inadvertently people in the same office are going to get information that they shouldn't have? We just think that being in the same office increases that chance dramatically.

THE COURT: Are there any particular assistant U.S. attorneys in particular districts that you've dealt with in death penalty cases involving psychological issues that you think would be appropriate nominees for a taint team?

MR. BERRIGAN: I almost hesitate to answer this because the attorneys I'm going to mention I think are fine lawyers, and I certainly don't want to add to the strength of the other side which in my view's plenty strong to begin with. But in Kansas City they have a death penalty case going all the

Page 69

time. That is, there is always at least one federal capital case pending.

There was a gentleman there by the name of Mark Miller. I'm not sure he's still there. He's an assistant U.S. attorney. In fact, he was on the death penalty panel in Washington. I think he spent some time overseas teaching law to

81

some Bolivians or something. And if he's back, he'd be the best possible person you could find in this part of the country in my opinion.

Matt Whitworth is an experienced prosecutor, has been there for 20 years. He's tried death penalty cases in state and federal court. I've personally tried death penalty cases against him. He's one of the most skilled and knowledgeable U.S. attorneys that I've ever encountered, present counsel excepted.

THE COURT: And they're both in the Western District?

MR. BERRIGAN: Yes, sir, in the Western District of Missouri. And Jeff Valenti is another gentleman in the same office that does death penalty work. They have a death penalty team down there. I think any one of those people or two of them would be terrific.

THE COURT: Let me ask you this. If I did decide to go outside the district and appoint the Western District of Missouri as the taint team and I just left it to the discretion of the U.S. attorney to pick somebody, hopefully somebody with death penalty experience, that would be acceptable?

MR. BERRIGAN: That's why I mentioned it. I mean, these people have death penalty experience. I could say Minneapolis would be good. But I think they want somebody that

Page 70

knows what they're doing, and all I'm suggesting is that these folks do this a lot, and they have experts that they know that

82

are competent that they've used themselves, and I think that they would do a very good job for the government in this particular area.

I'm being quite open and honest about that even though eventually that could be to the detriment of my client that these are very skilled advocates. They know what they're doing. They know what they're looking for in terms of mental health experts that would be favorable government witnesses, and they've done it before a number of times. So I can recommend them highly. I frankly don't know any other attorneys outside of that office that are as skilled and capable as the gentlemen I've mentioned.

THE COURT: Any nominations, Mr. Williams, without agreeing -- I know you think I ought to just appoint the taint team, and there's a lot of good reasons why I should, and I might. But in the event that I don't . . .

MR. WILLIAMS: In the event that you don't, I know Matt Whitworth personally very well and think he's a great prosecutor. I'd have no concerns about him. I know Mark Miller vaguely. I've met him a couple times. I don't know him very well. I have no reason to discount in any way Mr. Berrigan's representations concerning Mr. Miller or the other gentleman that I don't know. Matt Whitworth I do know personally, and, you know, I'd be comfortable with him as heading the taint team.

THE COURT: And procedurally if I were to just order

83

Page 71

that, then somebody's going to contact them, or do I have to like call down there and set it up? Or once I enter a written order, I'm just curious about how it would happen.

MR. BERRIGAN: The Court really has to do -- if they are a taint team, Your Honor, at least in our view the Court has to communicate with those people or obviously one of your staff. But I think they would know very readily what it is that you want them to do once they get the order just given their experience.

THE COURT: And I can talk to them ex parte?

MR. BERRIGAN: Well, I think as a procedural matter, I mean, you're asking them not substantive issues but procedurally just as we discuss procedural matters off the record sometimes ex parte. I personally have no problem with that, nor do I think any member of our team would. But we really would much rather have the Court doing that than the government counsel.

THE COURT: Than the U.S. Attorney's Office.

MR. BERRIGAN: Right, exactly.

THE COURT: And I think if I did it, it'd be by telephone, but I think I'd have it reported.

MR. BERRIGAN: Well, that's probably the safest thing to do, sir.

THE COURT: And I do tend to have some off-the-record discussions because I know the lawyers and I trust them, and not that these wouldn't be trustworthy, but I don't know them. So

84

just be a little bit safer to have it reported and sealed.

MR. BERRIGAN: Sure, right.

THE COURT: And then if anything ever arose, it could be unsealed.

Page 72

MR. BERRIGAN: Defense has no problem with that proposed procedure.

MR. WILLIAMS: Your Honor, just so we're clear, I think that the way any taint team works is there's a one-way flow of information. And so in any case for a taint team to operate, they gotta have some idea what's going on. And so they will get information from the trial team, but no information goes the other way. It's a one-way flow of information.

So I can't see Matt Whitworth doing his job without being able to talk to us to get information, okay, what's your case about. They've gotta have some information to work with. They can't just do this in a vacuum.

So I think there's going to have to be communication between Mr. Whitworth and myself with the understanding that the information's going to be a one-way flow. He's going to have to have a copy of the indictment. He may have to have some summary of what the nature of the case is or something like that so he can make some decisions on who is best to hire on a case like this.

THE COURT: Well, what about this? I was going to suggest that that be reported as well.

85

MR. BERRIGAN: Well, I guess the problem with that is -- and again, I hope I'm not even in the least being suggestive in terms of impugning anybody's integrity here because I have the highest respect for Mr. Miller and Mr. Williams both. But procedurally you can see how that could be a problem, that there are these communications and even if they are one-way. Nobody else knows what they are.

THE COURT: Well, that's why if it was reported and

Page 73