then unsealed at the time of the penalty phase we could determine if there was a problem.

MR. BERRIGAN: Well, I guess our preference would be -- and if this doesn't work, Your Honor, obviously it doesn't work. But our preference would be if Mr. Whitworth needs information -- obviously he can get any pleadings he wants from the Court -- then he go through the Court to do that or perhaps some designated member of the Court's staff and that whatever he needs be provided to him.

Now, if there's something that he needs the Court doesn't have to make this decision, I can't imagine, you know, what it is. All he's doing is hiring mental health professionals and waiting for them to get a report back. So I don't know what Mr. Williams is thinking about in terms of what he needs. If he needs a summary of the case, we can send him a bunch of newspaper articles, and he can read quite a lot.

THE COURT: I think we can just send him your change

86

of venue motion.

MR. BERRIGAN: Exactly, right. He can read the four volumes of newspaper articles. I'm just concerned about what it is that is going to be sent to Mr. Whitworth for this purpose.

MR. WILLIAMS: Well, I guess my bottom line is you either trust the taint team or you don't. I mean, if there's such a concern that this taint team is somehow going to feed information back to us, then you can't trust the taint team in the first place. I don't know what information Mr. Whitworth needs or doesn't need, if anything.

I just can't contemplate if somebody called me up -- if I was called by a district court judge and said, Okay, you're

Page 74

now in charge of a taint team for a case in another district, I'd want to be able to know a little bit about what that case is dealing, what the nature of the charges are, what the nature of the evidence is so I can help make an intelligent decision. And to ask Mr. Whitworth to do that in a vacuum without having communication with me just defies common sense in my view. But --

THE COURT: Let me ask you this. Would you be insulted, offended, put off by having a court reporter record any phone conversations you had with whatever the taint team lawyer turned out to be?

MR. WILLIAMS: No, I have not the slightest concern that anything I ever did would be improper or that

87

Mr. Whitworth --

THE COURT: Neither do I. But that way if there ever was an allegation -- it's not that I have any concern that you would do anything improper. Quite the contrary. It's if there was ever an allegation by anybody. Might not be these lawyers. It might be post-conviction lawyers or appeal lawyers or some other lawyers. Might not even be lawyers. Might be Miss Johnson's family members or something. Then you're fully protected.

MR. WILLIAMS: Sure, and I have no problem with that, and I understand that. And, frankly, this isn't even my call. I mean, I think to the extent you assign somebody to be on the taint team, I think it's going to be their call on what information they need. Perhaps he doesn't need anything from us. If I was in his place, I'd want some information. But to the extent that he requests contact with the prosecution team on

Page 75

this and get information from us, I think that's something he should be able to be entitled to. But that's I think something that you can decide.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: And I don't want to suggest I'm trying to limit what access Mr. Whitworth has to information he needs. It's a question of where he gets it. And I'll say this for the record. I guess my experience in Missouri in 20 years of practice is when we have taint teams or even when prosecutors

88

are disqualified for a conflict of interest, there is absolutely no communication between the old prosecution team and the new team unless defense counsel's present or it's in the court proceeding. We don't have this kind of informal discussion that Mr. Williams is at least suggesting. I've just never seen that, so that's not within my experience. When you have a new team or a taint team, the whole purpose of that is there be no communication whatsoever between the two, the old team and the new team or the taint team and the government team.

THE COURT: Well, I think that's a more -- a broader view. I liked Mr. Williams' characterization that the information can only go one way.

MR. BERRIGAN: Except that there's no -- there's no -- there's no way to monitor that, Your Honor.

THE COURT: Well, there is if it's recorded.

MR. BERRIGAN: Well, yeah.

THE COURT: And then it's released to you all before the actual -- or at the beginning of the penalty phase.

MR. BERRIGAN: Well, again, whatever you decide the measures are appropriate but --

Page 76

THE COURT: Wouldn't that take care of your -- doesn't it satisfy both concerns to the extent that the taint team lawyer has this burning need to get some information from Mr. Williams that he might know that I certainly -- and I don't want to get involved in trying to supply information to the

89

taint team. That's not my job. And I'm not going to do it. But if he did -- I agree with you; I don't really know why he would have to. But if he felt he had to, we'd at least have the assurance that it would be recorded and that you'd be able to see the transcript to make sure no hanky panky took place.

MR. BERRIGAN: I can't agree to that only because -- I'll tell you what's going to happen. Eight years from now we're going to have a federal habeas hearing in here, and Pat Berrigan's going to be on the witness stand, and some very fine lawyers's going to ask me, Why couldn't Whitworth and Williams pick up the phone and talk to each other any time they wanted without being on the record and you agreed to that?

I mean, the whole idea of the taint team is, at least in my view, there be no danger of inadvertent communication. And what you're suggesting is that they self-monitor each other, that they're going to record whatever it is that they say. And that's fine, and you and I and everybody present can take them at their word, but that's not going to happen eight years from now if Miss Johnson's on --

THE COURT: But there will be a transcript of it that you'll see.

MR. BERRIGAN: How would we know, Your Honor -- and again --

THE COURT: How would you know what?

Page 77

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 4 of 200

MR. BERRIGAN: How do I know that they're recording?

90

Why can't Matt Whitworth pick up the phone and call C.J. Williams and not record a thing?

THE COURT: They could do that regardless of whether I -- they could always do that.

MR. BERRIGAN: Except that the order's allowing them to communicate with each other which we seek to avoid, period, that the taint team means you don't get to talk to Mr. Whitworth, Mr. Williams, and he doesn't get to talk to you, and if there's some problem with that that Mr. Whitworth has, not Mr. Williams, Mr. Whitworth has a problem, then that needs to be addressed with the Court. And until that day arrives, then this isn't something we need to worry about.

And, frankly, I don't think it is going to arrive. I think Mr. Whitworth knows as soon as he gets an order exactly what it means to hire a mental health expert for the government because he's done it a number of times. He knows who to hire, and he knows what it is that the government, Mr. Williams and Mr. Miller, are going to want. And he's quite capable of doing that, I can assure you.

So I don't foresee this as a big problem. Apparently Mr. Williams does. But I can't agree to a process, after asking for a taint team, that has the prosecution talking to the taint team under any circumstances.

THE COURT: Why don't we take a 15-minute recess. We'll use this clock up here. It's our new atomic clock. It's

91

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 5 of 200

set every few minutes or something.

(Recess at 3:07 p.m.)

THE COURT: Please be seated.

Mr. Williams, does that conclude the government's motions?

MR. WILLIAMS: It does, Your Honor. Thank you.

THE COURT: Defendant's first motion is to strike the death penalty.

MR. STOWERS: Unless there's something specific that the Court wants to discuss, we would just ask to submit that on the brief and the motion.

THE COURT: Okay. Number two.

MR. STOWERS: That's the prior court proceedings involving Mr. Honken; is that correct?

THE COURT: Right.

MR. STOWERS: As I understand where we are on that motion, I think the government is in agreement that with regard to his most recent conviction that is a matter that would not be raised, mentioned, or brought to the jury's attention by them at any point in the proceedings and that they would agree with the motion in limine being sustained as to that. Is that correct?

MR. WILLIAMS: That's correct, Your Honor.

MR. STOWERS: And then as to the other -- what I'll call the prior conviction -- they're both prior to now, but his older conviction, the one for which he was in prison at the time

92

he sustained his most recent death penalty conviction, I guess our issue with that is that that conviction and the fact that he pled guilty and walked into court in a guilty plea proceeding, that adjudication is not an adjudication that is in any way

Page 79

binding against our client because we weren't a party to that. We don't think that the particular offense of which he was convicted is a matter that our jury should be advised about because it's not -- again, it's the same problem. And we would ask that -- and I'm not sure how they want to use that is part of the problem.

So I think we may be better off for the government to address how they want to use it because we've had some conversations amongst counsel on that question trying to work through the issues on that prior one. And I think if they explain what they want to do, then maybe it'd be a little bit more orderly for me to respond to that because I think that's the issue.

THE COURT: Okay. Sure.

Mr. Williams?

MR. WILLIAMS: Your Honor, as part of the charged conduct, it is the continuing CCE that occurred up through the time period of 1996 where Defendant Honken and Defendant Cutkomp are both arrested, charged, and a meth lab was seized. That evidence will come out in the nature of us proving up our case, that there was a meth lab, that the defendant was part of that

93

meth lab, and that she was a co-conspirator and that this meth lab was seized and Cutkomp and Honken were arrested.

We don't plan on getting into the specific charges that Honken was charged with, but it's frankly going to be self-evident to the jury what he was charged with. When we talk about seizing a meth lab out of his house with defendant -- or Mr. Cutkomp, part of his testimony's going to be, You were convicted yourself. And what were you convicted of? And that

Page 80

was conspiracy to manufacture methamphetamine with Dustin Honken. And how many years did you receive? These years and so forth, and we go from there. So it's going to come up in that context. We don't plan on getting into how long of a sentence Mr. Honken got because it's not relevant.

THE COURT: But even if you did, so what?

MR. WILLIAMS: Frankly, yeah.

THE COURT: But right. It's not relevant.

MR. WILLIAMS: We're not going to get into it. The fact he was in prison in Colorado will come up. The defendant had contact with him while he was in prison in Colorado, and the nature of that contact and what occurred during those phone calls and so forth will most likely come out during the trial, so that -- he was sitting in a federal prison in Colorado at some point will come out as well.

At no point are we going to have a witness testify or are we going to argue that the jury should conclude that because

94

Honken and Cutkomp were found guilty of conspiring that they, therefore, ergo ought to conclude that the defendant is guilty as well.

We understand our obligation to prove her involvement in this conspiracy with the evidence we're going to put on at trial, and we intend to do that. So -- but we're not going to suggest somehow because these two gentlemen got convicted that she's guilty. She was not charged as a co-conspirator in that indictment in 1996, and we're not going to allege that she was. It's just not going to come out at all.

So I understand, I guess, to some degree the defense concerns if it was a case where they really thought we were

Page 81

going to be trying to suggest that these two gentlemen's guilty pleas means she's guilty, but we're not going that direction. So hopefully that helps the Court and the defense understand the nature.

THE COURT: Mr. Stowers?

MR. STOWERS: It does. With regard to Mr. -- the particular offense of which Mr. Honken was convicted is something, first of all, I don't know why it matters to bring that up, and I'm not sure it's relevant. But that adjudication is in a separate proceeding involving a separate party and is not in any way proof in our case of the fact that he was, in fact, guilty of that offense which sounds kind of strange to say.

95

THE COURT: It is strange to say, and I think you're dead wrong.

MR. STOWERS: Well, I think his --

THE COURT: It is proof that he's guilty of that crime.

MR. STOWERS: Well --

THE COURT: And the fact that she wasn't a party to it has nothing to do with it whatsoever. It's still proof that he's guilty of that crime. Now, whether that's relevant and should be admissible, but it certainly is proof. It's the only proof that there can be.

MR. STOWERS: Well, it's the same issue that can arise in the situation a little differently when you have a testifying person up in front of the Court and you've got a defendant on trial and you may have had the defendant testify or a witness testifying I should say to what they, for example, pled guilty

Page 82

to previously in court, and they might say, Yes, I was charged with that person sitting over there in court previously; I pled guilty to that offense, entered into a plea agreement.

Now, the purpose for that all happening is for the purpose of establishing the predicate for why they're here in court testifying.

THE COURT: Right. And there's a standard instruction that the jury can consider it for their credibility but it's not evidence of the defendant's guilt.

96

MR. STOWERS: Right.

THE COURT: And that's the same situation we have here.

MR. STOWERS: Precisely.

THE COURT: But it doesn't mean that they're not guilty of the crime they pled guilty or are convicted of.

MR. STOWERS: Well, not as to them, but it's not evidence of that for that purpose in our trial. In other words, it doesn't establish that fact in our trial.

For example, they couldn't bring in on Mr. Honken's most recent conviction the fact that he got convicted of participating in a continuing criminal enterprise and was the ring leader of that organization and that the charges in that case were identical to those in ours and then introduce that into evidence to establish that that allegation which is now also made in our case was true. It wouldn't be admissible for that purpose because of the hearsay, confrontation clause, et cetera, problems that occur because that adjudication was in a separate proceeding.

So we may be saying the same thing different ways or

Page 83

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 10 of 200

not saying the same thing at all. But our position is is that you can't use that adjudication which is a valid adjudication against a witness or Mr. Honken to prove -- to prove the matter that was adjudicated in our trial, and I think that's maybe the right way to say it.

97

THE COURT: To prove that there was a CCE --

MR. STOWERS: For example.

THE COURT: Yes. No, I agree with that.

MR. STOWERS: Then we're all in agreement with what --

THE COURT: Yeah.

MR. STOWERS: Okay. And that's our concern. That's the reason we raised the issue, and we think that is something that shouldn't be brought into evidence in front of the jury particularly with regard to Mr. Honken who's not going to, as we understand it, testify in our trial. Now, as to a testifying witness, we got a different issue which we have the standard problem with a testifying witness.

THE COURT: Mr. Cutkomp, for example.

MR. STOWERS: Yeah. And that's a different question, one that's not really within the scope of this motion. But that's the standard issue that you have all the time through the jury instructions that -- I think the standard instructions cover that situation. And as to that, I think it's a different issue.

But as to an adjudication against somebody who's not going to be testifying here in our trial, we think that is not admissible to establish that whatever it was that adjudicated -- was adjudicated I should say against that person --

THE COURT: That's where I totally disagree with you.

Page 84

Of course it's admissible for that purpose, but that purpose

isn't relevant to anything in this trial.  But of course -- that's the only way you could prove it, and it's binding on the whole world.  It's an indisputable fact that Honken was convicted of the '96, pled guilty in whatever year it was, '97, was sentenced in '98.  That's an indisputable fact that applies to everyone.  It's a fact I can take judicial notice of.

MR. STOWERS:  Well, but it's not admissible --

THE COURT:  Well, that's a different question.  You're saying it doesn't prove that he was convicted.  Of course it proves he was convicted.

MR. STOWERS:  Well, it doesn't prove that the charge in our case against him was correct.  I mean, they have to separately --

THE COURT:  The charge in your case?

MR. STOWERS:  Yeah.

THE COURT:  What do you mean by that?

MR. STOWERS:  Well, it doesn't -- for example, they've got in this case continuing criminal enterprise.  Some of their allegations are that certain offenses were done by certain people during the course of this continuing criminal enterprise, okay, as part of the series of offenses that constitute the series for the CCE.  And one of those offenses very well could be, according to the government, the charge that Mr. Honken was convicted of in 1996 or '97, whichever the year was, and they may say, Well, look, here's a judgment of conviction; Mr. Honken

was convicted; there's one of them.

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 12 of 200

Then they bring in a judgment of conviction against Cutkomp and say there's another one. And they bring in another one, you know, from some other individual and say there's your three; they're a series; they're connected together; we'll connect them up through other evidence, and we've now proven our three because these gentlemen were already convicted as shown by the court documents in their cases, and that's the series. And then they go on to prove their other elements through other means. We don't think you can do that.

THE COURT: I don't know why you couldn't.

MR. STOWERS: Well, okay. And that's fine. But that's --

THE COURT: I don't know why you couldn't do that.

MR. STOWERS: Well --

THE COURT: They'd still have to prove up that they were -- but the actual proof of the conviction, that's how you prove a conviction, and there's no reason why they couldn't do it that way. The issue is was Angela Johnson part of that CCE. They can't prove that up through his conviction.

MR. STOWERS: Well, I guess what I'm -- I'm in disagreement with your statement in that regard, but we might be miscommunicating so . . .

THE COURT: Well, I don't think so. I think we just disagree.

100

MR. STOWERS: Yeah, and that's fine. But we've raised the issue. It's in our motion and our briefs, and that's our position on it, is that they should not be allowed to attempt to use Mr. Honken's previous conviction, either one of them, whether one that occurred last fall or the one that occurred

Page 86

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 13 of 200

seven years ago, eight years ago now, for the purpose of establishing the offenses of which he was convicted. And that's all. That's our position.

THE COURT: So I'm a little bit confused, Mr. Williams. Are you going to use it or not use it?

MR. WILLIAMS: We are going to be bringing out evidence that Mr. Honken was convicted of a drug offense. The exact nature of the charges I don't think are something we're going to dwell on, and what his sentence was we're not going to dwell on. But the fact that he was convicted and went to prison is going to be part and parcel of our evidence just because of the nature of the evidence that's going to come out, the timing of things.

THE COURT: And just to show the context of things.

MR. WILLIAMS: Right. I mean, for Mr. Cutkomp to testify about the conversation that he had with Honken, he's going to say Honken was on pretrial release, you know, on charges. I mean, it just comes out in the context of the entire case.

And I agree with the Court. I mean, we could -- if we

101

had three different co-conspirators as part of the CCE all of whom pled guilty to three distinct violations, I could get up, put that evidence on, and say there's my three. Now the question is was she part of it, and that's what the trial's about. But if that's part of my proof that there were three drug violations that occurred as part of the CCE, I think I have a right to do that.

THE COURT: Are you going to do it in this case?

MR. WILLIAMS: I'm going to bring out the fact that

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 14 of 200

Honken was convicted of a drug offense as part of it. But it's --

THE COURT: But without explaining what it was, how would the jury know that that's part of a predicate act if you're trying to prove it that way?

MR. WILLIAMS: I guess I haven't thought that out, and perhaps I'm going to focus on that. I mean, my thought is I'm going to prove this case just like we did the Honken case. In the Honken case we brought out the fact he was convicted of the drug offense, but certainly that wasn't the whole totality of our evidence of the CCE and the series of offenses.

THE COURT: Well, Mr. Stowers -- I'm sorry. I didn't mean to interrupt.

MR. STOWERS: No, that's fine.

THE COURT: I may be unaware of -- unaware, uninformed, ignorant, not smart enough to know the line of

102

authority you're thinking of, and so I think I just heard from Mr. Williams that he may, in fact, try and do that. So, you know, you can either just raise it at trial, or you can try and file a late motion on it.

MR. STOWERS: Well, it's news to me that that's what their desire was, to prove it that way, but we may have to address that in a motion now that he's told me that.

THE COURT: Right, right.

MR. STOWERS: So you're right.

THE COURT: Yeah.

MR. STOWERS: And that was unanticipated so -- but I understand what they want to do with regard to the Honken issue, and I think the record's been made on that question.

Page 88

THE COURT: Okay.

MR. STOWERS: With regard to the bill of particulars, we filed that because I wasn't sure that the prior ruling would apply to the new indictment. They've agreed that the bill of -- or the bills -- I don't know what the right phraseology is, the bills or the bill of particulars that they've already filed pursuant to the prior orders of the Court would apply to that new indictment which I think sort of renders the issue resolved.

THE COURT: Well, except that as I recall it, Judge Zoss denied your motion for bill of particulars, and you never appealed that to me.

MR. STOWERS: I think that's a diff -- if I understand

103

what -- I think that was a different motion for bill of particulars. On this one which was on -- if I've got it correct, on this one which is on the co-conspirators and the identification of the supervisors and the supervisees, I think that was granted, and I think that granted motion was affirmed, and the government's already filed their motion, their bills, unless I'm -- am I right about that, Mr. Williams?

MR. WILLIAMS: Yeah. As I understand what they're asking for we already complied. They wanted the names of the co-conspirators and the names of the CCE participants. That part was affirmed by Judge Zoss. We did comply with that and provided them information. I think that's all they're asking for now, and they're just wanting to make sure --

THE COURT: So are you withdrawing the motion?

MR. STOWERS: I think it's resolved because they're agreeing that their prior bill can be treated as responsive to this motion, so there's no issue.

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 16 of 200

THE COURT: Okay.

MR. STOWERS: So that takes care of that I believe.

The motion to strike, Your Honor, I think that speaks for itself largely. I understand the Court's -- or the government's response. The allegations that they've made in certain of these counts which we are addressing in this motion are exceedingly broad as we've indicated. We think those allegations are not sufficient to allege the -- an offense

104

within the series that's necessary under the CCE statute and that those allegations should be struck.

If that's not the right particular remedy because those allegations, in fact, are relevant to the CCE charges and they're really going to be part and parcel of their evidence in the case, that's fine.

But our position I guess would still remain that those allegations which are essentially unspecified aren't submissible in the final instructions to the jury because there's no way to -- there's no way for a jury to consider those and evaluate them and render a verdict on the allegations that are in the motion to strike that we've complained about because they're things like at some point over a six- or seven-year period somebody distributed drugs somewhere, someplace, and that was done as part of the continuing criminal enterprise.

So there's no real way to submit that question to the jury the way those allegations are crafted. And so whether it's struck now or not submitted later in the final submission to the jury does not matter to us. But the reason I raised it this way was to bring it to light now.

THE COURT: Well, but your argument is that they're

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 17 of 200

too vague.

MR. STOWERS: That's correct.

THE COURT: But you filed a motion for bill of particulars on those paragraphs, 1, 2, 4 of Counts 6 through 10,

105

and Judge Zoss denied the motion for bill of particulars on November 26, 2002, and you never appealed that ruling.

MR. STOWERS: Well, that may be. Maybe I'm missing something. Is that -- our claim is that these allegations should be struck because they're not --

THE COURT: I don't think that's the remedy. I think the remedy is the motion for bill of particulars, you filed that; you lost, and you never appealed it. So you've waived the argument it seems to me.

MR. STOWERS: Well, I don't -- I don't believe we have, but in any event, I think those issues in the long haul aren't going to be submissible to the jury because there's nothing to submit to the jury. There's nothing for them to be able to know that they're asked to decide. How can you render a verdict on an allegation unanimously between 12 people that at some point in time over a 6- or 7- or 8-year time period --

THE COURT: Because there's evidence to support it. Then the jury -- if there isn't evidence to support it, they don't find it. If there is, they find it. I think -- and, see, here's where I think the confusion is. Those allegations are vague.

MR. STOWERS: Right.

THE COURT: But the remedy for that is to not wait till the eve of trial and file a motion to strike. The remedy is a motion for bill of particulars. You filed that. You lost.

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 18 of 200

You never appealed it.

MR. STOWERS: Well, okay, and that might be your decision, but I guess in our position on this, I think that our -- here's what I would say. I think the allegations are so vague that they should be struck, and the reason they should be struck is they aren't -- they don't constitute submissible allegations to a jury. Now, I don't think that a bill of particulars can cure the invalidity of those allegations in the indictment.

Ordinarily -- I think the case is Russell versus United States which is a U.S. Supreme Court case. I don't have the cite off the top of my head. You can't cure an invalid indictment through a bill of particulars.

So I don't know that a bill of particulars would get us to where we would need to get anyway. Now, it might get us closer in some respects to curing some of the problems. But it -- in the sense of notice, helping you craft jury instructions, and that sort of thing.

But how are we going to submit allegations to a jury that some person who was one of these supervisors or underlings distributed drugs or possessed drugs with intent to distribute or manufactured drugs at some undefined place at some point in time over a seven-year period and --

THE COURT: I didn't have much problem submitting it in the codefendant's case.

MR. STOWERS: Well, that's the codefendant.

Page 92

THE COURT: Now, they weren't attacking it like you are.

MR. STOWERS: Yeah, but I think we've gotta have a unanimous jury verdict on each of these --

THE COURT: You do.

MR. STOWERS: -- each of the series, and then if you submit an allegation like this to a jury which is really not just one allegation; it's a myriad of allegations because it's going to include all of the allegations of all of the drug deliveries of all of the persons who participated purportedly in the CCE, it's going to include in the other respects all of the possessions with intent. It's going to include --

THE COURT: But what's the problem with that if the jury finds it beyond a reasonable doubt?

MR. STOWERS: Because they won't necessarily be unanimous on which particular instance and which particular person they're finding. They might all agree on different instances, and then you wouldn't have a unanimous verdict on those offenses that are included within the series, and that's why these allegations are unduly vague, and that's why they aren't going to be submissible, and that's why we've asked to have them struck. And we don't think you can cure that kind of a vagueness by going back to a bill of particulars as apparently now you're pointing out to me was denied by Judge Zoss and not

108

appealed. So --

THE COURT: I understand your argument now more clearly than I did before.

MR. STOWERS: And that's the argument, yeah.

THE COURT: What do you have to say to that,

Page 93

Mr. Williams?

MR. WILLIAMS: Your Honor, you already ruled on this exact same motion. They filed it, and on February 13 of 2003 you issued an order denying it on the same grounds. They had an identical motion to strike surplusage. And it's simply a case that as long as we have evidence to support the allegations that are made in there as part of each of these events, they are submissible to the jury.

We will have evidence that during this time period members of this conspiracy possessed drugs with the intent to distribute them. All the jury needs to find is did a participant in this conspiracy possess drugs during this time period. We don't have to prove each of the individual isolated events to establish that that was part of the series. And you found that back in February of 2003. That's not what's required as part of a series of continuing criminal enterprises.

So we're back over old ground in my view. We've dealt with this issue before, and I don't see that anything's changed.

THE COURT: Okay. Want to respond, Mr. Stowers?

MR. STOWERS: No.

109

THE COURT: Okay. How about trifurcation?

MR. STOWERS: That's Mr. Berrigan's motion.

MR. BERRIGAN: May it please the Court.

THE COURT: What's Willett doing here today?

MR. BERRIGAN: Not much, sir.

THE COURT: There's an honest concession.

MR. WILLETT: So stipulated.

MR. BERRIGAN: I'm not going to argue this much because by your question you clearly understand the issue.

Page 94

THE COURT: I think I do.

MR. BERRIGAN: Yes, sir. I mean, in a nutshell it's our contention based on Ring and Apprendi that an amount of the offense -- an aggravating circumstance is an element of the offense. It has to be proven beyond a reasonable doubt to a jury, and then the issue becomes in what setting is that done. The Federal Death Penalty Act provides that it's done in a sentencing hearing which also incorporates nonstatutory aggravating circumstances, mitigating circumstances, and does away essentially with the rules of evidence and a number of other evidentiary precautions that we would normally take in a trial.

We have the rules of evidence in typical trials. We don't allow evidence of future dangerousness. And a lot of things that would come in in a sentencing hearing and undoubtedly will come in in the sentencing hearing in Miss

110

Johnson's case would not come in if we applied trial rules, victim impact evidence being perhaps the best example, that we would never allow victim impact evidence in the trial of an issue typically as an element of the offense.

The government's position is, well, you know, the Federal Death Penalty Act is what it is; that's the procedure; you have no case law really to support your position. And that's true because, of course, Ring's only two years old, and so this issue comes up before the Court essentially without much guidance at least from the appellate courts.

But you can see the dilemma is clear, Your Honor, that the danger from the defense standpoint is that while the jury is considering evidence such as victim impact evidence that's

Page 95

bleeding into, if I could use that phrase, the statutory aggravating circumstance evidence. That is, the jury --

THE COURT: It might not be a good metaphor for this case.

MR. BERRIGAN: That's true. You're right. Too late now.

THE COURT: But I understand what you're -- I understand the point you're making.

MR. BERRIGAN: Right. We believe that the remedy for this problem essentially is to trifurcate the proceedings where we have the traditional first phase or guilt/innocence phase if you will, then a separate phase which will be the second phase

111

which would be the phase of the gateway phase if you will; that is, does the government have sufficient proof beyond a reasonable doubt to meet the factors that would be required to make this person death eligible?

THE COURT: Now, let's back up a minute.

MR. BERRIGAN: Yes, sir.

THE COURT: The record should reflect on the break after the court reporter left the courtroom I mentioned to the lawyers and the defendant that I thought a solution would be incorporating the gateway factors into a special interrogatory in the merits phase and have the jury decide that. And I know you're going to -- and I haven't thought that through completely. You obviously had a reaction to it that it wasn't a good idea, and I want to hear about that.

MR. BERRIGAN: Well, first I guess we were off the record, but I commend the Court on the record that that's an ingenious potential solution.

Page 96

THE COURT: Now, let me ask you --

MR. BERRIGAN: I had never contemplated that.

THE COURT: Whenever I've used ingenious in describing a lawyer's argument, they always lose, so I'm waiting for the other shoe to drop.

MR. BERRIGAN: That was the first shoe. The second shoe is that I think that has the problem in that it inappropriately -- and I understand that we would not give

112

guidance to the jurors as to the purpose of the question. I do understand that.

But I do think that that still has the unfortunate tendency of combining two separate and very distinct procedures. The first part of the trial really should be only on the issue -- and the parties are presenting evidence to this effect, that the government's trying to prove Angela Johnson guilty beyond a reasonable doubt of the charged offenses. The defense is rebutting that, and we're not dealing with aggravating circumstances, statutory aggravating circumstances, at least --

THE COURT: Well, let me ask you a couple questions if I may.

MR. BERRIGAN: Yes, sir.

THE COURT: Do you agree with me that there would be no further evidence by either party beyond what would be presented in the merits phase that the jury would need to hear to determine the gateway factors?

MR. BERRIGAN: That might be true in this particular case, Your Honor, but certainly it's not true in all cases. I mean, there are certain cases where --

THE COURT: Mr. Berrigan, I'm not very worried about

Page 97

other cases right now.

MR. BERRIGAN: Right, I understand. As I stand here, I suspect the government is not going to produce additional evidence in the -- to prove the aggravating circumstances, the

113

statutory aggravating circumstances, other than what they produce in the first phase. You could ask them about that.

THE COURT: Yeah, and I suspect you won't either.

MR. BERRIGAN: Right, that's right, because, of course, we're not proving anything.

THE COURT: I understand that. But if it -- if that turns out to be true -- and we don't have to decide that today -- but if it did turn out to be true, why couldn't we submit the gateway factors? I understand we're kind of mixing the phases a little bit. But how practically in this case could that in any way prejudice your client?

MR. BERRIGAN: It prejudices them in the mix, Your Honor, and I don't mean to be coy about that, but it really is a very important step to go from guilty of the charged offenses to are there aggravating circumstances proven beyond a reasonable doubt that are going to make this woman eligible for the death penalty. Those are very different and distinct steps under the law, and they need to be presented that way to the jury in a procedure that makes that very clear to them.

Now, I understand the evidence might be the same.

THE COURT: Why?

MR. BERRIGAN: Because that's the statutory scheme that the Congress has chosen.

THE COURT: Well, if we want to stick to statutory schemes, I didn't see anything about trifurcation in the

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 25 of 200

statutory scheme.

MR. BERRIGAN: No, of course not. If we had a statutory scheme, I wouldn't have to file a motion. No. Our contention is that this is the problem --

THE COURT: Well, my point is you don't want to stick to the statutory scheme.

MR. BERRIGAN: Of course not. That's right.

THE COURT: So why is it my fix even though it is not part of the statutory scheme -- I mean, I just don't see how you're prejudiced.

MR. BERRIGAN: Well, let's --

THE COURT: And as a practical matter, what would happen? Let's say we do it your way.

MR. BERRIGAN: Right.

THE COURT: We submit it on the merits. They come back, and then now we go to the gateway factors.

MR. BERRIGAN: Right.

THE COURT: You're not going to present any evidence. You're not going to present -- government won't present any evidence. You're not going to present any evidence. So we don't have any evidence, so we're really not having a second trial. Now we have a separate set of opening statements?

MR. BERRIGAN: Yes, sir.

THE COURT: Are we going to have opening statements?

MR. BERRIGAN: Yes.

THE COURT: And then closing arguments.

MR. BERRIGAN: If no evidence was presented, that's

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 26 of 200

right.  You bet.

THE COURT:  We'd have opening statements and closing arguments.

MR. BERRIGAN:  Sure.

THE COURT:  Just on the gateway factors.

MR. BERRIGAN:  Exactly, right, yeah, and we think that's a step the Eighth Amendment requires.  That's why we have a penalty phase in a capital case.

THE COURT:  Well, no court has never agreed with you.

MR. BERRIGAN:  Well, no, I think the courts have clearly found that capital sentencing proceedings are separate and apart from the first stage of the trial.

THE COURT:  Yeah, but they've never said that there has to be a separate trial on the gateway factors.

MR. BERRIGAN:  No, that's true, but they have separated punishment from guilt in a constitutionally significant way.  That is -- and, in fact, Ring is very clear on that.

THE COURT:  But why would the jury even know that --

MR. BERRIGAN:  They're supposed to know.  I guess that's my point.

THE COURT:  That's your point.

MR. BERRIGAN:  Right.

116

THE COURT:  You think they should know.

MR. BERRIGAN:  Yes, sir, exactly right.

THE COURT:  Well, then if that's true, if it's important to you that they know, then my solution doesn't make any sense.

MR. BERRIGAN:  Because your solution, they're only

Page 100

deciding guilt. They're not really deciding the issue about -- is this significant of a punishment really isn't in play. I mean, I understand the practical nature of that solution. It's very practical and saves time. But it really -- the trial at that point is about the guilt or innocence of the defendant and not the sentencing aspect that the Eighth Amendment protects. So I think that's the constitutional problem with that.

THE COURT: What are the downsides in your view of trifurcation?

MR. BERRIGAN: Just that there's probably a slight delay. I mean, particularly in this case, I figure it would probably be slight, I mean, as a practical matter and not certainly stipulating that the government would get where they want to be. But if they were not going to present additional evidence, I mean, I think you're right. It's a matter of additional instructions, opening statements, arguments, and resubmission and then the jury deciding has the government proven these required elements beyond a reasonable doubt to the unanimous satisfaction of all. And once they make that

117

determination, all we've lost is the time it's taken to get that done.

THE COURT: Let me ask you this, because I've never been in a trifurcated procedure.

MR. BERRIGAN: Nor have I, sir.

THE COURT: It seems almost silly to me to have opening statements and closing arguments. Could you just combine them? I mean, you'd give an opening statement. Then they'd give an opening statement. Then you'd give a closing argument? I mean, it doesn't make a whole lot of sense to me.

Page 101

MR. BERRIGAN:  I suppose you're right, Your Honor.  If the parties knew ahead of time there would be no evidence presented --

THE COURT:  We could kind of structure how to do it.

MR. BERRIGAN:  I don't see the point in making two arguments either, to be honest.  Right, I agree.  I think the parties could just argue, and then that would be it.

THE COURT:  And the instruction would be relatively simple.

MR. BERRIGAN:  Well, exactly.

THE COURT:  The gateway instruction.

MR. BERRIGAN:  Yes, sir, right, exactly.

THE COURT:  And your concern is that all of the traditional penalty evidence kind of -- the jury really shouldn't hear that before they determine the gateway factors.

118

MR. BERRIGAN:  Exactly, Your Honor.  If you buy the proposition which we think the law's pretty clear on -- and, in fact, I think the government actually agrees with us that the aggravating circumstances are elements of the offense.  They have to be proven just like the other elements.

THE COURT:  But even if they're not, why not trifurcate it?

MR. BERRIGAN:  Well, I'm in favor of trifurcation.  No, I'm all with you if you --

THE COURT:  I mean, it seems maybe it's just a fairer way to do it.

MR. BERRIGAN:  I think it certainly is because --

THE COURT:  So whether Ring requires it or anything else --

Page 102

MR. BERRIGAN: Right.

THE COURT: -- it just -- doesn't it seem like a fairer way to do it?

MR. BERRIGAN: It does, Your Honor, I think because we're combining really two different functions at this sentencing phase. One is that the government actually has to prove they met these elements of the offense kind of like they did in the first part of the trial.

And then the whole other part is the sentencing part, and that's where all this otherwise inadmissible evidence, frankly, comes in where victims are up on the witness stand

119

crying and playing movies about birthday parties and all this horrible future dangerousness evidence is coming in. And it's in our view very prejudicial in terms of whether the jury can independently assess whether we should be here to begin with; that is, has the government even met the statutory factors that let us get to the point where we're weighing --

THE COURT: And there's so little delay and inconvenience in terms of balancing everything.

MR. BERRIGAN: Yes, sir. We have noted, well, three cases we believe where this has been done. Mr. Williams points out he's been only able to verify one of those cases, but this is an issue that --

THE COURT: Well, on this particular issue I don't care whether it's ever been done.

MR. BERRIGAN: It's a new thing. I think it's something all courts are having to confront.

THE COURT: I don't see the downside to it, but that's why we have government lawyers here.

Page 103

MR. BERRIGAN:  Yes, sir.

THE COURT:  They're going to point it out to me.

Mr. Williams?

MR. WILLIAMS:  First of all, it's contrary to the statutory scheme, completely contrary to it.  Congress came up with the scheme that was supposed to be used in a capital case.  It has two phases.  In the second phase all of the aggravating

120

evidence is put on, all of the mitigating evidence is put on, and the jury weighs the entire thing.  The jury's instructed how to go through it.  We presume repeatedly in every case that the jury can follow instructions and they do.

To the extent that the defense is concerned that some evidence might spill over regarding the gateway factors, the Court can give them a limiting instruction to make sure the jury understands that they aren't to consider that evidence when they're considering the gateway factors if that's what they want.

The reason is because Congress set it up this way, that's the way the scheme has been established, and to start to create a trifurcation or multiplication of the penalty phase seems to me to be flying in the face of the scheme that was set up by Congress.

The practical problem with this is exactly what I'm starting to hear the defense argue, and that is this is a whole different issue over here, jury, that is, the aggravating factors, of future dangerousness, and so forth.  You can forget about these gateway factors.  You've already found those.  Let's sweep those under the rug.  Now let's pay attention to the additional aggravating factors.

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 31 of 200

That's not the scheme. The scheme is the jury is to consider all of the aggravating factors and weigh all of them together. And the concern I have is we go through a

121

trifurcation. All of a sudden we're going to be at the so-called penalty phase, and the jury's going to think, oh, we've handled already the gateway factors, so really all our focus is just on these additional aggravating factors and mitigating factors.

And that's not the scheme; that's not how it's set up. The jury's supposed to weigh everything. That's why there's one penalty phase. All the aggravating evidence comes in. All the mitigating evidence comes in, and the jury weighs it all. Before they get to the weighing part, they have to make certain steps along the way, and they do it, and they do it in case after case after case, and they do it well.

So to start toying with the scheme that Congress has set up for handling these capital cases because of the defense concern that's unverifiable that somehow some improper evidence is going to spill over makes no sense.

THE COURT: Well, makes some sense to me but . . .

MR. WILLIAMS: Well, I guess it just -- I have a real concern with trifurcating a capital case. It's not the way it was set up, and I think what we're going to end up with is some very clever arguments from the defense getting the jury unfocused on the totality of the aggravating factors when they're ultimately faced with making the decision, and I think that's the intent behind this or at least a consequence if not the intent behind this is to create that problem.

122

Page 105

I have been in contact with the AUSAs in now two districts where this has been done, and that's exactly what the defense has done during closing arguments during the penalty phase is attempted to trifurcate the jury's analysis of the aggravating factors, and that's why they're doing it that way in these other cases, and that's what I have a fear will happen in this case.

So that's the practical reason why it shouldn't be done that way. The legal reason is there's no basis for it. That's not the statutory scheme, and the only reported decision ever dealing with this issue has flatly rejected it. So I guess those are the government's position -- that's the government's position on that issue.

MR. BERRIGAN: May I respond briefly, Your Honor?

THE COURT: Yes.

MR. BERRIGAN: We all know the Federal Death Penalty Act obviously preceded the Ring and Apprendi decisions, and we're seeing just recently in Booker and Fanfan the results of these decisions on all aspects of criminal law and evidentiary issues and procedure. And it seems to me it would be a wise court to consider the effects of these decisions on capital sentencing procedures that were enacted long before these decisions became part of our legal culture.

I don't know what prejudice the government could complain of. They're not going to put in any evidence. They've

123

pretty much said this. They're not going to reproduce their evidence from the first phase in the penalty phase anyway. And

Page 106

so they're going to get up there and argue, Hey, remember all that evidence we gave you in the first phase, that's our statutory aggravator.

THE COURT: And I tell them that, that they can consider that in the instructions.

MR. BERRIGAN: Exactly, right, so how do I get up there and say, No, you can't do that? It's ludicrous. I couldn't possibly negate the effect of that evidence in any stage of the proceeding even if I wanted to, and I can't legally get up there and argue you can't consider it. I mean, that's ridiculous.

It's a very distinct issue that we're talking about; that is, the government has to prove these aggravating circumstances beyond a reasonable doubt to the jury, and it should be done in a procedure which comports with the trial as opposed to a typical sentencing proceeding because it is part of the trial. They have to prove those elements in order to make this woman eligible for the death penalty. And it seems to me that should be entirely consistent with the first part of the trial, not the sentencing hearing. When they get to the sentencing hearing, they're going to put on whatever evidence they choose to put on. They're not prejudiced in any way by this process.

124

THE COURT: Have you read the decision that Mr. Williams was talking about, the only reported decision that flatly rejects it?

MR. BERRIGAN: I apologize. I have not, Your Honor.

THE COURT: I haven't either, so I was just wondering what your critique of it was.

Page 107

MR. BERRIGAN: No, sir. I wish I knew the basis of that. But this makes sense to me both logically and legally.

THE COURT: Well, it does to me too except Mr. Williams has a pretty good argument that if Congress wanted trifurcation they would have set it up that way, but I guess your response is that you think this is actually constitutionally required by Ring?

MR. BERRIGAN: We do, Your Honor, right.

THE COURT: In that case Congress couldn't have anticipated that.

MR. BERRIGAN: Well, I don't believe so. They didn't anticipate the problem with the federal sentencing guidelines, and we've known for a couple of years that those were going to be a problem. I mean, I think a lot of judges, district judges, were anticipating, hey, we may have a problem with these federal -- these guidelines after Apprendi. I mean, everybody knew that, and sure enough, we did. And many wise judges took precautions in the interim to make sure that their cases weren't all going to get thrown out in the meantime.

125

And that's basically what we're asking here. I suppose if it doesn't happen, you know, we may be the beneficiaries at some point of a Supreme Court decision saying somebody should have had a trifurcated procedure, but we're not going to be the beneficiaries unless we ask for it, so that's what we're doing. We're asking for it.

THE COURT: Mr. Williams, anything else you want to add?

MR. WILLIAMS: No, Your Honor.

THE COURT: Are you really prejudiced by it?

Page 108

MR. WILLIAMS: I am. Having talked to the other AUSAs, my real concern is that when the jury has already handled an issue, the defendant seizes on the fact that we're now on to a third stage and in the jury's mind has the psychological effect that they have already handled some issues.

Now, I understand the Court's going to instruct them that that's not the case. They're supposed to take it all into account and I can argue till I'm blue in the face to take it into account.

THE COURT: And he can't argue that they can't take it into account. So I don't see how it gives them a tactical advantage.

MR. WILLIAMS: Well --

THE COURT: Let me ask you this. Well, would you -- would you be willing to give me transcripts of the closing

126

arguments of those cases where some assistant U.S. attorney claims it gave the defense some kind of sinister like tactical advantage and I could read it and make my own judgment because I don't see how it could?

MR. WILLIAMS: I could try to get ahold of them. I don't have them.

THE COURT: No, I know you don't have them. But I don't want to delay my ruling. Well, why don't we do this. Well, it seems to me there's a couple things you could do. If I allow trifurcation, you could file a motion to reconsider, and you could attach those transcripts.

MR. WILLIAMS: Fair enough.

THE COURT: You could also file a motion in limine or something to prevent the defense from arguing something that you

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 36 of 200

think is sinister as a result of my ruling. So there are some potential remedies.

MR. WILLIAMS: Sure.

THE COURT: What do you think of his argument that Congress didn't anticipate this because they couldn't have anticipated Ring?

MR. WILLIAMS: What Congress or what Ring and Apprendi and those decisions created was an obligation of the government to prove some factors to the jury beyond a reasonable doubt. In response to that, that can be done in a bifurcated setting, and the rules of evidence don't necessarily have to apply to it.

127

There's nothing in those rulings that say that the rules of evidence shall, therefore, apply to any stage of the proceeding where the government's going to be proving these additional factors that could increase the statutory penalty. That's not part of the holdings.

And so I think that's a leap that has been made here that because they're quasi-elements, therefore, they must be submitted in something called a trial and, therefore, the rules of evidence must apply, that's not in any of the Supreme Court holdings that get to that issue. Those holdings say the government has to prove it beyond a reasonable doubt, and we have to prove it to a jury, and they have to find it unanimously. Nothing's been established giving what stage of proceedings it's supposed to take place at nor what the rules of evidence shall be at that stage of the proceeding. So I think that's a leap that they're making in this case.

THE COURT: Do you think it's a far-fetched leap?

MR. WILLIAMS: I think it is in this particular

Page 110

instance given that the statutory scheme set up here by Congress for how we handle these capital cases contemplates a single penalty phase where all the evidence comes in at one time and has specifically said the rules of evidence don't apply at that stage. So I think it's a little bit of a leap in this case. Now --

THE COURT: Okay.

128

MR. WILLIAMS: You know, in the end is the government going to be devastated by the Court trifurcating it? No, I don't think so, and I think like you said, the Court could perhaps come back and create some remedies if I have a concern in that regard. But I just -- it's not the way the scheme was set up. I think there is a potential prejudice to the government with the jury, and I'm just concerned about that.

THE COURT: Mr. Berrigan, if I gave you your choice -- of course, it would be a forced choice. You'd have to elect A or B.

MR. BERRIGAN: Yes, sir.

THE COURT: A is you agreed to me submitting the gateway factors as a special interrogatory in the merits phase, or B would be no trifurcation. Which would you like? A or B? And I'm not even going to hold you to it.

MR. BERRIGAN: Right.

THE COURT: I'm just curious.

MR. BERRIGAN: Well, I'd have to choose A, Your Honor, because of the principles that I think the cases espouse, and that is that they're separate findings.

THE COURT: You'd have to choose B you mean.

MR. BERRIGAN: Judge, which was --

Page 111

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 38 of 200

THE COURT: A was adding the special interrogatory to the merits phase.

MR. BERRIGAN: Right. I'm sorry. Yes. My apologies.

I couldn't choose A because I think that there's a really separate and distinct issue.

THE COURT: Well, you could waive that issue. If you thought it was so important -- if you thought there was so much prejudice by allowing the gateway factors to be determined in the sentencing hearing, then you could say, Hey, I'd rather have it determined by the jury at the end of the merits phase with a special interrogatory, and I won't object to the fact that that's not what's contemplated by the statute.

MR. BERRIGAN: I think the problem then, I've waived other rights, and that is that I've waived the distinction between my client's Sixth Amendment right to a fair trial to be determined to be guilty beyond a reasonable doubt by a jury and her Eighth Amendment protection against capricious and arbitrary sentencing because I don't think --

THE COURT: Which one's more important?

MR. BERRIGAN: Well, I don't think that's a Hobson's choice that I can make, Your Honor, I mean as a lawyer. But if you're just asking for my opinion that is not actually what do I want, you know, I think your solution is a better one than what we have presently. That is, I do think having those things separate, the elements of the offense versus the sentencing way in the different rules, is a better procedure than what we have right now which is let's mix them all up together and you jurors, you know, try to figure it out.

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 39 of 200

THE COURT: But -- and after -- and if I gave you an opportunity to consult with your client and fully explain it because this is complicated stuff --

MR. BERRIGAN: Yes, sir.

THE COURT: -- you don't think there's any chance that you would -- if I gave you that forced choice you would opt for A which would be the gateway factors as special interrogatories.

MR. BERRIGAN: I don't think I could do that without -- and this is just my opinion -- without waiving our motion, Your Honor. I mean, unless you said to me, I'm not going to grant the motion; do you want -- do you want A, I'm not going to give you a trifurcated hearing, that's your ruling, I'm not going to do it but I'll give you A as an alternative to the denial of your motion, I'd take that.

THE COURT: Yeah, I guess that's what I was asking.

MR. BERRIGAN: Okay. I didn't understand that.

THE COURT: I'm sorry.

MR. BERRIGAN: Okay. If you're saying your motion's denied, do you want A, the answer is yes, absolutely, because I feel strongly that even though that doesn't -- that cures one problem and creates another --

THE COURT: It creates another.

MR. BERRIGAN: -- it's better than the Federal Death Penalty Act procedure presently, yes.

THE COURT: Mr. Williams?

131

MR. WILLIAMS: I don't know that I have anything to add, Your Honor.

THE COURT: You have exactly the same arguments to my
Page 113

solution, don't you?

MR. WILLIAMS: Basically, yes.

THE COURT: Well, let me ask you this. Would you rather have trifurcation, or would you rather have my solution?

MR. WILLIAMS: I don't -- I think from the government's standpoint, I don't think there's a problem with your solution as long as the jury's properly instructed. Our concern would be that the jury would be confused in some way that those are elements of the guilt issue which we'd have to somehow prove. I think it'd have to be clearly set out to them that they're different.

And so maybe the compromise solution between all this would be after the jury comes back with a guilty verdict simply send them back with a new interrogatory: Okay, now you found guilt. Here's a new interrogatory. Find these things.

The problem with that, though, is then it deprives us of the ability to argue. Three of the gateway -- we have to prove the intent gateway factor, and then we have to prove one of three additional statutory aggravating factors we've alleged. We'd like to make additional argument on those issues.

THE COURT: So why not trifurcate it then? That gives you the argument.

132

MR. WILLIAMS: It would give us the argument, but I don't think we have to do that. I don't think we have to get there. I think the government has the right to argue all the aggravating factors as one whole, and that's why I'm against trifurcation.

THE COURT: Well, I'm kind of troubled by the notion that all this evidence that, you know -- evidence is not really

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 41 of 200

the word for it -- all this information that comes in in the sentencing hearing can be considered by the -- not subject to the rules of evidence can be considered by the jury, you know, particularly victim impact statement. I've only heard it once in my life. It was very powerful stuff. You would agree with that. It was very powerful. And why should the jury hear that to determine a gateway factor? It's got nothing to do with the gateway factors, and it was the most -- some of the most powerful evidence in a very long trial, not necessarily the most powerful. Well, but maybe. Right up there at the top, and it's got nothing to do with the gateway factors, nothing, absolutely nothing. It's not subject to the rules of evidence. It was riddled with hearsay and opinion testimony. Probably some of the answers violated eight or ten rules of evidence simultaneously. And yet we're allowing the jury to consider that on something as important as a gateway factor. That troubles me.

MR. WILLIAMS: But, in fact, they aren't, Your Honor.

133

THE COURT: Well, how do you know that?

MR. WILLIAMS: Well, I guess it is difficult for me to imagine that when a juror's back there trying to figure out whether there was substantial premeditation and planning in committing this crime they're thinking, oh, well, let's see, how did the testimony about the victim impact factor into that decision. It just doesn't. It doesn't -- as you say, it has nothing to do with those issues.

THE COURT: I don't think human beings are capable of parsing it that way even if we know what the law is and try and do it. I mean, some are capable of it. I think I could do it,

Page 115

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 42 of 200

but I'm not sure most people could.  I just think --

MR. WILLIAMS:  I understand the Court's concerns.

THE COURT:  -- you know, jurors not trained in the law -- you know, I have to do that stuff all the time.  I knock out stuff on suppression, and we have a trial, and I know the person's guilty because I've suppressed the evidence but -- you know, but I don't think most jurors look at it that way.  I think that stuff is just so powerful.  And neither you or I really -- we're just speculating.  We can't measure it, but common sense and life experience tells me people don't necessarily analyze it that way.

MR. WILLIAMS:  And perhaps not.  I mean, I fully understand the defense concern, and I understand the Court's concern.  I guess we trust juries repeatedly to compartmentalize

134

evidence when they're told to do so and --

THE COURT:  Yeah, but, you know, those court of appeals judges have so much more faith in limiting instructions than I do and I think than you do.  I don't mean to speak for you, but I will.  It's pretty easy for some court of appeals judge that hasn't sat through a trial to say, hey, that limiting instruction was terrific, you know, but it's like the old white elephant.  You tell the jurors not to think about the white elephant, and they're thinking about the white elephant.

I don't know.  I'm just troubled by it.

MR. BERRIGAN:  Well, the --

THE COURT:  I'm sensitive to your argument that it's clearly not what the statute prescribed.

MR. WILLIAMS:  And just so I can give you what our alternatives would be in the event that you're going down this

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 43 of 200

road, between trifurcation and submitting it to the jury, if you're going to go that direction, I would rather have trifurcation, because I do think you have the right to make, you know, some argument and so forth, and I'd be concerned about the confusion of it. So thinking it out, if you're headed in that direction and you want to know which of those two alternatives I'd like --

THE COURT: Yes.

MR. WILLIAMS: -- given the Hobson choice I'm in at this point, I'd rather have trifurcation than just having empty

135

interrogatories go back to the jury without an opportunity to address that to the jury.

THE COURT: Anything else anybody wants to add on that issue?

MR. BERRIGAN: Just in regards to motions in limine, not to belabor this, Your Honor, but there's a huge difference between a motion in limine that asks jurors to consider evidence for a particular purpose, legal purpose, and not some other purpose. The problem with victim impact evidence has nothing to do with that consideration. It's the emotional impact it has on the jurors. I mean, that's why they do it. That's why these people are up there on the witness stand.

THE COURT: Right. That's a point well taken.

MR. BERRIGAN: Right. It has a devastating -- and you can't put that in a box. You can't say, Well, you know, you saw this little girl crying about her dad and how horrible this loss has been to her, but just consider that for this purpose. I mean, it's ridiculous, and it goes against human nature. We all know that. I mean, it's just not possible really to expect

Page 117

people to do that.  And I give you that, you know, we do to some extent because we claim that that's not so unduly prejudicial that it deprives the defendant of a fair trial.

But these are sort of apples and oranges quite -- I think, and I agree with Mr. Williams on this rare occasion. It's not a Hobson choice for us, but we much prefer trifurcation

136

as opposed to the Court's very ingenious potential solution.

THE COURT:  But you prefer my solution to no relief at all.

MR. BERRIGAN:  To nothing at all reluctantly.  Yes, I guess I'd have to say that.  If you'll give me a chance to look into that, I really do share some of Mr. Williams' concerns about that, that we are mixing this guilt/innocence issue with sentencing factors.  But I haven't had enough time to really analyze that in any kind of a reasonable, rational way.

THE COURT:  Well, I want to rule on all of the stuff as quick as I can.

MR. BERRIGAN:  Yes, sir, I understand.

THE COURT:  So, you know --

MR. BERRIGAN:  We've given you I guess our best off-the-cuff responses to that.

THE COURT:  If you want to have till Monday to file a supplemental brief or you file it as a motion to reconsider, but just don't give me a shotgun motion on everything you disagree with.

MR. BERRIGAN:  No, I understand, Your Honor.

THE COURT:  You know, but on this and, you know, the mental exam maybe but -- this particularly because it -- I blindsided you with it.

Page 118

MR. BERRIGAN: Well, I don't know that anybody's proposed your solution. At least I've not heard of that before.

137

So I hadn't given it any thought.

THE COURT: Probably because it's not a very good idea.

MR. BERRIGAN: May be a very good idea that nobody's thought of so . . .

THE COURT: Does that conclude all the motions?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Is the government asking for any special security for the trial?

MR. WILLIAMS: Your Honor, I'd like to have an opportunity to consult with the marshals. That's their decision in my view. I have a meeting set up with them tomorrow including the head U.S. marshal to talk about it. I don't anticipate it, but I want to talk with them. It's their expertise. It's their area, and I'll defer to their expertise on that particular one.

THE COURT: Just for the record, I haven't requested any special security. I had a discussion with our lead marshal today. He came to see me about security, and he asked if I had any special requests for security, and I said I had absolutely none, zero.

MR. BERRIGAN: We'd only ask what Mr. Honken's team belatedly asked, Your Honor, and that is to be advised of whatever security measures are put in place.

THE COURT: You'll know about it.

138

Page 119

MR. BERRIGAN: We don't know. Right.

THE COURT: Well, there aren't any that I know of, but if I find out there are going to be some, you'll be advised about it.

MR. BERRIGAN: That's all we're asking at this point. That was the problem I think with Mr. Honken's team because issues they became aware of later they thought might have impacted certain decisions.

THE COURT: Yeah, I -- I'll tell you, I wouldn't do that any differently.

MR. BERRIGAN: Right.

THE COURT: It's not an issue in this case, but if it was, I wouldn't tell you until after the fact.

MR. BERRIGAN: Well, we're at least asking to be told.

THE COURT: I would tell you after the fact, but I wouldn't tell you ahead of time because I think it's like totally ridiculous in my view to tell you ahead of time.

MR. BERRIGAN: Well, I can see their point. I think if extraordinary security measures were taken to the point where the Court's children were being escorted or something of that fashion, I could see a defense lawyer being very concerned about what impact that might have.

THE COURT: I could see it if the judge requested it. I can't see it if the marshals insisted on it. Huge difference. But that's not our case.

139

MR. BERRIGAN: No, sir, not yet.

THE COURT: So we don't have to worry about it yet. We have enough to worry about on our plate.

Page 120

MR. BERRIGAN: That's right.

THE COURT: Now, when will we be in a position to have a hearing on the change of venue motion?

MR. BERRIGAN: We received the disks from the Eastern and Western District yesterday, Your Honor. The people are looking at those as we speak.

THE COURT: And I think you're going to get the rest of them today from the Western Division, at least -- I think there's another 300 or so to give you today.

MR. BERRIGAN: I think certainly within the week we should have that analyzed sufficiently for this issue. That is, by the end of next week we'll be ready to address that issue with the Court.

THE COURT: Is that something we could do by telephone, or do you want to have a live hearing?

MR. BERRIGAN: I think our preference would be to have a live hearing given how, you know, hotly debated that particular issue has been, Your Honor, and we might actually have very brief evidence hopefully depending, of course, on what the questionnaires indicate.

THE COURT: Okay.

MR. WILLETT: Your Honor, if it please the Court.

140

THE COURT: Yes.

MR. WILLETT: I do know that I have a federal jury trial with Judge Reade starting on February 7 that will last four days, and I trust my co-counsel implicitly to take care of my client's interest, but this is one hearing that in a perfect world I'd like to be at if possible. I mean, I realize the Court wants to move and we need to move because of the current

Page 121

trial setting, but I just wanted to let the Court know that I have that February 7 through the 10th conflict that I don't think I can get rid of short of trying the case so . . .

MR. BERRIGAN: I guess that also brings up, Your Honor, it sure makes it a lot easier if we're not on our current trial schedule, that is, if we're not looking at March 7 as a definitive starting date. And I understood the Court's preference for that day or at least there was some talk about that at our last motions hearing here. But we've also discussed an alternative is the first week in April for various reasons. And it seems to me that if we could revisit that some of these scheduling problems aren't nearly as severe as they otherwise would be.

THE COURT: Have you discussed that among yourself at all about the March 7 date?

MR. WILLIAMS: Not really, Your Honor. I guess we don't care when we try it. I want to try it either March or April. I don't want to put it off any more than that, but

141

between March or April, the government doesn't care which way we go.

MR. BERRIGAN: Your Honor, we don't even know -- we haven't even been able to subpoena people, frankly, and don't get me wrong. There's no blame or anything going on. It's just there's some practical problems. We don't have hotel rooms. I mean, we're scrambling as it is. But if you would give any thought -- I'd be happy to get down on one knee for an April date as opposed to a March date. I'd do that in a heartbeat. And we're not asking for more than that. That is, I'm not asking to put it off.

Page 122

THE COURT: Let me ask you this. Do you feel you just need the extra time to be ready?

MR. BERRIGAN: Desperately, desperately, yes, sir, desperately need it. I know we may have given you some indication on other occasions we don't need it as desperately as we do.

THE COURT: But it's a fluid -- desperateness is a fluid concept. Would you agree, Mr. Berrigan?

MR. BERRIGAN: Yes, sir. We're getting more and more desperate as March 7 approaches, Your Honor.

I'll just throw this in for whatever it's worth. The Court was very quick to approve our amended budget regarding expert witnesses. There's been no further action regarding that from the circuit. Our mitigation investigator, Your Honor, is

142

not coming out here anymore. She's already $1,600 in the hole I think. I might be a little off on the numbers.

THE COURT: I think 14,000.

MR. BERRIGAN: I'm sorry?

THE COURT: 14,000 I think.

MR. BERRIGAN: Yes, sir.

THE COURT: But I just signed that voucher today.

MR. BERRIGAN: I appreciate that.

THE COURT: Yeah.

MR. BERRIGAN: We had an expert visit Miss Johnson on Monday. In order to get him to come, I had to personally pledge -- and I mean sign an agreement -- that I would pay him if the Court didn't pay him $7,400, and that's kind of the way we're going. That is not yet, but it has the potential to being a problem.

Page 123

THE COURT: Of course.

MR. BERRIGAN: And, of course, April would I think alleviate the potential pain there. I certainly would hope we would have some response soon from the circuit regarding our ability to have these experts --

THE COURT: Because that was sent in --

MR. STOWERS: I think it was the very end of December. We had the hearing on the 20th of December, and then I think the letter was transmitted to you -- well, maybe we visited about it then.

143

THE COURT: I tried to get it out very quickly. Didn't I copy you all in on the letter?

MR. BERRIGAN: It was out within two days, Your Honor. Again, I'm not suggesting the district court hasn't done everything possible to get this moving. But, again, you know, your powers are limited in that regard. And some of these folks are reluctant to work without some assurance they'll be paid, not the lawyers but at least the other people.

MR. WILLETT: Your Honor, if it please the Court, I just took a moment to confer with my client about this idea of April 4 since this sort of sprung up in the last few minutes, and she understands and she would be willing to wait until April 4 if the Court chose that date.

THE COURT: It would actually probably now be April 11 for reasons I don't want to get into.

MR. BERRIGAN: We have no problem with April 11, Your Honor.

THE COURT: Does the government resist an April 11 start date?

Page 124

MR. WILLIAMS: No, Your Honor.

THE COURT: Well, part of what I decide on the continuance is actually tied into how long I think jury selection will take which ties me into this issue about my suggestion for the peremptory challenges. And I'm confused now about whether we have agreement on how we're going to proceed on

144

jury selection.

MR. BERRIGAN: We thought -- at least the defense thought we did have an agreement, Your Honor. We understood that of the 20 challenges 15 would be exercised as we went and 5 would be held in reserve based on the last discussion that we had with the Court.

THE COURT: And everybody's on board on that.

MR. BERRIGAN: Right.

THE COURT: And how would it work practically, because aren't we going to be right back into individual jury questioning? I mean, isn't -- I know we talked about doing this panel thing.

MR. BERRIGAN: Yes, sir.

THE COURT: Are you still confident we're going to be able to do that?

MR. BERRIGAN: Well, I am, Your Honor, because I've done it, but I understand, Your Honor, the concerns that other parties have. It's not that much different, frankly, the individual questioning and the questioning in the panels because we're going to interact with the jurors individually, particularly regarding the death penalty. That is, we're going to ask questions of each juror individually that just happen to be -- there will be six or seven people sitting around them.

Page 125

But it does save us, at least in my view, a lot of time on some of the issues that we're going to be questioning them about.

145

And in my experience, it's gone well, and I do think it's a little more efficient.

THE COURT: So is it going to look like this? We're going to bring in 15?

MR. BERRIGAN: I would hope we wouldn't have 15 sitting at a time. Now, I understood you did 15 jurors in a whole day in Mr. Honken's case.

THE COURT: Right.

MR. BERRIGAN: I was going to suggest that we have two groups of eight, that we did eight in the morning and eight in the afternoon, for example, or, if you thought that was insufficient, a higher number.

THE COURT: So let's say we bring in eight in the morning, and the only thing that I would ask them initially would be -- I'd like to get the undue burden thing out of the way initially, and I don't think you would have an objection to that.

MR. BERRIGAN: No, sir.

THE COURT: And then I'd turn it over to the lawyers, and then at the very end I'd do reasonable doubt and presumption of innocence; right?

MR. BERRIGAN: Yes, sir.

THE COURT: But I guess we could wait and do that once at the very end of the day with both the morning and afternoon panel. It would mean they'd have to stick around a day, but

146

Page 126

that's not a big deal. Beats coming in every day for three weeks or something.

MR. BERRIGAN: Exactly.

THE COURT: Right?

MR. BERRIGAN: Sure. You could do it at the end if you wanted to. You could have them all come back, and we could do it as a big group.

THE COURT: Yeah, it wouldn't be too big because we're going to lose some on undue burden and some on death penalty and some for other reasons, so if we started with like 16, 8 in the morning and 8 in the afternoon --

MR. BERRIGAN: No. I'm sorry. I meant we could do that voir dire --

THE COURT: Oh, at the very end.

MR. BERRIGAN: At the very end because it seems to me we're going to need extra people. I'm not exactly sure how this part works. If we have five peremptories that we're going to exercise at the end, then we need some group of people available to exercise those out of.

THE COURT: Right, right. So we'd have to bring everybody back in. But the problem with waiting till the end to do it is my experience is that we lose people based on reasonable doubt and presumption of innocence because some people are unable or unwilling to give the defendant the full benefit of the presumption of innocence.

147

MR. BERRIGAN: Right.

THE COURT: And I'm unwilling to do that at the very end precisely for that reason because there's no way to anticipate how many we're going to lose. We have no way to

Page 127

anticipate how big the group would be.  So I want to do that either at the end of each -- at the morning session or the afternoon session, but I was thinking it'd be better to just do it once at the end of the afternoon session which would mean the morning people would have to come back, but they might not have to come back till three or something.

MR. BERRIGAN:  Exactly.

THE COURT:  Does that make sense?  Are you tracking me on that?

MR. BERRIGAN:  Yes, I track that exactly.

THE COURT:  Okay.  And then let's say I do all that and we're left with just, say -- so then we do -- I finish the presumption of innocence and reasonable doubt.  Then let's say we have 12 people left.  Then we send them out and you do your challenges for cause, or when are we going to do the challenges for cause?

MR. BERRIGAN:  I would expect we'd do those right away, that is, at the end of the panel.  You know what I mean?  That after we had the first group in the morning, when they were done, we would dismiss them, tell them to come back at four in the afternoon, make our challenges for cause right then while

148

it's fresh in our memory what the people just said.  Then we might be able to let some of those folks go.  You could even hold them for a few minutes while we did the challenges for cause, and some of them might not have to come back.

THE COURT:  But then you'd want to do the challenges for cause before you heard their answers to presumption of innocence and reasonable doubt?

MR. BERRIGAN:  Well, we could do additional challenges
Page 128

for cause then. So yes, I would, because what's the point? If somebody gives death penalty responses that they're clearly not qualified, we don't need them to come back at the end of the day to find out that they may also have a problem with the presumption --

THE COURT: So we'd have two rounds of challenges for cause.

MR. BERRIGAN: Right.

THE COURT: And then peremptory strikes would be the last thing done at the end of the day?

MR. BERRIGAN: Seems to me we could do it either right after the challenges for cause or at the end of the day, Your Honor.

THE COURT: Or both. Yeah, anybody you know you want to strike now, you don't even want them to come back and hear the reasonable doubt stuff, get rid of them.

MR. BERRIGAN: We might take a chance that maybe

149

they'd go out on the reasonable doubt is my thinking, to be honest with you. That is, I wasn't crazy about them, but let's give them a chance to go out on the reasonable doubt at the end of the day.

THE COURT: And then just exercise them at the end of the day.

MR. BERRIGAN: Right, exactly.

THE COURT: That would be fair because I'm kind of making you exercise them in kind of an unconventional way.

MR. BERRIGAN: Exactly.

THE COURT: Mr. Williams, do you have any objection to what we talked about, or Mr. Miller? Did you track it? It was

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 56 of 200

somewhat obtuse.  I wasn't very . . .

MR. MILLER:  I'm not sure I did, frankly, Your Honor.  The colloquy that the Court would ordinarily spend 90 minutes at the morning of the day doing would now be done at the end of the day.  Is that my understanding?

THE COURT:  Correct.

MR. MILLER:  All the challenges for cause would be following that and following everything else, but I assume we would still during our interview of the jurors be allowed to discuss such things as reasonable doubt and burden of proof?

THE COURT:  Oh, sure.

MR. MILLER:  And even though we may not feel that there's the basis for a challenge after we're done visiting with

150

these folks, after you're done, perhaps additional questions are raised, and counsel may want to revisit questioning of the individual jurors on those issues.  Is that where we're going?

THE COURT:  Sure.  And, matter of fact, I guess I probably prefer that you not deal with reasonable doubt and presumption of innocence in the individual questioning, in the panel questioning, but that you follow up -- I'd give you an opportunity to follow up on what I did at the end of the day before we exercised the challenges for cause and the peremptories.  But I guess you could -- if you wanted to bring it up, you could, but it's kind of like bringing it up once and coming back to it again.

MR. MILLER:  It just seems to me like we're going to be spending a lot of time -- and spending time is not necessarily the biggest concern here either.  I mean, I don't mind spending the time necessary.  I think it's going to be an

Page 130

important part of the case.

Frankly, since you led into this discussion with the question of trying to figure out how much time we're spending -- and again, I'm not saying that's necessarily our biggest concern here -- I think the fact that we're going to be exercising strikes on the fly means that we're going to be spending more time rather than less trying to develop a basis for a challenge and, accordingly, likely to slow things down, not that that's bad necessarily. But since you prefaced the question with how

151

much time are we going to be doing, I think that adds to it.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: I wanted to just suggest, Your Honor -- I know you think it's going to be hard to estimate how many people are going to go out on presumption of innocence and burden of proof issues. And, frankly, we weren't here for the Honken voir dire except one day that you did that voir dire, so I don't have any basis upon which to give you an estimate myself.

But it seems to me we could have enough extra people that we could do that -- if you wanted to, we could do it at the end where we had 20 extra jurors if you really thought we could lose 20 people, where we had 20 or 10 or whatever and did that colloquy just before the final jury was selected if that's a concern. I don't know if it's going to take an hour and a half at the end of the day. Frankly, if it does, I'm fine with that. But if that's a concern, that's one way to approach it.

Usually when I've done this in Missouri, we do the individual group voir dire first, and then we do a general voir dire at the end for the people who've survived the group voir

dire, the individual group, so it's somewhat similar to what I'm suggesting.

THE COURT: I want to try and keep that to a minimum, though, because I don't want to be in the situation where we're short.

152

MR. BERRIGAN: Right.

THE COURT: Because then it really gets screwy.

MR. BERRIGAN: Right, okay. Well, that's fine then. The end of the day will be fine.

THE COURT: But maybe everybody's interest would be better served by doing it that way, and it would give you an extra hour and a half during the day to ask jurors questions because of the way you're exercising your peremptories because I think you both have suggested to me that the unintended consequence of my asking you to take peremptory challenges on the fly is you're going to be asking more questions.

MR. BERRIGAN: Well, I hope not. Here's one thing it does do, Your Honor. And I don't think this voir dire's going to take nearly as long as Mr. Honken's. But sometimes you do sort of forget what jurors look like, and to bring them back at the end and to kind of have them all sitting there before we do the peremptories, that would be kind of nice to have them sitting there even to just do your questioning. And we can sort of refresh our recollection: I can't remember that guy being so bad; he's still here; that's one I want to get rid of. I can see that process being beneficial to the parties.

And if we just were careful that we had plenty of jurors -- and, frankly, I think this is going to go -- my estimate is it's going to go quickly enough that you're not

going to be nearly as concerned about that as we go that you are

153

now, that we have enough jurors that we don't have to worry about losing so many on the last day on those issues the Court's going to ask about that we don't have a jury eligible to be seated.

THE COURT: Well, let me ask you this. If I would hold off on doing my questioning about presumption of innocence and burden of proof, would you all at least probably raise it in jury -- I mean, I think I'd kind of like you to get into it.

MR. BERRIGAN: Sure.

THE COURT: So that if there are folks that are kind of obviously, oh, I could never -- you know, I have to presume the defendant innocent? Are you kidding me? I could never do that, that we get rid of them. The obvious ones we could get rid of I would think.

MR. BERRIGAN: The other advantage to you doing it at the very end, Your Honor, frankly, is we've been talking to these jurors about punishment issues for, you know, two or three hours, and then they go home, and then the trial's going to start, and they don't get it that the government still has to prove their case beyond a reasonable doubt. I mean, we've been spending so much time talking about what's going to happen to this woman after you convict her that I think they kind of lose the focus, frankly.

And doing it right at the end before the trial starts would be an excellent reminder to the jurors that, you know,

154

Page 133

we're not there yet, and the government has to prove their case beyond a reasonable doubt. If anybody's going to have a problem with that, then you can go home now. So our preference I think would be that you do do that before we start the trial.

THE COURT: And I think what we could do is we'd -- if you'll recall -- I don't know if you all on the Johnson team were aware of it. But we had panels going out for another month I think in Honken. And so we could have, you know, a considerable number of panels that if we did run -- you know, if it really went bad on the last day where we brought everybody in and we wind up short and nobody wants to give up their five peremptory challenges to get the trial rolling, then we could just go a couple more days with panels and then get enough and bring them back or something. So we'd have a mechanism in place if we did come up short. That make sense?

MR. WILLIAMS: Certainly, Your Honor.

THE COURT: Mr. Miller, you look very pensive today.

MR. MILLER: That's because I'm just a little bit confused, but I --

THE COURT: Well, I don't want you to be confused, and I know I've been confusing on this issue. So why don't you share with me what you're thinking and where I've confused you.

MR. MILLER: I just want to be clear which is more important to me than what method there is -- just I need to know what method it is -- we're going to have that 90-minute colloquy

155

that I've heard at the start of each day during Honken delivered only once and at the -- after we've already preliminarily passed for cause 22 plus some alternates.

THE COURT: Where does the 22 come from?

Page 134

MR. MILLER: We need 12 jurors, and we got an extra 5 strikes apiece that we haven't --

THE COURT: Twenty-two, right, yeah.

MR. MILLER: And I assume we're not going to do the process separately for the alternates, so we're going to have 22 plus X people passed for cause, and then you're going to give the -- what I referred to as the 90-minute colloquy, and then we're going to follow up with some more Q and A possibly on reasonable doubt and burden of proof, and then we'll be ready to exercise those last 5 apiece plus whatever pertains to the alternates.

THE COURT: Correct. Everybody pretty clear on that?

MR. BERRIGAN: Yes, sir.

THE COURT: So even if we have to bring in an extra 10 jurors, it's not that -- we had 75 in Honken, and we're talking about half of that.

MR. BERRIGAN: I can't imagine you'd need more than 45 at the end of the last voir dire, Your Honor, I mean, depending on how many alternates you want, or 50/50. Couldn't be more than that I wouldn't think.

THE COURT: No, I wouldn't think we'd even need that

156

many.

MR. BERRIGAN: Right. So we'd only have to qualify essentially 50 jurors before the last day.

THE COURT: I don't think we'd have to qualify anywhere near 50.

MR. BERRIGAN: No. I personally don't either. I don't think that many people are going to go out on this issue of presumption of innocence and burden of proof.

Page 135

THE COURT: Particularly if you all get into it at least some.

MR. BERRIGAN: Right.

THE COURT: Right. Okay. Now, are you willing -- does it make -- and I don't want to just do things like Honken because we did it that way if there's a better way to do it, there's a reason not to do it. In Honken the lawyers met, went through the questionnaires -- of course, the questionnaires were different -- and were able to come up with, out of the 600, 240 jurors which is a pretty high percentage that everybody agreed on we shouldn't even invite to the jury selection.

MR. BERRIGAN: We have certainly discussed that, Your Honor, and I think we could make that decision pretty quickly. Frankly, we can't make an educated call about that until we look at at least some of the questionnaires.

THE COURT: Let me ask you this. Do you think it might be -- could I encourage you to do that with an April 11

157

start date?

MR. BERRIGAN: Absolutely, Your Honor, absolutely. You know, the problem, as you know, I think, is that these are open-ended questions.

THE COURT: Yes.

MR. BERRIGAN: And Mr. Honken had these two very extreme ends of the bell curve, and so that wasn't very difficult putting aside the philosophical argument that maybe we should have people come into court and answer the questions anyway. But I've done that many times where we've stricken them before trial based on the responses in the questionnaire. I've done it many times.

Page 136

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 63 of 200

THE COURT: And it would just simply be what you all could agree on, so there's no real coercion to eliminate people. It's just -- you know, I think there are a certain percentage of jurors who clearly would be a horrible juror for everybody.

MR. BERRIGAN: Right.

THE COURT: And whatever percentage that might be, it'd be nice to get rid of them if there's a cost benefit to it. If it would take such an extraordinary amount of time and you'd only eliminate six people, we just ought to bring everybody in. And I think you'd be in a better position to know that after you've gone through the questionnaires. But I would really strongly, strongly, strongly encourage you to do it even if you don't want to do it. I realize there probably wouldn't be time

158

to do it with a March 4 trial date -- March 7 trial date.

MR. BERRIGAN: I'm not sure we'll have the questionnaires read by then, but we'll try. Honestly the practical problem, Your Honor, is that there will be jurors on there that will indicate that they're opposed to the death penalty in some fashion that might actually be able to qualify, and it's a very difficult decision to make -- for the defense counsel to make that decision on paper without seeing them given the relative rarity of those people in the population. What we see -- at least in my experience there are many more people that will say an eye for an eye, a tooth for a tooth than I could never give the death penalty under any circumstances, and giving away the few people that we could potentially rehabilitate -- and I'll grant you that frequently that's unsuccessful.

THE COURT: Yeah, and I don't have a problem if you want to try.

Page 137

MR. BERRIGAN: Right.

THE COURT: I don't have a problem with that.

MR. BERRIGAN: I didn't want to mislead anyone. I mean, it's a difficult, very difficult, decision.

THE COURT: And those weren't the type of people I was thinking that would be eliminated by agreement. I was thinking the ones that said, I don't believe in criminal law -- you know, that say the ridiculous things that have legitimate reasons that would be unduly burdensome. You know, they have three relatives

159

dying of cancer, you know, those type of people that you clearly agree on we'd just get rid of.

MR. BERRIGAN: Right. Well, there might be some issues, and we have not discussed it, but it seems like to me if the government agreed that if somebody knew Dustin Honken was convicted and got the death penalty, if they knew that, I mean, our position would be that juror would be disqualified. Maybe they don't share that.

THE COURT: They might not share that.

MR. BERRIGAN: If they did, maybe that's a juror that we could get rid of. There might be some issues like that that we could agree on, and there will be some whackos on there that we know --

THE COURT: And I guess it's mostly the whacko-proofing.

MR. BERRIGAN: Right.

THE COURT: We'll still wind up with some.

MR. BERRIGAN: None of us want to see the whackos here. I'm sure we'll be happy to get together on that.

THE COURT: Right. Anything else?

Page 138

MR. BERRIGAN: There's one matter. I just want to put this on the record because I don't -- later if it becomes more of an issue than it is, I don't want the Court to think we've been sandbagging in any way.

A recent discovery disclosure by the government the

160

defense contends contains attorney-client material. We are going to file a motion about that with the Court in an effort to get that material back. We have not done that. Mr. Williams has been kind enough -- I haven't spoken to him personally, but Mr. Willett has, and he's been kind enough to, for the time being, hold on to that material and not disseminate it until this issue is addressed with the Court.

And I want to just have that on the record so that if something happens in the interim that we all kind of know where we are at least as of today's date. At least that's my understanding of his position, and I think he completely disagrees with our position about whether or not this is confidential material, and I understand that. He's going to respond undoubtedly when we file our motion. But we would like to keep this at least present situation intact until we have a chance to address it with the Court if he's willing to do that.

MR. WILLIAMS: Your Honor, you're completely in the dark, so let me enlighten you a little bit on this.

Miss Johnson sent to a person named Valli Williams who was a former lawyer who was convicted by our office in the Northern District for a fraud or embezzlement -- she had met Valli Williams while serving time in Linn County Jail. Valli Williams goes to federal prison, ultimately gets out and relocates to Illinois. She's no longer a lawyer. She certainly

Page 139

doesn't represent the defendant in this case.

161

They continued to correspond, and in the process the defendant in this case sends to Miss Williams a time line of her life that was compiled at least in part by apparently their mitigation specialist.  And then in addition, it has defendant's handwritten notes on it.  She sends it to Valli Williams under cover of an attorney-client letter under a scheme that they had worked out between them to mark their envelopes attorney-client privileged to evade the jail procedures for opening the mail.

Because it wasn't, in fact, an attorney and because this was a scheme to evade the process, it was opened up as with the rest of her mail and ultimately provided to us.  I have it in our discovery at this point.  I think the defense has the theory it's a lot more helpful than I think it is.  I've looked at it briefly.  I don't think it's terribly important.

But we're not disseminating it.  We're hanging on to it, and we can litigate whether, in fact, it's attorney work product or whether they've waived the attorney work product down the road.  But that's what this is about.

THE COURT:  Sounds like a great issue for Judge Zoss.

MR. BERRIGAN:  The significance of this should not be lost on the Court, Your Honor.  This is an 80-page detailed chronology.  It is literally a road map of Miss Johnson's life, sometimes week to week, sometimes month to month.  It contains names of witnesses, things that have happened to her through her life.  And, in fact, anybody that has this material has the

162

defense mitigation case.  That's how important it is.

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 67 of 200

On the front it says Mary Goody, mitigation specialist, chronology, and then it goes on. And we are going to litigate this, but it's an extremely important document, at least in the defense perspective, and at least until the Court makes a decision about it, its confidentiality's critical to the successful ability of the defense we believe to present a successful case.

THE COURT: How soon can you get your motion on file?

MR. BERRIGAN: I'm certain we can get that done within the next week. I apologize it hasn't been ready yet. We've been unfortunately dealing with some other issues, but this is a very important issue to you, and we'll get it addressed very quickly.

MR. STOWERS: Next week.

MR. BERRIGAN: Next week, sir, if we could have a week.

MR. STOWERS: Probably by Wednesday.

THE COURT: Well, what's to filing the motion at least?

MR. BERRIGAN: Nothing. We just need to do a little bit of research. This really hasn't --

THE COURT: Why don't you get your motion on file first.

MR. BERRIGAN: We'll do that, sir.

163

THE COURT: So that I can get cracking on it.

MR. BERRIGAN: All right.

THE COURT: I'm just trying to think how many more hearings we're going to need in this case. We have this new matter.

Page 141

MR. BERRIGAN: Well, that's something we could probably take up at the same -- as long as Mr. Williams is holding on to it himself. That's my understanding is he personally has it.

MR. WILLIAMS: Yeah. I mean, just so we're clear --

THE COURT: What would you do with it?

MR. WILLIAMS: I don't know. I'm not sure whether they think -- whether they're concerned I'm going to disseminate it to you. I don't know. Tom, do you have a copy of it? Tom doesn't have a copy of it. I have a copy of it, and the agent who got it from the jail has a copy of it, and I think that's the only copies -- well, and there's a copy -- yeah. No, that's the only copies that exist, the two copies.

THE COURT: Was she disbarred at the time it was sent to her?

MR. WILLIAMS: Oh, yes.

THE COURT: And did Miss Johnson -- would you know whether Miss Johnson knew she was disbarred?

MR. WILLIAMS: Certainly, because they talk about the fact -- when they set up the scheme to send this, they

164

communicate the idea that, hey, let's do this; we'll mark it. I want to be careful. I don't know -- because I've just not spent a lot of time looking into this matter. But I don't know that there was communication necessarily that the defendant knew she was disbarred. I think that's pretty clear. I don't know that to be the case. Certainly she knows it wasn't her attorney.

She's sending it to Miss Williams because Miss Williams is going to write a book about the defendant's life, and that was the purpose of sending this to her was because she

Page 142

was going to write a book about the defendant. And so it wasn't sent because she was under some mistaken belief that Miss Williams was her attorney. It was sent for her enduring fame I guess or something.

MR. BERRIGAN: Your Honor, we're in a Catch-22 position because if I could tell you what they could do with this document and how damaging it potentially is, then I've really let the cat out of the bag.

THE COURT: Right, right.

MR. BERRIGAN: You know, but our contention is going to be that on its face you can look at this document and tell immediately that this is attorney work product and that it should not have been something that was disseminated by the government and should have been returned to defense counsel. But the merits of that aside, what we're at least --

THE COURT: I'm just curious. Why would that be? I

165

mean, even if it's work product, if your client knowingly sent it to somebody, it's --

MR. BERRIGAN: Well, that doesn't mean she intended --

THE COURT: It's her work product privilege, not yours.

MR. BERRIGAN: Doesn't mean that she intended that the government or anybody else have access to it other than the person that received it. It's only by the government taking the steps that they're, you know, copying her mail and all of her mail that they came into possession of this document. It's not like she gave it to them or had any intent that anybody else have it other than the recipient. And had the recipient been the only one to get it, we wouldn't be here arguing about this.

Page 143

But that's not what happened. The government took these measures to procure it. Now, they may have taken the same measures with respect to a lot of other documents. But this isn't something that kind of fell into their laps. They took action to get these things.

And the concern I have -- and I appreciate Mr. Williams has been very candid about this. Maybe he hasn't read it. But if he hasn't read it, I'd like something in place that he not read it. This is the kind of document that if he actually read the thing we wouldn't need to give him a witness list for the penalty phase witnesses. We wouldn't have need to have this argument we had earlier about what the potential

166

mental health issues are going to be. I mean, this is very damaging stuff. And we'd like it to be sealed presently at least until the Court can review it.

THE COURT: Do you have it with you, Mr. Williams?

MR. WILLIAMS: No, I don't have it with me, Your Honor.

THE COURT: Let me ask you this. How do you think we should handle it in the interim until I rule?

MR. WILLIAMS: I think simply instructing the government to leave it as it is. I mean, we're not doing anything with it. It's sitting in the discovery file and Agent Basler's file. Nothing's going to happen to it, and we can litigate this down the road.

I think it's very clear that the defendant has waived any work product. They don't think so. We can litigate that issue down the road. In the meantime, it will stay where it is, and we won't do anything with it.

Page 144

MR. BERRIGAN:  We'll be happy to take Mr. Williams at his word on that, Your Honor, but I'd like it to be sealed -- you know, just even in an envelope sealed in some fashion that other people don't have access to it such as Agent Basler.  He's not here.

THE COURT:  Right.

MR. BERRIGAN:  So we don't know what he might do with it.  If Mr. Williams took it into his own personal custody and

167

sealed it in some fashion --

THE COURT:  That's good enough for you?

MR. BERRIGAN:  That's right.  That's plenty good.  You bet.

THE COURT:  Do you have any problem doing that?

MR. WILLIAMS:  No.  I can do that, and I'll instruct Agent Basler to seal it and put it in his envelope.

THE COURT:  Oh, you each have one.

MR. WILLIAMS:  Yeah, I thought I made that clear.

THE COURT:  You probably did.

MR. WILLIAMS:  He has a case file that Agent Basler maintains that has all of his stuff including all the letters she sent, and it's in a section with letters she sent, and I have a copy of his file basically that has become our discovery file, so I can have both of them sealed, and they'll be in envelopes and not used.

MR. BERRIGAN:  That's all we'd ask.  Thank you. Thanks.

THE COURT:  Thank you.  Now, this other issue, the Honken debriefing, I don't want to get into it because we don't have the Honken defense team here.  Do you all agree we need to

Page 145

have a hearing on it with everybody present?

MR. WILLIAMS: Your Honor, I'm afraid I don't even feel competent to talk about it from the standpoint that I am -- I'm not the one --

℀

168

THE COURT: You're firewalled?

MR. WILLIAMS: Yeah, I'm firewalled off on that.

THE COURT: Kind of but kind of not, Mr. Berrigan; right?

MR. BERRIGAN: That's right.

THE COURT: It's a kind of a porous firewall.

MR. WILLIAMS: So I'm not sure of the answer to that question ultimately, Your Honor. I mean, all I know is that they filed a motion to get access to it. I don't know what it contains. I don't know what he said, and I don't know -- I've not seen the responsive pleadings or what's gone on since then, so I'm not sure what the status of that is. I think that's a question much better answered by Judy Whetstine.

MR. STOWERS: I don't think we need a full-blown, live, in-person evidentiary hearing.

THE COURT: Telephonic argument maybe with Parrish and -- I mean the Honken defense team, one or two or maybe all three of you and --

MR. STOWERS: Yeah, yeah, that's fine.

THE COURT: And then the government taint team.

MR. STOWERS: I suppose obviously, you know, Mr. Parrish and them may have a different view on that. They may want to put on some evidence, maybe a witness or something, that -- concerning the matter. I can't imagine what that would be, but I guess maybe my imagination isn't as big as theirs.

Page 146

But, you know, there may be things that they want to do.  I don't know.  I mean, I did get their response yesterday when I was finishing up a trial kind of like their one solution which is force the government to withdraw their death penalty notice against our client.  I thought that was a pretty good proposal.

THE COURT:  I'm sure you did.

MR. STOWERS:  We wouldn't need a -- we could shorten the trial.  We could do all sorts of things if that's where we were.

THE COURT:  But I wouldn't get to rule on your trifurcation motion.

MR. STOWERS:  Well, we could have a single-phase trial at that point just like every other trial.  So I don't know how much of a hearing we need.  I guess they should weigh in on that too.  But I don't feel a need myself to put on any evidence or anything that would require anything other than telephonic activity.

THE COURT:  Okay.  So we need to schedule a hearing on the venue motion.  Why don't we recess this hearing, go off the record, and just get our calendars out and find out if we can pick a day to have the venue hearing.  And hopefully we can maybe get this matter on the information sent to the disbarred lawyer that you just agreed to seal argued on the same day.

MR. WILLIAMS:  The only other thing I was going to bring up quickly -- and I don't think it will take much time --

but in the last trial you did not maintain the local rules on

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 74 of 200

the limitation on the time frame for opening statement and closing arguments, and we would ask for the same thing here, that we have an exception to the local rule for how long the openings and closings are.

MR. BERRIGAN: We're not opposing to that regarding the openings, Your Honor, but, frankly, we are opposed to it regarding the closing arguments.

First of all, I'm sure you'll recall, I saw the closings only in the first phase, but they lasted all day. And I recollect that each of the lawyers argued for over three hours, maybe three and a half hours. I have notes. But the problem in the closing part of the trial is that the government gets to go first and last which, if it's unlimited time, is a tremendous advantage on their second phase closing, at least in our view.

And the openings really doesn't matter because we're each up there once, so the parties should have as much time as they need to present their opening statements to the jury.

But in the closings, it's a real distinct disadvantage for the defense if nobody's heard from them in three and a half hours because the prosecutor's still speaking. And, frankly, at least in my view, in my humble opinion, those closing arguments were much longer than they actually needed to be in order to be effective, not that the parties were not effective because they

171

were, but they really kind of drug on.

So we have no opposition to that local rule being waived as to openings. But as to closings, we'd like some time limit that we could probably both mutually agree on, and it could be quite long, but we'd like some limitation.

Page 148

THE COURT: Well, I think maybe we have the same concern. I'm concerned not about these lawyers for the prosecution but some lawyers in the U.S. Attorney's Office in the Northern District of Iowa used to give a very short opening closing argument and then save everything for rebuttal, and I thought it was totally unfair, and I actually put a limit on it. I said with those particular lawyers their rebuttal was limited to half of their opening to reduce that sandbagging which is clearly what they were doing. And these two don't do that.

But we could have some kind of ratio maybe that your rebuttal is, you know, half as long as your opening or something. But that's not something I'm going to decide today. I'll give you as much time as you want for your openings, and then we'll have some dialogue about closing. I'm certainly not opposed to putting some reasonable limits on because it's just a long time. But, you know, it's going to be a long trial and a ton of evidence. And, you know, the local rule doesn't really contemplate trials like this. So I'm confident I'm going to waive the local rule. It's just a question of whether it will be an unlimited waiver or not, but we can work through that;

172

okay?

Anything else anybody wants to say? If not, we'll be in recess. Okay. Thank you. We'll be in recess.

(The foregoing hearing was

concluded at 5:10 p.m.)

Page 149

HEARING 7, 1-27-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                        3-2-06
Shelly Semmler, RMR, CRR              Date

Page 150

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 77 of 200

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

          Plaintiff,

     vs.

ANGELA JANE JOHNSON,                         Transcript of
                                             Hearing
          Defendant.
                                    /


          The Hearing held before the Honorable Mark W. Bennett,
Chief Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, February 11, 2005, commencing at 6:56 a.m.

                                             2


APPEARANCES:

For the Plaintiff:          C. J. WILLIAMS, ESQ.
                           Assistant United States Attorney
                           Suite 400 - Hach Building
                           401 First Street Southeast
                           Cedar Rapids, IA  52401

                           THOMAS HENRY MILLER, ESQ.
                           Iowa Attorney General's Office
                           Area Prosecutions Division
                           Hoover State Office Building
                           Des Moines, IA  50319

For the Defendant:         PATRICK J. BERRIGAN, ESQ.
                           Watson & Dameron
                           2500 Holmes
                           Kansas City, MO  64108

                           DEAN STOWERS, ESQ.
                           Rosenberg, Stowers & Morse
                           1010 Insurance Exchange Building
                           505 Fifth Avenue
                           Des Moines, IA  50309

                           ALFRED E. WILLETT, ESQ.
                           Terpstra, Epping & Willett
                           Higley Building - Suite 500
                           118 Third Avenue Southeast
                           Cedar Rapids, IA  52401
                      Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 78 of 200

Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

3

THE COURT:  Good morning.  Please be seated.  This is United States versus Angela Johnson, Criminal Number 2001-3046. Miss Johnson is personally present represented by her defense team, and both federal prosecutors are present, and we're here for a hearing on the change of venue motion by the defense which I've reserved ruling on.

Does the government have any evidence they'd like to present this morning?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Does the defense have any evidence they'd like to present?

MR. STOWERS:  Yes, Your Honor.

THE COURT:  Okay.  And be sure and put your microphone on.  You're going to have to learn how to do that by the time the trial starts or I'm going to put an electronic bracelet on your ankle and shock you every time you don't.

You may call your first witness.

MR. STOWERS:  I will, Your Honor.

THE COURT:  I was being facetious.

MR. STOWERS:  No, I knew that.

THE COURT:  Okay.

MR. STOWERS:  I got that one.

THE COURT:  Good, good.

MR. STOWERS:  I had some coffee this morning, so I'm a little sharper than usual.  But I wanted to cover a couple

4

Page 2

things first before we start.

THE COURT: Okay. Sure.

MR. STOWERS: I think there's -- obviously the Court has sent out and received back I think in excess now of a thousand questionnaires and then has also provided just this morning some additional ones to us that are still trickling in.

THE COURT: And then a list from the clerk's office which I have not reviewed yet -- I just glanced at it this morning -- indicating -- they make follow-up contact by telephone I think or letter or both, and it just indicates the results of what they've done to try and get everybody to answer their questionnaire.

MR. STOWERS: That's fine. And I just want to make sure that the questionnaires that have been returned are part of the -- sort of the court file in this case, although I know that they're under seal because of the confidentiality issues with the jury members that the Court wanted to have that stuff sealed from public access.

THE COURT: I don't know that they're part of the court file. I mean, they're not -- jury questionnaires are not filed like pleadings.

MR. STOWERS: Okay. That was a question.

THE COURT: We can make them part of a separate file under seal I assume for purposes of appellate review? Is that what you're talking about?

5

MR. STOWERS: Yeah, I just want to make sure that they're somewhere in the bowels of the clerk's office as part of the record in the case.

Page 3

THE COURT: Yeah, I think we'll go ahead and make it a separate like court file that will be under seal for confidentiality reasons but be part of the record so if you want to appeal whatever ruling I might make on the change of venue motion, that will be part of the record for appellate purposes.

MR. STOWERS: And that's fine.

The other thing is I know that the Court in its initial ruling on the venue motion had addressed a concept for how it was going to do or thinking of doing the sending out of questionnaires in the Eastern Division, and I think in the order the Court had indicated that it was going to exclude or select certain areas of the Eastern District when the jury was drawn.

But we subsequently had -- I think it was an off-the-record phone conference where I think we had indicated to the Court -- Mr. Berrigan did -- that we objected to that.

THE COURT: Right.

MR. STOWERS: And I think the Court just indicated it was going to send it out as a regular --

THE COURT: Correct.

MR. STOWERS: And I assume that's what happened.

THE COURT: Well, I don't know. I haven't looked at the questionnaires. You've got them all. Are there

6

questionnaire responses from people in the counties that I was originally going to exclude that you objected to? You'd know the answer to that question.

MR. STOWERS: Actually we haven't reviewed the questionnaires for location.

THE COURT: Well, you can review it and find out the answer to that question.

Page 4

MR. STOWERS: I just thought you would know.

THE COURT: I would have assumed you would have reviewed them.

MR. STOWERS: Well, we reviewed them for this purpose and not for that purpose.

THE COURT: Okay.

MR. STOWERS: We'd call Lisa Dahl.

THE COURT: Thank you. Please come forward, and I'll swear you in.

LISA DAHL, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. Try and adjust the chair and the two microphones so you can speak directly into the microphones. And when you're settled in, would you state your full name, please, and spell your last name for us.

It's the easiest question you're going to get today.

THE WITNESS: Thank you. My name is Lisa Dahl. My last name is spelled D-a-h-l.

7

THE COURT: Thank you.

Who's going to be doing the direct examination?

MR. STOWERS: I will, Your Honor.

THE COURT: Okay. Mr. Stowers? I'd appreciate it if you'd do it from the podium.

MR. STOWERS: Okay. That's fine.

THE COURT: I actually prefer lawyers -- and during the trial you'll be required to examine witnesses from the podium.

Good morning.

DIRECT EXAMINATION

Page 5

BY MR. STOWERS:

Q.   Ms. Dahl, how are you employed?

A.   Pardon?

Q.   How are you employed?

A.   Oh, how am I employed?  I work at Litigation Consultants, Inc.

Q.   And what is your position there?

A.   I'm a jury consultant.

Q.   And what is your involvement with that company particularly?

A.   I'm president of the company and own the company.

Q.   And how long have you worked there?

A.   I have had this company since 1996.

Q.   And can you give the Court an idea generally what

8

Litigation Consultants, Inc., does?

          THE COURT:   And before you do that, where is your company physically?

          THE WITNESS:   The company is in Lawrence, Kansas.

          THE COURT:   Okay.   Thank you.

          THE WITNESS:   Sure.

A.   I'm sorry.   Could you repeat the question?  What do we do?

Q.   Right.

A.   We study jury behavior.  We advise attorneys, and we work with judges in determining what types of attitudes and opinions people have in various types of cases, civil and criminal.

Q.   And how long have you been involved in that type of work?

A.   I've worked in this field since 1992, around about there.

Q.   And what is your educational background?

A.   I have a master's degree which is technically called a

Page 6

master's in special studies from the University of Kansas, and that master's degree includes work in psychology, communications, statistics, and law to the extent that it comes in through the political science department and observing the law school.

Q. And do you have an undergraduate degree as well?

A. Yes, I do.

Q. And what is that in?

A. Political science.

Q. And can you give the Court an idea of your professional

9

experience, your background, your employment experience since getting your master's degree, for example?

A. Oh, oh, oh. Sure.

THE COURT: Must be a little early for you, Mrs. Dahl.

THE WITNESS: I'm getting there.

THE COURT: Yeah.

THE WITNESS: Thank you.

THE COURT: Because this is the easy part.

THE WITNESS: Yeah.

A. I began working with Dr. Pete Roland at the University of Kansas as an intern in his office. He was a jury researcher and had a company that did jury research. The company was actually based out of Louisiana, but we had a Lawrence, Kansas, office. And I did that through graduate school. After graduate school, I went to Holland and Hart which is a law firm in Denver and worked in-house with Dr. Richard Crawford who was an in-house trial consultant, and I was his assistant.

After working with Dr. Crawford at Holland and Hart, I came back to the Kansas City area and with Dr. Roland formed a

Page 7

company called Roland, Jasa, and Dahl which was a trial consulting company.

After working at Roland, Jasa and Dahl as a partner, eventually I started my own company called Litigation Consultants, Inc., based it in Lawrence, and that would have occurred in 1996 and have been doing that ever since.

10

Q. Do you have a resume?

A. Yes, I do.

Q. I'm going to hand you what I've marked as Exhibit A and ask if you can identify that.

MR. STOWERS: I've given a copy to the government. I'll give a copy to the Court.

THE COURT: Thank you.

MR. STOWERS: Thank you.

A. This is my CV, and additionally there is attached a case list of capital and murder 1 case experience.

MR. STOWERS: I'd offer Exhibit A.

* * * *

(Exhibit A was offered.)

* * * *

THE COURT: Any objection to Exhibit A?

MR. MILLER: None, Your Honor.

THE COURT: Thank you. Exhibit A is received.

* * * *

(Exhibit A was admitted.)

* * * *

BY MR. STOWERS:

Q. Now, Ms. Dahl, some of the work you do is in the area of analysis of locations on the question of whether or not a

location is an appropriate location for trial based on venue issues; is that right?

11

A.    Yes.

Q.    And obviously in this case there is not a venue study, but can you give the Court just generally an idea of what would be involved for you to do a venue study?

A.    A venue study in the past that I've conducted and then testified about includes a telephone survey, a telephone survey of individuals in the venire where the alleged crime has occurred and then in an alternate venire that's away from the public interest of that crime.  That venue study surveys a representative sample, meaning not every household is called but, for example, maybe 400 individuals are called so that you could have a margin of error to infer what the population believes.  And then you would contrast if a venue as compared to an alternate venue is different and what level of knowledge, recall of case facts and then opinions exist as a baseline in that community.

Q.    Now, in this case you've had also the opportunity to review juror questionnaires; is that correct?

A.    Yes.

Q.    And you had some involvement in creating the questionnaire that actually was sent out; is that correct?

A.    Yes.

Q.    Now, have you had an opportunity to analyze the juror questionnaire with reference to the questions that might have some bearing on the issue of venue?

12

Page 9

A.   Yes.

Q.   And can you tell the Court initially, although I'm sure the Court's aware of it, but can you explain for the record anyway what the relevant questions are that would have something to do in your view with the venue issue?

A.   With venue specifically, questions that begin at question 63 in the questionnaire, although there's a question that doesn't have a question number that's just before question 63 and will be at top of page 11 and then through page 12; I believe the question would be question 73 if I could refer to my notes.

Q.   That's fine.

A.   Yes, through question 73, so essentially question 63 through 73 with the nonquestion numbered -- the nonnumbered question just before 63.

Q.   Okay.  And I guess what I'd like to do is sort of start with what I've referred to when I've talked to you as the top number which is the results, if you will, from the unnumbered question that immediately precedes question 63.

A.   Sure.

Q.   And that's the question that deals or requests that the jurors identify their familiarity with the case if you will.

A.   Right.  The actual question is, How familiar are you with these events or the people involved in this case?

Q.   And did you examine a substantial number of the

13

questionnaires that were returned by the prospective jurors in the western district on that question as well as in the eastern district?

Case 3:09-cv-03064-MWB-LTS     Document 284-68     Filed 06/23/11     Page 87 of 200

A. Yes, I did.

Q. Division I should say. And can you tell the Court what you found with regard to that?

A. With regard to that question, overall, 67 percent of the people in the western district marked that they had some familiarity with this case. In the eastern district, 59 percent of those who responded to this question that I reviewed marked that they had familiarity with this case.

THE COURT: Well, let me interrupt. How many questionnaires did you review?

THE WITNESS: I reviewed a sample size of -- I received 539 questionnaire files from the western district. Of those, I reviewed 381 files. Within those files --

THE COURT: I don't understand what you mean by file.

THE WITNESS: The PDF files that came.

THE COURT: Okay.

THE WITNESS: Not all of them were actual questionnaires, though, and so those were the files available to me. And then of those files, ones that actually filled out this questionnaire which would be our total in or sample would be 349 in the western district and 286 in the eastern district. And so in those two sample sizes, you would be working with a plus or

14

minus 4 percent margin of error.

THE COURT: And how did you determine the sample size?

THE WITNESS: The sample size was determined by how much margin of error I was willing to live with. That would be the sample size.

THE COURT: And how did you determine which of the questionnaires made it into the sample?

Page 11

THE WITNESS: The questionnaires were looked at in numeric order, in other words, the first files that I received, what I determined were not the first that were received by the Court as on some days I would receive, let's say, questionnaire number 10 and then the next day I would receive questionnaire number 2, and so I took that as to be a random sample of those who turned in questionnaires.

MR. STOWERS: Your Honor, I might --

THE COURT: That's not a random sample. Did you take statistics? That's not a random sample. Do you have a background in statistics?

THE WITNESS: Yes, I do.

THE COURT: Why do you believe that would be a random sample?

THE WITNESS: It is a random sample of the questionnaires that were turned in. It is not a sample that is turned in and mailed in order. It's as if you could have done the same thing by picking every ten questionnaires, but there's

15

not every --

THE COURT: That wouldn't be a random sample either if you picked every ten questionnaires. That would not -- that doesn't meet the statistical definition of a random sample.

MR. STOWERS: Your Honor, could I say one thing?

THE COURT: No, not right now. I'm talking to the witness.

That's your definition of a random sample?

THE WITNESS: Yes.

THE COURT: May I ask how well you did in statistics? Ma'am, that is not a random sample.

Page 12

THE WITNESS: Perhaps we have -- I mean, it's not a ran --

THE COURT: What's your definition of a random sample as a term of art in the scientific doctrine of statistics?

THE WITNESS: If I were taking a random sample of the population, it would be different than that. If I were doing a telephone survey, then my random sample would be generated by purchasing a sample and then randomly calling numbers within that. For the purposes of this which is somewhat of a convenient sample to begin with because we have only those people --

THE COURT: My question is is taking every tenth questionnaire a random sample?

THE WITNESS: Of this population, yes.

16

THE COURT: You may proceed.

BY MR. STOWERS:

Q. Ms. Dahl, just so it's clear, did you compare the results of your sampling, random or not, to the information that the government has apparently supplied -- well, they have supplied it to the Court in their brief that was filed yesterday.

A. Yes.

Q. And did you note in the government's brief that they had apparently reviewed each and every questionnaire that had been submitted up to that point in time?

A. Yes.

Q. And did your numbers match up with theirs?

A. Within a percentage point.

Q. Within one point? Now, when you used these figures, 67 percent in the western district and 59 percent in the Eastern

Division, is it the case that that's a compilation of a combination or a combined result of multiple responses to the question that is preceding number 63?

A.    Yes.

Q.    So you've added together responses from what boxes on that question that immediately precede 63?

A.    The "very familiar," the "somewhat familiar," and the "only just heard about it."  There's a fourth box, "not at all familiar."

Q.    Now, can you explain what it is that you believe that those

17

answers indicate with respect to familiarity that the prospective jurors would have with this case?

A.    When you look at the questions, the boxes "very familiar," "somewhat familiar," "only just heard about it," and "not at all familiar," and you tabulate those who indicate very familiar, somewhat familiar, only just heard about it, and not at all familiar, I would consider that 67 and 59 percent to be sort of a floor of how familiar people are with this case meaning that there are some individuals who marked not at all familiar and then write down comments that have familiarity.  So I think it's wrapped up in the term of familiar versus recall.

Q.    And was this question designed, if you will, if that's the right word with the idea of a venue study?

A.    No.

Q.    What's the concept of this question then in the questionnaire?

A.    This question is simply one of familiarity, not do you recall the -- this case or facts in this case.  And it was simply designed for people to indicate that, and it's somewhat

Page 14

not an accurate read of actually the depth of knowledge that people have.

THE COURT: Well, then that would be your fault for the design of the question, wouldn't it?

THE WITNESS: Yes.

THE COURT: Because you could have designed a question

18

that more carefully probed the knowledge of specific facts.

THE WITNESS: I could have.

THE COURT: Why didn't you?

THE WITNESS: I didn't design a venue survey. I designed a questionnaire that would be followed up on in court.

THE COURT: But you knew venue was still -- the question of venue was pending at the time this questionnaire was designed. You knew that, didn't you?

THE WITNESS: No, I did not.

THE COURT: The lawyers didn't tell you that?

THE WITNESS: That's not under the assumption that I made this questionnaire.

THE COURT: Okay.

BY MR. STOWERS:

Q. Ms. Dahl, when you say that these numbers that indicate some degree of familiarity with the case are a floor and then you've highlighted I think an example -- I think you said some people had responded not at all familiar but then answered elsewhere in the questionnaire that you noticed that they, in fact, were to some degree familiar with the case or had heard things about it, do you have some examples that you might be able to provide to the Court of that?

A. Sure. We're talking about familiarity, and this Juror

Page 15

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 92 of 200

Number 254 in the Western Division marks in the familiarity box "only just heard about it" and then continues to say something

19

about she held them with a gun, gunpoint, and killed them later, and he was convicted of murder, just that there was a meth lab in her home and that she assisted her boyfriend.

Another respondent marks "not at all familiar" and writes, I only just heard it once on the radio news about the conclusion of the case and the sentence given to Dustin Honken which was the death penalty.

In the Eastern Division, the same type of information -- and this is what the literature would call minimization language -- "only just heard about it" and writes Dustin Honken found guilty. And an example of a "not familiar" would be the only thing that I -- marking "not familiar," the only thing that I remember is the lady and the man killed five people.

Q. And those are some examples of what in your view?

A. Those would be examples of how people report their understanding of the word familiar, and the literature since about 1989 beginning with Dr. Ed Bronson talks about a minimization effect where people say, Only what I read in the paper which could be a great deal of information, but people use sort of shorthand codes to tell you what they know. So to the extent that somebody could say, Well, I know you, but I'm not familiar with you, the word "familiar" here doesn't accurately measure the depth of knowledge that one might have about the case.

20

Page 16

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 93 of 200

Q. Can you explain -- I think you used the word "recall" versus "familiar." What's the distinction if there is one between those two?

A. The distinction would be if I ask if -- do you recall this case, perhaps the "not at all familiars" would say, Yes, I recall that case. Do you recall a specific fact, that fact being that Dustin Honken was convicted or that fact being that Dustin Honken received the death penalty? Yes, I recall that information. So that would be recall versus how familiar are you.

Somebody might say, Well, I'm really not at all familiar, but I do know that Dustin Honken received the death penalty. And I guess one of the things that concerns me is that we do have "not at all familiars" that mark information that they know. We have "not at all familiars" who don't write anything. Can we assume that the "not at all familiars" actually don't have information that's been out in the public? And that's why the 67 percent and the 50 -- I'm sorry, the 67 percent and the 59 percent may just be an indication of what people are willing to report that they know or mark the box that they know but not an actual indication if people have facts in their head about this case.

Q. Now, there's another area that you attempted to track in the samples of these questionnaires that you did, and that had to do with people who, apart from hearing about the case in the

21

media, conversed about it with other persons; right?

A. Right.

Q. And you categorize that with some phraseology. What is that?

Page 17

A.    Have you talked about the case or have you had conversations about the case or have you overheard other people talking about the case?  It's sort of word on the street information about the case.

Q.    And why is that something that you felt might be important to look at?

A.    In venue studies and in literature that discusses what is -- what makes a community have salient information or attach importance to a case, people measure how information is disseminated and also how information or how the case is talked about.  And so oftentimes you'll have a question on a survey or a question in general that says, Well, have you talked about this case, or have you overheard others talking about this case, or from what sources have you gathered information about this case or did you hear about this case first?  And one of those would include word of mouth.  And those questions were included on this questionnaire, and I did some looking at those questions.

Q.    Is there a -- what -- is there a difference in your view between persons who merely might have read articles in the paper or seen something or heard something on the TV or radio and then

22

the conversational knowledge, if you will, about a case?

A.    There is a difference.

Q.    And can you explain what that is?

A.    And I guess I should say there are differences.  And differences are -- would include that conversations can carry with them opinions.  And town talk and water cooler talk and sale barn talk include information about did you hear X happened, and it also typically includes that person or the

Page 18

community's opinion about X happening. And it may include rumors or false information or an understanding, a community understanding, of what happened that isn't either portrayed in the media nor accurate to the facts. Oftentimes discussions about the case have much more potential to have strong opinions about the case stated, and that's somewhat different from just news media information about the case.

Q. Does the fact that there are these -- well, maybe you've already said it. Did you give us your numbers with regard to what your analysis showed on the conversation and the talking about?

A. I did not give you those numbers.

Q. Okay. Can you give those to us now?

A. Sure. Those numbers, the people in the sample that I looked at who would have marked either word of mouth information or that they discussed the case or overheard others discussing the case include in the western district 35 percent and in the

23

eastern district 25 percent.

Q. Does that number say anything about the depth, if you will, of interest in the case?

A. To me it indicates -- these numbers are -- in thinking about -- I mean, this is one in every three or one in every fourth person has had a conversation about this case or has overheard a conversation or got their information word of mouth, and that's significant to me saying that this case in both venues is being talked about, and I think that that shows attention that is being given to this case in addition to that information that you may have read about.

Q. Now, the questions that you reviewed to evaluate this
Page 19

talking about the case, which question numbers are those again?

A. 64, 65, and 66.

Q. Now, when you looked at this set of jury questionnaires, did you also try to evaluate, for example, within the time that you had to some extent the types of information that many of these people were reporting to have knowledge of or claiming to have knowledge of?

A. Yes.

Q. And do you have some examples of that that you think would be helpful to the Court?

A. May I ask you a question?

Q. Okay.

A. Are you talking about what they talked about? Are you

24

talking about just their open-ended comments about what they recall hearing?

Q. Either one I guess at this point.

A. Okay. Examples of what people are talking about, since we're on talking, would include, for example, Juror Number WO4 -- so we're in the western district on page 11 -- writes, I've seen a lot of news media in this case. I've heard about the meth associations of both Honken and Johnson. I followed Honken's trial and the death sentence punishment. I know that children were murdered by Honken with the help of Johnson. I've had several discussions with friends and family about the murders, the druggies involved, and the hope for a death sentence for people who have been so inhumane as to murder five people including children. There have been lots of views expressed, mostly negative, by many students, and the case has been discussed in our college newspaper. I've heard they want

Page 20

to move it to Minneapolis since so many people in Iowa have been exposed to media. I've heard comments that they think she is also guilty, meth operation and cover-up.

Juror Number 217 on page 11 writes, Honken was a low-life drug dealer with a history of dealing. He killed and -- people to cover up his drug dealing. They thought he killed the people, but it took a long time to find the bodies and prove him guilty. Talked with friends about what a low life Honken was and how he deserved the death penalty, how much tax

25

dollars are wasted on appeals to help him. Friends have said and discussed the above comments. Johnson was Honken's girlfriend, involved with Honken in the drugs and was his accomplice, although spelled accomplish, in his drug dealings and crimes.

The same types of comments are in the Eastern Division. Juror C53 on page 11 writes, I go to Aplington every Thursday not far from Mason City, talk to people at the sale barn and knew of these people, common knowledge four years ago. People seemed to know a lot about it, people I see at the sale barn in Appleton -- Aplington. It's hearsay from people from the sale about what happened, who they said did what. I heard Angela and Dustin killed these people so they would not testify.

And there are other examples in the Eastern Division. I heard on the news that Dustin Honken was convicted of the murders and that Angela Johnson was his accomplice and she told the authorities from the Mason -- where the bodies were. I heard that it was a drug deal gone bad. My mom told me about it when they first found the bodies in Mason City.

Those are examples of how people are talking about the

Page 21

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 98 of 200

case.

Q.    Now, I want to go back to the utilization of this questionnaire as a measure of where we are on this venue question versus, for example, your experience when you've had both a questionnaire and a venue study; okay?

26

A.    Okay.

Q.    Have you had the occasion to work on cases where there have been venue studies as you've described them earlier in your testimony and then also a questionnaire?

A.    Yes.

Q.    And have you made any observations in those cases and through your experience in your field about -- I'm going to call it a response rate; that might not be the right term -- about the response rate that is received from a venue study as you've described versus a formal questionnaire that is mailed out as was done here?

A.    Yes.

Q.    And can you explain to the Court what you've observed in that regard?

A.    In particular in mail-out questionnaires, the responses that come back, if you were to tally them in terms of the check boxes, are not at the same rate as you would measure something in the community if you were to do a telephone survey.

For example, you might have in a telephone survey if you recall the case, you might have 98 percent recognition or if you recall a specific fact, you might have high recognition, or if you ask an opinion question in a survey, definitely guilty, probably guilty, probably not guilty, definitely not guilty, or unsure, you might have a very high rate there of, you know, a

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 99 of 200

stratosphere of opinions. And then when the questionnaires come

27

in, they differ from what you actually saw in the survey work meaning that their numbers if you were to tabulate them are lower.

Q.   Obviously the Court's aware of this, but is there a difference in what can obviously be asked in a questionnaire of somebody who's a real live prospective juror versus a telephone survey in a venue study?

A.   Yes, there are differences.

Q.   For example, in a juror questionnaire like this, you couldn't very well go about saying to somebody something so particular as to alert them to the particular issue like did you hear that Dustin Honken had been convicted, did you hear that he had been put to death; is that right?

A.   That would be one of the differences.

Q.   But in a telephone survey, you might be able to get at that more directly through questioning of the individual over the phone?

A.   In a venue survey, you would have a section that would ask about information that's been reported in the media but potentially inadmissible at trial.

Q.   Now, when the jurors are receiving this questionnaire, they're receiving it as a formalized document from the Court. You're aware of that. And there's a cover letter that's attached.

A.   (Witness nodded head.)

28

Page 23

Q. And these people are notified that they're potentially going to be jurors on this particular case. You're aware of that.

A. Yes.

Q. Is there a difference in that approach to somebody versus the approach that would be taken with a venue study that also contributes to this --

A. Yes.

Q. -- this situation where you see in your venue study a higher response rate than you would see under the formal questionnaire?

A. Yes.

Q. And can you explain what that is?

A. Yes. It's in the -- you would hear it called -- if we were talking among social scientists, you would hear it called a demand characteristic, and that is that when people answer an interviewer that doesn't expect an answer, it doesn't have a good answer or a correct answer in mind, they more often than not or more truly reveal what their opinions are.

Once individuals sort of, if you will, have the courtroom brought into their house, they start assuming that there is a right answer and we know what the right answer is and that is that one should not have an opinion at this point about guilt, about the defendant, that that would not be a good characteristic to be a good citizen or a good juror to have,

29

that expressing opinions is actually what removes you from jury service and that the Court asks us in the cover letter to not assume guilt at all and so that then when we ask the question in the questionnaire do you have an opinion about guilt, we've

Page 24

already been told that the answer is we shouldn't have an opinion about guilt at this time.

And so the questionnaire has sort of this demand characteristic that there is a right answer and that is not to have an opinion at this time, whereas an interview doesn't have that same type of good citizen quality to it. It's more of a baseline of what the community actually believes in this case.

Q. Now, you've started to go into the next area which is what I wanted to get to which is the numbers that you identified with regard to the opinion about guilt or innocence. And can you give the Court, first of all, which question is that that dealt with the opinion about guilt or innocence?

A. The -- that would be question number 72.

Q. Okay. And did you come up with some numbers in your sample from the Eastern and Western Divisions about -- on that question I should say?

A. Yes, I did.

Q. Okay. And can you give those to the Court?

A. In the Western Division, those that reported that they had an opinion about the guilt or innocence of Angela was 15 percent. Those that were unsure of their opinion or unsure I

30

should say if they held an opinion was 28 percent; those that marked no, they did not have an opinion, 55 percent. And then I categorize 2 percent as other or unable to determine if they had an opinion or not. They may not have marked the box.

In the Eastern Division, it would be 14 percent reporting that they held an opinion about the guilt or innocence, 17 percent would be saying that they were unsure of whether or not they had an opinion, and 68 percent would say no,

they didn't have an opinion.

Q. Now, that -- those numbers were generated in a questionnaire that was sent out. The cover letter which you've reviewed indicated I believe that the jurors were supposed to presume that the defendant was innocent and not guilty?

A. Yes.

Q. And that the charges were merely allegations. I believe that was referenced in the cover letter.

A. Yes.

Q. But you nevertheless had, in the Western Division, if my math is right, 43 percent of the people respond that they already had an opinion one way or the other on the case or they were unsure what their -- I guess unsure what their opinion was?

A. Well, they were unsure if they had an opinion if you read the question.

Q. And then in the Eastern Division, the total would be 31 percent.

31

A. Correct.

Q. Can you explain to the Court the "unsure" category and what you believed that the response rate as to that category of answers means?

A. Let me first read the question. No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? Yes, no, unsure. Please explain. Individuals marked yes, I have an opinion, then would state an opinion. Sometimes that opinion would be of guilt. Sometimes that opinion would be of innocence. The people who marked "unsure" would write down things such as news media tends to make her out as an

Page 26

accomplice, so they're unsure sort of doesn't necessarily take away the idea that they write down an opinion. I think they're unsure as to whether or not they have that opinion. That's sort of as far as I could take what unsure might mean there.

Another unsure would be I don't know of Angela, but if she was linked with Dustin, she probably at least knew something of what was going on. So unsure is I think and can't be discounted as a category of potential opinion.

Q. I suppose every time you do one of these questionnaires and then get the opportunity to read responses you think of ways you might improve on certain of the questions; is that true?

A. That's very true.

Q. As I look at that question, I'm a little bit puzzled by the

32

category unsure. Can you explain what that was designed to uncover?

A. To me if you were to translate it back into a venue survey -- if you were to take off the unsures, people just in general answering of questions have a hard time choosing yes, I have an opinion. For example, in survey work at the beginning of the survey, you would say, At any time throughout this survey, if you are unsure of your opinion, if you don't know your opinion, or if you have no opinion at all, please tell me, and I will write that down for you. And if you actually then give them the option on each question, do you not have an opinion, are you unsure, or you don't know, the responses of people who choose those categories in survey work just exponent -- it's just -- the number just grows greatly as opposed to not always giving them that option, they then make a choice between the options that they have.

Page 27

So the unsure here I think is to, rather than have people mark "no, I don't have an opinion" have a place to mark "I have something; I don't know if it's an opinion or not, but here's what I've got."

Q. So maybe I'm characterizing your answer, but I'll go ahead and do it anyway. But are you saying basically that it would be a way of capturing people that have something that might be considered to be an opinion but which they would not want to declare to be an opinion in a question answer?

33

A. Yes.

Q. Now -- one moment. Were there some other question responses that you looked at on this venue question that you think are significant that the Court should be aware of?

A. Yes.

Q. And which questions would those be?

A. Two other areas that I think are very important is not just what the numbers are but what the open-ended comments say. And those open-ended comments that I looked at would most specifically be in response to question number 63.

The other area that I think is important to look at are their responses to question number 73 which is opinions about the death penalty or life imprisonment -- I'm sorry. I mischaracterized that. Opinions about an appropriate punishment for Angela Johnson if she were found guilty.

Q. Okay. Well, let's talk about question 63 first; okay?

A. Okay.

Q. Can you remind me what that question is?

A. Question 63 asks, What have you read, seen, or heard about this case, the crime, or people involved? Include as many

Page 28

details as you recall even if they were not included in the

statement above.

Q. And what were you looking for there in connection with this

venue issue?

A. The way that I looked at responses here -- and again, it's

34

of those people who are willing to write down what they

recalled -- you could look at their responses in terms of people

who write down nothing or know nothing. You could look at the

responses in terms of reporting just what -- because we had

given them on page 10 and on to page 11 a paragraph that

explains different details in the case as well as in the cover

letter a paragraph that explains different details in the case.

So some people wrote only things that were in that

paragraph, meaning they sometimes wrote only what you just told

me, or they sometimes wrote, Five bodies were found or things

that would have been included in that paragraph.

There were three other categories, though, that I

think are noteworthy. One is what I categorized as something

called notable, and that is people who would write down "only

what I heard on the news," "only what I read in the paper," and

then didn't describe anything more. And so with those people,

they may have all of the information in this case or at least we

don't know what information they have in this case, and those

people I tallied as people who were notable.

There was a category that I called special people, and

these people include people that write down more than just

notable information but things that would be in addition to the

paragraph above such as, I know that she wrote -- or that

someone, anyone -- I know that there was a map involved. I know

Page 29

that there was a suicide attempt.  I know that there was a meth

35

lab.  So things that were in addition to the paragraph above I noted as people who had special information or more than just what we told them.

And then a third category or maybe I'm on my fifth, but a third category really that I tallied was extra special people or people who had information that included that Dustin Honken was convicted, Dustin Honken had a trial, or Dustin Honken received the death sentence.  And those people were people that I tallied as extra special people.

Q.   And do you have the ability to quantify those different categories for the Court?

A.   I can quantify them, and I have to remind the Court or remind you that these are just baseline -- these are only of people who actually were willing to write down information, so these numbers don't mean that other people out there in the community don't have the same information.

THE COURT:   What percentage in your nonrandom sample size actually wrote a response to question 63?

THE WITNESS:   To question 63, actually wrote a response, the tallies that I have are 128 people of 286 in the eastern district wrote a response that was either notable, special, or extra special.  I do not have a tally of everybody who wrote down comments.  So, in other words, I didn't tally people who put down just the facts that were reported in here or wrote down the words "nothing."

36

THE COURT:   But surely you tallied how many people
Page 30

wrote a comment versus how many people who did not write a comment.

THE WITNESS:  I did not tally that.

THE COURT:  You did not tally that, okay.

THE WITNESS:  So that the --

THE COURT:  Why didn't you tally that?

THE WITNESS:  I don't know why I didn't tally that.

THE COURT:  Well, it seems to me that would be -- in the first analysis of this question, that would be the most important question initially because if a very small percentage responded in writing, then it's not representative of very much. So you'd want to know how many responded in writing.

THE WITNESS:  And I agree that it's not representative of very much because if a person didn't write anything, it doesn't mean that they don't have the information.

THE COURT:  I understand that.  I understand that. But that would be the starting point in terms of the analysis, to know what percentage actually wrote something.

THE WITNESS:  Right, and I don't have that number.

THE COURT:  Is there a reason why you don't have that number?

THE WITNESS:  No, there's not a reason other than I don't have that number.  I only scored for people who had one of the notable categories, only tallied those people.

37

BY MR. STOWERS:

Q.   And in -- I'm sorry.  You said it was 128 of 2 --

A.    In the eastern district, 128, so of those 3 categories, you know, includes 128 responses out of the 286 questionnaires that I looked at which is 45 percent.

Page 31

In the western district, 144 people had one of those 3 responses out of 349 which is 41 percent.

Q. Now, what do you believe that tells you?

THE COURT: Before we get to that, I'm confused. I thought you used as your sample size every tenth questionnaire.

THE WITNESS: No. That was -- when we were having a conversation about what random is, I said that as an example, and then we talked about whether or not that's random, but that's not how I looked at the data. I looked at --

THE COURT: Every questionnaire.

THE WITNESS: Not every questionnaire. Every questionnaire within the first --

THE COURT: Within the first 384 -- 381 files that you received?

THE WITNESS: Thank you. Yes.

THE COURT: Okay.

THE WITNESS: That would be for the western district.

MR. STOWERS: Are you done there?

THE COURT: I am, for a while.

BY MR. STOWERS:

38

Q. I want to make sure that -- I think the question I was trying to get to was what -- you said you scored 128 I think it was of 286 as either notable, special, or extra special. You had defined those categories earlier, and I want to make sure that it's clear what it is that you think that shows.

A. That 45 percent to me shows individuals who have information, potential information, that is more than just in the questionnaire. So to me they could have potentially inadmissible information, either clearly written down or

Page 32

potentially implied because they wrote just what was in the media.  The special people have just more information than what we gave them.

Q.    Okay.  Now, I want to go back to the original numbers that we started off with which were the responses to the unnumbered question ahead of 63 wherein you had indicated the numbers there showed that persons who expressed some degree of familiarity in response to that question in the Western Division, the number was 67 percent and in the eastern it was 59 percent.  These numbers now which you've scored out of question 63 itself are obviously lower than that.  Do you follow me?  In other words, people said they had some degree of familiarity in the western district, 67 percent in terms of the box checking.

A.    Yes.

Q.    But when they're asked the narrative question, your number drops in question 63.

39

A.    Right, but I guess I'm a little bit confused by your question.

Q.    Okay.

A.    But that number, what that number represents is --

Q.    Which number?

A.    The 45 percent, the 128, for example, in the eastern district, the judge very appropriately asked a question, well, how about all the people who marked something down?  I don't have that number.  So this number is less a hundred -- I guess I'm confused.  What is your question?

Q.    Well, the number of people who checked the box above paragraph -- above question 63, that they were either -- that they were to some degree familiar with the case, in the eastern

Page 33

district you said that was 59 percent.

A.    Yeah.

Q.    And in the western district 67 percent.

A.    Uh-huh.

Q.    Right?  And now you're talking about the responses to the actual narrative question number 63, the notable, the special, the extra special categories; right?

A.    Yes.

Q.    And I'm trying to figure out a comparison between those and your prior testimony about the answer to the unnumbered paragraph preceding 63, and what's the difference?  Why is there a difference there?

40

A.    The difference is a qualitative difference.  I mean, these are -- this is what people are writing down and sort of categories of what people are writing down rather than how people self-report how familiar they are.  And so, you know, for example, somebody could write down that they're only just familiar but write down that they have the extra special information of Dustin Honken's conviction.  So it's looking at the question as they -- kind of what they talked about or what they wrote about, what they themselves conveyed, you know, that percentage as compared to how people are familiar.  I'm not sure what your question is there.

Q.    That's fine.  I guess what I'm getting at is do you generally see in questionnaires a difference in response rates, if that's the right term, to a narrative question versus a check-the-box-type question?

A.    Yes.

Q.    And can you explain what the difference is that you
Page 34

generally see?

A.    In general we have people who are writers who like to write in detail, and I have examples of, you know, people who write an extreme amount of detail, and we have people who just don't write or who write the minimum because that's -- they're just in life not -- maybe they're talkers, not writers.  I mean, you see that in how people answer questions in class situations and other academic situations.

41

Q.    One of the things you started to talk about earlier was the responses to question number 73?

A.    Yes.

Q.    Are you ready to talk about that now?

A.    Okay.

Q.    Okay.  Let's talk about that.  First of all, what's the question again on 73?

A.    73 is, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children?  Yes, no, unsure, please explain.

Q.    And what were you looking for in your analysis of the responses to that question?

A.    The analysis to this question included tallying the yes, nos, and unsures.

Q.    Okay.  And can you give the Court those figures?

A.    Sure.  In the Western Division 47 percent of those that I reviewed said that yes, they had an opinion about the appropriate punishment.  27 percent did not have an opinion or said that they did not have an opinion about the appropriate punishment.  And 23 percent were unsure about their opinion.

Page 35

In the Eastern Division 53 percent said that they had an opinion about the appropriate punishment, 26 percent said that they did not have an opinion, and 17 percent were unsure of their opinion.

42

Q.    Now, what do those figures mean to you?
A.    The figures to me mean that in this question we've given them permission actually to have an opinion.  That is, before they've been told it is not appropriate to have an opinion about a person's guilt.  And so -- and that would be in question 72 we see what is one in every six person or so who gives us an opinion about guilt.  But in this next question we say, well, if she were found guilty, so it's a permission to have an opinion. And when we give the permission to have an opinion, then we see that the opinions grow greatly.  The yeses alone are 53 and 47 percent.  And you could categorize just as you could categorize with the question prior the unsures also potentially are opinions and that that number grows to the Eastern Division 70 and to the Western Division 51 percent.
Q.    And is that significant to you?
A.    To me that actually becomes the baseline of the extent that people have opinions in this case, it's expressed in that question; or I should say the extent that this questionnaire can measure those opinions, it's expressed in that question.
Q.    So make sure -- translating this for me and for the Court, it sounds like what you're saying is that you believe that the responses to this question may more accurately reflect what the community sentiment is in the two locations, if you will, with regard to what should happen in this case?
A.    It reflects that there is a community sentiment about this

Page 36

case.

Q.   Now, one of the things that obviously we're struggling with in this case is the idea that some jurors may have information from whatever source, media or otherwise, but may be asked questions either in this questionnaire or when they're called and then asked if they can set those aside and judge the case based upon the evidence presented in court and put all that other stuff out of their mind, and you're aware of that set-aside concept; right?

A.   Yes.

Q.   And are you aware of research that's been done by people in the field -- I don't know.  What is it?  Social science or psychology or what field would that be?

A.   It would be social science, law, and psychology.

Q.   Okay.  All of the above, okay.  With regard to this set-aside question, you're aware of some research that's been done in this area?

A.   Yes.

Q.   Okay.  And can you explain to the Court or describe for the Court what it is that that research in the field shows about whether or not that's a viable thing to do, particularly when you're talking about some of the information that we have here, a codefendant's conviction and sentence of death?

A.   Sure.  The studies that I'm aware of are --

     THE COURT:  Okay.  Let's back up.  Which studies?

     THE WITNESS:  Which studies?

Page 37

THE COURT: Have you ever done any such study?

THE WITNESS: No.

THE COURT: Okay. Which studies are you aware of?

THE WITNESS: These studies would be in an article written by Vidmar in 2002, and he summarizes studies. One of the foremost studies would be of Moran and Cutler that was done in 1991, and it studies the effects of pretrial publicity. There are other studies cited in that article --

THE COURT: Where is the article that you're relying on published? What journal?

THE WITNESS: Law and Human Behavior, February of 2002. And we have a copy of that here should you need it, should you like it.

THE COURT: I've actually already read it.

THE WITNESS: Okay. Good.

So within that article, Vidmar relays various studies that have been done.

THE COURT: But you're really just relaying to me something that you've read which I can read.

THE WITNESS: Yes.

THE COURT: You don't have any personal expertise in this area other than what you've read, and you're just simply parroting back to me what you've read.

THE WITNESS: Yes.

45

THE COURT: Okay. Well, you can keep going, but I just wanted to make sure that's what she's doing.

MR. STOWERS: Right.

BY MR. STOWERS:

Q. Go ahead.

Page 38

A.    So in the Vidmar article that reviews various studies conducted with regard to the effects of pretrial publicity on the public, one of the studies is a telephone survey that asks respondents, first of all, recall of the case and then asks respondents opinions about guilt and then asks the respondents how -- let me make sure I get the exact word here -- on a acceptable, unacceptable scale would it be for you if the defendant -- and there are two different instances, one that he asked was found not guilty by reason of insanity I believe, and the other one was just simply not guilty of killing her children.

And what Vidmar found was that there are high degrees of recognition and high degrees of feelings of guilt, definitely guilty, or probably guilty and high degrees of unacceptability that if a jury were to find somebody not guilty of one of these two things it would be unacceptable to them personally.  And then Vidmar asks the question, the set-aside question, that is about a paragraph long in his study that includes could you set information aside and be a fair and impartial juror.  And people respond at high rates saying yes to that.

46

Then he looks at -- at each one of these questions he also gathers their open-end responses, and what he finds is that people who are either quantitatively saying that a person is definitely guilty are also saying that they could set aside information and that they have made open-ended comments that say an individual is definitely guilty or should receive certain punishments but could set aside information.

And what he gleans from that is that the set-aside information is a false read of what somebody actually feels or

Page 39

believes because it carries with it a correct response, and the response is that a good juror can set aside information and be impartial rather than -- and it also sort of -- what he talks about in that particular article is that a person is perhaps a poor judgment of whether or not they can actually be impartial if, for example, they have inadmissible information.

The other -- there are actually several studies that are reported in that article, but one of the other ones that's notable is the Moran and Cutler study which was done in 1991 or at least published in 1991 in which it's an experimental study where individuals -- there's a control group and another group, and this is in a setting in which individuals in one group receive pretrial information, then receive information about the case, and then are asked to deliberate.

In the control group they do not receive pretrial information, are given the same information about the case and

47

asked to deliberate. And their rates -- the conviction rates are much higher in the group that -- and along with this, they're also asked the set-aside question. And the rates of those -- of conviction of those with pretrial publicity, though willing to set it aside, are significantly higher than those with no pretrial publicity at all. And Moran and Cutler gather that the set-aside question is ineffective at screening out those that pretrial publicity has perhaps made higher -- prone to conviction at a higher rate.

There are other studies in the Vidmar article, but if the Court has read that, he's very familiar then.

Q. First of all, is Vidmar recognized in your field as an expert?

Page 40

A.    Yes.

Q.    And do you know who he is?

A.    I'm not very familiar -- I mean, I don't know him personally.  I know who he is.  I've read his articles and perhaps have seen him in person speak.  That's the extent of my familiarity with him.

Q.    Is he a recognized authority in the area of jury studies and that sort of thing?

A.    Yes, he's extremely well respected as are Moran and Cutler and other individuals cited in the article.

Q.    And are those persons and their writings and their publications the type of materials that one in your line of work

48

would typically rely upon?

A.    Yes.

Q.    For making decisions in connection with your analysis of -- whether it be jury questionnaires or juror responses in voir dire, that sort of thing?

A.    Yes.

          MR. STOWERS:  One moment, Your Honor.

          That's all I have.  Thank you.

          THE COURT:  Who's going to be cross-examining for the government?

          MR. MILLER:  I will, Your Honor.

          THE COURT:  Mr. Miller?

                    CROSS-EXAMINATION

BY MR. MILLER:

Q.    Good morning, Ms. Dahl.

A.    Good morning.

Q.    My name's Tom Miller.  How do you do?

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 118 of 200

A. Just fine. Thank you.

Q. First I note from your resume or CV that the assignments that you perform at least for purposes of the table at the end are divided into various categories such as juror questionnaire design and coding.

A. Yes.

Q. Or venue study. When it comes time to enter U.S. versus Johnson on your table, you'll list juror questionnaire design

49

and coding for this case, I assume.

A. I haven't coded them yet. To me that would mean that I've reviewed them for jury selection purposes.

Q. I see. Okay. Juror questionnaire design. Up to this point you've done juror questionnaire design.

A. And I guess I would list that on that list should I -- should I put -- yes. However, I think that there are additions to the questionnaire that weren't necessarily in my original design.

Q. You're going to bill for juror questionnaire design to some degree, I assume, for work done in that regard?

A. Yes.

Q. And can you give us just some idea of how much work you have done in terms of hours?

A. In terms of the juror questionnaire design?

Q. Yes.

A. The juror questionnaire design would have been -- I don't have my exact notations in front of me, but it would have been six to eight hours, maybe five to eight hours. I would have to look specifically.

Q. I assume you've done quite a bit more hours than that on

Page 42

analyzing what you've seen in the way of responses so far.

A.   I have done some more.  I don't know if it's quite a bit more.

Q.   Approximately how many hours?

50

A.   It would take me a moment to -- I don't have that number in my head.  I've been working the last week and a half ish on it not every day.  If you give me a moment, I can reflect and give you an estimate.  I kind of have to go backwards.

Q.   Okay.  Well, I don't want to pause for too long, but if just a moment would do it, that'd be fine.

A.   I would have worked on this issue not last Monday but the Monday before, the Tuesday, Friday, Saturday, this Monday, this Tuesday, and then sort of just obsessed about thinking about it but not actually tallying about it from Wednesday till now.

Q.   That would be approximately --

A.   Those would be nonbilling hours but just reflection hours.  And so those -- that billing time would have -- I honestly don't have those numbers.  They would not be full eight-hour days.  I can tell you that.  I'm sorry.  I can't give you a number off -- I just would have to look at my notes.

Q.   How many days then that you had a substantial amount of time put into the effort?

A.   I have to use my fingers.  Six days that I would have worked on really looking at the data or tabulating the data or reading the open-end responses.  And on six of those days, my time would have varied between maybe two hours on maybe one day to, you know, maybe six hours on another day.

Q.   And if we were to categorize the assignment that those six or so days were spent doing, that would be what?  Venue

Page 43

assessment?

A. Yes, yes, uh-huh.

Q. It would not be venue study because you didn't do a venue study.

A. That's right. That's right.

Q. How much time does a venue study ordinarily require?

A. A venue study could be -- of my time is in the 40 to 60 hours, and we also, you know, have -- would then have the time of -- you know, that's to design, train, implement, interpret, and write about the venue data. And within that there would also be interviewers that are employed to make the phone calls, et cetera, et cetera. So there are other people attached to it.

Q. Forty to sixty hours plus some additional time, I take it then.

A. Other people time.

Q. What is an hour worth in terms of billable rate?

A. What do I bill per hour? Is that the question? $90.

Q. You did not do a venue study in this case. You could have, I assume.

A. Had I been asked.

Q. Yes. I assume the reason you didn't do one is because you weren't asked to do one.

A. Correct.

Q. Now, as to the work that you did do which is to evaluate what we have in these questionnaires, you've indicated that

between 15 and 14 percent of the respondents that you looked at indicated an affirmative response to question 72; is that

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 121 of 200

correct?

A.    Yes.

Q.    I want to get to 72 here, but let's -- I take it from your testimony in general that you feel that 72 doesn't stand alone. You interpret it with the questions that surround it beginning with the question that precedes number 63.

A.    Yes.

Q.    Fair statement?  The phrase "how familiar" is different from and less reliable, if I can use that, than the phrase "do you recall?"

A.    Certainly different.

Q.    Could you have phrased a question in terms of "do you recall?"

A.    Yes, had I been doing a venue survey.

Q.    Question 63 which asks for, in open-ended fashion, a description of what the person has read, seen, or heard about the case includes I believe you indicated five different categories of -- you've categorized the responses by different ways?

A.    I actually categorized three types of responses.  I acknowledge that there could be five or more different types of responses depending on how you look at it.  But I subjectively categorized three responses, three types of responses.

53

Q.    Subjectively.

A.    Yes.

Q.    And one of those you've described as being notable responses such as people who said, Only what I've seen in the news, something like that?

A.    That's right.

Page 45

Q. Certainly it would be reasonable to believe that some of those people in that category actually could give more detail than simply saying, Only what I've seen in the news.

A. Sure.

Q. Would it be unreasonable to think that use of the phrase "only" or "just what I saw in the news" could also be an acknowledgment on the part of the respondent that the news is incomplete and not even always reliable?

A. I wouldn't interpret it that way.

Q. You would not?

A. I would not.

Q. Now, you've done in-court assistance on a number of cases, and I assume that includes jury selection and voir dire.

A. Yes.

Q. Do you not recall hearing jurors on any number of occasions express the thought that what they read in the newspaper or hear on the TV is they understand very clearly less than complete and not always even reliable?

A. In response to a question about whether or not they

54

understand that what they've read in the newspaper or TV is less than complete, I have heard responses of people saying yes.

Q. In fact, you've heard that quite often.

A. I've heard that response before.

Q. Do you never believe it's truthful?

A. I believe that there's more underlying that response.

Q. Do you believe it's ever a truthful response?

A. Yes.

Q. As to questions 65 and 66, did you -- you gave us a percentage of the people who gave an affirmative answer to at

Page 46

least one of those two.  Did you break it down as to how many fell within 65 versus 66?

A.   No.  That number includes not just 65 and 66 but also the one that precedes it which would be, of course, sixty --

Q.   Sixty-four?

A.   -- four, thank you.

Q.   Which simply asks whether it's newspaper, television, radio, Internet, word of mouth, or other.

A.   Right.  So that number includes word of mouth plus talked and overheard.

Q.   Okay.

A.   Let me just double-check to see if I broke it down.  I'm pretty sure I didn't, but let me double-check.

Q.   Fine, thanks.

A.   No, I did not.

55

Q.   Would there in your opinion be any difference in the likelihood that a person has an opinion about a case as to whether they've talked about a case or merely heard others talking about the case?

A.   Your question is --

Q.   Poorly phrased.  Let me put it to you again.  Respondent A has talked about the case.  Respondent B has only heard others talk about the case.  Do you feel that Respondent A may actually be more likely to have an opinion about the case than Respondent B, or is that not a fair assumption on my part?

A.   I don't have anything -- any empirical research to back that up.  I guess what I would say is that -- or at least one of the reasons why I include both in questionnaires and in survey work the overheard question is because a lot of times people do

Page 47

report overhearing information.  That still makes them active participants in town talk or street talk or word of mouth stuff which I think is salient to how people then view the case, and they hear -- then in the overheard what they're hearing is what the community likes or wants or perceives about this case.

And so to say that if somebody has just talked about it or has talked about it a great deal versus somebody who's overheard a lot of discussions, I think there are two different elements there, one who's maybe expressed an opinion and one who understands what the community's opinion is and then maybe what one's opinion ought to be.

56

Q.    Ms. Dahl, question 66 does not ask, Have you overheard a lot of discussion?  It says, Have you heard other people talking about the case?  Are you indicating that if a person answered yes to that then they were active participants in discussions about the case?

A.    That they were active participants in -- yes, I am.

Q.    An affirmative response to question 66.

A.    Yes.

Q.    Let's talk about question 73.  You've indicated that in your opinion everyone -- or the total of people who did not answer no to question 73 is a baseline or floor of the number or percentage of people who come to this case with some opinion. Am I paraphrasing you accurately?

A.    Yes.

Q.    Now, when you prepared -- and did you phrase that question, by the way, in preparing this?

A.    I'll need to read the question to see if I phrase -- I need to look.  Do you mind?

Page 48

Q. Sure. Go ahead.

A. In part.

Q. Well, I'm focusing on the word "if." Did that come from your preparation, or was that inserted by others?

A. I cannot say for sure. I would have to look at the original drafts of that question or . . .

Q. Well, in any event, the question that we ultimately did get

57

responses to specifically asks the respondent to assume that Angela Johnson has been found guilty of intentionally killing five people including two children, doesn't it?

A. Yes.

Q. And you believe that no one who answered yes to that question comes to this case without an opinion about guilt?

A. No, that's not what I said. People who answer yes to that question have an opinion about this case. It is not -- I don't have a correlation -- and it's quite obvious that the people who didn't answer yes on question 72 just because of the discrepancy between the percentages that those same people didn't express an opinion here. But when they're given permission to express an opinion, they expressed it in this question number 73.

Q. Well, Ms. Dahl, assuming a person filling out the questionnaire reads it and understands it and makes an intelligent and truthful response, isn't it entirely possible that a person can answer truthfully no to question 72 and yes to question 73?

A. Yes, they can answer no to question 72 and truthfully believe that. Part of that also could be because we told them not to have an opinion about that earlier in the cover letter. And then once we tell them, okay, now you could have an opinion,

Page 49

they answer yes. Or they may actually not at all have an opinion as you're saying in question 72 or be unsure of their opinion and then have an opinion about this case and the

58

appropriate punishment.

Q. Particularly when they are asked to assume a finding of guilt.

A. Or when they're given permission to have an opinion, yes.

Q. And I guess we really don't know which it is in any given case, do we?

A. In this particular questionnaire, no.

Q. But if we were to assume that people who were intelligent, could read and write and did answer truthfully, then, in fact, those who answered no to 72 and yes to 73 are people who are simply telling us something about their opinion about the crime, not about the facts of this particular case.

A. I don't think it's as simple as if people can read and write and understand. I think it's what message did the person receive about what is an appropriate answer to question number 72 before they got question 72. So actually a very intelligent person would say, Well, you told me that I shouldn't have an opinion about guilt, and so I'm not going to say that I have an opinion about guilt or I'm unsure. I've got this thing. I don't know what it is, but I'm not supposed to have an opinion, so here it is. You tell me whether it's an opinion. And then when we say, Well, here's an option to give us an opinion, they do give us one.

Q. That's one possible explanation of the discrepancy.

A. Yes.

59

Page 50

Q.   But you could truthfully answer yes to -- excuse me, no to 72 and yes to 73.

A.   Yes, you could.

Q.   And there are a couple of differences between 72 and 73. First, 72 talks about guilt, and 73 talks about punishment.

A.   Yes.

Q.   72 asks whether they have any beliefs or opinions, and 73 invites them to make an assumption about guilt before indicating an opinion.

A.   Yes.

Q.   Fair statement?  In other words, 72 doesn't ask for any assumptions; 73 does.   73's a hypothetical question; fair statement?

A.   Yes.

Q.   About punishment.

A.   About -- well, I guess the hypothetical is about guilt.

Q.   The question of 73 is about guilt, not punishment?

A.   Well, you said it's a hypothetical about punishment, and I guess --

Q.   I can see the ambiguity in my question.   But it asks for an opinion about punishment, not about guilt; fair statement?

A.   Right.

Q.   And it asks for a hypothetical opinion or belief.

A.   No, I don't believe it's a hypothetical opinion or belief. I mean, the first prong -- I mean, you know, the first prong is

                                                            60

if she were found guilty, do you have an opinion about the appropriate punishment?  I don't think that if a person marks

                        Page 51

yes, I have an opinion about that that that opinion is hypothetical. I mean, that's -- that's an opinion about the appropriate punishment for Angela Johnson in this case.

Q. Well, for everyone who was willing to presume her innocent, it's a hypothetical; would you agree with me?

A. I would agree to the extent that we have differences in some semantics.

Q. Now let's look at question 72, and then I'm going to leave you alone. 72's the one I want to look at.

A. Okay.

Q. Of the portion of the questionnaires that you looked at, 15 percent in the west and 14 percent in the east answered yes; is that correct?

A. Yes.

Q. Did you note how many of those people who answered yes were people who indicated that they had no prior information about the case from the news or any other source?

A. I noted that informally and then read that in the government's brief and reflected that that seemed accurate as to my informal notes, though I did not carry those notes over to any formal analysis.

Q. And just from having participated in jury selection in the courtroom, you know for a matter of fact that some people will

61

form an opinion about guilt simply on the basis that a defendant has been arrested or charged; fair statement?

A. That's right.

Q. And that's true in any venue.

A. That's right.

Q. Now, of the 14 or 15 percent who indicated that they do

Page 52

have any belief or opinion about guilt, can you tell us how many have a firm or fixed opinion about guilt?

A.    This questionnaire does not ask about firm or fixed opinions.

MR. MILLER:  Thank you.  I have no further questions.

THE COURT:  Mr. Stowers, any redirect?

MR. STOWERS:  No thank you.

THE COURT:  I have not many but a few questions for you, Miss Dahl.  Just in perusing your curriculum vitae here, I note that your master's degree is in litigation science, but then there's a parentheses that says special studies.  I assume -- well, actually I think I know because I got on the University of Kansas website to see whether they offer a degree in litigation science.  They don't offer any such degree on a regular basis.  I mean, you did it as part of a special studies program.

THE WITNESS:  Right.  Would you like to know the history of that or --

THE COURT:  I don't really want to know the history of

62

it.  I just want to know -- yeah, you can explain to me in general.  I think I've got a sense of it.

THE WITNESS:  At the time when I received my graduate degree, it was a degree in special studies meaning that you studied under each professor.  After I was a student there in the years after that, they had actually a degree and maybe 11 people graduated with a degree in litigation science.  So then people ask you what your degree is in; well, eventually that course work became litigation science.

Ultimately the university did not receive funding --

Page 53

because it was from multiple departments, no department could get funding for it, and so funding at that time was kind of quashed in Kansas to approving any new degrees or certificates or whatever from non-funded programs. And so that program as a master's degree, eventually it went away.

THE COURT: The university doesn't currently offer a degree in litigation science.

THE WITNESS: That's correct.

THE COURT: And your degree was actually in special studies.

THE WITNESS: That's right.

THE COURT: And in your special studies you studied litigation science.

THE WITNESS: That's what it eventually became called.

THE COURT: Well, I don't mean to be too picky here,

63

but you go M.A., University of Kansas, comma, litigation science. You did not get a master's degree in litigation science. You got a master's degree in special studies.

THE WITNESS: In special studies.

THE COURT: And in that sense your resume is actually inaccurate because it should say, Master's degree, University of Kansas, comma, special studies with an emphasis in litigation science or the study of litigation science. But you indicate on this -- a fair reading of it is that your degree is in litigation science, and that's not what your degree is in.

THE WITNESS: My degree is in special studies. You're right.

THE COURT: Now, I want to go back to this notion that you had about the actual questionnaires in this case, and I want

Page 54

to read the question I asked and then your answer. My question was, How did you determine which of the questionnaires made it into the sample? The witness, which is you, The questionnaires were looked at in numeric order, in other words, the first files that I received, what I determined were not the first that were received by the Court as on some days I would receive, let's say, questionnaire number 10 and then the next day I would receive questionnaire number 2, and so I took that as to be a random sample of those who turned in questionnaires. That was your answer. Do you recall that?

THE WITNESS: Yes, I do.

64

THE COURT: What do you mean as you took it to be a random sample of those who turned in questionnaires?

THE WITNESS: What I mean by that is that I did not take the questionnaires that were turned in first meaning those who just mailed in their questionnaires first were the ones that I would look at. They were coming in in various order. So I looked at them in their numeric order which it would have included people who sometimes mailed in on the first day and sometimes mailed in on the second day.

My fear was that if you looked at them just in the order that they came into the Court that then that wouldn't be representative because some people for whatever reason may fill it out early and turn it in. And those people might, one could argue, have a different opinion than people who turned it in later.

But as they were arriving to me, once I got everybody in their numeric file order, I felt that that -- if I looked at them in file order and pulled out the first 380-some people that

Page 55

that was not misrepresenting who mailed in the questionnaire first versus later as there are people within that section who had mailed it in at various times.

THE COURT: What is your understanding as to when each of the potential jurors in the case were assigned a number?

THE WITNESS: My inference -- and I guess I'm inferring -- is that they seem to have gotten a number before

65

they were mailed out. And I guess maybe I --

THE COURT: Well, when you -- but you reviewed all 300 and -- you reviewed 349 questionnaires from the Western Division; correct?

THE WITNESS: 349 of those files that I opened were completed or filled out to some extent.

THE COURT: Right. And you reviewed all of them.

THE WITNESS: Yes.

THE COURT: So the order in which you reviewed them wouldn't have made any difference.

THE WITNESS: No, the order in which -- in which they came in -- I agree the order in which I reviewed them -- and maybe that's --

THE COURT: So I don't understand your concern about randomness in terms of the numbers because if you review all of them, it doesn't make any difference.

THE WITNESS: And maybe I misspoke. Maybe the --

THE COURT: I think you did.

THE WITNESS: Maybe the word that I should have used is -- or the question would be are those that I looked at representative.

THE COURT: Of the population.

Page 56

THE WITNESS: Of the population of those questionnaires that were sent out. Are they representative, or do they -- would they somehow misrepresent the population? And

66

I felt that it would misrepresent the population if these numbers that I was looking at were the ones that were mailed in first.

THE COURT: But if you look at every one of them, it doesn't make any difference.

THE WITNESS: But I didn't look at -- this is what I was worried about is that I didn't have the time or manpower to look at each and every questionnaire meaning all 1006 or whatever I had at that time, and so I had to choose a number that I could look at, a number meaning a sample size.

THE COURT: Okay.

THE WITNESS: And so I chose the first --

THE COURT: So what was your sample size for the western district?

THE WITNESS: The sample size for the western district -- excuse me for a moment -- 381 files, though I have that 349 are people who actually --

THE COURT: Filled out the questionnaire.

THE WITNESS: (Witness nodded head.)

THE COURT: And did you look at each one of the 349 questionnaires?

THE WITNESS: I looked at each one of the 349 questionnaires.

THE COURT: To do your analysis for the opinions that you've given here today.

67

Page 57

THE WITNESS: Yes.

THE COURT: Now, when you said earlier that if you would take every tenth -- here's what I understood you to say, that if you took every tenth questionnaire, that would be a random sample.

THE WITNESS: I did say that.

THE COURT: And that is not a random sample. Do you know why? What's the definition of a random sample?

THE WITNESS: I'm scared to say what I think the definition might be as that we might disagree.

THE COURT: Well, you tell me what you think it is.

THE WITNESS: The functional definition for me of what a random sample is or how you actually operationalize a random sample -- for example, this is what a computer would do, in old school you would do on the phone -- is you would open up the phone book, find a number -- to that page --

THE COURT: Let's back up. Give me a technical definition of a random sample.

THE WITNESS: It would be --

THE COURT: Let me give you one and see if you agree.

THE WITNESS: -- that a person that is chosen is actually not chosen that they have an equal chance of being chosen.

THE COURT: That's right. That every item in the population --

68

THE WITNESS: Has an equal --

THE COURT: -- has an equal opportunity to be chosen.

THE WITNESS: Yes.
Page 58

THE COURT: And if you take every tenth item, that's the exact opposite of a random sample.

THE WITNESS: Yes, I understand that.

THE COURT: So you would agree with me that every tenth one is by definition exactly not random.

THE WITNESS: Yes, I do agree and I --

THE COURT: So why did you say that that would be a random sample?

THE WITNESS: I said that that would be a random sample when I -- and I greatly apologize. I wanted to use the term would it be representative. I slangly used the term random sample, and I should not have. You're absolutely correct.

THE COURT: But in your area of expertise, the term random sample has a technical definition, doesn't it?

THE WITNESS: Yes, it does.

THE COURT: And in statistics random sample has an often misunderstood but very technical definition. Would you agree with that?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: If I might add, in being -- wanting to make sure that I looked at a representative sample, I called

69

sort of, if you will, two peers for peer review: If you had this situation, how appropriate or inappropriate would it be to look at these and told them sort of the history of what I perceived to be true, and their responses were, you know, that's what I would do is look at them -- look at the first X number thinking that that would be representative of the full 1,006 questionnaires. So to get a little bit peer input, you know, I

Page 59

tried to see what other people might do.

THE COURT: But you didn't need a representative sample because I thought I understood you to say you looked at every questionnaire that was filled out.

THE WITNESS: I didn't look at all 106 questionnaires. I wanted to make sure the sample I did look at would be representative of the whole sample of 106 questionnaires.

THE COURT: Where does 106 come from?

THE WITNESS: I'm sorry, 1,006, and that would be all the questionnaires that were filled out. I don't want to mislead the Court to say that I looked at all of the questionnaires. I looked at a sample, the sample size, from each batch, if you will.

THE COURT: Well, that's what I'm confused about. How did you arrive at your sample size?

THE WITNESS: It for me depended on -- at first I looked at the first 100, and your error rate there if you were to infer that then, you know, your error rate on a hundred, you

70

know, no matter what would be plus or minus 10 percent, or it might be a little bit less than that. And to me I wanted to get closer in case -- because what I was seeing with the first 100 is that the 2 venues were very similar so -- but 10 percent might be too close to call. I wanted that margin of error to be smaller and so actually used an error rate calculator. If your sample size is X and you look at X, what would your margin of error be, and I determined that to get under 5 percent.

THE COURT: Right. You wanted a margin of error of 4 percent, and that's what you used to determine your sample size.

THE WITNESS: Yeah, yes.

Page 60

THE COURT: And now I'm even more confused, but that's probably just me. I thought you indicated that you had 381 PDF files or files within the PDF from the western district, and of that you concluded that 349 were completed questionnaires.

THE WITNESS: And to be fully accurate, of the western district, I had available 539. I looked at the first 381. Of those 381, I found 349 had been completed.

THE COURT: Okay. So you had 539, and you looked at 381.

THE WITNESS: Yes.

THE COURT: And the methodology that you determined to look at the 381 rather than the 539 was?

THE WITNESS: To look at the first 385 jurors. So if they're in numeric order, I looked at the first --

71

THE COURT: Like 1 through 381.

THE WITNESS: Yes.

THE COURT: Because in your mind that would take out any bias from an early responder.

THE WITNESS: An early responder or any of what could be my self-selection bias.

THE COURT: Like taking every tenth one.

THE WITNESS: Taking every tenth one or Lisa Dahl likes that juror, let's look at that one.

THE COURT: Now, on this number that you came up with which I think is pretty close to what the government came up with in their brief on question 72 --

THE WITNESS: Yes.

THE COURT: -- question 72, No matter what you have read, seen, or heard, do you now have any beliefs or opinions

Page 61

about the guilt or innocence of Angela Johnson, the government came up with 13.51 percent, and you came up with 15 percent.

THE WITNESS: The 13.51 is in which?

THE COURT: Western Division.

THE WITNESS: Okay.

THE COURT: And I believe you came up with 15 percent.

THE WITNESS: Yes, I did. And I guess when I say -- earlier I said I was within a percentage point, I kind of rounded up theirs to 14.

THE COURT: That's right. I understood that. And you

72

don't really quibble -- I mean, we don't really know the government's methodology, but one could infer maybe not accurately but one could infer that they looked at all the questionnaires that were sent back.

THE WITNESS: And as I read their brief, that's the way I understood it.

THE COURT: Right. That's a logical inference from their brief.

THE WITNESS: Right.

THE COURT: And so you wouldn't be surprised at their number of 13.51.

THE WITNESS: No.

THE COURT: Which if our inference is accurate -- and we don't know that it is -- would be more accurate than your 15 percent but not probably statistically significant.

THE WITNESS: Correct.

THE COURT: Is that a fair statement?

THE WITNESS: Yes.

THE COURT: Now -- and I'm going -- this would require

Page 62

some speculation, but you have sufficient expertise that I would be interested in your speculation.

THE WITNESS: Okay.

THE COURT: If we went to the District of Minnesota, for example, and assume that we asked 600 potential jurors questioned and let's also assume that none of the 600 potential

73

jurors had any exposure to any type of pretrial publicity about United States versus Angela Johnson --

THE WITNESS: Uh-huh.

THE COURT: -- and we gave those potential jurors the same hypothetical about the facts in the Johnson case that we gave in the questionnaire -- I should say that you did or the Johnson defense team did because they're the ones that drafted the questionnaire. Are you with me so far?

THE WITNESS: Yes.

THE COURT: Okay. In your professional opinion, what would be a reasonable range that you would expect from those 600 jurors in Minnesota who had no exposure to pretrial publicity? How many of them would have answered no matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? What percentage of those folks do you think would have answered that question?

THE WITNESS: I think that the state actually has given us that answer in their brief, and it's something that I might expect there too in Minnesota, and if I may refer to the state's brief, it will take me just a second.

THE COURT: It's actually the federal government, but I realize most of your experience is in state court.

THE WITNESS: I'm sorry.

Page 63

THE COURT: That's okay.

THE WITNESS: In their footnote number 2, they note

74

that excluded from this number are those jurors who answered number 63 that they knew nothing about the case but had nevertheless formulated an opinion of the defendant's guilt, 5 jurors in the Western Division and 9 jurors in the Eastern Division. While these jurors may be later struck for cause, it can't be argued that their opinions of the defendant's guilt was a result of pretrial publicity.

So if we are to sort of -- if we were to take this as a sample of that, that would be what I would infer. In other words, people with no knowledge sometimes respond yes.

THE COURT: Sure, because there's a certain percentage of people based on my anecdotal experience doing hundreds of criminal jury trials in federal court who come in, know nothing about the case but assume -- but have an opinion about the defendant's guilt. It's usually that they're guilty because we wouldn't be here if the defendant wasn't guilty.

THE WITNESS: Correct.

THE COURT: And I assume that's probably been studied by folks like you and other social scientists.

THE WITNESS: Yes. There are some questions like -- and it's in -- Larry Wrightsman who was one of my professors writes about a juror bias scale, and the question asked, you know, if the government -- the question is if the government went to the trouble of bringing a person to trial, do you think that that person is definitely guilty, probably guilty and, you

75

Page 64

know, kind of measures it on that or I think actually Dr. Wrightsman writes it on a strongly agree, disagree scale. And I --

THE COURT: And what percentage usually strongly agree?

THE WITNESS: I don't have that number with me. With a few calls, I could get that number, but there is a number that does agree with that.

THE COURT: And I think it's higher than footnote 2 in the government's brief, isn't it?

THE WITNESS: It is higher than the footnote is. But your question is if we replicated this study in Minnesota how many people would respond that way. And if we replicated this study, we still have all of the sort of demand characteristics or the courtroom coming into your house and saying that somebody is presumed innocent, and so that number drops greatly. And so what you have left are the people who may have no knowledge but report a strong opinion.

And so that's what I -- so that number may not be the same as the number floating out there as if you -- you know, as our baseline because we've told them what the response is, and that is don't have an opinion right now.

THE COURT: Let me ask you this. Nobody's asked you this, but I'm curious. What concerns should I have -- as the person who has to make a decision about where this case should

76

be venued, what concerns should I have about trying this case in the western district -- in the Western Division of the Northern District of Iowa? Or let me ask it a different way. What

Page 65

concerns would you have as the defense expert in this area if I ultimately pick the Western Division of Iowa as the proper venue for this case?

THE WITNESS: My concerns are two or threefold. I can't figure out how many I have right yet. But my --

THE COURT: You know what? Hold that thought. It is now nine o'clock. I've made our court reporter work two straight hours without a break. I want to give you a chance to think about it.

THE WITNESS: Okay.

THE COURT: And so we're going to take a -- we'll take a half an hour break and come back at 9:30; okay?

THE WITNESS: Okay.

THE COURT: Thank you.

(Recess at 9:03 a.m.)

THE COURT: Please be seated.

Miss Dahl, do you remember the question? I don't.

THE WITNESS: There were one of two questions. One is what concerns should you have about the western district or what concerns might I have about the western district.

And I have five areas to talk to you about. And two of them really have to do with I guess how you go about making

77

that decision. And the question is are the numbers represented in the questionnaire estimates of what's actually out there in the population or what people actually think and feel or know.

THE COURT: Well, but isn't that the advantage of a questionnaire? We're not so worried about the population. These are actual jurors.

THE WITNESS: Right. And I'm saying the population of

Page 66

those --

THE COURT: Which is why --

THE WITNESS: -- who filled them out.

THE COURT: Let me add, which is why I think it's much better than a venue study.

THE WITNESS: And it may very well be. And I guess what I'm saying is yes responses to an opinion about guilt or innocence are quite likely underestimates of what people are actually believing.

THE COURT: Because?

THE WITNESS: Because of how they were provided the questionnaire with the idea that there really is a right answer to that question, and the right answer is you don't have an opinion about guilt when you walk into a courtroom, and we've sent this courtroom to them, and we've told them several times in the questionnaire before they get to the question that it's important that you understand the following are merely allegations; Miss Johnson has pled not guilty; she is presumed

78

innocent. So we've told them a lot of things that would make them think, well, the right thing to say here is I don't have an opinion, and so that number likely underestimates what perhaps a true opinion would be had we not prefaced it with what is the right answer here.

THE COURT: Okay. But isn't the flip side to that -- or I shouldn't say the flip side -- a countervailing concern is that most people are not itching to sit in a four-month death penalty trial, and most people know by answering yes, they have an opinion that that will increase the likelihood that the judge will take them off the case?

Page 67

THE WITNESS: That is a belief out there, but at the same time you have working the idea of what a good citizen is, and now I have been called to the situation. Now, I would ask my -- if I were just standing around the water cooler, how do I get off? Well, you say he's guilty. But here now I'm in here essentially in the presence of a judge who I need to please and I need to be a good citizen in my own mind and among my peers, and so there's a demand characteristic that tells you, well, I might have an opinion, but I'm not supposed to have one when I walk into the courtroom. And so now's my time to do my duty, and my duty is to say I don't have an opinion. And so I think that question underestimates the true opinions of what people are.

I think also on the underestimate idea is that we have

79

an underestimation of what information people actually have just because of the simple fact that some people write a lot of stuff. Some people aren't writers, they don't write anything at all. But they still might have information that they ought not have perhaps if it's inadmissible that the codefendant has been found guilty and gets the death sentence, whether or not that's information they should have or not. We don't know the extent that people have that information, and so that's an underestimate based on the questionnaire.

There's a second point, so the first point is that the instrument itself underestimates what's potentially out there in terms of opinions and knowledge.

The second point is that numbers don't always reflect whether or not somebody gets a change of venue. In other words, in the various surveys that I've worked on, for example, Kansas,

Page 68

State of Kansas, versus Della Marie Moore which was down in Clark County, Kansas, she's got in a survey a reported rate of 14 percent definite guilt and a reported rate of 30 percent probable guilt. And if you translate that, although it's difficult, but if you translate that into this survey as yes, I have an opinion or unsure if I have an opinion, definitely guilty being yes, probably guilty being unsure, those are the same types of rates that we're talking about. Della Marie Moore gets a change of venue.

In Kansas two brothers are charged with capital

80

murder. Their names are the Carr brothers. They have a guilt rating definite and probably equally split that totals 80 percent. They don't get a change of venue.

In the United States District Court, Mr. Wittig is charged with misusing money of Weststar. He has a guilt rating of 11 percent definitely guilty and 33 percent probably guilty. So again, if you use the yes, I have an opinion as definite and unsure as probable, he gets a change of venue. But John Robinson in -- for the state of Kansas who has a 67.6 percent total guilt rating doesn't.

And so numbers across the board, even though they're not necessarily reported in the case law because some people get change of venues, you never talk about them, some people don't and you do -- and those are low numbers -- don't necessarily reflect whether or not venue should be changed.

So that's the second point is that -- and just looking at the numbers isn't necessarily enough, which brings me to the third point, and the third point would be that what you don't know might hurt you here. That would be my concern, is that

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 146 of 200

there could be a great number of people in this -- in these jurors -- I'm sorry. I keep saying this population, but when I'm saying that I mean of these people that have filled out this questionnaire. These potential jurors may have knowledge about this inadmissible information and we just don't know that. And we on this questionnaire either could or couldn't have asked

81

about that depending on if it is or it isn't admissible fact, but it's certainly a touchy one. Do you ask about it in written press or paper? Do you ask about it now each individually?

And with that brings me to the fourth point of if people do have that information and we don't know about it, we have to find that out, and then can the person actually set that aside? And when I talk about set aside here, I think it's different than just perhaps a case -- a factual case of guilt, guilt -- did the government meet its burden in a factual setting of guilt because now we have something that I don't have information of how people set aside information in a death penalty situation and whether or not -- we don't have any studies that say whether or not they're able to do set-aside in what is essentially an emotional and what we know to be highly stressful as reported by your -- you know, federal judges, your colleagues, and jurors in post-trial interviews, highly stressful situation. Would somebody either consciously or subconsciously look outside of them to find out if what I'm doing is the right thing? Well, another jury has done that. I'm not supposed to think about that.

This is a really hard decision, and it's not factual. The problem is we don't know the extent in this population, these people who filled out, to people that actually know that.

Page 70

And then if we ask them all that, could they set them aside, that's my most troubling thing that I have a problem with.

82

THE COURT: Okay. But in that regard, who's to say that if the jurors know that Dustin Honken received the death penalty that that might not help Miss Johnson if she were found guilty? You don't know the answer to that question, do you?

THE WITNESS: I don't know which direction that goes. You're right. I don't know if it might favor --

THE COURT: Now, legal instincts are it's actually more favorable to her. It's not a consideration I'm going to make in this case.

THE WITNESS: I'm sorry. I didn't hear.

THE COURT: My legal instincts are that it's actually more favorable to her. If she is found guilty, I think she's better off with people who know the outcome of Dustin Honken's case because I think they would be less likely to impose the death penalty on her. That's just my own personal view.

THE WITNESS: And in my head I'm wildly debating that. I don't know which way that goes, but it certainly is something they could call on which questions whether or not they would set it aside. Does it help or does it hurt? I don't know. But it's something that is perhaps information they shouldn't have.

THE COURT: Okay. What was your fifth?

THE WITNESS: My fifth is that you have to look at how people are responding to this case. In at least self-reports we've got one in every three, one in every four persons hearing about it or talking about it. And so my question would be or my

83

Case 3:09-cv-03064-MWB-LTS   Document 284-68   Filed 06/23/11   Page 148 of 200

concern would be out there a community pressure, a community interest, or community idea of what should happen in this case, that people have talked about in just normal, hey, did you hear about this, I think this, what about this, and that now not just in a guilt setting, you know, but now you're in a difficult, stressful, emotional decision. Do you look outside to what you know that conversation was and how you might be viewed when you go home? Is that different than a venue that has no knowledge and hasn't had that discussion? That would be my concern not just with the western district but also with so far any of the divisions that we've looked at here.

THE COURT: Okay. Now let me ask you this. Are you aware of the other district that I have been considering on the change of venue motion?

THE WITNESS: Meaning the eastern --

THE COURT: No, a district other than in Iowa.

THE WITNESS: I have heard Minnesota.

THE COURT: Okay.

THE WITNESS: I am not -- was the question how familiar --

THE COURT: No. I just wondered -- that is the other district that I'm considering.

THE WITNESS: I have heard that you may be considering that.

THE COURT: Now, here's my concern about the District

84

of Minnesota. One of the things that made this case very newsworthy, just one of the things -- and when I'm talking about this case, I really mean Mr. Honken's case and Miss Johnson's case -- is that this was the first death penalty trial,
Page 72

Mr. Honken's -- Miss Johnson's will be the second -- in 41 years. Minnesota's last death penalty trial was in 1906, and it was a very controversial issue.

Matter of fact, what happened was the defendant was hung, but he didn't die right away. And it took I think 14 minutes, and it created a huge controversy, and the legislature as a result of that controversy did away with the death penalty. Actually Minnesota had been a very aggressive death penalty state. In the 1860s, they hung at one time 30 Native Americans on a single day. It was the largest mass hanging, largest death penalty procedure, in the United States history.

And so Minnesota has a very unique culture about death penalty. And, in fact, there have been bills in each of the last legislatures in recent times to reestablish the death penalty. So it's a relatively hot topic in Minnesota politics.

Can you imagine the pretrial publicity that would be generated by moving a federal case from one federal district to another? I mean, this is your area of expertise. You know far more about it than I do. How unusual is that in your experience? How many federal death penalty cases can you name where there was a change of venue from one federal district to

85

another? I can name one: Timothy McVeigh. Can you name another?

THE WITNESS: I cannot.

THE COURT: Mr. Berrigan, can you name another?

MR. BERRIGAN: No, sir.

THE COURT: Mr. Stowers, can you name another?

MR. STOWERS: I haven't even tried, but no, I can't.

THE COURT: Mr. Willett?

Page 73

MR. WILLETT: No, Your Honor, I cannot.

THE COURT: Mr. Williams.

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Miller.

MR. MILLER: No, sir.

THE COURT: That makes it pretty unique, doesn't it?

THE WITNESS: Unique to that issue.

THE COURT: Yes. Couldn't one reasonably assume that given the kind of history of the death penalty in Minnesota and the uniqueness of a federal court changing venue from one federal district to another and the fact pattern of this case that there would be substantial pretrial publicity in the District of Minnesota?

THE WITNESS: Yes.

THE COURT: So in your view why would we be better off if I transferred this case to the District of Minnesota? Or maybe that isn't your view, that we would be better off.

86

THE WITNESS: My view is that Iowa -- this case is big to Iowa. Both of these divisions that we've looked at it's important to, people are talking about it. They've lived with this case or elements of this case for years now. There is an idea of this is our community here, and we know actually a lot of facts that aren't just now coming to us a month before trial or two months before trial, and it's a controversial issue, and oh, my gosh, this is going to happen here. But we've lived with this case. We've seen it progress. We've seen the verdict. And we know about this. We talk about this.

Now, you might very well have people who mark at the same rates that they talk about it once you get up to Minnesota,

but it's a different -- it is not as deep or integrated I would assume or I'm assuming as in Iowa when you've lived with this case and know the outcome of at least the first half of this case, that that is different. Ownership is different. Now that it's coming here and it's controversial, is something that I talk about, but have I lived with it and know the realities of it and heard reporting on it every day for the last five years? I don't know how many but anyway, for the last how ever many years is different than --

THE COURT: It hasn't exactly been every day, though.

THE WITNESS: Every -- I'm sure it was a hot news story in many of those years in at least December when they closed out the year, so it would be a highly reported case

87

rather than two months of a highly reported, controversial issue, here's what we have to deal with. I think that's the difference between the two.

THE COURT: But wouldn't you anticipate with the expertise that you have substantial pretrial publicity in the District of Minnesota about this case should I change venue there? Wouldn't you anticipate that? Wouldn't that be reasonable?

THE WITNESS: Sure.

THE COURT: And in some respects, I would think there might be more pretrial publicity about this case going to trial in Minnesota than there would be in Iowa.

THE WITNESS: I can't speak to that.

THE COURT: But you don't know. I mean, we don't really know that.

Now, in reviewing your curriculum vitae as I have --

THE WITNESS:  Yes.

THE COURT:  This is a good thing.

THE WITNESS:  Okay.

THE COURT:  -- you have given I believe -- you've been active in actually jury selection in high-profile cases.

THE WITNESS:  Yes.

THE COURT:  Do you have any insights that you can share with me regardless of where I decide to hold the trial of things that I can do as the trial court judge to have a greater

88

confidence in the jurors that we select in terms of the types of questions we ask, the types of procedures we utilize?  Are you tracking what I'm --

THE WITNESS:  Yes.

THE COURT:  Yeah, I'd be interested in your views on that.

THE WITNESS:  Yeah, I have a couple of views for whatever they're worth.

My first view is that it's very helpful in order to understand where the person's coming from on whatever question that you're asking them but that has to do with the law and whatnot and how you're going to react in this courtroom that we can first get their reaction about what is your opinion here, what are your thoughts here before we then interject on them -- and it's the same thing with this questionnaire, sort of their naked response, if you will, before we then interject on them or the group as a whole what really is what we all love and cherish, the Constitution and everything wrapped up in that, meaning presumption of innocence and burden of proof, because all of those things we want to sign on to as people, but yet

we've -- you know, it's just the conflict that we have that we actually have some reactions.

THE COURT: Can I ask you a question about that?

THE WITNESS: Uh-huh.

THE COURT: One of the things that Mr. Berrigan

suggested -- normally I spend a lot of time in jury selection on reasonable doubt and presumption of innocence because those are core concepts that I value so deeply, and I want to do all that I can to make sure that we select jurors who maybe don't value them as much as I do but realize how important they are. And one of the -- and so I usually start with that.

And Mr. Berrigan suggested that maybe it would be better to hold off and do that at the end I think for precisely the reasons that you've articulated is you want to find out kind of what they think first so that you don't have the effect of my strong feelings about the presumption of innocence and proof beyond a reasonable doubt influencing the jurors' questions as we question them in the process. So that would be an example of implementing the point that you just raised.

THE WITNESS: Exactly. Let's empower them at the end, but let's find out --

THE COURT: Their true feelings early.

THE WITNESS: First. So that's excellent.

THE COURT: And, you know, I hadn't thought about that, but as soon as Mr. Berrigan raised it and I had a chance to think about it, it made great sense to me.

THE WITNESS: Cool.

THE COURT: So what else? What else do you have for me?

Page 77

THE WITNESS:  The other thing that I would suggest --

90

and this is one that is for some reason difficult to do sometimes by attorneys -- is to wait for it, and even for judges.  And what I mean by that is somebody might say X.  I think, you know, I have a feeling about whether or not the defendant should testify.  What else or why?  People only like to give a headline response, but ask the person -- and this is a survey technique that I think should be used in the courtroom: What else, what else, anything else or just the why, why do you think?  Anything else?  Touch the person at least three times in an open-ended manner because there's more -- and we kind of got that here.  There's more to that headline that they give us that we need to understand in order to intelligently use our peremptory strikes or just determine if maybe there's something more.  There's a lot of nonself-disclosure that happens in the courtroom.

So that's something.  Dig a little deeper, but in order to dig deeper, what it means, we must pause and not use our words, let them use theirs.  So that's very important.

And the third thing is that actually studies would say and post-trial interviews or post, I should say, voir dire interviews report that jurors are quite -- I hesitate to use the word intimidated but intimidated by the courtroom and want to please you.

And so to the extent that either you could let the attorneys ask the questions or when you ask the questions ask

91

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 155 of 200

them open endedly or -- I just saw a judge do this beautifully -- give -- and you really need to consider what the options are but some people think this in a very balanced way and some people think this and neither one of them's a politically correct thing, can you tell me what your thoughts are about either of those, that helps, but just know that people are constantly going to try to please you.

So if you can get them off of that because we need to find their core belief -- and by that it means another interviewer needs to do it -- then we're in a better spot.

And my final thing is I have great fundamental difficulty with the notion of set-aside, so I would urge you not to do that.

THE COURT: Well, do you think you can do set-aside -- rather than in an elite -- you know, this question can you set aside those views and be fair and impartial, I agree with you. That -- I mean, it probably technically fulfills the requirements of the Court of Appeals and the legal issues, but I wouldn't have a whole lot of confidence in somebody's answer to that question. But can you do set-aside by kind of asking open-ended questions?

THE WITNESS: I've tried to think a lot about how to ask a set-aside question. One of the ways -- like when I hear it asked, one of the things that I always wonder is, well, how would you go about doing that or how difficult would it be to do

92

that, I mean, because what we don't have in our head, any of us, is really an action plan for that. How do you not do that?

THE COURT: Well, for --

THE WITNESS: And so what I wonder is do you ask the

Page 79

juror that.

THE COURT: Here's an example, and I hadn't thought about it until this exchange. But instead of asking the question, Are you able to set aside the views you've indicated and be a fair and impartial juror, oh, sure, I can do that, asking them, Given the views that you've just told us about, how do you think that might affect your ability to be a fair and impartial juror in this case?

THE WITNESS: And I think I was with you up until "how do you think that might affect?" But when you put your ability to be fair and impartial, you've got two things going on with that end of the question. One is my ability. Well, you shouldn't question my ability. I can do what I need to do. And then when you tell me to be fair and impartial and I say, well, you know what? My ability to be fair and impartial is A-okay, I'm an American, I can do that.

THE COURT: How about this? How do you think it might affect your role as a juror in this case?

THE WITNESS: I like that a lot better. I like that a lot better, or better yet might be your decision making.

THE COURT: As a juror, yeah. How would it affect

93

your decision making?

THE WITNESS: Or what role would it play, if any?

THE COURT: But right. When you use the word "ability," that's kind of a trigger word. Nobody wants to say, Well, I don't have the ability to do that; right?

THE WITNESS: Right. I want to do my job right.

THE COURT: I think I've learned more about how to ask questions in the last five minutes than maybe in the first ten

Page 80

years of being a judge, so thank you very much.

THE WITNESS: Well, thank you. That's a great compliment. Thank you.

THE COURT: Thank you. I don't have any further questions. So I always want to give the lawyers an opportunity to follow up because I did go beyond the scope of direct examination.

MR. STOWERS: Just a little.

THE COURT: Just a little, right.

MR. STOWERS: I don't have any other questions, though.

THE COURT: That's an example of a lawyer telling a judge what they think they want to hear just like the jurors do.

Do you have any other questions? No? Mr. Williams, Mr. Miller?

MR. MILLER: No, sir.

THE COURT: Thank you. You may step down.

94

THE WITNESS: Thank you.

THE COURT: Okay. Now we need to argue the change of venue motion. Who's going to argue it? Mr. Stowers? Mr. Berrigan? You say Mr. Berrigan. He looks at you. No, you do it.

MR. STOWERS: Well, we were having that debate earlier. I think, Your Honor, we previously argued this motion quite a bit. The Court has the law in the briefs that the parties have filed. We've been talking here today primarily about the question of these questionnaires and what can be gleaned from them that might, A, help us in trying to convince you to change the venue in this case outside the northern half

Page 81

of the state of Iowa, ideally to Minnesota, which -- but that's just one option. Obviously there's other locations where the Court could change venue to, but that's the primary one that makes, in our way of thinking, a good deal of sense for the reasons I think that we've already previously gone over.

We've submitted to the Court since the last hearing several additional volumes of appendix materials which include additional newspaper reports and articles which we believe add further significance to the motion basis. Those articles continue to discuss the case and I believe almost to a one identify the prior verdict in Mr. Honken's case and the death penalty imposed, recite the facts concerning primarily this very issue that we're talking about here today which is the venue

95

thing and our desire to relocate the trial.

THE COURT: What about my concern that no matter where we relocate it to it would likely engender substantial pretrial publicity?

MR. STOWERS: Well, let's compare the one case that you mentioned where venue was changed, and that's McVeigh. It was changed from Oklahoma where the bombing and killings occurred to the state of Colorado, but nobody in that case surmised, thought, or conceived that there wasn't a huge amount of publicity in Colorado about Mr. McVeigh and Mr. Nichols' case. But nevertheless, the case was moved, and it was moved to the Denver area I believe where it was tried as a result of the venue being changed.

Now, the basis for the change of venue I assume in part was we've got a lot of publicity here pretrial, but it's more than that. It's the impact on the community of that

Page 82

particular crime, the degree to which that had sort of saturated the community with some local sentiments, and then how that would impact not only on the reality of whether or not that particular defendant, Mr. McVeigh, could get a fair trial but also on the perception that would have flowed from having that trial conducted in Colorado -- or in Oklahoma instead of in Colorado.

And I think the right call was made in that case, and I don't think very many people across the country even

96

questioned the rightness of that decision because of the obvious appearance that existed or that would have existed had that case stayed right there in Oklahoma and had gone through an attempt at picking 12 people to sit who could raise their hands and say that notwithstanding everything they could be fair and sit on the case.

Can we do that here? I'll concede we can probably find 12 people that will tell us the right things under oath in a recorded and reported voir dire proceeding. But that's not really the test, can you find 12 people plus the requisite number of alternates, of course.

The test is whether or not you as a judge looking at this case, looking at all of this publicity, knowing what you do about the local sentiments, knowing what you do about what the juror questionnaires show, knowing that this case has hit people pretty hard in the state of Iowa and it's impacted them in a big way and it's been a table discussion in this state by a lot, a lot of people, and we know that, but at the same time is it really the right thing to do to put Ms. Johnson on trial here in the northern half of the state under these circumstances?

Page 83

And we can talk about the law and say this case there was a higher degree of this and the percentage was this and that and the other thing. The issue is is it right, and our position is it isn't right. The venue rule gives you the authority to change venue. And we're asking that you use that authority that

97

you have on this record to change venue now. And that's our request.

THE COURT: Thank you, Mr. Stowers.

MR. STOWERS: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, first of all, we'd want to proffer on behalf of the United States that we did look at every single one of the questionnaires that came in to us, and the statistics that we cite in our brief is based on the review of every one of them, not a sampling of them.

The operative answer in the questionnaires to the question of 72 which, bottom line, is do you have an opinion, and the answer that we came up with as far as percentage is the same as what the defense came up with and their jury consultant came up with in a sampling which is basically 14 percent of the people had an opinion about this case.

Now, the defense expert asks you to imply or assume that if somebody said unsure that therefore they had an opinion. If you look at the questionnaires, that's not what they say. When they say unsure, my recollection is of the ones I went through -- and I went through myself about 300 of them, maybe 350 of them -- when they said unsure, the answer was unsure because I don't know what the evidence is and I don't have an opinion yet, not unsure because I have an opinion, I just don't

Page 84

want to give it.

98

So I think that feeds into the second point I want to make. The jury consultant -- and I have a lot of respect for Miss Dahl. I actually worked with her when I was in private practice in Kansas City on two different cases. But all due respect, they designed this questionnaire. They're the ones that came up with the questions to ask. They are asking you to make a lot of assumptions based on what they assume different answers mean, and they could have asked the questions the way they wanted to ask the questions to make the point which feeds into my next point, and that is, bottom line, it's their burden. They have the burden of proving in this case that the publicity so influenced the potential jurors in this case that we can't pick a fair jury. And the stats just don't back that. The statistics in this case based on this questionnaire suggest that very few people have really made up their mind about the defendant's guilt.

And to the extent that there's any concern, any lingering concern, or lingering doubt or residual doubt the Court might have about whether we can pick a fair and impartial jury from the western district of Iowa -- or Northern District of Iowa, Western Division, there's still other alternatives to remedy that, and that is we could send out another 400 questionnaires and let's get in a larger panel because if we know only 14 percent of this group is going to have a strong opinion, we can assume another 14 percent of this next group

99

will, and we'll have an even bigger panel to choose from, and we
Page 85

can make sure anybody who even borderline has an opinion we can get rid of and still have plenty of people to pick a jury from.

That's just one example of an additional remedy if there's any concern about publicity is just increase the pool because we do know that there's a large population of jurors out there who have no opinion about this case, and from that pool, we can pick a fair and impartial jury for this case in the Northern District of Iowa.

THE COURT:  We can also, if I were to keep the venue in the Western Division, start jury selection and see.  That's one of the remedies the circuit talks about.  Just because we start jury selection doesn't mean that we actually have to empanel a jury in this division if we have sufficient difficulty in obtaining a fair and impartial jury.

MR. WILLIAMS:  Absolutely.  Ultimately what the defense has asked you to do is without even starting the jury selection move the venue based on their presumption that the publicity has been so intense that we can't pick a fair and impartial jury.  It's their burden to show that, and the questionnaire doesn't support that.  So the case law suggests the next alternative is you go to jury selection.

And you're absolutely right, Your Honor.  If we're in the middle of jury selection and we find out that Miss Dahl's assumptions and the defense's assumptions are correct and that

100

we really have a bunch of underlying opinions that never came out through the questionnaire because the right questions weren't asked, then the Court can change venue after we get in jury selection if we find we can't do that.

THE COURT:  But what I can't do is give the defense

Page 86

more peremptory strikes than you get; right?

MR. WILLIAMS: Afraid not, Your Honor.

THE COURT: What do you think -- I mean, it's all speculation, and everybody's got a different view. But if we were to change venue to the District of Minnesota, what do you think the likely pretrial publicity would be?

MR. WILLIAMS: All I can tell you is from anecdotal because based on the possibility it may be moved up there, obviously we've been contingency planning, and so I've had discussions with the U.S. Attorney's Office up in Minnesota concerning office space and so forth. And the reaction up there is, oh, man, is this going to hit the front pages when I'm talking to people up there because of the same thing. They just have not had one up there, and I've been told as well that it's a controversial --

THE COURT: Since 1906.

MR. WILLIAMS: Right. And they keep -- and as you said, they keep introducing bills to reintroduce it, and it's a hot political issue in the state of Minnesota. And so the anecdotal responses I'm getting is they think there's going to

101

be a huge reaction in the press up there. But that's purely anecdotal.

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: I'll waive my World Federation of Wrestling rule, no tag teaming the judge. I'll waive that on this issue if any of the other lawyers would like to share with me any thoughts that they have.

Mr. Berrigan, I was just perceiving you were itching

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 164 of 200

to get up there.

MR. BERRIGAN: Your Honor, it's a minor point, but I think it is important, the question that you asked earlier about Mr. Honken and the effect of the knowledge that he's been convicted and sentenced to death, how that might affect the jurors' ability to be a juror in Angela Johnson's case. And I think it's debatable as you point out as to the penalty. That is, we've discussed this maybe on the record that the defense might even attempt to put in evidence about Mr. Honken's punishment. But if we did that, it would be in the penalty phase, and we would hope that the jurors might think, you know, one person executed for this crime is sufficient justice.

But I don't think we've considered, at least not on the record, how that decision affects the jurors' ability to give Angela Johnson the presumption of innocence, and arguably she's entitled to that it seems. That is, just because it's

102

helpful in the penalty phase doesn't mean that's information that's at all helpful to her when we're deciding the issue of guilt. And I think -- I hope we could agree that would not be helpful.

THE COURT: I can't imagine how it could be.

MR. BERRIGAN: I can't either, frankly.

THE COURT: Right. I agree with you on that.

MR. BERRIGAN: The relationship between them is very close. They're not husband and wife. They have a child together, and they're very intricately involved in these crimes as we all know and as the publicity has reflected. The reason people know about Angela Johnson for the most part is because of the coverage of Dustin Honken's case, not her case. And so I

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 165 of 200

think that's a very real concern.

If we had had a venue survey -- and I'm going to take full responsibility, and I think I have in the past. On December the 20th you asked me this very question, if you want to present that evidence, why don't you do it today, and I admitted I wish I had. At this point I didn't think it was prudent given things that have happened in the past, but we would ask jurors in a venue survey that very direct question, what do you know about Mr. Honken's trial, whether or not he was convicted, and what the punishment was. We don't want to ask that question -- I don't know how we could -- in this questionnaire. And it's possible, it's certainly possible, that

103

jurors would have that information and not mention it to us. That's entirely possible. The question's asking them about the factual scenario of the case, not really the results of Mr. Honken's trial. This is a very poor instrument.

And Mr. Williams makes a good point. Well, you designed it. Well, that's true, but they had their own questionnaire. They agreed to it. They have some minor responsibility although it's our responsibility to deal with this issue, but we wouldn't do it in a questionnaire I guess is my point. They're really quite different instruments, a questionnaire and a venue survey, whatever you think of them and the validity of each. We would never -- we never designed this questionnaire to be a test of pretrial publicity, and I don't want any suggestion that that's what our thinking was. Maybe it should have been, but that wasn't it.

So I wanted to make that very small point.

THE COURT: Well, I don't think it's a small point.

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 166 of 200

MR. BERRIGAN: It's of grave concern. Frankly, if Mr. Honken's trial hadn't taken place and he hadn't been convicted and he hadn't been sentenced to death and these are the numbers that we had, our concern would be substantially reduced, substantially reduced. But it has, and none of us can change that. And it is going to be in the paper in Minnesota. I get your point. Certainly there's going to be a lot of publicity but, you know --

104

THE COURT: And so why would we be better off up there because it's going to be in some sense newer, of kind of greater interest, more immediate, and I think harder to overcome than -- because I think a lot of people -- I don't think you'd forget the fact -- if you knew that Mr. Honken got the death penalty, that's not something someone is likely to forget. But the nuances of what happened in his trial are things that people would forget eight or ten months later or whenever it is.

MR. BERRIGAN: That might be true except they're going to be reminded of them. You know, it's kind of like when we were in law school and they were coming up for the bar exam. We had contracts first year in law school, and now we know it's on the test, so we rush in and get into a BAR/BRI class and listen to three or four hours of a lecture. Well, if that was all we did and we hadn't taken contracts, I dare say we're in a world of hurt when the exam comes up and now the questions are about contracts.

And that's really what's going on in Minneapolis. They're getting a bar review, BAR/BRI class, on United States versus Dustin Honken. The people in Iowa, they've taken the whole class. They've been there three hours a week listening to

Case 3:09-cv-03064-MWB-LTS    Document 284-68    Filed 06/23/11    Page 167 of 200

the professor, took the midterm. Their knowledge of this is much more indepth and engrained, and it's taken place over a period of years.

And you're right. The publicity's going to be great.

105

But it's not the same type of engrained, we've lived with this case, this has affected the people of Iowa. And we know -- you know, Iowa hasn't had a death penalty case for a long time, but it's their case. It's not -- this case is not vested with the people of Minnesota. It is with the people of Iowa. So I guess that's all I really wanted to add. Thank you.

THE COURT: Thank you. Anybody else want to add anything? Mr. Williams?

MR. WILLIAMS: Just to respond to that, the suggestion here is everybody in Iowa knows about this case. We know that from the Western Division 165 potential jurors said they know nothing whatsoever about the Honken case. We know from the eastern side 205 potential jurors know nothing about this case. We could pick a jury simply from 165 people who know absolutely nothing about this case from the Western Division. So to the extent that there's concern, we can answer that through the normal jury selection process. Thank you.

THE COURT: Okay. Now, I have not decided where venue will be, but we have a lot of decisions that we need to make relatively quickly. So assuming that venue remains in Sioux City, just assume that -- and we're just talking hypothetically now -- but assuming venue remains here, is there any sense that we should send out another round of questionnaires? Is there any sense that maybe you would want to just use the 165 folks who knew nothing about the case and start building a larger jury

Page 91

pool using that number, or can -- take the flip side of that. Now that you have 500-plus questionnaires from the Western Division, is there an ability to agree that certain people shouldn't even be brought in like you did last time? I think you eliminated 240 out of 600 by agreement between the lawyers.

I've noticed one thing. For whatever reason, there was more agreement going on in the Honken case than there will be in this one. That's become obvious to me in many ways.

But what else should we be doing if venue does stay in the Western Division? Should we be sending out more questionnaires? Are you going to make an attempt to try and eliminate some of the 581 who have responded so that we're not bringing them all in and the people that we do bring in we have a more realistic chance that they could qualify as a juror? Do you want to change gears in the middle of our process now and do something else? Have you given any thought to any of this? Mr. Williams?

MR. WILLIAMS: Your Honor, we will certainly attempt to sit down with defense counsel and eliminate in advance those people that we can agree just clearly can't sit as potential jurors in this case. We'll certainly attempt to do that with the defense. I don't know how successful it will be. But we'll certainly attempt to do it.

As to whether there's a need to send out more questionnaires, it can't hurt, but the government's view of this

is given the responses we have we think we can pick a jury from

Page 92

what we have at this point. I don't think we'll have a problem picking a jury.

THE COURT: Did you look at the undue burden question?

MR. WILLIAMS: We looked at those in passing, and I think my gut reaction to it is roughly the same as what we had in Honken. There's a number of people that, you know, probably 70 percent of them indicated some type of hardship. But of those, the people who really have a hardship is maybe as low as 20 percent or 15 to 20 percent that we would probably agree just up front knocking them off.

THE COURT: I think we are going to have a problem that we didn't have in Honken, and that is that now that at the defense request I moved the trial a month closer to summer, this trial is going to go into a substantial portion of the summer, and there are a lot of people who work at places where they have to take vacation certain weeks. And that is not a -- we had that a little bit in Mr. Honken's case but not very much because we didn't start jury selection till -- when did we start? The 17th of August?

MR. WILLIAMS: 17th, yeah.

THE COURT: So we had a little bit of that, but I think that's going to be a bigger issue in this case than it was there.

Any thoughts on if I do keep it here what we need to

108

do?

MR. BERRIGAN: Well, number one, we'd like the Court to add jurors, Your Honor. It seems to me that aside from the cost and the general hassle of doing that, the benefit is that we're not putting ourselves in a position where we're worried

Page 93

about the numbers.

My own view is that when we get close to a position where we may not have sufficient amount of jurors there's a hydraulic pressure that's asserted on all of us to try to qualify jurors that we might not otherwise be so enamored of. And if we have plenty of jurors, then that is avoided, and it seems to me that's the greatest benefit of having extra jurors, that we don't have to worry about those types of things.

THE COURT: I'm not very concerned about the logistics of getting more jurors.

MR. BERRIGAN: All right.

THE COURT: I thought our -- the clerk's office did a fabulous job, and if I ask them to do it again in this case, I'm confident that they'll be as dedicated and rise to the task and do it as well.

Are you going to make any effort to meet with the government lawyers and try and reduce the pool?

MR. BERRIGAN: Yes, sir. I hadn't gotten to that point yet. But absolutely, we'll do that. You can see, as we all know, the questionnaire is different, particularly on the

109

death penalty questions. We've discussed that the procedure in Honken probably won't be as applicable to Miss Johnson in that particular area.

THE COURT: Right, and I can appreciate that.

MR. BERRIGAN: But there are lots of other areas -- right, lots of other areas we can talk about, and we're happy to do it, and I would suggest at least on the questionnaire that I thought we cooperated very well together. So I don't think this is a big hurdle.

Page 94

THE COURT: There wasn't much cooperation. They had theirs; you had yours. And the government capitulated and said go ahead, send out the defense. That's not what I call cooperation.

MR. BERRIGAN: Actually back behind the scenes, Your Honor, there were a lot of changes made at Mr. Williams' request, but we need not belabor that.

Lastly, I think you asked about voir dire.

THE COURT: Yes.

MR. BERRIGAN: Okay. We're satisfied with the procedure that's in place. I mean, we haven't had any misgivings about that since we, I suppose, tentatively decided what we were going to do with the 15 peremptories as we go and the 5 in reserve at the end, that that's what's still being contemplated. The defense is fine with that.

THE COURT: What about this notion, though, of no

110

individual questioning?

MR. BERRIGAN: I think we are going to have to question people individually based on their small group responses. Let's just say for an example -- I don't know what the question would be, but there was a -- maybe there's a question designed to get at this very idea that somebody might have knowledge about Mr. Honken's case. My preference would be if somebody raised their hand, do you have any knowledge about Mr. Honken's legal proceedings, and they raise their hand, that we might take those at the bench rather than even taint the small group of six or eight or whatever that we have.

Now, that's given my view that that does taint them.

THE COURT: Now, would you agree with me that that's a

Page 95

change of position for you?

MR. BERRIGAN: The individual questioning?

THE COURT: Yes, that I was the proponent of individual questioning and you were saying all along, nope, we can do it in these small groups and obviate the need for individual questioning. Or do I have revisionist history going here which I sometimes do?

MR. BERRIGAN: No, sir, I think I'm not being clear. I still am a proponent of the small groups, and I think we should do that. But in the small groups there may be very few subject areas --

THE COURT: Where we're going to have to do individual

111

questioning.

MR. BERRIGAN: Exactly right. That's all I'm saying, and that seems to me to be one that just springs to mind. That's all.

THE COURT: Mr. Williams, Mr. Miller, you're not in favor of more questionnaires going out, but are you actually opposed to it?

MR. WILLIAMS: Not at all, Your Honor. We're not opposed to it, and I don't want to suggest we were at all. We think -- if you think back about the Honken case, we had panels going out for a month that we didn't even touch.

THE COURT: We did.

MR. WILLIAMS: And I think there was a perception with that case, certainly one I had, is that, oh, my gosh, we don't have enough, we don't have enough. We had more than enough, and I think we have more than enough here. Now, if there is a concern that maybe we don't, there's no harm in sending out more

Page 96

questionnaires. I think in the end we're going to have panels going out a month that we never touch in this case. But we're not opposed to sending out more questionnaires.

THE COURT: And I agree with your analysis that we had more than -- we had -- you know, we had panels going out way beyond what we needed. Maybe the key is to take a little bit tougher look at the questionnaire answers and eliminate more jurors based on the questionnaire answers. We might not need as

112

many panels going out because the likelihood that the jurors that we actually invite in -- there's a greater likelihood that they can be selected. And we could really do both. We could add -- increase the number of jurors, maybe not another round of 600, maybe another round of 200 questionnaires, but with the understanding that the lawyers would be a little bit more aggressive in eliminating jurors by agreement. Is that a possibility, do you think?

MR. WILLIAMS: Certainly, Your Honor.

THE COURT: Mr. Berrigan, what do you think?

MR. BERRIGAN: Certainly. We're happy to look at that, Your Honor.

MR. MILLER: Your Honor?

THE COURT: Yes, Mr. Miller.

MR. MILLER: We haven't made and really haven't been able to make any effort on agreeing on elimination without knowing what venue we're going to be in. And once we do that -- and I hate to jinx myself -- but I think there's been a mutual willingness to cooperate between counsel on both sides. We just -- part of the reason we got a lot further a lot faster with the Honken case was because we had multiple choice and we

Page 97

were only talking about one venue, so it really hasn't been a possibility yet.

But I certainly think that we can give them a list and they can give us a list of people that each of us think can be

113

discarded without further questioning and that at least a large portion of both lists can probably be agreed.

If I could address the question about individual voir dire too --

THE COURT: Yeah.

MR. MILLER: -- because it came to my attention, my experience is primarily in dealing with the whole panel and questioning everybody at once, so I'm certainly comfortable with doing it in any size of group, but it has been my experience that individual questioning does tend to get more candor and more willingness for people to open up and give expansive responses to open-ended questions. And in view of the fact that we're going to be doing a portion of that with a large fraction if not a majority of these jurors anyway, I just wonder if total individual questioning coupled with, say, a time pool of 20 minutes per juror or something might be just as efficient in view of the fact that we are anticipating reducing the time for jury selection as a result of doing strikes on the fly, at least to some degree reducing it that way. Just my thought, Your Honor.

THE COURT: Okay. Thank you. Thank you, Mr. Miller.

Here's what I'm going to do I think, I think. I think I'll let you know on Monday what I'm going to do on venue. I'm not going to have time to crank out an opinion. I'm still tinkering with -- I have a 108-page draft on the last round of

pretrial motions. It hasn't been proofread yet, and there are a couple of things that I'm going to be changing, not the results of the ruling but just some rationale I'm going to be adding and modifying. And I hope to have that out in the next week.

One of the reasons why I didn't get it out as quickly as I thought I would -- I hope you probably picked up on it -- as soon as I changed the trial date, I didn't feel the need to get my ruling out quite as quickly. I could have gotten it out, but it wouldn't have been as good. So I'm taking a little bit of extra time because I knew we had the time by virtue of the trial. I'm not going to take a month longer, but I'm going to take a week or two longer to get my ruling out.

What I think I may do on Monday is give you a quick up or down on the venue and then follow it up with a -- I'm not going to spend a whole lot of time on an opinion on it because I'm confident no matter what I do it's well within my discretion or I wouldn't be doing it. I may be wrong, but I'm confident that it's well within my discretion or I wouldn't be doing it. So I think you need to know up or down where we're going to be, and I've ruled out Cedar Rapids, and that's relatively obvious I think, or isn't it obvious, Mr. --

MR. WILLIAMS: Quite obvious, Your Honor.

THE COURT: Okay. So it's either going to be in Minnesota or here. And I've continued to make arrangements in Minnesota, so I certainly haven't ruled that out yet. But I

think you need to know and you need to know quickly. So it will probably be my first one-sentence ruling. Venue in this case

will be in, and then I'll follow it up with something a little more thorough but not necessarily very elaborate.

Anything else on the agenda? We don't have an agenda, but anything anybody wants to put on the agenda?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the defense, Your Honor. Thank you.

THE COURT: Okay. Well, my goal was to have this hearing to get you on the road in time to get home to your families by dinner time, and hopefully we have achieved that goal. I appreciate everybody coming in to Sioux City. And I guess we don't have another hearing set, do we, on anything?

MR. WILLIAMS: Not at this time, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: Your Honor, there are some motions pending. I don't know if you contemplated -- Your Honor, there are some motions pending.

THE COURT: Since the last round?

MR. BERRIGAN: Yes, sir. I think there's at least the motion regarding the document that has fallen --

THE COURT: Oh, yeah, yeah, the motion with regard to -- just refresh my recollection.

116

MR. BERRIGAN: The chronology, a chronology of Miss Johnson's life that was prepared by the defense mitigation expert.

THE COURT: Right. We have that issue, and then we also have the issue that Honken is raising; correct?

MR. BERRIGAN: Yes, Your Honor.

Page 100

THE COURT: And on that we'll need to have a hearing, but they need to be included in that hearing. And that's it that's pending that hasn't been heard; correct?

MR. BERRIGAN: That's right, Your Honor. And, in fact, my recollection was because of the number of lawyers involved we discussed the possibility of doing that on the telephone. That is, we're not contemplating putting on evidence. I'm not sure about the government, but the defense is not. I doubt Mr. Honken's team is. Yeah, on Mr. Honken's issue alone I'm talking about.

THE COURT: Yes.

MR. BERRIGAN: But we would --

THE COURT: Are we going to need an evidentiary hearing on this other issue?

MR. BERRIGAN: Yes, I think so. It will be brief, but we probably do need to put on some evidence, yes, sir.

THE COURT: Who would the witnesses be in that hearing? Do you know?

MR. BERRIGAN: We're not frankly sure yet, Your Honor,

117

although I think we'll be able to ascertain that very soon. We're working on that.

THE COURT: Can I ask you to do this? Would the lawyers meet with my law clerk Roger and figure out a date for the -- because we need to have a hearing on that, and I'm just jammed up. I've got two jury trials next week.

MR. BERRIGAN: No, that's why I raised it, Your Honor. We'd like to do that while we're all here if we could.

THE COURT: Yeah, why don't you find a time so we can lock in a time to hear that and get it resolved.

Page 101

MR. BERRIGAN: Yes, sir. Thank you.

THE COURT: Thanks for raising it. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. Safe travels. We'll be in recess.

MR. STOWERS: Thank you.

(The foregoing hearing was

concluded at 10:32 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

3-5-06
Date

♀

118

INDEX

WITNESS:                                                    PAGE:

LISA DAHL

    MR. STOWERS                                        7

    MR. MILLER                                        48

*****

EXHIBITS:

A                                                          10

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

   vs.

ANGELA JANE JOHNSON,

     Defendant.

_____/

COPY

No. CR01-3046

TRANSCRIPT OF
PHONE HEARING

**TO BE FILED UNDER SEAL**

     The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 7, 2005, commencing at 2:30 p.m.

APPEARANCES

For the Plaintiff:        ROSEANN KETCHMARK, ESQ.
                           MATT WHITWORTH, ESQ.
                           Assistant United States Attorneys
                           Charles Evans Whittaker Courthouse
                           Room 5510
                           400 East Ninth Street
                           Kansas City, MO  64106

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                           Watson & Dameron
                           2500 Holmes
                           Kansas City, MO  64108

Reported by:           Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846

THE COURT: Good afternoon. This is United States versus Angela Johnson, 2001-3046. We're here in a sealed conference with the taint team members, Assistant U.S. Attorneys Matt Whitlock (sic) and Roseann Ketchmark from the Western District of Missouri, and Pat Berrigan, death penalty counsel for Angela Johnson. Well, Mr. Berrigan?

MR. BERRIGAN: How are you, sir?

THE COURT: Good.

MR. BERRIGAN: Good.

THE COURT: I spent all weekend reading state Supreme Court and Court of Appeals decisions on this issue because there's not much under federal law. So what's the deal? You're instructing Miss Johnson to take the Fifth Amendment with regard to questions propounded by any government experts about her involvement in the criminal activity that gives rise to the indictment?

MR. BERRIGAN: Without I guess disclosing attorney-client privileges, Your Honor, I wanted to raise this as an issue as I think I did during the hearing, although I haven't reviewed a transcript.

THE COURT: I don't believe you did.

MR. BERRIGAN: I'm sorry?

THE COURT: I don't believe you raised this issue.

MR. BERRIGAN: Well, I -- I may stand corrected, but I certainly brought it to the attention of Mr. Whitworth the other

day when we spoke because I didn't want it to suddenly arise during the course of the evaluation by the government experts so that we could deal with it if need be ahead of time. The case law -- and first of all, I guess I certainly agree there's very little on this particular issue in the federal courts. And I just think there's a substantial difference between Miss Johnson putting her mental health in evidence as a defense in the first phase and thereby waiving her Fifth Amendment privilege all together in the second phase if she does not put into evidence mental health at the time of the offense, for example, specifically dealing with mitigating circumstances that would pertain to mental health issues, for example, that she was under unusual and substantial duress or at the time of the offense she suffered from incapacity to appreciate the harmfulness of her conduct.

And I told Mr. Whitworth that I instructed our experts not to discuss these issues with her so as to avoid the possibility that the government's argument would be, well, this is only rebuttal to what your experts have already done. My experts have not, will not be questioning Miss Johnson regarding the actual commission of the murders or what her mental state was at that time.

THE COURT: Are they going to give an opinion about what her mental state was at that time?

MR. BERRIGAN: No, no, they are not.

THE COURT: They're not going to give an opinion about her mental state at the time of the --

MR. BERRIGAN: Commission of the murders.

THE COURT: Yes.

MR. BERRIGAN: That's right, Your Honor.

THE COURT: So is it -- and I'm not trying to get you to disclose more than you need to.

MR. BERRIGAN: Right.

THE COURT: But is it basically her current mental --

MR. BERRIGAN: Current and past, I mean, particularly her past.

THE COURT: And would the past precede or come before the murders?

MR. BERRIGAN: Oh, definitely came before the murders. Just by way of an analogy -- and I don't want to give you the wrong idea. I'm not arguing Miss Johnson's mentally retarded, but let's just say that for the sake of argument that she was and I wanted to present evidence that she was mentally retarded in the penalty phase of the trial. My belief is that that would not, first of all, be a first phase defense unless her mental retardation provided a complete defense, she was unable to appreciate the nature and quality of the harmfulness of her conduct, but it certainly would be a relevant mitigating case -- certainly we've had many cases, Atkins versus Virginia among them -- to indicate that is a significant mitigating

factor and in some circumstances can be a bar to the death penalty.

I believe the defense can put on that evidence of the mental health professionals without one iota of discussion of the actual murders and what happened next and who killed who and what step was taken and preceding the murders and how did you dispose of the bodies because that evidence doesn't directly relate to the mental health diagnosis there. Mental retardation is not offense specific.

And this kind of comes in under the catch-all mitigator that other individuals -- I think the scope of mitigating evidence is certainly broad enough to incorporate and encompass mental health evidence without it necessarily directed to the mental state at the time of the commission of the murders, and I don't -- I'm not trying to hide the ball. I think it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders. It only brings the jury's attention back to the commission of the murders when in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating circumstances that might exist regarding the defendant and her background and character.

So that's our position. If the defense isn't going to get into this area, the government's not entitled to either.

THE COURT: Well, it's not quite that simple because let me use the last phrase you used. If the defense isn't going to get into this area, what exactly does that mean? I mean, if you're arguing, for example, that she's suffering from some kind of mental illness or condition related to child abuse or maybe she had an incident that gave rise to posttraumatic stress disorder, whatever it is, and she had that and your psychologist or psychiatrist or both could put whatever label they want on her mental illness, condition, disease, et cetera, and she had that before the commission of the murders and she had it after the commission of the murders, then you might then want to then argue that -- I mean, it depends on how you're going to argue it. You could argue that while your experts didn't question her about the specifics of the killing, she had this condition and somehow that renders her less culpable in the commission of the murders.

And if that's how you're going to argue it, then I think there's a strong argument that even though your experts didn't ask it the government experts ought to be able to ask.

If instead you're going to argue that she simply suffers from A, B, C, and D and that's a mitigating factor that the jury should use in making the decision not to impose the death penalty, then there's less of a compelling need for the government to get into it. Do you see what I'm saying?

MR. BERRIGAN: Yes, Your Honor.

THE COURT: So it's not quite as simple.

MR. BERRIGAN: Of course, I'm very aware of this issue, and so I'm going to be very careful I think not to tread on ground that I can't support with the direct evidence of the mental health experts.

THE COURT: Well, let me ask you this fundamental question.

MR. BERRIGAN: Yes, sir.

THE COURT: Why do you think the current 12.2 doesn't act as a complete waiver should you decide to put on mental health evidence in the penalty phase? I mean, the rule could be read that way.

MR. BERRIGAN: I don't think it can be read that way consistent with the Fifth Amendment, Your Honor. I mean, I -- there's certainly no dispute -- and I'm not proffering any -- that when a defendant offers mental health evidence to try to avoid responsibility for a crime, they waive their Fifth Amendment right completely.

But there are a number of different circumstances in which a defendant could offer mental health testimony in the penalty phase of the trial without implicating the mental state at the time of the murders themselves, and I agree. You know, I suppose the government could say, well, you know, your mental health experts did evaluate her in terms of her mental state at the time of the murders, so what difference does it make if she

had PTSD or suffered from child abuse. But, frankly, that's a jury determination, and my experts are subject to cross-examination on their failure to inquire about her mental state at the time of the murders. I think arguably the government probably could do that. I haven't really looked into it very much. But I don't agree I suppose that --

THE COURT: Well, do you have 12.2 --

MR. BERRIGAN: I could get it --

THE COURT: -- in front of you?

MR. BERRIGAN: -- right here.

THE COURT: Okay. Why don't you take a look at 12.2(c)(4) that talks about inadmissibility of a defendant's statements. And read that and then read the subsection (B) underneath it which is kind of the exception. And it seems to me that the only reading of the rule is that it's a waiver of the Fifth Amendment.

Now, the scope of the waiver may be subject to some nuance dispute, but there's no question that that is a waiver because it talks about the trigger that makes a defendant's statements inadmissible if she puts it in -- if she calls expert testimony in a capital sentencing phase, then her statements become admissible. That has to be a waiver of her Fifth Amendment right. Otherwise her statements wouldn't be admissible.

MR. BERRIGAN: Yeah, I don't disagree with that, Your

Honor. But, for example, I mean, she can't refuse -- in our situation if she were to give evidence to our experts about her background and there was some evidence of abuse that was going to be testified to, she can't claim the Fifth Amendment privilege respecting that area when the government tries to evaluate her. I don't disagree with that at all. Otherwise they'd have no evaluation whatsoever.

But it seems like a very special circumstance all together when the defendant's being questioned about the crime itself when she's not waived her Fifth Amendment privilege respecting her defense, she never contended that she had a mental disease that constituted a defense in the first phase of the trial, and all she's trying to do is put in mental health testimony regarding certain diagnosis that might be relevant to the jury's assessment of her character or background.

THE COURT: Well, let me ask you this. Precisely because it's used only in the penalty phase and not in the merits phase, doesn't she have -- assuming that 12.2(c)(4) is not a complete waiver, doesn't she have less of an interest in her Fifth Amendment right with regard to the commission of the crime after she's been found guilty? I mean, I understand the Fifth Amendment still applies through sentencing. I understand that.

MR. BERRIGAN: Well, I guess my argument would be no. I mean, there's always the possibility that that verdict may not

withstand appellate review, that those statements could be used certainly if not directly against her for impeachment purposes perhaps. I frankly don't know what the law is on that, but we know there's a great deal of difference in the law between the admission of statements directly and those that are used for impeachment purposes, even those that are begotten by ill means.

THE COURT: But I'm assuming they couldn't be used in a retrial either because they couldn't be used on the merits.

MR. BERRIGAN: No, not on the merits. No, I agree. I suspect they couldn't be used on the merits. It'd be an interesting issue if she came back in the second part of a trial and testified inconsistently in the first phase respecting some testimony she gave to a mental health expert that was conducted during the penalty phase of her first trial. I frankly don't know how that would go. I wouldn't bet my house on it.

THE COURT: Yeah. Well, why don't we hear from the government. Mr. Whitlock?

MR. WHITWORTH: Yes, Your Honor. It's our position that -- and Pat was kind enough to give me a heads-up to this last week, but it's our position that Rule 12.2, if a defendant wants to put on mental health evidence in either the guilt or sentencing phase, they essentially are giving up their right not to talk about the case with the expert witnesses for the government because my question, of course, Your Honor, would be -- and we're kind of operating in a vacuum here -- would be

why -- if the -- the jury, of course, is free to consider any evidence as mitigating evidence. And if a defendant puts on evidence, for instance, that -- I don't think mental retardation's going to be the issue here, but let's say -- and I'm -- that the defendant here wants to put on evidence to show that she was battered and that she was under duress when she committed this offense with her boyfriend, then I would think that that clearly goes to her state of mind at the time of the offense. And so the jury's going to think of it in that way. And so if it's going to be offered for some purpose other than this defendant's state of mind at the time of the offense, then why are we even needed as taint counsel?

THE COURT: Well, you're needed for a whole lot of reasons unrelated to this issue, basically the kind of timing of 12.2. I mean, that's the primary reason. We didn't appoint a taint team because I thought they were going to raise a Fifth Amendment issue with regard to the government experts questioning her about the offense. That wasn't the reason.

MR. WHITWORTH: Okay.

THE COURT: So it's really unrelated to why we have a taint team. It just so happens that the taint team now has to handle this issue. But your argument why do we need a taint team, there's lots of reasons why we need a taint team. If you don't see it, I don't have the time to educate you on it, but it's not for this issue.

MR. WHITWORTH: Okay. Well, the other que -- I guess -- I was looking at -- basically I think the purpose of 12.2, the reason they put it in is because of the Fifth Amendment concerns a defendant had, legitimate Fifth Amendment concerns. And we believe that the section you identified, Your Honor -- you obviously studied this already -- constitutes a waiver. And we don't know how the defendant's going to offer this evidence in this case. It seems to me that if our experts are precluded from inquiring into the defendant's state of mind or the events surrounding the murder, then if later at trial when the evidence is offered it turns out that it does relate to that issue in some fashion, then, you know, we're going to have to stop the trial, go back and have our experts talk to the defendant again.

THE COURT: But isn't the thrust of 12.2 as it relates to the context of this case is to provide the government with adequate rebuttal, not perfect rebuttal but adequate rebuttal? If it was perfect rebuttal, they wouldn't have the timing issues. You'd just be able to go ahead and examine them across the board. And so it seems to me that Rule 12.2 sets up a kind of symmetry all aimed at giving the government a fair opportunity of rebuttal. And if the defense psychiatrist and psychologist didn't question in this area, why should you be able to? Why are you handicapped by rebutting the defendant's case by not being able to?

I mean, it'd be a whole different story if they were going to do it, if they were going to question her about the crimes and give opinions based on that. Then basic notions of reciprocity and fairness would trigger your right to do that, it seems.

But when Mr. Berrigan is making a representation that they're not going there, why should you be able to go there? And do you have a single case that would suggest -- because I'll tell you something. There's very few state cases -- and I picked states because I knew what the federal law was, and there's not much, if any, out there on this issue. There are very, very few, if any, state cases that support your view, and the clear majority view is that there's an actual exception for questioning about the crime. And I'm going to give the parties an opportunity to brief it if they want to. I suspect I know a great deal more about it than the lawyers do at this point only because I spent the weekend reading over a dozen state Supreme Court and Court of Appeal decisions and three law review articles on the subject.

MR. WHITWORTH: Judge, I'm sorry if I ruined your weekend.

THE COURT: Well, that's what I get paid these big bucks for. It's neither the first time nor the last time, and actually I rather enjoy it. So I'm not upset by it. It was an interesting learning experience for me, and I realize it came up

quickly on Friday, but my job is to figure it out. Sometimes the parties help me do that. Sometimes they don't. And I don't really plan on it, to be honest with you, after 11 years of this.

MR. WHITWORTH: What I did do is I called Matt Hellman who's with our capital case unit on Friday afternoon, and I asked him if this issue had come up before in any of the capital cases around the country because the rule as you noted isn't -- and Matt advised that this same issue came up in a case out of Massachusetts, and he told me that apparently the def -- they were -- they had taken it to the judge.

THE COURT: And they worked out a compromise. You're talking about United States versus Sampson.

MR. WHITWORTH: Is that the one?

THE COURT: Judge Wolf, Mark Wolf. If that's the case -- there have been only been two capital cases I'm aware of in Massachusetts, that one Sampson and then another one where they actually pled guilty and just went to trial on the penalty phase. But is there -- there are numerous reported decisions in Sampson. There's about a dozen reported decisions, and I don't think Judge Wolf ever expressly -- matter of fact, I'm sure didn't address this in any of his reported decisions, and he wrote publishable decisions on virtually every ruling.

MR. WHITWORTH: Well, if I recall right, I think Matt Hellman told me that the defense had withdrawn the mental health

issue and they didn't have to resolve it.

THE COURT: Oh, I see.

MR. WHITWORTH: So I'm not aware of any cases. It just struck me that it seemed to me that we would -- you know, any information that we would gain as taint counsel would never be given to the trial team so if there were any Fifth Amendment or any damaging statements made by the defendant, if it turns out that the evidence is offered for a purpose totally unrelated to the defendant's state of mind at the time of the offense, then we -- the trial team will never get that information unless it turns out later that it is relevant to the state of mind or a jury could consider it as evidence related to the defendant's state of mind. Then in that event we would be prepared to rebut that at the sentencing phase, and that was the reason I just felt like we ought to bring this to your attention.

THE COURT: No, I appreciate -- I appreciate it being brought to my attention. I appreciate it being brought quickly too. Of course, we have a record made here today, but, you know, part of how I would tentatively rule would depend upon the purpose for which the defendant is offering -- I don't know -- you know, I'm in the dark as to what you're doing, Mr. Berrigan, in terms of your mental health experts.

MR. WHITWORTH: Judge, may I offer a suggestion?

THE COURT: Yeah.

MR. WHITWORTH: We would not object if you would have

an ex parte conversation with Mr. Berrigan about the reason the evidence is being offered so you could reach that -- or make that determination without us being involved. You know, certainly we would trust your judgment. But, you know, for instance, if it's -- let's say it's a duress-type related defense, mental health evidence related to battered spouse or something of that nature. I think that that clearly is evidence which would go directly -- be offered directly for the purpose or indirect purpose of how the defendant was thinking, what her thought process was at the time these murders were committed.

And so in that event I would say there's a strong argument the government should be able to inquire into her state of mind or her -- the murders when our experts are examining her. If it's mental retardation, that's different. I think that's a different issue, and I think that Mr. Berrigan would have a stronger point there.

THE COURT: Well, Mr. Berrigan, maybe I could ask it this way. Are you putting at issue in the penalty phase Miss Johnson's state of mind at the time of the murders?

MR. BERRIGAN: No, Your Honor. I mean, that -- I didn't want to sandbag anybody with this. It seems completely counterproductive as Mr. Whitworth suggested that we would have to stop the trial or reevaluate Miss Johnson. So for some period of time my mental health experts have been under very strict instructions not to inquire into this area of her mental

status at the time of the murders. It's counterproductive, frankly, in my opinion for the defense to inquire into that in this particular case. And I intend to offer no evidence on that.

And I just wanted to bring that to Mr. Whitworth and Miss Ketchmark's attention so that they kind of have a heads-up when they were talking to their mental health people regarding the evaluation of Miss Johnson and if they had a problem with it as they obviously do, they could bring it to your attention which we've done.

But I realize that we're -- the defense is really on very perilous ground by taking this position if we were to seek to introduce evidence at trial that Miss Johnson was suffering from duress at the time of the murders. Well, I don't know how that works without the defense people evaluating that much less the prosecution having a chance to do it. So that's not our intention whatsoever. I've gone out of my way to avoid that very issue.

THE COURT: Well, let me ask you this. Are you willing to kind of enter into a written stipulation that you are not putting the defendant's state of mind at the time of the murders in issue in the penalty phase?

MR. BERRIGAN: If you'll let me consider that, the implications of that, Your Honor, I'll be happy to do so, not do it on the phone.

THE COURT: Yeah, I'm not asking you to do it now. I'm sorry if you would have thought that.

MR. BERRIGAN: Certainly. I think I've made that oral representation.

THE COURT: Yeah, I think you've made something very close to that.

MR. BERRIGAN: I think so as well, and I probably wouldn't have a problem with it if you at least give me 24 hours to think about this issue.

THE COURT: And this way you can talk to taint team counsel and try and work something out, but then we'd have something in a nice neat little package.

MR. BERRIGAN: Right.

THE COURT: Mr. Whitlock, are you opposed to that? Does that -- it might resolve some of your concerns but not all of your concerns.

MR. WHITWORTH: That's fine, Your Honor, with me, either that or we remain -- I want to make it clear that we have no objection, Your Honor, if Mr. Berrigan wants to reveal to you without us being involved the nature of the evidence so that you can kind of do a pretrial ruling in your mind at least about this issue and you can come back and say, hey, no questions about -- from your experts about the defendant's involvement in these murders can be asked of your experts. We will certainly respect that, Your Honor.

THE COURT: Let me ask you this: Does either side want to take a look at the case law? And you could do something real informal like just send what I call a letter brief where you just cite the cases and what you think they hold rather than writing a more formal brief? I mean, I feel very well grounded, and I've looked at a lot of law, but I certainly don't want to foreclose the parties from trying to take a look at this issue.

MR. WHITWORTH: Your Honor, I'll look into it from the government's standpoint. I apologize for not having done that over the weekend like you.

THE COURT: You don't have to apologize for it. Your jobs are much more stressful than mine, so I don't need the weekends to relax like the lawyers do. So I wouldn't have expected anybody to have done that on such short notice. But, you know, I felt I should do it. I'm not being critical in any way of the lawyers not doing it. I didn't expect that you would. But you want me to leave this open for a little while, maybe till the end of the week, and I'd be prepared to probably rule on Friday or perhaps next Monday?

MR. WHITWORTH: That's fine with us.

THE COURT: Why don't we do this.

MR. BERRIGAN: If you can give me till Monday, I've got a Tenth Circuit oral argument on Friday morning I need to spend a little bit of time preparing for.

THE COURT: I would hope so.

MR. BERRIGAN: But if I could just have till Monday, I'd have more than enough time. And as a corollary to this, Your Honor, I want to bring to your attention that I frankly misread the Court's order respecting the issue of who was picking the mental health experts for the government, although I think in hindsight when I re-read the order it's quite clear that Mr. Williams and Mr. Miller have that responsibility, not Mr. Whitworth and Miss Ketchmark.

So I have provided pursuant to the Court's order the mental health testing that's been done on Miss Johnson and sort of the specialties I guess of the four mental health experts. I've provided that to Mr. Williams but only today after a telephone conversation with him because I frankly thought that was the purview of Miss Ketchmark and Mr. Whitworth, and he has kindly corrected me; that is, Mr. Williams has.

So I don't know that he's going to be ready by March 11 to name experts or not, and I've certainly told him that I'd have no objection to whatever extension he needed, although I strongly suspect he has some people already in mind irrespective of the information I provided him. I don't frankly know right now -- he wasn't able to get back to me before this hearing -- whether he needs any more time than March 11 which is Friday, but I suspect he might, and I wanted to let you know that the fault there lies solely with me. Mr. Williams has been expecting me to give him the information, and I gave it to Miss

Ketchmark and Mr. Whitworth if that makes any sense at all.

THE COURT: It does. I totally understand.

MR. BERRIGAN: So he might be just a few more days. I doubt it will take him very much longer, and I don't know that this particular issue impacts that at all. I expect not.

THE COURT: I don't think it does. So why don't I give the parties till a week from today. Could you just e-mail me a letter brief?

MR. BERRIGAN: Yes, sir.

THE COURT: With any citations to authority and any argument you want to make. Don't feel compelled to send me anything. But I'll hold off ruling. But I'm going to rule pretty shortly thereafter.

MR. WHITWORTH: Okay.

THE COURT: And I don't think I need -- I'd feel un -- I don't know if Mr. Berrigan would be willing to tell me, but I'd feel even uncomfortable getting into what his defense is.

MR. BERRIGAN: I'm a little uncomfortable myself, Your Honor.

THE COURT: Well, so am I.

MR. BERRIGAN: But Mr. Whitworth's suggestion makes some sense to me, that if it were done ex parte maybe that really isn't much of a problem, and I think I could do it in a very simple, straightforward fashion. So if you could -- I'll submit that as well perhaps under cover -- under seal --