THE COURT: Or would you rather just do it at the end of this conversation?

MR. BERRIGAN: I'm sorry, sir?

THE COURT: Would you rather just do it at the end of this conversation?

MR. BERRIGAN: Oh, that would be fine.

THE COURT: Would you be prepared to do that?

MR. BERRIGAN: I think so, yes.

THE COURT: I think it'd be easier rather than writing because then I can ask some questions if I have any.

MR. BERRIGAN: Sure. You bet. Okay.

THE COURT: Miss Ketchmark, Mr. Whitworth, do we need anything further?

MR. WHITWORTH: No, I don't think so, Your Honor.

MS. KETCHMARK: No, sir. I think our big concern is that the jury, if they were to draw an inference that the mental issue was somehow a defense to the commission of the crime, how could we be -- how could C.J. be prepared to rebut that inference even if they don't claim that, even if Pat doesn't claim that, and I don't know that C.J. could rebut that with cross-examination of the expert because the expert may just say, I simply didn't look into that area. And then they're really at a loss. I was thinking, you know, maybe some agreed-upon instruction, but your idea of a stipulation may be a really nice idea.

THE COURT: Why don't you try and work it out.

I'm sorry, Mr. Whitworth. I was calling you Mr. Whitlock. I apologize for that.

MR. WHITWORTH: That's all right, Judge. I'm used to that.

THE COURT: Well, I imagine you get called worse, at least by defendants. So, Mr. Whitworth, I'm very sorry.

MR. WHITWORTH: That's all right.

THE COURT: I just made a note to myself who the counsel of record were, and I wrote down Whitlock instead of Whitworth, and I knew better, and I just realized I was doing it, so I'm a little punch crazy today, and I apologize for that. But if we don't need Mr. Whitworth and Miss Ketchmark anymore, then I'll just proceed ex parte with Mr. Berrigan, and I think that will help me flesh out the defense, and that's important to how I would rule in this case.

MR. WHITWORTH: Okay. I appreciate that. And, Your Honor -- or, Pat, if you could -- if you think of a way we can resolve this informally, please give me a call.

MR. BERRIGAN: Certainly.

MR. WHITWORTH: Okay. Thank you, Your Honor.

THE COURT: Oh, and just one other thing. I don't think the stipulation necessarily resolves the legal question, but I think it could have a huge impact on how I might rule.

MR. WHITWORTH: Okay.

THE COURT: So I think I still will need to rule. Of course, if the parties totally agree -- but I wasn't trying to force some agreement to avoid the need for ruling on it. I just thought a stipulation would assist in how ever I ruled so that there wouldn't be a violation of it down the road.

MR. WHITWORTH: I like the idea, Your Honor. I had thought of that myself, and I think that's a good suggestion.

THE COURT: Well, sometimes I have good ones. And sometimes I have pretty poor ones, but I usually have options available. So appreciate it very much. And we'll have the government lawyers hang up now, and then I'll proceed with Mr. Berrigan.

MR. WHITWORTH: Okay. Thank you for your time. We're hanging up.

(Ms. Ketchmark and Mr. Whitworth hung up the telephone.)

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Your Honor, here's my dilemma.

THE COURT: Yeah.

MR. BERRIGAN: It's my belief that Miss Johnson has suffered from certain mental conditions or defects, if you will, for quite a long period of time, and much of that arises out of some events in her childhood that were very traumatic in nature to say the least, and so these are sort of longstanding mental health issues.

And those -- the determination by a mental health expert that she's been suffering from that type of -- let's say depression as an example for a long period of time from childhood into her adult life in my view does not require the expert to then delve into what her mental status was at the time of the murders.

Now, having said that, I suppose the government could say, well, if you're contending she's suffering from depression over the course of her adult life, that she's got major depressive disorder, doesn't that impact her mental status at the time of the events? And frankly I don't know what the answer to that is.

It seems to me if you have a permanent mental condition -- retardation is another example -- that doesn't go away for a 24-hour period when some murder's being committed or some other unlawful activity. And we're not relying on that diagnosis to say that she's relieved of responsibility in any fashion because at the time of the murders she was suffering from major depressive disorder.

THE COURT: You're just going to argue it as a general mitigator.

MR. BERRIGAN: Right. Exactly, Your Honor.

THE COURT: That these -- whatever these psychiatric or psychological conditions are --

MR. BERRIGAN: Right.

THE COURT: -- that that's a mitigation and that they ought not to put her to death if they found her guilty.

MR. BERRIGAN: Right. But I am not going to argue specifically -- I can tell you for sure that I'm not arguing, for example, that she was under duress because of this relationship with Mr. Honken at the time of the murders, you know, that this is some kind of quasi-duress defense or something of that nature which I can understand frankly Mr. Whitworth's concern about that. I just don't know how much I can tell them or the Court I suppose.

THE COURT: Right, right.

MR. BERRIGAN: Without divulging --

THE COURT: But I think it would be important for how I would rule to indicate in your stipulation that you're not going to be arguing her culpability for the crime as a result of any mental disease, defect, or condition. You're going to be arguing it as a mitigation.

MR. BERRIGAN: Yes. I understand what you're saying, Your Honor, but I guess mitigation -- I guess my concern is mitigation does affect one's culpability -- at least her moral culpability for the crime.

THE COURT: Moral culpability for punishment.

MR. BERRIGAN: For punishment.

THE COURT: Right.

MR. BERRIGAN: I represented Christopher Simmons whose

decision came down last week. For many years I've been representing him, and the court held that his age, you know, reduces his moral culpability. This is sort of an analogous situation.

For punishment purposes, yes, I'm arguing that Miss Johnson has less moral culpability because of these mental defects that she's had, but they're not related to the murders. That is, it's not something that arose during the course of the murder. They're longstanding mental health defects that she's experienced at least since adolescence.

So I don't know if that's a distinction without a difference or if that has any meaning for the Court where the defense is coming from regarding this type of evidence.

THE COURT: No, it does have meaning because, you know, you could -- you could have the psychologist and psychiatrist testify that even though she was found guilty that she's not as responsible for the crime as someone who didn't have these conditions even though they never questioned her about her involvement in the crime.

MR. BERRIGAN: Right.

THE COURT: But you're not going to do that.

MR. BERRIGAN: I'm not going to have -- I'm not going to do what? I'm sorry?

THE COURT: You're not going to have your experts testify she's less culpable about the commission of the crime.

MR. BERRIGAN: I don't think they could because they haven't examined her about that, and I don't know that that evidence, given the scope of their evaluation, really would be appropriate.

THE COURT: Yeah.

MR. BERRIGAN: So no, I don't intend to do that. I think the -- from my vantage point, the evidence that's going to have most impact is mitigation evidence of these longstanding problems, not -- it's counterproductive for me to get into --

THE COURT: The crime.

MR. BERRIGAN: -- the crime, right, for obvious reasons. It's a horrible crime.

THE COURT: Right. Why would you want to get into it? Yeah.

MR. BERRIGAN: And I don't want that to be the main focus of the penalty phase of the trial, at least if I can prevent it. Obviously the government may have some say about that. So I'm making every effort to at least try to avoid that through mental health testimony not only by the government witnesses but my own witnesses as well.

THE COURT: Okay. I have a fairly clear, somewhat murky understanding.

Can I ask you one other question? It is slightly ex parte, but I asked the other side in an ex parte hearing I had with Williams and Whitlock earlier today which I guess I

wasn't supposed to tell you I had it.

MR. BERRIGAN: Whitworth.

THE COURT: Yeah, Whitworth. But anyway, where are you on selection of jurors that are going to be eliminated by agreement, because our clerk's office is really on me? They've got to send notices out. They want to do it by the 21st --

MR. BERRIGAN: Okay.

THE COURT: -- of this month, and supposedly you guys were going to try and agree on knocking out, you know, X numbers of jurors.

MR. BERRIGAN: Mr. Miller called me last week, and he has at least identified people that have definite scruples that he'd like to talk about. So far as I know, that's the only category. I'm working with Miss Dahl, Lisa Dahl, in an effort to identify -- really I think we'd like to get the hardship people identified quickly.

THE COURT: I'd like to get as many as you can agree on for whatever reason -- as long as you agree they're gone, but the bottom line is come the 21st, we're going to start putting them in panels.

MR. BERRIGAN: All right, sir.

THE COURT: So we're going to have to know before the 21st who you agree on. I don't care what the reason is.

MR. BERRIGAN: I understand.

THE COURT: Yeah, I just want to eliminate as many

people as we can so that we're not spending our valuable time on people who are ultimately going to go out.

MR. BERRIGAN: Of course, Your Honor.

THE COURT: Right?

MR. BERRIGAN: Of course we are working on that and Miss Dahl's working on it with me.

THE COURT: And now you know. I don't think I ever gave you a deadline. Really probably be the 18th is the drop-dead deadline for that, and all I need to know is some e-mail confirmed by both sides that this is the list of jurors who we don't need to bring in for jury selection.

MR. BERRIGAN: I understand, Your Honor.

THE COURT: Anything else?

MR. BERRIGAN: I don't think so, sir.

THE COURT: Thank you. Bye now.

(The foregoing hearing was concluded at 3:09 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Shelly Semmler, RMR, CRR

6-1-05
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | |
| vs. | |
| ANGELA JANE JOHNSON, | Transcript of Phone Hearing |
| Defendant. | |
| / | TO BE FILED UNDER SEAL |

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 31, 2005, commencing at 3:45 p.m.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JUDITH WHETSTINE, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA 52401 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO 64108 |
| | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA 50309 |
| Court Reporter: | Shelly Semmler, RMR, CRR<br>320 Sixth Street<br>Sioux City, IA 51101<br>(712) 233-3846 |

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 10 of 282

THE COURT: Okay. This is United States versus Angela Johnson, Criminal Number 2001-3046. And who's handling this matter for the defense?

MR. STOWERS: I will be. Mr. Berrigan's here in case anything special arises.

THE COURT: And does "I will be" have a name?

MR. STOWERS: Oh, I'm sorry. Dean Stowers.

THE COURT: Thank you.

And, Miss Whetstine, are you handling it for the taint team?

MS. WHETSTINE: That's correct, Your Honor.

THE COURT: Okay. Now, I think this is a result of the notice of intent to use Honken proffer filed under seal on March 23. So the issue now is when and to whom is this proffer information made available to on the prosecution team. Would that be the issue, Mr. Stowers?

MR. STOWERS: I would guess so. I mean, we were told to file the notice. We filed the notice within the time period that the Court indicated, and the Court in a prior ruling had made some statements about subsequent issues that it would entertain once we filed that notice including how particularly that would be handled as far as the subsequent handling of this material.

THE COURT: Okay. Well, what's your view?

MR. STOWERS: I guess our view is that the reason for

4

it being -- what is the word? The reasons for it being protected by this taint team situation don't really affect us or impact on us or our client, and those are really issues of concerns of Mr. Honken and the government who have that

Page 2

agreement that the Court reviewed and evaluated prior to or in connection with its prior ruling when the material was produced to us. So I guess that's really a issue for the Court to evaluate in the context of Mr. Honken and the government's agreement.

THE COURT: So do you have any --

MR. STOWERS: We don't have a strong feeling one way or the other.

THE COURT: So you don't have any problem turning this over to the prosecution team which would be Mr. Williams and Mr. Miller.

MR. STOWERS: Yeah, we don't, no.

THE COURT: Okay. Miss Whetstine, what's your position?

MS. WHETSTINE: Your Honor, our position is that we would -- as the taint team I would recommend that the proffer material be turned over to the prosecution team after the jury has rendered its verdict on the guilt phase, that the same restrictions that the Court previously imposed in terms of how the Johnson prosecution team uses the information, for instance, attaching proffer materials to a motion which is not filed under

5

seal or making references to the proffer information in open court during the guilt phase of the trial, that those restrictions continue until after the jury has reached its verdict on the guilt phase and at which time I would then turn over the proffer -- Honken proffer materials to the prosecution team.

THE COURT: What's the problem with turning it over to the prosecution team now?

Page 3

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 12 of 282

MS. WHETSTINE: We're just still trying to work in an abundance of caution here. I understand that the post-trial motions in Honken are still pending. I'm not -- Mr. Williams told me that the Honken defense will have another 30 days in which to respond to the motions. And, therefore, the Court would obviously not be ruling on those post-trial motions prior to the Johnson trial starting. I had called the Honken attorneys, of course, expressed concern that the Court might have access to the information. Well, that's not an issue with us turning it over to the prosecution team.

THE COURT: So why can't you turn it over now?

MS. WHETSTINE: We could, but, on the other hand, what if -- you know, what if Miss Johnson were acquitted and we had turned materials over prior to the conclusion of the Johnson case, and what if --

THE COURT: So what?

MS. WHETSTINE: -- you were reversed? We would not

6

have needed to then turn the materials over. I'm sorry. What if the Honken conviction were reversed? You know, I'm using all these --

THE COURT: Well, you know, my knowledge of the Honken proffer has nothing to do with my ability to retry the case should it be reversed or should I set it aside. I mean, that's a nothing issue.

MS. WHETSTINE: And I --

THE COURT: I realize Mr. Parrish --

MS. WHETSTINE: My major concern would be, of course, with the prosecution team.

THE COURT: Well, you know, I think they ought to have

Page 4

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 13 of 282

it to prepare early.  If you don't, that's fine.  You don't have to turn it over unless and until she's convicted.

MS. WHETSTINE:  I have talked to Mr. Williams, and I said, When do you need this?  And he thought about it, and he said that he would be comfortable receiving it after the verdict is returned on the guilt phase.

THE COURT:  Okay.  Mr. Stowers, you don't have any -- even though you were willing to give it to them now, you don't have any objection to holding off, do you?

MR. STOWERS:  As long as the government's comfortable with that position, that's for them to, I guess, evaluate and decide upon, and if that's what their decision is, that's their decision.

7

THE COURT:  And you don't have a problem with it.

MR. STOWERS:  Well, I have a mild concern.

THE COURT:  What would that be?

MR. STOWERS:  Well, the prosecutors on this case who are actually trying the case in front of the jury I think ought to be aware of the evidence that we believe is exculpatory to our client or mitigating.

THE COURT:  Well, that's what I think because I think it would put them in quite a box.

MR. STOWERS:  But if they don't feel the same way as a group over there in Cedar Rapids, I guess that's for them to decide.

THE COURT:  Far be it from you to help them out; right?

MR. STOWERS:  Yeah, but it almost to me gets into almost a quasi or maybe actually an ethical issue as to whether

Page 5

or not they have the right to maintain deliberate ignorance of this material as they're doing and as they've done so far.

MS. WHETSTINE:  Well, if the Johnson -- and again, I don't know what the Johnson defense team strategy is.  I don't know what the defense is.

MR. STOWERS:  Okay.

MS. WHETSTINE:  If you believe --

THE COURT:  Neither do they.  I was just kidding.

MS. WHETSTINE:  If the defense team believes there are

8

some ethical issues that you've identified as a result of reviewing the Honken proffer materials which the prosecutors need to deal with at the guilt phase, then I need to know about it.

THE COURT:  And I wasn't tracking you, Dean Stowers, as to what those ethical issues might be.  But that's because I'm so in the dark on this.

MR. STOWERS:  Well, I think if you read the proffer it might be more apparent, but I know you haven't wanted to do that yet, and that's understandable.

THE COURT:  Right.  And would those problems be ameliorated or exacerbated by turning it over to Mr. Williams and Mr. Miller early?

MR. STOWERS:  I think -- I don't know anymore.  I guess I'll just stop talking because I think I'm talking myself into a circle, and maybe that's the best thing to do.  I think this is a government issue and they need to resolve it amongst themselves.

MS. WHETSTINE:  The defense team for Ms. Johnson has indicated they don't intend to use it until the penalty phase.

Page 6

I don't -- if they think there is a possibility that it is material in some way in the guilt phase, then I need to know about that.

THE COURT: Well, material to who?

MS. WHETSTINE: Well, to the government.

9

THE COURT: Well, that's not their job.

MS. WHETSTINE: I understand.

THE COURT: That's your job.

MS. WHETSTINE: If it's an ethical issue that they want to complain about, then --

THE COURT: Well, I didn't hear Mr. Stowers say he wanted to complain about it. Did you, Mr. Stowers?

MR. STOWERS: No. I have no hesitancy to complain when I want to.

THE COURT: That's what you're paid these big bucks to do, isn't it?

MR. STOWERS: Well, I'm a paid complainer.

THE COURT: There you go.

MR. STOWERS: No. I understand what the government's position is, and I'm comfortable with their position as is Mr. Berrigan I guess. We're comfortable with what they've decided to do, and if the Court --

THE COURT: Well, Miss Whetstine, are you comfortable with it?

MS. WHETSTINE: Yes, I am, Your Honor.

THE COURT: So just so that we're clear, you don't intend to turn it over to the Johnson prosecution team, that is, Mr. Williams and Mr. Miller, unless and until Miss Johnson is found guilty and then there's a penalty phase.

Page 7

MS. WHETSTINE: That's correct. And if for some

10

reason I learned of something unusual, unforeseen that was occurring during the guilt phase that led me to believe I should turn it over, then I would file a motion under seal so the Court could consider that.

THE COURT: That sounds very reasonable. And I'm assuming you've looked at this material.

MS. WHETSTINE: I have reviewed it, yes.

THE COURT: Okay. So you're in at least somewhat of a position to know whether there's an ethical problem or not.

MS. WHETSTINE: Correct.

THE COURT: Okay. Well, I'm comfortable with the position that everybody stated.

MR. STOWERS: Okay.

THE COURT: Anything else we need to know?

MR. STOWERS: Many things that we don't know that we need to know, but since we don't know them, we wouldn't know.

THE COURT: That's probably true.

Miss Whetstine, do you have any understanding of what the higher-ups at the Justice Department are doing and when they're going to do it? Do you have any idea when they'll make a decision?

MS. WHETSTINE: I don't know since I'm not the one who communicates with them. However, I did ask Mr. Murphy the other day what he knew in terms of timing, and he said he had heard nothing and his prior experience had been that it had taken

11

three to four weeks for them to review the last go-around

involving Mr. Honken. So I don't have anything of help, and perhaps Mr. Williams could be more helpful because he would be coordinating with Mr. Murphy.

THE COURT: He didn't seem to know anything either when I asked him a few minutes ago in our hearing with the defense lawyers present. So it just seems like it's in the DOJ vortex in DC and may come out some time.

MS. WHETSTINE: Correct. One thing I might mention, just raise as an issue -- and maybe it isn't an issue at this point -- when we had the first motion by the Johnson defense team in order to have the proffer materials produced, there was a discussion about whether or not when the proffer material was presented by the Johnson team at the penalty phase or whatever phase that perhaps the courtroom would be closed because of concerns Mr. Honken had.

And I just wanted to mention to the Court as well as the Johnson team that if that issue does arise during the trial, more than likely it will be our position that it cannot be closed, particularly because that also implicates, I would assume, final argument since I would assume that if material is presented during the penalty phase the attorneys will want to argue it to the jury as well.

So I don't know whether or not that remains an issue the Court will need to address, but I just wanted to alert

12

counsel and the Court that that was still out there.

THE COURT: I appreciate you raising that. Anything else?

MS. WHETSTINE: I have nothing.

MR. STOWERS: The only thing I think, now that we've

given notice that we want to use the proffer itself, previously our request was to have the government produce the proffer materials as well as the polygraph. But we didn't seek the agreement, the proffer agreement itself, to be produced, and the government did not produce it even though it was provided to the Court by I think the government under seal.

And I guess as part of the presentation of that evidence at the so-called penalty phase of the trial, we'd want to as part of laying the context for the proffer introduce probably into evidence the proffer agreement as perhaps an exhibit. And, therefore, we would like to request that that be produced by the government to us in anticipation of that.

THE COURT: Miss Whetstine, what's your position?

MS. WHETSTINE: I don't have any objections to doing that. Perhaps the prosecution may raise some objection, but they can do that during the penalty phase if they want -- you know, if they object to it being introduced for some reason which I'm not aware of.

THE COURT: Right. The only thing we're deciding now is whether it should be turned over to the Johnson defense team,

13

and you have no objection to it being turned over.

MS. WHETSTINE: That's correct.

THE COURT: Okay. Then I'll order that it be turned over.

MR. STOWERS: Thank you.

THE COURT: And anything else, Mr. Stowers, that you can think of?

MR. STOWERS: No, not right now. Thank you.

THE COURT: Okay. Miss Whetstine, anything else?

MS. WHETSTINE:  No, Your Honor.

THE COURT:  Okay.  Thank you.

MS. WHETSTINE:  Thank you.

(The foregoing hearing was concluded at 4:03 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                    3-5-06
        Shelly Semmler, RMR, CRR                Date

Page 11

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 20 of 282

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,                 Transcript of
                                 Phone Hearing
       Defendant.
                   /

The Phone Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 31, 2005, commencing at 2:43 p.m.

APPEARANCES:

For the Plaintiff:       C. J. WILLIAMS, ESQ.
                     Assistant United States Attorney
                     Suite 400 - Hach Building
                     401 First Street Southeast
                     Cedar Rapids, IA  52401

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                     Watson & Dameron
                     2500 Holmes
                     Kansas City, MO  64108

                     ALFRED E. WILLETT, ESQ.
                     Terpstra, Epping & Willett
                     Higley Building - Suite 500
                     118 Third Avenue Southeast
                     Cedar Rapids, IA  52401

Court Reporter:        Shelly Semmler, RMR, CRR
                     320 Sixth Street
                     Sioux City, IA  51101
                     (712) 233-3846

♀

2

THE COURT:  This is United States of America versus Angela Johnson, Criminal Number 2001-3046.  Why don't we take up the government's motion for extension of time to file motion to

Page 1

compel disclosure of psychotherapist privileged documents first. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. We are merely seeking permission at this point to obtain these records having fully understood at this point the defendant's going to present some type of psychological defense and now becoming aware after we reviewed the file that she had undergone some type of psychological evaluation in the past.

THE COURT: How do you know that, just out of curiosity?

MR. WILLIAMS: Because of the suicide attempt that took place in the Wood -- in the Black Hawk County Jail. We know that she was seen by a psychiatrist after that because of jail records.

THE COURT: Okay.

MR. WILLIAMS: And so there has to be some records that exist out there based on that, and I don't know if she's had other stuff in the past or not because obviously I don't know what her psychological background is. But --

THE COURT: So what are you seeking? Just those records?

MR. WILLIAMS: Any records that exist. If, for

3

example -- part of my problem is obviously I don't know what's going on. If, in fact, this woman has had a life-long period of psychological problems and that is part of what the defense is attempting to present with their psychological experts, then there may be a whole host of time she's seen by psychiatrists going back to her childhood up through the suicide attempt. Or there may be nothing more than her seeing the psychiatrist after

Page 2

the suicide attempt. So my motion seeks any psychological records that the defense has in their possession concerning treatment by her at any time.

THE COURT: Okay. Is the motion timely?

MR. WILLIAMS: No, it is not.

THE COURT: And what's your reason for it not being timely?

MR. WILLIAMS: The time that we got disclosure -- and the defense is right on this. They did give us the notice on November 12 that they were going to be seeking -- that they were going to be presenting psychological damage theory during the penalty phase. After that it took me basically some time to wrap my mind around it, recognize that she -- go back through the record, recognize she had had some type of psychological evaluation previously and then recognize the need that I or, in fact, frankly my experts are going to want to have those records available for them to review.

THE COURT: So basically you didn't think of it in

                                                        4

time.

MR. WILLIAMS: Yeah.

THE COURT: Okay. But you were pretty preoccupied with other matters.

MR. WILLIAMS: Yeah, we had a few other things going on.

THE COURT: Now, if I were to grant you relief, when do you think you'd be entitled to this information?

MR. WILLIAMS: Well, I think there's a difference between this and Rule 12 because what we're not seeking by any means is anything they have done in preparation for litigation.

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 23 of 282

This is just past psychological records. So Rule 12 doesn't necessarily apply to that. In fact, it doesn't apply to that. But the theory behind Rule 12 at least in part might apply to the extent the defense is only presenting this defense at the time of the penalty phase. Logic would probably hold that I wouldn't be entitled to this until the time.

THE COURT: Would the taint team be entitled to it --

MR. WILLIAMS: Exactly. That's where we go next. It seems to me, though, if we've got a taint team out there and you've authorized them to have her evaluated and try to consider, you know, from the government's standpoint, I think an order -- appropriate order would be ordering them to provide any of these records to the taint team.

THE COURT: Okay. Who's going to be arguing this for

5

the defense? I'm sorry. Was there anything else you wanted to add, Mr. Williams?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Who's going to be arguing this for the defense?

MR. BERRIGAN: It's Pat Berrigan, Your Honor.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: The specific incident that Mr. Williams is referring to, Miss Johnson's suicide attempt in the Black Hawk County Jail, the follow-up medical treatment I think if we're talking about the same thing involves a psychiatrist who the defense hired for purposes of litigation. I understand that he's not seeking information along those lines.

THE COURT: I didn't understand what you meant. Who's not seeking information along what lines?

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 24 of 282

MR. BERRIGAN: Well, Mr. Williams made it clear in his motion and I think he has at least in my mind here today that he's not seeking any records from any of the experts that have been retained by the defense in preparation for the litigation in this case. And if that's true, all I'm saying is that the person who saw Miss Johnson after the suicide attempt at the Black Hawk County Jail is one of those people.

THE COURT: Yeah, I doubt if Mr. Williams knew that.

MR. BERRIGAN: Right, and I'm just telling you that. There's no sense hiding the ball on that. And then --

6

THE COURT: But --

MR. BERRIGAN: My position I suppose is if the Court's ruling in this case were consistent with its position regarding other issues we've litigated concerning raw data, then I suppose that the logical solution is to give this information to the taint team as well, although I want to be consistent. I don't believe that they should get that until Rule 12 would kick in, that is, after Miss Johnson's been convicted and provided notice that she intends to go forward with mental health evidence. And I say that understanding the Court's ruling regarding the raw data information and that that might well apply to this situation as well.

THE COURT: Okay. Mr. Williams, were you aware that the psychiatrist that Miss Johnson saw was one retained by the defense following the suicide, and what difference, if any, do you think that makes?

MR. WILLIAMS: Well, I think it probably does make a difference. All I know is that the records show that she started receiving psychotropic medication on -- by order of her

Page 5

psychiatrist after the suicide, and from that I derived the conclusion that she saw some psychiatrist for whatever problems she was having at that time. I wasn't aware that the only -- apparently the only reason she saw one is because the defense hired one in anticipation of litigation. It looked to me as if it was a cause and effect after the suicide. So I wasn't aware

7

of that.

If what they're representing is that is the only person who saw her after the suicide, then I suppose in theory that would probably come under Rule 12 then at that point, and then it would kick back to your analysis under Rule 12 and the prior rulings.

THE COURT: Well, I don't think it comes under Rule 12 at all. Just because the defense retained that expert?

MR. WILLIAMS: Well, if they're saying they retained that expert in anticipation of litigation and the only way they're going to present it is at the penalty phase, then I think it probably does.

But I just -- and I have to go on Mr. Berrigan's representation on this. I just don't know -- if she's receiving medication back in 2000 after she attempted to commit suicide, that would suggest to me that that's not -- those records and that analysis was not done in anticipation of presenting some type of psychological defense at the time of the trial but to treat her for her psychological problems that she's apparently suffering at that time.

THE COURT: Well, is this -- let me ask Mr. Berrigan. Is the psychiatrist who saw her following the suicide one of the experts that you've given notice of under Rule 12.2?

Page 6

MR. BERRIGAN: Well, I can tell you this, Your Honor. Certainly a psychiatrist that we hired that we did give notice regarding Rule 12.2 is one of the people that saw her after the suicide. He's a psychiatrist. Now, if she saw some other psychiatrist after the suicide, I don't have any personal knowledge of that. It's not impossible. Maybe the jail sent a psychologist or a psychiatrist up there unbeknownst to me. I wouldn't necessarily have that information. But we certainly did hire a psychiatrist, and it wasn't to treat Miss Johnson for suicide. I don't have the ability to spend the government's money to provide her medical treatment. That expert was retained specifically --

THE COURT: But I'm a little confused. Is that an expert that you've given notice of under 12.2 to the government?

MR. BERRIGAN: Yes, sir, yeah. We gave notice -- we gave notice of him back in 2002, in November 2002. We reaffirmed that notice recently.

THE COURT: Well, Mr. Williams, how does this, if at all, information modify your motion?

MR. WILLIAMS: Well, I don't know that it does to the extent that because there's a taint team in place it strikes me that we should still be -- to the extent the defense is in possession of any records pertaining to her psychological treatment, not evaluation for purposes of litigation but treatment, I think we're entitled to those, and I think those can be safely turned over to the taint team now and not have to wait until after the guilt phase of the trial. To the extent

Page 7

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 27 of 282

that they're in possession of only records pertaining to an evaluation, then that's subject to the Court's order already entered.

THE COURT: Well, Mr. Berrigan represented that it wasn't for purposes of treatment.

MR. BERRIGAN: Mr. Williams is talking about other records, Your Honor, I think. I think we're settled that this visit, if you will, by the psychiatrist after the suicide attempt, that's something that was done in furtherance of the litigation. But he's talking about are there other records that exist other than those and, if so, he still wants them. Is that correct?

MR. WILLIAMS: That's exactly right. If I understand it, you're saying that the only thing you have at this point with regard to the suicide is in anticipation of litigation. Now my question is if there's any other records.

MR. BERRIGAN: Right. I understand the request, Your Honor. I suppose our position on that is that unless it would have some relevance to the mental health testimony that might be offered in the second phase, then they shouldn't be disclosed. In other words, if -- let's just say --

THE COURT: Well, you don't even say there are any records.

MR. BERRIGAN: No, I know I'm not. But I think there should be at least sort of an initial determination that if

10

records exist that they bear some relevance to the litigation that's going on, that this isn't just some -- you know, any psychiatric records or psychological or psychotherapist records

Page 8

your client ever procured are now within the domain of the government for use during the penalty phase if they have no relevance to the issues that are going to arise regarding mental health testimony in the penalty phase of the trial.

THE COURT: Well, but how do I know at this point whether they have any relevance? We don't even know what your psychological arguments are.

MR. BERRIGAN: I understand that.

THE COURT: Well, I'm going to order it all produced to the taint team.

MR. BERRIGAN: Okay.

THE COURT: Any uncertainty about my ruling?

MR. BERRIGAN: No, sir.

THE COURT: Mr. Williams, is that a problem?

MR. WILLIAMS: Not at all, Your Honor.

THE COURT: And that includes the psychiatrist that the government retained -- or that the defense retained. Why shouldn't that be turned over to the taint team?

MR. BERRIGAN: Well, because those are under the purview of Rule 12.2, Your Honor.

THE COURT: Well, that occurred before you even gave notice.

11

MR. BERRIGAN: Well, that doesn't mean we weren't contemplating it. We don't have to give notice and then hire somebody. We hire psychologists and psychiatrists in every capital case for the express purpose of investigating whether or not there might be mental health issues that might be presented in the first or second phase of the trial. I wouldn't give notice until I knew that we had something to talk about. We do,

Page 9

so we gave notice, but that expert was hired obviously well before the notice was given in anticipation of that --

THE COURT: So under my existing order, how does my existing order cover the expert that you retained at or near the time of the alleged suicide?

MR. BERRIGAN: Well, he's an expert that's testifying in the penalty phase of the trial regarding mental health issues that we intend to present as mitigation evidence. That's what triggered the Rule 12.2 psychiatric request. So he is an expert hired in anticipation of litigation.

THE COURT: So what?

MR. BERRIGAN: Well, Rule 12.2 says we don't have to give them those reports until after the client's been convicted and there's an intent to go forward with this type of evidence. Very specific about that, taint team or no taint team.

THE COURT: Well, that's not what you say in your resistance.

MR. BERRIGAN: Which resistance are you speaking of,

12

Your Honor?

THE COURT: The one you filed on this issue.

MR. BERRIGAN: Well, you broadened the issue substantially from what the government requested. They specifically --

THE COURT: That's not true, Mr. Berrigan.

MR. BERRIGAN: Yes, sir.

THE COURT: That's not true.

MR. BERRIGAN: Well, with all due respect, I believe it is.

THE COURT: Well, it's not. You didn't claim

Page 10

that . . .

MR. BERRIGAN: Your Honor, this suicide thing didn't come up until oral argument right now. That's not in the government's motion. I wasn't asked to address it.

MR. WILLIAMS: It's actually on page 2 of my motion. I talk about the suicide attempt as the grounds for how we knew that she had received some type of psychological treatment.

MR. BERRIGAN: I stand corrected.

THE COURT: Absolutely. It's under the first sentence under Roman numeral 2, background on page 2. Well, your position in paragraph 1 of your motion is you never have to give the material to the government.

MR. BERRIGAN: Yes, that's true. That is our position.

13

THE COURT: Well, what's the basis for that position?

MR. BERRIGAN: Well, because we don't think there's any case law that establishes that. The government hasn't cited any.

THE COURT: Well, if this is an expert that's testifying which the government did not know when they filed the motion, why wouldn't it be covered by my previous ruling and 12.2 that you have to turn it over to the taint team if she's found guilty and you interject the psychological defense in litigation?

MR. BERRIGAN: I'm not arguing with that, Your Honor, but that's --

THE COURT: But you don't say that in your resistance. You say they're not entitled to anything, and that's not true. Your resistance is misleading. You knew you had a psychiatrist

Page 11

who you had retained who did the evaluation at your request after the suicide and that that would have to be turned over under 12.2, but your motion basically says you don't have to turn anything over.

MR. BERRIGAN: Well, if you give me a minute, Your Honor, let me cite to the specific portion of the brief by the government where they say the only records they're seeking are those not produced or derived from the course of litigation. And this is on page 1 of their motion, the first paragraph, the last sentence. To be clear, the government is seeking only

14

records of past mental health treatment not discovery of reports or evaluations conducted by defense experts in anticipation of litigation. Since they weren't seeking those records, I didn't address that issue. I think that is covered by your previous ruling.

THE COURT: Okay. You agree that you have to turn over the records of the psychiatrist that you've hired after the suicide as part of the 12.2 prior rulings.

MR. BERRIGAN: Of course we do.

THE COURT: Okay. Now I -- I wasn't real clear. Now I understand that. So you're right. The government did say that they weren't seeking that in this motion. So what they are seeking is anything else.

MR. BERRIGAN: Yes, sir. I understand that, and you've ordered that to be produced to the taint team, and we'll do that forthwith.

THE COURT: Okay. So that resolves this motion.

Now, we have your motion which is denominated a motion for subpoenas directed to U.S. Probation Office?

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 32 of 282

MR. WILLETT: Judge, if it please the Court, I've been asked to argue that this afternoon.

THE COURT: Okay. Mr. Willett?

MR. WILLETT: Your Honor, there's three basic facts I'd like to set out for the Court before we get started here.

THE COURT: Well, before we get started, I don't think

it was timely filed, so why don't you address that.

MR. WILLETT: Yes, Your Honor. I can tell you that on -- I believe it was February 18 of this year I initially filed what was styled an ex parte application which Judge Zoss denied without prejudice on February 22.

THE COURT: Yeah, but that's beyond the time for filing pretrial motions.

MR. WILLETT: Well, Your Honor, since I styled it in that -- yes, Your Honor, I would agree.

THE COURT: Right.

MR. WILLETT: I guess to get to the end point, Your Honor, the application for a subpoena, I'm not sure it was untimely filed. But when we restyled it as a motion for subpoenas --

THE COURT: It's now untimely.

MR. WILLETT: Yes, I would agree.

THE COURT: Right. And you put your eggs in the basket that you could serve an ex parte notice and get the documents that way following the deadline for pretrial motions, and Judge Zoss ruled against you. Now you're coming back with a motion that's untimely.

MR. WILLETT: Yes, Your Honor. Judge Zoss denied it without prejudice asking that we consider the seven factors

outlined in his order.  And since it was denied without prejudice, it was decided that we would refile it.

16

THE COURT:  Yeah, but you could have filed it before the deadline in this case.

MR. WILLETT:  Absolutely, Your Honor.  I will not disagree.

THE COURT:  So it's untimely.

MR. WILLETT:  Yes, Your Honor, it is untimely.

THE COURT:  What's your good cause?

MR. WILLETT:  The good cause is that the idea came to me when the idea came to me, Your Honor, and I can also tell you for good cause I believe what's important, Your Honor, is we do have one old PSIR that was given to us through discovery, and that was utilized in the Massiah hearing.  We have the PSIR of Robert McNeese when he was sentenced in the Middle District of Florida from 1996, and that was given to us in discovery, bate stamps K000750 through K000776.  And at the Massiah hearing, I cross-examined Mr. McNeese on that portion of his PSIR which dealt with his mental health history starting at page 484, line 25, through page 486, line 15.

THE COURT:  What does any of that have to do with anything relevant to this motion?

MR. WILLETT:  Well, I think what it has to do, Your Honor, is what we're trying to do here is we're trying to make the playing field level.  I would agree with Mr. Williams on two points if the Court wants to grant us relief.

First of all, we don't need PSIRs for 17 individuals.

17

Page 14

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 34 of 282

The PSIRs we are requesting would be for 11 individuals that remained that have PSIRs in the Northern District of Iowa.

The second thing I would agree which we suggest as an alternative but I would agree with Mr. Williams, that if the Court wishes to grant us relief, probably the easiest method to do this is for the Court to review those portions of the PSIRs --

THE COURT: I'm not going to do that. Your motion's untimely. I'm not going to start reviewing documents based -- for an untimely motion. I'm not going to do it. You could have filed this a year ago or earlier. And the only good cause you have is you didn't think about it. That's not good cause.

Now, why don't you finish your argument. But I'm not going to review these in camera. I guarantee you that's not happening.

MR. WILLETT: The other alternative, Your Honor --

THE COURT: I've done a lot of work on this case that the lawyers should have done, and I'm sick and tired of it. And I'm talking about the defense, not the government. I've had to find law and do your work for you, and I'm not doing it anymore.

MR. WILLETT: Does the Court wish me to finish the argument?

THE COURT: Sure.

MR. WILLETT: Thank you. Your Honor, the argument is is that the reason we're trying to obtain these PSIRs is

18

obviously the U.S. Attorney's Office had this information in the prosecution of those 11 individuals. We're just trying to level the playing field in terms of the information that's available. The types of information in the PSIRs that we believe would be

Page 15

relevant to the defense of our client would be categories such as, for example, Mr. Cutkomp, his offense conduct portion might very well be relevant to our defense. For the other ten individuals, the more general categories of their total offense level, their criminal history category which would show their guideline range, their criminal convictions, and the description of those offenses, whether these people have mental or emotional health history, whether they have substance abuse history, and the sentences that they received, the length -- if they were sentenced to incarceration, the length of their incarceration. We believe those are the types of factors that would reflect on the credibility or the bias of those types of witnesses.

THE COURT: Have you gone to the defense lawyers in the case and asked for a copy of the PSIR?

MR. WILLETT: No, Your Honor, I've not.

THE COURT: Why didn't you do that before you filed a motion?

MR. WILLETT: I will take responsibility for not thinking of that, Your Honor.

THE COURT: Well, that's not a very novel thought. I mean, all the defense lawyers have the PSIRs. You could get on

19

computerized docket sheets, figure out who the defense lawyers are, and ask them to turn them over to you. But you'd rather have me read them in camera I guess.

MR. WILLETT: Judge, the Court's made clear that the Court's not going to do that, so I'm not going to ask the Court to reconsider something it's already said it won't do.

THE COURT: Now, to the extent that any of these PSIRs contain Brady or Giglio material, the government has an

Page 16

obligation to go through the PSIRs and turn that over to you independent of your motion, don't they?

MR. WILLETT: Well, I would agree with that, Judge. I don't know what Mr. Williams' position is.

THE COURT: Well, why don't we find out from Mr. Williams.

MR. WILLIAMS: I agree, Your Honor.

THE COURT: Now, Mr. Williams, didn't you have some kind of an agreement in the Honken case -- and I realize that wouldn't be binding in this case. Didn't you voluntarily give the PSIRs of a number of individuals, or am I mistaken about that?

MR. WILLIAMS: No, no. I think what you're thinking of, Your Honor, is they wanted the BOP -- I can't think the name of the record, like their main file at the BOP.

THE COURT: Right.

MR. WILLIAMS: For a number of inmates, and we agreed

20

to turn those over, voluntarily get those from the BOP and turn those over. Honken's counsel never sought, never requested anything from the PSIRs.

THE COURT: Okay. Now, don't these -- setting aside for a moment that the motion is in my view totally untimely and there's no good cause -- let's set that aside for a minute -- don't some of these witnesses fall in different categories? For example, Cutkomp, they probably have a greater argument for Cutkomp's PSIR than for some of the others.

MR. WILLIAMS: As a codefendant, yes, Your Honor.

THE COURT: Right. Are you in a position to voluntarily turn over Cutkomp's PSIR?

Page 17

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 37 of 282

MR. WILLIAMS: If the Court orders me to, I'd be glad to. The difficulty is the way I read the law is that's a court document that I don't have the liberty to turn over without a court order because, as I understand, the PSIR is a document produced by the Court for the Court, and we're given the luxury of having a copy of it, but it's a court document that I don't have the liberty to turn over. I'd be more than glad to turn it over to the defense if the Court authorizes me to do that.

THE COURT: Now, are there other witnesses who fall somewhere between a court reporter who was a foundation witness and -- that are closer to Cutkomp than the court reporter in terms of the list of -- I guess with 17 now is 11. Somehow I'm supposed to I guess somehow know what those 11 are, but I don't.

21

MR. WILLETT: Your Honor, may I answer that question for you?

THE COURT: Yes. Yeah. How am I supposed to know which 11 you want now?

MR. WILLETT: I'll be glad -- I'll be glad to tell you, Judge.

THE COURT: But I was supposed to just divine it?

MR. WILLETT: No, Your Honor. Between our motion and Mr. Williams' resistance, I was able to discern the 11 that were still at issue, and I'll be glad to tell you --

THE COURT: Did you think about filing -- did you think about filing a supplemental piece of paper that would then alert me to which 11 you were talking about?

MR. WILLETT: No, Your Honor, and I'll take responsibility for that mistake.

THE COURT: Well, why are there so many mistakes?

Page 18

Isn't it common sense that if we're talking about 11 it would be helpful if the judge knew which 11 we were talking about?

MR. WILLETT: Absolutely, Judge. I'm not arguing with you. But I am prepared at this moment to tell you which 11 I think are still at issue.

THE COURT: Okay. Why don't you tell me which 11 are.

MR. WILLETT: Anthony Altimus, Peggy Baca, Holly Christensen, Sara Bramow, Tim Cutkomp, Angela Euans -- and that has a unique spelling; it's E-u-a-n-s -- Shelly Jenney, Anthony

22

Johnson, Jill Mannion, Robert McNeese. And we'd still request Mr. McNeese, Your Honor, because the PSIR we have is from the Middle District of Florida from 1996.

THE COURT: And you want his from the Northern District of Iowa.

MR. WILLETT: Yes, Your Honor. And then finally, Judge, Duane White.

THE COURT: Okay.

MR. WILLETT: Now, if I may expand on one other question the Court raised, the parameters of this, we have everything from Cutkomp from one end and to lesser individuals at the other. Several of these female inmates are individuals that the government's theory will be that my client made incriminating admissions to them. Now, they may not be codefendants, but I think that type of testimony is obviously very damaging, and we want to be able to contest it by every piece of information that we have.

There are certain individuals such as I think Duane White would be an example that we might see in reference to the drug conspiracy aspects of this case, maybe an unindicted

Page 19

co-conspirator, if you will. We have people such as Anthony Johnson who was incarcerated in the Woodbury County Jail with Mr. Honken, and there might be references to what my client's conduct may or may not have been while Mr. Honken was incarcerated in that jail. So that's sort of the horizon if you

23

will, Judge.

THE COURT: Okay. Now, let me ask Mr. Williams, who would fall in Cutkomp's shoes or similarly situated as kind of perhaps in a broad view an unindicted co-conspirator?

MR. WILLIAMS: The only person in the government's view that would potentially fall in that area would be Duane White, possibly arguably Anthony Johnson and Anthony Altimus, although our position is and the evidence I think will show Anthony Johnson did not know that when he was providing a meth recipe to Honken for a thousand dollars the thousand dollars was going to be used to bond out Anthony Altimus to go kill people. So I can't say that he's really a co-conspirator of anybody.

THE COURT: What about Altimus?

MR. WILLIAMS: Altimus is except our record review is that Altimus has never been a federal inmate. He's one of the people we point out in our response when we went to the BOP and went to the public records, we can't find that he's ever been a federal inmate, so to our knowledge there isn't any PSIR on him.

MR. WILLETT: Judge, I apologize. I'm looking at page 4 of Mr. Williams' response, and he does lay that out. I think the reason I had him listed is that the government said that they may use Mr. Altimus as a penalty phase witness, but later on in page 4 he does note that Mr. Altimus was not a federal witness.

Page 20

THE COURT: So you're withdrawing your request for a

24

PSIR from him because there is none.

MR. WILLETT: Yeah, because there is none, so the issue's moot, so we're down to ten individuals.

THE COURT: So, Mr. Williams, you would say Cutkomp, Anthony Johnson, and maybe Duane White?

MR. WILLIAMS: That's correct, Your Honor.

MR. WILLETT: And then, Your Honor, I think the other category of witnesses or of individuals we're left with are people that Angela Johnson allegedly made admissions to, and all of those are women except Mr. McNeese, and you're already familiar with Mr. McNeese.

MR. WILLIAMS: Your Honor, on behalf of the United States, C.J. Williams speaking. If the Court authorizes me to do this, I would be glad -- and this may be the easiest solution to this thing -- is to get the PSIRs for all these people they're looking for and put them in the discovery file and give the defendant access to them. That wouldn't require any review by the Court. It would be perhaps the easiest and safest way to do it. We've always taken the position, though, that those are not our property and not something we have the right to hand over without court authorization.

THE COURT: Well, it rewards the defense for filing a late motion that by their own admission they have no good cause for filing late.

MR. WILLIAMS: That's true, Your Honor.

25

Page 21

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 41 of 282

THE COURT: Mr. Willett, do you have any other argument for good cause? I mean, it just seems like these deadlines mean nothing.

MR. WILLETT: Your Honor, I'm not going to sit here and try to come up with something just to facilitate this request. I came up with the idea when I came up with the idea. It's certainly been pointed out to me that it was late. It's certainly been pointed out to me that it was untimely. The only good cause I want the Court to consider is that we're just trying to operate on a level playing field.

THE COURT: Well, that's not good cause. That's a theory of yours, but it's not good cause.

MR. WILLETT: Your Honor, I'm not going to sit here and talk about the press of other cases or the press of other business preventing me from having this thought. I'm not going to go that route. I don't think it's appropriate. When the thought came to me, I acted upon it. I acted upon it in February. Judge Zoss dismissed it without prejudice and said we could refile it considering the factors that he outlined in his order, and we did that. And you can certainly say that when I thought of it in February it was untimely. I understand where the Court's coming from.

THE COURT: Yeah. If I haven't said that, I will. When you thought of it in February, it was untimely.

Well, I think I'm going to order the government to

26

turn over Cutkomp, Johnson, and White. And then with regard to the others, you have no obligation to do anything except if it's Giglio or Brady, you have an obligation independent of the defendant's motion.

Page 22

MR. WILLIAMS: Certainly.

THE COURT: And I fully expect that you would comply with that, but I'm not going to order that you turn over any of the PSIRs. You can turn over any information that would be Brady or Giglio, and if you want on your own to turn over all of them to the defense, you can do it, and I'll order that but only to the extent that you make a decision that you want to voluntarily do it. I'll let you off the hook, you know, by ordering it, but I'm not ordering you to do it. I'm only saying that if you voluntarily decide to do it, then I've ordered you to do it.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: So it's up to you. You know, given their rather hardball litigation position about not stipulating to anything, I wouldn't give it to them if I were you, but that's your decision to make. But I just think it's untimely, and I've given you more relief than you're entitled to either under the law -- even if it was timely, I've given you more relief, Mr. Willett, than the case law you cited in my view entitles you to.

MR. WILLETT: I understand where you're coming from,

27

Judge.

THE COURT: And just so that we're clear, I -- and I don't know if the Johnson lawyers know this, but in the Honken trial I gave the Honken defense lawyers very wide latitude in the cross-examination of the -- what I call "Honken confessed to me" witnesses. And I let them cross-examine far beyond what the rules of evidence would have required. And I always try and learn from my mistakes. I think it was a mistake for me to do

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 43 of 282

it, and I'm not going to do it in this case. You'll be entitled to all the cross-examination the Federal Rules of Evidence and the case law allows. But I'm not going to go beyond that because in reflection I don't think it was fair to the government for me to do that.

So I just wanted -- I don't know if you knew the scope of cross-examination I allowed, for example, on the cross-examination of Tokars from Atlanta and several of the other witnesses, but I allowed the defense to go way beyond what the rules of evidence allow, and I'm not going to do that in this case. So I just wanted to put you on notice of that.

MR. WILLETT: I hear you, Judge.

THE COURT: But you'll be allowed, you know, full cross-examination.

Anything else we need to talk about?

MR. WILLETT: Not in regards to this motion, Your Honor. I thought there were -- Mr. Berrigan can correct me if

28

I'm wrong. I thought maybe there was some other defense issues, or maybe we've resolved everything.

THE COURT: Well, let's find out. I'm not sure I'm aware of anything, but I'm usually the last to know.

So Mr. Berrigan, is there anything else?

MR. BERRIGAN: Not that I'm aware of. I understand we have the 3:45 hearing on a separate matter.

THE COURT: Yeah, that's on a separate matter, and that's with the taint team.

MR. BERRIGAN: Right. I think maybe that's what Mr. Willett's referring to.

THE COURT: Let me ask, while I've got everybody on

Page 24

the line, is this case going to trial a week from Monday or not?

MR. WILLIAMS: Your Honor, on behalf of the United States, all I can tell you at this point is we don't know. We're waiting for word from Washington is the most I can tell you at this point, and they aren't letting me know anything at this point.

THE COURT: Mr. Berrigan, do you know anything?

MR. BERRIGAN: I'm forced to rely on Mr. Williams, Your Honor, not that he's an inadequate conduit, but I've heard not only from him but other assistant United States attorneys that the Department of Justice is just not very forthcoming with information till they've made a final decision, and there's been a very firm offer on the table for more than a week. We're all,

29

of course, eager to get a response. But I have no more insight than what Mr. Williams gives me.

THE COURT: I don't want to intrude into this too far, so if you think I am, Mr. Berrigan, tell me it's none of my business, but was that offer from you to the government or the other way around?

MR. BERRIGAN: I don't think there's any secret here, Your Honor. You'll recall that we had a conference call -- my recollection, it was an informal one -- between yourself, Mr. Miller and I.

THE COURT: Yes.

MR. BERRIGAN: Regarding some -- I think they were jury strike issues, and there was an informal discussion about our negotiations, and I think I made it quite clear what the offer would be, and we formalized that in writing. We've supplemented that when the government's requested us to do so.

Page 25

I think the defense in fairness has done everything we can --

THE COURT: I'm sure you've done --

MR. BERRIGAN: -- to avoid a trial in this matter, and now I'm afraid it rests with the Department of Justice.

MR. WILLIAMS: It's gone out with our recommendation, and all we can do at this point is wait for the yea or nay from Washington I'm afraid, Your Honor.

THE COURT: And, Mr. Berrigan, do you have any idea when you'll hear?

30

MR. BERRIGAN: No, sir. We won't hear. Mr. Williams will hear, and he'll --

THE COURT: Oh, and then Mr. Williams will be the one to know, and then he'll let the rest of us know?

MR. BERRIGAN: Department of Justice does not feel it warranted to communicate with the defense team directly, so I understand they'll talk to Mr. Williams and he'll call us.

MR. WILLIAMS: The minute I hear anything I will obviously let everybody know.

THE COURT: Okay. Mr. Berrigan, you're far and away the most experienced of any of us in these matters. Do you have any idea based on your prior experience and discussion with other federal death penalty counsel how close the government cuts these decisions? You know what I mean?

MR. BERRIGAN: I can tell you, Your Honor, that the last time we attempted this it took more than two weeks, and I am very hopeful that won't be the case because if it is we won't know anything until at least next Monday. And I know Mr. Williams has been checking diligently. I'm certainly happy, if he's amenable, to fly down to Washington and twist any arms

Page 26

necessary. I wish I could tell you. It's ridiculous that we, I think, are all gearing up and spending a lot of time preparing for trial and there's a possibility that maybe it won't happen. But, of course, we just don't know. And I've talked to a lot of people about our prospects. And because we have a new attorney

31

general, I don't think anybody really can answer the -- that question with any intelligence.

THE COURT: What's your percentage?

MR. BERRIGAN: I think it's a coin toss, sir.

THE COURT: It's a 50/50?

MR. BERRIGAN: Yes, sir, yeah.

THE COURT: Okay. Well, that's about as informed a judgment we'll have I think until we find out the answer.

MR. BERRIGAN: I sure wish it was higher, but we don't have any experience upon which to base our prediction.

THE COURT: Yeah, and I think the new attorney general throws a lot of uncertainty into the mix.

MR. BERRIGAN: Right.

MR. WILLIAMS: Well, I think this is the first one that I'm aware of that he's dealt with since he's taken office, so we don't have a track record even with another one.

THE COURT: But the defense probably has a better shot with this attorney general than with the former.

MR. BERRIGAN: Well, I am aware of one case that went to trial in St. Louis, Your Honor, earlier in the month. It was kind of an unusual post settlement. The defendant would waive a jury for death waiver. The local U.S. attorney was on board for that, but the Department of Justice -- I guess the committee recommended it, but the attorney general declined to

Page 27

accept that offer, and that case did go to trial.  That's the

32

only one I know of that he's actually made a decision in so far, and that's kind of an aberration, frankly.

THE COURT:  Yeah, sounds like fairly unusual.

Now, let me ask this question.  I'm going to be out of town this weekend, and I'm going to be out of town next Tuesday through late Friday evening.  And so are you anticipating any last-minute motions or necessity to have me rule on anything, because I don't like last-minute issues?  And if you know of anything even potentially in the pipeline, I'd like you to alert me to it.

MR. WILLIAMS:  On behalf of the United States, Your Honor, we're not aware of anything at this point.

MR. BERRIGAN:  The defense isn't aware of anything, Your Honor, and I suppose that somewhat depends on whether the Court is still entertaining strikes.  We frankly weren't -- and it's our own fault we didn't ask.  But we weren't contemplating the possibility that the Court would hear motions without counsel being involved.

THE COURT:  I'm sorry.  I'm not -- I'm just kind of slow today, Mr. Berrigan.  I'm not really tracking you.

MR. BERRIGAN:  Well, some of these jurors are apparently contacting the clerk's office or the Court, these potential jurors --

THE COURT:  Yeah.

MR. BERRIGAN:  -- requesting excusals that we're not

33

privy to.  That is, we're not -- we're advised of the Court's

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 48 of 282

ruling but we're not participating in that discussion.

THE COURT: My position is you don't have a right to participate in it.

MR. BERRIGAN: Well, I just wanted to make sure that was clear.

THE COURT: That is clear. I've never allowed lawyers to participate in it in any other case.

MR. BERRIGAN: Okay, sir.

THE COURT: And it would be totally unworkable if every time a juror prior to trial says, I have this conflict or I have that to get the lawyers on the phone or hold a hearing on it.

MR. BERRIGAN: Well, I can only say from my own experience, Your Honor, we certainly have done that in many cases in the past.

THE COURT: Well, I've never done it, and I don't intend to ever do it until the circuit tells me I have to.

MR. BERRIGAN: I just wanted to be --

THE COURT: What's the prejudice to you?

MR. BERRIGAN: We don't know I think is the problem.

THE COURT: Well, you're not entitled to any specific juror.

MR. BERRIGAN: No, I can't cite to anyone.

THE COURT: There's no law that says you're entitled

34

to any specific juror.

MR. BERRIGAN: I know that, sir, but let's take, for example, if college students were excluded as a group, there certainly might be an issue about whether that impacted the defendant's Sixth Amendment right.

Page 29

THE COURT: I would never exclude college students as a group.

MR. BERRIGAN: My point is only, Your Honor, because we don't know what the requests are, we don't know what the rulings are, we don't have any record of any of this. And defense attorneys are always wary when we don't have records, as you know, and so it raises some concern. But you've addressed it directly, so I think I'm certainly satisfied we have a record now.

THE COURT: Well, when did you first learn that jurors were being excused for various reasons?

MR. BERRIGAN: We first got the order from the Court -- I think there were over a hundred jurors struck -- and at the time Mr. Miller and I, as you know, were trying to come up with our own list. And, frankly, I think those largely corresponded. I haven't had the time to go through every one, so I don't mean to suggest that I think the Court's doing anything improper in terms of these rulings. I suspect all of these people have made hardship requests. The concern's just been that we don't know how that works, and I should have

35

anticipated this potentially, and I didn't. And you pointed out repeatedly today, you know, that that's our responsibility so . . .

THE COURT: Well, yeah, but let's get back to when did you first learn of it?

MR. BERRIGAN: Well, I don't have the order in front of me, Your Honor, but whenever that first court order was that excused the hundred or so jurors for cause. The Court listed them specifically, that these people were being excused, and

Page 30

there were categories --

THE COURT: Excuse me. But the first order excusing the hundred jurors were based on the information you gave us.

MR. BERRIGAN: No, I think the Court -- well, maybe I'm mistaken, but I understood that the Court -- there were actually two groups. There's a group that Mr. Miller and I came up with by agreement. And we learned that the Court had already stricken a large number of those people. Well, maybe not a large number but over a hundred based on -- I guess based on its own motion. And that group of people, you know, we didn't -- we wouldn't receive any information about these folks having moved to be excused or what the basis of those motions were. And I noted the Court just gave us an order yesterday. There were four additional jurors and only four I think stricken; two were deferred. And those were also motions made to the Court.

THE COURT: Yeah, but, see, I don't know -- I mean,

36

our practice has always been to exclude potential jurors prior to trial without involving the lawyers when a potential juror makes a specific request, and I guess you're saying that we really shouldn't do it that way, that every time a potential juror in every case gives a reason why they can't serve I have an obligation to disclose that to the lawyers in the case and have a hearing on it?

MR. BERRIGAN: No, not at all, Your Honor, because usually I think there's widespread agreement that the jurors should be excused. But it's no less a part of the court record than if the juror came in and asked to be excused. That would be done in court. There would be some record of it. The parties could object or not as they thought appropriate

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 51 of 282

representing their client, and the Court would make a ruling. And just the fact that some juror sends a note or a letter or calls to the court clerk's office in our view doesn't -- somehow circumvents that process.

THE COURT: Well, what authority do you have that you're entitled to be involved in that process?

MR. BERRIGAN: There isn't any. I think it's really under the larger rubric -- and again, I mean, we'd have to show prejudice I think is the real problem. But it's just under the larger rubric that the jury should be drawn from a fair cross-section of the community. So not knowing what the basis of the requests were or the Court's justification

37

eventually, getting rid of those jurors raises a concern. I certainly don't have any specific jurors that I could point to to say that juror should have been kept or not because there's really no record of that. So we're just kind of in the dark about how this takes place. It's not the procedure because you've told us that but what the requests are.

THE COURT: Well, I think it is in the court file actually. I think all of the excuses from jurors that have been ruled on are part of the court file. I may be wrong about that. It's never come up before.

MR. BERRIGAN: And I haven't requested to look at that. I think to the extent it is in the court file, those folks have already been excused.

THE COURT: But you really expect that in every criminal case we have we're supposed to have a hearing with the lawyers before we grant an excuse?

MR. BERRIGAN: No, and I don't think the lawyers in

Page 32

most cases worry about these things, Your Honor, at least not in my experience. But we do in capital cases for the obvious reasons.

THE COURT: Well, it's actually not so obvious to me. We're bringing in -- we started with, you know, many more hundreds of jurors than we probably needed.

MR. BERRIGAN: I'm not being critical of the process.

THE COURT: And one of the reasons I started with so

38

many was so that there wouldn't be any problem if people got excused as long as they presented a prima facie legitimate reason for their being excused. So I don't know what else to say.

MR. BERRIGAN: Nor do I, sir.

THE COURT: Okay.

MR. WILLETT: Judge, this is Al Willett. May I ask one question?

THE COURT: Yes, sure.

MR. WILLETT: My understanding when I heard the Court articulate its professional schedule over the next week or so is that if Department of Justice in DC wants to accept our offer there's only maybe a day before this -- a day or two before this trial starts where the Court would be available in Sioux City to take a plea. I mean, if I heard everything right, it's like either next Monday, the 5th -- or excuse me, next Monday, the 4th or the following Monday, the 11th, and otherwise the Court would be away from Sioux City. Did I understand that right?

THE COURT: You did understand it. Now, I do have a preliminary injunction hearing scheduled next Saturday and Sunday all day both days, the 9th and 10th, that weekend.

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 53 of 282

MR. WILLETT: Yes.

THE COURT: And I'm about to enter a ruling that will obviate the need for that preliminary injunction hearing. So I would be available Saturday and/or Sunday to do it or Monday. I

39

mean, we've got jurors coming in on Tuesday, so I think if I took the plea on Monday we'd be able to notify the jurors. I'd be glad to do it on the weekend too if the parties want to do it on a Saturday or Sunday.

MR. WILLETT: Well, Judge, that's the only part of the week I've not had court with you yet. I've been there for early morning and night court.

THE COURT: We have had night court.

MR. WILLETT: So who knows? We may end up having Saturday morning court. I just want to make sure if word comes down we're available --

MR. BERRIGAN: Your Honor, if we're able to do the plea, we'd certainly like to do it as soon as possible.

THE COURT: I'd say Saturday or Sunday, I'd be happy to do it either day. It won't be a problem for me. It's just whatever would be easiest for the lawyers -- well, you'll have all next week, and my secretary will be here, so if it turns out you find out while I'm out of state, she can schedule the plea for, you know, Saturday or Sunday or Monday, whatever the lawyers' preference would be.

MR. BERRIGAN: Thank you, sir.

THE COURT: But I agree. It'd be probably better to do it on -- you know, the earlier the better, so if we could do it on Saturday, that'd be fine. I don't get in till I think 10:30 Friday night. That's when my plane lands. So I'd like a

Page 34

little bit of time to look over whatever we're going to be doing on Saturday, but we can certainly start on Saturday, or we can do it Saturday afternoon or Sunday or whatever works best for everybody. So just let my secretary know, and she can go ahead and set it up.

And, Al Willett, if it works out that we can do it on the weekend, then you'll be pretty far along in doing the full --

MR. WILLETT: I'll have my merit badge, Your Honor.

THE COURT: That's right, your extra duty merit badge, early morning court, night court, and weekend court. Doesn't get any better than that, does it, Mr. Willett?

MR. WILLETT: It's a full life. It's a full life, Judge.

THE COURT: Anything else?

MR. WILLETT: Not on behalf of the defense, Judge.

MR. WILLIAMS: No, Your Honor, not on behalf of the United States.

THE COURT: I don't know if you checked your e-filings today, but I did file a very extensive order on jury selection earlier today.

MR. WILLETT: Yes, Judge. This is Al. I did receive it.

THE COURT: Okay. Just thought I'd give you a heads-up because nobody would know it was coming.

MR. BERRIGAN: We have it, sir.

HEARING 9, 3-31-05

THE COURT: Thank you.

(The foregoing hearing was

concluded at 3:39 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR
3-5-06
Date

Page 36

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 56 of 282

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,                         Transcript of
                                    Final Pretrial
       Defendant.        /            Conference


       The Final Pretrial Conference held before the
Honorable Mark W. Bennett, Chief Judge of the United States
District Court for the Northern District of Iowa, at the Federal
Courthouse, 320 Sixth Street, Sioux City, Iowa, April 11, 2005,
commencing at 2:32 p.m.

2


APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 57 of 282

Also present:              Bill Basler

Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA 51101
                           (712) 233-3846

☿

3

THE COURT: Good afternoon. Please be seated. Okay. This is United States versus Angela Johnson, Criminal Number 2001-3046. We're here for a final pretrial before jury selection tomorrow.

Agenda items, Mr. Williams, Mr. Miller, does the government have anything on their list?

MR. WILLIAMS: Just a few issues, Your Honor. First of all, just to clarify I think where we are on jury selection, I think that's one of the main things we want to make sure we understand the Court's idea of how we're going to do this.

THE COURT: And we're going to talk about that at some length. That's number one on my list.

MR. WILLIAMS: We have met today -- we attempted before unsuccessfully to meet with the defense about knocking off some of the extreme view folks on death penalty. We got a call this morning from the defense wanting to talk about it again. We've met, and we have at least with the first week's panels met with them and agreed to some degree on knocking off some of the extreme view jurors.

THE COURT: Why wasn't that done earlier? We can't replace these people on such short notice.

MR. BERRIGAN: May it please the Court.

THE COURT: I'm not very pleased.

MR. BERRIGAN: I wouldn't expect you would be, Your Honor. I don't know if you're asking me to respond or not.

Page 2

THE COURT: Yeah, I'm asking for somebody to respond.

MR. BERRIGAN: Mr. Miller and I were primarily responsible for this part of the voir dire process. We concentrated our efforts on the hardship motions which were, as you know, over 200. There was some discussion in that process --

THE COURT: Well, why would you do that?

MR. BERRIGAN: Well, because that -- given the time constraints that we thought we were under, that seemed to be the easiest, quickest way to get rid of jurors without substantial disagreement.

THE COURT: Yeah, but it's the least important.

MR. BERRIGAN: I'm sorry, sir?

THE COURT: But it's the least important.

MR. BERRIGAN: Well, it seems to me that saving jurors from a trip to Sioux City for whatever reason would be equally important. That was easiest for us to do. We did discuss death penalty views during that process. We did not have general agreement about how that would work. So we went ahead and excused all the jurors we could by agreement on hardship.

Then we've just recently focused on death penalty questions. And to be honest, there's been substantial disagreement about that as well. But we've been able to at least strike some of the jurors by agreement if the Court's interested in doing that.

THE COURT: Do you have a list?

Page 3

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 59 of 282

MR. BERRIGAN: Yes, sir, I do.

THE COURT: Am I going to get that list at some point, or was I supposed to just kind of divine it?

MR. BERRIGAN: We did this, Your Honor, less than an hour ago. I'm happy to make copies.

THE COURT: Is that before or after you did the motion to dismiss?

MR. BERRIGAN: That would have been after the motion.

THE COURT: After the motion to dismiss, okay.

MR. BERRIGAN: Yes, sir, right. I can do it in any manner you like, sir.

THE COURT: Well, I'd like a written -- do you have a written list?

MR. BERRIGAN: Yes, sir.

THE COURT: How many jurors are we talking about?

MR. BERRIGAN: On the first panel we've --

THE COURT: So we're talking about jurors that you want me to excuse now who are supposed to come in tomorrow morning.

MR. BERRIGAN: Yes, sir, that's right.

THE COURT: Okay.

MR. BERRIGAN: But in the first group of -- I believe there's 14, we have agreed to strike 8 for cause based on our mutual agreement that these jurors would not be able to consider

6

both ranges of punishment.

On the second panel, we've yet to reach final agreement on any of those jurors, but we've had discussions --

THE COURT: Just a second. We're now -- you expect me to dismiss eight people tomorrow which leaves us with what? Six

Page 4

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 60 of 282

or seven?

MR. BERRIGAN: Your Honor, the decision whether to dismiss them is entirely up to the Court. We're making a joint motion regarding eight jurors.

THE COURT: But do you realize what a waste that is now to spend a day on six or seven people? If you'd done this even a week or two ago, we might have been able to move people up on panels.

MR. BERRIGAN: Yes, sir, I do realize that. It would have been --

THE COURT: Well, why are you doing that?

MR. BERRIGAN: We're doing it better late than never is our position.

THE COURT: I'm not sure that's true. I think it may be better to bring them in and find out if they've changed their mind.

MR. BERRIGAN: Whatever you'd like, sir. We're obviously going to be here doing jury selection in any case.

THE COURT: I am absolutely astounded that you waited till the last minute to do this. Is there some explanation?

7

MR. BERRIGAN: None other than what I've already given you, sir.

THE COURT: Well, that's totally unsatisfactory.

MR. BERRIGAN: I understand that.

THE COURT: Why are we in this situation, Mr. Miller?

MR. MILLER: Your Honor, about a month ago I suggested that we could agree to excuse people with extreme views on the death penalty, and I was advised that the defense team felt that they wanted the opportunity to rehabilitate people on that and,

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 61 of 282

therefore, that that wasn't something that we should be negotiating, that they would negotiate on the hardships only, so that's what we did.

THE COURT: And then what led to the change of position? Do you know?

MR. MILLER: Well, I learned about 11:00 this morning and I think counsel earlier this morning learned that they wanted to meet to excuse some people on death penalty issues, so we did at 1:00. There are clearly some people who at least on paper do not appear to be death qualifiable or life qualifiable.

THE COURT: Well, you know, that was the whole purpose of the questionnaire, Mr. Berrigan. It wasn't to figure out hardships. Those are easy to figure out. I mean, I thought that's what you were doing. Nobody clued me in that you weren't . . .

Is this some kind of strategy thing that I'm not

8

getting here?

MR. BERRIGAN: No, sir. The truth is that we couldn't separate out in many instances legitimate hardship requests from death penalty views. There became a question, at least in my mind, as to whether or not motions were being made for death penalty views or hardship, and it was a blend that in my view did not work. When we finished the hardship, we turned our attention --

THE COURT: What do you mean motions being made?

MR. BERRIGAN: Well, discussions between Mr. Miller and I. I think Mr. Miller was acting in good faith. I have no doubt of that. But, for example, there were jurors who favored life imprisonment that were subject to suggestions for hardship

Page 6

that I felt might not be appropriate jurors for excusal based on their life positions and not strong hardships.  So we had a number of disagreements about that, frankly.  And as a result, I thought it would be easier, as you pointed out, much easier, to concentrate on at least what we could agree on which was hardship without --

THE COURT:  Well, how is it that today you could agree on eight where a month ago you couldn't?

MR. BERRIGAN:  Only because we didn't finish that process a month ago, sir.

THE COURT:  Well, why not?  I mean, I appointed three lawyers.  What's the value of a third lawyer if you couldn't do

9

things in a timely fashion?  I've continued this case at your request how many times?

MR. BERRIGAN:  I know at least once.

THE COURT:  I've ruled speedily on all of your motions including ruling on the one you filed today.  And you're telling me that you couldn't have gotten together earlier to do this, but at the eleventh hour now you've been able to do it.

MR. BERRIGAN:  I'm not suggesting it would have been impossible, Your Honor.  I do have other responsibilities regarding this case pertaining to the mitigation that did take up some of my time.  Perhaps it could have been better spent in this process.  We just didn't get to it until recently.

THE COURT:  Well, why -- okay.  Why would it be better to dismiss the eight tomorrow than to just bring them in and see what happens?

MR. BERRIGAN:  Well, only to save them the trip from wherever it is they're driving from.  These are people that, I

Page 7

would suggest to the Court, are really at the very ends of the bell curve on death penalty views which is why we've been able to reach agreement, frankly. If there's been any doubt by either party as to whether the juror might qualify, there was no agreement. And yet still a very large number of this first panel fell into that category.

THE COURT: Okay. Why don't we go through this week. You have eight tomorrow.

10

MR. BERRIGAN: Yes, sir. Juror Number 3 --

THE COURT: No, just -- I don't want to get to the numbers yet.

MR. BERRIGAN: I see.

THE COURT: How many in the rest of the week? How many in each day?

MR. BERRIGAN: Well, on Panel B, Your Honor, which would be the Wednesday panel, we have not reached final agreement on that group. There are at least six jurors under active consideration. On Panel C which is Thursday's panel we've agreed to six excusals. And on Friday, Panel D, we've agreed to three excusals, and there's one additional juror under consideration.

THE COURT: Do you understand the problems this creates?

MR. BERRIGAN: I do in terms of getting jurors to fill in those spaces, yes, sir. I don't --

THE COURT: Yeah, that's exactly the problem.

MR. BERRIGAN: Yes, sir. Despite that problem, Your Honor, it seems to me it would still be beneficial not to needlessly bring in people who arguably at least by the parties'

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 64 of 282

consensus aren't going to qualify for the panel. So this is late obviously. But at least in some cases we're saving some jurors a trip to Sioux City who arguably should not --

THE COURT: But do you realize the impact this is

11

going to have on the length of time it's going to take to select a jury?

MR. BERRIGAN: I guess we were hoping that perhaps at least next week if we're able to continue this process, if the voir dire --

THE COURT: Do you understand the burden that this puts on our limited resources in the clerk's office to try and all of a sudden call people and advance them on panels?

MR. BERRIGAN: I do realize that that would be necessary in order to fill up the panels given the strikes we're proposing, yes, sir.

THE COURT: Mr. Miller, having sat through jury selection in the Honken case, do you think we're better off letting all of these jurors go at literally the eleventh hour and with no ability to fill in this week, limited ability to fill in next week? Are we better off, or would we be better off bringing them all in here and finding out if some of them might qualify?

MR. MILLER: It's a close question because I think for those that cannot qualify we can learn that very quickly. But it would save a few minutes for each of those if we were to excuse them and not talk to them at all. The shame obviously is the fact that we're only talking to 7 or 8 as opposed to 15.

THE COURT: We're talking to seven people tomorrow or six.

MR. MILLER: Exactly. There would be some savings in time, and it's possible that of the 17 or so that are under consideration for excuse, there might be a couple that actually could death and life qualify. So it may be a trade-off. It may be a fair trade-off. It wouldn't, I don't think, save a great deal of time, but it would I think clearly save some time not to talk to . . .

THE COURT: When is it did you think we were going to let these people know? Who's going to stay late to try and -- to call them?

MR. BERRIGAN: I don't know, sir. I don't know. It seems that the people that are coming in tomorrow obviously need to be notified as soon as possible. The other people --

THE COURT: Because some of them come in the night before.

MR. BERRIGAN: That may be, Your Honor. I don't know obviously. The people that are coming after tomorrow we have obviously a little more time to do. But it seems to me the savings is to the jurors, not to us.

THE COURT: Well, that's certainly true. There's not only not a savings to us, this is going to unduly prolong the jury selection process because you've chosen to wait till the eleventh hour to do it. Do you disagree with that?

MR. BERRIGAN: No, I don't, Your Honor. Assuming that these strikes could have been made earlier, I agree with you

13

wholeheartedly.

THE COURT: Assuming they could have been made earlier

Page 10

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 66 of 282

and we could have had panels of 15 coming in, it's now going to substantially prolong the jury selection process.

MR. BERRIGAN:  I think at least this week, Your Honor. I agree --

THE COURT:  Okay.  Why don't you give -- do you have a list of the eight people?  Do you have a typewritten list?

MR. BERRIGAN:  Yes, it's a printed list, Your Honor.

THE COURT:  Okay.  That's fine.  Why don't you give it to Carey so she can take it into the clerk's office and we can go ahead and dismiss the jurors.  If you have it for tomorrow --

MR. BERRIGAN:  Yes, sir.

THE COURT:  -- and it's your final list for tomorrow as well -- I'm sorry, the next day, for Wednesday?

MR. BERRIGAN:  Wednesday we haven't finished. Thursday and Friday are done.  Wednesday we're hopefully after this hearing going to finish.

THE COURT:  Okay.  But you have finished Thursday and Friday?

MR. BERRIGAN:  Yes, sir.

THE COURT:  Okay.  Why don't you give that to Carey as well too.

And, Carey, if they can get extra people here tomorrow -- I can't imagine that they could --

14

THE CLERK:  Suzanne will try.

THE COURT:  If they can, that'd be great.  If they can't, totally understandable.

I'm just trying to understand why we're in this situation.  You were just too busy to do it earlier?

MR. BERRIGAN:  No, Your Honor.  There was a decision

Page 11

made -- it was a proactive decision -- not to discuss the life/death jurors the same time we were doing the hardship. And I may not have been clear about why I thought that was a problem, but it was a problem because we weren't sure whether or not these jurors standing alone on either issue should have been stricken. It was causing more discussion about each juror than I thought was at all beneficial. And we weren't making progress.

When we put aside the life/death views all together and looked at hardship, Mr. Miller and I, I thought, did quite well. We reached agreement I think on more than 200 people. That nonetheless took some time. We should have then very quickly switched to life/death qualification. But because of some other obligations that I had respecting this case, that didn't happen. That was my responsibility as in terms of the defense team. I'm particularly suited for that given my experience in this area, and I did not choose to delegate that to Mr. Willett or Mr. Stowers, much to obviously the detriment of the Court's schedule. So I apologize for that. But I've not

15

been sitting around drinking iced tea.

THE COURT: No, no, no, I know that. I know you --

MR. BERRIGAN: And it was a decision that was made. In hindsight --

THE COURT: But, you know, I guess my expectation is -- and I think you've understood this before -- by appointing a third lawyer that you're not statutorily entitled to that these kinds of problems -- that's why I did it, so that we wouldn't have these kinds of problems.

MR. BERRIGAN: I understand that.

Page 12

THE COURT: One of the reasons why.

MR. BERRIGAN: Yes, sir.

THE COURT: And now we have these problems.

MR. BERRIGAN: And you've expressed that to me in the past.

THE COURT: And it must have fallen on deaf ears.

MR. BERRIGAN: Not entirely, sir. I just didn't think I could delegate that particular responsibility to Mr. Willett or Mr. Stowers. That really was uniquely my responsibility. I didn't get it done. That's all it is. It didn't happen in a timely fashion, and I don't offer any excuses for that.

THE COURT: So when will you have the names of the jurors for next week?

MR. BERRIGAN: Well, I think this process has taken us a couple of hours a panel. But if we have breaks now -- and I

16

suspect tomorrow will be a shorter day than we might have ordinarily had -- I don't see why we couldn't get to a couple of panels tomorrow for next week. And then as we go through the week, we'll continue this process. So I do suspect that next week the Court will have full panels and we'll by the end of this week --

THE COURT: Well, we're not going to have full panels because we can't fill in that quickly.

MR. BERRIGAN: And I don't know how long it takes.

THE COURT: We don't have the resources to do that.

Okay. Now, the consequence is that if we do get people to fill in, you may have virtually no notice. You may have their -- we may tell you the morning somebody shows up that you have a new member of your panel, and you'll just have to

Page 13

scramble with it. And we will give you as much notice as we can because I want you to have as much notice as we can, but I'd rather have live bodies in here than be concerned about giving notice to everybody given the -- you know, this is a huge problem for me in terms of scheduling. I mean, I can see the implications that it's going to have for jury selection, and the whole -- all the thought that went into designing and customizing jury selection for this case was predicated on the fact that we'd have panels of 15 every day, and now we don't.

And -- but there's nothing I can do about it now other than it is not a very propitious beginning for this trial. And

17

in case you haven't figured it out, I'm incredibly disappointed, Mr. Berrigan, that you put me into this situation. I think you were totally unfair about it.

MR. BERRIGAN: I don't have anything else to add, sir.

THE COURT: Okay. What else do we need to figure out about jury selection?

MR. WILLIAMS: Your Honor, I want to just clarify, and this is my fault for lack of memory. My recollection when we discussed how we were going to do the jurors by number and so forth that there was a discussion about whether the parties could conduct any outside investigation of the potential jurors. And my recollection, our recollection, is that that was prohibited. And I just wanted to clarify that.

But when I went back to look at the order on the issue, there wasn't anything in there speaking about it in the order. And so we've not and I just want to clarify there is no outside investigation of these jurors.

And that raises a second question that I remember

Page 14

talking about before, but, again, when I went back to the order, I didn't see the Court's thought in there, and that is we typically run criminal histories on jurors in case the clerk's office misses somebody who's not qualified. And we didn't know if you wanted us to do that in this case or not. But we could obviously do that if the Court wants us to and provide copies to the defense as well. So that's just one issue that --

18

THE COURT: Okay. Let's take that up.

Mr. Berrigan, do you have any problem with that?

MR. BERRIGAN: We do, Your Honor. The jurors are asked questions about that in qualification, and we certainly take them at their word. There's no reason to run criminal history checks on them.

THE COURT: What's the downside? What's the prejudice to doing it?

MR. BERRIGAN: Well, I think it, frankly, invades their privacy rights. I understand I'm in the position of speaking for the jurors, but certainly in my practice that would be considered somewhat offensive that a certain citizen comes forward in responsibility -- to fulfill a responsibility as a juror and has a criminal records history run by the Court --

THE COURT: Except the problem is, Mr. Berrigan, if you found out after the fact that somebody had a criminal record, you'd be the first one moving for a new trial.

MR. BERRIGAN: I suspect the Court would remind me of this record at that time when I told the Court that I was opposed --

THE COURT: And I expect you would say you've had a change of heart now and now that you've discovered -- so we've

Page 15

done it in every case. There's no statutory bar that I know of, and I -- yes.

MR. BERRIGAN: I'm sorry, sir. I thought you asked

19

for my view. We're opposed to it.

THE COURT: I did. I did. Okay. No, I was asking -- you're right. I was asking for your view.

You can go ahead and do that as long as you give the other side the results.

MR. WILLIAMS: Very good, Your Honor. Will do.

THE COURT: If you want to. If you don't want to do it, that's fine too.

MR. WILLIAMS: No, we think it's helpful. It's rare, but once in, you know, every 50 jurors we come across somebody who actually has been convicted, and for some reason it doesn't get picked up someplace.

THE COURT: Either forgets about it or fails to disclose it.

MR. WILLIAMS: Right.

THE COURT: And that happens with some frequency.

MR. WILLIAMS: Yeah, yeah. So we'll run those, and we'll get a copy of whatever we come up with to the defense as well.

THE COURT: Do you know of any legal prohibition in doing it?

MR. WILLIAMS: No. We've actually looked into that just to make sure that we were on solid ground doing that before, not in relation to this case, in relation to cases a long time ago. And there's no problem that we've been able to

20

Page 16

discover on that.

THE COURT: Okay. What else is on your list on jury selection?

MR. WILLIAMS: Nothing else on jury selection, Your Honor.

THE COURT: Okay. Mr. Berrigan, what's on your list in terms of jury selection?

MR. BERRIGAN: Well, I think the Court has already indicated that we're going to discuss the process, and that's of great interest to all of us obviously.

THE COURT: Yes, right, right.

MR. BERRIGAN: And I think all of the questions we have, Your Honor, relate to that subject, the process.

THE COURT: Okay. Why don't we just take them up in the order that you have them.

MR. BERRIGAN: The first would be that we have in the past discussed group voir dire versus individual voir dire and how that would take place. The defense I hope has made our position consistently clear that we would prefer to question the jurors in a group regarding issues surrounding the death penalty in particular.

That raises a potential issue: How do we handle jurors' knowledge of pretrial publicity issues and how much they know about the case because the danger, of course, is if you were to ask specific questions of a juror about what they've

21

said -- seen about a case on television or heard or read in the newspaper, then they might give information that could

Page 17

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 73 of 282

potentially taint the rest of the panel members.

And our suggestion on this is that we do a general group voir dire on the issue of the death penalty and whatever other issues the parties want to cover and then at the end of that process of the group voir dire we ask people whether or not they have particular knowledge about the case, and then we individually question only those respondents.

I'd also suggest that there will still be some jurors who through the process of death qualification are going to be clearly strikes or potential strikes for cause that the parties might even be able to agree. If there are people during the general questioning in the group that are strikes for cause, we may need not necessarily bring them back if there's an agreement on their unqualified -- their inability to qualify for jury service.

So I think the questioning on publicity would be fairly minimal in terms of the number of jurors we'd have to question individually if we use that system. So that was the first thing I wanted to propose.

THE COURT: Why don't you go through the other things on your list.

MR. BERRIGAN: We've been told that we're having -- we're using our peremptory challenges as we go, that we'll use

22

15 and be able to reserve 5. It seems to me that in order to have a panel of 12 qualified jurors if we were striking as we went that we'd have to have 22 people in the box. When we had 22 qualified, we have our 5 peremptories for each side, and we have our final 12 whether or not both parties have used their 15 peremptory challenges if that makes sense.

Page 18

THE COURT:  Well, it makes sense conceptually.  I don't agree with your math.

MR. BERRIGAN:  Okay, sir.

THE COURT:  Because we haven't taken into account the alternates.

MR. BERRIGAN:  And I haven't -- I'm not including them.

THE COURT:  Okay.

MR. BERRIGAN:  In fact, that's my next question is I don't know that we've ever discussed --

THE COURT:  I don't think we have.

MR. BERRIGAN:  -- how to do the alternates.

THE COURT:  Right.

MR. BERRIGAN:  But I did think at least that portion of the voir dire excluding the alternates, Your Honor, we should have a fixed procedure in mind in terms of how many people are going to be qualified jurors before we stop and say that -- out of that group take 5 off, use your last 5 peremptory challenges till that 12 is done.

23

THE COURT:  Yeah.  Between the government and the defense there's ten peremptory challenges left.  We have 12 trial jurors.  To that extent your math is correct; we need 22.  Now we have to account for the alternates; correct?

MR. BERRIGAN:  Yes, sir, right.

THE COURT:  We're going to use six alternates.

MR. BERRIGAN:  And then I guess it depends on whether you would give us proportionate strikes.  I mean, if we were --

THE COURT:  Well, I think I'm going to stick with the rule, and I think the rule says each side has three additional

Page 19

strikes.

MR. BERRIGAN: All right, sir. Very well. We just didn't --

THE COURT: Are you suggesting we deviate from the rule?

MR. BERRIGAN: Well, we'd certainly like more strikes obviously. It would seem if you did it proportionally to the 12 in the box we'd be arguably entitled to 10 because we used 20 to get 12, so why not 10 to get 6, but I'd be willing to meet you halfway on that, more than halfway, sir. We'd be happy with six for six, each side having six which is obviously more than three but less than ten.

THE COURT: Yeah, I'm going to stick with the rule. You each get three. So that means we have to add six alternates and six strikes.

24

MR. BERRIGAN: Three each.

THE COURT: Right? So now we're up to 34; is that correct?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. And then we have to account for last-minute problems.

MR. BERRIGAN: I know we've discussed that in the past, Your Honor. Frankly -- and I understand that in Mr. Honken's case there were some last-minute problems that arose. But I think the voir dire in this case is going to last -- or did last longer than we anticipate the voir dire to last here given the change in procedure.

THE COURT: Well, let's back up. And I hate to be beating you up on this. I think voir dire might not have lasted

Page 20

as long in this case had you done what I thought you were going to do but you didn't do until today. Now I expect it's going to last quite a bit longer.

MR. BERRIGAN: I understand the voir dire in Mr. Honken's case to last three weeks.

THE COURT: Well, actually it lasted I believe either 12 or 14 days.

MR. BERRIGAN: Days.

THE COURT: Yeah. It went over three weeks, so one could say it lasted three weeks, but it didn't last 15 days. I know that. I think it was 12 days. But we're going to exceed

25

that in this case if tomorrow is any indication. But . . .

MR. BERRIGAN: I think tomorrow probably is an aberration in terms of numbers, sir, but I take your point.

THE COURT: I think that's wishful thinking.

MR. BERRIGAN: Right. Nonetheless, we don't -- we'd like the Court not to have sort of a second voir dire at the end because our fear is that we're going to have jurors opting out because they've now had the realization that they're actually going to be selected and there's a real likelihood they're going to serve on this jury trial that could last for a couple of months and that that's going to cause at least some people to try perhaps to get out of jury service after they've been properly qualified as jurors. We'd like not to give them that opportunity, frankly.

So our hope would be that once we finish with the alternates we would be done; there would be no further voir dire; the jurors would be informed to start, come back, and we would start the beginning of the trial.

Page 21

THE COURT: So let me just see if I kind of conceptualize this. We bring in 34 people.

MR. BERRIGAN: Yes, sir.

THE COURT: The first thing you do is you each exercise five strikes.

MR. BERRIGAN: No, no, I'm sorry, sir. I -- and that's where I guess we did have some mix-up. That process has

26

been done. When we have 22 in the box, each side looks at those 22, and right then they pick 5 they want to get rid of, but we haven't even gotten to alternates. Whether they've used their 15 peremptories or not, once we have 22 qualified, we have enough because you only have 5 in reserve. And so each side gets rid of 5. That's 10 off the 22. That's 12. That's the jury panel. And then we bring in these other group of -- I guess till we get to the point of 12 more qualified jurors. We strike three each, and we have six, and those are the alternates. And we'd hope, of course, the Court didn't inform the jurors as to who was who. But at that point when we've had 12 in the box for the alternates and we exercise our 3 peremptories, the jury selection process is over in our view and the trial should begin.

THE COURT: Okay. Now, in order to -- when we put the 22 in the box, are you suggesting we just take the first 22 that have been qualified?

MR. BERRIGAN: Yes, sir.

THE COURT: Take them in order?

MR. BERRIGAN: We understood the strikes would be made as we went, so at the end of the day or the end of the panel, how ever you're going to do it, there's going to be motions for

Page 22

cause.

THE COURT: Right.

MR. BERRIGAN: The people that are surviving those

motions, each party has an opportunity to exercise peremptory challenges as they see fit.

THE COURT: Right.

MR. BERRIGAN: The jurors that survive both those motions, that's one of the 22. So when we get to the point whenever it is that we have 22 qualified jurors who have survived that process, then we stop, and we make our peremptory challenges out of that group.

THE COURT: When you say we stop, we've got to bring all 22 back.

MR. BERRIGAN: I don't know why we would, sir. We know who they are. Parties have seen them. We just look at the list.

THE COURT: Oh, you don't actually want them to come back.

MR. BERRIGAN: No, sir, not until the trial's starting.

THE COURT: Because generally lawyers will want to look at all 22, be able to refresh their recollection on who it is and then exercise their strikes with the jurors present. But you're suggesting that once we get 22 qualified we just stop, the jurors aren't even present, and you -- you know, probably I'll have you alternate one, one, go back and forth.

MR. BERRIGAN: That's my next question.

THE COURT: Right. That was going to be your next

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 79 of 282

question.

MR. BERRIGAN:  Right.

THE COURT:  And then we -- and that gives us our 12 trial jurors.

MR. BERRIGAN:  That's right, sir.  And then they're called by the clerk and informed that they're going to be jurors and we'll notify them as to when to come in.

THE COURT:  And then what do we do about the alternates?

MR. BERRIGAN:  Then we continue to bring in our panels until we have 12 now in the box, you know, 12 that have survived cause and peremptory -- just 12 because we're going to use our 3 peremptories at the same time.  So we strike from those 12 three each, and we have 6, and those are the alternates, and at that point the jury selection in our view is over.

THE COURT:  And we never actually bring them back in.

MR. BERRIGAN:  No, sir.

THE COURT:  So each juror comes to the courthouse one time, each potential juror.

MR. BERRIGAN:  We have all day to talk to them.  You've given us plenty of time.  We have our 20-page questionnaire.  We have our collective knowledge of the juror.  That's ample time in my view to make decisions about the jurors.  We're exercising peremptories as we go.  We know who these people are.

29

THE COURT:  Okay.  I hadn't actually envisioned it this way, but it's fine.  It actually sounds good to me.  I like it.  And it would speed things up which I like.

Page 24

MR. BERRIGAN: Yes, sir.

THE COURT: Here's what I see as the problem. We do it exactly as you say. We bring 18 people in. We know who the 12 trial jurors are and who the 6 alternates are. We're about to start opening statements, and a juror raises their hand: I can no longer -- as I've had a chance to think about this, I could no longer be fair and impartial; I would only impose the death penalty if the defendant was convicted. Bingo, they're gone. Now we're down to five alternates.

MR. BERRIGAN: Then have eight alternates.

THE COURT: Pardon me?

MR. BERRIGAN: Then have eight.

THE COURT: We can't have eight. The rule doesn't allow it.

MR. BERRIGAN: Well, I mean --

THE COURT: The rule doesn't allow it. It allows maximum six. It's very clear. There's no statutory authority.

MR. BERRIGAN: We think that six are more than sufficient even under that potential scenario, sir. And if we bring them back, we're encouraging that very response.

THE COURT: But isn't that -- don't you want to find those things out? You don't want to encourage them, you know.

30

I mean, you don't want to affirmatively -- but you have to plan for the contingency. And your system has no planning for the contingency other than to burn up alternates. And the more alternates you burn up, the more likelihood we're going to run out of jurors and we're going to wind up in a mistrial in the middle or towards the end of the case. And I realize that while you may think that's a good idea I don't. I'm not saying you do

Page 25

think it's a good idea; I said may. And that's the problem I see with your system.

MR. BERRIGAN: I don't know how many people did that in Mr. Honken's case, sir. I mean, how many people came in at the last day and said for some reason or another they no longer felt they could serve?

THE COURT: How many did we lose on the last day? I thought it was more than two, but I may be wrong.

MR. WILLIAMS: We were thinking it was two or three, and then we lost two alternates during the trial itself because we ended up --

MR. MILLER: We ended up using all the alternates in the Honken case as I recall.

THE COURT: What do you mean using all the alternates?

MR. MILLER: We ended up only with 12 people and no alternates ultimately.

MR. WILLIAMS: I think we only ended up with four alternates left at the end of the trial. We lost two -- we lost

31

two during the --

THE COURT: We lost two very quickly because remember we had two jurors in front, and we were able to move them back there much sooner than I had hoped we would?

MR. WILLIAMS: And then we lost one more.

MR. MILLER: The very last alternate served.

MR. WILLIAMS: That's because they chose -- they had the choice of three, and they chose the last one.

MR. BERRIGAN: There is this difference, Your Honor.

THE COURT: Yeah.

MR. BERRIGAN: The alternates, certainly that group,

Page 26

we'll have selected them very recently. I mean, it seems somewhat inconsistent that they would come in two days after they're selected and say, you know, all of a sudden something's happened.

THE COURT: What's happened is they found out they're actually going to be on the jury. That's what's happened.

MR. BERRIGAN: Exactly, right.

THE COURT: It's not so much a timing question as the realization that, gee, I thought my odds were pretty good of not serving. Now I'm on it. What can I say or do so I don't have to do it?

MR. BERRIGAN: Maybe we should just notify people that if they're not stricken they're going to be on the jury because that's the truth largely. I mean, we are going to have these

32

peremptory challenges, but for the most part more of those people are going to be jurors than are not. When we have 22 in the box, 12 of them -- your chances are better, 60 percent, that you're going to be on the jury. I see no harm in saying if you survive this process you are a juror, so please let us know if there's any potential problem with that proposition.

THE COURT: Let me ask you this.

MR. BERRIGAN: Yes, sir.

THE COURT: What would the harm be in bringing them all back for the final day? You think -- if we didn't ask questions, because here's what I'm thinking? Then we could -- if we brought everybody back and on the first 22 you exercised 5 each, we now know who our 12 trial jurors are. We then put 12 more in the box. Each side exercises their three. We now know who our six alternates are. We now have 18.

Page 27

MR. BERRIGAN: Right.

THE COURT: Then if there's a -- without soliciting questions about have you rethought your position about the death penalty, you know, not asking for trouble but anticipating that trouble may be lurking, we have four or five more jurors, and we only use them if we have to?

MR. BERRIGAN: That's fine, sir. But why wouldn't we do that at the opening and even have jurors held in abeyance if you wanted to? If we had a couple of people leave, have a panel available to come in if we actually thought we needed them

33

because two or three people opted out just before opening statements. We could bring in a panel and out of that 15 get whoever we needed to fill in for the alternates. They are alternates, after all.

THE COURT: Because by screening four or five extra jurors in the process, we don't have to start from square one on hardship and death penalty issues and go back to the full panel-type voir dire. We know we have people who have passed and we have some extra bodies.

MR. BERRIGAN: Right. I mean, my original suggestion as you recall is we had eight instead of six which you've told me is not acceptable. But I really do think that would make much more sense. And I don't know why the parties couldn't waive that for any particular reason, frankly, out of an abundance of caution. Who's prejudiced by having two extra alternates that we might not need? If we don't need them --

THE COURT: And they'd only be -- so we'd bring -- so what would we do? We'd bring 20 jurors in, other than the fact that we have no seats for the extra 4, but --

Page 28

MR. BERRIGAN: Well, they wouldn't actually be here at the same -- oh, you mean at the beginning of the trial, sir?

THE COURT: Yeah.

MR. BERRIGAN: Yeah. For a very short period of time, for a few minutes perhaps, we'd have 20 people and nobody raises their hand and jumps up and down to get off. Then we send those

34

extra two people home, and we're done. And if two people do jump up and down, then we have those other two to take their place, and we're done also, and we haven't had them all come back to volunteer to get off. We haven't had them make a second trip, I mean, if nothing else.

THE COURT: Here's the interesting thing. It was the -- and I'll try and keep comparisons to a minimum, but seeing as I've only had one death penalty case, that's all I have to compare. It was the defense in Honken that was absolutely adamant about bringing everybody back. I didn't really want to do it. And they were absolutely adamant about bringing everybody back, and they had six or seven questions that they insisted I ask, and you have exactly the opposite approach.

MR. BERRIGAN: We have confidence that we're going to do a good job in selecting the jurors, sir.

THE COURT: Well, they did too.

MR. BERRIGAN: We have every confidence in the prosecution as well given their already demonstrated competence in that area with Mr. Honken's case. So I don't see any point in having them make a second trip needlessly, frankly.

THE COURT: Okay. Can I stop you where we are so far?

MR. BERRIGAN: Yes, sir.

Page 29

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 85 of 282

THE COURT: Who wants to respond for the government?

MR. MILLER: Well, Your Honor, point by point, first

35

as to group versus individual voir dire, we don't have a strong feeling one way, Your Honor. I don't think it prejudices either side as to which option there is.

I think, however, I would remind the Court and counsel, I think the last time we met, I did express some concern about doing group rather than individual. I know that we could complete each panel each day regardless of which way we do it. Twenty minutes per juror proved more than satisfactory for the state's voir dire. I think we're going to be doing substantial individual voir dire in any event in view of the fact that this jury has been more exposed to pretrial publicity than the last one has in that many of them have heard about the previous trial.

And finally, Your Honor, it's simply my experience that we do get more candor out of people when they aren't responding in front of the rest of their peers.

The other effect is that there is some tendency I think from some jurors to tailor their answers based upon what they see in the way of reaction to their fellow jurors when they are voir dired as a group.

So these are all reasons I think it would be more beneficial to do individual voir dire. Again, it's not prejudicial to us to do group, and we can do it either way. But I just simply raise that as a consideration.

THE COURT: Well, we did it kind of both ways in

36

Page 30

Honken. I mean, we had some group stuff, and then the individual questioning was primarily on death penalty views, wasn't it? What else was it on primarily? It was death penalty, wasn't it?

MR. MILLER: Primarily it was death penalty. But it's my understanding that the defense wants to do death penalty as a panel rather than individual.

THE COURT: Okay. Why don't you keep going.

MR. MILLER: I think the other issue was -- I guess I don't have any other thoughts.

THE COURT: Do you have any thoughts about Mr. Berrigan's proposal about not bringing everybody back in the group?

MR. MILLER: No, Your Honor. We're not prejudiced either way. Again, there's a trade-off. It takes an extra day to do it. It may be a day well spent if we find that we have problems that need to be corrected. That's the trade-off. We sure can live with it either way.

THE COURT: Okay. Mr. Berrigan, I want to come back to you on this group versus individual issue.

MR. BERRIGAN: Yes, sir.

THE COURT: Kind of outline for me how you would like it to work. Let's suppose we had 15 coming in tomorrow.

MR. BERRIGAN: Yes, sir.

THE COURT: Now, tomorrow it seems to me that it's

37

kind of silly when we only have six to do it as a group because we have so much time. And it would be interesting to me -- this is just what I'm tentatively thinking -- to do it individual

Page 31

tomorrow and then the next day if we have more do it more as a group and kind of compare the two.

MR. BERRIGAN: And certainly if you'd like to do that, Your Honor, that's fine. To be honest, I've not had the experience of doing the individual voir dire. But my experience in doing the groups has been almost the opposite of what Mr. Miller's saying, that when people are in a group they're more comfortable sitting next to their sort of fellow draftees answering these questions than by themselves in front of this big group of lawyers and the judge. They take some comfort from the fact that they're not alone. And I don't worry too much about them sort of adopting other jurors' views about this issue because we've discussed it extensively in the questionnaire.

THE COURT: And from day one whenever the subject would come up, you've always expressed a preference for group.

MR. BERRIGAN: I have a very strong preference for it to the extent, Your Honor, that if -- you know, if publicity was a problem, I'd be willing to do that in some other fashion. My great fear is we'll feel the need to do individual because of the publicity aspects of this, and I don't feel that way at all.

I agree with Mr. Miller; this case has gotten a lot of publicity but certainly not more than Mr. Honken's. And to be

38

honest, the publicity that even Miss Johnson's case has gotten has focused a lot on Mr. Honken, not on Miss Johnson.

THE COURT: Right.

MR. BERRIGAN: I mean, there are a lot of jurors in these questionnaires -- you've seen them yourselves -- they know something about Mr. Honken. They don't really claim to know much, if anything, about Miss Johnson. We have much less fear

Page 32

than the Honken group does, frankly, about the pretrial publicity regarding Miss Johnson.  We really do.  And we're willing --

THE COURT:  Well, that wasn't the position you took at the change of venue hearing.

MR. BERRIGAN:  Well, we are concerned about it.  I don't think --

THE COURT:  Well, would you agree that that's exactly opposite of the position you took at the change of venue issue?

MR. BERRIGAN:  We didn't have the questionnaires at the time, Your Honor.  But yes, I agree with you.

THE COURT:  Okay.  You're entitled to change your mind.

MR. BERRIGAN:  I've been somewhat encouraged by the questionnaires, to be honest, in that people don't seem to have a -- at least they haven't written down a lot of information.  I suppose when we ask them it can turn out to be quite differently.  I feel very strongly that the jurors are

39

emboldened when they're sitting there in a group and that they're much more candid with us about their views.

THE COURT:  Of course, you've never done individual questioning to have a comparison to.

MR. BERRIGAN:  You're right, sir.  I've seen it done.  I've watched it.  And I've always had the impression that it was not nearly as good.  And I'll also admit that a lot of attorneys that do capital work feel quite differently.

THE COURT:  Right.  But this is your case; it's not their case.

MR. BERRIGAN:  Right.  And I don't have any misgivings

Page 33

in my own mind. I hope I'm clear. This isn't a close call for me.

THE COURT: I can't remember you having misgivings about anything you've argued, Mr. Berrigan. If it ever happens, I'll be sure and remind you. But based on experience, I don't think that's something I'm going to experience.

MR. BERRIGAN: I would suggest we try the small group, and then if you don't like it, we can revert to what we know.

THE COURT: No, no, I want to do it. You've been consistent and persuasive on it. And there's no preference to the government that I can tell in doing it, and you feel it's a better way to go. I'm willing to try it but with one caveat. I'm unwilling to do pretrial publicity in a group.

MR. BERRIGAN: Yes, sir. And I'm fine with that, sir.

40

The only reason I -- my preference --

THE COURT: You want to do the death penalty stuff, you want to do anything else in group, do it in group.

MR. BERRIGAN: All right, sir.

THE COURT: Is that fair?

MR. BERRIGAN: Yes, sir. We were -- our intent was -- if you'd permit us is to ask the publicity question at the very end of the group voir dire.

THE COURT: Yes, and then --

MR. BERRIGAN: And then we would dismiss the -- based on the responses obviously dismiss the panel and bring people back one at a time.

THE COURT: But only those ones who raised their hand.

MR. BERRIGAN: Yes, sir. And perhaps not even all of those if there was agreement that for other reasons the juror

Page 34

need not come back.

THE COURT:  Right.  Maybe when we send them out we can then do the challenges for cause.

MR. BERRIGAN:  That would be our preference.

THE COURT:  If we get rid of people, who cares -- if it's somebody that I strike, it doesn't make any difference whether they raised their hand on pretrial publicity; right?

MR. BERRIGAN:  Yes, sir, that's right.

THE COURT:  So just to kind of -- I want to conceptualize it.  We bring in 12 people on Thursday of this

41

week if we have 12.

MR. BERRIGAN:  Yes, sir, right.

THE COURT:  What happens?

MR. BERRIGAN:  Well, depending -- I think that would be our day to go first.

THE COURT:  Oh, because you're alternating.

MR. BERRIGAN:  It's the government's day.

THE COURT:  Oh, are you alternating?

MR. BERRIGAN:  I thought the Court had allowed us to do that.

THE COURT:  That's fine.

MR. BERRIGAN:  So we understood the government was going to go first.

THE COURT:  Let's say it's your day.  What do we do?

MR. BERRIGAN:  We have them sitting in the box, and I would start by introducing myself --

THE COURT:  You don't even want me to introduce the lawyers in the case.

MR. BERRIGAN:  No, you can do that, sir.  I do it as a

Page 35

matter of course, but I won't do it if you do it.

THE COURT:  Hey, it's your day.  If you don't want me to introduce you --

MR. BERRIGAN:  No, I had forgotten that you did that, and I'm perfectly fine with that, sir.  I see it on the overhead.

42

THE COURT:  You know, maybe we can go through this overhead as part of this conversation.

MR. BERRIGAN:  Yes, sir.

THE COURT:  I would like to introduce the name of the case and introduce the lawyers because to me it's almost rude.  It's just a matter of common courtesy.  I've always just introduced the lawyers, you know, but if you don't want me to, I won't.

MR. BERRIGAN:  No, sir.  We're fine with it.

THE COURT:  I don't feel strongly about it, but I kind of like to introduce the lawyers, and I would like to go through the courtroom participants because I like to demystify this stuff for jurors.  They come in here in your typical two-day drug case, and they're apprehensive.  You know how apprehensive they're going to be in a death penalty case.  So I like to spend a little time with them to just kind of put them at ease and so they know who are these people in the courtroom.  What is Carey doing sitting over there?  What are -- the gentlemen with the blue blazers and the earpiece, what are they doing?  I'd like to explain that.

And I'd like to tell them a little bit about the function of the jury and the function of the judge just to give them some information.  I think it's very important for me to

Page 36

put jurors at ease, potential jurors, and I think by giving them some basic information that's simple to understand, it just

43

helps get them a little bit more at ease until you question them.

I would like to do probably the slide on voir dire just to explain we're going to have 18 jurors, 6 will be alternates. They won't know who the alternates are. See, and that's another thing. Under your system they do know they're alternates.

MR. BERRIGAN: No, I would not tell them that, sir.

THE COURT: Well, when we do 22 and you exercise -- oh, that's right, because we're not doing -- actually if we brought them back in -- well, we'd have to group them. Right. Okay. I gotcha. They wouldn't know they're alternates.

MR. BERRIGAN: We'd mix them up. Right.

THE COURT: And then we get to the next slide which would be the jury selection process.

MR. BERRIGAN: If I might interject, Your Honor.

THE COURT: Yeah.

MR. BERRIGAN: Regarding the voir dire slide.

THE COURT: Yeah.

MR. BERRIGAN: I just wanted to make a suggestion on the goal of voir dire.

THE COURT: Okay.

MR. BERRIGAN: I understand we all know, us lawyers, the goal is to find jurors who are fair and impartial.

THE COURT: Yeah.

44

Page 37

MR. BERRIGAN: I think that kind of goes without saying, and the negative aspect of giving that information is that I believe it sends a wrong signal to the jurors that might contradict with the open and honest suggestion that follows thereafter, that is, that those concepts aren't necessarily compatible. Somebody who's open and honest might not be fair, they might be partial, and we want to know that. I mean, that's the whole purpose of this proceeding.

THE COURT: Do you want me to just cross it out?

MR. BERRIGAN: I would love for you to do that, sir.

THE COURT: I'd be happy to cross it out. You want me to just say it's our goal to find 18 jurors.

MR. BERRIGAN: Yes, sir.

THE COURT: I have no problem with that. Okay. And then I'd like to just give them an overview of what's going to happen, and that's where we come back to you now because I'm not still crystal clear in my mind what's going to happen. So we can spend some time now so that I can fill in this slide for tomorrow.

MR. BERRIGAN: Yes, sir. I'm looking at the jury selection process slide.

THE COURT: Yes.

MR. BERRIGAN: We have no problem with that at all, sir.

THE COURT: Except I'm not sure there will be much

45

introductory explanation and questions by me. We'll probably wind up taking that bullet point out.

MR. BERRIGAN: Other than what you've been doing up to that point.

Page 38

THE COURT: Right, yeah. And I would have already done it. So there's no need announcing I have done it after the fact.

MR. BERRIGAN: The pool of 75 or so might be --

THE COURT: Right, and that's obviously going to change. Matter of fact, depending on what we agree to at the end of this hearing -- I mean, I want to tell them something about how they'll be notified.

MR. BERRIGAN: Right.

THE COURT: But it probably won't be -- we're certainly not bringing 75 back in. I was thinking about bringing about 40 in, but I'm pretty persuaded not to bring anybody back and do it your way. And, you know, we can figure out how long we think it's going to take, maybe two to three weeks, whatever. There's probably -- is there any need for me to do a statement of the case? I don't think so.

MR. BERRIGAN: We'd prefer not, sir, frankly.

THE COURT: Okay. Statement of the case -- do you have any objection to that? I'm assuming you're going to jump in here if you have a huge objection.

MR. MILLER: No objection.

46

THE COURT: Then do you have any problem if I just call on one of the lawyers on each side and have them introduce people?

MR. BERRIGAN: Not at all, sir.

THE COURT: And do you want me to alternate each day?

MR. BERRIGAN: It doesn't matter, sir.

THE COURT: You don't care.

MR. BERRIGAN: No, sir.

Page 39

THE COURT: They're kind of used to the government going first.

MR. BERRIGAN: Exactly. We're just interested in the questioning.

THE COURT: Okay. And then do you have any problem with -- what is the estimated length of this trial? I've heard varying estimates.

MR. WILLIAMS: Three months, Your Honor.

THE COURT: Okay. Now, that includes the jury selection.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Three months? Is that what you want me to tell them?

MR. BERRIGAN: I'd be very surprised, but if that's what the government says, yes, sir. We're not in a position to dispute them.

THE COURT: Now, do you want me to raise the severe

47

and extraordinary hardship?

MR. BERRIGAN: We would prefer not to, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: We have gone to some pains to weed out a lot of those people.

THE COURT: And that's something you'd prefer to do.

MR. BERRIGAN: We'd prefer to do that maybe perhaps at the end of the group questioning. Publicity, we can do hardship and, to the extent somebody responded, bring them back individually.

THE COURT: Let me ask you this. This is where I'm going to see if you're willing to compromise.

Page 40

MR. BERRIGAN: Yes, sir.

THE COURT: I would look through the questionnaires the night before each panel, and there would be on the average six or so people who claim -- that's just a guess, my recollection -- six or so people who would claim it's a severe and extraordinary hardship. I would start off by talking about the importance of jury duty, the opportunity to serve their country which is what jury duty is. And when I got done, some days nobody claimed it was a severe or extraordinary hardship. We had -- I remember a couple times we had farmers who farmed full time, worked in manufacturing full time, were not going to get paid except for the first two weeks of jury service who had claimed it was an extraordinary hardship, but once they heard me

48

talk about their duty to serve said that they have changed their mind and they thought they did have a duty to serve and it wasn't an extraordinary hardship.

And I think, all due respect to how ever persuasive you are and I'm sure on every other issue in the case you'd be far more persuasive than I would be, but I think coming from me it's more persuasive, and I think we will have fewer claims of hardship if I do it.

MR. BERRIGAN: Yes, sir. I wasn't going to suggest the lawyers do anything other than try to identify those people who are making a claim.

THE COURT: Okay.

MR. BERRIGAN: That is, at the end of the general voir dire or group voir dire we would ask people these two subjects, publicity, how many people here know something about the case as a result of media attention it's been given, and how many people

Page 41

here claim an extraordinary hardship.

THE COURT: But, see, they're much more apt to claim it with you than with me.

MR. BERRIGAN: You know, the truth is, Your Honor, that I'm looking through the group, and I see three people for the week, for the week --

THE COURT: Because you've weeded that out.

MR. BERRIGAN: Right, that we thought had maybe even a close call.

49

THE COURT: Well, what's the harm in me doing it?

MR. BERRIGAN: It's just that -- it's not identifying them. It's your duty to serve and planting this notion that they -- you know, this is a -- we all recognize this is one of our duties as citizens and we should honor it and respect it and make every effort to be jurors when we're asked to do so. Our concern is that bleeds into their responses on other issues, albeit if we did it at the end I see that as less of a problem, frankly. I mean, that is if it's at the end of the questioning because we've already talked about everything else to them, so it doesn't really matter that they're now encouraged to be jurors by the Court.

MR. MILLER: May it please the Court.

THE COURT: Yeah.

MR. MILLER: Your Honor, I feel otherwise. I think we're going to end up wasting more time if we wait until the end. On those occasions where we do have people who are, in fact, excused for hardship, getting them out of the way early saves the time that would otherwise be used interviewing them.

THE COURT: And we can spend more time on other

Page 42

jurors.  That's -- I think I'm going to --

MR. BERRIGAN:  Well, can I ask the Court to consider this perhaps mild alternative?

THE COURT:  Sure.

MR. BERRIGAN:  And that is when you ask them if there

50

are jurors who claim that there's a hardship that those people are addressed out of the hearing of the rest of the panel?  I, frankly, think those numbers are going to be --

THE COURT:  Why?

MR. BERRIGAN:  Well, it's the same concern.  We're waving the mesh flag, and I saw this in Mr. Honken's trial.  I thought it was quite effective.  I was shocked that not more people raised their hand.  I think that works.

THE COURT:  But that's what you're afraid of, that it works; right?

MR. BERRIGAN:  Yes, it works, you're right.  Those people are getting another message.

THE COURT:  What message might that be?

MR. BERRIGAN:  That it's your obligation to be a juror if you can, you know, that this is difficult service, this is a long trial.

THE COURT:  What's wrong with that message?

MR. BERRIGAN:  Because that might keep them from responding I think as openly and candidly as they might otherwise because they're going to recognize some of their feelings aren't consistent with that obligation to serve.

So let's -- just for an example, a juror who has some very strong pro-death penalty views who might be inclined to demonstrate that in the questioning might feel as a result of

Page 43

the Court's admonition about hardship that they really need to

51

put that aside and be a juror and participate in this trial making it that much more difficult for the defense at least in my view to get at their true concerns regarding the death penalty.  I think the Court does such an effective job -- we've talked about this in other areas in terms of the presumption of innocence and the burden of proof.

THE COURT:  I think I'll let you do that in this trial.

MR. BERRIGAN:  I thought you do a great job, sir.  I think if you recall we asked you to do it at the end.

THE COURT:  You just want to pick and choose.

MR. BERRIGAN:  I just want to do it at the end. That's all, because I think it's so effective it keeps jurors on who might not otherwise survive this process.

THE COURT:  Well, let's come back to that one.  And then the next slide right below it, facts of the case, talked to anyone, read -- I'm going to leave that totally alone.  You don't want me to ask that.

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  What are we doing about potential witnesses?  Do you have witness lists?

MR. WILLIAMS:  Yes, Your Honor.  In fact, I gave you a copy.  It's on your bench there.  We got from the defense their -- I put it up right before the hearing next to your note pad.

52

Page 44

THE COURT: Oh, here it is.

MR. WILLIAMS: And what we've done is combined all of the government's witnesses, both guilt and penalty phase, all the defense guilt and penalty, put them alphabetical order and put towns to the extent we had them next to the names.

THE COURT: Okay. Do you agree with this list?

MR. BERRIGAN: I haven't seen it yet, but I have no reason to doubt that it's not accurate, Your Honor. Our request would be that the lawyers be allowed to ask that question as well.

THE COURT: Sure. So I'm out of the potential witness questioning.

MR. BERRIGAN: I'm afraid so, sir.

THE COURT: Hey, you're making my job easier. I appreciate it.

MR. WILLIAMS: Judge, the only thing I would ask with respect to that is last time what we did is we made a new set of 15 copies every day as we went, and then we handed them out to the jurors. Just as a purely logistical matter, with our office moving over to new space, we have one very slow copier downstairs, and if we could hand these out to the jurors, ask them not to mark on them, hand them back to the CSOs so we can, to the extent possible, reuse them every day because logistically it's going to be hard to run that many copies.

THE COURT: Although it's kinda nice to -- we'll just

53

make the copies. Don't you want to give it to them so they can mark on it, though?

MR. WILLIAMS: Yeah. I mean, if it would make it easier for them to remember who they knew, that'd be fine. My

recollection from last time -- I could be wrong -- is most of them didn't write on them. Most of them would just thumb through and say, We know this person.

THE COURT: When are they going to be given this?

MR. WILLIAMS: I think they need to be given that when they come in because if we're going to do group voir dire, we don't have the time for them to be downstairs before they come up for individual voir dire. So if we're going to have this mean anything to them, I think they need to be given that so they have some time to look at it before they come in here for voir dire.

THE COURT: So that means the jury clerk will probably -- do you have any problem with the jury clerk handing this to each of the --

MR. BERRIGAN: No, sir.

THE COURT: -- and saying this is -- you don't actually have on here that it's a witness list.

MR. WILLIAMS: We can put -- I was just cautious to put a caption on it because I didn't know what everybody would want.

THE COURT: Can we just put a caption on it "witness

54

list"?

MR. BERRIGAN: Right.

MR. WILLIAMS: Potential witness list?

MR. BERRIGAN: Potential witness list.

MR. WILLIAMS: Or list of potential witnesses?

THE COURT: You know, if it was nonlawyers, they would put witness list recognizing that some --

MR. WILLIAMS: Very good. Witness list it is.

Page 46

THE COURT: Then you can put a footnote "but both parties reserve the right to call other witnesses not on the list if the situation should arise."

Okay. So who's going to have -- we're going to have this tomorrow morning?

MR. WILLIAMS: Yeah. We will have it -- we'll bring it up to the clerk's office by, you know, 7:30, 8:00 in the morning.

THE COURT: Okay. Now, do you want me to talk about formal charges, accusation, difference between grand jury and trial jury or not?

MR. BERRIGAN: No, sir. If you feel compelled to do so but --

THE COURT: I don't feel compelled to do so but -- that's fine. I won't talk about it.

MR. BERRIGAN: I don't think so, sir.

THE COURT: I think -- have you heard my explanation

55

of the difference between a trial jury and a grand jury?

MR. BERRIGAN: I may have. I'm not sure.

THE COURT: I don't think you have, because if you had I can't imagine you wouldn't want me to do it. But you know what? I'll be very agreeable. I won't do that. But let me say this. I think that's the single most important thing I do to ensure a defendant a fair trial, but I have no need to do it.

MR. BERRIGAN: No, I just am confused about when you're talking about it.

THE COURT: You don't want me to do anything but -- I know you don't want me to do anything until the end. I understand that completely.

Page 47

MR. BERRIGAN: Okay. Then I misunderstood.

THE COURT: And I don't have a problem with that.

MR. BERRIGAN: Okay. Well, I would like it done at the end. I thought we were still kind of going --

THE COURT: No, no, no. I'm just trying to figure out what I'm doing and what I'm not doing. I'm doing everything at the end that I can do at the end.

MR. BERRIGAN: We absolutely would like that at the end, and we like the presumption of innocence and the burden of proof and the charge not being evidence. We would like the Court to do that, respectfully request that you do it at the end of the voir dire before the jurors are dismissed for the day.

THE COURT: Okay. So that I'll do at the end.

56

MR. WILLIAMS: Your Honor, one request with respect to that. As we went through the Honken trial, you started to amend the way you do that a little bit just to let the jury know that we don't have a choice; we have to take it to the grand jury; this isn't --

THE COURT: I tried to make it more balanced.

MR. WILLIAMS: And we loved -- in the end I think that helped a lot, and it obviated any need for me to spend time messing with that issue.

THE COURT: And just refresh my recollection about what you think I should say -- it's not going to be totally balanced but to make it more balanced.

MR. WILLIAMS: You indicate that the government has to use the system, that it's designed to have somebody else other than just the prosecutor make the decision on whether to charge somebody, at least runs it by some citizens which they don't

Page 48

have to do in state court. And that's basically it. As long as the jury doesn't get the impression that we thought this idea up the other day and thought, jeez, let's go out and start using a grand jury because we can abuse people's rights, I think that would be fine.

THE COURT: Yeah. The one thing that's unresolved now is the severe and extraordinary hardship and when to do it. I mean, normally I like to do it early because if we're going to dismiss somebody for it, I want to get them out of here so it

57

gives us more time to spend on the other issues.

MR. BERRIGAN: And, Your Honor, I'm fine with that, frankly, if it were done in an -- if not an individual setting but just the people that have indicated a hardship. I, frankly, think those numbers are going to be small.

THE COURT: Because you've eliminated most of them.

MR. BERRIGAN: Right, exactly. So in a panel of 15 if you had more than 2 people or 3, I'd be very surprised. And those people could be talked to all at the same time before we even did general voir dire if you'd like to get rid of them. We have no problem with that. It's the -- when it's done in front of the group, we're expressly concerned about the message.

THE COURT: Yet there's then another kind of delay where some people are sitting around. I'm not going to do it that way.

MR. BERRIGAN: Then we'd ask it be done with publicity.

THE COURT: At the end.

MR. BERRIGAN: Yes, sir. I think the parties have tried very hard to get rid of the legitimate hardships. And

Page 49

we'll continue to explore that as we go.

THE COURT: No, I can do it at the end.

MR. BERRIGAN: Okay.

THE COURT: I can do it at the end because there shouldn't be that many.

58

MR. BERRIGAN: There should not, sir.

THE COURT: Right.

MR. MILLER: Your Honor, I think there still are plenty. Over half of the people who've returned questionnaires indicated a claim of hardship, and so we're going to have I think three or four per panel. We're going to have some claims. Some are clearly not going to be very legitimate, and others may very well have a lot of legitimacy to it, but it's going to be a waste of this Court's time and everyone's time to be discovering that only at the end of the voir dire process each day. And inevitably if we are discussing any issue whatsoever with these folks relating to their ability to be fair and impartial, one of the things they're going to volunteer is the fact that, by golly, I am going to be working every night and coming in here dog tired every day, and that hardship is going to make it hard for me to be a fair juror to both sides.

It's going to be discussed, and it seems to me discussing it up front is ultimately going to save a great deal of time for us. We can do it at the end of the day. It clearly doesn't prejudice either side to do it as far as placement. But I'm just trying to consider economy of the time we're going to be spending with these jurors.

MR. BERRIGAN: If I could respond briefly, I think the Court's worried about legitimately wasting the time of people

Page 50

that shouldn't be here because of a hardship.  There may be

59

other people that claim it.  But after at least as I saw Mr. Honken's case, not many people persisted in that claim in the face of the Court's discussion about their obligation for jurors.

THE COURT:  Well, not many did compared to the people who claimed it in the questionnaire.

MR. BERRIGAN:  Exactly.

THE COURT:  But there were usually anywhere from two to four each day that were dismissed for hardship.

MR. BERRIGAN:  And all I'm suggesting -- I disagree with Mr. Miller -- there may be another four or five people that might have said something but we're not going to be wasting their time because they're not going to be legitimate hardships. We've reviewed those.  And I don't think we're going to see a lot of people with legitimate hardships.  There are going to be some folks that don't want to be here, but I don't think we're wasting their time because they're going to be here anyway.

THE COURT:  Well, here's the counter to your argument.

MR. BERRIGAN:  Yes, sir.

THE COURT:  They know at some point -- I would believe at some point most jurors would have an expectation that they're going to be asked about whether it's a severe or extraordinary hardship.  If I wait till the end, they may not be very candid about their death penalty issues and forthcoming because they figure, I don't really have to get into that; I don't have to

60

disclose anything because I'm going to bank on the fact that my
Page 51

excuse is good enough that that's the one that's going to get me off at the end.

MR. BERRIGAN:  That's a possibility.

THE COURT:  It's equally as plausible as yours.

MR. BERRIGAN:  Right.  And we see the other thing too is sometimes they answer questions that might not reflect their true views about some of these issues because they really want to get off for hardship.  They flip that around.  They're just jurors who want to get off.

THE COURT:  I don't find very many of those in the Northern District, period.

MR. BERRIGAN:  Well, Your Honor, if you feel strongly about it, it's not that big of a deal.

THE COURT:  I don't really feel strongly about it, but I want to try and figure out how I can achieve my objective about doing it earlier, getting them off so you have more time to spend with the other jurors and achieve your objective about not having that influence their remaining answers.

What if after I ruled on extraordinary hardships, you know, I brought it up with the jurors and I dismissed whoever I also talked about after that saying that that I just spent some time with you on your duty to serve.  You also have a duty not to serve if your views -- but you don't want me to use the word fair and impartial.  If your views affect your ability to be

61

fair and impartial and the lawyers are going to ask you a bunch of questions about your ability to be fair and impartial and it's very important that you answer them as honestly and openly as you can and that you serve the country just as well by disclosing things that would indicate that you're not a good

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 108 of 282

juror for this case as you do if you're selected?  If I did something like that, would that help?

MR. BERRIGAN:  I think it would, Your Honor.  And I'd only ask to substitute their honest, open responses for fair and impartial, that that's their obligation to the Court and the parties, not to be fair and impartial but to be completely open and honest because that's how we pick the best 12 jurors for this case because I think that's really what we're trying to encourage in this process.

THE COURT:  Okay.

MR. BERRIGAN:  Fair and impartial's kind of a code term.

THE COURT:  So you want me to really stay away from that.

MR. BERRIGAN:  We would like if at all possible.  I know it's difficult.

THE COURT:  Yeah, it's part of my incantation.  So I'll work hard on it; okay?

MR. BERRIGAN:  Thank you, sir.

THE COURT:  So I think I will take that up early, take

62

up the extraordinary hardship; okay?  Now, what are we flip flopping each day?  Who goes first?

MR. BERRIGAN:  Yes, sir.

THE COURT:  So then you're going to do -- we're going to do group questioning, but both sides will say towards the end -- well, who goes first tomorrow?

MR. BERRIGAN:  The prosecution goes first.

THE COURT:  Okay.

MR. BERRIGAN:  We'd be happy to go first if they'd

Page 53

like, but I think they usually do go first.

THE COURT: So how are we going to get to the fair and impartial -- I'm sorry. How are we going to get to the pretrial publicity question?

MR. BERRIGAN: It would be incumbent upon the prosecution or the defense, but one of us has to ask that during the end of our voir dire, and our preference I guess would be that the second party did it because that seems to make more sense, that we would then stop the voir dire and deal with that issue. But we could do it --

THE COURT: But it would be the last thing we're going to deal with as a group in the morning; right?

MR. BERRIGAN: Right, right.

THE COURT: This is starting to get very confusing to me. So then we're going to do that individually. Then we're going to bring them back. Then I'm going to do the burdens of

63

proof -- nature of indictment, burdens of proof?

MR. BERRIGAN: Yes, sir.

THE COURT: And then when we're done with that --

MR. BERRIGAN: We could make --

THE COURT: We have to send them all out again?

MR. BERRIGAN: No, sir. I would suggest we make our cause strikes at the end of the publicity if we bring in the publicity questions because we've already got the jurors out. So we'd bring in the ones that have publicity. We talk to them.

THE COURT: Yeah, but a lot of jurors go out on burden of proof. A lot more went out on cause on burden of proof than they did on pretrial publicity in the Honken case.

MR. BERRIGAN: And I just haven't had the
Page 54

experience --

THE COURT:  Burden of proof is the single biggest red flag that I kick jurors out on for cause because they don't believe they can give the defendant the full benefit of the presumption of innocence.

MR. BERRIGAN:  We could do the cause at the end then. I see no harm in that either.  But you're right.  I mean, after they go out on the general, they would have to come back for the -- for at least the Court's questioning.  And we'd be finished with the questioning.  The parties would make their strikes.  The jurors don't need to be here for that.

THE COURT:  Well, how do we inform them?

64

MR. BERRIGAN:  Well, I suppose how ever you usually do that, sir.  I've had experiences where that's not done in court, but we certainly could do it in court.

THE COURT:  I think we'd have to send them all out again and then take up the -- Mr. Williams, you're shaking your head.

MR. WILLIAMS:  You know, what it sounds like to me, Your Honor, is the defense wants to use your skill when they want it, when they think it's beneficial.  When they don't think it's beneficial, they want you to be quiet, and they want to do it in such a way --

THE COURT:  That is what they want, but what's wrong with that?

MR. WILLIAMS:  Well, it's going to be a ridiculous setup.  What I'm hearing is we're going to have jurors up and back, up and back, up and back.  And sometimes you're talking to them and then you're going to talk to them again.

Page 55

My view is let them handle presumption of proof -- presumption of innocence, burden of proof, and the nature of indictment. If they don't trust themselves to do it and they only think you can do it, then, you know -- I just -- it's annoying to me to listen to the defense recognize your skill in handling these issues but then want to pick and choose what they want you to handle in the order they want you to handle it in such a way that we're going to have jurors inconvenienced and us

65

inconvenienced and delays built into this process to have people in and out so they can orchestrate this in the perfect way they have in mind.

And it just seems to me at some point if they're working that hard on it, let them handle the voir dire themselves and get the Court out of it. But that's just frustration speaking, Your Honor.

MR. BERRIGAN: At the risk of prolonging this discussion, may I respond briefly, Your Honor?

THE COURT: Sure.

MR. BERRIGAN: The jurors are only going to be in here, in this room twice, once for the general voir dire questions in the group, and then we're going to have some people come back for publicity, and then the group's going to come back for your questioning, and these are areas that are particularly appropriate for the Court to be inquiring about. These are principles of justice. They're not defense principles. They're not Pat Berrigan's rules. These are the court rules. The Court's had obviously a lot of experience. Everybody acknowledges, including the prosecution, that the Court does this particularly well. I don't know why they would be

Page 56

prejudiced by the Court doing it.

THE COURT: Well, I mean, there's a lot of merit to what Mr. Williams is saying. You want to design -- I mean, you have expressed today a rather complicated, to me, way you want

66

to do it which really you cherry pick what you think I do best, and then you want me not to do anything that interferes with your theory like talking to them about severe and extraordinary hardship because that somehow might bleed over into their views on the death penalty or something which I think is awfully convoluted personally. And you are. You're trying to take the very best of what you see that I do that is very defense oriented -- it is defense oriented, and I know it's defense oriented, but I've done it anyway. I don't have to spend the time I do. I don't have to use the examples I do. It's very, very defense oriented.

And I think what he's saying is you want me out of it, keep me out of it. Don't have me do the things that I do that are very defense oriented because you're not willing to have me do anything else.

MR. BERRIGAN: It's just the order. We're not asking the Court not to do anything it normally does other than change the order in which it's done. That's all. That's all we're asking, that the lawyers precede the Court in the questioning.

THE COURT: Well, I think I'll let you do it all. You want to do nature of indictment, burden of proof, and presumption of innocence, you all can do it in your jury selection. So, I mean, I guess I don't have to let you do any of it, but bottom line is you want to minimize my involvement. I don't take that personally. That's fine. It's your case.

Page 57

You discuss burden of proof, presumption of innocence, and nature of the indictment if you want to. You don't have to. You can do that.

And that way there won't be any need to bring them back, that once we finish with the questioning on pretrial publicity we can just keep all the jurors out, exercise the challenges for cause, exercise any peremptories, bring the jurors back one time, and tell them who's going home and who's -- what do I say? They're tentatively on the jury?

MR. BERRIGAN: Yes, sir.

THE COURT: Yeah, why don't we do it that way. Are there any questions about jury selection?

MR. BERRIGAN: Just one last little thing, Your Honor.

THE COURT: Yeah.

MR. BERRIGAN: In our -- the defense -- when we're doing our group voir dire, I really intended only to address questions regarding the death penalty and was going to have Mr. Willett really handle the rest of the voir dire if you'd permit us to split it in that fashion.

THE COURT: Sure. That's not a problem.

MR. BERRIGAN: I didn't want to surprise anybody.

THE COURT: No, no, no, that's not a problem. That's fine. Two of the three will be earning your keep this week, and I'm sure Mr. Stowers will be very helpful with --

MR. WILLETT: Mr. Stowers is doing a lot of

68

behind-the-scenes work that the Court doesn't see in the

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 114 of 282

courtroom, Your Honor.

THE COURT: That's true. So that means you won't be here for jury selection or be out of the courtroom doing behind-the-scenes work.

MR. WILLETT: My understanding is that Mr. Stowers will be with us, and when he needs to be doing something, he may be sent away on a mission, sort of like calvary, if you will, but Mr. Stowers will be with us.

THE COURT: So if he's here all week, then your statement that he's actually doing a lot of work during jury selection behind the scenes, how much weight should I give that if I don't see him leaving to do these things?

MR. WILLETT: Mr. Stowers has been working during the evening hours also, Your Honor, so he has been earning his keep.

THE COURT: I didn't say he wasn't, but I said he's not really going to be participating in jury selection, and you suggested that he'll be working behind the scenes, and I'm suggesting that he's not going to be working behind the scenes because he's going to be here in the courtroom during jury selection.

MR. WILLETT: I guess when the Court said working behind the scenes, I was thinking of times when we were not in the courtroom, Your Honor, and I apologize for misconstruing your language.

69

THE COURT: Okay. So any questions about jury selection?

MR. WILLIAMS: Just a clarification -- we talked about this before, and I think I understand -- but whoever goes first starts the exercise of the strikes first; is that correct? So

Page 59

for tomorrow, for example, when we go first in voir dire, then when it comes time to exercise strikes --

THE COURT: You'll exercise as many strikes as you want, as many of your 15.

MR. WILLIAMS: Right. And we strike first, and then the defense gets to exercise their peremptories. Tomorrow or the next day when they go first, they exercise first.

THE COURT: Correct. Any problem with that, Mr. Berrigan?

MR. BERRIGAN: No. Just to be sure, does that mean we're striking -- doing all our peremptories, or are we alternating you do one, we do one?

THE COURT: Well, you can't do that because you don't know how many anybody would strike. I think you strike who you want the one day. Then you get a chance to strike anybody you want. Then the next day you go first.

MR. BERRIGAN: Okay. So one side would just do all their peremptories.

THE COURT: Anywhere from 0 to 15.

MR. BERRIGAN: Before the other side did any.

70

THE COURT: Right.

MR. BERRIGAN: I understand.

THE COURT: Anything else on jury selection?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: What else is on the agenda then?

MR. WILLIAMS: Two things I have down, Your Honor. One is we are going to be invoking the rule against witnesses being in the courtroom. We want to make sure that there's a

Page 60

formal invocation of that rule.

THE COURT:  Any objection to Rule 615 being invoked, and do you have any exceptions you want me to make?

MR. BERRIGAN:  Not at this time, Your Honor.  I'm not sure when that starts.  Is it starting at the opening statement?  It seems to me there would be no harm in people sitting through voir dire if they chose to do that.

MR. WILLIAMS:  And I don't see a problem with voir dire.

THE COURT:  Okay.  Then we can start with opening statements.

MR. WILLIAMS:  Then the only other thing is the defense motion to dismiss and just to request some additional time -- I just have not -- I got two minutes --

THE COURT:  I've ruled on it.

MR. WILLIAMS:  Oh, you have.

71

THE COURT:  I entered a written ruling this afternoon.

MR. WILLIAMS:  Saves me some work then.

THE COURT:  It does.

MR. WILLIAMS:  Thank you.

THE COURT:  Maybe I granted it.  You ought to check.

MR. WILLIAMS:  I was just going to say Tom just asked, Shall we all leave now?

THE COURT:  I'm not very smart, but if I granted it, we wouldn't be here.

What else -- where are we on exhibit lists?  I realize the trial isn't -- you know, we're not starting evidence, but . . .

MR. WILLIAMS:  We have notebooks -- the defense has

Page 61

long had our witness and exhibit lists and copies of our exhibits already provided to them. We have notebooks for Court just as we did in Honken that we'll provide the Court tomorrow that has our exhibit list, our witness list, and all our exhibits that are paper documents.

THE COURT: Did you give them an exhibit list in the format I like to see if they're objecting to certain exhibits?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And when will the defense have for me the exhibit list with the objections that you're lodging to the exhibits?

MR. BERRIGAN: We have the exhibit list I believe

72

presently, Your Honor. We've not yet lodged any objections to the exhibits. If you're giving us some type of a deadline, we'll certainly endeavor to meet that.

THE COURT: Yeah. How about -- well, we don't know when the trial's going to start. How long do you need to fill in your objections to the government's exhibits?

MR. BERRIGAN: May I have just a moment, sir?

THE COURT: Sure.

MR. BERRIGAN: Frankly, we're not certain ourselves other than I think we could safely say we could have that done by the beginning of the opening statements of the trial. And if the Court needed it before then --

THE COURT: Well, I'd like it before then. Why don't you -- I don't want to -- why don't you have Mr. Stowers do it for the next two weeks?

MR. BERRIGAN: I'm sure Mr. Stowers will be working on it, Your Honor. No doubt about that.

Page 62

THE COURT:  Would a week from Friday be unreasonable?

MR. BERRIGAN:  No, sir.

MR. STOWERS:  No, I don't believe so.

THE COURT:  Would that give you enough time?

MR. STOWERS:  Yeah.

THE COURT:  Because I'd like to have it a week from Friday.

Anything else?

73

MR. WILLIAMS:  Not on behalf of the United States.

MR. BERRIGAN:  There is one on behalf of the defense, Your Honor.  It just arose today.  We've endeavored to provide clothes for Miss Johnson so she can be appropriately dressed during the trial.  And she's being housed here in the Woodbury County Jail during the pendency of the trial.  But there have arisen some issues particularly regarding her ability to be -- present herself to the jury in an attractive fashion that us males don't worry about, things like makeup, having some hairspray that she can fix her hair so that she doesn't have to come in as jail people typically look, not completely I suppose the way the rest of us look.

THE COURT:  So you want her to stop by the spa in the marshal's office first?

MR. BERRIGAN:  No.  It'd be nice.  But we have makeup, and we have these things.

THE COURT:  The federal spa service?

MR. BERRIGAN:  No, sir.  We've gotten these things together for her at our own expense, and we'll be happy to provide them, but the marshal's service has a policy -- and I don't -- I don't know if it's particular to this district --

Page 63

HEARING 11, 4-11-05 final pretrial conference

that they won't allow her to have makeup and look in a mirror and use a wide-tooth comb and fix her hair with hairspray. And so -- and I don't fault them personally. It's a policy. But it seems to me that given the very serious nature of this case and

74

our effort not to convey the impression that Miss Johnson's incarcerated --

THE COURT: Which is totally ridiculous.

MR. BERRIGAN: Totally unrealistic, right. It may be. But I think it's our obligation to do that as best we can. We'd like her to have access to these things. I don't know that there are security issues involved. I don't know, frankly, what the basis of the policy is other than I'm sure it's unusual given the relative number of women versus men that are in this situation.

To the extent that the Court would be willing to intervene to allow her to have makeup and hairspray and a comb and a mirror to prepare herself in the morning before court, we're asking the Court's intervention to allow her to do that.

THE COURT: Would you consult with Miss Johnson and find out the time frame that she would need, how much time we're talking about?

MR. BERRIGAN: I can tell you that we'd really like her here in the courtroom at least an hour before the start of court so that she can change appropriately because I understand the changing takes place here in the marshal's office, that she has to put her clothes on here, her makeup and so forth, so if that wouldn't be wholly unreasonable, I think an hour should be plenty of time for her to present herself in a nice condition.

THE COURT: But, see -- what time are we starting jury

Page 64

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 120 of 282

selection?  8:30?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  I don't know that we established that.  8:30?

MR. WILLIAMS:  That's what I thought your order said.  I'd have to look at it again, but I think it's 8:30.

THE COURT:  Well, there are a lot of days -- once the trial starts, there's a lot of days where I meet maybe for a half an hour before, and I want the defendant present.

MR. BERRIGAN:  Yes, sir.

THE COURT:  And I don't think we'll have to meet much during jury selection because I think after the end of the day we'll kind of critique it to see if there's anything we can do better.  We shouldn't really have a need to meet earlier.

We have our marshal.  Duane?

DEPUTY WALHOF:  Yes, sir, Judge.

THE COURT:  Would you mind going to the podium and tell me what the marshal's view is.

DEPUTY WALHOF:  We've provided the basic hygiene needs, deodorant, that type stuff, a wide-tooth comb.  She's been given that.  As for the regular makeup, hairspray, eye liner, all that stuff, district policy is we don't provide that or don't have defendants use that.  They don't allow it at the jail.  We don't like keeping it here.  There's a lot of small things and springs and brushes and all kinds of stuff that I

don't really want to keep track of as to what goes in and what comes out of the cellblock every day.

THE COURT: Well, I admit even ten years of experience has ill equipped me to rule on this motion because it's never come up before. Could we -- and I know makeup is a very individual thing.

MR. BERRIGAN: We're happy to keep custody of these products so the marshal's service doesn't have responsibility for holding on to them, Your Honor.

THE COURT: Yeah, but, see, it's not just keeping custody. It's inventorying it to make sure that everything that goes in gets back out, and that's a security measure that our United States Marshal's Service can't delegate to defense counsel.

MR. BERRIGAN: And I understand. But we understood Miss Johnson was strip searched anyway coming over from the county jail. So I'm not sure when exactly --

THE COURT: Well, but I thought you wanted her to use all the makeup stuff here.

MR. BERRIGAN: We do because they won't do --

THE COURT: Well, strip searching her at the county jail doesn't do anything. I mean, is there some -- I was just thinking this would make a great law review article. Is there some kind of middle position like hairspray because that doesn't take very long and that's probably the most prominent feature

77

that jurors would see from a distance? I mean, whether Angela Johnson had eye liner on or not -- and I'm not trying to make light of it -- isn't something that I could detect from here.

MR. BERRIGAN: I think women are a little more -- and I don't want to be sexist about this. I'm serious. I think women are much more sensitive to these issues. They can see a

Page 66

woman who's not wearing makeup. I'm oblivious.

THE COURT: Yeah, but a lot of women don't wear makeup.

MR. BERRIGAN: Well, I think somebody in this situation, Your Honor, on trial for their life, people would expect her to be as presentable as possible. We're not trying to create a security issue, but makeup, eye liner, we understand that that's inapplicable for the jail. Who needs makeup at the jail and eye liner? But we're not in the jail. And we're asking just for a little forbearance on this issue. It is kind of a big deal, frankly. Miss Johnson just wants to look as good as she can while these jurors are watching her every day during this trial and that she doesn't think she can do that without makeup. And I've not seen her with makeup, so I have nothing to compare that to, but it's very important to her.

THE COURT: But would you agree with me that -- I mean, to the extent that we're going to do individual questioning we could just put the jurors back in here and not have the jurors go into the witness box so that no juror would

78

ever get closer than, you know, what's that? Twenty-five feet? So I don't know much about makeup, but it seems to me like hairspray and lipstick would be about the only things you could observe from that distance and things like eye liner and eye shadow -- I mean, I don't know what's all involved here.

MR. BERRIGAN: There's only five things we're requesting: Hairspray, foundation, blush, lipstick, and mascara and I suppose a mirror to the extent that that would be obviously necessary to apply these things. We have these items. We're not asking anybody else to provide them, just that she be

able to use them.

THE COURT: So it's just five things?

MR. BERRIGAN: Yes, sir. And a mirror I guess would be six.

THE COURT: Do you have a mirror?

MR. BERRIGAN: Yes, sir. There's a handheld mirror I got at Walgreen's yesterday.

THE COURT: Would it be very hard to inventory that each day?

DEPUTY WALHOF: That'd be fine, Your Honor. I think we can make that work if that's what the Court wants to do.

MR. BERRIGAN: We'd very much appreciate that.

THE COURT: You don't see a security risk with just those items.

DEPUTY WALHOF: If it becomes an issue --

79

THE COURT: You'll let me know.

DEPUTY WALHOF: -- I'll let you know.

THE COURT: Okay. I'll go ahead and grant you that.

MR. BERRIGAN: Thank you, sir. That's all the defense had.

THE COURT: Thank you for raising it. That's all you had?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Mr. Williams, Mr. Miller, do you have anything else? I guess you said no.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Now, what can we do -- I'm sorry. What can the defense do to make sure we don't have the problem that we're going to have tomorrow with only six or seven jurors

Page 68

showing up? How quickly can you move on that?

MR. WILLETT: We have -- with the government now they have Panel B, our proposed strikes, and they're looking at those, sir, now. I won't answer for them, how much more time they need, but I don't think it will be that long. We can have at least Monday's panel to them tonight also. That would be Panel E. And --

THE COURT: Now, are you going to be beefing about the fact -- because it seems to me you have complained about this previously; maybe I'm wrong -- that if we go to later panels and try and get those people to move into the earlier panels, you

80

don't have a problem with that?

MR. BERRIGAN: No, absolutely not.

THE COURT: I mean, I imagine the clerk's office is just going to -- I hate to use the word randomly because I'm not using it in a scientific sense -- will just start with the later panels and just start calling whoever they can get ahold of and see if they can get them to come in early.

MR. BERRIGAN: That's fine.

THE COURT: You're not going to object that it's somehow some nonrandom manipulation of the jury panel.

MR. BERRIGAN: No, sir. We're not trying to reduce the numbers. Fifteen is fine with us, and how ever you fill them in is fine with us also. We presume that will be as random as is reasonably possible and whoever can come in can come in. I don't know what the process --

THE COURT: Well, I'd encourage you to -- you know, I'm going to talk to our clerk over in Cedar Rapids when I get off the phone (sic) and see if we can get some person power from

Page 69

Cedar Rapids because we don't have -- we don't have the person power here to do this. We're cut to the bone on personnel anymore because of budgetary problems. And we didn't anticipate this. Did you think maybe about giving me a heads-up about it?

MR. BERRIGAN: Not until I at least talked to the government. I wasn't sure, frankly, if we could agree based on my previous discussions with Mr. Miller. And again, casting no

81

aspersions whatsoever, he is an advocate for his position -- I respect that -- as I am for mine. We weren't able to agree when we talked about this issue in the context of hardship. It just didn't happen. We should have made the effort earlier after the hardships were done, and I've said several times that didn't happen. And I take responsibility for that.

THE COURT: Yeah, but the problem is, you know, you take responsibility for it, but there's no --

MR. BERRIGAN: There's no consequence.

THE COURT: -- consequence.

MR. BERRIGAN: Right, other than the discussion we've had today. I understand that, sir. Certainly if you come up with a consequence, I stand ready to abide by that. I'm not making light of the situation. I hear you that this is a bad situation.

THE COURT: No, I'm not --

MR. BERRIGAN: But we are at least -- belated as it is, I hope you respect the fact that we are trying to get rid of some people even now that shouldn't be here, but that is the goal.

THE COURT: There aren't going to be any consequences. I wish there were, but I couldn't think of any, so I'm off that.

Page 70

MR. MILLER: May it please the Court.

THE COURT: Yes.

MR. MILLER: Your Honor, just so we're very clear, it

82

was five or six weeks ago -- and perhaps Mr. Berrigan and I did not have a meeting of the minds at the time, but I submitted to defense counsel a list of over 100 people who I thought were not death qualifiable and invited the defense to give me a list of those they felt were not life qualifiable. And it was my understanding at that point that defense counsel simply felt that was not an issue that we could address at that point, and so it wasn't.

It will clearly inconvenience both sides to try to read and review and assess questionnaires on the fly, and that does disturb me, but I don't see an efficient way of doing it any other way. So we'll just have to do it that way.

THE COURT: Well, I guess either side could just balk at it and say we're not going to do it and just bring the people in.

MR. MILLER: I'd rather get this jury in three weeks than six, and I think that's the only way we're going to get it in three weeks.

THE COURT: But I realize it's a hardship for lawyers to do now what I expected -- was I somehow unclear in my expectations maybe? I must have been. Usually I'm pretty clear what my expectations are. But I must have not been very clear, so it's probably my fault. I don't actually understand this. Panel A, Juror 97, no life, what does that mean?

MR. MILLER: Your Honor, the ones where we have a

83

Page 71

circle beside them are the ones where there was an agreement.

THE COURT: Oh, okay. And what does the C mean? There's a C and then a circle.

MR. BERRIGAN: Those are agreed strikes for cause.

THE COURT: What does the C mean? Cause.

MR. BERRIGAN: For cause, yes, sir.

THE COURT: I just wondered what the initial -- what the letter C meant.

MR. BERRIGAN: That's all. That's just a code for cause.

THE COURT: Okay. And the circle means you agreed.

MR. BERRIGAN: Yes, sir.

THE COURT: Good. Okay. We'll be in recess. Thank you.

MR. BERRIGAN: Thank you, sir.

(The foregoing hearing was

concluded at 4:18 p.m.)

                         CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                        3-6-06
    Shelly Semmler, RMR, CRR                Date

Page 72

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

        Plaintiff,                         Sioux City, Iowa
                                             May 9, 2005
   vs.                                     4:15 p.m.

ANGELA JANE JOHNSON,                         EX PARTE PROCEEDINGS

        Defendant.
_____/

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 129 of 282

```
APPEARANCES:

For the Plaintiff:      Counsel not present

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                        Watson & Dameron
                        2500 Holmes
                        Kansas City, MO  64108

                        DEAN STOWERS, ESQ.
                        Rosenberg, Stowers & Morse
                        1010 Insurance Exchange Building
                        505 Fifth Avenue
                        Des Moines, IA  50309

Court Reporter:         Shelly Semmler, RMR, CRR
                        320 Sixth Street
                        Sioux City, IA  51101
                        (712) 233-3846
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 130 of 282

(Proceedings reconvened in the Court's chambers in the presence of the Court and Mr. Berrigan.)

MR. BERRIGAN: There have been some communications amongst the defense team that are going to require us to change some strategy as the trial goes on, and the real short question I have for Your Honor is if we found it necessary that one of the lawyers not be present in court working on the trial in some other way while court was going on, do you have any problem with that?

THE COURT: No, particularly if we make a record with regard to the defendant not having a problem with it.

MR. BERRIGAN: Okay. I didn't --

THE COURT: I mean, my view is she's entitled to two.

MR. BERRIGAN: Right.

THE COURT: I think she could even waive the two requirement.

MR. BERRIGAN: Right.

THE COURT: But as long as she consents, it's not a problem.

MR. BERRIGAN: Okay.

THE COURT: I don't even think it would be a problem if she didn't consent to it, but you obviously wouldn't do it if your client didn't consent.

MR. BERRIGAN: Can I prepare something in writing, or do you need to talk to her verbally? And it doesn't really

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 131 of 282

matter. Whatever your preference is. I didn't think it was a matter for the prosecution to really have input on. It's very much an internal decision.

THE COURT: Right, right, right. No, absolutely. It's perfectly appropriate ex parte.

MR. BERRIGAN: I could prepare maybe an ex parte letter and affidavit, and then in court we could make some record that she has reviewed that and I'm submitting it to the Court, how ever you suggest to handle it.

THE COURT: Why don't we just do it in court so you don't have to go to the extra effort of preparing anything in writing.

MR. BERRIGAN: Great.

THE COURT: Does it need to be done like tomorrow morning?

MR. BERRIGAN: It's possibly we might miss part of tomorrow.

THE COURT: Okay.

MR. BERRIGAN: But we can do it in the morning. We'll all be here in the morning. If we have to leave, it will be in the afternoon.

THE COURT: Why don't we do it at 4:45 this afternoon in the courtroom.

MR. BERRIGAN: Oh, great, excellent.

THE COURT: Would you just mind telling the marshals

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 132 of 282

not to transport her back.

MR. BERRIGAN:  That's fine.

THE COURT:  And we'll just get it back this afternoon.

MR. BERRIGAN:  Thanks.  I know some judges are a little leery about it, but it's kind of important.

THE COURT:  No, no.

MR. BERRIGAN: Thanks a lot.

(Recess at 4:17 p.m.)

(Proceedings reconvened in open court in the presence of the Court, Mr. Berrigan, Mr. Stowers, and the defendant.)

THE COURT:  Okay.  Please be seated.  The record should reflect that the defendant, Angela Johnson, is personally present along with two of three counsel, Patrick Berrigan and Dean Stowers, and we are meeting ex parte on the record based on a request made by Mr. Berrigan.  Mr. Berrigan?

MR. BERRIGAN:  May it please the Court.  There have been some developments, Your Honor, that the defense team has deemed it necessary that there be some work that continue during the trial that needs to take place outside of the courtroom during the time that witnesses might be testifying.

Obviously there are three lawyers.  We're asking the Court's permission that one of the lawyers perhaps not be present every day during all of the witnesses' testimony and that we expect this is a very temporary situation, but it's one that could occur as early as tomorrow, so we wanted to bring it

to the attention of the Court in case you'd have any misgivings or concerns about that.

We've discussed it with Miss Johnson. She's certainly agreeable and amenable to one of her lawyers not being here if he's needed to do things outside of the courtroom in her defense.

And to be clear, this would be an attorney working on this case on Miss Johnson's behalf, not down at the library reading a book. If we weren't here, we would certainly be working on Miss Johnson's behalf.

And I mentioned this to the Court, and the Court wanted to be assured that Miss Johnson consented to the attorney's absence if the attorneys felt it was necessary, and I believe that she does, and if I might ask her.

THE COURT: Okay. Could I ask a couple questions first before we find out from Miss Johnson?

MR. BERRIGAN: Certainly.

THE COURT: Would it be the same attorney who's going to be absent, or could that be on a rotating basis?

MR. BERRIGAN: It could be, but it very likely will be myself, Your Honor, and I expect it will be probably only this week and probably only during the course of the next two days.

THE COURT: Okay.

MR. BERRIGAN: I would be very surprised if it lasted any longer than that or it were anybody other than myself that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:09-cv-03064-MWB-LTS   Document 284-89   Filed 06/23/11   Page 134 of 282

wasn't present in court.

THE COURT: Why don't we even make it broader so that -- let me just tell you what my own view is. My own view is you don't even need my permission, that that's something you would have a right to do. I appreciate you letting me know because if I saw somebody was missing, maybe I would have a duty to inquire why. I would have given you the benefit of the doubt. I think if neither one of the two remaining lawyers said anything to me, I would assume that you're working on the case and you just have matters that need to take you outside the courtroom. I don't see a problem with it at all. I appreciate the fact that you brought it to my attention. And -- but I think we ought to make the agreement broad enough so if it happens at some other point in the trial, I think I might have a problem if we got to less than two because Angela Johnson is statutorily entitled to two lawyers, and I kind of take that to mean probably two lawyers in the courtroom.

MR. BERRIGAN: Yes, sir. I think there's zero chance that we'd ever have less than two, and frankly right now, Your Honor, we're just not anticipating this issue to carry beyond this week. You're right. I mean, there's a possibility that something else could come up. This is going to be a long trial. And if so --

THE COURT: So why don't you just make a record with Angela Johnson to find out if she consents to at any time during

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

the course of the merits phase and/or penalty phase if we ever get there just having two lawyers present in the courtroom on her behalf.

MR. BERRIGAN: Okay.

THE COURT: Okay.

MR. BERRIGAN: With the explanation we've had in court and our own discussions, Miss Johnson, is it agreeable to you that if your counsel felt it was necessary that one of the lawyers not be present during court proceedings where witnesses are testifying because we needed to work on some other matter of your trial, would that be acceptable to you under the conditions we've discussed?

THE DEFENDANT: Yes, it is.

MR. BERRIGAN: Do you have any questions about it at all?

THE DEFENDANT: No.

MR. BERRIGAN: Is there anything else you'd like, sir?

THE COURT: No thank you.

MR. BERRIGAN: Thank you, sir.

THE COURT: Okay. Thank you very much.

(The foregoing proceedings were

adjourned at 4:50 p.m.)
                          CERTIFICATE
        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


        s/ Shelly Semmler                      5-25-11
      Shelly Semmler, RMR, CRR                   Date

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:09-cv-03064-MWB-LTS   Document 284-69   Filed 06/23/11   Page 136 of 282

VOLUME 10A SEALED, 5-19-05

2199

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                  No. CRO1-3046

        Plaintiff,                Sioux City, Iowa
                             May 19, 2005
   vs.                           12:38 p.m.

ANGELA JANE JOHNSON,             VOLUME 10A of 24

        Defendant.
                       /        TO BE FILED UNDER SEAL

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2200

APPEARANCES:

For the Plaintiff:       C. J. WILLIAMS, ESQ.
(via speakerphone)     Assistant United States Attorney
                     Suite 400 - Hach Building
                     401 First Street Southeast
                     Cedar Rapids, IA  52401

For the Defendant:       PATRICK J. BERRIGAN, ESQ.
                     Watson & Dameron
                     2500 Holmes
                     Kansas City, MO  64108

                     DEAN STOWERS, ESQ.
                     Rosenberg, Stowers & Morse
                     1010 Insurance Exchange Building
                     505 Fifth Avenue
                     Des Moines, IA  50309

For Dustin Honken:       ALFREDO PARRISH, ESQ.
(via speakerphone)     Parrish, Kruidenier, Moss, Dunn
                       Boles, Gribble & Cook
                     2910 Grand Avenue
                     Des Moines, IA  50312

                     LEON F. SPIES, ESQ.
                     Mellon and Spies
                     Suite 411
                     Iowa State Bank Building
                     Iowa City, IA  52240

Also present:            Dustin Honken
(via speakerphone)

Page 1

Case 3:09-cv-03064-MWB-LTS  Document 284-69  Filed 06/23/11  Page 137 of 282

Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

⚲

2201

THE COURT:  Okay.  The members of the public have now left the courtroom.  Although there was a member of the press here, everyone has now left the courtroom except the Johnson defense team and Angela Johnson personally, my law clerks, and the U.S. marshals.  I'm going to seal the remaining portion of the record.

Is it permissible now, Mr. Spies and Mr. Parrish, if I make that single inquiry of Mr. Honken and ask --

MR. PARRISH:  Let me suggest it is, Your Honor.  Mr. Honken, you understand what the judge has said to you?

MR. HONKEN:  Yes, I do.

MR. PARRISH:  And is that in agreement with what you and I discussed yesterday and what you discussed with Mr. Spies last week?

MR. HONKEN:  Yes, it is.

MR. PARRISH:  Okay.  We're prepared then, Your Honor.

THE COURT:  Okay.  Mr. Honken, you have been subpoenaed to testify on behalf of Angela Johnson in the penalty phase, and your lawyers have indicated to everyone in no uncertain terms that you intend to invoke your Fifth Amendment right not to testify, and I just wanted to make sure that that is the case.  If called as a witness by the defense in the penalty phase of Angela Johnson's trial, would you invoke your Fifth Amendment right not to testify?

MR. HONKEN:  Yes, Your Honor.

⚲

2202

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 138 of 282

THE COURT: Okay. Thank you very much. I don't believe there's any -- let me ask the Johnson defense lawyers, is there any further record we need to make on this matter?

MR. STOWERS: Not with regard to Mr. Honken's position.

THE COURT: Okay. Well, with regard to --

MR. STOWERS: Well, we'd like to know if the government will contend at some future date that this record is not adequate to establish that Mr. Honken would take the Fifth if he were called in open court in this matter because we don't want the government to later claim there's some defect in the proceedings that we've undertaken.

THE COURT: Why would the government claim that? You're the one subpoenaing.

MR. STOWERS: I don't know why, but if our position at a later date is that Mr. Honken took the Fifth and, therefore, we weren't able to call him and then at some later date he becomes available, the government might say the record here was not adequate to do that, and I just --

THE COURT: Mr. Williams?

MR. WILLIAMS: I guess, Your Honor, my position is the record is what the record is, and I'm not in a position to indicate whether it's adequate or not. It appears adequate to me. I don't know why it wouldn't be adequate. But ultimately, you know, if -- I can't imagine this issue arising, but if it

2203

ever did, I think that's ultimately up to the courts to decide whether the record's adequate or not.

THE COURT: Okay. Let me ask the Johnson defense
Page 3

team.  Is there any reason to leave the Honken defense team and Mr. Honken on the line?  We need to call Mr. Williams on a matter related to our case on jury instructions, but do we need either Mr. Honken or his defense team any further?

MR. PARRISH:  Your Honor, Al Parrish.  Do you have like two seconds -- if you don't, that's fine -- while Mr. Williams is on with one quick matter I think we could take care of?  If you don't have time, I can understand.

THE COURT:  No, I think I do.  But let me find out. Is there anything further, Mr. Stowers?

MR. STOWERS:  I don't believe so, Your Honor.

THE COURT:  Okay.  Mr. Parrish?

MR. PARRISH:  Yes.  It will take two seconds, Your Honor.  We were going to file another quick motion today.  We are having a terrible time with the telephone system at Marion, and we called Mr. Williams this morning to see if he could give us five extra days.  He does not oppose it.  I know you've been very patient about it.

THE COURT:  I think I've already granted the motion.

MR. PARRISH:  Great.  I'm in Ottumwa, so I haven't had a chance to look at it.

THE COURT:  I realize you're having a lot of

2204

difficulty, so I've already granted the motion.

MR. PARRISH:  Thanks, Judge, and we'll be in touch. And, Leon, we'll talk later.

MR. SPIES:  Thank you.

THE COURT:  Thank you.

MR. SPIES:  Thank you, Your Honor.

THE COURT:  And, Mr. Williams, do we have a number to

Page 4

call you back on?

MR. WILLIAMS:  Yes, I'm at my office.  It's my regular line, 391-363-6333.

THE COURT:  Okay.  We'll call you right back.

(Recess at 12:49 p.m.)

                              CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                         10-5-05
      Shelly Semmler, RMR, CRR                Date

Page 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

  vs.

ANGELA JANE JOHNSON,

      Defendant.

_____/

No. CR01-3046

Sioux City, Iowa
May 26, 2005
1:13 p.m.

**TO BE FILED UNDER SEAL**



TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:
(via speakerphone)

    ROSEANN KETCHMARK, ESQ.
    MATT WHITWORTH, ESQ.
    Assistant United States Attorney
    Charles Evans Whittaker Courthouse
    Room 5510
    400 East Ninth Street
    Kansas City, MO  64106

For the Defendant:
(via speakerphone)

    PATRICK J. BERRIGAN, ESQ.
    Watson & Dameron
    2500 Holmes
    Kansas City, MO  64108

Court Reporter:

    Shelly Semmler, RMR, CRR
    320 Sixth Street
    Sioux City, IA  51101
    (712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good afternoon, Counsel. This is United States of America versus Angela Johnson, Criminal Number 2001-3046. I'm here in Sioux City, and I have my court reporter, and I'm not exactly sure what the purpose of the meeting is, of this conference is, but I know there was a request yesterday by the outside taint attorneys Roseann Ketchmark and Matt Whitworth from the Western District of Missouri who are the taint team lawyers in this case, and you did send me a courtesy copy of the outside taint attorneys' request for disclosure by defendant of results and reports of any examination on mental conditions, and that's about all I know.

MS. KETCHMARK: Yes, sir, that's correct. And I think yesterday Matt and I had a telephone conference with Pat Berrigan to discuss getting the experts' reports to each other and just talking about the mental condition. And there were basically four comments that Pat made that are of concern to us that because time is of the essence in some areas we thought it might be best to have a conference call and take it up immediately with you and go from there.

THE COURT: Okay.

MS. KETCHMARK: I can just kind of tell you what our four concerns are. The first one is in our discussing with Pat

reports and results of experts, Pat's opinion is that the rule requires the government's expert to prepare reports but not the defense experts. I just was not able to read that from the rule. I could be wrong. I just didn't find that the rule supported that, and that's of some concern. And Pat said that he is recommending that the defense experts not prepare reports.

And the third concern is --

THE COURT: Well, what's the second concern? I thought that was the first concern.

MS. KETCHMARK: The first concern is that the government's experts have to prepare reports and the defense experts do not.

THE COURT: Okay. That's two concerns or one?

MS. KETCHMARK: That's the first concern is that just that there are different rules for the experts.

THE COURT: And the second concern is the fact that apparently Mr. Berrigan has indicated he's instructed his experts not to prepare reports.

MS. KETCHMARK: Recommending that they not prepare reports.

THE COURT: Yeah.

MS. KETCHMARK: And then third, our experts are prepared to -- if needed prepare reports. They're believing that they should prepare a report and have asked Pat for additional information specifically to what information the

defense experts are relying on that they should also review, witnesses, collateral witnesses that may be important, if they can have contact information so they could call -- Pat told us yesterday he is not inclined to provide any of those requested information to our experts. And so that's our third concern.

And then our fourth concern is -- and this kind of is reflected in our letter brief, that the position we're put in and the prosecution, that the mental condition does not have any bearing on the defendant's thinking or behavior at the time of the offense and, therefore, we cannot ask questions about the offense, and we can sure live with that.

And our point is that although -- that the jury needs to understand that. Yesterday Pat said that the judge is clear, the prosecution team, the taint team, the experts, and that he are all clear on those parameters, but our point is the most important folks that need to have that basic understanding is the jurors, that this mental condition didn't affect the behavior and the thinking of the defendant at the time of the offense, yet Pat's opposed to preparing a stipulation to advise the jury of that, those parameters.

So those are our four concerns. And our experts are put in the position where they don't know what they're looking for. We've kind of tried to move forward with a lot of unknowns, and so we sure don't hold it against Pat in any way that he's been very strategic in trying to put himself in the

best advantage, but we're just trying to level the playing field.

THE COURT: Okay. Why don't we try to get through to the heart of the matter. Let's go through them one at a time.

Mr. Berrigan, what's your authority for the proposition that the government experts have to prepare reports but your experts don't?

MR. BERRIGAN: The rule, Your Honor, Rule 12.2(c)(3) talks about the disclosure of the results and reports of the defendant's expert examination. I don't see anywhere in the rule and I'm not aware of any other authority and, frankly, in the past I have not had experts prepare reports necessarily when they're testifying in the mitigation phase of a capital murder case and the testimony is not about the defendant's mental state at the time of the murders. So I don't think it's a situation where there's some burden upon the defense to put on -- put in reports, written reports in order to --

THE COURT: How do you get -- just a second. How do you get your construction out of the rule?

MR. BERRIGAN: I just don't think the rule -- the rule addresses government's examination and reports. It doesn't compel any reports from defense experts. So I don't think the defense is compelled to produce any reports. Certainly we, I think, need to provide by way of a general explanation about what the expert's testimony's going to be about. We need to

provide some explanation about what the testimony is going to be about.

THE COURT: I don't understand how you conclude that under the rule. Which specific rule are you looking at?

MR. BERRIGAN: I'm looking at 12.2.

THE COURT: Well, what part of 12.2?

MR. BERRIGAN: 12.2(c)(3).

THE COURT: After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination.

MR. BERRIGAN: Right.

THE COURT: What's ambiguous about that?

MR. BERRIGAN: Nothing. I think if there was a report we would absolutely have to disclose it.

THE COURT: Well, I think it's unethical for you to instruct an expert not to prepare a report.

MR. BERRIGAN: I haven't in -- well, okay.

THE COURT: Well, what have you done? You've told them not to prepare a report.

MR. BERRIGAN: The experts asked me, Your Honor, whether we want a report. I have not asked them for a report.

THE COURT: Well, here's the deal. I'm going to make it real simple. You can either have them prepare a report -- has the government -- has the government exchanged their results

and reports yet?

MR. BERRIGAN: No, sir.

THE COURT: Okay. And your -- let me ask the taint team lawyers. Your experts don't have their reports done?

MS. KETCHMARK: Not at this point. They have requested additional information before they prepare their report.

THE COURT: Well, we're out of time.

MS. KETCHMARK: They can prepare it very quickly.

THE COURT: Okay. Okay. I hear you. Well, here's what I'm ruling. Either your experts, Mr. Berrigan, prepare reports and turn them over, or I'm going to give the government the right to take their telephonic deposition.

MR. BERRIGAN: Okay.

THE COURT: So it's your choice.

MR. BERRIGAN: All right.

THE COURT: But I don't think you can do this. And I don't think you can evade the rule by not having them prepare reports.

MR. BERRIGAN: I'll have them prepare a report if I'm being directed to do so.

THE COURT: Well, either that or I'm going to give the government the right to take their deposition.

MR. BERRIGAN: Right. I understand the options.

THE COURT: So we've resolved number one. Have we --

is there anything else about number one that I need to rule on, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: No, sir. That takes care of 1 and 2.

THE COURT: Okay. Three is -- this is a little bit more problematic. The experts apparently relied on interviews of other individuals? Is that it? Is that what you're saying?

MS. KETCHMARK: We're saying we don't know what they've relied on, and they just want to make sure that they covered the important information.

THE COURT: Well, as part of their -- as part of the -- as part of their report, they're going to have to list all information they relied upon. And if it's interviewing individuals, they'll have to list the individuals and summarize the nature of the interview.

MS. KETCHMARK: Okay. Okay. They were interested in talking to like her ex-husband, her sister, and curious about contact information like phone numbers. Those folks would be helpful to get a better understanding.

MR. BERRIGAN: Your Honor?

THE COURT: Yes.

MR. BERRIGAN: These individuals, these two gentlemen that the government has hired to do the evaluation, talked to Miss Johnson for five and a half hours a month ago. And as far as I can tell, they've not done anything since. They certainly had the opportunity to ask her any questions they wanted about

who they should interview, how to get ahold of those folks. I have a copy of their transcript of that interview. They did not do that. Now you're kind of asking me at the eleventh hour to give the prosecution work product of the defense in order for them to kind of, I guess, get up to speed.

THE COURT: Well, who the experts talked to is not work product.

MR. BERRIGAN: No, I understand that. But they're apparently wanting me to put them in contact with people.

THE COURT: Well, I don't think you have to do it, but I think the experts do. The experts have to list all the information that they relied upon. And if they talked to somebody, they have to list identifying information about who it is they talked to and their address and phone number if they have it.

MR. BERRIGAN: Well, the rule -- and again, this is Rule 12.2(c)(3) -- anticipates that that report would go to the government after we have the government's report. So I don't know how they use our report to then be the base of their subsequent investigation to do their report when they should have done that from the beginning.

MS. KETCHMARK: I think the judge addressed that in his order how the taint team effects the raw data sent to the government's expert as well as the report.

THE COURT: Well, I don't remember what the order

said, but this was exactly the kind of problem I was trying to avoid. But you know, Mr. Berrigan, I just knew it was going to happen.

MR. BERRIGAN: Your Honor, I got a letter about this on Tuesday. I mean, these guys talked --

THE COURT: Yeah, but, Mr. Berrigan, to tell your experts not to prepare reports --

MR. BERRIGAN: Well, Your Honor, even if -- let's assume my experts had prepared a report. Let's assume that happened. The government would not get that until after they'd already given us a report, and now they're asking us for information that they want to use in preparation I guess to do some more investigation to prepare a report. I mean, they --

THE COURT: Okay. I under -- here's -- I understand what you're saying. I'm going -- here's what I'm going to do. The government has to turn over their reports without that additional information.

MS. KETCHMARK: Okay.

THE COURT: You then, Mr. Berrigan, have to give the government in your reports all of the information your experts relied upon. And if the government experts then want to go out and contact those people and change any opinions in their reports, they're free to do so.

MR. BERRIGAN: Okay.

MS. KETCHMARK: We understand.

THE COURT: But that solves -- and I think Mr. Berrigan's right. There's no requirement that that information be turned over in advance to the government -- to assist the government in conducting their investigation and report. But I think it's only fair that the government experts have the information that the defense experts relied upon. And they may, in fact, revise or modify any initial conclusions that they came to based on that new information.

MS. KETCHMARK: I understand.

THE COURT: And that's consistent or at least it's not inconsistent with 12.2.

MS. KETCHMARK: Okay. Okay.

THE COURT: What other problems are there?

MS. KETCHMARK: Our concern about the jury drawing the inference -- the common sense inference that if they're putting on mental condition as a mitigator that the jurors probably would say, well, that should -- that affected her behavior and thinking at the time of the offense, and they've clearly said that is not what they are arguing.

THE COURT: Did you ever enter into a written agreement about that?

MS. KETCHMARK: Well, we asked Mr. Berrigan about that yesterday, to enter into a stipulation that we had talked about on one of our previous conference calls. He said he was disinclined to enter a stipulation which I'm sure that's his

choice.

THE COURT: Yes. I think there's nothing that I can do to require him to stipulate to it. I just want you to reduce to writing what your agreement is, and then I'll decide if the jury should be told that in the instruction.

MS. KETCHMARK: Thank you. And I think that may be the best resolution is an instruction.

THE COURT: But right. Neither the government nor I can require Mr. Berrigan to stipulate to it. All I'm trying to do is see if you can agree on what the agreement was because I think we were all in agreement about it. And if not, I can go back and get a transcript done, but it would just be faster and easier if you would just reduce to writing what you agreed upon, and then I'll take up the question about whether at the appropriate time the jury should be informed of that agreement by way of either an oral instruction from me or include it in the written instructions.

MS. KETCHMARK: My notes reflect that that understanding is the mental condition did not affect the behavior or the thinking of the defendant surrounding the time of the offense.

THE COURT: Mr. Berrigan, is that in the ballpark?

MR. BERRIGAN: Well, it is, Your Honor, but there are really two issues. One is -- and I'm not sure which one the government's interested in or both. One is the limitations on

the experts in terms of questioning Miss Johnson, and none of the experts have questioned her about the actual homicides. And that was based upon our representation our expert did not do that as well, and this was a rebuttal evaluation.

What the government's asking for a little different I think which is kind of the -- some instruction to the jurors that tells them not to consider her mental state in some regard, and I'm not exactly sure, you know, what that pertains to.

THE COURT: Well, I thought you indicated in the prior hearing -- if I have to get the transcripts, I will -- that you were not taking the position that she had a -- that -- your mitigation had nothing to do with her mental state at the time of the offense.

MR. BERRIGAN: That's right, yeah. And I've tried to be consistent about that. We've not suggested at all that her mental condition affected her ability to in any way participate in the homicides. She does have a couple chronic conditions, chronic meaning going back almost her entire life -- one is depression, and one is posttraumatic stress disorder -- which certainly existed at the time of the homicide, but they don't go away, but we're not claiming that these homicides had anything to do with her conditions or vice versa. In fact, that will be our position certainly in the penalty phase. I'm not sure why we need a stipulation or something to that effect, Your Honor, when that's going to be clear from the testimony, but the

government's alleging we do. None of the experts are going to talk of any opinion different than what I've told you.

THE COURT: And, Mr. Berrigan, I'm not saying I'm going to instruct the jury about that. I'm just saying if I decide to I'd like agreed-upon language.

MR. BERRIGAN: Okay. Well, I guess we can see what they proffer and take a look at it.

MS. KETCHMARK: In our letter brief, we addressed our concern. This has been a concern from the --

THE COURT: Now just a second. When you say letter brief --

MS. KETCHMARK: Yes, sir.

THE COURT: -- I don't have a letter brief.

MR. BERRIGAN: I don't either.

MS. KETCHMARK: It was a March 14 letter brief that we mailed to you. Let's see. It's about --

THE COURT: Back in March?

MS. KETCHMARK: Yes. And Pat didn't submit one. And based on our letter brief and our conference call, you issued about a 36-page order.

THE COURT: Oh, okay. I thought you were talking about a letter brief filed in the last 24 hours.

MR. BERRIGAN: I did as well.

MS. KETCHMARK: This has been a concern from the beginning, and we addressed that on page -- specifically page 5

about the possibility -- and 6, the top of page 6, about possible stipulations and our beliefs that the jury would draw a wrong inference from this mental condition. And then in your -- in response to our letter brief and our conference call, in your order you addressed it specifically on page 34 about how we may enter into stipulations and that a stipulation would likely dissipate our concern, and you mentioned -- and I can't put my finger on it now but how an instruction may be necessary, and I just can't put my --

THE COURT: Yeah, okay. But the bottom line is I think a stipulation would be in order, but I can't make Mr. Berrigan stipulate to it nor can the government. And if he doesn't want to stipulate to it, he doesn't have to, and then I'll have to decide based on the evidence and probably the argument whether or not a further instruction is necessary. If I think the defense is trying to somehow get around this agreement -- and I don't suspect that Mr. Berrigan would ever do that -- I just want to be ready with language if I think I need to tell the jury something. And the language I would tell the jury would simply reflect what the parties have previously agreed to.

MS. KETCHMARK: Okay.

THE COURT: So I want to make it clear I'm not saying I'm going to tell the jury anything. I'm just trying to anticipate if I ever need to tell them which I kind of doubt

based on what Mr. Berrigan is representing to me, I'd be ready to go with some language that the parties at least can agree that that's what their agreement was. I don't expect Mr. Berrigan to agree that I should tell the jury that.

MR. BERRIGAN: Right.

THE COURT: Mr. Berrigan, are you tracking me?

MR. BERRIGAN: Yes, I am, Your Honor. Yes, I am.

THE COURT: Okay. And Miss Ketchmark and Mr. Whitworth, are you tracking me?

MS. KETCHMARK: Yes.

MR. WHITWORTH: Yes, Your Honor.

MS. KETCHMARK: It was page 7 of your order, I'm sorry, where it says it might be necessary for the Court to give an instruction.

THE COURT: Okay. Are there any other issues that are outstanding now? And how soon will the parties -- well, let me back up here. I guess under the rule the defendant has to confirm an intent to offer during the sentencing proceeding expert evidence on mental condition after the defendant is found guilty. And, Mr. Berrigan, you're doing that, aren't you?

MR. BERRIGAN: That's exactly right, Your Honor.

THE COURT: Yeah, there's no question about that.

MR. BERRIGAN: Right.

MS. KETCHMARK: Okay.

THE COURT: Do the parties anticipate problems in the

timing of the exchange of this information?

MR. BERRIGAN: No, sir. I guess it depends on when the government report comes in, but I think my experts can have their reports in very quickly I suspect. I'll call them right away.

MS. KETCHMARK: We will.

MR. WHITWORTH: Judge, we talked to our experts, and they had indicated to us they could have something -- they thought they could have something ready by the end of this week which is tomorrow or Saturday I would think. But as soon as we get it, we will get it to Pat.

THE COURT: And it's not likely, is it, Pat Berrigan, that you'll be putting on any experts next week?

MR. BERRIGAN: Well, no. That's right, Your Honor. I think our first expert is scheduled for 8:30 in the morning on Monday, the 6th. So I won't have any experts testifying next week. Of course, we do have the matter of opening statements.

THE COURT: Yes.

MR. BERRIGAN: And so it would be helpful obviously to have the information as soon as possible. But I don't anticipate expert testimony until the week following.

THE COURT: Okay. So we at least have some time to get these reports exchanged but not a whole lot of time.

MR. BERRIGAN: Right.

MS. KETCHMARK: I do have a couple of issues. When

does the wall actually come down? Will that be when --

THE COURT: I don't know. That's a good question. I was wondering the same thing.

MS. KETCHMARK: Surely by opening statement when they advise the jury? I don't know if maybe any sooner. Or maybe I'm wrong and it's later. But I think my plan is to go up and personally turn over our information we have, our collection of --

THE COURT: What's the need for the taint team after the finding of guilt?

MR. BERRIGAN: I suppose theoret -- well, we're not presenting any evidence, Your Honor.

THE COURT: Yeah, your eligibility argument?

MR. BERRIGAN: Right. That's the only thing I can think of.

THE COURT: But because there's no --

MR. BERRIGAN: It would seem to me there's no reason at all to have the taint team continue.

THE COURT: Now let me ask you this. Because we're not putting on any evidence on the eligibility phase, would you have any problem with the wall coming down now once the guilty verdicts had come in?

MR. BERRIGAN: I'm sorry. I didn't understand that question, sir.

THE COURT: Well, because we're not --

MR. BERRIGAN: No, I don't really -- no, I think after the exchange of the reports I've got no problem with the wall coming down.

MS. KETCHMARK: Okay.

MR. BERRIGAN: I think -- see, I think, Your Honor, the defense has an opportunity -- I'm not going to suggest we'd exercise it, but we'd have an opportunity once we got the government's reports I suppose theoretically to change our mind.

THE COURT: Yes.

MR. BERRIGAN: Withdraw our notice, so I don't think until we've made that determination that the wall can come down. But, you know, that's not going to take me any time at all, and I'd be very surprised if we made a change in our strategy in terms of putting on mental health evidence, but I suppose as a legal matter that should at least occur that we would have the government's evaluation and have made a determination about whether it was still going forward.

THE COURT: Well, why would it be necessary to keep the wall in effect if -- you're obviously not going to turn over your reports once you've seen the government reports unless you're going to proceed.

MR. BERRIGAN: Right. It's the government -- it's the trial attorneys' access to the government's report I think is the danger. They could potentially use that I suppose in the penalty phase if they have access to it, and I think that's the

whole idea, that if the defense isn't going forward, then that information does not become available to them, to the government attorneys that are trying the penalty phase. Did that make any sense?

THE COURT: Well, what was the original reason for the taint team anyway?

MR. BERRIGAN: Well, it's this whole idea under the rule that these reports not be available to the government's trial prosecutors until we're in the penalty phase and the defense has made the determination to go forward with mental health evidence, and one way that -- it's supposed to make the process a little easier I think for the government because they can have some attorneys that are out of the process that are kind of working on this evaluation, and that would be, of course, Miss Ketchmark and Mr. Whitworth, and they're going along preparing that evaluation for potential use by the trial team lawyers, and having a taint team would, you know, better enable that process. At least that was my understanding.

THE COURT: Well, but if you look at Rule 12.2(c)(2) --

MR. BERRIGAN: Uh-huh.

THE COURT: -- it says, "Must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing

proceedings expert evidence on mental conditions." You've already confirmed that intent.

MR. BERRIGAN: Yes, we have. And you could take the position that that's sufficient to turn it over. I think the danger in that is if we withdrew it to what extent that report then could be used by the government in penalty phase creates legal issues that at least it seems to me we might not want to deal with.

But having said that, it would be extremely unlikely that we're going to change our position, and I don't expect, you know, waiting for us to look at the government's report's really going to take any additional time at all, but it provides quite a bit of, I suppose, safety in terms of not having any possibility that the government's mental evaluation would be misused for any purpose for which it was not intended.

THE COURT: Okay. So your position, Mr. Berrigan, is that the wall doesn't come down until you've seen the government reports and reconfirm your intent to proceed with mental health evidence.

MR. BERRIGAN: Right, because at that point really it seems to me no need for the taint lawyers any longer since we're going forward and all the information's on the table.

THE COURT: And we don't know exactly when the government reports are going to be produced to you?

MR. BERRIGAN: Apparently not, sir.

THE COURT: Do you have a date in mind, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: Earlier this week they said they could have it by the end of the week, that they were waiting for Mr. Berrigan's response, so it sounds as if it could happen quickly.

THE COURT: Okay.

MR. WHITWORTH: Your Honor, as soon as we finish this phone call, we'll get in touch with them and ask them to get that done as quickly as possible.

THE COURT: Okay. And, Mr. Berrigan, I suspect that once you review those reports you'll know immediately whether you intend to proceed or not?

MR. BERRIGAN: Yes, sir, yeah. I have no reason to delay, Your Honor.

THE COURT: And then would you then make a commitment to me to inform the taint team that you're proceeding and that we can all agree that once you do that and you will do that as soon as reasonably practicable after receiving the government reports then the wall can come down?

MR. BERRIGAN: Absolutely. And I can't -- hopefully I'll have these reports this week, and I would hope that decision would be made no later than by the start of court on Monday morning if not sooner.

THE COURT: Well, I would think -- unless I'm missing

something here, I think you could read the reports and pretty much make a decision after you read them and let them know some time this weekend by e-mail.

MR. BERRIGAN: Yeah, absolutely. But they're talking about Saturday. I don't know -- yeah, we could send you an e-mail as well so you'd know ahead of time. Sure. I'll be happy to do that.

MR. WHITWORTH: Are you holding court Monday, or is it --

THE COURT: No, I'm not holding court, but I'll be in town, so if I get an e-mail and I have to hold court, I will.

MR. BERRIGAN: Yeah, I misspoke. I meant Tuesday, right.

THE COURT: No, I knew you meant on Tuesday. Yeah, but if issues come up, feel free to just e-mail me over the weekend. I've got a Blackberry, and I'm never far from it. And I deal with a lot of things that come up on short notice.

MR. BERRIGAN: Okay. We'll do that.

THE COURT: I think we've resolved everything we need to resolve.

There is this issue -- but I don't have the right lawyers on here -- about the proffer -- oh, but let me -- as long as I've got some government lawyers. They're not actually the right lawyers, but it's good enough for me, so, Miss Ketchmark and Mr. Whitworth, you're not exactly going to know

what I'm talking about, but all I need to know is a response from Mr. Berrigan. Mr. Berrigan, the government filed a motion -- the other taint team filed a motion about telling the victims' family members about the nature of the proffer.

MR. BERRIGAN: Yeah, we're opposed to that, Your Honor. I did read the motion. It's rather short.

THE COURT: Yes.

MR. BERRIGAN: It seems to rely on what effect this might have on the victims' family members. Frankly -- and I don't know. The Court hasn't made the decision yet on Mr. Vest, but, you know, if he testifies, the victim family members are already going to have heard very similar testimony. They already heard it in Mr. Honken's case.

THE COURT: I was going to say that's right, they've already heard it in Honken's case.

MR. BERRIGAN: Yeah, when Mr. Vest testified.

THE COURT: Right.

MR. BERRIGAN: So I don't know what their concern is, to be honest, and I don't --

THE COURT: Well, is the Honken proffer all that different than the Vest testimony?

MR. BERRIGAN: That's what I'm suggesting to you, sir. I know you haven't had a chance to see it, but it's not that much different. And there's no bombs in there that they would not have already heard having listened to Mr. Vest, so I'm not

sure what the concern is there. Maybe the taint team's unaware that Mr. Vest testified in the Honken case or is unaware of his testimony is the only thing I could surmise because it makes no sense, frankly. This testimony's been out there. The victims' families already heard it from a different source admittedly, but there's nothing new in this.

We are opposed to it. It seems like it creates a lot of potential problems because a lot of these folks are going to testify. And I don't know what effect, if any, it's going to have on their testimony. But, you know, I suppose if the government wanted to put the proffer in -- I doubt they're going to -- they could do that before the victims' family testified and they'd know about it. But other than that, we don't think it's appropriate.

THE COURT: Okay. I just wanted to know what your position is.

MR. BERRIGAN: Yes, sir.

THE COURT: We'll take it up with everybody Tuesday morning.

MR. BERRIGAN: We have a written response, Your Honor, that will be filed today.

THE COURT: Oh, okay. I made a decision that I'm not going to look at the proffer until af -- until after the eligibility phase determination.

MR. BERRIGAN: Sure.

THE COURT: And if there's a determination that's favorable to the defendant, then I never need to see the proffer.

MR. BERRIGAN: Right.

THE COURT: If the eligibility phase goes against the defendant, then I need to see it so I could rule on its admissibility.

MR. BERRIGAN: Right.

THE COURT: Right?

MR. BERRIGAN: Yes, sir. I think that makes sense, and it's not going to take long I don't think for the Court to make -- I mean, if we're at the penalty phase, I don't think it will take long to make a determination about the admissibility of the proffer, frankly.

THE COURT: Okay. Yeah, I've given it a lot of thought.

MR. BERRIGAN: I know. I know you have.

THE COURT: You know, I'd like to see it before I rule on it obviously, but if it's similar to Vest, I have a very good understanding of what that might be like.

MR. BERRIGAN: Right.

THE COURT: Okay. Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

MS. KETCHMARK: Since we're in a better position than the prosecution team to submit our understanding of the

agreement or proposed instruction that we should do that before we wrap up as taint counsel?

THE COURT: Yes, that'd be nice.

MS. KETCHMARK: And should that be a formal response or an informal correspondence?

THE COURT: You can kind of just do it informally.

MS. KETCHMARK: Okay.

THE COURT: Great. Thank you. Thank you all very much.

(The foregoing hearing was

concluded at 1:47 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Shelly Semmler, RMR, CRR

5-31-05
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | |
| vs. | |
| ANGELA JANE JOHNSON, | TRANSCRIPT OF PHONE HEARING |
| Defendant. | |

The Hearing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, June 23, 2005, commencing at 12:50 p.m.

APPEARANCES:

For the Plaintiff:  C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA  52401

For the Defendant:  DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA  50309

Court Reporter:  Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

THE COURT:  Okay.  I entered an order, but that was before I got the government's response.

MR. STOWERS:  Right.

THE COURT:  And I'm a little bit confused.  The government now says the purpose of it was to investigate whether there were grounds for seeking a new trial?  Mr. Williams, isn't

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 169 of 282

that what you allege?

MR. WILLIAMS: That's my understanding from talking with Mr. Stowers this morning. The conversation went something along the lines of "I have no objection to it if the purpose is to, you know, learn how to be a better lawyer, but if it's for the purpose of looking to see if there's grounds for a new trial, then I object to it." And Mr. Stowers' response was "Why else would you do it," along those lines. And I think we just have a fundamental disagreement about the ability of counsel to conduct such an investigation.

MR. STOWERS: Well, okay. May -- I'm sorry.

THE COURT: So is that the purpose?

MR. STOWERS: No.

THE COURT: Well, then why did you tell Mr. Williams it was, or do you dispute --

MR. STOWERS: Well, I don't think that's an accurate rendition of our conversation, but it was kind of a rambling phone call at about eight in the morning.

THE COURT: Well, it's the kind of flippant response

3

that you've certainly been known to give. It would be very in keeping with -- well, just a second. I'm talking.

MR. STOWERS: Yeah.

THE COURT: It would be very in keeping with the response of yours, "What other purpose is there?" So I'm now -- my level of suspicion and skepticism is now sufficiently raised.

MR. STOWERS: Well, here's -- let me explain to you why we want to interview the jurors. I mean, obviously the jury returned a verdict that was quite surprising to all of us on our side of the case. We want to understand what happened

Page 2

basically.

THE COURT: Well, that's not the purpose of being allowed to interview jurors.

MR. STOWERS: I'm sorry?

THE COURT: I said that's specifically not a purpose of me waiving the local rule. I waive the local rule to allow lawyers to contact jurors to find out kind of how they can improve their craft which is actually somewhat unnecessary given this questionnaire that I give the jurors that they fill out that I think is more accurate than anything they would tell you by telephone. And then I'm going to make those available to the lawyers.

MR. STOWERS: Okay.

THE COURT: So you just want to go on a fishing expedition to try and figure out why the jury reached their

4

verdict, and that's absolutely an impermissible motivation to contact jurors.

MR. STOWERS: Well, that's not really a fair characterization of what we're interested in.

THE COURT: It's exactly what you told me. What do you mean it's not a fair characterization? Just a second. Just a second. Okay. You know what, Stowers? This is over.

MR. STOWERS: Well --

THE COURT: You keep interrupting me --

MR. STOWERS: I'm sorry.

THE COURT: Nope. You keep doing it. You keep interrupting me. I'm not having that.

MR. STOWERS: I apologize.

THE COURT: You told me that the purpose of it was you

Page 3

were surprised by the verdict. I was surprised by the verdict, but that doesn't give you a right to then go on a fishing expedition to find out why they arrived at their verdict, and that's exactly what you told me, and that is a fishing expedition for a new trial motion, and I'm not going to allow it.

MR. STOWERS: That's not what we're doing, though. I mean, I guess --

THE COURT: Well, that's what you just told me you were doing.

MR. STOWERS: I understand, Judge. I think that's

5

what I'm saying, but you're hearing it as something that -- not what I'm intending.

THE COURT: Okay. Well, that could be. Tell me what you're intending.

MR. STOWERS: What we're intending to do is do what I would consider to be sort of the routine postmortem on what happened in our case with respect to how we did with this jury because obviously they had a reaction to what we did that was different than what we were perceiving and what we thought happened. And that's what we're trying to figure out. I think it's for the purpose of helping us understand things, and that's really what it's about.

It's not for the purpose of making these jurors feel uncomfortable or anything else or for the purpose of trying to develop a basis for a new trial. It's for the purpose of evaluating for ourselves what in the heck happened here from our point of view with regard to our performance and our presentation and perhaps that of our -- you know, our overall

Page 4

performance.  There's a lot of upset on our part of the case which I'm sure you can understand.

THE COURT:  Of course I can understand that.

MR. STOWERS:  And it's very troubling to us.  We think from our point of view that it would be helpful to know something from some of the jurors I guess.  I don't have a script or a list of questions that we plan to ask them.  It's

6

sort of a -- from my point of view, if I have an adverse verdict on a case, I always like to attempt anyway to contact at least a few of the jurors to see what their thinking was about what the heck we did on the case or if we did something wrong in the way we did something, and that happens quite frequently on cases. It's how we can improve our performance and evaluate it, and that's really what I'm saying when I'm saying I'm trying to figure out what happened.  And that's kind of a common thing in cases to do.

The purpose isn't to go out there and say -- quiz these jurors about a variety of issues that might cross into the 606-type stuff under the rules of evidence which you note in your order.

But I guess it's just important as well to note that I called Mr. Williams after receiving his motion and your order, and my understanding is they don't really have a problem with the wordage of your order as it is being allowed so long as we don't get into what would be essentially a fishing-type expedition or those kind of things, so long as we're operating on a good-faith basis here which I think we are.  And so I'm sorry I interrupted you earlier.  I didn't mean to do that.

THE COURT:  Thank you, Mr. Stowers.

Page 5

Mr. Williams?

MR. WILLIAMS: Your Honor, Mr. Stowers is right. You know, given the language of your order with the understanding

7

that the phraseology that counsel can't interview jurors for the purpose of investigating those jurors being broad enough to include doing a fishing expedition to look for juror misconduct, I don't have a problem if the purpose of the debriefing of the jurors, if you will, is for the purpose articulated by Mr. Stowers today.

I candidly have concern given our conversation this morning that that's not what the intent was. But if the intent has changed or if I misunderstood the intent from this morning as Mr. Stowers just said and we have an understanding that they're prohibited from, you know, conducting this fishing expedition looking for juror misconduct or other grounds for a new trial, then I don't have a difficulty with that type of interview of jurors.

THE COURT: Well, the problem is, you know, it's totally unregulated once they start contacting the jurors. And it's such a gray area as to what contact -- what constitutes a fishing expedition in Rule 606(b) land and what constitutes legitimate inquiry just trying to find out where they went wrong in their case that I'm a little bit troubled by it because I'm -- you know, I'm just skeptical of your motivation based on what you told me.

You did a nice job on recovery stating a permissible basis to want to interview the jurors, but I'm not convinced that that's your real motivation in wanting to interview the

8

Page 6

jurors. So, I mean, you have no right to interview them.

On the other hand, I've waived at the government's request on several occasions, haven't I, Mr. Williams? I've had the government request an opportunity to interview jurors, particularly in the reverse of this case when there's a not guilty verdict.

MR. WILLIAMS: Certainly. And --

THE COURT: And I've granted those in every case I believe.

MR. WILLIAMS: Yeah, I think you have, Your Honor, and I found it very helpful both, you know, when we won or lost or, you know, if there's a -- you know, a new witness. One of the things we focus on is if we have somebody who's never testified before in court, we ask them how could that witness have improved their testimony, could they have improved it, did they explain things well, you know, so forth.

And so we ask about demonstratives, did they like them, did they dislike them, you know, did they think that they were readable. I find this type of debriefing can be very educational and very helpful for future cases.

My concern is simply that this is being used as a conduit for looking for grounds for finding error somehow in this case.

THE COURT: Who's going to be doing the interviewing, Mr. Stowers?

9

MR. STOWERS: Well, I guess we hadn't settled on that. It's going to be -- my belief is that it should involve at least one of the defense attorneys. We were going to do them by phone

Page 7

if we can reach these folks by phone.

THE COURT: Do you have that information from the juror questionnaires?

MR. STOWERS: We have from -- some of the questionnaires I believe did have phone numbers on them, but I'm not sure it's all on there. My understanding is the clerk of court may have a listing of juror --

THE COURT: Yeah, I'm sure they do.

MR. STOWERS: -- telephone numbers, and they may need the Court's permission or would want it obviously to release that to us. I think we have like 6 or 7 phone numbers for the jurors at this point, but we don't have all 12 of them. We would certainly, as you note in your order, respect their wish not to contact them or discuss things with them if they don't want to talk to us.

But I think if it was done with one of the attorneys, undoubtedly either myself or Mr. Berrigan, then it would be most safe I guess if that's the word for it from the Court's point of view that we wouldn't cross any lines that the Court feels shouldn't be crossed in terms of the propriety of what we do or how we treat these folks in our phone calls. And that was my plan was to probably try to make some of the calls myself.

10

THE COURT: And what types of questions do you think you'd be asking?

MR. STOWERS: Oh, I suppose we'd ask them things about the attorneys, is there anything we did that troubled them, any particular issues with any of the witnesses, things of that nature.

THE COURT: Do you understand you're specifically

Page 8

precluded from asking them questions about their deliberations?

MR. STOWERS: Right.

THE COURT: And you're not going to tape record --

MR. STOWERS: No.

THE COURT: -- or record any of the -- if I allow you to do it -- I've already told them -- I gave them a heads-up when I talked to them after the verdict that I may allow the lawyers to contact them.

MR. STOWERS: Right.

THE COURT: And I told them that they had to make an individual decision whether they wanted to talk to the lawyers or not and that they had the right to talk to them and if they wanted to talk to them that was fine with me and if they didn't want to talk to the lawyers that was fine with me and they had the right not to answer any specific question they didn't feel comfortable answering. And I told them that the lawyers would not be asking them if they were to be contacted at all about the juror deliberations because that's not a permissible grounds to

11

discuss with the jurors.

MR. STOWERS: Uh-huh.

THE COURT: So they've been forewarned that it may happen.

MR. STOWERS: Okay.

THE COURT: I mean, I'm very skeptical that your true motivation is a fishing expedition for a new trial, and I don't see that in a negative way really. I mean, you know, the stakes were always very high. They're even higher now. And I'm just a little bit skeptical.

MR. STOWERS: Right.

Page 9

THE COURT: And I have a basis to be skeptical based on what I understood you to say and what Mr. Williams understood you to say.

Mr. Williams, any final thoughts on the matter?

MR. WILLIAMS: No, Your Honor. I think you understand my position on it, and obviously I have complete faith and comfort in whatever your order is.

THE COURT: Do you think, Mr. Williams, that we have to have -- it's kind of hard to give real clear guidance on this.

MR. WILLIAMS: I agree.

THE COURT: You know, I've given some kind of general parameters. I'm getting ready to go to the airport in a little bit, so I don't have much time to do anything else today on

12

this.

MR. WILLIAMS: No. And I think, Your Honor, the -- it seems to me that to the extent that at some point the defense -- let's say they go out and they do these interviews and now suddenly they say, oh, gee whiz, we have grounds now because of this interview for, you know, a new trial, at some point the Court will have that in front of it to cross that bridge once again about whether they went farther than they were allowed to, whether that's admissible evidence, whether that's something you're going to allow in, whether you're going to allow a hearing and so forth.

And so, you know, perhaps the way the Court's order sits right now and based on the representations made by defense counsel we're okay. And if suddenly despite this we suddenly have a motion for new trial based on juror interviews, then we

can perhaps cross that bridge if we have to down the road.

THE COURT: You know, and the bottom line is if there was some impermissible misconduct, you know, like three jurors bringing a Bible in or something, you know, there's lots of Bibles-in-the-jury-room cases.

MR. WILLIAMS: Uh-huh.

THE COURT: If there was something like that that happened, justice is served by finding out about it.

MR. WILLIAMS: Sure.

THE COURT: Not by taking an ostrich approach to it.

13

On the other hand -- and that's why I say it's a fine line. While justice is served by doing that, justice is not served by interrogating the jurors about their deliberations and their process and search for some kernel of information that might lead to a motion for new trial.

MR. WILLIAMS: Correct.

MR. STOWERS: Right.

THE COURT: And so I guess if everybody understands the basic ground rules, you know, generally we shouldn't be afraid of more information.

So I'm going to go ahead and allow it consistent with the order that I entered earlier and with hopefully a fairly clear understanding by Mr. Stowers. And again, I'm going to ask you to remind each juror that they have a right -- it's fine that you tell them that they have a right not to talk to you. It's fine to make the pitch about what -- we'd really like to talk to you.

MR. STOWERS: Uh-huh.

THE COURT: You don't have to be totally neutral. I

Page 11

mean, you know, you can explain to them why you're calling and why you'd like to talk to them. But you have to really do a good job of respecting their views if they decide, one, not to talk to you or decide not to answer any question.

MR. STOWERS: Right.

THE COURT: If I get an inkling that any pressure has

14

been put on any potential juror -- you know the reason why we have this local rule? Does anybody know the history of it?

MR. WILLIAMS: I don't, Your Honor.

THE COURT: Well, it was at Judge Vietor's insistence. And what happened was the government interviewed a jury after a not-guilty verdict and at least in Judge Vietor's view made at least one juror feel that they had done the wrong thing by voting not guilty, and he was furious about it. This was back when I was a magistrate judge. And that's the origin of this joint local rule.

Now, I've always taken kind of the opposite side, that just because you have one or two incidents of misconduct, it doesn't justify a prophylactic rule that prohibits lawyers from contacting jurors. So I've waived it in -- I think in every case where I've been asked to do it. But that's kind of the history behind the rule.

So go ahead, but proceed with caution and care.

MR. STOWERS: Thank you.

THE COURT: Okay.

MR. STOWERS: Can I bring up one final thing --

THE COURT: Yes.

MR. STOWERS: -- not on this topic? We had asked to have our post-trial motion time extended to July 29, and you

Page 12

went ahead and granted that before the jury came back with their verdicts.

15

THE COURT: Yes, and I asked you several times before that if that was going to be enough time.

MR. STOWERS: You absolutely did, and your skepticism about that was probably --

THE COURT: Well placed.

MR. STOWERS: -- well placed.

THE COURT: And now you're telling me it's not enough time. Why would the change in the verdict affect your time for filing a motion for new trial?

MR. STOWERS: It might not, but I don't know what in the world we were thinking when we picked that date because Berrigan is leaving on -- I think it's the 27th for three weeks.

THE COURT: But he said all that when I asked him several times.

MR. STOWERS: Exactly.

THE COURT: Yeah.

MR. STOWERS: The only thing is the issues of this being a death penalty verdict, in my mind I could really use his wisdom on death penalty law which I'm no expert on, and I would like to have a couple more weeks, till the middle of August, just to make sure he's back in enough time to be able to give his input into it.

And I'm told or at least I've been cautioned, though I haven't researched it yet, that if we were to do what I was contemplating which is wait until somewhere into late July and

16

Page 13

then ask the Court to extend the time further there might be a problem with that because your further extension wasn't granted within the seven days post verdict.

THE COURT:  I think we must have entered five extensions in the Honken case.

MR. STOWERS:  Well, I don't want to get them in trouble.

THE COURT:  Yeah.  Now there's a new motion that Mr. Williams can file.

MR. WILLIAMS:  Certainly.

MR. STOWERS:  Somebody suggested that to me, that maybe there was a prohibition on further extensions being granted outside the seven days which kind of blew me away, and I hadn't had a chance to go back and look at whether or not that's a correct statement of the law.

THE COURT:  Well, let's find out from Mr. Williams.  Do you have any objection?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  What date would you like to extend it to?

MR. STOWERS:  Mid-August which would --

THE COURT:  Do you have a calendar in front of you?

MR. STOWERS:  If I can make this work.

MR. WILLIAMS:  August 12 is a Friday.  August 15 is a Monday.  August 19 is a Friday.

17

THE COURT:  How about this?  We'll extend it to August 19.

MR. STOWERS:  Thank you, Judge.  I'm sorry for the --

Page 14

THE COURT:  We'll get that order out today so it's within the seven days.  I'm actually not surprised by the request.

MR. STOWERS:  Yeah.

THE COURT:  I thought you were cutting it awfully close, and obviously the stakes have changed dramatically with the verdict.

MR. STOWERS:  Right.

THE COURT:  And so I can appreciate the fact that you need additional time because it's just simply -- it's a different paradigm now with a death penalty verdict than it would have been with a life imprisonment verdict.

MR. STOWERS:  Yes.  Thank you.  I appreciate that.

THE COURT:  No.  I understand that.  Anything else we need to take up?

MR. STOWERS:  No.

THE COURT:  Okay.

MR. STOWERS:  Have a nice trip.

THE COURT:  Thank you.  Bye now.

MR. WILLIAMS:  Thanks, Judge.

(The foregoing hearing was concluded at 1:14 p.m.)

⚥

18

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                9-29-05
                                         Date

Page 15

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 184 of 282

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. CR01-3046 |
| vs. | ) | |
| | ) | TRANSCRIPT OF |
| ANGELA JOHNSON, | ) | POST-TRIAL MOTIONS |
| | ) | |
| Defendant. | ) | |
| | ) | |

Transcript of post-trial motions, held before Chief Judge Mark W. Bennett at the United States District Courthouse, 101 First Street SE, Cedar Rapids, Iowa, commencing at 2:57 p.m., november 16, 2005, before Tracy A. H. Lamp, Certified Shorthand Reporter and Notary Public in and for the State of Iowa.

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 185 of 282

APPEARANCES

On behalf of Plaintiff:      Charles J. Williams
                                  Assistant United States
                                      Attorney
                                  P.O. Box 74950
                                  401 First Street SE
                                  Cedar Rapids, IA  52401


On behalf of Defendant:      Rosenberg & Stowers
                                  Attorneys at Law
                                  1010 Insurance Exchange
                                      Building
                                  505 Fifth Avenue
                                  Des Moines, IA  50309
                             By:  Dean Stowers

                                  Patrick Berrigan
                                  Attorney at Law
                                  2500 Holmes
                                  Kansas City, MO  64108

                                  Terpstra, Epping & Willett
                                  Attorneys at Law
                                  118 Third Avenue SE
                                  Suite 500
                                  Cedar Rapids, IA  52401-1424
                             By:  Alfred E. Willett

*T.A. REPORTING  (319) 626-7616*

<u>INDEX</u>

<u>WITNESS</u>                    <u>EXAMINATION</u>              <u>PAGE</u>

<u>EXHIBIT</u>                       <u>OFFERED</u>           <u>RECEIVED</u>

Government's Exhibit Number

Certificate of Shorthand Reporter                    114

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 187 of 282

THE COURT:  This is United States versus Angela Johnson, 2001-3046.  We're here on the post-trial motions.  Are there any preliminary matters?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

THE COURT:  Mr. Stowers?

MR. STOWERS:  No, Your Honor.  Thank you.

THE COURT:  I'm going to give each side an hour, and you can divide it up any which way you want including your rebuttal time, so who's going to start for the defendant?

MR. STOWERS:  I think I can, Your Honor.

THE COURT:  Okay.

MR. STOWERS:  Thank you.  Is this coming through for you?

THE COURT:  Yes.

MR. STOWERS:  I can't quite tell.

THE COURT:  Thank you.

MR. STOWERS:  Your Honor, we filed a motion for new trial pursuant to the Court's directive within the time period that it provided and provided the Court also after it gave us some additional time to file a brief in support of that motion.

THE COURT:  Well, I gave you all the time you asked for.

MR. STOWERS:  Exactly.

THE COURT:  Yeah.

MR. STOWERS:  And we appreciate that.  We filed it, and I'm sure the Court's reviewed it, and --

THE COURT:  You're right about that.

MR. STOWERS:  And gone over the many, many points that we've raised in the motion for new trial.  It's always a debate just say when you're representing somebody whether or not you want to do sort of a specifically targeted type motion in this kind of circumstance or whether or not you want to try and sort of laundry-list out the various points of error that you believe occurred during the course of the proceedings, and obviously I'm sure that you have detected that we laundry-listed out the various points of error because of the nature of this case.

THE COURT: Which I would fully expect in a case like this. I was actually surprised that you didn't come up with more than 38 errors.

MR. STOWERS: Well --

THE COURT: No, I fully understand you have an obligation to raise every single issue that you can, and I appreciate that.

MR. STOWERS: And I know you do.

THE COURT: And I would have expected you to do that.

MR. STOWERS: There's probably many other errors that we haven't found, so if you find any other errors that you'd like to rely upon --

THE COURT: I'm free to find plain error; is that right?

MR. STOWERS: -- then you can go ahead and rely on those in granting a new trial, but, in any event, it's not our intention here today to go over entirely all of the points we've made in the brief or those that we didn't make so well, but --

THE COURT: And if you think the time limit is inadequate, I was going to give you all the time you need actually. We probably should have set this a little earlier in the day. It was probably my error in scheduling, but I'm not here to cut you guys off. I want to hear everything you have to say on the argument.

MR. STOWERS: Well, I think the initial thought was that it's an ample amount of time, and it's certainly good that you've granted us some time to present things. In large part I think that if there are specific issues that the Court would like to have us address or elaborate upon further or if the Court was unclear on something, we'd be happy to address those, of course. Let me kind of go through a few of the things that we think might be ones that the Court is thinking about in some way or might want to have us elaborate on.

THE COURT: Before you get to that --

MR. STOWERS: Yes.

THE COURT: -- can I ask you a question. I'm curious -- maybe I don't have the timing of this right, but I issued an order on October 19th entitled "Order Setting Oral Arguments on Defendant's Post-trial Motions," and in that I discussed the issue that you raised that was kind of on a separate track, if you will, the alleged juror misconduct

issue.

MR. STOWERS: Right.

THE COURT: And I denied it but gave you -- well, actually ordered supplemental briefs.

MR. STOWERS: Right.

THE COURT: And you had two opportunities to file supplemental briefs, and you didn't file anything.

MR. STOWERS: Exactly, and --

THE COURT: And I'm just curious as to -- can you shed any light on that if you can.

MR. STOWERS: Well, here's the light I can shed on it, because when I got Mr. Williams' filing, his most recent filing on that issue, because he did file a brief --

THE COURT: Yes. He complied with the order.

MR. STOWERS: Right.

THE COURT: Right.

MR. STOWERS: There's -- i think what happened, when that order came in, I think it came in on the 19thby electronic filing. I started a trial with Judge Pratt on the 24th of October, which isn't any kind of an excuse, but it was a two-week trial.

THE COURT: Americans United?

MR. STOWERS: Yeah. And it's not over yet. Actually it restarts on the 28th of November, and I got the order -- and the first part of the order, in the descriptive portion of the order there's a suggestion in there that if we wish to file any additional argument in support of this situation on the juror misconduct claim, that we could do so. Then, of course, later, as you point out, you set forth a schedule by which you set forth supplemental briefing schedule, and I think the way I originally read that was it wasn't a mandated thing, that the Court had denied it subject to hearing further argument, and if anybody wanted to file additional briefing, that we could, and frankly, I don't know what else we can say about that issue. Substantively -- now, we could certainly dig and dig and dig for additional authority till we couldn't dig any longer,

and I don't think we'd get closer to answering or satisfying the things that you were concerned about in your order.

THE COURT: Okay. That's fine.

MR. STOWERS: That's my best explanation.

THE COURT: That's a fine explanation. I just want to make sure that you hadn't thought that you had asked for additional time and I hadn't received it or something like that.

MR. STOWERS: No.

THE COURT: You made a voluntary decision not to file a supplemental brief because you thought it was fully briefed; that's fine.

MR. STOWERS: Right.

THE COURT: Okay.

MR. STOWERS: And that's the way we feel about it, and I guess we could start with that issue or we could close with it, whichever -- since the Court started with it.

THE COURT: Well, I think it's last in your -- isn't it 38?

MR. STOWERS: In the sequence, but sometimes last isn't always least. It's causing a fair amount of controversy, but in any event, this is the Juror 55 issue, and there was some information that came to light that we supplied to the Court in the form of an affidavit that indicates that Juror 55 --

THE COURT: And the affidavit actually didn't even disclose who the affiant was. I had no idea. I knew it wasn't one of the appointed lawyers in the case, and based on the record we made about granting you exception to the local rule to allow you to contact the jurors, it was my understanding that the lawyers were going to do that.

MR. STOWERS: And we were, and that was the original intention, and then as the time ran out at the end of June, we didn't do that because, A, Mr. Berrigan was on his way to Ireland for a multi-week trip. I, first week of July, was taking a long-planned vacation with my wife for a week to Alaska.

THE COURT: And much deserved for both of you I might add.

MR. STOWERS: And so the decision was made -- and also because we actually

became concerned based on some comments that the Government made that we -- if we did an interview of any of the jurors after the trial, we could wind up in a position where we'd be the one signing the post-trial affidavit if something did come up, which it did.

THE COURT:  'Course, that wasn't the purpose of the --

MR. STOWERS:  Right, but when you're interviewing somebody, a lot of times they say something, and that's what happened with Juror Number 55.

THE COURT:  But my point is you didn't even tell me who the affiant was.

MR. STOWERS:  Well, that's true.

THE COURT:  I don't know who -- it's an affidavit from who?

MR. STOWERS:  He worked for the jury consultant that we used on the case.

THE COURT:  And how was I supposed to derive that?

MR. STOWERS:  You weren't.

THE COURT:  Well, don't you think it would be helpful when you file an affidavit that I would at least know something about who the affiant was?

MR. STOWERS:  Well, it might if --

THE COURT:  Oh, it might.

MR. STOWERS:  If his credibility were in question.

THE COURT:  Well, I didn't even know who he worked for or what his position was.

MR. STOWERS:  Well, yeah, I understand that, but I don't --

THE COURT:  You don't think that's important?

MR. STOWERS:  I didn't think it was actually  --

THE COURT:  Okay.

MR. STOWERS:  -- at the time.

THE COURT:  Well, I did.

MR. STOWERS:  'Cause I felt like he was reporting on an interview that he had done.  It was a fairly innocuous report of what had been stated to him by Juror 55, and that's what it was.

THE COURT:  Well, when I had an understanding that the lawyers were going to do the interview based on the record we made and I get an affiant from some third party

and I don't know who that third party is, what his affiliation, if any, is to the defense team or to anyone else, it's a little bit perplexing.

MR. STOWERS: I can understand that. So -- but in any event, Juror Number 55 made certain statements in this interview indicating, among other things, that during that one-week recess prior to closing arguments in the penalty phase he had traveled to visit his son at the federal correctional institution in Oxford, Wisconsin, and he traveled there with I believe his wife and perhaps other family members, and that while there at that correctional institution visiting his son -- and the fact that this juror had a son who was in federal custody I believe was a matter that came up during voir dire, so that part was something that was known to everybody as it was disclosed by the juror I think on his questionnaire and during the reported jury selection. So that part was not any surprise, that he had a son in a federal facility, but he used that week to go up there and visit his son, and then because apparently this juror had some level of curiosity about what federal prison conditions would be like for an inmate sentenced either to life or to death which were the two options that this juror was very well aware of that this juror would be asked to be deciding upon the following week, the juror inquired of a jail person, a prison official, at the U.S. bureau of Prisons, presumably, what would be the differences and received a -- according to the juror, a very innocuous response. Mr. Dillingham did not follow up on that with this juror, didn't pursue it further, was not something that he was asked to do. It's something that came up in response to an innocuous question about "what did you think about your week off," and this statement followed. The reason he didn't follow up on it or do anything further is precisely because that was not something that would have been appropriate to do at that time because there was no role on his part that he was supposed to be undertaking, actually investigating some kind of misconduct. So he reported what transpired, and we conveyed that on to the Court.

The juror also indicated -- and I believe that this was also something that came out in voir dire, maybe in the jury questionnaire -- that the juror had some prior law enforcement experience, the particulars of which I'm not clear are part of the record or are known to us. As a part of that prior law enforcement experience the juror

reported to Mr. Dillingham that he had some experience with the legal system and that he had shared his knowledge about a defendant -- a convicted defendant's postconviction rights, post-verdict rights, if you will, and that had to do with the notion in his view that there would be three automatic appeals and that there would be various levels of review and that the jury basically would just be getting the first cut, if you will, at the -- at this decision-making process and that there would be other levels of review. That part of what this juror reported to the other jurors -- and it's not crystal clear from Mr. Dillingham's affidavit exactly when it is that this report by Juror Number 55 was made to his fellow jurors about the juror's impact of a verdict of death, but it's our interpretation of that that it occurred during the very death penalty deliberations, that is, phase three deliberations. I think that's the only reasonable interpretation. Again, that wasn't specifically followed up on by Mr. Dillingham because that wasn't what he was asked to do. It wouldn't have been appropriate for us to call him up like the Court's order and say "Mr. Dillingham, you need to follow up on that." That didn't sound right to us. We passed that on to the Court through the affidavit and pointed out the impact that we think that has.

We think those two things are kind of interrelated in some way because, first of all, the comments of the juror about inquiring of the prison official, prison guard and making those inquiries out of curiosity say to us, number one, first of all, that I don't think there's any real quarrel that it was improper for the juror to do that and it's a violation of this Court's repeated admonishments that the juror not do anything of that sort. May be an innocent explanation why he thought that was acceptable and not violative of the Court's instruction, but we haven't heard that part of it yet.

But, in any event, he had a concern about what would happen to the defendant under the two sentencing options. He had that concern in the days leading up to the final deliberation point in the case, and then at the same time this juror was also -- was also in his mind conscious of the fact that Angela Johnson might have these various post-verdict levels of review by various courts, and it's our -- and he shared those comments with other jurors who may have had some concerns that, you know, this is a final decision, this is a big deal, and this juror allayed those concerns through his comments

or at least he attempted to do that and to share with them his perceived knowledge about that process which gets into the Caldwell versus Mississippi area, and that's what we think is a troublesome thing, and that's why we think that between this juror's thinking about and concerns about what level of custody or situation she'd be held in based on the verdict and his views on levels of additional review, that this juror may have been thinking together with his fellow jurors that what they were doing is issuing some kind of nonbinding recommendation of some kind that, of course, would be subject to some judicial reviews and that it wouldn't really be a final jury verdict carrying the weight and import of a jury verdict of death that this jury was required to have impressed upon it in which I would have thought the Court had impressed upon the juror that "this is your decision, I'm just the judge." And I have to say, you know, with the Honken case still pending at that time and the various publicity surrounding his new trial motion, I don't know, but it's my sense that maybe that diminished even further to some extent this jury's perception of the finality of their verdict.

And so in total we think this shows sort of enough information through these comments that we've reported to the Court that the Court ought to do something further, and our suggestion is that the Court hold a hearing. If the Court does not feel a hearing is appropriate, then some level of inquiry ought to be undertaken. I don't think it makes sense to have both parties running around trying to do their own investigations of this 'cause we're just going to get into a big ball of wax. I think it needs to be done through the auspices of the Court, because under these circumstances if there's a reasonable possibility, I think is the phraseology in the cases, that this conduct on the part of Juror 55 infected not only -- well, either his own individual thinking or the thinking of any other juror, and under the cases it appears that that would be a basis for the Court granting relief. We just think that there ought to be some further record made of precisely what occurred, and that's all I have to say about that issue.

THE COURT: Mr. Stowers, maybe it would be better to do kind of point-counterpoint.

MR. STOWERS: That's fine.

THE COURT: Because I'm going to let you raise every issue you want. You're not really constrained by my suggested hour. Do you have any problem if we do that?

MR. STOWERS: No.

THE COURT: Because it might be easier to assimilate, because you have a lot of issues you want to argue.

Mr. Williams.

MR. WILLIAMS: Your Honor, I'm not going to belabor too much. The first position we have on this is that the very inquiry made by the defense violated the Court's order. It violated the Court's order because, as the Court understood, certainly the Government understood, that any inquiry was to be made by counsel, and that's not just a flippant decision by the Court. The purpose of that is counsel is answerable to the Court, some third-party consultant down in Kansas City isn't, and that was the reason why it was important that counsel conduct that.

THE COURT: Have you gone back and reread the transcript on that?

MR. WILLIAMS: I have. It's not clear.

THE COURT: Yeah, I was going to say, I kind of thought that's what our agreement was. When I looked at the transcript, that really wasn't -- it was close, but it wasn't quite there.

MR. WILLIAMS: Right. I agree.

THE COURT: I think they probably violated the spirit but not the letter of the understanding; maybe not even the spirit of the understanding.

MR. WILLIAMS: Yeah, I agree. I've looked at the transcript. It isn't clear. It's mentioned, but it isn't exactly clear on that.

The Rule 606(b) prohibition was clear that they were not to inquire anything barred by 606 B, and the very inquiry into discussions that occurred within the jury confines is a violation of 606 B, and the fact that the question -- a question was asked of what the juror did on the vacation and one-week break we had between the penalty phase and beginning of the arguments, in my view, had no other purpose other than to inquire about misconduct. It can't arguably be said "what did you think about my

argument" or "how do you think our witnesses did."  I mean this is nothing but a fishing expedition in my view.  That said --

THE COURT:  And if that's true, that would violate not only the spirit but the letter of the transcript and the agreement as to the purpose of doing a -- waiving the local rule and allowing juror interviews.

MR. WILLIAMS:  That's correct, Your Honor.  The down side by having somebody other than one of the lawyers conduct this inquiry as we have no idea how that got miscommunicated, if it got communicated to this third party, so hence the problem that was generated by the defense and the actions here, but more to the merits of this position,
Mr. Stowers, in fact, I think described this as an innocuous response from the guard, and that's what it was.  The guard's response to Juror 55's alleged inquiry about the different conditions was innocuous, particularly if you look at the evidence presented in this case, and Your Honor made that finding in its October 19th, I believe, or 16th order which it noted the defense itself presented evidence during the penalty phase about conditions that the defendant was going to be placed in if she received a life sentence.  There was expert testimony by the defense about the other conditions that could be imposed on the defendant by the Federal Bureau of Prisons, and in particular it's hard for -- defense in this case is assuming that this was somehow prejudicial to the defendant.  It's not necessarily the case.  As I argued in my supplemental brief, the jurors -- i mean the defense argued to the jurors, "hey, let my client live because she's such a benefit to other inmates that she'll help them," and to the extent that a juror then finds out, in fact, if she's sentenced to life, would be in general population, would be with other inmates, that does nothing but feed into the factor if you let her live, she's going to be with other people.

So it isn't at all established by the defense that there is a reasonable possibility that this conduct regarding the prison conditions at all prejudiced the defendant or would have led to a different verdict in any event.  The -- and ultimately our position, again, is that it's harmless error if you look at the overall weight of the evidence.

*T.A. REPORTING  (319) 626-7616*

With regard to the alleged misconduct by Juror 55 and allegedly articulating and discussing with the other jurors that there is some automatic three appeal rights and so forth, one, that is just laterally barred by 606 B, the defense attempting to resurrect that and somehow bring it in by saying that they perceive or infer that somehow it's related to the other misconduct. I don't see it. I don't buy it. It's just -- it's an inquiry that's simply not appropriate to be considered. Even if the Court considered that, this Court instructed the jurors -- rather, this Court implicated the concept with this jury that they were the final decision-makers in this case of defendant's fate from the minute you started talking to these jurors through every jury instruction they received to the very end and the verdict form. So to the extent that some juror believed in their mind or even articulated to believe that there is somehow automatic appeals, there is no way given the Court's instructions that every juror didn't realize that they made the decision on what was going to happen to Angela Johnson. In any event, again, the same harmless error analysis applies. When you look at the overall weight of the Government's evidence, there's no reason to believe given the weight of the evidence in this case that the jurors made the decision based on anything other than the evidence.

THE COURT: And I assume any reasonable juror would assume that there would be an appeal. They wouldn't know if it's automatic or discretionary, but I think any juror in any serious penalty case, let a lone a death penalty case, would assume before they got to the courthouse that there was ultimately going to be an appeal. I mean that comes as a surprise to no citizen that serious criminal matters get appealed.

MR. WILLIAMS: And we know that from the very jury questionnaires we went through. Probably one out of every two or three mention the appeal process that was available for somebody facing the death penalty and their views pro and against the appeals process. So, no, I think common knowledge it's going to be appealed, so how that can prejudice the defendant is beyond me. So I think the Court's appropriately ruled that the defendant has not made a showing adequate for any further evidentiary hearing and inquiry into this and has failed to meet the burden to establish cause for new trial.

THE COURT: Thank you. Mr. Stowers.

MR. STOWERS: Just to briefly respond to that and then move on, it seems that to the extent the Court did inculcate the jury with the fact that they were going to be the final decision-maker, it, nevertheless, came up in this jury deliberation, and this juror had to or felt it necessary or it was discussed that there was this process involved. I don't think there's any real question but that type of an argument had been made by Government counsel, or if there had been something done by either one of the parties during the course of the trial to that effect, that it would violate Caldwell versus Mississippi.

THE COURT: But this is a far different situation from Caldwell, and don't you assume -- i mean we're not a mouse in the corner in jury deliberations. Don't you assume in most cases there might be discussions about "what happens if we do this" and "what happens if we do that," and the concept of an appeal is so well ingrained in sixth grade civics class, everybody knows about appeals. You can't open a newspaper without reading about an appeal.

MR. STOWERS: Right. No, I understand that they know about appeals --

THE COURT: And you don't think jurors might discuss that in your typical case?

MR. STOWERS: Well --

THE COURT: Somebody might say "hey, what happens if we find the defendant guilty, will they be able to appeal that ruling"; I bet that happens in most cases.

MR. STOWERS: There's probably all sorts of improper things that jurors discuss that we don't know about.

THE COURT: That's true.

MR. STOWERS: And some we don't find out about, but for some reason legally we overlook them. The question is whether or not this is the kind of thing that under the law let's just assume that the jury didn't think they were the final decision maker, and we all knew that, and there was 12 people walked in here and said, "Yeah, the judge said that, but we know he's supposed to do that, but we know the truth. He's going to review what we did and so will these other courts that are going to review it, and, yeah, he said that, but we don't really believe it." So 12 people walk through here and say that under

oath in a new trial hearing, are we going to sit here and do nothing about it in a death penalty case when the rationale Caldwell versus Mississippi would seem to me to apply almost identically to that scenario as it would the scenario where they got that belief from either the parties or the Court through --

THE COURT:  I don't think the rationale prevents the jurors from discussing that issue if they want to.

MR. STOWERS:  The problem is is that they did, and it appears that it was in part something that they evaluated, and it was evaluated with Number 55 who was also trying to figure out under what conditions might the defendant be warehoused while these three automatic appeals were ongoing, and that's why we think there's a reasonable possibility of prejudice been shown sufficiently at least to warrant some further inquiry on the part of the Court.

Let me go to point number 18 which is the closing argument during the first phase --

THE COURT:  Well, I've got a couple questions.  Are you going in order kind of?

MR. STOWERS:  I've gone 28 to 18.

THE COURT:  Then are you going 18 forward basically, or are you going to jump back?

MR. STOWERS:  I was thinking about that, yeah.

THE COURT:  Okay.  Just out of curiosity, on issue 4  --

MR. STOWERS:  Uh-huh.  Right.

THE COURT:  -- if you really believe that, why didn't you brief it?  I mean you didn't suggest -- you didn't brief anything on that issue.  It's against the weight of the evidence and it's a miscarriage of justice, and then all you do is cite the standard, but you don't even suggest in any way, shape, or fashion how it might be against the weight of the evidence, and if you don't take the time to articulate the basic premise of your argument, are you expecting me to go through the entire record and do that?

MR. STOWERS:  Well --

THE COURT:  I don't know.  Are you?  You didn't do it.  As a matter of

fact, not only did you not do that, you didn't do anything.

MR. STOWERS:  Well, we --

THE COURT:  Did you?

MR. STOWERS:  We didn't do anything more than what we did in the brief.

THE COURT:  You wrote one paragraph.

MR. STOWERS:  Well, on that specific point.

THE COURT:  Right.

MR. STOWERS:  But some of that argument is contained in other parts of the brief.  The fact that there's separate brief points is a vehicle for presenting the issue in that manner.

THE COURT:  Okay.  Where in the brief?

MR. STOWERS:  But we --

THE COURT:  Just a second.  You said it's contained somewhere else in the brief.

MR. STOWERS:  Yeah.

THE COURT:  You tell me, where in the brief did you specifically argue any aspect of brief point 4?

MR. STOWERS:  I think we've argued that the evidence did not support the verdict on the guilt phase on the offenses in question because the conspiracy, for example, and the CCE had ceased to continue as of roughly THE COURT:  I don't know.  Are you?  You didn't do it.  As a matter of fact, not only did you not do that, you didn't do anything.

MR. STOWERS:  Well, we --

THE COURT:  Did you?

MR. STOWERS:  We didn't do anything more than what we did in the brief.

THE COURT:  You wrote one paragraph.

MR. STOWERS:  Well, on that specific point.

THE COURT:  Right.

MR. STOWERS:  But some of that argument is contained in other parts of the brief.  The fact that there's separate brief points is a vehicle for presenting the issue

in that manner.

THE COURT:  Okay.  Where in the brief?

MR. STOWERS:  But we --

THE COURT:  Just a second.  You said it's contained somewhere else in the brief.

MR. STOWERS:  Yeah.

THE COURT:  You tell me, where in the brief did you specifically argue any aspect of brief point 4?

MR. STOWERS:  I think we've argued that the evidence did not support the verdict on the guilt phase on the offenses in question because the conspiracy, for example, and the CCE had ceased to continue as of roughly March of 1993 and that it was in at least a dormant period during the summer and fall of 1993 all the way until the fall of 1995.

THE COURT:  You did argue a little bit about that on some points with regard to the merits phase.

MR. STOWERS:  Right.

THE COURT:  How about with regard to the eligibility and penalty phase?

MR. STOWERS:  No, on the eligibility phase I think we have argued on one of the later brief points  --

THE COURT:  Which one?

MR. STOWERS:  -- that -- let me find it.  Thought we had a brief point that dealt with the aggravator for -- or the Gateway  -- I'm sorry, the "Gateway" factor.

THE COURT:  Well, you either briefed it or you didn't, so why don't you move on.  Anything else you want to respond to my question about 4?

MR. STOWERS:  Yeah.  I think that that's also addressed in part when we discussed what we consider to be inconsistencies in the verdicts that the jury reached on mitigators, certain of the mitigators which we think were supported fully by the evidence.  For example, no prior criminal record, relative culpability, some of those mitigators that we argue in the later brief points, we think the verdicts are so far contrary to the evidence on those -- we think the findings that the jury reached on the special

*T.A. REPORTING  (319) 626-7616*

interrogatory on the mitigators are so far contrary to the evidence that it shows that they did not weigh those factors or maybe didn't understand what they were and maybe simply ignored them such that they never got put into the analysis by the jury such that their penalty phase verdict was against the weight of the evidence and a miscarriage of justice.

THE COURT:  Okay.  Now, on number 5 I also have a question.  Number 5 is your interview issue.

MR. STOWERS:  Right.

THE COURT:  And I just honestly don't recall, but I knew you would  -- I've had a lot of trials since this one.  Did you make any record after jury selection that there were various things that occurred in jury selection that indicated that the panel we selected was not fair and impartial and that there's some further showing based on what actually happened in jury selection that it was error for me to deny the change of venue?

MR. STOWERS:  Actually at the time we filed this we had a debate down in Mr. Berrigan's office down in Kansas City about whether or not we had raised that, again, in some manner sufficient to preserve the pretrial motion which you denied on the publicity issue, and I don't think that it was reraised.

THE COURT:  Is there any -- okay.

MR. STOWERS:  I don't think it was.

THE COURT:  Let me ask you this:  Is there any requirement that it actually be reraised at that point?

MR. STOWERS:  That's a tricky question for a higher court probably to decide.  I'm going to say that the record that we made was adequate to preserve the issue for further review by a court of appeals.  I'll say that without any authority or citation to the record because I think I have to say that, but I understand your concern on that point.  It's a concern that we have about that issue as well.

THE COURT:  And I actually did not remember.

MR. STOWERS:  Oh.  My -- the one thing that I think we did do during jury selection that went back to this original issue which is we did ask the Court some point during the process for additional peremptory challenges.

THE COURT: And you tied it back to your venue motion.

MR. STOWERS: Yeah.

THE COURT: Yeah.

MR. STOWERS: So I think that would be the clearest point in the record where the issue was re-addressed by the Court during jury selection, and, of course, that was denied by the Court.

THE COURT: I just want to interrupt you for a second, give the Government -- do you have any response as to whether or not that's required?

MR. WILLIAMS: I don't, Your Honor. Honestly I did not brief it. I did not research that because it was not an issue that was ultimately raised here, so I don't have an answer to that question.

THE COURT: Okay. That's fine. Mr. Stowers, you may proceed.

MR. STOWERS: I was going to talk about brief point number 18 which is the closing argument by the Government and the chart that was displayed by Mr. Miller on PowerPoint on closing argument about no claim of innocence.

THE COURT: And did you make a contemporaneous objection?

MR. STOWERS: We did. Mr. Willett did make that objection during Mr. Miller's closing, and the Court overruled it promptly, and the -- if you remember going back to closing, we tried to show for you and brief on page 30 the chart that was shown, and it had eight names of witnesses who testified on behalf of the Government. All but the defendant's sister and sister-in-law, Johnson and Jacobson, were fellow inmate witnesses who had had contact with Angela Johnson during her time pretrial but post-arrest on the charges before the jury, and they --

THE COURT: Can I ask a question?

MR. STOWERS: Yeah.

THE COURT: Did you have either an official transcript or real-time transcript at the time you filed this brief?

MR. STOWERS: No, we did not.

THE COURT: Okay.

MR. STOWERS: And I don't even know if we -- in the first section that has

been provided I'm not sure the first phase of closing is done yet.  I could be wrong about that, but I haven't had time to go through that first set of disks which came through about a week and a half ago.

THE COURT:  Yeah, that's not something I would know about.

MR. STOWERS:  But in any event, it would be in Mr. Miller's closing, and there would be a point in there where Mr. Miller was telling the jury that the defendant, Angela Johnson, while in custody after having been charged with these murder offenses had had contact with these people, some of whom testified to having had their contact with her, I think they all testified to that, and they all -- and his chart had the phrase "no claim of innocence" in it, and he emphasized this during his argument that she had made no claim of innocence to these people prior to trial when she was incarcerated which we believe crosses the line to a comment on her exercise of her right to make no comment and make no claims one way or another with regard to the instant charges.  She's under no obligation to make a claim of innocence as a charged defendant and certainly would be told, as everybody knows, by the lawyer whether she followed that advice or not not to say anything to any of these folks, but in any event, the argument, it seems to us, did cross the line between permissible comment on what their evidence was into an absence of a denial of guilt or an absence of a claim of innocence on the part of the defendant.  She doesn't have to stand up and say she's innocent.

THE COURT:  I understand.  Can I interrupt for a second.

MR. STOWERS:  Yes.

THE COURT:  Mr. Willett, do you recall  -- and I'm going to go back and read the transcript on that, I assure you that, but I'm just curious if you recall if the objection you made -- i believe that was at side-bar, or did we send the jury out?

MR. WILLETT:  Your Honor, I knew you were going to call upon me as soon as my name was mentioned, and I've been sitting here trying to remember, and my most sincere and honest answer is that I don't have a memory one way or the other, Your Honor, and  --

THE COURT:  Okay.

MR. WILLETT:  -- I apologize, but we're just going to have to read the transcript.

THE COURT: Exactly. And I just don't recall either which probably means you're not going to be able to answer my second question, which is fine, and the record will obviously speak for itself, but I was wondering whether you believe the record that was made at the time is broad enough and extensive enough to include all of the subsidiary kind of issues that you're raising in this brief today, if you understand my question. It was a lousy question.

MR. WILLETT: I do, Your Honor, but it's impossible for me to answer the second question if I don't have a memory as to the first question.

THE COURT: You might not remember the procedure, but you might remember the substance of it, so that's why I ask the second question. The answer is you don't. I certainly don't either.

MR. WILLETT: I don't, Your Honor.

THE COURT: Okay. And this is easily cured by taking a look at the transcript, so --

MR. WILLETT: Absolutely.

THE COURT: Anything else you wanted to add on that point?

MR. STOWERS: Just Mr. Berrigan and I remember poking Mr. Willett in the side, and I think he made the objection from counsel table, and I think he stated Fifth Amendment in his objection, something about right to silence, I believe.

MR. WILLETT: Judge, that I do remember. I do remember getting poked by Mr. Berrigan, so that I remember.

THE COURT: Okay. Mr. Williams, anything you want to comment on this point?

MR. WILLIAMS: Very briefly. We gave our response in the brief, our responsive brief on this issue number 18. The issue of objection is one that needs to be traced back actually to when the evidence came in, because this was nothing more than a summary chart of what testimony came in through the witnesses, and so the question is during the trial when these witnesses testified and they testified "Angela gave me this confession, she told me she was involved in a murder, she said this, she said that," we asked did she at any point proclaim that she was innocent of any involvement in that, and

*T.A. REPORTING   (319) 626-7616*

the question is did he object at that point, because absent objections at that point that were erroneously overruled, then there's nothing impermissible for counsel during summary argument to the jury to simply go back and summarize the evidence at that point. There's no allegation nor did Mr. Miller make any further elaboration on that that --

THE COURT: Well, except that if it's impermissible argument that violates the defendant's Fifth Amendment rights, you have a professional obligation not to argue it whether they made a contemporaneous objection back into the evidence or not. I don't think it opens the door to make what would otherwise would be an impermissible argument. They might not have preserved it, but I don't think that's license for you to violate -- i'm not saying Mr. Miller did, but I'm saying I don't think that's license for you to go ahead and violate the defendant's Fifth Amendment right, is it?

MR. WILLIAMS: I see your point, and your point's well taken. I guess, though, in the overall analysis to determine whether they preserved this issue based on their objection, it's not simply sufficient for them to object to it at that point in my view. More fundamentally to the issue of whether it was an improper comment on defendant's right to remain silent, it was not. Mr. Miller was simply saying that when she gave confessions to people that she did not know at that time were law enforcement agents or law enforcement officers, when she's confessing her crime, the question is did she during that confession claim she's innocent, and the answer is no. There's a huge difference between that and commenting on the defendant's right to remain silent in response to questioning once she's advised of her rights, so I think that's where the defense loses.

THE COURT: Mr. Stowers.

MR. STOWERS: The only counterpoint to that I would make is I think there may have been questions like that asked of some of these folks who were on their list. I'm certainly 99 percent confident it wasn't a question that was asked by the prosecution of all of them. And the second thing is that with regard to many of these people, their testimony about what Angela Johnson said to them, in several of these witnesses, my recollection is that their statements of what she supposedly said to them were like little snippets of comments that they overheard from Angela Johnson either -- one of them I think

in a gym at the Linn County jail or something and some other various snippets that the Government felt were relevant, but they weren't the type of full-blown conversations and discussions certainly that

Mr. McNeese got into with her, and as a result of that I think it -- it's a different argument as to somebody who all they have is sort of a passing comment with than it might be with somebody who had a full-blown conversation with the defendant and then might be able to say fairly "oh, well, she didn't tell them she didn't do it" or something, but as to somebody you only have a passing comment to that's later recounted, the idea that she also didn't at the same time claim her innocence seems to me that it shifts the burden of proof and comment on her right to remain silent.

I want to talk about another -- and I am going to jump around now.

THE COURT:  Okay.  Are you going backwards now?

MR. STOWERS:  I'm going to jump towards the end of the list, then I'll jump back, but since they're all numbered, I don't think it will be too confusing.

THE COURT:  But are you going back to the ones between 18, or are we done with those?

MR. STOWERS:  Do you have one you would like to --

THE COURT:  No.  My next one is 24, but what's your next one?  We'll go in order.

MR. STOWERS:  Let me talk about brief point 33 which I think is kind of an interesting question, and this is one that -- to answer the question you had about the last one --

THE COURT:  And that's the verdict form.

MR. STOWERS:  Yes.

THE COURT:  Can I ask you a question about that initially?

MR. STOWERS:  Yeah.

THE COURT:  Which I think you're probably going to address.  I don't recall that you made any objection to it, and I suspect that that's why you phrased it "the verdict forms were plainly erroneous" because you're trying to bring it within the plain error doctrine.

MR. STOWERS: Well, it's embarrassing to say that all the work that we did on these instructions and all the times that we visited about the third phase instructions --

THE COURT: Which were -- we had many, many discussions. I made many -- Mr. Berrigan came up with numerous suggestions that I think improved the instructions, the vast majority of which I think I granted. It was very, very -- as a matter of fact, in my entire career as a judge I've never had a lawyer more helpful in jury instructions coming up with better ideas to improve the instructions than Mr. Berrigan did.

MR. STOWERS: Right. And this is one I just have to confess that we all agree we didn't make this particular objection on our verdict form, so there's no preserved error. I remember when we were visiting on Sunday night about these instructions in our final conference, I was looking at them and looking at them and saying to myself something doesn't sit right with me in my stomach about them that I couldn't put my finger on, and it came to me too late what I think was a real big problem with the verdict form, because the verdict form is -- as you know, had two options on it for the jury in this case which I think is actually the correct verdict form maybe if there were different statutory offenses charged than the one here, because in some other cases you do wind up with basically a life or death and the jury does make that -- I think under Title 18 the jury actually does vote on a life sentence or a death sentence, but in the Title 21 offense -- and I think the verdict form -- I haven't gone back and checked. It's probably modeled after the Eighth Circuit standard on this, and under Title 21 the situation was that the jury got to decide death or no death, but that's all they got to decide which the Court told them in the narrative portion of the instructions and was correct in doing that, and based on the record the parties made, we weren't going to make a dispute about 20 years as the minimum which is the statutory offense based on the way voir dire was done, and that record was made, but was still going to be a judge decision on the ultimate penalty.

Well, the way the verdict form went, in our view, it required the jury -- there was only one way the jury could reach a life verdict and that was if all 12 of them signed the verdict form saying it was their verdict. So all 12 of them had to agree on a

life verdict, sign their names, and certify that that was their verdict and that they were in agreement with that. They did that to the death verdict, but they would have had to also do that to a life verdict. It's a very unbelievable oversight on our part that we didn't see that because what the verdict form in our view should have said -- and apparently this has happened in other jurisdictions as you might have found out. The verdict form should have said "we the jury unanimously find sentence of death is appropriate" or whatever the particular phraseology would be, and then option two would be "we the jury are unable to reach a unanimous verdict of death." Those should have been the two options in this case because it was -- a non-unanimous verdict in this case was a verdict, and that's a verdict we were entitled to, and it's more than a little embarrassing that we didn't ask for that as our verdict, but we didn't, and we think it was plain error to not have that as the verdict form.

Now, this jury was a very diligent jury, but as like most juries, they had that lengthy verdict form.

THE COURT: Yeah, they're constrained by what we gave them in the verdict form.

MR. STOWERS: And the verdict form said go through here and step one, two, and three, I think it might have been, on that third part of the trial and fill out the forms in this manner and then you have to sign back here on the last page and then you have to certify under the statute that this wasn't improperly motivated by something else, and the jury went through the forms, and they even -- at one point, as you remember, they had to ask for a new form because they wanted to fill out the form whatever the reasoning was.

So the form was really the focal point, you know, in the deliberations, and then we have this verdict form. So the verdict form actually is inconsistent with the narrative instructions and with what the statutory --

THE COURT: I don't think so, but I understand you think that.

MR. STOWERS: But there was no way for the verdict to be returned other than as a unanimous verdict or as a unanimous verdict in this case because of the way the verdict form was set up. There simply was no nonunanimous verdict, and a nonunanimous

verdict in this case was a verdict, and it was a verdict of life, and that was our verdict, and that was a verdict we're entitled to have the jury consider reaching, and obviously given the fact that the jury didn't come back in five minutes and reach a death penalty verdict, there were some jurors that were thinking about imposing a life sentence on Angela Johnson in this case.

The Government's going to tell you that we polled the jury afterwards and the jurors all said they were voting for death. I think that doesn't really change anything about our argument in that at that point when 12 people walk in the room on an emotionally charged case like this after they've signed the verdict forms and you've got 12 people that were together for ten weeks on this trial, nobody in their right mind unless they're filming a television show or something is going to expect one of these jurors to stand up and say "I just can't do it." Frankly, I've never heard of it happening. Maybe it's happened. You may have seen it happen, but I've never heard of it happening, and frankly it's unheard of, and the reason is once they've signed a verdict form and come in, they've reached a pact, if you will, that that's the verdict, and they're not going to stand up and say "we want to do something different."

Our minority jurors, that is, the life jurors, had a right in this case to return all on their lonesome  -- if there's only one of them to say "I want life in this case, show me where I sign for that verdict," and they didn't have to convince eleven other people that it was a life verdict to get to that verdict, and that's why this verdict form is in error. Now, if it wasn't plain error, maybe we were, unfortunately, ineffective in some way for failing to object, and I guess we have to concede that because we didn't object to it.

THE COURT: Well, that assumes that there was error in the verdict form.

MR. STOWERS: We feel very strongly that there was, so thank you.

THE COURT: Mr. Williams.

MR. WILLIAMS: There's no error in the verdict form. The verdict form does not read "do you unanimously find life," "do you unanimously find death." The jury instructions make it clear and, as I may have mentioned in the brief, this Court made it clear from the beginning of jury selection that the jurors  -- a single juror who doesn't

want to vote for death penalty, the verdict is automatically life at that point.  There is no misunderstanding that the Court's instructions couldn't have been more clear on that, and the verdict form simply says register what your vote is, you know, what's the bottom line on this, and so the jurors easily could have followed the Court's instructions, determined that we have 11 in favor of death, one against, so we would have recorded life, and for all we know that's how it came to Greg Nicholson's conclusion; could have been a single holdout in favor of life on that.

So we just fundamentally disagree with the defense.  We don't think the verdict form was erroneous, don't think there's anything inconsistent with the verdict form versus the Court's instructions, and we don't think the Court's instructions could have been any more clearer than they were.

THE COURT:  As the defense indicated, there may be a better way to do it.

MR. WILLIAMS:  Perhaps.

THE COURT:  I'm not sure that rises to plain error.

MR. WILLIAMS:  Or error at all in my view.

THE COURT:  Okay.  Your next point.

MR. STOWERS:  I think I started to touch on this one earlier which is number 32 which is the findings with regard to the -- certain of the mitigators.  We had set up on the verdict forms and the interrogatories certain findings for the jury to make with regard to each of the mitigating factors, and as you remember, it was set up for each of the ten counts, and then there was a number of mitigators assigned, and there was a chart with boxes and things like that, and they were to record on there the number of jurors who found that that mitigator had applied  -- or had been proven, I should say.  Actually this is another thing.  I guess when you go back and you see the verdict -- the findings of the jury and you look at them, the first thing that struck me was some of them didn't seem to make any sense in light of what I thought the evidence was in the case, and when you look at the verdict forms the way that --

THE COURT:  But you don't vote.

MR. STOWERS:  Right.  On the findings, though --

THE COURT:  I wouldn't have voted the same way on some of those things.

MR. STOWERS:  Right, but some of them, for example, no prior criminal history, no prior criminal record I think the phrase is in the statute, there was no prior criminal record, there was evidence there was no prior criminal record, and there was absolutely no way a jury could say that that had not been proven by a preponderance of the evidence and still claim to be --

THE COURT:  Well, if that's true, why didn't you ask me to instruct them as a matter of law that that was proven.  You could have done that.

MR. STOWERS:  I guess I never even thought --

THE COURT:  I mean you raised a lot of other motions  -- no offense -- that had less merit than that one.  Certainly if there was no evidence of it, you could have instructed me to make that finding as a matter of law and not let the jury decide it.

MR. STOWERS:  I guess I don't know if that would have been proper.  I hadn't even thought about that actually.  There was no prior criminal record.  For some reason some of the jurors thought that that hadn't been proven by the greater weight of the evidence and then I started to scratch my head about that to try to figure out what they may have done, and my sense is that perhaps what happened was some of the jurors may have thought even though there was no prior criminal record, that didn't apply.

THE COURT:  That it's not mitigating.

MR. STOWERS:  Well, that's a whole other problem.

THE COURT:  Yeah.  What is the problem there?

MR. STOWERS:  I think that gets us into the whole issue in part of -- I think that Mr. Berrigan is going to address in this part which is the no weight argument.

THE COURT:  Yeah.  Does tie into it, doesn't it?

MR. STOWERS:  Yeah.  Because some of these mitigators that we had instructed on were statutory mitigators, some of them were non-statutory mitigators, and there's no prior criminal record, of course, is a statutory mitigator, and it's our view that, first of all  -- and I think Mr. Berrigan can probably elaborate on this better as somebody who knows something about death penalty.  I'm just a novice, but  --

THE COURT:  We all are except Mr. Berrigan.

*T.A. REPORTING  (319) 626-7616*

MR. STOWERS:  Particularly in a case where you're dealing with a statutory mitigator.  The legislature, in this case Congress, has said that's a mitigating circumstance.  If proven, that's a mitigating circumstance, statutorily legally so defined, and the jury is not free with a statutory mitigator, in our view, to say Congress said that it's mitigating, we think it's aggravating, for example; not on the statutory for sure.  We think that's also true on a nonstatutory, but for sure on a statutory mitigator we think that the legal declaration that that's a mitigator is binding on the jury and that all we have to do for the statutory mitigator for the jury is prove it by a preponderance.  Once we've done that, we've proven a mitigator, it gets on the scale.  How much weight  -- how much weight is up to them to decide, and in this case I think the jury, for whatever reason, may have decided even if it was proven, for some reason it doesn't apply as a mitigator in our view.

THE COURT:  But isn't that just rank speculation?

MR. STOWERS:  Well, it was proven, and then the question is how could six -- for example, I think it was six --

THE COURT:  How did six people not check it.

MR. STOWERS:  Right.

THE COURT:  Right.

MR. STOWERS:  So either they disregarded the evidence with regard to that or they said "yeah, it was proven, but."  I mean I think it's sort of one door or the other.  I don't know what the third door would be with regard to that finding no prior criminal record.  Those would seem to me to be the only two options I can piece together from what we have, that is, that they either disregarded the evidence or I guess the other one would be they were completely confused about what it was or  -- which we get to too as well because the Government may have supplied some confusion on that.

THE COURT:  Maybe they didn't remember the evidence.  Is that the same as disregarding the evidence?

MR. STOWERS:  Well, I would contend it is, because I think it's the same thing as disregarding if you don't remember it.

THE COURT:  Was there a requirement that they have to remember the

evidence?  Is there any case that has ever held that, that a jury has to remember the evidence?

MR. STOWERS:  Well, if they didn't and they just went out and decided the case without remembering what the case was about, maybe that gets back to one of these other brief points we were talking about, number 4 I think, because then we could be talking about a miscarriage of justice situation for sure, but it seems to me that we know what the evidence was.  I don't think we can define that a jury didn't remember it.  I think sort of the  --

THE COURT:  Well, when you're asking for a third possibility, seems to me that's as plausible as the other two.  The question is are any of the three troubling enough that we have a real serious problem here.  I don't know the answer to that question yet.

MR. STOWERS:  And I was just talking about that one.  There was a couple of others that we've talked about on our brief on the mitigators that were kind of interesting when you look at them that maybe indicate something else was going on here in terms of the way the jury was understanding what it was being asked to do, and I don't know how to go --

THE COURT:  Can I interrupt you for a second.

MR. STOWERS:  Yeah.

THE COURT:  Mr. Berrigan.

MR. BERRIGAN:  Yes.

THE COURT:  In your experience is it common to have some type of jury form, whether it's in a chart like I chose to do or some other way, for the jury to individually indicate --

MR. BERRIGAN:  The numbers.

THE COURT:  -- the numbers on the mitigators?

MR. BERRIGAN:  Yes, sir.  In my experience we almost always use the numbers.  I believe -- to some extent, not talking to the jurors about some of these particular issues, obviously we're speculating, but if you'll recall, this issue arose  -- this "no weight" versus "give effect" came up early.

THE COURT:  Early in the case.

MR. BERRIGAN:  And it was vigorously argued.

THE COURT:  Yes, it was.

MR. BERRIGAN:  We filed a written motion asking for you to reconsider the ruling that you had made, and Mr. Williams' position was that "the Eighth Circuit says I can do this."  Even age 18 there's no requirement that that be given effect as a mitigator.  There's an Eighth Circuit opinion on that which is remarkable which we've cited in the brief.  It's United States versus Paul, 217 F.3d 989, and I have to admit that's what the opinion says.  That same court, however, severely criticized the prosecutor for making essentially the same argument in a case that I was involved in, it was Simmons versus Bowersox in the Eighth Circuit; it's also cited; it later became Roper versus Simmons, and it said you can't get up there in front of a jury and argue that being 17 is not a mitigating circumstance that has to be considered, and that was my position I think with this voir dire at the time, and my belief is that's what happened.

And if you'll recall, Mr. Williams took a position in closing argument, and I don't think I objected unfortunately, and he got up there and said, you know, it doesn't matter that this woman has no criminal history, we know she was engaged in criminal activity by her admission she was a drug addict, you shouldn't consider the fact that she has no criminal record as a mitigator; and jurors, some, bought that argument.  I think that's what happened.  Whether they can buy it or not, at least in the Eighth Circuit, apparently is debateable.  Our position is -- and I'm not going to belabor this, but Justice O'Connor at least thinks no, "give effect" means give effect.  And we're losing Justice O'Connor sadly, and maybe the Supreme Court will take a different view, and I think this issue is very much up in the air quite frankly.  I don't think there's really a definitive U.S. Supreme Court case law on this issue, but I  --

THE COURT:  It makes a huge difference to you, but I doubt it's going to be one that you're going to be able to --

MR. BERRIGAN:  Yeah, I'm not optimistic about our chances, I'll frankly admit that, Your Honor, but it just seems -- this illustrates the problem that if the going to address them separately.  The first is the argument we argued and argued and

argued, does the jury have to give some weight to a mitigating factor that they find, and I think the law is clear and my position hasn't changed that the answer to that is no. They need to make a finding whether, in fact, it exists or not, but they have no obligation to give it any weight.

To the extent that you can argue that the jury -- it's up to the jury to decide how much weight to give it and then say but they have to give it some weight, it takes away from the first point, it's up to them to determine how much weight, and how much weight is up to them. So I just fundamentally disagree with that. We belabored that point beyond any need to do more.

As to the prior criminal record, I think where the defense argument fails here is what does that mean, and "no criminal record" in their view means no prior criminal convictions. Unfortunately, both the Supreme Court and Congress disagree with the meaning of that phrase. Congress in Title 18, 3592 sub (a), sub (5) defined "no prior criminal record" under the Title 18 scheme for the death penalty and said that means the defendant did not have a significant prior history of other criminal conduct, not prior convictions. In Delo versus Lashley the Supreme Court confirmed that same interpretation in 1993 when they said moreover, the statutory mitigating circumstances refers not to arrests or convictions but more broadly to criminal activity.

My position to the jury was that this defendant has no prior criminal convictions; that means squat because the jury heard all kinds of evidence about the defendant's prior criminal conduct, her criminal activity that began back in 1992 at least and continued through 1998, and when that term "prior criminal record" is viewed as Congress views it and as the Supreme Court views it, there is nothing inconsistent with the jury to conclude that I was right and that she has a prior criminal record in that sense. The defense asked for no further definition of this phrase, did not ask the Court to instruct the jury as to prior criminal convictions in which case I would have conceded, yeah, she has no prior criminal convictions; of course not. We have no evidence to the contrary. But that's not what they argued, that's not what the phrase means, and that's not what I was allowed to argue given the definition of that phrase. They may regret that they didn't ask for a different definition, but given that they used the statutory

language arrived at by Congress and that's how Congress defines it, there's nothing inconsistent with the jury's verdict; there's nothing improper about my argument given the facts of the case.

MR. STOWERS: Maybe I don't know what the word "prior" means, but all I've heard Mr. Williams say is that their evidence of the crimes for which she was charged and convicted at the time that we entered the penalty phase constitutes a prior criminal record, and I don't think the statute under any circumstance can be construed in that way. The only thing that "prior" could mean I would think would be prior to the offenses of which she was convicted. Maybe I'm wrong about that. Maybe it's before the date you get to trial, you know, I'm not sure, but I think that the word "prior" would have to be construed as prior to the -- in this case, the homicides of which she was --

THE COURT: Okay. What's your response, Mr. Williams, to that point?

MR. WILLIAMS: To that? The evidence also brought out at the trial was this defendant before she ever got involved with Dustin Honken was distributing dope for herself and also ultimately for Mr. DeGeus, and in the process she was supplying her sister with dope, she was supplying her friend Christy Gaubatz with drugs, and all that occurred prior to her ultimate involvement with Dustin Honken and the charged conduct in this case. So even if you narrowly define "prior criminal record" --

THE COURT: Wasn't it part of the same conspiracy involving Dustin Honken and DeGeus? Wasn't DeGeus getting his dope from Honken?

MR. WILLIAMS: I don't think in 1992 and before when the evidence was from the defendant's sister and from Christy Gaubatz that she was distributing and using drugs that --

THE COURT: And that would have been prior to DeGeus hooking up with Honken.

MR. WILLIAMS: Right, because that occurred only after Honken went down to Arizona in late 1992, started cooking in May 1992.

THE COURT: Any response?

MR. STOWERS: I don't remember that particular evidence that way, but I

could be wrong.  I mean the record is what it is on whatever it was, but I think the charge was -- i don't have the Indictment in front of me, but I thought it was 1992.  Maybe it was like the January date on or about all the way up until '99 or something.  That was the time period of the charges in the Indictment.  So, you know, I think it was all sort of within the scope of the overall activity that they had indicted for, which we never understood exactly what the full scope of it was, but the focus of the case was obviously on the homicides.

I think the Court had -- well, let me just go back to something quick because I think Mr. Berrigan touched on number 34 which is the penalty phase closing argument which Mr. Williams may have addressed as well, and I'll just -- the Court's going to have an opportunity to look back at whatever the record shows on this because I'm sure the court reporter's busily working back in Sioux City on the transcript, but it's my recollection that during

Mr. Williams' closing on the two points identified in number 34, the part about no prior criminal record and the part about the defendant essentially blaming the victims with one of her mitigators which, in fact, was a statutory mitigator, that those were the subject of objections by Mr. Berrigan during the penalty phase closing of the Government, and the Court overruled those objections and allowed counsel to proceed with their argument.  That's my recollection of those specific issues in 34.

Let me just touch on one other thing that I was going to skip over, but since there seems to be a little extra time, number 14 is back to slightly plowed ground but not completely plowed.  I think it needs to be replowed, and that is the issue that we addressed with the Court throughout much of the trial of what -- what is the significance or nonsignificance or what is the relevance or lack of relevance of the evidence of criminal activity that the jury was hearing about that occurred after the 1993 killings.  That evidence consisted of a wide sort of smorgasbord of items but largely consisted of drug trafficking activity by various alleged coconspirators; it consisted of some activities on the part of Angela Johnson in an effort to restart some meth-making activities.

THE COURT:  But did you ever ask me to do a limiting instruction?

MR. STOWERS: Actually we did.

THE COURT: Oh, you did. Okay.

MR. STOWERS: Actually --

THE COURT: Did you propose one?

MR. STOWERS: Actually we proposed multiple ones because the Court had some concerns about --

THE COURT: Because I think there were incorrect statements of the law.

MR. STOWERS: We took the Rule 404(b) model from the Eighth Circuit, modified it a couple times, and filed it throughout the course of trial. I think there may be three separate ones. I don't have good references at my fingertips here today, but they are there in the filings with the Court. There was that activity.

There was the activity of statements to Mr. Jeff Honken that was hotly contested about alleged statements threatening his own children by Angela Johnson. There was her activity at Mr. Honken's sentencing which was odd and interesting, I suppose, for the jurors. There was this --

THE COURT: Can I ask you about that issue?

MR. STOWERS: Yeah.

THE COURT: What number is that?

MR. STOWERS: We're on 14 I think, sir. It carries into another one.

THE COURT: Yeah. It takes us into 24.

MR. STOWERS: Okay.

THE COURT: And I'm actually looking at the brief point in your table of contents, and it talks about my remedy denied you the opportunity to take the sting out of the evidence. I thought the remedy that I created was she wasn't allowed to say that she was my law clerk, and she wasn't allowed to say that the threat was against me, and then now you're criticizing my remedy, and I don't believe you criticized my remedy at the time, but maybe you did. But I thought I did all of that to assist the defendant.

MR. STOWERS: Actually I don't think I was there at the time the record was made on that issue because I think that was an issue that was addressed at the time that I was out of court. I think Mr. Berrigan addressed that issue.

THE COURT: I thought that was well within my discretion to let it all in, but I thought I bent over backwards to try to limit that, and maybe -- i'm going to go back and read the record made on it.

MR. BERRIGAN: You did limit it, Your Honor. There's no question about that.

THE COURT: I mean I can understand that you're objecting to the admissibility of that testimony, but then to turn around and say that my remedy deprived you of due process, that was hard for me to swallow when I read that because I thought I on my own took fairly extraordinary steps to limit the Government's evidence.

MR. BERRIGAN: It was a remedy, but it wasn't the remedy we wanted which was exclusion of the evidence.

THE COURT: Is that really all you're saying, that I should have excluded it?

MR. BERRIGAN: Right. My recollection is that this woman was allowed to say she was an attorney, but she was not allowed to indicate that she had been employed by the court in any capacity. I don't recollect what other steps may have been taken, but I do know that the Court went out of its way to disassociate the witness from the Court itself so that there was no suggestion that her testimony might be bolstered in any way by prior relationship with the Court before, of course, Ms. Johnson was on trial. We may have taken some other steps as well, but I don't recall what she said.

THE COURT: But, see, that's -- i understand your argument maybe that you objected to that testimony at all. I understand that.

MR. BERRIGAN: Yes.

THE COURT: But I guess I don't understand -- and I guess I'm just looking at the brief point, "The Court's remedy denied the defendant the opportunity to take the sting out of the evidence and created a false impression for the jury." I'm not understanding that -- seems to me the false impression was to your advantage, the false impression being that the jury didn't get the whole truth that she was my law clerk and she thought the threat was directed against me. Am I wrong that that was to your advantage?

*T.A. REPORTING  (319) 626-7616*

MR. BERRIGAN:  No, that was to our advantage.  I don't think her testimony -- i'm trying to remember if she even suggested or said anything about a threat to the Court.  I think that might have been the import of the testimony, that Ms. Johnson said something of a threatening nature.  I don't know that the testimony indicated that it was towards you specifically.

THE COURT:  It did, but she wasn't allowed to testify to that.

MR. BERRIGAN:  That's what I mean, but she didn't say that.  Wasn't there an apology  -- Mr. Stowers and I are trying to remember exactly  --

THE COURT:  I made full disclosure on the record several times about it, that I received a letter from her, that I didn't consider it a threat, I didn't pursue it at all.

MR. BERRIGAN:  Right.

THE COURT:  I guess what I'm understanding is if all you're saying is that I shouldn't have admitted the evidence, I understand that argument completely, but when I read the brief point, it sounds like I created some remedy that made things worse for you all, and it seems to me that that simply isn't accurate.

MR. BERRIGAN:  I would not -- yeah, if that's what it suggests, I don't think we could argue --

THE COURT:  Well, how else could you read that?  "The Court's remedy denied the defendant the opportunity to take the sting out of the evidence and created a false impression for the jury."

MR. BERRIGAN:  Well, our recollection is that part of the remedy had to do with the letter of apology, that there was some discussion about whether or not we'd be able to present any testimony, because my recollection is you didn't have the letter of apology any longer, so we couldn't --

THE COURT:  I don't keep --

MR. BERRIGAN:  I'm not being critical.

THE COURT:  I get dozens of letters a week from inmates.

MR. BERRIGAN:  Whatever happened to it, it wasn't available.  I'm not being critical of the Court for not keeping the letter.

THE COURT:  Yeah, I tossed it.

MR. BERRIGAN:  But the fact it was gone, this woman got to testify here's some subsequent letter of apology that we can't really discuss.

THE COURT:  Well, you could have asked Jennifer Rinden about that, if she had knowledge that there was a letter of apology sent.

MR. BERRIGAN:  My recollection is that that went to the Court.

THE COURT:  She was my law clerk.

MR. BERRIGAN:  I'm sorry, you're talking about your present law clerk.

THE COURT:  No.  I'm talking about that letter came -- the law clerk who testified.

MR. BERRIGAN:  Yes.

THE COURT:  That's who we're talking about here.  She was still my law clerk when the letter of apology came, and she knew about it, and if you wanted to get that into evidence, I can't imagine I wouldn't have let you ask her if she knew that a letter of apology was sent.  I wouldn't have allowed her to testify that the letter was sent to me because that would have implicated me, and I was going out of my way to protect the defendant on this issue.  You see what I'm saying?

MR. BERRIGAN:  I do, Your Honor, and the only thing I can imagine is that we didn't have the knowledge that she had gotten the letter of apology or knew something about it.

THE COURT:  She didn't get the letter because it was addressed to me, but because she was the law clerk on that case, I discussed it with her, and I guess you would have known that had you asked her.

MR. BERRIGAN:  Perhaps.

THE COURT:  Yeah.  I guess what I'm getting at is I read this as you somehow saying I prevented you from getting into the letter of apology, and I don't think I did.

MR. BERRIGAN:  Well, I think our position was the only way we thought we could get into the letter of apology was to have the letter or, you know, have some type of --

THE COURT: Well, couldn't you have asked Jennifer Rinden "did you know" -- "was there a letter of apology sent"?

MR. BERRIGAN: We only would have asked her that only if we knew it. We can only presume that the defense, for whatever reason, didn't know that Jennifer Rinden knew about the letter of apology or had some favorable testimony to offer, because otherwise I can't imagine why we wouldn't have asked her about it. I mean I don't know even as I'm standing here what the woman knew about the letter of apology other than what you're telling me.

THE COURT: But let me ask you this: Would it come as a surprise to you that a law clerk assigned to the case who went to the marshals thinking the judge had been threatened, that when a letter of apology came in, I wouldn't have discussed it with the law clerk to put her mind at ease?

MR. BERRIGAN: I would be surprised if you didn't, and I know you have multiple law clerks, and I suspect once you got the letter, you would have brought it to her attention. I don't know what to say --

THE COURT: I'm not criticizing you about it. It seems me -- i'm trying to cut to the bottom line, and I'll just repeat again, I understand your argument it shouldn't have been admitted, but it seems to me you make me out to be the bad guy, and I thought I did everything I could, everything you asked of me and more -- I think some of those ideas may have been mine -- to try and limit the impact of this testimony.

MR. BERRIGAN: That may be. I'm sure we were concerned about -- i know we were concerned about any evidence that this woman was working for the Court, because obviously that carries all kinds of problems for the defense.

THE COURT: Well, let me just ask you this one more time: How did my remedy deny the defendant the opportunity to take the sting out of the evidence and create a false impression with the jury?

MR. BERRIGAN: The only two answers I can give I've given. One is that the remedy we believe was insufficient, her testimony should have been excluded in its entirety; and secondly, we didn't have the letter of apology, and I can't imagine that the defense team knew -- perhaps we should have known, that this woman knew about the letter

of apology, would be able to testify about it, but I don't believe we did know that. Maybe we should have made some inquiry, but we didn't, because I think if we would have known that, we would have asked her about it.  That's obviously somewhat favorable.

THE COURT:  Did you ever ask the Government if they'd stipulate a letter of apology was sent?

MR. BERRIGAN:  I don't recall, Your Honor.  I think we voiced some real concerns about this person testifying to Mr. Williams when her name appeared on the witness list, but I don't recall any request for particular stipulation.  We might have had some discussion about -- in fact, I think we sort of did, that Mr. Williams wasn't going to mention that she had worked for you.  I think they voluntarily might have thought that was a little too much, but that's all I can recall of that, and I'm sorry.

THE COURT:  That's fine.  Mr. Williams, anything you want to respond to on that point?

MR. WILLIAMS:  I think the Court's right that a lot of the remedy we came up with was part your idea and part my idea, that we just wouldn't mention she was a clerk for you.  You ultimately and specifically instructed us, and it worked out we didn't -- nothing false was ever presented to the jury.  What we said was she was a clerk working for the clerk's office which was, in fact, true.  She happened to be a law clerk assigned to you, but --

THE COURT:  But she was actually -- among my other law clerks, she was employed by the clerk's office.

MR. WILLIAMS:  Right, and it was unnecessary for the jury to know she was assigned to work as a law clerk for you.  So there was nothing false ever presented to the jury.  The Court did protect the defendant by limiting this information.  Nothing about the remedy that the Court imposed or the restrictions the Court imposed on the Government in presenting this evidence barred the defense in any way from bringing up this apology stuff, and so I'm lost a little bit.  Whether the letter existed anymore or not, as long as this evidence came in, what was barring the defense from presenting anything about this apology?  How were they going to present it otherwise?  They're not saying somehow your remedy barred them from presenting that evidence of the apology in some way.  I'm not sure

how they thought they were going to get that in, but you're absolutely right, it made sense they simply could have asked your law clerk. Beyond that they could have concluded logically that somebody on your staff would know about this letter of apology beyond yourself.

THE COURT: My secretary.

MR. WILLIAMS: Secretary, maybe somebody from the clerk's office. So inquiry could have been made. If they wanted to present that evidence, they could have. The point is there's nothing on the record where the defense ever said "Judge, we'd like to introduce evidence of this apology" and you said no. Simply didn't happen. And so for the defense to complain now the protections the Court imposed for the defendant somehow prejudiced the defendant, it just doesn't apply.

THE COURT: I mean actually I assume you didn't get into the apology because you didn't want to call attention to it and make it sound worse than it actually was.

MR. BERRIGAN: My recollection is that we made a record at the time that this issue arose. What we failed to do, I think, is to accurately state what our position was at the time that that record was made. I feel fairly confident in saying that at the time the Court fashioned the remedy, whoever's idea it was, it wasn't a remedy that was agreeable by the defense in all aspects, that we had some complaint about it.

THE COURT: Sure, because you didn't want the witness to testify at all.

MR. BERRIGAN: Right. Exactly. If there was anything else we complained about, I don't remember what it was.

THE COURT: Well, I must be really dense, and I'm sorry, but what was the false impression that my remedy created?

MR. BERRIGAN: The only thing I can think of would have to do with the letter of apology, and I don't think that was in front of the jurors in any fashion, so I'm not sure how to answer that question.

THE COURT: Okay. That's fine.

MR. BERRIGAN: I think it was an inartfully-worded point. There was an issue about this woman's testimony, it was raised, and I hope it preserved at the trial.

We haven't done a good job of re-articulating what that was in point number 24.

THE COURT: I appreciate that.

MR. STOWERS: Saying this humorously, I think Mr. Berrigan's complaint that he doesn't want to tell you about is he wanted you to testify at the trial.

THE COURT: There you go.

MR. STOWERS: But in any event, I think I was trying to make a point -- maybe I've covered this enough for you, but that was number 14, and that has to do with the activities occurring that went to the --

THE COURT: Yes.

MR. STOWERS: And then let me jump to another point I wanted to visit about which is one of the subparts of number 19, just some of the issues that sort of relate to some of the intricacies of this rather oddly-worded statute.

THE COURT: Well, we really made an awfully full record on that, don't you think, in the various jury instruction conferences we had?

MR. STOWERS: Right. And the one I really wanted to talk about was B which starts on page 33, and this -- first of all, I think we cited on page 33 a case Garrett. That's the wrong case. We corrected that in one of the subsequent filings, but it actually should be the Rutledge case which is the case from the U.S. supreme Court that requires the jury to be unanimous on each of the offenses that constitute the series in a CCE charge, but one of the problems with this Indictment was that we tried to identify for the Court ahead of time, that meaning before trial, was that certain of these underlying offenses were so vaguely charged. They would say things like the drugs were distributed from 1992 to 1998 by a member of the continuing criminal enterprise. Then there would be one, possessed with intent drugs in that time period or manufactured, those being substantive offenses, without identifying who, precisely what, where, or when. And then we get, you know, that submitted in that form to the jury in the verdict forms because that's the way it was charged, and then we have also -- we get our verdict back. Jury says that was proven, somebody did that between 1992 and 1998, and all 12 of them were unanimous.

THE COURT: Did you object to that part of the verdict form?

MR. STOWERS:  Yes, we did.

THE COURT:  Okay.  I thought you did.

MR. STOWERS:  Because our view was you really couldn't get a unanimous verdict on -- you wouldn't know if you did or not because you don't know what they're being asked to decide; what event, what person did that, where did it occur, what circumstances, are all 12 jurors agreeing on the same --

THE COURT:  But did you ever proffer a proposed verdict form?

MR. STOWERS:  Our position --

THE COURT:  -- on this point?

MR. STOWERS:  Without essentially -- our objection was that you couldn't submit that.  It wasn't anything that created a submissible issue for the jury, and as a result we couldn't go back and say, Well, maybe they can submit that -- remember that testimony from Jeff Honken about making a batch of meth in Arizona in the fall of 1992, they could put that in there, and our position was that would be an amendment to the Indictment at that point and that that wouldn't be appropriate to do.

So we objected to it, pretrial we objected to it and the instructions, and then there's another interlaced problem with that which is although they had some of these broadly-worded clauses in the series that they had charged in the Indictment, they also had some specific ones.  So when they had a specific charge, it might have related to possessed with intent to distribute with regard to Mr. Nicholson on the occasion of his arrest in March of 1993.  Well, that fell within the time period of the other charge which covered the whole time period.  'Course, the jury found that was proven beyond a reasonable doubt, that is, the Nicholson possession with intent.  So then we have that situation potentially merging with the other jury finding on the more broadly-worded charge because it's almost like the lesser-included within that.  So we don't know if those are two separate offenses that the jury was finding to have been committed as part of the series or only one or what precisely was found.  We think that's occurred in a number of different instances such that if you strike out the findings that were made on those underlying series, you won't wind up with three remaining, and if you don't have three, then you don't have the series, and then you don't have the CCE

verdicts, and that only goes to the five CCE counts.

THE COURT: Mr. Williams, you want to respond to that?

MR. WILLIAMS: Yeah, I'm at a loss on understanding the defense argument because the only allegation they've made that there were vague underlying predicate offenses are as to 1 through 6. We allege 13 the jury found -- I think in my brief I said 12 of the 13, but as I look back now -- yeah, they found 12 of the 13 out of this, so even if you throw out six of them, they still found more than three predicate offenses that are sufficient to sustain a CCE conviction, so it's moot.

MR. STOWERS: Then that kind of goes back to one of the other issues which is our position being that the CCE had to have been in existence not later than the time of the killings in question, and therefore the series, if there was three, couldn't be three that happened, say, in 1994 or '5 or '6 or '7 or '8. It had to be three by the date of the killings in question, and if it didn't happen by the date of the killings in question, then there was no CCE that the defendant could have been, quote, unquote, working in furtherance of at that time because there no CCE. So the CCE had to exist on or before the date of the killings, and then it had to continually exist at that time as well, and that's my response.

THE COURT: What are some of the other ones you want to argue? Because I have a couple more questions on some.

MR. STOWERS: I think I was going to turn it over to Mr. Berrigan on some of the jury issues and jury selection.

MR. BERRIGAN: Frankly, Your Honor, as I reviewed the jury issues in preparing for the argument, I think we've argued all of these issues --

THE COURT: I think you've briefed them exceptionally well.

MR. BERRIGAN: Unless you have questions, I don't intend to argue these again. So I think the defense, absent questions from the Court, has concluded our argument.

THE COURT: I wanted -- the poem, number 25.

MR. BERRIGAN: Yes, sir.

THE COURT: Did you object to that?

MR. BERRIGAN:  I think we did, yes, sir.
Mr. Stowers and Ms. Johnson assure me that we did.  Their memory is better than mine, but I suspect I would have objected to that because I've seen that issue come up in other cases, and I do think -- and I well realize that appellate courts have been given some great latitude on this victim impact evidence, but there has to be a line somewhere, and it's hard to tell where it is, but we sure think that's over it.

THE COURT:  It's troubling.

MR. BERRIGAN:  Well, I don't want to pontificate about jury impact evidence, but you've seen it twice now.  It's a funeral that takes place in the courtroom.

THE COURT:  Absolutely.

MR. BERRIGAN:  The impact on the jurors is tremendous.

THE COURT:  Which is why I can't imagine not trifurcating the case.  That was always my motivation for trifurcating it.  Not that it necessarily helps, because there are other problems with  --

MR. BERRIGAN:  Right.  They're going to be crying at whatever stage that testimony is in because these jurors are really -- in fairness, they associate themselves much more to the families of the victims than the family of Ms. Johnson; I mean that's only natural, and they're saying to themselves and they're seeing themselves potentially in that situation, and we're particularly talking about dead little girls, and we've got those pictures up there in the bathing suits that have been in the ground for seven years, and now we're talking about poems that were said at funerals.  I'm not sure.  I've seen it so much now.  You hate to be inured to it, but it's not inured to the jurors.  They are powerfully swayed by this, and I know it's difficult for courts to draw the line, but this poem situation was completely, in our view, unnecessary and  --

THE COURT:  The only thing in the Government's favor, it had -- this is just my perspective having been the trial judge in both cases.  It had less impact coming from the brother than it did from the little girl who wrote it.  I don't know if that's why they elected to use the brother or not.  I suspect it's more logistics.

MR. BERRIGAN:  The other thing  -- I didn't see the penalty phase in the Honken case.  I thought this witness, Mr. Milbreth, was as powerful a penalty phase

witness as the Government had in the whole trial.  To have a man like that up there crying, obviously a man of strong character and personal faith, this is a gentleman that you wouldn't expect to be likely shedding tears.  To see him break down on the witness stand, even the male jurors  -- particularly the male jurors in the case had a hard time with that.

THE COURT:  I understand.  Maybe it's a toss-up because he was a very good witness, but to have the little girl across the street who was the same age read -- who wrote the poem --

MR. BERRIGAN:  Sure.  Unfortunately I didn't see that.

THE COURT:  Right.  I guess I don't have to decide which is more powerful.  Of course, I'm not a big fan of victim impact testimony at all, and I think I've made that clear on some of my rulings.  If you've ever sat through it, you'd know that it's unbelievably  --

MR. BERRIGAN:  Well, in some states they don't allow it.

THE COURT:  Well, the Supreme Court didn't allow it until they did an about-face in, what was it, Tennessee versus somebody.

MR. BERRIGAN:  Payne versus Tennessee, 1991.  In 1989 they did not allow it, Booth versus Maryland.  Two years later Justice Scalia joined the court.  Justice Marshall in his dissent was extremely critical of the court changing its position in two years.

THE COURT:  Didn't I say in one of my opinions that I was fairly confident that no justice on the Supreme Court who voted for it ever sat in a federal death penalty trial and heard it?  I meant to put that in one of my opinions because I believe that.

MR. BERRIGAN:  I'm sure that's quite true, because to see it in action is quite something.

THE COURT:  Well, let's give Mr. Williams a chance to weigh in.  We've been both beating up on him.

MR. WILLIAMS: Sure.  Obviously I can make a record here.  It did factor into my analysis the fact I thought the use of the ten-year-old -- then ten, now whatever it is, 19, 18-year-old girl in the Honken case was more devastating.  I think the Court

knows from the way we presented the penalty phase and the victim impact that I did my best to minimize the amount of victim impact evidence we put in while still doing my job to let the jury know the victim impact. We called only six victim impact witnesses at the penalty phase of the Johnson trial. I was concerned where that line was --

THE COURT: Which is going to help you on this issue.

MR. WILLIAMS: Pardon me?

THE COURT: I don't know how I'm going to right to hear. Yes, it's powerful evidence, but the crime was a powerful crime, and we have placed -- congress has placed the jurors in the position of sentencing, a position the Court would normally have, and any judge sentencing somebody for a violent crime is entitled to know what that victim impact is. Congress has enacted the Justice for All Act that now mandates that the Court listen to victim impact testimony in a number of cases for the very purpose that it's believed that a Court should take into account what that crime did to the people that were the victims of the crime, and to the extent that we've put the jury in that position, I think the jury's entitled to know what that impact is. Yes, it needs to be limited to some -- i think we went beyond the call of limiting what we could have put on in this case, and I don't think this poem took it over that barrier.

MR. BERRIGAN: Can I respond briefly, Your Honor?

THE COURT: Yes.

MR. BERRIGAN: Because I -- the issue is not whether Mr. Williams could have put on more. Arguably he could have put on more. It's the nature of what was put on that we're complaining about. I found it puzzling, to be honest, that if he was concerned about the poem after
Mr. Honken's trial that he dared to go forward nonetheless, changing the witness, perhaps, but not the poem in
Ms. Johnson's trial thinking perhaps it wouldn't have quite as much impact, but it is the poem that makes the difference.

If Mr. Milbreth's up there talking about the weather, nobody's going to be complaining. This was a poem read at the funerals, and his reaction I think could have been easily expected by Mr. Williams. Mr. Milbreth testified in the first phase of the

trial; he was emotional then.  Here he came back in the penalty phase, and Mr. Williams knows he's going to read the poem.  He knows what's going to happen.  That poem was, yes, powerful, but there are limits to how much power you can put into this victim impact evidence.  Even Justice Scalia says the Fourth Amendment still applies to victim impact evidence, and our position is not "Mr. Williams, you were way over the top on all the victim impact evidence."  Many of the witnesses were handled with grace, I thought, and with restraint, but not this one, and it can be one that can do it.  One witness can push things over the edge, and that's just our position.  I don't want the record to be such that we're accusing Mr. Williams of going way beyond bounds with the totality of the victim impact evidence, but in this particular case our view is with respect to his judgment, that he did go over the edge here.

THE COURT:  My only point was that if he had, it would make this poem even more damaging.  I'm not trying to minimize the effect of the poem in this particular case.  I'm not trying to do that.

MR. BERRIGAN:  I understand.

THE COURT:  It was very powerful.

MR. BERRIGAN:  Right.

THE COURT:  And I have to make the judgment whether that crossed line or not.

MR. BERRIGAN:  Exactly.

THE COURT:  I can totally understand your argument.

MR. BERRIGAN:  We don't have Christmas videos on top of the poem; I've seen that, and birthday cards and all kinds of other stuff.  There's some crazy stuff that sometimes goes on in these cases.

THE COURT:  'Course, we had an Easter picture.

MR. BERRIGAN:  That's true.  But I suggest there aren't too many cases I've had where people are reading poems about funerals.  It just doesn't happen very often, and I think this was somewhat exceptional.

THE COURT:  Do you have any other things you want to argue?  I have another

issue I'd like to raise that I don't think anybody's raised.

MR. STOWERS:  We could do that or --

THE COURT:  Take yours.

MR. STOWERS:  I was going to talk about lucky number 13 which is the issue of Mr. Honken's 1997 guilty plea and conviction for --

THE COURT:  Yes.

MR. STOWERS:  Okay.  That's an issue that came up before the trial.  The Court did rule on it before trial.  It was the subject of some pretrial motions in limine, I believe, briefed by both parties and then ruled on by the Court which we note in here.  This was something also that I just want to point out in case you're scouring the record with the help of your law clerks back in Sioux City.  This was something that was argued by Mr. Miller in closing, and one of the things he said in closing was that Mr. Honken's guilty plea established one of the elements that he was going through in his closing argument, which was lengthy and a long argument, but he was going through the elements of the offenses, and he said that that establishes, you know, whatever the elements were that he was arguing about at that point which I believe included the charge of conspiracy and that that established a conspiracy because he's already pled to that, and that's what she's charged with that, the only thing we have to figure out is was she involved with the murders.

Now, that under point 13 was exactly why the evidence was inadmissible, because you can't use that evidence, which is Mr. Honken's plea, as proof of Angela Johnson's guilt which is what the whole point of that brief point is which we put together for the Court, and I just want to make sure that the Court understood that that was the argument that we made originally and we make now because we really --

THE COURT:  And I just don't recall, did you ask me to give a limiting instruction on this too?

MR. STOWERS:  I think what happened was based on your ruling in limine, you ruled in limine that this was just coming in.

THE COURT:  In and it didn't need a limiting instruction.

MR. STOWERS: Well, your ruling says what it says, but I think it was just coming in, and it's coming in for all the reasons that the Government wanted it in and that sort of thing, and I think you addressed its admissibility in a fairly blanket ruling that said it's coming in, it's admissible, it's clearly admissible, and we think in these cases actually it was fairly inadmissible, but that's just something I want to draw your attention to is point 13.

THE COURT: Mr. Williams.

MR. WILLIAMS: I don't know that I have anything more to add than what we've briefed on this issue. The evidence was admissible. I think you ruled correctly on that, and I don't recall what Mr. Miller's argument was on this particular point, so it's hard for me at this stage to respond to whether he argued improperly on that or not. So I'm just at a loss on how to argue on that. We don't have a transcript of his closing argument. I don't recall that he said that, but be that as it may, I think it was admissible. Defense did not request a limiting instruction, and given the overall weight of the evidence, even if Mr. Miller somehow made reference to it in a way he shouldn't have, I don't think it made a difference in the outcome of the case.

THE COURT: Anything else you want to argue?

MR. STOWERS: No. Thank you.

THE COURT: Okay. Here's my question for both sides: There is a ton written in the legal literature about the arbitrariness when it comes to the imposition of the death penalty. There are cases that talk about it, there are books written about it, legal scholars have written about it, social scientists have studied it. There's a whole body of literature about the arbitrariness about the death penalty, and here's my question: What's the significance, if any, of the fact that the jury in this case imposed the death sentence on eight counts, the Government -- on an aiding and abetting theory, and the jury in the Honken case imposed the death penalty I guess on four of 17 counts? What's the significance of that? Nobody raised -- did anybody raise that or argue it? I mean I've read so much. I've actually read everything you filed, and I've studied it, and I've put a lot of work already into thinking about it and reading and studying many of the issues you raised. I haven't gotten through all of them, but this is very troubling to

me.

MR. BERRIGAN: We raised in point 35, Your Honor, I guess somewhat related issue but not the specific issue that you're talking about. We talked a little bit about the disproportionality of the death penalty.

THE COURT: Yes.

MR. BERRIGAN: But you're right, this is a little bit different. I think in some respects the Court's in an unusual and almost unique opportunity to have two separate trials with the codefendants and having a chance to listen to the evidence in both cases. Counsel -- we had the chance to at least listen to most of Mr. Honken's evidence. We don't have any explanation that we could proffer to the Court -- any rational explanation as to why the jury would give Mr. Honken death with respect to the two children, and we can't -- obviously that makes sense, but not give death as to the other victims and yet in Ms. Johnson's case give her death in all victims except Greg Nicholson. And why was Greg Nicholson differentiated; what special circumstances about his factual scenario would warrant a sentence of life and not death? You could maybe see it with DeGeus, with the abusive background and his relationship with Ms. Johnson that maybe death would make sense in that particular case. This is a guy who -- not to say he had it coming, but you could see some reason why she might want to kill him. That doesn't apply to Greg Nicholson. She doesn't know Greg Nicholson from Adam. They've never seen each other, and yet the jury thought was something, and so our view was how could it not be arbitrary, and particularly respecting vis-a-vis Mr. Honken's verdict, but I recognize there are a lot of factors that come into play. There's the skill of counsel. There are the particular arguments that are advanced by both parties. There's a lot of nebulous factors, but if we were to look strictly at the facts of the case, I don't think there's any reasonable, rational explanation as to how these different results make sense. To that extent, that advances the argument that, yes, it's arbitrary.

The same week that Ms. Johnson's case started trial, efforts to negotiate a plea fell through, plea for life imprisonment. Eric Rudolph that week had his life spared by the federal government essentially because he had explosives hidden in a cave. He had been accused and was pleading guilty to having started the Olympic bombing. There was a

police officer killed in Atlanta in 1996. He had shot people related to abortion clinics. He's one of the most notorious murderers in America, and somehow somebody thought his life should be spared and Ms. Johnson's case should proceed to trial. That wasn't Mr. Williams' decision; I'm not accusing him of that, but if that's not arbitrary, I don't know what is. Yes, we believe it's arbitrary that Ms. Johnson got the result that she did. I'd have to acknowledge that there is an issue that the Government will raise, and I might as well bring it to your attention, is what difference does it make.

THE COURT: Because of the overlapping --

MR. BERRIGAN: Because of the children.

THE COURT: Right.

MR. BERRIGAN: Those two are consistent, and we can all understand how -- the death of children, that's the most severe aggravating circumstance you can possibly have, and there's objective literature to bear that out. There's a jury works project that's been going for years, there's post-trial interviews where juries are asked about aggravating circumstances, but as to the other victims, I don't know, Mr. Williams may have a rational explanation, but we sure don't. We've scratched our heads about this verdict in many respects long after it's over with and continue to do that throughout our careers.

THE COURT: Comes as no surprise to counsel that I was very surprised by the penalty phase verdict.

MR. BERRIGAN: We understand that, Your Honor.

THE COURT: I would say "surprise" would be an understatement largely because I thought you did such an exceptional job in the penalty phase.

MR. BERRIGAN: Thank you, sir, although the objective facts would indicate otherwise. Mr. Williams did apparently better job than we did, but I appreciate that.

THE COURT: I can't imagine anybody doing a better job than you did in the penalty phase. I don't want to sing your praises too high because you'll be back maybe in a couple years on an ineffective claim.

MR. BERRIGAN: Certainly unlikely I'll get a big head about it given the results, judge, but I appreciate the comments nonetheless.

THE COURT: Very troubling to me.

MR. WILLIAMS: I understand. I don't think you should read anything into it for a number of reasons. First of all, let me respond to the allegation that the Department of Justice has been somehow irrational in the Rudolph case versus this case. In the same argument made by Mr. Berrigan about it making no sense, he then went on to say the killing of children is the most aggravating factor that exists. So to the extent that he's saying somehow the Department of Justice was irrational in reaching the life plea with Rudolph, the fact is Rudolph didn't kill in cold blood two little girls who were totally innocent, and if anybody wants to look at that and say the Department of Justice is somehow being unfair and irrational --

THE COURT: That's not what troubles me about the Rudolph case, so don't -- i thought a lot about it at the time in thinking it was kind of a bizarre fortuity that he had this cache of weapons or something and that's how he got off, got out of the death penalty, but I'm not in a position to second-guess the Department of Justice when they seek the death penalty and when they don't. I wish I was, but I'm not.

MR. WILLIAMS: And I appreciate Mr. Berrigan's comments that this wasn't a decision I made or even my office made on how this --

THE COURT: But isn't the eight counts for somebody who -- i mean you prosecuted both cases. You could hardly say that based on the evidence in both cases Angela Johnson was more culpable than Dustin Honken.

MR. WILLIAMS: I don't know about that, Your Honor.

THE COURT: Okay. Tell me about that.

MR. WILLIAMS: Two things. One is I don't think we can speculate as to what the jury was thinking. First of all, not the same jury. We don't know what the dynamics were back in the jury room. We can do nothing but engage in speculation that all the jurors weighed all the evidence exactly the same and said "in this case we find her more culpable than him." As Mr. Berrigan admits, any number of factors that could have gone into play. In the Honken case there could have been a single, lone holdout juror who decided "I don't want to vote death on these other ones, but I'll do it for the girls" for

no rational reason at all and that's what kept it from going to the death penalty; has nothing to do with the evidence.

So you can't conclude anything, particularly because we had two different juries, but even if we had the same jury and they came back that way, I don't think you can reach any conclusion without engaging in nothing but speculation, but to the extent we're going to engage in speculation, I don't think it is unreasonable for the jury to conclude in this case that Angela Johnson was more culpable than Dustin Honken, and I've said in my brief Adolf Hitler killed 6 million Jews and never executed a single one of them personally, and yet no one can say that his role was less culpable than the person who actually pulled the trigger. That's obviously an incredible extreme example, but it is one that if you take it smaller in this case, there is a rational basis for the jury to have concluded.

We presented evidence that prior to Dustin Honken meeting Angela Johnson he did not engage in any violence. He wasn't a violent person. He shot nobody. He beat nobody. In contrast, Angela Johnson was a violent person. She was angry, she was volatile, and when you mix those two people together, death results, and it is not irrational for the jury to have looked at this and said, you know, Honken was a planner, he was a schemer, he was a dreamer, he clearly had this great plan to be a big drug dealer in the world and he thought about a lot of different things, but you know when it came down to it, it was Angela Johnson who pushed him, who was saying "do it." When in 1996 Honken is arrested again, it was Angela Johnson saying "do something about Cobeen, come on, do something." It was Angela Johnson who went out and bought the weapon. It was Angela Johnson who made entry into the house.

So it's not at all irrational for the jury, and the Court shouldn't be concerned that this jury said looking at their relevant conduct, yes, Honken pulled the trigger on every one of these murders, but that's not the definition of who is more morally and criminally culpable.

THE COURT: So can I summarize your argument and see if this is what you're saying. In your view an aider and abettor can be more morally culpable than the principal.

MR. WILLIAMS:  Yes, Your Honor.  Because an aider and abettor technically is somebody who only facilitates -- takes some action to facilitate the killing versus the person who actually pulls the trigger.  So if I've got a buddy who is an idiot and follows everything I tell him to do, and I say "take this gun, go and kill this person" and I give him the gun and my act is aiding and abetting his murder of somebody else, anybody is going to say I'm more culpable than this poorly educated, uncontrollable person who did that.  Now, that's not this case, but the principle applies.  Simply because somebody is convicted as an aider and abettor does not mean they are less morally culpable than the person who is the principal, particularly in a murder case.

THE COURT:  Mr. Berrigan.

MR. BERRIGAN:  Wonder if I could respond briefly.  I did get to listen to Mr. Williams argue at essentially the summary judgment motion, the motion for judgment of acquittal at the close of the Government's case that Mr. Honken raised and going on in great lengths -- encourage the Court to look at the transcript.  Mr. Honken was, in fact, the force behind these murders, that he had planned, he had schemed, it was his idea, he's the one that got Angela Johnson to carry out, on and on and on.  There was little discussion about Angela Johnson initiating anything.  Obviously he took a different tact, although --

THE COURT:  He wasn't trying Angela Johnson in the Honken case.

MR. BERRIGAN:  That's right.

THE COURT:  He's not allowed to change gears?

MR. BERRIGAN:  He can't change theories, at least legitimately I don't think.  It's just not true.  You know the evidence in this case as well as anybody.  Who's under investigation for distribution of cocaine -- i mean methamphetamine?  It was Dustin Honken.  The reason Greg Nicholson was killed, because he was going to testify against Dustin Honken.  The reason Terry DeGeus was killed, despite the sort of theory this was payback for abuse years ago, is because he's got a grand jury investigation; he's going to implicate Dustin Honken.  The only reason Angela Johnson goes to the house is because Dustin Honken can't show up at the house.  Greg Nicholson knows Dustin Honken.  He sees him, all hell is going to break loose.  He doesn't know Angela Johnson.

Angela Johnson gets the gun because Dustin Honken is on pretrial release. He can't go somewhere and register a Tech 9. There's all kinds of reasons Dustin Honken is the force behind these murders, and to take the position she's somehow more culpable stretches credulity really if you look at these facts objectively. Does that mean she can't get the same punishment? Sadly, no, Your Honor. The case law is clear that she could be subjected to it, but this idea that she's the leader, if you will, in this conspiracy to commit these murders is absolutely crazy, and I don't know how Mr. Williams could argue that with a straight face. Dustin Honken's the guy that's motivating these murders. I don't know what he's talking about --

THE COURT: You didn't hear his allocution.

MR. BERRIGAN: I'm sorry?

THE COURT: You didn't hear his allocution.

MR. BERRIGAN: That's true. You're right. He was innocent, I forgot. Some of us may not buy that altogether.

I don't know where that gets us on the arbitrariness thing to be honest. I do think it's just inconceivable to me how somebody could rationally explain the result even within Angela Johnson's case itself, much less compared to Dustin Honken, and say there's no element of arbitrariness involved in these proceedings.

THE COURT: Can I ask you another question about that, and this is troubling to me, but I don't know where it fits in, if at all, on any of the motions for post-trial motions, but I just -- i keep coming back to it, and it's hard for me to articulate, so I'll just do the best I can. The evidence of Angela Johnson's actual involvement is incredibly ambiguous, and there's something troubling to me about giving somebody the death penalty when you don't know exactly what they did.

MR. BERRIGAN: There was only one witness that testified about it and that was that fellow in prison that Dustin Honken talked about. I thought he was one of the more incredible witnesses that testified, but that was it. There wasn't anybody else there. Mr. Williams acknowledged that Dustin Honken pulled the trigger, there's no argument about that. He's the one that executed these people. We argued about how far away he was and where were the children and what was going on when the two adults were

being executed, because nobody knew.  Nobody has any idea.

THE COURT:  And maybe it's just an emotional reaction I'm having, not really a legal issue; I haven't sorted it out, but I have a very strong feeling that the very uneasiness about a death penalty verdict when the evidence is ambiguous as to the defendant's role.  It's very troubling.  I don't know if that gives rise to a legal issue that grants a new trial or not, I haven't been able to sort it out; that's why I'm asking if you can help, but it's very  -- and maybe it is just an emotional issue; I don't know.  Maybe it's not a legal issue, but it's very troubling to me.

MR. STOWERS:  I think this kind of touches a little bit on the Tison and Eddings cases from the U.S. supreme Court that requires a certain level of participation and culpability in the conduct giving rise to the murders, and that standard has to be met in the evidence; it has to be found by the jury based on sufficient evidence, and the statute parrots back those legal standards from those two U.S. supreme Court cases.

So if you're troubled, as when I made the argument during the eligibility phase, that there really wasn't sufficient evidence to support findings on certain of those eligibility factors because there really wasn't anything to explain precisely that she had the requisite degree of participation such that they could get through the gateway, if you will, that is one of the points that we've made in our filing, that there's substantial question about that, and the evidence really doesn't get them there under the reasonable doubt standard if it is too ambiguous and uncertain about what precisely she did or didn't do or where precisely she was or wasn't at what time, et cetera, et cetera, et cetera, and that's why we've made that argument.  And even assuming technically that the evidence might be sufficient under the standard of review, which is very favorable for the Government on that type of an issue, there is still the ability that the Court has under the new trial standard, which you're very familiar with, to say it's really kind of against the weight of the evidence such that there's been a miscarriage of justice which is why we've raised sort of this umbrella allegation which, as you pointed out, is under-briefed.  Thank you.

THE COURT:  Thank you.  Mr. Williams.

MR. WILLIAMS:  Your Honor, in this case there was no confession, there was

no testimony by either of the two participants in the murder, and so no one other than the defendants will ever know exactly what happened and exactly what their roles were in this case, and we were left in this case with circumstantial evidence. I think the circumstantial evidence was quite consistent in what her role was, what she did to aid and abet the murders in this case, and so I don't find her role to be ambiguous given the circumstantial evidence of the case. We'll never know what happened that night. We just never will. We won't know --

THE COURT: There's a lot of ambiguity for me. I mean I know you say Dustin Honken pulled the trigger, could have; I don't know that. I don't know that that is true. I mean I don't know, you know, what Angela Johnson did in the house; you know, did she assist in tying them up, did she hold the gun on them, did she man the video camera. I mean there's a -- did she drive somebody out to the grave site, did she go out before and help -- i mean there's a lot of arguments required. Tell you this, there are more unanswered questions than there are questions answered. I mean I can come up with 300 questions in my mind about what happened that I don't have any confidence -- now, maybe it's not my job to come up with those questions; maybe it's not my job to solve the crime. All I'm saying is I have this very strong sense that I don't know what happened, and that makes me very uneasy about a death verdict, and like I said, that maybe isn't even a legal issue. I haven't been able to sort it out yet. I will, because I have to, but it's troubling to me, and I don't agree with you that the evidence was very strong on her actual involvement. I don't know, but convince me.

MR. WILLIAMS: Your Honor, none --

THE COURT: And I'm not sure you have to convince me. You know, I'm not sure that's ultimately going to be a stumbling block for the Government.

MR. WILLIAMS: Ultimately I had to convince the jury, and Congress gave this decision to the jury to make, and the reason they did is because they are in a better position as representatives of the citizens to make such a hard decision in this case. This was a circumstantial evidence case. In any case there's circumstantial evidence you're going to have lot of unanswered questions. We don't know who made the entry and how it was exactly made, we don't know how long they were in the house, we don't know what

they did.  I could come up with a thousand things we don't know exact details, but we do know certain things she did do, and we proved those beyond a reasonable doubt.

We proved beyond a reasonable doubt on any day the defendant bought the gun that was used in the murders.  We proved what her role was -- that she was actually there that night, that she made entry into the house.  So if you look at what we did prove about what her role was, we proved role significant and sufficient for a jury to conclude that death was appropriate punishment for her role in these murders.  Sure, there's always going to be unanswered questions, and absent a confession from either one of the defendants or some videotape of what happened that night, we're never going to know a lot of those details, but that shouldn't -- that's not our burden.  Our burden of proof is not to prove every single detail of what happened during the murder.  Our burden is different from that, and we proved the case to the jury, we proved it beyond a reasonable doubt, we proved it to the extent that not a single juror had residual doubt as to the defendant's guilt in this case, and under those -- under that level of proof, I don't think it is at all unreasonable for a jury to conclude that death is appropriate.  Would you make a different decision if you were a juror, would I make a different decision?  We might.  Absolutely we might, but that is not --

THE COURT:  And the evidence would have allowed it.

MR. WILLIAMS:  And the evidence would have allowed it.

THE COURT:  Right.  But that's not the issue.

MR. WILLIAMS:  That's the jury's decision, and that's why Congress gave that decision to the jury.

THE COURT:  Anything else?

MR. STOWERS:  Just that when you continue to work on these issues, if you have any other questions for counsel or something, you want to have a phone conference to attempt to get some help with some arguments and things, we'd be happy to participate.

THE COURT:  Okay.  I did want to -- i don't know if you know this, I'm sure you probably do, I suspect Mr. Berrigan does, I was actually working about eight or nine days ago on the allocution issue, because on my own I've had second thoughts about my ruling long before you filed post-trial motions.  It wasn't something I ever -- i read the

cases very quickly; wasn't something that I gave the amount of thought to that I probably think I should have. It's caused me some concern in thinking about it, so I -- i mean I knew it was going to be an issue on post-trial motions, and so I started doing some research on it, and I actually found a case favorable to the defense that nobody had cited because it wasn't in Westlaw, and I always use Westlaw, and on my own -- i actually asked one of my law clerks, I said would you check Lexis to see if there's anything on this, and they found a case. I think it was from the Eastern District of Michigan, Judge Bell who I know, and a very, very thoughtful opinion on that.

So I was actually writing some things about that issue, and then on November 7th the Eighth Circuit Court of Appeals decided U.S. versus Purkey; were you aware of that?

MR. BERRIGAN: No, sir, I was not.

THE COURT: Okay. It's a death penalty case out of Kansas City. I think it's P-u-r-k-e-y.

MR. BERRIGAN: Purkey?

THE COURT: Purkey, yeah.

MR. BERRIGAN: I'm surprised, but I'm not familiar with it.

THE COURT: And they held there is no right of allocution. It's a very complicated issue, and as I went back and reread the Fourth Circuit case and I think there's a Fifth Circuit case, started reading some law review articles about it, I actually looked at over 50 state court cases on it and state habeas cases on it, something I was really delving into, and all of a sudden the Eighth Circuit decides this case and in one paragraph of what I think was a very complicated issue they said there was no right of allocution, so I kind of stopped my research at that point because it's now settled law; I just thought if you didn't know about it. I actually have a Westlaw site. It's 2005 Westlaw 2923, 515. 2923, 515. And there are a plethora of issues, as you might guess. It's a direct appeal, and I didn't read all the other issues, I just focused on the allocution one. So there may be some issues in there that actually have some bearing on this case, so I thought I'd bring that to counsel's attention for whatever value, if any, that that would have.

Anything else?

MR. WILLIAMS:  No, Your Honor.  Would you want to visit scheduling issues?

THE COURT:  Oh, yeah.

MR. WILLETT:  Judge, would you give me a moment to address a couple of questions that you raised?

THE COURT:  Sure.

MR. WILLETT:  Thanks.  You know I can't sit here for two hours and not participate.

THE COURT:  I can appreciate that.

MR. WILLETT:  The evidence of my client's actual involvement, whether alleged or proved depending on which side you talk to, is more than just incredibly ambiguous.  I think for every person who heard this case, whether in the first trial or second trial, for as many people who heard it, as many people would have a different opinion as to what Angela Johnson did or did not do, and it shouldn't bother you that it's just "well, maybe it's just me being emotional and I'm not considering it in the right frame of mind as the judge who will have to impose a sentence."  I think for what Mr. Stowers said to you earlier, this is a legal analysis that the Court has to conduct.  It's just not an emotional reaction based on one's philosophy or one's beliefs, and I think if the Court is having this much trouble trying to define in the Court's mind what was Angela Johnson's involvement or lack of involvement, that is an issue the Court should consider based upon what Mr. Stowers said to you earlier in trying to fashion the appropriate ruling in these matters.

Mr. Williams' argument that an aider and abettor is more morally culpable than the principal --

THE COURT:  Could be more.

MR. WILLETT:  Could be more morally culpable than a principal, as desperately as I have wanted to forget this trial, I don't remember that being one of your jury instructions as to what your definition of the law is and is not, and I won't go into what I think about who's the principal versus who's the aider and abettor.  The hour is late, and the need for that explanation is not necessary, but you're never going to

convince me that a man with a college education who was incredibly bright was taking orders from my client regardless of what allure Mr. Williams wanted to paint to the jury that my client may have been able to impose upon Mr. Honken. There was one mastermind in this case and one only and that was Mr. Honken, and so for Mr. Williams to suggest or argue to the Court that the evidence could show that my client was the mastermind or by analogy that she could be Adolf Hitler is, in my own opinion, ludicrous, and I would ask the Court to consider that.

What is the significance of the jury giving my client eight death counts versus the four death counts in Honken? It's arbitrary, and they got it wrong. Now, then, the overlap is the two children. That's the obvious overlap. As Mr. Berrigan said, one can even go one step further and come up with a rationale or a thesis or a belief as to why the jury gave Angela Johnson the death sentence for Terry DeGeus based upon their prior relationship. There's no way in my own mind you can separate Greg judge, I'm probably the least academic mind sitting in the well of this courtroom, but in my own analysis, it's an easy thing to take care of. We're going to have an evidentiary hearing, we're going to invite Juror Number 55 to the federal courthouse in Sioux City, and we're going to ask him what he said to his fellow jurors, and then we will know, and then there will not be any lingering doubt if the Court has to impose the sentence that this jury brought forth, but I think when the Court is worrying about the ambiguity of my client's' alleged involvement, the Court might also wish to consider the ambiguity of what did Juror 55 say or not say to the other jurors.

I think the other thing that can be pointed out, Your Honor, is the mitigators, and what I was struck with immediately after this jury verdict was Mr. Stowers calling me on his cell phone as we were all leaving Sioux City saying "Al, I don't understand how they came back with some of the votes they came back with," and Mr. Stowers has ably pointed those out in his brief. I'm not going to repeat them. If the jury got the mitigators wrong, then that is support to show the arbitrary and capricious nature of the sentence they imposed against my client.

And the umbrella issue that the Court might wish to consider and the Court can decide whether it was preserved accurately or not is the issue of venue; is the issue

of venue.  The Court wrestled with this, I realize that.  I realize the Court wrestled with this mightily, but we were placed in the same ocean, if you will, where the first trial was tried, and it took us 15 days to pick a jury of 12 individuals and six alternates.  We went two consecutive days without being able to impanel a single juror, and the one story that I tell everyone who asks me what was it like to pick a jury in a federal death penalty case is the incredibly honest man, the blue collar worker who I believe was from Theisen's who told the Court that he really kept up with the Honken case, this was the subject of coffee break discussion; when he got your letter, he religiously stayed away from coffee break, wouldn't associate with his peers, and then Mr. Berrigan asked the question, "Did you hear anything before you came to trial?" "Well, yes, just yesterday I did."  "Well, what did you hear?"  "Well, my fellow workers knew I was coming to this trial, and they told me" -- and he pointed at my client  -- "that bitch should die too," and that's what we had to fight through, and he was the only one honest enough to state it, and the Court did its job and excused him, but that's what we were up against, and, Judge, it's my candid opinion the Court can look to any of the things I've said in the last few minutes to support the arbitrary and capricious nature of what the jury did to my client.  Thank you.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  Well, without repeating myself, I really don't want to respond to every one of Mr. Willett's arguments.  It's largely repetition of what we've heard already.  With regard to the venue issue which hasn't been raised or argued today, I just don't think the record is going to support the allegation that this jury was in any way impacted by the Honken case.  Sure, there's going to be a few jurors who had heard about the case and had been talked to by other jurors, and the Court properly dismissed those jurors.

It took 14 days to pick the Honken case, took 15 days here, and largely it took 15 days because of the defense style or method they wanted to use for the jury selection.  So the duration means nothing.  The fact we went two days without being able to impanel a single juror, invite the Court to look at those days.  I doubt the reason was because every one of the jurors we talked to knew too much about the Honken case.

THE COURT:  Well, one of the reasons was we didn't have 15 jurors like I anticipated.

MR. WILLIAMS:  On many days.

THE COURT:  On many days.  Most days.

MR. WILLIAMS:  So I think we had a jury that this Court took incredible steps to make sure was not impacted by the Honken case, and I think it's nothing but supposition at this point to suggest otherwise.  The record just doesn't support that position.

So, again, without repeating myself, I think we've already addressed the other issues that Mr. Willett raised.

THE COURT:  Anything else?

MR. STOWERS:  (Shakes head.)

THE COURT:  Did the parties have any problem with setting the sentencing for December 20th?  It's -- you know, I don't really have strong feelings one way or the other.

MR. BERRIGAN:  I understand everybody else was available both the 19th and the 20th.  I had the only conflict.

THE COURT:  And you're available on the 20th, not the 19th.

MR. BERRIGAN:  Yes, sir.  We have no problem going forward on that date if the Court desires to do that.

THE COURT:  I don't have any problem setting it, but I'm not going to let that date dictate my ruling.

MR. BERRIGAN:  We presume that to be the case.

THE COURT:  Yeah.  Well, I hope you understand that.  We move sentencings many times a week over at Sioux City, and --

MR. BERRIGAN:  In most criminal cases I'm involved in, the Court sets the argument on the new trial motion and the sentencing on the same date.  I don't presume that that means the Court's already made the decision about the new trial motion or the merits, and we do not presume so here.  So having said that, we're quite comfortable setting the sentencing date on the 20th.

THE COURT: And if I'm not ready to rule on the 20th or before that, we'll just put off the sentencing. That's half of Jennifer's job, rescheduling sentencings.

MR. BERRIGAN: We're present at the convenience of the Court. There is one related matter, and I know you have little control over these things, but --

THE COURT: Oh, on the transfer.

MR. BERRIGAN: Yes. To the extent that the Court has any influence with the marshal's office that we could possibly get Ms. Johnson moved in anticipation of sentencing as soon as possible, we'd be delighted to do so.

THE COURT: One of the reasons for setting the sentencing was that that would facilitate a much more rapid movement, and I know there are problems. I haven't gotten into the details with the marshals, but I kind of know your position on it.

MR. BERRIGAN: Thank you very much. That's all I wanted to mention.

THE COURT: If we set it later in the day -- what time do you want to set it on the 20th assuming we'll go ahead with sentencing on the 20th?

MR. BERRIGAN: I think Mr. Willett, Mr. Stowers think early afternoon would work fine. That would certainly work fine for me. I'm going to come up the night before and visit with Ms. Johnson, so really doesn't matter.

THE COURT: If you're all going to come the night before, I'd just as soon set it for late morning. If you're going to travel that day, I'm going to set it for afternoon.

MR. WILLETT: Late morning is fine. With all the shortcuts I learned going back and forth, I could leave early in the morning and be there late morning.

THE COURT: Would eleven o'clock be okay? If it's too early, tell me.

MR. WILLETT: No, judge, I can make that trip in four hours and five minutes if necessary.

MR. BERRIGAN: If that's fine with Mr. Williams, that's fine with us, judge.

THE COURT: Why don't we set it for eleven o'clock on the 20th subject to it being bumped if I'm not ready to rule.

*T.A. REPORTING  (319) 626-7616*

Okay.  Anything further, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  Thank you very much for your briefing and argument, and thank the defense again for their argument.

MR. WILLETT:  Judge, thank you for rescheduling this in Cedar Rapids to allow me to participate.

THE COURT:  Well, you earned that many times over.  My pleasure.

(The hearing concluded at 5:38 p.m., november 16, 2005.)

*T.A. REPORTING  (319) 626-7616*

<u>CERTIFICATE</u>

I, the undersigned, a Certified Shorthand Reporter and Notary Public of the State of Iowa, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the proceedings named on the caption sheet hereof.

I further certify that the foregoing transcript is a true and correct transcript of my original stenographic notes.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this hearing is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this _____ day of November, 2005.

 

Tracy A. H. Lamp
Certified Shorthand    Reporter
and Notary Public

*T.A. REPORTING  (319) 626-7616*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

        Plaintiff,

    vs.

ANGELA JANE JOHNSON,                         TRANSCRIPT OF
                                             SENTENCING
        Defendant.
                                   /

        The Sentencing held before the Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, December 20, 2005, commencing at 11 a.m.

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500

Case 3:09-cv-03064-MWB-LTS     Document 284-69     Filed 06/23/11     Page 253 of 282

                              118 Third Avenue Southeast
                              Cedar Rapids, IA  52401

Also present:              Bill Basler
                          Jay Jackson, U.S. Probation

Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

♀

                                                              3

THE COURT:  Please be seated.  This is United States versus Angela Johnson, Criminal Number 2001-3046.  Miss Johnson is personally present represented by her three lawyers, Dean Stowers, Patrick Berrigan, and Al Willett.  The U.S. Attorney's Office is represented by Assistant U.S. Attorney C.J. Williams and Iowa Assistant Attorney General Tom Miller who's been designated as a special assistant U.S. attorney for this case and the codefendant's case, Dustin Honken.

Mr. Williams, does the government have any objections to the presentence report?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Does the government know if any of the victims wish to be heard pursuant to the Justice For All Act and Federal Rule of Criminal Procedure 32?

MR. WILLIAMS:  We have three victim family members who would like to be heard by the Court, and then we'd ask the Court to open it up to see if any other family members would like to in light of those statements.

THE COURT:  Okay.  And who would those three family members be?

MR. WILLIAMS:  Be Brenda Stone, Ronda Francis, and Robert Milbrath.

THE COURT:  Thank you.

MR. WILLIAMS:  Thank you.
                              Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 254 of 282

THE COURT: Who's lead counsel for purposes of the

4

sentencing? Mr. Stowers? Mr. Willett? Mr. Berrigan?

MR. WILLETT: Your Honor, if it please the Court. I guess between Mr. Berrigan and myself, we will bring this to resolution. We did file an objections letter to the PSIR, Your Honor. It was sent to Mr. Jackson by me on December 8 of this year. There are certain factual issues that we do not wish to concede. However, the Court does not have to determine or resolve any of those issues in order to impose the sentence today.

THE COURT: And we will make part of the record -- it already is because your objection letter is attached to the presentence investigation report. But I want to officially note on the record that my understanding is that there's no need for me to rule on any of those objections but you've preserved your record with regard to the contested matters that have no impact on the ultimate sentence by virtue of your objection letter. Is that satisfactory?

MR. WILLETT: Yes, Your Honor. That is satisfactory. I guess the only thing I would add is, you know, we did object to the imposition of a fine based upon my client's indigent status, and maybe that's an issue the Court would have to decide. But other than that --

THE COURT: I am going to decide that.

MR. WILLETT: Okay.

THE COURT: And I'm not going to impose a fine.

5

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 255 of 282

MR. WILLETT: Thank you, Your Honor. Other than that, you are right that we were making clarification to objections to preserve the record for later review. Besides the fact that my client will have a right of allocution which she wishes to exercise, it's my understanding that Mr. Berrigan wishes to make a few remarks on Miss Johnson's behalf. And also as we've placed the Court on notice prior to the commencement of this proceeding today, Miss Alyssa Johnson, my client's oldest daughter, would like an opportunity to speak today.

THE COURT: And just so the record is clear, you don't have any authority for the proposition that Alyssa Johnson has a right to speak, but you always could call her as a witness in the case.

MR. WILLETT: That is true, Your Honor. We have no legal authority for the proposition. We could call her as a witness which seems to be maybe the longer way to handle the situation. And we're asking for the Court to indulge us in this request to allow Miss Alyssa Johnson to speak.

THE COURT: Okay. Mr. Williams, any objection from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Willett, have you had a full, fair, and complete opportunity to review the presentence report?

MR. WILLETT: Yes, Your Honor. I received the report some time after November 24, 2005. I can't recall the exact

6

date. It came to my attention that the report had been sent out. I contacted Mr. Jackson. He was very prompt in sending me a copy. I think I saw my client within I believe 48 hours of when I received the report, and I was able to file my objections

Page 4

letter by December 8 which still came within the time frame set by the local rule.

THE COURT: Is there anything you'd like me to take up before we hear from the victims and then hear the allocution, if any, from the defendant and her daughter?

MR. WILLETT: Not on behalf of the defense, Your Honor.

THE COURT: Okay. Mr. Williams, you may proceed with the three family victim members that you've identified in whatever order you would like.

MR. WILLIAMS: Thank you, Your Honor. The United States would ask Brenda Stone to step forward to begin with.

THE COURT: Good morning.

MS. STONE: My name is Brenda Stone. I'm Terry DeGeus's youngest sister.

Angela, you disgust me. I have lost countless nights of sleep --

MR. BERRIGAN: I'm going to have to object, Your Honor. We don't intend to cross-examine the witnesses, but it's inappropriate for any of the people testifying to be addressing my client directly. These comments should be addressed to the

7

Court. We would strongly object to the personalized nature of the comments from this witness and hope that that won't be repeated.

THE COURT: Well, I'm going to allow the individuals to -- they're really addressing the Court, but they can make comments concerning Miss Johnson, so please proceed. Your objection's noted for the record, but it's actually overruled.

MS. STONE: I've lost countless nights of sleep

thinking of how you can take part of murdering children, your own children home in bed.  Living with yourself must be hard. My brother loved you, and you took him from those who loved him. How dare you.

You and Dustin put my family and myself through a living hell.  We will live in this hell until we die, not until you die.  You will get your peace when you are laid to rest. Waking up suddenly after dreaming of the murder of my brother being shot and picturing in my mind what happened to him that night is more than I have been able to emotionally and mentally bear.  I suffered depression from this ordeal, and I continue to fight for normalcy in my life.

I'm continually haunted with hearings, trials, letters, letters from lawyers, crime victim organizations, newspaper articles, people stopping me on the street asking questions, calls from reporters, TV news reporters, and just plain inconsiderate people.

8

Every time a person comes up missing, a murder happens, a shooting takes place, a drug deal goes down, I think of Angela and Dustin all over again.  My mind cannot escape this nightmare.

My niece Ashley grew up without my brother.  I can't imagine what it was like for her to not know where her dad was for all those years and then to know the truth.  I can't imagine what it was like for her to have slept in the same house as Angela and watch her father hold Angela and have kissed him and to know now what she has done, killed him and taken him from her in such a heinous way.

My parents have undergone the most traumas from all of

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 258 of 282

this, a child missing, rumors of what could have happened to him starting from leaving town to hide from Dustin, from being in the witness protection program, to being killed, not knowing what was truth or fiction, having to financially support his home while he was missing, car insurance, lack of income from not having him as an employee to work for them, trials, and many other expenses along the way, emotional distraught from guilt.

When preparing for this day, my friends asked me to mention my faith. I am a Christian, and I want to be forgiving. But in this case I give it to God. You see, I don't care if Angela goes to heaven or hell. If she found God, I don't care. I know that her mother loves her very much, and I know that her family shows unconditional love. But she still deserves just

9

punishment.

Even after they are both put to death, my brother will still be gone. And I will still have bad dreams, and I will still picture Amber and Kandi being so scared and their execution in my mind, and I will still picture the horror Lori went through the night Angela took the lives of all of our loved ones. I will still hurt inside, and I will still long for my brother.

But at least when she is gone, I won't be scared anymore that she won't do the same to others or to me what she has done to all of our families and to others. The world will be just a little safer when she's gone.

And Alyssa's loss I am sorry for. To lose a mother will be painful. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: United States would ask Ronda Francis

Page 7

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 259 of 282

to step forward.

MS. FRANCIS: Good morning, Your Honor.

THE COURT: Good morning.

MS. FRANCIS: I'm Ronda, and, of course, as most everybody knows, I'm Terry's oldest sister. We're here today because over 12 years ago our loved ones' lives were taken away from us. We came here to hear the words of justice and finally get a little closure -- a little closer to some closure. To explain what we, the families of the victims, have been through

10

would be impossible.

The endless years of pain and suffering, of not knowing what happened but then to hear the truth was so hard to bear. To hear what kind of hell they all actually went through was beyond all our nightmares. We, Terry's family, knew since that night that Angela called Terry that she and Dustin were responsible for him never coming home again.

To think this woman was loved by my brother sickens me. He loved her. He gave up a lot to be with her. She came to family functions and got to know us. She used to have my niece Ashley at her house because Terry would bring her there.

So what kind of cold, heartless person could purposely plan and carry out the murder of someone who loved her? She didn't just lure him to his death. She tortured, taunted, and tried to humiliate him. She enjoyed beating the life from my brother. This was true murder, cold and calculated and enjoyed.

When I think about the night you killed Greg, Lori, Kandi, and Amber, I think how their last minutes of life were pure hell, Greg and Lori trying to protect the lives of those little girls, knowing they would all die and what was going

Page 8

through Kandi and Amber's young minds. Did they know what was happening, that their mother and sister were just killed and they were next? As a mother, what would I have been going through?

So I ask you, Angela, how could you do this great sin?

11

Being a mother yourself and being pregnant, how could you take all these lives unless you had no heart or soul at all?

I thought about your daughters and how you have made their lives hell. We wish them no ill will, and we feel for them. Did you ever once give them a thought? Did you ever think about --

MR. BERRIGAN: I'm going to renew my objection again, Your Honor, and ask that it be continuing to this idea that the witnesses can address my client directly during a sentencing hearing when they should be testifying to the Court. I understand they're upset and there's going to be a natural amount of emotion, but it's inappropriate in any sentencing hearing to be addressing the defendant directly. This is a court proceeding. And if the objection's to be overruled, I'd like the record to reflect it's continuing during the course of the proceedings this morning.

THE COURT: Mr. Berrigan, you may have a continuing objection, and your objection is overruled.

You may proceed.

MS. FRANCIS: Did you ever think about all the lives you were affecting by what you were doing? Were you that selfish and desperate, or did you really think you would get away with it forever?

We've seen the articles in the paper about how much

Page 9

your mother loves you, that your daughters and granddaughter

would be hurt if you were put to death. She doesn't think you should die for killing five people because she's a mother who loves her daughter and doesn't want her to die.

Well, I sat by Marge Milbrath that day your sentence came from the jury, the emotions of a mother and a grandmother running deep in her soul for the loss of her daughter and granddaughters at the hands of vicious killers.

So, Angela, do you and your mother believe that Lori, Kandi, and Amber deserve death because they were in the wrong place at the wrong time? And do you think Greg deserved to die to protect your way of life? And Terry, should he die because you didn't love him anymore and he knew too much so you wanted him out of the way?

All of this -- all of us didn't want harm to come to the people we love, but you took that into your own hands. These were thought-out, planned murders, five deaths all by your choice. Even the Lord believes in punishment for sins.

I've watched you in the courtroom acting so cocky, flipping your hair, smirking at people. You've sat and stared at all of us like you think we should squirm or something. You have no remorse. You still think you're getting away with it. You chose this path, and now your family is suffering for it. Can you fix it? I don't see how. Is your pain as great as ours has been? I don't think so. What if someone took you and your daughters and shot you one by one? How would you feel then?

What if someone had taken Dustin and shot and beat him to death?

What would you cry for then? You're only going to die once, and you won't feel any pain or suffering. You're getting off easy compared to what you did to them.

I hope that God forgives you. I hope the faces of those five people haunt you even into death. I'll never forgive you. I don't think you'll go to heaven. That's the nice way I can put it because my sister said I shouldn't say I hope you rot in hell. You're a disgrace to women everywhere.

THE COURT: Mr. Williams?

MR. WILLIAMS: United States asks Robert Milbrath to step forward.

MR. MILBRATH: Good morning.

THE COURT: Good morning, Mr. Milbrath.

MR. MILBRATH: Morning. I am Robert Milbrath, the younger brother of Lori, Kandi, and Amber -- or the younger brother of Lori and the uncle of Kandi and Amber.

I've had some time to think about what I would say today during your time of sentencing. Today, Angela, we all have had choices. Choices that you made were not very smart but choices that you and your family will have to pay the ultimate price for, that is, your life.

Angela, your choice was to be -- Angela, your choice was to go out and purchase the gun in your name. You went to Lori's house and played the person who needed to look up an

14

address because you were lost. And you were the one that held my sister and nieces prisoners in their own home until Dustin came to help.

You knew that someone was going to die that night. You knew they were all going to die. The sad thing is you were

a mother yourself with Alyssa being the same age as Kandi and being pregnant with Marvea; yet you stepped into being a murderer and out of the motherhood. Now you want to step back into being a mother because it's convenient for you. It does not work that way.

The choices that you made will forever affect your mom, dad, brother, sisters, and, unfortunately, your children. But what they need to remember is it is you who made the wrong choice. They're the ones that will also pay the price along with everybody else. The price tag of the wrong choice again will be your life.

Justice prevailed, and we will see it through to your execution. The deal you made with the devil is now -- the deal you made with the devil and the devil -- excuse me. The deal you made with the devil is now due. He is waiting for you. Thank you.

MR. WILLIAMS: Your Honor, no other family victim members have expressed an interest in speaking, but I'd ask you to address them just in case any of them want to.

THE COURT: Okay. Are there any other family members

15

or relatives of the five victims that would like to say anything? Please come forward.

No one's come forward.

MR. WILLIAMS: Very good. Thank you, Your Honor.

THE COURT: Thank you, Mr. Williams.

Mr. Willett, would you like to proceed with Mr. Berrigan's comments first, Angela Johnson's allocution, or Alyssa Johnson?

MR. BERRIGAN: I think our preference would be that

Miss Alyssa Johnson go first followed by Miss Johnson. I don't know whether Mr. Williams intends to make any remarks regarding sentencing -- I'll repeat that.

Your Honor, it would be our preference that Alyssa Johnson go first followed by her mother's statement and allocutions. I'm not sure whether the government intends to make any remarks regarding sentencing. We know that's a predetermined decision. Nonetheless, I have less than five minutes of remarks I'd ask the Court's indulgence to make.

THE COURT: Of course. Alyssa Johnson, you can come forward now.

MS. ALYSSA JOHNSON: I'd like to thank you, Judge Bennett, for allowing me to speak today. My name is Alyssa Johnson, and I'm the oldest daughter of Angela Johnson.

First and foremost, I find this to be the moment that I have been long waiting for. Speaking to everyone in relation

16

to the victims as well as many others left with a great loss, my heart goes out to you. Having a three-year-old daughter of my own, I simply can't begin to imagine the heartache of losing two precious little girls. I feel in no way should this have been brought upon all of us as those touched are great in number.

For my 22 years of life, I've never supported capital punishment for several reasons, the most prominent being is murder is murder. This holds true whether it's on the streets or on the building which yields our government's name.

Life in prison without the possibility of parole is by far the most severe punishment while still maintaining our humanity. Although I must admit I'm not devastated over Dustin sitting on death row, I still believe you nor I under the Ten

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 265 of 282

Commandments have the right to put him to death. I plead to you not to misconstrue this as kinship, for I hate him as much today as I did 12 years ago.

Throughout the court proceedings, spoken out many times was the comment in the nature of how they would never wish their pain and sorrow on to anyone. On the contrary, you are. With respect, I have never undermined this tragedy or the anguish experienced as the result of it. However, may I remind you together we share in this tragedy? Even in our most pure era to live by an eye for an eye, our whole world would be blind. I must also acknowledge the fact that had my mother not met Dustin Honken she would not be sitting at that table right

17

now nor I here speaking today.

I know this to be true provided that very acquaintance was that of her descent. For Dustin to think even after his incarceration that he has the master plan and death to all that stands in his way is inconceivable to me. What selfish ignorance he displays time and time again.

Meeting Dustin had little to no effect of the relationship my mother suffered with Terry DeGeus. Although nothing constitutes a murder, I find myself asking why it is my mother's fortunate to still be alive today. Countless times I recall such violent demeanor shown to my mother from Terry. Petrifying doesn't even begin to describe the emotions my mother felt following his actions.

No matter how psychologically or verbally abusive Terry would become towards my mother, I would never leave the room, the reason for this solitarily due to my knowledge that as long as I remained in the corner of that very room he would not

Page 14

hit her. I cannot tell you the reason he had for this, but he repeatedly demonstrated this to me. Regardless of my mother's pleas to leave the room, stubbornly I would remain.

After my mother's trial, I experienced a growing obligation to address an all-too-frequent negligence imposed by our government. I understand that though I would never compare my grief to that of victims' family, I am by no means a sitting codefendant. I am still a U.S. citizen that maintains and

18

exercises full rights and privileges.

My mother was the center of a capital murder trial, and yet I was not given so much as a thought as to if I would need any assistance.

Furthermore, the same government without second thought paid all expenses for a large group of people all to whom sat to the left of me, not once but twice. Yes, the government paid all expenses for five to seven people to attend the trial for both Dustin and my mother. Now compare that to the single check of $300 I received as compensation for a subpoena during the penalty phase.

The longer I pondered the differences between that group to myself and how our rights might constitutionally differ, the more concerned I became. To think that had I not been able to cut here and arrange there, I would not have been able to support my mother at her most time of need. This I find to be very troubling since the trial itself was held over three hours away. I know that I am not the first person to find themselves in such disarray and most certainly not the last. This unethical prejudice urgently calls for amendment.

I hope the justice that which is so aggressively

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 267 of 282

sought meets to the satisfaction. I acknowledge Mr. Williams is simply doing his job and a fine one at that. However, I still can't help to ask do you really believe and support a hundred percent of everything that you say? In all respects of the many

19

exaggerations you tossed here and there, your analogy of Adolf Hitler to my mother tops them all. Hitler is responsible for millions of deaths while ordering sick and demented experiments on human beings just as starters. For you to even breathe my mother's name in the same sentence with his makes me question as if we're still on the same level of reality.

To come out of losing the reason for my very existence not completely lost and broken sounds to be a miracle. This could not have been achieved without all of what my mother has raised and taught to me. Never have I met a woman so strong and determined to survive and yet still offer tremendous support. I believe in my mother's innocence, and may any guilt of her being informed after the fact rest on Dustin.

You should also know that the day my mother dies a part of me will die right along with her. And yet in such a paradox manner, she will forever live within me. And this is something that is so potent and can never be taken away. Thank you.

THE COURT: Thank you.

Miss Johnson, if it'd be easier for you to remain seated, you may if you'd like to.

THE DEFENDANT: Okay. I think I will.

THE COURT: And just pull that microphone close so we can make sure we make a full record of everything that you say.

THE DEFENDANT: Okay. Thank you.

First and foremost, I must send my sincere apology to both the Duncans as well as the DeGeuses for not coming forward with the information I unfortunately was burdened with. Due to understandable circumstances I felt from the fear and the safety regarding my own children, I simply couldn't.

Under different circumstances, this case could have been put to rest years ago. However, regretfully so, instead of offering me protection to cooperate, I was told Dustin had a hit out on my life and my life was in danger. I am a single mother with two daughters of my own counting on me to keep myself and them safe.

I am contu -- I was continually harassed by local authorities and DCI and was served with several search warrants on my residence executed by men dressed in black ski masks in attempts to only instill more fear rather than confidence in our system only further preventing me from coming forward. I was harassed at work, that which led to a flood of lies by the government agents to my current employers, was a reoccurring incident.

I was continually threatened and intimidated, and still no protection was offered to me until a year ago when I had to be secretly housed in an undisclosed location because of more threats from Dustin Honken. No such safety existed for me when, in fact, the government sees him as so dangerous that he was actually bolted to the floor during his entire trial.

It sickens me to know what happened to the victims,

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 269 of 282

even more so to not be able to tell anyone. I have shed many tears for the Duncans and for Terry DeGeus. I was a pawn in Dustin's manipulative lifestyle. He lied and lied to me over and over again. He only knows how to manipulate and scheme to his benefit. He has no conscience, and I am sorry that he is the father of my youngest daughter. I pray she never knows him for what he truly is, a monster and a sociopath that will never admit to what he's done.

I must take this opportunity to clear up another falsehood the government has strived and accomplished to be believed. Terry DeGeus was -- never, ever under any circumstances had any agreement to cooperate with law enforcement. Terry was not a snitch. He never even went before the grand jury. Terry DeGeus was a good man with a drug and anger problem. Never did I ever wish any harm to come to him even after the worst beating I sustained from him. Yes, I was used to lure Terry to his death, but I did it unknowingly at the time. I regret it terribly to this day. I will only continue to do so each and every day to come. I know that Terry does not blame me, and I understand that Ashley can't help to. But your dad was no snitch.

I'm so sorry for my role in these terrible events. I regret I wasn't intelligent enough to see through Dustin, to be a stronger person, to not fall under his manipulation, a flaw in

22

which I contribute to my naive lifestyle as a functioning drug addict for almost 15 years. This is my own fault and causes me much regret and remorse that runs deep. I long for the day when the whole world knows the truth, what really did happen as I know it. It has never been my intention to keep the truth from

Page 18

the world or my family. You all know -- have the right to know.

I would like to take these last few minutes to thank my wonderful family including my devoted daughters, friends for their endless support. It has been a long, hard road with -- which my children and my family have become victims to. I know how hard this has been on my daughters to be kept away from me, yet I am still so privileged to have a close and loving relationship with them both. They have been nothing less than brave and strong through this nightmare and have never doubted me. I love you, Alyssa and Marvea Jane.

This would not have been possible without the financial support from my mom, dad, brother, and sisters and my dear friend Dave. I cherish all these relationships and appreciate and love you all.

By no fault of my attorneys, my trial was a joke. I had no doubt I would be found guilty. You simply don't win in federal court.

That said, I never actually believed I would receive the death penalty until I met my jury. They all had their minds made up before we even started opening statements. Not one

23

juror would look me in the eye. Now they have blood on their hands for putting to death an innocent woman, mother, sister, and daughter. I survived beatings and threats of death by Terry DeGeus. I survived death threats by Dustin Honken only to be put to death by my government.

I'd like to take -- thank Duane and the U.S. Marshal's Service for their kindness to myself and my family during my incarceration and during my trial. My attorneys have worked endless hours to save my life. To them it was more than just

Page 19

their job. The people who on my legal team really care about me and my daughters as we do them, please know that I don't blame any of you, and I love each and every one of you dearly. Thank you.

THE COURT: Thank you.

Mr. Berrigan?

MR. BERRIGAN: I defer to the prosecution if they had remarks, Your Honor. I suppose --

THE COURT: Well, I called on you, Mr. Berrigan.

MR. BERRIGAN: I'm sorry?

THE COURT: I called on you.

MR. BERRIGAN: Okay. Then I'll proceed.

THE COURT: Okay. Thank you.

MR. BERRIGAN: Just a few years ago, Your Honor, I was at a sentencing in Kansas City representing a young man who had been convicted of raping and killing a ten-year-old girl. And

24

during the sentencing hearing, he was brief and succinct. He pointed to each of the individuals in the courtroom including the judge, the prosecution, spectators, even the victim's family, and to each shouted out an expletive before he sat down and was sentenced to death.

He was angry for sure. But he was also desperate to maintain some control over his life in a situation in which he felt he was being treated -- he felt he was being treated like vegetables that had spoiled in a refrigerator bin.

And I can understand that despair at times. Sometimes, like today, I am tempted to denounce the death penalty, the people who urge it on us, the skewed process by which it is eventually enacted including the process wherein

Page 20

victims' family members testify and we have actual funerals before trials in the course of a jury determination about whether somebody should live or die.

I am sad and angry mostly with myself for having allowed this woman for whom now I've represented four years and care very much about to get to the point where she will very likely be strapped to a gurney and executed in perhaps just a few short years. And I know from knowing her what an excellent mother she is, that she's a faithful daughter, that she is a beloved sister.

And I know that she didn't kill anybody. She didn't actually kill a soul. And how ever the prosecution might want

25

to machinate the facts, the truth is -- and we all know it -- that to this couple there was one leader. Nobody ever had to twist Dustin Honken's arm to murder people who were going to, he perceived, testify against him. And he intended full well to murder this woman for the same reason.

But to denounce people who support the death penalty or the penalty itself gets us very little, if anything at all. And I want to make very clear that I and nobody on our defense team is at all upset with the victims' family members that have come in and testified. My objections don't mean to reflect that.

They, of everyone involved in this process, they at least have a reason to come forward. It's an emotional reason that they've had tremendous loss and pain and suffering, and so it's quite understandable that retribution would be first and foremost on their mind. Their reaction is an emotional reaction.

Page 21

And even if many of these people might have agreed before trial that a sentence of life imprisonment was appropriate -- and I suspect they did, because we had those discussions -- I still understand how they could come before the Court and before the jurors and suggest no, death is what they want.

But more troubling is that the members of our own criminal justice system, all of us, the public might not

26

recognize it, but we recognize that this penalty really is morally wrong. We recognize that it's as arbitrary and capricious as a plane crashing. We know that.

We know that the week that Alberto Gonzales decided that Angela Johnson had to die he decided that same week that Eric Rudolph, a man responsible by his own admission for the Atlanta Olympic bombings and the killing of abortion doctors and bombing of clinics, got to live because he had bombs hidden in a cave somewhere.

Before the end of the week, before the end of the year, there will be over 125 murders in my hometown in Kansas City. That's more than one every three days. None of the killers of those people will face the death penalty, and in the last few years nobody has. And it's hard to explain that as anything other than arbitrary and capricious because I have to imagine that some of those were very bad murders. I don't know how we could explain that one single state of the 50 executes more people than the rest of the states combined and that geography somehow gets to decide who lives and who dies.

So I'm going to sit down and stop railing against the death penalty because I know the decision the Court has to make.

Page 22

But I do believe that we bear, we, the members of the profession and the people that really control this process, we bear personal responsibility for our role in it.

And I'm reminded of Dante's quote when he wrote that

27

the hottest places in hell are reserved for those people who in time of great moral crisis maintain their neutrality. And I fear some day that the retribution will come down on us.

I appreciated the remarks in the sentencing towards the end regarding the Court's personal view of the case. I understand your legal obligations, Your Honor. But, frankly, I wish things were quite different. And if this Court of all the courts I've ever been in front of can't reverse this conviction, then nobody can. Thanks for hearing me.

THE COURT: Thank you, Mr. Berrigan.

Any of the other defense lawyers like to say anything?

Mr. Miller, Mr. Williams anything you'd like to add?

MR. MILLER: No, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: No thank you, Your Honor.

THE COURT: On Counts 1 and 6, I find the total offense level is 45, criminal history category 1, for a United States Sentencing Guideline advisory imprisonment range of life imprisonment. Notwithstanding the stipulation that the defense entered into with the government at trial concerning the life sentence on any counts the jury did not find the death penalty, I believe I have an independent obligation to review the factors in Title 18 section 3553(a), and I have done so. And after my review of those factors, I believe the advisory United States Sentencing Guideline suggestion of life imprisonment is

Page 23

appropriate. So on Counts 1 and 6, I impose life imprisonment on each count.

On Counts 2, 3, 4, and 5, conspiracy to commit murder while engaging in the manufacture and distribution of methamphetamine, Angela Johnson, you are sentenced to death on each count.

On Counts 7, 8, 9, and 10, continuing criminal enterprise murder, Angela Johnson, you are sentenced to death on each count.

Each count shall run concurrently. The time, place, and manner of execution are to be determined by the attorney general provided that the time shall not be sooner than 60 days from the date of the filing of this judgment.

Of course, an appeal will be taken. Mr. Berrigan and the defense team has raised numerous substantial substantive issues for appeal. And upon the filing of the notice of appeal, my judgment will be stayed until further order of this Court until receipt of any mandate by the United States Court of Appeals.

I'm required to impose a statutory term of three years of supervised release. I'm ordering restitution in the amount of $73,856.49. While incarcerated, pursuant to the Bureau of Prisons' financial responsibility program, you shall make reasonable payments not to exceed 50 percent of the funds you have available but in no event less than $25 per quarter. Your

restitution is joint and several with co-conspirator Dustin Honken. There's a hundred-dollar special assessment on each

count for a total of a thousand dollars.

You don't have the ability to pay a fine, so the fine is waived. Interest is waived on the restitution.

Pursuant to 18 United States Code section 3596, you're committed to the custody of the Bureau of Prisons until exhaustion of all procedures for appeal of the judgment and review of the sentence.

When and if the sentence is ever to be implemented, the attorney general of the United States shall release you to the custody of the United States marshal who shall supervise implementation of the sentence of death in the manner prescribed by the state of -- and I've left that blank, so any suggestions from counsel? As all counsel in the case know, a rather obscure and unique portion of federal death penalty law requires me to state a jurisdiction.

Mr. Berrigan, you're probably more knowledgeable than any of us in the courtroom on that issue. Let me just tell you what my tentative thoughts were. My understanding is that the Bureau of Prisons is going to designate a facility at Bryan, Texas, for Angela Johnson. So I was going to designate Texas as a state for the implementation of the penalty should it ever come to that and also probably as an alternative Indiana because that's the location of the so-called federal death row. But I'd

30

be happy to have any input from you on this matter.

MR. BERRIGAN: Given that Mr. Stowers and I and Mr. Willett will be working on Miss Johnson's appeal, Your Honor, and for the obvious reasons that her family as you well know is here in Iowa, we'd like to leave open the possibility that the Bureau of Prisons might decide through their

Page 25

contractual relationship with the Department of Corrections of the state of Iowa that she could be placed at the women's penitentiary in Mitchellville, Iowa.

I understand that they have a contractual relationship, and, in fact, one of the witnesses that testified doing a life sentence in federal custody is housed in Mitchellville. That may not be their likely determination, but I wouldn't want to preclude that. And if the Court could consider including that in your recommendation, certainly that would be our very, very strong preference. It would be much easier for us to confer with Miss Johnson in Mitchellville, Iowa, than it would be in Texas or even Indiana. So I'll leave that to your sound judgment. Thank you.

THE COURT: That's actually a -- in typical lawyer fashion, that's actually a different question.

MR. BERRIGAN: Okay.

THE COURT: And I will rec -- I think what I'll do -- well, I want to hear from the government but -- because -- but I will at least put in the judgment that the defense urges that

31

the Bureau of Prisons place Angela Johnson at Mitchellville, Iowa, to facilitate working with defense counsel on the appeals. I'll certainly -- I'm not sure I'm going to endorse that as a recommendation from the Court, but I'll certainly include that on behalf of the defense team in the case.

My question went to this quirky part of federal law that actually requires me to designate a state for the place of execution --

MR. BERRIGAN: Oh.

THE COURT: -- should one ever take place in this

Page 26

case.

MR. BERRIGAN:  I see.

THE COURT:  And I actually have the responsibility as I understand federal law to designate a specific state, and that's what my inquiry was about, and that's what I was talking about in terms of Texas or Indiana as the place of execution.

MR. BERRIGAN:  I see.

THE COURT:  And, for example, I think you're familiar with the district court decision I believe by Judge Wolf of the District of Massachusetts where he chose I believe New Hampshire.  Massachusetts does not have the death penalty, and you have to pick a state that currently has the death penalty.  I think it's largely kind of a premature decision but I think one that I'm required to make now.  And I'm confident that this decision, should it ever be necessary to implement it, could be

32

revisited at a later date.

MR. BERRIGAN:  Is the Court's understanding that the state has to contain a Bureau of Prisons facility that houses women?

THE COURT:  No, it does not.

MR. BERRIGAN:  In that case, Your Honor, I'd ask for Missouri.  My own state is fourth in the nation in executions.  Although we haven't executed a woman for some time, we do have maximum security institutions for women there, two of them, either of which would be very convenient for me to visit Miss Johnson.  So -- and, of course, it's adjacent to Iowa, and given that Iowa doesn't have the death penalty, obviously this state's not available for that purpose.  So that would be our request.

THE COURT:  And there would certainly be some

Page 27

advantages, assuming you were still on the defense team at that point because of the closeness to your client in terms of any last-minute stays or other filings that you would want to make.

MR. BERRIGAN: Yes, sir. Yes, sir.

THE COURT: Okay. Mr. Williams, does the government have a position?

MR. WILLIAMS: We do, Your Honor. We would ask that you place first on the list Indiana. That is the location of the only federal facility designed for implementation of the federal death penalty. And so on behalf of the Department of Justice, we ask that you designate that location first. We

33

don't object if you say in the alternative Missouri or Texas or whatever other state, but we ask that you put Indiana first for that reason.

THE COURT: And what about the related but separate issue that Mr. Berrigan raised? And that would be the designation of a facility by the Bureau of Prisons. And, of course, I can only recommend. So what's the government's position on that?

MR. WILLIAMS: I think the position you articulated, one that you would include in the judgment that that's their request, we don't have an objection to.

THE COURT: Okay. Well, all due respect to the government on the place of execution, it seems to me that Missouri makes more sense because of its proximity to learned counsel in this case. Of course, if it goes down the road and there's a different set of lawyers on any 2255 or other subsequent proceedings, then Missouri would be less persuasive. So I have to designate a state. I think I will designate

Page 28

Case 3:09-cv-03064-MWB-LTS    Document 284-69    Filed 06/23/11    Page 280 of 282

Missouri, then Indiana, and then Texas, the only theory on Texas being that my understanding is the likely place for designation for Angela Johnson would be Bryan, Texas, but I will include in my judgment entry in this case the defense request for Mitchellville, Iowa.

Other than advising the defendant of her right to appeal, Mr. Williams, is there anything further from the

34

government?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Mr. Miller, anything further from the government?

MR. MILLER:  No, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  No, sir.  Thank you.

THE COURT:  Mr. Stowers?

MR. STOWERS:  No thank you.

THE COURT:  Mr. Willett?

MR. WILLETT:  No thank you, Your Honor.

THE COURT:  Angela Johnson, you have the right to appeal the sentence that I've imposed and the jury decision, the finding of guilt, the imposition of the death penalty.  You need to file a notice of appeal with the clerk of our court within ten days from today's date.  If you can't afford to pay for a lawyer or pay for the costs of an appeal, those costs will be paid on your behalf.

Good luck to both sides on your appeal.  The defense has raised numerous issues on appeal.  I did the best I could in my post-trial motion ruling of some 297 pages to try and resolve those issues.  But I take great comfort in the fact that you'll

Page 29

have an opportunity to have all of my rulings from the very first ruling I made in the case until my very last ruling that I made in the case reviewed by higher courts. And good luck to

35

both sides on your appeal. Thank you. We'll be in recess.

(The foregoing sentencing was

concluded at 11:52 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                        12-23-05
        Shelly Semmler, RMR, CRR              Date

Page 30